ORIGINAL

FILED
APR 1 9 2006
U.S. COURT OF FEDERAL CLAIMS

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| CONSOLIDATED EDISON COMPANY OF NEW YORK, INC. & SUBSIDIARIES, Plaintiff, | ) | No. 06-305 T |
| v. | ) | |
| THE UNITED STATES, Defendant. | ) | |

## COMPLAINT

Plaintiff, Consolidated Edison Company of New York, Inc. & Subsidiaries, brings this action for a refund of federal taxes paid in connection with the Internal Revenue Service's proposed adjustments to its federal tax return for the taxable year ending December 31, 1997. The adjustments are related to Plaintiff's investment in an electric generation facility located outside Rotterdam, The Netherlands.

In support of its refund claim, Plaintiff alleges as follows:

## JURISDICTION AND SUMMARY OF ACTION

1. Plaintiff, Consolidated Edison Company of New York, Inc. & Subsidiaries ("Con Edison NY"), brings this refund action, founded upon the Internal Revenue Code of 1986, for the recovery of federal income tax paid by Plaintiff for the taxable year ended December 31, 1997 ("the 1997 taxable year").

2. Defendant is the United States of America.

3. This Court has jurisdiction by reason of 28 U.S.C. §§ 1346(a)(1) and 1491(a)(1) and 26 U.S.C. § 7422.

4. On or before September 9, 1998, Con Edison NY filed a timely federal consolidated income tax return for the 1997 taxable year with the Internal Revenue Service ("IRS") and timely paid income taxes in the amount of $291,003,408.

5. Con Edison NY's name, address, and identification number appearing on the 1997 tax return are: Consolidated Edison Company of New York, Inc. & Subsidiaries; 4 Irving Place, Room 615-S, New York, New York, 10003; and 13-5009340, respectively.

6. During the 1997 taxable year, Con Edison NY, through its subsidiaries, made an investment in an electric generation plant in The Netherlands. The plant is generally known as "RoCa3" and is owned by N.V. Electriciteitsbedrijf Zuid-Holland ("South Holland Electric"). This transaction is hereinafter referred to as the "RoCa3 Investment."

7. On its 1997 tax return, Con Edison NY reported rental income with respect to the RoCa3 Investment and deducted rental expense, amortization of expenses, and interest expense relating to the property and indebtedness incurred in the RoCa3 Investment, for a net loss of $937,331.

8. The IRS, during a routine audit of Con Edison NY's tax return for the 1997 taxable year, disputed Con Edison NY's tax treatment of the RoCa3 Investment.

9. On or about September 15, 2005, the IRS issued a Notice of Proposed Adjustment to Con Edison NY, proposing additional federal income of $937,331 for the 1997 taxable year with respect to the RoCa3 Investment.

10. The IRS's proposed adjustments resulted in a tax increase of $328,066, increasing Con Edison NY's federal income tax liability for the 1997 taxable year from $291,003,408 to $291,331,474.

11. On or about November 3, 2005, Con Edison NY paid the proposed tax deficiency of $328,066 to the IRS.

12. On or about December 2, 2005, Con Edison NY filed a Form 1040X (Amended U.S. Corporation Income Tax Return) with the IRS requesting a refund of erroneously paid federal income taxes for the 1997 taxable year in the amount of $328,066. The requested refund was solely attributable to Con Edison NY's payment of the proposed tax deficiency referred to in paragraphs 10 and 11 above. A true and complete copy of this claim for refund is attached as Exhibit A.

13. By a notice of disallowance dated March 15, 2005, the IRS disallowed Con Edison NY's claim for refund. A true and complete copy of this notice of disallowance is attached as Exhibit B.

14. The IRS's disallowance of Con Edison NY's claim for refund was erroneous.

15. Con Edison NY requests a refund of its overpayment of $328,066 of federal tax for the 1997 taxable year, plus interest and allowable costs.

16. No action on the claim for refund attached as Exhibit A has been taken by Congress or any agency of the United States or in any judicial proceeding, including any in the Tax Court of the United States.

17. Con Edison NY has timely filed this Complaint for a refund of federal taxes paid within two years of the date of the notice of disallowance as required under 26 U.S.C. § 6532(a).

18. Con Edison NY is the sole owner of the claim included in Exhibit A and asserted herein, and has made no assignment thereof.

## FACTUAL BACKGROUND

### A. Con Edison NY's Energy Business

19. At the time of the RoCa3 Investment, Con Edison NY was a widely-held and publicly-traded company on the New York Stock Exchange. It owned 100% of Consolidated Edison Development, Inc. ("Con Edison Development"), which in turn owned 100% of Consolidated Edison Leasing, Inc. ("Con Edison Leasing"). Con Edison NY has since become a wholly owned subsidiary of Consolidated Edison, Inc. ("CEI"), which also owns Con Edison Development as well. Like Con Edison NY before it, CEI is widely-held and publicly-traded on the New York Stock Exchange.

20. Con Edison NY is one of the nation's oldest and largest investor-owned energy companies with approximately $21 billion in assets. It is a regulated public utility that was incorporated in 1884 and currently delivers electric service to almost all of New York City and most of Westchester County – a service area having a population of approximately 9 million. Con Edison NY also supplies gas in parts of New York City and Westchester County. Con Edison NY also owns and operates the largest district steam system in the world, providing steam service in most of Manhattan.

21. Prior to the 1990s, Con Edison NY, as was the case with most electric utilities, offered electric service in a "bundled" format. In other words, Con Edison NY owned and operated the generation plants that produced electricity as well as the transmission and distribution systems that delivered the electricity to its customers. Con Edison NY owned gas-fired, oil-fired, and nuclear-powered plants with a total electric-generating capacity of 8,300 megawatts. As a regulated public utility, all of Con Edison NY's operations were subject to regulation by the New York Public Service Commission ("PSC").

**B. The Deregulation of Con Edison NY's Energy Business**

22. Beginning in March 1993, the PSC took a number of steps to develop a competitive electric industry in the state of New York. This process commenced with the PSC's initiation of a proceeding entitled "Proceeding On Motion Of The Commission To Address Competitive Opportunities Available To Customers Of Electric And Gas Service And Develop Criteria For Utility Responses" (the "Competitive Opportunities Proceeding"). The purpose of the Competitive Opportunities Proceeding was to deregulate the electric generation plants owned by New York State utilities and to have the price for the output of those plants determined by market forces rather than through regulated rates.

23. The Competitive Opportunities Proceeding was divided into two phases. Phase I was designed to discuss, investigate, and address the issues involved in moving to a competitive marketplace. Phase II, commencing in August of 1994, involved a collaborative effort between electric utilities and other interested parties to develop models for restructuring the electric industry within New York.

24. Phase II of the process culminated with a May 1996 PSC Opinion stating the PSC's vision for the electric utility industry and ordering Con Edison and certain other major electric utilities in New York State to file plans describing how they would restructure their operations to bring about a competitive marketplace for, among other things, electric generation. The Opinion "strongly encouraged" the utilities to sell their generating plants to unregulated entities so as to facilitate the development of a competitive marketplace. The May 1996 PSC Opinion also invited utilities to propose the corporate structures, including unregulated subsidiaries, that would further the PSC's restructuring goals.

**C. Con Edison NY'S Response to Deregulation**

25. As a result of the Competitive Opportunities Proceeding, Con Edison NY knew in the mid-1990s that it would be required to restructure its regulated businesses and allowed to expand into competitive unregulated businesses. Con Edison NY further understood that it might be required to sell most if not all of its electric generation plants and concluded that it should grow its business by (among other things) investing its capital in unregulated businesses and facilities. Con Edison NY also recognized that the PSC's rules were likely to prohibit Con Edison NY from reinvesting in electric generation plants within New York State.

26. Consequently, Con Edison NY began to develop a strategy that would allow it to effectively compete in a deregulated industry through the development and growth of unregulated businesses. Con Edison NY's strategy included, among other things, growth through the investment of capital in unregulated energy-related businesses and facilities outside of New York State.

27. In May 1995, Con Edison NY requested permission from the PSC to invest up to 5% (approximately $504 million) of its consolidated capital in unregulated subsidiaries that would (i) provide energy services; (ii) invest and/or participate in international energy infrastructure projects; and (iii) market its technical services.

28. In July 1996, the PSC issued an order (the "July 1996 Order") which deferred action on Con Edison NY's May 1995 request, but granted Con Edison NY authority to invest up to $50 million in unregulated subsidiaries which would invest in two of the three requested projects: the investment and/or participation in international energy infrastructure projects, and the marketing of technical services internationally. The PSC stated that these investments would be "largely international" and could be made through "development companies, investment funds, joint ventures, or other vehicles." In accordance with the PSC's plan to encourage

divestiture of public utility-owned electric generation plants, the PSC prohibited Con Edison NY from investing in any project that might provide electric energy to customers within New York State.

29. In response to the July 1996 Order, in October 1996 Con Edison NY formed a new subsidiary, Gramercy Development, Inc., to carry out the investments allowed by such Order. Gramercy Development, Inc. later changed its name to Con Edison Development.

30. In October 1996, Con Edison NY filed a rate and restructuring plan as mandated by the PSC. This plan also included a petition to adopt a holding company structure. Con Edison NY's restructuring plan proposed an approach to a competitive electric generation market that included, among other things, divestiture of its generating plants, a plan for retail competition, and a corporate reorganization into a holding company structure. The proposed holding company structure would allow Con Edison to form unregulated subsidiaries whose investment decisions would no longer require prior PSC approval.

31. In September 1997, the PSC and Con Edison NY ultimately agreed on a restructuring plan that was embodied in a Settlement Agreement ("the Settlement"). The Settlement included, among other things, (i) a new rate plan during the period of the transition to competition, (ii) a commitment by Con Edison NY to divest at least 50% of its New York City electric generation plants by 2002 to unregulated third parties so as to help implement a fully competitive market for electric generation, and (iii) authorization for Con Edison NY to form a holding company whose subsidiaries would consist of Con Edison NY and several unregulated subsidiaries, including Con Edison Development.

32. The Settlement permitted the new holding company to invest up to 5% of its consolidated capital in unregulated subsidiaries, consistent with Con Edison NY's May 1995

request. While the Settlement replaced the July 1996 Order, pursuant to a Statement of Policy dated July 17, 1998, the PSC imposed a prohibition against investments in electric generation assets in New York State by Con Edison NY's unregulated affiliates, albeit as a rebuttable presumption that such investments would unacceptably exacerbate the potential for the exercise of vertical market power.

33. As allowed by the Settlement, the shareholders of Con Edison NY formed CEI in January 1998. As part of the transition to a holding company structure, Con Edison NY and Con Edison Development, as well as several other unregulated subsidiaries of Con Edison NY, became subsidiaries of CEI.

34. In 1999, pursuant to the Settlement with the PSC, Con Edison NY completed the sales of almost 6,300 megawatts of its approximately 8,300 megawatts of electric generation assets for an aggregate price of $1.8 billion. In 2000, Con Edison NY entered into a contract to sell its nuclear-generating facilities, with electric generating capacity in excess of 900 megawatts, for an aggregate price of $502 million, not including fuel and other adjustments. That transaction closed in 2001. Today, the remaining electric generation assets owned by Con Edison NY are held in connection with, and are ancillary to, its steam generation business.

**D. The Business Of Con Edison Development**

35. Con Edison Development was formed to take advantage of the Con Edison group's expertise in the construction and operation of electric generating plants and to pursue energy-related investments on a world-wide basis free from regulation by the PSC.

36. Con Edison Development's initial business plan, formulated in 1997, was a long-term plan which was designed to take advantage of the world-wide trend to deregulation and envisioned Con Edison Development's potential growth into a worldwide integrated utility business. However, because the growth into unregulated investments, particularly those outside

New York State, was a new venture for the Con Edison group, Con Edison Development adopted a gradual and measured approach to these investments.

37. As the initial step in its business plan, Con Edison Development focused on three categories of investment: (i) development of new energy projects, such as electric power generation; (ii) acquisition of existing infrastructure, including portions of operating electric, gas, thermal, and water utilities; and (iii) leasing portions of energy systems, such as power plants or distribution systems. Con Edison Development also planned to market technical services regarding the design, building, operation, and management of modern utilities.

38. Pursuant to this strategy, Con Edison Development began to participate in energy-related projects through investments operated by others, such as investments in energy funds. In July 1997, Con Edison Development made its first energy infrastructure investment, namely a capital commitment to provide up to $5 million to a fund sponsored by Energy Investors Fund called Project Finance Fund III, LP. Project Finance III utilized the funds received from Con Edison Development and other similar equity investors to invest in energy and infrastructure projects worldwide.

39. Con Edison Development also relied on outside consultants to locate potential international energy infrastructure investment opportunities. In March 1997, Con Edison Development entered into an agreement with International Energy Partners, L.P. ("IEP"). IEP had a portfolio of international energy infrastructure investment opportunities that it was pursuing. Pursuant to this agreement, Con Edison Development was given preferred rights to participate in certain investment opportunities identified by IEP.

40. One of the earliest opportunities presented to Con Edison Development by IEP was a minority investment in a relatively small power facility (42 megawatts) in Eastern

Guatemala, generally known as Generadora Electrica del Norte, Limitada ("Genor"). Con Edison Development acquired and still owns indirectly through subsidiaries a 49% interest in Genor; the remaining 51% is owned by local investors.

41. Con Edison Development also explored leasing investments in energy facilities. Con Edison Development was interested in investing through leases because these investments (i) provided highly predictable and front-loaded earnings; (ii) achieved good to excellent investment yields; (iii) were less risky than direct ownership of operating assets; and (iv) could be implemented more quickly than direct investments in projects requiring a long development cycle. Leases, from Con Edison Development's perspective, also provided a means to (i) forge relationships with utilities abroad that would allow for further opportunities in the future; (ii) compete effectively with other domestic entities already involved in overseas investments; and (iii) diversify risk in terms of operations and geography. Con Edison Development was interested in potential leasing investments in Europe, Australia, and the U.S.

42. Consistent with its objective of gradually becoming a worldwide integrated utility business, Con Edison Development searched for opportunities related to utilities undergoing privatization in Central and South America, Europe, Southeast Asia, and the United States. Employees of the Con Edison group spent significant amounts of time in China, Australia, the Philippines, Mexico, El Salvador, Argentina and Nicaragua pursuing energy infrastructure investments and other potential energy-related businesses (such as the marketing of technical services).

43. Con Edison Development continued to pursue energy infrastructure investments both inside and outside the United States until the late 1999 to early 2000 time frame. At that time, a business decision was made to focus on energy infrastructure opportunities in the United

States, in particular the Northeast and Mid-Atlantic states (other than New York State). This decision was based on a number of considerations, including (i) marketplace pricing indicated that the risks inherent in energy infrastructure investments outside the United States could no longer be justified in light of anticipated returns on such investments, particularly in relation to the anticipated returns and risks on such investments inside the United States, and (ii) the recognition that Con Edison Development and its affiliates could better employ their expertise in the energy markets and the electric utility industry inside the United States, particularly in the Northeast and Mid-Atlantic states.

**E. The RoCa3 Investment**

44. During 1997, Con Edison Development developed plans and guidelines for its future growth as an unregulated subsidiary of the Con Edison group. Con Edison Development also began to identify possible investment prospects, including a number of leasing investments.

45. Consistent with its business plan, one of the projects identified by Con Edison Development during 1997 as a potential leasing investment was a recently constructed 220 megawatt gas-fired combined cycle electric generation plant outside of Rotterdam, The Netherlands. The plant is named "RoCa3," after its location on the border between Rotterdam and Capelle aan den IJssel, and is next to two previously constructed plants. The RoCa3 plant has at all relevant times been owned by South Holland Electric, an electric generation company in The Netherlands that has been involved in the coordination and transport of electrical energy in the province of Zuid-Holland since 1941, and in the production of heat and electricity since 1987.

46. At the time Con Edison Development was considering an investment in the RoCa3 plant, The Netherlands and the European Union were also in the process of deregulating electric generation facilities.

47. Since Con Edison Development did not have prior experience in complex leasing transactions, it decided to invest in conjunction with experienced market participants. In the case of the RoCa3 Investment, Con Edison Development decided to make its investment jointly with Banc One Leasing Corp. ("Banc One").

48. Before making a decision to proceed with the RoCa3 Investment, Con Edison Development considered many factors, including (i) South Holland Electric's business and creditworthiness; (ii) conditions in the energy markets for The Netherlands and Europe; (iii) the political, legal, and economic climate of The Netherlands; (iv) the economic return and accounting income of the RoCa3 Investment; (v) the quality of the RoCa3 plant; (vi) the connection between the RoCa3 plant and the Con Edison group's core business activities;; and (vii) the terms of the transaction. Con Edison Development also considered the potential risks and benefits associated with its residual value interest in the RoCa3 plant. In the leasing context, residual value refers to the remaining useful life and value of an asset at the end of the lease of that asset.

49. Con Edison Development retained a number of consultants to assist in its review of the RoCa3 Investment.

50. On behalf of Con Edison Development and Banc One, Duke Engineering & Services ("Duke Engineering") performed a comprehensive engineering review of the RoCa3 plant's technology. Duke Engineering made a site visit to inspect the RoCa3 plant, interviewed key plant personnel, and reviewed plant documents.

51. Duke Engineering found the RoCa3 plant's design and components to be of high quality using state-of-the-art proven technology and rated the RoCa3 plant as "above average" in each of the four factors that contribute to a plant's useful life. Duke Engineering further

concluded that the RoCa3 plant complied with current environmental regulations; that its fuel supply was adequate under the current purchasing agreements; and that South Holland Electric's maintenance philosophy, practices, and facilities were better than average.

52. On behalf of Con Edison Development and Banc One, Tauw Milieu bv ("Tauw Milieu") conducted an environmental, health, and safety assessment of the RoCa3 plant. Tauw Milieu performed an on-site inspection, interviewed South Holland Electric personnel, and reviewed applicable environmental laws and regulations in conducting its review.

53. Tauw Milieu concluded that the RoCa3 plant's environmental condition was very good and that it was in substantial compliance with all applicable environmental and health and safety requirements.

54. On behalf of Con Edison Development and Banc One, Deloitte & Touche performed a comprehensive valuation assessment of the RoCa3 plant. Deloitte & Touche conducted a physical inspection of the RoCa3 plant, interviewed South Holland Electric personnel, and analyzed the power industry in The Netherlands and its regulatory environment, natural gas resources, and the Dutch natural gas industry.

55. To arrive at a fair market value for the RoCa3 plant, Deloitte & Touche analyzed South Holland Electric's financial statements, the RoCa3 plant's construction expenses and projected operating and other expenses, comparable market transactions, and similar publicly listed companies. Deloitte & Touche then studied historical power plant useful life data to determine the RoCa3 plant's useful life and residual value. Finally, Deloitte & Touche assessed the various options available to South Holland Electric and Con Edison Development under the proposed Investment.

56. Deloitte & Touche concluded that, as of December 15, 1997, the proposed closing date for the RoCa3 Investment, the RoCa3 plant had a remaining useful life of at least 54 years.

57. In addition to the work performed by these consultants, Con Edison Development sent a team of its own and Con Edison NY employees to inspect the RoCa3 plant and to discuss the plant's operations with South Holland Electric's engineers.

58. Based upon its extensive review of the proposed RoCa3 Investment, the board of directors of Con Edison Development approved the RoCa3 Investment on December 10, 1997. The major benefits of the transaction were identified as follows:

(1) Highly predictable earnings

(2) Front loaded earnings under FASB accounting rules

(3) Good to excellent investment yields

(4) Relatively low risk

(5) Tax benefits of leasing

(6) Strategic value of leasing, *i.e.*, the ability to more fully understand the legal, regulatory, commercial and tax environment in The Netherlands and the European Union, thus providing the basis for better informed decisions regarding potential future investments.

59. Con Edison expected a pre-tax economic profit of at least $60 million from the RoCa3 Investment. This pre-tax profit would provide an internal rate of return of approximately 3% to 4%.

60. Con Edison Development expected that the yield on the RoCa3 Investment for accounting and financial reporting purposes would be in excess of 12%.

61. On December 15, 1997, Con Edison Development, through its subsidiary Con Edison Leasing, and South Holland Electric entered into a lease and sublease of RoCa3, whereby Con Edison Leasing leased an undivided 47% interest in the RoCa3 plant from South Holland

Electric for approximately 43.2 years ("the Headlease"), and then subleased the RoCa3 plant back to South Holland Electric for approximately 20.1 years ("the Sublease"). Banc One entered into a similar Headlease and Sublease for the remaining interest in the RoCa3 plant.

62. Con Edison Leasing formed a trust to enter into the various leases and other agreements that were involved in the RoCa3 Investment. The role of the trust has no effect on the tax treatment of the RoCa3 Investment. Thus, for simplicity, this Complaint describes the RoCa3 Investment as if Con Edison Leasing had invested directly in the RoCa3 Investment.

63. Under the Headlease, Con Edison Leasing, as lessee, is obligated to make two lump-sum payments of rent to South Holland Electric. The first payment was due in 1997 at the beginning of the Headlease, and the second payment is due in 2041 at the end of the Headlease. The amounts of these rent payments were based on the fair market rental value of the RoCa3 plant as of December 15, 1997.

64. Con Edison Leasing funded its initial payment of rent under the Headlease by investing $39,320,000 of its own cash and by borrowing $80,792,270.36 from Hollandsche Bank-Unie N.V. ("Hollandsche"). Con Edison Leasing also paid $4,125,000 in transaction costs in connection with entering into the RoCa3 Investment.

65. At the end of the Headlease in 2041, the RoCa3 plant will have a remaining useful life of at least 10.8 years. This period is 20% of the 54-year useful life of the RoCa3 plant as of December 15, 1997, as determined by Deloitte & Touche. Tax law has long recognized that if an asset has a residual life at the end of the lease of 15% of the asset's original useful life, then the lease qualifies as a "true lease" for federal income tax purposes.

66. Deloitte & Touche also determined that at the end of the Headlease, the RoCa3 plant will have a remaining residual value of at least 20% of the fair market value of the RoCa3

plant as of December 15, 1997. Tax law has long recognized that if an asset has a residual value at the end of the lease of 15% of the asset's original cost, then the lease qualifies as a "true lease" for federal income tax purposes.

67. The Sublease set forth the terms under which Con Edison Leasing leased its undivided interest in the RoCa3 plant to South Holland Electric. Events of default under the Sublease include South Holland Electric's failure to make rent payments, declaration or filing of bankruptcy, failure to maintain RoCa3, and failure to maintain appropriate insurance. Con Edison Leasing's remedies upon a default include causing South Holland Electric to return Con Edison Leasing's interest in the RoCa3 plant.

68. At the end of the 20.1-year term of the Sublease from Con Edison Leasing to South Holland Electric, South Holland Electric has an option to purchase Con Edison Leasing's remaining 23.1-year interest in the RoCa3 plant at a fixed price. Deloitte & Touche determined that the price of South Holland Electric's purchase option will exceed the fair market value of the 23.1-year interest it would obtain and, therefore, South Holland Electric is not likely to exercise that option.

69. If South Holland Electric does not exercise its purchase option, then Con Edison Leasing, as lessee, has the opportunity to earn additional income by (i) claiming possession of its interest in the RoCa3 plant for the remaining 23.1 years of the Headlease; (ii) subleasing the RoCa3 plant to a third party for the remaining 23.1 years; or (iii) renewing the Sublease with South Holland Electric for an additional 16.5 years through the exercise of a "Renewal Option."

70. Deloitte & Touche determined that the fixed price of the rental payments due from South Holland Electric under Con Edison Leasing's Renewal Option will be below the fair

market rental value for a lease of a similar facility during the 16.5 year renewal term and, therefore, Con Edison Leasing is not likely to exercise its Renewal Option.

71. If South Holland Electric does not exercise its purchase option and Con Edison Leasing does not exercise its Renewal Option, which Deloitte & Touche indicated is the most likely outcome, then Con Edison Leasing will have possession of its interest in the RoCa3 plant for the 23.1 years remaining under the Headlease, which is 53.5% of its 43.2-year term. If Con Edison Leasing does exercise its Renewal Option, then at the end of the Renewal Option, Con Edison Leasing will have possession of its interest in the RoCa3 plant for the 6.7 years remaining under the Headlease, which is 15.5% of its 43.2-year term. In either case, Con Edison Leasing will have a residual interest in the RoCa3 plant that is greater than 15% of the Headlease term. The value of Con Edison Leasing's residual interest in the RoCa3 plant is also expected to be significantly higher than 15%.

72. At the end of either (i) the Sublease in 2017 or (ii) the Renewal Option term in 2034, as applicable, South Holland Electric is obligated to return to Con Edison Leasing its undivided interest in the RoCa3 plant in its original condition, ordinary wear and tear excepted, and the plant must pass certain specified redelivery acceptance tests. Duke Engineering anticipated that the plant would meet the requirements stated in the transaction and expected that the plant would be in similar or better operational condition as compared to equivalent power plants because of the high quality of the original equipment and design features.

73. South Holland Electric is the operator of the RoCa3 plant during the term of the Sublease. Con Edison Leasing, Banc One, and South Holland Electric entered into agreements providing for the operation and maintenance of RoCa3 upon the expiration of the Subleases to South Holland Electric. Pursuant to these agreements, Con Edison Leasing and Banc One have

the right to remove South Holland Electric as the operator of the RoCa3 plant upon the expiration of the Subleases.

74. In entering into the RoCa3 Investment, Con Edison Leasing assumed a significant amount of risk, including the risk that South Holland Electric would not be able to make or would refuse to make its required rent payments, the risk that South Holland Electric would go bankrupt, and the risk that the leased equipment would be damaged or otherwise suffer an unanticipated diminution in value.

75. As lessor under the Headlease, South Holland Electric assumed the risk that Con Edison Leasing would be unable to make the second lump-sum rent payment due under the terms of the Headlease.

76. Hollandsche, Con Edison Leasing's lender, assumed the risk that Con Edison Leasing would be unable to make the required loan payments.

77. As is typical in conservatively structured transactions, the RoCa3 Investment included a number of features that were designed to reduce the financial risks assumed by the parties. These features included collateral deposits, pledges of collateral, and an early buy-out option. However, these features did not and could not insulate Con Edison Leasing or the other parties from all risks presented by the RoCa3 Investment.

## COUNT ONE: THE IRS'S PROPOSED TAX TREATMENT OF THE RoCa3 INVESTMENT WAS ERRONEOUS

### A. The Headlease and Sublease Between Con Edison Leasing and South Holland Electric Should Be Respected Because Con Edison Leasing Retains Sufficient Benefits and Burdens of Ownership With Respect To Its Leasehold Investment in the Roca3 Plant

78. Con Edison NY reincorporates by reference and re-alleges the facts set forth in paragraphs 1 through 77 above.

79. Generally, a lease is an arrangement where one party (the "lessor") has a property interest in an asset or a right to use an asset and provides possession and the right to use that asset to another party (the "lessee") for a fixed period of time in exchange for payment of rent.

80. For federal income tax purposes, a lease arrangement will be respected as a "true lease" (instead of a loan or other form of transaction) if the lessor retains sufficient benefits and burdens of ownership. This determination generally depends on whether the lessor has a meaningful equity investment in the asset throughout the entire lease term and a meaningful residual interest in the asset at the end of the lease term. Decades of judicial authority have found a 15% residual value to be meaningful. Thus, if at the end of the lease term, the asset is expected to have a remaining useful life (and remaining value) equal to at least 15% of its original estimated useful life (and original cost), the arrangement will be respected for tax purposes as a true lease or sublease, as the case may be.

81. The lessor in a lease transaction can use either equity or a combination of equity and debt to finance the purchase or lease of the asset. When a lessor uses non-recourse debt to finance the purchase or lease of the asset, the transaction is called a leveraged lease.

82. In a typical leveraged lease transaction, an investor purchases or leases an asset and borrows money to finance some or all of the investment. The investor then leases the asset to a third party who uses the asset in its business operations. In this type of transaction, it is a common business practice for the investor to lease the asset to the party which originally sold or leased it to the investor, *i.e.*, a "sale-leaseback" or "lease-leaseback" transaction.

83. In leveraged lease transactions the lessor will earn profits from the rent payments it receives and from the residual value of the property once the lease expires. Additionally, a leveraged lease transaction will often provide a benefit in the form of a limited tax deferral, in

which an amount of federal income tax that would otherwise have been paid one year is deferred until a later year. This is so because leveraged lease transactions often produce losses for federal income tax purposes in the early years of the transaction due to depreciation, rental expense, amortization, and interest deductions. These losses are offset by profits or gains for federal income tax purposes in the later years of the transaction. This tax deferral effect of leveraged lease transactions has been approved by the courts and the IRS for many years.

84. The RoCa3 Investment, entered into by Con Edison Leasing and South Holland Electric on December 15, 1997, was a leveraged lease transaction because a portion of Con Edison Leasing's investment was financed through a non-recourse loan from Hollandsche.

85. The Headlease from South Holland Electric to Con Edison Leasing and the Sublease from Con Edison Leasing to South Holland Electric both qualify as leases for federal tax purposes because in each case (i) the leases transferred possession of the property interest in return for the obligation to pay rent and provided for transfer of possession back to the lessor in the event of a default, and (ii) the lessors' return depended upon the residual value of the property at the end of the respective lease.

### B. Con Edison NY Properly Reported the RoCa3 Investment on Its 1997 Tax Return

86. Con Edison NY properly reported income and claimed deductions on its 1997 tax return in connection with the RoCa3 Investment.

87. As lessee under the Headlease, Con Edison Leasing is required to make rent payments to South Holland Electric. Con Edison Leasing accrued rental deductions on its 1997 tax return for these payments in accordance with the terms of the Headlease.

88. As lessee under the Sublease, South Holland Electric is required to make rent payments to Con Edison Leasing. Con Edison Leasing accrued income on its 1997 tax return with respect to these payments in accordance with the terms of the Sublease.

89. Section 467 of the Internal Revenue Code generally requires rent to be allocated to tax periods in accordance with the terms of a lease, except as otherwise required by section 467. Section 467 also authorizes the IRS to issue regulations regarding the allocation of rental payments to tax periods. Although section 467 was enacted in 1984, the Treasury Department did not promulgate final regulations pursuant to section 467 until 1999, that is, nearly 15 years later.

90. On June 3, 1996, before Con Edison Leasing entered into the RoCa3 Investment, the Treasury Department issued "proposed" regulations under Section 467 of the Internal Revenue Code (the "Proposed Section 467 Regulations"). These regulations, however, were not made final until May 18, 1999 (the "Final Section 467 Regulations").

91. Certain provisions of the Proposed Section 467 Regulations could have altered the method in which Con Edison Leasing reported the rental expense and income resulting from the Headlease and Sublease, respectively, on its 1997 income tax return, but these provisions were not applicable to leases that were entered into prior to the Final Section 467 Regulations as long as the allocation of rent agreed to by the parties was not designed for the principal purpose of avoiding income tax.

92. Both the Proposed Section 467 Regulations and the Final Section 467 Regulations contain a "safe harbor" provision. This provision states that the avoidance of income tax will not be considered to be a principal purpose for the method of allocating rent agreed to by the parties

if the rent allocated to each calendar year is no more than 10% higher or lower than the average rent for all calendar years under the lease.

93. The rent allocation contained in the Headlease and Sublease met the 10% "safe harbor" rule that is contained in the Proposed Section 467 Regulations and the Final Section 467 Regulations. Under the IRS's own rules, the rent allocation methodology in each of the leases is not considered to be for the principal purpose of avoiding income tax. Because the allocations of rent under the Headlease and Sublease satisfied the 10% safe harbor provision, Con Edison NY's reported rental expense deductions and rental income from the RoCa3 Investment as reported on its 1997 income tax return complied with the Proposed Section 467 Regulations and the Final Section 467 Regulations.

94. Con Edison NY properly reported deductions for accrual of interest expense with respect to its loan from Hollandsche.

95. Con Edison NY properly reported deductions for the amortization of transaction costs incurred with respect to the RoCa3 Investment.

**COUNT TWO: CON EDISON NY IS ENTITLED TO A REFUND OF TAXES**

96. Con Edison NY incorporates by reference and re-alleges the facts set forth in paragraphs 1 through 95 above.

97. Pursuant to 26 U.S.C. §§ 61 and 467, Con Edison NY included a total of $399,963 in rental income on its income tax return for the 1997 taxable year with respect to South Holland Electric's obligation to pay rent under the terms of the Sublease.

98. Pursuant to 26 U.S.C. §§ 162(a)(3), 167, and 467, Con Edison NY deducted a total of $1,082,350 in rental expense and transaction costs on its income tax return for the 1997

taxable year as a result of the rental payments made to South Holland Electric under the terms of, and in amortization of transaction costs relating to, the Headlease.

99. Pursuant to 26 U.S.C. § 163, Con Edison NY deducted a total of $254,944 in interest expense on its income tax return for the 1997 taxable year as a result of interest accruing on the bank loan it obtained to fund a portion of its rental payments under the Headlease.

100. The IRS proposed to disallow all of Con Edison NY's deductions for (i) rental payments required to be made to South Holland Electric under the terms of the Headlease, (ii) the interest payments required to be made to Hollandsche, and (iii) the amortization of transaction costs.

101. The IRS also proposed to reduce Con Edison NY's rental income by the amount of rental payments due from South Holland Electric under the Sublease.

102. These proposed adjustments had the effect of recalculating Con Edison NY's taxable income for the 1997 taxable year as if Con Edison NY had not engaged in the RoCa3 Investment.

103. The changes proposed by the IRS increased Con Edison NY's taxable income for the 1997 taxable year by a net amount of $937,331.

104. As a result of this proposed increase in taxable income, the IRS demanded an additional $328,066 in federal income tax from Con Edison NY for the 1997 taxable year.

105. On or about November 3, 2005, Con Edison NY paid to the IRS at Chicago, Illinois the proposed tax deficiency of $328,066.

106. The adjustments made by the IRS to Con Edison NY's taxable income for the 1997 taxable year were contrary to controlling tax law, and Con Edison NY is entitled to a

complete refund of the $328,066 of federal income taxes erroneously paid with respect to the RoCa3 Investment.

**DEMAND FOR JUDGMENT**

WHEREFORE, Con Edison of NY respectfully requests that this Court enter judgment in its favor and against the Defendant in the amount of $328,066, plus interest and costs allowed by law, and provide such other relief as the Court may deem just.

Respectfully submitted this 18th day of April, 2006.

Respectfully Submitted,

Thomas C. Durham

Thomas C. Durham
MAYER, BROWN, ROWE & MAW LLP
71 South Wacker Drive
Chicago, Illinois 60606
Tel: (312) 701-7216
Fax: (312) 706-9187
tdurham@mayerbrownrowe.com

Attorney for Plaintiff

OF COUNSEL:

David F. Abbott
Brian P. Trauman
MAYER, BROWN, ROWE & MAW LLP
1675 Broadway
New York, New York 10019
Tel: (212) 506-2500
Fax: (212) 262-1910

Nicole Bielawski
MAYER, BROWN, ROWE & MAW LLP
1909 K Street, N.W.
Washington, D.C. 20217
Tel: (202) 263-3000
Fax: (202) 263-3300

# EXHIBIT A

conEdison

James C. Allan
Manager – Tax

4 Irving Place
New York, NY 10003
212 460 4003
allanj@coned.com

COPY

December 2, 2005

**CERTIFIED MAIL**
7002 3150 0000 3587 0465

Internal Revenue Service Center
Ogden, UT 84201-0012

Dear Sir or Madam:

Enclosed is Form 1120X **Amended U.S. Corporation Income Tax Return** prepared on behalf of **Consolidated Edison of New York, Inc. and Subsidiaries** for the year ended December 31, 1997.

The taxpayer's original federal income return for the tax year 1997 included a net loss in the amount of $937,331 from a transaction in which subsidiaries of the taxpayer leased an undivided interest in an electric generating plant from an entity in the Netherlands, and subleased the undivided interest back to that entity (a so-called "lease-in/lease-out" or "LILO" transaction). The loss resulted from deductions for rental, amortization and interest expenses in excess of income from leaseback rental payments for the year in question. Upon audit, the Service disallowed this loss, and proposed a resulting tax deficiency in the amount of $328,066. The taxpayer paid this proposed tax deficiency on or about November 3, 2005. See attached letter to Internal Revenue Service dated November 3, 2005, and executed Forms 870, 4549 and 5701.

The taxpayer believes that its original treatment and reporting of the transaction described above was correct, and that the proposed deficiency by the Service as described above was erroneous. Accordingly, the taxpayer believes that the payment of the proposed deficiency was made in error, and respectfully requests a prompt refund of the erroneously paid taxes in the amount of $328,066.

Please contact us if you have any questions.

Sincerely,

James C. Allan

James C. Allan

Form **1120X** (Rev. December 2004) Department of the Treasury Internal Revenue Service

# Amended U.S. Corporation Income Tax Return

OMB No. 1545-0132

For tax year ending ▶ December, 1997 (Enter month and year.)

| Please Type or Print | |
|---|---|
| Name | Consolidated Edison of New York, Inc. & Subsidiaries |
| Employer identification number | 13-5009340 |
| Number, street, and room or suite no. (If a P.O. box, see instructions.) | 4 Irving Place Room 615-S |
| City or town, state, and ZIP code | New York, NY 10003 |
| Telephone number (optional) | 212.460.4003 |

Enter name and address used on original return (If same as above, write "Same.")

Same

Internal Revenue Service Center where original return was filed ▶ Ogden, UT

## Fill in applicable items and use Part II on the back to explain any changes

**Part I Income and Deductions** (see instructions)

| | | | (a) As originally reported or as previously adjusted | (b) Net change—increase or (decrease)—explain in Part II | (c) Correct amount |
|---|---|---|---|---|---|
| 1 | Total income (Form 1120 or 1120-A, line 11) | 1 | 7,140,361,364 | 399,963.00 | 7,140,761,327 |
| 2 | Total deductions (total of lines 27 and 29c, Form 1120, or lines 23 and 25c, Form 1120-A) | 2 | 6,303,649,841 | 1,337,294.00 | 6,304,987,135 |
| 3 | Taxable income. Subtract line 2 from line 1 | 3 | 836,711,523.00 | (937,331.00) | 835,774,192.00 |
| 4 | Tax (Form 1120, line 31, or Form 1120-A, line 27) | 4 | 291,331,474.00 | (328,066.00) | 291,003,408.00 |

**Payments and Credits** (see instructions)

| | | | (a) | (b) | (c) |
|---|---|---|---|---|---|
| 5a | Overpayment in prior year allowed as a credit | 5a | | 0.00 | |
| b | Estimated tax payments | 5b | 291,003,408.00 | 0.00 | 291,003,408.00 |
| c | Refund applied for on Form 4466 | 5c | | 0.00 | |
| d | Subtract line 5c from the sum of lines 5a and 5b | 5d | 291,003,408.00 | 0.00 | 291,003,408.00 |
| e | Tax deposited with Form 7004 | 5e | | 0.00 | |
| f | Credit from Form 2439 | 5f | | 0.00 | |
| g | Credit for Federal tax on fuels | 5g | | 0.00 | |

| | | | |
|---|---|---|---|
| 6 | Tax deposited or paid with (or after) the filing of the original return | 6 | 328,066.00 |
| 7 | Add lines 5d through 6, column (c) | 7 | 291,331,474.00 |
| 8 | Overpayment, if any, as shown on original return or as later adjusted | 8 | |
| 9 | Subtract line 8 from line 7 | 9 | 291,331,474.00 |

**Tax Due or Overpayment** (see instructions)

| | | | |
|---|---|---|---|
| 10 | **Tax due.** Subtract line 9 from line 4, column (c). If paying by check, make it payable to the **"United States Treasury"** ▶ | 10 | 0.00 |
| 11 | **Overpayment.** Subtract line 4, column (c), from line 9 ▶ | 11 | 328,066.00 |
| 12 | Enter the amount of line 11 you want: **Credited to 20__ estimated tax** ▶ **Refunded** ▶ | 12 | 328,066.00 |

**Sign Here**

Under penalties of perjury, I declare that I have filed an original return and that I have examined this amended return, including accompanying schedules and statements, and to the best of my knowledge and belief, this amended return is true, correct, and complete. Declaration of preparer (other than taxpayer) is based on all information of which preparer has any knowledge.

▶ Robert N. Hoglund — Signature of officer | 2 Dec 05 — Date | ▶ Sr. Vice President & C.F.O. — Title

**Paid Preparer's Use Only**

Preparer's signature ▶ | Date | Check if self-employed ☐ | Preparer's SSN or PTIN

Firm's name (or yours if self-employed), address, and ZIP code ▶ | EIN | Phone no.

**Part II** **Explanation of Changes to Items in Part I** (Enter the line number from page 1 for the items you are changing, and give the reason for each change. Show any computation in detail. Also, see **What To Attach** on page 3 of the instructions.)

If the change is due to a net operating loss carryback, a capital loss carryback, or a general business credit carryback, see **Carryback Claims** on page 3, and check here . . . ▶ ☐

Reference attached for explanation of changes to items in Part I

## EXPLANATION OF CHANGES TO ITEMS IN PART I

The taxpayer's original federal income return for the tax year 1997 included a net loss in the amount of $937,331 from a transaction in which subsidiaries of the taxpayer leased an undivided interest in an electric generating plant from an entity in the Netherlands, and subleased the undivided interest back to that entity (a so-called "lease-in/lease-out" or "LILO" transaction). The loss resulted from deductions for rental, amortization and interest expenses in excess of income from leaseback rental payments for the year in question. Upon audit, the Service disallowed this loss, and proposed a resulting tax deficiency in the amount of $328,066. The taxpayer paid this proposed tax deficiency on or about November 3, 2005. See attached letter to Internal Revenue Service dated November 3, 2005, and executed Forms 870, 4549 and 5701.

The taxpayer believes that its original treatment and reporting of the transaction described above was correct, and that the proposed deficiency by the Service as described above was erroneous. Accordingly, the taxpayer believes that the payment of the proposed deficiency was made in error, and respectfully requests a prompt refund of the erroneously paid taxes in the amount of $328,066.

Pursuant to IRS Notice 2003-76, transactions similar to the one described above have been identified by the Treasury Department and the IRS as "listed transactions" for purposes of the regulations under sections 6011 and 6111 of the Code. Therefore, assuming that the Service intends to deny this refund claim, the taxpayer requests that the Service do so as soon as possible, and in any event prior to the 6 month period referred to in Section 6532(a)(1) of the Code.

conEdison

James C. Allan
Manager – Tax

4 Irving Place
New York, NY 10003
212 460 4003
allanj@coned.com

COPY

November 3, 2005

***REGISTERED MAIL***

Internal Revenue Service
C/o Lance LaShaw 10th Floor
Group 1463
110 West 44th Street
New York, NY 10036

---

**RE: Consolidated Edison Company of New York, Inc.**
**E.I.N.: 13-5009340**
**Form: 870**
**Tax Period ended: December 31, 1997**
**Issue: EZH LILO Transaction**

Dear Mr. LaShaw:

Enclosed are executed Forms 870, 4549 and 5701 for the EZH LILO transaction adjustment for the tax period ended December 31,1997. In addition, we are enclosing our Check No.: E 748716 for $328,066 for payment of the additional liability.

Please contact us if you have any questions.

Sincerely,

James C. Allan

James C. Allan
Manager - Tax

Enclosure(s)

DO NOT CASH UNLESS BACK OF CHECK CONTAINS ARTIFICIAL WATERMARK

conEdison

4 IRVING PLACE
NEW YORK, NY 10003

EIN: 13-5009340
PERIOD ENDING: 12/1997
FORM: 1120

| DATE | NOT GOOD AFTER |
|---|---|
| 11 04 05 | 03 01 06 |

E 748716

60-160
433

E748716

PAY **** THREE HUNDRED TWENTY EIGHT THOUSAND SIXTY SIX DOLLARS 00 CTS

$328,066 00

TO THE ORDER OF

UNITED STATES DEPT TREASURY
INTERNAL REVENUE SERVICE
PO BOX 6229
CHICAGO, IL 60680-6229

PAYABLE AT
MELLON BANK, N.A.
PITTSBURGH, PA

VICE PRESIDENT & TREASURER
CON EDISON

⑈00748716⑈ ⑆043301601⑆ 000⑈3156⑈

conEdison

4 IRVING PLACE
NEW YORK, NY 10003

REMITTANCE STATEMENT

PLEASE INDICATE CONSPICUOUSLY THIS UNIQUE CODE ON FUTURE INVOICES

PAYEE CODE: S8682

DATE PAID: 11 04 05

E

CHECK NUMBER: 748716

E748716

| VOUCHER DATE NUMBER | INVOICE DATE | REFERENCE | AMOUNT OF INVOICE | DISCOUNT | TOTAL |
|---|---|---|---|---|---|
| 051100960 | 051102 | | 328,066 00 | 0 00 | 328,066 00 |
| | | TOTAL ▶ | 328,066 00 | 0 00 | 328,066 00 |

THE ENCLOSED CHECK IS TENDERED IN FULL PAYMENT OF ITEMS ENUMERATED ABOVE. IF INCORRECT, PLEASE RETURN TO CASH CONTROL

Form 870 (Rev. March 1992)

Department of the Treasury—Internal Revenue Service

# Waiver of Restrictions on Assessment and Collection of Deficiency in Tax and Acceptance of Overassessment

Date received by Internal Revenue Service

Names and address of taxpayers *(Number, street, city or town, State, ZIP code)*

Consolidated Edison Co.
4 Irving Place
New York, New York 10003

Social security or employer identification number

13-5009340

Increase (Decrease) in Tax and Penalties

| Tax year ended | Tax | Penalties | | | |
|---|---|---|---|---|---|
| 1997 | 328,066 | 0 | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

(For instructions, see back of form)

**Consent to Assessment and Collection**

I consent to the immediate assessment and collection of any deficiencies *(increase in tax and penalties)* and accept any overassessment *(decrease in tax and penalties)* shown above, plus any interest provided by law. I understand that by signing this waiver, I will not be able to contest these years in the United States Tax Court, unless additional deficiencies are determined for these years.

| | | |
|---|---|---|
| YOUR SIGNATURE HERE | | Date |
| SPOUSE'S SIGNATURE | | Date |
| TAXPAYER'S REPRESENTATIVE HERE | William T. Abbott – Director | Date 11/2/2005 |
| CORPORATE NAME | Consolidated Edison Co of N.Y. 13-5009340 | |
| CORPORATE OFFICER(S) SIGN HERE | Title | Date |
| | Title | Date |

| Form 4549 (Rev. March 2005) | Department of the Treasury-Internal Revenue Service **Income Tax Examination Changes** | Page 1 of 2 |
|---|---|---|

| Name and Address of Taxpayer | Taxpayer Identification Number | Return Form No.: |
|---|---|---|
| Consolidated Edison Co.<br>4 Irving Place<br>New York, New York 10003 | 13-5009340 | 1120 |
| | Person with whom examination changes were discussed. | Name and Title: James C. Allan, Manager Tax Compliance |

| 1. Adjustments to Income | Period End 1997 | Period End | Period End |
|---|---|---|---|
| a. EZH LILO Transaction | 937,331 | | |
| b. | | | |
| c. | | | |
| d. | | | |
| e. | | | |
| f. | | | |
| g. | | | |
| h. | | | |
| i. | | | |
| j. | | | |
| k. | | | |
| l. | | | |
| m. | | | |
| n. | | | |
| o. | | | |
| p. | | | |
| 2. Total Adjustments | 937,331 | | |
| 3. Taxable Income Per Return or as Previously Adjusted | 835,774,192 | | |
| 4. Corrected Taxable Income | 836,711,523 | | |
| Tax Method | | | |
| Filing Status | | | |
| 5. Tax | 292,849,033 | | |
| 6. Additional Taxes / Alternative Minimum Tax | 0 | | |
| 7. Corrected Tax Liability | 292,849,033 | | |
| 8. Less Credits a. General Business Credit | 1,517,559 | | |
| b. | | | |
| c. | | | |
| d. | | | |
| 9. Balance *(Line 7 less Lines 8a through 8d)* | 291,331,474 | | |
| 10. Plus Other Taxes a. | | | |
| b. | | | |
| c. | | | |
| d. | | | |
| 11. Total Corrected Tax Liability *(Line 9 plus Lines 10a through 10d)* | 291,331,474 | | |
| 12. Total Tax Shown on Return or as Previously Adjusted | 291,003,408 | | |
| 13. Adjustments to: a. | | | |
| b. | | | |
| 14. Deficiency-Increase in Tax or *(Overassessment-Decrease in Tax)* *(Line 11 less Line 12 adjusted by Lines 13a plus 13b)* | 328,066 | | |
| 15. Adjustments to Prepayment Credits - Increase *(Decrease)* | | | |
| 16. Balance Due or *(Overpayment)* - *(Line 14 adjusted by Line 15)* *(Excluding interest and penalties)* | 328,066 | | |

The Internal Revenue Service has agreements with state tax agencies under which information about federal tax, including increases or decreases, is exchanged with the states. If this change affects the amount of your state income tax, you should amend your state return by filing the necessary forms.

You may be subject to backup withholding if you underreport your interest, dividend, or patronage dividend income you earned and do not pay the required tax. The IRS may order backup withholding *(withholding of a percentage of your dividend and/or interest income)* if the tax remains unpaid after it has been assessed and four notices have been issued to you over a 120-day period.

| Form 4549 (Rev. March 2005) | Department of the Treasury-Internal Revenue Service **Income Tax Examination Changes** | Page 2 of 2 |
|---|---|---|
| Name of Taxpayer Consolidated Edison Co. | Taxpayer Identification Number 13-5009340 | Return Form No.: 1120 |

| 17. Penalties/ Code Sections | Period End 1997 | Period End | Period End |
|---|---|---|---|
| a. | | | |
| b. | | | |
| c. | | | |
| d. | | | |
| e. | | | |
| f. | | | |
| g. | | | |
| h. | | | |
| i. | | | |
| j. | | | |
| k. | | | |
| l. | | | |
| m. | | | |
| **18. Total Penalties** | 0 | | |
| Underreporter attributable to negligence: *(1981-1987)* *A tax addition of 50 percent of the interest due on the underpayment will accrue until it is paid or assessed.* | | | |
| Underreporter attributable to fraud: *(1981-1987)* *A tax addition of 50 percent of the interest due on the underpayment will accrue until it is paid or assessed.* | | | |
| Underreporter attributable to Tax Motivated Transactions *(TMT)*. The interest will accrue and be assessed at 120% of the under-payment rate in accordance with IRC §6621(c) | | | |
| **19. Summary of Taxes, Penalties and Interest:** | | | |
| a. Balance due or *(Overpayment)* Taxes - *(Line 16, Page 1)* | 328,066 | | |
| b. Penalties *(Line 18)* - computed to | 0 | | |
| c. Interest *(IRC § 6601)* - computed to | | | |
| d. TMT Interest - computed to *(on TMT underpayment)* | | | |
| e. Amount due or *(refund)* - *(sum of Lines a, b, c and d)* | 328,066 | | |

**Other Information:**

| Examiner's Signature: | Employee ID: | Office: | Date: |
|---|---|---|---|
| [signature] Mary C. Gruszka | 13-24116 | 110 West 44th Street, NYC | 11/2/05 |

Consent to Assessment and Collection- I do not wish to exercise my appeal rights with the Internal Revenue Service or to contest in the United States Tax Court the findings in this report. Therefore, I give my consent to the immediate assessment and collection of any increase in tax and penalties, and accept any decrease in tax and penalties shown above, plus additional interest as provided by law. It is understood that this report is subject to acceptance by the Area Director, Area Manager, Specialty Tax Program Chief, or Director of Field Operations.

***PLEASE NOTE:*** *If a joint return was filed, BOTH taxpayers must sign.*

| Signature of Taxpayer | Date: | Signature of Taxpayer | Date: |
|---|---|---|---|
| [signature] | 11/2/2005 | | |
| By: | | Title: | Date: |

Substitute for Form 5701

Department of the Treasury – Internal Revenue Service

NOTICE OF PROPOSED ADJUSTMENT

COPY

Name and Address of Taxpayer  S.S.N. or E.I.N.: 13-5009340  Issue No: 1

CONSOLIDATED EDISON COMPANY OF NEW YORK, INC. AND SUBSIDIARIES
4 IRVING PLACE

Date Issued: 9/15/2005

NEW YORK NY 10003

Entity No: 000001 Entity: CONSOLIDATED EDISON COMPANY OF NEW YORK, INC. AND SUBSIDIARIES

Proposed By: MARY E. GRUSAKY  Title: ACCOUNT COORDINATOR

ID:

Submitted To: JAMES C. ALLAN  Title: MANAGER, TAX  Response Due: 9/20/2005

Authorized Representative's Action:

✓ Agree ___Agree In Part ___Disagree ___Have Additional Information; Will Submit By: ____________

Robert N. Hoglund  Chief Financial Officer & SVP  9/20/05

Authorized Signature  Title  Date

Based on the information we now have available and our discussions with you, we believe the proposed adjustment listed below should be Included in the revenue agent's report. However, if you have additional information that would alter or reverse this proposal, please furnish This information as soon as possible.

| Year | Issue Raised | Category | Amount |
|---|---|---|---|
| 199712 | OTHER INCOME | OTHER INCOME | 937,331.00 |

For Explanation of Items See Attached Pages

Approved by:

Name: ____________ Title: ____________ Date: ________

Name: ____________ Title: ____________ Date: ________

Name: ____________ Title: ____________ Date: ________

Name: ____________ Title: ____________ Date: ________

Form CG5701

Room 615-S

PS Form 3800, June 2002 (Reve
r two years
Class Mail® or Priority Mail®.
rnational mail.
with Certified Mail. For
Mail.
equested to provide proof of
complete and attach a Return
plicable postage to cover the
I". To receive a fee waiver for
your Certified Mail receipt is
cted to the addressee or
mark the mailpiece with the
ired, please present the arti-
stmark on the Certified Mail
postage and mail.
**when making an inquiry.**
**available on mail**

**CERTIFIED MAIL**

Internal Revenue Service Center
Ogden, UT 84201-0012

ED MAIL
evenue Service Center
T 84201-0012

7002 3150 0000 3587 0465
7002 3150 0000 3587 0465

**U.S. Postal Service™**
**CERTIFIED MAIL™ RECEIPT**
*(Domestic Mail Only; No Insurance Coverage Provided)*

For delivery information visit our website at www.usps.com®

**OFFICIAL USE**

J. ALLAN
1/97 1120X

| | |
|---|---|
| Postage | $ |
| Certified Fee | |
| Return Reciept Fee (Endorsement Required) | |
| Restricted Delivery Fee (Endorsement Required) | |
| Total Postage & Fees | $ |

Postmark Here

Sent To INTERNAL REVENUE SERVICE

Street, Apt. No.; or PO Box No.

City, State, ZIP+4 OGDEN, UT 84201-0012

PS Form 3800, June 2002 See Reverse for Instructions

Room 615-?

conEdison
a conEdison, inc. company

# EXHIBIT B

**Internal Revenue Service** | **Department of the Treasury**

Date: 3/15/06

**Taxpayer Identification Number:**
13-5009340
**Form:**
1120
**Tax Period(s) Ended and Claim Amount:**
199712 $328,066

Consolidated Edison of N.Y. Inc. & Subs.
4 Irving Place Room 615-S
New York, N.Y. 10003

**Date Claim Received:**

**Person to Contact:**
Jeffrey Goldfarb

**Contact Telephone Number:**
(212)719-6628
**Employee Identification Number:**
13-21158
**Last date to Respond to this Letter:**

Dear Mr. Allan

We examined your claim and propose:

☐ Partial disallowance, as shown in the enclosed examination report. If you accept our findings, please sign and return the enclosed Form 2297, *Waiver Form* and Form 3363, *Acceptance Form.*

☒ Full disallowance, as shown in the enclosed examination report or at the end of this letter. If you accept our findings, please sign and return the enclosed Form 2297, *Waiver Form* and Form 3363, *Acceptance Form.*

☐ Full disallowance with additional tax due, as shown in the enclosed examination report. If you accept our findings, please sign and return the enclosed Form 2297, *Waiver Form* and the examination report.

*Note: If your claim involves a joint return, both taxpayers must sign the form(s).*

If you are a "C" Corporation filer, Section 6621(c) of the Internal Revenue Code provides for an interest rate 2% higher than the standard interest rate on deficiencies of $100,000 or more.

If you don't agree with our findings, you may request a meeting or telephone conference with the supervisor of the person identified in the heading of this letter. If you still don't agree with our findings, we recommend that you request a conference with our Appeals Office. If you request a conference, we will forward your request to the Appeals Office and they will contact you to schedule an appointment.

If the proposed change to tax is:

- $25,000 or less for *each* referenced tax period; you may send us a letter requesting Appeals consideration, indicating what you don't agree with and the reasons why you don't agree.

- More than $25,000 for *any* referenced tax period; you must submit a formal protest.

The requirements for filing a formal protest are explained in the enclosed Publication 3498, *The Examination Process.* Publication 3498 also includes information on your *Rights as a Taxpayer* and the *IRS Collection Process.*

If you don't respond by the date shown in the heading of this letter, we will process your case based on the adjustments shown in the enclosed examination report or the explanations given at the end of this letter.

If you have any questions, please contact the person whose name and telephone number are shown in the heading of this letter. Thank you for your cooperation.

Sincerely yours,

Cheryl Claybough, Acting DFO

Enclosures:
☐ Examination Report
Form 2297
☐ Form 3363
Publication 3498
Envelope

Form **2297** (Rev. March 1982)

Department of the Treasury-Internal Revenue Service

# Waiver of Statutory Notification of Claim Disallowance

I, Consolidated Edison of N.Y. & Subs. 13-5009340 of 4 Irving Place New York, N.Y. 10003
(Name, SSN or EIN) (Number, Street, City or Town, State, ZIP Code)

waive the requirement under Internal Revenue Code section 6532(a)(1 ) that a notice of claim disallowance be sent to me by certified or registered mail for the claims for credit or refund shown in column (d), below.

I understand that the filing of this waiver is irrevocable and it will begin the 2-year period for filing suit for refund of the claims disallowed as if the notice of disallowance had been sent by certified or registered mail.

**Claims**

| (a) Taxable Period Ended | (b) Kind of Tax | (c) Amount of Claim | (d) Amount of Claim Disallowed |
|---|---|---|---|
| 9712 | Income | $328,066 | $328,066 |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

If you file this waiver for a joint return, both you and your spouse must sign the original and duplicate of this form. Sign your name exactly as it appears on the return. If you are acting under power of attorney for your spouse, you may sign as agent for him or her.

Your Signature ________ (Date signed)

Spouse's Signature If A Joint Return Was Filed ________ (Date signed)

For an agent or attorney acting under a power of attorney, a power of attorney must be sent with this form if not previously filed.

Taxpayer's Representative Sign Here ________ (Date signed)

For a partnership with excise or employment tax liability, all partners must sign. However, one partner may sign with appropriate evidence of authorization to act for the partnership.

Partnership/ Corporate Name: ________

For a person acting in a fiduciary capacity (executor, administrator, trustee), file Form 56, Notice Concerning Fiduciary Relationship, with this form if not previously filed.

For a corporation, enter the name of the corporation followed by the signature and title of the officer(s) authorized to sign.

Partners/ Corporate Officers Sign Here ________ (Title) (Date signed)

________ (Title) (Date signed)

NOTE - Filing this waiver within 6 months from the date the claim was filed will not permit filing a suit for refund before the 6-month period has elapsed unless a decision is made by the Service within that time disallowing the claims.

Form **2297** (Rev. March 1982)

Department of the Treasury-Internal Revenue Service

# Waiver of Statutory Notification of Claim Disallowance

I, Consolidated Edison of N.Y. & Subs. 13-5009340 (Name, SSN or EIN) of 4 Irving Place New York, N.Y. 10003 (Number, Street, City or Town, State, ZIP Code)

waive the requirement under Internal Revenue Code section 6532(a)(1 ) that a notice of claim disallowance be sent to me by certified or registered mail for the claims for credit or refund shown in column (d), below.

I understand that the filing of this waiver is irrevocable and it will begin the 2-year period for filing suit for refund of the claims disallowed as if the notice of disallowance had been sent by certified or registered mail.

**Claims**

| (a) Taxable Period Ended | (b) Kind of Tax | (c) Amount of Claim | (d) Amount of Claim Disallowed |
|---|---|---|---|
| 9712 | Income | $328,066 | $328,066 |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

If you file this waiver for a joint return, both you and your spouse must sign the original and duplicate of this form. Sign your name exactly as it appears on the return. If you are acting under power of attorney for your spouse, you may sign as agent for him or her.

For an agent or attorney acting under a power of attorney, a power of attorney must be sent with this form if not previously filed.

For a partnership with excise or employment tax liability, all partners must sign. However, one partner may sign with appropriate evidence of authorization to act for the partnership.

For a person acting in a fiduciary capacity (executor, administrator, trustee), file Form 56, Notice Concerning Fiduciary Relationship, with this form if not previously filed.

For a corporation, enter the name of the corporation followed by the signature and title of the officer(s) authorized to sign.

Your Signature ▶ ____________________ (Date signed)

Spouse's Signature If A Joint Return Was Filed ▶ ____________________ (Date signed)

Taxpayer's Representative Sign Here ▶ ____________________ (Date signed)

Partnership/ Corporate Name: ____________________

Partners/ Corporate Officers Sign Here ▶ ____________________ (Title) (Date signed)

▶ ____________________ (Title) (Date signed)

NOTE - Filing this waiver within 6 months from the date the claim was filed will not permit filing a suit for refund before the 6-month period has elapsed unless a decision is made by the Service within that time disallowing the claims.

Form **3363**
(Rev. November 1983)

Department of the Treasury — Internal Revenue Service

# Acceptance of Proposed Disallowance of Claim for Refund or Credit

Name(s), SSN or EIN, and address of taxpayer(s) *(Number, Street, City or Town, State, ZIP Code)*

Consolidated Edison of New York. Inc. & Subs.
4 Irving Place Room 615-S
New York, N.Y. 10003

| Year or Period | Date Claim Filed | Kind of Tax | Amount of Claim | Amount of Claim Disallowed | Amount of Claim Allowed |
|---|---|---|---|---|---|
| 9712 | | Income | $328,066 | $328,066 | 0 |
| | | | | | |
| | | | | | |
| | | | | | |

I accept the proposal of the Internal Revenue Service to disallow the claim(s) to the extent described above. This means only that I do not want the Service to consider the claim(s). It does not waive my right to file suit on the disallowance.

If you file this acceptance for a joint return, both you and your spouse must sign the original and duplicate of this form. Sign your name exactly as it appears on the return. If you are acting under power of attorney for your spouse, you may sign as agent for him or her.

For an agent or attorney acting under a power of attorney, a power of attorney must be sent with this form if not previously filed.

For a partnership with exise or employment tax liability, all partners must sign. However, one partner may sign with appropriate evidence of authorization to act for the partnership.

For a person acting in a fiduciary capacity (executor, administrator, trustee), file Form 56, Notice Concerning Fiduciary Relationship, with this form if not previously filed.

For a corporation, enter the name of the corporation followed by the signature and title of the officer(s) authorized to sign.

**Your Signature** ▶ ____________________ (Date)

**Spouse's Signature If A Joint Return Was Filed** ▶ ____________________ (Date)

**Taxpayer's Representative Sign Here** ▶ ____________________ (Date)

**Partnership/ Corporate Name** ▶ ____________________

**Partners/ Corporate Officers Sign Here**
▶ ____________________
(Title) (Date)
▶ ____________________
(Title) (Date)

Form **3363** (Rev. November 1983)

Department of the Treasury — **Internal Revenue Service**

# Acceptance of Proposed Disallowance of Claim for Refund or Credit

Name(s), SSN or EIN, and address of taxpayer(s) *(Number, Street, City or Town, State, ZIP Code)*

Consolidated Edison of New York. Inc. & Subs.
4 Irving Place Room 615-S
New York, N.Y. 10003

| Year or Period | Date Claim Filed | Kind of Tax | Amount of Claim | Amount of Claim Disallowed | Amount of Claim Allowed |
|---|---|---|---|---|---|
| 9712 | | Income | $328,066 | $328,066 | 0 |
| | | | | | |
| | | | | | |
| | | | | | |

I accept the proposal of the Internal Revenue Service to disallow the claim(s) to the extent described above. This means only that I do not want the Service to consider the claim(s). It does not waive my right to file suit on the disallowance.

If you file this acceptance for a joint return, both you and your spouse must sign the original and duplicate of this form. Sign your name exactly as it appears on the return. If you are acting under power of attorney for your spouse, you may sign as agent for him or her.

For an agent or attorney acting under a power of attorney, a power of attorney must be sent with this form if not previously filed.

For a partnership with exise or employment tax liability, all partners must sign. However, one partner may sign with appropriate evidence of authorization to act for the partnership.

For a person acting in a fiduciary capacity (executor, administrator, trustee), file Form 56, Notice Concerning Fiduciary Relationship, with this form if not previously filed.

For a corporation, enter the name of the corporation followed by the signature and title of the officer(s) authorized to sign.

**Your Signature** ▶ ____________________ (Date)

**Spouse's Signature If A Joint Return Was Filed** ▶ ____________________ (Date)

**Taxpayer's Representative Sign Here** ▶ ____________________ (Date)

**Partnership/ Corporate Name** ▶ ____________________

**Partners/ Corporate Officers Sign Here** ▶ ____________________ (Title) (Date)

▶ ____________________ (Title) (Date)