IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| CONSOLIDATED EDISON COMPANY OF NEW YORK, INC. & SUBSIDIARIES, | ) | |
| Plaintiff, | ) | No. 06-305 T |
| v. | ) | Judge Marian Blank Horn |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

# JOINT STATUS REPORT

Pursuant to the September 26, 2006 Order of this Court, Consolidated Edison Company of New York, Inc. & Subsidiaries ("Con Edison") and the United States (collectively, "the parties") hereby file this Joint Status Report.

## A. Status of Discovery

1. Joint Statement of Discovery Activities and Timeline

a. In accordance with Rule of Court of Federal Claims ("RCFC") 26 and Appendix A thereto, the parties filed a Joint Status Report on September 11, 2006.

b. On September 25, 2006, the parties exchanged their initial Rule 26(a) disclosures.

c. On September 29, 2006, the United States served its First Set of Interrogatories and First Request for Production.

d. On October 13, 2006, after communications between the parties, pursuant to a request by Con Edison, the United States provided additional information regarding the individuals identified in the United States' Rule 26(a) disclosures.

e. On October 24, 2006, Con Edison served its First Set of Interrogatories, First Request for Production of Documents and First Requests for Admission.

f. On November 2, 2006, Con Edison timely served its responses to the United States' First Set of Interrogatories.

g. On November 3, 2006, Con Edison timely served its responses to the United States' First Request for production of documents.

h. On November 17, 2006, after communications between the parties, Con Edison served its First Supplement to its Rule 26(a) disclosures, naming an additional four individuals that it may rely upon to support its claims or defenses and identifying further documents that it may use to support its claims or defenses.

i. Also on November 17, 2006, after communications between the parties, Con Edison served its First Supplement to the United States' Request for Production of Documents, producing additional documents.

j. On December 1, 2006, the United States timely served its responses to Con Edison's First Set of Interrogatories, First Request for Production of Documents, and First Requests for Admission.

k. On December 1, 2006, in response to a written request by the United States, Con Edison reproduced documents in unredacted form that had initially been turned over with redactions. Con Edison's counsel represented that such redactions had

been made by Con Edison during the audit on the basis of relevance and the delay in production was attributable to the difficulty Con Edison had in locating unredacted copies of the documents.

l. On December 13, 2006, after communications between the parties, Con Edison served its Second Supplement to its Rule 26(a) disclosures and identified additional documents that it may rely upon to support its claims or defenses.

m. Also on December 13, 2006, after communications between the parties, Con Edison served its First Supplement to the United States' First Set of Interrogatories and its Second Supplement to the United States' Request for Production of Documents, as well as a revised privilege log.

n. Con Edison has, on January 5, 2007, after communications between the parties, further supplemented its responses to United States' First Set of Interrogatories.

o. The parties have exchanged numerous letters and conducted several telephone conferences regarding the appropriateness of each side's respective responses to the discovery requests served upon them, all in an effort to resolve the issues without the need for Court intervention. At this point it appears that the parties have been able to satisfactorily resolve some of those issues. However, several significant issues remain unresolved despite diligent effort by counsel for the parties, and these issues will be presented to the Court in the near future for resolution.

2. Pending Discovery Issues

*a. Con Edison's Pending Discovery Issues*

Con Edison intends to file a Motion to Compel regarding:

- the United States' responses to Con Edison' First Set of Interrogatories;
- the United States' responses to Con Edison's First Requests for Admission;
- the United States' privilege log; and
- the United States' response to Con Edison's Document Request No. 4.

*b. United States' Pending Discovery Issues*

The United States intends to file a Motion to Compel regarding:

- Con Edison's responses to United States' First Set of Interrogatories; and
- Con Edison's responses to United States' First Request for Production.

The United States also intends to file a Motion for a Protective Order with respect to Con Edison's Document Request No. 4.

3. Anticipated Additional Fact Discovery

*a. letters of request*

The United States has concluded that it needs documents and testimony from foreign entities that participated or assisted in the LILO transaction at issue. To obtain this information, the United States will file a motion with the Court in the coming week pursuant to RCFC 28(b), and in accordance with the Hague Convention of 18 March 1970 on the Taking of Evidence Abroad in Civil or Commercial Matters, requesting that the Court issue Letters of Request to The Netherlands, Germany and England.

*b. 30(b)(6) deposition*

The parties are in the process of coordinating the 30(b)(6) deposition of Con Edison, and expect that this deposition will occur this month.

*c. Third party subpoenas*

The United States will serve third party subpoenas on numerous entities that participated in the transaction at issue in the instant case.

*d. Depositions*

The United States will notice depositions of fact witnesses. Con Edison will notice depositions of certain individuals currently or formerly with the Internal Revenue Service who were identified in the United States' Rule 26(a) disclosures.

**B. Request For Enlargement of Discovery Period and Number of Depositions**

Given the status of the discovery as discussed above, the parties' substantial and sustained efforts to obtain discovery, that necessary discovery involves numerous third parties, some located outside the United States, and that certain issues regarding the scope of permissible discovery and privileges will be presented to the Court for resolution, the United States requested Con Edison's consent to enlarge the period for fact discovery by four (4) months and to increase the number of permitted depositions to thirty (30). Con Edison, although it does not anticipate needing either additional time or additional depositions, consented to the United States' request.

Assuming that the Court grants the request, the parties have agreed to the following revised discovery schedule:

| | |
|---|---|
| June 22, 2007 | Fact Discovery Closes |
| July 6, 2007 | Simultaneous Exchange of Expert Reports |

| | |
|---|---|
| August 3, 2007 | Simultaneous Exchange of Expert Rebuttal Reports |
| August 31, 2007 | Expert Discovery Closes |

If the Court feels it would be helpful, the parties request the scheduling of a status conference to discuss these matters further.

**C. Pending LILO Cases**

1. *BB&T Corporation v. United States*, Case No. 1:04-cv-00941-NCT (Middle District of North Carolina) (Summary Judgment was recently granted for the United States. A copy of the Memorandum Opinion entered on January 4, 2007 is attached.)

2. *UnionBanCal Corp. and Subsidiaries v. United States*, Case No. 06-587 ("*UnionBanCal*") (Court of Federal Claims)

3. *Fifth Third Bancorp v. United States*, No. 05-350 (S.D. Ohio)

4. *Altria Group, Inc. v. United States*, No. 06-9430-RJH (S.D.N.Y.)

**D. Possibility of Settlement**

As expressed in their previous status report, the settlement of this matter is unlikely. The parties, however, have agreed to keep the lines of communication open.

**E. Other Pertinent Matters**

For the United States - Given the discovery obtained to date, and the recent decision in *BB&T Corporation v. United States,* it appears more likely that the United States will file a motion for summary judgment in the instant case.

Con Edison currently believes that, in light of the significant factual issues in dispute, summary judgment will not be appropriate.

Respectfully submitted this 8th day of January, 2007.

January 8, 2007
Date

/s/ Thomas C. Durham
THOMAS C. DURHAM
Attorney of Record
MAYER, BROWN, ROWE & MAW LLP
71 South Wacker Dr.
Chicago, IL 60606
(312) 701-7216 (telephone)
(312) 706-9187 (facsimile)
Attorney for Plaintiff

January 8, 2007
Date

/s/ David S. Geier
DAVID N. GEIER
Attorney of Record
U.S. Department of Justice
Tax Division
Court of Federal Claims Section
Post Office Box 26
Ben Franklin Station
Washington, DC 20044
(202) 616-3448 (telephone)
(202) 307-0054 (facsimile)

EILEEN J. O'CONNOR
Assistant Attorney General
DAVE GUSTAFSON
Chief, Court of Federal Claims Section
STEVEN I. FRAHAM
Assistant Chief

January 8, 2007

/s/ Steven I. Frahm
Of Counsel
Attorneys for Defendant

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| BB&T CORPORATION, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | No. 1:04CV00941 |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |

MEMORANDUM OPINION

TILLEY, District Judge

This matter is before the Court on the parties' cross Motions for Summary Judgment [Docs. #36 and 38]. For the reasons discussed below, the United States of America's Motion for Summary Judgment [Doc. #36] is GRANTED, and Plaintiff BB&T Corporation's Motion for Summary Judgment [Doc. #38] is DENIED.

I.

This matter is an action pursuant to 26 U.S.C. § 7422 in which Plaintiff BB&T Corporation ("BB&T") seeks to recover funds allegedly overpaid when the Internal Revenue Service ("IRS") disallowed certain tax deductions associated with BB&T's participation in a Lease-In/Lease-Out ("LILO") transaction (the "Transaction") with Sodra Cell AB ("Sodra"), a Swedish company. The parties have entered into a stipulation regarding undisputed facts, and the parties have stipulated to the admissibility of numerous documents.

BB&T is a financial services company whose subsidiaries operate banking

offices throughout the southeastern United States. [Stip. Facts ¶¶ 1-3]. Sodra manufactures wood pulp and is one of the world's leading manufacturers of wood pulp for the open market. [Stip. Facts ¶¶ 19-20]. The Transaction at issue involves the lease and sublease of the pulp manufacturing equipment (the "Equipment") at one of Sodra's pulp-manufacturing facilities. [Stip. Facts ¶ 25].

At the time of the Transaction, Sodra used the Equipment to manufacture pulp continuously, seven days a week, all year round. [Stip. Facts ¶ 28]. In 1995 and 1997, Sodra made extensive improvements to the Equipment in order to increase production capacity and reduce emissions at a cost in excess of $125 million. [Stip. Facts ¶¶ 29-30]. From 1997 to 2001, Sodra made additional modifications to the Equipment at a cost in excess of $74 million. [Stip. Facts ¶ 32].

In or about May 1997, Craig Knight from Knight, Tallman & van Tol Capital Partners, L.L.C. ("KTV") solicited BB&T to participate in the Transaction. [Stip. Facts ¶ 32]. BB&T attended a presentation in which KTV described the Transaction as a "tax driven structure" and also described the "tax savings generated by the structure."[1] [Doc. #36, Ex. 10]. Prior to this presentation, BB&T

[1]BB&T has objected to the Court's consideration of certain presentation documents asserting that the documents constitute hearsay and that they "are simply preliminary presentations by outside advisors." [Doc. #44 at 15]. Under the Federal Rules of Evidence hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted" and is inadmissible. Fed. R. Evid. 801, 802. In this case, the KTV presentation materials are not offered to prove the

had not participated in any LILO transactions. [Stip. Facts ¶ 49].

After the KTV presentation, BB&T independently reviewed the terms of the Transaction. In particular, BB&T hired Deloitte and Touche LLP to prepare a report regarding the estimated value and useful life of the Equipment and the value of BB&T's interest in the Equipment at various points in time. [Stip. Fact ¶ 50]. BB&T personnel also drafted memoranda analyzing the Transaction. An internal BB&T memorandum described the Transaction as a "tax-driven deal" promising an after-tax yield "largely generated by the tax benefits association with accelerated tax deductions for rent" over the first five years. [Doc. #36, Ex. 11 and Ex. 15].

On June 30, 1997, Sodra and BB&T, through a trust, entered into the Transaction by executing a series of agreements. Essentially, the Transaction consists of a "Head Lease" in which BB&T acquired an undivided interest in the Equipment for a period of 36 years ending June 30, 2033 and an immediate shorter term sublease (the "Lease") of the undivided interest in the Equipment back to Sodra for a term of 15.5 years. [Stip. Facts ¶¶ 41-42].

The Head Lease required BB&T to pay rent to Sodra in two installments.

---

truth of the matter asserted in those materials, that is whether BB&T would in fact receive tax benefits and acceleration of accounting income on after tax cash flows by entering into the Transaction. Rather, the presentation materials are offered to show words used to describe the transaction as they may relate to BB&T's state of mind or motive for entering into the Transaction. United States v. Leake, 642 F.2d 715, 720-21 (4th Cir.1981) (concluding that an out-of-court statement was not hearsay because it was offered to show the effect of the statement on the defendant's state of mind and not to prove the truth of the matter asserted in the statement).

The first installment (the "initial Head Lease Payment"), approximately $86.2 million, was due on the closing date[2] and is allocated to the first five years of the Head Lease term. [Stip. Facts ¶ 69]. The second installment (the "Deferred Head Lease Payment") of approximately $557.8 million is due in 2038, five years after the expiration of the Head Lease term, and is allocated to the last 31.5 years of the Head Lease term. [Stip. Facts ¶ 69].

BB&T paid the Initial Head Lease Payment with $18,228,895 of its own funds plus $68,008,236 from a non-recourse loan from Hollandsche Bank-Unie N.V. ("HBU"). [Stip. Facts ¶ 76]. HBU is a wholly owned subsidiary of ABN-AMBRO Bank N.V. ("ABN"). [Stip. Facts ¶ 77]. On June 30, 1997, ABN, on behalf of HBU, transferred $68,008,236 (the funds representing the HBU loan) into BB&T's Trust (the "Trust") account at ABN. [Stip. Facts ¶ 80]. BB&T transferred $18,228,895 into the Trust account at ABN. [Stip. Facts ¶ 81]. Thus, at closing a total of $86,237,131 was deposited into the Trust account at ABN either by BB&T or on BB&T's behalf.

Also at closing, Sodra was required to pay $68,008,236 (an amount equal to the amount of the HBU loan that was deposited into the Trust account at ABN on behalf of BB&T) to ABN as "Debt PUA Issuer" under the Debt Payment Undertaking Agreement ("Debt PUA"). [Stip. Facts ¶ 82]. Under the Debt PUA,

---

[2]At closing, BB&T also paid fees associated with the transaction in the amount of approximately $5.5 million and also paid approximately $4 million to KTV as an advisory fee. KTV in turn paid a $1 million advisory fee to BB&T.

ABN is obligated to make certain payments to BB&T on Sodra's behalf. [Stip. Facts ¶ 89].

In addition to the $68,008,236 payment to the Debt PUA Issuer, Sodra was required to pay $12,000,193 to Fleet National Bank ("Fleet") as the "Equity PUA Issuer" under the Equity Payment Undertaking Agreement ("Equity PUA"). [Stip. Facts ¶ 82]. Under the Equity PUA, Fleet was required to use the $12,000,193 to purchase certain government securities. [Stip. Facts ¶¶ 105-107].

Sodra's Debt PUA and Equity PUA payments were made at closing as follows: (1) the Trust, on Sodra's behalf, made the $68,008,236 payment that Sodra was required to make to ABN as Debt PUA Issuer using proceeds of BB&T's first installment payment [Stip. Facts ¶ 83]; and (2), the Trust, on Sodra's behalf, made the $12,000,193 payment Sodra was required to make to the Equity PUA Issuer also using proceeds of BB&T's first installment payment. [Stip. Facts ¶ 84]. In sum, $86,237,131 was deposited into the Trust account at ABN either by BB&T or on BB&T's behalf. Of the total deposited by BB&T, $80,008,429 was paid on Sodra's behalf to the Equity PUA the Debt PUA, leaving a balance of $6,228,702, which the Trust transferred to Sodra's account at ABN. BB&T has described this $6 million payment as Sodra's "incentive for doing the deal." [Doc. #36, ex. 15 at 2].

Pursuant to the Lease, Sodra is required to make annual rent payments to BB&T. [Stip. Facts ¶ 86]. Sodra's rent payments are equal to BB&T's scheduled

loan payments to HBU, in both amount and timing, through January 1, 2012. [Stip. Facts ¶ 87]. In addition, BB&T's scheduled debt payments to HBU on the HBU loan,[3] and Sodra's annual rent payments to BB&T, are equal to the scheduled payments required by the Debt PUA, which obligates ABN to pay Sodra's rent during the Head Lease term directly to HBU, until January 1, 2012. [Stip. Facts ¶ 90]. The interest rate on the funds that Sodra paid to the Debt PUA Issuer is equal to the interest rate on the HBU loan. [Doc. #36, ex. 15 at 2]. Thus, the Debt PUA payments from ABN to its subsidiary HBU satisfy both Sodra's rental obligations to BB&T under the sublease and BB&T's obligations to HBU under the loan agreement. [Stip. Facts ¶¶ 93-95]. Finally, the Debt PUA obligates ABN to make a final payment of $11,542,500 in 2013, either to or for the benefit of Sodra, depending on which of the options at the end of the Lease are exercised by the parties. [Stip. Facts ¶¶ 122, 137, 144.]

At the end of the Lease term on January 1, 2013, Sodra can elect to purchase BB&T's remaining interest under the Head Lease for five payments totaling $46,856,927. [Stip. Facts. ¶¶ 117-19]. If Sodra exercises this Purchase

---

[3]In order to secure BB&T's obligation to satisfy the HBU loan, BB&T executed a Loan and Security Agreement under which BB&T assigned to HBU a lien on the Head Lease, the Lease, BB&T's right to receive rent from Sodra, and BB&T's right to receive payments pursuant to the Debt PUA. [Stip. Facts ¶ 91]. To that end, the Lease instructed Sodra to pay rent directly to HBU. [Stip. Facts ¶ 92]. The funds paid to the Equity PUA Issuer, which were used to purchase certain government securities, were specifically excluded as collateral under the Loan and Security Agreement. [Stip. Facts ¶ 115].

Option,[4] the final payment under the Debt PUA ($11,542,500) is applied toward the Purchase Option price, which will pay the HBU Loan in full. [Stip. Facts ¶ 122]. In addition, the Equity PUA Issuer will make the five payments due under the Equity PUA ($35,314,427). Thus, the Equity PUA payments and Debt PUA payments total the $46,856,927 needed to fund Sodra's purchase option. [Stip. Facts. ¶¶ 120-22]. If Sodra exercises the purchase option, BB&T will be relieved of its obligation to make the deferred Head Lease payment. [Stip. Facts ¶ 124].

If Sodra elects not to exercise the purchase option, BB&T can either (1) require Sodra to renew the Lease for a period of 13.3 years (the "Sublease Renewal"); (2) enter into a lease with a third party (the "Replacement Sublease"); or (3) take possession of the Equipment. [Stip. Facts ¶ 131]. In the event BB&T requires Sodra to renew the Lease, the funds remaining in the Debt PUA and the Equity PUA are enough to satisfy in full the rental payments of the extended sublease. [Doc. #36, ex. 15; see also Stip. Facts. ¶ 139]. If Sodra does not exercise the Purchase Option and BB&T does not require Sodra to renew the Lease, then the funds in the Equity PUA account will be transferred to Sodra. [Stip. Facts ¶ 142]. In addition, pursuant to the Return Option or the Replacement Lease Option, Sodra receives the final payment under the Debt PUA. [Stip. Facts. ¶¶ 143-44].

---

[4]In their report, Deloitte & Touche concluded that Sodra was more likely to return the Equipment to BB&T in 2013 than to exercise the purchase option, which would be funded in full by the funds in the Debt PUA and the Equity PUA.

Under any of these latter options, BB&T would remain obligated to make the $557.8 million deferred Head Lease payment in 2038, which BB&T explained to its Loan Policy Committee would be "ultimately offset by the Sublease Renewal or Replacement Sublease rents plus an implied interest rate." [Doc. #36, ex. 14 at 5]. In particular, at the beginning of the Sublease Renewal Term or Replacement Sublease Term, BB&T would pledge the Sublease Renewal rents or Replacement Sublease rents as collateral for its payment of the deferred Head Lease payment. [Id.] The parties structured the Transaction so that the Sublease Renewal rents or Replacement Sublease rents would grow at a predetermined rate so that by the time the Deferred Head Lease Payment becomes due, the value of those rents is equal to the Deferred Head Lease Payment and that "obligation is fulfilled with no additional funding requirement on the part of" BB&T. [Id.]. Moreover, even if the interest rates are not as the parties assumed and the sums BB&T has pledged as collateral do not total $557.8 million as of 2038, Sodra has no recourse against BB&T for any deficiency. [See Doc. #36, ex. 12 at sec. 16(b)(1)(c)]. Thus, BB&T is not required to expend any additional funds, other than its initial investment in the Transaction, in order to make the Deferred Head Lease payment.

Sodra was also required to set up a long term Letter of Credit "for the protection of BB&T in case something happens to cause the transaction to 'unwind early.'" [Doc. #36, ex. 15 at 2]. BB&T understood that while the "LOC value changes over time, [it] is always in an amount large enough that when added to

the securities [purchased pursuant to the Equity PUA] and paid to BB&T, would make us whole including the required yield." [Doc. #36, ex. 15 at 2].

Pursuant to a Tax Indemnity Agreement, Sodra agreed that for United States federal income tax purposes, neither it, nor any of its personnel, would take a position inconsistent with the characterization of Sodra as the owner, head lessor, and lessee of the Equipment. [Stip. Facts ¶ 53].

On June 3, 1996, prior to the closing date of the Transaction, the IRS issued proposed rules pursuant to Section 467 of the Internal Revenue Code. [Stip. Facts ¶ 154]. These proposed rules were adopted as final regulations on May 18, 1999. [Stip. Facts ¶ 156]. As a result of these final regulations, BB&T did not participate in any other LILO transactions after April 1, 1999. [Stip. Facts ¶ 157].

BB&T reported the following items of income on its 1997 federal income tax return with respect to the Transaction: (1) rent from Sodra in the amount of $3,381,518 and (2) amortization of an advisory fee it received from KTV in the amount of $55,120. BB&T claimed the following deductions on its 1997 federal income tax return associated with the Transaction: (1) rent to Sodra in the amount of $9,894,362; (2) interest expense in the amount of $2,820,925; and (3) amortization of the fees and expenses paid in connection with the Transaction in the amount of $137,943. Upon audit of BB&T's 1997 federal income tax return, the IRS disregarded the income and disallowed the deductions associated with the Transaction resulting in an increase of $9,416,592 in BB&T's taxable income for

1997. BB&T paid a deficiency for 1997 in the amount of $3,295,807 plus $1,296,861 in interest for a total of $4,592,668. BB&T filed a claim for refund, which the IRS denied. BB&T filed the instant action for refund of the deficiency and interest. Both parties filed motions for summary judgment.

The parties have not cited, nor has the Court located, any decisions discussing income tax deductions associated with LILO transactions. Thus, the propriety of BB&T's deductions associated with the Transaction is an issue of first impression.

II.

Summary judgment is proper only when, viewing the facts in the light most favorable to the non-moving party, there is no genuine issue of any material fact, and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(e); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Cox v. County of Prince William, 249 F.3d 295, 299 (4th Cir. 2001). An issue is genuine if a reasonable jury, based on the evidence, could find in favor of the non-moving party. Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986); Cox, 249 F.3d at 299. There is no genuine issue of material fact if the nonmoving party fails to make a sufficient showing on an essential element of its case as to which it would have the burden of proof at trial. Celotex, 477 U.S. at 322-23. In essence, the summary judgment analysis concerns "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one

party must prevail as a matter of law." Anderson, 477 U.S. at 251-52; O'Connor v. Consol. Coin Caterers Corp., 56 F.3d 542, 545 (4th Cir.1995).

III.

The Supreme Court has long held that "an income tax deduction is a matter of legislative grace and that the burden of clearly showing the right to the claimed deduction is on the taxpayer." Interstate Transit Lines v. Comm'r, 319 U.S. 590, 593 (1943). Moreover, deductions are strictly construed and allowed only "as there is a clear provision therefor." New Colonial Ice Co. v. Helvering, 292 U.S. 435, 440 (1934). In determining whether a particular deduction should be allowed, courts must be mindful that "[t]he legal right of a taxpayer to decrease the amount of what otherwise would be his taxes, or altogether avoid them, by means which the law permits, cannot be doubted. But the question for determination is whether what was done, apart from the tax motive, was the thing which the statute intended." Gregory v. Helvering, 293 U.S. 465, 469 (1935). Thus, the question in this case is whether BB&T has clearly shown that its claimed deductions are what the applicable Internal Revenue Code statutes intended.

A.

The parties agree it is a central tenet of income tax law that the substance of a transaction, rather than its form, governs for tax purposes. Frank Lyon Co. v. United States, 435 U.S. 561, 572-73 (1978). The substance over form doctrine recognizes that the "incidence of taxation depends upon the substance of the

transaction . . . . To permit the true nature of a transaction to be disguised by mere formalisms, which exist solely to alter tax liabilities, would seriously impair the effective administration of the tax policies of Congress." Comm'r v. Court Holding Co., 324 U.S. 331, 334 (1945). As the Fourth Circuit has explained the doctrine: "Because substance takes precedence over form in tax law, however, we cannot permit the parties' chosen language to control the tax consequences of their transaction." Halle v. Comm'r, 83 F.3d 649, 655 (4th Cir. 1996).

Sodra and BB&T selected the form of a lease and immediate sublease, also referred to as a LILO, for the Transaction. As a result of this form selected by the parties, BB&T claimed a substantial rent deduction and deductions for fees associated with the Transaction on its 1997 income taxes. The question, however, is whether this form should be respected for tax purposes.

1.

The parties agree that in order for BB&T to be entitled to deduct rent and other expenses associated with the Head Lease, it is necessary for BB&T to have acquired a leasehold interest in the Equipment. The Government asserts that "Sodra continues to use the pulp-making equipment as before" and concludes that "Sodra never conveyed to BB&T a real leasehold interest in its property, and BB&T is not entitled to the tax deductions it claims." [Doc. # 36, at 14]. BB&T, on the other hand, asserts that Sodra's use of the Equipment was altered by the Transaction in that Sodra was required to pay rent to use the equipment and that

Sodra assumed several new obligations regarding the Equipment such as "maintaining and operating the Equipment consistently with certain standards, holding a specified amount of insurance, and filing certain reports." [Doc. #44, at 11].

The undisputed facts relevant to this inquiry are as follows: (1) Prior to the Closing Date, Sodra operated the Equipment in the normal course of its pulp-manufacturing business. [Stip. Facts ¶ 54]; (2) Prior to the Closing Date, Sodra was responsible for all costs associated with the Equipment's use and maintenance. [Stip. Facts ¶ 55]; (3) Pursuant to the Head Lease, during the Head Lease term, BB&T is entitled to sole possession of the Equipment, subject to Sodra's right to an annual inspection, is entitled to operate the Equipment until the end of the Head Lease Term, is required to use, operate, maintain, service, repair, and overhaul the Equipment, is responsible for all costs related to the use and maintenance of the Equipment, and is entitled to retain all profits from its use of the Equipment. [Stip. Facts ¶¶ 56-60]; (4) Pursuant to the Lease, during the Lease term, Sodra is entitled to sole possession of the Equipment, subject to BB&T's right to an annual inspection, is entitled to operate the Equipment until the end of the Head Lease Term, is required to use, operate, maintain, service, repair, and overhaul the Equipment, is responsible for all costs related to the use and maintenance of the Equipment, and is entitled to retain all profits from its use of the Equipment. [Stip. Facts ¶¶ 56-60]; (5) The combined effect of the Head Lease

and Lease is that BB&T does not have the right to possess the Equipment (apart from its right to make an annual inspection) and does not have the right to use the Equipment (except by leasing it to Sodra) until the end of the Lease term, the occurrence of a Lease default, or early termination of the Lease. [Stip. Facts ¶¶ 67-68; (6) Between 1995 and 2001, Sodra has invested approximately $199.6 million in improvements and modifications to the Equipment [Stip. Facts ¶¶ 30-31].

Where a conveyance of property is accompanied by retention of the same interest in the property, only a future interest in the property is conveyed. Ashlock v. Comm'r, 18 T.C. 405 (1952); Alstores Realty Corp. v. Comm'r, 46 T.C. 363, 371 (1966); see also Kruesel v. United States, 12 A.F.T.R. 2d 5701, 5704-05 (D. Minn. 1963) (considering whether the taxpayers had sold their entire "bundle of rights" in property and concluding that taxpayers had reserved a life estate.)

In Ashlock, a property owner sold certain property but retained possession and the right to receive rents for approximately two additional years. Ashlock, 18 T.C. at 407. The issue before the court was whether the rents constituted taxable income. The court found that the taxpayer had acquired only a future interest in the property because "the [sellers] not only retained the rents legally but they also retained control and benefits of ownership." Id. at 411. In particular, the Ashlock court noted that the sellers agreed to pay property taxes, insurance premiums, normal maintenance and expenses. Id. Moreover, in the event the property was damaged or destroyed, the loss would be borne by the sellers during the two year

period. Id. Ashlock was decided on the basis of substance over form: "taxation is not so much concerned with the refinements of title as it is with actual command over the property taxed - the actual benefit for which the tax is paid." Ashlock, 18 T.C. at 411 (quoting Corliss v. Bowers, 281 U.S. 376, 378 1930).

In Alstores Realty, on the other hand, the court rejected the taxpayer-buyer's argument (based on Ashlock) that "although in form there may have been a sale and leaseback, in substance, there was a conveyance of a future interest" where the seller "retained its right to occupancy not as a lessee . . . but as a legal owner of a reserved term for years." Alstores, 46 T.C. at 371. The Alstores court, analyzing similar factors to those considered in Ashlock, concluded that the buyer in Alstores (unlike the buyer in Ashlock) had agreed to pay for heat, electricity, and water for the seller-tenant. Id. at 372. In addition, the buyer, rather than the seller, bore the risk or burden in the event the property was damaged or destroyed. Ultimately, the court rejected the taxpayer-buyer's argument and concluded that "the buyer bore the risks and burdens of ownership" and was the legal owner for tax purposes. Id.

According to the form established by the parties, Sodra purported to lease the right to use and possess the Equipment to BB&T and immediately sublease back from BB&T the same rights to use and possess the Equipment. In this case, Sodra (as did the seller in Ashlock) retained in substance, at least for the term of the Lease, its rights of use and possession as the legal owner of the Equipment.

Indeed, as the stipulated facts make clear, the rights that Sodra purportedly transferred to BB&T under the Head Lease are identical to the rights that BB&T purportedly transferred back to Sodra under the Lease. [Compare Stip. Facts ¶¶ 56-60 with ¶¶ 62-66; see Stip Facts ¶¶67-68 ].

In substance, Sodra's use and possession of the Equipment was unaltered by the Transaction (but for BB&T's annual right of inspection). In particular, Sodra used, maintained, and serviced the Equipment as it did before the Transaction and even made significant investments in and improvements to the Equipment. In addition, Sodra was entitled to all of the profits generated from the use of the Equipment during the term of the Lease. Moreover, although the form of the transaction required Sodra to make rent payments to BB&T, those payments were in fact made by the Debt PUA, were funded in full by BB&T's Initial Head Lease Payment, and did not require Sodra to invest any of its own funds.

BB&T also asserts that Sodra was required to assume additional obligations as a result of the Lease. In support of this assertion, BB&T has cited sections 15(g) and 16(a) of Exhibit 12 to Doc. #36, which is the Head Lease document. Exhibit 12 does not contain a section labeled 15(g), and section 16(a) creates BB&T's duty to provide acceptable collateral to secure BB&T's obligation to make the Deferred Head Lease Payment. Upon review of the Lease, which is Exhibit 13 to Document #36, it appears that BB&T may have been attempting to refer to sections 5(g) and 6(a) of Exhibit 13. Section 5(g) of the Lease requires Sodra to

prepare certain reports associated with Governmental Actions that must be filed with any Governmental Authority. Section 6(a) of the Lease provides that Sodra must maintain insurance on the Equipment. There is no indication in the record that either these government reports or the requirement of insurance were obligations unique to the Lease and not borne by Sodra prior to execution of the Lease.

In addition, BB&T asserts that it acquired a leasehold interest in the Equipment because in the event Sodra elects not to exercise the purchase option and BB&T compels Sodra to execute an additional sublease, then the Equipment would be returned to BB&T with nine years remaining in the Head Lease and BB&T will "bear an unlimited risk of loss" on that leasehold interest. [Doc. #44, at 15]; Thomas v. Comm'r, 84 T.C. 412, 435 (1985) (considering whether taxpayer bore the risk of losing its investment in computer equipment).

The Thomas court noted that the taxpayer "bore the risk at the end of the leases that the residual value would not be sufficient to recoup its cash outlay." 84 T.C. at 435. Here, however, the Transaction was structured so that there was no risk to BB&T's initial (and only) cash outlay. Of the $18,228,895 million that BB&T initially transferred into the Trust account at ABN, $12,000,193 was paid to the Equity PUA to purchase certain government securities. The remainder of BB&T's equity investment, $6,228,702, was transferred to Sodra's account at ABN as Sodra's "incentive for doing the deal." [Doc. #36, ex. 15 at 2]. In the

event Sodra exercises the purchase option, the funds in the Equity PUA will be returned to BB&T through the payment of the purchase price. In the event Sodra does not exercise the purchase option and BB&T enforces the Sublease Renewal provision, the funds in the Equity PUA will be returned to BB&T through the Sublease Renewal rents. Moreover, BB&T's own internal documents note that Sodra's Letter of Credit requirement added to BB&T's security that its initial investment, *and* anticipated after-tax yield, would be protected from loss at all times. [Doc. #36, ex. 15, at 2].

In sum, because Sodra retained, in substance, all of the rights it possessed in the Equipment, at least for the term of the Lease, BB&T could not have acquired any of those rights during the term of the Lease. Rather, BB&T could acquire only a future interest in the Equipment that will mature at the end of the Lease term and then only in the event Sodra elects not to exercise its option (funded in full by the Equity PUA and the Debt PUA) to buyout BB&T's interest in the Head Lease. BB&T's payments to Sodra are not "rent payments." The fact that BB&T did not acquire a current leasehold interest in the Equipment is further demonstrated by the fact that BB&T bore no real risk of loss of its initial investment in the Transaction.

2.

The Government also asserts that the Head Lease and Lease should be disregarded or collapsed asserting that when parties have established two or more separate transactions that create offsetting obligations in order to generate tax

savings, courts have collapsed these offsetting obligations and recharacterized the transactions into a single transaction. Rogers v. United States, 281 F.3d 1108 (10th Cir. 2002) (recharacterizing purported loan and stock option transaction into a sale/redemption of stock in exchange for cash); United States v. Ingalls, 399 F, 2d 143, 145-46 (5th Cir. 1968) (disregarding offsetting installment obligations that could be accomplished through a simple bookkeeping entry); Big "D" Development Corp. v. Comm'r, T.C. Memo 1971-148 (1971), aff'd 453 F.2d 1365 (5th Cir. 1972) (disregarding series of bookkeeping entries intended to qualify land sale transaction at issue for installment method of reporting income).

The Government asserts the following facts demonstrate that the Head Lease and Lease, as well as the myriad (and circular) financing agreements, essentially create offsetting obligations for Sodra and BB&T. Specifically: (1) Pursuant to the "Head Lease" BB&T acquired an undivided interest in the Equipment for a period of 36 years [Stip. Fact ¶ 41]; (2) Pursuant to the Lease, Sodra immediately acquired the same undivided interest in the Equipment a term of 15.5 years. [Stip. Fact ¶ 42]; (3) The Debt PUA payments satisfy both Sodra's rental obligations to BB&T under the sublease and BB&T's obligations to HBU under the loan agreement. [Stip. Facts ¶¶ 93-95]; (4) The interest rate on the funds that Sodra paid to the Debt PUA Issuer is equal to the interest rate on the HBU loan. [Doc. #36, ex. 15 at 2]; (5) Sodra's purchase option at the end of the Lease term is funded entirely from the Debt PUA and the Equity PUA. [Stip. Facts.

¶¶ 120-22]; (6) In the event Sodra does not exercise the purchase option and BB&T requires Sodra to renew the Lease, the funds remaining in the Debt PUA and the Equity PUA are enough to satisfy in full the rental payments of the extended sublease. [Doc. #36, ex. 15; see also Stip. Facts. ¶ 139]; (7) If Sodra does not exercise the purchase option and BB&T remains obligated to make the $557.8 million deferred Head Lease payment in 2038, which would be "ultimately offset by the Sublease Renewal or Replacement Sublease rents plus an implied interest rate." [Doc. #36, ex. 14 at 5]. In sum, the Government concludes that these reciprocal obligations, which were designed to create significant tax savings, should be collapsed to reflect the true substance of the transaction – BB&T's payment of transaction costs and its investment in the government securities purchased by Fleet pursuant to the Equity PUA.

BB&T asserts the Government has mischaracterized the facts regarding the Transaction. In support of its arguments, however, BB&T relies upon the closing documents themselves, and in so doing, elevates form over substance. For example, in response to the Government's claim that the Lease rent payments are made "at no cost" to Sodra, BB&T cites the $68 million that Sodra was required to pay pursuant to the Debt PUA. [Doc. #44, at 6 ("Since Sodra paid $68 million for the Debt PUA, the payment of its rental obligations pursuant to the Debt PUA cannot possibly be described as 'at no cost' to Sodra.")]. In substance, however, Sodra was not required to expend any of its own funds. Rather, the funds for

Sodra's $68 million payment were provided by HBU to a trust account at ABN and the Trust made a $68,008,236 payment, on behalf of Sodra, to ABN as the Debt PUA Issuer. [Stip Facts ¶¶ 80-83].

Similarly, in challenging the Government's contention that the $557.8 million head lease payment is only "theoretically due," BB&T refers to portions of the Head Lease discussing the logistics of the Deferred Head Lease payment. While the form of the Transaction may require BB&T to make a Deferred Head Lease Payment in the amount of $557.8 million, in substance the Sublease Renewal rents or Replacement Sublease rents would grow at a predetermined rate so that by the time the Deferred Head Lease Payment becomes due, the value of those rents would be equal to the Deferred Head Lease Payment. Thus, in substance, BB&T is not required to expend any additional funds, other than its initial investment in the Transaction, in order to make the Deferred Head Lease payment.

When these offsetting and reciprocal obligations are disregarded, it is clear that BB&T and Sodra did not enter into a lease and sublease of the Equipment. Under the form selected by the parties, Sodra purportedly leased its right to use and possess the Equipment to BB&T under the Head Lease. BB&T's right to use and possess the Equipment under the Head Lease is offset by Sodra's right to use and possess the Equipment under the Lease. Sodra's rental payments under the Lease are equal in timing and amount to BB&T's debt servicing payments to HBU. If Sodra elects to purchase BB&T's interest in the Head Lease at the end of the

Lease term, the purchase price will be funded in full by the Equity PUA and the Debt PUA. If Sodra elects not to exercise the purchase option, BB&T's Deferred Head Lease payment will be funded in full (and if not completely funded will be no-recourse to BB&T) by the Sublease Renewal Rent or Sublease Replacement Rent. Once these obligations are disregarded, all that remains is BB&T's payment of transaction costs and investment in government securities purchased by the Equity PUA.

3.

BB&T did not acquire a current leasehold interest in the Equipment. When the substance of the Transaction, and not its form, is considered, BB&T acquired only a future interest in the right to use and possess the Equipment. Moreover, when the reciprocal and offsetting obligations of the Transaction are disregarded, it becomes clear that BB&T paid transaction costs and invested in government securities purchased through the Equity PUA. As such, BB&T was not entitled to deduct rent and other transaction costs on its 1997 income taxes. The Government's Motion for Summary Judgment on the propriety of the rent and expense deductions is GRANTED.

B.

Section 163(a) of the Internal Revenue Code provides generally for the deductibility of interest: "There shall be allowed as a deduction all interest paid or accrued within the taxable year on indebtedness." 26 U.S.C. § 163(a). It is well

established that "deductible interest can only accrue on *genuine* indebtedness." Halle v. Comm'r, 83 F.3d 649, 655 (4th Cir. 1996). The term "'interest on indebtedness' means compensation for the use or forbearance of money." Deputy v. du Pont, 308 U.S. 488, 498 (1940). In determining whether a loan transaction involves genuine indebtedness, courts "must look beyond the parties' terminology to the 'substance and economic realities'" of the transaction. Halle, 83 F.3d at 655.

In this case, the stipulated facts relevant to the section 163(a) deduction are as follows: (1) BB&T paid the advance Head Lease payment, in part, with the proceeds of a non-recourse loan from HBU in the amount of $68,008,236 [Stip. Facts ¶ 76]; (2) At closing, ABN, "on behalf of HBU," transferred $68,008,236 to BB&T's Trust account at ABN [Stip. Facts ¶ 80]; (3) At closing, the Trust made a $68,008,236 payment, on behalf of Sodra, to ABN as the Debt PUA Issuer [Stip. Facts ¶¶ 82-83]; (4) During the Basic Lease Term, BB&T's scheduled debt payments to HBU and Sodra's annual rent payments to BB&T are equal to the scheduled payments required by the Debt PUA [Stip. Facts ¶ 90]; (5) During the basic lease term, the Debt PUA payments will satisfy both Sodra's rent to BB&T and BB&T's debt service payments (including principal and interest) to HBU in full [Stip. Facts ¶¶ 93-95]; and (6) on its 1997 federal income tax return, BB&T claimed an interest expense deduction in the amount of $2,820,925 [Stip. Facts. ¶ 159].

When the intermediate payment steps are disregarded, which must be done in order to consider the substance of the loan transaction and not the form selected by the parties, it becomes clear that the loan transaction is only a circular transfer of funds in which the HBU loan is paid from the proceeds of the loan itself. There was no money lent to BB&T in a substantive sense, and the HBU loan does not reflect genuine indebtedness. See Felcyn v. United States, 691 F. Supp. 205, 212 (C.D. Cal. 1988) (finding taxpayer was not entitled to section 163(a) deduction where interest purportedly paid on the "loan" at issue was "simply part[ ] of a circularization of funds which do not amount a loan").

For interest to accrue, at least within the meaning of section 163(a), there must be an underlying indebtedness requiring an "unconditional and legally enforceable obligation for the payment of money." Autenreith v. Comm'r, 115 F.2d 856, 858 (3d Cir.1940), aff'g 41 B.T.A. 319 (1940). In this case, although the loan documents – the form selected by the parties – may provide that BB&T has a legal obligation to repay the loan, the transaction in fact – the substance – does not actually require BB&T to pay any money to HBU. As noted above, through the circular nature of the transaction, BB&T's purported principal and interest payments are actually paid from the proceeds of the loan itself. In fact, after the closing in June 1997, BB&T was not required to provide any additional funds over the life of the loan. As such, BB&T's purported interest payments cannot be what Congress intended to allow as an income tax deduction. See

Hines v. U. S., 912 F.2d 736, 741 (4th Cir. 1990) ("The lease and debt payments between the [parties] were structured to be offsetting. The circularity meant that the transaction became self-sustaining after the payments at closing with virtually no further financial input necessary from any of the parties."); Bridges v. Comm'r, 39 T.C. 1064, 1077, aff'd 325 F.2d 180 (4th Cir. 1963) (noting that transaction as structured by the parties created a situation where "there was no reason to think that [the taxpayer] would have been called upon to pay the note out of his own funds or to put up additional collateral" and concluding that the transaction at issue "merely provided the facade of a loan").

Moreover, even if ABN were to become bankrupt and be unable to make the required payments under the Debt PUA, BB&T still would not be required to make any payments to HBU. First, it must be noted that BB&T required a particular credit rating for ABN as the Debt PUA as assurance that the possibility of such a bankruptcy was remote. In addition, as BB&T internal documents make clear, even if the Debt PUA issuer failed, BB&T would not need to advance any additional funds: "If the Issuer fails, Sodra is still obligated for the rental payments and the rental payments will be used by BB&T to retire the debt. However, if Sodra is unable to make rental payments, the loan is non-recourse to BB&T." [Doc. #36, ex. 14 at 26].

Section 163(a) was intended to create a deduction for interest paid or accrued on indebtedness. Here, the purported loan from HBU to BB&T does not

constitute genuine indebtedness. Despite the form of the Loan and Security Agreement, in substance, BB&T was not required to make any payments to HBU. Rather, the debt service payments were made from the proceeds of the loan itself. BB&T has not established that it was entitled to an interest deduction pursuant to section 163(a). The Government's Motion for Summary Judgment on the interest deductions is GRANTED.

IV.

In conclusion, the United States of America's Motion for Summary Judgment [Doc. #36] is GRANTED. Therefore, Plaintiff BB&T Corporation's Motion for Summary Judgment [Doc. #38] is DENIED, and BB&T's Motion to Preclude Expert Testimony [Doc. #61] is DENIED as MOOT.

This the day of January 4, 2007

/s/ N. Carlton Tilley, Jr.
United States District Judge