**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **CONSOLIDATED EDISON COMPANY OF NEW YORK, INC. & SUBSIDIARIES,** | ) | |
| **Plaintiff,** | ) | **No. 06-305 T** |
| **v.** | ) | **Judge Marian Blank Horn** |
| **THE UNITED STATES,** | ) | |
| **Defendant.** | ) | |

**PLAINTIFF'S MOTION FOR PROTECTIVE ORDER**

The Plaintiff, Consolidated Edison Company of New York, Inc. ("Con Edison NY"), hereby moves this Court, pursuant to Rule of Court of Federal Claims 26(b)(2)(iii) and (c), for a protective order limiting the scope of discovery sought by the Defendant, the United States, from third parties. The United States has issued 14 subpoenas instructing third parties to produce information which is irrelevant to the claims and defenses at issue in the tax refund proceeding commenced by Con Edison NY. In particular, the United States seeks over 1.5 million pages of documents concerning more than 60 transactions in which Con Edison NY did not participate. The production of the documents requested in the third party subpoenas, if permitted, will impose a substantial burden, expense, and delay upon the Court, Con Edison NY, and the third parties.

The 14 third party subpoenas were issued in violation of the rules of this Court in at least three respects:

(a) the subpoenas were not issued in compliance with Rule 45(c)(1), which requires that a party or an attorney responsible for issuing a subpoena "take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena;"

(b) the subpoenas request information that is not "relevant to the claim or defense of any party," in violation of Rule 26(b)(1); and

(c) the subpoenas are not in compliance with the limitations set forth in Rule 26(b)(2)(iii), in that the burden and expense of the proposed discovery outweighs its likely benefit.

For these reasons, the Plaintiff is entitled to a protective order which prohibits the discovery of transactions which are not relevant to the parties' claims and defenses in the tax refund proceeding pending before this Court. Specifically, Con Edison NY seeks a protective order limiting discovery to communications by the third parties with Con Edison NY and/or its advisors with respect to lease-in, lease-out transactions during 1997 and 1998.

Con Edison NY has conferred in good faith, pursuant to Rule 26(c), with the United States regarding this Motion for Protective Order, and the parties were not able to reach an agreement regarding the scope of third party discovery.

A Memorandum in Support of Plaintiff's Motion for Protective Order, setting forth the facts relevant to this Motion, the burden and delay imposed by the United States' requests for irrelevant information, and the legal authority in support of Con Edison's Motion for Protective Order, is attached.

Respectfully submitted this 8th day of March, 2007.

/s/ Thomas C. Durham
Thomas C. Durham
MAYER, BROWN, ROWE & MAW LLP
71 South Wacker Drive
Chicago, Illinois 60606
Tel: (312) 701-7216
Fax: (312) 706-9187
tdurham@mayerbrownrowe.com

Attorney for Plaintiff

# CERTIFICATE OF SERVICE

I, Thomas C. Durham, hereby certify that on this 8th day of March, 2007, I electronically filed the foregoing **Motion for Protective Order**, **Memorandum in Support** thereof, and **Affidavit of Thomas C. Durham** using the CM/ECF system, which will send notification of such filing to counsel of record in this matter who are registered on the CM/ECF system, including counsel for the United States of America identified below:

David N. Geier
U.S. Department of Justice
Tax Division, Room 7919
555 Fourth Street, N.W.
Washington, D.C. 20001

/s/ Thomas C. Durham
Thomas C. Durham
MAYER, BROWN, ROWE & MAW LLP
71 South Wacker Drive
Chicago, Illinois 60606
Tel: (312) 701-7216
Fax: (312) 706-9187
tdurham@mayerbrownrowe.com

Attorney for Plaintiff

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **CONSOLIDATED EDISON COMPANY OF NEW YORK, INC. & SUBSIDIARIES,** | ) | |
| **Plaintiff,** | ) | **No. 06-305 T** |
| **v.** | ) | **Judge Marian Blank Horn** |
| **THE UNITED STATES,** | ) | |
| **Defendant.** | ) | |

**MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION FOR PROTECTIVE ORDER**

Thomas C. Durham
MAYER, BROWN, ROWE & MAW LLP
71 South Wacker Drive
Chicago, Illinois 60606
Tel: (312) 701-7216
Fax: (312) 706-9187
tdurham@mayerbrownrowe.com

Attorney for Plaintiff

## TABLE OF CONTENTS


Page

TABLE OF AUTHORITIES ..... iii

I. CON EDISON NY'S BUSINESS AND THE LEASING TRANSACTION AT ISSUE ..... 3

II. THE UNITED STATES' REQUESTED DISCOVERY ..... 7

A. The Capstar Subpoena ..... 8

B. The PricewaterhouseCoopers LP Subpoena ..... 9

C. The Bayerische Landesbank Subpoena ..... 10

D. The Areva NP, Inc. Subpoena ..... 11

E. The Credit Suisse Subpoenas ..... 11

F. The Cornerstone Subpoena ..... 12

G. The ABN Subpoenas ..... 12

H. The Banc One Subpoena ..... 12

I. The Mitchell & Titus Subpoena ..... 13

ARGUMENT ..... 14

A. THE DISCOVERY REQUESTED BY THE UNITED STATES DOES NOT SATISFY THE RELEVANCE STANDARD OF RCFC 26(b)(1) ..... 14

1. All Discovery is Subject to the Relevance Standard of RCFC 26(b)(1) ..... 14

2. The Third Party Subpoenas Do Not Seek Information Relevant to the Parties' Claims or Defenses ..... 16

B. THE DISCOVERY REQUESTED BY THE UNITED STATES IS PROHIBITED BY RCFC 26(b)(2)(iii) ..... 19

C. THE COURT'S DECISION IN JADE TRADING IS DISTINGUISHABLE ..... 22

CONCLUSION ..... 26

# TABLE OF AUTHORITIES

Page

Cases

*Allen v. Howmedica Leibinger*, 190 F.R.D. 518 (W.D. Tenn. 1999) .......... 16

*American International Specialty Lines Ins. Co. v. NWI-I, Inc.*, __ F.R.D. __, 2007 WL 98312, *11 (N.D. Ill. Jan 16, 2007) .......... 20

*Bondi v. Grant Thornton Int.*, 2006 WL 2088193, *1 (S.D.N.Y. 2006) .......... 20

*Crawford-El v. Britton*, 523 U.S. 574 (1998) .......... 14

*During v. City University of New York*, 2006 WL 2192843, *2 (S.D.N.Y. 2006) .......... 14, 19

*EEOC v. Renaissance III Organization*, 2006 WL 832504 (N.D. Tex. 2006) .......... 21

*Food Lion, Incorporated v. United Food and Commercial Workers International Union*, 103 F.3d 1007 (D.C. Cir. 1996) .......... 17, 18, 26

*Frank Lyon Company v. United States*, 435 U.S. 561 (1978) .......... 26

*Gefen v. Commissioner*, 87 T.C. 1471 (1986) .......... 25

*Hickman v. Taylor*, 329 U.S. 495 (1947) .......... 14

*In re PE Corp. Secs. Litig.*, 221 F.R.D. 20 (D. Conn. 2003) .......... 15

*In Re: Sealed Case (Medical Records)*, 381 F.3d 1205 (D.C. Cir. 2004) .......... 19

*Jade Trading, LLC v. United States*, 65 Fed. Cl. 188 (2005) .......... passim

*Johnson v. United States*, 11 Cl. Ct. 17 (1986) .......... passim

*Katz v. Batavia Marine*, 984 F.2d 422 (Fed. Cir. 1993) .......... 21

*Koch v. Koch Industries, Inc.*, 203 F.3d 1202 (10th Cir. 2002) .......... 20, 21

*Micro Motion, Inc. v. Kane Steel Co., Inc.*, 894 F.2d 1318 (Fed. Cir. 1990) .......... passim

*Quadrant EPP USA v. Menasha Corp.*, 2007 WL 320286, *2 (E.D.Pa. 2007) .......... 21

*Ricotta v. Allstate Insurance Company*, 211 F.R.D. 622 (S.D. Cal. 2002) .......... 17

*Syposs v. United States*, 181 F.R.D. 224 (W.D.N.Y. 1998) .......... 14

*Wiginton v. CB Richard Ellis, Inc.*, 229 F.R.D. 568 (ND. Ill. 2004) .......... 20

Statutes

I.R.C. section 6111 .......... 8

Rules of the Court of Federal Claims

Rule 26(b) .......... 21

Rule 26(b)(1) .......... passim

Rule 26(b)(2) .......... passim

Rule 26(c) .......... 1, 3, 15

Rule 45 .......... 1, 2, 3, 14

Rule 45(b)(1) .......... 7, 8

Rule 45(c)(1) .......... 3

Federal Rules of Civil Procedure

Rule 26 .......... 14, 15, 19, 20

Rule 26(b)(1) .......... 14, 19

Rule 26(b)(2) .......... 14, 19, 20, 22

Rule 26(c) .......... 19

Other

Committee Notes on Rules - 2000 Amendment (FRCP Rule 26) ........ 19

Committee Notes on Rules - 2006 Amendment (FRCP Rule 26) ........ 14

Federal Transit Administration, *Innovative Financing Techniques for America's Transit Systems* (Sept. 1998); available at www.fta.dot.gov/printer_friendly/planning_environment_3450.html ........ 8

JAMES WM. MOORE, MOORE'S FEDERAL PRACTICE ........ 14, 15, 19

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **CONSOLIDATED EDISON COMPANY OF NEW YORK, INC. & SUBSIDIARIES,** | ) | |
| **Plaintiff,** | ) | **No. 06-305 T** |
| **v.** | ) | |
| **THE UNITED STATES,** | ) | |
| **Defendant.** | ) | |

**MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION FOR PROTECTIVE ORDER**

The Plaintiff, Consolidated Edison Company of New York, Inc. ("Con Edison NY") respectively submits this Memorandum in Support of its Motion for Protective Order pursuant to Rule 26(c) of the Rules of the Court of Federal Claims ("RCFC"). Con Edison NY has filed its Motion for Protective Order because the third party discovery currently being sought by the Defendant, the United States, is irrelevant to the claims and defenses involved in this case and will impose an undue burden on this Court, Con Edison NY, and the third parties. This Memorandum is filed in support of that Motion.

The United States has issued 14 subpoenas to third parties pursuant to RCFC 45 ("Third Party Subpoenas"). These subpoenas request information concerning more than sixty transactions which have absolutely no connection with Con Edison NY. These subpoenas, if enforced, would result in the production of over 1.5 million pages[1] of documents which have no possible relevance to Con Edison NY's case. These subpoenas have other flaws as well:

[1] The estimate of sixty transactions and 1.5 million pages is conservative, since it is based solely on the Capstar Subpoena.

(a) Some of the Third Party Subpoenas are unlimited in time, requiring the production of documents through the current date; and

(b) Some of the Third Party Subpoenas concern transactions entered into in tax years after the date of the current lawsuit, and thus involve matters not before the Court.

Con Edison NY is entitled to a trial of the facts on its own case. The United States, however, apparently plans to place *all* lease-in, lease-out transactions on trial based on its claim that all such transactions are "identical." The law in this Court establishes, however, that the relevant legal issues must be decided by reference to Con Edison NY's conduct, not the conduct of third parties engaged in transactions in which Con Edison NY was not involved. In addition, the United States cannot possibly establish its claim that all lease-in, lease-out transactions are "identical." This claim is based on nothing more than pure speculation. In short, the requested discovery represents a classic case of an overbroad "fishing expedition."

The requests for such material place an undue burden on Con Edison NY, this Court, and the third parties. Unless Con Edison NY's motion is granted, Con Edison NY will be required to review over 1.5 million pages of documents which have absolutely no connection to its case. The necessity of reviewing this voluminous amount of irrelevant material may lead the United States to request an extension of the discovery schedule and trial date. Con Edison NY will object to any attempt to introduce this irrelevant material into evidence, and thus the discovery disputes will extend into the trial, and by necessity will require the participation of the Court. The requested irrelevant discovery obviously places an undue burden on the third parties.

Con Edison NY expects that one or more of the Third Party Subpoenas may lead to motions to compel and/or motions to quash pursuant to RCFC 45, unless the scope of the Third Party Subpoenas is voluntarily limited by the United States. Without regard to any motions

under RCFC 45, however, Con Edison NY has the independent right to a protective order under RCFC 26(c) in order to protect Con Edison NY from the burden of irrelevant discovery.

Con Edison NY has conferred with the United States in an attempt to resolve these matters but these discussions have not been successful. Con Edison NY has concluded that the Court's guidance is necessary with respect to the scope of discovery.

The Third Party Subpoenas do not comply with the rules of this Court which require that the party issuing the subpoena "take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena." RCFC 45(c)(1). The appropriate remedy is for the Court to issue a protective order as requested by Plaintiff's Motion for Protective Order.

This Memorandum is organized as follows: Part I provides a brief overview of Con Edison NY's business and the leasing transaction in question, which is necessary to understand the context of the issues presented by Con Edison NY's Motion. Part II describes the Third Party Subpoenas. The Argument sets forth the relevant legal authorities applicable to Con Edison NY's Motion.

## I. CON EDISON NY'S BUSINESS AND THE LEASING TRANSACTION AT ISSUE

Con Edison NY, as described more fully in the Complaint, filed this tax refund proceeding challenging the Internal Revenue Service's disallowance of certain deductions associated with its leveraged lease of an interest in an electric generation facility in the Netherlands. The interest in the facility, referred to as the "RoCa3 Facility," was leased by a subsidiary of Con Edison NY from South Holland Electric for a period of approximately 43 years and was then leased back for a period of approximately 20 years.

The circumstances of Con Edison NY's decision to make an investment in the RoCa3 facility are unique. In the early 1990s, Con Edison NY expected that the State of New York was

likely to deregulate its electric generation business. Ex. 1.[2] Beginning in 1994, Con Edison NY began to evaluate business strategies to compete successfully in a deregulated environment. Ex. 2.

As part of its response to deregulation, Con Edison NY decided to establish new subsidiaries for the purpose of making unregulated investments. Ex. 3. Con Edison NY expected that these subsidiaries would make international investments. On July 12, 1996, the State of New York Public Service Commission ("PSC") authorized Con Edison NY "to invest up to 50 million dollars in unregulated subsidiaries." The PSC's July 12, 1996 Order reflected the PSC's understanding that "[t]he business opportunities that Con Edison NY is considering for the projects that are the subject of the Order are largely international." Ex. 4.

Following the July 12, 1996 Order, Con Edison NY established Gramercy Development, Inc. ("Gramercy") in October 1996 for the purpose of making investments permitted by the July 12, 1996 Order. Exs. 5, 6. Gramercy subsequently changed its name to Consolidated Edison Development, Inc. ("CED") in September, 1997.[3]

In early 1997, Gramercy (and subsequently CED) began investigating leases of energy assets as potential investments. CED contacted Cornerstone Financial Advisors L.P. ("Cornerstone"), an experienced leasing advisor, to learn more about the leasing business. CED was interested in leasing investments because they produced highly predictable, front loaded earnings under the accounting rules applicable to leveraged lease accounting. Ex. 7. CED also believed that an international lease would provide an introduction to European energy markets, where it planned to expand.

---

[2] All exhibit references are to the Exhibits attached to the Affidavit of Thomas C. Durham, attached to this Memorandum.

[3] The name change did not affect the management or activities of Gramercy.

CED limited its review of leasing investments to assets Con Edison NY was familiar with, *i.e.*, assets used in the electric and gas industries. Ex. 7. CED spent several months learning the details of leveraged leases[4] before it first considered engaging in a specific transaction. In August or September of 1997, CED learned (through Cornerstone) that South Holland Electric was interested in obtaining lease financing for the RoCa3 Facility. South Holland Electric's advisor was Capstar Partners, Inc. ("Capstar").

A team from Con Edison NY, including a Con Edison NY engineer, inspected the RoCa3 Facility on November 11, 1997. In addition to the Con Edison NY engineer, this team included a number of other professionals retained by Con Edison NY:

(1) an appraiser from Deloitte & Touche;

(2) an environmental consultant from Tauw Milieu;

(3) an engineering consultant from Duke Engineering & Services, Inc.; and

(4) an expert in Dutch law.

Before making the decision to invest in the RoCa3 Facility, CED, individually and through its advisors, conducted significant due diligence. CED considered the economics and risks associated with the leasing transaction in the same manner in which it evaluated all of its business activities. This due diligence process included a review of relevant information, such as:

(1) a review of South Holland Electric and its business;

(2) a review of the RoCa3 Facility; and

(3) information on the Dutch energy markets.

---

[4] CED began the study of leveraged leases no later than May of 1997. Ex. 8. CED did not make its bid to participate in the RoCa 3 Investment until September 26, 1997. Ex. 9.

The results of this due diligence process were included in memoranda presented to CED's board.

CED and South Holland Electric completed the lease of the RoCa3 Facility (the "RoCa3 Investment") on December 15, 1997. The transaction was structured as a "lease-in, lease-out," in which South Holland Electric leased an undivided interest in the Facility to CED for a period of approximately 43 years, ending on February 24, 2041 (the "Lease"). Con Edison NY then subleased the RoCa3 Facility back to South Holland Electric for a period of approximately 20 years, ending on January 2, 2018 (the "Sublease"). At the end of the Sublease, South Holland Electric has an option to purchase CED's remaining interest in the Lease, and CED has an option to renew the Sublease if South Holland Electric does not exercise its purchase option.

CED entered into a second lease-in, lease-out transaction with NUON Gasnetwerken II B.V. (the "NUON Investment") in May of 1999. This transaction involved a gas distribution network located in the Netherlands. The NUON Investment took place in 1999, two taxable years after the South Holland Electric transaction, and therefore has no effect on the tax year before the Court, *i.e.*, 1997.

CED pursued two other leasing opportunities in 1998. One, referred to as "ENECO," involved a gas and hot water distribution system located in the Netherlands. Con Edison NY withdrew from this project when its due diligence indicated the project would not comply with CED's internal standards. Ex. 10. CED unsuccessfully bid to participate in another lease of a gas distribution network located in the Netherlands, referred to as "MEGA," but its bid was rejected. Ex. 11. During the time period from 1997 through 1999, CED became aware of other potential leasing investments from time to time, but it never made a bid to participate in any other lease-in, lease-out transactions.

If the parties to the RoCa3 Investment comply with the terms of the documents and there are no defaults or other events leading to a premature termination, CED will earn a pre-tax profit in excess of $60 million. This profit is attributable to rental payments due from South Holland Electric and CED's rights in the residual value of the property after the expiration of the Sublease. The Form 5701 issued to Con Edison NY by the Internal Revenue Service confirmed this profit calculation, but recharacterized the profit as "interest income." Ex. 12.

As is the case with all leveraged leases, CED's lease with South Holland Electric was expected to produce tax deductions and tax savings in its early years, but will produce an even greater amount of taxable income and taxes payable in later years. *See Johnson v. United States*, 11 Cl. Ct. 17, 29-30 (1986). If, as indicated above, CED earns a profit of approximately $60 million from the RoCa3 Investment, CED's projections indicate it will pay approximately $21 million in additional tax on that profit.

The United States has claimed that CED's leasing transaction with South Holland Electric "lack[s] economic substance and/or constitute[s] a sham." Joint Preliminary Status Report (September 11, 2006). This Court has held that a leasing transaction has economic substance and will not be treated as a sham if it is expected to produce a "mere 'modicum' of profit." *Johnson*, 11 Cl. Ct. at 25. In judging whether a leasing transaction has economic substance, the most important factor is a review of the taxpayer's action and conduct in connection with the transaction in question. *Id.* at 28-29.

## II. THE UNITED STATES' REQUESTED DISCOVERY

The United States has issued 14 Third Party Subpoenas pursuant to RCFC 45(b)(1). Each of the Subpoenas seeks information which is irrelevant to the issues in this proceeding and imposes a significant burden, individually and collectively, on Con Edison, as well as the third parties. Some of these third parties have filed objections with the Department of Justice.

Con Edison NY does not object to discovery relevant to Con Edison's participation in the RoCa3 Investment. It seeks a protective order limiting the scope of discovery to prevent the burdens resulting from the discovery of irrelevant information.

A. The Capstar Subpoena

On January 26, 2007, the United States served a subpoena on Capstar Partners, Inc. pursuant to RCFC 45(b)(1). Ex. 13. Capstar served as South Holland Electric's advisor in the RoCa3 Investment. It did not provide any services or advice to CED.

In the mid to late 1990s, Capstar was engaged in the business of providing advisory services to entities seeking lease financing.

During the late 1990s, the United States government, through the Federal Transit Administration, was actively engaged in promoting, reviewing, and approving lease-in, lease-out transactions for domestic transit assets. Capstar was involved in lease-in, lease-out transactions that were reviewed and approved by the Federal Transit Administration during this period. Many domestic transit agencies, such as the Washington Metropolitan Area Transit Authority ("WMATA"), engaged in lease-in, lease-out transactions of their assets, such as subway cars, with the review and approval of the federal government.[5]

The Internal Revenue Service has conducted and completed an audit of Capstar pursuant to section 6111 of the Internal Revenue Code concerning Capstar's obligations to register lease-in, lease-out transactions. It is Con Edison NY's understanding, based on discussions with Capstar's counsel, that this audit included 55 lease-in, lease-out transactions and resulted in the production of over 1.5 million pages of documents to the IRS. It is also Con Edison NY's

[5] The Federal Transit Administration's review and approval of lease-in, lease-out transactions was necessary for assets originally purchased with federal financing. In September of 1998, the Federal Transit Administration published a handbook entitled "Innovative Financing Techniques for America's Transit Systems" which included a description of the use of lease-in, lease-out transactions. This handbook stated that over $2 billion in transit assets had been financed with lease-in, lease-out transactions. This document continues to be available on the FTA's web site at www.fta.dot.gov/printer_friendly/planning_environment_3450.html.

understanding that the Department of Justice is seeking access to this material for use in Con Edison NY's case. Additionally, the Department of Justice is seeking from Capstar documents related to an additional 8-10 transactions closed prior to 1997. The overwhelming majority of the documents sought from Capstar will involve transactions in which Con Edison NY had absolutely no involvement.

The Subpoena issued to Capstar (the "Capstar Subpoena") is extraordinarily broad. It seeks information on *all* lease-in, lease-out transactions in which Capstar was involved, without regard to whether Con Edison NY was involved in or had knowledge of those transactions. Thus, the Capstar Subpoena would cover, for example, multiple lease-in, lease-out transactions with WMATA and other U.S. transit agencies, in which Con Edison NY played no role.

Finally, the Capstar Subpoena appears to seek Capstar's legal analysis of certain issues involving lease-in, lease-out transactions.

The Capstar Subpoena is not limited by any time frame; in fact, it requests Capstar's analysis of a 2002 revenue ruling, issued more than four years after CED's lease with South Holland Electric.

B. The PricewaterhouseCoopers LP Subpoena

On February 6, 2007, the United States served a Subpoena on PricewaterhouseCoopers LLP ("PwC"). Ex. 14. PwC was Con Edison NY's auditor in 1997 and continues to serve as Con Edison NY's auditor.

Con Edison NY sought PwC's advice on the financial accounting for the RoCa3 Investment. PwC confirmed that the RoCa3 Investment should be treated as a leveraged lease for financial accounting purposes.

During the relevant time period, a division of PwC was apparently engaged in providing lease advisory services. PwC provided these services to MEGA. As described above, CED did

not enter into the MEGA transaction. To the best of CED's knowledge, PwC did not provide advisory services in either of its lease-in, lease-out transactions, *i.e.*, RoCa3 and NUON.

The Subpoena issued to PricewaterhouseCoopers is extraordinarily broad. Among other items, it seeks:

(a) all audit workpapers of Con Edison NY for 1997 through the present;

(b) all documents regarding the financial classification of all leases considered by Con Edison NY from 1997 through the present;

(c) all documents regarding all lease advisory services provided by PWC (not limited to leases in which Con Edison NY was involved);

(d) all documents relating to the preparation and review of Con Edison NY's state and federal tax returns for 1997 through the present; and

(e) all documents containing an analysis of lease-in, lease-out transactions (not limited to transactions in which Con Edison NY was involved).

The PwC Subpoena is explicit in requiring the production of many items for 1997 through the present.

C. <u>The Bayerische Landesbank Subpoena</u>

On February 6, 2007, the United States served a Subpoena on Bayerische Landesbank ("Bayerische"), a German bank. Ex. 15. Bayerische's role in the RoCa3 Investment was limited; it provided a letter of credit to support certain of South Holland Electric's obligations under the Sublease from Con Edison NY to South Holland Electric.

Once again, the Subpoena issued to Bayerische is extraordinarily broad. It requests all documents in Bayerische's possession relating to *all* lease-in, lease-out transactions Bayerische participated in from 1996 through 2001, without regard to whether Con Edison NY was involved in or had knowledge of such transactions.

D. The Areva NP, Inc. Subpoena

On February 6, 2007, the United States served a subpoena on Areva NP, Inc. ("Areva"). Ex. 16. A subsidiary of Areva acquired Duke Engineering & Services, Inc. ("Duke") in 2002. Duke performed an engineering review of the RoCa3 Facility on behalf of CED.

The Areva Subpoena requests all documents concerning Duke's "inspection, analysis, or evaluation" of 22 energy facilities between 1997 and 2001. One of these is the NUON lease, which CED actually entered into, and two of them are the MEGA and ENECO leases, which CED did not enter into. To the best of Con Edison NY's knowledge, no one at CED reviewed any engineering reports for the remaining leases listed in the Areva Subpoena.

E. The Credit Suisse Subpoenas

On February 6, 2007, the United States served Subpoenas on four entities[6] affiliated with Credit Suisse, a Swiss bank (the "Credit Suisse Subpoenas"). Exs. 17-20. Credit Suisse entities played a limited role in the RoCa3 Investment. Credit Suisse First Boston created a custody account which an affiliate of South Holland Electric used to provide collateral for certain of South Holland Electric's obligations. Credit Suisse Finance Products provided CED with letters regarding the market rates of interest on certain loans and collateral deposits in connection with the RoCa3 Investment.

The Credit Suisse Subpoenas are extraordinarily broad. The Credit Suisse Subpoenas request all documents in Credit Suisse's possession regarding *all* lease-in, lease-out transactions for the years 1996 though 2001, without regard to whether CED was involved in or had knowledge of such transactions.

[6] The four entities are Credit Suisse Financial Corp., Credit Suisse (USA), Inc., Credit Suisse Holdings (USA), Inc., and Credit Suisse First Boston International (USA), Inc.

F. The Cornerstone Subpoena

On February 1, 2007, the United States served a Subpoena on Cornerstone Financial Advisors L.P. ("Cornerstone"). Ex. 21. Cornerstone provided advisory services to CED with respect to the South Holland Electric and NUON transactions.

The Cornerstone Subpoena requests all documents concerning *all* LILO transactions in which Cornerstone was involved from 1996 through 2001, without regard to whether CED was involved in such transactions or had knowledge of such transactions.

Con Edison NY understands that Cornerstone and the United States are engaged in discussions which would potentially limit the scope of the Cornerstone Subpoena.

G. The ABN Subpoenas

On January 30, 2007, the Unites States served Subpoenas on three entities[7] associated with ABN AMRO NV, a Dutch Bank. Exs. 22-24. ABN AMRO NV played a limited role in the RoCa3 Investment. It held an account which South Holland Electric used to provide collateral for certain of South Holland Electric's obligations.

The ABN Subpoenas are extraordinarily broad. They request all documents in ABN's possession regarding *all* lease-in, lease-out transactions for the years 1996 through 2001, without regard to whether CED was involved in or had knowledge of such transactions.

H. The Banc One Subpoena

On February 22, 2007, the United States served a Subpoena on Banc One Leasing Corporation, now known as Chase Equipment Leasing, Inc. ("Banc One"). Ex. 25. Banc One acquired an undivided interest in the RoCa3 Facility as part of the same transaction in which CED acquired its interest.

[7] The three entities are ABN AMRO Bank NV, ABN AMRO Incorporated, and ABN AMRO North America, Inc.

The Banc One Subpoena requests all documents in Banc One's possession regarding 22 lease-in, lease-out transactions. One of these is the NUON Investment, which CED actually entered into in 1999, and two of them are the ENECO and MEGA leases, which CED did not enter into. CED never made a bid to participate in any of the remaining leases listed in the Banc One Subpoena.

I. The Mitchell & Titus Subpoena

On February 6, 2007, the United States served a subpoena on Mitchell & Titus, LLP. Ex. 26. Mitchell & Titus is an accounting firm that provided general accounting, bookkeeping, and tax services to CED; it did not serve as either CED's or Con Edison NY's outside auditor.

The Subpoena served on Mitchell & Titus is extraordinarily broad. Among other items, it seeks:

(a) all audit workpapers of Con Edison NY for 1997 through the present;

(b) all documents regarding all leases entered into by Con Edison NY from 1997 through the present;

(c) all documents regarding all leases considered by Con Edison NY from 1997 through the present;

(d) all documents regarding all leveraged leases entered into by Con Edison NY from 1997 through the present;

(e) all documents regarding all leveraged leases considered by Con Edison NY from 1997 through the present; and

(f) all documents relating to the preparation and review of Con Edison NY's state and federal tax returns for 1997 through the present.

## ARGUMENT

### A. THE DISCOVERY REQUESTED BY THE UNITED STATES DOES NOT SATISFY THE RELEVANCE STANDARD OF RCFC 26(b)(1)

#### 1. All Discovery is Subject to the Relevance Standard of RCFC 26(b)(1)

The scope of discovery is limited, pursuant to RCFC 26(b)(1), to "any matter, not privileged, that is *relevant to the claim or defense of any party*." (emphasis added). RCFC 26(b)(1). In addition, "[a]ll discovery is subject to the limitations imposed by Rule 26(b)(2)(i), (ii), and (iii)."[8] RCFC 26(b)(1). RCFC 26(b)(1) is identical to Rule 26(b)(1) of the Federal Rules of Civil Procedure ("FRCP").

The Third-Party Subpoenas issued by the United States pursuant to RCFC 45 are subject to the overriding relevance requirement of RCFC 26(b)(1). *See During v. City University of New York*, 2006 WL 2192843, *2 (S.D.N.Y. 2006); *Syposs v. United States*, 181 F.R.D. 224, 226 (W.D.N.Y. 1998). Discovery, while broad, has boundaries, "and a request is improper if it does not seek information that may bear on some issue the district court will have to decide in the course of bringing the case to its ultimate conclusion." JAMES WM. MOORE, MOORE'S FEDERAL PRACTICE, § 26.41(6)(a) (hereafter "Moore's"); *see Micro Motion, Inc. v. Kane Steel Co., Inc.*, 894 F.2d 1318, 1322 (Fed. Cir. 1990) (quoting *Hickman v. Taylor*, 329 U.S. 495, 507 (1947) to the effect that the breadth of discovery is not unlimited). The Supreme Court has recognized that Rule 26 vests the "trial judge with broad discretion to tailor discovery narrowly." *Crawford-El v. Britton*, 523 U.S. 574, 598 (1998).

FRCP Rule 26(b)(1) was amended in 2000 to narrow the scope of "relevance" for discovery purposes. Under the prior version of Rule 26(b)(1) "[a] request for discovery was

---

[8] As of December 1, 2006, FRCP Rule 26(b)(2) was amended. The Committee Note to the December 1, 2006 change states that subdivision (b)(2) was amended to address issues involving the difficulties in "locating, retrieving, and providing discovery of some electronically stored information." In particular, Rule 26(b)(2)(iii) was moved to Rule 26(b)(2)(C)(iii), but the language otherwise remains materially unchanged.

considered relevant if there was any possibility that the information sought may be relevant to the subject matter of the action." Moore's, *supra* at § 26.41(6)(b). The 2000 amendment narrowed this definition, focusing the determination of relevance on "the actual claims and defenses" contained in the parties' pleadings, rather than on the more general subject matter of the pending action.[9] FRCP Rule 26 Committee Notes on Rules – 2000 Amendment, Subdivision (b)(1); Moore's, *supra* at § 26.41(6)(c); *In re PE Corp. Secs. Litig.*, 221 F.R.D. 20, 24 (D. Conn. 2003).

This change was also incorporated in the RCFC at 26(b)(1). As a result of this amendment, a party seeking discovery must demonstrate "a more substantial connection between the information sought by discovery requests and the claims and defenses alleged in the pleadings than was previously the case." Moore's, *supra* at § 26.41(6)(c). Where the party seeking discovery fails to show that the information sought is relevant, "[d]iscovery may not be had." *Micro Motion,* 894 F.2d at 1323. RCFC 26(b)(2) provides for the issuance of a protective order under RCFC 26(c) when the requested discovery is either not relevant or violates the limitations of RCFC 26(b)(2).

The Federal Circuit, applying the less restrictive standard contained in the prior version of FRCP 26(b)(1), quashed a third-party subpoena seeking irrelevant information in *Micro Motion, Inc.*, 894 F.2d 1318. In that patent infringement lawsuit, the plaintiff sought discovery from third parties which produced devices potentially similar to the device at issue in the lawsuit. The discovery sought was intended to assist the plaintiff in proving damages in its patent infringement suit. The court explained that a trial court has "discretion to deny a plaintiff's proposed method of proof of damages which imposes too great a burden on court proceedings."

---

[9] Information "relevant to the subject matter" is also subject to discovery, but only on the showing of "good cause." RCFC 26(b)(1).

*Id.* at 1324. The Federal Circuit held that discovery should not be allowed when the "inquiry is based on the party's mere suspicion or speculation." *Id.* at 1326. Discovery is limited to the proof of existing claims, and does not provide for attempts to discover new claims. *Id.* at 1327.

The Federal Circuit thus denied the requested discovery because it was based on nothing more than a "suspicion of infringement" by the third party. *Id.* The Federal Circuit was also influenced by the possibility that an already "complex" suit would be turned into "an absolute quagmire of proofs." *Id.* at 1324; *see also Allen v. Howmedica Leibinger*, 190 F.R.D. 518 (W.D. Tenn. 1999) (following the reasoning in *Micro Motion*).

2. <u>The Third Party Subpoenas Do Not Seek Information Relevant to the Parties' Claims or Defenses</u>

The discovery requested by the United States in the Third-Party Subpoenas does not come close to satisfying the relevance standard set forth in *Micro Motion*, much less the amended and narrowed relevance standard of RCFC 26(b)(1). It appears that the United States would like to develop a claim that CED's lease transaction was part of a "pattern" of "identical" transactions. The attempt to prove such a claim, however, represents a classic example of discovery based on "mere suspicion or speculation." In addition, as discussed below, this case does not present the "pattern" of similar transactions creating offsetting gains and losses presented to this Court in *Jade Trading, LLC v. United States*, 65 Fed. Cl. 188 (2005). See Part C, below.

It is impossible to imagine how other leasing transactions in which Con Edison NY did not participate would be relevant to the parties' "claims or defenses," as required by RCFC 26(b)(1). The discovery requested by the United States consists, in large part, of requests for documents concerning leases in which Con Edison NY was not involved. As described above, Con Edison NY's entry into leasing transactions was the result of a unique set of circumstances,

*i.e.*, its entry into unregulated businesses resulting from the State of New York's deregulation of Con Edison NY's energy business.

Other leasing transactions will, by definition, include different lessors, different lessees, different assets with different characteristics (including different useful lives), different due diligence processes, and different agreements containing different terms with different economics. Thus, information concerning other leasing transactions cannot possibly be related to the parties' "claims or defenses," as required by RCFC 26(b)(1).

The issue of whether CED's transaction is profitable, and thus satisfies the economic substance standard, *see Johnson*, 11 Cl. Ct. at 25, will depend upon the particular facts of CED's transaction. CED's due diligence efforts will be a major component of its "claims and defenses." *Id.* at 28-29. The relevant evidence in this regard will include evidence concerning CED's intent and whether it acted "according to reasonable business practices." *Id.* at 29. As discussed above, Con Edison NY intends to provide evidence demonstrating that its decision to enter into a leasing transaction was a direct result of the deregulation of its traditional utility business. Evidence regarding other taxpayers and other transactions could have no bearing on Con Edison NY's case. *See Food Lion, Incorporated v. United Food and Commercial Workers International Union*, 103 F.3d 1007, 1013 (D.C. Cir. 1996) (rejecting discovery from third parties when issue depended upon party's intent); *see also Ricotta v. Allstate Insurance Company*, 211 F.R.D. 622 (S.D. Cal. 2002) (rejecting request for all reports prepared by a particular engineer).

The decision in *Food Lion* highlights "the problems of boundless discovery without a meaningful standard of relevance." 103 F.3d at 1014. Discovery of independent transactions which have no connection to the underlying litigation, save for a common third party, cannot be

allowed, or "where would the stopping point be?" *Id.* Plainly, there is no "stopping point" to the United States' requests, and this Court must therefore impose one.

The United States will apparently claim that the RoCa3 Investment is part of an overall "pattern" involving "identical" lease-in, lease-out transactions. The United States does not have any evidence to support this claim (otherwise its third party discovery would not be necessary), and thus its position is based on "mere suspicion or speculation." *Micro Motion*, 894 F.2d at 1326. To date, the United States has not conducted any depositions. Con Edison NY, on the other hand, can produce voluminous documentation showing that it reviewed the RoCa3 Investment in a businesslike manner with the intent of earning a profit.

A transaction in which Con Edison NY was not involved cannot possibly provide relevant information to the parties' "claims or defenses" or provide information that will bear on the issues this Court must decide. Of course, all business transactions of the same class will share certain similarities; all mergers will resemble all other mergers, etc. This does not form a basis for requiring evidence on all other transactions falling under a general class, particularly when different parties are involved.

Finally, as described in *Micro Motion*, evidence regarding other transactions would lead to an "absolute quagmire of proofs." 894 F.2d at 1234. The United States has described the transaction at issue as "complicated." Joint Preliminary Status Report (September 11, 2006). The United States' requested discovery would multiply this complexity by dozens of transactions, each as "complicated" as the transaction at issue, involving millions of pages of documents. Since Con Edison NY played absolutely no role in such transactions, the requested discovery is necessarily irrelevant.

B. THE DISCOVERY REQUESTED BY THE UNITED STATES IS PROHIBITED BY RCFC 26(b)(2)(iii)

Even if the discovery requested by the United States passes the relevance standard set forth in RCFC 26(b)(1), this Court must still consider whether the production of the requested material is subject to the limitations of RCFC 26(b)(2). The minimal, if any, relevance of the third party discovery requested by the United States is outweighed by the significant burden, expense, and delay which will result from the requested discovery.

"If a matter is relevant and potentially discoverable," a "court [must] then consider whether additional Rule 26 limitations on discovery apply," which include Rule 26(b)(2) and (c). *During*, 2006 WL 2192843 at *2; *see Micro Motion*, 894 F.2d at 1323.

As stated above, FRCP Rule 26(b)(1) was amended in 2000 to add a sentence to the subdivision calling a Court's attention to subdivision (b)(2)(i), (ii), and (iii). The FRCP Rule 26 Committee Notes on Rules – 2000 Amendment, Subdivision (b)(2), provide that "[t]hese rules apply to discovery that is otherwise within the scope of subdivision (b)(1)." The Committee noted that this cross-reference was arguably "redundant," but was intended "to emphasize the need for active judicial use of subdivision (b)(2) to control excessive discovery." FRCP Rule 26 Committee Notes on Rules – 2000 Amendment, Subdivision (b)(2); *In Re: Sealed Case (Medical Records)*, 381 F.3d 1205, 1215 (D.C. Cir. 2004) (quoting the 2000 Committee Notes to show the need for judicial intervention to control excessive discovery); Moore's, *supra* at § 26.41(6)(c) (stating that the added reference to Rule 26(b)(2) in Rule 26(b)(1) is "a clarion call for the courts to use their administrative authority to control discovery to eliminate those instances in which the parties stray far afield from the factual issues that are at the heart of their case and are verging on discovery abuse, rather than seeking a fair and just resolution of the case.").

RCFC 26(b)(2)(iii) provides that a court may limit the use of discovery methods when "the burden or expense of the proposed discovery outweighs its likely benefit, taking into account the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the litigation, and the importance of the proposed discovery in resolving the issues." Rule 26(b)(2)(iii) allows "a court ... [to] limit discovery if it determines that the burden of the discovery outweighs its likely benefit." *See American International Specialty Lines Ins. Co. v. NWI-I, Inc.*, __ F.R.D. __, 2007 WL 98312, *11 (N.D. Ill. Jan 16, 2007); *Wiginton v. CB Richard Ellis, Inc.*, 229 F.R.D. 568, 571 (ND. Ill. 2004) (noting that Rule 26(b)(2)(iii) has been "dubbed the proportionality test"). Rule 26(b)(2)(iii) "is most commonly invoked where a party seeks voluminous or inaccessible documents of dubious relevance." *Bondi v. Grant Thornton Int.*, 2006 WL 2088193, *1 (S.D.N.Y. 2006).

In *Koch v. Koch Industries, Inc.*, 203 F.3d 1202, 1237-38 (10th Cir. 2002), the 10th Circuit affirmed the district court's holding that plaintiffs' discovery requests on non-party banks were barred by Rule 26 because "the burden and expense of producing these documents far outweighed the Plaintiffs' *mere hope that they might find something upon which to base a claim*." *Id.* at 1238 (emphasis added). The Tenth Circuit noted that Rule 26(b)(2)(iii) was added to encourage judges to control the extent of discovery and to discourage and prevent discovery overuse. *Id.* The plaintiffs in *Koch* employed a discovery strategy, similar to that of the United States in this case, of asserting "broad, non-specific allegations." *Id.* "When a plaintiff first pleads it allegations in entirely indefinite terms, without in fact knowing of any specific wrongdoing by the defendant, and then bases massive discovery requests upon those nebulous allegations, in the hope of finding particular evidence of wrongdoing, that plaintiff abuses the judicial process." *Id.* The Tenth Circuit concluded the district court properly applied limits set

out in Rule 26(b)(2)(iii) since "the likely benefit of this attempted fishing expedition was speculative at best." *Id.*; *see also Quadrant EPP USA v. Menasha Corp.*, 2007 WL 320286, *2 (E.D.Pa. 2007) (finding that plaintiff's discovery request was nothing more than "pure speculation" constituting a fishing expedition, and that the number of hours required to review 50,000 plus pages of documents to satisfy its discovery request clearly outweighed any likely benefit of such undertaking); *EEOC v. Renaissance III Organization*, 2006 WL 832504 (N.D. Tex. 2006) (finding that the party seeking discovery did not meet its burden of showing the discovery sought was reasonably calculated to lead to the finding of admissible evidence simply by stating the records sought "will likely contain information which will or could affect the value of these employees' claim.").

RCFC 26(b) is applicable to discovery of nonparties, and "nonparty status may be considered by the court in weighing the burdens imposed in the circumstances." *Katz v. Batavia Marine*, 984 F.2d 422, 424 (Fed. Cir. 1993).

The voluminous discovery requested by the United States plainly outweighs its likely benefit to this case. The Third Party Subpoenas request voluminous documents concerning transactions in which Con Edison NY had absolutely no involvement. For the reasons stated above in Part A.2., it is impossible to imagine how leasing transactions to which Con Edison NY was not a party could relate to the parties' "claims or defenses." RCFC 26(b)(1). The burdens caused by the production of over 1.5 million pages, weighed against the fact that these documents have no relevance to the case before the Court, requires a protective order under RCFC 26(b)(2) and (c).

The burden of this production, which, by definition, falls upon nonparties, is obvious. The production of this irrelevant material will also be a burden to this Court and Con Edison NY,

as it will inevitably lead to ongoing disputes over relevance and may lengthen the time required for discovery and trial. Con Edison NY also should not be subject to the immense burden of reviewing over 1.5 million pages of documents which have no relevance to its case.

C. THE COURT'S DECISION IN *JADE TRADING* IS DISTINGUISHABLE

Con Edison NY expects that the United States will rely on this Court's decision in *Jade Trading, LLC v. The United States*, 65 Fed. Cl. 188 (2005). The significant differences between the United States' requested discovery in Con Edison NY's case and the discovery at issue in *Jade Trading* demonstrates why the Third Party Subpoenas are in violation of RCFC 26(b)(1) and 26(b)(2)(iii).

In *Jade Trading*, the plaintiffs reported large capital gains as a result of a sale of a cable business. As a result, they were presented with "various strategems to 'shelter' those gains from federal income taxation." *Id.* at 190. The plaintiffs entered into a transaction, marketed by BDO Seidman, called "Son of BOSS," which was designed to offset their capital gains with a transaction creating an artificial loss matching the capital gain.

In *Jade Trading*, the United States requested a limited amount of information from BDO Seidman through a third party subpoena, not the millions of pages it has requested here. The third party subpoena at issue in *Jade Trading* was narrowly tailored, and was limited to evidence demonstrating that BDO Seidman had marketed "Son of BOSS" to individuals with large capital gains. The United States issued third party subpoenas to BDO Seidman, which requested the "Form 1040 cover pages, Schedule D and Schedule K-1 for the years 1999-2000" for 46 non-parties who had entered into "virtually identical tax shelter transactions" through BDO Seidman. *Id.* The government sought this evidence to make its "pattern evidence" claim that the plaintiff's transactions "did not represent routine investment activity." *Id.*

There are numerous distinctions between Con Edison NY's case and the facts of *Jade Trading*. First, the Third Party Subpoenas at issue in this case are infinitely broader and more burdensome than the subpoenas at issue in *Jade Trading*. The subpoena in *Jade Trading* was limited to determining the "amount of capital gains and losses claimed by these taxpayers and the dates on which they were incurred." *Id.* at 191. As described above, the requested material consisted of the cover pages of the Form 1040, Schedule D, and Schedule K-1 for the years 1999-2000 for 46 taxpayers. Assuming that this material consisted of approximately 10 pages per taxpayer per year, the total volume of the requested material was less than 1,000 pages. Notably, the government *did not* request – as it repeatedly does here – "all documents" concerning the other transactions. Thus, the burden associated with the requested production in *Jade Trading* is not remotely comparable to the over 1.5 million pages requested by the Third Party Subpoenas.

Second, the holding in *Jade Trading* depends upon the existence of "virtually identical tax shelter transactions." The transactions at issue in *Jade Trading* were specifically designed to "offset" the taxpayer's capital gains, and the BDO Seidman subpoena was limited to that subject. In deciding the relevance issue, the court specifically focused on the pattern of matching gains and losses. *Id.* at 191. There is no such similarity in Con Edison NY's case. The evidence will show that CED reviewed the RoCa3 Investment in a businesslike manner and conducted significant due diligence over a period of months. Con Edison NY limited its lease-in, lease-out investments to assets with which it was familiar. It is impossible to imagine how other transactions involving different assets, such as, for example, a leasing transaction involving the Washington, D.C. subway, which does not involve Con Edison, could provide information relevant to Con Edison NY's case.

The terms of Con Edison NY's lease-in, lease-out transaction depended upon a variety of factors, such as the value of the RoCa3 Facility and its useful life. The terms of Con Edison NY's leasehold investment in the RoCa3 Facility were the subject of negotiation between the parties, in which Con Edison NY and South Holland Electric sought terms to their advantage. When, as was the case with the proposed MEGA investment, the terms offered by Con Edison NY were less favorable than the terms offered by another investor, MEGA did not accept Con Edison NY's bid. These facts should be contrasted with those of *Jade Trading*, where the court relied on "similarities" of "timing, sequences, and prices" in enforcing the subpoena. *Id.* at 191.

The United States will not be able to demonstrate that all lease-in, lease-out transactions are "identical." Each transaction will involve a different asset with different characteristics, different lessees, and different contractual agreements with different terms. If the United States had evidence that these terms were "identical" (which it apparently had in *Jade Trading*), this fishing expedition would not be necessary.

The issues presented by the United States' "economic substance" and "sham" theories will depend, in large part, upon the due diligence effort conducted by CED. *See Johnson*, 11 Cl. Ct. at 28-29. As stated above, Con Edison's facts will demonstrate that it acted in a reasonable and businesslike manner, with the expectation of making a profit. This will distinguish CED's situation from other "tax shelters," *see Johnson*, 11 Cl. Ct. at 29, and will also distinguish CED's situation from *Jade Trading*, in which there was no possibility of profit.

Third, in *Jade Trading*, the third party request was limited to BDO Seidman LLP, which marketed the Son of BOSS transaction and directly solicited the taxpayer's participation. BDO Seidman tailored the transaction to create an artificial loss which offset the taxpayer's capital gain. There is no analogous party present in Con Edison NY's case. Con Edison NY retained

Cornerstone to provide it with advice regarding leasing transactions. Con Edison NY was interested in such investments as a result of its plans to expand into unregulated businesses. The United States will not be able to produce evidence that Cornerstone tailored the RoCa3 Investment to create a particular tax result, as was the case in *Jade Trading*.

Since Capstar was not CED's advisor, CED had no control over Capstar and did not look to Capstar for advice. Despite this fact, however, the United States seeks over 1.5 million pages from Capstar. Once again, this is a significant difference from *Jade Trading*, where the subpoena was limited to the taxpayer's advisor, BDO Seidman.

In *Jade Trading*, BDO Seidman worked directly with the taxpayers to create a transaction which offset their capital gains. Thus, the subpoena was explicitly aimed at discovering "pattern" evidence regarding the use of the Son of BOSS transaction to offset capital gains with matching losses. *Id.* at 191.

In this case, however, there is no "pattern" of matching losses with gains; for the 1997 tax year at issue, the EZH transaction produced $937,000 in losses but Con Edison NY nonetheless paid $291,000,000 in taxes. In short, there is no party to this transaction which played BDO Seidman's role of matching gains with losses, thus creating the "pattern" present in *Jade Trading*. Thus, Con Edison NY's case does not contain the most significant fact in *Jade Trading*, *i.e.*, a broker who creates the common "pattern."

The United States will likely argue that CED's leasing transactions produces a "pattern" of losses upfront, followed by taxable income in later years. This argument proves too much. *All* leveraged leases produce the same pattern. *Johnson,* 11 Cl. Ct. at 30; *Gefen v. Commissioner*, 87 T.C. 1471, 1494 (1986). Thus, the United States' argument would justify the

introduction of "pattern evidence" with respect to *all* leveraged leasing transactions, raising the obvious question of "[w]here would the stopping place be?" *Food Lion*, 103 F.3d at 1014.

Finally, *Jade Trading* involved sham tax shelters unlikely to result in a profit. This case, however, unlike *Jade Trading*, involves leveraged leasing, a form of transaction well known to this Court. *Johnson*, 11 Cl. Ct. at 17. The United States will likely claim that there is no precedent for lease-in, lease-out transactions (although the Supreme Court's decision in *Frank Lyon Company v. United States*, 435 U.S. 561 (1978), did involve a lease-in, lease-out of the underlying land). The federal government, however, through the Federal Transit Administration, actively participated in the promotion of leasing transactions using the lease-in, lease-out structure. See page 8 of this Memorandum. This case is similar to all other leveraged leasing investments in that Con Edison NY made an investment in property and expects to receive a return on that investment in the form of rent and the residual value of the property. Con Edison NY conducted an extensive review of the transaction. The terms of the transaction provide that Con Edison NY will earn a profit in excess of $60 million if the parties comply with the terms of their agreement. The Revenue Agent's report prepared by the IRS does not deny that the transaction is profitable, but claims that this profit should be recharacterized as profit from a loan rather than a lease.

For many decades, courts have decided leveraged leasing cases without regard to "pattern" evidence concerning all other leveraged leasing transactions. There is no reason why that practice should be changed in the present case.

## CONCLUSION

WHEREFORE, Plaintiff Con Edison NY respectfully requests that this Court enter a protective order as requested by Plaintiff's Motion for Protective Order.

Respectfully submitted this 8th day of March, 2007.

/s/ Thomas C. Durham
Thomas C. Durham
MAYER, BROWN, ROWE & MAW LLP
71 South Wacker Drive
Chicago, Illinois 60606
Tel: (312) 701-7216
Fax: (312) 706-9187
tdurham@mayerbrownrowe.com

Attorney for Plaintiff

CERTIFICATE OF SERVICE

I, Thomas C. Durham, hereby certify that on this 8th day of March, 2007, I electronically filed the foregoing Memorandum in Support of Plaintiff's Motion for Protective Order using the CM/ECF system, which will send notification of such filing to counsel of record in this matter who are registered on the CM/ECF system, including counsel for the United States of America identified below:

David N. Geier
U.S. Department of Justice
Tax Division, Room 7919
555 Fourth Street, N.W.
Washington, D.C. 20001

/s/ Thomas C. Durham
Thomas C. Durham
MAYER, BROWN, ROWE & MAW LLP
71 South Wacker Drive
Chicago, Illinois 60606
Tel: (312) 701-7216
Fax: (312) 706-9187
tdurham@mayerbrownrowe.com

Attorney for Plaintiff

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **CONSOLIDATED EDISON COMPANY OF NEW YORK, INC. & SUBSIDIARIES,** | ) | |
| **Plaintiff,** | ) | **No. 06-305 T** |
| **v.** | ) | **Judge Marian Blank Horn** |
| **THE UNITED STATES,** | ) | |
| **Defendant.** | ) | |

**AFFIDAVIT OF THOMAS C. DURHAM**
**IN SUPPORT OF PLAINTIFF'S MOTION**
**FOR PROTECTIVE ORDER**

I, Thomas C. Durham, hereby declare and certify pursuant to 28 U.S.C. § 1746 as follows:

1. I am a member of the bar of the Court of Federal Claims and the Attorney of Record for Consolidated Edison Company of New York, Inc. ("Con Edison NY") in the above-captioned proceeding. I submit this Affidavit in support of Plaintiff's Motion for Protective Order.

2. A true and correct copy of the decision in *Energy Association of New York State v. Public Service Commission*, 653 N.Y.S.2d 502 (1996), bates numbered PF007494-7511, is attached hereto as Exhibit 1. (Page 1)

3. A true and correct copy of the minutes of a meeting of the Planning and Environmental Committee of the Board of Trustees of Con Edison NY, dated July 26, 1994, bates numbered PF007535-37, is attached hereto as Exhibit 2. (Page 20)

4. A true and correct copy of a memorandum from Kevin Burke, Vice President of Corporate Planning, to Eugene McGrath, Chairman of the Board of Directors, dated April 20, 1995, bates numbered PF007549-51, is attached hereto as Exhibit 3. (Page 24)

5. A true and correct copy of the order of the State of New York Public Service Commission, dated July 12, 1996, bates numbered PF005135-45, is attached hereto as Exhibit 4. (Page 28)

6. A true and correct copy of a memorandum from Kevin Burke, Vice President of Corporate Planning, to Eugene McGrath, Chairman of the Board of Directors, dated September 18, 1996, bates numbered PF004361-64, is attached hereto as Exhibit 5. (Page 40)

7. A true and correct copy of the minutes of the first meeting of the Board of Directors of Gramercy Development, Inc., dated October 28, 1996, bates numbered PF009556-63, is attached hereto as Exhibit 6. (Page 45)

8. A true and correct copy of the Leasing White Paper, prepared by Con Edison NY, bates numbered PF008275-80, is attached hereto as Exhibit 7. (Page 55)

9. A true and correct copy of the minutes of a meeting of the Board of Directors of Gramercy Development, Inc., dated May 29, 1997, bates numbered PF009605-08, is attached hereto as Exhibit 8. (Page 61)

10. A true and correct copy of a letter from Cornerstone Financial Advisors to n.v. Electriciteitsbedrijf Zuid-Holland (South Holland Electric), dated September 26, 1997, bates numbered PF006085-87, is attached hereto as Exhibit 9. (Page 66)

11. A true and correct copy of a memorandum from Charles Muoio to Mary Jane McCartney, et al., dated February 13, 1998, bates numbered PF007322-23, is attached hereto as Exhibit 10. (Page 70)

12. A true and correct copy of an electronic mail message from Brian DePlautt to Charles Muoio, et al., dated October 19, 1998, bates numbered PF008274, is attached hereto as Exhibit 11. (Page 73)

13. A true and correct copy of a schedule, entitled Calculation of OID, prepared by the Internal Revenue Service, bates numbered US00133, is attached hereto as Exhibit 12. (Page 75)

14. A true and correct copy of the subpoena the United States served upon Capstar Partners, Inc. in the above-captioned matter is attached hereto as Exhibit 13 (exhibits omitted). (Page 77)

15. A true and correct copy of the subpoena the United States served upon PricewaterhouseCoopers LLP in the above-captioned matter is attached hereto as Exhibit 14 (exhibit A-1 omitted). (Page 88)

16. A true and correct copy of the subpoena the United States served upon Bayerische Landesbank in the above-captioned matter is attached hereto as Exhibit 15 (exhibits A-1 and A-3 omitted). (Page 115)

17. A true and correct copy of the subpoena the United States served upon Areva NP, Inc. in the above-captioned matter is attached hereto as Exhibit 16 (exhibit omitted). (Page 137)

18. A true and correct copy of the subpoena the United States served upon Credit Suisse Financial Corp. in the above-captioned matter is attached hereto as Exhibit 17 (exhibits A-1 and A-11 omitted). (Page 147)

19. A true and correct copy of the subpoena the United States served upon Credit Suisse (USA), Inc. in the above-captioned matter is attached hereto as Exhibit 18 (exhibits A-1 and A-11 omitted). (Page 185)

20. A true and correct copy of the subpoena the United States served upon Credit Suisse Holdings (USA), Inc. in the above-captioned matter is attached hereto as Exhibit 19 (exhibits A-1 and A-11 omitted). (Page 220)

21. A true and correct copy of the subpoena the United States served upon Credit Suisse First Boston International (USA), Inc. in the above-captioned matter is attached hereto as Exhibit 20 (exhibits A-1 and A-11 omitted). (Page 255)

22. A true and correct copy of the subpoena the United States served upon Cornerstone Financial Advisors L.P. in the above-captioned matter is attached hereto as Exhibit 21 (exhibits omitted). (Page 290)

23. A true and correct copy of the subpoena the United States served upon ABN AMRO Bank NV in the above-captioned matter is attached hereto as Exhibit 22 (exhibits A-1 and A-2 omitted). (Page 301)

24. A true and correct copy of the subpoena the United States served upon ABN AMRO Incorporated in the above-captioned matter is attached hereto as Exhibit 23 (exhibits A-1 and A-2 omitted). (Page 312)

25. A true and correct copy of the subpoena the United States served upon ABN AMRO North America, Inc. in the above-captioned matter is attached hereto as Exhibit 24 (exhibits A-1 and A-2 omitted). (Page 320)

26. A true and correct copy of the subpoena the United States served upon Chase Equipment Leasing, Inc. in the above-captioned matter is attached hereto as Exhibit 25 (exhibits omitted). (Page 328)

27. A true and correct copy of the subpoena the United States served upon Mitchell &

Titus L.L.P. in the above-captioned matter is attached hereto as Exhibit 26 (exhibits omitted). (Page 342)

As noted above, duplicative copies of the Complaint filed by Plaintiff and Rev. Rul. 2002-69 have been removed from the third party subpoenas in order to lessen the volume of the Exhibits.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on: March 8, 2007

/s/ Thomas C. Durham
Thomas C. Durham
MAYER, BROWN, ROWE & MAW LLP
71 South Wacker Drive
Chicago, Illinois 60606
Tel: (312) 701-7216
Fax: (312) 706-9187
tdurham@mayerbrownrowe.com

Attorney for Plaintiff

CERTIFICATE OF SERVICE

I, Thomas C. Durham, hereby certify that on this 8th day of March, 2007, I electronically filed the foregoing Affidavit of Thomas C. Durham in Support of Plaintiff's Motion for Protective Order using the CM/ECF system, which will send notification of such filing to counsel of record in this matter who are registered on the CM/ECF system, including counsel for the United States of America identified below:

David N. Geier
U.S. Department of Justice
Tax Division, Room 7919
555 Fourth Street, N.W.
Washington, D.C. 20001

/s/ Thomas C. Durham

Thomas C. Durham
MAYER, BROWN, ROWE & MAW LLP
71 South Wacker Drive
Chicago, Illinois 60606
Tel: (312) 701-7216
Fax: (312) 706-9187
tdurham@mayerbrownrowe.com

Attorney for Plaintiff