# EXHIBIT 1

Westlaw



C

Supreme Court, Albany County, New York.
In the Matter of ENERGY ASSOCIATION OF NEW YORK STATE et al., Petitioners,
and Public Utility Law Project of New York, Inc., et al., Intervenors-Petitioners,
v.
PUBLIC SERVICE COMMISSION OF the STATE OF NEW YORK, Respondent,
and New York State Department of Law, et al., Intervenors-Respondents.
Nov. 25, 1996.

Electric utilities petitioned for judicial review of Public Service Commission (PSC) order on transition to competitive electric industry, which ordered electric utilities to file restructuring plans, rejected utilities' claim that consumers, as a matter of law, must pay rates designed to recover all stranded costs, and set forth Commission policy statement on electric competition. The Supreme Court, Albany County, Harris, J., held that: (1) Commission had jurisdiction to require utilities to file plans on how they would restructure in competitive marketplace; (2) areas of utilities' petitions for judicial review, as to whether Commission could direct retail electric wheeling, electric generation deregulation, or asset divestiture, did not state cause of action due to lack of justiciable controversy; (3) Commission did not lack authority under Public Service Law to order retail wheeling of electricity by electric utilities; (4) Commission was not preempted by any federal law, including Federal Power Act, from ordering retail wheeling of electricity by electric utilities; (5) failure to guarantee utilities full recovery of stranded costs, based on Commission decision to examine recoverability of stranded costs on case-by-case basis, would not constitute breach of contract under utilities' alleged regulatory compact with state; and (6) Commission order was not "rule" under State Administrative Procedure Act (SAPA).

Petitioners' motion denied.

West Headnotes

[1] **Electricity 145 ⟹1**

145 Electricity
145k1 k. Regulation in General; Statutes and Ordinances. Most Cited Cases
For purposes of judicial review of Public Service Commission (PSC) order on transition to competitive electric industry, on factual issues and decisions, unless they were obviously arbitrary and capricious, Supreme Court had to defer to expertise of Commission and not attempt to superimpose its own factual perceptions.

[2] **Electricity 145 ⟹1**

145 Electricity
145k1 k. Regulation in General; Statutes and Ordinances. Most Cited Cases
For purposes of judicial review of Public Service Commission (PSC) order on transition to competitive electric industry, factual determinations were province of People, acting through legislature, and Commission insofar as authority was properly delegated thereto; only the law was province of Supreme Court, limited solely to question as to whether legal authority existed for actions of Commission, not merits of those actions, subject to rules prohibiting arbitrary and capricious actions.

[3] **Electricity 145 ⟹1**

145 Electricity
145k1 k. Regulation in General; Statutes and Ordinances. Most Cited Cases
Public Service Commission (PSC) had jurisdiction to require electric utilities to file plans on how they would restructure in competitive marketplace, in Commission order on transition to competitive electric industry, despite contention that Commission could not require utilities to file plans

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

that included actions beyond Commission's legal authority to mandate; Commission had jurisdiction over utility rates, services, and long-range economic planning. McKinney's Public Service Law §§ 4, subd. 1, 5, subd. 2, 65, 66, subd. 10.

[4] **Monopolies 265 ⇐17(2.2)**

265 Monopolies
265II Trusts and Other Combinations in Restraint of Trade
265k11 Combinations Prohibited
265k17 Sale of Goods; Discrimination and Price Maintenance
265k17(2.1) Dealing with Certain Persons Only, and Discrimination Against Particular Buyers
265k17(2.2) k. In General. Most Cited Cases

State and federal antitrust laws, as well as antidiscrimination provisions of Public Service Law, prohibit utilities from denying competitors use of their distribution facilities in order to maintain monopolies. Sherman Act, § 2, 15 U.S.C.A. § 2; McKinney's General Business Law § 340; McKinney's Public Service Law § 65, subd. 2.

[5] **Electricity 145 ⇐1**

145 Electricity
145k1 k. Regulation in General; Statutes and Ordinances. Most Cited Cases

Areas of electric utilities' petitions for judicial review of Public Service Commission (PSC) order on transition to competitive electric industry, as to whether Public Service Commission (PSC) could direct retail electric wheeling, electric generation deregulation, or asset divestiture, did not state cause of action due to lack of justiciable controversy, where Commission had not directed those actions, but had made policy statement adopting principle of retail wheeling and established implementation date as goal. Sherman Act, § 2, 15 U.S.C.A. § 2; McKinney's General Business Law § 340; McKinney's Public Service Law § 65, subd. 2.

[6] **Electricity 145 ⇐1**

145 Electricity
145k1 k. Regulation in General; Statutes and Ordinances. Most Cited Cases

**Monopolies 265 ⇐12(16)**

265 Monopolies
265II Trusts and Other Combinations in Restraint of Trade
265k11 Combinations Prohibited
265k12 In General
265k12(15.5) State or Governmental Action
265k12(16) k. Regulated Industries; Public Utilities. Most Cited Cases

Public Service Commission (PSC) did not lack authority under Public Service Law to order retail wheeling of electricity by electric utilities; specific grant of authority in Public Service Law, authorizing retail wheeling under specific circumstances, could not be construed to defeat agency's ability to implement broad remedial powers under other circumstances, and refusal to deliver competitor's electricity, while delivering one's own, would create preferential use of distribution system, contrary to Public Service Law provision governing unreasonable prejudice by electric corporation, and otherwise violate state and federal antitrust laws. Sherman Act, § 2, 15 U.S.C.A. § 2; McKinney's Statutes §§ 96, 97, 321, 341; McKinney's Public Service Law §§ 4, subd. 1, 65, subds. 1, 3, 66, subd. 1; McKinney's General Business Law § 340.

[7] **Monopolies 265 ⇐17(2.2)**

265 Monopolies
265II Trusts and Other Combinations in Restraint of Trade
265k11 Combinations Prohibited
265k17 Sale of Goods; Discrimination and Price Maintenance
265k17(2.1) Dealing with Certain Persons Only, and Discrimination Against Particular Buyers
265k17(2.2) k. In General. Most Cited Cases

Under "essential facilities doctrine," refusal to deal with competitor is violative of antitrust laws if there is control of essential facility by monopolist,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

competitor's inability practically or reasonably to duplicate essential facility, denial of use of facility to competitor, and feasibility of providing facility. Sherman Act, § 2, 15 U.S.C.A. § 2.

[8] **Electricity 145 ⇐1**

145 Electricity
145k1 k. Regulation in General; Statutes and Ordinances. Most Cited Cases
Public Service Law could not be restrictively read, for purposes of determining whether Public Service Commission (PSC) had authority to order retail wheeling of electricity by electric utilities. McKinney's Public Service Law §§ 4, subd. 1, 65, subds. 1, 3, 66, subd. 1.

[9] **Electricity 145 ⇐1**

145 Electricity
145k1 k. Regulation in General; Statutes and Ordinances. Most Cited Cases

**States 360 ⇐18.73**

360 States
360I Political Status and Relations
360I(B) Federal Supremacy; Preemption
360k18.73 k. Public Utilities. Most Cited Cases
Public Service Commission (PSC) was not preempted by any federal law, including Federal Power Act, from ordering retail wheeling of electricity by electric utilities. Federal Power Act, § § 201(a, b), 212(g), as amended, 16 U.S.C.A. §§ 824(a, b), 824k(g).

[10] **Public Utilities 317A ⇐114**

317A Public Utilities
317AII Regulation
317Ak114 k. Service and Facilities. Most Cited Cases
Utilities are not entitled to deny public, or competitors, access to facilities in public rights-of-way.

[11] **Monopolies 265 ⇐12(2)**

265 Monopolies
265II Trusts and Other Combinations in Restraint of Trade
265k11 Combinations Prohibited
265k12 In General
265k12(2) k. Subject Matter in General. Most Cited Cases
Utilities do not have property interest in customers or right, statutorily or constitutionally, to de facto monopoly. U.S.C.A. Const.Amend. 5.

[12] **Electricity 145 ⇐1**

145 Electricity
145k1 k. Regulation in General; Statutes and Ordinances. Most Cited Cases
If Public Service Commission (PSC) would lighten regulation of electric generation to accommodate competition, justiciable issue would be whether such action rationally advanced legislature's purpose of bringing customers just and reasonable electric service; that was legislative standard, to be determined in particular cases by Commission expertise, subject to judicial review to guard against arbitrary and capricious decisions. McKinney's Public Service Law § 65, subd. 1.

[13] **Courts 106 ⇐19**

106 Courts
106I Nature, Extent, and Exercise of Jurisdiction in General
106k16 Jurisdiction of Property or Other Subject-Matter Involved
106k19 k. Situation of Personal Property. Most Cited Cases
Academic questions are not proper subject for judicial review.

[14] **Monopolies 265 ⇐20(11.1)**

265 Monopolies
265II Trusts and Other Combinations in Restraint of Trade
265k11 Combinations Prohibited
265k20 Corporate Acquisitions or Mergers
265k20(11) Particular Industries
265k20(11.1) k. In General. Most Cited Cases

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Asset divestiture by electric utilities for purposes of transition to competitive electric industry could be effected through exercise of powers inherent in Public Service Commission's (PSC) discretion to set rates; if events would ultimately demonstrate that utility ownership of generation facilities jeopardized just and reasonable rates or safe and adequate services, Commission could condition discretionary rate relief on asset divestiture. McKinney's Public Service Law §§ 65, 66.

[15] **Electricity 145 ⚷11.3(7)**

145 Electricity
145k11.3 Regulation of Charges
145k11.3(7) k. Judicial Review and Enforcement. Most Cited Cases
Failure to guarantee electric utilities full recovery of stranded costs arising from competition in electric industry, based on Public Service Commission (PSC) decision to examine recoverability of stranded costs on case-by-case basis, would not constitute breach of contract under utilities' alleged regulatory compact with State to provide safe and reliable service in return for prudent cost recovery, for purposes of judicial review of Commission order on transition to competitive electric industry. McKinney's Public Service Law §§ 25, 65, subd. 1, 72.

[16] **Public Utilities 317A ⚷114**

317A Public Utilities
317AII Regulation
317Ak114 k. Service and Facilities. Most Cited Cases
If utilities fail to provide service, regardless of their rate levels, Public Service Commission (PSC) may take preventive, corrective, or remedial action. McKinney's Public Service Law §§ 25, 65, subd. 1, 72.

[17] **Electricity 145 ⚷11.3(5)**

145 Electricity
145k11.3 Regulation of Charges
145k11.3(5) k. Reasonableness of Charges. Most Cited Cases

**Gas 190 ⚷14.4(1)**

190 Gas
190k14 Charges
190k14.4 Reasonableness of Charges
190k14.4(1) k. In General. Most Cited Cases
"Just and reasonable" gas and electric utility rates do not necessarily guarantee utilities net revenues nor do they immunize utilities from effects of competition. McKinney's Public Service Law § 65, subd. 1.

[18] **Constitutional Law 92 ⚷252.5**

92 Constitutional Law
92XII Due Process of Law
92k252.5 k. Rights, Interests, Benefits, or Privileges Involved, in General. Most Cited Cases
Due process clause cannot be applied to insure values or to restore values that have been lost by operation of economic forces. U.S.C.A. Const.Amend. 14.

[19] **Public Utilities 317A ⚷119.1**

317A Public Utilities
317AII Regulation
317Ak119 Regulation of Charges
317Ak119.1 k. In General. Most Cited Cases
Regulation does not insure that business shall produce net revenues, nor does Constitution require that losses of business in one year shall be restored from future earnings. U.S.C.A. Const.Amend. 14.

[20] **Electricity 145 ⚷11.3(1)**

145 Electricity
145k11.3 Regulation of Charges
145k11.3(1) k. In General. Most Cited Cases

**Gas 190 ⚷14.4(2)**

190 Gas
190k14 Charges
190k14.4 Reasonableness of Charges
190k14.4(2) k. Elements Considered in General. Most Cited Cases

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**Gas 190 ⇐14.5(6)**

190 Gas
190k14 Charges
190k14.5 Judicial Review and Enforcement of Regulations
190k14.5(6) k. Scope of Review and Trial De Novo. Most Cited Cases
For gas and electric utility ratemaking purposes, Public Service Commission (PSC) is free to entertain or ignore any particular factor, or to assign whatever weight it deems appropriate; statute governing order fixing price of gas or electricity mandates only that rates fixed by Commission be just and reasonable and, consequently, unless it is shown that judgment of Commission was exercised without any rational basis or without any reasonable support in record, its determination is not to be set aside. McKinney's Public Service Law § 72.

[21] **Electricity 145 ⇐11.3(5)**

145 Electricity
145k11.3 Regulation of Charges
145k11.3(5) k. Reasonableness of Charges. Most Cited Cases

**Gas 190 ⇐14.4(1)**

190 Gas
190k14 Charges
190k14.4 Reasonableness of Charges
190k14.4(1) k. In General. Most Cited Cases
Unless shown to be unjust and unreasonable, gas and electric utility rates fixed by Public Service Commission (PSC) are valid. McKinney's Public Service Law § 72.

[22] **Public Utilities 317A ⇐119.1**

317A Public Utilities
317AII Regulation
317Ak119 Regulation of Charges
317Ak119.1 k. In General. Most Cited Cases
For utility ratemaking purposes, if end result is just and reasonable balancing of consumer and investor interests, Public Service Commission (PSC) may employ prudent investment test or any other formula or combination of formulae without offending Federal Constitution. McKinney's Public Service Law § 72.

[23] **Public Utilities 317A ⇐123**

317A Public Utilities
317AII Regulation
317Ak119 Regulation of Charges
317Ak123 k. Reasonableness of Charges in General. Most Cited Cases

**Public Utilities 317A ⇐194**

317A Public Utilities
317AIII Public Service Commissions or Boards
317AIII(C) Judicial Review or Intervention
317Ak188 Appeal from Orders of Commission
317Ak194 k. Review and Determination in General. Most Cited Cases
Single immutable rule of utility ratemaking is whether end result is just and reasonable, and fair as between utilities' customers and their stockholders; that is determination of regulatory body, subject only to prohibition against arbitrary and capricious decisionmaking, and courts must otherwise defer to expertise of regulatory body. U.S.C.A. Const.Amend. 14; McKinney's Public Service Law § 72.

[24] **Electricity 145 ⇐1**

145 Electricity
145k1 k. Regulation in General; Statutes and Ordinances. Most Cited Cases

**Electricity 145 ⇐11.3(1)**

145 Electricity
145k11.3 Regulation of Charges
145k11.3(1) k. In General. Most Cited Cases
Public Service Commission (PSC) order on transition to competitive electric industry, instructing electric utilities to file restructuring plans, rejecting utilities' claim that consumers, as a matter of law, must pay rates designed to recover all stranded costs, and stating Commission's policy on

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

competitive marketplace, was not "rule" under State Administrative Procedure Act (SAPA); Act provided that nonbinding statements of general policy were not rules, and Commission's rejection of utilities' stranded costs claim simply restated well-established law and was application of binding principle of law, not within concept of Act "rule." McKinney's State Administrative Procedure Act § 102(2)(a), (2)(b)(iv).

[25] **Administrative Law and Procedure 15A⟹410**

15A Administrative Law and Procedure
15AIV Powers and Proceedings of Administrative Agencies, Officers and Agents
15AIV(C) Rules and Regulations
15Ak410 k. Filing. Most Cited Cases
Only a fixed, general principle to be applied by administrative agency without regard to other facts and circumstances relevant to regulatory scheme of statute it administers constitutes "rule" or " regulation" required by state constitutional provision to be filed in office of Department of State. McKinney's Const. Art. 4, § 8.

[26] **Electricity 145 ⟹1**

145 Electricity
145k1 k. Regulation in General; Statutes and Ordinances. Most Cited Cases
If and when Public Service Commission (PSC) would approve or reject electric utility plan on how utility would restructure in competitive marketplace, or would order restructuring in certain manner, Commission would be promulgating "rule" and would have to take appropriate action under State Administrative Procedure Act (SAPA). McKinney's State Administrative Procedure Act §§ 101 et seq., 102(2)(a).

[27] **Electricity 145 ⟹1**

145 Electricity
145k1 k. Regulation in General; Statutes and Ordinances. Most Cited Cases
Statutory provision, stating that Public Service Commission (PSC) shall encourage all persons and corporations subject to its jurisdiction to formulate and carry out long-range programs for performance of their public service responsibilities with economy, efficiency, and care for public safety, preservation of environmental values, and conservation of natural resources, empowers Commission to require electric utilities to file plans outlining how they would adapt to competitive electric industry. McKinney's Public Service Law § 5, subd. 2.

[28] **Electricity 145 ⟹11.3(6)**

145 Electricity
145k11.3 Regulation of Charges
145k11.3(6) k. Proceedings Before Commissions. Most Cited Cases
Electric utilities are not, as a matter of law, entitled to rates that are designed to recover all competitive losses resulting from competitive electric industry, irrespective of impact that such rates would have on consumers or state's economy.

****506 *925** Gibson, Dunn & Crutcher, L.L.P. ( Theodore B. Olson, of the Washington, DC Bar, admitted pro hac vice, of counsel), and Davis, Polk & Wardwell, New York City (Guy Miller Struve, of ***926** counsel), for Energy Association of New York State and others, petitioners.
Howard Shapiro and Stuart I. Silbergleit, Albany, and LeBouef, Lamb, Greene & MacRae, L.L.P., Albany (Paul L. Gioia, of counsel), for Energy Association of New York State, petitioner.
Gould & Wilkie, New York City (Robert J. Glasser, of counsel), for Central Hudson Gas & Electric Corporation, petitioner.
Edwin W. Scott, New York City, for Consolidated Edison Company of New York, Inc., petitioner.
Leonard P. Novello, Hicksville, for Long Island Lighting Company, petitioner.
Huber, Lawrence & Abell, New York City ( Kenneth M. Jasinski, of counsel), for New York State Electric & Gas Corporation, petitioner.
Franklin K. Breselor, Albany, for Niagara Mohawk Power Corporation, petitioner.
John L. Carley, Pearl River, for Orange and Rockland Utilities, Inc., petitioner.
Nixon, Hargrave, Devans & Doyle, Rochester (Richard N. George, of counsel), for Rochester Gas

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

and Electric Corporation, petitioner.
Christina C. Forbes, Washington, DC, for Edison Electric Institute, intervenor-petitioner.
B. Robert Piller and Gerald A. Norlander, Albany, for Public Utility Law Project of New York, Inc. and another, intervenors-petitioners.
Irwin Geller, Ridgefield, Connecticut, for Utility Workers Union of America, Local 102, intervenor-petitioner.
Sherman, Dunn, Cohen, Leifer & Yelling, P. C., Washington, DC (Victoria L. Bor, of counsel), and Prozefsky, Branley & Murphy, Albany (Anthony J. Murphy, of counsel), for International Brotherhood of Electrical Workers, AFL-CIO, intervenor-petitioner.
Maureen O. Helmer, Albany (Lawrence G. Malone, of counsel), for Public Service Commission of State of New York, respondent.
Dennis C. Vacco, Attorney-General, New York City (Richard W. Golden, of counsel), for New York State Department of Law, intervenor-respondent.
James F. Warden, Jr., Albany, for New York State Consumer Protection Board, intervenor-respondent.
Kudman, Trachten & Kessler, New York City ( Phyllis J. Kessler, of counsel), for New York Energy Buyer's Forum and others, intervenors-respondents.
Couch, White, Brenner, Howard & Feigenbaum, L.L.P., Albany (Barbara S. Brenner, of counsel), for Multiple Intervenors, intervenor-respondent.
Duncan, Weinberg, Miller & Pembroke, P. C., Washington, DC (R. Michael Sweeny, of counsel), for Municipal Electric Utilities Association of New York State, intervenor-respondent.
Robert J. Cassandro, Jericho, for Wheeled Electric Power Company, intervenor-respondent.
**507 White & Case, South Washington, DC ( Carmen D. Legato, of counsel), and Cohen, Dax, Koenig & Willes, P. C., Albany (John W. Dax, of counsel), for National Power Lenders Forum, amicus curiae.
*927 JOSEPH HARRIS, Justice:

PREFACE

In mythological times fire was the exclusive property of the gods. When Prometheus, a Titan, broke the monopoly of the gods and brought the gift of fire to mankind, so incensed were the gods that they caused Prometheus to be chained to a great rock where during the day an eagle devoured his liver. During the night his liver regenerated and the process continued until Prometheus was freed by Hercules.

We turn now to the real world. Fire no longer belongs to the gods, but to the People. The overriding issue of this case is the mode to be followed by the People for generation, transmission and distribution of fire, transmogrified in the context of this case into electric energy-monopolistic or competitive, or some gradation in between.

There is no question that the People, acting through their Legislature, have the ultimate right to choose-now and for the future of the Twenty First century and for all times-what that mode shall look like. Nor is there any question but that the Legislature of the State of New York-which is the embodiment of the People of the State of New York-has the right to delegate the necessary choices to the Public Service Commission (PSC) as its action arm, provided that the Legislature promulgates necessary and appropriate guidelines for the exercise of those choices, so that those choices will represent not the purely independent choice of the said PSC, but the intent of the Legislature.

The only question remaining, respecting the several particularized issues of this case, and the authority of the PSC to so act upon, is whether or not the Legislature has properly delegated to the PSC the necessary authority. This Court finds it has. The Public Service Law is a blueprint within which the Public Service Commission is charged with the governance of the energy resources of the State of New York within the guidelines therein set forth!

THE FACTS

In March 1993 the Public Service Commission of the State of New York ("PSC") commenced the Herculean task of smoothing New York's transition to an increasingly competitive electric industry by instituting Phase I of an administrative proceeding

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

designed to discuss, investigate and address relevant issues.

***928** Phase II commenced in August 1994 "to identify regulatory and ratemaking practices that will assist in a transition to a more competitive electric industry designed to increase efficiency in the provision of electricity while maintaining safety, environmental, affordability, and service quality goals." [FN1] This involved a broad and intensive collaboration on the part of the electric utilities and the PSC to develop potential models for restructuring the electric industry, culminating on May 20, 1996 with the issuance by the PSC of Opinion 96-12. [FN2]

FN1. *Re Competitive Opportunities Available to Customers of Elec. & Gas Serv. (Order Instituting Phase II of Proceeding),* case 93-M-0229, 154 PUR4th 35, 36-38 (1994).

FN2. More formally the issues involved herein are embodied in *Re Competitive Opportunities Regarding Elec. Serv. (Opinion & Order Regarding Competitive Opportunities for Elec. Serv.,* cases 94-E-0952 *et al.,* Opn No. 96-12, 168 PUR4th 515 [1996] ) and *Re Competitive Opportunities Regarding Elec. Serv. (Opinion & Order Deciding Petitions for Clarification & Rehearing,* cases 94-E-0952 *et al.,* Opn No. 96-17, --- PUR4th --- [slip op, July 17, 1996] ). The basic opinion for which judicial review is sought remains Opinion No. 96-12, and for ease of reference it will be that opinion which will be discussed here.

Opinion 96-12 contains three steps: (1) orders electric utilities to file plans on how they would restructure in a competitive marketplace; (2) rejects the utilities' claim that consumers, *as a matter of law* , must pay rates designed to recover *every* dollar of stranded costs, [FN3] regardless of origin and ratepayer impact, reserving the issue for a factual case-by-case analysis and determination; and (3) sets forth a PSC policy statement****508** on electric competition ("Vision Policy").

FN3. Revenue shortfalls occasioned for diverse reasons.

## THE ISSUES

The utilities' petition raises four issues: (1) Did the PSC have jurisdiction to require utility filings? (the PSC's response is in the affirmative); (2) Did the PSC's rejection of the utilities' demand that *all* competitive losses be borne by consumers breach a regulatory compact, violate the Public Service Law, or infringe on the utilities' constitutional rights? (in each category the response of the PSC is in the negative); (3) Did the PSC fail to comply with the State Administrative Procedure Act ("SAPA")? (the response of the PSC is in the negative); (4) May a utility challenge a Policy Statement which is non-justiciable because it does not order the actions which the utilities contest? (the response of the PSC is in the negative).

Further, although the PSC did not order the utilities to sell assets or carry electricity of other providers and did not ***929** deregulate generation, the utilities ask the Court to declare whether the PSC has jurisdiction to do so. The PSC contends that these jurisdictional issues are non-justiciable and do not state a cause of action.

[1] [2] The Court wishes to make crystal clear that on factual issues and decisions, unless same are obviously arbitrary and capricious, the Court must defer to the expertise of the PSC and not attempt to superimpose its own factual perceptions. Factual determinations are the province of the People, acting through their representatives, the Legislature, and the PSC insofar as authority is properly delegated thereto; only the Law is the province of the Court, limited solely to the question as to whether legal authority existed for the actions of the PSC-not the merits of those actions. [FN4] (See: *New York Telephone Co. v. Public Service Commission,* 98 A.D.2d 535, 471 N.Y.S.2d 891 [1984] ).

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

FN4. Once again, subject to the rules prohibiting arbitrary and capricious actions.

THE LAW

***Re: The Power of the PSC to Require Regulated Utilities to File Plans***

Section 5(2) was added to the Public Service Law in 1970. It was a revolutionary enhancement of the functions of the PSC in the management and control of the electrical industry in the State of New York, transforming the traditional role of the Commission from that of an instrument for a simple case-by-case consideration of rates requested by utilities to one charged with the duty of long-range planning for the public benefit. In his approval memorandum, Governor Rockefeller stated in clarion tones a call for the electrical industry of New York State to enter the new world of modern technology:

"This bill ... makes the first basic reorganization in the structure of the Public Service Commission ... By changing the Commission's direction, composition and operations, it will enable the Commission to meet the challenges of modern technology, now and in the future, and to respond more fully to public need.

The bill specifically directs the Commission to encourage utilities subject to its jurisdiction to formulate and carry out long-range programs, both individually and cooperatively, for the performance of their responsibilities with economy, efficiency and care for public safety, preservation of environmental ***930** values and conservation of natural resources. Recognition of the interdependence of these factors and of the crucial importance of long-range planning for the public weal represents a major departure from existing responsibilities of the Commission, which have traditionally been confined to case by case consideration of rates, service level and franchises." (Governor's Mem. approving L.1970, ch. 155, 1970 N.Y.Legis.Ann., at 475.)

Simply, Public Service Law, sec. 5, entitled " Jurisdiction, powers and duties of public service commission", in subdivision 2 thereof, states:

"The commission shall encourage all persons and corporations subject to its jurisdiction to formulate and carry out long-range programs, individually or cooperatively, for the performance of their public service responsibilities with economy, efficiency, and care for public safety, the preservation of environmental values and the conservation of natural resources."

****509** Moving out from this basic charge, Public Service Law, sec. 65(1) declares: "Every gas corporation, every electric corporation and every municipality shall furnish and provide such service, instrumentalities and facilities as shall be safe and adequate and in all respects *just and reasonable.*" (Emphasis supplied).

Section 66 of the Public Service Law is entitled " General powers of commission in respect to gas and electricity." Subdivision 1 declares that the commission shall: "1. Have general supervision of all gas corporations and electric corporations ..."

Section 66(10) recites in pertinent part: "The commission may require of all such corporations, persons or municipalities, specific answers to questions upon which the commission may need information, and may also require such corporations, persons or municipalities to file periodic reports in the form, covering the period and filed at the time prescribed by the commission."

And ultimately Public Service Law, sec. 4(1) recites: "There shall be in the department of public service a public service commission, which shall possess the powers and duties hereinafter specified, and also *all powers necessary or proper to enable it to carry out the purposes of this chapter.*" [Emphasis supplied]

[3] Petitioners acknowledge that Public Service Law, sec. 66(10) empowers the Commission to require answers to specific questions "upon which the [PSC] may need information" but contest ***931** the applicability of section 66(10) by claiming that " the Commission may not require the utilities to file plans that include actions that are beyond the Commission's legal authority to mandate." (Pet., par. 116)

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Their position is without merit. The PSC *has* jurisdiction over utility rates, services and long-range economic planning. (Public Service Law, sections 5(2), 65, 66(10) and 4(1)).

As stated by the Court of Appeals in the *Matter of Consolidated Edison Company of New York, Inc. v. Public Service Commission,* 47 N.Y.2d 94, 102-103, 417 N.Y.S.2d 30, 390 N.E.2d 749 [1979], rev'd on other grounds, 447 U.S. 530, 100 S.Ct. 2326, 65 L.Ed.2d 319: "In light of current exigencies, one of the policies of any public service legislation must be the conservation of our vital and irreplaceable resources. The Legislature has but recently imposed upon the commission a duty to ' encourage all persons and corporations ... to formulate and carry out long-range programs ... [for] the preservation of environmental values and the conservation of natural resources' (Public Service Law, sec. 5, subd. 2). Implicit in this amendment is a legislative recognition of the serious situation which confronts our State and Nation. More important, conservation of resources has become an avowed legislative policy embodied in the commission's enabling act (see, also, *Matter of New York State Council of Retail Merchants v. Public Serv. Commn. of State of New York,* 45 N.Y.2d 661, 673-674 [412 N.Y.S.2d 358, 384 N.E.2d 1282] )."

The PSC's action in Opinion 96-12, requiring the regulated electric utilities to file plans to "carry out long-range programs ... for the performance of their public service responsibilities with economy, efficiency, and care for ... the conservation of natural resources" (Public Service Law, sec. 5(2)), being expressly authorized by Public Service Law, sections 5(2), 65, 66(10) and 4(1), there is no conflict with *Boreali v. Axelrod,* 71 N.Y.2d 1, 523 N.Y.S.2d 464, 517 N.E.2d 1350. (See, *Matter of Multiple Intervenors v. PSC,* 166 A.D.2d 140, 569 N.Y.S.2d 522, [3rd Dep't 1991] ). FN5

FN5. "Since the Legislature and not the PSC has, thus, chosen the end to be accomplished, has given the PSC broad discretion to choose the means of achieving the legislative objective, and the PSC's choice of rate-making incentives for effective DSM energy conservation programs embodied in Opinion No. 89-29 clearly bears a reasonable relationship to the purpose of the enabling legislation [ PSL sec. 5(2) ], the challenge to the PSC determination withstands any objections based upon *Boreali v. Axelrod,* supra" ( *Multiple Intervenors,* supra, p. 144, 569 N.Y.S.2d 522).

**932 MONOPOLISTIC AND COMPETITIVE CONSIDERATIONS OF OPINION 96-12*

[4] State and federal antitrust laws, as well as anti-discrimination provisions of the Public Service Law, prohibit utilities from denying competitors use of their distribution ****510** facilities in order to maintain monopolies. See: New York General Business Law, sec. 340 (Donnelly Act); 15 U.S.C.A., sec. 2 (Sherman Anti-Trust Act); Public Service Law, sec. 65(2).

[5] In their petition, petitioners ask the Court to declare that the PSC may not direct retail wheeling, generation deregulation or asset divestiture.

The Commission has not in fact directed these actions; thus a justiciable controversy is not presented. (See, *Cuomo v. Long Island Lighting Co.,* 71 N.Y.2d 349, 525 N.Y.S.2d 828, 520 N.E.2d 546 (1988)). Unless and until the Commission takes directive action there is no justiciable controversy. (See, *Church of St. Paul and St. Andrew v. Barwick,* 67 N.Y.2d 510, 505 N.Y.S.2d 24, 496 N.E.2d 183 [1986], cert. denied, 479 U.S. 985, 107 S.Ct. 574, 93 L.Ed.2d 578 [1986] ). Because the PSC has not in fact ordered utilities either to sell assets or carry the electricity of others (retail wheeling), and has not in fact modified its regulation of the generation of electricity, the areas of the petition dealing with these issues do not state a cause of action. (See, *Jamaica Water v. P.S.C.,* 152 A.D.2d 17, 547 N.Y.S.2d 933 [3rd Dept.1989] ).

The Commission policy statement adopted the principle of retail wheeling (utilities carrying electricity to end users in return for a reasonable "

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

retail wheeling" rate) (without directing same), and established, as a goal, a January 1, 1998 implementation date. No direction was necessary because electricity rates have yet to be "unbundled" (i.e., disassembled and broken into their component parts), open transmission access has not yet taken effect, and given the "essential facilities" doctrine of the antitrust laws and anti-discrimination provisions of the Public Service Law, a retail wheeling directive ought not to be necessary. FN6

FN6. It appears also that the PSC wants a brief period of wholesale wheeling before getting into retail wheeling.

[6] Nevertheless, petitioners assert that the Commission allegedly lacks authority under the Public Service Law to order retail wheeling, and that in addition, the issue of retail wheeling is preempted by the Federal Power Act. In addition to the fact that the PSC has not ordered retail wheeling, the position of the petitioners above set forth is clearly without merit. A specific grant of authority in the Public Service Law, authorizing ***933** retail wheeling under specific circumstances, may not be construed to defeat an agency's ability to implement broad remedial powers under other circumstances. (See, McKinney's Cons.Laws of N.Y., Book 1, Statutes, sections 96, 97, 321, 341; *Matter of Bath and Hammondsport R.R. Co. v. NYS Dep't of Envtl. Conservation*, 73 N.Y.2d 434, 440, 541 N.Y.S.2d 732, 539 N.E.2d 560 [1989]; see also, PSL, sec. 65(1) (assure the provision of safe and adequate electricity service at rates that are " just and reasonable"), PSL, sec. 65(3) (require utilities to provide services in a non-discriminatory manner), PSL, sec. 66(1) (exercise general supervision of all electric corporations and plants), and PSL, sec. 4(1) (exercise "all powers necessary or proper to enable it to carry out the purposes" of the Public Service Law).)

Refusal to deliver a competitor's electricity, while delivering one's own, would create a preferential use of the distribution system (contrary to PSL, sec. 65(3)) and otherwise violate state and federal antitrust laws.

[7] Utility services have traditionally been "bundled " (i.e., customers have paid for all elements-generation, transmission, delivery, customer billing) in a single rate. Over the last two decades, however, state and federal regulators have "unbundled" or disaggregated, telephone and natural gas service into discrete components in order to engender competition for the unbundled element. (See, *Associated Gas Distributors v. F.E.R.C.*, 824 F.2d 981 (D.C.Cir.1987), cert. denied sub nom. *Interstate Natural Gas Assn. v. Federal Energy Regulatory Commn.*, 485 U.S. 1006, 108 S.Ct. 1468, 99 L.Ed.2d 698 (1988), wherein the D.C. Circuit Court of Appeals affirmed a decision of the Federal Energy Regulatory Commission that " bundled" gas rates were anti-competitive and, therefore, in order to achieve "just and reasonable" rates had to be unbundled; see ****511** also, *MCI Telecommunications Corp. v. Federal Communications Commission*, 561 F.2d 365 (D.C.Cir.1977), cert. denied, 434 U.S. 1040, 98 S.Ct. 780, 54 L.Ed.2d 790 (1978), overturning an FCC decision that failed to require a regulated utility to provide access to its network). FN7

FN7. Under the essential facilities doctrine, a refusal to deal with a competitor is violative of antitrust laws if there is (1) control of the essential facility by a monopolist; (2) a competitor's inability practically or reasonably to duplicate the essential facility; (3) the denial of the use of the facility to a competitor; and (4) the feasibility of providing the facility. (See, *MCI Communications Corp. v. AT & T*, 708 F.2d 1081, 1132, 1133 (7th Cir.1983), cert. denied, 464 U.S. 891, 104 S.Ct. 234, 78 L.Ed.2d 226 [1983] ).

[8] The Public Service Law must not be restrictively read, lest as stated by the Court of Appeals in ***934***Matter of New York Tel. Co. v. P.S.C.*, 72 N.Y.2d 419, 427-428, 534 N.Y.S.2d 136, 530 N.E.2d 843 (1988), "... [s]uch a restricted reading of Public Service Law § 110(3) would frustrate the very ameliorative purpose of the legislation ..." And in *Niagara Mohawk v. P.S.C.*,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

69 N.Y.2d 365, 372, 514 N.Y.S.2d 694, 507 N.E.2d 287 (1987), said Court, in upholding a PSC decision ordering refunds of previously recovered fuel expenses and reversing the Appellate Division's reading of the Public Service Law, called for "a realistic appraisal of a particular situation to determine whether the administrative action reasonably promotes or transgresses the pronounced legislative judgment."

In *Otter Tail Power Co. v. United States*, 410 U.S. 366, 374, 93 S.Ct. 1022, 1028, 35 L.Ed.2d 359 (1973) the U.S. Supreme Court held that courts may order retail wheeling to remedy antitrust violations.

As far back as 1919, then Judge (later United States Supreme Court Justice) Benjamin Cardozo wrote in *In re Pennsylvania Gas Co.*, 225 N.Y. 397, 122 N.E. 260 (1919), aff'd 252 U.S. 23, 40 S.Ct. 279, 64 L.Ed. 434 (1920), that utilities using governmental power of eminent domain and using public rights-of-way have an "inherent duty" to serve that public.

[9] Neither is the PSC preempted from effectuating retail wheeling by any federal law. Section 201(b) of the Federal Power Act limits the jurisdiction of the Federal Energy Regulatory Commission ("FERC ") to "the transmission of electric energy in interstate commerce and to the sale of electric energy at wholesale in interstate commerce." (16 U.S.C., sec. 824(b)). Further, section 201(a) of the Federal Power Act declares that "... federal regulation ... extend[s] only to those matters which are not subject to regulation by the States." (16 U.S.C., sec. 824(a)). Finally, that retail wheeling is the province of state jurisdiction becomes crystal clear from section 212(g) of the Federal Power Act, wherein it is stated that "no order [requiring transmission service] may be issued ... which is inconsistent with any State law which governs the retail marketing areas of electric utilities." (16 U.S.C., sec. 824k(g)). [See also, Energy Policy Act of 1992 (Pub.L. 102-486, 106 U.S.Stat. 2776), in which Congress reaffirmed that the regulation of retail electric sales is a matter of state jurisdiction].

Petitioners' constitutional claims against retail wheeling center around their contention that requiring them to carry competitors' electricity would amount to a "taking", even though said competitors would be required to pay "just and reasonable" rates. The argument then switches to the contention ***935** of petitioners that they must be afforded full "stranded costs." FN8

FN8. Infra.

In *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982) the U.S. Supreme Court did indeed hold a New York statute mandating a permanent attachment of cable television wires to a private building amounted to a taking, but carefully emphasized the vital distinction between a permanent, physical occupation by a private enterprise and "a regulation that merely restricts the use of property." [*Ibid.*, p. 430, 102 S.Ct. p. 3164]. Retail wheeling is not affected by this holding inasmuch as the carrying of a competitor's electricity is not a permanent, physical occupation, and further, that utilities are quasi-public. In *Rochester Gas and Elec. Corp. v. PSC*, 71 N.Y.2d 313, 525 N.Y.S.2d 809, 520 N.E.2d 528 (1988) the New York Court of Appeals rejected the argument that to require a utility to carry a competitor's natural ****512** gas resulted in a physical invasion of RG & E's distribution system, holding that to require a regulated utility to carry that which it has always carried does not amount to a taking inasmuch as the utility is not being forced to provide services beyond its original commitment, but is only being required to furnish services it has always provided. (See also, *In re Pennsylvania Gas Co.*, 225 N.Y. 397, 122 N.E. 260 [1919], aff'd 252 U.S. 23, 40 S.Ct. 279, 64 L.Ed. 434 [1920]; *U.S. v. Ohio Oil Co.*, 234 U.S. 548, 34 S.Ct. 956, 58 L.Ed. 1459 [1913]; *Kansas City Power and Light Co. v. State Corp. Comm'n*, 238 Kan. 842, 715 P.2d 19 [1986], appeal dismissed, 479 U.S. 801, 107 S.Ct. 41, 93 L.Ed.2d 4 [1986], wherein the Court held that legislation mandating that electric utilities interconnect their facilities with those of private cogenerators did not constitute a taking.)

[10] [11] Utilities are not entitled to deny the public, or competitors, access to facilities in *public*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

rights-of-way. (*United States v. Ohio Oil Co.*, 234 U.S. 548, 34 S.Ct. 956, 58 L.Ed. 1459 [1913] ). Nor do they have a property interest in customers or a right, statutorily or constitutionally, to a *de facto* monopoly. In *MCI Telecommunications Corp. v. FCC,* 561 F.2d 365 (D.C.Cir.1977), cert. denied 434 U.S. 1040, 98 S.Ct. 780, 781, 54 L.Ed.2d 790 (1978), the Court stated: "... [t]he ultimate test of industry structure in the communications common carrier field must be the public interest, not the private financial interests of those who have until now enjoyed the fruits of *de facto* monopoly." FN9 [*Id.* at 380]. (See also, *Tennessee Power Co. v. T.V.A.*, 306 U.S. 118 [1939] ).

FN9. Including a 60% differential between New York State rates and those throughout the rest of the nation.

***936** Courts have repeatedly confirmed that the PSC has broad discretion to select the means for achieving the Legislature's goals of "just and reasonable rates" and economic, efficient service. (See, *Consolidated Edison v. PSC,* 47 N.Y.2d 94, 417 N.Y.S.2d 30, 390 N.E.2d 749 [1979], rev'd on other grounds, 447 U.S. 530, 100 S.Ct. 2326, 65 L.Ed.2d 319 [1980] ). Further, the Courts have recognized that to introduce "competition into a monopolistic marketplace and thus lower prices to consumers" is well within the Commission's jurisdiction. (*Matter of CNG Transmission Corp. v. New York State Public Serv. Comm'n,* 185 A.D.2d 671-2, 585 N.Y.S.2d 916). And in *Matter of Rochester Gas and Electric Corp. v. PSC,* 117 A.D.2d 156, 160, 501 N.Y.S.2d 951 [3rd Dep't 1986], the Third Department declared: "The use by an administrative agency of the evolutional approach is particularly fitting.... Respondent has been delegated, by the Legislature, the difficult and sensitive responsibility of balancing the conflicting interests of the public and the utilities. In fulfilling that obligation, it cannot become stagnated but must adapt to the changing patterns in the industry, and rational responses by respondent should not be a target of judicial intervention."

Electric service comprises three elements: generation, transmission and distribution. Opinion 96-12's policy statement does not envision unregulated transmission and distribution rates, although the PSC clearly has the power to do so.

[12] It is in the area of generation that the petitioners contest a future policy of regulatory forbearance. Section 65(1) of the Public Service Law calls on the PSC to set "just and reasonable" rates for electric service. Petitioners suggest that the PSC may not allow market pressures to set rates for the generation component of electric service.

In *Elizabethtown Gas Co. v. Federal Energy Regulatory Comm'n,* 10 F.3d 866, 869 (D.C.Cir.1993), the Court held FERC's approval of market-based pricing was "just and reasonable" because, in part, FERC had emphasized that it would exercise its oversight powers to assure that a market rate was "just and reasonable." This decision was consistent with the basic economic principle that "in a competitive market, where neither buyer nor seller has significant market power, it is rational to assume that the terms of their voluntary exchange are reasonable, and specifically to infer that price is close to marginal cost, such that the seller makes only a normal return on its investment." ****513** (*Tejas Power Corp. v. FERC,* 908 F.2d 998, 1004 [D.C.Cir.1990] ).

If and when the PSC lightens regulation of generation to accommodate competition, the justiciable issue will be whether ***937** such action rationally advances the Legislature's purpose of bringing customers "just and reasonable" electric service. That is the legislative standard, to be determined in particular cases by PSC expertise, subject to judicial review to guard against arbitrary and capricious decisions.

[13] [14] Opinion 96-12 encourages utilities to divest themselves of generation assets in order to facilitate the development of a competitive market place "not subject to the abuses of dominant market power" (*Re Competitive Opportunities Regarding Elec. Serv. [Opinion & Order Regarding Competitive Opportunities for Elec. Serv.],* cases 94-E-0952 *et al.*, Opn. No. 96-12, 168 PUR 4th 587, at n. 98). It does not, however, in fact direct divestiture. Nevertheless petitioners petition the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Court for a declaration that the Commission lacks authority to do so. Though academic questions are not a proper subject for judicial review (*Cuomo v. Long Island Lighting,* 71 N.Y.2d 349, 525 N.Y.S.2d 828, 520 N.E.2d 546 [1988] ), it is meaningful to note that divestiture may be effected through exercise of powers inherent in the PSC's discretion to set rates. FN10

FN10. Public Service Law, section 72 expressly authorizes the PSC to condition rate increases on "such terms, conditions or safeguards as the commission may prescribe."

Prometheus' act of courage and beneficence in breaking the monopoly of the gods by giving electrical energy to mankind-and its terrible consequences to him-may not be demeaned by a mere transfer of that monopoly to the lords of industry, for the benefit only of some and not of all. It was a gift to *mankind,* not a gift to a favored few. If events ultimately demonstrate that utility ownership of generation facilities jeopardizes "just and reasonable" rates or "safe and adequate" services (PSL, sections 65, 66; *Matter of Public Serv. Comm'n v. Jamaica Water Supply Co.,* 42 N.Y.2d 880, 397 N.Y.S.2d 784, 366 N.E.2d 872 [1977] ), it would appear the Commission may condition discretionary rate relief on asset divestiture.

***OPINION 96-12 AND STRANDED COSTS*** FN11

FN11. Revenue shortfalls.

In Opinion 96-12 the Public Service Commission rejected a claim by the utility industry that rates, as a matter of law, must be designed to reimburse them for every dollar that the utilities may lose due to competition.

The electric utility industry repeatedly professed recognition that a competitive electric marketplace was inevitable and in the public interest; it, however, conditioned its cooperation on ***938** an assurance that ratepayers would underwrite all stranded costs-in the context of this case, competitive losses. Having, as a matter of law, been denied that assurance, the utilities brought this petition denying a jurisdictional base for the other aspects of Opinion 96-12.

[15] One of the arguments made by petitioners in support of their claims for total recovery of their stranded costs (as against the PSC decision, based on the law, to examine the recoverability of stranded costs on a case-by-case basis) is that they contracted with New York State to provide safe and reliable service in return for prudent cost recovery; that this constituted a "regulatory compact"; and that failure to guarantee full recovery of stranded costs constitutes a breach of contract. These arguments are contradicted by the Public Service Law and have repeatedly been rejected by the courts. (See, Public Service Law, sec. 72; *Abrams v. Public Serv. Comm'n,* 67 N.Y.2d 205, 212, 501 N.Y.S.2d 777, 492 N.E.2d 1193 [1986], which has interpreted section 72 as empowering the PSC to deny utilities recovery of prudent costs; *Matter of Consolidated Edison Co. of N.Y. v. New York State PSC,* 53 A.D.2d 131, 134, 385 N.Y.S.2d 209 [3rd Dep't 1976], *motion for leave to appeal denied,* 40 N.Y.2d 803, 387 N.Y.S.2d 1030, 356 N.E.2d 482, wherein the court stated "other than the accomplishment of a just and reasonable result there is no requirement in law that any specific factors should be considered in fixing utility rates ...").

****514** [16] Since the turn of the century, electric utilities have been on notice that they are required to serve the public need for electricity, not in return for a particular ratemaking method, but in return for a variety of powers traditionally reserved to the sovereign, including eminent domain and the use of public rights-of-way. (*Tismer v. The New York Edison Co.,* 228 N.Y. 156, 161, 126 N.E. 729 [1920] ("... the duty to serve would exist without the statute, for it results from the acceptance of the franchise of a public service corporation"); see also, *In re Pennsylvania Gas Co.,* 225 N.Y. 397, 406, 122 N.E. 260 [1920] ). If utilities fail to provide service, regardless of their rate levels, the PSC may take preventive, corrective or remedial action (PSL, sections 25, 65(1), 72; *Matter of the*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*PSC v. Jamaica Water Supply Co.*, 54 A.D.2d 10, 386 N.Y.S.2d 230 [1976], aff'd 42 N.Y.2d 880, 397 N.Y.S.2d 784, 366 N.E.2d 872 [1977] ).

The basis of agency ratemaking authority has traveled a path from "fair value" of "used and useful " assets (see, *Smyth v. Ames*, 169 U.S. 466, 18 S.Ct. 418, 42 L.Ed. 819 [1898] ), this language giving way to "prudent investment" language, to specific valuation methods based on an "end-result test", which enables agencies to use *any* ratemaking ***939** method of their choosing provided that the "end result" of the process is "just and reasonable" rates. (See, *Federal Power Comm'n v. Hope Natural Gas Co.*, 320 U.S. 591, 601-2, 64 S.Ct. 281, 287-88, 88 L.Ed. 333 [1944] ).

[17] [18] [19] "Just and reasonable" rates do not necessarily guarantee utilities net revenues nor do they immunize utilities from the effects of competition. "The due process clause ... has not and cannot be applied to insure values or to restore values that have been lost by the operation of economic forces." (*Mkt. St. Ry. Co. v. Railroad Comm'n of Cal.*, 324 U.S. 548, 567, 65 S.Ct. 770, 780, 89 L.Ed. 1171 [1945], reh'g denied 324 U.S. 890, 65 S.Ct. 1020, 89 L.Ed. 1438 [1945] ). " Regulation does not insure that the business shall produce net revenues, nor does the Constitution require that the losses of the business in one year shall be restored from future earnings." (*Federal Power Commission v. Natural Gas Pipeline Co. of America*, 315 U.S. 575, 590, 62 S.Ct. 736, 745, 86 L.Ed. 1037 [1942]; *San Diego Land and Town Co. v. Jasper*, 189 U.S. 439, 447, 23 S.Ct. 571, 574, 47 L.Ed. 892 [1903]; see also, *Covington and Lexington Turnpike Rd. Co. v. Sandford*, 164 U.S. 578, 596, 17 S.Ct. 198, 205, 41 L.Ed. 560 [1896], wherein the court held that the public need not be subject to unreasonable rates so that stockholders may earn dividends; rather, in order to be "just and reasonable", rates simply must reflect a fair balancing of ratepayer and shareholder interests).

In *Los Angeles Gas and Electric Corp. v. Railroad Comm'n of Cal.*, 289 U.S. 287, 306, 53 S.Ct. 637, 644, 77 L.Ed. 1180 [1933], the Court wrote that " while cost must be considered, the Court has held that it is not an exclusive or final test. The public have not underwritten the investment." And in *PSC of Mont. v. Great Northern Utilities Co.*, 289 U.S. 130, 135, 53 S.Ct. 546, 548, 77 L.Ed. 1080 [1933], the Court expounded "[t]he loss of, or the failure to obtain, patronage, due to competition, does not justify the imposition of charges that are exorbitant and unjust to the public. The ... Constitution ... does not protect public utilities against such business hazards."

The New York Public Service Commission generally has based rates on projections of prudent costs, but when necessary it has deviated from that procedure in order to avoid excessive or unreasonable rates. (See: *Matter of Rochester Gas and Electric Corp. v. PSC*, 108 A.D.2d 35, 488 N.Y.S.2d 303 [3 rd Dep't 1985]; *Matter of St. Lawrence Gas Co. v. PSC*, 42 N.Y.2d 461, 398 N.Y.S.2d 868, 368 N.E.2d 1234 [1977], wherein the Court confirmed a Commission decision denying a utility rate recovery of losses due to competition; PSC Case 27032, *Central Hudson Gas and Electric Corporation (Central Hudson)*, Opinion No. 77-6, 17 N.Y. PSC 401, 408-9 [1977], wherein the Commission denied a utility rate recovery of a portion of carrying charges on excess capacity that was prudently constructed; PSC Case 26943, *Niagara Mohawk Corporation*, Opinion 76-23, 16 N.Y. PSC 908, 923-930 [1976] ).

[20] ***940** The law of ratemaking in New York State-indeed, throughout the United ****515** States-is well and thoroughly stated in *Matter of Abrams v. PSC*, 67 N.Y.2d 205, 501 N.Y.S.2d 777, 492 N.E.2d 1193 [1986]. The Court affirmed the findings of the PSC's Administrative Law Judge and of the Appellate Division, Third Department [104 A.D.2d 135, 483 N.Y.S.2d 785], and held that under the rule enunciated in *Power Comm'n v. Hope Gas Co.*, 320 U.S. 591, 64 S.Ct. 281, 88 L.Ed. 333, the PSC was not obligated to use any particular formula or combination of formulae to determine rates and that in the instant case the PSC's application of the "prudent investment" test was "fair and reasonable" under the circumstances. "... Public Service Law § 72 empowers the PSC to consider all factors 'which in its judgment' are relevant 'with due regard among other things to a reasonable average return upon capital actually

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

expended.' The PSC is free to entertain or ignore any particular factor, or to assign whatever weight it deems appropriate ... Section 72 mandates only that the rates fixed by the PSC be 'just and reasonable' and, consequently, unless it is shown that the judgment of the PSC was exercised 'without any rational basis or without any reasonable support in the record', its determination is not to be set aside ... " (*Matter of Abrams v. PSC,* 67 N.Y.2d 205, 212, 501 N.Y.S.2d 777, 492 N.E.2d 1193, *supra.*)

[21] The rule of *Smyth v. Ames*, supra, does not prevail today. "In 1942 in its decision in *Power Comm'n v. Pipeline Co.*, 315 U.S. 575, 62 S.Ct. 736, 86 L.Ed. 1037, the Supreme Court overruled so much of *Smyth v. Ames* as prescribed a requirement for valuation based on 'fair value.' The Court held that '[t]he Constitution does not bind the ratemaking bodies to the service of any single formula or combination of formulas' (*Id.* at p. 586, 62 S.Ct. at p. 743). Two years later, in the landmark decision of *Power Comm'n v. Hope Gas Co.*, 320 U.S. 591, 64 S.Ct. 281, supra, the Court reaffirmed the rules stated in *Power Comm'n v. Pipeline Co.*, supra, and added that 'it is the result reached not the method employed which is controlling' (*Id.*, at p. 602, 64 S.Ct. at p. 288). Unless shown to be 'unjust and unreasonable', the rates are valid." (*Abrams*, supra, at p. 213, 501 N.Y.S.2d 777, 492 N.E.2d 1193).

[22] "In New York, the courts and the PSC have availed themselves of the latitude afforded by *Hope Gas Co.*, supra and have not insisted upon a rigid approach (cites omitted)." "[T]here is no Federal proscription against the use of the 'prudent investment' test ... Of course, the New York Public Service Commission is not *bound* under *Hope Gas Co.*, supra to use the 'prudent investment' approach and, indeed, it has not always done so (cites omitted). But if the end result is a ***941** just and reasonable balancing of consumer and investor interests, the PSC *may* employ the 'prudent investment' test or any other formula or combination of formulae without offending the Federal Constitution or decisional law." (*Abrams*, supra, pp. 214-215, 501 N.Y.S.2d 777, 492 N.E.2d 1193).

[23] When the wheat is separated from the chaff, the one immutable rule of ratemaking comes down to this: Is the "end result" "just and reasonable" -and fair as between the utilities' customers and their stockholders. That is a determination of the regulatory body, subject only to the prohibition against arbitrary and capricious decisionmaking. The Courts must otherwise defer to the expertise of the regulatory body!

***PROCEDURAL CONSIDERATIONS UNDER SAPA RESPECTING OPINION 96-12***

[24] In addition to directing the utilities to file rate/restructuring plans by October 1, 1996 to further the parties' analysis of how New York State can best make the transition to a competitive electric industry, and rejecting the claim of the utilities that they were entitled, as a matter of law, to rates based on every dollar of prudent investment regardless of customer impact, Opinion 96-12 further sets forth the Commission's "policy" on how a competitive industry should be structured-not by direction but by vision.

Opinion 96-12 in no way restructures the electric industry. It reflects an *expectation*, not a *direction*, of utility action, and calls for the collaboration of the electrical energy industry to join the Commission in an exploration of a future blueprint for the industry in a competitive mode. (See, ****516** *Matter of Roman Catholic Diocese of Albany v. N.Y.S. Dep't of Health*, 66 N.Y.2d 948, 498 N.Y.S.2d 780, 489 N.E.2d 749 (1985); *Abreu v. Coughlin*, 161 A.D.2d 844, 555 N.Y.S.2d 889 (3rd Dep't 1990).) Section 102(2)(b)(iv) of the State Administrative Procedure Act ("SAPA") provides that non-binding "statements of general policy" are not rules. SAPA, section 102(2)(a), defining "rule" , talks in terms of the *implementation or application of law*.

[25] "[O]nly a fixed, general principle to be applied by an administrative agency without regard to other facts and circumstances relevant to the regulatory scheme of the statute it administers constitutes a rule or regulation required by N.Y. Constitution, article IV, § 8 to be filed in the office

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

of the Department of State." (*Matter of Roman Catholic Diocese of Albany*, supra, at 951).

The Commission's rejection of the utilities' claim to rates based on every dollar of stranded costs, regardless of rate ***942** impact, simply re-stated well-established law. This was neither a "rule" nor a "policy" but the application of a binding principle of law, not within the concept of a SAPA "rule."

[26] Neither was the Commission's instruction to the utilities to file restructuring proposals a "rule", but a continuing step in the collaborative process. If and when the Commission approves or rejects a plan, or orders restructuring in a certain manner, it will be promulgating a rule and must take appropriate action under SAPA. (See, *Matter of New York City Transit Authority v. New York State Dep't of Labor*, 88 N.Y.2d 225, 644 N.Y.S.2d 463, 666 N.E.2d 1336 (1996)).

The thought processes of the PSC in carrying out its duties cannot be placed in a strait-jacket, lest it becomes rigid and ineffective.

SUMMARY AND CONCLUSION

After the in-depth analysis of the issues set forth in the Court's decision heretofore, it would serve a useful purpose to summarize said issues and the Court's conclusions respecting same. There is between the parties no dispute as to what these issues are; the only dispute is as to the court's conclusions.

[27] This lawsuit can be reduced to four questions. First, does the PSC have jurisdiction to require utilities to file plans outlining how they would adapt to a competitive electric industry? The answer is yes. Section 5(2) of the Public Service Law empowers the PSC to direct such filings.

[28] The second question is whether utilities, as a matter of law, are entitled to rates that are designed to recover all competitive losses, irrespective of the impact that such rates would have on consumers or a State's economy. The courts have answered no. *Duquesne Light Co. v. Barasch*, 488 U.S. 299, 109 S.Ct. 609, 102 L.Ed.2d 646 (1989); *Los Angeles Gas & Elec. v. Railroad Comm'n of Cal.*, 289 U.S. 287, 53 S.Ct. 637, 77 L.Ed. 1180 (1933); *Market St. v. Railroad Comm'n of Cal.*, 324 U.S. 548, 65 S.Ct. 770, 89 L.Ed. 1171 (1945), *reh'g denied*, 324 U.S. 890, 65 S.Ct. 1020, 89 L.Ed. 1438 (1945); *Matter of Abrams v. Public Serv. Comm'n*, 67 N.Y.2d 205, 501 N.Y.S.2d 777, 492 N.E.2d 1193 (1986); *St. Lawrence Gas v. Public Serv. Comm'n*, 42 N.Y.2d 461, 398 N.Y.S.2d 868, 368 N.E.2d 1234 (1977); *Rochester Gas and Elec. v. Public Service Comm'n*, 108 A.D.2d 35, 37, 488 N.Y.S.2d 303 (3rd Dep't 1985).

The third question facing the Court is whether a utility may challenge a Policy Statement that does not order the actions which the utility contests. The courts have held that judicial review is not appropriate when "the effect on plaintiff ... is incomplete and undetermined." ***943***Church of St. Paul and St. Andrew v. Barwick*, 67 N.Y.2d 510, 522, 505 N.Y.S.2d 24, 496 N.E.2d 183 (1986), *cert. denied*, 479 U.S. 985, 107 S.Ct. 574, 93 L.Ed.2d 578 (1986).

Finally, has the PSC violated SAPA? Opinion 96-12 (1) instructs utilities to file plans, (2) states existing regulatory law respecting stranded costs, and (3) states the PSC's Policy on a competitive electric marketplace. It is not a rule under the State Administrative Procedure Act because SAPA section 102(2)(b)(iv) expressly exempts instructions and policy statements from the definition of a rule and a reaffirmation of regulatory law does not fall within SAPA's definition of a rule.

****517** Accordingly, the motion by petitioners to annul the Public Service Commission's call for restructuring of the electric industry and ultimate transfer of same from monopoly to competition-as set forth in *Re Competitive Opportunities Regarding Elec. Serv. (Opinion & Order Regarding Competitive Opportunities for Elec. Serv.)* (cases 94-E-0952 *et al.*, Opn No. 96-12, 168 PUR4th 515, *supra*), and *Re Competitive Opportunities Regarding Elec. Serv. (Opinion & Order Deciding Petitions for Clarification and Rehearing)* (cases 94-E-0952 *et al.*, Opn No. 96-17, --- PUR4th ----, *supra*), is in all respects denied.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

N.Y.Sup.,1996.
Energy Ass'n of New York State v. Public Service Com'n of State of N.Y.
174 P.U.R.4th 406, 169 Misc.2d 924, 653 N.Y.S.2d 502

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 2

MINUTES

of the meeting of the Planning and Environmental Committee of the Board of Trustees of Consolidated Edison Company of New York, Inc. held at 4 Irving Place, New York on Tuesday, July 26, 1994 at 10:00 a.m.

Archie M. Bankston, Secretary of the Committee, recorded the minutes of the meeting.

Present: - Peter W. Likins, Chairman of the Committee, Gordon J. Davis, Ruth M. Davis, Ellen V. Futter, Arthur Hauspurg, Sally Hernandez-Piñero, Frederick P. Rose and Myles V. Whalen, Jr., constituting the full Committee.

Present by Invitation: - Eugene R. McGrath, Raymond J. McCann, Robert G. Schwartz, J. Michael Evans, Charles F. Soutar, Mary Jane McCartney, T. Bowring Woodbury, II and Kevin Burke.

- - - -

With the concurrence of Dr. Peter W. Likins, the Chairman of the Committee, the Chairman of the Board commented briefly on the report the Committee would receive. He stated that the principal matter of business for consideration at the meeting was a presentation by management on the Company's Strategic Opportunities. He then introduced Mr. Kevin Burke, Vice President, Corporate Planning to the members of the Committee.

- - - -

At Dr. Likins request, Mr. Burke presented Management's report. He stated that the presentation was a report on the present status of Management's review of strategic opportunities for the Company, that the review was conducted primarily by the staff of the Corporate Planning organization whose mission includes the review of such opportunities, and that the principal purpose of the presentation was to provide the Committee with information concerning the opportunities which Management is reviewing. He also stated that the objectives of this review are consistent with those of the Energy Strategy about which the Committee has been briefed periodically. He noted that the presentation focused on Corporate Planning's preliminary analysis of opportunities for regulated utilities in non-regulated activities and on data currently collected on other utilities for evaluation of possible synergistic opportunities.

CE 014935

- - - -

Mr. Burke then reported on the review of the diversification activities undertaken by other utilities. He stated that the most common activities undertaken in utility diversification efforts include independent power projects in the United States and in

foreign countries, real estate development, energy services, financial services, and energy marketing. He reported on the experience of various utilities with respect of these activities. Mr. Burke responded to the questions raised by the members of the Committee regarding utility diversification.

Mr. Rose left the meeting.

- - - -

Mr. Burke next reported on a comparison of the financial performance of diversified utilities to those utilities which did not have significant diversification activities, and on a comparison of the relative financial performance of the diversified activities to the core utility business. He indicated that while some utilities have had considerable success in selected diversification activities, generally utilities which conducted diversified activities had lower returns for their stockholders than had the utilities which had not diversified. In addition, he noted that with respect to the utilities which had diversified, their utility business sector generally outperformed the diversified business sector. He responded to various questions raised by members of the Committee.

Dr. Davis left the meeting during the discussion.

- - - -

Mr. Burke next reported that the lessons learned from this review included that the utility diversification efforts should be closely related to the utilities' core business, that the utility should maintain clearly focused objectives, and that the diversification activities should be initiated by financially strong utilities. He also reported that it would focus its further reviews of diversification opportunities on independent power projects, energy marketing and energy services.

- - - -

Management then reported on its ongoing reviews of the potential benefits of synergistic opportunities with other utilities. Mr. Burke stated that Management is conducting a preliminary review of the operational and financial performance of various utilities and, if appropriate, a more detailed review will be undertaken.

Concluding his report, Mr. Burke stated that Management would periodically discuss with the Committee its review of these strategic opportunities.

During the ensuing discussion, the Committee members asked various questions about matters related to the Company's review of strategic opportunities. Messrs. Burke, McGrath and McCann responded to such questions.

Mr. Schwartz left the meeting during the discussion.

- - - -

There being no further business, on motion, duly seconded and carried, the meeting was adjourned.

Archie M. Bankston
Secretary
Planning and Environmental Committee

# EXHIBIT 3

Con Edison **memorandum**

April 20, 1995

TO: Eugene R. McGrath
Chairman of the Board

FROM: Kevin Burke
Vice President
Corporate Planning

SUBJECT: Petition to the Public Service Commission for Authority to Invest in Subsidiaries

This memorandum advises the Board of Trustees of management's intention to petition the Public Service Commission for a blanket authorization to invest funds in unregulated subsidiaries, which in turn would be authorized to make investments in lower-tier subsidiaries. Under the Public Service Law, the Company is required to obtain the Commission's authorization to invest funds in non-utility businesses. At this time management is not seeking authorization from the Board of Trustees either to form any subsidiaries or to invest the Company's funds in any subsidiaries. Authorization would be requested from the Board of Trustees prior to taking such actions.

The regulated utility industry is undergoing dramatic changes as a result of market forces and regulatory initiatives at both the federal and state level. These changes, among other things, require regulated utilities to compete with both regulated and unregulated entities for markets. Faced with this increasing competition, it is prudent for the Company to develop additional services for its customers and to explore sources of revenues outside of our traditional regulated lines of business. In order to facilitate such undertakings, we must have the ability to deploy capital rapidly and flexibly, without the delays necessarily associated with obtaining regulatory approvals for the investments on a specific, case-by-case basis.

The unregulated subsidiaries would represent an important strategic initiative for the Company. As the competitive market for energy continues to evolve, the subsidiaries would help prepare the Company for future developments.

The Company will apply to the Commission for the authority to invest funds, not exceeding 5% of Con Edison's consolidated capital, in unregulated subsidiaries which could engage or invest in certain lines of non-utility businesses. At December 31, 1994, 5% of the Company's consolidated capital was approximately $500 million. The Company will propose that the subsidiaries be authorized to engage or invest in energy-related businesses, environmental and

technical services, area development businesses, telecommunications, or financial services. Con Edison proposes that the authority granted by the Commission be subject to specific terms and conditions. We believe that these terms and conditions will be responsive to the issues raised in two similar proceedings in recent years, in which other New York State utilities (Brooklyn Union and New York State Electric & Gas) sought and were granted similar authorization.

The prior proceedings, which consumed approximately two years from initial petition to final grant of authorization, provide useful precedents for a set of terms and conditions which will enable the Commission to discharge its regulatory responsibilities, without unnecessarily interfering with the Company's ability to implement decisions to pursue and fund appropriate unregulated opportunities. Con Edison believes that it and the Commission can build on the experience of the prior proceedings, to arrive, in a much shorter time, at a mutually agreeable result. We expect to negotiate the specific terms of the authorization with the Commission's staff and other intervening parties.

In the prior proceedings similar groups of issues were identified and addressed by essentially similar mechanisms. These groups of issues were:

- Protecting the ratepayer
- Commission oversight
- Positive ratepayer benefits and the royalty issue

With respect to protection of the ratepayer, concerns were expressed by the Commission that the proposed pursuit of non-utility activities might adversely affect the financial strength, or in an extreme case, the financial stability of the utility. This might occur through a general deterioration of the utility's credit, or the imposition on the utility of a significant liability arising from a non-utility activity. Concerns were also expressed that the non-utility activities could lead to distraction of management's attention from utility operations, cross-subsidies and self-dealing. In the prior proceedings, these concerns were addressed by:

- limits on the amounts authorized for investment in non-utility activities,
- limits on the degree to which the non-utility investments may be leveraged,
- suspension of the authorization in the event of a downgrading of the utility's credit below a specified level,
- prohibition of sales of goods or services to the utility by its non-utility affiliates, and
- free-standing operation of the non-utility subsidiaries.

With respect to Commission oversight, concerns were expressed in the prior proceedings that procedures be established to permit appropriate monitoring of the utility's compliance with the terms of the authorization. The following mechanisms addressed these concerns in the prior proceedings:

- access to the books and records of unregulated subsidiaries (with appropriate procedures to protect the confidentiality of information provided to the Commission's staff),
- periodic reports on the operations of the unregulated subsidiaries,
- maintenance of time sheets and other cost-allocation procedures, and
- reports on the formation of subsidiaries.

With respect to positive ratepayer benefits and the royalty issue, the Commission has insisted that a utility's ratepayers be compensated on the theory that there are certain "intangible benefits" that would be received by the proposed subsidiaries through their association with the utility (the "royalty" issue) and that in any case the ratepayers should receive some "positive benefits" as a result of the authorization. In each of the prior proceedings, the utility agreed to provide a monetary benefit to ratepayers. Con Edison will propose that the "royalty" issue be combined with the "positive ratepayer benefit" issue, with both claims to be satisfied by a single, combined monetary benefit credited by Con Edison to the ratepayers based on a specific percentage of the net investment in the subsidiaries.

We will keep the Board informed of the results of our negotiations with the Commission.

# EXHIBIT 4

STATE OF NEW YORK
PUBLIC SERVICE COMMISSION

At a session of the Public Service Commission held in the City of New York on June 19, 1996

COMMISSIONERS PRESENT:

John F. O'Mara, Chairman
Eugene W. Zeltmann
Harold A. Jerry, Jr.
William D. Cotter
Thomas J. Dunleavy

CASE 95-M-0418 - Petition of Consolidated Edison Company of New York, Inc. under Sections 107 and 70 of the Public Service Law for Approval to Use Revenues Received from Rendition of Public Service for investment(s) in an unregulated subsidiary or subsidiaries, not to exceed 5% of the company's consolidated capital.

ORDER APPROVING USE OF UP TO $50 MILLION TO INVEST IN UNREGULATED SUBSIDIARIES

(Issued and Effective July 12, 1996)

BY THE COMMISSION:

This Order authorizes Consolidated Edison Company of New York, Inc. (Con Edison, the company, or "the petitioner") to invest up to $50 million dollars in unregulated subsidiaries for two types of projects, subject to the terms and conditions contained herein.

Background

By petition filed May 2, 1995, Con Edison requested blanket approval under Public Service Law (PSL) sections 107 and 70 to invest up to 5% of its consolidated capitalization (about $504 million) in unregulated subsidiaries. The company's petition incorporated many of the aspects of the diversification orders authorizing investments by The Brooklyn Union Gas Company

and New York State Electric & Gas Corporation (NYSEG)[1] in recent years. The company indicated that a blanket authorization would enable it to deploy capital rapidly and flexibly into and among new unregulated businesses, without the delays associated with obtaining regulatory approvals for such investments on a case-by-case basis. The company filed proposed supplements to its petition in letters dated September 29, and December 28, 1995.

On May 3, 1996, the company requested our interim consideration of three types of projects (to be funded with up to $120 million). We are reserving decision on one of the projects, an energy services company (ESCO) for gas, oil and electricity, because the rules/constraints for ESCOs are the subject of the company's filing in the competitive opportunities case.[2] We are, however, authorizing the company to invest up to $50 million in unregulated subsidiaries for the other two types of projects: the investment and/or participation in energy infrastructure projects, and marketing of its technical services, subject to the restrictions discussed herein.

The company's investment in these projects will not impair either its financial condition or its operations and, so, will not have an adverse impact on ratepayers,[3] provided that ratepayers are adequately protected from Con Edison's forays into

---

1 Case 89-G-0941, The Brooklyn Union Gas Company, Order Adopting Recommended Decision, (issued March 27, 1991); Case 93-G-0941, The Brooklyn Union Gas Company, Opinion and Order Approving Settlement With Modifications, Opinion No. 94-22 (issued April 29, 1994); and Case 91-M-0838, New York State Electric & Gas Corporation, Order Approving Stipulation and Agreement Subject To Conditions (issued April 28, 1992).

2 Case 94-E-0952 et al., In the Matter of Competitive Opportunities Regarding Electric Service, Opinion and Order Regarding Competitive Opportunities for Electric Service, Opinion No. 96-12 (issued May 20, 1996), p. 92.

3 Given the company's capitalization as of December 31, 1995 and Standard & Poor's published bond rating criteria, a loss of a total $80 million authorization (including $30 million previously granted for Promark) would reduce Con Edison's common equity ratio from 54.8% to 54.2% and increase its debt ratio from 45.2% to 45.8%.

unregulated businesses by an adequate royalty payment.[1] However, one of the funds that Con Edison plans to invest in owns projects in the Northeast US, and that fund allows participants the option of direct additional investment in projects. In view of our interest in utility divestiture of generation, it may be counterproductive for the company to acquire a major or controlling ownership interest in New York State IPP projects. Therefore, Con Edison is prohibited from 1) holding a controlling interest in a fund that holds New York State energy projects[2] and 2) making any direct investment in New York State energy property. This authorization is also subject to deferral of the royalty payments issue until after Con Edison's filing required under Opinion No. 96-12 is received by the Commission, suspension of investment authority in the event of bond downgradings, and affiliate transaction restrictions.

Con Edison's Petition

On May 2, 1995 Con Edison filed a generic diversification petition, modeled closely after our orders involving diversification settlements for NYSEG and Brooklyn Union Gas Company. Con Edison requested approval to invest up to 5% of its capitalization in competitive ventures.[3] Con Edison's proposed safeguards are summarized as follows:

- The company plans to protect ratepayers, provide for regulatory oversight, provide positive benefits payments to ratepayers and address ratemaking issues.

---

[1] Case 91-M-0838, New York State Electric & Gas Corporation, Order Approving Stipulation and Agreement Subject to Conditions (issued April 28, 1992), mimeo p. 9.

[2] A "New York State energy project" is a project that is either located in New York State, or provides electric energy to any entity in New York State, either directly or indirectly.

[3] The 5% is modeled after NYSEG's authorization. Brooklyn Union was granted authority to invest up to 20% of its capitalization in competitive ventures.

- The safeguards it proposes are to:
  - limit its investment by keying it to 5% of its capitalization,
  - phasing in that limit over a period of 5 years,
  - limit the scope of its investments,
  - limit the degree to which the non-utility investments may be leveraged,
  - suspend its authorization to invest in the event of a downgrading of its credit rating below a specified level,
  - employ strict limits on and full accounting for, use of revenues for non-utility activities,
  - prohibit, in the absence of express Commission approval, the sales of goods and services to Con Edison by its non-utility affiliates and provide written disclosure of other affiliate transactions, and
  - eliminate, as far as practicable, common costs through free-standing operation of the non-utility subsidiaries (e.g., independent procurement).

Discussion

We are deferring action on Con Edison's generic 5% diversification request and are providing a limited authorization for up to $50 million for two types of projects. Issues related to investment limits, the suspension of investment authority, affiliate transactions, and royalty payments, as they relate to the two projects, are discussed below.

The business opportunities that Con Edison is considering for the projects that are the subject of this Order are largely international.[1]

---

[1] Con Edison also requested authorization for a third project, an additional $70 million investment for Promark, to broaden its function to an energy supply and services company for gas, electric and oil.

a) $40 million - Investment in a subsidiary or subsidiaries targeting energy infrastructure projects. The investments may be made through development companies, investment funds, joint ventures or other vehicles. The company is currently considering an investment of approximately $10 to $15 million in foreign region development companies in Asia and Latin America, as well as approximately $20 to $30 million in an investment fund which has a portfolio of international and domestic IPP projects.

b) $10 million - Investment in a subsidiary or subsidiaries that would allow Con Edison to market its technical services internationally. The company specifically noted two opportunities in China.

Con Edison's proposal to invest in international (domestic and foreign) energy infrastructure projects would for the most part be as an investor through established funds. As a participant in such funds, Con Edison would have only indirect influence over the funds' investments, assuming it did not acquire a controlling interest. The fund manager also facilitates "direct" investment in specific projects, from time to time, by approaching participants in the fund with direct investment opportunities.

We are concerned that the company's investments and/or participation in New York energy projects[1] may be inconsistent with the divestiture of generation encouraged in the competitive opportunities case.[2] Therefore, Con Edison is hereby restricted from having a controlling interest in any fund that owns New York State energy projects, and from making any direct investment in any New York State energy project. This restriction on investment type can be revisited after the company's filing is received.

One of the energy infrastructure funds that Con Edison plans on investing in consists of only foreign investment, and

---

1 As defined herein, <u>supra</u>.

2 Opinion No. 96-12, <u>supra</u>, at 60.

investment in that fund is acceptable under the competitive opportunities case. Similarly, its investment in a subsidiary to market technical services is acceptable.

Con Edison's proposal included several criteria for the suspension of investment authority which were not consistent with our previous decisions.[1] Accordingly, Con Edison is directed to:

- Recognize both Moody's Investors Service (Moody's) and Standard & Poor's (S&P's) bond ratings of its first mortgage bond securities in its determination of suspension triggers;
- Suspend its investment authority at an S&P rating of its first mortgage bonds to "BBB" or lower and/or a Moody's rating of "Baa2" or lower until its debt is upgraded to a rating of no lower than "BBB+" by S&P and to no lower than "Baa1" by Moody's, and;
- Recognize all S&P and Moody's downgrade actions, regardless of the reason for the downgrade.

Con Edison proposed safeguards for transactions between it and its subsidiaries in response to staff's concerns about its potential for self-dealing[2] and its ability to unintentionally subsidize its subsidiaries. The safeguards include the provision that any transactions involving the delivery of goods or services between Con Edison and its subsidiaries will be reflected in a written contract or memorandum which would be submitted to the

---

1 Case 93-M-0453, Niagara Mohawk Power Corporation, Order Authorizing Additional Investment, (issued November 18, 1993), p. 11.

Case 91-M-0838, New York State Electric & Gas Corporation, Order Approving Stipulation and Agreement Subject to Conditions (issued April 28, 1992), pp. 10 - 11.

2 A self-dealing problem could occur if, for example, Con Edison acquired an independent power producer with whom it was already doing business.

Commission for approval, consent or acquiescence prior to the transaction, subject to three exceptions.[1]

In addition to the safeguard above, this authorization is subject to the our "Interim Standards for Transactions Between LDCs and Related Companies"[2] attached as Appendix III to the Order in Case 93-G-0932,[3] as they apply to the two types of projects hereby authorized.

Finally, we shall continue to monitor Con Edison's customer service performance to ensure that the Company's increased interest in subsidiaries does not distract its management from providing good service to customers.

All issues concerning royalty payments, e.g., the level, application base and duration, will be deferred until we receive the company's filing in the competitive opportunities case. Con Edison is on notice that any royalty decision in this proceeding is subject to our discretion regarding retroactivity to the date of the first investment made pursuant to this Order, and that we previously established a rebuttable presumption that

---

1 The exceptions, listed in the company's September 29, 1995 letter, are: (i) provision of tariffed services by Con Edison to the subsidiaries, (ii) investments by Con Edison in subsidiaries consistent with the terms of the requested authorization, and (iii) joint use of Con Edison personnel and facilities for oversight, reporting and administrative purposes in cases necessitated by the subsidiary infrastructure (e.g., Board and CEO involvement, finance, accounting, auditing, legal and taxes).

2 A related company is an affiliate or a subsidiary.

3 Case 93-G-0932, Proceeding on Motion of the Commission to Address Issues Associated with the Restructuring of the Emerging Competitive Natural Gas Market, Order Concerning Compliance Filings, (issued March 28, 1996) p. 31 and Appendix III. The Order requires the formulation of safeguards which include fully separated operations, and a prohibition on direct transactions between the LDC and the affiliate; it also provides an extensive list of proposed standards of conduct.

a 2% royalty will be imputed for ratemaking purposes with respect to a utility's investment in competitive enterprises.[1]

NYOHA filed comments requesting that the company's petition be denied because 1) it would be premature to act upon the proposal prior to a decision in the gas appliance subsidiary case[2] and 2) the proposed conditions for affiliate transactions are more liberal than those we previously approved. This Order is limited to Con Edison's subsidiary investments in two types of projects. Therefore, with the exception of NYOHA's concern about affiliate transactions, which is addressed herein, its comments will be considered when we rule on the full petition.

Funding and out-of-pocket monies for these subsidiaries should be recorded in Account 123.1, Investments in Subsidiary Companies. Any services provided to the subsidiaries by Con Edison employees should be recorded on a fully loaded basis including all payroll overheads and proportional time allocations, and any other materials or services provided by Con Edison should be charged on a fully distributed cost.

The Commission orders:

1. Consolidated Edison Company of New York, Inc. is authorized to use no more than $50 million of its revenues derived from the rendition of utility service in New York State, for the purpose of investing in unregulated subsidiaries for two types of projects: one which would invest in international (foreign and domestic) energy infrastructure projects, and one which would allow Con Edison to market technical services in international markets, subject to the terms and conditions specified in this Order.

2. Con Edison is prohibited from having a controlling interest in any fund that owns New York State energy projects,

---

[1] Case 87-C-8959, Rochester Telephone Corporation, Opinion and Order Concerning Royalty, Opinion No. 93-11 (issued July 6, 1993), mimeo p. 74.

[2] Case 93-G-0804 - Proceeding on Motion of the Commission to Examine Guidelines for Gas Utility Marketing/Appliance Service Programs, Request for Comments, (issued July 17, 1995).

and is prohibited from making any direct investments in New York State energy projects.[1] This restriction may be reconsidered after Con Edison's restructuring filing is received by the Commission in Case 94-E-0952.

3. Con Edison is authorized under Section 70 of the Public Service Law to acquire, directly or indirectly, securities of subsidiaries as contemplated by Exhibit 1 of the company's petition, notwithstanding that some or all of such subsidiaries may be deemed to be engaged in the same or a similar business as Petitioner.

4. The subsidiary or subsidiaries shall use the funds only to participate in the two types of projects specified in Clauses 1 of this Order.

5. In the event of any downgrade of Con Edison's first mortgage bonds either by Moody's Investors Service (Moody's) to "Baa2" or lower or by Standard & Poor's (S&P's) to "BBB" or lower, the investment authority granted by this Order shall be suspended until Con Edison's first mortgage bonds are upgraded to a rating of no lower than "Baa1" by Moody's and no lower than "BBB+" by S&P's.

6. Con Edison is directed to comply with the "Interim Standards for Transactions Between LDCs and Related Companies" contained in the Order Concerning Compliance Filings, Appendix III in Case 93-G-0932. Con Edison shall also comply with the additional safeguards for affiliate transactions proposed by the Petitioner in its letter dated September 29, 1995.

7. No further investment by the petitioner in the subsidiary or subsidiaries using revenue derived from the rendition of utility service beyond the $50 million authorized by this Order is permitted without the express approval of the Commission.

---

[1] A "New York State energy project" is a project that is either located in New York State, or provides electric energy to any entity in New York State, either directly or indirectly.

8. Petitioner shall employ necessary and appropriate cost allocation procedures to insure assignment to the subsidiary or subsidiaries of joint and common costs on a fully distributed basis. The identification of joint and common costs and the basis for all such allocations shall be filed with the Director of the Office of Accounting & Finance of the Department of Public Service within 30 days of the date of this Order.

9. All such allocations shall be subject to audit and adjustment by the Commission. All books and records of such subsidiary shall be made available to the staff of the Department of Public Service upon request; however, the Commission will entertain requests that any information deemed proprietary by petitioner or third parties be afforded appropriate protection under applicable Commission regulations.

10. Any revenues received or income earned or tax credits generated by the subsidiary or subsidiaries shall be used for the purposes set forth in Ordering Paragraph 1 of this Order or transferred to Con Edison.

11. In the event the Commission determines at any time that any amounts of money, personnel, resources, assets or anything of value have not been properly charged to the subsidiary or subsidiaries or if the Commission determines that Con Edison has engaged in a consistent pattern of misallocating money, personnel, resources, assets or anything of value, in addition to any and all powers, rights and remedies available under law, the Commission reserves the right to modify treatment of revenues, earnings, and/or tax benefits generated by such subsidiary or subsidiaries.

12. The structure and degree of separation of the subsidiary/subsidiaries from Con Edison's utility activities shall follow the same type of separation requirements as those for co-generation and hydro subsidiaries described in Section 66-c(3) and (4) of the Public Service Law. Specifically, the subsidiary/subsidiaries shall operate at arms length from the petitioner; the subsidiary shall pay the same rates as other customers for the parent's utility services, shall have separate

officers, personnel, and computer services, and shall maintain its own books; the parent corporation shall not engage in promoting the sales of the subsidiary/subsidiaries; the parent shall not provide the subsidiary/subsidiaries with proprietary customer information and any information it provides to the subsidiary/subsidiaries must be made available to any member of the public on the same terms; and the rate of return allowance of the utility will not include any of the capitalization of the subsidiary/subsidiaries.

13. Con Edison is hereby informed that in deciding issues in Case 94-E-0952, the Commission will not be bound by its decisions in this proceeding.

14. Petitioner shall file with the Commission an unconditional acceptance of this Order agreeing to obey all the terms, conditions and requirements of this Order. If such acceptance is not so filed within a period of 30 days from the effective date of this Order, this Order may be revoked by the Commission without further notice.

15. This proceeding is continued.

By the Commission,

(SIGNED)

JOHN C. CRARY
Secretary

# EXHIBIT 5

Con Edison memorandum

September 18, 1996

To: Eugene R. McGrath
Chairman of the Board

From: Kevin Burke
Vice President
Corporate Planning

Subject: Proposed Formation of an Unregulated Energy Infrastructure Development and Technical Services Subsidiary

This memorandum requests approval of the Board of Trustees to form and to invest up to $50 million in a wholly owned subsidiary of Con Edison that would invest in energy infrastructure development projects and market technical services worldwide. The investments may be made directly in infrastructure projects and technical services and through development companies, investment funds, joint ventures or other vehicles. Second tier subsidiaries may also be established.

As the Board was previously advised, the Company petitioned the Public Service Commission (PSC) in May 1995 for authorization to invest up to 5% of its consolidated capital in unregulated subsidiaries that could invest in certain lines of businesses. These lines of business include energy related, environmental and technical services, area development businesses, telecommunications, financial services and up to 10% of the authorized amount in businesses not specifically authorized. After discussions with the staff of the PSC concerning the petition, the Company was informed that the Commission would approve investment of up to $50 million for energy infrastructure projects and technical services, but would defer

final action on the petition pending the Company's filing in the Competitive Opportunities Proceeding. It issued an order to that effect on July 12, 1996.

The subsidiary is an important strategic initiative for the Company. It will allow the Company to operate in an increasingly competitive environment with flexibility and responsiveness to market demand. The subsidiary will gain valuable experience that will be helpful as the Company expands into the other markets.

The projected international independent power market is growing. According to one estimate, over 90% of the domestic and international power sector is in principle open to independent power activity, compared to less than 30% in 1993. Generation opportunities have increased more than five fold and distribution opportunities are 5 to 10 times what they were in 1992. Overall, this represents more than $125 billion of potential investments.

The international market for technical services and the transfer of technology focused on energy is also expanding. This market is still developing particularly in countries where the need for expertise and capital exceeds the resources. The World Bank cites that 40% of the developing country generating capacity is unavailable due to mismanagement and inefficiency. Interest in this market is quickly developing, as major engineering firms and other utilities begin to comprehend the size of the market. Since New York City is the financial center of the world and the utility that serves New York City has high visibility, Con Edison has been approached on numerous occasions by potential customers to provide training, engineering expertise and technology. We believe that this market presents unique opportunities that will benefit Con Edison's shareholders.

The proposed subsidiary would be a development company that will provide the necessary management services needed to acquire, develop, finance, build, and operate infrastructure projects that include energy production facilities and utility delivery systems. The process of managing these projects will be undertaken with selected

strategic partners and with many of the functions supplied through contracts with international companies. In addition, the subsidiary would market Con Edison's technical services in the targeted geographic areas in a manner that will add value to the subsidiary's customers. Initially, the subsidiary would focus on small to medium sized projects domestically and internationally. It is expected that the subsidiary would expand its operation in the next two years.

The subsidiary will operate under authority granted by the PSC in its order issued July 12, 1996. The order incorporates procedures regulating the transactions between Con Edison and the subsidiary. These procedures, which include such things as cost allocation principles and restrictions on contracts between the subsidiary and Con Edison, are designed to ensure that Con Edison's customers are not subsidizing the subsidiary for the benefit of the Company's shareholders. The subsidiary will develop corporate procedures to follow the guidelines and provide the necessary information to Con Edison to comply with the order.

The initial staff of the subsidiary would include a combination of Con Edison employees and experienced industry professionals. The first year staffing plan contemplates seven professionals and will expand as the businesses grow. One of the key employees, Charles Muoio, was hired by Con Edison last September in anticipation of the approval of the Company's Petition. Mr. Muoio brings over 20 years of experience in the power industry, including 14 years as an executive with a successful generation development subsidiary of an electric utility. In his tenure, Mr. Muoio participated in key positions including development, construction, asset management and strategic planning.

The proposed subsidiary's Board of Directors would initially be composed of three Con Edison officers. The chairperson of the board would be Mary Jane McCartney, Senior Vice President of Gas Operations. The other two board members would be Joan Freilich, Senior Vice President and Chief Financial Officer, and Paul Kinkel, Vice President of Maintenance and Construction. The President of

the Subsidiary will keep Con Edison's Board of Trustees informed of significant events and will also report on its progress annually.

Several scenarios have been evaluated. A conservative business plan scenario projects in ten years that the subsidiary will manage a portfolio of projects representing approximately $300 million. The subsidiary could sustain losses in its first three full years of operation as it establishes a foothold in a capital intensive industry, but is expected to enhance earnings as it grows over time. The initial $50 million will be used to invest in energy infrastructure projects and market technical services. Additional capital will be required and Con Edison will seek authority from the PSC to make additional investments as part of its corporate restructuring proposal to be submitted on October 1st in the Competitive Opportunities Case. After additional investment is approved by the PSC, the Subsidiary will seek Con Edison's Board of Trustees' approval for additional funding.

Suggested Board Resolutions are attached.