# EXHIBIT 6

# MINUTES OF THE FIRST MEETING OF THE BOARD OF DIRECTORS OF GRAMERCY DEVELOPMENT, INC

The first meeting of the Board of Directors of Gramercy Development, Inc was held at the offices of Consolidated Edison Company of New York, Inc on October 28, 1996 at 5 00 p m

The following were present

Mary Jane McCartney
Paul H Kinkel

being two of the Directors and a quorum Ms Joan S Freilich was absent Mr Charles Muoio and Mr Peter A Irwin, of Consolidated Edison Company of New York, Inc , were also present by invitation

Ms McCartney called the meeting to order

Upon motion duly made, seconded and unanimously carried, Ms McCartney was duly elected temporary chairman of the meeting and Mr Kinkel was elected temporary secretary thereof They accepted their respective offices and proceeded with the discharge of their duties

The secretary presented to the meeting a waiver of notice thereof, signed by all of the Directors of the Corporation The chairman directed that the original of such waiver be annexed to these minutes

The secretary then presented to the meeting the Certificate of Incorporation, duly filed with the Secretary of State of the State of New York on October 18, 1996 Upon a review of the Certificate of Incorporation by the Directors, the Chairman directed that a copy of the Certificate of Incorporation together with a copy of the filing notice received from Department of State, be annexed to these minutes

The secretary then presented to the meeting the Statement of Incorporator in Lieu of Organization Meeting, dated October 28, 1996, and signed by the incorporator, together with a copy of the By-laws which were adopted in said statement Thereupon, on motion duly made, seconded and unanimously carried, it was

> RESOLVED, that the Statement of Incorporator in Lieu of Organization Meeting dated October 28, 1996, which has been presented to this meeting, be and it hereby is in all respects approved, and that all action thereby shown to have been taken or authorized be and the same hereby

is in all respects approved, ratified and confirmed, and it is further

RESOLVED, that the By-laws in the form adopted by the incorporator in the aforementioned statement be and they hereby are in all respects approved and adopted as and for the By-laws of this Corporation, and it is further

RESOLVED, that copies of the Statement of Incorporator in Lieu of Organization Meeting and of the By-laws be annexed to the minutes of this meeting

The secretary then presented to the meeting a copy of the Order of the State of New York Public Service Commission Approving Use of Utility Revenue for Investment(s) in an unregulated subsidiary or subsidiaries, issued and effective July 12, 1996 The Board of Directors reviewed and discussed the provisions of said order The chairman directed that a copy of said order be annexed to the minutes of this meeting

The secretary submitted to the meeting the form of a seal proposed for use as the corporate seal of the Corporation Upon motion duly made, seconded and unanimously carried, it was

RESOLVED, that the seal now presented at this meeting, an impression of which is directed to be made in the margin of the minute book, be and the same hereby is approved and adopted as and for the corporate seal of the Corporation

The Directors then duly nominated and unanimously elected Mary Jane McCartney to serve as the Chairman of the Board of Directors of the Corporation

The meeting then proceeded to the election of officers specified in the By-laws The following were duly nominated and, a vote having been taken, were unanimously elected as officers of the Corporation to serve until the meeting of the Board of Directors following the next annual meeting of shareholders and until their successors are elected and qualified

President Charles Muoio
Secretary Peter A Irwin

The Chairman and Secretary thereupon assumed their respective offices in place and stead of the temporary chairman and the temporary secretary

The Chairman then suggested that it was desirable to describe the powers and duties of the officers of the Corporation After discussion and deliberation, upon motion duly made, seconded and unanimously carried, it was

RESOLVED, that the President shall be the chief executive officer of the Corporation and shall have the general powers and duties of supervision and management usually vested in the office of president of a corporation, that he shall have general supervision, direction and control of the business of the Corporation, that he shall have authority to execute leases and other contracts on behalf of the Corporation as the Board of Directors shall authorize the execution thereof, and that he shall cause the corporate seal of the Corporation to be affixed to any instrument requiring it and when so affixed the seal shall be attested by the signature of the Secretary, and it is further

RESOLVED, that the Secretary shall give, or cause to be given, notice of all meetings of stockholders and directors and all other notices required by law or by the By-laws, that the Secretary shall record all the proceedings of the meetings of the Corporation and of the Board of Directors in a book to be kept for that purpose, that the Secretary shall keep in safe custody the corporate seal of the Corporation, and when authorized by the Board of Directors or the President affix the same to any instrument requiring it, and when so affixed it shall be attested by the Secretary's signature

The Chairman then suggested that the Secretary of the Corporation be authorized to procure the necessary books and that the President of the Corporation be authorized to pay all expenses and to reimburse all persons for expenditures made in connection with the organization of the Corporation After deliberation and discussion, on motion duly made, seconded and unanimously carried, it was

RESOLVED, that the Secretary of the Corporation be and he hereby is authorized and directed to procure all corporate books, books of account and stock-books required by the statutes of the State of New York or necessary or appropriate in connection with the business of the Corporation, and it is further

RESOLVED, that the President of the Corporation be and he hereby is authorized to pay all charges and expenses incident to or arising out of the organization of the Corporation and to reimburse any person who has made any disbursements therefor

The Secretary then presented to the meeting a proposed form of certificate for fully paid and non-assessable shares of stock of the Corporation The Chairman directed that a specimen copy of such form of certificate be annexed to the minutes of the meeting Upon motion duly made, seconded and unanimously carried, it was

RESOLVED, that the form of certificate for fully paid and non-assessable shares of stock of the Corporation submitted to this meeting, be and it hereby is adopted as the certificate to represent fully paid and non-assessable shares of stock, and that a specimen of such certificate be annexed to the minutes of this meeting

The Secretary then presented to the meeting a proposed Subscription Agreement between the Corporation and Consolidated Edison Company of New York, Inc , evidencing the following subscription

| Subscriber | Number of Shares | Consideration |
|---|---|---|
| Consolidated Edison Company of New York, Inc | 200, at the par value of $100 per share | $20,000 00 |

After deliberation and discussion, on motion duly made, seconded and unanimously carried, it was

RESOLVED, that the Subscription Agreement between the Corporation and Consolidated Edison Company of New York, Inc , which has been submitted at this meeting, be and it hereby is approved, that said agreement be executed by Consolidated Edison Company of New York, Inc and by the President of the Corporation on behalf of the Corporation, that the corporate seal of the Corporation be affixed thereto by the Secretary and that the

Secretary attest thereto by his signature, and that an original executed version thereof be annexed to the minutes of this meeting, and it is further

RESOLVED, that the foregoing subscription of Consolidated Edison Company of New York, Inc be and it hereby is accepted, and that upon payment therefor by the subscriber, the proper officers be and they hereby are authorized and directed to issue an appropriate share certificate to the subscriber

The Chairman then stated that it was desirable to designate a depository for the funds of the Corporation

Upon motion duly made, seconded and unanimously carried, it was

RESOLVED, that The Chase Manhattan Bank be and it hereby is designated as a depository of the funds of the Corporation, and it was further

RESOLVED, that if such depository requires from time to time a prescribed form of resolution or resolutions of the Board of Directors, in connection with the designation of persons authorized to sign checks, drafts and other instruments or any other matter, each such resolution, if approved by the Chairman of the Board, shall be deemed to have been, and hereby is, adopted pursuant to these resolutions, and, if so approved, the Secretary of the Corporation is hereby authorized to certify from time to time the adoption of such resolutions as though such resolutions were now presented and adopted pursuant to these resolutions, and all such resolutions shall be made a part of the records of the Company

The Chairman then stated that it was appropriate to adopt a resolution authorizing the Corporation to qualify to do business in various jurisdictions

Upon motion duly made, seconded and unanimously carried, it was

RESOLVED, that for the purpose of authorizing the Corporation to do business in any state, territory or dependency of the United States or any foreign country in which it is necessary or expedient for the Corporation to transact business, the proper officers of the Corporation are hereby authorized to appoint and

substitute all necessary agents or attorneys for service of process, to designate and change the location of all necessary statutory offices and, under the corporate seal, to make and file all necessary certificates, reports, powers of attorney and other instruments as may be required by the laws of such state, territory, dependency or country to authorize the Corporation to transact business therein and, whenever it is expedient for the Corporation to cease doing business therein and withdraw therefrom, to revoke any appointment of agent or attorney for service of process, and to file such certificates, reports, revocations of appointment or surrender of authority as may be necessary to terminate the authority of the Corporation to do business in any such state, territory, dependency or country

The Secretary then presented to the meeting a proposed General Service Agreement between the Corporation and Consolidated Edison Company of New York, Inc After discussion and deliberation and upon motion duly made, seconded and unanimously carried, it was

RESOLVED, that the General Services Agreement between the Corporation and Consolidated Edison Company of New York, Inc , which has been submitted at this meeting, be and it hereby is approved, that said contract be executed by Consolidated Edison Company of New York, Inc and by the President of the Corporation on behalf of the Corporation, and that an original executed version thereof be annexed to the minutes of this meeting

Discussion was then had on the establishment and maintenance of offices of the Corporation to be located initially in the County of New York, State of New York After deliberation and discussion, on motion duly made, seconded and unanimously carried, it was

RESOLVED, that offices of the Corporation be established and maintained in the State of New York and in the County of New York, and that for the purpose of establishing and maintaining such offices, the proper officers of the Corporation are hereby authorized and directed to take whatever steps may be necessary or expedient to locate desirable office space and establish and maintain such offices, and that the President be and here hereby is authorized to negotiate and, subject to Board approval, execute and enter into leases on behalf of the Corporation, with whatever assistance he deems

necessary from counsel retained by the Corporation and approved by the Board of Directors

Discussion was then had on various tax matters affecting the Corporation The Secretary presented to the meeting a letter from the Tax Department of Consolidated Edison Company of New York, Inc , dated October 28, 1996, outlining certain proposed actions to be taken on behalf of the Corporation relating to tax matters On motion duly made, seconded and unanimously carried, it was

REVOLVED, that the actions outlined in the letter from the Tax Department of Consolidated Edison Company of New York, Inc , dated October 28, 1996, be and they hereby are approved, and that a copy of said letter be annexed to the minutes of this meeting

The Chairman then suggested that it would be necessary and desirable for the Corporation to obtain insurance including liability insurance, fire and hazard insurance once offices are established, and health and hospitalization insurance for its officers and employees, and to take steps to obtain workers' compensation insurance coverage for its employees After discussion and deliberation, upon motion duly made, seconded and unanimously carried, it was

RESOLVED, that for the purpose of obtaining such insurance as may be necessary or expedient for the Corporation to purchase, including liability insurance, fire and hazard insurance once offices are established, and health and hospitalization insurance and workers compensation insurance for its officers and employees, once employees are hired, the proper officers of the Corporation be and they hereby are authorized to purchase any such insurance and to enter into contracts for such insurance, and it is further

RESOLVED, that in the event and to the extent that health benefits for the Corporation's employees will be covered by the plans established by Consolidated Edison Company of New York, Inc , the proper officers of the Corporation are hereby authorized to enter into and execute such agreements or other instruments with Consolidated Edison Company of New York, Inc as may be necessary to obtain coverage for the Corporation's employees and that in such an event, the proper officers of the Corporation are hereby authorized to reimburse Consolidated Edison Company of New York, Inc for

payment made by it to the insurer on the Corporation's behalf

Upon motion duly made, seconded and unanimously carried, it was

RESOLVED, that the proper officers of the Corporation be and they hereby are specifically authorized to order and obtain such stationery, supplies, office equipment and other similar items, and to retain and hire such employees, agents and representatives of the Corporation as may be necessary or expedient for the Corporation to commence doing business

Upon motion duly made, seconded and unanimously carried, it was

RESOLVED, that the Corporation proceed to carry on the business for which it was incorporated

There being no further business before the meeting, the same was, on motion, duly adjourned

Secretary

# EXHIBIT 7

**Executive Summary**

One element of a diversified investment portfolio for Con Edison is the relatively low risk and attractive return profile of leases. This paper describes sale-leasebacks, identifies major risks and benefits, and details a recommended investment.

Investments of this type would be accounted for as leveraged leases, allowing for front-loaded earnings, and generate after tax yields of between 15% and 25% over their lives, after taking account of typical capital structure and debt costs.

The earnings come from a combination of lease payments and tax deductions. Con Edison, with its high tax rate and large taxable income position, is in a particularly favorable position to take advantage of such a program.

**What is a sale-leaseback?**

In its most basic form, a sale-leaseback is the purchase of an asset and the subsequent leaseback of that asset to the seller under a long term lease agreement. Under a so-called "leveraged lease", the investor uses non-recourse debt to reduce the equity needed to purchase the asset.

Since its inception in 1964, the leveraged leasing market has continually developed new variations on this basic theme to accommodate increasingly complex accounting and tax laws and regulations. The latest of these variations are the "lease-leaseback" structures in which an asset is leased (instead of purchased) and the leasehold rights derived from that lease are then leased back to the initial owner of the facility. Lease-leaseback structures have been developed to optimize the benefits that can be derived by the utility and the investor in these transactions.

**What kind of lease structures will be considered?**

Under the proposed investment program, investments will be considered in both sale-leasebacks and lease-leasebacks, depending on prevailing market conditions.

Because the specific transaction currently under consideration by CED is a lease-leaseback we will use this type of structure in our example of a typical transaction.

**How would a typical transaction work?**

In a typical lease-leaseback transaction, a special purpose subsidiary owned by an investor, in this case CED, would establish a trust. On the closing date, CED would invest equity in the trust and the trust would borrow non-recourse debt for the project. Concurrently the trust would enter into a lease agreement with a utility under which the trust would lease an asset, for example a power plant, from the utility for 44 years. The trust would, at the same time, lease the plant back to the utility for 20 years, after which the trust would have a number of options, described below. The initial 20 year term of the leaseback has been chosen to

optimize the benefits available to both the utility and the investor. A 44 year leaseback would not qualify for the tax treatment that CED and the foreign utility seek.

On the closing date of the lease, the utility would establish, for the benefit of CED, (a) a trust account containing U.S. Treasury securities and (b) an irrevocable bank letter of credit from a bank rated AA or better, both in amounts that, when combined, fully secure the obligations of the utility to CED. In the event the utility were to fail to make the payments due to CED under the lease, CED could take the U.S. Treasury securities and draw on the letter of credit to satisfy any shortfalls.

At the end of the initial 20 year lease, the utility would have the option to purchase the plant at a pre-agreed fixed price. If the utility did purchase the plant at this time, the transaction would be completed. If the utility did not purchase the plant at the end of year 20, the trust would have the option to either (a) lease the plant to a third party for the remaining 24 years of the lease, (b) use the plant itself, or (c ) require the utility to re-lease the plant for an additional 17 years at prices that would assure CED of its expected return.

Responsibility for the condition of the plant would rest with the utility during the initial term of the lease, and with the third party during a subsequent lease. During the remaining seven years under the lease, CED could either use the plant itself or lease the plant to third parties and in doing so obtain additional revenue. The base case economics assume no revenue for this period. At the end of the 44 year lease CED would be required to return the plant to the utility.

**How would CED derive its return under a sale-leaseback?**

Under a typical lease-leaseback structure an investor's earnings are generated by applying a constant rate of return to a declining investment balance according to lease accounting rules established by the Financial Accounting Standards Board. As the investment balance declines so do the earnings and hence the earnings are front-loaded.

The following chart details the earnings profile for the first 10 years of a typical lease-leaseback

| Year (US$) | Investment | Earnings |
|---|---|---|
| 1997 | 43,047,734 | 353,054 |
| 1998 | | 4,154,042 |
| 1999 | | 3,961,165 |
| 2000 | | 3,748,210 |
| 2001 | | 3,512,950 |
| 2002 | | 3,252,891 |
| 2003 | | 2,965,245 |
| 2004 | | 2,646,897 |
| 2005 | | 2,294,361 |
| 2006 | | 1,903,735 |

The following graph details the earnings for a typical lease-leaseback.




The transactions contemplated will be structured in such a way that CED will obtain the same yields and rates of return regardless of whether the utility exercises its purchase option at the end of year 20 or is required to re-lease the plant for an additional 17 years.

**Do we have a specific transaction in mind?**

CED's strategy will be to invest in transactions in conjunction with experienced market participants, to concentrate on assets familiar to Con Edison and to deal with utilities in countries with high credit ratings.

CED is currently pursuing the potential investment of $43 million in a recently commissioned gas-fired combined cycle power plant, the RoCa3 plant, located near the city of Rotterdam in the Netherlands. The plant, owned by EZH, one of the four regulated generation utilities in the Netherlands, is currently undergoing engineering, environmental, and valuation reviews by our consultants, and has recently been inspected by internal personnel.

We are pursuing this investment opportunity in conjunction with an experienced and knowledgeable lease investor, Bank One Leasing Inc. Bank One and CED have retained Shearman & Sterling for tax and legal advice, and, among others, Duke Engineering for engineering reviews, Tauw Milieu, a well-respected Dutch environmental firm, for an environmental assessment and Deloitte & Touche for valuation assessments of the plant.

The transaction is anticipated to generate over $4 million in earnings during 1998 and is expected to generate an after tax yield of 19.7%, assuming that CED's investment is 50% equity/50% debt.

**What are major benefits from these transactions to the investor?**

(1) Highly Predictable Earnings

The earnings from these transactions are highly predictable because each of the cash inflows and outflows to the transaction is contractually agreed to on the closing date and because the utility's lease obligations are fully secured by the U.S. Treasuries and the bank letter of credit.

(2) Front Loaded Earnings

Because the transactions will be afforded leveraged lease accounting treatment under Financial Accounting Standards Board rules, the earnings profile for these transactions is "front-loaded' and hence provides more earnings in the early years of the transaction than in the latter years of the transaction.

(3) Good to Excellent Investment Yields

After tax yields on leasing projects are anticipated to range from a good 15% to an excellent 25% depending on the type of lease structure utilized and the leverage applied. For example, under the initial lease investment contemplated the return of 19.7% assumes a relatively conservative leverage rate of 50%. Measurement of after tax yields, assuming a theoretical case in which the corporation has no debt (the so called "all equity return") range from 9.0% to 12.3%.

(4) Economic Value

Because of the utility payment protection structures and the low probability of losses derived from adverse tax actions, the risk adjusted rates of return exceed the required rates of return for these investments.

(5) Strategic Value of Leasing

Participation in these transactions affords CED the opportunity to more fully understand the legal, regulatory, commercial and tax environment of the countries in which the leased assets are located. This in-depth understanding can provide the basis for better informed decisions regarding potential investment and partnering opportunities as the utility infrastructures in these highly developed countries are opened to investments from external sources.

**What are major benefits from these transactions to the utility?**

In entering into these transactions, the utility is able, at little or no perceived risk to itself, to obtain (a) up to 100% long term financing for a plant, (b) interest rates that may be lower than those available from domestic credit sources and (c ) front-end loaded funding benefits, while maintaining operating control of the plant. In the case of the investment contemplated by CED, the benefit to the utility is about 6.9% of the asset value, or $10.3 million.

**What are the major risks from these transactions to the investor?**

(1) Utility Credit Risks

Perhaps the greatest risk to the trust is the risk that the utility will default on its obligation to pay rent during the lease term. In order to minimize this risk the trust will require that the utility's lease obligations be fully secured by a combination of U.S. Treasury securities and letters of credit issued by banks with S&P ratings of AA or above. In the event the utility fails to make the lease rent payments due, the investor can use the Treasuries and the proceeds from the letter of credit to return its capital and to provide it with its expected yield.

(2) Foreign Country Tax Risks

Another major risk implicit in the transaction is the risk that the tax laws or regulations of the country in which the asset is located change in a way that would result in lower returns to the trust, and hence the investor. Investments under the proposed program would be structured so that the risks associated with foreign country tax law changes would be fully borne by the utility.

(3) Pending U.S. Tax Regulations

Pending tax regulations, if enacted, could significantly reduce the tax benefit to be derived by investors in lease-leaseback transactions such as the investment under consideration by CED, as described above. [redacted]

If the pending regulations are published prior to the closing date, CED will defer the contemplated investment pending a restructuring of the transaction.

(4) U.S. Tax Audits

It is anticipated that the transactions will be structured in ways that will make any challenges to the structure by the IRS under current regulations difficult to support or litigate. Preliminary indications from our tax counsel are that [redacted] Our tax counsel, is very experienced in negotiating and advising on leveraged lease transactions.

In the worst case tax scenario, a claim would be litigated and won in tax court by the IRS. In this case, financial analysis indicates a 100% return of CED's capital and a return on capital of 2.4% over the lease term.

(5) Country Risks

The proposed investment program will target investments in developed and highly rated countries. The initial proposed investment under the program will be in the AAA-rated Netherlands. Potential downstream opportunities include transactions in the Netherlands, Switzerland, Australia, Germany and the United States. The contemplated transactions will be fully denominated in U.S. dollars and will have no foreign exchange risks.

(6) Limited Liquidity

Investments in the assets contemplated under the proposed investment program are designed to generate earnings and cash flow over extended periods of time. While these investments do not carry the liquidity of publicly-traded securities, they can be sold if necessary, although most likely at a discount to then-current book value. The economics of these investment structures typically drive most investors to continue to maintain the investments on their books through their scheduled terms. The proposed investment program contemplates holding these investments accordingly.

**Is anyone else doing these transactions?**

Leasing investment programs form an integral part of the earnings and investment profiles of a wide range of companies, including electric and gas utilities and holding companies such as Public Service Enterprise Group, Duquesne Light, Edison International, Southern Company, Cilcorp, and Southern Indiana Gas; telephone companies such as ATT, Nynex/Bell Atlantic, Ameritech, and US West; banks such as, Bank of New York, First Chicago, Nationsbank, Bank One, and First Chicago; various insurance companies, as well as industrial corporations such as Philip Morris, Pitney Bowes, Chrysler Corporation, Dana Corporation and General Electric.

**What are we requesting approval to do?**

Approval is requested to initiate a leasing investment program and to make such investments as are deemed reasonable by the Board of Directors of CED, within the capital allocations made to CED from time to time by the Board of Directors of the holding company.

One of the requirements the market imposes is that investors have a substantial net worth, in the order of $100 million. To provide for the necessary net worth requirement as well as to provide for funds to make the equity investments, management also requests that it be given the authority to make additional investments in CED sufficient to satisfy the net worth requirements.

# EXHIBIT 8

MINUTES of a MEETING
of
THE BOARD OF DIRECTORS OF
GRAMERCY DEVELOPMENT, INC

A meeting of the Board of Directors of Gramercy Development, Inc was held at the offices of Consolidated Edison Company of New York, Inc on May 29, 1997 at 8 30 a m

Peter A Irwin, Secretary of the Company, recorded the minutes of the meeting

Present - Mary Jane McCartney, Chairman of the Board, Joan S Freilich and Paul H Kinkel

Present by Invitation Charles Muoio, President of the Company, Michael Madia and Brian DePlautt, Vice Presidents of the Company, and Kevin Burke, Vice President of Consolidated Edison, Company of New York, Inc

\- - - -

Ms McCartney called the meeting to order, noting that an agenda had been distributed to the members of the Board, along with some backup materials, which she ordered filed with the Secretary's records of the meeting

\- - - -

Mr Irwin noted that drafts of the minutes of the meetings of the Board held on March 10, 1997 and May 22, 1997 had not been distributed to the Board prior to this meeting and he recommended that consideration of them, be deferred until the next meeting of the Board The Board concurred

\- - - -

At Ms McCartn y's request, Mr Muoio reported that the Company had engaged the accounting firm of Mitchell & Titus to provide accounting services for the Company and that the firm was in the process of working on the May financial statements and reformatting previous statements He also reported that the Company had hired Jessie Lee, as an office manager and manager of information services

\- - - -

Mr Muoio then discussed the need to develop benefit plan descriptions for the Company's benefits He reported that an outside consultant could prepare the necessary documents at an estimated cost of about $20 - $25

thousand There followed a discussion of alternatives, and Mr Muoio agreed to explore whether there was a less expensive method to prepare the descriptions

- - - -

At Ms McCartney's request, Mr DePlautt then reviewed the April financial statements which were included in the materials presented to the Board He noted that a $3,000,000 payment had been made to IEP Global Development, which had been expensed, and that it was expected that an additional $2,000,000 payment would be made later in the year

Mr DePlautt also discussed the development by the Company of accounting polices and procedures, which would be reviewed by Con Edison's Accounting Department, and the development of short and long term financial forecasts A Board member suggested that the accounting policies and procedures also be reviewed by Con Edison's Auditing Department Mr Muoio discussed a capital expenditure scenarios There followed a discussion of the need and framework for developing the Company's financial forecasts and financing plans

- - - -

Mr Madia, referring to Section 3 of the materials distributed to the Board members, discussed certain options with respect to tax strategy and the utilization of foreign tax credits Mr Muoio reported that a member of the law firm of Reid and Priest, who has been representing the Company, would make a presentation on June 5th to the Company and interested Con Edison personnel on international taxation and tax strategy

- - - -

At Ms McCartney's request, Mr DePlautt, referring to Section 4 of the materials presented to the Board, then discussed various investment options under consideration by the Company

He began by discussing lease investments, in which the Company would participate as lessor of infrastructure projects He discussed the tax advantages of lease structures, the expected returns, the possibility of near term enhancements to earnings and cash flows, and the financing of the investments for the projects, including the possibility of "back-leveraging" the Company's equity participation He

reviewed various investment risks, including the length of the investments, "cliff" earnings in some cases, tax and credit risks and technological risks He then discussed the review that was underway of various projects, several established participants in the lease market and the possibility of a participating with an experienced player, and consideration being given to engaging Cornerstone Financial, a well established financial consultant to participants in the lease market, as an advisor to the Company

Mr DePlautt then discussed the Company's review of two types of projects that would be eligible for special tax treatment under the Internal Revenue Code, "Section 42," low income housing projects and "Section 29" alternate fuels projects He briefly reviewed the two types of projects and noted that preliminary reviews and discussions were underway

He next discussed the review the Company has underway of the possibility of purchasing all or a portion of an existing IPP developer, including Charter Oak Energy, a subsidiary of Northeast Utilities, which is for sale He reviewed Charter Oak's portfolio of projects and discussed other existing IPP developers under preliminary review

Mr DePlautt then reported on the Company's discussions with Energy Management, Inc ("EMI") about a new 165 MW plant in Massachusetts He reviewed the status of the plant and the gas contractual and financing arrangements He also discussed the Company's review of possible joint ventures in telecommunications and cable with Telergy, Inc and Apollo South

- - - -

At the request of Ms McCartney, Mr Madia then reported on the status of the Company's possible investment of up to $30 million as part of a consortium to acquire 110 MW of existing electric generation in Guatemala from Empresa Elecrica de Guatemala, S A ("EEGSA")plus a commitment to construct a new power plant that will be subject to an 18-year power purchase agreement with EEGSA He discussed the project's scope and status of the project, financing, the schedule for the review and bids, the role of IEP Global and the other expected members of the consortium

Mr Madia also reviewed the status of the proposal to participate in a consortium to acquire 60% of the shares of Empresa de Generacion de Arequipa S A , a Peruvian electric generating company He discussed the facilities, the schedule

for the proposal and other members of the proposed consortium

There followed a discussion of the two projects' assets, expected returns and risks

- - - -

At the request of Ms McCartney, Mr Muoio, then discussed his recent trip to Russia with representatives of Asea Brown Boveri ("ABB"), to visit installations employing the Fisonic energy technology He discussed the sites visited in St Petersburg and Moscow, the ABB representatives' positive review of the technology, manufacturing and quality control issues, and the possibility of a joint venture or royalty arrangement with ABB There followed a discussion of the Fisonic technology and the Company's possible role in developing it

Ms Freilich left the meeting

- - - -

Mr Muoio then discussed the due diligence process for the Company's projects and the need to do background investigations on the Company's potential international partners He reported that the Company was considering various firms that could perform the necessary investigations

- - - -

Ms McCartney and Mr Muoio then reported on their recent visit to China They discussed the cities and people that were visited and the status of possible projects and products that could be marketed Mr Muoio discussed the desirability of providing complete integrated systems on common platforms rather than isolated products and various options that were open to the Company There followed a discussion of various opportunities in China

- - - -

There being no further business, on motion, duly seconded and carried, the meeting was adjourned

Secretary

# EXHIBIT 9

CORNERSTONE FINANCIAL ADVISORS
LIMITED PARTNERSHIP
RIVERWALK, SUITE 450
2150 EAST LAKE COOK ROAD
BUFFALO GROVE, ILLINOIS 60089
(847) 465-0086 FAX (847) 465-0083

September 26, 1997

Mr. J.A. Hoyte de Jong
Mr. Jan Trapman
n.v. Electriciteitsbedrijf Zuid-Holland
Von Geusaustraat 193
2270 AX Voorburg

**RE: Leveraged Lease Financing of EZH's RoCa3 Gas-Fired Power Facility**

Gentlemen:

Cornerstone Financial Advisors Limited Partnership ("Cornerstone") on behalf of Banc One Leasing Corporation ("BOLC") and Consolidated Edison Development, Inc. ("CDI") (individually, an "Equity Investor", and, collectively, the "Equity Investors"), is pleased to submit to n.v. Electriciteitsbedrijf Zuid-Holland ("EZH") the following proposal for each Equity Investor to make one or more equity investments on an undivided interest basis in the lease/leaseback financing of a portion of the RoCa3 power station (the "Facility"). The specifics of our proposal are outlined below.

1. Lease Economics and Equity Investor Participation

a. Lease Economics

The proposal contemplates using a "467 structure," which based on the pricing assumptions in the attached Exhibit I (the "Pricing Assumptions"), provides EZH with a net present value benefit ("NPV Benefit") of 7.88 percent of the value of the undivided interest. Prior to closing, if any of the Pricing Assumptions change (including any proposed or enacted change in tax law or tax regulations), the resulting NPV Benefit set forth will be adjusted to allow each Equity Investor to maintain its net economic return and, to the extent consistent therewith, to maximize the NPV Benefit to EZH. The enclosed proposal remains subject to review by the Equity Investors' appraiser and tax counsel, and each Equity Investor reserves the right to reoptimize the pricing file, including the purchase option price and date, while maintaining the NPV Benefit.

September 26, 1997
Page 2

b. Equity Investor Participation

The Equity Investors will participate on an undivided interest basis as follows:

| Equity Investor | Facility Cost ($ millions) | Anticipated Funding Date |
|---|---|---|
| BOLC | $ 50 | January 6, 1998 |
| CDI | 150 | November 1, 1997 |
| Total | $200 | |

2. Documentation

The Equity Investors will retain the law firm of Shearman & Sterling ("S&S") to serve as legal counsel. We propose using as a basis for the transaction the lease documentation from the EZH/BOLC transaction which closed in March 1997 (the "Precedent Documents"). It is our understanding that a German lease exists on some portion of the Facility. It is important that S&S and the Equity Investors' local counsel obtain an understanding of the German lease transaction quickly so that BOLC and CDI can be assured that the transaction will have acceptable commercial and tax risk profiles. In order to accomplish this, S&S and local counsel will require the German lease documentation, a rental schedule, and an understanding of the economic and legal defeasance structure. In addition, if this transaction is to proceed quickly, BOLC and CDI need assurances that the German lessor understands the timing of this transaction and is willing to cooperate as needed.

3. Letter of Credit

The lease documentation requires that a letter of credit issued from an acceptable bank be effective and legally enforceable at all times to protect the Equity Investors' equity exposure. To avoid exceeding the Equity Investors' credit exposure limits for Dutch banks, the Equity Investors require that the letter of credit in this transaction be provided by a non-Dutch bank.

September 26, 1997
Page 3

4. Due Diligence Schedule

The Equity Investors are willing to use Deloitte & Touch Valuation Group ("DTVG") to serve as the appraiser, Duke Engineering & Services, Inc. ("Duke") as the structural engineer, and Tauw Milieu ("Tauw") as the environmental consultant. We believe that the combination of an experienced due diligence team and Precedent Documents will make this an efficient and smooth transaction.

5. Next Step

We are, however, concerned about the availability of the legal resources and outside consultants which are needed to close this transaction in the fourth quarter of 1997. As such, if this proposal is acceptable we would encourage EZH to execute a commitment/expense letter quickly so that the Equity Investors can reserve the requisite investment capacity and retain the professional firms needed to close the transaction.

This letter is an expression of interest only and is not intended to be a binding commitment or an offer to make an equity investment. Unless accepted in writing by October 3, 1997, this indicative economic proposal shall expire. If you have any questions, please call Mark DeTrempe or me at (847) 465-0065. We look forward to reviewing this proposal with you.

Very truly yours,

CORNERSTONE FINANCIAL ADVISORS
LIMITED PARTNERSHIP

Rob Holzman

Robert D. Holzman
Vice President

MJD/cak

cc: Brian DePlautt
Michael P. Mattasits

Enclosure

mark/l267

# EXHIBIT 10

---

Date: February 13, 1998

To: Mary Jane McCartney
Joan Freilich
Paul Kinkel
Peter Irwin
Kevin Burke

From: Charles Muoio

Re: ENECO Lease

---

As we have been discussing over the last several days, the ENECO lease "due diligence" has resulted in a deterioration of the return, [redacted] and other issues. At this time, after consultation with management, CED recommends exiting the transaction and is exploring the steps necessary to cancel our participation. The following is an estimate of the potential commercial and legal ramifications of our decision to withdraw from the transaction.

## Commercial

CED's withdrawal from the transaction could have an adverse impact on the credibility of CED as an entity that can be relied upon to negotiate and close transactions in the leasing market since our minimum acceptable return was not adequately communicated to all the parties. This loss of credibility could reduce CED's chances of being awarded future transaction mandates, because of the risk that CED will not close the transactions.

In effort to ameliorate these commercial risks we are currently developing a list of reasons why this transaction was rejected internally which list may include the following:

- Asset Mortgage Coverage: Because of the unique nature of Dutch mortgage rules it may not be possible to obtain a clear mortgage on all of the assets contemplated in the transaction, most significantly the majority of the gas distribution assets. As a result of this, management has not become fully comfortable with the secondary security support for this transaction, and will seek to pursue those transactions that bring with them more substantial mortgage protections.

- Regulatory: The nature of the assets and the path to the control of the assets in the event that CED were required to obtain control of the assets does not appear to provide CED with the clear cut opportunity to obtain control of the asset in a manner that is consistent with the expectations of management. Issues include the realities of regulatory hurdles that CED may be required to clear in the event an attempt were made to transfer control to CED.

- Legal Opinion: [redacted]

- Unlevered Return: Our offer letter, as well as our board presentation, assumed a 9.75% unlevered return. As a result of a number of changes to the assumptions in the transaction we no longer are able to achieve the target 9.75% return, but are facing an unlevered return, depending on assumptions, ranging from 8.87% to 8.38%. These changes include, CED's decision to require, and hence pay for, a letter of credit at closing instead of having a springing letter of credit paid for by ENECO, a possible change in the structure of the transaction related to tax opinion issues and other fine tuning of assumptions. The return level has been deemed not acceptable for this transaction.

## Legal

In addition to absorbing CED's internal expenses on this transaction to date, CED's withdrawal from the transaction may create a legal liability for CED to pay certain transaction expenses. If CED withdraws from the transaction (not in conformance with the offer letter) and the transaction does not close as a result of the CED withdrawal, then CED would be responsible for the payment of its portion of transaction expenses, including certain third party legal and legal out of pocket expenses. Based on preliminary estimates these legal expenses could be approximately $400k. If the transaction does close or CED exits within the terms of the offer letter, then CED would not be liable for these third party legal expenses.

There is the possibility that ENECO may propose a series of structural changes that may mitigate the commercial, legal and economic issues in the transaction and which provide the originally estimated return. If ENECO proposes these solutions, CED would recommend the renewal of the pursuit of this transaction.

# EXHIBIT 11

From: Windows/admin/Brian
Sent: 10/19/1998 10:55:15 AM (Eastern Time)
To: Charles Muoio
CC: 'Mary Jane McCartney'; 'Robert Stelben'
Subject: MEGA Proposal

MEGA's advisors, PriceWaterhouseCoopers ("PWC") advised us that MEGA has chosen to award the gas distribution lease mandate to Fleet Bank.

PWC indicated that the award to Fleet was based on the following considerations: (a) security structure / economics - Fleet agreed to use a AAA security structure, such as an AIG, Berkshire or AMBAC GIC in lieu of CED's requirement for US Treasuries. This alternate security structure can generate a significant economic benefit and it appears that Fleet gave MEGA all of the benefit here. (b) Documentation - MEGA believed they might be able to get better terms and conditions by negotiating new documents with Fleet, rather than by, in effect, duplicating the EZH documentation with us.

We are halting development efforts on MEGA and are redirecting resources to our other lease pipeline projects including (a) NUON - Netherlands, (b) Electrabel - Belgium,and (c) ESAG - Germany

# EXHIBIT 12

**Consolidated Edison Leasing Inc.**
**Roca Facility No. 2 Lease-In/Lease-out Transaction**
**Calculation of OID**

If basic term and EBO is used to determine amounts to be reported

| | | | | |
|---|---|---|---|---|
| Total to be received | | | 104,419,396 | "Loan Payments" and EBO amounts |
| Total investment "Loan": Portion of | | | | |
| | TP Equity | 39,320,000 | | |
| | Third Party Loan | 0 | 39,320,000 | |
| | Anticipated Interest Income | | 65,099,396 | |
| Transaction Costs | | | 4,125,000 | |
| Amortization Period | | | 22.0 | yrs. |
| Interest Rate - Interpolated | | | 0.0451008315 | 0 |

**If a position is taken that a lease is a financing arrangement to the extent of the cash investment by the US taxpayer and disregarding the third party loan, you have to determine the following to convert the lease to a loan. Using the contracts you will determine:**

**The date and amount of the "loan".**
**The amount of each payment to be made to repay the "Loan".**
**The dates on which the payments are to be made.**

**The accrual period and amount of interest income will be interpolated from the above.**

| Tax Year | Days | "Loan" Balance | "Loan" Payment | Interpolated Interest Income | Interest Expense | Amortization of Transaction Cost | Net Gain ( Loss ) As a Loan | Net Gain ( Loss ) As a LILO Lease | Adjustment Difference |
|---|---|---|---|---|---|---|---|---|---|
| | | 39,320,000 | | | | | | | |
| 1997 | 16 | 39,398,816 | 0 | 78,818 | | ( 8,317 ) | 70,500 | | 70,500 |
| 1998 | 360 | 41,175,736 | 0 | 1,776,919 | | ( 187,122 ) | 1,589,797 | | 1,589,797 |
| 1999 | 360 | 43,032,795 | 0 | 1,857,060 | | ( 187,122 ) | 1,669,938 | | 1,669,938 |
| 2000 | 360 | 44,973,610 | 0 | 1,940,815 | | ( 187,122 ) | 1,753,693 | | 1,753,693 |
| 2001 | 360 | 47,001,957 | 0 | 2,028,347 | | ( 187,122 ) | 1,841,225 | | 1,841,225 |
| 2002 | 360 | 49,121,785 | 0 | 2,119,827 | | ( 187,122 ) | 1,932,705 | | 1,932,705 |
| 2003 | 360 | 51,337,218 | 0 | 2,215,433 | | ( 187,122 ) | 2,028,311 | | 2,028,311 |
| 2004 | 360 | 53,652,569 | 0 | 2,315,351 | | ( 187,122 ) | 2,128,229 | | 2,128,229 |
| 2005 | 360 | 56,072,345 | 0 | 2,419,775 | | ( 187,122 ) | 2,232,653 | | 2,232,653 |
| 2006 | 360 | 58,601,254 | 0 | 2,528,909 | | ( 187,122 ) | 2,341,787 | | 2,341,787 |
| 2007 | 360 | 61,244,219 | 0 | 2,642,965 | | ( 187,122 ) | 2,455,843 | | 2,455,843 |
| 2008 | 360 | 64,006,385 | 0 | 2,762,165 | | ( 187,122 ) | 2,575,043 | | 2,575,043 |
| 2009 | 360 | 66,893,126 | 0 | 2,886,741 | | ( 187,122 ) | 2,699,619 | | 2,699,619 |
| 2010 | 360 | 69,910,061 | 0 | 3,016,938 | Third party debt disregarded | ( 187,122 ) | 2,829,814 | | 2,829,814 |
| 2011 | 360 | 73,063,063 | 0 | 3,153,002 | | ( 187,122 ) | 2,965,880 | | 2,965,880 |
| 2012 | 360 | 71,137,298 | 5,220,970 | 3,295,205 | | ( 187,122 ) | 3,108,083 | | 3,108,083 |
| 2013 | 360 | 74,345,649 | 0 | 3,208,351 | | ( 187,122 ) | 3,021,229 | | 3,021,229 |
| 2014 | 360 | 77,698,700 | 0 | 3,353,051 | | ( 187,122 ) | 3,165,929 | | 3,165,929 |
| 2015 | 360 | 81,202,976 | 0 | 3,504,276 | | ( 187,122 ) | 3,317,154 | | 3,317,154 |
| 2016 | 360 | 84,865,298 | 0 | 3,662,322 | | ( 187,122 ) | 3,475,200 | | 3,475,200 |
| 2017 | 360 | 88,692,793 | 0 | 3,827,495 | | ( 187,122 ) | 3,640,373 | | 3,640,373 |
| 2016 | 360 | 92,692,912 | 0 | 4,000,119 | | ( 187,122 ) | 3,812,997 | | 3,812,997 |
| 2017 | 360 | 96,873,439 | 0 | 4,180,527 | | ( 187,122 ) | 3,993,405 | | 3,993,405 |
| 2018 | 1 | 89,519,401 | 7,362,950 | 8,912 | | | 8,912 | | 8,912 |
| 2018 | 104 | 67,581,097 | 22,958,869 | 1,020,565 | | | 1,020,565 | | 1,020,565 |
| 2018 | 61 | 45,138,688 | 22,958,869 | 516,461 | Same year | | 516,461 | | 516,461 |
| 2018 | 92 | 22,700,077 | 22,958,869 | 520,258 | | | 520,258 | | 520,258 |
| 2018 | 91 | 0 | 22,958,869 | 258,792 | | | 258,792 | | 258,792 |
| | | | 104,419,396 | 65,099,396 | 0 | ( 4,125,000 ) | 60,974,396 | 0 | 60,974,396 |

Same year

The "loan Payment" amount has been reduced by the amount that relates to the circular flow debt defeasance.
The loan repayments are those cash flows that are returned to the taxpayer
Excluded from this are payments from the equity deposit that are used to pay the third party lender.

File: OID Calc Tab: OID - Accrual EBO





US00133

# EXHIBIT 13

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| CONSOLIDATED EDISON COMPANY OF NEW YORK, INC. & SUBSIDIARIES, | ) | |
| Plaintiff, | ) | |
| v. | ) | No. 06-305 T<br>Judge Marian Blank Horn |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

NOTICE OF ISSUANCE OF SUBPOENAS DUCES TECUM

The United States of America, by and through its undersigned counsel, pursuant to Court of Federal Claims Rule 45(b)(1) hereby gives notice of the issuance of the attached subpoenas duces tecum issued to Capstar Partners, Inc. and Capstar Partners L.L.C. respectively.

DAVID N. GEIER
Attorney of Record
U.S. Department of Justice, Tax Division
Post Office Box 26
Ben Franklin Station
Washington, D.C. 20044
Telephone: (202) 616-3448
Facsimile: (202) 307-0054

EILEEN J. O'CONNOR
Assistant Attorney General
DAVE GUSTAFSON
Chief, Court of Federal Claims Section
STEVEN I. FRAHM
Assistant Chief, Court of Federal Claims Section

JOSEPH A. SERGI
Trial Attorney
JAMES E. WEAVER
Trial Attorney
ADAM R. SMART
Trial Attorney

January 26, 2007

CERTIFICATE OF SERVICE

I hereby certify that on January 26, 2007, a copy of the foregoing Request for Production was sent via United States Mail, postage prepaid, addressed to the following:

Thomas C. Durham, Esq.
MAYER, BROWN, ROWE & MAW LLP
71 South Wacker Drive
Chicago, Illinois 60606

DAVID N. GEIER
Trial Attorney, Tax Division
U.S. Department of Justice

# United States Court of Federal Claims

Consolidated Edison Company of New York, Inc. & Subsidiaries,

vs

THE UNITED STATES

No. 06-305-T

## SUBPOENA

To Capstar Partners Inc.
40 East 52nd St., 12th Fl.

New York, New York 10022

☐ YOU ARE COMMANDED to appear at the place, date, and time specified below to testify in the above case.

PLACE OF TESTIMONY

COURTROOM

DATE AND TIME

☐ YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case.

PLACE OF DEPOSITION

DATE AND TIME

☒ YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below (list documents or objects):

See Exhibit A, attached hereto.

| PLACE | DATE AND TIME |
|---|---|
| U.S. Attorney's Office, Southern District of New York, One St. Andrews Plaza, New York, NY 10007 * (* Alternative arrangements can be made) | February 19, 2007 11:00 a.m. |

☐ YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

PREMISES

DATE AND TIME

Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify. RULE 30(b)(6).

Attorney of Record for Defendant January 25, 2007

ISSUING OFFICER SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT) DATE

DAVID N. GEIER, JUSTICE DEPT., TAX DIVISION, COURT OF FEDERAL CLAIMS SECTION, P. O. BOX 26, BEN FRANKLIN STATION, WASHINGTON, DC 20044, (202) 616-3448

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER



2184896.1

NOTE - If the place of travel is more than 100 miles (by the shortest usual means of travel) from the place where the subpoena is served, or if the place of deposition is more than 100 miles from the place where the deponent resides, is employed or transacts business in person, the person served may regard the command as optional unless there is attached to the subpoena an order of the court requiring his/her appearance, notwithstanding the distance of travel. In any event, response to the subpoena will entitle the person to the fees and mileage allowed by law.

**PROOF OF SERVICE**

**SERVED** DATE PLACE

SERVED ON (PRINT NAME) MANNER OF SERVICE

☐ Fees tendered for one day's attendance and mileage allowed by law.

(Fees and mileage need not be tendered when the subpoena is issued on behalf of the United States or an officer or agency thereof.)

**DECLARATION OF SERVICE**

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the proof of Service is true and correct.

Executed on ______________________
DATE

SIGNATURE OF SERVER

ADDRESS OF SERVER

Rule 45.

(c) Protection of Persons Subject to Subpoenas.

(1) A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena. The court shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction, which may include, but is not limited to, lost earnings and a reasonable attorney's fee.

(2)(A) A person commanded to produce and permit inspection and copying of designated books, papers, documents or tangible things, or inspection of premises need not appear in person at the place of production or inspection unless commanded to appear for deposition, hearing or trial.

(B) Subject to paragraph(d)(2) of this rule, a person commanded to produce and permit inspection and copying may, within 14 days after service of the subpoena or before the time specified for compliance if such time is less than 14 days after service, serve upon the party or attorney designated in the subpoena written objection to inspection or copying of any or all of the designated materials or of the premises. If objection is made, the party serving the subpoena shall not be entitled to inspect and copy the materials or inspect the premises except pursuant to an order of the court. If objection has been made, the party serving the subpoena may, upon notice to the person commanded to produce, move at any time for an order to compel the production. Such an order to compel production shall protect any person who is not a party or an officer of a party from significant expense resulting from the inspection and copying commanded.

(3)(A) On timely motion, the court shall quash or modify the subpoena if it

(i) fails to allow reasonable time for compliance; or

(ii) requires disclosure of privileged or other protected matter and no exception or waiver applies, or

(iii) subjects a person to undue burden.

(B) if a subpoena

(i) requires disclosure of a trade secret or other confidential research, development, or commercial information; or

(ii) requires disclosure of an unretained expert's opinion or information not describing specific events or occurrences in dispute an resulting from the expert's study made not at the request of any party,

the court may, to protect a person subject to or affected by the subpoena, quash or modify the subpoena or, if the party on whose behalf the subpoena is issued shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated, the court may order appearance or production only upon specified conditions.

(d) Duties in Responding to Subpoena.

(1) A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the demand.

(2) When information subject to a subpoena is withheld on a claim that it is privileged or subject to protection as trial preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications, or things not produced that is sufficient to enable the demanding party to contest the claim.

**EXHIBIT A TO SUBPOENA DIRECTED TO CAPSTAR PARTNERS INC.**

DEFINITIONS AND INSTRUCTIONS

1. The words "document" and "writing" are to be liberally construed to include all records or other tangible forms which are in your possession or custody or subject to your control. This includes, but is not limited to drafts or finished versions, originals, copies, nonidentical copies, (whether by reason of handwritten notations on them or otherwise), and applies regardless of however the document may have been created, produced or stored (whether manually, mechanically, electronically, or otherwise). To be clear, documents shall include any and all types of writings, drawings, graphs, charts, photographs, and data compilations, whether in written, computerized, electronically stored or other format. Defendant requests that any and all computerized and electronically stored information be produced in reasonably usable form.

2. If any document would have been responsive to these requests no longer exists, please state the following for each document: the date of destruction, the reason for destruction, and the person(s) responsible for the decision to destroy the document(s) and for the actual destruction of the documents.

3. The term "Con Ed" shall refer to Consolidated Edison Company of New York, Inc. & Subsidiaries, and affiliated companies, including, but not limited to, Consolidated Edison Development, Inc., Consolidated Edison Leasing, Inc., and Consolidated Edison, Inc.

4. The term "Banc One" shall refer to Banc One Leasing Corp. its related affiliates, subsidiaries, successors, and assigns, including, but not limited to, and any person, officer, director, accountant, lawyer, agent, or entity acting on behalf of any of the foregoing organizations.

5. The term "EZH" shall refer to N.V. Electriciteitsbedrifj Zuid-Holland, its related affiliates, subsidiaries, successors, and assigns, including, but not limited to, Preussen Elektra A.G. and E.ON Benelux Generation N.V., and any person, officer, director, accountant, lawyer, agent, or entity acting on behalf of any of the foregoing organizations.

6. The term "RoCa3" shall refer to the gas fired CHP facility located in the Netherlands on the border between Rotterdam and Capelle aan den IJessel, constituting the third unit alongside two previously built units, which was owned by EZH on or about December 15, 1997.

7. The term "Lease Transaction" shall refer to the series of transactions pertaining to the RoCa3 facility as described in paragraphs 61-77, inclusive of the complaint, attached hereto as Exhibit A-1.

8. The term "Capstar" shall refer to Capstar Partners Inc. and/or any and all affiliated businesses, successors, assigns, predecessor or successor businesses, and any person, officer, director, accountant, lawyer, agent, or entity acting on behalf of Capstar Partners Inc.

## DOCUMENTS REQUESTED

Request No. 1: All documents within the possession, custody or control of Capstar that refer to, discuss, evidence or relate to the inception, promotion, recommendation, consideration, planning, approval, implementation, and/or oversight of the Lease Transaction.

Request No. 2: All documents within the possession, custody or control of Capstar that refer to, discuss, evidence or relate to the inception, promotion, recommendation, consideration, planning, approval, implementation, and/or oversight of the transaction between

Banc One and EZH involving the purported lease and sublease of an undivided interest in the RoCa3 facility.

Request No. 3: All documents within the possession, custody or control of Capstar that refer to, discuss, evidence or relate to the acquisition of EZH by Preussen Elektra AG and the effect of such acquisition on the Lease Transaction.

Request No. 4: All documents within the possession, custody or control of Capstar refer to, discuss, evidence or relate to the inception, promotion, recommendation, consideration, planning, approval, implementation, and/or oversight following lease transactions:

a. NUON lease (Netherlands);

b. MEGA Gas and Thermal Distribution lease/leaseback (Netherlands);

c. EPON lease (Netherlands);

d. ENECO lease (Netherlands);

e. ENN lease (Nethelands);

f. ENW gas lease (Netherlands);

g. MCN lease (United States);

h. ELECTRABEL power plant lease/leaseback (Belgium);

i. Diefland gas and thermal distribution lease/leaseback (Netherlands);

j. Linz power plant lease/leaseback (Austria);

k. UNA power plant lease/leaseback (Netherlands);

l. EG Laufenburg lease/leaseback (Switzerland);

m. Humber power lease/leaseback (United Kingdom);

n. EWZ electric transmission grid lease/leaseback (Switzerland);

o. ESAG lease (Germany);

p. REMU lease (Netherlands);

q. DELTA lease (Netherlands);

r. ZETA/TEL lease (Netherlands);

s. EDON lease (Netherlands);

t. DEW lease (Germany);

u. VASA lease (Germany); and

v. SWISCO lease (Switzerland).

Request No. 5: All documents within the possession, custody or control of Capstar (and/or any and all affiliated businesses, successors, assigns, predecessor or successor businesses, and any person, officer, director, accountant, lawyer, agent, or entity acting on behalf of Capstar) that refer to, discuss, evidence or relate to the inception, promotion, recommendation, consideration, planning, approval, implementation, and/or oversight any other transaction similar to the Lease Transaction and/or the transaction described in Revenue Ruling 2002-69, 2002-2 C.B. 760 (copy attached hereto as Exhibit A-2), considered by any client of Capstar, including but not limited to Con Ed and/or Banc One, from 1996 through 2001.

Request No. 6: All documents in the possession, custody or control of Capstar that contain an analysis of Revenue Ruling 2002-69, 2002-2 C.B. 760.

Request No. 7: All documents in the possession, custody or control of Capstar that contain an analysis or discussion of the Final Regulations issued by the Department of Treasury on May 18, 1999, which are entitled "Section 467 Rental Agreements; Treatment of Rent and Interest Under Certain Agreements for the Lease of Tangible Property," and which may be found

at 64 FR 26845-01, including the impact these Final Regulations would or may have on transactions similar to the Lease Transaction and/or the transaction described in Revenue Ruling 2002-69, 2002-2 C.B. 760.

Request No. 8: All copies and drafts of the document entitled "Lease Screening Criteria" dated July 21, 1997 in the possession, custody or control of Capstar.

Request No. 9: All documents in the possession, custody or control of Capstar that evidence promotional, marketing or presentation materials regarding the type of transaction described in Revenue Ruling 2002-69, 2002-2 C.B. 760.

Request No. 10: A copy of all versions of Capstar's document retention policies in place from 1997 through the present.