# EXHIBIT 14

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| CONSOLIDATED EDISON COMPANY OF NEW YORK, INC. & SUBSIDIARIES,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | ) | No. 06-305 T<br>Judge Marian Blank Horn |

NOTICE OF ISSUANCE OF SUBPOENA DUCES TECUM

The United States of America, by and through its undersigned counsel, pursuant to Court of Federal Claims Rule 45(b)(1) hereby gives notice of the issuance of the attached subpoena duces tecum issued to Pricewaterhouse Coopers LLP.

DAVID N. GEIER
Attorney of Record
U.S. Department of Justice, Tax Division
Post Office Box 26
Ben Franklin Station
Washington, D.C. 20044
Telephone: (202) 616-3448
Facsimile: (202) 307-0054

EILEEN J. O'CONNOR
Assistant Attorney General
DAVID GUSTAFSON
Chief, Court of Federal Claims Section

STEVEN I. FRAHM
Assistant Chief, Court of Federal Claims Section

JOSEPH A. SERGI
Trial Attorney
JAMES E. WEAVER
Trial Attorney
ADAM R. SMART
Trial Attorney

February 6, 2007

CERTIFICATE OF SERVICE

I hereby certify that on February 6, 2007, a copy of the foregoing Notice of Issuance of Subpoena Duces Tecum was sent via United States Mail, postage prepaid, addressed to the following:

Thomas C. Durham, Esq.
MAYER, BROWN, ROWE & MAW LLP
71 South Wacker Drive
Chicago, Illinois 60606

DAVID N. GEIER
Trial Attorney, Tax Division
U.S. Department of Justice

# United States Court of Federal Claims

Consolidated Edison Company of New York, Inc. & Subsidiaries,

vs

THE UNITED STATES

No. 06-305-T

**SUBPOENA**

To Pricewaterhouse Coopers L.L.P.
300 Madison Ave., 21st Floor
New York, New York 10017

☐ YOU ARE COMMANDED to appear at the place, date, and time specified below to testify in the above case.

PLACE OF TESTIMONY

COURTROOM

DATE AND TIME

☐ YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case.

PLACE OF DEPOSITION

DATE AND TIME

☒ YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below (list documents or objects):

See Exhibit A, attached hereto.

U.S. Attorney's Office, Southern District of New York, One St. Andrews Plaza, New York, NY 10007 * — February 28, 2007 11:00 a.m.

PLACE (* Alternative arrangements can be made) — DATE AND TIME

☐ YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

PREMISES

DATE AND TIME

Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify. RULE 30(b)(6).

Attorney of Record for Defendant — February 6, 2007

ISSUING OFFICER SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT) — DATE

DAVID N. GEIER, JUSTICE DEPT., TAX DIVISION, COURT OF FEDERAL CLAIMS SECTION, P. O. BOX 26, BEN FRANKLIN STATION, WASHINGTON, DC 20044, (202) 616-3448

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER

NOTE - If the place of travel is more than 100 miles (by the shortest usual means of travel) from the place where the subpoena is served, or if the place of deposition is more than 100 miles from the place where the deponent resides, is employed or transacts business in person, the person served may regard the command as optional unless there is attached to the subpoena an order of the court requiring his/her appearance, notwithstanding the distance of travel. In any event, response to the subpoena will entitle the person to the fees and mileage allowed by law.

**PROOF OF SERVICE**

**SERVED**

DATE PLACE

SERVED ON (PRINT NAME) MANNER OF SERVICE

☐ Fees tendered for one day's attendance and mileage allowed by law.
(Fees and mileage need not be tendered when the subpoena is issued on behalf of the United States or an officer or agency thereof.)

**DECLARATION OF SERVICE**

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the proof of Service is true and correct.

Executed on ____________________
DATE

SIGNATURE OF SERVER

ADDRESS OF SERVER

Rule 45.

(c) Protection of Persons Subject to Subpoenas.

(1) A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena. The court shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction, which may include, but is not limited to, lost earnings and a reasonable attorney's fee.

(2)(A) A person commanded to produce and permit inspection and copying of designated books, papers, documents or tangible things, or inspection of premises need not appear in person at the place of production or inspection unless commanded to appear for deposition, hearing or trial.

(B) Subject to paragraph(d)(2) of this rule, a person commanded to produce and permit inspection and copying may, within 14 days after service of the subpoena or before the time specified for compliance if such time is less than 14 days after service, serve upon the party or attorney designated in the subpoena written objection to inspection or copying of any or all of the designated materials or of the premises. If objection is made, the party serving the subpoena shall not be entitled to inspect and copy the materials or inspect the premises except pursuant to an order of the court. If objection has been made, the party serving the subpoena may, upon notice to the person commanded to produce, move at any time for an order to compel the production. Such an order to compel production shall protect any person who is not a party or an officer of a party from significant expense resulting from the inspection and copying commanded.

(3)(A) On timely motion, the court shall quash or modify the subpoena if it

(i) fails to allow reasonable time for compliance; or

(ii) requires disclosure of privileged or other protected matter and no exception or waiver applies, or

(iii) subjects a person to undue burden.

(B) if a subpoena

(i) requires disclosure of a trade secret or other confidential research, development, or commercial information; or

(ii) requires disclosure of an unretained expert's opinion or information not describing specific events or occurrences in dispute an resulting from the expert's study made not at the request of any party,

the court may, to protect a person subject to or affected by the subpoena, quash or modify the subpoena or, if the party on whose behalf the subpoena is issued shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated, the court may order appearance or production only upon specified conditions.

(d) Duties in Responding to Subpoena.

(1) A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the demand.

(2) When information subject to a subpoena is withheld on a claim that it is privileged or subject to protection as trial preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications, or things not produced that is sufficient to enable the demanding party to contest the claim.

EXHIBIT A TO SUBPOENA DIRECTED TO PRICEWATERHOUSE COOPERS, LLP

**DEFINITIONS AND INSTRUCTIONS**

1. The words DOCUMENT and WRITING are to be liberally construed to include all records or other tangible forms which are in your possession or custody or subject to your control. This includes, but is not limited to drafts or finished versions, originals, copies, nonidentical copies, (whether by reason of handwritten notations on them or otherwise), and applies regardless of however the document may have been created, produced or stored (whether manually, mechanically, electronically, or otherwise). To be clear, documents shall include any and all types of writings, drawings, graphs, charts, photographs, and data compilations, whether in written, computerized, electronically stored or other format. Defendant requests that any and all computerized and electronically stored information be produced in reasonably usable form.
2. If any DOCUMENT would have been responsive to these requests no longer exists, please state the following for each DOCUMENT: the date of destruction, the reason for destruction, and the person(s) responsible for the decision to destroy the DOCUMENT(s) and for the actual destruction of the DOCUMENTS.
3. The term "CON ED" shall refer to Consolidated Edison Company of New York, Inc. & Subsidiaries, and its related affiliates, subsidiaries, successors, and assigns, including, but not limited to, Consolidated Edison Development, Inc., Consolidated Edison Leasing, Inc., and Consolidated Edison, Inc. and any person, officer, director, accountant, lawyer, agent, or entity acting on behalf of any of the foregoing organizations.
4. The term "EZH" shall refer to N.V. Electriciteitsbedrifj Zuid-Holland, its related affiliates, subsidiaries, successors, and assigns, including, but not limited to, Preussen Elektra A.G. and E.ON Benelux Generation N.V., and any person, officer, director, accountant, lawyer, agent, or entity acting on behalf of any of the foregoing organizations.
5. The term "ROCA3" shall refer to the gas fired CHP facility located in the Netherlands on the border between Rotterdam and Capelle aan den IJessel, constituting the third unit

alongside two previously built units, which was owned by EZH on or about December 15, 1997.

6. The term "BANC ONE" shall refer to Banc One Leasing Corp. its related affiliates, subsidiaries, successors, and assigns, including, but not limited to, and any person, officer, director, accountant, lawyer, agent, or entity acting on behalf of any of the foregoing organizations.

7. The term "LEASE TRANSACTION" shall refer to the series of transactions pertaining to the ROCA3 facility as described in paragraphs 61-77, inclusive of the complaint, attached hereto as Exhibit A-1.

8. The term "LEASE TRANSACTION PARTICIPANTS" refers to the following entities: ABN AMRO Bank N.V.; Hollandsche Bank-Unie N.V.; EZH; Con Ed; Credit Suisse Financial Products; Credits Suisse First Boston; Bayerische Landesbank AG; Wilmington Trust Co.; ABB Leasing GmbH; and any and all affiliated businesses, successors, assigns, predecessor or successor businesses, and any person, officer, director, accountant, lawyer, agent, or entity acting on behalf of any of the foregoing organizations.

9. The term "CAPSTAR" refers to Capstar Partners L.L.C., its related affiliates, subsidiaries, successors, and assigns, and any person, officer, director, member, accountant, lawyer, agent, or entity acting on behalf of any of the foregoing organizations.

10. The term "CORNERSTONE" refers to Cornerstone Financial Advisors L.P., its related affiliates, subsidiaries, successors, and assigns, and any person, officer, partner, accountant, lawyer, agent, or entity acting on behalf of any of the foregoing organizations.

11. The term "PWC" refers to Pricewaterhouse Coopers, LLP, its related affiliates, subsidiaries, successors, and assigns, and any person, officer, partner, accountant, lawyer, agent, or entity acting on behalf of any of the foregoing organizations.

**DOCUMENTS REQUESTED**

REQUEST NO. 1: Complete copies of audited financial statements, including but not limited to, all audit opinions and workpapers, for CON ED for the years 1997 through to the present.

REQUEST NO. 2: All DOCUMENTS in the possession, custody, or control of PWC that concern, describe, or relate in any way to the LEASE TRANSACTION.

REQUEST NO. 3: All DOCUMENTS in the possession, custody, or control of PWC that concern, describe, or relate in any way to the calculation and/or financial statement classification of the ROCA3 facility for the years 1997 through to the present.

REQUEST NO. 4: All DOCUMENTS in the possession, custody, or control of PWC that concern, describe, or relate in any way to the calculation and/or financial statement classification of or the LEASE TRANSACTION for the years 1997 through to the present.

REQUEST NO. 5: All DOCUMENTS in the possession, custody, or control of PWC that concern, describe, or relate in any way to the calculation and/or financial statement classification of leases considered by CON ED for the years 1997 through to the present.

REQUEST NO. 6: All DOCUMENTS in the possession, custody, or control of PWC that concern, describe, or relate in any way to the calculation and/or financial statement classification of leases considered by CON ED for the years 1997 through to the present, including, but not limited to the following lease transactions:

a. NUON lease (Netherlands);

b. MEGA Gas and Thermal Distribution lease/leaseback (Netherlands);

c. EPON lease (Netherlands);

d. ENECO lease (Netherlands);

e. ENN lease (Netherlands);

f. ENW gas lease (Netherlands);

g. MCN lease (United States);

h. ELECTRABEL power plant lease/leaseback (Belgium);

I. Diefland gas and thermal distribution lease/leaseback (Netherlands);

j. Linz power plant lease/leaseback (Austria);

k. UNA power plant lease/leaseback (Netherlands);

l. EG Laufenburg lease/leaseback (Switzerland);

m. Humber power lease/leaseback (United Kingdom);

n. EWZ electric transmission grid lease/leaseback (Switzerland);

o. ESAG lease (Germany);

p. REMU lease (Netherlands);

q. DELTA lease (Netherlands);

r. ZETA/TEL lease (Netherlands);

s. EDON lease (Netherlands);

t. DEW lease (Germany);

u. VASA lease (Germany); and

v. SWISCO lease (Switzerland).

REQUEST NO. 7: All DOCUMENTS in the possession, custody, or control of PWC that concern, describe, or relate in any way to the calculation and/or financial statement classification of leveraged leases entered into by CON ED for the years 1997 through to the present.

REQUEST NO. 8: All DOCUMENTS in the possession, custody, or control of PWC that concern, describe, or relate in any way to the calculation and/or financial statement classification of leveraged leases considered by CON ED for the years 1997 through to the present, including, but not limited to the transactions lease transactions listed in REQUEST NO. 6.

REQUEST NO. 9: All DOCUMENTS in the possession, custody, or control of PWC that concern, describe, or relate in any way to the PWC national leasing meeting held on November 24, 1997, as identified in the memorandum, Bates No. PF005690, attached hereto as Exhibit A-2.

REQUEST NO. 10: All DOCUMENTS in the possession, custody, or control of PWC that concern, describe, reflect or relate in any way to the analysis, discussions, and/or conclusions regarding the issues raised and/or discussed at the PWC national leasing meeting held on November 24, 1997.

REQUEST NO. 11: All DOCUMENTS in the possession, custody, or control of PWC that concern, describe, reflect or relate in any way to the "other leasing transactions" identified and/or referenced in Exhibit A-2.

REQUEST NO. 12: All DOCUMENTS in the possession, custody, or control of PWC that concern, describe, or relate in any way to the proposals made to CON ED by PWC referenced in the November 21, 1997 memorandum, Bates No. PF005647, attached hereto as Exhibit A-3.

REQUEST NO. 13: All DOCUMENTS in the possession, custody, or control of PWC that concern, describe, or relate in any way to PWC's representation of other lessors in connection with Section 467 lease in / lease out transactions as referred to in Exhibit A-3 and the correspondence from CON ED, Bates No. PF005699, attached hereto as Exhibit A-4.

REQUEST NO. 14: All DOCUMENTS in the possession, custody, or control of PWC that concern, describe, or relate in any way to the MEGA lease transaction identified in the email correspondence, Bates No. PF008274 attached hereto as Exhibit A-5.

REQUEST NO. 15: All copies, including drafts and electronic copies, in the possession, custody, or control of PWC of the tax opinion letter written by PWC in connection with the LEASE TRANSACTION, dated December 10, 1997.

REQUEST NO. 16: All copies, including drafts and electronic copies, of all tax opinion letters written by Shearman & Sterling in connection with the LEASE TRANSACTION in the possession, custody, or control of PWC.

REQUEST NO. 17: All DOCUMENTS in the possession, custody, or control of PWC that concern, describe, or relate in any way to the preparation or review of CON ED's State and

Federal income tax returns, including, but not limited to, provision workpapers, schedule M-1 adjustments, and tax return preparation workpapers for the periods in question.

REQUEST NO. 18: All DOCUMENTS in the possession, custody, or control of PWC that concern, describe, or relate in any way to the determination of CON ED's permanent and temporary differences between book and tax income, including, but not limited to, workpapers used in determinations of FASB Statement 96, APB No. 11; FASB Statement 109; and FASB Statement 115 calculations for the years 1997 through to the present.

REQUEST NO. 19: All DOCUMENTS in the possession, custody, or control of PWC that concern, describe, or relate in any way to any correspondence between PWC and LEASE TRANSACTION PARTICIPANTS, pertaining to the LEASE TRANSACTION during 1997 through to the present.

REQUEST NO. 20: All DOCUMENTS in the possession, custody, or control of PWC that concern, describe, or relate in any way to any correspondence between PWC and LEASE TRANSACTION PARTICIPANTS, pertaining to the discussion of leveraged lease transactions during 1997 through to the present.

REQUEST NO. 21: All DOCUMENTS in the possession, custody, or control of PWC that concern, describe, evidence, contain or relate in any way to any correspondence between PWC and BANC ONE pertaining to the discussion of leveraged lease transactions during 1997 through to the present.

REQUEST NO. 22: All DOCUMENTS in the possession, custody, or control of PWC that concern, describe, evidence, contain or relate in any way to any correspondence between PWC and CAPSTAR, pertaining to the discussions of leveraged lease transaction during 1997 through to the present.

REQUEST NO. 23: All DOCUMENTS in the possession, custody, or control of PWC that concern, describe, contain or relate in any way to any correspondence between PWC and

CORNERSTONE, pertaining to the discussions of leveraged lease transaction during 1997 through to the present.

REQUEST NO. 24: All DOCUMENTS in the possession, custody or control of PWC that contain an analysis of Revenue Ruling 2002-69, 2002-2 C.B. 760, attached hereto as Exhibit A-6.

REQUEST NO. 25: All DOCUMENTS in the possession, custody or control of PWC that contain an analysis or discussion of the Final Regulations issued by the Department of Treasury on May 18, 1999, which are entitled "Section 467 Rental Agreements; Treatment of Rent and Interest Under Certain Agreements for the Lease of Tangible Property," and which may be found at 64 FR 26845-01, including the impact these Final Regulations would or may have on transactions similar to the LEASE TRANSACTION and/or the transaction described in Revenue Ruling 2002-69, 2002-2 C.B. 760.

REQUEST NO. 26: All DOCUMENTS within the possession, custody or control of PWC that refer to, discuss, evidence, or relate in any way to the acquisition of EZH by Preussen Elektra AG and the effect of such acquisition on the LEASE TRANSACTION.

REQUEST NO. 27: A copy of all of PWC's document retention policies in place at any time during 1997 through to the present.

# EXHIBIT A-2

Date: November 21, 1997

To: Mary Jane McCartney

From: Brian DePlautt

Re: Consolidated Edison Development, Inc.
EZH Lease
Accounting

---

The following is the current status of the PW accounting review:

(1) Jim Dewey has reviewed the Arthur Andersen draft letter and the supporting transaction description and has requested us to provide him with the answers to a number of questions regarding the transaction.

(2) Prior to Jim's departure for New York this afternoon, we answered some of the questions he raised in his e-mail during a conference call with him and Cornerstone. In this conference call we also identified some of the accounting issues that PW was interested in resolving.

(3) Jim has reviewed the transaction with Ted Baron, the PW national leasing person and Jim has indicated that the EZH transaction would be added to a PW national leasing meeting that had been scheduled for this coming Monday (November 24). The purpose of this meeting was to discuss three other leasing transactions from PW clients that have identical or nearly identical accounting profiles and to determine if PW will afford these transactions the leveraged lease accounting treatment that is being sought.

(4) The PW leasing meeting is said to have been called in order to address a number of fundamental accounting issues that arise from the lease in / lease out structure that the four leases in question contemplate. Among the questions to be addressed are interpretations of economic life tests and interpretations as to how the head lease accounting and sublease accounting tie together under the lease in / lease out structure.

While these questions affect the accounting treatment of the EZH transaction , which is a 467 lease in / lease out, it is not anticipated that that similar questions arise from other structures such as the lower yielding Pickle-Dole transactions we are contemplating as fall back structures on other transactions.

cc: J.Freilich
R. Stelben
H. Schoenblum
C. Muoio

CE 004764

# EXHIBIT A-3

Date: November 21, 1997

To: Mary Jane McCartney

From: Brian DePlautt

Re: Consolidated Edison Development, Inc.
EZH Lease
Status Update

The following is the current status on some of the issues on the EZH Lease:

(1) Accounting

We anticipate receiving the latest draft of the Arthur Andersen accounting letter Monday morning and will distribute it to PW and internally when we receive it.

We have delivered written responses to all of PW's questions and are awaiting their questions.

We have requested Jim Dewey to contact Leo Naughton of PW. Leo is a former tax partner at Shearman & Sterling and employee of the US Treasury who is heading up a lease advisory business at PW which represents Lessors in 467 lease in / lease out transactions. Leo and his team recently make a proposals to CED to either: (a) represent lessors bringing 467 lease in / lease out transactions to CED to invest in, or (b) to provide CED with buy side lease advisory services in support of CED's pursuit of these transactions.

To the extent that Leo's group is actively involved on both the buy and sell side of these transactions it is possible that he may be able to provide some insight to the audit side of PW regarding the way in which the participants in the 467 lease market account for these transactions. Leo is awaiting Jims' call.

(2) Internal Legal

# EXHIBIT A-4

Consolidated Edison Development, Inc.
111 Broadway, 8th Floor
New York, NY 10006
Tel: (212) 393-9242 ext: 240
Fax (212) 393-9282

November 21, 1997

Price Waterhouse
One Mony Plaza
Syracuse, New York 13202

Attn: James Dewey

Re: Leasing Questions

Dear Jim:

Further to our telcon we understand that Leo Naughton of PW is currently representing clients involved in transactions which utilize the 467 lease in / lease out structure.

Could I ask you to contact Leo to discuss with him his perspective on transactions of this type and his experience with other companies participating in these transactions. Leo's telephone number is (212) 596-8218.

Please contact me if there are any questions or problems. Thank you.

Best Regards,
Consolidated Edison Development, Inc.
by:

Brian DePlautt
Vice President

# EXHIBIT A-5

From: Windows/admin/Brian
Sent: 10/19/1998 10:55:15 AM (Eastern Time)
To: Charles Muoio
CC: 'Mary Jane McCartney'; 'Robert Stelben'
Subject: MEGA Proposal

MEGA's advisors, PriceWaterhouseCoopers ("PWC") advised us that MEGA has chosen to award the gas distribution lease mandate to Fleet Bank.

PWC indicated that the award to Fleet was based on the following considerations: (a) security structure / economics - Fleet agreed to use a AAA security structure, such as an AIG, Berkshire or AMBAC GIC in lieu of CED's requirement for US Treasuries. This alternate security structure can generate a significant economic benefit and it appears that Fleet gave MEGA all of the benefit here. (b) Documentation - MEGA believed they might be able to get better terms and conditions by negotiating new documents with Fleet, rather than by, in effect, duplicating the EZH documentation with us.

We are halting development efforts on MEGA and are redirecting resources to our other lease pipeline projects including (a) NUON - Netherlands, (b) Electrabel - Belgium,and (c) ESAG - Germany

# EXHIBIT A-6

**Internal Revenue bulletin**

**Bulletin No. 2002–44**
**November 4, 2002**

## HIGHLIGHTS OF THIS ISSUE

**These synopses are intended only as aids to the reader in identifying the subject matter covered. They may not be relied upon as authoritative interpretations.**

## SPECIAL ANNOUNCEMENT

**Announcement 2002–101, page 800.**
This announcement solicts applications from potential partners to participate in the 2003 IRS Individual *e-file* Partnership Program. The partnership opportunities are a result of RRA 98, which requires the IRS to receive 80 percent of all returns electronically by 2007. RRA 98 authorized the IRS Commissioner to promote the benefits of and encourage the use of *e-file* services through partnerships with various entities that offer low cost tax preparation and electronic filing of income tax returns for qualified taxpayers. Those applicants that are accepted as partners will have a link(s) and description(s) of their services placed on the IRS website at *www.irs.gov* (IRS *e-file* Partners Page).

## INCOME TAX

**Rev. Rul. 2002–69, page 760.**
**Business expenses; interest; lease-in/lease-out transactions.** A taxpayer may not deduct currently, under sections 162 and 163 of the Code, rent and interest paid or incurred in connection with a lease-in/lease-out (LILO) transaction that properly is characterized as conferring only a future interest in property. Rev. Rul. 99–14 modified and superseded.

**Rev. Rul. 2002–71, page 763.**
**Notional principal contract (NPC).** This ruling provides guidance on the timing of recognition of gain or loss on the termination of a notional principal contract that hedges a portion of the term of a debt instrument issued by the taxpayer.

**Rev. Rul. 2002–72, page 759.**
**Low-income housing credit; satisfactory bond; "bond factor" amounts for the period October through December 2002.** This ruling announces the monthly bond factor amounts to be used by taxpayers who dispose of qualified low-income buildings or interests therein during the period October through December 2002. This ruling also provides a summary of the bond factor amounts for dispositions occurring during the period January through September 2002.

**REG–112306–00, page 767.**
Proposed regulations under section 1296 of the Code contain procedures for certain United States persons holding marketable stock in a passive foreign investment company (PFIC) to elect mark to market treatment for that stock. A public hearing is scheduled for November 6, 2002.

**REG–150313–01, page 777.**
Proposed regulations under sections 302, 304, and other sections of the Code provide guidance regarding the treatment of the basis of redeemed stock when a distribution in redemption of such stock is treated as a dividend. The regulations also provide guidance regarding certain acquisitions of stock by related corporations that are treated as distributions in redemption of stock. A public hearing is scheduled for February 20, 2003.

**Notice 2002–70, page 765.**
This notice alerts taxpayers and their representatives about certain reinsurance transactions intended to shift income to offshore related companies purported to be insurance companies that are subject to little or no U.S. federal income tax. These transactions often do not generate the federal tax benefits that taxpayers claim are allowable for federal income tax purposes. This notice also alerts taxpayers, their representatives, and promoters of these transactions, to certain reporting and record keeping obligations and penalties that they may be subject to with respect to these transactions.

**Announcement 2002–100, page 799.**
This document contains corrections to proposed regulations under section 1503(d) of the Code (REG–106879–00, 2002–34 I.R.B. 402) relating to the events that require the recapture of dual consolidated losses.

**Finding Lists begin on page ii.**
**Index for July through October begins on page v.**

Department of the Treasury
**Internal Revenue Service**

Table 1 (cont'd)
Rev. Rul. 2002–72
Monthly Bond Factor Amounts for Dispositions Expressed
As a Percentage of Total Credits

| | Calendar Year Building Placed in Service or, if Section 42(f)(1) Election Was Made, the Succeeding Calendar Year | | | |
|---|---|---|---|---|
| Month of Disposition | 1999 | 2000 | 2001 | 2002 |
| Jan '02 | 70.13 | 70.98 | 72.28 | 72.55 |
| Feb '02 | 69.92 | 70.77 | 72.05 | 72.55 |
| Mar '02 | 69.73 | 70.58 | 71.84 | 72.55 |
| Apr '02 | 69.55 | 70.40 | 71.67 | 72.55 |
| May '02 | 69.38 | 70.24 | 71.51 | 72.55 |
| Jun '02 | 69.21 | 70.09 | 71.37 | 72.55 |
| Jul '02 | 69.05 | 69.94 | 71.25 | 72.55 |
| Aug '02 | 68.90 | 69.81 | 71.14 | 72.55 |
| Sep '02 | 68.76 | 69.68 | 71.04 | 72.55 |
| Oct '02 | 68.62 | 69.57 | 70.94 | 72.55 |
| Nov '02 | 68.49 | 69.45 | 70.86 | 72.55 |
| Dec '02 | 68.37 | 69.35 | 70.78 | 72.55 |

For a list of bond factor amounts applicable to dispositions occurring during other calendar years, see: Rev. Rul. 98–3, 1998–1 C.B. 248; Rev. Rul. 2001–2, 2001–1 C.B. 255; and Rev. Rul. 2001–53, 2001–2 C.B. 488.

DRAFTING INFORMATION

The principal author of this revenue ruling is Gregory N. Doran of the Office of Associate Chief Counsel (Passthroughs and Special Industries). For further information regarding this revenue ruling, contact Mr. Doran at (202) 622–3040 (not a toll-free call).

## Section 162.—Trade or Business Expenses

*26 CFR 1.162–11: Rentals.*
*(Also § 163; 1.163–1.)*

**Business expenses; interest; lease-in/lease-out transactions.** A taxpayer may not deduct currently, under sections 162 and 163 of the Code, rent or interest paid or incurred in connection with a lease-in/lease-out (LILO) transaction that properly is characterized as conferring only a future interest in property.

## Rev. Rul. 2002–69

ISSUE

May a taxpayer deduct currently, under §§ 162 and 163 of the Internal Revenue Code, rent and interest paid or incurred in connection with a "lease-in/lease-out" ("LILO") transaction?

FACTS

*X* is a U.S. corporation. *FM* is a foreign municipality that has historically owned and used certain property. As of 1997, it is estimated that the property has a remaining useful life of 50 years and a fair market value of $100 million. *BK1* and *BK2* are banks. None of these four parties is related to any of the others.

On January 1, 1997, *X* and *FM* entered into a LILO transaction under which *FM* leased the property to *X* under a "Headlease," and *X* immediately leased the property back to *FM* under a "Sublease." The term of the Headlease is 40 years. The primary term of the Sublease is 20 years. Moreover, as described below, the Sublease also may be renewed for a term of 10 years ("put renewal term") at the option of *X*. *X*'s right to possess the property under the Headlease for the first 20 years is substantially the same as *FM*'s right to possession under the Sublease for the primary term.

The Headlease requires *X* to make two rental payments to *FM* during its 40-year term: (1) an $89 million prepayment at the beginning of year 1; and (2) a postpayment at the end of year 40 that has a discounted present value of $8 million. For federal income tax purposes, *X* and *FM* allocate the prepayment ratably to the first 6 years of the Headlease and the future value of the postpayment ratably to the remaining 34 years of the Headlease.

The Sublease requires *FM* to make fixed, annual rental payments over both the primary term and, if exercised, the put renewal term. The fixed, annual payments during the put renewal term are equal to 90 percent of the amounts that (as of January 1, 1997) are projected to be the fair market value rental amounts for that term.

To partially fund the $89 million Headlease prepayment, *X* borrows $54 million from *BK1* and $6 million from *BK2*. Both loans are nonrecourse, have fixed interest rates, and provide for annual debt service payments that fully amortize the loans over the 20-year primary term of the Sublease. The amount and timing of the debt ser-

vice payments mirror the amount and timing of the Sublease payments due during the primary term of the Sublease. The remaining $29 million of the Headlease prepayment is provided by *X*.

Upon receiving the $89 million Headlease prepayment, *FM* deposits $54 million into a deposit account with an affiliate of *BK1* and $6 million into a deposit account with an affiliate of *BK2*. The deposits with the affiliates of *BK1* and *BK2* earn interest at the same rates as the loans from *BK1* and *BK2*. *FM* directs the affiliate of *BK1* to pay *BK1* annual amounts equal to 90 percent of *FM*'s annual rent obligation under the Sublease (that is, amounts sufficient to satisfy *X*'s debt service obligation to *BK1*). The parties treat these amounts as having been paid from the affiliate to *FM*, then from *FM* to *X* as rental payments, and finally from *X* to *BK1* as debt service payments. In addition, *FM* pledges the deposit account to *X* as security for *FM*'s obligations under the Sublease, while *X*, in turn, pledges its interest in *FM*'s pledge to *BK1* as security for *X*'s obligations under the loan from *BK1*. Similarly, *FM* directs the affiliate of *BK2* to pay *BK2* annual amounts equal to 10 percent of *FM*'s annual rent obligation under the Sublease (that is, amounts sufficient to satisfy *X*'s debt service obligation to *BK2*). The parties treat these amounts as having been paid from the affiliate to *FM*, then from *FM* to *X* as rental payments, and finally from *X* to *BK2* as debt service payments. Although *FM*'s deposit with the *BK2* affiliate is not pledged, the parties understand that *FM* will use the account to pay the remaining 10 percent of *FM*'s annual rent obligation under the Sublease.

As a result of the foregoing arrangement, *X*'s obligation to make the property available under the 20-year primary term of the Sublease is completely offset by *X*'s right to use the property under the Headlease. *X*'s obligation to make debt service payments on the loans from *BK1* and *BK2* is completely offset by *X*'s right to receive Sublease rentals from *FM*. Moreover, *X*'s exposure to the risk that *FM* will not make the rent payments is further limited by the arrangements with the affiliates of *BK1* and *BK2*. In the case of the loan from *BK1*, *X*'s economic risk is eliminated through the defeasance arrangement. In the case of the $6 million loan from *BK2*, *X*'s economic risk, although not eliminated, is substantially reduced through the deposit arrangement. As a result, neither bank requires an independent source of funds to make the loans, or bears significant risk of nonpayment. In short, during the primary Sublease term, the transaction is characterized by reciprocal and circular obligations that offset one another.

At the end of the Sublease primary term, *FM* has a fixed-payment option to purchase from *X* the Headlease residual (the right to use the property beyond the Sublease primary term subject to the obligation to make the rent postpayment) for a fixed exercise price equal to 105 percent of the amount that (as of January 1, 1997) is projected to be the future fair market value of the Headlease residual. If *FM* exercises the option, the transaction is terminated at that point, and *X* receives the exercise price of the option and is not required to make any portion of the postpayment due under the Headlease. If *FM* does not exercise the option, *X* may elect to (1) use the property itself for the remaining term of the Headlease, (2) lease the property to another person for the remaining term of the Headlease, or (3) compel *FM* to lease the property for the 10-year put renewal term of the Sublease. If *FM* does not exercise the fixed-payment option and *X* exercises its put renewal option, *X* will receive rents that are equal to 90 percent of the amounts that are (as of January 1, 1997) projected to be the fair market rents for that term. If the actual fair market rents in 20 years turn out to be less than the amount specified in the put renewal option and *FM* does not exercise the fixed-payment option, *X* will be able to compel *FM* to lease the property for rents that are greater than the then fair market rental value. Thus, as a practical matter, the fixed-payment option and put renewal option operate to "collar" the value of the Headlease residual during the primary term.

In addition, *X* has nominal exposure to *FM*'s credit under the fixed-payment option and, if exercised, the put renewal term. At the inception of the transaction, *X* requires *FM* to invest $15 million of the Headlease prepayment in highly-rated debt securities that will mature in an amount sufficient to fund the fixed amount due under the fixed-payment option, and to pledge these debt securities to *X*. This arrangement ensures that *FM* is able to make the payment under the fixed-payment option. Having economically defeased both its rental obligations under the Sublease and its fixed-payment under the fixed-payment option, *FM* keeps the remaining portion of the Headlease prepayment as its return on the transaction. If *FM* does not exercise the fixed-payment option and *X* exercises the put renewal option, *X* can require *FM* to purchase a letter of credit guaranteeing the put renewal rents. If *FM* does not obtain the letter of credit, *FM* must exercise the fixed-payment option.

For tax purposes, *X* claims deductions for interest on the loans and for the allocated rents on the Headlease. *X* includes in gross income the rents received on the Sublease. If the fixed-payment option is exercised, *X* also includes the option price and recaptures rent deductions taken during the primary Sublease term that are attributable to the postpayment it is no longer required to make.

## LAW AND ANALYSIS

*X* and *FM*'s allocations of the prepayment and the postpayment for federal income tax purposes meet the uneven rent test contained in proposed § 467 regulations (§ 1.467-3(c)(2)(i)), and under those regulations the Headlease would not be treated as a disqualified leaseback or long-term agreement subject to constant rental accrual. Because this LILO transaction was entered into after June 3, 1996, and on or before May 18, 1999, the provisions of the proposed regulations are available. *See* § 1.467-9(c). For later years, however, final § 467 regulations effective May 18, 1999, treat the prepayment of rent as resulting in a deemed loan from *X* to *FM* and require the imputation of interest income to *X*. § 1.467-4. Moreover, *X*'s rent deduction would be subject to proportional rent rules that reflect the time value of money concept. *See* § 1.467-2(c).

The substance of a transaction, not its form, governs its tax treatment. *Gregory v. Helvering*, 293 U.S. 465 (1935). In *Frank Lyon Co. v. United States*, 435 U.S. 561, 573 (1978), the United States Supreme Court stated, "In applying the doctrine of substance over form, the Court has looked to the objective economic realities of a transaction rather than to the particular form the parties employed." The Court evaluated the substance of the transaction in *Frank Lyon* to determine that it was indeed a sale/leaseback, as it was structured,

rather than a financing. The Court subsequently relied on its approach in *Frank Lyon* to recharacterize a sale and repurchase of federal securities as a loan, finding that the economic realities of the transaction did not support the form chosen by the taxpayer. *Nebraska Dep't of Revenue v. Loewenstein*, 513 U.S. 123 (1994).

Where parties have in form entered into two separate transactions that result in offsetting obligations, the courts often have collapsed the offsetting obligations and recharacterized the two transactions as a single transaction. In *Rogers v. United States*, 281 F.3d 1108 (10th Cir. 2002), the part-owner (Fogelman) of a professional baseball team that was organized as an S corporation borrowed money from the S corporation. The nonrecourse loan was secured by Fogelman's ownership interest in the corporation and his existing option to purchase the rest of the shares from the taxpayer (Kauffman), the other owner of the team. Fogelman also granted the corporation an option to purchase both his shares and his existing option to buy Kauffman's shares. The option price was an amount equal to the outstanding loan balance. The corporation exercised its option immediately but deferred closing until the due date of Fogelman's loan, five months later. On that date, Fogelman transferred his shares in the corporation to the corporation in lieu of its foreclosure on the loan. The corporation claimed that the shares had no value at that time and deducted the loan amount as a bad debt, which was passed through to Kauffman.

The court in *Rogers* applied the substance over form doctrine to collapse the loan and the option transaction into a redemption of Fogelman's stock in exchange for cash. Fogelman had no incentive to repay the loan because any reduction in the loan balance would reduce the option price. The immediate exercise of the option precluded any attempt by Fogelman to repay the loan and keep the stock. On the basis of those facts, among others, the court held that the substance of the transaction was a sale of Fogelman's stock to the corporation.

In *Bussing v. Commissioner*, 88 T.C. 449, *reconsideration denied*, 89 T.C. 1050 (1987), a Swiss subsidiary of a computer leasing company (AG) purchased computer equipment in a sale/leaseback transaction involving a five-year lease. Subsequently, AG purportedly sold the equipment to a domestic corporation (Sutton), which in turn purportedly sold interests in the equipment to the taxpayer (Bussing) and four other individual investors. Bussing acquired his interest in the computer equipment subject to the underlying lease by paying cash, short-term promissory notes, and a long-term promissory note to Sutton. Bussing then leased his interest in the equipment back to AG for nine years. The rents due Bussing from AG equaled Bussing's annual payments on the long-term promissory note to Sutton for the first three years and were supposed to generate nominal annual cash flow thereafter.

The court first disregarded Sutton's participation in the transactions on substance over form grounds. It then held that Bussing's long-term indebtedness also must be disregarded because it was completely offset by AG's rent payments in a "purported sale-leaseback pursuant to which the respective lease and debt obligations flow between only two parties." *Id.* at 458. The court stated,

> The respective obligations between AG and Bussing cancel each other out. Any possible claim by AG with respect to the note is fully offset by AG's rental obligation to Bussing. . . . Bussing, effectively, will never be required to make any payments on his debt obligation, a feature of the transaction that we believe the parties intended to achieve.

*Id.* After collapsing the offsetting loan and lease, the court concluded that Bussing had acquired an interest in a joint venture with AG and the other investors to the extent of his cash payment only.

Courts have similarly disregarded the parties' obligations in purported installment sales where the taxpayer received an installment note that was offset by some other arrangement between the two parties, indicating that the maker of the note would not be called upon to pay the installment obligation. *See Rickey v. Commissioner*, 502 F.2d 748 (9th Cir. 1974), *aff'g* 54 T.C. 680 (1970). Although taxpayers are entitled to arrange the terms of a sale in order to qualify for the installment method, "the arrangements must have substance and must reflect the true situation rather than being merely the formal documentation of the terms of the sale." *Id.* at 752–53, quoting 54 T.C. 680 at 694. *See also United States v. Ingalls*, 399 F.2d 143 (5th Cir. 1968); *Blue Flame Gas Co. v. Commissioner*, 54 T.C. 584 (1970); *Greenfield v. Commissioner*, T.C. Memo. 1982–617; *Big "D" Development Corp. v. Commissioner*, T.C. Memo. 1971–148, *aff'd per curiam*, 453 F.2d 1365 (5th Cir.1972).

Similarly, the Headlease and Sublease impose offsetting obligations that must be disregarded, regardless of whether other components of the LILO transaction are respected. During the first 20 years of its term, the Headlease confers to X a right to use the property that is immediately reversed by the Sublease grant to FM of substantially the same right to use property. In the LILO transaction, the Sublease interest retained by *FM* is of the same nature as the Headlease interest conveyed to *X*. Because the transfer and retransfer of the right to possess the property for the first 20 years are disregarded as offsetting obligations, the transaction that remains is, at best, a transfer of funds from *X* to *FM* in exchange for *FM*'s obligation to repay those funds and provide *X* the right to begin to lease the property in 20 years.

An analogous situation occurs when the conveyance of property is accompanied by the retention of some interest in the same property. If the interest retained is of substantially the same nature as the interest conveyed, only a future interest is conveyed. In *McCully Ashlock v. Commissioner*, 18 T.C. 405 (1952), *acq.*, 1952–2 C.B. 1, taxpayer had acquired property through a deed dated June 6, 1945. The seller, however, had retained the right to possession and rentals through August 15, 1947. The court found that taxpayer had acquired only a future interest in the property because "the trustees [sellers] not only retained the rents legally but they also retained control and benefits of ownership." *Id.* at 411. Consequently, rentals from the property were income to the seller.

Similarly, in *Kruesel v. United States*, 63–2 U.S. Tax Cas. (CCH) ¶ 9714 (D. Minn. 1963), the court concluded that taxpayer had transferred only a future, remainder interest in property and reserved a life estate. The government had unsuccessfully argued that taxpayer had sold its entire interest in the property and the taxpayer's amount realized on the sale included the value of a right to occupancy provided to the taxpayer by the buyer.

In contrast, in *Alstores Realty Corp. v. Commissioner*, 46 T.C. 363 (1966), *acq.*, 1967–2 C.B.1, the court held that a sale of property accompanied by the reservation of a right of occupancy did not result in the transfer of only a future interest because the seller's right of occupancy was in the nature of a leasehold interest, because the purchaser acquired the benefits and burdens of ownership of the property.

*Alstores* can be distinguished from *McCully Ashlock* and *Kruesel*. *McCully Ashlock* and *Kruesel* conclude that where a retained interest is of the same nature as the interest conveyed, only a future interest has been transferred. In *Alstores*, the interests were not of the same nature.

Similarly, the LILO transaction is distinguishable from the transaction involved in *Comdisco, Inc. v. Commissioner*, 756 F.2d 569 (7th Cir. 1985). In that case, equipment was subject to end user leases, and the lessor of that equipment assigned an interest to taxpayer in a transaction designed to give the taxpayer investment tax credits. The taxpayer's entitlement to the credits depended on whether it had the status of lessee/sublessor. In concluding that it did, the court noted a number of factors that supported taxpayer's claim that it had acquired a leasehold interest. The taxpayer was obligated to the lessor in the event of a default by the sublessee. The taxpayer relet certain equipment after one sublease had expired. In connection with another sublease, the taxpayer was responsible for rent to its assignor in excess of amounts paid by the sublessee directly to the assignor. The court also emphasized the regulatory restrictions on direct leases between the assignor and the end users. *Id.* at 576–77. Unlike *Comdisco*, in the LILO transaction the headlessor and the sublessee are the same party. Further, in the LILO transaction the headlessee/sublessor is not materially exposed to the risk that the sublessee will fail to make rent payments.

Section 162(a)(3) permits a deduction for rentals and other payments required to be made as a condition to the continued use or possession, for purposes of the trade or business, of property. Because *X* does not acquire a current leasehold interest in the property, it is not entitled to current deductions for rent. The $29 million "equity" portion of the Headlease prepayment is, effectively, a payment for at most *X*'s right under the Headlease to lease the property 20 years hence for a term of 20 years. (Economically, $29 million is an overpayment for the value of any right that *X* obtains to lease the property in the future. *X* was willing to overpay in this manner, however, in order to induce *FM* to participate in the transaction.). In accordance with § 467, the $29 million "equity" portion of the Headlease prepayment is deductible over the 20-year residual term of the Headlease (the 10-year put renewal term and the 10-year "shirttail" period). Alternatively, in the event *FM* exercises its fixed-price option at the end of the primary term of the Sublease, *X* will have gain or loss equal to the difference between the option price and *X*'s cost of acquiring a right to the Headlease residual term. Section 1001.

The remainder of the Headlease prepayment, $60 million, must be disregarded, because the "loans" that purportedly finance this portion of the Headlease prepayment are without substance. In *Bridges v. Commissioner*, 39 T.C. 1064, *aff'd* 325 F.2d 180 (4th Cir. 1963), taxpayer "borrowed" funds from banks and used the funds to purchase Treasury notes, which the banks held as collateral and ultimately sold to satisfy taxpayer's debts. The court's rationale for disallowing taxpayer's deductions of prepaid interest is equally applicable here:

> [P]etitioner at no time had the uncontrolled use of any additional money, of the bonds, or of the interest on the bonds. He assumed no risk of a rise or fall in the market price of the bonds and could not take advantage of such. His payment to the bank was not for the use or forbearance of money; it was for the purchase of a rigged sales price for the bonds and for a tax deduction. Petitioner incurred no genuine indebtedness, within the meaning of the statute, and as a payment of interest, this transaction was also a sham.

*Id.* at 1078–79. Neither *X* nor *FM* obtain use of the "borrowed" funds. The "loans" purportedly are made to finance *X*'s acquisition of the Headlease interest. But that leasehold interest is substantially offset by an interdependent Sublease with the Headlessor. What remains can only be enjoyed after 20 years and after the loans have been "repaid" using "rents" from a Sublease that itself lacks substance. Under the circumstances, the loans are disregarded.

Although this ruling refers to a foreign municipality and its property, the analysis and holding apply as well to LILO transactions that involve or include domestic tax-exempt or tax-indifferent entities.

HOLDING

A taxpayer may not deduct currently, under §§ 162 and 163, rent or interest paid or incurred in connection with a LILO transaction that properly is characterized as conferring only a future interest in property.

Where appropriate, the Service will continue to disallow the tax benefits claimed in connection with LILO transactions upon other grounds, including that the substance over form doctrine requires their recharacterization as financing arrangements and that they are to be disregarded for lack of economic substance.

EFFECT ON OTHER DOCUMENTS

Rev. Rul. 99–14, 1999–1 C.B. 835, is modified and superseded.

DRAFTING INFORMATION

The principal author of this revenue ruling is John Aramburu of the Office of Associate Chief Counsel (Income Tax & Accounting). For further information regarding this revenue ruling, contact Mr. Aramburu at (202) 622–4960 (not a toll-free call).

## Section 163.—Interest

*26 CFR 1.162–17: Interest deduction in general.*

**May a taxpayer deduct currently, under § 163, interest paid or incurred in connection with a lease-in/lease-out (LILO) transaction that properly is characterized as conferring only a future interest in property. See Rev. Rul. 2002–69, page 760.**

## Section 446.—General Rule for Methods of Accounting

*(Also 26 CFR 1.446–4)*

**Notional principal contract (NPC).** This ruling provides guidance on the timing of recognition of gain or loss on the termination of a notional principal contract that hedges a portion of the term of a debt instrument issued by the taxpayer.

# EXHIBIT 15

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| CONSOLIDATED EDISON COMPANY OF NEW YORK, INC. & SUBSIDIARIES, Plaintiff, | ) | |
| v. | ) | No. 06-305 T<br>Judge Marian Blank Horn |
| THE UNITED STATES, Defendant. | ) | |

NOTICE OF ISSUANCE OF SUBPOENA DUCES TECUM

The United States of America, by and through its undersigned counsel, pursuant to Court of Federal Claims Rule 45(b)(1) hereby gives notice of the issuance of the attached subpoena duces tecum issued to Bayerische Landesbank.

DAVID N. GEIER
Attorney of Record
U.S. Department of Justice, Tax Division
Post Office Box 26
Ben Franklin Station
Washington, D.C. 20044
Telephone: (202) 616-3448
Facsimile: (202) 307-0054

EILEEN J. O'CONNOR
Assistant Attorney General
DAVID GUSTAFSON
Chief, Court of Federal Claims Section

STEVEN I. FRAHM
Assistant Chief, Court of Federal Claims Section

JOSEPH A. SERGI
Trial Attorney
JAMES E. WEAVER
Trial Attorney
ADAM R. SMART
Trial Attorney

February 6, 2007

CERTIFICATE OF SERVICE

I hereby certify that on February 6, 2007, a copy of the foregoing Notice of Issuance of Subpoena Duces Tecum was sent via United States Mail, postage prepaid, addressed to the following:

Thomas C. Durham, Esq.
MAYER, BROWN, ROWE & MAW LLP
71 South Wacker Drive
Chicago, Illinois 60606

DAVID N. GEIER
Trial Attorney, Tax Division
U.S. Department of Justice

# United States Court of Federal Claims

Consolidated Edison Company of New York, Inc. & Subsidiaries,

vs

THE UNITED STATES

No. 06-305-T

## SUBPOENA

To Bayerische Landesbank
560 Lexington Avenue
New York, NY 10022

☐ YOU ARE COMMANDED to appear at the place, date, and time specified below to testify in the above case.

PLACE OF TESTIMONY — COURTROOM

DATE AND TIME

☐ YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case.

PLACE OF DEPOSITION — DATE AND TIME

☒ YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below (list documents or objects):

See Exhibit A, attached hereto.

U.S. Attorney's Office, Southern District of New York, One St. Andrews Plaza, New York, NY 10007 * — February 28, 2007 11:00 a.m.

PLACE (* Alternative arrangements can be made) — DATE AND TIME

☐ YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

PREMISES — DATE AND TIME

Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify. RULE 30(b)(6).

[signature] Attorney of Record for Defendant — February 6, 2007

ISSUING OFFICER SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT) — DATE

DAVID N. GEIER, JUSTICE DEPT., TAX DIVISION, COURT OF FEDERAL CLAIMS SECTION, P. O. BOX 26, BEN FRANKLIN STATION, WASHINGTON, DC 20044, (202) 616-3448

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER

NOTE - If the place of travel is more than 100 miles (by the shortest usual means of travel) from the place where the subpoena is served, or if the place of deposition is more than 100 miles from the place where the deponent resides, is employed or transacts business in person, the person served may regard the command as optional unless there is attached to the subpoena an order of the court requiring his/her appearance, notwithstanding the distance of travel. In any event, response to the subpoena will entitle the person to the fees and mileage allowed by law.

**PROOF OF SERVICE**

SERVED

DATE PLACE

SERVED ON (PRINT NAME) MANNER OF SERVICE

☐ Fees tendered for one day's attendance and mileage allowed by law.
(Fees and mileage need not be tendered when the subpoena is issued on behalf of the United States or an officer or agency thereof.)

**DECLARATION OF SERVICE**

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the proof of Service is true and correct.

Executed on ______________________

DATE

SIGNATURE OF SERVER

ADDRESS OF SERVER

Rule 45.

(c) Protection of Persons Subject to Subpoenas.

(1) A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena. The court shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction, which may include, but is not limited to, lost earnings and a reasonable attorney's fee.

(2)(A) A person commanded to produce and permit inspection and copying of designated books, papers, documents or tangible things, or inspection of premises need not appear in person at the place of production or inspection unless commanded to appear for deposition, hearing or trial.

(B) Subject to paragraph(d)(2) of this rule, a person commanded to produce and permit inspection and copying may, within 14 days after service of the subpoena or before the time specified for compliance if such time is less than 14 days after service, serve upon the party or attorney designated in the subpoena written objection to inspection or copying of any or all of the designated materials or of the premises. If objection is made, the party serving the subpoena shall not be entitled to inspect and copy the materials or inspect the premises except pursuant to an order of the court. If objection has been made, the party serving the subpoena may, upon notice to the person commanded to produce, move at any time for an order to compel the production. Such an order to compel production shall protect any person who is not a party or an officer of a party from significant expense resulting from the inspection and copying commanded.

(3)(A) On timely motion, the court shall quash or modify the subpoena if it

(i) fails to allow reasonable time for compliance; or

(ii) requires disclosure of privileged or other protected matter and no exception or waiver applies, or

(iii) subjects a person to undue burden.

(B) if a subpoena

(i) requires disclosure of a trade secret or other confidential research, development, or commercial information; or

(ii) requires disclosure of an unretained expert's opinion or information not describing specific events or occurrences in dispute an resulting from the expert's study made not at the request of any party,

the court may, to protect a person subject to or affected by the subpoena, quash or modify the subpoena or, if the party on whose behalf the subpoena is issued shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated, the court may order appearance or production only upon specified conditions.

(d) Duties in Responding to Subpoena.

(1) A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the demand.

(2) When information subject to a subpoena is withheld on a claim that it is privileged or subject to protection as trial preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications, or things not produced that is sufficient to enable the demanding party to contest the claim.

# EXHIBIT A TO SUBPOENA DIRECTED TO BAYERISCHE LANDESBANK

## DEFINITIONS AND INSTRUCTIONS

1. The words "document" and "writing" are to be liberally construed to include all records or other tangible forms which are in your possession or custody or subject to your control. This includes, but is not limited to drafts or finished versions, originals, copies, nonidentical copies, (whether by reason of handwritten notations on them or otherwise), and applies regardless of however the document may have been created, produced or stored (whether manually, mechanically, electronically, or otherwise). To be clear, documents shall include any and all types of writings, drawings, graphs, charts, photographs, and data compilations, whether in written, computerized, electronically stored or other format. Defendant requests that any and all computerized and electronically stored information be produced in reasonably usable form.

2. If any document would have been responsive to these requests no longer exists, please state the following for each document: the date of destruction, the reason for destruction, and the person(s) responsible for the decision to destroy the document(s) and for the actual destruction of the documents.

3. The term "Con Ed" shall refer to Consolidated Edison Company of New York, Inc. & Subsidiaries, and affiliated companies, including, but not limited to, Consolidated Edison Development, Inc., Consolidated Edison Leasing, Inc., and Consolidated Edison, Inc.

4. The term "Banc One" shall refer to Banc One Leasing Corp. its related affiliates, subsidiaries, successors, and assigns, including, but not limited to, and any person, officer, director, accountant, lawyer, agent, or entity acting on behalf of any of the foregoing organizations.

5. The term "EZH" shall refer to N.V. Electriciteitsbedrifj Zuid-Holland, its related affiliates, subsidiaries, successors, and assigns, including, but not limited to, Preussen Elektra A.G. and E.ON Benelux Generation N.V., and any person, officer, director, accountant, lawyer, agent, or entity acting on behalf of any of the foregoing organizations.

6. The term "RoCa3" shall refer to the gas fired CHP facility located in the Netherlands on the border between Rotterdam and Capelle aan den IJessel, constituting the third unit alongside two previously built units, which was owned by EZH on or about December 15, 1997.

7. The term "Lease Transaction" shall refer to the series of transactions pertaining to the RoCa3 facility as described in paragraphs 61-77, inclusive of the complaint, attached hereto as Exhibit A-1.

8. The term "BL" refers to Bayerische Landesbank, its related affiliates, subsidiaries, successors, and assigns, and any person, officer, partner, accountant, lawyer, agent, or entity acting on behalf of any of the foregoing organizations.

**DOCUMENTS REQUESTED**

Request No. 1: All documents within the possession, custody or control of BL that refer to, discuss, evidence or relate to the Lease Transaction.

Request No. 2: All documents within the possession, custody or control of BL that refer to, discuss, evidence or relate to the transaction between Banc One and EZH involving the purported lease and sublease of an undivided interest in the RoCa3 facility.

Request No. 3: All documents within the possession, custody or control of BL that refer to, discuss, evidence or relate to Irrevocable Standby Letter of Credit No. 151221116 dated

December 15, 1997, identified at Bates Nos. US06193-06204, attached hereto as Exhibit A-2, or any other letters of credit issued by BL in connection with the Lease Transaction.

Request No. 4: All documents within the possession, custody or control of BL that refer to, discuss, evidence or relate to any other transaction substantially similar to the Lease Transaction and/or the transaction described in Revenue Ruling 2002-69, 2002-2 C.B. 760 (copy attached hereto as Exhibit A-3), from 1996 through 2001.

Request No. 5: All correspondence, communications, or reporting made to any governmental regulatory authority by BL or on BL's behalf in the possession, custody or control of BL that refer to, discuss, evidence or relate to the Lease Transaction and/or the letters of credit issued in connection with the Lease Transaction.

Request No. 6: All documents within your possession, custody or control of BL that refer to, discuss, evidence or relate to the acquisition of EZH by Preussen Elektra AG and the effect of such acquisition on the Lease Transaction and/or Irrevocable Standby Letter of Credit No. 151221116.

Request No. 7: A copy of all versions of BL's document retention policies in place at any time from 1997 through the present.

# EXHIBIT A-2

IRREVOCABLE STANDBY LETTER OF CREDIT
Letter of Credit No. 15122116

December 15, 1997

Consolidated Edison Leasing, Inc.
c/o Consolidated Edison Development, Inc.
111 Broadway, 8th Floor
New York, NY 10006

Wilmington Trust Company, as Trustee under
the Trust Agreement (Roca Facility Trust No. 2)
dated as of December 15, 1997 between Wilmington
Trust Company and the Investor identified therein
Rodney Square North
1100 North Market Street
Wilmington, Delaware 19890-0001

Ladies and Gentlemen:

1. At the request and on the instructions of our customer, N.V. Electriciteitsbedrijf Zuid-Holland ("EZH"), in connection with the Participation Agreement dated as of December 15, 1997 between EZH, as Lessor and Sublessee, Consolidated Edison Leasing, Inc., as Investor, Hollandsche Bank-Unie N.V., as Lender, and Wilmington Trust Company, not in its individual capacity, except as otherwise expressly provided therein but solely as Trustee, as the same may be amended or supplemented from time to time, we hereby establish in the favor of each of you (each, an "LC Beneficiary") this Irrevocable Letter of Credit No. 15122116 in a maximum amount available for drawing on any date in any period during the term hereof equal to the amount shown in Annex A hereto as the Stated Amount in effect for such period, as such amount may be adjusted in accordance with the terms hereof. The Stated Amount for any period identified on Annex A may be changed only with our consent and the consent of EZH and of each LC Beneficiary as evidenced by a Notice of Amendment in the form of Exhibit 1. This Letter of Credit is effective immediately and expires on the Expiration Date (as defined in paragraph 13 hereof and as adjusted in accordance with the terms hereof).

2. Only one drawing may be made hereunder (it being understood that the correction of a non-conforming certificate is not a separate drawing). Such drawing hereunder shall be made by presentation, as provided for below, of an appropriately completed certificate, signed by a person who

US06193

states that he or she is an Authorized Officer of an LC Beneficiary, in the form of Exhibit 2 attached hereto and the original of this Letter of Credit on or prior to the Expiration Date at the offices of our New York branch located on the date hereof at 560 Lexington Avenue - 17th Floor, New York, New York 10022, (Attention: Lending Division). As used herein, (A) "Authorized Officer" shall mean (i) with respect to the Investor, the President, any Executive Vice President, any Senior Vice President, any Vice President, the Secretary, the Treasurer or any other authorized officer of the Investor or any attorney-in-fact, authorized agent, trustee or receiver acting on behalf of the Investor and (ii) with respect to the Trustee, any officer of Wilmington Trust Company in its corporate trust department or any attorney-in-fact, authorized agent, trustee or receiver acting on behalf of the Trustee, and (B) "Business Day" shall mean any day other than a Saturday or Sunday or a day on which banking institutions in New York, NY, are authorized or required by law to close.

3. Only an LC Beneficiary may make a drawing under this Letter of Credit. Any certificate presented under this Letter of Credit must be dated no later than the date of its presentation to us and may be presented only on a Business Day. Such presentation shall be made by physical delivery of the required certificate and the original of this Letter of Credit by hand delivery or registered mail or overnight or express courier; provided, however, that such presentation shall be deemed to have been made on the New York Business Day on which such original certificate and original of this Letter of Credit are physically received; provided, further, however, that, if the day of such receipt is not a New York Business Day, such presentation shall be deemed to have been made on the next succeeding New York Business Day (the date or deemed date of presentation of a certificate in compliance with the terms and conditions of this Letter of Credit is referred to herein as the "Presentation Date").

4. If a certificate is presented by either LC Beneficiary at our offices in compliance with the terms and conditions of this Letter of Credit at or before 3:00 p.m., New York City time (hereinafter referred to as "New York Time"), on a Business Day, we will pay the amount demanded therein (not in excess of the Stated Amount applicable on such Presentation Date) to the LC Beneficiary specified in such certificate in immediately available funds by wire transfer to the account of such LC Beneficiary, designated in such certificate, no later than 2:00 p.m., New York Time, on the next Business Day. If a certificate is presented by either LC Beneficiary at our offices in compliance with the terms and conditions of this Letter of Credit after 3:00 p.m., New York Time on a Business Day, we will pay the amount demanded therein (not in excess of

the Stated Amount applicable on such Presentation Date) to the LC Beneficiary specified in such certificate in immediately available funds by wire transfer to the account of such LC Beneficiary, designated in such certificate, no later than 2:00 p.m., New York Time, on the second next succeeding Business Day.

5. We agree to make all payments under this Letter of Credit in currency of the United States with our own funds and not with any funds of EZH. Any and all payments made by us hereunder shall be made free and clear of and without deduction for any present or future taxes, levies, imposts, deductions, charges, or withholdings, and all liabilities with respect thereto (all such taxes, levies, imposts, deductions, charges, withholdings and liabilities being hereinafter referred to as "Taxes"). If any deduction or withholding of Taxes is required by law to be made by us hereunder, we shall (i) subject to the next sentence, increase the amount to be paid so that the net amount actually paid to the relevant LC Beneficiary pursuant to a certificate shall equal the amount due and payable to such LC Beneficiary in accordance with such certificate; (ii) pay to the relevant taxing or other authorities within the period for payment permitted by applicable law the full amount of the deduction or withholding of Taxes; and (iii) notify each LC Beneficiary thereof and provide evidence of payment to each LC Beneficiary as soon as practicable of the amount as deducted or withheld. The increase, if any, of the amounts to be paid pursuant to the preceding sentence shall not result in payments hereunder in excess of the Stated Amount in effect at such time.

6. If any certificate presented to our office does not, in any instance, strictly conform to the terms and conditions of this Letter of Credit, we shall give notice to each LC Beneficiary prior to the time we would have been obligated to make a payment pursuant to paragraph 4 above had such certificate strictly conformed to the terms and conditions of this Letter of Credit that such certificate is not in conformity with this Letter of Credit, stating the reasons therefor and that we are holding this Letter of Credit and certificate in safekeeping to be returned to an LC Beneficiary as either LC Beneficiary may direct. Upon being notified that a certificate is not in conformity with this Letter of Credit, either LC Beneficiary may attempt to correct such nonconforming certificate before the Expiration Date.

7. If the original of this Letter of Credit has been lost, stolen, mutilated or destroyed, upon receipt of (i) a $500 replacement fee and payment for any legal costs incurred by us in connection with such loss, theft, mutilation or destruction and (ii)(A) in the case of loss, theft or destruction of this Letter of Credit, a certificate of an Authorized Officer of the Investor to such

effect and an uncollateralized indemnity agreement in form and substance satisfactory to us of an LC Beneficiary or another entity satisfactory to us and (B) in the case of mutilation of this Letter of Credit, this Letter of Credit, we will issue a replacement letter of credit in favor of the LC Beneficiaries dated the same date, bearing a new number, and ~~in~~ the same Stated Amount (as the same may have been amended) as, and with other provisions identical to, this Letter of Credit. Upon the issuance of a replacement letter of credit in accordance with the preceding sentence, the Stated Amount of this Letter of Credit bearing No. 15122116 shall be reduced to zero dollars.

8. By paying to either LC Beneficiary the full amount demanded in accordance with a certificate duly presented hereunder, we shall be fully discharged from our obligation under this Letter of Credit and we shall not thereafter be obligated to make any further payments under this Letter of Credit. By paying to either LC Beneficiary the full amount demanded in accordance with such accompanying certificate we make no representation as to the correctness of such amount demanded. We hereby waive any rights of subrogation that we may acquire by law or in equity as a result of making any payments hereunder. You have been informed that we have entered into a reimbursement agreement with EZH dated as of December 15, 1997.

9. Communication with us in respect to this Letter of Credit shall be in writing and shall be addressed to our Luxembourg branch at 3, rue Jean Monnet, L2180 Luxembourg, Attention: Corporate and Structured Finance Department (telecopy: 352.42.434.3399) with a copy to our New York branch at the address above, Telecopy No. (212) 310-9868 (or such other address or office as designated by us in writing to you) specifically referring to this Letter of Credit by number and date.

10. Except as specifically otherwise set forth herein, this Letter of Credit shall be governed by and construed in accordance with the Uniform Customs and Practices for Documentary Credits (1993 Revision), International Chamber of Commerce Publication No. 500 (the "UCP"). We expressly agree that to the extent Articles 13(b) and 14(d)(i) of the UCP (the "Articles") would or could be construed to extend the express time periods referred to in this Letter of Credit, we knowingly and willingly waive our rights in respect of such Articles and will honor any demand for payment complying with the terms of this Letter of Credit upon the terms provided herein. In addition, we knowingly and willingly agree that, if an event of force majeure described under Article 17 of the UCP occurs, the "Expiration Date" shall be extended until the date that is 20 days after

such force majeure ceases to exist. This Letter of Credit shall be deemed to be made under the laws of New York State and as to matters not addressed by the UCP, is governed by the laws of the State of New York. We knowingly and willingly waive Section 5-112 of the New York Uniform Commercial Code and we will honor any demand for payment complying with the terms of this Letter of Credit upon the terms provided herein. Such waiver shall not affect or be construed to affect the express time periods for payment set out in this Letter of Credit.

11. Anything to the contrary in Article 48 of the UCP notwithstanding, this Letter of Credit shall be transferable in whole, or in part. Transfer by an LC Beneficiary of its interest hereunder may only be made in accordance with a transfer by the Trustee or the Investor of its interest in the transaction contemplated by the Participation Agreement. Transfer of this Letter of Credit to such transferee shall be effected by the presentation to us of the original of this Letter of Credit accompanied by a written request designating such transferee and the portion to which such transferee is entitled in the form of Exhibit 3 attached hereto. Upon such presentation and written request, we shall forthwith transfer all or the relevant portion of this Letter of Credit, issuing to both the transferee and, as applicable, either or both of the LC Beneficiaries (to the extent that either or both of the LC Beneficiaries retain an interest hereunder) an irrevocable letter of credit in the appropriate pro rata portion of the Stated Amount in effect at such time, and on the same terms as and for the same period as this Letter of Credit. The transferor shall pay to us a fee of $500 in connection with such transfer.

12. This Letter of Credit (including the Exhibits and Annex A hereto) sets forth in full our undertaking, and such undertaking shall not in any way be modified, amended, amplified or limited by reference to any document, instrument or agreement referred to herein, except only the notices of amendment, the certificates and the request for transfer; and any such reference shall not be deemed to incorporate herein by reference any document, instrument or agreement except for such notices of amendment, certificates and request for transfer. Our obligation to make payment under this Letter of Credit is independent of, and is not conditioned upon, the payment of any fee.

13. This Letter of Credit shall expire at 5:00 p.m., New York Time, on January 2, 2001 (such date and any extended expiration date effected as a result of a force majeure described under Article 17 of the UCP or pursuant to the following proviso being referred to as the "Expiration Date"); provided that this Letter of Credit shall, as of the date 30 days

prior to the then Expiration Date, be (and shall be deemed to have been) automatically extended for an additional period expiring on the one year anniversary of the then Expiration Date, unless written notice from us is received by each of the LC Beneficiaries that we elect not to renew this Letter of Credit at least 60 (and no more than 90) days prior to the initial Expiration Date or subsequent Expiration Date, as applicable. Any notices pursuant to the preceding sentence shall be given to: (i) the Trustee at Rodney Square North, 1100 North Market Street, Wilmington, Delaware 19890-0001, Attention: Corporate Trust Administration (telecopy: 302-651-8882) and (ii) the Investor c/o Consolidated Edison Development, Inc. at 111 Broadway, 8th Floor, New York, New York 10006, Attention: Vice President (telecopy: 212-393-9282). All notices required or permitted by the terms hereof shall be in writing, shall make specific reference to this Letter of Credit, its number, date and "the EZH-Roca 3-1997-Leveraged Lease Financing," and shall become effective when received and shall be sent by telecopier (and confirmed by overnight delivery service or by overnight delivery service or by hand).

14. Notwithstanding any provision of this Letter of Credit to the contrary, if the Expiration Date or subsequent Expiration Date is not a Business Day, such date shall be automatically extended to the next succeeding Business Day.

Yours very truly,

BAYERISCHE LANDESBANK GIROZENTRALE,
Luxembourg Branch

By: [signature]
Name: Alexander Kuhnert
Title: Vice President

ANNEX A

Annex A to Irrevocable Standby Letter of Credit
No. 15122116 dated December 15, 1997

PERIOD

| From and including | To and including | Stated Amount |
|---|---|---|
| December 15, 1997 | January 2, 1999 | $25,262,613.45 |
| January 3, 1999 | January 2, 2000 | $31,215,462.32 |
| January 3, 2000 | January 2, 2001 | $36,383,630.80 |
| January 3, 2001 | January 2, 2002 | $40,931,091.13 |
| January 3, 2002 | January 2, 2003 | $44,807,910.01 |
| January 3, 2003 | January 2, 2004 | $47,959,969.36 |
| January 3, 2004 | January 2, 2005 | $50,327,780.17 |
| January 3, 2005 | January 2, 2006 | $51,845,503.33 |
| January 3, 2006 | January 2, 2007 | $52,441,217.23 |
| January 3, 2007 | January 2, 2008 | $52,035,374.03 |
| January 3, 2008 | January 2, 2009 | $50,492,917.69 |
| January 3, 2009 | January 2, 2010 | $47,645,813.60 |
| January 3, 2010 | January 2, 2011 | $43,911,894.49 |
| January 3, 2011 | January 2, 2012 | $39,940,871.52 |
| January 3, 2012 | January 2, 2013 | $35,717,688.58 |
| January 3, 2013 | January 2, 2014 | $31,502,609.86 |
| January 3, 2014 | January 2, 2015 | $27,075,128.90 |
| January 3, 2015 | January 2, 2016 | $22,366,502.91 |
| January 3, 2016 | January 2, 2017 | $17,358,879.16 |
| January 3, 2017 | January 2, 2018 | $12,033,271.30 |
| January 3, 2018 | January 2, 2019 | $ 8,544,725.48 |

EXHIBIT 1
TO IRREVOCABLE STANDBY LETTER
OF CREDIT NO. 15122116 DATED DECEMBER 15, 1997

NOTICE OF AMENDMENT OF IRREVOCABLE STANDBY
LETTER OF CREDIT NO. 15122116 DATED DECEMBER 15, 1997

[Date]

Consolidated Edison Leasing, Inc.
c/o Consolidated Edison Development, Inc.
111 Broadway, 8th Floor
New York, NY 10006

Wilmington Trust Company, as Trustee under
the Trust Agreement (Roca Facility Trust No. 2)
dated as of December 15, 1997 between Wilmington
Trust Company and the Investor identified therein
Rodney Square North
1100 North Market Street
Wilmington, Delaware 19890-0001

Reference is hereby made to irrevocable Standby Letter of Credit No. ____ dated December 15, 1997 (the "Letter of Credit") issued by us in your favor (the terms defined therein and not otherwise defined herein being used herein as defined in the Letter of Credit). We hereby notify you that, in accordance with the terms of the Letter of Credit, the Stated Amount for the period commencing on _______ and ending on _______ shall be, and Annex A thereto is hereby correspondingly amended, effective as of January 3, ____.

Except as expressly stated herein the Letter of Credit shall remain in full force and effect.

This letter should be attached to the Letter of Credit and made an integral part thereof.

BAYERISCHE LANDESBANK GIROZENTRALE,
Luxembourg Branch

By: ______________________
Name:
Title:

N.V. ELECTRICITEITSBEDRIJF ZUID-HOLLAND

By: ______________________
Name:
Title:

CONSOLIDATED EDISON LEASING, INC.

By: ______________________
Name:
Title:

WILMINGTON TRUST COMPANY,
as Trustee

By: ______________________
Name:
Title:

EXHIBIT 2 TO
IRREVOCABLE STANDBY
LETTER OF CREDIT NO. 15122116 DATED DECEMBER 15, 1997

CERTIFICATE

[Date]

The undersigned, an Authorized Officer of the LC Beneficiary, hereby certifies in connection with Letter of Credit No. 15122116, dated December 15, 1997, issued by Bayerische Landesbank Girozentrale, Luxembourg branch, in favor of Consolidated Edison Leasing, Inc. (the "Letter of Credit"; any capitalized term used and not otherwise defined herein shall have the meaning set forth in the Letter of Credit), as follows:

(a) [Name of LC Beneficiary] is a beneficiary of the Letter of Credit (the "LC Beneficiary"). Payment of $____________ is hereby demanded under the Letter of Credit, which amount does not exceed the lesser of (i) the Stated Amount and (ii) the aggregate amount payable to the Trustee and the Investor under the Operative Documents.

(b) The undersigned is delivering this certificate because of a Sublessee Event of Default or a Lessor Event of Default has occurred and is continuing.

Payment of the amount demanded hereunder should be made to [name of LC Beneficiary] at [wire transfer details].

IN WITNESS WHEREOF, the undersigned has executed this certificate as of the ____ day of __________, ____.

[Name of LC Beneficiary]

By: ________________________
Name:
Title:

EXHIBIT 3 TO
IRREVOCABLE STANDBY
LETTER OF CREDIT NO. 15122116 DATED DECEMBER 15, 1997

INSTRUCTION TO TRANSFER

[Date]

[ISSUER]

Re: Irrevocable Letter of Credit No. 15122116 dated December 15, 1997 (the "Letter of Credit"; terms defined in the Letter of Credit are used herein as therein defined)

Ladies and Gentlemen:

For value received, the undersigned, an Authorized Officer of [name of LC Beneficiary] hereby irrevocably instructs you to transfer to:

______________________________
(Name of Transferee)

______________________________
(Address)

[a ____% interest in] all rights of [name of LC Beneficiary] to draw under the above-captioned Letter of Credit. We have transferred to the above-name transferee [__% of] our beneficial interest in the Trust referred to in the Letter of Credit.

By this transfer, a [__%] interest in all rights of [name of LC Beneficiary] in the Letter of Credit shall be transferred to the transferee and the transferee shall hereafter have the sole rights with respect to such [__%] interest as an LC Beneficiary. Please issue the following replacement letters of credit in accordance with the Letter of Credit: [Describe new LC Beneficiaries and related Annexes A]. Upon the issuance of one or more letters of credit reflecting the relative interests of the undersigned and the above-named transferee in the Letter of Credit, [name of LC Beneficiary] discharges you from all obligations to the undersigned with respect to any such transferred interest in the Letter of Credit.

The Letter of Credit, together with a certified check for $500 in payment of the transfer fee, is returned herewith in exchange for the issuance of one or more replacement letters of credit in accordance with the Letter of Credit.

[Name of LC Beneficiary]

By: ______________________________
Name:
Title: