**No. 06-305 T**
**(Judge Marian Blank Horn)**

---

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

---

**CONSOLIDATED EDISON COMPANY**
**OF NEW YORK, INC. & SUBSIDIARIES**

**Plaintiff**

**v.**

**THE UNITED STATES,**

**Defendant**

---

**DECLARATION OF DAVID N. GEIER**

---

I, David N. Geier, pursuant to 28 U.S.C. § 1746, declare and state to the best of my knowledge as follows:

1. I am employed as a trial attorney with the United States Department of Justice, Tax Division in Washington, D.C. I am assigned responsibility for representing the interests of the United States in the above-captioned case. I am familiar with the documents produced by the Internal Revenue Service from its administrative file pertinent to the above captioned case, and the portions produced to Plaintiff by the United States in discovery. I am also responsible for and familiar with the documents produced by Plaintiff during discovery in the above captioned

matter. I make this declaration in support of the United States' Motion for Protective Order.

2. Attached hereto as Exhibit 1 is a true and correct copy of the Order issued by the United States District Court for the District of Columbia on November 28, 2006 in the case *Mayer, Brown, Rowe & Maw, LLP v. Internal Revenue Service*, 04-2187 (D.D.C. Nov. 28, 2006).

3. Attached hereto as Exhibit 2 is a true and correct copy of the Second Declaration of Lambert-Dean filed in connection with *Mayer, Brown, Rowe & Maw, LLP v. Internal Revenue Service*, 04-2187.

4. Attached hereto as Exhibit 3 is the relevant excerpt from a true and correct copy of a letter dated December 7, 2006, from Plaintiff's counsel addressed to David Geier, counsel for the Government.

5. Attached hereto as Exhibit 4 is a true and correct copy of an internal Con Edison memorandum dated November 20, 1997, produced to the IRS during the audit stage of the matter currently before this Court, and included within the portions of the IRS administrative file produced to Plaintiff during discovery.

6. Attached hereto as Exhibit 5 is a true and correct copy of the relevant excerpts from Volume 1 of the "EZH Briefing Memo", entitled "Risk Analysis", produced to the IRS during the audit stage of the matter currently before this Court, and included within the portions of the IRS administrative file produced to Plaintiff during discovery.

7. Attached hereto as Exhibit 6 is a true and correct copy of a letter titled "EZH RoCa 3 Facility Lease," marked "DRAFT", produced by Plaintiff in the course of discovery.

8. Attached hereto as Exhibit 7 is a true and correct copy of an internal Con Edison email dated December 12, 1997, produced to the IRS during the audit stage of the matter

currently before this Court, and included within the portions of the IRS administrative file produced to Plaintiff during discovery.

9. Attached hereto as Exhibit 8 is a true and correct copy of an internal Con Edison memorandum dated July 26, 1999, and produced to the IRS with redactions during the audit stage of the matter currently before this Court, and included within the portions of the IRS administrative file produced to Plaintiff during discovery.

10. Attached hereto as Exhibit 9 is a true and correct copy of a document titled "Leasing White Paper," produced by Plaintiff in the course of discovery, with redactions made by Plaintiff.

11. Attached hereto as Exhibit 10 is a true and correct copy of the unpublished Memorandum and Order issued by the United States District Court for the District of Massachusetts, *United States v. Nordberg*, 1996 WL 170119, at *3 (D. Mass.), *aff'd*, 97 F.3d 1445 (1st Cir. 1996).

I declare under the penalty of perjury that the foregoing is true and correct.

Executed this 16th day of March, 2007 in Washington D.C.

s/ David N. Geier
DAVID N. GEIER
Trial Attorney, Tax Division
U.S. Department of Justice

# EXHIBIT 1

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **MAYER, BROWN, ROWE & MAW LLP,** <br><br> **Plaintiff,** <br><br> **v.** <br><br> **INTERNAL REVENUE SERVICE,** <br><br> **Defendant.** | ) | **Civil Action No. 04-2187 (RMC)** |

**ORDER**

The law firm of Mayer, Brown, Rowe & Maw LLP ("Mayer Brown") filed an unopposed motion for clarification of the Court's October 24, 2006 Order, seeking a fuller statement of the reasoning supporting the Court's Order. Mayer Brown contends that it would be an abuse of discretion for the Court to deny a reasonable request for specification of the bases for denying access to documents in a case under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552. *Schwartz v. IRS*, 511 F.2d 1303, 1307-08 (D.C. Cir. 1975). The Court hereby grants Mayer Brown's motion for clarification and sets forth the reasoning for its October 24, 2006 Order below.

Mayer Brown submitted three requests for records to the Internal Revenue Service ("IRS") under FOIA. When the IRS failed to respond, Mayer Brown instituted this suit. Thus prompted, the IRS answered the requests, produced approximately 7,000 documents in whole or in part, and withheld about 23,000 documents. The parties disputed, through cross motions for summary judgment, whether the scope of the search for responsive records was adequate and whether the IRS has properly relied upon FOIA Exemptions 5 and 7(E). On August 21, 2006, the

Court granted in part and denied in part the cross motions in a Memorandum Opinion and Order, which stated in part, "[T]he Court cannot determine if Exemption 7(E) applies and will order the IRS to submit representative samples of the documents for in camera review." The IRS filed a notice of in camera submission [Dkt. #27 & #29], and Mayer Brown filed a response to the notice of submission [Dkt. #28 & #32]. The Court finds that Exemption 7(E) applies to the documents submitted for in camera review.

FOIA Exemption 7(E), 5 U.S.C. § 552(b)(7)(E), provides an exemption from disclosure for "records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information . . . would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigation or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law." *See Tax Analysts v. I.R.S.*, 294 F.3d 71 (D.C. Cir. 2002) (Exemption 7(E) permits the withholding of guidelines for law enforcement, not just records or information regarding an individual violation of the law). Courts have held that under Exemption 7(E), the IRS may withhold documents containing selection criteria used by revenue agents in selecting accounts to audit. *American Society of Pension Actuaries v. IRS*, 746 F. Supp. 188, 190 (D.D.C. 1990) ("If taxpayers were able to gain access to the IRS's selection criteria, and to use this access to ensure for themselves a low risk of audit, the government's enforcement objectives could be impeded."); *accord Klunzinger v. IRS*, 27 F. Supp. 2d 1015, 1027-28 (W.D. Mich. 1998) (IRS established that documents were withheld under Exemption 7(E) because disclosure "would reveal confidential information regarding when the IRS would undertake compliance activity.").

In this case, the IRS asserts that Exemption 7(E) applies to certain portions of the

draft LILO ASGs, as well as the final [redacted] version of the document as it was released to the public. Ms. Lambert-Dean attests:

> [These portions] relate to specific predominately internal settlement guideline ranges. The information at issue consists of an articulation of the Service's ultimate objectives, specific settlement ranges or percentages, and assessments of litigating hazards and vulnerabilities associated with the Service positions. ASGs set parameters by which appeals officers enforce tax laws under the Internal Revenue Code, thus meeting the requirement that they be "records compiled for law enforcement purposes."

Second Lambert-Dean Decl. ¶ 13; *see also* Lambert-Dean Decl. ¶ 44. The Court agrees with the IRS that the portions of the LILO ASGs withheld fall within Exemption 7(E). In its October 24, 2006 Order, the Court found:

> [T]he Court has carefully reviewed the documents submitted and the response and has determined that the documents submitted for in camera review are not subject to release under FOIA Exemption 7(E), 5 U.S.C. § 552(B)(7)(E), because they are guidelines for law enforcement purposes, disclosure of which could reasonably be expected to risk circumvention of the law.

The documents withheld under Exemption 7(E) include settlement strategies and objectives, assessments of litigating hazards, acceptable ranges of percentages for settlement, and similar "tolerance" information from draft LILO ASGs. These are guidelines for IRS Appeals agents to use in reaching settlements with taxpayers. If taxpayers were able to gain access to the IRS's strategies and ranges for settlement, they could use this information to their advantage and the government's enforcement objectives could be impeded. Exemption 7(E) applies to the documents subject to the Court's in camera review because they are guidelines for law enforcement purposes, disclosure of which could reasonably be expected to risk circumvention of the law.

Accordingly, it is hereby

**ORDERED** that Mayer Brown's unopposed motion for clarification [Dkt. # 33] is **GRANTED**; and it is

**FURTHER ORDERED** that the documents submitted for in camera review [Dkt. #27 & #29] are not subject to release under FOIA Exemption 7(E), 5 U.S.C. § 552(b)(7)(E); and it is

**FURTHER ORDERED** that, with regard to the documents submitted for in camera review, the IRS's motion for summary judgment [Dkt. #15] is **GRANTED** and Mayer Brown's cross motion for summary judgment [Dkt. #19] is **DENIED**.

**SO ORDERED.**

Date: November 28, 2006

/s/
ROSEMARY M. COLLYER
United States District Judge

# EXHIBIT 2

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| MAYER, BROWN, et al., | ) | |
| Plaintiffs, | ) | 1:04 CV-02187 |
| v. | ) | |
| INTERNAL REVENUE SERVICE | ) | |
| Defendant. | ) | |

SECOND DECLARATION OF DEBORAH LAMBERT-DEAN

I, DEBORAH LAMBERT-DEAN, pursuant to the provisions of 28 U.S.C. § 1746, declare and say:

1. I am an attorney in the Office of Chief Counsel, Disclosure & Privacy Law, Branch 2, Internal Revenue Service [IRS] and, since January 2005, I have been assigned to the above-captioned case. I have been employed as an attorney in Disclosure & Privacy Law since September 1987.

2. As part of my official duties, I am responsible for coordinating with the Department of Justice the IRS's defense of the Freedom of Information Act (FOIA) lawsuit in which this declaration is being filed.

3. I have personally reviewed and am familiar with all the documents at issue in this lawsuit.

4. In the "DECLARATION OF DEBORAH LAMBERT-DEAN" dated December 6, 2005, (hereafter referenced as my "first Declaration" or the "12-06-05 Lambert-Dean Declaration") which was submitted to the Court in conjunction with the Government's Motion for Summary Judgment, I described the IRS search for



DEFENDANT'S EXHIBIT 1

responsive documents and those categories of documents which the IRS has determined to be responsive to plaintiff's Freedom of Information Act (FOIA) request, but which were exempt from disclosure under the FOIA.

5. I am submitting the instant Declaration in response to plaintiff's "Cross-Motion for Summary Judgment," dated January 20, 2006. I have attempted to structure my responses to correspond to certain of the issues that were raised by plaintiff in their "MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO THE INTERNAL REVENUE SERVICE'S MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT OF MAYER BROWN'S CROSS-MOTION FOR SUMMARY JUDGMENT" (hereafter referenced as the "Cross-Motion").

6. Plaintiff has indicated in its "Cross-Motion" that it is interested in a broader interpretation of the documents sought in its FOIA requests, such that all documents "pertaining" to the published guidance as well as "post-decisional interpretive documents" would be responsive. Based on this interpretation of the documents sought, plaintiff has requested that the agency undertake a new search for responsive documents. Such an expansive interpretation of plaintiff's requests, effectively capturing all documents that in any way "pertain" to any of the published guidance at issue, would be an enormous burden to the agency. For example, there were settlement discussions undertaken between the IRS and numerous taxpayers who had engaged in prohibited leasing arrangements which were encompassed under a "global settlement initiative" project. This project, along with initiatives associated with a "joint task force" formed by the IRS with respect to these leasing

practices resulted in the creation of thousands of pages of documents, of which I am aware. These "global settlement initiative" documents as well as the documents generated as a result of the "joint task force" were not pertinent to the formulation of any published guidance, but rather are documents that were generated after the agency had finalized its position with respect to LILO transactions. These documents are associated with the agency's enforcement proceedings with respect to identified taxpayers who had been involved in these types of prohibited leasing practices. Additionally, such documents would most likely consist in large-part of data that is subject to the confidentiality provisions of 26 U.S.C. § 6103, the type of information which plaintiff has indicated it is not interested in obtaining. Further, having not represented to those functions that were asked to search that responsive documents would encompass all documents that "pertain" to LILO and SILO published guidance in any manner, including documents generated after such published guidance was finalized, I do not know that initiatives such as the global settlement and task force projects are the only such initiatives that may generate documents responsive to such an expansive request. There may well be a myriad of further information that is unknown to our office at this time which would in some manner "pertain" to a "post decisional" interpretation of LILO/SILO published guidance.

7. Plaintiff has indicated at page 11 of their "Cross-Motion" that it has narrowed the scope of documents sought to exclude the material withheld under FOIA Exemption 2 (*see* ¶ 28 of the 12-6-05 Lambert-Dean Declaration), FOIA Exemption 3 asserted in conjunction with 26 U.S.C. § 6103 (*see* ¶ 29-31 of the 12-6-

05 Lambert-Dean Declaration), FOIA Exemption 5 as attorney client privileged as described at paragraphs 33(a) and 33(c) of the 12-6-05 Lambert-Dean Declaration, FOIA Exemption 5 as attorney work product as described at ¶ 34 of the 12-6-05 Lambert-Dean Declaration, and FOIA Exemption 6 (*see* ¶ 40-43 of the 12-6-05 Lambert-Dean Declaration).

8. Excluding those documents referenced in paragraph 7, *supra*, the documents that remain at issue fall within either the "deliberative process" or the "attorney-client" component of FOIA, Exemption 5, or FOIA Exemption 7(E).

9. With respect to those documents remaining at issue which the agency asserts are protected by the deliberative process privilege, FOIA Exemption 5, these total approximately 15,701 pages.[1] Of these 15,701 pages, approximately 8,245 pages are drafts of requested published guidance, including the Lease-in Lease-Out Appeals Settlement Guidelines (LILO ASG) (approximately 1,243 pages), the LILO Coordinated Issue Paper (LILO CIP) (approximately 1,592 pages), Revenue Rulings 99-14 (approximately 81 pages) and 2002-69 (approximately 634 pages), and the Sale-in Lease-Out Notice 2005-13 (the SILO Notice) (approximately 4,695 pages). The remainder of the documents at issue for which the Government is asserting FOIA Exemption 5 and the deliberative process privilege total approximately 7,456 pages.

10. Approximately 8,245 pages of documents remaining at issue in the instant case are drafts of published guidance that have been issued and are

---

1 I have personally counted all the pages referenced in this paragraph, but I have only gone through and counted them once. I believe these pages number totals are reasonably accurate, but without double or triple counting for accuracy, I do not feel comfortable making such a definitive statement. Therefore, I have used the qualifier "approximately" prior to each page number total.

available to the public in their final version. Plaintiff has requested that the Court order defendant to prepare a "Vaughn index" with respect to all documents for which the agency has asserted deliberative process privilege. These "draft" documents were described in paragraphs 36 and 37 of my first Declaration and any further attempt to more completely describe drafts of published guidance in various stages of development in a Vaughn index format would be repetitive and time-consuming to the IRS and would not in any meaningful way advance the plaintiff's or the court's understanding of the documents in question for the purpose of the pending cross-motion for summary judgment. As to final decisions that were made by agency executives with respect to agency positions regarding LILO/SILO transactions, the final decisionmakers did not adopt or incorporate the deliberations contained in these drafts documents. Furthermore, drafts of published guidance that are subsequently finalized are not relied upon by the agency in any of its dealings with the taxpaying public as only the final product provides instruction and guidance for decisions made by agency personnel with respect to any tax matter. Such draft documents are maintained by the agency only as an historical record of the deliberations with respect to the guidance that lead up to the formulation of the final product. These draft documents are retained in a case file associated with the guidance project to which they pertain and occasionally also by the individuals who worked on the draft. They are not distributed within the agency, nor are they stored in any database that would be available to agency personnel working on related matters. It is the policy within the Office of Chief Counsel to place reliance only upon finalized published guidance. This policy is reflected in Chief Counsel Notice

2003-014 which clarifies the authoritative position that finalized published guidance has within the Office of Chief Counsel of the IRS by instructing that all Chief Counsel attorneys are required to follow the legal positions established in finalized published guidance in advice and litigation. (A copy of this Notice, CC-2003-014, issued May 8, 2003, is attached as Exhibit A to this Declaration).

11. To estimate the burden that may be placed upon the agency should the court determine to order a Vaughn index of remaining documents at issue, including draft documents, I have attempted to determine the number of hours worked on this specific case (the Mayer, Brown FOIA litigation) by IRS Chief Counsel personnel through the end of the fiscal year that ended September 30, 2005. By my estimate, personnel within the Office of Chief Counsel have worked approximately 2700 hours on the instant litigation through September 30, 2005. This time includes search and processing time for the documents at issue. In an effort that would be more akin to the formulation of a Vaughn index, myself and a paralegal within the Legal Processing Division of the Office of Associate Chief Counsel for Procedure & Administration worked approximately 530 hours preparing the Privilege Log with respect to the BB&T litigation concerning the LILO Revenue Rulings and LILO CIP documents that is described in my first Declaration at ¶ 25. Given the demands made upon the attorneys in my office by other litigation, advisory opinions, published guidance projects, etc., I believe that any index sufficient to meet the requirements for a Vaughn index would take many months of attorney work time to complete.

12. With respect to the single document described in paragraph 33(b) of my first declaration as pages 5670-71, and which we identified specifically as

falling within the attorney-client privilege as it is articulated at Exemption 5 to the FOIA, plaintiff in its "Cross-Motion" has expressed an interest in more information about this document. It is a memorandum written by an attorney in the Office of the Associate Chief Counsel for Financial Institutions and Products (FIP) in response to a request from an attorney in the Office of Associate Chief Counsel, Passthroughs and Special Industries (PSI). The opening paragraph of the document indicates that the attorney in PSI had provided the FIP attorney with language that had been proposed for inclusion in a Revenue Agents Report and Form 5701 (Notice of Proposed Adjustment) associated with LILO transactions that were being prepared for issuance by a field office of the IRS. The PSI attorney had requested that FIP review the documents and apply its subject matter expertise to the issues raised by the documents and provide any necessary analysis to PSI prior to the finalization of the RAR/Form 5701. The body of the memorandum is a discussion of issues raised by the proposed RAR/Form 5701, for which FIP retains subject matter jurisdiction within the Office of Chief Counsel, with analysis supported in some instances by case law as to whether certain portions of the documents should be revised and suggestions as to nature of those revisions. The tone of the response indicates that the advice rendered was intended to be confidential. This document was provided to our office by the Office of Division Counsel (Large and Mid-Size Business) (LMSB). LMSB was the function charged with preparation of the RAR/Form 5701 at issue in the memorandum and the electronic mail communications that immediately precede pages 5670-71 suggest that LMSB had sought out the advice of both

PSI and FIP with respect to certain issues presented during the drafting of the RAR/Form 5701. There is no indication that this document was dispersed within the agency outside these functions, then or subsequently. Indeed, in my review of all documents responsive to plaintiff's "LILO requests," I found only this one copy of this memorandum. This document is also deliberative in that it is not a final signed document and there are handwritten notations on the document that indicate someone reviewing it was making determinations as to what information would be included within the final version of the memorandum. Therefore, this document is included within those documents described at ¶¶ 36 (generally) and 39(a) (specifically) of my first Declaration where the agency asserted that in addition to falling within the attorney-client privilege at Exemption 5 of the FOIA, this document is also exempt from disclosure under the FOIA under the deliberative process privilege at Exemption 5.

13. With respect to the draft LILO ASGs that are described at ¶ 44 and (more fully) at ¶ 12 and footnote 7 in my first Declaration, certain portions of documents were not released because the material therein is exempt from disclosure pursuant to FOIA exemption (b)(7)(E). Exemption (b)(7)(E) provides an exemption from disclosure for "records or information compiled for law enforcement purposes . . . [which] would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law." Certain portions of draft LILO Appeals Settlement Guidelines(LILO ASG) as well as the final version

of that document as it was released to the public, consist of material that falls within Exemption 7(E) because they relate to specific predominately internal settlement guideline ranges. The information at issue consists of an articulation of the Service's ultimate objectives, specific settlement ranges or percentages, and assessments of litigating hazards and vulnerabilities associated with the Service positions. ASGs set parameters by which appeals officers enforce tax laws under the Internal Revenue Code, thus meeting the requirement that they be "records compiled for law enforcement purposes." While it is true that legislative initiatives have resulted in a prohibition of these abusive leasing transactions since 2004, there are still active settlement discussions ongoing between the IRS and taxpayers who engaged in LILO transactions. Plaintiff acknowledges this on-going enforcement activity in their "Cross-Motion" at page 11, stating that the IRS has either "audited or is in the process of conducting audits of substantially all taxpayers which engaged in LILO and tax-exempt sale-leaseback transactions. The total amount at issue will likely be in the billions of dollars." At present, based on information obtained from the Office of the Director of Appeals, there are more than 50 LILO cases open and pending in the Appeals function with an estimated total tax at issue of almost 1.5 billion dollars. There are more than 1 dozen LILO cases open in the Compliance function with an estimated total tax at issue of almost 1.2 billion dollars. There are currently two LILO cases in litigation. The Appeals Division estimates that approximately 80% of the affected LILO taxpayers have not yet resolved their tax liabilities. The revelation of the types of material for which we have asserted Exemption

7(E), including the disclosure of settlement strategies, assessments of litigating hazards, and acceptable ranges or percentages for settlement, and similar "tolerance" information could have a very real and immediate impact upon these open cases resulting in according taxpayers an unfair advantage in the negotiation process to the detriment of the public fisc. Further, these ongoing enforcement actions are being undertaken with respect to those taxpayers who have come forward and identified themselves to the agency as entities that engaged in prohibited leasing practices. There may very well be any number of other participants in such activities who remain unknown to the IRS. Providing information with respect to settlement ranges and hazards assessments to those who may be attempting to assess whether the odds are in their favor if they try to stay hidden or whether they should risk presenting themselves to the IRS, as well as to current and potential future litigants would likewise place the IRS at an unfair disadvantage. Furthermore, disclosure of the guidelines could prejudice the agency's interests in identifying which of the outstanding cases are the "best" cases to litigate in an attempt to establish correct principles of tax law. Moreover, plaintiff's, at page 7 of their Cross-Motion, noted that the issuance of Revenue Ruling 99-14 had resulted in the discontinuance of LILO structured leasing arrangements by taxpayers, but taxpayers continued to enter into SILO transactions as a tax avoidance scheme until legislative initiatives stymied these schemes as well. As plaintiffs have very effectively pointed out in their Cross-Motion, as soon as the IRS or Congress takes action to halt one abusive tax avoidance scheme, taxpayers will attempt to maneuver their transactions in such

a way as to create another. To allow the disclosure of the information at issue in these drafts LILO ASGs which the agency asserts is protected by Exemption 7(E) would unfairly tip the balance in favor of those taxpayers who were attempting to circumvent the law by continuing to engage in activities which the IRS had clearly signaled it considered illegal. As an example of the types of incentives taxpayers have to engage in such risky behavior, LMSB estimates that there were about 50 taxpayers involved in almost 400 SILO transactions for which they claimed tax deductions in excess of 35 billion dollars.

14. With respect to all draft LILO ASG documents which were withheld in their entirety, the agency asserts that these documents fall within the deliberative process exemption to the FOIA, Exemption 5. (See ¶ 37(d) of my first Declaration, with respect to the assertion of Exemption 5 for all draft LILO ASGs withheld in their entirety). With respect to those draft LILO ASGs that were released in part, and which are described at ¶¶ 12 and 44 of my first Declaration, the agency asserts FOIA Exemption (b)(7)(E), for the reasons cited in the preceding paragraph, for those portions of these documents that were withheld. (See ¶ 13 of the "Second Lambert-Dean Declaration").

15. As I represented in my first Declaration, I am familiar with the segregation requirement of subsection (b) of the FOIA for any nonexempt information contained in responsive agency records. In my review of responsive documents, I attempted to make every reasonably segregable non-exempt portion of every responsive document available to the plaintiff. With respect to the determination as to whether entire pages of documents, especially electronic

mail transmittals, were withheld in their entirety, I looked to the standard of whether any meaningful data would be made available to plaintiff after having determined what of the data was deliberative. When, after looking to redact deliberative data from the documents, I determined that the only data that would not fall within the deliberative process exemption to the FOIA were items such as the "to" and "from" lines in message headings and/or words or sentence fragments that were of no consequence and/or render the document meaningless, I withheld the document in its entirety.

16. With respect to a letter sent to plaintiff by Symeria Rascoe, an employee in the Office of Governmental Liaison and Disclosure (GLD), dated January 13, 2005, and referenced at ¶ 4 of "Mayer, Brown, Rowe & Maw LLP's Statement of Material Facts as to Which There is No Genuine Dispute," any communication between plaintiff and the IRS after the date that plaintiff files litigation is properly channeled through the Department of Justice attorney who represents the agency in the case. Furthermore, within the IRS, after a requester has filed suit with respect to a FOIA request, my office assumes

/////////

/////////

/////////

/////////

/////////

/////////

/////////

jurisdiction for all matters related to that litigation. Therefore, at the time Ms. Rascoe issued this letter, her office was no longer responsible for responding to plaintiffs' FOIA requests and retained no subject matter jurisdiction.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on February 15, 2006.

DEBORAH LAMBERT-DEAN
Office of Chief Counsel
(Disclosure & Privacy Law)
Internal Revenue Service
Washington, D.C. 20224

Department of the Treasury | Internal Revenue Service | Office of Chief Counsel

# Notice

CC-2003-014

May 8, 2003

**Subject:** Following Published Guidance in Advice and Litigation
**Cancellation Date:** Upon Incorporation Into the CCDM

**Purpose**

This notice clarifies and supersedes the Chief Counsel Notice (CC-2002-043) dated October 17, 2002, regarding the requirement that Chief Counsel attorneys follow legal positions established by published guidance in papers filed in the Tax Court or in defense or suit letters sent to the Department of Justice. This notice also continues the requirement established in the previous notice that all briefs, trial memoranda and motions to be filed in the Tax Court or letters to the Department of Justice that seek to distinguish a position set forth in published guidance shall be subject to national office review prior to filing in the Tax Court or transmission to the Department of Justice.

**Discussion**

**Overview**

This topic was recently discussed as part of the mandatory Ethics IVT broadcast nationwide on May 5, 2003. In that IVT, we went over what should now be familiar principles that were derived from the Chief Counsel's Roles memo issued on August 26, 2002. In short, those principles are as follows. Published guidance comes within the province of the Associate Chief Counsel offices. In contrast, litigation primarily falls under the jurisdiction of the Division Counsel. Tax policy should not be made through litigation. Therefore, our litigating positions should be derived from, and consistent with, the Internal Revenue Code and our published guidance. Any disagreement between a Division Counsel office and an Associate Chief Counsel office concerning the legal positions to be pursued in litigation or other resolution of a case, and whether a position proposed to be taken in a particular case conflicts with published guidance, should be resolved through the existing reconciliation procedures.

**Specific rules**

The specific rules regarding the requirement to follow published guidance are as follows:

**(1) Chief Counsel attorneys may not argue contrary to final guidance**

Filing Instructions: Binders ______ Master Sets: NO X RO ___
NO: Circulate ___ Distribute X to: All Personnel ___ Attorneys X In: all divisions
RO: Circulate ___ Distribute X to: All Personnel ___ Attorneys X In: all divisions
Other: National FOIA Reading Room
Electronic Filename: CC-2003-014 Original signed copy in: ______

Exhibit A

Final guidance consists of final regulations, temporary regulations, revenue rulings, revenue procedures, IRB notices, and announcements. PLRs, TAMs or CCA do not constitute final guidance. Those documents are case specific and are not prepared with the intention of having other taxpayers rely upon them. They are, however, guidance with respect to the taxpayer whose transaction or case was the subject of the ruling or advice. Good judgment dictates, however, that Chief Counsel attorneys should coordinate with the Associate Chief Counsel office with subject matter jurisdiction over the issue if a Chief Counsel attorney proposes to take a position that conflicts with any PLR, TAM or CCA addressing the issue. This potential conflict may suggest an internal disagreement between the Associate Chief Counsel office and Division Counsel office, or between two Associate Chief Counsel offices, that requires reconciliation.

(a) <u>Final or temporary regulations in force</u>

If there are final or temporary regulations in force regarding an issue, Chief Counsel attorneys generally should follow the final or temporary regulations, even if the Service has subsequently issued proposed regulations addressing the issue, which might yield a different result if the proposed regulations were actually adopted and in effect. For example, if the application of the proposed regulations would have an adverse effect on the taxpayer by reaching a result that is not achievable under the final or temporary regulations, then the proposed regulations should not be applied in that situation. Proposed regulations do not operate to alter temporary or final regulations until they are finalized and adopted. Hence, where there are final or temporary regulations on an issue, as well as proposed regulations, Chief Counsel attorneys should follow the final or temporary regulations, not the proposed regulations.

(2) <u>Effect of proposed regulations</u>

Proposed regulations have no legal effect unless and until they are adopted. This is so, even if there are no final or temporary regulations currently in force pertaining to the matter in question. Prior to adoption, proposed regulations can be withdrawn or modified at any time. Taxpayers generally should not rely on proposed regulations for planning purposes, except where there are no applicable final or temporary regulations in force and there is an express statement in the proposed regulations that taxpayers may rely on them currently. If there are applicable final or temporary regulations in force, taxpayers may only rely on proposed regulations for planning purposes in the limited circumstance where the proposed regulations contain an express statement permitting taxpayers to rely on them currently, notwithstanding the existence of the final or temporary regulations. In contrast, as set forth in rule (3), Chief Counsel attorneys should look to the proposed regulations to determine the office's position on the issue.

(a) <u>Proposed regulations should not be the subject of PLRs or TAMs</u>

In light of the fact that proposed regulations have no legal effect, Chief Counsel attorneys should not issue PLRs or TAMs interpreting proposed regulations. Instead, PLRs or TAMs should interpret the statute, taking into account relevant case law and final guidance. Of course, that interpretation should be consistent with, and guided by, the proposed regulations, unless there are final or temporary regulations in force pertaining to the matter, in which case, the final or temporary regulations should be followed as stated in rule (1)(a). Moreover, proposed regulations should not be cited as authority for the positions taken in PLRs or TAMs. Rather, PLRs or TAMs should set forth the reasoning supporting the positions in the proposed

regulations. It is permissible, however, to refer to the proposed regulations for illustrative purposes to show that the office is being consistent in its interpretation of the statute.[1]

**(3) If there are no final or temporary regulations currently in force addressing a particular matter, Chief Counsel attorneys may not take a position that is inconsistent with proposed regulations**[2]

If there are no final or temporary regulations currently in force addressing a particular matter, but there are proposed regulations on point, consistent with the principles set forth in rules (2) and (2)(a), Chief Counsel attorneys should look to the proposed regulations to determine the office's position on the issue. Thus, Chief Counsel attorneys ordinarily should not take any position in litigation or advice that would yield a result that would be harsher to the taxpayer than what the taxpayer would be allowed under the proposed regulations. In this regard, if a taxpayer has not followed the proposed regulations, but takes a position that is nonetheless a reasonable interpretation of the statute, coordination with the Associate Chief Counsel office having subject matter jurisdiction over the issue would be appropriate to determine the best course of action.

**(4) Perceived conflicts between proposed regulations and final guidance or between two or more pieces of nonregulatory final guidance should be coordinated**

If a Chief Counsel attorney believes that a proposed regulation conflicts with a revenue ruling, notice, announcement or other final guidance, the matter should be brought to the attention of the Associate Chief Counsel office with subject matter jurisdiction over the issue. Similarly, notification and reconciliation is appropriate if the perceived conflict is between two or more revenue rulings, notices, announcements or other nonregulatory final guidance. This may occur, for example, where a proposed regulation has been outstanding for a long time but due to more recent events, the office issues a notice stating that a position set forth in the proposed regulation is being reconsidered.

**(5) Case law invalidating or disagreeing with the Service's published guidance does not alter rule 1 or 3**

Chief Counsel attorneys may not rely on case law to take a position that is less favorable to the taxpayer in a particular case than the position set forth in published guidance. This means that in circumstances where Chief Counsel attorneys must follow published guidance under the rules set forth above, it is irrelevant that the result under the case law would be more advantageous to the Service than under the Service's published guidance. Under those circumstances, Chief Counsel attorneys must follow the position in the published guidance and give the taxpayer the more beneficial treatment, notwithstanding that the treatment is inconsistent with the case law. For example, if a revenue ruling provides that a particular expense may be currently deducted, Chief Counsel attorneys should not challenge the deduction even though under the applicable case law, the expense might be capitalized.

---

[1] The principles stated herein are also applicable to briefs, other court filings, and letters to the Department of Justice.

[2] But see rule (4) regarding circumstances where subsequently issued published guidance calls into question the continuing vitality of the proposed regulations.

**(6) The government's authority to resolve cases through settlement or other dispute resolution mechanisms remains unchanged, so long as the rules set forth above are not violated**

The requirement to follow published guidance means that Chief Counsel attorneys are prohibited from taking positions in litigation or advice that is inconsistent with published guidance. That does not mean, however, that every case presenting an issue that is the subject of published guidance must be litigated if the taxpayer does not concede the issue in full. In other words, this requirement is not intended to foreclose the possibility of recommending settlement or concession of an issue in a particular case based on litigating hazards. For example, if there is an adverse circuit court opinion on an issue governed by published guidance, it may be appropriate in a TAM, CCA or other legal advice to recommend settlement or concession of the issue in light of Golsen v. Commissioner, 54 T.C. 742 (1970), aff'd, 445 F.2d 985 (10th Cir. 1971), since the Tax Court ordinarily would follow the adverse circuit court precedent. The exception would be if the Service is seeking a vehicle to request the circuit court to reconsider the issue or the Service is continuing to litigate the issue in other circuits in an effort to create a conflict among the circuits for the purpose of seeking Supreme Court review of the issue. A relevant consideration in giving advice in this situation is whether the Service issued an AOD stating what action should be taken in cases appealable to the adverse circuit. Since this is likely to be a fluid situation, the matter should be coordinated with the Associate Chief Counsel office with subject matter jurisdiction over the issue.

**Distinguishing published guidance**

Reasonable minds can sometimes differ over whether a proposed position in a current case can be effectively distinguished from an existing published position. Likewise, Chief Counsel attorneys may encounter rulings that appear outdated or inconsistent with well-established case law. In those situations, Chief Counsel attorneys should bring the ruling or other published guidance to the attention of the Associate Chief Counsel office with subject matter jurisdiction over the issue so that the Associate Chief Counsel office can consider whether to revoke or modify the published guidance or determine whether the published guidance can be distinguished in a particular case. Accordingly, all briefs, motions, trial memoranda and letters that seek to distinguish a litigation position from a published guidance position must be reviewed by the national office prior to filing with the Tax Court or transmission to the Department of Justice, regardless of the issue or amount involved.

**Conclusion**

Our litigating positions should be derived from, and consistent with, the Internal Revenue Code and our published guidance. A reading of the Roles Memo and the Tax Court opinions where the court has found that respondent argued contrary to published guidance should make us sensitive to that principle. See Rauenhorst v. Commissioner, 119 T.C. 157 (2002); Walker v. Commissioner, 101 T.C. 537 (1993); Phillips v. Commissioner, 88 T.C. 529 (1987). See also Byrne v. Commissioner, T.C. Memo. 2002-319.

**Effect on other documents**

Chief Counsel Notice CC-2002-043 is clarified, modified and superseded.

Any questions regarding the matters contained herein should be directed to George Bowden or Henry Schneiderman of the Office of the Associate Chief Counsel (Procedure and Administration) at (202) 622-3400.

/s/
DEBORAH A. BUTLER
Associate Chief Counsel
(Procedure and Administration)

# EXHIBIT 3

***Request for Production of Documents***

The United States' response to Request for Production No. 4, requesting a final version of the Appeals Settlement Guidelines, refers to *Mayer, Brown, Rowe & Maw LLP v. Internal Revenue Service*. That proceeding, commenced under the Freedom of Information Act ("FOIA"), does not provide a valid basis for the United States to refuse to produce the requested document. First, the Court's order of November 28, 2005 was predicated solely on FOIA Exemption 7(E). Mayer, Brown is not aware of any legal authority which would create an evidentiary privilege in litigation parallel to the exemption granted by 7(E). If the United States is aware of any such authority, we would appreciate it if you would identify it. In the absence of such authority, the United States should produce the final version of the Appeals Settlement Guidelines.

Second, while the United States' response alleges that "all drafts" are protected from disclosure by the deliberative process privilege, the final version of the Appeals Settlement Guidelines (the one Con Edison actually requested) would not be protected by the deliberative process privilege. The IRS conceded in the context of the *Mayer Brown* FOIA proceeding that the deliberative process privilege did not apply to the final version of the Appeals Settlement Guidelines and did not raise this issue. Thus, the sole basis for withholding the final version was Exemption 7(E), which, as stated above, does not represent a valid evidentiary privilege. In order to address potential concerns regarding the government's law enforcement objectives, Mayer, Brown is willing to enter into a protective order or similar arrangement regarding disclosure of the final version of the Appeals Settlement Guidelines.

Finally, the Appeals Settlement Guidelines are relevant to the pending case because the United States has characterized the transaction at issue an "abusive tax shelter." Mayer, Brown has reason to believe, based on the drafts of the Appeals Settlement Guidelines previously produced, that the United States is in possession of information which would demonstrate that the transaction at issue is not an abusive tax shelter. Furthermore, Mayer, Brown believes that the final version of the Appeals Settlement Guidelines is inconsistent with the United States' litigating position in this case. Therefore, Con Edison is entitled to production of the final version of the Appeals Settlement Guidelines under applicable discovery rules. *See* RCFC 26(b) ("Parties may obtain discovery regarding any matter, not privileged, that is relevant to the claim or defense of any party....").

***Privilege Log***

The United States' privilege log does not provide Con Edison with sufficient information to determine whether the documents identified are protected under the privileges claimed. In particular, there are a number of individuals on the privilege log whose role has not been identified. The United States declined to answer Interrogatory No. 9, which asked it to identify

# EXHIBIT 4

Date: November 20, 1997

To: Robert Stelben
Hyman Schoenblum

From: Brian DePlautt

Re: Consolidated Edison Development, Inc.
EZH Lease

The following is an update regarding certain accounting and tax aspects of the EZH transaction.

(1) Tax Risk Letter

Shearman & Sterling is finalizing the Tax Risk Letter, which will outline the major tax risks in the 467 structure, and hopes to have it to us by Thursday, November 20, or Friday November 21.

The critical path on this item is: (a): the completion and turnaround of the tax partner's final comments to the existing draft letter.

(2) Tax Change Letter

Shearman & Sterling is finalizing the Tax Change Letter, which will outline the retroactive or prospective nature of historical changes in leveraged lease tax regulations, and hopes to have it to us by Thursday, November 20, or Friday November 21.

The critical paths on this item are: (a) the completion of the legislative history research on one of the changes and (b) the completion and turnaround of the tax partner's comments to the existing draft letter.

Shearman has indicated that they would like to reserve the right to delay delivery to us of one of these two letters beyond the target delivery dates in the event they are required to fight fires on other fronts.

(3) Arthur Anderson Accounting Letter

Arthur Anderson ("AA") has prepared a draft accounting letter and is the process of drafting an added paragraph to the letter. The added paragraph is said to address what the accounting treatment would be, starting in year 21, in the event that EZH did not exercise its Fixed Purchase Option ("FPO") in year 20.

The critical paths on this item are: (a) AA's review of the clarifications of the transaction structure provided to it last night, (b) the drafting by the partner of the added paragraph that deals with what happens in the event EZH does not exercise the FPO and (c ) the conceptualization of the specific accounting entries that would be required in the event the proposed phase two treatment were to be implemented.

AA has indicated that it will seek to provide us with verbal direction with respect to the resolution of these issues on Thursday November 20, subject to time constraints at the partner level, with a letter to follow as soon as possible. We continue to reiterate to AA the immediate urgency of our desire for the resolution of these issues and the receipt of their letter.

cc: MJ McCartney
J. Freilich
C. Muoio

# EXHIBIT 5

## 13. RISK ANALYSIS

| RISK | MITIGATION | ESTIMATED REMAINING RISK LEVEL |
|---|---|---|
| | | |
| **Political and Regulatory** | | |
| Expropriation | (a) AAA rated Country<br>(b) Equity exposure defeased by (i) AA Bank L/C and (ii) Treasury securities | Low |
| Political Violence | (a) AAA rated Country<br>(b)Equity exposure defeased by (i) AA Bank L/C and (ii) Treasury securities | Low |
| Change in Law | (a) AAA rated Country<br>(b) Equity exposure defeased by (i) AA Bank LC and (ii) Treasury securities<br>(c) EZH takes all local country change in law risk | Low |
| | | |
| **Currency** | | |
| Inconvertibility/Transfer | (a) AAA rated Country<br>(b) Currently fully convertible<br>(c) No negative history | Low |
| Devaluation | (a) All payments payable in US Dollars<br>(b) Sublease payments supported by (i) AA Bank L/C and defeased by (ii) Treasury securities, both denominated in US Dollars | Low |
| | | |
| **Financing** | | |
| Debt Availability | Bank debt will close on the same day the Head Lease and Sublease close (together the "Closing Date"). | Low |
| Interest Rate Changes | Interest rates will be fixed on the Closing Date | Low |
| | | |
| **Technology** | | |
| Existing Plant | (1) Newly constructed plant<br>(2) Over 500 units of the Frame E installed.<br>(3) Satisfactory engineering report from Duke Engineering to be received prior to closing. | Low |

| | | |
|---|---|---|
| New Plants | Not applicable | |
| Stranded Assets | Upcoming regulations (Dutch Electricity Act, and EU Directive on open border competition in electricity) could expose EZH to competitive pressures from EDF, VEBA and others selling at below fully loaded costs. Mitigations of this risk are (a) consolidation of the Dutch Genco's in a larger, stronger firm, (b) fully defeased nature of EZH obligations which transfer credit risk from EZH to AA Banks and Treasury securities. | Low |
| | | |
| **Construction Risk** | | |
| EPC Contractor Guarantees | Plant is complete and operating | n/a |
| Use of proven technologies -CT | GE E Frame family (7E and 9E) has an installed fleet of over 500 units worldwide. | Low |
| Use of proven technologies - STG | ABB condensing steam turbine is standard technology. | Low |
| Use of proven technologies - HRSG | Stork Ketels waste heat boiler is standard technology | Low |
| Use of proven technologies - CO2 boiler | Stork Ketels CO2 boiler is an open item. This technology, and the design, construction and operation needs to be reviewed in the due diligence process. | Open |
| Fixed price EPC contract | Plant is complete and operating | n/a |
| Heat Rate | Risk is held by EZH | Low |
| | | |
| **Plant Operations** | | |
| Operations & Maintenance | Risk is held by EZH | Low |
| Force Majeure | Risk is held by EZH | Low |
| | | |
| **Fuel** | | |
| Availability | Risk is held by EZH | Low |

| | | |
|---|---|---|
| Price Fluctuations | Risk is held by EZH | Low |
| | | |
| **EZH Performance** | | |
| Sublease Rent - Project Debt Portion | (a) Secured by the Debt Defeasance Deposit, invested in AA Bank deposit, pledged to lender bank. | Low |
| Sublease Rent - Equity Portion | (a) Secured by the Investor Defeasance Deposit, invested in Treasury securities. | Low |
| Fixed Price Option Payment | (a) Secured by the Investor Defeasance Deposit, Invested in Treasury securities | Low |
| Early Termination Amounts | (a) Secured by the combination of (b) AA Bank L/C and (b) Investor Defeasance Deposit, invested in Treasury securities. | Low |
| | | |
| **Dutch taxes** | | |
| Change in Dutch tax law | Full indemnity from EZH | Low |
| | | |
| **US taxes** | | |
| **Headlease is not a true lease,** and Sublease is a true lease,<br><br>hence CED is deemed the purchaser of the asset, and<br><br>CED is forced to depreciate the plant straight line over 47 yrs | Legal opinion is expected to be a "should" ( 80 - 90%) | Low |
| Headlease is a true lease, and **Sublease is not a true lease,**<br><br>hence equity investment is deemed a loan, and<br><br>CED is not allowed to deduct Headlease rent, and is deemed to receive interest income from Sublessee | Legal opinion is expected to be a "should" ( 80 -90% ) | Low |
| **Headlease is a disqualified leaseback,**<br><br>hence, Constant rental accruals required on headlease, and<br><br>deductions are back loaded | Legal opinion is expected to be a "reasoned should" (80 - 85%) | Low |

| | | |
|---|---|---|
| **Sublease put renewal is disregarded, both leases are considered one lease,**<br><br>hence, Sublease rent levelization required, and<br><br>CED is forced to frontload Sublease rental income. | Legal opinion is expected to be a "should" ( 80 - 90%) | Low |
| **467 Regs are finalized** prior to close and transaction fails to close | EZH pays all third party transaction costs. | Medium |
| **Accounting** | | |
| Headlease will not pass the FASB 13 test for leveraged leases. | (a) Industry practice survey from Cornerstone indicates the following firms consistently close transactions similar to the EZH transaction including (1) PSRC, (2) Duquense (3) Nynex, (4) Ameritech, (5) Banc One, and (6) Bank of New York. | Low |
| **Environmental** | | |
| Existing Plant | (1) Tauw Milieu b.v. Netherlands engineer report.<br>(2) Full Indemnity from EZH | Low |
| New Plant | (1) Tauw Milieu b.v., Netherlands engineer report<br>(2) Full Indemnity from EZH | Low |
| | | |
| **Labor** | | |
| Inadequate Skills | Risk is held by EZH | Low |
| Unrest | Risk is held by EZH | Low |
| | | |
| **Worst Case Scenario** | | |
| Total Project Collapse | Project structure collapses and Trust draws on Bank L/C, Debt Defeasance and Treasury securities for payment of outstanding debt and equity | Low |

# EXHIBIT 6

**DRAFT**

December [__], 1997

VIA MAIL

[Consolidated Edison Leasing, Inc.]
111 Broadway
8th Floor
New York, NY 10006

EZH RoCa 3
Facility Lease

Gentlemen:

We have acted as special counsel to [Consolidated Edison Leasing, Inc., a Delaware] corporation (the "Investor") in connection with the transactions contemplated by the Participation Agreement, dated as of December [__], 1997 (the "Participation Agreement"), among N.V. Electriciteitsbedrijf Zuid-Holland, a public limited liability company incorporated under the laws of The Netherlands (the "Lessor" and "Sublessee"), the Investor, [Investor Guarantor, if any], Wilmington Trust Company, not in its individual capacity, except as otherwise expressly provided in the Participation Agreement, but solely as Trustee under the Trust Agreement, dated as of December [__], 1997 (the "Lessee", "Sublessor" and "Trustee"), and Hollandsche Bank-Unie N.V., a public company with limited liability organized and existing under the laws of The Netherlands (the "Lender"). This opinion is delivered pursuant to Sections 3(b)(viii) and 6(vi) of the Participation Agreement. All capitalized terms used herein and not otherwise defined herein shall have the meanings assigned to them in Appendix A to the Participation Agreement or the Operative Documents.

The Participation Agreement provides, among other things, that on the Closing Date the Trustee, acting on behalf of the Investor, will cause the Trust established pursuant to the Trust Agreement to lease the Facility from the Lessor pursuant to the Lease dated as of the Closing Date, and that on the Closing Date, concurrently with entering into the Lease, the Trustee, acting on behalf of the Investor, will cause the Trust to sublease the Facility to the Sublessee pursuant to the Sublease dated as of the Closing Date. The Participation

CE 006789

Agreement further provides that pursuant to the terms of the Loan and Security Agreement entered into on the Closing Date, the Lender will make the Loan to the Trustee at the times and for the purposes agreed to therein.

The Trust Agreement provides that the Trustee will (i) hold all of its estate, right, title and interest in and to the Facility under the Lease and the Sublease, the Operative Documents and any other property contributed by the Investor for the use and benefit of the Investor, (ii) distribute all payments and amounts received by it (other than amounts necessary to pay certain fees and expenses of the Trustee) to the Investor, (iii) subject to the terms therein, exercise its rights (upon instructions received from the Investor) and perform its duties under said Operative Documents in accordance with the terms thereof and (iv) subject to the terms therein, take such other action in connection with the foregoing as the Investor may from time to time direct.

[Pursuant to the German Lease, the German Lessor has leased the German Equipment to the Lessor for a period of approximately 13.5 years, ending October 24, 2009. Under the German Lease, the Lessor has the option to purchase (the "German Purchase Option") the German Equipment from the German Lessor at the end of the German Lease for a fixed price equal to [__]% of the original cost of the German Equipment. We understand that this price will, based on the Appraisal, be equal to approximately [__]% of the fair market value of the German Equipment at the exercise date. The purchase option price has been economically defeased by the Lessor, and the Lessor will authorize the Trustee to exercise the German Purchase Option on behalf of the Lessor if the Lessor does not so exercise the German Purchase Option. We understand that the German Lessor is treated as the owner of the German Equipment for German income tax purposes.]

We have participated in the preparation, execution and delivery of the Operative Documents and we have reviewed [the German Documents]. In arriving at the opinions expressed below, we have assumed the genuineness of all signatures and the due authorization, execution and delivery by the parties thereto of the Transaction Documents executed on or prior to the date hereof and have examined and relied on such agreements and instruments and on the representations and warranties as to factual matters contained in or made pursuant to the Transaction Documents. We have also assumed that the other opinions of counsel to the various parties to the Operative Documents delivered on the Closing Date are correct.

We have examined a leveraged lease pricing printout [(name of pricing file, time of printout)] from Cornerstone Financial Advisors, dated December [__], 1997 (the "Pricing File"). In view of such examination, we have assumed that the maintenance of minimum investment (at not less than an acceptable level), profit and positive cash flow requirements set forth in section 4(1)(B) and section 4(6) of Revenue Procedure 75-21, 1975-1 C.B. 715, have been satisfied and that the safe harbor as set forth in Section 1.467-3(c)(2)(i) of the Proposed Treasury Regulations, as it applies to Lease Basic Rent

CE 006790

under the Lease, to Sublease Basic Rent during the Sublease Basic Term and to Sublease Renewal Rent during the Sublease Renewal Term, if any, has been satisfied in each case.

We have examined a report, dated December [__], 1997, prepared by the Appraiser as to, among other things, [(i) the fair market value of the Facility on the Closing Date, (ii) the estimated useful life, residual value and commercial utility of the Facility, (iii) the fair market value of the Facility on the Lease Termination Date, (iv) the fair market value of the Sublessor's Lease Interest on the Closing Date, on the Sublease Basic Termination Date and on the Sublease Renewal Termination Date, (v) the fair rental value of the Sublessor's Lease Interest, (vi) the absence of compulsion on the Sublessee to exercise the Sublease Purchase Option on the Sublease Basic Termination Date, (vii) the determination that it is not generally expected that the Sublessor will exercise the Sublease Renewal Option, and (viii) the compulsion of the Lessor to exercise the German Purchase Option with respect to the German Equipment.] We have assumed that the conclusions stated therein are correct and that none of the terms and conditions of, or the operation of any of the provisions in, the Operative Documents would cause such conclusions to change. In addition, we have examined and relied on the originals, or copies certified or otherwise identified to our satisfaction, of such other records, documents, certificates and other instruments as we have deemed appropriate to enable us to give the opinions expressed below.

We have also assumed that (i) the method of accounting used by the Investor with respect to the transactions contemplated by the Operative Documents is not a change in accounting methods for Federal income tax purposes, (ii) none of the parties to the Operative Documents [(except the Investor Guarantor)] is related to the Investor within the meaning of Section 267 of the Internal Revenue Code of 1986, as amended (the "Code"), (iii) none of the terms and conditions of, or the operation of, any of the provisions in the Operative Documents would operate to cause the exercise of any option at the Sublease Basic Termination Date, (iv) the transactions contemplated by the Operative Documents produce a pre-tax profit for the Investor and (v) there are no agreements or arrangements with respect to the transactions contemplated by the Operative Documents that are not set forth in the Operative Documents.

Based upon the foregoing and in reliance thereon and subject thereto, and based upon an analysis of the Code, the Treasury Regulations promulgated thereunder (including proposed, temporary and final regulations), revenue rulings and revenue procedures of the Internal Revenue Service, court decisions and such other laws and facts as we have deemed relevant and necessary, it is our opinion that for Federal income tax purposes:

1. Each of the Lease and the Sublease is a "true lease", the Trust will be treated as the lessee under the Lease and as the sublessor under the Sublease, the Investor will be the owner and sole beneficiary of the Trust and the Investor will be entitled and

required to take into account each item of income, gain, loss, deduction and credit of the Trust with respect to its interest in the Facility, the Lease, the Sublease and the Loan evidenced by the Loan and Security Agreement.

2. The Investor should be entitled to rental deductions under Section 162 of the Code for scheduled installments of Lease Basic Rent payable under the Lease in the amounts and in the periods to which such installments relate, as specified in the Lease, in accordance with Section 467(b)(1) of the Code. Neither the Lease nor the Sublease constitutes a "disqualified leaseback or long-term agreement" within the meaning of Section 467(b)(4) of the Code.

3. The Loan evidenced by the Loan and Security Agreement constitutes a debt obligation of the Trust and all amounts payable thereon as interest with respect thereto will be deductible by the Investor, when accrued in accordance with the terms thereof, pursuant to Section 163 of the Code and the Treasury Regulations promulgated thereunder.

4. The Investor will be entitled to deductions for amortization of Transaction Expenses on a straight-line basis over the Lease Term, the Sublease Basic Term and the term of the Loan evidenced by the Loan and Security Agreement, respectively and the allocation of Transaction Expenses in accordance with the terms of the Pricing File appears to constitute a reasonable allocation thereof.

5. The German Lease constitutes a financing rather than a "true lease", under which the German Lessor is a secured lender and the Lessor is the borrower and owner of the German Equipment.

The opinions set forth above are based on current Federal income tax law and administrative practice as in effect on the date hereof. Any inaccuracy in the applicable facts or the assumptions we have made, or any change after the date hereof in the applicable law, could adversely affect the opinions given herein. We do not undertake to advise you as to any future changes in Federal income tax law or administrative practice that may affect our opinion unless we are specifically retained to do so.

# EXHIBIT 7

**Brian DePlautt**

**From:** Brian DePlautt
**Sent:** Friday, December 12, 1997 9:31 PM
**To:** 'Mary Jane McCartney'
**Cc:** 'Joan Freilich'; 'Paul Kinkel'; 'Robert Steiben'; 'H SCHOENBLUM'; 'Chuck Muoio'; 'Peter Irwin'; 'John Perkins'; 'James Tam'; 'Andy Scher'
**Subject:** EZH LEASE UPDATE

The following is a status update on the EZH lease transaction.

(1) Rumors continue to circulate in the market that final 467 Regulations may be issued sometime next week. The proposed Regulations state that the Regulations would be final on the day following the day in which the Regulations were published in the Federal Register. Hence if the Regulations were published in the Federal Register on Monday December 15, lease agreements entered into on Tuesday December 16 would be subject to the new regulations, but lease agreements entered into on Monday December 15 would not be subject to the Regulations.

(2) The parties working on the EZH transaction, including EZH, Bank One, Con Edison, White & Case, Shearman & Sterling, Capstar and Cornerstone have agreed to attempt to accelerate the original closing schedule, which envisioned a closing on Thursday December 18. The parties are now attempting to be ready to achieve a closing, if necessary, sometime during the evening of Monday December 15. It is not yet certain that this accelerated closing date can be achieved.

(3) Meetings are scheduled for this weekend to attempt to resolve the open transaction issues and to document the resolution of those issues.

(4) Revisions to the current version of the pricing proforma, which now includes the sublease loan structure, will be taking place over the weekend and on Monday December 15. It is possible that changing pricing parameters, including changing market interest rates, may continue to put pressure on the economics of the transaction and could require CEL to increase its lease investment amount in order to maintain its target yield of 12.25%. Any investment increases would have the effect of earning 12.25% (unlevered) on a larger base. Preliminary pricing indications are that potential increases in the lease investment amount could range from $.5mm to $1.5mm. The CED Board approval allows for an additional investment of up to $4.3mm.

(5) Consolidated Edison Leasing, Inc. ("CEL") was established on Thursday December 11, 1997 and a board meeting was held on Friday December 12 in which Chuck Muoio, Brian DePlautt and Mike Madia were named as directors, Andy Scher was named as corporate secretary and corporate resolutions

authorizing the EZH Lease Investment, the establishment of bank accounts and associated actions were passed.

(6) On Friday December 12 CEL signed a Trust Agreement with Wilmington Trust Company for the establishment of ROCA FACILITY TRUST NO. 2. Wilmington Trust Company is attempting to have bank accounts established for the this trust by Monday December 15. The purpose of these bank accounts is to receive the CEL investment transfer scheduled for Monday December 15.

(7) It is anticipated that the lease investment amount will be transferred to the ROCA FACILITY TRUST NO. 2. bank account on Monday December 15. It has been determined that the transaction expenses will be paid directly by CEL to the invoicing parties in the weeks following the closing date

(8) CEL is working with Citibank to establish a bank account by Monday December 15 in order to include this bank account name and number in the closing documents.

(9) CEL has advised Treasury of the Monday December 15 closing target and has requested that they make available for transfer the investment funds on that date. Treasury is standing by to make the transfer, subject to their receipt of a valid GOI and the bank account information (scheduled to be received from Wilmington Trust Company on Monday December 15).

(10) On Monday December 15, a GOI request will be circulated requesting that the required investment amount be transferred to the newly established ROCA TRUST NO. 2 bank account at Wilmington Trust. This GOI will be supported by copies of the CEI, CED and CEL Board of Directors resolutions. On Monday CEL will need to determine who is the appropriate party to sign this GOI.

# EXHIBIT 8

Date: 7/26/99

To: Steve Bram cc: Mike Bray

From: Brian DePlautt

Re: Leasing Overview

## OVERVIEW

CED has, to date, invested $93.3 mm of equity in two cross border lease transactions with two Dutch utilities, EZH[redacted] The EZH transaction, which closed in December of 1997, is the lease and leaseback of a cogeneration facility located near the city of Rotterdam. [redacted]

Both of the transactions were structured as so-called LILO transactions (Lease In / Lease Out) under Section 467 of the IRS code. Recent regulations imposed by the U.S. Treasury have made LILO transactions less attractive financially with the result that CED is now focusing its development efforts on transactions with alternate lease structures such as sale-leasebacks and service contracts.

| SUMMARY FINANCIALS | EZH | [redacted] |
|---|---|---|
| Total leasehold value: | $150 mm | [redacted] |
| CED equity Investment: | $43.4 mm | [redacted] |
| Leasehold facility: | Cogen plant | [redacted] |
| After tax IRR: | 13.6% | [redacted] |
| GAAP Yield: | 12.2% | [redacted] |
| CED earnings for the year 1999: | $5.0 mm | [redacted] |
| CED earnings for the year 2000: | $4.7 mm | [redacted] |
| Total CED earnings for the years 1997-2019: | $38.4 mm | |
| Total CED earnings for the years 1997-2042: | $66.0mm | |
| Total CED earnings for the years 1999-2023: | | [redacted] |
| Total CED earnings for the years 1999-2046: | | [redacted] |

## OTHER

[redacted]

[redacted]

# EXHIBIT 9

## Executive Summary

One element of a diversified investment portfolio for Con Edison is the relatively low risk and attractive return profile of leases. This paper describes sale-leasebacks, identifies major risks and benefits, and details a recommended investment.

Investments of this type would be accounted for as leveraged leases, allowing for front-loaded earnings, and generate after tax yields of between 15% and 25% over their lives, after taking account of typical capital structure and debt costs.

The earnings come from a combination of lease payments and tax deductions. Con Edison, with its high tax rate and large taxable income position, is in a particularly favorable position to take advantage of such a program.

### What is a sale-leaseback?

In its most basic form, a sale-leaseback is the purchase of an asset and the subsequent leaseback of that asset to the seller under a long term lease agreement. Under a so-called "leveraged lease", the investor uses non-recourse debt to reduce the equity needed to purchase the asset.

Since its inception in 1964, the leveraged leasing market has continually developed new variations on this basic theme to accommodate increasingly complex accounting and tax laws and regulations. The latest of these variations are the "lease-leaseback" structures in which an asset is leased (instead of purchased) and the leasehold rights derived from that lease are then leased back to the initial owner of the facility. Lease-leaseback structures have been developed to optimize the benefits that can be derived by the utility and the investor in these transactions.

### What kind of lease structures will be considered?

Under the proposed investment program, investments will be considered in both sale-leasebacks and lease-leasebacks, depending on prevailing market conditions.

Because the specific transaction currently under consideration by CED is a lease-leaseback we will use this type of structure in our example of a typical transaction.

### How would a typical transaction work?

In a typical lease-leaseback transaction, a special purpose subsidiary owned by an investor, in this case CED, would establish a trust. On the closing date, CED would invest equity in the trust and the trust would borrow non-recourse debt for the project. Concurrently the trust would enter into a lease agreement with a utility under which the trust would lease an asset, for example a power plant, from the utility for 44 years. The trust would, at the same time, lease the plant back to the utility for 20 years, after which the trust would have a number of options, described below. The initial 20 year term of the leaseback has been chosen to

optimize the benefits available to both the utility and the investor. A 44 year leaseback would not qualify for the tax treatment that CED and the foreign utility seek.

On the closing date of the lease, the utility would establish, for the benefit of CED, (a) a trust account containing U.S. Treasury securities and (b) an irrevocable bank letter of credit from a bank rated AA or better, both in amounts that, when combined, fully secure the obligations of the utility to CED. In the event the utility were to fail to make the payments due to CED under the lease, CED could take the U.S. Treasury securities and draw on the letter of credit to satisfy any shortfalls.

At the end of the initial 20 year lease, the utility would have the option to purchase the plant at a pre-agreed fixed price. If the utility did purchase the plant at this time, the transaction would be completed. If the utility did not purchase the plant at the end of year 20, the trust would have the option to either (a) lease the plant to a third party for the remaining 24 years of the lease, (b) use the plant itself, or (c ) require the utility to re-lease the plant for an additional 17 years at prices that would assure CED of its expected return.

Responsibility for the condition of the plant would rest with the utility during the initial term of the lease, and with the third party during a subsequent lease. During the remaining seven years under the lease, CED could either use the plant itself or lease the plant to third parties and in doing so obtain additional revenue. The base case economics assume no revenue for this period. At the end of the 44 year lease CED would be required to return the plant to the utility.

**How would CED derive its return under a sale-leaseback?**

Under a typical lease-leaseback structure an investor's earnings are generated by applying a constant rate of return to a declining investment balance according to lease accounting rules established by the Financial Accounting Standards Board. As the investment balance declines so do the earnings and hence the earnings are front-loaded.

The following chart details the earnings profile for the first 10 years of a typical lease-leaseback

| Year (US$) | Investment | Earnings |
|---|---|---|
| 1997 | 43,047,734 | 353,054 |
| 1998 | | 4,154,042 |
| 1999 | | 3,961,165 |
| 2000 | | 3,748,210 |
| 2001 | | 3,512,950 |
| 2002 | | 3,252,891 |
| 2003 | | 2,965,245 |
| 2004 | | 2,646,897 |
| 2005 | | 2,294,361 |
| 2006 | | 1,903,735 |

The following graph details the earnings for a typical lease-leaseback.




The transactions contemplated will be structured in such a way that CED will obtain the same yields and rates of return regardless of whether the utility exercises its purchase option at the end of year 20 or is required to re-lease the plant for an additional 17 years.

**Do we have a specific transaction in mind?**

CED's strategy will be to invest in transactions in conjunction with experienced market participants, to concentrate on assets familiar to Con Edison and to deal with utilities in countries with high credit ratings.

CED is currently pursuing the potential investment of $43 million in a recently commissioned gas-fired combined cycle power plant, the RoCa3 plant, located near the city of Rotterdam in the Netherlands. The plant, owned by EZH, one of the four regulated generation utilities in the Netherlands, is currently undergoing engineering, environmental, and valuation reviews by our consultants, and has recently been inspected by internal personnel.

We are pursuing this investment opportunity in conjunction with an experienced and knowledgeable lease investor, Bank One Leasing Inc. Bank One and CED have retained Shearman & Sterling for tax and legal advice, and, among others, Duke Engineering for engineering reviews, Tauw Milieu, a well-respected Dutch environmental firm, for an environmental assessment and Deloitte & Touche for valuation assessments of the plant.

The transaction is anticipated to generate over $4 million in earnings during 1998 and is expected to generate an after tax yield of 19.7%, assuming that CED's investment is 50% equity/50% debt.

**What are major benefits from these transactions to the investor?**

(1) Highly Predictable Earnings

The earnings from these transactions are highly predictable because each of the cash inflows and outflows to the transaction is contractually agreed to on the closing date and because the utility's lease obligations are fully secured by the U.S. Treasuries and the bank letter of credit.

(2) Front Loaded Earnings

Because the transactions will be afforded leveraged lease accounting treatment under Financial Accounting Standards Board rules, the earnings profile for these transactions is "front-loaded" and hence provides more earnings in the early years of the transaction than in the latter years of the transaction.

(3) Good to Excellent Investment Yields

After tax yields on leasing projects are anticipated to range from a good 15% to an excellent 25% depending on the type of lease structure utilized and the leverage applied. For example, under the initial lease investment contemplated the return of 19.7% assumes a relatively conservative leverage rate of 50%. Measurement of after tax yields, assuming a theoretical case in which the corporation has no debt (the so called "all equity return") range from 9.0% to 12.3%.

(4) Economic Value

Because of the utility payment protection structures and the low probability of losses derived from adverse tax actions, the risk adjusted rates of return exceed the required rates of return for these investments.

(5) Strategic Value of Leasing

Participation in these transactions affords CED the opportunity to more fully understand the legal, regulatory, commercial and tax environment of the countries in which the leased assets are located. This in-depth understanding can provide the basis for better informed decisions regarding potential investment and partnering opportunities as the utility infrastructures in these highly developed countries are opened to investments from external sources.

**What are major benefits from these transactions to the utility?**

In entering into these transactions, the utility is able, at little or no perceived risk to itself, to obtain (a) up to 100% long term financing for a plant, (b) interest rates that may be lower than those available from domestic credit sources and (c ) front-end loaded funding benefits, while maintaining operating control of the plant. In the case of the investment contemplated by CED, the benefit to the utility is about 6.9% of the asset value, or $10.3 million.

**What are the major risks from these transactions to the investor?**

(1) Utility Credit Risks

Perhaps the greatest risk to the trust is the risk that the utility will default on its obligation to pay rent during the lease term. In order to minimize this risk the trust will require that the utility's lease obligations be fully secured by a combination of U.S. Treasury securities and letters of credit issued by banks with S&P ratings of AA or above. In the event the utility fails to make the lease rent payments due, the investor can use the Treasuries and the proceeds from the letter of credit to return its capital and to provide it with its expected yield.

(2) Foreign Country Tax Risks

Another major risk implicit in the transaction is the risk that the tax laws or regulations of the country in which the asset is located change in a way that would result in lower returns to the trust, and hence the investor. Investments under the proposed program would be structured so that the risks associated with foreign country tax law changes would be fully borne by the utility.

(3) Pending U.S. Tax Regulations

Pending tax regulations, if enacted, could significantly reduce the tax benefit to be derived by investors in lease-leaseback transactions such as the investment under consideration by CED, as described above.

[redacted]

If the pending regulations are published prior to the closing date, CED will defer the contemplated investment pending a restructuring of the transaction.

(4) U.S. Tax Audits

It is anticipated that the transactions will be structured in ways that will make any challenges to the structure by the IRS under current regulations difficult to support or litigate. [redacted]. Our tax counsel, is very experienced in negotiating and advising on leveraged lease transactions.

In the worst case tax scenario, a claim would be litigated and won in tax court by the IRS. In this case, financial analysis indicates a 100% return of CED's capital and a return on capital of 2.4% over the lease term.

(5) Country Risks

The proposed investment program will target investments in developed and highly rated countries. The initial proposed investment under the program will be in the AAA-rated Netherlands. Potential downstream opportunities include transactions in the Netherlands, Switzerland, Australia, Germany and the United States. The contemplated transactions will be fully denominated in U.S. dollars and will have no foreign exchange risks.

(6) Limited Liquidity

Investments in the assets contemplated under the proposed investment program are designed to generate earnings and cash flow over extended periods of time. While these investments do not carry the liquidity of publicly-traded securities, they can be sold if necessary, although most likely at a discount to then-current book value. The economics of these investment structures typically drive most investors to continue to maintain the investments on their books through their scheduled terms. The proposed investment program contemplates holding these investments accordingly.

**Is anyone else doing these transactions?**

Leasing investment programs form an integral part of the earnings and investment profiles of a wide range of companies, including electric and gas utilities and holding companies such as Public Service Enterprise Group, Duquesne Light, Edison International, Southern Company, Cilcorp, and Southern Indiana Gas; telephone companies such as ATT, Nynex/Bell Atlantic, Ameritech, and US West; banks such as, Bank of New York, First Chicago, Nationsbank, Bank One, and First Chicago; various insurance companies, as well as industrial corporations such as Philip Morris, Pitney Bowes, Chrysler Corporation, Dana Corporation and General Electric.

**What are we requesting approval to do?**

Approval is requested to initiate a leasing investment program and to make such investments as are deemed reasonable by the Board of Directors of CED, within the capital allocations made to CED from time to time by the Board of Directors of the holding company.

One of the requirements the market imposes is that investors have a substantial net worth, in the order of $100 million. To provide for the necessary net worth requirement as well as to provide for funds to make the equity investments, management also requests that it be given the authority to make additional investments in CED sufficient to satisfy the net worth requirements.

# EXHIBIT 10

**H**
Briefs and Other Related Documents
U.S. v. NordbergD.Mass.,1996.
United States District Court, D. Massachusetts.
UNITED STATES of America, Plaintiff,
v.
Paul C. NORDBERG and Debra L. Nordberg, Defendants.
**No. CIV. A. 93-12681-NMG.**

April 08, 1996.

MEMORANDUM AND ORDER
GORTON, District Judge.
*1 There are five motions currently pending before this Court in the above-entitled civil action: 1) defendants' motion for judgment on the pleadings [Docket # 11], 2) plaintiff's motion for partial summary judgment on defendants' counterclaim [# 12], 3) defendants' motion to compel [# 17], 4) plaintiff's motion for a **protective** order [# 18], and 5) plaintiff's motion for partial summary judgment [# 20]. For the reasons that follow, the defendants' motion to compel will be denied and plaintiff's motion for summary judgment will be allowed; the remaining motions will, therefore, be denied as moot.

I. *Introduction*

*1 On December 9, 1993, the United States government filed this civil action, pursuant to 26 U.S.C. § 7405, to collect what it asserts was an erroneous refund paid to defendants. Section 7405 provides that "[a]ny portion of a tax imposed by this title, refund of which is erroneously made, ... may be recovered by civil action brought in the name of the United States." The dispute arises out of defendants' 1987 tax return, which was the subject of a lengthy IRS audit that lasted until May, 1990. The issue in the case is whether the defendants' treatment of their 1987 securities trading losses on their 1987 tax return was erroneous as a matter of law.

*1 Although an initial "Audit Report" issued by the IRS to the Nordbergs in May, 1990, indicated no deficiency, the agency later alleged a deficiency of $30,665, plus interest. By December 10, 1991, defendants paid, under protest, the entire amount of the alleged deficiency.

*1 In late December, 1991, the IRS issued a check payable to defendants for $45,188.25 as a refund for overpayment of their 1987 taxes. In May, 1992, however, the IRS informed defendants that the refund was erroneous and requested repayment. Defendants, claiming that the refund was owed to them, refused to return the money. Subsequently, the IRS refused to refund the defendants' claimed overpayments on their 1991 and 1992 tax returns but instead applied those amounts ($2,430 and $5,317, respectively) to the claimed outstanding liability.[FN1]

*1 On December 9, 1993, the United States filed the instant suit to recover the amount of the erroneous refund plus statutory interest. The defendants filed an answer and counterclaim on December 29, 1993, seeking return of the money held by the IRS as credits toward repayment of the alleged deficiency.

II. *Defendants' Motion to Compel [Docket # 17]:*

*1 Defendants' motion to compel asserts that the government has repeatedly objected to and declined to answer requests for admissions and interrogatories concerning various aspects of the IRS' audit of their 1987 tax return. The importance of the audit, at least to the defendants, is further evidenced by their expressed desire to depose IRS employees involved during the process, which has led the government to file a motion for a **protective** order. The government responds that, in light of the sole issue at stake in the underlying action, the defendants' requests for admissions and production of documents fail to satisfy the requirements of Fed.R.Civ.P. 26(b). This Court agrees.

*2 Resolution of the case at bar turns solely on the specific issue of whether the Nordbergs' treatment of their 1987 trading losses was erroneous as a matter of law. Their discovery requests seek to obtain information about the reasoning and processes by which **IRS** employees involved with the audit of the taxpayers'

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

return decided to assess the tax liabilities with respect to their trading transactions. The discovery does **not** relate to the facts existing during 1987, upon which the **IRS** determinations were based. In light of the principle that a challenge to a tax determination results in a trial ***de novo*** rather than a review by this Court of an existing administrative record, the **defendants'** discovery requests fail to satisfy the mandate of Fed.R.Civ.P. 26(b) that information sought to be discovered be relevant or "reasonably calculated to lead to the discovery of admissible evidence." *See, e.g., Lewis v. Reynolds,* 284 U.S. 281, 283 (1932); *Ruth v. United States,* 823 F.2d 1091, 1094 (7th Cir.1987) ("courts conduct a ***de novo*** review of the ... assessment"); *Greenberg's Express, Inc. v. Commissioner,* 62 T.C. 324, 328 (1974) (a court's determination as to a taxpayer's liability "must be based on the merits of the case and **not** any previous record developed at the administrative level").

*2 The information sought by defendants which forms the basis for the motion to compel is, therefore, evidence which would not be relevant to determining their 1987 tax liability. Information about people who participated in the audit is not relevant, nor are notes made by IRS employees during the audit. Indeed, the audit of the Nordbergs' 1987 tax return took place well after the tax year at issue. In short, the information requested by defendants has no bearing on the sole issue in the case at bar because the Nordbergs' ultimate tax liability is not influenced by the IRS' conduct or findings during the audit. In rejecting a similar argument, one District Court denied a motion to compel upon observing that:

*2 the opinions, impressions, conclusions and reasoning of IRS agents are irrelevant to the validity of the assessment against [the taxpayer].... Resolution of the[ ] issues depends solely on application of the pertinent law to the facts of [the] case.... [T]he opinions of individual IRS agents regarding their propriety are immaterial.

*2 *Garity v. United States,* 81-2 U.S.T.C. (CCH) P 9599, 1980 WL 1765, at *2 (E.D.Mich. May 20, 1980). Similarly, the Southern District of New York has recognized that:*2 [t]he subjective analysis of the agent and technical advisor based upon the information derived from [taxpayer's] records and their respective opinions as to the proper method to be applied in determining whether taxes are due form no part of the [taxpayer's] case. While no doubt disclosure of such information would be of interest to [taxpayer], it is not essential nor required for proper preparation.

*2 *Detroit Screwmatic Co. v. United States,* 49 F.R.D. 77, 79 (S.D.N.Y.1970).

*3 Furthermore, if the Nordbergs' treatment of the trading losses on their 1987 tax return was erroneous as a matter of law, they are liable regardless of what an IRS agent, at any time, might have thought. *See United States v. Tuthill,* 55 F.2d 415, 416 (7th Cir.1931); *United States v. Ellis,* 154 F.Supp. 32, 38 (S.D.N.Y.1957), *aff'd,* 264 F.2d 325 (2d Cir.1959); *see also Flamingo Fishing Corp. v. United States,* 31 Fed.Cl. 655, 658 (1994) (where the Court of Claims allowed the government's motion for **protective** order precluding taxpayer from deposing IRS agents because agents' opinions and conclusions regarding the applicable Code provisions were irrelevant to the determination of the case). Accordingly, defendants' motion to compel will be DENIED.

III. *Plaintiff's Motion for Partial Summary Judgment [Docket # 20]:*

*3 The government has also filed a motion for "partial summary judgment on the issue of the nature of the defendants' losses from trading in 1987." In the memorandum in support of its motion, the government enumerates the "questions presented" to the Court as: 1) whether Paul Nordberg was a trader or a dealer with respect to the options he traded in 1987, and, accordingly, 2) whether the losses from the trading activity are properly capital or ordinary. The Nordbergs vigorously contest the government's assertion that there is no genuine issue of any material fact with respect to the nature of the losses, and, therefore, it is important for this Court to identify precisely the material facts upon which plaintiff bases its motion.

A. *The Summary Judgment Standard*

*3 Summary judgment shall be rendered where the pleadings, discovery on file and affidavits, if any,

show "there is no genuine issue of material fact and ... the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The Court must view the entire reeord in the light most favorable to the plaintiffs and indulge all reasonable inferenees in their favor. *O'Connor v. Steeves*, 994 F.2d 905, 907 (1st Cir.1993).

*3 With respect to a motion for summary judgment, the burden is on the moving party to show that "there is an absence of evidenee to support the non-moving party's case." *FDIC v. Municipality of Ponce*, 904 F.2d 740, 742 (1st Cir.1990) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). If the movant satisfies that burden, it shifts to the non-moving party to establish the existence of a genuine material issue. *Id.* In deciding whether a factual dispute is genuine, this Court must determinc whether "the evidence is such that a reasonable jury could return a verdiet for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The nonmovant's assertion of mere allegation or denial of the pleadings is insufficient on its own to establish a genuine issue of material fact. Fed.R.Civ.P. 56(e).

B. *Material Facts*

*3 On their joint income tax return for 1987, the Nordbergs reported, on Schedulc C (entitled "Profit or (Loss) From Business or Profession"), losses of $86,821.86. Aeeording to a letter written by Paul Nordberg to the Internal Revenue Service, those losses resultcd from his trading of securities called "OEX options," which arc "puts" and "calls" indcxed to a basket of stocks in the Standard & Poors 100. In response to the United States' Requests for Admissions, Paul Nordberg admittcd that his trading of securities in 1987 was donc "exclusively for an account" in the Nordbcrgs' name at Shearson, Lehman Brothers. Governmcnt Exhibit 9 at p. 4.

*4 Moreover, Mr. Nordbcrg admitted that hc was aware of no faets or evidence that in 1987 he ever traded securities cxcept through a "sccurities exchange," assuming that that term encompasses the Chicago Board of Exchangc. *Id.* at pp. 5-6. By reporting the losses on a Schcdule C form, the Nordbergs claimed the cntire trading loss as an ordinary business loss. An audit by the IRS followed, with whieh the defendants eooperated fully.

*4 At the eonelusion of the exhaustive audit, the only unresolved substantive issue was whether Paul Nordberg's trading losses for the 1987 tax year were capital or ordinary. Indeed, in a letter to the IRS dated May 8, 1989, Mr. Nordberg wrote that:

*4 [T]he only material, unresolved matter is the proper treatment ... of Nordberg's trading of seeurities.... The issue to be determined is whether Nordberg is limited to a maximum "Capital Loss" deduction of $3,000 (for 1987) or is entitled to treat the entire net trading loss in 1987 as the loss ineurred in a "business" or "trade", and therefor [sie] deductible in its entirety in 1987.

*4 Government Exhibit 2, p. 2.

*4 According to an "Income Tax Examination Changes" form dated July 11, 1990, thc IRS changed the characterization of the Nordbergs' 1987 loss to a capital loss. Government Exhibit 3. Consequently, the IRS proposed a deficiency of $30,665, plus interest, for a total of $44,015.70. In November and December of 1991, the dcfendants made payments by check in the amount equal to the total amount of the assessment, plus interest.

*4 By what the IRS admits was mistake, it issued a refund check to the Nordbergs on December 20, 1991, for $45,188.25, representing thc payments made by dcfendants plus $388.25 in interest. Government Exhibits 4, 6. In carly 1992, thc IRS sent the defendants a notice that 1) informed them that the refund cheek had bcen issued erroneously, and 2) requested repayment. Government Exhibit 7. By letter dated February 14, 1992 to the IRS Center Director, the Nordbergs informed the Serviee that they would not return the moncy. The government then commcnecd the pending lawsuit.

C. *Legal Analysis*

*4 Sections 165(a) and (c) of the Internal Revenue Code permit individuals to deduct losses incurred in a trade or businčss or in a transaction entered into for profit. 26 U.S.C. § 165(a), (c). Section 165(f) provides, however, that capital losses are deductible

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

only to the extent allowed by sections 1211 and 1212. Under section 1211, an individual's capital losses are deductible only to the extent of capital gains, plus $3,000 of ordinary income.

***4** Section 1221 of the Code broadly defines the term "capital asset" as "property held by the taxpayer (whether or not connected with his trade or business)," and then narrows that definition by enumerating various exceptions. The relevant provision in the case at bar is section 1221(1), which excludes from the definition of capital assets:

***4** stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business[.]

***5** 26 U.S.C. § 1221(1).

***5** In the case at bar, the government maintains that 1) Paul Nordberg was a trader in securities (as opposed to a dealer) who engaged in securities transactions entirely on his own account and lacked "customers," and 2) he cannot, therefore, invoke the exception to the definition of capital asset provided by § 1221(1). The government asserts that the Nordbergs' 1987 losses were therefore capital in nature and, accordingly, they must repay to the United States "the portion of the refund attributable to the disallowance of the Nordbergs' ordinary loss claim." Government Memorandum at 14.

***5** To determine whether securities constitute "property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business," see § 1221(1), courts have identified three classifications of purchasers of securities: dealers, traders and investors. *E.g., United States v. Wood,* 943 F.2d 1048, 1051 (9th Cir.1991); *King v. Commissioner,* 89 T.C. 445, 457-58 (1987). Of those three classifications, only the first two are relevant to the case at bar. "The tax liability of a seller of securities depends upon which classification best identifies the seller; dealers may qualify for [the § 1221(1) exception], while traders and investors do not." *Wood,* 943 F.2d at 1051.

***5** The critical issue in distinguishing between dealers and traders is whether the taxpayer has "customers." *Wood,* 943 F.2d at 1050-53. The United States Tax Court explained that a "dealer" is a person who purchases securities or commodities with the expectation of realizing a profit,

***5** not because of a rise in value during the interval of time between purchase and resale, but merely because they have or hope to find a market of buyers who will purchase from them at a price in excess of their cost. This excess or mark-up represents remuneration for their labors as a middle man bringing together buyer and seller, and performing the usual services of retailer or wholesaler of goods.

***5** *Kemon v. Commissioner,* 16 T.C. 1026, 1032-33 (1951). The *Kemon* Court thus employed a "merchant" analogy to determine whether a seller of securities is a dealer who sells to "customers" for purposes of section 1221. *See id.; see also Wood,* 943 F.2d at 1051; *United States v. Diamond,* 788 F.2d 1025, 1029 (4th Cir.1986).

***5** "Traders," on the other hand, are sellers of securities or commodities who "depend upon such circumstances as a rise in value or an advantageous purchase to enable them to sell at a price in excess of cost." *Kemon,* 16 T.C. at 1033. In contrast to dealers, traders "perform[ ] no merchandising functions nor any other service which warrants compensation by a price mark-up of the securities he or she sells." *Id.* at 1032-33; *Diamond,* 788 F.2d at 1029. A trader will be deemed to be engaged in a "trade or business" if his or her trading is frequent and substantial. *King,* 89 T.C. at 458. As the *Wood* Court observed, however, although "[g]enerally both dealers and traders will be engaged in a trade or business[,] only a dealer ... has customers." 943 F.2d at 1052. In short, unlike a trader, a dealer in securities or commodity futures can take advantage of the section 1221(1) exception to capital asset tax treatment because the latter deals in property held "primarily for sale to customers in the ordinary course" of business. *Id.; see also* 26 U.S.C. § 1221(1).

***6** The foregoing cases illustrate that, even when a taxpayer is engaged in the trade or business of selling securities, the gains or losses derived from that activ-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

ity are nonetheless capital in nature if the taxpayer has no customers. *See* Diamond, 788 F.2d at 1028; King, 89 T.C. at 458. In *Diamond,* for example, the Court of Appeals observed that the taxpayer's emphasis upon the significant financial and hourly commitment to securities trading "misses the crucial point that, whether or not his 1980 transactions amounted to a trade or business, he was not selling 'to customers' for purposes of § 1221(1)." FN2 788 F.2d at 1028. In the case at bar, then, even assuming that Paul Nordberg was engaged in the "trade or business" of trading securities, this Court's focus properly turns to the issue of whether or not he had "customers" within the meaning of § 1221(1).

***6** Numerous cases demonstrate that a taxpayer who trades solely on his own account through a broker has no customers with respect to the securities so traded. *Diamond,* 788 F.2d at 1028 ("courts have clearly and consistently held that a taxpayer who trades securities for his own account does not sell 'to customers' within the meaning of § 1221(1)"); *Van Suetendael v. Commissioner,* 152 F.2d 654 (2d Cir.1945) (per curiam). In the instant case, the Nordbergs admit both that their trading of securities in 1987 was exclusively for an account in their name at Shearson, Lehman Brothers and that they are aware of no facts or evidence that in 1987 they ever traded securities other than through a securities exchange. Government Exhibit 9 at p. 4.

***6** Defendants attempt to avert summary judgment merely by reciting that "a significant factual issue in dispute in this case is whether [defendants] had 'customers,' " and citing a dictionary definition of the term "customer" (i.e., "one that purchases a commodity or service"). Opposition at 9. Defendants further reason that:

***6** by that straightforward meaning of the term, there could not have been sales (which there undisputedly were) in the absence of the "seller" (Paul Nordberg) having "customers." A "customer" is always needed for a sale to occur.

***6** *Id.*

***6** Several courts have, however, considered and rejected the argument that securities sold by taxpayers through a broker *eventually* reach customers. *See, e.g.,* *George E. Warren Co. v. United States,* 53 F.Supp. 578, 581 (D.Mass.1944) ("[w]hile it may be contended that each time [the taxpayer corporation which was not a dealer in securities] sold the securities it dealt with a customer, such is not true within a fair reading of the taxing statute"); *Mirro-Dynamics,* 374 F.2d at 16 (rejecting taxpayer's argument that securities it sold eventually reached customers); *Seeley v. Helvering,* 77 F.2d 323, 324 (2d Cir.1935) ("So far as [the taxpayer] traded in securities on his own account, his sales were on the exchange to persons whom he did not even know; these were not his customers....").

***7** In *Swartz v. Commissioner,* for example, the Tax Court dismissed the taxpayer's argument that his commodity contract trades, all of which were made through Merrill Lynch or Prudential-Bache, were made to "customers." Rather, the Court observed that those brokerage houses "were not [taxpayer's] customers, but ... [he] was one of their customers," and the court declined to regard as taxpayer's customers "the nameless members of the commodity markets who ultimately purchased the commodity contracts [taxpayer] sold and sold the commodity contracts [he] purchased." T.C.Memo. 1987-582, *aff'd,* 876 F.2d 657 (8th Cir.1989), *cert. denied,* 494 U.S. 1006 (1990).

***7** In short, if a taxpayer transacting in securities has no customers, then that taxpayer cannot, within the meaning of the second clause of § 1221(1), hold securities "primarily for sale to customers in the ordinary course of his trade or business." As the Fourth Circuit Court of Appeals noted in *Diamond,*

***7** [t]he government's position ... merely reflects the well-settled rule that a trader buying and selling securities exclusively for his own account does not sell 'to customers,' whatever the character of his transactions.

***7** 788 F.2d at 1030.

***7** A taxpayer without customers likewise cannot satisfy the first clause of § 1221(1), to wit, hold the securities as "stock in trade ... which would properly be included in the inventory of the taxpayer if on hand at

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

the elose of the taxable year." The general rules governing inventories are enumerated in section 471 of the Intcrnal Revenue Code. *See* 26 U.S.C. § 471. Tellingly, regulation 1.471-5, promulgated under that Code seetion, applies to taxpayers who are "dealers" in securities, and states that:

*7 For the purposes of this section, a dcaler in securities is a mcrchant of securities ..., with an establishcd place of business, regularly engaged in the purchase of seeurities and their resale to customcrs; that is, one who as a merehant buys securities and sells them to customers with a view to the gains and profits that may be derived therefrom.... Taxpayers who buy and sell or hold seeurities for investment or speculation, irrespective of whether such buying or selling constitutes the earrying on of a tradc or businCss, ... are *not* dealers in securities within the meaning of this section.

*7 Treas.Reg. 1.471-5 (emphasis added); *see also Mirro-Dynamics,* 374 F.2d at 16; *Swartz v. Commissioner,* 876 F.2d 657, 659 (8th Cir.1989) (rejecting taxpayer's argument that his commodity futures eontracts were property he included in inventory at the end of each tax year, explaining that "[e]ommodity futures contracts are capital assets in the hands of a trader"), *cert. denied,* 494 U.S. 1006 (1990).

*7 This Court concludes, therefore, that the seeurities that Mr. Nordberg purchased and sold for his own account at Shearson, Lehman Brothers were capital assets in his hands, and the losses from such trading were eapital in nature.

ORDER

*8 For the foregoing reasons:

*8 1) The defendants' motion to compel [Doeket # 17] is DENIED;

*8 2) The plaintiff's motion for summary judgment [Doeket # 20] is ALLOWED; and

*8 3) The defendants' motion for judgment on the pleadings [Doeket # 11], the plaintiff's motion for partial summary judgment on defendants' eounterclaim [Doeket # 12] and the plaintiff's motion for a **protective** order [Doeket # 18] are DENIED AS MOOT.

*8 So ordered.

FN1. The IRS withheld the later refunds pursuant to 26 U.S.C. § 6402(a), whieh provides that "[i]n the case of any overpaymcnt, the Secretary, within the applieablc period of limitations, may credit the amount of such overpayment, ineluding any interest allowed thercon, against any liability in rcspect of an internal revenue tax on the part of the person who made the overpayment...."

FN2. It is worth noting that the phrase "to eustomers" was added to the predeeessor of § 1221(1) to exclude from the definition of capital assets only those securities bought and sold by dealers, and not those traded by investors on their own account. *See Mirro-Dynamics Corp. v. United States,* 374 F.2d 14, 16 (9th Cir.1967) (eiting legislative history); *see also MacAdam v. Commissioner,* 62 T.C.Mcmo. 1991-410, 1991 WL 157917 (1991).

D.Mass.,1996.
U.S. v. Nordberg
Not Reported in F.Supp., 1996 WL 170119 (D.Mass.), 77 A.F.T.R.2d 96-2158, 96-1 USTC P 50,295

Briefs and Other Related Doeuments (Back to top)

• 4:93CV12681 (Doeket) (Dec. 09, 1993)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.