# EXHIBIT A

Rev. Rul. 99-14, 1999-13 I.R.B. 3, 1999-1 C.B. 835, 1999 WL 127035 (IRS RRU)

Internal Revenue Service (I.R.S.)
Revenue Ruling

BUSINESS EXPENSES; INTEREST; LEASE-IN/LEASE-OUT TRANSACTIONS
Released: March 11, 1999

**Section 162.--Trade or Business Expenses**, 26 CFR 1.162-11: *Rentals.*

**Section 163.--Interest**, 26 CFR 1.163-1: *Interest deduction in general.*

**Section 6601.--Interest on Underpayment, Nonpayment, or Extensions of Time for Payment, of Tax**, 26 CFR 301.6601-1: *Interest on underpayments.*

**Section 6611.--Interest on Overpayments**, 26 CFR 301.6611-1: *Interest on overpayments.*

**Section 6621.--Determination of Rate of Interest**, 26 CFR 301.6621-1: *Interest rate.*

**Business expenses; interest; lease-in/lease-out transactions.** A taxpayer may not deduct, under sections 162 and 163 of the Code, rent and interest paid or incurred in connection with a lease-in/lease-out (LILO) transaction that lacks economic substance.

May a taxpayer deduct interest paid or incurred in connection with a lease-in/lease-out (LILO) transaction that lacks economic substance?

How is the net interest rate of zero in section 6621(d) of the Code to be applied to interest accruing before October 1, 1998, with respect to overlapping tax underpayments and tax overpayments?

How is the net interest rate of zero in section 6621(d) of the Code to be applied to interest accruing before October 1, 1998, with respect to overlapping tax underpayments and tax overpayments?

How is the net interest rate of zero in section 6621(d) of the Code to be applied to interest accruing before October 1, 1998, with respect to overlapping tax underpayments and tax overpayments?

**Business expenses; interest; lease-in/lease-out transactions.** A taxpayer may not deduct, under sections 162 and 163 of the Code, rent and interest paid or incurred in connection with a lease-in/lease-out (LILO) transaction that lacks economic substance.

ISSUE

May a taxpayer deduct, under § § 162 and 163 of the Internal Revenue Code, rent and interest paid or incurred in connection with a "lease-in/lease-out" ("LILO") transaction?

FACTS

*X* is a U.S. corporation. *FM* is a foreign municipality that has historically owned and used certain property having a remaining useful life of 50 years and a fair market value of $100 million. *BK1* and *BK2* are banks. None of the parties is related.

On January 1, 1997, *X* and *FM* entered into a LILO transaction under which *FM* leased the property to *X* under a "Headlease," and *X* immediately leased the property back to *FM* under a "Sublease." The term of the Headlease is 34 years. The "primary" term of the Sublease is 20 years. Moreover, as described below, the Sublease may also have a "put renewal" term of 10 years.

The Headlease requires *X* to make two rental payments to *FM* during its 34-year term: (1) an $89 million "prepayment" at the beginning of year 1; and (2) a "post-payment" at the end of year 34 that has a discounted present value of $8 million. For federal income tax purposes, *X* and *FM* allocate the prepayment ratably to the first 6 years of the Headlease and the future value of the postpayment

ratably to the remaining 28 years of the Headlease.

The Sublease requires *FM* to make fixed, annual rental payments over both the primary term and, if exercised, the put renewal term. The fixed, annual payments during the put renewal term are substantially higher than those for the primary term. Nevertheless, the fixed, annual payments during the put renewal term are projected (as of January 1, 1997) to equal only 90 percent of the fair market value rental amounts for that term.

At the end of the Sublease primary term, *FM* has a "fixed- payment option" to purchase from *X* the Headlease residual (the right to use the property beyond the Sublease primary term subject to the obligation to make the rent postpayment) for a fixed amount that is projected (as of January 1, 1997) to be equal to the fair market value of the Headlease residual. If *FM* exercises the option, the transaction is terminated at that point and *X* is not required to make any portion of the post-payment due under the Headlease. If *FM* does not exercise the option, *X* may elect to (1) use the property itself for the remaining term of the Headlease, (2) lease the property to another person for the remaining term of the Headlease, or (3) compel *FM* to lease the property for the 10-year put renewal term of the Sublease. If *FM* does not exercise the fixed-payment option and *X* exercises its put renewal option, *X* can require *FM* to purchase a letter of credit guaranteeing the put renewal rents. If *FM* does not obtain the letter of credit, *FM* must exercise the fixed-payment option.

To partially fund the $89 million Headlease prepayment, *X* borrows $54 million from *BK1* and $6 million from *BK2*. Both loans are nonrecourse, have fixed interest rates, and provide for annual debt service payments that fully amortize the loans over the 20-year primary term of the Sublease. The amount and timing of the debt service payments mirror the amount and timing of the Sublease payments due during the primary term of the Sublease.

Upon receiving the $89 million Headlease prepayment, *FM* deposits $54 million into a deposit account with an affiliate of *BK1* and $6 million into a deposit account with an affiliate of *BK2*. The deposits with the affiliates of *BK1* and *BK2* earn interest at the same rates as the loans from *BK1* and *BK2*. FM directs the affiliate of *BK1* to pay *BK1* annual amounts equal to 90 percent of *FM*'s annual rent obligation under the Sublease (that is, amounts sufficient to satisfy *X*'s debt service obligation to *BK1*). The parties treat these amounts as having been paid from the affiliate to *FM*, then from *FM* to *X* as rental payments, and finally from *X* to *BK1* as debt service payments. In addition, *FM* pledges the deposit account to *X* as security for *FM*'s obligations under the Sublease, while *X*, in turn, pledges its interest in *FM*'s pledge to *BK1* as security for *X*'s obligations under the loan from *BK1*. Similarly, *FM* directs the affiliate of *BK2* to pay *BK2* annual amounts equal to 10 percent of *FM*'s annual rent obligation under the Sublease (that is, amounts sufficient to satisfy *X*'s debt service obligation to *BK2*). The parties treat these amounts as having been paid from the affiliate to *FM*, then from *FM* to *X* as rental payments, and finally from *X* to *BK2* as debt service payments. Although this deposit account is not pledged, the parties understand that *FM* will use the account to pay the remaining 10 percent of *FM*'s annual rent obligation under the Sublease.

*X* requires *FM* to invest $15 million of the Headlease prepayment in highly-rated debt securities that will mature in an amount sufficient to fund the fixed amount due under the fixed-payment option, and to pledge these debt securities to *X*. Having economically defeased both its rental obligations under the Sublease and its fixed payment under the fixed-payment option, *FM* keeps the remaining portion of the Headlease prepayment as its return on the transaction.

For tax purposes, *X* claims deductions for interest on the loans and for the allocated rents on the Headlease. *X* includes in gross income the rents received on the Sublease and, if and when exercised, the payment received on the fixed payment option. By accounting for each element of the transaction separately, *X* purports to generate a stream of substantial net deductions in the early years of the transaction followed by net income inclusions on or after the conclusion of the Sublease primary term. As a result, *X* anticipates a substantial net after-tax return from the transaction. *X* also anticipates a positive pre-tax economic return from the transaction. However, this pre-tax return is insignificant in relation to the net after-tax return.

## LAW AND ANALYSIS

In general, a transaction will be respected for tax purposes if it has "economic substance which is compelled or encouraged by business or regulatory realities, is imbued with tax-independent considerations, and is not shaped solely by tax-avoidance features that have meaningless labels

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

attached." *Frank Lyon Co. v. United States*, 435 U.S. 561, 583-84 (1978); *James v. Commissioner*, 899 F.2d 905, 908-09 (10th Cir. 1990). In assessing the economic substance of a transaction, a key factor is whether the transaction has any practical economic effect other than the creation of tax losses. Courts have refused to recognize the tax consequences of a transaction that does not appreciably affect the taxpayer's beneficial interest except to reduce tax. The presence of an insignificant pre-tax profit is not enough to provide a transaction with sufficient economic substance to be respected for tax purposes. *Knetsch v. United States*, 364 U.S. 361, 366 (1960); ACM *Partnership v. Commissioner*, 157 F.3d 231, 248 (3d Cir. 1998); *Sheldon v. Commissioner*, 94 T.C. 738, 768 (1990).

In determining whether a transaction has sufficient economic substance to be respected for tax purposes, courts have recognized that offsetting legal obligations, or circular cash flows, may effectively eliminate any real economic significance of the transaction. For example, in *Knetsch*, the taxpayer purchased an annuity bond using nonrecourse financing. However, the taxpayer repeatedly borrowed against increases in the cash value of the bond. Thus, the bond and the taxpayer's borrowings constituted offsetting obligations. As a result, the taxpayer could never derive any significant benefit from the bond. The Supreme Court found the transaction to be a sham, as it produced no significant economic effect and had been structured only to provide the taxpayer with interest deductions.

In *Sheldon*, the Tax Court denied the taxpayer the purported tax benefits of a series of Treasury bill sale-repurchase transactions because they lacked economic substance. In the transactions, the taxpayer bought Treasury bills that matured shortly after the end of the tax year and funded the purchase by borrowing against the Treasury bills. The taxpayer accrued the majority of its interest deduction on the borrowings in the first year while deferring the inclusion of its economically offsetting interest income from the Treasury bills until the second year. The transactions lacked economic substance because the economic consequences of holding the Treasury bills were largely offset by the economic cost of the borrowings. The taxpayer was denied the tax benefit of the transactions because the real economic impact of the transactions was "infinitesimally nominal and vastly insignificant when considered in comparison with the claimed deductions." *Sheldon* at 769.

In *ACM Partnership*, the taxpayer entered into a near-simultaneous purchase and sale of debt instruments. Taken together, the purchase and sale "had only nominal, incidental effects on [the taxpayer's] net economic position." *ACM Partnership* at 250. The taxpayer claimed that, despite the minimal net economic effect, the transaction had a large tax effect resulting from the application of the installment sale rules to the sale. The court held that transactions that do not "appreciably" affect a taxpayer's beneficial interest, except to reduce tax, are devoid of substance and are not respected for tax purposes. *ACM Partnership* at 248. The court denied the taxpayer the purported tax benefits of the transaction because the transaction lacked any significant economic consequences other than the creation of tax benefits.

Viewed as a whole, the objective facts of the LILO transaction indicate that the transaction lacks the potential for any significant economic consequences other than the creation of tax benefits. During the 20-year primary term of the Sublease, *X*'s obligation to make the property available under the Sublease is completely offset by *X*'s right to use the property under the Headlease. *X*'s obligation to make debt service payments on the loans from *BK1* and *BK2* is completely offset by *X*'s right to receive Sublease rentals from *FM*. Moreover, *X*'s exposure to the risk that *FM* will not make the rent payments is further limited by the arrangements with the affiliates of *BK1* and *BK2*. In the case of the loan from *BK1*, *X*'s economic risk is completely eliminated through the defeasance arrangement. In the case of the smaller loan from *BK2*, *X*'s economic risk, although not completely eliminated, is substantially reduced through the deposit arrangement. As a result, neither bank requires an independent source of funds to make the loans, or bears significant risk of nonpayment. In short, during the Sublease primary term, the offsetting and circular nature of the obligations eliminate any significant economic consequences of the transaction.

At the end of the 20-year Sublease primary term, *X* will have either the proceeds of the fixed-payment option or a Headlease residual that has a fair market value approximately equal to the proceeds of the fixed payment option. If, at the end of the 20-year Sublease primary term, the Headlease residual is worth more than the payment required on the fixed-payment option, *FM* will capture this excess value by exercising the fixed payment option, leaving *X* with only the proceeds of the option. Conversely, if, at the end of the 20-year Sublease primary term, the Headlease residual is worth significantly less than the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

payment required on the fixed-payment option, *X* will put the property back to *FM* under the put renewal option at rents, that while initially projected to be at only 90 percent of estimated fair market value, are (because of the decline in the value of the property) greater than fair market value. Thus, the fixed payment option and put renewal option operate to "collar" the value of the Headlease residual during the primary term, limiting much of the economic consequence of the Headlease residual.

In addition, facts indicate that there is little economic consequence from *X*' s nominal exposure to *FM*'s credit under the fixed-payment option and, if exercised, the put renewal term. At the inception of the transaction, *FM* was required to use a portion of the Headlease prepayment to purchase highly-rated debt securities that were pledged to *X*, ensuring *FM*'s ability to make the payment under the fixed-payment option. If *FM* does not exercise the fixed-payment option and *X* exercises the put renewal option, *X* can require *FM* to purchase a letter of credit guaranteeing *FM*'s obligation to make the put renewal rent payments. If *FM* does not obtain the letter of credit, *FM* must exercise the fixed-payment option. Thus, as a practical matter, the transaction is structured so that *X* is never subject to *FM*'s credit.

The conclusion that *X* is insulated from any significant economic consequence of the Headlease residual is further supported by several factors indicating that the parties expect *FM* to exercise the fixed-payment option. First, *FM* has historically used the property. Second, because the fixed payment obligation is fully defeased, *FM* need not draw on other sources of capital to exercise the option. However, if *FM* does not exercise the fixed payment option and *X* exercises the put renewal option, *FM* would be required to draw on other sources of capital to satisfy its put renewal rental obligations.

In sum, the LILO transaction lacks the potential for significant economic consequences other than the creation of tax benefits. During the primary term of the Sublease, *X*'s obligations to provide property are completely offset by its right to use property. *X*'s obligations to make debt service payments on the loans are completely offset by *X*'s right to receive rent on the Sublease. These cash flows are further assured by the deposit arrangements with the affiliates of *BK1* and *BK2*. Finally, *X*'s economic exposure to the Headlease residual is rendered insignificant by the option structure and the pledge of the securities that defeases *FM*'s option payment. Thus, the only real economic consequence of the LILO transaction during the 20-year primary term of the Sublease is *X*'s pre-tax return. This pre-tax return is too insignificant, when compared to *X*'s after-tax yield, to support a finding that the transaction has significant economic consequences other than the creation of tax benefits.

Some of the features of the LILO transaction discussed above are present in transactions that the Service will respect for federal income tax purposes. For example, an arrangement for "in-substance defeasance" of an outstanding debt was respected in Rev. Rul. 85-42, 1985-1 C.B. 36. By contrast, in the LILO transaction, the deposit arrangement exists from the inception of the transaction, eliminating any need by *BK1* and *BK2* for an independent source of funds. Similarly, other features of the LILO transaction, such as nonrecourse financing and fixed-payment options, are respected in other contexts. However, when these and other features are viewed as a whole in the context of the LILO transaction, these features indicate the transaction should not be respected for tax purposes.

As a result of the transaction lacking economic substance, *X* may not deduct interest or rent paid or incurred in connection with the transaction.

The Service will scrutinize LILO transactions for lack of economic substance and/or, in appropriate cases, recharacterize transactions for federal income tax purposes based on their substance. *See, e.g., Gregory v. Helvering* 293 U.S. 495 (1935), *Bussing v. Commissioner*, 88 T.C. 449 (1987), *Supplemental Opinion*, 89 T.C. 1050 (1987). Use of terms such as "loan," "lease," "Headlease," and "Sublease" in this revenue ruling should not be interpreted to indicate the Service's acceptance of *X*'s characterization of the LILO transaction described above.

HOLDING

A taxpayer may not deduct, under § § 162 and 163, rent and interest paid or incurred in connection with a LILO transaction that lacks economic substance.

EFFECT ON OTHER DOCUMENTS

Rev. Rul. 85-42 is distinguished.

DRAFTING INFORMATION

The principal author of this revenue ruling is John Aramburu of the Office of Assistant Chief Counsel (Income Tax and Accounting). For further

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

information regarding this revenue ruling contact Mr. Aramburu on (202) 622-4960 (not a toll-free call).

Rev. Rul. 99-14, 1999-13 I.R.B. 3, 1999-1 C.B. 835, 1999 WL 127035 (IRS RRU)
END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT B

**H**

Rev. Rul. 2002-69, 2002-44 I.R.B. 760, 2002-2 C.B. 760, 2002 WL 31272941 (IRS RRU)

Internal Revenue Service (I.R.S.)
IRS RRU
Revenue Ruling

BUSINESS EXPENSES; INTEREST; LEASE-IN/LEASE-OUT TRANSACTIONS
Released: October 12, 2002

**Section 163.--Interest**, 26 CFR 1.162-17: *Interest deduction in general.*

May a taxpayer deduct currently, under § 163, interest paid or incurred in connection with a lease-in/lease-out (LILO) transaction that properly is characterized as conferring only a future interest in property.

**Section 162.--Trade or Business Expenses**, 26 CFR 1.162-11: *Rentals.*

**Business expenses; interest; lease-in/lease-out transactions.** A taxpayer may not deduct currently, under sections 162 and 163 of the Code, rent and interest paid or incurred in connection with a lease-in/lease-out (LILO) transaction that properly is characterized as conferring only a future interest in property. Rev. Rul. 99-14 modified and superseded.

**Business expenses; interest; lease-in/lease-out transactions.** A taxpayer may not deduct currently, under sections 162 and 163 of the Code, rent or interest paid or incurred in connection with a lease-in/lease-out (LILO) transaction that properly is characterized as conferring only a future interest in property.

ISSUE

May a taxpayer deduct currently, under § § 162 and 163 of the Internal Revenue Code, rent and interest paid or incurred in connection with a "lease-in/lease-out" ("LILO") transaction?

FACTS

*X* is a U.S. corporation. *FM* is a foreign municipality that has historically owned and used certain property. As of 1997, it is estimated that the property has a remaining useful life of 50 years and a fair market value of $100 million. *BK1* and *BK2* are banks. None of these four parties is related to any of the others.

On January 1, 1997, *X* and *FM* entered into a LILO transaction under which *FM* leased the property to *X* under a "Headlease," and *X* immediately leased the property back to *FM* under a "Sublease." The term of the Headlease is 40 years. The primary term of the Sublease is 20 years. Moreover, as described below, the Sublease also may be renewed for a term of 10 years ("put renewal term") at the option of *X*. *X*'s right to possess the property under the Headlease for the first 20 years is substantially the same as *FM*'s right to possession under the Sublease for the primary term.

The Headlease requires *X* to make two rental payments to *FM* during its 40-year term: (1) an $89 million prepayment at the beginning of year 1; and (2) a postpayment at the end of year 40 that has a discounted present value of $8 million. For federal income tax purposes, *X* and *FM* allocate the prepayment ratably to the first 6 years of the Headlease and the future value of the postpayment ratably to the remaining 34 years of the Headlease.

The Sublease requires *FM* to make fixed, annual rental payments over both the primary term and, if exercised, the put renewal term. The fixed, annual payments during the put renewal term are equal to 90 percent of the amounts that (as of January 1, 1997) are projected to be the fair market value rental amounts for that term.

To partially fund the $89 million Headlease prepayment, *X* borrows $54 million from *BK1* and $6 million from *BK2*. Both loans are nonrecourse, have fixed interest rates, and provide for annual debt service payments that fully amortize the loans over the 20-year primary term of the Sublease. The amount and timing of the debt service payments mirror the amount and timing of the Sublease

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

payments due during the primary term of the Sublease. The remaining $29 million of the Headlease prepayment is provided by *X*.

Upon receiving the $89 million Headlease prepayment, *FM* deposits $54 million into a deposit account with an affiliate of *BK1* and $6 million into a deposit account with an affiliate of *BK2*. The deposits with the affiliates of *BK1* and *BK2* earn interest at the same rates as the loans from *BK1* and *BK2*. *FM* directs the affiliate of *BK1* to pay *BK1* annual amounts equal to 90 percent of *FM*'s annual rent obligation under the Sublease (that is, amounts sufficient to satisfy *X*'s debt service obligation to *BK1*). The parties treat these amounts as having been paid from the affiliate to *FM*, then from *FM* to *X* as rental payments, and finally from *X* to *BK1* as debt service payments. In addition, *FM* pledges the deposit account to *X* as security for *FM*'s obligations under the Sublease, while *X*, in turn, pledges its interest in *FM*'s pledge to *BK1* as security for *X*'s obligations under the loan from *BK1*. Similarly, *FM* directs the affiliate of *BK2* to pay *BK2* annual amounts equal to 10 percent of *FM*'s annual rent obligation under the Sublease (that is, amounts sufficient to satisfy *X*'s debt service obligation to *BK2*). The parties treat these amounts as having been paid from the affiliate to *FM*, then from *FM* to *X* as rental payments, and finally from *X* to *BK2* as debt service payments. Although *FM*'s deposit with the *BK2* affiliate is not pledged, the parties understand that *FM* will use the account to pay the remaining 10 percent of *FM*'s annual rent obligation under the Sublease.

As a result of the foregoing arrangement, *X*'s obligation to make the property available under the 20-year primary term of the Sublease is completely offset by *X*'s right to use the property under the Headlease. *X*'s obligation to make debt service payments on the loans from *BK1* and *BK2* is completely offset by *X*'s right to receive Sublease rentals from *FM*. Moreover, *X*'s exposure to the risk that *FM* will not make the rent payments is further limited by the arrangements with the affiliates of *BK1* and *BK2*. In the case of the loan from *BK1*, *X*'s economic risk is eliminated through the defeasance arrangement. In the case of the $6 million loan from *BK2*, *X*'s economic risk, although not eliminated, is substantially reduced through the deposit arrangement. As a result, neither bank requires an independent source of funds to make the loans, or bears significant risk of nonpayment. In short, during the primary Sublease term, the transaction is characterized by reciprocal and circular obligations that offset one another.

At the end of the Sublease primary term, *FM* has a fixed-payment option to purchase from *X* the Headlease residual (the right to use the property beyond the Sublease primary term subject to the obligation to make the rent postpayment) for a fixed exercise price equal to 105 percent of the amount that (as of January 1, 1997) is projected to be the future fair market value of the Headlease residual. If *FM* exercises the option, the transaction is terminated at that point, and *X* receives the exercise price of the option and is not required to make any portion of the postpayment due under the Headlease. If *FM* does not exercise the option, *X* may elect to (1) use the property itself for the remaining term of the Headlease, (2) lease the property to another person for the remaining term of the Headlease, or (3) compel *FM* to lease the property for the 10-year put renewal term of the Sublease. If *FM* does not exercise the fixed-payment option and *X* exercises its put renewal option, *X* will receive rents that are equal to 90 percent of the amounts that are (as of January 1, 1997) projected to be the fair market rents for that term. If the actual fair market rents in 20 years turn out to be less than the amount specified in the put renewal option and *FM* does not exercise the fixed-payment option, *X* will be able to compel *FM* to lease the property for rents that are greater than the then fair market rental value. Thus, as a practical matter, the fixed-payment option and put renewal option operate to "collar" the value of the Headlease residual during the primary term.

In addition, *X* has nominal exposure to *FM*'s credit under the fixed-payment option and, if exercised, the put renewal term. At the inception of the transaction, *X* requires *FM* to invest $15 million of the Headlease prepayment in highly-rated debt securities that will mature in an amount sufficient to fund the fixed amount due under the fixed-payment option, and to pledge these debt securities to *X*. This arrangement ensures that *FM* is able to make the payment under the fixed-payment option. Having economically defeased both its rental obligations under the Sublease and its fixed-payment under the fixed-payment option, *FM* keeps the remaining portion of the Headlease prepayment as its return on the transaction. If *FM* does not exercise the fixed-payment option and *X* exercises the put renewal option, *X* can require *FM* to purchase a letter of credit guaranteeing the put renewal rents. If *FM* does not obtain the letter of credit, *FM* must exercise the fixed-payment option.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

For tax purposes, *X* claims deductions for interest on the loans and for the allocated rents on the Headlease. *X* includes in gross income the rents received on the Sublease. If the fixed-payment option is exercised, *X* also includes the option price and recaptures rent deductions taken during the primary Sublease term that are attributable to the postpayment it is no longer required to make.

LAW AND ANALYSIS

*X* and *FM*'s allocations of the prepayment and the postpayment for federal income tax purposes meet the uneven rent test contained in proposed § 467 regulations (§ 1.467-3(c)(2)(i)), and under those regulations the Headlease would not be treated as a disqualified leaseback or long-term agreement subject to constant rental accrual. Because this LILO transaction was entered into after June 3, 1996, and on or before May 18, 1999, the provisions of the proposed regulations are available. *See* § 1.467-9(c). For later years, however, final § 467 regulations effective May 18, 1999, treat the prepayment of rent as resulting in a deemed loan from *X* to *FM* and require the imputation of interest income to *X*. § 1.467-4. Moreover, *X*'s rent deduction would be subject to proportional rent rules that reflect the time value of money concept. *See* § 1.467-2(c).

The substance of a transaction, not its form, governs its tax treatment. *Gregory v. Helvering*, 293 U.S. 465 (1935). In *Frank Lyon Co. v. United States*, 435 U.S. 561, 573 (1978), the United States Supreme Court stated, "In applying the doctrine of substance over form, the Court has looked to the objective economic realities of a transaction rather than to the particular form the parties employed." The Court evaluated the substance of the transaction in *Frank Lyon* to determine that it was indeed a sale/leaseback, as it was structured, rather than a financing. The Court subsequently relied on its approach in *Frank Lyon* to recharacterize a sale and repurchase of federal securities as a loan, finding that the economic realities of the transaction did not support the form chosen by the taxpayer. *Nebraska Dep't of Revenue v. Loewenstein*, 513 U.S. 123 (1994).

Where parties have in form entered into two separate transactions that result in offsetting obligations, the courts often have collapsed the offsetting obligations and recharacterized the two transactions as a single transaction. In *Rogers v. United States*, 281 F.3d 1108 (10th Cir. 2002), the part-owner (Fogelman) of a professional baseball team that was organized as an S corporation borrowed money from the S corporation. The nonrecourse loan was secured by Fogelman's ownership interest in the corporation and his existing option to purchase the rest of the shares from the taxpayer (Kauffman), the other owner of the team. Fogelman also granted the corporation an option to purchase both his shares and his existing option to buy Kauffman's shares. The option price was an amount equal to the outstanding loan balance. The corporation exercised its option immediately but deferred closing until the due date of Fogelman's loan, five months later. On that date, Fogelman transferred his shares in the corporation to the corporation in lieu of its foreclosure on the loan. The corporation claimed that the shares had no value at that time and deducted the loan amount as a bad debt, which was passed through to Kauffman.

The court in *Rogers* applied the substance over form doctrine to collapse the loan and the option transaction into a redemption of Fogelman's stock in exchange for cash. Fogelman had no incentive to repay the loan because any reduction in the loan balance would reduce the option price. The immediate exercise of the option precluded any attempt by Fogelman to repay the loan and keep the stock. On the basis of those facts, among others, the court held that the substance of the transaction was a sale of Fogelman's stock to the corporation.

In *Bussing v. Commissioner*, 88 T.C. 449, *reconsideration denied*, 89 T.C. 1050 (1987), a Swiss subsidiary of a computer leasing company (AG) purchased computer equipment in a sale/leaseback transaction involving a five-year lease. Subsequently, AG purportedly sold the equipment to a domestic corporation (Sutton), which in turn purportedly sold interests in the equipment to the taxpayer (Bussing) and four other individual investors. Bussing acquired his interest in the computer equipment subject to the underlying lease by paying cash, short-term promissory notes, and a long-term promissory note to Sutton. Bussing then leased his interest in the equipment back to AG for nine years. The rents due Bussing from AG equaled Bussing's annual payments on the long-term promissory note to Sutton for the first three years and were supposed to generate nominal annual cash flow thereafter.

The court first disregarded Sutton's participation in the transactions on substance over form grounds. It then held that Bussing's long-term indebtedness also must be disregarded because it was completely offset by AG's rent payments in a "purported sale-leaseback pursuant to which the respective lease and debt

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

obligations flow between only two parties." *Id.* at 458. The court stated,

> The respective obligations between AG and Bussing cancel each other out. Any possible claim by AG with respect to the note is fully offset by AG's rental obligation to Bussing.... Bussing, effectively, will never be required to make any payments on his debt obligation, a feature of the transaction that we believe the parties intended to achieve.*Id.* After collapsing the offsetting loan and lease, the court concluded that Bussing had acquired an interest in a joint venture with AG and the other investors to the extent of his cash payment only.

Courts have similarly disregarded the parties' obligations in purported installment sales where the taxpayer received an installment note that was offset by some other arrangement between the two parties, indicating that the maker of the note would not be called upon to pay the installment obligation. *See* *Rickey v. Commissioner*, 502 F.2d 748 (9th Cir. 1974), *aff'g* 54 T.C. 680 (1970). Although taxpayers are entitled to arrange the terms of a sale in order to qualify for the installment method, "the arrangements must have substance and must reflect the true situation rather than being merely the formal documentation of the terms of the sale." *Id.* at 752-53, quoting 54 T.C. 680 at 694. *See also* *United States v. Ingalls*, 399 F.2d 143 (5th Cir. 1968); *Blue Flame Gas Co. v. Commissioner*, 54 T.C. 584 (1970); *Greenfield v. Commissioner*, T.C. Memo. 1982-617; *Big "D" Development Corp. v. Commissioner*, T.C. Memo. 1971-148, *aff'd per curiam*, 453 F.2d 1365 (5th Cir.1972).

Similarly, the Headlease and Sublease impose offsetting obligations that must be disregarded, regardless of whether other components of the LILO transaction are respected. During the first 20 years of its term, the Headlease confers to X a right to use the property that is immediately reversed by the Sublease grant to FM of substantially the same right to use property. In the LILO transaction, the Sublease interest retained by *FM* is of the same nature as the Headlease interest conveyed to *X*. Because the transfer and retransfer of the right to possess the property for the first 20 years are disregarded as offsetting obligations, the transaction that remains is, at best, a transfer of funds from *X* to *FM* in exchange for *FM*'s obligation to repay those funds and provide *X* the right to begin to lease the property in 20 years.

An analogous situation occurs when the conveyance of property is accompanied by the retention of some interest in the same property. If the interest retained is of substantially the same nature as the interest conveyed, only a future interest is conveyed. In *McCully Ashlock v. Commissioner*, 18 T.C. 405 (1952), *acq.*, 1952-2 C.B. 1, taxpayer had acquired property through a deed dated June 6, 1945. The seller, however, had retained the right to possession and rentals through August 15, 1947. The court found that taxpayer had acquired only a future interest in the property because "the trustees [sellers] not only retained the rents legally but they also retained control and benefits of ownership." *Id.* at 411. Consequently, rentals from the property were income to the seller.

Similarly, in *Kruesel v. United States*, 63-2 U.S. Tax Cas. (CCH) ¶ 9714 (D. Minn. 1963), the court concluded that taxpayer had transferred only a future, remainder interest in property and reserved a life estate. The government had unsuccessfully argued that taxpayer had sold its entire interest in the property and the taxpayer's amount realized on the sale included the value of a right to occupancy provided to the taxpayer by the buyer.

In contrast, in *Alstores Realty Corp. v. Commissioner*, 46 T.C. 363 (1966), *acq.*, 1967-2 C.B.1, the court held that a sale of property accompanied by the reservation of a right of occupancy did not result in the transfer of only a future interest because the seller's right of occupancy was in the nature of a leasehold interest, because the purchaser acquired the benefits and burdens of ownership of the property.

*Alstores* can be distinguished from *McCully Ashlock* and *Kruesel*. *McCully Ashlock* and *Kruesel* conclude that where a retained interest is of the same nature as the interest conveyed, only a future interest has been transferred. In *Alstores*, the interests were not of the same nature.

Similarly, the LILO transaction is distinguishable from the transaction involved in *Comdisco, Inc. v. Commissioner*, 756 F.2d 569 (7th Cir. 1985). In that case, equipment was subject to end user leases, and the lessor of that equipment assigned an interest to taxpayer in a transaction designed to give the taxpayer investment tax credits. The taxpayer's entitlement to the credits depended on whether it had the status of lessee/sublessor. In concluding that it did, the court noted a number of factors that supported taxpayer's claim that it had acquired a leasehold interest. The taxpayer was obligated to the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

lessor in the event of a default by the sublessee. The taxpayer relet certain equipment after one sublease had expired. In connection with another sublease, the taxpayer was responsible for rent to its assignor in excess of amounts paid by the sublessee directly to the assignor. The court also emphasized the regulatory restrictions on direct leases between the assignor and the end users. *Id.* at 576-77. Unlike *Comdisco*, in the LILO transaction the headlessor and the sublessee are the same party. Further, in the LILO transaction the headlessee/sublessor is not materially exposed to the risk that the sublessee will fail to make rent payments.

Section 162(a)(3) permits a deduction for rentals and other payments required to be made as a condition to the continued use or possession, for purposes of the trade or business, of property. Because *X* does not acquire a current leasehold interest in the property, it is not entitled to current deductions for rent. The $29 million "equity" portion of the Headlease prepayment is, effectively, a payment for at most *X*'s right under the Headlease to lease the property 20 years hence for a term of 20 years. (Economically, $29 million is an overpayment for the value of any right that *X* obtains to lease the property in the future. *X* was willing to overpay in this manner, however, in order to induce *FM* to participate in the transaction.). In accordance with § 467, the $29 million "equity" portion of the Headlease prepayment is deductible over the 20-year residual term of the Headlease (the 10-year put renewal term and the 10-year "shirttail" period). Alternatively, in the event *FM* exercises its fixed-price option at the end of the primary term of the Sublease, *X* will have gain or loss equal to the difference between the option price and *X*'s cost of acquiring a right to the Headlease residual term. Section 1001.

The remainder of the Headlease prepayment, $60 million, must be disregarded, because the "loans" that purportedly finance this portion of the Headlease prepayment are without substance. In *Bridges v. Commissioner*, 39 T.C. 1064, *aff'd* 325 F.2d 180 (4th Cir. 1963), taxpayer "borrowed" funds from banks and used the funds to purchase Treasury notes, which the banks held as collateral and ultimately sold to satisfy taxpayer's debts. The court's rationale for disallowing taxpayer's deductions of prepaid interest is equally applicable here:

> [P]etitioner at no time had the uncontrolled use of any additional money, of the bonds, or of the interest on the bonds. He assumed no risk of a rise or fall in the market price of the bonds and could not take advantage of such. His payment to the bank was not for the use or forbearance of money; it was for the purchase of a rigged sales price for the bonds and for a tax deduction. Petitioner incurred no genuine indebtedness, within the meaning of the statute, and as a payment of interest, this transaction was also a sham.*Id.* at 1078-79. Neither *X* nor *FM* obtain use of the "borrowed" funds. The "loans" purportedly are made to finance *X*'s acquisition of the Headlease interest. But that leasehold interest is substantially offset by an interdependent Sublease with the Headlessor. What remains can only be enjoyed after 20 years and after the loans have been "repaid" using "rents" from a Sublease that itself lacks substance. Under the circumstances, the loans are disregarded.

Although this ruling refers to a foreign municipality and its property, the analysis and holding apply as well to LILO transactions that involve or include domestic tax-exempt or tax-indifferent entities.

HOLDING

A taxpayer may not deduct currently, under §§ 162 and 163, rent or interest paid or incurred in connection with a LILO transaction that properly is characterized as conferring only a future interest in property.

Where appropriate, the Service will continue to disallow the tax benefits claimed in connection with LILO transactions upon other grounds, including that the substance over form doctrine requires their recharacterization as financing arrangements and that they are to be disregarded for lack of economic substance.

EFFECT ON OTHER DOCUMENTS

Rev. Rul. 99-14, 1999-1 C.B. 835, is modified and superseded.

DRAFTING INFORMATION

The principal author of this revenue ruling is John Aramburu of the Office of Associate Chief Counsel (Income Tax & Accounting). For further information regarding this revenue ruling, contact Mr. Aramburu at (202) 622-4960 (not a toll-free call).

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Rev. Rul. 2002-69, 2002-44 I.R.B. 760, 2002-2 C.B. 760, 2002 WL 31272941 (IRS RRU)
END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT C

INTERNAL REVENUE SERVICE
www.irs.gov

IRS News Release

Media Relations Office Washington, D.C. Tel. 202.622.4000
For Release: 10/11/02 Release No: IR-2002-108

**IRS REAFFIRMS ABUSIVE NATURE OF 'LILO' TAX SHELTER TRANSACTION**

WASHINGTON – The Internal Revenue Service today reaffirmed its 1999 conclusion that a taxpayer may not deduct rent or interest paid or incurred in connection with a Lease-In/Lease-Out Transaction, also known as a "LILO" transaction.

"This ruling is part of our larger effort to respond to abusive transactions," said IRS Commissioner Charles O. Rossotti. "Abusive tax shelters unfairly place more tax burden on other taxpayers."

"We have refined our analysis of LILOs based on information from actual transactions and have presented a legal position that gives clear guidance to the field and taxpayers alike explaining why we believe these transactions do not work," said IRS Chief Counsel B. John Williams, Jr. "Our primary position is that LILOs, in substance, confer only a future interest in property to the U.S. taxpayer, rather than a current leasehold interest."

"Our position does not rely on the lack of a pre-tax profit potential or business purpose. There may be situations, however, where those facts exist," Williams said. "In such situations, we may challenge the tax treatment of the transactions on those grounds as well."

The IRS's legal position is contained in Revenue Ruling 2002-69, which will be available at *www.irs.gov* and published in Internal Revenue Bulletin 2002-44, dated November 4, 2002. The 1999 IRS position on LILO is contained in Revenue Ruling 99-14, which was published in Internal Revenue Bulletin 1999-13, dated March 29, 1999.

X X X