# EXHIBIT D

DRAFT: 6/6/03

APPEALS SETTLEMENT GUIDELINE
ALL INDUSTRIES
LOSSES CLAIMED AND INCOME TO BE REPORTED FROM
LEASE IN/LEASE OUT TRANSACTIONS
UIL 9307.07-00

## STATEMENT OF ISSUES

1. Should taxpayer be allowed deductions for the amortization of advance rental payments in relation to lease in/ lease out ("LILO") transactions?

2. Should the taxpayer be allowed deductions for the amortization of fees resulting from their participation in LILO transactions?

3. Should taxpayer be allowed interest expense deductions in relation to their participation in LILO transactions?

4. (Alternative position) Whether LILO transactions constitute financing arrangements, in which case deductions for amortization of rents and transaction fees, and interest expense should be denied.

5. (Alternative position) Whether LILO transactions have economic substance entitling taxpayers to deductions for amortization of rents and transaction fees, and interest expense.

6. (Alternative Position) Should taxpayer include in income original issue discount (OID) from the equity collateral portion[1] of the transaction under the financing arrangement argument or because this part of the transaction has economic substance?

7. Do the provisions of IRC § 467 disallow claimed advance rent payment expense deductions resulting from the taxpayer's participation in LILO transactions entered into after May 18, 1999?

8. Should the penalties under IRC § 6662 apply to LILO transactions?

---

[1] This is a part of the transaction, which requires the tax-exempt entity involved in the LILO transaction to deposit an amount with a custodian. The custodian invests the amount in high quality debt securities in a way that assures that the future value of the investment will equal exactly the amount needed by the tax-exempt entity to exercise the purchase option at the end of the sublease. Please refer to page 5 herein for additional details.

## COMPLIANCE'S POSITION

Compliance's position on issues one and two is based on Revenue Ruling 2002-69.[2] Relying on the substance over form doctrine, this Revenue Ruling argues that the leases involved in a LILO transaction are offsetting obligations of the same nature and should be collapsed into a single transaction, resulting in the conveyance of a future interest only. Therefore, the Ruling concludes that the taxpayer is not entitled to deduct advance rent payments made under the "Head Lease."[3]

The revenue ruling makes a distinction between the equity and debt portions of the advance rent payment made by the United States taxable entity (referred to interchangeably as "the taxpayer" or "the U.S. Taxpayer." The equity portion is treated by the Ruling as a payment for the right of occupancy at the end of the sublease basic term (a future interest).[4] The consequence of this assertion is that no current rent expense deduction is allowed.

As a further consequence of the offsetting obligations of the Head Lease and sublease, the debt portion is disregarded on the basis that it has no substance. Therefore, the interest paid on the debt portion of the rent payment is disallowed.

## INDUSTRY/TAXPAYER POSITION

The industry's position is that the U.S. Taxpayers should be allowed both the amortization and interest expense deductions because the Head Lease and sublease do not substantially offset each other.

According to the industry, the Head Lease and sublease convey dissimilar rights and obligations. These concern a variety of items, including priority of claims, termination rights, time to maturity, amounts of rental payments required, purchase option provisions, and conditions of default and applicable remedies. The dissimilarity in rights and obligations between the Head Lease and sublease are illustrated by the mismatch of Head Lease and sublease rental payments with respect to timing and amount, and the fact that the lessors[5] have different capabilities with respect to declaring default.

The industry points out that the U.S. taxpayer and the tax-exempt entity also face different risks of default. The U.S. taxpayer faces the risk of default by the sublessee in the case of the sulessee's bankruptcy, failure to insure the property, insolvency or financial distress,[6] nonpayment of rents, and failure to comply with other covenants of the sublease (such as maintenance and improvement requirements).

---

[2] 2002-44 IRB 760. Compliance has set forth its position in a draft Coordinated Issue Paper ("CIP"). The CIP has not been issued; it is under review by Chief Counsel.
[3] The "Head Lease" is the original lease under which the tax-exempt entity leases the asset it owns to the United States taxable entity.
[4] Also known as the early buyout date or EBO date.
[5] Both the Head Lessor or sublessor.
[6] The term "financial distress" has been used by industry proponents without further explanation. It is taken herein to mean the seizure of personal property to enforce payment of debt.

By contrast, the tax-exempt entity faces a less significant risk of default on the part of the U.S. taxpayer or Head Lessee. Since the U.S. taxpayer has prepaid all of the rent that it is permitted to prepay under the terms of the Head Lease, its interest in the subject property is securely established and usually can be lost only in the unlikely event of severe financial distress. Therefore, the relative security of each party's possessory interest in the subject property under its respective leases further demonstrates that the interests of the U.S. Taxpayer and the tax-exempt entity do not offset each other in any way.

The industry representatives also point out that the obligation to make debt service payments is not "completely offset" by the investor's right to receive sublease payments as asserted in Rev. Rul. 2002-69. In their view, the sublease and the loan financing the Head Lease prepayment are independent obligations. Evidence supporting this assertion is that the obligation to make the payments on the loan financing the prepayment continues regardless of whether or not the U.S. taxpayer receives sublease payments.

**DISCUSSION**

Background

LILO arrangements were being used in recent years in an attempt to avoid the unfavorable depreciation provisions applicable to leases of property to tax-exempt lessees (foreign or domestic). With LILOs, the United States or domestic investor (taxpayer) acquires a leasehold interest in the property (instead of an ownership interest) and simultaneously subleases it to the tax-exempt owner. The investor will then generally make a large upfront payment under a "Head Lease." The large upfront payment is then amortized under rules that are more favorable than the depreciation rules that would apply if the investor had acquired an ownership interest.[7]

---

[7] Since there is no change in ownership, and no sale to the U.S. taxpayer, the transaction is not subject to depreciation rules under IRC §168. As of 1995, there had been no Treasury Regulations issued governing IRC §467 and there was no rule under §467 that dealt with leases entered into with tax-exempt entities. According to Rev. Rul. 2002-69, the U.S. Taxpayer's allocation of the prepaid advance rent payment and the post-payment, if included in LILO transactions, meets the uneven rent test contained in Prop. Reg. § 1.467-3(c)(2)(i). The consequence of this is that the Head Lease would not be treated as either a disqualified leaseback or a long-term agreement subject to constant rent accrual. In other words, the U.S. taxpayer could amortize the advance rent payment over 6 years, or even one or two years, if it so chose. This loophole, seemingly allowing the accelerated amortization of the rent payments, is what sprung the emergence of LILOs. These provisions of the proposed regulation apply to LILO transactions entered into after June 3, 1996, and on or before May 18, 1999. See Prop. Reg. § 1.467-9(c). Note that the final §467 regulations effective May 18, 1999, treat the prepayment of rent as resulting in a deemed loan from the U.S. taxpayer to the tax-exempt entity requiring the imputation of interest income to the U.S. taxpayer. See Treas. Reg. §1.467-4. Also note that the U. S. taxpayer's rent deduction would be subject to proportional rent rules reflecting the time value of money concept. See Treas. Reg. 1.467-2(c). The issuance of these final §467 regulations and of Rev. Rul. 99-14, C. B. 99-1,

General Facts Relating to LILOs

In a typical LILO transaction, a taxpayer will lease an asset from a tax-exempt (or tax indifferent) entity. This initial lease is generally referred to as the "Head Lease."

The types of assets involved in these transactions include subway cars and lines, locomotives, municipal buildings, passenger railway systems, ferryboats, airplanes, power plants, and sewage treatment plants. The estimated useful life of these assets is generally 50 years.

The types of tax-exempt or tax-indifferent entities involved in LILOs include domestic or foreign, governmental or quasi-governmental entities. The tax-exempt entity is the owner and operator of the asset before and after entering into the LILO arrangement, and retains control of the asset during the term of the leases (i.e., the tax-exempt entity retains control of the asset throughout the entire arrangement).

For purposes of this memorandum, the general LILO pattern (both legal and financial) is derived primarily from Revenue Ruling 2002-69; the author has added clarifications and definitions.

*The general legal terms of a LILO arrangement are as follow:*

The U.S. Taxpayer enters the "Head Lease" through a grantor trust ("the trust"). The trust is set up for the benefit of the U.S. taxpayer, and it leases the asset from the tax-exempt entity for a period of 40 years. The trust immediately subleases the asset to the tax-exempt entity for a period of 20 years[8].

As can be observed, at the end of the 20-year sublease period, 20 years remain under the "Head Lease." At this point, the tax-exempt entity has a fixed payment option to purchase the "Head Lease" residual from the trust at a specified price.[9] If this option is exercised, the trust does not have to make the post payment (final payment) under the "Head Lease." Alternatively, the tax-exempt entity can decline to purchase the asset but potentially be compelled to renew the lease for 10 years (called the put renewal

---

835, effectively stopped further taxpayer involvement with LILO transactions (i.e., no new LILOs after 1999).

[8] The sublease is a net lease. A net lease requires the lessee to maintain and repair the property, obtain insurance, etc.
[9] This specified price is projected as of the closing date of the transaction to be equal to the fair market value of the "Head Lease" residual (i.e., the fair market value of the remaining 20 years).

period). The trust can require a letter of credit for the 10-year period, and if the tax-exempt entity does not obtain the letter of credit, it must exercise the purchase of the "Head Lease."

The remaining 10 years, the "shirt tail period," is the period remaining under the "Head Lease" during which the trust can use the asset as it sees fit, including leasing the asset to another party.

At the end of the 40-year "Head Lease" term, the asset reverts to the tax-exempt entity.

*The general financial terms of a LILO arrangement are as follow:*

The "Head Lease" sets forth the rent to be paid by the trust. There will generally be a pre-payment and a post-payment. The pre-payment is made at the inception of the "Head Lease" and the post-payment, a much larger amount in absolute or constant dollars[10], is to be made in the 40th year.

The trust finances the pre-payment with an amount contributed by the U.S. taxpayer, and a larger amount (the balance) borrowed from two banks. The two bank loans are non-recourse loans[11]. Using the scenario in Revenue Ruling 2002-69 as an example, the U.S. taxpayer contributes $29 million into the trust for the purpose of funding part of the $89 million pre-payment due under the "Head Lease." The trust then borrows $54 million from one bank and $6 million from another to complete the $89 million needed for the pre-payment.

When the pre-payment is made to the tax-exempt entity, the tax-exempt entity deposits $54 million into an account with one bank and $6 million into an account with another. The banks into which these deposits are made are called the deposit takers and are generally affiliates[12] of the banks that loaned the $60 million to the trust. These banks pay the tax-exempt entity the same interest rate on the deposits as their affiliates charge the trust for the $60 million loan. The tax-exempt entity pledges the deposits to the trust for its obligations under the sublease agreement. The trust, in turn, pledges its interest in the pledge made by the tax-exempt entity to the banks as collateral for the loans[13].

---

[10] As opposed to present-value dollars. The Revenue Ruling indicates that the present value of the post payment is $8 million. The absolute amount to be paid in the 40th year is not given.

[11] A non-recourse loan is a loan in which the lender cannot claim more than the collateral as repayment in the event that payments on the loan are stopped. A LILO investor leases the asset and finances the lease pre-payment with a down payment and the proceeds from a non-recourse loan. In the event that the transaction turns sour, the LILO investor is not apt to lose more than the down payment.

[12] In some cases, one might find that the deposit taker is the same bank that loaned the money to the trust. These could be considered a more egregious situation.

[13] Revenue Ruling 2002-69 states that the purpose of the tax-exempt entity making the deposits is to "defease" both the trust's debt to the banks and the sublease obligations of the tax-exempt entity to the trust. To "defease" in this context means to render null and void. Additionally, the draft of the coordinated issue paper and the Revenue Ruling refer to this defeasance as the first circular flow of funds and as the "debt defeasance."

As explained above, using Rev. Rul. 2002-69 as an example, $89 million is the prepayment of the rent made by the trust to the tax-exempt entity. Of that amount, the flow of $60 million has been explained in the preceding paragraph, of the remaining $29 million, $15 million is deposited with a custodian who invests it in high quality debt securities[14], usually treasury strips[15]. The maturity value of these securities is arranged to be equal to the amount due under the fixed purchase option available to the tax-exempt entity to purchase the "Head Lease" at the end of the 20th year.[16] The $14 million balance belongs to the tax-exempt entity, representing a fee paid to it for its participation in the transaction.

*Tax consequence of LILO structure to U.S. taxpayer*

The U. S. taxpayer will report the annual sublease payments received from the tax-exempt entity as rental income. Additionally, the U.S. taxpayer will write-off, on a straight line-basis, the $89 million pre-payment over a six-year period (or shorter period). The present value of the post-payment is written off, also on a straight-line basis, over years 7 through 40 (the remaining 34 years). The interest on the two bank loans is likewise deducted, and the LILO transaction costs are amortized over the life of the "Head Lease."

Legal Analysis[17]

**Issues 1 and 2 (amortization of advance rent and fees)**

The Internal Revenue Service set forth its original position with respect to LILOs in Revenue Ruling 99-14. The Service's position in that Revenue Ruling was that taxpayers involved in LILOs are not entitled to deductions related to such transactions because LILOs lack economic substance.

In October 2002, the Service adjusted its position with the issuance of Revenue Ruling 2002-69. This Revenue Ruling, which modified and superseded[18] Rev. Rul. 99-14,

---

[14] This is called the "equity collateral."

[15] STRIPS is an acronym for "Separate Trading of Registered Interest and Principal of Securities." They are Treasury securities that have had their coupons and principal separated into what effectively become zero-coupon Treasury bonds.

[16] This is referred to as the second circular flow and as the "equity defeasance." It is also referred to as the Early Buyout Option or "EBO."

[17] Rev. Rul. 2002-69 and the draft of the Coordinated Issue Paper ("CIP") from Compliance have been used as the foundation for this section.

[18] "*Superseded* describes a situation where the new ruling does nothing more than restate the substance and situation of a previously published ruling (or rulings). Thus, the term is used to republish under the 1986 Code and regulations the same position published under the 1939 Code and regulations. The term is also used when it is desired to republish in a single ruling a series of situations, names, etc., that were previously published over a period of time in separate rulings. If the new ruling does more than restate the substance of a prior ruling, a combination of terms is used. For example, *modified* and *superseded* describes a situation where the substance of a previously published ruling is being changed in part and is continued without change in part and it is desired to restate the valid portion of the previously published

concludes that taxpayers involved with LILO transaction do not acquire a current leasehold interest and, therefore, are not entitled to current deductions for rent and interest. For this assertion, the Service relies primarily on substance over form doctrine.

Before embarking on the legal analysis, it would be helpful to point out that there is no law (statutory or case) on point with respect to LILOs. The use of the substance over form doctrine to craft the future interest argument asserted by Compliance is novel.[19] Discussion and analysis of the approach follows below.

The seminal substance over form case is Gregory v. Helvering, 293 U.S. 465 (1935). Gregory v. Helvering stands for the proposition that the substance of a transaction, not its form, governs its tax treatment. More recently, in Frank Lyon Co. v. United States, 435 U.S. 561, 573 (1978), the Supreme Court stated: "In applying the doctrine of substance over form, the Court has looked to the objective economic realities of a transaction rather than to the particular form the parties employed."

In a subsequent Supreme Court case, the Court applied the substance over form analysis to construe a sale and repurchase of federal securities as a loan. The Court found that the economic realities of the transaction did not support the form chosen by the taxpayer. Nebraska Department of Revenue v. Loewenstein, 513 U.S. 123 (1994).

Some courts have collapsed offsetting obligations, and recharacterized two transactions as a single transaction where parties have in form entered into separate transactions that result in offsetting obligations. Illustrative of this is Rogers v. United States, 281 F.3d 1108 (10th Cir. 2002), where a part-owner/shareholder of a professional baseball team organized as a Subchapter S corporation borrowed money from the S corporation. He used a nonrecourse loan secured by the shareholder's ownership interest in the corporation and his existing option to purchase the rest of the shares from the other co-owner of the team. The shareholder also granted the corporation an option to purchase both his shares and his existing option to buy the other co-owner's shares. The option price was an amount equal to the outstanding loan balance. The corporation exercised its option immediately but deferred closing for five months until the due date of the shareholder's loan. Rogers applied the substance over form doctrine to collapse the loan and the option transaction into a redemption of the shareholder's stock in exchange for cash. There was no incentive to repay the loan on the part of the shareholder because any reduction in the loan balance would reduce the option price. The immediate exercise of the option prevented any attempt by the shareholder to repay the loan and keep his stock. In this case, the court held that the substance of the transaction was a sale of stock to the corporation – this was based, *inter alia*, on the offsetting loan and option.

---

ruling in a new ruling that is self contained. In this case the previously published ruling is first modified and then, as modified, is superseded." (From Definition of Terms in the Cumulative Bulletins).

[19] The "future interest"argument is not a novel concept in Federal taxation – it's novel with respect to this transactional arena.

Another substance over form case was Bussing v. Commissioner, 88 T.C. 449, reconsideration denied, 89 T.C. 1050 (1987). In Bussing, a Swiss subsidiary of a computer leasing company (AG) purchased computer equipment in a sale/leaseback transaction involving a five-year lease. Later, AG purportedly sold the equipment to a domestic corporation, which in turn supposedly sold interests in the equipment to the taxpayer (Bussing) and four other individual investors. The taxpayer acquired his interest in the computer equipment subject to the underlying lease with a cash payment, short-term promissory notes, and a long-term promissory note to the domestic corporation. The taxpayer then leased his interest in the equipment back to AG for nine years. The rents due the taxpayer from AG equaled the taxpayer's annual payments on the long-term promissory note for the first three years and were supposed to generate nominal annual cash flow from then on. The Bussing court first disregarded the domestic corporation's participation in the transactions using the substance over form doctrine. The court went on to hold that the taxpayer's long-term indebtedness also must be disregarded because it was completely offset by AG's rent payments in a "purported sale-leaseback pursuant to which the respective lease and debt obligations flow between only two parties." Bussing at 458. The court basically held that the obligations between AG and the taxpayer cancelled each other out and that the taxpayer would not be required to make any payments on his obligation. The court collapsed the offsetting loan and lease, and concluded that, to the extent of his cash payment, the taxpayer had acquired an interest in a joint venture.

Other courts have disregarded the parties' obligations in professed installment sales where the taxpayer received an installment note that was counterbalanced by some other arrangement between the two parties, signifying that the maker of the note would not be called upon to pay the installment debt. In Rickey v. Commissioner, 502 F.2d 748 (9th Cir. 1974), aff'g 54 T.C. 680 (1970), the court determined that although taxpayers are entitled to arrange the terms of a sale in order to qualify for the installment method, "the arrangements must have substance and must reflect the true situation rather than being merely the formal documentation of the terms of the sale." Rickey at 752-53, quoting 54 T.C. at 694. Other cases, along the same vein, were referred to in Revenue Ruling 2002-69. These are: United States v. Ingalls, 399 F.2d 143 (5th Cir. 1968); Blue Flame Gas Co. v. Commissioner, 54 T.C. 584 (1970); Greenfield v. Commissioner, T.C. Memo. 1982-617 (notes ignored because cash loan from buyer and taxpayer's installment note were to be paid through offsetting book entries); Big "D" Development Corp. v. Commissioner, T.C. Memo. 1971-148, aff'd per curiam, 453 F.2d 1365 (5th Cir. 1972)(cross indebtedness lacking in reality where full receipt of the total consideration merely awaited the command of the seller).

In McCully Ashlock v. Commissioner, 18 T.C. 405 (1952), acq., 1952-2 C.B. 1, the taxpayer acquired property through a deed dated June 6, 1945, but the seller had retained the right to possession and rentals through August 15, 1947. The court held that the taxpayer had acquired only a future interest in the property because "the (sellers) not only retained the rents legally but they also retained control and benefits of ownership." McCully Ashlock, at 411. Thus, rentals from the property were income to

the seller.[20] This case stands for the proposition that when the conveyance of property is accompanied by the retention of some interest in the same property, if the interest retained is of substantially the same nature as the interest conveyed, only a future interest is conveyed.[21]

In applying the preceding general legal principles to LILO transactions, we can come to the broad theoretical conclusion that when parties enter into two separate transactions that result in offsetting obligations, the offsetting obligaticns can be collapsed and the two transactions are re-characterized as a single transaction.

Under the Head Lease, the U.S. Taxpayer has a right to use the property that is immediately reversed by the sublease. The tax-exempt entity has the same right to use the property as the U.S. Taxpayer. The transfer and re-transfer of the property are offsetting obligations that should be disregarded. Consequently, the transaction that remains is apparently a transfer of funds (the $29 million) from the U.S. Taxpayer to the tax -exempt entity in exchange for the latter's obligation to repay those funds and provide the U.S. Taxpayer the potential right to begin to lease the property in the future if the tax-exempt entity does not exercise the Early Buyout Option. Therefore, the amortization of the rental expenses and transaction fees claimed with regard to LILO transactions should be disallowed under § 162.[22]

In evaluating the hazards of litigation presented by this position in LILO cases, the first line of inquiry has to address whether a court would find that the Head Lease and the sublease operative documents and actual benefits/burdens impose offsetting obligations. Courts will look at each party's obligations with respect to lease term, rental payments termination rights, purchase options, default events and remedies available. The possibility that some courts could be influenced by differences in these factors has to be recognized in a hazard of litigation assessment.

---

[20] Please note, as in the net leases that are a feature of LILOs, in McCulley Ashlock the seller agreed to pay property taxes, insurance, and normal maintenance items and other expenses.
[21] Along the same line of thought, in Kruesel v. United States, 63-2 U.S.T.C. ¶ 9714 (D. Minn. 1963), the court concluded that the taxpayer had transferred only a future remainder interest in property and reserved a life estate. Note that Revenue Ruling 2002-69 distinguished Alstores Realty Corp. v. Commissioner, 46 T.C. 363 (1966), acq., 1967-2 C.B.1. In Alstores, the court held that a sale of property accompanied by the reservation of a right of occupancy did not result in the transfer of only a future interest because the seller's right of occupancy was in the nature of a leasehold interest, because the purchaser acquired the benefits and burdens of ownership of the property. McCully Ashlock and Kruesel conclude that where a retained interest is of the same nature as the interest conveyed, only a future interest has been transferred. According to Revenue Ruling 2002-69, in Alstores, the interests were not of the same nature.

[22]SEC. 162. TRADE OR BUSINESS EXPENSES: IRC, 2003-CODE-VOL, SEC. 162. TRADE OR BUSINESS EXPENSES. -162(a) IN GENERAL.—There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including—**162(a)(3)** rentals or other payments required to be made as a condition to the continued use or possession, for purposes of the trade or business, of property to which the taxpayer has not taken or is not taking title or in which he has no equity.



13 J.

The possibility also exists, especially in the absence of court cases on point, that a court could look to jurisprudence outside the tax arena, albeit of little or no precedential value, but could certainly be persuasive. LILO industry representatives have cited state tax and commercial cases which have accepted that a Head Lease coupled with a sublease of shorter duration create separate and distinct property interests, with dissimilar legal entitlements, and should not be collapsed. See, for example, City of Desert Hot Springs v. County of Riverside, 91 Cal. App. 3d 441 (1979), and Stockholders & Spouses of Carioca, 687 P. 2d 1261.

Another factor presenting hazards for the Government is that the case authority that bridges the gap between Lyon, Lowenstein, and Rogers on the one hand, and the future interest argument on the other are all lower court decisions. These are: Bussing v. Commissioner, 88 TC 449 (1987) (Tax Court case), McCully Ashlock v. Commissioner, 18 T.C. 405 (1952), acq., 1952-2 C.B. 1 (Tax Court case), and Kruesel v. United States, 63-2 U.S. Tax Cas. (CCH) ¶ 9714 (D. Minn. 1963)(District Court case).

Adding to the concern, and perhaps to the hazards of litigation, is the fact that McCully Ashlock and Kruesel are not leasing cases; and while appellate cases, Lowenstein and Rogers are not either.

The success in court of the position expounded in Revenue Ruling 2002-69 and in the draft CIP also hinges on the courts' acceptance of the Service's application of the cited case law to the LILO facts. Will a court be willing to analogize non-leasing cases to LILOs? Will LILO representatives be successful at distinguishing the rest of the cited authority?

As mentioned previously, the future interest argument is novel in this particular area of taxation. While the distinction between present and future interests are important in other areas of taxation,[23] the novelty of its use in the LILO arena poses the risks inherent in asserting any groundbreaking argument. This aspect should be considered in any hazards assessment in LILO cases.

Based on the preceding analysis, the future interest argument as proposed in Revenue Ruling 2002-69 and the draft of the CIP appears pose **50 to 30 percent hazards of litigation for the Government**. This hazards range can decrease depending on the specific facts of each case. The factors decreasing hazards, and suggested values for decreasing hazards, will be discussed in the **SETTLEMENT GUIDELINES** section of this writing.

**ISSUE 3 (interest expense)**

The nonrecourse loans made by the lending bank may be disregarded because they lack economic substance even though they allegedly finance the Head Lease advance

[23] See, for example IRC § 167(d), which distinguishes between the interests of life tenants and other term interests and remaindermen of trusts and estates.

rent payment. In Bridges v. Commissioner, 39 T.C. 1064, aff'd, 325 F.2d 180 (4th Cir. 1963), the taxpayer "borrowed" funds from banks, used the funds to purchase Treasury notes (which the banks held as collateral), and ultimately sold these same notes to satisfy his debts. The Tax Court's rationale for disallowing the taxpayer's deductions of prepaid interest was: "[Taxpayer] at no time had the uncontrolled use of any additional money, of the bonds, or of the interest on the bonds. He assumed no risk of a rise or fall in the market price of the bonds and could not take advantage of such. His payment to the bank was not for the use or forbearance of money; it was for the purchase of a rigged sales price for the bonds and for a tax deduction. [Taxpayer] incurred no genuine indebtedness, within the meaning of the statute, and as a payment of interest, this transaction was also a sham. Bridges, at 1078-79.

According to the Bridges court, § 163 presupposes that the alleged debt not be a sham or incurred in a sham transaction. "Interest", as used in the statute, has a commercial connotation. Regardless of the resulting tax consequences, amounts paid as interest must have commercial reality, there must be some valid commercial reason for paying interest, and the borrower must in fact receive something in the transaction itself that would warrant payment of interest. Hence, to be deductible, the amounts paid must constitute interest and represent compensation for the use or forbearance of money. Where the taxpayer cannot benefit economically from the transaction except through tax deductions, the amount paid is not for the use or forbearance of money. The Tax court also noted, "We doubt that the bank at any time actually had any of its money out on loan or that its portfolio of Treasury notes actually changed. The transaction merely provided the 'facade' of a loan." Bridges, at 1077.

Additionally, the interest expense may be disallowed under § 163 since interest expense may not be deducted when it is incurred in transactions "that can not with reason be said to have purpose, substance, or utility apart from their anticipated tax consequences." Sheldon v. Commissioner, 94 T.C. 738, 760 (1990) (quoting Goldstein v. Commissioner, 364 F.2d 734, 740 (2d Cir. 1966)). Consequently, transactions merit respect and give rise to deductible interest only if there is some tax-independent purpose for the transactions. Moreover, the Service may disallow interest deductions on the grounds that "transactions which do not vary control or change the flow of economic benefits are to be dismissed from consideration" if they "do not appreciably change the taxpayer's financial position." ACM Partnership, 157 F.3d 231, 248 (3d Cir. 1998)(quoting Weller v. Commissioner, 270 F.2d 294, 297 (3d Cir. 1959)).

Goldstein v. Commissioner, 364 F.2d 734 (2d Cir. 1966), aff'g 44 T.C. 284 (1965) found that §163 did not permit a deduction for interest paid or accrued in loan arrangements without purpose, substance, or utility apart from their anticipated tax consequences. Furthermore, the Service need not always first label a purported loan transaction a "sham" in order to deny a deduction for interest paid in connection with the loan. See also Lee v. Commissioner, 155 F.3d 584 (2d Cir. 1998), aff'g and remanding T.C. Memo. 1997-172, rejecting the broader idea expressed in Rice's Toyota World, Inc. v. Commissioner, 752 F.2d 89 (4th Cir. 1985), that whether a debt contracted in return for



137

an expected tax benefit will support an interest deduction depends simply on whether the debt itself is genuine.

In addition, the mere fact that a promissory note is given does not prove the existence of a loan if there was no genuine indebtedness. That is, the simple measure of drawing up papers has never been recognized as controlling for tax purposes when the objective economic realities are to the contrary. Frank Lyon, 435 U.S. at 573 (quoting Commissioner v. Tower, 327 U.S. 280, 291 (1946)). Furthermore, even if all papers signed appear to show legitimate debt, in sham transactions such papers often are executed solely for the purpose of obtaining tax deductions. Meyer v. Commissioner, T.C. Memo. 1986-328 (no indebtedness existed in transaction with circular funding). Further, in Greenfield v. Commissioner, T.C. Memo. 1982-617, the court found repayments that were mere bookkeeping entries significant (the interest rate and monthly payment on the notes were also identical). The Greenfield court did not respect the loan. Also, in Blue Flame Gas Co. v. Commissioner, 54 T.C. 584 (1970), the supposed loans were not respected because the payments took the form of bookkeeping entries, the loan was in the exact amount of the rent due under the leases, and repayment dates of the loan and rent payments were found to be intentionally designed to match.

According to the Revenue Ruling 2002-69, the portion of the Head Lease advance rent payment or prepayment financed with the nonrecourse loans must be disregarded because the loans are without substance. Neither the U.S. Taxpayer nor the tax-exempt entity obtains use of the ostensibly borrowed funds. . Upon receipt of funds from the U.S. Taxpayer, the tax-exempt entity immediately deposits the full amount of the nonrecourse loan with the lender's affiliate via the Payment Undertaking Agreement. The Deposit is then used only to make the tax-exempt entity's rent payments to the U.S. Taxpayer, which in turn immediately forwards the full amount of the rent received to the lenders. See Bridges v. Commissioner, supra. In addition, according to the CIP, there are various credit supports or security arrangements[24] that ensure that the lenders never lose control of the nonrecourse loan funds.

[24] The CIP goes into a more detailed analysis. It states that the nonrecourse loans lack substance because there are no credit risks to any of the parties involved. The lenders are not at risk because they retain total control over the nonrecourse loan funds due to the Payment Undertaking Agreement, the Lender Security Package, and the Tax Exempt Entity's promise that it will not permit any liens on the Deposit. Further, the Tax Exempt Entity agrees not to terminate the Head Lease until Lender 1 is paid in full, the Sublease provides for direct payment of the Tax Exempt Entity's rent to Lender 1, and Lender 1 may take action against Lender 2/the Deposit Taker; (b) the U.S. Taxpayer is not at risk due to the high credit rating of the Tax Exempt Entity, it holds a first priority perfected interest in the Equity Collateral, and the Tax Exempt Entity must provide a satisfactory guarantee or letter of credit to the U.S. Taxpayer should its credit rating dip, the country in which it is located ceases to own a majority interest in the tax-exempt entity, or it does not exercise the Early Buyout Option. Additionally, the tax-exempt entity's obligation to pay rent is absolute, and it may not sublease the property or assign any of its rights without the U.S. taxpayer's approval; and (c) the tax-exempt entity is protected through receipt of all the funds needed to make its rent payments at the beginning of the transaction and its exercise of the Early Buyout Option ensures it will retain control over the underlying asset throughout the transaction. See Saviano v. Commissioner, 765 F.2d 643 (7th Cir. 1985), aff'g 80 T.C. 955 (1983).

An additional argument in support of disregarding the loans is that the leasehold interest supposedly financed by the loans is substantially offset by the sublease with the tax-exempt entity. Therefore, the U.S. Taxpayer cannot itself use the property for at least the twenty-year duration of the sublease. For example, in Blue Flame Gas Company v. Commissioner, 54 T.C. at 595, a cash payment was not characterized as a loan because no repayment would ultimately be necessary due to contemporaneous lease obligations.

The fact that the amount of rent to be paid by the tax-exempt entity exactly equals the amount of the U.S. Taxpayer's loan payments to the lending banks is another indicia of the lack of substance in these loans. Additionally, the Deposit and Payment Undertaking Agreement with the banks' affiliates ensure that the U.S. taxpayer need not expend any of its own funds to make the principal and interest payments. Further, the amount of interest charged by lenders on the nonrecourse loans exactly equal the amount of interest paid by its affiliates on the deposits made by the tax-exempt entity. Also, the tax exempt entity retains control at all times of the property subject to the LILO, the debt defeasance ensures that the tax-exempt entity will make all rent payments due, and the equity defeasance ensures that the Early Buyout Option will be exercised.

In evaluating the hazards of litigation with respect to this issue, recognition has to be given to the fact that the Government's position primarily relies on the Bridges case. A case that could be factually distinguishable from LILOs, Bridges involved no profit motive and totally rigged transactions – this may not be found with the LILOs. Courts could find that LILO transactions have valid commercial reasons for paying interest because the U.S. taxpayer received a current leasehold interest and a meaningful pre-tax profit, the Government's position might fail.

As mentioned in the preceding paragraphs, there are other factors that could help shore up the strength of the Government's case. Those are:

- Same interest rates charged by the lending banks as those paid by the affiliate deposit takers
- The credit support mechanisms or security arrangements
- The fact that the lease or rent payments equal the the debt service payments
- The fact that nonrecourse loans are involved

Overall, based on the preceding analysis, the Government appears to face hazards of litigation, which reflect those faced in the future interest issue (ISUUE 1). This is because the success of the position relies to a great extent on the success of the future interest argument (see the **SETTLEMENT GUIDELINES** section of this memorandum).

**ISSUE 4 (financing arrangement)**

Revenue Ruling 2002-69 preserved the option to, in the appropriate factual circumstances, disallow tax benefits claimed from entering into LILO transactions on the alternative ground that the substance over form doctrine requires their characterization as a financing arrangement. Revenue Ruling 2002-69 reserved the argument, and the CIP covered the legal analysis in more detail.

Commissioner v. Court Holding Company, 324 U.S. 331, 334 (1945) stated that since the incidence of taxation depends upon the substance of a transaction, to allow the true nature of a transaction to be disguised by mere formalisms, existing solely to alter tax liabilities, would seriously impair the effective administration of the tax policies of Congress. Furthermore, Helvering v. Lazarus & Co., 308 U.S. 252, 255 (1939) held that the substance over form doctrine is "concerned with substance and realities, and formal written documents are not rigidly binding."

Based on the Frank Lyon case, the Government can determine whether a transaction involves: (1) substance encouraged by business or regulatory realities; (2) tax-independent considerations; and (3) characteristics not shaped solely by tax-avoidance considerations that have meaningless labels attached. Furthermore, the Service may look at actualities, and, upon determining that the form employed for carrying out the challenged tax event is unreal, may sustain or disregard the fiction as best serves the purposes of the tax statute. Derr v. Commissioner, 77 T.C. 708, 721, 722 (1981)(citing Higgins v. Smith, 308 U.S. 473, 476-477 (1940)); see also Rogers v. United States, 281 F.3d at 1115 (major purpose of the substance over form doctrine is to recharacterize transactions in accordance with their true nature); Zmuda v. Commissioner, 731 F.2d 1417 (9th Cir. 1984), aff'g 79 T.C. 714 (1982)(although a transaction may be structured to satisfy the formal requirements of the Internal Revenue Code, it may be denied legal effect if its sole purpose is to avoid taxation).

Furthermore, the Government may dismiss transactions exhibiting the absence of changes in control of property or lacking a flow of economic benefits because the incidence of taxation depends upon the substance of the transaction and not its mere form where the form is not in accordance with economic reality. Additionally, an absence of arm's-length dealing requires a court to consider whether the form and substance of the transaction were the same. Derr v. Commissioner, 77 T.C. at 723 (citing Gregory v. Helvering). See also Hilton v. Commissioner, 74 T.C. 305 (1980).

Leases or supposed leases have been recharecterized as financing arrangements by courts when they have exhibited the following characteristics:

- owner/lessor lacks both the risk of depreciation and the benefit of appreciation
- owner/lessor does not retain significant and genuine attributes of the traditional lessor status (see Frank Lyon, 435 U.S. at 584)

- owner/lessor does not bear market risk with respect to the property (see Kwiat v. Commissioner, T.C. Memo. 1992-433 (quoting Aderholt Specialty Co. v. Commissioner, T.C. Memo. 1985-491

Consequently, a LILO will likely be respected only if the U.S. Taxpayer as Headlessee/Sublessor retains significant and genuine attributes of the traditional lessor status. Otherwise, the LILO could be recharacterized as a financing arrangement. See the **SETTLEMENT GUIDELINES** section of this memorandum for comments on the hazards of litigation regarding this issue.

**ISSUE 5 (economic substance)**

The Service set forth its economic substance position with respect to LILOs in Revenue Ruling 99-14. In October 2002, the Service issued Rev. Rul. 2002-69 (discussed above), which clearly preserved this argument when it chose not to revoke Rev. Rul. 99-14.

Revenue Ruling 99-14 examines several factors to support the position that LILOs lack economic consequences other than the creation of tax benefits. The Ruling points to the offsetting and circular nature of the LILO arrangement, as evidenced by the following:

- The obligation of the trust to make the property available under the sublease is completely offset by its right to use the property under the headlease.
- The trust's obligation to make debt service payments on the loans from the two banks is completely offset by the sublease payments from the tax-exempt entity.
- The deposit arrangements with the bank affiliates limit the risk that the tax-exempt entity will not make the required rental payments to the trust.
- The economic risk to the trust with respect to the $54 million loan from the bank is eliminated through the deposit of the same amount with the bank's affiliate.
- The economic risk to the trust with respect to the $6 million loan from the bank is substantially reduced by the deposit arrangement.
- Neither bank bears any significant risk of nonpayment as a result of the above-referenced deposit arrangement.
- The trust's economic exposure to the Head Lease residual is rendered insignificant by the put option structure and the pledge of the securities that defeases the foreign entity's option payment.
- The pre-tax economic return to the trust is insignificant when compared to its after tax yield.

The courts have developed a number of general principles of taxation that govern the adjudication of economic substance cases. In Frank Lyon Co. v. United States, 435 U.S. 561, 583-584 (1978), the Supreme Court held that a transaction will be respected

for tax purposes if it has "economic substance which is compelled or encouraged by business or regulatory realities, is imbued with tax-independent considerations, and is not shaped solely by tax-avoidance features that have meaningless labels attached."

Other courts have held that when the form of a transaction lacks economic substance, the form may be disregarded and the proper tax treatment may be determined, consistent with the substance of the transaction. ACM Partnership v. Commissioner, 157 F.3d 231 (3d Cir. 1998), aff'g and rev'g T.C. Memo. 1997-115, cert. denied, 526 U.S. 1017 (1999).

The doctrine of economic substance applies where a taxpayer seeks to claim tax benefits not intended by Congress through transactions that serve no economic purpose other than tax savings. United States v. Wexler, 31 F.3d 117, 122 (3d Cir. 1994), cert. denied, 513 U.S. 1190 (1995); Yosha v. Commissioner, 861 F.2d 494, 498-499 (7th Cir. 1988), aff'g Glass v. Commissioner, 87 T.C. 1087 (1986); Weller v. Commissioner, 31 T.C. 33 (1958), aff'd, 270 F.2d 294 (3d Cir. 1959), cert. denied, 364 U.S. 908 (1960); Saba Partnership v. Commissioner, T.C. Memo. 1999-359.

In evaluating whether a LILO transaction has economic substance, a key factor is whether the arrangement has any practical economic effect other than the creation of tax losses. Several courts have declined to recognize the tax consequences of a transaction that does not affect the taxpayer's beneficial interest, but only reduces taxes. The presence of an insignificant pretax profit is not enough to provide sufficient economic substance for a transaction to be respected for tax purposes. Courts have also recognized that offsetting legal obligations, or circular cash flows, may effectively eliminate any real economic significance of the transaction. Knetsch v. United States, 364 U.S. 361, 366 (1960); ACM Partnership v. Commissioner, 157 F.3d at 243; Sheldon v. Commissioner, 94 T.C. 738, 768 (1990).

The factual determination of whether economic substance exists depends on whether the transaction is rationally related to a useful nontax purpose that is plausible in light of the taxpayer's conduct and useful in light of the taxpayer's economic situation and intentions. The utility of the stated purpose, and the rationality of the means chosen to effect that purpose, must be evaluated in conjunction with commercial practices of the relevant industry. Cherin v. Commissioner, 89 T.C. 986, 993-994 (1987). Consequently, a rational relationship between purpose and means ordinarily will not be found unless a reasonable expectation exists that the nontax benefits would be at least commensurate with the transaction costs. Yosha, supra; ACM Partnership, 157 F.3d at 249.

Determining whether a transaction lacks economic substance requires the analysis of two related factors: (1) whether the transaction was carried out for a valid business purpose (a subjective factor); and (2) whether the transaction has economic substance other than just creating tax benefits (an objective factor). ACM Partnership, 157 F.3d at 247-248; Casebeer, 909 F.2d 1360, 1363 (9th Cir. 1990), aff'g T.C. Memo. 1987-628; Kirchman v. Commissioner, 862 F.2d 1486, 1490-1491 (11th Cir. 1989).

To have a business purpose, the transaction must be "rationally related to a useful nontax purpose that is plausible in light of the taxpayer's conduct and ... economic situation." ACM Partnership, T.C. Memo. 1997-115, aff'd in relevant part, 157 F.3d 231 (3d Cir. 1998); Kirchman v. Commissioner, 862 F.2d, 1486, 1490-1491.

To have economic substance, the transaction must appreciably affect the taxpayer's beneficial interest, absent tax benefits. Knetsch v. United States, 364 U.S. at 366; ACM Partnership, 157 F.3d at 248.

Some courts have recognized that offsetting legal obligations may effectively eliminate any real economic significance of the transaction. These offsetting obligations are referred to as circular cash flows. Knetsch v. United States, 364 U.S. 361 (1960); Hines v. Commissioner, 912 F.2d 736, 741 (4th Cir. 1990). In Knetsch, the taxpayer borrowed against increases in the cash value of a bond. Therefore, the bond and the taxpayer's borrowings constituted offsetting obligations and the taxpayer could never derive any significant benefit from the investment. The Supreme Court held that the transaction was a sham because it produced no significant economic effect; it had been structured only to provide the taxpayer with interest deductions.

Minimal profits in relation to the tax benefits are not sufficient to imbue an otherwise questionable transaction with economic substance. ACM Partnership, 157 F.3d at 258; Sheldon v. Commissioner, 94 T.C. at 767-768; Saba Partnership v. Commissioner, T.C. Memo. 1999-359. Analysis of economic factors should be focused on the taxpayer's calculations at the outset of the transaction. ACM Partnership, 157 F.3d at 257.[25]

Minimal profit is not conclusive in finding that a transaction exhibited economic substance. See Bryant v. Commissioner, 928 F.2d 745 (6th Cir. 1991), aff'g in part and rev'g in part, T.C. Memo. 1988-341; Jacobson v. Commissioner, 915 F.2d 832 (2d Cir. 1990). The fact that a taxpayer is willing to accept a minimal profit with limited upward profit potential may be indicative that the transaction was tax motivated. See Hines, supra; Prager v. Commissioner, T.C. Memo. 1993-452; Pacheco v. Commissioner, T.C. Memo. 1989-296.[26]

---

[25] In ACM Partnership v. Commissioner, 157 F.3d 231 (3d Cir. 1998), the taxpayer entered into a near-simultaneous purchase and sale of debt instruments. Taken together, the purchase and sale "had only nominal, incidental effects on the taxpayer's net economic position." ACM Partnership,157 F.3d at 250. The taxpayer claimed that, despite the minimal net economic effect, the transaction had economic substance. The court held that transactions that do not "appreciably" affect a taxpayer's beneficial interest, except to reduce tax, are devoid of substance and are not respected for tax purposes. ACM Partnership, 157 F.3d at 248. The court denied the taxpayer the purported tax benefits of the transaction because the transaction lacked any significant economic consequences other than the creation of tax benefits.

[26] In Hines v. Commissioner, 912 F.2d 736 (4th Cir. 1990), the Fourth Circuit found that a leasing transaction was a sham. In doing so, it described a $17,000 profit potential as "minimal" on an eight-year investment of $130,000. The Fourth Circuit also found evidence of tax motivation in the offsetting obligations to pay rent and debt service. The transaction also involved the use of related parties to avoid § 465. Therefore, minimal profits on lease transactions may be overlooked when tax considerations have taken over.

While claims of pre-tax profit are not dispositive, there is some precedent that economic substance for a lease transaction will be satisfied if there is "some modicum" of economic substance, which may mean "some modicum" of pre-tax profit. See Rice's Toyota World, Inc. v. Commissioner, 81 T.C. 184, 203 n.17 (1983) [CCH Dec. 40,410], aff'd in part and rev'd in part on other grounds, 752 F.2d 89 (4th Cir. 1985) [85-1 USTC ¶9123]. See Estate of Thomas v. Commissioner, 84 T.C. 412, 440 n.52 (1985) [CCH Dec. 41,943].

With respect to how pre-tax profit is viewed, it is interesting to note that several courts have used time value of money concepts, more specifically, present value calculations, in examining profitability. See ACM Partnership v. Commissioner, 157 F.3d at 259; Hilton v. Commissioner, 671 F.2d 316, 317 (9th Cir. 1982), aff'g 74 T.C. 305 (1980); Citizens & Southern Corp. v. Commissioner, 91 T.C. 463, 498 (1988), aff'd, 919 F.2d 1492 (11th Cir. 1990).

The preceding judicial holdings provide support for the economic substance argument. The precedents provide support for disallowing expenses of the trust related to the amortization of the pre and post rental payments, and of transaction fees. But there is also specific support for the disallowance of the interest expense deductions taken by the trust. Courts have disallowed interest deductions that are part of a sham transaction even when they arise out of a bona fide debt. The leading case on this issue is Goldstein v. Commissioner, 364 F.2d 734 (2d Cir. 1966), cert. denied, 385 U.S. 1005 (1967). In Goldstein, an individual who, after winning $140,218 in the Irish Sweepstakes, borrowed nearly $1 million from two banks at 4 percent interest in order to buy U. S. Treasury notes paying 1 1/2 percent interest. The Goldstein court held that the individual could not deduct $81,396 in interest prepaid to the banks. The loans were not sham transactions, but the interest deduction was denied because the taxpayer did not enter into the transactions in order to derive any economic gain through appreciation in value of the Treasury notes, but borrowed the money solely in order to secure a large interest deduction, which could be deducted from her sweepstakes winnings.

A number of Courts have followed Goldstein in disallowing interest deductions where they are an integral part of a transaction found to lack economic substance. See Wexler v. United States, 31 F.3d at 125-126; Winn-Dixie Stores, Inc. v. Commissioner, 113 T.C. 254, 279 (1999), aff'd, 254 F.3d 1313 (11th Cir. 2001); Arrowhead Mountain Getaway, Ltd. v. Commissioner, T.C. Memo. 1995-54, aff'd, 80 A.F.T.R.2d 5664 (9th Cir. 1997); Seykota v. Commissioner, T.C. Memo. 1991-541 and Lee v. Commissioner, T.C. Memo. 1997-172.

Based on the legal precedents discussed above, Revenue Ruling 99-14 and the draft of the coordinated issue paper from Compliance conclude that LILOs do not have economic substance. Therefore, according to Compliance, the amortization of the pre and post payments, the interest expense, and the amortization of the transaction fees should be disallowed in full.

In applying the facts of LILO transaction to the preceding law, care has to be taken to ascertain whether a circular flow exists as a result of rental payments due from the tax-exempt entity equaling the loan payments on the nonrecourse loans due from the trust. Also, whether the interest rate paid on deposits is the same as the interest rate paid on the loans. This is referred to as the first circular flow of funds, and is the point made by Revenue Ruling 99-14 when it states that the trust's obligation to make debt service payments on the loans from the two banks is completely offset by the sublease payments from the tax-exempt entity.

The second circular flow of funds occurs as a result of the deposit with a custodian (by the tax-exempt entity) of funds that will exactly equal the amount due under the fixed purchase option at the end of the 20th year. Since the funds will be there when the purchase option is available, the tax-exempt entity will be likely to exercise the option. This is the point made by Revenue Ruling 99-14 when it states that the trust's economic exposure to the Head Lease residual is rendered insignificant by the put option structure and the pledge of the securities that defeases the foreign entity's option payment.[27]

The probable termination of the Head Lease (as a result of the put option) before the amount of taxable income exceeds the deductions[28] is another indication of the lack of business purpose independent of tax considerations. This is because the pre-tax profit is diminished by the absence of rental income during the 14 years remaining in the "Head Lease."

If these two circular flows are present, there is no change in the economic position of the trust (the U.S. taxpayer), and application of the Knesch and the ACM Partnership cases would indicate lack of economic substance.

Additionally, there is no change in the economic position of the trust because there is no credit risk. This point is made in Revenue Ruling 99-14 when it states:

- The deposit arrangements with the bank affiliates limit the risk that the tax-exempt entity will not make the required rental payments to the trust.
- The economic risk to the trust with respect to the $54 million loan from the bank is eliminated through the deposit of the same amount with the bank's affiliate.
- The economic risk to the trust with respect to the $6 million loan from the bank is substantially reduced by the deposit arrangement.
- Neither bank bears any significant risk of nonpayment as a result of the above-referenced deposit arrangement.

Another indicia of the lack of economic substance is the minimal pre-tax profit when compared to its after tax yield. According to the draft of the coordinated issue paper, revenue agents have calculated that the potential pretax profit is typically 3% or less absent tax benefits. However, the pretax profit is negative using a present value analysis. Such minimal returns over such a long period of time show a lack of economic

[27] The deposit with the custodian is referred to as "equity collateral."
[28] This is because the trust will no longer receive rental income for the remaining 14 years.

substance. See Hines, supra. See the **SETTLEMENT GUIDELINES** section of this memorandum for comments on the hazards of litigation regarding this issue.

**ISSUE 6 (original issue discount)**

In LILO transactions, some of the funds originally invested by the U.S. Taxpayer (through the Trust) from its own pocket are used to purchase highly rated securities to fund the second circular flow. Eventually, the full amount of the securities will be returned to the trust through the fixed purchase option.[29] The original investment is thus returned to the trust with accrued interest to boot. Original Issue Discount (OID) income could, therefore, be attributed to the trust. See Sheldon, 94 T.C. at 762; Leema Enterprises v. Commissioner, T.C. Memo. 1999-18; IRC §§ 1271-1275; and James v. United States, 366 U.S. 213 (1961).

This is an argument made by Compliance, but it requires that part of the pre payment made by the trust be deemed a loan. The part deemed to be a loan would be the amount invested by the tax-exempt entity, through the custodian, in debt securities. The argument is that it is really not a pre payment, but rather, it is a loan from the trust to the tax-exempt entity, which is returned to the trust later with interest, through the exercise of the purchase option. This argument would be applicable whether the alternative substance over form/financing arrangement or the alternative lack of economic substance approach is used in addressing LILOs.

**ISSUE 7 (IRC §467)**

Final IRC §467 Treasury Regulations effective May 18, 1999, treat the prepayment (or advance rent) as resulting in a deemed loan from the U.S. Taxpayer to the tax-exempt entity and require the imputation of interest income to the U.S. Taxpayer. See Treas. Reg. §1.467-4.

Additionally, Treas. Reg. § 1.467-1(a)(1) states that § 467 calls for a lessor or lessee of tangible property to use the accrual method of accounting and time value of money principles to treat rents regardless of their method of accounting. Moreover, the regulation provides that in cases involving tax avoidance, the lessor and lessee must take rent into account under a constant rental accrual method; accordingly, rent is treated as accruing ratably over the entire lease term. This regulation effectively prevents the prepayment of rent in LILO transactions. Notably, Treas. Reg. § 1.467-1(c)(1) generally includes as "section 467 rental agreements" a rental agreement[30] with increasing or decreasing rents or deferred or prepaid rents. See Treas. Reg. § 1.467-1(c)(3) for the definition of prepaid rent. Again, the final regulations limit the accelerated rental deductions so attractive to U.S. Taxpayers involved in LILO transactions.

This issue was covered in the CIP to alert Revenue Agents that beginning on May 18, 1999, the prepayment of rent will be treated as resulting in a deemed loan from the U.S.

---

[29] That is, the funds used to purchase the securities may be deemed a loan to the tax-exempt entity.
[30] Treas. Reg. § 1.467-1(h)(12) defines "rental agreement."



146

taxpayer to the tax-exempt entity requiring the imputation of interest income to the U.S. taxpayer. See Treas. Reg. §1.467-4. Also note that the U. S. taxpayer's rent deduction would be subject to proportional rent rules reflecting the time value of money concept. See Treas. Reg. 1.467-2(c ). The issuance of these final §467 regulations and of Rev. Rul. 99-14, C. B. 99-1, 835, effectively stopped further taxpayer involvement with LILO transactions.[31]

**<u>ISSUE 8</u> (penalties)**

The determination of the applicability of the penalties under IRC § 6662 should be made on a case-by-case basis.[32] Generally, the Government will face substantial hazards of litigation in these cases unless there is some documentary evidence of tax avoidance purpose.

<u>Part I - *The Accuracy-Related Penalty*</u>. A significant matter relevant to the potential assertion of the accuracy-related penalty attributable to a substantial understatement is whether the transaction constitutes a tax shelter as defined in Internal Revenue Code § 6662(d)(2)(C)(iii). The transaction will constitute a tax shelter if a significant purpose of the transaction is the avoidance or evasion of federal income tax (if the transaction was entered into before August 6, 1997, a "principal purpose" standard applies). If the transaction is a tax shelter, then, as explained below, the requirements of Treas. Reg. §1.6662-4(e) should be carefully scrutinized to determine whether a corporate taxpayer had sufficient "reasonable cause" to avoid the accuracy-related penalty attributable to a substantial understatement. If a LILO transaction lacks economic substance, the position should be that the principal purpose of such transactions is the avoidance of federal income tax. Accordingly, LILO transactions could be considered tax shelters. According to sources from Compliance, the penalty will generally not be asserted unless something is found in the documentation indicating that the transaction was entered into for tax considerations.

With the preceding in mind, the application of the penalties should be based on an evaluation of the facts developed in view of the following legal standards:

Section 6662 imposes an accuracy-related penalty in an amount equal to 20 percent of the portion of an underpayment attributable to, among other things: (1) negligence or

---

31 . See footnote 7, <u>Supra.</u>

32 It is important to note that on January 14, 2002, in Announcement 2002-2, 2002-21.R.B. 304, the Service announced a disclosure initiative to encourage taxpayers to disclose their tax treatment of tax shelters and other items for which the imposition of the accuracy-related penalty may be appropriate if there is an underpayment of tax. In return for a taxpayer disclosing any item in accordance with the provisions of this announcement before April 23, 2002, the Service agreed to waive the accuracy-related penalty under I.R.C. § 6662(b)(1), (2), (3), and (4) for any underpayment of tax attributable to that item.

disregard of rules or regulations and (2) any substantial understatement of income tax. See Treas. Reg. §§ 1.6662-1 through 1.6662-4.

Treas. Reg. § 1.6662-2(c) provides that there is no stacking of the accuracy-related penalty components. Thus, the maximum accuracy-related penalty imposed on any portion of an underpayment is 20 percent, even if that portion of the underpayment is attributable to more than one type of misconduct (e.g., negligence and substantial understatement). See Treas. Reg. § 1.6662-1(d) for the effective dates for the provisions of § 6662.

Part II -*Negligence or disregard of rules or regulations.* Negligence includes any failure to make a reasonable attempt to comply with the provisions of the Internal Revenue Code or to exercise ordinary and reasonable care in the preparation of a tax return. See Internal Revenue Code § 6662(c) and Treas. Reg. § 1.6662-3(b)(1). Negligence also includes the failure to do what a reasonable and ordinarily prudent person would do under the same circumstances. See Marcello v. Commissioner, 380 F.2d 499 (5th Cir. 1967), aff'g 43 T.C. 168 (1964); Neely v. Commissioner, 85 T.C. 934, 947 (1985).

Treas. Reg.§ 1.6662-3(b)(1)(ii) provides that negligence is strongly indicated where a taxpayer fails to make a reasonable attempt to ascertain the correctness of a deduction, credit or exclusion on a return that would seem to a reasonable and prudent person to be "too good to be true" under the circumstances. The Tax Court also sustained the application of the negligence penalty in Sheldon v. Commissioner, supra, stating that the taxpayer, "intentionally entered into loss-producing repos in order to generate and claim tax benefits." Therefore, if the facts establish that a taxpayer reported losses from a transaction that lacked economic substance, then the accuracy-related penalty attributable to negligence may be applicable if the taxpayer failed to make a reasonable attempt to ascertain the correctness of the claimed losses or deductions.

"Disregard of rules and regulations" includes any careless, reckless, or intentional disregard of rules and regulations. A disregard of rules or regulations is "careless" if the taxpayer does not exercise reasonable diligence in determining the correctness of a position taken on its return that is contrary to the rule or regulation. A disregard is "reckless" if the taxpayer makes little or no effort to determine whether a rule or regulations exists, under circumstances demonstrating a substantial deviation from the standard of conduct observed by a reasonable person. Additionally, disregard of the rules and regulations is "intentional" where the taxpayer has knowledge of the rule or regulation that it disregards. Treas. Reg. § 1.6662-3(b)(2).

Moreover, a reasonable basis is a relatively high standard of tax reporting, one significantly higher than not frivolous or not patently improper. Thus, the reasonable basis standard is not satisfied by a return position that is merely arguable or colorable. Conversely, under Treas. Reg. § 1.6662-(b)(3), a return position is reasonable where based on one or more of the authorities listed in Treas. Reg. § 1.6662-4(d)(3)(iii), taking into account the relevance and persuasiveness of the authorities and subsequent developments, even if the position does not satisfy the substantial authority standard

defined in Treas. Reg. § 1.6662-4(d)(2). Furthermore, the reasonable cause and good faith exception in Treas. Reg. § 1.6664-4 may relieve the taxpayer from liability from the negligence penalty, even if the return position does not satisfy the reasonable basis standard. See Treas. Reg. § 1.6662-3(b)(3).

"Rules and regulations" includes the provisions of the Internal Revenue Code and revenue rulings or notices issued by the Internal Revenue Service and published in the Internal Revenue Bulletin. Treas. Reg. § 1.6662-3(b)(2). Therefore, if the facts indicate that a taxpayer took a return position contrary to any published notice or revenue ruling, the taxpayer may be subject to the accuracy-related penalty for an underpayment attributable to disregard of rules and regulations, if the return position was taken subsequent to the issuance of a notice or revenue ruling.

The accuracy-related penalty for disregard of rules and regulations will not be imposed on any portion of underpayment due to a position contrary to rules and regulations if: (1) the position is disclosed on a properly completed Form 8275 or Form 8275-R (the latter is used for a position contrary to regulations) and (2), in the case of a position contrary to a regulation, the position represents a good faith challenge to the validity of a regulation. This adequate disclosure exception applies only if the taxpayer has a reasonable basis for the position and keeps adequate records to substantiate items correctly. Treas. Reg. § 1.6662-3(c)(1). Moreover, a taxpayer who takes a position contrary to a revenue ruling or a notice has not disregarded the ruling or notice if the contrary position has a realistic possibility of being sustained on its merits. Treas. Reg. § 1.6662-3(b)(2).

Taxpayers participating in LILO transactions prior to the issuance of Revenue Ruling 99-14 on March 11, 1999, could not take positions contrary to a published notice or revenue ruling. However, for LILO transactions predating the issuance of Rev. Rul. 99-14, a taxpayer could still be liable for the negligence penalty based upon a failure to make a reasonable attempt to comply with the provisions of the Internal Revenue Code or to exercise ordinary and reasonable care in the preparation of a tax return.

<u>Part III - *Substantial Understatement of Income Tax.*</u> A substantial understatement of income tax exists for a taxable year if the amount of understatement exceeds the greater of 10 percent of the tax required to be shown on the return or $5,000 ($10,000 in the case of corporations other than S corporations or personal holding companies). IRC § 6662(d)(1).

In the case of items of corporate taxpayers attributable to tax shelters, neither exception (1) nor (2) in IRC§ 6662(d)(2)(B), reduction for understatement due to position of taxpayer or disclosed item, applies. IRC§ 6662(d)(2)(C)(ii). Therefore, if a corporate taxpayer has a substantial understatement that is attributable to a tax shelter item, the accuracy-related penalty applies to the understatement unless the reasonable cause and good faith exception applies. The definition of tax shelter includes, among other things, any plan or arrangement a significant purpose of which is the avoidance or evasion of federal income tax. IRC§ 6662(d)(2)(C)(iii).

For transactions entered into before August 6, 1997, the relevant standard was whether tax avoidance or evasion was the "principal purpose" of the entity, plan, or arrangement. Treas. Reg. § 1.6662-4(g)(2)(i). If the facts establish that an understatement attributable to the disallowance of losses or deductions from a LILO transaction exceeds the greater of 10 percent of the tax required to be shown on the return or $5,000 ($10,000 in the case of corporations other than S corporations or personal holding companies), a substantial understatement penalty may be applicable.

Part IV - *The Reasonable Cause Exception*. The accuracy-related penalty does not apply with respect to any portion of an underpayment with respect to which it is shown that there was reasonable cause and that the taxpayer acted in good faith. IRC § 6664(c)(1). The determination of whether a taxpayer acted with reasonable cause and in good faith is made on a case-by-case basis, taking into account all pertinent facts and circumstances. Treas. Reg.§ 1.6664-4(b)(1). Generally, the most important factor is the extent of the taxpayer's effort to assess the proper tax liability. IRC 6664(c)(1).

Reliance on the advice of a professional tax advisor does not necessarily demonstrate reasonable cause and good faith. Reliance on professional advice does constitute reasonable cause and good faith if, under all the circumstances, such reliance was reasonable and the taxpayer acted in good faith. IRC §6664 ( C); See also United States v. Boyle, 469 U.S. 241 (1985) (reasonable cause is established when a taxpayer shows that he reasonably relied on the advice of an accountant or attorney). However, in no event will a taxpayer be considered to have reasonably relied in good faith on advice unless all the requirements of Treas. Reg. § 1.6664-4(c) are satisfied. In addition, the fact that the taxpayer satisfies the regulation will not necessarily establish that the taxpayer reasonably relied on the advice of a professional tax advisor or other advisor in good faith. For example, if the taxpayer knew, or should have known, that the advisor lacked knowledge in the relevant aspects of Federal tax law, reliance may not be reasonable or in good faith. Treas. Reg. § 1.6664-4(c)(1).

If a taxpayer's reliance on advice is to be sufficiently reasonable so as possibly to negate a § 6662(a) accuracy-related penalty, the Tax Court in Neonatalogy Associates P.A. v. Commissioner, 115 T.C. 43 (2000) stated that the taxpayer has to satisfy the following three-prong test: (1) the advisor was a competent professional who had sufficient expertise to justify reliance; (2) the taxpayer gave to the advisor the necessary and accurate information; and (3) the taxpayer actually relied in good faith on the advisor's judgment. Taxpayers not satisfying all three prongs have not demonstrated the reasonableness of their position.

Additionally, the advice must be based upon all pertinent facts and circumstances and the law as it relates to those facts and circumstances. For example, the advice must take into account the taxpayer's purpose (and the relative weight of such purpose) for entering into a transaction and for structuring a transaction in a particular manner. A taxpayer will not be considered to have reasonably relied in good faith on professional tax advice if the taxpayer fails to disclose a fact it knows, or should know, to be relevant

to the proper tax treatment of an item. Treas. Reg. § 1.6664-4(c)(1)(i). The advice must not be based on unreasonable factual or legal assumptions (including assumptions as to future events) and must not unreasonably rely on the representations, statements, findings, or agreements of the taxpayer or any other person. For example, the advice must not be based upon a representation or assumption that the taxpayer knows, or has reason to know, is unlikely to be true, such as an inaccurate representation or assumption as to the taxpayer's purposes for entering into a transaction or for structuring a transaction in a particular manner. Treas. Reg. § 1.6664-4 ( c)(1)(i). Also, where a tax benefit depends on nontax factors, the taxpayer has a duty to investigate such underlying factors. The taxpayer cannot simply rely on statements by another person, such as those of a promoter. See Novinger v. Commissioner, T.C. Memo. 1991-289 (taxpayer could not avoid the negligence penalty merely because his professional advisor had read the prospectus and had advised the taxpayer that the underlying investment was feasible from a tax perspective, assuming the facts presented were true). Further, if the tax advisor is not versed in these nontax factors, mere reliance on the tax advisor does not suffice. See Addington v. United States, 205 F.3d 54 (2d Cir. 2000) (taxpayer's reliance on tax advisor was not reasonable given the cautionary language in offering memoranda and the tax advisor's lack of adequate knowledge to evaluate essential aspects of the underlying investment); Freytag v. Commissioner, 89 T.C. 849 (1987), aff'd, 904 F.2d 1011 (5th Cir. 1990) (reliance on tax advice not reasonable where taxpayer did not consult experts with respect to the bona fides of the financial aspects of the investment); Goldman v. Commissioner, 39 F.3d 402 (2d Cir. 1994) (taxpayer's reliance on accountant's advice to invest in a partnership engaged in oil and gas was not reasonable where accountant lacked industry knowledge); Collins v. Commissioner, 857 F.2d 1383 (9th Cir. 1988) (penalties upheld where advisor "knew nothing firsthand" about the venture).

The mere fact that the value of property has been appraised does not ordinarily indicate reasonable cause and good faith.[33] Other factors to consider include: (1) the methodology and assumptions underlying the appraisal; (2) the appraised value; (3) the relationship between appraised value and purchase price; (4) the circumstances under which the appraisal was obtained; and (5) the appraiser's relationship to the taxpayer or to the activity in which the property is used. Treas. Reg. § 1.6664-4(b)(1). When considering an appraisal as an aspect of reasonable cause and good faith in a LILO transaction, particular attention should be paid to factors (3), (4), and (5).

Regarding reasonable cause for the substantial understatement penalty attributable to tax shelter items of a corporation, special rules apply (see § 6662(d)(2)(C)(iii)) for the definition of a tax shelter. Whether a corporation acted with reasonable cause and good faith is based on an examination of all pertinent facts and circumstances. Treas. Reg.

[33] Lilo transactions will normally involve appraisals. The appraisals will attempt to establish that the fair market value of the Head Lease residual at the purchase option date will be less than the purchase option price. This helps taxpayers establish that the tax-exempt entity will not be likely to exercise the purchase option. The appraisals do something else, they discuss the future rental stream, and it will usually be high enough to establish that the U.S. Taxpayer will want to keep the Head Lease and not force the tax-exempt-entity to purchase the Head Lease residual through the put option. By doing this, the U.S. Taxpayer hopes to defeat the Service's contention that it has no economic exposure in these deals.

§ 1.6664-4(e)(1). A corporation's legal justification may be taken into account, as appropriate, in establishing that the corporation acted with reasonable cause and in good faith in its treatment of a tax shelter item, but only if there is substantial authority within the meaning of Treas. Reg. § 1.6662-4(d) for the treatment of the item and the corporation reasonably believed, when the return was filed, that such treatment was more likely than not the proper treatment. Treas. Reg. § 1.6664-4(e)(2)(i). But under that regulation, a failure to satisfy the minimum requirements will preclude a finding of reasonable cause and good faith based (in whole or in part) on a corporation's legal justification. Pursuant to Treas. Reg. § 1.6662-4(e)(2)(ii), the provisions of Treas. Reg. § 1.6664-4(e)(1) on the effect of adequate disclosure do not apply where the item or position on the return is attributable to a tax shelter as defined in § 6662(d)(2)(C)(iii) and Treas. Reg. § 1.6662-4(g)(2).

The Treasury regulations provide that in meeting the requirement of "reasonably believing" that the treatment of the tax shelter item was more likely than not the proper treatment, the corporation may reasonably rely in good faith on the opinion of a professional tax advisor if the opinion is based on the tax advisor's analysis of the pertinent facts and authorities in the manner described in Treas. Reg. § 1.6662-4(d)(3)(ii). The latter regulation provides that the weight accorded an authority depends on its relevance, persuasiveness, and the type of document providing the authority. That is, a case or revenue ruling or other authority having only some facts in common with the tax treatment at issue is not particularly relevant if the authority may be materially distinguished on its facts or is otherwise inapplicable to the tax treatment in issue.

Under Treas. Reg. § 1.6662-4(d)(3)(iii), substantial authority for the tax treatment of an item includes: (1) Applicable provisions of the Internal Revenue Code and other statutory provisions; (2) Proposed, temporary, and final regulations construing such statutes; (3) Revenue Rulings and Revenue Procedures; (4) Tax treaties and the regulations thereunder, and Treasury Department and other official explanations of such treaties; (5) Court cases; (6) Congressional intent as reflected in committee reports, joint explanatory statements of managers included in conference committee reports, and floor statements made prior to enactment by one of a bill's managers; (7) General explanations of tax legislation prepared by the Joint Committee on Taxation (the Blue Book); (8) Private letter rulings and technical advice memoranda issued after October 31, 1976; (9) Actions on decisions and general counsel memoranda issued after March 12, 1981 (as well as general counsel memoranda published in pre-1955 volumes of the Cumulative Bulletin); (10) Internal Revenue Service information or press releases; and (11) Notices, announcements and other administrative pronouncements published by the Service in the Internal Revenue Bulletin.

Treas. Reg. § 1.6664-4(e)(2)(i)(B)(2) also requires that the opinion unambiguously state that the tax advisor concludes that there is a greater than 50- percent likelihood that the tax treatment of the item will be upheld if challenged by the Service. Therefore, the tax advisor's opinion should be considered in determining whether these requirements are

met. Taxpayers not providing the advice on which they relied cannot meet the requirements of Treas. Reg. § 1.6664-4(e)(2)(i)(B)(2).

While satisfaction of the "substantial authority" and "belief" requirements is necessary to a reasonable cause finding, this may not be sufficient. For example, reasonable cause may still not exist if the taxpayer's participation in the tax shelter lacked significant business purpose, if the taxpayer claimed benefits that were unreasonable in comparison to the initial investment in the tax shelter, or if the taxpayer agreed with the shelter promoter that the taxpayer would protect the confidentiality of the tax aspects of the structure of the tax shelter. Treas. Reg. § 1.6664-4(e)(3).

As discussed in the preceding pages, the circular cash flows or defeasance, the nominal rate of return or profit (absent the tax benefits), the lack of credit risk, the lack of valid business purpose, and the termination of the Head Lease at the point in the transaction where the trust has maximized its tax benefits (and before it has received significant taxable income[34]) are characteristics of LILOs that may demonstrate a lack of economic substance.

**SETTLEMENT GUIDELINES**

receive lease payments that could be generated during the put renewal term and the "shin tail period.