# EXHIBIT E

# APPEALS

## APPEALS COORDINATED ISSUE PROGRAM

## APPEALS SETTLEMENT GUIDELINES

| | |
|---|---|
| INDUSTRY: | All Industries |
| ISSUE: | Lease in/ Lease Out (LILOs) |
| COORDINATOR: | Luis E. Arritola |
| TELEPHONE: | (305) 982-5264 |
| FACSIMILE: | (954) 982-5405 |
| UIL NO: | 9300.07-00 |
| FACTUAL / LEGAL ISSUE: | FACTUAL |

APPROVED:

for /s/ Thomas C. Lillie — Feb 23, 2004
DIRECTOR, TECHNICAL GUIDANCE — DATE

/s/ L.P. Mahler — Feb 23, 2004
DIRECTOR, TECHNICAL SERVICES — DATE

Effective Date: Feb 23, 2004

**APPEALS SETTLEMENT GUIDELINE**
**ALL INDUSTRIES**
**LOSSES CLAIMED AND INCOME TO BE REPORTED FROM**
**LEASE IN/LEASE OUT TRANSACTIONS**
**UIL 9307.07-00**

## STATEMENT OF ISSUES

1. Should the United States taxable entities (referred to interchangeably as "taxpayers" and "U.S. taxpayers") be treated as acquiring a future leasehold interest in property, rather than a current leasehold interest (the "Head Lease") encumbered by a subsequent re-lease ("Sublease"), in relation to lease in/ lease out ("LILO") transactions, thus disallowing deductions for current lease expenses and related fees?

2. Should taxpayers be allowed interest expense deductions under § 163 in relation to their participation in LILO transactions?

3. (Alternative position) Whether LILO transactions in substance constitute financing arrangements, in which case deductions for amortization of rents and transaction fees and interest expense should be denied.

4. Do the provisions of § 467 of the Internal Revenue Code affect claimed advance rent expense deductions resulting from taxpayers' participation in LILO transactions?

5. Should the penalties under § 6662 apply to LILO transactions?

## COMPLIANCE'S POSITION

Compliance's position on issues one and two is based on Rev. Rul. 2002-69.[1] Under the "substance over form" doctrine, the leases involved in a LILO transaction are offsetting obligations of the same nature and should be collapsed into a single transaction, resulting in the conveyance of a future interest only. Therefore, taxpayers are not entitled to deduct advance rent payments or fees relating to the period of the Head Lease offset by the Sublease.

There is a distinction between the equity and debt portions of the advance rent payment made by taxpayers. The equity portion is treated as a payment for the right of occupancy at the end of the Sublease basic term, and thus no current rent expense deduction is allowed for this portion.

---

[1] Rev. Rul. 2002-69, 2002-C.B. 760.

As a further consequence of the offsetting obligations of the leases, the debt portion is disregarded on the basis that it has no substance. Therefore, the interest paid on the debt portion of the rent payment is disallowed.

## INDUSTRY/TAXPAYER POSITION

The industry's position is that taxpayers should be allowed both the amortization and interest expense deductions because the Head Lease and the Sublease do not substantially offset each other.

According to the industry, the Head Lease and the Sublease convey dissimilar rights and obligations. These concern a variety of items, including priority of claims, termination rights, time to maturity, amounts of rental payments required, purchase option provisions, and conditions of default and applicable remedies. The dissimilarity in rights and obligations between the Head Lease and the Sublease are illustrated by the mismatch of Head Lease and Sublease rental payments with respect to timing and amount, and the fact that the lessors[2] have different capabilities with respect to declaring default.

The industry points out that the parties to the LILO transactions, as lessors, also face different risks of default. U.S. taxpayers face the risk of default by the Sublessee in the case of the Sublessee's bankruptcy, failure to insure the property, insolvency or financial distress,[3] nonpayment of rents, and failure to comply with other covenants of the Sublease (such as maintenance and improvement requirements).

By contrast, the Sublessee (generally a tax-exempt or tax-neutral entity) faces a less significant risk of default on the part of the U.S. taxpayer or Head Lessee. Since the U.S. taxpayer has prepaid all of the rent that it is permitted to prepay under the terms of the Head Lease, its interest in the subject property is securely established and usually can be lost only in the unlikely event of severe financial distress. Therefore, the relative security of each party's possessory interest in the subject property under its respective leases further demonstrates that the interests of the U.S. taxpayer and the tax-exempt entity do not offset each other in any way.

The industry representatives also point out that the obligation to make debt service payments is not "completely offset" by taxpayers' rights to receive Sublease payments, as asserted in Rev. Rul. 2002-69. In their view, the Sublease and the loan financing the Head Lease prepayment are independent obligations. Evidence supporting this assertion is that the obligation to make the payments on the loan financing the prepayment continues regardless of whether or not the U.S. taxpayer receives Sublease payments.

---

[2] Both the Head Lessor and the Sublessor.

[3] The term "financial distress" has been used by industry proponents without further explanation. It is taken herein to mean the seizure of personal property to enforce payment of debt.



Any line marked with a # is for Official Use Only

## DISCUSSION

Background

LILO arrangements were used in recent years in an attempt to avoid the unfavorable depreciation provisions applicable to property leased to tax-exempt entities (foreign or domestic). With LILOs, taxpayers would acquire leasehold interests in property (instead of ownership interests) from tax-exempt owners and simultaneously sublease the property back to the owner. Taxpayers generally made large upfront payments under the Head Lease which, pursuant to then-effective proposed regulations under § 467, were deductible under favorable amortization rules. Final §467 regulations, effective May 18, 1999, however, now treat prepayments of rent as deemed loans from taxpayers to the tax-exempt entities, requiring the imputation of interest income to the taxpayers and subjecting the rent deductions to proportional rent rules reflecting the time value of money concept. The issuance of these final regulations and of Rev. Rul. 99-14, 1991-1 C. B. 835, effectively stopped further taxpayer involvement with LILO transactions (i.e., no new LILOs on or after May 18, 1999).

General Facts Relating to LILOs

In a typical LILO transaction, a taxpayer will lease a long-lived asset from a tax-exempt or tax-indifferent entity. This initial lease is generally referred to as the "Head Lease." Assets involved in these transactions include subway cars and lines, locomotives, municipal buildings, passenger railway systems, ferryboats, airplanes, power plants, and sewage treatment plants.

The types of tax-exempt or tax-indifferent entities involved in LILOs include domestic and foreign entities, including governmental or quasi-governmental agencies. The tax-exempt entity retains ownership of the asset before and after entering into the LILO arrangement, and retains operating control of the asset at all times.

Rev. Rul. 2002-69 provides an example of a typical LILO transaction. In this example, a U.S. taxpayer, using a grantor trust,[4] leases the asset from a tax-exempt entity (the Head Lease) for a 40-year net lease term, with a pre-payment due at the beginning of the term and a larger post-payment due at the end of the term. The asset is simultaneously subleased to the tax-exempt entity for a 20-year net lease term (the Sublease), with periodic rent payments due.

At the end of the Sublease term, the tax-exempt entity has a fixed payment buy-out option to purchase the Head Lease residual (at 105 percent of the fair market value of the residual as projected at the beginning of the LILO transaction). If the option is exercised, the U.S. taxpayer does not make the post-payment. Although the tax-exempt entity can decline to exercise this option, the U.S. taxpayer has a "put renewal option" to compel the tax-exempt entity to renew the lease for 10 years (called the put renewal period) if the tax-exempt entity does not exercise the buy-out option. The U.S.

[4] For purposes of this discussion the grantor trust layer of the transaction will be disregarded.

taxpayer can require a letter of credit for the 10-year period, and if the tax-exempt entity does not obtain the letter of credit it must exercise the purchase of the Head Lease. If the U.S. taxpayer exercises the put renewal option, then during the final 10 years of the Head Lease (the "shirt tail period") the U.S. taxpayer can use the asset as it sees fit, including leasing the asset to another party. At the end of the Head Lease term, the asset reverts to the tax-exempt entity.

The U.S. taxpayer pays a portion of the pre-payment in cash, but a larger part of the pre-payment is financed by non-recourse loans.[5] In the example in Rev. Rul. 2002-69, the U.S. taxpayer contributes $29 million and it borrows $54 million from one bank and $6 million from another to complete the $89 million needed for the pre-payment. The tax-exempt entity deposits $54 million of the pre-payment into an account with one bank and $6 million into an account with another. The banks into which these deposits are made (the "deposit takers") are affiliates of the banks that loaned the $54 million and $6 million to finance the pre-payment.[6] These banks pay the tax-exempt entity the same interest rate on the deposits as their affiliates charge the U.S. taxpayer for the $54 million and $6 million loans. The tax-exempt entity pledges the deposits to the U.S. taxpayer for its obligations under the Sublease agreement, and the U.S. taxpayer, in turn, pledges its interest in the pledge made to it by the tax-exempt entity to the banks as collateral for the loans.[7]

Of the $89 million pre-payment amount, the flow of $60 million has been explained in the preceding paragraph. Of the remaining $29 million, $15 million is deposited with a custodian who invests it in high quality debt securities,[8] usually U.S. Treasury STRIPS.[9] The maturity value of these securities is arranged to be equal to the amount due under the fixed purchase option at the end of the Sublease.[10] The $14 million balance belongs to the tax-exempt entity, representing a fee paid to it for its participation in the transaction.

The U.S. taxpayer reports the periodic Sublease payments received from the tax-exempt entity as rental income. Additionally, the U.S. taxpayer writes off, on a straight line-basis, the $89 million pre-payment over a six-year (or shorter) period. The present

---

[5] A non-recourse loan is a loan in which the lender cannot claim more than the collateral as repayment in the event that payments on the loan are stopped. A LILO investor leases the asset and finances the lease pre-payment with a down payment and the proceeds from a non-recourse loan. In the event that the transaction turns sour, the LILO investor is not apt to lose more than the down payment.
[6] In some cases, one might find that the deposit taker is the same bank that loaned the money to the U.S. taxpayer. These could be considered more egregious situations.
[7] Rev. Rul. 2002-69 states that the purpose of the tax-exempt entity making the deposits is to "defease" both the U.S. taxpayer's debt to the banks and the Sublease obligations of the tax-exempt entity to the U.S. taxpayer. To "defease" in this context means to render null and void. Additionally, the coordinated issue paper and the Revenue Ruling refer to this defeasance as the first circular flow of funds and as the "debt defeasance."
[8] This is called the "equity collateral."
[9] STRIPS is an acronym for "Separate Trading of Registered Interest and Principal of Securities." They are Treasury securities that have had their coupons and principal separated into what effectively become zero-coupon Treasury bonds.
[10] This is referred to as the second circular flow and as the "equity defeasance."

value of the post-payment is written off, also on a straight-line basis, over years 7 through 40 (the remaining 34 years).[11] The interest on the bank loans is likewise deducted, and the LILO transaction costs are amortized over the life of the Head Lease.

## LEGAL ANALYSIS AND LITIGATING HAZARDS

As is generally the case with many structured transactions, there is no case or statute directly addressing the precise facts of LILO transactions. The discussion below, however, describes extensive precedents applying substance-over-form concepts to transactions similar to LILOs.

Legal Analysis of Issue 1: The Future Interest Argument

Rev. Rul. 2002-69 concludes that taxpayers involved with LILO transactions do not acquire a current leasehold interest and, therefore, are not entitled to current deductions for rent and interest. For this assertion, the Service relies primarily on the substance over form doctrine.

The seminal substance over form case is Gregory v. Helvering, 293 U.S. 465 (1935). Gregory v. Helvering stands for the proposition that the substance of a transaction, not its form, governs its tax treatment. More recently, in Frank Lyon Co. v. United States, 435 U.S. 561, 573 (1978), the Supreme Court stated: "In applying the doctrine of substance over form, the Court has looked to the objective economic realities of a transaction rather than to the particular form the parties employed."

In a subsequent Supreme Court case, the Court applied the substance over form analysis to construe a sale and repurchase of federal securities as a loan. The Court found that the economic realities of the transaction did not support the form chosen by the taxpayer. Nebraska Department of Revenue v. Loewenstein, 513 U.S. 123 (1994).

Some courts have collapsed offsetting obligations, and recharacterized two transactions as a single transaction, where parties have in form entered into separate transactions that result in offsetting obligations. Illustrative of this is Rogers v. United States, 281 F.3d 1108 (10th Cir. 2002), where a part-owner/shareholder of a professional baseball team organized as a Subchapter S corporation borrowed money from the S corporation. He used a nonrecourse loan secured by the shareholder's ownership interest in the corporation and his existing option to purchase the rest of the shares from the other co-owner of the team. The shareholder also granted the corporation an option to purchase both his shares and his existing option to buy the other co-owner's shares. The option price was an amount equal to the outstanding loan balance. The corporation exercised its option immediately but deferred closing for five months until the due date of the shareholder's loan. Rogers applied the substance over form doctrine to collapse the loan and the option transaction into a redemption of the shareholder's stock in exchange for cash. There was no incentive to repay the loan on the part of the

---

[11] In some cases, the amount amortized is the absolute amount of the post payment (as opposed to the present value). This is considered a more abusive taxpayer posture.

shareholder because any reduction in the loan balance would reduce the option price. The immediate exercise of the option prevented any attempt by the shareholder to repay the loan and keep his stock. In this case, the court held that the substance of the transaction was a sale of stock to the corporation – this was based, *inter alia*, on the offsetting loan and option.

Another substance over form case was Bussing v. Commissioner, 88 T.C. 449 (1987), reconsideration denied, 89 T.C. 1050 (1987). In Bussing, a Swiss subsidiary of a computer leasing company (AG) purchased computer equipment in a sale/leaseback transaction involving a five-year lease. Later, AG purportedly sold the equipment to a domestic corporation, which in turn supposedly sold interests in the equipment to the taxpayer (Bussing) and four other individual investors. The taxpayer acquired his interest in the computer equipment subject to the underlying lease with a cash payment, short-term promissory notes, and a long-term promissory note to the domestic corporation. The taxpayer then leased his interest in the equipment back to AG for nine years. The rents due the taxpayer from AG equaled the taxpayer's annual payments on the long-term promissory note for the first three years and were supposed to generate nominal annual cash flow from then on. The Bussing court first disregarded the domestic corporation's participation in the transactions using the substance over form doctrine. The court went on to hold that the taxpayer's long-term indebtedness also must be disregarded because it was completely offset by AG's rent payments in a "purported sale-leaseback pursuant to which the respective lease and debt obligations flow between only two parties." Bussing at 458. The court basically held that the obligations between AG and the taxpayer cancelled each other out and that the taxpayer would not be required to make any payments on his obligation. The court collapsed the offsetting loan and lease, and concluded that, to the extent of his cash payment, the taxpayer had acquired an interest in a joint venture. Although LILO transactions tend to involve more than two parties, the agreements among the parties may be collapsed because they are contemporaneously executed and integrally related.[12]

Other courts have disregarded the parties' obligations in professed installment sales where the taxpayer received an installment note that was counterbalanced by some other arrangement between the two parties, signifying that the maker of the note would not be called upon to pay the installment debt. In Rickey v. Commissioner, 502 F.2d 748 (9th Cir. 1974), aff'g 54 T.C. 680 (1970), the court determined that, although taxpayers are entitled to arrange the terms of a sale in order to qualify for the installment method, "the arrangements must have substance and must reflect the true situation rather than being merely the formal documentation of the terms of the sale." Rickey at 752-53, quoting 54 T.C. at 694. Other cases, along the same vein, were

[12] The Head Lease and Sublease are nominally separate legal documents. Both leases, however, are executed pursuant to the comprehensive Participation Agreement, which likely provides that no party is entitled to benefits or subject to liabilities, as the case may be, under any agreement until all participants have executed all agreements. Thus, the Head Lease and Sublease are integrated into a single legal document.

referred to in Rev. Rul. 2002-69. These are: United States v. Ingalls, 399 F.2d 143 (5th Cir. 1968); Blue Flame Gas Co. v. Commissioner, 54 T.C. 584 (1970); Greenfield v. Commissioner, T.C. Memo. 1982-617 (notes ignored because cash loan from buyer and taxpayer's installment note were to be paid through offsetting book entries); Big "D" Development Corp. v. Commissioner, T.C. Memo. 1971-148, aff'd per curiam, 453 F.2d 1365 (5th Cir. 1972) (cross indebtedness lacking in reality where full receipt of the total consideration merely awaited the command of the seller).

In McCully Ashlock v. Commissioner, 18 T.C. 405 (1952), acq., 1952-2 C.B. 1, the taxpayer acquired property through a deed dated June 6, 1945, but the seller had retained the right to possession and rentals through August 15, 1947. The court held that the taxpayer had acquired only a future interest in the property because "the (sellers) not only retained the rents legally but they also retained control and benefits of ownership." McCully Ashlock, at 411. Thus, rentals from the property were income to the seller.[13] This case stands for the proposition that when the conveyance of property is accompanied by the retention of some interest in the same property, if the interest retained is of substantially the same nature as the interest conveyed, only a future interest is conveyed.[14]

In applying the preceding general legal principles to LILO transactions, we can come to the broad theoretical conclusion that when parties enter into two separate transactions that result in offsetting obligations, the offsetting obligations can be collapsed and the two transactions are recharacterized as a single transaction.

Under the Head Lease, the U.S. taxpayer has a right to use the property that is immediately reversed by the Sublease. The tax-exempt entity has the same right to use the property as the U.S. taxpayer. The transfer and re-transfer of the property are offsetting obligations that should be disregarded. Consequently, the transaction that remains is apparently a transfer of funds (the $29 million) from the U.S. taxpayer to the tax-exempt entity in exchange for the latter's obligation to repay those funds and provide the U.S. taxpayer the potential right to begin to lease the property in the future if the tax-exempt entity does not exercise the fixed payment option. Therefore, the deduction of the rental expenses and transaction fees claimed with regard to LILO transactions should be disallowed as trade or business expenses under § 162.

---

[13] Please note, as in the net leases that are a feature of LILOs, in McCulley Ashlock the seller agreed to pay property taxes, insurance, and normal maintenance items and other expenses.

[14] Along the same line of thought, in Kruesel v. United States, 63-2 U.S.T.C. ¶ 9714 (D. Minn. 1963), the court concluded that the taxpayer had transferred only a future remainder interest in property and reserved a life estate. Note that Rev. Rul. 2002-69 distinguished Alstores Realty Corp. v. Commissioner, 46 T.C. 363 (1966), acq., 1967-2 C.B.1. In Alstores, the court held that a sale of property accompanied by the reservation of a right of occupancy did not result in the transfer of only a future interest because the seller's right of occupancy was in the nature of a leasehold interest and the purchaser acquired the benefits and burdens of ownership of the property. McCully Ashlock and Kruesel conclude that where a retained interest is of the same nature as the interest conveyed, only a future interest has been transferred. According to Rev. Rul. 2002-69, in Alstores the interests were not of the same nature.

Litigating Hazards of Issue 1: The Future Interest Argument

#
#
#
#
#
#

#
#
#
#
#
#
#
#
#
#

#
#
#
#
#
#

#
#
#
#
#
#

#
#
#
#
#

The factors influencing the hazards assessment will be discussed in the **SETTLEMENT GUIDELINES** section of this writing.

15

Legal Analysis of Issue 2: The §163 Interest Expense Argument

Section 163 allows a deduction for all interest paid or accrued within the taxable year on indebtedness. The nonrecourse loans made by the lending banks, however, may be disregarded even though they allegedly finance the Head Lease advance rent payment. In Bridges v. Commissioner, 39 T.C. 1064, aff'd, 325 F.2d 180 (4th Cir. 1963), the taxpayer "borrowed" funds from banks, used the funds to purchase Treasury notes (which the banks held as collateral), and ultimately sold these same notes to satisfy his debts. The Tax Court's rationale for disallowing the taxpayer's deductions of prepaid interest applies equally to LILOs:

> [Taxpayer] at no time had the uncontrolled use of any additional money, of the bonds, or of the interest on the bonds. He assumed no risk of a rise or fall in the market price of the bonds and could not take advantage of such. His payment to the bank was not for the use or forbearance of money; it was for the purchase of a rigged sales price for the bonds and for a tax deduction. [Taxpayer] incurred no genuine indebtedness, within the meaning of the statute, and as a payment of interest, this transaction was also a sham.

Bridges at 1078-79.

According to the Bridges court, § 163 presupposes that the alleged debt not be a sham or incurred in a sham transaction. "Interest," as used in the statute, has a commercial connotation. Regardless of the resulting tax consequences, amounts paid as interest must have commercial reality, there must be some valid commercial reason for paying interest, and the borrower must in fact receive something in the transaction itself that would warrant payment of interest. Hence, to be deductible, the amounts paid must constitute interest and represent compensation for the use or forbearance of money. Where the taxpayer cannot benefit economically from the transaction during the initial Sublease term except through tax deductions, the amount paid is not for the use or forbearance of money. The Tax Court also noted, " We doubt that the bank at any time actually had any of its money out on loan or that its portfolio of Treasury notes actually changed. The transaction merely provided the 'facade' of a loan." Bridges, at 1077.

Additionally, the interest expense may be disallowed under § 163 since interest expense may not be deducted when it is incurred in transactions "that can not with reason be said to have purpose, substance, or utility apart from their anticipated tax consequences." Sheldon v. Commissioner, 94 T.C. 738, 760 (1990) (quoting Goldstein v. Commissioner, 364 F.2d 734, 740 (2d Cir. 1966)). Consequently, transactions merit respect and give rise to deductible interest only if there is some tax-independent purpose for the transactions. Moreover, the Service may disallow interest deductions on the grounds that "transactions which do not vary control or change the flow of economic benefits are to be dismissed from consideration" if they "do not appreciably change the taxpayer's financial position." ACM Partnership, 157 F.3d 231, 248 (3d Cir. 1998) (quoting Weller v. Commissioner, 270 F.2d 294, 297 (3d Cir. 1959)).

Goldstein v. Commissioner, 364 F.2d 734 (2d Cir. 1966), aff'g 44 T.C. 284 (1965), found that §163 did not permit a deduction for interest paid or accrued in loan arrangements without purpose, substance, or utility apart from their anticipated tax consequences. Furthermore, the Service need not always first label a purported loan transaction a "sham" in order to deny a deduction for interest paid in connection with the loan. See also Lee v. Commissioner, 155 F.3d 584 (2d Cir. 1998), aff'g and remanding T.C. Memo. 1997-172, rejecting the broader idea expressed in Rice's Toyota World, Inc. v. Commissioner, 752 F.2d 89 (4th Cir. 1985), that whether a debt contracted in return for an expected tax benefit will support an interest deduction depends simply on whether the debt itself is genuine.

In addition, the mere fact that a promissory note is given does not prove the existence of a loan if there was no genuine indebtedness. That is, the simple measure of drawing up papers has never been recognized as controlling for tax purposes when the objective economic realities are to the contrary. Frank Lyon, 435 U.S. at 573 (quoting Commissioner v. Tower, 327 U.S. 280, 291 (1946)). Furthermore, even if all papers signed appear to show legitimate debt, in sham transactions such papers often are executed solely for the purpose of obtaining tax deductions. Meyer v. Commissioner, T.C. Memo 1986-328 (no indebtedness existed in transaction with circular funding). Further, in Greenfield v. Commissioner, T.C. Memo 1982-617, the court found repayments that were mere bookkeeping entries significant (the interest rate and monthly payment on the notes were also identical). The Greenfield court did not respect the loan. Also, in Blue Flame Gas Co. v. Commissioner, 54 T.C. 584 (1970), the supposed loans were not respected because the payments took the form of bookkeeping entries, the loan was in the exact amount of the rent due under the leases, and repayment dates of the loan and rent payments were found to be intentionally designed to match.

According to Rev. Rul. 2002-69, the portion of the Head Lease advance rent payment or prepayment financed with the nonrecourse loans must be disregarded because the loans are without substance. Neither the U.S. taxpayer nor the tax-exempt entity obtains use of the ostensibly borrowed funds. Upon receipt of funds from the U.S. taxpayer, the tax-exempt entity immediately deposits the full amount with the lender's affiliate via the Payment Undertaking Agreement. The deposit is then used only to make the tax-exempt entity's rent payments to the U.S. taxpayer, which in turn immediately forwards the full amount of the rent received to the lenders. See Bridges v. Commissioner, supra. In addition, according to the CIP, there are various credit supports or security arrangements[16] that ensure that the lenders never lose control of the nonrecourse loan funds.

[16] The CIP goes into a more detailed analysis. It states that the nonrecourse loans lack substance because there are no credit risks to any of the parties involved. The lenders are not at risk because they retain total control over the nonrecourse loan funds due to the Payment Undertaking Agreement and the Loan and Security Agreement. Further, the tax-exempt entity agrees not to terminate the Head Lease until the lenders are paid in full, the Sublease provides for direct payment of the tax-exempt entity's rent to the lenders, and the lenders may take action against the deposit takers. The U.S. taxpayer is not at risk because it holds a first priority perfected interest in the equity collateral, and because the tax-exempt entity must provide a satisfactory guarantee or letter of credit to the U.S. taxpayer if its credit rating dips,

The leasehold interest supposedly financed by the loans is substantially offset by the Sublease with the tax-exempt entity. Therefore, the U.S. taxpayer cannot itself use the property for at least the twenty-year duration of the Sublease. For example, in Blue Flame Gas Company v. Commissioner, 54 T.C. at 595, a cash payment was not characterized as a loan because no repayment would ultimately be necessary due to contemporaneous lease obligations.

The Deposit and Payment Undertaking Agreement with the banks' affiliates generally ensures that the U.S. taxpayer will not ultimately bear the burden of the principal and interest payments other than amounts possibly paid by the Equity Custodian. Further, the amount of interest charged by lenders on the nonrecourse loans exactly equals the amount of interest paid by its affiliates on the deposits made by the tax-exempt entity. Also, the tax-exempt entity retains control at all times of the property subject to the LILO, and the debt defeasance ensures that the tax-exempt entity will make all rent payments due.

Litigating Hazards of Issue 2: The Interest Expense Argument

#
#
#
#
#
#
#

#
#

#
#
#
#
#

#
#
#
#

Legal Analysis of Issue 3: The Financing Arrangement Argument

Rev. Rul. 2002-69 reserved the option, in the appropriate factual circumstances, to disallow tax benefits claimed from entering into LILO transactions on the alternative ground that the substance over form doctrine requires their characterization as a financing arrangement. Rev. Rul. 2002-69 reserved the argument, and the CIP covered the legal analysis in more detail.

Commissioner v. Court Holding Company, 324 U.S. 331, 334 (1945) stated that since the incidence of taxation depends upon the substance of a transaction, to allow the true nature of a transaction to be disguised by mere formalisms, existing solely to alter tax liabilities, would seriously impair the effective administration of the tax policies of Congress. Furthermore, Helvering v. Lazarus & Co., 308 U.S. 252, 255 (1939) held that the substance over form doctrine is "concerned with substance and realities, and formal written documents are not rigidly binding."

Based on the Frank Lyon case, the Government can determine whether a transaction involves: (1) substance encouraged by business or regulatory realities; (2) tax-independent considerations; and (3) characteristics not shaped solely by tax-avoidance considerations that have meaningless labels attached. Furthermore, the Service may look at actualities, and, upon determining that the form employed for carrying out the challenged tax event is unreal, may sustain or disregard the fiction as best serves the purposes of the tax statute. Derr v. Commissioner, 77 T.C. 708, 721, 722 (1981) (citing Higgins v. Smith, 308 U.S. 473, 476-477 (1940)); see also Rogers v. United States, 281 F.3d at 1115 (major purpose of the substance over form doctrine is to recharacterize transactions in accordance with their true nature); Zmuda v. Commissioner, 731 F.2d 1417 (9th Cir. 1984), aff'g 79 T.C. 714 (1982) (although a transaction may be structured to satisfy the formal requirements of the Internal Revenue Code, it may be denied legal effect if its sole purpose is to avoid taxation).

Furthermore, the Government may dismiss transactions exhibiting the absence of changes in control of property or lacking a flow of economic benefits because the incidence of taxation depends upon the substance of the transaction and not its mere form where the form is not in accordance with economic reality. Additionally, an absence of arm's-length dealing requires a court to consider whether the form and substance of the transaction were the same. Derr v. Commissioner, 77 T.C. at 723 (citing Gregory v. Helvering). See also Hilton v. Commissioner, 74 T.C. 305 (1980).

Leases or supposed leases have been recharacterized as financing arrangements by courts when they have exhibited the following characteristics:

- ? owner/lessor lacks both the risk of depreciation and the benefit of appreciation
- ? owner/lessor does not retain significant and genuine attributes of the traditional lessor status (see Frank Lyon, 435 U.S. at 584)
- ? owner/lessor does not bear market risk with respect to the property (see Kwiat v. Commissioner, T.C. Memo. 1992-433 quoting Aderholt Specialty Co. v. Commissioner, T.C. Memo. 1985-491).

Consequently, a LILO will likely be respected only if the U.S. taxpayer as Sublessor retains significant and genuine attributes of the traditional lessor status. Otherwise, the LILO could be recharacterized as a financing arrangement. See the **SETTLEMENT GUIDELINES** section of this memorandum for comments on the hazards of litigation regarding this issue.

Under the alternative financing arrangement argument, the U.S. taxpayer may be required to report original issue discount (OID) income. See §§ 1271-1275. In this scenario, the U.S. taxpayer is treated as making a loan to the tax-exempt entity in an amount at least equal to the equity collateral,[17] and this amount, plus accrued but unpaid interest, is returned when the fixed payment buy-out option is exercised or the put renewal sublease rent is paid.

This is an argument made by Compliance, but it requires that part of the prepayment made by the trust be deemed a loan. The part deemed to be a loan would be the amount invested by the tax-exempt entity, through the custodian, in debt securities. However, because the terms of the deemed loan are not clear, and there is no fixed amount guaranteed to be returned to the taxpayer, determining the amount of OID is exceedingly complicated.

Legal Analysis of Issue 4: § 467

If the arrangements involved in a LILO transaction qualify as true leases for federal income tax purposes, the proper application of § 467 to such leases must be considered.

Section 467, which applies to "section 467 rental agreements," was added to the Internal Revenue Code by § 92(a) of the Tax Reform Act of 1984 (P.L. 98-369). Section 467(d)(1) defines a "section 467 rental agreement" as any rental agreement for the use of tangible property that provides for increasing or deferred rents. For this purpose deferred rent means rent allocable to the use of property for a calendar year not payable by the close of the succeeding calendar year. In addition, the final § 467 regulations apply § 467 to rental agreements for the use of tangible property that provide for decreasing rents or prepaid rent. For this purpose prepaid rent means rent paid in a calendar year that is allocable to the use of property following the close of the

[17] The CIP discusses alternative ways of determining the amount of the deemed loan in section b of the Substance Over Form/Financing Arrangement discussion.

succeeding calendar year. Section 467 does not apply to rental agreements that do not provide for more than $250,000 of rent.

Section 1.467-1(a)(4) of the Income Tax Regulations states that no inference should be drawn from any final regulation provision regarding whether an arrangement constitutes a lease for federal tax purposes. Section 1.467-1(a)(5) also provides that notwithstanding § 467 and the pertinent regulations, other authorities such as the substance over form doctrine may be applied by the Service to determine § 467 rental agreement income and expense.

Congress enacted § 467 as an anti-abuse provision. The accounting methods required by § 467 have three primary purposes: (1) to match the income and deductions of lessor and lessee by requiring accrual accounting for § 467 rental agreements, (2) to adjust rents in appropriate circumstances to take into account the time value of money, and (3) to prevent tax avoidance.

To achieve these objectives § 467 provides for one of three different accrual accounting methods depending on the circumstances: (1) allocation of rent in accordance with the rental agreement, (2) the proportional rental method which adjusts rents for the time value of money, and (3) the constant rental method which prevents tax avoidance. The first method requires taking rents into account as allocated pursuant to the rental agreement. The § 467 regulations provide for rent to be allocated in one of two ways: (1) by means of a specific allocation, and (2) in the absence of a specific allocation, according to the rent payment schedule.

A rental agreement specifically allocates fixed rent if it unambiguously specifies, for periods no longer than a year, a fixed amount of rent for which the lessee becomes liable on account of the use of the property during that period. To qualify as a specific allocation, the total amount of fixed rent allocated must equal the total amount of fixed rent payable under the lease. Section 1.467-1(c)(ii)(2). Rent may be specifically allocated in a manner different from when it is payable. In the absence of a specific allocation of rent the amount of rent payable during a rental period[18] is allocable to that rental period. Rent payable prior to the beginning of the lease term is allocable to the first rental period of the lease. Rent payable after the end of the lease term is allocable to the last rental period of the lease. Section 1.467-1(c)(2)(ii)(2).

A § 467 rental agreement that specifically allocates fixed rent may provide for deferred or prepaid rent, as defined in § 467 and the associated regulations. If the rental agreement does this but fails to provide adequate interest, within the meaning of § 1.467-2, on the deferred or prepaid fixed rent, the § 467 regulations require the deferred or prepaid fixed rent to be adjusted to take into account the time value of money. The regulations do this by requiring the proportional rental amount to be taken into account rather than the allocated rent. To determine the proportional rental amount, the amount of fixed rent allocated to any rental period during the lease term must be multiplied by

---

[18] To determine rental period length see Treas. Reg. § 1.467-1(j)(5).

the proportional rental fraction. The fraction's numerator equals the sum of the present values of the amounts payable as fixed rent and interest thereon under the rental agreement. The fraction's denominator equals the sum of the present values of the fixed rent allocated to each rental period under the rental agreement. Section 1.467-2(c).

A net deferral of rent makes the proportional rental fraction less than 1, causing the fixed rent to be taken into account for any rental period to be less than the amount of fixed rent allocated to that rental period. A net prepayment of rent makes the proportional rental fraction greater than 1, causing the fixed rent to be taken into account for any rental period to be greater than the amount of fixed rent allocated to that rental period. The proportional rental method requires the lessor and the lessee to take interest on deferred or prepaid fixed rent into account as it accrues.

Section 467 does not apply to rental agreements having only decreasing or prepaid rents prior to the appropriate effective dates of the § 467 regulations. However, even in the absence of implementing regulations, § 467(a)(2) requires interest to be taken into account on deferred rent. Section 467(b)(1)(B) requires deferred rent to be taken into account at present value if the rental agreement fails to provide adequate interest on such rent.

Finally, to prevent allocations of either increasing or decreasing rents from resulting in tax avoidance, in the case of certain leasebacks or long-term agreements the § 467 regulations allow the Commissioner to require parties to a § 467 rental agreement to take rent into account using the constant rental method. Section 1.467-3(a) does not allow parties to a § 467 rental agreement to unilaterally adopt constant rental accrual based on tax avoidance. The Commissioner must determine that constant rental accrual is required to prevent tax avoidance. Under the constant rental method the parties must take into account a constant amount of rent, adjusted for the length of the rental period, for each rental period of the lease. The present value of the sum of the constant rental amounts equals the sum of the present values of the amounts payable under the lease as rent or interest.

Constant rental accrual applies in the case of disqualified leasebacks and long-term agreements. If the term of a rental agreement is in excess of 75 percent of the statutory recovery period of the leased property, the rental agreement qualifies as a long-term agreement. § 467(b)(4)(A). Section 1.467-3(b)(2) defines a § 467 rental agreement as a leaseback if the lessee (or a related person) had any interest in the property (other than a de minimis interest) at any time during the two-year period ending on the agreement date. For this purpose, interests in property include options and agreements to purchase the property and, in the case of subleased property, any interest as a sublessor.

Most or perhaps all LILO Headleases qualify as long-term agreements. Likewise, a LILO Sublease always qualifies as a leaseback within the meaning of § 467. Disqualified status attaches to a leaseback or long-term agreement if a principal



Any line marked with a # is for Official Use Only

purpose for providing increasing or decreasing rents is tax avoidance. The details of how the § 467 regulations determine whether a principal purpose of a lease's rent allocation is tax avoidance need not be set forth here. Suffice it to say that the U.S. Taxpayer pays United States income taxes and the Tax-Exempt Entity pays no United States income taxes associated with a LILO. Because a LILO Headlease invariably provides for decreasing rents, absent extraordinary circumstances the Head Lease will qualify as a tax avoidance lease subject to constant rental accrual unless the Headlease rent allocation satisfies certain safe harbors. Likewise, if the Sublease provides for increasing rents its rent allocation must also satisfy these same safe harbors to avoid constant rental accrual.

Because one or more of the leases involved in a LILO will have either increasing or decreasing fixed rents, to avoid constant rental accrual such leases will generally have to allocate rents in a manner that satisfies one of the uneven rent tests of §1.467-3(c)(4). These are the 90/110 test for personal property and the 85/115 test for certain leased real estate. Leases of personal property satisfy the 90/110 test if the rent allocated to each calendar year during the lease term does not vary by more than 10 percent from the average rent allocated to all calendar years during the lease term (with special rules for annualizing rent in the case of periods of less than a calendar year). The 85/115 test for certain real estate leases operates in a similar fashion. For further details of how these tests operate see § 1.467-3(c)(4).

The § 467 regulations generally apply to disqualified leasebacks and long-term agreements entered into after June 3, 1996. For rental agreements that are not disqualified leasebacks or long-term agreements, the § 467 regulations generally apply to rental agreements entered into after May 18, 1999. Prior to the amendment of the § 467 regulations on January 4, 2001, the regulations provided a safe harbor from constant rental accrual for rental agreements providing for $2,000,000 or less of rent. Among other things, the 2001 amendments to the § 467 regulations removed the $2,000,000 or less safe harbor for § 467 rental agreements entered into on or after July 19, 1999. For further information relating to effective dates see § 1.467-9.

Various arguments are available under § 467 for reducing the tax benefits flowing from a LILO transaction. For example, if a Headlease that is a long-term agreement is treated as extending only through the expected exercise of the buyout option, it will fail the uneven rent test, and the U.S. taxpayer can be required to use the constant rental accrual method to determine its rent deductions. Alternatively, if the main Sublease term is aggregated with the term of a renewal sublease, the resulting lease will fail the uneven rent test, and the U.S. taxpayer must include sublease rent based on the constant rental accrual method.



**Any line marked with a # is for Official Use Only**

Legal Analysis of Issue 5: Penalties Under § 6662

The determination of the applicability of the penalties under § 6662 should be made on a case-by-case basis.[19] #
#
#

An important matter relevant to the potential assertion of the accuracy-related penalty attributable to a substantial understatement is whether the transaction constitutes a tax shelter as defined in § 6662(d)(2)(C)(iii). If a "significant purpose" of LILO transactions is the avoidance of federal income tax, LILO transactions will be considered tax shelters (unless the transaction was entered into before August 6, 1997, in which case a "principal purpose" test applies).

If the analysis of the "significant purpose" (or "principal purpose") of a LILO yields that a transaction is a tax shelter, then, as explained below, the requirements of Treas. Reg. §1.6664-4(f) should be carefully scrutinized to determine whether a corporate taxpayer had sufficient "reasonable cause" to avoid the accuracy-related penalty attributable to a substantial understatement #
#
#

With the preceding in mind, the application of the penalties should be based on an evaluation of the facts developed in view of the following legal standards:

Part I - *The Accuracy-Related Penalty*. Section 6662 imposes an accuracy-related penalty in an amount equal to 20 percent of the portion of an underpayment attributable to, among other things: (1) negligence or disregard of rules or regulations, and (2) any substantial understatement of income tax. Treas. Reg. § 1.6662-2(c) provides that there is no stacking of the accuracy-related penalty components. Thus, the maximum accuracy-related penalty imposed on any portion of an underpayment is 20 percent (40% for gross valuation misstatements), even if that portion of the underpayment is attributable to more than one type of misconduct (e.g., negligence and substantial understatement). Treas. Reg. § 1.6662-2(c).

For purposes of § 6662, the term "underpayment" is defined as the amount by which any tax imposed exceeds the excess of the sum of the amount shown as the tax by the taxpayer on his return, plus amounts not so shown previously assessed (or collected

[19] It is important to note that on January 14, 2002, in Announcement 2002-2, 2002-1 C.B. 304, the Service announced a disclosure initiative to encourage taxpayers to disclose their tax treatment of tax shelters and other items for which the imposition of the accuracy-related penalty may be appropriate if there is an underpayment of tax. In return for a taxpayer disclosing any item in accordance with the provisions of this announcement before April 23, 2002, the Service agreed to waive the accuracy-related penalty under § 6662(b)(1), (2), (3), and (4) for any underpayment of tax attributable to that item.

without assessment), over the amount of rebates made. Section 6664(a)(1), (2); Treas. Reg. § 1.6664-2(a)(1), (2).

Part II -*Negligence or Disregard of Rules or Regulations.* Negligence includes any failure to make a reasonable attempt to comply with the provisions of the Internal Revenue Code or to exercise ordinary and reasonable care in the preparation of a tax return. See § 6662(c) and Treas. Reg. § 1.6662-3(b)(1). Negligence also includes the failure to do what a reasonable and ordinarily prudent person would do under the same circumstances. See Marcello v. Commissioner, 380 F.2d 499 (5th Cir. 1967), aff'g 43 T.C. 168 (1964); Neely v. Commissioner, 85 T.C. 934, 947 (1985).

Treas. Reg.§ 1.6662-3(b)(1)(ii) provides that negligence is strongly indicated where a taxpayer fails to make a reasonable attempt to ascertain the correctness of a deduction, credit or exclusion on a return that would seem to a reasonable and prudent person to be "too good to be true" under the circumstances. The Tax Court also sustained the application of the negligence penalty in Sheldon v. Commissioner, supra, stating that the taxpayer "intentionally entered into loss-producing repos in order to generate and claim tax benefits." Therefore, if the facts establish that a taxpayer reported losses from a transaction that was shaped solely by tax-avoidance purpose, and the taxpayer failed to correct the situation, then the accuracy-related penalty attributable to negligence may be applicable.

The Third Circuit, in sustaining the accuracy-related penalty on grounds of negligence in Neonatology Associates, P.A., v. Commissioner, 299 F. 3d 221 (3rd Cir. 2002), explicitly warned: "When, as here, a taxpayer is presented with what would appear to be a fabulous opportunity to avoid tax obligations, he should recognize that he proceeds at his own peril."

A return position that has a reasonable basis is not attributable to negligence. Treas. Reg. § 1.6662-3(c). A reasonable basis is a relatively high standard of tax reporting, one significantly higher than not frivolous or not patently improper. Thus, the reasonable basis standard is not satisfied by a return position that is merely arguable or colorable. Conversely, under Treas. Reg. § 1.6662-(3)(b)(3), a return position is reasonable where based on one or more of the authorities listed in Treas. Reg. § 1.6662-4(d)(3)(iii), taking into account the relevance and persuasiveness of the authorities and subsequent developments, even if the position does not satisfy the substantial authority standard defined in Treas. Reg. § 1.6662-4(d)(2). Furthermore, the reasonable cause and good faith exception in Treas. Reg. § 1.6664-4 may relieve the taxpayer from liability from the negligence penalty, even if the return position does not satisfy the reasonable basis standard. See Treas. Reg. § 1.6662-3(b)(3).

"Disregard of rules and regulations" includes any careless, reckless, or intentional disregard of rules and regulations. A disregard of rules or regulations is "careless" if the taxpayer does not exercise reasonable diligence in determining the correctness of a position taken on its return that is contrary to the rule or regulation. A disregard is "reckless" if the taxpayer makes little or no effort to determine whether a rule or



**Any line marked with a # is for Official Use Only**

regulations exists, under circumstances demonstrating a substantial deviation from the standard of conduct observed by a reasonable person. Additionally, disregard of the rules and regulations is "intentional" where the taxpayer has knowledge of the rule or regulation that it disregards. Treas. Reg. § 1.6662-3(b)(2).

"Rules and regulations" includes the provisions of the Internal Revenue Code and revenue rulings or notices issued by the Internal Revenue Service and published in the Internal Revenue Bulletin. Treas. Reg. § 1.6662-3(b)(2). Therefore, if the facts indicate that a taxpayer took a return position contrary to any published notice or revenue ruling, the taxpayer may be subject to the accuracy-related penalty for an underpayment attributable to disregard of rules and regulations, if the return position was taken subsequent to the issuance of a notice or revenue ruling.

The accuracy-related penalty for disregard of rules and regulations will not be imposed on any portion of underpayment due to a position contrary to rules and regulations if: (1) the position is disclosed on a properly completed Form 8275 or Form 8275-R (the latter is used for a position contrary to regulations) and (2), in the case of a position contrary to a regulation, the position represents a good faith challenge to the validity of a regulation. This adequate disclosure exception applies only if the taxpayer has a reasonable basis for the position and keeps adequate records to substantiate items correctly. Treas. Reg. § 1.6662-3(c)(1). Moreover, a taxpayer who takes a position contrary to a revenue ruling or a notice has not disregarded the ruling or notice if the contrary position has a realistic possibility of being sustained on its merits. Treas. Reg. § 1.6662-3(b)(2).

Taxpayers filing returns reporting LILO transactions prior to the issuance of Rev. Rul. 99-14 on March 11, 1999, could not take positions contrary to a published notice or revenue ruling. However, taxpayers filing returns reporting LILO transactions after the issuance of Rev. Rul. 99-14 took positions contrary to a published notice or revenue ruling, even though the transaction had been entered into prior to the issuance of Rev. Rul. 99-14.

For LILO transactions reported on returns predating the issuance of Rev. Rul. 99-14, however, a taxpayer could still be liable for the negligence penalty based upon a failure to make a reasonable attempt to comply with the provisions of the Internal Revenue Code or to exercise ordinary and reasonable care in the preparation of a tax return.

Part III - *Substantial Understatement of Income Tax.* A substantial understatement of income tax exists for a taxable year if the amount of understatement exceeds the greater of 10 percent of the tax required to be shown on the return or $5,000 ($10,000 in the case of corporations other than S corporations or personal holding companies). Section 6662(d)(1).

In the case of items of corporate taxpayers attributable to tax shelters, neither exception (1) nor (2) in § 6662(d)(2)(B), reduction for understatement due to position of taxpayer or disclosed item, applies. Section 6662(d)(2)(C)(ii). Therefore, if a corporate taxpayer has a substantial understatement that is attributable to a tax shelter item, the accuracy-related penalty applies to the understatement unless the reasonable cause and good faith exception applies. The definition of tax shelter includes, among other things, any plan or arrangement a significant purpose of which is the avoidance or evasion of federal income tax. Section 6662(d)(2)(C)(iii).

For transactions entered into before August 6, 1997, the relevant standard was whether tax avoidance or evasion was the "principal purpose" of the entity, plan, or arrangement. Treas. Reg. § 1.6662-4(g)(2)(i). If the facts establish that an understatement attributable to the disallowance of losses or deductions from a LILO transaction exceeds the greater of 10 percent of the tax required to be shown on the return or $5,000 ($10,000 in the case of corporations other than S corporations or personal holding companies), a substantial understatement penalty may be applicable.

Part IV - *The Reasonable Cause Exception*. Section 6664 provides an exception to the imposition of accuracy-related penalties if the taxpayer shows that there was reasonable cause for the underpayment and that the taxpayer acted in good faith. See § 6664(c). Treas. Reg. 1.6664-4(b)(1) states that, in general, the determination of whether a taxpayer acted with reasonable cause and good faith is made on a case by case basis, taking into account all pertinent facts and circumstances. The most important factor is the extent of the taxpayer's effort to assess the taxpayer's proper tax liability. See Estate of Simplot v. Commissioner, 112 T.C. 130, 183 (1999) (citing Mandelbaum v. Commissioner, T.C. Memo. 1995-255), rev'd on other grounds, 249 F.3d 1191 (9th Cir. 2001); see also Treas. Reg. § 1.6662-4(g)(4)(ii); 1.6664-4(b)(1), (c)(1)(i).

Reasonable reliance, in good faith, upon a tax opinion provided by a professional tax advisor is a defense to the negligence penalty. The reliance itself, however, must be objectively reasonable in the sense that the taxpayer supplied the professional with all the necessary information to assess the tax matter and that the professional himself does not suffer from a conflict of interest or lack of expertise that the taxpayer knew of or should have known about. See Treas. Reg. § 1.6664-4(c); Neonatology Associates, P.A., v. Commissioner, 299 F.2d 221 (3rd Cir. 2002) (citing Ellwest Stereo Theatres of Memphis, Inc. v. Commissioner, T.C. Memo 1995-610). It is well established that taxpayers generally cannot "reasonably rely" on the professional advice of a tax shelter promoter. See Goldman v. Commissioner, 39 F.3d 402, 408 (2d Cir. 1994) ("Appellants cannot reasonably rely for professional advice on someone they know to be burdened with an inherent conflict of interest."), affg. T.C. Memo 1993-480; Neonatology Associates, P. A., supra at 98 ("Reliance may be unreasonable when it is placed upon insiders, promoters, or their offering materials, or when the person relied upon has an inherent conflict of interest that the taxpayer knew or should have known about."); Marine v. Commissioner, 92 T.C. 958, 992-993 (1989), affd. without published opinion 921 F.2d 280 (9th Cir. 1991). Such reliance is especially unreasonable when the advice

would seem to a reasonable person to be "too good to be true." Pasternak v. Commissioner, 990 F.2d 893, 903 (6th Cir. 1993), affg. Donahue v. Commissioner, T.C. Memo 1991-181; Elliott v. Commissioner, 90 T.C. 960, 974 (1988), affd. without published opinion 899 F.2d 18 (9th Cir. 1990); Gale v. Commissioner, T.C. Memo 2002-54.

Reliance on professional advice does, however, constitute reasonable cause and good faith if, under all the circumstances, such reliance was reasonable and the taxpayer acted in good faith. Section 6664(c); see also United States v. Boyle, 469 U.S. 241 (1985) (reasonable cause is established when a taxpayer shows that he reasonably relied on the advice of an accountant or attorney). In addition, the fact that the taxpayer satisfies the regulation will not necessarily establish that the taxpayer reasonably relied on the advice of a professional tax advisor or other advisor in good faith. For example, if the taxpayer knew, or should have known, that the advisor lacked knowledge in the relevant aspects of Federal tax law, reliance may not be reasonable or in good faith. Treas. Reg. § 1.6664-4(c)(1). Also, reasonable cause may still not exist if the taxpayer's participation in the tax shelter lacked significant business purpose, if the taxpayer claimed benefits that were unreasonable in comparison to the initial investment in the tax shelter, or if the taxpayer agreed with the shelter promoter that the taxpayer would protect the confidentiality of the tax aspects of the structure of the tax shelter. Treas. Reg. § 1.6664-4(e)(3).

If a taxpayer's reliance on advice is to be sufficiently reasonable so as possibly to negate a § 6662(a) accuracy-related penalty, the Tax Court in Neonatalogy Associates P.A. v. Commissioner, 115 T.C. 43 (2000), aff'd 299 F.3d 221 (3rd Cir. 2002), stated that the taxpayer has to satisfy the following three-prong test: (1) the advisor was a competent professional who had sufficient expertise to justify reliance; (2) the taxpayer gave to the advisor the necessary and accurate information; and (3) the taxpayer actually relied in good faith on the advisor's judgment. Taxpayers not satisfying all three prongs have not demonstrated the reasonableness of their position.

Additionally, the advice must be based upon all pertinent facts and circumstances and the law as it relates to those facts and circumstances. For example, the advice must take into account the taxpayer's purpose (and the relative weight of such purpose) for entering into a transaction and for structuring a transaction in a particular manner. A taxpayer will not be considered to have reasonably relied in good faith on professional tax advice if the taxpayer fails to disclose a fact it knows, or should know, to be relevant to the proper tax treatment of an item. Treas. Reg. § 1.6664-4(c)(1)(i). The advice must not be based on unreasonable factual or legal assumptions (including assumptions as to future events) and must not unreasonably rely on the representations, statements, findings, or agreements of the taxpayer or any other person. For example, the advice must not be based upon a representation or assumption that the taxpayer knows, or has reason to know, is unlikely to be true, such as an inaccurate representation or assumption as to the taxpayer's purposes for entering into a transaction or for structuring a transaction in a particular manner. Treas. Reg. § 1.6664-4 (c)(1)(i). Also, where a tax benefit depends on nontax factors, the



Any line marked with a # is for Official Use Only

taxpayer has a duty to investigate such underlying factors. The taxpayer cannot simply rely on statements by another person, such as those of a promoter. See Novinger v. Commissioner, T.C. Memo 1991-289 (taxpayer could not avoid the negligence penalty merely because his professional advisor had read the prospectus and had advised the taxpayer that the underlying investment was feasible from a tax perspective, assuming the facts presented were true). Further, if the tax advisor is not versed in these nontax factors, mere reliance on the tax advisor does not suffice. See Addington v. United States, 205 F.3d 54 (2d Cir. 2000) (taxpayer's reliance on tax advisor was not reasonable given the cautionary language in offering memoranda and the tax advisor's lack of adequate knowledge to evaluate essential aspects of the underlying investment); Freytag v. Commissioner, 89 T.C. 849 (1987), aff'd, 904 F.2d 1011 (5th Cir. 1990) (reliance on tax advice not reasonable where taxpayer did not consult experts with respect to the bona fides of the financial aspects of the investment); Goldman v. Commissioner, 39 F.3d 402 (2d Cir. 1994) (taxpayer's reliance on accountant's advice to invest in a partnership engaged in oil and gas was not reasonable where accountant lacked industry knowledge); Collins v. Commissioner, 857 F.2d 1383 (9th Cir. 1988) (penalties upheld where advisor "knew nothing firsthand" about the venture).

The mere fact that the value of property has been appraised does not ordinarily indicate reasonable cause and good faith.[20] Other factors to consider include: (1) the methodology and assumptions underlying the appraisal; (2) the appraised value; (3) the relationship between appraised value and purchase price; (4) the circumstances under which the appraisal was obtained; and (5) the appraiser's relationship to the taxpayer or to the activity in which the property is used. Treas. Reg. § 1.6664-4(b)(1). When considering an appraisal as an aspect of reasonable cause and good faith in a LILO transaction, particular attention should be paid to factors (3), (4), and (5).

Regarding reasonable cause for the substantial understatement penalty attributable to tax shelter items of a corporation, special rules apply (see § 6662(d)(2)(C)(iii) for the definition of a tax shelter). Whether a corporation acted with reasonable cause and good faith is based on an examination of all pertinent facts and circumstances. Treas. Reg. § 1.6664-4(e)(1). A corporation's legal justification may be taken into account, as appropriate, in establishing that the corporation acted with reasonable cause and in good faith in its treatment of a tax shelter item, but only if there is substantial authority within the meaning of Treas. Reg. § 1.6662-4(d) for the treatment of the item and the corporation reasonably believed, when the return was filed, that such treatment was more likely than not the proper treatment. Treas. Reg. § 1.6664-4(e)(2)(i). But under that regulation, a failure to satisfy the minimum requirements will preclude a finding of reasonable cause and good faith based (in whole or in part) on a corporation's legal justification. Pursuant to Treas. Reg. § 1.6662-4(e)(2)(ii), the provisions of Treas. Reg.

[20] LILO transactions will normally involve appraisals. The appraisals will attempt to establish that the fair market value of the Head Lease residual at the purchase option date will be less than the purchase option price. This helps taxpayers establish that the tax-exempt entity will not be likely to exercise the purchase option. The appraisals do something else: they discuss the future rental stream, and it will usually be high enough to establish that the U.S. taxpayer will want to keep the Head Lease and not force the tax-exempt entity to purchase the Head Lease residual through the put option period. By doing this, the U.S. taxpayer hopes to defeat the Service's contention that it has no economic exposure in these deals.

§ 1.6664-4(e)(1) on the effect of adequate disclosure do not apply where the item or position on the return is attributable to a tax shelter as defined in § 6662(d)(2)(C)(iii) and Treas. Reg. § 1.6662-4(g)(2).

The Treasury regulations provide that in meeting the requirement of "reasonably believing" that the treatment of the tax shelter item was more likely than not the proper treatment, the corporation may reasonably rely in good faith on the opinion of a professional tax advisor if the opinion is based on the tax advisor's analysis of the pertinent facts and authorities in the manner described in Treas. Reg. § 1.6662-4(d)(3)(ii). The latter regulation provides that the weight accorded an authority depends on its relevance, persuasiveness, and the type of document providing the authority. That is, a case or revenue ruling or other authority having only some facts in common with the tax treatment at issue is not particularly relevant if the authority may be materially distinguished on its facts or is otherwise inapplicable to the tax treatment in issue.

Under Treas. Reg. § 1.6662-4(d)(3)(iii), substantial authority for the tax treatment of an item includes: (1) Applicable provisions of the Internal Revenue Code and other statutory provisions; (2) Proposed, temporary, and final regulations construing such statutes; (3) Revenue Rulings and Revenue Procedures; (4) Tax treaties and the regulations thereunder, and Treasury Department and other official explanations of such treaties; (5) Court cases; (6) Congressional intent as reflected in committee reports, joint explanatory statements of managers included in conference committee reports, and floor statements made prior to enactment by one of a bill's managers; (7) General explanations of tax legislation prepared by the Joint Committee on Taxation (the Blue Book); (8) Private letter rulings and technical advice memoranda issued after October 31, 1976; (9) Actions on decisions and general counsel memoranda issued after March 12, 1981 (as well as general counsel memoranda published in pre-1955 volumes of the Cumulative Bulletin); (10) Internal Revenue Service information or press releases; and (11) Notices, announcements and other administrative pronouncements published by the Service in the Internal Revenue Bulletin.

Treas. Reg. § 1.6664-4(e)(2)(i)(B)(2) also requires that the opinion unambiguously state that the tax advisor concludes that there is a greater than 50 percent likelihood that the tax treatment of the item will be upheld if challenged by the Service. Therefore, the tax advisor's opinion should be considered in determining whether these requirements are met. Taxpayers not providing the advice on which they relied cannot meet the requirements of Treas. Reg. § 1.6664-4(e)(2)(i)(B)(2).

While satisfaction of the "substantial authority" and "belief" requirements is necessary to a reasonable cause finding, this may not be sufficient. For example, reasonable cause may still not exist if the taxpayer's participation in the tax shelter lacked significant business purpose, if the taxpayer claimed benefits that were unreasonable in comparison to the initial investment in the tax shelter, or if the taxpayer agreed with the shelter promoter that the taxpayer would protect the confidentiality of the tax aspects of the structure of the tax shelter. Treas. Reg. § 1.6664-4(e)(3).

**SETTLEMENT GUIDELINES**

Issues 1 and 2

#
#

#
#

#
#
#
#
#
#
#
#
#
#
#
#
#
#

#
#
#
#
#
#
#
#
#
#
#

#
#
#
#
#
#

exempt

*6*

#
#
#
#
#
#

#
#
#
#

#
#
#
#
#

#
#
#

#
#
#

#
#
#
#
#
#
#
#

#
#
#



**Any line marked with a # is for Official Use Only**

#
#
#
#

#
#
#

#

#
#
#

#

#
#
#
#
#
#

For further information on this memorandum, contact Luis E. Arritola at 305-982-5264.

22

#
#

#
#
#
#
#
#
#



Any line marked with a # is for Official Use Only

# EXHIBIT F

# Officials Provide Updates on LILOs and Credit Card Crackdowns

by Sheryl Stratton

**IRS officials at a May 10 meeting of the American Bar Association Section of Taxation's Civil and Criminal Tax Penalties Committee gave compelling status reports on the offshore voluntary disclosure program and LILO litigation strategy.**

**Date:** May 13, 2003

Full Text Published by taxanalysts

IRS officials at a May 10 meeting of the American Bar Association Section of Taxation's Civil and Criminal Tax Penalties Committee gave compelling status reports on the offshore voluntary disclosure program and LILO litigation strategy.

## Voluntary Disclosure

"It's not over until it's over" was the government's message on the IRS's offshore voluntary compliance initiative, which officially ended April 15. The IRS had received 1,264 applications as of May 9, according to Steven Burgess, the program's national coordinator. About 88 percent of the applications came in after April 5, and applications are still being received from taxpayers living in foreign countries. However, the IRS expects to meet its 30-day deadline for notifying applicants whether they qualify for the initiative, Burgess said.

Burgess said that although applications have come from taxpayers in 46 different states and 48 countries, most of the taxpayers live in Florida, California, Texas, and New York. Two-thirds of the applicants are individuals. Half of the applications have been prepared by the taxpayers, and 40 percent by attorneys, according to Burgess.

Nearly all offshore arrangements involved complicated schemes, Burgess said. Over 200 taxpayers lost their money after depositing it into the foreign account.

Even though the period for participating in the offshore voluntary disclosure initiative has ended, the IRS encourages taxpayers to come in, said Kevin Brown, division counsel for the IRS's Small Business/Self-Employed Division. Although the best offer has expired, taxpayers will still do better to voluntarily come in because they'll get a better deal now than if they wait for the IRS to find them, he said.

Voluntary disclosure is a "hard sell" to clients worried about criminal referral, said panelists Miriam Fisher of Washington's Hogan & Hartson, and Larry Campagna of Houston's Chamberlain, Hrdlicka, White, Williams & Martin.

Until the IRS gives some assurance that the information won't be criminally referred, Campagna said, there is no way the agency will get all the information it otherwise could. He asked about the feasibility of allowing the taxpayer to check eligibility for voluntary disclosure by providing only a name and a taxpayer identification number.

That is essentially what the voluntary disclosure program is about, said Nancy J. Jardini, deputy director of the IRS's Criminal Investigation Division. The IRS will not create a substantive right for taxpayers choosing to voluntarily disclose information. And if the taxpayer doesn't otherwise qualify for voluntary disclosure, the IRS isn't going to take additional steps to provide assurances, she said.

## To Designate or to De-Designate

Referring to his May 9 announcement that the IRS will first litigate the most circular of the LILO transactions, IRS Chief Counsel B. John Williams said that if the lending bank is the same as the depositing bank, and if the interest rates on the cash flows are the same, "one might conclude from that that nothing happened."

These types of LILO cases will be teed up first for litigation designation, which he signs off on only after meeting with the taxpayers. "It is amazing to me how strenuously taxpayers argue against being designated for litigation," Williams said.

The specified class of LILO cases will not involve much expert testimony or factual development, Williams said. And because there is a pretax return of 2 to 4 percent on the transactions, the IRS will not waste resources arguing economic substance. (For prior coverage, see *Doc 2003-11791 (3 original pages)* [**PDF**] or *2003 TNT 91- 2*.)

"If we are thoughtful and strategic, we can take it on and get it done without being deluged by numbers and factual development," Williams said. The IRS has the resources to do much more litigation than it has been doing, he said.

Although the IRS has decided against offering a settlement initiative for LILOs and lease-strips, the decision does not preclude taxpayers from settling on an individual basis unless their case has already been designated for litigation. Nor does it preclude the possibility for a settlement initiative in the future for lease-strips, he said.

But Williams said he is looking to expand the volume of cases being designated for litigation. Designating a case for litigation is an appropriate enforcement tool, Williams explained, and is a comprehensive process. (For prior comments on designation, see the full text of the chief counsel's April 24 speech to the Tax Court Judicial Conference, *Doc 2003-10653 (5 original pages)* [**PDF**] or *2003 TNT 82-27*.) Williams said that because he signs off on designations and de-designations, the latter "is not going to happen very often." Williams has designated four cases for litigation, and none have been de-designated.

Williams said the Appeals office is independent even if it talks to chief counsel attorneys about the hazards of litigation. Just because the two organizations talk does not mean Appeals lacks independence, he said. To suggest otherwise is to "miss the fundamental truth of the system."

**Justice Does Its Part**

Also addressing the committee was Eileen J. O'Connor, assistant attorney general, Justice Department Tax Division. O'Connor said her department is out to increase the quantity and quality of criminal prosecutions, particularly of tax shelter promoters.

The Justice Department has been able to reduce the time spent on investigations and prosecutions by instilling a sense of urgency in the special agents and prosecutors. Calling Justice's corporate fraud enforcement efforts a "useful model in real-time enforcement," she said "speed matters" in dealing with white-collar crime.

The Justice Department has also been busy getting civil injunctions against tax scam promoters, O'Connor said. The government enjoined 18 tax scam promoters in 2002 and has already sought action against 11 in 2003, she said. The department is already involved in a collection action against one taxpayer caught in the offshore credit card crackdown.

"We are going to act more quickly. We are going to act more often. And we are going to act more intelligently," O'Connor said. "The era of declining federal enforcement of tax laws has ended."

Comment on this story

### Tax Analysts Information

**Jurisdiction:** United States
**Subject Area:** Litigation and appeals
Penalties
Practice and procedure
Compliance
**Author:** Stratton, Sheryl
**Institutional Author:** Tax Analysts
**Tax Analysts Document Number:** Doc 2003-11915 (3 original pages)
**Tax Analysts Electronic Citation:** 2003 **TNT 92-2**
**Cross Reference:** For prior coverage see *Doc 2003-11791 (3 original pages)* [**PDF**] or *2003 TNT 91-2*. For the full text of the chief counsel's April 24 speech to the Tax Court Judicial Conference, see *Doc 2003-10653 (5 original pages)* [**PDF**] or *2003 TNT 82-27*.

Use this link to bookmark or link to this document