# EXHIBIT C-1

Date: November 20, 1997

To: Robert Stelben
Hyman Schoenblum

From: Brian DePlautt

Re: Consolidated Edison Development, Inc.
EZH Lease

The following is an update regarding certain accounting and tax aspects of the EZH transaction.

(1) Tax Risk Letter

Shearman & Sterling is finalizing the Tax Risk Letter, which will outline the major tax risks in the 467 structure, and hopes to have it to us by Thursday, November 20, or Friday November 21.

The critical path on this item is: (a): the completion and turnaround of the tax partner's final comments to the existing draft letter.

(2) Tax Change Letter

Shearman & Sterling is finalizing the Tax Change Letter, which will outline the retroactive or prospective nature of historical changes in leveraged lease tax regulations, and hopes to have it to us by Thursday, November 20, or Friday November 21.

The critical paths on this item are: (a) the completion of the legislative history research on one of the changes and (b) the completion and turnaround of the tax partner's comments to the existing draft letter.

Shearman has indicated that they would like to reserve the right to delay delivery to us of one of these two letters beyond the target delivery dates in the event they are required to fight fires on other fronts.

(3) Arthur Anderson Accounting Letter

Arthur Anderson ("AA") has prepared a draft accounting letter and is the process of drafting an added paragraph to the letter. The added paragraph is said to address what the accounting treatment would be, starting in year 21, in the event that EZH did not exercise its Fixed Purchase Option ("FPO") in year 20.

The critical paths on this item are: (a) AA's review of the clarifications of the transaction structure provided to it last night, (b) the drafting by the partner of the added paragraph that deals with what happens in the event EZH does not exercise the FPO and (c ) the conceptualization of the specific accounting entries that would be required in the event the proposed phase two treatment were to be implemented.

AA has indicated that it will seek to provide us with verbal direction with respect to the resolution of these issues on Thursday November 20, subject to time constraints at the partner level, with a letter to follow as soon as possible. We continue to reiterate to AA the immediate urgency of our desire for the resolution of these issues and the receipt of their letter.

cc: MJ McCartney
J. Freilich
C. Muoio

# EXHIBIT C-2

| | |
|---|---|
| Date: | November 21, 1997 |
| To: | Mary Jane McCartney |
| From: | Brian DePlautt |
| Re: | Consolidated Edison Development, Inc.<br>EZH Lease<br>Status Update |

The following is the current status on some of the issues on the EZH Lease:

(1) Accounting

We anticipate receiving the latest draft of the Arthur Andersen accounting letter Monday morning and will distribute it to PW and internally when we receive it.

We have delivered written responses to all of PW's questions and are awaiting their questions.

We have requested Jim Dewey to contact Leo Naughton of PW. Leo is a former tax partner at Shearman & Sterling and employee of the US Treasury who is heading up a lease advisory business at PW which represents Lessors in 467 lease in / lease out transactions. Leo and his team recently make a proposals to CED to either: (a) represent lessors bringing 467 lease in / lease out transactions to CED to invest in, or (b) to provide CED with buy side lease advisory services in support of CED's pursuit of these transactions.

To the extent that Leo's group is actively involved on both the buy and sell side of these transactions it is possible that he may be able to provide some insight to the audit side of PW regarding the way in which the participants in the 467 lease market account for these transactions. Leo is awaiting Jims' call.

(2) Internal Legal

We have retained Con Edison's legal department to read the project documents and to help prepare the legal deliverables on the transaction such as Incumbency Certificates etc. The primary point of contact is Andrew Scher who was a tax specialist prior to joining Con Edison. We have delivered all of the available project agreements to him as well as the Project Briefing Memorandum.

(3) Tax History Letter

Shearman & Sterling has delivered their tax history letter to us which reviews the history of tax law and code changes relating to leveraged leases. The letter covers research for the period 1985 to the present and is available for distribution to any interested parties. We have distributed this letter to the Con Edison attorney who is helping us with Legal Services.

(4) Tax Risk Letter

Shearman & Sterling has delivered their tax risk letter to us and it is in conformance with the conversations and meetings we have had with them in the past. We have distributed this letter to the Con Edison attorney who is helping us with Legal Services.

cc: J. Freilich
R. Stelben
H. Schoenblum
C. Muoio

# EXHIBIT C-3

## 13. RISK ANALYSIS

| RISK | MITIGATION | ESTIMATED REMAINING RISK LEVEL |
|---|---|---|
| | | |
| **Political and Regulatory** | | |
| Expropriation | (a) AAA rated Country<br>(b) Equity exposure defeased by (i) AA Bank L/C and (ii) Treasury securities | Low |
| Political Violence | (a) AAA rated Country<br>(b)Equity exposure defeased by (i) AA Bank L/C and (ii) Treasury securities | Low |
| Change in Law | (a) AAA rated Country<br>(b) Equity exposure defeased by (i) AA Bank LC and (ii) Treasury securities<br>(c) EZH takes all local country change in law risk | Low |
| | | |
| **Currency** | | |
| Inconvertibility/Transfer | (a) AAA rated Country<br>(b) Currently fully convertible<br>(c) No negative history | Low |
| Devaluation | (a) All payments payable in US Dollars<br>(b) Sublease payments supported by (i) AA Bank L/C and defeased by (ii) Treasury securities, both denominated in US Dollars | Low |
| | | |
| **Financing** | | |
| Debt Availability | Bank debt will close on the same day the Head Lease and Sublease close (together the "Closing Date"). | Low |
| Interest Rate Changes | Interest rates will be fixed on the Closing Date | Low |
| | | |
| **Technology** | | |
| Existing Plant | (1) Newly constructed plant<br>(2) Over 500 units of the Frame E installed.<br>(3) Satisfactory engineering report from Duke Engineering to be received prior to closing. | Low |



US01594

| | | |
|---|---|---|
| New Plants | Not applicable | |
| Stranded Assets | Upcoming regulations (Dutch Electricity Act, and EU Directive on open border competition in electricity) could expose EZH to competitive pressures from EDF, VEBA and others selling at below fully loaded costs. Mitigations of this risk are (a) consolidation of the Dutch Genco's in a larger, stronger firm, (b) fully defeased nature of EZH obligations which transfer credit risk from EZH to AA Banks and Treasury securities. | Low |
| | | |
| **Construction Risk** | | |
| EPC Contractor Guarantees | Plant is complete and operating | n/a |
| Use of proven technologies -CT | GE E Frame family (7E and 9E) has an installed fleet of over 500 units worldwide. | Low |
| Use of proven technologies - STG | ABB condensing steam turbine is standard technology. | Low |
| Use of proven technologies - HRSG | Stork Ketels waste heat boiler is standard technology | Low |
| Use of proven technologies - CO2 boiler | Stork Ketels CO2 boiler is an open item. This technology, and the design, construction and operation needs to be reviewed in the due diligence process. | Open |
| Fixed price EPC contract | Plant is complete and operating | n/a |
| Heat Rate | Risk is held by EZH | Low |
| | | |
| **Plant Operations** | | |
| Operations & Maintenance | Risk is held by EZH | Low |
| Force Majeure | Risk is held by EZH | Low |
| | | |
| **Fuel** | | |
| Availability | Risk is held by EZH | Low |

| | | |
|---|---|---|
| Price Fluctuations | Risk is held by EZH | Low |
| | | |
| **EZH Performance** | | |
| Sublease Rent - Project Debt Portion | (a) Secured by the Debt Defeasance Deposit, invested in AA Bank deposit, pledged to lender bank. | Low |
| Sublease Rent - Equity Portion | (a) Secured by the Investor Defeasance Deposit, invested in Treasury securities. | Low |
| Fixed Price Option Payment | (a) Secured by the Investor Defeasance Deposit, invested in Treasury securities | Low |
| Early Termination Amounts | (a) Secured by the combination of (b) AA Bank L/C and (b) Investor Defeasance Deposit, invested in Treasury securities. | Low |
| | | |
| **Dutch taxes** | | |
| Change in Dutch tax law | Full indemnity from EZH | Low |
| | | |
| **US taxes** | | |
| **Headlease is not a true lease,** and Sublease is a true lease,<br><br>hence CED is deemed the purchaser of the asset, and<br><br>CED is forced to depreciate the plant straight line over 47 yrs | Legal opinion is expected to be a "should" ( 80 - 90%) | Low |
| Headlease is a true lease, and **Sublease is not a true lease,**<br><br>hence equity investment is deemed a loan, and<br><br>CED is not allowed to deduct Headlease rent, and is deemed to receive interest income from Sublessee | Legal opinion is expected to be a "should" ( 80 -90% ) | Low |
| **Headlease is a disqualified leaseback,**<br><br>hence, Constant rental accruals required on headlease, and<br><br>deductions are back loaded | Legal opinion is expected to be a "reasoned should" (80 - 85%) | Low |

| | | |
|---|---|---|
| **Sublease put renewal is disregarded, both leases are considered one lease,**<br><br>hence, Sublease rent levelization required, and<br><br>CED is forced to frontload Sublease rental income. | Legal opinion is expected to be a "should" ( 80 - 90%) | Low |
| **467 Regs are finalized** prior to close and transaction fails to close | EZH pays all third party transaction costs. | Medium |
| **Accounting** | | |
| Headlease will not pass the FASB 13 test for leveraged leases. | (a) Industry practice survey from Cornerstone indicates the following firms consistently close transactions similar to the EZH transaction including (1) PSRC, (2) Duquense (3) Nynex, (4) Ameritech, (5) Banc One, and (6) Bank of New York. | Low |
| **Environmental** | | |
| Existing Plant | (1) Tauw Milieu b.v. Netherlands engineer report.<br>(2) Full Indemnity from EZH | Low |
| New Plant | (1) Tauw Milieu b.v., Netherlands engineer report<br>(2) Full Indemnity from EZH | Low |
| | | |
| **Labor** | | |
| Inadequate Skills | Risk is held by EZH | Low |
| Unrest | Risk is held by EZH | Low |
| | | |
| **Worst Case Scenario** | | |
| Total Project Collapse | Project structure collapses and Trust draws on Bank L/C, Debt Defeasance and Treasury securities for payment of outstanding debt and equity | Low |

# EXHIBIT C-4

## Executive Summary

One element of a diversified investment portfolio for Con Edison is the relatively low risk and attractive return profile of leases. This paper describes sale-leasebacks, identifies major risks and benefits, and details a recommended investment.

Investments of this type would be accounted for as leveraged leases, allowing for front-loaded earnings, and generate after tax yields of between 15% and 25% over their lives, after taking account of typical capital structure and debt costs.

The earnings come from a combination of lease payments and tax deductions. Con Edison, with its high tax rate and large taxable income position, is in a particularly favorable position to take advantage of such a program.

### What is a sale-leaseback?

In its most basic form, a sale-leaseback is the purchase of an asset and the subsequent leaseback of that asset to the seller under a long term lease agreement. Under a so-called "leveraged lease", the investor uses non-recourse debt to reduce the equity needed to purchase the asset.

Since its inception in 1964, the leveraged leasing market has continually developed new variations on this basic theme to accommodate increasingly complex accounting and tax laws and regulations. The latest of these variations are the "lease-leaseback" structures in which an asset is leased (instead of purchased) and the leasehold rights derived from that lease are then leased back to the initial owner of the facility. Lease-leaseback structures have been developed to optimize the benefits that can be derived by the utility and the investor in these transactions.

### What kind of lease structures will be considered?

Under the proposed investment program, investments will be considered in both sale-leasebacks and lease-leasebacks, depending on prevailing market conditions.

Because the specific transaction currently under consideration by CED is a lease-leaseback we will use this type of structure in our example of a typical transaction.

### How would a typical transaction work?

In a typical lease-leaseback transaction, a special purpose subsidiary owned by an investor, in this case CED, would establish a trust. On the closing date, CED would invest equity in the trust and the trust would borrow non-recourse debt for the project. Concurrently the trust would enter into a lease agreement with a utility under which the trust would lease an asset, for example a power plant, from the utility for 44 years. The trust would, at the same time, lease the plant back to the utility for 20 years, after which the trust would have a number of options, described below. The initial 20 year term of the leaseback has been chosen to

optimize the benefits available to both the utility and the investor. A 44 year leaseback would not qualify for the tax treatment that CED and the foreign utility seek.

On the closing date of the lease, the utility would establish, for the benefit of CED, (a) a trust account containing U.S. Treasury securities and (b) an irrevocable bank letter of credit from a bank rated AA or better, both in amounts that, when combined, fully secure the obligations of the utility to CED. In the event the utility were to fail to make the payments due to CED under the lease, CED could take the U.S. Treasury securities and draw on the letter of credit to satisfy any shortfalls.

At the end of the initial 20 year lease, the utility would have the option to purchase the plant at a pre-agreed fixed price. If the utility did purchase the plant at this time, the transaction would be completed. If the utility did not purchase the plant at the end of year 20, the trust would have the option to either (a) lease the plant to a third party for the remaining 24 years of the lease, (b) use the plant itself, or (c ) require the utility to re-lease the plant for an additional 17 years at prices that would assure CED of its expected return.

Responsibility for the condition of the plant would rest with the utility during the initial term of the lease, and with the third party during a subsequent lease. During the remaining seven years under the lease, CED could either use the plant itself or lease the plant to third parties and in doing so obtain additional revenue. The base case economics assume no revenue for this period. At the end of the 44 year lease CED would be required to return the plant to the utility.

**How would CED derive its return under a sale-leaseback?**

Under a typical lease-leaseback structure an investor's earnings are generated by applying a constant rate of return to a declining investment balance according to lease accounting rules established by the Financial Accounting Standards Board. As the investment balance declines so do the earnings and hence the earnings are front-loaded.

The following chart details the earnings profile for the first 10 years of a typical lease-leaseback

| Year (US$) | Investment | Earnings |
|---|---|---|
| 1997 | 43,047,734 | 353,054 |
| 1998 | | 4,154,042 |
| 1999 | | 3,961,165 |
| 2000 | | 3,748,210 |
| 2001 | | 3,512,950 |
| 2002 | | 3,252,891 |
| 2003 | | 2,965,245 |
| 2004 | | 2,646,897 |
| 2005 | | 2,294,361 |
| 2006 | | 1,903,735 |

The following graph details the earnings for a typical lease-leaseback.




The transactions contemplated will be structured in such a way that CED will obtain the same yields and rates of return regardless of whether the utility exercises its purchase option at the end of year 20 or is required to re-lease the plant for an additional 17 years.

**Do we have a specific transaction in mind?**

CED's strategy will be to invest in transactions in conjunction with experienced market participants, to concentrate on assets familiar to Con Edison and to deal with utilities in countries with high credit ratings.

CED is currently pursuing the potential investment of $43 million in a recently commissioned gas-fired combined cycle power plant, the RoCa3 plant, located near the city of Rotterdam in the Netherlands. The plant, owned by EZH, one of the four regulated generation utilities in the Netherlands, is currently undergoing engineering, environmental, and valuation reviews by our consultants, and has recently been inspected by internal personnel.

We are pursuing this investment opportunity in conjunction with an experienced and knowledgeable lease investor, Bank One Leasing Inc. Bank One and CED have retained Shearman & Sterling for tax and legal advice, and, among others, Duke Engineering for engineering reviews, Tauw Milieu, a well-respected Dutch environmental firm, for an environmental assessment and Deloitte & Touche for valuation assessments of the plant.

The transaction is anticipated to generate over $4 million in earnings during 1998 and is expected to generate an after tax yield of 19.7%, assuming that CED's investment is 50% equity/50% debt.

**What are major benefits from these transactions to the investor?**

(1) Highly Predictable Earnings

The earnings from these transactions are highly predictable because each of the cash inflows and outflows to the transaction is contractually agreed to on the closing date and because the utility's lease obligations are fully secured by the U.S. Treasuries and the bank letter of credit.

(2) Front Loaded Earnings

Because the transactions will be afforded leveraged lease accounting treatment under Financial Accounting Standards Board rules, the earnings profile for these transactions is "front-loaded' and hence provides more earnings in the early years of the transaction than in the latter years of the transaction.

(3) Good to Excellent Investment Yields

After tax yields on leasing projects are anticipated to range from a good 15% to an excellent 25% depending on the type of lease structure utilized and the leverage applied. For example, under the initial lease investment contemplated the return of 19.7% assumes a relatively conservative leverage rate of 50%. Measurement of after tax yields, assuming a theoretical case in which the corporation has no debt (the so called "all equity return") range from 9.0% to 12.3%.

(4) Economic Value

Because of the utility payment protection structures and the low probability of losses derived from adverse tax actions, the risk adjusted rates of return exceed the required rates of return for these investments.

(5) Strategic Value of Leasing

Participation in these transactions affords CED the opportunity to more fully understand the legal, regulatory, commercial and tax environment of the countries in which the leased assets are located. This in-depth understanding can provide the basis for better informed decisions regarding potential investment and partnering opportunities as the utility infrastructures in these highly developed countries are opened to investments from external sources.

**What are major benefits from these transactions to the utility?**

In entering into these transactions, the utility is able, at little or no perceived risk to itself, to obtain (a) up to 100% long term financing for a plant, (b) interest rates that may be lower than those available from domestic credit sources and (c ) front-end loaded funding benefits, while maintaining operating control of the plant. In the case of the investment contemplated by CED, the benefit to the utility is about 6.9% of the asset value, or $10.3 million.

**What are the major risks from these transactions to the investor?**

(1) Utility Credit Risks

Perhaps the greatest risk to the trust is the risk that the utility will default on its obligation to pay rent during the lease term. In order to minimize this risk the trust will require that the utility's lease obligations be fully secured by a combination of U.S. Treasury securities and letters of credit issued by banks with S&P ratings of AA or above. In the event the utility fails to make the lease rent payments due, the investor can use the Treasuries and the proceeds from the letter of credit to return its capital and to provide it with its expected yield.

(2) Foreign Country Tax Risks

Another major risk implicit in the transaction is the risk that the tax laws or regulations of the country in which the asset is located change in a way that would result in lower returns to the trust, and hence the investor. Investments under the proposed program would be structured so that the risks associated with foreign country tax law changes would be fully borne by the utility.

(3) Pending U.S. Tax Regulations

Pending tax regulations, if enacted, could significantly reduce the tax benefit to be derived by investors in lease-leaseback transactions such as the investment under consideration by CED, as described above.

[redacted]

If the pending regulations are published prior to the closing date, CED will defer the contemplated investment pending a restructuring of the transaction.

(4) U.S. Tax Audits

It is anticipated that the transactions will be structured in ways that will make any challenges to the structure by the IRS under current regulations difficult to support or litigate. [redacted]. Our tax counsel, is very experienced in negotiating and advising on leveraged lease transactions.

In the worst case tax scenario, a claim would be litigated and won in tax court by the IRS. In this case, financial analysis indicates a 100% return of CED's capital and a return on capital of 2.4% over the lease term.

(5) Country Risks

The proposed investment program will target investments in developed and highly rated countries. The initial proposed investment under the program will be in the AAA-rated Netherlands. Potential downstream opportunities include transactions in the Netherlands, Switzerland, Australia, Germany and the United States. The contemplated transactions will be fully denominated in U.S. dollars and will have no foreign exchange risks.

(6) Limited Liquidity

Investments in the assets contemplated under the proposed investment program are designed to generate earnings and cash flow over extended periods of time. While these investments do not carry the liquidity of publicly-traded securities, they can be sold if necessary, although most likely at a discount to then-current book value. The economics of these investment structures typically drive most investors to continue to maintain the investments on their books through their scheduled terms. The proposed investment program contemplates holding these investments accordingly.

**Is anyone else doing these transactions?**

Leasing investment programs form an integral part of the earnings and investment profiles of a wide range of companies, including electric and gas utilities and holding companies such as Public Service Enterprise Group, Duquesne Light, Edison International, Southern Company, Cilcorp, and Southern Indiana Gas; telephone companies such as ATT, Nynex/Bell Atlantic, Ameritech, and US West; banks such as, Bank of New York, First Chicago, Nationsbank, Bank One, and First Chicago; various insurance companies, as well as industrial corporations such as Philip Morris, Pitney Bowes, Chrysler Corporation, Dana Corporation and General Electric.

**What are we requesting approval to do?**

Approval is requested to initiate a leasing investment program and to make such investments as are deemed reasonable by the Board of Directors of CED, within the capital allocations made to CED from time to time by the Board of Directors of the holding company.

One of the requirements the market imposes is that investors have a substantial net worth, in the order of $100 million. To provide for the necessary net worth requirement as well as to provide for funds to make the equity investments, management also requests that it be given the authority to make additional investments in CED sufficient to satisfy the net worth requirements.

# EXHIBIT C-5

From: Windows/admin/Brian
Sent: 2/9/1998 6:46:48 PM (Eastern Time)
To: 'Mary Jane McCartney'
CC: 'Chuck Muoio'
Attachments: ENECO WHITE PAPER 4.DOC
Subject: ENECO White Paper

The following is the ENECO White Paper with the changes requested. At the end of this White Paper is an attachment of the White Paper which should show the graph.

Leasing White Paper
(ENECO 4)

Overview

This Leasing White Paper will provide the reader with the following information: (1) a summary review of a recent lease investment made by Consolidated Edison Development, Inc. ("CED'), (2) a summary review of a new lease investment CED is pursuing, and (3) a general background on leasing.

(1) Summary Review of Recent Lease Investment

CED has participated in one lease-leaseback transaction to date. In December 1997 CED invested $43.5mm for a $150mm undivided interest in the EZH RoCa3 combined cycle power plant located in the Netherlands. The following is a summary of that transaction:

Project Name: EZH RoCa3
Project Country: The Netherlands
Country Credit Rating: AAA
Project Assets: 220MW gas-fired combined cycle power plant
Project Location; Rotterdam, the Netherlands
Total Project Cost: $316mm
CED Portion of Total Cost: $150mm
CED Equity Amount: $43.5mm
Co-investor: Banc One Leasing Corporation
Security for CED Equity: US Treasury securities plus
Letter of credit from AA rated bank
CED Yield to term: 18+% (assuming a 50%/50% debt/equity)

(2) Summary Review of a Potential New Lease Investment

CED is currently pursuing the potential investment of approximately $43 million in a portion of the natural gas and hot water distribution network presently owned and operated by N.V. ENECO. ENECO is a regulated electric, gas and thermal distribution utility with a service territory which includes the cities of Rotterdam and The Hague in the southern portion of the Netherlands. ENECO is rated AA with a "stable" outlook by Standard & Poors.

CED's market entry strategy is to invest in transactions in conjunction with experienced market participants, to concentrate on assets familiar to Con Edison and to deal with utilities in countries with high credit ratings. CED is pursuing this investment opportunity in conjunction with two experienced and



recommended investment.

Investments of this type would be accounted for as leveraged leases, allowing for front-loaded earnings, and generate after tax yields of between 10% and 25% over their lives, after taking account of typical capital structure and debt costs.

The earnings in these transactions come from a combination of lease payments and tax deductions. Con Edison, with its high tax rate and large taxable income position, is in a particularly favorable position to take advantage of such a program.

What is a sale-leaseback?

In its most basic form, a sale-leaseback is the purchase of an asset and the subsequent leaseback of that asset to the seller under a long term lease

agreement. Under a so-called "leveraged lease," the investor uses non-recourse debt to reduce the equity needed to purchase the asset.

Since its inception in 1964, the leveraged leasing market has continually developed new variations on this basic theme to accommodate increasingly complex accounting and tax laws and regulations. The latest of these variations are the "lease-leaseback" structures in which an asset is leased (instead of purchased) and the leasehold rights derived from that lease are then leased back to the initial owner of the facility. Lease-leaseback structures have been developed to optimize the benefits that can be derived by the utility (lessee) and the investor in these transactions.

What kind of lease structures will be considered?

Under the proposed investment program, investments will be considered in both sale-leasebacks and lease-leasebacks, depending on prevailing market conditions.

Because the specific transaction currently under consideration by CED is a lease-leaseback we will use this type of structure in our example of a typical transaction.

How would a typical transaction work?

In a typical lease-leaseback transaction, a special purpose subsidiary owned by an investor, in this case CED, would establish a trust. On the closing date, CED would invest equity in the trust and the trust would borrow non-recourse debt for the transaction. Concurrently the trust would enter into a lease agreement with a utility under which the trust would lease an asset, for example a gas and hot water distribution system, from the utility for 42 years. The trust would, at the same time, lease the system back to the utility for 23 years, after which the trust would have a number of options, described below. The initial 23 year term of the leaseback has been chosen to optimize the benefits available to both the utility and the investor. A 42-year leaseback would qualify for the tax treatment that CED and the foreign utility seek.

On the closing date of the lease, the utility would establish, for the benefit of CED, (a) a trust account containing U.S Treasury securities and (b) an irrevocable bank letter of credit from a bank rated AA or better, both in amounts that, when combined, fully secure the obligations of the utility to CED. In the event the utility were to fail to make the payments due to CED under the lease, CED could take the U.S. Treasury securities and draw on the letter of credit to satisfy any shortfalls.

At the end of the initial 23 year lease, the utility would have the option to purchase the system at a pre-agreed fixed price. If the utility did purchase the system at this time, the transaction would be completed. If the utility did not purchase the system at the end of year 23, the trust would have the option to either (a) lease the system to a third party for the remaining 19 years of the lease, (b) use the system itself, or (c) require the utility to re-lease the system for an additional 12 years at prices that would assure CED of its expected return.

Responsibility for the condition of the system would rest with the utility during the initial term of the lease, and with the third party or the utility

during a subsequent lease. During the remaining 7 years under the lease, CED could either use the system itself, return the system to the utility or lease the system to third parties and in doing so obtain additional revenue. The base case economics assume no revenue for this period. At the end of the 42-year lease CED would be required to return the system to the utility.

How would CED derive its return under a lease-leaseback?

Under a typical lease-leaseback structure an investor's earnings are generated by applying a constant rate of return to a declining investment balance according to lease accounting rules established by the Financial Accounting Standards Board. As the investment balance declines so do the earnings and hence the earnings are front-loaded. The following schedule details the earnings profile for the first 10 years of a typical lease-leaseback

| Year | Investment ($MM) | Earnings ($MM) |
|---|---|---|
| 1998 | 42.9 | 2.3 |
| 1999 | 2.4 | |
| 2000 | 2.3 | |
| 2001 | 2.2 | |
| 2002 | 2.1 | |
| 2003 | 2.0 | |
| 2004 | 1.8 | |
| 2005 | 1.7 | |
| 2006 | 1.6 | |
| 2007 | 1.4 | |

The following chart details the earnings for a typical lease-leaseback

It is anticipated that transactions will be structured such that CED will obtain approximately the same earnings regardless of whether the utility exercises its purchase option or not.

What are major benefits from these transactions to the investor?

1. Highly Predictable Earnings

The earnings from these transactions are highly predictable because each of the cash inflows and outflows to the transaction are contractually agreed to on the closing date and because, in the event of a utility payment default, the trust can take the U.S. Treasuries and draw on the bank letter of credit.

2. Front Loaded Earnings

Because the transactions will be afforded leveraged lease accounting treatment under Financial Accounting Standards Board rules, the earnings profile for these transactions is "front-loaded' and hence provides more earnings in the early years of the transaction than in the latter years of the transaction.

3. Good to Excellent Investment Yields

After tax yields on leasing projects are anticipated to range from a good 10%

to an excellent 25% depending on the type of lease structure utilized and the leverage applied. For example, under the initial lease investment contemplated the return of 12.5% assumes a relatively conservative leverage rate of 50%. Measurement of after tax yields, assuming a theoretical case in which the corporation has no debt (the so called "all equity return") typically range from 8.5% to 12.5%.

4. Economic Value

Because of the utility payment protection structures and the relatively low probability of losses derived from adverse tax actions, the risk adjusted rates of return exceed the required rates of return for these investments.

5. Strategic Value of Leasing

Participation in these transactions affords CED the opportunity to more fully understand the legal, regulatory, commercial and tax environment of the countries in which the leased assets are located. This in-depth understanding can provide the basis for better informed decisions regarding potential investment and partnering opportunities as the utility infrastructures in these highly developed countries are opened to investments from external sources.

What are major benefits from these transactions to the utility?

In entering into these transactions, the utility is able, at little or no perceived risk to itself, to obtain (a) up to 100% long term financing for a system, (b) interest rates that may be lower than those available from domestic credit sources and (c) front-end loaded funding benefits, while maintaining operating control of the system. In the case of the investment contemplated by CED, the net cash benefit to the utility is approximately 3% of the value of the leased asset, or approximately $8.5 million.

What are the major risks from these transactions to the investor?

1. Utility Credit Risks

Perhaps the greatest risk to the trust is the risk that the utility will default on its obligation to pay rent during the lease term. In order to minimize this risk the trust will require that the utility's lease obligations be fully secured by a combination of U.S. Treasury securities and letters of credit issued by banks with S&P ratings of AA or above. In the event the utility fails to make the lease rent payments due, the investor can use the Treasuries and the proceeds from the letter of credit to return its capital and to provide it with its expected yield.

2. Foreign Country Tax Risks

Another major risk implicit in the transaction is the risk that the tax laws or regulations of the country in which the asset is located change in a way that would result in lower returns to the trust, and hence the investor. Investments under the proposed program would be structured so that the risks associated with foreign country tax law changes would be fully borne by the utility.

3. Pending U.S. Tax Regulations

Pending tax regulations, if enacted, could significantly reduce the tax benefit to be derived by investors in lease-leaseback transactions such as the investment under consideration by CED, as described above.

[redacted]

If the pending regulations are published prior to the closing date, CED will defer the contemplated investment pending a restructuring of the transaction.

4. U.S. Tax Audits

It is anticipated that the transactions will be structured in ways that will make any challenges to the structure by the IRS under current regulations difficult to support or litigate by the IRS. [redacted] Our tax counsel is very experienced in negotiating and advising on leveraged lease transactions.

In a downside tax scenario a claim would be litigated and won in tax court by the IRS. In this case, financial analysis indicates a return of CED's capital with a return on CED's capital of 2.4% over the lease term.

5. Country Risks

The proposed investment program will target investments in developed and highly rated countries. The initial proposed investment under the program will be in the AAA-rated Netherlands. Potential downstream opportunities include transactions in the Netherlands, Switzerland, Australia, Germany and the United States. The contemplated transactions will be fully denominated in U.S. dollars.

6. Limited Liquidity

Investments in the assets contemplated under the proposed investment program are designed to generate earnings and cash flow over extended periods of time. While these investments do not carry the liquidity of publicly-traded securities, they can be sold if necessary, although most likely at a discount to then-current book value. The economics of these investment structures typically drive most investors to continue to maintain the investments on their books through their scheduled terms. The proposed investment program contemplates holding these investments accordingly.

Is anyone else doing these transactions?

Leasing investment programs form an integral part of the earnings and investment profiles of a wide range of companies, including affiliates of electric and gas utilities and holding companies such as Public Service Electric and Gas, Duquesne Light, Edison International, Southern Company,

Cilcorp, and Southern Indiana Gas; telephone companies such as ATT, Nynex/Bell Atlantic, Ameritech, and US West; banks such as Bank of New York, First Chicago, Nationsbank, Bank One, and First Chicago; various insurance companies, as well as industrial corporations such as Philip Morris, Pitney Bowes, Chrysler Corporation, Dana Corporation and General Electric.

# EXHIBIT C-6

**Brian DePlautt**

**From:** Brian DePlautt
**Sent:** Friday, December 12, 1997 9:31 PM
**To:** 'Mary Jane McCartney'
**Cc:** 'Joan Freilich'; 'Paul Kinkel'; 'Robert Stelben'; 'H SCHOENBLUM'; 'Chuck Muoio'; 'Peter Irwin'; 'John Perkins'; 'James Tam'; 'Andy Scher'
**Subject:** EZH LEASE UPDATE

The following is a status update on the EZH lease transaction.

(1) Rumors continue to circulate in the market that final 467 Regulations may be issued sometime next week. The proposed Regulations state that the Regulations would be final on the day following the day in which the Regulations were published in the Federal Register. Hence if the Regulations were published in the Federal Register on Monday December 15, lease agreements entered into on Tuesday December 16 would be subject to the new regulations, but lease agreements entered into on Monday December 15 would not be subject to the Regulations.

(2) The parties working on the EZH transaction, including EZH, Bank One, Con Edison, White & Case, Shearman & Sterling, Capstar and Cornerstone have agreed to attempt to accelerate the original closing schedule, which envisioned a closing on Thursday December 18. The parties are now attempting to be ready to achieve a closing, if necessary, sometime during the evening of Monday December 15. It is not yet certain that this accelerated closing date can be achieved.

(3) Meetings are scheduled for this weekend to attempt to resolve the open transaction issues and to document the resolution of those issues.

(4) Revisions to the current version of the pricing proforma, which now includes the sublease loan structure, will be taking place over the weekend and on Monday December 15. It is possible that changing pricing parameters, including changing market interest rates, may continue to put pressure on the economics of the transaction and could require CEL to increase its lease investment amount in order to maintain its target yield of 12.25%. Any investment increases would have the effect of earning 12.25% (unlevered) on a larger base. Preliminary pricing indications are that potential increases in the lease investment amount could range from $.5mm to $1.5mm. The CED Board approval allows for an additional investment of up to $4.3mm.

(5) Consolidated Edison Leasing, Inc. ("CEL") was established on Thursday December 11, 1997 and a board meeting was held on Friday December 12 in which Chuck Muoio, Brian DePlautt and Mike Madia were named as directors, Andy Scher was named as corporate secretary and corporate resolutions

authorizing the EZH Lease Investment, the establishment of bank accounts and associated actions were passed.

(6) On Friday December 12 CEL signed a Trust Agreement with Wilmington Trust Company for the establishment of ROCA FACILITY TRUST NO. 2. Wilmington Trust Company is attempting to have bank accounts established for the this trust by Monday December 15. The purpose of these bank accounts is to receive the CEL investment transfer scheduled for Monday December 15.

(7) It is anticipated that the lease investment amount will be transferred to the ROCA FACILITY TRUST NO. 2. bank account on Monday December 15. It has been determined that the transaction expenses will be paid directly by CEL to the invoicing parties in the weeks following the closing date

(8) CEL is working with Citibank to establish a bank account by Monday December 15 in order to include this bank account name and number in the closing documents.

(9) CEL has advised Treasury of the Monday December 15 closing target and has requested that they make available for transfer the investment funds on that date. Treasury is standing by to make the transfer, subject to their receipt of a valid GOI and the bank account information (scheduled to be received from Wilmington Trust Company on Monday December 15).

(10) On Monday December 15, a GOI request will be circulated requesting that the required investment amount be transferred to the newly established ROCA TRUST NO. 2 bank account at Wilmington Trust. This GOI will be supported by copies of the CEI, CED and CEL Board of Directors resolutions. On Monday CEL will need to determine who is the appropriate party to sign this GOI.

# EXHIBIT C-7

# Leasing White Paper
# (ENECO 4)

## Overview

This Leasing White Paper will provide the reader with the following information: (1) a summary review of a recent lease investment made by Consolidated Edison Development, Inc. ("CED'), (2) a summary review of a new lease investment CED is pursuing, and (3) a general background on leasing.

## (1) Summary Review of Recent Lease Investment

CED has participated in one lease-leaseback transaction to date. In December of 1997 CED invested $43.5mm for a $150mm undivided interest in the EZH RoCa3 combined cycle power plant located in the Netherlands. The following is a summary of that transaction:

| | |
|---|---|
| Project Name: | EZH RoCa3 |
| Project Country: | The Netherlands |
| Country Credit Rating: | AAA |
| Project Assets: | 220MW gas-fired combined cycle power plant |
| Project Location; | Rotterdam, the Netherlands |
| Total Project Cost: | $316mm |
| CED Portion of Total Cost: | $150mm |
| CED Equity Amount: | $43.5mm |
| Co-investor: | Banc One Leasing Corporation |
| Security for CED Equity: | US Treasury securities plus<br>Letter of credit from AA rated bank |
| CED Yield to term: | 18+% (assuming a 50%/50% debt/equity) |

## (2) Summary Review of a Potential New Lease Investment

CED is currently pursuing the potential investment of approximately $43 million in a portion of the natural gas and hot water distribution network presently owned and operated by N.V. ENECO. ENECO is a regulated electric, gas and thermal distribution utility with a service territory which includes the cities of Rotterdam and The Hague in the southern portion of the Netherlands. ENECO is rated AA with a "stable" outlook by Standard & Poors.

CED's market entry strategy is to invest in transactions in conjunction with experienced market participants, to concentrate on assets familiar to Con Edison and to deal with utilities in countries with high credit ratings. CED is pursuing this investment opportunity in conjunction with two experienced and knowledgeable lease investors, Banc One Leasing Corporation ("Banc One")

and Public Service Resources Corporation ("PSRC"), an affiliate of Public Service Electric and Gas. Banc One, PSRC and CED have retained Hunton & Williams for tax and legal advice, and, among others, Duke Engineering for engineering reviews, Tauw Milieu, a well-respected Dutch environmental firm, for an environmental assessment and Deloitte & Touche for a valuation assessment of the system.

The transaction is anticipated to generate approximately $2.3 million in earnings during 1998 and is expected to generate an after tax yield of approximately 12.5% assuming that CED's investment is 50% equity/50% debt.

CED is currently performing due diligence on this potential transaction and is negotiating with ENECO in an attempt to reach agreement on the terms and conditions of the various contracts required for the investment. Preliminary indications are that this process could conclude with a go/no-go investment decision by CED as early as late February 1998.

| | |
|---|---|
| Project Name: | ENECO |
| Project Country: | The Netherlands |
| Country Credit Rating: | AAA |
| Project Assets: | Natural gas and hot water distribution network |
| Project Location: | Rotterdam and The Hague, the Netherlands |
| Total Project Cost: | $810mm |
| CED Portion of Total Cost: | $285mm |
| CED Equity Amount: | $43.5mm |
| Co-investors: | Banc One Leasing Corporation<br>Public Service Resource Corporation |
| Security for CED Equity: | US Treasury securities plus<br>Letter of credit from AA rated bank |
| CED Yield to term: | 12.5+% (assuming a 50%/50% debt/equity) |

## (3) General Background on Leasing

**Executive Summary**

One element of a diversified investment portfolio for Con Edison is the relatively low risk and attractive return profile of leases. This paper describes sale-leasebacks, identifies major risks and benefits, and details a recommended investment.

Investments of this type would be accounted for as leveraged leases, allowing for front-loaded earnings, and generate after tax yields of between 10% and 25% over their lives, after taking account of typical capital structure and debt costs.

The earnings in these transactions come from a combination of lease payments and tax deductions. Con Edison, with its high tax rate and large taxable income position, is in a particularly favorable position to take advantage of such a program.

**What is a sale-leaseback?**

In its most basic form, a sale-leaseback is the purchase of an asset and the subsequent leaseback of that asset to the seller under a long term lease agreement. Under a so-called "leveraged lease," the investor uses non-recourse debt to reduce the equity needed to purchase the asset.

Since its inception in 1964, the leveraged leasing market has continually developed new variations on this basic theme to accommodate increasingly complex accounting and tax laws and regulations. The latest of these variations are the "lease-leaseback" structures in which an asset is leased (instead of purchased) and the leasehold rights derived from that lease are then leased back to the initial owner of the facility. Lease-leaseback structures have been developed to optimize the benefits that can be derived by the utility (lessee) and the investor in these transactions.

**What kind of lease structures will be considered?**

Under the proposed investment program, investments will be considered in both sale-leasebacks and lease-leasebacks, depending on prevailing market conditions.

Because the specific transaction currently under consideration by CED is a lease-leaseback we will use this type of structure in our example of a typical transaction.

**How would a typical transaction work?**

In a typical lease-leaseback transaction, a special purpose subsidiary owned by an investor, in this case CED, would establish a trust. On the closing date, CED would invest equity in the trust and the trust would borrow non-recourse debt for the transaction. Concurrently the trust would enter into a lease agreement with a utility under which the trust would lease an asset, for example a gas and hot water distribution system, from the utility for 42 years. The trust would, at the same time, lease the system back to the utility for 23 years, after which the trust would have a number of options, described below. The initial 23 year term of the leaseback has been chosen to optimize the benefits available to both the utility and the investor. A 42-year leaseback would qualify for the tax treatment that CED and the foreign utility seek.

On the closing date of the lease, the utility would establish, for the benefit of CED, (a) a trust account containing U.S Treasury securities and (b) an irrevocable bank letter of credit from a bank rated AA or better, both in amounts that, when combined, fully secure the obligations of the utility to CED. In the event the utility were to fail to make the payments due to CED under the lease, CED could take the U.S. Treasury securities and draw on the letter of credit to satisfy any shortfalls.

At the end of the initial 23 year lease, the utility would have the option to purchase the system at a pre-agreed fixed price. If the utility did purchase the system at this time, the transaction would be completed. If the utility did not purchase the system at the end of year 23, the trust would have the option to either (a) lease the system to a third party for the remaining 19 years of the lease, (b) use the system itself, or (c) require the utility to re-lease the system for an additional 12 years at prices that would assure CED of its expected return.

Responsibility for the condition of the system would rest with the utility during the initial term of the lease, and with the third party or the utility during a subsequent lease. During the remaining 7 years under the lease, CED could either use the system itself, return the system to the utility or lease the system to third parties and in doing so obtain additional revenue. The base case economics assume no revenue for this period. At the end of the 42-year lease CED would be required to return the system to the utility.

**How would CED derive its return under a lease-leaseback?**

Under a typical lease-leaseback structure an investor's earnings are generated by applying a constant rate of return to a declining investment balance according to lease accounting rules established by the Financial Accounting Standards Board. As the investment balance declines so do the earnings and hence the earnings are front-loaded. The following schedule details the earnings profile for the first 10 years of a typical lease-leaseback

| Year | Investment ($MM) | Earnings ($MM) |
|---|---|---|
| 1998 | 42.9 | 2.3 |
| 1999 | | 2.4 |
| 2000 | | 2.3 |
| 2001 | | 2.2 |
| 2002 | | 2.1 |
| 2003 | | 2.0 |
| 2004 | | 1.8 |
| 2005 | | 1.7 |
| 2006 | | 1.6 |
| 2007 | | 1.4 |

The following chart details the earnings for a typical lease-leaseback




It is anticipated that transactions will be structured such that CED will obtain approximately the same earnings regardless of whether the utility exercises its purchase option or not.

**What are major benefits from these transactions to the investor?**

1. Highly Predictable Earnings

   The earnings from these transactions are highly predictable because each of the cash inflows and outflows to the transaction are contractually agreed to on the closing date and because, in the event of a utility payment default, the trust can take the U.S. Treasuries and draw on the bank letter of credit.

2. Front Loaded Earnings

   Because the transactions will be afforded leveraged lease accounting treatment under Financial Accounting Standards Board rules, the earnings profile for these transactions is "front-loaded' and hence provides more earnings in the early years of the transaction than in the latter years of the transaction.

3. Good to Excellent Investment Yields

   After tax yields on leasing projects are anticipated to range from a good 10% to an excellent 25% depending on the type of lease structure utilized and the leverage applied. For example, under the initial lease investment

contemplated the return of 12.5% assumes a relatively conservative leverage rate of 50%. Measurement of after tax yields, assuming a theoretical case in which the corporation has no debt (the so called "all equity return") typically range from 8.5% to 12.5%.

4. Economic Value

Because of the utility payment protection structures and the relatively low probability of losses derived from adverse tax actions, the risk adjusted rates of return exceed the required rates of return for these investments.

5. Strategic Value of Leasing

Participation in these transactions affords CED the opportunity to more fully understand the legal, regulatory, commercial and tax environment of the countries in which the leased assets are located. This in-depth understanding can provide the basis for better informed decisions regarding potential investment and partnering opportunities as the utility infrastructures in these highly developed countries are opened to investments from external sources.

**What are major benefits from these transactions to the utility?**

In entering into these transactions, the utility is able, at little or no perceived risk to itself, to obtain (a) up to 100% long term financing for a system, (b) interest rates that may be lower than those available from domestic credit sources and (c) front-end loaded funding benefits, while maintaining operating control of the system. In the case of the investment contemplated by CED, the net cash benefit to the utility is approximately 3% of the value of the leased asset, or approximately $8.5 million.

**What are the major risks from these transactions to the investor?**

1. Utility Credit Risks

Perhaps the greatest risk to the trust is the risk that the utility will default on its obligation to pay rent during the lease term. In order to minimize this risk the trust will require that the utility's lease obligations be fully secured by a combination of U.S. Treasury securities and letters of credit issued by banks with S&P ratings of AA or above. In the event the utility fails to make the lease rent payments due, the investor can use the Treasuries and the proceeds from the letter of credit to return its capital and to provide it with its expected yield.

2. <u>Foreign Country Tax Risks</u>

Another major risk implicit in the transaction is the risk that the tax laws or regulations of the country in which the asset is located change in a way that would result in lower returns to the trust, and hence the investor. Investments under the proposed program would be structured so that the risks associated with foreign country tax law changes would be fully borne by the utility.

3. <u>Pending U.S. Tax Regulations</u>

Pending tax regulations, if enacted, could significantly reduce the tax benefit to be derived by investors in lease-leaseback transactions such as the investment under consideration by CED, as described above.

[redacted]

If the pending regulations are published prior to the closing date, CED will defer the contemplated investment pending a restructuring of the transaction.

4. <u>U.S. Tax Audits</u>

It is anticipated that the transactions will be structured in ways that will make any challenges to the structure by the IRS under current regulations difficult to support or litigate by the IRS. [redacted]

Our tax counsel is very experienced in negotiating and advising on leveraged lease transactions.

In a downside tax scenario a claim would be litigated and won in tax court by the IRS. In this case, financial analysis indicates a return of CED's capital with a return on CED's capital of 2.4% over the lease term.

5. <u>Country Risks</u>

The proposed investment program will target investments in developed and highly rated countries. The initial proposed investment under the program will be in the AAA-rated Netherlands. Potential downstream opportunities include transactions in the Netherlands, Switzerland,

Australia, Germany and the United States. The contemplated transactions will be fully denominated in U.S. dollars.

6. Limited Liquidity

Investments in the assets contemplated under the proposed investment program are designed to generate earnings and cash flow over extended periods of time. While these investments do not carry the liquidity of publicly-traded securities, they can be sold if necessary, although most likely at a discount to then-current book value. The economics of these investment structures typically drive most investors to continue to maintain the investments on their books through their scheduled terms. The proposed investment program contemplates holding these investments accordingly.

**Is anyone else doing these transactions?**

Leasing investment programs form an integral part of the earnings and investment profiles of a wide range of companies, including affiliates of electric and gas utilities and holding companies such as Public Service Electric and Gas, Duquesne Light, Edison International, Southern Company, Cilcorp, and Southern Indiana Gas; telephone companies such as ATT, Nynex/Bell Atlantic, Ameritech, and US West; banks such as Bank of New York, First Chicago, Nationsbank, Bank One, and First Chicago; various insurance companies, as well as industrial corporations such as Philip Morris, Pitney Bowes, Chrysler Corporation, Dana Corporation and General Electric.

# EXHIBIT C-8

**Brian DePlautt**

**From:** Brian DePlautt
**Sent:** Friday, December 12, 1997 9:42 AM
**To:** 'McCartney, Mary Jane'
**Cc:** Charles Muoio
**Subject:** RE: Meeting with John Hancock Investment Officers

YES.

MONDAY HAS BEEN ESTABLISHED BY THE LAWYERS AND THE ADVISORS AS THE TENTATIVE "ACCELERATED CLOSE" TARGET DATE.

(1) WE ARE WORKING WITH TREASURY TO ARRANGE A $43 MM TRANSFER FOR MONDAY (2) WE HAVE BACK BURNERED GETTING THE AUDITED FINANCIALS AND WE ARE WORKING WITH THE LAWYERS AND ADVISORS TO, AS A RESULT OF THE ACCELERATED CLOSE TO REACH AGREEMENT ON DELIVERING AUDITED FINANCIALS AFTER THE CLOSING DATE

From: McCartney, Mary Jane[SMTP:MCCARTNEYM@coned.com]
Sent: Friday, December 12, 1997 8:39 AM
To: 'bdeplautt@gdi.inter-web.com'
Subject: FW: Meeting with John Hancock Investment Officers

Are you working with Treasury to expedite the transfer, audited financial statements, etc. to get this done?

> -----Original Message-----
> From: Irwin, Peter
> Sent: Thursday, December 11, 1997 9:06 PM
> To: McCartney, Mary Jane
> Subject: RE: Meeting with John Hancock Investment Officers
>
> Mary Jane - I heard only late this afternoon that the tax regs may
> come out on Monday and they are trying to see if they can close the
> EZH lease this weekend. I assume you are up to speed on this
> development?
>

**CE 016587**

CE 016588

CE 016589

# EXHIBIT C-9

**DRAFT**

December [__], 1997

VIA MAIL

[Consolidated Edison Leasing, Inc.]
111 Broadway
8th Floor
New York, NY 10006

EZH RoCa 3
Facility Lease

Gentlemen:

We have acted as special counsel to [Consolidated Edison Leasing, Inc., a Delaware] corporation (the "Investor") in connection with the transactions contemplated by the Participation Agreement, dated as of December [__], 1997 (the "Participation Agreement"), among N.V. Electriciteitsbedrijf Zuid-Holland, a public limited liability company incorporated under the laws of The Netherlands (the "Lessor" and "Sublessee"), the Investor, [Investor Guarantor, if any], Wilmington Trust Company, not in its individual capacity, except as otherwise expressly provided in the Participation Agreement, but solely as Trustee under the Trust Agreement, dated as of December [__], 1997 (the "Lessee", "Sublessor" and "Trustee"), and Hollandsche Bank-Unie N.V., a public company with limited liability organized and existing under the laws of The Netherlands (the "Lender"). This opinion is delivered pursuant to Sections 3(b)(viii) and 6(vi) of the Participation Agreement. All capitalized terms used herein and not otherwise defined herein shall have the meanings assigned to them in Appendix A to the Participation Agreement or the Operative Documents.

The Participation Agreement provides, among other things, that on the Closing Date the Trustee, acting on behalf of the Investor, will cause the Trust established pursuant to the Trust Agreement to lease the Facility from the Lessor pursuant to the Lease dated as of the Closing Date, and that on the Closing Date, concurrently with entering into the Lease, the Trustee, acting on behalf of the Investor, will cause the Trust to sublease the Facility to the Sublessee pursuant to the Sublease dated as of the Closing Date. The Participation

Agreement further provides that pursuant to the terms of the Loan and Security Agreement entered into on the Closing Date, the Lender will make the Loan to the Trustee at the times and for the purposes agreed to therein.

The Trust Agreement provides that the Trustee will (i) hold all of its estate, right, title and interest in and to the Facility under the Lease and the Sublease, the Operative Documents and any other property contributed by the Investor for the use and benefit of the Investor, (ii) distribute all payments and amounts received by it (other than amounts necessary to pay certain fees and expenses of the Trustee) to the Investor, (iii) subject to the terms therein, exercise its rights (upon instructions received from the Investor) and perform its duties under said Operative Documents in accordance with the terms thereof and (iv) subject to the terms therein, take such other action in connection with the foregoing as the Investor may from time to time direct.

[Pursuant to the German Lease, the German Lessor has leased the German Equipment to the Lessor for a period of approximately 13.5 years, ending October 24, 2009. Under the German Lease, the Lessor has the option to purchase (the "German Purchase Option") the German Equipment from the German Lessor at the end of the German Lease for a fixed price equal to [__]% of the original cost of the German Equipment. We understand that this price will, based on the Appraisal, be equal to approximately [__]% of the fair market value of the German Equipment at the exercise date. The purchase option price has been economically defeased by the Lessor, and the Lessor will authorize the Trustee to exercise the German Purchase Option on behalf of the Lessor if the Lessor does not so exercise the German Purchase Option. We understand that the German Lessor is treated as the owner of the German Equipment for German income tax purposes.]

We have participated in the preparation, execution and delivery of the Operative Documents and we have reviewed [the German Documents]. In arriving at the opinions expressed below, we have assumed the genuineness of all signatures and the due authorization, execution and delivery by the parties thereto of the Transaction Documents executed on or prior to the date hereof and have examined and relied on such agreements and instruments and on the representations and warranties as to factual matters contained in or made pursuant to the Transaction Documents. We have also assumed that the other opinions of counsel to the various parties to the Operative Documents delivered on the Closing Date are correct.

We have examined a leveraged lease pricing printout [(name of pricing file, time of printout)] from Cornerstone Financial Advisors, dated December [__], 1997 (the "Pricing File"). In view of such examination, we have assumed that the maintenance of minimum investment (at not less than an acceptable level), profit and positive cash flow requirements set forth in section 4(1)(B) and section 4(6) of Revenue Procedure 75-21, 1975-1 C.B. 715, have been satisfied and that the safe harbor as set forth in Section 1.467-3(c)(2)(i) of the Proposed Treasury Regulations, as it applies to Lease Basic Rent

under the Lease, to Sublease Basic Rent during the Sublease Basic Term and to Sublease Renewal Rent during the Sublease Renewal Term, if any, has been satisfied in each case.

We have examined a report, dated December [__], 1997, prepared by the Appraiser as to, among other things, [(i) the fair market value of the Facility on the Closing Date, (ii) the estimated useful life, residual value and commercial utility of the Facility, (iii) the fair market value of the Facility on the Lease Termination Date, (iv) the fair market value of the Sublessor's Lease Interest on the Closing Date, on the Sublease Basic Termination Date and on the Sublease Renewal Termination Date, (v) the fair rental value of the Sublessor's Lease Interest, (vi) the absence of compulsion on the Sublessee to exercise the Sublease Purchase Option on the Sublease Basic Termination Date, (vii) the determination that it is not generally expected that the Sublessor will exercise the Sublease Renewal Option, and (viii) the compulsion of the Lessor to exercise the German Purchase Option with respect to the German Equipment.] We have assumed that the conclusions stated therein are correct and that none of the terms and conditions of, or the operation of any of the provisions in, the Operative Documents would cause such conclusions to change. In addition, we have examined and relied on the originals, or copies certified or otherwise identified to our satisfaction, of such other records, documents, certificates and other instruments as we have deemed appropriate to enable us to give the opinions expressed below.

We have also assumed that (i) the method of accounting used by the Investor with respect to the transactions contemplated by the Operative Documents is not a change in accounting methods for Federal income tax purposes, (ii) none of the parties to the Operative Documents [(except the Investor Guarantor)] is related to the Investor within the meaning of Section 267 of the Internal Revenue Code of 1986, as amended (the "Code"), (iii) none of the terms and conditions of, or the operation of, any of the provisions in the Operative Documents would operate to cause the exercise of any option at the Sublease Basic Termination Date, (iv) the transactions contemplated by the Operative Documents produce a pre-tax profit for the Investor and (v) there are no agreements or arrangements with respect to the transactions contemplated by the Operative Documents that are not set forth in the Operative Documents.

Based upon the foregoing and in reliance thereon and subject thereto, and based upon an analysis of the Code, the Treasury Regulations promulgated thereunder (including proposed, temporary and final regulations), revenue rulings and revenue procedures of the Internal Revenue Service, court decisions and such other laws and facts as we have deemed relevant and necessary, it is our opinion that for Federal income tax purposes:

1. Each of the Lease and the Sublease is a "true lease", the Trust will be treated as the lessee under the Lease and as the sublessor under the Sublease, the Investor will be the owner and sole beneficiary of the Trust and the Investor will be entitled and

required to take into account each item of income, gain, loss, deduction and credit of the Trust with respect to its interest in the Facility, the Lease, the Sublease and the Loan evidenced by the Loan and Security Agreement.

2. The Investor should be entitled to rental deductions under Section 162 of the Code for scheduled installments of Lease Basic Rent payable under the Lease in the amounts and in the periods to which such installments relate, as specified in the Lease, in accordance with Section 467(b)(1) of the Code. Neither the Lease nor the Sublease constitutes a "disqualified leaseback or long-term agreement" within the meaning of Section 467(b)(4) of the Code.

3. The Loan evidenced by the Loan and Security Agreement constitutes a debt obligation of the Trust and all amounts payable thereon as interest with respect thereto will be deductible by the Investor, when accrued in accordance with the terms thereof, pursuant to Section 163 of the Code and the Treasury Regulations promulgated thereunder.

4. The Investor will be entitled to deductions for amortization of Transaction Expenses on a straight-line basis over the Lease Term, the Sublease Basic Term and the term of the Loan evidenced by the Loan and Security Agreement, respectively and the allocation of Transaction Expenses in accordance with the terms of the Pricing File appears to constitute a reasonable allocation thereof.

5. The German Lease constitutes a financing rather than a "true lease", under which the German Lessor is a secured lender and the Lessor is the borrower and owner of the German Equipment.

The opinions set forth above are based on current Federal income tax law and administrative practice as in effect on the date hereof. Any inaccuracy in the applicable facts or the assumptions we have made, or any change after the date hereof in the applicable law, could adversely affect the opinions given herein. We do not undertake to advise you as to any future changes in Federal income tax law or administrative practice that may affect our opinion unless we are specifically retained to do so.

No opinion is expressed as to any matter not specifically addressed herein. Furthermore, this opinion may not be relied upon by any party other than the addressee hereof without the prior express written consent of the undersigned.

Very truly yours,

WEF/MA
NYLAA/588.3

CE 006793

** TOTAL PAGE.006 **

# EXHIBIT C-10

SHEARMAN & STERLING

December 4, 1997

**Memorandum to:** Files

EZH RoCa 3
Tax Characterization of German Lease

## I. Facts

Pursuant to a purchase agreement, dated December 13, 1995 ("Purchase Agreement I") EZH[1] has sold one steamturbogenerator ("Equipment I") to the German Lessor. Pursuant to another purchase agreement, dated December 13, 1995 ("Purchase Agreement II"), EZH has sold one gasturbogenerator ("Equipment II" and collectively with Equipment I, the "Equipment") to the German Lessor. The purchase price for Equipment I is DM 65 million; the purchase price for Equipment II is DM 85.4 million.

Pursuant to the German Lease, the German Lessor has leased the Equipment to EZH for a term of 13.5 years commencing on April 24, 1995 and ending on October 24, 2009 (the "Expiry Date"). The German Lease provides for scheduled semi-annual payments of rent ("Rent") in DM as set forth as a percentage of Equipment cost in Schedule C to the German Lease.

EZH may modify and alter the Equipment, provided that the modification or alteration does not (i) change the fundamental nature or identity of the Equipment, (ii) result in a transfer of title to the Equipment from the German Lessor to EZH, (iii) diminish or impair the value, utility or condition of the Equipment, or (iv) result in an event of loss as specified in the German Lease (such modifications or alterations collectively being referred to as "Permitted Modifications").

On the Expiry Date, the German Lessor may require EZH to purchase the Equipment (the "Lessor Put Option"). If the German Lessor exercises the Lessor Put Option, the purchase price for Equipment I (the "Purchase Price I") is DM 29.6 million and

---

[1] Unless otherwise defined herein, capitalized terms have the meanings assigned to them in the Participation Agreement, dated as of December [__], 1997, with respect to the EZH Facility (as defined therein).

the purchase price for Equipment II (the "Purchase Price II") is DM 39.3 million. If the German Lessor does not exercise the Lessor Put Option, EZH has the option (the "EZH Purchase Option") to purchase Equipment I for an amount equal to the sum of Purchase Price I plus 25% of the excess of the fair market value of Equipment I over Purchase Price I (such amount being the "EZH Purchase Option Price I") and to purchase Equipment II for an amount equal to the sum of Purchase Price II plus 25% of the excess of the fair market value of Equipment II over Purchase Price II (such amount being the "EZH Purchase Option Price II").

Pursuant to the "Accounts Receivable Purchase Agreement", dated December 13, 1995, CS First Boston (Nederland) N.V. (the "Bank") has purchased from the German Lessor the German Lessor's right to receive payments of (i) Rent, (ii) termination value in the event of a default by EZH, and (iii) termination value in case of an event of loss with respect to the Equipment, in each case payable by EZH pursuant to the terms of the German Lease (collectively, the "Purchased Receivables"). The purchase price payable by the Bank for the Purchased Receivables is DM 49,082,633 with respect to Equipment I and DM 64,318,706 with respect to Equipment III.

Pursuant to the "Assumption Agreement", dated December 13, 1995, the Bank has assumed payment obligations of EZH under the German Lease ("Specified Payments") which correspond to the Purchased Receivables.[2] The consideration payable by EZH for the assumption of the Specified Payments by the Bank is DM 49,082,633 with respect to Equipment I and DM 64,318,706 with respect to Equipment II. Section 5.1 of the Assumption Agreement provides under the caption: "Assumption (Schuldbeitritt) by the Bank" that "as between the Bank and EZH[,] the Bank shall be the sole obligor in respect of Specified Payments."

[We understand that EZH has used a portion of the purchase price paid by the German Lessor to EZH pursuant to Purchase Agreement I and Purchase Agreement II to purchase DM-denominated zero coupon bonds which will, on the Expiry Date, accrue to an amount substantially equal to Purchase Price I and Purchase Price II, respectively. We further understand that such zero coupon bonds are held by the Bank but that EZH has been discharged of its obligation to pay Purchase Price I and Purchase Price II.]

---

[2] In fact, the Purchased Receivables are expressed in DM, whereas the Specified Payments assumed by the Bank pursuant to the Assumption Agreement are expressed in NLG. Based on a discussion with Clifford Chance, we understand that the Specified Payments should also be expressed in DM.

# EXHIBIT C-11

**ConEdisonDevelopment**
111 Broadway, 8th Floor New York, NY 10006
Tel: (212) 393-9242 Fax: (212) 393-9282

December 10, 1997

Price Waterhouse
One Money Plaza
Syracuse, NY

Attn: James Dewey

Re: Accounting for leases

Dear Jim:

Further to our telcon please find enclosed a copy of the draft tax opinion letter on the EZH transaction. Please contact me if there are any questions or problems. Thank you.

Best Regards

Consolidated Edison Development, Inc.
by:

Brian DePlautt
Vice President

cc: C. Muoio
A. Kendall
A. Bulacan

CE 006787