# EXHIBIT C-12

Memorandum

| | |
|---|---|
| To | Consolidated Edison Development Files |
| From\Location | James M. Dewey, Syracuse |
| Date | November 26, 1997 |
| Re | **Consolidated Edison Development Leveraged Lease** |

Consolidated Edison Development (CED) proposes to enter into a leasing transaction that will use the leveraged lease accounting model of FAS 13. Brian DePlautt, Vice President, and I have had several discussions regarding this proposed transaction and he has provided the following information which we have relied upon in reaching our conclusions regarding the proposed accounting:

- A memorandum—*Transaction Structure Description*. This memorandum, written by representatives of Cornerstone Financial Advisors LP, CED's financial advisor in this transaction, was provided to Ben Neuhausen of Arthur Andersen LLP (AA). AA was requested by Cornerstone to provide their opinion regarding the appropriate accounting for this hypothetical transaction.
- Letter dated November 21, 1997 of AA. This letter describes AA's conclusions regarding the transactions described in the Transaction Structure Description.
- Responses to questions. During the course of discussions regarding the transactions, a number of questions were developed and responses were provided by CED and/or Cornerstone.

These documents are attached.

The fundamental structure is a "lease-in" by a Trust established by CED of an electric utility asset from a Dutch municipal electric utility (EZH). The Trust is a lessee in this transaction. Simultaneously, the Trust "leases out" the leased asset to a subsidiary of EZH. In this transaction the Trust is a sublessor.

**Accounting for the "Head Lease"**

The head lease in is a 44-year lease requiring one payment at closing and one payment at the end of the term of the lease. FAS 13 requires that a lease be accounted for as a capital lease if it meets any one of the following criteria:

- The lease transfers the asset to the lessee at the end of the lease term;

- The lease contains a bargain purchase option;
- The lease term is 75% or greater of the economic useful life of the property; and
- The present value of the minimum lease payments is 90% or more of the fair value of the lease property at the inception of the lease.

We have been advised that Deloitte & Touche Valuation Services ("D&T") will provide an appraisal of the fair value of the property at the inception of the lease and an opinion as to the economic useful life of the property. We have also been advised that Cornerstone will provide a calculation of the present value of the minimum lease payments (both for the Head Lease and the sublease).

For purposes of this memo, we have assumed that the economic life of the property is less than 58-2/3 years and that the present value of the minimum lease payments (MLP's) exceeds 90% of the fair value of the property. Therefore, the proposed Head Lease transaction meets at least two requirements for classification by the Trust as a capital lease asset and obligation in the amount equal to the present value of the MLP's, provided such value does not exceed the fair value of the property.

**Accounting for the Sublease**

The sublease has an initial term of 20 years with a purchase option at the end of that term. Should the purchase option not be exercised, the Trust as sublessor has a put renewal option under which the sublessee would pay rent for 17 years.

To determine the accounting for the sublease, the Trust is required to consider the same four criteria as described above. The Transaction Structure Description, page 4, indicates that "it is reasonable to assume, based on non-economic factors mentioned above, that the credit and collateral requirements outlined below that the sublessee will exercise the purchase option." If, as of the inception of the lessee, the exercise of its purchase option is "reasonably assured," then the sublease meets the second criteria—bargain purchase option. Also, we have been advised that the MLP's under the sublease will equal or exceed 90% of the fair value of the leased property. As a result, the sublease meets both the second and fourth criteria of FAS 13. However, FAS 13, paragraphs 35 through 39, specify additional tests for accounting and reporting for subleases and similar transactions. We have considered in particular the requirements of paragraph 39.b. Paragraph 39.b requires "if the original (Head Lease) met either criteria c or d but not criteria a or b of paragraph 7, the original lessee shall, with one exception, classify the new lease in accordance with the criteria of paragraph 7.c and 8 only." The Head Lease meets both criteria c and d. Paragraph 39.b further provides "the one exception arises when the timing and other circumstances surrounding the sublease are such as to suggest that the sublease was entered as an integral part of the overall transaction in which the original lessee serves only as an intermediary. In that case, the sublease shall be classified according to the criteria of paragraph 7.c and d, as well as the criteria of paragraph

To the Consolidated Edison Files
Page 3
November 26, 1997

8. In applying the criteria of 7.d the fair value of the lease property shall be the fair value to the original lessor at the inception of the original lease." We have considered whether the Trust formed by CED meets the definition of a "intermediary" and have concluded that it does. Therefore, the sublease can be classified either according to paragraph 7.c or d, that is, the 75% of economic life test or the 90% of fair value of the leased property test. If the sublease meets three further conditions of FAS 13 it will meet the requirements for direct financing lease treatment. These conditions are:

- The fair value of the leased asset is equal to the Trust's cost
- The trust has no significant future costs with respect to the leased property or the transaction that are unknown
- Collectibility is reasonably assured

D&T will provide an opinion regarding the fair value of the property which will indicate that the fair value will equal the cost to the Trust. The Head Lease is triple net, therefore there are no future unknown costs. EZH is a municipal entity with an "A" credit rating. Accordingly, the sublease may be accounted for as a direct financing lease under FAS 13.

In order for the direct financing lease to be accounted for as "leveraged lease," FAS 13 provides three further conditions:

- The transaction involves at least three parties—a lessor, a lessee and a long-term creditor;
- The financing provided by the long-term creditor is non recourse to the general credit of the lessor and is "substantial;" and
- The lessor's net investment declines in the early years of the lease and rises in subsequent years. ?

The first condition is met. The lessor is EZH, the lessee is the CED Trust and the long-term creditor is proposed to be ABN Bank. The third condition is also met. The Transaction Structure Description contains a schedule which reflects the required pattern of declining net investment in the early years of the lease and increasing investment in subsequent years. With respect to the second condition described above, the AA letter and the Transaction Structure Description describe the "recourse provisions of the proposed transaction." The last three paragraphs of the AA letter, page 4, describe how, from an accounting perspective, the proposed transactions meet the recourse provisions of the second criteria to be accounted for as a leveraged lease. We agree with these conclusions, assuming that the proposed structure is put in place in the final transaction. The financing is also substantial as, according to the Transaction Structure Description, it exceeds 50% of the fair value of the property.

To the Consolidated Edison Files
Page 4
November 26, 1997

As a result, the sublease qualifies first as a direct financing lease and furthermore meets the criteria classified as a leveraged lease under FAS 13.

**Definition of a Lease**

We also considered the question of whether or not this proposed transaction is in fact a lease covered by FAS 13. Under FAS 13, "a lease is defined as an agreement conveying the right to use property, plant or equipment (land and/or depreciable assets) usually for a stated period of time." We have been advised that the lessee, the Trust, has the right to use the property. If the put renewal option is exercised by the Trust at the end of the put renewal period (i.e., year 37 of the sublease), there will remain seven years under the term of the original head lease. During that period, the Trust has the right to use the property and derive rents or other revenues from such use. Also, at the end of the initial term of the sublease (year 20) if neither the purchase option nor the put renewal option is exercised, then the Trust has the right under the Head Lease to use the property and derive rents or other revenues therefrom. As a result, we believe the proposed transaction meets the definition of a "lease."

**Qualifications**

The above conclusions are subject to the transactions being executed in form and substance substantially as described above and receipt of the documents prepared by D&T and Cornerstone regarding fair market value and economic useful life, and the present value of MLP's, respectively. Also, the management representation letter will contain representations consistent with the information provided above including the following:

- Fair value of the property
- Economic useful life of the property
- Present value of minimum lease payments
- The ability of the trust to "use" the property and, therefore, treat the Head Lease and the sublease as leases under FAS 13

on-ed\memos\levlease\to the file

CE 003771

# EXHIBIT C-13

In ACM, the taxpayer entered into a near-simultaneous purchase and sale of debt instruments. Taken together, the purchase and sale "had only nominal, incidental effects on (the taxpayer's) net economic position." ACM at 250. The taxpayer claimed that despite the minimal net economic effect resulting from the application of the installment sale rules to the sale. The court held that transactions that do not "appreciably" affect a taxpayer's beneficial interest, except to reduce tax, are devoid of substance and are not respected for tax purposes. ACM at 248. The court denied the taxpayer the purported tax benefits of the transaction because the transaction lacked any significant economic consequences other than the creation of tax benefits.

Taxpayer's Position:

In a meeting with the taxpayer on March 5,2002, their position was that their position is stated in the tax opinion letter written by Price Waterhouse on December 10,1997.

Here are some of their main positions:

1.) After examining the leveraged lease pricing printout from Cornerstone Financial Advisors (advisor to Roca on this lilo transaction) they feel that they are in compliance with Revenue Procedure 75-21, the safe harbor provisions of Proposed Treasury Regulations 1.467-3©(2)(i).

2.) After examining the appraisal report, they stated that the fair market value on the plant on the closing date, and lease termination date was fairly stated. The estimated useful life, residual value was fairly stated.

Conclusion:

Viewed as a whole, the objective facts of this Lilo transaction indicate that the transaction lacks the potential for any significant economic consequences other than the creation of tax benefits. I will describe the various reasons I have come to this conclusion:

a.) The presence of a number of defeasance arrangements during the life of the transaction that are offsetting and circular in nature which eliminate any significant economic consequences of the transaction. Some of theses are outlined below:

   1.) debt defeasance account, set up at inception of deal (12-15-97) to pay the $ 80.8 million debt that Roca through the trustee (Wilmington Trust) had used in the inception of the deal to finance the debt portion of the $120.1 million prepayment.
   2.) investor defeasance account, set up at inception of deal to enable EZH to pay the fixed payment option at the end of the 20th year.
   3.) lease collateral deposit, set up at the beginning of the put renewal term to pay the non-recourse portion of the Head Lease rents due at end of the 44th year .
   4.) trustee treasury collateral deposit, set up at the beginning of the put renewal term to pay the recourse portion of the Head Lease rent.

b.) There is an undisclosed subsidiary (Con Edison Leasing, Inc.) on the Form 851,which was incorporated in Delaware for the purpose of a single transaction, to engage in an activity, cross border leasing which is outside the corporation's core business of supplying electricity, gas and steam in the New York metropolitan area. It had no activity in prior years, but material losses in the current and subsequent years.

# EXHIBIT C-14

| | A | B | C | D |
|---|---|---|---|---|
| 1 | Region | Project # | Country | Project Name |
| 2 | 1000-North | | | |
| 3 | America | | | |
| 4 | | 1001 | USA | VISY Paper |
| 5 | | 1002 | USA | Charter Oak Energy |
| 6 | | 1003 | USA | Nations Energy |
| 7 | | 1004 | Mexico | Lerma Industrial Park |
| 8 | | 1005 | USA | Ada Cogeneration |
| 9 | | 1006 | USA | Carson Cogeneration |
| 10 | | 1007 | World wide | EDHI Agreement |
| 11 | 3000 - Latin | | | |
| 12 | America & | | | |
| 13 | Caribbean | | | |
| 14 | | 3001 | Peru | EGASA/EGESUR |
| 15 | | 3002 | Guatemala | Guatemala privatization |
| 16 | | 3003 | Guatemala | GENOR |
| 17 | | 3004 | El Salvador | El Salvador Electricity |
| 18 | | 3005 | Peru | Peru Power Holdings |
| 19 | | 3006 | Peru | EGEMSA |
| 20 | | 3007 | Jamaica | Rockfort Diesel |

CE 011990

| | E | F | G | H | I | J |
|---|---|---|---|---|---|---|
| 1 | Description | Size | Fuel/Tech. | Partners | Target Return | BOD Approved |
| 2 | | | | | | |
| 3 | | | | | | |
| 4 | Greenfield on-site generation | 60-100MW | Landfill & Natural Gas | VISY | N/A | No |
| 5 | Acquisition of a utility's sub. | | various | | | No |
| 6 | Acquisition of a utility's sub. | | | | | No |
| 7 | Greenfield on-site generation | 100MW | Natural Gas | | | No |
| 8 | Acquisition of operating plant with PPA | 29.4 MW | Natural Gas | MCNIC/Delta | 13% | No |
| 9 | Acquisition of operating plant with PPA | 42 MW | Natural Gas | MCNIC/Delta | 13% | No |
| 10 | $100 million equity | various | various | CEA | market | Yes |
| 11 | | | | | | |
| 12 | | | | | | |
| 13 | | | | | | |
| 14 | acquisition of operating generation assets & construction of new generation | 305 MW | various | Constellation | | No |
| 15 | acquisition of operating generation assets & construction of new generation | 150MW | various | IEP/IPL | | Yes |
| 16 | construction of onsite generation | 40MW | diesel | IEP/IPL | | Yes |
| 17 | Acquisition of operating distribution company | | | | | |
| 18 | Greenfield construction | 150 - 500MW | Natural gas/GTSC | IEP | | No |
| 19 | Acquisition of operating hydro plant | 100MW | hydro | | | No |
| 20 | Construction of expansion at an existing site | 30MW | diesel | IEP | | No |

CE 011991

PF006322

| | K | L | M |
|---|---|---|---|
| 1 | **Current Status** | **Reason** | Status |
| 2 | | | |
| 3 | | | |
| 4 | Rejected by CED | CED is prohibited from NYS projects | Inactive |
| 5 | Rejected by CED. | CED is not interested in these minority project interests and personnel with limited track record. | Inactive |
| 6 | Rejected by CED | CED is not interested in these small project interests; key people have left and most markets are covered by CED and IEP. | Inactive |
| 7 | Feasibility study underway | | Active |
| 8 | Due diligence underway | | Active |
| 9 | Due diligence underway | | Active |
| 10 | CEA Implementing | | Active |
| 11 | | | |
| 12 | | | |
| 13 | | | |
| 14 | CED withdrew | CED decided to focus on Guatemala. In retrospect, decision was a good one since the sale is delayed. | Inactive |
| 15 | CED consortium did not win the bid | Competitive with the winner; lost by $0.002? | Inactive |
| 16 | Project scheduled to close on??? | | Active |
| 17 | Rejected by CED | Too much capital needed by 12/31/97 ($150-$200M). Technical expertise not quite ready | Inactive |
| 18 | Rejected by CED | Long term fuel supply questionable; SCGT can not compete long term in deregulated environment | Inactive |
| 19 | CED interested but project is on hold by government | | Active |
| 20 | CED is not pursuing | Capacity is not needed presently. | Active |

| | A | B | C | D |
|---|---|---|---|---|
| 21 | | 3008 | Jamaica | Caribbean Cement |
| 22 | | 3009 | Peru | Southern Peru Mining |
| 23 | | 3010 | Venezuela | Margarita Island |
| 24 | | 3011 | Brazil | Electrosul Generation |
| 25 | | 3012 | | |
| 26 | 5000 - Western | | | |
| 27 | Europe | | | |
| 28 | | 5001 | Belgium | Belgian Refinery Cogeneration |
| 29 | | 5002 | Germany | DEA Mineraloel |
| 30 | | 5003 | Portugal | Sidurgia Ncional, SA |
| 31 | | 5004 | Germany | GASAG Berliner Gaswerke Aktiengesellschaft |
| 32 | | 5005 | Netherlands | EPON |
| 33 | | 5006 | Netherlands | EZH |
| 34 | | 5007 | Netherlands | ENW Gas |

| | E | F | G | H | I | J |
|---|---|---|---|---|---|---|
| 21 | Construction of expansion at an existing site | 60MW | coal | IEP | | No |
| 22 | Greenfield construction of generation | 200-300MW | coal | IEP/Southern | | No |
| 23 | Acquisition of electric system | | | Sithe/Marubeni | | No |
| 24 | Privatization of generation | 3680MW | hydro/thermal | | | No |
| 25 | | | | | | |
| 26 | | | | | | |
| 27 | | | | | | |
| 28 | Acquisition of existing plant | 30-40MW | various | | | No |
| 29 | Construction of onsite generation | 40MW | GTCC | | | No |
| 30 | Construction of onsite generation | | open | | | No |
| 31 | acquisition of gas distribution company | | | | | No |
| 32 | Sale leaseback | $150M | GTCC | Banc One | | Yes |
| 33 | Sale leaseback | $150M | GTCC | Banc One | | Yes |
| 34 | Sale leaseback | $150M | | Banc One | | Yes |

| | K | L | M |
|---|---|---|---|
| 21 | CED is not pursuing | Capacity is not needed until 2001 | Active |
| 22 | CED considering for the future | Capacity not needed at this time | Active |
| 23 | CED considering participation with strong partners | Project is delayed by Venezuelan government | Active |
| 24 | Preliminary; CED is to study the Information Memorandum | | Active |
| 25 | | | |
| 26 | | | |
| 27 | | | |
| 28 | CED evaluating. Engaged Pan Eurasian to do market study | | Active |
| 29 | CED is in early stage of development | | Active |
| 30 | CED is in early stage of development, Pan Eurasian to explore further | | Active |
| 31 | CED unable to pursue | Timing is too short and capital requirement is too great ($500M) | Inactive |
| 32 | CED pursuing | | Inactive |
| 33 | Documentation completed; most recent draft of the D&T valuation letter will be returned to D&T with comments this week. When D&T issues the final letter, Sherman & Sterling will then issue its final opinion letter, both of which will be sent to PW for us | | Inactive |
| 34 | CED pursuing | | Active |

| | A | B | C | D |
|---|---|---|---|---|
| 35 | | 5008 | Netherlands | ENECO |
| 36 | | 5009 | Switzerland | SIG District Heating Plant |
| 37 | | 5010 | Netherlands | UNA Power Plant |
| 38 | | 5011 | Switzerland | EG Laufenburg & EWZ |
| 39 | | 5012 | UK | Humber Power |
| 40 | 6000 - Eastern | | | |
| 41 | Europe | | | |
| 42 | | 6001 | Czech Republic | Kladno ECK/ECKG |
| 43 | | 6002 | Poland | EC Melec |
| 44 | | 6003 | Poland | Legnica CHP |
| 45 | | 6004 | Czech Republic | Budejovice CHP |
| 46 | | 6005 | Poland | Elana CHP |
| 47 | | 6006 | Hungary | Nitrokemia |
| 48 | | 6007 | Austria | CEnergy AG |

| | E | F | G | H | I | J |
|---|---|---|---|---|---|---|
| 35 | Leaseback of hot water and gas distribution | $200M | | Banc One | | Yes |
| 36 | Construction of onsite generation | 25-50MW | GTCC | | | No |
| 37 | | | | | | No |
| 38 | Leaseback | $600-800M | hydro | Capstar | | No |
| 39 | Leaseback | $700M | gas | NatWest | | No |
| 40 | | | | | | |
| 41 | | | | | | |
| 42 | Acquisition of existing plant | 365MW | gas and brown coal | | | Yes |
| 43 | Construction of expansion to Polish thermal plant | 200MW | GTCC | | | No |
| 44 | Construction of generation | 30-100MW | coal | | | No |
| 45 | Construction of expansion of plant | 401MW | gas and coal | | | No |
| 46 | Acquisition of existing plant | 40-100MW | gas and coal | | | No |
| 47 | Acquisition of existing plant | 30MW | open | | | No |
| 48 | Strategic investor in company to invest in Eastern European energy companies | $25M minimum | | CA IB Investment Bank AG | 20% | No |

CE 011997

PF006328

| | K | L | M |
|---|---|---|---|
| 35 | CED pursuing; The due diligence trip to ENECO did not reveal any fatal flaws. Two days of negotiations with ENECO generated good progress. Revised transaction schedule issued by ENECO's investment advisor shows closing on 2/13/98. | | Active |
| 36 | CED in early stage development; Pan Eurasian screening the economics | | Active |
| 37 | CED needs more information | | Active |
| 38 | CED studying the preliminaries | | Active |
| 39 | CED studying the preliminaries | | Active |
| 40 | | | |
| 41 | | | |
| 42 | CED pursued but effort stopped | Capital requirement exceeded those desired for first int'l deal | Inactive |
| 43 | CED pursuing. Engaged Pan Eurasian to do market study on Poland | | Active |
| 44 | CED pursuing. Engaged Pan Eurasian to do market study on Poland | | Active |
| 45 | CED investigating | | Active |
| 46 | CED pursuing. Engaged Pan Eurasian to do market study on Poland | | Active |
| 47 | More information needed for CED to decide | | Active |
| 48 | Information received on 1/12/98. CED is currently reviewing the concept and learn more about the players. | | Active |

# EXHIBIT C-15

To: Herbert Rosenbluth

Re: IDR# OHR-0102
SAIN# 613

Date: April 9, 2002

Reference is made to above captioned Information Document Request (IDR), as amended to reflect a response date of April 21, 2002, a copy of which is attached hereto as Exhibit A. In your IDR, you suggest that a loss taken by the taxpayer in the amount of $937,331 has been "deemed" not deductible, and you question why the resulting underpayment of tax should not be subject to penalties as "negligence" under Subsections 6662(a), (b)(1) and (c) of the Internal Revenue Code of 1986, as amended (the "Code").

We have no documentation from the Internal Revenue Service evidencing a disallowance of the loss in question, nor do we have any reason to believe that the loss should be disallowed. In light of this, and the fact that no grounds for any such disallowance are stated in your IDR, it is difficult to speculate regarding the applicability of any penalties. Nevertheless, assuming for the sake of argument that there were to be a final determination of a court of competent jurisdiction disallowing the loss in question, the penalties under subsections (a), (b)(1) and (c) of Code Section 6662 would be inapplicable for the reasons set forth below.

Code Sections 6662(a) and (b)(1) provide for a penalty in the case of "negligence or disregard of rules or regulations." Code Section 6662(c) provides that the term "negligence" includes any failure to make a reasonable attempt to comply with the provisions of this title. Code Section 6664(c) provides that no penalty may be imposed under Code Section 6662 with respect to any portion of an underpayment if it is shown that there was a reasonable cause for such portion and that the taxpayer acted in good faith with respect to such portion.

In connection with the transaction in question, the taxpayer sought the advice of both internal and outside tax advisors, who performed exhaustive research in order to render this advice. Established case law supports the position that the taxpayer is the both the lessee and the sublessor of an undivided interest in a power plant. See, e.g., Frank Lyon Co. v. United States, 435 U.S. 561 (1978). See, also, Rev. Proc. 75-21, 1975-1 C.B. 715. This being the case, the Code expressly permits the taxpayer to deduct the expenses which are the subject of your IDR; namely, interest, rent and other expenses incurred by the taxpayer in its capacity as a lessee/sublessor in the transaction. See, Code Sections 162 and 163. Taxpayer has not, to its knowledge, disregarded any rules or regulations in connection with its legal analysis of this transaction, and such analysis in and of itself represents a reasonable attempt by the taxpayer to comply with the Code. The law is clear that a taxpayer who reasonably relies on the advise of competent tax advisors is generally relieved from liability for negligence. See, Treas. Reg. Sec. 1.6664-4(b) and (c). See, also, 2002 CCH Standard Federal Tax Reporter (89th Ed.), Para. 39,651.155 (and authorities cited therein).

Moreover, as previously indicated in taxpayer's response to your IDR# OHR-0101 (SAIN# 526), the transaction in question clearly had both economic substance and a strong business purpose, and was both consistent with, and in furtherance of, the taxpayer's stated business plan of making investments in both domestic and international energy infrastructure projects. The taxpayer entered into this transaction only after undertaking exhaustive due diligence. The taxpayer's due diligence efforts are set forth in detail in IDR# 75 (SAIN# 608), and are far in excess of what reasonable prudence would require.

In light of the good faith efforts undertaken by the taxpayer to ascertain the proper treatment under the Code of the transaction in question, and the care and prudence exercised by the taxpayer prior to making this investment, the penalties for negligence provided for in subsections (a), (b)(1) and (c) of Code Section 6662 cannot be applicable.

223318

Substitute for
Form 4564

Department of the Treasury - Internal Revenue Service
INFORMATION DOCUMENT REQUEST

Name and Address of Taxpayer
CONSOLIDATED EDISON COMPANY OF NEW YORK, INC. AND SUBSIDIARIES
4 IRVING PLACE

NEW YORK NY 10003

S.S.N. or E.I.N.: 13-5009340

IDR No: OHR-0102
Sain No: 613

Date Issued: 03/21/2002

Tax Periods: 199712

Entity No: 000001 Entity: CONSOLIDATED EDISON COMPANY OF NEW YORK, INC. AND SUBSIDIARIES

Subject: NEGLIGENCE PENALTY

Submitted To: JAMES C. ALLAN Title: MANAGER, FED. I.T. Response Due: 03/28/2002

Workpaper Ref: Dates of Previous Requests:

Requested Information:

This IDR replaces and supersedes IDR 100 in which the Examining Officer ited the wrong subsection of the IRC.

The taxpayer deducted a loss of $937,331 on its Form 1120 for 1997. The oss stems from the taxpayer's participation in a lease-in and lease-out ransaction. It has been deemed that the loss is not deductible and that such eduction constitutes negligence as defined in IRC Sec. 6662(c). Accordingly, he penalty under IRC Sec.6662(a) is deemed applicable. also see Sec 6662(b)(1)

The penalty equals 20% of the portion of the underpayment of tax ttributable to such deduction.

Attached hereto is a copy of the code sections cited above.

Please submit a written statement giving reasons why the penalty should ot be assessed.

Please return a copy of this request with the requested documents to:

Herbert Rosenbluth

Requester: HERBERT ROSENBLUTH ID: 13-20091 Title: TEAM COORDINATOR
Address: 110 WEST 44TH STREET Office: 212-719-6037 Ext:
Exam Site: 212-460-3119 Ext:
City: NEW YORK NY 10017



US06049

# EXHIBIT C-16

# ConEdison*Development*

## Leasing Overview

11-7-97



CE 003946

PF003022

# Leasing

## What is it ?

The purchase and leaseback of power plants and distribution systems to utilities

# Leasing

## How does it work ?

CED invests in a trust

The trust borrows project finance debt

The Trust uses its capital to purchase a power plant from a utility

A utility leases the plant from the Trust

# Leasing

## How does it work ?

At the end of the lease the trust can either

(a) sell the plant to the utility,

(b) sell the plant on the market, or

(c ) enter into a new lease with the utility

# Leasing

## How does it work ?

Because we own the trust we get to keep the excess cash in the trust, and we get to depreciate the plant against our taxes

Because we have a high taxable income we can value the depreciation benefits at a higher rate than many other entities

# Leasing

## How does it work ?

INSERT LEASE STRUCTURE CHART HERE

# Leasing

## What are the major risks ?

Credit Risk on utility rent payments

- Failure to receive rent payments puts the <u>return of</u> our capital at risk
- We require full credit support for the utility's rent obligations (Letters of Credit and Treasuries)

# Leasing

## What are the major risks ?

### Dutch Tax Risks

- Changes in Dutch tax laws put our <u>return on</u> capital at risk
- We require that these risks are fully bourne by the utility leasing the plant



CE 003953

PF003029

# Leasing

## What are the major risks ?

### U.S. Tax Risks

- Downside cases put portions of our <u>return on</u> captial at risk
- We use top tax advisors and "tight" transaction structures to withstand audits and to limit downside economics

# Leasing

## What are the major risks ?

### U.S. Tax Risks

Tax downsides range from 10% to 2% yields

# Leasing

## What are the benefits ?

Highly predicatable earnings

All payment streams are agreed to at financial closing

(if we don't get paid we draw on the security)

# Leasing

## What are the benefits ?

Front loaded earnings

- Earnings provide "cover" for startups

Typical Earnings Profiles






CE 003957

PF003033

# Leasing

## Market entry strategy

- Participate with experienced players
  (PSRC/Bank One)
- Stay with familiar assets
  (Power plants and pipes and wires)
- Minimize country risks
  (AAA rated and developed)
- Retain top advisors
  (Shearman, Cornerstone)

# Leasing

## Transaction Selection Criteria

| | |
|---|---|
| Equity Size | $30-$50 million |
| Asset Types | Power and distribution |
| Structures | Defeased with Treasuries and AA Bank L/C's |
| Markets | Europe, Australia, U.S. |
| Bid Partners | Utilities subs & Banks |

# Leasing

## Typical transaction

| | |
|---|---|
| Project | "EZH" |
| Asset Type | Power Plant |
| Country | Netherlands |
| Structure | Defeased 467 |
| Equity | $43 million |
| Partner | Banc One Leasing |

# Leasing
## EZH Returns

| Leverage(1) | 0% | 50% | 70% |
|---|---|---|---|
| Nominal ROE | 12.25 | 19.68 | 29.59 |
| Effective ROE | 12.96 | 21.56 | 33.96 |
| IRR | 13.36 | 22.32 | 34.28 |

(1) 12 year amort debt at T+150

# Leasing

## Summary

- Front loaded earnings
- Good to excellent ROE's
- Tax risk minimized
- Credit risk defeased
- Worst case - capital returned with low ROE