**No. 06-305 T**
**(Judge Marian Blank Horn)**

---

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

---

**CONSOLIDATED EDISON COMPANY**
**OF NEW YORK, INC. & SUBSIDIARIES**

**Plaintiff**

**v.**

**THE UNITED STATES,**

**Defendant**

---

# DEFENDANT'S SECOND MOTION TO COMPEL

---

**EILEEN J. O'CONNOR**
***Assistant Attorney General***

**DAVID GUSTAFSON**
**STEVEN I. FRAHM**
**DAVID N. GEIER**
**JOSEPH A. SERGI**
**JAMES E. WEAVER**
**ADAM R. SMART**
***Attorneys***
***Tax Division***
***Department of Justice***
***Washington, D.C. 20044***
**(202) 616-3448 (telephone)**
**(202) 307-0054 (facsimile)**

TABLE OF CONTENTS

TABLE OF AUTHORITIES . . . . . ii

QUESTIONS PRESENTED . . . . . 1

STATEMENT OF FACTS . . . . . 2

A. Background – The LILO Transaction . . . . . 2

B. Insufficient Responses To Discovery . . . . . 3

1. *Interrogatory No. 2–Plaintiff's other LILO transactions* . . . . . 3

2. *Interrogatory No. 3–Information underlying Plaintiff's allegations regarding the LILO transaction at issue* . . . . . 5

3. *Interrogatory No. 7–Plaintiff's investigation of the LILO Transaction at issue* . . . . . 8

4. *Interrogatory No. 12–Tax Indemnity Agreement* . . . . . 9

5. *Interrogatory No. 14–Outside consultants regarding the LILO transaction* . . . . . 10

6. *Interrogatory No. 16–Reasons for a trust* . . . . . 11

7. *Document Request Nos.1 and 2* . . . . . 12

ARGUMENT . . . . . 13

A. Defendant Is Entitled to Information That Explains the Transaction . . . . . 13

B. Defendant is Entitled to Information Related to the Subjective Intent of Plaintiff . . . . . 18

C. Plaintiff's Reliance on Rule 33(d) is Improper . . . . . 23

CONCLUSION . . . . . 26

TABLE OF AUTHORITIES

**FEDERAL CASES**

*ACM Partnership v. Commissioner,* 157 F.3d 231 (3d Cir. 1998), *cert. denied,* 526 U.S. 1017 (1999) . . . . . 18

*American Electric Power. Co., Inc. v. United States*, 326 F.3d 737 (6th Cir. 2003) . . . . . 18

*BB&T Corporation v. United States,* No. 1:04-cv-00941, 2007 WL. 37798 (M.D.N.C. Jan. 1, 2007) . . . . . 18

*Cabot v. United States,* 35 Fed. Cl. 80 (Ct. Cl. 1996) . . . . . 13

*Coltec Industries, Inc. v. United States*, 454 F.3d 1340 (Fed. Cir. 2006) . . . . . 18-19

*Frank Lyon Co. v. United States*, 435 U.S. 561 (1978) . . . . . 19

*Harding v. Dana Transport, Inc.*, 914 F. Supp. 1084 (D.N.J. 1996) . . . . . 16

*Helt v. Metropolitan District Commission,* 113 F.R.D. 7 (D. Conn. 1986) . . . . . 13

*Knetsch v. United States*, 364 U.S. 361 (1960) . . . . . 18

*Muhich v. Commissioner*, 238 F.3d 860 (7th Cir. 2001) . . . . . 18

*Rose v. Commissioner*, 868 F.2d 851 (6th Cir. 1989) . . . . . 18

*S.E.C. v. Elfindepan, S.A.*, 206 F.R.D. 574 (M.D.N.C. 2002) . . . . . 23, 25

*In re Sealed Case*, 676 F.2d 793 (D.C. Cir. 1982) . . . . . 16

*In re Sealed Case*, 737 F.2d 94 (D.C. Cir. 1984) . . . . . 16

*Sochin v. Commissioner*, 843 F.2d 351 (9th Cir.), *cert. denied*, 488 U.S. 824 (1988) . . . . . 18

*In re Sulfuric Acid Antitrust Litigation*, 231 F.R.D. 351 (N.D. Ill. 2005) . . . . . 23

*Transpac Drilling Venture, 1983-2 by Dobbins v. United States*, 32 Fed. Cl. 810 (1995) . . . . . 18

**COURT RULES**

RCFC 26 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

RCFC 33 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

RCFC 37 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

**MISCELLANEOUS**

8 J. Wigmore, *Evidence in Trials at Common Law* § 2327 at 636 . . . . . . . . . . . . . . . . 16

**No. 06-305 T**
**(Judge Marian Blank Horn)**

---

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

**CONSOLIDATED EDISON COMPANY**
**OF NEW YORK, INC. & SUBSIDIARIES**

**Plaintiff**

**v.**

**THE UNITED STATES,**

**Defendant**

## DEFENDANT'S SECOND MOTION TO COMPEL

Pursuant to RCFC 37(a)(2)(B), Defendant moves this Court to compel Plaintiff to fully respond to Defendant's Interrogatories and Request for Production. Counsel for Defendant discussed the issues with Plaintiff's counsel in correspondence and by telephone in a good faith effort to resolve the matter, but was unsuccessful. The Court's assistance is essential, and Defendant submits the following in support of its motion:

## QUESTIONS PRESENTED

1. Whether a Plaintiff in a tax refund litigation may withhold information bearing on the structure and mechanics of the tax shelter transaction at issue in the litigation.

2. Whether a Plaintiff in a tax refund litigation may withhold information bearing on Plaintiff's subjective intent in deciding to participate in the tax shelter scheme.

3. Whether Plaintiff has properly relied on Court of Federal Claims Rule 33(d) to respond to Interrogatories propounded to it, where it failed to specifically identify the documents from which an answer may be derived or where the documents cited do not contain information responsive to the interrogatory or do not contain a complete response.

## STATEMENT OF FACTS

A. Background - The LILO Transaction

This case involves the proper tax treatment to be accorded Plaintiff's LILO shelter transaction. Consolidated Edison Company of New York, Inc. & Subsidiaries ("Con Ed" or "Plaintiff") participated in a lease-in/lease-out ("LILO") shelter transaction involving a power station (the "RoCa3" facility owned by South Holland Electric (N.V. Electriciteitsbedrifj Zuid-Holland) (hereinafter "EZH")) located in the Netherlands (hereinafter the "LILO Transaction"). Plaintiff, a United States taxpayer, through a subsidiary, purported to lease property from its owner, EZH, under a head lease and simultaneously purported to lease the property back to EZH under a sublease. As is typical in a LILO transaction, the counter-party, EZH, is an entity, in this case a foreign corporation, that is not subject to federal income taxation, and therefore is unable to claim federal income tax benefits, like depreciation, associated with ownership of the RoCa3 facility. After the close of the transaction, EZH or its successors continued to operate the property and retained all of the benefits and burdens associated with the property's use and ownership. Nevertheless, Plaintiff claimed rent and interest deductions associated with the purported head lease. The specific substantive issue raised in this refund suit is whether Plaintiff is entitled to deductions for rent, interest, and transaction costs its asserts were incurred in 1997 in connection with the LILO Transaction.

Defendant contends that the tax deductions claimed by Plaintiff are improper for several reasons, including that Plaintiff did not acquire a genuine leasehold interest in property in 1997

when it participated in the LILO Transaction and did not incur a genuine debt obligation, entitling it to tax deductions. Perhaps most important for the purposes of this motion, Defendant contends that the LILO Transaction should be disregarded under the economic substance doctrine, which requires, among other things, that the Court examine Plaintiff's motivation for engaging in the LILO Transaction.

B. Insufficient Responses To Discovery

On September 29, 2006, Defendant served its initial discovery requests. These requests were intended to narrow the issues for trial and determine which witnesses Defendant would need to notice for depositions.

On November 2 and 3, 2006, Plaintiff responded. (Interrogatory Responses and Request for Production Responses, attached as Exhibits A-1 and A-5 respectively[1]). Despite many letters, emails and telephone calls, Plaintiff has failed to fully respond to the following Interrogatories and Requests for Production.

1. *Interrogatory No. 2–Plaintiff's other LILO transactions*

Defendant's Interrogatory No. 2 sought information and documents regarding other LILO and tax shelter transactions Plaintiff evaluated from 1996-1998:

> **Identify all other LILO transactions or shelter transactions presented to, considered, reviewed or analyzed by the Plaintiff in 1996, 1997 or 1998, and identify all documents in connection with your consideration, review or analysis.**

In its initial response to this interrogatory (November 2, 2006), Plaintiff objected that it was not relevant, overbroad, and unduly burdensome and, subject to that objection, identified only a single LILO transaction ("NUON"), but refused to identify or produce to Defendant

[1]All exhibits referred to in this motion are attached to the Declaration of David N. Geier, filed concurrently.

specific documents descriptive of its participation in the NUON LILO. (Exhibit A-1). Plaintiff also advised that it would identify other LILO transactions it considered in response to Defendant's First Set of Requests for Production of Documents. (*Id.*). While Plaintiff's response to Request for Production Number 1 identified four leasing transactions it had considered, it did not produce any documents, despite Defendant's Request, that reflected Plaintiff's consideration, review, or analysis of those transactions. (*See* Exhibit A-5).

Soon after its initial response, Plaintiff advised in November 13, 2006 correspondence that it would supplement its response. (Exhibit B-2). A few days later, however, Plaintiff retracted that representation, stating it "is not prepared to respond at this time." (November 17, 2006 correspondence, attached as Exhibit B-3). The following month, Plaintiff explained that "[i]t is impossible for current representatives of [Plaintiff] to certify under oath what transactions were 'considered' or 'reviewed' by any employee of the company approximately ten years ago." (First Supplemental Inter. Resp., attached as Exhibit A-2). Plaintiff limited its response to only transactions "*substantively evaluated and presented*" to its Board of Trustees and then only to discussions of "certain leasing transactions" contained in the Board of Director Minutes of Con Edison Development.[2] (*Id.*) (emphasis added). With only one exception discussed below, Plaintiff has produced no further information concerning these transactions.

On February 16, 2007, two months after Plaintiff's refusal to provide further documentation pertaining to other LILO transactions it considered, Plaintiff produced limited documentation pertaining to one LILO transaction considered during 1998, the MEGA

[2]Plaintiff originally claimed to limit its response to "LILO and other leasing transactions which it entered or considered," (Exhibit B-2), and then later further limiting its response to those "substantively evaluated and presented" to its Board of Trustees. (Exhibit A-2).

transaction. (Exhibit B-6). This transaction is referenced in a few of the documents previously produced by Plaintiff, as are several other LILO transactions. In addition to its failure to produce information about these other LILOs, it appears that the documentation produced on February 16, 2007 with respect to the MEGA transaction is incomplete.[3] For example, in its production there is almost no correspondence pertaining to the transaction, nor any version of a "white paper" which summarizes a transaction and generally is a component of such transactions. Further, Plaintiff has not produced any further documentation pertaining to the other LILO transactions mentioned in its own documents, apparently because of its unilateral decision to limit Defendant's request and exclude transactions that were not presented to its Board.

2. *Interrogatory No. 3–Information underlying Plaintiff's allegations regarding the LILO transaction at issue*

Defendant's Interrogatory No. 3 requested detail concerning the basis for Plaintiff's allegations in the Complaint regarding the mechanics of the LILO transaction at issue:

> **Describe how the rent obligation and various option prices described in paragraphs 63, 64, 68 and 69 of the Complaint were negotiated, calculated and allocated.**

Plaintiff's initial response on November 2, 2006, was vague, no less conclusory than the allegations in the Complaint, and unhelpful (Exhibit A-1):

> The terms of the Lease Transaction were negotiated to optimize the economic returns to each party. In particular, Con Edison negotiated the terms of the transaction to provide a yield for financial accounting purposes, consistent with

---

[3]Consistent with this evaluation of the documents produced, Plaintiff's counsel, as recently as the beginning of March, informed Defendant that it intended, at some undefined point in the future, to produce further documents pertaining to the MEGA LILO transaction, as well as another LILO, ENECO. Plaintiff has yet to do so, and this pattern of piecemeal production of documents over a period of several months with no assurance that it is anywhere near complete leaves Defendant with no choice but to turn to the Court to ensure Plaintiff makes prompt, full, and complete production in response to discovery requests.

> its investment objectives." The parties' negotiations were constrained by factors such as the useful life of the property in question and the fair market value of the leasehold interest acquired by Con Edison. In negotiating the specific terms of the transaction, the parties utilized computer software which optimizes the economic return to each party, taking such constraints into account.
>
> The terms of the Lease Transaction were also constrained by the requirements of section 467 of the Internal Revenue Code. The allocations of rental income and deductions for tax purposes were designed to comply with section 467.

In response, Defendant wrote and explained that the answer contained no factual support and instead relied upon conclusory contentions. (Nov. 8, 2006 correspondence, attached as Exhibit B-1). On November 13, 2006, Plaintiff supplemented its response and relayed that the Lease Transaction was actually subject to a competitive bidding process - a response that conflicts with Plaintiff's initial discovery response that the terms were negotiated. (Exhibit B-2).

Plaintiff's supplementation remained extremely broad. While it identified certain assumptions it made in submitting its "bid," it failed to explain how many of these assumptions were derived. Instead, Plaintiff explained that "computer software was used to set forth rental schedules which 'optimize' the yield to Con Edison while maintaining the net present value benefit offered to South Holland Electric." (Exhibit B-2). Plaintiff offered that the "net present value benefit bargained for by South Holland Electric is the amount of the benefit retained by South Holland Electric after taking into account the net present value of its obligations under the lease, including the potential exercise of the purchase option should South Holland Electric choose that option" and that the allocation of income and deductions were "designed to comply with section 467" of the Internal Revenue Code. (*Id.*).

Since Defendant's Interrogatory asked for an explanation how specific amounts were negotiated or allocated between the parties, but Plaintiff had still failed to answer that question,

Defendant wrote to Plaintiff on December 12, 2006, challenging the adequacy of the response. (Exhibit B-4). By letter dated December 21, 2006, Plaintiff remained vague and unresponsive:

> As explained previously, Con Edison and South Holland Electric negotiated the rent and option prices in order to maximize their respective economic returns from the transaction, should the option be exercised. Also, as explained previously, the rental amounts were allocated in accordance with section 467 of the Internal Revenue Code for tax purposes. Rental amounts were calculated by reference to the fair market rental value of the property. As explained in the supplemental information provided, which the United States agreed was helpful, the parties' negotiations on these points were constrained by factors such as the fair market value of the property and its useful life. If, by its request, the United States intended a different meaning for "negotiated," "calculated," and "allocated" other than the meanings of those words as we understand them, Con Edison requests that the United States clarify its request.
>
> In response to the United States' follow-up question in its correspondence of December 12, 2006, the computer program used was called "ABC." This computer program is identified on the top of each of the pricing runs which Con Edison previously produced. The program was created by Warren & Selbert, Incorporated. See www.warren-selbert.com. Robert Holzman, identified in Con Edison's First Supplement to its Rule 26(a) Disclosures, ran this software program on behalf of Con Edison. Con Edison has already provided information on "how" the software was used. The ABC program is standard software which is widely used in the leasing industry in order to perform the calculations required in connection with leasing transactions. As previously indicated, one of the functions of this software is to calculate rental amounts in a manner which will optimize the economic returns to each party. It is also capable of performing the calculations required by section 467 in order to ensure compliance with those provisions.

(Dec. 21, 2006 correspondence, attached as Exhibit B-5).

This response, like its prior response, fails to explain how the specific amounts were negotiated or allocated between the parties or how many of the assumptions were derived.

3. *Interrogatory No. 7–Plaintiff's investigation of the LILO transaction at issue*

Plaintiff alleges in its Complaint that it performed due diligence in connection with its decision to enter into the LILO transaction at issue, and that entered into the LILO transaction because it promised economic returns. (Compl. ¶¶ 49-60). Defendant therefore served

Interrogatory No. 7 to elicit information about due diligence investigation of the LILO transaction:

> **Identify any studies, analyses, forecasts, projections or other due diligence performed or prepared by any individual or entity in connection with the Lease Transaction, including the individuals or entities that performed such study or analysis, and all documents that mentions, describes or evidences such study or analysis.**

In its November 2, 2006, response, Plaintiff stated that it would produce documents "to the extent not privileged" (Exhibit A-1):

> The studies prepared by outside advisors are identified in response to Interrogatory 1 and have been provided as part of Plaintiffs Rule 26(a) disclosures or will be produced in response to the United States' First Request for Production, with the exception of legal opinions which are being withheld pursuant to the attorney-client privilege. Con Edison also relied upon internal reports and memoranda, all of which have been provided as part of Plaintiffs Rule 26 disclosure.
>
> Con Edison will produce, to the extent not previously produced in its Rule 26(a) disclosures and to the extent not privileged, the documents which mention, describe or evidence the aforementioned studies as part of its response to the United States' First Request for Production.

On November 8, 2006, Defendant noted that it had not received a privilege log with respect to Plaintiff's interrogatory responses and requested that to the extent information responsive to interrogatories, such as Interrogatory Number 7, was being withheld from Defendant, that Plaintiff specifically describe the information and the applicable privilege. (Exhibit B-1). Plaintiff has not provided such a description.

4. *Interrogatory No. 12–Tax Indemnity Agreement*

Defendant's Interrogatory No. 12 asked for an explanation of the reasons for a Tax Indemnity Agreement:

> **If Plaintiff executed a tax indemnity agreement, set forth the terms of each such agreement, explaining the reasons for entering the agreement.**

In its initial response, objected to the inquiry regarding the reasons for the Agreement to the extent it seeks legal advice. (Exhibit A-1):

> A copy of the Tax Indemnity Agreement was provided as part of Plaintiff's Rule 26(a) disclosure. The Tax Indemnity Agreement was entered into to address the matters set forth therein. Plaintiff objects to this Interrogatory to the extent it seeks legal advice concerning the reasons for entering into the Tax indemnity Agreement.

On November 13, 2006, Plaintiff reiterated its position that a copy of the Tax Indemnity Agreement had been produced and that it "was entered into for the purpose of addressing the matters set forth therein" (Exhibit B-2), but then changed course, and represented that it was not in possession of any documents setting forth its reasons for entering into the Tax Indemnity Agreement and was not withholding any such information on a claim of privilege. (*Id.*). Defendant challenged the sufficiency of the response. (Exhibit B-4). Plaintiff responded that tax indemnity agreements "are commonly used in leveraged leasing transactions" and that both parties to its lease "would likely have expected the closing documents to include a tax indemnity agreement." (Exhibit B-5). In circular fashion, Plaintiff articulated that the "reasons for entering the agreement" can best be understood by examining the terms of the Agreement itself. (*Id.*). According to Plaintiff, because "the burden of summarizing the terms of this agreement would be 'substantially the same' for [Plaintiff] as it would be for the United States, [Plaintiff] has provided a complete response to this Interrogatory. *See* RCFC 33(d)." (*Id.*).

On March 15, 2007, Plaintiff supplemented its response reversing itself once again and contradicted its representation that it was not withholding any information on account of privilege. (Exhibit A-4). Plaintiff now advised that it entered into a Tax Indemnity Agreement

"based upon the advice of its counsel." (*Id.*). Plaintiff declined to further respond stating that the advice was protected by privilege. (*Id.*).

5. *Interrogatory No. 14–Outside consultants regarding the LILO transaction*

Plaintiff's Complaint alleges that it entered into the LILO transaction at issue after communications with outside consultants, so Interrogatory No. 14 inquired about those consultations:

> **Identify all outside consultants you communicated with to locate potential international energy infrastructure investment opportunities (including energy facilities), including in your response the opportunities that were presented to you and all documents that you reviewed or were provided in connection therewith.**

In its initial response to this Interrogatory, Plaintiff objected that the Interrogatory is "immaterial and irrelevant," specifically objecting that "Con Edison's review of other international energy transactions is not relevant to the determination of the proper tax treatment of the Lease Transaction." (Exhibit A-1). It also objected, claiming the inquiry was overbroad and unduly burdensome, because Plaintiff communicated with numerous outside consultants. Subject to its objections, Plaintiff identified two consultants, but provided no other information and did not identify any documents, as requested. (*Id.*).

On November 8, 2006, Defendant wrote and explained that its effort to learn of communications which address the subject matter of the lawsuit was an appropriate discovery request if only for the fact that the consultants were referred to in Plaintiff's Complaint (*see*, *e.g.*, Compl. at ¶ 49). (Exhibit B-1). Further, to the extent that Plaintiff believed the requests to be overly broad and/or unduly burdensome, it had not articulated any "burden," nor had it explained how the requests might be narrowed instead of ignored. (*Id.*).

In a December 21, 2006 letter, Plaintiff explained that it had identified all of its advisors with respect to the EZH LILO Transaction, but refused to identify outside consultants other than Cornerstone and International Energy Partners,[4] refused to completely identify the responsive opportunities presented to it, and refused to identify (or produce) all responsive documents. (Exhibit B-5). On February 16, 2007, several months after its responses were due, Plaintiff produced additional documents pertaining to International Energy Partners. (Exhibit B-6). However, Plaintiff continues to refuse to produce responsive information pertaining to its other advisors and the opportunities presented to it.

6. *Interrogatory No. 16–Reasons for a trust*

Defendant's Interrogatory No. 16 asks why a trust was used in the LILO transaction:

> **State the basis for your decision to form a trust to enter into the Lease Transaction.**

Plaintiff initially responded that the use of a trust was "standard and customary" in leveraged leases and, at the same time (but inconsistently) objected on grounds of attorney-client privilege. (Exhibit A-1). On December 13, 2006, Plaintiff confirmed its earlier response, yet also suggested that the use of a trust was so standard that it should not be assumed that the decision to use a trust was Plaintiff's decision (Exhibit A-2):

> Con Edison incorporates its original response to Interrogatory No. 16. Con Edison further objects to Interrogatory No. 16 on the basis that it assumes the decision to form a trust was Con Edison's decision. As stated in the original response to Interrogatory No. 16, the use of ownership trusts is standard and

[4]Plaintiff refused to identify such consultants despite the fact that in its original response to Interrogatory No. 14 it stated that it had consulted with "numerous outside consultants to locate potential international energy infrastructure investments." (Exhibit A-1). Further, Plaintiff's own board minutes indicate that it had relationships with other consultants for the purpose of locating potential international energy infrastructure investments. (*See*, *e.g.*, PF009513-16, attached hereto as Exhibit C-1).

> customary in leveraged leases. Furthermore, while Con Edison has no specific knowledge of South Holland Electric's reasons, if any, for preferring an ownership trust, Con Edison understands that lessees often prefer this structure.

On March 15, 2007, Plaintiff again supplemented its response. (Exhibit A-4). Plaintiff now represented that it entered into the trust "based upon the advice of its counsel." (*Id.*). Plaintiff declined to further respond stating that the advice was protected by privilege.[5] (*Id.*).

7. *Document Request Nos.1 and 2*

Defendant propounded two document requests:

<u>Request No. 1</u>

**All documents identified, described, mentioned or referred to in your responses to the interrogatories served concurrently herewith.**

<u>Request No. 2</u>

**All documents relied upon or reviewed by you in preparing your responses to the interrogatories served concurrently herewith.**

Like its responses to interrogatories, Plaintiff either refused or failed to provide all responsive information. Each time Defendant informed Plaintiff of the insufficiency of a response, Plaintiff produced more information. (*See*, *e.g.*, Plaintiff's First and Second Supplemental Responses, attached as Exhibits A-6 & A-7, and Exhibit B-6). Despite its numerous supplements, Plaintiff has still failed to fully respond to the requests.

Because Defendant's Request for Production essentially incorporates its Interrogatories (*see* Exhibit A-5), Plaintiff's objections to the document requests and claimed reasons for non-

---

[5] Plaintiff has not supplemented its privilege log as a result of this claim with respect to Interrogatory Numbers 12 and 16; thus it is unclear whether Plaintiff is withholding responsive documents on the basis of a privilege or whether Plaintiff is referring only to oral communications with counsel.

compliance were incorporated in the responses to these interrogatories and more fully discussed above.

## ARGUMENT

Defendant is entitled to discover information and documents in Plaintiff's possession, custody, or control that are relevant to the subject matter of this action. *See* RCFC 26(b)(1); *Cabot v. United States*, 35 Fed. Cl. 80, 84 (Ct. Cl. 1996); *Helt v. Metropolitan District Comm'n*, 113 F.R.D. 7, 12 (D. Conn. 1986).

A. Defendant Is Entitled to Information That Explains the Transaction

At the center of this case is a series of complicated documents, which Plaintiff claims, at least from a federal income tax perspective, constitute a valid lease arrangement. Plaintiff describes the LILO Transaction as "complex." (Compl. at ¶ 47). Indeed, according to Plaintiff, it was specifically designed to hinder the United States' ability to uncover the truth. In Plaintiff's own words:

> It is anticipated that the transactions will be structured in ways that will make any challenge to the structure by the IRS difficult to support or litigate.

(CE012022, attached as Exhibit C-2). That this transaction was designed to frustrate the IRS does not render documents which may shed light on this scheme exempt from discovery.

Plaintiff has made several allegations in its Complaint regarding the mechanics of the LILO Transaction, including allegations concerning the rental payments and option prices. (Compl. ¶¶ 63, 64, 68 & 69). Defendant's Interrogatory Number 3 seeks to determine "how the rent obligation and various option prices described in paragraphs 63, 64, 68 and 69 of the Complaint were negotiated, calculated and allocated." Despite this straight-forward request, Plaintiff's responses have been a moving target. Plaintiff first responded by asserting, "Con

Edison *negotiated* the terms of the transaction to provide a yield for financial accounting purposes, consistent with its investment objectives." (Exhibit A-1) (emphasis supplied). Then, on November 13, 2006, Plaintiff stated, "the investment in the Lease Transaction was subject to a *competitive bidding process*. Bates #PF003241-46 [attached as Exhibit C-3][6] set forth the terms of Con Edison's bid." (Exhibit B-2) (emphasis supplied). After that, on December 21, 2006, Plaintiff contended that the process was *negotiated*, and apparently not bid, stating that "Con Edison and South Holland Electric *negotiated* the rent and option prices in order to maximize their respective economic returns."[7] (Exhibit B-5) (emphasis supplied). Plaintiff's response is deficient, as demonstrated by Plaintiff's lack of consistency in answering and the absence of detail as to how the rent and other financial arrangements in the instant transaction were derived. Plaintiff should be required to fully identify the details of its negotiations (or those performed on its behalf) and/or the details underlying the assumptions used in making its bid or engaging in negotiations.

---

[6]This document contained certain assumptions of values, interest rates, and time periods related to the submission of a proposal from Plaintiff to EZH. However, Plaintiff did not explain how the assumptions in the document were determined or how costs were allocated among the parties. Moreover, Plaintiff failed to set forth any of the communications that occurred between the parties to arrive at these assumptions.

[7]After receiving Defendant's second follow-up request for information responsive to interrogatory Number 3, Plaintiff stated "[t]he fact that the United States may have follow-up questions as a result of [our] response does not indicate that Con Edison's response was deficient." (Exhibit B-5). In fact, Plaintiff's response is deficient, as demonstrated by Plaintiff's lack of consistency in responding and the absence of any detail as to how the rent schedules in the instant transaction were calculated.

Similarly, Interrogatory Number 12 asked Plaintiff to explain the reasons for entering into a tax indemnity agreement.[8] (Exhibit A-1). Plaintiff objected to the request on the grounds of attorney-client privilege and referred the Defendant to the terms of the tax indemnity agreement itself. (*Id.*). When pressed, Plaintiff acknowledged that no privileged information existed. (Exhibit B-2).[9] Now, months later, Plaintiff amended its response to state that it entered into the tax indemnity agreement, "based upon the advice of its counsel," and then refused to disclose the advice given. (Exhibit A-4). Setting aside what appears to be Plaintiff's gamesmanship, Plaintiff has still not answered the interrogatory and it should not be permitted to raise, waive, and then raise once again a privilege to avoid responding.

In Interrogatory Number 7, Plaintiff was asked to identify any studies, analyses, forecasts, projections or other due diligence performed or prepared by any individual or entity in connection with the Lease Transaction, including the individuals or entities that performed such study or analysis, and all documents that mention, describe or evidence such study or analysis. (Exhibit A-1). In response, Plaintiff indicated it was withholding legal opinions responsive to this request. (*Id.*). Both in its Complaint (Compl. ¶ 49) and in response to another interrogatory (Interrogatory No. 4 - in which the Plaintiff was asked to describe the risks associated with the transaction and the steps taken to mitigate such risks), Plaintiff explained that it relied upon

---

[8]Among other things, the tax indemnity agreement prohibits EZH from taking an inconsistent position with Plaintiff's tax treatment of the transaction, or from making an agreement within five years of closing of the transaction, among other things, committing EZH to the exercise or non-exercise of the "Sublease Purchase Option", which would render Plaintiff's tax treatment of the transaction invalid. (*See* §§ 3(e)-(f) & 4, attached as Exhibit C-4).

[9]Plaintiff indicated that it is not aware of any documents detailing its reasons for entering into the tax indemnity agreement–thus, indicating that it understood the thrust of the question. However, instead of providing an explanation of its reasons, it continued to point to the agreement itself. (Exhibit B-2).

outside consultants. Despite injecting the advice of consultants into the case, which evidently includes counsel, Plaintiff nevertheless has withheld responsive information obtained from these consultants on the basis of a privilege claim.

Plaintiff has the burden of sustaining any claimed privilege. *In re Sealed Case*, 737 F.2d 94, 99 (D.C. Cir. 1984). Despite Plaintiffs' blanket claim of privilege, it is unlikely that all parts of every document are entitled to be withheld on a claim of privilege. It is likely that at least some withheld information originated with the promoters who designed and helped orchestrate this LILO transaction.[10] Moreover, when a litigant's "conduct touches a certain point of disclosure, fairness requires that his privilege shall cease whether he intended that result or not. He cannot be allowed, after disclosing as much as he pleases, to withhold the remainder." 8 J. Wigmore, *Evidence in Trials at Common Law* § 2327 at 636 (J. McNaughton rev. 1961), *quoted with approval in In re Sealed Case*, 676 F.2d 793, 807 (D.C. Cir. 1982); *see also Harding v. Dana Transport, Inc*., 914 F. Supp. 1084, 1092 (D.N.J. 1996). Thus Plaintiff should not have the benefit of pleading self-serving statements and then withholding information to determine whether they are supported.

In addition to privileged material, there is evidence Plaintiff has withheld responsive, non-privileged documents. For example, Board minutes of the predecessor to Consolidated Edison Development, Inc. ("CED"), dated July 23, 1997, refer to a presentation to the Board of Directors discussing a document entitled "Lease Screening Criteria," dated July 21, 1997. (PF009612-9614, attached as Exhibit C-5). Plaintiff has not provided this Lease Screening

[10]Given the relatively small number of documents set forth on Plaintiff's privilege log, an *in camera* review of the documents identified on the log would seem to be an appropriate method for making such a determination.

document. Similarly, CED's October 27, 1997 Board minutes (PF009505-06, attached as Exhibit C-6), indicate that there was a discussion of materials submitted to the Board of Trustees of Consolidated Edison, Inc. in support of pursuing "tax advantaged leasing" (presumably including the instant LILO transaction). However, it does not appear that these materials were provided either. These materials evidently contain an analysis used in pursuit of the instant LILO transaction. The information sought is designed to lead to relevant information related to Plaintiff's intent in entering into the transaction.

In Interrogatory Number 16, Defendant requested that Plaintiff state the basis for its decision to form a trust to enter into the Lease Transaction. Plaintiff first objected on the ground of attorney-client privilege. (Exhibit A-1). Plaintiff next responded in conclusory fashion that the interrogatory mistakenly presumed that it was Plaintiff's decision to form the trust and that Plaintiff did not know what reasons, if any, EZH may have had for preferring a trust, and further responded that "the use of ownership trusts is standard and customary in leveraged leases." (Dec. 13, 2006 Supplemental Response, attached as Exhibit A-2). Several months later, on March 15, 2007, Plaintiff provided a new response, inconsistent with its earlier response. (Mar. 15, 2007 Supplemental Response, attached as Exhibit A-4). Plaintiff advised that it entered into the trust, "based upon the advice of its counsel." (*Id.*). Plaintiff declined to further respond, stating that the advice was protected by privilege. (*Id.*). Plaintiff's responses are, at the very least, incomplete.[11]

---

[11]If Plaintiff does not know why it formed a trust, then simply stating that it does not know why a trust was used would be a sufficient response. However, absent provision of its reasons or a statement that it does not know why it formed a trust, Plaintiff's response is deficient.

B. Defendant is Entitled to Information Related to the Subjective Intent of Plaintiff

One of the issues in this case is whether Plaintiff can meet its burden to establish that its LILO shelter transaction has economic substance. Under the economic substance doctrine, transactions that are invented solely to create tax deductions and otherwise have no economic substance, even though formally complying with the letter of the Internal Revenue Code, will not be recognized. *Knetsch v. United States*, 364 U.S. 361 (1960); *see also BB&T Corporation v. United States*, No. 1:04-cv-00941, 2007 WL 37798, at *11-*12 (M.D.N.C. Jan. 1, 2007) (slip opinion) (a copy of which is attached as Exhibit D-1). That is, "whether the transaction had any practicable economic effect other than the creation of income tax losses." *Rose v. Commissioner*, 868 F.2d 851, 853 (6th Cir. 1989). The first prong of this test requires an analysis as to whether the transaction had economic substance beyond the generation of tax benefits. This determination is exclusively an objective analysis. *Coltec Industries, Inc. v. United States*, 454 F.3d 1340, 1356 (Fed. Cir. 2006). The second prong looks to whether the taxpayer possessed a non-tax business purpose in entering the transaction, which is a subjective analysis. *Sochin v. Commissioner*, 843 F.2d 351, 354 (9th Cir.), *cert. denied*, 488 U.S. 824 (1988); *accord, ACM Partnership v. Commissioner*, 157 F.3d 231, 248 (3d Cir. 1998), *cert. denied*, 526 U.S. 1017 (1999); *Muhich v. Commissioner*, 238 F.3d 860, 864 (7th Cir. 2001); *Transpac Drilling Venture, 1983-2 by Dobbins v. United States*, 32 Fed. Cl. 810, 820 (1995); *American Elec. Power. Co., Inc. v. United States*, 326 F.3d 737, 741 (6th Cir. 2003).

To litigate this issue, Defendant must discover, among other things, Plaintiff's motivation for entering into the LILO Transaction. One mechanism to evaluate Plaintiff's intent and purpose in entering into the LILO Transaction is to compare it with other similar transactions Plaintiff considered. As this comparison will yield valuable information as to whether the LILO

Transaction reflects business or regulatory reality, the requested documents are relevant, indeed essential, to a determination of economic substance. *See Frank Lyon Co. v. United States*, 435 U.S. 561, 583-84 (1978); *Coltec Industries, Inc.*, 454 F.3d at 1355 n.13.

Interrogatory Number 2 requests that Plaintiff identify other LILO transactions or shelter transactions presented to, considered, reviewed or analyzed by the Plaintiff in 1996, 1997 or 1998, and identify all documents in connection with its consideration, review or analysis. Plaintiff objected to the request as overbroad and unduly burdensome and claimed it the request was "immaterial and irrelevant" and "not relevant to the determination of the proper tax treatment of the Lease Transaction."[12] (Exhibit A-1). Moreover, Plaintiff unilaterally limited the scope of Interrogatory Number 2 to transactions "substantively" evaluated and presented to the Board of Trustees of the parent company of Consolidated Edison Development ("CED"), Consolidated Edison, Inc.[13] (Exhibit A-2). Plaintiff can not unilaterally narrow the scope of Defendant's interrogatory so as to exclude relevant information as to which Plaintiff has made no showing of undue burden.[14]

---

[12] Plaintiff initially claimed that it did understand what a "tax shelter" was. In an attempt to avoid further delay, Defendant provided Plaintiff with a printout from the IRS website.

[13] Plaintiff also stated that "Con Edison and Consolidated Edison, Inc. did not substantively evaluate and present to the Board of Trustees (or its equivalent at any subsidiary), during 1996 through 1998, any shelter transactions, as defined by the United States' correspondence of November 8, 2006, other than certain leasing transactions presented to Con Edison Development." (Exhibit A-2). Despite this final clause, Plaintiff failed to identify all transactions and documents responsive to this request, instead relying on various and incomplete references in various minutes of CED board meetings.

[14] Plaintiff initially claimed that it is only aware of one other transaction: the NUON transaction, but claimed the transaction is irrelevant and refused to provide complete documentation pertaining to this transaction. (Exhibit A-1).

Plaintiff's response was insufficient, because it excludes matters that may have been submitted to the Board of any of its subsidiaries and, critically, because it appears that a great deal of planning, consideration and analysis of other international transactions occurred without reaching the level of what Plaintiff has referred to as a "substantive" presentation to any Board. For example, Defendant is aware that Plaintiff actually placed a bid on at least one other shelter transaction, the MEGA transaction, but apparently that transaction did not obtain substantive board review.[15] (*See* PF009355-56; PF009544-47, attached as Exhibits C-7 & C-8). Further, Plaintiff widely distributed an analysis of the MEGA transaction to members of the Board of CED and other employees and officers of Plaintiff (S*ee* PF008309-17, attached as Exhibit C-9).[16] Therefore, Plaintiff's line drawing on what constitutes "substantive" review by its Board is apparently designed to shield the disclosure of discoverable information.[17] While the specific actions Plaintiff could take without "substantive" input from its Board are unclear, it is apparent

---

[15]On February 16, 2007, Plaintiff produced further documentation pertaining to the MEGA transaction. (Exhibit B-6). However, the documentation does not appear to be complete. Further, it is not clear why Plaintiff has suddenly chosen to now draw the line at the MEGA transaction, and still refuses to provide documentation pertaining to the other LILO transactions identified in its previously produced documents.

[16]As is apparent from Plaintiff's production of numerous versions of the ENECO White Paper for another lease transaction (ENECO) (*see*, *e.g.*, Exhibit C-10), and memoranda discussing the proposed presentation of the transaction to the board of CED, along with a fact sheet detailing the transaction (PF008320-21, attached as Exhibit C-11),Plaintiff's response is deficient, and a large amount of responsive information may exist, pertaining to the other international leasing transactions Plaintiff considered.

[17] In fact, a document entitled, "Con Edison Development, Inc. September 1998 Report to Board of Trustees" contains a great deal of discussion concerning the MEGA transaction and refers to numerous other leasing transactions being considered by Plaintiff. (PF009359-60, attached as Exhibit C-12). Thus, it is readily apparent that presentations of these lease transactions could have occurred at the highest level in Consolidated Edison, Inc., without meeting Plaintiff's unilateral limitation of "substantively considered."

that a great deal could be undertaken, and that Plaintiff's limitation is shielding important responsive information.

Plaintiff goes as far as to state that "[i]t is impossible for current representatives of Con Edison to certify under oath what transactions were 'considered' or 'reviewed' by any employee of the company approximately ten years ago." Despite this, Defendant, after sifting through documents produced by Plaintiff, was able to identify at least 22 other international lease transactions considered by Plaintiff during the responsive time period.[18] Many of the references are cursory and indicate that much more information exists pertaining to these transactions.[19]

Defendant also requested that Plaintiff identify all outside consultants used to locate potential international energy infrastructure investment opportunities and identify related documents. (Interrogatory No. 14, Exhibit A-1). This request, like Interrogatory Number 2 discussed above, is intended to shed light on Plaintiff's subjective intent in seeking out such transactions. Plaintiff claimed this request was overbroad and unduly burdensome and that the information sought was not relevant to the determination of the proper tax treatment of the Lease Transaction. This response is baffling since, in its Complaint, Plaintiff placed these other transactions at issue. (Compl. at ¶¶ 37-43). The Complaint contains numerous allegations

---

[18] *See, e.g.*, Exhibit C-12; PF006436 (attached as Exhibit C-13); PF009366 (attached as Exhibit C-14); and PF004246-47 (attached as Exhibit C-15).

[19]While Plaintiff claims that Interrogatory Number 2 is burdensome, documents Plaintiff produced during the IRS audit indicate that it organized its documents by transaction. (*See* US08404, asking an employee to change a file cabinet name to EZH/EON Benelux in response to a change in ownership of the RoCa3 facility, attached as Exhibit C-16). Further, in its February 16, 2006, production of documents, Plaintiff produced the documents pertaining to the MEGA transaction in sequential order by both CE and PF bates numbers, further indicating that the documents are organized in a manner that would facilitate production. Therefore, Plaintiff should be able to retrieve responsive documents from the file for each lease transaction without undue burden.

pertaining to Plaintiff's purported international business investment plans to prove the subjective intent prong under the economic substance doctrine. (*Id*.). In fact, the Complaint alleges that "Con Edison Development also relied on outside consultants to locate potential international energy infrastructure investment opportunities." (Compl. at ¶ 39). Despite the fact that Plaintiff put this subject matter at issue, Plaintiff objected to the request:

> Con Edison continues to believe that Interrogatory No. 14 is overbroad. Con Edison is – to state the obvious – an energy company. Its entire business involves investment in energy infra-structure and thus Interrogatory No. 14 in effect requests information regarding virtually all of Con Edison's business operations over an unlimited time span. . . .[20]

(Exhibit B-5). Plaintiff's objection ignores the word "international" in the Interrogatory. Plaintiff's objections are without merit.

This Court should order Plaintiff to fully respond to Interrogatory Numbers 2 and 14 and produce the documents corresponding with each of these Interrogatories in response to Request for Production Numbers 1 and 2.

C. <u>Plaintiff's Reliance on Rule 33(d) is Improper</u>

Many of Plaintiff's responses to the interrogatories identified above, and its subsequent supplementations and explanations, refer to documents and make conclusory assertions that the burden of culling through the Plaintiff's records to the answer is equally burdensome to the

---

[20] Plaintiff goes as far as to state, "Con Edison would like to avoid the United States' current practice (*see*, *e.g.*, Interrogatory Nos. 2, 3, and 14) of serving Interrogatories which are overbroad or which the United States interprets in an overbroad manner and then unfairly alleging a lack of cooperation by Con Edison. . . . . Con Edison believes, however, that this process would be aided if the United States asked more specific questions." (Exhibit B-5). Interrogatory Number 2 sought information related to other shelters and LILOs considered, Interrogatory Number 3 sought information on how various transactional data referred to in the Complaint were negotiated and calculated and Interrogatory Number 14 seeks information related to Plaintiff's purported business purpose listed in the Complaint.

parties and that Plaintiff had no further obligation to respond. (*See* Exhibits A-3, at pp. 3-4, B-2 at pp. 5-6, B-5 at pp. 2, 4 & 6). Plaintiff is wrong.

In order to satisfy its burden under Rule 33(d), a party must demonstrate (1) "that the documents will actually reveal answers to the interrogatories"; and (2) the party must demonstrate that the burden is in fact just as equal on the propounding party as it is on the responding party. *S.E.C. v. Elfindepan, S.A.*, 206 F.R.D. 574, 576 (M.D.N.C. 2002). Further, the "producing party [must] have adequately and precisely specified for each interrogatory, the actual documents where information will be found." *Id.* Here Plaintiff has failed this test on both prongs.

For example, Plaintiff has failed to identify the specific documents that would provide the responses to the propounded interrogatories with respect to Interrogatory Numbers 1, 7 and 15, instead claiming that "[t]he task of organizing the documents provided by reference to each Interrogatory would be substantially the same" for both parties. (*See* Exhibit B-2). In fact, with respect to Interrogatory Number 1, Plaintiff did not even initially claim reliance on documents produced. (*See* Exhibit A-1). Only after Defendant challenged the sufficiency of Plaintiff's responses, did Plaintiff claim reliance on documents produced in lieu of a complete written response to this interrogatory, but only in a general sense, referring to *all* documents produced to Defendant. (Exhibit A-3, p.3). Certainly as the party familiar with the transaction and the documents it produced, Con Ed cannot claim that the burden is equal among the parties. *See In re Sulfuric Acid Antitrust Litigation*, 231 F.R.D. 351, 366 (N.D. Ill. 2005) (requiring the defendant to provide an actual response to the interrogatories where the defendant's familiarity with the documents coupled with defense counsel's own familiarity, based on at least one prior review of the documents, demonstrated the burden was not in fact equal for the plaintiffs).

Further, even where Plaintiff has attempted to identify specific documents, as it did with respect to Interrogatory Numbers 2, 3, 12 and 14, the documents referred to do not contain all of the information sought by the respective interrogatories.[21] For example, Interrogatory Number 3 seeks information regarding the negotiation and calculation of rent and other items, but the sole document Plaintiff refers to in response (Exhibit C-3) does not contain all of the factors used by Plaintiff in calculating and negotiating the requested values, or an explanation of how these assumptions were derived. Therefore, Plaintiff's reference to documents (Exhibit C-3) is not an adequate response.[22] In a supplementation to its response to Interrogatory Number 14 (Exhibit A-5), Plaintiff points to bates ranges dealing with non-leasing international infrastructure investments considered (although these ranges fall short of providing complete responsive information with respect to these non-leasing transactions), but fails to provide any such ranges

[21]Plaintiff's improper reliance on RCFC 33(d) is further revealed by its failure to amend its response to Defendant's Interrogatories when it made three supplemental submissions of documents (one of which also was not accompanied by an amendment to Plaintiff's Response to Defendant's Request for Production). (*See* Exhibits A-6, A-7, & B-6).

[22]If the Court agrees with the Defendant's assertion that Plaintiff has inappropriately limited its response to Interrogatory Number 2, as discussed above, then Plaintiff has also failed to properly respond to Interrogatory Number 2, in that the only documents referred to by Plaintiff, the minutes of CED's board (Exhibit A-5), provide only minimal information regarding other LILO transactions responsive to the interrogatory, and even a review of the documents produced by Plaintiff, but not specifically referenced, would not provide a full response to the interrogatory as the documents actually produced, primarily contain oblique references to other LILO transactions, with little or no detail. Therefore, a further written response detailing the information sought in Interrogatory No. 2, would be required. Further, while pointing to documents concerning the NUON Transaction, Plaintiff has failed to provide the responsive documentation to Defendant, while claiming it has produced extensive documentation to the IRS concerning the transaction. This is not a sufficient response in that Defendant is entitled to seek production from Plaintiff under the discovery devices provided by the Court regardless of items produced to the IRS during audit, just as it was entitled to do concerning the EZH LILO Transaction. As such, Plaintiff must respond accordingly and produce the documents pertaining to the NUON Transaction.

with respect to leasing investments which could provide responsive information concerning outside consultants. Even more extreme is Plaintiff's approach to Interrogatory 12, which requested an explanation of the reasons for entering into the Tax Indemnity Agreement. As discussed above, the Tax Indemnity Agreement itself provides no discussion of Plaintiff's reasons for entering into the agreement, and Plaintiff has admitted that it is not aware of any other documents that contain such a discussion. Therefore a written response by Plaintiff to Interrogatory Number 12 is required. Thus, even to the limited extent Plaintiff has produced documentation that may be responsive to Defendant's interrogatories, its failure to specify the documents that would provide the source for a responsive answer or to provide all of the documentation necessary for a complete response necessitates a written response by Plaintiff to the respective interrogatories. *Elfindepan, S.A.*, 206 F.R.D. at 576.

## CONCLUSION

For the reasons given above, this court should:

1. Order Plaintiff to fully answer the Interrogatory Nos. 2, 3, 7, 12, 14, and 16, and Document Request Nos. 1 and 2;

2. Order whatever additional relief the Court deems appropriate.

Respectfully submitted,

s/ David N. Geier

DAVID N. GEIER
Attorney of Record
U.S. Department of Justice, Tax Division
Post Office Box 26
Ben Franklin Station
Washington, D.C. 20044
Telephone: (202) 616-3448
Facsimile: (202) 307-0054

EILEEN J. O'CONNOR
Assistant Attorney General
DAVID GUSTAFSON
Chief, Court of Federal Claims Section
STEVEN I. FRAHM
Assistant Chief, Court of Federal Claims Section
JOSEPH A. SERGI
JAMES E. WEAVER
ADAM R. SMART
Trial Attorneys

s/ Steven I. Frahm
Of Counsel

April 4, 2007