# EXHIBIT C-1

MINUTES of a MEETING

of

THE BOARD OF DIRECTORS OF

CONSOLIDATED EDISON DEVELOPMENT, INC

A meeting of the Board of Directors of Consolidated Edison Development, Inc was held at the offices of Consolidated Edison Company of New York, Inc at 4 Irving Place, New York, N Y on December 18, 1997 at 12 00 p m

Peter A Irwin, Secretary of the Company, recorded the minutes of the meeting

Present Mary Jane McCartney, Chairman of the Board and Joan S Freilich,

Absent Paul H Kinkel

Present by Invitation Charles Muoio, President of the Company, Vicki Kuo, Manager of Business Development, Ronald Bozgo, a General Manager of CECONY, Andrew Scher, a member of CECONY's Law Department and Edwin J Ortiz a Director in CECONY's Employee Relations Department

- - - -

Ms McCartney called the meeting to order, noting that materials had been distributed to the members Board She ordered them to be filed with the records of the meeting

- - - -

The Minutes of the meetings of the Board held on November 24, 1997 and December 15, 1997 were presented to the Board and unanimously approved

- - - -

At Ms McCartney's request Mr Muoio, reviewed the financial statements included in the Agenda materials, including the balance sheet, statement of operations and changes in retained earnings and statement of cash flows

- - - -

Mr Muoio next reported on the closing of the EZH leasing transaction, noting that after intense negotiations over last week and the weekend, it had closed on Monday, December 15th He also discussed the development of the 1998 business plan At the suggestion of one of the Board members, it was

agreed to include a list of projects being considered by the Company with the Board materials each month

\- - - -

At Ms McCartney's request, Mr Muoio then discussed the status of the GENOR project, noting that the interim loan transactions were being closed today to provide the necessary credit support to allow the EPC contractor, Wartsilla, NSD, to ship the generating equipment He reviewed the financial arrangements noting that the Company through its subsidiary Con Edison Development Guatemala would be providing a $5 4 million backstop letter of credit secured by a pledge and security agreement covering Interamerican Power and Light's stock interest in GENOR In response to a question, Mr Muoio discussed the status of the purchase power agreements for the project

\- - - -

At Ms McCartney's request, Mr Muoio, then discussed a project the Company has under consideration to acquire an interest, in partnership with Delta Power Company, LLC, in the ADA Cogeneration Plant in Ada, Michigan He noted that the plant provides about 30 MW of firm capacity to Consumers Energy under a purchase power agreement and that it supplies steam to the headquarters and manufacturing facilities of Amway Corporation

There followed a discussion of how the plant would fit into the Company's business strategy, the engineering, environmental and other due diligence that would be done, the need to understand the regulatory situation in Michigan, the status of the fuel contracts for the plant, and the tight time schedule for the project

\- - - -

Mr Muoio then discussed the possibility of the Company partnering with ENEL, the Italian electric utility, to develop a power plant project in China using coal fired equipment ENEL has in storage He noted that the project is two to three years away from development

There followed a discussion about whether this project would pass the Company's screen for capital investment, the risks of generating projects in China and the status and technology of the equipment in storage

\- - - -

Mr Muoio next reported that the offering letter had been sent on the proposed ENECO gas and hot water distribution systems leasing opportunity in the Netherlands and that ENECO was expected to respond in the next few days

- - - -

At Ms McCartney's request, Mr Bozgo and Ms Kuo then reviewed the status of the Distribution Management System (DMS) project in Zhejiang China They began by reviewing the schedule, noting that it was expected that the Request for Proposals would be issued by February 15, 1998 and that the responses would be due on April 15th They then discussed the training of the Chinese representatives who had recently visited New York and the conclusions that had been drawn, including that Con Edison/ESCA appears to be the Chinese representatives preferred supplier, that Con Edison's GIS is superior to any on the market, that EC 2000 is an excellent turnkey product, and that there was a preference for Japanese electrical equipment

Mr Bozgo and Ms Kuo then reviewed the project action plan, including maintaining contact with Zhejiang, finalizing the ESCA agreement, developing technical documentation and copyright protection, and evaluating a local partner They also discussed the worldwide market for DMS technology, noting that it was growing, that the Asia market was the largest by far, that a turnkey approach was preferred and that the Distribution Automation market is even bigger They also discussed estimated revenue breakdowns and DMS business risks, including project, technical and commercial risks

They then reviewed the market for DMS in China, including that there were 30 major control centers with DMS efforts on the planning horizon They reviewed three projects in addition to the Zhejiang project, in Beijing, Zhenzhou, and Chengdu and the long term potential in China, noting that electric distribution was expected to become a prime focus

There followed a discussion of the development of the Company's long term strategy and objectives in China, the goals at the end of five years and the costs to get there

Mr Bozgo and Ms Kuo left the meeting

- - - -

There then followed a discussion of an agreement with EDHI, Inc a subsidiary of Public Services Enterprise Group

under which EDHI would refer projects to the Company for proposed investment

- - - -

Mr Ortiz entered the meeting At Ms McCartney's request, he reviewed the Company's benefits plans, including the level of contributions under the Company's medical and dental plans He also reviewed a proposal to establish a voluntary tax-advantaged flexible benefits program for the Company funded by payroll reductions which could be used by the participants for unreimbursed health care up to a maximum of $5,000 and dependant care expenses up to a maximum of $5,000 He next reviewed a proposal to establish a life insurance program of one times salary currently subject to a $150,000 cap

After discussion, on motion duly seconded and carried, the Board approved the establishment of the flexible benefits plan and life insurance plan

- - - -

There being no further business, on motion, duly seconded and carried, the meeting was adjourned

Secretary

# EXHIBIT C-2

## Executive Summary

One element of a diversified investment portfolio for Con Edison is the relatively low risk and attractive return profile of leases. This paper describes sale-leasebacks, identifies major risks and benefits, and details a recommended investment.

Investments of this type would be accounted for as leveraged leases, allowing for front-loaded earnings, and generate after tax yields of between 15% and 25% over their lives, after taking account of typical capital structure and debt costs.

The earnings come from a combination of lease payments and tax deductions. Con Edison, with its high tax rate and large taxable income position, is in a particularly favorable position to take advantage of such a program.

### What is a sale-leaseback?

In its most basic form, a sale-leaseback is the purchase of an asset and the subsequent leaseback of that asset to the seller under a long term lease agreement. Under a so-called "leveraged lease", the investor uses non-recourse debt to reduce the equity needed to purchase the asset.

Since its inception in 1964, the leveraged leasing market has continually developed new variations on this basic theme to accommodate increasingly complex accounting and tax laws and regulations. The latest of these variations are the "lease-leaseback" structures in which an asset is leased (instead of purchased) and the leasehold rights derived from that lease are then leased back to the initial owner of the facility. Lease-leaseback structures have been developed to optimize the benefits that can be derived by the utility and the investor in these transactions.

### What kind of lease structures will be considered?

Under the proposed investment program, investments will be considered in both sale-leasebacks and lease-leasebacks, depending on prevailing market conditions.

Because the specific transaction currently under consideration by CED is a lease-leaseback we will use this type of structure in our example of a typical transaction.

### How would a typical transaction work?

In a typical lease-leaseback transaction, a special purpose subsidiary owned by an investor, in this case CED, would establish a trust. On the closing date, CED would invest equity in the trust and the trust would borrow non-recourse debt for the project. Concurrently the trust would enter into a lease agreement with a utility under which the trust would lease an asset, for example a power plant, from the utility for 44 years. The trust would, at the same time, lease the plant back to the utility for 20 years, after which the trust would have a number of options, described below. The initial 20 year term of the leaseback has been chosen to

optimize the benefits available to both the utility and the investor. A 44 year leaseback would not qualify for the tax treatment that CED and the foreign utility seek.

On the closing date of the lease, the utility would establish, for the benefit of CED, (a) a trust account containing U.S. Treasury securities and (b) an irrevocable bank letter of credit from a bank rated AA or better, both in amounts that, when combined, fully secure the obligations of the utility to CED. In the event the utility were to fail to make the payments due to CED under the lease, CED could take the U.S. Treasury securities and draw on the letter of credit to satisfy any shortfalls.

At the end of the initial 20 year lease, the utility would have the option to purchase the plant at a pre-agreed fixed price. If the utility did purchase the plant at this time, the transaction would be completed. If the utility did not purchase the plant at the end of year 20, the trust would have the option to either (a) lease the plant to a third party for the remaining 24 years of the lease, (b) use the plant itself, or (c ) require the utility to re-lease the plant for an additional 17 years at prices that would assure CED of its expected return.

Responsibility for the condition of the plant would rest with the utility during the initial term of the lease, and with the third party during a subsequent lease. During the remaining seven years under the lease, CED could either use the plant itself or lease the plant to third parties and in doing so obtain additional revenue. The base case economics assume no revenue for this period. At the end of the 44 year lease CED would be required to return the plant to the utility.

**How would CED derive its return under a sale-leaseback?**

Under a typical lease-leaseback structure an investor's earnings are generated by applying a constant rate of return to a declining investment balance according to lease accounting rules established by the Financial Accounting Standards Board. As the investment balance declines so do the earnings and hence the earnings are front-loaded.

The following chart details the earnings profile for the first 10 years of a typical lease-leaseback

| Year (US$) | Investment | Earnings |
|---|---|---|
| 1997 | 43,047,734 | 353,054 |
| 1998 | | 4,154,042 |
| 1999 | | 3,961,165 |
| 2000 | | 3,748,210 |
| 2001 | | 3,512,950 |
| 2002 | | 3,252,891 |
| 2003 | | 2,965,245 |
| 2004 | | 2,646,897 |
| 2005 | | 2,294,361 |
| 2006 | | 1,903,735 |

The following graph details the earnings for a typical lease-leaseback.




The transactions contemplated will be structured in such a way that CED will obtain the same yields and rates of return regardless of whether the utility exercises its purchase option at the end of year 20 or is required to re-lease the plant for an additional 17 years.

**Do we have a specific transaction in mind?**

CED's strategy will be to invest in transactions in conjunction with experienced market participants, to concentrate on assets familiar to Con Edison and to deal with utilities in countries with high credit ratings.

CED is currently pursuing the potential investment of $43 million in a recently commissioned gas-fired combined cycle power plant, the RoCa3 plant, located near the city of Rotterdam in the Netherlands. The plant, owned by EZH, one of the four regulated generation utilities in the Netherlands, is currently undergoing engineering, environmental, and valuation reviews by our consultants, and has recently been inspected by internal personnel.

We are pursuing this investment opportunity in conjunction with an experienced and knowledgeable lease investor, Bank One Leasing Inc. Bank One and CED have retained Shearman & Sterling for tax and legal advice, and, among others, Duke Engineering for engineering reviews, Tauw Milieu, a well-respected Dutch environmental firm, for an environmental assessment and Deloitte & Touche for valuation assessments of the plant.

The transaction is anticipated to generate over $4 million in earnings during 1998 and is expected to generate an after tax yield of 19.7%, assuming that CED's investment is 50% equity/50% debt.

**What are major benefits from these transactions to the investor?**

(1) Highly Predictable Earnings

The earnings from these transactions are highly predictable because each of the cash inflows and outflows to the transaction is contractually agreed to on the closing date and because the utility's lease obligations are fully secured by the U.S. Treasuries and the bank letter of credit.

(2) Front Loaded Earnings

Because the transactions will be afforded leveraged lease accounting treatment under Financial Accounting Standards Board rules, the earnings profile for these transactions is "front-loaded' and hence provides more earnings in the early years of the transaction than in the latter years of the transaction.

(3) Good to Excellent Investment Yields

After tax yields on leasing projects are anticipated to range from a good 15% to an excellent 25% depending on the type of lease structure utilized and the leverage applied. For example, under the initial lease investment contemplated the return of 19.7% assumes a relatively conservative leverage rate of 50%. Measurement of after tax yields, assuming a theoretical case in which the corporation has no debt (the so called "all equity return") range from 9.0% to 12.3%.

(4) Economic Value

Because of the utility payment protection structures and the low probability of losses derived from adverse tax actions, the risk adjusted rates of return exceed the required rates of return for these investments.

(5) Strategic Value of Leasing

Participation in these transactions affords CED the opportunity to more fully understand the legal, regulatory, commercial and tax environment of the countries in which the leased assets are located. This in-depth understanding can provide the basis for better informed decisions regarding potential investment and partnering opportunities as the utility infrastructures in these highly developed countries are opened to investments from external sources.

**What are major benefits from these transactions to the utility?**

In entering into these transactions, the utility is able, at little or no perceived risk to itself, to obtain (a) up to 100% long term financing for a plant, (b) interest rates that may be lower than those available from domestic credit sources and (c ) front-end loaded funding benefits, while maintaining operating control of the plant. In the case of the investment contemplated by CED, the benefit to the utility is about 6.9% of the asset value, or $10.3 million.

**What are the major risks from these transactions to the investor?**

(1) Utility Credit Risks

Perhaps the greatest risk to the trust is the risk that the utility will default on its obligation to pay rent during the lease term. In order to minimize this risk the trust will require that the utility's lease obligations be fully secured by a combination of U.S. Treasury securities and letters of credit issued by banks with S&P ratings of AA or above. In the event the utility fails to make the lease rent payments due, the investor can use the Treasuries and the proceeds from the letter of credit to return its capital and to provide it with its expected yield.

(2) Foreign Country Tax Risks

Another major risk implicit in the transaction is the risk that the tax laws or regulations of the country in which the asset is located change in a way that would result in lower returns to the trust, and hence the investor. Investments under the proposed program would be structured so that the risks associated with foreign country tax law changes would be fully borne by the utility.

(3) Pending U.S. Tax Regulations

Pending tax regulations, if enacted, could significantly reduce the tax benefit to be derived by investors in lease-leaseback transactions such as the investment under consideration by CED, as described above.

[redacted]

If the pending regulations are published prior to the closing date, CED will defer the contemplated investment pending a restructuring of the transaction.

(4) U.S. Tax Audits

It is anticipated that the transactions will be structured in ways that will make any challenges to the structure by the IRS under current regulations difficult to support or litigate. [redacted]. Our tax counsel, is very experienced in negotiating and advising on leveraged lease transactions.

In the worst case tax scenario, a claim would be litigated and won in tax court by the IRS. In this case, financial analysis indicates a 100% return of CED's capital and a return on capital of 2.4% over the lease term.

(5) Country Risks

The proposed investment program will target investments in developed and highly rated countries. The initial proposed investment under the program will be in the AAA-rated Netherlands. Potential downstream opportunities include transactions in the Netherlands, Switzerland, Australia, Germany and the United States. The contemplated transactions will be fully denominated in U.S. dollars and will have no foreign exchange risks.

(6) Limited Liquidity

Investments in the assets contemplated under the proposed investment program are designed to generate earnings and cash flow over extended periods of time. While these investments do not carry the liquidity of publicly-traded securities, they can be sold if necessary, although most likely at a discount to then-current book value. The economics of these investment structures typically drive most investors to continue to maintain the investments on their books through their scheduled terms. The proposed investment program contemplates holding these investments accordingly.

**Is anyone else doing these transactions?**

Leasing investment programs form an integral part of the earnings and investment profiles of a wide range of companies, including electric and gas utilities and holding companies such as Public Service Enterprise Group, Duquesne Light, Edison International, Southern Company, Cilcorp, and Southern Indiana Gas; telephone companies such as ATT, Nynex/Bell Atlantic, Ameritech, and US West; banks such as, Bank of New York, First Chicago, Nationsbank, Bank One, and First Chicago; various insurance companies, as well as industrial corporations such as Philip Morris, Pitney Bowes, Chrysler Corporation, Dana Corporation and General Electric.

**What are we requesting approval to do?**

Approval is requested to initiate a leasing investment program and to make such investments as are deemed reasonable by the Board of Directors of CED, within the capital allocations made to CED from time to time by the Board of Directors of the holding company.

One of the requirements the market imposes is that investors have a substantial net worth, in the order of $100 million. To provide for the necessary net worth requirement as well as to provide for funds to make the equity investments, management also requests that it be given the authority to make additional investments in CED sufficient to satisfy the net worth requirements.

# EXHIBIT C-3

**ConEdisonDevelopment**
111 Broadway, 8th Floor New York, NY 10006
Tel: (212) 393-9242 Fax: (212) 393-9282

October 21, 1997

N.V. Electriciteitsbedrijf Zuid-Holland
Von Geusaustraat 193
Postbus 909
Voorburg 2270 AX
The Netherlands

Attention: Mr. J.A. Hoyte de Jong
Finance Director

**RE: Leveraged Lease Financing of EZH's RoCa3 Gas-Fired Power Facility**

Dear Mr. de Jong:

Consolidated Edison Development, Inc. ("CED") is pleased to submit to N.V. Electriciteitsbedrijf Zuid-Holland ("EZH") the following proposal for CED or an affiliate thereof to make an equity investment in the lease/leaseback financing of approximately $150 million undivided interest in the RoCa3 Power Station and the carbon dioxide and heat distribution networks connected thereto (the "Facility").

CED's economic proposal is based on the Pricing Assumptions in Exhibit I and provides EZH with a net present value benefit (the "NPV Benefit") of 7.88 percent of Facility Cost. Prior to closing, if any of the Pricing Assumptions change, the pricing set forth will be adjusted to allow CED to maintain its net economic return and, to the extent consistent therewith, to maximize the Net Present Value Benefit to EZH. For this purpose, net economic return shall mean net after-tax yield and total after-tax cash flow, and at least 90 percent of each amount of periodic after-tax cash flow, in each case measured utilizing the multiple investment sinking fund method of analysis. The enclosed proposal remains subject to review by the appraiser and CED's tax counsel and CED reserves the right to reoptimize the lease rents while maintaining the NPV Benefit.

CED has retained the law firm of Shearman & Sterling ("S&S"). CED proposes to retain Loeff Claeys Verbeke ("Loeff") as its local counsel in The Netherlands. CED agrees to use Deloitte & Touche LLP ("DTVG") as the appraiser, Duke Engineering & Services, Inc. ("Duke Engineering") as independent engineer, and Tauw Milieu ("Tauw") as environmental consultant for

CE 006750

the transaction. CED and EZH agree to use the documents from the EZH/BOLC transaction completed earlier this year as the basis for the documentation of the proposed transaction as adjusted for the economic structure utilized herein.

If the transaction is consummated, CED will be responsible for all reasonable Transaction Expenses (as specified) in the documentation subject to the maximum equity investment defined in the attached Exhibits. Notwithstanding the foregoing, if the transaction is not consummated for any reason, EZH will pay all fees, costs and expenses of all parties and their advisors, including reasonable fees and expenses of S&S, Loeff Claeys Verbeke ("Loeff") counsel to be appointed by CED, DTVG, Duke Engineering, Tauw, CED's insurance consultant, and the out-of-pocket expenses of CED and Cornerstone Financial Advisors Limited Partnership ("Cornerstone"), provided that CED will bear the fees and expenses of S&S and the out-of-pocket expenses of CED and Cornerstone if such failure to consummate the transaction is due solely to a failure by CED to negotiate the transaction in good faith.

CED and EZH agree that no public announcement of their negotiations or the signing of this proposal letter shall be made by either EZH or CED without the consent of the other. This letter is a proposal only and, except with respect to the preceding paragraph regarding fees, costs and expenses, shall not create a right in either party to seek damages or any other remedy for failure to complete the transaction contemplated by this letter. Furthermore, CED's proposal is contingent upon (1) participation of lenders on terms acceptable to CED, (2) the issuance of all necessary internal approvals for this transaction by appropriate authorizing committees of CED, (3) receipt of satisfactory opinions (including a tax opinion), and accounting determinations (4) third-party, expert letters and reports satisfactory to CED as to (a) the reasonableness of the interest rate on the third-party non-recourse loan, the terms of the debt defeasance and related matters, and (b) insurance and environmental matters (5) receipt of an appraisal and engineering report satisfactory to CED, and (6) negotiation and execution of documentation mutually acceptable to CED and EZH. In addition, EZH's acceptance of this proposal (but not its agreement with respect to fees, cost and expenses set forth in the previous paragraph) is contingent upon (1) participation of lenders on terms acceptable to EZH, (2) issuance of all necessary approvals and authorization for this transaction by EZH's board or other internal approval and by governmental agencies, (3) receipt of satisfactory opinions (including tax and accounting) (4) negotiation and execution of documentation mutually acceptable to CED and EZH, and (5) approval from existing lenders of EZH and from the Municipality of Rotterdam.

If the terms and conditions set forth in this letter and in the proposal and Exhibits attached hereto are acceptable, please have an authorized officer execute this letter and return an executed copy to CED by facsimile no later than October 22, 1997, at which time this proposal will, unless theretofore so accepted, expire unless extended in writing by CED.

We are anxious to proceed with the process as outlined above. We very much look forward to working with EZH and Capstar Partners, Inc. on this attractive investment opportunity. If you have any questions on the above, please do not hesitate to contact Mark DeTrempe or Robert Holzman of Cornerstone or me at (212) 393-9242 ext. 240.

Sincerely,

CONSOLIDATED EDISON
DEVELOPMENT, INC.
By:

Name: Brian DePlautt
Title: Vice President

ACCEPTED AND AGREED TO:

N.V. ELECTRICITEITSBEDRIJF ZUID-HOLLAND
By:

Name: J.A. Hoyte de Jong
Title: Finance Director

Attachments

cc: Mark J. DeTrempe
Robert D. Holzman

CE 006752

EXHIBIT I

CONSOLIDATED EDISON DEVELOPMENT, INC.

PRICING ASSUMPTIONS FOR

EZH - ROCA 3

| | |
|---|---|
| o Estimated Facility Cost: | $250 - $300 million |
| o Value of Undivided Interest: | $150 million |
| o Leasehold Cost = PV of Head Lease Rent (as a percentage of Value of Undivided Interest): | 98.86 percent |
| o Maximum Equity Investment Including Transaction Expenses: | $42,000,000 |
| o Closing/Base Sublease Initial Term Commencement Date: | November 1, 1997 |
| o Fixed Price Purchase Option (FPO) Date: | January 2, 2018 |
| o Sublease Termination Date: | January 2, 2035 |
| o Head Lease Termination Date: | November 1, 2041 |
| o Rent and Debt Payment Periodicity: | Annual, beginning January 2, 1998 |
| o Transaction Expenses (as a percentage of Value of Undivided Interest): | 2.00 percent |
| o **Benefit (Percentage of Value of Undivided Interest):** | **7.88 percent** |
| o Head Lease Term: | 44.00 years |
| o Sublease Term: Base Term: | 20.17 years |
| Renewal Term: | 17.00 years |
| o Non-recourse Debt Rate: | 7.50 percent per annum |
| o Equity Discount Rate: | 6.75 percent per annum |

CE 006753

**EXHIBIT I**

**CONSOLIDATED EDISON DEVELOPMENT, INC.**

**PRICING ASSUMPTIONS FOR**

**EZH - ROCA 3**

| | |
|---|---|
| o Sublease Loan Rate: | No sublease loan or "third party" loan is contemplated by this proposal. |
| o Head Lease Discount Rate: | 8.25 percent per annum |
| o Lease Collateral Deposit Rate: | 7.25 percent per annum |
| o Trustee Treasury Collateral Rate: | 6.75 percent per annum |
| o Appraisal Assumptions: | |
| Equipment Remaining Useful Life: | 55 years |
| Asset Fair Market Values: | Per attached schedule |
| WACC Used to Create Leasehold Fair Market Values: | 10.00 percent (per annum) |
| Maximum Sublease Renewal Rentals (90 percent of FMV): | 12.15 percent per annum, in arrears |
| Present Value of the FMV of the Final 6.83 years of the Head Lease as of the FPO Date: | 10.94 percent of Value of Undivided Interest |

CE 006754

** TOTAL PAGE.06 **

CED 10/21/97
ASSET FAIR MARKET VALUES
PRELIMINARY

## APPRAISAL VALUE CURVE

### Gas-Fired Power Plant Lease Analysis
### Preliminary FMV Lease Analysis

| Lease Age | Equipment Age | Uninflated FMV | Inflated FMV as a Percent of Original FMV |
|---|---|---|---|
| 0 | 0 | 1.000 | 1.000 |
| 1 | 1 | 0.983 | 1.012 |
| 2 | 2 | 0.966 | 1.024 |
| 3 | 3 | 0.948 | 1.036 |
| 4 | 4 | 0.931 | 1.048 |
| 5 | 5 | 0.913 | 1.059 |
| 6 | 6 | 0.896 | 1.070 |
| 7 | 7 | 0.878 | 1.080 |
| 8 | 8 | 0.861 | 1.090 |
| 9 | 9 | 0.843 | 1.100 |
| 10 | 10 | 0.825 | 1.109 |
| 11 | 11 | 0.807 | 1.117 |
| 12 | 12 | 0.789 | 1.125 |
| 13 | 13 | 0.771 | 1.132 |
| 14 | 14 | 0.752 | 1.139 |
| 15 | 15 | 0.734 | 1.143 |
| 16 | 16 | 0.716 | 1.146 |
| 17 | 17 | 0.697 | 1.152 |
| 18 | 18 | 0.678 | 1.155 |
| 19 | 19 | 0.660 | 1.156 |
| 20 | 20 | 0.641 | 1.157 |
| 21 | 21 | 0.622 | 1.156 |
| 22 | 22 | 0.602 | 1.154 |
| 23 | 23 | 0.583 | 1.152 |
| 24 | 24 | 0.564 | 1.147 |
| 25 | 25 | 0.545 | 1.141 |
| 26 | 26 | 0.525 | 1.133 |
| 27 | 27 | 0.506 | 1.124 |
| 28 | 28 | 0.487 | 1.114 |
| 29 | 29 | 0.468 | 1.102 |
| 30 | 30 | 0.449 | 1.088 |
| 31 | 31 | 0.429 | 1.072 |
| 32 | 32 | 0.410 | 1.055 |
| 33 | 33 | 0.391 | 1.037 |
| 34 | 34 | 0.373 | 1.018 |
| 35 | 35 | 0.354 | 0.997 |
| 36 | 36 | 0.336 | 0.974 |
| 37 | 37 | 0.318 | 0.950 |
| 38 | 38 | 0.301 | 0.925 |
| 39 | 39 | 0.284 | 0.899 |
| 40 | 40 | 0.267 | 0.872 |
| 41 | 41 | 0.251 | 0.843 |
| 42 | 42 | 0.235 | 0.814 |
| 43 | 43 | 0.220 | 0.785 |
| 44 | 44 | 0.206 | 0.754 |
| 45 | 45 | 0.192 | 0.724 |
| 46 | 46 | 0.178 | 0.693 |

Useful Life is approximately 55 years and is based on a new facility.

These values are subject to change based upon equipment inspection and receipt of additional information from the equipment manufacturer and operator.

This information is provided for informational purposes only, any reliance on or decisions made based on this information are the responsibility of the party making the decision.

CE 006755

# EXHIBIT C-4

**EXECUTION COPY**

---

# TAX INDEMNITY AGREEMENT

ROCA Facility Trust No. 2

dated as of December 15, 1997

between

ELECTRICITEITSBEDRIJF ZUID-HOLLAND

and

CONSOLIDATED EDISON LEASING, INC.

---

TABLE OF CONTENTS


| | Page |
|---|---|
| SECTION 1. Definitions | 1 |
| SECTION 2. Tax Assumptions | 5 |
| SECTION 3. Sublessee's Income Tax Representations, Warranties and Covenants | 8 |
| SECTION 4. Intention of Parties; Records | 10 |
| SECTION 5. Indemnity for Loss of Tax Benefits | 10 |
| SECTION 6. Survival | 25 |
| SECTION 7. Method of Payment | 25 |
| SECTION 8. Late Payments | 25 |
| SECTION 9. GOVERNING LAW | 25 |
| SECTION 10. Notices | 26 |
| SECTION 11. Assignment by Investor or the Sublessee | 26 |
| SECTION 12. No Set-Off | 26 |
| SECTION 13. Counterparts | 26 |
| SECTION 14. Headings | 26 |
| SECTION 15. Amendments, Supplements, etc | 26 |
| SECTION 16. Protection of Assumed Tax Benefits | 27 |
| SECTION 17. Future Changes | 27 |

APPENDIX A. Copy of Exhibit I to the Appraisal.

APPENDIX B. Copy of Exhibit 12A to the Engineer's Report.

# TAX INDEMNITY AGREEMENT

This TAX INDEMNITY AGREEMENT (ROCA Facility Trust No. 2), dated as of December 15, 1997, between N.V. ELECTRICITEITSBEDRIJF ZUID-HOLLAND, as Sublessee, and Consolidated Edison Leasing, Inc., as Investor (this "Agreement").

WITNESSETH:

WHEREAS the Sublessee, the Investor, and the other parties described therein, have undertaken certain obligations and transactions described in the Participation Agreement dated as of December 15, 1997, pursuant to which the Sublessor and the Sublessee have entered into the Sublease dated as of December 15, 1997 (said Sublease and all amendments thereto entered into from time to time and executed by the parties thereto collectively referred to herein as the "Sublease").

WHEREAS in consideration of the parties hereto entering into the Participation Agreement and the transactions contemplated thereby, the parties hereto desire to enter into this Agreement providing for certain indemnities by the Sublessee to the Investor and certain reimbursements by the Investor to the Sublessee.

NOW, THEREFORE, the parties hereto do hereby agree as follows:

SECTION 1. Definitions.

(a) General. All capitalized terms herein shall have the meanings set forth in Appendix A to the Participation Agreement except to the extent provided for or supplemented by the provisions of this Agreement for the purposes of a particular section, paragraph or clause, including, without limitation, the definitions set forth in Section 1(b) hereof.

(b) Special Definitions.

"Final Determination" shall mean (i) a decision, judgment, decree or other order by any court of competent jurisdiction, which decision, judgment, decree or other order has become final (i.e., when all appeals allowable hereby and by law have been exhausted by either party to the action or the time for filing such appeals has expired) or, in any case where judicial review shall at the time be unavailable by reason of the proposed adjustment involving a decrease in a net operating loss or business credit carryforward, a decision, judgment, decree or other order of an administrative official or agency of competent jurisdiction, which decision, judgment, decree or other order has become final (i.e., when all administrative appeals in accordance with Section 5(g) hereof have been exhausted by either party), (ii) a closing agreement entered into pursuant to Section 7121 of the Code or any other settlement agreement entered into in connection with an administrative or judicial proceeding, (iii) the

expiration of the time for instituting a claim for refund, or if such a claim was filed, the expiration of the time for instituting suit with respect thereto or (iv) the expiration of the time for instituting suit with respect to a claimed deficiency.

"Investor" means the Investor and the affiliated group of corporations within the meaning of Section 1504 of the Code, filing (or which will file or has filed) a consolidated United States Federal income tax return with the Investor.

"Investor's Tax Rate" shall mean the combined effective United States Federal and state income tax rate used in the calculation of the Investor's Net Economic Return.

"Permitted Act" shall mean

(i) the negotiation, execution and delivery by any Sublessee Person of any of the Operative Documents or the Specified Documents and the consummation of the transactions required thereby on or before the Closing Date;

(ii) any act expressly required or expressly permitted by the Operative Documents (other than (I) any substitution or replacement of the Facility (or any Part thereof or interest therein), (II) any sub-sublease of the Undivided Interest or the Facility (or any Part thereof or interest therein), or assignment of the Sublease, (III) any merger, consolidation or other disposition of any Sublessee Person, other than a Merger Event which is also a Permitted Merger, (IV) the removal of the Trustee at the request of the Sublessee, (V) any voluntary or involuntary case or proceeding seeking relief of debts of any Sublessee Person, (VI) any decommissioning or mothballing of the Facility or any Part thereof, or (VII) any act or failure to act in connection with the German Documents, other than any act or failure to act in accordance with the Assignment of German Purchase Option Rights or upon the prior written request of the Investor; provided that an act shall not be considered to be expressly permitted merely because such act is not prohibited

(iii) the taking of any proper tax, financial accounting or financial reporting positions, not including any written position taken for U.S. Federal income tax purposes that is inconsistent with the Tax Assumptions;

(iv) the use, maintenance and operation of the Facility in the customary business of the Sublessee or any other Sublessee Person, unless such use, maintenance or operation is in violation of the provisions of any Operative Document;

(v) any amendment or other change to any Transaction Document (x) to which the Investor is a party (or consents in writing or which the Investor requires) or (y) to which the Sublessor is a party and to which the Sublessor has expressly consented in writing or

which the Sublessor has required (in either case, acting at the express written direction of the Investor), provided, however, that, in each case, such consent specifically references to this Agreement; and

(vi) any modification, alteration, addition or improvement.

provided that (A) for purposes of this Agreement, the terms Operative Documents, German Documents, Specified Documents and Transaction Documents include such agreements only as in effect and as delivered on or before the Closing Date and (B) the preceding subclause (A) does not apply either with respect to such agreements which have been amended or changed in a manner described in the preceding clause (v) or with respect to Section 5(a)(i)(I), 5(a)(ii)(L), 5(c)(vi), 5(c)(xvii), 5(c)(xx) or 6 hereof.

"Specified Documents" shall mean the following German Documents: (i) Purchase Agreement Gasturbogenerator, (ii) Transfer Deed Gasturbogenerator, (iii) Purchase Agreement Steamturbogenerator, (iv) Transfer Deed Steamturbogenerator, (v) Equipment Lease Agreement Gasturbogenerator, (vi) Acceptance Certificate Gasturbogenerator, (vii) Equipment Lease Agreement Steamturbogenerator, (viii) Acceptance Certificate Steamturbogenerator, (ix) Accounts Receivable Purchase Agreement Gasturbogenerator, (x) Accounts Receivable Purchase Agreement Supplement Gasturbogenerator, (xi) Accounts Receivable Purchase Agreement Steamturbogenerator, (xii) Accounts Receivable Purchase Agreement Supplement Steamturbogenerator, (xiii) Assumption Agreement Gasturbogenerator, (xiv) Supplement to Assumption Agreement Gasturbogenerator, (xv) Assumption Agreement Steamturbogenerator, (xvi) Supplement to Assumption Agreement Steamturbogenerator, (xvii) ABB Comfort Letter regarding Gasturbogenerator, (xviii) ABB Comfort Letter regarding Steamturbogenerator, (xix) Certificate Process Agent Gasturbogenerator, (xx) Certificate Process Agent Steamturbogenerator, (xxi) VAT Agreement Gasturbogenerator, and (xxii) VAT Agreement Steamturbogenerator; the documents set forth in clauses (i), (iii), (v), (vii), (ix), (xi), (xiii), (xv), (xxi) and (xxii), each dated December 13, 1995, the documents set forth in clauses (ii), (iv), (vi), (viii), (x), (xii), (xiv) and (xvi), each dated April 24, 1996, the documents set forth in clauses (xvii) and (xviii), each dated March 29, 1996, and the documents set forth in clauses (xix) and (xx), each dated February 16, 1996.

"Sublessor Group" shall mean the Investor and the Sublessor (but only to the extent that the Sublessor is acting at the express written direction of the Investor).

"Tax Representations" shall mean the representations, warranties and covenants set forth in Section 3 hereof and the Sublessee's representations, warranties, covenants or agreements set forth in Section 7 (other than subsection (s), (v), (z), (aa), (bb), (dd) or (kk)),

Section 11(d) (other than clause (ii), (vi) or (vii)) or Section 11(e)(xiii) of the Participation Agreement.

"Treasury Rate" means the applicable Federal rate (annual) (determined under Section 1274(d) of the Code or any successor provision thereto), taking into account the period of time of the discounting period, plus fifty (50) basis points.

SECTION 2. Tax Assumptions. Lease Basic Rent, Sublease Basic Rent, Sublease Renewal Rent, Sublease Termination Value, Sublease Special Termination Value, Sublease Special Special Termination Value, Settlement Amount, Sale Remedy Purchase Price, the amounts set forth in the Sublessee Loan Agreement, Sublease Purchase Option Price and the Investor's Net Economic Return have been based, in part, upon the following income tax assumptions (collectively, the "Tax Assumptions") that are assumed for U.S. Federal income tax purposes and for U.S. state and local ("State") income tax purposes:

(a) The Trust will be treated as a grantor trust or will otherwise be disregarded for Federal income tax purposes and the Investor, as owner of the entire trust, will be entitled and required to take into account, in computing its taxable income, all items of income, gain, loss, deduction and credit with respect to the interest of the Trust in or under the Undivided Interest;

(b) The Lease and the Sublease will each be treated as a "true lease" for Federal and State income tax purposes; the Lessor will be treated as the lessor of the Undivided Interest and the Trust will be treated as the lessee of the Undivided Interest under the Lease and the Trust will be treated as the sublessor of the Undivided Interest under the Sublease and the Sublessee will be treated as the sublessee of the Undivided Interest under the Sublease;

(c) The Investor will be allowed rental deductions under Sections 162 of the Code for Lease Basic Rent in each taxable year of the Lease Term in an amount equal to the actual amount of Lease Basic Rent allocated with respect to the taxable year in accordance with the Lease Basic Rent schedule in Exhibit A to the Lease to the portion of the Lease period within such taxable year (the "Rent Deductions");

(d) The Investor will amortize its Transaction Expenses in the following manner (such deductions collectively being the "Amortization Deductions"):

(i) one-third of Transaction Expenses on a straight-line basis over a period equal to the sum of the Sublease Basic Term and the Sublease Renewal Term,

(ii) one-third of Transaction Expenses on a straight-line basis over a period equal to the Lease Term,

(iii) one-third of Transaction Expenses on a straight-line basis over a period equal to the term of the Loan Agreement;

(e) The obligations evidenced by the Loan Certificates will constitute indebtedness of the Trust, and the Investor will be entitled to current deductions under Section 163 of the Code for interest, premium (if any) and all other amounts (except principal) paid or accrued on the Loan Certificates (the "Interest Deductions");

(f) As a result of entering into the transactions contemplated by the Operative Documents, the Investor will not be required to include any amount in gross income, other than

(i) payments of Sublease Basic Rent or Sublease Renewal Rent in the amounts and at the times as such payments are accrued or paid under the terms of the Sublease,

(ii) the amount constituting gain for taxable income purposes upon payment of Sublease Termination Value, Sublease Special Termination Value, Sublease Special Special Termination Value, Settlement Amount or Sale Remedy Purchase Price in the amount and at the time such payment is determined to be made,

(iii) amounts constituting gain for taxable income purposes upon payment pursuant to the exercise of the Sublease Purchase Option at the time such payments are required to be made,

(iv) payments made on an After-Tax basis,

(v) any other amount to the extent such item of income results in an equal and offsetting deduction (other than Rent Deductions, Amortization Deductions or Interest Deductions) of the same character (or a different character if nonetheless offsetting) in the same taxable year as the inclusion,

(vi) amounts payable to the Trustee or the Investor and specifically identified as interest under the Operative Documents or amounts that are not provided for in the Operative Documents and that are characterized as interest pursuant to judicial proceedings, and

(vii) interest on the Sublessee Loan and any collateral as security for the obligations to pay Lease Rent, including the Trustee Treasury Collateral, the Lease Collateral Deposit and Acceptable Substitute Collateral (the failure of any assumption of this Section 2(f) to be true, being referred to herein as an "Inclusion");

(g) The Investor will be required to take into account items of income, gain, loss and deductions in accordance with the accrual method of accounting and the taxable year of the Investor will be the calendar year;

(h) The Investor's Tax Rate will be 35% in the taxable year ending in 1997 and thereafter;

(i) The Investor will always have sufficient taxable income to utilize the Interest Deductions, Amortization Deductions and the Rent Deductions;

(j) The Investor will be entitled to deductions for Lease Basic Rent, Transaction Expenses and interest accrued on the Loan for State income tax purposes (the "State Tax Deductions") at the same time and in the same amount as the corresponding Rent Deductions, Interest Deductions and Amortization Deductions for Federal income tax purposes; and the Investor will be required to include amounts in income for State income tax purposes only if, to the same extent and at the same time as such amounts are required to be included in income for Federal income tax purposes;

(k) One hundred percent of Sublease Basic Rent and Sublease Renewal Rent and all other amounts received during the Sublease Basic Term and the Sublease Renewal Term or with respect to the transactions contemplated by the Operative Documents will be treated as foreign source income, and all amounts received under the Sublease at the expiration of the term thereof will be treated as foreign source income; and

(l) The Investor will not be subject to application of Section 467(b)(2) of the Code with respect to Lease Basic Rent, Sublease Basic Rent or Sublease Renewal Rent.

Except as otherwise provided in Section 3 hereof, the Sublessee makes no representation or warranty as to the validity of the Tax Assumptions and nothing herein shall be deemed to be such a representation or warranty. Except as expressly provided in this Agreement, the Sublessee will not indemnify the Investor for any of the above assumptions.

SECTION 3. Sublessee's Income Tax Representations, Warranties and Covenants. The Sublessee hereby represents, warrants and covenants to the Investor that:

(a) On the Closing Date, the Facility will not require any improvement, modification or addition (other than ancillary items of removable equipment of the kind that is customarily selected and furnished by purchasers and lessees of similar facilities) in order for the Facility to be rendered complete for its intended use by the Lessor, the Lessee, the Sublessor or the Sublessee.

(b) No Sublessee Person has or will directly or indirectly acquire or hold any interest in the Loan or make any loan to or deposit with or enter into any arrangement, contract, relationship or understanding with the Lender (or any party related to the Lender or any Person that funds the Lender or the Deposit Bank) that in any such case is related to the transactions contemplated by the Operative Documents, which loan, deposit, arrangement, contract, relationship or understanding directly or indirectly (A) changes the rights or interests of the Lender under the Loan Agreement or the Deposit Bank in the Rotte Deposit or (B) transfers the Lender's risk of loss with respect to the Loan, in each case other than (i) as described in Section (2)(a)(iv) or (xiv) of the Participation Agreement, (ii) as required by the Operative Documents or (iii) if it is a Permitted Act.

(c) During the Lease Term, (i) neither the German Lessor (acting in accordance with the terms and conditions of the German Documents or acting or failing to act with the consent or acquiescence of EZH or any Affiliate thereof (or any successor or assign thereof or any stichting for which the ultimate risk of loss with respect to funds of the stichting rests with any of the foregoing)) nor any Sublessee Person will take any written position for U.S. Federal income tax purposes that is inconsistent with the Tax Assumptions (unless taking such position is (based on a written opinion, to be delivered as soon as practicable prior to the date on which such position will be taken, of White & Case or other independent tax counsel selected by the Sublessee and reasonably acceptable to the Investor) required to avoid the impositions of penalties or additions to tax) and (ii) no Sublessee Person will claim Lease Basic Rent payable under the Lease as an item of gross income on a United States Federal, state or local income tax return in a manner that is inconsistent with the tax treatment of such Lease Basic Rent assumed by the Investor as described in Section 2(c) hereof.

(d) (i) all written information supplied to the Appraiser or confirmed in writing by the EZH, and set forth in Exhibit A hereto as information relied upon by the Appraiser, and (ii) all written information supplied to the Engineering Consultant or confirmed in writing by EZH, and set forth in Exhibit B hereto as information relied upon by the Engineering Consultant, was accurate and sufficiently complete so as not to be misleading and no material information was withheld relating to such information provided as of the date given and as of the Closing Date (it being agreed that to the extent the information provided should reasonably be understood to constitute a projection, judgment or expectation and not a fact, EZH shall not be deemed to be in breach of this representation by reason of such

projection, judgment or expectation proving to be incomplete, misleading or untrue, provided that such projection, judgment or expectation was made and furnished in good faith).

(e) As of the Closing Date, (i) no Sublessee Person will have taken any official corporate action requiring the exercise or non-exercise of the Sublease Purchase Option, (ii) none of the organizational or governing documents of, or the regulations of, any Sublessee Person require the exercise or non-exercise of the Sublease Purchase Option, and (iii) none of the accounting or tax positions under Applicable Dutch Law of any Sublessee Person have the effect of legally requiring or economically compelling the exercise or non-exercise of the Sublease Purchase Option.

(f) There are no current (and there is no present intention or understanding to enter into any), and throughout the first five years of the Sublease, will not be any, written or oral agreements, side letters or like arrangements (other than as set forth in the Operative Documents and in the Specified Documents) between (x) any Sublessee Person and (y) any person whether or not described in clause (x), that in any such case is related or relevant to the transactions contemplated by the Operative Documents (I) legally requiring or economically compelling the exercise or non-exercise of the Sublease Purchase Option or (II) altering any of the agreements or terms or conditions set forth in the Operative Documents (excluding, for purposes of this clause (II), any of the foregoing agreements, side letters or like arrangements that are relevant to the Loan, the Rotte Deposit, the Lender or the Deposit Bank).

(g) The Facility will have been used in commercial service on or before the Closing Date.

(h) The Facility will at all times be located outside the United States.

(i) As of the Closing Date, no agreement entered into by any Sublessee Person exists, outside the Operative Documents and the Specified Documents, which alters or which would alter any of the terms or conditions of the Operative Documents.

(j) During each calendar year in the Sublease Basic Term none of the gross income from the Sublease will be U.S. source income.

(k) [Intentionally omitted].

(l) The German Documents constitute the only documents that relate to the German Lease and the documents provided by EZH to the Investor and purported by EZH to be the German Documents constitute the German Documents as in effect on the date given and on the Closing Date, and each of the German Documents constitutes legal, valid and binding obligations of the parties thereto (and any successors and assigns), enforceable against the

parties thereto (and any successors and assigns) in accordance with its respective terms except as such enforcement may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the rights of creditors generally and by general principles of equity.

SECTION 4. Intention of Parties; Records. The Investor, the Sublessee and each other Sublessee Person intend for all purposes that the Lease and the Sublease will each be treated as a "true lease" for United States Federal and State income tax purposes, that the Lessor will be treated as the lessor of the Undivided Interest , that the Trust will be treated as the lessee and sublessor of the Undivided Interest , and that the Sublessee will be treated as the sublessee of the Undivided Interest. The Sublessee covenants that it will file and will cause each Sublessee Person to file such returns, take such actions and execute such documents as requested by the Investor that may be reasonable and necessary to facilitate accomplishment of the intent hereof. Within a reasonable time (and in any event within 45 days) after written request therefor, the Sublessee shall provide (or cause an Sublessee Person to provide) such information and copies of records that are within the control of or otherwise reasonably available to the Sublessee (or such Sublessee Person) as the Investor may reasonably require to enable the Investor to fulfill or pursue its Federal and State income tax return filing, audit and litigation obligations or rights.

SECTION 5. Indemnity for Loss of Tax Benefits.

(a) Generally. If

(i) the Investor shall lose the right to claim, shall not claim (based on a written opinion, to be delivered as soon as practicable prior to the date on which the tax return is to be filed on which such claim will not be made, of Shearman & Sterling or other independent tax counsel selected by the Investor and reasonably acceptable to the Sublessee that there is not a reasonable basis, within the meaning of Section 6662(d)(2)(B)(ii)(II) of the Code (or such other level of confidence required by the Code at the time to avoid the imposition of penalties), to make such claim), or shall suffer a disallowance, delay, recapture or deferral in whole or part of the Rent Deductions, the Amortization Deductions, or the Interest Deductions as a result of:

(A) (x) any act of a Sublessee Person (other than a Permitted Act) or the failure of any Sublessee Person to perform an act that is required by Applicable Law or by the Operative Documents, or (y) any act or failure to act by the German Lessor in accordance with the terms of the German Documents or any other act or failure to act by the German Lessor taken with the consent or acquiescence of EZH or any Affiliate thereof or any successor or assign thereof

or any stichting for which the ultimate risk of loss with respect to the funds of the stichting rests with any of the foregoing;

(B) any breach or inaccuracy of any of the Tax Representations;

(C) the bankruptcy or insolvency of any Sublessee Person;

(D) any disposition, loss, damage, destruction, casualty, substitution, theft, taking, confiscation, requisition, seizure or condemnation of or the occurrence, of other casualty to, all or any part of the Undivided Interest or the Facility or any Part thereof or interest therein (other than pursuant to repairs or maintenance or pursuant to modifications, alterations, additions or improvements described in clause (vi) of the definition of Permitted Act);

(E) any exercise of remedies while a Sublessee Event of Default shall have occurred and be continuing (unless Sublease Termination Value, Sublease Special Termination Value, Sublease Special Special Termination Value, Settlement Amount or Sale Remedy Purchase Price or an amount measured with respect thereto, has been received in full);

(F) [intentionally omitted];

(G) the exercise of any right in Section 11(d)(iii) of the Participation Agreement or any subleasing or any assignment by the Sublessee of the Undivided Interest or the Facility (or any Part thereof or interest therein);

(H) any current legally binding agreements entered into prior to the Closing Date by any Sublessee Person other than Transaction Documents);

(I) any breach or default by any Sublessee Person under any of the German Documents;

(J) [intentionally omitted];

(K) any acquisition, purchase or receipt of the German Equipment as the result of the exercise by the Trustee, the Investor or the Lender of any option, right or remedy granted to the Trustee, the Investor or the Lender under any of the Transaction Documents or under any mortgage, pledge or assignment related thereto, or any disposition, transfer or sale of the

German Equipment so acquired, purchased or received; provided, however that the Investor shall not be indemnified hereunder to the extent that the net amount actually realized upon distribution, transfer, sale, lease or sublease of such German Equipment, or any other income producing transaction in respect of such German Equipment, in each case other than pursuant to the Operative Documents, exceeds the excess of the After-Tax proceeds from such transaction over the amount of the indemnity in respect of this paragraph (K); or

(L) any substitution of the German Equipment pursuant to Section 7(h) of the Sublease; or

(ii) the Investor shall be required to include or shall include (based on a written opinion, to be delivered as soon as practicable prior to the date on which the return is to be filed on which such inclusion will be made, of Shearman & Sterling or other independent tax counsel selected by the Investor and reasonably acceptable to the Sublessee that there is not a reasonable basis, within the meaning of Section 6662(d)(2)(B)(ii)(II) of the Code (or such other level of confidence required by the Code at the time to avoid the imposition of penalties), for excluding such amounts) in its gross income for Federal income tax purposes any amount other than any amount described as a required inclusion in Section 2(f) hereof as a result of:

(A) any breach or inaccuracy of any of the Tax Representations;

(B) any prepayment, late payment or failure to make a payment of Sublease Basic Rent or Sublease Renewal Rent, other than a prepayment effected by or required pursuant to the Operative Documents;

(C) any modification, alteration, addition or improvement not treated as a permitted severable or a permitted non-severable improvement under Rev. Proc. 75-21 and Rev. Proc. 79-48;

(D) any warranty, condemnation, insurance or similar proceeds relating to the Undivided Interest or the Facility that are not received and retained by the Sublessor or the Investor;

(E) an event or circumstance described in Section 5(a)(i)(A);

(F) the bankruptcy or insolvency of any Sublessee Person;

(G) any current legally binding agreements entered into prior to the Closing Date by any Sublessee Person (other than the Transaction Documents);

(H) any payments made by the Sublessee as a result of exercising its rights with respect to Acceptable Substitute Credit Protection under Section 11(k) of the Participation Agreement;

(I) the exercise of any right in Section 11(d)(iii) of the Participation Agreement or any subleasing or any assignment by the Sublessee of the Undivided Interest or the Facility (or any Part thereof or interest therein);

(J) any replacement or substitution of the Facility or any part thereof or any modification, alteration, addition or improvement (other than pursuant to repairs or maintenance or pursuant to modifications, alterations, additions or improvements that are treated as permitted severable or permitted non-severable improvements under Rev. Proc. 75-21 and Rev. Proc. 79-48, provided that the foregoing exclusion from this clause (J) of permitted severable and permitted non-severable improvements shall not apply to any such event that results in the type of income inclusion and under the circumstances described in Section 5(c)(v)(4));

(K) any disposition of any interest in the Undivided Interest or the Facility resulting from the exercise of remedies while a Sublessee Event of Default shall have occurred and be continuing;

(L) any breach or default by any Sublessee Person under any of the German Documents;

(M) [intentionally omitted];

(N) any acquisition, purchase or receipt of the German Equipment as the result of the exercise by the Trustee, the Investor or the Lender of any option, right or remedy granted to the Trustee, the Investor or the Lender under any of the Transaction Documents or under any mortgage, pledge or assignment related thereto, or any disposition, transfer or sale of the German Equipment so acquired, purchased or received; provided, however that the Investor shall not be indemnified hereunder to the extent that the net amount actually realized upon distribution, transfer, sale, lease or sublease of such German Equipment, or any other income producing transaction in respect of such German Equipment, in each case other than pursuant to the Operative

Documents, exceeds the excess of the After-Tax proceeds from such transaction over the amount of the indemnity in respect of this paragraph (N); or

(O) any substitution of the German Equipment pursuant to Section 7(h) of the Sublease;

any of the events described in clauses (i) or (ii) of this Section 5(a) being hereinafter referred to as a "Loss."

(iii) Indemnity. If a Loss shall occur, then the Investor shall promptly notify the Sublessee of such Loss, and the Sublessee will pay to the Investor as an indemnity an amount, at the election of the Sublessee, determined in accordance with Section 5(a)(iii)(A), (B) or (C) hereof. If the Sublessee shall not have the Sublessee Minimum Rating and if the Investor so requests, the Sublessee shall provide or cause to be provided the Investor with collateral reasonably satisfactory to the Investor for the amount of its obligations under Section 5(iii)(A) and (C) in the event the net present value of such payments exceeds $1,000,000 using a discount rate equal to the Treasury Rate. The Sublessee shall only be obligated to indemnify in respect of a Loss attributable to any State tax consequences, in the event that there is a corresponding Loss for Federal tax purposes in such year.

(A) Pay-As-You-Go. The Sublessee may elect to pay to the Investor such amount or from time to time such amounts as, on an After-Tax basis, will be equal to (1) the Federal and State income taxes payable by the Investor from time to time for any taxable year as a result of such Loss computed in accordance with the Tax Assumptions (except that, in the case of a Loss described in Section 5(a)(ii), and for purposes of computing any "gross up" or "reverse gross up" amount, Federal income taxes shall be computed on the basis of the highest marginal rates in effect, for corporate income tax purposes for the period or periods affected), and (2) the aggregate amount of any interest, penalties or additions to tax (except additions or penalties imposed by Code Sections 6651(a)(1) (relating to late filing of a return), 6651(a)(2) or (3) (relating to late payment of tax), and 6663 (relating to penalties for fraud) or successor provisions thereto) payable by the Investor in respect of such additional income taxes.

(B) Lump Sum Payment. The Sublessee may elect to pay a lump sum amount which shall be sufficient to preserve the Investor's Net Economic Return on an After-Tax basis as if such Loss had not occurred. The computation of such lump sum amount shall be made by the Investor utilizing the methodology and assumptions, including the Tax Assumptions (except that,

in the case of a Loss described in Section 5(a)(ii), and for purposes of computing any "gross up" or "reverse gross up" amount, Federal, state and local income taxes shall be computed on the basis of the highest marginal rate in effect for corporate income tax purposes at the time such Loss arises or, to the extent known at the time of payment of such lump sum amount, the highest marginal rates in effect for corporate income tax purposes for the period or periods affected), except as such assumptions shall be varied to take into account such Loss and any prior Loss in a manner consistent with the Operative Documents. The computation of such lump sum amount under this paragraph (B) also shall take into account any past, current and anticipated interest, penalties and additions to tax (except additions or penalties imposed by Code Sections 6651(a)(1) (relating to late filing of a return), 6651(a)(2) or (3) (relating to late payment of tax), and 6663 (relating to penalties for fraud) or successor provisions thereto, or any corresponding state or local penalties or additions to tax) payable by the Investor as a result of such Loss and any anticipated tax savings as a result of such Loss and the circumstances and consequences thereof.

(C) Supplemental Payments. The Sublessee may elect to make a series of supplemental payments over the then remaining Sublease Basic Term, with corresponding adjustments to Sublease Termination Value, Sublease Special Termination Value, Sublease Special Special Termination Value, Settlement Amount and Sale Remedy Purchase Price, and the price payable in connection with the exercise of any fixed price purchase option under the Sublease to reflect the occurrence of such Loss so that the supplemental payments and Sublease Termination Value, Sublease Special Termination Value, Sublease Special Special Termination Value, Settlement Amount, Sale Remedy Purchase Price and purchase option price shall be sufficient to preserve the Investor's Net Economic Return on an After-Tax basis as if such Loss had not occurred. The computation thereof shall be made by the Investor utilizing the methodology and assumptions, including the Tax Assumptions (except that, in the case of a Loss described in Section 5(a)(ii), and for purposes of computing any "gross up" or "reverse gross up" amount, Federal, state and local income taxes shall be computed on the basis of the highest marginal rates in effect for corporate income tax purposes for the period or periods affected), utilized by the Investor in determining Sublease Basic Rent, Sublease Termination Value, Sublease Special Termination Value, Sublease Special Special Termination Value, Settlement Amount and Sale Remedy Purchase Price, as such assumptions shall be varied to take into account such Loss and any prior Loss in a manner consistent with the Operative Documents. The computation also shall take into account, any past, current and anticipated

interest, penalties and additions to tax (except additions or penalties imposed by Code Sections 6651(a)(1) (relating to late filing of a return), 6651(a)(2) or (3) (relating to late payment of tax), and 6663 (relating to penalties for fraud) or successor provisions thereto, or any corresponding state or local penalties or additions to tax) payable by the Investor as a result of such Loss and any anticipated tax savings as a result of such Loss and the circumstances and consequences thereof.

(b) Time of Payment. Following a Loss, or if contested in accordance with Section 5(g), following a Final Determination (to the extent such Final Determination gives rise to an indemnity obligation hereunder by the Sublessee) with respect to such Loss, the Investor shall give the Sublessee a written notice requesting payment of the indemnity, calculation of the alternative indemnity payment amounts under Section 5(a)(iii)(A), (B) and (C), and a statement describing in reasonable detail the manner in which the computation of such alternative indemnity payments amounts were made. Upon the later of 30 days after receipt of such notice, or 10 days after conclusion of any verification process pursuant to Section 5(f) hereof, the Sublessee shall elect in writing among the alternative indemnity amounts to be paid under Section 5(a)(iii)(A), (B) or (C) hereof, and, in the absence of such election, Section 5(a)(iii)(B) shall be deemed elected on the final day of such election period. Any indemnity under Section 5(a)(iii)(B) shall be paid within 30 days after such election. Any indemnity payable under Section 5(a)(iii)(A) shall be paid on the next succeeding date after such election on which a payment of the additional tax giving rise to such indemnity (including all extensions actually requested and granted) is due, and, in the case of an indemnity payable under Section 5(a)(iii)(A), from time to time thereafter and on the date at least 2 Business Days prior to the date or dates any additional payment of tax giving rise to such indemnity (including all extensions actually requested and granted) is due. The indemnity payable under Section 5(a)(iii)(C) shall begin to be paid on the next succeeding date after such election on which a payment of Sublease Basic Rent is due and (prospectively) on each succession due for Sublease Basic Rent under the Sublease Basic Term; provided, however, no payments under Sections 5(a)(iii)(A), (B) or (C) shall be payable until (i) the date of a Final Determination with respect to a Loss that is contested pursuant to Section 5(g) hereof or (ii) after conclusion of any verification process pursuant to Section 5(f) hereof, in which case, the indemnity payable under Section 5(a) shall be payable in accordance with the above (as if the conclusion of the verification process occurred on the date required for election of the method of indemnity payments; provided, however, that if a verification process shall have occurred (the expenses of which are payable by the Sublessee in accordance with Section 5 (f) hereof), the Sublessee shall pay to the Investor interest at the Federal Funds Rate (from the time the indemnity hereunder first became payable to the time such indemnity is actually received by the Investor) on the indemnity amount payable hereunder.

(c) Excluded Events. Notwithstanding the foregoing, the Sublessee shall not have any liability to the Investor under this Section 5 for an otherwise indemnifiable Loss if the Loss results from one or more of the following events (regardless of whether the event fails to be described in any other of the following events):

(i) the failure of the Lease or the Sublease to constitute, for Federal or State income tax purposes, on or after the Closing Date, a true lease or of the Trust or the Investor to be treated as either the lessee under the Lease or the sublessor under the Sublease of the Undivided Interest or the failure of the Trustee or the Investor to be treated as the borrower under the Loan, unless, in any such case, such failure is a result of (1) the breach or inaccuracy of any of the Tax Representations, (2) an act by a Sublessee Person that is not a Permitted Act or the failure of any Sublessee Person to perform an act that is required by Applicable Law or by the Operative Documents or the German Documents, (3) a Sublessee Event of Default, or (4) an event or circumstance described in Section 5(a)(i)(B) or (C) hereto;

(ii) the inaccuracy of any conclusions of the Appraisal or the report prepared by the Engineering Consultant, except as a result of the breach or inaccuracy of the Tax Representations set forth in subsections (a), (d), (e), (f) or (g) of Section 3 hereof;

(iii) the application of Section 467(b)(2) of the Code, provided that this exclusion shall not apply to any Loss resulting from (1) the breach or inaccuracy of any of the Tax Representations set forth in Section 3 hereof, (2) any event or circumstance described in Section 5(a)(i) (other than subclause (C) or (H) thereof) or in Section 5(a)(ii) (other than subclause (F) or (G) thereof), (3) a Sublessee Person taking any written position for U.S. Federal income tax purposes that is inconsistent with the Tax Assumptions, (4) any merger or consolidation of a Sublessee Person (other than a Merger Event which is also a Permitted Merger), (5) any amendment to or other change to any Operative Document unless such amendment is a Permitted Act, (6) any reset or restructuring with respect to the Loan under the Loan Agreement or Sublease Basic Rent or Sublease Renewal Rent in connection with the provision of Acceptable Substitute Credit Protection or an adjustment pursuant to Section 3(e) of the Sublease; and provided further that this exclusion shall not apply to the inclusion of an income item itself that results from any event described in Section 5(a)(ii) above to the extent such inclusion is independent of the consequences of such event under Section 467(b)(2) of the Code and any regulations thereunder;

(iv) a voluntary or involuntary transfer by the Investor of the Undivided Interest or the Facility (or any Part thereof or interest therein) or any voluntary or involuntary transfer by the Investor or the Trust or any Affiliate of either

such Person of any interest arising under the Transaction Documents or in the Facility or in any such Person (other than as a direct or indirect result of (A) any Sublessee Event of Default, (B) any substitution, replacement, improvement or modification of or addition to the Facility, (C) any breach or inaccuracy of the Tax Representation in Section 3(k) or any event or circumstance described in subclause (I) of Section 5(a)(i), (D) an act of the German Lessor in accordance with the terms of the German Documents or any other act or failure to act by the German Lessor taken with the consent or acquiescence of EZH or any Affiliate thereof, or (E) any acquisition, purchase or receipt of the German Equipment as the result of the exercise by the Trustee, the Investor or the Lender of any option, right or remedy granted to the Trustee, the Investor or the Lender or any disposition, transfer or sale of the German Equipment so acquired, purchased or received);

(v) any amendment to or change in the Code, Regulations or judicial interpretation thereof enacted, promulgated, issued or rendered after the Closing Date other than the adoption as final or temporary regulations of the proposed regulations under Section 467 of the Code as published in the Federal Register on June 3, 1996, to the extent such final or temporary regulations are in relevant part substantially similar to such proposed regulations; provided that this clause (v) shall not apply to (1) any substitution, replacement or refinancing, (2) changes in interest, penalties and additions to tax, (3) reduce any amount payable hereunder to less than the amount that would have been payable if such change had not occurred, (4) any Loss as a result of any event or circumstance set forth in subclause (J) of Section 5(a)(ii) (disregarding the parenthetical therein) occurring after such amendment or change which constitutes an income inclusion (other than as a result of the incorrectness of any other Tax Assumption), or (5) any event or circumstance described in Section 5(c)(iii)(1) through (6), if and to the extent such inclusion would not have occurred but for an amendment or change to Section 467(b)(2) of the Code shall have occurred or if the proposed regulations under Section 467 of the Code shall have been promulgated as final or temporary regulations to the extent such final or temporary regulations are in relevant part not substantially similar to such proposed regulations or if any subsequent change to such final or temporary regulations shall have been promulgated;

(vi) the Sublessee's purchase of the Sublessor's Lease Interest pursuant to the Sublease Purchase Option or any event or circumstances for which Sublease Termination Value, Sublease Special Termination Value or Sublease Special Special Termination Value (or any amount determined by reference to such values) is required to be, and has been, received (and any other amounts owed under the Operative Documents) other than to the extent such Sublease Termination Value, Sublease Special Termination Value or Sublease Special Special Termination Value does not accurately reflect of the timing of such event;

(vii) the Investor's failure to claim properly and timely or to have sufficient income to benefit from the Rent Deductions, Amortization Deductions or Interest Deductions (unless pursuant to an opinion of counsel (described in Section 5(a)(i)) or the Investor's taking a tax reporting position that triggered an income inclusion (described in Section 5(a)(ii)) unless pursuant to an opinion of counsel (described in Section 5(a)(ii)) or the Sublessee's failure to satisfy its obligation under Section 4 to provide appropriate information requested by the Trust under Section 4;

(viii) penalties or additions to tax under Section 6662 or 6663 of the Code or relating to estimated tax, in either case to the extent resulting from or measured by matters unrelated to the transactions contemplated by the Operative Documents;

(ix) the failure of the Trust to be treated as a grantor trust or a pass-through entity or to otherwise be disregarded for Federal income tax purposes;

(x) the failure of the Trust or the Investor to comply with the contest provisions in this Agreement but only if the failure precludes the contest of the Loss;

(xi) the status of a member of the Sublessor Group as an entity subject to the provisions of Sections 55, 56, 57, 58, 59, 59A, 291, (except if such application is a result of the Sublessee's act) 465, 469, 501, 542, 593, 552, 851, 856 or 1361 of the Code;

(xii) a determination that the Investor is not holding its Undivided Interest in the ordinary course of a trade or business for purposes of Section 162 of the Code or that the Investor did not enter the transaction for profit;

(xiii) the Investor or the Trust having a short taxable year;

(xiv) any fraud, willful misconduct or gross negligence of a member of the Sublessor Group;

(xv) the failure of a member of the Sublessor Group to file any return in accordance with the appropriate filing procedure and timely to file such return unless as a result of the failure of the Sublessee to comply with Section 4;

(xvi) any member of the Sublessor Group being or becoming for Federal income tax purposes a charitable organization, a tax-exempt entity within the meaning of Section 168 of the Code, an agency or instrumentality of the United States, a state or political subdivision thereof or an international organization;

(xvii) any Loss arising from an event occurring after the earliest of (A) the expiration or earlier termination of the Sublease Term (including the Sublease Renewal Term, if any) in circumstances other than the circumstances contemplated by clause (B) or (C); (B) the termination of the Sublease in consequence of the occurrence of an event giving rise to the Investor's right to receive an amount computed by reference to Sublease Termination Value, Sublease Special Termination Value or Sublease Special Special Termination Value (provided that such amount and all other amounts owed pursuant to the Operative Documents is, in fact, received) or (C) the return of possession of the Undivided Interest to the Sublessor pursuant to and in accordance with the terms of the Sublease;

(xviii) an act or failure to act of the Trustee, in its capacity as trustee and not in its individual capacity, in breach of its covenants, warranties or other obligations under the Trust Agreement pursuant to which it was appointed as Trustee but only to the extent that such act or failure to act is at the direction of the Investor;

(xix) the inclusion in income by the Investor upon or after termination of the Sublease of amounts attributable to improvements, modifications or additions to the Facility;

(xx) an amendment, supplement, modification or waiver ("Amendment") to any Operative Document to which any member of the Sublessor Group is a party, and to which no Sublessee Person is a party or which Amendment is not initiated or requested by or consented to by any Sublessee Person in writing, other than any Amendment (A) that may be necessary or appropriate to, and is in conformity with any Amendment to any Operative Document initiated or requested by or consented to by an Sublessee Person in writing, (B) that is required by the terms of the Operative Documents, (C) that is due to or in connection with a Sublessee Event of Default that shall theretofore have occurred and be continuing, or (D) that is in connection with any Amendment of the Operative Documents required by law;

(xxi) the inaccuracy of the assumption in Section 2(k) hereof (but this exclusion shall not apply to State income tax inclusions resulting from the breach of the representation set forth in Section 3(h) hereof);

(xxii) any loss of foreign tax credits; or

(xxiii) the characterization and treatment of the transactions contemplated by the Operative Documents for Dutch legal, tax, accounting and financial purposes.

No inference, negative or positive, shall be drawn from this Section 5(c) in interpreting whether or not a Loss is otherwise subject to indemnification under Section 5 hereof.

(d) Tax Savings. If as the result of a Loss with respect to which (i) the Sublessee is required to indemnify the Investor and (ii) the Sublessee has paid all amounts that have to date been payable, the Investor shall realize any reduction in Federal or State income taxes (determined using the same assumptions used in calculating the Loss) that it would not have realized but for such Loss or the event giving rise thereto, and not previously taken into account in computing the amount of the indemnity payable hereunder, and to any interest on any refund attributable to such reduction, then the Investor shall pay the Sublessee an amount equal to such reduction in Federal income tax plus an additional amount equal to any further reduction in its Federal income taxes attributable to such payment, provided such payment shall not put the Investor in an After-Tax position less favorable than it would have been in had the Loss not occurred (as determined using the same assumptions used for purposes of calculating the indemnity paid to the Investor); provided further that the Investor shall not be required to make any payment pursuant to this Section 5(d) to the extent that the amount of such payment would exceed the sum of all prior payments by the Sublessee with respect to such Loss less the amount of all prior payments by the Investor (and the amount of any excess described in the preceding proviso shall reduce pro tanto any amount that the Sublessee is subsequently obligated to pay pursuant to Section 5(a) hereof) and the Investor shall not be required to make any payment under this Section 5(d) while a Sublessee Major Default shall have occurred and be continuing. Any payment due to the Sublessee pursuant to this Section 5(d) shall be paid promptly and in any event within 15 days after the Investor shall realize such tax benefit (realized and computed in accordance with Section 5(e) hereof and the Tax Assumptions contained in Section 2 hereof as adjusted). If for any reason any tax benefit that was paid to the Sublessee pursuant to this Section 5(d) or taken into account in computing the amount payable hereunder shall be lost or otherwise determined to be unavailable, such loss or unavailability shall be treated as a Loss subject to indemnification hereunder.

(e) Certain Payment Assumptions for Indemnities and Tax Savings.

(i) For purposes of computing the amount of income taxes payable as a result of a Loss described in Section 5(a)(ii) and any reduction in income taxes that are realized as a result of an event that gave rise to a Loss described in Section 5(a)(ii) hereof, and for purposes of computing any gross-up or reverse gross-up amount, it shall be assumed that the Investor is subject to the highest marginal Federal and applicable state and local corporate income tax rates applicable for the relevant period or periods (taking into account the deductibility of state and local taxes for Federal income tax purposes) and that all the other Tax Assumptions are correct in the absence of such Loss and any prior or contemporaneous Loss.

(ii) For purposes of computing the amount of Federal income taxes payable as a result of a Loss described in Section 5(a)(i) and any reduction in Federal or State income taxes that is realized as a result of an event that gave rise to a Loss described in Section 5(a)(i), it shall be assumed that the Investor is subject to Federal and State income tax at the Investor's Tax Rate and that all the Tax Assumptions are correct in the absence of such Loss and any prior or contemporaneous Loss that the Investor suffers a loss of State Tax Deductions and State Interest Deductions that correspond to a loss of deductions for Federal purposes.

(f) Verification. If the Sublessee so requests in writing within 30 days after receipt of the written notice of computations or payments described in Section 5(b) or 5(d) above, any determination shall be reviewed by an internationally recognized independent United States accounting firm mutually acceptable to the Sublessee and the Investor. Such accounting firm shall be asked to verify, after consulting with the Sublessee and the Investor, whether the Investor's computations are correct, and to report its conclusions to both the Sublessee and the Investor. The Investor and the Sublessee hereby agree to provide such accountants with all information and materials as shall be reasonably necessary or desirable in connection herewith. The fees and expenses of the accountants in verifying an adjustment pursuant to this Section 5(f) shall be paid by the Investor if the accountants shall determine that the present value (using the Treasury Rate) of the total payments to be made with respect to the Loss calculated by the Investor is in error by more than five percent to the detriment of the Sublessee than the present value (using the Treasury Rate) of the correct payments. If the accountants do not so determine, such fees and expenses of the accountants shall be paid by the Sublessee. Such accounting firm shall be requested to make its determination within 30 days. In the event such accounting firm shall determine that such computations are incorrect, then such firm shall determine what it believes to be the correct computations. The computations of the accounting firm shall be final, binding and conclusive upon the Sublessee and the Investor absent manifest error. Any information provided to such accountants by any Person shall be and remain the exclusive property of and shall be deemed by the parties to be (and the accountants will confirm in writing that they will treat such information as) the private, proprietary and confidential property of such Person, and no person other than the accountants will be entitled thereto, and all such materials shall be returned to such Person. The Sublessee shall have no right to inspect the books, records, tax returns or other documents of or relating to the Investor. The Sublessee and the Investor agree that the accounting firm's sole responsibility shall be to verify the amount of any payment hereunder and that matters of interpretation are not within the scope of such firm's responsibilities.

(g) Contests. In the event a written claim (including a written proposed Revenue Agent's Report) shall be made by the Internal Revenue Service that, if successful, would result in a Loss for which Sublessee would be required to indemnify the Investor, the Investor hereby agrees to notify the Sublessee in writing of such claim within 30 days after its

receipt and agrees to take such action in connection with contesting such claim as the Sublessee shall request in writing from time to time; provided, however, that the Investor agrees to pursue (I) all administrative appeals, proceedings, hearings and conferences with respect to the claim if the Investor has one or more other substantial tax items for the same taxable year and is pursuing such administrative appeals, proceedings, hearings or conferences with respect to other such item(s) and (II) the appeal of any judicial determination in respect of such claim, it being agreed that no appeal to the United States Supreme Court shall be required; provided further, however, that (i) within 30 days after receipt by the Sublessee of the Investor's notice of such claim, the Sublessee shall request in writing that such claim be contested, (ii) the amount of such proposed adjustments (including taxes, interest, penalties and additional amounts relating thereto) is at least U.S.$100,000 (and for this purpose, any proposed adjustment that relates to an issue that could affect more than one taxable year or could involve the transactions contemplated by the Operative Documents shall be treated as involving the total potential undiscounted payments, taking into account all taxable years to which the proposed adjustment could relate and all potential claims with respect to the transactions contemplated by the Operative Documents that could be brought against members of the Sublessor Group for all open years if the theory or theories upon which the actual claim is based applies to such claim), except in the case of the appeal of an adverse judicial decision, in which case such threshold amount shall be $200,000, (iii) the conduct of the contest shall remain within the sole discretion and control (exercised in good faith) of the Investor and its counsel, who shall determine the nature of all action to be taken to contest such proposed adjustment including, without limitation, (x) whether the proposed adjustment shall be contested initially by way of judicial or administrative proceedings or both (subject to clause (I) above), (y) whether the proposed adjustment shall be contested by resisting payment or paying tax and seeking a refund thereof and (z) if the Investor shall undertake judicial action, the court of competent jurisdiction in which to contest each proposed adjustment, provided, that in conducting such contest, the Investor shall keep the Sublessee reasonably informed of the status of the contest, shall consult in good faith with the Sublessee regarding the conduct of the contest, shall permit the Sublessee or its counsel to review in advance and comment upon any written submission to be made to the administrative agency or court which is the forum for such contest and shall consider in good faith any request that the Sublessee or its counsel be present at hearings, conferences, trials and other proceedings involved in such contest, (iv) prior to Investor taking any action to contest such claim, the Sublessee shall have furnished the Investor with an opinion of White & Case or other independent tax counsel selected by the Sublessee and reasonably satisfactory to the Investor to the effect that a reasonable basis exists to contest such claim within the meaning of ABA Formal Opinion No. 85-352 (or any amendment thereto or substitution thereof) or, in the case of an appeal of an adverse judicial determination, that there is strong likelihood (although not necessarily more likely than not) that such adverse judicial determination will be reversed or substantially modified for the position asserted in such appeal, (v) the Sublessee shall have agreed to pay the Investor and shall pay on a current basis all reasonable out-of-pocket costs and expenses that the Investor

shall incur in connection with contesting such claim, including, without limitation, reasonable attorneys', accountants' and investigatory fees and disbursements, (vi) if the Investor shall determine to pay the tax with respect to the claim and sue for a refund, the Sublessee shall advance to the Investor on an interest-free basis (with no additional net After-Tax cost to the Investor) sufficient funds to pay such tax and interest, penalties and additions to tax payable with respect thereto, (vii) no Sublessee Major Default shall have occurred and be continuing, and (viii) the Sublessee shall provide to the Investor such information (including, but not limited to, books, records or written statements by the Sublessee's employees) that is within the control of the Sublessee and is reasonably necessary for (and relate solely to) the conduct of the contest. Subject to the foregoing, Investor shall be in sole control of the contest proceeding. Without limiting the generality of the preceding sentence, if the Sublessee disagrees with the Investor concerning any action to be taken in contesting a claim hereunder, the decision of the Investor shall be controlling.

Notwithstanding any other provision contained in this Section 5(g), the Investor may settle any claim otherwise indemnifiable hereunder for any taxable year if the Investor (x) (a) waives the payment by the Sublessee of any amount that might otherwise be payable by the Sublessee under this Section 5 by way of indemnity in respect of such claim for such taxable year and any other claim the contest of which is precluded by declining to take such action and (b) pays to the Sublessee any amount previously paid or advanced by the Sublessee pursuant to this Section 5(g)(vi) with respect to such claim or contest of such claim or (y) the Sublessee consents in writing to such settlement, such consent not to be unreasonably withheld (based solely on the merits of the items as to which the Sublessee may be liable hereunder).

Upon a Final Determination of any contest conducted pursuant to this Section 5(g), the Investor shall be obligated to refund to the Sublessee any advances by the Sublessee hereunder or any payment made pursuant to Section 5 hereof with respect to the Loss that was the subject of such contest, unless Investor shall elect to set off such advances or payments against any liability the Sublessee may then have to the Investor.

In any circumstance where judicial review shall be unavailable as a matter of law, the Sublessee's right to cause a contest hereunder, and the Investor's obligation, if any, to contest hereunder, shall become operative at the earliest time such a contest may be initiated pursuant to law, notwithstanding the fact that such contest shall have been previously unavailable by reason of a Final Determination described in clause (i) of the definition thereof.

Notwithstanding anything to the contrary contained in this Section 5(g), the Investor shall not be required to contest any claim hereunder if the subject matter thereof shall be of a continuing nature and shall have been previously decided by a court of competent jurisdiction pursuant to the contest provisions of this Section 5(g), unless there shall have been a change in law (or interpretation thereof) or change in facts after the date with respect to

which such previous contest shall have been decided, and the Investor shall have received, at the Sublessee's expense, an opinion of White & Case or other independent tax counsel selected by the Sublessee and reasonably acceptable to the Investor to the effect that as a result of the change in law (or interpretation thereof) or change in facts, there is substantial likelihood that the Investor will prevail in such contest.

SECTION 6. Survival. The representations, warranties, covenants and indemnities of the Sublessee and the Investor provided for herein and all the rights and obligations arising from this Agreement shall survive the expiration or other termination of the Lease and are expressly made for the benefit of and shall be enforceable by the successors and assigns of each party as permitted in accordance with the Operative Documents; provided that no assignment by any party hereto shall relieve any party of its obligations hereunder or increase the obligations of any party hereunder, provided that the applicable tax rates of the Investor or its successors shall be utilized for purposes of Section 5(e)(i) hereof.

SECTION 7. Method of Payment. All references to dollars or U.S. $ herein shall mean United States dollars. All payments to be made to the Investor by the Sublessee pursuant to this Agreement shall be made in dollars by wire transfer to such bank account of the Investor as the Investor from time to time shall have directed to the Sublessee as set forth in the Lease, such direction to be given in writing at least five (5) Business Days prior to the due date thereof and if no instructions have been received, by check payable to the Investor and mailed to the address referred to in the Participation Agreement. All payments to be made to the Sublessee by the Investor pursuant to this Agreement shall be made in dollars by wire transfer to such bank account as the Sublessee from time to time shall have directed to the Investor, such direction to be given in writing at least five (5) Business Days prior to the due date thereof and if no instructions have been received, by check payable to the Sublessee and mailed to the address referred to in the Participation Agreement.

SECTION 8. Late Payments. Except as otherwise provided in this Agreement, any amount payable to the Investor or the Sublessee under this Agreement not paid within 10 days from the date due and payable under this Agreement shall bear interest from the due date to the date paid at the Overdue Rate.

SECTION 9. GOVERNING LAW. THIS AGREEMENT SHALL BE IN ALL RESPECTS GOVERNED BY THE LAW OF THE STATE OF NEW YORK, INCLUDING ALL MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE.

SECTION 10. Notices. All notices, requests, or other communications required under the terms and provisions hereof shall be given in the manner set forth in Section 22 of the Participation Agreement.

SECTION 11. Assignment by Investor or the Sublessee. The obligations and liabilities of the Sublessee and the Investor arising under this Agreement are expressly made for the benefit of, and shall be enforceable by, the Investor and the Sublessee and their respective successors and assigns.

SECTION 12. No Set-Off. Except as provided by this Agreement, no payment required to be made by the Sublessee or the Investor pursuant to this Agreement shall be subject to any right of set-off, counterclaim, defense, abatement, suspension, deferment or reduction, and the Sublessee and the Investor shall have no right to be released, relieved or discharged from any obligation or liability under this Agreement for any reason whatsoever. Nothing contained herein shall be construed to waive any claim which the Sublessee or the Investor might have under any of the Operative Documents (including this Agreement and including, without limitation, claims or defenses that indemnities or other payments demanded from or paid by the Sublessee or the Investor were erroneous) or otherwise, or to limit the right of the Sublessee or the Investor to make any claim it might have against the Investor or the Sublessee or any other Person or to pursue such claim in such manner as the Sublessee or the Investor shall deem appropriate or to require the Sublessee or the Investor to pay the same obligation more than once (including, but not limited to, the duplication of amounts paid hereunder with amounts required to be paid and to the extent included in the calculation of Sublease Termination Value, Sublease Special Termination Value, Sublease Special Special Termination Value, Settlement Amount or Sale Remedy Purchase Price, provided, that such amounts have been received by the Investor).

SECTION 13. Counterparts. This Agreement may be executed simultaneously in any number of counterparts, each of which when so executed shall be deemed an original and such counterparts together shall constitute and be one and the same instrument.

SECTION 14. Headings. The headings of the Sections of this Agreement are for convenience of reference only and shall not modify, define or limit any of the terms or provisions hereof.

SECTION 15. Amendments, Supplements, etc. This Agreement and any of the terms hereof may not he terminated, amended, supplemented, waived or modified orally, but only by an instrument in writing signed by the party against which the enforcement of the termination, amendment, supplement, waiver or modification shall be sought.

SECTION 16. Protection of Assumed Tax Benefits. The Sublessee will make a good faith effort to take, and to cause each Sublessee Person and such other Persons as the Investor may reasonably identify to take such action and execute such documents as the Investor may reasonably request in writing which are reasonable and necessary to establish and protect the Tax Assumptions. Nothing in this Section 16 shall be construed to limit any

Sublessee Person's use or operation of the Facility under the Operative Documents or to require any Person to take any action or execute any document that in such Person's sole and absolute opinion (exercised in good faith) might cause such Person or any Affiliate of such Person or, in the case of the Sublessee, any Sublessee Person any adverse effect (unless appropriately and satisfactorily indemnified therefor). The party requesting any such action or the execution of any such documents shall pay on an After-Tax basis all reasonable expenses of each other party.

SECTION 17. Future Changes. In the event any change in law or other circumstance causes material harm to any Sublessee Person, the Investor or any Affiliate of any thereof or in the event it is possible to eliminate or reduce any existing or potential material harm or create or increase any benefit available to any party, each party agrees, if requested, to negotiate in good faith with each other party regarding amending the Operative Documents or taking (or failing to take) any other appropriate action to remove or minimize such material harm or create or increase any benefit; provided, however, that no party shall be obligated to accept any amendment of any Operative Document or to take (or fail to take) any action if, in that party's sole and absolute opinion, such amendment, act or failure might cause such party or any Affiliate of such party any adverse effect (unless appropriately and satisfactorily indemnified therefor); provided further, however, that the party requesting the amendment or action shall pay, on an After-Tax basis, the reasonable expenses of each other party; provided further, however, that the Tax Assumptions shall be adjusted as appropriate to reflect any such amendments or acts (or failures to act) of any party.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed all as of the day and year first above written.

N.V. ELECTRICITEITSBEDRIJF ZUID-HOLLAND

By: ______________________________
Name: J. A. Hoyte de Jong
Title: Attorney-in-Fact

CONSOLIDATED EDISON LEASING, INC.

By: ______________________________
Name:
Title:

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be duly executed all as of the day and year first above written.

N.V. ELECTRICITEITSBEDRIJF ZUID-HOLLAND

By: ______________________________
Name:
Title:

CONSOLIDATED EDISON LEASING, INC.

By: ______________________________
Name: BT DePlautt
Title: Vice President