# EXHIBIT 1

2375158.1

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| CONSOLIDATED EDISON COMPANY | ) | |
| OF NEW YORK, INC. | ) | |
| & SUBSIDIARIES, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 06-305 T |
| | ) | Judge Marian Blank Horn |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

**REQUEST FOR INTERNATIONAL JUDICIAL ASSISTANCE PURSUANT TO THE HAGUE CONVENTION OF 18 MARCH 1970 ON THE TAKING OF EVIDENCE ABROAD IN CIVIL OR COMMERCIAL MATTERS**

1.      **Sender:**

      **Requesting Judicial Authority**
      United States Court of Federal Claims
      717 Madison Place, NW
      Washington, DC 20005
      United States of America

2.      **Recipient:**

      **Central Authority of the Netherlands**
      De Officier van Justitie
      Postbus 20302
      2500 EH THE HAGUE
      The Netherlands

3.      **Person to Whom the Executed Request is to be Returned**

      David N. Geier
      U.S. Department of Justice, Tax Division
      555 4th St. NW
      JCB Room 7919
      Washington DC 20001

**IN CONFORMITY WITH ARTICLE 3 OF THE CONVENTION, THE UNDERSIGNED APPLICANT HAS THE HONOR TO SUBMIT THE FOLLOWING REQUEST:**

**4.**     **Requesting Judicial Authority**

United States Court of Federal Claims
717 Madison Place, NW
Washington, DC 20005
United States of America

**5.**     **To the Competent Authority of the Netherlands:**

The Public Prosecutor
The Hague District Court
Prins Clauslaan 60
2595 AJ THE HAGUE
The Netherlands

**6.**     **Case Information:**

Consolidated Edison Company of New York, Inc. & Subsidiaries v. The United States, Case No. 06-305 T (U.S. Court of Federal Claims)

**7.**     **Names and Addresses Parties and Their Representatives:**

| | |
|---|---|
| Plaintiff: | Consolidated Edison Company of New York, Inc. & Subsidiaries (hereinafter collectively "Con Ed") |
| Represented by: | Thomas C. Durham<br>Nicole Bielawski<br>MAYER, BROWN, ROWE & MAW LLP<br>71 South Wacker Dr.<br>Chicago, IL 60606 |
| Defendant: | The United States of America |
| Represented by: | David Geier<br>Attorney of Record<br>U.S. Department of Justice, Tax Division<br>555 4th St. NW<br>JCB Room 7919<br>Washington, DC 20001<br>202-616-3448 |

Eileen J. O'Connor
Assistant Attorney General
David Gustafson
Chief, Court of Federal Claims Section
Steven I. Frahm
Assistant Chief, Court of Federal Claims Section

Joseph A. Sergi
Trial Attorney
James E. Weaver
Trial Attorney
Adam R. Smart
Trial Attorney
U.S. Department of Justice, Tax Division

**8.      Nature and Purpose of Proceedings and Summary of Facts**

There is currently pending in the United States Court of Federal Claims a suit captioned

Consolidated Edison Company of New York, Inc. & Subsidiaries v. United States, No. 06-305 T,

in which the plaintiff, "Con Ed," seeks a refund of federal income taxes paid to the United States.

The fundamental issue in a tax refund suit is whether the taxpayer can establish that it has overpaid

its taxes for the periods in suit.  *See Lewis v. Reynolds*, 284 U.S. 281 (1932); *Dysart v. United States*,

169 Ct. Cl. 276, 340 F.2d 624 (1965).  In this case, plaintiff participated in a lease-in/lease-out

("LILO") transaction involving a power station (the "RoCa3" facility owned by South Holland

Electric (N.V. Electriciteitsbedrifj Zuid-Holland) (hereinafter "EZH")) located in the Netherlands.

The specific substantive issue raised in this refund suit is whether plaintiff is entitled to deductions

for rent, interest, and transaction costs in connection with the LILO to reduce its 1997 federal

income tax liability.

Because the counter-party to the LILO shelter, as well as third party consultants and banks involved are located in foreign countries, including your country, the United States has requested the assistance of this Court to obtain discovery from foreign entities in its jurisdiction.

<u>The Transaction</u>

The United States' position is that Con Ed, a United States taxpayer, through a subsidiary, purported to lease property from its owner, EZH, under a head lease and simultaneously purported to lease the property back to EZH under a sublease. As is typical in a LILO transaction, the counter-party, EZH, is a foreign entity that pays no taxes in the United States. EZH is unable to claim federal income tax benefits, like depreciation, associated with its ownership of the RoCa3 facility. Immediately after the transaction was entered into, and continuing to date, EZH or its successors (including E.On Benelux Generation N.V., a subsidiary of E.On Energie A.G.) have continued to operate the facility and have retained all of the benefits and burdens associated with its use and ownership. For its part, Con Ed claimed rent and interest deductions associated with the purported head lease.

According to the LILO documents provided to the United States by Con Ed, the United States contends that (1) a foreign bank, Hollandsche Bank-Unie N.V. ("HBU") purported to make a non-recourse loan to Con Ed to finance the head lease payments, (2) EZH's sublease rent payments are essentially identical in timing and amount to Con Ed's loan payments, (3) the loan proceeds were not paid to EZH but rather were held by ABN AMRO Bank N.V. ("ABN AMRO"), the parent bank of HBU, and used to satisfy the identical owner rent payments from EZH and Con Ed's purported loan repayments to HBU. Further, other financial entities, such as Credit Suisse Financial Products, Credit Suisse First Boston (collectively "Credit Suisse"), and Bayerische Landesbank A.G., were

also involved in the financing aspects of the LILO shelter transaction.  The circular financing arrangement among Con Ed, EZH and the foreign banks virtually ensured that (1) neither Con Ed nor EZH will need to use their own funds to satisfy their respective obligations under the operative documents (save for the fees and other costs paid by the taxpayer in connection with the transaction); and (2) EZH will retain dominion and control over the subject property.

It is the United States' position that the tax deductions and losses claimed by Con Ed in connection with the LILO shelter transaction are improper and that Con Ed will not be able to prove it is entitled to a refund because:

- Con Ed did not acquire a genuine leasehold interest in property in 1997 when it participated in the LILO;

- Con Ed did not incur a genuine debt obligation in connection with the LILO;

- The LILO tax shelter transaction and components thereof lacked economic substance and/or constitute a sham;

- The tax deductions fail when the step transaction doctrine is applied and the steps which comprise the tax shelter are collapsed and then viewed as a single transaction;

- Con Ed is not entitled to an interest expense deduction with respect to its "non-recourse loan," because such loan does not result in a use of the loan proceeds by Con Ed nor does it constitute a true forbearance by the lender;  and

- The LILO shelter here at issue creates, at most, a contingent future leasehold interest not entitling Con Ed to any present deductions on account thereof.

In short, the United States contends that other than the execution of paper and the payment of fees, nothing happens.

The United States has requested information about this LILO transaction from Con Ed directly.  Con Ed has represented that information about the LILO transaction is held by third parties involved in the LILO transaction, some of whom are identified in this Letter of Request.

The information being sought goes to the substance and operation of the LILO transaction at issue in the instant case, including, among other things, the financing arrangement, the counter-party's treatment of the transaction, and any due diligence performed in anticipation of the transaction.

This Court considers that it is necessary in the interest of justice that documentary evidence be obtained for use at trial in this case from several of the LILO transaction participants or their successors in interest, namely N.V. Electriciteitsbedrijf Zuid-Holland, Tauw Milieu B.V., Hollandsche Bank-Unie N.V., ABN AMRO Bank N.V. and Moret Ernst & Young, or their respective successors in interest.

**9.      Evidence to Be Obtained or Other Judicial Act to Be Performed**

      a.      <u>E.On Benelux Generation N.V. (formerly N.V. Electriciteitsbedrijf Zuid-Holland)</u>

This Court respectfully requests that E.On Benelux Generation N.V. (formerly N.V. Electriciteitsbedrijf Zuid-Holland) (hereinafter "E.On Benelux"), whose business address is Capelseweg 400, 3068 AX Rotterdam, The Netherlands, be requested to produce the documents identified in Exhibit A attached hereto, copies of which should be provided to the attorneys for the parties to this litigation.

      b.      <u>Tauw B.V. and/or Tauw Milieu B.V.</u>

This Court respectfully requests that Tauw B.V. and/or Tauw Milieu B.V., whose business address is Handelskade 11, PO Box 133, 7400 AC Deventer, The Netherlands, be requested to produce the documents identified in Exhibit B attached hereto, copies of which should be provided to the attorneys for the parties to this litigation.

c.    Hollandsche Bank-Unie N.V.

This Court respectfully requests that Hollandsche Bank-Unie N.V., whose business address is Coolsingel 104, 3011 AG - Rotterdam, The Netherlands, be requested to produce the documents identified in Exhibit C attached hereto, copies of which should be provided to the attorneys for the parties to this litigation.

d.    ABN AMRO Bank N.V.

This Court respectfully requests that ABN AMRO Bank N.V., whose business address is Foppingadreef 22, Postbus 283, 1000 EA Amsterdam, The Netherlands, be requested to produce the documents identified in Exhibit D attached hereto, copies of which should be provided to the attorneys for the parties to this litigation.

e.    Ernst & Young (formerly Moret Ernst & Young)

This Court respectfully requests that Ernst & Young (formerly Moret Ernst & Young), whose business address is Boompjes 258, 3011 XZ Rotterdam, The Netherlands, be requested to produce the documents identified in Exhibit E attached hereto, copies of which should be provided to the attorneys for the parties to this litigation.

f.    Credit Suisse First Boston (Nederland) N.V.

This Court respectfully requests that Credit Suisse First Boston (Nederland) N.V., whose business address is Honthorststraat 19, 1071 DC Amsterdam, The Netherlands be requested to produce the documents identified in Exhibit F attached hereto, copies of which should be provided to the attorneys for the parties to this litigation.

7

**10.**     **Procedural Requests**

This Court respectfully requests that counsel for plaintiff and defendant identified above be notified of the time and place of the execution or executions of the Request, and that attendance by representatives of the parties be permitted at such execution or executions.  In the event that the evidence sought cannot be taken in the manner requested, it is to be taken in the manner as provided by local law.

**11.**     **Reimbursement**

The United States is prepared to reimburse your Court for all costs incurred in executing the instant request.

The courts of the United States are authorized by law to extend similar assistance to the tribunals of the Netherlands and will gladly reciprocate the courtesies shown by the courts of the Netherlands.  The Court extends to the judicial authorities of the Netherlands the assurances of its highest considerations.

_____

MARIAN BLANK HORN
Judge United States Court of Federal Claims

Dated: _____

SEAL

_____

# EXHIBIT A

**EXHIBIT A**

**DOCUMENTS TO BE PRODUCED BY EZH/E.ON BENELUX GENERATION N.V.**

**DEFINITIONS & INSTRUCTIONS**

A.      "Document," "record" and "material" include any written, printed, typed, electronic or graphic matter of any kind or nature.  Any draft or non-identical copy constitutes a separate document for purposes of these requests.  The terms shall be construed to include, but shall not be limited to, correspondence, electronic mail, notes, notations, contracts, brochures, agreements, deeds, leases, letters, memoranda, checks, bank statements, reports, analyses, projections, studies, records, corporate minutes, financial statements, financial records, accounting or audit workpapers (including permanent workpapers), spreadsheets, transcripts, recordings, and all other types of written or documentary materials.

B.      Any copy of a document that varies in any way from the original or from any other copy of the document, whether by reason of handwritten or other notation or any omission, shall constitute a separate document and must be produced. Each document is to be produced in its entirety, without abbreviation or expurgation, and the person who made the notation identified.

C.      If any documents are withheld under a claim of privilege, furnish a list identifying each document for which a privilege is claimed, together with the following information and sufficient details so as to permit a court to adjudicate the validity of the claim of privilege: date, sender, recipient, type (e.g., letter, memorandum, telegram, chart, photograph, etc.), subject matter of the document, the basis on which a privilege is claimed, and the paragraph or paragraphs of this request to which the document responds.

D.      If any document that would have been responsive to these requests no longer exists, please state the following for each document: the date of destruction, the reason for destruction, and the person(s) responsible for the decision to destroy the document(s) and for the actual destruction of the documents.

E.      Responses to these requests should be made in a manner consistent with Fed. R. Evid. 902(12), Certified Foreign Records of Regularly Conducted Activity.

F.      The term "Con Ed" shall refer to Consolidated Edison Company of New York, Inc. & Subsidiaries, and affiliated companies, including, but not limited to, Consolidated Edison Development, Inc., Consolidated Edison Leasing, Inc., and Consolidated Edison, Inc.

G.      The term "Banc One" shall refer to Banc One Leasing Corp. its related affiliates, subsidiaries, successors, and assigns, including, but not limited to, and any person, officer, director, accountant, lawyer, agent, or entity acting on behalf of any of the foregoing organizations.

H.      The term "EZH" shall refer to N.V. Electriciteitsbedrifj Zuid-Holland, its related affiliates, subsidiaries, successors, and assigns, including, but not limited to, Preussen Elektra A.G. and E.ON Benelux Generation N.V., and any person, officer, director, accountant, lawyer, agent, or entity acting on behalf of any of the foregoing organizations.

I.      The term "E.On Energie" shall refer to E.On Energie A.G., its related affiliates, subsidiaries, successors, predecessors and assigns, and any person, officer, director, accountant, lawyer, agent, or entity acting on behalf of any of the foregoing organizations.

J.      The term "RoCa3" shall refer to the gas fired CHP facility located in the Netherlands on the border between Rotterdam and Capelle aan den IJessel, constituting the third unit alongside two previously built units, which was owned by EZH on or about December 15, 1997.

K.      The term "HBU" shall refer to Hollandsche Bank-Unie N.V., its related affiliates, subsidiaries, successors, and assigns, and any person, officer, director, accountant, lawyer, agent, or entity acting on behalf of any of the foregoing organizations.

L.      The term "ABN AMRO" shall refer to ABN AMRO Bank N.V., its related affiliates, subsidiaries, successors, and assigns, and any person, officer, director, accountant, lawyer, agent, or entity acting on behalf of any of the foregoing organizations.

M.      The term "Tauw" shall refer to Tauw Milieu B.V., its related affiliates, subsidiaries, successors, and assigns, including, but not limited to, Tauw B.V., and any person, officer, director, accountant, lawyer, agent, or entity acting on behalf of any of the foregoing organizations.

N.      The term "Credit Suisse" shall refer to Credit Suisse Financial Products, Credit Suisse First Boston, their related affiliates, subsidiaries, successors, and assigns, and any person, officer, director, accountant, lawyer, agent, or entity acting on behalf of any of the foregoing organizations.

O.      The term "ABB Leasing" shall refer to ABB Leasing GmbH, Asia Brown Boveri A.G. & Co. Leasing KG, Asia Brown Boveri A.G., or any other related affiliates, subsidiaries, successors, and assigns, and any person, officer, director, accountant, lawyer, agent, or entity acting on behalf of any of the foregoing organizations.

P.      The term "Lease Transaction" shall refer to the series of transactions pertaining to the RoCa3 facility as described in paragraphs 61-77, inclusive of the complaint attached to hereto as Exhibit A-1.

Q.      The term "Lease Transaction Participants" refers to the following entities: ABN AMRO Bank N.V.; Hollandsche Bank-Unie N.V.; EZH; Con Ed; Credit Suisse; Bayerische Landesbank; Wilmington Trust Co.; and ABB Leasing GmbH, and any and all affiliated businesses, successors, assigns, predecessor or successor businesses, and any person, officer, director, accountant, lawyer, agent, or entity acting on behalf of any of the foregoing organizations.

R.      The term "Capstar" refers to Capstar Partners L.L.C., its related affiliates, subsidiaries, successors, and assigns, and any person, officer, director, member, accountant, lawyer, agent, or entity acting on behalf of any of the foregoing organizations.

S.      The term "Cornerstone" refers to Cornerstone Financial Advisors L.P., its related affiliates, subsidiaries, successors, and assigns, and any person, officer, partner, accountant, lawyer, agent, or entity acting on behalf of any of the foregoing organizations.

## DOCUMENTS TO BE PRODUCED

### THE LEASE TRANSACTION

1.      The drafts located in your files of the documents identified as "Operative Documents and Certain Other Basic Documents" on pages three through six (US08961-08964) of the document entitled "Closing Memorandum" (US08959-US08972), a copy of which is attached hereto as Exhibit A-2.

2.      The documents, including memoranda, notes, emails, correspondence, located in your files referring to the rent obligation and option prices for the Lease Transaction, specifically including those documents in your files evidencing how the rent obligation and option prices were negotiated, calculated and allocated.

3.      The documents in your files discussing how each participant to the Lease Transaction was selected.

4.      The documents in your files referring to the bids or proposals submitted by the participants or entities desiring to participate in the Lease Transaction or a substantially similar type

of lease transaction involving the RoCa3 facility, whether or not such bids or proposals were accepted by EZH.

5.      The documents, including memoranda, notes, emails, correspondence, in your files referring to the Tax Indemnity Agreement, attached hereto as Exhibit A-3.

**OUTSIDE ADVISORS**

6.      The documents in your file that discuss or refer to Capstar's involvement in the inception, promotion, recommendation, marketing, planning, approval or implementation of the Lease Transaction.

7.      The correspondence and communication between EZH and Capstar in your file discussing the inception, promotion, recommendation, marketing, planning, approval or implementation of the Lease Transaction.

8.      The documents in your files that discuss or refer to Cornerstone's role in the inception, promotion, recommendation, planning, approval or implementation of the Lease Transaction.

9.      The correspondence and communication between EZH and Cornerstone in your files discussing the inception, promotion, recommendation, planning, approval or implementation of the Lease Transaction.

10.      The correspondence and communication between Capstar and Cornerstone in your files discussing the inception, promotion, recommendation, planning, approval or implementation of the Lease Transaction.

11.      The correspondence and communication between EZH and advisors retained by EZH, other than Capstar or Cornerstone, in your files discussing the Lease Transaction.

12.      The correspondence and communications in your files between E.On Energie, E.On Benelux, or Preussen Elektra and Capstar that occurred subsequent to the closing of the Lease Transaction and discussing the Lease Transaction.

13.     The correspondence and communications in your files between E.On Energie, E.On Benelux, or Preussen Elektra and Cornerstone that occurred subsequent to the closing of the Lease Transaction and discussing the Lease Transaction.

14.     The correspondence and communication between EZH or its representatives and advisors and Banc One in your files that discuss the lease transaction involving the  remaining interest in the RoCa3 facility not involved in the Lease Transaction.

15.     The documents in your files pertaining to the  "advisory services" provided to EZH by ABB Leasing that served as the basis for the invoice attached hereto as Exhibit A-4.

16.     The correspondence and communications between EZH and ABB Leasing in your file that pertain to the Lease Transaction or the "US-Lease" referred to in the invoice attached hereto as Exhibit A-4.

17.     The documents in your files pertaining to the lease or other financing arrangement involving the RoCa3 facility and/or equipment located at the facility in which ABB Leasing is or was a participant prior to the closing of the Lease Transaction.

18.     The correspondence and communication between EZH and ABB Leasing in your files pertaining to any lease or financing arrangement discussed in paragraph 17.

19.     The correspondence and communication between E.On Energie, Preussen Elektra AG, E.On Benelux B.V., EZH or their representatives and any of the Lease Transaction Participants during the period leading up to the Preussen Elektra AG acquisition of EZH (the "Preussen Elektra/EZH acquisition") which pertain to the Lease Transaction or the effect of the Preussen Elektra/EZH acquisition on the Lease Transaction.

20.     The correspondence and communication between E.On Energie, Preussen Elektra AG, E.On Benelux B.V., EZH or their representatives and any of the Lease Transaction Participants subsequent to the Preussen Elektra/EZH acquisition which pertain to the Lease Transaction or the effect of the Preussen Elektra/EZH acquisition on the Lease Transaction.

## RISK/BENEFIT ANALYSIS OF THE TRANSACTION

21.     The documents in your files containing or discussing the analysis or calculations performed by or on behalf of EZH regarding the Lease Purchase Option and Sublease Purchase Option as identified in Section 25 of the "Lease Agreement" (US09324-09352) and Section 19 of

the "Sublease Agreement" (US09385-09440) respectively, copies of which are attached hereto as Exhibit A-5 and A-6 respectively.

22.     The documents in your files discussing the likelihood that EZH would exercise the Sublease Purchase Option.

23.     The documents in your files discussing or analyzing the risks faced by EZH with respect to the Lease Transaction.

24.     The documents in your files discussing or analyzing the steps that could be or were taken to reduce or mitigate the risks to EZH with respect to the Lease Transaction.

25.     The documents in your files discussing or analyzing the risks faced by the Lease Transaction Participants other than EZH with respect to the Lease Transaction.

26.     The documents in your files discussing or analyzing the steps that could be or were taken to reduce or mitigate the risks to the Lease Transaction Participants other than EZH with respect to the Lease Transaction.

27.     The correspondence, memoranda, opinion letters, or other communications from or to representatives of Shearman & Sterling; Loeff Clays & Verbeke; Clifford Chance; Davis, Polk & Wardell; Nauta Dutilh; Loyens & Volkmaars; White & Case; Morris, James, Hitchens & Williams; or Oppenhoff & Radler in your file which discuss the Lease Transaction.

**PRESENTATIONS**

28.     The documents in your files which were used in or refer to any presentations regarding the Lease Transaction or a similar type of transaction involving the RoCa3 facility made to EZH by Capstar or Cornerstone.

29.     The documents in your files which were used in or refer to any presentations regarding the Lease Transaction made to Con Ed or representatives of Con Ed by representatives of EZH, Cornerstone, or Capstar.

30.     The documents in your files used in or referring to presentations like that identified above in paragraph number 26, made to any other entities or individuals besides Con Ed or their representatives during the time prior to December 15, 1997.

Exhibit A                                    6

**DUE DILIGENCE**

31.     The studies, analyses, forecasts, projections or other due diligence documents in your files prepared in connection with the Lease Transaction.

32.     The documents in your files discussing the studies, analyses, forecasts, projections or other due diligence prepared in connection with the Lease Transaction.

33.     The communication or correspondence between any representative of EZH and Deloitte & Touche Valuation Group in your files that pertains to the appraisal performed by Deloitte & Touche in connection with the Lease Transaction.

34.     The documents in your files containing or discussing the appraisal performed by Deloitte & Touche Valuation Group in connection with the Lease Transaction.

35.     The communication or correspondence between any representative of EZH and Duke Engineering & Service in your files that pertain to the analysis and investigation of the RoCa3 facility performed by Duke Engineering & Service.

36.     The documents in your files containing or referring to the analysis and investigation performed by Duke Engineering & Service in connection with the Lease Transaction.

37.     The communication or correspondence between representatives of EZH and Tauw in your files that pertain to the analysis, investigation and assessment of the RoCa3 facility performed in connection with the Lease Transaction.

38.     The documents in your files containing or referring to the analysis, investigation, and assessment performed by Tauw in connection with the Lease Transaction.

**FINANCING OF THE LEASE TRANSACTION**

39.     The communications, correspondence, memoranda, and opinion letters in your files to or from Credit Suisse in your files that pertain to market rates for loans and/or depositis made in connection with the Lease Transaction.

40.     The communications, correspondence, and memoranda between EZH and ABN AMRO in your files that discuss or pertain to the Lease Transaction, specifically including the financing of the Lease Transaction.

41.     The communications, correspondence, and memoranda between EZH and HBU in your files that pertain to the Lease Transaction, specifically including the financing of the Lease Transaction.

42.     The communications, correspondence, and memoranda between EZH and Bayerische Landesbank in your files that pertain to the Lease Transaction, specifically including the financing and/or use of letters of credit, including Irrevocable Standby Letter of Credit No. 151221116, in connection with the Lease Transaction.

43.     The documents in your files pertaining to or discussing Account Number 50.22.51.093 "HBU Assignment Account EZH 1997 Roca 3 Trust 2" at ABN AMRO.

44.     The documents in your files pertaining to or discussing Account Number 43510-0 "EZH 1997 ROCA Facility Trust No. 2" at the Wilmington Trust Company.

45.     The documents in your files pertaining to or discussing the other bank accounts used in connection with the Lease Transaction other than those identified in paragraphs 43 and 44 above.

46.     The documents in your files pertaining to the purchase of US treasury strip coupons CUSIP 912833JX9, CUSIP 912833KN9, CUSIP 912833KQ2, CUSIP 912833KRO, CUSIP 912833KS8, and CUSIP 912833KT6, discussed in the documents identified as Bates Nos. US01835, US01836, and US01837-US01840, attached hereto as Exhibits A-7, A-8 and A-9 respectively.

47.     The documents in your files discussing the payment of Credit Suisse with funds from Account No. 43510-0 held at Wilmington Trust Company for the purchase of the aforementioned US treasury strips.

## EZH'S VIEW OF THE LEASE TRANSACTION

48.     The internal EZH documents in your files discussing the Lease Transaction or the decision to enter into the Lease Transaction or a transaction substantially similar to the Lease Transaction involving the RoCa3 facility.

49.     The documents in your files evidencing how EZH formerly treated and currently treats, describes, or lists the Lease Transaction for the purposes of its accounting and financial reporting obligations.

50.     The documents in your files discussing how the Lease Transaction was treated for the purposes of the Preussen Elektra/EZH acquisition.

51.     The correspondence and communications between representatives of EZH, Con Ed, Preussen Elektra AG and/or E.On Energie in your files which pertain to the arrangement between Con Ed and EZH.

52.     The documents in your files discussing, for the purposes of the Preussen Elektra/EZH acquisition, the Lease Transaction's impact on the RoCa3 facility.

53.     The documents in your files discussing, for the purposes of the Preussen Elektra/EZH acquisition, the Sublease Purchase Option

54.     The documents in your files discussing, for the purposes of the Preussen Elektra/EZH acquisition, the Tax Indemnity Agreement.

55.     The correspondence between representatives of EZH, Preussen Elektra AG, E.On Benelux N.V., or E.On Energie and representatives of Con Ed in your files which occurred subsequent to the Preussen Elektra/EZH acquisition and which discuss the Lease Transaction.

56.     The documents in your files containing or referring to the analyses performed for or on behalf of EZH, Preussen Elektra AG, E.On Benelux N.V., or E.On Energie with respect to the treatment of the Lease Transaction and/or the RoCa3 facility for the purposes of the Preussen Elektra/EZH acquisition.

57.     The closing documents and schedules from the Preussen Elektra/EZH acquisition in your files that refer to the Lease Transaction or Con Ed.

58.     The documents in your files reflecting or referring to the due diligence performed by or on behalf of Preussen Elektra AG, E.On Benelux B.V., or E.On Energie assessing the risks and/or benefits of the Lease Transaction.

59.     The documents in your files reflecting or referring to the valuation of the RoCa3 facility for the purposes of the Preussen Elektra/EZH merger.

**MAINTENANCE AND OPERATION OF THE FACILITY**

60.     Th documents in your files evidencing any involvement by Con Ed in the RoCa3 facility from December 15, 1997 until the present, including, but not limited to, funding, operating or managing the RoCa3 facility or auditing, reviewing, advising EZH, E.On Benelux B.V., or E.On Energie, or consulting with EZH, E.On Benelux B.V., or E.On Energie pertaining to the operation of the RoCa3 facility.

61.     The documents in your files discussing Con Ed's role in any major capital improvements to the RoCa3 facility.

62.     The documents in your files discussing Con Ed's role in any maintenance or repairs to the RoCa3 facility since December 15, 1997.

63.     The documents in your files discussing any contribution by Con Ed to the operating expenses of the RoCa3 facility from December 15, 1997 to the present.

**GOVERNMENTAL APPROVALS**

64.     The correspondence and other written communication in your files between governmental authorities in the Netherlands and EZH, or representatives of EZH, pertaining to the Lease Transaction or Con Ed's involvement in the RoCa3 facility prior to the closing date of the Lease Transaction.

65.     The documents in your files reflecting the approvals obtained from governmental authorities in the Netherlands for the purposes of the Lease Transaction.

66.     The documents in your files that were provided to any governmental authority in the Netherlands by EZH or any representative of EZH for the purpose of obtaining approval or permission to enter into the Lease Transaction.

67.     The correspondence or other written communication in your files between EZH or any representative of EZH and any governmental authority in the Netherlands pertaining to the approvals or permissions necessary to enter into the Lease Transaction.

68.     The documents in your files provided to the Dutch Internal Revenue Service ("Belastingdienst") by EZH or any representative of EZH, including but not limited to Loyens &

Volkmaars, for the purpose of determining the appropriate tax treatment of the transaction under the laws of the Netherlands.

69.     The correspondence or other written communication in your files between EZH or any representative of EZH, including but not limited to Loyens & Volkmaars, and Belastingdienst regarding the appropriate tax treatment of the transaction under the laws of the Netherlands.

# EXHIBIT A-1

## IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| CONSOLIDATED EDISON COMPANY OF NEW YORK, INC. & SUBSIDIARIES, | ) ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) |
| THE UNITED STATES, | ) ) |
| Defendant. | ) ) ) |

**FILED** APR. 1 9 2006

**06-305** **T**

No._____

### COMPLAINT

Plaintiff, Consolidated Edison Company of New York, Inc. & Subsidiaries, brings this action for a refund of federal taxes paid in connection with the Internal Revenue Service's proposed adjustments to its federal tax return for the taxable year ending December 31, 1997. The adjustments are related to Plaintiff's investment in an electric generation facility located outside Rotterdam, The Netherlands.

In support of its refund claim, Plaintiff alleges as follows:

### JURISDICTION AND SUMMARY OF ACTION

1.      Plaintiff, Consolidated Edison Company of New York, Inc. & Subsidiaries ("Con Edison NY"), brings this refund action, founded upon the Internal Revenue Code of 1986, for the recovery of federal income tax paid by Plaintiff for the taxable year ended December 31, 1997 ("the 1997 taxable year").

2.      Defendant is the United States of America.

3.      This Court has jurisdiction by reason of 28 U.S.C. §§ 1346(a)(1) and 1491(a)(1) and 26 U.S.C. § 7422.

1

4.      On or before September 9, 1998, Con Edison NY filed a timely federal consolidated income tax return for the 1997 taxable year with the Internal Revenue Service ("IRS") and timely paid income taxes in the amount of $291,003,408.

5.      Con Edison NY's name, address, and identification number appearing on the 1997 tax return are:  Consolidated Edison Company of New York, Inc. & Subsidiaries; 4 Irving Place, Room 615-S, New York, New York, 10003; and 13-5009340, respectively.

6.      During the 1997 taxable year, Con Edison NY, through its subsidiaries, made an investment in an electric generation plant in The Netherlands.  The plant is generally known as "RoCa3" and is owned by N.V. Electriciteitsbedrijf Zuid-Holland ("South Holland Electric"). This transaction is hereinafter referred to as the "RoCa3 Investment."

7.      On its 1997 tax return, Con Edison NY reported rental income with respect to the RoCa3 Investment and deducted rental expense, amortization of expenses, and interest expense relating to the property and indebtedness incurred in the RoCa3 Investment, for a net loss of $937,331.

8.      The IRS, during a routine audit of Con Edison NY's tax return for the 1997 taxable year, disputed Con Edison NY's tax treatment of the RoCa3 Investment.

9.      On or about September 15, 2005, the IRS issued a Notice of Proposed Adjustment to Con Edison NY, proposing additional federal income of $937,331 for the 1997 taxable year with respect to the RoCa3 Investment.

10.     The IRS's proposed adjustments resulted in a tax increase of $328,066, increasing Con Edison NY's federal income tax liability for the 1997 taxable year from $291,003,408 to $291,331,474.

2

11.     On or about November 3, 2005, Con Edison NY paid the proposed tax deficiency of $328,066 to the IRS.

12.     On or about December 2, 2005, Con Edison NY filed a Form 1040X (Amended U.S. Corporation Income Tax Return) with the IRS requesting a refund of erroneously paid federal income taxes for the 1997 taxable year in the amount of $328,066. The requested refund was solely attributable to Con Edison NY's payment of the proposed tax deficiency referred to in paragraphs 10 and 11 above. A true and complete copy of this claim for refund is attached as Exhibit A.

13.     By a notice of disallowance dated March 15, 2005, the IRS disallowed Con Edison NY's claim for refund. A true and complete copy of this notice of disallowance is attached as Exhibit B.

14.     The IRS's disallowance of Con Edison NY's claim for refund was erroneous.

15.     Con Edison NY requests a refund of its overpayment of $328,066 of federal tax for the 1997 taxable year, plus interest and allowable costs.

16.     No action on the claim for refund attached as Exhibit A has been taken by Congress or any agency of the United States or in any judicial proceeding, including any in the Tax Court of the United States.

17.     Con Edison NY has timely filed this Complaint for a refund of federal taxes paid within two years of the date of the notice of disallowance as required under 26 U.S.C. § 6532(a).

18.     Con Edison NY is the sole owner of the claim included in Exhibit A and asserted herein, and has made no assignment thereof.

3

## FACTUAL BACKGROUND

### A.   Con Edison NY's Energy Business

19.   At the time of the RoCa3 Investment, Con Edison NY was a widely-held and publicly-traded company on the New York Stock Exchange. It owned 100% of Consolidated Edison Development, Inc. ("Con Edison Development"), which in turn owned 100% of Consolidated Edison Leasing, Inc. ("Con Edison Leasing"). Con Edison NY has since become a wholly owned subsidiary of Consolidated Edison, Inc. ("CEI"), which also owns Con Edison Development as well. Like Con Edison NY before it, CEI is widely-held and publicly-traded on the New York Stock Exchange.

20.   Con Edison NY is one of the nation's oldest and largest investor-owned energy companies with approximately $21 billion in assets. It is a regulated public utility that was incorporated in 1884 and currently delivers electric service to almost all of New York City and most of Westchester County – a service area having a population of approximately 9 million. Con Edison NY also supplies gas in parts of New York City and Westchester County. Con Edison NY also owns and operates the largest district steam system in the world, providing steam service in most of Manhattan.

21.   Prior to the 1990s, Con Edison NY, as was the case with most electric utilities, offered electric service in a "bundled" format. In other words, Con Edison NY owned and operated the generation plants that produced electricity as well as the transmission and distribution systems that delivered the electricity to its customers. Con Edison NY owned gas-fired, oil-fired, and nuclear-powered plants with a total electric-generating capacity of 8,300 megawatts. As a regulated public utility, all of Con Edison NY's operations were subject to regulation by the New York Public Service Commission ("PSC").

4

**B.      The Deregulation of Con Edison NY's Energy Business**

22.      Beginning in March 1993, the PSC took a number of steps to develop a competitive electric industry in the state of New York.  This process commenced with the PSC's initiation of a proceeding entitled "Proceeding On Motion Of The Commission To Address Competitive Opportunities Available To Customers Of Electric And Gas Service And Develop Criteria For Utility Responses" (the "Competitive Opportunities Proceeding").  The purpose of the Competitive Opportunities Proceeding was to deregulate the electric generation plants owned by New York State utilities and to have the price for the output of those plants determined by market forces rather than through regulated rates.

23.      The Competitive Opportunities Proceeding was divided into two phases.  Phase I was designed to discuss, investigate, and address the issues involved in moving to a competitive marketplace.  Phase II, commencing in August of 1994, involved a collaborative effort between electric utilities and other interested parties to develop models for restructuring the electric industry within New York.

24.      Phase II of the process culminated with a May 1996 PSC Opinion stating the PSC's vision for the electric utility industry and ordering Con Edison and certain other major electric utilities in New York State to file plans describing how they would restructure their operations to bring about a competitive marketplace for, among other things, electric generation. The Opinion "strongly encouraged" the utilities to sell their generating plants to unregulated entities so as to facilitate the development of a competitive marketplace.  The May 1996 PSC Opinion also invited utilities to propose the corporate structures, including unregulated subsidiaries, that would further the PSC's restructuring goals.

5

### C.   Con Edison NY'S Response to Deregulation

25.     As a result of the Competitive Opportunities Proceeding, Con Edison NY knew in the mid-1990s that it would be required to restructure its regulated businesses and allowed to expand into competitive unregulated businesses.  Con Edison NY further understood that it might be required to sell most if not all of its electric generation plants and concluded that it should grow its business by (among other things) investing its capital in unregulated businesses and facilities.  Con Edison NY also recognized that the PSC's rules were likely to prohibit Con Edison NY from reinvesting in electric generation plants within New York State.

26.     Consequently, Con Edison NY began to develop a strategy that would allow it to effectively compete in a deregulated industry through the development and growth of unregulated businesses.  Con Edison NY's strategy included, among other things, growth through the investment of capital in unregulated energy-related businesses and facilities outside of New York State.

27.  . .In May 1995, Con Edison NY requested permission from the PSC to invest up to 5% (approximately $504 million) of its consolidated capital in unregulated subsidiaries that would (i) provide energy services; (ii) invest and/or participate in international energy infrastructure projects; and (iii) market its technical services.

28.     In July 1996, the PSC issued an order (the "July 1996 Order") which deferred action on Con Edison NY's May 1995 request, but granted Con Edison NY authority to invest up to $50 million in unregulated subsidiaries which would invest in two of the three requested projects:  the investment and/or participation in international energy infrastructure projects, and the marketing of technical services internationally.  The PSC stated that these investments would be "largely international" and could be made through "development companies, investment funds, joint ventures, or other vehicles."  In accordance with the PSC's plan to encourage

6

divestiture of public utility-owned electric generation plants, the PSC prohibited Con Edison NY from investing in any project that might provide electric energy to customers within New York State.

29. In response to the July 1996 Order, in October 1996 Con Edison NY formed a new subsidiary, Gramercy Development, Inc., to carry out the investments allowed by such Order. Gramercy Development, Inc. later changed its name to Con Edison Development.

30. In October 1996, Con Edison NY filed a rate and restructuring plan as mandated by the PSC. This plan also included a petition to adopt a holding company structure. Con Edison NY's restructuring plan proposed an approach to a competitive electric generation market that included, among other things, divestiture of its generating plants, a plan for retail competition, and a corporate reorganization into a holding company structure. The proposed holding company structure would allow Con Edison to form unregulated subsidiaries whose investment decisions would no longer require prior PSC approval.

31. In September 1997, the PSC and Con Edison NY ultimately agreed on a restructuring plan that was embodied in a Settlement Agreement ("the Settlement"). The Settlement included, among other things, (i) a new rate plan during the period of the transition to competition, (ii) a commitment by Con Edison NY to divest at least 50% of its New York City electric generation plants by 2002 to unregulated third parties so as to help implement a fully competitive market for electric generation, and (iii) authorization for Con Edison NY to form a holding company whose subsidiaries would consist of Con Edison NY and several unregulated subsidiaries, including Con Edison Development.

32. The Settlement permitted the new holding company to invest up to 5% of its consolidated capital in unregulated subsidiaries, consistent with Con Edison NY's May 1995

7

request.  While the Settlement replaced the July 1996 Order, pursuant to a Statement of Policy dated July 17, 1998, the PSC imposed a prohibition against investments in electric generation assets in New York State by Con Edison NY's unregulated affiliates, albeit as a rebuttable presumption that such investments would unacceptably exacerbate the potential for the exercise of vertical market power.

33.    As allowed by the Settlement, the shareholders of Con Edison NY formed CEI in January 1998.  As part of the transition to a holding company structure, Con Edison NY and Con Edison Development, as well as several other unregulated subsidiaries of Con Edison NY, became subsidiaries of CEI.

34.    In 1999, pursuant to the Settlement with the PSC, Con Edison NY completed the sales of almost 6,300 megawatts of its approximately 8,300 megawatts of electric generation assets for an aggregate price of $1.8 billion.  In 2000, Con Edison NY entered into a contract to sell its nuclear-generating facilities, with electric generating capacity in excess of 900 megawatts, for an aggregate price of $502 million, not including fuel and other adjustments. That transaction closed in 2001.  Today, the remaining electric generation assets owned by Con Edison NY are held in connection with, and are ancillary to, its steam generation business.

**D.    The Business Of Con Edison Development**

35.    Con Edison Development was formed to take advantage of the Con Edison group's expertise in the construction and operation of electric generating plants and to pursue energy-related investments on a world-wide basis free from regulation by the PSC.

36.    Con Edison Development's initial business plan, formulated in 1997, was a long-term plan which was designed to take advantage of the world-wide trend to deregulation and envisioned Con Edison Development's potential growth into a worldwide integrated utility business.  However, because the growth into unregulated investments, particularly those outside

8

New York State, was a new venture for the Con Edison group, Con Edison Development adopted a gradual and measured approach to these investments.

37.    As the initial step in its business plan, Con Edison Development focused on three categories of investment:  (i) development of new energy projects, such as electric power generation; (ii) acquisition of existing infrastructure, including portions of operating electric, gas, thermal, and water utilities; and (iii) leasing portions of energy systems, such as power plants or distribution systems.   Con Edison Development also planned to market technical services regarding the design, building, operation, and management of modern utilities.

38.    Pursuant to this strategy, Con Edison Development began to participate in energy-related projects through investments operated by others, such as investments in energy funds. In July 1997, Con Edison Development made its first energy infrastructure investment, namely a capital commitment to provide up to $5 million to a fund sponsored by Energy Investors Fund called Project Finance Fund III, LP.  Project Finance III utilized the funds received from Con Edison Development and other similar equity investors to invest in energy and infrastructure projects worldwide.

39.    Con Edison Development also relied on outside consultants to locate potential international energy infrastructure investment opportunities.   In March 1997, Con Edison Development entered into an agreement with International Energy Partners, L.P. ("IEP"). IEP had a portfolio of international energy infrastructure investment opportunities that it was pursuing.  Pursuant to this agreement, Con Edison Development was given preferred rights to participate in certain investment opportunities identified by IEP.

40.    One of the earliest opportunities presented to Con Edison Development by IEP was a minority investment in a relatively small power facility (42 megawatts) in Eastern

Guatemala, generally known as Generadora Electrica del Norte, Limitada ("Genor").   Con Edison Development acquired and still owns indirectly through subsidiaries a 49% interest in Genor; the remaining 51% is owned by local investors.

41.   Con Edison Development also explored leasing investments in energy facilities. Con Edison Development was interested in investing through leases because these investments (i) provided highly predictable and front-loaded earnings; (ii) achieved good to excellent investment yields; (iii) were less risky than direct ownership of operating assets; and (iv) could be implemented more quickly than direct investments in projects requiring a long development cycle.   Leases, from Con Edison Development's perspective, also provided a means to (i) forge relationships with utilities abroad that would allow for further opportunities in the future; (ii) compete effectively with other domestic entities already involved in overseas investments; and (iii) diversify risk in terms of operations and geography.   Con Edison Development was interested in potential leasing investments in Europe, Australia, and the U.S.

42.   Consistent with its objective of gradually becoming a worldwide integrated utility business, Con Edison Development searched for opportunities related to utilities undergoing privatization in Central and South America, Europe, Southeast Asia, and the United States. Employees of the Con Edison group spent significant amounts of time in China, Australia, the Philippines, Mexico, El Salvador, Argentina and Nicaragua pursuing energy infrastructure investments and other potential energy-related businesses (such as the marketing of technical services).

43.   Con Edison Development continued to pursue energy infrastructure investments both inside and outside the United States until the late 1999 to early 2000 time frame.   At that time, a business decision was made to focus on energy infrastructure opportunities in the United

States, in particular the Northeast and Mid-Atlantic states (other than New York State). This decision was based on a number of considerations, including (i) marketplace pricing indicated that the risks inherent in energy infrastructure investments outside the United States could no longer be justified in light of anticipated returns on such investments, particularly in relation to the anticipated returns and risks on such investments inside the United States, and (ii) the recognition that Con Edison Development and its affiliates could better employ their expertise in the energy markets and the electric utility industry inside the United States, particularly in the Northeast and Mid-Atlantic states,

E.      **The RoCa3 Investment**

44.      During 1997, Con Edison Development developed plans and guidelines for its future growth as an unregulated subsidiary of the Con Edison group. Con Edison Development also began to identify possible investment prospects, including a number of leasing investments.

45.      Consistent with its business plan, one of the projects identified by Con Edison Development during 1997 as a potential leasing investment was a recently constructed 220 megawatt gas-fired combined cycle electric generation plant outside of Rotterdam, The Netherlands. The plant is named "RoCa3," after its location on the border between Rotterdam and Capelle aan den IJssel, and is next to two previously constructed plants. The RoCa3 plant has at all relevant times been owned by South Holland Electric, an electric generation company in The Netherlands that has been involved in the coordination and transport of electrical energy in the province of Zuid-Holland since 1941, and in the production of heat and electricity since 1987.

46.      At the time Con Edison Development was considering an investment in the RoCa3 plant, The Netherlands and the European Union were also in the process of deregulating electric generation facilities.

11

47. Since Con Edison Development did not have prior experience in complex leasing transactions, it decided to invest in conjunction with experienced market participants. In the case of the RoCa3 Investment, Con Edison Development decided to make its investment jointly with Banc One Leasing Corp. ("Banc One").

48. Before making a decision to proceed with the RoCa3 Investment, Con Edison Development considered many factors, including (i) South Holland Electric's business and creditworthiness; (ii) conditions in the energy markets for The Netherlands and Europe; (iii) the political, legal, and economic climate of The Netherlands; (iv) the economic return and accounting income of the RoCa3 Investment; (v) the quality of the RoCa3 plant; (vi) the connection between the RoCa3 plant and the Con Edison group's core business activities;; and (vii) the terms of the transaction. Con Edison Development also considered the potential risks and benefits associated with its residual value interest in the RoCa3 plant. In the leasing context, residual value refers to the remaining useful life and value of an asset at the end of the lease of that asset.

49. Con Edison Development retained a number of consultants to assist in its review of the RoCa3 Investment.

50. On behalf of Con Edison Development and Banc One, Duke Engineering & Services ("Duke Engineering") performed a comprehensive engineering review of the RoCa3 plant's technology. Duke Engineering made a site visit to inspect the RoCa3 plant, interviewed key plant personnel, and reviewed plant documents.

51. Duke Engineering found the RoCa3 plant's design and components to be of high quality using state-of-the-art proven technology and rated the RoCa3 plant as "above average" in each of the four factors that contribute to a plant's useful life. Duke Engineering further

12

concluded that the RoCa3 plant complied with current environmental regulations; that its fuel supply was adequate under the current purchasing agreements; and that South Holland Electric's maintenance philosophy, practices, and facilities were better than average.

52.     On behalf of Con Edison Development and Banc One, Tauw Milieu bv ("Tauw Milieu") conducted an environmental, health, and safety assessment of the RoCa3 plant. Tauw Milieu performed an on-site inspection, interviewed South Holland Electric personnel, and reviewed applicable environmental laws and regulations in conducting its review.

53.     Tauw Milieu concluded that the RoCa3 plant's environmental condition was very good and that it was in substantial compliance with all applicable environmental and health and safety requirements.

54.     On behalf of Con Edison Development and Banc One, Deloitte & Touche performed a comprehensive valuation assessment of the RoCa3 plant. Deloitte & Touche conducted a physical inspection of the RoCa3 plant, interviewed South Holland Electric personnel, and analyzed the power industry in The Netherlands and its regulatory environment, natural gas resources, and the Dutch natural gas industry.

55.     To arrive at a fair market value for the RoCa3 plant, Deloitte & Touche analyzed South Holland Electric's financial statements, the RoCa3 plant's construction expenses and projected operating and other expenses, comparable market transactions, and similar publicly listed companies. Deloitte & Touche then studied historical power plant useful life data to determine the RoCa3 plant's useful life and residual value. Finally, Deloitte & Touche assessed the various options available to South Holland Electric and Con Edison Development under the proposed Investment.

56.     Deloitte & Touche concluded that, as of December 15, 1997, the proposed closing date for the RoCa3 Investment, the RoCa3 plant had a remaining useful life of at least 54 years.

57.     In addition to the work performed by these consultants, Con Edison Development sent a team of its own and Con Edison NY employees to inspect the RoCa3 plant and to discuss the plant's operations with South Holland Electric's engineers.

58.     Based upon its extensive review of the proposed RoCa3 Investment, the board of directors of Con Edison Development approved the RoCa3 Investment on December 10, 1997. The major benefits of the transaction were identified as follows:

      (1)     Highly predictable earnings

      (2)     Front loaded earnings under FASB accounting rules

      (3)     Good to excellent investment yields

      (4)     Relatively low risk

      (5)     Tax benefits of leasing

      (6)     Strategic value of leasing, *i.e.*, the ability to more fully understand the legal, regulatory, commercial and tax environment in The Netherlands and the European Union, thus providing the basis for better informed decisions regarding potential future investments.

59.     Con Edison expected a pre-tax economic profit of at least $60 million from the RoCa3 Investment. This pre-tax profit would provide an internal rate of return of approximately 3% to 4%.

60.     Con Edison Development expected that the yield on the RoCa3 Investment for accounting and financial reporting purposes would be in excess of 12%.

61.     On December 15, 1997, Con Edison Development, through its subsidiary Con Edison Leasing, and South Holland Electric entered into a lease and sublease of RoCa3, whereby Con Edison Leasing leased an undivided 47% interest in the RoCa3 plant from South Holland

Electric for approximately 43.2 years ("the Headlease"), and then subleased the RoCa3 plant back to South Holland Electric for approximately 20.1 years ("the Sublease"). Banc One entered into a similar Headlease and Sublease for the remaining interest in the RoCa3 plant.

62.    Con Edison Leasing formed a trust to enter into the various leases and other agreements that were involved in the RoCa3 Investment. The role of the trust has no effect on the tax treatment of the RoCa3 Investment. Thus, for simplicity, this Complaint describes the RoCa3 Investment as if Con Edison Leasing had invested directly in the RoCa3 Investment.

63.    Under the Headlease, Con Edison Leasing, as lessee, is obligated to make two lump-sum payments of rent to South Holland Electric. The first payment was due in 1997 at the beginning of the Headlease, and the second payment is due in 2041 at the end of the Headlease. The amounts of these rent payments were based on the fair market rental value of the RoCa3 plant as of December 15, 1997.

64.    Con Edison Leasing funded its initial payment of rent under the Headlease by investing $39,320,000 of its own cash and by borrowing $80,792,270.36 from Hollandsche Bank-Unie N.V. ("Hollandsche"). Con Edison Leasing also paid $4,125,000 in transaction costs in connection with entering into the RoCa3 Investment.

65.    At the end of the Headlease in 2041, the RoCa3 plant will have a remaining useful life of at least 10.8 years. This period is 20% of the 54-year useful life of the RoCa3 plant as of December 15, 1997, as determined by Deloitte & Touche. Tax law has long recognized that if an asset has a residual life at the end of the lease of 15% of the asset's original useful life, then the lease qualifies as a "true lease" for federal income tax purposes.

66.    Deloitte & Touche also determined that at the end of the Headlease, the RoCa3 plant will have a remaining residual value of at least 20% of the fair market value of the RoCa3

15

plant as of December 15, 1997. Tax law has long recognized that if an asset has a residual value at the end of the lease of 15% of the asset's original cost, then the lease qualifies as a "true lease" for federal income tax purposes.

67.     The Sublease set forth the terms under which Con Edison Leasing leased its undivided interest in the RoCa3 plant to South Holland Electric. Events of default under the Sublease include South Holland Electric's failure to make rent payments, declaration or filing of bankruptcy, failure to maintain RoCa3, and failure to maintain appropriate insurance. Con Edison Leasing's remedies upon a default include causing South Holland Electric to return Con Edison Leasing's interest in the RoCa3 plant.

68.     At the end of the 20.1-year term of the Sublease from Con Edison Leasing to South Holland Electric, South Holland Electric has an option to purchase Con Edison Leasing's remaining 23.1-year interest in the RoCa3 plant at a fixed price. Deloitte & Touche determined that the price of South Holland Electric's purchase option will exceed the fair market value of the 23.1-year interest it would obtain and, therefore, South Holland Electric is not likely to exercise that option.

69.     If South Holland Electric does not exercise its purchase option, then Con Edison Leasing, as lessee, has the opportunity to earn additional income by (i) claiming possession of its interest in the RoCa3 plant for the remaining 23.1 years of the Headlease; (ii) subleasing the RoCa3 plant to a third party for the remaining 23.1 years; or (iii) renewing the Sublease with South Holland Electric for an additional 16.5 years through the exercise of a "Renewal Option."

70.     Deloitte & Touche determined that the fixed price of the rental payments due from South Holland Electric under Con Edison Leasing's Renewal Option will be below the fair

16

market rental value for a lease of a similar facility during the 16.5 year renewal term and, therefore, Con Edison Leasing is not likely to exercise its Renewal Option.

71. If South Holland Electric does not exercise its purchase option and Con Edison Leasing does not exercise its Renewal Option, which Deloitte & Touche indicated is the most likely outcome, then Con Edison Leasing will have possession of its interest in the RoCa3 plant for the 23.1 years remaining under the Headlease, which is 53.5% of its 43.2-year term. If Con Edison Leasing does exercise its Renewal Option, then at the end of the Renewal Option, Con Edison Leasing will have possession of its interest in the RoCa3 plant for the 6.7 years remaining under the Headlease, which is 15.5% of its 43.2-year term. In either case, Con Edison Leasing will have a residual interest in the RoCa3 plant that is greater than 15% of the Headlease term. The value of Con Edison Leasing's residual interest in the RoCa3 plant is also expected to be significantly higher than 15%.

72. At the end of either (i) the Sublease in 2017 or (ii) the Renewal Option term in 2034, as applicable, South Holland Electric is obligated to return to Con Edison Leasing its undivided interest in the RoCa3 plant in its original condition, ordinary wear and tear excepted, and the plant must pass certain specified redelivery acceptance tests. Duke Engineering anticipated that the plant would meet the requirements stated in the transaction and expected that the plant would be in similar or better operational condition as compared to equivalent power plants because of the high quality of the original equipment and design features.

73. South Holland Electric is the operator of the RoCa3 plant during the term of the Sublease. Con Edison Leasing, Banc One, and South Holland Electric entered into agreements providing for the operation and maintenance of RoCa3 upon the expiration of the Subleases to South Holland Electric. Pursuant to these agreements, Con Edison Leasing and Banc One have

17

the right to remove South Holland Electric as the operator of the RoCa3 plant upon the expiration of the Subleases.

74.    In entering into the RoCa3 Investment, Con Edison Leasing assumed a significant amount of risk, including the risk that South Holland Electric would not be able to make or would refuse to make its required rent payments, the risk that South Holland Electric would go bankrupt, and the risk that the leased equipment would be damaged or otherwise suffer an unanticipated diminution in value.

75.    As lessor under the Headlease, South Holland Electric assumed the risk that Con Edison Leasing would be unable to make the second lump-sum rent payment due under the terms of the Headlease.

76.    Hollandsche, Con Edison Leasing's lender, assumed the risk that Con Edison Leasing would be unable to make the required loan payments.

77.    As is typical in conservatively structured transactions, the RoCa3 Investment included a number of features that were designed to reduce the financial risks assumed by the parties. These features included collateral deposits, pledges of collateral, and an early buy-out option. However, these features did not and could not insulate Con Edison Leasing or the other parties from all risks presented by the RoCa3 Investment.

### COUNT ONE:  THE IRS'S PROPOSED TAX TREATMENT OF THE RoCa3 INVESTMENT WAS ERRONEOUS

**A.    The Headlease and Sublease Between Con Edison Leasing and South Holland Electric Should Be Respected Because Con Edison Leasing Retains Sufficient Benefits and Burdens of Ownership With Respect To Its Leasehold Investment in the Roca3 Plant**

78.    Con Edison NY reincorporates by reference and re-alleges the facts set forth in paragraphs 1 through 77 above.

18

79.   Generally, a lease is an arrangement where one party (the "lessor") has a property interest in an asset or a right to use an asset and provides possession and the right to use that asset to another party (the "lessee") for a fixed period of time in exchange for payment of rent.

80.   For federal income tax purposes, a lease arrangement will be respected as a "true lease" (instead of a loan or other form of transaction) if the lessor retains sufficient benefits and burdens of ownership.   This determination generally depends on whether the lessor has a meaningful equity investment in the asset throughout the entire lease term and a meaningful residual interest in the asset at the end of the lease term.   Decades of judicial authority have found a 15% residual value to be meaningful.  Thus, if at the end of the lease term, the asset is expected to have a remaining useful life (and remaining value) equal to at least 15% of its original estimated useful life (and original cost), the arrangement will be respected for tax purposes as a true lease or sublease, as the case may be.

81.   The lessor in a lease transaction can use either equity or a combination of equity and debt to finance the purchase or lease of the asset.   When a lessor uses non-recourse debt to finance the purchase or lease of the asset, the transaction is called a leveraged lease.

82.   In a typical leveraged lease transaction, an investor purchases or leases an asset and borrows money to finance some or all of the investment.   The investor then leases the asset to a third party who uses the asset in its business operations.   In this type of transaction, it is a common business practice for the investor to lease the asset to the party which originally sold or leased it to the investor, *i.e.*, a "sale-leaseback" or "lease-leaseback" transaction.

83.   In leveraged lease transactions the lessor will earn profits from the rent payments it receives and from the residual value of the property once the lease expires.   Additionally, a leveraged lease transaction will often provide a benefit in the form of a limited tax deferral, in

19

which an amount of federal income tax that would otherwise have been paid one year is deferred until a later year. This is so because leveraged lease transactions often produce losses for federal income tax purposes in the early years of the transaction due to depreciation, rental expense, amortization, and interest deductions. These losses are offset by profits or gains for federal income tax purposes in the later years of the transaction. This tax deferral effect of leveraged lease transactions has been approved by the courts and the IRS for many years.

84.     The RoCa3 Investment, entered into by Con Edison Leasing and South Holland Electric on December 15, 1997, was a leveraged lease transaction because a portion of Con Edison Leasing's investment was financed through a non-recourse loan from Hollandsche.

85.     The Headlease from South Holland Electric to Con Edison Leasing and the Sublease from Con Edison Leasing to South Holland Electric both qualify as leases for federal tax purposes because in each case (i) the leases  transferred possession of the property interest in return for the obligation to pay rent and provided for transfer of possession back to the lessor in the event of a default, and (ii) the lessors' return depended upon the residual value of the property at the end of the respective lease.

**B.      Con Edison NY Properly Reported the RoCa3 Investment on Its 1997 Tax Return**

86.     Con Edison NY properly reported income and claimed deductions on its 1997 tax return in connection with the RoCa3 Investment.

87.     As lessee under the Headlease, Con Edison Leasing is required to make rent payments to South Holland Electric. Con Edison Leasing accrued rental deductions on its 1997 tax return for these payments in accordance with the terms of the Headlease.

20

88.     As lessee under the Sublease, South Holland Electric is required to make rent payments to Con Edison Leasing. Con Edison Leasing accrued income on its 1997 tax return with respect to these payments in accordance with the terms of the Sublease.

89.     Section 467 of the Internal Revenue Code generally requires rent to be allocated to tax periods in accordance with the terms of a lease, except as otherwise required by section 467. Section 467 also authorizes the IRS to issue regulations regarding the allocation of rental payments to tax periods. Although section 467 was enacted in 1984, the Treasury Department did not promulgate final regulations pursuant to section 467 until 1999, that is, nearly 15 years later.

90.     On June 3, 1996, before Con Edison Leasing entered into the RoCa3 Investment, the Treasury Department issued "proposed" regulations under Section 467 of the Internal Revenue Code (the "Proposed Section 467 Regulations"). These regulations, however, were not made final until May 18, 1999 (the "Final Section 467 Regulations").

91.     Certain provisions of the Proposed Section 467 Regulations could have altered the method in which Con Edison Leasing reported the rental expense and income resulting from the Headlease and Sublease, respectively, on its 1997 income tax return, but these provisions were not applicable to leases that were entered into prior to the Final Section 467 Regulations as long as the allocation of rent agreed to by the parties was not designed for the principal purpose of avoiding income tax.

92.     Both the Proposed Section 467 Regulations and the Final Section 467 Regulations contain a "safe harbor" provision. This provision states that the avoidance of income tax will not be considered to be a principal purpose for the method of allocating rent agreed to by the parties

21

if the rent allocated to each calendar year is no more than 10% higher or lower than the average rent for all calendar years under the lease.

93.     The rent allocation contained in the Headlease and Sublease met the 10% "safe harbor" rule that is contained in the Proposed Section 467 Regulations and the Final Section 467 Regulations.  Under the IRS's own rules, the rent allocation methodology in each of the leases is not considered to be for the principal purpose of avoiding income tax.  Because the allocations of rent under the Headlease and Sublease satisfied the 10% safe harbor provision, Con Edison NY's reported rental expense deductions and rental income from the RoCa3 Investment as reported on its 1997 income tax return complied with the Proposed Section 467 Regulations and the Final Section 467 Regulations.

94.     Con Edison NY properly reported deductions for accrual of interest expense with respect to its loan from Hollandsche.

95.     Con Edison NY properly reported deductions for the amortization of transaction costs incurred with respect to the RoCa3 Investment.

## COUNT TWO:  CON EDISON NY IS ENTITLED TO A REFUND OF TAXES

96.     Con Edison NY incorporates by reference and re-alleges the facts set forth in paragraphs 1 through 95 above.

97.     Pursuant to 26 U.S.C. §§ 61 and 467, Con Edison NY included a total of $399,963 in rental income on its income tax return for the 1997 taxable year with respect to South Holland Electric's obligation to pay rent under the terms of the Sublease.

98.     Pursuant to 26 U.S.C. §§ 162(a)(3), 167, and 467, Con Edison NY deducted a total of $1,082,350 in rental expense and transaction costs on its income tax return for the 1997

taxable year as a result of the rental payments made to South Holland Electric under the terms of, and in amortization of transaction costs relating to, the Headlease.

99.     Pursuant to 26 U.S.C. § 163, Con Edison NY deducted a total of $254,944 in interest expense on its income tax return for the 1997 taxable year as a result of interest accruing on the bank loan it obtained to fund a portion of its rental payments under the Headlease.

100.    The IRS proposed to disallow all of Con Edison NY's deductions for (i) rental payments required to be made to South Holland Electric under the terms of the Headlease, (ii) the interest payments required to be made to Hollandsche, and (iii) the amortization of transaction costs.

101.    The IRS also proposed to reduce Con Edison NY's rental income by the amount of rental payments due from South Holland Electric under the Sublease.

102.    These proposed adjustments had the effect of recalculating Con Edison NY's taxable income for the 1997 taxable year as if Con Edison NY had not engaged in the RoCa3 Investment.

103.    The changes proposed by the IRS increased Con Edison NY's taxable income for the 1997 taxable year by a net amount of $937,331.

104.    As a result of this proposed increase in taxable income, the IRS demanded an additional $328,066 in federal income tax from Con Edison NY for the 1997 taxable year.

105.    On or about November 3, 2005, Con Edison NY paid to the IRS at Chicago, Illinois the proposed tax deficiency of $328,066.

106.    The adjustments made by the IRS to Con Edison NY's taxable income for the 1997 taxable year were contrary to controlling tax law, and Con Edison NY is entitled to a

complete refund of the $328,066 of federal income taxes erroneously paid with respect to the RoCa3 Investment.

## DEMAND FOR JUDGMENT

WHEREFORE, Con Edison of NY respectfully requests that this Court enter judgment in its favor and against the Defendant in the amount of $328,066, plus interest and costs allowed by law, and provide such other relief as the Court may deem just.

Respectfully submitted this 18th day of April, 2006.

Respectfully Submitted,

Thomas C. Durham
MAYER, BROWN, ROWE & MAW LLP
71 South Wacker Drive
Chicago, Illinois 60606
Tel: (312) 701-7216
Fax: (312) 706-9187
tdurham@mayerbrownrowe.com

Attorney for Plaintiff

OF COUNSEL:

David F. Abbott
Brian P. Trauman
MAYER, BROWN, ROWE & MAW LLP
1675 Broadway
New York, New York 10019
Tel: (212) 506-2500
Fax: (212) 262-1910

Nicole Bielawski
MAYER, BROWN, ROWE & MAW LLP
1909 K Street, N.W.
Washington, D.C. 20217
Tel: (202) 263-3000
Fax: (202) 263-3300

# EXHIBIT A-2

# CLOSING MEMORANDUM

## (ROCA FACILITY TRUST NO.2)

### N.V. ELECTRICITEITSBEDRIJF ZUID-HOLLAND,
Lessor,

### N.V. ELECTRICITEITSBEDRIJF ZUID-HOLLAND,
Sublessee,

### HOLLANDSCHE BANK-UNIE N.V.,
Agent and Lender,

### BAYERISCHE LANDESBANK,
L/C Issuer

### CONSOLIDATED EDISON LEASING, INC.,
Investor

and

### WILMINGTON TRUST COMPANY,
not in its individual capacity, except as otherwise
expressly provided therein, but solely as Trustee

December 15, 1997

0000HYX1.W51

Bond 5/1/01

US08959

CERTAIN REFERENCED ENTITIES

N.V. ELECTRICITEITSBEDRIJF ZUID-HOLLAND ("EZH"), Lessor

N.V. ELECTRICITEITSBEDRIJF ZUID-HOLLAND ("EZH"), Sublessee

HOLLANDSCHE BANK-UNIE N.V. ("HBU"), Lender

BAYERISCHE LANDESBANK GIROZENTRALE, ("BL"), L/C Issuer

BOI LEASING CORPORATION ("BOI"), CONSOLIDATED EDISON LEASING INC. ("CELI"), Investor

WILMINGTON TRUST COMPANY ("WTC"), not in its individual capacity, except as otherwise expressly provided herein, but solely as Trustee

SHEARMAN & STERLING ("S&S"), Special counsel to Investor

WHITE & CASE, Special Counsel to EZH, ("W&C")

LOYENS & VOLKMAARS, Special Dutch Tax Counsel to EZH, ("L&V")

LOEFF CLAEYS VERBEKE, Special Dutch Counsel to Investor and [Investor Guarantor], ("LCV")

OPPENHOFF & RÄDLER, Special German Counsel to the Investor [and the Lender] ("O&R")

CLIFFORD CHANCE, Special Dutch Counsel to EZH, ("CC")

CLIFFORD CHANCE-FRANKFURT, Special German Counsel to EZH, ("CC-Frankfurt")

CORNERSTONE FINANCIAL ADVISORS, ("CFA")

CAPSTAR PARTNERS, INC., ("CPI")

ABN AMRO BANK N.V., ("ABN") Deposit Bank

DELOITTE & TOUCHE ("D&T")

TAUW MILIEU, Environmental Consultant ("TAUW")

CS FIRST BOSTON CORPORATION, ("CSFB")

DAVIS POLK & WARDWELL, Special Counsel to Lender and Agent, ("DPW")

NAUTA DUTILH, Special Dutch Counsel to Lender and Agent ("ND")

MORRIS, JAMES, HITCHENS & WILLIAMS, Special Delaware counsel to the Bank, ("MJH&W")

US08960

Responsibility

1.  <u>Operative Documents and Certain Other Basic Documents</u>

   1.01    Participation Agreement                      (W&C)

        (a)  Definitions (Appendix A)             (W&C)

        (b)  Schedules

| | | |
|---|---|---|
| SCHEDULE 1 - | Schedule of Commitments | (CPI/CFA) |
| SCHEDULE 2A - | Scheduled Purchases of Trustee Treasury Collateral | (CPI/CFA) |
| SCHEDULE 3 - | Schedule of Permitted Successor Trustees | (S&S) |
| SCHEDULE 3(x) - | Schedule of Environmental Certificate | (W&C/S&S) |
| SCHEDULE 7(d) - | Schedule of Governmental Approvals, Registrations and Notices | (EZH/CC) |
| SCHEDULE 7(q) - | Schedule of Information | (EZH/CC) |
| SCHEDULE 7(r) | Schedule of Rights to the Network Being Negotiated | (CC) |
| SCHEDULE 7(t) - | Schedule of Description | (EZH/CC) |
| SCHEDULE 7(bb) - | Schedule of Financial Statements | (CC) |
| SCHEDULE 7(cc)(iii) - | Schedule of Violations | (EZH) |
| SCHEDULE 7(cc)(iv) - | Schedule of Compliance with Rules, Regulations and Laws | (CC) |
| SCHEDULE 7(gg) - | Schedule of Plans and Specifications | (CPI/CFA) |
| SCHEDULE 7(hh) - | Schedule of Adverse Events | (EZH/CC) |
| SCHEDULE 7(ll) - | Schedule of Environmental Information | (TAUW)) |
| SCHEDULE 7(mm) - | Schedule of Encroachments | (CC) |
| ANNEX A - | L/C Termination Values | (FCLC) |

0000HYX1.W51                         -3-

US08961

| | ANNEX B - | Form of Assignment and Assumption Agreement | (W&C) |
|---|---|---|---|
| | ANNEX C - | Assumed Maximum Credit Exposure Amount | (FCLC) |
| | ANNEX I - | Addresses and Telecopier Numbers for Notices | (W&C) |
| 1.02 | Lease Agreement | | (S&S) |
| | EXHIBIT A - | Lease Basic Rent | (CPI/CFA) |
| | EXHIBIT B - | Excluded Portion Amounts | (CPI/CFA) |
| | EXHIBIT C - | Lease Collateral Deposit Amounts | (CPI/CFA) |
| | EXHIBIT D - | Lease Termination Value | (CPI/CFA) |
| | EXHIBIT E - | Operations Maintenance Program | (CPI/CFA) |
| 1.03 | Lease Certificate of Acceptance | | (S&S) |
| 1.04 | Sublease Agreement | | (W&C) |
| | EXHIBIT A - | Form of Sublease Certificate of Acceptance | (W&C) |
| | EXHIBIT B - | Sublease Rent | (CPI/CFA) |
| | EXHIBIT C - | Sublease Termination Values | (CPI/CFA) |
| | EXHIBIT D - | Sublease Special Termination Values | (CPI/CFA) |
| | EXHIBIT E - | Facility Value, Common Facilities Values | (CPI/CFA) |
| | EXHIBIT F - | Sublease Special Special Termination Values | (CPI/CFA) |
| | SCHEDULE I - | Sublease Purchase Option Price | (CPI/CFA) |
| 1.05 | Sublease Certificate of Acceptance | | (W&C) |
| 1.06 | Trust Agreement | | (W&C) |
| 1.07 | Loan and Security Agreement | | (W&C) |
| 1.08 | Loan Certificate | | (W&C) |

US08962

| | | |
|---|---|---|
| 1.09 | Tax Indemnity Agreement | (W&C/S&S) |
| 1.10 | Dutch Supplemental Pledge to Loan and Security Agreement | (CC) |
| 1.11 | Facility Operating Agreement | (W&C) |
| 1.12 | Common Facilities Use Agreement | (W&C) |
| 1.13 | Facility Support Agreement | (W&C) |
| 1.14 | Access Agreement | (W&C) |
| 1.15 | Notarial Deed of Easement | (CC) |
| 1.16 | First Priority Mortgage | (CC) |
| 1.17 | Second Priority Mortgage | (CC) |
| 1.18 | Collateral Rights Agreement | (CC) |
| 1.19 | IJssel Agreement | (W&C) |
| 1.20 | Sublessee Pledge and Security Agreement | (W&C) |
| 1.21 | Dutch Supplemental Pledge to Sublessee Pledge and Security Agreement | (CC) |
| 1.22 | Custody Agreement | (W&C) |
| 1.23 | Rotte Agreement | (CC) |
| 1.24 | Sublease Deposit, Pledge and Repledge Agreement | (CC) |
| 1.25 | Assignment for Security (Sublessor's Lease Interest) | (W&C) |
| 1.26 | Dutch Supplemental Pledge to the EZH Pledge and Security Agreement | (CC) |
| 1.27 | Notarial Deed of Establishment | (CC) |
| 1.28 | Dutch Supplemental Pledge to Assignment for Security (Sublessor's Lease Interest) | (CC) |
| 1.29 | Deed of Establishment of Stichting IJssel | (CC) |
| 1.30 | Deed of Establishment of Stichting Rotte | (CC) |
| 1.31 | Deed of Establishment of Stichting Roca | (CC) |
| 1.32 | EZH Pledge and Security Agreement | (W&C) |
| 1.33 | Sublease Second Priority Pledge Agreement | (CC) |
| 1.34 | Letter of Credit | (CC) |

0000HYX1.W51

-5-

US08963

| 1.35 | Reimbursement Agreement | (DPW) |
| 1.36 | Account Pledge Agreement | (W&C) |
| 1.37 | Notice Acknowledgment of Account Pledge | (W&C) |
| 1.38 | Change of Law Agreement | (CC) |
| 1.39 | VAT Agreement | (LV/CC) |
| 1.40 | Assignment Agreement | (CC) |
| 1.41 | Security Assignment Agreement | (CC) |
| 1.42 | Pledge Agreement | (CC) |
| 1.43 | Closing Funding Memorandum | (S&S) |
| 1.44 | Sublessee Loan Agreement | (W&C) |
| 1.45 | Building Right | (CC) |

## 2. Closing Documents - Relating to Facility and Common Facilities

2.01   Appraisal of the Undivided Interest, the Sublessor's Lease          (D&T)
       Interest, the Facility, the Network, the Common Facilities and
       the Property Rights performed by Deloitte & Touche
       Valuation Group.

2.02   Copies of UCC financing statements and filings executed by          (W&C)
       the Trustee, as debtor, and the Lender, as secured party, to be
       filed with the Secretary of State in Delaware, with respect to
       the security interests created by the Loan Agreement.

2.03   Ruling from the appropriate taxing authority in The                 (L&V)
       Netherlands confirming that under Applicable Dutch Law no
       transfer taxes shall be payable in connection with the leasing
       and subleasing of the Undivided Interest and the exercise of
       the Sublease Purchase Option.

2.04   Rulings on corporate income taxes from the appropriate taxing       (L&V)
       authorities in The Netherlands.

2.05   Arrangement from the appropriate taxing authority in The            (L&V)
       Netherlands confirming that under Applicable Dutch Law no
       value added taxes shall be payable in connection with the
       leasing and subleasing of the Undivided Interest and the
       exercise of the Sublease Purchase Option.

US08964

2.06    Certificate of EZH's insurance broker or the insurer, as the          (CC/EZH)
        case may be, setting forth in reasonable detail the insurance
        obtained by or on behalf of the Sublessee in accordance with
        Section 11 of the Sublease and stating that such insurance is in
        full force and effect and that all premiums then due thereon
        have been paid; together with certified copies of all policies
        evidencing such insurance (or certificates therefor signed by
        the insurer or an agent authorized to bind the insurer).

2.07    Report delivered by Duke Engineering and Services, Inc.              (DUKE)

2.08    Report delivered by Tauw Milieu bv.                                  (TAUW)

2.09    Copies of documents evidencing the existence and substance            (CC)
        of any resolutions required by the Municipality to grant the
        Leasehold Right, the Building Right to EZH and the Turbine
        Building Right (together with an extract of the land registry of
        Rotterdam from which it appears that on the Closing Date the
        Municipality is the owner of the Station Site, that the Notarial
        Deed of Establishment has been duly registered, and that the
        Station Site has not been encumbered by any Liens of the type
        that would be reflected thereon (other than Permitted Liens)).

2.10    Description of the Station Site, the Unit, the Network and the         (CC)
        Common Facilities.

2.11    Certificate of EZH addressed to Deloitte & Touche LLP as to          (EZH)
        the operation and output of the Facility.

3.  Closing Documents Delivered by EZH, as Lessor and Sublessee

3.01    Power of attorney of EZH regarding the officials authorized to        (CC)
        execute and deliver on its behalf the Operative Documents and
        any other documents and agreements to be delivered in
        connection therewith.

3.02    Certified copies of documents evidencing the corporate               (CC)
        approval and actions of EZH, including resolutions of the
        board of directors, duly authorizing the transactions
        contemplated by the Operative Documents and the execution,
        delivery and performance by EZH of each Operative
        Document to which it is a party, including

US08965

(a) a certificate signed by a Managing Director of EZH on behalf of EZH's Board of Managing Directors confirming that such Board has authorized and approved the transactions contemplated by the Operative Documents and the execution, delivery and performance by EZH of such Operative Document

(b) a certificate signed by the Chairman of EZH's Board of Supervisory Directors confirming that such Board has approved the transactions contemplated by the Operative Documents and

(c) the request by EZH of the concurring advice and the unconditional concurring advice of EZH's Works Council.

3.03   Certified copies of the Articles of Association of EZH either certified by the Chamber of Commerce in The Hague, The Netherlands, or in the form of authenticated copies.   (CC)

3.04   Evidence of governmental approvals and evidence of approvals or consents, or the providing of notification or registration, if any, required for the consummation of the Transaction.   (CC)

3.05   Officer's Certificate of EZH stating with respect to itself that   (W&C)

(1) the representations and warranties of EZH contained in Section 7 of the Participation Agreement, and the representations made as of the signing date (if any) and in all the other Operative Documents to which EZH is a party, except the Tax Indemnity Agreement, are true and accurate on and as of the Closing Date;

(2) all covenants and conditions required to be performed or fulfilled by EZH prior to or on the Closing Date have been performed and fulfilled; and

(3) each Operative Document to which EZH is a party is in full force and effect with respect to it.

3.06   Environmental Certificate of an Officer of EZH in the form of Schedule 3(x) of the Participation Agreement.   (S&S)

3.07   Copies from EZH of the rulings referenced in Section 5(k) of the PA duly certified by the authorities which had issued such rulings and an Officer's Certificate certifying that such copies of the rulings are true and correct.   (L&V)

US08966

4. Closing Documents Delivered by the Bank

4.01   Certificate of an Assistant Secretary of the Bank, as to   (MJH&W)

    (a) the Certificate of Incorporation of the Bank,

    (b) the By-Laws of the Bank,

    (c) the resolutions of the board of directors duly authorizing the transactions contemplated by the Operative Documents and the execution, delivery and performance by the Bank of each Operative Document to which it is a party and

    (d) the incumbency of certain officers of the Bank authorized to execute and deliver on its behalf the Operative Documents and any other documents and agreements to be delivered in connection therewith.

4.02   Officer's Certificate of the Bank, stating that   (MJH&W)

    (1) the representations and warranties of the Bank contained in Section 9 of the Participation Agreement and the representations made as of the signing date (if any) and in all the other Operative Documents to which the Bank is a party are true and accurate on and as of the Closing Date and

    (2) each Operative Document to which it is a party is in full force and effect with respect to it.

4.03   Officer's Certificate of the Trustee stating that   (MJH&W)

    (1) the representations and warranties of the Trustee contained in Section 9 of the Participation Agreement and the representations and warranties made by the Trustee as of the signing date (if any) and in all the other Operative Documents to which the Trustee is a party are true and accurate on and as of the Closing Date;

    (2) all covenants and conditions required to be performed or fulfilled by the Trustee prior to or on the Closing Date have been performed and fulfilled;

    (3) both before and after giving effect to the transactions contemplated by the Operative Documents, no Loan Event of Default, Loan Default, Sublessor Event of Default or Sublessor Default caused by the Trustee has occurred as of the Closing Date or would occur as of the Closing Date but for the requirement that notice be given or that time elapse; and

US08967

(4) each Operative Document to which it is a party is in full force and effect with respect to it.

5. Closing Documents Delivered by the Investor

5.01    Certificate of an Assistant Secretary of the Investor, as to          (S&S)

(a) the Certificate of Incorporation of the Investor,

(b) the By-Laws of the Investor,

(c) the resolutions of the board of directors duly authorizing the transactions contemplated by the Operative Documents and the execution, delivery and performance by the Investor of each Operative Document to which it is a party and

(d) the incumbency of certain officers of the Investor authorized to execute and deliver on its behalf the Operative Documents and any other documents and agreements to be delivered in connection therewith.

0000HYX1.W51                        -10-

US08968

5.02    Officer's Certificate of the Investor stating that                    (S&S)

    (1) the representations and warranties of the Investor contained in Section 8 of the Participation Agreement and the representations made as of the signing date (if any) and in all the other Operative Documents to which the Investor is a party, except the Tax Indemnity Agreement, are true and accurate on and as of the Closing Date;

    (2) all covenants and conditions required to be performed or fulfilled by the Investor prior to or on the Closing Date have been performed and fulfilled;

    (3) both before and after giving effect to the transactions contemplated by the Operative Documents, no Loan Event of Default, Loan Default, Sublessor Event of Default or Sublessor Default caused by the Investor has occurred as of the Closing Date or would occur as of the Closing Date but for the requirement that notice be given or that time elapses; and

    (4) each Operative Document to which it is a party is in full force and effect with respect to it.

6.    Closing Documents Delivered by the Lender

    6.01    Power of attorney of the Lender regarding the officials                  (DPW)
authorized to execute and deliver on its behalf the Operative Documents and any other documents and agreements to be delivered in connection therewith.

    6.02    IRS Form 1001.                                                    (DPW)

US08969

7.  Documents delivered by the Stichting IJssel

   7.01   An extract from the Commercial Register.   (CC)

   7.02   Certified copies of documents evidencing the corporate  (CC)
approval, including a power of attorney, and actions of
Stichting IJssel, including resolutions of the board of
directors, duly authorizing the transactions contemplated by
the Operative Documents and the execution, delivery and
performance by Stichting IJssel of each Operative Document
to which it is a party.

   7.03   Certified copies of the charter documents of the Stichting  (CC)
IJssel.

8.  Documents Delivered by Stichting Rotte

   8.01   An extract from the Commercial Register.   (CC)

   8.02   Certified copies of documents evidencing the corporate  (CC)
approval, including a power of attorney and actions of
Stichting Rotte, including resolutions of the board of
directors, duly authorizing the transactions contemplated by
the Operative Documents and the execution, delivery and
performance by Stichting Rotte of each Operative Document
to which it is a party.

   8.03   Certified copies of the charter documents of the Stichting  (CC)
Rotte.

9.  Documents Delivered by Stichting Roca

   9.01   An extract from the Commercial Register.   (CC)

   9.02   Certified copies of documents evidencing the corporate  (CC)
approval, including a power of attorney and actions of
Stichting Roca, including resolutions of the board of directors,
duly authorizing the transactions contemplated by the
Operative Documents and the execution, delivery and
performance by the Stichting Roca of each Operative
Document to which it is a party.

   9.03   Certified copies of the charter documents of the Stichting  (CC)
Roca.

US08970

## 10. Opinions

10.01    Opinion of White & Case, special New York counsel to EZH,           (W&C)
         Stichting Rotte, Stichting IJssel and Stichting Roca, addressed
         to the Investor, the Bank, the Trustee and the Deposit Bank.

10.02    Opinion of Morris, James, Hitchens & Williams, special            (MJH&W)
         Delaware counsel to the Bank and the Trustee, in its
         individual capacity and as Trustee, addressed to the Investor,
         the Bank, the Trustee, the Deposit Bank, the Lender and
         EZH.

10.03    Opinion of Shearman & Sterling, special United States counsel       (S&S)
         to the Investor, addressed to the Investor, the Bank, the
         Trustee, the Deposit Bank, the Lender and EZH.

10.04    Opinion of Consolidated Edison, Inc. In-House Counsel,              (S&S)
         Andrew Scher, addressed to the Investor, the Bank, the
         Trustee, the Deposit Bank, the Lender and EZH.

10.05    Opinion of Clifford Chance, special Dutch counsel to EZH,           (CC)
         Stichting Rotte, Stichting IJssel, Stichting Roca and the
         Bayerische Landesbank, addressed to the Investor, the Bank,
         the Trustee, the Lender and EZH.

10.06    Opinion of Nauta Dutilh, special Dutch Counsel to the Lender       (ND)
         and the Deposit Bank, in form and substance satisfactory to
         the Lender.

10.07    Tax opinion of Shearman & Sterling, special United States tax      (S&S)
         counsel to the Investor, in form and substance reasonably
         satisfactory to the Investor.

10.08    Tax opinion of Loyens & Volkmaars, special Dutch tax              (L&V)
         counsel to EZH, addressed to the Investor, the Bank, the
         Trustee, the Deposit Bank, the Agent, the Lender and EZH.

10.09    Opinion of Loeff Claeys Verbeke, special Dutch counsel to          (LCV)
         the Investor, in form and substance satisfactory to the
         Investor.

10.10    Tax opinion of Loeff Claeys Verbeke, special Dutch tax             (LCV)
         counsel to the Investor, in form and substance satisfactory to
         the Investor.

10.11    Opinion of Nauta Dutilh, special Dutch counsel to the Lender        (ND)
         and the Deposit Bank.

US08971

# EXHIBIT A-3

**EXECUTION COPY**

---

## TAX INDEMNITY AGREEMENT

ROCA Facility Trust No. 2

dated as of December 15, 1997

between

ELECTRICITEITSBEDRIJF ZUID-HOLLAND

and

CONSOLIDATED EDISON LEASING, INC.

---

CE 000918

PF000697

## TABLE OF CONTENTS

Page

SECTION 1. Definitions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   1

SECTION 2. Tax Assumptions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   5

SECTION 3. Sublessee's Income Tax Representations, Warranties and Covenants . . . . .   8

SECTION 4. Intention of Parties; Records  . . . . . . . . . . . . . . . . . . . . . . . . . . . .   10

SECTION 5. Indemnity for Loss of Tax Benefits . . . . . . . . . . . . . . . . . . . . . . . . .   10

SECTION 6. Survival  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   25

SECTION 7. Method of Payment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   25

SECTION 8. Late Payments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   25

SECTION 9. GOVERNING LAW  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   25

SECTION 10. Notices  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   26

SECTION 11. Assignment by Investor or the Sublessee . . . . . . . . . . . . . . . . . . . . .   26

SECTION 12. No Set-Off . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   26

SECTION 13. Counterparts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   26

SECTION 14. Headings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   26

SECTION 15. Amendments, Supplements, etc . . . . . . . . . . . . . . . . . . . . . . . . . . .   26

SECTION 16. Protection of Assumed Tax Benefits . . . . . . . . . . . . . . . . . . . . . . . .   27

SECTION 17. Future Changes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   27

APPENDIX A.       Copy of Exhibit 1 to the Appraisal.

APPENDIX B.       Copy of Exhibit 12A to the Engineer's Report.

CE 000919

PF000698

### TAX INDEMNITY AGREEMENT

This TAX INDEMNITY AGREEMENT (ROCA Facility Trust No. 2), dated as of December 15, 1997, between N.V. ELECTRICITEITSBEDRIJF ZUID-HOLLAND, as Sublessee, and Consolidated Edison Leasing, Inc., as Investor (this "Agreement").

### WITNESSETH:

WHEREAS the Sublessee, the Investor, and the other parties described therein, have undertaken certain obligations and transactions described in the Participation Agreement dated as of December 15, 1997, pursuant to which the Sublessor and the Sublessee have entered into the Sublease dated as of December 15, 1997 (said Sublease and all amendments thereto entered into from time to time and executed by the parties thereto collectively referred to herein as the "Sublease").

WHEREAS in consideration of the parties hereto entering into the Participation Agreement and the transactions contemplated thereby, the parties hereto desire to enter into this Agreement providing for certain indemnities by the Sublessee to the Investor and certain reimbursements by the Investor to the Sublessee.

NOW, THEREFORE, the parties hereto do hereby agree as follows:

SECTION 1. Definitions.

(a)     General. All capitalized terms herein shall have the meanings set forth in Appendix A to the Participation Agreement except to the extent provided for or supplemented by the provisions of this Agreement for the purposes of a particular section, paragraph or clause, including, without limitation, the definitions set forth in Section l(b) hereof.

(b)     Special Definitions.

"Final Determination" shall mean (i) a decision, judgment, decree or other order by any court of competent jurisdiction, which decision, judgment, decree or other order has become final (i.e., when all appeals allowable hereby and by law have been exhausted by either party to the action or the time for filing such appeals has expired) or, in any case where judicial review shall at the time be unavailable by reason of the proposed adjustment involving a decrease in a net operating loss or business credit carryforward, a decision, judgment, decree or other order of an administrative official or agency of competent jurisdiction, which decision, judgment, decree or other order has become final (i.e., when all administrative appeals in accordance with Section 5(g) hereof have been exhausted by either party), (ii) a closing agreement entered into pursuant to Section 7121 of the Code or any other settlement agreement entered into in connection with an administrative or judicial proceeding, (iii) the

CE 000920

PF000699

2

expiration of the time for instituting a claim for refund, or if such a claim was filed, the
expiration of the time for instituting suit with respect thereto or (iv) the expiration of the time
for instituting suit with respect to a claimed deficiency.

"Investor" means the Investor and the affiliated group of corporations within the
meaning of Section 1504 of the Code, filing (or which will file or has filed) a consolidated
United States Federal income tax return with the Investor.

"Investor's Tax Rate" shall mean the combined effective United States Federal
and state income tax rate used in the calculation of the Investor's Net Economic Return.

"Permitted Act" shall mean

(i)     the negotiation, execution and delivery by any Sublessee Person of any
of the Operative Documents or the Specified Documents and the consummation of the
transactions required thereby on or before the Closing Date;

(ii)     any act expressly required or expressly permitted by the Operative
Documents (other than (I) any substitution or replacement of the Facility (or any Part thereof
or interest therein), (II) any sub-sublease of the Undivided Interest or the Facility (or any Part
thereof or interest therein), or assignment of the Sublease, (III) any merger, consolidation or
other disposition of any Sublessee Person, other than a Merger Event which is also a Permitted
Merger, (IV) the removal of the Trustee at the request of the Sublessee, (V) any voluntary or
involuntary case or proceeding seeking relief of debts of any Sublessee Person, (VI) any
decommissioning or mothballing of the Facility or any Part thereof, or (VII) any act or failure
to act in connection with the German Documents, other than any act or failure to act in
accordance with the Assignment of German Purchase Option Rights or upon the prior written
request of the Investor; provided that an act shall not be considered to be expressly permitted
merely because such act is not prohibited

(iii)     the taking of any proper tax, financial accounting or financial reporting
positions, not including any written position taken for U.S. Federal income tax purposes that is
inconsistent with the Tax Assumptions;

(iv)     the use, maintenance and operation of the Facility in the customary
business of the Sublessee or any other Sublessee Person, unless such use, maintenance or
operation is in violation of the provisions of any Operative Document;

(v)     any amendment or other change to any Transaction Document (x) to
which the Investor is a party (or consents in writing or which the Investor requires) or (y) to
which the Sublessor is a party and to which the Sublessor has expressly consented in writing or

CE 000921

PF000700

3

which the Sublessor has required (in either case, acting at the express written direction of the Investor), provided, however, that, in each case, such consent specifically references to this Agreement; and

(vi)    any modification, alteration, addition or improvement.

provided that (A) for purposes of this Agreement, the terms Operative Documents, German Documents, Specified Documents and Transaction Documents include such agreements only as in effect and as delivered on or before the Closing Date and (B) the preceding subclause (A) does not apply either with respect to such agreements which have been amended or changed in a manner described in the preceding clause (v) or with respect to Section 5(a)(i)(I), 5(a)(ii)(L), 5(c)(vi), 5(c)(xvii), 5(c)(xx) or 6 hereof.

"Specified Documents" shall mean the following German Documents: (i) Purchase Agreement Gasturbogenerator, (ii) Transfer Deed Gasturbogenerator, (iii) Purchase Agreement Steamturbogenerator, (iv) Transfer Deed Steamturbogenerator, (v) Equipment Lease Agreement Gasturbogenerator, (vi) Acceptance Certificate Gasturbogenerator, (vii) Equipment Lease Agreement Steamturbogenerator, (viii) Acceptance Certificate Steamturbogenerator, (ix) Accounts Receivable Purchase Agreement Gasturbogenerator, (x) Accounts Receivable Purchase Agreement Supplement Gasturbogenerator, (xi) Accounts Receivable Purchase Agreement Steamturbogenerator, (xii) Accounts Receivable Purchase Agreement Supplement Steamturbogenerator, (xiii) Assumption Agreement Gasturbogenerator, (xiv) Supplement to Assumption Agreement Gasturbogenerator, (xv) Assumption Agreement Steamturbogenerator, (xvi) Supplement to Assumption Agreement Steamturbogenerator, (xvii) ABB Comfort Letter regarding Gasturbogenerator, (xviii) ABB Comfort Letter regarding Steamturbogenerator, (xix) Certificate Process Agent Gasturbogenerator, (xx) Certificate Process Agent Steamturbogenerator, (xxi) VAT Agreement Gasturbogenerator, and (xxii) VAT Agreement Steamturbogenerator; the documents set forth in clauses (i), (iii), (v), (vii), (ix), (xi), (xiii), (xv), (xxi) and (xxii), each dated December 13, 1995, the documents set forth in clauses (ii), (iv), (vi), (viii), (x), (xii), (xiv) and (xvi), each dated April 24, 1996, the documents set forth in clauses (xvii) and (xviii), each dated March 29, 1996, and the documents set forth in clauses (xix) and (xx), each dated February 16, 1996.

"Sublessor Group" shall mean the Investor and the Sublessor (but only to the extent that the Sublessor is acting at the express written direction of the Investor).

"Tax Representations" shall mean the representations, warranties and covenants set forth in Section 3 hereof and the Sublessee's representations, warranties, covenants or agreements set forth in Section 7 (other than subsection (s), (v), (z), (aa), (bb), (dd) or (kk)),

CE 000922

4

Section 11(d) (other than clause (ii), (vi) or (vii)) or Section 11(e)(xiii) of the Participation Agreement.

"Treasury Rate" means the applicable Federal rate (annual) (determined under Section 1274(d) of the Code or any successor provision thereto), taking into account the period of time of the discounting period, plus fifty (50) basis points.

SECTION 2.  Tax Assumptions.  Lease Basic Rent, Sublease Basic Rent, Sublease Renewal Rent, Sublease Termination Value, Sublease Special Termination Value, Sublease Special Special Termination Value, Settlement Amount, Sale Remedy Purchase Price, the amounts set forth in the Sublessee Loan Agreement, Sublease Purchase Option Price and the Investor's Net Economic Return have been based, in part, upon the following income tax assumptions (collectively, the "Tax Assumptions") that are assumed for U.S. Federal income tax purposes and for U.S. state and local ("State") income tax purposes:

(a)     The Trust will be treated as a grantor trust or will otherwise be disregarded for Federal income tax purposes and the Investor, as owner of the entire trust, will be entitled and required to take into account, in computing its taxable income, all items of income, gain, loss, deduction and credit with respect to the interest of the Trust in or under the Undivided Interest;

(b)     The Lease and the Sublease will each be treated as a "true lease" for Federal and State income tax purposes; the Lessor will be treated as the lessor of the Undivided Interest and the Trust will be treated as the lessee of the Undivided Interest under the Lease and the Trust will be treated as the sublessor of the Undivided Interest under the Sublease and the Sublessee will be treated as the sublessee of the Undivided Interest under the Sublease;

(c)     The Investor will be allowed rental deductions under Sections 162 of the Code for Lease Basic Rent in each taxable year of the Lease Term in an amount equal to the actual amount of Lease Basic Rent allocated with respect to the taxable year in accordance with the Lease Basic Rent schedule in Exhibit A to the Lease to the portion of the Lease period within such taxable year (the "Rent Deductions");

(d)     The Investor will amortize its Transaction Expenses in the following manner (such deductions collectively being the "Amortization Deductions"):

(i)     one-third of Transaction Expenses on a straight-line basis over a period equal to the sum of the Sublease Basic Term and the Sublease Renewal Term,

CE 000923

PF000702

5

        (ii)     one-third of Transaction Expenses on a straight-line basis over a period equal to the Lease Term,

        (iii)    one-third of Transaction Expenses on a straight-line basis over a period equal to the term of the Loan Agreement;

     (e)    The obligations evidenced by the Loan Certificates will constitute indebtedness of the Trust, and the Investor will be entitled to current deductions under Section 163 of the Code for interest, premium (if any) and all other amounts (except principal) paid or accrued on the Loan Certificates (the "Interest Deductions");

     (f)    As a result of entering into the transactions contemplated by the Operative Documents, the Investor will not be required to include any amount in gross income, other than

        (i)     payments of Sublease Basic Rent or Sublease Renewal Rent in the amounts and at the times as such payments are accrued or paid under the terms of the Sublease,

        (ii)    the amount constituting gain for taxable income purposes upon payment of Sublease Termination Value, Sublease Special Termination Value, Sublease Special Special Termination Value, Settlement Amount or Sale Remedy Purchase Price in the amount and at the time such payment is determined to be made,

        (iii)   amounts constituting gain for taxable income purposes upon payment pursuant to the exercise of the Sublease Purchase Option at the time such payments are required to be made,

        (iv)   payments made on an After-Tax basis,

        (v)    any other amount to the extent such item of income results in an equal and offsetting deduction (other than Rent Deductions, Amortization Deductions or Interest Deductions) of the same character (or a different character if nonetheless offsetting) in the same taxable year as the inclusion,

        (vi)   amounts payable to the Trustee or the Investor and specifically identified as interest under the Operative Documents or amounts that are not provided for in the Operative Documents and that are characterized as interest pursuant to judicial proceedings, and

**CE 000924**

**PF000703**

6

     (vii)    interest on the Sublessee Loan and any collateral as security for the obligations to pay Lease Rent, including the Trustee Treasury Collateral, the Lease Collateral Deposit and Acceptable Substitute Collateral (the failure of any assumption of this Section 2(f) to be true, being referred to herein as an "Inclusion");

     (g)    The Investor will be required to take into account items of income, gain, loss and deductions in accordance with the accrual method of accounting and the taxable year of the Investor will be the calendar year;

     (h)    The Investor's Tax Rate will be 35% in the taxable year ending in 1997 and thereafter;

     (i)    The Investor will always have sufficient taxable income to utilize the Interest Deductions, Amortization Deductions and the Rent Deductions;

     (j)    The Investor will be entitled to deductions for Lease Basic Rent, Transaction Expenses and interest accrued on the Loan for State income tax purposes (the "State Tax Deductions") at the same time and in the same amount as the corresponding Rent Deductions, Interest Deductions and Amortization Deductions for Federal income tax purposes; and the Investor will be required to include amounts in income for State income tax purposes only if, to the same extent and at the same time as such amounts are required to be included in income for Federal income tax purposes;

     (k)    One hundred percent of Sublease Basic Rent and Sublease Renewal Rent and all other amounts received during the Sublease Basic Term and the Sublease Renewal Term or with respect to the transactions contemplated by the Operative Documents will be treated as foreign source income, and all amounts received under the Sublease at the expiration of the term thereof will be treated as foreign source income; and

     (l)    The Investor will not be subject to application of Section 467(b)(2) of the Code with respect to Lease Basic Rent, Sublease Basic Rent or Sublease Renewal Rent.

     Except as otherwise provided in Section 3 hereof, the Sublessee makes no representation or warranty as to the validity of the Tax Assumptions and nothing herein shall be deemed to be such a representation or warranty. Except as expressly provided in this Agreement, the Sublessee will not indemnify the Investor for any of the above assumptions.

     SECTION 3.  Sublessee's Income Tax Representations, Warranties and Covenants.  The Sublessee hereby represents, warrants and covenants to the Investor that:

CE 000925

7

(a)     On the Closing Date, the Facility will not require any improvement, modification or addition (other than ancillary items of removable equipment of the kind that is customarily selected and furnished by purchasers and lessees of similar facilities) in order for the Facility to be rendered complete for its intended use by the Lessor, the Lessee, the Sublessor or the Sublessee.

(b)     No Sublessee Person has or will directly or indirectly acquire or hold any interest in the Loan or make any loan to or deposit with or enter into any arrangement, contract, relationship or understanding with the Lender (or any party related to the Lender or any Person that funds the Lender or the Deposit Bank) that in any such case is related to the transactions contemplated by the Operative Documents, which loan, deposit, arrangement, contract, relationship or understanding directly or indirectly (A) changes the rights or interests of the Lender under the Loan Agreement or the Deposit Bank in the Rotte Deposit or (B) transfers the Lender's risk of loss with respect to the Loan, in each case other than (i) as described in Section (2)(a)(iv) or (xiv) of the Participation Agreement, (ii) as required by the Operative Documents or (iii) if it is a Permitted Act.

(c)     During the Lease Term, (i) neither the German Lessor (acting in accordance with the terms and conditions of the German Documents or acting or failing to act with the consent or acquiescence of EZH or any Affiliate thereof (or any successor or assign thereof or any stichting for which the ultimate risk of loss with respect to funds of the stichting rests with any of the foregoing)) nor any Sublessee Person will take any written position for U.S. Federal income tax purposes that is inconsistent with the Tax Assumptions (unless taking such position is (based on a written opinion, to be delivered as soon as practicable prior to the date on which such position will be taken, of White & Case or other independent tax counsel selected by the Sublessee and reasonably acceptable to the Investor) required to avoid the impositions of penalties or additions to tax) and (ii) no Sublessee Person will claim Lease Basic Rent payable under the Lease as an item of gross income on a United States Federal, state or local income tax return in a manner that is inconsistent with the tax treatment of such Lease Basic Rent assumed by the Investor as described in Section 2(c) hereof.

(d)     (i) all written information supplied to the Appraiser or confirmed in writing by the EZH, and set forth in Exhibit A hereto as information relied upon by the Appraiser, and (ii) all written information supplied to the Engineering Consultant or confirmed in writing by EZH, and set forth in Exhibit B hereto as information relied upon by the Engineering Consultant, was accurate and sufficiently complete so as not to be misleading and no material information was withheld relating to such information provided as of the date given and as of the Closing Date (it being agreed that to the extent the information provided should reasonably be understood to constitute a projection, judgment or expectation and not a fact, EZH shall not be deemed to be in breach of this representation by reason of such

CE 000926

PF000705

8

projection, judgment or expectation proving to be incomplete, misleading or untrue, provided that such projection, judgment or expectation was made and furnished in good faith).

(e)     As of the Closing Date, (i) no Sublessee Person will have taken any official corporate action requiring the exercise or non-exercise of the Sublease Purchase Option, (ii) none of the organizational or governing documents of, or the regulations of, any Sublessee Person require the exercise or non-exercise of the Sublease Purchase Option, and (iii) none of the accounting or tax positions under Applicable Dutch Law of any Sublessee Person have the effect of legally requiring or economically compelling the exercise or non-exercise of the Sublease Purchase Option.

(f)     There are no current (and there is no present intention or understanding to enter into any), and throughout the first five years of the Sublease, will not be any, written or oral agreements, side letters or like arrangements (other than as set forth in the Operative Documents and in the Specified Documents) between (x) any Sublessee Person and (y) any person whether or not described in clause (x), that in any such case is related or relevant to the transactions contemplated by the Operative Documents (I) legally requiring or economically compelling the exercise or non-exercise of the Sublease Purchase Option or (II) altering any of the agreements or terms or conditions set forth in the Operative Documents (excluding, for purposes of this clause (II), any of the foregoing agreements, side letters or like arrangements that are relevant to the Loan, the Rotte Deposit, the Lender or the Deposit Bank).

(g)     The Facility will have been used in commercial service on or before the Closing Date.

(h)     The Facility will at all times be located outside the United States.

(i)     As of the Closing Date, no agreement entered into by any Sublessee Person exists, outside the Operative Documents and the Specified Documents, which alters or which would alter any of the terms or conditions of the Operative Documents.

(j)     During each calendar year in the Sublease Basic Term none of the gross income from the Sublease will be U.S. source income.

(k)     [Intentionally omitted].

(l)     The German Documents constitute the only documents that relate to the German Lease and the documents provided by EZH to the Investor and purported by EZH to be the German Documents constitute the German Documents as in effect on the date given and on the Closing Date, and each of the German Documents constitutes legal, valid and binding obligations of the parties thereto (and any successors and assigns), enforceable against the

CE 000927

PF000706

9

parties thereto (and any successors and assigns) in accordance with its respective terms except as such enforcement may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the rights of creditors generally and by general principles of equity.

SECTION 4. Intention of Parties; Records. The Investor, the Sublessee and each other Sublessee Person intend for all purposes that the Lease and the Sublease will each be treated as a "true lease" for United States Federal and State income tax purposes, that the Lessor will be treated as the lessor of the Undivided Interest , that the Trust will be treated as the lessee and sublessor of the Undivided Interest , and that the Sublessee will be treated as the sublessee of the Undivided Interest. The Sublessee covenants that it will file and will cause each Sublessee Person to file such returns, take such actions and execute such documents as requested by the Investor that may be reasonable and necessary to facilitate accomplishment of the intent hereof. Within a reasonable time (and in any event within 45 days) after written request therefor, the Sublessee shall provide (or cause an Sublessee Person to provide) such information and copies of records that are within the control of or otherwise reasonably available to the Sublessee (or such Sublessee Person) as the Investor may reasonably require to enable the Investor to fulfill or pursue its Federal and State income tax return filing, audit and litigation obligations or rights.

SECTION 5. Indemnity for Loss of Tax Benefits.

(a)   Generally. If

(i)   the Investor shall lose the right to claim, shall not claim (based on a written opinion, to be delivered as soon as practicable prior to the date on which the tax return is to be filed on which such claim will not be made, of Shearman & Sterling or other independent tax counsel selected by the Investor and reasonably acceptable to the Sublessee that there is not a reasonable basis, within the meaning of Section 6662(d)(2)(B)(ii)(II) of the Code (or such other level of confidence required by the Code at the time to avoid the imposition of penalties), to make such claim), or shall suffer a disallowance, delay, recapture or deferral in whole or part of the Rent Deductions, the Amortization Deductions, or the Interest Deductions as a result of:

(A)   (x) any act of a Sublessee Person (other than a Permitted Act) or the failure of any Sublessee Person to perform an act that is required by Applicable Law or by the Operative Documents, or (y) any act or failure to act by the German Lessor in accordance with the terms of the German Documents or any other act or failure to act by the German Lessor taken with the consent or acquiescence of EZH or any Affiliate thereof or any successor or assign thereof

CE 000928

10

or any stichting for which the ultimate risk of loss with respect to the funds of the stichting rests with any of the foregoing;

(B)    any breach or inaccuracy of any of the Tax Representations;

(C)    the bankruptcy or insolvency of any Sublessee Person;

(D)    any disposition, loss, damage, destruction, casualty, substitution, theft, taking, confiscation, requisition, seizure or condemnation of or the occurrence, of other casualty to, all or any part of the Undivided Interest or the Facility or any Part thereof or interest therein (other than pursuant to repairs or maintenance or pursuant to modifications, alterations, additions or improvements described in clause (vi) of the definition of Permitted Act);

(E)    any exercise of remedies while a Sublessee Event of Default shall have occurred and be continuing (unless Sublease Termination Value, Sublease Special Termination Value, Sublease Special Special Termination Value, Settlement Amount or Sale Remedy Purchase Price or an amount measured with respect thereto, has been received in full);

(F)    [intentionally omitted];

(G)    the exercise of any right in Section 11(d)(iii) of the Participation Agreement or any subleasing or any assignment by the Sublessee of the Undivided Interest or the Facility (or any Part thereof or interest therein);

(H)    any current legally binding agreements entered into prior to the Closing Date by any Sublessee Person other than Transaction Documents);

(I)    any breach or default by any Sublessee Person under any of the German Documents;

(J)    [intentionally omitted];

(K)    any acquisition, purchase or receipt of the German Equipment as the result of the exercise by the Trustee, the Investor or the Lender of any option, right or remedy granted to the Trustee, the Investor or the Lender under any of the Transaction Documents or under any mortgage, pledge or assignment related thereto, or any disposition, transfer or sale of the

CE 000929

11

German Equipment so acquired, purchased or received; provided, however that the Investor shall not be indemnified hereunder to the extent that the net amount actually realized upon distribution, transfer, sale, lease or sublease of such German Equipment, or any other income producing transaction in respect of such German Equipment, in each case other than pursuant to the Operative Documents, exceeds the excess of the After-Tax proceeds from such transaction over the amount of the indemnity in respect of this paragraph (K); or

(L)     any substitution of the German Equipment pursuant to Section 7(h) of the Sublease; or

(ii)     the Investor shall be required to include or shall include (based on a written opinion, to be delivered as soon as practicable prior to the date on which the return is to be filed on which such inclusion will be made, of Shearman & Sterling or other independent tax counsel selected by the Investor and reasonably acceptable to the Sublessee that there is not a reasonable basis, within the meaning of Section 6662(d)(2)(B)(ii)(II) of the Code (or such other level of confidence required by the Code at the time to avoid the imposition of penalties), for excluding such amounts) in its gross income for Federal income tax purposes any amount other than any amount described as a required inclusion in Section 2(f) hereof as a result of:

(A)     any breach or inaccuracy of any of the Tax Representations;

(B)     any prepayment, late payment or failure to make a payment of Sublease Basic Rent or Sublease Renewal Rent, other than a prepayment effected by or required pursuant to the Operative Documents;

(C)     any modification, alteration, addition or improvement not treated as a permitted severable or a permitted non-severable improvement under Rev. Proc. 75-21 and Rev. Proc. 79-48;

(D)     any warranty, condemnation, insurance or similar proceeds relating to the Undivided Interest or the Facility that are not received and retained by the Sublessor or the Investor;

(E)     an event or circumstance described in Section 5(a)(i)(A);

(F)     the bankruptcy or insolvency of any Sublessee Person;

CE 000930

PF000709

12

(G)     any current legally binding agreements entered into prior to the Closing Date by any Sublessee Person (other than the Transaction Documents);

(H)     any payments made by the Sublessee as a result of exercising its rights with respect to Acceptable Substitute Credit Protection under Section 11(k) of the Participation Agreement;

(I)     the exercise of any right in Section 11(d)(iii) of the Participation Agreement or any subleasing or any assignment by the Sublessee of the Undivided Interest or the Facility (or any Part thereof or interest therein);

(J)     any replacement or substitution of the Facility or any part thereof or any modification, alteration, addition or improvement (other than pursuant to repairs or maintenance or pursuant to modifications, alterations, additions or improvements that are treated as permitted severable or permitted non-severable improvements under Rev. Proc. 75-21 and Rev. Proc. 79-48, provided that the foregoing exclusion from this clause (J) of permitted severable and permitted non-severable improvements shall not apply to any such event that results in the type of income inclusion and under the circumstances described in Section 5(c)(v)(4));

(K)     any disposition of any interest in the Undivided Interest or the Facility resulting from the exercise of remedies while a Sublessee Event of Default shall have occurred and be continuing;

(L)     any breach or default by any Sublessee Person under any of the German Documents;

(M)     [intentionally omitted];

(N)     any acquisition, purchase or receipt of the German Equipment as the result of the exercise by the Trustee, the Investor or the Lender of any option, right or remedy granted to the Trustee, the Investor or the Lender under any of the Transaction Documents or under any mortgage, pledge or assignment related thereto, or any disposition, transfer or sale of the German Equipment so acquired, purchased or received; provided, however that the Investor shall not be indemnified hereunder to the extent that the net amount actually realized upon distribution, transfer, sale, lease or sublease of such German Equipment, or any other income producing transaction in respect of such German Equipment, in each case other than pursuant to the Operative

CE 000931

PF000710

13

Documents, exceeds the excess of the After-Tax proceeds from such transaction over the amount of the indemnity in respect of this paragraph (N); or

(O)    any substitution of the German Equipment pursuant to Section 7(h) of the Sublease;

any of the events described in clauses (i) or (ii) of this Section 5(a) being hereinafter referred to as a "Loss."

(iii)    Indemnity. If a Loss shall occur, then the Investor shall promptly notify the Sublessee of such Loss, and the Sublessee will pay to the Investor as an indemnity an amount, at the election of the Sublessee, determined in accordance with Section 5(a)(iii)(A), (B) or (C) hereof. If the Sublessee shall not have the Sublessee Minimum Rating and if the Investor so requests, the Sublessee shall provide or cause to be provided the Investor with collateral reasonably satisfactory to the Investor for the amount of its obligations under Section 5(iii)(A) and (C) in the event the net present value of such payments exceeds $1,000,000 using a discount rate equal to the Treasury Rate. The Sublessee shall only be obligated to indemnify in respect of a Loss attributable to any State tax consequences, in the event that there is a corresponding Loss for Federal tax purposes in such year.

(A)    Pay-As-You-Go. The Sublessee may elect to pay to the Investor such amount or from time to time such amounts as, on an After-Tax basis, will be equal to (1) the Federal and State income taxes payable by the Investor from time to time for any taxable year as a result of such Loss computed in accordance with the Tax Assumptions (except that, in the case of a Loss described in Section 5(a)(ii), and for purposes of computing any "gross up" or "reverse gross up" amount, Federal income taxes shall be computed on the basis of the highest marginal rates in effect, for corporate income tax purposes for the period or periods affected), and (2) the aggregate amount of any interest, penalties or additions to tax (except additions or penalties imposed by Code Sections 6651(a)(1) (relating to late filing of a return), 6651(a)(2) or (3) (relating to late payment of tax), and 6663 (relating to penalties for fraud) or successor provisions thereto) payable by the Investor in respect of such additional income taxes.

(B)    Lump Sum Payment. The Sublessee may elect to pay a lump sum amount which shall be sufficient to preserve the Investor's Net Economic Return on an After-Tax basis as if such Loss had not occurred. The computation of such lump sum amount shall be made by the Investor utilizing the methodology and assumptions, including the Tax Assumptions (except that,

CE 000932

14

in the case of a Loss described in Section 5(a)(ii), and for purposes of computing any "gross up" or "reverse gross up" amount, Federal, state and local income taxes shall be computed on the basis of the highest marginal rate in effect for corporate income tax purposes at the time such Loss arises or, to the extent known at the time of payment of such lump sum amount, the highest marginal rates in effect for corporate income tax purposes for the period or periods affected), except as such assumptions shall be varied to take into account such Loss and any prior Loss in a manner consistent with the Operative Documents. The computation of such lump sum amount under this paragraph (B) also shall take into account any past, current and anticipated interest, penalties and additions to tax (except additions or penalties imposed by Code Sections 6651(a)(1) (relating to late filing of a return), 6651(a)(2) or (3) (relating to late payment of tax), and 6663 (relating to penalties for fraud) or successor provisions thereto, or any corresponding state or local penalties or additions to tax) payable by the Investor as a result of such Loss and any anticipated tax savings as a result of such Loss and the circumstances and consequences thereof.

(C)   Supplemental Payments. The Sublessee may elect to make a series of supplemental payments over the then remaining Sublease Basic Term, with corresponding adjustments to Sublease Termination Value, Sublease Special Termination Value, Sublease Special Special Termination Value, Settlement Amount and Sale Remedy Purchase Price, and the price payable in connection with the exercise of any fixed price purchase option under the Sublease to reflect the occurrence of such Loss so that the supplemental payments and Sublease Termination Value, Sublease Special Termination Value, Sublease Special Special Termination Value, Settlement Amount, Sale Remedy Purchase Price and purchase option price shall be sufficient to preserve the Investor's Net Economic Return on an After-Tax basis as if such Loss had not occurred. The computation thereof shall be made by the Investor utilizing the methodology and assumptions, including the Tax Assumptions (except that, in the case of a Loss described in Section 5(a)(ii), and for purposes of computing any "gross up" or "reverse gross up" amount, Federal, state and local income taxes shall be computed on the basis of the highest marginal rates in effect for corporate income tax purposes for the period or periods affected), utilized by the Investor in determining Sublease Basic Rent, Sublease Termination Value, Sublease Special Termination Value, Sublease Special Special Termination Value, Settlement Amount and Sale Remedy Purchase Price, as such assumptions shall be varied to take into account such Loss and any prior Loss in a manner consistent with the Operative Documents. The computation also shall take into account, any past, current and anticipated

CE 000933

15

interest, penalties and additions to tax (except additions or penalties imposed by Code Sections 6651(a)(1) (relating to late filing of a return), 6651(a)(2) or (3) (relating to late payment of tax), and 6663 (relating to penalties for fraud) or successor provisions thereto, or any corresponding state or local penalties or additions to tax) payable by the Investor as a result of such Loss and any anticipated tax savings as a result of such Loss and the circumstances and consequences thereof.

(b)     Time of Payment.  Following a Loss, or if contested in accordance with Section 5(g), following a Final Determination (to the extent such Final Determination gives rise to an indemnity obligation hereunder by the Sublessee) with respect to such Loss, the Investor shall give the Sublessee a written notice requesting payment of the indemnity, calculation of the alternative indemnity payment amounts under Section 5(a)(iii)(A), (B) and (C), and a statement describing in reasonable detail the manner in which the computation of such alternative indemnity payments amounts were made.  Upon the later of 30 days after receipt of such notice, or 10 days after conclusion of any verification process pursuant to Section 5(f) hereof, the Sublessee shall elect in writing among the alternative indemnity amounts to be paid under Section 5(a)(iii)(A), (B) or (C) hereof, and, in the absence of such election, Section 5(a)(iii)(B) shall be deemed elected on the final day of such election period.  Any indemnity under Section 5(a)(iii)(B) shall be paid within 30 days after such election.  Any indemnity payable under Section 5(a)(iii)(A) shall be paid on the next succeeding date after such election on which a payment of the additional tax giving rise to such indemnity (including all extensions actually requested and granted) is due, and, in the case of an indemnity payable under Section 5(a)(iii)(A), from time to time thereafter and on the date at least 2 Business Days prior to the date or dates any additional payment of tax giving rise to such indemnity (including all extensions actually requested and granted) is due.  The indemnity payable under Section 5(a)(iii)(C) shall begin to be paid on the next succeeding date after such election on which a payment of Sublease Basic Rent is due and (prospectively) on each succession due for Sublease Basic Rent under the Sublease Basic Term; provided, however, no payments under Sections 5(a)(iii)(A), (B) or (C) shall be payable until (i) the date of a Final Determination with respect to a Loss that is contested pursuant to Section 5(g) hereof or (ii) after conclusion of any verification process pursuant to Section 5(f) hereof, in which case, the indemnity payable under Section 5(a) shall be payable in accordance with the above (as if the conclusion of the verification process occurred on the date required for election of the method of indemnity payments; provided, however, that if a verification process shall have occurred (the expenses of which are payable by the Sublessee in accordance with Section 5 (f) hereof), the Sublessee shall pay to the Investor interest at the Federal Funds Rate (from the time the indemnity hereunder first became  payable to the time such indemnity is actually received by the Investor) on the indemnity amount payable hereunder.

CE 000934

PF000713

16

(c)     Excluded Events.  Notwithstanding the foregoing, the Sublessee shall not have any liability to the Investor under this Section 5 for an otherwise indemnifiable Loss if the Loss results from one or more of the following events (regardless of whether the event fails to be described in any other of the following events):

(i)     the failure of the Lease or the Sublease to constitute, for Federal or State income tax purposes, on or after the Closing Date, a true lease or of the Trust or the Investor to be treated as either the lessee under the Lease or the sublessor under the Sublease of the Undivided Interest or the failure of the Trustee or the Investor to be treated as the borrower under the Loan, unless, in any such case, such failure is a result of (1) the breach or inaccuracy of any of the Tax Representations, (2) an act by a Sublessee Person that is not a Permitted Act or the failure of any Sublessee Person to perform an act that is required by Applicable Law or by the Operative Documents or the German Documents, (3) a Sublessee Event of Default, or (4) an event or circumstance described in Section 5(a)(i)(B) or (C) hereto;

(ii)     the inaccuracy of any conclusions of the Appraisal or the report prepared by the Engineering Consultant, except as a result of the breach or inaccuracy of the Tax Representations set forth in subsections (a), (d), (e), (f) or (g) of Section 3 hereof;

(iii)     the application of Section 467(b)(2) of the Code, provided that this exclusion shall not apply to any Loss resulting from (1) the breach or inaccuracy of any of the Tax Representations set forth in Section 3 hereof, (2) any event or circumstance described in Section 5(a)(i) (other than subclause (C) or (H) thereof) or in Section 5(a)(ii) (other than subclause (F) or (G) thereof), (3) a Sublessee Person taking any written position for U.S. Federal income tax purposes that is inconsistent with the Tax Assumptions, (4) any merger or consolidation of a Sublessee Person (other than a Merger Event which is also a Permitted Merger), (5) any amendment to or other change to any Operative Document unless such amendment is a Permitted Act, (6) any reset or restructuring with respect to the Loan under the Loan Agreement or Sublease Basic Rent or Sublease Renewal Rent in connection with the provision of Acceptable Substitute Credit Protection or an adjustment pursuant to Section 3(e) of the Sublease; and provided further that this exclusion shall not apply to the inclusion of an income item itself that results from any event described in Section 5(a)(ii) above to the extent such inclusion is independent of the consequences of such event under Section 467(b)(2) of the Code and any regulations thereunder;

(iv)     a voluntary or involuntary transfer by the Investor of the Undivided Interest or the Facility (or any Part thereof or interest therein) or any voluntary or involuntary transfer by the Investor or the Trust or any Affiliate of either

CE 000935

PF000714

17

such Person of any interest arising under the Transaction Documents or in the Facility or in any such Person (other than as a direct or indirect result of (A) any Sublessee Event of Default, (B) any substitution, replacement, improvement or modification of or addition to the Facility, (C) any breach or inaccuracy of the Tax Representation in Section 3(k) or any event or circumstance described in subclause (I) of Section 5(a)(i), (D) an act of the German Lessor in accordance with the terms of the German Documents or any other act or failure to act by the German Lessor taken with the consent or acquiescence of EZH or any Affiliate thereof, or (E) any acquisition, purchase or receipt of the German Equipment as the result of the exercise by the Trustee, the Investor or the Lender of any option, right or remedy granted to the Trustee, the Investor or the Lender or any disposition, transfer or sale of the German Equipment so acquired, purchased or received);

(v)   any amendment to or change in the Code, Regulations or judicial interpretation thereof enacted, promulgated, issued or rendered after the Closing Date other than the adoption as final or temporary regulations of the proposed regulations under Section 467 of the Code as published in the Federal Register on June 3, 1996, to the extent such final or temporary regulations are in relevant part substantially similar to such proposed regulations; provided that this clause (v) shall not apply to (1) any substitution, replacement or refinancing, (2) changes in interest, penalties and additions to tax, (3) reduce any amount payable hereunder to less than the amount that would have been payable if such change had not occurred, (4) any Loss as a result of any event or circumstance set forth in subclause (J) of Section 5(a)(ii) (disregarding the parenthetical therein) occurring after such amendment or change which constitutes an income inclusion (other than as a result of the incorrectness of any other Tax Assumption), or (5) any event or circumstance described in Section 5(c)(iii)(1) through (6), if and to the extent such inclusion would not have occurred but for an amendment or change to Section 467(b)(2) of the Code shall have occurred or if the proposed regulations under Section 467 of the Code shall have been promulgated as final or temporary regulations to the extent such final or temporary regulations are in relevant part not substantially similar to such proposed regulations or if any subsequent change to such final or temporary regulations shall have been promulgated;

(vi)   the Sublessee's purchase of the Sublessor's Lease Interest pursuant to the Sublease Purchase Option or any event or circumstances for which Sublease Termination Value, Sublease Special Termination Value or Sublease Special Special Termination Value (or any amount determined by reference to such values) is required to be, and has been, received (and any other amounts owed under the Operative Documents) other than to the extent such Sublease Termination Value, Sublease Special Termination Value or Sublease Special Special Termination Value does not accurately reflect of the timing of such event;

CE 000936

PF000715

18

(vii)   the Investor's failure to claim properly and timely or to have sufficient income to benefit from the Rent Deductions, Amortization Deductions or Interest Deductions (unless pursuant to an opinion of counsel (described in Section 5(a)(i)) or the Investor's taking a tax reporting position that triggered an income inclusion (described in Section 5(a)(ii)) unless pursuant to an opinion of counsel (described in Section 5(a)(ii)) or the Sublessee's failure to satisfy its obligation under Section 4 to provide appropriate information requested by the Trust under Section 4;

(viii)   penalties or additions to tax under Section 6662 or 6663 of the Code or relating to estimated tax, in either case to the extent resulting from or measured by matters unrelated to the transactions contemplated by the Operative Documents;

(ix)   the failure of the Trust to be treated as a grantor trust or a pass-through entity or to otherwise be disregarded for Federal income tax purposes;

(x)   the failure of the Trust or the Investor to comply with the contest provisions in this Agreement but only if the failure precludes the contest of the Loss;

(xi)   the status of a member of the Sublessor Group as an entity subject to the provisions of Sections 55, 56, 57, 58, 59, 59A, 291, (except if such application is a result of the Sublessee's act) 465, 469, 501, 542, 593, 552, 851, 856 or 1361 of the Code;

(xii)   a determination that the Investor is not holding its Undivided Interest in the ordinary course of a trade or business for purposes of Section 162 of the Code or that the Investor did not enter the transaction for profit;

(xiii)   the Investor or the Trust having a short taxable year;

(xiv)   any fraud, willful misconduct or gross negligence of a member of the Sublessor Group;

(xv)   the failure of a member of the Sublessor Group to file any return in accordance with the appropriate filing procedure and timely to file such return unless as a result of the failure of the Sublessee to comply with Section 4;

(xvi)   any member of the Sublessor Group being or becoming for Federal income tax purposes a charitable organization, a tax-exempt entity within the meaning of Section 168 of the Code, an agency or instrumentality of the United States, a state or political subdivision thereof or an international organization;

CE 000937

PF000716

19

(xvii)  any Loss arising from an event occurring after the earliest of (A) the expiration or earlier termination of the Sublease Term (including the Sublease Renewal Term, if any) in circumstances other than the circumstances contemplated by clause (B) or (C); (B) the termination of the Sublease in consequence of the occurrence of an event giving rise to the Investor's right to receive an amount computed by reference to Sublease Termination Value, Sublease Special Termination Value or Sublease Special Special Termination Value (provided that such amount and all other amounts owed pursuant to the Operative Documents is, in fact, received) or (C) the return of possession of the Undivided Interest to the Sublessor pursuant to and in accordance with the terms of the Sublease;

(xviii)  an act or failure to act of the Trustee, in its capacity as trustee and not in its individual capacity, in breach of its covenants, warranties or other obligations under the Trust Agreement pursuant to which it was appointed as Trustee but only to the extent that such act or failure to act is at the direction of the Investor;

(xix)   the inclusion in income by the Investor upon or after termination of the Sublease of amounts attributable to improvements, modifications or additions to the Facility;

(xx)   an amendment, supplement, modification or waiver ("Amendment") to any Operative Document to which any member of the Sublessor Group is a party, and to which no Sublessee Person is a party or which Amendment is not initiated or requested by or consented to by any Sublessee Person in writing, other than any Amendment (A) that may be necessary or appropriate to, and is in conformity with any Amendment to any Operative Document initiated or requested by or consented to by an Sublessee Person in writing, (B) that is required by the terms of the Operative Documents, (C) that is due to or in connection with a Sublessee Event of Default that shall theretofore have occurred and be continuing, or (D) that is in connection with any Amendment of the Operative Documents required by law;

(xxi)   the inaccuracy of the assumption in Section 2(k) hereof (but this exclusion shall not apply to State income tax inclusions resulting from the breach of the representation set forth in Section 3(h) hereof);

(xxii)  any loss of foreign tax credits; or

(xxiii)  the characterization and treatment of the transactions contemplated by the Operative Documents for Dutch legal, tax, accounting and financial purposes.

CE 000938

20

No inference, negative or positive, shall be drawn from this Section 5(c) in interpreting whether or not a Loss is otherwise subject to indemnification under Section 5 hereof.

(d)     Tax Savings.  If as the result of a Loss with respect to which (i) the Sublessee is required to indemnify the Investor and (ii) the Sublessee has paid all amounts that have to date been payable, the Investor shall realize any reduction in Federal or State income taxes (determined using the same assumptions used in calculating the Loss) that it would not have realized but for such Loss or the event giving rise thereto, and not previously taken into account in computing the amount of the indemnity payable hereunder, and to any interest on any refund attributable to such reduction, then the Investor shall pay the Sublessee an amount equal to such reduction in Federal income tax plus an additional amount equal to any further reduction in its Federal income taxes attributable to such payment, provided such payment shall not put the Investor in an After-Tax position less favorable than it would have been in had the Loss not occurred (as determined using the same assumptions used for purposes of calculating the indemnity paid to the Investor); provided further that the Investor shall not be required to make any payment pursuant to this Section 5(d) to the extent that the amount of such payment would exceed the sum of all prior payments by the Sublessee with respect to such Loss less the amount of all prior payments by the Investor (and the amount of any excess described in the preceding proviso shall reduce pro tanto any amount that the Sublessee is subsequently obligated to pay pursuant to Section 5(a) hereof) and the Investor shall not be required to make any payment under this Section 5(d) while a Sublessee Major Default shall have occurred and be continuing.  Any payment due to the Sublessee pursuant to this Section 5(d) shall be paid promptly and in any event within 15 days after the Investor shall realize such tax benefit (realized and computed in accordance with Section 5(e) hereof and the Tax Assumptions contained in Section 2 hereof as adjusted).  If for any reason any tax benefit that was paid to the Sublessee pursuant to this Section 5(d) or taken into account in computing the amount payable hereunder shall be lost or otherwise determined to be unavailable, such loss or unavailability shall be treated as a Loss subject to indemnification hereunder.

(e)     Certain Payment Assumptions for Indemnities and Tax Savings.

(i)     For purposes of computing the amount of income taxes payable as a result of a Loss described in Section 5(a)(ii) and any reduction in income taxes that are realized as a result of an event that gave rise to a Loss described in Section 5(a)(ii) hereof, and for purposes of computing any gross-up or reverse gross-up amount, it shall be assumed that the Investor is subject to the highest marginal Federal and applicable state and local corporate income tax rates applicable for the relevant period or periods (taking into account the deductibility of state and local taxes for Federal income tax purposes) and that all the other Tax Assumptions are correct in the absence of such Loss and any prior or contemporaneous Loss.

CE 000939

PF000718

21

(ii)   For purposes of computing the amount of Federal income taxes payable as a result of a Loss described in Section 5(a)(i) and any reduction in Federal or State income taxes that is realized as a result of an event that gave rise to a Loss described in Section 5(a)(i), it shall be assumed that the Investor is subject to Federal and State income tax at the Investor's Tax Rate and that all the Tax Assumptions are correct in the absence of such Loss and any prior or contemporaneous Loss that the Investor suffers a loss of State Tax Deductions and State Interest Deductions that correspond to a loss of deductions for Federal purposes.

(f)   Verification.  If the Sublessee so requests in writing within 30 days after receipt of the written notice of computations or payments described in Section 5(b) or 5(d) above, any determination shall be reviewed by an internationally recognized independent United States accounting firm mutually acceptable to the Sublessee and the Investor.  Such accounting firm shall be asked to verify, after consulting with the Sublessee and the Investor, whether the Investor's computations are correct, and to report its conclusions to both the Sublessee and the Investor.  The Investor and the Sublessee hereby agree to provide such accountants with all information and materials as shall be reasonably necessary or desirable in connection herewith.  The fees and expenses of the accountants in verifying an adjustment pursuant to this Section 5(f) shall be paid by the Investor if the accountants shall determine that the present value (using the Treasury Rate) of the total payments to be made with respect to the Loss calculated by the Investor is in error by more than five percent to the detriment of the Sublessee than the present value (using the Treasury Rate) of the correct payments.  If the accountants do not so determine, such fees and expenses of the accountants shall be paid by the Sublessee.  Such accounting firm shall be requested to make its determination within 30 days.  In the event such accounting firm shall determine that such computations are incorrect, then such firm shall determine what it believes to be the correct computations.  The computations of the accounting firm shall be final, binding and conclusive upon the Sublessee and the Investor absent manifest error.  Any information provided to such accountants by any Person shall be and remain the exclusive property of and shall be deemed by the parties to be (and the accountants will confirm in writing that they will treat such information as) the private, proprietary and confidential property of such Person, and no person other than the accountants will be entitled thereto, and all such materials shall be returned to such Person.  The Sublessee shall have no right to inspect the books, records, tax returns or other documents of or relating to the Investor.  The Sublessee and the Investor agree that the accounting firm's sole responsibility shall be to verify the amount of any payment hereunder and that matters of interpretation are not within the scope of such firm's responsibilities.

(g)   Contests.  In the event a written claim (including a written proposed Revenue Agent's Report) shall be made by the Internal Revenue Service that, if successful, would result in a Loss for which Sublessee would be required to indemnify the Investor, the Investor hereby agrees to notify the Sublessee in writing of such claim within 30 days after its

CE 000940

PF000719

22

receipt and agrees to take such action in connection with contesting such claim as the Sublessee shall request in writing from time to time; provided, however, that the Investor agrees to pursue (I) all administrative appeals, proceedings, hearings and conferences with respect to the claim if the Investor has one or more other substantial tax items for the same taxable year and is pursuing such administrative appeals, proceedings, hearings or conferences with respect to other such item(s) and (II) the appeal of any judicial determination in respect of such claim, it being agreed that no appeal to the United States Supreme Court shall be required; provided further, however, that (i) within 30 days after receipt by the Sublessee of the Investor's notice of such claim, the Sublessee shall request in writing that such claim be contested, (ii) the amount of such proposed adjustments (including taxes, interest, penalties and additional amounts relating thereto) is at least U.S.$100,000 (and for this purpose, any proposed adjustment that relates to an issue that could affect more than one taxable year or could involve the transactions contemplated by the Operative Documents shall be treated as involving the total potential undiscounted payments, taking into account all taxable years to which the proposed adjustment could relate and all potential claims with respect to the transactions contemplated by the Operative Documents that could be brought against members of the Sublessor Group for all open years if the theory or theories upon which the actual claim is based applies to such claim), except in the case of the appeal of an adverse judicial decision, in which case such threshold amount shall be $200,000, (iii) the conduct of the contest shall remain within the sole discretion and control (exercised in good faith) of the Investor and its counsel, who shall determine the nature of all action to be taken to contest such proposed adjustment including, without limitation, (x) whether the proposed adjustment shall be contested initially by way of judicial or administrative proceedings or both (subject to clause (I) above), (y) whether the proposed adjustment shall be contested by resisting payment or paying tax and seeking a refund thereof and (z) if the Investor shall undertake judicial action, the court of competent jurisdiction in which to contest each proposed adjustment, provided, that in conducting such contest, the Investor shall keep the Sublessee reasonably informed of the status of the contest, shall consult in good faith with the Sublessee regarding the conduct of the contest, shall permit the Sublessee or its counsel to review in advance and comment upon any written submission to be made to the administrative agency or court which is the forum for such contest and shall consider in good faith any request that the Sublessee or its counsel be present at hearings, conferences, trials and other proceedings involved in such contest, (iv) prior to Investor taking any action to contest such claim, the Sublessee shall have furnished the Investor with an opinion of White & Case or other independent tax counsel selected by the Sublessee and reasonably satisfactory to the Investor to the effect that a reasonable basis exists to contest such claim within the meaning of ABA Formal Opinion No. 85-352 (or any amendment thereto or substitution thereof) or, in the case of an appeal of an adverse judicial determination, that there is strong likelihood (although not necessarily more likely than not) that such adverse judicial determination will be reversed or substantially modified for the position asserted in such appeal, (v) the Sublessee shall have agreed to pay the Investor and shall pay on a current basis all reasonable out-of-pocket costs and expenses that the Investor

CE 000941

23

shall incur in connection with contesting such claim, including, without limitation, reasonable attorneys', accountants' and investigatory fees and disbursements, (vi) if the Investor shall determine to pay the tax with respect to the claim and sue for a refund, the Sublessee shall advance to the Investor on an interest-free basis (with no additional net After-Tax cost to the Investor) sufficient funds to pay such tax and interest, penalties and additions to tax payable with respect thereto, (vii) no Sublessee Major Default shall have occurred and be continuing, and (viii) the Sublessee shall provide to the Investor such information (including, but not limited to, books, records or written statements by the Sublessee's employees) that is within the control of the Sublessee and is reasonably necessary for (and relate solely to) the conduct of the contest. Subject to the foregoing, Investor shall be in sole control of the contest proceeding. Without limiting the generality of the preceding sentence, if the Sublessee disagrees with the Investor concerning any action to be taken in contesting a claim hereunder, the decision of the Investor shall be controlling.

Notwithstanding any other provision contained in this Section 5(g), the Investor may settle any claim otherwise indemnifiable hereunder for any taxable year if the Investor (x) (a) waives the payment by the Sublessee of any amount that might otherwise be payable by the Sublessee under this Section 5 by way of indemnity in respect of such claim for such taxable year and any other claim the contest of which is precluded by declining to take such action and (b) pays to the Sublessee any amount previously paid or advanced by the Sublessee pursuant to this Section 5(g)(vi) with respect to such claim or contest of such claim or (y) the Sublessee consents in writing to such settlement, such consent not to be unreasonably withheld (based solely on the merits of the items as to which the Sublessee may be liable hereunder).

Upon a Final Determination of any contest conducted pursuant to this Section 5(g), the Investor shall be obligated to refund to the Sublessee any advances by the Sublessee hereunder or any payment made pursuant to Section 5 hereof with respect to the Loss that was the subject of such contest, unless Investor shall elect to set off such advances or payments against any liability the Sublessee may then have to the Investor.

In any circumstance where judicial review shall be unavailable as a matter of law, the Sublessee's right to cause a contest hereunder, and the Investor's obligation, if any, to contest hereunder, shall become operative at the earliest time such a contest may be initiated pursuant to law, notwithstanding the fact that such contest shall have been previously unavailable by reason of a Final Determination described in clause (i) of the definition thereof.

Notwithstanding anything to the contrary contained in this Section 5(g), the Investor shall not be required to contest any claim hereunder if the subject matter thereof shall be of a continuing nature and shall have been previously decided by a court of competent jurisdiction pursuant to the contest provisions of this Section 5(g), unless there shall have been a change in law (or interpretation thereof) or change in facts after the date with respect to

CE 000942

PF000721

24

which such previous contest shall have been decided, and the Investor shall have received, at the Sublessee's expense, an opinion of White & Case or other independent tax counsel selected by the Sublessee and reasonably acceptable to the Investor to the effect that as a result of the change in law (or interpretation thereof) or change in facts, there is substantial likelihood that the Investor will prevail in such contest.

SECTION 6. Survival. The representations, warranties, covenants and indemnities of the Sublessee and the Investor provided for herein and all the rights and obligations arising from this Agreement shall survive the expiration or other termination of the Lease and are expressly made for the benefit of and shall be enforceable by the successors and assigns of each party as permitted in accordance with the Operative Documents; provided that no assignment by any party hereto shall relieve any party of its obligations hereunder or increase the obligations of any party hereunder, provided that the applicable tax rates of the Investor or its successors shall be utilized for purposes of Section 5(e)(i) hereof.

SECTION 7. Method of Payment. All references to dollars or U.S. $ herein shall mean United States dollars. All payments to be made to the Investor by the Sublessee pursuant to this Agreement shall be made in dollars by wire transfer to such bank account of the Investor as the Investor from time to time shall have directed to the Sublessee as set forth in the Lease, such direction to be given in writing at least five (5) Business Days prior to the due date thereof and if no instructions have been received, by check payable to the Investor and mailed to the address referred to in the Participation Agreement. All payments to be made to the Sublessee by the Investor pursuant to this Agreement shall be made in dollars by wire transfer to such bank account as the Sublessee from time to time shall have directed to the Investor, such direction to be given in writing at least five (5) Business Days prior to the due date thereof and if no instructions have been received, by check payable to the Sublessee and mailed to the address referred to in the Participation Agreement.

SECTION 8. Late Payments. Except as otherwise provided in this Agreement, any amount payable to the Investor or the Sublessee under this Agreement not paid within 10 days from the date due and payable under this Agreement shall bear interest from the due date to the date paid at the Overdue Rate.

SECTION 9. GOVERNING LAW. THIS AGREEMENT SHALL BE IN ALL RESPECTS GOVERNED BY THE LAW OF THE STATE OF NEW YORK, INCLUDING ALL MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE.

SECTION 10. Notices. All notices, requests, or other communications required under the terms and provisions hereof shall be given in the manner set forth in Section 22 of the Participation Agreement.

CE 000943

PF000722

25

SECTION 11. Assignment by Investor or the Sublessee. The obligations and liabilities of the Sublessee and the Investor arising under this Agreement are expressly made for the benefit of, and shall be enforceable by, the Investor and the Sublessee and their respective successors and assigns.

SECTION 12. No Set-Off. Except as provided by this Agreement, no payment required to be made by the Sublessee or the Investor pursuant to this Agreement shall be subject to any right of set-off, counterclaim, defense, abatement, suspension, deferment or reduction, and the Sublessee and the Investor shall have no right to be released, relieved or discharged from any obligation or liability under this Agreement for any reason whatsoever. Nothing contained herein shall be construed to waive any claim which the Sublessee or the Investor might have under any of the Operative Documents (including this Agreement and including, without limitation, claims or defenses that indemnities or other payments demanded from or paid by the Sublessee or the Investor were erroneous) or otherwise, or to limit the right of the Sublessee or the Investor to make any claim it might have against the Investor or the Sublessee or any other Person or to pursue such claim in such manner as the Sublessee or the Investor shall deem appropriate or to require the Sublessee or the Investor to pay the same obligation more than once (including, but not limited to, the duplication of amounts paid hereunder with amounts required to be paid and to the extent included in the calculation of Sublease Termination Value, Sublease Special Termination Value, Sublease Special Special Termination Value, Settlement Amount or Sale Remedy Purchase Price, provided, that such amounts have been received by the Investor).

SECTION 13. Counterparts. This Agreement may be executed simultaneously in any number of counterparts, each of which when so executed shall be deemed an original and such counterparts together shall constitute and be one and the same instrument.

SECTION 14. Headings. The headings of the Sections of this Agreement are for convenience of reference only and shall not modify, define or limit any of the terms or provisions hereof.

SECTION 15. Amendments, Supplements, etc. This Agreement and any of the terms hereof may not be terminated, amended, supplemented, waived or modified orally, but only by an instrument in writing signed by the party against which the enforcement of the termination, amendment, supplement, waiver or modification shall be sought.

SECTION 16. Protection of Assumed Tax Benefits. The Sublessee will make a good faith effort to take, and to cause each Sublessee Person and such other Persons as the Investor may reasonably identify to take such action and execute such documents as the Investor may reasonably request in writing which are reasonable and necessary to establish and protect the Tax Assumptions. Nothing in this Section 16 shall be construed to limit any

CE 000944

26

Sublessee Person's use or operation of the Facility under the Operative Documents or to require any Person to take any action or execute any document that in such Person's sole and absolute opinion (exercised in good faith) might cause such Person or any Affiliate of such Person or, in the case of the Sublessee, any Sublessee Person any adverse effect (unless appropriately and satisfactorily indemnified therefor). The party requesting any such action or the execution of any such documents shall pay on an After-Tax basis all reasonable expenses of each other party.

SECTION 17. Future Changes. In the event any change in law or other circumstance causes material harm to any Sublessee Person, the Investor or any Affiliate of any thereof or in the event it is possible to eliminate or reduce any existing or potential material harm or create or increase any benefit available to any party, each party agrees, if requested, to negotiate in good faith with each other party regarding amending the Operative Documents or taking (or failing to take) any other appropriate action to remove or minimize such material harm or create or increase any benefit; provided, however, that no party shall be obligated to accept any amendment of any Operative Document or to take (or fail to take) any action if, in that party's sole and absolute opinion, such amendment, act or failure might cause such party or any Affiliate of such party any adverse effect (unless appropriately and satisfactorily indemnified therefor); provided further, however, that the party requesting the amendment or action shall pay, on an After-Tax basis, the reasonable expenses of each other party; provided further, however, that the Tax Assumptions shall be adjusted as appropriate to reflect any such amendments or acts (or failures to act) of any party.

CE 000945

27

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed all as of the day and year first above written.

N.V. ELECTRICITEITSBEDRIJF ZUID-HOLLAND

By: _____

     Name: J. A. Hoyt / de Jong
     Title: Attorney-In-Fact

CONSOLIDATED EDISON LEASING, INC.

By: _____

     Name:
     Title:

CE 000946

27

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed all as of the day and year first above written.

N.V. ELECTRICITEITSBEDRIJF ZUID-HOLLAND

By: _____
      Name:
      Title:

CONSOLIDATED EDISON LEASING, INC.

By: _____
      Name: BF DePlant
      Title: Vice President

CE 000947

PF000726

# EXHIBIT A-4



**A B B   L E A S I N G   G M B H**

APPROVED
FOR
PAYMENT
BY:
DATE:

An

**Con Edison Leasing**
c/o Consolidated Leasing Development
111 Broadway, 8th Floor

**New York, NY 10006**
**USA**

| Datum | : 1998-02-02 | | |
| Unsere Zeichen | : LEA/JV | Rechnungsnr. | : 500 5000081 |

| Pos. | Bezeichnung | | Betrag |
|---|---|---|---|
| | For the Closing of the US-Lease we charge you according to mandate: | | |
| 1 | Advisory Services provided to EZH  according to Mandate 0,2375% of USD 257,782,783.59 | USD | 612.234,11 |
| 2 | Out-of-pocket Expenses DEM 16.247,32 against DEM/USD 1,81 <br> - Accomodation Expenses <br> - Flight fares | USD | 8.976,42 |

| | | | |
|---|---|---|---|
| Payment date | Net amount | USD | 621.210,53 |
| | VAT | | - |
| Erfüllungsort und <br> Gerichtsstand <br> ausschl. Mannheim | Total payment | USD | 621.210,53 |

Claude Onvlee

/   ABB Leasing GmbH

Michael Presti

**CE 009798**

APPROVED
FOR
PROCESSING
BY:
DATE:

**ABB Leasing GmbH**

| Postal Adress: | Kallstadter Straße 1 | Head Office Mannheim | Managing Director | Bankers: | |
|---|---|---|---|---|---|
| P.O. Box 10 03 51 | D-68309 Mannheim | Registry Court Mannheim | Michael Press | Deutsche Bank AG Mannheim | Dresdner Bank AG Mannheim |
| D-68128 Mannheim | Phone + 49 (0) 6 21 - 3 81 -0 | Commercial register HRB 5699 | | Account 0 492 017 | Account 670 17 23 |

PF004033

# EXHIBIT A-5

EXECUTION COPY

# LEASE AGREEMENT

## (ROCA FACILITY TRUST NO. 2)

dated as of December 15, 1997

Between

### N.V. ELECTRICITEITSBEDRIJF ZUID-HOLLAND

as Lessor,

and

### WILMINGTON TRUST COMPANY,

not in its individual capacity,
except as otherwise expressly provided herein,
but solely as Trustee,

as Lessee

0000HYVC.W51

US09324

## TABLE OF CONTENTS

Page

Section 1.    Definitions: References ........................... 2
    (a)    Definitions .......................................... 2
    (b)    References ......................................... 2
    (c)    Headings ........................................... 2
    (d)    Appendices, Schedules and Exhibits .................. 2

Section 2.    Lease of Undivided Interest; Delivery and Acceptance ....... 2

Section 3.    Term and Rent ................................... 2
    (a)    Lease Term ........................................ 2
    (b)    Lease Basic Rent .................................. 2
    (c)    Lease Supplemental Rent ............................ 3
    (d)    Payments of Lease Rent ............................. 3
    (e)    Security for Unpaid Lease Rent ...................... 3
    (f)    Substitution of Lease Collateral .................... 6
    (g)    Permitted Investments .............................. 7
    (h)    Withholding Taxes .................................. 8
    (i)    [Reserved] ......................................... 8

Section 4.    Disclaimer; Warranties; Quiet Enjoyment. .............. 8
    (a)    Disclaimer ......................................... 8
    (b)    Warranties ......................................... 9
    (c)    Quiet Enjoyment .................................... 9
    (d)    Power of Attorney .................................. 9

Section 5.    Return of Undivided Interest ....................... 10

Section 6.    Liens ........................................... 10

Section 7.    Lessee Maintenance Obligations; Possession; Subleasing ...... 10
    (a)    Lessee Maintenance Obligations ...................... 10
    (b)    Lessor Maintenance Obligations ...................... 11
    (c)    [Reserved] ......................................... 11
    (d)    [Reserved] ......................................... 11
    (e)    Operation and Use; Possession and Subleasing ......... 11

Section 8.    Modifications ..................................... 11

Section 9.    [Reserved] ....................................... 12

0000HYVC.W51

US09325

                                                                    Page

Section 10.    [Reserved] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   12

Section 11.    Insurance. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   12

Section 12.    Inspection . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   12

Section 13.    Assignment, Etc. . . . . . . . . . . . . . . . . . . . . . . . . . . . .   13

Section 14.    Events of Default . . . . . . . . . . . . . . . . . . . . . . . . . . .   13
       (a)     Lessor Events of Default  . . . . . . . . . . . . . . . . . . . . . . .   13
       (b)     Lessee Events of Default  . . . . . . . . . . . . . . . . . . . . . . .   16

Section 15.    Sublessor's Lease Interest Transfer, Etc . . . . . . . . . . . . . . .   18

Section 16.    Further Assurances . . . . . . . . . . . . . . . . . . . . . . . . . . .   19

Section 17.    Notices . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   19

Section 18.    Absolute Obligation To Pay Lease Rent . . . . . . . . . . . . . . . .   19

Section 19.    True Lease, Etc  . . . . . . . . . . . . . . . . . . . . . . . . . . . .   20

Section 20.    Security for Lessee's Obligation to Lender  . . . . . . . . . . . . .   20

Section 21.    Concerning Trustee  . . . . . . . . . . . . . . . . . . . . . . . . . .   21

Section 22.    Covenants of Lessee . . . . . . . . . . . . . . . . . . . . . . . . . .   21

Section 23.    Severability . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   22

Section 24.    Miscellaneous . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   22
       (a)     Deemed Compliance. . . . . . . . . . . . . . . . . . . . . . . . . . .   22
       (b)     [Reserved] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   22
       (c)     Counterparts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   22
       (d)     Amendments and Waivers  . . . . . . . . . . . . . . . . . . . . . . .   23
       (e)     CHOICE OF LAW . . . . . . . . . . . . . . . . . . . . . . . . . . . .   23

Section 25.    End of Sublease; Lessee Purchase Option . . . . . . . . . . . . . . .   23
       (a)     End of Sublease. . . . . . . . . . . . . . . . . . . . . . . . . . . . .   23
       (b)     Lessee Purchase Option. . . . . . . . . . . . . . . . . . . . . . . . .   23

0000HYVC.W51

US09326

|  |  | Page |
|---|---|---|
| Section 26. | Assumption by Sublessee of Lease Rent . . . . . . . . . . . . . . . . | 24 |
| Section 27. | Registered Instrument . . . . . . . . . . . . . . . . . . . . . . . . | 25 |

Exhibit A - Lease Basic Rent
Exhibit B - Excluded Portion Amounts
Exhibit C - Lease Collateral Deposit and Payment Amounts
Exhibit D - Settlement Amounts
Exhibit E - Operations Maintenance Program

Appendix A - Form of Lease Certificate of Acceptance

0000HYVC.W51

US09327

LEASE AGREEMENT
(ROCA FACILITY TRUST NO. 2)

This LEASE AGREEMENT, dated as of December 15, 1997 (as from time to time amended, restated, supplemented or otherwise modified, this "Lease" or this "Agreement"), between N.V. ELECTRICITEITSBEDRIJF ZUID-HOLLAND, a public limited liability company organized under the laws of The Netherlands, as lessor (together with its successors and permitted assigns, the "Lessor"), and WILMINGTON TRUST COMPANY, a Delaware banking corporation, not in its individual capacity but solely as Trustee under the Trust Agreement, as lessee (together with its successors and permitted assigns, the "Lessee");

W I T N E S S E T H :

WHEREAS, prior to the execution and delivery hereof, the Investor and the Bank entered into the Trust Agreement whereby the Bank is to acquire and hold the Trust Estate for the benefit of the Investor;

WHEREAS, concurrently herewith, EZH, the Investor, the Trustee, the Bank and the Lender are entering into the Participation Agreement, dated as of the date hereof (as from time to time amended, restated, supplemented or otherwise modified, the "Participation Agreement"); and

WHEREAS, the Lessor desires to undertake herein to lease to the Lessee, and the Lessee desires to undertake herein to lease from the Lessor, the Undivided Interest, as more fully hereinafter set forth;

NOW, THEREFORE, in consideration of the mutual agreements herein contained, and other good and valuable consideration, receipt of which is hereby acknowledged, the parties hereto agree as follows:

Section 1.    Definitions; References.

(a)    Definitions.  Capitalized terms used herein shall, unless defined herein, have the respective meanings set forth in Appendix A to the Participation Agreement.

0000HYVC.W51

US09328

(b)   References.   References in this Lease to sections, paragraphs, clauses, appendices, schedules and exhibits are to sections, paragraphs, clauses, appendices, schedules and exhibits in and to this Lease unless otherwise specified.

(c)   Headings.   The headings of the various sections, paragraphs and clauses of this Lease and the table of contents are for convenience of reference only and shall not modify, define, expand or limit any of the terms or provisions hereof.

(d)   Appendices, Schedules and Exhibits.   Any appendices, schedules and exhibits are part of this Lease.

Section 2.   Lease of Undivided Interest; Delivery and Acceptance.

The Lessor hereby agrees (subject to satisfaction or waiver of the conditions set forth in Section 5 of the Participation Agreement) to lease the Undivided Interest to the Lessee and the Lessee hereby agrees (subject to satisfaction or waiver of the conditions set forth in Section 3 of the Participation Agreement) to lease the Undivided Interest from the Lessor hereunder, commencement of the term of such lease to be evidenced by, and effective from, the execution and delivery by the Lessee of a Lease Certificate of Acceptance in the form of Appendix A.

Section 3.   Term and Rent.

(a)   Lease Term.   The Lease Term for the leasing of the Undivided Interest shall commence on the Closing Date and shall terminate on the Lease Termination Date unless earlier terminated in accordance with the express provisions hereof.

(b)   Lease Basic Rent.   The Lessee and the Lessor agree to allocations of Lease Basic Rent for the Undivided Interest in respect of the Lease Term for each lease rent period, beginning with the commencement of the Lease Term, as set forth opposite such lease rent period on Exhibit A. The Lessee agrees to pay the Lessor any and all Lease Basic Rent in accordance with Section 3(d).

(c)   Lease Supplemental Rent.   The Lessee agrees to pay to the Lessor any and all Lease Supplemental Rent when and as the same shall become due and owing. The Lessee shall pay, as Lease Supplemental Rent, on demand, an amount equal to interest at the Overdue Rate on any part of any installment of Lease Rent not paid when due, in accordance with Section 3(d)(i) hereof, for the period until the same shall be paid in full.

US09329

(d)     Payments of Lease Rent.  (i)  All Lease Rent shall be paid in Dollars in immediately available funds by not later than 11:00 AM, New York City time: on the due date therefor; provided, however, that, to the extent the Lease Basic Rent is payable on the Closing Date in accordance with clause (ii) below, any assignment of an account containing any portion of Lease Basic Rent by the Lessee to the Lessor or as directed by the Lessor as set forth in the Closing Funding Memorandum shall be treated as a payment of such Lease Basic Rent by the Lessee on the date of such assignment and as timely paid.  Except as set forth in the preceding sentence, all Lease Rent payable to the Lessor hereunder shall be paid by the Lessee to the Lessor to an account designated by the Lessor ten (10) Business Days prior to such payment of Lease Rent becoming due, or to such other account as the Lessor shall have specified in a notice to the Lessee at least ten (10) Business Days prior to the date on which such Lease Rent shall be due.  If any payment hereunder is due on a date that is not a Business Day, then payment is to be made on the next following Business Day, and the amount to be paid on such next Business Day shall be the amount that would have been payable on the date that is not a Business Day.

(ii)     On the Closing Date, the Lessee shall pay an amount of Lease Basic Rent equal to the Prepayment Amount as set forth on Exhibit A.  The Prepayment Amount shall be allocated as set forth on Exhibit A.  All remaining Lease Basic Rent shall be paid on the Lease Termination Date in an amount equal to the sum of all allocated Lease Basic Rent minus the Prepayment Amount (the "Final Basic Rent Payment").  Such Final Basic Rent Payment shall be allocated as set forth on Exhibit A.

(e)     Security for Unpaid Lease Rent.  On the date (the "Collateral Date") that is the Sublease Basic Termination Date (or, if the Sublease is earlier terminated pursuant to Section 9(b) thereof, the later of (x) the Sublease Obsolescence Termination Date and (y) the Crossover Date), the Lessee shall take, or cause the Investor to take, the following actions and provide, or cause the Investor to provide, to the Lessor the following collateral as security for its obligations to pay Lease Rent:

(i)     The Lessee shall cause the Investor to perform its obligations under Section 11(a)(ix) of the Participation Agreement.

(ii)     The Lessee shall cause the Investor to perform its obligations under Section 11(a)(x) of the Participation Agreement with respect to the Trustee Treasury Collateral.  All costs and expenses incurred in connection with the preparation, negotiation, execution and delivery of the relevant pledge agreement (including the reasonable legal fees and expenses of the Investor and

US09330

the Lessee) shall be paid by the Lessor, on an After-Tax basis to the Lessee and the Investor.

(iii)    If either (i) the Collateral Date is any date other than the Sublease Basic Termination Date or (ii) the Collateral Date is the Sublease Basic Termination Date and the Sublessor elects any option other than the Sublease Renewal Option on such date, the Lessee shall, on the Collateral Date, at the request of the Lessor:

(A)    enter into a custody agreement with a custodian bank selected by the Investor and acceptable to the Lessor, pursuant to which, among other things, the custodian bank will establish an account to hold on behalf of the Lessee subject to a security interest in favor of the Lessor U.S. Government Obligations or obligations of other issuers which obligations shall be rated at least Aa2 by Moody's and AA by S&P. Such custody agreement shall be in substantially the form of the Custody Agreement, with such changes as may be necessary to reflect the differing parties to the custody agreement, the different character of the pledged securities and the differing security interests created by the pledge agreement described in clause (B) below and any changes in law between the Closing Date and the Collateral Date. All costs and expenses incurred in connection with locating and retaining a custodian bank (including the reasonable legal fees and expenses of the Investor and the Lessee in connection with the preparation, negotiation, execution and delivery of the custody agreement) and establishing and maintaining an account at such bank shall be paid by the Lessor on an After-Tax basis to the Lessee and the Investor; and

(B)    enter into a pledge agreement contemplating the purchase of U.S. Government Obligations or obligations of other issuers which obligations shall be rated at least Aa2 by Moody's and AA by S&P having a maturity as close as possible to, but not later than, the Lease Termination Date and having a scheduled amount payable at maturity of not less than the excess of the Final Basic Rent Payment over the sum of (a) the Maturity Amount of the Trustee Treasury Collateral, (b) the projected value as of the Lease Termination Date of the Lease Collateral Deposit and any Acceptable Substitute Collateral, and (c) the aggregate amount of the principal of and accrued interest on the Sublessee Loan scheduled to be outstanding at the Lease Termination Date, pursuant to which it shall (1) deposit such U.S. Government Obligations or other obligations, as the case may be, in the account established pursuant to

US09331

the custody agreement described in clause (A), above, and (2) grant to the Lessor a first priority security interest in such U.S. Government Obligations or other obligations, as the case may be, to secure the Lessee's obligations to pay Lease Rent (the "Incremental Collateral Pledge"). Such pledge agreement shall be in substantially the form of the Sublessee Pledge and Security Agreement, with such changes as may be necessary to reflect the differing parties to the pledge agreement, the differing character of the pledged obligations, the differing security interests created in the U.S. Government Obligations or other obligations, as the case may be, and any changes in law between the Closing Date and the Collateral Date. The Lessee shall, upon the request of the Lessor and at the Lessor's cost and expense, take all actions necessary to maintain the first priority security interest created by the pledge agreement until the earlier of (x) the time the Lessee has fulfilled its obligations with respect to Lease Rent or (y) such time as the Lessee provides to the Lessor Acceptable Substitute Collateral therefor in accordance with Section 3(f). All costs and expenses incurred in connection with the preparation, negotiation, execution and delivery of the pledge agreement (including the reasonable legal fees and expenses of the Investor and the Lessee) shall be paid by the Lessor, on an After-Tax basis to the Lessee and the Investor.

(iv)    If the Collateral Date is the Sublease Basic Termination Date and the Sublessor elects the Sublease Renewal Option, the Lessee will enter into a fixed rate deposit and pledge agreement that has been arranged by the Lessor in accordance with Section 20A(a)(i) of the Sublease pursuant to which (A) the Lessee will agree to make deposits (collectively or as replaced by Acceptable Substitute Collateral, the "Lease Collateral Deposit") at the times and in the amounts set forth on Exhibit C hereto with a financial institution unrelated to the Lessor or any Affiliate thereof, selected by the Lessor, the long-term Dollar denominated senior unsecured debt obligations of which are rated at least AA by S&P and Aa2 by Moody's and is otherwise acceptable to the Lessee, (B) such financial institution will agree to accept the Lease Collateral Deposit, which deposit will accrue interest at a fixed rate (the "Actual Lease Collateral Rate"), and to make scheduled payments to the Lessee in the amounts set forth on Exhibit C hereto, as such amounts in clauses (A) and (B) are adjusted pursuant to Section 3(e) of the Sublease and (C) the Lessee will grant to the Lessor a first priority pledge of its rights against the financial institution with respect to the Lease Collateral Deposit. Such deposit and pledge agreement shall be in a form reasonably satisfactory to the Lessee, the Lessor and such financial institution as deposit taker and shall provide for the Lessee to create

0000HYVC.W51                    5

US09332

in favor of the Lessor a first priority pledge of the Lessee's rights against such financial institution to the Lessee Collateral Deposit. The Lessee shall, upon the request of the Lessor and at the Lessor's cost and expense, take all actions necessary to maintain such first priority pledge until the earlier of (x) the payment in full of all Lease Rent, or (y) such time as the Lessee provides to the Lessor Acceptable Substitute Collateral therefor in accordance with Section 3(f). All costs and expenses incurred in connection with locating and retaining a financial institution to act as the deposit bank (including the reasonable legal fees and expenses of the Investor and the Lessee in connection with the preparation, negotiation, execution and delivery of the deposit and pledge agreement and legal opinions in respect of enforceability thereof) and establishing and maintaining an account at such bank shall be paid by the Lessor, on an After-Tax basis to the Lessee and the Investor. The collateral described in clauses (e)(ii), (e)(iii) and (e)(iv) of this Section 3 or, if applicable, any Acceptable Substitute Collateral therefor shall constitute the "Lease Collateral").

(f)      Substitution of Lease Collateral.  (i)  At any time during the Lease Term, the Lessee or the Investor may replace (or establish initially, as the case may be) any or all of the Lease Collateral with (1) a letter of credit or a payment agreement for the benefit of the Lessor opened for the account of the Lessee by a bank, the Dollar-denominated long-term senior unsecured debt of which is, as of the date of issuance of such letter of credit or such payment agreement, rated at least Aa2 by Moody's or AA by S&P; provided, however, that if at any time the rating of the issuing bank's obligations of the character described above shall cease to meet the rating criteria described above and 45 days shall have elapsed from the earlier of (x) the date on which the Lessee or the Investor shall have Actual Knowledge of such fact and (y) the date on which the Lessor shall so state in a notice to the Lessee, such letter of credit shall cease to be Acceptable Substitute Collateral hereunder; and, (2) a first priority perfected security interest pursuant to an instrument satisfactory in form and substance to the Lessor in (A) cash, (B) direct obligations of the United States and agencies thereof for which the full faith and credit of the United States is pledged or, (C) obligations fully guaranteed by the United States or (3) any other collateral acceptable to the Lessor in its sole discretion or any combination of the collateral described in clauses (1) and (2) above; provided, further, however, that, in each case described above, the property comprising the collateral provides for scheduled payments (whether pursuant to a withdrawal under a deposit agreement, a drawing under a letter of credit or a payment at maturity of a bond or other security) on the dates and in amounts at least equal to the amount of the payments scheduled to be made from the collateral being replaced (any and all collateral described in clauses (1), (2) and (3) shall constitute "Acceptable Substitute Collateral").

US09333

(ii)   In connection with the replacement of any collateral in accordance with clause (2) of Section 3(f)(i), (A) the Lessee shall, as applicable, pledge or assign such collateral to the Lessor pursuant to a pledge or assignment in form and substance reasonably satisfactory to the Lessor and (B) the Lessor shall release or cause the release of any security interest (including any repledge) that it has or that it has granted with respect to the collateral that has been substituted and shall execute such forms and documents reasonably requested by the Lessee to evidence such release.

(g)   Permitted Investments.   The Lessee covenants that, unless the Lessee has provided the Lessor with Acceptable Substitute Collateral in accordance with Section 3(f) hereof for amounts (other than amounts that constitute or would constitute a Lease Excluded Payment) equivalent to those payable under the Sublessee Loan Agreement, the Lessee (A) shall not, without the prior written consent of the Lessor (1) exercise any remedies under the Sublessee Loan Agreement (other than pursuant to Section 11(c) thereof and other than to the extent of any Lease Excluded Payment) unless the Lessee shall invest all proceeds (other than any proceeds constituting Lease Excluded Payments) received in connection with such exercise in Permitted Investments and shall grant a first priority perfected security interest in such Permitted Investments to the Lessor or (2) amend, modify or supplement the Sublessee Loan Agreement and (B) shall, in the event the Lessee is making the Permitted Investments referred to in clause (A)(1), follow the Lessor's directions regarding which Permitted Investments to make for any period during which Permitted Investments are earning a return less than the Lessee would have earned had the full Sublessee Loan remained in effect.   For purposes of this Lease, any reference to the Sublessee Loan shall be deemed to include any Acceptable Substitute Collateral for the Sublessee Loan as well as any Permitted Investments referred to in this paragraph.

(h)   Withholding Taxes.   Notwithstanding anything herein to the contrary, any payment of Lease Rent hereunder shall be reduced by the amount of any withholding taxes required to be withheld on any such payment under Applicable Law. The payment of any Lease Rent due hereunder net of such withholding taxes shall be deemed payment in full of such Lease Rent. Neither the Lessee nor the Investor shall have any liability to the Lessor with respect to any such withholding taxes; provided, however, that the Lessee shall, at the time of payment, be required to pay and indemnify the Lessor, on an After-Tax basis, for any taxes referred to in this paragraph payable as a result of (i) the Lessee not being organized under the laws of the United States, (ii) if the Lessee is a trust or partnership, the Lessee having any beneficiary or partner (as the case may be) that is not a U.S. corporation, (iii) the Investor not being either (a) a United States corporation or (b) a United States trust or a United States partnership all of whose beneficiaries or partners are United States corporations or (iv) the Lessee or the Trustee not reflecting the transaction contemplated by this Lease in

US09334

its books and records in the United States as an asset of a United States office of such Person.

       (i)    |Reserved|.

      Section 4.    Disclaimer; Warranties; Quiet Enjoyment.

       (a)    Disclaimer. As between the Lessor and the Lessee, the Lessee acknowledges and agrees that (A) THE LESSOR IS NOT A MANUFACTURER OR A DEALER IN PROPERTY OF THE KIND OF THE UNDIVIDED INTEREST AND (B) THE UNDIVIDED INTEREST IS LEASED HEREUNDER IN THE STATE AND CONDITION OF EVERY PART THEREOF WHEN THE SAME FIRST BECAME OR BECOMES SUBJECT TO THIS LEASE, WITHOUT REPRESENTATION OR WARRANTY OF ANY KIND BY THE LESSOR, EXPRESS OR IMPLIED, AS TO THE TITLE, MERCHANTABILITY, COMPLIANCE WITH SPECIFICATIONS, CONDITION, DESIGN, OPERATION, FREEDOM FROM PATENT OR TRADEMARK INFRINGEMENT, ABSENCE OF LATENT DEFECTS OR FITNESS FOR USE OF THE FACILITY (OR ANY PART THEREOF), OR ANY OTHER REPRESENTATION OR WARRANTY WHATSOEVER, EXPRESS OR IMPLIED, WITH RESPECT TO THE FACILITY (OR ANY PART THEREOF) OR THE UNDIVIDED INTEREST. The provisions of this Section 4(a) have been negotiated, and, except to the extent otherwise expressly stated, the foregoing provisions are intended to be a complete exclusion and negation of any representations or warranties by the Lessor, express or implied, with respect to the Facility that may arise pursuant to any Applicable Law now or hereafter in effect, or otherwise. Nothing in this Section 4(a) shall derogate from any representation or warranty made by the Lessor or Sublessee in any Operative Document.

       (b)    Warranties. The Lessor does hereby constitute the Lessee, its successors and assigns, the Lessor's true and lawful attorney irrevocably, with full power (in the name of the Lessor or otherwise) to ask, require, demand, receive, compound and give acquittance for any and all monies and claims for monies due and to become due under or arising out of any and all Warranties and for such period as the Lessee may exercise rights with respect thereto under this Section 4(b), to endorse any checks or other instruments or orders in connection therewith and to file any claims or take any action or institute (or, if previously commenced, assume control of) any proceedings and to obtain any recovery in connection therewith the Lessee may deem to be necessary or advisable with respect to such monies and claims for monies.

      During the Lease Term, the Lessee, to the exclusion of the Lessor, shall have the benefit of and shall be entitled to enforce, in its own name, and, to the extent

US09335

necessary, in the name of the Lessor, any and all of the Warranties, including all claims for damages arising from the Warranties. The Lessor agrees that at any time and from time to time upon the written request of the Lessee, the Lessor will promptly and duly execute and deliver any and all such further instruments and documents and take such further action as the Lessee may reasonably request in order to obtain the full benefits of the warranties and of the rights and powers granted under this Section 4.

(c)     Quiet Enjoyment.  The Lessor covenants that, neither the Lessor nor any Affiliate or any other Person claiming by, through or under it shall (except when, if the Sublease is not in effect, a Lease Event of Default shall have occurred and be continuing and the Lessee shall have received notice thereof from the Lessor) take or cause to be taken any action contrary to the Lessee's rights under this Lease to possession, use and quiet enjoyment of the Undivided Interest during the Lease Term.

(d)     Power of Attorney.  The Lessor hereby grants to the Lessee an irrevocable power of attorney for the duration of this Lease to exercise the rights of EZH under the Location Permits, the Network Deeds and Channel Building Right Deed in order to afford the Lessee access to the Network and the Cooling Water Channel and EZH shall provide the Lessee such assistance as is reasonably necessary to exercise its rights under such Location Permits, the Network Deeds and the Channel Building Right Deed.

Section 5.     Return of Undivided Interest.

The Lessee shall redeliver the Undivided Interest to the Lessor at the end of the Lease Term.   Upon such redelivery, the Undivided Interest shall be free and clear of all Liens (other than Permitted Liens) and the Facility shall be in the condition required by Section 7(a) hereof; provided, however, that, if the Lessor shall fail to perform any Operations Maintenance for any reason, the Lessee shall not be required to perform such Operations Maintenance even if such Operations Maintenance would otherwise be necessary to restore the Facility to the condition described in Section 7(a).

Section 6.     Liens.

The Lessee shall not directly or indirectly create, incur, assume, permit or suffer to exist any Trustee Lien on or with respect to the Undivided Interest, the Facility, the Property Rights, the Building Right, the Turbine Building Right, the Network Building Rights or the Channel Building Right or this Lease other than Permitted Liens.  The Lessee shall promptly, at its own expense, take such action as may be necessary to duly discharge any Trustee's Lien on or with respect to the Undivided Interest, the Facility, the Building Right, the Turbine Building Right, the

US09336

Network Building Rights or the Channel Building Right, other than a Permitted Lien arising at any time during the Lease Term.

Section 7.   Lessee Maintenance Obligations; Possession; Subleasing

(a)   Lessee Maintenance Obligations.   Prior to the Sublease Termination Date, the Lessee, at its own expense, will maintain, repair and preserve the Facility, or cause the same to be maintained, repaired and preserved, in accordance with the provisions of Section 7(a) of the Sublease which are incorporated herein for such purpose, mutatis, mutandis as if such provisions applied to the Lessee; provided, however, that, by entering into the Sublease with the Sublessee, Lessee shall be deemed to have complied with the first sentence of this Section 7(a) whether or not Sublessee actually complies with Section 7 of the Sublease.   On and after the Sublease Termination Date, the Lessee, at its own expense, will maintain, repair and service, or cause to be maintained, repaired and serviced, the Facility in accordance with Prudent Industry Practice in The Netherlands for Base Load, gas-fired power plants; provided, however, that so long as the Facility Operating Agreement shall be in effect, the Lessee shall be deemed to have complied with this second sentence of this Section 7(a).   It shall be solely the Lessor's responsibility to carry out all Operations Maintenance, and the Lessee shall have no obligation at any time to perform such Operations Maintenance.

(b)   Lessor Maintenance Obligations.   The Lessor, shall perform, on a reasonably timely basis, all Operations Maintenance with respect to the Facility as set forth in the current Operations Maintenance Program, as modified by the Lessor; provided, however, that the Operations Maintenance Program shall not be modified in a manner that would result in the useful life, value, residual value, utility, operating efficiency or capacity of the Facility being less than what the useful life, value, residual value, utility, operating efficiency or capacity would have been if the original Operations Maintenance Program had been carried out.   The Lessor shall furnish to the Lessee a report (the "Operations Maintenance Report") stating the total cost of all Operations Maintenance and describing separately and in reasonable detail all Operations Maintenance having a value in excess of 700,000 Dutch Guilders made during the period from the date hereof to the first Report Delivery Date in the case of the first such Operations Maintenance Report, and during the period from the end of the period covered by the previous report to the date one year from the end of such previous period, in the case of subsequent Operations Maintenance Reports.

(c)   [Reserved].

(d)   [Reserved].

0000HYVC.W51                                    10

(e)    Operation and Use; Possession and Subleasing.  (1) Operation and Use.  The Lessee shall not (i) operate or use the Facility in violation of any Applicable Law, the requirements of any applicable insurance policies required to be maintained pursuant to Section 11 or licenses in effect from time to time necessary for the continued operation of the Facility, or (ii) use the Cooling Water Station other than in accordance with its designated use as specified in the Transfer Deed; provided, however, that the Lessee shall not be responsible under this Section 7(e) for any use by the Sublessee, the Operator under the Facility Operating Agreement or any Person claiming through either of them.

(2)  Possession and Subleasing.  The Lessee may, without the prior written consent of the Lessor, during the Lease Term sublease the Undivided Interest or in any manner, deliver, transfer or relinquish possession of its interest in the Facility. :

Section 8.    Modifications.

The Lessee, at its own cost and expense, may from time to time make or cause to be made such other modifications and improvements to the Facility as the Lessee shall consider desirable in the proper conduct of its business ("Lease Modifications"); provided, however, that this right shall be granted exclusively to the Sublessee during the term of the Sublease.   Title to all Sublease Nonseverable Modifications shall, without further act, vest in EZH free and clear of all Liens, except Permitted Liens.   Title to all modifications or improvements made as part of the Operations Maintenance Program with respect to the Facility and the Network shall vest in EZH.  All such modifications or improvements shall be deemed to constitute part of the Facility, and an undivided interest equal to the Undivided Interest Percentage in respect thereof shall become part of the Undivided Interest and subject to this Lease.

Section 9.    [Reserved].

Section 10.    [Reserved].

Section 11.    Insurance.

Each of the Lessor and the Lessee shall have the right to carry insurance on the Facility for their own benefit.   Upon the termination of the Sublease, at the request of the Lessee, the Lessor shall, at the Lessee's sole cost and expense, carry insurance for the benefit of the Lessee in the same amounts and with the same coverage as Sublessee is required to carry pursuant to the terms of the Sublease as at the last day of the Sublease Term.

0000HYVC.W51                          11

US09338

Section 12.    Inspection.

The Lessor or its authorized representatives may, subsequent to the last day of the Sublease Term, (i) once during each calendar year upon 15 Business Days' prior notice in writing to the Lessee and (ii) without limitation as to intervals between inspections and as often as such Person may deem necessary upon 5 days' prior notice in writing to the Lessee from and during such time as (A) a Lessee Event of Default shall have occurred and be continuing or (B) the Undivided Interest is being returned pursuant to Section 25 and at their own risk and expense, inspect the Facility or any Part thereof, and the records of the Lessee relating thereto, which inspections shall be conducted at reasonable times and at the Station Site or where such records are then located; provided, however, that, at each inspection, the representatives of the Lessor may be accompanied by, and must follow the reasonable directions of, representatives of the Lessee or any sublessee.  No inspection pursuant to this Section 12 shall significantly interfere with the normal use, commercial operation or maintenance of the Facility or the normal conduct of the Lessee's or sublessee's business.  Each inspection shall be conducted in accordance with the Sublessee's safety and insurance programs or those of any Operator of the Facility.  In connection with such inspection rights of the Lessor, in no event shall (i) the Lessor have any duty or obligation to make any such inspection or (ii) the Lessee or any sublessee have any duty or obligation to disclose any confidential information or trade secret to any Person except as specifically required by the terms of the Operative Documents.

Section 13.    Assignment, Etc.

The Lessor may not, without prior written consent of the Lessee, assign any of its rights hereunder or in the Undivided Interest or the Facility, except to the extent provided in the Participation Agreement.  Except as expressly permitted in the Operative Documents, the Lessee may not, without the consent of the Lessor, assign or convey its right, title and interest in and to this Lease or the Undivided Interest.  The Lessor hereby consents to the entry by the Lessee into, and performance by the Lessee of, the Operative Documents (including the Sublease), including any assignment pursuant thereto.  The terms and provisions of this Lease shall be binding upon and inure to the benefit of the Lessor and the Lessee and their respective successors and permitted assigns.

Section 14.    Events of Default.

(a)    Lessor Events of Default.  Each of the following events shall constitute a "Lessor Event of Default":

0000HYVC.W51                        12

US09339

(i)      a breach of the covenant of quiet enjoyment as provided in Section 4(c) hereof after the last day of the Sublease Term that, if capable of remedy, remains unremedied for ten (10) Business Days after written notice or, if the Lessor is diligently attempting to cure such breach and there is no material risk of loss, sale or forfeiture of the Facility and there is no material interference with the use, operation or possession of the Facility, remains unremedied for 30 days after notice from the Lessee to the Lessor; or

(ii)      the Lessor shall fail to perform or observe in any material respect any covenant, obligation or agreement to be performed by it hereunder or under Section 11(d) or (e) of the Participation Agreement (other than as referred to in clause (i) above or (vi) below), and such failure shall continue unremedied as of the 30th day (or, if such default is capable of cure, the 180th day, if the Lessor has notified the Lessee in writing prior to such 30th day that it is (and it actually is) diligently attempting to cure such breach by appropriate action or proceedings) after the earlier of (x) the date on which notice of such breach shall have been given by the Lessee to the Lessor and (y) the date on which a Responsible Officer of the Lessor shall have Actual Knowledge (A) of such breach and (B) that such breach will constitute a Lessor Event of Default if not cured; or

(iii)      the Lessor (i) is declared bankrupt by a Dutch court and (A) the Lessor shall have failed to institute an appeal within the maximum time allowed therefor by Applicable Dutch Law (which as of the Closing Date is 8 days), or, in the case of a default judgment, the Lessor shall have failed to file an opposition request within the maximum time allowed therefor by Applicable Dutch Law (which as of the Closing Date is 14 days after such default judgment) and if the default judgment is subsequently upheld, the Lessor shall have failed to institute an appeal within the maximum time allowed therefor by Applicable Dutch Law (which as of the Closing Date is 8 days) or (B) if the Lessor has instituted a timely appeal, such bankruptcy has not been lifted within 90 days after such bankruptcy has first been declared or (C) the trustee in bankruptcy of the Lessor has not declared in writing to the Lessee or the Investor within 30 days of the bankruptcy of the Lessor that there will not be a "temporary stay" (*afkoelingsperiode*) under Section 63a of The Netherlands Bankruptcy Act, (ii) files for a provisional suspension of payments or requests to be declared bankrupt or (iii) commences a voluntary case under any other bankruptcy law now or hereafter in effect or a judicial proceeding seeking the appointment of a trustee, receiver, liquidator, custodian or other similar official of it or any substantial part of its property, or consents to any such relief or to the appointment of or taking possession by any such official in any voluntary

US09340

case or other proceeding commenced against it. or files for a provisional suspension of payments, or takes any corporate action to authorize, or in furtherance of, any of the foregoing; or

(iv)    the Lessor is dissolved (other than by reason of a statutory merger permitted by the Operative Documents) and/or enters into liquidation, whether voluntarily or involuntarily, under any Applicable Law or United States law to which the Lessor is subject if, as a result of the application of such law, the rights of the Lessee or the Investor under the Operative Documents would be adversely affected; or

(v)    the Lessor shall propose or enter into any arrangement or composition with or for the benefit of its creditors generally or shall propose an out of court settlement of indebtedness with its creditors generally, or propose or enter into any liquidation or dissolution of itself or its assets generally (other than as provided for under clause (iii) hereof) or a petition or proceeding under any Dutch bankruptcy or moratorium law (or United States bankruptcy or moratorium law or other applicable bankruptcy or moratorium law to which the Lessor is subject if, as a result of the application of such law, the rights of the Lessee or the Investor under the Operative Documents would be adversely affected) shall be filed or commenced against the Lessor and shall not be dismissed within 120 days; or

(vi)    (A) the Sublessee shall fail to maintain, replace, renew or ensure the maintenance of the Letter of Credit in accordance with Section 11(d)(vii) of the Participation Agreement (including failure to renew or replace an existing Letter of Credit at least 30 days prior to the scheduled expiration thereof) or (B) the Letter of Credit shall become unenforceable, illegal, void or otherwise fail to comply with the requirements of Section 11(d)(vii) of the Participation Agreement; or

(vii)    (A) the German Lessor shall have declared any German Lease to be in default, and shall be exercising remedies as a result of a default under the German Lease pursuant to Section 14.2 thereof or shall have given notice that it will, subject to any purchase option in favor of the Sublessee under the German Lease as a result of such default, exercise remedies as a result of such default pursuant to Section 14.2 thereof, and (B) any Sublessee Person under any German Lease shall have failed (1) to pay to the German Lessor all of the amounts due and payable by it under Section 14 of any German Lease within one day (excluding Saturdays and Sundays and any other day on which commercial banking institutions (with respect to any material commercial

US09341

banking services) are closed or authorized or required by law, regulation or executive order to be closed in each jurisdiction in which collateral securing the payment obligations of any Sublessee Person under any German Lease is located) after receipt of such declaration; provided, however, that, if any Sublessee Person is precluded from making such payment to the German Lessor on such day because it is a day on which commercial banking institutions (with respect to any material commercial banking services) are closed in Germany, the Sublessee shall not be in default under this clause (vii) if any Sublessee Person makes such payment on the next day on which it is not so precluded or (2) to cure any other default under any German Lease that has a cure period of at least 5 days within 5 days prior to the expiration of the cure period applicable with respect thereto; provided further, however, that notwithstanding the foregoing, the Sublessee shall not be in default under this clause (vii) from and after such time as title to all German Equipment shall have been transferred to the Lessor free and clear of any rights of, or claims by, the German Lessor; or

(viii)  termination of the German Lease without the Lessor obtaining title to the German Equipment subject to Section 7(h) of the Sublease; or

(ix)  there shall be a payment default under the Sublessee Loan Agreement as of the last day of the Sublease Basic Term unless the Sublessee has purchased the Sublessor's Lease Interest; or

(x)  the Lessor shall fail to pay the Settlement Amount on the date such payment shall be due and such failure shall be continuing on the 10th day after notice of such failure shall have been given to the Lessor.

(b)  Lessee Events of Default.  Each of the following events shall constitute a "Lessee Event of Default":

(i)  the Lessee shall (i) fail to pay Lease Basic Rent and such failure shall be continuing on the fifth Business Day after such payment shall be due, or (ii) fail to pay any payment of Lease Supplemental Rent and such failure shall continue for ten days after receipt of notice of such failure by the Lessee from the Lessor; or

(ii)  at any time after the Collateral Date, the Lessee shall fail to maintain the Lease Collateral required under Section 3(e), and shall not cure such failure within 20 Business Days after notice of such failure shall have been given by the Lessor to the Lessee, unless such failure is a result of any act, failure to act or breach by the Lessor or any Affiliate thereof; or

US09342

    (iii) the Lessee, the Investor or a Transferee's Guarantor (if any) shall file a voluntary petition in bankruptcy or a voluntary petition seeking reorganization in a case or proceeding under any applicable bankruptcy or insolvency law (as now or hereafter in effect) or the Lessee, the Investor or a Transferee's Guarantor (if any) shall by voluntary petition seek relief under the provisions of any now existing or future bankruptcy, insolvency or other similar law providing for the liquidation, reorganization or winding-up of corporations, or providing for an agreement, composition, extension or adjustment with its creditors unless, in the case of a Transferee's Guarantor, such Transferee's Guarantor has been substituted by a non-defaulting Transferee's Guarantor; or

    (iv) a receiver, trustee liquidator or custodian of the Lessee, the Investor or a Transferee's Guarantor (if any) or of a substantial part of its property shall be appointed by court order and such order shall remain in effect for more than 90 days; or the Lessee, the Investor or a Transferee's Guarantor (if any) shall be adjudicated bankrupt or insolvent or any of its properties shall be sequestered by court order and such order shall remain in effect for more than 90 days; or a petition shall be filed against the Lessee, the Investor or a Transferee's Guarantor (if any) under any bankruptcy, reorganization, arrangement, insolvency, readjustment of debt, dissolution or liquidation law of any jurisdiction, whether now or hereafter in effect, and shall not be dismissed within 90 days after such filing; or an order for relief shall be entered against the Lessee, the Investor or a Transferee's Guarantor (if any); or the Lessee, the Investor or a Transferee's Guarantor (if any) shall make a general assignment for the benefit of its creditors; or the Lessee, the Investor or a Transferee's Guarantor (if any) shall admit in writing its inability to pay its debts generally as they become due, or shall be unable to pay or shall be generally not paying its debts as they become due.

    Section 15. <u>Sublessor's Lease Interest Transfer, Etc</u>. Notwithstanding any other provision hereof or of any other Operative Document, if a Lessee Event of Default, a Lessor Event of Default or a Lease Facility Event of Loss shall have occurred and be continuing and:

    (a) the Sublease is not in effect, the sole remedy which the Lessor or the Lessee, as the case may be, shall be entitled to exercise (in the case of a Lessee Event of Default or a Lessor Event of Default), and the sole action that the parties may take (and shall take, on the first SADD that is neither less than 30 days nor more than 180 days after the Lease Facility Event of Loss) (in the case of a Lease Facility Event of Loss), is to cause a "Sublessor's Lease Interest Transfer" by giving notice thereof

0000HYVC.W51       **16**

US09343

to the Lessee or the Lessor, as the case may be, and the Designated Successor Lessee, in which case:

       (i)    the Settlement Amount determined as at such SADD shall be due and payable as at such SADD, and the Lessor hereby agrees to make such payment to the Investor (the payment of the Settlement Amount in connection with a Sublessor's Lease Interest Transfer being in consideration of the overcollateralization theretofore of accrued but unpaid Lease Rent);

       (ii)    the Sublessor's Lease Interest shall, automatically and without the requirement of any action on the part of any Person, be assigned, effective as at such SADD, to the Designated Successor Lessee which shall, automatically and without the requirement of any action on the part of any Person, assume and become obligated to pay and perform all of the Lessee's obligations under the Lease (including the obligation to pay Lease Rent) and each of the Investor and the Lessee shall, automatically and without the requirement of any action on the part of any Person, be released from all obligations under or in respect of the Lease; and

       (iii)    all rights of the Lessee in respect of Lease Collateral, if any, shall, subject to the prior payment of the Settlement Amount as provided for in clause (i) above, automatically and without the requirement of any action on the part of any Person, be transferred as at such SADD to the Designated Successor Lessee, provided, however, that rights to any Lease Collateral having, as at such SADD, an aggregate fair market value that is in excess of the aggregate of (x) the present value of the Final Basic Rent Payment, calculated as at such SADD using 8.16 percent as the annually compounded discount rate and (y) any unpaid reimbursement obligation payable in respect of any drawing under any Letter of Credit shall be released to or retained by, as the case may be, the Lessee; or

       (b)    the Sublease is in effect, the sole remedy upon a Lessee Event of Default or a Lessor Event of Default, and the sole action either party may take upon a Lease Facility Event of Loss, is to exercise remedies or take other appropriate action under the Sublease.

Section 16.    <u>Further Assurances.</u>

       The Lessee and the Lessor will promptly and duly execute and deliver at the Lessor's cost such further documents and assurances, and take all actions necessary to perfect or protect and to maintain the perfection and protection of the

0000RYVC.W51           17

US09344

interests of the Lessor in the Undivided Interest and this Lease (except in respect of Liens attributable to the Lessor) and take such further actions as are necessary or desirable in order effectively to carry out the intent and purpose of this Lease and the Operative Documents to which the Lessor is a party (including to confirm the Designated Successor Lessee's rights in respect of Lease Collateral upon any Sublessor's Lease Interest Transfer pursuant to Section 15(a) hereof, it being agreed that the Lessee shall be entitled to select the Lease Collateral in respect of which, if any, it is entitled to retain rights).

Section 17.   <u>Notices</u>.

All notices required or permitted by the terms of this Lease shall be given and shall become effective in the manner specified in Section 22(a) of the Participation Agreement.

Section 18.   <u>Absolute Obligation To Pay Lease Rent</u>.

The Lessee's obligation to pay all Lease Rent payable hereunder shall be absolute and unconditional under any and all circumstances and shall not be affected by any circumstance of any character, including, without limitation, (i) any setoff, counterclaim, recoupment, defense or other right which the Lessee may have against the Lessor or any other Person under any Operative Document or otherwise, (ii) any defect in the condition, design, operation, merchantability or fitness for use of the Facility, any unavailability of the Facility after the delivery and acceptance of the Facility by the Lessee hereunder for any reason, (iii) any loss or destruction of, or damage to, the Facility or interruption or cessation in the use or possession thereof by the Lessee for any reason whatsoever and of whatever duration, (iv) the requisitioning, seizure or other taking of title to or use of the Facility by any government or governmental authority or otherwise, (v) the invalidity or unenforceability or lack of due authorization or other infirmity of this Lease, (vi) the lack of right, power or authority of the Lessor to enter into this Lease, (vii) any ineligibility of the Facility for any particular use, whether or not due to any failure of the Lessee to comply with any Applicable Law, (viii) force majeure or any frustration, (ix) any legal requirement similar or dissimilar to the foregoing, any present or future law to the contrary notwithstanding, (x) any insolvency, bankruptcy, reorganization or similar proceeding by or against the Lessee or any other Person, (xi) the Lessee or any other Person at any time having immunity from suit, prejudgment attachment, attachment in aid of execution or execution on the grounds of sovereignty or otherwise, and (xii) any Lien of any Person with respect to the Facility. The Lessee hereby waives, to the extent permitted by Applicable Law, any and all rights which it may now have or which at any time hereafter may be conferred on it, by statute or otherwise, to terminate, cancel, quit or

0000HYVC.W51                        18

US09345

surrender this Lease or to abate rent except in accordance with the express terms of this Lease and the other Operative Documents. Notwithstanding anything to the contrary in this Section 18, nothing in this Section 18 shall be construed to limit or otherwise affect the application of Sections 10, 15, 20 or 25.

Section 19.    True Lease, Etc.

(a)     It is the intent of the parties to this Lease that the Lease will be a true lease and not a "finance lease" as defined in Section 168(f) of the Internal Revenue Code of 1954, as amended and in effect prior to the Tax Reform Act of 1986 (P.L. 99-514), and that the Lessor shall at all times be considered to be the Lessor of the Undivided Interest which is the subject of this Lease for all purposes under Applicable Law, including but not limited to Federal, state, city and local income taxes or for franchise taxes measured by net income, and that this Lease conveys to the Lessee no right, title or interest in the Undivided Interest except as a lessee under Applicable Law.

(b)     The Lessor covenants that it will file such returns, take such actions and execute such documents as requested by the Lessee that may be reasonably necessary to facilitate accomplishment of the intent hereof. Within a reasonable time after written request therefor, the Lessor shall provide, at its sole expense, such information and copies of records that are within the control of and reasonably accessible to the Lessor as the Investor may reasonably require to enable the Investor to fulfill its United States Federal income tax return filing, audit and litigation obligations and any other filing or reporting requirement.

Section 20.    Security for Lessee's Obligation to Lender.

In order to secure all amounts payable by and all obligations to be performed by the Lessee under the Loan Agreement, the Lessee has agreed in the Loan Agreement, among other things, to assign to the Lender certain rights under this Lease and to pledge to the Lender, and to grant a security interest in favor of the Lender, in this Lease, subject to the reservations and conditions therein set forth. The Lessor hereby consents to such assignment and to the creation of such pledge and security interests and the pledges and security interests in the other Collateral created thereunder and acknowledges receipt of copies of the Trust Agreement and the Loan Agreement, it being understood that such consent shall not affect any requirements or the absence of any requirement for any consent under any other circumstances.

The Lessor hereby acknowledges receipt of due notice that the Lessee's interest in this Lease has been assigned to the Lender as security pursuant to the Loan

0000HYVC.W51                            19

US09346

Agreement to the extent provided in the Loan Agreement, so long as the obligations of the Trustee under the Loan Agreement have not been discharged pursuant to the terms thereof. Unless and until the Lessor shall have received written notice from the Lender that the Loan Agreement has been discharged pursuant to the terms thereof, the Lender shall have the right to exercise the rights of the Lessee under this Lease to the extent set forth in and subject in each case to the provisions of such Loan Agreement.

### Section 21.   Concerning Trustee.

The Bank is entering into this Lease solely in its capacity as Trustee under the Trust Agreement and not in its individual capacity and, except as otherwise provided in the Operative Documents, in no case shall the Bank (or any entity acting as successor or additional Trustee under the Trust Agreement) be personally liable for or on account of any of the statements, representations, warranties, covenants or obligations of the Lessee hereunder, or any such liabilities being hereby waived by the Lessee; provided, however, that the Bank (or any successor or additional Trustee) shall be personally liable to the Lessor hereunder for its own gross negligence or willful misconduct or for its failure to exercise ordinary care in the handling of money or for its breach of any representation or warranty or covenant expressly made in its individual capacity under the Operative Documents. If a successor Trustee is appointed in accordance with the terms of the Trust Agreement and the Participation Agreement, such successor Trustee shall, without any further act, succeed to all the rights, duties, immunities and obligations of the Lessee hereunder and the predecessor Trustee shall be released from all further duties and obligations hereunder arising after such successor Trustee has accepted such appointment.

### Section 22.   Covenants of Lessee.

The Lessee agrees that it shall not take any action with respect to the Station Site, the Common Facilities Site, the Facility Site or the Facility that EZH specifically requests that Lessee not to take if taking such action would cause EZH to default under the Notarial Deed of Establishment, the Building Right Deed, the Network Deeds, the Channel Building Right Deeds and the Location Permits; provided, however, that the Lessee shall not be required to take any action in connection with the foregoing; provided further that notwithstanding the foregoing, the Lessee shall not be required to refrain from taking any action if (i) the action is otherwise required or permitted by any other provision of this Lease or any other Operative Document or (ii) the action by the Lessee is not prohibited under this Lease or any other Operative Documents and the failure to take such action may adversely affect the Lessee or the Investor.

0000HYVC.WS1                              20

US09347

The Trustee agrees that, so long as the Trustee has any payment obligation under this Lease, the Trustee shall not distribute to the Investor any amount (other than Lease Excluded Payments) after the Sublease Basic Termination Date unless it shall have received written instructions from the Investor to distribute such amounts and the Lessee shall be in compliance with Section 3(e).

Section 23.   Severability.

Any provision of this Lease which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

Section 24.   Miscellaneous.

(a)   Deemed Compliance. Notwithstanding any other provision of this Lease, by entering into the Sublease, the Lessee shall be deemed to have complied with the obligations of the Lessee contained in Sections 5, 7(a), 7(e), and 12 during the Sublease Term without any action on the part of Lessee and regardless of any failure of Sublessee or its successors and permitted assigns to perform its corresponding obligations under Sublease.

(b)   [Reserved].

(c)   Counterparts. This Lease may be executed by the parties hereto in separate counterparts, each of which when so executed and delivered shall be an original, but all such counterparts shall together constitute but one and the same instrument.

(d)   Amendments and Waivers. No term or provision of this Lease may be changed, waived, discharged or terminated orally, but only by an instrument in writing signed by the party against which the enforcement of the change, waiver, discharge or termination is sought. This Lease shall constitute an agreement of lease, and nothing herein shall be construed as conveying to Lessee any right, title or interest in the Undivided Interest except as a lessee only. The termination of this Lease shall not affect the rights of the Lessee or the Lessor to recover damages for any antecedent breach of this Lease or to recover any sum otherwise due to such Person under the terms of this Lease and will be without prejudice to any right or action of such Person.

0000HYVC.W51                    21

US09348

(e)   CHOICE OF LAW.  THIS LEASE SHALL IN ALL RESPECTS BE GOVERNED BY THE LAW OF THE STATE OF NEW YORK, INCLUDING ALL MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE.  THIS AGREEMENT HAS BEEN DELIVERED IN THE STATE OF NEW YORK.

Section 25.   End of Sublease; Lessee Purchase Option.

(a)   End of Sublease.  After the last day of the Sublease Term, the Lessee may cancel this Lease and surrender to the Lessor its interest in any sublease of the Facility upon 10 days prior written notice to the Lessor; provided, however, that such cancellation and surrender shall (a) not excuse the Lessee from any obligation hereunder to pay Lease Rent and (b) excuse the Lessee from all obligations hereunder other than any obligation to pay Lease Rent.

(b)   Lessee Purchase Option.  Lessee shall have the option to purchase the Lessor's interest in the Undivided Interest for an amount equal to the then estimated Fair Market Value of such interest determined (except in the case of any purchase on the Lease Termination Date, taking into account the fact that the Undivided Interest is encumbered by this Lease) at the time of the exercise of such option, upon the occurrence of any of the following events (and provided that Sublessee does not exercise the Sublease Purchase Option under Section 19 of the Sublease or its options under Section 9 of the Sublease):

(i)   the Sublease Basic Termination Date or the Lease Termination Date;

(ii)   the Sublease Renewal Termination Date, if this Lease is still in effect;

(iii)   a Sublessee Event of Default occurs and is continuing; or

(iv)   Lessee, as Sublessor, gives a notice pursuant to Section 9(b) of the Sublease indicating its election to retain the Sublessor's Lease Interest.

Lessee shall notify Lessor in writing whether it will purchase such interest in the Undivided Interest pursuant to this Section 25(b): (a) not less than 90 days prior to the Sublease Basic Termination Date, the Sublease Renewal Termination Date or the Lease Termination Date; and (b) at any time within one year of the declaration of a Sublessee Event of Default if such Sublessee Event of Default is continuing.  If Lessee elects to purchase such interest in the Undivided Interest pursuant to this Section 25(b) upon payment to Lessor of an amount equal to the applicable purchase price, plus all other

0000HYVC.WS1                        22

US09349

amounts owing by Lessee to Lessor pursuant hereto (whether as Lease Rent or Lease Supplemental Rent), all of Lessor's right, title and interest in the Undivided Interest shall be deemed automatically to have been transferred by Lessor to Lessee or its designee, "as-is, where-is" without recourse or warranty of any kind, except with respect to the absence of Liens (other than Permitted Liens). Lessee shall prepare and Lessor shall execute, a termination of this Lease and a bill of sale or other instrument providing for the transfer of the Lessor's interest in the Undivided Interest as Lessee may reasonably request, all at the expense of Lessee. Upon compliance by Lessee with the provisions of this Section 25(b), this Lease shall terminate except in respect of liabilities and obligations of Lessee which have accrued but not been paid or which are in dispute as of the date of such transfer.

### Section 26.    Assumption by Sublessee of Lease Rent.

Upon Sublessee's or any Appropriate Purchaser's or any Designated Successor Lessee's assumption or deemed assumption pursuant to any Operative Document of all or any portion of unpaid Lease Rent and any other obligations of the Lessee hereunder, (a) the Trustee and the Investor shall be released from any and all such payments and other obligations and (b) the Lessor shall, at its own cost and expense, execute such documents as shall be necessary or reasonably requested by the Lessee to evidence such assumption and release, including a division of all obligations hereunder. Upon the assumption or deemed assumption of all the Lessee's obligations hereunder and the release of the Trustee from all such obligations, all references to the Investor in this Lease shall, with respect to all periods after such assumption, become inapplicable.

### Section 27.    Registered Instrument.

This Lease is a registered instrument. The Lessee will keep a record of Interest (the "Record of Interest"), in a form and using materials furnished by the Investor and reasonably acceptable to the Lessor, in which it will register, and will register any transfer of, the Lessor's interest in this Lease and in the rights to receive any payments hereunder.

No transfer by the Lessor (whether or not with the Lessee's consent) of any interest in this Lease or in the rights to receive any payments hereunder shall be permitted or effective unless such transfer is made upon the Lessee's Record of Interest. Unless a transfer is otherwise permitted under the Operative Documents, the Lessor shall not transfer its interest in the Undivided Interest, this Lease or the rights to receive any payments hereunder except by written application to the Lessee, stating the name of the proposed transferee and otherwise complying with the terms of the

0000HYVC.W51                              23

US09350

Operative Documents.  Unless a transfer is otherwise permitted under the Operative Documents, no such transfer by any Lessor shall be effective until, and such transferee shall succeed to the rights of such Lessor only upon, final acceptance and entry by the Lessee into the Lessee's Record of Interest of the transfer.

Prior to the entry by the Lessee into the Lessee's Record of Interest of any transfer by the Lessor as provided in the immediately preceding paragraph, the Lessee shall deem and treat the Lessor as the owner of this Lease for all purposes.

US09351

IN WITNESS WHEREOF, the Lessor and the Lessee have each caused this
Lease Agreement to be duly executed as of the day and year first above written.

N.V. ELECTRICITEITSBEDRIJF
ZUID-HOLLAND,

By_____
   Name:
   Title:    J. A. HOYTE de JONG
               Attorney-in-Fact

WILMINGTON TRUST COMPANY,
   not in its individual capacity, but
   solely as Trustee

By_____
   Name:
   Title:    JAMES P. LAWLER
               Vice President

Lease Agreement                            ROCA Facility Trust No. 2