# EXHIBIT C

# EXHIBIT C

## DOCUMENTS TO BE PRODUCED BY HOLLANDSCHE BANK-UNIE N.V.

## DEFINITIONS & INSTRUCTIONS

A. "Document," "record" and "material" include any written, printed, typed, electronic or graphic matter of any kind or nature. Any draft or non-identical copy constitutes a separate document for purposes of these requests. The terms shall be construed to include, but shall not be limited to, correspondence, electronic mail, notes, notations, contracts, brochures, agreements, deeds, leases, letters, memoranda, checks, bank statements, reports, analyses, projections, studies, records, corporate minutes, financial statements, financial records, accounting or audit workpapers (including permanent workpapers), spreadsheets, transcripts, recordings, and all other types of written or documentary materials.

B. Any copy of a document that varies in any way from the original or from any other copy of the document, whether by reason of handwritten or other notation or any omission, shall constitute a separate document and must be produced. Each document is to be produced in its entirety, without abbreviation or expurgation, and the person who made the notation identified.

C. If any documents are withheld under a claim of privilege, furnish a list identifying each document for which a privilege is claimed, together with the following information and sufficient details so as to permit a court to adjudicate the validity of the claim of privilege: date, sender, recipient, type (e.g., letter, memorandum, telegram, chart, photograph, etc.), subject matter of the document, the basis on which a privilege is claimed, and the paragraph or paragraphs of this request to which the document responds.

D. If any document that would have been responsive to these requests no longer exists, please state the following for each document: the date of destruction, the reason for destruction, and the person(s) responsible for the decision to destroy the document(s) and for the actual destruction of the documents.

E. Responses to these requests should be made in a manner consistent with Fed. R. Evid. 902(12), Certified Foreign Records of Regularly Conducted Activity.

F. The term "Con Ed" shall refer to Consolidated Edison Company of New York, Inc. & Subsidiaries, and affiliated companies, including, but not limited to, Consolidated Edison Development, Inc., Consolidated Edison Leasing, Inc., and Consolidated Edison, Inc.

G. The term "Banc One" shall refer to Banc One Leasing Corp. its related affiliates, subsidiaries, successors, and assigns, including, but not limited to, and any person, officer, director, accountant, lawyer, agent, or entity acting on behalf of any of the foregoing organizations.

H. The term "EZH" shall refer to N.V. Electriciteitsbedrifj Zuid-Holland, its related affiliates, subsidiaries, successors, and assigns, including, but not limited to, Preussen Elektra A.G. and E.ON Benelux Generation N.V., and any person, officer, director, accountant, lawyer, agent, or entity acting on behalf of any of the foregoing organizations.

I. The term "RoCa3" shall refer to the gas fired CHP facility located in the Netherlands on the border between Rotterdam and Capelle aan den IJessel, constituting the third unit alongside two previously built units, which was owned by EZH on or about December 15, 1997.

J. The term "HBU" shall refer to Hollandsche Bank-Unie N.V., its related affiliates, subsidiaries, successors, and assigns, and any person, officer, director, accountant, lawyer, agent, or entity acting on behalf of any of the foregoing organizations.

K. The term "ABN AMRO" shall refer to ABN AMRO Bank N.V., its related affiliates, subsidiaries, successors, and assigns, and any person, officer, director, accountant, lawyer, agent, or entity acting on behalf of any of the foregoing organizations.

L. The term "Credit Suisse" shall refer to Credit Suisse Financial Products, Credit Suisse First Boston, their related affiliates, subsidiaries, successors, and assigns, and any person, officer, director, accountant, lawyer, agent, or entity acting on behalf of any of the foregoing organizations.

M. The term "Lease Transaction" shall refer to the series of transactions pertaining to the RoCa3 facility as described in paragraphs 61-77, inclusive of the complaint attached hereto as Exhibit C-1.

N. The term "Lease Transaction Participants" refers to the following entities: ABN AMRO Bank N.V.; Hollandsche Bank-Unie N.V.; EZH; Con Ed; Credit Suisse; Bayerische Landesbank; Wilmington Trust Co.; and ABB Leasing GmbH, and any and all affiliated businesses, successors, assigns, predecessor or successor businesses, and any person, officer, director, accountant, lawyer, agent, or entity acting on behalf of any of the foregoing organizations.

O. The term "Capstar" refers to Capstar Partners L.L.C., its related affiliates, subsidiaries, successors, and assigns, and any person, officer, director, member, accountant, lawyer, agent, or entity acting on behalf of any of the foregoing organizations.

P. The term "Cornerstone" refers to Cornerstone Financial Advisors L.P., its related affiliates, subsidiaries, successors, and assigns, and any person, officer, partner, accountant, lawyer, agent, or entity acting on behalf of any of the foregoing organizations.

## DOCUMENTS TO BE PRODUCED

### THE LEASE TRANSACTION

1. The documents in the files of HBU that discuss the Lease Transaction.

2. The documents in the files of HBU that discuss or pertain to its solicitation as a potential participant in the Lease Transaction.

3. The documents in the files of HBU that discuss HBU's decision to participate in the Lease Transaction.

4. The documents in the files of HBU that contain the credit and/or risk of default analyses made in conjunction with the decision to participate in the Lease Transaction.

5. The documents in the files of HBU that describe or discuss the lease options the Lease Transaction provides to Con Ed and/or EZH, including documents that address the feasibility and/or likelihood of exercise of those options.

6. The documents in the files of HBU pertaining to the negotiation of any loans to Con Ed and/or EZH in conjunction with the Lease Transaction.

7. The documents in the files of HBU evidencing the transfer of any funds by or to any of the Lease Transaction Participants in connection with the Lease Transaction.

8. The documents in the files of HBU pertaining to the loans issued by HBU in connection with the Lease Transaction.

9. The documents in the files of HBU discussing a default or missed loan repayment by either Con Ed and/or EZH.

10. The documents in the files of HBU pertaining to the accounts at HBU related to the Lease Transaction.

**COMMUNICATIONS**

11. The letters, memoranda, notes, e-mails, and other written communication in the files of HBU exchanged by and/or between HBU and any of the Lease Transaction Participants (or their affiliates, assigns, or successors in interest) in connection with the Lease Transaction.

12. The letters, memoranda, notes, e-mails, and other written communication in the files of HBU exchanged by and/or between HBU and Capstar in connection with the Lease Transaction.

13. The letters, memoranda, notes, e-mails, and other written communication in the files of HBU exchanged by and/or between HBU and Cornerstone in connection with the Lease Transaction.

14. The letters, memoranda, notes, e-mails, and other written communication in the files of HBU exchanged by and/or between HBU and Banc One in connection with the Lease Transaction or a substantially similar transaction involving the RoCa3 facility.

**SIMILAR TRANSACTIONS**

15. The documents within the files of HBU that discuss or pertain to any of the following lease transactions considered by the plaintiff, Con Ed, between 1997 and 2001, including the documents discussing the solicitation of HBU as a potential participant in such a transaction and the documents reflecting HBU's consideration of such transactions and decision to participate in such transactions:

a. NUON lease (Netherlands);

b. MEGA Gas and Thermal Distribution lease/leaseback (Netherlands);

c. EPON lease (Netherlands);

d. ENECO lease (Netherlands);

e. ENN lease (Nethelands);

f. ENW gas lease (Netherlands);

g. MCN lease (United States);

h. ELECTRABEL power plant lease/leaseback (Belgium);

i. Diefland gas and thermal distribution lease/leaseback (Netherlands);

j. Linz power plant lease/leaseback (Austria);

k. UNA power plant lease/leaseback (Netherlands);

l. EG Laufenburg lease/leaseback (Switzerland);

m. Humber power lease/leaseback (United Kingdom);

n. EWZ electric transmission grid lease/leaseback (Switzerland);

o. ESAG lease (Germany);

p. REMU lease (Netherlands);

q. DELTA lease (Netherlands);

r. ZETA/TEL lease (Netherlands);

s. EDON lease (Netherlands);

t. DEW lease (Germany);

u. VASA lease (Germany); and

v. SWISCO lease (Switzerland).

16. The documents in the files of HBU that discuss any other transaction similar to the Lease Transaction and/or the transaction described in Revenue Ruling 2002-69, 2002-2 C.B. 760 (copy attached hereto as Exhibit C-2), from 1996 through 2001, including the documents discussing the solicitation of HBU as a potential participant in such a transaction and the documents reflecting HBU's consideration of such transactions and decision to participate in such transactions.

**REGULATORY COMMUNICATIONS**

17. The correspondence, communication, and reporting made to governmental regulatory authorities by HBU or on HBU's behalf in the files of HBU that pertain to or refer to the Lease Transaction and/or the financing of the Lease Transaction.

# EXHIBIT C-1

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

FILED APR 19 2006

| | |
|---|---|
| CONSOLIDATED EDISON COMPANY OF NEW YORK, INC. & SUBSIDIARIES, | |
| Plaintiff, | 06-305 T |
| v. | No. |
| THE UNITED STATES, | |
| Defendant. | |

## COMPLAINT

Plaintiff, Consolidated Edison Company of New York, Inc. & Subsidiaries, brings this action for a refund of federal taxes paid in connection with the Internal Revenue Service's proposed adjustments to its federal tax return for the taxable year ending December 31, 1997. The adjustments are related to Plaintiff's investment in an electric generation facility located outside Rotterdam, The Netherlands.

In support of its refund claim, Plaintiff alleges as follows:

## JURISDICTION AND SUMMARY OF ACTION

1. Plaintiff, Consolidated Edison Company of New York, Inc. & Subsidiaries ("Con Edison NY"), brings this refund action, founded upon the Internal Revenue Code of 1986, for the recovery of federal income tax paid by Plaintiff for the taxable year ended December 31, 1997 ("the 1997 taxable year").

2. Defendant is the United States of America.

3. This Court has jurisdiction by reason of 28 U.S.C. §§ 1346(a)(1) and 1491(a)(1) and 26 U.S.C. § 7422.

4. On or before September 9, 1998, Con Edison NY filed a timely federal consolidated income tax return for the 1997 taxable year with the Internal Revenue Service ("IRS") and timely paid income taxes in the amount of $291,003,408.

5. Con Edison NY's name, address, and identification number appearing on the 1997 tax return are: Consolidated Edison Company of New York, Inc. & Subsidiaries; 4 Irving Place, Room 615-S, New York, New York, 10003; and 13-5009340, respectively.

6. During the 1997 taxable year, Con Edison NY, through its subsidiaries, made an investment in an electric generation plant in The Netherlands. The plant is generally known as "RoCa3" and is owned by N.V. Electriciteitsbedrijf Zuid-Holland ("South Holland Electric"). This transaction is hereinafter referred to as the "RoCa3 Investment."

7. On its 1997 tax return, Con Edison NY reported rental income with respect to the RoCa3 Investment and deducted rental expense, amortization of expenses, and interest expense relating to the property and indebtedness incurred in the RoCa3 Investment, for a net loss of $937,331.

8. The IRS, during a routine audit of Con Edison NY's tax return for the 1997 taxable year, disputed Con Edison NY's tax treatment of the RoCa3 Investment.

9. On or about September 15, 2005, the IRS issued a Notice of Proposed Adjustment to Con Edison NY, proposing additional federal income of $937,331 for the 1997 taxable year with respect to the RoCa3 Investment.

10. The IRS's proposed adjustments resulted in a tax increase of $328,066, increasing Con Edison NY's federal income tax liability for the 1997 taxable year from $291,003,408 to $291,331,474.

11. On or about November 3, 2005, Con Edison NY paid the proposed tax deficiency of $328,066 to the IRS.

12. On or about December 2, 2005, Con Edison NY filed a Form 1040X (Amended U.S. Corporation Income Tax Return) with the IRS requesting a refund of erroneously paid federal income taxes for the 1997 taxable year in the amount of $328,066. The requested refund was solely attributable to Con Edison NY's payment of the proposed tax deficiency referred to in paragraphs 10 and 11 above. A true and complete copy of this claim for refund is attached as Exhibit A.

13. By a notice of disallowance dated March 15, 2005, the IRS disallowed Con Edison NY's claim for refund. A true and complete copy of this notice of disallowance is attached as Exhibit B.

14. The IRS's disallowance of Con Edison NY's claim for refund was erroneous.

15. Con Edison NY requests a refund of its overpayment of $328,066 of federal tax for the 1997 taxable year, plus interest and allowable costs.

16. No action on the claim for refund attached as Exhibit A has been taken by Congress or any agency of the United States or in any judicial proceeding, including any in the Tax Court of the United States.

17. Con Edison NY has timely filed this Complaint for a refund of federal taxes paid within two years of the date of the notice of disallowance as required under 26 U.S.C. § 6532(a).

18. Con Edison NY is the sole owner of the claim included in Exhibit A and asserted herein, and has made no assignment thereof.

## FACTUAL BACKGROUND

### A. Con Edison NY's Energy Business

19. At the time of the RoCa3 Investment, Con Edison NY was a widely-held and publicly-traded company on the New York Stock Exchange. It owned 100% of Consolidated Edison Development, Inc. ("Con Edison Development"), which in turn owned 100% of Consolidated Edison Leasing, Inc. ("Con Edison Leasing"). Con Edison NY has since become a wholly owned subsidiary of Consolidated Edison, Inc. ("CEI"), which also owns Con Edison Development as well. Like Con Edison NY before it, CEI is widely-held and publicly-traded on the New York Stock Exchange.

20. Con Edison NY is one of the nation's oldest and largest investor-owned energy companies with approximately $21 billion in assets. It is a regulated public utility that was incorporated in 1884 and currently delivers electric service to almost all of New York City and most of Westchester County – a service area having a population of approximately 9 million. Con Edison NY also supplies gas in parts of New York City and Westchester County. Con Edison NY also owns and operates the largest district steam system in the world, providing steam service in most of Manhattan.

21. Prior to the 1990s, Con Edison NY, as was the case with most electric utilities, offered electric service in a "bundled" format. In other words, Con Edison NY owned and operated the generation plants that produced electricity as well as the transmission and distribution systems that delivered the electricity to its customers. Con Edison NY owned gas-fired, oil-fired, and nuclear-powered plants with a total electric-generating capacity of 8,300 megawatts. As a regulated public utility, all of Con Edison NY's operations were subject to regulation by the New York Public Service Commission ("PSC").

**B. The Deregulation of Con Edison NY's Energy Business**

22. Beginning in March 1993, the PSC took a number of steps to develop a competitive electric industry in the state of New York. This process commenced with the PSC's initiation of a proceeding entitled "Proceeding On Motion Of The Commission To Address Competitive Opportunities Available To Customers Of Electric And Gas Service And Develop Criteria For Utility Responses" (the "Competitive Opportunities Proceeding"). The purpose of the Competitive Opportunities Proceeding was to deregulate the electric generation plants owned by New York State utilities and to have the price for the output of those plants determined by market forces rather than through regulated rates.

23. The Competitive Opportunities Proceeding was divided into two phases. Phase I was designed to discuss, investigate, and address the issues involved in moving to a competitive marketplace. Phase II, commencing in August of 1994, involved a collaborative effort between electric utilities and other interested parties to develop models for restructuring the electric industry within New York.

24. Phase II of the process culminated with a May 1996 PSC Opinion stating the PSC's vision for the electric utility industry and ordering Con Edison and certain other major electric utilities in New York State to file plans describing how they would restructure their operations to bring about a competitive marketplace for, among other things, electric generation. The Opinion "strongly encouraged" the utilities to sell their generating plants to unregulated entities so as to facilitate the development of a competitive marketplace. The May 1996 PSC Opinion also invited utilities to propose the corporate structures, including unregulated subsidiaries, that would further the PSC's restructuring goals.

C. **Con Edison NY'S Response to Deregulation**

25. As a result of the Competitive Opportunities Proceeding, Con Edison NY knew in the mid-1990s that it would be required to restructure its regulated businesses and allowed to expand into competitive unregulated businesses. Con Edison NY further understood that it might be required to sell most if not all of its electric generation plants and concluded that it should grow its business by (among other things) investing its capital in unregulated businesses and facilities. Con Edison NY also recognized that the PSC's rules were likely to prohibit Con Edison NY from reinvesting in electric generation plants within New York State.

26. Consequently, Con Edison NY began to develop a strategy that would allow it to effectively compete in a deregulated industry through the development and growth of unregulated businesses. Con Edison NY's strategy included, among other things, growth through the investment of capital in unregulated energy-related businesses and facilities outside of New York State.

27. In May 1995, Con Edison NY requested permission from the PSC to invest up to 5% (approximately $504 million) of its consolidated capital in unregulated subsidiaries that would (i) provide energy services; (ii) invest and/or participate in international energy infrastructure projects; and (iii) market its technical services.

28. In July 1996, the PSC issued an order (the "July 1996 Order") which deferred action on Con Edison NY's May 1995 request, but granted Con Edison NY authority to invest up to $50 million in unregulated subsidiaries which would invest in two of the three requested projects: the investment and/or participation in international energy infrastructure projects, and the marketing of technical services internationally. The PSC stated that these investments would be "largely international" and could be made through "development companies, investment funds, joint ventures, or other vehicles." In accordance with the PSC's plan to encourage

divestiture of public utility-owned electric generation plants, the PSC prohibited Con Edison NY from investing in any project that might provide electric energy to customers within New York State.

29. In response to the July 1996 Order, in October 1996 Con Edison NY formed a new subsidiary, Gramercy Development, Inc., to carry out the investments allowed by such Order. Gramercy Development, Inc. later changed its name to Con Edison Development.

30. In October 1996, Con Edison NY filed a rate and restructuring plan as mandated by the PSC. This plan also included a petition to adopt a holding company structure. Con Edison NY's restructuring plan proposed an approach to a competitive electric generation market that included, among other things, divestiture of its generating plants, a plan for retail competition, and a corporate reorganization into a holding company structure. The proposed holding company structure would allow Con Edison to form unregulated subsidiaries whose investment decisions would no longer require prior PSC approval.

31. In September 1997, the PSC and Con Edison NY ultimately agreed on a restructuring plan that was embodied in a Settlement Agreement ("the Settlement"). The Settlement included, among other things, (i) a new rate plan during the period of the transition to competition, (ii) a commitment by Con Edison NY to divest at least 50% of its New York City electric generation plants by 2002 to unregulated third parties so as to help implement a fully competitive market for electric generation, and (iii) authorization for Con Edison NY to form a holding company whose subsidiaries would consist of Con Edison NY and several unregulated subsidiaries, including Con Edison Development.

32. The Settlement permitted the new holding company to invest up to 5% of its consolidated capital in unregulated subsidiaries, consistent with Con Edison NY's May 1995

request. While the Settlement replaced the July 1996 Order, pursuant to a Statement of Policy dated July 17, 1998, the PSC imposed a prohibition against investments in electric generation assets in New York State by Con Edison NY's unregulated affiliates, albeit as a rebuttable presumption that such investments would unacceptably exacerbate the potential for the exercise of vertical market power.

33. As allowed by the Settlement, the shareholders of Con Edison NY formed CEI in January 1998. As part of the transition to a holding company structure, Con Edison NY and Con Edison Development, as well as several other unregulated subsidiaries of Con Edison NY, became subsidiaries of CEI.

34. In 1999, pursuant to the Settlement with the PSC, Con Edison NY completed the sales of almost 6,300 megawatts of its approximately 8,300 megawatts of electric generation assets for an aggregate price of $1.8 billion. In 2000, Con Edison NY entered into a contract to sell its nuclear-generating facilities, with electric generating capacity in excess of 900 megawatts, for an aggregate price of $502 million, not including fuel and other adjustments. That transaction closed in 2001. Today, the remaining electric generation assets owned by Con Edison NY are held in connection with, and are ancillary to, its steam generation business.

**D. The Business Of Con Edison Development**

35. Con Edison Development was formed to take advantage of the Con Edison group's expertise in the construction and operation of electric generating plants and to pursue energy-related investments on a world-wide basis free from regulation by the PSC.

36. Con Edison Development's initial business plan, formulated in 1997, was a long-term plan which was designed to take advantage of the world-wide trend to deregulation and envisioned Con Edison Development's potential growth into a worldwide integrated utility business. However, because the growth into unregulated investments, particularly those outside

New York State, was a new venture for the Con Edison group, Con Edison Development adopted a gradual and measured approach to these investments.

37. As the initial step in its business plan, Con Edison Development focused on three categories of investment: (i) development of new energy projects, such as electric power generation; (ii) acquisition of existing infrastructure, including portions of operating electric, gas, thermal, and water utilities; and (iii) leasing portions of energy systems, such as power plants or distribution systems. Con Edison Development also planned to market technical services regarding the design, building, operation, and management of modern utilities.

38. Pursuant to this strategy, Con Edison Development began to participate in energy-related projects through investments operated by others, such as investments in energy funds. In July 1997, Con Edison Development made its first energy infrastructure investment, namely a capital commitment to provide up to $5 million to a fund sponsored by Energy Investors Fund called Project Finance Fund III, LP. Project Finance III utilized the funds received from Con Edison Development and other similar equity investors to invest in energy and infrastructure projects worldwide.

39. Con Edison Development also relied on outside consultants to locate potential international energy infrastructure investment opportunities. In March 1997, Con Edison Development entered into an agreement with International Energy Partners, L.P. ("IEP"). IEP had a portfolio of international energy infrastructure investment opportunities that it was pursuing. Pursuant to this agreement, Con Edison Development was given preferred rights to participate in certain investment opportunities identified by IEP.

40. One of the earliest opportunities presented to Con Edison Development by IEP was a minority investment in a relatively small power facility (42 megawatts) in Eastern

Guatemala, generally known as Generadora Electrica del Norte, Limitada ("Genor"). Con Edison Development acquired and still owns indirectly through subsidiaries a 49% interest in Genor; the remaining 51% is owned by local investors.

41. Con Edison Development also explored leasing investments in energy facilities. Con Edison Development was interested in investing through leases because these investments (i) provided highly predictable and front-loaded earnings; (ii) achieved good to excellent investment yields; (iii) were less risky than direct ownership of operating assets; and (iv) could be implemented more quickly than direct investments in projects requiring a long development cycle. Leases, from Con Edison Development's perspective, also provided a means to (i) forge relationships with utilities abroad that would allow for further opportunities in the future; (ii) compete effectively with other domestic entities already involved in overseas investments; and (iii) diversify risk in terms of operations and geography. Con Edison Development was interested in potential leasing investments in Europe, Australia, and the U.S.

42. Consistent with its objective of gradually becoming a worldwide integrated utility business, Con Edison Development searched for opportunities related to utilities undergoing privatization in Central and South America, Europe, Southeast Asia, and the United States. Employees of the Con Edison group spent significant amounts of time in China, Australia, the Philippines, Mexico, El Salvador, Argentina and Nicaragua pursuing energy infrastructure investments and other potential energy-related businesses (such as the marketing of technical services).

43. Con Edison Development continued to pursue energy infrastructure investments both inside and outside the United States until the late 1999 to early 2000 time frame. At that time, a business decision was made to focus on energy infrastructure opportunities in the United

States, in particular the Northeast and Mid-Atlantic states (other than New York State). This decision was based on a number of considerations, including (i) marketplace pricing indicated that the risks inherent in energy infrastructure investments outside the United States could no longer be justified in light of anticipated returns on such investments, particularly in relation to the anticipated returns and risks on such investments inside the United States, and (ii) the recognition that Con Edison Development and its affiliates could better employ their expertise in the energy markets and the electric utility industry inside the United States, particularly in the Northeast and Mid-Atlantic states.

**E. The RoCa3 Investment**

44. During 1997, Con Edison Development developed plans and guidelines for its future growth as an unregulated subsidiary of the Con Edison group. Con Edison Development also began to identify possible investment prospects, including a number of leasing investments.

45. Consistent with its business plan, one of the projects identified by Con Edison Development during 1997 as a potential leasing investment was a recently constructed 220 megawatt gas-fired combined cycle electric generation plant outside of Rotterdam, The Netherlands. The plant is named "RoCa3," after its location on the border between Rotterdam and Capelle aan den IJssel, and is next to two previously constructed plants. The RoCa3 plant has at all relevant times been owned by South Holland Electric, an electric generation company in The Netherlands that has been involved in the coordination and transport of electrical energy in the province of Zuid-Holland since 1941, and in the production of heat and electricity since 1987.

46. At the time Con Edison Development was considering an investment in the RoCa3 plant, The Netherlands and the European Union were also in the process of deregulating electric generation facilities.

47. Since Con Edison Development did not have prior experience in complex leasing transactions, it decided to invest in conjunction with experienced market participants. In the case of the RoCa3 Investment, Con Edison Development decided to make its investment jointly with Banc One Leasing Corp. ("Banc One").

48. Before making a decision to proceed with the RoCa3 Investment, Con Edison Development considered many factors, including (i) South Holland Electric's business and creditworthiness; (ii) conditions in the energy markets for The Netherlands and Europe; (iii) the political, legal, and economic climate of The Netherlands; (iv) the economic return and accounting income of the RoCa3 Investment; (v) the quality of the RoCa3 plant; (vi) the connection between the RoCa3 plant and the Con Edison group's core business activities;; and (vii) the terms of the transaction. Con Edison Development also considered the potential risks and benefits associated with its residual value interest in the RoCa3 plant. In the leasing context, residual value refers to the remaining useful life and value of an asset at the end of the lease of that asset.

49. Con Edison Development retained a number of consultants to assist in its review of the RoCa3 Investment.

50. On behalf of Con Edison Development and Banc One, Duke Engineering & Services ("Duke Engineering") performed a comprehensive engineering review of the RoCa3 plant's technology. Duke Engineering made a site visit to inspect the RoCa3 plant, interviewed key plant personnel, and reviewed plant documents.

51. Duke Engineering found the RoCa3 plant's design and components to be of high quality using state-of-the-art proven technology and rated the RoCa3 plant as "above average" in each of the four factors that contribute to a plant's useful life. Duke Engineering further

concluded that the RoCa3 plant complied with current environmental regulations; that its fuel supply was adequate under the current purchasing agreements; and that South Holland Electric's maintenance philosophy, practices, and facilities were better than average.

52. On behalf of Con Edison Development and Banc One, Tauw Milieu bv ("Tauw Milieu") conducted an environmental, health, and safety assessment of the RoCa3 plant. Tauw Milieu performed an on-site inspection, interviewed South Holland Electric personnel, and reviewed applicable environmental laws and regulations in conducting its review.

53. Tauw Milieu concluded that the RoCa3 plant's environmental condition was very good and that it was in substantial compliance with all applicable environmental and health and safety requirements.

54. On behalf of Con Edison Development and Banc One, Deloitte & Touche performed a comprehensive valuation assessment of the RoCa3 plant. Deloitte & Touche conducted a physical inspection of the RoCa3 plant, interviewed South Holland Electric personnel, and analyzed the power industry in The Netherlands and its regulatory environment, natural gas resources, and the Dutch natural gas industry.

55. To arrive at a fair market value for the RoCa3 plant, Deloitte & Touche analyzed South Holland Electric's financial statements, the RoCa3 plant's construction expenses and projected operating and other expenses, comparable market transactions, and similar publicly listed companies. Deloitte & Touche then studied historical power plant useful life data to determine the RoCa3 plant's useful life and residual value. Finally, Deloitte & Touche assessed the various options available to South Holland Electric and Con Edison Development under the proposed Investment.

56. Deloitte & Touche concluded that, as of December 15, 1997, the proposed closing date for the RoCa3 Investment, the RoCa3 plant had a remaining useful life of at least 54 years.

57. In addition to the work performed by these consultants, Con Edison Development sent a team of its own and Con Edison NY employees to inspect the RoCa3 plant and to discuss the plant's operations with South Holland Electric's engineers.

58. Based upon its extensive review of the proposed RoCa3 Investment, the board of directors of Con Edison Development approved the RoCa3 Investment on December 10, 1997. The major benefits of the transaction were identified as follows:

(1) Highly predictable earnings

(2) Front loaded earnings under FASB accounting rules

(3) Good to excellent investment yields

(4) Relatively low risk

(5) Tax benefits of leasing

(6) Strategic value of leasing, *i.e.*, the ability to more fully understand the legal, regulatory, commercial and tax environment in The Netherlands and the European Union, thus providing the basis for better informed decisions regarding potential future investments.

59. Con Edison expected a pre-tax economic profit of at least $60 million from the RoCa3 Investment. This pre-tax profit would provide an internal rate of return of approximately 3% to 4%.

60. Con Edison Development expected that the yield on the RoCa3 Investment for accounting and financial reporting purposes would be in excess of 12%.

61. On December 15, 1997, Con Edison Development, through its subsidiary Con Edison Leasing, and South Holland Electric entered into a lease and sublease of RoCa3, whereby Con Edison Leasing leased an undivided 47% interest in the RoCa3 plant from South Holland

Electric for approximately 43.2 years ("the Headlease"), and then subleased the RoCa3 plant back to South Holland Electric for approximately 20.1 years ("the Sublease"). Banc One entered into a similar Headlease and Sublease for the remaining interest in the RoCa3 plant.

62. Con Edison Leasing formed a trust to enter into the various leases and other agreements that were involved in the RoCa3 Investment. The role of the trust has no effect on the tax treatment of the RoCa3 Investment. Thus, for simplicity, this Complaint describes the RoCa3 Investment as if Con Edison Leasing had invested directly in the RoCa3 Investment.

63. Under the Headlease, Con Edison Leasing, as lessee, is obligated to make two lump-sum payments of rent to South Holland Electric. The first payment was due in 1997 at the beginning of the Headlease, and the second payment is due in 2041 at the end of the Headlease. The amounts of these rent payments were based on the fair market rental value of the RoCa3 plant as of December 15, 1997.

64. Con Edison Leasing funded its initial payment of rent under the Headlease by investing $39,320,000 of its own cash and by borrowing $80,792,270.36 from Hollandsche Bank-Unie N.V. ("Hollandsche"). Con Edison Leasing also paid $4,125,000 in transaction costs in connection with entering into the RoCa3 Investment.

65. At the end of the Headlease in 2041, the RoCa3 plant will have a remaining useful life of at least 10.8 years. This period is 20% of the 54-year useful life of the RoCa3 plant as of December 15, 1997, as determined by Deloitte & Touche. Tax law has long recognized that if an asset has a residual life at the end of the lease of 15% of the asset's original useful life, then the lease qualifies as a "true lease" for federal income tax purposes.

66. Deloitte & Touche also determined that at the end of the Headlease, the RoCa3 plant will have a remaining residual value of at least 20% of the fair market value of the RoCa3

plant as of December 15, 1997. Tax law has long recognized that if an asset has a residual value at the end of the lease of 15% of the asset's original cost, then the lease qualifies as a "true lease" for federal income tax purposes.

67. The Sublease set forth the terms under which Con Edison Leasing leased its undivided interest in the RoCa3 plant to South Holland Electric. Events of default under the Sublease include South Holland Electric's failure to make rent payments, declaration or filing of bankruptcy, failure to maintain RoCa3, and failure to maintain appropriate insurance. Con Edison Leasing's remedies upon a default include causing South Holland Electric to return Con Edison Leasing's interest in the RoCa3 plant.

68. At the end of the 20.1-year term of the Sublease from Con Edison Leasing to South Holland Electric, South Holland Electric has an option to purchase Con Edison Leasing's remaining 23.1-year interest in the RoCa3 plant at a fixed price. Deloitte & Touche determined that the price of South Holland Electric's purchase option will exceed the fair market value of the 23.1-year interest it would obtain and, therefore, South Holland Electric is not likely to exercise that option.

69. If South Holland Electric does not exercise its purchase option, then Con Edison Leasing, as lessee, has the opportunity to earn additional income by (i) claiming possession of its interest in the RoCa3 plant for the remaining 23.1 years of the Headlease; (ii) subleasing the RoCa3 plant to a third party for the remaining 23.1 years; or (iii) renewing the Sublease with South Holland Electric for an additional 16.5 years through the exercise of a "Renewal Option."

70. Deloitte & Touche determined that the fixed price of the rental payments due from South Holland Electric under Con Edison Leasing's Renewal Option will be below the fair

market rental value for a lease of a similar facility during the 16.5 year renewal term and, therefore, Con Edison Leasing is not likely to exercise its Renewal Option.

71. If South Holland Electric does not exercise its purchase option and Con Edison Leasing does not exercise its Renewal Option, which Deloitte & Touche indicated is the most likely outcome, then Con Edison Leasing will have possession of its interest in the RoCa3 plant for the 23.1 years remaining under the Headlease, which is 53.5% of its 43.2-year term. If Con Edison Leasing does exercise its Renewal Option, then at the end of the Renewal Option, Con Edison Leasing will have possession of its interest in the RoCa3 plant for the 6.7 years remaining under the Headlease, which is 15.5% of its 43.2-year term. In either case, Con Edison Leasing will have a residual interest in the RoCa3 plant that is greater than 15% of the Headlease term. The value of Con Edison Leasing's residual interest in the RoCa3 plant is also expected to be significantly higher than 15%.

72. At the end of either (i) the Sublease in 2017 or (ii) the Renewal Option term in 2034, as applicable, South Holland Electric is obligated to return to Con Edison Leasing its undivided interest in the RoCa3 plant in its original condition, ordinary wear and tear excepted, and the plant must pass certain specified redelivery acceptance tests. Duke Engineering anticipated that the plant would meet the requirements stated in the transaction and expected that the plant would be in similar or better operational condition as compared to equivalent power plants because of the high quality of the original equipment and design features.

73. South Holland Electric is the operator of the RoCa3 plant during the term of the Sublease. Con Edison Leasing, Banc One, and South Holland Electric entered into agreements providing for the operation and maintenance of RoCa3 upon the expiration of the Subleases to South Holland Electric. Pursuant to these agreements, Con Edison Leasing and Banc One have

the right to remove South Holland Electric as the operator of the RoCa3 plant upon the expiration of the Subleases.

74. In entering into the RoCa3 Investment, Con Edison Leasing assumed a significant amount of risk, including the risk that South Holland Electric would not be able to make or would refuse to make its required rent payments, the risk that South Holland Electric would go bankrupt, and the risk that the leased equipment would be damaged or otherwise suffer an unanticipated diminution in value.

75. As lessor under the Headlease, South Holland Electric assumed the risk that Con Edison Leasing would be unable to make the second lump-sum rent payment due under the terms of the Headlease.

76. Hollandsche, Con Edison Leasing's lender, assumed the risk that Con Edison Leasing would be unable to make the required loan payments.

77. As is typical in conservatively structured transactions, the RoCa3 Investment included a number of features that were designed to reduce the financial risks assumed by the parties. These features included collateral deposits, pledges of collateral, and an early buy-out option. However, these features did not and could not insulate Con Edison Leasing or the other parties from all risks presented by the RoCa3 Investment.

## COUNT ONE: THE IRS'S PROPOSED TAX TREATMENT OF THE RoCa3 INVESTMENT WAS ERRONEOUS

### A. The Headlease and Sublease Between Con Edison Leasing and South Holland Electric Should Be Respected Because Con Edison Leasing Retains Sufficient Benefits and Burdens of Ownership With Respect To Its Leasehold Investment in the Roca3 Plant

78. Con Edison NY reincorporates by reference and re-alleges the facts set forth in paragraphs 1 through 77 above.

79. Generally, a lease is an arrangement where one party (the "lessor") has a property interest in an asset or a right to use an asset and provides possession and the right to use that asset to another party (the "lessee") for a fixed period of time in exchange for payment of rent.

80. For federal income tax purposes, a lease arrangement will be respected as a "true lease" (instead of a loan or other form of transaction) if the lessor retains sufficient benefits and burdens of ownership. This determination generally depends on whether the lessor has a meaningful equity investment in the asset throughout the entire lease term and a meaningful residual interest in the asset at the end of the lease term. Decades of judicial authority have found a 15% residual value to be meaningful. Thus, if at the end of the lease term, the asset is expected to have a remaining useful life (and remaining value) equal to at least 15% of its original estimated useful life (and original cost), the arrangement will be respected for tax purposes as a true lease or sublease, as the case may be.

81. The lessor in a lease transaction can use either equity or a combination of equity and debt to finance the purchase or lease of the asset. When a lessor uses non-recourse debt to finance the purchase or lease of the asset, the transaction is called a leveraged lease.

82. In a typical leveraged lease transaction, an investor purchases or leases an asset and borrows money to finance some or all of the investment. The investor then leases the asset to a third party who uses the asset in its business operations. In this type of transaction, it is a common business practice for the investor to lease the asset to the party which originally sold or leased it to the investor, *i.e.*, a "sale-leaseback" or "lease-leaseback" transaction.

83. In leveraged lease transactions the lessor will earn profits from the rent payments it receives and from the residual value of the property once the lease expires. Additionally, a leveraged lease transaction will often provide a benefit in the form of a limited tax deferral, in

which an amount of federal income tax that would otherwise have been paid one year is deferred until a later year. This is so because leveraged lease transactions often produce losses for federal income tax purposes in the early years of the transaction due to depreciation, rental expense, amortization, and interest deductions. These losses are offset by profits or gains for federal income tax purposes in the later years of the transaction. This tax deferral effect of leveraged lease transactions has been approved by the courts and the IRS for many years.

84. The RoCa3 Investment, entered into by Con Edison Leasing and South Holland Electric on December 15, 1997, was a leveraged lease transaction because a portion of Con Edison Leasing's investment was financed through a non-recourse loan from Hollandsche.

85. The Headlease from South Holland Electric to Con Edison Leasing and the Sublease from Con Edison Leasing to South Holland Electric both qualify as leases for federal tax purposes because in each case (i) the leases transferred possession of the property interest in return for the obligation to pay rent and provided for transfer of possession back to the lessor in the event of a default, and (ii) the lessors' return depended upon the residual value of the property at the end of the respective lease.

**B. Con Edison NY Properly Reported the RoCa3 Investment on Its 1997 Tax Return**

86. Con Edison NY properly reported income and claimed deductions on its 1997 tax return in connection with the RoCa3 Investment.

87. As lessee under the Headlease, Con Edison Leasing is required to make rent payments to South Holland Electric. Con Edison Leasing accrued rental deductions on its 1997 tax return for these payments in accordance with the terms of the Headlease.

88. As lessee under the Sublease, South Holland Electric is required to make rent payments to Con Edison Leasing. Con Edison Leasing accrued income on its 1997 tax return with respect to these payments in accordance with the terms of the Sublease.

89. Section 467 of the Internal Revenue Code generally requires rent to be allocated to tax periods in accordance with the terms of a lease, except as otherwise required by section 467. Section 467 also authorizes the IRS to issue regulations regarding the allocation of rental payments to tax periods. Although section 467 was enacted in 1984, the Treasury Department did not promulgate final regulations pursuant to section 467 until 1999, that is, nearly 15 years later.

90. On June 3, 1996, before Con Edison Leasing entered into the RoCa3 Investment, the Treasury Department issued "proposed" regulations under Section 467 of the Internal Revenue Code (the "Proposed Section 467 Regulations"). These regulations, however, were not made final until May 18, 1999 (the "Final Section 467 Regulations").

91. Certain provisions of the Proposed Section 467 Regulations could have altered the method in which Con Edison Leasing reported the rental expense and income resulting from the Headlease and Sublease, respectively, on its 1997 income tax return, but these provisions were not applicable to leases that were entered into prior to the Final Section 467 Regulations as long as the allocation of rent agreed to by the parties was not designed for the principal purpose of avoiding income tax.

92. Both the Proposed Section 467 Regulations and the Final Section 467 Regulations contain a "safe harbor" provision. This provision states that the avoidance of income tax will not be considered to be a principal purpose for the method of allocating rent agreed to by the parties

if the rent allocated to each calendar year is no more than 10% higher or lower than the average rent for all calendar years under the lease.

93. The rent allocation contained in the Headlease and Sublease met the 10% "safe harbor" rule that is contained in the Proposed Section 467 Regulations and the Final Section 467 Regulations. Under the IRS's own rules, the rent allocation methodology in each of the leases is not considered to be for the principal purpose of avoiding income tax. Because the allocations of rent under the Headlease and Sublease satisfied the 10% safe harbor provision, Con Edison NY's reported rental expense deductions and rental income from the RoCa3 Investment as reported on its 1997 income tax return complied with the Proposed Section 467 Regulations and the Final Section 467 Regulations.

94. Con Edison NY properly reported deductions for accrual of interest expense with respect to its loan from Hollandsche.

95. Con Edison NY properly reported deductions for the amortization of transaction costs incurred with respect to the RoCa3 Investment.

## COUNT TWO: CON EDISON NY IS ENTITLED TO A REFUND OF TAXES

96. Con Edison NY incorporates by reference and re-alleges the facts set forth in paragraphs 1 through 95 above.

97. Pursuant to 26 U.S.C. §§ 61 and 467, Con Edison NY included a total of $399,963 in rental income on its income tax return for the 1997 taxable year with respect to South Holland Electric's obligation to pay rent under the terms of the Sublease.

98. Pursuant to 26 U.S.C. §§ 162(a)(3), 167, and 467, Con Edison NY deducted a total of $1,082,350 in rental expense and transaction costs on its income tax return for the 1997

taxable year as a result of the rental payments made to South Holland Electric under the terms of, and in amortization of transaction costs relating to, the Headlease.

99. Pursuant to 26 U.S.C. § 163, Con Edison NY deducted a total of $254,944 in interest expense on its income tax return for the 1997 taxable year as a result of interest accruing on the bank loan it obtained to fund a portion of its rental payments under the Headlease.

100. The IRS proposed to disallow all of Con Edison NY's deductions for (i) rental payments required to be made to South Holland Electric under the terms of the Headlease, (ii) the interest payments required to be made to Hollandsche, and (iii) the amortization of transaction costs.

101. The IRS also proposed to reduce Con Edison NY's rental income by the amount of rental payments due from South Holland Electric under the Sublease.

102. These proposed adjustments had the effect of recalculating Con Edison NY's taxable income for the 1997 taxable year as if Con Edison NY had not engaged in the RoCa3 Investment.

103. The changes proposed by the IRS increased Con Edison NY's taxable income for the 1997 taxable year by a net amount of $937,331.

104. As a result of this proposed increase in taxable income, the IRS demanded an additional $328,066 in federal income tax from Con Edison NY for the 1997 taxable year.

105. On or about November 3, 2005, Con Edison NY paid to the IRS at Chicago, Illinois the proposed tax deficiency of $328,066.

106. The adjustments made by the IRS to Con Edison NY's taxable income for the 1997 taxable year were contrary to controlling tax law, and Con Edison NY is entitled to a

complete refund of the $328,066 of federal income taxes erroneously paid with respect to the RoCa3 Investment.

## DEMAND FOR JUDGMENT

WHEREFORE, Con Edison of NY respectfully requests that this Court enter judgment in its favor and against the Defendant in the amount of $328,066, plus interest and costs allowed by law, and provide such other relief as the Court may deem just.

Respectfully submitted this 18th day of April, 2006.

Respectfully Submitted,

Thomas C. Durham
MAYER, BROWN, ROWE & MAW LLP
71 South Wacker Drive
Chicago, Illinois 60606
Tel: (312) 701-7216
Fax: (312) 706-9187
tdurham@mayerbrownrowe.com

Attorney for Plaintiff

OF COUNSEL:

David F. Abbott
Brian P. Trauman
MAYER, BROWN, ROWE & MAW LLP
1675 Broadway
New York, New York 10019
Tel: (212) 506-2500
Fax: (212) 262-1910

Nicole Bielawski
MAYER, BROWN, ROWE & MAW LLP
1909 K Street, N.W.
Washington, D.C. 20217
Tel: (202) 263-3000
Fax: (202) 263-3300

# EXHIBIT C-2

**Internal Revenue bulletin**

**Bulletin No. 2002–44**
**November 4, 2002**

# HIGHLIGHTS OF THIS ISSUE

**These synopses are intended only as aids to the reader in identifying the subject matter covered. They may not be relied upon as authoritative interpretations.**

## SPECIAL ANNOUNCEMENT

**Announcement 2002–101, page 800.**
This announcement solicits applications from potential partners to participate in the 2003 IRS Individual *e-file* Partnership Program. The partnership opportunities are a result of RRA 98, which requires the IRS to receive 80 percent of all returns electronically by 2007. RRA 98 authorized the IRS Commissioner to promote the benefits of and encourage the use of *e-file* services through partnerships with various entities that offer low cost tax preparation and electronic filing of income tax returns for qualified taxpayers. Those applicants that are accepted as partners will have a link(s) and description(s) of their services placed on the IRS web-site at *www.irs.gov* (IRS *e-file* Partners Page).

## INCOME TAX

**Rev. Rul. 2002–69, page 760.**
**Business expenses; interest; lease-in/lease-out transactions.** A taxpayer may not deduct currently, under sections 162 and 163 of the Code, rent and interest paid or incurred in connection with a lease-in/lease-out (LILO) transaction that properly is characterized as conferring only a future interest in property. Rev. Rul. 99–14 modified and superseded.

**Rev. Rul. 2002–71, page 763.**
**Notional principal contract (NPC).** This ruling provides guidance on the timing of recognition of gain or loss on the termination of a notional principal contract that hedges a portion of the term of a debt instrument issued by the taxpayer.

**Rev. Rul. 2002–72, page 759.**
**Low-income housing credit; satisfactory bond; "bond factor" amounts for the period October through December 2002.** This ruling announces the monthly bond factor amounts to be used by taxpayers who dispose of qualified low-income buildings or interests therein during the period October through December 2002. This ruling also provides a summary of the bond factor amounts for dispositions occurring during the period January through September 2002.

**REG–112306–00, page 767.**
Proposed regulations under section 1296 of the Code contain procedures for certain United States persons holding marketable stock in a passive foreign investment company (PFIC) to elect mark to market treatment for that stock. A public hearing is scheduled for November 6, 2002.

**REG–150313–01, page 777.**
Proposed regulations under sections 302, 304, and other sections of the Code provide guidance regarding the treatment of the basis of redeemed stock when a distribution in redemption of such stock is treated as a dividend. The regulations also provide guidance regarding certain acquisitions of stock by related corporations that are treated as distributions in redemption of stock. A public hearing is scheduled for February 20, 2003.

**Notice 2002–70, page 765.**
This notice alerts taxpayers and their representatives about certain reinsurance transactions intended to shift income to offshore related companies purported to be insurance companies that are subject to little or no U.S. federal income tax. These transactions often do not generate the federal tax benefits that taxpayers claim are allowable for federal income tax purposes. This notice also alerts taxpayers, their representatives, and promoters of these transactions, to certain reporting and record keeping obligations and penalties that they may be subject to with respect to these transactions.

**Announcement 2002–100, page 799.**
This document contains corrections to proposed regulations under section 1503(d) of the Code (REG–106879–00, 2002–34 I.R.B. 402) relating to the events that require the recapture of dual consolidated losses.

**Finding Lists begin on page ii.**
**Index for July through October begins on page v.**

Department of the Treasury
**Internal Revenue Service**

Table 1 (cont'd)
Rev. Rul. 2002–72
Monthly Bond Factor Amounts for Dispositions Expressed
As a Percentage of Total Credits

| Month of Disposition | Calendar Year Building Placed in Service or, if Section 42(f)(1) Election Was Made, the Succeeding Calendar Year | | | |
|---|---|---|---|---|
| | 1999 | 2000 | 2001 | 2002 |
| Jan '02 | 70.13 | 70.98 | 72.28 | 72.55 |
| Feb '02 | 69.92 | 70.77 | 72.05 | 72.55 |
| Mar '02 | 69.73 | 70.58 | 71.84 | 72.55 |
| Apr '02 | 69.55 | 70.40 | 71.67 | 72.55 |
| May '02 | 69.38 | 70.24 | 71.51 | 72.55 |
| Jun '02 | 69.21 | 70.09 | 71.37 | 72.55 |
| Jul '02 | 69.05 | 69.94 | 71.25 | 72.55 |
| Aug '02 | 68.90 | 69.81 | 71.14 | 72.55 |
| Sep '02 | 68.76 | 69.68 | 71.04 | 72.55 |
| Oct '02 | 68.62 | 69.57 | 70.94 | 72.55 |
| Nov '02 | 68.49 | 69.45 | 70.86 | 72.55 |
| Dec '02 | 68.37 | 69.35 | 70.78 | 72.55 |

For a list of bond factor amounts applicable to dispositions occurring during other calendar years, see: Rev. Rul. 98–3, 1998–1 C.B. 248; Rev. Rul. 2001–2, 2001–1 C.B. 255; and Rev. Rul. 2001–53, 2001–2 C.B. 488.

DRAFTING INFORMATION

The principal author of this revenue ruling is Gregory N. Doran of the Office of Associate Chief Counsel (Passthroughs and Special Industries). For further information regarding this revenue ruling, contact Mr. Doran at (202) 622–3040 (not a toll-free call).

## Section 162.—Trade or Business Expenses

*26 CFR 1.162–11: Rentals.*
*(Also § 163; 1.163–1.)*

**Business expenses; interest; lease-in/lease-out transactions.** A taxpayer may not deduct currently, under sections 162 and 163 of the Code, rent or interest paid or incurred in connection with a lease-in/lease-out (LILO) transaction that properly is characterized as conferring only a future interest in property.

## Rev. Rul. 2002–69

ISSUE

May a taxpayer deduct currently, under §§ 162 and 163 of the Internal Revenue Code, rent and interest paid or incurred in connection with a "lease-in/lease-out" ("LILO") transaction?

FACTS

*X* is a U.S. corporation. *FM* is a foreign municipality that has historically owned and used certain property. As of 1997, it is estimated that the property has a remaining useful life of 50 years and a fair market value of $100 million. *BK1* and *BK2* are banks. None of these four parties is related to any of the others.

On January 1, 1997, *X* and *FM* entered into a LILO transaction under which *FM* leased the property to *X* under a "Headlease," and *X* immediately leased the property back to *FM* under a "Sublease." The term of the Headlease is 40 years. The primary term of the Sublease is 20 years. Moreover, as described below, the Sublease also may be renewed for a term of 10 years ("put renewal term") at the option of *X*. *X*'s right to possess the property under the Headlease for the first 20 years is substantially the same as *FM*'s right to possession under the Sublease for the primary term.

The Headlease requires *X* to make two rental payments to *FM* during its 40-year term: (1) an $89 million prepayment at the beginning of year 1; and (2) a postpayment at the end of year 40 that has a discounted present value of $8 million. For federal income tax purposes, *X* and *FM* allocate the prepayment ratably to the first 6 years of the Headlease and the future value of the postpayment ratably to the remaining 34 years of the Headlease.

The Sublease requires *FM* to make fixed, annual rental payments over both the primary term and, if exercised, the put renewal term. The fixed, annual payments during the put renewal term are equal to 90 percent of the amounts that (as of January 1, 1997) are projected to be the fair market value rental amounts for that term.

To partially fund the $89 million Headlease prepayment, *X* borrows $54 million from *BK1* and $6 million from *BK2*. Both loans are nonrecourse, have fixed interest rates, and provide for annual debt service payments that fully amortize the loans over the 20-year primary term of the Sublease. The amount and timing of the debt ser-

vice payments mirror the amount and timing of the Sublease payments due during the primary term of the Sublease. The remaining $29 million of the Headlease prepayment is provided by *X*.

Upon receiving the $89 million Headlease prepayment, *FM* deposits $54 million into a deposit account with an affiliate of *BK1* and $6 million into a deposit account with an affiliate of *BK2*. The deposits with the affiliates of *BK1* and *BK2* earn interest at the same rates as the loans from *BK1* and *BK2*. *FM* directs the affiliate of *BK1* to pay *BK1* annual amounts equal to 90 percent of *FM*'s annual rent obligation under the Sublease (that is, amounts sufficient to satisfy *X*'s debt service obligation to *BK1*). The parties treat these amounts as having been paid from the affiliate to *FM*, then from *FM* to *X* as rental payments, and finally from *X* to *BK1* as debt service payments. In addition, *FM* pledges the deposit account to *X* as security for *FM*'s obligations under the Sublease, while *X*, in turn, pledges its interest in *FM*'s pledge to *BK1* as security for *X*'s obligations under the loan from *BK1*. Similarly, *FM* directs the affiliate of *BK2* to pay *BK2* annual amounts equal to 10 percent of *FM*'s annual rent obligation under the Sublease (that is, amounts sufficient to satisfy *X*'s debt service obligation to *BK2*). The parties treat these amounts as having been paid from the affiliate to *FM*, then from *FM* to *X* as rental payments, and finally from *X* to *BK2* as debt service payments. Although *FM*'s deposit with the *BK2* affiliate is not pledged, the parties understand that *FM* will use the account to pay the remaining 10 percent of *FM*'s annual rent obligation under the Sublease.

As a result of the foregoing arrangement, *X*'s obligation to make the property available under the 20-year primary term of the Sublease is completely offset by *X*'s right to use the property under the Headlease. *X*'s obligation to make debt service payments on the loans from *BK1* and *BK2* is completely offset by *X*'s right to receive Sublease rentals from *FM*. Moreover, *X*'s exposure to the risk that *FM* will not make the rent payments is further limited by the arrangements with the affiliates of *BK1* and *BK2*. In the case of the loan from *BK1*, *X*'s economic risk is eliminated through the defeasance arrangement. In the case of the $6 million loan from *BK2*, *X*'s economic risk, although not eliminated, is substantially reduced through the deposit arrangement. As a result, neither bank requires an independent source of funds to make the loans, or bears significant risk of nonpayment. In short, during the primary Sublease term, the transaction is characterized by reciprocal and circular obligations that offset one another.

At the end of the Sublease primary term, *FM* has a fixed-payment option to purchase from *X* the Headlease residual (the right to use the property beyond the Sublease primary term subject to the obligation to make the rent postpayment) for a fixed exercise price equal to 105 percent of the amount that (as of January 1, 1997) is projected to be the future fair market value of the Headlease residual. If *FM* exercises the option, the transaction is terminated at that point, and *X* receives the exercise price of the option and is not required to make any portion of the postpayment due under the Headlease. If *FM* does not exercise the option, *X* may elect to (1) use the property itself for the remaining term of the Headlease, (2) lease the property to another person for the remaining term of the Headlease, or (3) compel *FM* to lease the property for the 10-year put renewal term of the Sublease. If *FM* does not exercise the fixed-payment option and *X* exercises its put renewal option, *X* will receive rents that are equal to 90 percent of the amounts that are (as of January 1, 1997) projected to be the fair market rents for that term. If the actual fair market rents in 20 years turn out to be less than the amount specified in the put renewal option and *FM* does not exercise the fixed-payment option, *X* will be able to compel *FM* to lease the property for rents that are greater than the then fair market rental value. Thus, as a practical matter, the fixed-payment option and put renewal option operate to "collar" the value of the Headlease residual during the primary term.

In addition, *X* has nominal exposure to *FM*'s credit under the fixed-payment option and, if exercised, the put renewal term. At the inception of the transaction, *X* requires *FM* to invest $15 million of the Headlease prepayment in highly-rated debt securities that will mature in an amount sufficient to fund the fixed amount due under the fixed-payment option, and to pledge these debt securities to *X*. This arrangement ensures that *FM* is able to make the payment under the fixed-payment option. Having economically defeased both its rental obligations under the Sublease and its fixed-payment under the fixed-payment option, *FM* keeps the remaining portion of the Headlease prepayment as its return on the transaction. If *FM* does not exercise the fixed-payment option and *X* exercises the put renewal option, *X* can require *FM* to purchase a letter of credit guaranteeing the put renewal rents. If *FM* does not obtain the letter of credit, *FM* must exercise the fixed-payment option.

For tax purposes, *X* claims deductions for interest on the loans and for the allocated rents on the Headlease. *X* includes in gross income the rents received on the Sublease. If the fixed-payment option is exercised, *X* also includes the option price and recaptures rent deductions taken during the primary Sublease term that are attributable to the postpayment it is no longer required to make.

## LAW AND ANALYSIS

*X* and *FM*'s allocations of the prepayment and the postpayment for federal income tax purposes meet the uneven rent test contained in proposed § 467 regulations (§ 1.467–3(c)(2)(i)), and under those regulations the Headlease would not be treated as a disqualified leaseback or long-term agreement subject to constant rental accrual. Because this LILO transaction was entered into after June 3, 1996, and on or before May 18, 1999, the provisions of the proposed regulations are available. *See* § 1.467–9(c). For later years, however, final § 467 regulations effective May 18, 1999, treat the prepayment of rent as resulting in a deemed loan from *X* to *FM* and require the imputation of interest income to *X*. § 1.467–4. Moreover, *X*'s rent deduction would be subject to proportional rent rules that reflect the time value of money concept. *See* § 1.467–2(c).

The substance of a transaction, not its form, governs its tax treatment. *Gregory v. Helvering*, 293 U.S. 465 (1935). In *Frank Lyon Co. v. United States*, 435 U.S. 561, 573 (1978), the United States Supreme Court stated, "In applying the doctrine of substance over form, the Court has looked to the objective economic realities of a transaction rather than to the particular form the parties employed." The Court evaluated the substance of the transaction in *Frank Lyon* to determine that it was indeed a sale/leaseback, as it was structured,

rather than a financing. The Court subsequently relied on its approach in *Frank Lyon* to recharacterize a sale and repurchase of federal securities as a loan, finding that the economic realities of the transaction did not support the form chosen by the taxpayer. *Nebraska Dep't of Revenue v. Loewenstein*, 513 U.S. 123 (1994).

Where parties have in form entered into two separate transactions that result in offsetting obligations, the courts often have collapsed the offsetting obligations and recharacterized the two transactions as a single transaction. In *Rogers v. United States*, 281 F.3d 1108 (10th Cir. 2002), the part-owner (Fogelman) of a professional baseball team that was organized as an S corporation borrowed money from the S corporation. The nonrecourse loan was secured by Fogelman's ownership interest in the corporation and his existing option to purchase the rest of the shares from the taxpayer (Kauffman), the other owner of the team. Fogelman also granted the corporation an option to purchase both his shares and his existing option to buy Kauffman's shares. The option price was an amount equal to the outstanding loan balance. The corporation exercised its option immediately but deferred closing until the due date of Fogelman's loan, five months later. On that date, Fogelman transferred his shares in the corporation to the corporation in lieu of its foreclosure on the loan. The corporation claimed that the shares had no value at that time and deducted the loan amount as a bad debt, which was passed through to Kauffman.

The court in *Rogers* applied the substance over form doctrine to collapse the loan and the option transaction into a redemption of Fogelman's stock in exchange for cash. Fogelman had no incentive to repay the loan because any reduction in the loan balance would reduce the option price. The immediate exercise of the option precluded any attempt by Fogelman to repay the loan and keep the stock. On the basis of those facts, among others, the court held that the substance of the transaction was a sale of Fogelman's stock to the corporation.

In *Bussing v. Commissioner*, 88 T.C. 449, *reconsideration denied*, 89 T.C. 1050 (1987), a Swiss subsidiary of a computer leasing company (AG) purchased computer equipment in a sale/leaseback transaction involving a five-year lease. Subsequently, AG purportedly sold the equipment to a domestic corporation (Sutton), which in turn purportedly sold interests in the equipment to the taxpayer (Bussing) and four other individual investors. Bussing acquired his interest in the computer equipment subject to the underlying lease by paying cash, short-term promissory notes, and a long-term promissory note to Sutton. Bussing then leased his interest in the equipment back to AG for nine years. The rents due Bussing from AG equaled Bussing's annual payments on the long-term promissory note to Sutton for the first three years and were supposed to generate nominal annual cash flow thereafter.

The court first disregarded Sutton's participation in the transactions on substance over form grounds. It then held that Bussing's long-term indebtedness also must be disregarded because it was completely offset by AG's rent payments in a "purported sale-leaseback pursuant to which the respective lease and debt obligations flow between only two parties." *Id.* at 458. The court stated,

> The respective obligations between AG and Bussing cancel each other out. Any possible claim by AG with respect to the note is fully offset by AG's rental obligation to Bussing. . . . Bussing, effectively, will never be required to make any payments on his debt obligation, a feature of the transaction that we believe the parties intended to achieve.

*Id.* After collapsing the offsetting loan and lease, the court concluded that Bussing had acquired an interest in a joint venture with AG and the other investors to the extent of his cash payment only.

Courts have similarly disregarded the parties' obligations in purported installment sales where the taxpayer received an installment note that was offset by some other arrangement between the two parties, indicating that the maker of the note would not be called upon to pay the installment obligation. *See Rickey v. Commissioner*, 502 F.2d 748 (9th Cir. 1974), *aff'g* 54 T.C. 680 (1970). Although taxpayers are entitled to arrange the terms of a sale in order to qualify for the installment method, "the arrangements must have substance and must reflect the true situation rather than being merely the formal documentation of the terms of the sale." *Id.* at 752–53, quoting 54 T.C. 680 at 694. *See also United States v. Ingalls*, 399 F.2d 143 (5th Cir. 1968); *Blue Flame Gas Co. v. Commissioner*, 54 T.C. 584 (1970); *Greenfield v. Commissioner*, T.C. Memo. 1982–617; *Big "D" Development Corp. v. Commissioner*, T.C. Memo. 1971–148, *aff'd per curiam*, 453 F.2d 1365 (5th Cir.1972).

Similarly, the Headlease and Sublease impose offsetting obligations that must be disregarded, regardless of whether other components of the LILO transaction are respected. During the first 20 years of its term, the Headlease confers to X a right to use the property that is immediately reversed by the Sublease grant to FM of substantially the same right to use property. In the LILO transaction, the Sublease interest retained by *FM* is of the same nature as the Headlease interest conveyed to *X*. Because the transfer and retransfer of the right to possess the property for the first 20 years are disregarded as offsetting obligations, the transaction that remains is, at best, a transfer of funds from *X* to *FM* in exchange for *FM's* obligation to repay those funds and provide *X* the right to begin to lease the property in 20 years.

An analogous situation occurs when the conveyance of property is accompanied by the retention of some interest in the same property. If the interest retained is of substantially the same nature as the interest conveyed, only a future interest is conveyed. In *McCully Ashlock v. Commissioner*, 18 T.C. 405 (1952), *acq.*, 1952–2 C.B. 1, taxpayer had acquired property through a deed dated June 6, 1945. The seller, however, had retained the right to possession and rentals through August 15, 1947. The court found that taxpayer had acquired only a future interest in the property because "the trustees [sellers] not only retained the rents legally but they also retained control and benefits of ownership." *Id.* at 411. Consequently, rentals from the property were income to the seller.

Similarly, in *Kruesel v. United States*, 63–2 U.S. Tax Cas. (CCH) ¶ 9714 (D. Minn. 1963), the court concluded that taxpayer had transferred only a future, remainder interest in property and reserved a life estate. The government had unsuccessfully argued that taxpayer had sold its entire interest in the property and the taxpayer's amount realized on the sale included the value of a right to occupancy provided to the taxpayer by the buyer.

In contrast, in *Alstores Realty Corp. v. Commissioner*, 46 T.C. 363 (1966), *acq.*, 1967–2 C.B.1, the court held that a sale of property accompanied by the reservation of a right of occupancy did not result in the transfer of only a future interest because the seller's right of occupancy was in the nature of a leasehold interest, because the purchaser acquired the benefits and burdens of ownership of the property.

*Alstores* can be distinguished from *McCully Ashlock* and *Kruesel*. *McCully Ashlock* and *Kruesel* conclude that where a retained interest is of the same nature as the interest conveyed, only a future interest has been transferred. In *Alstores*, the interests were not of the same nature.

Similarly, the LILO transaction is distinguishable from the transaction involved in *Comdisco, Inc. v. Commissioner*, 756 F.2d 569 (7th Cir. 1985). In that case, equipment was subject to end user leases, and the lessor of that equipment assigned an interest to taxpayer in a transaction designed to give the taxpayer investment tax credits. The taxpayer's entitlement to the credits depended on whether it had the status of lessee/sublessor. In concluding that it did, the court noted a number of factors that supported taxpayer's claim that it had acquired a leasehold interest. The taxpayer was obligated to the lessor in the event of a default by the sublessee. The taxpayer relet certain equipment after one sublease had expired. In connection with another sublease, the taxpayer was responsible for rent to its assignor in excess of amounts paid by the sublessee directly to the assignor. The court also emphasized the regulatory restrictions on direct leases between the assignor and the end users. *Id.* at 576–77. Unlike *Comdisco*, in the LILO transaction the headlessor and the sublessee are the same party. Further, in the LILO transaction the headlessee/sublessor is not materially exposed to the risk that the sublessee will fail to make rent payments.

Section 162(a)(3) permits a deduction for rentals and other payments required to be made as a condition to the continued use or possession, for purposes of the trade or business, of property. Because *X* does not acquire a current leasehold interest in the property, it is not entitled to current deductions for rent. The $29 million "equity" portion of the Headlease prepayment is, effectively, a payment for at most *X*'s right under the Headlease to lease the property 20 years hence for a term of 20 years. (Economically, $29 million is an overpayment for the value of any right that *X* obtains to lease the property in the future. *X* was willing to overpay in this manner, however, in order to induce *FM* to participate in the transaction.). In accordance with § 467, the $29 million "equity" portion of the Headlease prepayment is deductible over the 20-year residual term of the Headlease (the 10-year put renewal term and the 10-year "shirttail" period). Alternatively, in the event *FM* exercises its fixed-price option at the end of the primary term of the Sublease, *X* will have gain or loss equal to the difference between the option price and *X*'s cost of acquiring a right to the Headlease residual term. Section 1001.

The remainder of the Headlease prepayment, $60 million, must be disregarded, because the "loans" that purportedly finance this portion of the Headlease prepayment are without substance. In *Bridges v. Commissioner*, 39 T.C. 1064, *aff'd* 325 F.2d 180 (4th Cir. 1963), taxpayer "borrowed" funds from banks and used the funds to purchase Treasury notes, which the banks held as collateral and ultimately sold to satisfy taxpayer's debts. The court's rationale for disallowing taxpayer's deductions of prepaid interest is equally applicable here:

> [P]etitioner at no time had the uncontrolled use of any additional money, of the bonds, or of the interest on the bonds. He assumed no risk of a rise or fall in the market price of the bonds and could not take advantage of such. His payment to the bank was not for the use or forbearance of money; it was for the purchase of a rigged sales price for the bonds and for a tax deduction. Petitioner incurred no genuine indebtedness, within the meaning of the statute, and as a payment of interest, this transaction was also a sham.

*Id.* at 1078–79. Neither *X* nor *FM* obtain use of the "borrowed" funds. The "loans" purportedly are made to finance *X*'s acquisition of the Headlease interest. But that leasehold interest is substantially offset by an interdependent Sublease with the Headlessor. What remains can only be enjoyed after 20 years and after the loans have been "repaid" using "rents" from a Sublease that itself lacks substance. Under the circumstances, the loans are disregarded.

Although this ruling refers to a foreign municipality and its property, the analysis and holding apply as well to LILO transactions that involve or include domestic tax-exempt or tax-indifferent entities.

HOLDING

A taxpayer may not deduct currently, under §§ 162 and 163, rent or interest paid or incurred in connection with a LILO transaction that properly is characterized as conferring only a future interest in property.

Where appropriate, the Service will continue to disallow the tax benefits claimed in connection with LILO transactions upon other grounds, including that the substance over form doctrine requires their recharacterization as financing arrangements and that they are to be disregarded for lack of economic substance.

EFFECT ON OTHER DOCUMENTS

Rev. Rul. 99–14, 1999–1 C.B. 835, is modified and superseded.

DRAFTING INFORMATION

The principal author of this revenue ruling is John Aramburu of the Office of Associate Chief Counsel (Income Tax & Accounting). For further information regarding this revenue ruling, contact Mr. Aramburu at (202) 622–4960 (not a toll-free call).

## Section 163.—Interest

*26 CFR 1.162–17: Interest deduction in general.*

May a taxpayer deduct currently, under § 163, interest paid or incurred in connection with a lease-in/lease-out (LILO) transaction that properly is characterized as conferring only a future interest in property. See Rev. Rul. 2002–69, page 760.

## Section 446.—General Rule for Methods of Accounting

*(Also 26 CFR 1.446–4)*

**Notional principal contract (NPC).** This ruling provides guidance on the timing of recognition of gain or loss on the termination of a notional principal contract that hedges a portion of the term of a debt instrument issued by the taxpayer.

# EXHIBIT D

# EXHIBIT D

## DOCUMENTS TO BE PRODUCED BY ABN AMRO

## DEFINITIONS & INSTRUCTIONS

A. "Document," "record" and "material" include any written, printed, typed, electronic or graphic matter of any kind or nature. Any draft or non-identical copy constitutes a separate document for purposes of these requests. The terms shall be construed to include, but shall not be limited to, correspondence, electronic mail, notes, notations, contracts, brochures, agreements, deeds, leases, letters, memoranda, checks, bank statements, reports, analyses, projections, studies, records, corporate minutes, financial statements, financial records, accounting or audit workpapers (including permanent workpapers), spreadsheets, transcripts, recordings, and all other types of written or documentary materials.

B. Any copy of a document that varies in any way from the original or from any other copy of the document, whether by reason of handwritten or other notation or any omission, shall constitute a separate document and must be produced. Each document is to be produced in its entirety, without abbreviation or expurgation, and the person who made the notation identified.

C. If any documents are withheld under a claim of privilege, furnish a list identifying each document for which a privilege is claimed, together with the following information and sufficient details so as to permit a court to adjudicate the validity of the claim of privilege: date, sender, recipient, type (e.g., letter, memorandum, telegram, chart, photograph, etc.), subject matter of the document, the basis on which a privilege is claimed, and the paragraph or paragraphs of this request to which the document responds.

D. If any document that would have been responsive to these requests no longer exists, please state the following for each document: the date of destruction, the reason for destruction, and the person(s) responsible for the decision to destroy the document(s) and for the actual destruction of the documents.

E. Responses to these requests should be made in a manner consistent with Fed. R. Evid. 902(12), Certified Foreign Records of Regularly Conducted Activity.

F. The term "Con Ed" shall refer to Consolidated Edison Company of New York, Inc. & Subsidiaries, and affiliated companies, including, but not limited to, Consolidated Edison Development, Inc., Consolidated Edison Leasing, Inc., and Consolidated Edison, Inc.

G. The term "Banc One" shall refer to Banc One Leasing Corp. its related affiliates, subsidiaries, successors, and assigns, including, but not limited to, and any person, officer, director, accountant, lawyer, agent, or entity acting on behalf of any of the foregoing organizations.

H. The term "EZH" shall refer to N.V. Electriciteitsbedrifj Zuid-Holland, its related affiliates, subsidiaries, successors, and assigns, including, but not limited to, Preussen Elektra A.G. and E.ON Benelux Generation N.V., and any person, officer, director, accountant, lawyer, agent, or entity acting on behalf of any of the foregoing organizations.

I. The term "RoCa3" shall refer to the gas fired CHP facility located in the Netherlands on the border between Rotterdam and Capelle aan den IJessel, constituting the third unit alongside two previously built units, which was owned by EZH on or about December 15, 1997.

J. The term "HBU" shall refer to Hollandsche Bank-Unie N.V., its related affiliates, subsidiaries, successors, and assigns, and any person, officer, director, accountant, lawyer, agent, or entity acting on behalf of any of the foregoing organizations.

K. The term "ABN AMRO" shall refer to ABN AMRO Bank N.V., its related affiliates, subsidiaries, successors, and assigns, and any person, officer, director, accountant, lawyer, agent, or entity acting on behalf of any of the foregoing organizations.

L. The term "Credit Suisse" shall refer to Credit Suisse Financial Products, Credit Suisse First Boston, their related affiliates, subsidiaries, successors, and assigns, and any person, officer, director, accountant, lawyer, agent, or entity acting on behalf of any of the foregoing organizations.

M. The term "Lease Transaction" shall refer to the series of transactions pertaining to the RoCa3 facility as described in paragraphs 61-77, inclusive of the complaint attached hereto as Exhibit D-1.

N. The term "Lease Transaction Participants" refers to the following entities: ABN AMRO Bank N.V.; Hollandsche Bank-Unie N.V.; EZH; Con Ed; Credit Suisse; Bayerische Landesbank; Wilmington Trust Co.; ABB Leasing GmbH, and any and all affiliated businesses, successors, assigns, predecessor or successor businesses, and any person, officer, director, accountant, lawyer, agent, or entity acting on behalf of any of the foregoing organizations.

O. The term "Capstar" refers to Capstar Partners L.L.C., its related affiliates, subsidiaries, successors, and assigns, and any person, officer, director, member, accountant, lawyer, agent, or entity acting on behalf of any of the foregoing organizations.

P. The term “Cornerstone” refers to Cornerstone Financial Advisors L.P., its related affiliates, subsidiaries, successors, and assigns, and any person, officer, partner, accountant, lawyer, agent, or entity acting on behalf of any of the foregoing organizations.

## DOCUMENTS TO BE PRODUCED

### THE LEASE TRANSACTION

1. The documents in the files of ABN AMRO that discuss the Lease Transaction.

2. The documents in the files of ABN AMRO that discuss or pertain to its solicitation as a potential participant in the Lease Transaction.

3. The documents in the files of ABN AMRO that discuss ABN AMRO’s decision to participate in the Lease Transaction.

4. The documents in the files of ABN AMRO that contain the credit and/or risk of default analyses made in conjunction with the decision to participate in the Lease Transaction.

5. The documents in the files of ABN AMRO that describe or discuss the lease options the Lease Transaction provides to Con Ed and/or EZH, including documents that address the feasibility and/or likelihood of exercise of those options.

6. The documents in the files of ABN AMRO pertaining to the negotiation of any loans to Con Ed and/or EZH in conjunction with the Lease Transaction.

7. The documents in the files of ABN AMRO evidencing the transfer of any funds by or to any of the Lease Transaction Participants in connection with the Lease Transaction.

8. The documents in the files of ABN AMRO pertaining to the loans issued by ABN AMRO in connection with the Lease Transaction.

9. The documents in the files of ABN AMRO discussing a default or missed loan repayment by either Con Ed and/or EZH.

10. The documents in the files of ABN AMRO pertaining to the accounts at ABN AMRO related to the Lease Transaction.

**COMMUNICATIONS**

11. The letters, memoranda, notes, e-mails, and other written communication in the files of ABN AMRO exchanged by and/or between ABN AMRO and any of the Lease Transaction Participants (or their affiliates, assigns, or successors in interest) in connection with the Lease Transaction.

12. The letters, memoranda, notes, e-mails, and other written communication in the files of ABN AMRO exchanged by and/or between ABN AMRO and Capstar in connection with the Lease Transaction.

13. The letters, memoranda, notes, e-mails, and other written communication in the files of ABN AMRO exchanged by and/or between ABN AMRO and Cornerstone in connection with the Lease Transaction.

14. The letters, memoranda, notes, e-mails, and other written communication in the files of ABN AMRO exchanged by and/or between ABN AMRO and Banc One in connection with the Lease Transaction or a substantially similar transaction involving the RoCa3 facility.

**SIMILAR TRANSACTIONS**

15. The documents within the files of ABN AMRO that discuss or pertain to any of the following lease transactions considered by the plaintiff, Con Ed, including the documents discussing the solicitation of ABN AMRO as a potential participant in such a transaction and the documents reflecting ABN AMRO's consideration of such transactions and decision to participate in such transactions:

a. NUON lease (Netherlands);

b. MEGA Gas and Thermal Distribution lease/leaseback (Netherlands);

c. EPON lease (Netherlands);

d. ENECO lease (Netherlands);

e. ENN lease (Nethelands);

f. ENW gas lease (Netherlands);

g. MCN lease (United States);

h. ELECTRABEL power plant lease/leaseback (Belgium);

i. Diefland gas and thermal distribution lease/leaseback (Netherlands);

j. Linz power plant lease/leaseback (Austria);

k. UNA power plant lease/leaseback (Netherlands);

l. EG Laufenburg lease/leaseback (Switzerland);

m. Humber power lease/leaseback (United Kingdom);

n. EWZ electric transmission grid lease/leaseback (Switzerland);

o. ESAG lease (Germany);

p. REMU lease (Netherlands);

q. DELTA lease (Netherlands);

r. ZETA/TEL lease (Netherlands);

s. EDON lease (Netherlands);

t. DEW lease (Germany);

u. VASA lease (Germany); and

v. SWISCO lease (Switzerland).

16. The documents in the files of ABN AMRO that discuss any other transaction similar to the Lease Transaction and/or the transaction described in Revenue Ruling 2002-69, 2002-2 C.B. 760 (copy attached hereto as Exhibit D-2), from 1996 through 2001, including the documents discussing the solicitation of ABN AMRO as a potential participant in such a transaction and the documents reflecting ABN AMRO's consideration of such transactions and decision to participate in such transactions.

**REGULATORY COMMUNICATIONS**

17. The correspondence, communication, and reporting made to governmental regulatory authorities by ABN AMRO or on ABN AMRO's behalf in the files of ABN AMRO that pertain to or refer to the Lease Transaction and/or the financing of the Lease Transaction.

**OTHER AGREEMENTS**

18. A copy of the December 4, 1997 agreement described in the letter from EZH to ABN AMRO, Bates No. PF002857, attached here to as Exhibit D-3.

19. A copy of the documents in the files of ABN AMRO pertaining to or discussing the Alteration Fee referenced in Exhibit D-3.

# EXHIBIT D-1

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

FILED APR 19 2006

| | | |
|---|---|---|
| CONSOLIDATED EDISON COMPANY OF NEW YORK, INC. & SUBSIDIARIES, | ) | 06-305 T |
| Plaintiff, | ) | No. |
| v. | ) | |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

## COMPLAINT

Plaintiff, Consolidated Edison Company of New York, Inc. & Subsidiaries, brings this action for a refund of federal taxes paid in connection with the Internal Revenue Service's proposed adjustments to its federal tax return for the taxable year ending December 31, 1997. The adjustments are related to Plaintiff's investment in an electric generation facility located outside Rotterdam, The Netherlands.

In support of its refund claim, Plaintiff alleges as follows:

## JURISDICTION AND SUMMARY OF ACTION

1. Plaintiff, Consolidated Edison Company of New York, Inc. & Subsidiaries ("Con Edison NY"), brings this refund action, founded upon the Internal Revenue Code of 1986, for the recovery of federal income tax paid by Plaintiff for the taxable year ended December 31, 1997 ("the 1997 taxable year").

2. Defendant is the United States of America.

3. This Court has jurisdiction by reason of 28 U.S.C. §§ 1346(a)(1) and 1491(a)(1) and 26 U.S.C. § 7422.

4. On or before September 9, 1998, Con Edison NY filed a timely federal consolidated income tax return for the 1997 taxable year with the Internal Revenue Service ("IRS") and timely paid income taxes in the amount of $291,003,408.

5. Con Edison NY's name, address, and identification number appearing on the 1997 tax return are: Consolidated Edison Company of New York, Inc. & Subsidiaries; 4 Irving Place, Room 615-S, New York, New York, 10003; and 13-5009340, respectively.

6. During the 1997 taxable year, Con Edison NY, through its subsidiaries, made an investment in an electric generation plant in The Netherlands. The plant is generally known as "RoCa3" and is owned by N.V. Electriciteitsbedrijf Zuid-Holland ("South Holland Electric"). This transaction is hereinafter referred to as the "RoCa3 Investment."

7. On its 1997 tax return, Con Edison NY reported rental income with respect to the RoCa3 Investment and deducted rental expense, amortization of expenses, and interest expense relating to the property and indebtedness incurred in the RoCa3 Investment, for a net loss of $937,331.

8. The IRS, during a routine audit of Con Edison NY's tax return for the 1997 taxable year, disputed Con Edison NY's tax treatment of the RoCa3 Investment.

9. On or about September 15, 2005, the IRS issued a Notice of Proposed Adjustment to Con Edison NY, proposing additional federal income of $937,331 for the 1997 taxable year with respect to the RoCa3 Investment.

10. The IRS's proposed adjustments resulted in a tax increase of $328,066, increasing Con Edison NY's federal income tax liability for the 1997 taxable year from $291,003,408 to $291,331,474.

11. On or about November 3, 2005, Con Edison NY paid the proposed tax deficiency of $328,066 to the IRS.

12. On or about December 2, 2005, Con Edison NY filed a Form 1040X (Amended U.S. Corporation Income Tax Return) with the IRS requesting a refund of erroneously paid federal income taxes for the 1997 taxable year in the amount of $328,066. The requested refund was solely attributable to Con Edison NY's payment of the proposed tax deficiency referred to in paragraphs 10 and 11 above. A true and complete copy of this claim for refund is attached as Exhibit A.

13. By a notice of disallowance dated March 15, 2005, the IRS disallowed Con Edison NY's claim for refund. A true and complete copy of this notice of disallowance is attached as Exhibit B.

14. The IRS's disallowance of Con Edison NY's claim for refund was erroneous.

15. Con Edison NY requests a refund of its overpayment of $328,066 of federal tax for the 1997 taxable year, plus interest and allowable costs.

16. No action on the claim for refund attached as Exhibit A has been taken by Congress or any agency of the United States or in any judicial proceeding, including any in the Tax Court of the United States.

17. Con Edison NY has timely filed this Complaint for a refund of federal taxes paid within two years of the date of the notice of disallowance as required under 26 U.S.C. § 6532(a).

18. Con Edison NY is the sole owner of the claim included in Exhibit A and asserted herein, and has made no assignment thereof.

## FACTUAL BACKGROUND

### A. Con Edison NY's Energy Business

19. At the time of the RoCa3 Investment, Con Edison NY was a widely-held and publicly-traded company on the New York Stock Exchange. It owned 100% of Consolidated Edison Development, Inc. ("Con Edison Development"), which in turn owned 100% of Consolidated Edison Leasing, Inc. ("Con Edison Leasing"). Con Edison NY has since become a wholly owned subsidiary of Consolidated Edison, Inc. ("CEI"), which also owns Con Edison Development as well. Like Con Edison NY before it, CEI is widely-held and publicly-traded on the New York Stock Exchange.

20. Con Edison NY is one of the nation's oldest and largest investor-owned energy companies with approximately $21 billion in assets. It is a regulated public utility that was incorporated in 1884 and currently delivers electric service to almost all of New York City and most of Westchester County – a service area having a population of approximately 9 million. Con Edison NY also supplies gas in parts of New York City and Westchester County. Con Edison NY also owns and operates the largest district steam system in the world, providing steam service in most of Manhattan.

21. Prior to the 1990s, Con Edison NY, as was the case with most electric utilities, offered electric service in a "bundled" format. In other words, Con Edison NY owned and operated the generation plants that produced electricity as well as the transmission and distribution systems that delivered the electricity to its customers. Con Edison NY owned gas-fired, oil-fired, and nuclear-powered plants with a total electric-generating capacity of 8,300 megawatts. As a regulated public utility, all of Con Edison NY's operations were subject to regulation by the New York Public Service Commission ("PSC").

**B. The Deregulation of Con Edison NY's Energy Business**

22. Beginning in March 1993, the PSC took a number of steps to develop a competitive electric industry in the state of New York. This process commenced with the PSC's initiation of a proceeding entitled "Proceeding On Motion Of The Commission To Address Competitive Opportunities Available To Customers Of Electric And Gas Service And Develop Criteria For Utility Responses" (the "Competitive Opportunities Proceeding"). The purpose of the Competitive Opportunities Proceeding was to deregulate the electric generation plants owned by New York State utilities and to have the price for the output of those plants determined by market forces rather than through regulated rates.

23. The Competitive Opportunities Proceeding was divided into two phases. Phase I was designed to discuss, investigate, and address the issues involved in moving to a competitive marketplace. Phase II, commencing in August of 1994, involved a collaborative effort between electric utilities and other interested parties to develop models for restructuring the electric industry within New York.

24. Phase II of the process culminated with a May 1996 PSC Opinion stating the PSC's vision for the electric utility industry and ordering Con Edison and certain other major electric utilities in New York State to file plans describing how they would restructure their operations to bring about a competitive marketplace for, among other things, electric generation. The Opinion "strongly encouraged" the utilities to sell their generating plants to unregulated entities so as to facilitate the development of a competitive marketplace. The May 1996 PSC Opinion also invited utilities to propose the corporate structures, including unregulated subsidiaries, that would further the PSC's restructuring goals.

### C. Con Edison NY'S Response to Deregulation

25. As a result of the Competitive Opportunities Proceeding, Con Edison NY knew in the mid-1990s that it would be required to restructure its regulated businesses and allowed to expand into competitive unregulated businesses. Con Edison NY further understood that it might be required to sell most if not all of its electric generation plants and concluded that it should grow its business by (among other things) investing its capital in unregulated businesses and facilities. Con Edison NY also recognized that the PSC's rules were likely to prohibit Con Edison NY from reinvesting in electric generation plants within New York State.

26. Consequently, Con Edison NY began to develop a strategy that would allow it to effectively compete in a deregulated industry through the development and growth of unregulated businesses. Con Edison NY's strategy included, among other things, growth through the investment of capital in unregulated energy-related businesses and facilities outside of New York State.

27. In May 1995, Con Edison NY requested permission from the PSC to invest up to 5% (approximately $504 million) of its consolidated capital in unregulated subsidiaries that would (i) provide energy services; (ii) invest and/or participate in international energy infrastructure projects; and (iii) market its technical services.

28. In July 1996, the PSC issued an order (the "July 1996 Order") which deferred action on Con Edison NY's May 1995 request, but granted Con Edison NY authority to invest up to $50 million in unregulated subsidiaries which would invest in two of the three requested projects: the investment and/or participation in international energy infrastructure projects, and the marketing of technical services internationally. The PSC stated that these investments would be "largely international" and could be made through "development companies, investment funds, joint ventures, or other vehicles." In accordance with the PSC's plan to encourage

divestiture of public utility-owned electric generation plants, the PSC prohibited Con Edison NY from investing in any project that might provide electric energy to customers within New York State.

29. In response to the July 1996 Order, in October 1996 Con Edison NY formed a new subsidiary, Gramercy Development, Inc., to carry out the investments allowed by such Order. Gramercy Development, Inc. later changed its name to Con Edison Development.

30. In October 1996, Con Edison NY filed a rate and restructuring plan as mandated by the PSC. This plan also included a petition to adopt a holding company structure. Con Edison NY's restructuring plan proposed an approach to a competitive electric generation market that included, among other things, divestiture of its generating plants, a plan for retail competition, and a corporate reorganization into a holding company structure. The proposed holding company structure would allow Con Edison to form unregulated subsidiaries whose investment decisions would no longer require prior PSC approval.

31. In September 1997, the PSC and Con Edison NY ultimately agreed on a restructuring plan that was embodied in a Settlement Agreement ("the Settlement"). The Settlement included, among other things, (i) a new rate plan during the period of the transition to competition, (ii) a commitment by Con Edison NY to divest at least 50% of its New York City electric generation plants by 2002 to unregulated third parties so as to help implement a fully competitive market for electric generation, and (iii) authorization for Con Edison NY to form a holding company whose subsidiaries would consist of Con Edison NY and several unregulated subsidiaries, including Con Edison Development.

32. The Settlement permitted the new holding company to invest up to 5% of its consolidated capital in unregulated subsidiaries, consistent with Con Edison NY's May 1995

request. While the Settlement replaced the July 1996 Order, pursuant to a Statement of Policy dated July 17, 1998, the PSC imposed a prohibition against investments in electric generation assets in New York State by Con Edison NY's unregulated affiliates, albeit as a rebuttable presumption that such investments would unacceptably exacerbate the potential for the exercise of vertical market power.

33. As allowed by the Settlement, the shareholders of Con Edison NY formed CEI in January 1998. As part of the transition to a holding company structure, Con Edison NY and Con Edison Development, as well as several other unregulated subsidiaries of Con Edison NY, became subsidiaries of CEI.

34. In 1999, pursuant to the Settlement with the PSC, Con Edison NY completed the sales of almost 6,300 megawatts of its approximately 8,300 megawatts of electric generation assets for an aggregate price of $1.8 billion. In 2000, Con Edison NY entered into a contract to sell its nuclear-generating facilities, with electric generating capacity in excess of 900 megawatts, for an aggregate price of $502 million, not including fuel and other adjustments. That transaction closed in 2001. Today, the remaining electric generation assets owned by Con Edison NY are held in connection with, and are ancillary to, its steam generation business.

**D. The Business Of Con Edison Development**

35. Con Edison Development was formed to take advantage of the Con Edison group's expertise in the construction and operation of electric generating plants and to pursue energy-related investments on a world-wide basis free from regulation by the PSC.

36. Con Edison Development's initial business plan, formulated in 1997, was a long-term plan which was designed to take advantage of the world-wide trend to deregulation and envisioned Con Edison Development's potential growth into a worldwide integrated utility business. However, because the growth into unregulated investments, particularly those outside

New York State, was a new venture for the Con Edison group, Con Edison Development adopted a gradual and measured approach to these investments.

37. As the initial step in its business plan, Con Edison Development focused on three categories of investment: (i) development of new energy projects, such as electric power generation; (ii) acquisition of existing infrastructure, including portions of operating electric, gas, thermal, and water utilities; and (iii) leasing portions of energy systems, such as power plants or distribution systems. Con Edison Development also planned to market technical services regarding the design, building, operation, and management of modern utilities.

38. Pursuant to this strategy, Con Edison Development began to participate in energy-related projects through investments operated by others, such as investments in energy funds. In July 1997, Con Edison Development made its first energy infrastructure investment, namely a capital commitment to provide up to $5 million to a fund sponsored by Energy Investors Fund called Project Finance Fund III, LP. Project Finance III utilized the funds received from Con Edison Development and other similar equity investors to invest in energy and infrastructure projects worldwide.

39. Con Edison Development also relied on outside consultants to locate potential international energy infrastructure investment opportunities. In March 1997, Con Edison Development entered into an agreement with International Energy Partners, L.P. ("IEP"). IEP had a portfolio of international energy infrastructure investment opportunities that it was pursuing. Pursuant to this agreement, Con Edison Development was given preferred rights to participate in certain investment opportunities identified by IEP.

40. One of the earliest opportunities presented to Con Edison Development by IEP was a minority investment in a relatively small power facility (42 megawatts) in Eastern

Guatemala, generally known as Generadora Electrica del Norte, Limitada ("Genor"). Con Edison Development acquired and still owns indirectly through subsidiaries a 49% interest in Genor; the remaining 51% is owned by local investors.

41. Con Edison Development also explored leasing investments in energy facilities. Con Edison Development was interested in investing through leases because these investments (i) provided highly predictable and front-loaded earnings; (ii) achieved good to excellent investment yields; (iii) were less risky than direct ownership of operating assets; and (iv) could be implemented more quickly than direct investments in projects requiring a long development cycle. Leases, from Con Edison Development's perspective, also provided a means to (i) forge relationships with utilities abroad that would allow for further opportunities in the future; (ii) compete effectively with other domestic entities already involved in overseas investments; and (iii) diversify risk in terms of operations and geography. Con Edison Development was interested in potential leasing investments in Europe, Australia, and the U.S.

42. Consistent with its objective of gradually becoming a worldwide integrated utility business, Con Edison Development searched for opportunities related to utilities undergoing privatization in Central and South America, Europe, Southeast Asia, and the United States. Employees of the Con Edison group spent significant amounts of time in China, Australia, the Philippines, Mexico, El Salvador, Argentina and Nicaragua pursuing energy infrastructure investments and other potential energy-related businesses (such as the marketing of technical services).

43. Con Edison Development continued to pursue energy infrastructure investments both inside and outside the United States until the late 1999 to early 2000 time frame. At that time, a business decision was made to focus on energy infrastructure opportunities in the United

States, in particular the Northeast and Mid-Atlantic states (other than New York State). This decision was based on a number of considerations, including (i) marketplace pricing indicated that the risks inherent in energy infrastructure investments outside the United States could no longer be justified in light of anticipated returns on such investments, particularly in relation to the anticipated returns and risks on such investments inside the United States, and (ii) the recognition that Con Edison Development and its affiliates could better employ their expertise in the energy markets and the electric utility industry inside the United States, particularly in the Northeast and Mid-Atlantic states.

**E. The RoCa3 Investment**

44. During 1997, Con Edison Development developed plans and guidelines for its future growth as an unregulated subsidiary of the Con Edison group. Con Edison Development also began to identify possible investment prospects, including a number of leasing investments.

45. Consistent with its business plan, one of the projects identified by Con Edison Development during 1997 as a potential leasing investment was a recently constructed 220 megawatt gas-fired combined cycle electric generation plant outside of Rotterdam, The Netherlands. The plant is named "RoCa3," after its location on the border between Rotterdam and Capelle aan den IJssel, and is next to two previously constructed plants. The RoCa3 plant has at all relevant times been owned by South Holland Electric, an electric generation company in The Netherlands that has been involved in the coordination and transport of electrical energy in the province of Zuid-Holland since 1941, and in the production of heat and electricity since 1987.

46. At the time Con Edison Development was considering an investment in the RoCa3 plant, The Netherlands and the European Union were also in the process of deregulating electric generation facilities.

47. Since Con Edison Development did not have prior experience in complex leasing transactions, it decided to invest in conjunction with experienced market participants. In the case of the RoCa3 Investment, Con Edison Development decided to make its investment jointly with Banc One Leasing Corp. ("Banc One").

48. Before making a decision to proceed with the RoCa3 Investment, Con Edison Development considered many factors, including (i) South Holland Electric's business and creditworthiness; (ii) conditions in the energy markets for The Netherlands and Europe; (iii) the political, legal, and economic climate of The Netherlands; (iv) the economic return and accounting income of the RoCa3 Investment; (v) the quality of the RoCa3 plant; (vi) the connection between the RoCa3 plant and the Con Edison group's core business activities;; and (vii) the terms of the transaction. Con Edison Development also considered the potential risks and benefits associated with its residual value interest in the RoCa3 plant. In the leasing context, residual value refers to the remaining useful life and value of an asset at the end of the lease of that asset.

49. Con Edison Development retained a number of consultants to assist in its review of the RoCa3 Investment.

50. On behalf of Con Edison Development and Banc One, Duke Engineering & Services ("Duke Engineering") performed a comprehensive engineering review of the RoCa3 plant's technology. Duke Engineering made a site visit to inspect the RoCa3 plant, interviewed key plant personnel, and reviewed plant documents.

51. Duke Engineering found the RoCa3 plant's design and components to be of high quality using state-of-the-art proven technology and rated the RoCa3 plant as "above average" in each of the four factors that contribute to a plant's useful life. Duke Engineering further

concluded that the RoCa3 plant complied with current environmental regulations; that its fuel supply was adequate under the current purchasing agreements; and that South Holland Electric's maintenance philosophy, practices, and facilities were better than average.

52. On behalf of Con Edison Development and Banc One, Tauw Milieu bv ("Tauw Milieu") conducted an environmental, health, and safety assessment of the RoCa3 plant. Tauw Milieu performed an on-site inspection, interviewed South Holland Electric personnel, and reviewed applicable environmental laws and regulations in conducting its review.

53. Tauw Milieu concluded that the RoCa3 plant's environmental condition was very good and that it was in substantial compliance with all applicable environmental and health and safety requirements.

54. On behalf of Con Edison Development and Banc One, Deloitte & Touche performed a comprehensive valuation assessment of the RoCa3 plant. Deloitte & Touche conducted a physical inspection of the RoCa3 plant, interviewed South Holland Electric personnel, and analyzed the power industry in The Netherlands and its regulatory environment, natural gas resources, and the Dutch natural gas industry.

55. To arrive at a fair market value for the RoCa3 plant, Deloitte & Touche analyzed South Holland Electric's financial statements, the RoCa3 plant's construction expenses and projected operating and other expenses, comparable market transactions, and similar publicly listed companies. Deloitte & Touche then studied historical power plant useful life data to determine the RoCa3 plant's useful life and residual value. Finally, Deloitte & Touche assessed the various options available to South Holland Electric and Con Edison Development under the proposed Investment.

56. Deloitte & Touche concluded that, as of December 15, 1997, the proposed closing date for the RoCa3 Investment, the RoCa3 plant had a remaining useful life of at least 54 years.

57. In addition to the work performed by these consultants, Con Edison Development sent a team of its own and Con Edison NY employees to inspect the RoCa3 plant and to discuss the plant's operations with South Holland Electric's engineers.

58. Based upon its extensive review of the proposed RoCa3 Investment, the board of directors of Con Edison Development approved the RoCa3 Investment on December 10, 1997. The major benefits of the transaction were identified as follows:

(1) Highly predictable earnings

(2) Front loaded earnings under FASB accounting rules

(3) Good to excellent investment yields

(4) Relatively low risk

(5) Tax benefits of leasing

(6) Strategic value of leasing, *i.e.*, the ability to more fully understand the legal, regulatory, commercial and tax environment in The Netherlands and the European Union, thus providing the basis for better informed decisions regarding potential future investments.

59. Con Edison expected a pre-tax economic profit of at least $60 million from the RoCa3 Investment. This pre-tax profit would provide an internal rate of return of approximately 3% to 4%.

60. Con Edison Development expected that the yield on the RoCa3 Investment for accounting and financial reporting purposes would be in excess of 12%.

61. On December 15, 1997, Con Edison Development, through its subsidiary Con Edison Leasing, and South Holland Electric entered into a lease and sublease of RoCa3, whereby Con Edison Leasing leased an undivided 47% interest in the RoCa3 plant from South Holland

Electric for approximately 43.2 years ("the Headlease"), and then subleased the RoCa3 plant back to South Holland Electric for approximately 20.1 years ("the Sublease"). Banc One entered into a similar Headlease and Sublease for the remaining interest in the RoCa3 plant.

62. Con Edison Leasing formed a trust to enter into the various leases and other agreements that were involved in the RoCa3 Investment. The role of the trust has no effect on the tax treatment of the RoCa3 Investment. Thus, for simplicity, this Complaint describes the RoCa3 Investment as if Con Edison Leasing had invested directly in the RoCa3 Investment.

63. Under the Headlease, Con Edison Leasing, as lessee, is obligated to make two lump-sum payments of rent to South Holland Electric. The first payment was due in 1997 at the beginning of the Headlease, and the second payment is due in 2041 at the end of the Headlease. The amounts of these rent payments were based on the fair market rental value of the RoCa3 plant as of December 15, 1997.

64. Con Edison Leasing funded its initial payment of rent under the Headlease by investing $39,320,000 of its own cash and by borrowing $80,792,270.36 from Hollandsche Bank-Unie N.V. ("Hollandsche"). Con Edison Leasing also paid $4,125,000 in transaction costs in connection with entering into the RoCa3 Investment.

65. At the end of the Headlease in 2041, the RoCa3 plant will have a remaining useful life of at least 10.8 years. This period is 20% of the 54-year useful life of the RoCa3 plant as of December 15, 1997, as determined by Deloitte & Touche. Tax law has long recognized that if an asset has a residual life at the end of the lease of 15% of the asset's original useful life, then the lease qualifies as a "true lease" for federal income tax purposes.

66. Deloitte & Touche also determined that at the end of the Headlease, the RoCa3 plant will have a remaining residual value of at least 20% of the fair market value of the RoCa3

plant as of December 15, 1997. Tax law has long recognized that if an asset has a residual value at the end of the lease of 15% of the asset's original cost, then the lease qualifies as a "true lease" for federal income tax purposes.

67. The Sublease set forth the terms under which Con Edison Leasing leased its undivided interest in the RoCa3 plant to South Holland Electric. Events of default under the Sublease include South Holland Electric's failure to make rent payments, declaration or filing of bankruptcy, failure to maintain RoCa3, and failure to maintain appropriate insurance. Con Edison Leasing's remedies upon a default include causing South Holland Electric to return Con Edison Leasing's interest in the RoCa3 plant.

68. At the end of the 20.1-year term of the Sublease from Con Edison Leasing to South Holland Electric, South Holland Electric has an option to purchase Con Edison Leasing's remaining 23.1-year interest in the RoCa3 plant at a fixed price. Deloitte & Touche determined that the price of South Holland Electric's purchase option will exceed the fair market value of the 23.1-year interest it would obtain and, therefore, South Holland Electric is not likely to exercise that option.

69. If South Holland Electric does not exercise its purchase option, then Con Edison Leasing, as lessee, has the opportunity to earn additional income by (i) claiming possession of its interest in the RoCa3 plant for the remaining 23.1 years of the Headlease; (ii) subleasing the RoCa3 plant to a third party for the remaining 23.1 years; or (iii) renewing the Sublease with South Holland Electric for an additional 16.5 years through the exercise of a "Renewal Option."

70. Deloitte & Touche determined that the fixed price of the rental payments due from South Holland Electric under Con Edison Leasing's Renewal Option will be below the fair

market rental value for a lease of a similar facility during the 16.5 year renewal term and, therefore, Con Edison Leasing is not likely to exercise its Renewal Option.

71. If South Holland Electric does not exercise its purchase option and Con Edison Leasing does not exercise its Renewal Option, which Deloitte & Touche indicated is the most likely outcome, then Con Edison Leasing will have possession of its interest in the RoCa3 plant for the 23.1 years remaining under the Headlease, which is 53.5% of its 43.2-year term. If Con Edison Leasing does exercise its Renewal Option, then at the end of the Renewal Option, Con Edison Leasing will have possession of its interest in the RoCa3 plant for the 6.7 years remaining under the Headlease, which is 15.5% of its 43.2-year term. In either case, Con Edison Leasing will have a residual interest in the RoCa3 plant that is greater than 15% of the Headlease term. The value of Con Edison Leasing's residual interest in the RoCa3 plant is also expected to be significantly higher than 15%.

72. At the end of either (i) the Sublease in 2017 or (ii) the Renewal Option term in 2034, as applicable, South Holland Electric is obligated to return to Con Edison Leasing its undivided interest in the RoCa3 plant in its original condition, ordinary wear and tear excepted, and the plant must pass certain specified redelivery acceptance tests. Duke Engineering anticipated that the plant would meet the requirements stated in the transaction and expected that the plant would be in similar or better operational condition as compared to equivalent power plants because of the high quality of the original equipment and design features.

73. South Holland Electric is the operator of the RoCa3 plant during the term of the Sublease. Con Edison Leasing, Banc One, and South Holland Electric entered into agreements providing for the operation and maintenance of RoCa3 upon the expiration of the Subleases to South Holland Electric. Pursuant to these agreements, Con Edison Leasing and Banc One have

the right to remove South Holland Electric as the operator of the RoCa3 plant upon the expiration of the Subleases.

74. In entering into the RoCa3 Investment, Con Edison Leasing assumed a significant amount of risk, including the risk that South Holland Electric would not be able to make or would refuse to make its required rent payments, the risk that South Holland Electric would go bankrupt, and the risk that the leased equipment would be damaged or otherwise suffer an unanticipated diminution in value.

75. As lessor under the Headlease, South Holland Electric assumed the risk that Con Edison Leasing would be unable to make the second lump-sum rent payment due under the terms of the Headlease.

76. Hollandsche, Con Edison Leasing's lender, assumed the risk that Con Edison Leasing would be unable to make the required loan payments.

77. As is typical in conservatively structured transactions, the RoCa3 Investment included a number of features that were designed to reduce the financial risks assumed by the parties. These features included collateral deposits, pledges of collateral, and an early buy-out option. However, these features did not and could not insulate Con Edison Leasing or the other parties from all risks presented by the RoCa3 Investment.

## COUNT ONE: THE IRS'S PROPOSED TAX TREATMENT OF THE RoCa3 INVESTMENT WAS ERRONEOUS

### A. The Headlease and Sublease Between Con Edison Leasing and South Holland Electric Should Be Respected Because Con Edison Leasing Retains Sufficient Benefits and Burdens of Ownership With Respect To Its Leasehold Investment in the Roca3 Plant

78. Con Edison NY reincorporates by reference and re-alleges the facts set forth in paragraphs 1 through 77 above.

79. Generally, a lease is an arrangement where one party (the "lessor") has a property interest in an asset or a right to use an asset and provides possession and the right to use that asset to another party (the "lessee") for a fixed period of time in exchange for payment of rent.

80. For federal income tax purposes, a lease arrangement will be respected as a "true lease" (instead of a loan or other form of transaction) if the lessor retains sufficient benefits and burdens of ownership. This determination generally depends on whether the lessor has a meaningful equity investment in the asset throughout the entire lease term and a meaningful residual interest in the asset at the end of the lease term. Decades of judicial authority have found a 15% residual value to be meaningful. Thus, if at the end of the lease term, the asset is expected to have a remaining useful life (and remaining value) equal to at least 15% of its original estimated useful life (and original cost), the arrangement will be respected for tax purposes as a true lease or sublease, as the case may be.

81. The lessor in a lease transaction can use either equity or a combination of equity and debt to finance the purchase or lease of the asset. When a lessor uses non-recourse debt to finance the purchase or lease of the asset, the transaction is called a leveraged lease.

82. In a typical leveraged lease transaction, an investor purchases or leases an asset and borrows money to finance some or all of the investment. The investor then leases the asset to a third party who uses the asset in its business operations. In this type of transaction, it is a common business practice for the investor to lease the asset to the party which originally sold or leased it to the investor, *i.e.*, a "sale-leaseback" or "lease-leaseback" transaction.

83. In leveraged lease transactions the lessor will earn profits from the rent payments it receives and from the residual value of the property once the lease expires. Additionally, a leveraged lease transaction will often provide a benefit in the form of a limited tax deferral, in

which an amount of federal income tax that would otherwise have been paid one year is deferred until a later year. This is so because leveraged lease transactions often produce losses for federal income tax purposes in the early years of the transaction due to depreciation, rental expense, amortization, and interest deductions. These losses are offset by profits or gains for federal income tax purposes in the later years of the transaction. This tax deferral effect of leveraged lease transactions has been approved by the courts and the IRS for many years.

84. The RoCa3 Investment, entered into by Con Edison Leasing and South Holland Electric on December 15, 1997, was a leveraged lease transaction because a portion of Con Edison Leasing's investment was financed through a non-recourse loan from Hollandsche.

85. The Headlease from South Holland Electric to Con Edison Leasing and the Sublease from Con Edison Leasing to South Holland Electric both qualify as leases for federal tax purposes because in each case (i) the leases transferred possession of the property interest in return for the obligation to pay rent and provided for transfer of possession back to the lessor in the event of a default, and (ii) the lessors' return depended upon the residual value of the property at the end of the respective lease.

**B. Con Edison NY Properly Reported the RoCa3 Investment on Its 1997 Tax Return**

86. Con Edison NY properly reported income and claimed deductions on its 1997 tax return in connection with the RoCa3 Investment.

87. As lessee under the Headlease, Con Edison Leasing is required to make rent payments to South Holland Electric. Con Edison Leasing accrued rental deductions on its 1997 tax return for these payments in accordance with the terms of the Headlease.

88. As lessee under the Sublease, South Holland Electric is required to make rent payments to Con Edison Leasing. Con Edison Leasing accrued income on its 1997 tax return with respect to these payments in accordance with the terms of the Sublease.

89. Section 467 of the Internal Revenue Code generally requires rent to be allocated to tax periods in accordance with the terms of a lease, except as otherwise required by section 467. Section 467 also authorizes the IRS to issue regulations regarding the allocation of rental payments to tax periods. Although section 467 was enacted in 1984, the Treasury Department did not promulgate final regulations pursuant to section 467 until 1999, that is, nearly 15 years later.

90. On June 3, 1996, before Con Edison Leasing entered into the RoCa3 Investment, the Treasury Department issued "proposed" regulations under Section 467 of the Internal Revenue Code (the "Proposed Section 467 Regulations"). These regulations, however, were not made final until May 18, 1999 (the "Final Section 467 Regulations").

91. Certain provisions of the Proposed Section 467 Regulations could have altered the method in which Con Edison Leasing reported the rental expense and income resulting from the Headlease and Sublease, respectively, on its 1997 income tax return, but these provisions were not applicable to leases that were entered into prior to the Final Section 467 Regulations as long as the allocation of rent agreed to by the parties was not designed for the principal purpose of avoiding income tax.

92. Both the Proposed Section 467 Regulations and the Final Section 467 Regulations contain a "safe harbor" provision. This provision states that the avoidance of income tax will not be considered to be a principal purpose for the method of allocating rent agreed to by the parties

if the rent allocated to each calendar year is no more than 10% higher or lower than the average rent for all calendar years under the lease.

93. The rent allocation contained in the Headlease and Sublease met the 10% "safe harbor" rule that is contained in the Proposed Section 467 Regulations and the Final Section 467 Regulations. Under the IRS's own rules, the rent allocation methodology in each of the leases is not considered to be for the principal purpose of avoiding income tax. Because the allocations of rent under the Headlease and Sublease satisfied the 10% safe harbor provision, Con Edison NY's reported rental expense deductions and rental income from the RoCa3 Investment as reported on its 1997 income tax return complied with the Proposed Section 467 Regulations and the Final Section 467 Regulations.

94. Con Edison NY properly reported deductions for accrual of interest expense with respect to its loan from Hollandsche.

95. Con Edison NY properly reported deductions for the amortization of transaction costs incurred with respect to the RoCa3 Investment.

**COUNT TWO: CON EDISON NY IS ENTITLED TO A REFUND OF TAXES**

96. Con Edison NY incorporates by reference and re-alleges the facts set forth in paragraphs 1 through 95 above.

97. Pursuant to 26 U.S.C. §§ 61 and 467, Con Edison NY included a total of $399,963 in rental income on its income tax return for the 1997 taxable year with respect to South Holland Electric's obligation to pay rent under the terms of the Sublease.

98. Pursuant to 26 U.S.C. §§ 162(a)(3), 167, and 467, Con Edison NY deducted a total of $1,082,350 in rental expense and transaction costs on its income tax return for the 1997

taxable year as a result of the rental payments made to South Holland Electric under the terms of, and in amortization of transaction costs relating to, the Headlease.

99. Pursuant to 26 U.S.C. § 163, Con Edison NY deducted a total of $254,944 in interest expense on its income tax return for the 1997 taxable year as a result of interest accruing on the bank loan it obtained to fund a portion of its rental payments under the Headlease.

100. The IRS proposed to disallow all of Con Edison NY's deductions for (i) rental payments required to be made to South Holland Electric under the terms of the Headlease, (ii) the interest payments required to be made to Hollandsche, and (iii) the amortization of transaction costs.

101. The IRS also proposed to reduce Con Edison NY's rental income by the amount of rental payments due from South Holland Electric under the Sublease.

102. These proposed adjustments had the effect of recalculating Con Edison NY's taxable income for the 1997 taxable year as if Con Edison NY had not engaged in the RoCa3 Investment.

103. The changes proposed by the IRS increased Con Edison NY's taxable income for the 1997 taxable year by a net amount of $937,331.

104. As a result of this proposed increase in taxable income, the IRS demanded an additional $328,066 in federal income tax from Con Edison NY for the 1997 taxable year.

105. On or about November 3, 2005, Con Edison NY paid to the IRS at Chicago, Illinois the proposed tax deficiency of $328,066.

106. The adjustments made by the IRS to Con Edison NY's taxable income for the 1997 taxable year were contrary to controlling tax law, and Con Edison NY is entitled to a

complete refund of the $328,066 of federal income taxes erroneously paid with respect to the RoCa3 Investment.

## DEMAND FOR JUDGMENT

WHEREFORE, Con Edison of NY respectfully requests that this Court enter judgment in its favor and against the Defendant in the amount of $328,066, plus interest and costs allowed by law, and provide such other relief as the Court may deem just.

Respectfully submitted this 18th day of April, 2006.

Respectfully Submitted,

Thomas C. Durham
MAYER, BROWN, ROWE & MAW LLP
71 South Wacker Drive
Chicago, Illinois 60606
Tel: (312) 701-7216
Fax: (312) 706-9187
tdurham@mayerbrownrowe.com

Attorney for Plaintiff

OF COUNSEL:

David F. Abbott
Brian P. Trauman
MAYER, BROWN, ROWE & MAW LLP
1675 Broadway
New York, New York 10019
Tel: (212) 506-2500
Fax: (212) 262-1910

Nicole Bielawski
MAYER, BROWN, ROWE & MAW LLP
1909 K Street, N.W.
Washington, D.C. 20217
Tel: (202) 263-3000
Fax: (202) 263-3300

# EXHIBIT D-2

**Internal Revenue**
# bulletin

**Bulletin No. 2002–44**
**November 4, 2002**

## HIGHLIGHTS OF THIS ISSUE

**These synopses are intended only as aids to the reader in identifying the subject matter covered. They may not be relied upon as authoritative interpretations.**

## SPECIAL ANNOUNCEMENT

**Announcement 2002–101, page 800.**
This announcement solicts applications from potential partners to participate in the 2003 IRS Individual *e-file* Partnership Program. The partnership opportunities are a result of RRA 98, which requires the IRS to receive 80 percent of all returns electronically by 2007. RRA 98 authorized the IRS Commissioner to promote the benefits of and encourage the use of *e-file* services through partnerships with various entities that offer low cost tax preparation and electronic filing of income tax returns for qualified taxpayers. Those applicants that are accepted as partners will have a link(s) and description(s) of their services placed on the IRS web-site at *www.irs.gov* (IRS *e-file* Partners Page).

## INCOME TAX

**Rev. Rul. 2002–69, page 760.**
**Business expenses; interest; lease-in/lease-out transactions.** A taxpayer may not deduct currently, under sections 162 and 163 of the Code, rent and interest paid or incurred in connection with a lease-in/lease-out (LILO) transaction that properly is characterized as conferring only a future interest in property. Rev. Rul. 99–14 modified and superseded.

**Rev. Rul. 2002–71, page 763.**
**Notional principal contract (NPC).** This ruling provides guidance on the timing of recognition of gain or loss on the termination of a notional principal contract that hedges a portion of the term of a debt instrument issued by the taxpayer.

**Rev. Rul. 2002–72, page 759.**
**Low-income housing credit; satisfactory bond; "bond factor" amounts for the period October through December 2002.** This ruling announces the monthly bond factor amounts to be used by taxpayers who dispose of qualified low-income buildings or interests therein during the period October through December 2002. This ruling also provides a summary of the bond factor amounts for dispositions occurring during the period January through September 2002.

**REG–112306–00, page 767.**
Proposed regulations under section 1296 of the Code contain procedures for certain United States persons holding marketable stock in a passive foreign investment company (PFIC) to elect mark to market treatment for that stock. A public hearing is scheduled for November 6, 2002.

**REG–150313–01, page 777.**
Proposed regulations under sections 302, 304, and other sections of the Code provide guidance regarding the treatment of the basis of redeemed stock when a distribution in redemption of such stock is treated as a dividend. The regulations also provide guidance regarding certain acquisitions of stock by related corporations that are treated as distributions in redemption of stock. A public hearing is scheduled for February 20, 2003.

**Notice 2002–70, page 765.**
This notice alerts taxpayers and their representatives about certain reinsurance transactions intended to shift income to offshore related companies purported to be insurance companies that are subject to little or no U.S. federal income tax. These transactions often do not generate the federal tax benefits that taxpayers claim are allowable for federal income tax purposes. This notice also alerts taxpayers, their representatives, and promoters of these transactions, to certain reporting and record keeping obligations and penalties that they may be subject to with respect to these transactions.

**Announcement 2002–100, page 799.**
This document contains corrections to proposed regulations under section 1503(d) of the Code (REG–106879–00, 2002–34 I.R.B. 402) relating to the events that require the recapture of dual consolidated losses.

**Finding Lists begin on page ii.**
**Index for July through October begins on page v.**

Department of the Treasury
**Internal Revenue Service**

Table 1 (cont'd)
Rev. Rul. 2002–72
Monthly Bond Factor Amounts for Dispositions Expressed
As a Percentage of Total Credits

| | Calendar Year Building Placed in Service or, if Section 42(f)(1) Election Was Made, the Succeeding Calendar Year | | | |
|---|---|---|---|---|
| Month of Disposition | 1999 | 2000 | 2001 | 2002 |
| Jan '02 | 70.13 | 70.98 | 72.28 | 72.55 |
| Feb '02 | 69.92 | 70.77 | 72.05 | 72.55 |
| Mar '02 | 69.73 | 70.58 | 71.84 | 72.55 |
| Apr '02 | 69.55 | 70.40 | 71.67 | 72.55 |
| May '02 | 69.38 | 70.24 | 71.51 | 72.55 |
| Jun '02 | 69.21 | 70.09 | 71.37 | 72.55 |
| Jul '02 | 69.05 | 69.94 | 71.25 | 72.55 |
| Aug '02 | 68.90 | 69.81 | 71.14 | 72.55 |
| Sep '02 | 68.76 | 69.68 | 71.04 | 72.55 |
| Oct '02 | 68.62 | 69.57 | 70.94 | 72.55 |
| Nov '02 | 68.49 | 69.45 | 70.86 | 72.55 |
| Dec '02 | 68.37 | 69.35 | 70.78 | 72.55 |

For a list of bond factor amounts applicable to dispositions occurring during other calendar years, see: Rev. Rul. 98–3, 1998–1 C.B. 248; Rev. Rul. 2001–2, 2001–1 C.B. 255; and Rev. Rul. 2001–53, 2001–2 C.B. 488.

DRAFTING INFORMATION

The principal author of this revenue ruling is Gregory N. Doran of the Office of Associate Chief Counsel (Passthroughs and Special Industries). For further information regarding this revenue ruling, contact Mr. Doran at (202) 622–3040 (not a toll-free call).

## Section 162.—Trade or Business Expenses

*26 CFR 1.162–11: Rentals.*
*(Also § 163; 1.163–1.)*

**Business expenses; interest; lease-in/lease-out transactions.** A taxpayer may not deduct currently, under sections 162 and 163 of the Code, rent or interest paid or incurred in connection with a lease-in/lease-out (LILO) transaction that properly is characterized as conferring only a future interest in property.

## Rev. Rul. 2002–69

ISSUE

May a taxpayer deduct currently, under §§ 162 and 163 of the Internal Revenue Code, rent and interest paid or incurred in connection with a "lease-in/lease-out" ("LILO") transaction?

FACTS

*X* is a U.S. corporation. *FM* is a foreign municipality that has historically owned and used certain property. As of 1997, it is estimated that the property has a remaining useful life of 50 years and a fair market value of $100 million. *BK1* and *BK2* are banks. None of these four parties is related to any of the others.

On January 1, 1997, *X* and *FM* entered into a LILO transaction under which *FM* leased the property to *X* under a "Headlease," and *X* immediately leased the property back to *FM* under a "Sublease." The term of the Headlease is 40 years. The primary term of the Sublease is 20 years. Moreover, as described below, the Sublease also may be renewed for a term of 10 years ("put renewal term") at the option of *X*. *X*'s right to possess the property under the Headlease for the first 20 years is substantially the same as *FM*'s right to possession under the Sublease for the primary term.

The Headlease requires *X* to make two rental payments to *FM* during its 40-year term: (1) an $89 million prepayment at the beginning of year 1; and (2) a postpayment at the end of year 40 that has a discounted present value of $8 million. For federal income tax purposes, *X* and *FM* allocate the prepayment ratably to the first 6 years of the Headlease and the future value of the postpayment ratably to the remaining 34 years of the Headlease.

The Sublease requires *FM* to make fixed, annual rental payments over both the primary term and, if exercised, the put renewal term. The fixed, annual payments during the put renewal term are equal to 90 percent of the amounts that (as of January 1, 1997) are projected to be the fair market value rental amounts for that term.

To partially fund the $89 million Headlease prepayment, *X* borrows $54 million from *BK1* and $6 million from *BK2*. Both loans are nonrecourse, have fixed interest rates, and provide for annual debt service payments that fully amortize the loans over the 20-year primary term of the Sublease. The amount and timing of the debt ser-

vice payments mirror the amount and timing of the Sublease payments due during the primary term of the Sublease. The remaining $29 million of the Headlease prepayment is provided by *X*.

Upon receiving the $89 million Headlease prepayment, *FM* deposits $54 million into a deposit account with an affiliate of *BK1* and $6 million into a deposit account with an affiliate of *BK2*. The deposits with the affiliates of *BK1* and *BK2* earn interest at the same rates as the loans from *BK1* and *BK2*. *FM* directs the affiliate of *BK1* to pay *BK1* annual amounts equal to 90 percent of *FM*'s annual rent obligation under the Sublease (that is, amounts sufficient to satisfy *X*'s debt service obligation to *BK1*). The parties treat these amounts as having been paid from the affiliate to *FM*, then from *FM* to *X* as rental payments, and finally from *X* to *BK1* as debt service payments. In addition, *FM* pledges the deposit account to *X* as security for *FM*'s obligations under the Sublease, while *X*, in turn, pledges its interest in *FM*'s pledge to *BK1* as security for *X*'s obligations under the loan from *BK1*. Similarly, *FM* directs the affiliate of *BK2* to pay *BK2* annual amounts equal to 10 percent of *FM*'s annual rent obligation under the Sublease (that is, amounts sufficient to satisfy *X*'s debt service obligation to *BK2*). The parties treat these amounts as having been paid from the affiliate to *FM*, then from *FM* to *X* as rental payments, and finally from *X* to *BK2* as debt service payments. Although *FM*'s deposit with the *BK2* affiliate is not pledged, the parties understand that *FM* will use the account to pay the remaining 10 percent of *FM*'s annual rent obligation under the Sublease.

As a result of the foregoing arrangement, *X*'s obligation to make the property available under the 20-year primary term of the Sublease is completely offset by *X*'s right to use the property under the Headlease. *X*'s obligation to make debt service payments on the loans from *BK1* and *BK2* is completely offset by *X*'s right to receive Sublease rentals from *FM*. Moreover, *X*'s exposure to the risk that *FM* will not make the rent payments is further limited by the arrangements with the affiliates of *BK1* and *BK2*. In the case of the loan from *BK1*, *X*'s economic risk is eliminated through the defeasance arrangement. In the case of the $6 million loan from *BK2*, *X*'s economic risk, although not eliminated, is substantially reduced through the deposit arrangement. As a result, neither bank requires an independent source of funds to make the loans, or bears significant risk of nonpayment. In short, during the primary Sublease term, the transaction is characterized by reciprocal and circular obligations that offset one another.

At the end of the Sublease primary term, *FM* has a fixed-payment option to purchase from *X* the Headlease residual (the right to use the property beyond the Sublease primary term subject to the obligation to make the rent postpayment) for a fixed exercise price equal to 105 percent of the amount that (as of January 1, 1997) is projected to be the future fair market value of the Headlease residual. If *FM* exercises the option, the transaction is terminated at that point, and *X* receives the exercise price of the option and is not required to make any portion of the postpayment due under the Headlease. If *FM* does not exercise the option, *X* may elect to (1) use the property itself for the remaining term of the Headlease, (2) lease the property to another person for the remaining term of the Headlease, or (3) compel *FM* to lease the property for the 10-year put renewal term of the Sublease. If *FM* does not exercise the fixed-payment option and *X* exercises its put renewal option, *X* will receive rents that are equal to 90 percent of the amounts that are (as of January 1, 1997) projected to be the fair market rents for that term. If the actual fair market rents in 20 years turn out to be less than the amount specified in the put renewal option and *FM* does not exercise the fixed-payment option, *X* will be able to compel *FM* to lease the property for rents that are greater than the then fair market rental value. Thus, as a practical matter, the fixed-payment option and put renewal option operate to "collar" the value of the Headlease residual during the primary term.

In addition, *X* has nominal exposure to *FM*'s credit under the fixed-payment option and, if exercised, the put renewal term. At the inception of the transaction, *X* requires *FM* to invest $15 million of the Headlease prepayment in highly-rated debt securities that will mature in an amount sufficient to fund the fixed amount due under the fixed-payment option, and to pledge these debt securities to *X*. This arrangement ensures that *FM* is able to make the payment under the fixed-payment option. Having economically defeased both its rental obligations under the Sublease and its fixed-payment under the fixed-payment option, *FM* keeps the remaining portion of the Headlease prepayment as its return on the transaction. If *FM* does not exercise the fixed-payment option and *X* exercises the put renewal option, *X* can require *FM* to purchase a letter of credit guaranteeing the put renewal rents. If *FM* does not obtain the letter of credit, *FM* must exercise the fixed-payment option.

For tax purposes, *X* claims deductions for interest on the loans and for the allocated rents on the Headlease. *X* includes in gross income the rents received on the Sublease. If the fixed-payment option is exercised, *X* also includes the option price and recaptures rent deductions taken during the primary Sublease term that are attributable to the postpayment it is no longer required to make.

## LAW AND ANALYSIS

*X* and *FM*'s allocations of the prepayment and the postpayment for federal income tax purposes meet the uneven rent test contained in proposed § 467 regulations (§ 1.467–3(c)(2)(i)), and under those regulations the Headlease would not be treated as a disqualified leaseback or long-term agreement subject to constant rental accrual. Because this LILO transaction was entered into after June 3, 1996, and on or before May 18, 1999, the provisions of the proposed regulations are available. *See* § 1.467–9(c). For later years, however, final § 467 regulations effective May 18, 1999, treat the prepayment of rent as resulting in a deemed loan from *X* to *FM* and require the imputation of interest income to *X*. § 1.467–4. Moreover, *X*'s rent deduction would be subject to proportional rent rules that reflect the time value of money concept. *See* § 1.467–2(c).

The substance of a transaction, not its form, governs its tax treatment. *Gregory v. Helvering*, 293 U.S. 465 (1935). In *Frank Lyon Co. v. United States*, 435 U.S. 561, 573 (1978), the United States Supreme Court stated, "In applying the doctrine of substance over form, the Court has looked to the objective economic realities of a transaction rather than to the particular form the parties employed." The Court evaluated the substance of the transaction in *Frank Lyon* to determine that it was indeed a sale/leaseback, as it was structured,

rather than a financing. The Court subsequently relied on its approach in *Frank Lyon* to recharacterize a sale and repurchase of federal securities as a loan, finding that the economic realities of the transaction did not support the form chosen by the taxpayer. *Nebraska Dep't of Revenue v. Loewenstein*, 513 U.S. 123 (1994).

Where parties have in form entered into two separate transactions that result in offsetting obligations, the courts often have collapsed the offsetting obligations and recharacterized the two transactions as a single transaction. In *Rogers v. United States*, 281 F.3d 1108 (10th Cir. 2002), the part-owner (Fogelman) of a professional baseball team that was organized as an S corporation borrowed money from the S corporation. The nonrecourse loan was secured by Fogelman's ownership interest in the corporation and his existing option to purchase the rest of the shares from the taxpayer (Kauffman), the other owner of the team. Fogelman also granted the corporation an option to purchase both his shares and his existing option to buy Kauffman's shares. The option price was an amount equal to the outstanding loan balance. The corporation exercised its option immediately but deferred closing until the due date of Fogelman's loan, five months later. On that date, Fogelman transferred his shares in the corporation to the corporation in lieu of its foreclosure on the loan. The corporation claimed that the shares had no value at that time and deducted the loan amount as a bad debt, which was passed through to Kauffman.

The court in *Rogers* applied the substance over form doctrine to collapse the loan and the option transaction into a redemption of Fogelman's stock in exchange for cash. Fogelman had no incentive to repay the loan because any reduction in the loan balance would reduce the option price. The immediate exercise of the option precluded any attempt by Fogelman to repay the loan and keep the stock. On the basis of those facts, among others, the court held that the substance of the transaction was a sale of Fogelman's stock to the corporation.

In *Bussing v. Commissioner*, 88 T.C. 449, *reconsideration denied*, 89 T.C. 1050 (1987), a Swiss subsidiary of a computer leasing company (AG) purchased computer equipment in a sale/leaseback transaction involving a five-year lease. Subsequently, AG purportedly sold the equipment to a domestic corporation (Sutton), which in turn purportedly sold interests in the equipment to the taxpayer (Bussing) and four other individual investors. Bussing acquired his interest in the computer equipment subject to the underlying lease by paying cash, short-term promissory notes, and a long-term promissory note to Sutton. Bussing then leased his interest in the equipment back to AG for nine years. The rents due Bussing from AG equaled Bussing's annual payments on the long-term promissory note to Sutton for the first three years and were supposed to generate nominal annual cash flow thereafter.

The court first disregarded Sutton's participation in the transactions on substance over form grounds. It then held that Bussing's long-term indebtedness also must be disregarded because it was completely offset by AG's rent payments in a "purported sale-leaseback pursuant to which the respective lease and debt obligations flow between only two parties." *Id.* at 458. The court stated,

> The respective obligations between AG and Bussing cancel each other out. Any possible claim by AG with respect to the note is fully offset by AG's rental obligation to Bussing. . . . Bussing, effectively, will never be required to make any payments on his debt obligation, a feature of the transaction that we believe the parties intended to achieve.

*Id.* After collapsing the offsetting loan and lease, the court concluded that Bussing had acquired an interest in a joint venture with AG and the other investors to the extent of his cash payment only.

Courts have similarly disregarded the parties' obligations in purported installment sales where the taxpayer received an installment note that was offset by some other arrangement between the two parties, indicating that the maker of the note would not be called upon to pay the installment obligation. *See Rickey v. Commissioner*, 502 F.2d 748 (9th Cir. 1974), *aff'g* 54 T.C. 680 (1970). Although taxpayers are entitled to arrange the terms of a sale in order to qualify for the installment method, "the arrangements must have substance and must reflect the true situation rather than being merely the formal documentation of the terms of the sale." *Id.* at 752–53, quoting 54 T.C. 680 at 694. *See also United States v. Ingalls*, 399 F.2d 143 (5th Cir. 1968); *Blue Flame Gas Co. v. Commissioner*, 54 T.C. 584 (1970); *Greenfield v. Commissioner*, T.C. Memo. 1982–617; *Big "D" Development Corp. v. Commissioner*, T.C. Memo. 1971–148, *aff'd per curiam*, 453 F.2d 1365 (5th Cir.1972).

Similarly, the Headlease and Sublease impose offsetting obligations that must be disregarded, regardless of whether other components of the LILO transaction are respected. During the first 20 years of its term, the Headlease confers to X a right to use the property that is immediately reversed by the Sublease grant to FM of substantially the same right to use property. In the LILO transaction, the Sublease interest retained by *FM* is of the same nature as the Headlease interest conveyed to *X*. Because the transfer and retransfer of the right to possess the property for the first 20 years are disregarded as offsetting obligations, the transaction that remains is, at best, a transfer of funds from *X* to *FM* in exchange for *FM's* obligation to repay those funds and provide *X* the right to begin to lease the property in 20 years.

An analogous situation occurs when the conveyance of property is accompanied by the retention of some interest in the same property. If the interest retained is of substantially the same nature as the interest conveyed, only a future interest is conveyed. In *McCully Ashlock v. Commissioner*, 18 T.C. 405 (1952), *acq.*, 1952–2 C.B. 1, taxpayer had acquired property through a deed dated June 6, 1945. The seller, however, had retained the right to possession and rentals through August 15, 1947. The court found that taxpayer had acquired only a future interest in the property because "the trustees [sellers] not only retained the rents legally but they also retained control and benefits of ownership." *Id.* at 411. Consequently, rentals from the property were income to the seller.

Similarly, in *Kruesel v. United States*, 63–2 U.S. Tax Cas. (CCH) ¶ 9714 (D. Minn. 1963), the court concluded that taxpayer had transferred only a future, remainder interest in property and reserved a life estate. The government had unsuccessfully argued that taxpayer had sold its entire interest in the property and the taxpayer's amount realized on the sale included the value of a right to occupancy provided to the taxpayer by the buyer.

In contrast, in *Alstores Realty Corp. v. Commissioner*, 46 T.C. 363 (1966), *acq.*, 1967–2 C.B.1, the court held that a sale of property accompanied by the reservation of a right of occupancy did not result in the transfer of only a future interest because the seller's right of occupancy was in the nature of a leasehold interest, because the purchaser acquired the benefits and burdens of ownership of the property.

*Alstores* can be distinguished from *McCully Ashlock* and *Kruesel*. *McCully Ashlock* and *Kruesel* conclude that where a retained interest is of the same nature as the interest conveyed, only a future interest has been transferred. In *Alstores*, the interests were not of the same nature.

Similarly, the LILO transaction is distinguishable from the transaction involved in *Comdisco, Inc. v. Commissioner*, 756 F.2d 569 (7th Cir. 1985). In that case, equipment was subject to end user leases, and the lessor of that equipment assigned an interest to taxpayer in a transaction designed to give the taxpayer investment tax credits. The taxpayer's entitlement to the credits depended on whether it had the status of lessee/sublessor. In concluding that it did, the court noted a number of factors that supported taxpayer's claim that it had acquired a leasehold interest. The taxpayer was obligated to the lessor in the event of a default by the sublessee. The taxpayer relet certain equipment after one sublease had expired. In connection with another sublease, the taxpayer was responsible for rent to its assignor in excess of amounts paid by the sublessee directly to the assignor. The court also emphasized the regulatory restrictions on direct leases between the assignor and the end users. *Id.* at 576–77. Unlike *Comdisco*, in the LILO transaction the headlessor and the sublessee are the same party. Further, in the LILO transaction the headlessee/sublessor is not materially exposed to the risk that the sublessee will fail to make rent payments.

Section 162(a)(3) permits a deduction for rentals and other payments required to be made as a condition to the continued use or possession, for purposes of the trade or business, of property. Because *X* does not acquire a current leasehold interest in the property, it is not entitled to current deductions for rent. The $29 million "equity" portion of the Headlease prepayment is, effectively, a payment for at most *X*'s right under the Headlease to lease the property 20 years hence for a term of 20 years. (Economically, $29 million is an overpayment for the value of any right that *X* obtains to lease the property in the future. *X* was willing to overpay in this manner, however, in order to induce *FM* to participate in the transaction.). In accordance with § 467, the $29 million "equity" portion of the Headlease prepayment is deductible over the 20-year residual term of the Headlease (the 10-year put renewal term and the 10-year "shirttail" period). Alternatively, in the event *FM* exercises its fixed-price option at the end of the primary term of the Sublease, *X* will have gain or loss equal to the difference between the option price and *X*'s cost of acquiring a right to the Headlease residual term. Section 1001.

The remainder of the Headlease prepayment, $60 million, must be disregarded, because the "loans" that purportedly finance this portion of the Headlease prepayment are without substance. In *Bridges v. Commissioner*, 39 T.C. 1064, *aff'd* 325 F.2d 180 (4th Cir. 1963), taxpayer "borrowed" funds from banks and used the funds to purchase Treasury notes, which the banks held as collateral and ultimately sold to satisfy taxpayer's debts. The court's rationale for disallowing taxpayer's deductions of prepaid interest is equally applicable here:

> [P]etitioner at no time had the uncontrolled use of any additional money, of the bonds, or of the interest on the bonds. He assumed no risk of a rise or fall in the market price of the bonds and could not take advantage of such. His payment to the bank was not for the use or forbearance of money; it was for the purchase of a rigged sales price for the bonds and for a tax deduction. Petitioner incurred no genuine indebtedness, within the meaning of the statute, and as a payment of interest, this transaction was also a sham.

*Id.* at 1078–79. Neither *X* nor *FM* obtain use of the "borrowed" funds. The "loans" purportedly are made to finance *X*'s acquisition of the Headlease interest. But that leasehold interest is substantially offset by an interdependent Sublease with the Headlessor. What remains can only be enjoyed after 20 years and after the loans have been "repaid" using "rents" from a Sublease that itself lacks substance. Under the circumstances, the loans are disregarded.

Although this ruling refers to a foreign municipality and its property, the analysis and holding apply as well to LILO transactions that involve or include domestic tax-exempt or tax-indifferent entities.

HOLDING

A taxpayer may not deduct currently, under §§ 162 and 163, rent or interest paid or incurred in connection with a LILO transaction that properly is characterized as conferring only a future interest in property.

Where appropriate, the Service will continue to disallow the tax benefits claimed in connection with LILO transactions upon other grounds, including that the substance over form doctrine requires their recharacterization as financing arrangements and that they are to be disregarded for lack of economic substance.

EFFECT ON OTHER DOCUMENTS

Rev. Rul. 99–14, 1999–1 C.B. 835, is modified and superseded.

DRAFTING INFORMATION

The principal author of this revenue ruling is John Aramburu of the Office of Associate Chief Counsel (Income Tax & Accounting). For further information regarding this revenue ruling, contact Mr. Aramburu at (202) 622–4960 (not a toll-free call).

## Section 163.—Interest

*26 CFR 1.162–17: Interest deduction in general.*

May a taxpayer deduct currently, under § 163, interest paid or incurred in connection with a lease-in/lease-out (LILO) transaction that properly is characterized as conferring only a future interest in property. See Rev. Rul. 2002–69, page 760.

## Section 446.—General Rule for Methods of Accounting

*(Also 26 CFR 1.446–4)*

**Notional principal contract (NPC).** This ruling provides guidance on the timing of recognition of gain or loss on the termination of a notional principal contract that hedges a portion of the term of a debt instrument issued by the taxpayer.

# EXHIBIT D-3

[EZH Letterhead]

ABN AMRO Bank N.V.
P.O. Box 283
1000 EA Amsterdam
Attention: Financial Engineering

Re: EZH RoCa 3 Centrale

Dear Madams and Sirs:

Notwithstanding the provisions contained in Section 21 of the respective Participation Agreement, dated as of December 15, 1997, among (i) N.V. Electriciteitsbedrijf Zuid-Holland, as Lessor and Sublessee, (ii) BOI Leasing Corporation or Consolidated Edison Leasing, Inc., as the case may be, as Investor, (iii) Wilmington Trust Company, not in its individual capacity, except as otherwise expressly provided therein, but solely as Trustee, and (iv) Hollandsche Bank-Unie N.V., as Lender, the Alteration Fee provision in our agreement, dated December 4, 1997, remains in full force and effect.

Sincerely yours,

0000HJC4.W51