# EXHIBIT B

# EXHIBIT B

## DOCUMENTS TO BE PRODUCED BY CREDIT SUISSE FIRST BOSTON LTD.

## DEFINITIONS & INSTRUCTIONS

A. “Document,” “record” and “material” include any written, printed, typed, electronic or graphic matter of any kind or nature. Any draft or non-identical copy constitutes a separate document for purposes of these requests. The terms shall be construed to include, but shall not be limited to, correspondence, electronic mail, notes, notations, contracts, brochures, agreements, deeds, leases, letters, memoranda, checks, bank statements, reports, analyses, projections, studies, records, corporate minutes, financial statements, financial records, accounting or audit workpapers (including permanent workpapers), spreadsheets, transcripts, recordings, and all other types of written or documentary materials.

B. Any copy of a document that varies in any way from the original or from any other copy of the document, whether by reason of handwritten or other notation or any omission, shall constitute a separate document and must be produced. Each document is to be produced in its entirety, without abbreviation or expurgation, and the person who made the notation identified.

C. If any documents are withheld under a claim of privilege, furnish a list identifying each document for which a privilege is claimed, together with the following information and sufficient details so as to permit a court to adjudicate the validity of the claim of privilege: date, sender, recipient, type (e.g., letter, memorandum, telegram, chart, photograph, etc.), subject matter of the document, the basis on which a privilege is claimed, and the paragraph or paragraphs of this request to which the document responds.

D. If any document that would have been responsive to these requests no longer exists, please state the following for each document: the date of destruction, the reason for destruction, and the person(s) responsible for the decision to destroy the document(s) and for the actual destruction of the documents.

E. Responses to these requests should be made in a manner consistent with Fed. R. Evid. 902(12), Certified Foreign Records of Regularly Conducted Activity.

F. The term “Con Ed” shall refer to Consolidated Edison Company of New York, Inc. & Subsidiaries, and affiliated companies, including, but not limited to, Consolidated Edison Development, Inc., Consolidated Edison Leasing, Inc., and Consolidated Edison, Inc.

G. The term “Banc One” shall refer to Banc One Leasing Corp. its related affiliates, subsidiaries, successors, and assigns, including, but not limited to, and any person, officer, director, accountant, lawyer, agent, or entity acting on behalf of any of the foregoing organizations.

H. The term “EZH” shall refer to N.V. Electriciteitsbedrifj Zuid-Holland, its related affiliates, subsidiaries, successors, and assigns, including, but not limited to, Preussen Elektra A.G. and E.ON Benelux Generation N.V., and any person, officer, director, accountant, lawyer, agent, or entity acting on behalf of any of the foregoing organizations.

I. The term “RoCa3” shall refer to the gas fired CHP facility located in the Netherlands on the border between Rotterdam and Capelle aan den IJessel, constituting the third unit alongside two previously built units, which was owned by EZH on or about December 15, 1997.

J. The term “HBU” shall refer to Hollandsche Bank-Unie N.V., its related affiliates, subsidiaries, successors, and assigns, and any person, officer, director, accountant, lawyer, agent, or entity acting on behalf of any of the foregoing organizations.

K. The term “ABN AMRO” shall refer to ABN AMRO Bank N.V., its related affiliates, subsidiaries, successors, and assigns, and any person, officer, director, accountant, lawyer, agent, or entity acting on behalf of any of the foregoing organizations.

L. The term “Tauw” shall refer to Tauw Milieu B.V., its related affiliates, subsidiaries, successors, and assigns, including, but not limited to, Tauw B.V., and any person, officer, director, accountant, lawyer, agent, or entity acting on behalf of any of the foregoing organizations.

M. The term “CSFB” shall refer to Credit Suisse First Boston Ltd., its related affiliates, subsidiaries, successors, and assigns, and any person, officer, director, accountant, lawyer, agent, or entity acting on behalf of any of the foregoing organizations.

N. The term “Lease Transaction” shall refer to the series of transactions pertaining to the RoCa3 facility as described in paragraphs 61-77, inclusive of the complaint attached hereto as Exhibit B-1.

O. The term “Lease Transaction Participants” refers to the following entities: ABN AMRO Bank N.V.; Hollandsche Bank-Unie N.V.; EZH; Con Ed; Credit Suisse; Bayerische Landesbank; Wilmington Trust Co.; and ABB Leasing GmbH, and any and all affiliated businesses, successors, assigns, predecessor or successor businesses, and any person, officer, director, accountant, lawyer, agent, or entity acting on behalf of any of the foregoing organizations.

P. The term "Capstar" refers to Capstar Partners L.L.C., its related affiliates, subsidiaries, successors, and assigns, and any person, officer, director, member, accountant, lawyer, agent, or entity acting on behalf of any of the foregoing organizations.

Q. The term "Cornerstone" refers to Cornerstone Financial Advisors L.P., its related affiliates, subsidiaries, successors, and assigns, and any person, officer, partner, accountant, lawyer, agent, or entity acting on behalf of any of the foregoing organizations.

**DOCUMENTS TO BE PRODUCED**

1. The documents in the files of CSFB that discuss the Lease Transaction.

2. The documents in the files of CSFB that discuss or pertain to its solicitation as a potential participant in the Lease Transaction.

3. The documents in the files of CSFB that discuss CSFB's decision to participate in the Lease Transaction.

4. The documents in the files of CSFB that contain the analyses made in conjunction with the decision to participate in the Lease Transaction.

5. The documents in the files of CSFB that discuss the negotiations performed with respect to CSFB's role in the Lease Transaction or the purchase or issuance of US treasury strips in connection therewith.

6. The documents in the files of CSFB that describe or discuss the lease options the Lease Transaction provides to Con Ed and/or EZH, including documents that address the feasibility and/or likelihood of exercise of those options.

7. The documents in the files of CSFB discussing any negotiations performed with respect to the terms of the Lease Transaction or the purchase of US Treasury strips in connection therewith.

8. The documents in the files of CSFB evidencing the transfer of any funds by or to any of the Lease Transaction Participants in connection with the Lease Transaction or the purchase of US Treasury strips in connection therewith.

9. The documents in the files of CSFB containing or discussing Credit Suisse's analysis of appropriate market rates for the various loans, debt defeasance deposits, and collateral purportedly used in the Lease Transaction as identified in the correspondence Bates Nos. PF006130-31, PF006132-33, PF006134-35, PF006136-37, and PF006138-39, attached hereto as Exhibits B-2, B-3, B-4, B-5, and B-6 respectively, including, but not limited to, how the percentage rates set forth in each of those documents was selected.

10. The drafts and underlying work papers for the opinion letters referred to in paragraph 9 in the files of CSFB.

**COMMUNICATIONS**

11. The letters, memoranda, notes, e-mails, and other written communication in the files of CSFB exchanged by and/or between CSFB and any of the Lease Transaction Participants (or their affiliates, assigns, or successors in interest) in connection with the Lease Transaction or the US Treasury Strips purchased or issued in connection therewith.

12. The letters, memoranda, notes, e-mails, and other written communication in the files of CSFB exchanged by and/or between CSFB and Capstar in connection with the Lease Transaction or the US Treasury Strips purchased or issued in connection therewith.

13. The letters, memoranda, notes, e-mails, and other written communication in the files of CSFB exchanged by and/or between CSFB and Cornerstone in connection with the Lease Transaction or the US Treasury Strips purchased or issued in connection therewith.

14. The letters, memoranda, notes, e-mails, and other written communication in the files of CSFB exchanged by and/or between CSFB and Banc One in connection with the lease transaction between Banc One and EZH for the undivided interest in the RoCa3 facility not involved in the Lease Transaction, or the US Treasury Strips purchased or issued in connection therewith.

**ACCOUNT INFORMATION**

15. The documents in the files of CSFB discussing or referring to Account Number 2F4A2, as referred to in Bates Nos. PF002841-2843, attached hereto as Exhibit B-7, as it related to the Lease Transaction.

**TREASURY STRIPS**

16. The documents in the files of CSFB discussing or pertaining to the following US treasury strip coupons identified in documents identified as Bates Nos. US01835, US01836, and US01837-US01840, attached hereto as Exhibits B-8, B-9, and B-10:

US treasury strip coupons 11/15/2011, CUSIP 912833JX9;

US treasury strip coupon 11/15/2016, CUSIP 912833KK5;

US treasury strip coupon 2/15/2017, CUSIP 912833KL3;

US treasury strip coupon 5/15/2017, CUSIP 912833KM1;

US treasury strip coupon 8/15/2017, CUSIP 912833KN9;

US treasury strip coupon 2/15/2018, CUSIP 912833KQ2;

US treasury strip coupon 5/15/2018, CUSIP 912833KRO;

US treasury strip coupon 8/15/2018, CUSIP 912833KS8; and

US treasury strip coupon 11/15/2018, CUSIP 912833KT6,

including, but not limited to all documents pertaining to the purchase, issuance, and ownership of the treasury strips, the specific maturity dates, amounts, and percentages selected for each treasury strip, and the role of the treasury strips in the Lease Transaction and/or any substantially similar transaction involving the RoCa3 facility to which Banc One was a party.

17. The documents in the files of CSFB discussing or pertaining to the account or accounts containing the US treasury strip coupons identified in paragraph 16.

**SIMILAR TRANSACTIONS**

18. The documents within the files of CSFB that discuss or pertain to any of the following lease transactions considered by the plaintiff, Con Ed, between 1997 and 2001, including the documents discussing the solicitation of CSFB as a potential participant in such a transaction and the documents reflecting CSFB's consideration of such transactions and decision to participate in such transactions:

a. NUON lease (Netherlands);

b. MEGA Gas and Thermal Distribution lease/leaseback (Netherlands);

c. EPON lease (Netherlands);

d. ENECO lease (Netherlands);

e. ENN lease (Nethelands);

f. ENW gas lease (Netherlands);

g. MCN lease (United States);

h. ELECTRABEL power plant lease/leaseback (Belgium);

i. Diefland gas and thermal distribution lease/leaseback (Netherlands);

j. Linz power plant lease/leaseback (Austria);

k. UNA power plant lease/leaseback (Netherlands);

l. EG Laufenburg lease/leaseback (Switzerland);

m. Humber power lease/leaseback (United Kingdom);

n. EWZ electric transmission grid lease/leaseback (Switzerland);

o. ESAG lease (Germany);

p. REMU lease (Netherlands);

q. DELTA lease (Netherlands);

r. ZETA/TEL lease (Netherlands);

s. EDON lease (Netherlands);

t. DEW lease (Germany);

u. VASA lease (Germany); and

v. SWISCO lease (Switzerland).

19. The documents in the files of CSFB that discuss any other transaction similar to the Lease Transaction and/or the transaction described in Revenue Ruling 2002-69, 2002-2 C.B. 760 (copy attached hereto as Exhibit B-11), from 1996 through 2001, including the documents discussing the solicitation of CSFB as a potential participant in such a transaction and the documents reflecting CSFB’s consideration of such transactions and decision to participate in such transactions.

**CONTINUING COMMUNICATIONS**

20. The letters, memoranda, notes, e-mails, and other written communication in the files of CSFB exchanged by and/or between CSFB and E.On Benelux Generation N.V., E.On Energie A.G., or EZH, or representatives thereof, discussing the acquisition of EZH by Preussen

Elektra AG in connection with the Lease Transaction or the US treasury strip coupons identified in paragraph 16 above.

# EXHIBIT B-1

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| CONSOLIDATED EDISON COMPANY OF NEW YORK, INC. & SUBSIDIARIES, Plaintiff, | ) | FILED APR 19 2006 |
| v. | ) | No. 06-305 T |
| THE UNITED STATES, Defendant. | ) | |

COMPLAINT

Plaintiff, Consolidated Edison Company of New York, Inc. & Subsidiaries, brings this action for a refund of federal taxes paid in connection with the Internal Revenue Service's proposed adjustments to its federal tax return for the taxable year ending December 31, 1997. The adjustments are related to Plaintiff's investment in an electric generation facility located outside Rotterdam, The Netherlands.

In support of its refund claim, Plaintiff alleges as follows:

JURISDICTION AND SUMMARY OF ACTION

1. Plaintiff, Consolidated Edison Company of New York, Inc. & Subsidiaries ("Con Edison NY"), brings this refund action, founded upon the Internal Revenue Code of 1986, for the recovery of federal income tax paid by Plaintiff for the taxable year ended December 31, 1997 ("the 1997 taxable year").

2. Defendant is the United States of America.

3. This Court has jurisdiction by reason of 28 U.S.C. §§ 1346(a)(1) and 1491(a)(1) and 26 U.S.C. § 7422.

4. On or before September 9, 1998, Con Edison NY filed a timely federal consolidated income tax return for the 1997 taxable year with the Internal Revenue Service ("IRS") and timely paid income taxes in the amount of $291,003,408.

5. Con Edison NY's name, address, and identification number appearing on the 1997 tax return are: Consolidated Edison Company of New York, Inc. & Subsidiaries; 4 Irving Place, Room 615-S, New York, New York, 10003; and 13-5009340, respectively.

6. During the 1997 taxable year, Con Edison NY, through its subsidiaries, made an investment in an electric generation plant in The Netherlands. The plant is generally known as "RoCa3" and is owned by N.V. Electriciteitsbedrijf Zuid-Holland ("South Holland Electric"). This transaction is hereinafter referred to as the "RoCa3 Investment."

7. On its 1997 tax return, Con Edison NY reported rental income with respect to the RoCa3 Investment and deducted rental expense, amortization of expenses, and interest expense relating to the property and indebtedness incurred in the RoCa3 Investment, for a net loss of $937,331.

8. The IRS, during a routine audit of Con Edison NY's tax return for the 1997 taxable year, disputed Con Edison NY's tax treatment of the RoCa3 Investment.

9. On or about September 15, 2005, the IRS issued a Notice of Proposed Adjustment to Con Edison NY, proposing additional federal income of $937,331 for the 1997 taxable year with respect to the RoCa3 Investment.

10. The IRS's proposed adjustments resulted in a tax increase of $328,066, increasing Con Edison NY's federal income tax liability for the 1997 taxable year from $291,003,408 to $291,331,474.

11. On or about November 3, 2005, Con Edison NY paid the proposed tax deficiency of $328,066 to the IRS.

12. On or about December 2, 2005, Con Edison NY filed a Form 1040X (Amended U.S. Corporation Income Tax Return) with the IRS requesting a refund of erroneously paid federal income taxes for the 1997 taxable year in the amount of $328,066. The requested refund was solely attributable to Con Edison NY's payment of the proposed tax deficiency referred to in paragraphs 10 and 11 above. A true and complete copy of this claim for refund is attached as Exhibit A.

13. By a notice of disallowance dated March 15, 2005, the IRS disallowed Con Edison NY's claim for refund. A true and complete copy of this notice of disallowance is attached as Exhibit B.

14. The IRS's disallowance of Con Edison NY's claim for refund was erroneous.

15. Con Edison NY requests a refund of its overpayment of $328,066 of federal tax for the 1997 taxable year, plus interest and allowable costs.

16. No action on the claim for refund attached as Exhibit A has been taken by Congress or any agency of the United States or in any judicial proceeding, including any in the Tax Court of the United States.

17. Con Edison NY has timely filed this Complaint for a refund of federal taxes paid within two years of the date of the notice of disallowance as required under 26 U.S.C. § 6532(a).

18. Con Edison NY is the sole owner of the claim included in Exhibit A and asserted herein, and has made no assignment thereof.

## FACTUAL BACKGROUND

### A. Con Edison NY's Energy Business

19. At the time of the RoCa3 Investment, Con Edison NY was a widely-held and publicly-traded company on the New York Stock Exchange. It owned 100% of Consolidated Edison Development, Inc. ("Con Edison Development"), which in turn owned 100% of Consolidated Edison Leasing, Inc. ("Con Edison Leasing"). Con Edison NY has since become a wholly owned subsidiary of Consolidated Edison, Inc. ("CEI"), which also owns Con Edison Development as well. Like Con Edison NY before it, CEI is widely-held and publicly-traded on the New York Stock Exchange.

20. Con Edison NY is one of the nation's oldest and largest investor-owned energy companies with approximately $21 billion in assets. It is a regulated public utility that was incorporated in 1884 and currently delivers electric service to almost all of New York City and most of Westchester County – a service area having a population of approximately 9 million. Con Edison NY also supplies gas in parts of New York City and Westchester County. Con Edison NY also owns and operates the largest district steam system in the world, providing steam service in most of Manhattan.

21. Prior to the 1990s, Con Edison NY, as was the case with most electric utilities, offered electric service in a "bundled" format. In other words, Con Edison NY owned and operated the generation plants that produced electricity as well as the transmission and distribution systems that delivered the electricity to its customers. Con Edison NY owned gas-fired, oil-fired, and nuclear-powered plants with a total electric-generating capacity of 8,300 megawatts. As a regulated public utility, all of Con Edison NY's operations were subject to regulation by the New York Public Service Commission ("PSC").

## B. The Deregulation of Con Edison NY's Energy Business

22. Beginning in March 1993, the PSC took a number of steps to develop a competitive electric industry in the state of New York. This process commenced with the PSC's initiation of a proceeding entitled "Proceeding On Motion Of The Commission To Address Competitive Opportunities Available To Customers Of Electric And Gas Service And Develop Criteria For Utility Responses" (the "Competitive Opportunities Proceeding"). The purpose of the Competitive Opportunities Proceeding was to deregulate the electric generation plants owned by New York State utilities and to have the price for the output of those plants determined by market forces rather than through regulated rates.

23. The Competitive Opportunities Proceeding was divided into two phases. Phase I was designed to discuss, investigate, and address the issues involved in moving to a competitive marketplace. Phase II, commencing in August of 1994, involved a collaborative effort between electric utilities and other interested parties to develop models for restructuring the electric industry within New York.

24. Phase II of the process culminated with a May 1996 PSC Opinion stating the PSC's vision for the electric utility industry and ordering Con Edison and certain other major electric utilities in New York State to file plans describing how they would restructure their operations to bring about a competitive marketplace for, among other things, electric generation. The Opinion "strongly encouraged" the utilities to sell their generating plants to unregulated entities so as to facilitate the development of a competitive marketplace. The May 1996 PSC Opinion also invited utilities to propose the corporate structures, including unregulated subsidiaries, that would further the PSC's restructuring goals.

### C. Con Edison NY'S Response to Deregulation

25. As a result of the Competitive Opportunities Proceeding, Con Edison NY knew in the mid-1990s that it would be required to restructure its regulated businesses and allowed to expand into competitive unregulated businesses. Con Edison NY further understood that it might be required to sell most if not all of its electric generation plants and concluded that it should grow its business by (among other things) investing its capital in unregulated businesses and facilities. Con Edison NY also recognized that the PSC's rules were likely to prohibit Con Edison NY from reinvesting in electric generation plants within New York State.

26. Consequently, Con Edison NY began to develop a strategy that would allow it to effectively compete in a deregulated industry through the development and growth of unregulated businesses. Con Edison NY's strategy included, among other things, growth through the investment of capital in unregulated energy-related businesses and facilities outside of New York State.

27. In May 1995, Con Edison NY requested permission from the PSC to invest up to 5% (approximately $504 million) of its consolidated capital in unregulated subsidiaries that would (i) provide energy services; (ii) invest and/or participate in international energy infrastructure projects; and (iii) market its technical services.

28. In July 1996, the PSC issued an order (the "July 1996 Order") which deferred action on Con Edison NY's May 1995 request, but granted Con Edison NY authority to invest up to $50 million in unregulated subsidiaries which would invest in two of the three requested projects: the investment and/or participation in international energy infrastructure projects, and the marketing of technical services internationally. The PSC stated that these investments would be "largely international" and could be made through "development companies, investment funds, joint ventures, or other vehicles." In accordance with the PSC's plan to encourage

divestiture of public utility-owned electric generation plants, the PSC prohibited Con Edison NY from investing in any project that might provide electric energy to customers within New York State.

29. In response to the July 1996 Order, in October 1996 Con Edison NY formed a new subsidiary, Gramercy Development, Inc., to carry out the investments allowed by such Order. Gramercy Development, Inc. later changed its name to Con Edison Development.

30. In October 1996, Con Edison NY filed a rate and restructuring plan as mandated by the PSC. This plan also included a petition to adopt a holding company structure. Con Edison NY's restructuring plan proposed an approach to a competitive electric generation market that included, among other things, divestiture of its generating plants, a plan for retail competition, and a corporate reorganization into a holding company structure. The proposed holding company structure would allow Con Edison to form unregulated subsidiaries whose investment decisions would no longer require prior PSC approval.

31. In September 1997, the PSC and Con Edison NY ultimately agreed on a restructuring plan that was embodied in a Settlement Agreement ("the Settlement"). The Settlement included, among other things, (i) a new rate plan during the period of the transition to competition, (ii) a commitment by Con Edison NY to divest at least 50% of its New York City electric generation plants by 2002 to unregulated third parties so as to help implement a fully competitive market for electric generation, and (iii) authorization for Con Edison NY to form a holding company whose subsidiaries would consist of Con Edison NY and several unregulated subsidiaries, including Con Edison Development.

32. The Settlement permitted the new holding company to invest up to 5% of its consolidated capital in unregulated subsidiaries, consistent with Con Edison NY's May 1995

request. While the Settlement replaced the July 1996 Order, pursuant to a Statement of Policy dated July 17, 1998, the PSC imposed a prohibition against investments in electric generation assets in New York State by Con Edison NY's unregulated affiliates, albeit as a rebuttable presumption that such investments would unacceptably exacerbate the potential for the exercise of vertical market power.

33. As allowed by the Settlement, the shareholders of Con Edison NY formed CEI in January 1998. As part of the transition to a holding company structure, Con Edison NY and Con Edison Development, as well as several other unregulated subsidiaries of Con Edison NY, became subsidiaries of CEI.

34. In 1999, pursuant to the Settlement with the PSC, Con Edison NY completed the sales of almost 6,300 megawatts of its approximately 8,300 megawatts of electric generation assets for an aggregate price of $1.8 billion. In 2000, Con Edison NY entered into a contract to sell its nuclear-generating facilities, with electric generating capacity in excess of 900 megawatts, for an aggregate price of $502 million, not including fuel and other adjustments. That transaction closed in 2001. Today, the remaining electric generation assets owned by Con Edison NY are held in connection with, and are ancillary to, its steam generation business.

**D. The Business Of Con Edison Development**

35. Con Edison Development was formed to take advantage of the Con Edison group's expertise in the construction and operation of electric generating plants and to pursue energy-related investments on a world-wide basis free from regulation by the PSC.

36. Con Edison Development's initial business plan, formulated in 1997, was a long-term plan which was designed to take advantage of the world-wide trend to deregulation and envisioned Con Edison Development's potential growth into a worldwide integrated utility business. However, because the growth into unregulated investments, particularly those outside

New York State, was a new venture for the Con Edison group, Con Edison Development adopted a gradual and measured approach to these investments.

37. As the initial step in its business plan, Con Edison Development focused on three categories of investment: (i) development of new energy projects, such as electric power generation; (ii) acquisition of existing infrastructure, including portions of operating electric, gas, thermal, and water utilities; and (iii) leasing portions of energy systems, such as power plants or distribution systems. Con Edison Development also planned to market technical services regarding the design, building, operation, and management of modern utilities.

38. Pursuant to this strategy, Con Edison Development began to participate in energy-related projects through investments operated by others, such as investments in energy funds. In July 1997, Con Edison Development made its first energy infrastructure investment, namely a capital commitment to provide up to $5 million to a fund sponsored by Energy Investors Fund called Project Finance Fund III, LP. Project Finance III utilized the funds received from Con Edison Development and other similar equity investors to invest in energy and infrastructure projects worldwide.

39. Con Edison Development also relied on outside consultants to locate potential international energy infrastructure investment opportunities. In March 1997, Con Edison Development entered into an agreement with International Energy Partners, L.P. ("IEP"). IEP had a portfolio of international energy infrastructure investment opportunities that it was pursuing. Pursuant to this agreement, Con Edison Development was given preferred rights to participate in certain investment opportunities identified by IEP.

40. One of the earliest opportunities presented to Con Edison Development by IEP was a minority investment in a relatively small power facility (42 megawatts) in Eastern

Guatemala, generally known as Generadora Electrica del Norte, Limitada ("Genor"). Con Edison Development acquired and still owns indirectly through subsidiaries a 49% interest in Genor; the remaining 51% is owned by local investors.

41. Con Edison Development also explored leasing investments in energy facilities. Con Edison Development was interested in investing through leases because these investments (i) provided highly predictable and front-loaded earnings; (ii) achieved good to excellent investment yields; (iii) were less risky than direct ownership of operating assets; and (iv) could be implemented more quickly than direct investments in projects requiring a long development cycle. Leases, from Con Edison Development's perspective, also provided a means to (i) forge relationships with utilities abroad that would allow for further opportunities in the future; (ii) compete effectively with other domestic entities already involved in overseas investments; and (iii) diversify risk in terms of operations and geography. Con Edison Development was interested in potential leasing investments in Europe, Australia, and the U.S.

42. Consistent with its objective of gradually becoming a worldwide integrated utility business, Con Edison Development searched for opportunities related to utilities undergoing privatization in Central and South America, Europe, Southeast Asia, and the United States. Employees of the Con Edison group spent significant amounts of time in China, Australia, the Philippines, Mexico, El Salvador, Argentina and Nicaragua pursuing energy infrastructure investments and other potential energy-related businesses (such as the marketing of technical services).

43. Con Edison Development continued to pursue energy infrastructure investments both inside and outside the United States until the late 1999 to early 2000 time frame. At that time, a business decision was made to focus on energy infrastructure opportunities in the United

States, in particular the Northeast and Mid-Atlantic states (other than New York State). This decision was based on a number of considerations, including (i) marketplace pricing indicated that the risks inherent in energy infrastructure investments outside the United States could no longer be justified in light of anticipated returns on such investments, particularly in relation to the anticipated returns and risks on such investments inside the United States, and (ii) the recognition that Con Edison Development and its affiliates could better employ their expertise in the energy markets and the electric utility industry inside the United States, particularly in the Northeast and Mid-Atlantic states.

E. **The RoCa3 Investment**

44. During 1997, Con Edison Development developed plans and guidelines for its future growth as an unregulated subsidiary of the Con Edison group. Con Edison Development also began to identify possible investment prospects, including a number of leasing investments.

45. Consistent with its business plan, one of the projects identified by Con Edison Development during 1997 as a potential leasing investment was a recently constructed 220 megawatt gas-fired combined cycle electric generation plant outside of Rotterdam, The Netherlands. The plant is named "RoCa3," after its location on the border between Rotterdam and Capelle aan den IJssel, and is next to two previously constructed plants. The RoCa3 plant has at all relevant times been owned by South Holland Electric, an electric generation company in The Netherlands that has been involved in the coordination and transport of electrical energy in the province of Zuid-Holland since 1941, and in the production of heat and electricity since 1987.

46. At the time Con Edison Development was considering an investment in the RoCa3 plant, The Netherlands and the European Union were also in the process of deregulating electric generation facilities.

47. Since Con Edison Development did not have prior experience in complex leasing transactions, it decided to invest in conjunction with experienced market participants. In the case of the RoCa3 Investment, Con Edison Development decided to make its investment jointly with Banc One Leasing Corp. ("Banc One").

48. Before making a decision to proceed with the RoCa3 Investment, Con Edison Development considered many factors, including (i) South Holland Electric's business and creditworthiness; (ii) conditions in the energy markets for The Netherlands and Europe; (iii) the political, legal, and economic climate of The Netherlands; (iv) the economic return and accounting income of the RoCa3 Investment; (v) the quality of the RoCa3 plant; (vi) the connection between the RoCa3 plant and the Con Edison group's core business activities;; and (vii) the terms of the transaction. Con Edison Development also considered the potential risks and benefits associated with its residual value interest in the RoCa3 plant. In the leasing context, residual value refers to the remaining useful life and value of an asset at the end of the lease of that asset.

49. Con Edison Development retained a number of consultants to assist in its review of the RoCa3 Investment.

50. On behalf of Con Edison Development and Banc One, Duke Engineering & Services ("Duke Engineering") performed a comprehensive engineering review of the RoCa3 plant's technology. Duke Engineering made a site visit to inspect the RoCa3 plant, interviewed key plant personnel, and reviewed plant documents.

51. Duke Engineering found the RoCa3 plant's design and components to be of high quality using state-of-the-art proven technology and rated the RoCa3 plant as "above average" in each of the four factors that contribute to a plant's useful life. Duke Engineering further

concluded that the RoCa3 plant complied with current environmental regulations; that its fuel supply was adequate under the current purchasing agreements; and that South Holland Electric's maintenance philosophy, practices, and facilities were better than average.

52. On behalf of Con Edison Development and Banc One, Tauw Milieu bv ("Tauw Milieu") conducted an environmental, health, and safety assessment of the RoCa3 plant. Tauw Milieu performed an on-site inspection, interviewed South Holland Electric personnel, and reviewed applicable environmental laws and regulations in conducting its review.

53. Tauw Milieu concluded that the RoCa3 plant's environmental condition was very good and that it was in substantial compliance with all applicable environmental and health and safety requirements.

54. On behalf of Con Edison Development and Banc One, Deloitte & Touche performed a comprehensive valuation assessment of the RoCa3 plant. Deloitte & Touche conducted a physical inspection of the RoCa3 plant, interviewed South Holland Electric personnel, and analyzed the power industry in The Netherlands and its regulatory environment, natural gas resources, and the Dutch natural gas industry.

55. To arrive at a fair market value for the RoCa3 plant, Deloitte & Touche analyzed South Holland Electric's financial statements, the RoCa3 plant's construction expenses and projected operating and other expenses, comparable market transactions, and similar publicly listed companies. Deloitte & Touche then studied historical power plant useful life data to determine the RoCa3 plant's useful life and residual value. Finally, Deloitte & Touche assessed the various options available to South Holland Electric and Con Edison Development under the proposed Investment.

56. Deloitte & Touche concluded that, as of December 15, 1997, the proposed closing date for the RoCa3 Investment, the RoCa3 plant had a remaining useful life of at least 54 years.

57. In addition to the work performed by these consultants, Con Edison Development sent a team of its own and Con Edison NY employees to inspect the RoCa3 plant and to discuss the plant's operations with South Holland Electric's engineers.

58. Based upon its extensive review of the proposed RoCa3 Investment, the board of directors of Con Edison Development approved the RoCa3 Investment on December 10, 1997. The major benefits of the transaction were identified as follows:

(1) Highly predictable earnings

(2) Front loaded earnings under FASB accounting rules

(3) Good to excellent investment yields

(4) Relatively low risk

(5) Tax benefits of leasing

(6) Strategic value of leasing, *i.e.*, the ability to more fully understand the legal, regulatory, commercial and tax environment in The Netherlands and the European Union, thus providing the basis for better informed decisions regarding potential future investments.

59. Con Edison expected a pre-tax economic profit of at least $60 million from the RoCa3 Investment. This pre-tax profit would provide an internal rate of return of approximately 3% to 4%.

60. Con Edison Development expected that the yield on the RoCa3 Investment for accounting and financial reporting purposes would be in excess of 12%.

61. On December 15, 1997, Con Edison Development, through its subsidiary Con Edison Leasing, and South Holland Electric entered into a lease and sublease of RoCa3, whereby Con Edison Leasing leased an undivided 47% interest in the RoCa3 plant from South Holland

Electric for approximately 43.2 years ("the Headlease"), and then subleased the RoCa3 plant back to South Holland Electric for approximately 20.1 years ("the Sublease"). Banc One entered into a similar Headlease and Sublease for the remaining interest in the RoCa3 plant.

62. Con Edison Leasing formed a trust to enter into the various leases and other agreements that were involved in the RoCa3 Investment. The role of the trust has no effect on the tax treatment of the RoCa3 Investment. Thus, for simplicity, this Complaint describes the RoCa3 Investment as if Con Edison Leasing had invested directly in the RoCa3 Investment.

63. Under the Headlease, Con Edison Leasing, as lessee, is obligated to make two lump-sum payments of rent to South Holland Electric. The first payment was due in 1997 at the beginning of the Headlease, and the second payment is due in 2041 at the end of the Headlease. The amounts of these rent payments were based on the fair market rental value of the RoCa3 plant as of December 15, 1997.

64. Con Edison Leasing funded its initial payment of rent under the Headlease by investing $39,320,000 of its own cash and by borrowing $80,792,270.36 from Hollandsche Bank-Unie N.V. ("Hollandsche"). Con Edison Leasing also paid $4,125,000 in transaction costs in connection with entering into the RoCa3 Investment.

65. At the end of the Headlease in 2041, the RoCa3 plant will have a remaining useful life of at least 10.8 years. This period is 20% of the 54-year useful life of the RoCa3 plant as of December 15, 1997, as determined by Deloitte & Touche. Tax law has long recognized that if an asset has a residual life at the end of the lease of 15% of the asset's original useful life, then the lease qualifies as a "true lease" for federal income tax purposes.

66. Deloitte & Touche also determined that at the end of the Headlease, the RoCa3 plant will have a remaining residual value of at least 20% of the fair market value of the RoCa3

plant as of December 15, 1997. Tax law has long recognized that if an asset has a residual value at the end of the lease of 15% of the asset's original cost, then the lease qualifies as a "true lease" for federal income tax purposes.

67. The Sublease set forth the terms under which Con Edison Leasing leased its undivided interest in the RoCa3 plant to South Holland Electric. Events of default under the Sublease include South Holland Electric's failure to make rent payments, declaration or filing of bankruptcy, failure to maintain RoCa3, and failure to maintain appropriate insurance. Con Edison Leasing's remedies upon a default include causing South Holland Electric to return Con Edison Leasing's interest in the RoCa3 plant.

68. At the end of the 20.1-year term of the Sublease from Con Edison Leasing to South Holland Electric, South Holland Electric has an option to purchase Con Edison Leasing's remaining 23.1-year interest in the RoCa3 plant at a fixed price. Deloitte & Touche determined that the price of South Holland Electric's purchase option will exceed the fair market value of the 23.1-year interest it would obtain and, therefore, South Holland Electric is not likely to exercise that option.

69. If South Holland Electric does not exercise its purchase option, then Con Edison Leasing, as lessee, has the opportunity to earn additional income by (i) claiming possession of its interest in the RoCa3 plant for the remaining 23.1 years of the Headlease; (ii) subleasing the RoCa3 plant to a third party for the remaining 23.1 years; or (iii) renewing the Sublease with South Holland Electric for an additional 16.5 years through the exercise of a "Renewal Option."

70. Deloitte & Touche determined that the fixed price of the rental payments due from South Holland Electric under Con Edison Leasing's Renewal Option will be below the fair

market rental value for a lease of a similar facility during the 16.5 year renewal term and, therefore, Con Edison Leasing is not likely to exercise its Renewal Option.

71. If South Holland Electric does not exercise its purchase option and Con Edison Leasing does not exercise its Renewal Option, which Deloitte & Touche indicated is the most likely outcome, then Con Edison Leasing will have possession of its interest in the RoCa3 plant for the 23.1 years remaining under the Headlease, which is 53.5% of its 43.2-year term. If Con Edison Leasing does exercise its Renewal Option, then at the end of the Renewal Option, Con Edison Leasing will have possession of its interest in the RoCa3 plant for the 6.7 years remaining under the Headlease, which is 15.5% of its 43.2-year term. In either case, Con Edison Leasing will have a residual interest in the RoCa3 plant that is greater than 15% of the Headlease term. The value of Con Edison Leasing's residual interest in the RoCa3 plant is also expected to be significantly higher than 15%.

72. At the end of either (i) the Sublease in 2017 or (ii) the Renewal Option term in 2034, as applicable, South Holland Electric is obligated to return to Con Edison Leasing its undivided interest in the RoCa3 plant in its original condition, ordinary wear and tear excepted, and the plant must pass certain specified redelivery acceptance tests. Duke Engineering anticipated that the plant would meet the requirements stated in the transaction and expected that the plant would be in similar or better operational condition as compared to equivalent power plants because of the high quality of the original equipment and design features.

73. South Holland Electric is the operator of the RoCa3 plant during the term of the Sublease. Con Edison Leasing, Banc One, and South Holland Electric entered into agreements providing for the operation and maintenance of RoCa3 upon the expiration of the Subleases to South Holland Electric. Pursuant to these agreements, Con Edison Leasing and Banc One have

the right to remove South Holland Electric as the operator of the RoCa3 plant upon the expiration of the Subleases.

74. In entering into the RoCa3 Investment, Con Edison Leasing assumed a significant amount of risk, including the risk that South Holland Electric would not be able to make or would refuse to make its required rent payments, the risk that South Holland Electric would go bankrupt, and the risk that the leased equipment would be damaged or otherwise suffer an unanticipated diminution in value.

75. As lessor under the Headlease, South Holland Electric assumed the risk that Con Edison Leasing would be unable to make the second lump-sum rent payment due under the terms of the Headlease.

76. Hollandsche, Con Edison Leasing's lender, assumed the risk that Con Edison Leasing would be unable to make the required loan payments.

77. As is typical in conservatively structured transactions, the RoCa3 Investment included a number of features that were designed to reduce the financial risks assumed by the parties. These features included collateral deposits, pledges of collateral, and an early buy-out option. However, these features did not and could not insulate Con Edison Leasing or the other parties from all risks presented by the RoCa3 Investment.

## COUNT ONE: THE IRS'S PROPOSED TAX TREATMENT OF THE RoCa3 INVESTMENT WAS ERRONEOUS

### A. The Headlease and Sublease Between Con Edison Leasing and South Holland Electric Should Be Respected Because Con Edison Leasing Retains Sufficient Benefits and Burdens of Ownership With Respect To Its Leasehold Investment in the Roca3 Plant

78. Con Edison NY reincorporates by reference and re-alleges the facts set forth in paragraphs 1 through 77 above.

79. Generally, a lease is an arrangement where one party (the "lessor") has a property interest in an asset or a right to use an asset and provides possession and the right to use that asset to another party (the "lessee") for a fixed period of time in exchange for payment of rent.

80. For federal income tax purposes, a lease arrangement will be respected as a "true lease" (instead of a loan or other form of transaction) if the lessor retains sufficient benefits and burdens of ownership. This determination generally depends on whether the lessor has a meaningful equity investment in the asset throughout the entire lease term and a meaningful residual interest in the asset at the end of the lease term. Decades of judicial authority have found a 15% residual value to be meaningful. Thus, if at the end of the lease term, the asset is expected to have a remaining useful life (and remaining value) equal to at least 15% of its original estimated useful life (and original cost), the arrangement will be respected for tax purposes as a true lease or sublease, as the case may be.

81. The lessor in a lease transaction can use either equity or a combination of equity and debt to finance the purchase or lease of the asset. When a lessor uses non-recourse debt to finance the purchase or lease of the asset, the transaction is called a leveraged lease.

82. In a typical leveraged lease transaction, an investor purchases or leases an asset and borrows money to finance some or all of the investment. The investor then leases the asset to a third party who uses the asset in its business operations. In this type of transaction, it is a common business practice for the investor to lease the asset to the party which originally sold or leased it to the investor, *i.e.*, a "sale-leaseback" or "lease-leaseback" transaction.

83. In leveraged lease transactions the lessor will earn profits from the rent payments it receives and from the residual value of the property once the lease expires. Additionally, a leveraged lease transaction will often provide a benefit in the form of a limited tax deferral, in

which an amount of federal income tax that would otherwise have been paid one year is deferred until a later year. This is so because leveraged lease transactions often produce losses for federal income tax purposes in the early years of the transaction due to depreciation, rental expense, amortization, and interest deductions. These losses are offset by profits or gains for federal income tax purposes in the later years of the transaction. This tax deferral effect of leveraged lease transactions has been approved by the courts and the IRS for many years.

84. The RoCa3 Investment, entered into by Con Edison Leasing and South Holland Electric on December 15, 1997, was a leveraged lease transaction because a portion of Con Edison Leasing's investment was financed through a non-recourse loan from Hollandsche.

85. The Headlease from South Holland Electric to Con Edison Leasing and the Sublease from Con Edison Leasing to South Holland Electric both qualify as leases for federal tax purposes because in each case (i) the leases transferred possession of the property interest in return for the obligation to pay rent and provided for transfer of possession back to the lessor in the event of a default, and (ii) the lessors' return depended upon the residual value of the property at the end of the respective lease.

**B. Con Edison NY Properly Reported the RoCa3 Investment on Its 1997 Tax Return**

86. Con Edison NY properly reported income and claimed deductions on its 1997 tax return in connection with the RoCa3 Investment.

87. As lessee under the Headlease, Con Edison Leasing is required to make rent payments to South Holland Electric. Con Edison Leasing accrued rental deductions on its 1997 tax return for these payments in accordance with the terms of the Headlease.

88. As lessee under the Sublease, South Holland Electric is required to make rent payments to Con Edison Leasing. Con Edison Leasing accrued income on its 1997 tax return with respect to these payments in accordance with the terms of the Sublease.

89. Section 467 of the Internal Revenue Code generally requires rent to be allocated to tax periods in accordance with the terms of a lease, except as otherwise required by section 467. Section 467 also authorizes the IRS to issue regulations regarding the allocation of rental payments to tax periods. Although section 467 was enacted in 1984, the Treasury Department did not promulgate final regulations pursuant to section 467 until 1999, that is, nearly 15 years later.

90. On June 3, 1996, before Con Edison Leasing entered into the RoCa3 Investment, the Treasury Department issued "proposed" regulations under Section 467 of the Internal Revenue Code (the "Proposed Section 467 Regulations"). These regulations, however, were not made final until May 18, 1999 (the "Final Section 467 Regulations").

91. Certain provisions of the Proposed Section 467 Regulations could have altered the method in which Con Edison Leasing reported the rental expense and income resulting from the Headlease and Sublease, respectively, on its 1997 income tax return, but these provisions were not applicable to leases that were entered into prior to the Final Section 467 Regulations as long as the allocation of rent agreed to by the parties was not designed for the principal purpose of avoiding income tax.

92. Both the Proposed Section 467 Regulations and the Final Section 467 Regulations contain a "safe harbor" provision. This provision states that the avoidance of income tax will not be considered to be a principal purpose for the method of allocating rent agreed to by the parties

if the rent allocated to each calendar year is no more than 10% higher or lower than the average rent for all calendar years under the lease.

93. The rent allocation contained in the Headlease and Sublease met the 10% "safe harbor" rule that is contained in the Proposed Section 467 Regulations and the Final Section 467 Regulations. Under the IRS's own rules, the rent allocation methodology in each of the leases is not considered to be for the principal purpose of avoiding income tax. Because the allocations of rent under the Headlease and Sublease satisfied the 10% safe harbor provision, Con Edison NY's reported rental expense deductions and rental income from the RoCa3 Investment as reported on its 1997 income tax return complied with the Proposed Section 467 Regulations and the Final Section 467 Regulations.

94. Con Edison NY properly reported deductions for accrual of interest expense with respect to its loan from Hollandsche.

95. Con Edison NY properly reported deductions for the amortization of transaction costs incurred with respect to the RoCa3 Investment.

**COUNT TWO: CON EDISON NY IS ENTITLED TO A REFUND OF TAXES**

96. Con Edison NY incorporates by reference and re-alleges the facts set forth in paragraphs 1 through 95 above.

97. Pursuant to 26 U.S.C. §§ 61 and 467, Con Edison NY included a total of $399,963 in rental income on its income tax return for the 1997 taxable year with respect to South Holland Electric's obligation to pay rent under the terms of the Sublease.

98. Pursuant to 26 U.S.C. §§ 162(a)(3), 167, and 467, Con Edison NY deducted a total of $1,082,350 in rental expense and transaction costs on its income tax return for the 1997

taxable year as a result of the rental payments made to South Holland Electric under the terms of, and in amortization of transaction costs relating to, the Headlease.

99. Pursuant to 26 U.S.C. § 163, Con Edison NY deducted a total of $254,944 in interest expense on its income tax return for the 1997 taxable year as a result of interest accruing on the bank loan it obtained to fund a portion of its rental payments under the Headlease.

100. The IRS proposed to disallow all of Con Edison NY's deductions for (i) rental payments required to be made to South Holland Electric under the terms of the Headlease, (ii) the interest payments required to be made to Hollandsche, and (iii) the amortization of transaction costs.

101. The IRS also proposed to reduce Con Edison NY's rental income by the amount of rental payments due from South Holland Electric under the Sublease.

102. These proposed adjustments had the effect of recalculating Con Edison NY's taxable income for the 1997 taxable year as if Con Edison NY had not engaged in the RoCa3 Investment.

103. The changes proposed by the IRS increased Con Edison NY's taxable income for the 1997 taxable year by a net amount of $937,331.

104. As a result of this proposed increase in taxable income, the IRS demanded an additional $328,066 in federal income tax from Con Edison NY for the 1997 taxable year.

105. On or about November 3, 2005, Con Edison NY paid to the IRS at Chicago, Illinois the proposed tax deficiency of $328,066.

106. The adjustments made by the IRS to Con Edison NY's taxable income for the 1997 taxable year were contrary to controlling tax law, and Con Edison NY is entitled to a

complete refund of the $328,066 of federal income taxes erroneously paid with respect to the RoCa3 Investment.

## DEMAND FOR JUDGMENT

WHEREFORE, Con Edison of NY respectfully requests that this Court enter judgment in its favor and against the Defendant in the amount of $328,066, plus interest and costs allowed by law, and provide such other relief as the Court may deem just.

Respectfully submitted this 18th day of April, 2006.

Respectfully Submitted,

Thomas C. Durham
MAYER, BROWN, ROWE & MAW LLP
71 South Wacker Drive
Chicago, Illinois 60606
Tel: (312) 701-7216
Fax: (312) 706-9187
tdurham@mayerbrownrowe.com

Attorney for Plaintiff

OF COUNSEL:

David F. Abbott
Brian P. Trauman
MAYER, BROWN, ROWE & MAW LLP
1675 Broadway
New York, New York 10019
Tel: (212) 506-2500
Fax: (212) 262-1910

Nicole Bielawski
MAYER, BROWN, ROWE & MAW LLP
1909 K Street, N.W.
Washington, D.C. 20217
Tel: (202) 263-3000
Fax: (202) 263-3300

# EXHIBIT B-2

SUISSE

One Cabot Square
London E14 4QJ

Telephone 0171 888 2000
Facsimile 0171 888 1600

December 15, 1997

CONSOLIDATED EDISON LEASING, INC.
c/o Consolidated Edison Development, Inc.
111 Broadway
8th Floor
New York, NY 10006

Ladies and Gentlemen:

You have requested Credit Suisse Financial Products to indicate whether 7.10% per annum, compounded annually (equivalent to 6.98% per annum, compounded semi-annually) is the appropriate market rate for the Debt Defeasance Deposit (as described below).

Reference is made to the participation agreement dated as of December 15, 1997 (the "Participation Agreement") among n.v. Electriciteitsbedrijf Zuid-Holland, Hollandsche Bank-Unie N.V., Wilmington Trust Company, not in its individual capacity, except as otherwise expressly provided therein, but solely as trustee, and Consolidated Edison Leasing, Inc.

Please note that except as otherwise defined herein, all capitalised terms used herein shall have the meanings set forth in Appendix A to the Participation Agreement or in the other Operative Documents.

The transaction involves the lease of an Undivided Interest in certain Property Rights from EZH, as Lessor, to the Trustee, as Lessee, and a sublease of the Undivided Interest from the Trustee as Sublessor, to EZH, as Sublessee. The Trustee will issue fixed-rate U.S.-dollar-denominated limited recourse loan certificates to the Lender and will use the proceeds, together with funds obtained from the Investor to effect the payment or prepayment of a portion of Lease Basic Rent.

The Loan is recourse only to, and is secured by, (i) the Trustee's interest in the Undivided Interest (subject to German Leases) and the Trustee's rights (other than Excepted Rights and Excluded Payments) under the Operative Documents, and (ii) a repledge of the Debt Defeasance Deposit and certain other property securing Sublease Rent.

EZH, through the debt defeasance foundation will place the Debt Defeasance Deposit with the Deposit Bank. The defeasance deposit with the Defeasance Deposit Bank will be a fixed rate US $ denominated deposit with a final maturity of 20.05 years and average life of 26.74 years (the "Debt Defeasance Deposit Average Life"). The Debt Defeasance Deposit will rank pari passu with the senior, unsecured indebtedness of the Deposit Bank.

**CE 007200**

With respect to the Debt Defeasance Deposit in the initial amount of US$ 80,792,270.36, it is our judgement that the interest rate of 7.10% per annum, compounded annually (equivalent to 6.98% per annum, compounded semi-annually) is the appropriate commercially reasonable market rate for such deposit considering the long term unsecured credit worthiness of the Deposit Bank, the term and schedule of deposits into and withdrawals from such Debt Defeasance Deposit and the Deposit Bank's long term funding needs in conjunction with market supply and demand conditions for such source of funding at the time.

While there may be other interest rates for the deposit which we have considered and which may, in our opinion, also be commercially reasonable, we have no basis for concluding that such rates would be more appropriate for the Debt Defeasance Deposit.

It should be noted that the market for a long-term deposit is relatively illiquid and therefore there is a range of market interest rates which is dependent on market supply and demand conditions at the time. Quotes may vary daily based on a number of factors including, but not limited to, general economic and market conditions, prevailing interest rates, actions by Central Banks or other agencies or external political or societal events.

This letter is provided at your request and is intended for your internal use, use by you in connection with any tax proceeding and use by your counsel, as well as for internal use by your successors, permitted assigns, proposed assigns and their counsel, in each case only in connection with this transaction.

Very truly yours,

CREDIT SUISSE FINANCIAL PRODUCTS

By:
Name: Aarnout M. Snouck Hurgronje
Title: Director

CE 007201

# EXHIBIT B-3

One Cabot Square
London E14 4QJ
Telephone 0171 888 2000
Facsimile 0171 888 1600

December 15, 1997

CONSOLIDATED EDISON LEASING, INC.
c/o Consolidated Edison Development, Inc.
111 Broadway
8th Floor
New York, NY 10006

Ladies and Gentlemen:

You have requested Credit Suisse Financial Products to indicate whether 7.10% per annum, compounded annually (equivalent to 6.98% per annum, compounded semi-annually) is the appropriate market rate for the Loan (as described below).

Reference is made to the participation agreement dated as of December 15, 1997 (the "Participation Agreement") among n.v. Electriciteitsbedrijf Zuid-Holland, Hollandsche Bank-Unie N.V., Wilmington Trust Company, not in its individual capacity, except as otherwise expressly provided therein, but solely as trustee, and Consolidated Edison Leasing, Inc.

Please note that except as otherwise defined herein, all capitalised terms used herein shall have the meanings set forth in Appendix A to the Participation Agreement or in the other Operative Documents.

The transaction involves the lease of an Undivided Interest in certain Property Rights from EZH, as Lessor, to the Trustee, as Lessee, and a sublease of the Undivided Interest from the Trustee as Sublessor, to EZH, as Sublessee. The Trustee will issue fixed-rate U.S.-dollar-denominated limited recourse loan certificates to the Lender and will use the proceeds, together with funds obtained from the Investor to effect the payment or prepayment of a portion of Lease Basic Rent.

The Loan is recourse only to, and is secured by, (i) the Trustee's interest in the Undivided Interest (subject to German Leases) and the Trustee's rights (other than Excepted Rights and Excluded Payments) under the Operative Documents, and (ii) a repledge of the Debt Defeasance Deposit and certain other property securing Sublease Rent. The Loan has a final maturity to the reset date of approximately 20.05 years and an average life of 26.74 years (the "Loan Average Life").

With respect to the Loan, in the initial amount of U.S. $80,792,270.36, it is our judgement that the interest rate of 7.10% per annum, compounded annually (equivalent to 6.98% per annum, compounded semi-annually) is the appropriate commercially reasonable market rate

CE 007202

of such Loan, based on the market rates as of the Closing Date, and considering the credit of the Sublessee, the upfront fee to be paid, the security interests granted to the Lender (subject to the German Leases) and the Loan Average Life.

While there may be other interest rates for the Loan which we have considered and which may, in our opinion, also be commercially reasonable, we have no basis for concluding that any such rates would be more appropriate for the Loan. It was assumed that the Deposit securing the Loan is a cash balance that will be held at the Deposit Bank which will have a credit rating of at least AA by Standard & Poor's and Aa by Moody's Investor Service. The documents provide that the Deposit Bank can be replaced if credit quality deteriorates.

We have calculated this rate using the 10-year 6.125% U.S. Treasury Note of August 15, 2007 and the 30-year 6.125% U.S. Treasury Bond of November 15, 2027 each as of the close of business on December 9, 1997. Using these benchmarks, the interpolated U.S. Treasury Note yield with a maturity equal to the loan Average Life is 6.17% per annum, compounded annually (equivalent to 6.08% per annum, compounded semi-annually). Adding to the 6.17% per annum, compounded annually (equivalent to 6.08% per annum, compounded semi-annually) base rate a spread of approximately 90 basis points on the semi-annual base rate translates into a U.S. dollar interest rate of 7.10% per annum, compounded annually (equivalent to 6.98% per annum, compounded semi-annually).

It should be noted that the market for a long-term loan is relatively illiquid and therefore there is a range of market interest rates, which is dependent on market supply and demand conditions at the time. Quotes may vary daily based on a number of factors including, but not limited to, general economic and market conditions, prevailing interest rates, actions by Central Banks or other agencies or external political or societal events.

This letter is provided at your request and is intended for your internal use, use by you in connection with any tax proceeding and use by your counsel, as well as for internal use by your successors, permitted assigns, proposed assigns and their counsel, in each case only in connection with this transaction.

Very truly yours,

CREDIT SUISSE FINANCIAL PRODUCTS

By:
Name: Aarnout M. Snouck Hurgronje
Title: Director

CE 007203

# EXHIBIT B-4

SUISSE

One Cabot Square
London E14 4QJ

Telephone 0171 888 2000
Facsimile 0171 888 1600

December 15, 1997

CONSOLIDATED EDISON LEASING, INC.
c/o Consolidated Edison Development, Inc.
111 Broadway
8th Floor
New York, NY 10006

Ladies and Gentlemen:

You have requested Credit Suisse Financial Products to indicate whether 6.86% per annum, compounded annually (equivalent to 6.75% per annum, compounded semi-annually) is the appropriate market rate for the Lease Collateral Deposit (as described below).

Reference is made to the participation agreement dated as of December 15, 1997 (the "Participation Agreement") among n.v. Electriciteitsbedrijf Zuid-Holland, Hollandsche Bank-Unie N.V., Wilmington Trust Company, not in its individual capacity, except as otherwise expressly provided therein, but solely as trustee, and Consolidated Edison Leasing, Inc.

Please note that except as otherwise defined herein, all capitalised terms used herein shall have the meanings set forth in Appendix A to the Participation Agreement or in the other Operative Documents.

The transaction involves the lease of an Undivided Interest in certain Property Rights from EZH, as Lessor, to the Trustee, as Lessee, and a sublease of the Undivided Interest from the Trustee as Sublessor, to EZH, as Sublessee. The Trustee will issue fixed-rate U.S.-dollar-denominated limited recourse loan certificates to the Lender and will use the proceeds, together with funds obtained from the Investor to effect the payment or prepayment of a portion of Lease Basic Rent.

Lease Basic Rent not paid or prepaid on the Closing Date will be deferred, with no accrual of interest, until the Lease Termination Date. A portion of the deferred Lease Basic Rent will represent a recourse obligation of the Investor and the remainder of such Lease Basic Rent will be non-recourse. Lease Basic Rent will be secured by, among other things, the Lease Collateral Deposit.

The Trustee, as Sublessor, will enter into the Sublease for a term of 20.05 years. At the end of the Sublease Basic Term, the Sublessee, may either: (1) exercise the Sublease Purchase Option to acquire the Sublessor's Lease Interest and assume the Trustee's obligations under the Lease; or (2) return the Undivided Interest to the Trustee. If the Sublease Purchase Option is not exercised, the Trustee has the option to require the Sublessee to renew the Sublease for a 16.45 year renewal term. If the Sublessee exercises the Sublease Purchase Option, the Lease Collateral Deposit will not be established by the Trustee.

CE 007204

If the Sublessee does not exercise the Sublease Purchase Option, (i) if the Trustee exercises the Sublease Renewal Option, the Trustee will use a portion of the Sublease Renewal Rent to make serial investments in the Lease Collateral Deposit with the Lease Collateral Deposit Bank and (ii) if the Trustee does not exercise the Sublease Renewal Option, either (a) the Trustee will sublease the Undivided Interest to an entity other than EZH (the "Alternative Sublease") and will fund the Lease collateral Deposit using rent from the Alternative Sublease or (b) the Trustee will operate the Undivided Interest for its own account and will fund the Lease Collateral Deposit from operating profits or (c) the Sublessor's Lease Interest may be sold or otherwise transferred. The Lease Collateral Deposit will be pledged to the Lessor to secure Lease Basic Rent. The Lease Collateral Deposit will be a fixed-rate, U.S.-dollar-denominated deposit with a final maturity of approximately 20 years. The Lease Collateral Deposit will rank pari passu with the senior, unsecured indebtedness of the Lease Collateral Deposit Bank.

With respect to the Lease Collateral Deposit, it is our judgement that the interest rate of 6.86% per annum, compounded annually (equivalent to 6.75% per annum, compounded semi-annually) is the appropriate commercially reasonable market rate to assume you will be able to obtain in the future at the relevant time for such deposit considering the long term unsecured credit worthiness of the Lease Collateral Deposit Bank, the term and schedule of deposits into and withdrawals from such Lease Collateral Deposit and the Lease Collateral Bank's long term funding needs in conjunction with market supply and demand conditions for such source of funding at the time.

While there may be other interest rates for the Lease Collateral Deposit which we have considered and which may, in our opinion, also be commercially reasonable, we have no basis for concluding that any such rates would be more appropriate for the Lease Collateral Deposit.

It should be noted that the market for a long-term deposit is relatively illiquid and therefore there is a range of market interest rates which is dependent on market supply and demand conditions at the time. Quotes may vary daily based on a number of factors including, but not limited to, general economic and market conditions, prevailing interest rates, actions by Central Banks or other agencies or external political or societal events.

This letter is provided at your request and is intended for your internal use, use by you in connection with any tax proceeding, and use by your counsel, as well as for internal use by your successors, permitted assigns, proposed assigns and their counsel, in each case only in connection with this transaction.

Very truly yours,

CREDIT SUISSE FINANCIAL PRODUCTS

By: ______________________
Name: Aarnout M. Snouck Hurgronje
Title: Director

CE 007205

# EXHIBIT B-5

One Cabot Square
London E14 4QJ
Telephone 0171 888 2000
Facsimile 0171 888 1600

December 15, 1997

CONSOLIDATED EDISON LEASING, INC.
c/o Consolidated Edison Development, Inc.
111 Broadway
8th Floor
New York, NY 10006

Ladies and Gentlemen:

You have requested Credit Suisse Financial Products to indicate whether 7.43% per annum, compounded annually (equivalent to 7.30% per annum, compounded semi-annually) is the appropriate market rate for the Sublessee Loan (as described below).

Reference is made to the participation agreement dated as of December 15, 1997 (the "Participation Agreement") among n.v. Electriciteitsbedrijf Zuid-Holland, Hollandsche Bank-Unie N.V., Wilmington Trust Company, not in its individual capacity, except as otherwise expressly provided therein, but solely as trustee, and Consolidated Edison Leasing, Inc.

Please note that except as otherwise defined herein, all capitalised terms used herein shall have the meanings set forth in Appendix A to the Participation Agreement or in the other Operative Documents.

The transaction involves the lease of an Undivided Interest in certain Property Rights from EZH, as Lessor, to the Trustee, as Lessee, and a sublease of the Undivided Interest from the Trustee as Sublessor, to EZH, as Sublessee. The Trustee will issue fixed-rate U.S.-dollar-denominated limited recourse loan certificates to the Lender and will use the proceeds, together with funds obtained from the Investor to effect the payment or prepayment of a portion of Lease Basic Rent.

During the sublease basic term, a portion of the basic rent will be deferred and deemed lent back to EZH as the Sublessee Loan.

The Sublessee Loan is a full recourse obligation of EZH and will be secured, after the Sublease is terminated, by a letter of credit as well as by the Facility and the Common Facilities. Under certain circumstances EZH is permitted to substitute or use, in combination with the letter of credit, US Government obligations. The Sublessee Loan will be a fixed-rate US-dollar-denominated loan with a final maturity of approximately 43.19 years.

CE 007206

With respect to the Sublessee Loan, it is our judgment that the interest rate of 7.43% per annum, compounded annually (equivalent to 7.30% per annum, compounded semi-annually), is the appropriate commercially reasonable market rate for such loan, based on the market rates as of the Closing Date, and considering the credit of the Sublessee, the security interests granted to the Trustee and the Sublessee's option to prepay without penalty on the Sublease Basic Termination Date.

While there may be other interest rates for the Sublessee Loan which we have considered and which may, in our opinion, also be commercially reasonable, we have no basis for concluding that any such rates would be more appropriate for the Lease Collateral Deposit.

It should be noted that the market for a long-term loan is relatively illiquid and therefore there is a range of market interest rates which is dependent on market supply and demand conditions at the time. Quotes may vary daily based on a number of factors including, but not limited to, general economic and market conditions, prevailing interest rates, actions by Central Banks or other agencies or external political or societal events.

This letter is provided at your request and is intended for your internal use, use by you in connection with any tax proceeding and use by your counsel, as well as for internal use by your successors, permitted assigns, proposed assigns and their counsel, in each case only in connection with this transaction.

Very truly yours,

CREDIT SUISSE FINANCIAL PRODUCTS

By:
Name: Aarnout M. Snouck Hurgronje
Title: Director

# EXHIBIT B-6

One Cabot Square
London E14 4QJ
Telephone 0171 888 2000
Facsimile 0171 888 1600

December 15, 1997

CONSOLIDATED EDISON LEASING, INC.
c/o Consolidated Edison Development, Inc.
111 Broadway
8th Floor
New York, NY 10006

Ladies and Gentlemen:

You have requested Credit Suisse Financial Products to indicate whether 6.35% per annum, compounded annually (equivalent to 6.25% per annum, compounded semi-annually) is the appropriate market rate for the Trustee Treasury Collateral (as described below).

Reference is made to the participation agreement dated as of December 15, 1997 (the "Participation Agreement") among n.v. Electriciteitsbedrijf Zuid-Holland, Hollandsche Bank-Unie N.V., Wilmington Trust Company, not in its individual capacity, except as otherwise expressly provided therein, but solely as trustee, and Consolidated Edison Leasing Inc.

Please note that except as otherwise defined herein, all capitalised terms used herein shall have the meanings set forth in Appendix A to the Participation Agreement or in the other Operative Documents.

The transaction involves the lease of an Undivided Interest in certain Property Rights from EZH, as Lessor, to the Trustee, as Lessee, and a sublease of the Undivided Interest from the Trustee as Sublessor, to EZH, as Sublessee. The Trustee will issue fixed-rate U.S.-dollar-denominated limited recourse loan certificates to the Lender and will use the proceeds, together with funds obtained from the Investor to effect the payment or prepayment of a portion of Lease Basic Rent.

A portion of the Sublease Renewal Rent or certain other funds, if the Sublease Renewal Option is not exercised, will be used on certain specified dates by the investor to purchase US Government Obligations having a maturity on or before the Lease Termination Date (the "Trustee Treasury Collateral"). The Trustee Treasury Collateral will be pledged to the Lessor to secure the Investor's obligations under the Lease. No withdrawals will be made from the Trustee Treasury Collateral until the termination of the Lease, at which time all funds will be withdrawn. The Trustee Treasury Collateral will be a zero coupon, US dollar-denominated US Government Obligations with a full maturity of 23.2 years.

**CE 007208**

With respect to the Trustee Treasury Collateral, it is our judgement that the interest rate of 6.35 per annum, compounded annually (equivalent to approximately 6.25% per annum, compounded semi-annually) is the appropriate commercially reasonable market rate for such instruments, based on the market rates as of the Closing Date, and considering the creditworthiness of the US Government.

While there may be other interest rates for the Trustee Treasury Collateral, which we have considered and which may, in our opinion, also be commercially reasonable, we have no basis for concluding that any such rates would be more appropriate for the Trustee Treasury Collateral.

It should be noted that the market for a zero coupon, US dollar denominated US Government Obligations is dependent upon market supply and demand conditions at the time. Quotes may vary daily based on a number of factors such as general economic and market conditions, prevailing interest rates, actions by Central Banks or other agencies or external political or societal events.

This letter is provided at your request and is intended for your internal use in connection with any tax proceeding and use by your counsel, as well as for internal use by your successors, permitted assigns, proposed assigns and their counsel, in each case only in connection with this transaction.

Very truly yours,

CREDIT SUISSE FINANCIAL PRODUCTS

By:
Name: Aarnout M. Snouck Hurgronje
Title: Director

CE 007209

# EXHIBIT B-7

Notice of
Interests in U.S. Government Obligations

December 16, 1997

Credit Suisse First Boston
Five World Trade Center
7th Floor
New York, New York 10048
Attention: Mr. Ben Wojziehowski

Re: Account No. 2F4A2 (the "Account") of Stichting IJssel (the "Pledgor") pledged to Wilmington Trust Company, not in its individual capacity, but solely as Collateral Agent and Pledgee (the "Pledgee") for the benefit of (i) Wilmington Trust Company, not in its individual capacity but solely as Trustee, (ii) Consolidated Edison Leasing, Inc. (the "Investor") and (iii) n.v. Electriciteitsbedrijf Zuid-Holland ("EZH" or the "Sublessee" and together with the Trustee and the Investor, the "Beneficiaries") pursuant to the Sublessee Pledge and Security Agreement (Roca Facility Trust No. 2) dated as of December 15, 1997 among the Pledgor, the Pledgee, the Trustee, the Investor and the Sublessee (the "Agreement") (capitalized terms used but not otherwise defined herein have the respective meanings specified, whether or not by reference, in the Agreement)

PLEASE BE ADVISED THAT the Pledgor has purchased the securities set forth on Schedule I annexed hereto, and the Pledgee, for the benefit of the Beneficiaries, has purchased a first priority security interest in the following whether now owned or hereafter acquired (i) all U.S. Government Obligations (the "U.S. Government Obligations"), (ii) the Account, (iii) all funds, Financial Assets and

Investment Property from time to time credited thereto and all certificates and instruments from time to time representing or evidencing any funds, securities, investments, Financial Assets, Investment Property or other property credited from time to time to the Account, (iv) all notes, certificates of deposit, deposit amounts, checks and other investments from time to time hereafter delivered to or otherwise possessed by Credit Suisse First Boston on behalf of the Pledgor in substitution for any and all of the foregoing, (v) all interest, dividends, cash, instruments and other property from time to time received, receivable, or distributed in respect of any and all of the foregoing; all proceeds of any and all of the foregoing, and (vi) all Security Entitlements of the Pledgor in any and all of the foregoing and all proceeds of any such Security Entitlements (collectively, the "Collateral"). The aforesaid first priority security interest has been granted to the Pledgee to secure (i) certain obligations of EZH and, to the extent assumed by the Pledgor, the Pledgor to the Trustee under that certain Participation Agreement (Roca Facility Trust No. 2) and the other Operative Documents defined therein as such may be amended, supplemented or modified from time to time, certain of which have been assumed by the Pledgor pursuant to that certain Ijssel Agreement (Roca Facility Trust No. 2) dated as of December 15, 1997, among the Pledgor, EZH and the other parties thereto, (ii) certain obligations of EZH and, to the extent assumed by the Pledgor, the Pledgor under the Operative Documents, as such may be amended, supplemented or modified from time to time, made by EZH in favor of the Investor and (iii) certain obligations of Stichting Ijssel under that certain Ijssel Agreement (Roca Facility Trust No. 2) dated as of December 15, 1997 as such may be amended, supplemented or modified from time to time, among the Pledgor, the Sublessee and the other parties thereto. You should reflect the security interest described in this notice on your books and records accordingly.

Upon receipt of this notice, and each receipt by you of the U.S. Government Obligations, please acknowledge and confirm, among other things, that such U.S. Government Obligations are credited to the Account by you and the above-mentioned security interest in the Collateral is reflected on your books and records by delivering to the Pledgee at its address provided below a confirmation and agreement in the form annexed hereto, with a copy to our attention.

Very truly yours,

STICHTING IJSSEL

By______________________________
Name: **JAN TRAPMAN**
Title: **Attorney-in-Fact**

cc: Wilmington Trust Company
not in its individual capacity,
but solely as Collateral Agent
Rodney Square North
1100 North Market Street
Wilmington, Delaware 19890

CE 003101

# EXHIBIT B-8

SCHEDULE I
to
Notice

Schedule of U.S. Government Obligations
Pledged under the Agreement
(ROCA Facility Trust No. 2)

Designation by Name, Series, Maturity Date and CUSIP Number

Owned by the Pledgor as follows:

| Name | CUSIP No. | Amount (At Maturity) | Maturity Date |
|---|---|---|---|
| U.S. Government Obligations | 912833JX9 | $ 5,221,000.00 | 15-Nov-11 |
| U.S. Government Obligations | 912833KN9 | $ 7,363,000.00 | 15-Aug-17 |
| U.S. Government Obligations | 912833KQ2 | $22,959,000.00 | 15-Feb-18 |
| U.S. Government Obligations | 912833KR0 | $22,959,000.00 | 15-May-18 |
| U.S. Government Obligations | 912833KS8 | $22,959,000.00 | 15-Aug-18 |
| U.S. Government Obligations | 912833KT6 | $22,959,000.00 | 15-Nov-18 |



Exhibit B

(WED)12.17.97 20:07/ST.15:41/NO.3560372122 P 14/29
NOV 03 '98 14:17
WMC NY FAX DEPT
FROM WMC NY FAX DEPT
8474441100 PAGE.02

US01835

# EXHIBIT B-9

conEdison

Andrew W. Scher
Assistant General Counsel
Law Department

4 Irving Place
New York NY 10003
212 460 6209
212 677 5849 fax

May 24, 2001

VIA FAX

Jan Trapman, Treasurer
EZH
Von Geusaustratt 193
2274 RJ Voorburg

Re: Roca Facility Trust No. 2

Dear Mr. Trapman:

I am writing to follow-up on an e-mail sent to you on May 16th from Jeffrey Chu of Con Edison Development, which is the parent company of the Roca Facility Trust No. 2.

We have been requested to provide certain information regarding the US Treasury Strips purchased with respect to the equity portion of sublease rents payable for Roca Facility Trust No. 2. The information is being requested by the US Internal Revenue Service pursuant to a detailed audit of said transaction. Specifically, we are being asked to provide the following information:

A) A listing of the investments (product, CUSIP number, and amount purchased).
B) The date(s) of purchase.
C) The maturity date(s).
D) A history of the investments to date (the market value as of each L/C calculation date should be sufficient).

Although we have unofficial correspondence indicating some of this information, we have no official written communication addressing all of the listed information. Could you please provide this information to us, or authorize Credit Suisse First Boston to release such information to us, so that we may promptly respond to the US Internal Revenue Service? The account number at CSFB for this transaction is 2F4A20.

Thank you very much for your prompt attention to this request.

Very truly yours,

Andrew Scher

Exhibit C

# EXHIBIT B-10

e·on | Benelux

Fax

E.ON Benelux Generation n.v.
Von Geusaustraat 193
2274 RJ Voorburg
The Netherlands
T +31 70 382 00 26
F +31 70 383 39 01
www.eon-benelux.com
info@eon-benelux.com

Jan Trapman
Manager Financing & Risk Management
Financing & Risk Management
T +31 70 322 15 14
F +31 70 322 27 49
jan.trapman@eon-benelux.com

No. pages incl. cover 4

| | |
|---|---|
| To | Mr. Andrew Scher |
| Company | Consolidated Edison Co. |
| Department | |
| Fax no. | 001-212-6775850 |
| CC | |
| From | Jan Trapman |
| Date | May 30, 2001 |
| Reference | |

Dear Sir,

Re: your fax dd. May 24, 2001

I am sorry not to respond earlier, but I did not receive the e-mail your refers to of Mr. Chu.

Please find enclosed the information you requested:
- a copy of the purchase confirmation from December 17 1997
- a sheet with the most recent adjustment for the LC value, with the Strip prices of November 4, 2000.

I hope this will be sufficient for your purposes; otherwise call me or e-mail me (see my e-mail address above).
Kind regards

E.ON Benelux Generation n.v.

Jan Trapman

30 MAY 2001 11:29 EZH FEZ SECR.

CREDIT SUISSE | FIRST BOSTON

# FAX Transmittal

| | |
|---|---|
| DATE: | 17 December 1997 |
| SENT BY: | Hans Bruijn |
| TO: | Jan Trapman |
| COMPANY: | EZH<br>Den Haag<br>Nederland |
| FAX NUMBER: | 9 00 31 70 322 2749 |
| NUMBER OF PAGES (WITH COVER): | 2 |

MESSAGE:

Roca - St. Yssel

Dear Jan,

We are pleased to confirm the following trades:

Trade date 15 december 1997
Value date 17 december 1997

Credit Suisse First Boston sells $ 5,221,000
US treasury strip coupon 11/15/2011, cusip 912833JX9
Price 43.789%
Net amount $ 2,286,223.69

Con Ed

~~Credit Suisse First Boston sells $ 9,715,000
US treasury strip coupon 11/15/2016, cusip 912833KK5
Price 32.128%
Net amount $ 3,121,235.20~~

Bank One

~~Credit Suisse First Boston sells $ 28,201,000
US treasury strip coupon 2/15/17, cusip 912833KL3
Price 31.588%
Net amount $ 8,908,131.88~~

Barry Duo

Credit Suisse First Boston
One Cabot Square
London E14 4QJ
Telephone 0171 888 2696
Fax 0171 888 3879

~~Credit Suisse First Boston sells $ 28,201,000~~
~~US treasury strip coupon 5/15/2017, cusip 912833KM1~~
~~Price 31.119%~~
~~Net amount $ 8,775,869.19~~

Bank One

Credit Suisse First Boston sells $ 63,765,000
US treasury strip coupon 8/15/2017, cusip 912833KN9
Price 30.623%
Net amount $ 19,526,755.95

— Bk One $ 56,402,000.–
Con Ed $ 7,363,000.

Credit Suisse First Boston sells $ 22,959,000
US treasury strip coupon 2/15/2018, cusip 912833KQ2
Price 29.744%
Net amount $ 6,828,924.96

Con Ed

Credit Suisse First Boston sells $ 22,959,000
US treasury strip coupon 5/15/2018, cusip 912833KR0
Price 29.303%
Net amount $ 6,727,675.77

Con Ed

Credit Suisse First Boston sells $ 22,959,000
US treasury strip coupon 8/15/2018, cusip 912833KS8
Price 28.863%
Net amount $ 6,626,656.17

Con Ed

Credit Suisse First Boston sells $ 22,959,000
US treasury strip coupon 11/15/2018, cusip 912833KT6
Price 28.435%
Net amount $ 6,528,391.65

Con Ed

For the above transactions we will hold the bonds in your safekeeping accounts. Thank you for the business.

Sincerely, Hans Bruijn

cc, Maggie Morrow at Capstar partners

**EZH - Roca - Con Edison**
*Mark to Market*
Calculation Date: November 4, 2000

product ↓

| Cusip | *Treasury Date* | *Free Cash* | *Treasury Strip Amount* | *Treasury Price as of November 4, 2000** | *Fair Market Value of the Treasury* |
|---|---|---|---|---|---|
| 912833 JX9 | 15-Nov-11 | $ 5,220,969.87 | 5,221,000.00 | 51.93750% ✓ | 2,711,656.88 |
| 912833 KN9 | 15-Aug-17 | $ 7,362,950.33 | 7,363,000.00 | 36.09375% ✓ | 2,657,582.81 |
| 912833 KQ2 | 15-Feb-18 | $ 22,958,869.31 | 22,959,000.00 | 35.00000% ✓ | 8,035,650.00 |
| 912833 KR0 | 15-May-18 | $ 22,958,869.31 | 22,959,000.00 | 34.46875% ✓ | 7,913,680.31 |
| 912833 VS8 | 15-Aug-18 | $ 22,958,869.31 | 22,959,000.00 | 34.03125% ✓ | 7,813,234.69 |
| 912833 KT6 | 15-Nov-18 | $ 22,958,869.31 | 22,959,000.00 | 33.43750% | 7,676,915.63 |
| | | | | Fair Market Value | 36,808,720.31 ✓ |

*As published in The Wall Street Journal November 6, 2000

# EXHIBIT B-11

**Internal Revenue bulletin**

**Bulletin No. 2002–44**
**November 4, 2002**

# HIGHLIGHTS OF THIS ISSUE

**These synopses are intended only as aids to the reader in identifying the subject matter covered. They may not be relied upon as authoritative interpretations.**

## SPECIAL ANNOUNCEMENT

**Announcement 2002–101, page 800.**
This announcement solicts applications from potential partners to participate in the 2003 IRS Individual *e-file* Partnership Program. The partnership opportunities are a result of RRA 98, which requires the IRS to receive 80 percent of all returns electronically by 2007. RRA 98 authorized the IRS Commissioner to promote the benefits of and encourage the use of *e-file* services through partnerships with various entities that offer low cost tax preparation and electronic filing of income tax returns for qualified taxpayers. Those applicants that are accepted as partners will have a link(s) and description(s) of their services placed on the IRS website at *www.irs.gov* (IRS *e-file* Partners Page).

## INCOME TAX

**Rev. Rul. 2002–69, page 760.**
**Business expenses; interest; lease-in/lease-out transactions.** A taxpayer may not deduct currently, under sections 162 and 163 of the Code, rent and interest paid or incurred in connection with a lease-in/lease-out (LILO) transaction that properly is characterized as conferring only a future interest in property. Rev. Rul. 99–14 modified and superseded.

**Rev. Rul. 2002–71, page 763.**
**Notional principal contract (NPC).** This ruling provides guidance on the timing of recognition of gain or loss on the termination of a notional principal contract that hedges a portion of the term of a debt instrument issued by the taxpayer.

**Rev. Rul. 2002–72, page 759.**
**Low-income housing credit; satisfactory bond; "bond factor" amounts for the period October through December 2002.** This ruling announces the monthly bond factor amounts to be used by taxpayers who dispose of qualified low-income buildings or interests therein during the period October through December 2002. This ruling also provides a summary of the bond factor amounts for dispositions occurring during the period January through September 2002.

**REG–112306–00, page 767.**
Proposed regulations under section 1296 of the Code contain procedures for certain United States persons holding marketable stock in a passive foreign investment company (PFIC) to elect mark to market treatment for that stock. A public hearing is scheduled for November 6, 2002.

**REG–150313–01, page 777.**
Proposed regulations under sections 302, 304, and other sections of the Code provide guidance regarding the treatment of the basis of redeemed stock when a distribution in redemption of such stock is treated as a dividend. The regulations also provide guidance regarding certain acquisitions of stock by related corporations that are treated as distributions in redemption of stock. A public hearing is scheduled for February 20, 2003.

**Notice 2002–70, page 765.**
This notice alerts taxpayers and their representatives about certain reinsurance transactions intended to shift income to offshore related companies purported to be insurance companies that are subject to little or no U.S. federal income tax. These transactions often do not generate the federal tax benefits that taxpayers claim are allowable for federal income tax purposes. This notice also alerts taxpayers, their representatives, and promoters of these transactions, to certain reporting and record keeping obligations and penalties that they may be subject to with respect to these transactions.

**Announcement 2002–100, page 799.**
This document contains corrections to proposed regulations under section 1503(d) of the Code (REG–106879–00, 2002–34 I.R.B. 402) relating to the events that require the recapture of dual consolidated losses.

**Finding Lists begin on page ii.**
**Index for July through October begins on page v.**

Department of the Treasury
**Internal Revenue Service**

Table 1 (cont'd)
Rev. Rul. 2002–72
Monthly Bond Factor Amounts for Dispositions Expressed
As a Percentage of Total Credits

| | Calendar Year Building Placed in Service or, if Section 42(f)(1) Election Was Made, the Succeeding Calendar Year | | | |
|---|---|---|---|---|
| Month of Disposition | 1999 | 2000 | 2001 | 2002 |
| Jan '02 | 70.13 | 70.98 | 72.28 | 72.55 |
| Feb '02 | 69.92 | 70.77 | 72.05 | 72.55 |
| Mar '02 | 69.73 | 70.58 | 71.84 | 72.55 |
| Apr '02 | 69.55 | 70.40 | 71.67 | 72.55 |
| May '02 | 69.38 | 70.24 | 71.51 | 72.55 |
| Jun '02 | 69.21 | 70.09 | 71.37 | 72.55 |
| Jul '02 | 69.05 | 69.94 | 71.25 | 72.55 |
| Aug '02 | 68.90 | 69.81 | 71.14 | 72.55 |
| Sep '02 | 68.76 | 69.68 | 71.04 | 72.55 |
| Oct '02 | 68.62 | 69.57 | 70.94 | 72.55 |
| Nov '02 | 68.49 | 69.45 | 70.86 | 72.55 |
| Dec '02 | 68.37 | 69.35 | 70.78 | 72.55 |

For a list of bond factor amounts applicable to dispositions occurring during other calendar years, see: Rev. Rul. 98–3, 1998–1 C.B. 248; Rev. Rul. 2001–2, 2001–1 C.B. 255; and Rev. Rul. 2001–53, 2001–2 C.B. 488.

DRAFTING INFORMATION

The principal author of this revenue ruling is Gregory N. Doran of the Office of Associate Chief Counsel (Passthroughs and Special Industries). For further information regarding this revenue ruling, contact Mr. Doran at (202) 622–3040 (not a toll-free call).

## Section 162.—Trade or Business Expenses

*26 CFR 1.162–11: Rentals.*
*(Also § 163; 1.163–1.)*

**Business expenses; interest; lease-in/lease-out transactions.** A taxpayer may not deduct currently, under sections 162 and 163 of the Code, rent or interest paid or incurred in connection with a lease-in/lease-out (LILO) transaction that properly is characterized as conferring only a future interest in property.

## Rev. Rul. 2002–69

ISSUE

May a taxpayer deduct currently, under §§ 162 and 163 of the Internal Revenue Code, rent and interest paid or incurred in connection with a "lease-in/lease-out" ("LILO") transaction?

FACTS

*X* is a U.S. corporation. *FM* is a foreign municipality that has historically owned and used certain property. As of 1997, it is estimated that the property has a remaining useful life of 50 years and a fair market value of $100 million. *BK1* and *BK2* are banks. None of these four parties is related to any of the others.

On January 1, 1997, *X* and *FM* entered into a LILO transaction under which *FM* leased the property to *X* under a "Headlease," and *X* immediately leased the property back to *FM* under a "Sublease." The term of the Headlease is 40 years. The primary term of the Sublease is 20 years. Moreover, as described below, the Sublease also may be renewed for a term of 10 years ("put renewal term") at the option of *X*. *X*'s right to possess the property under the Headlease for the first 20 years is substantially the same as *FM*'s right to possession under the Sublease for the primary term.

The Headlease requires *X* to make two rental payments to *FM* during its 40-year term: (1) an $89 million prepayment at the beginning of year 1; and (2) a postpayment at the end of year 40 that has a discounted present value of $8 million. For federal income tax purposes, *X* and *FM* allocate the prepayment ratably to the first 6 years of the Headlease and the future value of the postpayment ratably to the remaining 34 years of the Headlease.

The Sublease requires *FM* to make fixed, annual rental payments over both the primary term and, if exercised, the put renewal term. The fixed, annual payments during the put renewal term are equal to 90 percent of the amounts that (as of January 1, 1997) are projected to be the fair market value rental amounts for that term.

To partially fund the $89 million Headlease prepayment, *X* borrows $54 million from *BK1* and $6 million from *BK2*. Both loans are nonrecourse, have fixed interest rates, and provide for annual debt service payments that fully amortize the loans over the 20-year primary term of the Sublease. The amount and timing of the debt ser-

vice payments mirror the amount and timing of the Sublease payments due during the primary term of the Sublease. The remaining $29 million of the Headlease prepayment is provided by *X*.

Upon receiving the $89 million Headlease prepayment, *FM* deposits $54 million into a deposit account with an affiliate of *BK1* and $6 million into a deposit account with an affiliate of *BK2*. The deposits with the affiliates of *BK1* and *BK2* earn interest at the same rates as the loans from *BK1* and *BK2*. *FM* directs the affiliate of *BK1* to pay *BK1* annual amounts equal to 90 percent of *FM*'s annual rent obligation under the Sublease (that is, amounts sufficient to satisfy *X*'s debt service obligation to *BK1*). The parties treat these amounts as having been paid from the affiliate to *FM*, then from *FM* to *X* as rental payments, and finally from *X* to *BK1* as debt service payments. In addition, *FM* pledges the deposit account to *X* as security for *FM*'s obligations under the Sublease, while *X*, in turn, pledges its interest in *FM*'s pledge to *BK1* as security for *X*'s obligations under the loan from *BK1*. Similarly, *FM* directs the affiliate of *BK2* to pay *BK2* annual amounts equal to 10 percent of *FM*'s annual rent obligation under the Sublease (that is, amounts sufficient to satisfy *X*'s debt service obligation to *BK2*). The parties treat these amounts as having been paid from the affiliate to *FM*, then from *FM* to *X* as rental payments, and finally from *X* to *BK2* as debt service payments. Although *FM*'s deposit with the *BK2* affiliate is not pledged, the parties understand that *FM* will use the account to pay the remaining 10 percent of *FM*'s annual rent obligation under the Sublease.

As a result of the foregoing arrangement, *X*'s obligation to make the property available under the 20-year primary term of the Sublease is completely offset by *X*'s right to use the property under the Headlease. *X*'s obligation to make debt service payments on the loans from *BK1* and *BK2* is completely offset by *X*'s right to receive Sublease rentals from *FM*. Moreover, *X*'s exposure to the risk that *FM* will not make the rent payments is further limited by the arrangements with the affiliates of *BK1* and *BK2*. In the case of the loan from *BK1*, *X*'s economic risk is eliminated through the defeasance arrangement. In the case of the $6 million loan from *BK2*, *X*'s economic risk, although not eliminated, is substantially reduced through the deposit arrangement. As a result, neither bank requires an independent source of funds to make the loans, or bears significant risk of nonpayment. In short, during the primary Sublease term, the transaction is characterized by reciprocal and circular obligations that offset one another.

At the end of the Sublease primary term, *FM* has a fixed-payment option to purchase from *X* the Headlease residual (the right to use the property beyond the Sublease primary term subject to the obligation to make the rent postpayment) for a fixed exercise price equal to 105 percent of the amount that (as of January 1, 1997) is projected to be the future fair market value of the Headlease residual. If *FM* exercises the option, the transaction is terminated at that point, and *X* receives the exercise price of the option and is not required to make any portion of the postpayment due under the Headlease. If *FM* does not exercise the option, *X* may elect to (1) use the property itself for the remaining term of the Headlease, (2) lease the property to another person for the remaining term of the Headlease, or (3) compel *FM* to lease the property for the 10-year put renewal term of the Sublease. If *FM* does not exercise the fixed-payment option and *X* exercises its put renewal option, *X* will receive rents that are equal to 90 percent of the amounts that are (as of January 1, 1997) projected to be the fair market rents for that term. If the actual fair market rents in 20 years turn out to be less than the amount specified in the put renewal option and *FM* does not exercise the fixed-payment option, *X* will be able to compel *FM* to lease the property for rents that are greater than the then fair market rental value. Thus, as a practical matter, the fixed-payment option and put renewal option operate to "collar" the value of the Headlease residual during the primary term.

In addition, *X* has nominal exposure to *FM*'s credit under the fixed-payment option and, if exercised, the put renewal term. At the inception of the transaction, *X* requires *FM* to invest $15 million of the Headlease prepayment in highly-rated debt securities that will mature in an amount sufficient to fund the fixed amount due under the fixed-payment option, and to pledge these debt securities to *X*. This arrangement ensures that *FM* is able to make the payment under the fixed-payment option. Having economically defeased both its rental obligations under the Sublease and its fixed-payment under the fixed-payment option, *FM* keeps the remaining portion of the Headlease prepayment as its return on the transaction. If *FM* does not exercise the fixed-payment option and *X* exercises the put renewal option, *X* can require *FM* to purchase a letter of credit guaranteeing the put renewal rents. If *FM* does not obtain the letter of credit, *FM* must exercise the fixed-payment option.

For tax purposes, *X* claims deductions for interest on the loans and for the allocated rents on the Headlease. *X* includes in gross income the rents received on the Sublease. If the fixed-payment option is exercised, *X* also includes the option price and recaptures rent deductions taken during the primary Sublease term that are attributable to the postpayment it is no longer required to make.

## LAW AND ANALYSIS

*X* and *FM*'s allocations of the prepayment and the postpayment for federal income tax purposes meet the uneven rent test contained in proposed § 467 regulations (§ 1.467–3(c)(2)(i)), and under those regulations the Headlease would not be treated as a disqualified leaseback or long-term agreement subject to constant rental accrual. Because this LILO transaction was entered into after June 3, 1996, and on or before May 18, 1999, the provisions of the proposed regulations are available. *See* § 1.467–9(c). For later years, however, final § 467 regulations effective May 18, 1999, treat the prepayment of rent as resulting in a deemed loan from *X* to *FM* and require the imputation of interest income to *X*. § 1.467–4. Moreover, *X*'s rent deduction would be subject to proportional rent rules that reflect the time value of money concept. *See* § 1.467–2(c).

The substance of a transaction, not its form, governs its tax treatment. *Gregory v. Helvering*, 293 U.S. 465 (1935). In *Frank Lyon Co. v. United States*, 435 U.S. 561, 573 (1978), the United States Supreme Court stated, "In applying the doctrine of substance over form, the Court has looked to the objective economic realities of a transaction rather than to the particular form the parties employed." The Court evaluated the substance of the transaction in *Frank Lyon* to determine that it was indeed a sale/leaseback, as it was structured,

rather than a financing. The Court subsequently relied on its approach in *Frank Lyon* to recharacterize a sale and repurchase of federal securities as a loan, finding that the economic realities of the transaction did not support the form chosen by the taxpayer. *Nebraska Dep't of Revenue v. Loewenstein*, 513 U.S. 123 (1994).

Where parties have in form entered into two separate transactions that result in offsetting obligations, the courts often have collapsed the offsetting obligations and recharacterized the two transactions as a single transaction. In *Rogers v. United States*, 281 F.3d 1108 (10th Cir. 2002), the part-owner (Fogelman) of a professional baseball team that was organized as an S corporation borrowed money from the S corporation. The nonrecourse loan was secured by Fogelman's ownership interest in the corporation and his existing option to purchase the rest of the shares from the taxpayer (Kauffman), the other owner of the team. Fogelman also granted the corporation an option to purchase both his shares and his existing option to buy Kauffman's shares. The option price was an amount equal to the outstanding loan balance. The corporation exercised its option immediately but deferred closing until the due date of Fogelman's loan, five months later. On that date, Fogelman transferred his shares in the corporation to the corporation in lieu of its foreclosure on the loan. The corporation claimed that the shares had no value at that time and deducted the loan amount as a bad debt, which was passed through to Kauffman.

The court in *Rogers* applied the substance over form doctrine to collapse the loan and the option transaction into a redemption of Fogelman's stock in exchange for cash. Fogelman had no incentive to repay the loan because any reduction in the loan balance would reduce the option price. The immediate exercise of the option precluded any attempt by Fogelman to repay the loan and keep the stock. On the basis of those facts, among others, the court held that the substance of the transaction was a sale of Fogelman's stock to the corporation.

In *Bussing v. Commissioner*, 88 T.C. 449, *reconsideration denied*, 89 T.C. 1050 (1987), a Swiss subsidiary of a computer leasing company (AG) purchased computer equipment in a sale/leaseback transaction involving a five-year lease. Subsequently, AG purportedly sold the equipment to a domestic corporation (Sutton), which in turn purportedly sold interests in the equipment to the taxpayer (Bussing) and four other individual investors. Bussing acquired his interest in the computer equipment subject to the underlying lease by paying cash, short-term promissory notes, and a long-term promissory note to Sutton. Bussing then leased his interest in the equipment back to AG for nine years. The rents due Bussing from AG equaled Bussing's annual payments on the long-term promissory note to Sutton for the first three years and were supposed to generate nominal annual cash flow thereafter.

The court first disregarded Sutton's participation in the transactions on substance over form grounds. It then held that Bussing's long-term indebtedness also must be disregarded because it was completely offset by AG's rent payments in a "purported sale-leaseback pursuant to which the respective lease and debt obligations flow between only two parties." *Id.* at 458. The court stated,

> The respective obligations between AG and Bussing cancel each other out. Any possible claim by AG with respect to the note is fully offset by AG's rental obligation to Bussing. . . . Bussing, effectively, will never be required to make any payments on his debt obligation, a feature of the transaction that we believe the parties intended to achieve.

*Id.* After collapsing the offsetting loan and lease, the court concluded that Bussing had acquired an interest in a joint venture with AG and the other investors to the extent of his cash payment only.

Courts have similarly disregarded the parties' obligations in purported installment sales where the taxpayer received an installment note that was offset by some other arrangement between the two parties, indicating that the maker of the note would not be called upon to pay the installment obligation. *See Rickey v. Commissioner*, 502 F.2d 748 (9th Cir. 1974), *aff'g* 54 T.C. 680 (1970). Although taxpayers are entitled to arrange the terms of a sale in order to qualify for the installment method, "the arrangements must have substance and must reflect the true situation rather than being merely the formal documentation of the terms of the sale." *Id.* at 752–53, quoting 54 T.C. 680 at 694. *See also United States v. Ingalls*, 399 F.2d 143 (5th Cir. 1968); *Blue Flame Gas Co. v. Commissioner*, 54 T.C. 584 (1970); *Greenfield v. Commissioner*, T.C. Memo. 1982–617; *Big "D" Development Corp. v. Commissioner*, T.C. Memo. 1971–148, *aff'd per curiam*, 453 F.2d 1365 (5th Cir.1972).

Similarly, the Headlease and Sublease impose offsetting obligations that must be disregarded, regardless of whether other components of the LILO transaction are respected. During the first 20 years of its term, the Headlease confers to X a right to use the property that is immediately reversed by the Sublease grant to FM of substantially the same right to use property. In the LILO transaction, the Sublease interest retained by *FM* is of the same nature as the Headlease interest conveyed to *X*. Because the transfer and retransfer of the right to possess the property for the first 20 years are disregarded as offsetting obligations, the transaction that remains is, at best, a transfer of funds from *X* to *FM* in exchange for *FM*'s obligation to repay those funds and provide *X* the right to begin to lease the property in 20 years.

An analogous situation occurs when the conveyance of property is accompanied by the retention of some interest in the same property. If the interest retained is of substantially the same nature as the interest conveyed, only a future interest is conveyed. In *McCully Ashlock v. Commissioner*, 18 T.C. 405 (1952), *acq.*, 1952–2 C.B. 1, taxpayer had acquired property through a deed dated June 6, 1945. The seller, however, had retained the right to possession and rentals through August 15, 1947. The court found that taxpayer had acquired only a future interest in the property because "the trustees [sellers] not only retained the rents legally but they also retained control and benefits of ownership." *Id.* at 411. Consequently, rentals from the property were income to the seller.

Similarly, in *Kruesel v. United States*, 63–2 U.S. Tax Cas. (CCH) ¶ 9714 (D. Minn. 1963), the court concluded that taxpayer had transferred only a future, remainder interest in property and reserved a life estate. The government had unsuccessfully argued that taxpayer had sold its entire interest in the property and the taxpayer's amount realized on the sale included the value of a right to occupancy provided to the taxpayer by the buyer.

In contrast, in *Alstores Realty Corp. v. Commissioner*, 46 T.C. 363 (1966), *acq.*, 1967–2 C.B.1, the court held that a sale of property accompanied by the reservation of a right of occupancy did not result in the transfer of only a future interest because the seller's right of occupancy was in the nature of a leasehold interest, because the purchaser acquired the benefits and burdens of ownership of the property.

*Alstores* can be distinguished from *McCully Ashlock* and *Kruesel*. *McCully Ashlock* and *Kruesel* conclude that where a retained interest is of the same nature as the interest conveyed, only a future interest has been transferred. In *Alstores*, the interests were not of the same nature.

Similarly, the LILO transaction is distinguishable from the transaction involved in *Comdisco, Inc. v. Commissioner*, 756 F.2d 569 (7th Cir. 1985). In that case, equipment was subject to end user leases, and the lessor of that equipment assigned an interest to taxpayer in a transaction designed to give the taxpayer investment tax credits. The taxpayer's entitlement to the credits depended on whether it had the status of lessee/sublessor. In concluding that it did, the court noted a number of factors that supported taxpayer's claim that it had acquired a leasehold interest. The taxpayer was obligated to the lessor in the event of a default by the sublessee. The taxpayer relet certain equipment after one sublease had expired. In connection with another sublease, the taxpayer was responsible for rent to its assignor in excess of amounts paid by the sublessee directly to the assignor. The court also emphasized the regulatory restrictions on direct leases between the assignor and the end users. *Id.* at 576–77. Unlike *Comdisco*, in the LILO transaction the headlessor and the sublessee are the same party. Further, in the LILO transaction the headlessee/sublessor is not materially exposed to the risk that the sublessee will fail to make rent payments.

Section 162(a)(3) permits a deduction for rentals and other payments required to be made as a condition to the continued use or possession, for purposes of the trade or business, of property. Because *X* does not acquire a current leasehold interest in the property, it is not entitled to current deductions for rent. The $29 million "equity" portion of the Headlease prepayment is, effectively, a payment for at most *X*'s right under the Headlease to lease the property 20 years hence for a term of 20 years. (Economically, $29 million is an overpayment for the value of any right that *X* obtains to lease the property in the future. *X* was willing to overpay in this manner, however, in order to induce *FM* to participate in the transaction.). In accordance with § 467, the $29 million "equity" portion of the Headlease prepayment is deductible over the 20-year residual term of the Headlease (the 10-year put renewal term and the 10-year "shirttail" period). Alternatively, in the event *FM* exercises its fixed-price option at the end of the primary term of the Sublease, *X* will have gain or loss equal to the difference between the option price and *X*'s cost of acquiring a right to the Headlease residual term. Section 1001.

The remainder of the Headlease prepayment, $60 million, must be disregarded, because the "loans" that purportedly finance this portion of the Headlease prepayment are without substance. In *Bridges v. Commissioner*, 39 T.C. 1064, *aff'd* 325 F.2d 180 (4th Cir. 1963), taxpayer "borrowed" funds from banks and used the funds to purchase Treasury notes, which the banks held as collateral and ultimately sold to satisfy taxpayer's debts. The court's rationale for disallowing taxpayer's deductions of prepaid interest is equally applicable here:

> [P]etitioner at no time had the uncontrolled use of any additional money, of the bonds, or of the interest on the bonds. He assumed no risk of a rise or fall in the market price of the bonds and could not take advantage of such. His payment to the bank was not for the use or forbearance of money; it was for the purchase of a rigged sales price for the bonds and for a tax deduction. Petitioner incurred no genuine indebtedness, within the meaning of the statute, and as a payment of interest, this transaction was also a sham.

*Id.* at 1078–79. Neither *X* nor *FM* obtain use of the "borrowed" funds. The "loans" purportedly are made to finance *X*'s acquisition of the Headlease interest. But that leasehold interest is substantially offset by an interdependent Sublease with the Headlessor. What remains can only be enjoyed after 20 years and after the loans have been "repaid" using "rents" from a Sublease that itself lacks substance. Under the circumstances, the loans are disregarded.

Although this ruling refers to a foreign municipality and its property, the analysis and holding apply as well to LILO transactions that involve or include domestic tax-exempt or tax-indifferent entities.

HOLDING

A taxpayer may not deduct currently, under §§ 162 and 163, rent or interest paid or incurred in connection with a LILO transaction that properly is characterized as conferring only a future interest in property.

Where appropriate, the Service will continue to disallow the tax benefits claimed in connection with LILO transactions upon other grounds, including that the substance over form doctrine requires their recharacterization as financing arrangements and that they are to be disregarded for lack of economic substance.

EFFECT ON OTHER DOCUMENTS

Rev. Rul. 99–14, 1999–1 C.B. 835, is modified and superseded.

DRAFTING INFORMATION

The principal author of this revenue ruling is John Aramburu of the Office of Associate Chief Counsel (Income Tax & Accounting). For further information regarding this revenue ruling, contact Mr. Aramburu at (202) 622-4960 (not a toll-free call).

## Section 163.—Interest

*26 CFR 1.162–17: Interest deduction in general.*

May a taxpayer deduct currently, under § 163, interest paid or incurred in connection with a lease-in/lease-out (LILO) transaction that properly is characterized as conferring only a future interest in property. See Rev. Rul. 2002–69, page 760.

## Section 446.—General Rule for Methods of Accounting

*(Also 26 CFR 1.446–4)*

**Notional principal contract (NPC).** This ruling provides guidance on the timing of recognition of gain or loss on the termination of a notional principal contract that hedges a portion of the term of a debt instrument issued by the taxpayer.

# EXHIBIT C

# EXHIBIT C

## DOCUMENTS TO BE PRODUCED BY STANDARD & POOR'S

## DEFINITIONS & INSTRUCTIONS

A. "Document," "record" and "material" include any written, printed, typed, electronic or graphic matter of any kind or nature. Any draft or non-identical copy constitutes a separate document for purposes of these requests. The terms shall be construed to include, but shall not be limited to, correspondence, electronic mail, notes, notations, contracts, brochures, agreements, deeds, leases, letters, memoranda, checks, bank statements, reports, analyses, projections, studies, records, corporate minutes, financial statements, financial records, accounting or audit workpapers (including permanent workpapers), spreadsheets, transcripts, recordings, and all other types of written or documentary materials.

B. Any copy of a document that varies in any way from the original or from any other copy of the document, whether by reason of handwritten or other notation or any omission, shall constitute a separate document and must be produced. Each document is to be produced in its entirety, without abbreviation or expurgation, and the person who made the notation identified.

C. If any documents are withheld under a claim of privilege, furnish a list identifying each document for which a privilege is claimed, together with the following information and sufficient details so as to permit a court to adjudicate the validity of the claim of privilege: date, sender, recipient, type (e.g., letter, memorandum, telegram, chart, photograph, etc.), subject matter of the document, the basis on which a privilege is claimed, and the paragraph or paragraphs of this request to which the document responds.

D. If any document that would have been responsive to these requests no longer exists, please state the following for each document: the date of destruction, the reason for destruction, and the person(s) responsible for the decision to destroy the document(s) and for the actual destruction of the documents.

E. Responses to these requests should be made in a manner consistent with Fed. R. Evid. 902(12), Certified Foreign Records of Regularly Conducted Activity.

F. The term "Con Ed" shall refer to Consolidated Edison Company of New York, Inc. & Subsidiaries, and affiliated companies, including, but not limited to, Consolidated Edison Development, Inc., Consolidated Edison Leasing, Inc., and Consolidated Edison, Inc.

G. The term "Banc One" shall refer to Banc One Leasing Corp. its related affiliates, subsidiaries, successors, and assigns, including, but not limited to, and any person, officer, director, accountant, lawyer, agent, or entity acting on behalf of any of the foregoing organizations.

H. The term "EZH" shall refer to N.V. Electriciteitsbedrifj Zuid-Holland, its related affiliates, subsidiaries, successors, and assigns, including, but not limited to, Preussen Elektra A.G. and E.ON Benelux Generation N.V., and any person, officer, director, accountant, lawyer, agent, or entity acting on behalf of any of the foregoing organizations.

I. The term "RoCa3" shall refer to the gas fired CHP facility located in the Netherlands on the border between Rotterdam and Capelle aan den IJessel, constituting the third unit alongside two previously built units, which was owned by EZH on or about December 15, 1997.

J. The term "Capstar" refers to Capstar Partners L.L.C., its related affiliates, subsidiaries, successors, and assigns, and any person, officer, director, member, accountant, lawyer, agent, or entity acting on behalf of any of the foregoing organizations.

K. The term "Cornerstone" refers to Cornerstone Financial Advisors L.P., its related affiliates, subsidiaries, successors, and assigns, and any person, officer, partner, accountant, lawyer, agent, or entity acting on behalf of any of the foregoing organizations.

## DOCUMENTS TO BE PRODUCED

### COMMUNICATIONS

1. The letters, memoranda, notes, e-mails, and other written communication in the files of Standard & Poor's exchanged by and/or between Standard & Poor's and Cornerstone, including but not limited to Rob Holzman, pertaining to EZH, the RoCa3 facility, the Dutch Energy Market, Con Ed, or the transaction between EZH and Con Ed.

2. The letters, memoranda, notes, e-mails, and other written communication in the files of Standard & Poor's exchanged by and/or between Standard & Poor's and Con Ed, including, but not limited to Brian DePlautt and Jeanette Li, pertaining to EZH, E.On Benelux Generation N.V., E.On Energie A.G., E.On Benelux B.V., the RoCa3 facility, the Dutch Energy Market, Con Ed, or the transaction between EZH and Con Ed.

3. The letters, memoranda, notes, e-mails, and other written communication in the files of Standard & Poor's exchanged by and/or between Standard & Poor's and Banc One pertaining to EZH, E.On Benelux Generation N.V., E.On Energie A.G., E.On Benelux B.V., the

RoCa3 facility, the Dutch Energy Market, Con Ed, or the transaction between EZH and Con Ed and or Banc One.

**ANALYSIS**

4. The documents in the files of Standard & Poor's containing or discussing the analyses performed by Standard & Poor's pursuant to a request by Cornerstone, Con Ed, Banc One or their representative, pertaining to EZH, E.On Benelux Generation N.V., E.On Energie A.G., E.On Benelux B.V., the RoCa3 facility, the Dutch Energy Market, Con Ed, or the transaction between EZH and Con Ed during the time period from November 1997 through December 1997 as may be reflected in correspondence between Standard and Poor's and Cornerstone, Bates Nos. PF000001, PF003585, and PF004056, attached hereto as Exhibits C-1, C-2, and C-3 respectively.

5. The documents in the files of Standard & Poor's containing or discussing the analyses performed by Standard & Poor's pursuant to a request by Cornerstone, Con Ed, or their representative, pertaining to EZH, E.On Benelux Generation N.V., E.On Energie A.G., E.On Benelux B.V., the RoCa3 facility, the Dutch Energy Market, Con Ed, or the transaction between EZH and Con Ed during the time period from January 2001 through March 2001 as may be reflected in correspondence between Standard and Poor's and Cornerstone, Bates Nos. US08402, attached hereto as Exhibit C-4.

**SIMILAR TRANSACTIONS**

6. The documents within the files of Standard & Poor's pertaining to any analyses performed by Standard & Poor's pursuant to a request by Cornerstone, Con Ed, Banc One or their representative in connection with the following lease transactions considered by the plaintiff, Con Ed, between 1997 and 2001, including the correspondence and communications between the Standard & Poor's and Cornerstone, Con Ed, Banc One or their representative pertaining to such transactions:

a. NUON lease (Netherlands);

b. MEGA Gas and Thermal Distribution lease/leaseback (Netherlands);

c. EPON lease (Netherlands);

d. ENECO lease (Netherlands);

e. ENN lease (Nethelands);

f. ENW gas lease (Netherlands);

g. MCN lease (United States);

h. ELECTRABEL power plant lease/leaseback (Belgium);

i. Diefland gas and thermal distribution lease/leaseback (Netherlands);

j. Linz power plant lease/leaseback (Austria);

k. UNA power plant lease/leaseback (Netherlands);

l. EG Laufenburg lease/leaseback (Switzerland);

m. Humber power lease/leaseback (United Kingdom);

n. EWZ electric transmission grid lease/leaseback (Switzerland);

o. ESAG lease (Germany);

p. REMU lease (Netherlands);

q. DELTA lease (Netherlands);

r. ZETA/TEL lease (Netherlands);

s. EDON lease (Netherlands);

t. DEW lease (Germany);

u. VASA lease (Germany); and

v. SWISCO lease (Switzerland).

# EXHIBIT C-1

European Ratings
Garden House
18 Finsbury Circus
London EC2M 7EP
Tel +44 (0)171-826 3800
Fax +44 (0)171-826 3890

**Standard & Poor's**
A Division of The McGraw-Hill Companies

19 November 1997

Rob Holzman
Vice President
Cornerstone Financial Advisors
Riverwalk Suite 450
2150 E.Lake Cook Road
Buffalo Grove
Illinois 60089
USA

Dear Rob

**Re: EZH**

Based on Standard & Poor's review of the Dutch electricity generation sector, I can confirm that companies such as Electriciteitsbedrijf Zuid Holland ("EZH"), are likely, if a rating were requested, to be rated at or above the " A" category.

This information is confidential and must not be disclosed under any circumstances to EZH or third parties (apart from your US utility client on this transaction). This opinion in no way constrains Standard & Poor's future actions with EZH.

Yours sincerely

Aidan O'Mahony

Aidan O'Mahony
Director
Corporate Ratings

CE 000002

# EXHIBIT C-2

European Ratings
Garden House
18 Finsbury Circus, London EC2M 7BP
Tel +44 (0)171 826 3612
Fax +44 (0)171 826 3690

Standard & Poor's
A Division of The McGraw-Hill Companies

# Facsimile

| | | | |
|---|---|---|---|
| Attention | Rob Holzman | From | Aidan O'Mahony |
| Company | Cornerstone Financial Advisors | Date | November 19, 1997 |
| Fax Number | 00 847 465 0083 | Total No. of Pages, Including this Cover | Two (2) |

- ☐ PLEASE FORWARD COPY/COPIES TO:
- ☐ PLEASE ACKNOWLEDGE RECEIPT
- ☐ HARD COPY TO FOLLOW

If this transmission is not received in good order
please call Tel +44 (0)171 826 3612 or advise by Fax +44 (0)171 826 3690

The information contained in this facsimile message is intended only for the person or entity named above. If you are not the intended recipient, please be aware that any dissemination or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify us by telephone and return the original message to us at the above address via Postal Service. Thank you.

COMMENTS:

Rob

Please refer to the attached revised letter. I can confirm that " A category" includes A-, A and A+. This is our standard wording. Please do not hesitate to contact me if you require any further information.

Regards

Aidan

CE 009256

# EXHIBIT C-3

Garden House
18 Finsbury Circus
London EC2M 7BP
Tel +44 (0)171-826 3800
Fax +44 (0)171-826 3890

#2-25

Standard & Poor's
A Division of The McGraw-Hill Companies

APPROVED
FOR
PAYMENT
BY: [signature]
DATE: 3-12-98

Mr Brian Deplautt
Consolidated Edison Development Inc
111 Broadway
8th Floor
New York
NY 10006

6 January 1998

Dear Mr Deplautt,

I enclose our invoice number 102138 for $5,000 in respect of the fee for analytical services in connection with Dutch Electricity Market.

If you have any queries, please contact Mrs Doreen Ziegenbalg on +44 171 826 3682. Otherwise I would be grateful if you could arrange payment as detailed on the invoice.

Yours sincerely,

Ian Hayes
Director

APPROVED
FOR
PROCESSING
BY: [signature]
DATE: 3-12-98

CE 009821

PF004056

# EXHIBIT C-4

**Li, Jeanette**

**From:** Ratings_Request [ratings_request@standardandpoors.com]
**Sent:** Friday, February 09, 2001 3:04 PM
**To:** 'LiJen@CONEDENERGY.COM'
**Subject:** Ratings Request

Thank you for your recent inquiry. The ratings information you requested is listed below:

---

**1.**

Issuer Name: E.ON Benelux B.V.
Not Rated

---

**2.**

Issuer Name: E.ON AG
Outlook: Negative
Commercial Paper: A-1+
Senior Secured:

Senior Unsecured: AA Subordinated:

Preferred Stock:

Issuer Credit Rating: AA

If you have any questions, please contact our Ratings Information Desk at (212) 438-2400, between the hours of 8:00 a.m. to 5:00 p.m. (Eastern time).

If you would like to send future ratings requests via e-mail, please send them to:
ratings_request@standardandpoors.com
Or, if you have access to the Internet, you can request up to five ratings at our new Ratings Services Page http://www.standardandpoors.com/ratings)

Prepared By:

***TC***

---

The information contained in this message is intended only for the recipient, may be privileged and confidential and protected from disclosure. If the reader of this message is not the intended recipient, or an employee or agent responsible for delivering this message to the intended recipient, please be aware that any dissemination or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify us by replying to the message and deleting it from your computer.

Thank you,
Standard & Poor's