# EXHIBIT 4

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| CONSOLIDATED EDISON COMPANY<br>OF NEW YORK, INC.<br>& SUBSIDIARIES,<br><br>Kläger,<br><br>gegen<br><br>DIE VEREINIGTEN STAATEN<br><br>Beklagte. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Nr. 06-305 T<br>Richterin Marian Blank Horn |

**ERSUCHEN UM INTERNATIONALE RECHTSHILFE GEM. DEM HAAGER ÜBEREINKOMMEN VOM 18. MÄRZ 1970 ÜBER DIE BEWEISAUFNAHME IM AUSLAND IN ZIVIL- ODER HANDELSSACHEN**

**1. Absender:**

**Ersuchende Justizbehörde:**
United States Court of Federal Claims
717 Madison Place, NW
Washington, DC 20005
United States of America

**2. Empfänger:**

**Zentralbehörde des Freien Bundesstaates Bayern**
Bayerisches Staatsministerium der JustizÜÜÜ
Justizpalast
Prielmeyerstrasse 7
80335 München, Deutschland

**3. Person, an welche das ausgeführte Rechtshilfeersuchen zurückzusenden ist:**

David N. Geier
U.S. Department of Justice, Tax Division
555 4th St. NW

JCB Room 7919
Washington DC 20001

**GEMÄSS ARTIKEL 3 DES ÜBEREINKOMMENS BEEHRT SICH DER NACHSTEHEND AUFGEFÜHRTE ANTRAGSTELLER, DAS FOLGENDE ERSUCHEN ZU STELLEN:**

**4. Ersuchende Justizbehörde**

United States Court of Federal Claims
717 Madison Place, NW
Washington, DC 20005
United States of America

**5. An die zuständige Behörde in München / Bayern**

Amtsgericht München
Justizgebäude
Pacellistrasse 5
80333 München
Deutschland

**6. Information zum Verfahren/Parteien:**
Consolidated Edison Company of New York, Inc. & Subsidiaries gegen Die Vereinigten Staaten, Fall Nr. 06-305 T (U.S. Court of Federal Claims)

**7. Namen und Anschriften der Parteien und ihrer Vertreter:**

Kläger: Consolidated Edison Company of New York, Inc. & Subsidiaries (nachstehend Con Ed genannt)

Vertreten durch: Thomas C. Durham
Nicole Bielawski
MAYER, BROWN, ROWE & MAW LLP,
71 South Wacker Dr.
Chicago, IL 60606

Beklagte: Die Vereinigten Staaten von Amerika

Vertreten durch: David Geier
Prozessbevollmächtigter
U.S. Department of Justice
Tax Division

555 4th St. NW
JCB Room 7919
Washington, DC 20001
Tel.: 202-616-3448

Eileen J. O'Connor
Assistant Attorney General

David Gustafson
Chief, Court of Federal Claims
Section

Steven I. Frahm
Assistant Chief, Court of
Federal Claims Section

Joseph A. Sergi
Trial Attorney

James E. Weaver
Trial Attorney

Adam R. Smart
Trial Attorney

U.S. Department of Justice,
Tax Division

**8. Art und Zweck des Verfahrens und Zusammenfassung des Sachverhaltes**

Im United States Court of Federal Claims ist zurzeit das Klageverfahren des Falles Consolidated Edison Company of New York, Inc. & Subsidiaries gegen die Vereinigten Staaten Nr. 06-305 T, anhängig, in welchem die Klägerin, Con Ed, eine Rückerstattung von Einkommenssteuern begehrt, welche an die Vereinigten Staaten entrichtet wurden. Bei einer Klage mit dem Begehren der Rückerstattung von Steuern ist die grundlegende

Frage, ob der Steuerzahler nachweisen kann, dass er in den infrage kommenden Zeiträumen Steuern überbezahlt hat. *Siehe Lewis gegen Reynolds*, 284 U.S. 281 (1932); *Dysart gegen United States*, 169 Ct. Cl. 276, 340 F.2d 624 (1965). In diesem Fall war der Kläger an einer Lease-in/Lease-out ("LILO") Transaktion beteiligt, bei der es um ein Kraftwerk in den Niederlanden ging (die RoCa3 Anlage, die der South Holland Electric (N.V. Electriciteitsbedrifj Zuid-Holland)(nachstehend ZH genannt) gehörte). In dieser Rückerstattungsklage geht es um die spezielle Sachfrage, ob der Kläger dazu berechtigt ist, Miete, Zinsen und die Kosten der Transaktion in Zusammenhang mit dem LILO von der Steuer abzusetzen, um die Steuerschuld für 1997 zu senken.

Da sich die Gegenpartei der LILO-Abschreibungsgesellschaft sowie beteiligte Dritte (Berater und Banken) im Ausland befinden, darunter auch in Deutschland, ersuchen die Vereinigten Staaten das Gericht um Rechtshilfe zur Erlangung der Bekanntgabe bzw. Vorlage von für den Rechtsstreit bedeutsamen Tatsachen und Urkunden durch die im Zuständigkeitsbezirk der ersuchten Behörde befindlichen juristischen Personen.

Die Transaktion

Die Vereinigten Staaten vertreten den Standpunkt, dass Con Ed, eine in den Vereinigten Staaten steuerpflichtige Gesellschaft, über eine Tochtergesellschaft angeblich von dem Eigentümer EZH unter einem Lead Lease [Hauptpachtvertrag] Grundbesitz gepachtet und diesen Grundbesitz angeblich gleichzeitig unter einem Sublease [Unterpachtvertrag] wieder an die EZH zurückverpachtet hat. Wie in einer LILO-Transaktion üblich, handelt es sich bei der Gegenpartei, nämlich der EZH, um ein ausländisches Unternehmen, das in den Vereinigten Staaten nicht steuerpflichtig ist. EZH kann in Zusammenhang mit seinem Eigentumsrecht an der RoCa3-Anlage keine U.S.-Bundesein-kommenssteuervergünstigungen, wie z.B. Abschreibungen, in Anspruch nehmen. EZH bzw. ihre Rechtsnachfolger (darunter auch E.On Benelux Generation N.V., eine Tochtergesellschaft der E.On Energie AG) haben die Anlage seit unmittelbar nach Durchführung der Transaktion betrieben und sämtliche Nutzen und Lasten in Zusammenhang mit der Verwendung bzw. dem Besitz der Anlage beibehalten und tun dies auch heute noch. Con Ed hat die Steuerabzüge für Pacht und Zinsen in Zusammenhang mit dem angeblichen Head Lease in Anspruch genommen.

Gemäss den LILO-Dokumenten, welche den Vereinigten Staaten von Con Ed zur Verfügung gestellt wurden, machen die Vereinigten Staaten geltend, dass (1) eine ausländische Bank, nämlich die Holländische Bank-Unie N.V. (BU), angeblich Con Ed zur Finanzierung der Zahlungen des Head Lease ein non-recourse Darlehen [Darlehen, bei dem die Haftung des Schuldners auf die verpfändete oder an den Gläubiger abgetretene Sache beschränkt ist], gewährt hat, (2) dass die Pachtzahlungen von EZH für den Sublease im Grossen und Ganzen in Bezug auf Zeitpunkt und Betrag mit den Darlehenszahlungen von Con Ed übereinstimmen, (3) dass die Erlöse aus dem Darlehen nicht an EZH gezahlt, sondern durch ABN AMRO Bank N.V. (ABN AMRO , der Stammbank von HBU), gehalten und zur Begleichung der identischen Pachtzahlungen von EZH an den Eigentümer sowie den angeblichen Darlehenstilgungen von Con Ed an HBU verwendet wurden. Weiterhin waren weitere Finanzinstitutionen, wie die Credit Suisse Financial Products, Credit Suisse First Boston (zusammen Credit Suisse und die Bayerische Landesbank AG) in die Transaktion zur Finanzierung der LILO-Steuerersparnismassnahme verwickelt. Durch diese zwischen Con Ed, EZH und den ausländischen Banken abgesprochene Rundfinanzierung wurde praktisch sicher gestellt, dass (1) weder Con Ed noch EZH ihre eigenen Mittel aufwenden müssen, um ihren

jeweiligen Verpflichtungen unter den rechtsbegründenden Dokumenten nachzukommen (ausgenommen der von dem Steuerzahler in Zusammenhang mit der Transaktion gezahlten Gebühren und sonstigen Kosten); sowie (2) dass EZH die Herrschaftsbefugnis und Kontrolle über die betreffende Anlage behält.

Die Vereinigten Staaten vertreten den Standpunkt, dass die von Con Ed im Zusammenhang mit der LILO-Steuerersparnismassnahme geltend gemachten Steuerabzüge und Verluste unrichtig sind und dass Con Ed nicht in der Lage ist, den Nachweis zu erbringen, dass ihr eine Rückerstattung zusteht, da:

- Con Ed zu dem Zeitpunkt der LILO Transaktion im Jahre 1997 kein echtes Pachtrecht erworben hat;

- Con Ed in Zusammenhang mit dem LILO keine echte Schuldverpflichtung erworben hat;

- Die LILO-Steuerersparnis-Transaktion bzw. Teile der LILO-Steuerersparnis- Transaktion der wirtschaftlichen Grundlage entbehrten bzw. eine Täuschung darstellten;

- Die Steuerabzüge fehlschlagen, wenn die schrittweise Transaktions-Doktrin angewendet wird und die Schritte, die zu der Steuerersparnis führen, entzerrt und dann als einzelne Transaktionen gewertet werden;

- Con Ed nicht berechtigt ist, die Zinskosten für das non-recourse Darlehen von der Steuer abzusetzen, da ein Darlehen dieser Art nicht dazu führt, dass die Erträge aus dem Darlehen Con Ed zur Verfügung stehen bzw. das Darlehen keine echte Stundung durch den Darlehensgeber darstellt; sowie

- die LILO-Steuerersparnismassnahme im vorliegenden Fall bestenfalls einen bedingten zukünftigen Pachtrechtbesitz

> schafft, der Con Ed nicht dazu berechtigt, daraus gegenwärtige Steuerabzüge abzuleiten.

Kurzum, die Vereinigten Staaten machen geltend, dass nichts stattfindet ausser der Ausfertigung von Dokumenten und der Zahlung von Gebühren.

Die Vereinigten Staaten haben Informationen über diese LILO-Transaktion unmittelbar von Con Ed angefordert. Con Ed gibt an, dass sich Informationen über die LILO-Transaktion bei Dritten befinden, die an der LILO-Transaktion beteiligt sind; einige dieser Dritten sind im vorliegenden Rechtshilfeersuchen genannt. Die ersuchten Informationen beziehen sich auf den wesentlichen Inhalt und das Wesen der Auswirkungen der LILO-Transaktion, um die es im vorliegenden Fall geht, unter anderem auch um die Finanzierungsvereinbarung, wie die Transaktion von der Gegenpartei behandelt wird, sowie welche Sorgfalt, falls zutreffend, in Erwartung der Transaktion ausgeübt wurde.

Das ersuchende Gericht hält es im Interesse des Rechts für erforderlich, dass von einigen der Teilnehmern an der LILO-Transaktion bzw. deren Sonderrechtsnachfolgern, nämlich E.On Energie AG und Bayerische Landesbank AG, schriftliches Beweismaterial zur Verwendung bei der Gerichtsverhandlung eingeholt wird.

**9. Einzuholendes Beweismaterial bzw. weitere auszuführende richterliche Handlungen**

a. E.On Energie AG

Das Gericht bittet, die E.On Energie AG, die Muttergesellschaft der E.On Benelux Generation N.V. (Sonderrechtsnachfolger der EZH), Geschäftssitz: Brienner Str. 40, 80333 München, Deutschland, zu ersuchen, die im anliegenden Beweisstück A aufgeführten Dokumente beizubringen; Kopien dieser Dokumente sind den Anwälten der Parteien dieser Klage zur Verfügung zu stellen.

b. Bayerische Landesbank AG

Das ersuchende Gericht bittet höflichst, die Bayerische Landesbank AG, Geschäftssitz: Brienner Str. 40, 80333 München, Deutschland, zu ersuchen, die in dem anliegenden Beweisstück B aufgeführten Dokumente beizubringen; Kopien dieser Dokumente sind den Anwälten der Parteien dieser Klage zur Verfügung zu stellen.

**10. Ersuchen zum Beantragten Verfahrensablauf**

Das ersuchende Gericht bittet höflichst, die vorstehend aufgeführten Anwälte des Klägers und bzw. der Beklagten über den Zeitpunkt und Ort der Ausführung des Ersuchens zu informieren, sowie, dass Vertreter der Parteien zu der Ausführung [des Rechtshilfeersuchens] zugelassen werden. In dem Fall, dass das ersuchte Beweismaterial nicht auf die beantragte Art und Weise

erlangt werden kann, soll es gemäss . dem örtlichen Recht erlangt werden.

**11. Erstattung von Kosten**

Die Vereinigten Staaten werden Ihrem Gericht auf Wunsch sämtliche bei der Ausführung des Ersuchens anfallenden Kosten erstatten.

Die Gerichte der Vereinigten Staaten sind gesetzlich unter dem Recht der Vereinigten Staaten ermächtigt, den Gerichten der Bundesrepublik Deutschland ähnliche Rechtshilfe zu leisten und werden das von den Gerichten der Bundesrepublik Deutschland erwiesene Entgegenkommen gerne erwidern. Das ersuchende Gericht versichert den Justizbehörden der Bundesrepublik Deutschland seine vorzügliche Hochachtung.

Richterin MARIAN BLANK HORN
UNITED STATES COURT OF FEDERAL CLAIMS

Datum: ______________________

SIEGEL

**BEWEISSTÜCK A**

**UNTERLAGEN, DIE VON DER E.ON ENERGIE AG BEIZUBRINGEN SIND**

**DEFINITIONEN & ANWEISUNGEN**

A. Die Begriffe Dokument, Akte und Material beziehen sich auf sämtliche schriftlichen, gedruckten, maschinengeschriebenen, elektronischen oder grafischen Sachen jeglicher Art. Im Sinne dieses Vorlageersuchens ist ein Entwurf oder eine nicht-identische Kopie als ein separates Schriftstück zu behandeln. Diese Begriffe sind so auszulegen, dass sie folgendes einschliessen, ohne darauf beschränkt zu sein: Korrespondenz, Email, Notizen, Anmerkungen, Verträge, Broschüren, Vereinbarungen, Rechtstitel, Pachtverträge, Briefe, Vermerke, Schecks, Kontoauszüge, Berichte, Analysen, Vorausplanungen, Studien, Akten, Sitzungsprotokolle, Bilanzen, Finanzunterlagen, Rechnungslegungs- oder Rechnungsprüfungs-Arbeitspapiere (auch unbefristete Arbeitspapiere), Tabellenkalkulationen, Niederschriften, Aufzeichnungen sowie alle anderen Arten von schriftlichem und dokumentierendem Material.

B. Jede Kopie eines Dokumentes, die sich auf irgend eine Art von dem Original bzw. von einer anderen Kopie des Dokumentes unterscheidet, entweder durch handschriftliche oder andere Anmerkungen oder jegliche Weglassungen, stellt ein separates Dokument dar und ist beizubringen. Jedes Dokument ist vollumfänglich beizubringen, ohne Abkürzungen oder Zensierungen, und die Person, welche die Anmerkungen gemacht hat, ist zu identifizieren.

C. Wenn irgendwelche Dokumente unter Berufung auf ein Verweigungerungsrecht vorenthalten werden, so ist eine Liste der entsprechenden Dokumente zusammen mit den folgenden Angaben und ausreichenden Details vorzulegen,, um einem Gericht die Entscheidung darüber erlauben, ob ein Verweigerungsrecht gegeben ist: Datum, Absender, Empfänger, Art (z.B., Brief, Vermerk, Telegramm, Tabelle, Fotografie, etc.), der Gegenstand des Dokumentes, die Grundlage für die Geltendmachung des Verweigerungsrechts, sowie der/die Abschnitt(e) des vorliegenden Vorlageersuchens, auf welche(n) sich das Dokument bezieht.

D. Falls ein Dokument, das unter dieses Vorlageersuchen fallen würde, nicht mehr existiert, wird um folgende Information über jedes Dokument gebeten: Wann es vernichtet wurde (Datum),

der Grund für die Vernichtung, sowie die verantwortliche(n) Person(en), welche die Entscheidung zur Vernichtung der/des Dokument(e)s getroffen hat/haben, sowie der Grund für die tatsächliche Vernichtung der/des Dokumente(s).

E. Die Beantwortung dieser Vorlageersuchen sollte gem. Fed. R. Evid. 902(12), Certified Foreign Records of Regularly Conducted Activity [Bundesregel zur Beweisaufnahme, beglaubigte ausländische Unterlagen über regelmässig vorgenommene geschäftliche Handlungen] erfolgen.

F. Der Begriff Con Ed bezieht sich auf Consolidated Edison Company of New York, Inc. & Tochtergesellschaften, ihr nahestehende Firmen, einschliesslich, aber nicht beschränkt auf Consolidated Edison Development, Inc., Consolidated Edison Leasing, Inc., und Consolidated Edison, Inc.

G. Der Begriff Banc One bezieht sich auf Banc One Leasing Corp., ihr nahestehende Firmen, Tochtergesellschaften, Rechtsnachfolger und Abtretungsempfänger einschliesslich, aber nicht beschränkt auf jede Person, leitenden Angestellten, Direktor, Steuerberater, Rechtsanwalt, Vertreter oder Firma, welche im Auftrag einer der vorstehend genannten Organisationen handelt.

H. Der Begriff ZH bezieht sich auf N.V. Electriciteitsbedrifj Zuid-Holland, ihr nahestehende Firmen, Tochtergesellschaften, Rechtsnachfolger und Abtretungsempfänger einschliesslich, aber nicht beschränkt auf Preussen Elektra AG und E.ON Benelux Generation N.V. und jede Person, leitenden Angestellten, Direktor, Steuerberater, Rechtsanwalt, Vertreter oder Firma, welche im Auftrag einer der vorstehend genannten Organisationen handelt.

I. Der Begriff .On Energie bezieht sich auf E.On Energie AG, ihr nahestehende Firmen, Tochtergesellschaften, Rechtsnachfolger und Abtretungsempfänger und jede Person, leitenden Angestellten, Direktor, Steuerberater, Rechtsanwalt, Vertreter oder Firma, welche im Auftrag einer der vorstehend genannten Organisationen handelt.

J. Der Begriff RoCa3 bezieht sich auf die mit Gas betriebene, in den Niederlanden an der Grenze zwischen Rotterdam und Capelle and den IJessel gelegene CHP-Anlage, welche neben den

beiden zuvor errichteten Anlagen die dritte Anlage darstellt und sich etwa am 15. Dezember 1997 im Besitz von EZH befand.

K. Der Begriff BU bezieht sich auf die Hollandsche Bank-Unie N.V., ihr nahestehende Firmen, Tochtergesellschaften, Rechtsnachfolger und Abtretungsempfänger und jede Person, leitenden Angestellten, Direktor, Steuerberater, Rechtsanwalt, Vertreter oder Firma, welche im Auftrag einer der vorstehend genannten Organisationen handelt.

L. Der Begriff ABN AMRO bezieht sich auf ABN AMRO Bank N.V., ihr nahestehende Firmen, Tochtergesellschaften, Rechtsnachfolger und Abtretungsempfänger und jede Person, leitenden Angestellten, Direktor, Steuerberater, Rechtsanwalt, Vertreter oder Firma, welche im Auftrag einer der vorstehend genannten Organisationen handelt.

M. Der Begriff Tauw bezieht sich auf Tauw Milieu B.V., ihr nahestehende Firmen, Tochtergesellschaften, Rechtsnachfolger und Abtretungsempfänger einschliesslich, aber nicht beschränkt auf Tauw B.V. und jede Person, leitenden Angestellten, Direktor, Steuerberater, Rechtsanwalt, Vertreter oder Firma, welche im Auftrag einer der vorstehend genannten Organisationen handelt.

N. Der Begriff Credit Suisse bezieht sich auf Credit Suisse Financial Products, Credit Suisse First Boston, ihr nahestehende Firmen, Tochtergesellschaften, Rechtsnachfolger und Abtretungsempfänger und jede Person, leitenden Angestellten, Direktor, Steuerberater, Rechtsanwalt, Vertreter oder Firma, welche im Auftrag einer der vorstehend genannten Organisationen handelt.

O. Der Begriff ABB Leasing bezieht sich auf ABB Leasing GmbH, Asia Brown Boveri A.G. & Co. Leasing KG, Asia Brown Boveri A.G., oder alle nahestehenden Firmen, Tochtergesellschaften, Rechtsnachfolger und Abtretungsempfänger und jede Person, leitenden Angestellten, Direktor, Steuerberater, Rechtsanwalt, Vertreter oder Firma, welche im Auftrag einer der vorstehend genannten Organisationen handelt.

P. Der Begriff Lease-Transaktion bezieht sich auf eine Reihe von Transaktionen zwischen EZH und Con Ed am 15. Dezember 1997 über eine Treuhandschaft, über welche EZH mit einem Leasing-Vertrag angeblich ca. 47,468 % undivided interest [Ad Nutzniessung zur gesamten Hand] an der RoCa3-Anlage für einen Zeitraum von 44 Jahren an Con Ed leaste und Con Ed dann angeblich

den gleichen Anteil von 47,468 % an der RoCa3-Anlage unmittelbar für einen Zeitraum von 20 Jahren mit einem Unterpachtvertrag zurück an EZH geleast hat; nach Ablauf des Zeitraumes von 20 Jahren ergeben sich verschiedene Optionen, die in den Abschnitten 61-77, einschliesslich der als Beweisstück A-1 anliegenden Klageschrift, näher erläutert werden.

Q. Der Begriff Teilnehmer an der Lease-Transaktion bezieht sich auf die folgenden juristischen Personen: ABN AMRO Bank N.V., Hollandsche Bank-Unie N.V., EZH, Con Ed, Credit Suisse, Bayerische Landesbank, sowie Wilmington Trust Co., ABB Leasing und sämtliche nahestehenden Firmen, Tochtergesellschaften, Rechtsnachfolger und Abtretungsempfänger, Vorläuferfirmen oder Nachfolgerfirmen und jede Person, leitenden Angestellten, Direktor, Steuerberater, Rechtsanwalt, Vertreter oder Firma, welche im Auftrag einer der vorstehend genannten Organisationen handelt.

R. Der Begriff Capstar bezieht sich auf Capstar Partners L.L.C., ihr nahestehende Firmen, Tochtergesellschaften, Rechtsnachfolger und Abtretungsempfänger und jede Person, leitenden Angestellten, Direktor, Steuerberater, Rechtsanwalt, Vertreter oder Firma, welche im Auftrag einer der vorstehend genannten Organisationen handelt.

S. Der Begriff Cornerstone bezieht sich auf Cornerstone Financial Advisors L.P., ihr nahestehende Firmen, Tochtergesellschaften, Rechtsnachfolger und Abtretungsempfänger, sowie jede Person, leitenden Angestellten, Partner , Steuerberater, Rechtsanwalt, Vertreter oder Firma, welche im Auftrag einer der vorstehend genannten Organisationen handelt.

**BEIZUBRINGENDE DOKUMENTE**

**DIE LEASE-TRANSAKTION**

1. Die in Ihren Unterlagen befindlichen Entwürfe der Dokumente, welche auf den Seiten 3 bis 6 des Closing Memorandum [Ad Abschliessender Vermerk] (US087959-US08972) als Operative Documents and Certain Other Basic Documents [Ad Rechtsbegründende Dokumente und weitere grundlegende Dokumente] bezeichnet werden (US08961-08964). Eine Kopie des abschliessennden Vermerks ist als Anlage A-2 beigefügt.

2. Die in Ihren Unterlagen befindlichen Dokumente, einschliesslich Notizen, Anmerkungen, Emails, Korrespondenz bezüglich der Pachtzins-Verpflichtung und der Optionspreise für

die Lease-Transaktion, inbesondere einschliesslich der in Ihren Unterlagen befindlichen Dokumente, aus denen hervorgeht, wie die Pachtzins-Verpflichtungen und Optionspreise ausgehandelt, kalkuliert und zugeteilt wurden.

3. Die in Ihren Unterlagen befindlichen Dokumente, aus denen hervorgeht, wie jeder Teilnehmer an der Lease-Transaktion ausgewählt wurde.

4. Die in Ihren Unterlagen befindlichen Dokumente bezüglich der Angebote oder Vorschläge, die von den Interessenten einer Teilnahme an der Lease-Transaktion oder einer im wesentlichen ähnlichen Art von Lease-Transaktion bezüglich der RoCa3-Anlage eingereicht wurden, unabhängig davon, ob diese Angebote oder Vorschläge von EZH angenommen wurden.

5. Die in ihren Unterlagen befindlichen Dokumente, einschliesslich von Vermerken, Aufzeichnungen, Emails und Korrespondenz bezüglich des Tax Indemnity Agreement [Ad Steuerbefreiungsvereinbarung] (in der Anlage als Beweisstück A-3 beigefügt).

**EXTERNE BERATER**

6. Die in Ihren Unterlagen befindlichen Dokumente bezüglich der Rolle von Capstar bei dem Beginn, der Förderung, der Empfehlung, dem Marketing, der Planung, der Genehmigung bzw. der Umsetzung der Lease-Transaktion.

7. Die in Ihren Unterlagen befindliche Korrespondenz bzw. Kommunikationen zwischen EZH und Capstar bezüglich dem Beginn, der Förderung, der Empfehlung, dem Marketing, der Planung, der Genehmigung bzw. der Umsetzung der Lease-Transaktion.

8. Die in Ihren Unterlagen befindlichen Dokumente bezüglich der Rolle von Cornerstone bei dem Beginn, der Förderung, der Empfehlung, dem Marketing, der Planung, der Genehmigung bzw. der Umsetzung der Lease-Transaktion.

9. Die in Ihren Unterlagen befindliche Korrespondenz bzw. Kommunikationen zwischen EZH und Cornerstone bezüglich dem Beginn, der Förderung, der Empfehlung, dem Marketing, der Planung, der Genehmigung bzw. der Umsetzung der Lease-Transaktion.

10. Die in Ihren Unterlagen befindliche Korrespondenz bzw. Kommunikationen zwischen Capstar und Cornerstone bezüglich dem

Beginn, der Förderung, der Empfehlung, dem Marketing, der Planung, der Genehmigung bzw. der Umsetzung der Lease-Transaktion.

11. Die in Ihren Unterlagen befindliche Korrespondenz und Kommunikationen zwischen EZH und von EZH beauftragten Beratern, ausgenommen Capstar oder Cornerstone, bezüglich der Lease-Transaktion.

12. Die in Ihren Unterlagen befindliche Korrespondenz und Kommunikationen zwischen E.On Energie AG, E.On Benelux B.V., oder Preussen Elektra AG und Capstar bezüglich der Lease-Transaktion, welche nach dem Abschluss der Lease-Transaktion stattfanden und in denen die Lease-Transaktion angesprochen ist.

13. Die in Ihren Unterlagen befindliche Korrespondenz und Kommunikationen zwischen E.On Energie AG, E.On Benelux B.V., oder Preussen Elektra AG und Cornerstone bezüglich der Lease-Transaktion, welche nach dem Abschluss der Lease-Transaktion stattfanden und in denen die Lease-Transaktion angesprochen ist.

14. Die in Ihren Unterlagen befindliche Korrespondenz und Kommunikationen zwischen EZH oder seinen Vertretern und Beratern und Banc One bezüglich der Lease-Transaktion und dem verbleibenden Anteil an der RoCa3-Anlage, die nicht unter die Lease-Transaktion fällt.

15. Die in Ihren Unterlagen befindlichen Dokumente bezüglich der Beraterdienste die von ABB Leasing an EZH erbracht wurden und die Grundlage für die Rechnung darstellen, die in der Anlage als Beweisstück A-4 beigefügt ist.

16. Die in Ihren Unterlagen befindliche Korrespondenz und Kommunikationen zwischen EZH und ABB Leasing bezüglich der Lease-Transaktion oder dem S-Lease, auf welche in der Rechnung, die in der Anlage als Beweisstück A-4 beigefügt ist, Bezug genommen wird.

17. Die in Ihren Unterlagen befindlichen Dokumente bezüglich des Pachtvertrages und anderen finanziellen Vereinbarungen betreffend die RoCa3-Anlage bzw. in der Anlage befindlicher Gerätschaften, bei denen ABB Leasing beteiligt ist bzw. vor Abschluss der Leasing-Transaktion beteiligt war.

18. Die in Ihren Unterlagen befindliche Korrespondenz und Kommunikationen zwischen EZH und ABB Leasing bezüglich jeglicher unter 17 angesprochener Lease- und Finanzierungsvereinbarungen.

19. Die Korrespondenz und Kommunikationen zwischen E.On Energie AG, Preussen Elektra AG, E.On Benelux B.V., EZH oder deren Vertretern und allen Teilnehmern an der Lease-Transaktion während des Zeitraumes bis zur Übernahme von EZH durch Preussen Elektra AG (die Preussen Elektra/EZH Übernahme bezüglich der Lease-Transaktion oder den Auswirkungen der Preussen Elektra/EZH-Übernahme auf die Lease-Transaktion.

20. Die Korrespondenz und Kommunikationen zwischen E.On Energie AG, Preussen Elektra AG, E.On Benelux B.V., EZH oder deren Vertretern und allen Teilnehmern an der Lease-Transaktion nach der Preussen Elektra/EZH Übernahme bezüglich der Lease-Transaktion oder den Auswirkungen der Preussen Elektra/EZH-Übernahme auf die Lease-Transaktion.

**RISIKO /- NUTZEN ANALYSE DER TRANSAKTION**

21. Die in Ihren Unterlagen befindlichen Dokumente über die Analyse oder Kalkulationen, die von oder im Auftrag von EZH bezüglich der Lease Purchase Option [Ad Mietkaufoption] und Sublease Purchase Option [Ad Untermietsvertragsoption], wie aufgeführt in Abschnitt 25 des Lease Agreement [Mietsvertrag] (US09324-09352) bzw. Abschnitt 19 des Sublease Agreement [Untermietsvertrag] (US09385-09440)durchgeführt wurden; Kopien des Lease Agreement bzw. Sblease Agreement sind in der Anlage als Beweisstück A-5 bzw. A-6 beigefügt.

22. Die in Ihren Unterlagen befindlichen Dokumente, in denen angesprochen wird, mit welcher Wahrscheinlichkeit EZH die Sublease-Option wahrnehmen würde.

23. Die in Ihren Unterlagen befindlichen Dokumente, in denen die Risiken für EZH bezüglich der Lease-Transaktion angesprochen bzw. analysiert werden.

24. Die in Ihren Unterlagen befindlichen Dokumente, in denen die Schritte besprochen werden, die unternommen werden könnten bzw. unternommen wurden, um die Risiken für EZH bezüglich der Lease-Transaktion zu reduzieren bzw. auf ein Minimum zu beschränken.

25. Die in Ihren Unterlagen befindlichen Dokumente, in denen die Risiken für die Teilnehmer an der Lease-Transaktion (ausgenommen EZH) bezüglich der Lease-Transaktion angesprochen bzw. analysiert werden.

26. Die in Ihren Unterlagen befindlichen Dokumente, in denen die Schritte besprochen werden, die unternommen werden könnten bzw. unternommen wurden, um die Risiken für die Teilnehmer an der Lease-Transaktion (ausgenommen EZH) bezüglich der Lease-Transaktion zu reduzieren bzw. auf ein Minimum zu beschränken.

27. Die in Ihren Unterlagen befindliche Korrespondenz, Vermerke, Gutachten oder sonstigen Kommunikationen von oder an Vertreter von Shearman & Sterling; Loeff Clays & Verbeke; Clifford Chance; Davis, Polk & Wardell; Nauta Dutilh; Loyens & Volkmaars; White & Case; Morris, James, Hitchens & Williams; oder Oppenhoff & Radler, in denen die Lease-Transaktion angesprochen wird.

**DARLEGUNGEN**

28. Die in Ihren Unterlagen befindlichen Dokumente, die bei Darlegungen von Capstar und Cornerstone an EZH betreffend die Lease-Transaktion oder eine ähnliche Art von Lease-Transaktion in bezug auf die RoCa3-Anlage verwendet wurden oder sich auf solche Darlegungen beziehen.

29. Die in Ihren Unterlagen befindlichen Dokumente, die bei Darlegungen durch Vertreter von EZH, Cornerstone und Capstar gegenüber Con Ed oder Vertretern von Con Ed über die Lease-Transaktion verwendet wurden oder sich auf solche Darlegungen beziehen.

30. Die in Ihren Unterlagen befindlichen Dokumente, die bei Darlegungen wie den im obigen Absatz 26 genannten gegenüber jeglichen juristischen Personen oder Einzelpersonen (ausgenommen Con Ed) oder deren Vertreter vor dem 15. Dezember 1997 verwendet wurden.

**GEBÜHRENDE SORGFALT**

31. Die in Ihren Unterlagen befindlichen Studien, Analysen, Prognosen, Vorausplanungen oder andere Dokumente betreffend gebührende Sorgfalt, die in Zusammenhang mit der Lease-Transaktion angefertigt wurden.

32. Die in Ihren Unterlagen befindlichen Dokumente, in denen Studien, Analysen, Prognosen, Vorausplanungen oder andere Dokumente betreffend gebührende Sorgfalt angesprochen werden, welche in Zusammenhang mit der Lease-Transaktion angefertigt wurden.

33. Jegliche in Ihren Unterlagen befindliche Kommunikation oder Korrespondenz zwischen Vertretern von EZH und Deloitte & Touche Valuation Group betreffend das von Deloitte & Touche in Zusammenhang mit der Lease-Transaktion angefertigte Gutachten.

34. Die in Ihren Unterlagen befindlichen Dokumente, die das von Deloitte & Touche in Zusammenhang mit der Lease-Transaktion angefertigte Gutachten enthalten bzw. darauf Bezug nehmen.

35. Jegliche in Ihren Unterlagen befindliche Kommunikation oder Korrespondenz zwischen Vertretern von EZH und Duke Engineering & Service betreffend die Analyse und Untersuchung der RoCa3-Anlage durch Duke Engineering & Service.

36. Die in Ihren Unterlagen befindlichen Dokumente, welche die von Duke Engineering & Sons in Zusammenhang mit der Lease-Transaktion angefertigte Analyse und Untersuchung enthalten bzw. darauf Bezug nehmen.

37. Die in Ihren Unterlagen befindliche Kommunikation oder Korrespondenz zwischen Vertretern von EZH und Tauw betreffend die Analyse, Untersuchung und Bewertung der RoCa3-Anlage, die in Zusammenhang mit der Lease-Transaktion durchgeführt wurde.

38. Die in Ihren Unterlagen befindlichen Dokumente, welche die von Tauw im Zusammenhang mit der Lease-Transaktion durchgeführte Analyse, Untersuchung und Bewertung enthalten bzw. darauf Bezug nehmen.

**FINANZIERUNG DER LEASE-TRANSAKTION**

39. Die in Ihren Unterlagen befindlichen Kommunikationen, Korrespondenz, Vermerke und Gutachten an oder von Credit Suisse betreffend den Marktzinssatz für Darlehen und/oder Einzahlungen in Zusammenhang mit der Lease-Transaktion.

40. Die in ihren Unterlagen befindlichen Kommunikationen, Korrespondenz und Vermerke zwischen EZH und ABN AMRO betreffend die Lease-Transaktion, insbesondere einschliesslich der Finanzierung der Lease-Transaktion.

41. Die in ihren Unterlagen befindlichen Kommunikationen, Korrespondenz und Vermerke zwischen EZH und HBU betreffend die Lease-Transaktion, insbesondere einschliesslich der Finanzierung der Lease-Transaktion.

42. Die in Ihren Unterlagen befindlichen Kommunikationen, Korrespondenz und Vermerke zwischen EZH und Bayerische Landesbank betreffend die Lease-Transaktion, insbesondere der Finanzierung und/oder der Verwendung von Akkreditiven, einschliesslich dem Unwiderruflichen Bestandsakkreditiv Nr. 151221116 in Zusammenhang mit der Lease-Transaktion.

43. Die in Ihren Unterlagen befindlichen Dokumente betreffend Konto Nr. 50.22.51.093 HBU Assignment Account EZH 1997 Roca 3 Trust 2 bei ABN AMRO.

44. Die in Ihren Unterlagen befindlichen Dokumente betreffend Konto Nr. 43510-0 ZH 1997 ROCA Facility Trust No. 2 bei der Wilmington Trust Company.

45. Die in Ihren Unterlagen befindlichen Dokumente betreffend alle weiteren Bankkonten, ausser den vorstehend in Absätzen 43 und 44 aufgeführten Bankkonten, die in Zusammenhang mit der Lease-Transaktion verwendet wurden.

46. Die in Ihren Unterlagen befindlichen Dokumente betreffend den Kauf von US Treasury Strip Coupons CUSIP 912833JX9, CUSIP 912833KN9, CUSIP 912833KQ2, CUSIP 912833KRO, CUSIP 912833KS8 und CUSIP 912833KT6, um welche es in den unter Bates Nummern US01835, US01836, und US01837-US01840 aufgeführten Dokumenten geht, welche in der Anlage als Beweisstücke A-7, A-8 bzw. A-9 beigefügt sind.

47. Die in Ihren Unterlagen befindlichen Dokumente betreffend der von Credit Suisse vorgenommenen Zahlung für den Kauf der vorgenannten U.S. Treasury Strips mit Mitteln aus dem Konto Nr. 43510-0 bei der Wilmington Trust Company.

**DIE LEASE-TRANSAKTION AUS DER SICHT VON EZH / E.ON ENERGIE**

48. Die in Ihren Unterlagen befindlichen internen EZH-Dokumente betreffend die Lease-Transaktion oder die Entscheidung, die Lease-Transaktion oder eine der Lease-Transaktion im wesentlichen ähnliche Transaktion in Zusammenhang mit der RoCa3-Anlage einzugehen.

49. Die in Ihren Unterlagen befindlichen Dokumente, aus denen hervorgeht, wie EZH die Lease-Transaktion vormals behandelte bzw. zurzeit behandelt, beschreibt, oder die Lease-Transaktion zum Zwecke ihrer steuerlichen und finanziellen Berichtspflicht angibt.

50. Die in Ihren Unterlagen befindlichen Dokumente, aus denen hervorgeht, wie EZH die Lease-Transaktion vormals behandelte bzw. sie zurzeit behandelt, beschreibt, oder die Lease-Transaktion zum Zwecke ihrer steuerlichen und finanziellen Berichtspflicht angibt.

51. Die in Ihren Unterlagen befindlichen Dokumente, aus denen hervorgeht, wie die Lease-Transaktion zum Zwecke der Preussen Elektra/EZH Übernahme behandelt wurde.

52. Die in Ihren Unterlagen befindliche Korrespondenz und Kommunikationen zwischen Vertretern von EZH, Con Ed, Preussen Elektra AG und/oder E.On Energie AG betreffend der Abmachung zwischen Con Ed und EZH.

53. Die in Ihren Unterlagen befindlichen Dokumente betreffend der Auswirkung der Lease-Transaktion auf die RoCa3-Anlage im Hinblick auf die Preussen Elektra/EZH Übernahme.

54. Die in Ihren Unterlagen befindlichen Dokumente betreffend die Sublease Purchase Option [Ad Untermietsvertragsoption] im Hinblick auf die Preussen Elektra/EZH-Übernahme.

55. Die in Ihren Unterlagen befindlichen Dokumente betreffend der Tax Indemnity Agreement [Ad Steuerentschädigungsvereinbarung] im Hinblick auf die Preussen Elektra/EZH- ernahme.

56. Die in Ihren Unterlagen befindliche Korrespondenz zwischen Vertretern von EZH, Preussen Elektra AG, E.On Benelux B.V. oder E.On Energie und Vertretern von Con Ed, welche nach der Übernahme von EZH durch Preussen Elektra stattfand und bei der es um die Lease-Transaktion geht.

57. Die in Ihren Unterlagen befindlichen Dokumente, welche die Analysen enthalten bzw. auf die Analysen Bezug nehmen, die für oder im Auftrag von EZH, Preussen Elektra AG, E.On Benelux N.V. oder E.On Energie in bezug auf die Behandlung der Lease-Transaktion und/oder der RoCa3-Anlage im Hinblick auf die Übernahme von EZH durch Preussen Elektra durchgeführt wurden.

58. Die in Ihren Unterlagen befindlichen abschliessenden Dokumente und Terminpläne aus der Übernahme von EZH durch Preussen Elektra, in welchen auf die Lease-Transaktion oder Con Ed Bezug genommen wird.

59. Die in Ihren Unterlagen befindlichen Dokumente betreffend oder bezugnehmend auf die gebührende Sorgfalt, die durch oder im Auftrag von Preussen Elektra AG, E.On Benlelux B.V. oder E.On Energie bei der Bewertung der Risiken und/oder Nutzen der Lease-Transaktion ausgeübt wurde.

60. Die in Ihren Unterlagen befindlichen Dokumente, aus denen die Bewertung der RoCa3-Anlage im Hinblick auf die Preussen Elektra/EZH Übernahme behandelt bzw. darauf Bezug genommen wird.

**INSTANDHALTUNG UND BETRIEB DER ANLAGE**

61. Die in Ihren Unterlagen befindlichen Dokumente, aus denen eine Beteiligung von Con Ed an der RoCa3-Anlage vom 15. Dezember 1997 bis heute hervorgeht, einschliesslich, aber nicht beschränkt auf die Finanzierung, den Betrieb oder die Leitung der RoCa3-Anlage, oder die Revision, Überprüfung, Unterstützung von EZH, E.On Benelux B.V. oder E.On Energie, oder die Beratung mit EZH, E.On Benelux B.V. oder E.On Energie betreffend den Betrieb der RoCa3-Anlage.

62. Die in Ihren Unterlagen befindlichen Dokumente betreffend der Rolle von Con Ed bei grossen baulichen Verbesserungen an der RoCa3-Anlage.

63. Die in Ihren Unterlagen befindlichen Dokumente betreffend der Rolle von Con Ed bei der Instandhaltung bzw. Reparatur der RoCa3-Anlage seit dem 15. Dezember 1997.

64. Die in Ihren Unterlagen befindlichen Dokumente betreffend der Beteiligung von Con Ed an den Betriebskosten der RoCa3-Anlage vom 15. Dezember 1997 bis heute.

**BEHÖRDLICHE GENEHMIGUNGEN**

65. Die in Ihren Unterlagen befindliche Korrespondenz und andere schriftliche Kommunikationen zwischen den Behörden in den Niederlanden und EZH oder Vertretern von EZH betreffend die Lease-Transaktion oder die Rolle von Con Ed in der RoCa3-Anlage vor dem Tag, an dem die Lease-Transaktion abgeschlossen wurde.

66. Die in Ihren Unterlagen befindlichen Dokumente, die

Behörden in den Niederlanden von EZH oder Vertretern von EZH zur Verfügung gestellt wurden, um die Zustimmung bzw. Genehmigung für die Lease-Transaktion zu erhalten.

67. Die in Ihren Unterlagen befindliche Korrespondenz und andere schriftliche Kommunikationen zwischen EZH oder Vertretern von EZH und Behörden in den Niederlanden betreffend der erforderlichen Zustimmungen bzw. Genehmigungen für die Lease-Transaktion.

68. Die in Ihren Unterlagen befindlichen Dokumente, die den niederländischen Finanzbehörden (Belastingdienst) von EZH oder Vertretern von EZH zur Verfügung gestellt wurden, einschliesslich, aber nicht beschränkt auf Loyens & Volkmaars, um die ordnungsgemässe steuerliche Behandlung der Transaktion unter niederländischen Recht zu bestimmen.

69. Die in Ihren Unterlagen befindliche Korrespondenz oder andere schriftlichen Kommunikationen zwischen EZH oder Vertretern von EZH, einschliesslich, aber nicht beschränkt auf Loyens & Volkmaars und Belastingdienst in bezug auf die ordnungsgemässe steuerliche Behandlung der Transaktion unter niederländischen Recht.

# BEWEISSTÜCK B

## DOKUMENTE, DIE VON DER BAYERISCHEN LANDESBANK AG BEIZUBRINGEN SIND

## DEFINITIONEN & ANWEISUNGEN

A. Die Begriffe Dokument, Akte und Material beziehen sich auf sämtliche schriftlichen, gedruckten, maschinengeschriebenen, elektronischen oder grafischen Sachen jeglicher Art. Im Sinne dieses Vorlageersuchens ist ein Entwurf oder eine nicht-identische Kopie als ein separates Schriftstück zu behandeln. Diese Begriffe sind so auszulegen, dass sie folgendes einschliessen, ohne darauf beschränkt zu sein: Korrespondenz, Email, Notizen, Anmerkungen, Verträge, Broschüren, Vereinbarungen, Rechtstitel, Pachtverträge, Briefe, Vermerke, Schecks, Kontoauszüge, Berichte, Analysen, Vorausplanungen, Studien, Akten, Sitzungsprotokolle, Bilanzen, Finanzunterlagen, Rechnungslegungs- oder Rechnungsprüfungs-Arbeitspapiere (auch unbefristete Arbeitspapiere), Tabellen-kalkulationen, Niederschriften, Aufzeichnungen sowie alle anderen Arten von schriftlichem und dokumentierendem Material.

B. Jede Kopie eines Dokumentes, die sich auf irgend eine Art von dem Original bzw. von einer anderen Kopie des Dokumentes unterscheidet, entweder durch handschriftliche oder andere Anmerkungen oder jegliche Weglassungen, stellt ein separates Dokument dar und ist beizubringen. Jedes Dokument ist vollumfänglich beizubringen, ohne Abkürzungen oder Zensierungen, und die Person, welche die Anmerkungen gemacht hat, ist zu identifizieren..

C. Wenn Dokumente unter Berufung auf ein Verweigerungsrecht vorenthalten werden, so ist eine Liste der entsprechenden Dokumente zusammen mit den folgenden Angaben und ausreichenden Details vorzulegen, um einem Gericht die Entscheidung darüber zu erlauben, ob ein Verweigerungsrecht gegeben ist: Datum, Absender, Empfänger, Art (z.B., Brief, Vermerk, Telegramm, Tabelle, Fotografie, etc.), der Gegenstand des Dokumentes, die Grundlage für die Geltendmachung des Verweigerungsrechts, sowie der/die Abschnitt(e) des vorliegenden Vorlageersuchens, auf welche(n) sich das Dokument bezieht.

D. Wenn ein Dokument, das unter dieses Vorlageverlangen fallen würde, nicht mehr existiert, wird um folgende Information über jedes Dokument gebeten: Wann es vernichtet wurde (Datum), der Grund für die Vernichtung, sowie die verantwortliche(n) Person(en), welche die Entscheidung zur Vernichtung der/des Dokumente(s) getroffen hat/haben, sowie für die tatsächliche Vernichtung der/des Dokumente(s).

E. Die Beantwortung dieser Vorlageersuchen sollte gem. Fed. R. Evid. 902(12), Certified Foreign Records of Regularly Conducted Activity [Bundesregel zur Beweisaufnahme, beglaubigte ausländische Unterlagen über regelmässig vorgenommene geschätliche Handlungen] erfolgen.

F. Der Begriff Con Ed bezieht sich auf Consolidated Edison Company of New York, Inc. & Tochtergesellschaften, ihr nahestehende Firmen, einschliesslich, aber nicht beschränkt auf Consolidated Edison Development, Inc., Consolidated Edison Leasing, Inc., und Consolidated Edison, Inc.

G. Der Begriff Banc One bezieht sich auf Banc One Leasing Corp., ihr nahestehende Firmen, Tochtergesellschaften, Rechtsnachfolger und Abtretungsempfänger einschliesslich, aber nicht beschränkt auf, jede Person, leitenden Angestellten, Direktor, Steuerberater, Rechtsanwalt, Vertreter oder juristische Person, welche im Auftrag einer der vorstehend genannten Organisationen handelt.

H. Der Begriff EZH bezieht sich auf N.V. Electriciteitsbedrifj Zuid-Holland, ihr nahestehende Firmen, Tochtergesellschaften, Rechtsnachfolger und Abtretungsempfänger einschliesslich, aber nicht beschränkt auf, jede Person, leitenden Angestellten, Direktor, Steuerberater, Rechtsanwalt, Vertreter oder juristische Person, welche im Auftrag einer der vorstehend genannten Organisationen handelt.

I. Der Begriff E.On Energie bezieht sich auf E.On Energie AG, ihr nahestehende Firmen, Tochtergesellschaften, Rechtsnachfolger und Abtretungsempfänger einschliesslich, aber nicht beschränkt auf, jede Person, leitenden Angestellten, Direktor, Steuerberater, Rechtsanwalt, Vertreter oder juristische

Person, welche im Auftrag einer der vorstehend genannten Organisationen handelt.

J. Der Begriff RoCa3 bezieht sich auf die mit Gas betriebene, in den Niederlanden an der Grenze zwischen Rotterdam und Capelle an den IJessel gelegene CHP- Anlage, welche neben den beiden zuvor errichteten Anlagen die dritte Anlage darstellt und etwa am 15. Dezember 1997 EZH gehörte.

K. Der Begriff Lease-Transaktion bezieht sich auf eine Reihe von Transaktionen zwischen EZH und Con Ed am 15. Dezember 1997 über eine Treuhandschaft, über welche EZH mit einem Leasing-Vertrag angeblich ca. 47,468 % undivided interest [Ad Nutzniessung zur gesamten Hand] an der RoCa3-Anlage für einen Zeitraum von 44 Jahren an Con Ed leaste und Con Ed dann angeblich den gleichen Anteil von 47,468 % an der RoCa3-Anlage unmittelbar für einen Zeitraum von 20 Jahren mit einem Unterpachtvertrag zurück an EZH geleast hat; nach Ablauf des Zeitraumes von 20 Jahren ergeben sich verschiedene Optionen, die in den Abschnitten 61-77, einschliesslich der als Anlage B-1 anliegenden Klageschrift, erläutert werden.

L. Der Begriff Teilnehmer an der Lease-Transaktion bezieht sich auf die folgenden Gesellschaften: ABN AMRO Bank N.V., Hollandsche Bank-Unie N.V., EZH, Con Ed, Credit Suisse, Bayerische Landesbank, ABB Leasing GmbH, Wilmington Trust Co. und sämtliche nahestehenden Firmen, Tochtergesellschaften, Rechtsnachfolger und Abtretungsempfänger, Vorläuferfirmen oder Nachfolgerfirmen und jede Person, leitenden Angestellten, Direktor, Steuerberater, Rechtsanwalt, Vertreter oder Firma, welche im Auftrag einer der vorstehend genannten Organisationen handelt.

M. Der Begriff Capstar bezieht sich auf Capstar Partners L.L.C., ihr nahestehende Firmen, Tochtergesellschaften, Rechtsnachfolger und Abtretungsempfänger und jede Person, leitenden Angestellten, Direktor, Steuerberater, Rechtsanwalt, Vertreter oder Firma, welche im Auftrag einer der vorstehend genannten Organisationen handelt.

N. Der Begriff Cornerstone bezieht sich auf Cornerstone Financial Advisors L.P., ihr nahestehende Firmen, Tochtergesellschaften, Rechtsnachfolger und Abtretungsempfänger

sowie jede Person, leitenden Angestellten, Partner, Steuerberater, Rechtsanwalt, Vertreter oder Firma, welche im Auftrag einer der vorstehend genannten Organisationen handelt.

**BEIZUBRINGENDE DOKUMENTE**

**DIE LEASE-TRANSAKTION**

1. Die in den Unterlagen der Bayerischen Landesbank befindlichen Dokumente, in denen die Lease-Transaktion angesprochen wird.

2. Die in den Unterlagen der Bayerischen Landesbank befindlichen Dokumente, in denen die Anwerbung der Bayerischen Landesbank als eine potenzielle Teilnehmerin an der Lease-Transaktion angesprochen wird bzw. welche die Anwerbung der Bayerischen Landesbank als eine potenzielle Teilnehmerin betreffen.

3. Die in den Unterlagen der Bayerischen Landesbank befindlichen Dokumente, in denen die Entscheidung der Bayerischen Landesbank zur Teilnahme an der Lease-Transaktion angesprochen wird.

4. Die in den Unterlagen der Bayerischen Landesbank befindlichen Dokumente, in denen das Unwiderrufliche Bestandsakkreditiv Nr. 151221116, sowie jegliche de-rungen desselben, angesprochen wird bzw. welche das Unwiderrufliche Bestandsakkreditiv Nr. 151221116 betreffen.

5. Die in den Unterlagen der Bayerischen Landesbank befindlichen Dokumente betreffend die Aushandlung bzw. die Erteilung des Unwiderruflichen Bestandsakkreditivs Nr. 151221116 vom 15. Dezember 1997, aufgef rt als Bates-Nr. US06193-06204, anliegend als Anlage B-2 beigefügt.

6. Die in den Unterlagen der Bayerischen Landesbank befindlichen Dokumente, welche die Risiko- bzw. Nichterfüllungsanalysen enthalten, die in Zusammenhang mit der Entscheidung zur Teilnahme an der Lease-Transaktion bzw. dem Unwiderruflichen Bestandsakkreditiv Nr. 151221116 vom 15. Dezember 1997 angefertigt wurden.

7. Die in den Unterlagen der Bayerischen Landesbank befindlichen Dokumente, in denen die Pachtoptionen beschrieben oder angesprochen werden, welche die Lease-Transaktion Con Ed und/oder EZH gewährt, einschliesslich der Dokumente, in denen die Durchführbarkeit und/oder die Wahrscheinlichkeit der Ausübung dieser Optionen angesprochen wird.

8. Die in den Unterlagen der Bayerischen Landesbank befindlichen Dokumente, welche die Überweisung von Mitteln durch oder an Teilnehmer an der Lease-Transaktion in Zusammenhang mit der Lease Transkation oder dem Unwiderruflichen Bestandsakkreditiv Nr. 151221116 vom 15. Dezember 1997 belegen.

9. Die in den Unterlagen der Bayerischen Landesbank befindlichen Dokumente, welche das Risiko der Nichterfüllung in der Lease-Transaktion belegen.

10. Die in den Unterlagen der Bayerischen Landesbank befindlichen Dokumente, in denen eine Nichterfüllung oder eine säumige Tilgungsrate durch Con Ed und/oder EZH angesprochen wird.

**KOMMUNIKATIONEN**

11. Die in den Unterlagen der Bayerischen Landesbank befindlichen Briefe, Vermerke, Notizen, Emails oder anderen schriftliche Kommunikationen zwischen der Bayerischen Landesbank und den Teilnehmern an der Lease-Transaktion (oder deren nahestehende Firmen, Abtretungsempfänger oder Sonderrechtsnachfolger) in Zusammenhang mit der Lease-Transaktion und/oder dem Unwiderruflichen Bestandsakkreditiv Nr. 151221116 vom 15. Dezember 1997.

12. Die in den Unterlagen der Bayerischen Landesbank befindlichen Briefe, Vermerke, Notizen, Emails oder anderen schriftlichen Kommunikationen zwischen der Bayerischen Landesbank und Capstar in Zusammenhang mit der Lease-Transaktion oder dem Unwiderruflichen Bestandsakkreditiv Nr. 151221116 vom 15. Dezember 1997.

13. Die in den Unterlagen der Bayerischen Landesbank befindlichen Briefe, Vermerke, Notizen, Emails und anderen

schriftlichen Kommunikationen zwischen der Bayerischen Landesbank und Cornerstone in Zusammenhang mit der Lease-Transaktion und/oder dem Unwiderruflichen Bestandsakkreditiv Nr. 151221116 vom 15. Dezember 1997.

14. Die in den Unterlagen der Bayerischen Landesbank befindlichen Briefe, Vermerke, Notizen, Emails und anderen schriftlichen Kommunikationen zwischen der Bayerischen Landesbank und Banc One in Zusammenhang mit der Lease-Transaktion und/oder dem Unwiderruflichen Bestandsakkreditiv Nr. 151221116 vom 15. Dezember 1997.

15. Die in den Unterlagen der Bayerischen Landesbank befindlichen Briefe, Vermerke, Notizen, Emails und anderen schriftlichen Kommunikationen zwischen der Bayerischen Landesbank und Davis Polk in Zusammenhang mit der Lease-Transaktion und/oder dem Unwiderruflichen Bestandsakkreditiv Nr. 151221116 vom 15. Dezember 1997.

16. Die in den Unterlagen der Bayerischen Landesbank befindlichen Briefe, Vermerke, Notizen, Emails und anderen schriftlichen Kommunikationen, welche durch und/oder zwischen der Bayerischen Landesbank und EZH, E.On Benelux B.V., E.On Energie oder Con Ed, oder den Vertretern dieser Firmen, in bezug auf die Lease-Transaktion und/oder das Unwiderrufliche Bestandsakkreditiv Nr. 151221116 vom 15. Dezember 1997 ausgetauscht wurden, Bestandsakkreditive betreffend die Lease-Transaktion sowie die Auswirkungen, welche die Übernahme von EZH durch Preussen Elektra AG auf die Lease-Transaktion oder das Bestandsakkreditiv haben würde.

**ÄHNLICHE TRANSAKTIONEN**

17. Die in den Unterlagen der Bayerischen Landesbank befindlichen Dokumente, in denen jede andere, im wesentlichen der Lease-Transaktion ähnliche Transaktion und/oder die im Revenue Ruling [Ad Offizielle Stellungnahme der amerikanischen Steuerbehörde zu den steuerrechtlichen Folgen eines Sachverhaltes von allgemeinem Interesse] 2002-69, 2002-2 C.B. 760 beschriebene Transaktion (Kopie ist anliegend als Anlage B-3 beigefügt) zwischen 1996 und 2001, angesprochen wird, einschliesslich der Dokumente, in denen die Anwerbung der Bayerischen Landesbank als eine potenzielle Teilnehmerin an einer solchen Transaktion angesprochen wird, sowie die Dokumente, aus welchen die Erwägung der Bayerischen Landesbank bezüglich solcher Transaktionen sowie die Entscheidung zur Teilnahme an solchen Transaktionen hervorgeht.

**KOMMUNIKATIONEN MIT AUFSICHTSBEHÖRDEN**

18. Die in den Unterlagen der Bayerischen Landesbank befindliche Korrespondenz, Kommunikation und Berichte an Aufsichtsbehörden durch die Bayerische Landesbank oder im Auftrag der Bayerischen Landesbank, welche die Lease-Transaktion und/oder die Finanzierung der Lease-Transaktion betreffen oder auf diese Bezug nehmen.

# EXHIBIT 5

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| BB&T CORPORATION, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | No. 1:04CV00941 |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |

MEMORANDUM OPINION

TILLEY, District Judge

This matter is before the Court on the parties' cross Motions for Summary Judgment [Docs. #36 and 38]. For the reasons discussed below, the United States of America's Motion for Summary Judgment [Doc. #36] is GRANTED, and Plaintiff BB&T Corporation's Motion for Summary Judgment [Doc. #38] is DENIED.

I.

This matter is an action pursuant to 26 U.S.C. § 7422 in which Plaintiff BB&T Corporation ("BB&T") seeks to recover funds allegedly overpaid when the Internal Revenue Service ("IRS") disallowed certain tax deductions associated with BB&T's participation in a Lease-In/Lease-Out ("LILO") transaction (the "Transaction") with Sodra Cell AB ("Sodra"), a Swedish company. The parties have entered into a stipulation regarding undisputed facts, and the parties have stipulated to the admissibility of numerous documents.

BB&T is a financial services company whose subsidiaries operate banking

offices throughout the southeastern United States. [Stip. Facts ¶¶ 1-3]. Sodra manufactures wood pulp and is one of the world's leading manufacturers of wood pulp for the open market. [Stip. Facts ¶¶ 19-20]. The Transaction at issue involves the lease and sublease of the pulp manufacturing equipment (the "Equipment") at one of Sodra's pulp-manufacturing facilities. [Stip. Facts ¶ 25].

At the time of the Transaction, Sodra used the Equipment to manufacture pulp continuously, seven days a week, all year round. [Stip. Facts ¶ 28]. In 1995 and 1997, Sodra made extensive improvements to the Equipment in order to increase production capacity and reduce emissions at a cost in excess of $125 million. [Stip. Facts ¶¶ 29-30]. From 1997 to 2001, Sodra made additional modifications to the Equipment at a cost in excess of $74 million. [Stip. Facts ¶ 32].

In or about May 1997, Craig Knight from Knight, Tallman & van Tol Capital Partners, L.L.C. ("KTV") solicited BB&T to participate in the Transaction. [Stip. Facts ¶ 32]. BB&T attended a presentation in which KTV described the Transaction as a "tax driven structure" and also described the "tax savings generated by the structure."[1] [Doc. #36, Ex. 10]. Prior to this presentation, BB&T

---

[1]BB&T has objected to the Court's consideration of certain presentation documents asserting that the documents constitute hearsay and that they "are simply preliminary presentations by outside advisors." [Doc. #44 at 15]. Under the Federal Rules of Evidence hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted" and is inadmissible. Fed. R. Evid. 801, 802. In this case, the KTV presentation materials are not offered to prove the

had not participated in any LILO transactions. [Stip. Facts ¶ 49].

After the KTV presentation, BB&T independently reviewed the terms of the Transaction. In particular, BB&T hired Deloitte and Touche LLP to prepare a report regarding the estimated value and useful life of the Equipment and the value of BB&T's interest in the Equipment at various points in time. [Stip. Fact ¶ 50]. BB&T personnel also drafted memoranda analyzing the Transaction. An internal BB&T memorandum described the Transaction as a "tax-driven deal" promising an after-tax yield "largely generated by the tax benefits association with accelerated tax deductions for rent" over the first five years. [Doc. #36, Ex. 11 and Ex. 15].

On June 30, 1997, Sodra and BB&T, through a trust, entered into the Transaction by executing a series of agreements. Essentially, the Transaction consists of a "Head Lease" in which BB&T acquired an undivided interest in the Equipment for a period of 36 years ending June 30, 2033 and an immediate shorter term sublease (the "Lease") of the undivided interest in the Equipment back to Sodra for a term of 15.5 years. [Stip. Facts ¶¶ 41-42].

The Head Lease required BB&T to pay rent to Sodra in two installments.

---

truth of the matter asserted in those materials, that is whether BB&T would in fact receive tax benefits and acceleration of accounting income on after tax cash flows by entering into the Transaction. Rather, the presentation materials are offered to show words used to describe the transaction as they may relate to BB&T's state of mind or motive for entering into the Transaction. United States v. Leake, 642 F.2d 715, 720-21 (4th Cir.1981) (concluding that an out-of-court statement was not hearsay because it was offered to show the effect of the statement on the defendant's state of mind and not to prove the truth of the matter asserted in the statement).

The first installment (the "initial Head Lease Payment"), approximately $86.2 million, was due on the closing date[2] and is allocated to the first five years of the Head Lease term. [Stip. Facts ¶ 69]. The second installment (the "Deferred Head Lease Payment") of approximately $557.8 million is due in 2038, five years after the expiration of the Head Lease term, and is allocated to the last 31.5 years of the Head Lease term. [Stip. Facts ¶ 69].

BB&T paid the Initial Head Lease Payment with $18,228,895 of its own funds plus $68,008,236 from a non-recourse loan from Hollandsche Bank-Unie N.V. ("HBU"). [Stip. Facts ¶ 76]. HBU is a wholly owned subsidiary of ABN-AMBRO Bank N.V. ("ABN"). [Stip. Facts ¶ 77]. On June 30, 1997, ABN, on behalf of HBU, transferred $68,008,236 (the funds representing the HBU loan) into BB&T's Trust (the "Trust") account at ABN. [Stip. Facts ¶ 80]. BB&T transferred $18,228,895 into the Trust account at ABN. [Stip. Facts ¶ 81]. Thus, at closing a total of $86,237,131 was deposited into the Trust account at ABN either by BB&T or on BB&T's behalf.

Also at closing, Sodra was required to pay $68,008,236 (an amount equal to the amount of the HBU loan that was deposited into the Trust account at ABN on behalf of BB&T) to ABN as "Debt PUA Issuer" under the Debt Payment Undertaking Agreement ("Debt PUA"). [Stip. Facts ¶ 82]. Under the Debt PUA,

---

[2]At closing, BB&T also paid fees associated with the transaction in the amount of approximately $5.5 million and also paid approximately $4 million to KTV as an advisory fee. KTV in turn paid a $1 million advisory fee to BB&T.

ABN is obligated to make certain payments to BB&T on Sodra's behalf. [Stip. Facts ¶ 89].

In addition to the $68,008,236 payment to the Debt PUA Issuer, Sodra was required to pay $12,000,193 to Fleet National Bank ("Fleet") as the "Equity PUA Issuer" under the Equity Payment Undertaking Agreement ("Equity PUA"). [Stip. Facts ¶ 82]. Under the Equity PUA, Fleet was required to use the $12,000,193 to purchase certain government securities. [Stip. Facts ¶¶ 105-107].

Sodra's Debt PUA and Equity PUA payments were made at closing as follows: (1) the Trust, on Sodra's behalf, made the $68,008,236 payment that Sodra was required to make to ABN as Debt PUA Issuer using proceeds of BB&T's first installment payment [Stip. Facts ¶ 83]; and (2), the Trust, on Sodra's behalf, made the $12,000,193 payment Sodra was required to make to the Equity PUA Issuer also using proceeds of BB&T's first installment payment. [Stip. Facts ¶ 84]. In sum, $86,237,131 was deposited into the Trust account at ABN either by BB&T or on BB&T's behalf. Of the total deposited by BB&T, $80,008,429 was paid on Sodra's behalf to the Equity PUA the Debt PUA, leaving a balance of $6,228,702, which the Trust transferred to Sodra's account at ABN. BB&T has described this $6 million payment as Sodra's "incentive for doing the deal." [Doc. #36, ex. 15 at 2].

Pursuant to the Lease, Sodra is required to make annual rent payments to BB&T. [Stip. Facts ¶ 86]. Sodra's rent payments are equal to BB&T's scheduled

loan payments to HBU, in both amount and timing, through January 1, 2012. [Stip. Facts ¶ 87]. In addition, BB&T's scheduled debt payments to HBU on the HBU loan,[3] and Sodra's annual rent payments to BB&T, are equal to the scheduled payments required by the Debt PUA, which obligates ABN to pay Sodra's rent during the Head Lease term directly to HBU, until January 1, 2012. [Stip. Facts ¶ 90]. The interest rate on the funds that Sodra paid to the Debt PUA Issuer is equal to the interest rate on the HBU loan. [Doc. #36, ex. 15 at 2]. Thus, the Debt PUA payments from ABN to its subsidiary HBU satisfy both Sodra's rental obligations to BB&T under the sublease and BB&T's obligations to HBU under the loan agreement. [Stip. Facts ¶¶ 93-95]. Finally, the Debt PUA obligates ABN to make a final payment of $11,542,500 in 2013, either to or for the benefit of Sodra, depending on which of the options at the end of the Lease are exercised by the parties. [Stip. Facts ¶¶ 122, 137, 144.]

At the end of the Lease term on January 1, 2013, Sodra can elect to purchase BB&T's remaining interest under the Head Lease for five payments totaling $46,856,927. [Stip. Facts. ¶¶ 117-19]. If Sodra exercises this Purchase

---

[3]In order to secure BB&T's obligation to satisfy the HBU loan, BB&T executed a Loan and Security Agreement under which BB&T assigned to HBU a lien on the Head Lease, the Lease, BB&T's right to receive rent from Sodra, and BB&T's right to receive payments pursuant to the Debt PUA. [Stip. Facts ¶ 91]. To that end, the Lease instructed Sodra to pay rent directly to HBU. [Stip. Facts ¶ 92]. The funds paid to the Equity PUA Issuer, which were used to purchase certain government securities, were specifically excluded as collateral under the Loan and Security Agreement. [Stip. Facts ¶ 115].

Option,[4] the final payment under the Debt PUA ($11,542,500) is applied toward the Purchase Option price, which will pay the HBU Loan in full. [Stip. Facts ¶ 122]. In addition, the Equity PUA Issuer will make the five payments due under the Equity PUA ($35,314,427). Thus, the Equity PUA payments and Debt PUA payments total the $46,856,927 needed to fund Sodra's purchase option. [Stip. Facts. ¶¶ 120-22]. If Sodra exercises the purchase option, BB&T will be relieved of its obligation to make the deferred Head Lease payment. [Stip. Facts ¶ 124].

If Sodra elects not to exercise the purchase option, BB&T can either (1) require Sodra to renew the Lease for a period of 13.3 years (the "Sublease Renewal"); (2) enter into a lease with a third party (the "Replacement Sublease"); or (3) take possession of the Equipment. [Stip. Facts ¶ 131]. In the event BB&T requires Sodra to renew the Lease, the funds remaining in the Debt PUA and the Equity PUA are enough to satisfy in full the rental payments of the extended sublease. [Doc. #36, ex. 15; see also Stip. Facts. ¶ 139]. If Sodra does not exercise the Purchase Option and BB&T does not require Sodra to renew the Lease, then the funds in the Equity PUA account will be transferred to Sodra. [Stip. Facts ¶ 142]. In addition, pursuant to the Return Option or the Replacement Lease Option, Sodra receives the final payment under the Debt PUA. [Stip. Facts. ¶¶ 143-44].

---

[4]In their report, Deloitte & Touche concluded that Sodra was more likely to return the Equipment to BB&T in 2013 than to exercise the purchase option, which would be funded in full by the funds in the Debt PUA and the Equity PUA.

Under any of these latter options, BB&T would remain obligated to make the $557.8 million deferred Head Lease payment in 2038, which BB&T explained to its Loan Policy Committee would be "ultimately offset by the Sublease Renewal or Replacement Sublease rents plus an implied interest rate." [Doc. #36, ex. 14 at 5]. In particular, at the beginning of the Sublease Renewal Term or Replacement Sublease Term, BB&T would pledge the Sublease Renewal rents or Replacement Sublease rents as collateral for its payment of the deferred Head Lease payment. [Id.] The parties structured the Transaction so that the Sublease Renewal rents or Replacement Sublease rents would grow at a predetermined rate so that by the time the Deferred Head Lease Payment becomes due, the value of those rents is equal to the Deferred Head Lease Payment and that "obligation is fulfilled with no additional funding requirement on the part of" BB&T. [Id.]. Moreover, even if the interest rates are not as the parties assumed and the sums BB&T has pledged as collateral do not total $557.8 million as of 2038, Sodra has no recourse against BB&T for any deficiency. [See Doc. #36, ex. 12 at sec. 16(b)(1)(c)]. Thus, BB&T is not required to expend any additional funds, other than its initial investment in the Transaction, in order to make the Deferred Head Lease payment.

Sodra was also required to set up a long term Letter of Credit "for the protection of BB&T in case something happens to cause the transaction to 'unwind early.'" [Doc. #36, ex. 15 at 2]. BB&T understood that while the "LOC value changes over time, [it] is always in an amount large enough that when added to

the securities [purchased pursuant to the Equity PUA] and paid to BB&T, would make us whole including the required yield." [Doc. #36, ex. 15 at 2].

Pursuant to a Tax Indemnity Agreement, Sodra agreed that for United States federal income tax purposes, neither it, nor any of its personnel, would take a position inconsistent with the characterization of Sodra as the owner, head lessor, and lessee of the Equipment. [Stip. Facts ¶ 53].

On June 3, 1996, prior to the closing date of the Transaction, the IRS issued proposed rules pursuant to Section 467 of the Internal Revenue Code. [Stip. Facts ¶ 154]. These proposed rules were adopted as final regulations on May 18, 1999. [Stip. Facts ¶ 156]. As a result of these final regulations, BB&T did not participate in any other LILO transactions after April 1, 1999. [Stip. Facts ¶ 157].

BB&T reported the following items of income on its 1997 federal income tax return with respect to the Transaction: (1) rent from Sodra in the amount of $3,381,518 and (2) amortization of an advisory fee it received from KTV in the amount of $55,120. BB&T claimed the following deductions on its 1997 federal income tax return associated with the Transaction: (1) rent to Sodra in the amount of $9,894,362; (2) interest expense in the amount of $2,820,925; and (3) amortization of the fees and expenses paid in connection with the Transaction in the amount of $137,943. Upon audit of BB&T's 1997 federal income tax return, the IRS disregarded the income and disallowed the deductions associated with the Transaction resulting in an increase of $9,416,592 in BB&T's taxable income for

1997. BB&T paid a deficiency for 1997 in the amount of $3,295,807 plus $1,296,861 in interest for a total of $4,592,668. BB&T filed a claim for refund, which the IRS denied. BB&T filed the instant action for refund of the deficiency and interest. Both parties filed motions for summary judgment.

The parties have not cited, nor has the Court located, any decisions discussing income tax deductions associated with LILO transactions. Thus, the propriety of BB&T's deductions associated with the Transaction is an issue of first impression.

II.

Summary judgment is proper only when, viewing the facts in the light most favorable to the non-moving party, there is no genuine issue of any material fact, and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(e); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Cox v. County of Prince William, 249 F.3d 295, 299 (4th Cir. 2001). An issue is genuine if a reasonable jury, based on the evidence, could find in favor of the non-moving party. Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986); Cox, 249 F.3d at 299. There is no genuine issue of material fact if the nonmoving party fails to make a sufficient showing on an essential element of its case as to which it would have the burden of proof at trial. Celotex, 477 U.S. at 322-23. In essence, the summary judgment analysis concerns "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one

party must prevail as a matter of law." Anderson, 477 U.S. at 251-52; O'Connor v. Consol. Coin Caterers Corp., 56 F.3d 542, 545 (4th Cir.1995).

III.

The Supreme Court has long held that "an income tax deduction is a matter of legislative grace and that the burden of clearly showing the right to the claimed deduction is on the taxpayer." Interstate Transit Lines v. Comm'r, 319 U.S. 590, 593 (1943). Moreover, deductions are strictly construed and allowed only "as there is a clear provision therefor." New Colonial Ice Co. v. Helvering, 292 U.S. 435, 440 (1934). In determining whether a particular deduction should be allowed, courts must be mindful that "[t]he legal right of a taxpayer to decrease the amount of what otherwise would be his taxes, or altogether avoid them, by means which the law permits, cannot be doubted. But the question for determination is whether what was done, apart from the tax motive, was the thing which the statute intended." Gregory v. Helvering, 293 U.S. 465, 469 (1935). Thus, the question in this case is whether BB&T has clearly shown that its claimed deductions are what the applicable Internal Revenue Code statutes intended.

A.

The parties agree it is a central tenet of income tax law that the substance of a transaction, rather than its form, governs for tax purposes. Frank Lyon Co. v. United States, 435 U.S. 561, 572-73 (1978). The substance over form doctrine recognizes that the "incidence of taxation depends upon the substance of the

transaction . . . . To permit the true nature of a transaction to be disguised by mere formalisms, which exist solely to alter tax liabilities, would seriously impair the effective administration of the tax policies of Congress." Comm'r v. Court Holding Co., 324 U.S. 331, 334 (1945). As the Fourth Circuit has explained the doctrine: "Because substance takes precedence over form in tax law, however, we cannot permit the parties' chosen language to control the tax consequences of their transaction." Halle v. Comm'r, 83 F.3d 649, 655 (4th Cir. 1996).

Sodra and BB&T selected the form of a lease and immediate sublease, also referred to as a LILO, for the Transaction. As a result of this form selected by the parties, BB&T claimed a substantial rent deduction and deductions for fees associated with the Transaction on its 1997 income taxes. The question, however, is whether this form should be respected for tax purposes.

1.

The parties agree that in order for BB&T to be entitled to deduct rent and other expenses associated with the Head Lease, it is necessary for BB&T to have acquired a leasehold interest in the Equipment. The Government asserts that "Sodra continues to use the pulp-making equipment as before" and concludes that "Sodra never conveyed to BB&T a real leasehold interest in its property, and BB&T is not entitled to the tax deductions it claims." [Doc. # 36, at 14]. BB&T, on the other hand, asserts that Sodra's use of the Equipment was altered by the Transaction in that Sodra was required to pay rent to use the equipment and that

Sodra assumed several new obligations regarding the Equipment such as "maintaining and operating the Equipment consistently with certain standards, holding a specified amount of insurance, and filing certain reports." [Doc. #44, at 11].

The undisputed facts relevant to this inquiry are as follows: (1) Prior to the Closing Date, Sodra operated the Equipment in the normal course of its pulp-manufacturing business. [Stip. Facts ¶ 54]; (2) Prior to the Closing Date, Sodra was responsible for all costs associated with the Equipment's use and maintenance. [Stip. Facts ¶ 55]; (3) Pursuant to the Head Lease, during the Head Lease term, BB&T is entitled to sole possession of the Equipment, subject to Sodra's right to an annual inspection, is entitled to operate the Equipment until the end of the Head Lease Term, is required to use, operate, maintain, service, repair, and overhaul the Equipment, is responsible for all costs related to the use and maintenance of the Equipment, and is entitled to retain all profits from its use of the Equipment. [Stip. Facts ¶¶ 56-60]; (4) Pursuant to the Lease, during the Lease term, Sodra is entitled to sole possession of the Equipment, subject to BB&T's right to an annual inspection, is entitled to operate the Equipment until the end of the Head Lease Term, is required to use, operate, maintain, service, repair, and overhaul the Equipment, is responsible for all costs related to the use and maintenance of the Equipment, and is entitled to retain all profits from its use of the Equipment. [Stip. Facts ¶¶ 56-60]; (5) The combined effect of the Head Lease

and Lease is that BB&T does not have the right to possess the Equipment (apart from its right to make an annual inspection) and does not have the right to use the Equipment (except by leasing it to Sodra) until the end of the Lease term, the occurrence of a Lease default, or early termination of the Lease. [Stip. Facts ¶¶ 67-68; (6) Between 1995 and 2001, Sodra has invested approximately $199.6 million in improvements and modifications to the Equipment [Stip. Facts ¶¶ 30-31].

Where a conveyance of property is accompanied by retention of the same interest in the property, only a future interest in the property is conveyed. Ashlock v. Comm'r, 18 T.C. 405 (1952); Alstores Realty Corp. v. Comm'r, 46 T.C. 363, 371 (1966); see also Kruesel v. United States, 12 A.F.T.R. 2d 5701, 5704-05 (D. Minn. 1963) (considering whether the taxpayers had sold their entire "bundle of rights" in property and concluding that taxpayers had reserved a life estate.)

In Ashlock, a property owner sold certain property but retained possession and the right to receive rents for approximately two additional years. Ashlock, 18 T.C. at 407. The issue before the court was whether the rents constituted taxable income. The court found that the taxpayer had acquired only a future interest in the property because "the [sellers] not only retained the rents legally but they also retained control and benefits of ownership." Id. at 411. In particular, the Ashlock court noted that the sellers agreed to pay property taxes, insurance premiums, normal maintenance and expenses. Id. Moreover, in the event the property was damaged or destroyed, the loss would be borne by the sellers during the two year

period. Id. Ashlock was decided on the basis of substance over form: "taxation is not so much concerned with the refinements of title as it is with actual command over the property taxed - the actual benefit for which the tax is paid." Ashlock, 18 T.C. at 411 (quoting Corliss v. Bowers, 281 U.S. 376, 378 1930).

In Alstores Realty, on the other hand, the court rejected the taxpayer-buyer's argument (based on Ashlock) that "although in form there may have been a sale and leaseback, in substance, there was a conveyance of a future interest" where the seller "retained its right to occupancy not as a lessee . . . but as a legal owner of a reserved term for years." Alstores, 46 T.C. at 371. The Alstores court, analyzing similar factors to those considered in Ashlock, concluded that the buyer in Alstores (unlike the buyer in Ashlock) had agreed to pay for heat, electricity, and water for the seller-tenant. Id. at 372. In addition, the buyer, rather than the seller, bore the risk or burden in the event the property was damaged or destroyed. Ultimately, the court rejected the taxpayer-buyer's argument and concluded that "the buyer bore the risks and burdens of ownership" and was the legal owner for tax purposes. Id.

According to the form established by the parties, Sodra purported to lease the right to use and possess the Equipment to BB&T and immediately sublease back from BB&T the same rights to use and possess the Equipment. In this case, Sodra (as did the seller in Ashlock) retained in substance, at least for the term of the Lease, its rights of use and possession as the legal owner of the Equipment.

Indeed, as the stipulated facts make clear, the rights that Sodra purportedly transferred to BB&T under the Head Lease are identical to the rights that BB&T purportedly transferred back to Sodra under the Lease. [Compare Stip. Facts ¶¶ 56-60 with ¶¶ 62-66; see Stip Facts ¶¶67-68 ].

In substance, Sodra's use and possession of the Equipment was unaltered by the Transaction (but for BB&T's annual right of inspection). In particular, Sodra used, maintained, and serviced the Equipment as it did before the Transaction and even made significant investments in and improvements to the Equipment. In addition, Sodra was entitled to all of the profits generated from the use of the Equipment during the term of the Lease. Moreover, although the form of the transaction required Sodra to make rent payments to BB&T, those payments were in fact made by the Debt PUA, were funded in full by BB&T's Initial Head Lease Payment, and did not require Sodra to invest any of its own funds.

BB&T also asserts that Sodra was required to assume additional obligations as a result of the Lease. In support of this assertion, BB&T has cited sections 15(g) and 16(a) of Exhibit 12 to Doc. #36, which is the Head Lease document. Exhibit 12 does not contain a section labeled 15(g), and section 16(a) creates BB&T's duty to provide acceptable collateral to secure BB&T's obligation to make the Deferred Head Lease Payment. Upon review of the Lease, which is Exhibit 13 to Document #36, it appears that BB&T may have been attempting to refer to sections 5(g) and 6(a) of Exhibit 13. Section 5(g) of the Lease requires Sodra to

prepare certain reports associated with Governmental Actions that must be filed with any Governmental Authority. Section 6(a) of the Lease provides that Sodra must maintain insurance on the Equipment. There is no indication in the record that either these government reports or the requirement of insurance were obligations unique to the Lease and not borne by Sodra prior to execution of the Lease.

In addition, BB&T asserts that it acquired a leasehold interest in the Equipment because in the event Sodra elects not to exercise the purchase option and BB&T compels Sodra to execute an additional sublease, then the Equipment would be returned to BB&T with nine years remaining in the Head Lease and BB&T will "bear an unlimited risk of loss" on that leasehold interest. [Doc. #44, at 15]; Thomas v. Comm'r, 84 T.C. 412, 435 (1985) (considering whether taxpayer bore the risk of losing its investment in computer equipment).

The Thomas court noted that the taxpayer "bore the risk at the end of the leases that the residual value would not be sufficient to recoup its cash outlay." 84 T.C. at 435. Here, however, the Transaction was structured so that there was no risk to BB&T's initial (and only) cash outlay. Of the $18,228,895 million that BB&T initially transferred into the Trust account at ABN, $12,000,193 was paid to the Equity PUA to purchase certain government securities. The remainder of BB&T's equity investment, $6,228,702, was transferred to Sodra's account at ABN as Sodra's "incentive for doing the deal." [Doc. #36, ex. 15 at 2]. In the

event Sodra exercises the purchase option, the funds in the Equity PUA will be returned to BB&T through the payment of the purchase price. In the event Sodra does not exercise the purchase option and BB&T enforces the Sublease Renewal provision, the funds in the Equity PUA will be returned to BB&T through the Sublease Renewal rents. Moreover, BB&T's own internal documents note that Sodra's Letter of Credit requirement added to BB&T's security that its initial investment, *and* anticipated after-tax yield, would be protected from loss at all times. [Doc. #36, ex. 15, at 2].

In sum, because Sodra retained, in substance, all of the rights it possessed in the Equipment, at least for the term of the Lease, BB&T could not have acquired any of those rights during the term of the Lease. Rather, BB&T could acquire only a future interest in the Equipment that will mature at the end of the Lease term and then only in the event Sodra elects not to exercise its option (funded in full by the Equity PUA and the Debt PUA) to buyout BB&T's interest in the Head Lease. BB&T's payments to Sodra are not "rent payments." The fact that BB&T did not acquire a current leasehold interest in the Equipment is further demonstrated by the fact that BB&T bore no real risk of loss of its initial investment in the Transaction.

2.

The Government also asserts that the Head Lease and Lease should be disregarded or collapsed asserting that when parties have established two or more separate transactions that create offsetting obligations in order to generate tax

savings, courts have collapsed these offsetting obligations and recharacterized the transactions into a single transaction. Rogers v. United States, 281 F.3d 1108 (10th Cir. 2002) (recharacterizing purported loan and stock option transaction into a sale/redemption of stock in exchange for cash); United States v. Ingalls, 399 F, 2d 143, 145-46 (5th Cir. 1968) (disregarding offsetting installment obligations that could be accomplished through a simple bookkeeping entry); Big "D" Development Corp. v. Comm'r, T.C. Memo 1971-148 (1971), aff'd 453 F.2d 1365 (5th Cir. 1972) (disregarding series of bookkeeping entries intended to qualify land sale transaction at issue for installment method of reporting income).

The Government asserts the following facts demonstrate that the Head Lease and Lease, as well as the myriad (and circular) financing agreements, essentially create offsetting obligations for Sodra and BB&T. Specifically: (1) Pursuant to the "Head Lease" BB&T acquired an undivided interest in the Equipment for a period of 36 years [Stip. Fact ¶ 41]; (2) Pursuant to the Lease, Sodra immediately acquired the same undivided interest in the Equipment a term of 15.5 years. [Stip. Fact ¶ 42]; (3) The Debt PUA payments satisfy both Sodra's rental obligations to BB&T under the sublease and BB&T's obligations to HBU under the loan agreement. [Stip. Facts ¶¶ 93-95]; (4) The interest rate on the funds that Sodra paid to the Debt PUA Issuer is equal to the interest rate on the HBU loan. [Doc. #36, ex. 15 at 2]; (5) Sodra's purchase option at the end of the Lease term is funded entirely from the Debt PUA and the Equity PUA. [Stip. Facts.

¶¶ 120-22]; (6) In the event Sodra does not exercise the purchase option and BB&T requires Sodra to renew the Lease, the funds remaining in the Debt PUA and the Equity PUA are enough to satisfy in full the rental payments of the extended sublease. [Doc. #36, ex. 15; see also Stip. Facts. ¶ 139]; (7) If Sodra does not exercise the purchase option and BB&T remains obligated to make the $557.8 million deferred Head Lease payment in 2038, which would be "ultimately offset by the Sublease Renewal or Replacement Sublease rents plus an implied interest rate." [Doc. #36, ex. 14 at 5]. In sum, the Government concludes that these reciprocal obligations, which were designed to create significant tax savings, should be collapsed to reflect the true substance of the transaction – BB&T's payment of transaction costs and its investment in the government securities purchased by Fleet pursuant to the Equity PUA.

BB&T asserts the Government has mischaracterized the facts regarding the Transaction. In support of its arguments, however, BB&T relies upon the closing documents themselves, and in so doing, elevates form over substance. For example, in response to the Government's claim that the Lease rent payments are made "at no cost" to Sodra, BB&T cites the $68 million that Sodra was required to pay pursuant to the Debt PUA. [Doc. #44, at 6 ("Since Sodra paid $68 million for the Debt PUA, the payment of its rental obligations pursuant to the Debt PUA cannot possibly be described as 'at no cost' to Sodra.")]. In substance, however, Sodra was not required to expend any of its own funds. Rather, the funds for

Sodra's $68 million payment were provided by HBU to a trust account at ABN and the Trust made a $68,008,236 payment, on behalf of Sodra, to ABN as the Debt PUA Issuer. [Stip Facts ¶¶ 80-83].

Similarly, in challenging the Government's contention that the $557.8 million head lease payment is only "theoretically due," BB&T refers to portions of the Head Lease discussing the logistics of the Deferred Head Lease payment. While the form of the Transaction may require BB&T to make a Deferred Head Lease Payment in the amount of $557.8 million, in substance the Sublease Renewal rents or Replacement Sublease rents would grow at a predetermined rate so that by the time the Deferred Head Lease Payment becomes due, the value of those rents would be equal to the Deferred Head Lease Payment. Thus, in substance, BB&T is not required to expend any additional funds, other than its initial investment in the Transaction, in order to make the Deferred Head Lease payment.

When these offsetting and reciprocal obligations are disregarded, it is clear that BB&T and Sodra did not enter into a lease and sublease of the Equipment. Under the form selected by the parties, Sodra purportedly leased its right to use and possess the Equipment to BB&T under the Head Lease. BB&T's right to use and possess the Equipment under the Head Lease is offset by Sodra's right to use and possess the Equipment under the Lease. Sodra's rental payments under the Lease are equal in timing and amount to BB&T's debt servicing payments to HBU. If Sodra elects to purchase BB&T's interest in the Head Lease at the end of the

Lease term, the purchase price will be funded in full by the Equity PUA and the Debt PUA. If Sodra elects not to exercise the purchase option, BB&T's Deferred Head Lease payment will be funded in full (and if not completely funded will be no-recourse to BB&T) by the Sublease Renewal Rent or Sublease Replacement Rent. Once these obligations are disregarded, all that remains is BB&T's payment of transaction costs and investment in government securities purchased by the Equity PUA.

3.

BB&T did not acquire a current leasehold interest in the Equipment. When the substance of the Transaction, and not its form, is considered, BB&T acquired only a future interest in the right to use and possess the Equipment. Moreover, when the reciprocal and offsetting obligations of the Transaction are disregarded, it becomes clear that BB&T paid transaction costs and invested in government securities purchased through the Equity PUA. As such, BB&T was not entitled to deduct rent and other transaction costs on its 1997 income taxes. The Government's Motion for Summary Judgment on the propriety of the rent and expense deductions is GRANTED.

B.

Section 163(a) of the Internal Revenue Code provides generally for the deductibility of interest: "There shall be allowed as a deduction all interest paid or accrued within the taxable year on indebtedness." 26 U.S.C. § 163(a). It is well

established that "deductible interest can only accrue on *genuine* indebtedness." Halle v. Comm'r, 83 F.3d 649, 655 (4th Cir. 1996). The term "'interest on indebtedness' means compensation for the use or forbearance of money." Deputy v. du Pont, 308 U.S. 488, 498 (1940). In determining whether a loan transaction involves genuine indebtedness, courts "must look beyond the parties' terminology to the 'substance and economic realities'" of the transaction. Halle, 83 F.3d at 655.

In this case, the stipulated facts relevant to the section 163(a) deduction are as follows: (1) BB&T paid the advance Head Lease payment, in part, with the proceeds of a non-recourse loan from HBU in the amount of $68,008,236 [Stip. Facts ¶ 76]; (2) At closing, ABN, "on behalf of HBU," transferred $68,008,236 to BB&T's Trust account at ABN [Stip. Facts ¶ 80]; (3) At closing, the Trust made a $68,008,236 payment, on behalf of Sodra, to ABN as the Debt PUA Issuer [Stip. Facts ¶¶ 82-83]; (4) During the Basic Lease Term, BB&T's scheduled debt payments to HBU and Sodra's annual rent payments to BB&T are equal to the scheduled payments required by the Debt PUA [Stip. Facts ¶ 90]; (5) During the basic lease term, the Debt PUA payments will satisfy both Sodra's rent to BB&T and BB&T's debt service payments (including principal and interest) to HBU in full [Stip. Facts ¶¶ 93-95]; and (6) on its 1997 federal income tax return, BB&T claimed an interest expense deduction in the amount of $2,820,925 [Stip. Facts. ¶ 159].

When the intermediate payment steps are disregarded, which must be done in order to consider the substance of the loan transaction and not the form selected by the parties, it becomes clear that the loan transaction is only a circular transfer of funds in which the HBU loan is paid from the proceeds of the loan itself. There was no money lent to BB&T in a substantive sense, and the HBU loan does not reflect genuine indebtedness. See Felcyn v. United States, 691 F. Supp. 205, 212 (C.D. Cal. 1988) (finding taxpayer was not entitled to section 163(a) deduction where interest purportedly paid on the "loan" at issue was "simply part[ ] of a circularization of funds which do not amount a loan").

For interest to accrue, at least within the meaning of section 163(a), there must be an underlying indebtedness requiring an "unconditional and legally enforceable obligation for the payment of money." Autenreith v. Comm'r, 115 F.2d 856, 858 (3d Cir.1940), aff'g 41 B.T.A. 319 (1940). In this case, although the loan documents – the form selected by the parties – may provide that BB&T has a legal obligation to repay the loan, the transaction in fact – the substance – does not actually require BB&T to pay any money to HBU. As noted above, through the circular nature of the transaction, BB&T's purported principal and interest payments are actually paid from the proceeds of the loan itself. In fact, after the closing in June 1997, BB&T was not required to provide any additional funds over the life of the loan. As such, BB&T's purported interest payments cannot be what Congress intended to allow as an income tax deduction. See

Hines v. U. S., 912 F.2d 736, 741 (4th Cir. 1990) ("The lease and debt payments between the [parties] were structured to be offsetting. The circularity meant that the transaction became self-sustaining after the payments at closing with virtually no further financial input necessary from any of the parties."); Bridges v. Comm'r, 39 T.C. 1064, 1077, aff'd 325 F.2d 180 (4th Cir. 1963) (noting that transaction as structured by the parties created a situation where "there was no reason to think that [the taxpayer] would have been called upon to pay the note out of his own funds or to put up additional collateral" and concluding that the transaction at issue "merely provided the facade of a loan").

Moreover, even if ABN were to become bankrupt and be unable to make the required payments under the Debt PUA, BB&T still would not be required to make any payments to HBU. First, it must be noted that BB&T required a particular credit rating for ABN as the Debt PUA as assurance that the possibility of such a bankruptcy was remote. In addition, as BB&T internal documents make clear, even if the Debt PUA issuer failed, BB&T would not need to advance any additional funds: "If the Issuer fails, Sodra is still obligated for the rental payments and the rental payments will be used by BB&T to retire the debt. However, if Sodra is unable to make rental payments, the loan is non-recourse to BB&T." [Doc. #36, ex. 14 at 26].

Section 163(a) was intended to create a deduction for interest paid or accrued on indebtedness. Here, the purported loan from HBU to BB&T does not

constitute genuine indebtedness. Despite the form of the Loan and Security Agreement, in substance, BB&T was not required to make any payments to HBU. Rather, the debt service payments were made from the proceeds of the loan itself. BB&T has not established that it was entitled to an interest deduction pursuant to section 163(a). The Government's Motion for Summary Judgment on the interest deductions is GRANTED.

IV.

In conclusion, the United States of America's Motion for Summary Judgment [Doc. #36] is GRANTED. Therefore, Plaintiff BB&T Corporation's Motion for Summary Judgment [Doc. #38] is DENIED, and BB&T's Motion to Preclude Expert Testimony [Doc. #61] is DENIED as MOOT.

This the day of January 4, 2007

/s/ N. Carlton Tilley, Jr.
United States District Judge

# EXHIBIT 6

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| CONSOLIDATED EDISON COMPANY OF NEW YORK, INC. & SUBSIDIARIES, | ) | |
| Plaintiff, | ) | Case No.: 06-305 T |
| v. | ) | Hon. Marian Blank Horn |
| THE UNITED STATES OF AMERICA, | ) | |
| Defendant. | ) | |

**PLAINTIFF'S RESPONSES TO**
**UNITED STATES' FIRST SET OF INTERROGATORIES**

Pursuant to Rule of Court of Federal Claims ("RCFC") 33, Plaintiff, Consolidated Edison Company of New York, Inc. & Subsidiaries ("Con Edison"), provides the following responses to the United States' First Set of Interrogatories, subject to the objections and limitations specified.

Plaintiff is continuing to review the matters subject to this proceeding and reserves the right to supplement and/or amend its responses as necessary.

**GENERAL OBJECTIONS**

1. Con Edison objects to the United States' First Set of Interrogatories to the extent that the Interrogatories call for the disclosure of information that is subject to any claim of privilege or protection or that was prepared in anticipation of litigation. This includes without limitation, the attorney-client privilege or the work-product protection. The inadvertent disclosure by Con Edison of any information protected by the attorney-client privilege, the work-product protection or any other privilege shall not constitute a waiver of the applicable privilege or protection as to that information or any other related information.

2. Con Edison objects to the United States' First Set of Interrogatories to the extent that the United States purports to impose any requirement or discovery obligation other than or beyond those set forth in the RCFC or other applicable rules.

3. Con Edison objects to the United States' First Set of Interrogatories to the extent that the Interrogatories call for information or documents already known to be in the United States' possession.

4. Con Edison objects to the United States' First Set of Interrogatories to the extent that the Interrogatories seek immaterial and/or irrelevant information. By providing answers or producing documents, Con Edison does not concede that the information therein is material and/or relevant to any claims or defenses, or even that such information is reasonably calculated to lead to the discovery of admissible evidence.

5. By providing answers or producing documents in response to the United States' First Set of Interrogatories, Con Edison does not waive any of its objections and expressly reserves its right to object to the admissibility of the information therein.

6. Con Edison objects to the United States' Definitions in its First Set of Interrogatories to the extent that the Definitions define words to have something other than their ordinary meaning or employ grammar, syntax, and usage different from ordinary English grammar, syntax, and usage. Con Edison will not speculate as to the meaning of vague language within the First Set of Interrogatories and will assume that the United States has written the questions they intend to ask.

7. Con Edison objects to certain Interrogatories as overly broad, unduly burdensome, and seeking information that is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence. Such Interrogatories are specifically identified.

Con Edison hereby incorporates each of the foregoing General Objections into each of the following responses to the United States' First Set of Interrogatories, and provides each response subject to and without waiving these General Objections.

## RESPONSES TO INTERROGATORIES

**INTERROGATORY NO. 1:** Identify all individuals who have knowledge of the Lease Transaction, including each person's involvement in the promotion, recommendation, planning, approval, or implementation of any of the leases, and the nature and substance of the facts known (or believed to be known) by each person.

**RESPONSE:** Con Edison objects to Interrogatory No. 1 as overbroad and unduly burdensome. Con Edison is not aware of all individuals that have knowledge of the Lease Transaction. The Lease Transaction involved multiple entities, and Con Edison cannot determine all individuals at each entity who had knowledge regarding the Lease Transaction. Further, Con Edison cannot determine all of its current and former employees who had knowledge of the Lease Transaction.

Con Edison also objects to the Interrogatory as immaterial and irrelevant. The fact that an individual has knowledge of the Lease Transaction does not mean that the individual has discoverable information regarding the transaction.

Con Edison identified the current employees of Con Edison whom Con Edison may rely upon to support its claims and/or defenses in the instant proceeding in its Rule 26(a) disclosures. Subject to and without waiving its objections, Con Edison now identifies the nature of each of the identified individual's involvement and the general substance of the facts known by each.

Ms. Freilich was a member of the board of directors of Consolidated Edison Development, Inc. ("Con Edison Development") and together with other board members was

responsible for reviewing the decision to enter into the Lease Transaction. The facts known to Ms. Freilich relate to her review of the transaction.

Mr. DePlautt was a Vice President of Con Edison Development and was responsible for implementation of the Lease Transaction, through advisors retained by Con Edison Development. The facts known to Mr. DePlautt relate to the implementation and review of the Lease Transaction.

Mr. Burke was a Vice President of Consolidated Edison Co. of New York, Inc. and was responsible for developing Consolidated Edison Co. of New York, Inc.'s corporate goals for its unregulated subsidiaries. The facts known to Mr. Burke relate to Con Edison's plans to operate in a deregulated environment.

Mr. Muoio was President of Con Edison Development and was responsible for reviewing the decision to enter into the Lease Transaction. The facts known to Mr. Muoio relate to his review of the Lease Transaction.

Mr. Tai was a member of Consolidated Edison Co. of New York, Inc.'s Corporate Planning Department and has information relating to the deregulation of Con Edison's business and its entry into unregulated businesses.

Con Edison further identifies the following current employees of Con Edison who may have discoverable information regarding the Lease Transaction and the nature of each individual's involvement and the general substance of the facts known by each.

Andrew W. Scher
Consolidated Edison Co. of New York, Inc.
4 Irving Place
New York, New York 10003
Phone: 212-460-6209

Mr. Scher was the corporate secretary to Consolidated Edison Leasing, Inc. and provided legal advice in connection with the Lease Transaction. The facts known to Mr. Scher include legal advice provided to Con Edison, which is protected by the attorney-client privilege.

Mary Jane McCartney
Consolidated Edison Co. of New York, Inc.
4 Irving Place
New York, New York 10003
Phone: 212-460-6500

Ms. McCartney was a member of the board of directors of Con Edison Development and together with other board members was responsible for reviewing the decision to enter into the Lease Transaction. The facts known to Ms. McCartney relate to her review of the Lease Transaction.

Harry Morrison
Phone: 845-223-3289

Mr. Morrison is retired. He was responsible for inspecting the RoCa3 Facility on behalf of Con Edison.

Peter Irwin
Consolidated Edison Co. of New York, Inc.
4 Irving Place
New York, New York 10003
Phone: 212-460-4757

Mr. Irwin was the corporate secretary of Con Edison Development. The facts known to Mr. Irwin relate to the review of the Lease Transaction.

Con Edison also identifies the following individuals associated with unrelated entities, retained as advisors by Con Edison, who may have discoverable information regarding the Lease Transaction and the nature of each individual's involvement and the general substance of the facts known by each. Except as otherwise stated below, Con Edison's most recent information

concerning the addresses of the individuals below appears on their reports, which have been included as part of Plaintiff's Rule 26(a) disclosure.

Robert Holtzman
Crestview Capital Advisors Corporation
7946 Sitio Redondo, Suite 200
Carlsbad, California 92009
Phone: 760-944-9994

Con Edison retained Mr. Holtzman, through Cornerstone Financial Advisors L.P., to provide advice regarding leasing transactions in general and the structure, economics, and implementation of the Lease Transaction. The facts known to Mr. Holtzman relate to the structure, economics, and implementation of the Lease Transaction.

Richard K. Ellsworth, George P. Renock, and Steven Liu of Deloitte & Touche LLP prepared a valuation of the RoCa3 Facility. Mr. Ellsworth's current address is:

Deloitte Financial Advisory Services
2 World Financial Center
New York, NY 10281
(212) 436-2067

Richard R. Radini, Vice President, Generation Services, and Gerald F. Foley, Luis C. Gonzalez, and Anthony DeCristofaro of Duke Energy & Services provided an engineering valuation of the RoCa3 Facility.

Aidan O'Mahony
Standard & Poor's
Garden House
16 Finsbury Circus
EC2M 7BP
London, England
Phone: 44 0 171 826 3800

Mr. O'Mahony provided an evaluation of the credit of South Holland Electric.

Aarnout M. Snouck Hurgronje
Credit Suisse Financial Products
One Cabot Square
E14 40J
London, England
Phone: 44 0 171 888 2000

Credit Suisse provided opinions regarding the commercially reasonable interest rate for certain of the interest bearing instruments included in the Operative Documents.

Andrew D. Harding
J&H Marsh & McLennan of Illinois, Inc.
500 West Monroe Street
Chicago, Illinois 60661
Phone: 312-627-6655

Mr. Harding performed insurance due diligence with respect to the RoCa3 Facility.

Hans Nieuwenheis and Peter van Kernebeek of Tauw Milieu bv provided a due diligence, safety, and health report concerning the RoCa3 Facility.

William E. Flowers
J.J. Stevenson III, Esq.
Shearman & Sterling
599 Lexington Avenue
New York, New York 10022
Phone: 212-848-4000

Shearman & Sterling provided legal advice with respect to the Lease Transaction. Mr. Flowers is no longer at Shearman & Sterling.

Ben Neuhausen
Arthur Andersen LLP
33 West Monroe Street
Chicago, Illinois 60606

James M. Dewey
Price Waterhouse LLP
One Mony Plaza
Syracuse, New York 13202

Mr. Heuhausen and Mr. Dewey reviewed the accounting implications of the Lease Transaction.

Bart Meesters
Ebel Magnin
Loeff Claeys Verbeke
Apollolan 15
P.O. Box 75088
1070 AB Amsterdam
The Netherlands
Phone: 31 20 57 41 200

Loeff Claeys Verbeke provided Con Edison with legal advice.

Thomas O. Verhoeven
Oppenhoff & Rädler
712 Fifth Avenue, 30th Floor
New York, New York 10019
Phone: 212-801-3410

Oppenhoff & Rädler provided Con Edison with legal advice.

As for third parties not retained as advisors by Con Edison, the Defendant's letter of October 13, 2006 contains a list of persons named in the Operative Documents and other relevant documents. We expect that the persons named in that letter may have information regarding their respective institution's role in the Lease Transaction, but since these persons are not employees or agents of Con Edison, Con Edison does not have complete information regarding their knowledge of the facts.

**INTERROGATORY NO. 2:** Identify all other LILO transactions or shelter transactions presented to, considered, reviewed or analyzed by the Plaintiff in 1996, 1997 or 1998, and identify all documents in connection with your consideration, review or analysis.

**RESPONSE:** Con Edison objects to Interrogatory No. 2 as overbroad and unduly burdensome. The United States defined "shelter transaction" as "any transaction ... for which the possibility of, or potential for, a tax deduction or tax loss was either analyzed [sic] reviewed,

# EXHIBIT 7

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| CONSOLIDATED EDISON COMPANY OF NEW YORK, INC. & SUBSIDIARIES, | ) | |
| Plaintiff, | ) | Case No.: 06-305 T |
| v. | ) | Hon. Marian Blank Horn |
| THE UNITED STATES OF AMERICA, | ) | |
| Defendant. | ) | |

**PLAINTIFF'S SECOND SUPPLEMENT TO RESPONSES TO UNITED STATES' FIRST SET OF INTERROGATORIES**

Pursuant to Rule of Court of Federal Claims ("RCFC") 33, Plaintiff, Consolidated Edison Company of New York, Inc. & Subsidiaries ("Con Edison"), provides the following supplement to its Responses to the United States' First Set of Interrogatories. This supplement is provided subject to the general objections and limitations set forth in Plaintiff's Responses to United States' First Set of Interrogatories.

Plaintiff is continuing to review the matters subject to this proceeding and reserves the right to supplement and/or amend its responses as necessary.

**SECOND SUPPLEMENTAL RESPONSE**

**INTERROGATORY NO. 1:** Identify all individuals who have knowledge of the Lease Transaction, including each person's involvement in the promotion, recommendation, planning, approval, or implementation of any of the leases, and the nature and substance of the facts known (or believed to be known) by each person.

**RESPONSE:** Con Edison objects to Interrogatory No. 1 as overbroad and unduly burdensome. Con Edison is not aware of all individuals that had knowledge of the Lease Transaction. The Lease Transaction involved multiple entities, and Con Edison cannot determine all individuals at each entity who had knowledge regarding the Lease

Transaction. Further, the Lease Transaction was widely known at Con Edison and Con Edison cannot, even after a diligent review, represent under oath all of its current and former employees who had any knowledge of the Lease Transaction.

In addition, Interrogatory No. 1 is not limited to a single discrete subject as required by RCFC 33(a). Rather, Interrogatory No. 1 impermissibly attempts to elicit information concerning several distinct subject matters, including the promotion (if any), the recommendation, the planning, the approval, and the implementation of the Lease Transaction. Con Edison is not compelled to respond to a compound request, such as Interrogatory No. 1 Moreover, when the implicit subparts of Interrogatory No. 1 are considered, the United States' request likely exceeds the limit of 25 interrogatories set forth in RCFC 33(a).

Interrogatory No. 1 further requires Con Edison to set forth a detailed narrative, and thus, the Interrogatory is overly broad and unduly burdensome. The inclusion of the word "all" renders Interrogatory No. 1 vague and ambiguous, as well. The legal basis supporting Con Edison's objection is set forth in more detail in response to Interrogatory No. 15.

Con Edison also objects to the Interrogatory as immaterial and irrelevant. The fact that an individual has knowledge of the Lease Transaction does not mean that the individual has discoverable information regarding the transaction.

Subject to and without waiving its objections, Con Edison identified five current employees of Con Edison whom it may rely upon to support its claims and/or defenses in the instant proceeding in its Rule 26(a) Disclosures and First Supplement thereto. Con Edison further identified the nature of each individual's involvement in the Lease

Transaction and the general substance of the facts believed to be known by each in its Response to the United States' First Set of Interrogatories. In such Response, Con Edison also identified four additional former and current Con Edison employees and sixteen additional individuals associated with third-party entities and the nature of each individual's involvement in the Lease Transaction and the general substance of the facts believed to be known by each.

On October 13, 2006, the United States produced a list of individuals it claimed were identified in documents regarding the Lease Transaction. The United States, however, did not identify the "subject of the information" possessed by these individuals. It appears that some of the individuals identified in the list attached to the United States' October 13, 2006 correspondence were included solely because their names were on a Distribution List ("the Distribution List"). In its initial Response to Interrogatory No. 1, Con Edison stated its belief that the individuals identified in the list attached to the United States' correspondence of October 13, 2006 "*may* have information regarding their respective institution's role in the Lease Transaction." (emphasis added). Con Edison has undertaken its own review of the individuals listed in the United States' October 13, 2006 correspondence. As noted below, Con Edison, after a review of the relevant documents, believes that some of the individuals identified on the United States' list had no significant connection with the Lease Transaction.

Con Edison's information regarding the nature of each of these individual's involvement in the Lease Transaction and the general substance of the facts believed to be known by each is contained in Con Edison's business records regarding the Lease Transaction. Con Edison produced such records in accordance with RCFC 33(d).

Although Con Edison does not believe that it has an obligation to summarize the information contained in those business records, Con Edison will provide a summary of the nature of each individual's involvement in the Lease Transaction and the general substance of the facts believed to be known by each, in an effort to assist the United States and facilitate the discovery process.

Many of the individuals identified on the list attached to the United States' correspondence of October 13, 2006 are referenced briefly in the documents regarding the Lease Transaction; some were only identified on the Distribution List regarding the Lease Transaction. Con Edison has limited information regarding what, if any, involvement these individuals had. Con Edison, in an attempt at full disclosure, referenced these individuals in response to Interrogatory No. 1 and now provides further information regarding the identified individuals. This reference and information should not be construed as a representation by Con Edison that each of these individuals has discoverable information, but rather that they *may* have discoverable information.

This response supplements, but does not replace, Con Edison's initial response to United States' Interrogatory No. 1. Con Edison cautions the United States that the information provided in its Response to United States' Interrogatory No. 1 and this supplement hereto represents Con Edison's belief regarding each individual's involvement in the Lease Transaction and the general substance of the facts known by each. Con Edison is not in a position to certify under oath as to each individual's involvement in the Lease Transaction or the general substance of the facts known by each individual.

J. A. Hoyte de Jong
Jan Trapman
N. V. Electriciteitsbedrijf Zuid-Holland (EZH)
Von Geusaustraat 193
2270 AX Voorsburg
The Netherlands
Phone: 011-31-70-3820028

Con Edison believes that Masters de Jong and Trapman were involved, through their advisors and counsel, in negotiating the terms of the Lease Transaction on behalf of South Holland Electric. The initial proposal letters were addressed directly to Mr. de Jong, and he accepted the proposal letter and provided representations on behalf of South Holland Electric. Con Edison further believes that Mr. de Jong was also involved in due diligence regarding the RoCa3 Facility and negotiations regarding the letter of credit. Con Edison believes that Masters de Jong and Trapman may have had information regarding South Holland Electric and its business and the RoCa3 Facility.

Anton Zauner
Gregory Fulljames
Roger Liberman
Phillip Mintun
Margaret Morrow
Anna E. Endres
Louis DeCarlo
Capstar Partners, Inc.
40 East 52nd Street, 12th Floor
New York, NY 10021
Phone: (212) 339-4200

Con Edison believes that Masters Zauner, Fulljames, Liberman, Mintun and DeCarlo and Ms. Morrow and Endres were associated with Capstar Partners, which reviewed and advised South Holland Electric on the terms and economics of the Lease Transaction. Con Edison believes that these individuals may have been familiar with due

diligence performed by South Holland Electric and the letter of credit it obtained in connection with the Lease Transaction.

Edwin Noomen
Credit Suisse Financial Products
1 Cabot Square, 4th Floor
London, E14, 4QJ
Phone: 44-171-888-1724

Con Edison believes that Mr. Noomen, like Mr. Snouck Hurgronje who was previously identified, was associated with Credit Suisse, which provided opinions regarding the commercially reasonable interest rate for certain of the interest bearing instruments in the Operative Documents. Con Edison believe that Mr. Noomen is not listed on any document other than the Distribution List and is not aware of his specific role, if any, in connection with the Lease Transaction.

Ben Wojciehowski
Credit Suisse First Boston
Five World Trade Center
7th Floor
New York, New York 10048

Con Edison believes that Mr. Wojciehowski was associated with Credit Suisse First Boston, which was a custodian pursuant to the Custody Agreement.

Marianne Rosenberg
Robert Thorton Smith
Philip McCarthy
Francois Bardonnet
Paul Alfaks
Marc Mangum
Kimberly Delfino
White & Case
1155 Avenue of the Americas
New York, NY 10036
Phone: (212) 819-8380

Con Edison believes that Masters Smith, McCarthy, Bardonnet, Alfaks, Mangum, and Ms. Rosenberg and Delfino, were associated with White & Case, which provided legal advice to South Holland Electric regarding United States legal issues in connection with the Lease Transaction. Con Edison believes that these individuals may have reviewed and negotiated certain terms of the Lease Transaction on behalf of South Holland Electric.

Jim Donahue
Mike Mattasits
Banc One Leasing Corporation
111 Monument Center
Bank One Center
Suite 1931
Indianapolis, IN 46204
Phone: (317) 321-8044

Con Edison believes that Masters Donahue and Mattasits were associated with Banc One Leasing Corporation ("Banc One"), which negotiated and entered into a transaction with South Holland Electric in which it acquired an undivided leasehold interest in the RoCa3 Facility at or around the time of the Lease Transaction. Con Edison believes that certain aspects of Banc One's transaction and the Lease Transaction were negotiated with South Holland Electric at or around the same time. Con Edison believes that Masters Donahue and Mattasits may have had knowledge regarding the negotiation

and terms of the transaction entered into between Banc One and South Holland Electric and the negotiation and certain terms of the Lease Transaction. Con Edison also believes that Mr. Mattasits may have had information regarding due diligence conducted on the RoCa3 Facility.

John M. Sykes
Joonmoo Lee
Andrew Levy
John Kramer
Patricia Iandoli
Jerome Mounier
Colin Chang
Michael Apelt
Dan Kiely
Shearman & Sterling
599 Lexington Avenue
New York, NY 10022-6069
Phone: (202) 848-4000

Con Edison believes that Masters Sykes, Lee, Levy, Kramer, Mounier, Chang, Apelt, and Kiely and Ms. Iandoli, like Masters Flowers and Stevenson who were previously identified, were associated with Shearman & Sterling, which provided legal advice to Con Edison with respect to the Lease Transaction, including the terms of and proper Federal income tax treatment for the Lease Transaction.

David Strupp
Roger Wise
Kim Werderman
Siri Thomas
Davis Polk & Wardell
450 Lexington Avenue
New York, NY 10016
Phone: (212) 450-4800

Con Edison believes that Masters Strupp, Wise, and Thomas and Ms. Werderman were associated with Davis Polk & Wardell, which provided legal advice to Bayerische Landesbank Girozentrale, Luxembourg Branch, in connection with a letter of credit

obtained by South Holland Electric in favor of Con Edison and Wilmington Trust Company and also provided legal advice to Hollandsche Bank-Unie N.V. regarding United States law in connection with the Lease Transaction.

A. Rene Citroen
Tjepco van Voorst Vader
Louis Bouchez
Daphne Brinkhuis
Ken Breken
Nanette Rutgers
Clifford Chance
Apollolaan 171
1077 AS Amsterdam
The Netherlands
Phone: 011-31-20-577-7222

Con Edison believes that Masters Citroen, van Voorst Vader, Bouchez, and Breken and Ms. Brinkhuis and Rutgers were associated with Clifford Chance, which provided legal advice to South Holland Electric regarding Dutch legal issues in connection with the Lease Transaction.

Dr. Michael Weller
Clifford Chance
Oberlindau 54-56
D-60323
Frankfurt AM-Main
Germany

Con Edison believes that Dr. Weller was associated with Clifford Chance, and may have provided legal advice to South Holland Electric regarding the letter of credit it obtained in connection with the Lease Transaction. Dr. Weller also provided a legal opinion to Con Edison and Wilmington Trust Company.

Paul Stenrink
Gerald Wentink
Loyens & Volkmaars
Tripolis 300
P.O. Box 71170
1008 BD Amsterdam
Phone: 011-31-20-578-5785

Con Edison believes that Masters Stenrink and Wentink were associated with Loyens & Volkmaars, which provided legal advice to South Holland Electric regarding the proper tax treatment of the Lease Transaction under Dutch law.

Femke Bierman
Loeff Clayes Verbeke
Apollolaan 15, P.O. Box 75088
1070 AB Amsterdam
The Netherlands
Phone: 011-31-20-574-1507

Con Edison believes that Mr. Bierman, like Masters Meesters and Magnin who were previously identified, were associated with Loeff Clayes Verbeke, which provided legal advice to Con Edison regarding Dutch law in connection with the Lease Transaction.

Michael Ledyard
Morris James Hitchens & Williams
222 Delaware Ave.
P.O. Box 2306
Wilmington, DE 19899

Con Edison believes that Mr. Ledyard may have provided legal advice to the Trustee, Wilmington Trust Company, regarding the Lease Transaction. Con Edison believes that Mr. Ledyard may have had information regarding the formation of the Trust and its role in the Lease Transaction.

Don MacKelcan
Wilmington Trust Company
Rodney Square
1100 N. Market Street, Suite 2201
Wilmington, DE 19890
Phone: (302) 651-1118

Con Edison believes that Mr. MacKelcan was an employee of Wilmington Trust Company, which facilitated the Trust that participated in the Lease Transaction on behalf of Con Edison Development. Con Edison believes that Mr. MacKelcan may have had information on the formation of the Trust and its involvement in the Lease Transaction.

Mark J. DeTrempe
Tom Malia
Jay Sill
Donald Roback
Cornerstone Financial Advisors L.P.
Three Parkway North
Deerfield, IL 60015
Phone: (847) 444-1000

Con Edison believes that Masters DeTrempe, Malia, Sill, and Roback of Cornerstone Financial Advisors L.P. ("Cornerstone"), like Robert Holzman who was previously identified, may have provided advice regarding the economics and the implementation of the Lease Transaction. Mr. Holzman was Con Edison's primary contact at Cornerstone.

Austin Godfrey
Marlene Motyka
Deloitte Financial Advisory Services
2 World Financial Center
New York, NY 10281
Phone: (212) 436-2000

Con Edison believes that Mr. Godfrey and Ms. Motyka, like Masters Ellsworth, Renock and Liu who were previously identified, were associated with Deloitte Financial Advisory Services, which prepared a valuation of the RoCa3 Facility. Neither

Mr. Godfrey nor Ms. Motyka, however, are identified on any documents, other than the Distribution List, regarding the Lease Transaction. Con Edison is not familiar with any involvement of Mr. Godfrey and Ms. Motyka in the preparation and/or review of the appraisal for the Lease Transaction.

K. I. Schoppink
Moret Ernst & Young
Wassenaarseweg 80
2596 CZ The Hague
Phone: 31-70-328-6666

Con Edison believes that Moret Ernst & Young may have provided accounting services for South Holland Electric. Con Edison is not familiar with the specific involvement, if any, of Mr. Schoppink in connection with the Lease Transaction.

Sheldon Mittler
Duke Engineering & Services
One Huntington Quadrangle, Suite 1S01
Melville, NY 11747

Con Edison believes that Mr. Mittler, like Masters Radini, Foley, Gonzalez, and DeCristofaro who were previously identified, was associated with Duke Engineering & Services, which prepared an engineering valuation of the RoCa3 Facility. Con Edison is not familiar with the involvement, if any, of Mr. Mittler in the preparation and/or review of the report.

Richard Norbruis
Elizabeth van Schilfgaarde
Nauta Dutilh
1 Rockefeller Plaza
New York, NY 10020

Con Edison believes that Mr. Norbruis and Ms. van Schilfgaarde were associated with Nauta Dutilh, which provided legal advice to the Lender and the Deposit Bank,

including legal advice regarding due diligence associated with real property and mortgages, in connection with the Lease Transaction.

Nancy Dahl
First Security Bank, N.A.
79 South Main Street, 3rd Floor
Salt Lake City, UT 84111
Phone: (801) 246-5208

Con Edison is uncertain of the nature of the involvement of Ms. Dahl and/or First Security Bank, N.A. in or the general substance of the facts known by either regarding the Lease Transaction. First Security Bank is listed as a permitted successor trustee in the Participation Agreement.

Dr. Peter Hein
Alan & Overy
Taunustor 2
60311 Frankfurt AM-Main
Germany

Con Edison is uncertain of the nature of involvement of Dr. Hein and/or Alan & Overy in or the general substance of the facts known by either regarding the Lease Transaction. Con Edison believes Dr. Hein and/or Alan & Overy are not named on any document other than the Distribution List.

Warren Wegener
Marsh & McLennan
500 West Monroe, 22nd Floor
Chicago, IL 60661
Phone: (312) 627-6628

Con Edison believes that Mr. Wegener, like Mr. Harding who was previously identified, was associated with Marsh & McLennan, which performed insurance due diligence with respect to the RoCa3 Facility. Con Edison is not familiar with the involvement, if any, that Mr. Wegener had in connection with the Lease Transaction.

Hans Nieuwenhuis
Tauw Mileu
P.O. Box 133
7400 AC Deventer
The Netherlands
Phone: 011-31-570-699-829

Con Edison believes that Mr. Nieuwenhuis was associated with Tauw Mileu, which performed environmental due diligence of the RoCa3 Facility and prepared a report of such due diligence. Con Edison believes Mr. Nieuwenhuis was involved in the preparation of the report.

J. D. Dykstra
M. ten Cate
ABN AMRO Bank N.V.
Foreign Credit Services
Foppingadreef 22
P. O. Box 283
1000 EA Amsterdam
The Netherlands
Phone: (31) (20) 628743

Masters Dykstra and/or ten Cate signed various documents as attorneys-in-fact for ABN AMRO Bank. Con Edison believes they may have had information regarding ABN AMRO's participation in the Lease Transaction.

J.D. Dykstra
M. ten cate
Hollandsche Bank-Unie N. V.
Coolsingel 104
P.O. Box 249
3000 AE Rotterdam
The Netherlands

Masters Dykstra and ten Cate signed various documents as attorneys-in-fact for Hollandsche Bank-Unie N. V. Con Edison believes they may have had information regarding Hollandsche's participation in the Lease Transaction.

Alexander Kohnot
Bayerische Landesbank Girozentrale, Luxembourg Branch
3, rue Jeanne Monnet
L2180
Luxembourg
Phone: 352.42.434.3399

Con Edison believes that Mr. Kohnot may have had information regarding Bayerische Landesbank Girozentrale's furnishing of a letter of credit in connection with the Lease Transaction.

Additional individuals at Con Edison who had peripheral involvement in the Lease Transaction are referenced in response to Interrogatory No. 15.

**INTERROGATORY NO. 15:** Identify all individuals and entities, including third parties and employees, officers and members of the Board of Directors of Plaintiff, with whom you communicated about the Lease Transaction prior to entering into the transaction, setting forth the contents of the communications and identifying the documents mentioning, discussing, referring to or constituting the communications.

**RESPONSE:**

In its Response to the United States' First Set of Interrogatories, served on November 2, 2006, Con Edison objected to Interrogatory No. 15 as overbroad and burdensome. In particular, Con Edison explained that it is not possible for Con Edison to identify all individuals with whom it communicated or to set forth the contents of all such communications, many of which were of a routine administrative nature. The Lease Transaction was a business transaction and, as such, subject to normal business review procedures. Employees of unrelated entities were also involved in reviewing the Lease Transaction.