# Exhibit A

**Privilege Log by Consolidated Edison, Inc. of New York & Subsidiaries**
**(April 27, 2007)**

| Reference in Motion | Bates No. | Date | Author(s) | Recipient(s) | Description | Pages | Privilege |
|---|---|---|---|---|---|---|---|
| **Internal Memorandum** | No Bates Number | Oct. 23, 1997 | A. Scher | P. O'Shea | Memorandum providing legal advice | 2 | Attorney-Work Product |
| **Tax Change Letter** | CE012095-102 | Nov. 20, 1997 | W. Flowers<br>M. Apelt<br>D. Keily | B. DePlautt | Memorandum providing legal advice | 8 | Attorney Work Product |
| **Tax Risk Letter** | No Bates Number | Nov. 20, 1997 | W. Flowers<br>M. Apelt | B. DePlautt | Memorandum providing legal advice | 8 | Attorney Work Product |

# Exhibit B

SHEARMAN & STERLING

FAX: 212-848-7179
212-848-7181
TELEX: 667290 WUI

599 LEXINGTON AVENUE
NEW YORK, N.Y. 10022-6069
212 848-4000

ABU DHABI
BEIJING
DUSSELDORF
FRANKFURT
HONG KONG
LONDON
LOS ANGELES
NEW YORK
PARIS
SAN FRANCISCO
SINGAPORE
TOKYO
TORONTO
WASHINGTON, D.C.

WRITER'S DIRECT NUMBER:

(212) 848-8848

February 18, 1998

Brian DePlautt
Vice President
Consolidated Edison Development, Inc.
111 Broadway
8th Floor
New York, NY 10006

EZH RoCa 3
Facility Lease

Dear Brian:

With respect to the above matter, I am enclosing herewith two original copies of the Shearman & Sterling tax opinion (one for each addressee's files) and the appraisal conclusions letter from Deloitte & Touche. As noted in our opinion, we have assumed that the conclusions in the full text appraisal will be the same as those stated in the appraisal conclusions letter.

Sincerely,

Woody

William E. Flowers

MA
SS_NYL4A/18983

CE 003005

SHEARMAN & STERLING

FAX: 212-848-7179
212-848-7181
TELEX: 667290 WUI

599 LEXINGTON AVENUE
NEW YORK, N.Y. 10022-6069
212 848-4000

ABU DHABI
BEIJING
DUSSELDORF
FRANKFURT
HONG KONG
LONDON
LOS ANGELES
NEW YORK
PARIS
SAN FRANCISCO
SINGAPORE
TOKYO
TORONTO
WASHINGTON, D.C.

WRITER'S DIRECT NUMBER:

February 18, 1998

Consolidated Edison Development, Inc.
111 Broadway
8th Floor
New York, NY 10006

Consolidated Edison Leasing, Inc.
c/o Consolidated Edison Development, Inc.
111 Broadway
8th Floor
New York, NY 10006

EZH RoCa 3
Facility Lease

Gentlemen:

We acted as special counsel to Consolidated Edison Leasing, Inc., a Delaware corporation (the "Investor"), and Consolidated Edison Development, Inc., a New York corporation, in connection with the transactions contemplated by the Participation Agreement, dated as of December 15, 1997 (the "Participation Agreement"), among N.V. Electriciteitsbedrijf Zuid-Holland, a public limited liability company incorporated under the laws of The Netherlands (the "Lessor" and "Sublessee"), the Investor, Wilmington Trust Company, not in its individual capacity, except as otherwise expressly provided in the Participation Agreement, but solely as Trustee under the Trust Agreement, dated as of December 15, 1997 (the "Lessee", "Sublessor" and "Trustee"), and Hollandsche Bank-Unie N.V., a public company with limited liability organized and existing under the laws of The Netherlands (the "Lender"). This opinion is delivered pursuant to Sections 3(b)(viii) and 6(vi) of the Participation Agreement. All capitalized terms used herein and not otherwise defined herein shall have the meanings assigned to them in Appendix A to the Participation Agreement or the Operative Documents.

The Participation Agreement provides, among other things, that on the Closing Date, the Trustee, acting on behalf of the Investor, will cause the Trust established pursuant to the Trust Agreement to lease the Facility from the Lessor pursuant to the Lease dated as

of the Closing Date, and that on the Closing Date, concurrently with entering into the Lease, the Trustee, acting on behalf of the Investor, will cause the Trust to sublease the Facility to the Sublessee pursuant to the Sublease dated as of the Closing Date. The Participation Agreement further provides that pursuant to the terms of the Loan and Security Agreement entered into on the Closing Date, the Lender will make the Loan to the Trustee at the times and for the purposes agreed to therein.

The Trust Agreement provides that the Trustee will (i) hold all of its estate, right, title and interest in and to the Facility under the Lease and the Sublease, the Operative Documents and any other property contributed by the Investor for the use and benefit of the Investor and (ii) subject to, and in accordance with, the terms of the Operative Documents, distribute all payments and amounts received by it (other than amounts necessary to pay certain fees and expenses of the Trustee) to the Investor, exercise its rights (upon instructions received from the Investor) and perform its duties under said Operative Documents and take such other action in connection with the foregoing as the Investor may from time to time direct.

Pursuant to the two German Leases, the German Lessor has leased the German Equipment to the Lessor for a period of approximately 13.5 years, ending October 24, 2009 (the "German Lease Termination Date"). On the German Lease Termination Date, the German Lessor has the right to cause the Lessor to purchase (the "German Put Option") the German Equipment for a fixed price and, if the German Lessor does not exercise the German Put Option, the Lessor has the option to purchase (the "German Purchase Option") the German Equipment from the German Lessor. Based on the Appraisal, it appears that the Lessor will be economically compelled to exercise the German Purchase Option under one German Lease and that the German Lessor will be economically compelled to exercise the German Put Option under the other German Lease. Pursuant to the Assignment Agreement, the Lessor has authorized the Trustee to exercise each German Purchase Option on behalf of the Lessor if the Lessor does not so exercise the German Purchase Option. We understand that the German Purchase Option price under each German Lease has been economically defeased by the Lessor. Further, we understand that the German Lessor is treated as the owner of the German Equipment for German income tax purposes, but that the Lessor continues to treat itself as the owner of the German Equipment for Dutch tax and accounting purposes.

We have participated in the preparation, execution and delivery of the Operative Documents and we have reviewed the Operative Documents and the Specified Documents. In arriving at the opinions expressed below, we have assumed the genuineness of all signatures and the due authorization, execution and delivery by the parties thereto of the Operative Documents and the Specified Documents executed on or prior to the date hereof and have examined and relied on such agreements and instruments and on the representations and warranties as to factual matters contained in or made pursuant to the Operative Documents and the Specified Documents. We have also assumed that the other

opinions of counsel to the various parties to the Operative Documents delivered on the Closing Date are correct.

We have examined leveraged lease pricing printouts (ABC File: ezh2-c6a) from Cornerstone Financial Advisors, dated December 14, 1997 and December 19, 1997 (the "Pricing File"). In view of such examination, the maintenance of minimum investment (at not less than an acceptable level), profit and positive cash flow requirements, set forth in section 4(1)(B) and section 4(6) of Revenue Procedure 75-21, 1975-1 C.B. 715, have been satisfied and the safe harbor as set forth in Section 1.467-3(c)(2)(i) of the Proposed Treasury Regulations, as it applies to Lease Basic Rent under the Lease, to Sublease Basic Rent during the Sublease Basic Term and to Sublease Renewal Rent during the Sublease Renewal Term, if any, has been satisfied in each case.

We have examined a letter of conclusions, dated December 15, 1997, prepared by the Appraiser as to, among other things, (i) the fair market value of the Facility on the Closing Date, (ii) the estimated useful life, residual value and commercial utility of the Facility, (iii) the fair market value of the Facility on the Lease Termination Date, (iv) the fair market value of the Sublessor's Lease Interest on the Closing Date, on the Sublease Basic Termination Date and on the Sublease Renewal Termination Date, (v) the fair rental value of the Sublessor's Lease Interest, (vi) the absence of compulsion on the Sublessee to exercise the Sublease Purchase Option on the Sublease Basic Termination Date, (vii) the determination that it is not generally expected that the Sublessor will exercise the Sublease Renewal Option, and (viii) the expected fair market value of the German Equipment on the German Lease Termination Date. We have assumed that the conclusions stated therein are correct and that none of the terms and conditions of, or the operation of any of the provisions in, the Operative Documents would cause such conclusions to change. We have also assumed that the conclusions in the Appraisal will be the same as those stated in the letter of conclusions. In addition, we have examined and relied on the originals, or copies certified or otherwise identified to our satisfaction, of such other records, documents, certificates and other instruments as we have deemed appropriate to enable us to give the opinions expressed below.

We have also assumed that (i) the method of accounting used by the Investor with respect to the transactions contemplated by the Operative Documents is not a change in accounting methods for Federal income tax purposes, (ii) none of the parties to the Operative Documents (except the Trustee) is related to the Investor within the meaning of Section 267 of the Internal Revenue Code of 1986, as amended (the "Code"), (iii) none of the terms and conditions of, or the operation of, any of the provisions in the Operative Documents would operate to cause the exercise of any option at the Sublease Basic Termination Date, (iv) the transactions contemplated by the Operative Documents produce (in the absence of a default by any party with respect to its obligations under the Operative Documents) a pre-tax profit for the Investor and (v) there are no agreements or arrangements with respect to the

transactions contemplated by the Operative Documents that are not set forth in the Operative Documents.

Based upon the foregoing and in reliance thereon and subject thereto, and based upon an analysis of the Code, the Treasury Regulations promulgated thereunder (including proposed, temporary and final regulations), revenue rulings and revenue procedures of the Internal Revenue Service, court decisions and such other laws and facts as we have deemed relevant and necessary, it is our opinion that for Federal income tax purposes:

1. Each of the Lease and the Sublease is a "true lease"; the Trust will be treated as the lessee under the Lease and as the sublessor under the Sublease; the Trust will be treated as a grantor trust pursuant to Sections 671 et seq. of the Code; the Investor will be the owner and sole beneficiary of the Trust and the Investor will be entitled and required to take into account each item of income, gain, loss, deduction and credit of the Trust with respect to its interest in the Facility, the Lease, the Sublease and the Loan evidenced by the Loan and Security Agreement.

2. The Investor should be entitled to rental deductions under Section 162 of the Code for scheduled installments of Lease Basic Rent payable under the Lease in the amounts and in the periods to which such installments relate, as specified in the Lease, in accordance with Section 467(b)(1) of the Code. The Investor should be entitled to include in gross income all scheduled installments of Sublease Basic Rent (and Sublease Renewal Rent, if any) receivable under the Sublease during the Sublease Term in the amounts and in the periods to which such installments relate, as specified in the Sublease, in accordance with Section 467(b)(1) of the Code. Neither the Lease nor the Sublease constitutes a "disqualified leaseback" or "long-term agreement" within the meaning of Section 467(b)(4) of the Code.

3. The Loan evidenced by the Loan and Security Agreement constitutes a debt obligation of the Trust and all amounts payable thereon as interest with respect thereto will be deductible by the Investor, when accrued in accordance with the terms thereof, pursuant to Section 163 of the Code and the Treasury Regulations promulgated thereunder.

4. The Investor will be entitled to deductions for amortization of Transaction Expenses on a straight-line basis over the Lease Term, the Sublease Term and the term of the Loan evidenced by the Loan and Security Agreement, respectively, and we believe that the allocation of Transaction Expenses in accordance with the terms of the Pricing File constitutes a reasonable allocation thereof.

5. The German Lease constitutes a financing rather than a "true lease", under which the German Lessor is a secured lender and the Lessor is the borrower and owner of the German Equipment.

CE 003009

6. Provided that the Closing Date is prior to the effective date of the Final Treasury Regulations under Section 467 of the Code, a court should not construe such Final Treasury Regulations to apply to Lease Basic Rent, Sublease Basic Rent or Sublease Renewal Rent, if any, unless either the Lease or the Sublease constitutes a "disqualified leaseback" or a "long-term agreement," within the meaning of Section 467(b)(4) of the Code.

The opinions set forth above are based on current Federal income tax law and administrative practice as in effect on the date hereof. Any inaccuracy in the applicable facts or the assumptions we have made, or any change after the date hereof in the applicable law, could adversely affect the opinions given herein. We do not undertake to advise you as to any future changes in Federal income tax law or administrative practice that may affect our opinion unless we are specifically retained to do so.

No opinion is expressed as to any matter not specifically addressed herein. Furthermore, this opinion may not be relied upon by any party other than the addressees hereof without the prior express written consent of the undersigned.

Very truly yours,

Shearman & Sterling

WEF/MA
NYL4A/588.6

CE 003010

Deloitte & Touche LLP

Two World Financial Center
New York, New York 10281-1414

Telephone: (212) 436-2000
Facsimile: (212) 436-5000

December 15, 1997

Mr. Brian T. DePlautt
Vice President
Consolidated Edison Leasing, Inc.
111 Broadway
8th Floor
New York, NY 10006

Dear Mr. DePlautt:

Pursuant to your request, we conducted a study of the Unit, the Cooling Water Channel, the Cooling Water Station, the Common Facilities and the Network (collectively the "Facility") and the interests therein, as described in the attached report (the "Report"). We understand that Consolidated Edison Leasing Corporation (the "Investor") through Wilmington Trust Company (the "Trustee") intends to lease a 47.46835443 percent undivided interest in the Facility (the "Undivided Interest") from N.V. Energieproduktiebedrijf Zuid-Holland ("EZH") and simultaneously sublease the Undivided Interest to EZH on December 15, 1997 (the "Closing Date").

We understand that the purpose of our study is to provide a written report expressing and supporting our opinion of the current fair market value and respective future fair market values at various times of the Undivided Interest and the Facility and the useful life of the Facility, to analyze other aspects of the transaction economics, and to assist tax counsel in analyzing the tax consequences of the transaction. For the purpose of this Report, we define fair market value as the price at which property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell, with both having reasonable knowledge of the relevant facts. Capitalized terms not otherwise defined herein have the meanings assigned to them in the Report, and, to the extent not defined therein, in Appendix A to the Participation Agreement dated December 15, 1997 among the Investor, EZH and certain other parties.

Our study was conducted in accordance with generally accepted appraisal standards, as set forth by the American Society of Appraisers. This valuation report is prepared in conformity with the **Uniform Standards of Professional Appraisal Practice** of The Appraisal Foundation and the **Principles of Appraisal Practice and Code of Ethics** of the American Society of Appraisers. Accordingly, we performed such tests and procedures as we considered appropriate under the circumstances.

As a result of our study, we conclude that as of the Closing Date:

1. The fair market values of the Sublessor's Lease Interest, the Facility and the Undivided Interest are equal to US$148,200,000, US$316,000,000 and US$150,000,000, respectively as of the Closing Date. The equity investment of the Investor is at least 20 percent of the value of the interest of the Sublessor's Lease Interest as of the Closing Date;

2. The Facility is complete as of the Closing Date and does not require any additions, alterations, improvements or modifications for the intended use by EZH or the intended use by the Sublessor;

3. The Sublease Purchase Option Price (taking into account the assumption of Lease obligations and the transfer of deposits to the Sublessee) is greater than 100 percent of our expectation of the fair market value of the Sublessor's Lease Interest on the Sublease Basic Termination Date, including in such fair market value the effects of inflation or deflation;

4. Any amount of Sublease Basic Rent is no greater than our expectation of fair market rentals for the Undivided Interest at the time such amount of Sublease Basic Rent would be payable, and any amount of Sublease Renewal Rent (assuming present market conditions and interest rates obtained at the time) is no greater (taking into account fluctuations thereof as provided in the Operative Documents) than our expectation of 90 percent of the fair market rentals for the Undivided Interest at the time such amount of Sublease Renewal Rent would be payable, in each case taking into account in determining fair market rentals all obligations of the Sublessee under the Operative Documents and the effects of inflation or deflation;

5. The expected residual value of the Facility on the Lease Termination Date, without taking into account the effects of inflation or deflation, is expected to be at least 20 percent of the fair market value of the Facility as of the Closing Date;

6. Neither the physical attributes of the Facility, the applicable return provisions, the terms and conditions of any Sublease Renewal Term, the cost savings that the Sublessee could realize by purchasing the Sublessor's Lease Interest rather than other power production or transmission assets not then operated by the Sublessee nor any other identifiable factor which came to our attention in the course of our appraisal after due inquiry, will create a material inducement to the Sublessee or cause the Sublessee to exercise the Sublease Purchase Option. Neither the physical attributes of the Facility, the cost of arranging a new sublease with a party unrelated to the Sublessee, nor any other identifiable factor which came to our attention in the course of our appraisal after due inquiry, will create a material inducement to the Sublessor to exercise the Sublease Renewal Option;

7. Based on the comparative costs of the reasonably anticipated alternatives expected to be available to the Sublessee on the Sublease Basic Termination Date, the Sublessee is not expected to be under any economic compulsion to exercise the Sublease Purchase Option;

8. On the Sublease Basic Termination Date and on the Sublease Renewal Termination Date, if any, the use of the Sublessor's Lease Interest by the Sublessor or some person unrelated to the Sublessee, is expected to be commercially feasible based on technical knowledge and expertise that would be applied by prudent business persons on the basis of present knowledge and generally accepted operating standards;

9. The useful life of the Sublessor's Lease Interest: (i) as of the Closing Date is 43.2 years; (ii) as of the Sublease Basic Termination Date will be 23.1 years; and (iii) as of the end of the Sublease Renewal Termination Date will be 6.7 years;

10. The remaining useful life of the Facility as of the Closing Date is at least 54 years and as of the Lease Termination Date will be at least 10.8 years;

11. On the Lease Termination Date, the use of the Facility by the Lessor, EZH or some person unrelated to the Trustee and the Investor, will be commercially feasible based on the standards that would be applied by prudent business persons on the basis of present knowledge and generally accepted operating standards;

12. Lease Basic Rent represents the fair market rent for the Undivided Interest in the Facility over the Lease Term at the times such Lease Basic Rent is payable, taking into account in determining fair market rentals all obligations of the Lessee under the Operative Documents and the effects of inflation and deflation;

13. The Facility is fully integrated and self-contained and each component thereof is interrelated to the other components in terms of useful life, function and design and is not designed for use in commercial operation independent of the other components;

14. On the Sublease Basic Termination Date, the Sublessor's Lease Interest is expected to be able to be placed with a party unrelated to the Sublessee, EZH, the Investor or the Trustee pursuant to a new sublease that provides for rent payable in arrears equal to the estimated fair market rents for the Facility of 14.9 percent of the original fair market value of the Facility, taking into account the terms of the Control Documents;

15. On the Lease Termination Date, the remaining useful life of the Facility, without regard to any future Operations Maintenance Program, is expected to be at least 20 percent of the remaining useful life of the Facility as of the Closing Date;

CE 003013

16. On the Sublease Basic Termination Date, the expected residual values of the Sublessor's Lease Interest, both with and without taking into account the effect of inflation during the Sublease Basic Term, are estimated to be 129.0 percent and 69.7 percent of the value of the Sublessor's Lease Interest as of the Closing Date, and on the Sublease Renewal Termination Date, the expected residual values of the Sublessor's Lease Interest, both with and without taking into account the effect of inflation during the Sublease Basic Term and the Sublease Renewal Term, are estimated to be 70.9 percent and 22.7 percent of the value of the Sublessor's Lease Interest as of the Closing Date; and

17. The fair market value of the German Equipment, notably the steam turbine generator and the gas turbine generator, is expected to be DM 26,000,000 and DM 66,000,000, respectively, as of October 24, 2009 taking into account the effect of inflation or deflation.

In accordance with the guidelines set out by the American Society of Appraisers, we are independent of the Investor and EZH. We have no current or prospective financial interest in the appraised Facility. Our fee for this appraisal was in no way influenced by the results of our analysis.

During the course of this appraisal, we analyzed the electric power industry in The Netherlands and its regulatory environment. Additionally, we examined the transaction structure with regard to the Facility, and analyzed EZH's financial statements, the construction expenses and projected operating expenses for the Facility. Furthermore, we studied historical gas-fired power plant information in both Europe and the United States to determine the useful life of the Facility on each of the Sublease Basic Termination Date, the Sublease Renewal Termination Date and the Lease Termination Date. Subsequently, we estimated the residual value of the Facility on the Sublease Basic Termination Date and the residual value of the Sublessor's Lease Interest followed by an assessment of the alternatives available to the Sublessee and the Sublessor on the Sublease Basic Termination Date that was based upon our analysis of the rental rates and the residual values of the Sublessor's Lease Interest.

As part of this study, EZH provided us with schedules listing and identifying components of the Facility. In addition, we were provided materials describing the specifications and recommended maintenance and inspection procedures for the Facility. We also examined the Due Diligence Engineering Report prepared by Duke Engineering & Services, the independent engineer, concerning the Facility. Further, as part of this analysis we performed a physical inspection of the Facility on August 4, 1997 and November 11, 1997. We have also examined provisions that in our opinion are relevant to our analysis of the Lease, the Sublease and other Operative Documents.

A list of the schedules and materials furnished to us in writing by EZH and upon which we have relied in reaching the conclusions is provided in Exhibit I. As part of this appraisal we have not audited these data. Therefore, we express no opinion or any other form of assurance regarding their accuracy or fairness of presentation, except that based on our research and experience with similar facilities, we have no reason to believe that such data is inaccurate or incomplete or not fairly presented.

This opinion was prepared by Deloitte & Touche LLP Valuation Group ("D&TVG") for the Investor. The conclusions in this study reflect, among other things, our physical

inspection of the Facility, information obtained regarding gas-fired power plants, interviews with EZH (which have been relied upon by us in formulating the opinions contained herein solely to the extent information learned in such interviews has been confirmed in writing by EZH and listed in Exhibit I), our examination of provisions of the Operative Documents that in our opinion are relevant to our analysis and our best professional judgment as appraisers. Accordingly our conclusions reflect D&TVG's best judgment as appraisers in light of the information available to it at the time of preparation. In addition, at the request of the Investor, we have performed certain calculations of the available cash flows to the Investor. Any use which any party, other than the Investor, and affiliates of the Investor, and their respective counsel, (an "Other Party") makes of this opinion or any reliance on or decisions to be made based on it, are the responsibility of that party. By using this opinion, such Other Party consents that D&TVG has no liability with respect to such reliance or decisions. D&TVG accepts no liability for damages, if any, suffered by any such Other Party as a result of decisions made or actions taken based on this opinion. D&TVG shall have no liability to the Investor and affiliates of the Investor except to the extent caused by D&TVG's negligence, bad faith, willful misconduct or breach of its obligations set forth in the proposal between D&TVG and the Investor. This report is not to be reproduced in whole or in part without the written permission of D&TVG except for the Investor's internal use and for the purposes stated in our proposal.

We made no investigation of and assume no responsibility for title or liabilities against the property appraised. This report is subject to the General Agreement between D&TVG and the Investor.

The Report, which delineates the scope, procedures and conclusions of our appraisal, accompanies this letter. The accompanying statement of appraisal assumptions and limiting conditions, appraisal certification and appraisers' qualifications are integral parts of the report.

We are pleased to provide this service to you.

Deloitte & Touche LLP

# Exhibit C

## Executive Summary

One element of a diversified investment portfolio for Con Edison is the relatively low risk and attractive return profile of leases. This paper describes sale-leasebacks, identifies major risks and benefits, and details a recommended investment.

Investments of this type would be accounted for as leveraged leases, allowing for front-loaded earnings, and generate after tax yields of between 15% and 25% over their lives, after taking account of typical capital structure and debt costs.

The earnings come from a combination of lease payments and tax deductions. Con Edison, with its high tax rate and large taxable income position, is in a particularly favorable position to take advantage of such a program.

## What is a sale-leaseback?

In its most basic form, a sale-leaseback is the purchase of an asset and the subsequent leaseback of that asset to the seller under a long term lease agreement. Under a so-called "leveraged lease", the investor uses non-recourse debt to reduce the equity needed to purchase the asset.

Since its inception in 1964, the leveraged leasing market has continually developed new variations on this basic theme to accommodate increasingly complex accounting and tax laws and regulations. The latest of these variations are the "lease-leaseback" structures in which an asset is leased (instead of purchased) and the leasehold rights derived from that lease are then leased back to the initial owner of the facility. Lease-leaseback structures have been developed to optimize the benefits that can be derived by the utility and the investor in these transactions.

## What kind of lease structures will be considered?

Under the proposed investment program, investments will be considered in both sale-leasebacks and lease-leasebacks, depending on prevailing market conditions.

Because the specific transaction currently under consideration by CED is a lease-leaseback we will use this type of structure in our example of a typical transaction.

## How would a typical transaction work?

In a typical lease-leaseback transaction, a special purpose subsidiary owned by an investor, in this case CED, would establish a trust. On the closing date, CED would invest equity in the trust and the trust would borrow non-recourse debt for the project. Concurrently the trust would enter into a lease agreement with a utility under which the trust would lease an asset, for example a power plant, from the utility for 44 years. The trust would, at the same time, lease the plant back to the utility for 20 years, after which the trust would have a number of options, described below. The initial 20 year term of the leaseback has been chosen to

optimize the benefits available to both the utility and the investor. A 44 year leaseback would not qualify for the tax treatment that CED and the foreign utility seek.

On the closing date of the lease, the utility would establish, for the benefit of CED, (a) a trust account containing U.S. Treasury securities and (b) an irrevocable bank letter of credit from a bank rated AA or better, both in amounts that, when combined, fully secure the obligations of the utility to CED. In the event the utility were to fail to make the payments due to CED under the lease, CED could take the U.S. Treasury securities and draw on the letter of credit to satisfy any shortfalls.

At the end of the initial 20 year lease, the utility would have the option to purchase the plant at a pre-agreed fixed price. If the utility did purchase the plant at this time, the transaction would be completed. If the utility did not purchase the plant at the end of year 20, the trust would have the option to either (a) lease the plant to a third party for the remaining 24 years of the lease, (b) use the plant itself, or (c ) require the utility to re-lease the plant for an additional 17 years at prices that would assure CED of its expected return.

Responsibility for the condition of the plant would rest with the utility during the initial term of the lease, and with the third party during a subsequent lease. During the remaining seven years under the lease, CED could either use the plant itself or lease the plant to third parties and in doing so obtain additional revenue. The base case economics assume no revenue for this period. At the end of the 44 year lease CED would be required to return the plant to the utility.

**How would CED derive its return under a sale-leaseback?**

Under a typical lease-leaseback structure an investor's earnings are generated by applying a constant rate of return to a declining investment balance according to lease accounting rules established by the Financial Accounting Standards Board. As the investment balance declines so do the earnings and hence the earnings are front-loaded.

The following chart details the earnings profile for the first 10 years of a typical lease-leaseback

| Year (US$) | Investment | Earnings |
|---|---|---|
| 1997 | 43,047,734 | 353,054 |
| 1998 | | 4,154,042 |
| 1999 | | 3,961,165 |
| 2000 | | 3,748,210 |
| 2001 | | 3,512,950 |
| 2002 | | 3,252,891 |
| 2003 | | 2,965,245 |
| 2004 | | 2,646,897 |
| 2005 | | 2,294,361 |
| 2006 | | 1,903,735 |

CE 012019

The following graph details the earnings for a typical lease-leaseback.

NET INCOME FROM LEASING




The transactions contemplated will be structured in such a way that CED will obtain the same yields and rates of return regardless of whether the utility exercises its purchase option at the end of year 20 or is required to re-lease the plant for an additional 17 years.

**Do we have a specific transaction in mind?**

CED's strategy will be to invest in transactions in conjunction with experienced market participants, to concentrate on assets familiar to Con Edison and to deal with utilities in countries with high credit ratings.

CED is currently pursuing the potential investment of $43 million in a recently commissioned gas-fired combined cycle power plant, the RoCa3 plant, located near the city of Rotterdam in the Netherlands. The plant, owned by EZH, one of the four regulated generation utilities in the Netherlands, is currently undergoing engineering, environmental, and valuation reviews by our consultants, and has recently been inspected by internal personnel.

We are pursuing this investment opportunity in conjunction with an experienced and knowledgeable lease investor, Bank One Leasing Inc. Bank One and CED have retained Shearman & Sterling for tax and legal advice, and, among others, Duke Engineering for engineering reviews, Tauw Milieu, a well-respected Dutch environmental firm, for an environmental assessment and Deloitte & Touche for valuation assessments of the plant.

The transaction is anticipated to generate over $4 million in earnings during 1998 and is expected to generate an after tax yield of 19.7%, assuming that CED's investment is 50% equity/50% debt.

CE 012020

**What are major benefits from these transactions to the investor?**

(1) Highly Predictable Earnings

The earnings from these transactions are highly predictable because each of the cash inflows and outflows to the transaction is contractually agreed to on the closing date and because the utility's lease obligations are fully secured by the U.S. Treasuries and the bank letter of credit.

(2) Front Loaded Earnings

Because the transactions will be afforded leveraged lease accounting treatment under Financial Accounting Standards Board rules, the earnings profile for these transactions is "front-loaded" and hence provides more earnings in the early years of the transaction than in the latter years of the transaction.

(3) Good to Excellent Investment Yields

After tax yields on leasing projects are anticipated to range from a good 15% to an excellent 25% depending on the type of lease structure utilized and the leverage applied. For example, under the initial lease investment contemplated the return of 19.7% assumes a relatively conservative leverage rate of 50%. Measurement of after tax yields, assuming a theoretical case in which the corporation has no debt (the so called "all equity return") range from 9.0% to 12.3%.

(4) Economic Value

Because of the utility payment protection structures and the low probability of losses derived from adverse tax actions, the risk adjusted rates of return exceed the required rates of return for these investments.

(5) Strategic Value of Leasing

Participation in these transactions affords CED the opportunity to more fully understand the legal, regulatory, commercial and tax environment of the countries in which the leased assets are located. This in-depth understanding can provide the basis for better informed decisions regarding potential investment and partnering opportunities as the utility infrastructures in these highly developed countries are opened to investments from external sources.

**What are major benefits from these transactions to the utility?**

In entering into these transactions, the utility is able, at little or no perceived risk to itself, to obtain (a) up to 100% long term financing for a plant, (b) interest rates that may be lower than those available from domestic credit sources and (c ) front-end loaded funding benefits, while maintaining operating control of the plant. In the case of the investment contemplated by CED, the benefit to the utility is about 6.9% of the asset value, or $10.3 million.

**What are the major risks from these transactions to the investor?**

(1) Utility Credit Risks

Perhaps the greatest risk to the trust is the risk that the utility will default on its obligation to pay rent during the lease term. In order to minimize this risk the trust will require that the utility's lease obligations be fully secured by a combination of U.S. Treasury securities and letters of credit issued by banks with S&P ratings of AA or above. In the event the utility fails to make the lease rent payments due, the investor can use the Treasuries and the proceeds from the letter of credit to return its capital and to provide it with its expected yield.

(2) Foreign Country Tax Risks

Another major risk implicit in the transaction is the risk that the tax laws or regulations of the country in which the asset is located change in a way that would result in lower returns to the trust, and hence the investor. Investments under the proposed program would be structured so that the risks associated with foreign country tax law changes would be fully borne by the utility.

(3) Pending U.S. Tax Regulations

Pending tax regulations, if enacted, could significantly reduce the tax benefit to be derived by investors in lease-leaseback transactions such as the investment under consideration by CED, as described above.

CED's tax counsel has indicated that as long as the closing date for the contemplated investment occurs prior to the date the proposed regulations are published in the Federal Register, these pending regulations will not apply to the contemplated transaction retroactively.

If the pending regulations are published prior to the closing date, CED will defer the contemplated investment pending a restructuring of the transaction.

(4) U.S. Tax Audits

It is anticipated that the transactions will be structured in ways that will make any challenges to the structure by the IRS under current regulations difficult to support or litigate. Preliminary indications from our tax counsel are that the tax opinions will show an average likelihood of success above 90% if challenged by the IRS. Our tax counsel, is very experienced in negotiating and advising on leveraged lease transactions.

In the worst case tax scenario, a claim would be litigated and won in tax court by the IRS. In this case, financial analysis indicates a 100% return of CED's capital and a return on capital of 2.4% over the lease term.

(5) Country Risks

The proposed investment program will target investments in developed and highly rated countries. The initial proposed investment under the program will be in the AAA-rated Netherlands. Potential downstream opportunities include transactions in the Netherlands, Switzerland, Australia, Germany and the United States. The contemplated transactions will be fully denominated in U.S. dollars and will have no foreign exchange risks.

(6) Limited Liquidity

Investments in the assets contemplated under the proposed investment program are designed to generate earnings and cash flow over extended periods of time. While these investments do not carry the liquidity of publicly-traded securities, they can be sold if necessary, although most likely at a discount to then-current book value. The economics of these investment structures typically drive most investors to continue to maintain the investments on their books through their scheduled terms. The proposed investment program contemplates holding these investments accordingly.

**Is anyone else doing these transactions?**

Leasing investment programs form an integral part of the earnings and investment profiles of a wide range of companies, including electric and gas utilities and holding companies such as Public Service Enterprise Group, Duquesne Light, Edison International, Southern Company, Cilcorp, and Southern Indiana Gas; telephone companies such as ATT, Nynex/Bell Atlantic, Ameritech, and US West; banks such as, Bank of New York, First Chicago, Nationsbank, Bank One, and First Chicago; various insurance companies, as well as industrial corporations such as Philip Morris, Pitney Bowes, Chrysler Corporation, Dana Corporation and General Electric.

**What are we requesting approval to do?**

Approval is requested to initiate a leasing investment program and to make such investments as are deemed reasonable by the Board of Directors of CED, within the capital allocations made to CED from time to time by the Board of Directors of the holding company.

One of the requirements the market imposes is that investors have a substantial net worth, in the order of $100 million. To provide for the necessary net worth requirement as well as to provide for funds to make the equity investments, management also requests that it be given the authority to make additional investments in CED sufficient to satisfy the net worth requirements.

# Exhibit D

From: Windows/admin/Brian
Sent: 2/9/1998 6:46:48 PM (Eastern Time)
To: 'Mary Jane McCartney'
CC: 'Chuck Muoio'
Attachments: ENECO WHITE PAPER 4.DOC
Subject: ENECO White Paper

The following is the ENECO White Paper with the changes requested. At the end of this White Paper is an attachment of the White Paper which should show the graph.

Leasing White Paper
(ENECO 4)

Overview

This Leasing White Paper will provide the reader with the following information: (1) a summary review of a recent lease investment made by Consolidated Edison Development, Inc. ("CED'), (2) a summary review of a new lease investment CED is pursuing, and (3) a general background on leasing.

(1) Summary Review of Recent Lease Investment

CED has participated in one lease-leaseback transaction to date. In December 1997 CED invested $43.5mm for a $150mm undivided interest in the EZH RoCa3 combined cycle power plant located in the Netherlands. The following is a summary of that transaction:

Project Name: EZH RoCa3
Project Country: The Netherlands
Country Credit Rating: AAA
Project Assets: 220MW gas-fired combined cycle power plant
Project Location; Rotterdam, the Netherlands
Total Project Cost: $316mm
CED Portion of Total Cost: $150mm
CED Equity Amount: $43.5mm
Co-investor: Banc One Leasing Corporation
Security for CED Equity: US Treasury securities plus
Letter of credit from AA rated bank
CED Yield to term: 18+% (assuming a 50%/50% debt/equity)

(2) Summary Review of a Potential New Lease Investment

CED is currently pursuing the potential investment of approximately $43 million in a portion of the natural gas and hot water distribution network presently owned and operated by N.V. ENECO. ENECO is a regulated electric, gas and thermal distribution utility with a service territory which includes the cities of Rotterdam and The Hague in the southern portion of the Netherlands. ENECO is rated AA with a "stable" outlook by Standard & Poors.

CED's market entry strategy is to invest in transactions in conjunction with experienced market participants, to concentrate on assets familiar to Con Edison and to deal with utilities in countries with high credit ratings. CED is pursuing this investment opportunity in conjunction with two experienced and

CE 011957

knowledgeable lease investors, Banc One Leasing Corporation ("Banc One") and Public Service Resources Corporation ("PSRC"), an affiliate of Public Service Electric and Gas. Banc One, PSRC and CED have retained Hunton & Williams for tax and legal advice, and, among others, Duke Engineering for engineering reviews, Tauw Milieu, a well-respected Dutch environmental firm, for an environmental assessment and Deloitte & Touche for a valuation assessment of the system.

The transaction is anticipated to generate approximately $2.3 million in earnings during 1998 and is expected to generate an after tax yield of approximately 12.5% assuming that CED's investment is 50% equity/50% debt.

CED is currently performing due diligence on this potential transaction and is negotiating with ENECO in an attempt to reach agreement on the terms and conditions of the various contracts required for the investment. Preliminary indications are that this process could conclude with a go/no-go investment decision by CED as early as late February 1998.

Project Name: ENECO
Project Country: The Netherlands
Country Credit Rating: AAA
Project Assets: Natural gas and hot water distribution network
Project Location: Rotterdam and The Hague, the Netherlands
Total Project Cost: $810mm
CED Portion of Total Cost: $285mm
CED Equity Amount: $43.5mm
Co-investors: Banc One Leasing Corporation
Public Service Resource Corporation
Security for CED Equity: US Treasury securities plus
Letter of credit from AA rated bank
CED Yield to term: 12.5+% (assuming a 50%/50% debt/equity)

(3) General Background on Leasing

Executive Summary

One element of a diversified investment portfolio for Con Edison is the relatively low risk and attractive return profile of leases. This paper describes sale-leasebacks, identifies major risks and benefits, and details a recommended investment.

Investments of this type would be accounted for as leveraged leases, allowing for front-loaded earnings, and generate after tax yields of between 10% and 25% over their lives, after taking account of typical capital structure and debt costs.

The earnings in these transactions come from a combination of lease payments and tax deductions. Con Edison, with its high tax rate and large taxable income position, is in a particularly favorable position to take advantage of such a program.

What is a sale-leaseback?

In its most basic form, a sale-leaseback is the purchase of an asset and the subsequent leaseback of that asset to the seller under a long term lease

agreement. Under a so-called "leveraged lease," the investor uses non-recourse debt to reduce the equity needed to purchase the asset.

Since its inception in 1964, the leveraged leasing market has continually developed new variations on this basic theme to accommodate increasingly complex accounting and tax laws and regulations. The latest of these variations are the "lease-leaseback" structures in which an asset is leased (instead of purchased) and the leasehold rights derived from that lease are then leased back to the initial owner of the facility. Lease-leaseback structures have been developed to optimize the benefits that can be derived by the utility (lessee) and the investor in these transactions.

What kind of lease structures will be considered?

Under the proposed investment program, investments will be considered in both sale-leasebacks and lease-leasebacks, depending on prevailing market conditions.

Because the specific transaction currently under consideration by CED is a lease-leaseback we will use this type of structure in our example of a typical transaction.

How would a typical transaction work?

In a typical lease-leaseback transaction, a special purpose subsidiary owned by an investor, in this case CED, would establish a trust. On the closing date, CED would invest equity in the trust and the trust would borrow non-recourse debt for the transaction. Concurrently the trust would enter into a lease agreement with a utility under which the trust would lease an asset, for example a gas and hot water distribution system, from the utility for 42 years. The trust would, at the same time, lease the system back to the utility for 23 years, after which the trust would have a number of options, described below. The initial 23 year term of the leaseback has been chosen to optimize the benefits available to both the utility and the investor. A 42-year leaseback would qualify for the tax treatment that CED and the foreign utility seek.

On the closing date of the lease, the utility would establish, for the benefit of CED, (a) a trust account containing U.S Treasury securities and (b) an irrevocable bank letter of credit from a bank rated AA or better, both in amounts that, when combined, fully secure the obligations of the utility to CED. In the event the utility were to fail to make the payments due to CED under the lease, CED could take the U.S. Treasury securities and draw on the letter of credit to satisfy any shortfalls.

At the end of the initial 23 year lease, the utility would have the option to purchase the system at a pre-agreed fixed price. If the utility did purchase the system at this time, the transaction would be completed. If the utility did not purchase the system at the end of year 23, the trust would have the option to either (a) lease the system to a third party for the remaining 19 years of the lease, (b) use the system itself, or (c) require the utility to re-lease the system for an additional 12 years at prices that would assure CED of its expected return.

Responsibility for the condition of the system would rest with the utility during the initial term of the lease, and with the third party or the utility

during a subsequent lease. During the remaining 7 years under the lease, CED could either use the system itself, return the system to the utility or lease the system to third parties and in doing so obtain additional revenue. The base case economics assume no revenue for this period. At the end of the 42-year lease CED would be required to return the system to the utility.

How would CED derive its return under a lease-leaseback?

Under a typical lease-leaseback structure an investor's earnings are generated by applying a constant rate of return to a declining investment balance according to lease accounting rules established by the Financial Accounting Standards Board. As the investment balance declines so do the earnings and hence the earnings are front-loaded. The following schedule details the earnings profile for the first 10 years of a typical lease-leaseback

| Year | Investment ($MM) | Earnings ($MM) |
|---|---|---|
| 1998 | 42.9 | 2.3 |
| 1999 | 2.4 | |
| 2000 | 2.3 | |
| 2001 | 2.2 | |
| 2002 | 2.1 | |
| 2003 | 2.0 | |
| 2004 | 1.8 | |
| 2005 | 1.7 | |
| 2006 | 1.6 | |
| 2007 | 1.4 | |

The following chart details the earnings for a typical lease-leaseback

It is anticipated that transactions will be structured such that CED will obtain approximately the same earnings regardless of whether the utility exercises its purchase option or not.

What are major benefits from these transactions to the investor?

1. Highly Predictable Earnings

The earnings from these transactions are highly predictable because each of the cash inflows and outflows to the transaction are contractually agreed to on the closing date and because, in the event of a utility payment default, the trust can take the U.S. Treasuries and draw on the bank letter of credit.

2. Front Loaded Earnings

Because the transactions will be afforded leveraged lease accounting treatment under Financial Accounting Standards Board rules, the earnings profile for these transactions is "front-loaded' and hence provides more earnings in the early years of the transaction than in the latter years of the transaction.

3. Good to Excellent Investment Yields

After tax yields on leasing projects are anticipated to range from a good 10%

CE 011960

to an excellent 25% depending on the type of lease structure utilized and the leverage applied. For example, under the initial lease investment contemplated the return of 12.5% assumes a relatively conservative leverage rate of 50%. Measurement of after tax yields, assuming a theoretical case in which the corporation has no debt (the so called "all equity return") typically range from 8.5% to 12.5%.

4. Economic Value

Because of the utility payment protection structures and the relatively low probability of losses derived from adverse tax actions, the risk adjusted rates of return exceed the required rates of return for these investments.

5. Strategic Value of Leasing

Participation in these transactions affords CED the opportunity to more fully understand the legal, regulatory, commercial and tax environment of the countries in which the leased assets are located. This in-depth understanding can provide the basis for better informed decisions regarding potential investment and partnering opportunities as the utility infrastructures in these highly developed countries are opened to investments from external sources.

What are major benefits from these transactions to the utility?

In entering into these transactions, the utility is able, at little or no perceived risk to itself, to obtain (a) up to 100% long term financing for a system, (b) interest rates that may be lower than those available from domestic credit sources and (c) front-end loaded funding benefits, while maintaining operating control of the system. In the case of the investment contemplated by CED, the net cash benefit to the utility is approximately 3% of the value of the leased asset, or approximately $8.5 million.

What are the major risks from these transactions to the investor?

1. Utility Credit Risks

Perhaps the greatest risk to the trust is the risk that the utility will default on its obligation to pay rent during the lease term. In order to minimize this risk the trust will require that the utility's lease obligations be fully secured by a combination of U.S. Treasury securities and letters of credit issued by banks with S&P ratings of AA or above. In the event the utility fails to make the lease rent payments due, the investor can use the Treasuries and the proceeds from the letter of credit to return its capital and to provide it with its expected yield.

2. Foreign Country Tax Risks

Another major risk implicit in the transaction is the risk that the tax laws or regulations of the country in which the asset is located change in a way that would result in lower returns to the trust, and hence the investor. Investments under the proposed program would be structured so that the risks associated with foreign country tax law changes would be fully borne by the utility.

3. Pending U.S. Tax Regulations

Pending tax regulations, if enacted, could significantly reduce the tax benefit to be derived by investors in lease-leaseback transactions such as the investment under consideration by CED, as described above.

CED's tax counsel has indicated that as long as the closing date for the contemplated investment occurs prior to the date the proposed regulations are published in the Federal Register, these pending regulations will not apply to the contemplated transaction retroactively.

If the pending regulations are published prior to the closing date, CED will defer the contemplated investment pending a restructuring of the transaction.

4. U.S. Tax Audits

It is anticipated that the transactions will be structured in ways that will make any challenges to the structure by the IRS under current regulations difficult to support or litigate by the IRS. Preliminary indications from our tax counsel are that the tax opinions will provide a "should" level of opinion with respect to the likelihood of prevailing in an IRS challenge. Our tax counsel is very experienced in negotiating and advising on leveraged lease transactions.

In a downside tax scenario a claim would be litigated and won in tax court by the IRS. In this case, financial analysis indicates a return of CED's capital with a return on CED's capital of 2.4% over the lease term.

5. Country Risks

The proposed investment program will target investments in developed and highly rated countries. The initial proposed investment under the program will be in the AAA-rated Netherlands. Potential downstream opportunities include transactions in the Netherlands, Switzerland, Australia, Germany and the United States. The contemplated transactions will be fully denominated in U.S. dollars.

6. Limited Liquidity

Investments in the assets contemplated under the proposed investment program are designed to generate earnings and cash flow over extended periods of time. While these investments do not carry the liquidity of publicly-traded securities, they can be sold if necessary, although most likely at a discount to then-current book value. The economics of these investment structures typically drive most investors to continue to maintain the investments on their books through their scheduled terms. The proposed investment program contemplates holding these investments accordingly.

Is anyone else doing these transactions?

Leasing investment programs form an integral part of the earnings and investment profiles of a wide range of companies, including affiliates of electric and gas utilities and holding companies such as Public Service Electric and Gas, Duquesne Light, Edison International, Southern Company,

Cilcorp, and Southern Indiana Gas; telephone companies such as ATT, Nynex/Bell Atlantic, Ameritech, and US West; banks such as Bank of New York, First Chicago, Nationsbank, Bank One, and First Chicago; various insurance companies, as well as industrial corporations such as Philip Morris, Pitney Bowes, Chrysler Corporation, Dana Corporation and General Electric.

# Exhibit E

**Leasing White Paper**
**(ENECO 4)**

**Overview**

This Leasing White Paper will provide the reader with the following information: (1) a summary review of a recent lease investment made by Consolidated Edison Development, Inc. ("CED'), (2) a summary review of a new lease investment CED is pursuing, and (3) a general background on leasing.

**(1) Summary Review of Recent Lease Investment**

CED has participated in one lease-leaseback transaction to date. In December of 1997 CED invested $43.5mm for a $150mm undivided interest in the EZH RoCa3 combined cycle power plant located in the Netherlands. The following is a summary of that transaction:

| | |
|---|---|
| Project Name: | EZH RoCa3 |
| Project Country: | The Netherlands |
| Country Credit Rating: | AAA |
| Project Assets: | 220MW gas-fired combined cycle power plant |
| Project Location; | Rotterdam, the Netherlands |
| Total Project Cost: | $316mm |
| CED Portion of Total Cost: | $150mm |
| CED Equity Amount: | $43.5mm |
| Co-investor: | Banc One Leasing Corporation |
| Security for CED Equity: | US Treasury securities plus<br>Letter of credit from AA rated bank |
| CED Yield to term: | 18+% (assuming a 50%/50% debt/equity) |

**(2) Summary Review of a Potential New Lease Investment**

CED is currently pursuing the potential investment of approximately $43 million in a portion of the natural gas and hot water distribution network presently owned and operated by N.V. ENECO. ENECO is a regulated electric, gas and thermal distribution utility with a service territory which includes the cities of Rotterdam and The Hague in the southern portion of the Netherlands. ENECO is rated AA with a "stable" outlook by Standard & Poors.

CED's market entry strategy is to invest in transactions in conjunction with experienced market participants, to concentrate on assets familiar to Con Edison and to deal with utilities in countries with high credit ratings. CED is pursuing this investment opportunity in conjunction with two experienced and knowledgeable lease investors, Banc One Leasing Corporation ("Banc One")

CE 011965

and Public Service Resources Corporation ("PSRC"), an affiliate of Public Service Electric and Gas. Banc One, PSRC and CED have retained Hunton & Williams for tax and legal advice, and, among others, Duke Engineering for engineering reviews, Tauw Milieu, a well-respected Dutch environmental firm, for an environmental assessment and Deloitte & Touche for a valuation assessment of the system.

The transaction is anticipated to generate approximately $2.3 million in earnings during 1998 and is expected to generate an after tax yield of approximately 12.5% assuming that CED's investment is 50% equity/50% debt.

CED is currently performing due diligence on this potential transaction and is negotiating with ENECO in an attempt to reach agreement on the terms and conditions of the various contracts required for the investment. Preliminary indications are that this process could conclude with a go/no-go investment decision by CED as early as late February 1998.

| | |
|---|---|
| Project Name: | ENECO |
| Project Country: | The Netherlands |
| Country Credit Rating: | AAA |
| Project Assets: | Natural gas and hot water distribution network |
| Project Location: | Rotterdam and The Hague, the Netherlands |
| Total Project Cost: | $810mm |
| CED Portion of Total Cost: | $285mm |
| CED Equity Amount: | $43.5mm |
| Co-investors: | Banc One Leasing Corporation<br>Public Service Resource Corporation |
| Security for CED Equity: | US Treasury securities plus<br>Letter of credit from AA rated bank |
| CED Yield to term: | 12.5+% (assuming a 50%/50% debt/equity) |

**(3) General Background on Leasing**

**Executive Summary**

One element of a diversified investment portfolio for Con Edison is the relatively low risk and attractive return profile of leases. This paper describes sale-leasebacks, identifies major risks and benefits, and details a recommended investment.

Investments of this type would be accounted for as leveraged leases, allowing for front-loaded earnings, and generate after tax yields of between 10% and 25% over their lives, after taking account of typical capital structure and debt costs.

The earnings in these transactions come from a combination of lease payments and tax deductions. Con Edison, with its high tax rate and large taxable income position, is in a particularly favorable position to take advantage of such a program.

**What is a sale-leaseback?**

In its most basic form, a sale-leaseback is the purchase of an asset and the subsequent leaseback of that asset to the seller under a long term lease agreement. Under a so-called "leveraged lease," the investor uses non-recourse debt to reduce the equity needed to purchase the asset.

Since its inception in 1964, the leveraged leasing market has continually developed new variations on this basic theme to accommodate increasingly complex accounting and tax laws and regulations. The latest of these variations are the "lease-leaseback" structures in which an asset is leased (instead of purchased) and the leasehold rights derived from that lease are then leased back to the initial owner of the facility. Lease-leaseback structures have been developed to optimize the benefits that can be derived by the utility (lessee) and the investor in these transactions.

**What kind of lease structures will be considered?**

Under the proposed investment program, investments will be considered in both sale-leasebacks and lease-leasebacks, depending on prevailing market conditions.

Because the specific transaction currently under consideration by CED is a lease-leaseback we will use this type of structure in our example of a typical transaction.

**How would a typical transaction work?**

In a typical lease-leaseback transaction, a special purpose subsidiary owned by an investor, in this case CED, would establish a trust. On the closing date, CED would invest equity in the trust and the trust would borrow non-recourse debt for the transaction. Concurrently the trust would enter into a lease agreement with a utility under which the trust would lease an asset, for example a gas and hot water distribution system, from the utility for 42 years. The trust would, at the same time, lease the system back to the utility for 23 years, after which the trust would have a number of options, described below. The initial 23 year term of the leaseback has been chosen to optimize the benefits available to both the utility and the investor. A 42-year leaseback would qualify for the tax treatment that CED and the foreign utility seek.

On the closing date of the lease, the utility would establish, for the benefit of CED, (a) a trust account containing U.S Treasury securities and (b) an irrevocable bank letter of credit from a bank rated AA or better, both in amounts that, when combined, fully secure the obligations of the utility to CED. In the event the utility were to fail to make the payments due to CED under the lease, CED could take the U.S. Treasury securities and draw on the letter of credit to satisfy any shortfalls.

At the end of the initial 23 year lease, the utility would have the option to purchase the system at a pre-agreed fixed price. If the utility did purchase the system at this time, the transaction would be completed. If the utility did not purchase the system at the end of year 23, the trust would have the option to either (a) lease the system to a third party for the remaining 19 years of the lease, (b) use the system itself, or (c) require the utility to re-lease the system for an additional 12 years at prices that would assure CED of its expected return.

Responsibility for the condition of the system would rest with the utility during the initial term of the lease, and with the third party or the utility during a subsequent lease. During the remaining 7 years under the lease, CED could either use the system itself, return the system to the utility or lease the system to third parties and in doing so obtain additional revenue. The base case economics assume no revenue for this period. At the end of the 42-year lease CED would be required to return the system to the utility.

**How would CED derive its return under a lease-leaseback?**

Under a typical lease-leaseback structure an investor's earnings are generated by applying a constant rate of return to a declining investment balance according to lease accounting rules established by the Financial Accounting Standards Board. As the investment balance declines so do the earnings and hence the earnings are front-loaded. The following schedule details the earnings profile for the first 10 years of a typical lease-leaseback

| Year | Investment ($MM) | Earnings ($MM) |
|---|---|---|
| 1998 | 42.9 | 2.3 |
| 1999 | | 2.4 |
| 2000 | | 2.3 |
| 2001 | | 2.2 |
| 2002 | | 2.1 |
| 2003 | | 2.0 |
| 2004 | | 1.8 |
| 2005 | | 1.7 |
| 2006 | | 1.6 |
| 2007 | | 1.4 |

The following chart details the earnings for a typical lease-leaseback




It is anticipated that transactions will be structured such that CED will obtain approximately the same earnings regardless of whether the utility exercises its purchase option or not.

**What are major benefits from these transactions to the investor?**

1. Highly Predictable Earnings

   The earnings from these transactions are highly predictable because each of the cash inflows and outflows to the transaction are contractually agreed to on the closing date and because, in the event of a utility payment default, the trust can take the U.S. Treasuries and draw on the bank letter of credit.

2. Front Loaded Earnings

   Because the transactions will be afforded leveraged lease accounting treatment under Financial Accounting Standards Board rules, the earnings profile for these transactions is "front-loaded' and hence provides more earnings in the early years of the transaction than in the latter years of the transaction.

3. Good to Excellent Investment Yields

   After tax yields on leasing projects are anticipated to range from a good 10% to an excellent 25% depending on the type of lease structure utilized and the leverage applied. For example, under the initial lease investment

contemplated the return of 12.5% assumes a relatively conservative leverage rate of 50%. Measurement of after tax yields, assuming a theoretical case in which the corporation has no debt (the so called "all equity return") typically range from 8.5% to 12.5%.

4. Economic Value

Because of the utility payment protection structures and the relatively low probability of losses derived from adverse tax actions, the risk adjusted rates of return exceed the required rates of return for these investments.

5. Strategic Value of Leasing

Participation in these transactions affords CED the opportunity to more fully understand the legal, regulatory, commercial and tax environment of the countries in which the leased assets are located. This in-depth understanding can provide the basis for better informed decisions regarding potential investment and partnering opportunities as the utility infrastructures in these highly developed countries are opened to investments from external sources.

**What are major benefits from these transactions to the utility?**

In entering into these transactions, the utility is able, at little or no perceived risk to itself, to obtain (a) up to 100% long term financing for a system, (b) interest rates that may be lower than those available from domestic credit sources and (c) front-end loaded funding benefits, while maintaining operating control of the system. In the case of the investment contemplated by CED, the net cash benefit to the utility is approximately 3% of the value of the leased asset, or approximately $8.5 million.

**What are the major risks from these transactions to the investor?**

1. Utility Credit Risks

Perhaps the greatest risk to the trust is the risk that the utility will default on its obligation to pay rent during the lease term. In order to minimize this risk the trust will require that the utility's lease obligations be fully secured by a combination of U.S. Treasury securities and letters of credit issued by banks with S&P ratings of AA or above. In the event the utility fails to make the lease rent payments due, the investor can use the Treasuries and the proceeds from the letter of credit to return its capital and to provide it with its expected yield.

2. Foreign Country Tax Risks

Another major risk implicit in the transaction is the risk that the tax laws or regulations of the country in which the asset is located change in a way that would result in lower returns to the trust, and hence the investor. Investments under the proposed program would be structured so that the risks associated with foreign country tax law changes would be fully borne by the utility.

3. Pending U.S. Tax Regulations

Pending tax regulations, if enacted, could significantly reduce the tax benefit to be derived by investors in lease-leaseback transactions such as the investment under consideration by CED, as described above.

CED's tax counsel has indicated that as long as the closing date for the contemplated investment occurs prior to the date the proposed regulations are published in the Federal Register, these pending regulations will not apply to the contemplated transaction retroactively.

If the pending regulations are published prior to the closing date, CED will defer the contemplated investment pending a restructuring of the transaction.

4. U.S. Tax Audits

It is anticipated that the transactions will be structured in ways that will make any challenges to the structure by the IRS under current regulations difficult to support or litigate by the IRS. Preliminary indications from our tax counsel are that the tax opinions will provide a "should" level of opinion with respect to the likelihood of prevailing in an IRS challenge. Our tax counsel is very experienced in negotiating and advising on leveraged lease transactions.

In a downside tax scenario a claim would be litigated and won in tax court by the IRS. In this case, financial analysis indicates a return of CED's capital with a return on CED's capital of 2.4% over the lease term.

5. Country Risks

The proposed investment program will target investments in developed and highly rated countries. The initial proposed investment under the program will be in the AAA-rated Netherlands. Potential downstream opportunities include transactions in the Netherlands, Switzerland,

Australia, Germany and the United States. The contemplated transactions will be fully denominated in U.S. dollars.

6. Limited Liquidity

Investments in the assets contemplated under the proposed investment program are designed to generate earnings and cash flow over extended periods of time. While these investments do not carry the liquidity of publicly-traded securities, they can be sold if necessary, although most likely at a discount to then-current book value. The economics of these investment structures typically drive most investors to continue to maintain the investments on their books through their scheduled terms. The proposed investment program contemplates holding these investments accordingly.

**Is anyone else doing these transactions?**

Leasing investment programs form an integral part of the earnings and investment profiles of a wide range of companies, including affiliates of electric and gas utilities and holding companies such as Public Service Electric and Gas, Duquesne Light, Edison International, Southern Company, Cilcorp, and Southern Indiana Gas; telephone companies such as ATT, Nynex/Bell Atlantic, Ameritech, and US West; banks such as Bank of New York, First Chicago, Nationsbank, Bank One, and First Chicago; various insurance companies, as well as industrial corporations such as Philip Morris, Pitney Bowes, Chrysler Corporation, Dana Corporation and General Electric.