# EXHIBIT H

MAYER BROWN ROWE & MAW

Mayer, Brown, Rowe & Maw LLP
71 South Wacker Drive
Chicago, Illinois 60606-4637

Main Tel (312) 782-0600
Main Fax (312) 701-7711
www.mayerbrownrowe.com

**Thomas C. Durham**
Direct Tel (312) 701-7216
Direct Fax (312) 706-9187
tdurham@mayerbrownrowe.com

December 21, 2006

VIA UPS

David N. Geier
Joseph A. Sergi
U.S. Department of Justice
Tax Division
555 Fourth Street, N.W.
Room 7919
Washington, D.C. 20001

Re: Consolidated Edison Co. v. United States, Docket No. 06-305 T

Dear David and Joe:

This letter responds to the United States' correspondence of December 12, 2006, identifying additional concerns with respect to Con Edison's responses to the United States' First Set of Interrogatories and First Request for Production of Documents. This letter follows the structure of the United States' correspondence.

As explained in this letter, Con Edison has complied with its discovery obligations, and the United States' allegations to the contrary lack merit. Con Edison submits that the United States' current tactic of demanding on-going follow-up to its Interrogatories based upon overly broad interpretations of such Interrogatories is not effective. It would be more useful for both parties if the United States served directed Interrogatories.

Con Edison, as it has repeatedly stated, fully intends to satisfy its discovery obligations under the Rules of the Court of Federal Claims ("RCFC"). Con Edison, although it does not believe its responses are deficient, will provide additional information in an effort to address the United States' concerns.

**Interrogatories**

*(i) Interrogatory No. 1: Individuals with Knowledge*

The United States mischaracterizes Con Edison's response to Interrogatory No. 1. In its response to Interrogatory No. 1, Con Edison identified individuals who Con Edison believes may have discoverable information regarding the Lease Transaction, including nine current and

former employees of Con Edison and sixteen additional individuals associated with unrelated entities which were retained by Con Edison as advisors. Con Edison further described the nature of each individual's involvement in the Lease Transaction and the general substance of the facts Con Edison believes to be known by each. Con Edison's response to Interrogatory No. 1 is six pages in length.

In the last paragraph of its response to Interrogatory No. 1, Con Edison stated, in regards to Defendant's letter of October 13, 2006, "[w]e expect that the persons named in the letter *may have* information regarding their respective institution's role in the Lease Transaction...." (emphasis added). Contrary to the United States' allegation, Con Edison has not "decline[d] to provide any further information."

Con Edison has produced extensive documentation regarding the Lease Transaction. Many of the individuals identified in the Defendant's letter of October 13, 2006, are referenced in these documents. Pursuant to RCFC 33(d), it is acceptable for Con Edison to produce business records in response to an interrogatory. The burden of culling through these documents and summarizing the information that *may* be known by individuals identified would be "substantially the same" for Con Edison as it would be for the United States.

Con Edison initiated a telephone conference yesterday afternoon in an attempt to discuss some of the concerns raised in the parties' correspondence and work towards the resolution of such concerns. During the conference, counsel for the United States clarified their expectations with respect to Interrogatory No. 1. In particular, Joe Sergi articulated the United States' position that Con Edison has an obligation to summarize information contained in the business records produced. Con Edison does not agree with this position, but in an effort to assist the United States, Con Edison will supplement its response to Interrogatory No. 1 to provide such information.

Finally, Con Edison notes that in the United States' Rule 26(a) Disclosures, the United States identified all "individuals identified in the documents produced herewith" as individuals it may use to support its claims or defenses. The United States, despite our requests, has not provided any further information concerning these individuals it has indicated an intent to rely upon or the subject matter of the information possessed by them. Since the United States has identified these individuals as persons upon whom it intends to rely, we would expect the United States to describe the subject matter of their information, which it has not done. Con Edison, in contrast, has supplied information concerning the "subjects of the information" possessed by those individuals it intends to rely upon. Thus, Con Edison has been considerably more forthcoming than the United States in this regard.

*(ii) Interrogatory No. 2: Listed Transactions*

Con Edison, after further discussions with Con Edison employees, supplemented its response to Interrogatory No. 2 on December 13, 2006.

*(iii) Interrogatory No. 3: Pricing Information*

Con Edison's initial response to Interrogatory No. 3 was adequate. The fact that the United States may have follow-up questions as a result of that response does not indicate that Con Edison's response was deficient. Con Edison provided a supplemental response to Interrogatory No. 3, which the United States admits was helpful.

Con Edison's objection to Interrogatory No. 3 as vague and unclear was based upon the United States' attempt to expand the scope of the Interrogatory in its correspondence of November 8, 2006, thereby causing the Interrogatory to become vague and unclear.

As explained previously, Con Edison and South Holland Electric negotiated the rent and option prices in order to maximize their respective economic returns from the transaction, should the option be exercised. Also, as explained previously, the rental amounts were allocated in accordance with section 467 of the Internal Revenue Code for tax purposes. Rental amounts were calculated by reference to the fair market rental value of the property. As explained in the supplemental information provided, which the United States agreed was helpful, the parties' negotiations on these points were constrained by factors such as the fair market value of the property and its useful life. If, by its request, the United States intended a different meaning for "negotiated," "calculated," and "allocated" other than the meanings of those words as we understand them, Con Edison requests that the United States clarify its request.

In response to the United States' follow-up question in its correspondence of December 12, 2006, the computer program used was called "ABC." This computer program is identified on the top of each of the pricing runs which Con Edison previously produced. The program was created by Warren & Selbert, Incorporated. *See* www.warren-selbert.com. Robert Holzman, identified in Con Edison's First Supplement to its Rule 26(a) Disclosures, ran this software program on behalf of Con Edison. Con Edison has already provided information on "how" the software was used. The ABC program is standard software which is widely used in the leasing industry in order to perform the calculations required in connection with leasing transactions. As previously indicated, one of the functions of this software is to calculate rental amounts in a manner which will optimize the economic returns to each party. It is also capable of performing the calculations required by section 467 in order to ensure compliance with those provisions.

*(iv) Interrogatory No. 12: Tax Indemnity Agreement*

Tax indemnity agreements are commonly used in leveraged leasing transactions. Since such agreements are normally used in leveraged leasing transactions, both parties (through their counsel) would likely have expected the closing documents to include a tax indemnity agreement. The Tax Indemnity Agreement is a contract between two unrelated, adverse parties. As is the case with all contracts, the purpose of the contract is to set forth the terms of the parties' agreement with respect to the matters described in the contract. Thus, the "reasons for entering the agreement" can best be understood by examining the terms of the Agreement. The Agreement is a thirty-page document. Since Con Edison has produced a copy of the Tax Indemnity Agreement, and the burden of summarizing the terms of this agreement would be "substantially the same" for Con Edison as it would be for the United States, Con Edison has provided a complete response to this Interrogatory. *See* RCFC 33(d).

*(v) Interrogatory No. 14: Identify Outside Consultants*

The United States' claim that Con Edison has failed to identify "all advisors consulted with respect to the RoCa3" transaction is not correct. Con Edison wishes to make clear that it has identified *all* of its consultants with respect to the RoCa3 investment. Furthermore, in response to Interrogatory No. 7, Con Edison has provided all non-privileged correspondence with such consultants in its possession regarding the due diligence review of the transaction.

In response to Interrogatory No. 14, Con Edison identified Cornerstone as "the outside consultant" who helped Con Edison "locate" the RoCa3 investment. Con Edison did not retain any other consultants with respect to locating the RoCa3 investment. Cornerstone also located the other leasing investments identified in response to Interrogatory No. 2. No other consultants were retained in the process of locating those investments.

As for non-leasing investments, Con Edison previously identified International Energy Partners as an outside consultant which helped to locate infrastructure investments. International Energy Partners was responsible for locating the Genor investment, which was Con Edison Development's first non-leasing infrastructure investment. We have previously provided you with extensive material regarding International Energy Partners. *See* PF004426-44. This material identified potential infrastructure investments, including the Genor project, and described the merits of those projects.

In addition, Con Edison has provided extensive information regarding its plans for other non-leasing investments. This material includes, but is not limited to:

- all Minutes of Board of Trustee meetings in 1996 through 1998, *see, e.g.*, PF005950-53;

- extensive and detailed business plans, highlighting potential investments, *see, e.g.*, PF6438-89;
- reports to the Board of Trustees and other status reports, *see, e.g.*, PF6295-300; and
- numerous presentations to the Board of Trustees, *see, e.g.*, PF4223-43.

Two other early infrastructure investments highlighted in these materials were the Ada and Carson projects. *See, e.g.*, PF6295-300. Both of these investments were located by Delta Power Company, LLC.

In view of the extensive information provided, the United States' claim that Con Edison has not provided responsive information is clearly incorrect.

Con Edison continues to believe that Interrogatory No. 14 is overbroad. Con Edison is—to state the obvious—an energy company. Its entire business involves investment in energy infrastructure, and thus Interrogatory No. 14 in effect requests information regarding virtually all of Con Edison's business operations over an unlimited time span. The United States has not narrowed the Interrogatory either by reference to a specific time span or a specific entity, such as Consolidated Edison Development. In response to this overbroad interrogatory, Con Edison has provided, as described above, extensive information regarding the other infrastructure investments considered by Con Edison Development. As described in its Complaint, this material provides information regarding Con Edison's plans to operate in a deregulated environment.

Con Edison is willing to work with the United States in order to narrow the scope of Interrogatory No. 14. Absent the United States' cooperation in this matter, however, it is difficult for Con Edison to know how to proceed, as the United States' request that Con Edison provide all material regarding all infrastructure investments over an unlimited time span is clearly overbroad.

Con Edison would like to avoid the United States' current practice (*see, e.g.*, Interrogatory Nos. 2, 3, and 14) of serving Interrogatories which are overbroad or which the United States interprets in an overbroad manner and then unfairly alleging a lack of cooperation by Con Edison. Con Edison, as it has repeatedly stated, is committed to complying with its discovery obligations. Con Edison believes, however, that this process would be aided if the United States asked more specific questions.

(vi) *Interrogatory No. 15: Communications regarding Lease Transactions*

Con Edison, as permitted under RCFC 33(d), provided business records which set forth the communications of its current and former employees regarding the Lease Transaction. These documents provide extensive detail regarding Con Edison's review of the Lease Transaction. We have communicated with Con Edison's employees and they have confirmed to us that the documents previously provided set forth the substance of the communications of Con Edison with regard to the Lease Transaction. In response to Interrogatory No. 15, Con Edison has provided all responsive non-privileged documents in its possession. These documents identify the individuals who were parties to the communications regarding the Lease Transaction.

The United States indicates that it is aware of additional documents responsive to Interrogatory No. 15 that have not been produced. Con Edison requests that the United States provide copies of such documents so that Con Edison can evaluate the matter.

The United States clarified its interpretation of Interrogatory No. 15 in yesterday afternoon's telephone conference. Specifically, the United States informed Con Edison that it interprets Interrogatory No. 15 as calling for a written response summarizing communications, regardless of whether such communications are included in the documents produced. Con Edison does not agree with the United States' interpretation or the validity of that interpretation under the RCFC, but will supplement its response to provide such information in the spirit of cooperation.

Con Edison, in its General Objection No. 1, objected to all Interrogatories to "the extent that the Interrogatories call for the disclosure of information that is subject to any claim of privilege or protection or that was prepared in anticipation of litigation. This includes without limitation, the attorney-client privilege or the work product protection." Thus, Con Edison reserved its right to object to any Interrogatory on the basis of attorney-client privilege.

Finally, Con Edison wishes to emphasize that it has not withheld any responsive, non-privileged information in its possession with respect to Interrogatory No. 15.

**Privilege Log**

Con Edison believes it has produced unredacted copies of all responsive documents currently in its possession. It would be helpful if the United States could specifically identify any redacted document which it believes should have, but has not been, produced in unredacted form.

Con Edison disagrees with the United States' position regarding a waiver of the attorney-client privilege for the reasons set forth in our correspondence of December 1, 14, and 21, 2006, and does not intend to produce further documents protected by either the attorney-client privilege

or work product protection at this time. The United States has not explained why it disagrees with the legal analysis and authorities set forth in Con Edison's correspondence of December 1 and 14, 2006, or cited any legal authority to the contrary. In order for the parties to engage in a meaningful dialogue regarding the alleged waiver, it would be helpful for the United States to explain its legal analysis and identify the legal authority upon which it is relying.

Con Edison, although not waiving any objection to the United States' Interrogatories on the basis of privilege, states that it has not withheld any information in response to Interrogatory No. 12 on the basis of privilege.

**Rule 26(a) Disclosures**

Con Edison supplemented its Rule 26(a) Disclosures on November 17, 2006 and on December 13, 2006. Both supplementations have been timely. Con Edison will continue to supplement its responses as necessary.

The United States' response to Plaintiff's Interrogatory No. 1 indicates that the United States plans to contend that the transactions at issue were part of a pattern in which so-called "promoters" "sold" LILO transactions to "large corporations." In view of the United States' claims in this regard, Con Edison believes it is necessary to produce additional evidence which indicates that the United States government, through the Federal Transit Administration, played a crucial role in "promoting," reviewing, and approving LILO transactions. Con Edison, as a result of the United States' claims in this regard, will further supplement its Rule 26(a) Disclosures with material substantiating the Unites States' role in this regard. Furthermore, Con Edison will serve additional discovery with respect to this point. Depending upon the level of the United States' compliance with respect to the discovery requests, Con Edison may be required to identify additional witnesses who have knowledge of the United States' extensive role in promoting LILO transactions.

* * *

Con Edison has fully complied with its discovery obligations. The United States' allegations to the contrary are unsubstantiated and unwarranted and do not serve both parties' mutual interest in furthering the discovery process. Con Edison has, in no way, limited the United States' ability to conduct full and complete discovery in this matter.

Many of the United States' criticisms of Con Edison's discovery responses may relate to the United States' pre-conceived notion that a "promoter" "sold" the EZH transaction to Con Edison. *See* United States' response to Con Edison's Interrogatory No. 1. Con Edison is not aware of any information which would support this claim. It is not Con Edison's responsibility if the facts do not conform to the United States' pre-conceived notions.

Notwithstanding the United States' repeated correspondence to Con Edison, the United States has failed to respond to the Con Edison's correspondence of November 21, 2006 regarding a timeline for the exchange of expert witness reports, expert witness rebuttal reports, and expert witness depositions. Con Edison would appreciate it if the United States would respond to the issues raised in this correspondence at its earliest opportunity.

Sincerely,

Tom Durham

Thomas C. Durham
Nicole M. Bielawski

cc: A. Scher
Con Edison

# EXHIBIT I

GRAMERCY DEVELOPMENT, INC.

# International Energy Partners

Telephone: (212) 393-9242 • Fax: (212) 393-9282
111 Broadway, 8th Floor, New York, NY 10006

# International Energy Partners

Investment Commitment:

$10 million over two years

Uses of funds:

Personnel of IEP

- 16 professionals

Project development expenses

- legal
- engineering services
- permitting
- travel
- office administrative
- rent and overheads
- Development offices in Indonesia and Peru

What constitutes project development:

Initial marketing
Project concept
Feasibility studies
Formation of special purpose company (i.e. joint venture, consortium)
Project financial structure

- Legal and tax considerations
- Financial optimization

Economic analyses
Creation of project documentation

- Power purchase agreement
- Thermal sales agreement
- Fuel purchase agreement
- Site acquisition agreement
- EPC contract
- O&M contract
- Environmental permitting
- Insurance contracts
- etc.

Creation of financing documents

- Master loan document
- Inter-creditor agreement
- Equity subscription agreement

Role of GDI:

Approve IEP budget and operating plan

Direct IEP activities on specific projects
Coordinate selection of partners for projects
Participate in project development activities as GDI deems necessary
Obtain voting rights in special purpose project company

What happens at Financial Closing:

Commit equity
Participate in management of special purpose company (SPC)
Project constructed under EPC contract
Reimbursement of development capital subject to IEP Global agreement (project specific development funds returned to GDI after reserve requirements)
GDI earns portion of project development fee

What happens at Commercial Operation:

Project begins to generate electricity
SPC can invoice customer pursuant to PPA
Distributions to equity pursuant to financing documentation; lag is typically 6-12 months

Where does the cash flow:

Repatriate to GDI in U.S.
Leave funds in country for other investments
Repatriate to tax friendly country (i.e., Netherlands, Cayman Islands)

Existing IEP Projects and Schedules

| PROJECT | ESTIMATED FINANCIAL CLOSING | PROBABILITY PROJECT CLOSES (%) | PROBABILITY IEP GETS PROJECT (%) |
|---|---|---|---|
| 150 - 200 MW thermal power plant, Guatemala | 1998 | 100 | 60 |
| Acquisition of EGASA-EGESUR 95 MW thermal, 160 MW hydro, Peru | 1998 | 100 | 50 |
| Acquisition of EGEMSA 100 MW hydro, Peru | 1998 | 100 | 50 |
| 40 MW cogeneration plant for Arun Aromatic, Indonesia | 1998 | 60 | 95 |
| 12-15 MW Cikampek Industrial Park, Indonesia | 1998 | 50 | 70 |
| 100-150 MW combined cycle plant, Indonesia | 1998 | 70 | 50 |
| 30 MW Addition to Rockfort Diesel Station, Jamaica | 1999 | 75 | 95 |
| 100 MW natural gas cogeneration plant, Mexico | 1999 | 60 | 75 |
| 30-40 MW cogeneration plant, Mexico | 1999 | 50 | 50 |
| Conversion of existing Pertamina power plant to combined cycle through 20 year BOT, Indonesia | 1999 | 50 | 75 |
| 500 kV Transmission line, Indonesia | 1999 | 70 | 50 |
| Jakarta distribution upgrade | 1999 | 70 | 50 |
| 60 MW Power Plant for Caribbean Cement Company, Jamaica | 2000 | 50 | 75 |
| 200-300 MW Plant, Southern Peru Mining | 2000 | 50 | 50 |
| 400 MW PLN gas turbine repowering, Indonesia | 2000 | 25 | 25 |
| 240 MW combined cycle plant for Nantuna Island, Indonesia | 2000 | 50 | 25 |
| 120 MW hydro plant, Peru | 2001 | 25 | 25 |
| Taranhan 100 MW coal plant | 2003 | 25 | 20 |

# Merits of Existing Project Development Efforts By Country

I. Major Project Opportunities: The major project opportunities with the highest probability of near term (within 2-3 years) success are:

1. Guatemala (new RFP and small industrial cogeneration):

| | |
|---|---|
| Location: | Puerto Barrios, NE; Central Guatemala |
| Description: | 150 - 200 MW thermal power plant |
| Offtakers: | Guatemalan utility EEGSA and industrial customers |
| Schedule: | Utility to issue RFP in Q2-Q3 1997 |
| Partners: | Inter-American Power & Light ("IAPL") |
| Status: | Joint Development Agreement executed 2/28/97 |

Merits of project:

- Strong local partners: The principals of IAPL have been involved in 3 of the 4 IPP projects that have occurred in Guatemala.
- Industrial customers: The "tying up" of industrial customers provides the economies of scale of a larger plant, as well as an additional revenue source.
- Project Design: The conceptual design contemplated will be based on burning a local lower cost fuel.
- Immediate operations: The winner of the competitive bid is required to operate older facilities (100MW) while the new plant is being built. This provides an opportunity to use a financing scheme that has been used successfully in another Latin American project, whereby the sponsors risks are reduced by pledging cash flow from the existing operations towards the construction of the new facilities.
- Real Demand & PPA: The country has a real need for new capacity and it is one of the few places left where a PPA will be given.
- Financeable: A transaction in Guatemala can be project financed, as evidenced by deals that have closed (Enron, TECO, Caterpillar, IFC), as well as an appetite by commercial bankers to lend to well structured deals in Guatemala.

2. Jamaica (new facility & extension to Rockfort Project)

| | |
|---|---|
| Project/Location: | Caribbean Cement Project / Kingston, Jamaica |
| Description: | 60 MW Power Plant |
| Offtaker: | Jamaica Public Service ("JPS") |
| Schedule: | To be negotiated with JPS |
| Partners: | CMS Gen. / Caribbean Cement Company( "CCC") |
| Status: | Facility Sharing Agreement executed with CCC |

Merits of project:

- Strategic local partner: CCC is strategically situated and controls the major port capable of receiving imported coal.
- The principals of IEP won a competitive bid, then successfully developed and financed the Rockfort Project.
- Relationship with JPS: JPS needs new capacity and IEP / CCC has a good relationship with them.

| | |
|---|---|
| Project/Location: | Rockfort Diesel Station / Kingston, Jamaica |
| Description: | 30 MW addition to existing 60MW plant |
| Offtaker: | Jamaica Public Service ("JPS") |
| Schedule: | To be negotiated with JPS |
| Partners: | CMS Gen. |
| Status: | No agreements yet; JPS recognizes that cost of power from such an addition would be competitive with new baseload sources. |

Merits of project:

- Infrastructure already established: Leverages the resources of an existing facility and management organization.
- Timing of negotiations: The principals of IEP are intimately familiar with the existing contracts and agreements thus allowing for a short timeframe project development and financing.
- Capacity need: JPS needs new capacity and an extension to a diesel plant certainly provides reliable capacity.

3. Peru (4 potential projects / acquisitions being pursued)

| | |
|---|---|
| Project/Location: | Southern Peru |
| Description: | 200 - 300 MW baseload plant to supply mining industry. |
| Offtakers: | Copper industrials (Southern Peru; Cyprus Amax, BHP) |
| Schedule: | Plant to be on line in year 2000 |
| Partners: | Southern Electric International |
| Status: | No agreements; Feasibility and market analyses conducted; developed relationship with industrials. |

Merits of project:

- Demand growing: Electricity consumption from existing and new mines is expected to increase from 200MW today to 550MW in year 2000.
- Creditworthy customers: Industrials are major companies with substantial resources and good credit.
- Potential fuel advantage: IEP is investigating the possibility of using Bolivian gas as a fuel source instead of coal.

| | |
|---|---|
| Project/Location: | Southern Peru |
| Description: | Acquisition of EGASA-EGESUR regional utilities:<br>- 95MW thermal ; 160MW hydro |
| Offtakers: | Large industrials, including mines and the regional distribution companies. |
| Schedule: | July 1997 |
| Partners: | To be determined; IEP will only bid if it identifies an operator/partner |
| Status: | Due diligence underway; contacted privatization committee and met with their independent advisor. |

Merits of project:

- Potential for growth: Demand expected to increase from both mines and the newly designated industrial free trade zone.
- Potential for additional industrial development: Proximity of the port of Ilo and the construction of the Ilo-La Pax highway.
- Positioning for future growth: A long term perspective must be considered, such as the ability to participate in future gas-fired project using fuel from the Camisea field.

| | |
|---|---|
| Project/Location: | Southern Peru |
| Description: | Acquisition of EGEMSA regional utility:<br>- 100MW hydro |
| Offtakers: | Large industrials, including mines and the regional distribution companies. |
| Schedule: | October 1997 |
| Partners: | To be determined; IEP will only bid if it identifies an operator/partner |
| Status: | Held preliminary discussions with privatization committee. |

Merits of project:

- Similar to those of the EGASA-EGESUR Project.

| | |
|---|---|
| Project/Location: | Lima area |
| Description: | 120MW hydro |
| Offtakers: | Lima utility, Cementos Lima and other industrials. |
| Schedule: | Longer term (after year 2000) |
| Partners: | Cementos Lima |
| Status: | Held preliminary discussions with Cementos Lima. Pre-feasibility carried out by Cementos Lima, who expressed interest in IEP joining as co-developer. Water rights concession being obtained from the Ministry of Mines & Energy by Cementos Lima. |

Merits of project:

- Good local partner: Will serve as partial offtaker also.
- Resource mix: Despite the higher initial capital cost, a new hydro facility provides a diversification to the coming wave of fossil fueled projects.

4. Mexico (two cogeneration projects)

| | |
|---|---|
| Project/Location: | Lerma Industrial Park, Toluca, Mexico |
| Description: | 100 MW (est.) natural gas fired cogeneration |
| Offtakers: | Seven industrials, including Chrysler. |
| Schedule: | Electricity to replace utility provided power. |
| Partners: | US consulting firm that identified opportunity. |
| Status: | Agreement signed with industrial park for IEP to conduct the feasibility study, which will be co-funded by Trade Development Agency. If the results are favorable, the project will be developed on an exclusive basis. |

Merits of project:

- Strategic local partner: Industrials are well situated to lead Mexico's move toward deregulation and development of sources to compete with CFE.
- Trade Development Agency Involvement: A favorable feasibility study, having been co-funded by Trade Development Agency, provides a "stamp of approval" which can be used to facilitate project financing (i.e. US EXIM Bank, OPIC, etc.).
- Below radar screen: While the larger IPP players chase the big BOT/BOO projects (i.e. such as Merida, won by an AES led consortium), this provides GDI the opportunity to become involved at this time in a market with tremendous growth potential.

| | |
|---|---|
| Project/Location: | Industrias Unidas, S.A. (IUSA) Pasteje, Mexico |
| Description: | 30-40 MW power or cogeneration |
| Offtakers: | Industrias Unidas factory |
| Schedule: | Electricity to replace utility provided power. |
| Partners: | Industrias Unidas, S.A. |
| Status: | IEP attempting to recommence activities that were stopped when the PESO collapsed. |

Merits of project:

- Strategic local partner: Industrias Unidas has significant load.
- Larger project: Potential exists to combine with above project and build a larger project.

5. Indonesia (6 medium term & 3 long term projects)

| | |
|---|---|
| Project/Location: | Arun Aromatik, Aceh Province, North Sumatra |
| Description: | 40 MW cogeneration, #6 heavy oil from refinery |
| Offtakers: | PT Humpuss Aromatik, PLN |
| Schedule: | Q2 1998 |
| Partners: | PT H.A.; PT Emas Baharu Putra (Sutra; "EBP") |
| Status: | IEP signed MOU with PTHA & EBP; PTHA is currently evaluating the EPC bids for the aromatic complex. |

Merits of project:

- Strong local partners: PTHA will be committed to cogeneration project if the new aromatic project goes ahead. EBP's president is one of the sons of the country's president.
- Project location: Capacity to serve the aromatic complex does not currently exist.

| | |
|---|---|
| Project/Location: | Cikampek Industrial Park, Java |
| Description: | Phase I: 12-15 MW purchased from PLN; IEP installs a 6MW back-up diesel.<br>Phase II: 60MW GTCC |
| Offtakers: | Cikampek Industrial Park & its tenants |
| Schedule: | Ph. I: Q1 1998; Ph. II: 2000 |
| Partners: | PT Mandalapratama Permai |
| Status: | No agreements yet. Automobile plant to begin construction in early 1997. Phase I appears unfeasible; Phase II of greater interest. Industrial park currently requires this schedule. Objective is to combine the two phases. |

Merits of project:

- Industrial host: If automobile plant goes ahead, then Phase II will likely be needed.
- Local partner: Project can be pursued by local partner; IEP to take active role only when feasibility improves.

| | |
|---|---|
| Project/Location: | Nantuna Island, South China Sea near Kalimantan |
| Description: | 100-150 MW diesel & natural gas combined cycle |
| Offtakers: | Nantuna Island Development Corp. |
| Schedule: | Ph. I: 2 x 5MW diesel: 1997<br>Ph. II: 2 x 10MW diesel or gas: 1998<br>Ph. III: 2 x 40MW GTCC: 2000-2002 |
| Partners: | PT Swakarsa - Pertiwi;PT Yamabri DwibhaktiUtama<br>JD Statham & Assoc. (Powertek) |
| Status: | IEP signed MOU with Swakarsa on 12/19/95. Exxon prequalified the IEP/Swakarsa consortium for both the island and LNG infrastructure on May 30, 1996. |

Merits of project:

- Strong Industrial participation: Exxon involvement.
- Local partners: Project can be pursued by local partners; IEP to take active role when development effort increases.

| | |
|---|---|
| Project/Location: | Nantuna Island LNG, S. China Sea near Kalimantan |
| Description: | 240 MW natural gas combined cycle to supply the LNG facilities (6 trains x 40MW) |
| Offtakers: | Exxon. Pertamina, Mobile joint venture |
| Schedule: | 2000 |
| Partners: | PT Swakarsa - Pertiwi;PT Yamabri DwibhaktiUtama<br>JD Statham & Assoc. (Powertek) |
| Status: | same as above project |

Merits of project:

- Same as above.

| | |
|---|---|
| Project/Location: | Existing Pertamina oil refineries |
| Description: | Conversion of one or more Pertamina power plants to combined cycle through a 20 year BOT. |
| Offtakers: | PLN |
| Schedule: | 1999 |
| Partners: | Pertamina; PT Emas Baharu Putra ("EBP") |
| Status: | Conceptual proposal submitted in December 1996. IEP and EBP developing strategy for executing a MOU with Pertamina, and establishing a JV. |

Merits of project:

- Existing infrastructure: Pertamina's existing facilities provide a base to establish a long term cogeneration business at multiple locations.
- Strong host: Pertamina is the state owned oil company, and they desire to focus on fuel rather than electricity production.
- Strategic partner: EBP is politically well connected.

| | |
|---|---|
| Project/Location: | PLN gas turbine repowering |
| Description: | PLN has surplus GE Frame 5 and Westinghouse P251 GTs in inventory; with repowering the potential capacity totals approximately 400MW. |
| Offtakers: | PLN |
| Schedule: | 1999 and after |
| Partners: | To be determined |
| Status: | PLN confirmed interest in discussions with IEP. |

Merits of project:

- Existing equipment: it may be politically favorable for PLN to show that existing government owned equipment can be put to productive use. [note: the economic feasibility will however be difficult].
- Isolated locations: In areas that have transmission limitations, use of the older units may be justified.

Indonesia: Longer Term Opportunities

| | |
|---|---|
| Project/Location: | Tarahan III/IV, South Sumatra |
| Description: | Phase I: 100MW coal<br>Phase II: additional 100MW coal |
| Offtakers: | PLN |
| Schedule: | Ph. I: 2003; Ph. II: 2004 |
| Partners: | PT Emas Baharu Putra ("EBP") |
| Status: | Application for project sent to PLN Planning Director in March 1996. |

Merits of project:

- Strong local partner: EBP is politically well connected.

| | |
|---|---|
| Project/Location: | Tanjung Jati Transmission Line Project |
| Description: | 245 kilometers of 500kV T-line through western Java from Tanjung Jati plant to Purwodadi to Klaten (Jakarta). Project is BOT. |
| Offtakers: | PLN |
| Schedule: | 1999 |
| Partners: | PT Nusa Metricom Ekakarma, Burns McDonnell<br>PT Koosa Tripatria Pratama |
| Status: | MOU with partners signed on 8/30/96; Letter of interest sent to PLN on 10/4/96. |

Merits of project:

- Need for transmission capacity: new line would provide completion of the PLN electricity grid from Tanjung Jati to Jakarta area.
- Type of project: Build Own Transfer (BOT) provides financing and development opportunity, with long term ownership risk taken by PLN.

| | |
|---|---|
| Project/Location: | Jakarta Distribution Project |
| Description: | New system for part of Jakarta; BOT project. |
| Offtakers: | PLN |
| Schedule: | 1999 |
| Partners: | PT Nusa Metricom Ekakarma, Burns McDonnell<br>PT Koosa Tripatria Pratama |
| Status: | MOU with partners signed on 8/30/96. |

Merits of project:

- Need for distribution capacity: new system is needed in part of the city as a result of growing demand.
- Type of project: Build Own Transfer (BOT) provides financing and development opportunity, with long term ownership risk taken by PLN.
- Metropolitan environment: Provides opportunity for GDI to tap the expertise of its parent, specifically serving the utility needs of a major metropolitan area.

Icpmerit.doc

# IEP's Professional Staff

1. Principals

a. **R. THOMAS HOFFMANN**

R. Thomas Hoffmann is the President and Chief Executive Officer of IEF, the General Partner of International Energy Partners, L.P. He founded IEF in 1989. The business, now operated through International Energy Partners, has projects under active development in the Caribbean region, Latin America and Southeast Asia. Mr. Hoffmann took the lead role in structuring and sourcing the financing for the 60 MW Rockfort project in Jamaica. He also was lead negotiator for investment, tax and insurance matters.

Through his previous law practice, Mr. Hoffmann had substantial experience in corporate and project finance, acquisitions, and international joint ventures. He has advised several foreign governments on the creation of electric power legislation and regulation, and has participated in the drafting of joint venture, financing, and power purchase agreements for projects outside the United States.

Mr. Hoffmann received his J.D. in 1976 from New York University School of Law, where he was a Root-Tilden Scholar. He also studied law at Lincoln College, Oxford University, England, 1973-1975, where he was awarded a B.A. Jurisprudence. He received an A.B. English Honors Degree from Georgetown University, Washington, D.C., in May, 1972.

b. **RANDALL L. PHELPS**

Mr. Phelps has over 20 years' experience in corporate planning, development, marketing, and finance. Mr. Phelps is currently the Chairman of IEP, and was the lead negotiator for the Power Purchase Agreement, Fuel Supply Agreement, and Implementation Agreement for the 60 MW Jamaica Rockfort project.

For the past ten years, Mr. Phelps has been Chairman, President, and CEO of U.S. Energy Corporation. He has successfully negotiated power sales contracts, domestic and international wheeling agreements, fuel supply agreements, and non-recourse project financing for six alternative energy and cogeneration projects. Additionally, he serves on the

management committees that oversee the construction activities and ongoing operations of U.S. Energy's affiliated plants. Mr. Phelps has worked in the energy field since 1982, when he joined Agip Coal USA, a subsidiary of ENI, the Italian Energy Agency, as Executive Vice President. In this position, Mr. Phelps directed the marketing of over one million tons of coal annually in the domestic and export markets. Additionally, he was responsible for the administrative, legal, and financial affairs of the company.

After graduating from the University of Colorado School of Law in 1969, Mr. Phelps was a loan officer for Citibank, N.A., in Ecuador. In this capacity, Mr. Phelps served as an account officer for the petroleum industry customers who were developing the trans-Andean pipeline.

2. Key Professional Staff

a. **MANUEL F. ROJAS**

A native of Chile, Mr. Rojas is IEP's Senior Vice President for Latin American projects. Mr. Rojas has over 25 years of experience in the international trading of petroleum, steel, and copper in both Latin America and Southeast Asia. Mr. Rojas has in-depth knowledge of industrial firms throughout the world that are seeking to implement electric power and cogeneration projects. He is currently involved in the initiation of several power projects in Latin America.

From 1969 to 1982, Mr. Rojas was the President and Founder of Perta Oil Marketing Ltd. of Hong Kong, an affiliate of Pertamina, the Indonesian National Oil Company. By 1980, Perta Oil Marketing had reached a yearly sales level of over one billion U.S. dollars.

From 1970 to 1982, Mr. Rojas was also the Managing Director and stockholder of Instube Pipe Ltd., a joint venture with Sumitomo Corporation of Tokyo. Based in Singapore, Instube distributed tubular products for oil companies throughout the Far East.

In addition to his work for IEP, Mr. Rojas maintains the title of President of Petromet, Inc., a Maryland based company which has been active in consulting and trading of petroleum products and minerals from Venezuela, Ecuador, Peru, Chile, and Mexico.

b. **RICHARD C. WINSCH**

Mr. Winsch, Senior Vice President for IEP, has over twenty years experience in international finance with concentration in cross-border project and structured finance leveraged leasing, and private placement of both debt and equity.

Prior to joining IEP, Mr. Winsch served as a business development and finance consultant to independent power developers, Hart Associates, Inc. and Coastal Power Production Company. From 1989 to 1991, Mr. Winsch was Managing Director of Chase Manhattan Asia Limited, Tokyo, Japan. From 1986 to 1989, Mr. Winsch served as Senior Vice President-Project Finance of the investment bank, Eden Hannon & Company, where he originated and syndicated facility and lease project financing.

Prior to joining Eden Hannon, Mr. Winsch held both business development and management positions with Manufacturers Hanover Leasing Corporation from 1979-1986. These included Managing Director, Manufacturers Hanover Leasing K.K., Tokyo, 1985-1986; Vice President and Representative, Asia Pacific Project Finance, Hong Kong, 1982-1985; and Vice President, European Area Project Finance, London, England, 1979-1982. Prior to joining Manufacturers Hanover, Mr. Winsch served as a business development and credit officer of The Fidelity Bank in its Philadelphia, London and Paris offices.

Mr. Winsch holds a B.A. from The Citadel and an M.B.A. from the Pennsylvania State University.

c. **ROBERT E. POOLE**

Robert E. Poole is a Vice President of International Energy Partners. He manages the company's systems and oversees project schedules, financial projections for all projects, and utilization of technical consultants. He has participated in the successful acquisition and/or financing of six projects.

Prior to joining IEF, Mr. Poole worked with U.S. Energy since 1984, where he prepared the engineering and construction cost estimate for the Fairfield Energy Venture Project, a 30 MW wood-fired plant in Fort Fairfield, Maine.

Mr. Poole holds a B.S. degree in Mechanical Engineering and Civil Engineering from the University of Maryland.

3. Other Staff

The additional staff consists of project development and project/asset management professionals, analysts, a research/risk assessment specialist and administrative and support staff. Including the principals, IEP currently employees 14 people. It is planned to add two more business development professionals, one to be based in Latin America, and one in Indonesia.

# IEP's TRACK RECORD

## "AN EXAMPLE OF CREATIVE PROJECT FINANCING"

In October, 1994, IEP led the closing of a landmark project in the international private power field, the 60 MW slow speed diesel Rockfort power station in Kingston, Jamaica. The project has received considerable attention in the industry press. The project was noteworthy for a variety of reasons including:

It was the first international private power project to close which included participation by the World Bank (IBRD) and the InterAmerican Development Bank, in the form of a long term take-out arrangement that enabled private lenders to participate in the transaction. The World Bank and IDB's role took on added significance because the innovation in the Rockfort project is reflected in those institutions' creation of a private sector lending guarantee program which provides financing and credit support to international private power projects on an institutionalized basis.

The project was able to attract a low cost source of long-term, debt from CARIFA tax exempt bonds issued in Puerto Rico, a financing innovation that enabled the IEP team (Jamaica Private Power Company) to win a competitive bid by a large margin over its competition.

The project was the first of several private power initiatives in Jamaica to achieve financial closing. As the first such project to be negotiated with the Government of Jamaica, the JPPC project team had to solve myriad problems encountered in doing a private transaction of this type with a government for the first time.

This was the first international private power project to use political risk insurance from the Multilateral Investment Guaranty Authority (MIGA).

The Rockfort Project required an extraordinary amount of innovative problem solving to achieve Financial Closing, thus providing IEP's staff with critical experience in project elements such as currency conversion agreements, political risk insurance, cost indexing in multiple currencies, and so forth.

stafiep.doc