**No. 06-305 T**
**(Judge Marian Blank Horn)**

---

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

---

**CONSOLIDATED EDISON COMPANY OF NEW YORK, INC. & SUBSIDIARIES**

**Plaintiff**

**v.**

**THE UNITED STATES,**

**Defendant**

---

# DECLARATION OF JOSEPH A. SERGI

---

I, Joseph A. Sergi, pursuant to 28 U.S.C. § 1746, declare and state to the best of my knowledge as follows:

1. I am employed as a trial attorney with the United States Department of Justice, Tax Division in Washington, D.C. I am assigned responsibility for representing the interests of the United States in the above-captioned case. I am responsible for and familiar with the documents produced by Plaintiff during discovery in the above captioned matter. I make this declaration in support of the United States' Reply in Support of Defendant's Motion to Compel, Second Motion to Compel and Motion for Issuance of Letters of Request.

2. Attached hereto as Exhibit 1 is a true and correct copy of a document titled "Leasing White Paper 11-25-97", produced in the course of discovery.

3. Attached hereto as Exhibit 2 is a true and accurate copy of the relevant excerpts from a document entitled "PARTICIPATION AGREEMENT" dated as of December 15, 2997, produced in the course of discovery.

4. Attached hereto as Exhibit 3 is a true and accurate copy of a document titled "Con Edison Development, Inc. October 1998 Report to Board of Trustees," produced in the course of discovery.

5. Attached hereto as Exhibit 4 is a true and correct copy of an email, dated April 12, 2007, addressed to Plaintiff's counsel.

6. Attached hereto as Exhibit 5 is a true and accurate copy of the relevant excerpt from a presentation entitled "ConEdison*Development*" dated August 17, 1998, produced in the course of discovery.

7. Attached hereto as Exhibit 6 is a true and accurate copy of a document titled "Consolidated Edison Leasing, inc. 1998 Business Planning Meeting" dated January 21, 1998, produced in the course of discovery.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 2nd day of May, 2007 in Washington DC.

s/ Joseph A. Sergi
JOSEPH A. SERGI
Trial Attorney, Tax Division
U.S. Department of Justice

# EXHIBIT 1

Leasing White Paper
11-25-97

## Executive Summary

One element of a diversified investment portfolio for Con Edison is the relatively low risk and attractive return profile of leases. This paper describes sale-leasebacks, identifies major risks and benefits, and details a recommended investment.

In general, mManagement is seeking approval for the implementation of an investment program focusing on investments in sale-leasebacks and lease-leasebacks of domestic and international energy and infrastructure related facilities.

The initial focus of this initiative will be to invest in transactions in conjunction with experienced market participants, to concentrate on assets familiar to Con Edison and owned by utilities located in highly rated counties, to fully secure or ameliorate ~~defease~~ credit risks with U.S.Treasury bonds and letters of credit and to structure transactions in ways that will allow for strong tax opinions from top rated law firms.

Investments in these facilities will be accounted for as leveraged leases under ~~FASB 13~~ the applicable accounting standards, which will allow for front loaded earnings and the investments are anticipated to generate after tax yields of between 15% and 25% *[over the life of the investment?]*.

**What is a sale-leaseback?**

In its most basic form, (note comma added) a sale-leaseback is the purchase of an asset and the subsequent leaseback of that asset to the seller under a long term lease agreement. Under a so-called "leveraged lease" the investor uses non-recourse debt to reduce the equity needed to purchase the asset, ~~with the~~ resulting in ~~of~~ higher equity returns. Under a sale-leaseback the investor's (note, apostrophe added) return is derived from a combination of the excess ~~of~~ rental income over debt service (the "free cash flow") and the tax benefits that accrue to the investor from the depreciation deductions the investor takes on its ~~his~~ tax return.

Since theits inception of leveraged leases in 1964, ~~the leveraged leasing market has continually~~ several types of lease arrangements have been developed ~~new variations on this basic theme~~ to accommodate increasingly complex tax laws and regulations. The latest ~~of these~~ variations ~~are~~ is the lease-leaseback structures in which an asset is leased (instead of purchased) and the leasehold

CE 016740

PF008645

rights derived from that lease are then leased back to the initial owner of the facility.

Under the proposed lease investment ~~initiative~~, Con Edison intends to invest in both sale-leasebacks and lease-leasebacks depending on market conditions. ~~Because t~~The most probable transaction in the investment pipeline is a lease-leaseback, ~~we will use this type of structure in our example of a typical transaction.~~which is described in detail, below.

**How would a typical transaction work?**

In a typical lease-leaseback transaction, a special purpose subsidiary owned by Con Edison Development ("CED" *suggest CED or CEDI" a little confusing later on when you talk about "Con Edison Power Plant personnel]* ~~Con Edison~~") would establish a ~~Delaware~~ *[must it always be a Delaware trust?]* trust (the "Trust"). CED~~Con Edison~~ would invest equity in the Trust and the Trust would borrow non-recourse debt on the project. Concurrently the Trust would enter into an agreement with a ~~Dutch~~ *[this is a generic description so it doesn't have to refer to a "Dutch" utility]* utility (the"Utility") under which the Trust would lease a newly constructed power plant (the "Plant") from the Utility for 44 years*[is there a significance to 44 years?] [the "Headlease"]*. The Trust would, at the same time, lease back the Plant to the Utility for 20 years.

At the end of the initial 20-year lease the Utility would have the option to purchase the plant at a pre-agreed fixed price. If the Utility purchases the plant at that time the transaction is completed and no further obligations continue for either CED~~Con Edison~~ or the Utility.

If the Utility does not purchase the Plant at that time, the Trust may either (a) lease the Plant to a third party for the remaining 24 years of the Headlease, (b) use the Plant itself, or (c ) ~~force~~ require the Utility to re-lease the plant for an additional 17 years*[need to explain why it can't be leased for the full 24 years]*. Regardless of whether option (a), (b) or (c ) above is chosen the Trust will be required to return the Plant to the Utility at the end of year 44.

**What are the major risks in this type of transaction?**

(1) Utility Credit Risks

Perhaps the biggest risk to CED~~Con Edison~~'s equity is the risk that the Utility would~~will~~, for some reason, default on its obligation to pay rent when it is leasing back the plant. In order to ameliorate this risk the Trust ~~will~~ would require that the Utility's lease obligations to CED~~Con Edison~~ will be fully ~~defeased~~ secured

CE 016741

by a combination of U.S. Treasury [securities?]bonds held by a trustee such as Wilmington Trust Company and by letters of credit issued by banks with S&P ratings of AA or above.

In the event the Utility fails to make the lease payments due, CEDCon Edison couldcan use the Treasuries and the proceeds from the letter of credit to return its invested capital and protect its yield. In other words, CEDCon Edison would terminate the lease for default, and would recover all its invested capital plus its agreed return (needs more explanation...would it recover the return up to that date?)

I'd move US Tax Risk to 2nd place (as I've done below)

~~(2) Dutch Tax Law Risks~~

~~Another major risk implicit in the transaction is the risk that the tax laws or regulations of The Netherlands change in a way which would result in lower returns to the Trust or Con Edison. The transactions will be structured so that the risks associated with Dutch tax law changes will be fully borne by the Utility.~~

(32) U.S. Tax Law Risks

Pending IRS regulations

Proposed Treasury Regulations under Section 467 (dealing with lease-in / lease out transactions) were promulgated on June 3, 1996 *[ is this two much detail can't we just say the following?]*~~with two effective dates (i) with respect to "disqualified leasebacks" or "long term agreements" the regulations are effective if such a lease agreement was entered into after June 3, 1996. We have obtained written assurance~~ *[I wouldn't say written assurance they can't give an opinion in advance]* ~~from oOur tax counsel that it will provide us with a (do we know yet?) _______ opinion (__% probability) that our transaction will not be subject to stringent treatment under this case. (ii) with respect to other rental agreements subject to Section 467 of the Treasury Regulations t~~The regulations will become effective on the date the final 467 regulations will be published in the Federal Register. These regulations have, as of December 1, 1911-25-97 not been published in the Federal Register. If these Regulations were to apply to the proposed transaction, many (if not most) of the intended tax benefits of the transaction would be eliminated. Our tax counsel will provide us with a _______ opinion ( __% probability) to the effect that if our transaction closes before the final regulations are promulgated that it will not be subject to retroactive treatment. *[Can we say something like this? I thought this was an important issue for some of the Board members]*

(a) Potential tax audits *[There is no B?]*

CE 016742

With respect to the major tax risks identified in the transaction, our ~~by~~ Tax Counsel has*[I doubt they've already provided opinions]*, ~~it is anticipated that Tax Counsel will~~ provided tax opinions ~~which will~~ ranginge from a Qualified Should Opinion (80-85% likelihood of success if challenged by the IRS) to Should Opinions (90-95% likelihood of success if challenged by the IRS). (Needs a sentence of explanation....what has our counsel actually said?) [Do these opinions go to the retroactivity issue or to other issues?]

The average likelihood of success if challenged by the IRS based on the average of the Opinions is anticipated to be 90%.

(3) Dutch Tax Law Risks

Another major risk implicit in the transaction is the risk that the tax laws or regulations of The Netherlands change in a way which would result in lower returns to the Trust or Con Edison. *[Will there be an opinion from Dutch counsel?]* The transactions will be structured so that the risks associated with Dutch tax law changes will be fully borne by the Utility.

(4) Country Risks

The plan for the proposed ~~initial thrust of the proposed~~ investment program is to invest only in developed and highly rated countries with fully developed legal and commercial dispute resolution systems. The initial proposed investment under the program will be in the Netherlands, (AAA rated by S&P). Other ~~P~~potential ~~downstream~~ opportunities include transactions in Switzerland, Australia, Germany and the United States. The contemplated transactions are fully denominated in U.S. Dollars and are anticipated to carry neither foreign exchange transaction nor translation *[not sure I understand the difference]* risks.

**What are major benefits in this type of transaction?**

(1) Highly Predictable Earnings

The earnings from these transactions are highly predictable in that each of the inflows and outflows to the transaction ~~are~~ is contractually agreed to and fully determinable at closing.

(2) Front Loaded Earnings

Because the transactions will be afforded leveraged lease accounting ~~under FASB 13~~ the earnings profile for these transactions ~~are~~ is "front loaded" and

hence they provide more earnings in the early years of the transaction than in the latter years of the transaction.

This front loading earnings profile is driven by a declining investment balance structure not unlike the return on assets structure historically afforded the depreciated basis on regulated utility property.

This front loading has the effect of providing earnings ~~"cover"~~that offset ~~for~~ the early year startup losses that are anticipated from other non-regulated businesses. The following is a graphic representation of the comparative front loaded nature of leasing earnings.



(3) Good to Excellent Investment Yields

After tax yields on leasing projects are anticipated to range from a good 15% to an excellent 25% depending on the structure, leverage and risk profile chosen.

(4) Limited Downside Economics

Because the high cost credit risks associated with non-payment by the Utility have been structurally ameliorated by the ~~defeasement~~ secured mechanisms the remaining risks primarily reside at the US Tax Audit level which have relatively moderate economic downsides The after tax yields on investment when taking full account of the various tax downside scenarios range from 10.4% to 2.4%, but as mentioned above, tax counsel affords the 2.4% return case as~~n~~ extremely low probability (     %) based on the treatment given other similar cases when tax regulations change. *[It isn't just the retroactivity issue is it, aren't there other tax risks?]*~~.~~

(5) Strategic ~~Groundcover~~ Value of Leasing

Participation in these transactions affords the CED~~Con Edison~~ the opportunity to more fully understand the legal, regulatory, commercial and tax environment of the countries in which the leased assets are located. This in-depth understanding can provide the basis for better informed decisions regarding potential investment and partnering opportunities as the utility infrastructures in these highly desirable and developed countries are opened to investment from external sources.

**Do we have a specific transaction in mind?**

Yes, we are currently pursuing the potential investment of $43 million in a recently commissioned gas fired combined cycle power plant (the "RoCa3 Plant" or "the Plant") located near Rotterdam in ~~T~~ the Netherlands. The Plant, owned by EZH, one of the four regulated generation utilities in ~~T~~ the Netherlands is currently undergoing engineering, environmental, and valuation reviews by our consultants, and has been recently been inspected by Con Edison power plant personnel.

We are pursuing the investment opportunity in conjunction with an experienced and knowledgeable lease investor, Bank One Leasing Inc. and have retained a preeminent *[Shouldn't we identify - and has S&S reviewed this?]* law firm for tax and legal advice, and the best engineering, financial valuation, lease advisory and environmental advisory firms in the market.

The transaction is anticipated to deliver over $5 million in earnings in 1998 and is anticipated to generate an after tax yield of 19.7%. [over the life of the investment?]

**Is anyone else doing these transactions?**

For years, l~~L~~easing investment programs have formed an important part of the investment and earnings profiles of a wide range of companies including electric and gas utilities such as: PSE&G, Duquense Light, Edison International, Southern Company, Cilcorp, and Southern Indiana Gas;~~,~~ telephone companies such as AT&T, Nynex/Bell Atlantic, Ameritech, and US West;~~,~~ banks such as~~,~~ Bank of New York, Bank of America, Bank One, First Chicago, and First Union;~~,~~ various insurance companies and corporations such as Phillip Morris, General Electric, Chrysler, Pitney Bowes and Dana Corp.

**What are we requesting approval to do?**
Mention net worth issue ?

Approval is requested to initiate a leasing investment program and to make such leasing investments as are deemed reasonable by the management of Con Edison pursuant to the budgetary authority granted for unregulated investments. One of the requirements the market imposes is that investors have a substantial new worth, in the order of $100 million. To provide for the necessary net worth requirement as well as to provide for funds to make the equity investments, management also recommends that it be given the authority to make additional investments in CED sufficient to satisfy the net worth requirements. Any amounts invested in CED in excess of funds for particular transactions will be invested by CED at Con Edison's direction.

# EXHIBIT 2

EXECUTION COPY

# PARTICIPATION AGREEMENT

(ROCA FACILITY TRUST NO. 2)

dated as of December 15, 1997

Among

N.V. ELECTRICITEITSBEDRIJF ZUID-HOLLAND,
Lessor,

N.V. ELECTRICITEITSBEDRIJF ZUID-HOLLAND,
Sublessee,

CONSOLIDATED EDISON LEASING, INC.,
Investor,

HOLLANDSCHE BANK-UNIE N.V.,
Lender

and

WILMINGTON TRUST COMPANY,
not in its individual capacity, except as otherwise expressly provided herein, but solely as Trustee.

# TABLE OF CONTENTS

Page

SECTION 1. DEFINITIONS. .... 2

SECTION 2. PARTICIPATIONS. .... 2

(a) Agreements to Participate. .... 2
(b) Closing Date; Notice. .... 4
(c) [Reserved]. .... 4
(d) Closing. .... 4
(e) Postponement of Closing. .... 4

SECTION 3. CONDITIONS PRECEDENT TO PARTICIPATION OF THE INVESTOR. .... 4

SECTION 4. CONDITIONS PRECEDENT TO PARTICIPATION OF THE LENDER. .... 10

SECTION 5. CONDITIONS PRECEDENT TO PARTICIPATION OF EZH. .... 16

SECTION 6. OPINIONS. .... 18

SECTION 7. REPRESENTATIONS AND WARRANTIES OF EZH. .... 20

(a) Organization; Authority. .... 20
(b) Due Authorization; Consent. .... 20
(c) Compliance with Other Instruments and Applicable Dutch Law. .... 20
(d) Governmental Consents. .... 20
(e) Legal, Valid and Binding Obligations. .... 21
(f) Defaults. .... 21
(g) Litigation. .... 21
(h) Sovereign Immunity. .... 21
(i) Qualification in The Netherlands. .... 22
(j) Law of The Netherlands. .... 22
(k) Filings, Etc. .... 22
(l) Sublessee Event of Default; Sublessee Default; Sublease Facility Event of Loss. .... 22
(m) Liens. .... 22
(n) [Reserved]. .... 22
(o) Securities Representation. .... 23
(p) Licensed Producer of Energy. .... 23
(q) Accurate and Complete Disclosure. .... 23

PARTICIPATION AGREEMENT

(ROCA FACILITY TRUST NO. 2)

This PARTICIPATION AGREEMENT (ROCA FACILITY TRUST NO. 2), dated as of December 15, 1997 (as such agreement may from time to time be amended, supplemented or otherwise modified in accordance with the terms hereof and where applicable, the terms of the other Operative Documents, this "Participation Agreement" or "Agreement"), among (i) N.V. ELECTRICITEITSBEDRIJF ZUID-HOLLAND, a public limited liability company ("naamloze vennootschap") incorporated under the laws of The Netherlands and having its registered seat in The Hague, The Netherlands, as Lessor and Sublessee, (ii) CONSOLIDATED EDISON LEASING, INC., a Delaware corporation, as Investor, (iii) WILMINGTON TRUST COMPANY, a Delaware banking corporation, not in its individual capacity, except as otherwise expressly provided herein, but solely as Trustee under the Trust Agreement that creates the trust identified under the title hereof, and (iv) HOLLANDSCHE BANK-UNIE N.V., a public limited liability company ("naamloze vennootschap") organized and existing under the laws of The Netherlands, as Lender.

W I T N E S S E T H :

WHEREAS, the Trustee proposes to lease the Undivided Interest from the Lessor pursuant to the Lease;

WHEREAS, the Sublessee proposes to sublease the Undivided Interest from the Trustee pursuant to the Sublease; and

WHEREAS, the Lender has agreed to make a secured loan (the "Loan") to the Trustee in an amount equal to the Lender's Commitment in order to finance a portion of certain Lease Basic Rent payments by the Trustee.

NOW, THEREFORE, the parties hereto agree as follows:

SECTION 1. DEFINITIONS.

All capitalized terms used herein shall, unless defined herein, have the respective meanings set forth in Appendix A hereto.

SECTION 2. PARTICIPATIONS.

(a) Agreements to Participate. Subject to the terms and conditions of this Agreement and the other Operative Documents, and in reliance on the agreements, representations and warranties made herein, the parties agree to participate in the transactions described below on the Closing Date:

(i) the parties hereto agree to take the actions described in Article C of the Closing Funding Memorandum;

being understood that access to the other parts of the Facility is available under the other Operative Documents);

(xiv) the parties will enter into or cause to be entered into the other Operative Documents, including, without limitation, the Notarial Deed of Easement, the First Priority Mortgage, the IJssel Agreement, the Assignment for Security (Sublessor's Lease Interest), the Sublessee Loan Agreement, the Sublessee Pledge and Security Agreement, the IJssel Deposit, the Rotte Agreement, the Sublease Deposit, Pledge and Repledge Agreement and the EZH Pledge and Security Agreement; and

(xv) the parties will enter into the Second Priority Pledge Agreement.

(b) Closing Date; Notice. EZH agrees to give the Investor, the Bank, the Trustee and the Lender at least two Business Days' telephonic (confirmed in writing) or telefax notice of the Closing Date; provided, however, that as to the Investor and the Lender, the making of their respective Commitments available to the Bank on the Closing Date in the manner required by the Closing Funding Memorandum shall constitute a waiver of such notice requirement which shall be binding in that respect on the parties hereto. In no event shall the Closing Date be later than December 31, 1997, without the consent in writing of EZH, the Investor and the Lender.

(c) [Reserved].

(d) Closing. The closing hereunder in connection with the consummation of the transactions contemplated hereby to occur on the Closing Date (the "Closing") shall take place commencing after 5:30 P.M., New York City time on the Closing Date at the offices of White & Case, 1155 Avenue of the Americas, New York, New York 10036, or such other time and place on the Closing Date as the parties shall mutually agree upon.

(e) Postponement of Closing. The Closing Date in respect of which notice has been given or waived pursuant to Section 2(b) may be postponed from time to time for any reason if EZH gives the other parties hereto written notice of such postponement (including therein the designation of the date to which such scheduled Closing Date is to be postponed). In the event of any postponement of any Closing Date, the term "Closing Date" as used in this Agreement shall mean any such postponed "Closing Date"

## SECTION 3. CONDITIONS PRECEDENT TO PARTICIPATION OF THE INVESTOR.

The obligations of the Investor to take any action pursuant to Section 2 of this Participation Agreement shall be subject to the satisfaction or waiver by the Investor of the following conditions precedent (provided, however, that it shall not be a condition precedent to the obligations of the Investor that any document be produced or action be taken or payment made that is to be produced, taken or made by the Investor or by a Person within the Investor's control):

(a) Each of the Operative Documents shall have been duly authorized, executed and delivered by the respective parties thereto, and an executed original of each such

document (except (i) the original counterpart of the Sublease, which shall have been delivered to the Lender to perfect the security interests therein created by the Loan Agreement (ii) the original Loan Certificate, which shall have been delivered to the Lender and (iii) the Sublessee Note which shall have been delivered to the Trustee) shall have been delivered to the Investor.

(b) The Investor shall have received the following documents, each dated the Closing Date (all such documents to be in form and substance satisfactory to the Investor):

(i) an incumbency certificate or power of attorney, as the case may be, of each of the Bank, EZH, Stichting IJssel, the Deposit Bank, Stichting Rotte, Stichting Roca and the Lender regarding the officers authorized to execute and deliver on its behalf the Operative Documents and any other documents and agreements to be delivered in connection therewith;

(ii) certified copies of all documents evidencing the corporate approval and actions of the Bank, EZH, Stichting Rotte, Stichting IJssel and Stichting Roca, including resolutions of the board of directors of each such party, in each case duly authorizing the transactions contemplated hereby and the execution, delivery and performance by such party thereto of each Operative Document and, in the case of EZH, (a) a certificate signed by a Managing Director of EZH on behalf of EZH's Board of Managing Directors confirming that such Board has authorized and approved the transactions contemplated by the Operative Documents and the execution, delivery and performance by EZH of each Operative Document, (b) a certificate signed by the Chairman of EZH's Board of Supervisory Directors confirming that such Board has approved the transactions contemplated by the Operative Documents and (c) the request by EZH of the concurring advice and the unconditional concurring advice of EZH's Works Council;

(iii) certified copies of the charter documents and by-laws of the Bank;

(iv) a copy of the articles of association of EZH, either certified by the Chamber of Commerce of The Hague, The Netherlands, or in the form of an authenticated copy;

(v) [reserved];

(vi) certified copies of the charter documents of Stichting IJssel, Stichting Rotte and Stichting Roca;

(vii) the appraisal of the Property Rights performed by the Appraiser in form and substance satisfactory to the Investor (the "Appraisal");

(viii) the opinions of counsel required to be delivered to the Investor pursuant to Section 6 hereof;

(ix) evidence of governmental approvals and evidence of approvals or consents, or the providing of notification to, or registration with such Persons, if any, required for

(h) No Sublease Facility Event of Loss, Sublease Facility Partial Event of Loss or Burdensome Buyout Event shall have occurred and be continuing.

(i) No adjustment to Sublease Rent pursuant to Section 3(e) of the Sublease shall have occurred on or before the Closing Date that would yield a NPV Benefit of less than 5% of the Value of the Undivided Interest.

(j) There shall be no actions, suits, proceedings or governmental actions pending or, to the knowledge of the Sublessee, the Investor, the Lender, the Trustee, Stichting Rotte, Stichting IJssel, the Deposit Bank or Stichting Roca, threatened against any of the Sublessee, the Lender or the Trustee or the properties of any of such Persons before, or any order, judgment or decree has been issued by, any court or governmental department, commission, board, bureau, agency, or instrumentality, domestic or foreign, at the time of the Closing Date, to set aside, restrain, enjoin or prevent the completion and consummation of this Agreement or the transactions contemplated hereby or by any of the other Operative Documents or which, if determined adversely to any of such Persons, would affect the legality, validity or enforceability of any of the Operative Documents.

(k) EZH shall have received evidence reasonably satisfactory to it of the issuance of the rulings requested by it in connection with the Transaction.

(l) The Letter shall have been duly executed and delivered to EZH.

SECTION 6. OPINIONS.

The following opinions, each dated the Closing Date, are required to be delivered at the Closing:

(i) The Investor, the Bank, the Trustee, the Deposit Bank, the Lender and EZH shall have each received an opinion from White & Case, special New York counsel to EZH, Stichting Rotte, Stichting IJssel and Stichting Roca, in the form agreed upon by the parties hereto].

(ii) The Investor, the Bank, the Trustee, the Deposit Bank, the Lender and EZH shall have each received an opinion from Morris, James, Hitchens & Williams, special Delaware counsel to the Bank and the Trustee, in the form agreed upon by the parties hereto.

(iii) The Investor, the Bank, the Trustee, the Deposit Bank, the Lender and EZH shall have each received opinions from (A) Shearman & Sterling, special United States counsel to the Investor, in substantially the form agreed upon by the parties hereto, and (B) the Investor's internal counsel, in substantially the form agreed upon by the parties hereto.

(iv) The Investor, the Bank, the Trustee, the Lender, the Deposit Bank and EZH shall have each received an opinion from Clifford Chance, special Dutch counsel to

EZH, Stichting Rotte, Stichting IJssel, Stichting Roca and Bayerische Landesbank, in the form agreed upon by the parties hereto.

(v) The Lender shall have received an opinion from Nauta Dutilh, special Dutch counsel to the Lender and the Deposit Bank and (B) an opinion from Davis Polk & Wardwell, special New York Counsel to the Lender and the Deposit Bank.

(vi) The Investor shall have received a tax opinion from Shearman & Sterling, special United States tax counsel to the Investor, in form and substance satisfactory to the Investor.

(vii) The Investor, the Bank, the Trustee, the Deposit Bank, the Lender and EZH shall have received a tax opinion from Loyens & Volkmaars, special Dutch tax counsel to EZH, in the form agreed upon by the parties hereto.

(viii) The Investor shall have received an opinion from Loeff Claeys Verbeke, special Dutch counsel to the Investor, in form and substance satisfactory to the Investor.

(ix) The Investor, the Bank, the Trustee, the Deposit Bank and the Lender shall have each received an opinion from Oppenhoff & Rädler, special German counsel to the Investor and the Lender, in form and substance satisfactory to both the Investor and the Lender.

(x) The Investor shall have received a tax opinion from Loeff Claeys Verbeke, special Dutch tax counsel to the Investor, in form and substance satisfactory to the Investor.

(xi) The Investor, the Bank, the Trustee and EZH shall have each received an opinion of Nauta Dutilh, special Dutch counsel to the Lender and the Deposit Bank, in the form agreed upon by the parties hereto.

(xii) The Investor, the Bank, the Deposit Bank, the Trustee, the Lender and EZH shall have each received an opinion of Clifford Chance, special German counsel to EZH, in the form agreed upon by the parties hereto.

(xiii) The Investor, the Bank, the Trustee, the Deposit Bank, the Lender and EZH shall each have received an opinion of Davis Polk & Wardwell, special New York counsel to the L/C Bank, in the form agreed upon by the parties hereto.

(xiv) The Investor, the Bank, the Trustee, the Deposit Bank, the Lender and EZH shall each have received an opinion of Clifford Chance, special German counsel to the L/C Bank, in the form agreed upon by the parties hereto.

(xv) The Investor, the Bank, the Trustee, the Deposit Bank, the Lender and EZH shall each have received an opinion of Clifford Chance, special Luxembourg counsel to the L/C Bank, in the form agreed upon by the parties hereto.

# EXHIBIT 3

# Con Edison Development, Inc.
# October 1998 Report to Board of Trustees

Honda Motors, Exxon Chemical, Smurfit Paper, IBM, Motorola, Cemex and Roche.

- Mexico - Early stage feasibility of a 50 - 80 MW industrial cogeneration project for a customer with immediate needs in the El Salto Industrial Park.
- Philippines - Investment in inside-the-fence cogeneration projects in the Philippines with Integrated Utility Corporation (IUC), designed to serve the specific energy needs of high quality industrial customers.
- Argentina - Opportunity to develop, on a negotiated basis, a greenfield 400 MW gas-fired combined-cycle merchant plant in the city of Buenos Aires.
- Argentina: Early stage investigation of secondary market opportunities in distribution and transmission companies in the provinces of Catamarca, Formosa, Santa Fe and Cordova.

**Lease Projects Under Evaluation**

NUON Lease - Netherlands

- The contemplated transaction consists of the acquisition of up to $155 million of leasehold interests (+/- 10%), and the subsequent leaseback of the leasehold interests in the natural gas distribution assets owned by a subsidiary of nv NUON Energie-Ondememing voor Gelderland, Friesland en Flevoland ("NUON"), a utility serving the Provinces of Gelderland, Friesland and Flevoland located in the central portion of the Netherlands.

  The equity investment required to effect control of the contemplated leasehold interest is anticipated to be up to $48 million (+ / - 10%). The equity investment is anticipated to generate a minimum after tax internal rate of return ("IRR") of 13%, with a base case target IRR of 15%.

  The natural gas distribution assets to be leased are primarily comprised of natural gas pipelines and valving stations used to transport gas from the national gas transmission grid to the individual consumers served by NUON (the "Network"). NUON is owned by the Provinces of Gelderland, Friesland and Flevoland and by various municipalities in these Provinces.

  The project is similar to the EZH lease transaction closed by CED in December of 1997 in that it will be structured as a Section 467 triple net-lease lease-leaseback of leasehold interests in the Network. Under the contemplated transaction, CED or an affiliate (together "CED") would purchase leasehold interests in the Network for approximately 44 years from NUON and subsequently lease the leasehold interests back to NUON for approximately 25 years. At the end of the initial 25-year lease NUON would



CE 018473

PF009351

# Con Edison Development, Inc.
# October 1998 Report to Board of Trustees

have the right to purchase the Network at a pre-agreed price. If NUON did not purchase the Network at that time, CED would then have the right to "put" a lease back to NUON, in effect, forcing NUON to re-lease the Network for an additional period of approximately 12 years. At the end of this "put" renewal lease CED could either lease the Network to a third party for approximately 7 years or put the Network back to NUON.

The obligations of NUON to make payments for CED's benefit under the various agreements will be secured by combinations of: (i) a bank letter of credit ("L/C") and (ii) the pledge of U.S. Treasury Securities held in a U.S. domiciled trust account. The sum of the L/C's and the U.S. Treasury Securities will be sufficient to secure NUON's obligations to CED during the term of the lease. The risk that portions of CED's tax treatment on the transaction could be reversed will be mitigated by the opinions received from CED's outside tax counsel on the project.

It is anticipated that, concurrent with CED's proposal and negotiation with NUON, PSEG Resources ("PSEG") will be negotiating to obtain a leasehold interest in portions of the gas distribution assets of NUON with a value of to $150 million. PSEG recently invested in a leasehold interest in Dutch gas distribution assets, based on the EZH transaction structure, and it is CED's intention to use this recent transaction as the framework for CED's contemplated transaction with NUON. The current schedule anticipates the potential for a late December 1998 transaction closing.

- CED continues to follow the development of a number of potential lease transactions located in: Australia, Belgium, Germany, the Netherlands, Switzerland, and the United Kingdom, including (a) Electrabel - Belgium, a power plant and (b) ESAG – Germany an electric distribution system.
- CED continues market research and structure analysis on various project structures for investments in Internal Revenue Code Section 42 Affordable Housing Investments.

**Development Projects under Evaluation:**

- GENOR Expansion: Expansion of the GENOR diesel plant from 40 MW to 60 MW, serving increased regional industrial demand and the evolving Guatemalan wholesale market, is contingent upon expanded financing and a proven demand in a functioning wholesale market. CED has invested approximately $13.8 million in the 40 MW facility, in the form of equity and subordinated debt and shareholder loans.. Current refinancing discussions with major lenders, if

# Con Edison Development, Inc.
# October 1998 Report to Board of Trustees

successful, will lead to improved leverage and an enhanced IRR. Total cost for the 20 MW expansion, with all soft costs included, is approximately $23.5 million. CED's incremental equity investment is estimated to be $4.5 million.

- GENOR Peripherals: To improve and maintain access to customers, GENOR plans to upgrade local electric distribution and transmission lines. The GENOR project has already committed $1,200,000 to build distribution lines to connect isolated customers and will recover its investment through separate contracts. In addition, GENOR has identified other isolated customers and will invest in new distribution lines when competitive. GENOR also plans to initiate a fuel marketing business, discussed in prior reports. CED's incremental equity investment in these "peripherals" is estimated to be $3.5 million.

- Carson Cogeneration: The Purchase and Sale Agreement (PSA) is virtually complete and awaiting execution. Closing has been delayed by an issue with SCE, which is the sole responsibility of the seller. CED/MCNIC will not close the transaction until this issue is resolved. Reportedly, the seller has made considerable progress in resolving the issues with SCE and an expected final resolution is anticipated shortly. The delay is not adding to CED expenses. CED and MCNIC are now targeting a closing for October 30, 1998.

- Connecticut Energy Park : Early stage development of the Connecticut Energy Park project, a 270 MW combined cycle gas turbine merchant plant in Bozrah, Connecticut (near New Haven), with Energy Park Partners (EPP), an independent project development group, and Con Edison Energy. CED's development expenses could range up to $4 million. Current primary activity involves acquisition of the site for the project. Energy Park Partners is leading the site acquisition process. Permitting will commence upon business agreement to acquire the site. CED and EPP met recently to evaluate alternatives to the primary site. All sites are in the same area of Bozrah. EPP, on behalf of the project company, made proposals to landowners for site acquisition. With the cooperation and participation of the town of Bozrah, a land option agreement was executed by a private landowner and the town of Bozrah. CED and EPP will continue with site environmental assessment before the land is acquired. Having achieved site control, EPP and CED are now in a position to finalize their exclusive memorandum of understanding to commence development activities.

**<u>Technical Services Projects under Evaluation:</u>**

- Zhejiang DMS project. Zhejiang has issued a shortlist after preliminary review of the proposals. CED has been informed that it is ranked second on a short list of 4 competitors: Valment, CED, ABB and Siemens). CED and its partners are attending a clarification meeting in (10/18-21) in China.

# Con Edison Development, Inc.
# October 1998 Report to Board of Trustees

**Current Projects:**

- **GENOR Project Status Report:** Performance testing for phases 1 and 2 began October 13th. The GENOR plant reached a full 40MW on Wednesday, October 14th. Customers have signed PPA's amounting to over 15 MW, with anticipated additional sales within one to two weeks. GENOR is also negotiating to sign a seven-year PPA for 15MW to EEGSA, with the flexibility to increase this to 25MW should GENOR decide to expand its plant. A site visit and review session for Mr. Gedris has been scheduled November 2 to November 4. Messrs. Gedris and Madia will visit the GENOR/IPL office in Guatemala City on November 2, then visit the project site, tank farm facility and see some of the local distribution lines on Nov. 3rd.

- EZH Lease Project Status Report: In September, CED recorded after tax book income of $438 k on this transaction. This after tax book income is in line with plan. This brings the 1998 after tax book income from this project to just over $4.0 million.

- **ADA Cogeneration Project Status Report:** The plant continues to operate under the supervision of the O&M Contractor, General Electric Power Plant Operations, and the management direction of the co-General Partners, MCNIC, and CED. Operations in September were normal with the plant meeting all the Public Utilities Regulatory Policy Act ("PURPA") requirements for efficiency and operating standards for Qualifying Facilities ("QF") on both a monthly and year to date basis.

**Early Stage Projects:**

- Guatemala - Transmission Upgrade: The GENOR project's location in Puerto Barrios, is approximately 150 miles from Guatemala City which is the nation's hub of power generation and consumption. GENOR has commissioned a system stability study from Raytheon Engineers. Transmission upgrades may be necessary to permit GENOR's expansion to 60 MW; if so, the new Guatemalan regulatory structure allows significant benefits for private investment in such transmission improvements. The total estimated cost of this project is $16.4 million.

- El Salvador - Diesel Project: A small 30-40 MW thermal plant would supply strong industrial customers with lower priced and more reliable power. Site talks have been launched with top management at the RASA Fuel Refinery (owned by ESSO) located on the port of Acajutla. A strategic decision must be made whether to enter the Salvadoran market with this plant, or to use a larger solid fuel generation facility, as the entrée into the Salvadoran market. A second alternative under review would be to sell power to Salvadoran customers from

# Con Edison Development, Inc.
# October 1998 Report to Board of Trustees

the expanded GENOR project, pending construction of a solid fuel plant. Total estimated project cost - $42 million.

- El Salvador - Regional Solid Fuel Project: IEPGD is actively seeking a site and anchor customers for the development of a 150 MW solid fuel (coal) plant. The plant would probably be located near the port of Acajutla, in El Salvador, to decrease coal transport costs. The urgency of schedule is created by the need to establish a strategic toehold for the project ahead of, or in partnership with, potential competitors. Total estimated project cost - $210 million.
- Guatemala - Power Plant Acquisition at Sidegua Steel Mill: This three year old 40 MW project is an oil-fueled operating plant that utilizes Caterpillar diesel technology. SIDEGUA currently supplies 40% of its output to a steel mill and the other 60% to the local distribution company. The schedule will be a function of the seller's level of interest. The total acquisition cost is estimated to be $36 million. GENOR's local partner, IPL, has learned that the owner is willing to discuss selling the power plant. However, he will talk with multiple parties and may end up taking bids. CED will coordinate this activity closely with IEPGD and IPL.

**<u>Discontinued Projects</u>**

- MEGA - On October 7, 1998 CED submitted a proposal to MEGA regarding the lease-leaseback of portions MEGA's gas distribution assets located in the province of Limburg, in the southern portion of the Netherlands. Both CED's proposal, and a competitive proposal, believed to be from Fleet Bank, were reviewed by MEGA and MEGA's advisor Price Waterhouse ("PW"). Market information indicated that the competing proposal allowed for the use of alternate equity security structures in lieu of the US Treasury securities required under the CED proposal. The use of these alternate equity security structures generally provides recipients with benefit levels higher than if similar amounts of US Treasury securities were required. CED continues its review of these alternate equity security structures but is not prepared to recommend their use at this time.

  On October 19, MEGA's advisors, PriceWaterhouseCoopers ("PWC") confirmed that MEGA has chosen to award the gas distribution lease mandate to Fleet Bank. PWC indicated that the award to Fleet was based on the following considerations: (a) security structure / economics - Fleet agreed to use a AAA security structure, such as an AIG, Berkshire or AMBAC GIC in lieu of CED's requirement for US Treasuries. This alternate security structure can generate a significant economic benefit and it appears that Fleet gave MEGA all of the benefit here. (b) Documentation - MEGA believed they might be able to get better terms and conditions by negotiating new documents with Fleet, rather than by, in effect, duplicating the EZH documentation with CED. CED is halting

# Con Edison Development, Inc.
# October 1998 Report to Board of Trustees

development efforts on MEGA and are redirecting resources to other lease pipeline projects including (a) NUON - Netherlands, (b) Electrabel - Belgium, and (c) ESAG - Germany

October 22, 1998

# EXHIBIT 4

**Geier, David N. (TAX)**

---

**From:** Geier, David N. (TAX)
**Sent:** Thursday, April 12, 2007 3:31 PM
**To:** Durham, Thomas C.
**Cc:** Sergi, Joseph A. (TAX); Smart, Adam R. (TAX); Bielawski, Nicole M.
**Subject:** RE: Motion to Compel

Tom,

We are not quite sure why you are now seeking to claim that Interrogatory Number 14 does not pertain to consultants other than those involved in LILO transactions in that, as we explained to you during our recent telephone conference, the Interrogatory was modeled after the language used in your Complaint. Your recent email points to paragraph 49 of the Complaint, which admittedly refers only to consultants relating to LILO transactions, namely the one at issue at this case. However, if you would look at paragraph 39 of the Complaint, the one after which the Interrogatory was modeled, the paragraph refers to all types of international energy infrastructure projects as demonstrated by the remainder of the paragraph and the preceding two paragraphs which highlighted Con Ed's purported business plan.

This was also mentioned in our correspondence on November 8 and again on December 12, 2006, both leading up to the filing of our motion.

I hope you will reconsider your position on this matter.

Dave Geier

---

**From:** Durham, Thomas C. [mailto:TDurham@mayerbrownrowe.com]
**Sent:** Wednesday, April 11, 2007 10:53 AM
**To:** Geier, David N. (TAX)
**Cc:** Sergi, Joseph A. (TAX); Smart, Adam R. (TAX); Bielawski, Nicole M.
**Subject:** RE: Motion to Compel

David--Section 5 contains at least three references which indicate that this Interrogatory was limited to LILO transactions. First, the heading itself specifies "consultants regarding the LILO transaction."

Second, the first sentence of section 5 specifies that the Complaint "alleges that [Con Edison] entered into the LILO transaction at issue after communications with outside consultants, *so Interrogatory No. 14 inquired about those consultations.*"

Finally, you reference the consultants specified in paragraph 49 of the Complaint. That paragraph was clearly limited to the RoCa3 transaction.
-----Original Message-----
**From:** Geier, David N. (TAX) [mailto:David.N.Geier@usdoj.gov]
**Sent:** Monday, April 09, 2007 3:26 PM
**To:** Durham, Thomas C.
**Cc:** Sergi, Joseph A. (TAX); Smart, Adam R. (TAX)

**Subject:** Motion to Compel

Tom -

Following up on our conversation today - the reference in the title at section 5 of our second motion to compel to only LILO transactions is not correct. The discovery request tracked the language of the complaint which appears to us to refer to non-LILO transactions as well.

David N. Geier, Esq.
U.S. Department of Justice, Tax Division
Telephone (202) 616-3448
Facsimile (202) 307-0054

IRS CIRCULAR 230 NOTICE. Any advice expressed above as to tax matters was neither written nor intended by the sender or Mayer, Brown, Rowe & Maw LLP to be used and cannot be used by any taxpayer for the purpose of avoiding tax penalties that may be imposed under U.S. tax law. If any person uses or refers to any such tax advice in promoting, marketing or recommending a partnership or other entity, investment plan or arrangement to any taxpayer, then (i) the advice was written to support the promotion or marketing (by a person other than Mayer, Brown, Rowe & Maw LLP) of that transaction or matter, and (ii) such taxpayers should seek advice based on the taxpayers particular circumstances from an independent tax advisor.

This email and any files transmitted with it are intended solely for the use of the individual or entity to whom they are addressed. If you have received this email in error please notify the system manager. If you are not the named addressee you should not disseminate, distribute or copy this e-mail.

# EXHIBIT 5

# CED Strategic Focus of Business

## *Bids vs Negotiated Deals*

- Competitive Bidding
  - publicly scheduled often with short timeframe
  - potential for numerous participants
  - Predominantly price competitive
  - deal specific information often limited
- Negotiated Deals
  - unscheduled, often private or semi-private
  - fewer participants, relationships at senior management level primary driver for invitation to the table
  - price important, but outweighed by commitment to future synergies and cooperation
  - increased likelihood of convergence of corporate goals

# EXHIBIT 6

# CONSOLIDATED EDISON
# LEASING, INC.
# 1998 BUSINESS PLANNING MEETING

**Prepared by:**

**Cornerstone Financial Advisors Limited Partnership**

**January 21, 1998**

CORNERSTONE FINANCIAL ADVISORS
LIMITED PARTNERSHIP

## TABLE OF CONTENTS

I. CONSOLIDATED EDISON LEASING, INC.
1998 BUSINESS PLANNING MEETING

II. POTENTIAL TRANSACTIONS AS OF JANUARY 21, 1998

# CONSOLIDATED EDISON LEASING, INC.
# 1998 BUSINESS PLANNING MEETING

I. REVIEW 1997 ACTIVITY

A. ONE CLOSED TRANSACTION

- EZH - S467 (Sublease Loan) - December

B. BIDDING SUMMARY

1. Three Bid During 1997
2. One Failed to Close (EPON)
3. Two Deal Sources (Capstar, Babcock)
4. One Pending Transaction (ENECO)

C. STATUS OF CLOSED TRANSACTION AND CLEAN-UP STRATEGY

1. Documents
2. Appraisal
3. Opinions
4. Press Release/Picture Status

II. LEASE MARKET ENVIRONMENT

A. TAX LAW CHANGE VERY LIKELY TO OCCUR DURING 1998

B. LOW INTEREST RATES WILL PRESSURE BENEFITS

1. S467 (S&S)
   a. Sublease Loan
   b. Current Pay
2. S178 (H&W)

3. Pickle/Service Contract

C. **FAIRLY NON-COMPETITIVE MARKET**

1. Driven by Significant Supply of Lessee Assets

2. Historically Competitive Pricing and Bidding

3. Terms and Conditions ("T&C") are Pre-defined

4. As Market Becomes More Competitive, Efficient Approval and Bidding Processes Combined With Flexibility on T&C will be Key to Winning Transactions

D. **ASSET MIX AND TRANSACTION SIZE**

1. Facility Oriented Market

a. Distribution Assets (Gas, Water, Electricity, Cable)
b. Power Generation
c. Waste-to-Energy
d. Water Treatment
e. Hydroelectric

2. Transportation Equipment Most Competitive

3. Other Assets

a. Infrastructure
b. Qualified Technological Equipment (QTE-Telecom)
c. Real Estate

4. Service Contract Back-Up

III. **CEL OBJECTIVES AND CONSTRAINTS**

A. **CAPITAL**

1. Currently Allocated Capital

a. $43.5MM Invested in EZH RoCa 3

b. $43.5MM to be Invested on ENECO

c. $17.0MM Available for Investment

2. Future Capital

a. Back Leverage Potential

b. Budget and Board Process

B. **PEOPLE RESOURCES AND ADMINISTRATION**

1. Transactors

2. Pricing Support

3. Portfolio Administration

4. Law Firms

5. CEL Process

a. Accounting

i. Price Waterhouse
ii. Arthur Andersen
iii. Internal

b. Tax

i. Shearman & Sterling
ii. Internal (Annualization)

c. Credit

i. Board Package
ii. S&P Credit Rating

d. Board Meetings and Approval

i. CEL
ii. Holding Company

e. Other

6. Cornerstone Financial Advisors' Role

a. Transaction Sourcing and Screening

b. Transaction Structuring and Pricing

c. Negotiation/Documentation

d. Strategic Partnering, Syndicate Coordination

e. Ancillary Expert Assistance

i. Accounting
ii. Tax
iii. Credit

f. Other

**C. ASSET AND COUNTRY EXPOSURE**

1. Asset Mix

- Target assets supported by holding company expertise

2. Country Mix

a. Netherlands Portfolio Concentration, although German Based L/C Helps Diversify

b. Other Target Areas (Western Europe, Australia/New Zealand, U.S.)

**D. STRUCTURE**

1. Section 467 (S&S)

2. Section 178 (H&W)

3. Pickle/Service Contract

4. Other (QTE 5-year MACRS)

E. **CREDIT QUALITY**

1. Letter of Credit or Minimum Credit Rating

2. Equity Defeasance (US Treasuries or Other Instruments)

F. **RETURN AND PROFITABILITY TARGETS**

1. Nominal After-tax Yield

2. ROE at 1:1 Leverage; 7.41 Borrowing Rate

3. After-tax Book and Income Profile

IV. **DEVELOP STRATEGY TO ACHIEVE OBJECTIVES**

A. **REVIEW OBJECTIVES AND ASSESS CURRENT PROSPECTS**

1. Awarded

- ENECO ($285 Million, $43 Million Equity)

2. Proposed - See Potential Transactions List

B. **DISCUSS OTHER OPPORTUNITIES AND APPROACHES**