# IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| CONSOLIDATED EDISON COMPANY OF NEW YORK, INC. & SUBSIDIARIES,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES,<br><br>Defendant. | ) ) ) ) ) ) ) ) ) ) ) | Case. No. 06-305T<br><br>Hon. Marian Blank Horn |

## PLAINTIFF'S NOTICE OF COMPLIANCE WITH THE COURT'S ORDER OF MAY 7, 2007

The Plaintiff, Consolidated Edison Company of New York, Inc. & Subsidiaries ("Con Edison NY") respectively files this Notice of Compliance with the Court's Order of May 7, 2007 ("Order"), instructing Con Edison NY to provide certain materials in support of Plaintiff's Memorandum in Response to Defendant's Motion to Compel ("Plaintiff's Response"), by May 11, 2007.

The Court first instructed Con Edison NY to submit for *in camera* review copies of the three documents at issue in Defendant's Motion to Compel, which Con Edison NY has asserted are protected from disclosure by the work product doctrine. Con Edison NY represents that it sent true and correct copies of the three documents to the Court's chambers on May 10, 2007, by overnight delivery, to be received on May 11, 2007.

The Court also instructed Con Edison NY to file any declarations in support of the work product protections asserted with respect to the three documents at issue in Plaintiff's Response. Con Edison NY is producing the Affidavit of Andrew W. Scher, which is attached hereto as Exhibit A. The attachments identified in paragraphs 11 through 13 of the Affidavit were submitted *in camera* to the Court as set forth above.

Finally, the Court instructed Con Edison NY to file "copies of any previously disclosed documents containing information similar to that contained in the three documents on which the work product privilege is claimed." In response, Con Edison NY is producing the opinion letter from Shearman & Sterling, dated February 18, 1998 (CE003006-10), and the draft opinion, dated December 1, 1997 (CE016539-44) (collectively, the "LILO Opinion), which are attached hereto as Exhibits B and C.[1] Certain summary conclusions related to the discussions in the two

---

[1] The LILO Opinion was previously produced as Exhibit B to the Declaration of Thomas C. Durham, accompanying Plaintiff's Response. All documents referenced herein are identified by the CE bates number. All of these documents were identified on Plaintiff's privilege log and

Shearman & Sterling letters were set forth in the LILO Opinion. The LILO Opinion is, however, limited to Shearman & Sterling's conclusions and does not include the underlying analysis in support of such conclusions.

Con Edison NY believes that, with the exception of the LILO Opinion, no documents containing information similar to the work product contained in the three documents at issue were disclosed. The first two documents at issue, referred to in Plaintiff's Response as the Tax Risk Letter and the Tax Change Letter, contain Shearman & Sterling's work product, *i.e.*, its protected analysis, regarding the principal tax risks associated with lease-leaseback transactions and legislative and administrative conventions relevant to lease-leaseback transactions, respectively. Both letters contain detailed analysis which has not been disclosed in any form.

Other documents disclosed do not relate to the information contained in the three documents at issue and thus, are not responsive to the Order. To avoid any confusion, Con Edison provides the following explanation of these other documents. The majority of the other documents disclosed relate to the summary conclusions contained in the LILO Opinion but not the underlying, detailed analysis contained in the Tax Risk Letter and Tax Change Letter. By way of example, the Leasing White Paper (CE012018-23) contains Shearman & Sterling's conclusion that "as long as the closing date for the contemplated investment occurs prior to the date the proposed regulations are published in the Federal Register, these pending regulations will not apply to the contemplated transaction retroactively." A copy of this document is attached hereto as Exhibit D. Similar statements are included in draft versions of the Leasing White Paper (*i.e.*, CE016709-15) and related communications (*i.e.*, CE016587-89), attached hereto as Exhibits E and F. These statements reference the legal conclusion contained in paragraph 6 of the LILO Opinion that "prior to the effective date of the Final Treasury Regulations ..., a court should not construe such Final Treasury Regulations to apply to Lease Basic Rent." Statements such as those contained in the Leasing White Paper and drafts thereof do not disclose the analysis contained in either the Tax Change Letter or the Tax Risk Letter.

In addition, several other disclosed documents merely reference the fact that Shearman & Sterling was providing the Tax Risk Letter and the Tax Change Letter. These documents, however, do not disclose the analysis contained in the communications. By way of example, internal memoranda, one dated November 20, 1997 (CE004704-05) and one dated November 21, 1997 (CE004706-07), identify the general subject of the Tax Risk Letter and Tax Change Letter and the fact that both letters are forthcoming. A third internal memorandum, dated November 21, 1997 (CE008028), transmits the communications to in-house counsel. These documents, similarly, do not disclose the Shearman & Sterling analysis which Con Edison NY seeks to protect as work product. These documents are attached hereto as Exhibits G, H, and I.

The work product contained in the In-House Memorandum was not referenced in any of the other disclosed documents. Although several other documents previously identified on the privilege log discuss the involvement of Andrew Scher, the author of the In-House Memorandum, none of these documents discuss the work product at issue. These documents only reference the fact that Mr. Scher was engaged to assist Shearman & Sterling with legal tasks

---

previously produced to the Defendant in redacted form (with the exception of CE008028 and CE005825). Unredacted versions of the documents are forthcoming.

such as preparing documents. By way of example, an internal memorandum dated November 18, 1997 (CE005823) requests legal assistance from the Con Edison legal group and an internal memorandum dated November 21, 1997 (CE005825) conveys key transactional documents to Andrew Scher. These documents are attached hereto as Exhibits J and K. The documents attached as Exhibits D through K are not responsive to the Order but are attached to demonstrate that although other disclosed documents may reference Shearman & Sterling's advice, they do not reveal the substance of the three documents at issue, each of which remains protected by the work product doctrine.

As discussed more fully in Plaintiff's Response, there is no subject-matter waiver of the work product protection. Thus, a waiver of the attorney-client privilege on a particular subject matter does not affect a waiver of work product protection for that same subject matter. *See* Plaintiff's Response at p. 8; *see also In re: Echostar Commc'n Corp.*, 448 F.3d 1294, 1300 (Fed. Cir. 2006), *cert. denied* 127 S. Ct. 846 (2006) ("The attorney-client privilege and the work-product doctrine, through related, are two distinct concepts and waiver of one does not necessarily waive the other."). In this case, in which Con Edison NY has not placed advice of counsel at issue, the waiver of attorney-client privilege does not affect a waiver of work product. The three documents at issue in the United States' Motion to Compel remain protected by work product.

Respectfully submitted this 11th day of May, 2007,

/s/ Thomas C. Durham
THOMAS C. DURHAM
MAYER, BROWN, ROWE & MAW LLP
71 South Wacker Drive
Chicago, Illinois 60606
Tel: (312) 701-7216
Fax: (312) 706-9187
tdurham@mayerbrownrowe.com
*Attorney for Plaintiff*

*Of Counsel:*

DAVID F. ABBOTT
MAYER, BROWN, ROWE & MAW LLP
1675 Broadway
New York, New York 10019-5820
Tel: (212) 506-2642
Email: dabbott@mayerbrownrowe.com

THOMAS KITTLE-KAMP
MAYER, BROWN, ROWE & MAW LLP
71 South Wacker Drive
Chicago, Illinois 60606
Tel: (312) 701-7028
Email: tkittlekamp@mayerbrownrowe.com

## CERTIFICATE OF SERVICE

I hereby certify that on this 11th day of May, 2007, I filed a copy of the foregoing **Notice of Compliance with the Court's Order of May 7, 2007** using the Court's ECF/CM filing system. A notice of such filing will be automatically provided via the ECF/CM to counsel for the United States:

David N. Geier
U.S. Department of Justice, Tax Division
P.O. Box 26, Ben Franklin Station
Washington, D.C. 20044

/s/ Thomas C. Durham
THOMAS C. DURHAM
MAYER, BROWN, ROWE & MAW LLP
71 South Wacker Drive
Chicago, Illinois 60606
Tel: (312) 701-7216
Fax: (312) 706-9187
Email: tdurham@mayerbrownrowe.com
*Attorney of Record*

# Exhibit A

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **CONSOLIDATED EDISON COMPANY OF NEW YORK, INC. & SUBSIDIARIES,** | ) | |
| **Plaintiff,** | ) | **No. 06-305 T** |
| v. | ) | **Judge Marian Blank Horn** |
| **THE UNITED STATES,** | ) | |
| **Defendant.** | ) | |

**AFFIDAVIT OF ANDREW W. SCHER IN SUPPORT OF PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION TO COMPEL**

I, Andrew W. Scher, hereby declare and certify pursuant to 28 U.S.C. § 1746 as follows:

1. I am the Assistant General Counsel for Consolidated Edison Company of New York, Inc. ("Con Edison NY"), the Plaintiff in the above-captioned proceeding. I submit this Affidavit in Support of Plaintiff's Response to Defendant's Motion to Compel.

2. The Shearman & Sterling LLP ("Shearman & Sterling") communications (the "Tax Risk Letter" and "Tax Change Letter") and the internal Con Edison NY memorandum (the "In-House Memorandum") at issue were prepared in connection with Con Edison NY's decision to enter a leasing transaction with N.V. Electriciteitsbedrijf Zuid-Holland ("EZH").

3. The Tax Risk Letter, the Tax Change Letter and the In-House Memorandum were all created in anticipation of litigation.

4. Con Edison NY has not waived work product protection with respect to the Tax Risk Letter, the Tax Change Letter and the In-House Memorandum, and they remain protected as opinion work product.

5. Due to the large tax deductions associated with lease-leaseback transactions and the unsettled legal questions regarding application of certain Code provisions, including section 467, to lease-leaseback transactions, coupled with the fact that Con Edison NY's federal income tax returns for each of the 20 tax years preceding the year of the EZH transaction had been audited by the IRS, Con Edison NY had ample reason to believe that any contemplated lease-leaseback transaction that it entered into was likely to be challenged on audit by the IRS and might result in litigation.

6. Con Edison NY retained Shearman & Sterling to provide legal advice regarding the potential outcome of litigation regarding the tax aspects of the EZH transaction.

7. As part of the legal advice requested from Shearman & Sterling, Con Edison NY requested advice concerning the arguments likely to be made by the IRS in any litigation regarding the tax aspects of the EZH transaction. This advice was set forth in the "Tax Risk Letter."

8. As part of the legal advice requested from Shearman & Sterling, Con Edison NY requested legal advice concerning the potential retroactive application of new statutes or regulations to the EZH transaction. This advice was set forth in the "Tax Change Letter."

9. The Tax Risk Letter and the Tax Change Letter attempt to identify potential tax risks that needed to be considered prior to Con Edison NY's participation in any lease-leaseback transactions.

10. The In-House Memorandum was written at the request of the then General Counsel of Con Edison NY, Peter O'Shea, and discusses the anticipated tax treatment of the lease-leaseback transaction, the likelihood that it would be scrutinized by both the IRS and a

court, and the potential arguments which might be made by the IRS regarding the tax aspects of the EZH transaction.

11. A true and correct copy of the Shearman & Sterling Tax Risk Letter, dated November 20, 1997, is attached hereto as Exhibit 1. (Page 1)

12. A true and correct copy of the Shearman & Sterling Tax Change Letter, dated November 20, 1997, is attached hereto as Exhibit 2. (Page 9)

13. A true and correct copy of the Con Edison NY In-House Memorandum, dated October 23, 1997, is attached hereto as Exhibit 3. (Page 17)

14. Each of the these documents, the Tax Risk Letter, the Tax Change Letter and the In-House Memorandum, were prepared in connection with evaluating the risks of an anticipated IRS audit and subsequent tax litigation.

15. The Tax Risk Letter, the Tax Change Letter and the In-House Memorandum have not been disclosed, inadvertently or otherwise, to third parties, the IRS or the Department of Justice.

16. Con Edison NY has not placed at issue the work product of either Shearman & Sterling or in-house counsel, has not used the work product in a testimonial manner, and has not cited the work product in this proceeding.

I declare under penalty of perjury that based on my knowledge and belief the foregoing is true and correct.

Executed on: May 10, 2007

Andrew W. Scher
Consolidated Edison Co. of New York, Inc.
4 Irving Place, Room 1815-S
New York, NY 10003
Tel: (212) 460-6209
Fax: (212) 677-5849
schera@coned.com

Assistant General Counsel for Plaintiff

# Exhibit B

SHEARMAN & STERLING

FAX: 212-848-7179
212-848-7181
TELEX: 667290 WUI

599 LEXINGTON AVENUE
NEW YORK, N.Y. 10022-6069
212 848-4000

ABU DHABI
BEIJING
DUSSELDORF
FRANKFURT
HONG KONG
LONDON
LOS ANGELES
NEW YORK
PARIS
SAN FRANCISCO
SINGAPORE
TOKYO
TORONTO
WASHINGTON, D.C.

WRITER'S DIRECT NUMBER

February 18, 1998

Consolidated Edison Development, Inc.
111 Broadway
8th Floor
New York, NY 10006

Consolidated Edison Leasing, Inc.
c/o Consolidated Edison Development, Inc.
111 Broadway
8th Floor
New York, NY 10006

EZH RoCa 3
<u>Facility Lease</u>

Gentlemen:

We acted as special counsel to Consolidated Edison Leasing, Inc., a Delaware corporation (the "Investor"), and Consolidated Edison Development, Inc., a New York corporation, in connection with the transactions contemplated by the Participation Agreement, dated as of December 15, 1997 (the "Participation Agreement"), among N.V. Electriciteitsbedrijf Zuid-Holland, a public limited liability company incorporated under the laws of The Netherlands (the "Lessor" and "Sublessee"), the Investor, Wilmington Trust Company, not in its individual capacity, except as otherwise expressly provided in the Participation Agreement, but solely as Trustee under the Trust Agreement, dated as of December 15, 1997 (the "Lessee", "Sublessor" and "Trustee"), and Hollandsche Bank-Unie N.V., a public company with limited liability organized and existing under the laws of The Netherlands (the "Lender"). This opinion is delivered pursuant to Sections 3(b)(viii) and 6(vi) of the Participation Agreement. All capitalized terms used herein and not otherwise defined herein shall have the meanings assigned to them in Appendix A to the Participation Agreement or the Operative Documents.

The Participation Agreement provides, among other things, that on the Closing Date, the Trustee, acting on behalf of the Investor, will cause the Trust established pursuant to the Trust Agreement to lease the Facility from the Lessor pursuant to the Lease dated as

of the Closing Date, and that on the Closing Date, concurrently with entering into the Lease, the Trustee, acting on behalf of the Investor, will cause the Trust to sublease the Facility to the Sublessee pursuant to the Sublease dated as of the Closing Date. The Participation Agreement further provides that pursuant to the terms of the Loan and Security Agreement entered into on the Closing Date, the Lender will make the Loan to the Trustee at the times and for the purposes agreed to therein.

The Trust Agreement provides that the Trustee will (i) hold all of its estate, right, title and interest in and to the Facility under the Lease and the Sublease, the Operative Documents and any other property contributed by the Investor for the use and benefit of the Investor and (ii) subject to, and in accordance with, the terms of the Operative Documents, distribute all payments and amounts received by it (other than amounts necessary to pay certain fees and expenses of the Trustee) to the Investor, exercise its rights (upon instructions received from the Investor) and perform its duties under said Operative Documents and take such other action in connection with the foregoing as the Investor may from time to time direct.

Pursuant to the two German Leases, the German Lessor has leased the German Equipment to the Lessor for a period of approximately 13.5 years, ending October 24, 2009 (the "German Lease Termination Date"). On the German Lease Termination Date, the German Lessor has the right to cause the Lessor to purchase (the "German Put Option") the German Equipment for a fixed price and, if the German Lessor does not exercise the German Put Option, the Lessor has the option to purchase (the "German Purchase Option") the German Equipment from the German Lessor. Based on the Appraisal, it appears that the Lessor will be economically compelled to exercise the German Purchase Option under one German Lease and that the German Lessor will be economically compelled to exercise the German Put Option under the other German Lease. Pursuant to the Assignment Agreement, the Lessor has authorized the Trustee to exercise each German Purchase Option on behalf of the Lessor if the Lessor does not so exercise the German Purchase Option. We understand that the German Purchase Option price under each German Lease has been economically defeased by the Lessor. Further, we understand that the German Lessor is treated as the owner of the German Equipment for German income tax purposes, but that the Lessor continues to treat itself as the owner of the German Equipment for Dutch tax and accounting purposes.

We have participated in the preparation, execution and delivery of the Operative Documents and we have reviewed the Operative Documents and the Specified Documents. In arriving at the opinions expressed below, we have assumed the genuineness of all signatures and the due authorization, execution and delivery by the parties thereto of the Operative Documents and the Specified Documents executed on or prior to the date hereof and have examined and relied on such agreements and instruments and on the representations and warranties as to factual matters contained in or made pursuant to the Operative Documents and the Specified Documents. We have also assumed that the other

opinions of counsel to the various parties to the Operative Documents delivered on the Closing Date are correct.

We have examined leveraged lease pricing printouts (ABC File: ezh2-c6a) from Cornerstone Financial Advisors, dated December 14, 1997 and December 19, 1997 (the "Pricing File"). In view of such examination, the maintenance of minimum investment (at not less than an acceptable level), profit and positive cash flow requirements, set forth in section 4(1)(B) and section 4(6) of Revenue Procedure 75-21, 1975-1 C.B. 715, have been satisfied and the safe harbor as set forth in Section 1.467-3(c)(2)(i) of the Proposed Treasury Regulations, as it applies to Lease Basic Rent under the Lease, to Sublease Basic Rent during the Sublease Basic Term and to Sublease Renewal Rent during the Sublease Renewal Term, if any, has been satisfied in each case.

We have examined a letter of conclusions, dated December 15, 1997, prepared by the Appraiser as to, among other things, (i) the fair market value of the Facility on the Closing Date, (ii) the estimated useful life, residual value and commercial utility of the Facility, (iii) the fair market value of the Facility on the Lease Termination Date, (iv) the fair market value of the Sublessor's Lease Interest on the Closing Date, on the Sublease Basic Termination Date and on the Sublease Renewal Termination Date, (v) the fair rental value of the Sublessor's Lease Interest, (vi) the absence of compulsion on the Sublessee to exercise the Sublease Purchase Option on the Sublease Basic Termination Date, (vii) the determination that it is not generally expected that the Sublessor will exercise the Sublease Renewal Option, and (viii) the expected fair market value of the German Equipment on the German Lease Termination Date. We have assumed that the conclusions stated therein are correct and that none of the terms and conditions of, or the operation of any of the provisions in, the Operative Documents would cause such conclusions to change. We have also assumed that the conclusions in the Appraisal will be the same as those stated in the letter of conclusions. In addition, we have examined and relied on the originals, or copies certified or otherwise identified to our satisfaction, of such other records, documents, certificates and other instruments as we have deemed appropriate to enable us to give the opinions expressed below.

We have also assumed that (i) the method of accounting used by the Investor with respect to the transactions contemplated by the Operative Documents is not a change in accounting methods for Federal income tax purposes, (ii) none of the parties to the Operative Documents (except the Trustee) is related to the Investor within the meaning of Section 267 of the Internal Revenue Code of 1986, as amended (the "Code"), (iii) none of the terms and conditions of, or the operation of, any of the provisions in the Operative Documents would operate to cause the exercise of any option at the Sublease Basic Termination Date, (iv) the transactions contemplated by the Operative Documents produce (in the absence of a default by any party with respect to its obligations under the Operative Documents) a pre-tax profit for the Investor and (v) there are no agreements or arrangements with respect to the

transactions contemplated by the Operative Documents that are not set forth in the Operative Documents.

Based upon the foregoing and in reliance thereon and subject thereto, and based upon an analysis of the Code, the Treasury Regulations promulgated thereunder (including proposed, temporary and final regulations), revenue rulings and revenue procedures of the Internal Revenue Service, court decisions and such other laws and facts as we have deemed relevant and necessary, it is our opinion that for Federal income tax purposes:

1. Each of the Lease and the Sublease is a "true lease"; the Trust will be treated as the lessee under the Lease and as the sublessor under the Sublease; the Trust will be treated as a grantor trust pursuant to Sections 671 et seq. of the Code; the Investor will be the owner and sole beneficiary of the Trust and the Investor will be entitled and required to take into account each item of income, gain, loss, deduction and credit of the Trust with respect to its interest in the Facility, the Lease, the Sublease and the Loan evidenced by the Loan and Security Agreement.

2. The Investor should be entitled to rental deductions under Section 162 of the Code for scheduled installments of Lease Basic Rent payable under the Lease in the amounts and in the periods to which such installments relate, as specified in the Lease, in accordance with Section 467(b)(1) of the Code. The Investor should be entitled to include in gross income all scheduled installments of Sublease Basic Rent (and Sublease Renewal Rent, if any) receivable under the Sublease during the Sublease Term in the amounts and in the periods to which such installments relate, as specified in the Sublease, in accordance with Section 467(b)(1) of the Code. Neither the Lease nor the Sublease constitutes a "disqualified leaseback" or "long-term agreement" within the meaning of Section 467(b)(4) of the Code.

3. The Loan evidenced by the Loan and Security Agreement constitutes a debt obligation of the Trust and all amounts payable thereon as interest with respect thereto will be deductible by the Investor, when accrued in accordance with the terms thereof, pursuant to Section 163 of the Code and the Treasury Regulations promulgated thereunder.

4. The Investor will be entitled to deductions for amortization of Transaction Expenses on a straight-line basis over the Lease Term, the Sublease Term and the term of the Loan evidenced by the Loan and Security Agreement, respectively, and we believe that the allocation of Transaction Expenses in accordance with the terms of the Pricing File constitutes a reasonable allocation thereof.

5. The German Lease constitutes a financing rather than a "true lease", under which the German Lessor is a secured lender and the Lessor is the borrower and owner of the German Equipment.

6. Provided that the Closing Date is prior to the effective date of the Final Treasury Regulations under Section 467 of the Code, a court should not construe such Final Treasury Regulations to apply to Lease Basic Rent, Sublease Basic Rent or Sublease Renewal Rent, if any, unless either the Lease or the Sublease constitutes a "disqualified leaseback" or a "long-term agreement," within the meaning of Section 467(b)(4) of the Code.

The opinions set forth above are based on current Federal income tax law and administrative practice as in effect on the date hereof. Any inaccuracy in the applicable facts or the assumptions we have made, or any change after the date hereof in the applicable law, could adversely affect the opinions given herein. We do not undertake to advise you as to any future changes in Federal income tax law or administrative practice that may affect our opinion unless we are specifically retained to do so.

No opinion is expressed as to any matter not specifically addressed herein. Furthermore, this opinion may not be relied upon by any party other than the addressees hereof without the prior express written consent of the undersigned.

Very truly yours,

Shearman & Sterling

WEF/MA
NYL4A/588 6

# Exhibit C

FAX NUMBER(S)

(212) 848-7179
(212) 848-7180
(212) 848-7181
(212) 848-7182
(212) 848-7183

SHEARMAN & STERLING
599 Lexington Avenue
New York, New York 10022
Communications Dept. Telephone: (212) 848-8434

## FAX COVER SHEET

Reference No. 30336/2

Date: December 1, 1997

Name: Brian DePlautt

FAX Phone: 393-9282

Firm: Consolidated Edison Development, Inc.
Location: New York
Office Phone: 393-9242, Ext. 240

From: Michael Apelt
Room: 1166

Sender's Phone: (212) 848-7420

Document Page Count (Including Cover Sheet): 6

Comments:

EZH RoCa 3

Attached is a draft of our tax opinion to be delivered to you with respect to the above captioned transaction.

Please call me with any questions you may have.

RECEIVED
COMMUNICATIONS
97 DEC -1 PM 8:06

cc: Mr. Flowers

Confidentiality Note: The information transmitted in this facsimile message is sent by an attorney or his/her agent, is intended to be confidential and for the use of only the individual or entity named above. If the recipient is a client, this message may also be for the purpose of rendering legal advice and thereby privileged. If the reader of this message is not the intended recipient, you are hereby notified that any retention, dissemination, distribution or copy of this telecopy is strictly prohibited. If you have received this facsimile in error, please immediately notify us by telephone and return the original message to us at the address above via the mail service (we will reimburse postage). Thank you.

SS_NYL4A/660

Please note the total number of pages to be transmitted. If you do not receive the number indicated, please contact the Communications Department at (212) 848-8434.

**DRAFT**

December [__], 1997

VIA MAIL

[Consolidated Edison Leasing, Inc.]
111 Broadway
8th Floor
New York, NY 10006

EZH RoCa 3
Facility Lease

Gentlemen:

We have acted as special counsel to [Consolidated Edison Leasing, Inc., a Delaware] corporation (the "Investor") in connection with the transactions contemplated by the Participation Agreement, dated as of December [__], 1997 (the "Participation Agreement"), among N.V. Electriciteitsbedrijf Zuid-Holland, a public limited liability company incorporated under the laws of The Netherlands (the "Lessor" and "Sublessee"), the Investor, [Investor Guarantor, if any], Wilmington Trust Company, not in its individual capacity, except as otherwise expressly provided in the Participation Agreement, but solely as Trustee under the Trust Agreement, dated as of December [__], 1997 (the "Lessee", "Sublessor" and "Trustee"), and Hollandsche Bank-Unie N.V., a public company with limited liability organized and existing under the laws of The Netherlands (the "Lender"). This opinion is delivered pursuant to Sections 3(b)(viii) and 6(vi) of the Participation Agreement. All capitalized terms used herein and not otherwise defined herein shall have the meanings assigned to them in Appendix A to the Participation Agreement or the Operative Documents.

The Participation Agreement provides, among other things, that on the Closing Date the Trustee, acting on behalf of the Investor, will cause the Trust established pursuant to the Trust Agreement to lease the Facility from the Lessor pursuant to the Lease dated as of the Closing Date, and that on the Closing Date, concurrently with entering into the Lease, the Trustee, acting on behalf of the Investor, will cause the Trust to sublease the Facility to the Sublessee pursuant to the Sublease dated as of the Closing Date. The Participation

Agreement further provides that pursuant to the terms of the Loan and Security Agreement entered into on the Closing Date, the Lender will make the Loan to the Trustee at the times and for the purposes agreed to therein.

The Trust Agreement provides that the Trustee will (i) hold all of its estate, right, title and interest in and to the Facility under the Lease and the Sublease, the Operative Documents and any other property contributed by the Investor for the use and benefit of the Investor, (ii) distribute all payments and amounts received by it (other than amounts necessary to pay certain fees and expenses of the Trustee) to the Investor, (iii) subject to the terms therein, exercise its rights (upon instructions received from the Investor) and perform its duties under said Operative Documents in accordance with the terms thereof and (iv) subject to the terms therein, take such other action in connection with the foregoing as the Investor may from time to time direct.

[Pursuant to the German Lease, the German Lessor has leased the German Equipment to the Lessor for a period of approximately 13.5 years, ending October 24, 2009. Under the German Lease, the Lessor has the option to purchase (the "German Purchase Option") the German Equipment from the German Lessor at the end of the German Lease for a fixed price equal to [__]% of the original cost of the German Equipment. We understand that this price will, based on the Appraisal, be equal to approximately [__]% of the fair market value of the German Equipment at the exercise date. The purchase option price has been economically defeased by the Lessor, and the Lessor will authorize the Trustee to exercise the German Purchase Option on behalf of the Lessor if the Lessor does not so exercise the German Purchase Option. We understand that the German Lessor is treated as the owner of the German Equipment for German income tax purposes.]

We have participated in the preparation, execution and delivery of the Operative Documents and we have reviewed [the German Documents]. In arriving at the opinions expressed below, we have assumed the genuineness of all signatures and the due authorization, execution and delivery by the parties thereto of the Transaction Documents executed on or prior to the date hereof and have examined and relied on such agreements and instruments and on the representations and warranties as to factual matters contained in or made pursuant to the Transaction Documents. We have also assumed that the other opinions of counsel to the various parties to the Operative Documents delivered on the Closing Date are correct.

We have examined a leveraged lease pricing printout [(name of pricing file, time of printout)] from Cornerstone Financial Advisors, dated December [__], 1997 (the "Pricing File"). In view of such examination, we have assumed that the maintenance of minimum investment (at not less than an acceptable level), profit and positive cash flow requirements set forth in section 4(1)(B) and section 4(6) of Revenue Procedure 75-21, 1975-1 C.B. 715, have been satisfied and that the safe harbor as set forth in Section 1.467-3(c)(2)(i) of the Proposed Treasury Regulations, as it applies to Lease Basic Rent

under the Lease, to Sublease Basic Rent during the Sublease Basic Term and to Sublease Renewal Rent during the Sublease Renewal Term, if any, has been satisfied in each case.

We have examined a report, dated December [__], 1997, prepared by the Appraiser as to, among other things, [(i) the fair market value of the Facility on the Closing Date, (ii) the estimated useful life, residual value and commercial utility of the Facility, (iii) the fair market value of the Facility on the Lease Termination Date, (iv) the fair market value of the Sublessor's Lease Interest on the Closing Date, on the Sublease Basic Termination Date and on the Sublease Renewal Termination Date, (v) the fair rental value of the Sublessor's Lease Interest, (vi) the absence of compulsion on the Sublessee to exercise the Sublease Purchase Option on the Sublease Basic Termination Date, (vii) the determination that it is not generally expected that the Sublessor will exercise the Sublease Renewal Option, and (viii) the compulsion of the Lessor to exercise the German Purchase Option with respect to the German Equipment.] We have assumed that the conclusions stated therein are correct and that none of the terms and conditions of, or the operation of any of the provisions in, the Operative Documents would cause such conclusions to change. In addition, we have examined and relied on the originals, or copies certified or otherwise identified to our satisfaction, of such other records, documents, certificates and other instruments as we have deemed appropriate to enable us to give the opinions expressed below.

We have also assumed that (i) the method of accounting used by the Investor with respect to the transactions contemplated by the Operative Documents is not a change in accounting methods for Federal income tax purposes, (ii) none of the parties to the Operative Documents [(except the Investor Guarantor)] is related to the Investor within the meaning of Section 267 of the Internal Revenue Code of 1986, as amended (the "Code"), (iii) none of the terms and conditions of, or the operation of, any of the provisions in the Operative Documents would operate to cause the exercise of any option at the Sublease Basic Termination Date, (iv) the transactions contemplated by the Operative Documents produce a pre-tax profit for the Investor and (v) there are no agreements or arrangements with respect to the transactions contemplated by the Operative Documents that are not set forth in the Operative Documents.

Based upon the foregoing and in reliance thereon and subject thereto, and based upon an analysis of the Code, the Treasury Regulations promulgated thereunder (including proposed, temporary and final regulations), revenue rulings and revenue procedures of the Internal Revenue Service, court decisions and such other laws and facts as we have deemed relevant and necessary, it is our opinion that for Federal income tax purposes:

1. Each of the Lease and the Sublease is a "true lease", the Trust will be treated as the lessee under the Lease and as the sublessor under the Sublease, the Investor will be the owner and sole beneficiary of the Trust and the Investor will be entitled and

required to take into account each item of income, gain, loss, deduction and credit of the Trust with respect to its interest in the Facility, the Lease, the Sublease and the Loan evidenced by the Loan and Security Agreement.

2. The Investor should be entitled to rental deductions under Section 162 of the Code for scheduled installments of Lease Basic Rent payable under the Lease in the amounts and in the periods to which such installments relate, as specified in the Lease, in accordance with Section 467(b)(1) of the Code. Neither the Lease nor the Sublease constitutes a "disqualified leaseback or long-term agreement" within the meaning of Section 467(b)(4) of the Code.

3. The Loan evidenced by the Loan and Security Agreement constitutes a debt obligation of the Trust and all amounts payable thereon as interest with respect thereto will be deductible by the Investor, when accrued in accordance with the terms thereof, pursuant to Section 163 of the Code and the Treasury Regulations promulgated thereunder.

4. The Investor will be entitled to deductions for amortization of Transaction Expenses on a straight-line basis over the Lease Term, the Sublease Basic Term and the term of the Loan evidenced by the Loan and Security Agreement, respectively and the allocation of Transaction Expenses in accordance with the terms of the Pricing File appears to constitute a reasonable allocation thereof.

5. The German Lease constitutes a financing rather than a "true lease", under which the German Lessor is a secured lender and the Lessor is the borrower and owner of the German Equipment.

The opinions set forth above are based on current Federal income tax law and administrative practice as in effect on the date hereof. Any inaccuracy in the applicable facts or the assumptions we have made, or any change after the date hereof in the applicable law, could adversely affect the opinions given herein. We do not undertake to advise you as to any future changes in Federal income tax law or administrative practice that may affect our opinion unless we are specifically retained to do so.

No opinion is expressed as to any matter not specifically addressed herein. Furthermore, this opinion may not be relied upon by any party other than the addressee hereof without the prior express written consent of the undersigned.

Very truly yours,

WEF/MA
NYL4A/588.3

# Exhibit D

**Executive Summary**

One element of a diversified investment portfolio for Con Edison is the relatively low risk and attractive return profile of leases. This paper describes sale-leasebacks, identifies major risks and benefits, and details a recommended investment.

Investments of this type would be accounted for as leveraged leases, allowing for front-loaded earnings, and generate after tax yields of between 15% and 25% over their lives, after taking account of typical capital structure and debt costs.

The earnings come from a combination of lease payments and tax deductions. Con Edison, with its high tax rate and large taxable income position, is in a particularly favorable position to take advantage of such a program.

**What is a sale-leaseback?**

In its most basic form, a sale-leaseback is the purchase of an asset and the subsequent leaseback of that asset to the seller under a long term lease agreement. Under a so-called "leveraged lease", the investor uses non-recourse debt to reduce the equity needed to purchase the asset.

Since its inception in 1964, the leveraged leasing market has continually developed new variations on this basic theme to accommodate increasingly complex accounting and tax laws and regulations. The latest of these variations are the "lease-leaseback" structures in which an asset is leased (instead of purchased) and the leasehold rights derived from that lease are then leased back to the initial owner of the facility. Lease-leaseback structures have been developed to optimize the benefits that can be derived by the utility and the investor in these transactions.

**What kind of lease structures will be considered?**

Under the proposed investment program, investments will be considered in both sale-leasebacks and lease-leasebacks, depending on prevailing market conditions.

Because the specific transaction currently under consideration by CED is a lease-leaseback we will use this type of structure in our example of a typical transaction.

**How would a typical transaction work?**

In a typical lease-leaseback transaction, a special purpose subsidiary owned by an investor, in this case CED, would establish a trust. On the closing date, CED would invest equity in the trust and the trust would borrow non-recourse debt for the project. Concurrently the trust would enter into a lease agreement with a utility under which the trust would lease an asset, for example a power plant, from the utility for 44 years. The trust would, at the same time, lease the plant back to the utility for 20 years, after which the trust would have a number of options, described below. The initial 20 year term of the leaseback has been chosen to

optimize the benefits available to both the utility and the investor. A 44 year leaseback would not qualify for the tax treatment that CED and the foreign utility seek.

On the closing date of the lease, the utility would establish, for the benefit of CED, (a) a trust account containing U.S. Treasury securities and (b) an irrevocable bank letter of credit from a bank rated AA or better, both in amounts that, when combined, fully secure the obligations of the utility to CED. In the event the utility were to fail to make the payments due to CED under the lease, CED could take the U.S. Treasury securities and draw on the letter of credit to satisfy any shortfalls.

At the end of the initial 20 year lease, the utility would have the option to purchase the plant at a pre-agreed fixed price. If the utility did purchase the plant at this time, the transaction would be completed. If the utility did not purchase the plant at the end of year 20, the trust would have the option to either (a) lease the plant to a third party for the remaining 24 years of the lease, (b) use the plant itself, or (c ) require the utility to re-lease the plant for an additional 17 years at prices that would assure CED of its expected return.

Responsibility for the condition of the plant would rest with the utility during the initial term of the lease, and with the third party during a subsequent lease. During the remaining seven years under the lease, CED could either use the plant itself or lease the plant to third parties and in doing so obtain additional revenue. The base case economics assume no revenue for this period. At the end of the 44 year lease CED would be required to return the plant to the utility.

**How would CED derive its return under a sale-leaseback?**

Under a typical lease-leaseback structure an investor's earnings are generated by applying a constant rate of return to a declining investment balance according to lease accounting rules established by the Financial Accounting Standards Board. As the investment balance declines so do the earnings and hence the earnings are front-loaded.

The following chart details the earnings profile for the first 10 years of a typical lease-leaseback

| Year (US$) | Investment | Earnings |
|---|---|---|
| 1997 | 43,047,734 | 353,054 |
| 1998 | | 4,154,042 |
| 1999 | | 3,961,165 |
| 2000 | | 3,748,210 |
| 2001 | | 3,512,950 |
| 2002 | | 3,252,891 |
| 2003 | | 2,965,245 |
| 2004 | | 2,646,897 |
| 2005 | | 2,294,361 |
| 2006 | | 1,903,735 |

The following graph details the earnings for a typical lease-leaseback.




The transactions contemplated will be structured in such a way that CED will obtain the same yields and rates of return regardless of whether the utility exercises its purchase option at the end of year 20 or is required to re-lease the plant for an additional 17 years.

**Do we have a specific transaction in mind?**

CED's strategy will be to invest in transactions in conjunction with experienced market participants, to concentrate on assets familiar to Con Edison and to deal with utilities in countries with high credit ratings.

CED is currently pursuing the potential investment of $43 million in a recently commissioned gas-fired combined cycle power plant, the RoCa3 plant, located near the city of Rotterdam in the Netherlands. The plant, owned by EZH, one of the four regulated generation utilities in the Netherlands, is currently undergoing engineering, environmental, and valuation reviews by our consultants, and has recently been inspected by internal personnel.

We are pursuing this investment opportunity in conjunction with an experienced and knowledgeable lease investor, Bank One Leasing Inc. Bank One and CED have retained Shearman & Sterling for tax and legal advice, and, among others, Duke Engineering for engineering reviews, Tauw Milieu, a well-respected Dutch environmental firm, for an environmental assessment and Deloitte & Touche for valuation assessments of the plant.

The transaction is anticipated to generate over $4 million in earnings during 1998 and is expected to generate an after tax yield of 19.7%, assuming that CED's investment is 50% equity/50% debt.

**What are major benefits from these transactions to the investor?**

(1) Highly Predictable Earnings

The earnings from these transactions are highly predictable because each of the cash inflows and outflows to the transaction is contractually agreed to on the closing date and because the utility's lease obligations are fully secured by the U.S. Treasuries and the bank letter of credit.

(2) Front Loaded Earnings

Because the transactions will be afforded leveraged lease accounting treatment under Financial Accounting Standards Board rules, the earnings profile for these transactions is "front-loaded' and hence provides more earnings in the early years of the transaction than in the latter years of the transaction.

(3) Good to Excellent Investment Yields

After tax yields on leasing projects are anticipated to range from a good 15% to an excellent 25% depending on the type of lease structure utilized and the leverage applied. For example, under the initial lease investment contemplated the return of 19.7% assumes a relatively conservative leverage rate of 50%. Measurement of after tax yields, assuming a theoretical case in which the corporation has no debt (the so called "all equity return") range from 9.0% to 12.3%.

(4) Economic Value

Because of the utility payment protection structures and the low probability of losses derived from adverse tax actions, the risk adjusted rates of return exceed the required rates of return for these investments.

(5) Strategic Value of Leasing

Participation in these transactions affords CED the opportunity to more fully understand the legal, regulatory, commercial and tax environment of the countries in which the leased assets are located. This in-depth understanding can provide the basis for better informed decisions regarding potential investment and partnering opportunities as the utility infrastructures in these highly developed countries are opened to investments from external sources.

**What are major benefits from these transactions to the utility?**

In entering into these transactions, the utility is able, at little or no perceived risk to itself, to obtain (a) up to 100% long term financing for a plant, (b) interest rates that may be lower than those available from domestic credit sources and (c ) front-end loaded funding benefits, while maintaining operating control of the plant. In the case of the investment contemplated by CED, the benefit to the utility is about 6.9% of the asset value, or $10.3 million.

**What are the major risks from these transactions to the investor?**

(1) Utility Credit Risks

Perhaps the greatest risk to the trust is the risk that the utility will default on its obligation to pay rent during the lease term. In order to minimize this risk the trust will require that the utility's lease obligations be fully secured by a combination of U.S. Treasury securities and letters of credit issued by banks with S&P ratings of AA or above. In the event the utility fails to make the lease rent payments due, the investor can use the Treasuries and the proceeds from the letter of credit to return its capital and to provide it with its expected yield.

(2) Foreign Country Tax Risks

Another major risk implicit in the transaction is the risk that the tax laws or regulations of the country in which the asset is located change in a way that would result in lower returns to the trust, and hence the investor. Investments under the proposed program would be structured so that the risks associated with foreign country tax law changes would be fully borne by the utility.

(3) Pending U.S. Tax Regulations

Pending tax regulations, if enacted, could significantly reduce the tax benefit to be derived by investors in lease-leaseback transactions such as the investment under consideration by CED, as described above.

CED's tax counsel has indicated that as long as the closing date for the contemplated investment occurs prior to the date the proposed regulations are published in the Federal Register, these pending regulations will not apply to the contemplated transaction retroactively.

If the pending regulations are published prior to the closing date, CED will defer the contemplated investment pending a restructuring of the transaction.

(4) U.S. Tax Audits

It is anticipated that the transactions will be structured in ways that will make any challenges to the structure by the IRS under current regulations difficult to support or litigate. Preliminary indications from our tax counsel are that the tax opinions will show an average likelihood of success above 90% if challenged by the IRS. Our tax counsel, is very experienced in negotiating and advising on leveraged lease transactions.

In the worst case tax scenario, a claim would be litigated and won in tax court by the IRS. In this case, financial analysis indicates a 100% return of CED's capital and a return on capital of 2.4% over the lease term.

(5) Country Risks

The proposed investment program will target investments in developed and highly rated countries. The initial proposed investment under the program will be in the AAA-rated Netherlands. Potential downstream opportunities include transactions in the Netherlands, Switzerland, Australia, Germany and the United States. The contemplated transactions will be fully denominated in U.S. dollars and will have no foreign exchange risks.

(6) Limited Liquidity

Investments in the assets contemplated under the proposed investment program are designed to generate earnings and cash flow over extended periods of time. While these investments do not carry the liquidity of publicly-traded securities, they can be sold if necessary, although most likely at a discount to then-current book value. The economics of these investment structures typically drive most investors to continue to maintain the investments on their books through their scheduled terms. The proposed investment program contemplates holding these investments accordingly.

**Is anyone else doing these transactions?**

Leasing investment programs form an integral part of the earnings and investment profiles of a wide range of companies, including electric and gas utilities and holding companies such as Public Service Enterprise Group, Duquesne Light, Edison International, Southern Company, Cilcorp, and Southern Indiana Gas; telephone companies such as ATT, Nynex/Bell Atlantic, Ameritech, and US West; banks such as, Bank of New York, First Chicago, Nationsbank, Bank One, and First Chicago; various insurance companies, as well as industrial corporations such as Philip Morris, Pitney Bowes, Chrysler Corporation, Dana Corporation and General Electric.

**What are we requesting approval to do?**

Approval is requested to initiate a leasing investment program and to make such investments as are deemed reasonable by the Board of Directors of CED, within the capital allocations made to CED from time to time by the Board of Directors of the holding company.

One of the requirements the market imposes is that investors have a substantial net worth, in the order of $100 million. To provide for the necessary net worth requirement as well as to provide for funds to make the equity investments, management also requests that it be given the authority to make additional investments in CED sufficient to satisfy the net worth requirements.

# Exhibit E

Leasing White Paper
11-25-97

**Executive Summary**

One element of a diversified investment portfolio for Con Edison is the relatively low risk and attractive return profile of leases. This paper describes sale-leasebacks, identifies major risks and benefits, and details a recommended investment.

In general, m~~M~~anagement is seeking approval for the implementation of an investment program focusing on investments in sale-leasebacks and lease-leasebacks of domestic and international energy and infrastructure related facilities.

The initial focus of this initiative will be to invest in transactions in conjunction with experienced market participants, to concentrate on assets familiar to Con Edison and owned by utilities located in highly rated counties, to fully secure or ameliorate ~~defease~~ credit risks with U.S.Treasury bonds and letters of credit and to structure transactions in ways that will allow for strong tax opinions from top rated law firms.

Investments in these facilities will be accounted for as leveraged leases under ~~FASB 13~~ the applicable accounting standards, which will allow for front loaded earnings and the investments are anticipated to generate after tax yields of between 15% and 25% *[over the life of the investment?]*.

**What is a sale-leaseback?**

In its most basic form, (note comma added) a sale-leaseback is the purchase of an asset and the subsequent leaseback of that asset to the seller under a long term lease agreement. Under a so-called "leveraged lease" the investor uses non-recourse debt to reduce the equity needed to purchase the asset, ~~with the~~ resulting in ~~of~~ higher equity returns. Under a sale-leaseback the investor's (note, apostrophe added) return is derived from a combination of the excess of rental income over debt service (the "free cash flow") and the tax benefits that accrue to the investor from the depreciation deductions the investor takes on its ~~his~~ tax return.

Since the~~its~~ inception of leveraged leases in 1964, ~~the leveraged leasing market has continually~~ several types of lease arrangements have been developed ~~new variations on this basic theme~~ to accommodate increasingly complex tax laws and regulations. The latest ~~of these~~ variation~~s are~~ is the lease-leaseback structure~~s~~ in which an asset is leased (instead of purchased) and the leasehold

rights derived from that lease are then leased back to the initial owner of the facility.

Under the proposed lease investment~~ initiative~~, Con Edison intends to invest in both sale-leasebacks and lease-leasebacks depending on market conditions. ~~Because t~~The most probable transaction in the investment pipeline is a lease-leaseback, ~~we will use this type of structure in our example of a typical transaction.~~which is described in detail, below.

**How would a typical transaction work?**

In a typical lease-leaseback transaction, a special purpose subsidiary owned by Con Edison Development ("CED" *suggest CED or CEDI" a little confusing later on when you talk about "Con Edison Power Plant personnel]* ~~Con Edison~~") would establish a ~~Delaware~~ *[must it always be a Delaware trust?]* trust (the "Trust"). CED~~Con Edison~~ would invest equity in the Trust and the Trust would borrow non-recourse debt on the project. Concurrently the Trust would enter into an agreement with a ~~Dutch~~ *[this is a generic description so it doesn't have to refer to a "Dutch" utility]* utility (the"Utility") under which the Trust would lease a newly constructed power plant (the "Plant") from the Utility for 44 years*[is there a significance to 44 years?] [the "Headlease"]*. The Trust would, at the same time, lease back the Plant to the Utility for 20 years.

At the end of the initial 20-‑year lease the Utility would have the option to purchase the plant at a pre-agreed fixed price. If the Utility purchases the plant at that time the transaction is completed and no further obligations continue for either CED~~Con Edison~~ or the Utility.

If the Utility does not purchase the Plant at that time, the Trust may either (a) lease the Plant to a third party for the remaining 24 years of the Headlease, (b) use the Plant itself, or (c ) ~~force~~ require the Utility to re-lease the plant for an additional 17 years*[need to explain why it can't be leased for the full 24 years]*. Regardless of whether option (a), (b) or (c ) above is chosen the Trust will be required to return the Plant to the Utility at the end of year 44.

**What are the major risks in this type of transaction?**

(1) Utility Credit Risks

Perhaps the biggest risk to CED~~Con Edison~~'s equity is the risk that the Utility would~~will~~, for some reason, default on its obligation to pay rent when it is leasing back the plant. In order to ameliorate this risk the Trust ~~will~~ would require that the Utility's lease obligations to CED~~Con Edison~~ will be fully ~~defeased~~ secured

by a combination of U.S. Treasury [securities?]~~bonds~~ held by a trustee such as Wilmington Trust Company and by letters of credit issued by banks with S&P ratings of AA or above.

In the event the Utility fails to make the lease payments due, CED~~Con Edison~~ could~~can~~ use the Treasuries and the proceeds from the letter of credit to return its invested capital and protect its yield. In other words, CED~~Con Edison~~ would terminate the lease for default, and would recover all its invested capital plus its agreed return (needs more explanation...would it recover the return up to that date?)

I'd move US Tax Risk to 2nd place (as I've done below)

~~(2) Dutch Tax Law Risks~~

~~Another major risk implicit in the transaction is the risk that the tax laws or regulations of The Netherlands change in a way which would result in lower returns to the Trust or Con Edison. The transactions will be structured so that the risks associated with Dutch tax law changes will be fully borne by the Utility.~~

(~~3~~2) U.S. Tax Law Risks

Pending IRS regulations

Proposed Treasury Regulations under Section 467 (dealing with lease-in / lease out transactions) were promulgated on June 3, 1996 *[ is this two much detail can't we just say the following?]*~~with two effective dates (i) with respect to "disqualified leasebacks" or "long term agreements" the regulations are effective if such a lease agreement was entered into after June 3, 1996~~. ~~We have obtained written assurance~~ *[I wouldn't say written assurance they can't give an opinion in advance]* ~~from oOur tax counsel that it will provide us with a (do we know yet?) ________ opinion (__% probability) that our transaction will not be subject to stringent treatment under this case. (ii) with respect to other rental agreements subject to Section 467 of the Treasury Regulations t~~The regulations will become effective on the date the final 467 regulations will be published in the Federal Register. These regulations have, as of December 1, 19~~11-25-~~97 not been published in the Federal Register. If these Regulations were to apply to the proposed transaction, many (if not most) of the intended tax benefits of the transaction would be eliminated. Our tax counsel will provide us with a _______ opinion (___% probability) to the effect that if our transaction closes before the final regulations are promulgated that it will not be subject to retroactive treatment. [*Can we say something like this? I thought this was an important issue for some of the Board members]*

(a) Potential tax audits *[There is no B?]*

With respect to the major tax risks identified in the transaction, our by Tax Counsel has*[I doubt they've already provided opinions]*, it is anticipated that Tax Counsel will provided tax opinions which will ranginge from a Qualified Should Opinion (80-85% likelihood of success if challenged by the IRS) to Should Opinions (90-95% likelihood of success if challenged by the IRS). (Needs a sentence of explanation....what has our counsel actually said?) [Do these opinions go to the retroactivity issue or to other issues?]

The average likelihood of success if challenged by the IRS based on the average of the Opinions is anticipated to be 90%.

(3) Dutch Tax Law Risks

Another major risk implicit in the transaction is the risk that the tax laws or regulations of The Netherlands change in a way which would result in lower returns to the Trust or Con Edison. *[Will there be an opinion from Dutch counsel?]* The transactions will be structured so that the risks associated with Dutch tax law changes will be fully borne by the Utility.

(4) Country Risks

The plan for the proposed initial thrust of the proposed investment program is to invest only in developed and highly rated countries with fully developed legal and commercial dispute resolution systems. The initial proposed investment under the program will be in the Netherlands, (AAA rated by S&P). Other Ppotential downstream opportunities include transactions in Switzerland, Australia, Germany and the United States. The contemplated transactions are fully denominated in U.S. Dollars and are anticipated to carry neither foreign exchange transaction nor translation *[not sure I understand the difference]* risks.

**What are major benefits in this type of transaction?**

(1) Highly Predictable Earnings

The earnings from these transactions are highly predictable in that each of the inflows and outflows to the transaction are is contractually agreed to and fully determinable at closing.

(2) Front Loaded Earnings

Because the transactions will be afforded leveraged lease accounting under FASB 13 the earnings profile for these transactions are is "front loaded" and

hence they provide more earnings in the early years of the transaction than in the latter years of the transaction.

This front loading earnings profile is driven by a declining investment balance structure not unlike the return on assets structure historically afforded the depreciated basis on regulated utility property.

This front loading has the effect of providing earnings ~~"cover"~~that offset ~~for~~ the early year startup losses that are anticipated from other non-regulated businesses. The following is a graphic representation of the comparative front loaded nature of leasing earnings.




(3) Good to Excellent Investment Yields

After tax yields on leasing projects are anticipated to range from a good 15% to an excellent 25% depending on the structure, leverage and risk profile chosen.

(4) Limited Downside Economics

Because the high cost credit risks associated with non-payment by the Utility have been structurally ameliorated by the ~~defeasement~~ secured mechanisms the remaining risks primarily reside at the US Tax Audit level which have relatively moderate economic downsides The after tax yields on investment when taking full account of the various tax downside scenarios range from 10.4% to 2.4%, but as mentioned above, tax counsel affords the 2.4% return case as~~n~~ extremely low probability (    %) based on the treatment given other similar cases when tax regulations change. *[It isn't just the retroactivity issue is it, aren't there other tax risks?]*~~.~~

(5) Strategic ~~Groundcover~~ Value of Leasing

Participation in these transactions affords the CED~~Con Edison~~ the opportunity to more fully understand the legal, regulatory, commercial and tax environment of the countries in which the leased assets are located. This in-depth understanding can provide the basis for better informed decisions regarding potential investment and partnering opportunities as the utility infrastructures in these highly desirable and developed countries are opened to investment from external sources.

**Do we have a specific transaction in mind?**

Yes, we are currently pursuing the potential investment of $43 million in a recently commissioned gas fired combined cycle power plant (the "RoCa3 Plant" or "the Plant") located near Rotterdam in ~~T~~ the Netherlands. The Plant, owned by EZH, one of the four regulated generation utilities in ~~T~~ the Netherlands is currently undergoing engineering, environmental, and valuation reviews by our consultants, and has been recently been inspected by Con Edison power plant personnel.

We are pursuing the investment opportunity in conjunction with an experienced and knowledgeable lease investor, Bank One Leasing Inc. and have retained a preeminent *[Shouldn't we identify - and has S&S reviewed this?]* law firm for tax and legal advice, and the best engineering, financial valuation, lease advisory and environmental advisory firms in the market.

The transaction is anticipated to deliver over $5 million in earnings in 1998 and is anticipated to generate an after tax yield of 19.7%. [over the life of the investment?]

**Is anyone else doing these transactions?**

For years, l~~L~~easing investment programs have formed an important part of the investment and earnings profiles of a wide range of companies including electric and gas utilities such as: PSE&G, Duquense Light, Edison International, Southern Company, Cilcorp, and Southern Indiana Gas;~~,~~ telephone companies such as AT&T, Nynex/Bell Atlantic, Ameritech, and US West;~~,~~ banks such as~~,~~ Bank of New York, Bank of America, Bank One, First Chicago, and First Union;, various insurance companies and corporations such as Phillip Morris, General Electric, Chrysler, Pitney Bowes and Dana Corp.

**What are we requesting approval to do?**

Mention net worth issue ?

Approval is requested to initiate a leasing investment program and to make such leasing investments as are deemed reasonable by the management of Con Edison pursuant to the budgetary authority granted for unregulated investments. One of the requirements the market imposes is that investors have a substantial new worth, in the order of $100 million. To provide for the necessary net worth requirement as well as to provide for funds to make the equity investments, management also recommends that it be given the authority to make additional investments in CED sufficient to satisfy the net worth requirements. Any amounts invested in CED in excess of funds for particular transactions will be invested by CED at Con Edison's direction.

# Exhibit F

**Brian DePlautt**

**From:** Brian DePlautt
**Sent:** Friday, December 12, 1997 9:42 AM
**To:** 'McCartney, Mary Jane'
**Cc:** Charles Muoio
**Subject:** RE: Meeting with John Hancock Investment Officers

YES.

MONDAY HAS BEEN ESTABLISHED BY THE LAWYERS AND THE ADVISORS AS THE TENTATIVE "ACCELERATED CLOSE" TARGET DATE. SHEARMAN & STERLING HAS INDICATED THAT IT IS THEIR BELIEF THAT, IF THE REGS WERE TO BE RELEASED ON FRIDAY THEY WOULD NOT BE PUBLISHED IN THE FED REGISTER, AND HENCE EFFECTIVE, UNTIL MIDNIGHT MONDAY.

(1) WE ARE WORKING WITH TREASURY TO ARRANGE A $43 MM TRANSFER FOR MONDAY (2) WE HAVE BACK BURNERED GETTING THE AUDITED FINANCIALS AND WE ARE WORKING WITH THE LAWYERS AND ADVISORS TO, AS A RESULT OF THE ACCELERATED CLOSE TO REACH AGREEMENT ON DELIVERING AUDITED FINANCIALS AFTER THE CLOSING DATE

**From: McCartney, Mary Jane[SMTP:MCCARTNEYM@coned.com]**
Sent: Friday, December 12, 1997 8:39 AM
To: 'bdeplautt@gdi.inter-web.com'
Subject: FW: Meeting with John Hancock Investment Officers

Are you working with Treasury to expedite the transfer, audited financial statements, etc. to get this done?

\> -----Original Message-----
\> From: Irwin, Peter
\> Sent: Thursday, December 11, 1997 9:06 PM
\> To: McCartney, Mary Jane
\> Subject: RE: Meeting with John Hancock Investment Officers
\>
\> Mary Jane - I heard only late this afternoon that the tax regs may
\> come out on Monday and they are trying to see if they can close the
\> EZH lease this weekend. I assume you are up to speed on this
\> development?
\>
\> -----Original Message-----
\> From: McCartney, Mary Jane
\> Sent: Thursday, December 11, 1997 9:03 PM
\> To: 'Charles Muoio'
\> Cc: Burke, Kevin; Kinkel, Paul H.; Irwin, Peter
\> Subject: RE: Meeting with John Hancock Investment Officers





# Exhibit G

---

Date: November 20, 1997

To: Robert Stelben
Hyman Schoenblum

From: Brian DePlautt

Re: Consolidated Edison Development, Inc.
EZH Lease

---

The following is an update regarding certain accounting and tax aspects of the EZH transaction.

(1) Tax Risk Letter

Shearman & Sterling is finalizing the Tax Risk Letter, which will outline the major tax risks in the 467 structure, and hopes to have it to us by Thursday, November 20, or Friday November 21.

The critical path on this item is: (a): the completion and turnaround of the tax partner's final comments to the existing draft letter.

(2) Tax Change Letter

Shearman & Sterling is finalizing the Tax Change Letter, which will outline the retroactive or prospective nature of historical changes in leveraged lease tax regulations, and hopes to have it to us by Thursday, November 20, or Friday November 21.

The critical paths on this item are: (a) the completion of the legislative history research on one of the changes and (b) the completion and turnaround of the tax partner's comments to the existing draft letter.

Shearman has indicated that they would like to reserve the right to delay delivery to us of one of these two letters beyond the target delivery dates in the event they are required to fight fires on other fronts.

(3) Arthur Anderson Accounting Letter

Arthur Anderson ("AA") has prepared a draft accounting letter and is the process of drafting an added paragraph to the letter. The added paragraph is said to address what the accounting treatment would be, starting in year 21, in the event that EZH did not exercise its Fixed Purchase Option ("FPO") in year 20.

# Exhibit H

Date: November 21, 1997

To: Mary Jane McCartney

From: Brian DePlautt

Re: Consolidated Edison Development, Inc.
EZH Lease
Status Update

The following is the current status on some of the issues on the EZH Lease:

(1) Accounting

We anticipate receiving the latest draft of the Arthur Andersen accounting letter Monday morning and will distribute it to PW and internally when we receive it.

We have delivered written responses to all of PW's questions and are awaiting their questions.

We have requested Jim Dewey to contact Leo Naughton of PW. Leo is a former tax partner at Shearman & Sterling and employee of the US Treasury who is heading up a lease advisory business at PW which represents Lessors in 467 lease in / lease out transactions. Leo and his team recently make a proposals to CED to either: (a) represent lessors bringing 467 lease in / lease out transactions to CED to invest in, or (b) to provide CED with buy side lease advisory services in support of CED's pursuit of these transactions.

To the extent that Leo's group is actively involved on both the buy and sell side of these transactions it is possible that he may be able to provide some insight to the audit side of PW regarding the way in which the participants in the 467 lease market account for these transactions. Leo is awaiting Jims' call.

(2) Internal Legal

We have retained Con Edison's legal department to read the project documents and to help prepare the legal deliverables on the transaction such as Incumbency Certificates etc. The primary point of contact is Andrew Scher who was a tax specialist prior to joining Con Edison. We have delivered all of the available project agreements to him as well as the Project Briefing Memorandum.

(3) Tax History Letter

Shearman & Sterling has delivered their tax history letter to us which reviews the history of tax law and code changes relating to leveraged leases. The letter covers research for the period 1985 to the present and is available for distribution to any interested parties. We have distributed this letter to the Con Edison attorney who is helping us with Legal Services.

(4) Tax Risk Letter

Shearman & Sterling has delivered their tax risk letter to us and it is in conformance with the conversations and meetings we have had with them in the past. We have distributed this letter to the Con Edison attorney who is helping us with Legal Services.

cc: J. Freilich
R. Stelben
H. Schoenblum
C. Muoio

# Exhibit I

Date: November 21, 1997

To: Andrew Scher

From: Brian DePlautt

Re: Consolidated Edison Development, Inc.
EZH Transaction
Project Tax Information

---

Further to my telcon with Brian Cray in which you have been named as an attorney representing Consolidated Edison Development, Inc. please find enclosed the following documents:

(1) Shearman & Sterling Memo dated 11-20-97
Amendments to the Code and the Treasury Regulations
Impact on Leveraged lease Financing Transactions

(2) Shearman & Sterling Memo dated 11-20-97
Cross Border Equipment Leasing
Investor Tax Risks

**BECAUSE OF THE SENSITIVE NATURE OF THE INFORMATION CONTAINED IN THESE DOCUMENTS NEITHER DOCUMENT SHOULD BE DUPLICATED OR MADE REFERENCE TO IN ANY WRITTEN CORRESSPONDENCE WITHOUT MY EXPRESS WRITTEN PERMISSION AND BOTH DOCUMENTS SHOULD BE RETURNED TO ME BY 12-31-97.**

**BOTH OF THESE DOCUMENTS ARE CONFIDENTIAL & PRIVILEGED ATTORNEY-CLIENT COMMUNICATIONS.**

# Exhibit J

Date: November 18, 1997

To: Peter Irwin

From: Brian DePlautt

Re: CED
Legal Services Support

As you know CED is, at the direction of the CED Board of Directors, pursuing a potential investment in the EZH RoCa3 transaction in line with the CED Briefing Memorandum dated 10-23-97.

CED is actively involved in negotiating documents supporting this investment and in furtherance of this process CED will need to procure legal services to help satisfy the documentary requirements of the transaction (Incumbency Certificates etc) as well as to provide legal review of certain portions of the transaction documents for accuracy and appropriateness (CED Representations and Warranties etc).

While Shearman & Sterling have indicated a willingness to provide this "internal counsel" work it appears likely that we could significantly reduce our expenses and expedite the accomplishment of the work if we were able to complete some or all of these tasks using the resources of the Con Edison legal group. It is anticipated that CED would be charged for any legal services in a manner consistent with Con Edison's responsibility to protect the interests of its rate-payers.

Could I ask your help in identifying those internal resources in the Con Edison legal group for our review that might be able to be provide us with these services? Because of the tight deadlines that are anticipated for this transaction all of the potential candidates will have to be able to provide CED with up to 100% of their time on an absolute priority basis, if necessary, to the detriment of all other duties required by Con Edison for the entire period required by the transaction to close.

An outline line of the potential support services required is attached.

Thank you for your help on this and please contact me if you have any questions or problems.

cc: M.J. McCartney
J. Freilich
P. Kinkel
C. Muoio

# Exhibit K

Date: November 21, 1997

To: Andrew Scher

From: Brian DePlautt

Re: Consolidated Edison Development, Inc.
EZH Transaction

---

Further to my telcon with Brian Cray please find enclosed the following documents:

(1) Definitions
(2) Participation Agreement
(3) Sublease Agreement
(4) EZH Pledge and Security Agreement
(5) Custody Agreement
(6) Sublessee Pledge and Security Agreement
(7) Equity Defeasance Foundation Assumption Agreement
(8) Assignment for Security (Sublessor's Lease Interest
(9) Trust Agreement
(10) Project Briefing Memorandum dated 10-23-97

Please contact me if there are any questions or problems. Thank you.