# IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| CONSOLIDATED EDISON COMPANY OF NEW YORK, INC. & SUBSIDIARIES, | ) | |
| Plaintiff, | ) | Case. No. 06-305T |
| v. | ) | Hon. Marian Blank Horn |
| UNITED STATES, | ) | |
| Defendant. | ) | |

## PARTIES' JOINT STATUS REPORT IN RESPONSE TO THE COURT'S MAY 7, 2007 ORDER

The parties respectfully submit this Joint Status Report as directed by the fourth paragraph of the Court's Order dated May 7, 2007. The fourth paragraph directs that the Joint Status Report contain "a list which identifies, with specificity, what has been produced to defendant, what has not been produced, and whether there is a claim of privilege on the non-disclosed documents."

Counsel for the United States sent counsel for Plaintiff a list of general categories of information that the United States believes were not disclosed and a list of documents referencing information that the United States believes was requested but not disclosed in discovery. Counsel for Plaintiff provided the United States with a list of that Plaintiff believes to be all documents produced through its April 25, 2007, production and an updated privilege log.

Counsel for Plaintiff and counsel for the United States have conferred regarding their respective lists but have not reached an agreement regarding the completeness of Plaintiff's production. Discussions between counsel for Plaintiff and counsel for the United States are ongoing.

Below, this Joint Status Report identifies, by Interrogatory, the current status of discovery.

### 1. Interrogatory No. 2

*Interrogatory No. 2 states:* "Identify all other LILO transactions or shelter transactions presented to, considered, reviewed or analyzed by the Plaintiff in 1996, 1997 or 1998, and identify all documents in connection with your consideration, review or analysis."

*Plaintiff's Position*

Plaintiff previously has produced all available documents regarding LILO transactions which Plaintiff considered, but did not enter into, from 1996 through 1998. Plaintiff's understanding is that the court directed it to produce additional, nonprivileged documents related to the Nuon transaction, which Con Edison entered into in May 1999, approximately seventeen months after the Lease Transaction, and which is not at issue in this proceeding.

In response to the Court's Order, Plaintiff provided to its counsel approximately three boxes of documents related to the Nuon transaction, many of which were provided to the IRS during its administrative review of the Nuon transaction. These documents were provided to counsel for Plaintiff on May 11, 2007, in response to the Court's direction with respect to the Nuon transaction. Plaintiff has also collected files from key employees involved in the Nuon transaction. These documents are being reviewed by counsel for Plaintiff, and counsel believes that it will be able to produce responsive documents by May 21, 2007, along with a privilege log if a decision to claim privilege is made. In addition, counsel has located some additional documents related to the Nuon transaction in its database. Counsel believes that these documents, some of which will be duplicative of the documents contained in the three boxes, also will be produced by May 21, 2007.

Also in response to the Court's Order, Plaintiff provided to its counsel certain electronic files. Counsel for Plaintiff has also agreed, at the request of counsel for the United States, to search specific terms in electronic files regarding the Nuon transaction and produce responsive documents identified by those search terms. These documents will be produced as soon as practicable. Plaintiff's counsel believes that documents from these three sources (*i.e.*, the three boxes, the employee files, and the electronic database) will provide counsel for the United States with sufficient information regarding the Nuon transaction.

Until its review of the Nuon documents is complete, Plaintiff's counsel can not provide a list of all documents related to the Nuon transaction and/or identify those documents on which it may claim privilege. Plaintiff's counsel will provide both lists with its production on May 21, 2007. Interrogatory No. 2 is vague with respect to those documents requested after the date the Nuon transaction was entered into, and Plaintiff's counsel will provide all documents regarding the Nuon transaction in the sources identified above that would be responsive to Plaintiff's understanding of the United States' First Set of Interrogatories issued with respect to the EZH transaction at issue in this proceeding.

Plaintiff has provided, in response to the Order, a list of all documents which it believes have been produced to date, and an updated privilege log.[1] *See* Exhibit A and Exhibit B, respectively. The United States has attached, as referenced below, a list of documents received in the administrative process and/or from third parties which it believes Plaintiff should have produced in discovery. Plaintiff's counsel is still reviewing this list, but at least some of the

[1] The first part of the list, approximately 165 pages, identified documents provided on or before April 25, 2007. The second part of the list, approximately five pages, identified documents originally withheld or redacted under a claim of privilege and produced on May 15, 2007.

documents identified thereon have been produced in unredacted form. By way of example, PF003022-38 is an unredacted version of US02747-63, and PF008187-227 is an unredacted version of US08807-09. Contrary to the United States' allegations, both of these documents were produced in unredacted form in this litigation.

*United States' Position*

The Court ordered the parties to list, with specificity, what has not been produced, and whether there is a claim of privilege on the non-disclosed documents. In an effort to comply with that Order, the United States has attached as Exhibit C, a chart that describes and identifies documents it believes are in the Plaintiff's custody, possession, or control but which Plaintiff has not produced. Because the United States is unaware of the specific content of these documents, they may be responsive to more than one interrogatory. Moreover, since Plaintiff has not provided a complete listing of specific documents not produced to the United States, the documents identified in Exhibit C are not meant to be a complete listing of responsive documents Plaintiff may still have in its possession.

It is possible that some of the missing information is contained in the "approximately three boxes" gathered by Plaintiff's counsel after the May 4, 2007 hearing. Plaintiff has not identified which documents are privileged.

Because the documents, according to Plaintiff, will not be made available until May 21, 2007, the United States is unable to inform this Court, whether it believes the production is complete or will be complete before the taking of depositions and the close of discovery in this case.

It should also be noted that the Nuon documents provided to the IRS are not available to the Department of Justice, Tax Division because they are related to an ongoing audit. Moreover, given the large amount of responsive documents related to EZH that were either not provided during the audit of the EZH transaction or were heavily redacted, the United States is concerned that the production made to the IRS is not complete and/or contains redactions not appropriate to this litigation. *See* Chart of Redacted Documents attached as Exhibit C.

With regard to the electronic files, May 11, 2007, was the first time that the United States has heard of this issue. If there are documents (paper or electronic) responsive to any request, the United States is entitled to their immediate production.

**2. Interrogatory No. 3**

*Interrogatory No. 3 states*: "Describe how the rent obligation and various option prices described in paragraphs 63, 64, 68 and 69 of the Complaint were negotiated, calculated and allocated."

*Plaintiff's Position*

Plaintiff's response, dated November 2, 2006, and its supplements thereto, dated November 13 and December 21, 2006 (collectively, the "response"), identified a number of

factors in how these items were determined, including its yield and investment objectives, the useful life of the leased asset and the value of the asset obtained. The response referenced the terms of the bids and the assumptions of the bid. The response also referenced computer software which, after taking all constraints into account, optimizes the returns to each party. Plaintiff provided details on the program, called "ABC," and identified Robert Holzman as the individual who ran the program on behalf of Con Edison NY. The ABC software was not created by Con Edison NY or by Robert Holzman, but rather was and is a standard leasing software program available on a subscription basis to the leasing industry generally.

In an email dated May 9, 2007, the United States asked for "[s]ource documents underlying the rent obligations and various option prices described in the Complaint...." The United States affirmed that it had "the appraisal, by Deloitte, the environmental study by Tauw Milieu, and the engineering report by Duke Engineering."

Plaintiff can confirm that all documents in its possession reflecting the manner in which these amounts were calculated have been disclosed. Plaintiff is conducting a final review of its entire internal database, and, in the event any additional documents are located, will disclose those documents by May 21, 2007.

Although Plaintiff believes its prior response has been adequate and fully responsive, Plaintiff hereby supplements that response with the further description of how leasing pricing, and in particular the lease pricing in this transaction, was undertaken. Plaintiff believes that any further response to the question posed in Interrogatory No. 3 must be obtained by taking oral testimony.

The Leasing Transaction was priced, including the amounts of rent and the option prices, using the same variables as are present in virtually all leveraged leasing, and the process used was typical of leasing in general. In bid situations the pricing starts with the bid and response to and acceptance of the bid. This then constrains all that follows as the pricing must conform to the accepted bid.

Within the parameters of the bid and acceptance (*See* bid letters and responses/acceptances thereto [*e.g.*, PF006079-87]), additional variables are used to calculate actual rents and option prices and these depend on the same factors used for leasing in general. As these variables change or are confirmed, the calculations may change. These can be summarized as:

(1) asset quality and values, including closing date values, sufficient residual values, useful life, and satisfaction of various tests to ensure that the option prices are not less than expected asset values at the time of exercise, (*See* the Deloitte Appraisal [PF001530-1789], setting forth such matters as the value of the leased facility, the residual values of the facility at various points in time, and the useful life of the facility, and see also the Duke Engineering Report [PF001831-2103], concluding the estimated useful life of the facility and certain engineering matters contained therein),

(2) interest rates at the time of closing (*See* Interest Rate letters issued by Credit Suisse dated contemporaneously with the closing, setting forth their opinion for the proper market interest rates for various instruments issued at closing [*e.g.*, PF005880-89]),

(3) yield or return requirements of the investor (*See* Board Resolutions by Con Edison NY setting forth its yield requirements for entering into a leasing transaction [*e.g.*, PF003083, 3085-86]),

(4) any credit issues with the lessee (*See* Standard & Poor's credit rating letter on EZH [*e.g.*, PF000001, 6199]), and

(5) tax constraints laid down by decades of legal and IRS administrative precedent (such as the requirement for a certain residual value or expected useful life in order for the lease to be respected as such for US Federal income tax purposes).

All these variables are inputted into the ABC pricing software described previously and various pricing runs are made. These pricing runs then produce the actual rent figures and option prices which by reason of the design of the software program, satisfy each such constraint (*See, e.g.*, pricing run printout of the ABC software [PF008983-9190] which reflects all of the above).

*United States' Position*

As of this date, Plaintiff has certified that there are no further source documents or information related to the calculation, negotiation or allocation of the rent obligation and various option prices described in paragraphs 63, 64, 68 and 69 of its Complaint. The United States is not aware of information that contradicts this statement.

**3. Interrogatory No. 7**

*Interrogatory No. 7 states*: "Identify any studies, analyses, forecasts, projections or other due diligence performed or prepared by any individual or entity in connection with the Lease Transaction, including the individuals or entities that performed each study or analysis, and all documents that mentions [sic], describes [sic] or evidences [sic] such study or analysis."

*Plaintiff's Position*

Plaintiff has always understood Interrogatory No. 7 to request materials related to "due diligence" related to the Lease Transaction, including "studies, analyses, forecasts, projections…." Plaintiff interpreted the United States' specific reference to "*other* due diligence" to indicate that studies, analyses, forecasts, and projections were examples of the types of due diligence requested. (emphasis added). "Due diligence," by definition, is information considered in deciding whether to enter into a transaction. Plaintiff previously produced a significant volume of documents in response to Interrogatory No. 7. These documents were not limited to documents prepared before the Lease Transaction was consummated, but broadly included documents discussing the considerations underlying Plaintiff's decision to enter into the Lease Transaction, regardless of whether they were created before or after the Lease Transaction. Plaintiff did not, however, interpret Interrogatory No. 7 to

call for all post-transaction documents that, in any way, mention or reference, the Lease Transaction.

It is Plaintiff's position that, pursuant to the communications between the parties in response to the Court's Order, counsel for the United States has expanded the meaning of Interrogatory No. 7 to encompass "any studies, analyses, forecasts, [or] projections," regardless of whether these documents relate to "due diligence." Plaintiff, in an effort to fully cooperate with the requests by the United States and to resolve pending discovery disputes, has agreed to re-review all documents in its internal database and produce additional documents in the categories identified below, in response to the United States' expanded version of Interrogatory No. 7. Plaintiff believes that these documents are not responsive to the United States' original discovery request and is providing these documents only in response to the expansion of the United States' original request.

Based upon the re-review to date, the additional documents to be produced fall within the following general categories:

1. Any post-transaction communications with an outside consultant retained with respect to the Lease Transaction, regardless of the subject matter, including general correspondence;

2. Any "pricing runs" provided by Cornerstone, regardless of date or of issue;

3. Any post-transaction documents prepared internally by Plaintiff that could conceivably be considered a study, analysis, forecast, or projection; and

4. Any post-transaction communications with third parties referencing a review of the terms of the Lease Transaction, including yearly updates with respect to the letter of credit and annual reports and certifications received from EZH and its successor, EON Benelux.

Plaintiff believes that it will be able to complete this re-review and produce all additional documents by Monday, May 21, 2007. Plaintiff will verify its re-review and thereafter confirm that all responsive documents, including those falling within the expanded version of Interrogatory No. 7, have been produced. If, as part of its re-review, Plaintiff identifies additional documents for which claims of privilege will be made, a privilege log will be provided.

Plaintiff is concerned, however, regarding certain documents which counsel for the United States recently identified as documents missing from Plaintiff's response to Interrogatories. Plaintiff believes that many of the documents identified certainly do not constitute a study, analysis, forecast, or projection. Plaintiff has not interpreted Interrogatory No. 7 to request all post-transaction documents referencing or mentioning the Lease Transaction. Many of the documents identified on the United States' list, attached as Exhibit C, are post-transaction documents which include a reference to, but no analysis of, the Lease Transaction.

*United States' Position*

The United States has always intended for Interrogatory No. 7 to apply to all studies, analyses, forecasts, projections, or other due diligence related to the EZH LILO transaction, whether pre- or post-closing of the shelter transaction at issue here. Because the transaction is scheduled, according to Plaintiff, to continue for over twenty years, this information is certainly relevant to the bona fides of the transaction. As such, the United States has identified several documents generated after the transactions closing date that Plaintiff has not produced. See Exhibit C below. Plaintiff's response does not specifically identify additional responsive documents or whether it intends to assert any privileges with respect to any specific document.

Because the documents, according to Plaintiff, will not be made available until May 21, 2007, the United States is unable to inform this Court, whether it believes the production is complete or will be complete before the taking of depositions and the close of discovery in this case.

**4. Interrogatory No. 12**

*Interrogatory No. 12 states*: "If Plaintiff executed a tax indemnity agreement, set forth the terms of each such agreement, explaining the reasons for entering the agreement."

*Plaintiff's Position*

Plaintiff previously has provided all available, non-privileged documentation responsive to Interrogatory No. 12. Following its admitted waiver of the attorney-client privilege with Shearman & Sterling on certain specified topics, Plaintiff produced one additional document concerning Shearman & Sterling's review of the Tax Indemnity Agreement. [*See* CE007170-99.] This document, previously withheld as privileged, is the only document Plaintiff has been able to identify regarding Shearman & Sterling's review of the Tax Indemnity Agreement. The document was mistakenly identified on the privilege log as a one page document. The document, however, is not a legal opinion regarding the Tax Indemnity Agreement and is not responsive to the United States' request for materials explaining the reasons for entering into the agreement.

*United States' Position*

The United States is not aware of any additional information that contradicts Plaintiff's statements. Given that Plaintiff has certified, on numerous occasions, to both the United States and to the Court that there were no responsive documents to this request, the identification at this very late date of a Shearman Legal Opinion (which would also have been responsive to 7), which was never listed on a privilege log, raises a concern as to the existence of other similar documents.

**5. Interrogatory No. 14**

*Interrogatory No. 14 states*: "Identify all outside consultants you communicated with to locate potential international energy infrastructure investment opportunities (including energy facilities), including in your response the opportunities that were presented to you and all documents that you reviewed or were provided in connection therewith."

*Plaintiff's Position*

In response to Interrogatory No. 14, Plaintiff identified International Energy Partners (*see, e.g.*, PF004426-44) and provided materials with respect to its engagement of International Energy Partners to facilitate international infrastructure investments, primarily in South America. International Energy Partners is one example of the many outside consultants Plaintiff discussed international infrastructure investments with. Furthermore, Plaintiff has provided extensive materials from the 1996 through 1998 time period intended to provide the United States with an overview of the many international transactions that the Board considered. These documents included various Minutes of the Board of Trustees (*see, e.g.*, PF006382-85), business plans (*see, e.g.*, PF006438-89), reports to the Board of Trustees (*see, e.g.*, PF006295-300), and presentations to the Board of Trustees (*see e.g.*, PF004223-43) that identify or discuss other potential investment opportunities. In addition, Plaintiff has provided project listings that summarize the various projects considered by Con Edison Development in North America, Latin America & Caribbean, Europe and Asia (*see, e.g.*, PF006321-35).

In response to Interrogatory No. 2, Plaintiff previously produced all documents identifying advisors Plaintiff consulted regarding either the Lease Transaction or LILO transactions which Plaintiff considered but did not enter into. Included within Plaintiff's response were extensive material regarding Cornerstone, (*see, e.g.*, PF013064-81), the firm which advised Plaintiff on the Lease Transaction and certain other LILO transactions which Plaintiff considered but did not enter into. As discussed above, Plaintiff will provide the United States with documents related to Nuon transaction in response to Interrogatory No. 2.

Plaintiff understood the Court's oral ruling of May 7, 2007 to be agreeing that an additional production of information regarding advisors for the Nuon transaction would be a sufficient response to Interrogatory 14. The parties requested a transcript of the hearing to clarify their understanding the terms of the order. An excerpt of the transcript of the Court's ruling, received by the parties on May 16, 2007, is attached as Exhibit D.

Upon reviewing the transcript, Plaintiff's counsel concedes that the Court also ordered Plaintiff to produce documents which it "reviewed or were provided in connection" with its communications with advisors regarding international energy infrastructure investment opportunities. This production will require a significant effort by Plaintiff. Plaintiff has identified at least 33 potential transactions which fall within this broad definition for the 1996 and 1997 years only. (*See* PF006321-35.) It is unclear if the United States is requesting communications with outside consultants referencing these transactions or all documents referencing these transactions. Responding to either request is a tremendous undertaking, requiring Plaintiff to review all internal files, individual employee files, and electronic files for

any references to multiple transactions, many of which were not entered into and all of which are approximately 10 years old. Although it is difficult for Plaintiff to estimate the number of responsive documents, Plaintiff expects that its response would be tens of thousands of pages. The documents regarding the GENOR transaction in Guatemala, for example, likely match or outnumber the documents related to the Lease Transaction.

Plaintiff respectfully requests that the Court reconsider its order with respect to Interrogatory No. 14 in light of the significant burden and cost imposed. Plaintiff has in the past and continues to be willing to negotiate the scope of Interrogatory No. 14. Plaintiff has previously recommended that the United States select specific transactions, with respect to which it would provide key documents.

*United States' Position*

During the May 4, 2007, hearing, and consistent with the scope of Interrogatory No. 2, the Court narrowed this interrogatory to include only those transactions Plaintiff considered in 1996, 1997, or 1998. Plaintiff's response above acknowledges that responsive information exists. Plaintiff now acknowledges its obligations under the Court's Order, but has not indicated when any such search or production will take place.

**6. Interrogatory No. 16**

*Interrogatory No. 16 states*: "State the basis for your decision to form a trust to enter into the Lease Transaction."

*Plaintiff's Position*

Plaintiff provided a narrative response to Interrogatory No. 16.

Plaintiff has been unable to locate any responsive documentation.

*United States' Position*

The United States is not aware of any additional information that contradicts Plaintiff's statements that it has no documentation demonstrating the basis for its decision to form a trust to enter the Lease Transaction.

**7. "CE"-Denominated Documents**

*Plaintiff's Position*

In an email communication dated May 9, 2007, the United States referred to Bates Numbers bearing the prefix "CE" on all documents produced by Plaintiff and noted that, based upon productions by Plaintiff to date, there are ranges of CE-prefixed documents that have not been produced. In a telephone conference on May 11, 2007, counsel for Plaintiff explained that all documents received from Con Edison were marked with Bates Numbers bearing the prefix

"CE" and loaded into a database and a document is not necessarily responsive to discovery simply because it bears a CE prefix.

During the May 11 conference, counsel for United States requested that counsel for Plaintiff review all documents bearing the CE prefix which have not been produced and provide any additionally responsive material and/or affirm that there are no additional documents responsive to the United States' discovery requests. Pursuant to this request, counsel for Plaintiff is in the process of re-reviewing all documents with the CE prefix that were not previously provided. Plaintiff will provide, by May 21, 2007, all such documents. As of this Joint Status Report, Plaintiff has identified the following categories of documents, which will be produced after the review:

*Duplicates*. Pursuant to the request of counsel for the United States, Plaintiff will produce duplicates of responsive documents previously produced.

*Documents mistakenly not produced*. Plaintiff discovered as part of this review that it had mistakenly not produced a small number of documents that were responsive to the United States' discovery requests. To date, Plaintiff has identified only twelve such documents. Plaintiff will identify non-duplicate, responsive documents to the United States.

*Interrogatory No. 7*. As discussed above, Plaintiff has produced additional documents in response to Interrogatory No. 7, based upon the expanded definition of requested documents discussed above. This category combined with duplicates represents the majority of additional documents which will be produced.

*Nuon*. As discussed above, some documents related to Nuon were located among the CE documents.

Counsel for Plaintiff continues its re-review of the CE database, and it is possible that additional categories may be added.

Following completion of the production, counsel for Plaintiff will double-check the production to make sure that no responsive documents have been omitted. After so doing, counsel will affirm that no additional responsive documents are located in the CE database.

Plaintiff is taking all possible steps to respond to the United States' discovery, but it is under no obligation to produce all documents in its internal database which are not responsive. Most of the documents in the missing CE bates ranges identified by the United States are either responsive to the United States' expanded version of Interrogatory No. 7 or duplicates of documents previously produced. A representative sampling of such documents is attached as Exhibit E. Many of the documents identified on the United States' list of documents it believes it should have are not responsive to the expanded version of Interrogatory No. 7 or any other request set forth by the United States, and thus, Plaintiff was under no obligation to disclose such documents.

*United States' Position*

In an effort to resolve this issue in a timely fashion, the United States requested that Plaintiff turn over all missing CE documents. Plaintiff has not yet provided any of the missing CE documents and represents that it will some produce some by May 21, 2007, may produce others depending upon its review of the documents. The United States understands that this review may go well beyond May 21, 2007. The United States has identified, in Exhibit F, ranges of missing CE documents. If there are responsive documents to any discovery, then Plaintiff must immediately produce them.

**8. Electronic Discovery and sufficiency of the search for documents**

*United States' Position*

On May 15, 2007, Plaintiff delivered copies of two emails from Plaintiff's in-house counsel to employees at Plaintiff requesting that each current employee provide documents in their paper and computer files in response to IRS requests for information in connection with an audit of Plaintiff. These emails were sent in 2001 and 2005, prior to the initiation of this case. Plaintiff have been unable to advise us whether these previous searches are the entirety of its search for paper and electronic information in its possession that might be responsive to discovery. This raises several concerns with respect to the adequacy of Plaintiff's search in response to the United States' discovery requests. First, the 2001 email specifically states, with regard to the IRS's administrative requests for information about the transaction, that "[n]otwithstanding the broad language above, we interpret this request to be subject to the following limitations: (1) it applies only to an individual who is an officer, employee, or director of CED or CEL (as opposed to CEI or CECONY), and **who is still in the employ of the Con Edison corporate family . . . .**" (emph. added) This would mean that there is the very real potential that responsive documents have not been located because Plaintiff's search for documents and information did not include the numerous employees that have left Plaintiff prior to 2001 and 2005. In this case this gap is significant because the transaction closed in 1997 and Plaintiff acknowledges some of those employed in 1997 were not employed in later years. Further, based upon these emails, it appears that Plaintiff did not search their server during this search. Second, if the search was done several years prior to the United States' discovery requests, it is quite possible, and even likely that the scope of the search did not cover the information currently sought by the United States. What is even more troubling, is that the United States received a document from Plaintiff's accountant, Pricewaterhouse, which shows that Con Ed noted to its own auditors that a key aspect of its case was that "many of the personnel at CED involved in the transaction are no longer at the company." PWC0001477. Moreover, Plaintiff has maintained in this case that, "[i]t is impossible for current representatives of Con Edison to certify under oath what transactions were 'considered' or 'reviewed' by any employee of the company approximately ten years ago." Plaintiff's First Supplemental Response to Interrogatory No. 2. Therefore, the documents of former employees are even more crucial in the case.

Plaintiff must search these records and produce responsive documents from the electronic and paper files of both current and former employees and the United States is severely prejudiced by this lack of information.

*Plaintiff's Position*

Plaintiff provided the United States with the two internal document requests referenced above in an effort to provide full disclosure concerning its efforts to locate potentially responsive information. Plaintiff believes that its efforts were reasonable and have resulted in the collection of the vast majority, if not all, potentially responsive documents. The emails show that Plaintiff directed 33 employees on May 1, 2001 and 36 employees on November 14, 2005 to collect and forward materials pertaining to the Lease Transaction, including those employees' electronic documents. Plaintiff's internal production to date has totaled over 4,000 documents (over 26,000 pages), many of which were duplicates.

The United States has raised the concern that the search to date might not have produced files from potentially relevant employees who left Plaintiff's employ prior to 2001 and/or 2005. In an effort to address the United States' concerns, Plaintiff has volunteered to immediately re-review all steps it took to locate potentially responsive materials pertaining to the Lease Transaction and determine whether there have been any inadvertent failures to locate such materials. If any additional materials are located, Plaintiff will immediately review them for responsiveness to the United States' discovery and produce them. This re-review will encompass any potentially relevant employee with respect to Lease Transaction, regardless of the date that the employee left the company.

Plaintiff respectfully disagrees with the United States' interpretation of the cited document from Pricewaterhouse. The entire passage reads as follows:

> [Andrew Scher] reviewed the various forums for litigation and *the advantages and disadvantages* of being a test case. As to the specific elements of CED's case, [he] noted:
>
> i) "Strong business purpose" (both LILOs involve power plants)
>
> ii) A "good due diligence record" (personnel were sent over to the location of the plants to investigate prior to CED making the investment);
>
> iii) The "90-110" issue; (apparently some investors in LILOs did not take as aggressive a position as CED in applying section 467); and
>
> iv) "Personnel" (many of the personnel at CED involved in the transaction are no longer at the company). (Emphasis added).

Mr. Scher has represented to counsel for Plaintiff that the former two factors were advantages and the later two factors were disadvantages to it. The reference to this communication is a distraction to the main issue, that is the completeness of Plaintiff's discovery responses. Although Plaintiff believes that its response has been adequate, it will take all necessary steps to confirm its procedures and correct any deficiencies identified.

**Further Efforts by the Parties**

The parties are continuing to confer to resolve the issues identified above.

/s/ Thomas C. Durham
THOMAS C. DURHAM
Attorney of Record
MAYER, BROWN, ROWE & MAW LLP
71 South Wacker Dr.
Chicago, IL 60606
(312) 701-7216 (telephone)
(312) 706-9187 (facsimile)

THOMAS KITTLE-KAMP
MAYER, BROWN, ROWE & MAW LLP
71 South Wacker Dr.
Chicago, IL 60606
(312) 701-7028 (telephone)

DAVID ABBOTT
MAYER, BROWN, ROWE & MAW LLP
1675 Broadway
New York, NY 10019-5820
(212) 506-2642 (telephone)
*Attorneys for Plaintiffs*

/s/ David S. Geier
DAVID N. GEIER
Attorney of Record
U.S. Department of Justice, Tax Division
Court of Federal Claims Section
Post Office Box 26, Ben Franklin Station
Washington, DC 20044
(202) 616-3448 (telephone)
(202) 307-0054 (facsimile)

EILEEN J. O'CONNOR
Assistant Attorney General
DAVE GUSTAFSON
Chief, Court of Federal Claims Section

*Attorneys for Defendant*