# EXHIBIT

# 1

Watson, Farley & Williams

**Watson, Farley & Williams (New York) LLP**
100 Park Avenue
New York, New York 10017
Tel (212) 922 2200
Fax (212) 922 1512
Direct (212) 922 2205
Email smillman@wfw.com

Our reference: 22957.20000/19075667 v3

July 12, 2005

Con Edison Leasing, LLC
4 Irving Place
New York, NY 10003

Ladies and Gentlemen:

**Lease-In/Lease-Out Transaction--NUON**

## I. Purpose of this Letter

You have requested our opinion in connection with a transaction (the "**Transaction**") described below. The Transaction was consummated by Con Edison Leasing, LLC ("**Con Ed Leasing**" or "**Con Ed**") in 1999. You were represented in that transaction by the law firm of Shearman and Sterling, who provided an opinion to you as to the expected United States federal income tax consequences of the Transaction (the "**Shearman Tax Opinion**").

Since the closing of the Transaction, the Internal Revenue Service (the "**IRS**" ) has indicated to you its disagreement with your reporting of LILO transactions. In connection with the filing of your tax return for calendar year 2004, you have requested our review of the proper reporting of the Transaction. This letter describes our opinion of the proper reporting of the Transaction. This letter is based on the Internal Revenue Code of 1986, as amended (the "**Code**"), the regulations issued by the Treasury Department (the "**Regulations**"), judicial decisions and IRS rulings and pronouncements, in each case as they exist and are in effect on the date of this letter, all of which are subject to change, possibly with retroactive effect. This opinion is not binding on the IRS or the courts. There can be no assurances that the IRS will agree with this opinion, or that a court will not ultimately hold that conclusions different from those set forth herein should apply to the matters covered herein.

In preparing this opinion, we have examined and relied upon, with your consent, originals or copies, certified or otherwise identified to our satisfaction the documents set forth on Exhibit A to this letter (the "**Documents**"). Capitalized terms not defined in this letter have the meaning given to such terms in the Documents. Based on this examination, we understand the underlying facts to be as set forth below. In our examination of the Documents and any other materials referenced herein, we have assumed the genuineness of all signatures, the authenticity of all documents submitted to us as originals, and the conformity to original documents and to the specimens examined by us of all copies of documents submitted to us. We have also assumed that the Documents have not and will not be amended and that there are no agreements, understandings or arrangements relating to the execution of the Documents or the performance of any party's obligations under the Documents



Watson, Farley & Williams (New York) LLP is a limited liability partnership registered in England and Wales with registered number OC312253. It is regulated by the Law Society of England and Wales and its members are solicitors or registered foreign lawyers. A list of members of Watson, Farley & Williams (New York) LLP and their professional qualifications is open to inspection at the above address. Any reference to a 'partner' in relation to Watson, Farley & Williams (New York) LLP means a member, consultant or employee of Watson, Farley & Williams (New York) LLP.

Watson, Farley & Williams (New York) LLP or an affiliated undertaking has an office in each of the cities listed above.

except as contained in the Documents. We have assumed the accuracy of the English version of the Austrian Leases provided to us by you.

The analysis and conclusions set forth herein are based on:

- our review of the Documents and the other materials referenced herein, including without limitation the Appraisal (as defined below);
- our assumptions with respect to the Documents that (i) all opinions of counsel (other than the Shearman Tax Opinion) required by or issued in connection with the Documents were and are true and correct as of the date or dates as of which they were rendered, (ii) the Documents represent the valid and binding obligations of the respective parties thereto, enforceable in accordance with their respective terms, and constitute the entire agreement among the parties with respect to the subject matter thereof, (iii) all representations and warranties contained in the Documents were and are true and correct as of the date or dates to which they were made, and the parties thereto have complied and will comply with all of their respective representations, warranties, covenants, obligations and undertakings contained therein, and (iv) the transactions provided for in the Documents were and will be carried out in accordance with their terms, and that where any action or decision by any party requires the exercise of discretion, that such party's determination will be correct and in compliance with the relevant Document without regard to any standard of care imposed by such Document; and
- our review and analysis of such additional factual and other materials as we deemed appropriate, including but not limited to such legal authorities as we deemed applicable.

We also have reviewed and relied upon an analysis of such other documents, facts, records and matters of law (including, in particular, the Code, Treasury regulations, existing case law and published rulings and procedures of the IRS) as we have deemed relevant or necessary, and the accuracy of the opinions (other than the Shearman Tax Opinion) delivered in connection with the Transaction.

We acknowledge that Con Ed Leasing reports its U.S. federal income taxes on the consolidated return with Consolidated Edison, Inc. as the common parent.

This letter constitutes a "reliance opinion" as defined in section 10.35 of IRS Circular 230.

## II. <u>The Transaction</u>

CE 010371

### A. <u>Description</u>

Con Ed Leasing entered into a lease-in, lease-out ("**LILO**") transaction (the "**Transaction**") with NUON Gasnetwerken II B.V. ("**NUON**", the "**Lessor**" or the "**Sublessee**") on May 18, 1999 (the "**Closing Date**"). The property subject to the Transaction is a network of gas transportation pipelines, connecting stations, district stations, delivery stations and associated personal property and support properties, as set forth on Schedule 7(r) to the Participation Agreement (the "**Network**"). Con Ed contributed its equity investment to a trust (the "**Trust**", or as context requires, the "**Lessee**" or "**Sublessor**"), created by an agreement with Wilmington Trust Company, not in its individual capacity but solely as trustee, and the Trustee entered into the Transaction with NUON. The

investment in the Network is in the form of a lease between NUON as lessor (the "**Lessor**") and the Trustee as lessee (the "**Lessee**") (the "**Lease**") of an undivided interest in the Network (the "**Undivided Interest**") worth approximately $155,000,000, based on an independent appraisal, dated May 18, 1999 (the "**Appraisal**") given by Deloitte & Touche LLP (the "**Appraiser**"). Based on the Appraisal, the total useful economic life of the Network as of the Closing Date was 58 years. The Undivided Interest is approximately 41.44 percent of the value of the total property rights comprising the Network. Another equity investor entered into a LILO transaction with NUON with respect to the remaining undivided interest in the Network, also in the form of a lease of an undivided interest.

The basic transaction structure is as follows:

(1) N.V. NUON VNB ("**VNB**") and N.V. NUON VNB Beheer ("**VNB Beheer**"), each a public limited liability company incorporated under the laws of the Netherlands, and N.V. Nuon Energie-Onderneming Voor Gelderland, Friesland en Flevoland, leased the Network to NUON Gasnetwerken I B.V., NUON Gasnetwerken II B.V., and NUON Gasnetwerken III B.V. under a lease (the "**Existing Lease**"),
(2) Con Ed Leasing made an equity investment of approximately 34.24 percent of the cost of the Lease "Prepayment Amount" (as defined below) with respect to the Undivided Interest by way of contribution to the Trust,
(3) the Trustee borrowed the remaining 65.76 percent of the cost of the Lease "Prepayment Amount" (as defined below) with respect to the Undivided Interest from two German banks (the "**Loan**"),
(4) the Trustee leased the Undivided Interest from NUON pursuant to the Lease and paid a specified amount of Lease rent on the Closing Date (the "**Prepayment Amount**"),
(5) the Trustee leased its interest in the Network under the Lease (the "**Sublessor's Lease Interest**") to NUON as sublessee under the sublease between the Trustee and NUON (the "**Sublease**"), and
(6) the Sublessee entered into the arrangements described below under Sublessee's Collateral Arrangements".

*Austrian Lease*

Certain gas meter equipment that is related to the Network (the "**Austrian Equipment**") is subject to an Austrian law financing transaction that had been entered into by VNB on December 16, 1993--prior to the Transaction (the "**Austrian Lease**").[1] It is not clear whether or not the Austrian Equipment is in fact a part of the Network but, with your permission, we assume for purposes of this letter that such equipment is included in the Network. The lessor under the Austrian Lease, M&A Maschinen Anlagen Leasing GmbH, (the "**Austrian Lessor**") acquired title to several water meters and three gas meters for a total purchase price of 94,211,828.20 Austrian Schillings pursuant to a Supply Contract. VNB is the lessee under the Austrian Lease. The Austrian Lease expires with respect to one lot of gas meters on June 20, 2005 and with respect to the other two lots of gas meters on December 20, 2006. In addition, VNB and the Austrian Lessor each have the right to terminate the Austrian Lease in respect of all of the Austrian Equipment upon 30 days written notice to the

---

[1] Our description of the Austrian Lease is based on descriptions contained in the documents set forth in Exhibit A, as well as our review of 9 documents purporting to be the Austrian Leases, written in English. You have informed us that you are not able to determine whether the originals of these 9 documents were in German, and if so who prepared the translations. We note that the English versions may not be complete or represent all of the documentation relating to the Austrian Lease.

other party at the end of the 90th month after the beginning of the Austrian Lease (June 20, 2001) and every 6 months thereafter to the end of the Austrian Lease. VNB also has the right to terminate the Austrian Lease at any time that a bankruptcy proceeding is instituted upon the Austrian Lessor or a similar insolvency event occurs. The only event of default under the Austrian Lease is a failure of VNB to make payments due under the Austrian Lease for 30 days or more.

Pursuant to an Option Agreement, VNB has the right to purchase the Austrian Equipment in any circumstance where the Austrian Lease is terminating. The purchase price is 51,836,262.79 Austrian Schillings if the purchase happens on June 20, 2001. On any other date, the purchase price is an amount determined by an appraiser.

Pursuant to the Forfait Agreement, the Austrian Lessor sold the right to the Austrian Lease receivables to CSFB Investments B.V. ("**CSFB**") for 80,080,053.97 Austrian Schillings. VNB defeased its obligations under the Austrian Lease by paying CSFB 94,211,828.20 Austrian Schillings pursuant to the Assumption Agreement. Also pursuant to the Assumption Agreement, CSFB assumes VNB's obligation to pay rent under the Austrian Lease and purchase option price under the Option Agreement. VNB further agrees with CSFB to exercise its option to purchase the equipment under the Option Agreement and gives CSFB the right to exercise the option on behalf of VNB. CSFB therefore has purchased the right to the rent receivables under the Austrian Lease and has assumed the obligation to pay the Austrian Lease rent as of the initial closing of the Austrian Lease. We have not been informed as to whether VNB (or CSFB) did in fact exercise its right to terminate the Austrian Lease and buy the Austrian Equipment.

Furthermore, the Lessor makes the following representations in the Participation Agreement relating to the Austrian Lease:

- The Existing Lessor owns the Network, notwithstanding that the Existing Lessor is possibly, not the legal owner of all Parts of the Network, and VNB has access to the Network and the exclusive right to use, operate, possess and maintain the Network, subject to the Existing Lease, and VNB's exclusive right to use, operate, access and maintain the Network is not impaired by the absence of legal title to any part thereof. There is no reason, to the knowledge after due inquiry, of Gasnetwerken II why the Existing Lessor would not be capable of continuing to so own the Network for a period of at least 125% of the Lease Term, other than as the result of a dispossession as referenced in Section 7(x)(iii) hereof.

- No other person has claimed or claims ownership of the Network or any part thereof other than the lessor under the Austrian Lease.

- No responsible Officer of Gasnetwerken II or the Existing Lessor has Actual Knowledge of any Austrian Lease Event of Default or Austrian Lease Default as of the Closing Date after giving effect to the consummation of the transactions contemplated hereby. The execution of the Operative Documents, the exercise by each party thereto of its rights (subject to the limitations set forth in Section 15 of the Sublease) and the performance by each party thereto of its obligations thereunder, will not, at any time during the Lease Term, result in an Austrian Lease Default or Austrian Lease Event of Default. The documents constituting the Austrian Lease are enforceable against each party thereto in accordance with their terms except as limited by applicable bankruptcy, insolvency or other similar laws affecting

enforcement of creditors' rights generally and by general principle of equity ("Treu und Glauben").

- To the Actual Knowledge, after consultation with Dutch counsel, of the Existing Lessor and Gasnetwerken II no change in Applicable Dutch Law is pending or proposed which could affect the ability of the Existing Lessor or Gasnetwerken II to make the representations and warranties set forth in clause (A) and (B) hereof.

*Lease*

The Lease was entered into on the Closing Date and ends on October 12, 2045 (the "**Lease Termination Date**") with a term of 46.4 years. Lease rent is payable in two installments, the first installment was paid on the Closing Date and the remaining Lease Basic Rent is payable on the Lease Termination Date. The Lessee funded its payment of the Prepayment Amount with an equity contribution of $44,574,750.00 and borrowed the remaining $85,590,788.08 on a limited recourse basis from the Lenders under the Loan Agreement as described below under "The Loan Agreement."

The Lessee will pay the final Lease rent from three (3) sources--the Trustee Treasury Collateral, the Sublessee Loan, and the Lease Collateral Deposit, each of which is described below. The balance of the Sublessee Loan on the Lease Termination Date plus the amount in the Trustee Treasury Collateral plus the balance of the Lease Collateral Deposit are expected to equal the amount of the final Lease rent payment. In the Lease, the Lessor and the Lessee agreed that Lease rent is allocated in accordance with a schedule.

The Lessee is required to post collateral to secure its obligation to pay Lease rent if at the end of the sublease the sublessee does not elect to purchase the Trustee's interest under the Lease and the Trustee does not elect to renew the sublease as more fully described below. The Lease collateral consists of U.S. Treasury securities held pursuant to a custody agreement and subject to a security interest in favor of the Lessor under a pledge agreement (the "**Trustee Treasury Collateral**"). The principal amount at maturity of the Trustee Treasury Collateral must equal a scheduled amount necessary to pay Lease rent due on the Lease Termination Date.

At the end of the Lease, the Lessee is required to return the facility to the Lessor unless it elects one of its other end of Lease term options. At the end of the Sublease, the Lessee may cancel the Lease and surrender to the Lessor its interest in any sublease of the Network upon 10 days prior written notice to the Lessor but such a cancellation shall not relieve the Lessee of its obligation to pay Lease rent but shall excuse the Lessee from all of its other obligations under the Lease. In addition, upon the occurrence of certain events, namely the Base Sublease Termination Date, the Sublease Renewal Termination Date or the Lease Termination Date occurs, the Lessee elects to retain the Sublessor's Lease Interest at the end of the Sublease or a Sublessee event of default has occurred and is continuing, the Lessee is entitled to purchase the Lessor's interest in the Undivided Interest in the Network for its then fair market value.

If there is a Lessee or Lessor event of default under the Lease, or an event of loss, and the Sublease is not in effect (*i.e.* the Sublease has ended and the Sublessee has not purchased the Sublessor's Lease Interest), the sole remedy for either the Lessor or the Lessee is a "Sublessor's Lease Interest Transfer" to a "Designated Successor Lessee." If the Sublessee does not elect the purchase option

under the Sublease, NUON shall on or prior to the Base Sublease Termination Date give notice to the Investor and the Lessee appointing a person organized and existing under the laws of The Netherlands to act as successor lessee under the Lease (the "**Designated Successor Lessee**"). The Lessee would receive termination value in the case of the Lessor event of default or event of loss, and would transfer the Lease collateral to the Designated Successor Lessee who would assume the obligation to pay the Final Lease Rent Payment. We note that in any case where the Lessee wishes to retain and operate the Network, rather than lease it to a person other than the Sublessee, it has the option to purchase the Undivided Interest pursuant to its fair market value purchase option.

The Lessor covenanted and acknowledged that the parties intend to treat the Lease as a true lease for U.S. federal income tax purposes.

*The Loan Agreement*

The Lessee borrowed $42,795,394.04 from Landesbank Sachsen Girozentrale as lender (the "**Series A Lender**"), and the same amount from Landesbank Hessen-Thüringen Girozentrale as the second lender (the "**Series B. Lender**") for a total borrowing of $85,590,788.08 (or 65.76 percent of the total amount required to pay the Lease Prepayment amount)(the Series A loan and the Series B loan being collectively the "**Loan**"). The Loan Certificates have a stated maturity date of July 1, 2036, after the end of the Base Sublease Term, but at the end of a possible Sublease Renewal term. The interest rate on the Loan is 6.76% per annum.

For the first five years after the Closing Date, Con Ed Leasing was liable to the Lenders for amounts of principal and interest on the Loan Certificates up to an aggregate amount not to exceed an amount equal to 5% of the highest aggregate principal amount of the Loan Certificates outstanding at any time, provided that the Lenders have already exhausted all remedies and the Collateral.

*Sublease*

The Sublease commenced on the Closing Date and ends on January 2, 2023 (the "**Base Sublease Term**"). Sublease rent is allocated on a schedule to the Sublease (Exhibit B) and is payable annually on each January 2 during the Base Sublease Term.

The Sublessee borrowed the amount needed to fund its Sublease Basic Rent for the payments due on January 2 of 2003 through 2007, and a portion of the amount needed to fund its Sublease Basic Rent for the payment due on January 2, 2008, from the Trustee at a fixed rate of interest of 8.67% pursuant to the Sublessee Loan Agreement (the "**Sublessee Loan**"). The Sublessee Loan matures on October 12, 2045 (the Lease termination date). The Sublessee is required to make payments during the term of the Sublessee loan in accordance with a schedule. A large payment is due on the Sublease Termination Date and a balloon payment is due on the Lease Termination Date. This balloon payment will be used to pay a portion of the final Lease rent payment.

The Sublessee has various buyout options (1) a "Burdensome Buyout Right," (2) a right of "Voluntary Termination for Economic Obsolescence," (3) a "Special Purchase Option," and (4) at the end of the Sublease, a "Sublease Purchase Option." The Sublessee may exercise its Burdensome Buyout Right if a "Burdensome Buyout Event" occurs. The Burdensome Buyout Right is exercisable on 15 Business Days notice to the Sublessor, the Lender and the Investor (or such shorter period as necessary to avoid illegality) and is the sole remedy to the Sublessee as a result of a

Sublessor Event of Default (except that the Sublessee retains the right to make a claim for damages against the person at fault (either the Investor or the trustee of the Sublessor) other than a claim for the Sublessee's net present value benefit). A Burdensome Buyout Event occurs if a Sublessor Event of Default occurs and is continuing, it becomes illegal for the Sublessee to continue as the sublessee under the Sublease, or an event has occurred which in the opinion of Sublessee counsel is likely to give rise to an obligation on the Sublessee to make general tax or general indemnity payments or payments under the Tax Indemnity Agreement that would be avoided if the Sublease were terminated but only if the aggregate amount of avoided payments on a present value basis would exceed a specified amount. The Sublessee does not have the right to terminate the Sublease under the Burdensome Buyout Right if the Sublessee has intentionally caused a Burdensome Buyout Event for the purpose of enabling the Sublessee to exercise the Burdensome Buyout Right.

The Sublessee may exercise its Special Purchase Option if the Investor or any Affiliate thereof is acquired by or acquires, merges, or consolidates with. or purchases substantially all of the assets of a "Competitor" (as defined in the Participation Agreement) of NUON. The Sublessee must pay an amount equal to the higher of the then fair market value of the Sublessor's Lease Interest in the network or the termination value. In exchange, the Sublessor will terminate the Sublease and Sublessee will assume all of Sublessor's obligations under the Lease, including the obligation to pay any unpaid Lease Rent and Sublessor will transfer the Lease collateral to Sublessee.

Sublessee's Termination Options. The Sublessee may exercise its purchase option at the end of the Base Sublease Term (the "**Sublease Purchase Option**") by (1) assuming the Sublessor's obligations under the Lease, including Sublessor's obligation to pay Lease final basic rent, (2) paying the Sublease Purchase Option Price in cash or in a minimum cash amount and the rest by delivering the proceeds of the Equity Collateral free and clear of all Liens, and (3) paying any accrued but unpaid Sublease Basic Rent or supplemental rent. The Sublease Purchase Option Price is approximately $ 239,408,980.51 (154.45740678 percent of the original value of the Undivided Interest of $155,000,000.00). The Minimum Cash Amount would be approximately $114,752,009.13 ($155 million value of undivided interest times 74.03355428%).

Sublessor's End of Sublease Term Options. If the Sublessee does not elect to purchase the Sublessor's Lease Interest at the end of the Base Sublease Term, the Sublessor has the option to (1) cause the Sublessee to renew the Sublease for a term beginning on January 2, 2023 and ending on July 1, 2036, or (2) to cause the Sublessee to redeliver in place the Sublessor's Lease Interest. If the Sublease is renewed, the Loan Certificates will still be outstanding but the Lender has the right to reset the interest rate or transfer the Loan Certificates to another Lender. If the Sublessor elects to retain the Sublessor's Lease Interest, the Sublessor must arrange for payment in full of the principal amount of all the Loan Certificates on the Sublease Termination Date.

At the end of the Sublease, if the Sublessee has not exercised its Sublease Purchase Option, the Sublessee is required to arrange a Lease Collateral Deposit account, to provide a letter of credit that meets the requirements set forth in the Participation Agreement, and to make the payment required under the Sublessee Loan. If the Sublessor receives the letter of credit, it must release the Equity Deposit (described below), and if the Sublessee makes the payment under the Sublessee Loan, the Sublessor must use such amount to purchase U.S. government securities to post as collateral for its obligations to pay rent under the Lease.

*Sublessee's Collateral Arrangements*

Debt collateral. The Sublessee was required to use part of the Lease Prepayment Amount (an amount equal to the original principal amount of the Trustee's loan) to fund the required payments under two payment undertaking agreements, one with Landesbank Hessen-Thüringen Girozentrale (the "**Helaba PUA**"), and one with Landesbank Sachsen Girozentrale (the "**Sachsen PUA**")(each such bank being a "**Payment Undertaking Party**"). In exchange for the upfront payment by Sublessee, each Payment Undertaking Party promises to pay to the Trustee amounts equivalent to the Sublease rentals owed by Sublessee at the times when such Sublease rental is due. Each Payment Undertaking Party is not required to make any Sublease rental payments to the extent that such payments are made out of the Sublessee Loan. The Sublessee assigned each Payment Undertaking Agreement to the Trustee to secure its Sublease Obligations and the Trustee pledged its interest in the Helaba PUA to the Series A Lender and the Sachsen PUA to the Series B Lender. We have assumed, without investigation, that all of the above steps were accomplished properly.

Equity Collateral. A separate Dutch law foundation or stichting, "Stichting Nuonnet E-I" agreed to assume the obligation of Sublessee to pay Sublease Rent in exchange for the contribution by Sublessee to Stichting Nuonnet E-I of certain US Government securities to secure the equity portion of the Sublease rent (the "**Equity Payment Undertaking Agreement**").[2]

The documentation of the LILO make it clear that in no event was the Sublessee released from its obligation to pay Sublease rent, whether the debt portion or the equity portion thereof, as a consequence of entering into the Helaba PUA, the Sachsen PUA or the Equity Payment Undertaking Agreement.[3]

*Appraisal*

Con Ed obtained the Appraisal from the Appraiser. The Appraiser's analysis reached a number of conclusions, including an estimate of the fair market value and useful life of the Sublessor's Lease Interest, the Network and the Undivided Interest. The following are the conclusions of the Appraisal in full:

1. On the Closing Date, the Network is complete for its intended use and does not require any improvement, modification, addition or alteration in order to be rendered complete for its intended use. The Network, as designated, constructed and maintained, constitutes a fully integrated network and, when operated, is a fully integrated and self-contained unit. Each component of the Network is interrelated to the other components of the Network with respect to useful life, function and design and no such component is designed for, or intended for use in, commercial operation independent of the other components of the Network.
2. Upon the termination of the Lease, it is reasonable to expect that it will be economically and commercially feasible for the Lessor to operate the Network or to sell or lease the Network Undivided Interest to a person (other than the Investor or an

[2] The equity collateral arrangements in the NUON transaction are established pursuant to the Equity Payment Undertaking Agreement.

[3] See section 2.6 of the Helaba PUA, section 2.6 of the Sachsen PUA, and section 2.03 of the Equity Payment Undertaking Agreement.

Affiliate of the Investor) which could operate the Network on a commercially reasonable basis.

3. Upon the termination of the Sublease, it is reasonable to expect that it will be economically and commercially feasible for the Sublessor to operate the Network or to sell or lease the Undivided Interest to a person (other than the Sublessee or an Affiliate of the Sublessee) which could operate the Network on a commercially reasonable basis.
4. On the Closing Date, the Sublessor has sufficient rights to all support equipment, services and supplies (including, without limitation, access rights) which are necessary for the use and operation of the Network on a commercially reasonable basis during the Lease Term.
5. On the Closing Date, the fair market value of the Network is equal to US$374,078,000.
6. On the Closing Date, the fair market value of the Undivided Interest is equal to US$155,000,000.
7. On the Closing Date, the fair market value of the Sublessor's Lease Interest is equal to US$151,494,600.
8. On the Closing Date, the fair market value of the Sublessor's Lease Interest as a percent of the fair market value of the Undivided Interest is equal to 97.7 percent.
9. On each Sublessee Basic Rent Payment Date, the aggregate balance of the Loan Certificates will not exceed 90 percent of the expected fair market value of the Sublessor's Lease Interest taking into account the effects of inflation and deflation.
10. On the Lease Termination Date, the residual value of the Network is expected to be equal to US$108,064,800, which constitutes at least 20 percent of the fair market value of the Network as of the Closing Date, disregarding the effects of inflation and deflation.
11. On the Lease Termination Date, the residual value of the Undivided Interest is expected to be equal to US$44,782,100, which constitutes at least 20 percent of the fair market value of the Undivided Interest as of the Closing Date, disregarding the effects of inflation and deflation.
12. On the Lease Termination Date, the residual value of the Network is expected to be equal to US$331,085,000, taking into account the effects of inflation and deflation.
13. On the Sublease Renewal Term Termination Date, the residual value of the Sublessor's Lease Interest is expected to be equal to US$77,941,300, which constitutes at least 20 percent of the fair market value of such Sublessor's Lease Interest on the Closing Date, disregarding the effects of inflation and deflation.
14. On the Base Sublease Termination Date, the residual value of the Sublessor's Lease Interest is expected to be equal to US$221,879,300, taking into account the effects of inflation and deflation.
15. On the Closing Date, the estimated remaining useful life of the Network is equal to at least 58 years.
16. On the Lease Termination Date, the remaining useful life of the Network is expected to be equal to at least 11.6 years, which constitutes at least 20 percent of the Network's estimated remaining useful life as of the Closing Date.
17. On the Sublease Renewal Term Termination Date, the remaining useful life of the Sublessor's Lease Interest is expected to be equal to at least 9.3 years, which constitutes at least 20 percent of the Lease Term.

18. On the Base Sublease Termination Date, the remaining useful life of the Sublessor's Lease Interest is expected to be at least 22.8 years, which constitutes at least 49.1 percent of the Lease Term.
19. On the Base Sublease Termination Date, the Sublessee Purchase Option Price (taking into account the Sublessee's assumption of the Lessee's obligation to pay the Final Basic Rent Payment on the date due) is greater than 110 percent of the expected fair market value of the Sublessor's Lease Interest, taking into account the effects of inflation and deflation. Accordingly, the Sublessee will not be under any economic compulsion to exercise the Sublessee Purchase Option and it will be more likely for the Sublessee to return the Undivided Interest to the Sublessor than to exercise the Sublessee Purchase Option.
20. None of (i) the physical attributes of the Network, (ii) the applicable return conditions of the Sublease, (iii) the terms and conditions of the Sublease Renewal Term, (iv) the cost savings that the Sublessee could realize by purchasing the Sublessor's Lease Interest or (v) any other identifiable factor which came to our attention in the course of our appraisal, is expected to create a material inducement to the Sublessee to exercise the Sublessee Purchase Option.
21. As of the commencement of the Sublease Renewal Term, the present value of Sublease Renewal Term Basic Rent is not greater than 80 percent of the present value of the expected fair market rental value of the Sublessor's Lease Interest during the Sublease Renewal Term.
22. None of (i) the physical attributes of the Network, (ii) the cost of arranging a new sublease (which we have determined to be 2 percent of the fair market value of the Sublessor's Lease Interest on the Base Sublease Termination Date) with an entity which is not an Affiliate of the Sublessee, (iii) the ability of the Sublessor to lease the Undivided Interest to a new sublessee, or (iv) any other identifiable factor which came to our attention in the course of our appraisal is expected to create a material inducement to the Sublessor to exercise the Sublease Renewal Option. Accordingly, it is reasonable to conclude that the Sublessor is more likely to arrange for a new sublease than to exercise the Sublease Renewal Option.
23. The payments of Lease Basic Rent represent fair market payment for the lease of the Undivided Interest pursuant to the Lease.
24. Taking into account (i) the Final Basic Rent Payment, (ii) the time at which such Final Basic Rent Payment is due and payable, (iii) Sublease Renewal Term Basic Rent, if any, (iv) the reasonably expected fair market rent from a new sublease, in the event the Undivided Interest is leased to a new sublessee after the termination of the Sublease, (v) the Lessee's collateralization obligations with respect to the Final Basic Rent Payment, and (vi) the expected fair market value of the Sublessor's Lease Interest it is likely that the Final Basic Rent Payment will be paid in full when due.
25. There is no identifiable factor that came to our attention during the course of our appraisal that creates a material inducement to the Investor, the Lessor, the Lessee, the Sublessor or the Sublessee to disregard the provisions of the Operative Documents in a manner which would preclude the Sublessor from operating the Network or leasing the Undivided Interest in accordance with the terms of the Operative Documents.
26. Based on the schedules provided by the Investor showing expected pretax inflows and outflows, we calculated a pretax internal rate of return of 4.3 percent if the Sublessee exercises the Sublessee Purchase Option, 6.8 percent if the Sublessor exercises the

Sublease Renewal Option or 7.6 percent if the Sublessor enters into a new sublease, in each case taking into account Transaction Expenses.

B. Investor's Tax Characterization

It is our understanding that the Investor has treated the transaction for tax purposes as follows:

- The Lease is a lease from the Lessor to the Lessee. The stated rental under the Lease is to be deducted in accordance with the allocation schedule set forth in the Lease.
- The Sublease is a lease from Lessee to Sublessee. The stated rentals under the Sublease are included in income as allocated in the Sublease.
- The stated interest under the Sublessee Loan is included in income as accrued.
- The Loan represents valid indebtedness of the Trust and the Investor is entitled to interest expense deductions with respect to the Loan under Section 163 of the Code.

## III. Conclusions

You have requested our opinion respecting the proper United States federal income tax reporting of the Lease and Sublease. Based on the reasoning set forth below, it is our opinion that:

A. True Lease

The Lease should be treated as a lease from the Lessor to the Lessee for U.S. federal income tax purposes and the Sublease should be treated as a lease from Lessee to Sublessee. As a consequence of this treatment, the rental under the Lease should be deducted by you and the rental under the Sublease should be included in income by you.

B. The Loan

The Loan constitutes a debt obligation of the Trust and amount of interest payable thereunder is deductible by Con Ed when accrued in accordance with the terms thereof, pursuant to Section 163 of the Code and the regulations thereunder.

C. Code Section 467--the Lease

Rentals under the Lease should be deductible in the amounts and in the periods to which such rentals relate as set forth in the Lease.

D. Code Section 467--the Sublease and Sublessee Loan

Rentals under the Sublease should be included in income in the amounts and in the periods to which such rental relates as set forth in the Sublease.[4] We are also of the view that the interest on the Sublessee Loan should be reported as accrued.

* * * * *

This letter is solely for your benefit. We express no opinion as to any matters other than those opinions expressly provided herein. The opinion may not be relied upon by any other person, quoted, reproduced in whole or in part or otherwise used without our express written consent.

No opinion is expressed as to any United States federal income tax or other consequences of the Transaction except as expressly set forth above, and no opinion is expressed as to any transactions either not consummated in accordance with the terms of, or otherwise not contemplated by, the Documents.

The foregoing represents our view as to what a court of law, presented with all material facts fully disclosed and properly presented and the law fully and properly briefed, would conclude under law existing as of the date of this letter regarding the United States federal income tax treatment of the Transaction. Our opinion is not a guarantee of such tax consequences or the outcome of any administrative proceeding or litigation and there can be no guarantee that the IRS will not take a contrary position to our opinion or that a court considering the issues presented by the Transaction would not come to a holding contrary to our opinion.

The foregoing opinions are predicated upon the facts, assumptions and understandings specified herein or set forth in the Documents and upon the Code, the existing Treasury regulations promulgated thereunder (or the lack thereof), and the existing administrative and judicial interpretations of the Code and of such regulations, all as in effect on the date hereof. No assurances can be given that any of the foregoing authorities will not be modified, revoked, supplemented, revised, reversed or overruled, or that any such modification, revocation, supplementation, revision, reversal or overruling will not adversely affect the tax consequences of the Transaction to Con Ed Leasing. The opinion set forth herein above represents conclusions based upon the Documents, facts, assumptions and representations referred to herein and in the Documents, and any changes, amendments or inaccuracy of any of the foregoing could affect the opinions given herein. Although we have made such inquiries and performed such investigation as appropriate as your special United States federal income tax counsel in connection with a review of the Transaction, we have not undertaken an independent investigation of all the facts referred to herein.

We undertake no responsibility to update or supplement this opinion. This opinion is issued solely to Con Ed Leasing. and may not be relied upon by any person or entity other than the addressee of this letter without our express written consent.

---

[4] As discussed below, the strength of this conclusion is partly based on the fact that the IRS has not determined the Sublease to be a disqualified leaseback or long term agreement within the meaning of the Section 467 regulations. Also as noted in the discussion below, we are of the view that the taxpayer is more likely than not to prevail on the issue of whether the rents under the Sublease should be reported as set forth in the Lease even if the IRS were to determine that the Sublease is a disqualified leaseback or long term agreement.

## IV. Analysis

### A. True Lease

#### 1. Framework of the Analysis

We have first examined the Lease and Sublease separately and determined that each one—looked at individually—would properly be treated as a lease for U.S. federal income tax purposes. We have then examined whether the overall structure should cause the separate components of the transaction to be disregarded. We have factored into this analysis the contentions made by the IRS.

The remainder of this section discussed the standards for analyzing whether a lease should be respected as a true lease at some length. These standards are then applied in the next two sections to the Lease and the Sublease separately. Finally, we review the arguments that the Lease and Sublease, taken together, should be treated differently than if the two were unrelated transactions.

##### a. Overview

A transaction purporting to be a lease may be characterized as a lease, a loan, a conditional sale or some other financing arrangement for United States federal income tax purposes.[5] If a lease is not treated as a "true lease," but instead as a conditional sale or a loan, the rental payments would be regarded as either installment payments of the purchase price for the property or as principal and interest on a loan. In the case of a leveraged lease, where the lessor borrows a substantial part of the cost of acquiring the leased property, the lender also could be viewed as having an equity interest in the transaction.

The true lease analysis is aimed at determining whether a purported lease transaction will be respected as a lease for United States federal income tax purposes. Generally, the form of a transaction chosen by the parties will be respected if it is consistent with the legal effects of the transaction.[6] Thus, a lessor must retain significant and genuine attributes of a traditional lessor to be respected as such, but once having done so, the transaction is deemed to be a lease unless other factors can be shown to demonstrate that it is not.

There is virtually no statutory or regulatory authority for determining whether a transaction is a true lease. In the absence of controlling statutory authority, tax advisers must look to pronouncements of the IRS and to case law. The IRS has issued some published rulings regarding lease characterization and has established certain guidelines to distinguish leases from other transactions for advance ruling purposes. There is a substantial body of case law on lease characterization issues.

##### b. IRS Guidelines and Related Case Law

CE 010382

---

[5] *See* Elise I. Strauss, "U.S. Federal Income Tax Considerations in Leasing Transactions," in *Equipment Leasing* 79, 85 (Ian Shrank & Elise I. Strauss eds., (PLI) 1995).

[6] *Mukerji v. Com'r*, 87 T.C. 926, 958 (1986); *Rice's Toyota World v. Com'r*, 81 T.C. 184, 196 (1983), *aff'd in part, rev'd in part*, 752 F.2d 89 (4th Cir. 1985).

Revenue Procedure 2001-28 (the "**Guidelines**"), sets forth the criteria that the IRS will use to determine whether a "leveraged lease" (*i.e.*, a lease where the lessor borrows a substantial amount of the funds necessary to acquire the property to be leased) is, in fact, a true leases for purposes of issuing an advance ruling. The Guidelines supersede a group of earlier revenue procedures, Revenue Procedure 75-21, 1975-1 C.B. 715, as supplemented by Revenue Procedure 75-28, 1975-1 C.B. 752; Revenue Procedure 76-30, 1975-2 C.B. 647 and Revenue Procedure 79-48, 1979-2 C.B. 529 (the "**Old Guidelines**"). The present Guidelines and the Old Guidelines are substantially identical—the new formulation consolidates the advice and makes some changes to reflect changes in statute (such as Section 467) that relate to lease reporting but do not affect the basic "true lease" safe harbor.

It is important to note, however, that the Guidelines provide a framework within which the IRS will issue rulings, but do not purport to state substantive law:

> These guidelines do not define, as a matter of law, whether a transaction is or is not a lease for United States Federal income tax purposes and are not intended to be used for audit purposes.[7]

Although the Guidelines only provide a "safe harbor" (and the Guidelines expressly state that if they are not satisfied "the IRS nevertheless will consider ruling in appropriate cases on the basis of all the facts and circumstances[8]), they are useful for determining whether a leveraged lease will be treated as a true lease.

The IRS states that it will consider a contract to be a lease for income tax purposes under this safe harbor if all of the following conditions are met:

(1) ("**At-Risk**") the lessor makes and maintains throughout the Term a minimum unconditional "at risk" investment;

(2) ("**Residual Life and Value**") the lessor must demonstrate that the property is expected to have as of the end of the Term, including renewal terms, a residual value equal to 20 percent of the original cost and a remaining economic useful life equal to 20 percent of its originally estimated useful life;

(3) ("**No Bargain Purchase**") the lessee has no right to purchase the property for a price less than fair market value and the lessor has no right to cause another party to purchase the property;

(4) ("**No Lessee Investment**") the lessee may not furnish any part of the cost of the property, including certain improvements to the property;

---

[7] Rev. Proc. 2001-28, section 3.00.

[8] Rev. Proc. 2001-28, section 4.00. *See* Priv. Ltr. Rul. 8232001 (August 31, 1981).

CE 010383

(5) (**"No Lessee Guarantee"**) the lessee may not lend or guarantee any part of the acquisition indebtedness of the lessor; and

(6) (**"Expected Profit"**) the lessor must expect to receive a profit on the transaction, without taking into account the expected tax benefits.[9]

In addition, the IRS will consider whether the leased property is usable by the lessor or some other person at the end of the Term other than for purposes of continued leasing or transfer to the lessee (*i.e.*, whether it is "limited use property").[10]

c. Detailed Discussion of True Lease Characteristics

Based on the Guidelines, the following discussion describes the various factors that are used by the IRS and by courts to determine whether a transaction should be characterized as a lease or as a loan, a sale, or some other type of arrangement.

(1) Minimum Unconditional At-Risk Investment

Under Revenue Procedure 2001-28, the lessor must maintain a minimum unconditional "at-risk" investment in the leased property. In order to meet this requirement, the lessor:

- must have a minimum unconditional "at risk" equity investment in the property at the commencement of the Term of 20 percent of the cost of the property,
- must maintain the minimum investment throughout the term of the lease, and
- must have a residual interest at the end of the Term.[11]

The objective of the equity investment requirement is to ensure that the lessor has a meaningful amount subject to loss or downside risk, because in a typical leveraged lease the acquisition indebtedness is nonrecourse to the lessor.

When the property is first placed in service, the minimum investment of 20 percent must be an "equity investment." An equity investment includes consideration paid and personal liability incurred by the lessor for acquisition of the property. Recourse debt is only included in the equity investment if the net worth of the lessor is sufficient to satisfy any personal liability, and nonrecourse debt is not included. In addition, the minimum investment must be "unconditional," which means that the lessor must not be entitled to a return of that investment from the lessee or any of its affiliates after the property is first placed in service or use by the lessee.[12] For example, an exceptionally large prepayment of rent may be considered a prohibited return of the lessor's investment. Lease provisions that require the lessee to pay a certain amount to the lessor upon the occurrence of a casualty, default, or other termination event (*i.e.*, payments of stipulated loss value) generally would

---

[9] Rev. Proc. 2001-28, sections 4.01-4.06.

[10] Rev. Proc 2001-28, section 5.02.

[11] Rev. Proc. 2001-28, section 4.01.

[12] Rev. Proc. 2001-28, Section 4.01.

not be considered a lessee return of the lessor's initial investment.[13] Burdensome buyout payments made at the option of the lessee should not be considered to be a prohibited return of a lessor's investment because such payments are solely at the option of the lessee.[14]

The Guidelines provide that, in order to maintain the minimum required investment throughout the Term, the "the excess of the cumulative payments required to have been paid by the lessee to or for the lessor over the cumulative disbursements required to have been paid by or for the lessor in connection with the ownership of the property must never exceed the sum of (i) any excess of the lessor's initial equity investment over 20 percent of the cost of the property plus (ii) the cumulative pro rata portion of the projected profit from the transaction (exclusive of tax benefits)."[15] In other words, the excess of rent and other payments by the lessee to the lessor over payments made by the lessor, such as loan payments, may not exceed the sum of the amount of the lessor's investment in excess of the minimum requirement and the pro rata projected non-tax profit from the transaction. This requirement will be satisfied in part if the estimated residual value of the property at the end of the Term is equal to at least 20 percent of the cost of the property, but the Guidelines also require that the lessor's non-tax profit be returned ratably over the Term and the minimum initial investment be returned only at the end of the Term. This requirement is difficult to meet unless rent payments and debt amortization are fairly even; however, this requirement of a continuing level of investment and ratable profit realization has not been adopted by courts. The third prong of the minimum unconditional at-risk investment requirement will be discussed below under "Residual Value and Residual Useful Life."

The significance of an equity investment in property to a determination that an equity investor is a lessor for United States Federal income tax purposes is deeply rooted in the tax law.[16] A taxpayer without an equity interest in the property may have no ownership interest, but may have merely purchased a package of tax benefits.[17] Courts have, however, often sustained transactions as valid leases in cases where the equity investment was less than the 20 percent required for an advance ruling.[18]

(2) Residual Value and Useful Life

In order for a lessor to be considered the tax owner of leased property, case law and the Guidelines require the property to have a substantial useful life and residual value at the end of the Term. Otherwise, the lessor may be deemed to have transferred its entire interest in the property to the lessee. In order to meet the requirement in the Guidelines that the lessor have a residual interest at the end of the Term, the lessor must demonstrate that a reasonable estimate of the fair market value

---

13 *See* Priv. Ltr. Rul. 7847053 (Aug. 21, 1978); Priv. Ltr. Rul. 7830135 (Apr. 28, 1978) (no impermissible return of investment where lessor entitled to termination payment if it becomes subject to burdensome regulatory regime when no such regulations applied at the time of the transaction). *But see Hilton v. Com'r*, 74 T.C. 305, 358 (1980) (lessor's entitlement to condemnation proceeds considered in determining whether the lessor was tax owner of property).

14 *See* William A. Macan IV & Richard L. Umbrecht, "Tax Aspects of Equipment Leasing," in EQUIPMENT LEASING-LEVERAGED LEASING 313, 319 (Bruce E. Fritch et al. eds., 1988).

15 Rev. Proc. 2001-28, Section 4.01(2).

16 *Frank Lyon*, 435 U.S. at 585; *Rice's Toyota World*, 81 T.C. at 196.

17 *Goldwasser*, 56 T.C.M. at 614.

18 *See Frank Lyon*, 435 U.S. at 585 (6% equity); *Mukerji*, 87 T.C. at 967-68 (16.5% equity); *Estate of Thomas*, 84 T.C. at 440 n.51 (13% equity); *B&A Distributing*, 56 T.C.M. 959 (1% cash at commencement of lease, up to 16% equity within the first year).

of the property at the end of the Term is equal to at least 20 percent of the original cost of the property without accounting for inflation. In addition, the longer of one year or 20 percent of the original useful life of the property must be a reasonable estimate of the remaining useful life of the property at the end of the Term. For purposes of applying the Guidelines, the Term includes all renewal or extension terms except renewals or extensions at the option of the lessee at fair rental value at the time of such renewal or extension.

(i) Residual Value

The Tax Court has recognized that residual value is particularly important for determining the true lease status of a transaction.[19] In *Goldwasser*, the Tax Court stated that, due to the nature of computer leasing, parties seldom, if ever, realize positive cash flow during the Term, but rely on the expected residual value to make a profit.[20] The Tax Court in that case found that the transaction was a "sham," because the contingent rent payments necessary to make the transaction profitable would not occur until after the end of the useful lives of the equipment.[21]

In one particularly pro-taxpayer decision, the Seventh Circuit sustained a lessor-lessee /sublessor-sublessee relationship where the taxpayer (lessee/sublessor) had little residual interest or profit expectations beyond an investment tax credit that it received under the lease.[22] The court considered the treatment of three different transactions containing the following terms: (1) a sixty-month lease and a sixty-month sublease at the same stated rent; (2) a sixty-month lease and a forty-eight-month sublease at the same stated rent; and (3) a sixty-month lease and a sixty-month sublease with nominally higher rent due under the sublease. An important factor was that the taxpayer retained an obligation to pay rent under the lease in the event of default by the sublessees.[23] Thus, where even a minimal residual value or incremental rent exists after the expiration of the lease/sublease, a taxpayer may expect that the courts will respect the form of the transaction.

Unlike the Guidelines, the case law has no bright line test for the amount of residual value that must remain in leased property at the expiration of the lease. Many leasing transactions have been sustained as such with estimated residual values of less than 20 percent.[24] Case law has permitted the value of leased property at the end of the Term to be as little as 10 percent of the original cost of the leased property without characterizing the transaction as a sale.[25] This is significantly lower than the Guidelines' requirement that 20 percent of original cost (computed without regard to inflation or deflation) remain at the end of the Term. The analysis with respect to residual value is based on the status of the economy and the market at the time the transaction is consummated.[26]

---

19 *Rice's Toyota World*, 81 T.C. at 202; *Goldwasser*, 56 T.C.M. at 614; *B&A Distributing*, 56 T.C.M. at 961.

20 56 T.C.M. at 613.

21 *Id.* at 614. *See Gralnek v. Com'r*, 57 T.C.M. (CCH) 1313 (1989) (leases respected because projected residual values were sufficient to provide a reasonable profit).

22 *Comdisco, Inc. v. U.S.*, 756 F.2d 569, 578 (7th Cir. 1985).

23 *Id.* at 575.

24 *See Levy*. 91 T.C. at 858 (10% to 20%); *Mukerji*, 87 T.C. at 931 (10% to 20%); *B&A Distributing*, 56 T.C.M. at 959 (10% to 20%); *Northwest Acceptance Corp.*, 58 T.C. at 839 (80% of leases had 10% residual); *Lockhart Leasing Co.*, 54 T.C. 301, 306 (1970) (10% average residual for leases).

25 *LTV Corp. v. Com'r*, 63 T.C. 39, 50 (1974); *L.W. Hardy Co., Inc. v. Com'r*, 52 T.C.M. (CCH) 1540 (1987). *See also* Priv. Ltr. Rul. 7511201000A (Nov. 20 1975).

26 *Levy*, 91 T.C. at 858; *Mukerji*, 87 T C at 964-65.

(ii) Useful Life

An examination of the policy underlying the limit on the duration of a Term in determining true lease status is helpful to understand how "useful life" should be measured. It has long been held that a lease transaction that conveys property to a lessee for the property's entire economic useful life will be treated as a conveyance rather than as a lease.[27] Where the leased property has little or no residual life at the end of a Term, the lessor effectively parted with his entire interest in the property when he entered into the lease. Even though the lessor receives a fixed stream of payments denominated as "rent," such payments are, in reality, installment payments of the purchase price on a sale rather than "rent."

As discussed above, case law does not appear to deal directly with useful life in determining whether a putative lessor has retained sufficient benefits and burdens of ownership. Nevertheless, the Guidelines require that leased property have an anticipated useful life at the end of the Term equal to the greater of 20 percent of its original useful life or one year. At first blush, that rule may appear to do no more than reinforce the 20 percent value rule by requiring that, at the end of the Term, property have utility commensurate with its value.

(3) Purchase Options

A long standing principle in true lease analysis is that where the lessee may acquire the lessor's interest in the leased property for an amount which is nominal in relation to the value of the property at the time the option is exercised, then the transaction may be recharacterized as a sale or a loan. The Guidelines provide that "[n]o member of the Lessee Group may have a contractual right to purchase the property from the lessor at a price less than its fair market value at the time the right is exercised."[28] In theory, a lessee will be economically neutral if the purchase option price equals the fair market value of the property at the time the option is exercised and will have an incentive to exercise the purchase option if the price is set at a bargain rate. The Guidelines are fairly strict in that they appear to prohibit fixed price purchase options. Case law, however, clearly supports the practice of having a fixed price purchase option in an amount equal to the expected fair market value of the property at the time the option is exercisable, based on an independent appraisal.[29]

In addition to the restrictions on lessee purchase options, the Guidelines prohibit the lessor from having a contractual right to require anyone to purchase the property.[30]

(4) Lessee Investment/Lessee Loans

The Guidelines prohibit the lessee from providing any of the lessor's cost of the leased property. Although a lessee may not furnish any part of the cost of the leased property, a lessee may need to make improvements to the property. The Guidelines indicate that a lessee may be deemed to have

---

[27] *See, e.g., Estate of Starr v. Com'r*, 274 F.2d 294 (9th Cir. 1959).

[28] Rev. Proc. 2001-28, section 4.03.

[29] *See Frank Lyon Co. v. U.S.*, 435 U.S. 561 (1978); *Lockhart Leasing Co. v. U.S.*, 446 F.2d 269 (10th Cir. 1971). A possible complication arises where the property is limited use property (see discussion below under "Limited Use Property"). In such cases, the IRS may find that the lessee will be compelled to exercise a purchase option notwithstanding the fact that the purchase option price is equal to the fair market value of the property at the time the option is exercisable.

[30] Rev. Proc. 2001-28, section 4.03.

furnished part of the cost of the leased property if the lessee pays for certain improvements to the property.[31] In addition, the Guidelines state that no member of the lessee group may "lend to the lessor any of the funds necessary to acquire the property, or guarantee any indebtedness created in connection with the acquisition of the property by the lessor."[32] Courts generally do not impose an absolute prohibition on lessee loans as part of a true lease analysis. Nevertheless, significant contributions by a lessee, whether in the form of an investment in the property or a loan or guarantee of lessor debt, may be an indication that the transaction is in substance a partnership between the lessor and the lessee.

(5) Lessor's Nontax Profit on Transaction

The Guidelines further require that a lessor must expect to receive a profit on the transaction without taking into account expected tax benefits. Specifically, the Guidelines provide that:

> (1) Overall Profit. the aggregate amount required to be paid by the lessee to or for the lessor over the Term plus the value of the residual investment . . . exceed an amount equal to the sum of the aggregate disbursements required to be paid by or for the lessor in connection with the ownership of the property and the lessor's [e]quity [i]nvestment in the property, <u>including any direct cost to finance the [e]quity [i]nvestment</u>, and
>
> (2) the aggregate amount required to be paid to or for the lessor over the Term exceeds by a reasonable amount the aggregate disbursements required to be paid by or for the lessor in connection with the ownership of the property.[33]

One commentator has suggested that the "direct cost to finance the equity investment" refers to interest expense incurred with respect to funds borrowed to make the equity investment if funds have been specifically borrowed for such purpose.[34]

The Guidelines do not specify the amount of "profit" that a transaction must generate. Thus, it has been suggested that, as long as the lessor's receipts from the transaction (gross rents plus the estimated residual value available to it) exceed disbursements (debt service plus other transaction expenses) plus the equity investment by even one dollar, a lessor will satisfy the Guidelines' profit requirement.[35] The Guidelines also require the satisfaction of a reasonable independent cash flow requirement. "Cash flow" is a different concept from that of profit; a transaction can generate cash

---

[31] Rev. Proc. 2001-28, section 4.04.

[32] Rev. Proc. 2001-28, section 4.05.

[33] Rev. Proc. 2001-28, section 6 (emphasis added).

[34] Macan & Umbrecht, *supra*, at 435, n.286.

[35] Macan & Umbrecht, *supra*, at 434-35.

flow even though it does not produce an overall profit and, conversely, can generate an overall profit without any cash flow. The Guidelines do not specify what a reasonable amount of cash flow is. The cases have not shared the Guidelines view that cash flow is a separate consideration.

(6) Limited Use Property

As discussed above, the fact that the lessee may expect to purchase the leased property at the end of the Term generally is not inconsistent with true lease status under the case law. Under the Guidelines, however, the IRS has announced that it will not issue private rulings that a lease is a true lease if the leased property is so-called "limited use" property. The Guidelines consider property to be of "limited use" if:

> "at the end of the Term there will probably be no potential lessees or buyers other than members of the lessee group . . . [with the result that] the lessor . . . will probably sell or rent the property to a member of the lessee group, thus enabling the lessee group to enjoy the benefits of the use or ownership of the property for substantially its entire useful life."[36]

Case law does not appear to give the same importance to the limited use nature of leased property as the Guidelines, except where the limited use nature of the property clearly has a negative impact on the ability of the lessor to realize the residual value of the property. For example, in *Estate of Starr v. Com'r*,[37] the court held that a purported lease of custom designed sprinkler systems was not a true lease. In that case the sprinkler systems had only scrap value if they were removed from the premises on which they were installed and the lessee had the option to renew the lease for nominal amounts at the end of the original 5-year Term. Thus the lessor had no residual interest in the sprinkler systems. *Estate of Starr*, however, can be contrasted with *Cooper v. Com'r*,[38] where the Tax Court addressed leases of solar water heating systems installed on the roofs of houses. Once installed, the systems were likely to remain on the same houses indefinitely. The court, however, held that the leases were true leases because, among other things, it appeared that the lessors would be able to continue to charge a reasonable rent and earn a profit from the transaction in spite of the limited use nature of the systems. See also, *Electric & Neon Inc. v. Com'r*,[39] for a strong inferential holding that custom-made signs that were only useful to the original lessees were properly the subject of a "true lease".

2. True Lease Characterization of the Lease

a. Effect of the Austrian Lease

As discussed above, a premise of a contract being treated as a true lease for income tax purposes is that the legal rights appurtenant to the contract correspond to a lease. While the Lease is in the form of a conventional lease, the Austrian Lease raises some questions as to the rights conveyed to the Lessee with respect to the Austrian Equipment. The Lease purports to convey a right of possession

---

36 Rev. Proc. 2001-28, section 5.02.

37 274 F.2d 294 (9th Cir. 1959).

38 88 T.C. 84 (1987).

39 56 T.C. 1324 (1971), *acq.*, 1973-2 C.B. 1.

CE 010389

to the undivided interest in the Network until 2045. Legal opinions given at the closing by attorneys for both the Lessor and the Lessee conclude that the Lease is enforceable according to its terms. Based on those legal opinions (but not on any independent analysis of the underlying law) we have assumed that the Lease validly delivers a right of possession to the undivided interest in the Network to the Lessee for the stated term, subject to dispossession if the Lessor should lose the right of possession. However, the Lessor has an absolute right to ensure its possession of the gas meters included in the Austrian Equipment past the end of the Austrian Lease by purchasing the Austrian Equipment pursuant to the Option Agreement. Further, in the Assumption Agreement, the Lessor has agreed to exercise its right to purchase the Austrian Equipment pursuant to the Option Agreement and if it does not, CSFB has the right to exercise it on behalf of the Lessor. Because CSFB will receive the payment of purchase option price in its capacity as owner of the payment pursuant to clause 2.3(b) of the Forfait Agreement, CSFB would be likely to make sure that the option to purchase the Austrian Equipment is exercised.

Taken together, these facts should cause the Lease to be treated as transferring a right of possession for the stated term of the Lease. Therefore, if the Lease should otherwise be treated as a true Lease for U.S. income tax purposes, the Austrian Lease should not affect this characterization. As discussed below, we believe that the Lease should in fact be treated as a true lease for U.S. income tax purposes.

b. Characterization of the Lease

The Lease satisfies most of the true lease tests in the Guidelines and complies with applicable case law when a Guideline requirement is not satisfied:

(1) Minimum Investment at Risk

The initial rent payment of approximately $130 million is approximately 80% of the value of the leased property ($155 million) on the closing date, so the Lessor's net investment at the Closing of the Transaction was on the order of 20% of value. There are no further Lease rental payments until the end, so the amount at risk should remain at this level throughout the Lease.

(2) Residual Life and Value

The Lease Term, useful life and residual value are within the Guideline parameters, as demonstrated by the Appraisal conclusions.

(3) No Bargain Purchase Option

The Lessee does not have a fixed-price purchase option so there is no bargain purchase option; consequently, this Guideline is met. The Lessee does have a fair market value purchase option which is consistent with a true lease status of the Lease.

(4) No Lessee Investment or Loan

The Guideline that might be at issue in the Lease is the rule that the lessee not have provided a loan the lessor. To some extent this reflects the holding of *Frank Lyon*[40] that when a sale and leaseback does not involve a third independent party, the lease should be subject to greater scrutiny than if three unrelated parties are involved. In a simple sale-leaseback where the buyer/lessor purchases property from the seller/lessee for cash and a note owed to the lessee, there are two main concerns about the transaction based on the absence of a third-party lender. The first is that the lessee's rights as lender might prevent the lessor from enforcing its rights in a lease default. The second is that the sale price (and rents) may be artificially inflated, since no outside party is evaluating the adequacy of the collateral for the loan.

In the instant transaction, of course, there is no loan from the Lessee to the Lessor. The Lease is a two-party transaction, but the Lessee has no rights that prevent the Lessor from declaring the Lessee in default of its obligations except those defaults the Lessor itself causes as Sublessee. The valuation concerns are addressed by the opinion of the Appraiser as to fair market value and fair rental value.

Another concern underlying the Guideline that there be no investment in the asset by the lessee is that an investment by the lessee in the asset might predispose the lessee to exercise its purchase option in order to avoid losing the money invested in the asset. As the Lessee has no fixed-price purchase option, this concern is not relevant to the analysis of the Lease.

(5) Expected Profit

The total of Lease rents and residual value represents a large profit to the Lessor.

(6) Conclusion

The Lease meets all the criteria of case law for being treated as a true lease for US federal income tax purposes. Although the absence of a third-part lender to the lessor under the Lease and the presence of a large rent prepayment merit scrutiny, upon examination, in context these do not impugn the character of the Lease. Neither is there a concern that the rent prepayment will induce the Lessee to exercise a purchase option. Thus, the Lease, if viewed by itself, should be characterized as a true lease for U.S. income tax purposes.

3. True Lease Characterization of the Sublease

Viewing the Sublease by itself, it appears to meet all the relevant criteria or a finding that it is a true lease for tax purposes.

a. Minimum Investment at Risk

The Lessee's initial at-risk investment was approximately $44.5 million, well in excess of 20% of the $155 value of the Lessee's interest. We have been informed by Con Ed that by its calculations, it continues to exceed the 20% "minimum amount at-risk" test of the Guidelines throughout the term of the Sublease.

---

40 *Frank Lyon*, 435 U.S. at 573 (1978).

b. Residual Value and Life

The asset being leased under the Sublease is the Lessee's right of possession under the Lease. Hence the appropriate examination of useful life and residual value is a comparison of the useful life of the Lessee's asset—the 46.4 year term of the Lease—and the expected value of the right of the Lessee to use the property at the end of the Sublease term in comparison to the value of the Lessee's rights at inception of the Sublease. For this purpose, the appropriate inquiry might be at the end of the basic Sublease term (not including any possible renewal). It is not necessary to determine whether the renewal should be included in the calculus because even if the Sublease term is treated as being the combined initial term plus the Renewal term, the residual life and value of the Sublessor's Lease Interest are sufficient. The maximum term of the Sublease is approximately 37 years even with renewal. Thus, the remaining useful life at the end of the longest Sublease term is over 9 years, which is about 19% of the original useful life of the Sublessor's Lease Interest (46.4 years), well within the residual life accepted in the case law. (On the Base Sublease Termination Date, the remaining life of approximately 23 years is about half of the original useful life of the Sublessor's Lease Interest.) The residual value of the Lessee's interest at the latest date the Sublease can end is expected to be approximately 20% of the value of the Sublessor's Lease Interest at inception of the Sublease, not taking inflation into account (more if projected inflation is factored in).

c. No Bargain Purchase Option

The Sublessee has a purchase option that is outside the Guideline because it is for a fixed purchase price. However, the fixed price is in excess of the projected value of the asset to be purchased. Under the case-law discussed above, therefore, the purchase option at higher than projected value should not affect whether the Sublease is treated as a true lease.

d. No Lessee Investment, Loan or Guaranty

The Sublessee has represented in the Tax Indemnity Agreement that there are no rights or obligations with respect to the Loan other than the rights and obligations under the Operative Documents and that the Network at the Closing Date was complete and did not require any improvement or modification in order to be complete for its intended use.[41] Based on those representations, the Sublease meets these guidelines.

e. Expected Profit

We have been informed that the Lessee will make a substantial profit if the Sublessee purchases at the purchase option price or if the property is worth the projected value at the date the asset is returned under the Sublease.

f. Conclusion

Based on these factors, the Sublease, viewed by itself, should be treated as a true lease for U.S. federal income tax purposes.

---

[41] Sections 3(b) and 3(a) of the Tax Indemnity Agreement, respectively.

4. Should the Lease and Sublease be treated as differently because of the overall Transaction

a. General Tax Principles

There are a small group of related tax-principles under which a multiple-component transaction can be characterized differently from the sum of the individual steps. These doctrines overlap and, are, to a degree, fact-dependent. As you know, the IRS has raised a series of objections to LILO transactions, almost all of this nature. In the next several sections, therefore, we have examined the arguments presented by the IRS as to why the steps of a LILO transaction should be collapsed or disregarded.

The official statements of IRS position on LILOs appear in Revenue Ruling 99-14[42] and Revenue Ruling 2002-69.[43] In addition, in March 2005, the IRS issued a notice relating to a type of transactions ("**SILOs**") which bear sufficient resemblance to LILOs that we will examine the argument presented in Notice 2005-13 as well. In addition, the IRS has issued notices to Con Ed Development (the "**Audit Notices**") directly addressing a LILO transaction entered into by Con Ed in 1997. We have reviewed those Audit Notices, which essentially repeat the argument of Revenue Ruling 2002-69 and make reference to Revenue Ruling 99-14. We have, therefore, not addressed the Audit Notices separately below.

Before reviewing this series of arguments individually, it is worthwhile noting that although no court has examined a transaction substantially similar to the instant Transaction, at least one court has examined a transaction that had some of the most salient features on which the IRS has based its objections. *Comdisco, Inc. v. U.S.*, 756 F.2d 569 (7th Cir. 1985), posed the case of transactions similar to the instant one in many respects—the taxpayer was the lessee and sublessor of an interest in equipment and claimed an investment tax credit with respect to its investment as a lessee under the lease. In *Comdisco*, the taxpayer had little residual interest in the lease after entering into the sublease and had little profit expectation aside from the tax benefits.[44] The court considered the treatment of three different transactions containing the following terms: (1) a sixty-month lease and a sixty-month sublease at the same stated rent; (2) a sixty-month lease and a forty-eight month sublease at the same stated rent; and (3) a sixty-month lease and a sixty-month sublease with a nominally higher rent under the sublease. As to each of these transactions, the court sustained the position of the taxpayer that the lease and sublease should be viewed separately. The court upheld the taxpayer's position that it was a lessee and sublessor of the equipment, finding it significant that the taxpayer retained the obligation to pay rent under the lease in the event of a default under the subleases.[45] In the *Comdisco* transactions, unlike the instant transaction, the sublessee was not related to the head lessee, the lessee's obligations to the lessor were not limited recourse, and the sublessee did not arrange for a defeasance of its rent obligations.

---

[42] 1999-1 C.B. 835.

[43] 2002-2 C.B. 760.

[44] *Comdisco*, 756 F.2d at 578.

[45] *Id.* at 575.