# EXHIBIT 1
# (CONTINUED)

b. Revenue Ruling 99-14

(1) Background

Revenue Ruling 99-14 was issued in March of 1999. Revenue Ruling 99-14 essentially makes the argument that a LILO transaction "lacks economic substance." The ruling is premised on factual assumptions that the IRS has subsequently discovered are generally inapplicable to most LILOs. As a result, Revenue Ruling 2002-69 was issued in 2002 generally reducing the IRS argument against LILOs to a single, more technical issue.

(2) Relationship of Facts to the Transaction

Revenue Ruling 99-14 describes a basic series of facts more or less similar to the Transaction. Some of the facts are more extreme than are present in the instant Transaction, and the ruling makes several core factual assumptions that are not applicable to the Transaction. First, the ruling states as a fact that the taxpayer's pretax return on the transaction is "insignificant" in relation to the taxpayer's net after tax return. This assumption is relied on heavily throughout the ruling's legal analysis. The IRS has implicitly recognized that this assertion is false for most LILO transactions in issuing Revenue Ruling 2002-69, which does not rely on this factual underpinning.[46] You have informed us that your expected pre-tax return on this transaction is in excess of an annual compound yield of 3% and your expected after tax return is in approximately equivalent to an annual compound yield of over 15%. We are unable to find any instance in the case law where an annual pre-tax yield of 3% was treated as insignificant. [47]

(3) Analysis of the "Lack of Economic Substance" Argument

Revenue Ruling 99-14 argues that because the taxpayer's expected pretax return is insignificant in comparison to the taxpayer's expected after-tax return, the transaction should be disregarded under the doctrine that a transaction without economic substance will not be given tax effect. Although the core factual premise of Revenue Ruling 99-14—that the pretax return will be insignificant in comparison to the after-tax return—is absent in the Transaction, we have nonetheless examined the application of the economic substance doctrine below.

The IRS analysis of the economic substance doctrine is tied to two principal cases not involving leasing transactions, *Sheldon*[48]and *ACM.*[49] However, prior to addressing the general tax law, it is

---

[46] Revenue Ruling 2003-69 does reserve the economic substance arguments of Revenue Ruling 99-14 with the following language:

> Where appropriate, the Service will continue to disallow the tax benefits claimed in connection with LILO transactions upon other grounds, including that the substance over form doctrine requires their recharacterization as financing arrangements and that they are to be disregarded for lack of economic substance.

[47] Revenue Ruling 99-14 also asserts that various factors exist "indicating that the parties expect [the sublessee] to exercise the fixed-payment option." The factors cited in the ruling are that the sublessee has "historically used the property" and the fact that the purchase option price is fully defeased. While both of these facts are true in the Transaction, the premise that the "parties expect" the purchase option to be exercised is directly contrary to the conclusions of the Appraisal, on which the taxpayer, presumably, based its expectations.

[48] *Sheldon v. Com'r*, 94 T.C. 738 (1990).

important to note that there is, in fact, a body of case law examining the question of what economic substance a leasing transaction is required to have. The clearest enunciation of how the economic substance requirement applies to leases can be found in *Rice's Toyota World*,[50] which requires, in essence that the taxpayer have a business purpose and a reasonable possibility of a profit:

> To treat a transaction as a sham, the court must find that the taxpayer was motivated by no business purposes other than obtaining tax benefits in entering into the transaction, and the transaction has no economic substance because no reasonable possibility of a profit exists.[51]

Under the standard of Rice's Toyota World, of course, the Transaction would be respected in that there is an expectation—rather than a mere possibility—of a substantial profit and that profit represents a business purpose.

The cases relied upon by the Service impose a heavier burden on the taxpayer than *Rice's Toyota World*. But even if the standards they impose are applicable to a three-party lease, the Transaction appears to be outside their ambit. In *Sheldon*, for example, the Tax Court considered a series of Treasury bills purchased by the taxpayer using borrowed funds secured by the Treasury bills. While the transactions could (and one did) make a small profit, the magnitude of any potential profit ($18,000) was tiny in comparison to the investment ($1,000,000). The Tax Court found that the transaction should be disregarded. It applied the standard of an earlier case, *Goldstein v. Com'r*, which denied a deduction for interest that could "not with reason be said to have any purpose, substance or utility apart from [the] anticipated tax benefit."[52] In applying *Goldstein*, the Tax Court found that the potential nontax profits were too insignificant to matter and that the sole objective of the taxpayer was, therefore, to obtain the interest deductions. Unlike *Sheldon*, in the Transaction, the taxpayer expects a very large pre-tax profit, representing both a large return on investment and a significant yield on the use of capital.

The *ACM* case involves a complex series of transactions designed to take advantage of some of the partnership basis tax rules. Unlike *Sheldon*, the transaction did have the possibility of earning a meaningful profit. However, the court determined that, on average, the taxpayer would be expected to lose money, taking into account the fees paid to arrangers for the various steps in the transaction.[53] The *ACM* court concluded that there was a "lack of objective economic consequences" to the taxpayer from the transaction. However, unlike *Sheldon*, in a simple comparison of money invested and money returned, the taxpayer did make an overall profit, even after fees. The transaction continued for a period of time and over that period, the investment earned a fixed periodic return. The return was, however, in the court's words, "just three basis points more than the cash was earning on deposit."

---

49 *ACM Partnership v. Com'r*, 157 F.3d 231 (3d Cir. 1998). The Revenue Ruling also references *Knetsch v United States*, 364 U.S. 361 (1960), a Supreme Court case in which the taxpayer had no possibility of a profit.

50 *Rice's Toyota World v. Com'r*, 752 F. 2d 89 (4th Cir 1985).

51 *Id.* at 91.

52 364 F. 2d, 734, 704 (1966).

53 More recently, the District Court in *Long Term Capital Holdings v. U.S*, 330 F. Supp.2d 122 (D.Conn. 2004), found similarly, that a transaction should be disregarded for tax purposes because the transaction would be expected to result in a loss on average, once all the costs and fees were properly taken into account.

CE 010395

To the extent that *ACM* can be read as imposing a standard requiring the taxpayer to show that it expects a higher pretax return than a deposit would earn, the Transaction may fail the test of *ACM* as we understand that Con Ed's pre-tax rate of return, if the Purchase Option is exercised, is less than the rate available to the Sublessee on the deposit it made to fund the Purchase Option price, and hence less than prevailing deposit rates. We do not view *ACM* as staking out this position. Aside from the fact that every leveraged lease, every tax-exempt bond and many tax-advantaged transactions would automatically fail this test as well, we note that the core conclusion of the *ACM* court was that there was a "lack of economic consequences" with respect to certain steps of the transaction. In context, we read this to mean that in addition to not having a higher pre-tax return on the investment than a deposit, after entering into the various steps of the transaction the ACM taxpayer also remained in essentially the same economic position as having a deposit—being entitled, in essence, to known pretax cash flow a known times from a specific, high-credit obligor, and hence certain steps were deemed to be unnecessary to any business purpose in the transaction and were only entered into to obtain certain tax benefits.

On the facts of the instant Transaction, the Appraisal concludes that the Sublease Purchase Option is at a price higher than projected value, that neither the contract terms nor the physical attributes of the leased property create a material inducement to exercise the Sublease Purchase Option and that, therefore, the Sublessee is not expected to be under any economic compulsion to the exercise the Sublease Purchase Option. Thus, neither the timing nor the amounts of the taxpayer's future pre-tax cash flows are known with such certainty as to be comparable to a deposit.[54]

c. Revenue Ruling 2002-69

(1) Overview

In Revenue Ruling 2002-69, which supersedes Revenue Ruling 99-14, the IRS essentially abandoned the premise that the LILO transaction should not be respected based on the economic substance argument.[55] Instead, the IRS asserts that the head lease and sublease, when viewed together, result in the sublease canceling out the U.S. investor's possessory right in the asset under the head lease for the duration of the sublease term.

In the view of the IRS, an investor in a LILO purchases only a future interest in the asset and does not have any current leasehold; consequently, the investor is not entitled to rental deductions under the head lease. This conclusion is not premised on any direct authority. Indeed, as we will see, the limited case law directly related to the proposition is contrary to the IRS position. Instead, the IRS argues from two lines of cases. One line, represented by *Rodgers*[56] and *Bussing*,[57] hold that in some

---

[54] Note, however, that if the assertion of Revenue Ruling 99-14 that the "parties expect" the purchase option to be exercised were true, the argument that the transaction should be disregarded under the principles of *ACM* would be much stronger.

[55] Revenue Ruling 2002-69 does preserve the claim that the economic substance doctrine might apply to some LILOs, stating:

> Where appropriate, the Service will continue to disallow the tax benefits claimed in connection with LILO transactions upon other grounds, including that the substance over form doctrine requires their recharacterization as financing arrangements and that they are to be disregarded for lack of economic substance.

[56] *Rogers v. United States*, 281 F.3d 1108 (10th Cir. 2002).

[57] *Bussing v. Com'r*, 88 T.C. 449, *reconsideration denied*, 89 T.C 1050 (1987).

CE 010396



PF030541

circumstances a transaction involving reciprocal offsetting obligations between the same parties may be disregarded for tax purposes. The other line of cases, represented by *McCully Ashlock*,[58] *Kreusel*[59] and *Alstores Realty Corp.*[60] attempt to determine whether when a taxpayer sells property and retains the right to possess the property for a period after the date of sale, the transaction is a sale of the entire property (and a lease back) or a mere sale of a future interest.

Before reviewing those cases, it should be noted that in some sense, every lessor who subleases his property has retained only a future interest—if a lease is a right to possess property for a term of years, then a lessee who subleases property no longer has the right of possession during the term of the sublease. However, it is settled law that a sublease does not in itself turn the top lease into a mere future interest. As the IRS acknowledges in Revenue Ruling 2002-69, in *Comdisco*,[61] the Seventh Circuit held that a series of lease and subleases in some of which the sublease term was as long as the lease term and in others of which the sublease rent was equal to the lease rent, were nonetheless properly treated for tax purpose as separate leases and subleases. *Comdisco* differs, as the ruling points out, from the LILOs in several respects. First, none of the subleases in *Comdisco* were back to the lessor under the main lease, whereas in a LILO the sublease is back to the head lease lessor. Second, the court in *Comdisco* took note of the fact that the lease/sublease arrangement solved a regulatory problem of one of the parties. Finally, the *Comdisco* court noted that if the sublessee had defaulted on its obligation to pay rent, the head lessor "would have taken the ordinary route pursued by most creditors of looking to a financially responsible obligor -- in this case, [head lessee]." In the LILO context, the obligation of head lessee (Con Ed) to pay head lease rents is largely without recourse to the head lessee, so this factor is arguably absent.[62]

A second case makes it clear that even a lease and lease back has not been viewed by the courts as obviously resulting in no present interest. *Frank Lyon Co*,[63] the principal Supreme Court decision analyzing when a sale and leaseback should be respected for tax purposes, actually contains a lease and lease back as part of the structure. The case involves a sale and leaseback of a building. The ground on which the building is built is leased to the taxpayer through a ground lease, so the leaseback is, in substance a lease of a purchased building and a sublease back of the ground-leased land. At no point does the court or the IRS suggest that there is anything suspect about the ground lease and sublease back. While no substantive law can be drawn from this fact, it provides confirmation that at the time of Frank Lyon, there was no law suggesting an argument recharacterizing the transaction because of the lease and lease back of the land.

The IRS assertion that lease and leaseback in a LILO represents a mere future interest is, therefore, essentially a claim that developing case law should be read to imply this conclusion, not a claim that settled case law exists in support of it. And, indeed, the "Offsetting Obligations" cases relied upon

---

58 *McCully Ashlock v. Com'r*, T.C. 405 (1952), *acq*., 1952-2 C.B. 1

59 *Kruesel v. United States*, 63-2 U.S. Tax Cas. (CCH) & 9714 (D. Minn. 1963).

60 *Alstores Realty Corp. v. Com'r*, 46 T.C. 363 (1966), acq., 1967-2 C.B. 1.

61 *Comdisco, Inc. v. Com'r*, 756 F.2d 569 (7th Cir. 1985).

62 In Revenue Ruling 2002-69, the IRS states this distinction as "in the LILO transaction the headlessee/sublessor is not materially exposed to the risk that the sublessee will fail to make rent payments," in effect arguing that the defeasance accounts render the sublessor not exposed to the risk that the sublessee will fail to make rent payments. The IRS argument in this respect seems to focus on a different point than the *Comdisco* court did. Moreover, the IRS argument effectively leaps past the risks that in a default by the sublessee, there will be defenses to an attempt by the head lessee/sublessor to seize the collateral as payment of damages.

63 *Frank Lyon*, 435 U.S. at 573 (1978).

by the IRS are both subsequent to *Frank Lyon*. On the other hand, the "Future Interest" cases relied upon by the IRS all predate *Frank Lyon*.

We discuss these two sets of cases below. As to the Offsetting Obligation cases, we believe that the IRS is attempting to apply the doctrines of the cases to facts that do not meet the premises of the cases. As to the Future Interest cases, we believe that these cases do not stand for the propositions attributed to them by the IRS. Based on our analysis of these two lines of cases, we believe that a court should not treat the Lease and Sublease as creating a mere future interest in the Lessee.

(2) Offsetting Obligations

The ruling cites *Rogers v. U.S.*[64] in support of its contention that where the parties have in form entered into two separate transactions that result in offsetting obligations, the courts often will collapse the offsetting obligations and recharacterize the separate transactions as one transaction. The *Rodgers* case did not involve a leasing transaction. In *Rogers*, Mr. Fogelman owned a 49% interest in an S corporation and an option to acquire the other 51%. Some time later, Mr. Fogelman ran into financial difficulties and requested a nonrecourse loan from the S corporation. The S corporation obtained the money as a loan from the 51% shareholder and reloaned the money to Mr. Fogelman on a nonrecourse basis secured by Mr. Fogelman's ownership interest in the S corporation and his option to purchase the other half of the corporation's stock. Mr. Fogelman granted the S corporation an option to purchase his share of the S corporation (including his option to purchase the other 51% of the stock). The S corporation exercised its option contemporaneously with making the loan to Mr. Fogelman but delayed closing the stock purchase until the beginning of the following year.

The purchase price under the option was the outstanding balance of the Fogelman loan with accrued and unpaid interest as of the option closing date. The S corporation later foreclosed on the loan, took the stock and claimed a bad debt deduction on the assertion that the stock was worthless. The IRS reads this opinion as standing for the proposition that the obligation of the borrower to repay the S corporation and the obligation of the S corporation to pay the purchase price are offsetting. The Tenth Circuit, however, did not enter into such an analysis. Instead the court applied a standard "substance over form" analysis in holding that the transaction was always intended by both parties to be a redemption of the stock by the S corporation, not a loan. In deciding this, the Tenth Circuit found that the clear intention of the parties, and the clear effect of the rights of the parties from the two transactions was to effect a sale of the stock. It quoted the following portion of the District Court opinion in analyzing the taxpayer's arguments:

> The transaction gave [the borrower] no incentive or obligation to repay his purported debt . . . and he parted with all of the burdens, and all but two of the benefits[,] of his [S corporation] interest on the date the "loan" closed. Moreover, he had no way to continue to retain even those two benefits beyond [the next January] and had absolutely no *right* to retain his [S corporation] interest simply by paying off his purported debt in light of the option he granted to [the S corporation] as an integral part of the transaction. This is the stuff of substance. Legally, it overwhelms the nominal form of the transaction, in which the parties

64 281 F.3d 1108 (10th Cir. 2002).

> paid a minimal loan tax . . . [and] overwhelms any evanescent desire [the borrower] may have had to perpetuate his dream of [S corporation] ownership by having the transaction structured as a loan. [The borrower] agreed on July 31, 1990 to a transaction that gave him no right to retain any ownership in the [S Corporation] even if he paid off his "loan."[65]

Revenue Ruling 2002-69 does not claim that the parties intended to effectuate a transaction different from a lease and sublease. It purports to assert that a lease and leaseback to the same party is intrinsically a pair of offsetting obligations, regardless of the overall structure of the transaction. We do not find *Rogers* to provide any support for their premise.

*Bussing* is a simple two-party sale and lease back (after ignoring the presence of an intermediate party who has no substantive role in the transaction). The taxpayer purchased equipment from the seller for cash and a gave the seller a note. The taxpayer then leased the property back to the seller for rents that were just slightly larger than the payments due under the note. (The taxpayer might also become entitled to additional rents at a later date.) The court held that the note was not true indebtedness because the rent and debt obligations cancelled each other out. In making this determination, the Tax Court did not focus merely on the fact that the amounts were the same, but instead on the fact that even if the rent were not paid, *Bussing* would not be required to pay the notes out of his own cash:

> Bussing, effectively, will never be required to make any payments on his debt obligation, a feature of the transaction that we believe the parties intended to achieve. Therefore, for Federal income tax purposes we disregard Bussing's obligation in the principal amount of $202,888.00.[66]

Because the court treated *Bussing* as a two-party transaction, the transaction merits a higher degree of scrutiny than in *Frank Lyon*, and under that stricter standard, the court determined that the parties did not intend the taxpayer ever to be responsible for the repayment of the purported loan other than though the offsetting obligation. Like *Rogers*, the holding in *Bussing* is based on a finding that the documents do not reflect the true agreement between the parties.

It is possible that the IRS may assert that the documents in the Transaction also do not reflect the true agreement among the parties—as we have noted, Revenue Ruling 99-14 contains language that may imply that the IRS believes that both parties expect the purchase option to be exercised—but we are not aware of any reason to believe that the documents do not reflect the actual Transaction.

*Bussing* and *Comdisco* present, together, another issue. In *Comdisco*, the equal and simultaneous rent obligations of a head lease/sublease pair were respected in part because the court concluded that in the event the sublessee fails to pay rent to the head lessee/sublessor, the head lessee will nonetheless be called upon to pay the head lease rent to the head lessor. In contrast, in *Bussing*, equal and simultaneous rent and debt service obligations were treated as illusory, in part because the court concluded that in the event the lessee/lender failed to pay rent, the lessor/borrower would not be called upon to pay debt service.

---

65 281 F.3d at 1126-1127.

66 *Bussing*, 88 T.C. at 458.

The Lease and Sublease in the current Transaction do not contain equal and simultaneous rent obligations, to be offset. The Lease provides for two rent payments, one at inception and one well after the end of the Sublease (even if it is renewed). The Lessee's obligation to make the second Lease payment is limited in recourse to the Lease asset and various collateral accounts. Moreover, the collateral accounts are partially funded payments over the Sublease term by the Sublessee. If a court were to view the Lease and Sublease rent obligations as "offsetting" because of this, it might also conclude that the Lessee does not have an obligation under the Lease to make the second Lease payment if the Sublease rent is not paid and that, therefore, the separate obligations are, as in *Bussing*, essentially, illusory. We do not believe that this argument would prevail. Assuming, based on the Appraisal that there is a realistic probability that the Sublease Purchase Option will not be exercised, the Sublease rent payments will be made far earlier than the Lease second payment is due and there will be a substantial amount of money (plus interest on it) in real, third-party accounts for a substantial period of time between the date the Sublease rent obligations are paid and the date the final Lease rental payment is due.

The Offsetting Obligations cases do not really address the conclusion the IRS reaches in Revenue Ruling 2002-69. They address the consequences of offsetting monetary obligations. The IRS contention in Revenue Ruling 2002-69 is not that the rents are offsetting but that the rights granted by the Lease and Sublease are "offsetting" and result in no present interest. Neither *Rogers* nor *Bussing*, nor any other case of that type appear to us to provide support for this theory. They do not address the issue at all.

(3) Future Interest

The second leg of the IRS argument in Revenue Ruling 2002-69 rests on the assertion that a series of cases that attempt to determine whether or not a present interest exists in a nonpossessory party support the IRS's conclusion that a LILO transaction creates only a future interest in property. These cases generally deal with the situation where the owner of property sells the property to a buyer but remains in possession of the property for a period of time after the sale. In each case, the court is called upon to decide whether the seller's continuing tenancy is in the nature of a retained term interest or in the nature of a lease. Equivalently, the court is deciding whether the buyer purchased full ownership of the property and leased the property back to the seller or, instead, merely purchased a future interest.

We were able to identify six cases on this fact-pattern. Three of these—*McCully Ashlock,*[67] *Kreusel,*[68] and *Alstores,*[69] are discussed in the ruling. The other three are *Eller*[70] and *Gilbertson*[71] (which hold that there is not a future interest) and *Steinway.*[72] These cases can be divided neatly into three pairs. In *McCully Ashlock* and *Kreusel*, the documentation denominated the rights of the seller who remained in possession to be a retained interest, the IRS contested this characterization and lost. In *Eller* and *Gilbertson*, the documentation denominated the rights of the seller who remained in

---

67 *McCully Ashlock v. Com'r*, 18 T.C. 405 (1952), *acq.*, 1952-2 C.B. 1.

68 *Kruesel v. United States*, 63-2 U.S. Tax Cas. (CCH) & 9714 (D. Minn. 1963).

69 *Alstores Realty Corp. v. Com'r*, 46 T.C. 363 (1966), *acq.*, 1967-2 C.B.1.

70 *Eller v. Com'r*, 77 T.C. 934 (1981).

71 *Gilberson v. Com'r*, 44 TCM 154 (1982).

72 *Steinway & Sons v. Com'r*, 46 T.C. 375 (1966).

CE 010400

possession as a lease, the IRS contested this characterization and lost. *Alstores* and *Steinway* concern the two parties to a single transaction. The documentation was silent as to the character of the continuing possession, the buyer and seller took inconsistent tax positions, the IRS took both to court, itself taking inconsistent positions. The tax court decided—in both cases—that the retained possession was a lease. It is noteworthy that in every case where the documentation expressed a clear intent as to the character of the ongoing possession, the court characterized the rights consistently with the documentation. This may be in part because the substantive differences between a retained term interest and a lease are small.

Revenue Ruling 2002-69 describes the governing distinction among the three of these cases it reviews as based on whether the retained interest was of the "same nature" as the interest conveyed:

> *Alstores* can be distinguished from *McCully Ashlock* and *Kruesel. McCully Ashlock* and *Kruesel* conclude that where a retained interest is of the same nature as the interest conveyed, only a future interest has been transferred. In *Alstores*, the interests were not of the same nature.

This seems to be a misreading of the cases. None of the cases purport to look at the comparative nature of the interest conveyed (title) and the interest retained. The cases, as noted above, are deferential to the form chosen. However, in all six cases the "form" conveyed was a sale. In two (*McCully Ashlock* and *Kreusel*) the form conveyed was expressly a sale of a future interest, in the others, the legal conveyance was of fee simple title. None of the cases remotely suggest that there is a such a "same form" rule.

The courts in these cases did attempt to distinguish between a leasehold interest and a future interest. In addition to the chosen form, the courts looked to:

- Whether, as is typical of a lease but not of a retained interest, there were limitations on the use of the property by the person in possession. In the two cases in which the possession was under a document called a lease, there were such restrictions. The two cases in the form of a retained interest there were not. The ambiguous documents in *Alstores* and *Steinway* which were held to be leases, do contain such restrictions.

- Whether, as is typical in a lease, the titleholder was responsible for the property taxes and insurance, or as is typical in a retained interest, the possessor was responsible for the property taxes and insurance. In *Kreusel*, although the transaction was in the form of a retained interest, the titleholder was responsible for property taxes and insurance. This was the primary basis for the IRS attack on the form chosen by the parties, but the court was not persuaded that this factor was sufficient in itself.

- Whether the titleholder (as is typical in a lease) or the possessor (as is typical in retained interest) bears the financial cost of the property becoming unusable for a period during the term. Oddly, only in *Alstores* and *Steinway* did the failure of the property to be useable result in a cost to the titleholder. Even in *Eller* and *Gilbertson*, where the possessory right was documented as leases, there was no financial cost to the titleholder of the property becoming unusable.

In addition to these six "retained possession" cases, another case, *Oscar Thomas*,[73] presents facts that can be viewed as representing a lease and retained sublease. In *Oscar Thomas*, the taxpayer entered into a 99 year lease from owner "subject" to an existing lease with five years remaining. The parties (including the IRS) treated the 99 year lease as a lease rather than a sale, but the IRS argued that the "rent" for the first five years should be treated as the acquisition price of a leasehold for a term starting five years out. The IRS argument was not based on a "same type of interest" theory but on the premise that the purpose of the lessee in entering into the lease before the end of the ongoing superior lease was to obtain possession in five years and that, therefore, the rent during the first five years should be capitalized (and, presumably, amortized over the remaining 94 years). The Tax Court's holding that the lease is a current interest and the rent is currently deductible is, of course, inconsistent with the IRS assertions about whether the transfer and retention represents rights of the same type.

One other judicial analysis of the distinction between a future interest and a current possessory interest seemed relevant to us. In *Coleman*,[74] Tax Court Judge Tannenwald initially undertook an extensive investigation of whether a leasing transaction created present ownership or a mere future interest, exploring the facts of the case and their relationship to the question at great length. After reconsideration, the judge withdrew the original opinion (which held that under a substantive analysis, the taxpayer had only a future interest) with a second opinion that held that the taxpayer would be held to the form of the transaction (documented as a future interest) and the court would not review a claim by the taxpayer that the transaction should be treated inconsistently with the form chosen by the taxpayer. While the facts of *Coleman* are complex and confusing—they run to more than 50 pages—one portion of the withdrawn analysis is worthy of note. In the initial *Coleman* opinion, Judge Tannenwald considered what effect the "net lease" provisions of the lease should have on the analysis. These provisions effectively charge property taxes, insurance and the cost of unavailability on the possessor. The view of the withdrawn *Coleman* opinion was that these and other typical net lease provisions were a neutral factor in the analysis.

In the instant Transaction, the documentation is clearly intended to be a pair of leases, each lease contains limitations on use and other terms typical of net leases of this type. We do not find any basis in the case law for concluding that the interests of the Lessee/Sublessor in the property are merely a future interest.

d. Notice 2005-13

In March of 2005, the IRS issued Notice 2005-13[75] which identified a group of transactions as "listed transactions." The identified transactions, often called "SILOs" were described in the notice as abusive transactions. The notice explains the IRS view of why the SILO transactions are abusive. While a Notice is not a statement of an IRS legal position, and Notice 2005-13 does not purport to address LILOs, we have reviewed whether the legal analysis of Notice 2005-13 affects our view of the Transaction. The Notice describes the salient characteristics of certain sale-and-leaseback transactions that become listed transactions under the Notice. It also contains an explanation of the IRS reasoning in this respect. Essentially, the Notice argues that in a sale and leaseback with the

---

73 *Oscar L. Thomas and Rita C. Thomas v. Com'r*, 31 T. C. 1009 (1959).

74 *Coleman v. Com'r*, 85 T.C. 622 (1986) was withdrawn, vacated and replaced by *Coleman v. Com'r*, 87 T.C. 178 (1986), *aff'd per curiam*, 833 F.2d 303 (3rd Cir. 1987).

75 2005-9 I.R.B. 630.

specified characteristics, the balance of the benefits and burdens of ownership do not lie with the purported owner but with the purported lessee. The factors that the IRS appears to find relevant to this balancing are:

- That the lessee is a tax-indifferent person;
- That the lessee has used only a small portion of the purchase price received to provide operating financing or cost of acquisition financing;
- That the lessor is protected against the risk of lessee nonpayment of rent by various defeasance accounts;
- That the lessor bears little risk of decline in the property's value because of mechanisms for passing the risk onto the lessee; and
- That the combination of purchase option and lessee obligations in the event the purchase option is not exercised "significantly increase the likelihood" the purchase option will be exercised.

The Notice notes at some length that none of these factors are present in *Frank Lyon* and that, therefore, none have been blessed by the Supreme Court. It does not provide any basis in case law for its conclusion that this combination of factors tips the balance in the manner suggested. Indeed, based on the cases sited in the Notice (and our own research) most of these factors do not appear to have been considered by any court in the context of a sale leaseback.

The position taken by the IRS in Notice 2005-13 is relevant to the Transaction even though the Transaction is not a sale-leaseback, because the Transaction partakes of most of these factors in a fashion that is the same or analogous to the SILO transactions. Specifically:

- The Sublessee is a tax-indifferent person;
- A large portion of the proceeds of the first Lease Payment were used to create defeasances and, therefore, were not available to the Sublessee to finance the property or operations;
- The Sublessor has the benefit of the fact that the Loan is protected by defeasance accounts, as well as the benefit of equity defeasance account, limiting its risk of Sublessee nonpayment;
- The economic effect of the "put renewal" option in the Sublease is economically similar to the "service contract" option in one of the two paradigm SILOs outlined in the notice, which presumably means the IRS would consider the Lessee as bearing little risk of the decline in value of the property; and
- The "put renewal" option might also be considered by the IRS to have an impact on purchase option exercise similar to that of the service contract option in a LILO.

We have, therefore considered whether the IRS position in Notice 2005-13 affects our view of the Transaction. We do not think that the analysis in the Notice is soundly based. We are, in the first instance, unaware of any case law suggesting that the taxability of the lessee is relevant to the analysis of the structure. Similarly, we are not aware of any case law suggesting that the Lessee

providing additional collateral to the Lessor adversely affects the tax analysis.[76] Although we believe that in a number of the decided cases the lessee provided additional support for its obligations (such as a letter of credit), we are not aware of (and the IRS does not allude to) any case that has considered this fact to be a negative factor. As to the fourth factor—which seems to relate to the fact that the rent (including the put renewal) will fully pay some minimum return, we are again unable to find cases which consider this fact relevant, although we believe that some or all of the cases probably relate to "full payout" leases which have this characteristic.

Two of the factors appear to us to have significance under the case law. First, it is clear that the lessee's need to receive a "full financing" may be a positive factor in analyzing a leveraged lease, as indicated by the lower scrutiny undertaken in *Frank Lyon* because of the existence of the outside loan and the underlying business purposes. Absent such "full financing," a lease may appropriately be subjected to greater scrutiny. Second, if it were true that the end-of-lease obligations made the purchase option exercise substantially certain, that in itself might well be a reason to question the treatment of the Transaction. However, the Appraisal concludes that these contractual terms do not represent a "material inducement" to the Sublessee to exercise the purchase option.

e. Summary

Overall, and based on our assumption that the documentation states the actual agreement of the parties and that the conclusions of the Appraiser are correct, we believe that the Lease and Sublease should be each viewed as a true lease for U.S. federal income tax purposes. While the IRS has advanced a large number of novel arguments, we believe that in a properly presented case, these arguments should not be successful in respect of the Transaction.

B. Loan

We have also been asked to opine that the Loan represents valid indebtedness of the Trust and the Investor is entitled to interest expense deductions with respect to the Loan under Section 163 of the Code. The principal argument of the IRS to disallow the taxpayer's claimed interest expense deductions on the loan used to acquire the head lease interest in a LILO transaction is contained in Revenue Ruling 2002-69. The IRS argues that the loans are without substance because neither the head lessor nor the head lessee obtain the use of the borrowed funds and the proceeds are used to finance the acquisition of a leasehold interest that is "substantially offset by an interdependent Sublease with the Headlessor." The IRS continues to argue that "what remains can only be enjoyed after 20 years and after the loans have been "repaid" using "rents" from a Sublease that itself lacks substance." Having concluded that the IRS argument in Revenue Ruling 2002-69 that the Lease and Sublease should be treated as offsetting obligations which create only a future interest in the Network should be viewed as incorrect, we likewise conclude that a court should find this argument for disregarding the Loan to be incorrect.

We note that Revenue Ruling 2002-69 cites *Bridges v. Com'r*,[77] for the proposition that the head lessee/sublessor's loans must be disregarded. To be sure, the court in *Bridges* disregarded the taxpayer's purported indebtedness, but the *Bridges* facts are distinguishable from the Transaction. In

---

[76] Indeed, as the IRS noted in Revenue Ruling 99-14, the IRS has explicitly blessed an obligor providing defeasance collateral, in circumstances where the defeasance collateral was not part of the original transaction. *See* Rev. Rul. 85-42, 1985-2 C.B. 36.
[77] 39 T.C. 1064, *aff'd* 325 F.2d 180 (4th Cir. 1963).

*Bridges*, the taxpayer borrowed from a bank to buy Treasury Notes and bonds at a discount from maturity value and pledged the notes and bonds to secure the taxpayer's loan to the bank. The proceeds of the notes upon maturity were used to satisfy the loans. The taxpayer owed interest to the bank which exceeded the discount on the purchase of the notes. The court found that the taxpayer had no profit potential with respect to the transaction and therefore had no valid indebtedness to the bank. The transaction was designed solely to give the taxpayer capital gain treatment on a sale of the notes and an interest expense deduction instead of ordinary interest income. In the Transaction, the Trust is borrowing from a bank to fund the prepayment of Lease rental. It is acquiring a current possessory leasehold right in the Network with the proceeds of that Loan. The Investor is personally liable for a significant amount of the Loan during the first five years of the Lease. Furthermore, the Investor has a substantial pre-tax profit potential with respect to the Transaction.

Leaving aside the IRS's arguments in Revenue Ruling 2002-69 which are without merit, we note that, in general, nonrecourse debt is respected as valid indebtedness for tax purposes.[78] This principle is based on the premise that, notwithstanding the lack of recourse to the borrower, there is an expectation that the borrower will repay the debt in full. Such an expectation of repayment exists only where the borrower has an economic incentive to satisfy the obligation, such as where the principal amount of the nonrecourse indebtedness does not exceed the value of the property securing the debt thereby resulting in an equity in the property that the borrower would not give up to the lender. The Sublessor borrowed less than 80% of the amount required to acquire its interest under the Lease. It therefore has a substantial equity investment to protect and would be expected to pay off the Loan in order to protect that investment.

The IRS could argue that because the Sublessor pledged cash collateral (that was pledged to it by the Sublessee) to the lender in an amount equal to the principal amount of the loan that the loan should not be respected. In its own published revenue ruling, Revenue Ruling 85-42, 1985-1 C.B. 37, the Service has held that the economic defeasance of a debt obligation will not extinguish the debt even if the risk that the borrower would not pay is virtually eliminated as a result of the pledge of collateral so long as there is no legal release on the debt. In Revenue Ruling 85-42, the pledge of collateral happened after the initial closing date for the loan, however. Although the IRS contends that the result should be different if the defeasance is created at the time of the original transaction, it does not provide any substantive basis for this contention. It is clearly stated in the Helaba PUA and the Sachsen PUA that the Sublessee is not legally released from its obligation to pay rent under the Sublease as a result of entering into these Agreements or any pledge thereof:

> Notwithstanding the provisions of Section 2.2 hereof or anything herein or elsewhere contained, the Sublessee is and shall remain liable for all of its obligations under the Sublease, including its obligation to pay all Sublease Rent thereunder and (ii) nothing in this Agreement shall release, relieve, modify, novate, waive or reduce the obligations of the Sublessee to any Person under the Sublease, the Participation Agreement or any other Operative Document.[79]

---

[78] *See Crane v. Com'r*, 331 U.S. 1 (1947).

[79] Helaba PUA, Section 2.6(a), Sachsen PUA, Section 2.6(a).

Likewise, the Trust is not legally released from its obligation to pay the Loan by its pledge of the Helaba PUA and the Sachsen PUA and the Lender does not have title to the Collateral for the Loan.[80]

C. Deduction of Head Lease Rents

1. Overview

We have also been asked to state our view on the method by which Con Ed is claiming rental deductions under the Lease. The Lease provides for two cash rent payments. It separately provides for an allocation of these total payments to specific periods. Con Ed has deducted the rent in the amounts and at the times allocated.

Section 467 provides that, in general, rent is deducted as allocated, except that certain rent "to be paid" after the close of the period shall be deducted "under present value concepts" in the amounts "determined under regulations."[81]

We have, therefore, reviewed below the questions of whether the Lease is a "Section 467 rental agreement," whether any regulations under 467 are applicable to the Lease and, finally, assuming that the Lease is a 467 rental agreement and that there are no Section 467 regulations applicable to the Lease, whether the deductions of Lease rent should be based under Section 467(b)(1)(B) on "present value concepts." The discussion below concludes, first that the Lease is a Section 467 rental agreement, second that the proposed and final Section 467 regulations do not apply to the Lease and, finally, that present value concepts mentioned in Section 467(b)(1)(B) should not apply to the Lease.

2. Treatment of the Lease as a Section 467 Rental Agreement

Section 467 applies only to a lease which constitutes a "section 467 rental agreement." To be a section 467 rental agreement, a document must be a lease of tangible property and there must be either increasing rent or there must be "rent payable after the close of the year following the calendar year" to which the rent is allocated. The Lease is a lease of tangible property and has deferred rent meeting this requirement.

3. Application of the Section 467 Regulations to the Lease

Section 467 was added to the Code in 1984. The IRS proposed, in 1996, and adopted, in 1999, a series of regulations under Section 467 (the "**Section 467 Regulations**").[82] The Section 467 Regulations do not apply to all section 467 rental agreements. Instead they apply to only to a section

---

[80] See section 9.3 of the Loan Agreement which provides that "no Holder shall have legal title to any part of the Collateral"].

[81] Section 467(b)(1) provides:

(b) Accrual of rental payments

(1) Allocation follows agreement

Except as provided in paragraph (2), the determination of the amount of the rent under any section 467 rental agreement which accrues during any taxable year shall be made--

(A) by allocating rents in accordance with the agreement, and

(B) by taking into account any rent to be paid after the close of the period in an amount determined under regulations which shall be based on present value concepts.

[82] Treas. Reg. § 1.467-1 through Treas. Reg. § 1.467-9.

467 rental agreement which is either entered into, or substantially modified after May 18, 1999,[83] and to those section 467 rental agreements entered into (or substantially modified) after June 3, 1996 which are "[d]isqualified leasebacks and long-term agreements."[84]

The Lease was entered into on May 18, 1999 and after June 3, 1996 and has not been modified since. Hence, the Section 467 Regulations apply to the Lease only if it is a "disqualified leaseback or long term agreement" as defined in Section 467. This term is defined in Section 467(b)(4) and in the Section 467 Regulations.[85] The definition has three components: the lease must be relatively long, a "principal purpose for providing increasing or decreasing rent" must be the avoidance of tax, and the IRS must determine that the lease should be treated as a disqualified leaseback or long term agreement.

The Lease meets the length requirement, but it does not fall within the "principal purpose" requirement by virtue of a safe-harbor. Each of the legislative history to section 467, the proposed Section 467 regulations and the Section 467 Regulations[86] contains a safe harbor (the "**Uneven Rent Test**") under which the Lease rents will not be treated as having such a purpose if this safe harbor is met. The Uneven Rent Test is a mechanical calculation based on the allocation of rents. You have advised us that this calculation has been done and the Lease rent allocation meets the safe harbor. Based on this assumption, the Section 467 Regulations do not apply to the Lease.

4. Discounting of the Lease Rental Deductions

a. Overview

By its terms, section 467(b)(1) requires both the lessor and lessee to report rental income and deduction in the amount and at the time in which the rent is allocated, and in the case of rents paid "after the close of the period" to which they are allocated, section 467(b)(1)(B) states that the income or deduction be determined "in an amount determined under regulations which shall be based on present value principles." Thus, section 467(b)(1)(B) requires a determination of what rents are paid after the period to which they are allocated, when the payment occurs and then reporting as income or deduction the "amount determined under regulations--" but the section 467 regulations are not applicable to the Lease. The question is what amount should be reported in the absence of regulations that are legally applicable to the Lease.

The IRS appears to contend that absent applicable Treasury regulations, a taxpayer is required to invent a system for applying present value concepts to lease rent paid after the close of the period to which it is allocated. You have deducted the rent as allocated. We believe that in the absence of applicable regulations, this method of reporting should be correct, because, for the reasons discussed below, we do not believe that section 467(b)(1)(B) should be read to provide a different method for deducting rent than ultimately was used in the regulations.

---

83 Treas. Reg. § 1.467-9(a)(2).

84 Treas. Reg. § 1.467-9(a)(1).

85 I.R.C. § 467(b)(4); Treas. Reg. § 1.467-3(b).

86 Treas. Reg. § 1.467-3(c)(3)(i).

CE 010407

b. Summary of our Reasoning

Our principle reason for this conclusion is that the statutory language requires it—there is no "amount determined under regulations." We note, however, that as a policy matter, courts have sometimes attempted to find a way to make a statute that depends on regulations effective even in the absence of any regulations. For example, in *John A Francisco*,[87] the Tax Court interpreted the income exclusion of Section 931(a) as effective even though Section 931(d)(2) provides that "[t]he determination as to whether income is described in [section 931(a)(1)] shall be made under regulations prescribed by the Secretary" and no regulations had been issued under Section 931(d)(2). In reaching this conclusion, the Tax Court explicitly found that that section 931(a)(1) by itself provided the exclusion. It also found that relevant regulations existed (the sourcing regulations under sections 861-865) which made it clear what income was to be treated as within Section 931(a)(1). Finally, the court held that language of Section 932(d)(2) did not require that the applicable regulation be denominated as a regulation under Section 932. The Tax Court in *Francisco* understood, therefore, in order to find the exclusion available it was bound to find both that, implementing the statute without section 932 regulations was appropriate to the intent of Congress and that the statute was, by its terms, self-operative (or operative with the Section 861 *et seq.* regulations) and that with the Section 861 et seq. regulations the meaning of section 931 was clear.

The words of Code section 467 do not provide direct authority to discount rental income and deductions. Moreover, we do not believe that a court should attempt to force the words of the statute to make present value principles apply to leases that are not within the Section 467 regulations. First, as we will discuss at some length below, there are important ambiguities in attempting to apply the statute directly that can produce wildly differing results. In fact, the Section 467 Regulations as implemented do not attempt to fit within the statutory framework but instead take a different approach which avoids the ambiguities and opportunities for abuse that might otherwise arise. Second, we believe that it is not possible to read Section 467(b)(1)(B) as requiring discounting of a lessee's rental deductions but not of the corresponding rental income of the lessor. This would provide opportunities for lessors to restate past income from leases downward. Finally, an attempt to apply Section 467(b)(1)(B) outside of the framework of final regulations results intrinsically in applying this rule—reducing lessor income as well as lessee deductions to instances it was never intended to cover.

This last point derives from the fact that, if Section 467(b)(1)(B) is to be read as self-effectuating, it applies to all leases, whether or not the lease has any rents which are deferred further than the next taxable year within the meaning of Section 467(d) which defines a section 467 rental agreement—we shall call this condition "long deferred rent." As we shall see, the regulations take an approach under which if there is no such long deferred rent," there is also no Section 467(b)(1)(B) adjustment. Section 467 itself, however—if Section 467(b)(1)(B) were read without the word "determined under regulations"—would require discounting of rental income even where there is no long deferred rent. The consequence is that a lease which states a monthly rent but actually provides for payments every six months, would be affected by this rule. (We have illustrated the problem in the latter part of Example 2 below.)

---

[87] *John A. Francisco v. Com'r*, 119 T.C. 317 (2002).

c. Section 467 Regulations

An attempt to apply Section 467(b)(1)(B) literally, without the benefit of regulations, requires, on its face, making the following series of determinations:

1. which rent payments are associated with each rent allocation,
2. which rent allocations are subject to discounting, and
3. the time period for the discounting between allocation and payment.

As we will see, the correct choice is not obvious. In reviewing the problems, it is useful to understand how the IRS solved these issues in the Section 467 regulations. The simple answer, oddly enough, is that the IRS bypassed all three issues completely by using its broader regulatory authority under section 467(h) to write a wholly different rule. We have described below the rule the IRS did write.

Section 467(b)(1)(B) applies to all leases which have "rent paid" after the period to which it is allocated. The Section 467 Regulations deal with both "deferred" rent of this type and "prepaid rent."[88] The relevant regulation, Treas. Reg. §1.467-2, provides a rule (the "**Proportional Rental Rule**") that works roughly as follows:

- first, determine whether the lease has prepaid rent or deferred rent (each as defined) —if it does not, just a deduct and include as allocated (unless some other rule applies),
- next determine whether the lease already states an appropriate interest component to reflect prepayment or deferral (in effect, whether the lease calculates interest on a "467 loan" balance based on the difference between cumulative rent allocated and cumulative rent paid)—if it does, again include and deduct rent as allocated (and the interest as computed),
- Finally, if neither exception applies, compute the "proportional rental amount" for each period and use that, instead of the amount allocated, as the rental income and deduction. Based on the difference between the cumulative "proportional rental amount" and the cumulative rent paid, the taxpayer must create a "467 loan" balance and charge or credit interest at a specified rate.

This proportional rental rule determines in effect first whether the lease has <u>any</u> deferred (or prepaid) rent. For this purpose, a lease has deferred rent if the cumulative allocated rent as of the end of any taxable year is less than the cumulative rent scheduled to be paid as of the end of the <u>next</u> taxable year.[89] In effect, this rule treats leases as subject to "discounting" only if the cash and allocations get at least a full year out of sync—what we called "long deferred rent" earlier, not merely if there is any "rent paid after" the end of the period to which it is allocated.[90] However, once it is determined that there exists any long deferred rent, the regulation creates an artificial deduction schedule. The schedule is based on present value principles: the proportionate rent stream has the same present

---

[88] Section 467 itself does not provide rules for prepaid rent. However, the IRS exercised its authority to write parallel rules for prepaid rent.

[89] The regulations also use this definition to determine whether a lease is a "section 467 rental agreement" (Code Section 467(d)) because of having "at least one amount allocable to the use of property during a calendar year which is to be paid after the close of the calendar year following the calendar year in which such use occurs." Note that this rule avoids attempting to characterize when a particular allocated amount is paid.

[90] Allocation periods need not be taxable years but can be any specified period not more than a year.

value as the cash rent stream (and the same relationship between allocation periods as the allocation stream.) This has the effect of discounting each and every allocation as if every rent payment is deferred, in each case for the same period.[91] The proportional rental rule thus makes no attempt to determine which payments belong to which proportional rents (or which portions of a payment are rent and which are interest.) Instead it adopts what might be thought of as a "present-value based" average deferral for every rental, but no express rule defining when any particular amount of allocated rent is deemed paid.

d. Determining Which Payments are Attributable to Which Allocated Rent

While the Proportional Rental Rule provides a workable, unambiguous and fair answer to how to account for the timing of payments and allocations, it is not possible to view that rule as being the rule called for by Section 467(b)(1)(B) in the absence of regulations. In the first place, section 467(b)(1)(B) contains no exception limiting its ambit only to leases in which there is at least one instance of long deferred rent—unless it is the limitation on its application to the amounts "determined under regulations."

Moreover, section 467(b)(1)(B) clearly contemplates determining, for each allocation, the date on which the allocated rent is paid. There are at least three, totally different rules that could be applied:

1. Specified Attribution: One approach, which matches the way many leases actually read, is to look to the timing specified in the lease.

2. First In-First Out: Under this approach, rent payments would be attributed to allocations in the order made, so that the first rent would be attributed to the first period until payments exceed the allocation for that period, and then attributed to the second period and so on. Note that this approach corresponds to the thought behind the Section 467 determination of whether there is any "deferred rent."

3. Equal Deferral: Another approach corresponding to the proportional rent thought in the regulations is to assign each cash rent payment to every allocation period in such a way that each allocation is paid with the same deferral as every other allocation.

Each of these approaches presents problems, and not surprisingly, none of them was adopted by the IRS. In fact, the IRS adopted a "First-In-First-Out" rule for one purpose (deciding whether discounting is applicable at all) and an "Equal Deferral" rule (the Proportional Rental Rule) for the actual discounting.

Oddly, the most reasonable interpretation of the statutory language by itself is the Specified Attributions rule: the statute would seem to be envisioning a lease that says that rent accrued for some year will be payable in some other year. Yet this rule is subject to substantial manipulation (as shown in Example 1).

CE 010410

[91] In the case of a lease which has deferred rent but no prepaid rent, the proportionate rent will generally be a fraction of the allocated rent.

Example 1: Specified Attributions.

- Specification of First Year's Rent to Final Year. Lets consider a ten-year lease that allocates $100 of rent to each year, payable at the end of the year, except that the first year's rent is not payable until the end of the tenth year. If the specification is treated as governing, the first years' rent is discounted nine years and all other rents are to be reported as stated.

- Specification of Each Years Rent to Following Year. However, if the identical allocation and cash payments are attributed differently in the lease, the approach results in wildly different answers. For example, if the lease specifies that each year's rent is paid at the end of the following year, then each year's rent is discounted, but only by one year.

- Effect on Characterization of the Lease. Even worse, on this approach, the core question of whether the lease is a section 467 rental agreement is affected by the specification. Recall that the definition of a section 467 rental agreement also looks to when an amount allocated is paid. Assuming that in the absence of regulations the statute should be read as applying the same rule for determining when allocated rent is paid for purposes of Section 467(b)(1)(B) as for purposes of Section 467(d), the specification of the first year's rent to the final year makes the lease a section 467 rental agreement, because the first year's rent is paid after the close of the following taxable year. On the other hand, if lease years happen to correspond to tax years, the specification of each year's rent to the following year results in no rent being paid later than the close of the taxable year following the year to which it is allocated.

Not surprisingly, the Section 467 Regulations do not use a specified attribution rule for any purpose.

The FIFO and Equal Deferral rules are not as subject to taxpayer manipulation. However, each one alone produces uncomfortable results by making many leases subject to discounting. In addition, a FIFO rule would allow the taxpayers leeway to decide on the amount of discount to a degree (as explained in Example 2).

Example 2: FIFO

- Let us consider a ten year lease in which the lessee and the lessor are calendar year taxpayers but the lease commences on July 1. The lease calls for an annual payment of $100 on each anniversary of the lease commencement. It also allocated $100 to each lease year as rent.[92]
- One would normally expect the lessor to report $50 of rent in the first taxable year, $100 in each of the 9 next taxable years and $50 in the last year. The lessee's deductions would be expected to mirror this. Indeed, this is precisely how the income will be reported under the Section 467 regulations, since the proportional rental rule will not be invoked.
- If the rent is allocated to each lease year as $100 per year, this is also the way Section 467(b)(1)(B) would work under a First-Out, First-In approach.
- Suppose, however, that while the payments are as stated above, the lease provides for semi-annual allocations of $50 of rent to each semi-annual period. Under a first-in, first out rule

[92] This lease is not a section 467 lease. It could be made to be one by adding one increasing rent allocation at any point. We have not done so to make the illustration easier to follow.

> (and indeed under almost any rule that attempts to apply Section 467(b)(1)(B) literally but without the words "determined under regulations") the $50 allocated to the first taxable year and the first allocation period is unpaid at the end of the period. Under the FIFO rule, it is treated as paid in July of the following year. If the discount rate is 10% per annum, therefore, the lessor is only required to report $47.50 of income in the first taxable year.[93]

This may be a nice result for the lessor, but we believe that it does not comport with the intention of the statute. An equal deferral approach would produce different numbers (since every rent accrual is discounted) but the same basic problem. Regulations were needed to reach the result that the lessor has to report the entire $50 as income in the first year, and $100 each year thereafter and they were actually promulgated.

e. Summary

Code section 467(b)(1)(B), by its terms applies only to an amount "determined under regulations" and there is, for the Lease, no such amount. An attempt to apply Section 467(b)(1)(B) without benefit of regulations leads to ambiguities. Even if the ambiguities are resolved, the literal reading of the provision, without modification by regulations, would produce inappropriate results in many instances. For these reasons we believe that a court should neither be permitted to determine that Section 467(b)(1)(B) required reporting of an amount other than the amount allocated nor desire to do so.

D. Analysis of Reporting of Sublease Rents

1. Overview of Sublease Issues

The Sublease calls for rent to be paid during the Base Sublease Term. A portion of the rent paid by Sublessee is then lent by Sublessor to Sublessee under the Sublessee Loan and the Sublessee Loan accrues compound interest at a rate of 8.67% per annum (the "**Sublessee Loan Interest Rate**") and is due and payable on the date the Lease is scheduled to terminate. If the Sublessee does not exercise its option to purchase the Sublessor's Lease Interest at the end of the Base Sublease Term, the Sublessor can renew the Sublease for an additional term (the Sublease Renewal Term) for specified rents. The rents during the Sublease Renewal Term are:

- Less than the fair market rents for the Renewal Term projected in the Appraisal, and
- Higher than the average allocated rent for the Base Sublease Term.

Section 467 provides rules for reporting income from leases, including the Sublease. The general rule of Section 467 is that rents are reported by the lessee and lessor as allocated if the lease contains a valid allocation.[94] However, Section 467 contains two exceptions to this rule. The first exception is if the lease is a "disqualified leaseback" or "long-term agreement" (a "**Disqualified Lease**") in which case, the lessor and the lessee must report the lease rental using a "constant rental accrual" method.[95] The second (which we discuss elsewhere in the context of the Lease) is that, in the case of

---

93 Note that the example uses a semi-annual allocation period to make the point. The same result occur if the lease states the rent on a monthly basis.

94 I.R.C. § 467(a)(1).

95 I.R.C. § 467(b)(2).

certain "deferred" rents, the rental deduction and income may be reported as determined under regulations on a present value basis.[96]

The statutory language of Section 467 was supplemented by regulations proposed in 1996 (the "**Proposed Regulations**")[97] and by the final version of those regulations, adopted in 1999 (the "**Final Regulations**").[98] The Proposed Regulations and the Final Regulations differ from the basic rules of Code Section 467 and from each other in a number of ways. The difference that is critical to our analysis is the definition of Disqualified Lease. We discuss in the next section the relevant differences in the definitions relevant to a determination of whether a lease is a Disqualified Lease and the effect each such definition would have on the treatment of the Sublease. After determining which set of rules applies to the Sublease, we then turn to a discussion of the tax accounting for rental income under the Sublease.

2. Disqualified Lease

a. Overview of "Disqualified Lease"

i. In General

The basic rules for whether a lease is a Disqualified Lease are essentially the same in the statute, the Proposed Regulations and the Final Regulations. For a sufficiently long term agreement involving sufficiently large rents, a lease is a Disqualified Lease if:

1. The lease provides for increasing or decreasing rent,[99]
2. "A principal purpose" for the increasing or decreasing rent is the avoidance of Federal tax, and
3. The IRS determines that the agreement should be treated as a Disqualified Lease.

You have informed us that, as of the date of this writing, the Sublease has not been the subject of determination by the IRS that it is a Disqualified Lease. Therefore, as a matter of technical law, the Sublease cannot yet be a Disqualified Lease, regardless of the existence of other two factors that would render the Sublease a Disqualified Lease because all three elements are required. Thus, it is clear that, as of this writing, the Sublease should not be treated as being a Disqualified Lease and thus the rentals should be reported as set forth in the Sublease. However, the rest of this discussion deals with whether the first two listed factors are met with respect to the Sublease--and whether as a result the Sublease could be determined to be a Disqualified Lease by the IRS (a "**Potentially Disqualified Lease**").

ii. The 90-110 Test

In analyzing the "principal purpose" test, both the legislative history of Section 467 and the Proposed and Final Regulations provide a "90-110 test" as a safe harbor whereby if a lease meets the "90-110

[96] I.R.C. § 467(a)(2).

[97] IA-292-84, 1996-28 IRB 38.

[98] Treas. Reg. §§ 1.467-1 through 1.467-9.

[99] Under Section 467 (absent regulations), a Disqualified Lease must have "increasing" rents. (Section 467(b)(4)(B)), subject to authority granted to the IRS to promulgate similar rules for leases with decreasing rents (Section 467(f)).

CE 010413



PF030558

test" it cannot be treated as a Potentially Disqualified Lease.[100] Simplifying the test, this safe-harbor is met if the actual allocated rent for any year is not less than 90% of the average annual rent over the term of the lease and never more than 110% of the average.

The statute, Proposed and Final Regulations each contain different rules for determining when to include a renewal term in the term of a lease for purposes of determining each annual rent and the average rent during the term of the lease. You have informed us that the Sublease allocations will meet the 90-110 test if the relevant lease term includes only the Base Sublease Term and not if the Sublease Renewal Term is included.

iii. Renewal Term Rules

Code Section 467 itself contains virtually no direct information about whether a taxpayer is required to include a renewal term as part of the lease term when accounting for rent.[101] The Proposed Regulations had provided that an optional renewal period was included in the lease term unless the option was not expected to be exercised.[102] The Final Regulations continue this rule as to options of the lessee to renew, but provide that any renewal which is at the option of the lessor is automatically included in the lease term for purposes of section 467.[103]

Based on the Appraisal conclusion that the Sublessor is unlikely to exercise the Sublease Renewal Option, it would appear that under the Proposed Regulations the Sublease Renewal Term would not be included in the lease term so the Sublease would not be a Potentially Disqualified Lease, but that under the rules of the Final Regulations, the Sublease Renewal Term automatically would be included and, as a result, the Sublease would be a Potentially Disqualified Lease. The question is which set of regulations must be applied to the Sublease.

b. Effective Dates

i. In General

The Final Regulations apply in general, to rental agreements entered into after May 18, 1999.[104] The Sublease was entered into on May 18, 1999. The Final Regulations are, however, also applicable to any lease entered into after June 3, 1996 if the lease is a Disqualified Lease.[105] Presumably, this rule should be read as applying to any lease which is a Disqualified Lease under the

---

[100] The 90-110 test reference in the legislative history is to a test contained in the Guidelines, as they existed in 1984 (§ 5.02 of Rev. Proc. 75-21). Under this test, the lease term included all renewals other than renewals at the option of the lessee at fair market rent as determined at the time of renewal (Rev. Proc. 75-21, § 4(2) ). The Proposed and Final regulations modify and refine that test.

[101] Code section 467(e)(6) provides that "except as provided in regulations prescribed by the Secretary, there shall not be taken into account in computing the term of any agreement for purposes of this section any extension which is solely at the option of the lessee."

[102] Proposed Regulations § 1.467-1(h)(5) (defining lease term) stated: "an option period is included in the lease term only if it is expected, as of the agreement date, that the option will be exercised by either the lessor or the lessee."

[103] Treas. Reg. § 1.467-1(h)(6) (defining lease term) now states "Lease term means the period during which the lessee has use of the property subject to the rental agreement, including any option of the lessor to renew or extend the term of the agreement. An option of the lessee to renew or extend the term of the agreement is included in the lease term only if it is expected, as of the agreement date, that the option will be exercised."

[104] Treas. Reg. § 1.467-9(a)(2).

[105] Treas. Reg. § 1.467-9(a)(1).

rules of the Final Regulations (as the rule does not specify that the Proposed Regulations apply for this purpose). However, other statements of the Secretary of the Treasury and the IRS have indicated that their intent was for the rules in the Proposed Regulations to apply for purposes of making determinations during the period from June 3, 1996 through May 18, 1999.

ii. Election to Apply Proposed Regulations For Interim Period Leases

The Final Regulations provide a special effective date election, supposedly to deal with the differences between the Proposed Regulations and the Final Regulations. Treasury Regulation § 1.467-9(c) permits the taxpayer to elect to apply the rules of the Proposed Regulations for leases, such as the Sublease, which were entered into during the period beginning after June 3 1996 and ending on May 18, 1999 (the "**Interim Period**"):

> In the case of any leaseback or long-term agreement (other than a disqualified leaseback or long-term agreement) entered into [during the Interim Period], a taxpayer may choose to apply the provisions of [the Proposed Regulations].

In explaining this provision, the Treasury described its purpose as follows:

> Other commentators requested that taxpayers be permitted to rely on the provisions of the proposed regulations in the case of leasebacks and long-term agreements entered into during the interim period. According to these commentators, *the terms of certain leasebacks and long-term agreements entered into during the interim period were structured so as to comply with the safe harbors and other provisions of the proposed regulations in order to ensure that these agreements would not be treated as disqualified leasebacks or long-term agreements.* In the absence of a provision permitting taxpayers to rely on the provisions of the proposed regulations in these cases, *these agreements might lose their safe-harbor protection because of changes made in the final regulations.* Accordingly, the final regulations permit taxpayers to rely on the provisions of the proposed regulations in the case of any leaseback or long-term agreement entered into during the interim period. No specific election is required in the case of an agreement subject to this provision. (emphasis added.)[106]

The explanation clearly implies that the effective date provision is intended to permit a taxpayer to apply the rules of the Proposed Regulations for purposes of determining whether a lease entered into during the Interim Period is a Disqualified Lease. As discussed above, under those Proposed Regulations, the Sublease would not be a Disqualified Lease.

---

[106] *See* T.D. 8820, April 30, 1999 promulgating the Final Regulations.

iii. Meaning of "(other than a disqualified leaseback or long-term agreement)" in Election to Apply Proposed Regulations

The Treasury's explanation of the Final Regulations does not explain the meaning of the parenthetical exclusion in Treasury Regulation § 1.467-9(c) which states that the election is available for a long-term lease "(other than a disqualified leaseback or long-term agreement)." There are two ways to interpret this phrase. One possibility is that the phrase means a Disqualified Lease as determined under the rules of the Final Regulations. The other is the interpret it to apply only to a Disqualified Lease as determined under the Proposed Regulations.

As a matter of simple linguistic interpretation, there is a strong argument that the phrase should be read as applying to the rules as in effect under the Final Regulations. This would, however, have the effect of making the special rule of very limited value--a taxpayer who structured a transaction so as not to be Disqualified Lease under the Proposed Regulations achieves no protection from the Final Regulations in those respects in which the Final Regulations differ.[107] The explanation in the preamble to the Final Regulations clearly indicates that the election is provided because without it, taxpayers who relied on the Proposed Regulations "might lose their safe-harbor protection because of changes made in the final regulations."

The legal effect of the explanatory portion of a Treasury decision is unclear; it may not be possible for a taxpayer to rely on it to resolve an ambiguity in the accompanying Treasury regulation. However, the IRS has implicitly interpreted this special effective date election to mean that the Proposed Regulations apply in determining whether the sublease in a LILO transaction is a Disqualified Lease. In Revenue Ruling 2002-69, the IRS described a headlease and sublease very much like the Lease and Sublease. In particular, the sublease described in Revenue Ruling 2002-69 contained a provision allowing the lessor to renew the lease at specified rents for an additional period, just like the Sublease does. The revenue ruling does not provide sufficient facts to ascertain that the Sublease would pass the Proposed Regulation 90-110 test (applied without including the optional renewal term) and would fail the Final Regulations 90-110 test (applied with including the renewal term), but the IRS description of the applicable law makes it clear that the IRS views Treasury Regulation § 1.467-9(c) as applicable:

> Because this LILO transaction was entered into after June 3, 1996, and on or before May 18, 1999, the provisions of the proposed regulations are available.[108]

Interpreting Treasury Regulation § 1.467-9(c) as applying the Disqualified Lease test of the Proposed Regulations is a sensible interpretation of the parenthetical phrase--under this interpretation, a lease entered into during the Interim Period which would be a Disqualified Lease under the Proposed Regulations becomes subject to the Final Regulations, instead of to the Proposed Regulations, for all purposes. This was the clearly expressed intent of the Proposed Regulations and consequently a taxpayer who entered into a lease which was a Disqualified Lease under the Proposed Regulations

---

[107] The taxpayer might apply the rule to protect against IRS determinations under the "naked' Section 467 provisions, but we see no indication in the explanation that any such limited assistance was intended.

[108] *See* § 1.467-9(c).

was on notice that the Final Regulations would apply to the transactions.[109] Also under this interpretation, a lease structured to comply with the safe harbor in the Proposed Regulations so as to avoid classification as a Disqualified Lease would continue to enjoy the safe harbor under the Final Regulations.

In general, a taxpayer is entitled to rely on a revenue ruling published in the Internal Revenue Bulletin, which Revenue Ruling 2002-69 clearly is.[110] If the facts and circumstances of the taxpayer's transaction are the same as those in the revenue ruling and the ruling has not been superseded then courts generally will require the IRS to take a position consistent with its published ruling.[111]

c. Conclusions As To Potentially Disqualified Lease

We believe that the better view is that Treasury Regulation § 1.467-9(c) has the effect of excluding the Sublease from the Final Regulations version of the Disqualified Lease definition by virtue of the taxpayer implicitly electing to apply the Proposed Regulations. This appears to have been the intention and understanding of the drafters of the Final Regulations and Revenue Ruling 2002-69 makes it clear that the IRS interprets the effective date election this way. We note, however, that a strong case can be made that the plain words of Treasury Regulation § 1.467-9(c) exclude any lease that is a Disqualified Lease under the provisions of the Final Regulations. It can also be argued that Revenue Ruling 2002-69 does not explicitly address the issue of whether the Sublease renewal term must be included in the 90-110 test for purposes of determining the availability of the Proposed Regulations. Overall, we are of the view that an implicit election under Treasury Regulation § 1.467-9(c) is more likely than not to be available for the Sublease.

3. Accrual of Sublease and Sublessee Loan Income.

a. Overview

Assuming that the Proposed Regulations apply to the Sublease, we review below whether the Sublease rents should be reported as allocated in the Sublease or using some other method. Under the Proposed Regulations, if the stated allocations are valid, then the rent is reportable as allocated unless the "proportional rental" rule of Proposed Regulation § 1.467-2 applies. We review the allocations and the application of the proportional rental rule in the sections below. Assuming that the implicit election under Treasury Regulation § 1.467-9(c) is available for the Sublease, we conclude that the Sublease rent allocations should be valid and that the proportional rental rule should not apply.

b. Validity of the Allocations

CE 010417

---

109 Proposed Regulation § 1.467-8 (Effective Date) read:

> Sections 1.467-1 through 1.467-7 [the rest of the Proposed Regulations] are effective for-
>
> (a) Rental agreements entered into after the date these regulations are published as final regulations in the Federal Register; and
>
> (b) Disqualified leasebacks and long-term agreements entered into after June 3, 1996.

110 *See* Treas. Reg. § 601.601(d)(2).

111 *See Rauenhourst v. Com'r*, 119 T.C. 157 (2002)(IRS may not argue against principles stated in a longstanding revenue ruling); *Walker v. Com'r*, 101 T.C. 537 (1993).

Proposed Regulation § 1.467-1(d)(1) provides (with exceptions not relevant here) that rental income for any period is the "fixed rent for [the period] (determined under paragraph (d)(2) of this section)" plus any stated interest provided in the rental agreement. Proposed Regulation § 1.467(d)(2) then states that the "fixed rent" for a period is one of:

- In the case of a disqualified leaseback or long-term agreement, the "constant rental amount (Prop. Reg. § 1.467-1(d)(2)(i));
- In the case of a lease which is not a disqualified leaseback or long-term agreement, and which does not provide "adequate interest on fixed rent," the "proportional rental amount (as determined under section 1.467-2(c))" (Prop. Reg. § 1.467-1(d)(2)(ii)); and
- Otherwise, "the fixed rent for a rental period is the amount of fixed rent allocated to the rental period under the rental agreement, as determined under [Proposed Regulation 1.467-1(c)(2)(ii)]" (Prop. Reg. § 1.467-1(d)(2)(ii)).

We concluded earlier that, based on the safe harbor in the Proposed Regulations, the Sublease should not be a disqualified leaseback or long-term agreement for purposes of the Proposed Regulations and we conclude below that the Sublease should be treated as having "adequate interest on fixed rent" for purposes of the Proposed Regulations. Thus, the applicable rule for accounting for rental income under the Sublease should be Proposed Regulation § 1.467-1(d)(2)(iii): the amount of fixed rent allocated to the rental period under the rental agreement if the agreement allocation is valid under Proposed Regulation § 1.467-1(c)(2)(ii). That section provides that:

> A rental agreement specifically allocates fixed rent if the rental agreement unambiguously specifies, for periods no longer than a year, a fixed amount of rent for which the lessee becomes liable on account of the use of the property during that period, and the total amount of fixed rent specified is equal to the total amount of fixed rent payable under the lease.[112]

The Sublease contains a specific allocation of rent on Exhibit B to the Sublease, which specifically allocates the fixed rent for which the Sublessee becomes liable for the period.[113] The periods are no longer than one year. You have informed us that the total amount allocated is equal to the total rent payable. Consequently, the Sublease's allocation is valid and, if the proportional rental rules do not apply, the income from the Sublease and Sublease Loan should be the sum of the allocated rent and the stated interest on the Sublease Loan.

c. Proportional Rental Rule

Proposed Regulation § 1.467-2 provides for a "proportional rental" inclusion--a fixed fraction of allocated rent is includible in each period. The proportional rule applies only if the rental agreement "does not provide adequate interest on fixed rent under [Proposed Regulations § 1.467-2(b)]."[114]

---

112 Prop. Reg. § 1.467-1(c)(2)(ii).

113 "Fixed Rent" is "any rent to the extent its amount and the time at which it will be paid are fixed and determinable under the terms of the [lease agreement]" (Proposed Regulations § 1.467-1(h)(3 i).

114 Prop. Reg. § 1.467-2(a).

Adequate interest on fixed rent exists, under the Proposed Regulations, if any of several conditions are met. The first is that the rental agreement "has no prepaid or deferred rent as described in [Proposed Regulation] §1.467-1(c)(3)."[115] An agreement has deferred rent for this purpose if, as of the end of any taxable year, the cumulative allocated rent exceeds the cumulative rent payable as of the end of the following taxable year. Prepaid rent is defined similarly--cumulative paid rent at the end of any taxable year exceeds cumulative allocated rent as of the end of the following taxable year. Under the terms of the Sublease, all rent is payable during the period to which it is allocated, so there is no deferred or prepaid rent.

An argument could be made, however, that the Sublessee Loan is a disguised form of deferred rent. The argument would be that the "payment" of rent under the Sublease and the use of these payments to make the advances of the Sublessee Loan back to the Sublessee are really no payment of rent at all during the years in which such advances are made. The argument would be that, viewed together, the Sublease and Sublessee Loan provide for payment of rent to be deferred, and to accrue interest until paid at the Sublessee Loan Interest Rate.

We have not considered the strength or weakness of this argument because whether it is correct or not should not affect the reporting of income under the Sublease and Sublease Loan. The proportional rental rule does not apply where the agreement "provides interest (the stated rate of interest) on deferred or prepaid fixed rent at a single fixed rate" provided that the stated rate of interest "is no lower than 110 percent of the applicable Federal rate" at the date of the lease agreement.[116] Viewing the Sublessee Loan as a rent deferral instead of a true loan still results in there being adequate interest on the fixed rent because the Sublessee Loan Interest Rate exceeds 110 percent of the applicable Federal rate.[117]

Yours faithfully

Watson Farley & Williams (New York) LLP

**Watson, Farley & Williams (New York) LLP**

[115] Prop. Reg. § 1.467-2(b)(1)(i).

[116] Prop. Reg. § 1.467-2(v)(1)(ii).

[117] 110% of the long-term AFR for May 1999 (the applicable month and year for the Transaction) would be 6.23 percent compounded annually. See Rev. Rul. 99-21, 1999-1 C.B. 970.

CE 010419