**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **CONSOLIDATED EDISON COMPANY OF NEW YORK, INC. & SUBSIDIARIES,** | ) | |
| **Plaintiff,** | ) | **No. 06-305 T** |
| **v.** | ) | **Judge Marian Blank Horn** |
| **THE UNITED STATES,** | ) | |
| **Defendant.** | ) | |

**JOINT STATEMENT OF ISSUES OF FACT**

The Plaintiff, Consolidated Edison Company of New York and Subsidiaries, and the Defendant, the United States of America, pursuant to the Court's Scheduling Order revised August 31, 2007, submit this Joint Statement of Issues of Fact.

**PLAINTIFF'S SEPARATE STATEMENT:**

All capitalized terms are as defined in Appendix A to the Participation Agreement and Appendix A to the Facility Operating Agreement, both dated as of December 15, 1997. Other defined terms are:

"ABN" refers to ABN AMRO Bank N.V.

"Con Edison NY" refers to Consolidated Edison Company of New York, Inc. and its subsidiaries.

"EZH" refers to Electriciteitsbedrijf Zuid-Holland.

"EZH Lease Transaction" refers to the transaction described in paragraphs 64-73 of Con Edison NY's Complaint.

"HBU" refers to Hollandsche Bank-Unie N.V.

As this is a Joint Statement of Issues of Fact, Con Edison NY does not agree that it must prevail on all issues listed herein in order to obtain its requested refund.

**A. <u>Benefits and Burdens</u>**

1. Whether, as of December 15, 1997, it was reasonably expected that economic or other factors would compel EZH to exercise its Sublease Purchase Option on January 2, 2018, so that the exercise of the Option by EZH was virtually certain?

2. Whether, as of December 15, 1997, ConEdison NY reasonably expected that the Sublease Purchase Option was not compelled or virtually certain to be exercised?

3. Whether EZH will possess a significant residual interest in the RoCa3 Facility after the termination of the Lease to Con Edison NY?

4. Whether, if EZH does not exercise the Sublease Purchase Option and Con Edison NY exercises the Retention Option, Con Edison NY expected to have a residual interest in the RoCa3 Facility from January 2, 2018 to February 24, 2041?

5. Whether Con Edison NY expected that it would be precluded from exercising the Retention Option by reason of section 20(c)(ii) of the Sublease (requiring repayment of the Loan Certificates)?

6. Whether, if EZH does not exercise the Sublease Purchase Option and Con Edison NY exercises the Sublease Renewal Option, Con Edison NY expected to have a residual interest in the RoCa3 Facility from June 15, 2034 to February 24, 2041?

7. Whether Con Edison NY expected its leasehold interest in the RoCa3 Facility to have significant value after the expiration of the Sublease Renewal Option?

8. Whether, pursuant to the provisions of the Facility Operating Agreement and other Operative Documents, Con Edison NY will be entitled to sell its pro rata share of the

electrical and thermal output of the RoCa3 Facility after the expiration of the Sublease Agreement (assuming EZH does not exercise its Sublease Purchase Option)?

9. Whether, pursuant to the provisions of the Facility Operating Agreement and other Operative Documents, Con Edison NY will be responsible for its pro rata share of the expenses of the RoCa3 Facility after the expiration of the Sublease Agreement (assuming EZH does not exercise its Sublease Purchase Option)?

10. Whether pursuant to the provisions of the Operative Documents, ConEdison NY can expect to have sufficient access rights to use common facilities, and support rights to permit commercial operation of the RoCa3 Facility and to permit sales of electrical and thermal output from the RoCa3 Facility to the extent of its interest therein.

11. Whether Con Edison NY and Banc One together have the right to remove EZH as Operator of the RoCa3 Facility after the expiration of their Subleases to EZH (assuming EZH has not exercised its Sublease Purchase Options)?

12. Whether, pursuant to the provisions of the Facility Operating Agreement, Con Edison NY would be required to pay a fee to EZH as the Operator of the Facility following the expiration of the Sublease to EZH (assuming EZH has not exercised the Sublease Purchase Option)?

**B. <u>Pre-Tax Profit</u>**

13. Whether the EZH Lease Transaction, on an objective basis, was likely to produce a pre-tax profit?

14. Whether the pre-tax profit from the EZH Lease Transaction was consistent with the pre-tax profit from leveraged lease transactions for assets of similar size?

15. Whether Con Edison NY's yield on the EZH Lease Transaction for financial reporting purposes was expected to be at least 12%?

16. Whether, as a principle of corporate finance and standard business practice, potential investments should be evaluated on a pre-tax or after-tax basis?

17. Whether Con Edison NY expected to report additional taxable income and pay additional taxes as a result of entering into the EZH Lease Transaction?

**C. <u>Subjective Business Purpose</u>**

18. Whether Con Edison NY's decision to invest in the EZH Transaction was encouraged by business or regulatory reality?

19. Whether the investment in the EZH Lease Transaction was undertaken as part of Con Edison NY's expansion into unregulated investments, including international investments, as part of the deregulation of its utility business?

20. Whether the EZH Lease Transaction had a business or corporate purpose other than to reduce taxes?

21. Whether Con Edison NY's management was motivated solely by tax considerations in making the decision to enter into the EZH Lease Transaction?

**D. <u>Con Edison NY's Due Diligence</u>**

22. Whether Con Edison NY's review of the proposed EZH Lease Transaction was conducted in a prudent, business-like, and reasonable manner, including reasonable due diligence, such as:

(a) Obtaining an appraisal of the RoCa3 Facility from Deloitte & Touche;

(b) Obtaining an engineering review of the RoCa3 Facility form Duke Engineering and Services;

(c) Obtaining an environmental review of the RoCa3 Facility from Tauw Milieu?

(d) Conducting a due diligence site visit;

(e) Reviewing technical material;

(f) Obtaining appropriate legal non-US tax opinions.

23. How was the EZH Lease Transaction introduced to Con Edison NY?

**E. <u>Leveraged Lease Accounting</u>**

24. Whether the EZH Lease Transaction qualifies for leveraged lease accounting?

25. Whether the EZH Lease Transaction produces front-loaded earnings for financial reporting purposes?

26. Whether the earnings pattern produced by leveraged lease accounting was one of Con Edison NY's reasons for entering the EZH Lease Transaction?

**F. <u>Leveraged Leasing Issues</u>**

27. Whether it is a common commercial practice for leveraged leases to be structured so that the investor's return from the lease, including a scheduled termination value in the event of default or other termination, will provide the investor with a return of its equity plus its minimum expected after-tax rate of return?

28. Whether the default provisions and early termination provisions of the EZH Lease Transaction are similar to those of other leveraged lease transactions?

29. Whether the use of credit support for a lessee's obligations is a common commercial practice in financial transactions, including leveraged leasing?

30. Whether the use of credit support had a business purpose in the context of the EZH Lease Transaction?

31. Whether the matching of rental payments due on a leveraged lease to the debt service with respect to the lease, both in timing and amount, is a normal commercial practice in leveraged leasing?

32. Whether the use of net leases, in which the lessee in possession of the property is responsible for maintenance, insurance, and taxes with respect to the property, is a normal commercial practice in leveraged leasing?

33. Whether the use of nonrecourse debt is a normal commercial practice in leveraged leasing?

34. Whether leveraged lease transactions generally result in accelerated earnings for financial reporting purposes?

35. Whether leveraged lease transactions generally result in a deferral of income taxes which are taken into account by the equity investors in determining their accounting yields?

**G. Substance v. Form Issues**

36. Whether Con Edison NY and EZH agreed that the Lease Agreement and the Sublease Agreement were intended to qualify as leases for federal income tax purposes?

37. Whether Con Edison NY has retained significant and genuine attributes of a lessor with respect to the RoCa3 Facility, such as:

(a) the right to receive rent;

(b) the right to declare a default if EZH does not comply with its obligations as lessee;

(c) the right to repossess its interest in the RoCa3 Facility upon a default; and

(d) the right to earn income from the residual value of the RoCa3 Facility after the expiration of the Sublease with EZH?

38. Whether the terms of the EZH Lease Transaction were subject to negotiation prior to Closing?

39. Whether the form of the EZH Lease Transaction resulted in the creation of genuine obligations enforceable by unrelated parties?

40. Whether the form of the EZH Lease Transaction has practical economic effects aside from any tax benefits?

41. Whether the EZH Lease Transaction was imbued with tax-independent considerations and was not shaped solely by tax-avoidance features?

42. Whether EZH may experience a financial detriment if the EZH Lease Transaction is terminated before the Sublease Basic Termination Date and that financial detriment cannot be calculated as of the Closing Date because it is dependent on variables only knowable in the future?

43. Whether the Sublease Deposit and IJssel Deposit would be treated as eliminating EZH's obligations for financial reporting purposes?

44. Whether ConEdison NY understood that HBU and ABN are financial institutions which, though affiliated, have separate operations, assets, and management?

**H. <u>Miscellaneous Issues</u>**

45. Whether it was reasonable for Con Edison NY to expect the value of its undivided leasehold interest in the RoCa3 Facility to be greater than the amount of its non-recourse indebtedness owed to HBU throughout the term of the EZH Lease Transaction?

46. Whether Con Edison NY is required to fund the Trustee Treasury Collateral and Lease Collateral Deposit if the Sublease Purchase Option is not exercised by EZH?

47. Whether the Facility Operating Agreement contains provisions for resolving potential conflicts between EZH, Banc One, and Con Edison NY concerning the operation of the RoCa3 Facility?

48. Whether EZH remains legally liable for the payment of Sublease rent (including Sublease Basic Rent or any Sublease Supplemental Rent) regardless of any collateral or other credit support pledged for such payments?

49. Whether EZH has interest rate risk (or opportunity) on the funds in the Ijssel deposit?

50. Whether EZH has default risk on funds in the Sublease Deposit?

51. Whether Con Edison NY has interest rate risk (or opportunity) on the Lease Collateral Deposit or Trustee Treasury Collateral?

52. Whether the existence of the Letter of Credit, Sublease Deposit and Ijssel Deposit changed the payment expectation under the Sublease from speculative to non-speculative?

## DEFENDANT'S SEPARATE STATEMENT:

### A. <u>Substance over Form</u>

The following facts are relevant to the Court's determination of whether Plaintiff obtained a current leasehold interest in the RoCa3 Facility ("Facility") in 1997 that entitles Plaintiff to claim a deduction for rent expense, interest expense, and other fees for that taxable year:

1. Does the substance of the EZH LILO transaction (the "Transaction") comport with the form of a genuine leasing transaction that should be respected for federal income tax purposes?

2. By entering into this transaction, did Plaintiff obtain a current lease interest, or merely a future contingent interest?

3. Whether EZH ever relinquished to Plaintiff any of the benefits (rewards) or burdens (risks) of ownership of the undivided leasehold interest in the Facility.

4. Whether Plaintiff enjoyed the benefits, and shouldered the burdens, of owning an interest in the Facility during the initial sublease term?

5. Whether Plaintiff bore any substantial, genuine risk of incurring an economic loss on its investment in the Lease.

6. Whether the Transaction allows Plaintiff to use or benefit from the Facility, or provides Plaintiff with an unconditional right to use or enjoy the Facility at any time during the initial sublease term?

7. Whether Plaintiff has the right to operate or profit from the use of the Facility?

8. Before the purchase option date, did Plaintiff have any capital at risk in the Transaction, or was Plaintiff assured a risk-free return of its investment?

9. Whether Plaintiff's recovery of its purported equity investment depends to any extent on the residual value of its claimed leasehold interest (the market value of that interest at the end of the sublease term)?

10. Whether any return on Plaintiff's proposed equity investment is "collared" by a purchase option, and a sublease renewal option, that place a ceiling and a floor, respectively, on such return?

11. Whether any potential profit to Plaintiff is derived from leasing the Facility, and not the investments that were purchased at the outset of the Transaction?

12. To what extent will any return to Plaintiff vary depending upon which end-of-sublease option is exercised?

13. What benefit did Plaintiff receive for its participation in this transaction?

14. Whether EZH retained the rights and responsibilities with respect to the Equipment it possessed at the outset of the Transaction?

15. What risks, if any, did Plaintiff assume in entering into the transaction?

16. What steps did Plaintiff take to mitigate or eliminate risks associated with the RoCa3 transaction?

17. What is the substantive effect of the equity defeasance and debt defeasance in the transaction?

18. What is the purpose of the Rotte agreement in the transaction?

19. What is the purpose of the RoCa Foundation in the Transaction?

20. What is purpose of the IJssel Agreement and IJssel deposit in the Transaction?

21. What is the purpose of the Debt Defeasance in the Transaction?

22. What is the purpose of the Equity Defeasance in the Transaction?

23. What is the purpose of the Letter of Credit requirement in the Transaction?

24. What is the purpose of the sublessee loan in this Transaction?

25. What are the substantive effects of the circular cash flows in this transaction?

26. Whether, despite having the right to inspect the facility each year, Plaintiff's failure to visit the RoCa3 facility until 2005, after the tax audit related to this transaction had begun, supports the argument that Plaintiff did not have the benefits or burdens of ownership in the Facility and that the transaction was motivated by tax avoidance.

27. Whether the existence of a pre-funded purchase option means dominion and control over the property remains with EZH.

**B. <u>Debt Issue</u>**

In addition to those listed above, the following additional facts would be relevant to the Court's determination of whether the loan from Hollandsche Bank-Unie N.V.("HBU") to



2753617.1

Plaintiff constitutes a bona fide debt for tax purposes that entitles Plaintiff to claim an interest expense deduction.

28. Whether the HBU loan was genuine.

29. Whether the HBU loan did not finance meaningful business activity.

30. Whether the HBU loan was incurred solely to obtain a tax deduction.

31. Whether the circular flows of funds in the transaction eliminated the possibility of any use or forbearance of money by Plaintiff or by EZH.

32. Whether HBU faced any risk of non-repayment of the loan.

33. Whether Plaintiff negotiated or participated in the process of obtaining the HBU loan.

**C. <u>Economic Substance</u>**

In addition to the above facts, the following facts would be relevant to a determination of whether the Transaction should be disregarded under the economic substance doctrine:

34. Whether Plaintiff had a reasonable possibility of realizing a net economic profit, apart from claimed tax benefits.

35. Whether, objectively, a reasonable possibility of profit from the Transaction existed absent claimed tax benefits.

36. Whether Plaintiff lacked a reasonable expectation to earn a non-tax profit from the Transaction.

37. Whether Plaintiff could have earned a profit from its investment in the Transaction through simpler or more direct methods.

38. Whether the Transaction had any meaningful effect on Plaintiff's economic position, other than the payment of transaction costs, an Accommodation Fee to EZH and the

investment in fixed-rate securities, or whether the Transaction was simply a sale of tax benefits to Plaintiff?

39. Whether, when taking into account the time value of money, the transaction fails to generate a meaningful economic profit absent the claimed tax benefits.

40. Whether or not the present value of the projected after-tax cash flows exceeded the present-value of the projected pre-tax cash flows, and, if so, by what relative amount.

41. Whether the purpose of Plaintiff's tax-advantaged LILO investments was to reduce income taxes.

42. Whether Plaintiff's incentive for engaging in the RaCAa LILO Transaction ("Transaction") was to substantially reduce its U.S. taxes.

43. Whether the Transaction significantly supports Plaintiff's stated non-tax business reason of gaining entry into the Netherlands?

44. Whether the primary purpose of the Transaction was Plaintiff's stated non-tax business reasons?

45. Whether Plaintiff's participation in the Transaction and consideration of and participation in other LILO transactions was inconsistent with the other investments considered and engaged in by Plaintiff.

46. Whether Plaintiff considered or invested in transactions outside of its stated area of expertise, other than tax advantaged transactions.

47. Whether the fact that a financial institution entered into a substantially similar LILO Transaction with EZH for the remaining interest in the Facility in connection with Plaintiff's entry into the Transaction undermines Plaintiff's stated non-tax business reasons for entering into the transaction.

48. Whether Plaintiff intended to enter into the Netherlands power market for any other purpose than tax advantaged leasing transactions.

49. Whether Plaintiff considered or entered into any transactions in the Netherlands other than LILO transactions or other tax advantaged leasing transaction.

50. Whether the New York Public Service Commission encouraged Plaintiff to enter into the transaction?

51. Whether Plaintiff structured this Transaction, without a valid non-tax business purpose, in order to create a tax benefit.

52. Whether Plaintiff entered into the Transaction to reduce its tax liability.

53. Whether Plaintiff's actions since it closed the Transaction show that Plaintiff's participation was motivated by tax avoidance.

54. Whether the fact that Plaintiff has not received or reviewed financial documentation related to the payments or receipts in connection with the Transaction indicates the transaction was motivated by tax avoidance.

55. Whether the accounting benefits, if any, associated with the Transaction are largely dependent upon the tax benefits generated by the transaction.

56. Whether there is a reasonable chance Plaintiff will be able to sublease the Facility to a company other than EZH?

57. Whether Plaintiff attached importance to the conditions precedent to entering into the Transaction.

58. Whether the reports from Deloitte & Touche and Duke Engineering Services correctly determined the remaining useful life of the Facility.

59. Whether the report from Deloitte & Touche properly estimated the value of the Facility.

60. Whether Plaintiff received the final report, if any, from Duke Engineering Services.

61. Whether, and the extent to which, provisions of the Operative Documents were the product of arms length negotiations.

**D. <u>Other Issues</u>**

62. Whether it was Plaintiff's intention, at the outset, to be a passive investor in tax advantaged LILO leasing transactions in order to gain expertise to help it locate, package and market those types of transactions to investors (acting like an investment banker).

63. What is the purpose of the tax indemnity agreement in this transaction, and why did Plaintiff find it necessary to be indemnified if EZH represented in writing that the sublease was not a true lease, or took a position inconsistent with other tax assumptions stated in the Tax Indemnity Agreement?

64. Whether Plaintiff improperly destroyed responsive emails related to its evaluation of the transaction.

65. Whether Plaintiff improperly withheld responsive documents in the possession of their trustee, Wilmington Trust Company.

Dated: September 21, 2007

/s/ David F. Abbott
David F. Abbott
Attorney of Record
MAYER BROWN LLP
1675 Broadway
New York, NY 10019-5820
Tel: (212) 506-2642
Fax: (212) 849-5642
dabbott@mayerbrown.com
Attorney for Plaintiff

/s/ David N. Geier
David N. Geier
Attorney of Record
Joseph A. Sergi
Adam Smart
Trial Attorneys, Tax Division
U.S. DEPARTMENT OF JUSTICE
Post Office Box 26, Ben Franklin Station
Washington, D.C. 20044
Tel. (202) 616-3448
Fax: (202) 307-0054
David.N.Geier@usdoj.gov

Richard T. Morrison
Assistant Attorney General
David Gustafson
Chief, Court of Federal Claims Section
Steven I. Frahm
Assistant Chief, Court of Federal Claim Section