IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| CONSOLIDATED EDISON COMPANY OF NEW YORK, INC. & SUBSIDIARIES, | ) | |
| Plaintiff, | ) | Case No.: 06-305 T |
| v. | ) | Hon. Marian Blank Horn |
| THE UNITED STATES OF AMERICA, | ) | |
| Defendant. | ) | |

STIPULATION REGARDING UNDISPUTED FACTS

Plaintiff, Consolidated Edison Company of New York, Inc. ("Con Edison NY") and Subsidiaries, and defendant, the United States of America, by their undersigned counsel, hereby stipulate to the following statements solely for purposes of this litigation. For purposes of this stipulation, terms such as lease, sublease, rent, loan, debt, proceeds, purchase, transfer and sale are used for the convenience of the Court, and do not indicate that defendant respects them as such. Similarly, for purposes of this stipulation, the term LILO is used for the convenience of the Court, and do not indicate that plaintiff respects it as such. Capitalized terms that are not defined in this Stipulation are defined in Appendix A to the Participation Agreement dated as of December 15, 1997 among N.V. Electriciteitsbedrijf Zuid-Holland ("EZH"), Consolidated Edison Leasing, Inc. ("CEL"), and the other parties named therein (the "Participation Agreement"), unless otherwise indicated. The parties agree that all exhibits identified in this Stipulation are accepted as authentic. All copies shall be considered electronic reproductions of the original and shall be treated as if they were originals as defined in Fed. R. Evid. 1001(4).

All evidentiary objections to the statements of facts and/or exhibits set out within this Stipulation are waived unless expressly reserved. Headings have been provided for convenience

and reference. The headings are not stipulations of fact. The parties reserve all rights to amend any paragraphs herein that are a result of scriveners' error, or that the parties agree do not reflect the intentions of the parties with respect that particular paragraph. Exhibits referenced herein appear in the Joint Exhibit List.

STIPULATION

**I.** Con Edison NY

1. The transaction that is the subject of this dispute, defined in paragraph 58 below and discussed throughout this Stipulation of Facts, was effected by the execution of the transaction documents, including but not limited to the Operative Documents. The transaction documents that were included in the transaction closing binders are attached as Exhibits 1-103, corresponding to Tabs 1-103 in such binders. (PF000007-2865).

2. In its 1997 annual report, Con Edison NY stated that it is one of the nation's largest publicly held energy companies (PF004876), listing approximately $14.7 billion in assets on its consolidated balance sheet as of December 31, 1997. (PF004906). It is a regulated public utility that was organized under the laws of the State of New York on November 10, 1884. (PF004876). In its 1997 annual report, Con Edison NY stated that it transmitted and delivered electric service and delivered natural gas to customers in New York City and most of Westchester County, New York, and supplies steam to approximately 2,000 buildings in Manhattan. (PF004876). The 1997 annual report of Con Edison NY 1997 is attached as Exhibit __ (PF004875-930, PF326744-99 (color)).

3. Prior to January 1, 1998, Con Edison NY was a widely held and publicly traded company on the New York Stock Exchange. (PF004876) Con Edison NY's 1998 Annual Report provides that as a result of a reorganization on January 1, 1998, Con Edison NY has since

become a wholly-owned subsidiary of Consolidated Edison, Inc. ("CEI"). (PF004957). Like Con Edison NY before it, CEI is widely held and publicly traded on the New York Stock Exchange. The annual report of CEI for 1998 is attached as Exhibit __. (PF004931; see also SEC Form U-3A-2, PF009976).

4. Prior to its deregulation, Con Edison NY offered electric service in a "bundled" format, i.e., it owned and operated the generation plants that produced electricity as well as the transmission and distribution systems that delivered the electricity to its customers. (See PF004897; PF007735). In its 1998 Annual Report CEI stated that, prior to its deregulation, Con Edison NY owned gas-fired, oil-fired, and nuclear-powered plants with a total electric-generating capacity of 8,300 megawatts ("MW"). (PF004987).

**II.** The Deregulation of Con Edison NY's Energy Business

5. The New York Public Service Commission ("PSC") is responsible for regulating the power industry in the State of New York. Prior to deregulating certain aspects of Con Edison NY's business, all of its operations were subject to regulation by the PSC.

6. Beginning in March 1993, the PSC took a number of steps to develop a competitive electric industry in the state of New York. (PF007750). This process commenced with the PSC's initiation of a proceeding entitled "Proceeding On Motion Of The Commission To Address Competitive Opportunities Available To Customers Of Electric And Gas Service And Develop Criteria For Utility Responses" (the "Competitive Opportunities Proceeding"). (PF007821 n.2).

7. The stated purpose of the Competitive Opportunities Proceeding was to evaluate "ways the [electric service] industry could be restructured" due to the "increasing competitive options" available to consumers. (PF007750).

8. The Competitive Opportunities Proceeding was divided into two phases. Phase I was designed to discuss, investigate, and address the issues involved in moving toward a competitive marketplace. The objective of Phase II, commencing in August 1994, was to "identify regulatory and rate-making practices that will assist in the transition to a more competitive industry while increasing efficiency and maintaining safety, environmental, affordability, and service quality goals." The PSC encouraged electric utilities and other interested parties to "work collaboratively toward the development of a set of principles to guide the transition toward a more competitive electric marketplace" noting that the "[i]ssues set for examination include those related to the establishment of fully efficient wholesale markets for electricity, as well as pricing reforms necessary to reflect those efficiencies in retail rates." The PSC's August 1994 Order initiating Phase II is attached as Exhibit __. (PF007708-12).

9. Phase II of the process culminated with a May 1996 PSC Opinion stating the PSC's vision for the electric utility industry and ordering Con Edison and certain other major electric utilities in New York State to file plans describing how they would restructure their operations to bring about a competitive marketplace for, among other things, electric generation. The Opinion "strongly encouraged" the utilities to sell their generating plants to unregulated entities so as to facilitate the development of a competitive marketplace. The May 1996 PSC Opinion also invited utilities to propose the corporate structures, including unregulated subsidiaries, that would further the PSC's restructuring goals. The May 1996 PSC Opinion is attached as Exhibit __. (PF007735).

**III.** Con Edison NY's Response to Deregulation

**A.** The Planning and Environmental Committee

10. The Planning and Environmental Committee of the Board of Trustees of Con Edison NY would review plans for Con Edison NY's future actions, including Con Edison NY's

response to the deregulation process, provide advice and consent to the management of Con Edison NY regarding such plans, and submit recommendations to the Board of Trustees of Con Edison NY regarding such plans.

11. Minutes of the Planning and Environmental Committee indicate that it studied the deregulation process in other jurisdictions. (PF007562, PF007564)

12. Minutes of the Planning and Environmental Committee of the Board of Trustees of Con Edison NY relating to the deregulation process and Con Edison NY's plans in response are attached as follows:

| | |
|---|---|
| July 26, 1994 | PF007535 |
| April 25, 1995 | PF007543 |
| May 23, 1995 | PF007559 |
| June 27, 1995 | PF007592 |
| September 26, 1995 | PF007645 |
| November 28, 1995 | PF007653 |
| March 26, 1996 | PF007671 |
| June 25, 1996 | PF007679 |
| January 28, 1997 | PF007687 |
| March 25, 1997 | PF007693 |
| June 24, 1997 | PF007701 |

13. Reports from the Planning and Environmental Committee to the Board of Trustees of Con Edison NY dated August 23, 1994, May 23, 1995, July 25, 1995, October 24, 1995, December 19, 1995, April 23, 1996, July 23, 1996, January 28, 1997, April 22, 1997, and July 22, 1997 are attached as Exhibits __ through __. (PF007538, PF007553, PF007596, PF007648, PF007656, PF007674, PF007682, PF007687, PF007696, PF007705). The minutes of the meetings of the Planning and Environmental Committee do not reflect discussions of leasing transactions or leasing opportunities.

**B.** The Formation of Consolidated Edison Development, Inc.

14. A memorandum dated April 20, 1995, advising the Con Edison NY Board of Trustees of management's intention to petition the Public Service Commission for a blanket

authorization to invest funds in unregulated subsidiaries, which in turn would be authorized to make investments in lower-tier subsidiaries is attached as Exhibit __. (PF007549)

15. Minutes of the May 23, 1995 Con Edison NY Board of Trustees meeting discussing management's intention to petition the PSC for an authorization to invest funds in unregulated subsidiaries are attached as Exhibit ___. (PF289242, PF289255). The minutes do not reflect a discussion of leasing transactions.

16. On May 2, 1995, Con Edison NY requested permission from the PSC to invest up to 5% (approximately $504 million) of its consolidated capital in unregulated subsidiaries identified on Exhibit I to the May 2, 1995 Request. An incomplete copy of the May 2, 1995 request, without Exhibit I, is attached as Exhibit _, PF005000-38.[1] The request does not include a discussion of leasing transactions.

17. On July 12, 1996, the PSC issued an order (the "July 12, 1996 Order") which deferred action on Con Edison NY's May 2, 1995 request, but granted Con Edison NY authority to invest up to $50 million in unregulated subsidiaries which would invest in two of the three requested projects: the investment and/or participation in energy infrastructure projects, and the marketing of technical services. The PSC stated that "[t]he business opportunities that Con Edison is considering for the projects that are the subject of this Order are largely international." While the PSC noted that the energy infrastructure project investments "may be made through development companies, investment funds, joint ventures and other vehicles" the PSC stated that "Con Edison's proposal to invest in international (domestic and foreign) energy infrastructure projects would for the most part be as an investor through established funds." In accordance with the PSC's plan to encourage divestiture of public utility-owned electric generation plants,

---

[1] Plaintiff has been unable to locate a copy of the document that included Exhibit I.

the PSC prohibited Con Edison NY from "having a controlling interest in any fund that owns New York State energy projects, and from making direct investment in any New York State energy project." The July 12, 1996 Order is attached as Exhibit __. (PF004645, PF005135). The July 12, 1996 Order did not address the specific Transaction at issue in this case.

18. An internal Con Edison NY memorandum dated September 18, 1996, seeking approval from the Con Edison NY Board of Trustees to form and to invest up to $50 million in a wholly-owned subsidiary to invest in energy infrastructure development projects and to market technical services worldwide is attached as Exhibit __. (PF004361). The memo did not address the specific Transaction at issue in this case.

19. On October 18, 1996, Con Edison NY formed a new subsidiary, Gramercy Development, Inc., ("GDI") to carry out the investments set forth in the September 18, 1996 memorandum. (Gramercy Board Minutes Oct 28, 1996, PF009556; Certificate of Incorporation, PF009567). On September 24, 1997, GDI changed its name to Consolidated Edison Development, Inc. ("CED"). (CED Board Minutes, PF009501; Certificate of Name Change, PF005514).

20. As of December 15, 1997, Con Edison NY owned 100% of the outstanding stock of CED. (SEC Form U-3A-2, PF009976-83, at PF009978).

**C.** Con Edison NY's Settlement with the PSC

21. On October 1, 1996, Con Edison NY filed a response to the PSC's May 20, 1996 Order. This response included a rate and restructuring plan and also included a petition to adopt a holding company structure. Con Edison NY's restructuring plan proposed an approach to a competitive electric generation market that included, among other things, divestiture of its generating plants, a plan for retail competition, and a corporate reorganization into a holding

company structure. The proposed holding company structure would allow Con Edison to form unregulated subsidiaries whose investment decisions would no longer require prior PSC approval. Con Edison NY's plan is attached as Exhibit __. (PF005146, PF005308). The restructuring plan does not reflect a discussion of leasing transactions.

22. In September 1997, the PSC and Con Edison NY ultimately agreed on a restructuring plan that was embodied in an Amended and Restructured Agreement and Settlement (the "Settlement," attached as Exhibit __, PF005061-124). Upon approval of the Settlement, the July 12, 1996 Order (attached as Exhibit __, PF005125-34) no longer applied to Con Edison NY. The Settlement included, among other things, (i) a new rate plan during the period of the transition to competition, (ii) a commitment by Con Edison NY to divest at least 50% of its New York City electric generating fossil fueled MW capacity plants by year end 2002 to unregulated third parties so as to help implement a fully competitive market for electric generation, and (iii) authorization for Con Edison NY to form a holding company whose subsidiaries would consist of Con Edison NY and several unregulated subsidiaries, including Con Edison Development. The Settlement did not address the specific Transaction at issue in this case.

23. The Settlement permitted the new holding company to invest up to 5% of its consolidated capital in unregulated subsidiaries. (PF005117).

24. The minutes of the December 12, 1997 joint meeting of the Board of Directors of CEI and the Board of Trustees of Con Edison NY provide that the shareholders of Con Edison NY approved the formation of CEI on December 12, 1997. The minutes are attached as Exhibit __ (PF264988-5007). As part of the transition to a holding company structure, Con Edison NY

and CED, as well as several other unregulated subsidiaries of Con Edison NY, became subsidiaries of CEI on January 1, 1998. (1997 Annual Report, PF004878.)

25. CEI's 1998 Annual Report states that by March 2, 1999, pursuant to the Settlement with the PSC, Con Edison NY had sold almost 6,300 MW of its approximately 8,300 MW of electric generation assets for an aggregate price of $1.8 billion, and that completion of these sales will result in an estimated net after-tax gain of $384 million (1998 Annual Report, Exhibit __, PF004931-96 at PF004987). In 2000, Con Edison NY contracted to sell its nuclear-generating facilities, with electric generating capacity of approximately 1000 megawatts, for an aggregate price of $504.5 million, not including fuel and other adjustments, which transaction closed in 2001. (CEI 2002 10-K, Exhibit __, PF271882-2122 at PF272046). In 2001, Con Edison NY sold approximately 1,480 MW additional electric generating assets. (Exhibit __ at PF272046). The remaining electric generating assets owned by Con Edison NY are held in connection with, and are ancillary to, its steam generation business. (CEI notes to consolidated financial statements, Exhibit __, PF274689-735, at PF274712).

**D.** Con Edison NY's Other Unregulated Subsidiaries

26. Con Edison NY formed other unregulated subsidiaries in conjunction with its decision to enter into unregulated businesses:

27. Consolidated Edison Solutions, Inc., formerly ProMark Energy, Inc., was formed to provide electricity and natural gas to commercial and residential customers in the Northeast. (Annual Report 1997, PF004875, PF004896)

28. Consolidated Edison Energy, Inc. was formed to market specialized energy capacity and risk management services to wholesale customers in the Northeast and mid-Atlantic

states. (Annual Report 1997, PF004875, PF004891, ConEdison Energy Business Plan Executive Overview Oct. 27, 1997, PF004891, PF004735)

29. Consolidated Edison Communications, Inc. was formed to build and manage communication networks. (SEC Form S-4 filed Oct. 1997, PF009984, PF009986)

**IV.** CED's Business Plans

30. GDI's initial business plan, for 1997, is attached hereto as Exhibit _ (PF004560-644). The Executive Summary of this Business Plan, which sets forth, among other things, an overview of Objectives, Strategy and Projections is at pages 1 through 11 of the Business Plan. (PF004563-73).

31. The following minutes of meetings of the CED board of directors are identified:

| | |
|---|---|
| 10/28/1996 | PF009556-563 |
| 1/3/1997 | PF009590-PF009593 |
| 1/30/1997 | PF009594-PF009597 |
| 3/10/1997 | PF009598-PF009602 |
| 5/22/1997 | PF009603-PF009604 |
| 5/29/1997 | PF009605-08 |
| 6/20/1997 | PF009609 |
| 7/23/1997 | PF009612-14 |
| 8/27/1997 | PF009615-17 |
| 9/25/1997 | PF009501-04 |
| 10/20/1997 | CON-046-1588-1590 |
| 10/29/1997 | PF009505-06 |
| 11/24/1997 | PF009507-09 |
| 12/15/1997 | PF009510-12 |
| 12/18/1997 | PF009513-PF009516 |
| 1/29/1998 | PF269311-14 |
| 2/26/1998 | PF009521-26 |
| 3/25/1998 | PF009527-530 |
| 4/30/1998 | PF009531-35 |
| 5/29/1998 | PF009536-39 |
| 7/1/1998 | PF009540-PF009543 |
| 9/25/1998 | PF009544-47 |
| 10/29/1998 | PF009548-PF009551 |
| 11/25/1998 | PF009552-PF009555 |
| 12/15/1998 (unsigned) | PF009346-47 |
| 12/16/1998 | PF029930-2993138 |
| 1/27/1999 | PF022821-23 |

| | |
|---|---|
| 3/3/1999 | PF029892-PF029894 |
| 4/14/1999 | PF030745-PF030748 |
| 5/12/1999 | PF030793-PF030795 |
| 6/25/1999 | CON-020-2241-2245 |
| 7/14/1999 | CON-067-0128 to 0131 |
| 8/11/1999 (draft) | CON-067-0139 to 0143 |
| 8/11/1999 | PF325493-496 |
| 9/15/1999 | PF325498-500 |
| 10/13/1999 | PF325502-04 |
| 11/171999 | PF283703-706 |
| 1/12/2000 | PF291736-39 |
| 2/9/2000 | PF291726-731 |
| 3/8/2000 | PF291721-24 |

32. The following reports to the CEI Board of Trustees are identified:

| | |
|---|---|
| 2/1998 | PF020123 24 |
| 3/1998 | PF273872 PF273874 |
| 4/1998 | PF289115 PF289116 |
| 5/1998 | PF273866 PF273871 |
| 6/1998 | PF273860 PF273865 |
| 7/1998 | PF006295 PF006300 |
| 8/1998 | PF272718 PF272723 |
| 9/1998 | CON 074 0203 0210 |
| 10/1998 | CON 067 0929 0934 |
| 11/1998 | PF272772 PF272777 |
| 1/1999 | PF271467 271469 |
| 2/1999 | PF273982 84 |
| 3/1999 | PF273990 94 |
| 4/1999 | PF271516 521 |
| 5/1999 | PF272724 PF272730 |

33. The following weekly reports of CED are identified:

| | |
|---|---|
| 7/10/1998 | PF274120-125 |
| 7/24/1998 | PF079875-879 |
| 7/31/1998 | PF082596-597 |
| 8/7/1998 | PF082594-595 |
| 8/27/1998 | PF079790-791 |
| 9/4/1998 | PF082582-584 |
| 9/11/1998 | PF079774-775 |
| 9/25/1998 | PF082576-577 |
| 10/2/1998 | PF082570-573 |
| 10/9/1998 | PF082574-575 |

| | |
|---|---|
| 10/16/1998 | PF082557-558 |
| 10/30/1998 | PF077389-391 |
| 11/7/1998 | CON-067-1989-1990 |
| 11/13/1998 | PF082551-552 |
| 12/11/1998 | PF082479-481 |
| 12/18/1998 | PF082489-491 |
| 12/31/1998 | PF082497-498 |
| 1/8/1999 | PF082512-514 |
| 1/9/1999 | PF082509-511 |
| 1/15/1999 | PF082502-503 |
| 1/29/1999 | PF082506-508 |
| 2/5/1999 | CON-020-2532-2536 |
| 2/12/1999 | PF274073-076 |
| 2/26/1999 | PF271558-559 |
| 3/5/1999 | PF274098-101 |
| 3/12/1999 | PF274093-097 |
| 3/26/1999 | PF082532-535 |
| 4/16/1999 | PF082471-472 |
| 4/30/1999 | PF274054-057 |
| 5/7/1999 | PF274102-104 |
| 5/28/1999 | PF082536-538 |
| 6/4/1999 | PF082525-26 |
| 6/11/1999 | PF082515-517 |
| 6/18/1999 | PF082521-522 |
| 6/22/1999 | PF083356-358 |
| 7/9/1999 | PF074291-292 |
| 7/19/1999 | PF074259-260 |

34. Presentations, business plans, and other similar material describing CED's anticipated business plans during the 1997-1999 time period includes, but is not limited to, the following documents:

PF003022
PF004186
PF004189
PF004223
PF004244 (undated)
PF004250
PF004288
PF004324
PF004366
PF004416
PF004426

PF004445
PF004525
PF004758
PF004778 (unsigned)
PF005511
PF006438
PF010721
PF012414
PF012474
PF012449
PF250103

35. In March 1997, CED entered into an agreement with International Energy Partners, L.P. ("IEP"). IEP had a portfolio of international energy infrastructure investment opportunities that it was pursuing. Pursuant to this agreement, CED was given preferred rights to participate in certain investment opportunities identified by IEP. The Limited Liability Company Agreement of IEP Global Development, LLC, between CED and IEP is attached as Exhibit __. (PF009825)

36. The minutes of the June 20, 1997 meeting of the CED Board of Directors provide that the CED Board authorized a capital commitment of $5 million in Project Finance Fund III, LP, a fund sponsored by Energy Investors Fund ("EIF"). (6/20/1997 GDI Board Meeting Minutes, PF009609-11). Project Finance III utilized the funds received from CED and other equity investors to invest in energy and infrastructure projects worldwide. (Project Finance Fund III, L.P. Limited Partnership Agreement (PF263838-911), § 1.03 (PF263844), Schedule A (PF263910)).

37. An undated internal GDI presentation regarding IEP, including a list of potential international projects, is attached as Exhibit __. (PF004426-44).

38. An early joint venture between CED and IEP was a minority ownership investment in a relatively small power facility (40 megawatts) in Eastern Guatemala, generally

known as Generadora Electrica del Norte, Limitada ("Genor"). CED indirectly acquired an approximate 44% ownership interest in Genor through its investment in Energy Finance Partners of Central America, ("EFPCA") with IEP and others; the remaining 51% was owned by local investors. (GENOR Participation Agreement, CON-003-2388 to CON-003-2450; Consolidated Edison Development Summary of Investments December 2000 (PF099377-99, see PF09377-80). According to a January 7, 1999 internal CED year in review presentation, attached hereto as Exhibit ___, CED had both an ownership and management role in the Genor facility. (PF250103-22, at PF250106).

39. In 1997 and 1998, CED considered purchasing an ownership interest in Empresa Electrica de Guatemala, S.A. ("EEGSA"), Guatemala's largest distribution utility serving over 500,000 customers in Guatemala City and surrounding areas. A copy of the Briefing Paper dated June 2, 1998 pertaining to the Privatization of Empresa Electrica de Guatemala, S.A., is attached as Exhibit___. (PF247000) In connection with the privatization of EEGSA, CED requested authorization to bid in a consortium with Enron and Union Fenosa for at least 80% of EEGSA's shares. A copy of Near-Term Investment Strategy and Privatization of Empresa Electrica de Guatemala, S.A., July 21, 1998 is attached as Exhibit ____. (PF286626, PF286627).

40. The January 7, 1999 year in review presentation also provided that CED was forced to withdraw from the consortium when CEI would not approve CED's participation in a bid of over $400 million for EEGSA. (PF250108-09).

41. A June 18, 1997 presentation provides that GDI considered acquiring a portion of EGASA-EGESUR's generating assets, together with a consortium of other investors, in connection with EGASA's privatization. The presentation also provided that EGASA was a

Peruvian utility that could produce 305 MW of power. A copy of the presentation "Gramercy Development Inc., June 18, 1997" is attached as Exhibit ___. (PF012414, PF012423).

42. A June 6, 1997 memorandum provides that GDI, decided not to pursue the EGASA-EGESUR bid because (a) the project may have required a larger equity investment than GDI was prepared to commit to the project; (b) resources at IEP were being drawn away to the detriment of other projects; (c) anticipated bid price higher than originally contemplated would be necessary; and (d) EIF (see paragraph 36 above) resource constraints. (CON-060-0792 through -0794).

43. In 1997, GDI considered making an investment in a cogeneration project at Arun Aromatik in Indonesia through IEP. A memorandum provided to CED by IEP provides that the capacity to serve the Aromatik complex did not exist. (Memo IEP provided to GDI, PF004426; CED presentation entitled 1998 Business Plan, dated October 1997, PF004525). The April 30, 1998 Minutes of the Board of Directors of CED provides that at some IEP shifted its focus to projects in the Philippines due to problems with the Indonesian economy. (April 30, 1999 CED Board Minutes, PF009531, PF009534).

44. IEP shifted focus away from the project at Arun Aromatik in early 1998 due to problems with the Indonesian economy. (April 30, 1999 CED Board Minutes, PF009531, PF009534).

45. July 27, 1998 materials provided to the CED Board of Directors discussed an investment in three industrial cogeneration projects that were in the advanced stages of development by a Philippine engineering company, Integrated Utility Corporation ("IUC"). The materials indicate that IUC had provided engineering services to Coca-Cola in the Philippines for years, and had contracts to install cogeneration systems at a Coca-Cola plant, as well as similar

systems for Nissin Biscuits and Arcya Glass. The materials assumed that CED fund 60% of the contracts for the installation. A copy of the Business Development Report on the proposed transaction with IUC is attached as Exhibit ___. (PF249290, PF249301).

46. As part of the Sale and Redemption Agreement entered into with IEP on February 26, 1999, CED assigned its interests in the IUC project to IEP. (PF009792-824).

47. Volume I of a document entitled CEPALCO Investment Recommendation, dated September 23, 1998 provides that, CED considered making an investment in Cagayan Electric Power & Light Company ("CEPALCO"), an energy distribution company and the Philippines' fourth largest electrical utility. CEPALCO was interested in raising $11 million to $12 million by selling convertible preferred stock which would convert to a 25 percent ownership position in CEPALCO. CED considered purchasing at least $6.8 million of these preferred shares (convertible to 15 percent of CEPALCO). The Investment recommendation also provides that this transaction could stand alone, as the first the first part of CED's Anchor and Cluster strategy in the Philippines. In addition, specific potential follow-on investments in the Philippines were listed.. A copy of Volume I of the CEPALCO Investment Recommendation dated September 23, 1998 is attached as Exhibit ___. (PF241914, at PF241917).

48. A CED year in review presentation for 1998 provides that the CEPALCO acquisition was discontinued following the conclusion by CED that, although the project was a viable investment, "the Asian Crisis presented too much risk for CED to invest in the Philippines." (PF250103, PF250111).

49. A July 24, 1998 document included as part of the CED Board of Directors Meeting materials dated July 30, 1998, provides that in 1998, CED participated in a project in China named Jiangsu Transmission & Distribution Planning and that as part of this project, CED

consulted and trained local engineers in distribution reliability practices used by the Con Edison group and identified energy losses on the distribution system. A copy of the CED Board of Directors Meeting materials dated July 30, 1998 is attached as Exhibit ___. (PF249290)

50. A CED document dated September 3, 1998 indicates that the Jiangsu Transmission & Distribution Planning project was completed in August 1998. (PF010756, PF010758; PF249338, PF249341).

**V.** CED's Review of Leasing Investments

51. CED began discussions with Cornerstone Financial Advisors L.P. ("Cornerstone") to provide advice concerning leasing investments in approximately May 1997. (PF013051).

52. A document entitled "Cornerstone Financial Advisors Limited Partnership Organization Description," was provided to GDI. It is attached as Exhibit _ (PF013052-62).

53. Cornerstone gave a presentation to GDI on May 21, 1997, concerning leasing. A copy of the outline of that presentation is attached as Exhibit _ (PF013041-45).

54. The board minutes for the CED Board of Directors Meeting held May 29, 1997, reflect that CED began to consider leasing investments on or before May 29, 1997. (PF009605-09).

55. CED retained Cornerstone to provide financial services in connection with the Transaction. A copy of the October 21, 1997 fully executed engagement letter signed by Rob Holzman of Cornerstone and Brian DePlautt of CED is attached as Exhibit _ (PF004016-17).

56. CED also retained Cornerstone to provide financial services in connection with CED's review of other lease-leaseback transactions. These transactions included a lease-leaseback transaction involving an electric generation facility in The Netherlands, referred to as the EPON transaction (Exhibit _, PF015186-88); a lease-leaseback transaction involving gas

distribution assets in The Netherlands owned by ENECO (Exhibit _, CFA00079); a lease-leaseback transaction involving gas distribution assets in The Netherlands owned by MEGA (Exhibit _, PF010598-99); and a lease-leaseback transaction involving gas distribution assets in The Netherlands owned by NUON (Exhibit _, PF028189-90).

(a) As of August 22, 1997, CED had prepared a briefing memorandum pertaining to a potential lease-leaseback transaction with EPON involving a gas fired, combined cycle power plant (Exhibit _, PF0015872-925, Briefing Memorandum; PF009617, Aug. 27, 1997 CED Bd. Min.) but in late 1997, CED decided to not pursue the EPON transaction (Exhibit_, Nov. 24, 1997 CED Bd. Minutes, PF009509).

(b) As of September 30, 1997, CED had prepared a draft briefing memorandum on a potential lease-leaseback transaction with ENECO involving natural gas distribution assets. (Exhibit _, CFA06242-96, fax from DePlautt to Cornerstone sending draft memorandum; Exhibit _, CFA13324, Summary of Transaction from Cornerstone to CED). CED also prepared a White Paper pertaining to the ENECO transaction. (White Paper, PF015594) CED submitted a proposal on the ENECO transaction, which was accepted on or about October 22, 1997. (Exhibit _, CFA00633-50, commitment letter; Exhibit _, CFA06502-12, accepted proposal). CED ultimately withdrew from the transaction in February 1998. (Exhibit _, 2/26/98 CED Bd. Min., PF009525) A CED memorandum discussing reasons for the withdrawal is attached as Exhibit _(PF015582-83 and PF011612).

(c) As of September 19, 1998, CED had prepared a draft briefing memorandum on a potential lease-leaseback transaction with MEGA involving natural gas assets. (Exhibit _, 9/10/98 draft briefing memorandum PF082600-70; see Exhibit _, 9/3/98 draft briefing memorandum, PF015699-765). CED submitted a proposal to MEGA on or about October 7, 1998. (Exhibit _, CFA13811-18). CED's proposal was not accepted. (Exhibit _, PF008274).

(d) CED prepared a briefing memorandum as well as other documents pertaining to a potential lease-leaseback transaction with NUON involving natural gas distribution assets. (Exhibit _, PF029956-82 (vol. 1); PF029984-30079 (vol. 2); PF030081-253 (vol. 3); Exhibit ___, PF_____ white paper; Investment Recommendation, PF026751). CED submitted a proposal, which was accepted. (10/27/98 Bid, PF023221-34; 12/10/98 Updated Bid, PF036709-11; 2/12/98 Acceptance, PF025865-78). CED closed the transaction with NUON pursuant to documents dated as of May 18, 1999. (E.g., NUON Participation Agreement, PF023404-717; CED February 2000 Business Plan, PF070412, PF070427).

**VI.** EZH and the RoCa3 Facility

57. On August 25, 1997 Cornerstone notified CED of the possibility of entering into a leveraged lease with EZH of a new power generation facility (the "RoCa3 Facility") located near Rotterdam, The Netherlands. (Exhibit _, Holzman notes, CFA15388-92 at CFA15391-92).

58. CEL Trust and EZH entered into the transaction (the "Transaction") that is the subject of this action, pursuant to the documents identified in paragraph 1, on December 15, 1997. The Transaction involved a lease of an undivided interest in the RoCa3 Facility to CEL Trust pursuant to a Lease Agreement and a shorter term sublease of this undivided interest in the RoCa3 Facility from CEL Trust to EZH pursuant to a Sublease Agreement, among other agreements, and therefore is sometimes referred to as a lease-in, lease-out or "LILO" transaction, or lease/lease-back transaction.[2]

**A.** EZH's Historical Business

59. N.V. Electriciteitsbedrijf Zuid-Holland ("EZH") was, on December 15, 1997, an energy company that owned, among other things, several energy generating facilities in The Netherlands. Ex. __, PF_ (EZH 1997 Annual Report).

60. According to correspondence from EZH, the RoCa3 facility opened for commercial operation in 1996, with commercial delivery of heat commencing on January 1, 1996, commercial delivery of electricity commencing on May 1, 1996 and supply of $CO_2$ commencing on July 1, 1996 (PF007229-40).

61. An EZH document entitled "Innovation for the B Triangle" provides that EZH has been responsible for the coordination and transport of electrical energy in the southern Netherlands since 1941. The document also provides that in 1987, EZH began producing heat

2 Banc One Leasing Corp. ("Banc One") and EZH also entered into a lease/lease-back, involving the remaining undivided interest in the Facility as of December 15, 1997. See Exhibit _ (PF_).

and electricity, which EZH supplied to distribution companies which in turn delivered the electricity and heat to the customers, and that the addition of the RoCa3 Facility in June 1996 allowed EZH to produce and provide carbon dioxide to horticulture operators. A copy of "Innovation for the B Triangle" is attached as Exhibit _, PF000002-__, at PF000006.

62. A page from EZH's corporate website entitled "EZH 24 Hours A Day" updated as of August 4, 1997, provides that EZH was one of four national power generating companies in The Netherlands. A copy of "EZH 24 Hours A Day" is attached as Exhibit ___, PF003003-04.

63. Pursuant to section 7(a) of the Participation Agreement, EZH represented that as of December 15, 1997, EZH was a public limited liability company with its registered seat in The Hague, duly authorized to do business in The Netherlands. (PF000056).

64. An online version of EZH's 1996 Annual Report provides that the net generating capacity of EZH's power stations rose from 2,381 MW in 1995 to 2,601 MW in 1996. This version of EZH's 1996 Annual Report further provides that this 220 MW(e) increase was due to the RoCa3 Facility coming into operation in June 1996. The RoCa3 Facility got its name because it is located between Rotterdam and Capelle aan de IJssel and it is the third power generating facility at this location. (PF002872, PF002879).

65. EZH's 1997 Annual Report states that the net generating capacity of EZH's power stations fell from 2,601 MW in 1996 to 2,281 MW in 1997. A copy of the EZH 1997 Annual Report is attached as Exhibit __. (EZH 1997 Annual Report, PF003501, PF003509).

66. EZH's 1997 Annual Report that in 1997, various municipalities owned the issued capital stock of EZH as follows: Province of South Holland (15%), and the Municipalities of Delft (9%), Dordrecht (16%), Leiden (12%), The Hague (15%), and Rotterdam (28%). The

remaining 5% was owned by EZH. A copy of the EZH 1997 Annual Report is attached as Exhibit _, PF003501-29 at PF003523.

67. Internal EZH documents discussing the Transaction are attached as Exhibit _, PF265081-PF265111 (Dutch, and English translation).

68. Other documents regarding EZH not otherwise identified herein are attached as:

PF003057-62
PF003063-81
PF003441-68

**B.** EZH's Ownership Changes

69. EZH's 1999 Annual Report provides that on July 16, 1999 (after the transaction at issue in this case closed), EZH shareholders entered into a stock purchase agreement with PreussenElektra AG pursuant to which EZH shareholders agreed to sell their stock in EZH to PreussenElektra AG. PreussenElektra AG was a German utility and a subsidiary of the German VEBA group. A copy of EZH's 1999 Annual Report is attached as Exhibit _, PF007980-8046, at PF007992.

70. On July 20, 1999 EZH sent a letter to CED stating that the EZH shareholders and PreussenElektra had reached an agreement, in principle, for the purchase and sale of the EZH shares. A copy of the July 20, 1999 letter from EZH to CED is attached as Exhibit ___. (PF017438).

71. By letter dated September 15, 2000, EZH advised CED that in January 2000, PreussenElektra acquired 100 percent ownership of EZH. The letter also provided that in June 2000, VEBA AG and VIAG AG merged to form E.ON AG, a German company the shares of which were listed on both the Frankfurt and New York stock exchanges, in 2000. The letter also provided that E.ON Energie AG, a wholly-owned subsidiary of E.ON AG, acquired the shares of

EZH as part of the merger. A copy of a September 15, 2000 letter from EZH to CED is attached as Exhibit __. (PF017425-26).

72. By letter dated December 11, 2000, E.ON Benelux Generation N.V. informed CED that EZH had changed its name to E.ON Benelux Generation N.V. A copy of a December 11, 2000 letter from E.ON Benelux Generation N.V. is attached as Exhibit ___. (PF009625)

**C.** The RoCa3 Facility

73. The RoCa3 Facility is located in an industrial area in the southwestern region of The Netherlands, on the border between Rotterdam and Capelle aan den IJssel, constituting the third unit alongside two previously built units. (See "Innovation in the B Triangle," PF000002). The generating unit at RoCa3 is a gas fired combined heat and power ("CHP") plant that supplies electrical and thermal energy and carbon dioxide (the "Unit"). (PF000002).

74. A document provided by EZH (PF006262-92), Exhibit _ hereto), and included behind Schedule 7(t) of the Participation Agreement (PF000245-74) provides that the RoCa3 Facility, including the Common Facilities and the Network, includes among other things the electric-generating Unit, the Common Facilities, the Cooling Water Station, the Cooling Water Channel, the Network, and the Facility Personal Property.

(a) Appendix A of the Participation Agreement defines the Unit as the gas-fired, electric generating unit known as RoCa3 having a rated capacity of 220 net megawatts, all as more fully described in Section 7(t) to the Participation Agreement, and any and all Modifications thereto and Parts thereof. (PF000200).

(b) Appendix A and Schedule 7(t) of the Participation Agreement define the Common Facilities as the gas receiving station, the pump room, the office building, which includes the control room, and certain parking spaces. (PF000151, PF000272).

(c) Appendix A of the Participation Agreement defines the Cooling Water Station as the cooling water station owned by EZH pursuant to the Transfer Deed and described more fully in Schedule 7(t) to the Participation Agreement, and any and all Modifications thereto and Parts

thereof. (PF000152). Documents provided by EZH in correspondence to Shearman & Sterling indicate that the Cooling Water Station is located at the River Hollandsche IJssel, noting that the inlet station and pump station of the Cooling Water Station are utilized for cooling. These same EZH documents indicate that the Cooling Water Station is located about five kilometers from the Unit. (PF006262-92; Participation Agreement § 7(t), PF000271).

(d) Appendix A and Schedule 7(t) of the Participation Agreement define the Cooling Water Channel as the cooling water pipes leading from the Cooling Water Station to the Unit and vice versa as well as from the Cooling Water Station to the River Hollandsche IJssel and vice versa. (PF000152, PF000271).

(e) Appendix A of the Participation Agreement defines the Network as the pipelines from and to the Unit for the delivery of heat and $CO_2$ containing gas to Energie Delfland NV including the control systems and communication cables thereto, all as more fully described in Schedule 7(t) to the Participation Agreement, and any and all Modifications thereto and Parts thereof. (PF000172).

(f) Appendix A of the Participation Agreement defines the Facility Personal Property as all movable property which forms or will form part of the Facility. (PF000160).

**VII.** The EZH Transaction

75. Cornerstone, on behalf of CED and Banc One Leasing Corp. ("Banc One"), submitted a proposal to EZH to enter into a lease/lease-back of the RoCa3 Facility on September 26, 1997. This proposal letter is attached as Exhibit ___. (PF006085). This proposal was not executed by EZH.

76. On October 21, 1997, CED sent a proposal directly to EZH to make an equity investment in the lease/leaseback of the RoCa3 Facility. This proposal was accepted by EZH on October 22, 1997. This fully executed proposal along with fax cover sheets transmitting the proposal is attached as Exhibit ___. (PF003239-46).

77. CED's October 21, 1997 proposal provided that it was subject to (a) participation of lenders on terms acceptable to CED; (b) issuance of necessary approvals within CED; (c)

receipt of satisfactory opinions (including a tax opinion) and accounting determinations; (d) satisfactory third-party expert letters and reports concerning (i) the reasonableness of the interest rate on the third part non-recourse loan, the debt defeasance and related matters, (ii) insurance matters, (iii) environmental matters, (iv) an engineering report, and (v) an appraisal report; and (e) negotiation of documentation mutually acceptable to EZH and CED. (PF003241, PF003242).

78. CED retained a number of consultants in connection with the RoCa3 Transaction.

**A.** Duke Engineering

79. A document entitled "EZH-RoCa CHP Power Station Unit No. 3 Due Diligence Report, Revision 0" prepared by Duke Engineering & Services ("Duke Engineering") addresses several topics concerning an engineering review of the RoCa3 Facility. The document indicates that Duke Engineering made site visits on October 16-17, 1997 and November 11, 1997 to inspect the RoCa3 Facility, interview key plant personnel, and review plant documents. This document indicates that the principal individuals from Duke Engineering involved in the matters discussed in the document were Richard K. Radini, Gerald F. Foley, Luis C. Gonzalez and Anthony DeCristofaro. (PF001851). This document is attached as Exhibit __ (PF001831-2103, at PF001851).[3]

80. Section 3(l) of the Participation Agreement provides that the closing of the EZH transaction was contingent upon CED receiving a satisfactory report from Duke Engineering. (PF000043).

---

[3] The parties do not agree whether this is the final Duke Engineering Report in connection with the RoCa3 Facility or whether a final Duke Engineering Report was ever delivered to CED.

**B.** Tauw Milieu

81. A document entitled Due Diligence Environmental, Safety and Health Report[4], which was sent to CED by Tauw Milieu by letter dated January 14, 1998, addresses several topics concerning an environmental, health, and safety assessment of the RoCa3 Facility. [According to section 2.3.2 of the document, Tauw performed on-site inspections on October 7, 1997 and October 23, 1997, interviewed EZH personnel, and reviewed applicable environmental laws and regulations in conducting its review. (PF002135).] According to section 2.1 of the document, Hans Nieuwenhuis was the project manager in connection with the production of this document. This document is attached as Exhibit __ (PF002105-370).

82. Section 3(m) of the Participation Agreement provides that the closing of the EZH transaction was contingent upon CED receiving a satisfactory report from Tauw Milieu. (PF000043).

**C.** Deloitte & Touche

83. A document entitled "Appraisal Report, RoCa3 Electric Generating Facility" (the "Appraisal"), dated 12/15/97 and provided to CED by Deloitte & Touche LLP ("Deloitte"), addresses an appraisal of the RoCa3 Facility and aspects of the Transaction. The Appraisal indicates that the principal individuals from Deloitte & Touche on the engagement were Richard K. Ellsworth, George P. Revock, and Steven Liu. (PF001617-25). A copy of the Appraisal is attached as Exhibit __. (PF001530-787).

---

4 The United States has not yet had an opportunity to depose Mr. Nieuwenhuis, but will be allowed to do so prior to Mr. Nieuwenhuis testifying at trial. Therefore, the United States cannot at this time stipulate to many of the facts surrounding Tauw's involvement other than that the document identified above was prepared and appears to reflect evaluations conducted by Tauw in connection with the RoCa3 facility.

**D.** Accounting Matters

84. Cornerstone engaged Arthur Andersen, for the benefit of CED, to prepare a report regarding the accounting treatment for a hypothetical lease transaction. Exhibit _ is a copy of the Arthur Andersen Report (PF005873-78), and Exhibits _, _, _ (PF008521-27; PF005970-975; PF008531-37) are drafts thereof. Exhibit _ (PF021828-31) is a copy of the hypothetical lease transaction.

85. PriceWaterhouse prepared a report concerning the accounting treatment of the Transaction. Exhibit _ (PF005664-67) is a copy of the PriceWaterhouse report.

**E.** Legal Matters

86. The law firm of Loeff Claeys Verbeke issued an opinion concerning, among other things, the effect of the choice of law provisions contained in the Operative Documents, whether a Dutch court would enforce the Operative Documents, and whether the security agreements created valid and enforceable security rights under Dutch law in favor of the respective parties to the Operative Documents. (Loeff Claeys Verbeke opinion dated 12/15/97, PF266588, PF266592).

87. The law firm of Shearman & Sterling offered tax and other legal advice in connection with the Transaction. Documents entitled "Cross-Border Equipment Leasing Investor Tax Risks," dated 11/20/97, PF030848-55 and "Amendments to the Code and the Treasury Regulations Impact on Leveraged Lease Financing Transactions," dated 11/20/97, PF030812-19. A copy of the final tax opinion from the law firm of Shearman & Sterling pertaining to the Transaction, provided to CED on February 18, 1998, is attached as Exhibit __ (PF015503).

**F.** Cornerstone Financial Advisors

88. Cornerstone prepared computerized pricing runs to reflect, among other things, the anticipated cash flows and of the EZH Transaction. Cornerstone sent what it referred to as the final versions of the pricing runs to CED on or about March 12-13, 1998. These pricing runs, and a cover letter accompanying same, are attached as Exhibits __, PF08899, PF008983, PF008984, PF009069.

89. Documents pertaining to Cornerstone's role as advisor to CED include: CFA00014-16; CFA00017-20; CFA04008-10; CFA04392-420; CFA06716-18; CFA06720-23; CFA06724-28; PF011704-31; CFA00009-10; CFA00021-23; CFA00026; PF027522-28; CFA00034-37; CFA00054-69.

90. Cornerstone assisted CED in understanding how leveraged leases are treated for financial accounting purposes. (e.g., Exhibit _, CFA15388-92).

91. Cornerstone, in connection with the Transaction, requested information regarding EZH's creditworthiness. Correspondence regarding EZH's creditworthiness is attached as Exhibits:

PF003584-85
PF005524

92. An October 30, 1997 memo from Rob Holzman states that "EZH and Capstar have arranged for a site visit at the EZH RoCa3 facility on Tuesday, November 11, 1997." The memo listed a team of individuals who "have indicated that they plan on attending all or some of the Tuesday due diligence." The individuals listed were:

Rob Holzman – Cornerstone
Mark DeTrempe – Cornerstone
Brian DePlautt – CED
Harold Morrison – CED
Woody Flowers – Shearman & Sterling
Dan Kiely – Shearman & Sterling

Rich Radini – Duke Engineering
Rick Ellsworth – Deloitte & Touche
Femke Bierman – Loeff Claeys Verbeke
Hans Nieuwenhuis – Tauw Milieu

The memo is attached as Exhibit _ (PF005914-15). A facsimile from Capstar Partners further describing the site visit is attached hereto as Exhibit __, US08256-62. CED's next site visit occurred in November 2005. A copy of an inspection report discussing the November 2005 site visit is attached hereto as Exhibit __ (PF020551-66).

**G.** EZH's Representations, Warranties and Covenants

93. Section 11(d)(viii) of the Participation Agreement required that EZH deliver to the Trustee, CEL and HBU the Survey, and any amendment thereto, prepared in connection with the execution and registration of the Building Right Deed. (PF000088). Section 11(d)(ix) of the Participation Agreement required EZH to, within 14 days after the Closing Date, deliver to the Trustee, CEL and HBU a certified extract from the Rotterdam land registry showing the Building Right Deed, the Channel Building Right Deed, the Transfer Deed, the Network Deeds, the First Priority Mortgage and the Notarial Deed of Establishment have been duly filed and recorded. (PF000088).

**VIII.** CED Approval Process for the EZH Transaction

94. On October 28, 1997, CED made a presentation to the Con Edison NY Board of Trustees concerning its business plan and to request an additional $100 million investment in CED to support tax advantaged leasing investments. The vote on this request was postponed until a later date. (Exhibit __, PF 007512).

95. CED employees (or others on their behalf) produced documents for the use of CED and CEI management in considering the Transaction or issues related to the Transaction, including but not limited to the following:

(a) A two-volume Project Briefing Memorandum, dated October 23, 1997.

Volume One of the Project Briefing Memorandum contained information

on The Netherlands, EZH, the RoCa3 Facility, the Dutch electric industry, the due diligence process, the accounting for the transaction, and the benefits and risks of entering into the Transaction. Volume Two contained certain background documents, such as EZH's annual report. Volume One and Volume Two of the Project Briefing Memorandum are attached as Exhibits __ and __, respectively. (PF003759-838, PF003840-4004).

(b) A document entitled "Leasing White Paper" which discusses the characteristics of lease-leaseback transactions generally, as well as the potential RoCa3 transaction specifically, was prepared in November and December 1997. This final Leasing White Paper, which was provided to the Board of Trustees of CEI, is attached as Exhibit _ (PF015866-71).

(c) Attached as Exhibits are draft Leasing White Papers: PF015618-625; PF015626-633; PF015634-641; PF015642-48; PF015649-655; PF015656-662; PF015663-670; PF015673-75.

(d) An Investment Recommendation which was submitted to CED's Board of Directors in conjunction with resolutions authorizing the investment in the RoCa3 Facility. A copy of the memorandum submitting the Investment Recommendation to the CED Board of Directors is attached as Exhibit _ (PF002866-71).

(e) A Project Fact Sheet is attached as Exhibit _ (PF003009).

(f) The September 25, 1997 Board Minutes of [CED] are attached as Exhibit __ (PF005514).

(g) The October 23, 1997 Project Briefing Memorandum.

(h) An October 23, 1997, memorandum and board resolution are attached as Exhibit __ (PF004357).

(i) An October 23, 1997 memorandum is attached as Exhibit __ (PF030830-31).

(j) An October 27, 1997 memorandum is attached as Exhibit __. (PF002866).

(k) The Investment Recommendation and board resolution are attached as Exhibit __ (PF002867).

(l) The October 28, 1997 Board of Trustees Minutes are attached as Exhibit __ (PF007512).

(m) The October 23, 1997 CED memo with the notation "Memorandum dated 10/23/97 was not approved by the Board on 10/28/97" is attached as Exhibit __ (PF004755).

(n) The October 29, 1997 CED Board Minutes are attached as Exhibit __ (PF008322).

(o) The November 24, 1997 CED Board Minutes are attached as Exhibit __. (PF005518)

(p) A November 25, 1997 memorandum is attached as Exhibit __ and __. (PF005681)

(q) A December 9, 1997 memorandum is attached as Exhibit __. (PF003217)

(r) Investment Recommendation and board resolution are attached as Exhibit __. (PF003218)

(s) A December 9, 1997 memorandum with attached resolution and leasing white paper are attached as Exhibit __. (PF020543)

(t) A December 10, 1997 Investment Recommendation and Board of Directors resolution are attached as Exhibit __. (PF05573)

96. On December 10, 1997, the CED Board authorized the investment and participation in the EZH RoCa3 project subject to CEI approval and the provision of the necessary funds. The Certificate of the Secretary of CED certifying this board resolution is attached as Exhibit __. (PF003083).

97. The executed approval of the EZH RoCa3 project by the CED Board of Directors was conditioned upon (a) a 10% or better after-tax yield as calculated for accounting and financial reporting purposes; (b) the amount committed to the project not exceeding $47.4 million; (c) an engineering study regarding the condition of the facility; and (d) a satisfactory environmental study. (PF003083).

98. On December 12, 1997, the CEI Board of Directors held a board meeting and authorized an additional $100 million investment in CED to support tax advantaged leasing investments. The Certificate of CEI certifying this board resolution is attached as Exhibit __. (PF003082) The December 12, 1997 Board Minutes are attached as Exhibit __. (PF004801) A copy of the December 9, 1997 memo requesting additional investment with the notation "Consolidated Edison Co. of New York Inc. Board of Trustee Approved Dec. 12, 1997" is attached as Exhibit __. (PF012016)

99. Consolidated Edison Leasing, Inc. ("CEL") was organized in the State of Delaware on December 11, 1997 as a wholly owned subsidiary of CED. (Certificate of Incorporation, PF002641-43, Exhibit __; December 12, 1997 CEL Board Minutes, PF005498-503, Exhibit __). CEL was incorporated as a special purpose company for the purpose of serving as the grantor in the RoCa Facility Trust No. 2 (February 5, 1999 Weekly Report of CED, CON-020-2534, Exhibit __).

100. On December 12, 1997, the CEL Board of Directors held the first meeting of the Board and passed a resolution authorizing investment and participation in the EZH RoCa3 project. (PF005498-503). The Board noted that the EZH RoCa3 project had already been approved by the boards of directors of CED and CEI. An undated Certificate of the Secretary of CEL certifying this board resolution is attached as Exhibit __. (PF003085-86).

101. On December 15, 1997, CEL held a special meeting of the Board and adopted revised resolutions that could be provided to EZH without disclosing the limits as to the total amount that could be invested and the minimum return to the company with respect to the Transaction which were originally set forth in the December 12, 1997 resolution. The December 15, 1997 Board Minutes are attached as Exhibit __ (PF004005-07). The revised resolution is attached as Exhibit __ (PF002649).

**IX.** The EZH Transaction

102. As of December 12, 1997, CEL entered into a Trust Agreement with Wilmington Trust Company (the "Trustee"), under which the Trustee agreed to act as trustee of a trust, RoCa Facility Trust No. 2, for the benefit of CEL (the "CEL Trust") in connection with the Transaction. (Trust Agreement, PF000610)

103. CEL formed the special purpose CEL Trust to enter into the Lease Agreement and Sublease Agreement as well as other agreements that were involved in the Transaction. (Briefing Memorandum at PF003791; PWC auditor memorandum, PF237784-88). The role of the trust has no effect on the tax treatment of the Transaction. For federal income tax purposes, CEL is required to report, and does report, the income and expenses of the CEL Trust as if they were CEL's own income and expenses.

104. As of December 15, 1997, EZH and CEL, directly or through the CEL Trust, entered into the Transaction, along with other third parties, by executing a series of agreements including, among others: (1) the Participation Agreement; (2) the Lease Agreement; (3) the Lease Certificate of Acceptance; (4) the Sublease Agreement; (5) the Sublease Certificate of Acceptance; (6) the Loan and Security Agreement; (7) the Sublessee Loan Agreement, (8) the Tax Indemnity Agreement; (9) the IJssel Agreement; (10) the Rotte Agreement; (11) the Sublease Deposit, Pledge and Repledge Agreement; (12) the Sublease Pledge and Security

Agreement; (13) the Custody Agreement; (14) the Sublessee Loan Agreement; (15) the Facility Operating Agreement; (16) the Common Facilities Use Agreement; (17) the Facility Support Agreement; and (18) the Access Agreement. (Participation Agreement section 3(a), PF000040-41; section 4(a), PF000046; section 5(a), PF000052).

105. Additionally, the Transaction was conditioned on the receipt of a number of documents satisfactory to CEL, HBU and EZH, including contemporaneous reports of consultants and legal opinions in all relevant jurisdictions. (Participation Agreement section 3(b), PF000041-42; section 4(b), PF000046-48; section 5(a), PF000052-53).

106. Section 21 of the Participation Agreement provides that the amount of the Transaction Expenses, as defined in the Participation Agreement, was arrived at by taking a fixed portion, in this case 2%, of the value of the Undivided Interest. (PF000135). Section 21 of the Participation Agreement also provides that if Transaction Expenses in actuality exceeded the 2% amount, those excess costs would be borne by EZH. (PF000135). In this case the amount of Transaction Expenses resulting from this formula was $3,000,000.00. Section 21 of the Participation Agreement, in conjunction with Appendix A thereto, also provided that to the extent actual Transaction Expenses were less than the 2% amount, the Trust was responsible for Additional Transaction Expenses, i.e. expenses of representatives of EZH in preparation of the Operative Documents, up to the 2% amount. (PF000135; PF000145). CED incurred additional expenses in connection with entering into the Transaction, that were not included within the Transaction Expenses, such as the fees charged by Cornerstone and PriceWaterhouse.

**A.** EZH's Representations, Warranties and Covenants

107. Section 7 of the Participation Agreement contains representations and warranties set forth as follows (PF000056-67):

(a) EZH is a public limited liability company duly authorized to do business in The Netherlands and is authorized to perform its obligations under the Transaction Documents.

(b) The execution of the Transaction has been authorized by EZH and all necessary approvals and consents have been obtained.

(c) The execution of the Operative Documents by EZH will not constitute a default under or result in the creation of any Lien (other than pursuant to the Operative Documents).

(d) The execution of the Operative Documents by EZH does not require any governmental approvals or consents, other than those already obtained or otherwise set forth in section 7(d) of the Participation Agreement.

(e) The Transaction Documents, when executed and delivered, will constitute legal, valid, and binding obligations of EZH, enforceable against EZH.

(f) EZH is not in default of any agreement, which default would have an adverse effect on EZH or its ability to perform any of its obligations under any Transaction Documents.

(g) There is no pending litigation or action threatened, the subject of which questions any Transactional Document or, that if adversely determined would materially and adversely affect EZH's financial condition, business, or operations.

(h) No sovereign immunity applies to the Facility or EZH, with respect to claims pursuant to the Operative Documents.

(i) CEL, WTC and HBU can exercise all of their rights and remedies under the Operative Documents regardless of whether they are qualified to do business under the laws of The Netherlands.

(j) Performance by CEL, WTC or HBU of any of the actions contemplated by the Operative Documents would not violate Dutch law.

(k) No actions, other than those in Participation Agreement Section 11(d), are necessary to establish and protect the WTC's interest in the Undivided Interest.

(l) No Sublessee Default, Sublessee Event of Default, Sublease Facility Event of Loss, Sublease Facility Partial Event of Loss or Burdensome Buyout Event exists or has occurred as of the Closing Date.

(m) There will be no Liens on the Facility as of the Closing Date (other than certain Permitted Liens identified or specified).

(n) Reserved.

(o) EZH has not offered any interest in any Loan Certificate, Sublessee Note or the Facility or the Undivided Interest for sale to anyone other than CEL and HBU and not more than 150 other financial institutions. EZH has not caused any action to be taken that would result in a violation of Section 5 of the U.S. Securities Act of 1933, as amended.

(p) EZH is a Licensed Producer.

(q) Taken as a whole, the information package regarding the Facility provided by EZH on or before the Closing does not contain any untrue statement of a material fact. There is no fact of a material nature concerning the

environmental conditions of the Facility known to EZH that Tauw Milieu was not given an opportunity to inspect.

(r) EZH is the owner of the Unit (other than the German Equipment), the Leasehold Right, the Building Right, the Cooling Water Station, the Channel Building Right, and the Network Building Right free and clear of all Liens (other than certain permitted liens identified or specified). EZH is the economic owner of those parts of the Network and the Cooling Water Channel which are not subject to the Network Building Right and the Channel Building Right, respectively. The absence of legal title has no adverse impact on EZH's right to exclusive use and possession of the Network and the Cooling Water Channel.

(s) The execution and delivery of the Operative Documents will not involve any prohibited transaction within the meaning of ERISA Sections 406(a)(1)(A)-(D) and 406(b) or I.R.C. Section 4975(c)(1)(A)-(F).

(t) The descriptions of the Facility, Station Site, Building Site, Cooling Water Station Site, Turbine Building Right, Channel Building Right, and Network Building Rights are correct and sufficiently complete to identify such property.

(u) The executions by EZH, Stichting IJssel, Stichting Rotte, and Stichting Roca of the Operative Documents do not have an adverse effect on creditors under Dutch law.

(v) Neither EZH nor any of its affiliates holds any interest in the Loan, or has entered into any arrangement which changes the rights of the Lender

under the Loan Agreement, or the Lender or the Deposit Bank under the Sublease Deposit, Pledge, and Repledge Agreement, or has entered into any agreement transferring the Lender's risk of loss with respect to the Loan to EZH or its affiliates.

(w) EZH has no knowledge of any German Lease Default or German Lease Event of Default and the execution of the Operative Documents will not result in such an event.

(x) EZH has filed all required tax returns and has paid or provided reserves for the payment of all taxes.

(y) Ground rent under the Notarial Deed of Establishment, the Building Right Deed, and the Turbine Building Right Deed either has been paid for a term of 50 years from April 1, 1987, or is not payable.

(z) EZH is not subject to regulation as a holding company under the Public Utility Holding Company Act of 1935.

(aa) EZH is not an investment company or a company controlled by an investment company as used in the Investment Company Act.

(bb) EZH's balance sheets, consolidated profit and loss accounts, and consolidated cash flow statements as of December 31, 1996 fairly present EZH's operational and financial condition as of that date. There has been no material adverse change in EZH's financial condition since December 31, 1996, except as specified in Schedule 7(bb) to the Participation Agreement.

(cc) (i) The location, occupancy, operation, and use of the Unit, the Common Facilities, the Cooling Water Channel, the Cooling Water Station, and the Network are in compliance with the Applicable Dutch Law and Environmental Laws (except as specified in the Tauw Milieu report); (ii) No operations conducted at the Station Site, the Building Site, the Unit, the Common Facilities, the Cooling Water Channel, or the Network regarding Hazardous Substances are controlled, regulated, or prohibited under Environmental Law (except as in compliance with Environmental Law); (iii) Except as specified in Schedule 7(cc)(iii) to the Participation Agreement, the Unit, the Common Facilities, the Cooling Water Channel, the Cooling Water Station, the Network, the Building Site, and the Cooling Water Station Site are, under existing Environmental Law, free from a level of contamination requiring action by a Governmental Authority; (iv) Except as specified in Schedule 7(cc)(iv) of the Participation Agreement, EZH (a) is not aware of any health or safety violations pertaining to the Facility; (b) is not aware of releases of Hazardous Substances from the Facility; and (c) is not liable for the costs of cleaning up any release of hazardous substances from the Facility, (v) EZH has taken all required remedial action regarding releases of Hazardous Substances.

(dd) EZH is in full compliance with the Sublease regarding insurance.

(ee) As of the Closing Date, the electric utility business in The Netherlands is subject to the Electrictity Act, including the Electricity Plan ("E-Plan")

and the Cooperation Agreement. The E-Plan does not relate to power stations that are not owned by or at the disposal of a Licensed Producer. The Electricity Act will not prevent a person other than EZH from using the Unit for non-public supply. Under the Electricity Act, no license is required for a Person other than EZH to operate the Unit. If the Facility is no longer owned or at the disposal of EZH, there is no provision in the Electricity Act that would preclude EZH or another Licensed Producer from operating the Facility for any such other Person; or such other Person from (i) selling the electricity generated by the Unit to non-public supply; (ii) exporting the electricity; or (iii) selling the electricity to public supply. (PF000064).

(ff) (i) Other than those already obtained, no action is necessary by any Governmental Authority for the operation of the Facility by EZH; (ii) As of the Closing Date no Applicable Dutch Law would preclude CEL Trust, after the Sublease Termination Date, from entering into contractual arrangements for the wheeling of electricity produced by the Facility over the high-voltage grid to any large customer within The Netherlands, or to a point of interconnection for export to neighboring countries; (iii) The Unit is included in the merit order under the SEP dispatch plan; and (iv) As of the Closing Date EZH has no contracts requiring the sale of energy, heat, or $CO_2$ produced by the Facility beyond the Sublease Basic Termination Date.

(gg) (i) The Plans and Specifications made available to Duke Engineering are true and complete in all material respects; (ii) The testing and start-up procedures, and the operation and maintenance programs relating to the Unit, are consistent with the Plans and Specifications, Applicable Dutch Law, and Prudent Industry Practice; and (iii) The Unit has a capacity and functional ability to perform, on a continuing basis, the function for which it was designed.

(hh) On the Closing Date, there are no events or conditions affecting the Facility which would materially adversely affect the capability of the Facility to operate or materially impair its value.

(ii) Taking into account applicable Dutch law, the property rights and interests made available to CEL Trust under the Control Documents and other Operative Documents following the Sublease Termination Date or an exercise of remedies under section 15 of the Sublease permit CEL Trust, on a commercially practicable basis, the use, operation, and possession the RoCa3 Facility, the ingress and regress for any reasonable purpose in connection with its rights under the Control Documents, the procurement of gas, water and other Operating Inputs, and transmission services from the Station Site to the SEP Grid or other such available grids.

(jj) The Unit is not a Power Plant as defined in the Electricity Act.

(kk) Translations of certain Dutch documents are complete and accurate.

(ll) All information specified on Schedule 7(ll) of the Participation Agreement relating to environmental information provided to Tauw Milieu is true in all material respects.

(mm) Schedule 7(mm) describes the principal encroachments onto the land adjacent to the Building Site.

(nn) Reserved.

(oo) EZH has no intent to decommission the Unit and reasonably believes that decommissioning of the Unit will not occur during the Sublease Term.

(pp) No action has been taken in connection with EZH's dissolution or bankruptcy.

(qq) Submission by EZH to the non-exclusive jurisdiction of the Supreme Court of the State of New York and the United States District Court for the Southern District of New York, as provided in Section 22(h) of the Participation Agreement, is valid and binding on EZH.

(rr) EZH is in compliance with all of its obligations under the Notarial Deed of Establishment, the Building Right Deed, the Channel Building Right Deed, the Network Deeds and all permits relating the Cooling Water Channel and the Network.

(ss) Reserved.

(tt) Reserved.

(uu) As of the Closing Date, EZH has not received any notice from ABB that ABB has assigned EZH's rights in the German Leases to another party.

108. Section 11(d)(iv) of the Participation Agreement provides that EZH will provide CEL and HBU with audited financial statements; interim financial reports if such reports are available to creditors generally; explanations of the financial statements or interim reports, if requested; and ratings by S&P, Moody's or other debt rating services issued to or obtained by EZH, and prompt notice of any downgrades of EZH's credit rating. (PF000082-83).

109. Section 11(d)(v) of the Participation Agreement provides that EZH shall remain a Licensed Producer unless the loss of such status will not have any adverse effect on the Trustee, CEL or HBU, or on EZH's ability to perform its obligations under the Operative Documents, or if the Trustee, CEL or HBU determines that such adverse effect was material, they were indemnified to their reasonable satisfaction. (PF000083).

110. Section 11(d)(vi) of the Participation Agreement (PF000083-84) provides that EZH will:

111. Section 11(d)(vi) of the Participation Agreement (PF000083-84) provides that EZH will:

(a) Comply, at its own expense, with all environmental laws applicable to the RoCa3 facility;

(b) Obtain, in full compliance with all Environmental Laws, all necessary authorizations for the operation of the RoCa3 facility by EZH as Sublessee;

(c) Not release, treat, store, or generate Hazardous Substances at RoCa3 or the Station Site, or permit any transportation of Hazardous Substances other than in full compliance with all Environmental Laws;

(d) Conduct and complete all required investigations, and undertake any cleanup, regarding Hazardous Substances at RoCa3, as required under the Environmental Laws or by any Governmental Authority in accordance with such laws;

(e) Provide CEL and HBU copies of all communications relating to any alleged or actual violation of environmental law in any material (or likely to become material) respect including any release of Hazardous Substances in violation of the Environmental Laws; and

(f) Take reasonable steps to ensure that RoCa3 will be free from a level of contamination that could cause or lead to any action by a Governmental Agency or another third party under Environmental Law or Applicable Dutch Law.

## X. The Lease Agreement

112. Under the Lease Agreement, EZH is identified as the lessor and CEL Trust is identified as the lessee. (PF000352).

113. Section 3 of the Lease Agreement, in conjunction with Appendix A to the Participation Agreement, provides that the Trust is the Lessee of a 47.468354430380% undivided interest (the Undivided Interest) in the RoCa3 facility for 43.2 years (the Lease Interest), commencing with the Closing Date (i.e., December 15, 1997) and ending on the Lease Termination Date (i.e., February 24, 2041) (the Lease Term). PF000353; PF000150; PF000168; PF000200.

114. The Lease Certificate of Acceptance provides that EZH delivered and leased to CEL Trust under the Lease and CEL Trust accepted and leased the Undivided Interest from EZH

under the Lease, for all purposes of the Lease. The Lease Certificate of Acceptance is attached as Exhibit __. (PF000409).

115. Section 7(a) of the Lease Agreement provides that, prior to the Sublease Termination Date, CEL Trust at its own expense is required to maintain, repair and preserve the RoCa3 facility in accordance with the standards set forth in Section 7(a) of the Sublease Agreement, but that by entering into the Sublease Agreement with EZH and prior to the Sublease Termination Date, CEL Trust was deemed to have complied with its maintenance, repair, and preservation obligations as defined by the Lease. (PF000361).

**A.** Payments Under the Lease

116. Section 3(d)(ii) of the Lease Agreement, in conjunction with Exhibit A thereto, requires CEL Trust to pay rent to EZH in two installments. The first installment – in the amount of approximately $120.1 million – was due on the Closing Date (the "Prepayment Amount" or "Initial Basic Rent Payment"). The second installment – in the amount of approximately $831.5 million – is due on the Lease Termination Date, February 24, 2041 (the "Final Basic Rent Payment"). (PF000354; PF000380-81).

117. The Initial Basic Rent Payment is the sum of the CEL Trust's commitment of $39,320,000 ("Investor's Commitment") and HBU's commitment of $80,792,270.36 ("Lender's Commitment"). (Participation Agreement, Schedule A, PF000202).

118. Section 2.2 of the Loan and Security Agreement, in conjunction with the Loan Certificate and Schedule 1 to the Participation Agreement, provides that Hollandsche Bank-Unie N.V. ("HBU") would provide a non-recourse loan ("HBU loan") in the amount of $80,792,270.36 (the "Lender's Commitment") at 7.10% interest to the Trust. (PF000689).

119. Annex A-1 to the Loan Certificate provides that the maturity date of the HBU Loan was January 2, 2027. PF000694.

120. The Lease Agreement, Exhibit A, allocates the Initial Basic Rent Payment to the rent due on the periods ended January 2, 1998, January 2, 1999, January 2, 2000, January 2, 2001, and January 2, 2002, and to part of the rental payment due for the rental period ending January 2, 2003. The Lease Agreement, Exhibit A, allocates the Final Basic Rent Payment to the remaining rent periods of the Lease Term, including a payment in 2003 (i.e., 2003-2041). PF000380-81.

121. The Participation Agreement, Section 5(g), provides that EZH's participation in the Transaction was conditioned upon CEL and HBU making available their respective $39,320,000 and $80,792,270.36 commitments. (PF000052).

122. A General Office Invoice dated December 15, 1997, executed by Charles Muoio, requesting payment from Con Edison NY to CED in the amount of $39,320,000.00, is attached as Exhibit _ (PF016794).

123. A General Office Invoice dated December 15, 1997, with a fax line dated December 16, 1997, executed by Joan Freilich, approved Con Edison NY's, on CED's behalf, wiring of the Investor's Commitment to the WTC Account. (PF003230).

124. Article B of the Closing Funding Memorandum provides that CEL transferred $39,320,000.00 (the "Investor's Commitment") available to the Trust by funding the WTC Account No. 43510-0, ROCA Facility Trust No. 2. ("WTC Account") with the Investor's Commitment. (PF001450, PF001453).

125. Article C of the Closing Funding Memorandum provides that CEL made its Investor's Commitment available to the Trustee by transferring and assigning its rights in the

WTC Account. (PF001454). Exhibit A to the Closing Funding Memorandum reflects that CEL transferred its rights in the WTC Account. (PF001464).

126. Article B of the Closing Funding Memorandum provides that HBU had on deposit its Lender's Commitment in ABN AMRO Bank N.V. Account No. 50.22.51.093 ("ABN Account"). (PF001453).

127. Article C of the Closing Funding Memorandum provides that HBU made its Lender's Commitment to the Trustee by transferring and assigning its rights in respect of the ABN Account to CEL Trust. (PF001454). Exhibit B of the Closing Funding Memorandum reflects that CEL Trust transferred its rights in the ABN Account. (PF001467).

128. Article C of the Closing Funding Memorandum provides that the CEL Trust paid the Initial Basic Rent Payment by transferring and assigning to EZH both the WTC Account and the ABN Account. (PF001454) Exhibit C to the Closing Funding Memorandum reflects that CEL Trust transferred its rights in the WTC Account and the ABN Account to EZH. (PF001472).

129. Article D of the Closing Funding Memorandum provided that CEL transferred to ABN AMRO Bank N.V. $274,050.11 in payment of the Lender's Fee. (PF001455).

130. Annex-1 to the Loan Certificate issued by [CEL Trust] provides the Schedule of Payments and the Loan Amortization Schedule. (PF000694-95).

131. An ABN AMRO document, in Capstar's files, indicates that HBU was a wholly owned subsidiary of ABN AMRO Bank N.V. (CAP00209971-76).

132. Section 10(c) of the Participation Agreement provides that HBU is regularly engaged in banking, is making the Loan in the ordinary course of its business, its day-to-day operations are separate from ABN AMRO Bank N.V., it has not transferred any part of the Loan

or risks associated with making such Loan to any Person or Affiliate thereof (including ABN AMRO) with obligations under the Operative Documents, and the Operative Documents contain all of the agreements on the part of the Lender or any Affiliate thereof (including ABN AMRO) relating to the transactions contemplated by the Operative Documents. (PF000071).

**B.** Lessor Events of Default

133. Section 14(a) of the Lease Agreement, the following would constitute Lessor Events of Default (PF000363):

(a) EZH breaches the covenant of quiet enjoyment provided in section 4(c) of the Lease after the Sublease Term, and does not timely cure said breach (Lease § 14(a)(i), PF000364);

(b) EZH fails to perform or observe in any material respect its covenants, obligations, or agreements under the Lease Agreement or sections 11(d) and (e) of the Participation Agreement and EZH cannot timely cure such failure (Lease § 14(a)(ii), PF000364);

(c) EZH is declared bankrupt and does not successfully appeal such determination in a timely manner (Lease § 14(a)(iii), PF000364-65);

(d) EZH is dissolved or liquidated, other than by reason of an allowed merger, if the rights of CEL Trust or CEL are adversely affected (Lease § 14(a)(iv), PF000365);

(e) EZH proposes or enters into an arrangement for the benefit of its creditors (Lease § 14(a)(v), PF000365);

(f) EZH fails to maintain the Letter of Credit (Lease § 14(a)(vi), PF000365);

(g) EZH defaults under the German Lease and the German Lessor exercises its remedies under the German Lease or gives notice of its intent to do so (Lease § 14(a)(vii), PF000365-66);

(h) A termination of the German Lease without EZH obtaining title to the German Equipment (Lease § 14(a)(viii), PF000366);

(i) A payment default under the Sublessee Loan Agreement as of the last day of the Sublease Basic Term, unless EZH has already purchased Lessor CEL Trust's interest in the Facility (Lease § 14(a)(ix), PF000366); and

(j) EZH failing to pay the Settlement Amount which has not been timely resolved (Lease Agreement § 14(x), PF000366).

(k) The Lease Agreement (Lease § 15(a), PF000367-38) provides that if a Lessor Event of Default has occurred and the Sublease is not in effect: (a) EZH is to pay CEL the Settlement Amount, as set out in Exhibit D to the Lease Agreement (Lease Ex. D, PF000384-95); (b) CEL's Lease Interest is to be automatically assigned to the Designated Successor Lessee (any Person chosen by EZH, so long as such Person is organized under the laws of The Netherlands); and (c) CEL is to transfer its rights in certain collateral, subject to the prior payment of the Settlement Amount, to the Designated Successor Lessee, except as otherwise provided.

(l) Section 15(b) of the Lease Agreement provides that if a Lessee or Lessor Event of Default has occurred and the Sublease is in effect, then the sole action of either EZH or CEL Trust is to exercise any of its remedies or take other appropriate action under the Sublease. (PF000367-38).

## XI. The Sublease Agreement

**A.** Rights under the Sublease

134. Under the Sublease Agreement, CEL Trust was identified as the sublessor and EZH was identified as the sublessee. PF000513.

135. Section 3(a) of the Sublease Agreement, in conjunction with Appendix A of the Participation Agreement, provides that CEL Trust leases the Undivided Interest in the RoCa3 Facility to EZH for a period of 20.1 years (the "Sublease Basic Term"), commencing on the Closing Date (i.e., December 15, 1997) and expiring on the Sublease Basic Termination Date (i.e., January 2, 2018). (PF000514; PF000187). The Sublease Basic Term has a duration of approximately 46.53% of the Lease Term (20.1 years divided 43.2 years).

136. Section 20(a)(i) of the Sublease Agreement provides for a Sublease Renewal Option (which is described more fully in paragraphs __ through __), whereby CEL Trust has a conditional option to require EZH to renew the Sublease for an additional 16.5 years from the Sublease Basic Termination Date and ending on June 15, 2034 (the "Sublease Renewal Term"). The combined Sublease Basic Term and the Sublease Renewal Term has a duration of 84.72% of

the Lease Term (36.6 years divided by 43.2 years). (PF000418, PF000192, PF000187, PF000150).

137. Section 7(a) of the Sublease Agreement provides that EZH "at its own expense, will maintain, overhaul, inspect, test, repair and service" the Facility, or cause such to be done, "on a basis no less favorable than [EZH's] maintenance and repair program from time to time for similar facilities owned, leased or operated by [EZH] or its Affiliates and in accordance with Prudent Industry Practice" during the Sublease Basic Term. (PF000428). Section 7(a) of the Sublease Agreement further provides that EZH shall maintain, overhaul, inspect, test, repair and service the Facility (i) in good operating order, repair and condition; (ii) in compliance with Applicable Dutch Law; (iii) in compliance with any insurance requirements and the requirements of the German Documents; and (iv) at a level and in a manner that will maintain any existing manufacturer's Warranties. (PF000428).

138. According to the Operative Documents, New York law is controlling for purposes of some Operative Documents, including the Participation Agreement, Lease, and Sublease (see, e.g., Participation Agreement, Section 22(e), PF000136; Lease Agreement, Section 24(e), PF000373; Sublease Agreement, Section 30, PF000467), while Dutch law is controlling for some others.

**B.** Payments Under the Sublease

139. The Sublease Agreement, Section 3(b) (PF000418) and Exhibit B, Part I (PF000474) required that during the Sublease Basic Term, EZH is required to pay annual rents to CEL as follows[5]:

---

[5] Each scheduled rent payment is the product of Sublease rent percentage (Sublease, Exhibit B, PF000474) and $150 million, the value of the Undivided Interest as set forth in Exhibit E of the Sublease (PF000496).

| Date | Scheduled Sublease Rents |
|---|---|
| Dec 15, 1997 | $ 0.00 |
| Jan 2, 1998 | 424,960.41 |
| Jan 2, 1999 | 8,999,161.52 |
| Jan 2, 2000 | 8,999,161.52 |
| Jan 2, 2001 | 8,999,161.52 |
| Jan 2, 2002 | 8,999,161.52 |
| Jan 2, 2003 | 8,999,161.52 |
| Jan 2, 2004 | 8,999,161.52 |
| Jan 2, 2005 | 8,999,161.52 |
| Jan 2, 2006 | 8,999,161.52 |
| Jan 2, 2007 | 8,999,161.52 |
| Jan 2, 2008 | 8,964,978.83 |
| Jan 2, 2009 | 7,358,487.86 |
| Jan 2, 2010 | 7,362,962.76 |
| Jan 2, 2011 | 7,362,950.30 |
| Jan 2, 2012 | 7,362,950.33 |
| Jan 2, 2013 | 7,362,950.33 |
| Jan 2, 2014 | 7,362,950.33 |
| Jan 2, 2015 | 7,362,950.33 |
| Jan 2, 2016 | 7,362,950.33 |
| Jan 2, 2017 | 7,362,950.33 |
| Jan 2, 2018 | 7,362,950.33 |

140. The Sublease Agreement, Section 3(b) (PF000418) and Exhibit B, Part II (PF000475) requires that if the Sublease Renewal Term becomes operative, EZH would be required to pay annual rents to CEL as follows[6]:

| Date | Scheduled Sublease Rents |
|---|---|
| Jan 2, 2019 | 18,225,000.00 |
| Jan 2, 2020 | 18,225,000.00 |
| Jan 2, 2021 | 18,225,000.00 |
| Jan 2, 2022 | 18,225,000.00 |
| Jan 2, 2023 | 18,225,000.00 |
| Jan 2, 2024 | 18,225,000.00 |
| Jan 2, 2025 | 18,225,000.00 |
| Jan 2, 2026 | 18,225,000.00 |

---

[6] Each scheduled rent payment is the product of Sublease rent percentage (Sublease, Exhibit B, PF000475) and $150 million, as set forth in Exhibit E of the Sublease (PF000496).

| | |
|---|---|
| Jan 2, 2027 | 18,225,000.00 |
| Jan 2, 2028 | 18,225,000.00 |
| Jan 2, 2029 | 18,225,000.00 |
| Jan 2, 2030 | 18,225,000.00 |
| Jan 2, 2031 | 18,225,000.00 |
| Jan 2, 2032 | 18,225,000.00 |
| Jan 2, 2033 | 18,225,000.00 |
| Jan 2, 2034 | 18,225,000.00 |
| Jun 15, 2034 | 8,251,875.00 |

141. Section 18 of the Lease Agreement provides that CEL Trust's obligation to pay Lease Rent payable under the Lease Agreement is absolute and unconditional under any and all circumstances, including, among others, any setoff, counterclaim, recoupment or defense it may have against EZH. (PF000369).

142. Section 18 of the Sublease Agreement provides that EZH's obligation to pay all Sublease Rent payable under the Sublease is absolute and unconditional, and shall not be affected by any character, including, among others, any setoff, counterclaim, recoupment abatement, suspension, deduction deferment, reduction, defense or other right which EZH may have against the CEL, CEL Trust or HBU. (PF000461).

**C.** Covenants and Representations Under the Sublease

143. Section 8(b) of the Sublease Agreement provides that during the term of the Sublease, EZH may not sub-sublease the Facility unless it satisfies the stated conditions and agreements. So long as those conditions are satisfied, section 8(b) provides that EZH does not need approval from CEL, CEL Trust or HBU for such sub-sublease; however, EZH remains liable for all of its obligations under the Operative Documents. (PF000435-36).

144. Section 6 of the Sublease Agreement provides that during the term of the Sublease, EZH will not permit any Lien to exist on the Facility, except as otherwise provided therein. (PF000427).

145. Section 7(b) of the Sublease Agreement provides that during the term of the Sublease, EZH is required, at its own expense, to make or cause to be made such modifications as shall be required to comply with Applicable Dutch Law (see Participation Agreement, App. A, Definitions, PF000146), the provisions of any insurance policy required to be carried under the Sublease, and the German Documents, as well as to maintain the Warranties. (PF000428)

146. Section 7(b) of the Sublease Agreement provides that during the term of the Sublease, EZH can modify or cause improvements to the RoCa3 Facility that it deems desirable in the course of its business. Those modifications shall not impair the RoCa3 Facility's operation, decrease its residual value or remaining useful life, or cause it to become commercially unusable to any Person other than the Sublessee or an Affiliate of the Sublessee or that would alter the primary function of the Facility. (PF000428).

147. The Sublease Agreement, Section 7(c), provides that during the term of the Sublease, all replacement parts used by EZH must meet certain specified standards, such as being free and clear of Liens and shall be in at least as good operating condition as the parts replaced, and shall have the same value, utility and useful life as the replaced part. (PF000429).

148. Section 7(f) of the Sublease Agreement provides that during the term of the Sublease, EZH is required to: (i) maintain daily operating logs showing the output of the Facility; (ii) keep maintenance and repair reports in sufficient detail to indicate the name, character and date of major work done, including the cost of such work, if normally maintained by EZH; (iii) maintain a current operating manual and a complete set of Plans and Specifications; (iv) maintain a current Common Facilities Book which is adequate to enable an engineer not otherwise familiar with the Facility to identify and locate the various components of the Common Facilities; (v) maintain records of fuel costs and other costs of the Facility so long as

those records are normally kept in the course of its business; (vi) make available the above-described reports to CEL Trust in connection with any inspection under Sublease § 12, provided that so long as no Sublessee Event of Default shall have occurred and be continuing, such reports may be destroyed in accordance with RoCa3's normal document retention program, but in no event prior to two years after the date of such reports. (PF000433)

149. Section 11(d)(iv)(E) of the Participation Agreement provides that EZH is to provide an annual Officer's Certificate from a Responsible Officer certifying that the officer is familiar with the Operative Documents and the terms thereof and that the officer's review of the transactions and conditions of EZH does not reveal a condition or event that constitutes a Sublessee Default or Sublessee Event of Default, or if such a condition or event does exist, describing the nature thereof and what steps are being taken or are planned to remedy it. The Officer's Certificate shall also include the names of the Responsible Officers for the next 12-month period as well as the credit rating of the letter of credit issuer. (PF000082).

150. 176(a) CEL has copies of such Officer's Certificates in its records for the years 1999 (PF007909), 2000 (PF009626), 2002 (PF009676), and 2004 (PF009636).

**D.** Premature Terminations of the Lease and/or the Sublease

151. The Sublease to EZH may be terminated before the Sublease Term expires by any of the following events ("Premature Terminations"):

(a) a Burdensome Buyout Event (Sublease § 9(a), PF000436-37; see paragraphs 152-154);

(b) a Voluntary Termination for Economic Obsolescence (Sublease § 9(b), PF000438-40; see paragraphs 155-158);

(c) an Early Purchase Option (Sublease § 9(c), PF000440-41; see paragraph 201);

(d) a Sublease Facility Event of Loss (Sublease § 10, PF000441-46; see paragraphs 160-161); or

(e) a Sublessee Event of Default (Sublease § 15, PF000455-60; see paragraphs 163-164).

**(1)** Burdensome Buyout Event

152. Upon the occurrence of a Burdensome Buyout Event, EZH has the right to terminate the Sublease and to purchase CEL Trust's interest under the Lease. (Sublease § 9(a), PF000436-37).

153. A Burdensome Buyout Event would occur if (a) a Sublessor Event of Default occurs and is continuing, (b) it becomes illegal for EZH to continue as Sublessee or to make payments on the Sublease; (c) EZH becomes liable for additional costs and expenses of providing additional credit support; (d) EZH becomes liable for additional taxes (such as withholding taxes, tariffs, duties, ad valorem taxes and other government charges) which could be avoided by purchasing CEL Trust's interest; or (e) a merger of EZH with one or more electricity producers as part of a reorganization of the Dutch electricity generation industry if EZH determines that such a merger might result in a liability under the Tax Indemnity Agreement as a result of the application of section 467 of the Code. A Burdensome Buyout Event does not occur if EZH intentionally causes such event. (Participation Agreement, App'x A, Definitions, "Burdensome Buyout Event," PF000148-49).

154. Upon the occurrence of a Burdensome Buyout Event, EZH could choose to terminate the Sublease by assuming CEL Trust's obligations under the Lease, and paying to CEL Trust the Burdensome Buyout Value (Sublease § 9(a), PF000436-37):

(a) In the event of a Burdensome Buyout Event arising from a Sublessor Event of Default that was caused by CEL Trust or CEL, Burdensome Buyout Value means Sublease Special Termination Value. (Sublease § 9, PF000436-41; Participation Agreement, App'x A, Definitions, "Burdensome Buyout Event," PF000148-49).

(b) In the event of a Burdensome Buyout Event caused (i) by a Sublessor Event of Default that was not caused by CEL Trust; (ii) by it becoming

illegal for EZH to continue as Sublessee or to make payments on the Sublease; or (iii) by EZH becoming liable for additional costs and expenses of providing additional credit support under the Operative Documents or by EZH becoming liable for additional taxes (such as withholding taxes, tariffs, duties, ad valorem taxes and other government charges) which could be avoided by purchasing CEL Trust's Lease Interest if such amount would exceed an amount as determined herein, Burdensome Buyout Value means Sublease Termination Value. (Participation Agreement, App'x A, Definitions, "Burdensome Buyout Event," PF000148-49).

(c) In the event of a Burdensome Buyout Event caused by EZH or a change in Dutch law, Burdensome Buyout Value means the greater of Fair Market Value or Sublease Termination Value. (Participation Agreement, App'x A, Definitions, "Burdensome Buyout Event," PF000148-49).

(d) In the event of a Burdensome Buyout Event caused by a merger of EZH with one or more electricity producers as part of a reorganization of the Dutch electricity generation industry if EZH determines that such a merger might result in a liability under the Tax Indemnity Agreement as a result of the application of section 467 of the Code, EZH could be required to pay Sublease Special Special Termination Value. (Participation Agreement, App'x A, Definitions, "Burdensome Buyout Event," PF000148-49).

**(2)** Voluntary Termination for Economic Obsolescence

155. Section 9(b) of the Sublease Agreement provides that EZH has the right, after December 15, 2002, to terminate the Sublease if EZH determines the Facility is technologically or economically obsolete, or is surplus to EZH's needs. (PF000438-40).

156. Section 9(b) of the Sublease Agreement provides that in the event that EZH declares a Voluntary Termination for Economic Obsolescence, EZH must attempt to sell CEL Trust's Lease Interest to a third party Appropriate Purchaser for cash, the net proceeds of which must be delivered to CEL Trust. (PF000438-40).

157. Section 9(b)(ii) of the Sublease Agreement provides that in addition to the cash payment of the net sales proceeds described in paragraph 156, EZH must pay to CEL Trust in

cash the excess, if any, of the Sublease Termination Value over such net cash proceeds. (PF000439).

158. In the event that EZH declares a Voluntary Termination for Economic Obsolescence, section 9(b)(iii) of the Sublease provides that CEL Trust may elect, in lieu of the sale of the Lease Interest to a third party described in paragraph 156, to take possession of the Lease Interest for the remainder of the Lease Term. In the event of such an election by CEL Trust, EZH shall cease its efforts to sell CEL Trust's Lease Interest and instead deliver possession of the Facility to CEL Trust under the Lease. (PF000439). CEL's right to exercise this option under the Economic Obsolescence Provisions is conditioned upon making security arrangements for the payment of Lease Basic Rent and paying to HBU sufficient funds to repay the aggregate unpaid principal amount of the Loan Certificates together with all accrued interest thereon. (PF000439-40).

**(3)** Early Purchase Option

159. Section 9(c) of the Sublease provides that EZH has the right to purchase CEL Trust's Lease Interest on the occurrence of a Sublease Early Purchase Option Event, which would result from CEL's (or an affiliate of CEL's) acquisition of, merger or consolidation with, or purchase of a Competitor of EZH. Upon the exercise of its rights following a Sublease Early Purchase Option Event, EZH must pay CEL an amount equal to the greater of the Sublease Termination Value on that date or the Fair Market Sales Value of CEL Trust's Lease Interest. A Competitor of EZH means a person who either (i) produces electrical power for sale to energy purchasers in the Benelux or (ii) has a material interest in or is an affiliate of such person. (Sublease § 9(c), PF000440; Participation Agreement, App'x A, Definitions, "Sublease Early Purchase Option Event," PF000188, "Competitor of EZH," PF000151).

**(4)** Sublease Facility Event of Loss

160. Section 10 of the Sublease provides that EZH is required to purchase CEL Trust's Lease Interest for the Sublease Termination Value upon the occurrence of a Sublease Facility Event of Loss resulting from (Sublease § 10, PF000441-42; Participation Agreement, App'x A, Definitions, "Sublease Facility Event of Loss," PF000188):

(a) loss of the Facility or the use thereof resulting from destruction or damage which repair is uneconomic or which renders the Facility permanently unfit for normal use;

(b) damage to the Facility resulting in an insurance payment on the basis of a total loss;

(c) a change in Applicable Law preventing the operation of the Facility for Base Load use as of the last day of the Sublease Basic Term or Sublease Renewal Term;

(d) a change in Applicable Law rendering use of the Facility discontinued; or

(e) a change in Applicable Dutch law affecting CEL Trust's ability to enforce its rights under the Operative Documents.

161. In the event of a Sublease Facility Event of Loss resulting from the seizure or condemnation of the Facility by any Governmental Authority for the shorter of the balance of the Sublease Term or more than two years unless waived by the Trustee and HBU, EZH is required to purchase CEL Trust's Lease Interest for an amount equal to the greater of the Sublease Termination Value or Fair Market Sales Value. (Sublease § 10, PF000441-42; Participation Agreement, App'x A, Definitions, "Sublease Facility Event of Loss," PF000188).

**(5)** Sublease Facility Partial Event of Loss

162. Section 10(b)(i) of the Sublease Agreement provides that if at any time after December 15, 2009, and prior to January 2, 2018, an event occurs which results in a significant reduction in the output capacity and/or efficiency of the Facility, EZH may elect not to restore the Facility and to declare a Sublease Facility Partial Event of Loss, provided no Sublessee Loan Event of Default, Sublessee Major Default, Sublessee Event of Default, or German Lease Event of Default shall have occurred and be continuing. Section 10(b)(ii) of the Sublease Agreement provides that in this event, EZH will be deemed to have assumed CEL Trust's obligations under the Lease equal to the Partial Loss Percentage of such obligations and EZH will be required to pay the Sublease Termination Value multiplied by the Partial Loss Percentage to CEL Trust. Section 10(b) also provides that if the Facility Value after the Sublease Facility Partial Event of Loss is less than 50% of the Value as of the Closing Date, EZH must restore the output capacity and/or efficiency of the Facility to the level that would cause the reduction in the Facility Value resulting from such Sublease Facility Partial Event of Loss not to exceed such percentage, or a Sublease Facility Event of Loss will be deemed to have occurred. (PF000442-44).

**E.** Sublessee Events of Default and CEL's Remedies upon Default

163. Section 14 of the Sublease Agreement provides that the following acts would constitute a Sublessee Event of Default (PF000451):

(a) failure of EZH to make payments of Sublease Basic Rent, Sublease Renewal Rent, Sublease Termination Value, Sublease Special Termination Value, Sublease Special Special Termination Value, Fair Market Sales Value of Sublessors's Lease Interest, Sublease Purchase Option Price or Sublease Supplemental Rent required to be paid pursuant to the Sublessee Loan Agreement (Sublease § 14(a), PF000451);

(b) representations or warranties made by EZH are discovered to be untrue, inaccurate, or misleading in any material respect and EZH cannot timely cure such default (Sublease § 14(b), PF000451-52);

(c) EZH fails to perform or observe in any material respect its covenants, obligations, or agreements and EZH cannot timely cure such default, with the exception of its maintenance obligations under section 7(a) (other than clause (ii) thereof) to the extent such compliance therewith is impossible or impracticable as a consequence of Force Majeure (Sublease § 14(c), PF000452);

(d) EZH is declared bankrupt and does not successfully appeal such determination in a timely manner (Sublease § 14(d), PF000452-53);

(e) EZH is dissolved or liquidated, other than by reason of an allowed merger, if the rights of CEL Trust or CEL are adversely affected (Sublease § 14(e), PF000453);

(f) EZH proposes or enters into an arrangement for the benefit of its creditors (Sublease § 14(f), PF000453);

(g) EZH fails to maintain required insurance (Sublease § 14(g), PF000453);

(h) EZH fails to maintain the Letter of Credit (Sublease § 14(h), PF000453);

(i) EZH fails to maintain and protect HBU's security interest in the Facility (Sublease § 14(i), PF000453);

(j) CEL Trust shall fail to have a first priority perfected security interest in the IJssel Deposit, unless waived by CEL Trust and CEL (Sublease § 14(j), PF000454);

(k) Intentionally omitted;

(l) EZH fails to arrange for the Lease Collateral Deposit as of the last day of the Sublease Basic Term (unless it has purchased CEL Trust's Lease Interest) (Sublease § 14(l), PF000454);

(m) if CEL Trust elects the Sublessee Renewal Option, and EZH fails to obtain necessary governmental approvals or fails to take any required action with respect to the Loan Certificates including, provided that certain conditions are met, the purchase thereof (Sublease § 14(m), PF000454; Participation Agreement § 11(d)(xiii), PF000088-89; § 11(l), PF000097);

(n) a payment default under the Sublessee Loan Agreement as of the last day of the Sublease Basic Term, unless EZH has already purchased CEL Trust's Lease Interest (Sublease § 14(n), PF000454);

(o) termination of the Leasehold Right, the Building Right, or the Turbine Building Right (Sublease § 14(o), PF000454);

(p) foreclosures on liens on the Facility having a value in excess of $1 million (Sublease § 14(p), PF000454);

(q) defaults under the German Lease and the German Lessor exercises its remedies under the German Lease or gives notice of its intent to do so (Sublease § 14(q), PF000454-55);

(r) termination of the German Lease without EZH obtaining title to the German Equipment (Sublease § 14(r), PF000455);

(s) failure by EZH to pay ground rent due under the Notarial Deed of Establishment (Sublease § 14(s), PF000455);

(t) failure by Stichting Roca to pay the Sale Remedy Purchase Price as defined in the Change of Law Agreement (Sublease § 14(t), PF000455);

(u) the Pledge shall fail to constitute a first priority security interest in the EuroClear securities, continuing for 30 days (Sublease § 14(u), PF000455; Pledge Agreement § 2, PF001441)

(v) EZH exercises the Sublease Purchase Option and fails to comply with its terms as of the last day of the Sublease Basic Term (Sublease § 14(v), PF000455).

164. Under section 15 of the Sublease, in the event of a Sublessee Event of Default, CEL Trust is entitled to choose from the following remedies to the extent permitted by Applicable Law (PF000455-60):

(a) require EZH to assume CEL Trust's obligations under the Lease and pay to CEL Trust the higher of Fair Market Sales Value or the Sublease Termination Value (Sublease § 15(a)(i), PF000456);

(b) require EZH to pay liquidated damages in the payment of the amount of Sublease Termination Value that exceeds either (i) the Fair Market Rental over the Life of the Lease or (ii) Fair Market Sales Value of CEL Trust's Lease Interest (Sublease § 15(a)(ii), PF000456-55);

(c) require EZH to return the Undivided Interest to CEL Trust, in accordance with Section 5 of the Sublease Agreement (Sublease § 15(a)(iii), PF000457-58);

(d) sell CEL Trust's Lease Interest, along with any property pledged to secure EZH's obligations under the Sublease, with the requirement that CEL

Trust account to EZH with respect to the sale of certain collateral identified therein (Sublease § 15(a)(iv), PF000458);

(e) subject to the Operating Agreement and without terminating the Sublease Agreement, use, operate, or sublease the Undivided Interest to others, with no duty to account to EZH for the proceeds therefrom, but with the rent owed by EZH being reduced by any amount received by CEL Trust from subleasing the Undivided Interest (Sublease § 15(a)(vi), PF000458);

(f) require EZH to assume CEL Trust's obligations under the Lease and may require EZH to pay the Equity Portion of the Sublease Termination Value and any unpaid Sublease Rent (Sublease § 15(a)(vii), PF000459); or

(g) any other right or remedy available under law (Sublease § 15(a)(viii), PF000459).

**F.** The Sublease Purchase Option

165. Section 19 of the Sublease provides that, at the end of the Sublease Basic Term (on January 2, 2018, the Sublease Basic Termination Date), EZH can elect to purchase CEL Trust's remaining Lease Interest (the "Sublease Purchase Option") for the Sublease Purchase Option Price (together with any unpaid Sublease Basic Rent due and payable before the Sublease Basic Termination Date), plus the assumption by EZH of all of CEL Trust's obligations under the Lease, including the obligation to make the Final Basic Rent Payment. (PF000462). Upon the exercise of the Sublease Purchase Option, CEL will transfer the Sublessee Loan to EZH in accordance with the terms thereof. (PF000463).

129. Schedule I to the Sublease Agreement provides that the Sublease Purchase Option Price shall be 143.63396613% of the "appraised" value of the Undivided Interest, which equates to $215,450,949.20. PF000508; see also Sublease § 19, PF000462.

166. Under the Sublease Purchase Option, CEL will also receive $7,326,950.33 as Sublease Basic Rent on January 2, 2018. (Sublease § 3(b), PF000418, Ex. B, PF000474).

167. The Sublease Purchase Option provides that CEL Trust will make arrangements to pay the remaining balance of the HBU Loan equal to $123,615,472 (including payment of the installment that was due on such date) and HBU will release its lien on the Lease. (Loan Certificate Annex A, PF000695; Sublease § 20, PF000463). The total amount receivable by CEL will, after the release of such lien, be $99,162,427.53. (($215,450,949.20 plus $7,326,950.33) minus $123,615,472).

168. If EZH exercises the Sublease Purchase Option, then upon CEL Trust's receipt of the Sublease Purchase Option Price and EZH's assumption of CEL's obligations under the Lease, CEL's interest in the Lease will revert to EZH and EZH will assume CEL's obligation to make the Final Basic Rent Payment. Under the Sublease Purchase Option, CEL will be relieved of its obligation to make the Final Basic Rent Payment, and EZH will owe the Final Basic Rent Payment to itself. (Sublease § 19, PF000462).

**G.** The Sublease Renewal Option and Retention Option

169. The Sublease Agreement provides that if EZH does not elect the Sublease Purchase Option, CEL Trust can require EZH to (i) renew the Sublease for a Sublease Renewal Term of 16.5 years (the "Sublease Renewal Option"), or (ii) return the Sublessor's Lease Interest to CEL Trust (the "Retention Option"). (Sublease § 20, PF000463).

170. Section 20 of the Sublease Agreement provides that if EZH fails to elect the Sublease Purchase Option, and CEL Trust fails to elect, no later than 60 days prior to the Sublease Basic Termination Date, either the Sublease Renewal Option or Retention Option, CEL Trust will be deemed to have elected the Sublease Renewal Option. (PF000463).

**(1)** Sublease Renewal Option

171. Under the Sublease Renewal Option, EZH will be obligated under the Sublease to make the Final Sublease Basic Rent payment due on January 2, 2018 equal to $7,362,950.33. (Sublease § 3(a), Ex. B, PF000474).

172. Under the Sublease Renewal Option, EZH will be obligated to pay Sublease Renewal Rents to CEL Trust, as identified in paragraph 201. (Sublease § 3(a), Ex. B, Part II, PF000475).

173. Under the Sublease Renewal Option, in addition to the Sublease renewal rent payments set forth in the Sublease Agreement, section 5 of the Sublessee Loan Agreement provides that EZH will be obligated to make payments to CEL Trust under the Sublessee Loan. (Sublessee Loan § 5, PF001477). Schedule A of the Sublessee Loan (PF001507-08) provides that the Sublessee's payments under the Sublessee Loan will be[7]:

| | |
|---|---|
| $37,525,237 | @ 1-2-2018 |
| $9,649,098 | @ 1-2-2032 |
| $12,062,039 | @ 1-2-2033 |
| $9,720,944 | @ 1-2-2034 |
| $5,238,696 | @ 6-15-2034 |
| $5,319,460 | @ 1-2-2035 |

[7] Each scheduled loan payment is the product of the Sublessee loan percentage value (Sublessee Loan, Schedule A, PF001507-08) and $150 million, the value of the Undivided Interest (Sublease, Exhibit E, PF000496).

$1,155,324 @ 1-2-2036

$93,128,382 @ 1-2-2041

$414,931,341 @ 2-24-2041

174. Section 20(b)(i) of the Sublease provides that if CEL Trust exercises the Sublease Renewal Option, EZH will be obligated to arrange for a reset of the interest rate on the Loan Certificate or its purchase by another lender or the Sublessee. (Sublease § 20(b)(i), PF000463; Loan and Security Agreement § 2.17, PF000655-56).

175. In the event of a reset of the interest rate discussed above in paragraph 174, then under section 3(e) of the Sublease Agreement, all amounts of Sublease Renewal Rent, the Sublease Termination Value, the Sublease Special Termination Value, the Sublease Special Special Termination Value, the Settlement Amounts, the amounts on schedule A to the Sublessee Loan Agreement, the Letter of Credit Termination Value, and the amounts set forth on Schedule 2A to the Participation Agreement shall be adjusted to the extent necessary to preserve the net economic return to CEL. (PF000419).

176. If the Sublease Renewal Option is elected, the Loan and Security Agreement provides that CEL Trust will have continuing non-recourse debt service payments to make. These payments are identified in the Loan and Security Agreement as $7,362,950.33 on January 2, 2018, and payments of $18,225,000.00 on each January 2 from 2019 to 2026, and payment of $14,546,488.00 on January 2, 2027. (Loan Certificate, Annex A-1, PF000695).

177. If the Sublease Renewal Option is elected, section 3(b) of the Lease Agreement provides that CEL Trust will be required to make the Final Basic Rent Payment of $831,525,734.00 on February 24, 2041. (Lease § 3(b), PF000353, Ex. A, PF000381).

178. Section 7(e)(2) of the Lease Agreement provides that at any point, including at the end of the Sublease Renewal Term, June 15, 2034, CEL Trust may lease the Undivided Interest

to another party or EZH for the remainder of the Lease Term or take possession of the Facility and have it operated at its own expense and for its own benefit for the remainder of the Lease Term. (PF000362).

**(2)** Retention Option

179. Section 20(a) of the Sublease Agreement provides that if CEL does not exercise the Sublease Renewal Option, it may exercise the Retention Option. (PF000463).

180. Section 20(c) of the Sublease Agreement provides that under the Retention Option, EZH will return the Sublessee's Lease Interest to CEL Trust on January 2, 2018. (PF000463). In order to exercise its Retention Option, CEL Trust shall make arrangements, in a manner acceptable to HBU, for the payment of the principal amount of all Loan Certificates. (Loan and Security Agreement § 2.13(a)(viii), PF000652). If CEL Trust fails to make such arrangements and HBU provides timely notice of such failure, CEL Trust will be deemed to have elected the Sublease Renewal Option. (PF000464).

181. The Sublease Agreement, Exhibit B, indicates that under the Retention Option, EZH will have to make the Sublease Basic Rent payment due on January 2, 2018 equal to $7,362,950.33. This is the Final Sublease Basic Rent payment due during the initial basic term of the Sublease. (PF000474).

182. Under the Retention Option, section 5 of the Sublessee Loan Agreement provides that CEL Trust has a right to receive payments on the Sublessee Loan. (PF001477). Schedule A of the Sublessee Loan provides that CEL Trust will receive the following payments on the Sublessee Loan (PF001506-07):

| | |
|---|---|
| $37,525,237 | @ 1-2-2018 |
| $9,649,098 | @ 1-2-2032 |
| $12,062,039 | @ 1-2-2033 |
| $9,720,944 | @ 1-2-2034 |
| $5,238,696 | @ 6-15-2034 |
| $5,319,460 | @ 1-2-2035 |
| $1,155,324 | @ 1-2-2036 |
| $93,128,382 | @ 1-2-2041 |
| $414,931,341 | @ 2-24-2041 |

183. Section 3 and Exhibit A of the Lease Agreement provide that under the Retention Option, EZH will have a right to receive the Final Basic Rent Payment on February 24, 2041 equal to $831,525,734. (Lease § 3, PF000353-59, Ex. A, PF000381).

184. Under the Retention Option, CEL Trust has a right to receive the Final Sublease Basic Rent payment on January 2, 2018 equal to $7,362,950.33. (Sublease Ex. B, PF000474).

**XII.** Security Agreements

**A.** Sublease Deposit

185. Sections 5(b)(v), 3(b)(iv) and 4(b)(vi) of the Participation Agreement provide that as a condition precedent to the parties entering into the Transaction, EZH, CEL and HBU were to receive certified copies of the charter documents of Stichting Rotte ("Rotte Foundation"). (PF000052 (EZH), PF000041 (CEL), PF000047 (HBU)). The Deed of Establishment of Stichting Rotte, "Oprichting Stichting Rotte," attached hereto as Exhibit _, provides that on December 12, 1997, EZH established the Rotte Foundation. (PF001245-53 (Dutch), PF001254-61 (English)). The Deed of Establishment of Stichting Rotte, Article 3, provides that the Rotte Foundation's objective was to purchase debt instruments, to make deposits, and to grant security

interests in its assets to third parties to secure EZH's payment obligations under the Sublease and other Operative Documents. (PF001255).

186. The Deed of Establishment of Stichting Rotte provides that the Rotte Foundation's managing board consists of three members, an EZH employee and two trust companies. (PF001260-61). Article 5 of the Deed of Establishment of Stichting Rotte provides that the managing board appoints the members of the board, unless a Sublessee Event of Default has occurred and is continuing, in which case CEL Trust may appoint an additional member to the board. (PF001256).

187. EZH, Stichting Rotte, Stichting Roca, and CEL Trust entered into the Rotte Agreement in order to provide security for EZH's payment obligations. Section 3 of the Rotte Agreement provides that, on the Closing Date, EZH shall pay to the Rotte Foundation $80,792,270.36 (the "Sublease Deposit Amount" or "Sublease Payment Amount"). (PF001096). The Sublease Deposit, Pledge and Repledge Agreement, Annex B, provides that the Sublease Deposit Amount is $80,792,270.36. (PF001135). Article C of the Closing Funding Memorandum provides that EZH made the Sublease Payment Amount to the Rotte Foundation by transferring and assigning its rights in the ABN Account (PF001454). Exhibit D to the Closing Funding Memorandum reflects that EZH transferred and assigned to the Rotte Foundation its rights in the ABN Account (PF001473).

188. The interest rate on the funds that the Rotte Foundation deposited with ABN pursuant to the Rotte Agreement is 7.10% per annum, compounded annually (equivalent to 6.98% compounded semi-annually). PF022863.

189. Section 4(b) of the Rotte Agreement (PF001095-96), in connection with section 2(a) of the Sublease Deposit, Pledge and Repledge Agreement (PF001116) provides that, upon

receipt of the Sublease Deposit Amount, the Rotte Foundation shall deposit that amount with ABN AMRO Bank N.V. ("ABN"), which together with all interest accrued thereon, is called the "Sublease Deposit". Article C of the Closing Funding Memorandum provides that the Rotte Foundation made the Sublease Deposit to ABN by transferring and assigning its rights in the ABN Account. (PF001454). Exhibit E to the Closing Funding Memorandum reflects that the Rotte Foundation transferred and assigned to ABN its rights in the ABN Account (PF001461).

190. The Rotte Foundation represented, in Section 7(e) of the Rotte Agreement, that its obligations under the Rotte Agreement are valid and enforceable except they may be limited by bankruptcy or similar laws affecting the rights of creditors generally. (PF001098).

126. Section 6(d) of the Rotte Agreement provides that a bankruptcy or insolvency of EZH or any other sublessee shall not terminate the Rotte Agreement, or "otherwise affect the rights, obligations and liabilities hereunder of the parties hereto." (PF001097).

191. In 1997, as a Netherlands company, EZH's functional currency was the Dutch Guilder ("NLG"). (EZH Annual Report 1997, PF003505). Section 3(d) of the Sublease Agreement (PF000418), section 2(d) of the Sublease Deposit, Pledge and Repledge Agreement (PF001117), and section 9(f) of the Rotte Agreement (PF001100) all provide that all payments due under the terms of such respective agreements are due to be paid in U.S. dollars.

192. Section 2(d) of the Rotte Agreement provides that the Rotte Foundation's payment obligations are limited to the Sublease Deposit. (PF001095).

193. Section 3(a) of the Sublease Deposit, Pledge and Repledge Agreement provides that, as security for EZH's rental payment or other payment obligations under the Sublease, the Rotte Foundation grants to the Trust a first priority right of pledge in the Sublease Deposit. (PF001118-20).

194. Section 4(a) of the Sublease Deposit, Pledge and Repledge Agreement provides that, as security for the obligation of CEL Trust to repay the Secured Amounts (i.e., the amounts owed by CEL Trust to HBU pursuant to the Loan Agreement and Loan Certificates, not in excess of the amount of Sublease Rent required to be paid pursuant to the terms of the Sublease Agreement), CEL Trust repledged the first priority right of pledge to HBU. PF001115; PF001120.

124. The Granting Clause of the Loan and Security Agreement provides that CEL Trust assigns to HBU a lien (referred to as the "Lien of the Loan Agreement") on, among other things, the Lease Agreement, the Sublease Agreement, all rents, profits, revenues and other income from the property subjected to the Lien of the Loan, CEL Trust's right to receive rent from EZH, to "secure the prompt payment of principal of and interest on, and all other amounts due with respect to" all Loan Certificates issued under the Loan and Security Agreement. (PF000642-43). Section 3(d) of the Sublease Agreement provides that, so long as the Lien of the Loan Agreement has not been discharged, CEL instructed EZH to pay its rent payment obligations under the Sublease (except for Excluded Payments and Excluded Portion) directly to HBU. (Sublease § 3(d), PF000418-19; Loan and Security Agreement § 2.6, PF000648).

195. Under the Sublease Deposit, Pledge and Repledge Agreement, the Sublease Deposit is to be used, to the extent available, to pay EZH's annual rent obligations to CEL under the Sublease Agreement during the Sublease Basic Term. (Sublease Deposit, Pledge and Repledge Agreement, Ann. B, PF001134-35).

196. The scheduled payments made out of the Sublease Deposit are equal in amount to EZH's Sublease Basic Rent payments for years 2005 through 2018. (Sublease Deposit, Pledge and Repledge, Ann. B, PF001134-35). In 2004, the Sublease Deposit, Pledge and Repledge

Agreement payments, if and when made, together with the proceeds from the Sublessee Loan, satisfy a portion of EZH's annual rent obligations to CEL Trust during the Sublease Basic Term.

197. The scheduled withdrawals pursuant to the Sublease Deposit, Pledge and Repledge Agreement as set forth in Annex B to the Sublease Deposit, Pledge and Repledge Agreement (PF001135) are as follows:

| | |
|---|---|
| 1/2/1998 | $0 |
| 1/2/1999 | $0 |
| 1/2/2000 | $0 |
| 1/2/2001 | $0 |
| 1/2/2002 | $0 |
| 1/2/2003 | $0 |
| 1/2/2004 | $8,330,120.01 |
| 1/2/2005 | $8,999,161.52 |
| 1/2/2006 | $8,999,161.52 |
| 1/2/2007 | $8,999,161.52 |
| 1/2/2008 | $8,964,978.83 |
| 1/2/2009 | $7,358,487.86 |
| 1/2/2010 | $7,362,962.76 |
| 1/2/2011 | $7,362,950.30 |
| 1/2/2012 | $7,362,950.33 |
| 1/2/2013 | $7,362,950.33 |
| 1/2/2014 | $7,362,950.33 |
| 1/2/2015 | $7,362,950.33 |
| 1/2/2016 | $7,362,950.33 |
| 1/2/2017 | $7,362,950.33 |
| 1/2/2018 | $7,362,950.33 |
| 1/2/2019 | $18,225,000.00 |
| 1/2/2020 | $18,225,000.00 |
| 1/2/2021 | $18,225,000.00 |
| 1/2/2022 | $18,225,000.00 |
| 1/2/2023 | $18,225,000.00 |
| 1/2/2025 | $18,225,000.00 |
| 1/2/2026 | $18,225,000.00 |
| 1/2/2027 | $14,546,488.08 |

198. Section 4(c) of the Sublease Deposit, Pledge and Repledge Agreement provides that ABN agreed to make certain payments to HBU so long as a Repledge exists with respect to the Sublease Deposit or the Lien of the Loan Agreement has not been discharged. (PF001120).

199. If ABN makes the payment obligations it agreed to make under the Sublease Deposit, Pledge and Repledge, the remaining payments that ABN agreed to make at any time will equal the remaining principal and interest payments due on the HBU Loan. (Loan Certificate, Ann. A-1, PF000694-95; Sublease Deposit, Pledge and Repledge, Ann. B, PF001134-35).

200. Section 2(c) of the Rotte Agreement provides that, notwithstanding the provisions of the Rotte Agreement, EZH remains liable for all Sublease Obligations. (PF001095; Sublease § 14(a), PF000451).

201. Section 11(k) of the Participation Agreement provides that, if the rating of ABN's long term unsecured senior debt obligations falls below A2 by Moody's or A by S&P, EZH, at its option and expense, may replace the Sublease Deposit with Acceptable Substitute Credit Protection if it can arrange for one or more Lenders to purchase the Loan Certificates from HBU for a purchase price of at least the principal remaining and any outstanding interest thereon, pursuant to the terms of that provision. If EZH replaces the Sublease Deposit with Acceptable Substitute Credit Protection, EZH is required to provide CEL and HBU a first priority security interest in such security. (PF000095-97).

202. Section 2(f) of the Sublease Deposit, Pledge and Repledge Agreement provides that ABN shall not use the Sublease Deposit to set off any amounts or obligations owed to ABN by HBU, the Rotte Foundation, the Trustee, or EZH. (PF001117-18).

203. Similarly, HBU waived any rights to cause the use of any part of the Sublease Deposit as a setoff against EZH or the Rotte Foundation. (Loan and Security Agreement § 9.14, PF000676).

204. Section 6(c) of the Rotte Agreement provides that, upon termination of the Rotte Agreement, the Rotte Foundation shall transfer all of the securities held in the Sublease Deposit to EZH or pay EZH an amount equal to the fair market value those securities. (PF001097).

**B.** The IJssel Agreement

205. Sections 5(b)(v), 3(b)(iv) and 4(b)(iv) of the Participation Agreement provide that as a condition precedent to the parties entering into the Transaction, EZH, CEL and HBU were to receive certified copies of the charter documents of Stichting IJssel (the "IJssel Foundation"). (PF000052 (EZH), PF000041 (CEL); PF000047 (HBU)). The Deed of Establishment of Stichting IJssel, "Oprichting Stichting IJssel, " attached hereto as Exhibit _, provides that on December 12, 1997 EZH established the IJssel Foundation. (PF001227 (Dutch), PF001236 (English)). The Deed of Establishment of Stichting IJssel, Article 3, provides that the IJssel Foundation's objective was to purchase debt instruments, to make deposits, and to grant security interests in its assets to third parties to secure certain of EZH's payment obligations under the Sublease and other Operative Documents. (PF001237).

206. The Deed of Establishment of Stichting IJssel provides that the IJssel Foundation's managing board consists of three members, an EZH employee and two trust companies. (PF001243). Article 5 of the Deed of Establishment of Stichting IJssel provides that the managing board appoints the members of the board, unless a Sublease Event of Default has occurred and is continuing, in which case CEL Trust may appoint an additional member to the board. (PF001238).

207. The IJssel Foundation represented, in Section 7(e) of the IJssel Agreement, that its obligations under the IJssel Agreement are valid and enforceable except they may be limited by bankruptcy or similar laws affecting the rights of creditors generally. (PF001004).

208. To secure EZH's payment obligations under the Sublease and other Operative Documents, EZH transferred to Stichting IJssel, on the day after Closing, $31,252,643.73 (which number is indicated by a fax from Credite Suisse sent by E.On to EZH, US01837-39, attached hereto as Exhibit _)[8] to be deposited and credited to the Account (as defined in the Custody Agreement) which was to be used to purchase U.S. Government Securities. (IJssel Agreement § 3, PF001001-02; fax confirmation, PF018711-12).

209. Section 3(a) of the IJssel Agreement (PF001001), in conjunction with section 2.1 of the Sublessee Pledge and Security Agreement (PF001023), and section 3 of the Custody Agreement (PF001070) provide that on the date following the Closing Date, EZH would transfer to Stichting IJssel, by way transferring to ABA 021000089 Account No. 2F4A2 at Citibank, New York (maintained as a custodial account (the "Account," referred to in this Stipulation for clarity as the "Custody Account") by Credit Suisse First Boston ("CSFB")) $31,252,643.73 or an amount sufficient to purchase the U.S. Government Obligations described in section 11(d)(xiv) of the Participation Agreement. (PF000089).[9]

210. After their purchase and delivery of said obligations, the IJssel Deposit contains fixed-rate zero coupon U.S. Government Obligations for each amount of the Equity Portion of the Sublease Basic Rent, if made, and the Equity Portion of the Purchase Option Price, if paid, with a maturity date prior to the date such amount is due and with a value at maturity at least equal to such amount. (PF000089; PF001001; PF001023; PF001070-71).

---

[8] This number is also shown as $30,083,052.77 in the March 18, 1998 Pricing Runs provided by Cornerstone as the "Final Pricing Runs." (Exhibit _, PF008932). Plaintiff agrees that this number ($30,083,052.77) appears on the Final Pricing Runs, but asserts that the number in paragraph 208 ($31,252,643.73) is the correct one.

[9] See footnote 8.

211. Section 3(a) of the Custody Agreement provides that upon the occurrence of the transfer from EZH to Stichting IJssel described in paragraph 209, CSFB was obligated to use the funds it received in its capacity as Custodian to immediately purchase contains fixed-rate zero coupon U.S. Government Obligations identified on Schedule I to the Custody Agreement, to be held in the Custody Account. (PF001071-72; PF0001082). Schedule I to the Custody Agreement (PF001082) did not list any U.S. Government Obligations; however, references to U.S. Government Obligations are found at Schedule I to Exhibit B of the Custody Agreement (PF001088), Schedule I to Confirmation and Agreement (PF001051), and Annex A to the IJssel Agreement (PF001013):

| Amount at Maturity | Payment Date |
|---|---|
| $5,220,969.87 | Jan. 2, 2012 |
| $7,362,950.33 | Jan. 2, 2018 |
| $22,958,869.31 | Apr. 15, 2018 |
| $22,958,869.31 | Jun. 15, 2018 |
| $22,958,869.31 | Sep. 15, 2018 |
| $22,958,869.31 | Dec. 15, 2018 |

212. Correspondence dated December 17, 1997 addressed to CSFB from the IJssel Foundation entitled “Notice of Interest in U.S. Government Securities,” attached hereto as Exhibit _ (PF264480-88), includes a Schedule I, which identifies the following government obligations as being purchased by the IJssel Foundation:

| CUSIP No. | Maturity Date | Amount at Maturity |
|---|---|---|
| 912833JX9 | Nov. 15, 2011 | $5,221,000.00 |
| 912833KN9 | Aug. 15, 2017 | $7,363,000.00 |

| | | |
|---|---|---|
| 912833KQ2 | Feb. 15, 2018 | $22,959,000.00 |
| 912833KR0 | May 15, 2018 | $22,959,000.00 |
| 912833KS8 | Aug. 15, 2018 | $22,959,000.00 |
| 912833KT6 | Nov. 15, 2018 | $22,959,000.00 |

213. Section 3(b) of the Custody Agreement provides that CSFB, once it purchased the U.S. Government Obligations, was to credit them to the Account. (PF001072).

214. Section 3(a) and 3(c) of the IJssel Agreement provides that all U.S. Government Obligations and any funds in the Account, together with the proceeds thereon constituted the IJssel Deposit. (PF001001-02).

215. In 1997, as a Netherlands company, EZH's functional currency was the Dutch Guilder ("NLG"). (EZH Annual Report 1997, PF003505). Section 3(d) of the Sublease Agreement (PF000418), section 2(d) of the Sublease Deposit, Pledge and Repledge Agreement (PF001117), and section 10(f) of the IJssel Agreement (PF001071) all provide that all payments due under the terms of such respective agreements are due to be paid in U.S. dollars.

216. Section 2(d) of the IJssel Agreement provides that any payments that Stichting IJssel may make under the IJssel Agreement or otherwise are limited to the IJssel Deposit. (PF001001).

217. Section 2(c) of the IJssel Agreement provides that, notwithstanding Stichting IJssel's agreement to make certain payments under the IJssel Agreement, EZH remains liable for all Payment Obligations (as defined in section 1(b) of the IJssel Agreement). (PF001001).

218. Under section 2.1 of the Sublessee Pledge and Security Agreement, as security for prompt payment of the Secured Obligations (as defined in the Sublessee Pledge and Security Agreement). Stichting IJssel granted a first priority security interest in the Account, the U.S.

Government Obligations, and any earnings thereon (collectively, the "Collateral," referred to in this Stipulation for clarity as the "IJssel Collateral") to EZH and CEL Trust. (PF001023).

219. The Granting Clause of the Loan and Security Agreement, in conjunction with Appendix A of the Participation Agreement, specifically excludes the IJssel Collateral as collateral under the Loan and Security Agreement. (PF000155-58; PF000644.)

220. CSFB was required to record Stitching IJssel's ownership and CEL's and EZH's first security interests in the Custody Account. (Custody Agreement §9(d), PF001075).

221. Section 2(a) of the Dutch Supplemental Pledge to the Sublessee Pledge and Security Agreement provides that "[a]s security for the prompt payment when due of all the Trustee Secured Obligations," Stichting IJssel grants to Wilmington Trust Company as Trustee, a first priority right of pledge in the IJssel Collateral. (PF001058). "Trustee Secured Obligations" means all of EZH's, as Sublessee's, and the IJssel Foundation's obligations. (PF001022).

222. Section 3(a) of the Dutch Supplemental Pledge to the Sublessee Pledge and Security Agreement provides that "[a]s security for the prompt payment when due of all the Investor Secured Obligations" Stichting IJssel grants to CEL, a second priority right of pledge in the IJssel Collateral, subordinated only to CEL Trust's first priority right of pledge in the Collateral. (PF001058). "Investor Secured Obligations" means all of EZH's, as Sublessee's, and the IJssel Foundation's, obligations to CEL under the Operative Documents. (Sublessee Pledge and Security Agreement, PF001021).

223. Section 3(a) of the Dutch Supplemental Pledge to the Sublessee Pledge and Security Agreement provides that "[a]s security for the prompt payment when due of all the [Sublessee Secured Obligations]" Stichting IJssel grants to EZH a third priority right of pledge in

the IJssel Collateral, subordinated only to CEL Trust and CEL's respective rights of pledge in the IJssel Collateral. (PF001059). "Sublessee Secured Obligations" means all of the IJssel Foundation's obligations to return all monies and securities in the IJssel Deposit, upon termination of the IJssel Agreement. (PF001022).

224. Section 11 of the Custody Agreement provides that the assets of the Custody Account will not be subject to setoff, banker's lien, or any other right in favor of any Person. (PF001077-78).

225. Section 6(c) of the IJssel Agreement provides that EZH may terminate the IJssel Agreement but not prior to the termination of the Sublease and the Payment Obligation as defined therein. Upon the termination of the IJssel Agreement, all funds held by the IJssel Foundation are to be transferred to EZH. (PF001003).

**C.** Letters of Credit

226. Section 11(d)(vii) of the Participation Agreement provides that EZH is required to maintain one or more Letters of Credit in favor of CEL Trust and CEL, for the benefit of CEL Trust and CEL, to secure obligations of EZH to CEL Trust and CEL under the Operative Documents. (PF000086-88).

227. EZH caused the Bayerische Landesbank Girozentrale, Luxembourg Branch ("Bayerische Landesbank") to issue Irrevocable Standby Letter of Credit No. 15122116, dated December 15, 1997, in favor of CEL and CEL Trust. (Letter of Credit and exhibits thereto, PF006191-96 (L/C), PF018677-82 (exhibits)).

(a) Letters titled "Notice of Amendment of Irrevocable Standby Letter of Credit No. 15122116 Dated December 15, 1997" were sent to CEL and CEL Trust on: (i) November 20, 1998 (PF007896-97); (ii) December 6, 1999 (PF017726-27); and December 11, 2000 (PF017354-55).

(b) In December 2001, CEL agreed to substitute Irrevocable Standby Letter of Credit No. 15122116, dated December 15, 1997 for a replacement letter

issued by Nordeutsche Landesbank Girozentrale. (PF020581; PF020587; PF020588; PF020612-35).

228. Letters titled "Notice of Amendment of Irrevocable Standby Letter of Credit No. 15122116 Dated January 03, 2002" were sent to CEL and CEL Trust on: (a) November 28, 2002 (PF020605-PF020606); (b) December 8, 2003 (PF028006-20); (c) November 22, 2004 (PF020719-PF020720); and (d) November 24, 2005 (PF020654-PF020655).

229. As required by the Operative Documents, EZH has adjusted the Required Amount of the Letter of Credit for periods commencing after the Closing Date. Correspondence from EZH and successors indicates that the amount of the Letter of Credit was adjusted as set forth below:

| Period | Amount |
|---|---|
| January 3, 1999 – January 2, 2000 | $29,050,809.59 |
| January 3, 2000 – January 2, 2001 | $47,623,816.00 |
| January 3, 2001 – January 2, 2002 | $50,068,980.67 |

(PF008053; PF017300-01; PF017298-99)

230. The Reimbursement Agreement provides that if Bayerische Landesbank makes a payment under the Letter of Credit, Bayerische Landesbank shall require that EZH pay to Bayerische Landesbank the amount paid by it under the Letter of Credit, including interest from the date of payment by Bayerische Landesbank. In addition, the Reimbursement Agreement states that EZH will indemnify Bayerische Landesbank against any costs or expenses arising out of or incurred in connection with the Letter of Credit. (Reimbursement Agreement § 6.3, PF001330, PF001337).

**D.** The Sublease Purchase Option

231. Section 19 of the Sublease Agreement provides that if EZH elects the Sublease Purchase Option, the Sublease Purchase Option Price of $275,450,950.25 can be paid (i) in cash

or (ii) $123,615,472 in cash plus delivery of the remaining U.S. Government Obligations from the IJssel Deposit, valued at their respective maturity dates, as explained in paragraph 233. (PF000462; PF000508).

(a) CEL Trust has assigned the right to receive the $123,615,472 to HBU, under the Loan and Security Agreement, to repay the HBU Loan. (PF000642).

232. Under the Sublease Purchase Option, the IJssel Deposit has bonds with a maturity value of $7,326,950.33 that mature on January 2, 2018 that EZH can use to pay Sublease Basic Rent that is due on that date. (Sublease § 19, PF000462).

233. Under the Sublease Purchase Option, the U.S. Government Obligations remaining in the IJssel Deposit will be four bonds of $22,958,869.31 each (valued as of their respective maturity dates, April 15, June 15, September 15, and December 15, 2018), totaling $91,835,477.24. (Sublease § 19, PF000462).

234. If EZH elects the Sublease Purchase Option, EZH will be able to withdraw $123,615,472 from the Sublease Deposit under the Sublease Deposit, Pledge and Repledge Agreement on January 2, 2018, assuming that ABN has complied with that Agreement. (PF001106).

235. The scheduled balance of the Sublease Deposit (PF001116) as of January 2, 2018, plus the value of the U.S. Government Obligations remaining in the IJssel Deposit (PF001013) (at their respective maturity dates) would together equal the Sublease Purchase Option Price.

236. If EZH exercises the Sublease Purchase Option, ABN will pay the balance of the Sublease Deposit to HBU. That payment will be credited toward EZH's payment of the Sublease Option Purchase Price to CEL Trust, and shall in turn be credited toward CEL's payment of its obligations under the HBU Loan. If ABN has made all the payments it is required to make under the Sublease Deposit to HBU, the HBU Loan will be paid in full.

237. Under the Sublease Purchase Option, after the $123,615,472 balance of the Loan from HBU is repaid as described above in paragraph 231(a), HBU will release its Lien on the Lease. CEL Trust then may distribute the $7,326,950.33 of Sublease Basic Rent to CEL along with all subsequent payments from the IJssel Deposit (totaling $91,835,477.24). (Trust Agreement § 4.01, PF000617). The total amount receivable by CEL will therefore be $99,162,427.57.

**E.** Sublease Renewal Option

238. Under the Sublease Renewal Option, EZH will be required to maintain an acceptable letter of credit in favor of CEL securing its obligations under the Sublease Renewal Option. Such letter of credit will be for amounts set forth on Annex A to the Participation Agreement. EZH will be required to pay the fees associated with maintenance of this letter of credit. (Participation Agreement § 11(d)(vii), PF000086-87; App'x A, Definition "L/C Termination Value," PF000165; Annex A, L/C Termination Values).

239. The Sublease Deposit, Pledge and Repledge Agreement will not be terminated in the event the Sublease is renewed. Accordingly, the Sublease Deposit continues with its scheduled investment and withdrawals. This schedule of withdrawals will permit EZH withdrawals of $7,362,950.33 on January 2, 2018 and $18,225,000.00 on each January 2 from 2019 to 2026 inclusive and then $14,546,488.08 on January 2, 2027. At that point, the Sublease Deposit would be exhausted. Sublease Deposit, Pledged and Repledge, Annex B, PF001135.

240. Under the Sublease Renewal Option, the IJssel Deposit has bonds with maturity dates as follows: $7,326,950.33 on January 2, 2018 and $22,958,869.31 on each of April 15, June 15, September 15 and December 15 of 2018, which will be available to EZH.

241. If CEL Trust elects the Sublease Renewal Option, section 3(e) of the Lease Agreement provides that CEL shall, unless the procedure in paragraph 242 is followed, fund two deposits to provide collateral for the Final Basic Rent Payment. These deposits are the Lease Collateral Deposit (Lease § 3(e)(iv), PF000356) and the Trustee Treasury Collateral (Participation Agreement § 11(a)(xi), PF000075).

242. Section 3(f) of the Lease Agreement provides that if CEL so chooses, in lieu of the Lease Collateral Deposit and the Trustee Treasury Collateral, CEL or CEL Trust may provide: (1) a letter of credit, and (2) a first priority security interest in either cash or United States-backed securities, or (3) any other collateral that is acceptable to EZH in its sole discretion; so long as, in each case described above, the property compromising the Acceptable Substitute Collateral provides for payments on the same dates and in the same amounts as the payments that would have been made from the replaced collateral. Acceptable Substitute Collateral means any and all collateral described in clauses (1), (2), and (3), above. Section 3(f) of the Lease Agreement provides that if CEL chooses to fund either the Trustee Treasury Collateral or Lease Collateral Deposit, CEL may, at any time during the Lease Term, replace either with Acceptable Substitute Collateral. (PF000357).

243. Unless CEL elects to use Acceptable Substitute Collateral, the Lease Agreement section 3(e)(iv) provides that CEL will make deposits in the Lease Collateral Deposit. These deposits will be made with an AA/Aa2 rated financial institution, will bear a fixed rate of interest and will be available to make scheduled payments as set forth on Lease Exhibit C. The Lease Collateral Deposit will be pledged to EZH to secure the Final Basic Rent Payment owed it on February 24, 2041. Lease Exhibit C provides that the deposits will be equal to $3,678,511.92 on January 2, 2027 and thereafter $18,225,000.00 on each January 2 from 2028 to and including

2034, and then $8,251,875.00 on June 15, 2034. (Lease § 3(e)(iv) (PF000356) and Lease Exhibit C (PF000383)).

244. Exhibit C to the Lease Agreement provides that on June 15, 2034, the date of the last scheduled deposit into the Lease Collateral Deposit, it is scheduled to have a balance of $176,210,292.09. (PF000383).

245. Unless CEL elects to use Acceptable Substitute Collateral, the Lease Agreement section 3(e)(ii) provides that under both the Sublease Renewal Option and the Retention Option, CEL will, pursuant to section 11(a)(xi) of the Participation Agreement, purchase U.S. Government Obligations on each date and with maturity amounts set forth in Schedule 2A of the Participation Agreement (i.e., $141,671,596.40), and maturity dates as close to, but not later than, the Lease Termination Date (February 24, 2041). CEL would then deposit those U.S. Government Securities in a custodial account established by CEL, for the benefit of CEL, with a security interest in EZH's favor ("Trustee Treasury Collateral") to secure a portion of CEL Trust's obligations to make the Final Basic Rent Payment. (Participation Agreement §§ 11(a)(x), (xi), PF000075; Sch. 2A, PF000203).

246. The total amount of the final payment due pursuant to the Sublessee Loan Agreement ($414,931,341), plus the amount of the Trustee Treasury Collateral ($141,671,596.40) and the Lease Collateral Deposit would total $831,525,734 as of February 24, 2041, assuming that (i) CEL funds the Lease Collateral Deposit and the Trustee Treasury Collateral, and (ii) that CEL is able to earn an interest rate of 6.86% on the Lease Collateral Deposit from June 15, 2034 until February 24, 2041. (Participation Agreement, App'x A, Definitions, "Expected Lease Collateral Rate," PF000159).

247. If CEL elects to replace the Lease Collateral Deposit or the Trustee Treasury Collateral with Acceptable Substitute Collateral, it may use the replaced Lease Collateral Deposit and/or Trustee Treasury Collateral for any purpose it deems appropriate. Lease Agreement, section 3(f) (PF000357).

248. The payment of the Final Basic Rent Payment ($831.5 million) is a recourse liability of CEL to the extent of $141,671,596.40. This amount would be satisfied by the creation of the Trustee Treasury Collateral (if CEL chooses to create that account), or the Acceptable Substitute Collateral, to the extent CEL used such collateral to replace the Trustee Treasury Collateral. (Lease § 3(d)(ii), PF000354).

249. In addition, CEL has a recourse liability to EZH for the remaining portion of the $831.5 million to the extent of amounts, if any, CEL receives from the CEL Trust after the Sublease Basic Termination Date (January 2, 2018). (Participation Agreement § 11(a)(viii), PF000074).

**F.** Retention Option

250. Under the Retention Option, EZH will be required to maintain an acceptable letter of credit in favor of CEL securing its obligations under the Operative Documents which in this case will be for the Sublessee Loan only. Such letter of credit will be for amounts set forth on Annex A to the Participation Agreement. EZH will be required to pay the fees associated with maintenance of this letter of credit. (Participation Agreement § 11(d)(vii), PF000086-87).

251. Under the Retention Option, the Sublease Deposit, Pledge and Repledge Agreement will be terminated. (Sublease Deposit, Pledge and Repledge § 2(c), PF001125). Accordingly, the Sublease Deposit comes due. This will permit EZH withdrawals of $7,362,950.33 on January 2, 2018 and $116,252,521.63 for the balance on such date, at which

point the deposit will have been exhausted. (Sublease Deposit, Pledge and Repledge, PF001116).

252. Under the Retention Option, the IJssel Deposit has bonds maturing as follows: $7,326,950.33 on January 2, 2018 and $22,958,869.31 on each of April 15, June 15, September 15 and December 15 of 2018, which will be available to EZH. (IJssel Agreement, PF001013).

253. If CEL elects the Retention Option, it shall, unless the procedure in paragraph 254 is followed, fund the Trustee Treasury Collateral (Participation Agreement § 11(a)(xi), PF000075) and the Incremental Collateral Pledge (Lease § 3(e)(iii), PF000356-57) to provide collateral for the payment of the Final Basic Rent Payment.

254. If CEL so chooses, in lieu of the Lease Collateral Deposit and the Trustee Treasury Collateral, CEL or CEL Trust may provide: (1) a letter of credit, and (2) a first priority security interest in either cash or United States-backed securities , or (3) any other collateral that is acceptable to EZH in its sole discretion; so long as, in each case described above, the property compromising the Acceptable Substitute Collateral provides for payments on the same dates and in the same amounts as the payments that would have been made from the replaced collateral. Acceptable Substitute Collateral means any and all collateral described in clauses (1), (2), and (3), above. If CEL chooses to fund either the Trustee Treasury Collateral or Lease Collateral Deposit, CEL may, at any time during the Lease Term, replace either with Acceptable Substitute Collateral. (Lease, § 3(f), PF000357).

255. If CEL chooses to fund the Trustee Treasury Collateral, the account would consist of U.S. Treasury obligations to be purchased on January 2, 2018, with maturities as close to, but not later than, the Lease Termination Date (February 24, 2041) with a maturity amount of

$141,671,596.40. The amount that CEL will need to pay for the necessary collateral on January 2, 2018 will depend upon the interest rates prevailing at that time. (Participation Agreement § 11(a)(x)-(xi), PF000075).

256. If CEL chooses to fund the Incremental Collateral Pledge Pledge, CEL will enter into a custody arrangement to hold on behalf of EZH either U.S. Government Obligations or other corporate bonds with ratings of at least Aa2 and AA (the "Incremental Collateral Pledge"). [See Lease § 3(e)(iii)]. These deposits will bear a fixed rate of interest determined as of the date funded and will be available to make maturity payments in 2041 in an amount not less than the dollar amount equal to (i) the excess of the Final Basic Rent Payment, over (ii) the sum of the Lease Collateral Deposit and Trustee Treasury Collateral maturity at February 24, 2041 and the scheduled payment of the Sublessee Loan also on the Lease expiration. This deposit will be pledged to EZH to secure the incremental shortfall on the Final Basic Rent Payment owed it on February 24, 2041.

257. The total amount of the final payment due pursuant to the Sublessee Loan Agreement ($414,931,341), plus the amount of the Lease Collateral Deposit and Trustee Treasury Collateral and the projected value of the Incremental Collateral Pledge, will total $831,525,734 as of February 24, 2041, assuming that (i) CEL elects to fund the Incremental Collateral Pledge and the Trustee Treasury Collateral, and (ii) that CEL is able to earn an interest rate of 6.86% on the Incremental Collateral Pledge from the date funded until February 24, 2041. (Participation Agreement, App'x A, Definitions, "Expected Lease Collateral Rate," PF000159).

258. If CEL elects to replace the Incremental Collateral Pledge or the Trustee Treasury Collateral with Acceptable Substitute Collateral it may use the replaced Incremental Collateral

Pledge or the Trustee Treasury Collateral if any as it deems appropriate. Lease Agreement, section 3(f) (PF000357).

259. The payment of the Final Basic Rent Payment ($831.5 million) is a recourse liability of CEL to the extent of $141,671,596.40. This amount would be satisfied by the creation of the Trustee Treasury Collateral if CEL chooses to create that account. (Participation Agreement, § 11(a)(viii), PF000074).

260. In addition, CEL has a recourse liability to EZH for the remaining portion of the $831.5 million to the extent of amounts, if any, CEL receives from the CEL Trust after the Sublease Basic Termination Date (January 2, 2018). (Participation Agreement, § 11(a)(x)-(xi), PF000075).

**XIII.** Other Agreements

**A.** The Sublessee Loan Agreement

261. Section 2 of the Sublessee Loan Agreement provides that CEL Trust shall lend to EZH the amounts set forth on Schedule A to the Sublessee Loan Agreement, i.e., on each stated date, an amount equal to the product of the value of the Undivided Interest multiplied by the applicable percentage under the "Loans" caption on Schedule A. (PF001477, PF001507-08). Section 6(a) of the Sublessee Loan Agreement provides for interest at 7.43% per annum. (PF001478).

262. The Sublessee Loan provides that the amounts borrowed by EZH pursuant to the Sublessee Loan Agreement were equal in amount and timing to the Sublease Basic Rent owed to CEL Trust in 1998 through 2003 In 2004, the amount of the Sublessee Loan equals a portion of the Sublease Basic Rent paid by EZH to CEL Trust. (Section 7, PF001478, and Sch A, PF001507).

| Date | Sublessee Loan |
| --- | --- |

| | |
|---|---|
| 1/2/1998 | $424,960.41 |
| 1/2/1999 | $8,999,161.52 |
| 1/2/2000 | $8,999,161.52 |
| 1/2/2001 | $8,999,161.52 |
| 1/2/2002 | $8,999,161.52 |
| 1/2/2003 | $8,999,161.52 |
| 1/2/2004 | $669,041.51 |

263. From 1998 through 2003, the amounts of the Sublessee Loans made by CEL to EZH as set forth on Schedule A to the Sublessee Loan Agreement under the column "Loans" were equal in amount and timing to the amounts set forth in the Total Sublease Rent column for the same time period on Part I to Exhibit B to the Sublease Agreement. In 2004, the amount of the Sublessee Loan made from CEL to EZH is equal to a portion of the 2004 Sublease Rent.

264. Section 5 of the Sublessee Loan Agreement provides that EZH is required to repay the Sublessee Loan as set forth on Schedule A to the Sublessee Loan Agreement, and that the Sublessee Loan cannot be prepaid except as stated in the Operative Documents. (PF001477).

**B.** The Facility Operating Agreement

265. The preamble to the Facility Operating Agreement provides that EZH, CEL Trust and Banc One Trust entered into the Facility Operating Agreement "to establish their respective rights and obligations in respect of matters relating to the operation of the Facility" during the Lease Term. (PF000764).

266. Section 2.1 of the Facility Operating Agreement provides that EZH shall be the original Operator of the RoCa3 Facility. (PF000765). Section 2.1 also provides that, during the

terms of the CEL Trust and Banc One Trust Subleases, EZH may not be removed as Operator[10] of the Facility unless (a) there is a Facility Operating Agreement Default which remains uncured after EZH receives notice from CEL, CEL Trust, Banc One, or Banc One Trust, or a Sublessee Event of Default occurs under any sublease; and (b) CEL Trust and Banc One Trust agree to remove EZH as the Operator (because CEL Trust and Banc One Trust, together, possess the necessary two-thirds of Entitlement Shares to vote for the removal of EZH as Operator, in these circumstances). (PF000766).

267. Entitlement Shares equal any Leaseholder's Adjusted Undivided Interest Percentage and a Facility Users Adjusted Undivided Interest. (Facility Operating Agreement, section 3.1, PF000769). A Leaseholder means any Trustee (CEL Trust or Banc One Trust) or EZH, to the extent its Property Rights are not subject to a lease by either Trustee. (Facility Operating Agreement, App'x A, PF000812). A Facility User means (i) any Lessee (except if such Lessee has subleased its Undivided Interest to another Person) or any Person during the time, and to the extent its subleasing an Undivided Interest; (ii) EZH after the termination of either Trustee's Lease; or (iii) EZH or any other Person during the time such person has been given the rights to market and sell Energy from the RoCa3 facility. (Facility Operating Agreement, App'x A, PF000807).

268. Section 2.1 of the Facility Operating Agreement also provides that, after the terms of both Subleases (assuming EZH does not exercise its purchase options with respect to either lease), EZH can be removed as the Operator during such period by a two-thirds vote of all Entitlement Shares, by CEL Trust and Banc One Trust. EZH may request to be removed as

---

[10] Certain defined terms used in the Facility Operating Agreement, the Common Facilities Use Agreement, the Facility Support Agreement, and the Access Agreement are defined in Appendix A to the Facility Operating Agreement.

Operator and by a two-thirds vote of the Entitlement Shares, EZH's request may be granted. Following EZH's removal as Operator, a new Operator can be appointed by a majority vote of the Entitlement Shares by CEL Trust and Banc One Trust. In no case may a Leaseholder that is an Operator or an Affiliate thereof vote any Entitlement Shares regarding its removal as Operator. (PF000766).

269. Section 2.3 of the Facility Operating Agreement provides that, after the respective terms of the Subleases, EZH or any successor Operator is entitled to receive monthly fees from CEL Trust and Banc One Trust, according to the respective Entitlement Shares of each, for its operation of the RoCa3 Facility. Section 2.3 also sets forth the process for determining the amount of such fee. (PF000767-68).

(a) Section 5.3 of the Facility Operating Agreement provides that on the termination of the Sublease, each Facility User has the right to schedule for its own account Heat and Power from the RoCa3 Facility equal to the product of its Entitlement Share and the capability of RoCa3 to produce heat and power. (PF000779).

(b) Section 5.2 of the Facility Operating Agreement provides that the Facility Users are required to pay a portion of the operation and maintenance expenses according to their respective Entitlement Shares. (PF000778-79).

**C.** The Common Facilities Use Agreement

270. Appendix A of the Facility Operating Agreement defines the Common Facilities as "the improvements known as the pumproom, the office building containing among other things the control room, the gas receiving station and parking spaces, located on the Building Site and generally described in the certificate EZH delivered pursuant to Section 3(t) of the Participation Agreement." (PF000802). Appendix A also defines the Facility as the Unit (i.e., the RoCa3 Unit), the Common Facilities, the Cooling Water Station, the Cooling Water Tower, and the Network, including the Facility Personal Property (such as desks, computers, and the

like), and any and all Modifications thereto and Parts thereof. (PF000806). Appendix A of the Participation Agreement also defines the Unit as the gas-fired electric generating unit known as RoCa3 having a rated capacity of 220 net MW, all as more fully described in section 7(t) of the Participation Agreement, and any and all Modifications thereto and Parts thereof. (PF000825).

271. EZH, CEL Trust, and Banc One Trust entered into the Common Facilities Use Agreement to establish their respective rights and obligations relating to the use of the Common Facilities. (PF000833).

272. The Common Facilities Use Agreement provides that the parties entered into it in order to make the Common Facilities available for the operation of the Other Units. (Recitals, PF000856).

273. Section 2.2 of the Common Facilities Use Agreement provides that after the respective terms of the Subleases, upon receipt of Notice, EZH is required to pay a fee to each Facility User, which fees must be set and agreed to by EZH and the Facility Users. (PF000834-35).

**D.** The Facility Support Agreement

274. Section 3 of the Facility Support Agreement provides that EZH grants to CEL Trust and Banc One Trust (or anyone subleasing an interest from CEL Trust and Banc One Trust) the right to use certain equipment, parts, and supplies necessary or useful for operating, maintaining, repairing, testing, renewing or inspecting the Facility. (PF000858-59).

275. Section 4 of the Facility Support Agreement provides that EZH will provide, make available or cause to be made available certain services necessary to operate the Facility. (PF000859).

276. Section 4A of the Facility Support Agreement provides that the Facility Users are required to pay a fee to EZH for the equipment, parts, services, and supplies provided to said Facility Users. (PF000859-60). For the definition of "Facility User," see paragraph 267.

**E.** The Access Agreement

277. Section 2 of the Access Agreement provides that EZH grants an easement to CEL Trust on the Station Site as necessary for the leasing and operation of the Facility. (PF000873-74).

**F.** The Tax Indemnity Agreement

278. Section 4 of the Tax Indemnity Agreement provides that it is the intent of CEL and EZH that the Lease and the Sublease will each be treated as a "true lease" for U.S. federal and state income tax purposes; that EZH will be treated as the lessor and sublessee of the Undivided Interest, and that CEL Trust will be treated as the lessee and sublessor of the Undivided Interest. (PF000707).

279. Section 4 of the Tax Indemnity Agreement provides that "[w]ithin a reasonable time (and in any event, within 45 days) after written request therefor, [EZH] shall provide … such information and copies of records that are within the control of or otherwise reasonably available to [EZH] as [CEL] may reasonably require to enable [CEL] to fulfill or pursue its Federal and State income tax return filing, audit and litigation obligations or rights." (PF000707).

280. Section 3(f) of the Tax Indemnity Agreement provides that, on the date of closing, EZH was not a party to, nor did it have any present intention or understanding to enter into any, and throughout the five years of the Sublease, there will not be any written or oral agreements or like arrangements, other than as set forth in the Operative Documents and in the Specified

Documents, legally requiring or economically compelling the exercise or non-exercise of the Sublease Purchase Option, or altering any of the agreements or terms or conditions set forth in the Operative Documents. (PF000706).

281. Section 3(c) of the Tax Indemnity Agreement provides that during the Lease Term, for U.S. federal and state income tax purposes, neither EZH nor the German Lessor will not take any written position inconsistent with the Tax Assumptions set forth in Section 2 of the Tax Indemnity Agreement, unless it is required in order to avoid a tax penalty; and EZH will not claim Lease Basic Rent payable under the Lease as an item of gross income on a U.S. federal, state or local income tax return in a manner that is inconsistent with the tax treatment of such Lease Basic Rent assumed by CEL as described in Section 2(c). (PF000702, PF000705).

282. The tax assumptions set forth in Section 2 of the Tax Indemnity Agreement include (except as stated in section 3 of this agreement EZH made no representation or warranty as to the validity of these tax assumptions and unless expressly provided for in this agreement, EZH will not indemnify CEL for any of these assumptions):

(a) The Trust will be treated as a grantor trust or otherwise disregarded for Federal income tax purposes, and CEL, as the owner of the trust will be required to take into account all items of gain, loss, deduction and credit in connection with its Undivided Interest.

(b) That the Lease and Sublease will each be treated as "true leases"; EZH will be treated as the Lessor of the Undivided Interest and the CEL Trust will be treated as the Sublessor and EZH will be treated as the Sublessee;

(c) CEL will amortize the transaction expenses on a straight-line basis, one-third of which over the Lease Term, one-third over the Sublease Renewal Term, and one-third over the term of the Loan. That the Lease and Sublease will each be treated as "true leases"; EZH will be treated as the Lessor of the Undivided Interest and the CEL Trust will be treated as the Sublessor and EZH will be treated as the Sublessee;

(d) That CEL will be allowed annual rental deductions under section 162 of the I.R.C. for the Lease Basic Rent during the Lease Term as set allocated in Exhibit A to the Lease Agreement;

(e) CEL is required to take into account items of income, gain, loss and deductions in accordance with the accrual method of accounting,

(f) That the obligations evidenced by the Loan Certificate will constitute indebtedness of CEL Trust and that CEL will be entitled to interest deductions in connection therewith under Section 163 of the I.R.C.;

(g) CEL will always have sufficient income to utilize the Interest Deductions, Amortization Deductions and Rent Deductions; and

(h) CEL will not be subject to I.R.C. section 467(b)(2) with respect to Lease Basic Rent, Sublease Basic Rent or Sublease Renewal Rent. (PF000703-04).

283. Section 3(e) of the Tax Indemnity Agreement provides that, as of the Closing Date, (i) EZH will not have taken any official corporate action requiring the exercise or non-exercise of the Sublease Purchase Option; (ii) none of the organizational or governing documents of EZH require the exercise or non-exercise of the Sublease Purchase Option; and (iii) none of the accounting or tax positions under Applicable Dutch Law of EZH have the effect of legally requiring or economically compelling the exercise or non-exercise of the Sublease Purchase Option. (PF000706).

284. Section3(d) of the Tax Indemnification Agreement provides that all information that EZH provided to the Appraiser as set forth in appendix A attached thereto and all information supplied to the Engineering Consultant as set forth in appendix B was accurate and sufficiently complete. (PF000705).

**XIV.** The German Leases

285. The recitals of the Assignment Agreement provide that on December 13, 1995, EZH sold and transferred title to a steam turbine generator and a gas turbine generator (the "German Equipment") to Asea Brown Boveri AG & Co. Leasing KG ("ABB"). A copy of the Assignment Agreement is attached as Ex.__, PF001411-__ at PF001409. The recitals of the Assignment Agreement also provide that on that same day, EZH entered into two separate

German Leases with ABB, one lease for each generator, by which EZH leased, under German law, the German Equipment from ABB for a period of about 13.5 years from April 24, 1996 through October 24, 2009. Copies of the gas turbine and steam turbine German Leases are attached hereto as Exhibits ___ and ___, respectively. (German Lease (gas), PF288061-123, at § 3.1, PF288023; and German Lease (steam) PF288124-85).

286. Each German Lease provides ABB with an option to put the respective German Equipment to EZH by providing written notice of its election to EZH no later than nine months prior to October 24, 2009. (German Lease (gas) § 15.1, PF288094; German Lease (steam) § 15.1, PF288157). If ABB exercises one of its puts, then upon receipt of full payment from EZH of the Lessor's Unamortized Investment Balance and all other amounts of Rent and Supplemental Rent due and payable as of October 24, 2009, the German Lessor is required to transfer all of its legal and beneficial right, title and interest in the German Equipment at issue to EZH. (German Lease (gas) § 15.2, PF288094; German Lease (steam) § 15.2, PF288157).

287. If, however, ABB does not exercise its put under either of the applicable German Leases, EZH may purchase the German Equipment under that German Lease by exercising its Right of First Refusal and paying the Lessor's Unamortized Investment Balance plus 25% of any excess of Fair Market Value over the Lessor's Unamortized Investment Balance. (German Lease (gas) § 15.3, PF288095; German Lease (steam) § 15.3, PF288158). The German Lessor is required to transfer legal and beneficial right, title and interest upon receiving full payment from EZH. (German Lease (gas) § 15.4, PF288095; German Lease (steam) § 15.4, PF288158).

288. Section 1 of the German Lease (gas) provides that the Lessor's Unamortized Investment Balance in connection with the gas turbine generator means DEM 29,600,000. (PF288069).

289. Section 1 of the German Lease (steam) provides that the Lessor's Unamortized Investment Balance in connection with the steam turbine generator means DEM 39,300,000. (PF288132).

290. Pursuant to the Assignment Agreement, EZH assigned to CEL Trust and Banc One Trust all of its Lease Rights under the two German Leases. The Lease Rights include all of EZH's rights, title, and interest under and in connection with each German Lease in and to:

(a) The right to acquire title to the German Equipment pursuant to Sections 13 (i.e., Event of Loss), 14 (i.e., Events of Default), and/or 15 (i.e., Sale of Equipment at End of Term, which covers both the German Lessor's put and the Right of First Refusal) of each German Lease;

(b) The Right of First Refusal set forth in Section 15.3 of each German Lease;

(c) EZH's right under the German Leases to claim amounts of money if ABB breaches its obligation to transfer title to EZH under the circumstances described in Sections 13.2 (i.e., Termination upon Event of Loss), 14.2 (i.e., Termination upon Even of Default) (in conjunction with par. 4 of the Letter Agreement), 15.2 and 15.4 of each German Lease;

(d) All of EZH's rights under the Letter Agreement.

A copy of the Assignment Agreement is attached as Exhibit ___. (PF001407-20).

291. Under Section 7 of the Assignment Agreement (PF001414) CEL Trust and Banc One Trust, as well as on behalf of their respective Lenders, irrevocably authorized EZH as their true and lawful attorney to exercise all of their German Rights, unless a Sublessee Event of Default has occurred and is continuing. To the same effect, section 4(d) of the Sublease provides that CEL Trust authorized EZH as its true and lawful attorney to exercise all of its German Rights, unless a Sublessee Event of Default has occurred and is continuing. (PF000424).

292. Under section 7(w) of the Participation Agreement, EZH represented that as of the Closing Date, after due inquiry EZH had no knowledge of a German Lease Default or German Lease Event of Default under the German Leases, and represented that the execution of

the EZH Transaction will not result in any German Default or German Lease Event of Default. (PF000061-62).

293. Under section 4 of the Assignment Agreement, EZH covenanted that it would not do or cause to be done anything that would negatively affect this assignment or the rights of CEL Trust or Banc One Trust. (PF001413). In addition, under the Participation Agreement, EZH made a number of covenants with respect to the German Leases and the German Equipment, including:

(a) EZH will not agree to modify the German Leases in a manner adverse to CEL, Banc One or the Lender, and must notify CEL, Banc One and the Lender of any proposed amendment to the German Leases at least 30 days before the effective date;

(b) EZH will not allow any Lien on the German defeasance arrangements, other than those permitted by a German Document;

(c) EZH shall provide CEL and the Lender copies of all material notices received pursuant to a German Document;

(d) EZH shall cause to be timely satisfied each condition precedent to its right to purchase and to the purchase of the German Equipment under Section 15.3 of the German Lease or the Letter, unless the Lessor shall theretofore have purchased such German Equipment;

(e) Subject to Section 7(h) of the Sublease, EZH shall not cause or permit the German Lessor to gain possession of or to sever the German Equipment or to render the German Equipment inoperable; and

(f) Subject to the terms and provisions of the German Lease, EZH will not agree to any change in the status of the German Lessor without CEL's consent. (Participation Agreement Section 11(e)(xv), PF000093-94).

294. The Sublease Agreement sets out certain events with respect to the German Leases and German Rights that are Sublessee Events of Default. (See paragraph 163(q) and (r)). The Lease Agreement also sets out certain events with respect to the German Leases and German Rights that are Lessor Events of Default. (See paragraph 133(g) and (h)).

295. Section 7(h) of the Sublease provides that if the German Lessor does not exercise its put option under the applicable German Lease and neither EZH nor any other Person entitled to do so has exercised the applicable Right of First Refusal, EZH can replace the German Equipment with Substitute German Equipment. CEL Trust may, however, refuse to accept any equipment as Substitute German Equipment resulting in EZH not being able to substitute the German Equipment. EZH's failure to comply with the conditions and obligations set out in Section 7(h) of the Sublease voids *ab initio* EZH's right to effect such substitution, unless otherwise agreed by CEL Trust. (PF000434-35).

296. The recitals of the Pledge Agreement in respect of the Securities held in EuroClear provide that to meet certain Payment Obligations and to avoid currency risks in connection with the German Leases, EZH purchased EuroClear Securities and deposited them in a EuroClear Account, with ABN as custodian. Section 2 of the Pledge Agreement provides that EZH pledges to CEL Trust, Banc One Trust and HBU these EuroClear Securities and any claim it may have against the Custodian (defined at PF001440, ABN) for the performance of EZH's obligations under section 11(e)(xvi) of each of the Participation Agreements (all of which concern obligations with respect to the German Leases).[11] Section 4.2 of the Pledge Agreement provides that EZH may not take or cause to be taken any action that would affect the Pledgees' rights under the Pledge Agreement, except to the extent permissible under that agreement. (PF001442-43). Section 5 of the Pledge Agreement provides that so long as no Sublessee Event of Default has occurred and is continuing, EZH may, from time to time, use the EuroClear

[11] The Participation Agreement contains a formatting error in Section 11(e)(xv) and (xvi). Section 11(e)(xv) contains subparagraph A and subparagraphs B through F were mistakenly placed under Section 11(e)(xvi). Thus, some references to Section 11(e)(xvi) are really references to Section 11(e)(xv). (PF000093-94).

Securities to satisfy its Payment Requirements under the German Leases. (PF001443). The Pledge Agreement is attached as Exhibit ___. (PF001438-49).

**XV.** Con Edison NY's Financial and Tax Reporting of the Transaction

297. For financial reporting and accounting purposes, CED reported income from the EZH transaction as follows:

| Year | Income |
|---|---|
| 1998 | $ 8,096,792 |
| 1999 | $ 7,664,971 |
| 2000 | $10,477,019 |

(PF269332, PF269915, PF270441, PF270701).

298. Con Edison NY and CEI reported the following amounts of federal taxable income and federal tax liability on their return (the 1997 tax return is attached as Exhibit _):

| Year | Taxable Income | Tax Liability |
|---|---|---|
| 1997 | $835,774,192 | $291,003,408 |

(a) CED's Certified Financial Statements for December 31, 1998 and 1997 is attached as Ex. ___. (PF283918-29).

(b) CED's Certified Financial Statements for December 31, 1999 and 1998 is attached as Ex. ___. (PF285242-53).

(c) The "Statements of Earnings in Accordance with FASB Accounting Standard No. 13" is attached as Ex. ___. (PF009096-146)

(d) CED's December 1999 Financial Highlights is attached as Ex. ___. (PF270440-453).

299. Con Edison NY reported $399,693 in rental income on its 1997 federal income tax return in connection with the Transaction.

300. Con Ed claimed the following deductions on its 1997 federal income tax return with respect to the Transaction:

(a) rent to EZH in the amount of $1,072,652;

(b) interest expense in the amount of $254,944; and

(c) amortization of the fees and expenses paid in connection with the Transaction, in the amount of $9,698.

301. Upon audit of Con Edison NY's 1997 federal income tax return, the Internal Revenue Service ("IRS") disregarded the income and disallowed the deductions reported by Con Edison NY from the Transaction.

302. The IRS's proposed adjustments in connection with the Transaction resulted in an increase of $937,331 in Con Edison NY's taxable income for 1997.

303. As a result of its proposed adjustments in connection with the Transaction, the IRS assessed against Con Edison NY a deficiency for 1997 in the amount of $328,066.

304. Con Edison NY paid this deficiency on or about November 3, 2005.

305. Con Edison NY filed a claim for refund (Form 1120X) with the IRS on December 2, 2005, pertaining to the Transaction.

306. The IRS denied this claim for refund on March 15, 2006.

Dated: September 21, 2007

/s/ David F. Abbott
David F. Abbott
Attorney of Record
MAYER BROWN LLP
1675 Broadway
New York, NY 10019-5820
Tel: (212) 506-2642
Fax: (212) 849-5642
dabbott@mayerbrown.com

William A. Schmalzl
Thomas Kittle-Kamp
Matthew C. Houchens
Brian W. Kittle
MAYER BROWN LLP
71 South Wacker Dr.
Chicago, IL 60606

Attorneys for Plaintiff

/s/ David N. Geier
David N. Geier
Attorney of Record
Joseph A. Sergi
Adam Smart
Trial Attorneys, Tax Division
U.S. DEPARTMENT OF JUSTICE
P.O. Box 26, Ben Franklin Station
Washington, D.C. 20044
Tel: (202) 616-3448
Fax: (202) 307-0054
David.N.Geier@usdoj.gov

Richard T. Morrison
Assistant Attorney General
David Gustafson
Chief, Court of Federal Claims Section
Steven I. Frahm
Asst. Chief, Court of Federal Claims Section