**No. 06-305 T**
**(Judge Marian Blank Horn)**

---

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

**CONSOLIDATED EDISON COMPANY**
**OF NEW YORK, INC. & SUBSIDIARIES**

**Plaintiff,**

**v.**

**THE UNITED STATES,**

**Defendant.**

# TRIAL BRIEF OF THE UNITED STATES

During December 1997, Plaintiff ("Con Ed") engaged in a complicated lease-in/lease-out tax shelter commonly referred to as a LILO (the "Transaction"). The Transaction involved a facility located in the Netherlands ("Facility") owned and operated by EZH. Con Ed purported to lease the Facility from EZH under a lease and simultaneously purported to sublease the Facility back to EZH. To this day, EZH (and its successors) continue to own and operate the Facility in its business as it always has. On its federal income tax return, Con Ed reported rental income and far greater tax deductions for rent, interest, and amortized transaction in connection with this Transaction. The Internal Revenue Service disallowed the deductions and disregarded the rental income. Con Ed then paid the resulting deficiency, and filed this suit for a tax refund.[1]

[1]The amount directly at issue in this case is the tax impact of the LILO shelter for only two weeks – $328,066. The real amount is far greater. The shelter is expected to last twenty years and the amounts of tax benefits claimed in subsequent years is and will be very substantial.

Con Ed's claimed tax deductions are improper for three reasons. First, looking at the Transaction as a whole reveals that Con Ed did not in substance acquire a present leasehold interest in EZH's property. Second, Con Ed did not incur genuine indebtedness in connection with the deal. Third, and alternatively, the Transaction should be disregarded under the economic substance doctrine. Con Ed bears the burden of proof on all these issues.

**ARGUMENT**

**I. The Transaction's Substance Controls**

A transaction's substance, not its form, determines its treatment for federal income tax purposes. *Gregory v. Helvering,* 293 U.S. 465 (1935). For this reason, courts have never regarded "the simple expedient of drawing up papers" as controlling for tax purposes where, as here, a transaction's objective economic realities do not comport with the form in which the deal has been cast. *Commissioner v. Tower*, 327 U.S. 280, 291 (1946); *Commissioner v. Duberstein*, 363 U.S. 278 (1960); *Frank Lyon Co. v. United States*, 435 U.S. 561, 573 (1978). Thus, when the substance of a transaction differs from its form, substance controls. *See Nebraska Dep't of Revenue v. Loewenstein*, 513 U.S. 123 (1994) (recharacterizing a "sale" and "repurchase" of municipal bonds as a secured lending transaction).

In evaluating the merits of the tax deductions here, this Court must determine whether, in substance, EZH transferred an interest in property to Con Ed. *H.J. Heinz Co. v. United States*, 76 Fed. Cl. 570 (Ct. Cl. 2007); *Grodt & McKay Realty, Inc. v. Commissioner*, 77 T.C. 1221, 1237 (1981). This requires a comparison of the Transaction's operative documents to any real world substantive rights and duties of the participants that actually changed as a consequence of the Transaction. Doing so here demonstrates that while the form of the Transaction is dizzying in its

complexity, its substance is as follows: Both before and after the Transaction, EZH continued to operate the Facility. Con Ed acquired no right to profit and had no exposure to loss from the operation of the Facility. Other than Con Ed's up-front payment of an accommodation fee and other costs to those who facilitated the Transaction under which the tax benefits are being claimed, monies went in an accounting circle and never truly changed hands. In essence, Con Ed purchased the tax benefits at issue here for a fee and an investment in government securities (or alternatively, if not a direct investment in government securities, then a loan by Con Ed to EZH secured by the government securities). At the end of the day, other than an up-front accommodation fee and costs paid by Con Ed for the tax benefits, no other monies truly changed hands. It follows that EZH never conveyed to Con Ed a true leasehold interest in its property, and Con Ed is not entitled to the tax deductions it claims.

To prevail, Con Ed must prove that it both attained and retained significant and genuine attributes of an owner of a traditional leasehold interest in EZH's property. *Frank Lyon*, 435 U.S. at 584, 98 S. Ct. at 1304. Those attributes are present only when the person purporting to own a leasehold interest enjoys the benefits and bears the burdens normally incident to possession of such an interest. *Coleman v. Commissioner*, 16 F.3d 821, 826 (7th Cir. 1994), citing *Frank Lyon, supra*. *See also Heinz*, 76 Fed. Cl. at 582. In this case, the reciprocal nature of Con Ed's and EZH's rights and duties contained in the Operative Documents, the circular flow of funds that from the outset virtually ensured payment of the respective obligations created thereunder, and EZH's continued and unabated use of its Facility at no cost to itself, mean that Con Ed had neither the benefits nor the burdens of the leasehold interest it claims.

The controlling and persuasive case law confirms this substance over form result. In *Frank Lyon, supra*, taxpayer purported to engage in a sale/leaseback of a building. The building, however, was constructed with funds that were dedicated to the project and which consisted of cash and proceeds of a recourse loan. The Supreme Court concluded that the taxpayer remained the true owner of the building for tax purposes, and it relied on the fact that the taxpayer alone was liable for the debt that financed the construction of the building, and bore the risk of loss if the building declined in value. *Frank Lyon*, 435 U.S. at 581.

Following the Supreme Court's lead in *Frank Lyon*, courts have focused on the existence of both financial risk and economic risk of loss through declines in market value as indicia of "tax" ownership. *See e.g., Coleman*, 16 F. 3d at 826-27 (denying depreciation deductions to a taxpayer who purportedly acquired computer equipment with nonrecourse debt through a sale/leaseback); *Swift Dodge v. Commissioner*, 692 F.2d 651, 652-54 (9th Cir. 1982) (all of the indicia of ownership in general, and the risk of depreciation in particular, rested with the users of the vehicles (not the taxpayer), thus the transactions were, in substance, conditional sales).

Recently, a nearly identically structured LILO transaction was disallowed in *BB&T Corporation v. United States*, 2007 WL 37798 (M.D.N.C. Jan. 4, 2007) (*on appeal*). In 1997, BB&T, like Con Ed here, purported to lease property from a foreign entity in a LILO transaction and reported rent income and claimed much larger deductions for rent, interest and transaction expenses. The district court granted the United States' motion for summary judgment and held that BB&T failed to prove it had acquired a genuine leasehold interest or had engaged in purposeful borrowing. In form, BB&T had acquired a "lease" and a "loan," but the district court,

noting the absence of an at-risk investment, determined that the taxpayer lacked an interest in the property. *See Estate of Thomas*, 84 T.C. 412 (1985).

The *BB&T* court held that the foreign entity, in substance, retained its same interest in the property and continued to enjoy the same benefits and burdens of ownership it had before the Transaction. The court further concluded that the transaction was not sustainable under precedent upholding sale/leaseback transactions (where the taxpayers had at-risk investments in the leased property), because BB&T's investment was (as BB&T itself concluded in its internal documents) protected from loss. Viewing the LILO as an integrated transaction (instead of focusing on isolated steps), the court determined that the parties' rights and obligations were offsetting, including the rent and debt obligations. Collapsing those obligations, the court concluded that BB&T and the foreign entity did not – in substance – enter into a lease and sublease. Instead, the court held that BB&T paid transaction costs (in exchange for tax benefits) and invested in government securities, not the leased asset.

Likewise, Con Ed did not acquire a leasehold interest in EZH's property for tax purposes. Con Ed bore no financial risk for the loan. The proceeds remained at all times with the lender's parent company, and this circular financing arrangement provided a ready source of funds to repay the loan. In addition, Con Ed took steps to mitigate all risk in the Transaction. In short, the repayment of the outstanding loan and the equity investment are fully defeased.

Further, as in *BB&T*, the Transaction features a fully funded Purchase Option that EZH can "exercise" at the end of the Lease that minimizes the extent to which Con Ed can participate in any possible residual benefit. Similarly, Con Ed's Lease Renewal Option limits the extent to which Con Ed will suffer from any decrease in market value. In effect, these two options at the

end of the sublease act in tandem to cap the residual value of Con Ed's purported leasehold interest, and protect Con Ed from the risk that the value of its interest will decline. Recently, the Second Circuit concluded that a bank lacked an equity investment in a partnership for that very reason. *TIFD III-E, Inc. v. United States*, 459 F.3d 220, 223 (2d Cir. 2006); *see also International Paper Co. v. United States*, 33 Fed. Cl. 384 (Ct. Cl. 1995), citing *PACCAR v. Commissioner*, 85 T.C. 754 (1985) ("A sale is completed and ownership rights transfer to the buyer when the buyer acquires the 'benefits and burdens of ownership.'").

EZH's option to purchase Con Ed's interest in the lease for a fixed price, coupled with Con Ed's option to force EZH to renew the sublease should conditions dictate, leave the benefits and burdens of ownership of the lease interest exactly where they have always been – with EZH. Unless and until both EZH and/or Con Ed decide otherwise, EZH will possess the Facility "rent-free", remain responsible for all costs and capital improvements associated with the Facility's use and maintenance, and retain all profits from operation of the Facility. Thus, the Transaction did not result in a transfer of a current property interest from EZH to Con Ed. Granted, if EZH fails to exercise its prefunded Purchase Option and Con Ed fails to extend the sublease, there may come a time when Con Ed acquires an interest in the Facility, but that day has not yet arrived. Of course, the Court is free to conclude that EZH will likely exercise the Purchase Option if it believes its failure to do so would seriously depart from its past conduct. *Dow v. United States*, 435 F.3d 594, 601-02 (6th Cir. 2006). Indeed, the facts suggest that EZH, through its successor company, will continue its long-standing use, operation, and possession of the Facility. EZH and its successors have been the sole owner and operator of the Facility since it opened, and continue to maintain and upgrade the Facility in an effort to improve its

production capabilities. As the Sixth Circuit ruled in *Dow, supra*, Con Ed cannot merely hold out the prospect of a change in EZH's historic behavior as a basis to sustain the Transaction.

The Transaction at issue is not a "genuine multi-party transaction with economic substance . . . compelled or encouraged by business or regulatory realities." *Frank Lyon, supra* at 584. On the contrary, Con Ed's documents describe the Transaction as a tax-driven deal between Con Ed and EZH, in which Con Ed obtained certain tax benefits, and EZH received an accommodation fee (referred to as a Net Present Value Benefit). The circular financing arrangement, in which Con Ed's "debt" is paid by EZH's "rent" and money never leaves the control of the lender's affiliates, is transparent and must disregarded. Once the illusion of this "debt loop" is stripped away from the Transaction, the lease and sublease are easily collapsed; all that is left is Con Ed's payment of transaction costs and its investment in government securities which accounts for the entirety of Con Ed's pretax profits.

## II. <u>Con Ed Is Not Entitled to an Interest Expense Deduction</u>

Section 163(a) of the Internal Revenue Code generally allows taxpayers a deduction for all interest paid or accrued within the taxable year on indebtedness. Interest refers to compensation for the use or forbearance of money. *Int'l Paper Co,* 33 Fed. Cl. at 384, citing *Deputy v. DuPont*, 308 U.S. 488, 498 (1940). In order to claim a deduction, however, the debt on which the interest is paid must be genuine. *Knetsch v. United States*, 364 U.S. 361 (1960).[2]

Con Ed's nonrecourse loan lacks substance, and should not be treated as a genuine debt. The funds used to make the loan were "loaned" to Con Ed (nonrecourse) by the lender; Con Ed

---

[2]Similarly, the disallowance of the purported "rent" paid by Con Ed would also be disallowed under §162(a)(3) of the Internal Revenue Code (26 U.S.C.), which requires that deductible rent be paid for the "use or possession" of property.

in turn "paid" the funds to EZH; EZH then "paid" the funds to the lender's parent. The parent then "paid" these funds to its subsidiary (the lender) to satisfy both EZH's rent obligations under the lease and Con Ed's obligations under the loan agreement (debt defeasance). Thus, no funds left the lender's corporate umbrella, and no portion of this purported borrowing was ever invested in the Facility, or put to any other purposeful use by either Con Ed or EZH.

In examining an identical financing structure in *BB&T*, the court concluded that the interest expense deduction was not valid, because the purported loan was in substance only a circular transfer of funds in which the loan was repaid from the proceeds of the loan itself, none of which was put to any substantive, purposive use. 2007 WL 37798, at *11-12.

**III. <u>The Transaction Lacks Economic Substance</u>**

The Economic Substance Doctrine requires disregarding transactions for tax purposes that lack economic reality, even if they comply with the literal terms of the Internal Revenue Code. *Coltec Industries, Inc. v. United States*, 454 F.3d 1340 (Fed. Cir. 2006). Con Ed bears the burden of proving that the LILO Transaction has economic substance. *Id.* This Court, in *Rothschild v. United States*, 407 F.2d 404, 411 (Ct. Cl. 1969), has described this burden as "unusually heavy." *Coltec*, 454 F.3d at 1355; *Heinz,* 76 Fed. Cl. at 584 ( "A taxpayer must prove that its transaction was both purposeful and substantive--if proof in either regard is lacking, the transaction is a sham."). In short, the Federal Circuit adopted a disjunctive test, under which the lack of either an objective or a subjective business purpose would be grounds to disregard a transaction. *Coltec, 454 F.3d at 1355-56.* Thus, the transaction will be disregarded if a plaintiff is unable to prove that (1) the transaction has a reasonable expectation of profit existing outside

of the tax benefits and (2) the transaction was motivated by a business purpose other than obtaining tax benefits. *Id.*

Con Ed did not have a reasonable opportunity for a pretax profit. When transaction costs, and the time value of money are considered, this Transaction produces a substantial pretax loss. *See ACM Partnership v. Commissioner*, 157 F.3d 231, 259 (3d Cir 1998); *Dow,* 435 F.3d at 600-01. In addition, the Court must determine whether the cash flows on which Con Ed relies should be considered at all. In cases such as this, the relevant inquiry is whether the transaction that generated the disputed tax deductions – not a piece of the transaction – has economic substance. *Coltec,* 454 F.3d at 1356-57. For this reason, the economic substance of leasing transactions often turns on whether the taxpayer reasonably expected to earn a profit from the residual value of the leased property after the lease expires. *Gilman v. Commissioner*, 933 F.2d 143, 149 (1991). No such potential exists here, because any profit Con Ed can reasonably expect is simply the risk-free return generated from the purchase of government securities. In fact, Con Ed did not even value the residual interest.

Quite apart from its inability to generate a meaningful profit, absent tax benefits in dispute, Con Ed also lacks a genuine non-tax business purpose for entering into the Transaction. The facts belie Con Ed's claim that it entered into the Transaction to gain entry into the Netherlands power industry. First, Con Ed's own employees will testify that it never considered any nontax driven investments in this country. Second, Con Ed eliminated the Netherlands during its country screening process prior to the transaction and confirmed this in a second country screening process conducted after the transaction. Moreover, Con Ed never even visited the Facility until the audit started, almost eight years after the closing of the Transaction. This

reveals that the Transaction was purely a tax driven deal to Con Ed. Con Ed also asserts that another non-tax business purpose for the Transaction was to achieve leveraged lease accounting. As a matter of law this stated reason is not sufficient to satisfy the subjective aspect of the economic substance test because the benefits of leveraged lease accounting are largely dependent on the tax deductions in dispute. An accounting benefit from a transaction that lacks economic substance cannot imbue the transaction generating the tax benefit with economic substance for tax purposes. *American Electric Power, Inc. v. United States*, 136 F. Supp. 2d 762, 791-92 (S.D. Ohio), aff'd 326 F. 3d 737 (6th Cir. 2003), quoting *Winn-Dixie Stores, Inc. v. Commissioner,* 113 T.C. 254, 287 (1999), *aff'd* 254 F. 3d 1313 (11th Cir. 2001) ("If a legitimate business purpose for the use of the tax savings were sufficient to breathe substance into a transaction whose only purpose was to reduce taxes, [then] every sham tax shelter device might succeed.").

Respectfully submitted,

s/ David N. Geier
DAVID N. GEIER
Attorney of Record
U.S. Department of Justice, Tax Division
Post Office Box 26
Washington, D.C. 20044
Telephone: (202) 616-3448
Facsimile: (202) 307-0054
RICHARD T. MORRISON
Assistant Attorney General
DAVID GUSTAFSON
Chief, Court of Federal Claims Section
STEVEN I. FRAHM
Assistant Chief, Court of Federal Claims Section

s/ Steven I. Frahm
Of Counsel

October 5, 2007