IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| **CONSOLIDATED EDISON COMPANY OF NEW YORK, INC. & SUBSIDIARIES,** | ) | |
| **Plaintiff,** | ) | **No. 06-305T** |
| **v.** | ) | **Judge Marian Blank Horn** |
| **THE UNITED STATES,** | ) | |
| **Defendant.** | ) | |

**PLAINTIFF'S PRE-TRIAL BRIEF**

This case involves the tax treatment of a leveraged lease. In a leveraged lease, the lessor expects to earn a profit by using equity and borrowed funds to acquire an interest in an asset and then lease it to another party in return for rent. Because the lessor also expects to enjoy tax deferral benefits arising from deductions for interest and depreciation/amortization, it frequently can offer the lessee rental terms that are more favorable than the lessee could have incurred by owning the asset and financing or refinancing it with debt. Leveraged leasing is a well-established business practice (for an overview, see *In re Delta Air Lines, Inc.*, 370 B.R. 552, 554-55 (Bankr. S.D.N.Y. 2007)) and receives highly favorable accounting treatment pursuant to Statement of Financial Accounting Standards No. 13, Accounting for Leases ("FAS 13").

In considering this case, it is critically important to bear in mind that Plaintiff expected to earn a minimum pre-tax profit of $60.1 million and pay additional federal income tax of at least $21.3 million over the life of the transaction. This profit is not generated by tax deductions, and could turn out to be higher. As with all leveraged leases, the tax advantage provided by the transaction was the deferral of tax to a later period, not its avoidance. Under FAS 13, this tax

deferral feature allows the profits to be front-loaded to the early years of the lease for financial reporting purposes.

Leasing has been the subject of administrative rulings and court decisions stretching back 50 years. The IRS first issued guidance regarding leases in Rev. Rul. 55-540, 1955-2 C.B. 39; indeed, in Rev. Rul. 82-61, 1982-1 C.B. 13, the IRS approved the lease of an undivided interest in a power generation facility on facts closely similar to those involved here. Disputes between taxpayers and the IRS ultimately led to the Supreme Court's decision in *Frank Lyon v. United States*, 435 U.S. 561 (1978), which approved the sale-leaseback of a bank headquarters, holding:

> [W]here, as here, there is a genuine multiple-party transaction with economic substance which is compelled or encouraged by business or regulatory realities, is imbued with tax-independent considerations, and is not shaped solely by tax-avoidance features that have meaningless labels attached, the Government should honor the allocation of rights and duties effectuated by the parties. Expressed another way, *so long as the lessor retains significant and genuine attributes of the traditional lessor status, the form of the transaction adopted by the parties governs for tax purposes.*

*Id.* at 583-84 (emphasis added).

*Frank Lyon* is a seminal case. First, it is one of the key Supreme Court decisions underpinning the economic substance doctrine, which disallows the tax benefits of transactions "that comply with the literal terms of the tax code but lack economic reality." *Coltec Indus., Inc. v. United States*, 454 F.3d 1340, 1352 (Fed. Cir. 2006), *cert denied*, 127 S. Ct. 1261 (2007). Second, *Frank Lyon* is the centerpiece of an extensive body of cases and rulings that have developed a series of tests used to determine whether leases have economic substance. Third, *Frank Lyon* establishes that, where a leasing transaction possesses economic substance, "the form of the transaction adopted by the parties governs for tax purposes" and cannot be ignored by appeal to vague principles of substance over form. *Frank Lyon*, 435 U.S. at 584. In other words, if a lease possesses economic substance, its form as a lease will be respected.

This memorandum first sets forth a brief description of the transaction at issue and then summarizes the judicial and administrative tests used to examine the economic substance of leases. It closes with a discussion of two arguments that Defendant likely will make.

## I. THE TRANSACTION

In 1997, a subsidiary of Plaintiff, Consolidated Edison Leasing, Inc. ("CEL"), acting through a trust, entered into a lease transaction with a Dutch utility, N.V. Electriciteitsbedrijf Zuid-Holland ("EZH"). In the transaction, EZH leased an undivided 47% interest in the Roca3 power plant to CEL for a term of 43.2 years (the Lease), 80% of the plant's estimated remaining useful life of 54 years. CEL immediately leased the plant back to EZH for a term of 20.1 years (the Sublease). The transaction, which continues to this day, is similar to a sale-leaseback, but instead involves a lease-leaseback.

Each of the parties possesses certain options at the end of the Sublease. EZH has an option to buy out CEL's leasehold rights at the Sublease end, but the price was set above the estimated fair market value of those rights as of the exercise date. If EZH does not exercise its option, CEL can (1) sell its share of the Roca3 plant's output for the remaining 23.1 years of the Lease or sublease the plant to a third party for any period it chooses during that period, or (2) renew the Sublease with EZH for an additional 16.5 years, but at a rental set below the estimated fair market value of rentals at that time. If the latter option is chosen, CEL may sell its share of the output of the Roca3 plant during the 6.7 years of the Lease term remaining after the Sublease renewal ends.

CEL was obligated to make two lump sum payments of rent to EZH, one at the Lease inception and the other at the Lease end. In order to make the initial payment, CEL invested $39.32 million in equity and borrowed $80.8 million from a third-party lender on a nonrecourse

basis (hence making the Sublease a "leveraged lease"). EZH, in turn, agreed to make rental payments to CEL in return for the Sublease back to EZH. CEL reports the rentals as income and reports deductions based upon interest payments made to the lender and amortization of the Lease rent.

## II. JUDICIAL AND REGULATORY TESTS OF LEASING SUBSTANCE

### A. Pre-Tax Profit

The leasing authorities require that the transaction have a reasonable expectation of producing a pre-tax profit to the lessor. *Rice's Toyota World, Inc. v. Comm'r*, 81 T.C. 184, 195-210 (1983), *aff'd on this issue*, 752 F.2d 89, 91-95 (4th Cir. 1985); *Johnson v. United States*, 11 Cl. Ct. 17, 25 (1986); *Levy v. Comm'r*, 91 T.C. 838, 853-58 (1998); *Torres v. Comm'r*, 88 T.C. 702, 718-19 (1987); *Cooper v. Comm'r*, 88 T.C. 84, 103-09 (1987); *Mukerji v. Comm'r*, 87 T.C. 926, 958-68 (1986); Rev. Proc. 75-21, 1975-1 C.B. 715, 716, *modified by* Rev. Proc. 79-48, 1979-2 C.B. 529, Rev. Proc. 81-71, 1981-2 C.B. 731, and *modified and superseded by* Rev. Proc. 2001-28, 2001-1 C.B. 1156, 1159. Although the Federal Circuit does not appear to have addressed leveraged leases in a published opinion, an unpublished opinion affirmed this Court's rejection of a leveraged lease that, among other things, had no "'objectively reasonable possibility of making a profit.'" *Drobny v. United States*, 86 F.3d 1174 (Fed. Cir. 1996) (table) (1996 WL 170445) (q*uoting Johnson v. United States*, 32 Fed. Cl. 709, 717 (Ct. F. Cl. 1995)), *cert. denied*, 519 U.S. 1055 (1997).

This focus upon the expectation of pre-tax profit is a fundamental aspect of the economic substance doctrine. As the Federal Circuit explained in *Coltec*, "all courts have looked to the objective reality of the transaction in assessing its economic substance." *Coltec*, 454 F.3d at 1356. Thus, a transaction objectively possesses economic substance where it presents the

"opportunity of profit . . . separate and apart from the tax deduction." *Rothschild v. United States*, 407 F.2d 404, 412 (Ct. Cl. 1969). *See Coltec*, 454 F.2d at 1356 (looking to an "'*objective* determination of whether a *reasonable* possibility of profit from *the transaction* existed'") (*quoting Black & Decker Corp. v. United States*, 436 F.3d 431, 441-42 (4th Cir. 2006) (first two emphases added by court; omitting internal quotations from original)); *see id.* (considering "'whether the transaction affected the taxpayer's financial position in any way'") (*quoting In re CM Holdings, Inc.*, 301 F.3d 96, 103 (3d Cir. 2002)).

The transaction at issue possesses objective economic substance because it is reasonably expected to produce substantial pre-tax profits over its life. If the transaction is terminated upon expiration of the Sublease in 2018, it is projected to produce a pre-tax profit of $60.1 million and Plaintiff is expected to pay federal income tax of $21.3 million. If the transaction continues until the Lease expires in 2042, it is projected to produce a pre-tax profit of at least $101.5 million and Plaintiff is expected to pay federal income tax of $35.5 million. The latter anticipated profits could be higher still (or lower), depending upon sales made during the period after expiration of the Sublease. These projected financial profits come entirely from the payments that the lessee is required to make to Plaintiff and are not generated by the claimed tax deductions.

Defendant likely will argue that the pre-tax profit from the transaction was lower than Plaintiff could have earned from alternative investments. The leasing authorities, however, hold that the amount of pre-tax profit should not be compared to the potential profit of other transactions and refuse to adopt a standard that compares the pre-tax profit from a leasing transaction to the amount of profit achievable with some benchmark rate of return. *Hilton v. Comm'r*, 671 F.2d 316, 317 (9th Cir. 1982); *Johnson*, 11 Cl. Ct. at 36; *Estate of Thomas v. Comm'r*, 84 T.C. 412, 440 n.52 (1985); *Ockels v. Comm'r*, T.C. Memo. 1987-507, 54 T.C.M.

785, 197 n.15 (1987); Rev. Proc. 2001-28, 2001-1 C.B. 1156, 1159, *modifying and superseding* Rev. Proc. 75-21, 1975-1 C.B. 715, 716; Treas. Reg. § 1.183-2(b)(9).

The presence of an expected pre-tax profit is also directly relevant to the issue of subjective business purpose. *Coltec* states that the economic substance doctrine "may well also apply if the taxpayer's *sole subjective motivation is tax avoidance* even if the transaction has [objective] economic substance." *Coltec*, 454 F.3d at 1355 (emphasis supplied). The trial record will show that, while Plaintiff recognized the advantage of tax deferral provided by leveraged leasing, its primary goals were the achievement of pre-tax profits, the favorable front-loading of financial earnings provided under FAS 13, and successful expansion into international and other deregulated markets following deregulation in New York. Plaintiff's interest in leasing arose because its expansion into deregulated markets was expected to produce sizeable start-up losses, which the front-loaded nature of lease earnings helped to ameliorate. Plaintiff limited its consideration of leases to power assets, with which it was deeply familiar, and engaged in rigorous due diligence. The company was proud of the transaction and prominently featured it in its 1997 annual report. Leasing was not an activity the "sole subjective motivation [for which] was tax avoidance." *Coltec*, 454 F.3d at 1355.

**B. <u>Significant Useful Life/Residual Value</u>**

In considering the economic substance of a lease, the cases require consideration of whether the leased asset is projected to have a useful life that exceeds the terms of the lease by a meaningful period, so that the lessor can profit from use of the property during the residual period (*i.e.*, the period following the expiration of the lease). The point of this test is to determine whether the lessor has a "meaningful possessory right in the property" and thus may be treated as its owner. *Torres*, 88 T.C. at 721. *See Rice's Toyota*, 752 F.2d at 92, 94-95; *Johnson*, 11 Cl. Ct.

at 33-37; *Levy*, 91 T.C. at 858-59; *Gefen v. Comm'r*, 87 T.C. 1471, 1490-92 (1986); *Mukerji*, 87 T.C. at 960-68; *Estate of Thomas*, 84 T.C. at 433-34; Rev. Proc. 75-21, 1975-1 C.B. 715, 715-16, *modified and superseded by* Rev. Proc. 2001-28, 2001-1 C.B. 1156, 1157; Rev. Rul. 55-540, 1955-2 C.B. 39, 40. Here, both the Lease and Sublease easily satisfy the test.

**C. Minimum Equity Investment and Nonrecourse Debt**

FAS 13 conditions leveraged lease accounting upon the lessor's use of nonrecourse debt to make its investment in the asset. The leasing authorities require that the fair market value of the leased asset throughout the life of the lease reasonably be expected to exceed the amount of the debt, hence ensuring that the lessor will have an equity investment in the leased asset which it is unlikely to abandon. *See Rice's Toyota*, 752 F.2d at 93-94; *Estate of Franklin v. United States*, 544 F.2d 1045, 1048 (9th Cir. 1976); *Levy*, 91 T.C. at 861-62; *Gefen*, 87 T.C. at 1493-94; *Torres*, 88 T.C. at 721-22. The fact that all or a substantial portion of rentals are applied to debt service has been held a neutral fact in the leasing tax analysis. *See, e.g.*, *Frank Lyon*, 435 U.S. at 566, 572; *Levy*, 91 T.C. at 860. CEL's 32% equity investment easily satisfies this test.

**D. Lease Purchase Options**

It is customary in leases for the lessee or the lessor to possess a variety of options with respect to the leased property. For example, it is typical to give the lessee the option to buy the property upon expiration of the lease. The authorities are clear that the exercise of such options should be treated as speculative, unless the option price is nominal or such a bargain that the lessee will be compelled to exercise the option. Absent the latter type of option, the lessor can expect to continue to profit from use of the property during the residual value period. *Frank Lyon*, 435 U.S. at 581; *Am. Realty Trust v. United States*, 498 F.2d 1194, 1199 (4th Cir. 1974); *Lockhart v. United States*, 446 F.2d 269, 271-72 (10th Cir. 1971); *Transamerica v. United States*,

15 Cl. Ct. 420, 442 (Cl. Ct. 1998), *aff'd on other issues*, 902 F.2d 1540 (Fed. Cir. 1990); *Belz Inv. Co. v. Comm'r*, 72 T.C. 1209, 1229 (1979), *aff'd*, 661 F.2d 76 (6th Cir. 1981); *LTV Corp. v. Comm'r*, 63 T.C. 39, 50 (1974); *Northwest Acceptance Corp v. Comm'r*, 58 T.C. at 847-48; Rev. Rul. 55-540, 1955-2 C.B. 39. The record will show that neither party was compelled to exercise its options, which, far from being a bargain, were set at prices that were out of the money.

## III. LIKELY ARGUMENTS BY DEFENDANT

### A. Credit Enhancement

Plaintiff expects that Defendant will raise issues pertaining to certain credit enhancement or risk mitigation features of the transaction. Upon receiving the initial payment for the Lease, EZH deposited money in an account to provide security for payment of the rentals attributable to the nonrecourse loan (the "debt deposit") and in an account to provide security for a payment of the rentals attributable to CEL's equity investment (the "equity deposit"). These are referred to as "economic defeasances," because they served to reduce CEL's risk of non-payment, but did not relieve EZH of its legal liability to make the rental payments. These defeasance deposits also served to reduce EZH's risks, such as currency rate risk, though EZH continued to bear default risk on the debt deposit and interest rate risk on the equity deposit. Further, these deposits could not insulate EZH from the staggering liabilities it would face if the transaction were terminated early; for example, if EZH were to commit a default on the Sublease in 2008, it would be required to make an out-of-pocket payment of $48 million or more. While EZH provided a letter of credit intended to provide security to CEL for such payments, EZH would be required to reimburse the letter of credit issuer for any payment made on the instrument.

Federal tax law provides standards for when a defeasance deposit will result in a recharacterization of a transaction. Under these standards, no recharacterization should occur

and EZH should be treated as the owner of the funds in the applicable deposits for federal tax purposes if EZH remains legally liable to pay rent to Plaintiff and the funds in the deposits are available to EZH to satisfy that liability. *Douglas v. Willcuts,* 296 U.S. 1, 9 (1935); Rev. Rul. 85-42, 1985-1 C.B. 36; Treas. Reg. § 1.61-13(b). Stated another way, EZH will be treated as the owner of the funds in the deposits and the transaction will be respected if those funds either will be used to satisfy EZH's obligations or otherwise will be returned to EZH.

Any attempt to mitigate or reduce credit risks presented in the EZH Transaction should not be treated as evidence that the transaction lacks economic substance. *See Compaq Computer Corp. v. Comm'r*, 277 F.3d 778, 787 (5th Cir. 2001); *United Parcel Service of America, Inc. v. Comm'r,* 254 F.3d 1014, 1018 (11th Cir. 2001); *IES Industries, Inc. v. United States*, 253 F.3d 350, 355 (8th Cir. 2001); *Gefen*, 87 T.C. at 1494 n.15, 1503. In addition, an exposure to a significant risk of non-payment by the lessee (i.e., credit risk) has specifically been held to be unnecessary for a transaction to qualify as a lease. *Gefen v. Comm'r,* 87 T.C. at 1494 n.15, 1503. Further, the credit quality of investments used to economically defease an obligation is not a factor in determining the character of the obligation and defeasance for Federal income tax purposes. *See* Rev. Rul. 85-42, 1985-1 C.B 36, where the defeasance itself was U.S. Treasury bonds. *See also* Treas. Reg. § 1.861-10T(b)(7) (recognizing common use of credit enhancement in leveraged leases and providing favorable sourcing rule); Treas. Reg. § 1.1001-3(e)(4)(iv)(A) (defeasance feature not treated as modifying financial instrument).

**B. <u>Current Interest</u>**

Under well settled leasing law, the lessor possesses a current interest in the leasehold even though the lessee has use and possession of the asset during the term of the leasehold, incurs costs to maintain and insure the property, and profits from operation of the property

during the lease term. *Frank Lyon,* 435 U.S. at 567, 583-84; *Lockhart*, 446 F.2d at 270; *Comdisco v. United States,* 756 F.2d 569, 574, 576 (7th Cir. 1985); *Torres,* 88 T.C. at 721; *Mukerji,* 87 T.C. at 962; *Estate of Thomas,* 84 T.C. at 433.

Nevertheless, Defendant likely will argue that the Lease and Sublease result in offsetting obligations and thus Plaintiff has not acquired a present interest in the RoCa3 plant, relying upon *BB&T Corporation v. United States,* 2007 WL 37798 (M.D.N.C. 2007), *appeal docketed,* No. 07-1177 (4th Cir. March 1, 2007). *BB&T* failed to apply (or even cite) the Fourth Circuit's controlling precedent in *Rice's Toyota*; granted summary judgment without considering whether the transaction had a reasonable expectation of pre-tax profit and a business purpose (contrary to the teaching of *Coltec*, 454 F.3d at 1356, and *Rothschild*, 407 F.2d at 412); and disregarded the lease transaction based upon the presence of factors found in typical leases, namely, that the lessee possessed, operated, maintained and profited from the equipment during the lease term. The district court's opinion in *BB&T* ignores the pertinent law and is deeply mistaken.

Respectfully Submitted:

Dated: October 5, 2007

/s/ David F. Abbott
David F. Abbott
MAYER BROWN
1675 Broadway
New York, NY 10019-5820
Tel: (212) 506-2344
Fax: (212) 706-9187
dabbott@mayerbrown.com

Attorney for Plaintiff