**No. 06-305 T**
**(Judge Marian Blank Horn)**

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

**CONSOLIDATED EDISON COMPANY OF NEW YORK, INC. & SUBSIDIARIES**

**Plaintiff**

**v.**

**THE UNITED STATES,**

**Defendant**

# MEMORANDUM IN SUPPORT OF THE UNITED STATES' SPOLIATION OF EVIDENCE CLAIM

**RICHARD T. MORRISON**
***Assistant Attorney General***

**DAVID GUSTAFSON**
**STEVEN I. FRAHM**
**DAVID N. GEIER**
**JOSEPH A. SERGI**
**ADAM R. SMART**
**KAREN M. GROEN**
***Attorneys***
***Tax Division***
***Department of Justice***
***Washington, D.C. 20044***
**(202) 616-3448 (telephone)**
**(202) 307-0054 (facsimile)**

TABLE OF CONTENTS

TABLE OF AUTHORITIES . . . . . . . . . . iii

FACTS . . . . . . . . . . 1

ARGUMENT . . . . . . . . . . 5

A. There Was Spoliation of Evidence . . . . . . . . . . 6

B. Plaintiff Failed to Preserve Relevant Evidence . . . . . . . . . . 10

# TABLE OF AUTHORITIES

## FEDERAL CASES

*AAB Joint Venture v. United States*, 75 Fed. Cl. 432 (2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Columbia First Bank, FSB v. United States*, 54 Fed. Cl. 693 (2002). . . . . . . . . . . . . . . . . . . . . . . .6

*Eaton Corp. v. Appliance Valves Corp.*, 790 F.2d 874 (Fed. Cir. 1986). . . . . . . . . . . . . . . . . . . . 6

*Slattery v. United States*, 46 Fed. Cl. 402 (2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*United Med. Supply Co., Inc. v. United States*, 77 Fed. Cl. 257 (2007). . . . . . . . . . . . . . . . . . . . . 5

## REVENUE RULINGS

Rev. Rul. 99-14 (Mar 11, 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .2, 9

**06-305 T**
**(Judge Marian Blank Horn)**

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

**CONSOLIDATED EDISON COMPANY**
**OF NEW YORK, INC. & SUBSIDIARIES**

**Plaintiff,**

**v.**

**THE UNITED STATES,**

**Defendant.**

**MEMORANDUM IN SUPPORT OF THE UNITED STATES' SPOLIATION OF EVIDENCE CLAIM**

The United States is pursuing a claim of spoliation because Plaintiff destroyed emails in 2000, at a time when it was anticipating litigation. At such a juncture, Plaintiff had a duty to preserve these emails which discussed the EZH LILO Transaction before this Court. Plaintiff's failure to preserve records warrants an adverse inference that the destroyed information, if now available, would have been favorable to the United States and harmful to Consolidated Edison. In the alternative, the United States requests that Plaintiff be prohibited from relying upon testimony of witnesses to the extent such testimony concerns the existence of emails discussing the EZH LILO Transaction where such emails have not been produced to the United States.

**FACTS**

On or about August 25, 1997 Consolidated Edison Development ("CED"), a wholly owned subsidiary of Consolidated Edison, Inc. (collectively "Plaintiff"), began considering the

EZH LILO Transaction. (Stipulation of Fact ¶ 57) The transaction closed on December 15, 1997. (*Id.* at ¶ 58)

Even at that early point in time litigation was anticipated. As stated by Andrew Scher, counsel for CED and a member of the Consolidated Edison, Inc. legal department who was involved in the pursuit of the EZH LILO Transaction, several documents created in October and November 1997 "were all created in anticipation of litigation" and were created to evaluate the risks of subsequent tax litigation. (Trial Ex. 1318, ¶¶ 3, 14) At the time Plaintiff entered into the EZH LILO Transaction, Plaintiff was well aware of the unsettled legal issues concerning the EZH LILO Transaction and had ample reason to believe that entry into any LILO transaction might lead to litigation. (*Id.* at ¶ 5) In fact, not only did Plaintiff believe entry into the EZH LILO Transaction might lead to litigation, it believed litigation was "extremely likely" (Memorandum in Response to Defendant's Motion to Compel at 10 (Docket No. 26, hereinafter "Response")) and that the circumstances surrounding the transaction supported that expectation. (Response at 11)

Plaintiff's anticipation of litigation in late 1997 was only magnified in March 1999 when the IRS issued Revenue Ruling 99-14 which gave notice of its decision to deny deductions for LILO transactions such as the EZH LILO Transaction. Rev. Rul. 99-14 (Mar 11, 1999). At the time the Revenue Ruling was issued, Plaintiff disagreed with the IRS's approach toward LILOs. (Scher Tr. Testimony, Vol. 19, 11/13/07, p. 4099-100) That disagreement could only heighten Plaintiff's anticipation of future litigation. Shortly after the issuance of this Revenue Ruling Andrew Scher prepared a "Draft analysis of IRS Ruling as applied to EZH and Nuon transactions" (Bates CE 065578 and 66097), analyzing the Revenue Ruling and its application to

the EZH LILO Transaction. Once again, Plaintiff has claimed and continues to claim that this document was prepared in anticipation of litigation, listing the document on its current privilege log as work product. (Memorandum Ex. 1, p. 28, attached hereto)

During the fall and winter of 1997 and continuing after the close of the EZH LILO Transaction, CED and Con Edison employees communicated via email concerning the EZH LILO Transaction and other aspects of CED's leasing program, providing, among other things, updates concerning the EZH LILO Transaction and forwarding memoranda, presentations and revisions to documents concerning the EZH LILO Transaction. (*See, e.g.*, Trial Exs. 550; 557; 558; 844; 946; 959; 1118; 1119; 1120; 1131; 1222; 1264) Several of CED's officers and board members acknowledged that they, as well as other CED employees, regularly used email to communicate concerning the business of CED in the 1997 time period, and continue doing so through today. (*See* McCartney Tr. Testimony, Vol. 4, 10/22/07, p. 882; Muoio Trial Testimony, Vol. 9, 10/29/07, pp. 2005-06)

In late 2000, CED was operating on a small Linux email system, separate from the system that Consolidated Edison, Inc. was using. (Trial Ex. 1335, at 19509-10) At that time, CED switched over to the Consolidated Edison, Inc. main email system. (*Id.*) This process entailed using new servers and communication lines and assigning new IDs for CED employees that had not been on the Consolidated Edison, Inc. system. (*Id.*) During the switch, it was known that existing emails would not migrate over to the new email system. (*Id.*) After a meeting among the vice presidents of CED, Brian DePlautt and Michael Madia, as well as Dawson Newberry, director of information services at CED at the time, it was decided that a backup of the entire CED system would not be made prior to the changeover. Instead, CED

decided it would leave it to each individual employee to save emails to their own hard drive if the employee thought the email was important.[1] The process of saving individual emails to an employee's hard drive was more complicated than a simple "click and drag," and, in fact, no one from Mr. Newberry's team provided assistance or instructions to employees on how to make such transfers. (*Id.* at 19512-13, 19518) As a result of CED's switch of email systems, any emails that were not saved by an individual employee were lost.[2] (*Id.* at 1510)

Mr. Terrence Walsh, currently director of information technology planning at Consolidated Edison, systems manager for the network systems group at Consolidated Edison in 2000 and network analyst with the networking group at Consolidated Edison in 1997, testified that while he had received stop orders from the Consolidated Edison legal department with respect to backups and destruction of electronic information, he was not aware that any instructions to preserve any information with respect to the EZH LILO Transaction were ever received within the information and technology department of Consolidated Edison. (Trial Ex.

[1]Charles Muoio, who was president of CED when the EZH LILO Transaction was being considered, left CED in February 1999. (Muoio Tr. Testimony, Vol. 9, 10/29/07, p. 1902) Thus, none of his emails were saved from the old email system. Since CED neither backed up the entire CED system, nor appointed anyone to ensure that Mr. Muoio's emails were saved, it appears that a large swath of emails from one of the individuals integral to this transaction was destroyed during the changeover. Further, as noted by Mr. Newberry, hard drives were not backed up, and when a machine was taken out of service, the hard drive was removed and destroyed without first being examined. (Trial Ex. 1335, at 19516) Further, as testified to by Mr. Walsh, director of information technology planning at Consolidated Edison, there is no way to get locally stored information off of one's system when switching over to a new computer. (Trial Ex. 1336, at 19554)

[2]After the switchover occurred, CED, through Mr Newberry, instituted a document retention policy. (Trial Ex. 1335, at 19514) Under that current policy, tapes are now made every night and saved for ninety days and once a month a tape is made of the entire network and saved at the disaster recovery center. (*Id.* at 19515) Nevertheless, Plaintiff has never endeavored a search of these CED files in connection with this litigation. (*Id.* at 19523)

1336, at 19540-42, 19547-50) Thus, notwithstanding that litigation over the EZH LILO Transaction was anticipated at the time of this switchover, CED failed to ensure the retention of emails concerning the transaction. (*See* Trial Ex. 1335, at 1510-12)

**ARGUMENT**

"Spoliation is the destruction or significant alteration of evidence, or failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." *United Med. Supply Co., Inc. v. United States*, 77 Fed. Cl. 257, 263 (2007) (quoting *West v. Goodyear Tire & Rubber Co.*, 167 F.3d 776, 779 (2d Cir. 1999)). Sanctions for spoliation of evidence can be imposed by a Court based upon either the Court's inherent authority, or under Rule 37 of the Rules of the Court of Federal Claims. *Id.* at 263-64. Since the destruction of emails here occurred prior to the filing of the Complaint or the commencement of discovery, the Court's power derives from its inherent authority. *Id.* at 271. The Court here must determine whether there was spoliation, what evidence Plaintiff was required to preserve, and whether Plaintiff in fact preserved the required information. *See United Med. Supply Co., Inc.*, 77 Fed. Cl. at 263; *AAB Joint Venture v. United States*, 75 Fed. Cl. 432, 441 n.17 (2007) (citing *Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 216-19 (S.D.N.Y.2003)). Spoliation arises when litigation is "reasonably foreseeable," and evidence is destroyed, altered or not preserved. *United Med. Supply Co., Inc.*, 77 Fed. Cl. at 263. Once litigation was reasonably foreseeable, Plaintiff was required to preserve relevant evidence for this litigation. *See AAB Joint Venture*, 75 Fed. Cl. at 440-41 (citations omitted).

The United States is seeking an adverse inference as a result of the destruction of emails detailed above. Under this Court's most recent decision on the matter, *United Med. Supply Co.*,

77 Fed. Cl. at 267-71, an adverse inference may be made even without a showing of bad faith.[3] This Court should consider all of the circumstances carefully when considering whether the destroyed emails create an adverse inference with respect to Plaintiff's contentions regarding the EZH LILO Transaction. *Id.* at 270-71. Even if this Court determines under the circumstances not to apply an adverse inference, the United States requests that the Court instead prohibit Plaintiff from relying on testimony of former and current officers, directors and employees where such testimony specifically concerns the existence of email, or memoranda that could have been attached to emails, discussing various aspects of the transaction and where such documents have not been produced to the United States in discovery.

**A. There Was Spoliation of Evidence**

As indicated above, spoliation of evidence occurs when it has been destroyed, altered or not preserved and litigation was reasonably foreseeable. *United Med. Supply Co.*, 77 Fed. Cl. At 263. As also explained above, CED foresaw litigation even as it was considering the EZH LILO Transaction. When addressing whether there was a duty to preserve evidence this Court recently held that "[t]he duty to preserve attaches not just when suit is filed, but whenever a party knows

---

[3] A few earlier decisions of this Court indicate that such a showing is necessary. *See, e.g.*, *Columbia First Bank, FSB v. United States*, 54 Fed. Cl. 693, 703 (2002); *Slattery v. United States*, 46 Fed. Cl. 402, 404-05 (2000). However, in *United Medical Supply Co.*, 77 Fed. Cl. at 263-65, this Court addressed and distinguished the premise relied upon in those cases concerning the necessity of a showing of bad faith in a case decided under the law of this Circuit, noting that these cases contained practically no analysis and relied upon a misperception of a Federal Circuit decision, *Eaton Corp. v. Appliance Valves Corp.*, 790 F.2d 874 (Fed. Cir. 1986). The *United Med. Supply Co.* Court then pointed to several cases from the Federal Circuit, decided both before and after *Eaton*, where spoliation sanctions were upheld without a showing of bad faith. 77 Fed. Cl. at 265-66 (citing *Sensonics v. Aerosonic Corp.*, 81 F.3d 1566 (Fed. Cir. 1996); *Beatrice Foods, Co. v. New England Printing & Lithographing Co.*, 899 F.2d 1171, 1175-76 (Fed. Cir. 1990); *Kori Corp. v. Wilco Marsh Buggies & Draglines, Inc.*, 761 F.2d 649, 655 (Fed. Cir. 1985)).

or should know that evidence may be relevant to anticipated litigation." *AAB Joint Venture*, 75 Fed. Cl. at 440. Plaintiff has morphed whether litigation was reasonably foreseeable and whether evidence may be relevant to anticipated litigation into a claim that the "anticipation of litigation" standard applicable to work product protection applies here to the question of spoliation of evidence, the duty to preserve evidence, and the appropriateness of an adverse inference when evidence has been destroyed. However, as demonstrated by this Court in *AAB Joint Venture*, these are different inquiries. In that case, this Court concluded that the Government's duty to preserve evidence began when an administrative "request for equitable adjustment" was filed in July 2002, approximately 2 years prior to the commencement of the litigation. *Id.* at 441-42. Turning to the Government's claim of work product, the Court noted that all of the 35 documents at issue were generated after July 2002, the date on which the Court determined that the Government "could reasonably have anticipated litigation and was, therefore, obligated to preserve documents for discovery purposes." *Id.* at 445. The Court denied the Government's claim of work product (despite previously finding a duty to preserve evidence), noting that there was not a showing of a *real* possibility of litigation rather than just a *remote* possibility, thus demonstrating that the standard for triggering the duty to preserve relevant evidence is a lesser standard than the anticipation of litigation necessary for a party to successfully claim work product protection. *Id.*

Nevertheless, even under the standard for claiming work product protection, the evidence shows that Plaintiff did in fact reasonably anticipate litigation with respect to the EZH LILO Transaction prior to the email changeover in late 2000. As discussed above, specifically, Plaintiff made representations in its "Memorandum in Response to Defendant's Motion to

Compel" (Docket No. 26) and the supporting affidavit of Andrew Scher (Trial Ex. 1318) which demonstrate that Plaintiff anticipated litigation with respect to the EZH LILO Transaction at the time the transaction was being considered. Specifically, Andrew Scher stated that the documents in question "were all created in anticipation of litigation"[4] and that the documents were prepared to evaluate the risks of subsequent tax litigation. (Trial Ex. 1318, ¶¶ 3, 14) Mr. Scher's affidavit highlighted the unsettled legal questions concerning the EZH LILO Transaction and noted that Con Edison had ample reason to believe that entry into any LILO transaction might lead to litigation. (Id. at ¶ 5) Further, Plaintiff in its Memorandum filed with the Court has conceded that as early as October 23, 1997, the date Mr. Scher prepared an In-House Memorandum about the LILO transaction at issue, Plaintiff believed that litigation was "extremely likely" (Response at 10) and, further, that the circumstances surrounding the transaction "demonstrate the reasonableness of [Plaintiff's] expectation of litigation." (Response at 11) When asked at trial to comment on the positions taken in Plaintiff's filings with this Court, Mr. Scher claimed that he did not agree with the statement that "litigation was extremely likely" (Scher Tr. Testimony, Vol. 18, 11/12/07, pp. 4021-22), and claimed that additional words would need to be inserted in the language of certain statements to make them more accurate. (*Id.* at 4026-27, 4036-37) When asked to identify any other errors or misstatements in filings submitted by Plaintiff to the Court, Mr. Scher was unable to do so. (Scher Tr. Testimony, Vol. 18, 11/12/07, p. 4023-24) Mr. Scher

[4]At trial Mr. Scher attempted to minimize the impact of his affidavit by stating that it was based upon his prior, different understanding of the phrase "anticipation of litigation." (Scher Tr. Testimony, Vol. 18, 11/12/07, p. 4021) Mr. Scher now opportunistically asserts that his understanding is that the phrase is in fact much narrower than he previously believed and that his statement should be read accordingly (that is, as if he had said the documents were <u>not</u> created in anticipation of litigation). (*Id.*)

acknowledged that he was the individual at Consolidated Edison responsible for reviewing filings with the Court such as the memorandum in which Plaintiff made the assertions regarding the likelihood of litigation, and providing comments to outside counsel for Plaintiff if necessary. (*Id.* at 4029-30) Mr. Scher never indicated that he requested that outside counsel change any of the language contained in the Memorandum prior to filing it with the Court. Conveniently, he now claims that words needed to be changed, only after the production of documents was ordered over Plaintiff's objections and Plaintiff's incentives changed. Plaintiff's earlier submissions to the Court are consistent with documentary evidence created when it was contemplating the EZH LILO Transaction and which discussed the risk of litigation in connection with the transaction. For example, the Leasing White Paper (Trial Ex. 397 at 8124) discusses the impact of the transaction structure on the ability of the IRS to prevail should it seek to litigate the issue. It also includes the "downside" scenarios to Plaintiff should the IRS prevail in such litigation. (*See also* McCartney Tr. Testimony, Vol. 4, 10/22/07, p. 850 (discussing the fact that the Leasing White paper discussed the possibility of litigation))

Even if the Court were to determine that Plaintiff did not have a duty to preserve evidence in 1997, such an obligation certainly arose by March 1999, when the IRS released Revenue Ruling 99-14, giving notice that it would deny deductions from LILO transactions such as the one before this Court. *See* Rev. Rul. 99-14 (Mar 11, 1999). Plaintiff did not agree with the Revenue Ruling.[5] (Scher Tr. Testimony, Vol. 19, 11/13/07, p. 4099-100) Certainly, the issuance of the Revenue Ruling and Plaintiff's disagreement with it, made litigation over the

---

[5]Plaintiff highlighted this disagreement in argument before this Court, and miraculously cited it as support for its position that it did not anticipate litigation. (Vol. 16, 11/8/07, p. 3312)

EZH LILO Transaction all but certain. Indeed Plaintiff continues to assert that various documents from this time (such as Mr. Scher's "Draft analysis of IRS Ruling as applied to EZH and Nuon transactions" (Bates CE 065578)) were prepared in anticipation of litigation for purposes of claiming work product protection, and have not, therefore, been disclosed. (*See* Memorandum Ex. 1, p. 28) In so claiming, of course, Plaintiff is acting inconsistently with its position in the present dispute–that litigation was not anticipated until 2005.

Thus, the duty to preserve relevant evidence arose prior to the email switchover in fall 2000. According to Plaintiff's own assertions such a duty arose in late 1997, during the time CED was considering entering into the EZH LILO Transaction, or at the latest, by March 1999, when the IRS issued Revenue Ruling 99-14.

**B. Plaintiff Failed to Preserve Relevant Evidence**

As explained above, given the existence of this duty, Plaintiff's actions surrounding the switchover to the new email system in late 2000 were inappropriate and inadequate. It was well known by officers of CED that all emails not otherwise backed up or saved locally would be lost during the changeover. CED nevertheless decided only to ask each individual employee to download to its own hard drive any emails the individual thought were important. There was no instruction to preserve emails relating to the EZH LILO Transaction, nor any unified attempt to determine the types of emails that should have been preserved. In fact, the information and technology department at CED was not even asked to assist in making sure the emails selected by individuals for keeping were downloaded properly to the hard drive of that employee. Mr. Scher acknowledged that no hold or freeze order was issued to CED with respect to the

information on the network of CED concerning the EZH transaction prior to the email switchover, or ever, for that matter. (Scher Tr. Testimony, Vol. 19, 11/13/07, p. 4067)

The United States anticipates that Plaintiff will argue that the United States has not demonstrated that specific emails relevant to this case were destroyed by Plaintiff during the switchover. However, as indicated above, officers and directors fo CED testified that they regularly used email to communicate concerning the business of CED in 1997 and beyond. (*See* McCartney Tr. Testimony, Vol. 4, 10/22/07, p. 882; Muoio Tr. Testimony, Vol. 9, 10/29/07, pp. 2005-06). Further, documentary evidence produced by Plaintiff confirms that these individuals, as well as other employees of CED, used email as a mode of communication with respect to the EZH LILO Transaction. *See, e.g., supra* at 3. Thus, emails regarding the EZH LILO Transaction were indeed destroyed.

Further, while Mr. Scher testified that, "it appears that a fair amount of that information was, in fact, transferred and saved on their hard drives," (Scher Tr. Testimony, Vol. 19, 11/13/07, p. 4284), he does not mention that Mr. Muoio's hard drive would not have been part of this process. For example, Mr. Scher states that Ms. McCartney, Ms. Freilich and Mr. DePlautt's documents, provided to him in 2001, all included emails saved from the relevant time period, but does not mention *any* emails obtained that were sent or received by Mr. Muoio. (*Id.* at 4307-09) Also, Mr. Scher's statement that "a fair amount" was preserved also indicates that there is information that was not saved through the process Plaintiff chose to use. For example, a statement that there were emails in the materials provided by Ms. McCartney to Mr. Scher in 2001 is far from a statement that all of the relevant emails sent or received by Ms. McCartney

concerning the EZH transaction were preserved. It is simply a confirmation that Ms. McCartney did in fact use emails to communicate concerning the EZH LILO Transaction.

Thus, the evidence shows that CED's officers and directors used emails to communicate with respect to the EZH LILO Transaction and that Mr. Muoio's emails were not preserved to any extent. Moreover, in all likelihood Ms. McCartney, Ms. Freilich and Mr. DePlautt did not choose to save all relevant emails at the time of the switch over. The United States has been prejudiced by this failure to maintain the emails of the officers and directors of CED, because many of those individuals frequently testified that they did not recall with specificity their contemporaneous thoughts and impressions. (*See*, *e.g.*, McGrath Tr. Testimony, Vol. 2, 10/18/07, pp. 337-42, 345-46; Burke Tr. Testimony, Vol. 3, 10/19/07, p. 585; McCartney Tr. Testimony, Vol. 4, 10/22/07, p. 838; Muoio Tr. Testimony, Vol. 9, 10/29/07, pp. 1991-92) Further, in other situations an officer or director for Plaintiff would testify to remembering events occurring in a certain way, only to admit that they may have in fact occurred in a different manner when shown a document contradicting that recollection. (*See, e.g.*, McCartney Trial testimony, Vol. 4, 10/22/07, pp. 906-07 (where Ms. McCartney, Chairperson of the Board of CED in 1997, asserts that the purported environmental benefits of the EZH LILO Transaction were discussed at the annual 1998 shareholders meeting, but admits that, upon being shown the transcript from the meeting, there was in fact no such discussion)). Without all of the emails from this time period, the United States was deprived of the opportunity to fully probe the recollection of Plaintiff's witnesses, and was thereby prejudiced. Additional prejudice arose through the destruction of emails as the United States was unable to present communications between CED's officers and directors when they exchanged documents. For example, Plaintiff

turned over to the United States redlined versions of the Leasing White Paper, but no emails in which these drafts were sent, thus prohibiting the United States from attributing revisions, or comments on the revisions, to a particular individual. Ironically, Plaintiff objected on occasion to the redline comments, arguing that the United Sates had been unable to attribute the comments to a specific individual at Consolidated Edison.[6] (*See, e.g.*, Burke Tr. Testimony, Vol. 3, 10/19/07, p. 585) Had the United States had the emails forwarding the redlined documents in question, in all likelihood they would have indicated the specific individuals making those comments and permitted the United States to attribute the comments to specific officers or directors of CED.[7]

Plaintiff's failure to preserve records warrants a sanction in the form of an adverse inference that the information destroyed, if available, would have been favorable to the United States and harmful to Consolidated Edison. In the alternative, the United States requests that the Court prohibit Plaintiff from relying on testimony of witnesses where such testimony claims that discussions of the EZH LILO Transaction occurred in emails not produced to the United States.

---

[6]The United States sought the identity of the comment makers in its Rule 30(b)(6) deposition; however, Mr. Scher, the designee of Plaintiff, was unable to provide the identity of the maker or makers of the redline comments to the Leasing White Paper.

[7]For example, such emails were provided in connection with the Leasing White Paper prepared in connection with the ENECO and NUON Transactions. (*See, e.g.,* Trial Exs. 1119; 1131; 1172).

Respectfully submitted,

s/ David N. Geier
DAVID N. GEIER
Attorney of Record
U.S. Department of Justice, Tax Division
Post Office Box 26
Washington, D.C. 20044
Telephone: (202) 616-3448
Facsimile: (202) 307-0054

RICHARD T. MORRISON
Assistant Attorney General
DAVID GUSTAFSON
Chief, Court of Federal Claims Section

JOSEPH A. SERGI
ADAM R. SMART
KAREN M. GROEN
Trial Attorneys

s/ Steven I. Frahm
STEVEN I. FRAHM
Assistant Chief, Court of Federal Claims Section
Of Counsel

December 13, 2007