**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

No. 06-305 T
(Judge Marian Blank Horn)

CONSOLIDATED EDISON COMPANY
OF NEW YORK, INC. & SUBSIDIARIES,

Plaintiff,

v.

UNITED STATES,

Defendant.

---

# CONSOLIDATED EDISON'S MEMORANDUM IN SUPPORT OF ITS RCFC 52(c) MOTION AND IN OPPOSITION TO THE GOVERNMENT'S BRIEF REGARDING DEFENDANT'S SPOLIATION OF EVIDENCE CLAIM

---

DAVID F. ABBOTT
MAYER BROWN LLP
1675 Broadway
New York, NY 10019-5820
Tel: (212) 506-2642
Fax: (212) 849-5642

Of Counsel:
JOEL V. WILLIAMSON
MARCIA G. MADSEN
LUKE LEVASSEUR
MAYER BROWN LLP
*Counsel For Plaintiff*

January 3, 2008

# TABLE OF CONTENTS


Page

INTRODUCTION ... 1

PROPOSED FINDINGS OF FACT RELATED TO THE GOVERNMENT'S SPOLIATION OF EVIDENCE CLAIM ... 3

A. Relevant Background Of Consolidated Edison Development And The EZH Transaction ... 3

B. Mr. Scher's Limited Role In The EZH Transaction ... 4

C. The November 2000 Email System Change Effected By CED ... 5

D. Consolidated Edison's Preservation, Collection, And Production Of Relevant Materials ... 7

ARGUMENT ... 8

I. This Court Dismisses Claims Under RCFC 52(c) When A Party Fails To Establish The Elements Of Its Claim ... 8

II. The Evidence Offered By The Government Does Not Satisfy The Basic Requirements Of A Spoliation Of Evidence Claim ... 9

A. The Government Misstates The Elements Of A Spoliation Claim ... 9

B. The Government's Attempts To Establish Consolidated Edison's Duty To Preserve Evidence At A Time That Would Support The Spoliation Of Evidence Claim Are Fundamentally Flawed ... 11

1. The Government's Legal Position Regarding When A Party Should Be Deemed To Anticipate Litigation Is Erroneous ... 11

2. The Earliest Point In Time At Which Consolidated Edison Could Reasonably Have Anticipated Litigation Regarding The EZH Transaction Was The Completion Of The IRS' Audit ... 12

3. The Government's Assertions That Consolidated Edison Anticipated Litigation In 1997 Are Flawed ... 16

a. Consolidated Edison Understood "Litigation" For Work Product Purposes To Encompass An IRS Audit ... 16

b. The Government Is Improperly Arguing For Judicial Estoppel ... 19

4. The Government's Assertions That Consolidated Edison Anticipated Litigation As A Result Of IRS Revenue Ruling 99-14 Cannot Be Supported ... 20

C. None Of The Consolidated Edison Actions On Which The Government's Spoliation Claim Is Based Occurred With The Requisite "Culpable State Of Mind" ... 23

1. Before A Spoliation Sanction Can Be Imposed, This Court Requires A Higher Degree Of Fault Than The Government Has Alleged, Much Less Proven ..... 23

2. The Conduct At Issue In This Case Does Not Constitute A Culpable State Of Mind, Regardless Of The Standard ..... 25

D. The Government Has Failed To Prove Either That Documents Were Destroyed Or That It Was Prejudiced By The Purported Destruction..... 27

III. There Is No Basis For Any Sanction Against Plaintiff, Much Less The Overbroad Adverse Inferences The Government Requests ..... 32

CONCLUSION ..... 34

## TABLE OF AUTHORITIES

Page(s)

**Cases:**

*AAB Joint Venture v. United States*, 75 Fed. Cl. 432 (2007) .......... 11-12

*Adams v. United States*, 42 Fed. Cl. 463 (1998) .......... 23

*Aramburu v. Boeing Co.*, 112 F.3d 1398 (10th Cir. 1997) .......... 25, 33

*Beatrice Foods Co. v. New England Printing & Lithographing Co.*, 899 F.2d 1171 (Fed. Cir. 1990) .......... 24

*Buckley v. United States*, 57 Fed. Cl. 328 (2003) .......... 19

*Columbia First Bank, FSB v. United States*, 58 Fed. Cl. 54 (2003) .......... 23-24

*Columbia First Bank, FSB v. United States*, 54 Fed. Cl. 693 (2002) .......... 10, 23-27

*Consolidated Aluminum Corp. v. Alcoa*, 2006 WL 2583308 (M.D. La. July 19, 2006) .......... 30, 32-33

*Cooper v. United States*, 37 Fed. Cl. 28 (1996) .......... 9

*De Espana v. American Bureau of Shipping*, 2007 WL 1686327 (S.D.N.Y. June 6, 2007) .......... 30

*Duy Ngo v. Storlie*, 2006 WL 1046933 (D. Minn. Apr. 19, 2006) .......... 10

*Eaton Corp. v. Appliance Valves Corp.*, 790 F.2d 874 (Fed. Cir. 1986) .......... 23

*EEOC v. Lutheran Social Services*, 186 F.3d 959 (D.C. Cir. 1999) .......... 11

*Energy Capital Corp. v. United States*, 45 Fed. Cl. 481 (2000) .......... 11

*Hardwick Brothers Co. v. United States*, 36 Fed. Cl. 347 (1996) .......... 24

*Hartford Ins. v. Am. Automatic Sprinkler Sys.*, 23 F. Supp. 2d 623 (D. Md. 1998) .......... 25, 27

*Hodge v. Wal-Mart Stores, Inc.*, 360 F.3d 446 (4th Cir. 2004) .......... 25, 33

*Hooker v. United States*, —Fed. Cl. —, 2007 WL 4238998 (Nov. 28, 2007) .......... 9

*Jandreau v. Nicholson*, 492 F.3 (Fed. Cir. 2007) .......... 10

*Jinks-Ulmstead v. England*, 2005 WL 3312947 (D.D.C. Dec. 7, 2005) .......... 33

*Kori Corp. v. Wilco Marsh Buggies & Draglines, Inc.*, 761 F.2d 649 (Fed. Cir. 1985) ........ 24

*New Hampshire v. Maine*, 532 U.S. 742 (2001) ........ 19

*Persyn v. United States*, 34 Fed. Cl. 187 (1995) ........ 9

*Residential Funding Corp. v. DeGeorge Financial Corp.*, 306 F.3d 99 (2d Cir. 2002) ........ 10

*Sensonics, Inc. v. Aerosonic Corp.*, 81 F.3d 1566 (Fed. Cir. 1996) ........ 24

*Slattery v. United States*, 46 Fed. Cl. 402 (2000) ........ 23-24

*In re SmithKline Beecham Corp.*, 243 F.3d 565 (Fed. Cir. 2000) ........ 11

*Tri-County Motors, Inc. v. Am. Suzuki Motor Corp.*, 494 F. Supp. 2d 161 (E.D.N.Y. 2007) ........ 10

*United Medical Supply Co. v. United States*, 77 Fed. Cl. 257 (2007) ........ *passim*

*United States ex rel. Fago v. M&T Mortgage Corp.*, 235 F.R.D. 11 (D.D.C. 2006) ........ 11

*United States v. Roxworthy*, 457 F.3d 590 (6th Cir. 2006) ........ 11

*Vick v. Texas Employment Commission*, 514 F.2d 734 (5th Cir. 1975) ........ 25, 26-27, 33

*West v. Goodyear Tire & Rubber Co.*, 167 F.3d 776 (2d Cir. 1999) ........ 9

**Statutes:**

26 U.S.C. § 6001 ........ 7

**Miscellaneous:**

Fed. R. Civ. P. 50(a) ........ 9

Internal Revenue Manual 33.3.6.1 ........ 21

IRS Revenue Ruling No. 99-14, 1999-1 C.B. 835, 1999 WL 127035 (Mar. 11, 1999) ........ 14, 20-21

IRS Revenue Ruling No. 2002-69, 2002-2 C.B. 760, 2002 WL 31272941 (Oct. 11, 2002) ........ 21

RCFC 37 ........ 9, 34

RCFC 52(c) ........ 1, 8, 9

*Restatement (Third) of the Law Governing Lawyers* § 87 (2000) ..................................................16

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| CONSOLIDATED EDISON COMPANY OF NEW YORK, INC. & SUBSIDIARIES, | ) | |
| Plaintiff, | ) | |
| v. | ) | No. 06-305 T (Judge Marian Blank Horn) |
| UNITED STATES, | ) | |
| Defendant. | ) | |

**CONSOLIDATED EDISON'S MEMORANDUM IN SUPPORT OF ITS RCFC 52(c) MOTION AND IN OPPOSITION TO THE GOVERNMENT'S BRIEF REGARDING DEFENDANT'S SPOLIATION OF EVIDENCE CLAIM**

Following the close of the Government's evidence regarding its spoliation claim, plaintiffs, Consolidated Edison Company of New York, Inc. & Subsidiaries ("Consolidated Edison" or "plaintiff"),[1] made a motion for judgment on partial findings under RCFC 52(c). Tr. 4404-05; *see id.* at 4405-23. Pursuant to the Court's instructions during trial, and its December 5, 2007 order, plaintiff respectfully submits this memorandum in support of its motion for judgment on partial findings and for dismissal of the Government's spoliation claim, and in opposition to the Government's December 13, 2007 brief ("Gov't Br.").

**INTRODUCTION**

The Government led off its case with dramatic assertions of spoliation, but its presentation of evidence did not measure up to the advance billing. When pressed by the Court and the plaintiff to specify its claim and "muster up the proof and lay it out on this issue," the

[1] When necessary for clarity, we refer to the holding company, Consolidated Edison Company of New York, Inc., as "CECONY." We refer to Consolidated Edison Development as "CED." For the convenience of the Court, when the witness is not clear from context, we provide the witness' name in a parenthetical following the citation to the trial transcript ("Tr.").

Government failed to satisfy the basic requirements of a spoliation of evidence claim. Tr. 4412-13, 4433.

In its brief, the Government limits its spoliation of evidence claim to a single event: the purported loss of electronic communications and attachments (collectively, "email") in late 2000 when CED changed from a Linux-based, off-site contracted email provider to an Outlook email system with an on-site server. However, at trial, the Government failed to establish the basic elements of spoliation—even with respect to this limited claim.

- The Government failed to prove that Consolidated Edison had a duty to preserve evidence at any time relevant to the defendant's spoliation claim. The Government bases its assertion of a duty to preserve evidence on statements plaintiff made in April and May 2007 regarding three 1997 documents—two Shearman & Sterling opinions and an In-House Memorandum—which plaintiff had argued were protected by the work product doctrine. Plaintiff's argument was expressly based on the understanding that anticipation of an audit and administrative appeal before the Internal Revenue Service ("IRS") is sufficient to satisfy the anticipation of litigation test necessary for work product protection. The Court rejected that argument and held that Consolidated Edison's anticipation of an audit, as reflected in the three documents, did not satisfy the "anticipation of litigation" standard. The Government has offered no other contemporaneous evidence.

- The submissions made to the Court by plaintiff in April and May 2007 do not establish "anticipation of litigation" for preservation of evidence purposes. Moreover, at trial and in its brief, the Government has misquoted plaintiff's submissions, both of which plainly defined "anticipation of litigation" to include anticipation of an audit by the IRS. That mischaracterization does not aid the Government's position.

- The Government ignores the requirement of this Court and of the Federal Circuit that a party claiming spoliation of evidence demonstrate a culpable state of mind before any spoliation sanction may be imposed. In its brief, the Government references this Court's decision in *United Medical Supply Co. v. United States*, 77 Fed. Cl. 257 (2007), and asserts that proof of "bad faith" is no longer required. Not only has the Department of Justice taken unacceptably inconsistent positions before this Court with respect to the "culpable state of mind" requirement and the interpretation of controlling precedent, but the conduct of the Government in *United Medical* that merited sanctions—though *not* an adverse inference—was vastly more egregious than anything alleged (much less proven) in this case. The Government has failed to satisfy its burden of a culpable state of mind.

- Critically, the Government failed to demonstrate that email was actually lost as a result of the CED email system change or that such purported loss was prejudicial to its case. For instance, the Government erroneously asserts that the CED email system change affected

numerous people who were ***not*** employees of CED, were ***never*** on the CED email system, and were thus unaffected by the change. With respect to the ***two*** individuals who were on the CED system and whose emails could have been affected (Messrs. DePlautt and Muoio), the Government did not prove that their relevant emails from 1997 through November 2000 (when the spoliation claim ends) were not collected and produced in this litigation. The Government's assertions of lost emails are all speculative. What is more, even if emails were lost, the Government did not prove that any such emails contained relevant information, and thus that defendant was prejudiced by the purported loss.

- Finally, there is no basis for the Court to impose spoliation-based sanctions, much less the overly broad sanctions the Government seeks. The Government asks for two alternative adverse inferences, both of which are extremely broad. But the precedent on which defendant relies makes clear that any sanction must be tailored to the circumstances, and just and appropriate to the failure to preserve evidence. The facts in *United Medical* were extreme—preservation issues arose after the case was filed; Government personnel were not informed of their document preservation obligations for five years after the complaint and did not comply when informed; documents destroyed in circumstances amounting to malfeasance; and false statements made by the Department of Justice to the Court. Yet, the Court refused to make an adverse inference and imposed a lesser sanction. In this case, even if negligent spoliation had been proven—and it was not—the alternative inferences requested by the Department of Justice are wildly inappropriate.

In sum, the defendant's spoliation of evidence claim should be dismissed, and post-trial briefing of the merits of Consolidated Edison's tax claims should proceed at this time.

## PROPOSED FINDINGS OF FACT RELATED TO THE GOVERNMENT'S SPOLIATION OF EVIDENCE CLAIM

### A. Relevant Background Of Consolidated Edison Development And The EZH Transaction

In August 1997, CED began to consider the EZH lease-in lease-out ("LILO") transaction that is the subject of this lawsuit.[2] Oct. 3, 2007 Stipulation of Fact ("Stipulation") ¶ 57; Gov't Br. 1-2. CED submitted its initial proposal on September 26, 1997 and, after negotiation, the LILO transaction closed on December 15, 1997. Stipulation ¶¶ 75, 96-101, 104; Tr. 3991-92.

[2] To demonstrate the flaws related to the Government's spoliation of evidence claim, we address only the parts of the EZH transaction history that are relevant to that claim.

Mr. Brian DePlautt, CED's CFO and Vice President responsible for leasing transactions (among other things), was the principal CED employee assigned responsibility for the "day-to-day business decisions" regarding the EZH transaction. Tr. 4271 (Scher); *see* Tr. 4133-34 (same); Tr. 1970, 1973 (Muoio). Mr. DePlautt was one of five initial employees of CED and left the Company in 2005. Tr. 1906-07 (Muoio). CED's President and Chief Executive Officer, Mr. Charles Muoio, was responsible for all of CED's operations and was not responsible for the day-to-day activities related to EZH. *See* Tr. 1905 (Muoio).

At the time of this transaction, CED's Board of Directors consisted of three individuals. Tr. 670 (Freilich); Tr. 736, 742 (McCartney). Two of those directors were substantially involved with the analysis and approval of the EZH transaction. Ms. Joan Freilich was the Chief Financial Officer of Consolidated Edison, and Ms. Mary Jane McCartney was, and is, Consolidated Edison's Senior Vice President in charge of gas operations. Tr. 671 (Freilich); Tr. 737-38 (McCartney). CED's third director, Mr. Paul Kinkle, was not involved with the EZH transaction. Tr. 4270, 4329 (Scher).

**B. Mr. Scher's Limited Role In The EZH Transaction**

Mr. Andrew Scher began working as a tax attorney in Consolidated Edison's law department on September 2, 1997. Tr. 3985, 4002 (Scher). As part of a marketing effort by which Consolidated Edison wanted its in-house lawyers to become involved with CED activities, Mr. Scher met with Mr. Muoio on October 6, 1997. Tr. 4135, 4137-38, 4399 (Scher). After that one-hour meeting, during which EZH was discussed for 15 minutes, Mr. Scher was asked to "just memorialize the meeting," which he did. Tr. 4269 (Scher); *see* Tr. 4148, 4151; *see* JX 1231 (describing "foreign leasing transactions").

Two-and-one-half weeks later, CECONY's then-General Counsel, Mr. Peter O'Shea, learned about CED's consideration of the EZH transaction and wanted "some sort of down and dirty memo" to provide "detail about it." Tr. 4272. Mr. Scher spoke to Mr. DePlautt, for "half an hour, maybe an hour" (Tr. 4166) and, without reviewing documents or conducting further research, provided Mr. O'Shea a high-level description of the complex transaction on October 23, 1997. JX 390; Tr. 4166, 4197, 4271-73 (Scher).

Mr. Scher was assigned to work on the EZH transaction in November 1997. Tr. 4279-80 (Scher); JX 1150. The transaction, for which a bid had been made earlier, had "a very steep learning curve" (Tr. 4154), and as a non-leasing expert, Mr. Scher's primary responsibility was to monitor outside counsel (Shearman & Sterling, who had been engaged much earlier by Mr. DePlautt) and to "provide[] comments" that "were more of an editorial nature, not so much a substantive nature." Tr. 4278; *see* Tr. 4278-79 (Scher). Mr. Scher was not a decision-maker, but was "retained to read the project documents and to help prepare the legal deliverables on the transaction." Tr. 4280 (Scher); JX 1150; *see* Tr. 4277-78 (provided opinions regarding "fairly routine things such as . . . whether Con Edison Leasing was duly organized and duly . . . authorized to do business, whether a transaction was duly authorized by the board, those sorts . . . routine deal points").

### C. The November 2000 Email System Change Effected By CED

Although its arguments at trial suggested a much broader position, in its November 14 and December 13 briefs, the Government expressly limits its spoliation of evidence claim to a single event: CED's late 2000 change from a vendor-supplied and externally hosted, Linux email system to CECONY's on-site Outlook-based system. Gov't Nov. 14 Statement Of Spoliation Claim at 2; Gov't Br. 3-5. The essential facts related to that email system change are as follows.

Prior to November 2000, CED and CECONY used different email systems, which operated independently. JX 1335 at 19509; JX 3556 at 19545. CECONY was a large company that used a Microsoft Outlook-based email system and had its own network of email servers. JX 1335 at 19509. In contrast, CED was a small subsidiary located in a different office in New York City that used a Linux-based email system which was provided, hosted, and administered by an outside vendor. JX 1335 at 19509; *see* Tr. 4283-84.

In November 2000, CED's email system was changed, and CED's employees were moved to Consolidated Edison's email network. JX 1335 at 19509-10; Gov't Br. 3. During his deposition, Mr. Newberry explained that, unlike an Outlook system, CED's previous Linux system did not have a central backup or a catastrophic backup system. JX 1335 at 19510, 19513. Moreover, emails generated using CED's Linux-based, client-side, email system could not be migrated or backed up to Consolidated Edison's Outlook-based, server-side, email system. JX 1335 at 19510.

To maintain important materials, CED employees (email users) were instructed to copy necessary emails from the Linux-based system to their hard drives (JX 1335 at 19511) by using a specific command with which persons using that Linux-based system would have been familiar. JX 1335 at 19512. Although Mr. Newberry did not provide an "instruction session" tailored specifically "for saving emails locally," the Government mischaracterizes the IT department's actions by asserting that "no one . . . provided assistance or instructions to employees on how to make such transfers." Gov't Br. 4. In fact, CED provided individual training to its employees on the computer system "on an as-needed basis." JX 1335 at 19517-18 (Newberry).[3]

---

[3] The Government notes that Mr. Terrence Walsh, who testified by deposition, was not aware of any stop orders from the Consolidated Edison legal department with respect to the EZH transaction. JX 1336 at 19548; *see* Gov't Br. 4. Mr. Walsh was not employed in a position in

### D. Consolidated Edison's Preservation, Collection, And Production Of Relevant Materials

Consolidated Edison and its subsidiaries retain records of significant transactions to satisfy myriad corporate and regulatory requirements. For instance, Consolidated Edison maintains documentation related to large transactions when such materials may be necessary to support the tax treatment of significant transactions in an eventual audit. *See* 26 U.S.C. § 6001.

Consolidated Edison's tax return is audited by the IRS each year. *See* Stipulation ¶ 301, Tr. 4281 (Scher). Because of the size of the deductions associated with the EZH transaction, Consolidated Edison's executives anticipated that it would be reviewed during an audit. Tr. 4025-28, 4281 (Scher). Accordingly, they maintained documents relevant to the transaction, pursuant to IRC and other requirements. That said, "[b]ecause there were no litigations pending," Mr. Scher, who is a tax attorney and not a litigator, did not believe "there was [any] reason to issue a hold order." Tr. 4012-13, 4067.

The IRS' audit of Consolidated Edison's 1997 tax return began in 1999, and in May 2001, Mr. Scher became responsible for collecting documents responsive to the IRS' major EZH-related Information Document Requests ("IDRs"). Tr. 4303. When IDR No. 74 was issued in May 2001, JX 1337, Mr. Scher immediately began to collect the relevant documents by sending an email message to all the potentially relevant employees. JX 1319; Tr. 4295-303 (comparing IDR No. 74 with Mr. Scher's email). As a result of Mr. Scher's efforts, a large

---

which he would have received such instructions. JX 1336 at 19548. In addition, Mr. Walsh's testimony related to the CECONY's system, not CED's different system (before November 2000)—which, as explained above, did not allow for system backups. JX 1335 at 19510. The Government implies that hold orders prior to 2000 were commonly used and structured to capture electronic materials in the same way as they are today following enactment in December 2006 of the new Federal Rules. This implication is erroneous and misleading.

volume of documents, including contemporaneous emails, were collected from two sets of locations.

First, Mr. Scher personally collected documents from the CECONY and CED officials who were involved in the EZH transaction and who continued to work for one of the companies. Ms. McCartney and Ms. Freilich (through her secretary) provided Mr. Scher all of their responsive documents, which included "printed out copies of emails" from the relevant time period. Tr. 4307-08 (Scher). Mr. DePlautt's secretary "may have collected th[e documents] for him" and had "stacked them[] up in a room" at CED's offices for Mr. Scher to review. Tr. 4308. Mr. Scher did not meet with Mr. Muoio in 2001 because Mr. "Muoio had left by that time" (Tr. 4329); however, Mr. Scher explained that "particularly [for] Con Edison Development [people], the documents for the various people at [CED] were collected for me, and kept in a room" at CED's headquarters. Tr. 4306. Nothing in the record indicates that Mr. Muoio's documents, including his emails, were not collected and produced in this manner. *See* Gov't Br. 4.

Second, Mr. Scher also collected the materials in CED's EZH transaction file. That file included copies of "printouts of emails," as well as memoranda and faxes." Tr. 4323-24 (Scher). Those voluminous materials included emails and correspondence involving all of the participants in the transaction described above, and the documents were produced to the IRS in response to the IDRs, and in response to discovery in this lawsuit. The Government did not produce any evidence to suggest otherwise.

## ARGUMENT

### I. This Court Dismisses Claims Under RCFC 52(c) When A Party Fails To Establish The Elements Of Its Claim

RCFC 52(c) provides that, during trial, the Court may enter judgment against a party when it determines that, under controlling law, an issue must be decided against that party. The

applicable standard is *not* whether the party with the burden of proof—here, the Government—has made a *prima facie* case, as it would be for a directed verdict motion in a jury trial. *Cooper v. United States*, 37 Fed. Cl. 28, 35 (1996). Instead, because the Judges of this Court serve "as both the trier of fact and the trier of law," Rule 52(c) "envisions a different role for the judge than does Fed. R. Civ. P. 50(a)." *Id.* (citing *Persyn v. United States*, 34 Fed. Cl. 187, 194-95 (1995)). Rule 52(c) "permits the judge to weigh the evidence and does not require that the judge resolve all credibility determinations in favor of" the party presenting the claim. *Id.*; *see Hooker v. United States*, — Fed. Cl. —, No. 03-1501, 2007 WL 4238998 (Nov. 28, 2007).

## II. The Evidence Offered By The Government Does Not Satisfy The Basic Requirements Of A Spoliation Of Evidence Claim

### A. The Government Misstates The Elements Of A Spoliation Claim

The Government generally states, "[s]poliation is the destruction or significant alteration of evidence, or failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." Gov't Br. 5 (quoting *United Medical*, 77 Fed. Cl. at 263); *see West v. Goodyear Tire & Rubber Co.*, 167 F.3d 776, 779 (2d Cir. 1999).[4]

When the Government moves beyond its generalized definition of spoliation, and attempts to address the requirements to prove a spoliation claim, its analysis fails to address the required elements and is misleading.

The Government attempts to create its own spoliation test, *i.e.*, that, before spoliation can be found, "[t]he Court here must determine whether there was spoliation, what evidence Plaintiff was required to preserve, and whether Plaintiff in fact preserved the required information."

[4] Consolidated Edison agrees that any potential spoliation sanction in this case would be based on the Court's "inherent authority" (and not RCFC 37), because the conduct about which the Government complains occurred before a discovery order was issued. *See United Medical*, 77 Fed. Cl. at 268; Gov't Br. 5.

Gov't Br. 5. Significantly, that formulation does not comport with the three elements of a spoliation of evidence claim routinely described by this Court and other courts: "(1) there was a duty to preserve the lost evidence; (2) evidence was lost due to a culpable breach of that duty; and (3) the non-breaching party was prejudiced by the loss of the evidence." *Columbia First Bank, FSB v. United States*, 54 Fed. Cl. 693, 702 (2002) (quoting the Government's brief); *see Residential Funding Corp. v. DeGeorge Financial Corp.*, 306 F.3d 99, 105, 108 (2d Cir. 2002). While, the Government attempts to address (albeit inadequately) the "duty to preserve evidence" and prejudice issues, Gov't Br. 6-10, 10-13, it fails to address how the purported spoliation occurred with a required "culpable state of mind."

In an apparent effort to downplay the defects in its evidence, in its brief, the Government also fails to address which party bears the burden of proof. *See also* Sept. 28, 2007 Joint Statement—Issues of Law at 2. The relevant precedent makes clear that, as the proponent of the spoliation of evidence claim, the Government bears the burden of proof with respect to each element of the claim. *See Residential Funding*, 306 F.3d at 107 (holding that *the party seeking sanctions* for destruction of evidence "must establish" the three elements described above); *Jandreau v. Nicholson*, 492 F.3 1372, 1375 (Fed. Cir. 2007); *Duy Ngo v. Storlie*, No. 03-3376, 2006 WL 1046933, *3 (D. Minn. Apr. 19, 2006) ("The moving party has the burden to prove spoliation."); *Tri-County Motors, Inc. v. Am. Suzuki Motor Corp.*, 494 F. Supp. 2d 161, 177 (E.D.N.Y. 2007) ("The party moving for sanctions bears the burden of establishing ***all*** . . . of these elements." (emphasis added)).

**B. The Government's Attempts To Establish Consolidated Edison's Duty To Preserve Evidence At A Time That Would Support The Spoliation Of Evidence Claim Are Fundamentally Flawed**

At trial and in its brief, the Government failed to address the timeline of objective contemporaneous facts requested by the Court concerning when a party in Consolidated Edison's position could have anticipated litigation. Instead, defendant focuses primarily on litigation materials submitted by plaintiff in this lawsuit. We address the Court's requested timeline in section II.B.2 below, and explain the errors in the Government's arguments in sections II.B.3 and II.B.4 below.

**1. The Government's Legal Position Regarding When A Party Should Be Deemed To Anticipate Litigation Is Erroneous**

To determine when a party anticipated litigation, the Court must conduct a reasonableness inquiry based on objective facts. *AAB Joint Venture v. United States*, 75 Fed. Cl. 432, 445 (2007); *see In re SmithKline Beecham Corp.*, 243 F.3d 565 (Fed. Cir. 2000) (analyzing work product assertion; unpublished). As this Court recognized in its June 2007 ruling, that reasonableness inquiry has two parts. First, in light of the timeline of events from 1997 through 2004, the Court needs to determine when the relevant Consolidated Edison executives formed "a subjective belief that litigation was a real possibility" with respect to the EZH transaction. *EEOC v. Lutheran Social Services*, 186 F.3d 959, 968 (D.C. Cir. 1999). Second, most importantly, the Court must determine "whether that subjective anticipation of litigation was objectively reasonable." *United States v. Roxworthy*, 457 F.3d 590, 594 (6th Cir. 2006); *see United States ex rel. Fago v. M&T Mortgage Corp.*, 235 F.R.D. 11, 16 (D.D.C. 2006); *Energy Capital Corp. v. United States,* 45 Fed. Cl. 481, 485 (2000) (when litigation became a "real possibility").

The Government ignores this two-part test. In an effort to support its position, the Government also renews its erroneous argument that *AAB Joint Venture* supports the proposition

that "the [anticipation of litigation] standard for triggering the duty to preserve relevant evidence is a lesser standard than the anticipation of litigation necessary for a party to successfully claim work product protection." Gov't Br. 7. But the *AAB Joint Venture* defendant was denied work product protection because it failed to meet the only applicable standard, *i.e.*, "that the documents [at issue] were prepared in anticipation of litigation rather than for a business purpose." 75 Fed. Cl. at 445. Nothing in the Court's reasoning indicates that the "anticipation of litigation" standard is different in the work product and document preservation contexts. More fundamentally, in its brief (repeating a failure made during oral argument), the Government does not explain any functional, purported difference between "anticipation of litigation" for preservation purposes and "anticipation of litigation" for work product purposes. *See* Tr. 3335-43 (Government counsel was unable to explain any meaningful distinction in the purportedly different requirements). The purportedly differing language from *AAB Joint Venture* referenced in the Government's brief is not a proper distinction,[5] and defendant's argument is not otherwise supported. *See* Tr. 3335-43.

### 2. The Earliest Point In Time At Which Consolidated Edison Could Reasonably Have Anticipated Litigation Regarding The EZH Transaction Was The Completion Of The IRS' Audit

Mr. Scher testified that it was not until sometime in late 2004 or early 2005 that he determined that Consolidated Edison was unlikely to be able to resolve the dispute with the IRS in the Service's Appeals process, as most disputes are resolved. Tr. 4360-65. That subjective understanding must be considered in light of a series of objective events from which the Court

[5] In *AAB Joint Venture*, the Court denied work product protection, because, among other reasons, "Defendant does not show that there was a *real* possibility, rather than . . . just a remote possibility, of litigation at the time of preparation of the work product." *AAB Joint Venture*, 75 Fed. Cl. at 445. Contrary to the Government's assertions on page seven of its brief, however, the Court in *AAB Joint Venture* did not rule that a "remote" possibility of litigation was sufficient to establish a duty to preserve documents (*see id.* at 440-42), and we are aware of no precedent supporting either that formulation or any materially different standard regarding when a party can reasonably anticipate litigation.

could conclude that a party could reasonably anticipate litigation. As we demonstrate below, even if the Court were to disagree with Mr. Scher, the earliest Consolidated Edison could have reasonably anticipated litigation was at the conclusion of the audit process, when the IRS issued its Notice of Proposed Adjustment ("NOPA") on December 13, 2002. JX 10222.

In December 1997, CED completed the EZH transaction. As part of that transaction, it obtained leasing and tax counsel from leading American law firms and consultants, and its executives, and Board members, and executives and Board members of Consolidated Edison, believed the transaction, including the tax treatment, was appropriate. Tr. 903-06 (McCartney). One does not enter into a large transaction with the hopes or anticipation of litigating over the tax treatment involved; and there is no contemporaneous evidence that in 1997, Consolidated Edison's executives believed that litigation with the IRS was a "real possibility." To the contrary, Consolidated Edison received an opinion from outside tax counsel expressing a high level of confidence (a so-called "should" level or better opinion) that the transaction entitled it to the expected tax benefits. *See* JX 86.

Consolidated Edison and Mr. Scher always believed that the Company's tax return for 1997, like virtually every other tax year, would be audited. Tr. 4281; *see* Tr. 4026, 4349 (Scher). The Company also recognized that the size of the deductions involved in the EZH transaction likely would cause it to be called out in the audit. *See* Tr. 4025-28, 4281 (Scher). But in 1997, Consolidated Edison had no reason to believe that the potential dispute that might occur as part of the audit of the EZH transaction could not be resolved either in the standard IRS audit or in the Appeals process. Tr. 4286-87; *see* Tr. 4026, 4281, 4340-41 (Scher). Nothing about such an audit and appeal, or the Service's initiation or performance of the audit, would reasonably cause a

sophisticated taxpayer like Consolidated Edison to anticipate a lawsuit.[6] *See* Tr. 4281 (Scher). To the contrary, as explained below, the Service conducted an audit and appeal using its normal procedures, and Consolidated Edison had no reason to infer from the Government's conduct that a lawsuit was imminent.

The Government argues that the IRS' March 1999 issuance of Revenue Ruling No. 99-14 is the latest date at which Consolidated Edison should have anticipated litigation. We demonstrate the flaws in this argument at section II.B.4 below.

The next "critical path step" was the IRS' conclusion of the field audit and issuance of the IRS' NOPA on December 13, 2002. JX 10222; Tr. 4343; *see* Tr. 4341-44 (Scher). There, the IRS essentially disregarded the transaction in its entirety, *i.e.*, the Service disallowed relevant rental and interest deductions, and it disregarded the income Consolidated Edison was "picking up as rental income under the sublease." Tr. 4348. Although the IRS' total disallowance of the deductions appears to be a substantial change, such audit decisions constitute "the process," and Consolidated Edison gets similar "notices of proposed adjustment every year on every audit." Tr. 4349. The Company "anticipated that there would be a challenge of the EZH transaction," and that the challenge would be initiated by the IRS in this manner. Tr. 4349. That said, the IRS' issuance of the NOPA expressly set forth the Service's disagreement with Consolidated Edison's tax treatment of the EZH transaction. Given that statement, it might be argued that,

---

[6] The Government correctly refrains from asserting that either the IRS' initiation of the 1997 tax year audit during 1999, or the initiation of IDRs related to that tax year would have resulted in an anticipation of litigation.

despite the fact that it was expected, a reasonable taxpayer could have believed that the probability of litigation increased as a result of the NOPA.[7]

Finally, the Appeals process consisted of an initial protest filing in approximately March 2003 and several meetings with the "appeals agents." Tr. 4349-51 (Scher). The IRS' team (led by Mr. Luis Arritola) and Consolidated Edison's representatives met three times: (1) in late 2003, for a "meet and greet" type meeting in which general positions were explained, Tr. 4352-53; (2) in mid-2004, for a substantive meeting in which proposals were made and the IRS personnel were "fairly sympathetic to [Consolidated Edison's] arguments" and were discussing matters in good faith, Tr. 4355-59; and (3) a final meeting in "the summer of 2005, when the proposals were not accepted and the negotiations came to an end." Tr. 4360-66. Between the second and third meetings, the IRS issued its settlement guidelines for LILO transactions and, even though the specific amounts for which settlements could be made were redacted, Mr. Scher came to understand that the range of permissible settlements for the IRS probably was below the amount Consolidated Edison's management would likely be willing to accept. Tr. 4361-62. At that time, "hopes began to dim" that a negotiated resolution could be reached, and although the IRS continued to negotiate during the third meeting, Mr. Scher began to believe that the dispute regarding the EZH tax treatment would likely lead to a lawsuit. *See* Tr. 4362-66.

In its brief, the Government does not contest that the audit, IDRs, NOPA, IRS Appeals, and settlement meetings are standard parts of the dispute resolution process; nor does defendant contest that virtually all disputes with the IRS are settled through the audit and Appeals processes—and thus do not involve litigation. The Government cannot seriously, in good faith,

[7] Another issue in the 1997 audit related to a change in accounting for depreciation of assets and involved significant deductions that were disallowed in their entirety. That issue was resolved during the appeals process. *See* Tr. 4305-06 (Scher).

contend that there was no serious chance of resolution of this matter without litigation, as doing so would imply that the Service and Mr. Arritola were not negotiating in good faith. Indeed, the IRS issued settlement guidelines—***not*** "non-settlement mandates"—and a settlement proposal was made by the IRS. The Government's position in this lawsuit would render the IRS' resolution process a sham because the defendant is telling the Court that any reasonable taxpayer should have known that the Appeals process was a waste of time and that a lawsuit was inevitable.

### 3. The Government's Assertions That Consolidated Edison Anticipated Litigation In 1997 Are Flawed

The Government primarily argues that Consolidated Edison should have anticipated a lawsuit in 1997. Defendant supports this assertion with two, mid-2007 legal submissions in this lawsuit. Even putting aside the fact that the Government's argument is not based on objective contemporaneous facts, the brief and affidavit in question used the phrase "anticipation of litigation" in connection with the tax audit and Appeals process in a manner that the Government has repeatedly mischaracterized. When read fairly *and in conjunction with the Court's rulings*, those submissions make clear that in 1997 Consolidated Edison did not consider a lawsuit to be a "real possibility."

#### a. Consolidated Edison Understood "Litigation" For Work Product Purposes To Encompass An IRS Audit

Consolidated Edison's April 27 memorandum was a legal argument submitted as part of a discovery dispute related to three documents, which plaintiff argued were prepared in anticipation of litigation and were covered by the work product doctrine. In that April 27 brief, Consolidated Edison specifically explained that when it used the word "litigation," it "include[d] 'adversarial proceedings before an agency.'" Pl. Apr. 27 Memorandum at 10 (quoting *Restatement (Third) of*

*the Law Governing Lawyers* § 87 cmt. h (2000)). Accordingly, when plaintiff argued that "the EZH investment[] was certain to lead to an IRS audit and extremely likely to result in litigation," and that its "expectation of litigation" was "reasonable[]," that discussion must be read in context of the immediately preceding definition of "litigation" (*id.* at 10-11)—*e.g.*, in a manner that includes the Service's audit and Appeals processes. The Government's arguments in its brief—and its counsel's misleading questions during cross-examination on this issue at trial—deliberately ignore the manner in which "litigation" was defined in the April 27 brief and, thus, substantially mischaracterize Consolidated Edison's position. *See* Tr. 4021-22, 4026-27, 4036-37 (Scher); Gov't Br. 2, 8.

The Government similarly attempts to misuse Mr. Scher's subsequent May 10, 2007 affidavit, JX 1318, which was submitted in support of the earlier April 27 memorandum with regard to the three documents at issue. The Government's brief focuses exclusively on paragraphs 3 and 14 of the affidavit, which contain Mr. Scher's conclusion that the 1997 Shearman & Sterling memoranda and the In-House Memorandum were created in anticipation of litigation. Gov't Br. 2, 8. But the Government ignores paragraph 5 of the affidavit, in which Mr. Scher explains his understanding of the meaning of the phrase "anticipation of litigation." There, Mr. Scher explained that "Con Edison NY had ample reason to believe that any contemplated lease-leaseback transaction that it entered into was likely to be challenged on audit by the IRS *and might result in litigation*." JX 1318 ¶ 5 (emphasis added). Mr. Scher's affidavit, when read fairly, is consistent with his trial testimony that he believed Consolidated Edison's 1997 tax filing, including the EZH transaction, would be audited, and that he knew that disputes which cannot be resolved in the standard audit and Appeals process "might result in litigation." *Id.*; *see* Tr. 4286-

87.[8] In short, the Government, by selectively and misleadingly quoting the memorandum and the affidavit, attempts to portray Consolidated Edison as anticipating a lawsuit in 1997. But that is not what the documents say—they define "litigation" as including an IRS audit and Appeals processes.

In June 2007, this Court disagreed with Consolidated Edison's position that anticipation of an audit represents a sufficiently immediate threat to satisfy the objective requirement of reasonable "anticipation of litigation." June 6, 2007 Hearing Tr. 29-30, 32-34; Tr. 3976 (Court: "[T]here is a lot of indication that an IRS audit does not necessarily trigger a contemplation of litigation, but I repeated that on . . . Thursday [November 8], [and] I strongly believe that."). Although its understanding of the law being applied by the Court (per its June 2007 ruling) changed, Consolidated Edison's factual position was not altered in any way as a result of that ruling. The Company, and Mr. Scher, always understood that an audit and an IRS appeal regarding the EZH transaction were likely, with a subsequent lawsuit being a possibility. Tr. 4286-87. In our April 27, 2007 brief, the IRS audit and Appeals processes plainly were included within the definition of "litigation," and because Consolidated Edison anticipated an audit, the manner in which litigation was defined resulted in an argument that litigation was anticipated. The Court's June 2007 legal ruling disaggregated the audit and Appeals process from a lawsuit. While Consolidated Edison continued to anticipate the Service's processes, the Court did not

---

[8] The Government improperly continues its attack on Mr. Scher, asserting that he "now opportunistically asserts that his understanding . . . is in fact much narrower than he previously believed." Gov't Br. 8 n.4. Although he now understands (per the Court's ruling) that anticipating an audit is not the same as anticipating litigation, as demonstrated above, Mr. Scher's trial testimony and affidavit are consistent. Indeed, it is the Government's mischaracterization of the April 27 memorandum and the affidavit that are selective and "opportunistic."

consider "litigation" as including those processes. Given the Court's June 2007 ruling, it was no longer correct to say that plaintiff anticipated litigation in 1997.

**b. The Government Is Improperly Arguing For Judicial Estoppel**

Even if the Court were to conclude that Consolidated Edison changed its position with respect to when it reasonably anticipated litigation, the Government's attempt to constrain the plaintiff from relying on the Court's June 2007 ruling cannot be reconciled with judicial estoppel principles. See Gov't Br. 9. Under the judicial estoppel doctrine, when "a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position, especially if it be to the prejudice of the party who has acquiesced in the position formerly taken by him." *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001). But, as this Court has made clear, "judicial estoppel does not preclude [a party] from taking the position" if the party had not "successfully asserted [that] position" previously, *i.e.*, the party must have "received a benefit from the previously taken position in the form of judicial success." *Buckley v. United States*, 57 Fed. Cl. 328, 341-42 (2003). As Consolidated Edison did not prevail on its anticipation of litigation argument regarding the motion to compel, *i.e.*, the Court denied plaintiff's work product claim, it would be improper to restrain plaintiff from adapting its legal position to the Court's ruling and statements.

What is more, the Government's current position cannot be reconciled with the arguments it made—and prevailed on—regarding the work product dispute in May 2007. As the Court explained in response to Consolidated Edison's November 5, 2007 motion to limit testimony during trial, the Court's June 2007 ruling applied only to the three documents at issue. Tr. 3357-59. On April 3, 2007, the Government sought release of those documents based on the contention

that they were ***not*** created in anticipation of litigation in 1997—and it prevailed with that argument. Now, the Government relies on Consolidated Edison's submissions related solely to those same documents to contend Consolidated Edison did anticipate litigation. The Government has no other factual basis for its argument, and by using Consolidated Edison's rejected briefs and affidavit, has changed its position (on an argument it won) in violation of judicial estoppel principles. The Court's June 2007 ruling is dispositive as to whether the In-House Memorandum and the Shearman & Sterling materials were created in anticipation of litigation, and the Government cannot change its position, as it is attempting to do.

#### 4. The Government's Assertions That Consolidated Edison Anticipated Litigation As A Result Of IRS Revenue Ruling 99-14 Cannot Be Supported

The Government also contends that, if Consolidated Edison could not reasonably anticipate litigation in 1997, plaintiff should have anticipated litigation, and began preserving evidence, when the IRS issued Revenue Ruling No. 99-14 in March 1999. Gov't Br. 9-10. Although Consolidated Edison was aware of the Revenue Ruling, Mr. Scher explained that it did not change the Company's belief that any dispute with the IRS would be resolved in the ordinary audit and Appeals processes. The Government improperly ignores that evidence.

When Revenue Ruling No. 99-14 was issued, Consolidated Edison was concerned initially, as the Ruling raised issues regarding LILO-type transactions. Tr. 4282, 4340-41 (Scher). The Company's in-house and outside counsel analyzed the Ruling carefully, and they determined that it had no merit whatsoever. Tr. 4282; *see* Govt. Br. 9. At most, Mr. Scher explained that the 1999 Revenue Ruling "heightened [their] awareness that the transaction would be picked up on audit," as the transaction listing provisions of the Ruling made that outcome more likely. Tr. 4282-83; *see* Tr. 4096-99. But Consolidated Edison did not conclude that litigation was more

likely, as it was difficult to imagine that the Government would pursue litigation based on the weak legal position set forth in the Revenue Ruling.

Mr. Scher's and Consolidated Edison's legal analysis of Revenue Ruling No. 99-14 was correct. In 2002, the IRS withdrew that Ruling and, thereby, implicitly recognized the weakness of its analysis. *See* Tr. 4098-99, 4282 (Scher); IRS Revenue Ruling No. 2002-69, 2002-2 C.B. 760, 2002 WL 31272941 (Oct. 11, 2002) ("modif[ying] and supersed[ing]" Revenue Ruling No. 99-14). In light of the subsequent withdrawal of Revenue Ruling No. 99-14, and Consolidated Edison's undisputed contemporaneous understanding of its analytical weakness, the Government's assertion that "litigation over the EZH LILO Transaction [was] all but certain" after the issuance of the Revenue Ruling cannot be supported. Gov't Br. 9-10. Furthermore, material differences between the facts described in Revenue Ruling No. 99-14 and the EZH transactions are readily apparent. These include (among others) the lack of a significant profit in the facts described in the Revenue Ruling, as opposed to substantial profits expected from the EZH transaction. IRS Revenue Ruling No. 99-14, 1999-1 C.B. 835, 1999 WL 127035.

By contending that Consolidated Edison should have inferred that litigation was a near certainty as a result of the Revenue Ruling, the Government also improperly equates this type of Service pronouncement with a "Designation for Litigation" under the Service's long-standing guidelines. *See* Internal Revenue Manual 33.3.6.1 (Aug. 11, 2004) (available at http://www.irs.gov/irm/part33/ch03s06.html); IRM 35.3.14 (Dec. 8, 1993). Transactions that are subjects of Revenue Rulings are resolved and settled in the audit and Appeals processes regularly, and the fact that the IRS has a specific procedure to inform the taxpayer that litigation is on the horizon—and that this procedure was not invoked—cannot be reconciled with the Government's current position.

The Government also makes a belated, unsupportable argument that an erroneous entry on Consolidated Edison's final privilege log supports defendant's position that plaintiff anticipated litigation in 1999. Gov't Br. 3, 10. Consolidated Edison initially had withheld the subject document based on an unwaived attorney-client privilege claim (as the document reflects legal advice related to the NUON transaction), and a work-product claim with respect to EZH. Gov't Br., Exhibit at 28 ("3/--/1999" entry). Applying the Court's work product and discovery rulings in June 2007, plaintiff produced more than 400,000 pages of material in a short period of time, and counsel made correspondingly dramatic reductions and revisions to the privilege log.

Under the rationale of the Court's June 2007 rulings, the work product protection does not apply to the March 1999 memorandum in question, because (among other reasons) that document does not reference or directly address litigation. But, because the memorandum reflects attorney-client privileged communications concerning the NUON transaction, it was properly not produced to the Government. In the rush to effect the reductions and revisions to the privilege log, this entry was not corrected to only reflect an "Attorney-Client" assertion. Moreover, the erroneous designation had no effect on the Government, as the NUON document was properly withheld pursuant to a claim of attorney-client privilege.[9]

[9] Should the Court wish to review this document, Consolidated Edison will provide a copy to the Court for *in camera* inspection. However, to the extent the Government intended to rely on a notation in the privilege log to support a substantive assertion (as it now does), defendant should have pressed this issue during discovery or at trial (when the Government received Consolidated Edison's bench memorandum), so that it could have been addressed in a timely manner. As it failed to do so, the Government's argument is based on a document that is not in the record (and is otherwise unsupported).

### C. None Of The Consolidated Edison Actions On Which The Government's Spoliation Claim Is Based Occurred With The Requisite "Culpable State Of Mind"

#### 1. Before A Spoliation Sanction Can Be Imposed, This Court Requires A Higher Degree Of Fault Than The Government Has Alleged, Much Less Proven

This Court and the Federal Circuit have consistently demanded a high degree of fault before a spoliation sanction can be imposed. In the Federal Circuit's leading precedent, *Eaton Corp. v. Appliance Valves Corp.*, the court made clear that adverse inferences should not be made without a showing of "bad faith" destruction of relevant evidence. 790 F.2d 874, 878 (Fed. Cir. 1986); *see Columbia First Bank, FSB v. United States*, 58 Fed. Cl. 54, 56 (2003). In its brief, the Government relies on *United Medical* to contend that *Eaton* is not controlling precedent and that "bad faith" is not required. Gov't Br. 6 & n.3. Interestingly, when the Government was defending its actions in that same *United Medical* case, the Department of Justice took the opposite position, "relying upon *Eaton* . . . [to] assert[] that, in order to impose sanctions, this court must find that [the] destruction [at issue] was done in bad faith, essentially with knowledge that the documents would harm its case." 77 Fed. Cl. at 264.[10]

Although *Eaton* was a patent case that applied the law of the relevant regional circuit, and thus is not technically binding precedent in this case, this Court has consistently applied the *Eaton* ruling as persuasive authority. As explained in *Columbia First*, "despite the fact that the Federal Circuit was applying the law of another circuit at that time, *Slattery* [*v. United States*, 46

[10] The *United Medical* Court addressed the fact that the Government's arguments regarding the precedential force of the Federal Circuit's *Eaton* decision have been flatly inconsistent. *Id.* at 264-65 (noting that, when pursuing a spoliation claim in *Columbia First*, the Government interpreted *Eaton*'s effect in the opposite manner). Unchastened by that criticism, and as the decisions of this Court do not constitute binding precedent, *see Adams v. United States*, 42 Fed. Cl. 463, 472-73 (1998), the Government could flip-flop again in the next case regarding the meaning of *Eaton* and the controlling law in this Court—which is more than a little ironic, given the Government's accusation that others "opportunistically" change positions. Gov't Br. 8 n.4.

Fed. Cl. 402, 405 (2000)] and *Hardwick Brothers* [*Co. v. United States*, 36 Fed. Cl. 347, 417 (1996)] support the view that the spoliation rule in *Eaton Corp.* has become the settled law of this court." *Columbia First*, 58 Fed. Cl. at 56; *see Columbia First*, 54 Fed. Cl. at 703.

In any event, none of the precedents on which the Government relies materially reduced the "culpable state of mind" requirement applicable to a spoliation claim. *See* Gov't Br. 6 n.3. For instance, in *Sensonics, Inc. v. Aerosonic Corp.*, the court affirmed a spoliation sanction (in a patent case) for "purposeful" destruction of production records "during the litigation period" despite the fact that the records were clearly relevant to the patent-holder's damages, and despite the relevant party's "clear duty of keeping and preserving records." 81 F.3d 1566, 1572-73 (Fed. Cir. 1996). The Federal Circuit also affirmed a spoliation sanction in *Beatrice Foods Co. v. New England Printing & Lithographing Co.*, in which, "after extensive pre-trial procedures," there was an "outrageous . . . intentional destruction" of the type of document that provided "the only yardstick to measure accurately defendant's guilt in dollars." 899 F.2d 1171, 1173-74 (Fed. Cir. 1990).[11] These decisions—which involved sanctions for purposeful, intentional, or outrageous misconduct—make clear that the state-of-mind standard applicable in this Court is high.

Nor is *United Medical* helpful to the Government here, because (as we demonstrate below) defendant has not even alleged, much less proved, the type of conduct that resulted in sanctions in that case. In *United Medical*, the Court surveyed the applicable law of the Federal Circuit, this Court, and numerous other courts, and disagreed that bad faith was required because, among other reasons, the Court explained that mandating bad faith would "mean[] that evidence may be destroyed willfully, or through gross negligence or even reckless disregard, without any

[11] The Government (and the Court in *United Medical*) also cites *Kori Corp. v. Wilco Marsh Buggies & Draglines, Inc.*, 761 F.2d 649, 653-54 (Fed. Cir. 1985). That case involved uncertainty in damages calculations and did not address spoliation.

true consequences." 77 Fed. Cl. at 268. The Court had earlier recognized that some courts "require merely that there be a showing of fault, with the degree . . . ranging from mere negligence to bad faith, impacting the severity of the sanction." *Id.* at 266. But, putting aside the sanction imposed in that case (*see* section III below), the Court in *United Medical* based its sanction on the Government's failure to implement a hold order ***after litigation began***, and a pattern of "purposely . . . mak[ing] false statements to th[e] Court" that amounted to a "reckless disregard" of its acknowledged duty to preserve evidence.[12] *Id.* at 274. No such conduct is even alleged in this case.

**2. The Conduct At Issue In This Case Does Not Constitute A Culpable State Of Mind, Regardless Of The Standard**

In *Columbia First*, this Court analyzed a loss of vital evidence that occurred approximately five years after the lawsuit had been initiated, and one–and-one-half year after the parties were specifically instructed to "vacate all routine record retention procedures that otherwise would apply" and implement procedures that would ensure "that no documents reasonably related to the issues in th[e] case be destroyed." 54 Fed. Cl. at 702-03. The Court determined that the *Columbia First* "record supports no more than a finding that plaintiff negligently lost the documents." *Id.* at 704. Furthermore, courts have repeatedly held that discarding documents that might be evidence in the ordinary course of business demonstrates, at most, negligence. *Id.*; *see, e.g., Vick v. Texas Employment Comm'n*, 514 F.2d 734, 737 (5th Cir. 1975); *Hartford Ins. v. Am. Automatic Sprinkler Sys.*, 23 F. Supp. 2d 623, 627 (D. Md. 1998).

[12] Not only would it be unprecedented in this jurisdiction, but imposing an adverse inference (or any substantial sanction) based on negligence would implement an erroneous legal rule. As the Tenth Circuit has explained, "negligence in losing or destroying records is not enough [to justify an adverse inference] because it does not support an inference of consciousness of a weak case." *Aramburu v. Boeing Co.*, 112 F.3d 1398, 1407 (10th Cir. 1997); *see, e.g., Hodge v. Wal-Mart Stores, Inc.*, 360 F.3d 446, 450 (4th Cir. 2004).

Unlike the facts of *Columbia First*, and despite the Government's attempt to mischaracterize the record here, CED's email system change was an ordinary business decision. CED stopped using its separate email system—which had been provided and hosted off-site by an outside vendor, and did not provide the capability for a centralized or catastrophic backup. CED's employees were subsequently integrated onto CECONY's Outlook-based, company-wide, email network. JX 1335 at 19509-10. Nevertheless, the Government attempts to argue malfeasance on the part of CED by asserting—without citation—that "[a]fter a meeting among the vice presidents of CED [and] Dawson Newberry, director of information services at CED at the time, it was decided that a backup of the entire CED system would not be made prior to the changeover." Gov't Br. 3.[13] This argument is completely unsupported by the record. There is no evidence that, in late 2000, CED could have backed up its previous system but chose not to do so; instead, the decentralized nature of the client-side email system would have rendered any such attempt useless.[14] *See* JX 1335 at 19510.

Even if the Court held that the preservation obligation arose before the email system change, and even if the Government had proved that material emails had been lost, ***this change was not made*** for the purposes of frustrating future litigation. As an ordinary business decision, the loss of any emails would be evidence of, at most, negligence. *See Vick*, 514 F.2d at 737;

---

[13] The Government also argues that a CECONY Information Technology employee, Mr. Terrence Walsh, testified (by deposition) that "while he had received stop orders from the Consolidated Edison legal department" in other circumstances, he "was not aware [of such instructions] with respect to the EZH LILO Transaction." Gov't Br. 4-5. No preservation order was required, because Consolidated Edison did not anticipate litigation prior to the November 2000 email system change, and, in any event, Mr. Walsh was not employed in a position to receive such an instruction regarding CED in 1997. JX 1336 at 19548.

[14] Email systems such as Microsoft Outlook are "server-side" systems. Copies of files sent or received by these types of systems are retained on the servers. Linux systems are "client-side," which means that email files are retained on the server only until they are downloaded and viewed on the hard drive associated with the account.

*Hartford Ins. Co.*, 23 F. Supp. 2d at 627. No adverse inference or other sanction is appropriate based on such conduct.[15]

**D. The Government Has Failed To Prove Either That Documents Were Destroyed Or That It Was Prejudiced By The Purported Destruction**

As explained above, a party claiming spoliation of evidence must show that it "was prejudiced by the loss of the evidence." *Columbia First*, 54 Fed. Cl. at 702. Thus, a necessary predicate to the prejudice inquiry in this case is the requirement that the Government prove that emails actually were lost as a result of CED's November 2000 email system change. The Government failed to provide competent evidence on that issue. The Government also failed to prove that any allegedly lost emails involved relevant information.

As an initial matter, most of the executives discussed in the Government's brief were unaffected by CED's November 2000 email system change, to which the Government has limited its claim. In the section of its brief attempting to muster evidence related to prejudice, the Government addresses six people who might have sent or received email, the purported loss of which (as a result of CED's email system change) was allegedly prejudicial. Gov't Br. 11-13. Four of those individuals—Mss. McCartney and Freilich, and Messrs. McGrath and Burke—were never CED employees but were always employees of the parent company, CECONY. As such, their email accounts were on CECONY's network, and retention of their emails was unaffected by the CED email system change in November 2000. This fact was highlighted during trial when Mr. Scher explained that because he was not located at CED, he was not aware of the transition of CED to Consolidated Edison's network at the time it occurred. Tr. 4065.

[15] Here, the Government would have to show that the technology in use at the time was such that emails could be preserved. No such showing was attempted.

Only two individuals described in the Government's brief were on the CED system and could, conceivably, have had emails lost as a result of the November 2000 email system change.[16] In other words, the Government's entire spoliation of evidence claim is based on two CED employees, Messrs. DePlautt and Muoio. Moreover, any emails sent by Messrs. DePlautt or Muoio to a CECONY employee (as a recipient or a "carbon copy") would have been on the CECONY system; but the Government's claim does not include that system. Thus, properly understood, the Government's claim consists solely of emails that may have been sent between Messrs. DePlautt and Muoio, or emails sent by one of those individuals to relevant third-parties (such as Cornerstone) but not to a CECONY employee. Defendant failed to prove those two former CED employees generated any such emails—or, if such emails were generated, that hard copies were not retained and produced.

With respect to Mr. DePlautt, he continued to work for CED until 2005. Nothing indicates that his relevant emails were not saved in late 2000 (if not before). Indeed, Mr. Scher explained that Mr. DePlautt's records were collected for Mr. Scher in 2001, and that he reviewed and produced relevant materials (which included emails) in response to IDR No. 74. Tr. 4308.[17] Then, when Mr. DePlautt left CED in 2005, his computer was secured and preserved immediately. Tr. 4134-35 (Scher). The electronic communications that Mr. DePlautt had saved on his hard drive (which were voluminous) were searched for anything relating to the IRS audit

[16] Mr. Scher testified that the third CED executive in 1997, Mr. Madia, "really had no involvement with this transaction," Tr. 4329, and the Government does not dispute that fact.

[17] Numerous emails from Mr. DePlautt that were produced in response to IDR No. 74 were trial exhibits. JXs 550, 552, 557, 558, 836, 837, 838, 842, 843, 844; PXs 10031, 19962; DX 20111. Many other emails involving Mr. DePlautt, which were not produced in response to IDR No. 74, were included as joint exhibits in the record of these proceedings: JXs 188, 711, 795, 845, 847, 853, 1103, 1118, 1119, 1120, 1131, 1139, 1140, 1172, 1173, 1176, 1183, 1189, 1193, 1206, 1207, 1208, 1209, 1210, 1212, 1214, 1215, 1216, 1222, 1224, 1245, 1248, 1264, 1275, 1277, 1279, 1284, 1292, 1297, 1343; DXs 20087, 20096, 20098, 20130, 20131, 20142, 20143, 20144, 20145, 20160, 20161, 20162, 20166, 20167, 20169, 20171.

and the present litigation. JX 1335 at 19525. Although he testified at the trial, the Government did not ask Mr. DePlautt about how much email he generated regarding this transaction or whether or in what manner he preserved it. In short, the Government failed to put forward proof that any of Mr. DePlautt's emails were not retained and produced.

When Mr. Muoio left CED in 1999 (prior to the email system change), he provided all of the company's documents in his possession to CED. Tr. 2007-08 (Muoio). Mr. Muoio further explained that he did not remove any emails from his computer when he left CED. *Id.* Thus, Mr. Muoio's documents and the computer containing any emails that had been stored were included in CED's records since at least 1999.[18] Two years later, when Mr. Scher collected documents in response to the IDR, "the documents of the various people at ConEd Development were collected for [him], and kept in a room." Tr. 4306 (Scher). Documents related to the EZH transaction were also maintained in the "official EZH file." Tr. 4323 (Scher). Those documents included printouts of emails. *Id.*

The Government elicited no testimony, and offers no evidence, to support its assertion that relevant materials from Mr. Muoio were not included in either the files collected from his office or in the transaction file.[19] Emails to and from Mr. Muoio were included in the

[18] The Government implies that documents on Mr. Muoio's computer were lost when he left CED in 1999. Gov't Br. 4 n.1. But the Government mischaracterizes the testimony of Mr. Walsh by suggesting that he did not believe it was possible to retrieve information from a local hard drive when a user changes machines. *Id.* During his deposition, Mr. Walsh was asked whether, "when somebody changes their system, is there a way for ***all*** of the locally saved information to be put on the new system." JX 1336 at 19554 (emphasis added). That it is not possible to migrate ***all*** documents from an old computer to a new hard drive is materially different from testifying that no data can be retrieved from a hard drive.

[19] Instead, the Government relies on general testimony without any information regarding the specific actions taken with respect to Mr. Muoio's materials. JX 1335 at 19516; JX 1336 at 19554.

productions in response to the IRS' IDRs during the audit, as well as the production made to the Government in this lawsuit.[20]

The Government asserts, without citation, that Mr. Muoio's emails were not retained by CED because CED did not appoint anyone to ensure they were saved when CED changed email systems. Gov't Br. 4 n.1. The Government also relies on general testimony without any information regarding the specific actions taken with respect to Mr. Muoio's materials. *Id.* (citing JX 1335 at 19516; JX 1336 at 19554). But the Government, which bears the burden of proof, failed to ask appropriate questions of the relevant witnesses (or otherwise create a factual record) regarding what happened to Mr. Muoio's emails, documents, or hard drive after he left CED. Although the relevant witnesses appeared at trial, they were not examined on these issues by the Government. Accordingly, there is no basis in the record for this Court to find that any of Mr. Muoio's important or relevant emails were not retained and produced.

Even if the Government had proven actual loss of emails, that would not be sufficient. The moving party's failure to make the additional showing that the subject of the EZH transaction was included in any emails precludes a spoliation sanction based on the alleged destruction of emails. *See De Espana v. American Bureau of Shipping*, No. 03 Civ. 3573, 2007 WL 1686327, at 8 (S.D.N.Y. June 6, 2007). In addition, a mere allegation "that the destroyed information is relevant to this litigation based simply on the time frame and the individuals involved" is also insufficient to establish relevance. *Consolidated Aluminum Corp. v. Alcoa, Inc.*, No. 03-1055-C-M2, 2006 WL 2583308 (M.D. La. July 19, 2006). Each of the

[20] *See* JXs 268, 308, 327, 550, 552, 557, 622, 795, 836, 842, 844, 845, 847, 853, 1071, 1103, 1118, 1119, 1120, 1139, 1140, 1176, 1189, 1202, 1222, 1245, 1264, 1271, 1277, 1279, 1284, 1343; PXs 10006, 10031; DXs 20096, 20098, 20130, 20131.

Government's attempts to establish relevance asks the Court to accept rank speculation that should not be permitted.

The Government first asserts that executives like Mr. Muoio testified that they used email to communicate, and that documentary evidence confirms such 1997 email usage. But the conclusion that the Government draws from that fact—that "emails regarding the EZH LILO Transaction were indeed destroyed"— is a leap and does not follow as a matter of basic logic. Gov't Br. 11.

The Government next baldly asserts that, despite being instructed to save important emails, "*in all likelihood* Ms. McCartney, Ms. Freilich and Mr. DePlautt did not choose to save all relevant emails at the time of the switch over." Gov't Br. 12 (emphasis added). Putting aside Mss. McCartney's and Freilich's irrelevance (because they were not on the CED system), the Government assertion that CED officials, such as Mr. DePlautt, did not comply with the instruction to save important emails is rank speculation. The Government examined Mr. DePlautt (and other witnesses) and failed to create a foundation for this unsupported (and uncited) assertion. That failure of proof, among many others, dooms the Government's spoliation claim.

Finally, the Government attempts to demonstrate prejudice by speculating that additional emails might have provided opportunities to refresh recollections or impeach plaintiff's witnesses. Gov't Br. 13. By way of example, the Government asserts that the lack of emails "in which these drafts [which are redlined versions of the Leasing White Paper] were sent . . . prohibit[ed] the United States from attributing revisions, or comments on the revisions, to a particular individual." *Id.* But the Government failed to establish that revisions to the White Paper were sent by email—or, if revisions were transmitted in that manner, that the transmittal

emails included commentary.[21] Again, the Government had fair opportunity to examine the witnesses involved in drafting the White Paper and failed to build a record and prove its spoliation claim. Moreover, the emails related to White Papers that are referenced in the Government's brief, Gov't Br. 13 n.7 (citing JXs 1119, 1131, and 1172), were generated *after* the EZH transaction was completed. Nothing but the Government's speculation supports the assertion that emails related to the EZH White Paper were generated.

## III. There Is No Basis For Any Sanction Against Plaintiff, Much Less The Overbroad Adverse Inferences The Government Requests

The Government has failed to present sufficient evidence that CED's late 2000 email system change (and incorporation into the Consolidated Edison sever network) constituted spoliation of evidence. What is more, even if a duty to preserve evidence arose prior to November 2000, the circumstances surrounding the change to CED's email system do not support sanctions for spoliation against CED—much less the broad adverse inference that the Government seeks.

Although the Court has the authority to fashion appropriate sanctions for spoliation, the Court also "must construct a sanction that is just and proportionate in light of the circumstances underlying the failure to preserve relevant evidence, as well as the punitive, prophylactic, remedial and institutional purposes to be served by such sanctions." *United Medical*, 77 Fed. Cl. at 263-64, 270. The Court must ensure that it does not "use an elephant gun to slay a mouse." *Id.* at 271. Courts exercise restraint before implementing a drastic sanction that might lead to a determination on anything other than the merits. *Id.* at 270; *see Consolidated Aluminum*, 2006

[21] Transmittal emails would not necessarily have included commentary but may have merely attached documents with no discussion. The Government has not shown otherwise; nor did defendant create a record supporting its claim (by, for instance, questioning witnesses regarding the use of transmittal emails).

WL 2583308; *Jinks-Ulmstead v. England*, No. 99-2691, 2005 WL 3312947 (D.D.C. Dec. 7, 2005). Moreover, "[m]ere negligence is not enough, for it does not sustain an adverse inference of consciousness of a weak case." *Vick*, 514 F.2d at 737; *e.g.*, *Hodge*, 360 F.3d at 450; *Aramburu*, 112 F.3d at 1407.

The Government seeks the broadest possible adverse inference: "that the [allegedly] destroyed information, if now available, would have been favorable to the United States and harmful to Consolidated Edison." Gov't Br. 1, 13. To support the propriety of that request, the Government relies on this Court's *United Medical* decision. Gov't Br. 5-6. But, even if CED's decision to change its email system in late 2000 constituted spoliation, and even if the Government had demonstrated prejudice, the facts and result in *United Medical*—among many other cases—fatally undermine the Government's request.

The *United Medical* facts were dramatic. All of the document preservation and production issues in that case occurred ***after*** the lawsuit was filed, when the defendant's obligation to preserve evidence was clear. 77 Fed. Cl. at 271. Relevant Government personnel were not informed of their obligations for up to five years after the filing of the complaint (or did not comply when informed); and documents were indisputably destroyed as a result of improper communications and other actions that, "in various regards, [amounted to] malfeasance." *Id.* at 273-74. Further, in responding to the spoliation problems developing in the lawsuit, the Department of Justice made a series of representations about which the Court concluded: "the United States must be deemed purposely to have made false statements to this court." *Id.*

Even considering such "purpose[ful] . . . false statements" and "reckless disregard" for its preservation and production obligations, the Court declined to impose an adverse inference sanction. *Id.* at 274-75. In light of that ruling in the case principally relied on by defendant, the

Government's request for an unbridled adverse inference in this case is completely unsupported. No adverse inference was made against the Government based on its shocking conduct in *United Medical*, and thus, it is inappropriate for the same Department of Justice to demand a broad adverse inference here, based on conduct that, even if it were spoliation, amounted (at most) to negligent spoliation resulting from a decision made in the ordinary course of business that occurred six years before the lawsuit was filed.

The Government's request for an alternative sanction is similarly improper. Defendant asks that, if it cannot obtain the broad sanction, that Consolidated Edison "be prohibited from relying upon testimony of witnesses that concerns the existence of emails discussing the EZH LILO transaction where such emails have not been produced to the United States." Gov't Br. 1, 13. Although we have parsed the transcript, we are not aware of any such testimony in the record, and as the Government has failed to specify or reasonably explain the alternative relief it seeks, this alternative request should also be denied.[22]

**CONCLUSION**

For the reasons set forth above, and for the reasons explained in our previous briefs and during trial of this lawsuit, Consolidated Edison respectfully asks that the Government's spoliation of evidence claim be dismissed.

[22] In addition, no basis exists for a monetary sanctions award under Rule 37, as there is no evidence of additional financial burden to which the Government was subjected as a result of the claimed spoliation. None of the typical costs associated with imaging hard drives and processing back-up tapes were borne by the Government, and the Government has not sought compensation for any additional time or costs associated with this claim.

Respectfully submitted,

s/ David F. Abbott

DAVID F. ABBOTT
MAYER BROWN LLP
1675 Broadway
New York, NY 10019-5820
Tel: (212) 506-2642
Fax: (212) 849-5642

Of Counsel:
JOEL V. WILLIAMSON
MARCIA G. MADSEN
LUKE LEVASSEUR
MAYER BROWN LLP

January 3, 2008

*Counsel for Plaintiff*