**No. 06-305 T**
**(Judge Marian Blank Horn)**

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

**CONSOLIDATED EDISON COMPANY OF NEW YORK, INC. & SUBSIDIARIES**

**Plaintiff**

**v.**

**THE UNITED STATES,**

**Defendant**

# UNITED STATES' OPENING POST-TRIAL BRIEF

**NATHAN J. HOCHMAN**
***Assistant Attorney General***

**DAVID GUSTAFSON**
**STEVEN I. FRAHM**
**DAVID N. GEIER**
**JOSEPH A. SERGI**
**ADAM R. SMART**
**KAREN M. GROEN**
***Attorneys***
***Tax Division***
***Department of Justice***
***Washington, D.C. 20044***
**(202) 616-3448 (telephone)**
**(202) 307-0054 (facsimile)**

**TABLE OF CONTENTS**


**TABLE OF CONTENTS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

**TABLE OF AUTHORITIES** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . v

**INTRODUCTION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

**PROCEDURAL BACKGROUND** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

**FACTUAL STATEMENT** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

**I. REGULATORY AND STATUTORY BACKGROUND** . . . . . . . . . . . . . . . . . . . . . . . . . 8

**II. DETAILED STRUCTURE OF THE EZH LILO TRANSACTION** . . . . . . . . . . . . . . . . . 9

**A. Transaction Cash Flows** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

1. Lease Rent . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

2. Debt Defeasance Account . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

3. Equity Defeasance Account . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

4. Sublessee Loan . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

5. Letter of Credit . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

**B. End-of-sublease options** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

1. EZH's purchase option . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

2. CED's options . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

a. Sublease Renewal Option . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

b. Retention Option . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

3. Final Basic Rent Payment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

**III. THE PATH TO THE EZH LILO TRANSACTION** . . . . . . . . . . . . . . . . . . . . . . . . . 41

**A. The History of CED** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

**B. CED'S Consideration of LILO Transactions** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

**C. Pursuit of the EZH LILO Transaction** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

**D. The Papering of the EZH LILO Transaction** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

**E. The Closing** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 78

**F. CED'S Pursuit of Other LILOs** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 78

**IV. RISK LEVEL OF THE EZH LILO TRANSACTION** . . . . . . . . . . . . . . . . . . . . . . . . . . 83

**<u>ARGUMENT</u>** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 86

**I. BURDEN OF PROOF** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 86

**II. PLAINTIFF IS NOT ENTITLED TO DEDUCTIONS FOR AN ADVANCE HEAD LEASE PAYMENT AND TRANSACTION COSTS IN 1997** . . . . . . . . . . . . . . . . . . . . . 88

**A. The Transaction's Substance, Not Its Form, Determines Its Tax Treatment** . . . 88

**B. CED Failed to Acquire a Current Leasehold Interest in the EZH RoCa3 Facility** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 89

**C. The Court Should Collapse Reciprocal Rights and Obligations** . . . . . . . . . . . . 101

**III. PLAINTIFF IS NOT ENTITLED TO AN INTEREST EXPENSE DEDUCTION RELATED TO THE PURPORTED LOAN** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 105

**IV. THE TRANSACTION LACKS ECONOMIC SUBSTANCE** . . . . . . . . . . . . . . . . . . . . 107

**A. The Sham Transaction Doctrine and Economic Substance** . . . . . . . . . . . . . . . . 107

**B. Plaintiff's LILO Transaction Lacks Objective Economic Substance** . . . . . . . . 113

1. <u>Plaintiff Did Not Have a Reasonable Expectation of Profit, because the LILO Transaction Would Generate Huge Negative Cash Flows and Earnings on a Pre-Tax Basis</u> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 114

2. <u>Plaintiff Could Not Expect To Realize Economic Gains Typically Associated with Leveraged Leasing</u> . . . . . . . . . . . . . . . . . . . . . . . . . . 117

**C. Plaintiff's Asserted Business Purpose for Entering the LILO Transaction Is Not Credible** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 120

1. Without the Tax Benefits Plaintiff would not have Entered into the EZH LILO Transaction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 121

2. Plaintiff's Purported Business Purpose Lacks Merit . . . . . . . . . . . . . . . . 122

**CONCLUSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 131

**TABLE OF AUTHORITIES**

**FEDERAL CASES**

*ACM Partnership v. Commissioner*, 157 F.3d 231 (3d Cir. 1998) . . . . . . . . . . . . . . . . . . . *passim*

*ASA Investerings Partnership v. Commissioner*, 201 F.3d 505 (D.C. Cir. 2000) . . . . . . . . . . . 113

*Aderholt Specialty Co. v. Commissioner*, 50 T.C.M. (CCH) 1101, T.C. Memo (P-H) 1985-491 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 96

*Alstores Realty Co. v. Commissioner*, 46 T.C. 363 (1966) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 98

*American Electric Power Co., Inc. v. United States*, 326 F.3d 737 (6th Cir. 2003) . . . . . . . . . 87

*American Electric Power Co., Inc. v. United States*, 136 F. Supp. 2d 762 (S.D. Ohio 2001) . . 130

*Ballagh v. United States*, 331 F.2d 874 (Ct. Cl. 1964) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 123

*Basic Inc. v. United States*, 549 F.2d 740 (Ct. Cl. 1977) . . . . . . . . . . . . . . . . . . . . . . . . . . 122-123

*BB&T Corp. v. United States*, 2007 WL 37798 *7-8 (M.D.N.C. 2007) . . . . . . . . . . . . . . . *passim*

*Benedict v. United States*, 881 F. Supp. 1532 (D. Utah 1995) . . . . . . . . . . . . . . . . . . . . . . . . . 99

*Big "D" Development Corp. v. Commissioner*, 30 T.C.M. (CCH) 646 (1971) . . . . . . . . . . . . 101

*Black & Decker Corp. v. United States*, 436 F.3d 431 (4th Cir. 2006) . . . . . . . 109-110, 113, 118

*Blue Flame Gas Co. v. Commissioner*, 54 T.C. 584 (1970) . . . . . . . . . . . . . . . . . . . . . . . . . . 101

*Bridges v. Commissioner*, 39 T.C. 1064 (1963) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 105, 107

*Bussing v. Commissioner* 88 T.C. 449 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 103

*In re CM Holdings, Inc.*, 301 F.3d 96 (3d Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 110, 113

*Casebeer v. Commissioner*, 909 F.2d 1360 (9th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . 108

*Coleman v. Commissioner*, 16 F.3d 821 (7th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 90

*Coltec Industries, Inc. v. United States*, 454 F.3d 1340 (Fed. Cir. 2006) . . . . . . . . . . . . . . *passim*

*Commissioner v. Court Holding Co.*, 324 U.S. 331 (1945) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 108

*Commissioner v. Duberstein*, 363 U.S. 278 (1960) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 88

*Commissioner v. Indianapolis Power & Light Co.*, 493 U.S. 203 (1990) . . . . . . . . . . . . . . . . . 100

*Commissioner v. Tower*, 327 U.S. 280 (1946) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 88

*Compaq Computer Corp. v. Commissioner*, 277 F.3d 778 (5th Cir. 2001) . . . . . . . . . . . . . . . . . 87

*Deputy v. Du Pont*, 308 U.S. 488 (1940) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 105

*Dow Chemical Co. v. United States*, 435 F.3d 594 (6th Cir. 2006) . . . . . . . . . . . 87, 110, 118-119

*Estate of Thomas v. Commissioner*, 84 T.C. 412 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . 91, 93

*Felcyn v. United States*, 691 F. Supp. 205 (C.D. Cal.1988) . . . . . . . . . . . . . . . . . . . . . . . . . . 107

*Frank Lyon Co. v. United States*, 435 U.S. 561 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Gilman v. Commissioner*, 933 F.2d 143 (2d Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . 113, 118

*Goldberg v. United States*, 789 F.2d 1341, 1343 (9th Cir. 1986) . . . . . . . . . . . . . . . . . . . 108-109

*Greenfield v. Commissioner*, 44 T.C.M. (CCH) 1487 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . 101

*Gregory v. Helvering*, 293 U.S. 465 (1935) . . . . . . . . . . . . . . . . . . . . . . . . . . 87, 108-109, 123

*Grodt & McKay Realty, Inc. v. Commissioner*, 77 T.C. 1221 (1981) . . . . . . . . . . . . . . . . . . . . . 88

*H.J. Heinz Co. & Subsidiaries v. United States*, 76 Fed. Cl. 570 (Fed. Cl. 2007) . . . . . . . *passim*

*Helvering v. F. & R. Lazarus & Co.*, 308 U.S. 252 (1939) . . . . . . . . . . . . . . . . . . . . . . . . . . . 100

*Helvering v. Gowran*, 302 U.S. 238 (1937) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 87

*IES Industries, Inc. v. United States*, 253 F.3d 350 (8th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . 113

*INDOPCO, Inc. v. Comm'r*, 503 U.S. 79, 84 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 87

*International Paper Co. v. United States*, 33 Fed. Cl. 384 (Ct. Cl. 1995) . . . . . . . . . . . . . . . . . 104

*J. B. N. Telephone Co., Inc. v. United States*, 638 F.2d 227 (10th Cir. 1981) . . . . . . . . . . . . . . . 87

*Jade Trading v. United States*, 80 Fed. Cl. 11 (2007) . . . . . . . . . . . . . . . . . . . . . 87, 110, 113, 118

*James v. Commissioner*, 899 F.2d 905 (10th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . 110, 124

*Keener v. United States*, 76 Fed. Cl. 455 (Fed. Cl. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . 109

*Kirchman v. Commissioner*, 862 F.2d 1486 (11th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . 109

*Knetsch v. United States*, 364 U.S. 361 (1960) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 105, 113, 118

*Kruesel v. United States*, 63-2 U.S. Tax Cas. (CCH) ¶ 9714, 12 A.F.T.R.2d (RIA) ¶ 5701 (D. Minn. 1963) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 98

*Kuper v. Commissioner*, 533 F.2d 152 (5th Cir. 1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 123

*Kwiat v. Commissioner*, 64 T.C.M. (CCH) 327, T.C. Memo (RIA) 1992-433 (1992) . 95-96, 100

*Lerman v. Commissioner*, 939 F.2d 44 (3d Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . 109, 113

*Long Term Capital Holdings v. United States*, 330 F. Supp. 2d 122 (D. Conn 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 113-114, 123

*McCulley Ashlock v. Commissioner*, 18 T.C. 405 (1952) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 98

*N. Pacific Railway Co. v. United States*, 378 F.2d 686 (Ct. Cl. 1967) . . . . . . . . . . . . . . . . . . . 123

*National Starch & Chemical Corp. v. Commissioner*, 918 F.2d 426 (3rd Cir.1990) . . . . . . . . 109

*Neb. Department of Revenue v. Loewenstein*, 513 U.S. 123 (1994) . . . . . . . . . . . . . . . . . . 88, 89

*Newman v. Commissioner*, 902 F.2d 159 (2d Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 87

*Nicole Rose Corp. v. Commissioner*, 320 F.3d 282 (2d Cir. 2003) . . . . . . . . . . . . . . . . . . 108, 123

*Old Colony R. Co. v. Commissioner*, 284 U.S. 552 (1932) . . . . . . . . . . . . . . . . . . . . . . . . . . . 105

*PACCAR, Inc. v. Commissioner*, 85 T.C. 754 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 96, 104

*Rexnord, Inc. v. United States*, 940 F.2d 1094 (7th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . 96

*Rice's Toyota World, Inc. v. Commissioner*, 752 F.2d 89 (4th Cir. 1985) . . . . . . . . . 109-110, 113

*Rickey v. Commissioner*, 502 F.2d 748 (9th Cir. 1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 101

*Rogers v. United States*, 281 F.3d 1108 (10th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 101

*Rothschild v. United States*, 407 F.2d 404 (Ct. Cl. 1969) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 87

*Sacks v. Commissioner*, 69 F.3d 982 (9th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 87

*Saviano v. Commissioner*, 765 F.2d 643 (7th Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 109

*Swift Dodge v. Commissioner*, 692 F.2d 651 (9th Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . 91

*TIFD III-E , Inc. v. United States*, 459 F.3d 220 (2d Cir. 2006) . . . . . . . . . . . . . . . . . . 94-95, 104

*United Parcel Service of America, Inc. v. Commissioner*, 254 F.3d 1014 (11th Cir. 2001) . . 110

*United States v. Ingalls*, 399 F.2d 143 (5th Cir. 1968) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 101

*Volvo Cars of N.A., Inc. v. United States*, 92-2 U.S. Tax Cas. (CCH) ¶ 50,705 . . . . . . . . . . . . . 96

*Waterman S.S. Corp. v. Commissioner*, 430 F.2d 1185 (5th Cir. 1970) . . . . . . . . . . . . . . . . . . 123

*Weller v. Commissioner*, 270 F.2d 294 (3d Cir. 1959) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 108

*Williams v. Commissioner*, 1 F.3d 502 (7th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 98-99

*Winn-Dixie Stores, Inc. v. Commissioner*, 113 T.C. 254 (1999) . . . . . . . . . . . . . . . . . . . . 130-31

**FEDERAL STATUTES AND REGULATORY MATERIAL**

Jobs and Growth and Relief Reconciliation Act of 2003 (P.L. 108-27) at § 302 . . . . . . . . . . . . . 8

64 Fed. Reg. 26845 (May 18, 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 81

Rev. Rul. 72-543, 1972-2 C.B. 87 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 96

Rev. Rul. 99-14, 1999-1 C.B. 835, modified & superseded by Rev. Rul. 2002-69, 2002-2 C.B. 760 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Rev. Rul. 2002-69, 2002-2 C.B. 760 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

**CONGRESSIONAL MATERIALS**

H.R. Rep. No. 108-755 at 660, 662-663 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

**06-305 T**
**(Judge Marian Blank Horn)**

---

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

---

**CONSOLIDATED EDISON COMPANY OF NEW YORK, INC. & SUBSIDIARIES**

**Plaintiff,**

**v.**

**THE UNITED STATES,**

**Defendant.**

---

**UNITED STATES' OPENING POST-TRIAL BRIEF**

---

## INTRODUCTION

This case concerns whether Plaintiff is entitled to certain tax deductions in connection with the participation of its subsidiary, Consolidated Edison Development ("CED"), in a lease-in, lease-out (LILO) tax shelter. Plaintiff, a United States taxpayer, through a CED, purported to simultaneously lease a minority interest in a power facility, the RoCa3 Facility, from its owner, N.V. Electriciteitsbedrifj Zuid-Holland ("EZH"), under a head lease and lease the property back to EZH under a sublease. After the close of the transaction, EZH (or its successors) continued to operate the RoCa3 Facility and retained all of the benefits and burdens associated with the facility's use and ownership. Nevertheless, on its federal income tax return, Plaintiff reported

rental income and far greater tax deductions for purported rent, interest, and amortized transaction costs in connection with the EZH LILO Transaction. The Internal Revenue Service disallowed the deductions and disregarded the claimed rental income. Plaintiff then paid the resulting deficiency, and filed this suit for a tax refund.[1]

The specific substantive issue raised in this refund suit is whether Plaintiff is entitled to deductions for rent, interest, and transaction costs it asserts were incurred in 1997 in connection with the EZH LILO Transaction. As discussed more fully below, Plaintiff's claimed tax deductions are improper for three reasons. First, looking at the EZH LILO Transaction as a whole reveals that Plaintiff did not, in substance, acquire a present leasehold interest in the RoCa3 Facility. Second, Plaintiff did not incur genuine indebtedness in connection with the deal. Third, and alternatively, the Transaction should be disregarded under the economic substance doctrine. Plaintiff bears the burden of proof on all these issues.

The general structure of the transaction is as follows: The EZH LILO Transaction was carried out by a series of agreements, whereby a trust acting for CED (a subsidiary of Plaintiff) purported to lease a minority interest in the RoCa3 Facility, located in the Netherlands, from a foreign power company, EZH, for a period of 43.2 years, and simultaneously purported to sublease it back to EZH for a period of 20.1 years. (Joint Stipulation of Fact (hereinafter "Stip.") ¶¶ 104, 113, 135). After the papers were executed, EZH continues to operate and maintain the RoCa3 Facility, just as it did prior to entering into the Transaction. (Tr. 1343 (Holzman)).

---

[1]The amount directly at issue in this case is the tax impact of the LILO shelter for only two weeks – $328,066. The real amount is far greater. The shelter is expected to last twenty years and the amounts of tax benefits claimed in subsequent years are and will be very substantial.

CED partially financed its purported upfront rental payment in the EZH LILO Transaction through a purported non-recourse loan of $81 million from a foreign bank, Hollandsche Bank-Unie N.V. ("HBU"), a subsidiary of ABN-AMRO Bank N.V. ("ABN AMRO"). (Stip. ¶¶ 117, 131). Nevertheless, the entirety of the purported non-recourse loan never left the ABN AMRO corporate umbrella, as the proceeds were first placed in an account at ABN AMRO and, after a series of successive, circular transfers, were simply used by ABN AMRO to pay down the purported non-recourse loan provided by its corporate subsidiary, HBU. (Stip. ¶¶ 126, 127, 187, 189, 198, 199). Payments from the funds in the ABN AMRO account (which served as the Debt Defeasance Account and bore the same interest rate as the purported non-recourse loan) matched exactly the scheduled repayment of the purported non-recourse loan, and thus were designed to be sufficient to satisfy all of CED's payments on the purported non-recourse loan. (Stip. ¶¶ 118, 188, 199; Tr. 1272 (Holzman)). In other words, CED simply received the funds from HBU and caused them to be transferred them right back to HBU's parent company, who agreed to use those same funds to pay back the purported loan by HBU.

The remainder of CED's supposed initial rent payment was funded by a $39 million purported equity investment, but EZH was required to use approximately $31 million of that sum to purchase zero risk U.S. Treasury STRIPS with a predetermined maturation amount that matched CED's entire expected return from the transaction. (Stip. ¶¶ 208-210; Tr. 2174-75 (DePlautt); Tr. 3738-39, 3875-76 (Bent); DX 20194, Bates 25120). These Treasury STRIPS were placed in an investment account (which served as the Equity Defeasance Account) (Stip. ¶ 213), pledged to Plaintiff (and expressly not pledged to the lending institutions involved in the transaction), and could not be withdrawn by EZH. (Stip. ¶¶ 218, 219; Tr. 1447 (Holzman)).

EZH also allocated approximately $1.4 million of the equity investment to purchase a standby letter of credit to virtually eliminate any risk to CED of recovering its investment and expected return. (JX 330, Bates 7110 (report from pricing run reflecting letter of credit allocation); DX 20193, Bates 25093). EZH retained the remaining approximately $6 million of the equity investment as its fee for participating in the transaction. (Tr. 3706, 3718-19 (Bent); DX 20193, Bates 25087[2]).

At the end of the initial 20 year term, the operative documents provided that EZH had the option, the Sublease Purchase Option, to terminate the entire transaction for a preset purchase price, which price would be satisfied by the maturity value of the Treasury STRIPS and the remaining funds in the Debt Defeasance Account. (Stip. ¶¶ 165, 235; DX 20035, Bates 21361; DX 20195, Bates 25190). In other words, EZH could end the Transaction without cost by electing to have ABN AMRO credit to HBU the remainder of the funds securing the non-recourse loan, and transfer back to CED the Treasury STRIPS purchased with CED's equity investment at the beginning of the transaction. EZH would keep its fee and CED would have

[2]As explained in Stipulation ¶¶ 208 and 209 n.9, the final pricing run (conducted after the close of the transaction and never changed by Cornerstone (CED's advisor) to match the amount identified on JX 372) reflects that the amount used to purchase the Treasury STRIPS is $30,083,052.77; JX 372 indicates the amount used to purchase the Treasury STRIPS was $31,252,643.73. The difference in these amounts accounts for the difference in the projection of the Government's expert in equipment lease transactions (including the structuring, arranging and negotiation of those transactions), Mr. Paul Bent, of a $7.5 million fee to EZH at closing (DX 20193, Bates 25093), versus the approximately $6 million fee listed above. (Tr. 3707 (Bent)). In any event, the difference does not impact the mechanics of the Transaction, except to the extent it results in the computation of a different fee to EZH. With respect to the designation of expertise sought for Mr. Bent, as well as the other experts proffered by Defendant in this case (Drs. LaRue (Tr. 5045-46 (LaRue)) and Thomas (Tr. 4473-74 (Thomas)) and Mr. Ray (Tr. 4707 (Ray)), the Government sought these designations from the Court because of the nature of the assignment each expert was given in relation to this case. (Tr. 5373-74).

claimed tax deductions, without other real economic effect. (Tr. 3720-23 (Bent); DX 20194, Bates 25142). At least for the first 20 years, CED's return from this transaction was essentially the result of an investment in U.S. Treasury STRIPS (wrapped in the complicated artifice of a purported lease transaction) and its tax deductions. (Tr. 3738 (Bent)). The investment in Treasury STRIPS is something that CED could have done on its own, without sinking millions in transaction costs (Stip. ¶ 106; JX 508; JX 890; JX 892; JX 934; JX 1109, Bates 16272) to generate tax benefits by creating the appearance of a lease transaction. Further, CED's return from the EZH LILO Transaction is essentially riskless. (*See* DX 20193, Bates 25061 (noting that the defeasance mechanisms employed in the EZH LILO Transaction virtually assured CED's return from the transaction); JX 388, Bates 8021 (noting transaction is "fully defeased"); JX 397, Bates 8123 (noting that EZH's obligations to CED are fully secured by the U.S. Treasury STRIPS and letter of credit) and Bates 8124 (noting that in the event of default by EZH, CED can simply draw on the U.S. Treasury STRIPS and letter of credit to obtain its expected return); Tr. 3736-37, 3807 (Bent)).

The EZH LILO Transaction is structured for tax purposes to appear that EZH would not necessarily exercise the Sublease Purchase Option at year 20 and end the Transaction.[3] (*See* Tr. 1978 (Muoio) (noting that the purchase option price was set above fair market value for tax purposes); JX 329, Bates 7065 (Shearman & Sterling letter discussing requirement that the purchase option price must be set above market value)). Thus, the transaction documents provided that in the event EZH did not exercise the Sublease Purchase Option, subject to certain

---

[3]A tax indemnity agreement entered into by EZH specifically prohibited a formal agreement or arrangement whereby EZH would be required to exercise the Sublease Purchase Option. (Stip. ¶ 280-281; JX 9, Bates 676-77).

prerequisites, CED had the right to require EZH to renew the sublease for another 16.5 years ("the Sublease Renewal Option"), or to require EZH to return the undivided lease interest to Plaintiff for the duration of the lease term ("the Retention Option"). (Stip. ¶ 169).

Even assuming that EZH does not exercise the Sublease Purchase Option, CED's total return on its investment would be assured because it could exercise its renewal option, and EZH would be required to reinvest the money arising from the maturation of the original Treasury STRIPS in a similar investment vehicle that would have a maturity date towards the end of the lease term, simply deferring the riskless return for CED until the end of the 44 year lease term. (JX 397, Bates 8121 ("If the utility did not purchase the plant at year 20 the trust [for the benefit CED] would have the option to . . . require the utility to re-lease the plant for an additional 17 years at prices that would assure CED of its expected return."); JX 390 ("In either case [comparing EZH's exercise of the Sublease Purchase Option and CED's exercise of the renewal option], CED will receive sufficient funds from the EZH Sub-lessee (as rent and/or proceeds from the sale of the head lease pursuant to the [Sublease Purchase Option]) to pay-off the third party loans, recover its equity investment, and earn a return.")). While Plaintiff will claim that in such a situation it will be responsible for making a large back end rental payment in year 44, in fact, such a payment is non-recourse to Plaintiff and is made up of a series of offsets that require no additional deposit of funds and is entirely funded by Plaintiff's original equity. (Tr. 3744-47, 3920-21 (Bent); Tr. 1292-95 (Holzman); Tr. 5064-65 (LaRue); JX 130, Bates 3160; JX 555, bates 9961; DX 20193, Bates 25072-73; DX 20199, Bates 25337, n.22). Alternatively, as will be demonstrated below, the EZH LILO Transaction was entered into with the expectation and understanding that EZH would, in fact, exercise the Sublease Purchase Option and terminate the

transaction during year 20, never reaching this back end payment. (*See* JX 1142, Bates 16776; JX 390[4], Bates 8029 (noting that it is questionable that this back end payment will ever be made)).

**PROCEDURAL BACKGROUND**

On its consolidated U.S. Corporate Income Tax Return (Form 1120) for taxable year 1997, Plaintiff reported rent income received in the EZH LILO Transaction and it deducted rent, amortized transaction costs, and interest expense resulting from the Transaction. Specifically, Plaintiff reported amounts characterized as rental income ($399,693) and deducted amounts characterized as rental expenses ($1,072,652), amortization of transaction costs ($9,698), and interest expenses ($254,954) related to a purported property interest and indebtedness incurred in connection with the EZH LILO Transaction, for a net loss of $937,331. (Stip. ¶¶ 299-300). Upon audit of Plaintiff's 1997 federal income tax return, the Internal Revenue Service ("Service") disregarded the income, and disallowed the deductions, reported by Plaintiff from the EZH LILO Transaction. The Service's proposed adjustments in connection with the EZH LILO Transaction resulted in an increase of $937,331 in Plaintiff's taxable income for 1997. As a result of its proposed adjustments, the Service assessed against Plaintiff a deficiency for 1997 in the amount of $328,066. Plaintiff paid this amount and filed a claim for refund (Form 1120X) with the Service on December 2, 2005. The Service denied the claim, and on April 19, 2006, Plaintiff filed the instant suit seeking a refund of the amount of the deficiency. (Stip. ¶¶ 297-306).

[4]JX 1235 is identical to JX 390.

# FACTUAL STATEMENT

## I. REGULATORY AND STATUTORY BACKGROUND

This case concerns the propriety of certain tax deductions that Plaintiff claimed as a result of its participation in a LILO tax shelter. In 1999, the Service advised taxpayers that it would disallow under the economic-substance doctrine the rent and interest-expense deductions claimed in LILOs. Rev. Rul. 99-14, 1999-1 C.B. 835, modified and superseded by Rev. Rul. 2002-69, 2002-2 C.B. 760. The Service later ruled that it also would deny those tax benefits under the substance-over-form doctrine. Rev. Rul. 2002-69, 2002-2 C.B. 760.[5]

Because Congress considered LILOs and related abusive shelters to be a widespread problem, it amended the Code in 2004 to prophylactically eliminate them by statute, leaving to the Service the responsibility to challenge such transactions (using common-law doctrines) entered into prior to the law's effective date. Jobs and Growth and Relief Reconciliation Act of 2003 (P.L. 108-27) at § 302. As the legislative history to those amendments provides, the amendments were "not intended to affect the scope of any other present-law tax rules or doctrines applicable to purported leasing transactions," and "[n]o inference is intended regarding the appropriate present-law tax treatment of transactions entered into prior to the effective date." H.R. Rep. No. 108-755 at 660, 662-663 (2004).

---

[5]As a practical matter, taxpayers (including Plaintiff (Tr. 2035-36 (Muoio))) stopped engaging in LILOs after May 1999, when the Service adopted final Section 467 Treasury Regulations, which treat rent prepayments as loans and eliminate the tax benefits sought by parties entering into LILO Transactions. *See* 64 Fed. Reg. 26845 (May 18, 1999).

## II. DETAILED STRUCTURE OF THE EZH LILO TRANSACTION

EZH and CED (through a wholly owned subsidiary, Consolidated Edison Leasing ("CEL"), by way of a trust[6]) implemented the EZH LILO Transaction by executing a series of interrelated agreements. (Stip. ¶ 104). Under these agreements, EZH purported to lease a 47.47% interest in the RoCa3 Facility to CED for 43.2 years (i.e., from December 15, 1997 through February 24, 2041). (Stip. ¶ 113). CED simultaneously subleased its interest in the RoCa3 Facility back to EZH for 20.1 years (the "Sublease Basic Term"). (Stip. ¶ 135). At the end of the Sublease Basic Term (i.e., January 2, 2018), EZH can exercise the (prefunded by CED) Sublease Purchase Option to purchase CED's leasehold interest. (Stip. ¶ 165; Tr. 1326-29 (Holzman); Tr. 3047 (Mintun) (noting that one of the purposes of the defeasance accounts was to provide sufficient funds for EZH to exercise the Sublease Purchase Option); Tr. 3720-22 (Bent); JX 329, Bates 7063; JX 766, Bates 12462; DX 20193, Bates 25081-82; DX 20202, Bates 25384). If EZH does not exercise its prefunded Sublease Purchase Option, CED can, subject to fulfilling certain requirements, exercise the Sublease Renewal Option, renewing EZH's sublease until 2034 (the "Sublease Renewal Term") (Stip. ¶¶ 136, 169-78) or exercise the Retention Option, electing to have EZH return its 47.47% interest in the sublease to CED for the remainder of the lease term (i.e, through 2041). (Stip. ¶¶ 179-80).

---

[6]For ease of reference this brief will treat CED as the party to the transaction unless the need to distinguish the trust and/or CEL arises in a specific instance.

To this day, EZH[7] owns and operates the RoCa3 Facility as if the LILO Transaction never occurred.[8] As was the case prior to the Transaction, EZH has maintained possession of the RoCa3 Facility, continues to operate the facility in the normal course of its energy generation business, invests in major capital improvements to the RoCa3 Facility, remains responsible for all costs associated with its use and maintenance, and retains all of the income generated from the operation of the RoCa3 Facility. (Stip. ¶ 137; *see* Tr. 1343 (Holzman); JX 352, Bates 7476 (noting that the successor to EZH has worked very aggressively to improve efficiency and productivity); JX 369 and JX 876, Bates 13723 (installation of remote control systems in the Control Room); JX 370 (RoCa3 upgrade to GT brushseals)). Conversely, as long as EZH's sublease rent is "paid," CED cannot use or possess its leasehold interest in the RoCa3 Facility until 2018, and then only if EZH abandons its Sublease Purchase Option and CED complies with

---

[7]In or about January 2000, EZH, through a series of mergers and stock purchases, became E.On Benelux Generation n.v., a subsidiary of E.On Energie A.G. a German energy company. (Stip. ¶¶ 69-72; JX 292; JX 293; JX 294; JX 295). However, for ease of reference, EZH and its successor entities will be referred to as EZH throughout the brief unless it is necessary to refer to the successor entity by its specific name.

[8]In an effort to claim EZH undertook significant obligations by entering into the EZH LILO Transaction, Plaintiff will likely claim that EZH is under various requirements to maintain the RoCa3 Facility in a certain manner, provide yearly officer's certificates concerning its operations, maintain other logs and reports in its business, and maintain insurance on the facility. However, a close look at these requirements reveals that they effectively impose no greater burden on EZH than it has as an owner. For example, EZH must only maintain insurance of the same type it maintains on other facilities it operates. (JX 4, Bates 417). Similarly, EZH is required to use the same maintenance practices it uses at its other facilities. (JX 4, Bates 399). Further, many of the requirements concerning maintaining of reports only apply if EZH is already maintaining such reports. (JX 4, Bates 404; Stip. ¶ 148). Finally, the annual officer's certificate (*see* JX 367) is essentially a one page document with minimal information, attaching EZH's annual report created for shareholders – a *de minimis* undertaking that is simply insufficient to justify Plaintiff's assertions. Simply put, EZH undertook essentially no responsibilities greater than it already held as owner of the RoCa3 Facility. (*See* DX 20193, Bates 25087).

all of the requirements to exercise the Retention Option. (Stip. ¶ 180; Tr. 559-62 (Burke)). Further, CED cannot actually use or possess the RoCa3 Facility itself, because it possesses only a 47.47% leasehold interest, and the remainder of the facility (the majority share) is subject to a LILO transaction with Banc One Leasing Corp. (Stip. ¶ 58 n.2; JX 402, Bates 8143; Tr. 2867 (Mintun)). Because of the operation of the “Control Documents,” which set forth the rules in the event EZH does not exercise its prefunded Sublease Purchase Option, CED, as minority leaseholder, has no power to insert itself as the operator of the RoCa3 Facility even if, for the sake of argument, EZH chose not to exercise its prefunded Sublease Purchase Option.[9] (Stip. ¶¶ 266-68; JX 11, Bates 737; *see also* Tr. 3980 (Bent)).

**A. Transaction cash flows**

1. <u>Lease Rent</u>

The Lease Agreement required CED to pay rent to EZH in two installments: $120.1 million advance rent due (the “Initial Basic Rent Payment”) on the closing date, and $831.5 million deferred rent, theoretically due in 2041. (Stip. ¶ 116) For tax purposes, the $120.1 million advance rent was allocated to the first five years of the lease term, and the deferred $831.5 million rental payment was allocated to the remaining years of the transaction on an undiscounted basis, serving as the basis for Plaintiff’s claimed rental deductions in each of the

---

[9]Thus, CED’s use of its leasehold interest in the case of exercise of the Retention Option would be limited to obtaining its share of the output of the RoCa3 Facility (offset by its paying its share of the operation and maintenance expenses associated therewith) (Tr. 2250 (DePlautt); *see* Tr. 1393 (Holzman)), with the specifics of these future contingencies remaining undefined in large part. (*See* JX 11, Bates 738, 747). Further, as explained by Defendant’s expert, Mr. Bent, the combination of the Access Agreement and the Control Documents implies that CED can only require EZH to wheel an amount energy from the facility for which it already has an agreement in place to sell. (Tr. 3932-35 (Bent)).

respective years. (Stip. ¶ 120; *see* Tr. 1360-64 (Holzman)). As shown below, CED's obligation to make the $831.5 million payment in 2041 is eliminated or offset by other rights and obligations under the operative documents, and CED will not be required to make any further investment in the transaction beyond its initial equity investment. (*See infra* at 39-40; DX 20193, Bates 25071-73). CED paid the $120.1 million Initial Basic Rent Payment with an $80,792,270.36 non-recourse loan from HBU (the "Lender's Commitment"), and $39,320,000.00 of its own money (the "Investor's Commitment").[10] (Stip. ¶ 117). HBU is a wholly-owned subsidiary of ABN AMRO. (Stip. ¶ 131; JX 401; Tr. 1272 (Holzman)). Although the loan agreement is nominally between Wilmington Trust Company ("WTC" as trustee for CED) and HBU, the funds for the loan were furnished by ABN AMRO. (Stip. ¶ 126 (noting that the "lender's commitment" was located in an account at ABN AMRO)). ABN AMRO recognized this when early discussions concerning provision of the loan for the transaction were underway with EZH: "Thank you for inviting ABN AMRO Bank N.V. ('ABN AMRO') to act as *lender and defeasance bank* in a U.S. Lease Transaction . . . ." (JX 401 (emphasis added); Tr. 1273 (Holzman) (noting that he assumed Capstar, EZH's advisor, arranged for this)). Tellingly, it was ABN AMRO that was paid the fee for the loan provided by HBU. (Stip. ¶ 129; JX 43).

The EZH LILO Transaction is structured so that the loan proceeds remain with ABN AMRO. (Stip. ¶¶ 126-128, DX 20194, Bates 25129-31). The parties to this transaction refer to the "loan" involved in this case as "loop debt" in an apparent reference to the circular nature of

---

[10]The source of this $39,000,000.00 was actually Consolidated Edison Company of New York ("CECONY"). (Stip. ¶¶ 122-123).

the movement of the funds through the ABN AMRO banking family with practically no risk to the financial entity. (*See* JX 401 (ABN AMRO memorandum noting that the loan would be structured in such a way that it would be accredited a 0% risk weighting for ABN AMRO's purposes); JX 943 (fax from Shearman & Sterling, counsel for CED, describing the transaction)).[11]

On the closing date, payments due under the various agreements were effected through a series of ownership transfers of two accounts, the WTC Account and the ABN AMRO Account. As explained in more detail below, the WTC Account is the source of funds used to obtain the Treasury STRIPS placed in the Equity Defeasance Account, and the ABN AMRO Account eventually becomes the Debt Defeasance Account. A subsidiary of CED, Consolidated Edison Leasing, transferred the Investor's Commitment to the WTC Account and then transferred its rights in the account to WTC as trustee, essentially for the benefit of CED. (Stip. ¶¶ 124, 125; JX 43). The funds for the Lender's Commitment came from an ABN AMRO Account. (Stip. ¶ 126). HBU transferred its rights to the ABN AMRO account to CED (by way of the trust). (Stip. ¶ 126). Through the trust, CED then transferred its rights to these two accounts to EZH. (Stip. ¶ 128).

EZH, pursuant to the Rotte Agreement (JX 23, Bates 1067) and the Sublease Deposit, Pledge and Repledge Agreement (JX 24, Bates 1106), then in turn irrevocably transferred its rights to the ABN AMRO Account to the Rotte Foundation (JX 43, Bates 1444), a foundation

[11]Because of the lack of risk associated with the loan and the fact that ABN AMRO treated the loan as if it stood on both sides of the deal, the representations in section 10(c) of the Participation Agreement (JX 1, Bates 42) lack any real meaning, notwithstanding that Plaintiff will refer to them in an effort to show the debt is bona fide.

(i.e., trust) formed by EZH to insulate the funds deposited therein from bankruptcy. (Stip. ¶ 187; Tr. 1268 (Holzman) (noting that EZH could not remove the funds from this account)). The Rotte Foundation granted a first priority security interest in the ABN AMRO Account CED (through the trust) (Stip. ¶ 193; JX 24), and subsequently the Rotte Foundation then transferred its rights to the ABN AMRO Account to ABN AMRO. (Stip. ¶ 189; JX 43). The interest rate on the funds in the ABN AMRO Account (also referred to as the Sublease Deposit) was 7.10% compounded annually (Stip. ¶ 188), the same interest rate HBU charged on its loan to CED, using these very funds. (Stip. ¶ 118; Tr. 1272 (Holzman)). Because of these identical interest rates and because the funds in the ABN AMRO Account were only used to pay down the HBU Loan, the amount remaining in the ABN AMRO Account at any point in time would be equal to the outstanding payment owed on the HBU Loan. (Stip. ¶ 199). As the funds in the ABN AMRO Account were credited to HBU as "payments" on the HBU Loan, the loop was completed – all without the funds ever leaving ABN AMRO (other than the split second transfers of ownership of the ABN AMRO Account that occurred at closing). (*See* DX 20194, Bates 25130-31).

At the same time, pursuant to the IJssell Agreement (JX 19, Bates 972), in conjunction with the Sublessee Pledge and Security Agreement (JX 20, Bates 994), and the Custody Agreement (JX 22, Bates 1041), EZH transferred to the IJssell Foundation (another trust) approximately $31 million (from CED's equity investment) to be held in a Custodial Account by Credit Suisse as custodian (which served as the Equity Defeasance Account). (Stip. ¶¶ 208-209; Tr. 3702 (Bent); DX 20194, Bates 25120). Pursuant to the Custody Agreement, Credit Suisse was required to immediately purchase Treasury STRIPS in amounts and with maturity dates

sufficient to meet EZH's obligations under the operative documents (which in turn would provide CED's expected return from the transaction (Tr. 2174-75 (DePlautt); Tr. 3738-39 (Bent)) and place them in the Custody/Equity Defeasance Account.[12] (Stip. ¶¶ 208, 210-213; DX 20194, Bates 25120). The Equity Defeasance Account was pledged to CED (and expressly not pledged to the lending institutions involved in the transaction) (Stip. ¶¶ 218, 219, 225; JX 1, Bates 126-129; JX 7, Bates 615; JX 20, Bates 994), and could not be withdrawn by the IJssell Foundation prior to satisfying its obligations under the operative documents.[13] (JX 19, Bates 973; Tr. 2705 (Reed)).

Only after the transfers identified above were completed, did EZH receive the remaining amounts in the WTC Account, which after allocating approximately $1.4 million dollars as the present value estimate for purchase of the required standby letters of credit (JX 330, Bates 7099-7100 (showing undiscounted letter of credit fee estimates), Bates 7110 (report from pricing run reflecting letter of credit allocation); JX 332, Bates 7196 (same); DX 20193, Bates 25093; DX 20194, Bates 25128), left approximately $6 million, which is referred to by the parties to the deal as the NPV (net present value) benefit to EZH and is driven by CED's tax benefits (Tr. 2971-73 (Mintun)). As described next, the cash flows were carefully structured so that CED was guaranteed the ability to repay the HBU loan through the Debt Defeasance Account and recoup its investment through the Equity Defeasance Account.[14]

---

[12]The account and the Treasury STRIPS located therein are also referred to as the IJssell Deposit. (Stip. ¶ 214).

[13]*See infra* at 19-23.

[14]Plaintiff argues that the rent from leverage leases is typically pledged to the lender to secure the outstanding debt payments so as to convince the Court that the payment arrangement between ABN and HBU is not in any way unusual. (*See*, *e.g.*, Tr. 1406-07 (Holzman)).

2. Debt Defeasance Account

Except for years 1997 through 2003 and part of 2004 (when no payments are due to be made), during the Sublease Basic Term, both CED's loan payments and EZH's rent payments (which are structured to offset each other, other than the inclusion of one free cash payment to CED[15]) are made out of the Debt Defeasance Account (i.e. the ABN AMRO Account). (Stip. ¶¶ 195-199; Tr. 1282-83 (Holzman)). As security for EZH's obligation to make its rent payments under the sublease, CED was granted a first priority security interest in the Debt Defeasance Account. (Stip. ¶ 193; Exhibit 24, Bates 1089-1091). CED then pledged that security interest to HBU as security for the debt service payments on the HBU loan. (Stip. ¶ 194; JX Exhibit 24, Bates 1086; Bates 1091). CED directed that all rental payments (coming from ABN AMRO

---

However, as Defendant's expert, Paul Bent, explained, while investors in traditional leverage lease transactions often structure the transaction such that the lessee's rental payments satisfy the outstanding debt, the funds in those instances come from the lessee's operation of the asset (or at least its operations generally), not from the funds fronted by the "loan" itself and put to the side in an account to make those payments. (*See* Tr. 3717-18 (Bent); *see also* JX 288, Bates 5637 (where management of EZH questions why the defeasance accounts must be established instead of allowing EZH unfettered use of the funds injected into the Transaction at closing)). Thus, Plaintiff's argument simply ignores what is different than a so-called "typical leverage lease" with respect to the loan repayment in the EZH LILO Transaction – the source of the funds used to satisfy the rental payments and HBU loan repayments. Even Ms. McCartney, chair of the board of CED, recognized the unique nature of the rental structure of the EZH LILO Transaction when she noted that (contrary to the structure of the actual Transaction) it would be "logical" that EZH's ability to make its rental payments would derive from its ability to generate revenues from the operation of the RoCa3 Facility. (Tr. 951 (McCartney)).

[15]In 2012 an additional $5,220,969.87 in "rent payment" is made by EZH directly to CED in the form of a free cash payment. (JX 330, Bates 7084; Tr. 1277-78 (Holzman); Tr. 3711 (Bent)). This payment is completely funded by the maturity of a Treasury STRIP from the Equity Defeasance Account as described in further detail *infra*, and is not a payment from EZH's own funds. (Tr. 1277-78 (Holzman)). This "free cash" payment is the first of the scheduled payments from the Equity Defeasance Account that provides CED with its cash return. (Tr. 3711 (Bent)).

under the Rotte Agreement) be made directly to HBU, thus satisfying CED's debt service obligations. (Stip. ¶ 194A; JX 4, Bates 389-390). Because the amount initially deposited in the Debt Defeasance Account was equal to the "loan" provided by HBU; the interest rate on the account was identical to the interest rate on the HBU loan; EZH's scheduled rent payments (other than the free cash portions) under the Sublease Agreement equaled, in both timing and amount, CED's scheduled debt payments to HBU; and the periodic transfers of funds from ABN AMRO, which when made satisfied both EZH's rental obligations as well as CED's debt service obligations, the remaining balance in the Debt Defeasance Account would always be sufficient to cover the remaining debt service on the HBU loan at any given time. (*See* DX 20194, Bates 25132 (chart setting forth a comparison of the HBU loan and the ABN AMRO Debt Defeasance Account).

The transfer from the Rotte Foundation to ABN AMRO was irrevocable. (JX 43, Bates 1432) Upon transfer, the funds in the Debt Defeasance Account became ABN AMRO's asset, pledged to HBU. (*Id.* (noting that the Rotte Foundation transferred to ABN AMRO all of its "rights, title and interest in and to, exclusive dominion and control over" the Debt Defeasance Account)). Neither EZH nor its creditors has any right to the money in the event of EZH's bankruptcy. (Stip. ¶ 190A; *see* Tr. 1268-69 (Holzman) (noting that EZH had no access to the funds in the Debt Defeasance Account)). Essentially, this circular financing arrangement from a defeased account ensures that the sublease rent and HBU loan are paid at no cost to either EZH or CED, and virtually eliminates any risk of loss on the Transaction (except tax risk). (DX 20194, Bates 25129-32, 25148, 25155-56; DX 20193, Bates 25061-64; Tr. 3736-44 (Bent); Tr. 5054-55 (LaRue)).

If EZH elects the Sublease Purchase Option, ABN AMRO will cause HBU to credit the remaining $123,615,472 in the Debt Defeasance Account on January 2, 2018 toward CED's obligations to HBU, also in the amount of $123,615,472. (Stip. ¶¶ 234, 236; JX 24; DX 20193, Bates 25081). Thus, if the Sublease Purchase Option is elected the HBU Loan will be paid in full without cost to CED. (Stip. ¶ 236).

In order to further reduce the already minimal risk that ABN AMRO would not make payment to HBU under the terms of the operative documents, the Transaction provided further steps to replace ABN AMRO as the debt defeasance holder with other more secure defeasance mechanisms. (JX 1, Bates 66-67, 113-14 ; Tr. 1329-30 (Holzman) (noting that there were steps in place in the transaction to mitigate any risk of ABN AMRO's default on its obligations)). Thus, the only way that the debt defeasance mechanism would not perform its designated function and a payment default would occur is if the parties to the transaction decided not to use the alternative debt defeasance mechanisms provided in the Transaction and ABN AMRO subsequently defaulted on its obligation to make the payments to its own subsidiary HBU. This is simply an unrealistic result. In any event, EZH also served as a backstop to these various defeasance protections. As Mr. Mintun of Capstar acknowledged, the only risk of non-payment would be a failure of the defeasance accounts – i.e., the failure of all available debt defeasance mechanisms (including ABN AMRO, an AA rated bank, and the permitted substitute defeasance mechanisms) and the failure of the United States government in the case of the equity defeasance–coupled with the inability of EZH to actually make payments from its own funds. (Tr. 3051 (Mintun)).

3. Equity Defeasance Account

As discussed above, like the HBU loan proceeds (which remain with HBU's parent, ABN AMRO), most of the equity portion of CED's advance rent (except the approximately $6 million paid to EZH as an accommodation fee and the portion allocated to purchase the letter of credit) was transferred to the IJssell Foundation and deposited with another highly accredited bank – Citibank – pursuant to the IJssell Agreement and the Custody Agreement with Credit Suisse to fund the equity portion of EZH's sublease rental payments. (Stip. ¶¶ 208-209; Tr. 1287-89 (Holzman)). Again, this account was specifically excluded as collateral for the HBU loan[16] and the IJssell Foundation granted CED a security interest in the Equity Defeasance Account superior to that of EZH. (Stip. ¶¶ 218 -219, 221-223; JX 20, Bates 995; JX 21, Bates 1029-30; Tr. 1447 (Holzman)). As consideration for the transfer of funds, the IJssell Foundation agreed to undertake certain Payment Obligations of EZH, including the obligations to make payment of any equity portion of sublease basic or renewal rent, the equity portion of the Sublease Purchase Option price, any termination payments, and any free cash[17] payments required to be made under the operative documents. (JX 19, Bates 971-73). The IJssell Foundation could not withdraw the

---

[16]This is an important distinction from a traditional leverage lease. Since CED's equity investment is not actually at risk of seizure by HBU, Plaintiff's LILO Transaction is unlike a traditional leverage lease described by Plaintiff's expert, Dr. Ellis, in which a substantial portion of the overall investment by an equity investor may be at risk in the event of a default. (PX 10073, Bates 19999, ¶ 38).

[17]CED defined "free cash payments" as rents in excess of debt service and other obligations of the trustee. (JX 1142, Bates 16777). The free cash payments derived from the Equity Defeasance Account are the source of CED's return from the transaction (other than the tax benefits at issue here). (Tr. 3711 (Bent); DX 20193, Bates 25084). These payments are sometimes referred to as Excluded Payments.

investments in the Equity Defeasance Account until ***all*** Payment Obligations are satisfied. (JX 19, Bates 971-73).

Pursuant to prearranged instructions in the Custody Agreement, Credit Suisse used approximately $21 million of CED's equity investment to purchase Treasury STRIPS that are scheduled to mature, with the exception of one set to mature in 2012,[18] at the end of the Sublease Basic Term. (Stip. ¶ 211). On January 2, 2012, one of the Treasury STRIPS in the Equity Defeasance Account is set to mature in the amount of $5,220,969.87. (Stip. ¶ 211-212). This date corresponds with the first equity portion of sublease basic rent (also in the amount of $5,220,969.87). (Tr. 1289-90 (Holzman); Tr. 3711 (Bent)). If, as understood by the parties to the transaction, in 2018 EZH elects to end the LILO Transaction by purchasing CED's interest under the lease, EZH can satisfy the equity portion of the purchase price (approximately $92 million), by looking to the IJssell Foundation and Credit Suisse to transfer the Treasury STRIPS (and the earnings thereon) to CED as a Payment Obligation under the IJssell Agreement.[19] (Stip. ¶¶ 231-235, 237; JX 19, Bates 971-73; DX 20193, Bates 25063-64, 25081; Tr. 3721-24 (Bent)).

---

[18]Again this particular Treasury STRIPS investment represents the source of funds for the "free cash" portion of EZH's rental payment in 2012. (Tr. 1278 (Holzman)).

[19]The Sublease states that EZH may use "readily available funds" (which would be equal to the value of the Treasury STRIPS) to satisfy this portion of the Sublease Purchase Option price; however, this option appears highly unlikely given that it would require several extra steps to essentially put EZH in the same position and results in no practicable effect or benefit to EZH because it would have to come up with the cash to pay the purchase price, only to then cash in the Treasury STRIPS to replace this exact amount of cash outlay. (*See* Tr. 1376 (Holzman) (noting that EZH could pay the amount from sources other than the Treasury STRIPS, but acknowledging that it would simply have to pay the exact same amount as the value of those maturing Treasury STRIPS)). In other words, it is a zero sum game, as EZH will be in the exact same position financially it was before it exercised the Sublease Purchase Option whichever method it chooses.

The remaining Treasury STRIPS investment in the account, with a maturity date of January 2, 2018 in an amount of $7,326,950.33, is used to pay Sublease Basic Rent that is due on that date (and is another "free cash payment" to CED). (Stip. ¶ 232).

If EZH does not exercise its Sublease Purchase Option, CED can extend EZH's sublease and thereby require EZH, through the IJssell Foundation, and pursuant to Section 3(c) of the IJssell Agreement, to transfer the funds generated by the Treasury STRIPS to successor equity defeasance accounts to be used to pay EZH's renewal sublease rent and other Payment Obligations, including the "Excluded Payments" / "Excluded Portions" due at the end of the lease term pursuant to the Sublessee Loan Agreement described herein.[20] (JX 19, Bates 971, 973; DX 20193, Bates 25084). In other words, Section 3(c) of the IJssell Agreement required the IJssell Foundation to reinvest immediately all proceeds of the Treasury STRIPS remaining in the Equity Defeasance Account upon maturity of the Treasury STRIPS to the extent those funds were not allocated to a current payable Payment Obligation, such that those funds would be available to satisfy any remaining Payment Obligations. (JX 19, Bates 973).

By way of example, in the event EZH did not exercise the Sublease Purchase Option, the funds from the four Treasury STRIPS remaining in the Equity Defeasance Account valued at $22,958,869.31 each (valued as of their respective maturity dates, April 15, June 15, September 15, and December 15, 2018) (Stip. ¶ 233) would be handled as follows: (1) The IJssell Foundation would be required to transfer to CED $37,525, 237.44 as an excluded payment under

[20]While the technical language used to describe "Excluded Payments" is quite cumbersome and difficult to follow (*see* JX 1, Bates 130, 137-38), the term includes the means by which CED obtains its return on its investment in the event EZH does not elect the Sublease Purchase Option. (DX 20193, Bates 25084, 25091-92).

the sublessee loan[21] (JX 44, Bates 1478 (schedule of payments, set forth as a percentage which would equal this amount on January 2, 2018); JX 330, Bates 7084); (2) CED would then use $34,036,691.62 of that amount to fund the Trustee Treasury Collateral Account pursuant to Section 11(a)(x)-(xi) of the Participation Agreement (JX 1, Bates 46; JX 330, Bates 7084; DX 20193, Bates 25072; DX 20194, Bates 25121); and (3) Because Payment Obligations remain during the remainder of the lease term (the remaining equity portions of the sublease renewal rents and Excluded Payments which are comprised of (the annual "free cash" payments made to CED under the sublessee loan in 2032-2036, and 2041 (Stip. ¶¶ 173, 182; JX 44, Bates 1478-79; JX 330, Bates 7084; DX 20193, Bates 25091-92; DX 20194, Bates 25126, 25137), the IJssell Foundation would then be required to establish a successor custody account much like the initial Equity Defeasance Account, using the remaining funds from these four maturing Treasury STRIPS and acquire government obligations with maturity dates corresponding to these Payment Obligations (JX 19, Bates 971-73; DX 20193, Bates 25084; DX 20194, Bates 25120, 25137). Thus, EZH could not simply take this money and do as it pleases with it as Payment Obligations

---

[21]As described in more detail *infra*, the Trustee Treasury Collateral serves to secure a portion of the Final Basic Rent Payment purportedly due from CED. (*See* DX 20193, Bates 25072).

still remained under the Transaction.[22] (*See* Tr. 3718-19 (Bent) (noting that EZH does not get any more money other than the fee it receives at closing)).

By placing its equity investment in a defeased account, CED was able to ensure that it could recoup its investment in the Transaction, no matter what happened at the end of EZH's sublease – i.e. its free cash payments would guarantee its returns, whether those payments came in the form of the sublease purchase price, or as scheduled payments under the sublessee loan, all funded from the Equity Defeasance Account. (*See* JX 379, Bates 7948 and JX 380, Bates 7956 ("Cash returns on a lease-leaseback are derived from a combination of the excess rental income over the cost of the projected debt service (the "free cash flow") and the tax benefits . . . ."); *see also* JX 1107, Bates 16256; Tr. 1335-36 (Holzman) (noting the special equity security arrangements in place to preserve the economic return to CED); Tr. 3875-76 (Bent) (noting that CED expected to derive its return from the Equity Defeasance Account at the end of the Transaction's term)). As CED emphasized in its evaluation of the LILO, CED's equity investment would be returned to CED through EZH's exercise of its Sublease Purchase Option or CED's exercise of its Sublease Renewal Option (if EZH forgoes its Sublease Purchase Option). (JX 397, Bates 8121 ("If the utility did not purchase the plant at year 20 the trust would have the option to . . . require the utility to re-lease the plant for an additional 17 years at prices

[22]Dr. Reed, one of Plaintiff's experts, who performed an analysis of whether one could say with virtual certainty whether the Sublease Purchase Option would be exercised, admittedly did not take into account what actually happened to the funds in the Equity Defeasance Account if EZH did not exercise the Sublease Purchase Option when making his determination. (Tr. 2705-06 (Reed)). He simply relied on representations from Plaintiff's counsel to the effect that at some point EZH could use the funds outside of the transaction if it did not exercise the Sublease Purchase Option, but had no real understanding of how or when that might actually occur. (Tr. 2703-04 (Reed)).

that would assure CED of its expected return.") and 8122 ("The transactions contemplated will be structured in such a way that CED will obtain the same yields and rates of return regardless of whether the utility exercises its purchase option at year 20 or is required to re-lease the plant for an additional 17 years.").

4. Sublessee Loan

As part of the EZH LILO Transaction, EZH and CED, through the trust, entered into a Sublessee Loan Agreement, pursuant to which CED was to lend to EZH funds equal in amount and timing to the first six sublease rental payments under the sublease agreement, as well as the portion of the seventh sublease rental payment not covered by the scheduled payment from the Debt Defeasance Account in 2004. (Stip. ¶¶ 261-63; JX 44; Tr. 1282-83 (Holzman)). The purpose of this sublessee loan was to provide additional benefit to EZH, although neither Mr. Holzman from Cornerstone (CED's advisor), Mr. DePlautt (the primary contact at CED on the transaction) nor Mr. Mintun (EZH's advisor) could explain exactly how.[23] (Tr. 2226 (DePlautt); Tr. 1279 (Holzman); Tr. 3044-45 (Mintun)). Essentially, as explained in connection with CED's consideration of the EZH LILO Transactions, the Sublessee Loan worked as follows: Any annual sublease rental payments due but not paid from the Debt Defeasance Account were treated as deferred rents, and were treated as a sublessee loan. (JX 396, Bates 8115; JX 722, Bates 12246; *see also* Tr. 1282 (Holzman)). The Sublessee Loan Agreement set forth an interest

---

[23]Joint Exhibit 396 implies that the Sublessee Loan can be used in a transaction to maintain the yield to CED in the event of a change in interest rates prior to the close of the Transaction. (JX 396, Bates 8115). The sublessee loan portion of the Final Basic Rent Payment takes the place of a portion of the Lease Collateral Account portion of the final payment. (*Id.*). The confusion regarding the purpose of this aspect of the EZH LILO Transaction can be seen in Arthur Andersen's conflicting accounting treatments recommended for the sublessee loan. (*Compare* JX 555, Bates 9962 *with*, JX 1049, Bates 16270).

rate of 7.43% per annum for the amounts "borrowed" from CED by EZH pursuant to that agreement. (Stip. ¶ 261; JX 44). EZH could not prepay the sublessee loan (Stip. ¶ 264); however, if EZH exercised the Sublease Purchase Option, all rights CED held in the sublessee loan would be transferred to EZH. (JX 4, Bates 434). Therefore, EZH would essentially owe these obligations to itself, thus extinguishing the sublessee loan. (JX 44, Bates 1454; Tr. 3719 (Bent)).

In the event EZH does not elect the Sublease Purchase Option, the Sublessee Loan Agreement provides that EZH will be obligated to make payments to CED as follows: $37,525,237 on January 2, 2018; $9,649,098 on January 2, 2032; $12,062,039 on January 2, 2033; $9,720,944 on January 2, 2034; $5,238,696 on June 5, 2034; $5,319,460 on January 1, 2035; $1,155,324 on January 2, 2036; $93,128,382 on January 2, 2041 and $414,931,341 on February 24, 2041. (Stip. ¶¶ 173, 182). As explained above, the payment due on January 2, 2018, which derives from the maturation of the Treasury STRIPS in the Equity Defeasance Account, is designed to be sufficient to purchase U.S. Treasury STRIPS that would satisfy CED Trust's obligations to establish the Trustee Treasury Collateral Account (which in turn satisfies the only recourse portion of the Final Basic Rent Payment due from CED). (JX 722; Bates 12245). The final scheduled payment under the Sublessee Loan due on February 24, 2041 ($414,931,341) would simply be credited against a portion of the Final Basic Rent Payment due from CED Trust. (JX 396, Bates 8115). Further, in the event that in 2018 the interest rates for the defeasance mechanism accounts or available loans were not the same as those expected at the time of closing, the scheduled payments under the Sublessee Loan Agreement could be adjusted *up or down* to preserve CED's return from the transaction. (JX 4, Bates 390; Stip. ¶ 175

(discussing one of these scenarios); Tr. 3962-64 (Bent)). In other words, the sublessee loan had an adjustment mechanism that reduced significantly any interest rate risk that may have existed to CED even assuming EZH does not exercise the Sublease Purchase Option.

The remaining payments identified under the sublessee loan above are the source of the "free cash" payments to CED. As explained above, in 2018, assuming *arguendo* that EZH does not exercise its Sublease Purchase Option, EZH is required to reinvest the funds resulting from the maturing Treasury STRIPS originally purchased with CED's equity investment (except for the portion transferred to CED to establish the Trustee Treasury Collateral) in new government obligations sufficient to meet these free cash obligations. In other words, the new government obligations will have maturation dates and values that coincide with the free cash payment schedule under the sublessee loan.[24]

5. Letter of Credit

In combination with the defeasance accounts set up in connection with the transaction, EZH was required to purchase a letter of credit (Stip. ¶ 226) to further reduce any risk to CED in the transaction. (DX 20200, Bates 25354). At the closing, approximately $1.4 million dollars (the present value estimate for purchase of the required standby letters of credit) was allocated out of CED's equity investment to satisfy EZH's obligation to purchase such letters of credit going forward. (JX 330, Bates 7099-7100 (showing undiscounted letter of credit fee estimates), Bates 7110 (report from pricing run reflecting letter of credit allocation); JX 332, Bates 7196

[24]EZH also was required to purchase a letter of credit to secure the payment of these amounts in the event it does not exercise the Sublease Purchase Option (*see* Stip. ¶ 250), further eliminating risk to CED of the return on its equity investment even in the event the Sublease Purchase Option is not exercised.

(same); DX 20193, Bates 25093). Mr. Mintun of Capstar explained that Capstar would estimate the cost of the letter of credit requirements so that the owner of the asset could evaluate its return from the transaction after taking into account these expenses. (Tr. 2958 (Mintun)). The purpose of this letter of credit was to protect the return to CED in the unlikely event of a default by EZH. (JX 397, Bates 8121[25] ("At the closing date of the lease, the utility would establish, for the benefit of CED, (a) a trust account containing U.S. treasury securities and (b) an irrevocable bank letter of credit from a bank rated AA or better, both in amounts that when combined *fully* secure the obligations of the utility to CED."); *see also* Tr. 1337-38 (Holzman); DX 20200, Bates 25349-50). The letter of credit was designed to cover an amount greater than the projected difference between the value of the Treasury STRIPS and the scheduled termination value. (Tr. 1337-38 (Holzman); Tr. 2924 (Mintun); Tr. 3881 (Bent)).

The letter of credit was adjustable each year. (Stip. ¶ 229; JX 1, Bates 57; DX 20199, Bates 25338; DX 20200, Bates 25352; Tr.1338 (Holzman); Tr. 2923-34 (Mintun); Tr. 3754-56 (Bent)). The adjustment mechanism provided further protection against interest rate fluctuations in the event of a termination. (DX 20199, Bates 25338; DX 20200, Bates 25352-53; Tr. 3754-56 (Bent)). This protection operated as follows: 1) in the event of a termination, EZH owed to CED the corresponding termination value set forth in Appendix A to the Participation Agreement (JX 1, Bates 296); 2) EZH covered this amount in part by transferring to CED the Treasury STRIPS in the Equity Defeasance Account (Tr. 2944 (Mintun)); 3) because the Treasury STRIPS had a

[25]JX 397 contains the final version of the "Leasing White Paper" prepared by CED, which is attached to a Memorandum to the Board of Trustees of CECONY. Various drafts of this document are located at JX 378, JX 379, JX 380, JX 381, JX 383, JX 384, JX 385 and JX 386. (*See* Stip. ¶ 95).

maturation date in 2018, in the event the termination took place prior to the Sublease Purchase Option date, the Treasury STRIPS would have a value equal to the then open market price for selling such investments, which would vary over time depending on the prevailing interest rates at the time (Tr. 2958-60 (Mintun); Tr. 3825 (Bent)); 4) EZH would be required to make up any shortfall between this pre-maturation value of the Treasury STRIPS and the termination value (Tr. 2945-46 (Mintun); Tr. 3827 (Bent)); 5) in the event EZH could not pay all of the shortfall, CED could turn to the letter of credit to receive payment of any remaining shortfall (Tr. 2945-46 (Mintun); Tr. 1338 (Holzman)); and 6) the yearly adjustments to the letter of credit amount provided the ability to ratchet up or down the amount of the letter of credit to take into account the changes in prevailing interest rates at the time of the adjustments. (DX 20199, Bates 25338; DX 20200, Bates 25352; Tr. 3754-56 (Bent); *see* Tr.1338 (Holzman)). These adjustments reduced to a minimal level the likelihood that the letter of credit would not cover any shortfall EZH could not cover itself. (DX 20199, Bates 25338; DX 20200, Bates 25352-53).

In addition, in the event that EZH's credit rating dropped below a certain amount, a mechanism was built into the transaction whereby EZH would be required to provide a letter of credit in the amount of 125% of the expected shortfall.[26] (JX 1, Bates 57; DX 20199, Bates 25338; DX 20200, Bates 25351; Tr. 3755-56 (Bent)). Thus, when it became less likely that EZH

---

[26]Mr. Holzman testified that there was a risk that if EZH's credit rating dropped very low it might not be able to obtain a letter of credit from any financial institution. (Tr. 1437-38 (Holzman)). While this situation may occur, it did not actually pose any appreciable risk to CED's return from the EZH LILO Transaction because of the requirement for EZH to obtain the renewal of the letter of credit prior to the expiration of the previous letter of credit. (JX 1, Bates 57-58; Tr. 1446-47 (Holzman)). So, even if EZH could not renew the letter of credit, CED would have sufficient advance warning of this fact and be able to declare a default and recover under the letter of credit still in effect.

could cover the entirety of the shortfall itself, the amount of the letter of credit was increased to provide further protection to CED.

The use of this letter of credit in conjunction with the defeasance accounts, virtually eliminated any risk to CED that it would not receive its expected return on the transaction in the unlikely event of a termination. (JX 241, Bates 4459 ("We require full credit support for the utilities rent obligations (Letters of Credit and Treasuries)"); JX 397, Bates 8124 ("In the event the utility fails to make the lease rent payments when due, the investor can use the Treasuries and the proceeds on the letter of credit to return its capital and provide it with its expected yield."); DX 20199, Bates 25338; DX 20200, Bates 25354). CED itself recognized this, referring to the approach of using the defeasance accounts and a letter of credit as a "belt and suspenders " method of reducing the credit risk of EZH. (JX 1167, Bates 16949).

**B. End-of-sublease options**

1. <u>EZH's purchase option</u>

As explained above, at the end of the Sublease Basic Term, January 2, 2018, EZH can end the EZH LILO Transaction by choosing to exercise the Sublease Purchase Option and accessing the funds and securities in the Equity and Debt Defeasance Accounts to satisfy the Sublease Purchase Option price. On January 2, 2018, the funds remaining in the Debt Defeasance Account, combined with the increased value of the investments held by Credit Suisse in the Custody Account (i.e the Equity Defeasance Account), will equal (and thus offset) the Sublease Purchase Option price. (Stip. ¶¶ 234, 235, 237; *see* DX 20035, Bates 21361; Tr. 3003-04 (Mintun); Tr. 3720-22 (Bent); DX 20193, Bates 25081-82). EZH's exercise of its Sublease Purchase Option not only ends the Transaction, it eliminates CED's obligation to make the Final Basic Rent Payment (which EZH will technically assume and thereby owe to itself).

(Stip. ¶ 168; DX 20193, Bates 25082). Thus, EZH can terminate the Transaction in 2018 at no real cost to itself – the loan is simply considered paid off, and CED recoups the funds deposited with Credit Suisse in the Equity Defeasance Account with interest.

All of the parties to the transaction understood that this was the predetermined outcome of the transaction.[27] EZH did its planning for the LILO Transaction under the assumption that it would exercise the Sublease Purchase Option. (JX 1142). Mr. DePlautt, the main contact at CED with respect to the EZH LILO Transaction, was quite aware of this fact. (*Id.*). Mr. DePlautt relayed this information to CED's independent auditors, PriceWaterhouse Coopers ("PWC"). (*Id.*). When presenting the transaction to its own Board, EZH only discussed the exercise of the Sublease Purchase Option (not any of the other possibilities in the event that option was not exercised). (JX 288, Bates 5648). Mr. Scher, in-house counsel in CECONY's legal department, explained the transaction by stating that it is "questionable" that CED will even have to make the back end rental payment (ostensibly because the Sublease Purchase Option would be exercised thus relieving CED of such an obligation). (JX 390). In its Project Briefing Memorandum, CED also listed the failure to exercise the Sublease Purchase Option as part of its risk analysis chart, and listed the fact that the option was fully defeased as a mitigation of this risk to CED. (JX 363, Bates 7674). Similarly, the advisors involved in the transaction knew that despite the setting of the purchase price above the purported fair market value of the facility the exercise of the Sublease Purchase Option was the expected outcome in LILO Transactions. (JX 325, Bates 7032; JX 324, Bates 7029; Tr. 3061-62 (Mintun) (acknowledging

[27]The parties also understood that for tax purposes the appraisal had to give the appearance that this was not the case, as demonstrated by the terms of the Tax Indemnification Agreement. (JX 9).

that Capstar advised LILO clients that the final basic rent payment will never be made by equity investors because it is after the purchase option date, which option was in the client's economic interest to exercise)).

The transaction documents contain certain features which provide additional incentives to ensure that EZH would exercise the Sublease Purchase Option. First, in the event EZH did not exercise the Sublease Purchase Option, EZH was required to reach an agreement with another entity (and pay a fee to that entity) which would be willing to step into CED's shoes as lessee, ostensibly so that if CED chose to walk away from the transaction during either the Retention Option or the shirttail period that party would step into the Transaction and undertake CED's obligations during these periods. (JX 1, Bates 65 ("Designated Successor Lessee"); Tr. 3375-76 (Ellis)). Second, in failing to exercise the Sublease Purchase Option, EZH gives up control of its destiny to CED. (Tr. 4970-71 (Ray)). In other words, even if EZH no longer desired to be in the sublease, CED could force it to continue on by exercising its renewal option. This is compounded by the fact that under the Operating Agreement, EZH can be forced to continue as the operator of the facility even after the sublease is terminated. (Stip. ¶ 268; JX 11, Bates 737). Third, by failing to exercise the Sublease Purchase Option, EZH did not get the unencumbered use of the funds held in the defeasance accounts. It still had numerous obligations to which those funds needed to be allocated, not least of which was to reinvest them to provide CED's economic return from the transaction in the form of free cash payments. (JX 19, Bates 973; DX 20193, Bates 25084; DX 20194, Bates 25120 and 25137). Finally, the Final Basic Rent Payment from CED was illusory, as it primarily consisted of offsets and only a small portion of that payment was recourse, but only to the extent of whatever funds existed in the Trustee Treasury Collateral Account. (Tr. 3744-47, 3920-21 (Bent); Tr. 1292-95 (Holzman); Tr. 5064-65

(LaRue); JX 130, Bates 3160; JX 555, bates 9961; DX 20199, Bates 25337, n.22). Simply stated, these mechanisms dramatically skewed any incentive EZH may have had for deciding not to exercise the Sublease Purchase Option.

Only Deloitte & Touche ("Deloitte"), the appraiser retained by EZH to provide CED with an appraisal of the RoCa3 Facility, concluded that the most likely outcome would be that EZH would not exercise its Sublease Purchase Option, a conclusion it reached in every one of the hundreds of appraisals it conducted with respect to LILO Transactions (Tr. 1795-96 (Ellsworth)), and which as explained below, is flawed in numerous respects. (*See infra* at 67-73).

2. CED's options

For CED's federal tax purposes, however, the transaction documents had to be dressed to present the possibility that EZH may not exercise its purchase option. (*See* Tr. 1978 (Muoio); JX 329, Bates 7065). To ensure that this appearance was maintained, under the Tax Indemnity Agreement, EZH was prohibited from "formally" adopting a position with respect to the Sublease Purchase Option. (Stip. ¶ 280-281; JX 9, Bates 676-77). Consistent with this presentation, pursuant to the transaction documents, CED was provided essentially two end-of-sublease options if EZH did not exercise its Sublease Purchase Option. In that event, CED can (1) exercise the Sublease Renewal Option and renew EZH's sublease for an additional 16 years or (2) exercise the Retention Option and cause EZH to return its lease of a 47.47% undivided interest in the RoCa3 Facility to CED. (Stip. ¶ 169).

a. Sublease Renewal Option

Under the Sublease Renewal Option, EZH could continue to use and possess the RoCa3 Facility through the end of the Sublease Renewal Term, June 15, 2034. (Stip. ¶ 136). The sublease renewal rent due beginning in 2018 and running through 2027 will be paid from the

Debt Defeasance Account and will continue to equal and satisfy the debt service on the HBU loan until the debt is retired in 2027 and the funds in the Debt Defeasance Account are simultaneously exhausted. (Stip. ¶¶ 119, 176, 239). Beginning in 2027, the sublease rent will be funded by a portion of the proceeds from a successor custodial account containing new government obligations purchased pursuant to the IJssell Agreement upon the maturation of the original Treasury STRIPS in the Equity Defeasance Account (originally funded with CED's equity investment). (JX 19, Bates 971, 973; DX 20193, Bates 25079). EZH will also be required to post a letter of credit securing all amounts of sublease rents during the sublease renewal term, further eliminating credit risk to CED. (JX 722, Bates 12248).

Under the Sublease Renewal Option, CED pledges the sublease renewal rents beginning in 2027 (subsequent to satisfaction of the HBU loan) as collateral for its payment of the Final Basic Rent Payment (by way of the Lease Collateral Deposit). (Stip. ¶ 243). On June 15, 2034, the date of the last scheduled deposit into the Lease Collateral Deposit, that Deposit account is scheduled to have a balance of $176,210,292.09. (Stip. ¶ 244; JX 2, Bates 354). The pledged rents are scheduled to grow at a predetermined rate so that by the time the Final Basic Rent Payment becomes due, the value of the Sublease Renewal rents is equal to a specified portion of the Final Basic Rent Payment. (Stip. ¶ 243). The Lease Collateral Deposit is scheduled to grow to approximately $274,922,796.33 on the Lease Termination Date. (JX 330, Bates 7109; DX 20194, Bates 25122, 25139). In effect, the obligation to make the Final Basic Rent Payment is fulfilled with no additional funding requirement on the part of CED. (*See* JX 1118, Bates 16503 (CED noting that section 467 LILO Transactions are "prepaid transactions")). Thus, if EZH does not exercise its Sublease Purchase Option, CED can offset its obligation to pay almost a

third of its Final Basic Rent Payment by pledging to EZH a portion of the rent due from EZH under the Sublease Renewal Option by way of the Lease Collateral Deposit.

In addition, as mentioned above, under the Sublease Renewal Option (as well as the Retention Option) CED receives a payment of approximately $34 million from EZH resulting from the maturation of Treasury STRIPS originally purchased with CED's equity investment. CED will then use this amount to satisfy its requirement to purchase U.S. Government Obligations with maturity amounts set forth in Schedule 2A of the Participation Agreement (i.e., $141,671,596.40), and maturity dates as close to, but not later than, the Lease Termination Date (February 24, 2041). (Stip. ¶ 245; JX 1, Bates 174). CED would then deposit those U.S. Government Securities in a custodial account established by CED, for its own benefit, with a security interest in EZH's favor (known as the Trustee Treasury Collateral) to secure a portion (approximately $141.6 million) of CEL Trust's obligations to make the Final Basic Rent Payment.

Therefore, by exercising the Sublease Renewal Option, CED can ensure that the HBU loan is repaid, that it recoups the funds from the Equity Defeasance Account, and that its Final Basic Rent obligations are satisfied with no further investment by CED. Indeed, CED's internal evaluations of the LILO Transaction emphasized that, even if EZH declined to exercise its Sublease Purchase Option, CED had no real risk of loss, because CED could "require the utility to re-lease the plant for an additional 17 years at prices that would assure CED of its expected return." (JX 397, Bates 8121).

Under the Sublease Renewal Option, the Lease Term extends for approximately 6.7 years beyond the Sublease Renewal Term. (JX 363, Bates 7615). CED referred to this period as the "shirttail" period of the lease. (*Id.*). While at trial Plaintiff claimed this was a potential source of

residual value to CED in the event EZH did not elect the Sublease Purchase Option (because CED could ostensibly take possession of a 47.47% leasehold interest in the RoCa3 Facility for this period), in reality CED attributed no value to this period. (JX 257, Bates 4826 ("The CED base case economics assume no economic benefit from this 'shirt-tail' period."); JX 363, Bates 7615 (Project Briefing Memorandum, same quote); JX 436, Bates 8708 (CED Strategy Overview, same quote); *see also* JX 380, Bates 7956 (explaining that the transaction must include a shirttail period in the event of a sublease renewal, as opposed to extending the renewal for the remainder of the lease term, because CED must be "seen" as bearing risk in the transaction for tax purposes)). In fact, CED essentially disregarded this period, performed no analysis of its potential for additional value to CED, and gave it no weight in its decision whether to enter into the EZH LILO Transaction.[28] (Tr. 2165-66 (DePlautt)). Further, CED understood that upon the commencement of the shirttail period, it could simply require EZH to bear any benefits and/or burdens associated with the operation of the facility, walk away from any such obligations, and simply allow the accounts and offsets to run their course until the end of the Lease Term. (JX 605; Tr. 3375-76 (Ellis)).

---

[28]Further confirming CED's disregard of this period, Paul Bent, an expert for Defendant, explained that in typical leveraged lease transactions the residual value component of the transaction is taken into account when calculating the termination values that must be paid to the investor in an event of default. (Tr. 3571-72 (Bent)). He explained that termination values are designed to make the investor whole in the event of a default, which would mean providing th investor with all expected returns from the transaction, including the residual value component. (Tr. 3571-72 (Bent)). However, Mr. Bent, after reviewing the termination values in the EZH LILO Transaction, as well as the pricing runs associated with the Transaction explained that there was no residual component in the termination values in this case. (Tr. 3752-53 (Bent)).

b. Retention Option

Under the Retention Option, EZH will return its 47.47% undivided lease interest to CED on January 2, 2018. (Stip. ¶ 180; JX 4, Bates 434). In theory CED would be able to request its proportional (47.47%) share of output from the facility and be required to pay its proportional share of the operational and maintenance expenses therein. (Tr. 3931-37 (Bent)). Similar, as with the shirttail period, CED did no analysis of the economic returns to CED during the potential retention period in deciding to enter into the EZH LILO Transaction.[29] (Tr. 2170 (DePlautt); Tr. 889-90 (McCartney) (noting that CED did not focus on the residual value in making its decision to enter into the EZH LILO Transaction). When presenting the possible choices available in the EZH LILO Transaction internally, CED often fails to even mention the Retention Option. (*See*, *e.g.*, JX 363, Bates 7615 (Project Briefing Memorandum); JX 257, Bates 4825-26 (listing only the Sublease Renewal Option as a potential course for CED)). Further, CED's own advisors made no attempt to explain the cash flows inherent in this portion of the transaction, much less mention the option when providing a detailed description of the transaction.[30] (JX 722, Bates 12243). This failure to consider the Retention Option, or the

---

[29]This is directly contrary to the situation in typical leverage lease transactions, where the analysis of the potential returns during any potential residual period is an integral focus of the transaction, and often included in calculating the termination values used in the transaction. (Tr. 4751-52 (Ray); Tr. 3571-72 (Bent)). In fact, failure to include any estimates for potential returns during an anticipated residual period would essentially treat the transaction like a loan, not a lease. (Tr. 4751-52 (Ray)). Mr. Bent explained that it certainly was not a typical thing to book a zero residual in his experience with leveraged lease transactions. (Tr. 3965-66 (Bent)). This is demonstrated by BOLC, the co-investor in the EZH LILO Transaction, who had successfully engaged in several traditional leverage lease transactions where it booked its expected return from the residual value of the asset, and had surpassed those expectations. (Tr. 1064 (Holzman)).

[30]Interestingly, Deloitte also concluded that CED was more likely to choose the Retention Option once EZH failed to exercise the Sublease Purchase Option. (JX 46, Bates 1578). Thus,

shirttail period (which according to Plaintiff at trial is the potential source of residual upside and risk) is consistent with CED's view that it did not want to take on residual value risk in its lease transactions, the reason it chose to do LILO Transactions instead of traditional leverage lease transactions to begin with. (JX 1118).

To exercise the Retention Option, CED is required to arrange for payment of the principal amount of all Loan Certificates in an manner acceptable to HBU; failure to do so will result in election of the Sublease Renewal Option. (Stip. ¶ 180; JX 4, Bates 435; JX 7, Bates 623; Tr. 3940-43 (Bent)). Under the Retention Option, the Sublease Deposit, Pledge and Repledge Agreement will be terminated once the remaining principal and interest amounts in the Sublease Deposit/ Debt Defeasance Account have been fully exhausted. (Stip. ¶ 251; JX 24, Bates 1087, 1096). The election of the Retention Option will permit EZH (through the Rotte Foundation) withdrawals of $7,362,950.33 on January 2, 2018 and $116,252,521.63 for the

---

Deloitte concluded that the most likely outcome of the entire transaction was that EZH would refrain from exercising the Sublease Purchase Option, and CED would choose the Retention Option. However, as explained below, Deloitte's conclusion is not credible and is contradicted by the behavior of all parties to the transaction and their treatment of this purported option.

balance on such date, at which point the deposit will have been exhausted.[31] (Stip. ¶ 251; JX 24, Bates 1087).

Under the Retention Option CED would follow the same procedure it would under the Sublease Renewal Option with respect to creation of the Trustee Treasury Collateral. (Stip. ¶ 245). EZH would still owe the same schedule of payments under the Sublessee Loan Agreement (including the "free cash payments" that would provide CED with its return during this period), and would still be required to establish a letter of credit securing these amounts owed. (Stip. ¶¶ 182, 250). The only difference would be that instead of the Lease Collateral Deposit (which would be established in the event of the sublease renewal), CED can create what is known as the Incremental Collateral Account, whereby it can purchase government obligations to satisfy the portion of the Final Basic Rent Payment that would typically have been covered by the Lease Collateral Deposit under the Sublease Renewal Option.[32]

[31]It is unclear as to the timing of whether the Rotte Foundation must commit these withdrawals to HBU under section 4(c) of the Sublease Deposit, Pledge and Repledge Agreement because the agreement is not terminated until the funds are actually withdrawn, and until CED arranges for repayment of the HBU loan, such loan would still be a "Secured Obligation" under the Sublease Deposit, Pledge and Repledge Agreement. (JX 24, Bates 1091). Further, the lender's (HBU's) permission appears to be required to some extent for a repayment under section 2(c) of the Sublease Deposit Pledge and Repledge Agreement. (JX 24, Bates 1088 (Section 2(d)). If EZH does get to withdraw these funds for its own uses without allocating them to HBU, it would seem to create a huge disincentive for CED to elect the Retention Option as it would take an approximately $120,000,000 hit at the beginning of the retention period by arranging to repay the outstanding loan balance itself without relying on the Debt Defeasance Deposit to satisfy those amounts.

[32]Technically the Incremental Collateral is defined as the amount above the sum of the sublessee loan payment plus the Trustee Treasury Collateral and the Lease Collateral Deposit; however, because under the Retention Option no Lease Collateral Deposit is actually created, that amount would be equal to zero and is essentially replaced by the Incremental Collateral Pledge. (JX 2, Bates 326-327).

3. Final Basic Rent Payment

If EZH does not exercise its Sublease Purchase Option, CED theoretically remains obligated to pay the $831.5 million Final Basic Rent Payment to EZH in 2041. (Stip. ¶ 116; JX 2, Bates 325). CED understood, however, that its obligation was offset by the creation of the accounts referred to above, as well as the offset from the final "payment" due on the sublessee loan, with the result that CED would not be out of pocket to actually make this payment. (JX 321, Bates 7010; JX 722, Bates 12240 ("Although a portion of the second Head Lease payment in year 43.2 is described as 'recourse' to the investor in the legal documents (Participation Agreement), there is no situation in which the Trustee[/Investor] will have to provide additional funding from outside the transaction to satisfy such obligation."); Tr. 1294-95 (Holzman); Tr. 3919-20 (Bent) ("But the one thing I'm quite confident of is that ConEd does not pay that amount out of its pocket and does not pay anything further into this deal after its initial equity investment of $39 million."). The transaction is structured so that, in the event EZH does not exercise the Sublease Purchase Option, the total amount of the final payment due to CED pursuant to the Sublessee Loan Agreement, plus the amount of the Trustee Treasury Collateral, plus the amount of the Lease Collateral Deposit or the projected value of the Incremental Collateral Pledge (depending on whether the Sublease Renewal Option or Retention Option are elected), will total the amount of the Final Basic Rent Payment. (Stip. ¶¶ 246, 257).

Notwithstanding that the amounts when added together in each of these accounts will equal the stated Final Basic Rent Payment amount of $831,525,734 on February 24, 2041 only if (i) CED elects to fund the Trustee Treasury Collateral and either the Incremental Collateral Pledge or Lease Collateral Deposit (depending on the option selected) and (ii) that CED is able to earn an interest rate of 6.86% on the Incremental Collateral Pledge or Lease Collateral Deposit

(depending on which option is selected) from the date funded until February 24, 2041 (Stip. ¶¶ 246, 257), there are mechanisms in the transaction that render this distinction meaningless. First, Section 3(e) of the Sublease Agreement provides for adjustment of, among other things, the Sublease Renewal Rents, scheduled sublessee loan payments, and the amount of investment required by CED in the Trustee Treasury Collateral account, thereby ensuring that the inputs into the final number of $831,525,734 can be adjusted to reach this number all while maintaining the economic return to CED under the interest rates available for the Trustee Treasury Collateral, Lease Collateral Deposit and Incremental Collateral Pledge at the time they are established.[33] (JX 4, Bates 390; JX 1, Bates 174 (Trustee Treasury Collateral deposit schedule); JX 44, Bates 1478 (sublessee loan payment schedule); JX 722, Bates 12248; Tr. 3961-64 (Bent); Tr. 5312-15 (LaRue)). Second, the Final Basic Rent Payment is only recourse to the amount of the Trustee Treasury Collateral, or the Acceptable Substitute Collateral, to the extent CED uses such collateral to replace the Trustee Treasury Collateral. (Stip. ¶¶ 248, 259; JX 2, Bates 325). Therefore, regardless of the option CED elects, once CED creates the Trustee Treasury Collateral Account or provides Acceptable Substitute Collateral (which can include letters of credit, cash, other securities, or any other collateral acceptable to EZH), CED's liability for its Final Basic Rent Payment becomes a non-recourse obligation that EZH cannot enforce against

---

[33]Since the Sublessee Loan schedule and amounts are essentially paper entries that offsets the majority of Final Basic Rent Payment, the ability to adjust this amount up or down involves no real funds and means that no matter what the actual rates are on the Trustee Treasury Collateral, projected Incremental Collateral Pledge, and/or Lease Collateral Deposit, the amount of the payments under the sublessee loan can be increased to meet any projected shortfall. (JX 4, Bates 390; Tr. 3962-64 (Bent)). This ease of manipulation provides insight into the benefit to Plaintiff of including this mechanism in the EZH LILO Transaction, and Plaintiff has not suggested any other reason for the inclusion of the sublessee loan in the Transaction. (*See supra* at 24).

CED, and can only enforce against the assets held in the Trustee Treasury Collateral Account.[34] (Stip. ¶ 259; JX 1, Bates 45; JX 321, Bates 7010; JX 722, Bates 12240). Essentially CED could walk away from the transaction at the end of the Lease Term without ever making the Final Basic Rent Payment, and bear no risk concerning future interest rates or repercussions for failing to make the payment.

## III. THE PATH TO THE EZH LILO TRANSACTION

### A. The History of CED

Plaintiff, Consolidated Edison Company of New York and Subsidiaries (hereinafter “CECONY”), is an energy company serving New York City. (Stip. ¶ 2). In the mid-1990’s, the energy market in the State of New York underwent a restructuring, moving toward a more competitive market. (Stip. ¶¶ 7-10). The Competitive Opportunities Proceeding, the process employed by the New York Public Service Commission (hereinafter “PSC”) through which this restructuring took place, resulted in CECONY being required to sell off the large majority of its generation assets. (Stip. ¶¶ 7-10; Tr. 461 (Burke); JX 1332, Bates 19202 (noting that CECONY wanted to keep some generation assets but the PSC disagreed and required them to sell all such assets)). As a result of the sale of these electrical generation assets, CECONY experienced an estimated net after-tax gain of $384 million. (Stip. ¶ 25).

[34]Plaintiff may argue that by withdrawing the Trustee Treasury Collateral and replacing it with a letter of credit, which by the terms of the Lease, must provide for payments on the same dates and in the same amounts as the payments that would have been made from the replaced collateral (Stip. ¶ 254), it can have upside or risk from the use of the money it withdrew from the Trustee Treasury Collateral account. However, this purported upside and/or risk, which only appears after the Sublease Purchase Option date in any event, is simply not a part of this Transaction. It is merely Plaintiff’s inappropriate effort to inject risk associated with an unrelated potential side investment into the EZH LILO Transaction.

Another result of the Competitive Opportunities proceeding was that CECONY was permitted to form unregulated subsidiaries to participate in competitive businesses.[35] (Stip. ¶¶ 16-17, 22-23). In mid-1997, CECONY created four unregulated subsidiaries, CED,[36] Consolidated Edison Energy, Inc., Consolidated Edison Solutions, Inc., and Consolidated Edison Telecommunications, Inc. (collectively "the unregulated subsidiaries"). (Stip. ¶¶ 19-20, 26-29). The Order issued by the PSC in July 1996, permitting investment in unregulated subsidiaries prohibited direct investment in New York state energy projects. (Stip. ¶ 17). The July 1996 Order contemplated that while the unregulated subsidiaries would involve international and domestic investments outside of New York, those investments "would for the most part be as an investor through established funds." (Stip. ¶ 17; JX 137, Bates 3317; Tr. 484-85, 517 (Burke) (noting that CECONY represented to the PSC that its initial unregulated investments would be through investment funds)). There is no discussion of leasing transactions in the July 1996 Order. (Stip. ¶ 17, JX 137).

In September 1997 the PSC and CECONY reached an Amended and Restructured Agreement and Settlement (the "PSC Settlement") (Exhibit 145, Bates 3698-3761), which

[35] CECONY continued to operate as a regulated entity, focusing primarily on distribution of energy as opposed to generation. (Stip. ¶ 22; JX 145). CECONY underwent a conversion to a holding company structure in late 1997, forming Consolidated Edison, Inc. (hereinafter "CEI"), of which CECONY was the regulated subsidiary. (Stip. ¶ 24).

[36] CED was initially incorporated as Gramercy Development, Inc. because the PSC Order initially prohibited CECONY from using Consolidated Edison's name as part of its names for its unregulated subsidiaries. (Tr. 485 (Burke); Tr. 1906 (Muoio)). However, on September 24, 1997 Gramercy Development, Inc. changed its name to Consolidated Edison Development, Inc. (Stip. ¶ 19). For the purposes of this brief the entity will be referred to as CED.

governed CECONY's role in the restructuring of the New York energy market.[37] (Stip. ¶ 22). Neither the restructuring plan filed with the PSC by CECONY (which led to the PSC Settlement), nor the PSC Settlement itself mentioned leasing transactions. (Stip. ¶ 22; JX 145; Tr. 517-19 (Burke ) (notes that he does not recall CECONY ever mentioning leases to the PSC or seeking approval for lease transactions from the PSC)). As a result of the Settlement, CECONY no longer had to obtain approval from the PSC with respect to any of its investments through unregulated subsidiaries. (Stip. ¶ 21; JX 143, Bates 3346; JX 144, Bates 3508).

CECONY's Corporate Planning Department oversaw the creation of the unregulated subsidiaries. (Tr. 446, 486-87 (Burke)). Prior to their official formation, employees within Corporate Planning were responsible for helping in the creation of the business plans for the unregulated subsidiaries. (Tr. 446, 486-87 (Burke); Tr. 1904-05(Muoio)). The initial business plan for CED (Stip. ¶ 30; JX 136[38]) was created by Charles Muoio, President of CED, with the assistance of a few others, and under the guidance of Kevin Burke, head of Corporate Planning at the time.[39] (Tr. 1908 (Muoio); Tr. 514-15 (Burke)). As part of its initial business plan, CED intended to pursue several lines of business: (1) passive investments in investment funds, (2) development and/or acquisition of generation and energy infrastructure assets; and (3) technical services consulting. (JX 136, Bates 3248-50, 3269; Tr. 2057 (DePlautt); Tr. 1908-25 (Muoio)). According to CED's initial business plan, as well as the testimony of Mr. Muoio (Tr. 1925-27 (Muoio)), CED planned on incurring losses for several years until its proposed "greenfield

---

[37]Upon reaching this settlement, the July 1996 Order no longer applied to CECONY. (Stip. ¶ 22).

[38]JX 704 is identical to JX 136.

[39]Mr. Burke is currently Plaintiff's CEO and Chairman of the Board. (Tr. 425 (Burke)).

projects"[40] became profitable, which it anticipated would not be until 2001. (JX 136, Bates 3240-41).

From October 1996 through April 1997, the officers and directors of CED discussed several projects and investments as part of its business plan. (*See* JX 141, JX 165, JX 166, JX 167, JX 168). The initial projects pursued by CED, which were consistent with CECONY's representations to the PSC, were passive investments in energy funds such as International Energy Partners, L.P. and Project Finance Fund III, LP, a fund sponsored by Energy Investors Fund ("EIF"), which also had the potential for CED's investment in active projects identified by the funds. (Stip. ¶¶ 35-37; Tr. 1922, 1986 (Muoio); JX 136, Bates 3282; JX 165, Bates 4175; JX 167, Bates 4185; JX 251; JX 252, Bates 4710).

One of these add-on investments pursued by CED was in connection with a small power facility (40 MW) in Eastern Guatemala, generally known as Generadora Electrica del Norte, Limitada ("GENOR"). (Stip. ¶ 38). CED indirectly acquired about a 44% ownership interest in GENOR with IEP. (Stip. ¶ 38). The remaining portion of GENOR was owned by local investors in Guatemala. (Stip. ¶ 38). Following its entry into the GENOR project, and despite having only an indirect minority interest, CED actively managed this investment, placing a member on the board of GENOR and having representation in the day-to-day management of the GENOR facility. (Stip. ¶ 38; JX 262, Bates 4969; Tr. 2185 (DePlautt)). Ms. McCartney, chairperson of CED in the late 1990s, testified that CED often sent individuals to the GENOR project to help with maintenance and repairs. (Tr. 913 (McCartney)). Unlike CED's complete

[40]Mr. Burke noted that a greenfield project is "generally thought of as, start with a green field and propose to build a plant, be responsible for all of the engineering, construction, and then eventually operation and maintenance of that plant." (Tr. 490 (Burke)).

lack of involvement in the RoCa3 Facility subsequent to closing the EZH LILO Transaction, this active participation in the GENOR project is consistent with CED's stated goals of actively using its expertise in projects to optimize its returns: "CED/CECONY personnel provide oversight through participation on management boards, as project managers, plant managers, and for infrastructure projects, as technical and financial advisors." (JX 1200, Bates 17462).

As a follow up to its participation in the GENOR project, CED developed what it called its "anchor and cluster" strategy for its international investments, whereby it sought to make further investments using the GENOR investment as its "anchor," and cluster smaller investments near that project. (JX 160, Bates 4154; JX 266, Bates 5231; Tr. 2198 (DePlautt)). CED perceived this "anchor and cluster" strategy as the most effective way for it to expand its international business given its late entry into the international market. (JX 160, Bates 4154; JX 1078, Bates 15706; JX 348, Bates 7454; JX 1307). As part of this "anchor and cluster" strategy, in 1997 and 1998, CED considered purchasing an ownership interest in Empresa Electrica de Guatemala, S.A. ("EEGSA"), Guatemala's largest distribution utility serving over 500,000 customers in Guatemala City and surrounding areas. (Stip. ¶ 39; JX 266). However, CED withdrew from the project when CEI would not approve CED's participation in a $400 million bid consortium. (Stip. ¶ 40).

CED also pursued other "anchor and cluster" type investments in the Philippines. (Stip. ¶¶ 45-48; JX 162[41]; JX 189, Bates 4269; JX 271). However, CED determined that it would not enter into those transactions due to changes in the economic outlook of the Philippines. (Stip. ¶¶ 45-48). In early to mid-1999, CED continued to investigate other opportunities to expand its

[41]JX 735 and JX 1105 are identical to JX 162.

"anchor and cluster" strategy in Guatemala and Central America, abandoning exploration of other "anchor and cluster" investments in other parts of the world such as Eastern Europe, China and the Philippines. (JX 204, Bates 4343; JX 1056, Bates 15532-33; JX 1256, Bates 17823-24).[42]

As part of its technical services business line, CED pursued projects in China involving advising utilities on specific issues pertaining to energy infrastructure in large urban environments. (Stip. ¶¶ 49-50; Tr. 1913-14, 1937 (Muoio); JX 269; JX 354, Bates 7501). As CED explained to the board of trustees of its corporate parent, CECONY, because China was an emerging market and growing economy, despite the low returns from these types of projects, CED saw this as an opportunity to get its foot in the door in China so as to be able to better compete for forthcoming energy investment opportunities and to learn about the market in China. (JX 354, Bates 7501; JX 1332, Bates 19277). Consistent with this view, CECONY sent engineers to China to participate in learning opportunities there and incorporated some of the things it learned in its own business.[43] (JX 199, Bates 4319; *see also* JX 203, Bates 4340). CED

[42]Any notion that the EZH and NUON LILO Transactions were part of an "anchor and cluster" strategy in Europe is belied by the absence of any mention of these Transactions in any of CED's presentation materials concerning its "anchor and cluster" strategy. Further, in an email from Ms. McCartney in mid-1998, subsequent to entry into the EZH LILO Transaction, she requested that Mr. DePlautt come up with an *after the fact* rationale attempting to justify the leasing portfolio as part of CED's "core business", suggesting that Mr. DePlautt perhaps could attempt to tie the EZH LILO Transaction to its "anchor and cluster" strategy. (JX 1264; *see also* JX 1307, Bates 18588 (outline of meetings attempting to tie in "financial strategy," i.e. leases, in with anchor and cluster strategy in May 1998)). Tellingly, Plaintiff has never produced a document connecting CED's LILO investments to its anchor and cluster strategy.

[43]This is directly contrary to Plaintiff's treatment of its participation in LILOs, where there is no evidence Plaintiff sought to actually leverage its exposure in the Netherlands into learning opportunities.

also continually used its position in China to identify further opportunities for investment. (JX 203, Bates 4340; JX 250, Bates 4676).

Subsequent to the publication of its initial business plan for 1997, CED determined that it could not sustain losses for the period projected in the plan without significant impact on its ability to survive as an unregulated subsidiary of CECONY. (Tr. 1924-27 (Muoio); Tr. 524 (Burke); *see also* JX 1332, Bates 19223; Tr. 375 (McGrath) (noting that CED would have been terminated if it did not earn a sufficient return over time)). Among the projects CED looked to as a means to counteract its initial projection of sustained losses were mergers and acquisitions involving power facilities. (Tr. 1979-80 (Muoio)). However, after coming to the realization that mergers and acquisitions were simply too competitive a path for CED to pursue in its effort to create up front earnings and cash flow to minimize the impact of its pursuit of greenfield projects, CED began looking at other ways to generate upfront earnings and cash flow needed to survive. (Tr. 1979-80 (Muoio)). As part if its search, CED began looking at LILO tax shelter transactions (Tr. 790, 819-20 (McCartney); Tr. 543 (Burke); Tr. 1940-42 (Muoio); Tr. 2070-71 (DePlautt)), which it referred to as a type of "financial structuring" transaction (Tr. 1945-46, 1973, 1980-81(Muoio)). LILO transactions were designed to generate upfront earnings and cash flow from the tax benefits associated with the transactions.[44] (Tr. 717-18, 720-22 (Freilich); Tr. 850-51 (McCartney) (noting that the tax benefits of the EZH LILO Transaction enhanced CED's earnings); *see also* Tr. 1373-76 (Holzman) (refusing to state that the tax benefits had no effect on the front loaded earnings in the EZH LILO Transaction and noting that without the tax benefits

[44]Mr. Muoio explained that the tax benefits of these transactions was the deferral of income taxes paid for long periods of time, relying in the time value of money to create a benefit to Plaintiff. (Tr. 1943). One of CED's internal presentations described the benefit this way: "Deferred taxes are, in effect, interest-free loans from the government." (JX 1133, Bates 16628).

there would not be a positive cash flow from the transaction during the sublease basic term)). As explained by Joan Freilich, the CFO of CECONY (who also was a board member of CED when CED entered into the EZH LILO Transaction), without the tax benefits, a LILO transaction would not have the upfront earnings, and the cash flows in the early years would have been negative. (Tr. 717-18, 720-22 (Freilich)).

**B. CED's Consideration of LILO Transactions**

A discussion of leasing transactions appears in CED's board minutes for the first time on May 29, 1997. (JX 169). Around May 1997, CED had heard a presentation from Citibank on leasing transactions and was provided with materials discussing these transactions. (Tr. 2208 (DePlautt)); DX 20115). Mr. DePlautt, vice president of CED, also contacted Cornerstone Financial Advisors in connection with potential lease transactions, and had several discussions and communications with representatives of Cornerstone during the late spring and summer of 1997 concerning CED's participation in leasing transactions. (Stip. ¶ 51; Tr. 1014-15 (Holzman); JX 274; JX 282; JX 334; JX 335; JX 336; JX 337; JX 985). On May 21, 1997, Cornerstone gave a presentation to CED concerning leasing transactions. (Stip. ¶ 53; JX 276). As part of that presentation, Cornerstone indicated that a primary rationale for creating a leasing portfolio was "the use of tax base as a resource to generate book income." (JX 276).

On July 23, 1997, Mr. DePlautt informed CED's board of directors that Cornerstone had been retained as advisor to CED with respect to "tax-advantaged leasing structures." (JX 171, Bates 4196). At that meeting Mr. DePlautt discussed the various types of tax-advantaged leases being considered by CED and the impact that the proposed Section 467 Treasury Regulations

would have on its pursuit of the transactions.[45] (*Id.*). Cornerstone arranged meetings in August 1997 between CED representatives (Mr. DePlautt and Peter Irwin, a member of CECONY's legal department) and representatives from Shearman & Sterling LLP (JX 335; JX 345); Skadden, Arps, Slate, Meagher & Flom (JX 343, 344); and Hunton & Williams (JX 336; JX 345), all to discuss the types of leases that each law firm was involved with. (Tr. 2206-09 (DePlautt)). A primary focus of these meetings was for CED to become familiar with the tax aspects of LILO transactions, including the tax risks, the types of tax opinions each law firm could provide, and the impact of the proposed Section 467 Treasury Regulations on the transactions. (*See* JX 335; JX 336; JX 344). CED wanted to talk to these firms because it was looking for firms that "facilitate" lease transactions (JX 282, Bates 5489), as opposed to firms that would independently review proposed lease transactions.

CED initially wanted to pursue what was referred to as a "Pickle-Dole" leasing transaction (Tr. 2202-03 (DePlautt)); however, during a two hour meeting between Mr. DePlautt and Eugene McGrath,[46] then CEO and chairman of the board of trustees of CECONY (Tr. 112,

---

[45]As explained by Mr. Muoio, President of CED at the time, if this Treasury Regulation were published, CED would not have pursued any further LILO Transactions. (Tr. 2035-36 (Muoio)).

[46]Mr. McGrath testified that he was not really involved in the oversight of the transaction except to make sure it was "close to [CECONY's] knitting," and knew very little about its details other than it was a lease, and had no understanding of the tax aspects of the EZH LILO Transaction. (Tr. 165-66, 168 (McGrath)). Mr. McGrath also claimed that he did not get into the financial structure of the EZH LILO Transaction (Tr. 188 (McGrath)), and claimed that he was not aware of any tax advantages of leases or why individuals or companies in the highest tax brackets would want to do leases (Tr. 353-54 (McGrath)), despite the fact that those benefits were consistently mentioned in and the transactions were consistently described as tax-oriented and tax advantaged leases in presentations identified as being made to Mr. McGrath (JX 354; JX 1091, Bates 16150; JX 397; JX 1129). Further, during conversations between Mr. McGrath and Ms. McCartney concerning LILO Transactions, Mr. McGrath recognized the dubious nature of these transactions when he asked Ms. McCartney, "[a]re we just an investment company finding

120-21 (McGrath)), Mr. McGrath recommended that CED pursue the "more risky" [from a tax perspective] 467 LILO Transactions.[47] (JX 282, Bates 5488-89; Tr. 2202-03 (DePlautt)). CED, at the recommendation of Mr. McGrath, began pursuing the Section 467 lease-in lease-out (LILO) transactions (the type at issue in this case). (JX 282, Bates 5490).

The first LILO transaction CED pursued was in connection with the Eems Power Station located in the Netherlands, known as the EPON LILO Transaction. (JX 282, Bates 5489-90; JX 300). Cornerstone served as CED's leasing advisor and Shearman & Sterling as legal counsel in connection with the EPON LILO Transaction. (Stip. ¶ 56; JX 172, Bates 4199; JX 280). CED's bid on the EPON LILO Transaction was to be made with Banc One Leasing Corp ("BOLC") as bidding partner.[48] (JX 282, Bates 5490). In connection with its consideration of this project, CED, in conjunction with Cornerstone, prepared a briefing memorandum discussing various aspects of the transaction. (Stip. ¶ 56(a); JX 300[49]; Tr. 2219 (DePlautt)). The only benefits explicitly discussed in the briefing memorandum were (1) tax benefits from the rental deductions; (2) tax benefits from the interest deductions; and (3) the cash-on-cash return on investment received at the end of the sublease term (which comes form the U.S. Treasury STRIPS). (JX 300, Bates 5955). On August 27, 1997 the CED board of directors unanimously approved a resolution authorizing the pursuit of the EPON LILO Transaction. (JX 172, Bates

---

tax shelters, and is this the best one?" (JX 1132, Bates 16611).

[47]Section 467 transactions were considered more aggressive than Section 178 lease in lease out transactions because the Section 467 LILO Transactions had a higher tax risk (to offset the higher return it generated). (Tr. 2202 (DePlautt)).

[48]CED wanted to participate with another party engaging in LILO Transactions so it could learn the ins and outs of the transaction from that party. (Tr. 2078 (DePlautt)).

[49]JX 1115 is identical to JX 300.

4200). However, CED eventually discontinued pursuit of the EPON LILO Transaction in favor of the EZH LILO Transaction.

## C. Pursuit of the EZH LILO Transaction

At some point during its consideration of the EPON LILO Transaction, Cornerstone brought the EZH LILO Transaction to CED. (Stip. ¶ 57; JX 282, Bates 5490; Tr. 2082 (DePlautt)). While initially pursuing the EPON and EZH LILO transactions concurrently (JX 339; JX 930), consideration of the EPON LILO Transaction was eventually put on hold, and CED devoted its resources to pursuit of the EZH LILO Transaction. (JX 154, Bates 4130). The EZH LILO Transaction was brought to Cornerstone's attention by Shearman & Sterling prior to EZH retaining its advisor (Capstar Partners). JX 282, Bates 5490 (Flowers and Sykes are Shearman attorneys). Subsequently the transaction was formally brought to Cornerstone by Capstar Partners a lessee advisory firm in LILO Transactions, who represented EZH in this transaction. (Tr. 1025 (Holzman); Tr. 2854 (Mintun)). Capstar represented EZH in a prior LILO transaction with respect to another of its facilities, the Maasvlakte generation facility. (JX 288, Bates 5657 (EZH Board Minutes); JX 1334, Bates 19407 (Zauner Depo.); Tr. 2871-74, 2979-82 (Mintun)). The EZH LILO Transaction was based on the terms and structure of the Maasvlakte LILO Transaction.[50] (JX 288, Bates 5648, 5656-58; JX 943, Bates 14353; Tr. 2871-74, 2979-82 (Mintun); Tr. 2087 (DePlautt)). Because BOLC participated in the Maasvlakte LILO Transaction it was familiar with the general parameters of the proposed transaction. (*See*

---

[50]Plaintiff makes numerous claims that there are significant differences between the precursor transaction and the EZH LILO Transaction. Mr. Mintun's testimony belies such a claim: Mr. Mintun stated that there may have been structural differences between the two transactions; but, when asked for specifics, he was not able to provide any. (Tr. 3013-14 (Mintun)).

JX 1334, Bates 19483). In conjunction with EZH, Capstar also arranged the lenders, ABN AMRO and its subsidiary HBU (JX 401; Tr. 2875-76, 2999-3000 (Mintun)); the appraiser, Deloitte (DX 20027; Tr. 2983-85 (Mintun)); and the engineer, Duke Engineering and Services ("Duke") (DX 20028; Tr. 2995-96 (Mintun)), who would eventually be retained by CED.

Prior to making a bid on the EZH LILO Transaction, CED discussed the Transaction at several board meetings. (JX 140; JX 153; JX 154; JX 155; JX 354; JX 355; JX 393; JX 394). However, the minutes of these meetings reveal that, despite the fact that the proposed transaction was significantly larger than any other transaction under consideration by CED, the discussions were brief and contained little mention of the structure of the transaction and the various options available to CED with respect to the EZH LILO Transaction, focusing primarily on the projected return to CED from the transaction. (*Id.*). This is consistent with the inability of several of the officers and directors of CED to really explain any of the specific details of the transaction when queried at trial. (Tr. 944-50 (McCartney) ("Frankly what I know is we made an investment in a Dutch power plant through an arrangement where we made an investment and the utility made lease payments to us. And the complexities of who did what to whom I really left to financial people."); Tr. 2031-32 (Muoio) (noting that even though the EZH LILO was the largest transaction consummated while Mr. Muoio was at CED, he did not recall details of the transaction).

In conjunction with Cornerstone, CED created a briefing memorandum on the EZH LILO Transaction to present to its board of directors. (Stip. ¶ 95; JX 363[51]; JX 376; Tr. 2091, 2219

[51]JX 1136 is another, practically identical version of the EZH Briefing Memorandum, although it appears that Section 15 of the Memorandum differs between the two exhibits. However, Ms. McCartney indicated at trial that the CED board never considered that portion of the briefing memorandum, thus rendering any differences essentially moot. (Tr. 845-47

(DePlautt)). Again, as was the case in the EPON briefing memorandum, the only three benefits listed in the EZH briefing memorandum were (1) tax benefits from the rental deductions; (2) tax benefits from the interest deductions; and (3) the cash-on-cash return on investment received at the end of the sublease term (which derives from the maturation of the U.S. Treasury STRIPS purchased with CED's initial equity investment).[52] (JX 363, Bates 7647; Tr. 2174 (DePlautt); DX 20193, Bates 25064, 25084). In addition, CED created a risk analysis chart with the help of Cornerstone and Shearman & Sterling, analyzing the potential risks of the EZH LILO Transaction. (JX 363, Bates 7672; JX 936; JX 959; JX 960; Tr. 2229 (DePlautt)). The analysis indicated that CED's risks were low (which in several instances really meant non-existent[53] (Tr. 967-68 (McCartney) (noting that she understood there was no foreign currency exchange risk); *see also* Tr. 2229-32 (DePlautt)), except for the risk that the Treasury would publish regulations prior to closing of the transaction which would explicitly disallow of the tax treatment sought by Plaintiff. (JX 363, Bates 7672-74). That risk was listed as "medium."[54] (JX 363, Bates 7672-64).

---

(McCartney)).

[52]Mr. DePlautt, the individual at CED most involved in the EZH LILO Transaction, was unable to deny that the cash on cash return was the same as if CED had simply invested directly in Treasury STRIPS without the trappings of a LILO transaction; he claimed he would need to analyze the transaction more to answer that question. (Tr. 2175 (DePlautt)).

[53]Most likely, that is because CED used only five categories of risk: low, medium, high, N/A and open. (Tr. 2229-30 (DePlautt)).

[54]This is consistent with Paul Bent's expert testimony in which he indicated that the structure of the Transaction virtually eliminated CED's risk it would not obtain its expected return on the Transaction. (Tr. 3738-42 (Bent); DX 20193, Bates 25064). As Mr. DePlautt explained in a memorandum to Ms. McCartney discussing LILO Transactions, CED chose to focus on tax risks, and eliminate credit and residual risks from its leasing transactions. (JX 1118). According to CED's own documents, that is why it chose LILO transactions, rather than as opposed to traditional leverage leasing transactions that have both credit and residual risks.

On September 26, 1997, Cornerstone, on behalf of both CED and BOLC, submitted a proposal to EZH to enter into the EZH LILO Transaction. (Stip. ¶ 75; JX 768[55]). Much of the information included within the proposal, including numbers and the consultants such as Duke and Deloitte, was provided by EZH and Capstar to be included in the bid proposal.[56] (Tr. 1032, 1067-69 (Holzman); Tr. 2171-72, 2222 (DePlautt) (noting that CED did not chose the lease term, but that the number was provided to them)). Further, numbers in the bid proposal, such as the lease term of 44 years, were chosen exclusively because of the tax regulations, and not for any business purpose. (Tr. 2221 (DePlautt)). The time for EZH to accept the bid proposal passed without formal acceptance from EZH. On October 21, 1997, CED submitted an additional proposal directly to EZH for its portion of the EZH LILO Transaction (a 47.47% undivided interest).[57] (Stip. ¶ 76). The terms did not differ at all between the two proposals. (*Compare* JX 768, Bates 12482, *with* JX 298, Bates 5831). On October 22, 1997 EZH accepted CED's bid. (Stip. ¶ 76; JX 298).

Shortly after the bid was submitted, CECONY's legal department dispatched Andrew Scher, an in-house tax attorney, to CED to discuss the projects that CED was working on to determine whether he could be of any service to CED. (Tr. 4279-81, 4392-94 (Scher)). Mr. Scher and Charles McTiernen, then head of commercial litigation in CECONY's legal

---

[55]JX 297 is identical to the first three pages of JX 768; however, JX 297 does not contain the attachments that were sent with the letter which are included in JX 768.

[56]Shortly after CED entered into the EZH transaction, in January 1998, Cornerstone held a business planning meeting with CED whereby it helped CED in creating its business plan with respect to leasing transactions. (JX 340). The business plans highlighted the fact that the terms and conditions for the LILO transactions were "pre-defined." (JX 340).

[57]On October 20, 1997, BOLC submitted its own proposal to EZH with respect to the remaining 52.53% undivided leasehold interest in the RoCa3 Facility. (JX 937).

department and now its General Counsel, met with CED's president, Charles Muoio for approximately an hour to discuss the various activities being considered by CED, including its pursuit of LILO transactions. (Tr. 4148-52 (Scher); JX 1231). Mr. Scher, a tax attorney for many years before joining CECONY's legal department in September 1997, with an LL.M (Taxation) from New York University (Tr. 3987 (Scher)), was chosen to attend the meeting because he had a masters in tax, "to see where [he] would fit in with respect to all these transactions." (Tr. 4150 (Scher)). Mr. Scher drafted a memorandum memorializing the substance of the conversations at this meeting. (JX 1231). The parties to the meeting discussed that it was the tax benefits of the LILO transactions that "make these deals interesting" and that it was anticipated that "once [CED] gained expertise in the area, it would begin to locate, package and market these types of transactions to investors (acting like an investment banker)."[58] (JX 1231). Mr. Scher also had further conversations with Mr. DePlautt concerning the LILO Transactions. (Tr. 4197-4200, 4273-74 (Scher)).

Shortly before the transaction was presented to CECONY's Board of Trustees (JX 153; JX 354), CECONY's General Counsel, Peter O'Shea, directed Mr. Scher to provide more "detail about" the transaction. (Tr. 4199-200, 4272 (Scher)). Responding to that request, Mr. Scher[59]

---

[58]At trial Mr. Muoio claimed that he meant as CED became more familiar with these transactions, it would locate the LILO transactions itself and potentially package the transactions with itself as a co-investor (thus ostensibly obtaining the fees typically obtained by advisors such as Cornerstone from the co-investors in the transactions). (Tr. 2000-02 (Muoio)). Regardless, whether CED actually marketed LILOs in the future, it had its eye on becoming a promoter of LILO Transactions.

[59]In an effort to distance itself from Mr. Scher's memorandum, Plaintiff attempts to cast him as lacking any real understanding of the LILO Transaction. The evidence is to the contrary, because Mr. Scher is both an experienced tax attorney and had practical experience with leases. Without question, he was able to understand and analyze the tax implications of the transaction. (JX 390). Mr. Scher, as legal liaison between CED and CECONY (JX 1150; Tr. 854, 3995-96,

drafted a memorandum (JX 390) describing the transaction, its tax benefits, and his concerns regarding the structure of the transaction and its tax implications. (JX 390; Tr. 4166, 4197, 4208, 4210-11, 4271-73 (Scher)). Mr. Scher explained that "CED's tax position is based on a relatively *aggressive* reading of Internal Revenue Code § 467" and that promulgation of the proposed Section 467 Regulations "would foreclose such a reading." (JX 390, Bates 8029 (emphasis added); Tr. 4212-13 (Scher)). Mr. Scher explained to Mr. O'Shea that it was "questionable" whether the deferred lease payment due at the end of the lease would ever be made by CED.[60] (JX 390, Bates 8029).

Since the market for LILO transactions imposed a $100 million net worth requirement on equity investors seeking the losses generated by LILO transactions (JX 140, Bates 3335; JX 234, Bates 4425; JX 354, Bates 7500), and CED had limited net worth, it sought to obtain a $100 million stock subscription from CECONY to satisfy this obligation. (JX 544, Bates 9853; JX 703; JX 1232, Bates 17650). As a result, CED had to present its "tax advantaged leasing" business line as well as explain the reason for seeking to enter into LILO transactions to the Board of Trustees at its October 28, 1997 meeting. (Stip. ¶ 94; JX 354, Bates 7500-01).

Mr. McGrath, as chairman of the board of CECONY presided over the October 1997 CECONY Board of Trustees meeting when this explanation took place. (JX 354). Mr. Muoio

---

3998), was intimately familiar with the transaction. In fact, Mr. Scher acknowledged that as part of the transaction, "there were some negotiations by me." (Tr. 3997 (Scher)). Ms. McCartney, chairperson of CED at the time, explained Mr. Scher's involvement as follows: "This was a very new concept for us. So if there were people who knew what they were talking about, it made sense that we would bring them in to look at the documents." (Tr. 854 (McCartney)).

[60]As explained more fully above, the implication of this statement is that EZH would exercise its Sublease Purchase Option, as that is the only option available to the parties that would result in relieving CED of its obligation to make the Final Basic Rent Payment.

and Ms. McCartney represented CED at this meeting. (Tr. 833, 835 (McCartney); JX 354, Bates 7500). As head of Corporate Planning, Mr. Burke was also present (JX 354, Bates 7494, 7511), as was Ms. Freilich, in her role as Chief Financial Officer of CECONY. (JX 354, Bates 7495, 7503). The presentation involved a discussion of CED's various business lines: development of energy projects, acquisition of infrastructure, and tax-advantaged leasing transactions. (JX 354, Bates 7500). CED also discussed its pursuit of technical services consulting contracts in China, explaining that while the profits would not be particularly high from such transactions, other benefits included gaining in-country experience at little cost to CED and forming strong local partnerships which could provide a foothold in the Chinese market and allow for pursuit of other, possibly more lucrative projects. (JX 354, Bates 7500).

When presenting its pursuit of LILO transactions to the CECONY Board of Trustees, Ms. McCartney and Mr. Muoio emphasized only the tax benefits of these transactions, noting that other utilities had used the transactions "as a strategy to reduce tax payments." (JX 354, Bates 7500-01). Other than discussing the tax generated cash flows from the transactions, no other benefits of tax advantaged leasing were mentioned. (*Id.*). Similarly, in the slide presentation created for use during this presentation[61] (JX 254), the only benefits listed were front loaded

[61]Ms. McCartney's memory of the meeting was apparently faulty based on the stark contrast between her testimony and the minutes of the meeting. (*Compare* Tr. 786, 830-31 (claiming that the presentation only lasted ten minutes and that because of shortness of time CED's leasing program and the $100 million request for funding to invest in tax advantaged leasing was never discussed at the October 1997 CECONY Board of Trustees meeting ), *with* Tr. 833-35 (McCartney) (acknowledging that the minutes of the meeting indicate that a discussion of both matters actually occurred)). Similarly, Ms. McCartney claimed that at the annual shareholder's meeting Mr. McGrath touted the purported environmental benefits of the EZH LILO Transaction during his speech to the shareholders (Tr. 906-07); however, when shown a transcript of this speech she acknowledged there was no mention of purported environmental benefits. (Tr. 908; JX 857, Bates 13456). Along these lines Ms. McCartney later admitted that CED did not enter into the EZH LILO Transaction for any purported environmental benefits, but

earnings generated by the tax benefits and the "reasonable rates of return" from the transaction.[62] The presentation materials made no mention of any other benefits to CED. (*Id.*). At the conclusion of this board meeting, and after a closed session where the proposal was discussed (no record of what was discussed exists) (JX 354, Bates 7511), the Board of Trustees decided not to approve the stock subscription necessary to enter the EZH LILO Transaction and delayed its consideration until a later date. (JX 354, Bates 7513; JX 392, Bates 8104). Apparently there was a negative reaction to CED's business plan by the Board of Trustees. (JX 1229). The day after the CECONY's Board of Trustees meeting, at a CED Board of Directors meeting, the CED officers and directors discussed the Board of Trustees' concerns with CED's business plans, CED's leasing strategy, and what further information it could provide to the board of Consolidated Edison about its tax advantaged leasing program. (JX 153; JX 393; JX 1229). In addition, CED determined that it would postpone indefinitely its consideration of the ENECO Lease Transaction. (JX 153[63]; JX 1229).

---

instead for the up-front, predictable earnings. (Tr. 910 (McCartney)).

[62]The testimony of witnesses in this case is replete with explanations that the returns from this transaction would only have been reasonable *with* the tax benefits at issue in this case and that CED would never have entered into the transaction without the tax benefits. (JX 390; Tr. 850-51 (McCartney) (noting that CED would not have entered into the EZH LILO Transaction if the transaction only generated a 2.4% return); Tr. 2039-40 (DePlautt); *see also* Tr. 2035-36 (Muoio)). Further, there is no discussion by any employee of Plaintiff concerning any expected return from the transaction other than its return on the Treasury STRIPS investment and the tax benefits, such as the claimed residual value benefit being asserted by Plaintiff. In its Interrogatory responses, when asked to point to any factual support for its income projections from entering into the EZH LILO Transaction, Plaintiff only cited to the pricing runs (JX 1339, Bates 19583-84), which contain no analysis of any potential return other than the tax benefits and the return from the Treasury STRIPS investment (*see*, *e.g.*, JX 330).

[63]JX 393 is identical to JX 153.

Subsequent to this meeting, at Mr. McGrath's request, CED officers and directors began preparing a "Leasing White Paper", discussing the EZH LILO Transaction specifically and LILO Transactions generally. (Tr. 836 (McCartney)). CED's officers and directors all had a hand in preparing the document, as did Mr. Burke from CECONY's Corporate Planning, and Mr. Irwin and Mr. Scher from CECONY's legal department. (Tr. 836-38 (McCartney); JX 378, Bates 7942 & 7946; JX 605; JX 1101). Several versions containing both redline and handwritten comments were created. (JX 377; JX 378; JX 379; JX 380; JX 381; JX 383; JX 384; JX 385; JX 386). As explained in the final Leasing White Paper, the EZH LILO Transaction was structured in ways to make challenges to the structure "difficult" for the IRS to litigate (JX 397, Bates 8124), an acknowledgment that the structure of the transaction was difficult to comprehend and decipher. The document purported to set forth several benefits and risks to the transaction. For example, the White Paper explained that the risk that EZH would default on its obligation to make rental payments was minimized because the payments were "fully secured" through the use of defeasance deposits and a letter of credit. (JX 397, Bates 8124; *see also* Tr. 2234-35 (DePlautt) (who wrote that the credit risk to CED from EZH's ability to make its required payments was "fully defeased"); Tr. 943-44, 950 (McCartney) (noting that she understood from explanations by Mr. DePlautt and Mr. Muoio that the Treasury STRIPS and the letter of credit fully secured the cash flows to CED); Tr. 3049 (Mintun) (noting that the EZH LILO Transaction was a "fully defeased" transaction); Tr. 3817 (Bent) ("I think it is virtually impossible that there could be a failure to pay rent in this deal . . . .")). As explained by Mr. DePlautt, CED's return from the transaction was not actually dependent on EZH's ability to operate the RoCa3 Facility, since EZH could lose its license to generate electricity and CED would still receive its rental

payments under the transaction.[64] (Tr. 2231-32 (DePlautt); *see also* Tr. 951-52 (McCartney)). Further, the White Paper explained that CED had no currency risk in the Transaction, because it was denominated in United States dollars. (JX 397, Bates 8125; Tr. 967-68 (McCartney)). This further demonstrates that while CED may have characterized the risks in the transaction as "low" in its earlier prepared briefing memorandum, at least some of these risks were non-existent. (*See* JX 363, Bates 7672-75; *see also* Tr. 2229-32 (DePlautt) (noting that several of the credit risks were "fully defeased"); Tr. 3817 (Bent)).

In addition, a benefit described as "strategic groundcover" began appearing in early versions of the White Paper. (JX 383, Bates 7981; JX 385, Bates 7994). This rhetoric was eventually changed to "strategic value of leasing." (*Compare* JX 397, Bates 8123 with, JX 378 Bates 7943). CED claimed that the "value" or "groundcover" was its ability to leverage what it learned from the EZH LILO Transaction into other investments in the Netherlands. (JX 397, Bates 8123).

The effort to give substance to the EZH LILO Transaction by tying it to other potential Netherlands investments is mere window dressing. In fact, one reviewer of the white paper went as far to state that this benefit was "NOT MUCH OF A BENEFIT SINCE WE DO NOT PLAN ON DOING ANY OTHER WORK IN THOSE COUNTRIES." (JX 383, Bates 7981). Indeed Mr. Burke, Plaintiff's current CEO and a former director of CED, could not recall any attempts to locate investments in the Netherlands, or Western Europe for that matter, other than other LILO Transactions. (Tr. 565-66 (Burke)). Specifically, when Mr. Burke explained how he

---

[64]This directly undermines Mr. Burke's claim that one of the reasons the investment was aligned with Plaintiff's core competencies is that having an investor like Plaintiff, who could oversee operation of the facility, was important because "[y]ou wouldn't get much value from the plant if you didn't have the plant operating." (Tr. 501-02 (Burke)).

thought the EZH Transaction would lead to other transactions, he stated that by participating in LILO transactions, it would get CED's name out there as an entity that wanted to participate in "these transactions" which he explained meant further leasing transactions. (Tr. 566-67 (Burke)). Ms. McCartney, chairperson of CED had no idea how CED planned to learn from the EZH LILO Transaction. (Tr. 913-14 (McCartney)). Mr. McGrath, former CEO of CECONY, was not aware of anything Plaintiff did with respect to the EZH LILO Transaction to use its expertise, and the only transaction he could identify the EZH transaction leading to was the NUON LILO Transaction. (Tr. 280-81 (McGrath)). Consistent with this view, CED never listed the Netherlands as a potential location for energy or infrastructure investment in its various iterations of its potential country target list or in its Country Screening Process (created early in CED's existence (*see* JX 249, Bates 4638; JX 122, Bates 3135)).[65] (*See*, *e.g.*, JX 348, JX 374, Bates 7738-39; JX 541, Bates 9758-59; JX 643; JX 1087, Bates 15925, 15933). Instead CED was focused on growth countries, unlike those in Western Europe, where a need for capital investment was present in pursuing its non-leasing investments.[66] (Tr. 1964-66 (Muoio); *see*

---

[65]Further, Corporate Planning, the arm of CEI that engaged in larger scale international investments, other than England, never looked at investment projects in Western Europe or the Netherlands specifically. (Tr. 497, 513-514 (Burke); JX 1332, Bates 19284-87).

[66]Mr. Muoio indicated that this screening process was slanted away from Western Europe and the United States, but does not necessarily eliminate CED's pursuit of non-leasing investments in those countries. (Tr. 1965-68 (Muoio)). Plaintiff pointed to its investments in the United States as an example of this. However, this attempt to minimize the import of CED's focus in areas other than Western Europe and the Netherlands ignores that there is no evidence CED actually pursued non-leasing investments in the Netherlands or attempted to do so, and that the Country Screening Process only addresses potential investment targets outside the United States. (JX 1252, Bates 17781). Therefore, CED's pursuit of investments in the United States is simply irrelevant to the impact CED's country screening process has on its claim in its White Paper that it entered into the EZH LILO Transaction as a way to make further investment in the Netherlands.

*also* Tr. 897-98, 900-01 (McCartney) (affirming her prior testimony that you would not want to make an acquisition of a utility in a country without growth). The Netherlands was only listed in connection with its lease screening process. (*See, e.g.*, JX 320, Bates 6997; JX 348, Bates 7452; JX 360, Bates 7591).

Tellingly, CED made no attempt to visit the Netherlands (other than sending a couple of employees for a one-day trip in May 1999 regarding another LILO transaction), much less the EZH facility, subsequent to the closing. CED did not make its first "periodic inspection" of the RoCa3 Facility until November 2005, almost eight years after closing and when litigation was imminent. (JX 352). Even when, in May 1999, CED representatives went to the Netherlands and visited a portion of the NUON gas pipeline in connection with its second LILO transaction, there is no evidence they made any effort to travel to the EZH facility, only a few miles away.[67]

On or about December 9, 1997 a meeting was held between Mr. McGrath (CEO of CECONY), Robert Schwartz (chair of the finance committee of CECONY), Ms. McCartney (chair of CED) and Ms. Freilich (CFO of CECONY and board member of CED) concerning the

---

[67]To further demonstrate the disconnect between CED's genuine international transactions and its LILO transactions, in late 1998 through early 1999 CED decided to pull back from international investments and focus its efforts on domestic transactions. (JX 272, Bates 5334; JX 1132; JX 1063; Tr. 2019-21 (Muoio); Tr. 2189-90 (DePlautt)). In fact, this was a major reason that Mr. Muoio left CED in February 1999. (Tr. 2022-23 (Muoio)). Nevertheless, CED continued its pursuit of the NUON LILO Transaction in the Netherlands, closing the deal in May 1999. (Stip. ¶ 56(d); JX 313). Even CED's own employees recognized the inconsistency in its pursuit of tax-advantaged leasing transactions in Europe after its decision to pull back from regular international transactions and focus on domestic transactions in conjunction with Consolidated Edison Energy, another unregulated subsidiary of Plaintiff. (JX 1266). After closing the NUON transaction, CED continued to look at other tax advantaged leasing projects in the Netherlands. For example, it reviewed information on SILO/service contract transactions (a tax shelter transaction that evolved after the Section 467 Treasury Regulations closed the door on LILO transactions in May 1999) sent to them by Cornerstone. (JX 347; JX 1149; DX 20112).

EZH LILO Transaction. (JX 558; JX 1342, Bates 19647). There is no evidence of the specific discussions at this meeting. On December 10, 1997, the CED Board authorized the investment and participation in the EZH LILO Transaction. (Stip. ¶ 96; JX 355, Bates 7514). On December 12, 1997 the CEI Board of Directors (formerly CECONY's Board of Trustees) again considered CED's request for $100 million stock subscription (JX 397), and approved the $100 million to support CED's pursuit of "tax-advantaged lease investments." (Stip. ¶ 98; JX 147, Bates 3796; JX 356; JX 357, Bates 7536[68]; JX 358; JX 536).

To participate in the EZH LILO Transaction, CED formed a single purpose subsidiary, Consolidated Edison Leasing, Inc. (hereinafter "CEL"), whose sole purpose was to be the grantor in the trust used by Plaintiff to participate in the EZH LILO Transaction. (Stip. ¶ 99). Both Brian DePlautt and Charles Muoio were directors of CEL, and Andrew Scher was Secretary and General Counsel of CEL. (JX 361). At its first board meeting, on December 12, 1997, CEL approved participation in the EZH LILO Transaction. (Stip. ¶ 100; JX 361).

**D. The Papering of the EZH LILO Transaction**

Plaintiff was aware, from its tax counsel, that to lend an air of legitimacy to the Transaction, it was necessary to have various reports and opinion letters. (JX 329[69], Bates 7064, 7067; *see also* JX 1023, Bates 15183 (memorandum from tax counsel explaining the importance of obtaining an appraisal to support LILO Transactions in court). Plaintiff received an engineering report from Duke,[70] an environmental report from Tauw Milieu (herinafter "Tauw"),

[68]JX 147 is identical to JX 357.

[69]JX 1325 is identical to JX 329.

[70]From language in the cover letter, i.e. "draft", it is not clear the final report was ever delivered. (JX 52, Bates 1802).

and an appraisal from Deloitte. (Stip. ¶¶ 79, 81 & 83; JX 46; JX 52; JX 53). EZH retained Duke, Deloitte and Tauw to perform the "due diligence" necessary to support the useful life and values used in the transaction, long before an investor (in this case CED) had been identified. (Tr. 1588 (Nieuwenhuis); Tr. 2171-72 (DePlautt); Tr. 2882, 2892-93, 2896 (Mintun); JX 940, Bates 14345; JX 20027; JX 20028). Deloitte and Duke were commonly retained by lessees in LILO transactions before any investor was identified. (Tr. 2882, 2892-93, 2896 (Mintun)). As happened in this case, the equity investor would simply agree to use the preselected third parties chosen by the lessee and would pay the fee for the reports issued by these consultants.[71] (Tr. 2882, 2893-94 (Mintun); *see* JX 297, Bates 5825 ("CED agrees to use . . ."); JX 298). For example in the EZH LILO Transaction, CED did not retain Deloitte until almost a month after the transaction closed. (JX 1024; JX 1097). Hans Nieuwenhuis of Tauw never spoke to anyone from CED until after all of its due diligence trips had been performed. (Tr. 1590-92 (Nieuwenhuis)). Deloitte and Duke had been retained to participate in hundreds of LILO Transactions.[72] (Tr. 1794-95 (Ellsworth)). Deloitte in particular would be told what conclusions

[71]The fees paid to Deloitte and Duke for their services by CED in this instance were $95,094.00 (JX 890; JX 501) and $75,858.00 (JX 1025) respectively. These were equal to a 47.47% portion of the total bill with the remainders being paid by BOLC. (*See*, *e.g.*, JX 1025, $80,527.00 invoice for Duke). In the NUON transaction Deloitte and Duke were paid $141,666.00 and $114,216.65 by CED for its approximately 54% portion of the total invoices. (JX 1179; JX 1059). Given their heavy involvement in providing appraisals and engineering reports necessary to support the equity investor's tax counsel's opinions with respect to LILO Transactions, Deloitte and Duke made tens of millions of dollars by participating in LILO transactions.

[72]Mr. Holzman from Cornerstone testified that Deloitte and Duke provided the appraisal and engineering evaluations in many, if not all, LILO Transactions he participated in as an advisor. (Tr. 1401-02 (Holzman)). Similarly, Mr. Zauner of Capstar testified that Deloitte and Duke were typically involved in the LILO Transactions in which Capstar participated and that he could not remember an energy or infrastructure LILO transaction that did not involve Duke. (JX 1334, Bates 19412 and 19415).

it needed to reach in its appraisal reports issued in connection with LILO transactions by the attorneys representing the equity investors. (Tr. 1801-02 (Ellsworth); *see* JX 926[73] (ENECO); JX 1120). Shearman & Sterling also made suggestions and comments to the Deloitte report. (JX 1029).

With respect to the Duke report,[74] the version received by CED just prior to the closing asserts that the RoCa3 Facility has a useful life of 55 years, assuming replacement of the major components that make up the RoCa3 Facility, including the gas fired turbine. (JX 52, Bates 1815). Duke also assumed that the RoCa3 Facility would be operated at a base load level (i.e. a level that would result in the least amount of wear and tear on the components). (JX 52, Bates 1820, 1877). However, during the time Duke was performing its investigation, Capstar, apparently unbeknownst to Duke, discovered that the RoCa3 Facility was scheduled to operate at a mid-load level (JX 431, Bates 8608), which would increase the wear and tear on the facility, and all things being equal, diminish the useful life of the facility. (431, Bates 8608 (noting that Deloitte and Duke's conclusions regarding the long useful life of the facility were dependent on the facility being a base load facility); Tr. 2274-78, 2315-17 (Gonzalez)). CED and its advisers

[73]JX 1022 is identical to JX 926.

[74]While CED purportedly relied on outside engineers with respect to investigation of the EZH LILO Transaction, it will undoubtedly point to its own visit to the RoCa3 Facility as evidence of its purportedly substantial due diligence. However, this is simply a mischaracterization of this trip. The schedule of events demonstrates that the visit to the Netherlands spanned only two days, and encompassed a dinner the first night, a plant tour the morning of the second day and an afternoon session discussing the financial results of EZH. (JX 351; JX 353; Tr. 1384 (Holzman)). As explained by Hans Nieuwenhuis, senior consultant on the RoCa3 environmental due diligence team from Tauw (Tr. 1553 (Nieuwenhuis)), who was present at the visit to the RoCa3 Facility, this was really just a joint meeting to meet the people involved and was not really part of the due diligence process. (Tr. 1592, 1595-96 (Nieuwenhuis)). Further, there is no evidence of any report made back to CED or its board resulting from this one day trip to the RoCa3 Facility.

were all aware of this issue and the impact it would have on the validity of the appraisal conclusions they sought. (JX 431). There is no evidence that this matter was ever addressed, and Mr. Gonzalez, from Duke, indicated that he was not even aware of the issue (Tr. 2319-20). Thus, it appears that despite identifying this issue and being aware of the impact it would have on the useful life conclusions by Duke, neither Cornerstone nor CED attempted to share the information with Duke so that it could properly take this information into account.[75]

In addition, on the date of the closing, there was a flurry of communication between Duke and Cornerstone pertaining to the useful life of the facility and the impact the replacement of the gas fired turbine could have on the estimate of useful life. (JX 955; JX 964, JX 965; JX 966; Tr. 2329-34 (Gonzalez)). As a result of this communication, Duke was asked to state the following in its report: "After review of the legal documentation associated with the transaction, we believe that it addresses the issues associated with the proper maintenance, repair, and replacement of components, such that the facility can attain the projected 55-year useful life." (JX 966; Tr. 2329-30 (Gonzalez)). In order to include this statement, Duke informed Cornerstone that it would be necessary for the inclusion of the following language regarding the combustion turbine in the legal documentation: "EZH agrees that in order for the expected useful life to be achieved, the combustion turbine of the gas turbine generator will be replaced on or about 28 years after the initial date of operation." (JX 966; *see also* JX 955 (where Cornerstone forwarded this proposed language for the legal documentation to Duke)). However, the

[75]Similarly, John Kelly, Plaintiff's expert retained to provide opinions related to an appraisal review of the Deloitte appraisal, acknowledged that he was not aware of any information that Plaintiff had concerning the useful life of the facility other than that included in the Deloitte report (which would include the information concerning the RoCa3 Facility being operated as a middle load facility), noting that was not part of his assignment to evaluate such information. (Tr. 2841 (Kelly)).

requested language never appears in the legal documentation, and therefore, Duke would not opine in the executive summary that the maintenance and replacement requirements in the legal documentation were sufficient to cause the facility to reach the 55-year projected useful life. (*Compare* JX 965 and 966, *with* JX 52, Bates 1809). Regardless, CED chose to go forward with the transaction.

With respect to the Deloitte appraisal, one of the most important conclusions that counsel for equity investors required from the Deloitte reports was that the Sublease Purchase Option was not a "bargain purchase option" – i.e. that, in this case, EZH would not be under any economic compulsion nor face other non-economic factors that would induce it to exercise the Sublease Purchase Option. (Tr. 1817 (Ellsworth); JX 46, Bates 1570; Tr. 1431 (Holzman); JX 1325, Bates 19104-05 (opinion letter)). Deloitte concluded, as it did in all of the hundreds of appraisals it did in connection with LILOs (Tr. 1796 (Ellsworth)), that economically, EZH's best option was not to exercise the Sublease Purchase Option. (JX 46, Bates 1503, 1571-1572). Deloitte based this conclusion on the present value of the Sublease Purchase Option exercise price being higher than the costs of not exercising the Sublease Purchase Option (JX 46, Bates 1572). Deloitte further concluded that there were no non-economic factors (i.e. not strictly related to the comparison of the Sublease Purchase Option price to the value of the leasehold interest) that would create a material inducement or cause EZH to exercise the Sublease Purchase Option. (JX 46, Bates 1503). Mr. Ellsworth indicated that this conclusion was based on the form letter from EZH provided at closing which stated that "there is no known factor to EZH which creates a material inducement for EZH to exercise the purchase option or disregard the provision of the sublease related to the participation agreement." (Tr. 1774-76 (Ellsworth); JX 46, Bates 1603). Mr. Ellsworth indicated that the conclusion with respect to non-economic

factors was also in part based on Deloitte's examination of the Dutch electricity market and curiously, Deloitte's economic analysis. (Tr. 1776).

The assumptions and calculations that Deloitte used to reach these conclusions in the appraisal are simply incomplete and/or inaccurate.[76] First, Deloitte analyzed the economics of the Sublease Purchase Option price in a vacuum. Mr. Ellsworth admitted at trial that he was aware that the funds necessary to exercise the Sublease Purchase Option were set aside at closing. (Tr. 1796-98 (Ellsworth)). However, he indicated that the availability of these funds was simply not part of Deloitte's analysis. (*Id.*). Second, the analysis treated these funds much like cash that EZH could do with as it pleased, ignoring provisions of the IJssell Agreement which limited the ability of EZH to use these funds in the event the Sublease Purchase Option was not exercised. (JX 19, Bates 973; DX 20193, Bates 25084; DX 20194, Bates 25120 and 25137; Tr. 3718-19 (Bent) (noting that EZH does not get any more money other than the fee it receives at closing)). Mr. Ellsworth also admitted that he did not recall taking into account the consequences to EZH of not exercising the Sublease Purchase Option, and emphasized that this was not something that Deloitte was asked to include in its report. (Tr. 1768-69 (Ellsworth)). In taking into account the final rent payment required under the Lease Agreement (JX 46, Bates 1571), Deloitte ignored the non-recourse nature of the final payment (*see* JX 321, Bates 7011; JX 722, Bates 12240). Instead, Deloitte assumed that, unlike CED, who could satisfy its obligations solely by establishing the Trustee Treasury Collateral Account (JX 722, Bates 12244), that EZH would undertake the obligation to make the entirety of this payment if it

[76]Plaintiff's expert John Kelly, who performed an appraisal review of the Deloitte report, recognized numerous mistakes in Deloitte's appraisal and in several instances simply had no idea how Deloitte arrived at the numbers it used, and did not understand how Deloitte was using those numbers. (Tr. 2812-13 (Kelly)).

exercised the Sublease Purchase Option. (JX 46, 1571). Further, in making its comparison of the costs of EZH not exercising the Sublease Purchase Option (JX 46,Bates 1571-72), Deloitte ignored the potential of the Retention Option being exercised and only concentrated on the Sublease Renewal Option, ignored the fact that EZH would be responsible for any costs incurred by any parties in meeting the requirements of Section 20 and/or 20A under the Sublease if EZH does not exercise the Sublease Purchase Option (*See* JX 4, Bates 434-435), and did not account for the scheduled free cash payments EZH must make under the sublessee loan agreement (JX 330, Bates 7084; Stip. ¶ 173). Perhaps most striking is Deloitte's failure to even include an actual calculation of the comparison discussed in the second, third and fourth full paragraphs on Bates 1571 of the report.[77] (*See* JX 46, Bates 1571).

Even with respect to the calculations that Deloitte actually performed, such as the various discounted cash flow analyses, despite claiming that Deloitte in performing its analysis "considered the expected revenues to be derived from the operation of the facility, as well as the corresponding expenses that are necessary to operate the facility" (Tr. 1687 (Ellsworth)), Deloitte failed to take into consideration the fact that the replacement cost of the gas fired turbine in Exhibits XV, XX and XXI. (Tr. 1732 (Ellsworth)); JX 46, Bates 1716, 1746 & 1752 (row 8 in each respective chart fails to include the capital expenditure for replacement of gas fired turbine in calculations used to make determination of whether EZH would exercise the Sublease Purchase Option)). This figure would be in the hundreds of millions of guilders after inflation (JX 46, Bates 1684; JX 52, Bates 1914 (in 1997 U. S. Dollars); Tr. 2321 (Gonzalez) (noting that

[77]Even Mr. Kelly, who performed an analysis of the economic compulsion test purportedly performed by Deloitte, admitted that he could not find where Deloitte actually did the calculations it claimed supported its analysis. (Tr. 2810-12, 2831 (Kelly)).

it would cost approximately $25 million in U.S. dollars today)), and would be borne by the entity responsible for operating the facility on or about year 28.[78] In addition, when projecting the revenues, it appears Deloitte ignored the fact that replacement of this component would require the facility to be offline for approximately six months in year 28 (JX 52, Bates 1984), and instead simply projected revenues as if the facility was online the entire year. (JX 46, Bates 1716, 1746 & 1752). Deloitte's failure to account for this expense in its post Sublease Purchase Option calculations, simply renders its conclusions unreliable.

Further, this was not simply an oversight of which Plaintiff was unaware. As explained above, at the time of the closing, CED and its advisors attempted to include language in the transaction documents requiring EZH to replace the gas fired turbine at or about year 28 regardless of which options were exercised. This language was never included. Therefore, EZH would have the obligation to replace the equipment if the Sublease Renewal Option were exercised, or CED would have it, if the Retention Option were exercised (since, under the Retention Option, in conjunction with the Facility Operating Agreement CED would be responsible for its share of the maintenance and operation expenses during this period). (JX 11, Bates 747; Tr. 3898 (Bent)). Unlike Duke, which would not ignore the impact of the replacement of the gas turbine in rendering its opinion, Deloitte simply chose to ignore the cost of the turbine replacement, so that its conclusions would meet the requirements of tax counsel

[78]Even when it did include the cost of replacing the gas fired turbine, in its discounted cash flow analysis in Exhibit XI of the Deloitte Report (JX 46, Bates 1693), Deloitte purportedly made a mathematical mistake of hundreds of millions of guilders in its calculations pertaining to the replacement cost of the gas turbine, which, according to Deloitte would increase the value of the facility under that calculation. (JX 46, Bates 1684; Tr. 1699-1700 (Ellsworth)). However, Mr. Ellsworth did not expressly say how much the error was, and did not say how much it would affect the totality of the calculations in the report. (Tr. 1699-1700).

for CED, all within the knowledge of CED's advisors.[79] Notwithstanding CED's awareness of this issue, and presumably also awareness of its impact on the Deloitte appraisal, CED continued with the closing. Evidently, CED, also aware of the pending Section 467 Treasury Regulations, which would definitively preclude the tax benefits sought in the EZH LILO Transaction (Tr. 2035 (Muoio)), made a calculated decision to go ahead with the deal and hope that the mistake would go unnoticed.[80]

Deloitte's conclusion with respect to the impact of non-economic factors (JX 46, Bates 1572; Tr. 1773 (Ellsworth)) also lacks credibility when considered in light of the knowledge that CED and its advisors[81] had at the time of the Transaction. Mr. Ellsworth acknowledged that Deloitte would have wanted to talk to as many people as were relevant to the inquiry. (Tr. 1778). However, when asked who he spoke with to reach a conclusion, Mr. Ellsworth simply

[79]Deloitte did not even issue the final report and calculations supporting the report until months after the closing. (JX 46, Bates 1752 (*see* March 1998 calculation date); JX 1029; JX 1049). However, even with several months to correct this error, Deloitte failed to do so. This is even more troubling given that Deloitte relied upon Duke when rendering its opinions in LILO Transactions. (JX 46, Bates 1542; JX 1334, Bates 19412-13 (where Mr. Zauner states that Deloitte needed Duke's opinion to render its own opinions); Tr. 1645-46, 1655, 1662 (Ellsworth)).

[80]Interestingly when Plaintiff obtained another tax opinion with respect to the EZH LILO Transaction in 2005 the firm simply listed the conclusions reached by Deloitte and did not appear to undertake any review of the calculations underlying those assumptions in rendering its opinion to Plaintiff. (JX 1181, Bates 17162, Bates 17178). In fact the firm explicitly states that its opinion is based on the conclusions reached by Deloitte being correct (JX 1181, Bates 17186); however, there is no evidence that CED informed the firm of the mistakes Deloitte made in its appraisal.

[81]*See* JX 324 (description of hypothetical transaction whereby Cornerstone identifies some of these very same non-economic factors as shifting the probability towards exercise of the purchase option).

had no recollection.[82] (Tr. 1776-78 (Ellsworth)). His testimony regarding whether he had spoken to Mr. DePlautt, CED's contact on the EZH LILO Transaction (Tr. 2180 (DePlautt)) was neither forthcoming, nor credible. Although Mr. DePlautt had been informed, most likely by Cornerstone, that EZH had preplanned to exercise the Sublease Purchase Option prior to entering into the transaction (JX 1142, Bates 16776; Tr. 2238-39 (DePlautt)) and might have read materials from Citibank stating that the purchase options in "tax leases" (such as the one in this case) were structured "to create a situation at some point during the lease when the lessee [here EZH] is very likely to buy the asset" (Tr. 2217 (DePlautt)), Mr. Ellsworth nevertheless testified that while he did recall a meeting with Mr. DePlautt, he did not recall any specifics of any conversation with Mr. DePlautt.[83] (Tr. 1781 (Ellsworth)). When asked whether he considered that Mr. DePlautt had informed CED's auditors, PWC, that it was reasonably assured that EZH would exercise the Sublease Purchase Option and identified several factors that supported this statement (JX 1142, Bates 16776), Mr. Ellsworth stated he was not aware that CED had taken that position. (Tr. 1789 (Ellsworth)). Evidently Mr. Ellsworth did not speak to Mr. Mintun of Capstar, who advised clients such as EZH that the best option for them would be to exercise the Sublease Purchase Option. (Tr. 3061-62 (Mintun)). Instead Deloitte focused on the letter

---

[82]Mr. Kelly acknowledged that in performing his review of the Deloitte appraisal he had no way of knowing who Deloitte actually talked to and was not provided any underlying interviews indicating any such conversations ever occurred. (Tr. 2833-35 (Kelly)). In addition, Mr. Kelly admitted that he was not asked to look at the actual impact of any potential non-economic factors on EZH's decision to exercise the Sublease Purchase Option, noting that his assignment was limited to an examination of economic compulsion only. (Tr. 2831-32 (Kelly)).

[83]Although he claimed that he would have wanted to speak with representatives of CED concerning whether CED was more likely to exercise the Sublease Renewal Option or the Retention Option, he could not recall with whom he spoke (Tr. 1780 (Ellsworth)), and was either not aware or ignored that CED's internal documents failed to analyze any potential returns from the Retention Option.

Deloitte received from EZH (Tr. 1773 (Ellsworth)), a letter procured at the same time EZH was party to a Tax Indemnity Agreement as part of the LILO Transaction, which penalized EZH for denying the plausibility of CED's options or representing in writing that it had taken a position with respect to its exercise of the Sublease Purchase Option. (Stip. ¶¶ 280-281; JX 9, Bates 676-77).

CED also received (several months after the close of the transaction) interest rate letters concerning the interest rates charged in connection with the various accounts involved in the EZH LILO Transaction. The interest deductions associated with the accounts that were the subject of these letters were the source of a large portion of the tax benefits CED derived from the transaction. (Stip. ¶ 300). As a result, CED recognized the requirement that the interest rates connected with LILO transactions needed to be "arms length." (JX 1169, Bates 16970; JX 1325, Bates 19107). However, a review of the function of interest rates reveals that these were anything but "arms length", and that CED had no real interest in knowing whether an independent party believed them to be arms length and reasonable prior to entering into the transaction. The interest rate letters were provided by Credit Suisse – a co-advisor to EZH with Capstar, with a vested interest in the transaction. (JX 1334, Bates 19443; JX 670, Bates 11657; Tr. 2894 (Mintun)). Credit Suisse also served as custodian of the Equity Defeasance Account in the transaction. (JX 22; JX 371). Thus, Credit Suisse was not a third party financial institution with no connection to the transaction.[84]

---

[84]Similarly, in the NUON LILO Transaction, CED again simply used a party with a stake in the transaction to provide these interest rate letters which purportedly demonstrated that the rates used were reasonable arms length rates. (JX 1169, Bates 16970). However, this time CED simply used Capstar, an arranger of these transactions, and in this case NUON's advisor. (*See* JX 1011).

Further, the interest rate letters used in the transaction were form letters passed around by the various tax counsel that typically represented the parties to LILO transactions (JX 969), which were filled in by Credit Suisse and put on its letterhead. (*See* JX 912). CED did not even receive the final interest rate letters until several months after the closing of the EZH LILO Transaction.[85] (JX 905; JX 912; JX 1026; JX 1027; JX 1048).

CED also obtained reports from Arthur Andersen and its independent auditor PWC concerning the accounting treatment to be applied to the EZH LILO Transaction.[86] (Stip. ¶¶ 84-85). The Arthur Andersen opinion was based on a hypothetical lease transaction (a description of which was provided to it by Cornerstone). (Stip. ¶ 84; JX 324). The description of this transaction was for all practical purposes identical to the EZH Transaction.[87] Both the Arthur

---

[85]While Mr. Zauner of Capstar testified that typically equity investors would not close a transaction without having the necessary interest rate letters and that he could not think of an instance where the letters were not obtained prior to closing (JX 1334, Bates 19443), CED decided it could move forward with the transaction without them and would simply paper the transaction with the letters after the closing.

[86]CED informed its auditor several years later that this letter along with the post closing version of the Arthur Andersen letter served as the basis for the deal structure and the accounting treatment adopted. (JX 364).

[87]At trial Plaintiff argued that the hypothetical was based on the EPON LILO Transaction (which as discussed above was another Section 467 LILO Transaction CED considered), not the EZH LILO Transaction. This is simply irrelevant. The structure is practically the same, including similar lease terms, the same options, and the same types of defeasance mechanisms. (*Compare* JX 1109, Bates 16272 (description of EZH), *with* JX 971, Bates 14594 and JX 972 (descriptions of EPON); Tr. 1355 (Holzman)). Further, the transaction also involved a power generation facility in the Netherlands.

At trial Mr. Holzman appeared to claim the hypothetical description does not apply to the EZH LILO Transaction because the funds in the EZH LILO Transaction were not set aside at closing for exercise of the Sublease Purchase Option. (Tr. 1309-11 (Holzman)). The evidence, however, contradicts Mr. Holzman, since the funds used to purchase the Treasury STRIPS in the Equity Defeasance Account and the Debt Defeasance Account, which together equal the Sublease Purchase Option price, *were set aside at closing*. (Stip. ¶¶ 234, 235, 237; Tr. 1326-29 (Holzman); Tr. 2167 (DePlautt); Tr. 1796-98 (Ellsworth); *see also* Tr. 2944 (Mintun)).

Andersen report and the hypothetical transaction description recognized that it can be reasonably assumed that the sublessee will exercise the Sublease Purchase Option:

> Although the Purchase Option Price will be greater than or equal to the expected fair market value of the Sublessor's Lease Interest, taking into account possible required renewal rents, other non-economic factors such as the strategic nature of the asset to Sublessee's business and the fact that the proceeds required to purchase the Sublessor's lease interest are set aside at closing tend to shift the probability of the Sublessee executing the purchase option. Therefore it is reasonable to assume, based on non-economic factors mentioned above, plus the credit and collateral requirements outlined below that the Sublessee will exercise the Purchase Option.

(JX 324, Bates 7029). The additional credit and collateral requirements being referred to reflect that, the sublessee, in this case EZH, would not get to simply use the funds available to exercise the Sublease Purchase Option, and instead was required to commit the funds available to exercise the Sublease Purchase Option to other uses within the transaction. (JX 324, Bates 7030; *see* JX 19, Bates 973; DX 20193, Bates 25084; DX 20194, Bates 25120 and 25137; Tr. 3718-19 (Bent)). Arthur Andersen recognized the above quoted language and does not dismiss it, but

---

Therefore, Holzman's attempt to distinguish the hypothetical description is simply inaccurate, and the analysis of the hypothetical transaction could apply equally to the EZH LILO Transaction. In fact, CED recognized this when it provided the hypothetical description and a copy of the Arthur Andersen opinion on the hypothetical transaction to PWC for the purposes of preparing an opinion letter with respect to the EZH LILO Transaction. (*See* JX 1154).

Plaintiff now attempts to distance itself from the Arthur Andersen letter and the hypothetical transaction description by Cornerstone, because the statements that non-economic factors exist which would tend to shift the probability of exercise of the Sublease Purchase Option, run directly contradictory to the facade it attempts to create by pointing to the flawed Deloitte analysis that the most likely outcome of the EZH LILO Transaction is that EZH will not exercise the Sublease Purchase Option, all in an attempt to claim the possibility of some sort of residual benefit subsequent to the sublease termination date, many years in the future.

instead asserts that the determination of whether the exercise was "reasonably assured" was beyond the scope of an opinion on a hypothetical transaction.[88] (JX 322).

However, the PWC Opinion (JX 325[89]), which was based on the EZH Transaction, does draw conclusions with respect to the Sublease Purchase Option. CED provided PWC with information regarding the EZH LILO Transaction, including the transaction description from Cornerstone (JX 324), excerpts of the pricing runs (JX 766), as well as drafts of the Arthur Andersen report (JX 322; JX 323), and a draft of the tax opinion letter received from Shearman & Sterling (JX 1145). As part of preparing that opinion, PWC had numerous conversations with Mr. DePlautt concerning the transaction (JX 325, Bates 0731; Tr. 2161 (DePlautt)) and asked Mr. DePlautt numerous questions about the transaction, including whether or not CED was taking the position that EZH's exercise of its Sublease Purchase Option was "reasonably assured." (JX 1142; Tr. 2238-41 (DePlautt)). After asking for Cornerstone's input on the questions posed by PWC (JX 1444; Tr. 2238-39 (DePlautt)), Mr. DePlautt relayed to PWC that "Yes, among the reasons are (a) [the] facility is a newly built, key asset for the utility, (b) [EZH] has preplanned and done [its] economic analysis on the assumption that the plant will be purchased." (JX 1142, Bates 16776; Tr. 2238-39 (DePlautt)). At trial, Mr. DePlautt confirmed that the reasons provided to Mr. Dewey were accurate and that if he had any questions about their accuracy he would have made further inquiry. (Tr. 2162-63 (DePlautt)). In contrast to Deloitte's determination, a regular, interested participant in LILO Transactions, PWC, CED's

[88]However, when later, Arthur Andersen does issue an accounting letter with respect to the specific EZH LILO Transaction, in January 1999, curiously over a year after the transaction closed, it avoids having to make the determination that PWC made by choosing to look at two of the other prongs that will provide for the desired accounting treatment. (JX 555).

[89]JX 1195 is identical to JX 325.

independent auditor, concluded that the Sublease Purchase Option was a “bargain purchase option” because the exercise of the Sublease Purchase Option was “reasonably assured” at the inception of the lease.[90] (JX 325, Bates 7032).

In sum, CED was not concerned with obtaining “independent” appraisals and evaluations of the transaction, but was instead seeking to paper the transaction with superficially independent and complete reviews of the facility and the transaction it could advance to defend the Transaction if challenged. (*See, e.g.*, JX 1023, Bates 15183; JX 397, Bates 8124 (“It is anticipated that the transaction will be structured in ways that will make any challenges to the structure by the IRS under current regulations difficult to support or litigate.”)). However, the inconsistencies between these reports and the facts of the case (which were known to CED and its advisors), the mistakes and incomplete nature of the Deloitte appraisal, CED’s determination to enter into the transaction without actually first obtaining some of the opinions it purportedly needed to evaluate the transaction, the lack of true independence of the parties providing the “independent” analysis, and the other circumstances surrounding these opinions reveal the true dependent, preordained, and accommodating conclusions of the opinions.

---

[90]PWC made this determination during its analysis of how to account for the sublease. As part of that analysis PWC had to determine whether the sublease met two of the four following criteria:

(a) whether the sublease transfers the asset to the sublessee at the end of the sublease term;
(b) whether the sublease contains a bargain purchase option;
(c) whether the sublease term is greater than 75% of the economic useful life of the property (the leasehold interest is the asset with respect to the sublease); or
(d) whether the present value of the minimum sublease payments is 90% or more of the fair market value of the property at the inception of the sublease.

(JX 325).

**E. The Closing**

On or about December 12, 1997, in response to rumors in the marketplace that the Section 467 Treasury Regulations concerning LILOs might be published as early as December 15, 1997 (JX 557[91]), CED and the parties involved in the EZH LILO Transaction scrambled to move the closing up to a date prior to the rumored effective date of the regulations (JX 557, JX 1120; Tr. 2035 (Muoio)). The closing date was moved up to December 15, 1997. At approximately 5:30 p.m. on the date of the closing, Mr. DePlautt came back to CED headquarters for a board of directors meeting and explained that there still were some issues with the tax and accounting opinions and it was hoped that the issues could be worked out and the transaction could close as early as next week. (JX 155[92]). Nevertheless, despite the existence of these issues, the transaction purportedly closed that night at 11:57pm (JX 1271), the day prior to the rumored effective date of the Section 467 Treasury Regulations.

**F. CED'S Pursuit of Other LILOs**

Subsequent to the close of the EZH transaction, CED continued its pursuit of other lease-in lease-out transactions. One of those transactions was the ENECO transaction involving gas distribution facilities in the Netherlands owned by ENECO. (Stip. ¶ 56(b); JX 306). As part of that process, CED created a draft briefing memorandum. (JX 304). CED submitted a proposal on the ENECO LILO Transaction, which bid was accepted on October 22, 1997. (Stip. ¶ 56(b); JX 303; JX 305). During the process of pursuing the ENECO Transaction, Eugene McGrath, president and chairman of the board of CECONY, raised some questions concerning CED's

---

[91]JX 1140 is identical to JX 557.

[92]JX 490 is identical to JX 155.

pursuit of LILO transactions in light of the decision by GE Capital not to pursue such lease transactions. (JX 1118). In response to those concerns, Mary Jane McCartney, chair of the board of CED, communicated with Brian DePlautt concerning the rationale for choosing to pursue LILO transactions versus the types of leveraged lease transactions being pursued by GE Capital. (JX 1118). Mr. DePlautt explained that CED did not want to take on the residual value risks associated with traditional lease transactions, and instead chose to limit its exposure to tax risks. (JX 1118). Mr. DePlautt also indicated that to realize the full value from traditional lease transactions it was necessary to monitor payment streams from the lessee, and invest resources in remarketing the assets at the conclusion of the lease transaction to realize the residual value. Mr. DePlautt explained that CED did not have the ability or desire to take on such responsibilities with respect to its transactions. (JX 1118). This view is corroborated by the absence of any document in its files demonstrating that EZH's lease payments were being made on a timely basis – obviously because CED understood that the rent payments were completely secured by the Transaction's defeasance mechanisms. At some point in early 1998 CED abandoned pursuit of the ENECO transaction. (Stip. ¶ 56(b); JX 157, Bates 4142).

For a period of several months, CED suspended its pursuit of LILO transactions. (JX 262, Bates 4976[93]). In August/September 1998, however, CED pursued a LILO involving gas distribution assets in the Netherlands owned by MEGA. (Stip. ¶ 56(c); JX 262, Bates 4977). CED anticipated that this LILO would have a practically identical structure to the EZH transaction. (JX 203). As part of the process of pursuing the MEGA LILO Transaction, CED prepared another briefing memorandum. (Stip. ¶ 56(c); JX 309; JX 310). On October 7, 1998,

[93]JX 272 is identical to JX 262.

CED made a proposal to MEGA to participate in the MEGA LILO Transaction. (Stip. ¶ 56(c); JX 202, Bates 4334; JX 1037). However, on October 19, 1998, CED learned through PWC[94] that Fleet Bank had been chosen to participate in the MEGA LILO Transaction. (Stip. ¶ 56(c); JX 202, Bates 4334; JX 1245).

CED then made a bid in about a week on the NUON LILO Transaction (which it had begun considering in September along with numerous other LILO Transactions (JX 262, Bates 4978)), also involving gas distribution assets in the Netherlands. (JX 206; JX 312; JX 1192). The NUON LILO Transaction was based on the proposed MEGA LILO Transaction structure (which in turn had been based on the EZH LILO Transaction). (JX 206, Bates 4349; JX 1192; 1240, Bates 17728). Around this same time (October 1998), the CED Board of Directors required CED to withdraw from pursuit of traditional infrastructure transactions outside the northeast United States or Central America, limiting CED's scope to those two regions. (JX 262, Bates 4980; *see also* Tr. 2189 (DePlautt)). However, CED was not required to withdraw from consideration and pursuit of LILO Transactions in Western Europe, and quite the contrary, continued to pursue the NUON LILO Transaction to closing in May 1999. On December 10, 1998, Cornerstone submitted a letter to Capstar (NUON's advisor with respect to the NUON LILO Transaction), renewing its initial bid with a few adjustments concerning pre-closing impact of interest rates on the return to NUON. (Stip. ¶ 56(d); JX 319). On May 18, 1999, CED closed the NUON LILO Transaction, the same day the final Section 467 Treasury Regulations

---

[94]PWC had its own division that promoted LILO Transactions. (JX 1150). In fact, at some point that division made a presentation to CED in an effort to secure CED as a client. (JX 1150). However, CED chose to go with Cornerstone instead. Interestingly, when determining what accounting treatment to give to the EZH LILO Transaction, James Dewey, the PWC audit partner (JX 855, Bates 13343) providing the accounting letter discussed the matter with the promoter division within PWC. (JX 1150; JX 554).

were published in the Federal Register. (Stip. ¶ 56(d); JX 313); 64 Fed. Reg. 26845 (May 18, 1999). After the Section 467 Treasury Regulations disallowed the tax benefits of LILO Transactions, CED turned its attention to another type of leasing tax shelter transaction – SILOs.[95] (JX 1149). Through 1999 and into 2000 CED continued to investigate SILO Transactions in the Netherlands (JX 347; JX 915; JX 1006), while demonstrating no inclination to pursue other types of international investments.

Subsequent to the closing of the EZH LILO Transaction CED barely discussed the transaction, rarely mentioning the transaction at its board meetings. (*See, e.g.*, JX 173; JX 174; JX 177; JX 180). Even when it was discussed, it was in a cursory fashion, normally discussing the income booked from the transaction (*see, e.g.*, JX 161, 162), with no mention of any specifics of the operation of the plant, reports from EZH, or receipt of lease payments from EZH. Similarly, CED only reported such cursory information concerning booked income in its Reports to the Board of Trustees of CECONY. (*See, e.g.*, JX 189, 193, 195, 196, 197). CED's financial reporting demonstrates the lack of oversight and interest CED actually had with respect to the Transaction after closing. The pricing runs, i.e. the document showing the *projected* cash flows and income from the transaction at closing, were the source of information for yearly financial reporting of the transaction. (Tr. 723-25 (Freilich)). In other words, CED made no effort to examine the actual financial receipts or statements concerning the transaction after closing and simply relied on the projections. In fact, CED's own files did not even contain any such information.

[95] In fact, because of the pendency of those regulations, CED and counsel involved in the NUON LILO Transaction had identified a plan for converting the NUON LILO Transaction to a SILO transaction in the event the Section 467 Regulations were published prior to the transaction closing. (JX 1013).

There is simply no evidence of CED discussion of the operation of the plant, maintenance issues, rent payments, or any other matters concerning the RoCa3 Facility. By way of example, Tauw, during its environmental assessment of the RoCa3 Facility, identified a series of non-compliances at the facility that needed remediation by EZH. (*See* JX 53, Bates 2079-81). While EZH created a remediation plan and indicated that it intended to follow up on this plan to resolve those non-compliances (Tr. 1587 (Nieuwenhuis)), there is no evidence CED made any effort to determine whether the efforts were actually carried out, either by requesting Tauw to follow up (Tr. 1594-95 (Nieuwenhuis)) or following up itself. When asked how Plaintiff would know if there was a problem with the facility, Mr. McGrath testified, "If [the RoCa3 Facility] blew up we might know" there was a problem. (Tr. 283 (McGrath)). The only evidence of any effort by CED to monitor the EZH LILO Transaction were the once a year annual reports and officer's certificate sent by EZH. (Stip. ¶ 149-150). However, this information was extremely limited, and there is no evidence that anyone actually reviewed these documents, of any discussion of them at board meetings, or that anyone at CED followed up with EZH concerning their content. (JX 367; JX 368; JX 369; JX 370; Tr. 917-18 (McCartney); Tr. 601 (Burke) (who served as a board member of CED for a period of time subsequent to the closing of the EZH LILO Transaction)). In fact, CED did not even have the officer's certificates in its files for every year following the close of the EZH LILO Transaction.[96] (JX 367; JX 368; JX 369; JX 370).

---

[96]While Wilmington Trust, trustee for CED in the EZH LILO Transaction, did receive these documents for 2005, 2006 (JX 864; JX 876 (note the WTC Bates numbering in bottom corner)), there is no evidence that CED ever requested to see the documents, or that Wilmington Trust ever sent them to CED. It appears that Wilmington Trust simply received these documents, checked a box, and put them in a file somewhere.

Similarly, there is no evidence CED ever requested the reports it is entitled to seek from EZH under Section 7(f) of the Sublease. (*See* JX 4, Bates 404; Stip. ¶ 148).

Not until November 2005, shortly before the litigation in this case was filed, did CED send representatives to the RoCa3 Facility. (JX 352). Following this visit, CED questioned the limited nature of the information being received prior to the visit and noted the types of information that it should have been receiving if it had a true interest in the RoCa3 Facility.[97] (JX 352, Bates 7476-77). However, despite recognizing the deficiencies in the information CED was receiving, there is no evidence that CED made any effort to obtain more detailed information subsequent to this visit. (*See*, *e.g.*, Tr. 916-21 (McCartney)). The 2005 visit appears to be yet another effort to create window dressing to legitimize the Transaction.

## IV. RISK LEVEL OF THE EZH LILO TRANSACTION

While Plaintiff asserts that it faced many risks in entering into the EZH LILO Transaction, its structure, as described above, eliminates the risks normally associated with leveraged leasing transactions. To support its case, Plaintiff presented the testimony of David Ellis, who was certified as an expert in finance analysis and returns of complex financial transactions, including leases and the analysis and valuations of securities. (Tr. 3115 (Ellis)) While Dr. Ellis pointed to several similarities between the sublease portion of the EZH LILO Transaction and a traditional leveraged lease, several key elements were very different.[98] In fact,

[97]In fact, Cornerstone offered to provide lease servicing services to CED, which would have involved conducting inspections of the facility and otherwise monitoring the facility and the lease. (Tr. 1254-55 (Holzman)). However, CED declined to use such services (*Id.*), instead choosing to simply let the lease operate on autopilot.

[98] Dr. Ellis did not consider these differences when he wrote his report but instead focused on the similarities. (Tr. 3377 (Ellis)).

Dr. Ellis' starting point of interchanging the words sublease and lease was, in and of itself, a departure from traditional leveraged leases. (Tr. 3369-70 (Ellis)). The fact that the head lease and sublease were an integral whole was not common. (Tr. 3372-73 (Ellis )). In addition Dr. Ellis acknowledged numerous other ways in which the EZH LILO Transaction differed from traditional leveraged leases. First, full defeasance of both debt and equity is not a common characteristic of a leveraged lease. (Tr. 3373 (Ellis)). Second, completely circular cash flows were not listed by Dr. Ellis as a characteristic of typical leveraged leases. (Tr. 3373-74 (Ellis)). Third, a fully funded purchase option is not a characteristic of typical leveraged leases. (Tr. 3374 (Ellis)). Fourth, the existence of tax indemnity agreements are not common in leveraged leases. (Tr. 3374 (Ellis)). Fifth, Dr. Ellis did not include deferral of the basic rent for more than 40 years as a typical characteristic of a leveraged lease. (Tr. 3375 (Ellis)). Sixth, the walk away provision, which permitted CED to walk away from the Transaction after the sublease basic term with ten days notice, was not a typical characteristic of a leveraged lease. (Tr. 3375-76 (Ellis)). Seventh, the existence of the retention option, the purchase option, and the renewal option in the same transaction was not common. (Tr. 3385-86 Ellis).

Mr. Paul Bent, an expert retained by the government in the area of equipment lease transactions, including the structuring, arranging, and negotiation of such transaction (Tr. 3683 (Bent)), determined there were several features that collectively are atypical in leveraged leases (DX 20199, Bates 25336-37, 25339-40): First, the establishment at closing of the Equity Defeasance Account and its subsequent use is not typical of a leveraged lease. (Tr. 3760-61 (Bent)). Second, EZH, as sublessee, never realizes the actual value of the refinancing of its Facility. (Tr. 3717-18, 3760-61, 3957 (Bent) (noting that it is very unusual that very little of the actual cash invested in the Transaction goes to EZH)). Third, the establishment and accrual of

earnings on the Sublessee Loan and its use to provide an offset against around 50% of the Final Basic Rent Payment is atypical. (Tr. 3761-62 (Bent)). Fourth, the deemed payments of Recourse Lease Basic Rent, secured by the Trustee Treasury Collateral (in turn funded from the original Equity Defeasance Account) and the use of this device to account for approximately 17% of the Final Basic Rent Payment is not typical. (Tr. 3762-64 (Bent)). Fifth, the making of periodic Lease Collateral Deposits (in turn derived from the receipt of Sublease Renewal Rent) and the use of this mechanism to secure about one-third of the Final Basic Rent Payment is not typical. (Tr. 3764-65 (Bent)). Sixth, there was a constructive transfer from CED to EZH of CED's maintenance and repair obligations under the lease, even when no sublease was in place. (Tr. 3765-66 (Bent)). Seventh, equity and debt defeasance accounts were used to completely fund the exercise of various options under the sublease. (Tr. 3766, 3822 (Bent) (noting that he does not recall a deal where the ***full*** amount required to exercise the purchase option is available to the lessee (or in this case sublessee)). Finally, the Equity Defeasance Account was used as a hedge against the risk of loss due to unforseen changes in applicable Dutch law. (Tr. 3767 (Bent)). Although Mr. Bent acknowledged that many other features of the EZH LILO Transaction were typical of traditional leveraged lease transactions, collectively, the addition of the features identified above led Mr. Bent to conclude that the EZH LILO Transaction was not, as Plaintiff claims, a "typical" leveraged lease transaction. (Tr. 3768-69 (Bent)).

In fact, Plaintiff acknowledges the EZH LILO Transaction does not possess the typical risks associated with leveraged leases. In Joint Exhibit 1118, Mr. DePlautt, in an E-mail to Ms. McCartney, answers the question: "If GE Capital is not doing Section 467 lease transactions why should we?" (JX 1118). Mr. DePlautt states: "We have chosen a different risk profile. We want to preserve capital, taking tax risk instead of the credit risks and residual risk that GE

Capital takes is one way to do that." (*Id.*). Mr. DePlautt expands on his statement and writes: "In reviewing the spectrum of risks acceptable in a leasing portfolio, CED has chosen to exclude, to the extent reasonably possible, the credit risk and the residual risk value of assets, risks that GE Capital regularly accepts. And, instead, participate in transactions that have a concentration centered on tax risk." (*Id.*). That is precisely why Plaintiff entered into this transaction and took the steps that it took: to virtually eliminate the credit risk and the residual risk, while hoping for the tax benefits. (*See* Exhibit 363, Bates 7672; Tr. 3736-40, 3744 (Bent); *see* DX 20194, Bates 25146).

## ARGUMENT

Plaintiff's claimed tax deductions are improper for three reasons.[99] First, looking at the EZH LILO Transaction as a whole reveals that CED did not in substance acquire a present leasehold interest in EZH's property. Second, CED did not incur genuine indebtedness in connection with the deal. Third, and alternatively, the EZH LILO Transaction should be disregarded under the economic substance doctrine. As described more fully below, Plaintiff bears the burden of proof on each of these issues.

## I. BURDEN OF PROOF

The Court must make a *de novo* determination in resolving this dispute. The Court may sustain the Service's determinations based upon any applicable legal theory or authority, regardless of whether that authority or theory was expressed in the Statutory Notice of Deficiency. *Helvering v. Gowran*, 302 U.S. 238, 245-46 (1937) ("If the Commissioner was

[99]The amount directly at issue in this case is the tax impact of the LILO shelter for only two weeks in 1997 – $328,066. The real amount is far greater. The shelter is expected to last twenty years and the amounts of tax benefits claimed in subsequent years are and will be very substantial.

right in his determination, the [trial court] properly affirmed it, even if the reasons which he had assigned were wrong”). Thus, Plaintiff is not entitled to prevail merely by showing that the Service made an error of law or applied the law improperly in its case.

Plaintiff, like any other taxpayer, is “not automatically entitled to every claimed deduction. ‘[A]n income tax deduction is a matter of legislative grace and . . . the burden of clearly showing the right to the claimed deduction is on the taxpayer.’” *Dow Chem. Co. v. United States*, 435 F.3d 594, 599 (6th Cir. 2006), *cert. denied*, 127 S. Ct. 1251 (2007) (quoting *INDOPCO, Inc. v. Comm’r*, 503 U.S. 79, 84 (1992)). Thus, Plaintiff has the burden of proving its entitlement to deductions for rent, interest, and transaction costs for the year at issue in this case. In addition, in *Coltec*, the Federal Circuit determined that a taxpayer has the burden of proving that a transaction has economic substance. *Coltec Indus., Inc. v. United States*, 454 F.3d 1340, 1355 (Fed. Cir. 2006). *See also Jade Trading v. United States*, 80 Fed. Cl. 11, 46 (Ct. Cl. 2007); *Newman v. Comm’r*, 902 F.2d 159, 162-63 (2d Cir. 1990); *Compaq Computer Corp. v. Comm’r*, 277 F.3d 778, 780-81 (5th Cir. 2001); *Am. Elec. Power Co. v. United States*, 326 F.3d 737, 742 (6th Cir. 2003); *Sacks v. Comm’r*, 69 F.3d 982, 986 (9th Cir. 1995); *J. B. N. Tel. Co. v. United States*, 638 F.2d 227, 232 (10th Cir. 1981). The Federal Circuit explained in *Coltec*:

> In describing the history of the economic substance doctrine, our predecessor court in *Rothschild* stated, ‘Gregory v. Helvering requires that a taxpayer carry an unusually heavy burden when he attempts to demonstrate that Congress intended to give favorable tax treatment to the kind of transaction that would never occur absent the motive of tax avoidance.” 407 F.2d at 411 (quoting *Diggs v. Comm’r of Internal Revenue*, 281 F.2d 326, 330 (2d Cir.1960)).

*Coltec*, 454 F.3d at 1355-56 (citing *Rothschild v. United States*, 407 F.2d 404, 186 Ct. Cl. 709 (Ct. Cl. 1969)). Plaintiff must carry this heavy burden of proof on all issues.

## II. PLAINTIFF IS NOT ENTITLED TO DEDUCTIONS FOR AN ADVANCE HEAD LEASE PAYMENT AND TRANSACTION COSTS IN 1997

### A. The Transaction's Substance, Not Its Form, Determines Its Tax Treatment

There is a well-established principle that governs all tax disputes: a transaction's substance, not its form, determines its treatment for federal income tax purposes. *Gregory v. Helvering*, 293 U.S. 465 (1935). For this reason, courts have never regarded "the simple expedient of drawing up papers" as controlling for tax purposes where, as here, a transaction's objective economic realities do not comport with the form in which it was cast. *Frank Lyon Co. v. United States*, 435 U.S. 561, 573 (1978); *Comm'r v. Tower*, 327 U.S. 280, 291 (1946). Where the form of a transaction presents an accurate reflection of the substantive rights and responsibilities allocated by the parties, the form of the transaction should be respected. When it does not, however, and the substance of a transaction differs from its form, the transaction's substance controls. *Compare Frank Lyon*, 435 U.S. 561 (transaction structured and respected as a sale-leaseback) *with*, *Neb. Dep't of Revenue v. Loewenstein*, 513 U.S. 123 (1994) (transaction structured as a "sale" and "repurchase" of municipal bonds, recharacterized as a secured lending transaction). It is this principle, and not a taxpayer's desire to achieve particular tax results, that determines a transaction's effects for federal income tax purposes. *Frank Lyon*, 435 U.S. at 573; *Comm'r v. Duberstein*, 363 U.S. 278, 286 (1960).

Thus, if the Court concludes – as it should on the basis of the evidence in the case – that CED failed in substance to acquire a *current* leasehold interest in the RoCa3 Facility, regardless of the characterizations given to the Transaction in the operative documents, the Court should disregard the form of the Transaction for tax purposes. Without a current leasehold interest, Plaintiff is not entitled to deductions for the rent expense or transaction costs, nor the purported

rental income Plaintiff reported from purportedly subleasing its interest in the RoCa3 Facility back to EZH.

**B. CED Failed to Acquire a Current Leasehold Interest in the EZH RoCa3 Facility**

In evaluating the propriety of Plaintiff's claimed tax deductions, the Court must examine the relevant facts and circumstances of the EZH LILO Transaction to determine whether, in substance, EZH transferred an interest in property to CED. *Grodt & McKay Realty, Inc. v. Comm'r*, 77 T.C. 1221, 1237-38 (1981). This analysis requires a comparison of the operative documents of the EZH LILO Transaction to the substantive rights and duties actually conferred upon and undertaken by the Transaction participants. This comparison demonstrates that while the form of the Transaction is dizzying in its complexity, its substance boils down to a few elemental truths: Despite all the paperwork, EZH continued to operate the RoCa3 Facility just as it had before; EZH received a fee for accommodating the paperwork which facilitated Plaintiff's claim of tax benefits; Plaintiff's remaining equity investment covered transaction costs and an investment in Treasury STRIPS; and the role of ABN AMRO involved the circular flow of funds that never left the bank. In essence the EZH LILO Transaction was a ploy to generate tax benefits by paperwork and payments to accommodating parties.[100] Since EZH continues to own

[100]Both EZH and the Dutch taxing authority understood that this was the purpose of the transaction at issue. (JX 488, Bates 5637 ("Mr. Krenger is of the opinion that reasonable business management requires acting reservedly in this type of paper transactions that has as a goal to achieve a (major) financial advantage by mean of foreign tax systems"); JX 50 (noting that the Dutch taxing authority was "of the opinion that in actuality no other result is sought other than to obtain a tax benefit for the investors in America"). The EZH LILO Transaction should be considered a deemed loan of an amount from CED to EZH deposited in an "equity collateral account" used to purchase Treasury STRIPS that served as collateral for the loan, not the lease that Plaintiff is here claiming. In *BB&T Corp. v. United States*, the court found that the substance of the LILO transaction in that case was a direct acquisition of Treasury STRIPS by BB&T. 99 A.F.T.R.2d 2007-376, 2007 WL 37798 (M.D.N.C. January 4, 2007), *appeal pending*, No. 07-1177 (4th Cir.). The determination of which of these two characterizations (rather than

and use the RoCa3 Facility as before, EZH never conveyed to CED a real leasehold interest in its property, and Plaintiff is not entitled to claim tax deductions.

To prevail in this case, Plaintiff must show that it both attained and retained significant and genuine attributes of a traditional owner of property, or more precisely, a traditional owner of a leasehold interest in EZH's property. *Frank Lyon*, 435 U.S. at 584. Those attributes are present only when the person purporting to own a leasehold interest enjoys the benefits and bears the burdens normally incident to possession of such an interest. *See Coleman v. Comm'r*, 16 F.3d 821, 826 (7th Cir. 1994) (citing *Frank Lyon*, 435 U.S. at 582-84); *see also BB&T Corp. v. United States*, 2007 WL 37798 *7-8 (M.D.N.C. 2007). In this case, the reciprocal nature of the rights and duties exchanged by CED and EZH under the operative documents, the circular flow of funds that from the outset virtually ensure payment of the respective obligations created thereunder, and EZH's continued and unabated use of the RoCa3 Facility at no cost to itself, deprive CED of the benefits and burdens of the leasehold interest it claims to possess.

*Frank Lyon* concerned a sale-leaseback of a building that was constructed with funds that were fully dedicated to the project. 435 U.S. at 567. The funds consisted of a cash investment by the taxpayer, and proceeds of a recourse loan obtained by the taxpayer. *Id.* In concluding that the taxpayer was the owner of the building for tax purposes (and therefore entitled to the depreciation deductions it claimed on account of tax ownership), the Supreme Court relied on the fact that the taxpayer alone was liable for the debt that financed the

---

Plaintiff's claimed form) should prevail rests on the cases cited in *Nebraska Department of Revenue v. Loewenstein*, *supra*. Neither of these alternative characterizations provides support for the tax benefits claimed by Plaintiff here (or BB&T in that case).

construction of the building, and alone bore the risk of loss if the building declined in value. *Id*. at 581.

Since the Supreme Court's decision in *Frank Lyon*, courts have focused on the existence of both credit risk, and market value risk as central features of tax ownership. In *Coleman v. Commissioner*, the Seventh Circuit denied depreciation deductions to a taxpayer who purportedly acquired computer equipment through a sale-leaseback transaction because the taxpayer was not liable for the non-recourse debt that financed the taxpayer's purported purchase, and did not stand to gain (or lose) any residual value in the equipment at the end of the lease term. 16 F.3d at 826-27.

In *Swift Dodge v. Commissioner*, 692 F.2d 651 (9th Cir. 1982), the Ninth Circuit examined whether transactions involving "open end" vehicle leases constituted conditional sales, or, rather, leases as the taxpayer had argued. The Ninth Circuit relied on the fact that all of the indicia of ownership in general, and the risk of depreciation in particular, rested with the users of the vehicles (not the taxpayer) and found that the transactions were, in substance, conditional sales. *Id.* at 652-54. By contrast, where a taxpayer may either incur a loss, or earn a profit depending on the residual value of the property interest, the taxpayer is treated as the owner of that interest for tax purposes. *Estate of Thomas v. Comm'r*, 84 T.C. 412, 433-34 (1985). *See also Frank Lyon Co.*, 435 U.S. at 579 .

The District Court for the Middle District of North Carolina recently rejected a taxpayer's claimed tax benefits in a substantially similar LILO tax shelter. *BB&T Corp. v. United States*, 99 A.F.T.R.2d 2007-376, 2007 WL 37798 (M.D.N.C. January 4, 2007), *appeal pending*, No. 07-1177 (4th Cir.). BB&T purported to lease pulp manufacturing equipment from a tax indifferent entity under a Head Lease. *Id.* at *1-4. The equipment was immediately leased

back to the tax exempt entity under a sublease with terms that allowed it to effectively retain possession and control of the equipment at no cost to itself. *Id.* at *1, 6-7. BB&T paid fees to the transaction facilitators, and it also paid a relatively small cash fee to the tax exempt entity as its "incentive to do the deal." *Id.* at *8. Beyond that, the head lease and lease back to the tax exempt entity completely offset each other. *Id*. at *10. To illustrate, under the head lease, BB&T made a very large payment of "rent" to the tax exempt entity. *Id*. at *2. No other payments were made by BB&T during the term of the head lease. *Id.* at *2-3. BB&T financed this payment through non-recourse, "borrowed" funds and a cash outlay. *Id.* at *2. BB&T simultaneously purported to lease the property back to the tax exempt entity for a shorter lease term. *Id.* at *1. During the period of the leaseback, the "borrowed" funds were held in trust by the lender (or its affiliate) who acted as "debt payment undertaker" which was contractually bound to use the borrowed funds (with the interest they generated) to pay the tax exempt entity's supposed sublease rental payments and in turn to pay off BB&T's loan (with interest). *Id.* at *2. At the end of the initial sublease, the tax exempt entity could re-purchase the property, or if it declined, BB&T could force a renewal of the sublease. *Id.* at *3. BB&T funded the re-purchase with its own funds at the initial closing. *Id.* at *3. These funds were invested in Treasury notes which, when they matured and were combined with the funds in the Debt PUA account (i.e. the amounts held by the lender's affiliate),[101] would be sufficient in amount (or close to it) to fund the re-purchase price or the rents due under the renewal sublease. *Id.* at *8. The tax exempt entity again had the ability to retain possession and control of the equipment at no cost to itself. *Id.* at *1, *6-7. Recognizing the reciprocal nature of the transactions, the fact that no incidences

[101]The Debt PUA is analogous to the Debt Defeasance Account in the instant case at ABN AMRO.

of ownership were transferred (including risk of loss), and the non-recourse nature of the "debt" BB&T used to fund the alleged lease, the court disallowed the rent and interest expense deductions BB&T claimed. *Id.* at *10-11. Specifically, the district court determined that "the Transaction was structured so that there was no risk to B B & T's initial (and only) cash outlay." *Id.* at *8.

The Court of Federal Claims recently addressed the benefits and burdens test in determining whether an ownership interest existed for tax purposes. *See H.J. Heinz Co. v. United States*, 76 Fed. Cl. 570 (Ct. Cl. 2007).[102] The Court stated that "[a]mong the factors relevant to [the determination whether the taxpayer possesses the benefits and burdens of ownership] are: (i) whether the purchaser bears the risk of loss and opportunity for gain; (ii) which party receives the right to any current income from the property; (iii) whether legal title has passed; and (iv) whether an equity interest was acquired in the property." *Id.* at 581-82. And the Court cautioned that "[i]ndeed, none of these factors is necessarily controlling; the incidence of ownership, rather, depends upon all the facts and circumstances." *Id.* at 582.[103] While the issue in that case involved a determination of whether an ownership interest in stock was acquired for tax purposes,[104] the legal standard applies here, because as the Court stated

[102] *Heinz* involved a corporate tax shelter concerning intragroup redemption taxed as dividend that resulted in basis reallocation producing non-economic tax losses on the subsequent sale by subsidiary of parent stock. The Court struck down the transaction under the sham and step transaction doctrines.

[103] However, in some instances, the absence of a single factor could be determinative. *See BB&T*, 2007 WL 37798, at *7-8 (citing *Estate of Thomas v. Commissioner*, 84 T.C. 412 (1985)).

[104]The Court of Federal Claims in *Heinz* determined that the Heinz subsidiary did own the stock at issue. The facts of *Heinz* differ from those here as the subsidiary in *Heinz* plainly bore the risk of loss.

"[w]hile these factors typically are applied in discerning when a sale occurs, *particularly in contradistinguishing leases or loans*, they have also been employed more generally in determining to whom ownership, in a given transaction, was transferred . . ." *Id.* (emphasis added).

Turning to the substance of the EZH LILO Transaction, the facts demonstrate that CED did not acquire a current leasehold interest in EZH's property for tax purposes. CED bore no financial risk for the loan that financed most of the Initial Basic Rent Payment. First, HBU has no recourse against CED (or Plaintiff for that matter). (Stip. ¶ 118; JX 396, Bates 8117). Second, the loan proceeds were not even distributed to CED or EZH, as they are held by HBU's parent, ABN AMRO. (Stip. ¶¶ 126-131).[105] Finally, the circular financing arrangement between the Transaction participants provides a ready source of funds to repay the loan.[106] (Tr. 5060-63 (LaRue)).

In addition, CED's initial out of pocket payment after transaction costs and the accommodation fee to EZH is certainly not at risk, a point CED recognized in its evaluation of the Transaction. (JX 397, Bates 8121; JX 363, Bates 7674 (noting that even in the worst case scenario CED could draw on the Equity and Debt Defeasance Accounts and letter of credit to obtain its return on the Transaction); DX 20193, Bates 25061). The Second Circuit, in *TIFD III-*

---

[105]ABN AMRO wrote, "Thank you for inviting ABN AMRO Bank to act as lender and defeasance bank in a US lease transaction." (JX 401).

[106]Although there is the theoretical possibility that the loan might not be repaid through the Debt Defeasance Account if, for example, ABN AMRO were to declare bankruptcy (and the provision allowing for a change in the Debt Defeasance Account to another defeasance device had not been undertaken (JX 1, Bates 66-67)), CED and EZH both viewed that possibility as remote. (*See* Tr. 1329-30 (Holzman) (noting that there are steps in place to mitigate the possibility that any credit problems of ABN AMRO would have an impact on the Transaction).

*E, Inc. v. United States*, 459 F.3d 220 (2d Cir. 2006), rejected a transaction characterized as an equity interest, because the purported equity interest holder "enjoyed only a narrowly circumscribed ability to participate in profits in excess of their Applicable Rate of return," and "ran a small risk of shortfall in event of catastrophic loss – a risk so small that the district court disregarded it . . . .," *id.* at 233-34, 240-41. The Second Circuit found error with the lower court's determination that an equity interest existed, because "[t]he problem with this determination is that it depended on the fictions projected by the partnership agreement, rather than on the assessment of practical realities." *Id.* at 234.

The equity defeasance mechanisms coupled with the required letter of credit ensured CED would not lose its initial investment. (Tr. 3737-42, 3750-51 (Bent)). Moreover, the Transaction features both a purchase option that EZH can exercise at the end of the sublease that minimizes the extent to which CED can participate in any possible residual value rewards, and a sublease renewal option for CED, that limits the extent to which CED will suffer from any decrease in market value. In effect, these options at the end of the sublease's initial term act in tandem to cap the residual value of CED's purported interest in the head lease, as well as serve to protect CED from the risk that the value of its purported leasehold interest will decline. (JX 397, Bates 8121; *see* DX 20201, Bates 25366). Indeed, the effect of these options to "collar" the EZH LILO Transaction's upside reward and downside risk to CED strongly undermines any claim that CED acquired ownership of a leasehold interest in the RoCa3 Facility on the closing date.[107] In *Kwiat v. Commissioner*, 64 T.C.M. (CCH) 327, T.C. Memo (RIA) 1992-433 (1992),

[107]CED's internal documents recognized the predetermined and fixed nature of the payment streams it would receive from its LILO Transactions. (*See* JX 389, Bates 8025 ("The earnings from these transactions are highly predictable because the cash inflows and outflows to the transaction are contractually agreed to on the closing date"); JX 1133, Bates 16624 ("All

the Tax Court found that the mere existence of reciprocal put and call options placed the risk and rewards of ownership with the lessee/user of the subject property, not the putative lessor/owner who improperly claimed the depreciation deductions associated with the property. Examining the relevance of those options, the court wrote –

> [T]he issue is not whether a commercial sale ultimately will be completed, but whether the transaction, *as it stands at the time in question*, sufficiently shifts the benefits and burdens of ownership such that the transaction should, for tax purposes, be treated as if it were a sale. The mere presence of reciprocal puts and calls, exercisable within relatively short time periods, undoubtedly shifts substantial benefits and burdens of ownership. . . . Those benefits and burdens shift even if a sale is never "consummated."

64 T.C.M. at 334 (emphasis added). *See also Aderholt Specialty Co. v. Comm'r*, 50 T.C.M. (CCH) 1101, T.C. Memo (P-H) 1985-491 (1985) (holding that a sale constitutes a "disposition" for purposes of I.R.C. Section 47), and Rev. Rul. 72-543, 1972-2 C.B. 87. Conversely, a collar that allows a purported seller of a property interest to maintain, at its discretion, dominion and control over that interest is inconsistent with the notion of a transfer of ownership for tax purposes. *Cf. Rexnord, Inc. v. United States*, 940 F.2d 1094, 1097 (7th Cir. 1991) (citing *PACCAR, Inc. v. Commissioner*, 85 T.C. 754 (1985), *aff'd*, 849 F.2d 393 (9th Cir. 1988)); *Volvo Cars of N.A., Inc. v. United States*, 92-2 U.S. Tax Cas. (CCH) ¶ 50,705, 80 A.F.T.R. 2d (RIA) ¶ 97-6094 (M.D.N.C. Aug. 12, 1997).

EZH's option to purchase CED's interest in the Lease for a fixed-price, coupled with CED's option to force EZH to renew the sublease leave the benefits and burdens of ownership exactly where they have always been – with EZH. Unless and until EZH (or CED) decides

---

payment streams are predetermined").

otherwise, EZH will possess the RoCa3 Facility "rent free"[108]; remain responsible for all costs and capital improvements associated with the RoCa3 Facility's use and maintenance (Stip. ¶ 137; JX 876; Tr.1343 (Holzman); DX 20193, Bates 25087); and retain all profits from its operation. (Tr. 282-83 (McGrath) (stating that EZH continued to operate the facility as its own); *see also* Tr. 2223 (DePlautt) (stating that CED had no plans to actually run the RoCa3 Facility); Tr. 559-60 (Burke) (noting that, at least for the initial sublease term, if everything went according to plan EZH, not CED, would be running the RoCa3 Facility); Tr. 1756-57 (Ellsworth) (admitting that under the Sublease Renewal Option EZH would continue operating the facility and obtain the profits and bear the burdens of ownership)). Thus, the EZH LILO Transaction did not result in a transfer of a current property interest from EZH to CED. While there may come a time when CED acquires an interest in EZH's RoCa3 Facility if the parties' reciprocal options end (i.e. the 6.2 year shirttail period or the 23 year Retention Option period in the event EZH does not exercise the Sublease Purchase Option), that day has not yet arrived.

"The fact that BB&T did not acquire a leasehold interest in the Equipment is further demonstrated by the fact that BB&T bore no real risk of loss of its initial investment in the transaction." *BB&T*, 2007 WL 37798 at *8.[109] As was the case in *BB&T*, CED was assured a

[108]The possession is "rent free" because for the basic sublease term, the entirety of the "rent" is simply funded from CED's advance rent payment provided to EZH on day one and EZH is never required to go "out of pocket" to make the purported rent payments. (Tr. 3718-19 (Bent)).

[109]The argument that a possible future interest could serve as the basis for establishing a valid leasehold interest was rejected in *BB&T*, where the court held: "BB&T could acquire only a future interest in the Equipment that will mature at the end of the Lease term and then only in the event that Sodra (the tax exempt entity) elects not to exercise its option (funded in full by the Equity PUA and the Debt PUA) to buyout BB&T's interest in the Head Lease. BB&T's payments to Sodra are not 'rent payments.' The fact that BB&T did not acquire a leasehold interest in the Equipment is further demonstrated by the fact that BB&T bore no real risk of loss

minimum return irrespective of the residual value of the purported leasehold interest, *i.e.*, its value at the end of the basic sublease term. The absence of residual value risk is fatal to Plaintiff's claim of an interest in property. For now, ***the mere existence*** of the reciprocal options to terminate the deal or extend the sublease, tightly collared around a projected fair market value – when considered in conjunction with the other features of the Transaction that place the aforementioned benefits and burdens of ownership with EZH through at least the end of Basic Lease Term[110] – prevent Plaintiff from now being considered the owner of a current leasehold interest. *See McCulley Ashlock v. Comm'r*, 18 T.C. 405, 411-412 (1952), *acq.* 1952-2 C.B. 1 (taxpayer/ buyer acquired only a future interest in property where seller retained control and benefits of ownership); *Kruesel v. United States*, 63-2 U.S. Tax Cas. (CCH) ¶ 9714, 12 A.F.T.R. 2d (RIA) ¶ 5701 (D. Minn. 1963); *Alstores Realty Co. v. Commissioner*, 46 T.C. 363, 370-372 (1966), *acq.* 1967-2 C.B. 1 (taxpayer/buyer that assumed risk and burdens of ownership subject to a lease treated as property owner for tax purposes).

The correct timing of a transfer of property ownership for tax purposes was the central issue presented in *Williams v. Commissioner*, 1 F.3d 502 (7th Cir. 1993), *aff'g*, 63 T.C.M. (CCH) 2959 (1992), and *Benedict v. United States*, 881 F. Supp. 1532 (D. Utah 1995), two factually

---

of its initial investment in the transaction." *BB&T*, 2007 WL 37798 at *8.

[110]Further, as explained above (*see supra* at 35), even in the event of CED's exercise of the Sublease Renewal Option, CED understood that it faced no risk from the shirttail period, and could simply walk away from any obligations with respect to the facility (other than allowing the offsetting final rent payment mechanisms to come to fruition) at the end of the sublease renewal term. (JX 605; *see* Tr. 3375-76 (Ellis)). CED's failure to even attempt to analyze the potential returns or risks present in the shirttail period (*see* Tr. 2165-66, 2170 (DePlautt)) underscores the reality of the Transaction – that CED would simply never need to face any risks that may hypothetically be present in the shirttail period. Thus, even in the event of the Sublease Renewal Option the structure of the EZH LILO Transaction has stripped away the risks adherent with possession and operation of a leasehold interest during the shirttail period.

similar cases involving installment sales of town houses. In both cases, while the homes were under construction, the parties executed agreements of sale and deeds, and deposited checks in escrow pending completion of construction and closing. *Williams*, 1 F.3d at 504; *Benedict*, 881 F. Supp. at 1535-36. In the event of a breach by the sellers, the sales agreements provided that the buyers' sole remedy would be the return of their deposits plus interest. *Williams*, 1 F.3d at 504; *Benedict*, 881 F. Supp. at 1541. Reasoning that the buyers had neither possession of, nor the right to possess the respective homes before closing, and recognizing that the sales agreement explicitly denied the buyers the right to force conveyance, both of the courts found that the sales of the homes did not occur until closing. *Williams*, 1 F.3d at 507; *Benedict*, 881 F. Supp. at 1544.

Like the purported buyers in those cases, CED cannot possess or use its 47.47% leasehold interest in the RoCa3 Facility for at least 20.1 years (absent the remote chance of a default by ABN AMRO with respect to its obligations to the Debt Defeasance Account and EZH under the Sublease Agreement), and, after that, only in the unlikely event EZH decides not to exercise its prefunded Sublease Purchase Option. (Stip. ¶ 180; JX 1142, Bates 16776; Tr. 559-62 (Burke); *see supra* at 36-38). Even then, CED does not envision taking possession of its interest in the RoCa3 Facility. Rather, if EZH does not exercise the Sublease Purchase Option, CED anticipates that it will elect to have EZH renew the sublease, and that EZH will use the proceeds from the defeasance accounts to pay the sublease rent due during the renewal period and provide CED's return from the Transaction. (*See* s*upra* at 34; JX 257, Bates 4825-26; JX 363, Bates 7615; JX 397, Bates 8121; *see* DX 20194, Bates 25084).

Looking at the EZH LILO Transaction as a whole, whatever substantive property rights CED obtained on the closing date relate not to the RoCa3 Facility, but to the Treasury STRIPS

held by Credit Suisse in its capacity as custodian of the Equity Defeasance Account. (Stip. ¶ 213, 218, 219; Tr. 1447 (Holzman)). During its evaluation of the deal, CED noted that the equity defeasance, together with earnings thereon, would be returned to CED either through EZH's exercise of the Sublease Purchase Option, CED's exercise of the Sublease Renewal Option (if EZH does not exercise the Sublease Purchase Option), or some earlier termination of the sublease. (JX 257, Bates 4825-26; JX 397, Bates 8121-22). Seen in this context, CED's transfer of funds to be used in the equity defeasance account resembles a loan to EZH, with the amounts serving as security for EZH's borrowing. *Comm'r v. Indianapolis Power & Light Co.*, 493 U.S. 203 (1990), *aff'g* 857 F.2d 1162 (7th Cir. 1988), *aff'g*, 88 T.C. 964 (1987) (treating customer deposits as loans rather than advance payments for services where preconditions to return of the deposit were within the control of the customer). So viewed, whatever rights CED has in EZH's property are more akin to the rights conferred to a secured creditor, not the owner of a leasehold interest. *Helvering v. F. & R. Lazarus & Co.*, 308 U.S. 252, 255 (1939) ("We think the [Tax Court] justifiably concluded from its findings that the transaction between the taxpayer and the trustee bank, in written form a transfer of ownership with a lease back, was actually a loan secured by the property involved."). Here, that "property involved" is the Treasury STRIPS, not the property purportedly leased. That CED might, through the non-exercise of EZH's Sublease Purchase Option, and CED's not exercise of the Renewal Option, acquire a leasehold interest in the RoCa3 Facility in the future does not alter the fact the benefits and burdens associated with the head lease stay with EZH unless and until that situation occurs at the earliest in 2018. *Kwiat*, 64 T.C.M. at 334, n.8 ("Inasmuch as the 'benefits and burdens of ownership' inquiry focuses primarily upon the risk of economic depreciation and the

benefit of *possible* appreciation, it might aid the understanding to consider whether the ostensible lessor has retained the majority of the *potential* benefits and burdens of ownership.").

**C. The Court Should Collapse Reciprocal Rights and Obligations**

As described above, the Lease Agreement purports to provide CED with a leasehold interest in a 47.47% undivided interest in the RoCa3 Facility for 41 years. (Stip. ¶ 113). At the same time, however, the sublease purports to provide EZH with a leasehold interest in that same interest in the RoCa3 Facility which allows EZH to continue to possess the RoCa3 Facility and use it in its business. (Stip. ¶ 135; Tr.1343 (Holzman); Tr. 1756-57 (Ellsworth) (admitting that under the Sublease Renewal Option EZH would continue operating the facility and obtain the profits and bear the burdens of ownership); Tr. 282-83 (McGrath) (stating that EZH continued to operate the facility as its own); *see also* Tr. 2223 (DePlautt) (stating that CED had no plans to actually run the RoCa3 Facility); (Tr. 559-60 (Burke) (noting that, at least for the initial sublease term, if everything went according to plan EZH, not CED, would be running the RoCa3 Facility)). Where, as here, parties have purported to enter into two separate transactions that result in similar and reciprocal obligations, the transaction should be collapsed to reflect its true substance. *See Rogers v. United States*, 281 F.3d 1108 (10th Cir. 2002) (loan and option to purchase shareholder's stock collapsed to reveal a redemption of stock). The courts have collapsed reciprocal obligations that essentially offset each other. *See BB&T*, 2007 WL 37798 at *8-10; *Rickey v. Comm'r*, 502 F.2d 748 (9th Cir. 1974); *United States v. Ingalls*, 399 F.2d 143 (5th Cir. 1968), *cert. denied* 393 U.S. 1094 (1969); *Blue Flame Gas Co. v. Commissioner*, 54 T.C. 584 (1970); *Greenfield v. Commissioner*, 44 T.C.M. (CCH) 1487 (1982) (copy attached); *Big "D" Dev. Corp. v. Comm'r*, 30 T.C.M. (CCH) 646 (1971), *aff'd per curiam*, 453 F.2d 1365 (5th Cir.), *cert. denied* 406 U.S. 945 (1972).

This argument was specifically raised and adopted by the court in *BB&T* where the funding arrangements were virtually identical to those in this case.[111] The court held:

> When these offsetting and reciprocal obligations are disregarded, it is clear that BB&T and Sodra did not enter into a lease and sublease of the Equipment. Under the form selected by the parties, Sodra purportedly leased its right to use and possess the Equipment to BB&T under the Head Lease. BB&T's right to use and possess the Equipment under the Head Lease is offset by Sodra's right to use and possess the Equipment under the Lease. Sodra's rental payments under the Lease are equal in timing and amount to BB&T's debt servicing payments to HBU. If Sodra elects to purchase BB&T's interest in the Head Lease at the end of the Lease term, the purchase price will be funded in full by the Equity PUA and the Debt PUA. If Sodra elects not to exercise the purchase option, BB&T's Deferred Head Lease payment will be funded in full (and if not completely funded will be no-recourse to BB&T) by the Sublease Renewal Rent or Sublease Replacement Rent. Once these obligations are disregarded, all that remains is BB&T's payment of transaction costs and investment in government securities purchased by the Equity PUA.

---

[111] In *BB&T*, 2007 WL 33798 *9, the Transaction was structured as follows:

(1) Pursuant to the "Head Lease" BB&T acquired an undivided interest in the Equipment for a period of 36 years. (2) Pursuant to the Lease, Sodra [the tax indifferent entity] immediately acquired the same undivided interest in the Equipment for a term of 15.5 years. (3) The Debt PUA payments satisfy both Sodra's rental obligations to BB&T under the sublease and BB&T's obligations to HBU under the loan agreement. (4) The interest rate on the funds that Sodra paid to the Debt PUA Issuer is equal to the interest rate on the HBU loan. (5) Sodra's purchase option at the end of the Lease term is funded entirely from the Debt PUA and the Equity PUA. (6) In the event Sodra does not exercise the purchase option and BB&T requires Sodra to renew the Lease, the funds remaining in the Debt PUA and the Equity PUA are enough to satisfy in full the rental payments of the extended sublease. (7) If Sodra does not exercise the purchase option and BB&T remains obligated to make the $557.8 million deferred Head Lease payment in 2038, which would be "ultimately offset by the Sublease Renewal or Replacement Sublease rents plus an implied interest rate." (Internal citations omitted).

2007 WL 37798 *10. While the facts of all of the cases cited above, with the exception of *BB&T*, are different from those here, they further illustrate a principle under which this Court should collapse the EZH LILO Transaction, and disregard the economically offsetting rights and obligations that mark the first 20.1 years of the Transaction.

*Bussing v. Commissioner* is a factually similar case in which the principle of collapsing reciprocal obligations was applied. In that case, the taxpayer claimed depreciation deductions through a purported sale-leaseback of computer equipment between the taxpayer and two corporations (AG and Sutton). 88 T.C. 449, 451-55, *reconsideration denied*, 89 T.C. 1050 (1987). At the time of the transaction in question, AG owned the equipment subject to a lease to the user of the equipment. *Id.* at 451. AG sold the equipment to Sutton, which in turn sold the equipment to the taxpayer for cash and notes. *Id.* at 451-52. The taxpayer then leased his interest in the equipment back to AG for nine years. *Id.* at 453. The rents due the taxpayer on the leaseback exactly matched the debt service owed on the notes. *Id.* at 458. As a result, the taxpayer never received rent under the lease to AG, and never made any debt payments on the notes to Sutton. *Id.* Employing a two-part substance over form analysis, the court first disregarded Sutton's participation in the transaction and collapsed the transaction into a two-party deal. *Id.* at 457-58. The court then disregarded the offsetting debt and rent obligations between the taxpayer and AG, leaving the taxpayer with an interest in the equipment reflecting his cash investment in the property. *Id.*

Like the court *in Bussing*, this Court should disregard the offsetting debt and rental obligations. As described above, each year EZH owes rental payments. Under the operative documents, Plaintiff never receives these payments. Instead, the rental payments are used to pay down the HBU loan. EZH also makes no payments with funds of its own. Instead, the source

of the payments is the money in the account held at ABN AMRO, parent of HBU. Those funds are in turn derived from the HBU loan to CED. The circular flow of funds continues on autopilot for the 20 year period of the sublease (and through year 27 if the Sublease Renewal Option is exercised). In short, EZH never needs to come up with any money. The debt is fully defeased and there is no possibility of a payment default. (DX 20194, Bates 25129-32, 25148, 25155-56; DX 20193, Bates 25061-64; Tr. 3736-44 (Bent); Tr. 5054-55 (LaRue)). Plaintiff makes no money; EZH makes no money.

Further, as in *BB&T*, the Transaction features a fully funded purchase option that EZH can "exercise" at the end of the Lease that minimizes the extent to which CED can participate in any possible residual benefit. Similarly, CED's Sublease Renewal Option limits the extent to which CED will suffer from any decrease in market value. In effect, these two options at the end of the sublease act in tandem to cap the residual value of Con Ed's purported leasehold interest, and protect Con Ed from the risk that the value of its interest will decline. Recently, the Second Circuit concluded that a bank lacked an equity investment in a partnership for that very reason. *TIFD III-E, Inc. v. United States*, 459 F.3d 220, 223 (2d Cir. 2006); *see also Int'l Paper Co. v. United States*, 33 Fed. Cl. 384 (Ct. Cl. 1995) (citing *PACCAR, Inc. v. Commissioner*, 85 T.C. 754 (1985)) ("A sale is completed and ownership rights transfer to the buyer when the buyer acquires the 'benefits and burdens of ownership.'").

EZH's option to purchase CED's interest in the lease for a fixed price, coupled with CED's option to force EZH to renew the sublease should conditions dictate, leave the benefits and burdens of ownership of the lease interest exactly where they have always been – with EZH. Unless and until both EZH and/or CED decide otherwise, EZH will possess the RoCa3 Facility "rent-free", remain responsible for all costs and capital improvements associated with the

Facility's use and maintenance, and retain all profits from operation of the Facility. Thus, the Transaction did not result in a transfer of a current property interest from EZH to CED. Only, if EZH fails to exercise its prefunded Sublease Purchase Option and CED fails to extend the sublease, will CED acquire an interest in the RoCa3 Facility.[112] That day has not yet arrived.

## III. PLAINTIFF IS NOT ENTITLED TO AN INTEREST EXPENSE DEDUCTION RELATED TO THE PURPORTED LOAN

In addition to the improper deductions for rent expense under the head lease and transaction costs, discussed in the previous section, Plaintiff claimed an interest expense deduction in 1997 for interest paid on the HBU loan. Plaintiff is not entitled to that deduction.

Section 163(a) of the Internal Revenue Code generally allows taxpayers a deduction for all interest paid or accrued within the taxable year on indebtedness. For purposes of this section, interest refers to "compensation for the use or forebearance of money." *Bridges v. Comm'r,* 325 F.2d 180, 184 (4th Cir. 1963) (citing *Deputy v. DuPont*, 308 U.S. 488, 498 (1940); *Old Colony R. Co. v. Comm'r*, 284 U.S. 552, 560 (1932)). To be entitled to a deduction, however, the debt must be genuine. *Bridges v. Comm'r,* 39 T.C. 1064, 1075 (1963) (citing *Knetsch v. United States*, 364 U.S. 361 (1960)).

As explained above (*see supra* at 94, 104), the HBU loan lacks substance, and should not be treated as a genuine debt. The funds used to make the loan, which began (and ended) in an account at HBU's parent, ABN AMRO, 1) were "loaned" by HBU to CED on a nonrecourse basis; 2) CED "paid" the funds to EZH as part of the Advance Head Lease Payment; 3) EZH "paid" the funds to ABN AMRO as consideration for ABN AMRO's assumption of its

---

[112]This is assuming CED does not elect to use its walk away provision at that time (*see supra* at 31, 35; *see* Tr. 3375-76 (Ellis)), which if exercised further eliminates any downside risk to CED.

contractual obligations under the Debt Defeasance; and finally 4) ABN AMRO "paid" the funds to HBU to satisfy both EZH's rent obligations under the lease and CED's obligation under the loan agreement. Thus, the funds never left the ABN AMRO corporate umbrella; CED never received loan proceeds and never made loan payments of principal or interest. No portion of this purported borrowing was ever invested in the RoCa3 Facility, or put to any other purposeful use by either CED or EZH. ABN AMRO recognized as much in its accounting for the Transaction. (JX 401 (ABN memorandum noting that the loan would be structured in such a way that it would be accredited a 0% risk weighting for ABN AMRO's purposes); JX 943 (describing the financing as "loop debt").

In *Frank Lyon*, 435 U.S. at 576-81, the Supreme Court cited the recourse nature of the loan obtained by the taxpayer, and the fact that the loan proceeds were fully committed to construct the building in question as key factors to its substance over form analysis. Here, however, the proceeds of the HBU loan were never paid out and were completely committed to economically offsetting "payments" among the parties.

In *BB&T* the court disallowed the same sort of claimed interest deductions:

> [T]he Stipulated facts relevant to the section 163(a) deduction are as follows: (1) BB&T paid the advance Head Lease payment, in part, with the proceeds of a non-recourse loan from HBU in the amount of $68,008,236; (2) At closing, ABN, "on behalf of HBU," transferred $68,008,236 to BB&T's Trust account at ABN; (3) At closing, the Trust made a $68,008,236 payment, on behalf of Sodra, to ABN as the Debt PUA Issue; (4) During the Basic Lease Term, BB & T's scheduled debt payments to HBU and Sodra's annual rent payments to BB & T are equal to the scheduled payments required by the Debt PUA; (5) During the basic lease term, the Debt PUA payments will satisfy both Sodra's rent to BB&T and BB&T's debt service payments (including principal and interest) to HBU in full; and (6) On its 1997 federal income tax return, BB&T claimed an interest expense deduction in the amount of $2,820,925.

> When the intermediate payment steps are disregarded, which must be done in order to consider the substance of the loan transaction and not the form selected by the parties, *it becomes clear that the loan transaction is only a circular transfer of funds in which the HBU loan is paid from the proceeds of the loan itself.* There was no money lent to BB&T in a substantive sense, and the HBU loan does not reflect genuine indebtedness. *See Felcyn v. United States*, 691 F.Supp. 205, 212 (C.D. Cal.1988) (finding taxpayer was not entitled to section 163(a) deduction where interest purportedly paid on the "loan" at issue was "simply part[ ] of a circularization of funds which do not amount a loan").

2007 WL 37798 *9-10 (emphasis added).

The Tax Court has explained that a taxpayer is not entitled to the claim interest expense deductions when it has no real use of the borrowed money –

> [P]etitioner at no time had the uncontrolled use of any additional money, of the bonds, or of the interest on the bonds. He assumed no risk of a rise or fall in the market price of the bonds and could not take advantage of such. His payment to the bank was not for the use or forbearance of money; it was for . . . a tax deduction. Petitioner incurred no genuine indebtedness, within the meaning of the statute . . .

*Bridges*, 39 T.C. at 1078-79. As the evidence demonstrates, Plaintiff is not entitled to deduct interest on the HBU loan for the same reason. Its payment from HBU in form was not for the use of money, which CED never had, but for a tax deduction.

## IV. THE TRANSACTION LACKS ECONOMIC SUBSTANCE

### A. The Sham Transaction Doctrine and Economic Substance

The sham-transaction doctrine requires "disregarding, for tax purposes, transactions that comply with the literal terms of the tax code but lack economic reality." *Coltec*, 454 F.3d at 1352. The purpose of the doctrine is "to prevent taxpayers from subverting the legislative purpose of the tax code by engaging in transactions that are fictitious or lack economic reality

simply to reap a tax benefit." *Id.* at 1353-54. *See Frank Lyon*, 435 U.S. at 583-84; *Gregory v. Helvering*, 293 U.S. 465 (1935); *Nicole Rose Corp. v. Comm'r*, 320 F.3d 282, 284 (2d Cir. 2003); *ACM P'ship v. Comm'r*, 157 F.3d 231, 246 (3d Cir. 1998); *Casebeer v. Comm'r*, 909 F.2d 1360, 1363 (9th Cir. 1990).

The origin of the sham transaction doctrine lies in the classic Supreme Court decision of *Gregory v. Helvering*, 293 U.S. 465 (1935). In *Gregory*, the Court affirmed the Commissioner in denying deductions claimed by taxpayers for losses and expenses incurred in a corporate reorganization. The taxpayers had followed each step required by the Code for the reorganization. Nevertheless, the Court held these losses nondeductible, reasoning that the transaction was a "mere device" for the "consummation of a preconceived plan" and not a reorganization within the intent of the Code as it then existed. *Id.* at 469. Because the transaction lacked economic substance, as opposed to formal reality, it was not "the thing which the statute intended." *Id.* at 469-70.

The sham transaction doctrine is now a fundamental axiom of the federal tax law, *see generally* B. Bittker, Federal Taxation of Income, Estates and Gifts, § 4.3.3 (1981 and Supp.1988), and requires a rigorous examination by courts of the challenged transaction as a whole, as well as each step thereof, to determine if the substance of the transaction is consistent with its form. *ACM P'ship*, 157 F.3d at 246; *Weller v. Comm'r*, 270 F.2d 294, 296-97 (3d Cir. 1959). As the Supreme Court declared in *Commissioner v. Court Holding Co.*, 324 U.S. 331, 334, (1945): "To permit the true nature of a transaction to be disguised by mere formalisms, which exist solely to alter tax liabilities, would seriously impair the effective administration of the tax policies of Congress." The burden, of course, is on the taxpayer to show that the form of the transaction reflects its substance. *Goldberg v. United States*, 789 F.2d 1341, 1343 (9th Cir.

1986); *accord National Starch & Chem. Corp. v. Comm'r*, 918 F.2d 426, 429 (3rd Cir.1990), *aff'd*, *INDOPCO v. Comm'r*, 503 U.S. 79 (1992).

While a taxpayer can legitimately structure a transaction to minimize tax liability under the Code, the transaction must nevertheless have factual and economic substance in order to be "the thing which the statute intended." *Gregory*, 293 U.S. at 469. As the Seventh Circuit observed in *Saviano v. Commissioner*, 765 F.2d 643, 654 (7th Cir. 1985), a court need not recognize a taxpayer's contrived forms:

> The freedom to arrange one's financial affairs to minimize taxes does not include the right to engage in financial fantasies with the expectation that the [IRS] and the courts will play along. The Commissioner and the courts are empowered, and in fact duty-bound, to look beyond the contrived forms of transactions to their economic substance and to apply the tax laws accordingly.

Courts have recognized two basic types of sham transactions. Shams in fact are transactions that never occurred in reality. In such shams, taxpayers claim deductions for transactions that have been created on paper but which never took place. Shams in substance are transactions that actually occurred but are devoid of economic substance. *ACM P'ship*, 157 F.3d at 247 n.30 (citing *Kirchman v. Comm'r*, 862 F.2d 1486, 1492 (11th Cir. 1989); *accord Lerman v. Comm'r*, 939 F.2d 44, 49 n.6 (3d Cir. 1991). As fully discussed next, the overwhelming evidence heard at trial offers compelling reasons for the Court to conclude that the EZH LILO Transaction was a contrived tax shelter scheme.

As the Court of Federal Claims has observed, there are "two predominant 'tests' for identifying economic shams." *H.J. Heinz Co. & Subsidiaries*, 76 Fed. Cl. at 583 (citing *Keener v. United States*, 76 Fed. Cl. 455, 467 (Cl. Ct. 2007)). An economic sham has an "objective" prong, and a "subjective" prong. The objective prong looks to whether the transaction had a

real, pre-tax economic benefit. The subjective prong looks to whether that transaction was compelled by an actual business purpose. *ACM P'ship v. Comm'r,* 157 F.3d at 247; *Rice's Toyota World, Inc. v. Comm'r,* 752 F.2d 89, 91-95 (4th Cir. 1985); *Black & Decker Corp. v. United States*, 436 F.3d 431, 440-41 (4th Cir. 2006). Both prongs of this test, objective and subjective, require a determination whether the transaction possesses non-tax economic substance. *See, e.g., James v. Comm'r*, 899 F.2d 905, 908-09 (10th Cir. 1990).

The Federal Circuit has explained that, while subjective motivation may be pertinent, courts must look to the objective economic reality of the transaction:

> The Supreme Court cases and our predecessor court's cases have repeatedly looked to the objective economic reality of the transaction in applying the economic substance doctrine. *Gregory*, 293 U.S. at 469-70; *Frank Lyon Co.*, 435 U.S. at 584. . . . While the taxpayer's subjective motivation may be pertinent to the existence of a tax avoidance purpose, all courts have looked to the objective reality of the transaction is assessing its economic substance. *See, e.g., Black & Decker*, 436 F.3d 431 at 441-42 (noting that economic substance inquiry requires an "objective determination of whether a reasonable possibility of profit from the transaction existed") . . .; *Dow Chem. Co.*, 435 F.3d 594 at 599; *CM Holdings, Inc. (In re CM Holdings, Inc.*), 301 F.3d 96 at 103 (stating that the objective economic substance inquiry is "whether the transaction affected the taxpayer's financial position in any way"); *UPS*, 254 F.3d 1014 at 1018; *Rice's Toyota World, Inc. v. Comm'r,* 752 F.2d 89, 94 (4th Cir. 1985).

*Coltec*, 454 F.3d at 1356 n.16 (citations omitted in part). Indeed this Court recently opined that, in applying the economic substance doctrine, the "'objective economic reality of the transaction' is paramount." *Jade*, 80 Fed. Cl. at 47. Thus, a transaction's economic substance and business purpose "do not constitute discrete prongs of a 'rigid two-step analysis,' but rather represent related factors both of which inform the analysis of whether the transaction had sufficient

substance, apart from its tax consequences, to be respected for tax purposes."[113] *ACM P'ship*, 157 F.3d at 247.

Although courts have articulated the sham transaction test somewhat differently, all courts applying the doctrine have sought to determine what, in substance, actually occurred, and whether the transactions at issue "effected any real change in the flow of economic benefits" or "appreciably affected [the taxpayer's] beneficial interests aside from creating a tax advantage." *Coltec*, 454 F.3d at 1360 (internal quotations omitted). Ultimately, "a taxpayer must prove that its transaction was both purposeful and substantive." *H.J. Heinz Co.*, 76 Fed. Cl. at 584.

The Federal Circuit's recent decision in *Coltec* "offers a wealth of guidance" in applying the sham transaction doctrine. *Heinz,* 76 Fed. Cl. at 584. In *Coltec*, the taxpayer reported a multi-million dollar capital loss that was generated by selling artificially high-basis stock for a relatively low price. 454 F.3d at 1343. The taxpayer in *Coltec* admitted that one of the reasons for engaging in the transactions generating the claimed loss was tax avoidance, but it asserted that the loss was proper because it had other legitimate business reasons for the transactions and because the loss fell within the literal terms of the Code. The Court of Federal Claims ruled in favor of the taxpayer, holding, among other things, that the sham transaction doctrine did not apply to a transaction that, overall, had a bona fide business purpose and fell within the literal terms of the Code. *Id.* at 1346-47.

The Federal Circuit vacated the judgment, holding that the transaction must be disregarded because it lacked economic substance. *Id.* at 1343. Despite finding that the

[113]Other circuits, like the Fourth Circuit have adopted a strict standard for disregarding a transaction that requires both prongs be met, *Rice's Toyota*, 752 F.2d at 91; *see also Black & Decker*, 436 F.3d at 441.

taxpayer's transaction complied with all pertinent provisions of the Code and did not violate any statutory anti-abuse provisions, *id.* at 1347-52, the Federal Circuit disallowed the loss under the sham-transaction doctrine, *id.* at 1357-60. In discussing the contours of the doctrine, the Court focused on five general principles. First, "the law does not permit the taxpayer to reap tax benefits from a transaction that lacks economic reality," and "the doctrine may well also apply if the taxpayer's sole subjective motivation is tax avoidance even if the transaction has economic substance." Second, the taxpayer seeking a deduction has the "unusually heavy" burden of proving that the transaction is not a sham. *Id.* Third, the transaction should be looked at objectively. Fourth, "the transaction to be analyzed is the one that gave rise to the alleged tax benefit." And fifth, "arrangements with subsidiaries that do not affect the economic interest of independent third parties deserve particularly close scrutiny." *Id.* at 1355-1357.

In examining the economic substance of a transaction, the Federal Circuit recognizes the importance of focusing upon the activity that actually created the tax deduction, and not the window dressing that surrounds it. *Id.* at 1356-57 (noting that "there is a material difference between structuring a real transaction in a particular way to provide a tax benefit (which is legitimate), and creating a transaction without a business purpose, in order to create a tax benefit (which is illegitimate)."). Here, the transaction that generated the desired tax benefit (deductions for rent, interest, and transaction costs) was the simultaneous lease and sublease of the RoCa3 Facility. Focusing on that transaction, the rental and interest expense were features of circular

offsetting payments that occurred in form only. They had no objective economic reality.[114] The transaction costs were part and parcel of this same LILO Transaction.

**B. Plaintiff's LILO Transaction Lacks Objective Economic Substance**

The objective prong of the economic substance inquiry examines whether a transaction "appreciably affect[ed the taxpayer's] beneficial interest except to reduce his tax." *Knetsch*, 364 U.S. at 366. A minimal change in the taxpayer's position is not enough. *See ASA Investerings P'ship v. Comm'r,* 201 F.3d 505, 514 (D.C. Cir. 2000). While the courts sometimes use differing language to describe the test, the "main question these different formulations address is a simple one: absent the tax benefits, whether the transaction affected the taxpayer's financial position in any way." *In re CM Holdings, Inc.*, 301 F.3d. 96, 103 (3d Cir. 2002). In the Federal Circuit, the test requires that a taxpayer prove that a transaction had a "realistic financial benefit" beyond tax avoidance. *Coltec*, 454 F.3d at 1356. "More precisely, the economic substance inquiry requires an objective determination of whether a reasonable possibility of profit from the transaction existed, exclusive of tax benefits." *Jade Trading*, 80 Fed. Cl. at 48, *citing Coltec*, 454 F.3d at 1356 (*citing Black & Decker Corp. v. United States*, 436 F.3d 431, 441-42 (4th Cir. 2006)); *see also Gilman v. Comm'r*, 933 F.2d 143, 146 (2d Cir. 1991); *Lerman v. Commissioner*, 939 F.2d 44, 49 (3d Cir. 1991); *Rice's Toyota World, Inc. v. Comm'r*, 752 F.2d 89, 91 (4th Cir. 1985); *IES Indus. v. United States*, 253 F.3d 350, 353 (8th Cir. 2001); *ACM P'ship*, 157 F.3d at 250, 254; *Long Term Capital Holdings v. United States*, 330 F. Supp. 2d 122, 171 (D. Conn 2004), *aff'd by*

[114]In substance, Plaintiff's only economic return was from the Treasury STRIPS, which it easily could have purchased separately from the LILO Transaction, and cannot imbue that transaction, on which the tax benefits are claimed, with economic reality. (*See supra* n.100).

*unpub. op.*, 150 Fed. Appx. 40 (2d Cir. 2005). The EZH LILO Transaction fails the objective prong of the economic substance doctrine.

Like the transactions in the cases identified above, CED's LILO transaction had no practical economic effect apart from the creation of income tax losses. The LILO transaction did not appreciably affect CED's beneficial interest except to reduce its taxes. This objective fact can be demonstrated in two different ways. An aggregate economic analysis of the EZH LILO Transaction's expected cash flow and earnings results, both with and without the tax benefits of the rent and loan interest deductions, demonstrates that CED's LILO transaction could not reasonably be expected to generate an aggregate pre-tax profit. Alternatively, if the LILO plan is dissected so as to reveal its non-tax economic components, it becomes clear that CED did not expect to profit either from any residual value interest in the RoCa3 Facility or by running the RoCa3 Facility. This second mode of analysis reveals that the only financial benefit afforded by the EZH LILO Transaction was tax reduction and that the transaction does not possesses the benefits or hallmarks of a true leasing transaction.

1. <u>Plaintiff Did Not Have a Reasonable Expectation of Profit, because the LILO Transaction Would Generate Huge Negative Cash Flows and Earnings on a Pre-Tax Basis</u>

As part of his assignment, Dr. David LaRue, an expert retained by the government, concluded that, at the time CED entered into the Lease, there was no reasonable expectation that the CED could realize a pre-tax economic profit from its investment in the Transaction. (Tr. 5103-04 (LaRue); DX 20194, Bates 25111, 25154-55). As part of his analysis, Dr. LaRue analyzed the cash flow in the EZH LILO Transaction. (Tr. 5052-54 (LaRue); DX 20194, Bates 25147-55). Dr. LaRue determined that the offsetting and circular nature of the EZH and CED obligations eliminated any significant economic consequences of the transaction to CED other

than the "risk-free" return (6.184%) that would be earned on the $31,066,310 portion of CED's equity investment which had been placed in the Equity Defeasance Account (an invested in Treasury STRIPS) and the tax benefits. (DX 20194, Bates 25146; Tr. 5060-62, 5067-73, 5080 (LaRue)). Next, Dr. LaRue calculated the before-tax free cash flows and the after-tax cash flows, as well as the discounted present values[115] and net present values of these cash flows

---

[115] As explained by Dr. LaRue:

> The present value concept recognizes that a rational investor would prefer receiving $1 today over receiving $1 a year from now. The investor could invest the $1 received today at a specified rate of return and have more than $1 in a year. For example, suppose an investor could invest the $1 she receives today in a bank account earning 10% interest. In one year, assuming annual compounding, that $1 investment would be worth $1.10; in two years, it would be worth $1.21.
>
> Assuming that the appropriate interest rate is 10%, the investor should be indifferent between the right to receive $1 today and $1.10 in one year, or $1.21 in two years. In common parlance, $1 is said to be the present value of $1.10 in one year at 10%, or of $1.21 in two years at 10%. The interest rate used, in this example 10%, is referred to as the discount rate. The present value of a particular future amount can be expressed as a simple mathematical relationship between the future amount, the discount rate, and the amount of time until the future amount is received.
>
> Present value of X dollars = X times [1/( 1 + i )n]
>
> Where:
> X = sum of money received in the future
> n = number of periods into the future when X will be received
> i = discount rate
>
> Present value calculations allow the analyst to compare on an equal basis sums of money received or expended at different points in the future. Basically, an economic substance analysis requires a comparison of the present value of all of the pre-tax cash outflows for a particular investment with the present value of all cash inflows which that investment is expected to produce. From an economic substance perspective, if the present value of the cash inflows is greater than the present value of the cash outflows, the net present value will be positive and the investment will produce an economic return, on a pre-tax basis, to the investor. If, however, if the present value of the cash inflows is less than the present value of the cash outflows, the net present value of the investment will be negative and the investment cannot

based upon the exercise of the Sublease Purchase and Renewal Options respectively.[116] (DX 20194, Bates 21547-54). Once start up expenses are included into the figure, the pre-tax profit reduces to a net loss in the amount of $12,331,190 in the event EZH exercises the Sublease Purchase Option and a net loss of $27,950,583 if CED exercises the Sublease Renewal Option. (DX 20194, Bates 21555).

| Pre-Tax Cash Flows | Net Present Value Pre-Tax Before Fees | Net Present Value Pre-Tax After Fees | Net Present Value After Taxes |
|---|---|---|---|
| Purchase Option | $0 | ($12,331,190) | $21,229,672 |
| Renewal Option | ($15,619,393) | ($27,950,583) | $39,534,490 |

The meaning of these calculations is indisputable. With the tax benefit of the rent deductions and loan interest deductions, the LILO transaction plan was projected to be a big financial winner. Absent these deductions, however, the plan would have been a financial disaster.

Dr. LaRue also testified that he reviewed the cash flows during the retention and shirttail periods (Plaintiff's claimed source of residual value) and that the result of this calculation would not alter his conclusion that there was no reasonable expectation that CED could realize a pre-tax

be reasonably expected to yield a pre-tax return.
(DX 20194, Bates 25147 n.57; Tr. 5082-86 (LaRue).

[116] In making all of his present value calculations, Dr. LaRue used the risk-free interest rate of the Treasuries in the Investor Defeasance Deposit Account (i.e. the Equity Defeasance Account). (DX 20194, Bates 25147). As explained by Dr. LaRue, "The 'risk-free' interest rate is the theoretical rate of return attributed to an investment with zero risk. The risk-free rate represents the interest that an investor would expect to earn from a completely risk-free investment over a specified period of time. In practice, the risk-free rate does not technically exist (even the safest investments carry a very small amount of risk). . . . [I]nvestors typically use the interest rates on various U.S. Treasuries as a proxies for the risk-free rate because U.S. Government-issued securities are considered as having virtually no risk of default." (DX 20194, Bates 25147 n.59).

economic profit from its investment in the Transaction and "in fact made [his conclusion] stronger." (Tr. 5124-25, 5363-64 (LaRue)). No one rebutted Dr. LaRue's testimony in this respect and neither Plaintiff, nor any of its experts conducted the sort of analysis Dr. LaRue performed. (Tr. 5128-30 (LaRue)). Moreover, Joan Freilich, CFO of Plaintiff, confirmed Dr. LaRue's conclusion when she testified that the transaction's cash flows would be negative in the early years without the tax benefits. (Tr. 717-18, 720-22 (Freilich)).

2. Plaintiff Could Not Expect To Realize Economic Gains Typically Associated with Leveraged Leasing

A careful analysis of the Transaction's potential economic benefits also yields the conclusion that the EZH LILO Transaction was an economic loser absent the claimed tax benefits. As described above, Plaintiff took all steps to eliminate the potential benefits and risks normally associated with leasing transactions, leaving only a tax play. Both Dr. David Ellis and Mr. Paul Bent testified to the numerous differences here from typical leveraged leases. (*See supra* at 83-86). These differences stripped the transaction of any real economic effect. This was acknowledged in Joint Exhibit 1118, where Mr. Deplautt, states: "We have chosen a different risk profile. We want to preserve capital, taking tax risk instead of the credit risks and residual risk that GE Capital takes is one way to do that." (JX 1118). Mr. DePlautt expands on his statement and writes: "In reviewing the spectrum of risks acceptable in a leasing portfolio, CED has chosen to exclude, to the extent reasonably possible, the credit risk and the residual risk value of assets, risks that GE Capital regularly accepts. And, instead, participate in transactions that have a concentration centered on tax risk." (JX 1118). In effect, what Mr. DePlautt is saying is that the purpose of the LILO Transaction was solely for tax benefits. An examination of the risk chart CED created, in conjunction with Cornerstone, contained in Joint Exhibit 363,

confirms and expands upon the implementation of this strategy. (JX 363, Bates 7672-74). Each and every risk is low (and in reality in many cases practically non-existent), with exception of a medium tax risk. (*Id.*). Plaintiff's assessment of the low/non-existent risks in its risk chart confirms that its LILO transaction did not appreciably affect its beneficial interest except to reduce its tax. (JX 363, Bates 7672-74; JX 390, 8029). *Knetsch*, 364 U.S. at 366.

As demonstrated above, when transaction costs, and the time value of money are considered, even taking into account the return on the investment in Treasury STRIPS, this overall deal produces a substantial pre-tax loss. *Jade Trading*, 80 Fed. Cl. at 48 (citing *Coltec*, 454 F.3d at 1356 (citing *Black & Decker Corp.*, 436 F.3d at 441-42)); *see ACM P'ship v. Comm'r*, 157 F.3d at 259; *Dow Chemical Co.*, 435 F.3d at 600-01. In addition, the cash flows on which Plaintiff relies should not be considered at all. The relevant inquiry is whether the transaction that generated the disputed tax deductions – not a piece of the transaction – here the lease in, lease out, not the Treasury STRIPS investment – has economic substance. *Coltec*, 454 F.3d at 1356-57. For this reason, the economic substance of leasing transactions often turns on whether the taxpayer reasonably expected to earn a profit from the residual value of the leased property after the lease expires. *Gilman v. Comm'r*, 933 F.2d 143, 149 (2d Cir. 1991). No such potential exists here, because, as demonstrated above, any profit CED can reasonably expect is simply the risk-free return generated from the purchase of government securities. Contrary to Plaintiff's assertion of a potential residual value benefit, there is no contemporaneous discussion by any of Plaintiff's employees concerning any expected return from the transaction other than the tax benefits and the return on the Treasury STRIPS. (Tr. 2165-66, 2170 (DePlautt) (acknowledging that it did no analysis of the claimed residuary periods when entering into the transaction); Tr. 889-90 (McCartney) (noting that CED did not focus on any potential residual

value in deciding to enter into the EZH LILO Transaction); Tr. 4753, 4866 (Ray); *see also* JX 377, Bates 7934 ("The base case economics assumes no revenue for this [shirttail] period.")). Even after litigation began, in its Interrogatory responses, when asked to point to any factual support for its income projections when entering into the EZH LILO Transaction, Plaintiff cited only to the pricing runs (JX 1339, Bates 19583-84), which contain no analysis of any potential return other than the tax benefits and the return from the Treasury STRIPS investment. (*See, e.g.*, JX 330).

In reality Plaintiff recognized that there was no reasonable possibility of obtaining this claimed residual value because it knew that EZH would exercise the Sublease Purchase Option and the transaction would end without ever reaching these claimed residual periods.[117] (*See* JX 1142, Bates 16776; JX 390, Bates 8029; JX 324, Bates 7029). Again LILO transactions, specifically including this one, were designed to encourage the sublessee to exercise the purchase option.[118] (*See supra* 31-32 (discussing factors that shift the incentives to EZH towards

---

[117] Of course, the Court is free to conclude that EZH will likely exercise the Sublease Purchase Option if it believes its failure to do so would seriously depart from its past conduct. *Dow Chem. v. United States*, 435 F.3d 594, 601-02 (6th Cir. 2006). Indeed, the facts suggest that EZH, through its successor company, will continue its long-standing use, operation, and possession of the RoCa3 Facility. EZH and its successors have been the sole owner and operator of the Facility since it opened, and continue to maintain and upgrade the Facility in an effort to improve its production capabilities. (*See, e.g.*, JX 352; Bates 7476 (noting that the successor to EZH has worked very aggressively to improve efficiency and productivity); JX 369 and JX 876, Bates 13723 (installation of remote control systems in the Control Room); JX 370 (RoCa3 upgrade to GT brushseals)). As the Sixth Circuit ruled in *Dow Chemical Co.*, Plaintiff cannot merely hold out the prospect of a change in EZH's historic behavior as a basis to sustain the Transaction.

[118]Further, when coupled with CED's ability to walk away from the EZH LILO Transaction during the shirttail period or retention period, if EZH fails to exercise the Sublease Purchase Option (JX 605; Tr. 3375-76 (Ellis); *see also* Tr. JX 1, Bates 65 ("Designated Successor Lessee")), CED's failure to perform any analysis of these periods demonstrates that CED had no reasonable expectation that it would exploit the purported residual interest it now

exercise of the Sublease Purchase Option); Tr. 3061-62 (Mintun) (admitting that Capstar advised clients such as EZH that it was economically in their best interest to exercise the purchase option). As noted above, even if the Court were to take into account any potential revenues from this claimed residual period, Dr. LaRue concluded that his opinion that there was no reasonable expectation that CED could realize a pre-tax economic profit from its investment would not change. (Tr. 5124-25, 5363-64 (LaRue)). In short, the evidence demonstrates that CED did not have a reasonable expectation of any returns from the claimed residual periods in the EZH LILO Transaction.[119]

### C. Plaintiff's Asserted Business Purpose for Entering the LILO Transaction Is Not Credible

Quite apart from its inability to generate a meaningful profit, without the tax benefits in dispute, Plaintiff also lacks a genuine non-tax business purpose for CED's entry into the EZH LILO Transaction.[120] First, Plaintiff's employees readily admit that they would not have entered

---

claims.

[119]As noted above, even if the Court were to take into account any potential revenues from this claimed residual period, Dr. LaRue also testified that he reviewed the cash flows during the retention and shirttail periods and that the result of this calculation would not alter his conclusion that there was no reasonable expectation that CED could realize a pre-tax economic profit from its investment in the Transaction and "in fact made [his conclusion] stronger." (Tr. 5124-25, 5363-64 (LaRue)).

[120]Although the Court in *Coltec* explained that a transaction should be looked at objectively to determine whether it possesses economic substance, 454 F.3d at 1355-1357, The Court should not ignore the realities of the transaction. *See H.J. Heinz Co.*, 76 Fed. Cl. at 587 (noting in its sham transaction analysis that, "[t]his court will not don blinders to the realities of the transaction before it. Stripped of its veneer, the acquisition . . . had one purpose, and one purpose alone – producing . . . [tax benefits] . . . . There was no other genuine business purpose."). Here the EZH LILO Transaction provides only fictions that CED has the benefits of income and risk of loss. The practical realities of the EZH LILO Transaction will not result in any real income or risk of loss from CED's participation in the purported leasing transaction other than tax benefits claimed.

this transaction without the tax benefits and that the returns were otherwise inadequate. Second, the facts belie each of Plaintiff's purported claims of business purpose.

1. <u>Without the Tax Benefits Plaintiff would not have Entered into the EZH LILO Transaction</u>

Plaintiff was well aware of the crucial importance of tax benefits to the viability of the deal. The importance of the tax benefits to Plaintiff may be seen through a simple examination of its documents. When this transaction was first presented to the board of CED, the benefits were described as follows in the project briefing memorandum (Exhibit 363, Bates 7647): The benefits from the deduction of allocated headlease rent, tax benefits from the interest deduction taken (derived from the interest paid on the nonrecourse debt), and the actual cash-on-cash return of investment and profit received at the end of the term of the Sublease (which derives from the maturation of the Treasury STRIPS).[121] During the presentation to CECONY's board of trustees on October 28, 1997, only one benefit was memorialized in those minutes: "Several utilities have engaged in these cross-border leases as a strategy to reduce tax payments." (JX 354, Bates 7501). These statements show that taxes were the overriding factor. In addition, Plaintiff determined that without the tax benefits, the program would only achieve a 2.4 percent return. (*See* JX 381, Bates 7967). In another draft of the leasing white paper, an employee of Plaintiff noted, in red line, "What is the likelihood of a 2.4 percent return? Such a return is unacceptable." (JX 383, Bates 7501). Moreover, a memorandum by Mr. Scher, secretary and counsel to CED, provides "However, I suspect that the return on this transaction would not be acceptable without the tax benefits described below." (JX 390). Mr. Scher confirmed that this is

[121] Again there is no mention of any potential returns from the period after the expiration of the sublease term, once again undermining Plaintiff's claim that it expected that it could profit from any claimed residual value.

still his view. (Tr. 4208 (Scher)). Mr. Scher is not alone in his view. The testimony of witnesses in this case is repeatedly to the effect that the returns from this transaction would only have been reasonable with the tax benefits at issue in this case and that CED would never have entered into the transaction without the tax benefits. (Tr. 850-51 (McCartney) (noting that CED would not have entered into the EZH LILO Transaction if the transaction only generated a 2.4% return); Tr. 2039-40 (DePlautt); *see also* Tr. 2035-36 (Muoio)). This testimony and these exhibits demonstrate what was really driving Plaintiff – taxes.

2. Plaintiff's Purported Business Purpose Lacks Merit

Plaintiff attempted to tell a non-tax story at trial. It claimed that because of the then current regulatory environment, Plaintiff was compelled to form an unregulated subsidiary whose purpose was to expand into the international market. Plaintiff also claimed that it intended to go into a variety of countries in Western Europe (including the Netherlands), and that LILOs were the best way to learn about the area. Plaintiff also argued that it actually entered into this transaction for environmental benefits and the positive public relations benefits that would be generated, given its shaky history with environmental problems. Finally, Plaintiff argues that there were leverage lease accounting benefits to be obtained. These attempted justifications for the EZH LILO Transaction do not comport with the facts as reflected at the time Plaintiff decided to engage in the Transaction, namely that saving taxes gave life to the Transaction, not other, broader corporate goals.

In *Coltec*, the Federal Circuit cited *Basic Inc. v. United States*, 549 F.2d 740 (Ct. Cl. 1977), as a prime example of a taxpayer "creating a transaction, without a business purpose, in order to create a tax benefit." 454 F.3d at 1356-57. In *Basic*, the taxpayer planned to sell two of its subsidiaries to an unrelated third party. The buyer offered to purchase the assets of the

subsidiaries for cash, but the taxpayer preferred to sell the stock of its subsidiaries after orchestrating an intercompany stock dividend that would reduce its gain on the sale. *Basic,* 549 F.2d.at 742-43. The Court of Claims refused to honor the form of the transaction. After noting that the overall "transaction clearly had a business purpose, namely, to effect the sale and purchase of a business," the court stated "it is quite another matter to offer that same argument in explanation and justification for the stock transfer that took place between [the taxpayer and its subsidiary]." *Id.* at 745. The court stated, "[i]ndeed, if such an explanation were sufficient then all manner of intermediate transfers could lay claim to 'business purpose' simply by showing some factual connection, no matter how remote, to an otherwise legitimate transaction existing at the end of the line." *Id.* This is consistent with the decisions of numerous other courts holding that the legitimate business purposes of a larger transaction do not justify unnecessary steps inserted into the transaction simply to generate otherwise unavailable tax benefits. *See Ballagh v. United States*, 331 F.2d 874, 878 (Ct. Cl. 1964); *Nicole Rose*, 320 F.3d at 284; *ACM P'ship*, 157 F.3d at 260 & n.57; *Kuper v. Comm'r,* 533 F.2d 152, 158 (5th Cir. 1976); *Waterman S.S. Corp. v. Comm'r*, 430 F.2d 1185, 1195 (5th Cir. 1970); *Long Term Capital Holdings*, 330 F. Supp. 2d at 183; *see, e.g., Gregory,* 293 U.S. 465; *see also N. Pac. Ry. Co. v. United States,* 378 F.2d 686, 692-93 (Ct. Cl. 1967).

In this case, as in *Basic,* Plaintiff is attempting to conjure substance for the transaction at issue by bootstrapping onto CED's overall international expansion mission. The other aspects of CED's business did not drive the LILO Transaction here and therefore are not relevant. Leasing was not discussed in Plaintiff's documents until May 29, 1997. (JX 169). Moreover, the purpose of the LILO transactions was not to expand into international markets, but rather to use the tax benefits to generate up front earnings and cash flows to fund its other investments. ( JX

136, Bates 3240-41; Tr. 490 (Burke); 820 (McCartney)); 1924-27, 1940-1946; 1973;1979-1980 (Muoio); 2070-71 (DePlautt )). As this Court stated in *Coltec*, the transaction to be analyzed is the one that gave rise to the claimed tax benefit, which, in this case, was the LILO transaction. *See James v. Comm'r*, 899 F.2d 905, 910 (10th Cir. 1990) ("The only transactions at issue in this case are the purported sales by the Communications Group to the joint ventures. These sales cannot be legitimized because they are on the periphery of some legitimate transactions."). Just as the taxpayer in *Basic* could not articulate a reason for the intercompany dividend inserted into the sale of its subsidiaries, taxpayer here has not established any reasonable business purpose for the LILO Transaction. As the Court of Claims did in *Basic*, the Court should disregard this artificial, tax driven transaction as a sham and disallow the deductions.

As described above, while CED, an unregulated subsidiary, was organized to obtain the several goals articulated by Plaintiff, such as investing in international energy and infrastructure, the leasing activities were kept completely separate and were unrelated to those other purposes. Joint Exhibit 1268 provides the history and performance of the unregulated subsidiary. The document confirms the distinction between tax driven leasing transactions and CED's other operations:

> Con Edison Development Inc., CED, was legally established in the fourth quarter of 1996, and began operations with a four-person staff in March of 1997. CED's initial charter was to develop, invest, own and manage infrastructure assets in the United States, as well as in a select list of carefully screened countries in Latin America, Europe and the Pacific Rim. In addition, CED would create a tax advantage leasing segment to take advantage of certain cross-border leasing opportunities, while at the same time leveraging CEI's tax position.

(JX 1268). Moreover, in Joint Exhibit 1079, leasing was not in the original business plan for the company. (JX 1079). This document shows that it was added in the 1998 business plan. (*Id.*).

CED first pursued mergers and acquisitions as part of its business strategy, but when that proved too competitive, it turned to financial structuring, including LILOs. (Tr. 1979-80 (Muoio)). As Joint Exhibit 1123 shows, in 1999, the mission of the proposed leasing subsidiary of CED, CEL, was to increase CEI wealth by investing in projects that will reduce the amount of income taxes payable by CEI by using investment projects that will maximize the use of tax incentives. (JX 1123, Bates 16548).

CED's legitimate investments were losing money in the early years, and CED desperately needed to offset those losses. (Tr. 1924-27, 1979 (Muoio); Tr. 524 (Burke); *see also* JX 1332, Bates 19223; Tr. 375 (McGrath) (noting that CED would have been terminated if it did not earn a sufficient return over time)) Tr. 1979 (Muoio)). A LILO shelter was one of the fastest and least commercially risky ways to obtain those results. (*See* Tr. 1979-80 (Muoio) (noting that acquisitions were too competitive, so CED turned to financial structuring, specifically lease transactions to offset those losses)). Joint Exhibit 1252, a May 10, 1999 report entitled CED Overview, states, "To summarize, CED plans to use leases to produce front-end earnings and help optimize CEI's tax position, acquisitions of operating infrastructure to provide steady, ongoing returns and development of greenfield generation projects to provide earnings growth. Greenfield projects require upfront expenditures in the early years, but turn profitable as they operate and grow although, that may take up to 3 to 5 years to realize results." (JX 1252, Bates 17781). This document also states in reference to the EZH LILO Transaction, "Leases of this type provide CEI with an opportunity to enhance project returns by taking advantage of CEI's large and predictable tax obligation." (JX 1252, Bates 17782). In fact, Mr. Muoio, president of CED, testified that the leasing need not have been done by CED at all, and it was anticipated that CED, because of the background in financial structuring of its employees would do a couple of

leases and then break the leasing company off and turn it back over to the parent company. (Tr. 1992-93 (Muoio)).

Plaintiff also claims that since RoCa3 is a power plant, it is evidence of a business purpose. Once again, the documents tell a different story. Joint Exhibit 1132, a 1998 memo written after the EZH transaction by Ms. McCartney, summarizes a conversation she had with Mr. McGrath. She states, "ERM [Eugene R. McGrath] said that even a leasing business is somewhat foreign to our board and would have to be carefully sold. Are we just an investment company finding tax shelters, and is this the best one?"[122] (JX 1132). Further, there was no evidence that CED actually leveraged any of its "core competencies" with respect to the RoCa3 Facility. CED did not operate the RoCa3 Facility and EZH kept all power generation revenues. CED never even visited the facility until almost eight years after the Transaction closed (JX 352). Even with respect to the limited communications between EZH and CED concerning EZH's business (the yearly annual report and the one page certification (Stip.. ¶ 149-50; JX 367-370)), CED did not even have a complete set of these certifications in its files.[123] In fact, Mr. DePlautt testified that CED had no plans to actually operate the RoCa3 Facility. (Tr. 2223 (DePlautt)).

---

[122]In light of CED's apparent disinterest in the facility subsequent to the closing, perhaps the real reason it chose power facilities as the investment targets of its LILO transactions is because it knew that the unfamiliarity with the transaction would be softened if these type of assets were the subject of the transaction, as opposed to any real desire to actually leverage this asset for any legitimate future benefit to CED or Plaintiff.

[123]Ms. McCartney testified that she was not aware of the kind of reports CED was supposed to be receiving, and had no idea what kind of information CED might have received concerning the operation of the RoCa3 Facility. (Tr. 914-18 (McCartney)).

Plaintiff also now argues it sought to go into the Netherlands (or possibly as broad as Western Europe) as part of its business plan. But the contemporaneous documents do not support this claim. First, CED did not consider the Netherlands when it looked at legitimate energy investments in mid 1997. This can be seen from Joint Exhibit 249, regarding Gramercy Development, the predecessor to CED. On this handout for the planning meeting, prior to entry of the EZH LILO Transaction, Plaintiff lists countries it would consider going into. (JX 249, Bates 4638). Neither the Netherlands, nor any other country in Western Europe is on this list. However, a few pages later, the Netherlands is listed as a Capcorp target. (JX 249, Bates 4664). Capcorp was a potential business line that targeted products that were either tax leases or tax advantaged transactions involving I.R.C. Section 49 credits or I.R.C. Section 29 credits. (JX 249, Bates 4665). Moreover, when CED formalized this country screen after the date of the transaction, it continued to focus on countries other than the Netherlands. (*See* JX 348, JX 374, Bates 7738-39; JX 541, Bates 9758-59; JX 643; JX 1087, Bates 15925, 15933). For example, Joint Exhibit 1095, which is a presentation in 1998, contained a listing of target countries for infrastructure investment. (JX 1095, Bates 16201). Once again, the Netherlands does not appear on this list. However, it does appear a few pages later in a listing of potential tax advantaged leases. (JX 1095, Bates 16206).

In fact, even after CED stopped considering international investments altogether and turned its attention to domestic investments (JX 262, Bates 4980; *see also* Tr. 2189 (DePlautt)), it still pushed forward with another LILO investment in the Netherlands, the NUON transaction. (Stip.. ¶ 56(d); JX 313). John Hirst, an employee of Plaintiff, recognized the inconsistency of this approach in an E-mail. (JX 1249). He states, “CED intends to sell its ownership in the partnership owning Genor, as part of the overall strategy of CEI to focus activities in the New

England and Mid-Atlantic region, as well as in Central America. Bill: How does the last sentence for Genor square with EZH, Nuon and EIF?" (JX 1249). Through 1999 and into 2000 CED continued to investigate other tax advantaged leasing transactions in the Netherlands (JX 1149; JX 347; JX 915; JX 1006), while demonstrating no inclination to pursue legitimate energy transactions there.

After the close of the EZH LILO Transaction, Plaintiff also made no effort to use the EZH LILO Transaction to learn about the Netherlands or cultivate infrastructure investments there. (*See* Tr. 914 (McCartney) (noting that she had no idea how to respond to the question of how CED anticipated it would effectuate its stated purpose of learning about the Netherlands from the EZH LILO Transaction). The only further investments Plaintiff ever sought to pursue in the Netherlands were other LILO tax shelter transactions. In fact, despite having the right to inspect the facility each year, Plaintiff did not visit the facility until 2005, eight years after the closing. (JX 352). And that was only after the audit in this case was well under way. Since then, the only other trip to the facility has been with Plaintiff's counsel for this case in preparation for this litigation. (Tr. 4262-64 (Scher)). If Plaintiff's goal in engaging in EZH LILO Transaction had been to learn about the Netherlands, or other opportunities in that country, it would have taken steps to do so.[124]

Also telling is the timeline of Plaintiff's business purpose claims. The briefing memorandum created by CED provides that there were only three benefits to leasing (the tax benefit from headlease rent deductions, the tax benefit from interest deductions and the

[124]This can be contrasted with CED's treatment of its technical services line of investments discussed *supra* at 46-47, where there is actually evidence of CED leveraging its experience in those investments.

investment return from the Treasury STRIPS). (JX 363, Bates 7647). CED's initial assertions with respect to the benefits from LILOs were that they were a good strategy for reducing tax benefits. (*See*, *e.g.*, JX 354, Bates 7501). The leasing white paper adds the newer business reasons, but an early draft of the white paper has a redline that reads: "Strategic ground cover. Not much of a benefit since we do not plan on doing any other work in those countries."[125] (JX 383, Bates 7981). This statement is consistent with the country screening process discussed above.

Plaintiff also claims that there were environmental benefits from the EZH LILO Transaction by learning about the use of carbon dioxide for agriculture purposes. Plaintiff argues that this was so important to them that it put it in its annual report.[126] The documents tell the real story. There is not a single pre-transactional document that shows Plaintiff ever considered this to be a benefit at the time they entered into the transaction. Ms. McCartney indeed confirmed that the idea for mentioning the positive environmental characteristics of the RoCa3 Facility in the annual report did not arise until the transaction closed and that it was not a benefit Plaintiff considered when it entered into the transaction.[127] (Tr. 910 (McCartney)

---

[125]To the extent Plaintiff asserts that the United States has not attributed this statement to a specific individual within CED or CECONY, the United States requested in a 30(b)(6) deposition of Plaintiff that it ascertain the identity of the individual responsible for the statement. However, Plaintiff's representative at the 30(b)(6) deposition, Mr. Scher, claimed that he was unable to do so. Therefore any claim by Plaintiff that the Government cannot rely on this statement because it did not demonstrate the identity of the maker of the statement is disingenuous and improper.

[126]Of note is that Plaintiff knew of no way to actually use this technology in its business. (Tr. 594 (Burke)).

[127]Similarly, Ms. McCartney claimed that at the annual shareholder's meeting Mr. McGrath touted the purported environmental benefits of the EZH LILO Transaction during his speech to the shareholders (Tr. 906-07); however, when shown a transcript of this speech she

(explaining that CED entered into the transaction because of the upfront earnings, not any environmental benefits)).

Additional evidence belies Plaintiff's claim it was interested in environmental benefits from the EZH LILO Transaction. Each year, CED is entitled to receive an officer's certificate concerning general statements about the operation of the plant and an annual report of EZH. (*See, e.g.*, JX 876). One of those certificates states: "Our environmental annual report 2004 (in Dutch) is available upon request." (JX 876, Bates 13723). There is no evidence Plaintiff ever requested this environmental report. Similarly, CED does not have any post-transactional documents in its files about how its so-called investment was faring, such as bank statements from HBU or ABN AMRO, or rent reconciliations from EZH. If Plaintiff was concerned about the non-tax aspects of the Transaction, one would expect it to have these documents in its files. Instead, the transaction runs on autopilot. Plaintiff simply uses the pricing projections created at the time it entered into the Transaction in 1997 for its financial reporting and things go on with practically no oversight by Plaintiff. (Tr. 723-25 (Freilich)).

Finally, Plaintiff argues that another non-tax business purpose for the EZH LILO Transaction was to achieve leveraged lease accounting benefits. An accounting benefit from a transaction that lacks economic substance cannot imbue the transaction generating the tax benefit with economic substance for tax purposes. *Am. Elec. Power, Inc. v. United States*, 136 F. Supp. 2d 762, 791-92 (S.D. Ohio), *aff'd*, 326 F.3d 737 (6th Cir. 2003) (quoting *Winn-Dixie Stores, Inc. v. Comm'r*, 113 T.C. 254, 287 (1999), *aff'd* 254 F.3d 1313 (11th Cir. 2001)) ("If a legitimate business purpose for the use of the tax savings 'were sufficient to breathe substance into a

acknowledged that there was no mention of these purported environmental benefits. (Tr. 908; JX 857, Bates 13456).

transaction whose only purpose was to reduce taxes, [then] every sham tax-shelter device might succeed.'"). The benefits of leveraged lease accounting in the EZH LILO Transaction are largely dependent on the tax deductions. (*See* Tr. 717-18, 720-21 (Freilich); Tr. 850-51 (McCartney); Tr. 1373-76 (Holzman)).

When the contemporaneous evidence is placed alongside Plaintiff's after-the-fact claims of a non-tax business purpose, those claims do not withstand scrutiny. Plaintiff cannot meet its burden of demonstrating that it had a genuine non-tax business purpose for entering into the EZH LILO Transaction.

**CONCLUSION**

The Commissioner's determinations should be sustained and Plaintiff's Refund Claim denied. CED did not acquire a present leasehold interest in EZH's RoCa3 Facility for tax purposes. As the property's owner and user under the sublease, EZH 1) maintains dominion and control over the Facility; 2) bears all of the benefits and burdens associated with ownership; and 3) enjoys the unilateral right to terminate Plaintiff's interest in the Head Lease with funds Plaintiff provided. Thus, Plaintiff's Initial Lease Payment was not for the "continued use or possession" of property as required by section 162(a)(3) of the Internal Revenue Code. Nor was the interest on the purported HBU loan paid for the use or forbearance of money as required by section 163(a). Accordingly, the tax deductions for rent, interest, and transaction costs that Plaintiff claimed on its 1997 tax return as a result of entering into the EZH LILO Transaction are improper, and must be disallowed. In the alternative, the Court should disregard the EZH LILO Transaction for a lack of economic substance. The evidence in this case demonstrates that Plaintiff lacked a reasonable expectation of a pre-tax benefit from the Transaction and lacked a legitimate non-tax business purpose for participating in the Transaction.

Respectfully submitted,

s/ David N. Geier
DAVID N. GEIER
Attorney of Record
U.S. Department of Justice, Tax Division
Post Office Box 26
Washington, D.C. 20044
Telephone: (202) 616-3448
Facsimile: (202) 307-0054

NATHAN J. HOCHMAN
Assistant Attorney General
DAVID GUSTAFSON
Chief, Court of Federal Claims Section

JOSEPH A. SERGI
ADAM R. SMART
KAREN M. GROEN
Trial Attorneys

s/ Steven I. Frahm
STEVEN I. FRAHM
Assistant Chief, Court of Federal Claims Section
Of Counsel

April 7, 2008