IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| CONSOLIDATED EDISON COMPANY OF NEW YORK, INC. & SUBSIDIARIES, | ) | |
| Plaintiff, | ) | No. 06-305 T |
| v. | ) | Judge Marian Blank Horn |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

# PLAINTIFF'S OPENING POST-TRIAL BRIEF

DAVID F. ABBOTT
MAYER BROWN LLP
1675 Broadway
New York, NY 10019-5820
Tel: (212) 506-2642
Fax: (212) 849-5642
dabbott@mayerbrown.com

Of Counsel:
JOEL V. WILLIAMSON
THOMAS L. KITTLE-KAMP
BRIAN W. KITTLE
MICHAEL R. EMERSON
MEGAN E. WERNKE
MAYER BROWN LLP
*Counsel for Plaintiff*

April 7, 2008

# TABLE OF CONTENTS

Page


QUESTIONS INVOLVED .......... 2

STATEMENT OF THE CASE .......... 2

STATEMENT OF FACTS .......... 18

I. Con Edison History .......... 18

A. Con Edison and the New York State Power Industry Prior to Deregulation .......... 21

B. Con Edison's Response to Proposed Deregulation .......... 23

C. Con Edison NY's Proposed Restructuring Plan and Settlement With the PSC .......... 26

D. Formation of Gramercy Development and Its Name Change to Consolidated Edison Development .......... 29

II. Con Edison Development .......... 33

A. CED's First Business Plan .......... 35

1. CED's First Business Plan: Mission .......... 35

2. CED's First Business Plan: Objectives .......... 36

3. CED's First Business Plan: Business Focus .......... 37

4. CED's First Business Plan: Business Environment/Market Analysis and Strategy .......... 38

5. CED's First Business Plan: Financial Projections .......... 39

6. CED's First Business Plan: Potential Initial Investments .......... 39

B. CED Business Plan in Action: Addition of Leasing .......... 41

C. 1997 CED Investment Opportunities .......... 48

1. Fisonic Technology .......... 48

2. International Energy Partners ("IEP") .......... 49

3. Technical Services—China .......... 49

4. Energy Investment Fund III ("EIF") .......... 50

5. Empresa de Generacion de Arequipa S.A. ("EGASA") .......... 51

6. Empresa Electrica de Guatemala ("EEGSA") .......... 51

7. Lease Investments .......... 52

8. Tax-Advantaged Investments .......... 54

9. Acquisition of Independent Power Producer ("IPP") Developer .......... 55

## TABLE OF CONTENTS

**Page**

10. Acquisition of Independent Power Producer ("IPP") Project ..... 55
11. Telecommunications Industry ..... 55
12. Generadora Electrica Del Norte (GENOR) ..... 56
13. Ada Cogeneration Plant ..... 56

D. 1997 In Review & 1998 Business Plan ..... 57

E. Early-1998 CED Investment Opportunities ..... 60
1. Carson Cogeneration Plant ..... 61
2. Lease Investments ..... 61
3. Niagara Mohawk Asset Acquisition ..... 61
4. Central European Energy Company ("CEnergy") ..... 62
5. Cagayan Electric Power and Light Co, Inc. ("CEPALCO") ..... 62
6. Empresa Electrica de Guatemala ("EEGSA") ..... 63
7. Technical Services ..... 63

III. CED's Introduction To Cornerstone ..... 63

A. Leveraged Leasing ..... 63

B. CED's Hiring of Cornerstone as Its Financial Advisor ..... 64
1. Cornerstone ..... 65
2. Cornerstone's Education of CED ..... 67

IV. The Potential RoCa3 Transaction ..... 68

A. CED Learns of the Potential Leasing Transaction Involving the RoCa3 Facility ..... 68

B. EZH's Historical Business ..... 70

C. The RoCa3 Facility ..... 71

D. Overview of Cornerstone's Services as Related to the RoCa3 Transaction ..... 74
1. Transaction Economics and Pricing ..... 75

V. The Proposal Process ..... 76

A. CED's Initial Proposal ..... 76

B. CED's Accepted Proposal ..... 77
1. CED's Closing Conditions ..... 78

**TABLE OF CONTENTS**

**Page**


2. CED's Agreement to Use Precedent Documents ....................79
3. CED Viewed Banc One's Investment in the RoCa3 Facility as a Benefit ....................80
4. Proposal Economics ....................80
5. Due Diligence Experts ....................83

VI. The RoCa3 Transaction Due Diligence ....................85

A. CED's Site Visit of the Roca3 Facility ....................86

B. Credit Analysis of EZH ....................90

C. Duke Engineering ....................91

D. Deloitte & Touche ....................96

1. Facility Description, Supply of Natural Gas and Dutch Power Industry ....................99
2. Useful Life ....................101
3. Fair Market Value of the RoCa3 Facility as of December 15, 1997 ....................102
4. Residual Values of CED's Lease Interest ....................105
5. EZH Letter to Deloitte ....................106

E. Tauw Milieu ....................108

F. Accounting Matters ....................111

VII. CED Approval Process for the RoCa3 Transaction ....................114

A. Overview ....................114

B. Internal Review ....................116

C. Project Briefing Memorandum ....................117

D. Leasing White Paper ....................122

E. Investment Recommendation ....................125

VIII. The RoCa3 Transaction ....................126

A. The Participation Agreement ....................127

1. Conditions Precedent to CED's Willingness to Close the RoCa3 Transaction ....................128
2. Representations and Warranties EZH Made in Executing the Participation Agreement ....................129

B. Lease Agreement ....................133

# TABLE OF CONTENTS

**Page**


1. Payment of Lease Rent ....133
2. CED's Rights and Obligations Under the Lease Agreement ....134

C. HBU's Nonrecourse Loan to CED ....135
1. Percentage of Purchase Price Covered by the Nonrecourse Loan ....136
2. Repayment of the Nonrecourse Loan ....136
a. HBU's Receipt of a Security Interest ....137
b. Sublease Rents Paid Directly to HBU ....138
c. The Nonrecourse Provision ....138

D. Sublease Agreement ....139
1. EZH's Obligations and Limitations Under the Sublease Agreement ....139
2. Sublease Rents ....140
a. It Is Standard Leasing Practice for Sublease Rentals and Debt Service Payments to Be Equal in Timing and Amount ....141
b. Establishment of the Sublessee Loan ....142
3. EZH's Collateral Accounts ....143
a. Defeasances Are Used in Financial and Leasing Transactions ....143
b. EZH Remains Liable for All of Its Sublease Payment Obligations ....145
c. The Sublease Deposit and IJssel Deposit Are Economic Defeasances ....146
d. Benefits of the Sublease Deposit and IJssel Deposit ....147
(i) EZH's Benefits ....147
(ii) CED's Benefits ....149
e. The Sublease Deposit ....149
(i) Sublease Deposit Payments, Limitations on Payments and Termination ....150
(ii) Sublease Deposit Security Interests ....151
f. The IJssel Deposit ....152

# TABLE OF CONTENTS

**Page**


g. The Correlation of the Value of a STRIP to Interest Rates ....153

h. Payments from the Sublease Deposit and the IJssel Deposit ....155

4. EZH's Maintenance, Insurance and Use of the RoCa3 Facility ....155

a. Maintenance ....155

b. Further Leasing ....157

c. Insurance ....158

5. Potential Premature Terminations of Lease and Sublease ....159

6. Sublease Termination Value and Source of Funds ....165

7. Return Provisions ....170

E. End of Sublease Basic Term Options ....171

1. The Sublease Purchase Option ....171

2. The Sublease Renewal Option ....173

a. Sublease Renewal Option: The Sublease Deposit and the IJssel Deposit ....174

b. CED's Obligations if It Elects the Sublease Renewal Option ....175

(i) Sublease Renewal Option: Trustee Treasury Collateral ....177

(ii) Sublease Renewal Option: Lease Collateral Deposit ....178

c. CED's Projected Profit Through the Sublease Renewal Term ....179

d. Sublease Renewal Option: The Final Basic Rent Payment ....181

3. Retention Option ....182

a. CED's Collateral Obligations During the Retention Option Period ....184

(i) Retention Option: Trustee Treasury Collateral ....185

(ii) Retention Option: Incremental Collateral Pledge ....186

# TABLE OF CONTENTS

**Page**


b. Retention Option: The Final Basic Rental Payment ....187

F. CED's Operating Rights and Obligations ....188

1. Facility Operating Agreement ....190

a. The Operator's Obligations ....190

(i) During the Sublease Term ....190

(ii) Following Termination of the RoCa3 Sublease ....190

b. CED's Rights and Obligations ....192

c. Appointment and Removal of the Operator ....193

2. Facility Support Agreement ....195

3. Common Facility Use and Support Agreements ....196

G. CED's Operational Risks with Respect to the Undivided Interest ....197

IX. Post-Transaction Developments ....199

A. Con Edison's Publicizing of the RoCa3 Transaction ....199

B. CED's Financial Reporting of the RoCa3 Transaction ....200

C. Officer's Certificates ....201

D. EZH's Post-RoCa3 Transaction Ownership Changes ....202

E. NUON ....203

F. Change in CED's Overall Investment Strategy ....205

G. Post-Transaction Site Visit to RoCa3 Facility ....205

X. Expert Testimony ....206

A. Qualifications and Roles of Expert Witnesses ....206

1. Paul Bent ....207

2. David M. Ellis ....210

3. A.J. Goulding ....211

4. John P. Kelly ....213

5. David W. LaRue ....214

6. Samuel M. Ray ....215

7. John J. Reed ....217

8. Jacob K. Thomas ....218

## TABLE OF CONTENTS

**Page**


9. Roman L. Weil ....220

B. Themes of the Expert Witness Testimony ....222

1. The Leasing Experts Testified That the RoCa3 Transaction Is Within the Mainstream of Typical Leveraged Leasing Projects ....222

a. Due Diligence ....224

(i) Accountants and Appraisers ....224

(ii) Duke Engineering Report ....225

(iii) Environmental Report ....225

(iv) Legal Due Diligence ....225

(v) Site Visit ....225

b. Lease-Leaseback Structure ....226

c. Investment Trust ....226

d. Nonrecourse Debt ....226

e. Equity Defeasance Accounts ....227

f. Rental Payments Tied to Debt Service ....228

g. Recovery of Equity Only After Debt Is Paid Off ....228

h. Deferred Rents ....228

i. Purchase and Renewal Options ....229

j. Use of Equity Defeasance to Pay the Sublease Purchase Option Price ....229

k. Use of a Triple Net Lease ....230

l. Use of a "Hell or High Water" Lease ....230

m. Tax Indemnity Agreement (Ex. 9) ....230

n. Participation Agreement Provisions (Ex. 1) ....231

o. Sublease Provisions (Ex. 4) ....231

p. Schedule of Termination Values ....232

q. Structure of the RoCa3 Transaction's Repricing Mechanism ....232

r. Protection Against Change in Law ....232

s. Common Transaction Risks ....233

**TABLE OF CONTENTS**

**Page**


2. Expert Testimony Supports CED's Decision, from an Accounting Perspective, to Invest in a Leasing Transaction with a Pretax Profit in Order to Earn Predictable, Front-Loaded Earnings ....233
3. Expert Testimony Supports CED's Decision, from a Market and Regulatory Perspective, to Invest in a Cogeneration Facility in The Netherlands....237
4. CED Was Not Assured That EZH Would Exercise the Sublease Purchase Option in 2018....241
   a. Deloitte Reasonably Concluded in 1997 that EZH Would Not Be Economically Compelled to Exercise the Sublease Purchase Option....241
   b. The Uncertainty Associated with the Projected 2018 Lease Interest Value Would Have Prevented Parties in 1997 from Feeling Assured that EZH Would Exercise the Sublease Purchase Option ....243
   c. The Only Expert Qualified in Regulatory Economics and Electricity Markets Testified that CED Would Not Have Assumed that Market or Regulatory Factors Would Compel the Exercise of the Sublease Purchase Option....247
5. Expert Testimony Supported the Potential for CED to Operate the RoCa3 Facility and Sell Its Output ....251
6. Defendant's Experts Testified that CED Would Bear Economic Risk Related to the Successful or Unsuccessful Operation of the RoCa3 Facility During the Retention Option Period or the Shirt-Tail Period of the Sublease Renewal Option....253
7. CED's Consideration of the Tax Benefits of Leveraged Leasing Was Normal and Appropriate....257
8. Investors Do Not Use Analysis of Pretax Profitability Based Upon "Benchmark" Numbers to Evaluate Opportunities ....259

ARGUMENT....264

I. This Case Is Governed by a Well-Developed Body of Authorities that Specifies Standards for Determining True Lease Status for Tax Purposes....264

**TABLE OF CONTENTS**

**Page**

A. Introduction ........ 264
B. Administrative Guidance Governing Leasing ........ 266
1. Revenue Rulings 55-540 and 55-541 ........ 266
2. Revenue Ruling 60-122 ........ 268
3. Revenue Procedure 75-21 and Revenue Procedure 75-28 ("Leasing Guidelines") ........ 270
a. Minimum Unconditional "At Risk" Investment ........ 272
(i) Initial Minimum Investment ........ 272
(ii) Maintenance of Minimum Investment ........ 272
(iii) Residual Investment ........ 273
b. Lease Terms and Renewal Options ........ 275
c. Purchase and Sale Rights ........ 275
d. No Investment by Lessee ........ 277
e. No Lessee Loans or Guarantees ........ 278
f. Profit Requirement ........ 278
(i) Total Cash Flow ........ 279
(ii) Cash Flow over the Lease Term ........ 281
g. Uneven Rent Payments ........ 283
h. Limited Use Property ........ 283
(i) Revenue Procedure 76-30 ........ 283
(ii) Revenue Ruling 82-61 ........ 284
C. Additional Guidance Related to the Tax Treatment of Leasing Transactions ........ 287
1. Nonrecourse Debt ........ 288
2. Section 467 ........ 289
3. Section 470 ........ 290
D. *Frank Lyon* and the Economic Substance Doctrine ........ 294
1. *Frank Lyon* ........ 294
2. Economic Substance ........ 299
3. Application of the Economic Substance Doctrine to Leases ........ 303
E. Court of Federal Claims Precedent ........ 304

**TABLE OF CONTENTS**

**Page**


1. *Johnson v. United States*, 11 Cl. Ct. 17 (1986) (*Johnson I*).....305
2. *Transamerica Corporation v. United States*, 15 Cl. Ct. 420 (1988) (*Transamerica II*) and *Transamerica Corporation v. United States*, 7 Cl. Ct. 441 (1985) (*Transamerica I*) ..........308
3. *Johnson v. United States*, 32 Fed. Cl. 709 (1995) (*Johnson II*) ........................................................................................313

F. The Lease-In Lease-Out ("LILO") Rulings ........................................315

II. The RoCa3 Transaction Possesses Economic Substance ..............................321

A. The RoCa3 Transaction Possesses Objective Economic Substance ..........................................................................................321

1. The RoCa3 Transaction Was Projected to Earn a Minimum of $61 Million in Pretax Profit and Was Reported for Financial Purposes on the Reasonable Assumption that CED Could Earn Over $101 Million in Pretax Profit..........................................................................321
2. The RoCa3 Transaction Created Genuine Contractual Obligations and Economic Burdens and Benefits for CED, EZH and Other Parties Involved in the Transaction ..............322

B. CED Was Motivated By Genuine Business Reasons to Enter Into the RoCa3 Transaction ..............................................................324

1. The RoCa3 Transaction Generated a Pretax Profit that Provided CED Favorable Accounting Benefits ........................324
   a. CED Sought a Front-Loaded Earnings Profile for Financial Accounting and Reporting Purposes.............325
   b. The Leveraged Lease Structure Provides a Front-Loaded Earnings Profile for Accounting Purposes .......329
   c. CED Would Not Have Entered Into the RoCa3 Transaction Without Pretax Profits Because Pretax Profits Are Necessary to Achieving the Desired Accounting Treatment..................................................332
2. CED Entered into the RoCa3 Transaction to Gain Access to New European Energy Markets.........................................334
3. CED's Consideration of the Tax Benefits of the RoCa3 Transaction Is Irrelevant to the Economic Substance Doctrine .........................................................................................340

# TABLE OF CONTENTS

Page

III. The RoCa3 Transaction Satisfies the Requirements Established By the Leasing Authorities ....344

A. Minimum Unconditional "At Risk" Investment ....345

1. Initial Minimum Investment ....345

2. Maintenance of Minimum Investment ....346

3. Residual Investment ....346

B. Lease Terms and Renewal Options ....350

C. Purchase and Sale Rights ....350

D. No Investment by Lessee ....351

E. No Lessee Loans or Guarantees ....352

F. Profit Requirement ....352

1. Part I: Total Cash Flow ....352

a. Sublease Purchase Option ....353

b. Sublease Renewal Option ....356

c. Retention Option ....362

2. Part II: Cash Flow over Lease Term Without Any Residual ....364

G. Uneven Rent Payments ....364

H. Limited Use Property ....365

I. CED Complied with Other Tax Law Standards Governing Lease Transactions ....368

1. CED Complied with the §467 Rules ....368

2. CED's Loan from HBU Should Be Respected as a Bona Fide Debt ....370

IV. Defendant's Criticisms of the Transaction Are Without Foundation in Leasing Law or the Record ....372

A. The RoCa3 Transaction Created Real Rights and Imposed Real Obligations on Unrelated Parties ....372

1. Defendant's Arguments that EZH Never Transferred a Leasehold Interest to CED Would Bar Typical Features of Sale-Leasebacks and Leveraged Leases ....373

2. Lease-Leasebacks Are Commercially Common Variations of Sale-Leasebacks ....378

## TABLE OF CONTENTS

**Page**


3. The RoCa3 Transaction Created Binding Rights and Obligations ....................380

B. Defeasance Is a Commercially Common Technique for Mitigating Credit Risk and Does Not Deprive the RoCa3 Transaction of True Lease Status ....................387

1. Tax Law Principles Do Not Treat Economic Defeasance as Extinguishing Liability or Defeating True Lease Status ....................388

a. Tax Law Principles Distinguish Between Economic and Legal Defeasance ....................388

b. Both the IRS and the Courts Have Recognized that the Use of Mechanisms to Reduce Credit Risk Does Not Defeat True Lease Status ....................393

2. EZH's Obligations Were Economically, Not Legally, Defeased ....................398

3. Economic Defeasance Is Commonly Used in Leasing to Benefit Both the Lessor and Lessee ....................399

4. The Use of Economic Defeasance Did Not Eliminate Risk from the RoCa3 Transaction ....................402

a. CED Faced Default Risk ....................402

b. Defeasance Did Not Protect Either CED or EZH in the Event of a Premature Termination of the RoCa3 Transaction ....................404

C. The Sublease Purchase Option Is a True Option and Is Consistent with True Lease Status ....................414

1. Under the Authorities, the Sublease Purchase Option Should Be Respected Because EZH Was Under No Economic Compulsion to Exercise It ....................415

2. The Record Establishes That EZH Is Not Economically Compelled to Exercise the Purchase Option and That the Likely Outcome Is That CED Will Choose the Retention Option ....................418

a. Deloitte's Analysis Establishes that CED Will Choose the Retention Option ....................419

(i) EZH Will Not Be Economically Compelled to Exercise the Sublease Purchase Option ....................419

**TABLE OF CONTENTS**

**Page**


(ii) CED Will Most Likely Exercise the Retention Option ....... 422

b. Reed's Economic Analysis Confirms that EZH Will Not Be Economically Compelled to Exercise the Sublease Purchase Option ....... 423

c. Goulding Confirmed that EZH Would Not Be Under Any Regulatory or Market Compulsion to Exercise the Sublease Purchase Option ....... 427

3. Defendant Offered No Credible Proof Regarding the Sublease Purchase Option ....... 430

a. Defendant Presented No Economic Analysis Regarding the Likelihood the Purchase Option Will Be Exercised ....... 431

b. Thomas' Testimony on the Purported Non-Economic Factors Was Flawed and Well Beyond His Expertise ....... 432

c. Defendant's Expert Bent Testified that It Is Not Unusual in Leasing to Set Aside Amounts that Can Be Used to Fund the Exercise of Purchase Options ....... 437

d. Defendant Misreads the Contemporaneous Business Documents ....... 440

(i) CED Accounted for the Transaction Under the Assumption that the Purchase Option Would Not Be Exercised ....... 440

(ii) The Accounting Documents Are Not Evidence that EZH "Intended" to Exercise the Purchase Option ....... 441

(iii) As Defendant's Expert Ray Confirmed, No One Can Know Whether EZH's Management in 2018 Will Exercise the Sublease Purchase Option ....... 449

(iv) The RoCa3 Transaction Does Not Involve "Reciprocal Options" Limiting CED's Benefits and Burdens of Ownership ....... 452

D. CED Will Earn a Profit or Suffer a Loss Based on the RoCa3 Facility's Operations During the Residual Value Period, and the Cash Flows During this Period Would Not Be "Circular" ....... 454

## TABLE OF CONTENTS

Page


1. Under the Terms of the Facility Operating Agreement, CED Will Share in the Profit and Losses of the RoCa3 Facility During the Retention Option Period as Well as the Shirt-Tail Period ....... 456

2. CED Will Participate in the Management of the RoCa3 Facility During the Retention Option Period and the Shirt-Tail Period ....... 460

3. The Cash Flows Would Not Be Circular During Either the Retention Option Period or the Combined Sublease Renewal Term and Shirt-Tail Period ....... 461

a. The Retention Option ....... 462

(i) The Election of the Retention Option and the HBU Loan ....... 462

(ii) The IJssel Deposit and Sublease Deposit Under the Retention Option ....... 463

(iii) The Retention Option and the Final Basic Rent Payment ....... 464

b. The Sublease Renewal Option ....... 468

(i) The IJssel Deposit and Sublease Deposit ....... 468

(ii) The Sublease Renewal Option and the Final Basic Rent Payment ....... 469

4. LaRue Agreed that All of the Conclusions in His Report Were Incorrect Unless the Sublease Purchase Option Is Exercised ....... 471

a. Risks and Benefits from the RoCa3 Facility's Operations ....... 474

b. Fixed Cash Flows ....... 475

c. Circularity ....... 476

d. Economic Loss ....... 477

E. LaRue's Testimony Concerning CED's "Economic Profit" Is Based on Two Fundamental Errors ....... 480

1. The Courts Have Not Accepted LaRue's Definition of "Economic Profit" In Leasing Cases ....... 481

2. LaRue's Cash Flow Calculations Ignored the Shirt-Tail Period and the Retention Option ....... 492

# TABLE OF CONTENTS

**Page**

CONCLUSION .......... 495
APPENDIX A—GLOSSARY .......... A-1
APPENDIX B—WITNESS TRANSCRIPT INDEX .......... B-1
APPENDIX C—TIMELINE .......... C-1

# TABLE OF AUTHORITIES

**Page**

**Cases**


*Alstores Realty Corp. v. Comm'r*, 46 T.C. 363 (1966) ............................................374

*Am. Realty Trust v. United States*, 498 F.2d 1194 (4th Cir. 1974)...........350, 351, 415

*Barclays Mercantile Bus. Fin. Ltd. v. Mawson*, [2004] UKHL 51, [2005] 1 A.C. 684 (U.K.)...........................................................................396

*BB&T Corp. v. United States*, No. 1:04CV000941, 2007 WL 37798 (M.D.N.C., January 4, 2007) ...............................................................17

*Belz Inv. Co., Inc. v. Comm'r*, 72 T.C. 1209 (1979), *aff'd*, 661 F.2d 76 (6th Cir. 1981).................................................................416

*Benton v. Comm'r*, 197 F.2d 745 (5th Cir. 1952)...................................277, 417

*Bolger v. Comm'r*, 59 T.C. 760 (1973) ...........................................................320

*Boulware v. United States*, __U.S.__, 128 S.Ct. 1168 (2008) ..................................340

*Breece Veneer & Panel Co. v. Comm'r*, 232 F.2d 319 (7th Cir. 1956)..............277, 417

*Bridges v. Comm'r*, 325 F.2d 180 (4th Cir. 1963).............................................371

*Caddell v. Lexington County Sch. Dist. No. 1*, 373 S.E.2d 598 (S.C. 1988)..................................................................................380

*Cal-Maine Foods, Inc. v. Comm'r*, T.C. Memo. 1977-89, 36 T.C.M. (CCH) 383 (1977)...........................................................416

*City of Desert Hot Springs v. County of Riverside*, 91 Cal. App. 3d 441 (Cal. Dist. Ct. App. 1979) ................................379, 380

*Coleman v. Comm'r*, 87 T.C. 178 (1986) ......................................................364

*Colo. Nat'l Leasing, Inc. v. Gary Ref. Co. (In re Mesa Ref., Inc.)*, 65 B.R. 724 (D. Colo. 1986) (*Mesa Ref.*) .............................264, 276, 299, 350, 351

*Coltec Indus., Inc. v. United States*, 454 F.3d 1340 (Fed. Cir. 2006)................. passim

*Compaq Computer Corp. & Subsidiaries v. Comm'r*, 277 F.3d 778 (5th Cir. 2001)........................................................325, 341

*In re Continental Airlines, Inc.*, 932 F.2d 282 (3d Cir. 1991) .....................................4

*Cooper v. Comm'r*, 88 T.C. 84 (1987) .....................................303

*Crane v. Comm'r*, 331 U.S. 1 (1947) .....................................288, 370

*Douglas v. Willcuts*, 296 U.S. 1 (1935) .....................................389

*Drobny v. United States*, 86 F.3d 1174 (Fed. Cir. 1996) .....................................314

*Dunlap v. Comm'r*, 74 T.C. 1377 (1980), *rev'd on another issue*, 670 F.2d 785 (8th Cir. 1982).....................................282, 303, 376

*E. Coast Equip. Co. v. Comm'r*, 21 T.C. 112 (1953) .....................................415

*Emershaw v. Comm'r*, T.C. Memo. 1990-246, 59 T.C.M. (CCH) 621 (1990), *aff'd*, 949 F.2d 841 (6th Cir. 1991).....................................272, 303, 345

*Estate of Franklin v. Comm'r*, 544 F.2d 1045 (9th Cir. 1976) .....................................370

*Estate of Thomas v. Comm'r*, 84 T.C. 412 (1985) .....................................passim

*Fed. Nat'l Mortgage Ass'n v. United States*, 397 F.3d 1303 (Fed. Cir. 2004)...266, 321

*Fifth Third Bancorp v. United States*, No. 1:05-cv-350-TSH (Order Denying Def. Mot. Summ. J.) (S.D. Ohio, Feb. 19, 2008).....................................17, 18

*Frank Lyon Co. v. United States*, 435 U.S. 561 (1978) .....................................passim

*Gefen v. Comm'r*, 87 T.C. 1471 (1986) .....................................passim

*Gilman v. Comm'r*, 933 F.2d 143 (2d Cir. 1991) .....................................274, 304

*Greenbaum v. Comm'r*, T.C. Memo. 1987-222, 53 T.C.M. (CCH) 708 (1987) .....................................304, 483

*Gregory v. Helvering*, 293 U.S. 465 (1935) .....................................340

*Gulf Life Ins. Co. v. United States*, 118 F.3d 1563 (Fed. Cir. 1997).....................................340, 341

*Gunther v. Comm'r*, 909 F.2d 291 (7th Cir. 1990).....................................294

*Hall v. City of Balt.*, 250 A.2d 233 (Md. 1969) .....................................380

*Helvering v. Fuller*, 310 U.S. 69 (1940) .....................................389

*Hilton v. Comm'r*, 74 T.C. 305 (1980), *aff'd per curiam*, 671 F.2d 316 (9th Cir. 1982).....................................282, 376, 483

*Hilton v. Comm'r*, 671 F.2d 316 (9th Cir. 1982) ....................................................483

*Horn v. Comm'r*, 968 F.2d 1229 (D.C. Cir. 1992) ....................................................322

*Hudspeth v. Comm'r*, 509 F.2d 1224 (9th Cir. 1975) ..............................................278

*IES Indus., Inc. v. United States*, 253 F.3d 350 (8th Cir. 2001)..............300, 325, 343

*Ill. Valley Paving Co. v. Comm'r*, T.C. Memo. 1981-468, 42 T.C.M. (CCH) 909 (1981), *aff'd on another issue*, 687 F.2d 1043 (7th Cir. 1982).....277, 417

*Ingraham v. Comm'r*, 119 F.2d 223 (9th Cir. 1941)................................................389

*Johnson v. Comm'r*, T.C. Memo. 1962-209, 21 T.C.M. (CCH) 1126 (1962).............415

*Johnson v. United States*, 11 Cl. Ct. 17 (1986) (*Johnson I*) ................................passim

*Johnson v. United States*, 32 Fed. Cl. 709 (1995), *aff'd sub nom. Drobny v. United States*, 86 F.3d 1174 (Fed. Cir. 1996) (*Johnson II*)........................................................................265, 272, 313, 314

*Kaufman v. Comm'r*, T.C. Memo. 1987-350, 53 T.C.M. (CCH) 1348 (1987)..........................................................................................280, 304, 483

*Kirchman v. Comm'r*, 862 F.2d 1486 (11th Cir. 1989)............................................300

*Kwiat v. Comm'r*, T.C. Memo. 1992-433, 64 T.C.M. (CCH) 327 (1992)...........452, 453

*Lansburgh v. Comm'r*, T.C. Memo. 1987-491, 54 T.C.M. (CCH) 691 (1987)...........................................................................304

*Larsen v. Comm'r*, 89 T.C. 1229 (1987), *aff'd in part, rev'd in part on another issue sub nom. Casebeer v. Comm'r*, 909 F.2d 1360 (9th Cir. 1990) .....................282

*Lebowitz v. Comm'r*, 917 F.2d 1314 (2d Cir. 1990) ..................................................370

*Lemmen v. Comm'r*, 77 T.C. 1326 (1981)..............................................................483

*Levy v. Comm'r*, 91 T.C. 838 (1988) ...................................................................passim

*Lockhart Leasing Co. v. Comm'r*, 54 T.C. 301 (1970), *aff'd sub nom. Lockhart Leasing Co. v. United States*, 446 F.2d 269 (10th Cir. 1971) ........316, 394

*Lockhart Leasing Co. v. United States*, 446 F.2d 269 (10th Cir. 1971)....317, 351, 416

*LTV Corp. v. Comm'r*, 63 T.C. 39 (1974) ........................................................317, 416

*L.W. Hardy Co., Inc. v. Comm'r*, T.C. Memo. 1987-63, 52 T.C.M. (CCH) 1540 (1987) .......... 304

*Moser v. Comm'r*, T.C. Memo. 1989-142, 56 T.C.M. (CCH) 1604 (1989) .......... 303

*Mukerji v. Comm'r*, 87 T.C. 926 (1986) .......... passim

*Nw. Acceptance Corp. v. Comm'r*, 58 T.C. 836 (1972), *aff'd per curiam*, 500 F.2d 1222 (9th Cir. 1974) .......... 316, 350, 394, 415, 416, 455

*Ockels v. Comm'r*, T.C. Memo. 1987-507, 54 T.C.M. (CCH) 785 (1987) .......... 280, 303, 304, 483

*Oesterreich v. Comm'r*, 226 F.2d 798 (9th Cir. 1955) .......... 415

*Packard v. Comm'r*, 85 T.C. 397 (1985) .......... 395

*Pearlstein v. Comm'r*, T.C. Memo. 1989-621, 58 T.C.M. (CCH) 699 (1989) .......... 272, 303

*Penn-Dixie Steel Corp. v. Comm'r*, 69 T.C. 837 (1978) .......... 453, 454

*Petroleum Corp. of Tex., Inc. v. United States*, 939 F.2d 1165 (5th Cir. 1991) .......... 294

*Philip Morris Capital Corp. v. Kmart Corp.*, No. 07 C 1926, 2007 WL 3171316 (N.D. Ill., Oct. 24, 2007) .......... 343

*Quartzite Stone Co. v. Comm'r*, 30 T.C. 511 (1958) .......... 415

*R. v. Canada Trustco Mortgage Co.*, [2005] SCC 54 (Can.) (*aff'g* [2003] 4 C.T.C. 2009 (Can. Tax Ct.), and [2004] 2 C.T.C. 276 (Can. Tax Ct.)) .......... 396, 397

*Rice's Toyota World, Inc. v. Comm'r*, 752 F.2d 89 (4th Cir. 1985) .......... 278, 300

*Rice's Toyota World, Inc. v. Comm'r*, 81 T.C. 184 (1983), *aff'd*, 752 F.2d 89 (4th Cir. 1985) .......... 281, 288

*Roper v. Simmons,* 543 U.S. 551 (2005) .......... 396

*Rothschild v. United States,* 407 F.2d 404 (Ct. Cl. 1969) .......... 302, 371

*Rubin v. Comm'r*, T.C. Memo. 1989-484, 58 T.C.M. (CCH) 25 (1989) .......... 303

*Schillinger v. Comm'r*, T.C. Memo. 1990-640, 60 T.C.M. (CCH) 1470 (1990) .......... 483

*Shea v. Comm'r*, T.C. Memo. 1991-518, 62 T.C.M. (CCH) 1027 (1991) .......... 303

*Stanton v. Comm'r*, 34 T.C. 1 (1960) .......... 371

*State v. Sch. Bd. of Sarasota County*, 561 So. 2d 549 (Fla. 1990) .......... 380

*Torres v. Comm'r*, 88 T.C. 702 (1987) .......... passim

*Transamerica Corp. v United States*, 15 Cl. Ct. 420 (1988), *aff'd*, 902 F.2d 1540 (Fed. Cir. 1990) (*Transamerica II*) .......... passim

*Transamerica Corp. v. United States*, 7 Cl. Ct. 441 (1985) (*Transamerica I*) .......... passim

*Transcapital Leasing Assoc. 1990-II L.P. v. United States*, 97 A.F.T.R.2d 2006-1916 (W.D. Tx. 2006) .......... 278, 281, 304, 317, 484

*United Parcel Serv. of America, Inc. v. United States*, 254 F.3d 1014 (11th Cir. 2001) .......... 300, 323, 324, 381

*Walford v. Comm'r*, 123 Fed. Appx. 952 (10th Cir. 2005) .......... 484

*Warren v. Comm'r*, T.C. Memo. 1989-34, 56 T.C.M. (CCH) 1125 (1989) .......... 376

**Statutes**

I.R.C. §162 .......... 1

I.R.C. §163 .......... 1

I.R.C. §467 .......... 1, 287, 289, 290, 368, 369

I.R.C. §470 .......... 287, 290, 291, 292, 293, 294

**Regulations**

Treas. Reg. §1.61-13(b) .......... 390

Treas. Reg. §1.162-11(a) .......... 344

Treas. Reg. §1.467-1(c) .......... 289

Treas. Reg. §1001-3(e)(1) .......... 392

Treas. Reg. §1001-3(e)(4)(iv) .......... 392

Treas. Reg. §1001-3(e)(4)(vi) .......... 392

**Administrative Authorities**

I.R.S. Priv. Ltr. Rul. 81-20-024 (Feb. 17, 1981) ....................................................417

I.R.S. Priv. Ltr. Rul. 88-04-020 (Oct. 29, 1987)...............................................391, 392

I.R.S. Rev. Proc. 75-21, 1975-1 C.B. 715 ......................................................... passim

I.R.S. Rev. Proc. 75-28, 1975-1 C.B. 752 ......................................................... passim

I.R.S. Rev. Proc. 76-30, 1976-2 C.B. 647 ...............................................283, 284 , 365

I.R.S. Rev. Rul. 55-25, 1955-1 C.B. 283...............................................................267

I.R.S. Rev. Rul. 55-540, 1955-2 C.B. 39............................................................ passim

I.R.S. Rev. Rul. 55-541, 1955-2 C.B. 19........................................................267, 268

I.R.S. Rev. Rul. 55-542, 1955-2 C.B. 59...............................................................267

I.R.S. Rev. Rul. 60-122, 1960-1 C.B. 56........................................................268, 269

I.R.S. Rev. Rul. 82-61, 1982-1 C.B. 13............................................................ passim

I.R.S. Rev. Rul. 85-42, 1985-1 C.B. 36..........................................................317, 390

I.R.S. Rev. Rul. 99-14, 1999-1 C.B. 835.....................265, 315, 316, 317, 318, 319, 320

I.R.S. Rev. Rul. 2002-69, 2002-2 C.B. 760.........................265, 290, 318, 319, 320, 371

I.R.S. Tech. Adv. Mem. 93-131-001 (Apr. 7, 1992).................................................417

Prop. Treas. Reg. §1.467-3(b)(ii), 61 Fed. Reg. 27834............................................290

Prop. Treas. Reg. §1.467-3(c)(2)(i), 61 Fed. Reg. 27834...................................289, 365

Prop. Treas. Reg. §1.467-8(a), 61 Fed. Reg. 27834.................................................289

Prop. Treas. Reg. §1.467-8(b), 61 Fed. Reg. 27834.................................................289

T.D. 8820, 1999-1 C.B. 1209 ........................................................................289, 369

**Legislative History**

American Jobs Creation Act of 2004, Pub. L. No. 108-357,
118 Stat. 1418, 1602 ..........................................................................290, 291

GovTrack.us (database of federal legislation), http://www.govtrack.us/congress/bill.xpd?bill=s110-349 .....................................293

GovTrack.us (database of federal legislation), http://www.govtrack.us/congress/bill.xpd?bill=s110-2242 ...................................293

Heartland, Habitat, Harvest and Horticulture Act of 2007, S. 2242, 110th Cong. §505 ........................................................................................................293

Safe, Accountable, Flexible, and Efficient Transpiration Equity Act of 2005, H.R. 3, 109th Cong. §5511 ..................................................................................292

Small Business Work and Opportunity Act of 2007, S. 349, 110th Cong. §201 ......292

S. Rep. No. 100-001 (2007)..........................................................................................292

Tax Technical Corrections Act of 2007, Pub. L. No. 110-172, 121 Stat. 2473 .........293

**Other Authorities**

IAN SHRANK & ARNOLD G. GOUGH, JR., EQUIPMENT LEASING–LEVERAGED LEASING (4th ed. 2007)...........................................................................passim

IRS Release No. IR-2002-108.........................................................................................319

Letter from Eric Solomon to Norman Y. Mineta, Sec'y of U.S. Dep't of Transp. (Feb. 15, 2005), BNA DAILY TAX REPORT, Mar. 3, 2005........................291

*Orange County Goes Bust*, TIME, Dec. 19, 1994, http://www.time.com/time/magazine/article/0,9171,982031-3,00.html................408

*Standard and Poor's Ratings Definitions*, Mar. 17, 2008, http://www2.standardandpoors.com/portal/site/sp/en/us/ page.article/2,1,1,4,1204834067208.html ..........................................................393

Statement of Financial Accounting Standards No. 13 (FAS 13)........................passim

Statement of Financial Accounting Standards No. 125 (FAS 125)..........................146

*Timothy Aeppel et al.*, *Bear Stearns's Ripples Reach Corporate Sector*, WALL ST. J., Mar. 18, 2008 .....................................................................402

*Unofficial Transcript of W&M Hearing on Small-Business Bill Is Available*, 2007 TAX NOTES TODAY 62-63, Mar. 14, 2007.................................293

Wesley Elmore & Meg Shreve, *House Small Business Tax Package Headed Toward Bipartisan Passage*, 2007 TAX NOTES TODAY 31-1, Feb. 14, 2007 ........................................ 293

Pursuant to the Court's direction Consolidated Edison Co. of New York, Inc. ("Con Edison") submits its Opening Post-Trial Brief. Simultaneous reply briefs are due on May 23, 2008. The case involves the tax treatment of a leveraged lease transaction (the "RoCa3 Transaction") between a wholly owned subsidiary of Consolidated Edison Development, Inc. ("CED") and a Dutch utility, Electriciteitsbedrijf Zuid-Holland N.V. ("EZH"). Con Edison is the parent company of CED. The property subject to the leasing transaction is a gas-fired combined cycle cogeneration plant (the "RoCa3 Facility") located in the Netherlands.

The issues involve three separate classes of deductions claimed by Con Edison for the 1997 tax year. First, pursuant to I.R.C. §162(a)(3),[1] Con Edison deducted $1,072,652 in rental expense allocated to 1997 for the acquisition of CED's Lease Interest in the RoCa3 Facility. Defendant has not disputed that this amount was properly calculated under §467. (*See* Argument Section III.I.1.) Second, pursuant to §163(a), Con Edison deducted $254,944 in interest expense allocated to 1997. (Stip. ¶300) This interest expense was attributable to the nonrecourse debt incurred to pay part of the cost of CED's Lease Interest in the RoCa3 Facility. Defendant has not disputed that this amount was correctly calculated. Third, pursuant to §162(a), Con Edison deducted $9,698 in transaction costs allocated to 1997. (Stip. ¶300) Defendant has not made any separate arguments regarding these transaction costs and has not challenged this amount, but presumably claims that they are not deductible based upon its substance/form and economic substance

[1] Unless otherwise noted, all section references are to the Internal Revenue Code, as applicable in 1997.

theories. CED also reported rental income of $399,693 attributable to the rent owed to CED by EZH for 1997. (Stip. ¶299) These deductions and income totaled to a net deductible loss of $937,331 for 1997. (Stip. ¶¶299-300, 302)

## QUESTIONS INVOLVED

The parties have agreed that this case poses three issues of law:

1. Whether the form of the RoCa3 Transaction should be respected for tax purposes.

2. Whether the loan by Hollandsche Bank-Unie N.V. ("HBU") to the subsidiary of CED constitutes bona fide indebtedness and should be respected for federal income tax purposes.

3. Whether the investment in the RoCa3 Transaction has economic substance.

Con Edison bears the burden of proof on these issues.

## STATEMENT OF THE CASE

*Introduction*

The parties have offered the court radically different approaches for evaluating the RoCa3 Transaction. Con Edison contends that the Court should evaluate the transaction by reference to the detailed standards developed in a series of IRS administrative rulings and court decisions stretching back 50 years which govern whether a transaction is a "true lease" for tax purposes. The RoCa3 Transaction easily satisfies and surpasses these standards. Defendant disregards these standards and invites the Court to decide the case based upon generalized

appeals to "substance over form" and "economic substance," divorced from the five decades of administrative and judicial authorities that have applied these doctrines to leasing transactions.

Although there is little common ground between the parties, after a five-week trial at least three points are indisputable. First, in entering into the transaction, CED reasonably projected that it would earn a substantial pretax profit and pay substantial federal income taxes on this profit. At a minimum, the transaction is projected to generate a pretax profit of at least $61 million and CED is expected to pay incremental income taxes of $21.3 million on this profit. Second, the tax benefit that arises from the transaction is deferral, not tax elimination. Third, the transaction was structured in order to obtain the highly favorable front-loading of earnings offered by Statement of Financial Accounting Standards No. 13, Accounting for Leases ("FAS 13"). Under FAS 13, the projected pretax profits from a leveraged lease are largely front-loaded into the lease's early years for financial reporting purposes.

In short, the RoCa3 Transaction possesses economic substance and satisfies all previously identified requirements to qualify for true lease status under the tax law. It therefore merits respect as a true lease transaction.

*Summary of the Transaction*

Like all leveraged leases, the RoCa3 Transaction was implemented through detailed and complex contractual agreements designed to protect the interests of all

of the parties. However, the reasons for the transaction and its basic structure are relatively simple.

A leveraged lease involves the conveyance of an interest in an asset where the lessor (also called the "equity investor") uses both nonrecourse debt and its own capital to acquire its interest in the soon-to-be-leased asset. The asset can be acquired in various ways in order to permit the investor to enter into a leveraged lease. The lessor can purchase the asset from a manufacturer and then lease it to another party; the lessor can purchase the asset from someone who already owns it and then lease it back to the owner (a "sale-leaseback"); or the lessor can lease the asset from a current owner and sublease it back to the owner (a "lease-leaseback"). Assuming the rules concerning a true lease are respected, all of these acquisition techniques can be the basis for acquiring the asset.

Leveraged leases can serve different business purposes. From the lessee's perspective, a leveraged lease can be a cheaper way to finance the use of an asset or it can be used to refinance an existing asset to generate cash and hedge the long-term risks of owning the asset for its entire useful life. (Ex. 10073 (Ellis Initial Report) at pages 19997-98); *see also In re Continental Airlines, Inc.*, 932 F.2d 282, 284 (3d Cir. 1991) (describing customary practice in the airline industry of using leasing transactions both to acquire new aircraft and to sell and leaseback aircraft currently in the fleet "as a means of raising working capital"); *Mukerji v. Comm'r*, 87 T.C. 926, 942 (1986) (sale-leasebacks are simply "methods of financing" allowing the lessee "to preserve and increase its capital").

From the lessor's perspective, the lessor expects to profit by leasing the asset to another party in return for rent and by exploiting the asset's residual value after the lease term. Because the lessor also expects to enjoy tax deferral benefits arising from deductions for interest and depreciation/amortization, it frequently can offer the lessee rental terms that are more favorable than the lessee would have incurred by owning the asset and financing or refinancing it with debt. Indeed, these favorable rental terms are the very basis for the existence of the leveraged leasing industry, which is a well-established sector of the economy. (Ex. 10073 (Ellis Initial Report) at pages 19994-95, 19998) As of 1997, when the RoCa3 Transaction took place, leasing was a rapidly growing $179 billion industry. (*Id.*)

The RoCa3 Transaction is similar to a sale-leaseback, but involves a lease-leaseback. In 1997, a subsidiary of CED, Consolidated Edison Leasing, Inc. ("CEL"), acting through a trust, entered into a long-term lease with EZH. (For convenience, Con Edison will refer to the transaction as having occurred between EZH and CED.) EZH leased an undivided 47.47% interest in the RoCa3 Facility to CED for a term of 43.2 years (the Lease), which constituted 80% of the plant's estimated remaining useful life of 54 years. CED immediately subleased the RoCa3 Facility back to EZH for a term of 20.1 years (the Sublease). The transaction continues to this day.

Each of the parties possesses certain options at the end of the Sublease. EZH has an option (the "Sublease Purchase Option") to buy out CED's leasehold rights at the end of the Sublease Basic Term (January 2, 2018), but the price for this option was set above the estimated fair market value of those rights as of the exercise date.

If EZH does not exercise its option, CED can (1) sell its share of the RoCa3 Facility's output for the remaining 23.1 years of the Lease, or sublease the RoCa3 Facility to a third party for all or any portion of the remaining 23.1 years on any terms it chooses (the "Retention Option"), or (2) renew the Sublease with EZH for an additional 16.5 years (through June 15, 2034), but at rentals set below the estimated fair market value of rentals at that time (the "Sublease Renewal Option"). If the latter option is chosen, CED may then sell its share of the output of the RoCa3 Facility during the remaining 6.7 years of the Lease Term after the Sublease Renewal Option Period ends.

CED was obligated to make two lump sum payments of Lease rent to EZH, one at the Lease inception and the other at the Lease end. In order to make the initial payment, CED invested $39.32 million in equity and borrowed $80.79 million from a third-party lender, HBU, on a nonrecourse basis (hence making the Sublease a "leveraged lease"). EZH, in turn, agreed to make Sublease rental payments to CED in return for the Sublease back to EZH. CED reports the Sublease rentals as income and reports deductions based upon interest payments made to the lender and amortization of the Lease rent.

*Con Edison's Argument*

Following the Statement of Facts, Con Edison presents its legal argument. Con Edison's affirmative argument consists of three major sections. In Section I, Con Edison reviews the specific standards governing whether a lease will be respected for tax purposes and the development of the economic substance doctrine

that governs the tax treatment of all transactions. In Section II, Con Edison discusses the application of the economic substance doctrine to the RoCa3 Transaction. In Section III, Con Edison discusses the application of the leasing law standards to the transaction.

As set forth in Section I, the standards governing the tax treatment of leases are exceptionally well developed. The Internal Revenue Service ("IRS") first began issuing rulings to provide guidance with respect to leasing transactions in 1955. This administrative activity ultimately resulted in the issuance of the IRS "Leasing Guidelines," which consist of two revenue procedures, Revenue Procedure 75-21, 1975-1 C.B. 715, and Revenue Procedure 75-28, 1975-1 C.B. 752, governing the circumstances under which the IRS will issue taxpayers an advance ruling that a leveraged lease will be respected as a true lease for tax purposes. In a parallel development, an extensive series of court decisions, including four by this Court's predecessor, provided judicial guidance as to the requirements for true lease status, some of them significant alterations of the positions advocated by the IRS in the Leasing Guidelines.

The centerpiece of the leasing cases is *Frank Lyon v. United States*, 435 U.S. 561 (1978), which approved the sale-leaseback of a bank headquarters, holding that "so long as the lessor retains significant and genuine attributes of the traditional lessor status, the form of the transaction adopted by the parties governs for tax purposes." *Id.* at 583-84. *Frank Lyon* has had a significant impact both upon the

development of leasing law standards and upon the development of the economic substance doctrine.

There is also a significant body of law governing the application of the economic substance doctrine. In *Coltec Indus., Inc. v. United States*, 454 F.3d 1340, 1356 (Fed. Cir. 2006), *cert. denied*, 127 S. Ct. 1261 (2007), the Federal Circuit confirmed that every transaction must be evaluated for objective economic substance in order to be respected for tax purposes. A transaction possesses economic substance if it presents a reasonable possibility of generating a profit aside from tax consequences. A transaction also possesses economic substance if it has a genuine impact upon the interests of unrelated parties. *Coltec* also clarifies the role of the taxpayer's subjective business purpose: *Coltec* equates subjective business purpose with "subjective business profit motivation," *id.* at 1355 n.13 (citing *Dow Chem. Co. v. United States*, 435 F.3d 594, 599 (6th Cir. 2006), and states that a transaction "may well" be disallowed "if the taxpayer's sole subjective motivation is tax avoidance." *Id.* at 1355.

In accordance with *Coltec*'s mandate, Con Edison demonstrates in Section II that the RoCa3 Transaction possesses economic substance. Over its life, the RoCa3 Transaction is projected to earn a substantial pretax profit and will result in the payment of substantial federal income taxes. (*See* Argument Section II.A.1.) The RoCa3 Transaction also is a genuine multiple-party transaction that affects the rights and interests of unrelated parties: CED as lessor; EZH as lessee; and HBU as

nonrecourse lender to CED. (*See* Argument Section II.A.2.) Hence, viewed objectively, the RoCa3 Transaction possesses economic substance.

Much of the trial concerned Defendant's inquiry into CED's motivations for entering into the RoCa3 Transaction. The record establishes that CED entered into the transaction because it provided a pretax profit that, under FAS 13, was front-loaded into the early years of the transaction, a time when CED was projecting losses. The record further establishes that CED entered into the RoCa3 Transaction as an integral part of Con Edison's deregulation plan involving diversification efforts around the world. Con Edison prominently featured the RoCa3 Transaction in its 1997 annual report to illustrate CED's mission of "becom[ing] a leading investor in energy infrastructure projects." (Ex. 107 at page 2961; *see* Argument Section II.B.) While the RoCa3 Transaction, like all other leveraged leases, included a deferral of taxes, Defendant's leasing expert Samuel Ray testified that CED's tax motivations were no different than any other party that enters into a leveraged lease. (*See* Argument Section II.B.3.) Under the economic substance cases, all that is required is a nontax business purpose; the cases do not require a transaction devoid of tax motivation.

Having demonstrated that the RoCa3 Transaction possesses economic substance, Con Edison demonstrates in Section III that the transaction meets all of the specific requirements imposed by the leasing authorities. For clarity, Con Edison organizes this discussion around the specific requirements set forth in the Leasing Guidelines. Although the Leasing Guidelines are not binding, they

"constitute a relatively clear and concise list of principles and propositions made relevant by case law." IAN SHRANK & ARNOLD G. GOUGH, JR., EQUIPMENT LEASING–LEVERAGED LEASING, §4:2.2[C] at 4-18 (4th ed. 2007).[2] In this discussion, Con Edison specifically notes where the courts have altered the standards advocated by the IRS in the Leasing Guidelines. The tests set forth in the Leasing Guidelines are as follows:

*Minimum Unconditional "At Risk" Requirement*. The Leasing Guidelines specify that a taxpayer (1) must make an initial equity investment of at least 20% of the cost of the property to be leased; (2) maintain that investment throughout the life of the lease; and (3) obtain an opinion from a "qualified expert" that the value of the asset at the end of the lease, *i.e.*, the "residual value," will be equal to at least 20% of the property's cost, and that the useful life of the property at the end of the lease will be the greater of one year or 20% of the property's originally estimated useful life. CED's investment easily meets all of these requirements. (*See* Argument Sections III.A. and III.B.)

*Purchase Option*. Under the Leasing Guidelines, the IRS will not issue a favorable advance private letter ruling if the lessee has a purchase option that would allow it to buy the property at a fixed price. Here, EZH's purchase option does not satisfy this requirement, because the Sublease Purchase Option permits EZH to buy CED's Lease Interest for a fixed price of $215,450,950.25. However, this

[2] This text is hereinafter referenced as *Equipment Leasing*. At trial, *Equipment Leasing* was qualified as a learned treatise under Federal Rule of Evidence 803.18. (Tr. 3165-66, 3234-35 (Ellis))

is an instance in which the courts have not accepted the standard set by the Leasing Guidelines. The courts have allowed fixed-price options provided that they are not priced at a nominal amount, which, due to the bargain element, makes them virtually certain to be exercised. (*See* Argument Section III.C.)

*No Investment or Loans by Lessee*. Under the Leasing Guidelines, a lessee may not provide any part of the lessor's cost in acquiring its interest in the property or loan money to the lessor. CED paid the entire cost for its interest with its equity investment and the funds loaned to it by HBU. Hence, these requirements are satisfied. (*See* Argument Sections III.D. and III.E.)

*Profit Requirement*. The Leasing Guidelines require that a lease produce a pretax profit and generate positive cash flow over the term of the lease. Regarding the profit requirement, the Leasing Guidelines literally provide that one dollar of profit would be sufficient. The courts have never addressed such an extreme situation, but this Court's predecessor has specifically noted that the profit can be "minimal" under the Leasing Guidelines. *Johnson v. United States*, 11 Cl. Ct. 17, 26 (1986) ("*Johnson I*"). Here, under any possible scenario, the transaction is projected to generate a substantial pretax profit. (*See* Argument Section III.F.) Regarding the cash flow requirement, the courts repeatedly have recognized that a lease may be respected even if it does not generate any significant cash flow over the lease term. Here, the Transaction is projected to generate positive cash flow of $101 million over the Sublease Term; in contrast, in *Frank Lyon*, the lessor did not expect to receive *any* cash flow during the primary term of the lease and yet the Supreme

Court held that the form of the lease should be respected. (*See* Argument Section III.F.)

*Uneven Rent Payments*. Leases often provide for uneven rent payments that result in deferred or prepaid rents. The Leasing Guidelines allow uneven rental payments within certain parameters. The rental payments owed by CED to EZH were carefully structured to comply with the Leasing Guidelines and all applicable regulatory and statutory requirements. (*See* Argument Section III.G.; *see also* Argument Section III.I.)

*Limited Use Property*. EZH's interest in the RoCa3 Facility is not so-called "limited use property," which is property that cannot be used by the lessor at the end of the lease except for purposes of continued leasing or other transfer to the lessee. Here, CED negotiated for all the rights necessary to profit from the RoCa3 Facility's operation without the need for CED to continue to sublease the RoCa3 Facility to EZH or to sell it to EZH. (*See* Argument Section III.H.)

*Nonrecourse Debt.* Finally, Section III.J. demonstrates that, because CED maintains a substantial equity in the property, the nonrecourse loan from HBU should be respected as bona fide. (*See* Argument Section III.J.)

*Defendant's Arguments*

In Section IV, Con Edison addresses Defendant's principal arguments. Defendant's arguments are unified by a common defect: As Defendant's own leasing experts, Samuel Ray and Paul Bent, testified on cross-examination, the features of the RoCa3 Transaction to which Defendant assigns so much importance are

features found in a wide variety of leveraged leasing transactions. They simply do not have the significance that Defendant has attached to them.

Section IV.A. addresses Defendant's argument that no "real world substantive rights and duties of the participants . . . actually changed as a consequence of the Transaction." (Def.Tr.Br. at 2.) As Con Edison demonstrates, the key features that Defendant cites in support of this contention—*e.g.*, EZH's continued use of the property and retention of profits during the Sublease are typical features of all leveraged leases generally and sale-leasebacks specifically. Leases with these same features have repeatedly been upheld by the courts. (*See* Argument Section IV.A.1.) Lease-leasebacks are simply variations of sale-leasebacks; indeed, both Bent and Ray have structured transactions involving lease-leasebacks. (*See* Argument Section IV.A.2.) Further, as Bent confirmed, the RoCa3 Transaction resulted in legally enforceable obligations that materially altered the parties relationships to the asset and to each other. Among other things, the transaction imposed real restrictions on EZH's ability to dispose of the plant or any interest therein and created significant financial liabilities for EZH in the case of a default or premature termination of the RoCa3 Transaction. (*See* Argument Section IV.A.3.)

Section IV.B. addresses Defendant's criticisms of the use of economic defeasance to reduce credit risk in the transaction. Contrary to Defendant's arguments, tax law has long recognized that economic defeasance does not release an obligor (here, EZH) from its liabilities and that funds held in an economic

defeasance account remain the obligor's property. (*See* Argument Section IV.B.1.) Until the IRS objected to lease-leaseback transactions in 1999, the IRS itself had allowed the use of economic defeasance in leasing transactions. Significantly, the testimony of Defendant's leasing experts establishes that economic defeasance provides non-tax business benefits to both lessees and lessors and is "not uncommon" and not "atypical" in leasing transactions. (Tr. 3819 (Bent)); *see* Argument Section IV.B.3.) Finally, the record shows that, even with the defeasance accounts, both CED and EZH faced significant risks in the transaction; indeed, if the transaction was prematurely terminated because of a default by EZH, EZH could either lose its continued use of the RoCa3 Facility or be required to make a payment to CED that could cost EZH tens of millions of dollars. (*See* Argument Section IV.B.4.)

Section IV.C. addresses Defendant's contentions concerning the Sublease Purchase Option. Under case law, purchase options are respected unless the option price is set at such a nominal amount that the lessee is virtually certain to exercise the option; Con Edison can find no case that has questioned the validity of an option set *above* the expected fair market value of the property, as was the Sublease Purchase Option here. (*See* Argument Section IV.C.1.) To the contrary, this Court's predecessor previously concluded that a non-nominal purchase option must be respected, even where the asset was "indispensable" to the lessee's business and the lessee could not "foresee any circumstances or conditions that might arise which would cause it not to exercise the purchase option[]." *Transamerica Corp. v United*

*States*, 15 Cl. Ct. 420, 440-441 (1988), *aff'd*, 902 F.2d 1540 (Fed. Cir. 1990) ("*Transamerica II*"). Here, the option price is significant and the asset was not indispensable to EZH's municipal owners, who sold EZH to a private company two years after closing the RoCa3 Transaction.

Con Edison presented compelling expert testimony confirming on both economic and non-economic grounds Deloitte's conclusion that the most likely outcome in 2018 is that EZH will not exercise the Sublease Purchase Option and that CED will end up choosing the Retention Option. (*See* Argument Section IV.C.2.) In response, Defendant did not present any expert testimony offering an economic analysis regarding the likelihood that the Sublease Purchase Option will be exercised. Rather, Defendant presented testimony by expert witnesses (David W. LaRue and Jacob K. Thomas) unqualified to testify about the purported non-economic reasons that the Sublease Purchase Option would be exercised. (*See* Argument Section IV.C.3.a.-b.) Defendant also contends that there is something invalid about using the defeasance accounts to give EZH the financial wherewithal to exercise the Sublease Purchase Option; however, Bent's prior testimony on behalf of the taxpayer in another case established that "it is not unusual" to use funding mechanisms such as defeasance accounts to enable lessees to exercise purchase options should they choose to do so. (Tr. 3960, 3962; *see* Argument Section IV.C.3.c.) Defendant based most of its argument upon its mistaken and incomplete reading of accounting documents, failing to consider that CED accounted for the anticipated profits from the transaction under the assumption that the Sublease Purchase

Option would *not* be exercised. (*See* Argument Section IV.C.3.d.) Once again, Defendant's own experts gave testimony in favor of Con Edison. As Ray testified, no one can know who EZH's managers will be in 2018 and whether they will choose to exercise the Sublease Purchase Option. (*See* Argument Section IV.C.3.d.(iii).) LaRue agreed that whether EZH would exercise the Sublease Purchase Option is "pure speculation." (Tr. 5179; *see* Argument Section IV.C.3.a.)

Section IV.D. addresses Defendant's argument that the transaction resulted in "circular" movements of money and possesses no operational risks to CED. This argument is based upon Defendant's misunderstanding of the risks that CED faces if EZH does not exercise the Sublease Purchase Option and Defendant's misunderstanding of what will happen to the defeasance accounts if either the Retention Option or the Sublease Renewal Option is exercised. Put simply, if the Sublease Purchase Option is not exercised, CED's income will depend upon the operation of the RoCa3 Facility and the parties' obligations and will not represent a "circular" cash flow.

Finally, Section IV.E. addresses Defendant's argument that CED's projected profits from the transaction are insufficient because CED could have earned a higher pretax return from a different kind of investment. Defendant primarily bases this argument upon the testimony of LaRue. LaRue acknowledged that the RoCa3 Transaction is projected to be profitable, but argued that the pretax profit on the transaction was less than CED could have earned on another kind of investment. (*See* Argument Section IV.E.1.) LaRue's "economic profit" argument is contrary to

the leasing authorities and has been specifically rejected by this Court's predecessor. *See Johnson I*, 11 Cl. Ct. at 36-37. Further, this argument is contrary to the testimony of Defendant's leasing experts, who testified that the pretax return projected for the RoCa3 Transaction is perfectly consistent with the returns commonly found in leasing transactions. LaRue compounded his error by failing to review the relevant documents, which led him to "ignore" hundreds of millions of dollars in additional pretax profit. (*See* Argument Section IV.E.2.)

*Other Cases*

Con Edison expects that Defendant will rely heavily on the decision in the lease-leaseback case of *BB&T Corp. v. United States*, No. 1:04CV000941, 2007 WL 37798 (M.D.N.C. 2007), currently on appeal to the Fourth Circuit, No. 07-1177 (4th Cir. March 1, 2007). In *BB&T*, the parties filed cross-motions for summary judgment, and the case was decided on a stipulated record without the benefit of a fulsome development of the facts at trial, an understanding of the leasing industry, and the background of leasing, and the insights of experts subject to the benefits of cross-examination. *See Fifth Third Bancorp v. United States*, No. 1:05-cv-350-TSH, at 8 (Order Denying Def. Mot. Summ. J.) (S.D. Ohio, Feb. 19, 2008) ("*Fifth Third Order*").[3]

In this case, however, unlike *BB&T*, the parties obviously did not agree on the facts relevant to the Court's decision. A five-week trial was necessary to present the parties' competing view of the facts, such as whether EZH will be compelled to

[3] A copy of this Order was provided to the Court on February 22, 2008.

exercise the Sublease Purchase Option, whether the parties' rights and obligations were affected by the RoCa3 Transaction, and whether the transaction was motivated, "at least in part, by tax independent considerations, as well as whether Plaintiff retained significant and genuine attributes of the traditional lessor status." *See Fifth Third Order*, p. 8. As was the case in *Fifth Third*, "genuine issues of fact exist" concerning the status of the RoCa3 Transaction. *Id.* For this reason, "the *BB&T* decision is distinguishable if for no other reason than the *BB&T* court ruled based on a stipulated record." *Id.* (emphasis added).

*Appendices*

For the Court's convenience, Con Edison has attached three appendices to its Opening Post-Trial Brief. Appendix A is a glossary of relevant terms and individuals. Appendix B is a witness transcript index that lists the transcript volume, transcript pages and date(s) of testimony for each respective witness. Appendix C is a timeline of significant events prepared pursuant to the Court's request for "a chronology of the transaction." (Tr. 5379)

## STATEMENT OF FACTS

### I. Con Edison History

Consolidated Edison Company of New York's traditional lines of business were the generation and distribution of electricity and steam, and the delivery of natural gas in New York City and Westchester County in New York State. (Tr. 113 (McGrath)) Consolidated Edison's lineage can be traced back to 1823 when it was a gas company in New York State. (Tr. 110 (McGrath); Ex. 856 at page 13402; Tr. 492

(Burke)) In 1884, the company was named the Consolidated Gas Company following the merger of a group of gas companies (Ex. 856 at page 13402; Tr. 110 (McGrath)), and in November of 1884, the company was organized as a regulated public utility under the laws of New York State. (Stip. ¶2) The company began providing electricity-related services and steam in New York State during the 1880s. (Tr. 439, 492 (Burke)) In 1936, the company changed its name to the Consolidated Edison Company of New York ("Con Edison NY"). (Ex. 856 at page 13402; Tr. 110 (McGrath))

In 1990, Eugene McGrath was named CEO of Con Edison NY. (Tr. 112 (McGrath)) As the new CEO, McGrath faced many challenges such as safety and environmental concerns (Tr. 129 (McGrath)), corporate image issues (Tr. 130 (McGrath)) and potential deregulation. (Tr. 133 (McGrath)) McGrath spent an enormous amount of time restoring Con Edison NY's image to that of an "environmentally good company" following a major environmental issue involving the release of asbestos at Gramercy Park (Tr. 129 (McGrath)), which occurred in 1989. (Ex. 1306 at page 18457) The Gramercy Park incident resulted in costs exceeding $100 million (Ex. 1306 at page 18457) and Con Edison NY's being placed on probation for its environmental programs. (Ex. 1306 at page 18457; Tr. 129 (McGrath); *see also* Ex. 114 at pages 3110-11). As indicated by McGrath at the May 1997 Shareholders Meeting, Con Edison NY was "weaving environmental excellence into every aspect of" its "business." (Ex. 855 at pages 13349-50) McGrath also spent

a large part of his time studying the consequences of the expected deregulation of the electricity services industry in the United States. (Tr. 133 (McGrath))

In the mid-to-late 1990s, prior to deregulation, Con Edison NY was a vertically integrated electric utility, meaning it generated, transmitted and delivered electricity to its customers. (Tr. 113, 115-116 (McGrath); *see* Ex. 106 at page 2906; Ex. 143 at page 3394) This method of providing electrical service is referred to as a "bundled format." (*See* Stip. ¶¶3, 4; Ex. 143 at page 3394; Tr. 453-54 (Burke))

As of December 31, 1996, Con Edison NY provided electricity-related services to a service area of more than eight million people in New York City and Westchester County, New York. (Ex. 545 at page 9868; Tr. 113 (McGrath); Tr. 435 (Burke)) Con Edison NY's electrical services included:

- Owning and operating electricity generation assets such as gas-fired, oil-fired and nuclear-powered power generating facilities with a total generating capacity of 8,300 MW. (Stip. ¶4; Tr. 113 (McGrath); Tr. 432-33 (Burke)) Its generating assets included large cogeneration plants, which produced both power and steam (Tr. 114-16 (McGrath); Tr. 433 (Burke)); and

- Owning and operating transmission and distribution systems consisting of 88,788 miles of underground cable (Ex. 545 at page 9876; Tr. 433-34 (Burke))

Similar to its electricity business, Con Edison NY's steam business was vertically integrated, as it generated and distributed steam to lower Manhattan. (Tr. 114 (McGrath)) The steam that was produced in Con Edison NY's cogeneration plants (Tr. 114 (McGrath) was transported in the world's largest steam/heating system, consisting of 104 miles of mains and poles. (Ex. 545 at page 9876; Tr. 114

(McGrath); Tr. 437-38 (Burke)) Con Edison NY also delivered natural gas to one million customers covering Westchester County, the Bronx, Manhattan and parts of Queens. (Tr. 113-14 (McGrath); Tr. 436 (Burke))

During 1997, Con Edison NY continued to transmit and deliver electricity and natural gas to its customer base in New York City and Westchester County, and to supply steam to about 2,000 buildings in Manhattan. (Stip. ¶2; Tr. 678 (Freilich)) At the end of 1997, Con Edison NY had about $14.7 billion in assets, making it one of the nation's largest publicly held energy companies. (Stip. ¶2; Tr. 673 (Freilich))

### A. Con Edison and the New York State Power Industry Prior to Deregulation

The New York Public Service Commission ("PSC") regulates the electric industry in New York. (Stip. ¶5; Tr. 440 (Burke)) Before deregulation, Con Edison NY operated as a regulated utility and *all* of its operations were regulated by the PSC. (Stip. ¶5) The PSC established the rates that Con Edison NY could charge its customers for electricity services, and these rates were based on the costs of generating and delivering such electricity. (Tr. 440-441 (Burke))

In the 1990s, the electricity utility regulators both inside and outside the United States began to seek ways to improve efficiency of electricity services. (Tr. 133 (McGrath) It was believed that this would occur by separating the ownership of electric generating facilities from that of transmission and distribution systems. (Tr. 133 (McGrath); Tr. 446, 448 (Burke)) Specifically, the development of a competitive electricity industry in New York State started in March 1993, when the PSC

initiated the "Proceeding On Motion Of The Commission To Address Competitive Opportunities Available To Customers Of Electric And Gas Service And Develop Criteria For Utility Responses" (the "Competitive Opportunities Proceeding"). (Stip. ¶6; Tr. 448-49 (Burke)) Kevin Burke—vice president of Corporate Planning for Con Edison NY from 1993 through 1998 and Con Edison's current Chairman and CEO (Tr. 425-28)—explained that the purpose of the Competitive Opportunities Proceeding was to evaluate how the electricity services industry in New York State could be restructured to establish competitive options, including "a competitive market for wholesale electricity as well as a competitive market for retail electricity." (Tr. 446-47 (Burke); Stip. ¶7)

The Competitive Opportunities Proceeding was divided into two phases. (Stip. ¶8) Phase I involved investigating and addressing the issues that would develop from moving toward a competitive market. (Stip. ¶8; Ex. 110 at page 3080) Phase II, which commenced in August 1994, involved identifying regulatory and ratemaking practices to assist the New York electric utility industry's move toward a competitive industry. (Stip. ¶8; Ex. 110 at page 3080) The PSC encouraged electric utilities to collaborate on developing a set of principles to achieve this goal, including the examination of issues related to the establishment of an efficient wholesale electricity market and any necessary pricing reforms. (Ex. 110 at page 3080) The PSC specifically directed electric utilities to address whether the divestiture of the utilities' generating assets would enhance the electricity industry's move toward a competitive market. (*Id.*; Tr. 454-55 (Burke))

Phase II concluded in May 1996 with the PSC's opinion setting forth the PSC's vision to continue pursuing competition in the electricity generating industry. (Ex. 299 at page 5834) The PSC concluded that in any model where electricity generation is deregulated, generation must be separated from the transmission and distribution of electricity to prevent the creation of monopolistic-like market powers in any electricity utility. (Stip. ¶9, Ex. 299 at pages 5834, 5854, 5860, 5873; Tr. 134 (McGrath); Tr. 678 (Freilich)) The PSC thus "strongly encouraged" electricity utilities to sell their generating assets to unregulated entities in order to create a truly competitive market. (Stip. ¶9; Ex. 299 at pages 5873-74; Tr. 452-53 (Burke)) Through deregulation, the PSC intended to ensure that the retail providers that delivered electricity to consumers would not be the same company that actually generated the electricity. (Tr. 453-55 (Burke); Tr. 678 (Freilich)) Thus, electricity services would change from a bundled format to an unbundled format. At the same time, the PSC urged utilities to propose corporate structures, including the use of unregulated subsidiaries, that would further PSC's restructuring goals. (Stip. ¶9) The May 1996 Opinion ordered most electric utilities, including Con Edison NY, to file proposed plans by October 1, 1996 describing how each utility would restructure their operations to further the PSC's goals. (Ex. 299 at page 5887)

### B. Con Edison's Response to Proposed Deregulation

Con Edison NY's Corporate Planning department was given responsibility for reviewing the company's plans for future actions, *i.e.* its long-term strategy. (Tr. 444-45 (Burke)) Burke was appointed the head of Corporate Planning by McGrath,

and during Burke's tenure Corporate Planning focused on Con Edison NY's response to the impending deregulation process and the divestiture of its generating assets. (Tr. 444-46 (Burke))

By the mid-1990s Con Edison NY recognized that the PSC would require it to restructure its regulated businesses to some degree. (Ex. 114 at page 3112; Tr. 451-53 (Burke)) To be better equipped to deal with and perhaps guide the direction of deregulation in New York State, management studied the deregulation process as it moved forward throughout the United States and the United Kingdom. (Tr. 457-48 (Burke); Ex. 114 at page 3111) The United Kingdom's electricity industry was a point of focus since it had already undergone privatization and deregulation in 1990. (Ex. 114 at page 3111; Tr. 133 (McGrath)) Management also updated Con Edison NY's Board of Trustees on California's deregulation proposals. (Ex. 115 at page 3113, Ex. 118 at pages 3122-23; Tr. 457 (Burke)) Con Edison NY sent teams of employees to both the United Kingdom and California to learn about their deregulation processes and the electricity industry's response to such changes. (Tr. 457 (Burke); Tr. 149 (McGrath)) Con Edison NY personnel, as well as other interested parties, attended numerous hearings, meetings, and technical sessions involving the deregulation discussions. (Tr. 456 (Burke))

By the middle of 1994, Con Edison NY's management was well aware that electricity utility services in New York State would have to be unbundled, which would likely result in the utilities' having to divest some or all of their power-generating assets. (Tr. 454-55 (Burke); *see* Ex. 116 at page 3118) This divestiture

would achieve the PSC's goal of separating electricity generation from transmission and distribution services. (Tr. 454-55 (Burke); *see* Ex. 116 at page 3118) Unbundling was confirmed in the PSC staff's November 1995 proposal. (Ex. 117 at page 3120; Ex. 119 at page 3126) This proposal was a very significant development in Con Edison NY's history since Con Edison NY's electric services provided about 80-85% of its revenues (Tr. 438 (Burke); Tr. 136-37 (McGrath)), and 20% of Con Edison NY's total revenues were attributable to its power generating assets. (Tr. 679, 686 (Freilich)) With Con Edison NY receiving 20% of its earnings from its power generation assets (*Id.*), divestiture of these assets would result in a loss of those earnings. (Tr. 461-62 (Burke, testifying that "the loss of the power plants" would cause "the total earnings of the company" to "decrease if those earnings weren't replaced somehow"))

Prior to deregulation, the PSC established the rates that Con Edison NY, could charge customers. (Tr. 440 (Burke); Tr. 679 (Freilich)) The rates were generally set so that the utility would recover its operating and maintenance costs. (Tr. 441 (Burke); Tr. 679 (Freilich)) The rates the PSC allowed a utility to charge its customers also provided for a return of the utility's investment in a capital asset, as well as for a return on any debt that the utility issued with respect to the investment. (Tr. 441-42 (Burke); Tr. 679 (Freilich)) Thus, profits came from a return on invested capital, not from operations. (Tr. 441-42 (Burke))

In May 1996, the PSC issued an Opinion and Order instructing Con Edison NY to file a restructuring plan, and shortly thereafter, Con Edison NY's

management began to plan its response and to establish goals related to its restructuring. (*See* Stip. ¶¶9, 21; Tr. 456 (Burke)) This included enhancing shareholder value, maintaining its regulated business activities, maintaining financial strength and developing new unregulated activities (Ex. 119 at page 3127; *see* Ex. 855 at pages 13351-52; Tr. 139, 147, 152-58 (McGrath)) to replace the earnings expected to be lost through deregulation. (Tr. 679 (Freilich); Tr. 137-38 (McGrath)) Success in achieving these goals would occur through Con Edison NY's focusing on energy businesses, relying on its core competencies and seeking growth opportunities. (Ex. 119 at page 3127)

### C. Con Edison NY's Proposed Restructuring Plan and Settlement With the PSC

On October 1, 1996, Con Edison NY submitted a 162-page restructuring plan in response to the PSC's May 20, 1996 Opinion and Order. (Ex. 143 at page 3346) Con Edison NY's proposed restructuring plan provided for a restructuring of almost every aspect of its business, including its operations and organization. (Ex. 143 at page 3357)

Part of Con Edison NY's proposed restructuring included the divestiture of some of its power generating plants and a corporate reorganization. (Stip. ¶21) The proposed corporate reorganization was intended to transform Con Edison NY into a diversified public utility that would actively participate in the unregulated energy supply and services markets. (Ex. 143 at page 3359) This corporate reorganization also called for the formation of a holding company, which would allow the company to "meet the challenges of the evolving utility industry." (*Id.* at page 3482) These

new challenges would be met, in part, by establishing unregulated subsidiaries to take advantage of opportunities in both the energy and non-energy fields without needing prior PSC approval for specific investments or activities. (*Id.* at page 3494; Tr. 459-60 (Burke)) Prior to establishing a holding company structure, any investments that Con Edison NY pursued had to be approved by the PSC. (Tr. 459 (Burke))

In September 1997, the PSC and Con Edison NY agreed on a restructuring plan that was embodied in an Amended and Restructured Agreement and Settlement (the "Settlement"). (Stip. ¶22; Ex. 145 at pages 3698-761) The main features of the Settlement included a commitment by Con Edison NY to divest at least 50% of its New York City electric generating plants by year-end 2002 to unregulated third parties (Stip. ¶22; Tr. 678 (Freilich); Tr. 461 (Burke)) and authorization for Con Edison NY to form a holding company whose subsidiaries would consist of Con Edison NY and several unregulated subsidiaries. (Stip. ¶22; Tr. 459-60 (Burke))

The PSC considered the divestiture of at least 50% of Con Edison NY's New York City generating assets to be a "major step toward the development of a competitive, deregulated electricity market." (Ex. 145 at page 3744) However, Con Edison NY understood that the 50% divestiture of its generating assets would be the minimum amount it would have to divest. (Ex. 106 at page 2914) In fact, in July 1998, the PSC issued an order amending the 1997 Settlement (Ex. 108 at page

3048) and directing Con Edison to auction 100% of its New York City fossil-fuel generating capacity to third parties. (Ex. 108 at page 3048; Tr. 135-36 (McGrath))

Thus, Con Edison NY anticipated a loss of earnings from the divestiture of its generating assets. (Tr. 438, 461-62 (Burke); Tr. 138 (McGrath); Tr. 679 (Freilich)) At the same time the PSC gave Con Edison NY the authority to replace those lost earnings through new investments in unregulated businesses. (Ex 143 at page 3494) Significantly, in connection with Con Edison NY's corporate reorganization to a holding company structure, the 1997 Settlement also allowed the company to invest up to 5% of its consolidated capital in unregulated subsidiaries. (Stip. ¶23) This enabled Con Edison NY the opportunity to take advantage of over 100 years of expertise in providing electricity and gas services and to apply that expertise in the emerging competitive markets. (Tr. 139, 154 (McGrath))

On January 1, 1998, the holding company structure was implemented when Con Edison, Inc. ("CEI") was formed, and Con Edison NY and several unregulated subsidiaries became subsidiaries of CEI. (Stip. ¶24) Like Consolidated Edison NY before it, CEI is publicly held and traded on the New York Stock Exchange. (Stip. ¶3) Previously, Con Edison NY had formed unregulated subsidiaries as part of its plan to enter into unregulated business activities. (Stip. ¶26) Consolidated Edison Solutions, Inc., formerly ProMark Energy, Inc., had been previously formed to provide electricity and natural gas to commercial and residential customers in the Northeast. (Stip. ¶27; Ex. 106 at page 2912; Ex. 855 at page 13355; Tr. 139 (McGrath); Tr. 680 (Freilich)) Consolidated Edison Energy, Inc. had been formed to

purchase and sell energy to wholesale customers. (Stip. ¶28; Ex. 106 at page 2907; Tr. 139 (McGrath); Tr. 680 (Freilich)) Consolidated Edison Communications, Inc. was subsequently formed to build and manage communication networks. (Stip. ¶29; Ex. 151 at page 4114) In addition, Gramercy Development, Inc. had been formed in 1996 to invest in energy infrastructure projects around the world. (Stip. ¶¶18, 19; Ex. 855 at pages 13355-56; Tr. 140 (McGrath); Tr. 680-81 (Freilich))

Following the corporate reorganization, Con Edison NY divested its electricity generation assets as required by its Settlement with the PSC. By March 2, 1999, Con Edison NY had sold for $1.8 billion almost 6,300 MW of its nearly 8,300 MW electrical generating capacity. (Stip. ¶25, Tr. 461 (Burke)) In 2000, Con Edison NY sold its nuclear-generating facilities, with electrical generating capacity of approximately 1000 MW, for $504.5 million. (Stip. ¶25) In 2001, Con Edison NY sold approximately 1,480 MW of additional electrical generating assets. (Stip. ¶25) The 629 MW of electrical generating assets in New York City that Con Edison NY retained are only a small fraction of its prior electricity generating capacity and are limited to assets ancillary to its steam generation business (these generating assets produce both steam and electricity). (Stip. ¶25; Ex. 149 at page 4064; Tr. 137 (McGrath))

### D. Formation of Gramercy Development and Its Name Change to Consolidated Edison Development

In July of 1994, in anticipation of the expected deregulation of its electrical business, Con Edison NY began considering its potential opportunities in non-regulated activities. The Planning and Environmental Committee of Con Edison

NY's Board of Trustees reviewed plans for Con Edison NY's future actions, including Con Edison NY's response to the deregulation process. (Stip. ¶10; Ex. 112 at page 3101) The Planning and Environmental Committee also provided advice and consent to the management of Con Edison NY regarding such plans and submitted recommendations to the Board of Trustees of Con Edison NY regarding such plans. (Stip. ¶10; Ex. 112 at page 3101)

Corporate Planning researched the unregulated activities of other utilities, and Burke informed the Planning and Environmental Committee that power utility diversification efforts often included investments in independent power projects in the United States and in foreign countries, real estate development, energy services, financial services and energy marketing. (Ex. 112 at pages 3101-02; Tr. 464 (Burke)) The research indicated that other utilities sometimes made investments far afield of the power industry. (Tr. 464-65 (Burke); Tr. 150 (McGrath)) However, the research also indicated that the utilities that achieved the best financial results from diversification made investments that related to their core businesses and competencies. (Ex. 112 at page 3102; Ex. 123 at page 3137; Tr. 150-51 (McGrath); Tr. 464-66 (Burke)). As a result, Con Edison NY decided that its unregulated activities should be limited to investments with which it was familiar. This principle, which was established at the very beginning of Con Edison NY's study of unregulated investments, would become the central tenet of its approach toward deregulation. (*See, e.g.,* Ex. 136 at page 3253, Ex. 243 at page 4506; Ex. 354

at pages 7500-01; Ex. 856 at page 13419; Tr. 744-46, 756-58 (McCartney); Tr. 501-02 (Burke); Tr. 153-55 (McGrath))

In April of 1995, management advised the Con Edison NY Board of Trustees that it would be prudent for Con Edison NY to develop additional services to market to its customers and to explore additional sources of revenue outside of its regulated lines of business. (Ex. 133 at page 3172; Tr. 466-67 (Burke)) Management believed that establishing unregulated subsidiaries represented an important strategic initiative for Con Edison NY, and it intended to petition the PSC for authorization to invest up to 5% (about $504 million) of Consolidated Edison NY's consolidated capital in unregulated subsidiaries. (Ex. 133 at page 3172; Ex. 113 at page 3109; Tr. 477-78, 480-81 (Burke)) The unregulated subsidiaries would be authorized to make investments in energy-related businesses, environmental and technical services and telecommunications. (Ex. 133 at pages 3172-73; Tr. 479-80 (Burke)) On May 2, 1995, Con Edison NY petitioned the PSC for permission to invest in unregulated subsidiaries, which would make investments in non-utility businesses without needing prior PSC permission on an investment-by-investment basis. (Stip. ¶16; Tr. 480 (Burke))

On July 12, 1996, the PSC responded to Con Edison NY's petition by Order (the "July 12, 1996 Order"). (Ex. 137 at page 3317; Tr. 481-83 (Burke)) Although the PSC deferred taking direct action on Con Edison NY's May 2, 1995 petition, it did authorize Con Edison NY to invest up to $50 million in unregulated subsidiaries for the purpose of making investments in energy infrastructure and the provision of

technical services. (Ex. 137 at pages 3320-21; Tr. 480-82 (Burke)) The investments that Con Edison NY discussed in its petition were "largely international" (Ex. 137 at page 3320; Tr. 484 (Burke)) and would be made through any number of investment vehicles such as "development companies, investment funds, joint ventures or other vehicles." (Stip. ¶17; Ex. 137 at pages 3321-22; Tr. 484-85 (Burke)) The authorization made clear that any new Con Edison NY subsidiary was not permitted to purchase generating assets in New York. (Tr. 482 (Burke))

Shortly after receiving the July 12, 1996 Order, Con Edison NY's management sought approval from the Con Edison NY Board of Trustees to form a wholly-owned subsidiary to invest in infrastructure projects and to market technical services worldwide. (Stip. ¶18) On October 18, 1996, Con Edison NY formed a new subsidiary, Gramercy Development, Inc. ("GDI"), to carry out these investments. (Stip. ¶19) On September 24, 1997, GDI changed its name to Consolidated Edison Development, Inc. ("CED") (*id.*; Ex. 140 at page 3333) following Con Edison NY's Settlement with the PSC allowing Con Edison NY to change its unregulated subsidiaries' names to include the prominent "Con Edison" name. (Tr. 740 (McCartney); Tr. 684 (Freilich)) To simplify the discussion herein, both GDI and CED will be referred to as CED, unless the context requires a distinction between the two.

By the end of 1997, CED had completed one of its first international investments, the leveraged lease involving a power generating facility in The Netherlands (Ex. 107 at page 2961; *see* Ex. 858 at pages 13492-93) that is the

subject of this litigation. Shortly thereafter, CED made additional international investments in Guatemala and China (Ex. 107 at page 2961) and considered many other international projects as discussed below.

## II. Con Edison Development

Con Edison[4] formed CED to invest in energy infrastructure projects and to market technical services worldwide. (Stip. ¶18) Con Edison's management expected that these investments would assist Con Edison in replacing the income that was previously earned from generating assets that Con Edison would be required to divest. (Tr. 739-40 (McCartney); Tr. 138-40 (McGrath); Tr. 492-493 (Burke)) Since Con Edison had been receiving 20% of its earnings from its power generation assets (Tr. 679, 686 (Freilich)), divestiture of such assets would result in a loss of those earnings. (Tr. 461-62 (Burke))

On October 28, 1996, the CED Board of Directors held its first meeting. (Ex. 141 at page 3337) The CED Board consisted of Mary Jane McCartney, Joan Freilich and Paul Kinkel. (*Id.*) All members of the CED Board were senior employees of Con Edison: McCartney was Senior Vice President of Gas Operations (Tr. 736 (McCartney)), Freilich was Chief Financial Officer and Kinkel was Vice President of Engineering. (Tr. 742 (McCartney)) At this meeting, McCartney was elected Chairman of the CED Board, Charles Muoio was elected CED President, and Peter Irwin was elected CED Secretary. (Ex. 141 at page 3338-39) Muoio was responsible

[4] To simplify the discussion, hereafter Con Edison NY and Consolidated Edison, Inc. ("CEI") will be referred to as Con Edison unless the context requires a distinction between the two.

for, among other things, the development of CED's business plan, strategy and hiring staff. (Tr. 743 (McCartney)) Prior to joining Con Edison, Muoio worked at Niagara Mohawk Power Corporation ("Niagara Mohawk"), a regulated New York State utility. (Tr. 1892-95 (Muoio) While at Niagara Mohawk, Muoio was responsible for setting up and managing Hydra-Co, an unregulated international development company, and his responsibilities included business planning, development, construction and asset management. (Tr. 1895-99 (Muoio))

In early January 1997 Muoio was in negotiations to hire Michael Madia and Brian DePlautt as employees at CED. (Ex. 165 at page 4173) On January 30, 1997, Muoio discussed with the CED Board the hiring of Vicki Kuo, who had business contacts in China (Tr. 743 (McCartney), and the ongoing negotiations for hiring Madia and DePlautt. (Ex. 166 at page 4179) By March 1997, Kuo, Madia and DePlautt had all joined CED. (Ex. 167 at page 4183) At the March 10, 1997 CED Board meeting, Madia and DePlautt were elected Vice Presidents of CED. (*Id.* at page 4184) Prior to their joining CED, Madia had significant international development experience (Tr. 1907 (Muoio)) and DePlautt had significant project finance experience in the energy industry, including raising capital for energy related projects. (Tr. 2053-55 (DePlautt)) DePlautt's initial role was to search for energy-related investment opportunities within the core competencies of Con Edison that could provide earnings. (Tr. 2057, 2059 (DePlautt)) Kuo was CED's Business Development Manager (Ex. 171 at page 4195), and she used her contacts

with utilities in China to assist with CED's search for energy related projects in China. (Tr. 743 (McCartney))

### A. CED's First Business Plan

Prior to hiring the CED team (Ex. 167 at page 4183), Muoio drafted CED's first business plan in late 1996 or early 1997. (Tr. 746-47 (McCartney); Tr. 1908-09 (Muoio)) At a CED Board meeting on January 30, 1997, Muoio distributed a draft of the initial 1997 business plan to the CED Board. (Ex. 166 at page 4180) CED's 1997 Business Plan described various aspects of CED's operations, including its mission, objectives, business focus, the business environment, market analysis and strategy, financial projections and potential initial investments. (Ex. 136 at page 3233; *see also* Ex. 704[5]) The following is a discussion of the CED Business Plan.

#### 1. CED's First Business Plan: Mission

CED's initial mission was to develop, finance, build and operate domestic and international energy infrastructure projects. (Ex. 136 at pages 3236, 3248) To accomplish this objective, CED planned to make investments in "development companies, investment funds, joint ventures or other means." (*Id.* at page 3248) Con Edison's understanding of energy infrastructure in large metropolitan areas was a competitive advantage in the market, and for that reason CED focused on domestic and international infrastructure projects. (Tr. 1910-11 (Muoio))

---

[5] Exhibits 136 and 704 appear to be identical copies of the same document. Both versions were used at trial.

### 2. CED's First Business Plan: Objectives

CED set a number of initial objectives to progressively build up its investment portfolio. (Ex. 136 at page 3236) CED's objectives for 1997 included:

- building a management team;
- identifying energy infrastructure and technical services opportunities;
- developing strategic alliances;
- focusing on "small to medium size greenfield projects in conjunction with experienced partners, investment funds and other financial vehicles;"
- targeting domestic and international energy projects with returns commensurate with their risks; and
- building a "diversified portfolio to minimize potential risk."

(*Id.* at page 3248) CED planned to focus on projects that would allow CED to partner with a company or investment fund already in the market. (Tr. 1916 (Muoio)) To diversify the investment portfolio, CED anticipated making investments with a range of risks, including high, medium and low-risk projects. (Tr. 747 (McCartney); Tr. 1918-19 (Muoio))

To accomplish these objectives CED planned to build an investment portfolio by "actively developing new projects" and "selectively utiliz[ing] other passive investment vehicles." (Ex. 136 at page 3249; Tr. 745 (McCartney)) CED expected to invest in greenfield projects—new projects that would take several years to generate earnings—and anticipated balancing these long-term projects with near-term projects such as acquisitions and passive investments. (Tr. 1919-20 (Muoio)) CED also anticipated that investing in "existing projects, development companies

and investment funds" would enable CED to participate in projects right away. (Ex. 136 at page 3249)

Under CED's first business plan, CED planned to use a three-phased investment approach to gain entry to the energy infrastructure market. (Ex. 136 at pages 3249-50) In Phase 1 CED would start with small investments (between $10-$50 million) in the role of a participant along with other investors; it would then progress to larger dollar investments with an increased development role in the project in Phases 2 and 3. (*Id.* at pages 3249-50) In Phase 1—to achieve its objectives—CED planned to form strategic alliances with participants already in the market. (Tr. 1915 (Muoio)) The phased investment approach for market entry would enable CED to "progressively move up the risk/reward continuum" over time. (Ex. 136 at page 3250) Under this phased approach, as CED's business developed and matured over time, CED would be able to shift from a passive role as a project participant to a more active role as a project developer. (Tr. 1921-23 (Muoio))

**3. CED's First Business Plan: Business Focus**

CED expected that economic growth, the evolving worldwide energy regulatory environment, and the aging of existing global energy infrastructure would result in a global demand for additional sources of capital to finance energy infrastructure projects. (Ex. 136 at page 3253) Accordingly, CED planned to focus on developing, financing, building, and operating energy infrastructure systems, including energy production facilities, utility delivery systems and technical services: (*Id.*)

- Energy production facilities include greenfield and redeveloped electric and thermal facilities. (Ex. 136 at page 3253) A greenfield involves building a power plant or system where there was not a power plant or system, *i.e.* in a green field. (Tr. 754 (McCartney))

- Utility delivery systems include above and below ground hardware and software for the delivery, transmission, distribution and transportation of telecommunications, power, fuel or water to customers. (Ex. 136 at page 3253)

- Technical services include providing expertise needed to design, build, operate and manage utilities. (Ex. 136 at page 3253) CED planned to package and sell Con Edison's knowledge and experience in providing energy infrastructure services to a congested metropolitan area like New York City. (Tr. 1913-14 (Muoio); Tr. 752-53 (McCartney))

**4. CED's First Business Plan: Business Environment/Market Analysis and Strategy**

Ongoing domestic and international deregulation of the energy industry had resulted in competition and opportunities for CED in the worldwide energy or power market place. (Ex. 136 at pages 3256-58; Tr. 2377, 2391 (Goulding)) CED's target markets included the domestic and international unregulated power markets and the technical services markets. (Ex. 136 at pages 3262-65) CED's stated plans were to pursue opportunities that would enable it to gain market experience, achieve environmental excellence, meet or exceed targeted returns, and utilize the expertise of Con Edison. (*Id.* at pages 3239, 3261) These criteria were important considerations in CED's project review process. (Tr. 748-50 (McCartney)) By capitalizing on Con Edison's expertise and reputation, CED envisioned becoming a "leading international company in the development of energy infrastructure projects." (Ex. 136 at page 3268)

### 5. CED's First Business Plan: Financial Projections

Many of CED's expected investments would be capital intensive projects that would result in CED's operating at a loss for the first four to five years of operations. (Ex. 136 at pages 3240-41; Tr. 681-82 (Freilich)) In the first business plan, CED projected losses until 2001. (Ex. 136 at pages 3240-41, 3272) Because of the startup time and costs associated with energy project development, CED initially expected to sustain losses until those projects were operating. (Tr. 754 (McCartney); Tr. 1925-26 (Muoio); Tr. 681-82 (Freilich)) CED also recognized the potential negative impact of sustained losses at CED on Con Edison's earnings. (Tr. 1925-27 (Muoio)) Accordingly, CED planned to balance greenfield projects that take several years to generate earnings with investments that should generate near-term earnings, such as acquisitions and passive investments. (Tr. 1919-20 (Muoio))

### 6. CED's First Business Plan: Potential Initial Investments

CED identified various potential initial investments, including the Energy Investors Fund III, International Energy Partners, and several technical services opportunities in China. (Ex. 136 at pages 3244-45, 3275-301; Tr. 751-53 (McCartney))

To obtain near-term earnings, CED considered potential passive investments in energy-related funds that would generate near-term income. (*See* Ex. 136 at pages 3276, 3278) CED identified Energy Investors Fund III ("EIF") as a possible investment that would "generate income in the near term" and permit CED to gain access to the international market. (Ex. 136 at page 3276) EIF Fund was a

significant investor in unregulated power projects and development companies throughout the world and managed a diversified investment portfolio of over $400 million. (Ex. 136 at page 3277) CED's investment in EIF would allow CED to establish strong partnerships with development companies (*id.*), to gain access to a pipeline of projects in different regions, sectors and technologies (*id.*), to have the opportunity for additional project investment (*id.*), and to obtain market information and intelligence. (Tr. 1913 (Muoio))

CED also identified the Renewable Energy and Energy Efficiency Fund ("Renewable Energy Fund") as a possible investment that would "generate income in the near term" and permit CED to gain access to the international market. (Ex. 136 at page 3278) The Renewable Energy Fund focused on making investments in power projects in India, Central America, and Eastern Europe that relied on renewable resources, such as wind and water. (*Id.* at pages 3279-80)

CED identified International Energy Partners ("IEP") as a potential partner for immediate investment in greenfield projects in Latin America and the Pacific Rim region. (*Id.* at page 3281) IEP was an experienced independent development company that focused on small to medium sized generation projects in Asia and Latin America. (*Id.* at page 3282) Based on CED's investment in IEP, CED would have the right to actively participate in IEP's international projects. (*Id.* at page 3282) This participation would allow CED to team up with experienced developers and obtain development, construction and operating experience in Latin America and Asia. (*Id.* at pages 3281-82)

CED anticipated that Con Edison's technical services expertise in servicing New York City, a very large population in a relatively small and constrained area, would translate to cities in China. (Tr. 752-53 (McCartney); Tr. 1913-14 (Muoio)) CED identified the Zhejiang Distribution Automation Project (Ex. 136 at pages 3288-89) and the Beijing Transmission and Distribution Efficiency Improvement Study (*Id.* at pages 3292-93) as potential technical services opportunities in China. The Zhejiang and Beijing projects would involve CED providing consulting services based on CED's electricity transmission and distribution expertise. (*See* Ex. 136 at pages 3288-89, 3292-93)

Although CED had identified potential initial investments, this first business plan was written at the very outset of CED's existence (Tr. 1909 (Muoio)) and prior to assembling CED's management team. (*See* Ex. 167 at page 4183) Accordingly, CED's 1997 business plan recognized that as a new company CED would need to be flexible and be able to adapt to technical, financial, tax law and environmental regulation changes. (Ex. 136 at page 3310) Therefore, CED would adjust its investment focus to coincide with and adapt to market changes and opportunities. (Ex. 136 at page 3310; Tr. 755-56 (McCartney); Tr. 1927-28 (Muoio))

### B. CED Business Plan in Action: Addition of Leasing

By April of 1997, CED had compiled an initial list of potential development and technical services projects, which included a description and status update on each potential project. (Ex. 250 at pages 4678-80) In May of 1997, CED continued to search for potential investments to meet its goal of becoming a development

company involved in the acquisition, development, finance and management of infrastructure projects worldwide. (Ex. 243 at page 4476) CED also continued to follow its investment mission of creating a diversified portfolio of investments that would provide risk-appropriate rates of return. (*Id.* at page 4477) For example, CED targeted returns of 18-22% on higher-risk investments and returns of 10-13% on lower-risk investments. (*Id.*)

At this point in May, CED was pursuing passive investments, such as EIF and IEP, that would provide a project pipeline, an opportunity to work with experienced developers and portfolio diversity. (*Id.* at pages 4479-80) In addition, CED anticipated that passive investments would also provide near-term earnings. (*See* Ex. 136 at pages 3276, 3278; Tr. 1919-20 (Muoio)) CED was also in the process of reviewing potential telecommunication investments (Ex. 243 at page 4489), technology investments (*id.* at page 4491), technical services projects—such as transmission and distribution planning in China and Indonesia (*id.* at page 4492)—and other potential investment opportunities, including leasing,[6] section 42 (of the Internal Revenue Code) low-income housing credits, section 29 (of the Internal Revenue Code) alternative fuel production credits and independent power production. (*Id.* at pages 4493-4503; Ex. 261 at page 4949) "[R]isk/return profile decisions" and "opportunities to leverage core competencies" continued to guide CED's ongoing search for investment opportunities. (Ex. 243 at page 4506) Core competencies encompassed Con Edison's knowledge of and expertise in the electric

[6] Exhibits and testimony often refer to "leveraged leasing" as "leasing." See Facts Section III.A. for a discussion of leveraged leasing.

and gas business including plants, management, distribution and transmission systems (Tr. 756-57 (McCartney)), and these were considered to be CED's competitive advantage in the market. (Tr. 1945-46 (Muoio)) CED's core competency strategy was to identify projects within Con Edison's core competencies, including energy technologies that were familiar to Con Edison. (Tr. 757 (McCartney))

At this time in May 1997, CED began a preliminary review (Ex. 243 at page 4497; Ex. 261 at page 4953) of various domestic and international leveraged leasing projects involving power, water, gas and telecommunication assets. (Ex. 243 at page 4494, Ex. 261 at page 4950; Tr. 2065-66 (DePlautt)) Con Edison had experience and expertise in power, water, gas and telecommunication assets, and potential investments in these infrastructure assets were a natural extension of Con Edison's experience and expertise. (Tr. 1939-40 (Muoio)) CED identified goals for its potential investment in leasing projects, including early-year earnings and returns. (Ex. 243 at page 4494; Ex. 261 at page 4950) Near-term earnings from leasing could offset the startup losses associated with investments in greenfield project development. (Tr. 755 (McCartney)) Near-term earnings would balance out CED's other investments and also provide CED an opportunity to mitigate CED's impact on the earnings of Con Edison. (Tr. 1941-2 (Muoio); Tr. 686 (Freilich)) In addition to near-term earnings, leasing would also provide a lower-risk investment to balance CED's higher-risk investments in its investment portfolio. (Tr. 762 (McCartney))

Early on, CED identified the various advantages and disadvantages of building a leasing portfolio. (Ex. 243 at pages 4495-96; Ex. 261 at pages 4951-52)

The benefits to CED included near-term closings, immediate earnings, front-loaded income portfolio, earnings cover and reduction of tax obligations (Ex. 243 at page 4495; Ex. 261 at page 4951) The disadvantages included illiquidity of the investment and various risks such as credit and technology risk. (Ex. 243 at page 4496; Ex. 261 at page 4952) Near-term earnings from leasing would balance out and provide cover to offset the startup costs associated with other CED projects (Tr. 2070-71 (DePlautt)) and with other unregulated subsidiaries of Con Edison. (Tr. 1942 (Muoio)) Consistent with CED's core competency strategy, CED's leasing portfolio would also consist of assets that Con Edison knew well and with which it was familiar. (Tr. 756-58 (McCartney))

CED identified Cornerstone Financial Advisors ("Cornerstone") as a potential advisor on leasing investments. (Ex. 243 at page 4497; Ex. 261 at page 4953; Tr. 2075 (DePlautt)) CED made initial contact with Cornerstone on or about May 7, 1997. (Tr. 1014-16 (Holzman); *see* Stip. ¶51) CED management discussed its evaluation of leveraged leasing investment opportunities, including the benefits and risks of leasing, and the potential retention of Cornerstone with the CED Board at the May Board meeting. (Ex. 169 at pages 4189-90; Tr. 2077 (DePlautt))

In June 1997, roughly half a year after creation of its initial business plan, CED reiterated its goal of being involved in the acquisition, development, finance and management of infrastructure projects worldwide (Ex. 252 at page 4706) and reemphasized its investment strategy of creating a diversified portfolio of investments with varying rates of risk and return. (*Id.* at page 4707) CED

categorized energy projects such as greenfields as higher-risk, infrastructure projects as medium-risk and leasing projects and passive investments as lower-risk investments. (Tr. 762 (McCartney)) CED expected to receive returns of 18-22% on higher-risk investments (*see, e.g.*, greenfields (Tr. (762 (McCartney)), 14-17% on medium-risk investments (*see, e.g.*, infrastructure (Tr. 762 (McCartney)) and 10-13% on lower-risk investments (*see, e.g.*, leasing (Tr. 762 (McCartney)). (Ex. 252 at page 4707; Tr. 747, 763-64 (McCartney); Tr. 688 (Freilich))

During June 1997, CED continued to assess the various benefits of leasing, including near-term closings, front-loaded[7] income, predictable earnings, earnings cover and reduction of tax obligations (Ex. 252 at page 4730), and the various disadvantages of leasing, including illiquidity, earnings decline over time, and credit, technology and audit risks. (*Id.* at page 4732)

CED's management prepared a chart comparing the earnings profile of a typical lease to the earnings profile of a greenfield energy project. (*See* Ex. 252 at page 4731; Tr. 760-61, 768 (McCartney); Tr. 2079-80 (DePlautt); Tr. 686-87 (Freilich)) The timing of earnings from a potential lease investment was specifically considered by CED because near-term lease earnings would balance the overall investment portfolio by providing earnings at a time when other projects might be operating at a loss. (Tr. 761-62 (McCartney); Tr. 686-87 (Freilich)) As DePlautt explained, energy projects have "no income" for a number of years, and by entering into a leasing transaction that produces "earnings immediately" after closing "you

[7] Exhibits and testimony interchangeably describe leveraged lease earnings as front-loaded or near-term.

are covering [that] gap." (Tr. 2080 (DePlautt); Tr. 761-62 (McCartney); Tr. 686-87 (Freilich); *see* Ex. 252 at page 4731)

As detailed by Freilich, Holzman and Weil, FAS 13 instructs how a leveraged lease is reported for financial reporting purposes. (Tr. 690-91 (Freilich); Tr. 1019-20 (Holzman); Tr. 3497-99 (Weil)) Although the Securities and Exchange Commission ("SEC") has the Congressional mandate to regulate businesses and their accounting practices, the SEC has delegated the responsibility for the writing of accounting rules to the Financial Accounting Standards Board ("FASB"). (Tr. 3480-81(Weil)) Accordingly, FASB is responsible for developing accounting rules (Tr. 3186-87 (Ellis); Tr. 3480-81(Weil)) and issued Financial Accounting Standards 13 ("FAS 13") in 1976. (Tr. 3497-98 (Weil)) According to FAS 13, an investor in a leveraged lease must allocate its expected income from the transaction to the years in which the investor has a positive investment (*i.e.*, when the cumulative cash outflows, CED's investment, exceed the inflows).[8] (Tr. 690-91 (Freilich); Tr. 3517-18 (Weil)) This method of allocation results in a leveraged lease having near-term earnings. (Ex. 10077 (Weil Initial Report) at page 20267; Tr. 3517-18 (Weil))

By July 23, 1997, CED personnel, together with input from CED's Board, had developed the criteria it would use to assess potential lease investments. (Ex. 171 at pages 4196-97) These criteria included:

(1) Focusing its review of leasing transactions on power generation assets, and power, gas, steam and water treatment transmission and distribution assets; (Ex. 640 at page 11441)

---

[8] For further discussion of FAS 13 and leveraged lease accounting, see Facts Section X.B.

(2) Limiting the location of any potential leasing investments in infrastructure assets to Europe, Australia and the United States; (*id.*) and

(3) Requiring any potential leasing transaction to provide a 9% to 11% after-tax return (measured by using the Multiple Investment Sinking Fund method of FAS 13). (*Id.*)

In October 1997, CED continued to follow its strategy of utilizing Con Edison's core competencies and had focused its pursuit of worldwide investment opportunities on energy, infrastructure and leasing projects. (Ex. 254 at page 4783; Tr. 744-46 (McCartney)) By this time, CED anticipated closing an energy project and lease project by the end of 1997. (Ex. 254 at page 4785) Accordingly, CED targeted potential energy projects that involved buying or building generation in Guatemala, Indonesia and Mexico (*id.* at page 4788); potential infrastructure projects that involved acquiring all or part of existing electric, gas, water or thermal utilities in Latin America, Europe and the United States (*id.* at page 4789); and potential leasing projects that involved the acquisition and leaseback of power plants and distributions systems in Europe, Australia and the United States. (*Id.* at pages 4790-91) CED continued to focus on the potential leasing benefits of front-loaded, predictable earnings and reasonable rates of return (*id.* at page 4790), and CED also continued to pursue technical services opportunities involving automation and efficiency consulting in China. (*Id.* at pages 4794-96)

At the October Con Edison NY Board of Trustees meeting, an overview of CED and CED's search for investment projects was provided to the Con Edison NY Board. (Ex. 354 at pages 7500-01) CED explained its strategy of leveraging core

competencies in the pursuit of investment opportunities in energy, infrastructure, leasing and technical services projects around the world. (*Id.*; Tr. 756-58 (McCartney)) CED presented a summary of its activities, goals, financial plan and investments under consideration, including leasing and its benefits and risks. (Ex. 354 at pages 7500-01)

### C. 1997 CED Investment Opportunities

Consistent with CED's initial business plan and the developments during 1997, CED pursued investments in Latin America, Europe, Asia and the United States. (Tr. 773 (McCartney)) CED considered the following domestic and international investment opportunities in 1997:

#### 1. Fisonic Technology

In January of 1997, CED was in discussions with Fisonic Corporation regarding a joint venture to develop energy-saving technology. (Ex. 165 at page 4174) The Fisonic energy device would replace traditional commercial water heating. (Ex. 136 at page 3300) CED's investigation and due diligence of the Fisonic technology was ongoing throughout 1997. (Ex. 166 at page 4179) In May of 1997, after Muoio visited Russia to review applications of the technology, CED continued to contemplate a possible role in the development of the technology (Ex. 169 at page 4191) In November 1997, CED continued to investigate the Fisonic technology and performed testing of the technology. (Ex. 154 at pages 4128-29)

### 2. International Energy Partners ("IEP")

In January of 1997, CED was in discussions with IEP regarding CED's potential $10 million investment in IEP. (Ex. 165 at page 4175) IEP was a development company that focused on greenfield power project opportunities in Asia and Latin America. (*Id.*) In March 1997, CED continued negotiations with IEP (Ex. 167 at page 4184) and ultimately entered into an agreement with IEP. (Stip. ¶35) Pursuant to this agreement, CED was given preferred rights to participate in certain investment opportunities identified by IEP. (Stip. ¶35) This provided CED with a project pipeline for new investment opportunities. (*See* Ex. 243 at page 4480; Ex. 136 at pages 3281-82)

By May of 1997, CED had committed to make a $10 million investment in IEP. (Ex. 243 at page 4480) CED's investment gave CED the right to direct IEP's focus on markets and projects. (*Id.* at pages 4480-88) CED anticipated that the passive IEP investment would result in a pipeline of future projects in Latin America and Asia. (Ex. 252 at page 4710; Tr. 753 (McCartney)) In May 1997, CED invested $3 million in IEP. (Ex. 169 at page 4189) By September 1997, CED invested an additional $2 million in IEP and recognized that CED would be required to make an additional investment of $5 million in 1998. (Ex. 140 at page 3334)

### 3. Technical Services—China

In early January 1997, CED was working on a joint proposal with Power Technologies, Inc. ("PTI") for a study on the development of the transmission and

distribution system for the Beijing municipal region. (Ex. 165 at page 4176) CED proposed to provide the distribution work for the Beijing project study. (*Id.*) At the end of January 1997, CED submitted a proposal to North China Power Group Corporation (*Id.* at page 4179), but it was ultimately not selected for the Beijing project. (Ex. 167 at page 4184)

In May of 1997, after McCartney and Muoio returned from a visit to China, CED continued to investigate and pursue possible technical service opportunities in China. (Ex. 169 at page 4191) In June of 1997, CED discussed a proposal to develop a distribution management system ("DMS") for Zhejiang, China. (Ex. 170 at pages 4193-94) In July and August of 1997, Kuo, CED's Business Development Manager, updated the CED Board on the status of the Zhejiang DMS project and the next steps to be taken in the proposal process. (Ex. 171 at page 4197; Ex. 172 at page 4198) In December, CED continued to refine the project action plan for the Zhejiang DMS project. (Ex. 156 at page 4136)

In September of 1997, CED was selected as a contractor for a transmission and distribution planning study for the Jiangsu Provincial Electric Power Company in China. (Ex. 140 at page 3335) This project involved a joint venture with Power Technologies, Inc. and commenced in November 1997. (Ex. 178 at page 4226)

**4. Energy Investment Fund III ("EIF")**

In March 1997, CED considered making a $5 million investment in EIF. (Ex. 167 at page 4185) The other potential investors in the fund included John Hancock Mutual Life and Indeck Capital, Inc. (*Id.*) EIF would utilize the funds received from

CED and other equity investors to make investments in energy and infrastructure projects worldwide. (Stip. ¶36) In June, the CED Board authorized CED to invest $5 million in the Project Investment Fund III sponsored by EIF. (*Id.*; Ex. 170 at page 4193) In August, CED made a payment of $3.6 million to EIF. (Ex. 172 at page 4199) CED recognized that a benefit of making a passive investment in EIF was that the fund would provide portfolio diversity (Ex. 252 at page 4709), as well as near-term earnings. (Ex. 136 at page 3276) The investment in EIF gave CED access to the various projects and markets EIF participated in and the opportunity to make additional investments in those projects. (Tr. 1934-35 (Muoio))

**5. Empresa de Generacion de Arequipa S.A. ("EGASA")**

During 1997, many countries were deregulating their energy markets for privatization by allowing foreign investors to competitively bid on energy projects. (Tr. 1935 (Muoio)) In May of 1997, CED considered making a bid as part of a consortium for the acquisition of an interest in EGASA. (Ex. 168 at page 4186) EGASA was a Peruvian electric utility that could produce 305 MW of power. (Stip. ¶41) CED ultimately withdrew from the bidding consortium because the equity investment and bid price were higher than originally contemplated. (Stip. ¶42; Ex. 268 at pages 5253-55)

**6. Empresa Electrica de Guatemala ("EEGSA")**

In May of 1997, CED considered an investment of $30 million as part of a consortium to acquire electric generation from EEGSA and to construct a new power plant in Guatemala subject to a power purchase agreement with EEGSA.

(Ex. 169 at page 4190) In June, the CED Board continued to discuss the potential EEGSA investment and examined the letter of credit requirement for participation in the EEGSA bid. (Ex. 170 at page 4193) During July CED further discussed the terms of the bid for the EEGSA project. (Ex. 171 at pages 4195-96) At the July Board meeting, CED discussed the ongoing due diligence and informed the Board that CED's potential total investment would not exceed $32 million. (*Id.* at page 4196)

### 7. Lease Investments

At a CED Board Meeting on May 29, 1997, DePlautt made a presentation identifying lease investments as a potential investment option. (Ex. 169 at page 4189) DePlautt discussed lease investments in which CED would be a lessor of infrastructure projects. (*Id.*) At this meeting, DePlautt reviewed the benefits and risks associated with lease investments, including the benefits of near-term earnings and cash flows. (*Id.* at pages 4189-90) DePlautt indicated that CED was considering various leasing projects, the potential for co-involvement with an experienced participant in the lease market, and engaging Cornerstone as a lease advisor. (*Id.* at page 4190; Tr. 2077-78 (DePlautt)) At the July Board meeting, DePlautt provided an overview of CED's investigation of lease investments and informed the CED Board that Cornerstone had been retained to assist in the analysis of lease investments. (Ex. 171 at pages 4196-97) In September, DePlautt informed the Board that the leasing market requires investors to have a net worth

of approximately $100 million and that additional funding would be needed in order to meet this net worth requirement. (Ex. 140 at page 3335)

At a meeting of the Con Edison NY Board of Trustees in October 1997, CED provided an overview of leasing as an investment opportunity and described the net worth requirement of $100 million for participation in leasing projects. (Ex. 354 at pages 7500-01) CED was interested in leasing as an investment opportunity because leasing would provide near-term earnings that would balance CED's expected project development losses, reasonable rates of return and market entrance into new countries. (Tr. 760-61 (McCartney)) Leasing, along with CED's passive lower-risk investments in EIF and IEP, would help to balance and diversify CED's risk portfolio. (Tr. 762 (McCartney); Tr. 688 (Freilich))

At this October meeting with Con Edison NY's Board of Trustees, CED management also described a lease under active consideration with EZH, a Dutch utility. (Ex. 354 at page 7501) The lease would be structured as a "lease-leaseback" of an undivided interest in the RoCa3 Facility located in The Netherlands. (*Id.*) CED reported that its potential investment in the RoCa3 Transaction would be $43 million, with a minimum after-tax yield of 12%. (*Id.*) The RoCa3 Facility was a technology familiar to Con Edison (which owned several cogeneration plants) and the potential investment complied with CED's core competencies strategy. (Tr. 759-60 (McCartney)) CED recommended that the Board of Trustees increase the capitalization of CED in order to meet the net worth requirement for participation in the leasing market. (Ex. 354 at page 7501) At the conclusion of this meeting, the

Board of Trustees decided to defer consideration of CED's request for additional investment until a later date. (*Id.* at page 7513) After learning more about leasing (*see* Ex. 397 at pages 8118-25) and CED's due diligence on the RoCa3 Transaction (*see id.* at page 8122), the Con Edison NY Board of Trustees approved CED's additional funding request on December 12, 1997. (Stip. ¶98; Ex. 147 at page 3798)

In November of 1997, DePlautt reviewed the status of the proposed EZH lease project with the CED Board and indicated that negotiations and due diligence were ongoing. (Ex. 154 at page 4130) In December of 1997, DePlautt provided further details on the proposed investment. (Ex. 155 at pages 4131-32) On December 10, 1997, after receiving and reviewing various detailed briefings and written materials, the CED Board authorized CED's investment in the EZH lease project. (Ex. 355 at page 7514) The RoCa3 Transaction closed on December 15, 1997. (Stip. ¶¶58 and 104)

**8. Tax-Advantaged Investments**

In May of 1997, CED had identified section 42 low income housing projects and section 29 alternative energy projects as potential investment opportunities. (Ex. 169 at page 4190) These projects were eligible for special tax treatment under the Internal Revenue Code. (*Id.*) The Section 42 affordable housing program was a federal initiative to encourage private capital to fund the construction and operation of affordable housing for low income portions of the population (Ex. 1221 at page 17586), and CED considered making nominal investments in Section 42 projects. (Tr. 814-16 (McCartney)) Con Edison had participated in Section 42 projects in the

past, and CED hoped to achieve favorable public relations benefits by participating in projects in New York. (Tr. 2063-64 (DePlautt))

### 9. Acquisition of Independent Power Producer ("IPP") Developer

In May of 1997, CED considered acquiring an existing IPP developer, and CED had identified Charter Oak Energy as a potential candidate for acquisition. (Ex. 169 at page 4190) Charter Oak had existing investments in several projects around the world (Ex. 261 at page 4956) and had identified several potential international investments. (*Id.* at page 4957) Other potential IPP developers that CED identified were Intergen, Catamount and CNG. (*Id.* at page 4958)

### 10. Acquisition of Independent Power Producer ("IPP") Project

In May of 1997, CED had discussions with Energy Management, Inc. ("EMI") regarding a new plant in Massachusetts. (Ex. 169 at page 4190) The EMI plant was a new 165 MW merchant gas combined cycle plant. (Ex. 261 at page 4959)

### 11. Telecommunications Industry

In May of 1997, CED had reviewed the possibility of participating in joint ventures in the telecommunications industry with Telergy, Inc. or Apollo South. (Ex. 169 at page 4190) These opportunities would be an extension of Con Edison's existing knowledge and experience with telecommunications. (Tr. 1913-14; 1939-40 (Muoio)) In addition to Con Edison Communications, Inc., an unregulated subsidiary of Con Edison that built and operated fiber optic networks for wholesale telecommunications services (Ex. 149 at page 4041), Con Edison had an established

fiber optic cable, microwave and telephone network for the diverse communications required to operate the energy business. (Ex. 136 at page 3298)

**12. Generadora Electrica Del Norte (GENOR)**

In or around August 1997, CED had discussions with Interamerican Power and Light ("IPL") to participate in an investment in GENOR, a 40 MW electric power plant in Guatemala. (Ex. 172 at page 4199) GENOR was an energy/greenfield investment that involved the construction of a power plant and transmission line in Guatemala. (Tr. 758-59 (McCartney)) In September, Madia reviewed the details of CED's potential $12 million investment in GENOR with the CED Board. (Ex. 140 at page 3334) In October, after receiving and reviewing detailed briefings and written materials, the CED Board authorized CED's investment in the GENOR project. (Ex. 186 at pages 4255-56) The GENOR transaction closed in January 1998, and CED ultimately had both an ownership and management role in the GENOR facility. (Ex. 262 at page 4969) CED hoped the GENOR investment would be a foundation for future investments in the region. (Ex. 1077 at page 15700; Ex. 1219 at page 17559; Tr. 2198 (DePlautt))

**13. Ada Cogeneration Plant**

In December 1997, CED had discussions with Delta Power Company LLC ("Delta") to form a partnership in order to acquire an interest in the Ada cogeneration plant in Ada, Michigan. (Ex. 156 at page 4135) The Ada plant provided about 30 MW of electricity under a power purchase agreement and supplied steam to a manufacturing facility. (*Id.*) In February 1998, CED discussed the proposed

Ada investment with the CED Board, including the proposed refinancing of the project debt by ABN AMRO Bank. (Ex. 157 at pages 4138-40) On February 26, 1998, after receiving and reviewing detailed briefings and written materials, the CED Board authorized CED's investment in the Ada project. (*Id.* at pages 4139-40) The Ada transaction closed on March 19, 1998. (Ex. 158 at page 4147)

**D. 1997 In Review & 1998 Business Plan**

At the conclusion of 1997, CED assessed its first year of operations and its growing investment portfolio. (Ex. 248 at pages 4608-30) CED had completed several projects and achieved several of its goals, including gaining entry into international markets and establishing strategic alliances with, among others, Delta and Banc One. (*Id.* at page 4629) In 1997, CED had focused on making various energy-related investments, establishing an international presence, building strategic alliances and creating earnings to assist CED in becoming self-supporting. (*See* Ex. 248 at page 4610) At the end of 1997, CED's projects had enhanced Con Edison's reputation in Guatemala, The Netherlands and China and with strategic partners. (Ex. 242 at page 4471)

Going forward from 1997, CED planned to continue its efforts to build an international portfolio of energy, infrastructure and leasing projects with different risk profiles. (*Id.* at page 4470) CED's strategic focus for the next five years was to become a "Global Power Portfolio Builder" with a diversified portfolio focused on generation and infrastructure. (Ex. 248 at page 4611) CED projected this diversified investment portfolio would be comprised of 35% generation, 30% infrastructure and

35% leasing investments. (*Id.* at page 4619) CED anticipated a weighted average return of 10% on leasing investments (*id.* at page 4623) and a total weighted average return of 14% on this diversified portfolio. (*Id.* at page 4619) As part of CED's planned regional strategy, CED identified the United States for generation investments; Western Europe for generation, transmission, distribution and leasing investments; Eastern Europe, Asia and South America for generation, transmission, and distribution investments; and Central America for indexed generation investments. (*Id.* at page 4625) Moving forward, CED also planned to pursue higher-risk and higher return investments. (*Id.* at page 4630; Ex. 242 at page 4471)

In October of 1997, CED had begun to plan for 1998 and was in the process of developing its business plan for 1998. (*See* Exs. 247, 253, 257) CED anticipated making up to five investments in 1998 with a total equity investment of about $100 million (Ex. 247 at page 4574; Ex. 257 at page 4808), and expected to generate an additional $.02/share in earnings in 1998. (Ex. 257 at page 4808) Due to the dynamic nature of the marketplace, CED appreciated that its 1998 business plan would need to remain flexible with the timing and type of investments. (*Id.*; Ex. 634 at page 11315) This flexibility would position CED to review all promising opportunities, even those that did not fall within the original business plan. (Ex. 257 at page 4808; Tr. 1951-52 (Muoio))

Prior to the closing of the RoCa3 Transaction, but looking forward to 1998, CED planned to continue leveraging Con Edison's core competencies in the pursuit of investments in energy, infrastructure and leasing projects around the world. (Ex.

247 at page 4574; Ex. 257 at page 4808) Consistent with Con Edison's approach, as discussed above in Facts Section I.D., core competencies were generally viewed by CED as those advantages or corporate features that CED could use to its advantage in the marketplace. (Ex. 257 at page 4828) Specifically, CED recognized in the 1998 business plan that it should continue to build upon its and Con Edison's expertise in electric, gas and thermal engineering and in the provision of utility services in densely populated metropolitan areas. (*Id.* at page 4829) CED also anticipated making additional investments with IEP (*id.* at page 4818) and pursuing additional technical services opportunities in China and Indonesia. (*Id.* at page 4826) Muoio discussed the ongoing development of the 1998 business plan with the CED Board in December 1997. (Ex. 156 at page 4134)

At the February 1998 CED Board meeting, Muoio outlined CED's 1998 business plan including CED's strategies, goals, risk and return balance, and how the market and CED's focus had changed. (Ex. 157 at page 4141) At this February meeting, Muoio discussed CED's development of a country screening process. (*Id.* at pages 4139-40; *see* Ex. 374) The first phase of CED's screening process was a two-part risk screen designed to identify moderate- to low-risk countries and resulted in 86 countries with an acceptable risk level. (Ex. 157 at page 4140; Ex. 374 at pages 7721, 7723-34) These countries were then subjected to a three-part macroeconomic screen based on whether these countries would have adequate growth for the next five years, possessed consistent growth for the last five years, and had projects suitable for financing. (Ex. 157 at page 4140; Ex. 374 at pages 7734-39) This phase

of the screening process resulted in the identification of 37 countries that had an acceptable risk level and growth potential. (Ex. 157 at pages 4140-41; Ex. 374 at pages 7721, 7738-39) CED's country screen was a tool to organize thinking and review opportunities, but was not used as a method to eliminate countries. (Tr. 1967-68 (Muoio); Tr. 2432-33 (Goulding discussing Muoio's testimony) In fact, CED's screening process noted that CED would pursue opportunities in countries that did not pass the various screens (Ex. 374 at page 7740), and moreover, CED did pursue investments in places that were not on the list of 37 countries (Ex. 374 at pages 7738-39), including Indonesia (Ex. 159 at page 4151), the United States (Tr. 1967-68 (Muoio); Tr. 649-51 (Burke)) and The Netherlands. (Ex. 262 at page 4978)

In addition, Con Edison's 1997 Annual Report, signed on February 24, 1998 (Ex. 107 at page 2953), provided a summary of CED's international investments in The Netherlands, Guatemala and China, and highlighted CED's strategy and potential moving forward into 1998. (*Id.* at page 2961) It stated that CED "aims to become a leading investor in energy infrastructure projects" and "is poised to benefit" from the growth, privatization and restructuring trends shaping "energy industries in other nations." (*Id.*)

**E. Early-1998 CED Investment Opportunities**

Consistent with CED's developing business plan and the developments discussed above, CED considered the following domestic and international investment opportunities in early 1998:

**1. Carson Cogeneration Plant**

In January of 1998, CED considered a potential $8 million investment to acquire an interest in the Carson cogeneration project in Los Angeles, California. (Ex. 178 at pages 4224-25) At the March 25, 1998 CED Board meeting, CED provided further information regarding the proposed acquisition with MICNIC Power Company of an interest in the Carson 40 MW cogeneration plant. (Ex. 158 at page 4145) In April of 1998, Madia provided further details on the approximate $4 million investment in which CED, along with MICNIC, would acquire an interest in the Carson plant. (Ex. 159 at pages 4149-50) On April 30, 1998, after receiving and reviewing detailed briefings and written materials, the CED Board authorized CED's investment in the Carson project. (*Id.* at pages 4150-51) The Carson transaction closed in or around November of 1998. (Ex. 164 at page 4170)

**2. Lease Investments**

In March of 1998, DePlautt reported to the CED Board on the various leasing opportunities under consideration by CED, including the lease of electric facilities located in The Netherlands, Switzerland, United Kingdom and Australia. (Ex. 158 at page 4147)

**3. Niagara Mohawk Asset Acquisition**

In January of 1998, CED commenced a preliminary review of the possible acquisition of hydroelectric assets being sold by Niagara Mohawk Power Corporation. (Ex. 178 at page 4225)

### 4. Central European Energy Company ("CEnergy")

In January of 1998, CED considered a proposal to invest in CEnergy, an energy investment company for Central European assets and projects. (Ex. 178 at page 4225) At the March 25, 1998 CED Board meeting, CED's management provided further information regarding advantages and risks of the potential investment in a multiple utility company with energy investments in Central and Eastern Europe. (Ex. 158 at page 4146) CED's management indicated that a minimum $40 million investment would be required for an investor to obtain a management role in CEnergy. (*Id.*)

### 5. Cagayan Electric Power and Light Co, Inc. ("CEPALCO")

At the April 30, 1998 CED Board meeting, Madia reported that CED and IEP were investigating a potential investment in CEPALCO, an electric distribution company in the Philippines. (Ex. 159 at page 4151) Madia noted that IEP had shifted its focus to the Philippines and that IEP's strategy was similar to CED's Central American strategy of making a relatively small investment in a project that would serve as a platform for additional investment opportunities. (*Id.* at pages 4151-52) In 1998, Asia experienced a wide-spread financial crisis and currency devaluation that impacted the economies of various countries in Asia, including the Philippines. (Ex. 271 at page 5328; Ex. 712 at page 12191) Although the CEPALCO project was a viable investment, ultimately "the Asian Crisis presented too much risk for CED to invest in the Philippines." (Stip. ¶48)

### 6. Empresa Electrica de Guatemala ("EEGSA")

In April 1998, CED discussed making a proposal for participation in the potential privatization of EEGSA, the state owned power distribution company for Guatemala City and surrounding areas. (Ex. 159 at page 4152; Ex. 262 at page 4971) CED conducted extensive due diligence for its potential participation in the EEGSA privatization (Ex. 160 at page 4154; Ex. 262 at page 4971; Ex. 266 at pages 5223-49), and requested authorization to bid in a consortium for at least 80% of EEGSA's shares. (Stip. ¶39) However, CED did not receive approval for participation in a bid of over $400 million for EEGSA due to Con Edison's belief that EEGSA was only worth $300 million. (Ex. 262 at page 4972) Thus, CED ultimately withdrew from the consortium. (Stip. ¶40)

### 7. Technical Services

In 1998, CED participated in the Jiangsu Transmission & Distribution Planning project in China. (Stip. ¶49) As part of this project, CED relied on its expertise in the electric utility industry to consult and train local engineers in distribution reliability practices and to identify energy losses in the distribution system. (*Id.*) In August 1998, CED completed the Jiangsu Transmission & Distribution Planning project. (Stip. ¶50)

## III. CED's Introduction To Cornerstone

### A. Leveraged Leasing

A non-leveraged lease is a two-party transaction that involves a lessor, the owner of the asset, and the lessee, the asset user. (Tr. 1007-08 (Holzman); Tr. 3127 (Ellis)) A leveraged lease is a lease with the addition of a third party—a lender—

that provides a loan in the form of nonrecourse debt. (Tr. 1007-08 (Holzman); Tr. 3126-27 (Ellis); Tr. 3866 (Bent)) The lessor in a leveraged lease, also referred to as the equity investor, acquires its interest in the asset by combining its equity investment together with the nonrecourse loan. (Tr. 1007-08 (Holzman); Tr. 3126-27 (Ellis); Tr. 3866 (Bent)) For clarity, in this case the leveraged lease is the sublease and the asset "acquired" is CED's Lease Interest created under the Lease and the Control Documents.

In 1997, the leasing industry placed $180 billion of assets into service—representing one third of all equipment placed into service that year. (Ex. 10073 (Ellis Initial Report) at page 19994; Tr. 3123 (Ellis)) Since then, the leasing industry has continued to grow; by the end of 2000, it was a $200 billion industry. (Tr. 3124 (Ellis))

**B. CED's Hiring of Cornerstone as Its Financial Advisor**

As part of CED's preliminary review of leveraged lease transactions, CED identified Cornerstone, a well-established financial advisor, as its potential financial advisor for leasing transactions. (Ex. 261 at page 4953; Ex. 169 at page 4190; Tr. 2075, 2077 (DePlautt)) On or about May 7, 1997, CED contacted Cornerstone because it was interested in learning about leveraged leases as an investment that could provide income in the near term. (Tr. 1015-16 (Holzman); *see* Stip. ¶51; Tr. 2068-75 (DePlautt)) CED desired near-term income since the other investments it was considering, such as investments in merchant power plants,

would not produce positive income for a number of years.[9] (Ex. 252 at page 4731; Tr. 1015-16 (Holzman); Tr. 2080-81 (DePlautt)) CED, however, had little experience with leveraged lease transactions prior to contacting Cornerstone. (Tr. 1016 (Holzman)) CED ultimately engaged Cornerstone as its financial advisor. (Tr. 2078 (DePlautt))

**1. Cornerstone**

Cornerstone began business operations in 1990 as a financial advisory firm specializing in leveraged lease transactions. (Tr. 998-99; 1005-06 (Holzman)) Cornerstone's primary clientele were equity investors in leveraged lease transactions, such as financial institutions, utilities, insurance companies and industrial companies with credit arms. (Tr. 1005-07 (Holzman)) In 1997, Cornerstone was not a large company, but its expertise and reputation in the leveraged leasing industry were well-known. (Tr. 1012 (Holzman)) Cornerstone had represented clients in leveraged lease transactions involving a variety of assets, including aircraft, power industry assets, real estate and ocean going vessels. (Tr. 1005-07 (Holzman))

Part of the financial advisory services that Cornerstone provided to clients included dealing with the complexities of leveraged lease transactions, including:

- The economics of leveraged leasing, including pricing;

[9] A merchant power plant is a power plant that sells power on the spot market, meaning there is no long-term contract. (Tr. 1015-16 (Holzman))

- Accounting issues related to the financial reporting of leveraged leases under FAS 13[10];
- Regulatory issues when the asset being leased, such as a power plant, was subject to numerous regulatory requirements;
- Legal complexities surrounding the operation of the asset; and
- Tax issues, because all leases, including non-leveraged leases, involve tax considerations.

(Tr. 1035-39, 1252 (Holzman))

When CED contacted Cornerstone, CED made clear that it intended to take advantage of Con Edison's core competencies as a utility by making investments in assets with which it was familiar. (Tr. 1044-45 (Holzman)) CED told Cornerstone that it was specifically interested in leasing transactions that involved either power generation, or electric and gas transmission or distribution assets. (Tr. 1045 (Holzman); *see* Ex. 261 at page 4950) Cornerstone principals had been financial advisors on over $3.8 billion in power-generating asset leveraged lease transactions, mostly sale-leasebacks, involving fossil fuel, nuclear and alternative energy worldwide. (Tr. 1040-41 (Holzman))

Rob Holzman joined Cornerstone in 1990 as an associate whose job was to perform economic analyses of leveraged lease transactions. (Tr. 998-1000 (Holzman)) In leveraged leasing, pricing software is used to price a transaction, optimizing the pretax and after-tax cash flows for all involved parties. (Tr. 1000-01 (Holzman)) It takes four to five years of experience to become proficient at performing the pricing of a transaction. (Tr. 1003 (Holzman)) In 1994, Holzman was

[10] Exhibits and testimony commonly refer to FAS 13 as FASB 13. To simplify the discussion, FAS 13 and FASB 13 will be referred to as FAS 13.

promoted to manager and being more proficient with the pricing of leveraged lease transactions and having gained a better understanding of transactions, he was delegated greater responsibility with respect to transaction due diligence. (Tr. 1004 (Holzman)) In January 1997, Holzman was promoted to vice president, providing him with transaction management responsibilities, including assisting an investor's due diligence teams and overseeing the economic analysis, *i.e.*, the pricing of a transaction. (Tr. 1004-05 (Holzman)) In 2001, Holzman was promoted to managing director, which included much of the same responsibilities as vice president. (Tr. 1005 (Holzman))

### 2. Cornerstone's Education of CED

Cornerstone educated CED on the risks and rewards associated with leveraged lease transactions. (Tr. 1019 (Holzman)) Specifically, Cornerstone educated CED on the:

- commercial terms commonly used in a leveraged lease;
- pretax and after-tax cash flows of leveraged leases as they impact financial reporting;
- leasing terminology and structures;
- an investor's after-tax yield, which is its after-tax return;
- accounting benefits, such as when an investor is required to book and recognize income under FAS 13; and
- residual value of the asset.

(Tr. 1019-22 (Holzman)) Some of the risks about which Cornerstone educated CED included credit risk (*e.g.,* risk of nonpayment) and asset risk (*e.g.*, the sublessee not maintaining the asset). (Tr. 1023 (Holzman))

# IV. THE POTENTIAL ROCA3 TRANSACTION

## A. CED Learns of the Potential Leasing Transaction Involving the RoCa3 Facility

On August 25, 1997, Cornerstone notified CED of a potential leveraged lease transaction with EZH of a new cogeneration facility (the "RoCa3 Facility") located near Rotterdam, The Netherlands. (Stip. ¶57; Tr. 1025-27 (Holzman); Tr. 1082 (DePlautt)) Cornerstone had learned of the potential leasing transaction involving the RoCa3 Facility through Capstar Partners ("Capstar"), a financial advisory firm that typically represented sublessees, like EZH, in leveraged lease transactions.[11] (Tr. 1026-27 (Holzman)) Cornerstone informed CED of this potential leasing transaction, and CED expressed an interest in the RoCa3 Facility because of:

- its asset type;
- it was located in The Netherlands, which was a good country in which to conduct business; and
- the counter party, EZH, had good credit.

(Tr. 994, 1027-28 (Holzman))

CED understood the RoCa3 Facility since it was a gas-fired combined cycle cogeneration plant (Ex. 363 at page 7632; Tr. 1027-28 (Holzman); Tr. 162-64 (McGrath); Tr. 499-500 (Burke)) and Con Edison owned and operated similar equipment to that used in the RoCa3 Facility. (Tr. 165 (McGrath); Tr. 499-500

---

[11] In discussing leveraged leases in general, witnesses often referred to the equity investor as the lessor and the asset user as the lessee. Here, because CED is the Lessee/Sublessor and EZH is the Lessor/Sublessee, this discussion conforms the general discussions of leveraged leasing to "sublessor" and "sublessee" nomenclature for sake of simplicity and clarity as the Sublease is the leveraged lease for FAS 13 purposes.

(Burke)) Thus, a leveraged lease involving the RoCa3 Facility would have been consistent with Con Edison's approach toward deregulation of staying close to its core competencies by making investments in assets with which it was familiar. (Tr. 166 (McGrath); Tr. 500-02 (Burke))

The RoCa3 Facility, as a cogeneration facility, produces electricity, heat and carbon dioxide. (Ex. 363 at page 7632; Tr. 162-64 (McGrath); Tr. 500 (Burke)) The design of the facility enabled it to use less energy than conventional power generating facilities and emit less carbon dioxide and nitrogen oxide, making it "one of the most innovative and environmentally friendly" cogeneration facilities "in the world." (Ex. 363 at page 7632; Tr. 165, 180, 274-75, 371-72 (McGrath); Tr. 504-06 (Burke)) Con Edison had long been interested in helping maintain the environment. (Tr. 505 (Burke))

CED believed that an international investment, like the RoCa3 Transaction, would assist in establishing Con Edison's reputation as a company interested in international business in the power and utility industry. (Tr. 165; 277 (McGrath); Tr. 565 (Burke)) Investing in The Netherlands would provide Con Edison information on the European markets, governments and regulations. (Tr. 166-68 (McGrath)) In addition, The Netherlands was a democracy that possessed a favorable economic history and forecast. (Ex. 363 at page 7619-20; Tr. 1028 (Holzman)) The Netherlands had "one of the world's strongest country credit ratings, partly due to its continued low inflation and favorable balance of payments." (Ex. 363 at page 7617)

CED also took comfort in that EZH was a utility that was well established. (Tr. 2094-95 (DePlautt) EZH also had a strong credit rating as evidenced by the rating Standard and Poor's provided to CED as part of CED's due diligence, discussed in detail below. (Tr. 1028 (Holzman); *see* Ex. 349 at page 7467; Ex. 477 at page 9168)

**B. EZH's Historical Business**

CED's documentation includes an a detailed description of EZH's business. EZH had been responsible for the coordination and transport of electrical energy in the southern Netherlands since 1941. (Stip. ¶61) In 1987, EZH began generating electricity and heat that it supplied to customers through distribution companies. (Stip. ¶61) The addition of the RoCa3 Facility in June 1996 allowed EZH to also produce and provide carbon dioxide to local greenhouses (Stip. ¶61) and caused EZH's net generating capacity to increase by 220 MW from 2,381 MW in 1995 to 2,601 MW in 1996. (Stip. ¶64)

In 1997, EZH was one of four national power generating companies in The Netherlands. (Stip. ¶62) EZH was a public limited liability company, duly authorized to do business in The Netherlands. (Stip. ¶63) As a public limited liability company it was owned by various municipalities. (Stip. ¶66) As of December 15, 1997, the Closing Date of the RoCa3 Transaction, EZH was an energy company that owned various assets, including several energy generating facilities in The Netherlands. (Stip. ¶59)