In Deloitte & Touche's ("Deloitte") appraisal (the "Deloitte Appraisal") of the RoCa3 Facility, Deloitte noted that its review of the Dutch electricity industry indicated that in 1997 the Dutch electricity industry was moving towards deregulation. (Ex. 46 at page 1574; Tr. 2454-56 (Goulding, concluding that in 1997 deregulation was anticipated)) Deloitte also took note that this was consistent with the European Commission's efforts to deregulate the electric industry, which included relaxing the existing rules on competition. (Ex. 46 at pages 1574-75)

### C. The RoCa3 Facility

CED's documentation reflects a detailed understanding of the RoCa3 Facility. The RoCa3 Facility is located in the southwestern part of The Netherlands, between Rotterdam and Capelle aan den IJssel. (Stip. ¶¶73, 64; *see* Ex. 46 at page 1511) The RoCa3 Facility includes the electric-generating Unit, the Cooling Water Station, the Cooling Water Channel and the Network. (Ex. 1 at page 131) The RoCa3 Facility's generating unit (the "Unit") is a gas-fired combined cycle cogeneration facility that can produce electricity, heat and carbon dioxide. (Stip. ¶73; Ex. 46 at page 1511; Ex. 52 at page 1844)

As a combined cycle facility, the RoCa3 Facility uses a gas turbine and a steam turbine to produce electricity. (Ex. 46 at pages 1512-13; Ex. 52 at page 1844) Electricity is first produced in the gas turbine. (Ex. 46 at page 1512; Ex. 52 at page 1844) The gas turbine produces electricity by burning natural gas in a combustor, producing heat that is used to rotate the turbine that is coupled to an electric generator, resulting in electricity. (Ex. 46 at page 1511) In simple cycle operation,

the waste heat would be released into the air. (Ex. 46 at page 1511; Ex. 52 at page 1844) However, during combined cycle operation, the RoCa3 Facility directs the waste heat from the gas turbine to the heat recovery steam generator where it is used to convert water into steam. (Ex. 46 at page 1513; Ex. 52 at pages 1844, 1847) The steam is then directed to the steam generator where the steam is used to rotate the turbine that is coupled to a generator, resulting in additional electricity production. (Ex. 46 at page 1513; Ex. 52 at page 1847)

The steam used to produce power in the steam generator is subsequently returned to the heat recovery steam generator where it is reheated. (Ex. 46 at page 1513; Ex. 52 at page 1844) The steam is then used to supply district heat, which is delivered to nearby greenhouses. (Ex. 46 at pages 1511, 1513; Ex. 52 at page 1844) In addition, about 40% of the waste heat, which is part of the flue gasses, that passes through the heat recovery steam generator is directed to the carbon dioxide boiler. (Ex. 46 at page 1512) The flue gasses, which already includes carbon dioxide, are then enriched with additional carbon dioxide by burning natural gas. (*Id.*) The carbon dioxide is then compressed and transported to local greenhouses (*id.*) to enhance production of fruits and vegetables. (Ex. 822 at page 13120) The heat and carbon dioxide are transported via the Network, which includes all of the cables, pipes and control systems necessary to deliver the heat and carbon dioxide to Energie Delfland NV, which then distributes them to local greenhouses. (Stip. ¶74(e); Ex. 46 at page 1513))

The RoCa3 Facility's only fuel source is natural gas. (Ex. 46 at page 1512; Ex. 52 at page 1848) The RoCa3 Facility procures its fuel from Gasunie, the owner and manager of The Netherlands' high pressure natural gas grid. (Ex. 46 at pages 1512, 1519; Ex. 52 at pages 1848-49; *see also* Ex. 13 at page 831 (requiring EZH to procure gas from Gasunie on CED's behalf following the termination of the Sublease). Gasunie delivers natural gas directly to power generators in The Netherlands. (Ex. 46 at page 1519; *see* Ex. 52 at page 1848) The Netherlands has significant natural gas resources both domestically and in the nearby North Sea. (Ex. 46 at pages 1518-19)

Steam that is not used to generate electricity in the steam turbine or for district heating purposes is cooled in the steam condenser. (Ex. 52 at page 1858; Ex. 46 at page 1513) This is done by using water that is extracted from the River Hollandsche IJssel, which is about five kilometers away from Unit. (Ex. 52 at page 1858; Ex. 46 at pages 1513-14) The inlet and pump stations are part of the Cooling Water Station, located at the river, which are used in the process for cooling the waste water. (Stip. ¶74(c); Ex. 46 at pages 1513-14; *see* Ex. 52 at page 1858) Because the Cooling Water Station is located about five kilometers from the Unit, water is transported via the Cooling Water Channel, including piping to and from the Unit. (Stip. ¶74(c); (d); Ex. 46 at page 1514)

Because the RoCa3 Facility is the third unit at this location (Stip. ¶73) alongside two smaller units (Ex. 52 at page 1840), certain facilities—the Common Facilities—are shared by all three units at the site. (*See* Ex. 1 at page 243; Tr. 1103-

04 (Holzman)) These include the gas receiving station, the pump room and the office building, which includes the control room and parking spaces. (Stip. ¶74(b))

### D. Overview of Cornerstone's Services as Related to the RoCa3 Transaction

Both CED and Cornerstone spent an extraordinary amount of time on due diligence. (Tr. 994-95, 1079 (Holzman)) Cornerstone prepared the pricing runs that reflect the economics of the RoCa3 Transaction (Tr. 1029, 1046 (Holzman)) and provided transactional management, such as assisting in the negotiation of the transaction documents and terms. (Tr. 995-96, 1055 (Holzman)) Cornerstone's preparation of the pricing runs for the RoCa3 Transaction involved discussions with CED regarding its economic objectives for the proposed transaction. (Tr. 1029-30 (Holzman)) CED also hired a number of experts, including engineering and environmental experts to perform specific due diligence (Tr. 1053-54 (Holzman)), and Cornerstone managed these due diligence efforts (Tr. 1052 (Holzman)), including:

- credit due diligence on EZH (Tr. 995, 1046 (Holzman));
- asset due diligence, including reviewing Duke Engineering & Service's report (Tr. 995, 1046-47 (Holzman));
- environmental due diligence (Tr. 995, 1047 (Holzman));
- legal and regulatory due diligence (Tr. 1047-48 (Holzman)); and
- accounting due diligence. (Tr. 1054 (Holzman))

In managing these experts, Cornerstone discussed with each expert the substance of their respective analyses in an effort to ensure that no potential issues were missed. (Tr. 1053 (Holzman)) Given that there were so many

experts, hundreds of hours were invested in performing due diligence in connection with the RoCa3 Transaction. (Tr. 1079 (Holzman))

### 1. Transaction Economics and Pricing

The economics of leveraged lease transactions involve a set of pretax and after-tax cash flows. (Tr. 1051-52 (Holzman); *see* Stip. ¶88) Cornerstone assisted CED personnel in understanding the income profile of leveraged lease transactions, such as the RoCa3 Transaction, and how CED would recognize its return on the transaction. (Tr. 1051-52 (Holzman)) As discussed above, FAS 13 governs the financial reporting of a leveraged lease transaction. (Tr. 1020, 1038 (Holzman)) FAS 13 provides a required method for an equity investor in a leveraged lease to calculate its after-tax net income, which for any lease is always equal in the aggregate to after-tax cash flow (Tr. 1051-52 (Holzman)), and directs how the equity investor must report the resulting earnings for financial reporting purposes. (Tr. 1019-20 (Holzman))[12]

A pricing program is often used in the leasing industry to calculate and optimize the pretax and after-tax cash flows for all of the parties involved in a leveraged lease transaction. (Tr. 1000 (Holzman); Stip. ¶88) In the RoCa3 Transaction, Cornerstone relied on Warren & Selbert's ABC program, a widely used pricing software program in the leasing industry, in order to price the transaction. (Tr. 1000 (Holzman)) The ABC software is a pricing optimization program that optimizes the economics of the transaction for each party involved based on the

---

[12] For further discussion of FAS 13 and leveraged lease accounting, see below at Facts Section X.B.

various inputs, constraints and targets set by the parties. (Tr. 1000-01 (Holzman)) In other words, the ABC software calculates rent schedules and other necessary amounts by optimizing the cash flows around the inputs and constraints. (Tr. 1001, 1169-70 (Holzman)) Inputs are entered into the program by its programmer; these can include the debt rate for the nonrecourse loan and the cost of the asset or leasehold interest. (Tr. 1001 (Holzman)) Each input impacts the final pricing of the transaction. (Tr. 1213 (Holzman)) Constraints are also entered by the programmer and act as limitations imposed on the pricing of the transaction. (Tr. 1214 (Holzman)) For example, in the RoCa3 Transaction, CED set the minimum after-tax yield and minimum after-tax income (*see, e.g.*, Ex. 333 at page 7250) it wanted to receive from the transaction (Tr. 1052, 1214-15 (Holzman), and the program ensured that these constraints would be met in any schedules prepared for the Operative Documents. (Tr. 1169-70 (Holzman))

## V. The Proposal Process

### A. CED's Initial Proposal

On September 26, 1997, Holzman submitted an initial proposal to EZH on behalf of CED and Banc One Leasing Corp. ("Banc One") to enter into a lease-leaseback of the RoCa3 Facility. (Stip. ¶75; Ex. 297 at page 5823; Tr. 1055-56 (Holzman)) CED and Banc One submitted a joint proposal because each was interested in making an investment in separate undivided interests of the RoCa3 Facility. (Ex. 297 at page 5823; Tr. 1055-56 (Holzman) Banc One's involvement was

consistent with CED's goal to invest alongside experienced leveraged leasing industry participants. (Tr. 1977 (Muoio); *see* Ex. 640 at 11441)

Leveraged lease transactions of power facilities commonly involve multiple equity investors. (Tr. 1041 (Holzman)) Often each investor would receive an undivided interest in the facility, which usually involves some investors' receiving minority interests. (Tr. 1041-42 (Holzman)) When undivided interests are used, each investor exploits its interest in the facility by selling its individual share of the facility's output. (Tr. 1042 (Holzman))

EZH did not accept the September 26, 1997 proposal. (Stip. ¶75; Ex. 297 at page 5823; Tr. 1055-56 (Holzman)) This was not unusual because the purpose of the initial proposal was to inform EZH of CED's and Banc One's interest in possibly entering into a leasing transaction involving the RoCa3 Facility. (Tr. 2081-82 (DePlautt)) Holzman explained that this letter "begins or establishes negotiations with regard to . . . leveraged lease financing for" the RoCa3 Facility. (Tr. 1056 (Holzman)) Following the rejection of the initial proposal, EZH and CED engaged in many discussions and negotiations in an attempt to reach mutually agreed-upon terms for entering into a leveraged lease transaction for the RoCa3 Facility. (Tr. 1056 (Holzman))

**B. CED's Accepted Proposal**

On October 21, 1997, CED sent its own proposal (this time without Banc One) directly to EZH to make an equity investment in the lease-leaseback of a percentage interest of the RoCa3 Facility. (Stip. ¶76; Ex. 298 at page 5830) This

proposal was accepted by EZH on October 22, 1997. (Stip. ¶76; Ex. 298 at page 5830) It is common practice in leveraged lease transactions for an interested equity investor to submit more than one proposal before the parties agree to final terms. (Tr. 1057 (Holzman))[13] CED's proposal set forth conditions to closing, the proposed economics of the potential transaction, and CED's agreement to use precedent documents to begin document negotiations. (*See* Ex. 298)

### 1. CED's Closing Conditions

CED, in its accepted proposal, set numerous conditions precedent to its participation in the proposed leasing transaction (*Id.* at page 5829), including: terms of the lender's participation, such as an interest rate acceptable to CED; transaction documentation acceptable to CED; CED's receipt of satisfactory engineering, environmental and appraisal reports; and adequate insurance coverage on the facility. (Stip. ¶77; Ex. 298 at page 5829; Tr. 2088-90 (DePlautt); Tr. 1058-59 (Holzman)) As DePlautt explained, CED set out conditions to closing in the proposal to inform EZH that CED would be seriously reviewing issues related to all of these conditions. (Tr. 2088-89 (DePlautt)) For example, as DePlautt explained, CED was not going to (1) make an investment in a non-environmentally sound asset given Con Edison's history with environmental incidents (Tr. 2088-89), or (2) overpay for the asset. (Tr. 2089)

---

[13] Banc One also sent EZH its own proposal for the remaining interest in the RoCa3 Facility, which was also accepted by EZH. (*See* Stip. ¶58 fn 2)

### 2. CED's Agreement to Use Precedent Documents

Before the RoCa3 Transaction, EZH had entered into a leveraged lease transaction involving the Maasvlakte facility, a 800 MW coal-fired facility operated by EZH. (Tr. 1059-60 (Holzman)) The Maasvlakte documentation was the result of many months of negotiations between EZH and the equity investors in that leveraged lease transaction. (Tr. 1061-62 (Holzman)) Banc One was one of the equity investors in the Maasvlakte leveraged lease transaction (Tr. 1059-60 (Holzman)), and it was pleased with the commercial terms and conditions of the Maasvlakte documentation. (Tr. 1061-62 (Holzman)) Cornerstone was the financial advisor to a different equity investor in the Maasvlakte leveraged lease. (Tr. 1061 (Holzman)) As did Banc One, Cornerstone believed that the Maasvlakte documents would be a good basis for CED and EZH to begin negotiations for the documentation involving the RoCa3 Facility. (Tr. 1062 (Holzman)) Holzman explained at trial that in the leveraged leasing industry it is "very common for prior documents or precedent documents" (Tr. 1061 (Holzman); Tr. 2873-74 (Mintun)) to be used because there is no reason to "reinvent the wheel when you already know you're going to have a lot of new things to negotiate because of changes in a transaction." (Tr. 1062 (Holzman); Tr. 2872-73 (Mintun)) CED thus agreed to use EZH's Maasvlakte documentation to begin negotiations over the terms of the RoCa3 Transaction documentation. (Ex. 298 at page 5829; Tr. 1059-62 (Holzman); Tr. 2087 (DePlautt)) CED also thought its agreement to use the Maasvlakte documents would cause EZH to consider CED's proposal more seriously, overcoming to some

extent CED's lack of prior leasing experience. (Tr. 2087 (DePlautt)) However, as Phillip Mintun of Capstar, EZH's advisor in the RoCa3 Transaction, explained the documentation at closing would "look[] very different from the one that was" used as "the starting place." (Tr. 2874)

### 3. CED Viewed Banc One's Investment in the RoCa3 Facility as a Benefit

CED had proposed to invest in a $150,000,000 undivided interest in the RoCa3 Facility. (Ex. 298 at page 5828) Banc One proposed to enter into a leasing transaction with EZH for the remaining undivided interest in the RoCa3 Facility. (*See* Stip. ¶58 fn. 2) CED believed Banc One's involvement was a benefit because CED's first leveraged lease investment would be made alongside an experienced lease investor. (Tr. 1063 (Holzman); Tr. 1977 (Muoio)) For instance, CED found comfort in Banc One's ability to raise issues that may not have been raised by CED's due diligence team. (Tr. 1063 (Holzman)) CED also found comfort in Banc One's experience with assets being returned to it after its lease to a lessee had ended, because this had provided it with the opportunity to exploit those assets' residual values by remarketing or selling them. (Tr. 1062-64 (Holzman)) Residual value refers to an asset's remaining value at a future point in time. (Tr. 1064 (Holzman))

### 4. Proposal Economics

The October 21, 1997 CED proposal letter established the estimated economics of the proposed transaction based on a number of pricing assumptions expressly set forth therein. (Ex. 298 at page 5831) CED's assumed economic return,

including its net after-tax yield, after-tax cash flow and periodic after-tax cash flow from the transaction were protected by rent adjustments through the closing date of the RoCa3 Transaction should any of the underlying pricing assumptions or inputs change. (Tr. 1070-72 (Holzman)) If any of these initial pricing assumptions were to change by the close of the transaction, the ABC software will recalculate the economics of the proposed transaction to preserve CED's net economic return. (Tr. 1065 (Holzman)) Conversely, EZH bore the risk of the pricing assumptions changing, which would affect, positively or negatively, the net present value benefit of the lease transaction cash flows it would receive. (Tr. 1065-66 (Holzman))

The pricing assumptions used in the preliminary pricing for the October 21, 1997 proposal were provided by a variety of sources including CED, EZH via its advisor Capstar, Deloitte, as appraiser, and the engineer, Duke Engineering & Services ("Duke Engineering"). (Tr. 1066-70 (Holzman)) For example, the 44-year lease term (the term for which EZH would lease an undivided interest in the RoCa3 Facility to CED (Ex. 1 at page 139; Ex. 2 at page 324)) was driven by the RoCa3 Facility's estimated remaining economic useful life of 55 years; in other words, as of 1997, the RoCa3 Facility was expected to be operated for another 55 years. (Ex. 298 at pages 5831-32; Tr. 1067 (Holzman)) EZH provided the estimated facility cost of $250 to $300 million, and Cornerstone's understanding was that this was likely done in conjunction with Deloitte's preliminary estimate of value. (Tr. 1068 (Holzman)) CED provided its maximum equity investment of $42 million. (Tr. 1069 (Holzman)) Finally, Capstar estimated the nonrecourse debt interest rate of 7.5%.

(Tr. 1069 (Holzman)) None of the pricing assumptions provided by EZH and Capstar for the October 21, 1997 proposal letter were final. (Tr. 1074 (Holzman)) The due diligence performed on behalf of CED by Deloitte and Duke, as well as the passage of time and changes in market interest rates, resulted in a number of these preliminary pricing assumptions changing as of RoCa3 Transaction's closing on December 15, 1997. (Tr. 1072-73 (Holzman)) For example, by December 15, 1997, the due diligence Deloitte had performed in connection with its Appraisal analysis led it to conclude that the RoCa3 Facility's value was different than the $250 to $300 million amount used in the October 21, 1997 preliminary pricing. (Tr. 1072-73 (Holzman); *see, e.g.*, Ex. 46 at page 1503) These changes resulted in the economics of the RoCa3 Transaction also changing, such as the useful life of the RoCa3 Facility and the debt rate. (Tr. 1210-11 (Holzman))

In connection with the initial economics in the proposal, Deloitte had provided a preliminary fair market value curve for a new gas-fired power plant. (Ex. 298 at page 5833; Tr. 1073-74 (Holzman)) Such preliminary work by an appraisal firm was very common in the leasing industry. (Tr. 1075 (Holzman)) The preliminary value information Deloitte provided gave EZH, as well as any interested investors, an estimate of the size of an investment. (Tr. 1075 (Holzman)) Indeed, it was also necessary for the valuation curve to indicate the expected fair market value of a new gas-fired power plant during the term of the lease, which was based on the facility's having a remaining useful life of 55 years. (Tr. 1073-74 (Holzman)) Cornerstone would not have been able to complete its preliminary

pricing for the proposed transaction without the preliminary value curve because the information contained in the curve was input into the ABC software. (Tr. 1074-75 (Holzman))[14]

### 5. Due Diligence Experts

Muoio and DePlautt engaged in discussions over the types of due diligence experts that CED needed to hire. (Tr. 1969-70 (Muoio); Tr. 1023-24 (Holzman)) CED's October 21, 1997 proposal letter informed EZH that CED had hired Shearman & Sterling as its United States legal counsel and that CED intended to hire Loeff Claeys Verbeke ("Loeff Claeys") as its Dutch counsel. (Ex. 298 at page 5828) CED also agreed to hire Deloitte as the appraiser, Duke Engineering as an independent engineer, and Tauw Milieu ("Tauw") as the environmental consultant. (Ex. 298 at page 5828; Tr. 2085-87 (DePlautt))

CED hired Shearman & Sterling because it is a well-respected firm that was knowledgeable on leasing transactions. (Tr. 2083 (DePlautt)) CED considered other outside counsel; however, CED hired Shearman & Sterling because of its expertise and long-standing relationship with Con Edison. (Tr. 2083-84 (DePlautt); Tr. 386-87 (McGrath)) In fact, Shearman & Sterling's managing partner was a member of Con Edison's board of directors (Tr. 2083-84 (DePlautt); Tr. 386-87 (McGrath)), and CED took comfort in having one of its long-term legal advisors representing it in the RoCa3 Transaction. (Tr. 2084 (DePlautt))

---

[14] Following the November 11, 1997 site visit, Deloitte prepared a new valuation curve to reflect that the RoCa3 Facility was one year old as determined on the site visit. (Tr. 1631-32, 1634 (Ellsworth))

CED also retained Loeff Claeys as its Dutch counsel. (Tr. 1082 (Holzman); Tr. 2084-85 (DePlautt)) Since the RoCa3 Facility is physically located in The Netherlands, CED knew that applicable Dutch laws would need to be analyzed, interpreted and complied with. (Tr. 1082 (Holzman); Tr. 2084-85 (DePlautt))

CED hired Duke Engineering to perform an engineering due diligence review on the RoCa3 Facility since Duke Engineering was an extremely competent engineering consultant. (Tr. 1970 (Muoio); Tr. 2086 (DePlautt)) As of 1997, Con Edison had been a Duke client for about 10 years on a variety of different engagements. (Tr. 1504-05 (Radini))

CED hired Tauw to perform an environmental review of the RoCa3 Facility because Tauw was one of the more sophisticated environmental consultants. (Tr. 2025-26 (Muoio)) Holzman believed Tauw and its engineer Hans Nieuwenhuis were excellent and produced a very high-quality work product. (Tr. 1086-88 (Holzman)) In fact, Nieuwenhuis, in a prior transaction in which Cornerstone was involved, had identified a significant environmental issue. (Tr. 1088 (Holzman)) That issue resulted in the transactions not closing as planned. (Tr. 1088 (Holzman)) Months later, the lessee re-approached the equity investor after it remediated the issue and the transaction then proceeded to closing. (Tr. 1088 (Holzman))

CED agreed to hire Deloitte because it had a great reputation and CED was familiar with Deloitte. (Tr. 2086 (DePlautt); Tr. 1077 (Holzman)) In Holzman's experience, Deloitte "knew what they were doing" and "they were very capable" of

performing the analysis that "they were going to be asked to do." (Tr. 1077 (Holzman); *accord* Tr. 4750-51 (Ray, agreeing Deloitte was a competent appraiser))

## VI. The RoCa3 Transaction Due Diligence

Although very little RoCa3 Facility-specific due diligence had been done on CED's behalf as of October 21, 1997, when the proposal letter was sent to EZH (Tr. 1079-80 (Holzman)), ultimately hundreds of hours of due diligence were performed. (Tr. 1079 (Holzman)) It is very common for an equity investor to begin specific due diligence only after a proposal has been accepted because, as Holzman described, it makes "very little sense to spend your time [and] . . . personal resource[s]" on due diligence if you "you don't even know if there's going to be an agreement . . . to continue or move ahead with the transaction." (Tr. 1080 (Holzman)) The specific due diligence performed by and on behalf of CED involved the undertaking of the following tasks:

(1) Credit analysis of the transaction, specifically of EZH (Tr. 1046 (Holzman));

(2) Analysis of the energy market in The Netherlands (Tr. 1046, 1077 (Holzman));

(3) An assessment of the RoCa3 Facility, including its operations, quality and capital expenditures (Tr. 1046-47, 1077 (Holzman));

(4) An assessment of current environmental issues and potential future issues through the operation of the RoCa3 Facility (Tr. 1047, 1077 (Holzman));

(5) Confirmation that the proposed transaction qualified for leveraged lease accounting (Tr. 1054 (Holzman)); and

(6) Dutch legal issues pertaining to the RoCa3 Facility, including an extensive real estate legal review, and a review of the transaction's terms. (Tr. 1047, 1078 (Holzman))

### A. CED's Site Visit of the Roca3 Facility

On November 11, 1997, CED personnel, together with members of its due diligence team, made a site visit to the RoCa3 Facility. (Ex. 351 at page 7469; Tr. 2118-19 (DePlautt); Tr. 1081-96 (Holzman)) The due diligence team members on the site visit included:

- Outside financial advisor: Rob Holzman of Cornerstone (Tr. 1081 (Holzman));
- Internal CED reviewer: Brian DePlautt (Tr. 1081 (Holzman); Tr. 2119 (DePlautt));
- Internal Con Edison engineering reviewer: Harold Morrison (Tr. 1081 (Holzman); Tr. 2119 (DePlautt));
- Outside U.S. legal advisors: Woody Flowers and Dan Kiely of Shearman & Sterling (Ex. 351 at page 7469; Tr. 1092 (Holzman));
- Outside engineering reviewer: Luis Gonzales of Duke Engineering (Tr. 1843 (Gonzalez); Tr. 1083 (Holzman));
- Outside RoCa3 Facility appraiser: Rick Ellsworth of Deloitte (Tr. 1085 (Holzman); Tr. 1632, 1634 (Ellsworth));
- Outside local Dutch legal advisor: Femke Bierman of Loeff Claeys (Tr. 1082 (Holzman));
- Outside environmental reviewer: Hans Nieuwenhuis of Tauw. (Tr. 1086-87 (Holzman))

During the site visit, EZH personnel took the group on a tour of the site and the RoCa3 Facility, as well as the two other and much smaller facilities at the same site. (Tr. 1083 (Holzman)) Touring all three sites was necessary since CED and its due diligence team needed to understand the relationship between the two other facilities and the RoCa3 Facility. (Tr. 1083 (Holzman)) Holzman testified that the group reviewed and discussed the operations of the RoCa3 Facility with EZH

personnel in an attempt to identify any issues that could arise in connection with CED having "a good ownership interest in the asset." (Tr. 1083-84 (Holzman))

CED's visit to the RoCa3 Facility was critical to the due diligence of the RoCa3 Transaction. (Tr. 1083-84, 1093 (Holzman)) By physically observing the RoCa3 Facility, CED was able to fully appreciate how the facility operates, which it could not have done simply through a review of documents describing the facility. (Tr. 1083-84 (Holzman)) This site visit also was used to ensure that the transaction documents provided CED all the necessary rights and imposed the necessary obligations on EZH to place CED in a position to be able to sell its share of the RoCa3 Facility's output at a profit. (Tr. 1093-94 (Holzman))

Luis Gonzalez from Duke Engineering attended the site visit since he had an understanding of the RoCa3 Facility and its operations. (Tr. 1083 (Holzman)) Gonzalez used the site visit as an opportunity to explain to CED what Duke Engineering had learned about the RoCa3 Facility based on its review of technical information on the RoCa3 Facility and its prior visit to the RoCa3 Facility. (Tr. 1843-44 (Gonzalez))

Harold Morrison, a knowledgeable Con Edison power engineer, attended the site visit to assist in the engineering due diligence on the RoCa3 Facility. (Tr. 2119 (DePlautt); Tr. 1081 (Holzman)) Morrison's attendance indicated how interested CED was in determining the quality of the RoCa3 Facility. (Tr. 1846 (Gonzalez)) Morrison's experience allowed him to compare and contrast the RoCa3 Facility to Con Edison's facilities back in the United States, as well as identify any problems or

issues. (Tr. 1081-82 (Holzman)) During the site visit, Gonzalez and Morrison spent a lot of time discussing the engineering of the RoCa3 Facility. (Tr. 1844 (Gonzalez); Tr. 1083 (Holzman)) Morrison took a particular interest in learning about the carbon dioxide byproduct, which was sold to the local greenhouses, as well as the RoCa3 Facility's cleanliness as compared with Con Edison's existing facilities. (Tr. 1085 (Holzman)) Following the site visit, Morrison continued to ask questions, requested additional information, and engaged in discussions with the Duke Engineering due diligence team with regard to the RoCa3 Facility's efficiency and its production of carbon dioxide. (Tr. 1845 (Gonzalez))

Rick Ellsworth, the Deloitte appraiser in the RoCa3 Transaction, attended the site visit as part of his appraisal due diligence and to identify any issues that CED would need to address. (Tr. 1085 (Holzman)) This was Deloitte's second site visit to the RoCa3 Facility. (Ex. 46 at page 1505) During the November 11, 1997 site visit Ellsworth concluded that the RoCa3 Facility was one year old. (Tr. 1632, 1634 (Ellsworth)). As a result, Deloitte developed and provided to Cornerstone an updated fair market valuation curve specifically tailored to reflect this fact. (Tr. 1631-32, 1634 (Ellsworth); *compare* Ex. 298 at page 5833 *with* Ex. 956 at page 14421)

Hans Nieuwenhuis of Tauw attended the site visit as part of its environmental analysis to determine whether any existing or potential environmental problems existed at the RoCa3 Facility. (Tr. 1086-87 (Holzman)) Tauw had previously visited the RoCa3 Facility in connection with its

environmental analysis. (Tr.1589-90 (Nieuwenhuis)) Tauw ultimately drafted and provided a report containing all of its findings from its environmental analysis. (*See* Ex. 53)

Attorneys from Loeff Claeys and Shearman & Sterling were also present at the site visit to better understand the asset and make sure CED received the necessary rights to operate the RoCa3 Facility. (Tr. 1082, 1092 (Holzman)) Femke Bierman of Loeff Claeys, CED's Dutch counsel, attended the site visit to identify any potential issues with respect to CED's rights regarding the Station Site, access to the RoCa3 Facility, the RoCa3 Facility's connection to the high-voltage transmission grid (whereby the power generated by RoCa3 is transmitted), and the Cooling Water Channel.[15] (Tr. 1082 (Holzman)) Eventually, CED's rights to use the Cooling Water Channel became a significant focus of the CED due diligence team since that channel delivered the water from the Cooling Water Station[16] necessary to cool the RoCa3 Facility's generating unit. (Tr. 1089-90 (Holzman)) These issues led to several hours of due diligence to ensure CED had the rights it would need to operate the asset. (Tr. 1078, 1089-90 (Holzman)) CED also had to be apprised of any environmental issues that might exist with regard to accessing the water in the river and using it to cool the facility. (Tr. 1089 (Holzman))

---

[15] (*See* Facts Section IV.C.)
[16] (*See* Facts Section IV.C.)

Based on the site visit, Bierman suggested numerous revisions to Operative Documents, which CED and EZH then negotiated.[17] (Tr. 1090 (Holzman)) These negotiations ultimately resulted in the Operative Documents containing the rights CED would need to operate the RoCa3 Facility, under its Lease, should it be required or able to do so. (Tr. 1089, 1092 (Holzman)) These negotiations culminated with EZH's representing in the Participation Agreement that: (1) [the Operative Documents provide] CED with the use, operation, possession and access to the RoCa3 Facility (which includes the Unit, Network, Common Facilities, the Cooling Water Station and the Cooling Water Channel), (2) EZH knew of no law that would prevent CED from selling the RoCa3 Facility's output, and (3) CED could transmit the electricity over the high-voltage transmission grid. (Ex. 1 at pages 36-37)

**B. Credit Analysis of EZH**

Cornerstone assisted CED in understanding the credit risks involved in the transaction. (Tr. 1046 (Holzman)) EZH's credit was important to CED because EZH was responsible for, among other things, making rental payments and maintaining the asset during the term of the Sublease. (Ex. 4 at pages 389, 399; Tr. 1049-50 (Holzman)) Performing due diligence on EZH was one way to mitigate CED's exposure to credit risk (Tr. 1050 (Holzman)) and insure EZH's ability to maintain the RoCa3 Facility and protect CED's residual value. (Tr. 1053 (Holzman)) In fact, the due diligence performed by CED or on behalf of CED was extensive and likely greater than the due diligence in other leveraged lease transactions. (Tr. 1093

[17] Operative Documents include the transaction documents. (*See* Ex. 1 at pages 145-46)

(Holzman)) Cornerstone reviewed EZH's annual reports and the Electricity Act, which explained the electricity industry in The Netherlands. (Tr. 1048 (Holzman)) In addition, because CED did not possess credit analysis expertise, it requested Cornerstone's assistance in receiving a credit rating on EZH from Standard & Poor's, one of the world's leading credit agencies. (Tr. 1048 (Holzman)) Standard & Poor's concluded that EZH was likely an A rated company based on its review of the Dutch electricity generation industry sector. (Ex. 349 at page 7467; Ex. 477 at page 9168)

### C. Duke Engineering

Duke Engineering prepared an engineering due diligence report on the RoCa3 Facility for CED. (Stip. ¶79; Ex. 52 at page 1802; Tr. 1495 (Radini)) Its due diligence was a technical evaluation (Tr. 1831-32 (Gonzalez)) in order to provide an opinion on the asset's quality, including design and construction, its useful life and its projected operating costs. (Tr. 1833-34 (Gonzalez))

In 1997, Duke Engineering had over 1500 employees and was a subsidiary of Duke Energy. (Tr. 1467-68 (Radini)) The Duke Engineering individuals involved in the RoCa3 Transaction were Richard K. Radini, Gerald F. Foley, Luis C. Gonzalez and Anthony DeCristofaro. (Stip. ¶79) Radini was the head of the non-nuclear, non-hydro, non-transmission/distribution group. (Tr. 1468 (Radini)) Gonzalez was an electrical engineer who had over 30 years of experience designing and evaluating power plants as of 1997. (Tr. 2271 (Gonzalez); Tr. 1498 (Radini)) Foley was a senior mechanical engineer who had about 40 years of experience in power plant design as

of 1997. (Tr. 1833 (Gonzalez); Tr. 1498-99 (Radini)) DeCristofaro had about 15 years of experience as of 1997 in power plant design and specialized in power plant controls. (Tr. 1833 (Gonzalez); Tr. 1499 (Radini))

In 1997, Radini had supervision responsibilities over many Duke Engineering due diligence matters (Tr. 1489 (Radini)) and ensured that the report satisfied Duke Engineering's standard of quality. (Tr. 1496 (Radini)) Gonzalez selected the Duke Engineering team, attended the site visits, assisted in performing some of the analysis and reviewed the report. (Tr. 1832 (Gonzalez)) Gonzalez selected Foley and DeCristofaro to work on this project. (Tr. 1832 (Gonzalez)) Foley was the lead engineer and had the overall responsibility for preparing the due diligence report with the assistance of DeCristofaro. (Tr. 1856-57 (Gonzalez)) Gonzalez constantly communicated with the team concerning the report and reviewed and commented on the report as it was drafted. (Tr. 1856-57 (Gonzalez))

To perform an engineering due diligence, Duke Engineering prepares and sends to a facility operator a list of questions to inform it of the technical information that Duke Engineering would need to review during a site visit. (Tr. 1834-35 (Gonzalez); *see also* Ex. 52 at page 1813) Duke Engineering then conducted an initial site visit of the RoCa3 Facility on October 16 and 17, 1997. (Tr. 1836 (Gonzalez); *see* Ex. 52 at page 1813) During the site visit, Duke Engineering toured the RoCa3 Facility, inspected the facility's equipment, records, drawings and technical information, and spoke with engineers and operators about the technical aspects of the facility. (Tr. 1838-39 (Gonzalez); *see* Ex. 52 at page 1813) Through the

site visit, Duke Engineering was able to familiarize itself with the plant's components, the maintenance of such and how the plant is operated. (Tr. 1834-35 (Gonzalez)) At the end of the site visit, Duke Engineering personnel always conducted an exit interview to ensure that they had all of the documents necessary to complete their evaluation. (Tr. 1838-39 (Gonzalez)) A list of the technical information that EZH provided Duke Engineering is found in Exhibit 12A of the Duke report. (Ex. 52 at pages 1962-69; Tr. 1840-41 (Gonzalez))

Duke Engineering evaluated 10 different criteria in forming its opinion of the RoCa3 Facility's quality. (Ex. 52 at page 1873; Tr. 1872 (Gonzalez)) These criteria were the same used in any due diligence review, whether for a lease or purchase transaction of the same type of asset. (Tr. 1872 (Gonzalez)) Under Duke Engineering's methodology, an average rating means an asset is in accordance with standard industry practice and an above average rating means the asset is above the industry practice when compared with other facilities of similar design. (Tr. 2278-80 (Gonzalez)) Duke Engineering concluded that the RoCa3 Facility's:

- Plant Life Expectancy was *above average*;
- Availability was *above average*;
- Reliability was *above average*;
- Operability was *average*;
- Efficiency was *above average*;
- Plant Safety was *average*;
- Environmental Compliance was *above average*;
- Plant Staff Support, Training, Incentives were all *above average*;

- Site Plan and Structures were all *average*; and
- Future Plant Improvement/Renewal was *average*.

(Ex. 52 at page 1873) In short, the RoCa3 Facility received a good report card. (Tr. 2278-80 (Gonzalez))

Duke Engineering also rendered its opinion as to the useful life of the RoCa3 Facility. Useful life refers to the number of years that it makes economic sense to operate the facility, taking into account future operation-related costs. (Tr. 1485-86 (Radini)) Useful life was an important factor to CED since it directly affected CED's financial evaluation of the asset. (Tr. 1533 (Radini)) Duke Engineering determined that the useful life of the RoCa3 Facility was at least 55 years as of 1996. (Ex. 52 at page 1809) Because this is a combined-cycle facility, *i.e.*, producing electricity using a gas turbine and steam turbine, the useful life of the RoCa3 Facility will end if either the steam turbine or the boiler needs to be replaced, as these are the most expensive and crucial parts. (Tr. 1874-76 (Gonzalez)) Both a steam turbine and boiler last for around 60 years if properly maintained. (Tr. 1875-76 (Gonzalez))

The 55-year useful life for the RoCa3 Facility was slightly above average, but Gonzalez explained this useful life conclusion was appropriate because the RoCa3 Facility was very well-designed and because power plants in The Netherlands were generally very well-designed, constructed and maintained. (Tr. 1872-73) In The Netherlands prior to deregulation, the power industry generally retired a plant after about 35 and 45 years, but not because a plant was nonoperational due to some technical reason. (Tr. 2282 (Gonzalez)) By 1997 the expectation of

deregulation and increased competition caused power plants in The Netherlands to be operated for a longer time because in a competitive market, utilities operate power generating assets as long as they are making a profit from their operations. (Tr. 2282-83 (Gonzalez)) This phenomenon, the extension of useful lives on power assets, was in fact what was occurring in the rest of Europe as a result of deregulation. (Tr. 2283 (Gonzalez))

Duke Engineering also identified the costs associated with replacing or repairing some of the main components of the RoCa3 Facility in the "Operation Maintenance Program, Estimate of Costs" exhibit to its report. (Ex. 52 at pages 1913-16; Tr. 1877-78 (Gonzalez)) Duke Engineering was very familiar with these costs both because its parent, Duke Energy, had one of the largest fleets of gas-fired turbines in the United States and because it reviewed manufacturer information in connection with these costs. (Tr. 1878 (Gonzalez)) For example, Duke Engineering estimated that piping would need to be replaced between 25 and 35 years after the RoCa3 Facility was placed in service and that the cost, in 1997, of this replacement was $800,000. (*See* Ex. 52 at page 1916; Tr. 1880 (Gonzalez)) Duke Engineering also estimated that the gas turbine would need to be replaced about 28 years after the RoCa3 Facility was placed in service and that the cost, in 1997, of such replacement was $15,000,000. (Ex. 52 at page 1914; Tr. 1879-80 (Gonzalez)) CED would only be responsible for paying its portion of the $15,000,000 cost to replace the gas turbine based on its percentage interest in the RoCa3 Facility. (Tr. 1880 (Gonzalez)) Duke

Engineering thought that the cost to replace the gas turbine was minimal in comparison with the RoCa3 Facility's entire value. (Tr. 1880 (Gonzalez))

Duke Engineering also addressed what assets and services CED would need to operate the RoCa3 Facility in its report (Tr. 2285-86 (Gonzalez)), in a section entitled "Plant Resources to Operate ROC[A]3 Without EZH." (Ex. 52 at page 1902) Gonzalez testified that Duke Engineering was "specifically asked to" analyze and prepare this section "given the possibility that the investor would have to run the facility." (Tr. 2285-86 (Gonzalez)) For example, access to natural gas would be needed to operate the RoCa3 Facility. (Tr. 2286 (Gonzalez)) Duke Engineering also analyzed issues such as the operations and maintenance of the RoCa3 Facility, which would be addressed in the Control Documents.[18] (Tr. 2289-90 (Gonzalez)) Duke Engineering believed CED had the ability to operate the RoCa3 Facility since it was a utility with personnel experienced in power plant operations. (Tr. 2291 (Gonzalez))

### D. Deloitte & Touche

CED retained Deloitte to prepare an appraisal report (the Deloitte Appraisal) that would address the fair market value of the RoCa3 Facility, its remaining useful life, the residual value of the Lease Interest that CED acquired pursuant to the Lease at different points in time, whether the operation of the RoCa3 Facility would be commercially reasonable, and a number of other economic matters relating to the

[18] Control Documents include the Facility Operating Agreement, the Facility Support Agreement, Access Agreement and the Common Facilities Use Agreement. (Ex. 1 at page 122)

transaction. (Ex. 46 at page 1502) An appraisal provides an opinion of value prepared as of a specific date for a specific asset. (Tr. 1600-01 (Ellsworth)) As of December 15, 1997, Deloitte had reached all of its final conclusions and had provided to CED a final draft of its Appraisal, which would have been subject to only some minor editorial comments. (Tr. 1642-43 (Ellsworth)) The process of providing a final draft at closing and later providing the final bound appraisal after a transaction's close was common. (Tr. 1643 (Ellsworth))

The principal individuals from Deloitte on the engagement were Richard K. Ellsworth, George P. Revock and Steven Liu. (Stip. ¶83) Ellsworth managed and directed the preparation of the Appraisal. (Tr. 1601 (Ellsworth)) Prior to the RoCa3 Transaction, Deloitte had performed thousands of appraisals, several hundred of which involved power-generating assets throughout the world. (Tr. 1617-19 (Ellsworth)) Ellsworth had personally performed hundreds of appraisals, including 50 appraisals on power generating assets, 10 of which were gas-fired facilities like the RoCa3 Facility. (Tr. 1620, 1623-24 (Ellsworth)) Ellsworth completed his first appraisal of a power generating asset, a wood-burning power plant, in 1986. (Tr. 1621 (Ellsworth))

To prepare its Appraisal report, Deloitte personnel:

- made two physical inspections of the RoCa3 Facility on August 4 and November 11, 1997;
- interviewed EZH personnel;
- analyzed the power industry in The Netherlands and its regulatory environment;

- reviewed EZH's financial statements and construction and projected operating expenses for the RoCa3 Facility;
- studied historical information for gas-fired facilities in the United States and The Netherlands; and
- examined Duke Engineering's due diligence report.

(Ex. 46 at pages 1505-06)

Deloitte provided a summary of its Appraisal conclusions (Tr. 1636-37 (Ellsworth)), which were set forth in a summary letter. (Tr. 1637 (Ellsworth)) In this summary Deloitte concluded that:

- As of December 15, 1997, the fair market value of: (a) the RoCa3 Facility was $316,000,000, (b) the Undivided Interest was $150,000,000, and (c) CED's Lease Interest was $148,200,000 (Ex. 46 at page 1503; Tr. 1637-38 (Ellsworth));
- The RoCa3 Facility was complete, *i.e.*, nothing needed to be done for it to be operated for its intended use (Ex. 46 at page 1503; Tr. 1638-39 (Ellsworth));
- On the Lease Termination Date (February 24, 2041), the residual value of the RoCa3 Facility is expected to be at least 20% of the value on December 15, 1997 (Ex. 46 at page 1503; Tr. 1639-40 (Ellsworth));
- There is no economic or non-economic factor that will create a material inducement or cause EZH to exercise the Sublease Purchase Option (Ex. 46 at page 1503; Tr. 1770-72 (Ellsworth));
- As of the Sublease Basic Termination Date (January 2, 2018), the Sublease Purchase Option Price is greater than 100% of the fair market value of CED's remaining Lease Interest (Ex. 46 at page 1503);
- EZH is not expected to be economically compelled to exercise the Sublease Purchase Option (*Id.*);

- The Sublease Renewal Rent is no greater than 90% of the fair market value rentals for the Undivided Interest[19] (*Id.*);
- Upon the termination of the Sublease, the use of CED's Lease Interest is commercially feasible (*Id.* at page 1504; Tr. 1640 (Ellsworth));
- The remaining useful life of the RoCa3 Facility as of December 15, 1997 was 54 years and was expected to be 10.8 years on the Lease Termination Date (Ex. 46 at page 1504; Tr. 1640-41 (Ellsworth));
- On the Lease Termination Date, the remaining useful life of the RoCa3 Facility is expected to be at least 20% of RoCa3 Facility's remaining useful life as of December 15, 1997 (Ex. 46 at page 1504); and
- On the Sublease Basic Termination Date, which is January 2, 2018, CED's Lease Interest is expected to have a residual value with inflation of 129% and without inflation of 69.7% of the value of CED's Lease Interest as of December 15, 1997. On the Sublease Renewal Termination Date (June 15, 2034), CED's Lease Interest is expected to have a residual value with inflation of 70.9% and without inflation of 22.7% of the value of CED's Lease Interest as of December 15, 1997 (*Id.* at page 1505)

Deloitte's Appraisal contains a detailed discussion and analysis for each of its conclusions. (*See* Ex. 46)

### 1. Facility Description, Supply of Natural Gas and Dutch Power Industry

Deloitte described the RoCa3 Facility, the supply of natural gas, which is the RoCa3 Facility's fuel source, and the Dutch power industry in the Appraisal. The RoCa3 Facility description explains its ability to produce electricity, district heat and carbon dioxide. (Tr. 1645 (Ellsworth); Ex. 46 at pages 1511-14) Deloitte used information it had received from EZH along with Deloitte's knowledge of the Dutch

---

[19] CED leased from EZH an Undivided Interest in the RoCa3 Facility equal to about 47.47%. (Stip. ¶¶113, 114)

electricity and heating markets to draft this section. (Tr. 1645 (Ellsworth)) In addition, Deloitte reviewed Duke Engineering's due diligence report and discussed technical aspects of the RoCa3 Facility with Duke Engineering. (Tr. 1646 (Ellsworth))

Because the RoCa3 Facility is a gas-fired combined cycle facility, Deloitte investigated the long-term supply of natural gas in The Netherlands. (Tr. 1647-48 (Ellsworth)) In 1996, 49% of the electricity produced in The Netherlands was generated from natural gas. (Ex. 46 at page 1519) The worldwide demand for natural gas was expected to make it the fastest growing fossil fuel in the world. (*Id.* at page 1515) This was due to the fact that natural gas is a more environmentally friendly alternative fuel source and the fact that gas-fired power plants had lower capital costs, shorter construction times and decreased operating costs due to technological advancements. (*Id.* at pages 1515, 1518) The Netherlands obtains its natural gas from its own domestic resources and via importation from the North Sea. (*Id.* at pages 1518-19; Tr. 1648 (Ellsworth)) In The Netherlands, natural gas is purchased from Gasunie (the Dutch owner and manager of the high pressure gas grid in The Netherlands), which also purchases and transports gas in The Netherlands. (Ex. 46 at page 1519)

Deloitte also discussed the regulatory environment in 1997 and the projected deregulation of the Dutch electricity industry. (Tr. 1649-50 (Ellsworth); *see* Ex. 46 at pages 1521-37, 1574-75) Deloitte concluded that there was no known restriction on CED's ability to sell the RoCa3 Facility's output. (Tr. 1651 (Ellsworth)) Because The

Netherlands' electricity industry was moving toward deregulation in 1997 (Ex. 46 at pages 1527, 1536; Tr. 1649 (Ellsworth)), Deloitte concluded that if deregulation occurred, the Dutch electricity industry would be able to sell power throughout the European community. (Ex. 46 at page 1536)

**2. Useful Life**

To determine the expected useful life of a gas-fired facility Deloitte developed a lifing behavior curve based on a statistical analysis of the historical retirement of gas-fired facilities in the United States. (Ex. 46 at page 1541; Tr. 1655-56 (Ellsworth)) This analysis indicated a 45-year expected useful life based on historical data stemming back to periods prior to deregulation in the United States and Europe. (Ex. 46 at pages 1541, 1543, Ex. 52 at pages 1894-95; Tr. 1656-57 (Ellsworth)) However, Deloitte determined that the useful life of the RoCa3 Facility was 55 years because of:

(1) Utility operators' being economically encouraged to operate facilities longer due to deregulation (Ex. 46 at page 1542; Tr. 1658-59 (Ellsworth)), which was expected to occur in The Netherlands in the near future (*see* Ex. 46 at pages 1536, 1544, 1574-75);

(2) Technological advancements in the materials used in gas-fired facilities and the diagnostics used in the maintenance of the RoCa3 Facility (Tr. 1672-73 (Ellsworth)); and

(3) Compliance with the maintenance requirements under the Sublease as described in the Duke Engineering due diligence report. (Ex. 46 at page 1542; Tr. 1662-64 (Ellsworth))

Deloitte's 55-year useful life conclusion was consistent with Duke Engineering's useful life determination of the RoCa3 Facility. (Ex. 46 at page 1542) As of December 15, 1997, the Closing Date, the RoCa3 Facility was one year old; thus

Deloitte estimated that its expected remaining useful life was 54 years. (*Id.* at page 1543)

### 3. Fair Market Value of the RoCa3 Facility as of December 15, 1997

In valuing an asset, there are three different approaches that appraisers can use to develop the value of an asset: the Cost, Market and Discounted Cash Flow approaches. (Ex. 46 at page 1544; Tr. 1674-75 (Ellsworth)) Appraisal standards provide that all three approaches should be considered, but the use of any individual approach, or the weight given to it, depends on the specific information available for the asset being appraised. (Tr. 1675 (Ellsworth)) Deloitte considered each method, but primarily relied on the Cost approach in determining the fair market value of the RoCa3 Facility as of December 15, 1997 since the facility was then only a year old. (Ex. 46 at page 1562; Tr. 1675 (Ellsworth))

For the Cost approach, Deloitte used the Reproduction Cost New Method, which estimates the cost of replacing the same asset inflated to current (1997) dollars. (Tr. 1676-78 (Ellsworth); *see* Ex. 46 at page 1547-48) Deloitte made several positive adjustments to the cost of the facility—such as a "turnkey factor" reflecting that the construction of the RoCa3 Facility had been completed as of December 15, 1997, thereby reducing CED's exposure to construction risks such as delays, cost overruns and technological risks. (*See* Ex. 46 at page 1548; Tr. 1679 (Ellsworth)) Deloitte determined that the Reproduction Cost New value of the RoCa3 Facility as of December 15, 1997 was 622,365,040 NLGs (Dutch Guilders). (Ex. 46 at page 1548) Deloitte converted this amount to U.S. dollars (Ex. 46 at page 1549; Tr. 1683

(Ellsworth)), resulting in a rounded fair market value of $316,000,000 using the Reproduction Cost New Method. (Ex. 46 at page 1503) Deloitte confirmed the reasonableness of its conclusion by comparing the RoCa3 Facility's construction cost on a per-kilowatt basis to the construction costs published by McGraw-Hill Companies, Inc. (Tr. 1682 (Ellsworth))

The Market approach to valuation relies on market transactions for similar assets to provide an indication of value. (Ex. 46 at page 1549; Tr. 1684 (Ellsworth)) Deloitte considered the Comparable Transaction approach and Capital Market approach (Ex. 46 at page 1550; Tr. 1684-85 (Ellsworth)), but focused on the Capital Market approach. (*See* Ex. 46 at page 1550) Under the Capital Market approach, Deloitte compared the RoCa3 Facility with publicly traded companies that possess similar growth prospects. (*Id*. at page 1550) However, because the RoCa3 Facility itself is not a stand-alone company, Deloitte gave little weight to this approach (*Id*. at page 1562), and instead used it only as a measure of the reasonableness of its valuation under the Cost approach. (Tr. 1685 (Ellsworth)) Based on the Market approach, Deloitte estimated the RoCa3 Facility's value was 616,000,000 NLGs. (Ex. 46 at page 1555) This was slightly below the value of the RoCa3 Facility as of December 15, 1997 using the Reproduction Cost New approach. (*Id*. at pages 1548, 1555.)

The Discounted Cash Flow approach ("DCF") to valuation determines the value of an asset by estimating the cash flows that could be expected from operating the asset during its remaining useful life. (*Id*. at page 1555; Tr. 1686-87 (Ellsworth))

To determine the RoCa3 Facility's future cash flows, Deloitte estimated annual revenues by projecting actual revenues over the remaining useful life of the RoCa3 Facility and the corresponding expenditures (including Capital Expenditures) expected from the future operations. (*See* Ex. 46 at pages 1676-96; Tr. 1687 (Ellsworth)) These annual cash flows were then discounted to the present value as of December 15, 1997 and summed together to provide an estimated value of 670,000,000 NLGs. (*See* Ex. 46 at pages 1556, 1562, 1677-96; Tr. 1687, 1690-91 (Ellsworth)) Using the DCF approach, Deloitte's fair market value estimation of the RoCa3 Facility as of December 15, 1997 was higher than the fair market value determined under Reproduction Cost New approach. (Compare the estimated fair market value as of December 15, 1997 under the DCF approach of 670,000,000 NLGs with the estimated value of 622,365,040 NLGs under the Reproduction Cost New approach (Ex. 46 at page 1548)) The value determined under the DCF approach supports the reasonableness of the Reproduction Cost New approach and Market approach. (*Id.* at page 1562)

The RoCa3 Facility's revenues were expected to be from the sale of electricity, heat and carbon dioxide. (*Id.* at page 1677) Revenues from electricity are based on the number of hours that the RoCa3 Facility operates producing electricity. (Tr. 1688-89 (Ellsworth)) Deloitte adjusted the annual revenues for inflation based on its estimates of expected inflation rates and using its judgment regarding historic inflation rates in the United States and The Netherlands. (Ex. 46 at page 1559; Tr. 1688 (Ellsworth))

Deloitte also determined the annual expenses, such as the cost of fuel, operation and maintenance expenses, and the costs of transporting the energy from the RoCa3 Facility to customers. (Tr. 1689-91 (Ellsworth); *see* Ex. 46 at page 1682) In addition to fuel and operating costs, Deloitte projected the major maintenance expenses that would be undertaken during the useful life of the RoCa3 Facility. (Tr. 1691-92 (Ellsworth)) Although the Duke Engineering due diligence report provided the cost in 1997 dollars and timing of these expenses (Tr. 1692 (Ellsworth)), Deloitte indexed these amounts for inflation to the year in which the expenditure would occur and converted the costs to Dutch Guilders. (Tr. 1692-93 (Ellsworth))

**4. Residual Values of CED's Lease Interest**

Deloitte determined the expected residual values of CED's Lease Interest as of January 2, 2018, the Sublease Basic Termination Date, and June 15, 2034, the Sublease Renewal Termination Date. (Ex. 46 at page 1567; Tr. 1707 (Ellsworth)) Deloitte used the DCF approach to determine these residual values since that was the most direct method to determine a residual value (Tr. 1703 (Ellsworth)) and because the values that CED can exploit from either residual period (*i.e.*, the period after the Sublease ends) will depend on the cash flows generated by the RoCa3 Facility during the remainder of CED's Lease Interest. (Ex. 46 at page 1567) The DCF analysis Deloitte used to determine residual value as of the Sublease Renewal Termination Date (June 14, 2054) projected revenues and expenses for the RoCa3 Facility, like the DCF analysis used to estimate the fair market as of closing. (Tr. 1707 (Ellsworth); *see* Ex. 46 at page 1749) These projected cash flows represent

Deloitte's best estimate of the Lease Interest's residual value. (Tr. 1708 (Ellsworth)) For example, in determining the residual value of CED's Lease Interest following the Sublease Renewal Termination Date (from June 15, 2034 through February 24, 2041, or the "Shirt-Tail Period"), Deloitte projected the RoCa3 Facility to produce cash flow of 69,047,456 NLGs. (Ex 46 at page 1749; Tr. 1709-10 (Ellsworth))

The estimated residual value of CED's Lease Interest as of the Sublease Basic Termination Date in 2018 was expected to be 853,946,065 NLGs with inflation (Ex. 46 at page 1746) and 461,335,251 NLGs without inflation. (*Id.* at page 1716) The estimated residual value of CED's Lease Interest as of the Sublease Renewal Termination Date in 2034 was expected to be 469,112,897 NLGs with inflation (Ex. 46 at page 1749) and 150,574,012 NLGs without inflation (*Id.* at page 1721) Deloitte also expressed these amounts as a percentage of the original fair market value of CED's Lease Interest as of December 15, 1997:

| Estimated FMV as of: | With Inflation | Without Inflation |
|---|---|---|
| Sublease Basic Termination Date (January 2, 2018) | 129.0% | 69.7% |
| Sublease Renewal Termination Date (June 15, 2034) | 70.9% | 22.7% |

(Ex. 46 at page 1505)

### 5. EZH Letter to Deloitte

As part of the RoCa3 Transaction, EZH provided Deloitte with a signed letter dated December 15, 1997, in which EZH made three representations (*See* Ex. 56 at page 2511; Tr. 1429-31 (Holzman)):

- As of the Closing Date, the RoCa3 Facility is in service and is capable of generating electric power, district heating and carbon dioxide. No major improvements, alterations or modifications are required for the Facility to render it complete for its intended use;
- The Facility is substantially in the same condition it was when it was inspected by Deloitte & Touche on August 4, 1997; and
- There is no factor known to EZH that creates a material inducement for EZH to exercise the Sublease Purchase Option or disregard the provisions of the Sublease and related Participation Agreement.

(Ex. 56 at page 2511)

Deloitte requested the first representation because, based on its experience with new electricity generating facilities, it wanted assurance from the operator that the RoCa3 Facility was complete and operational without needing any improvements. (Tr. 1711-12 (Ellsworth); Tr. 1428-29 (Holzman)) Deloitte requested the second representation to confirm that nothing had changed since its first site visit on August 4, 1997 and the closing of the RoCa3 Transaction on December 15, 1997. (Tr. 1712-13 (Ellsworth); Tr. 1428-29 (Holzman)) Deloitte requested the third representation to confirm that EZH was not aware of any factor that would cause EZH to exercise the Sublease Purchase Option. (Tr. 1713-14 (Ellsworth) Holzman explained that it was important that EZH represent that "it did not have any cause for it or material inducement" that would "cause[] it to be materially induced to exercise the [Sublease] [P]urchase [O]ption" because a lease transaction cannot include "a bargain purchase option." (Tr. 1431 (Holzman)) Had any of EZH's representations in this letter been inaccurate or misleading in any material respect,

EZH would have been in default under the Sublease, entitling CED to exercise its remedies thereunder, as discussed in more detail below. (Ex. 4 at pages 422-23)

**E. Tauw Milieu**

Tauw prepared a report entitled Due Diligence Environmental, Safety and Health Report, which was sent to CED by Tauw in a letter dated January 14, 1998. (Stip. ¶81; Ex. 53) This report addressed several topics concerning the environmental, health and safety assessment of the RoCa3 Facility. (Stip. ¶81; *see* Ex. 53 at pages 2094-101)

Tauw usually performs environmental due diligence on behalf of financial clients, including private equity funds. (Tr. 1555 (Nieuwenhuis)) Hans Nieuwenhuis was the project manager in connection with the environmental due diligence of the RoCa3 Facility. (Stip. ¶81; Tr. 1562 (Nieuwenhuis)) Nieuwenhuis is still employed by Tauw as a senior consultant and has performed over 400 environmental due diligence projects. (Tr. 1553, 1556 (Nieuwenhuis)) Peter van Kernebeck and Peter Coenen were environmental auditors who attended the site visits, interviewed EZH personnel and reviewed documents in connection with the RoCa3 due diligence project. (Tr. 1562 (Nieuwenhuis))

According to Nieuwenhuis "[e]nvironmental due diligence is the investigation into the environmental status of a certain facility." (Tr. 1552 (Nieuwenhuis)) Such a review is often undertaken in connection with a transaction because the prospective investor wants be able to assess the environmental risks of a proposed transaction. (Tr. 1552 (Nieuwenhuis)) There are different levels of environmental due diligence:

- Phase Zero: This involves no field work (Tr. 1556-57 (Nieuwenhuis));

- Phase I: This is the most common environmental due diligence review undertaken. (Tr. 1556-57 (Nieuwenhuis)) Phase I is preferred since it allows Tauw personnel to make site visits, review documents relating to environmental issues and interview on-site personnel. (Tr. 1557 (Nieuwenhuis)) If soil and groundwater reports are available, they will be reviewed (Tr. 1579 (Nieuwenhuis));

- Phase II: This is an intrusive investigation and involves taking samples of ground water, soil and other materials when too little is known about the site (Tr. 1557 (Nieuwenhuis)) and;

- Phase III: This phase generally follows from a Phase II investigation where remediation or clean up is required after the ground water and soil testing. (Tr. 1557 (Nieuwenhuis))

Tauw encourages its clients to have at least a Phase I analysis performed. (Tr. 1558 (Nieuwenhuis))

In the RoCa3 Transaction, however, Tauw had a soil and ground water investigation report prepared as part of its due diligence; Tauw considered this a Phase II analysis. (Tr. 1564 (Nieuwenhuis); *see* Ex. 53 at page 2091) Tauw made site visits to the RoCa3 Facility, interviewed EZH personnel face-to-face and by phone, reviewed documents, and confirmed EZH had the proper permits and complied with regulatory requirements. (Stip. ¶81; Ex. 53 at pages 2132-33; Tr. 1578-79 (Nieuwenhuis)) Before any site visit, Tauw prepares a list of documents that it wants to review and requests a site map so that Tauw can check all areas where there could be an environmental issue. (Tr. 1579 (Nieuwenhuis))

In addition to areas usually covered by a due diligence environmental report, Tauw also performed a health and safety assessment (Tr. 1563-64 (Nieuwenhuis);

*see* Ex. 53 at pages 2091, 2101), which reviewed technical issues related to the heath and safety of the RoCa3 Facility's workers. (Tr. 1574-75 (Nieuwenhuis)) This assessment involved Tauw's reviewing and making sure the RoCa3 Facility complied with the Dutch laws and regulations related to health and safety. (Tr. 1575 (Nieuwenhuis))

Tauw identified whether the RoCa3 Facility complied with environmental, safety and health laws and regulations. (Tr. 1568-69 (Nieuwenhuis)) Any non-compliant features were separated into present and potential future non-compliances. (Tr. 1568-69 (Nieuwenhuis); *see, e.g.,* Ex. 53 at page 2096-98) Present and future non-compliances were then separated into major and minor non-compliances, with major non-compliances requiring a major cost to remediate. (Tr. 1568-69 (Nieuwenhuis)) Based on its analysis, Tauw came to a number of conclusions, which are detailed in its report, including:

- The RoCa3 Facility's overall environmental condition was very good and no direct evidence was found indicating any significant environmental problems affecting the site (Ex. 53 at page 2095; Tr. 1565-66 (Nieuwenhuis));
- The RoCa3 Facility's continued operation was not expected to present any significant environmental concerns (Ex. 53 at page 2095; Tr. 1566 (Nieuwenhuis));
- The RoCa3 Facility had no present or future major environmental non-compliances (Ex. 53 at pages 2096, 2098; Tr. 1570, 1572 (Nieuwenhuis));
- The RoCa3 Facility had a few present minor environmental non-compliances. (Ex. 53 at page 2096; Tr. 1570-71 (Nieuwenhuis)) A minor non-compliance sometimes required a minimum investment—but usually just administrative action (Tr. 1571 (Nieuwenhuis));

- The RoCa3 Facility had two future minor environmental non-compliances. (Ex. 53 at page 2098; Tr. 1572 (Nieuwenhuis)) For example, by 2003 the RoCa3 Facility Environmental Management Act permit would need to be changed to reflect certain water discharges from the facility into the sewer system (Ex. 53 at page 2098; Tr. 1572-73 (Nieuwenhuis)); and
- The RoCa3 Facility had no major health and safety non-compliances, and few minor health and safety non-compliances; thus Tauw concluded that these could be remedied without cost except for adopting some new procedures. (Ex. 53 at page 2101)

**F. Accounting Matters**

CED asked Cornerstone to assist it in obtaining an accounting opinion regarding whether the RoCa3 Transaction qualified for leveraged lease accounting. (Tr. 1054 (Holzman)) There are several tests to be applied in determining whether a lease is a leveraged lease. (*See* Ex. 10077 (Weil Initial Report) at pages 20256-59) To qualify as a leveraged lease, the lease must first qualify as a capital lease under FAS 13. (*Id.* at pages 20258-59) A lease will qualify as a capital lease if it meets any one of the four stated criteria in FAS 13. (*Id.*) These four criteria are:

(a) the asset is transferred to the lessee at the end of the lease term;

(b) the lease contains a bargain purchase option, which FASB defines as an option set at a price "sufficiently lower than the expected fair value" such that "exercise of the option appears, at the inception of the lease, to be reasonably assured." FAS 13, §§5(d), (7);

(c) the lease term is greater than 75% of the asset's useful life; and

(d) the minimum lease payments are 90% or more of the fair market value of the leased asset.

(*Id.*)

Second, the lease must qualify as a direct financing lease under FAS 13. (*Id.* at pages 20257-58) A lease will qualify as a direct financing lease if it meets the three stated criteria in FAS 13. (*Id.*) These three criteria are:

(a) the lease does not give rise to manufacturer's or dealer's profits or loss;

(b) the sublessor's collectibility of the minimum lease payments from the sublessee is reasonably predictable; and

(c) no important uncertainties surround the amount of unreimubursable costs yet to be incurred by the sublessor.

(*Id.*) Finally, in addition to qualifying as a capital lease and a direct financing lease, the lease must meet the three additional leveraged lease criteria stated in FAS 13. (*Id.* at page 20256) These three additional criteria are:

(a) the lease involves three parties: a lessee, a long-term creditor, and a lessor;

(b) the financing provided by the creditor to the lessor must be nonrecourse to the general credit of the lessor and provide the lessor with substantial leverage; and

(c) the lessor's net investment must decline during the early years and rise during the later years of the lease.

(*Id.*)

On October 27, 1997, Holzman, together with other Cornerstone personnel, drafted a summary memorandum based on another leveraged lease transaction in which CED was considering making an investment, the EPON transaction. (Tr. 1308-09, 1419-21, 1425-26 (Holzman); *see* Ex. 766 (complete), Ex. 1244 at pages 17743-47 (incomplete)) This memorandum was provided to Arthur Andersen to obtain an accounting letter with respect to whether the transaction described

therein satisfied the criteria to be booked for financial reporting as a leveraged lease under FAS 13. (Tr. 1293-94 (Holzman)) Holzman testified that the October 27, 1997 memorandum was only a draft because the details regarding a potential leveraged lease with EPON were still developing. (Tr. 1311-12 (Holzman)) Cornerstone did not prepare an updated memorandum for the potential leasing transaction with EPON because CED decided not to pursue that transaction. (Tr. 1311-12 (Holzman)); *see also* Stip. ¶56(a))

As of October 27, 1997, very little RoCa3 Transaction due diligence had been performed on the counterparty EZH or the RoCa3 Facility because EZH had only just accepted CED's October 21, 1997 proposal on October 22, 1997. (Tr. 1426-27 (Holzman)) Thus, as of the date of this draft letter, there had been no conversations with EZH, no appraisal prepared, no CED site visit made and no transaction documents drafted and negotiated. (Tr. 1426-27 (Holzman))

After the RoCa3 Transaction closed, Holzman prepared a memorandum summarizing the RoCa3 Transaction's structure. (Ex. 1151; Tr. 1432-33 (Holzman)) This memorandum was shared with Arthur Andersen so that they could evaluate the RoCa3 Transaction and provide guidance as to whether the transaction could be booked for financial accounting purposes under FAS 13. (Tr. 1432 (Holzman)) Arthur Andersen opined that the Lease in the RoCa3 Transaction is a lease (Ex. 722 at page 12238) and the Sublease in the RoCa3 Transaction is a leveraged lease. (*Id.* at page 12240) Arthur Andersen's opinion confirmed that the Sublease satisfied the

leveraged lease tests: the capital lease criteria, the direct financing lease criteria and the three additional leveraged lease criteria. (*Id.* at pages 12238-40)

## VII. CED Approval Process for the RoCa3 Transaction

### A. Overview

In September 1997, CED was considering participation in the leasing investment opportunity presented by the RoCa3 Transaction. (Ex. 140 at page 3335) At the September 25, 1997 CED Board Meeting, CED's management reported that the leasing market imposed a net worth requirement of $100 million on the equity investors in leasing transactions. (*Id.*) CED's management explained how this net worth requirement could be met, along with the possibility of seeking funding from Con Edison. (*Id.*)

At the October 28, 1997 Con Edison NY Board of Trustees meeting, CED management, including McCartney and Muoio, discussed the market-imposed net worth requirement for participation in leasing transactions and CED's potential investment in the RoCa3 Transaction. (Ex. 354 at page 7500-01) CED recommended that Con Edison NY increase CED's capitalization to meet the net worth requirement. (*Id.* at page 7501) At the conclusion of this meeting, the Board of Trustees deferred action on the request for additional investment in CED until a later date. (Stip. ¶94; Ex. 354 at page 7513)

At the October 29, 1997 CED Board meeting, CED management discussed the Board of Trustees' decision to defer action on CED's request for funding to

support leasing transactions and the additional information on leasing that could be provided to the Board of Trustees. (Ex. 153 at page 4127)

On December 10, 1997, the CED Board authorized CED's investment and participation in the RoCa3 Transaction, subject to Con Edison NY's approval of CED's request for $100 million and provision of the necessary funds.[20] (*See* Ex. 355 at page 7514) Prior to this approval, the CED Board received detailed briefings and written materials from CED management on September 25, 1997, October 23, 1997 and December 10, 1997, including memos, briefings or materials on the RoCa3 Transaction that included information on the facilities, potential framework for the structure of the contemplated transaction, the power market in The Netherlands, financing, environmental matters and other issues. (*Id.*)

On December 12, 1997, the Con Edison NY Board of Trustees authorized an additional $100 million investment in CED to support the leasing investments as described in the December 9, 1997 memorandum from McCartney to McGrath. (Ex. 147 at page 3798; Ex. 356 at page 7515) The December 9, 1997 memorandum requested the Board of Trustees' authorization of additional investment and attached a description of leasing investments ("the Leasing Whitepaper") for the Board of Trustees' review. (Ex. 397 at pages 8118-25) A copy of the December 9, 1997 memorandum was stamped with the notation "Consolidated Edison Co. of New York Inc. Board of Trustee Approved Dec. 12, 1997." (Ex. 536 at page 9734)

---

[20] The Con Edison NY Board of Trustees did not have to approve CED's investment or participation in the RoCa3 Transaction. (Tr. 956; 958-59 (McCartney))

At the December 15, 1997 CED Board meeting, the CED Board adopted revised resolutions for the approval of the RoCa3 Transaction. (Ex. 155 at page 4132) Accordingly, on December 15, 1997, after having received detailed briefings and written materials from CED's management, including memos, briefings or materials that included information on the facilities, potential framework for the structure of the contemplated transaction, the power market in The Netherlands, financing, environmental matters and other issues, the CED Board authorized the investment and participation in the RoCa3 transaction. (*Id.* at pages 4132-33) The RoCa3 Transaction closed on December 15, 1997. (*See* Stip. ¶58)

**B. Internal Review**

Prior to this approval, as part of CED's review of the potential investment in the RoCa3 Transaction, CED employees (or others on their behalf) prepared a number of documents for the use of CED and Con Edison management. (Stip. ¶95) These documents included, but are not limited to:

(1) A September 24, 1997 Project Fact Sheet (Ex. 388);

(2) An October 23, 1997 memorandum (Ex. 390);

(3) An October 23, 1997 memorandum (Ex. 489);

(4) An October 23, 1997 two-volume Project Briefing Memorandum (Exs. 363, 376);

(5) An October 23, 1997 memorandum and suggested Board resolution (Ex. 392);

(6) An October 27, 1997 memorandum (Ex. 382);

(7) An October 29, 1997 Investment Recommendation (*Id.*);

(8) A November 21, 1997 memorandum (Ex. 1150);

(9) A November 25, 1997 memorandum (Ex. 395);

(10) A December 8, 1997 Leasing White Paper (Ex. 377);

(11) A December 9, 1997 memorandum (Ex. 146);

(12) A December 9, 1997 memorandum, suggested Board resolution and Leasing White Paper (Ex. 397);

(13) A December 10, 1997 Investment Recommendation (Ex. 396); and

(14) A December 10, 1997 Investment Recommendation and suggested Board resolution (Ex. 398).

(Stip. ¶95)

**C. Project Briefing Memorandum**

The two-volume Project Briefing Memorandum dated October 23, 1997 was a comprehensive document prepared in the analysis and review of the proposed lease transaction (Stip. ¶95(a); *see* Exs. 363, 376) DePlautt compiled the Project Briefing Memorandum which consisted of information available as of that date to CED from various sources, including information from Cornerstone and EZH. (Tr. 2091 (DePlautt)) It also included information prepared by DePlautt based on his prior project finance experience. (Tr. 2104, 2108 (DePlautt)) The Project Briefing Memorandum was an attempt to provide a summary of much of the information that management and the CED Board would need to make a decision on the RoCa3 Transaction. (Tr. 2093 (DePlautt)) On October 23, 1997, DePlautt provided the two-

volume Project Briefing Memorandum to management and the CED Board, including Burke, McCartney and Freilich. (Ex. 489 at page 9577) Volume One of the Project Briefing Memorandum (Ex. 363[21]) contained information specific to the RoCa3 Transaction investment opportunity. (Ex. 489 at page 9577) Volume Two of the Project Briefing Memorandum (Ex. 376) contained background information on EZH, the Dutch electric industry, The Netherlands and the combustion turbine at the RoCa3 Facility. (Ex. 489 at page 9577)

Volume One of the Project Briefing Memorandum (Ex. 363 at page 7613) provided details on the following:

(1) *Project Overview*: This section provided a high-level overview of the RoCa3 Transaction. (Tr. 777-78 (McCartney); *see* Ex. 363 at page 7615) The proposed investment in the RoCa3 Transaction involved the lease-leaseback of an interest in the RoCa3 Facility in The Netherlands. (Ex. 363 at page 7615) It noted that the RoCa3 Facility was a gas-fired combined cycle power plant that started commercial operation in June 1996. (*Id.*) Under the proposed structure, CED would acquire a leasehold interest in the RoCa3 Facility from EZH and then sublease the leasehold interest back to EZH for a shorter period than the initial lease to CED. (*Id.*)

(2) *Country Description*: This section outlined the important features of The Netherlands, the country where the RoCa3 Facility was located. (Tr. 2093-4

[21] Exhibits 363 and 1136 were used interchangeably at trial as Volume One of the Project Briefing Memorandum. For purposes of simplicity, Exhibit 363 will be used in this discussion.

(DePlautt); *see* Ex. 363 at pages 7617-20) The Project Briefing Memorandum noted that The Netherlands had a high population density, a strong credit rating, a currency of The Netherlands guilder and was a member of the European Union, NATO, the United Nations and the Organization of Economic Cooperation and Development. (Ex. 363 at page 7617-18) It also noted that The Netherlands was a democracy, had a stable economy and issued debt with the highest possible rating of AAA by Standard & Poor's and Aaa by Moody's. (*Id.* at page 7617-20) This section also included a map of The Netherlands that identified the location of the RoCa3 Facility (*Id.* at page 7619) and an overview of the Dutch government, economy and environmental policies. (*Id.* at page 7620)

(3) *EZH Company Description*: The Project Briefing Memorandum noted that EZH was a municipally owned utility in The Netherlands that produced electricity and heat for the southern portion of The Netherlands. (Ex. 363 at page 7622) This section provided information about the potential counterparty in the RoCa3 Transaction (Tr. 2094 (DePlautt)), including EZH's financial performance. (Ex. 363 at pages 7622-23) This section also noted EZH's ownership structure, ongoing business ventures, generating capacity, fuel costs, tariff structure and competitive position. (*Id.* at pages 7622-30)

(4) *Power Plant Description*: This section described in detail the RoCa3 Facility, including that it was a gas-fired combined cycle cogeneration plant that produced up to 220 MW of electrical energy and that it was one of the most innovative and environmentally friendly generators in the world. (*Id.* at pages 7632-

38) The RoCa3 Facility was an environmentally friendly power plant in that it not only generated electricity, but also used its waste heat to supply heat and carbon dioxide to the glasshouse horticulture industry. (*Id.* at page 7633) The detailed information in this section about the RoCa3 Facility and its innovative environmental feature was provided by EZH.[22] (Tr. 2095-96 (DePlautt))

(5) *Dutch Electricity Industry*: This section highlighted the regulatory environment and the potential impact of deregulation on the RoCa3 Facility. (Tr. 2096-98 (DePlautt)) This section also noted the historical background of the Dutch electricity industry and examined the Dutch production, transportation, distribution and pricing of electricity. (Ex. 363 at pages 7640-42) In 1997, the Dutch electricity industry was governed by the Electricity Act of 1989. (*Id.* at page 7640) However, the Dutch government had made it known that a new Electricity Act in 1998 could liberalize the market for the production and distribution of electricity. (*Id.* at page 7642)

CED was aware of the potential for deregulation in The Netherlands and throughout the European Union (Tr. 2098 (DePlautt)) and of the potential opportunities for CED created by the deregulation happening around the world. (Tr. 493-95 (Burke)) This potential for deregulation was addressed in a section on the Dutch power industry in the Deloitte Appraisal. (Ex. 46 at pages 1521-37) Deloitte's regulatory description was consistent with the market information available in 1997 (Tr. 2400-03 (Goulding)), and from this information it was apparent in 1997

[22] The innovative environmental feature of the RoCa3 Facility was important to CED. (Tr. 780-81 (McCartney))

that the Electricity Act of 1989 would be replaced with deregulation. (*See* Ex. 10074 (Goulding Initial Report) at page 20084; Tr. 2454-56 (Goulding))

(6) *GAAP Earnings Profile*: This earnings profile graph indicated that earnings from the potential RoCa3 Transaction would be near-term earnings. (Ex. 363 at page 7653) This potential for near-term earnings was consistent with the goals CED had identified for leasing investments. (*See* Ex. 243 at page 4494; Ex. 261 at page 4950)

(7) *Due Diligence Process*: CED had identified project areas that would require further targeted due diligence efforts, including technical, environmental and valuation issues. (Ex. 363 at page 7670; Tr. 2083-86 (DePlautt)) These due diligence issues were to be addressed by experts retained by or on behalf of CED, and CED had identified Duke, Tauw and Deloitte to perform certain areas of due diligence. (Ex. 363 at page 7670)

(8) *Risk Analysis*: The risk analysis chart contained in this section identified and analyzed the various risks of CED's potential investment in the RoCa3 Transaction including technology risks, EZH performance risks and tax risks. (*Id.* at pages 7672-75) This risk analysis chart was prepared by DePlautt (Tr. 2104 (DePlautt)) and incorporated his prior risk analysis knowledge and experience from project finance transactions involving energy assets. (Tr. 2108 (DePlautt)) The risk analysis chart he created contained columns for risk, mitigation and estimated remaining risk level (Ex. 363 at pages 7672-75): the risk column listed potential risks for an investor in the RoCa3 Transaction; the mitigation column highlighted

aspects of the transaction that would reduce or mitigate those risks; and the estimated remaining risk level was the level of risk remaining after mitigation. (Tr. 2104-05 (DePlautt)) Remaining risk level was not quantified, but rather assigned a risk on the risk spectrum of high, medium, low or does not exist. (Tr. 2107-08 (DePlautt)) For example, the two defeasance deposits (debt and equity) and the letter of credit identified in the mitigation column for the various EZH performance risks (Ex. 363 at page 7674) provided security for the payment of rent, the Sublease Purchase Option Price and a portion of any termination value. (Tr. 2112-15 (DePlautt)) Despite these mitigating factors, the estimated remaining risk level for EZH's performance was "low" rather than non existent. (Ex. 363 at page 7674)

The more than 240-page Project Briefing Memorandum (Exs. 363 and 376 combined) provided an overview of the potential RoCa3 Transaction to the CED Board and CED senior management (Tr. 2091 (DePlautt)) and, in fact, was reviewed by Burke, McCartney and Freilich. (Tr. 502-03 (Burke), Tr. 776-77 (McCartney); (Tr. 696-97 (Freilich)) The CED Board used the Project Briefing Memorandum in its decision-making process for the RoCa3 Transaction. (Tr. 776-77 (McCartney))

**D. Leasing White Paper**

In response to a need to educate Con Edison NY's Board of Trustees on the specific issues, risks and opportunities presented by leasing, CED prepared a Leasing White Paper to provide a general discussion of the characteristics of leasing transactions. (Tr. 2120 (DePlautt); Tr. 789 (McCartney); Tr. 692 (Freilich)) DePlautt

drafted the Leasing White Paper and incorporated comments from various CED personnel (Tr. 2121-22 (DePlautt)), including McCartney (Tr. 789 (McCartney)) and Freilich. (Tr. 691-92 (Freilich)) Based on the comments received on various drafts of the Leasing White Paper, a final version of the Leasing White Paper was created (Tr. 838-39(McCartney)) and submitted to Con Edison NY's Board of Trustees. (Ex. 397 at pages 8118-25; Tr. 843 (McCartney)) The Leasing White Paper included an overview of the leasing investment opportunity, a description of the type of leasing transactions under consideration, a description of how a leasing transaction works, a description of the returns from a leasing transaction, a brief description of the RoCa3 Transaction under consideration, and a description of the benefits and risks of leasing transactions in general. (Ex. 397 at pages 8120-25)

As summarized by the Leasing White Paper, leasing investments, due to their relatively low risk and attractive return profile, would contribute to a diversified investment portfolio and would be accounted for as leveraged leases with front-loaded earnings. (Ex. 397 at page 8120) The Leasing White Paper noted that CED was considering both sale-leaseback and lease-leaseback structures. (*Id.*; Tr. 2120-23 (DePlautt)) The chart and graph provided in the Leasing White Paper illustrate the front-loaded earnings profile of a lease-leaseback structure. (Ex. 397 at pages 8121-22; Tr. 789-90 (McCartney); Tr. 692-93 (Freilich)) In the Leasing White Paper, CED reiterated the benefits of leasing—including highly predictable earnings, front-loaded earnings, good investment yields and strategic value (Ex. 397

at page 8123)—and the risks of leasing—including credit, tax and country risks. (*Id.* at pages 8124-25)

One of the risks identified was that, in a worst-case scenario, tax benefits would be eliminated from a leveraged lease transaction. (*Id.* at page 8124) Under this scenario, CED would receive a return of CED's capital and an *after-tax* return of 2.4% (*See* Ex. 397 at page 8124; Tr. 712-14 (Freilich); Tr. 507-08 (Burke); Tr. 2135-36 (DePlautt)) rather than the range of potential after-tax yields highlighted under the benefits of leasing. (*Id.* at page 8123) If 2.4% was the only possible return, CED would not have participated in a leveraged lease transaction. (Tr. 850-51 (McCartney); Tr. 335 (McGrath)) However, the 2.4% was a worst-case scenario with a low probability, and in fact, CED anticipated a much higher return. (Tr. 850-51 (McCartney))

CED was aware of the tax benefits provided by leveraged lease transactions. (*See, e.g.,* Ex. 243 at page 4495; Ex. 252 at page 4730; Ex. 259 at page 4915; Tr. 767 (McCartney); Tr. 717-18 (Freilich); Tr. 544-45 (Burke)) However, these benefits were just one of the many leveraged leasing benefits evaluated by CED. (Tr. 767 (McCartney); Tr. 4919-26 (Ray) (agreeing that based on his review of documents and depositions, tax benefits were just one of several important motivations for CED to enter into the RoCa3 Transaction)) In addition, Holzman pointed out that all leases, including leveraged leases, have a tax orientation and that in his experience taxes are not the sole motivation for entering into a leveraged lease transaction. (Tr. 1036-37 (Holzman); Tr. 3231-34 (Ellis) (explaining that taxes play

a role in all business transactions, including leveraged lease transactions, and that the tax benefit in leveraged leasing is the tax deferral))

Along with the December 9, 1997 request for additional investment of $100 million in CED, CED submitted the final version of the Leasing White Paper to the Con Edison NY's Board of Trustees. (Ex. 397 at pages 8118-25; Tr. 843 (McCartney))

**E. Investment Recommendation**

Along with a proposed CED Board resolution authorizing CED's investment in the RoCa3 Facility, CED management prepared an Investment Recommendation (Exs. 382, 396) for CED's Board in October and December of 1997. (Stip. ¶95(d), (q)) The final Investment Recommendation, dated December 10, 1997, was submitted to the CED Board on December 10, 1997. (Ex. 398) DePlautt prepared the Investment Recommendation for a discussion of the proposed lease transaction with the CED Board. (Tr. 792 (McCartney)) The Investment Recommendation also incorporated the October 23, 1997 Project Briefing Memorandum by reference and provided the CED Board with an overview of the potential investment in the RoCa3 Transaction, along with management's recommendation and conditions for Board approval. (Ex. 396 at pages 8114-16)

The conditions for CED Board approval listed in the Investment Recommendation included the aspects of the proposed RoCa3 Transaction that would have to be met in order to obtain the CED Board's approval. (Ex. 396 at pages 8115-16; Tr. 792 (McCartney)) These conditions for Board approval included: (a) a

specified minimum return; (b) a specified maximum investment; (c) completion of a satisfactory engineering report; (d) completion of a satisfactory environmental report; (e) CED's not registering for political risk insurance for its equity investment with the Overseas Private Investment Corporation or with the Multilateral Investment Guarantee Agency; and (f) delivery of appropriate industry-standard legal and tax opinions. (Ex. 396 at pages 8115-16) The RoCa3 Transaction would not have closed without favorable engineering and environmental reviews. (Tr. 782-83 (McCartney); *see* Ex. 1 at pages 11-17)

Subject to the conditions listed in the Investment Recommendation, the CED Board approved CED's investment in the RoCa3 Transaction. (Tr. 792-93 (McCartney)) A signed approval of the investment recommendation document was not necessary; CED's official approval of the RoCa3 Transaction is reflected in the CED Board minutes. (Tr. 989-90 (McCartney); *see* Exs. 355, 155) The December 10, 1997 Investment Recommendation represented the culmination of the due diligence process, and along with the Project Briefing Memorandum and the Leasing White Paper, was considered in the Board's review process. (Tr. 793 (McCartney))

**VIII. The RoCa3 Transaction**

CED established Consolidated Edison Leasing, Inc. ("CEL") to enter into the RoCa3 Transaction. (Stip. ¶99) On December 12, 1997, CEL entered into a Trust Agreement with Wilmington Trust Company (the "Trustee") to act as trustee of the RoCa Facility Trust No. 2 (the "CEL Trust"), for CEL's benefit in the RoCa3 Transaction. (Stip. ¶102; Ex. 6 at pages 581, 607) CEL formed the CEL Trust in

order to enter into the Participation Agreement, the Sublease Agreement, the Lease Agreement and certain other Operative Documents in the RoCa3 Transaction. (Stip. ¶103) The role of the trust has no effect on the tax treatment of the RoCa3 Transaction, and CEL reported all of the CEL Trust's income and expenses as its own. (Stip. ¶103)

On December 15, 1997, EZH and CED, directly or through the CEL Trust, entered into the RoCa3 Transaction, along with third parties, by executing the Operative Documents. The primary Operative Documents include, among others, the Participation Agreement, Lease Agreement, Sublease Agreement, Loan & Security Agreement, Facility Operating Agreement, Common Facilities Use Agreement, Facility Support Agreement, and Access Agreement. (Stip. ¶104; Ex. 1 at page 145) The Operative Documents set forth the rights and obligations of the various parties. (Tr. 1096 (Holzman)) CED, with the assistance of Cornerstone and CED's domestic and international counsel, negotiated the Operative Documents with EZH. (Tr. 1096 (Holzman)) To simplify the discussion, CED, CEL and the CEL Trust will be referred to throughout this brief as CED, unless the context requires a distinction among them.

### A. The Participation Agreement

The Participation Agreement establishes the various parties' agreements to participate in the RoCa3 Transaction (Ex. 1 at page 9-11; Tr. 1108-09 (Holzman)) and many of their rights and obligations. (Tr. 1097-98 (Holzman))

### 1. Conditions Precedent to CED's Willingness to Close the RoCa3 Transaction

Through the Participation Agreement, CED set a number of conditions precedent to its participation in the RoCa3 Transaction. (Ex. 1 at pages 11-17; Tr. 1109 (Holzman)) Conditions precedent are common in leveraged lease transactions. (Tr. 3830 (Bent)) The conditions in the RoCa3 Transaction were the result of negotiations between CED and EZH. (Tr. 1113 (Holzman)) As Holzman explained at trial, satisfaction of these conditions assured CED that "entering into this transaction would be prudent." (Tr. 1109 (Holzman)) Had any of these conditions failed to be satisfied, CED would not have been willing to enter into the RoCa3 Transaction. (Tr. 1113 (Holzman); Tr. 782-83 (McCartney); Tr. 3831-32 (Bent); Tr. 2088-90 (DePlautt)) The conditions precedent included, but are not limited to:

- CED's receipt of a satisfactory report from Tauw (the environmental engineer). (Stip. ¶82) This is a common condition precedent in leveraged lease transactions of an asset like the RoCa3 Facility, used to assure the investor that it would not incur environmental obligations or liabilities (Tr. 3832 (Bent));
- CED's receipt of a satisfactory report from Duke Engineering (the engineering consultant). (Stip. ¶80; Tr. 1110 (Holzman) This type of condition precedent is common in leveraged lease transactions involving a large facility (Tr. 3831-32 (Bent));
- CED's receipt of a satisfactory appraisal from Deloitte (the appraiser) (Ex. 1 at page 12);
- EZH's acquisition of all necessary approvals, consents, permits, authorizations, rights, licenses and filings to assure CED that the rights and obligations granted to it through the transaction were legal, valid and binding (Ex. 1 at page 15; Tr. 1111 (Holzman));
- EZH's provision of plans and specifications of the Unit and Common Facilities that was satisfactory to CED (Ex. 1 at pages

15-16; Tr. 1112 (Holzman); Tr. 3832-34 (Bent)) Defendant's leasing expert Paul Bent testified that it is "not unusual" in leveraged leases of power plants, and it is "more common" where the plant is new, for an equity investor to require such plans and specifications (Tr. 3834); and

- EZH's provision of a description of the RoCa3 Facility and the site where the RoCa3 Facility is located that was satisfactory to CED. (Ex. 1 at pages 15-16) It is common for an investor to request a description of the facility site when the site is part of the facility. (Tr. 1112 (Holzman); Tr. 3834-35 (Bent))

### 2. Representations and Warranties EZH Made in Executing the Participation Agreement

EZH also made more than 10 pages of Representations and Warranties. (Ex. 1 at pages 27-38; Tr. 1114 (Holzman)) Representations and Warranties—such as those made in the RoCa3 Transaction—are common in leveraged leasing. (Tr. 3835-36 (Bent); Tr. 1125 (Holzman)) These Representations and Warranties reflect CED's due diligence with respect to the RoCa3 Transaction (Tr. 1124 (Holzman)) and were negotiated between the two parties to get both CED and EZH comfortable with entering into the RoCa3 Transaction. (Tr. 1125 (Holzman); Tr. 3835-36 (Bent)) For example, CED's right to use and access the Cooling Water Channel and Cooling Water Station to cool the unit, an issue Femke Bierman had raised on the site visit, was specifically addressed in the Representations.[23] (Tr. 1126 (Holzman); *see, e.g.*, Ex. 1 at pages 36-37) Although Representations and Warranties are routine, the RoCa3 Transaction, like every leasing transaction, had its Representations and

---

[23] For a detailed discussion of the November 11, 1997 site visit, see Facts Section VI.A.

Warranties customized because each asset is unique, asset locations differ, and the parties involved are different. (Tr. 1125 (Holzman))

According to Mintun, the Representations and Warranties were "all important" and there were "certain ones" that EZH and Capstar, EZH's financial advisor, "would look at very seriously." (Tr. 2914-15 (Mintun)) Any Representation and Warranty made by EZH that is materially untrue, inaccurate or misleading would constitute an event of default under the Sublease. (Ex. 4 at pages 422-23; Tr. 1119 (Holzman); Tr. 2919 (Mintun); *see, e.g.*, Tr. 3841 (Bent)) An event of default results from the occurrence of certain events under either the Lease (Ex. 2 at pages 334-37) or the Sublease. (Ex. 4 at pages 422-26) EZH's Representations and Warranties include the following:

- EZH represented that the RoCa3 Facility's technical information and operating data, EZH's financial information, and The Netherlands' electricity industry information provided to CED and its due diligence team did not contain any material fact that was untrue or omit any fact critical to CED's due diligence of the transaction. (Stip. ¶107(q); Ex. 1 at page 30; Tr. 1115, 1117-18 (Holzman); *see, e.g.*, Ex. 1 at pages 181-213) This is a common representation made in a leveraged lease transaction. (Tr. 3836 (Bent)) It was made to assure CED that EZH had sufficiently considered whether it had provided CED with accurate and complete information to enter into the RoCa3 Transaction. (Tr. 1116 (Holzman); Tr. 3836 (Bent) (testifying that this Representation means EZH "completely disclosed all pertinent information that would be required for [CED] to make an informed

decision in investing in the project")) Any inaccuracy contained in this information could affect the RoCa3 Facility's ability to operate, its value or its expected residual value and therefore cause EZH to be in default under the Sublease. (Tr. 1119 (Holzman)) EZH understood this and gave serious consideration to this Representation. (Tr. 2914-15 (Mintun))

- EZH represented that it owned and had the power to transfer its interests in the RoCa3 Facility. (Stip. ¶107(r); Ex. 1 at pages 30-31; Tr. 2915-16 (Mintun)) EZH's Dutch counsel was required to perform title searches and check with the land registry to make sure EZH had all the appropriate rights and that those rights were registered. (Tr. 2916 (Mintun))

- EZH represented that all of the Plans and Specifications made available to Duke Engineering were true, complete and accurate. (Stip. ¶107(gg); Ex. 1 at page 36; Tr. 1120-21 (Holzman)) CED and Duke Engineering needed to rely on this information to determine the exact nature of the rights CED was acquiring and to assure CED that the documents provided by EZH contained everything CED would need in connection with the RoCa3 Facility. (Tr. 1121 (Holzman); Tr. 2916-17 (Mintun)) This Representation also confirmed that the RoCa3 Facility's 220 MW electrical generating unit would be able to operate, on a continuing basis, at its functional capacity. (Stip. ¶107(gg); Ex. 1 at pages 36, 171; Tr. 1121 (Holzman); Tr. 2918-19 (Mintun)) Representations regarding a facility's capacity and functionality are "normal" in leveraged leases of power plants. (Tr. 3839 (Bent)) Any inaccuracy

in information furnished to Duke Engineering by EZH could affect the value of the RoCa3 Facility to CED. (Tr. 1121 (Holzman))

- EZH represented that the Access Agreement, the Facility Operating Agreement, the Common Facilities Use Agreement and the Facility Support Agreement (the "Control Documents") provided CED with access to and use of the RoCa3 Facility, including: the Unit, the Network, the Cooling Water Station, the Cooling Water Channel and the Common Facilities; the provision of gas and water by EZH; and, if needed, transmission services from the site to the high-voltage transmission grid following CED's taking possession after the Sublease terminates. (Stip. ¶107(ii); Ex. 1. at page 37) This too is a "typical" representation and warranty in a leveraged lease involving a power generation facility in which the Control Documents provided these rights to the investors. (Tr. 3840-41 (Bent)) Again, this Representation made by EZH, the operator of the RoCa3 Facility, provided CED with comfort that it was receiving the necessary rights to sell its portion of the RoCa3 Facility's output. (Tr. 1122-23 (Holzman))

- EZH further represented that it was not aware of any law that would prevent CED from being able to sell its share of the power produced by the RoCa3 Facility, and that CED could transmit its power over the high-voltage transmission grid at commercially reasonable wheeling rates or tariffs. (Stip. ¶107(ff); Ex. 1 at page 36; Tr. 1119-20 (Holzman)) Bent testified that this representation was "not unusual" for leveraged leases that included operation-related representations. (Tr. 3837-39 (Bent)) CED required these representations to ensure that it possessed the

necessary rights to operate the RoCa3 Facility for a profit upon the termination of the Sublease, whenever that may be. (Tr. 1123 (Holzman))

### B. Lease Agreement

Under the Lease, EZH conveyed to CED a Lease Interest in the RoCa3 Facility for the Lease Term of 43.2 years (December 15, 1997 through February 24, 2041). (Stip. ¶¶112, 113; Ex. 2 at pages 323-24; Ex. 1 at pages 121, 139, 171; Tr. 1102-03 (Holzman)) CED accepted delivery of its 47.468354430380% Undivided Interest in the RoCa3 Facility from EZH on December 15, 1997. (Stip. ¶¶113, 114)

#### 1. Payment of Lease Rent

On December 15, 1997, CED, via the CEL Trust, paid the Initial Basic Rent Payment of $120,112,270.36. (Stip. ¶¶116, 125, 127 and 128) This payment was made by combining CED's equity commitment payment of $39,320,000 (Stip. ¶117; *see* Exs. 365, 366, 874) with the $80,792,270.36 from Hollandsche Bank-Unie's ("HBU's") nonrecourse loan to CED. (Stip. ¶¶118, 119)

The Initial Basic Rent Payment was made by CED's transferring $39,320,000 of its own funds to an account, the WTC Account, and assigning its rights in the WTC Account to the CEL Trust. (Stip. ¶124; Ex. 874 at page 13712) HBU also transferred and assigned its rights in a funded account, the ABN Account, containing $80,792,270.36, to the CEL Trust. (Stip. ¶¶126, 127) The CEL Trust then paid the Initial Basic Rent Payment by transferring and assigning these two accounts to EZH. (Stip. ¶128) Together these two accounts total $120,112,270.36,

the Initial Basic Rent Payment due on December 15, 1997. (Stip. ¶¶116, 125, 127, 128)

CED anticipated that it would have to pay $4,125,000 in transaction fees to third parties. (*See generally* Ex. 333 at page 7257) These transaction fees together with CED's equity commitment increased CED's total investment amount to $43,445,000. (*See* Ex. 333 at pages 7256-57)

CED's Final Basic Rent Payment of $831,525,734 is due on February 24, 2041, the "Lease Termination Date." (Stip. ¶116; Ex. 2 at pages 351-52) The Final Basic Rent Payment and the potential ways CED could fund this payment are discussed below at Facts Sections VII.E.2.d. and VII.E.3.b.

### 2. CED's Rights and Obligations Under the Lease Agreement

During the Lease Term, EZH is prohibited from interfering with CED's rights of possession, use and quiet enjoyment of the Undivided Interest. (Ex. 2 at page 331) Any interference with these rights constitutes an event of default under the Lease Agreement (Stip. ¶133(a)), allowing CED to exercise its remedies provided by the Lease. (Stip. ¶133(k), (l)) CED may also sublease or sell its Undivided Interest in the RoCa3 Facility without EZH's consent. (Ex. 2 at page 333)

On the other hand, CED has a number of obligations with which it must comply during the Lease Term, relating to things such as maintenance and insurance. CED is required to maintain and repair the RoCa3 Facility at its own expense, unless the Sublease is in effect. (Stip. ¶115; Ex. 2 at page 332) This exception for the Sublease Term ensures that EZH's failure to maintain the RoCa3

Facility under the Sublease could not result in CED's being placed in default under the Lease. (Tr. 3893-94 (Bent)) It would not make any sense to allow an EZH default under the Sublease to result in a CED default under the Lease, thereby allowing EZH to profit from its own default. (Tr. 3894 (Bent))

Following the termination of the Sublease, CED is responsible for the maintenance of the RoCa3 Facility, unless the Facility Operating Agreement is in effect. (Ex. 2 at page 332) In general, a leveraged lease of a facility that involves multiple parties, like the RoCa3 Facility, usually has an operating agreement that controls the facility's operations. (Tr. 1394-95 (Holzman)) Similar to the exception for the Sublease Term, the Facility Operating Agreement exception prevents the Operator's[24] failure to maintain the RoCa3 Facility under the Facility Operating Agreement from resulting in CED's default under the Lease Agreement. (*See* Ex. 2 at page 332; Tr. 3893-94 (Bent)) In addition, as long as the Facility Operating Agreement is in effect, the Operator will be responsible for maintaining the RoCa3 Facility (Ex. 2 at page 332; Ex. 11 at pages 742-43), and CED is obligated to pay the Operator for CED's portion of the maintenance expenses. (Ex. 11 at pages 749-50; Tr. 3902-04 (Bent); Tr. 1186-87 (Holzman))

### C. HBU's Nonrecourse Loan to CED

In all leveraged lease transactions, nonrecourse debt is used by the equity investor, together with its own equity funds, to acquire its interest in the leased asset. (Tr. 1007-08 (Holzman); Tr. 3127 and 3174-75 (Ellis); Tr. 3866 (Bent); Tr.

[24] EZH was appointed the initial Operator under the Facility Operating Agreement, but EZH can be removed as such for various reasons. (*See* Ex. 11 at pages 736-37)

4879-80 (Ray)) For a leveraged lease to qualify for leveraged lease accounting under FAS 13, the equity investor is required to leverage its investment with nonrecourse debt. (Tr. 3174-75 (Ellis); *see also* Facts Section VI.F.) In the RoCa3 Transaction, HBU provided the $80,792,270.36 nonrecourse loan to CED. (Stip. ¶118) HBU is regularly engaged in banking, and its loan in the RoCa3 Transaction was in the ordinary course of its business. (Stip. ¶132) HBU represented that its day-to-day operations are separate from ABN AMRO Bank N.V., although HBU is an ABN AMRO subsidiary. (Stip. ¶¶131, 132; Ex. 1 at page 42)

**1. Percentage of Purchase Price Covered by the Nonrecourse Loan**

In a leveraged lease, the equity investor takes out a nonrecourse loan to facilitate its investment. (Tr. 3866 (Bent); Tr. 1007-08 (Holzman)) It is standard practice in the leveraged leasing industry for the lender to finance up to 80% of the purchase price with nonrecourse debt. (Tr. 3866-67 (Bent)) In the RoCa3 Transaction, CED's equity investment was about one-third of the price paid at closing to obtain the Lease Interest, which according to Defendant's leasing expert Bent, was "more equity than I have seen in many other leveraged leases." (Tr. 3867-68)

**2. Repayment of the Nonrecourse Loan**

CED, as the borrower, is obligated to make the following debt service payments on the HBU loan:

| | |
|---|---|
| 1/2/2004 | $ 8,330,120.01 |
| 1/2/2005 | $ 8,999,161.52 |
| 1/2/2006 | $ 8,999,161.52 |

| | |
|---|---|
| 1/2/2007 | $ 8,999,161.52 |
| 1/2/2008 | $ 8,964,978.83 |
| 1/2/2009 | $ 7,358,487.86 |
| 1/2/2010 | $ 7,362,962.76 |
| 1/2/2011 | $ 7,362,950.30 |
| 1/2/2012 | $ 7,362,950.33 |
| 1/2/2013 | $ 7,362,950.33 |
| 1/2/2014 | $ 7,362,950.33 |
| 1/2/2015 | $ 7,362,950.33 |
| 1/2/2016 | $ 7,362,950.33 |
| 1/2/2017 | $ 7,362,950.33 |
| 1/2/2018 | $ 7,362,950.33 |
| 1/2/2019 | $18,225,000.00 |
| 1/2/2020 | $18,225,000.00 |
| 1/2/2021 | $18,225,000.00 |
| 1/2/2022 | $18,225,000.00 |
| 1/2/2023 | $18,225,000.00 |
| 1/2/2024 | $18,225,000.00 |
| 1/2/2025 | $18,225,000.00 |
| 1/2/2026 | $18,225,000.00 |
| 1/2/2027 | $14,546,488.08 |

(Stip. ¶167; Ex. 8 at page 666) A variety of events, including a Premature Termination Event, as defined below in Facts Section VIII.D.5., or CED's election of the Retention Option at the end of the Sublease Basic Term in 2018, would cause CED to be required to prepay the nonrecourse loan. (Ex. 7 at pages 622-23)

**a. HBU's Receipt of a Security Interest**

As security for prompt payment of principal and interest on its nonrecourse debt, CED assigned to HBU a mortgage interest in and a lien (the "Lien of the Loan Agreement") on the Lease, the Sublease, all rents, profits, revenues and other income from the property subjected to the Lien of the Loan Agreement, and CEL Trust's right to receive rent from EZH. (Stip. ¶194A ; Ex. 7 at pages 613-14) It is typical in a leveraged lease for the nonrecourse loan to be secured by a security

interest in the asset and the rentals owed to the equity investor. (Tr. 1258-59, 1270 (Holzman); Tr. 3174-75 (Ellis))

**b. Sublease Rents Paid Directly to HBU**

CED directed EZH to pay its Sublease rental obligations, except for certain excluded payments, directly to HBU. (Stip. ¶194A; Ex. 7 at page 619) As Defendant's leasing expert Bent testified, in leveraged lease transactions it is typical for rentals paid by a sublessee to go directly to the lender until the debt is retired. (Tr. 3709-10, 3871-72) This is because most leveraged lease transactions are typically structured so that the amount and timing of rent a sublessee, here EZH, is required to pay is the same as the amount and timing of the sublessor's (CED's) debt service payments until the nonrecourse debt is retired.[25] (Tr. 3743, 3869-71 (Bent); Tr. 4719-20 (Ray)) One reason for this is to prevent the sublessor (CED) from having to contribute additional equity funds to the transaction. (Tr. 3870 (Bent))

**c. The Nonrecourse Provision**

HBU's remedy for a default on the HBU Loan is limited to the principal and interest payments from the income and proceeds from the collateral, described above, with respect to which HBU received its security interest. (Ex. 7 at pages 618-19)

[25] In addition to these payments, EZH is scheduled to owe CED $5,220,970 in 2012, which will not be used for debt service. (*See* Ex. 333 at pages 7252, 7255)

### D. Sublease Agreement

The Sublease sets out the terms and conditions relating to CED's sublease of its Undivided Interest in the RoCa3 Facility to EZH. (Tr. 1103 (Holzman)) CED subleased the Undivided Interest in the RoCa3 Facility to EZH for a period of 20.1 years (the "Sublease Basic Term"), from December 15, 1997 through January 2, 2018 (the "Sublease Basic Termination Date"), which is 46.5278% of the Lease Term. (Stip. ¶135; Tr. 1130 (Holzman)) EZH's continued possession and use of the RoCa3 Facility under the Sublease is conditioned upon EZH's not being in default under the Sublease. (*See* Ex. 4 at pages 126-31)

On January 2, 2018, there are a number of options including, among others, the Sublease Renewal Option, whereby CED can cause EZH to renew the Sublease for another 16.5 years (the "Sublease Renewal Term"), from January 2, 2018 through June 15, 2034. (Stip. ¶136; Tr. 1130-31 (Holzman)) The combined length of the Sublease Basic Term and the Sublease Renewal Term is 84.7222% of the Lease Term. (Stip. ¶136)

#### 1. EZH's Obligations and Limitations Under the Sublease Agreement

By subleasing the Undivided Interest in the RoCa3 Facility from CED, EZH committed itself to perform a number of obligations, such as paying rent and maintaining the facility, in accordance with the terms and the standards set forth in the Sublease. (*See, e.g.*, Ex. 4 at pages 389, 399, 417) Limitations are also placed on EZH's use and possession of CED's Lease Interest in the RoCa3 Facility. (*See, e.g.*, Ex. 4 at pages 406, 418) EZH's failure to comply with its obligations and

limitations during the Sublease Term would result in an event of default under the Sublease (*See* Ex. 4 at page 422), entitling CED to exercise its remedies provided under the Sublease. (Ex. 4 at pages 426-31) All payments EZH has to make under the Sublease are to be made in U.S. dollars, but in 1997, EZH's functional currency was the Dutch Guilder ("NLG"). (Stip. ¶191)

### 2. Sublease Rents

During the Sublease Term, EZH is required to pay annual rents every January 2 throughout the Sublease Basic Term, from 1998 through 2018. (Ex. 4 at pages 389, 541-42; Tr. 1130 (Holzman); Tr. 3843 (Bent); *see* Stip. ¶¶139 and 140) If CED exercises the Sublease Renewal Option in 2018, EZH will continue to pay CED annual rents every January 2 throughout the Sublease Renewal Term, from 2019 through 2034, with a final Sublease rental payment due on June 15, 2034. (Ex. 4 at page 542) EZH did not prepay any of the scheduled Sublease rents. (Tr. 1132 (Holzman)) EZH's obligation to pay Sublease rent is absolute and unconditional; it is not subject to abatement, setoff, deduction or reduction. (Stip. ¶142; Ex. 4 at page 432; Tr. 1132-33 (Holzman); Tr. 2927 (Mintun)) EZH's failure to pay timely rents would constitute an event of default under the Sublease, entitling CED to exercise its remedies under the Sublease. (Ex. 4 at pages 422, 426-31; Tr. 1133 (Holzman); Tr. 2938-39 (Mintun))

During the Sublease Basic Term, EZH is required to pay annual rents to CED as follows:

| Date | Scheduled Sublease Rents |
|---|---|
| Dec 15, 1997 | $ 0.00 |
| Jan 2, 1998 | 424,960.41 |
| Jan 2, 1999 | 8,999,161.52 |
| Jan 2, 2000 | 8,999,161.52 |
| Jan 2, 2001 | 8,999,161.52 |
| Jan 2, 2002 | 8,999,161.52 |
| Jan 2, 2003 | 8,999,161.52 |
| Jan 2, 2004 | 8,999,161.52 |
| Jan 2, 2005 | 8,999,161.52 |
| Jan 2, 2006 | 8,999,161.52 |
| Jan 2, 2007 | 8,999,161.52 |
| Jan 2, 2008 | 8,964,978.83 |
| Jan 2, 2009 | 7,358,487.86 |
| Jan 2, 2010 | 7,362,962.76 |
| Jan 2, 2011 | 7,362,950.30 |
| Jan 2, 2012 | 7,362,950.33 |
| Jan 2, 2013 | 7,362,950.33 |
| Jan 2, 2014 | 7,362,950.33 |
| Jan 2, 2015 | 7,362,950.33 |
| Jan 2, 2016 | 7,362,950.33 |
| Jan 2, 2017 | 7,362,950.33 |
| Jan 2, 2018 | 7,362,950.33 |

(Stip. ¶139; Ex. 4 at page 445) Should CED elect the Sublease Renewal Option in 2018 (which is discussed in detail below), EZH would continue to owe Sublease rental payments ("Sublease Renewal Rents"). (Stip. ¶140; Ex. 4 at page 446)

**a. It Is Standard Leasing Practice for Sublease Rentals and Debt Service Payments to Be Equal in Timing and Amount**

The Sublease rental payment amounts EZH owes to CED equal CED's debt service on the HBU Loan from 2005 until it matures in 2027. (Compare rents listed above to CED's debt service obligations in Facts Section VIII.C.2.) Bent testified that it is "typical" in leveraged leases for the sublessee's rental payments to be "exactly equal to the [equity investor's] debt service" payments and for those to

occur on the same dates. (Tr. 3868-72, 3800-01 (Bent); *accord* Tr. 4719-20 (Ray)) Defendant's other leasing expert Samuel Ray furthered this point by testifying that "in most cases" the sublease rental in a leveraged lease "all goes to[ward] debt service" so that the equity investor "doesn't get any cash rentals" until the debt is retired. (Tr. 4719-20 (Ray); *accord.* Tr. 3869 (Bent))

**b. Establishment of the Sublessee Loan**

EZH requested and CED agreed (Ex. 44 at pages 1447-48) to allow EZH to defer making the following Sublease rental payments:

| Date | Scheduled Sublease Rents |
|---|---|
| Jan 2, 1998 | $ 424,960.41 |
| Jan 2, 1999 | 8,999,161.52 |
| Jan 2, 2000 | 8,999,161.52 |
| Jan 2, 2001 | 8,999,161.52 |
| Jan 2, 2002 | 8,999,161.52 |
| Jan 2, 2003 | 8,999,161.52 |
| Jan 2, 2004 | 669,041.51 |

(*See* Stip. ¶262; *see also* Ex. 44 at pages 1447-48) These deferred rental payments create the principal of the Sublessee Loan, the balance of which accrues interest at a fixed rate of 7.43%. (Stip. ¶261; Ex. 44 at page 1449) EZH owes the following scheduled payments on the Sublessee Loan:

| Date | Scheduled Sublessee Loan Payments |
|---|---|
| Jan 2, 2012 | $ 5,220,969.87 |
| Jan 2, 2018 | 37,525,237.44 |
| Jan 2, 2032 | 9,649,098.15 |
| Jan 2, 2033 | 12,062,039.15 |
| Jan 2, 2034 | 9,720,944.16 |
| Jun 15, 2034 | 5,238,696.07 |
| Jan 2, 2035 | 5,319,460.91 |
| Jan 2, 2036 | 1,155,324.82 |

| | |
|---|---|
| Jan 2, 2041 | 93,128.382.58 |
| Feb 24, 2041 | 414,931,341.27 |

(Ex. 44 at pages 1478-79) EZH provided a promissory note in favor of CED to confirm its obligation to pay principal and interest on the Sublessee Loan. (Ex. 44 at page 1448) All Sublessee Loan payments EZH owes are in U.S. dollars. (Ex. 44 at page 1449; Ex. 1 at page 124)

In leveraged lease transactions, deferred rental payments sometimes occur. (Tr. 3842-43 (Bent)) Bent testified that he has "done deals where rent is deferred" (Tr. 3843 (Bent)), and in those deals the sublessee is paying the deferred rents with an IOU rather than cash. (*Id.*) The IOU does not cancel a sublessee's otherwise-existing obligation for the payment of rent; that obligation continues and must be paid later. (*Id.*) In the RoCa3 Transaction, the Sublessee Loan is the equivalent of an IOU that EZH eventually must pay. (*Id.*)

### 3. EZH's Collateral Accounts

EZH established two collateral accounts, the Sublease Deposit and the IJssel Deposit, as security for certain of its payment obligations under the Sublease. (Tr. 1161-62 (Holzman))

#### a. Defeasances Are Used in Financial and Leasing Transactions

Defeasance involves the establishment of an account to fund an obligor's future obligation, thereby reducing the risk of nonpayment. (Ex. 10073 (Ellis Initial Report) at page 20001; Tr. 3184-85, 3203 (Ellis); Tr. 3734 (Bent)) Defeasances are similar to sinking funds and reserve accounts in that each of these mechanisms

mitigates future payment risks by the obligor, *e.g.*, an insurance company with respect to a claim. (Ex. 10073 (Ellis Initial Report) at page 20001; Tr. 3199-203 (Ellis); *see also* Ex. 20193 (Bent Initial Report) at page 25060 (and identical language in Ex. 20195 (Ray Initial Report) at page 25180)) Defeasance accounts are used in financial transactions such as corporate bonds, municipal bonds and securitized assets. (Ex. 10073 (Ellis Initial Report) at page 20001; Tr. 3760-61 (Bent); Tr. 4940-41 (Ray))

Bent testified that defeasance is "a common mechanism" in leases and other financing transactions. (Tr. 3760-61 (Bent); Tr. 4940 (Ray); Tr. 3199-203 (Ellis)) Defeasances are employed in cross-border transactions to protect against the sublessor's inability to recover funds due to jurisdictional or currency reasons (Tr. 3819-3820 (Bent)), and are especially used in long-term transactions. (Ex. 20193 (Bent Initial Report) at page 25061; Ex. 20195 (Ray Initial Report) at page 25180; Tr. 4941 (Ray)) Bent further testified that a sublessee may have an "interest in establishing a defeasance account" because, by receiving security, the nonrecourse loan lender will charge a lower interest rate on the loan. (Tr. 3820 (Bent); Ex. 10073 (Ellis Initial Report) at page 20001)) This will reduce the amount of the rental payments the sublessee will have to make. (*See* Ex. 10073 (Ellis Initial Report) at page 20001)

Defeasances are similar to other payment support instruments such as guarantees, financial insurances and credit default swaps ("CDS") (Tr. 3203, 3277-81 (Ellis)) because these instruments provide the purchaser of a fixed income

instrument with insurance against a default by the issuing entity. (Ex. 10078 (Ellis Rebuttal Report) at page 20362; Tr. 3277 (Ellis)) Financial guarantees are universally used in financial transactions around the world. (Ex. 10078 (Ellis Rebuttal Report) at pages 20361-62)) Similarly, the CDS market is a $20 trillion dollar market—over 60% of this market involves insuring obligations of entities with credit ratings of A, AA and AAA. (Ex. 10078 (Ellis Rebuttal Report) at page 20363; Tr. 3277-80 (Ellis)) The cost of a CDS reflects the price one has to pay to substitute the credit risk of one entity for that of another, and this cost is a quantification of the substituted entity's default risk. (Ex. 10078 (Ellis Rebuttal Report) at page 20362; Tr. 3458-59 (Ellis)) For example, Bank of America is a AA rated entity, yet it cost 53.144 basis points (a basis point is 1/100th of a percent) per annum for a ten-year period to ensure against Bank of America's defaulting on a specific payment obligation. (Ex. 10078 (Ellis Rebuttal Report) at page 20363; Tr. 3281 (Ellis)) Thus, to insure against Bank of America's defaulting on a $100 million obligation, it would cost $531,440 per year for 10 years. (Tr. 3281 (Ellis); *see* Ex. 10078 (Ellis Rebuttal Report) at page 20363) In fact, in 1997, ABN AMRO, the bank in which the Sublease Deposit is held, had an AA credit rating. (Tr. 3283 (Ellis))

**b. EZH Remains Liable for All of Its Sublease Payment Obligations**

EZH is responsible for making all rental payments under the Sublease. (Ex. 4 at page 432) Bent testified that this provision is referred to as a "hell or high water provision" because EZH is obligated to pay rent "regardless of any other circumstances with no offsets, no contingencies, no other factors that would prevent

it from paying rent. " (Tr. 3864-65 (Bent)) Bent further testified that hell or high water provisions are "quite typical" in leveraged leases and that he had "never done any kind of lease that's not a hell or high water lease." (Tr. 3864 (Bent))

Significantly, EZH remains liable for all of its payment obligations under the Sublease, regardless of its funding of the Sublease Deposit (*see* Stip. ¶200; Ex. 23 at page 1066) or its funding of the IJssel Deposit. (Stip. ¶217; Ex. 19 at page 972) In fact, should EZH fail to make any payment as required by the Sublease or Sublease Loan Agreement, EZH would be in default under the Sublease, entitling CED to exercise its remedies thereunder. (Ex. 4 at pages 422, 426-31)

### c. The Sublease Deposit and IJssel Deposit Are Economic Defeasances

Defeasance accounts have been the subject of financial analysis by the accounting profession. (*See generally* FAS 125; Tr. 3187-88 (Ellis)) The Financial Accounting Standards Board ("FASB") issues guidance on financial accounting treatment, including defeasances. (Tr. 3187-88 (Ellis)) In 1997, Financial Accounting Statement ("FAS") 125 contained guidance on the financial reporting of defeasances. (Tr. 3187-88 (Ellis)) FAS 125 separated defeasances into (a) legal defeasance, and (b) in-substance defeasance, which is also referred to as economic defeasance. (Tr. 3188-89 (Ellis)) Legal defeasance is where the obligor extinguishes its obligation to pay a liability owed to another and removes the liability from its financial statements. (Tr. 3188-89 (Ellis)) In economic defeasance, on the other hand, the obligor mitigates the economic impact of its payment obligation by placing

securities into an account established to repay that obligation (Tr. 3188 (Ellis)), but the obligor cannot remove the obligation from its books. (Tr. 3188-89 (Ellis))

Here, EZH cannot remove any of its obligations from its books under FAS 125 because (1) the IJssel Deposit and Sublease Deposit are economic defeasances and the obligor remains liable for the repayment of the obligation if the funds in the defeasance account prove to be insufficient (Tr. 3190-91 (Ellis)), (2) the obligees (CED and HBU) are not limited to seeking repayment from the funds in the defeasance account (Tr. 3191-94 (Ellis)), (3) any extra funds in the deposits remain the property of the obligor (EZH) (Tr. 3195-96 (Ellis)), and (4) the obligees are not part of the establishment of the defeasance accounts, as they only hold a security interest in the trust's assets. (Tr. 3196-97 (Ellis))

Since the close of the RoCa3 Transaction, FAS 125 was supplemented by FAS 140, which left the pertinent FAS 125 provisions intact without modification. (Tr. 3198 (Ellis))

#### d. Benefits of the Sublease Deposit and IJssel Deposit

##### (i) EZH's Benefits

EZH benefited from its establishment of the Sublease Deposit and IJssel Deposit, including by mitigating its currency risk and interest rate risk.

- Currency risk. Under the Sublease, all payments EZH owes to CED are to be made in U.S. dollars, yet EZH's functional currency was in Guilders (currently in Euros). (Stip. ¶191; Tr. 3205-06 (Ellis)) Because of this, EZH is exposed to currency exchange fluctuations. (Tr. 3178 (Ellis); Tr. 5163 (LaRue)) If the

dollar were to increase relative to the Dutch Guilder (now the Euro), EZH's economic benefit will decrease because EZH's cost in making Sublease rental payments has increased. (Ex. 10073 (Ellis Initial Report) at page 20000) EZH's establishment of U.S. dollar-denominated economic defeasance accounts (Stip. ¶¶191, 215; Ex. 24 at page 1088; Ex. 23 at page 1071; Ex. 19 at page 978; Tr. 3205-06 (Ellis)) to securitize its future dollar-denominated payments mitigated the currency risk it had with these future payment obligations. (Tr. 3205-06 (Ellis); Tr. 4810-02, 4809 (Ray)) Without establishing these accounts, there was a very real risk of currency fluctuations eroding EZH's economic benefits from the RoCa3 Transaction. (Ex. 10073 (Ellis Initial Report) at page 20000; Tr. 5163 (LaRue))

- Interest Rate Risk. Changes in interest rates can also affect a sublessee's economic benefit it receives from a leveraged lease transaction. (Ex. 10073 (Ellis Initial Report) at page 20000) Unless the funds a sublessee receives by entering into a sale-leaseback or lease-leaseback is invested at a fixed rate, the rate that the sublessee will earn on these funds is uncertain. (Ex. 10073 (Ellis Initial Report) at page 20000; Tr. 3205-06 (Ellis)) This uncertainty can erode the sublessee's economic benefit from the leasing transaction: the return on invested funds could be insufficient to cover its potential future payment obligations. (Ex. 10073 (Ellis Initial Report) at page 20000) In the RoCa3 Transaction, EZH mitigated this interest rate risk by establishing the Sublease Deposit and IJssel Deposit. (Tr. 3205-06 (Ellis)) However, as discussed below, the Sublease Deposit and

IJssel Deposit do not eliminate EZH's interest rate risk should a Premature Termination Event occur. (Tr. 3206-07 (Ellis); *see* Facts Section VIII.D.5.)

**(ii) CED's Benefits**

The establishment of the Sublease Deposit and IJssel Deposit mitigated CED's exposure to credit risk, *i.e.*, the risk that EZH would not make its payment obligations under the Sublease. (Tr. 1050-51 (Holzman); Tr. 3206-10 (Ellis); Tr. 3819-20 (Bent); *see* Ex 10078 (Ellis Rebuttal Report) at pages 20361, 20366) However, these accounts do not eliminate CED's exposure to credit risk. (Tr. 1050-51 (Holzman); Tr. 3203-04 (Ellis); Tr. 3737 (Bent)) The establishment of a defeasance account allows CED to substitute its exposure to EZH's credit for the defeasance account holder's credit. (Tr. 4915-17 (Ray)) In leveraged lease transactions, a sublessor, like CED, can face a material amount of risk even where the party responsible for making payments has exceptionally good credit—such as an A, AA or AAA-rated bank. (Tr. 4917-19 (Ray))

The Sublease Deposit also decreases the payment risk that the nonrecourse lender faced in the RoCa3 Transaction. (Ex. 10073 (Ellis Initial Report) at page 20001; Tr. 3820 (Bent))

**e. The Sublease Deposit**

Prior to the close of the RoCa3 Transaction, EZH established Stichting Rotte (also referred to as the "Rotte Foundation") to make deposits and grant security interests in its assets for the purpose of securing EZH's payment obligations under the Sublease and other Operative Documents. (Stip. ¶185) Neither CED nor any of

its affiliates were a party to the creation of Stichting Rotte. (*See* Ex. 30 at pages 1226-32) Stichting Rotte's managing board is comprised of three members, an EZH employee and two trust companies. (Stip. ¶186) Thus, EZH and the two trust companies control the Rotte Foundation's managing board. (*See* Stip. ¶186)

On December 15, 1997, EZH transferred $80,792,270.36 to Stichting Rotte by way of assignment and transfer of its rights in the ABN Account (Stip. ¶187) that the CEL Trust had assigned to EZH. (Stip. ¶128) Stichting Rotte used these funds to establish the Sublease Deposit, a deposit account held by ABN AMRO. (Stip. ¶¶187, 189) However, ABN AMRO cannot use the Sublease Deposit to set off any amount or obligation owed to it by HBU, Stichting Rotte, EZH or the Trustee. (Stip. ¶202)

**(i) Sublease Deposit Payments, Limitations on Payments and Termination**

Payments from the Sublease Deposit are scheduled to cover the debt portion of any EZH payment due under the Sublease. (*See* Stip. ¶¶197, 199; Ex. 1 at page 123) The debt portion is the fixed amount of each payment that EZH owes under the Sublease, which covers the principal and interest on the nonrecourse loan associated with the payment, until the debt is retired. (*See* Stip. ¶199; Ex. 23 at pages 1077, 1078) For example, on January 2, 2006, EZH owed CED a Sublease rental payment of $8,999,161.52, CED owed a debt service payment of $8,999,161.52 (Ex. 8 at page 666), and the Sublease Deposit was scheduled to make a payment of $8,999,161.52. (Stip. ¶197) The Sublease Deposit is owned by EZH, as EZH can use the deposit to pay a portion of its payment obligations under the

Sublease. (Stip. ¶139; Tr. 1161 (Holzman); Tr. 3197-98 (Ellis); Tr. 2255-58 (DePlautt); Tr. 3805-06 (Bent, agreeing that any payment from the Sublease Deposit is a "transfer of wealth on behalf of EZH"); *see* Stip. ¶¶195, 196)

Regardless of EZH's establishment of the Sublease Deposit, payments from the Sublease Deposit are limited to the amount of the deposit (Stip. ¶192), and EZH remains liable for all payments it may owe under the Sublease should the Sublease Deposit prove to be insufficient. (Stip. ¶200; Tr. 3191-94 (Ellis)) After the nonrecourse debt has been repaid, the remaining funds in the Sublease Deposit will be returned to EZH. (*See* Stip. ¶204; Ex. 23 at page 1068; Ex. 24 at page 1087; Tr. 3951-52 (Bent)) For example, if CED was to elect the Retention Option in 2018, the Sublease Deposit amount (scheduled to equal $123,615,472.00 at that time) would be returned to EZH free from any obligations owed to any other party in the RoCa3 Transaction. (*See* Stip. ¶251; Tr. 5255 (LaRue)) Thus, EZH receives an economic benefit from the Sublease Deposit. (Tr. 3195-98 (Ellis))

**(ii) Sublease Deposit Security Interests**

EZH granted CED a first-priority security interest in the Sublease Deposit as security for EZH's rental payments or other payments due under the Sublease. (Stip. ¶193) CED repledged its security interest in the Sublease Deposit to HBU as security for CED's debt service payments on the nonrecourse loan. (Stip. ¶194) HBU cannot use the Sublease Deposit as a setoff against EZH or the Rotte Foundation. (Stip. ¶203)

**f. The IJssel Deposit**

Prior to entering into the RoCa3 Transaction, EZH established Stichting IJssel (also referred to as the "IJssel Foundation") for the purpose of purchasing debt instruments, making deposits and granting security interests related to certain payment obligations under the Sublease and other Operative Documents. (*See* Stip. ¶209, Ex. 29) Neither CED nor any of its affiliates were a party to the establishment of Stichting IJssel. (*See* Ex. 29) Stichting IJssel's managing board is comprised of three members, an EZH employee and two trust companies. (Stip. ¶206) EZH and the two trust companies control Stichting IJssel. (Ex. 29 at page 1210-11)

To secure a portion of its payments due under the Sublease and the other Operative Documents, EZH transferred $31,252,643.73 to Stichting IJssel (Stip. ¶208; Ex. 872) to be used to purchase U.S. Government Obligations. (Stip. ¶208) This was accomplished in three steps. On December 16, 1997, the day after closing, EZH and Credit Suisse First Boston ("CSFB") agreed that CSFB would purchase the U.S. Government Obligations. (Ex. 43 at page 1426) EZH caused $31,252,643.73 to be transferred to Stichting IJssel by way of transferring to it a custody account, with CSFB as custodian and held at Citibank, New York, with a balance of $31,252,643.73. (Stip. ¶209) On December 17, 1997, two days after closing, CSFB used the funds to purchase the following fixed-rate zero coupon U.S. Government Obligations, U.S. Treasury STRIPs ("STRIPs") (Ex. 43 at page 1426; Stip.¶¶211, 212):

| CUSIP No. | Maturity Date | Amount at Maturity |
|---|---|---|
| 912833JX9 | Nov. 15, 2011 | $ 5,221,000.00 |
| 912833KN9 | Aug. 15, 2017 | $ 7,363,000.00 |
| 912833KQ2 | Feb. 15, 2018 | $22,959,000.00 |
| 912833KR0 | May 15, 2018 | $22,959,000.00 |
| 912833KS8 | Aug. 15, 2018 | $22,959,000.00 |
| 912833KT6 | Nov. 15, 2018 | $22,959,000.00 |

(Stip. ¶212; Ex. 373 at page 7707) These U.S. Treasury STRIPs constitute the IJssel Deposit. (Stip. ¶214; Tr. 1162 (Holzman))

### g. The Correlation of the Value of a STRIP to Interest Rates

A STRIP is a zero-coupon note that requires the United States to make a one-time payment at a specific future date, the maturity date. (Tr. 1163 (Holzman); Tr. 3214 (Ellis)) No payments are made during the term of the note. (Tr. 1163 (Holzman); Tr. 3214 (Ellis)) There is an inherent interest rate paid on a STRIP since it is purchased at a discount from its maturity date value; the difference between the maturity date value and the purchase price, divided by the term of the STRIP constitutes the interest rate inherent in the instrument. (Tr. 1163-64 (Holzman)) The current value of a STRIP on any given date is determined by comparing its yield to maturity against current market interest rates. (Tr. 3214-15 (Ellis)) Hence, like all fixed-rate debt instruments, the value of a STRIP during its term (prior to maturity) is inversely related to changes in interest rates. (Tr. 1164 (Holzman); Tr. 3215-16 (Ellis)) For example, if the current market interest rate exceeds the inherent interest rate on the STRIP, the value of the STRIP will decrease. (Tr. 1164 (Holzman); *see* Ex. 10078 (Ellis Rebuttal Report) at page 20364)

Because market interest rates dictate the value of a STRIP during its term, the value of the STRIP at any future date, except at maturity, is unknowable. (Tr. 1165-66 (Holzman)) For example, in 1997 one could not know the value of the STRIPs in the IJssel Deposit as of January 2003. (Tr. 1165 (Holzman))

A STRIP's value is more sensitive to interest rate changes than interest-paying debt instruments because a STRIP has only one lump sum payment, which constitutes a return of principal and a one-time payment of the inherent interest on the STRIP. (Ex. 10073 (Ellis Initial Report) at page 20008; Tr. 1164 (Holzman); Tr. 3223 (Ellis)) Ellis prepared a table showing the IJssel Deposit's sensitivity to interest rate changes on each December 17, from 1997 through 2017. (Ex. 10073 (Ellis Initial Report) at page 20037; Tr. 3218-25 (Ellis)) For example, on December 17, 2002, the IJssel Deposit's total value could increase or decrease 14.6995% if, as of that date, interest rates differed by 1% from the inherent rate on STRIPs. (Ex. 10073 (Ellis Initial Report) at page 20037; Tr. 3224-25 (Ellis)) In dollars, as of December 17, 2002, a positive 1% change in interest rates would result in the IJssel Deposit's total value decreasing by $15,349,213. (Tr. 3228 (Ellis); *see* Ex. 10073 (Ellis Initial Report) at page 20037) Thus, any interest rate change from the original purchase date interest rate would cause the value of the IJssel Deposit to change. (*See*, *e.g.*, Ex. 10073 (Ellis Initial Report) at page 20037) This risk is borne by EZH, as it established the deposit and because the proceeds secure EZH's obligations. (Tr. 3228 (Ellis); Tr. 5182-83 (LaRue); Tr. 1167-68, 1175 (Holzman))

### h. Payments from the Sublease Deposit and the IJssel Deposit

Stitching IJssel agreed to make certain payments on all or part of the equity portion of a payment that EZH owes under the Sublease Agreement, including Sublease Rents. (Ex. 19 at page 972) The equity portion of a payment is the amount of any payment in excess of the debt portion (Ex. 1 at page 126), which, as described above, is the portion of any payment EZH owes under the Sublease Agreement that is designated to service the nonrecourse debt.[26] Any payment that Stitching IJssel makes is limited to the value of the IJssel Deposit (Stip. ¶216), and EZH remains liable for all payments it owes under the Sublease. (Stip. ¶217) After the Sublease has terminated and EZH has paid all payments it owes under the Sublease, EZH may terminate the IJssel Agreement and cause Stichting IJssel to return all of the security in the IJssel Deposit to EZH. (Stip. ¶225)

As security for its payment obligations, Stichting IJssel granted CED a first priority security interest in the IJssel Deposit. (Stip. ¶218; Tr. 1162-63 (Holzman))

### 4. EZH's Maintenance, Insurance and Use of the RoCa3 Facility

### a. Maintenance

The Sublease Agreement imposes a number of maintenance obligations and standards upon EZH. (Ex. 4 at pages 399-406) All leveraged leases place the obligation to maintain the asset on the sublessee (here, EZH) (Tr. 3850 (Bent)), and

---

[26] The Debt Portion of these payments are set out in Annex B to the Rotte Agreement. (Ex. 23 at pages 1076-83)

none of the maintenance provisions the Sublease imposes on EZH are atypical. (Tr. 3849 (Bent))

The maintenance provisions deal with issues such as maintenance and repair, as well as modification of the facility and replacement of parts. (Ex. 4 at pages 399-400) EZH is required to maintain the RoCa3 Facility at its own expense on a basis no less favorable than the maintenance and repair program EZH employs at similar facilities and in accordance with Prudent Industry Practice. (Stip. ¶137; Tr. 2929 (Mintun)) By requiring EZH to maintain the RoCa3 Facility at a level of Prudent Industry Practice, EZH was required to maintain the facility not only on par with its other facilities, but also at a level consistent with the maintenance employed by other generating companies with similar facilities. (Tr. 2930-32 (Mintun)) Holzman explained that EZH is required to maintain the RoCa3 Facility to a level "that is satisfactory to" CED to protect "the quality of the facility during the [S]ublease [T]erm." (Tr. 1136 (Holzman); *accord.* Tr. 3171 (Ellis)) The maintenance EZH performs on the RoCa3 Facility is critical to the residual value that CED will be able to exploit upon the return of the Undivided Interest to it. (Tr. 1137 (Holzman))

EZH can make improvements to the RoCa3 Facility that it deems desirable (Stip. ¶146; Ex. 4 at page 399), provided that no modification impairs the facility's operations; alters the facility's primary function; decreases its value, residual value, remaining useful life or utility; or causes the facility to be commercially unusable to any party other than EZH or an affiliate thereof. (Stip. ¶146; Ex. 4 at page 399)

Similarly, the parts EZH uses as replacements have to meet specified standards such as having the same value, utility and useful life as the replaced part. (Stip. ¶147; Ex. 4 at page 400) Holzman explained that "the investor [CED] expects value to be in this asset when it's returned." (Tr. 1138)

Before entering into the RoCa3 Transaction, EZH was not subject to any maintenance requirements or restrictions. (Tr. 1138 (Holzman); Tr. 3138 (Ellis)) After closing the RoCa3 Transaction, EZH's failure to comply with the maintenance requirements under the Sublease would constitute an event of default under the Sublease, entitling CED to exercise its remedies. (Ex. 4 at page 423; Tr. 1138 (Holzman); Tr. 3139 (Ellis))

**b. Further Leasing**

Because EZH is subleasing CED's Undivided Interest in the RoCa3 Facility, any further lease that EZH entered into with another party would be a sub-sublease. (*See* Ex. 4 at page 407) The Sublease restricts EZH's right to sub-sublease the RoCa3 Facility to another party. (Stip. ¶143; Tr. 1139 (Holzman); Tr. 3851-52 (Bent)) For instance, the term of any sub-sublease may not extend beyond the Sublease Basic Termination Date, January 2, 2018. (Ex. 4 at page 407; Tr. 1140 (Holzman); Tr. 3852 (Bent)) Defendant's leasing expert Bent described this as "a material restriction." (Tr. 3852) EZH would also have to require any sub-sublessee to comply with the maintenance and replacement parts standards imposed under the Sublease. (Tr. 2932-33 (Mintun)) EZH was under no such leasing restrictions prior to entering into the RoCa3 Transaction. (Tr. 1140 (Holzman); Tr. 3852-53

(Bent)) A failure to comply with any of these restrictions would constitute an event of default under the Sublease. (Ex. 4 at page 423; Tr. 1141 (Holzman)) Even if EZH should enter into a sub-sublease, EZH remains primarily liable for the performance of each of its obligations under the Operative Documents. (Stip. ¶143; Ex. 4 at page 406; Tr. 1140 (Holzman))

c. **Insurance**

Leveraged leases always require the sublessee to carry insurance and to name the sublessor as an additional insured or payee. (Tr. 3853-54 (Bent); Tr. 3171 (Ellis))

The Sublease requires EZH to maintain certain types and levels of insurance with respect to the RoCa3 Facility. (Ex. 4 at pages 417-21; Tr. 3206-07 (Ellis)) The insurance provisions imposed by the Sublease are typical of those in other leveraged leases and operate normally. (Tr. 3853-54 (Bent)) EZH must maintain property and liability insurance on the RoCa3 Facility that is, at a minimum, equal to the amount of coverage EZH carries on similar properties. (Ex. 4 at page 417) The bodily injury and property damage liability insurance coverage EZH carries must have substantial minimum coverage amounts of 50,000,000 NLGs per occurrence and 100,000,000 NLGs per policy year. (*Id.*) EZH's deductible is also capped at 10,000,000 NLGs, which is inflated on an annual basis but can never exceed 20,000,000 NLGs (*Id.* at page 418); this limits the amount of self insurance EZH can carry. (Tr. 3139-40 (Ellis)) Before entering into the RoCa3 Transaction, EZH was

free to decide the amount of its deductible as well as insurance terms without restriction. (Tr. 3063 (Mintun); Tr. 3139-40 (Ellis))

During the Sublease Term, there is a risk that EZH would not be able to obtain certain types or amounts of coverage (Tr. 2933-35 (Mintun)), which could result from an event like a natural disaster, *i.e.*, a flood. (Tr. 2934-35 (Mintun)) EZH's failure to comply with these insurance requirements would constitute an event of default under the Sublease, entitling CED to exercise its remedies thereunder. (Ex. 4 at pages 424, 426-31; Tr. 3140 (Ellis); Tr. 2933-35 (Mintun))

### 5. Potential Premature Terminations of Lease and Sublease

The Sublease to EZH may be terminated before its term expires, upon the occurrence of certain events ("Premature Termination Events"). (Stip. ¶151; Tr. 3176 (Ellis)) In the case of a Premature Termination Event, CED can either cause EZH to make a substantial payment or cause the Sublease to terminate and cause EZH to return the Undivided Interest to CED for the remaining Lease Term, depending on which Premature Termination Event has occurred. (*See* Stip. ¶¶154, 156, 157, 159, 161; Tr. 3176-77 (Ellis)) The amount EZH may have to pay CED depends on the event causing the premature termination. (*See* Ex. 4 at pages 447-56) Depending on the event, the payment could be equal to the Sublease Termination Value, Sublease Special Termination Value, Sublease Special Special Termination Value or Fair Market Sales Value. (*See* Stip. ¶¶154, 156, 157, 159, 161; Tr. 3176-77 (Ellis)) All leveraged lease transactions have termination value

schedules to make the equity investor whole in case of a Premature Termination Event. (Tr. 3751-52 (Bent); Tr. 3176-77 (Ellis))

Sublease Termination Value is a payment designed to cover CED's investment balance, debt balance, taxes due and book income earned as of the date of the event causing a Sublease Termination Value payment. (Tr. 1143-44 and 1145 (Holzman); Tr. 2935-36 (Mintun); Tr. 3751-52 (Bent)) Sublease Termination Value is set forth in a schedule fixing the value each month[27] through the Sublease Basic Term and Sublease Renewal Term. (Ex. 4 at pages 447-56; Tr. 1144-45 (Holzman); Tr. 3751-52 (Bent)) The amount increases and decreases through time. (*See* Ex. 4 at pages 447-56) For example, the Sublease Termination Value on January 2 for 2003, 2008 and 2024 is $197,249,997.41, $214,044,269.41 and $142,484,725.89, respectively. (Ex. 4 at pages 448, 449, and 454)

Fair Market Sales Value is not a fixed amount, but rather will need to be determined by an independent appraisal as of the date of the event triggering the payment. (Ex. 1 at page 131-32; Tr. 1146-47 (Holzman)) Depending on the circumstances giving rise to a Premature Termination Event, Fair Market Sales Value is used as an alternative termination payment since the value of CED's Lease Interest in the RoCa3 Facility may exceed the fixed termination value at a particular point in time. (Tr. 2441 (Mintun); Tr. 3861-63 (Bent)) In other words, the Fair Market Sales Value provision protects CED's residual value interest in its leasehold. (Tr. 1147 (Holzman); Tr. 3861-63 (Bent))

---

[27] Sublease Termination Values are expressed as a percentage of the value of the Undivided Interest ($150 million). (*See* Ex. 4 at pages 447, 467)