Sublease Special Termination Value and Sublease Special Special Termination Value are set forth in a schedule fixing the value each month[28] through the Sublease Basic Term and Sublease Renewal Term. (Ex. 4 at pages 457-66 and 468-477, respectively) The Sublease Special Termination Value and Sublease Special Special Termination Value amounts increase and decrease through time. (Ex. 4 at pages 457-66 and 468-477, respectively) For example, the Sublease Special Termination Value and Sublease Special Special Termination Values on January 2 for 2003, 2008 and 2024 are $194,084,997.41, $210,879,269.01 and $142,484,725.89. (Ex. 4 at pages 448, 449, 454 (Sublease Special Termination Values) and 458, 459, 464 (Sublease Special Special Termination Values))

Premature Termination Events include the following:

Sublease Facility Event of Loss. A Sublease Facility Event of Loss is the result of some event rendering the RoCa3 Facility incapable of continued use. (Stip. ¶160; Tr. 1141-42 (Holzman)) Provisions covering termination payments for asset events of loss are common in leasing transactions (Tr. 1142-43 (Holzman), and Bent testified that there is nothing "unusual" about the Sublease Facility Event of Loss provisions used in the RoCa3 Transaction. (Tr. 3855 (Bent)) Event of Loss provisions are commonly included in a leveraged lease to protect the sublessor's economic interest in the leased asset. (Tr. 3855-56 (Bent)) Examples of Sublease Facility Events of Loss include (1) destruction or damage to the facility that is

[28] Sublease Special and Special Special Termination Values are expressed as a percentage of the Value of the Undivided Interest ($150 million). (*See* Ex. 4 at pages 457, 468)

either not economically efficient to repair or renders the RoCa3 Facility unfit for use (Stip. ¶160; Tr. 2935-36 (Mintun)), or (2) a governmental taking by any Dutch or European Union governmental body. (Stip. ¶161; Ex. 1 at page 133; Tr. 1142 (Holzman)) Where a Sublease Facility Event of Loss occurs due to a governmental taking, EZH would be required to pay the higher of the Sublease Termination Value or Fair Market Sales Value. (Stip. ¶161; Ex. 4 at page 413; Tr. 1142, 1146 (Holzman))

Burdensome Buyout Event. A Burdensome Buyout Event would occur if (1) a change in The Netherlands law made it illegal for EZH to continue as Sublessee or for it to continue making payments under the Sublease (Stip. ¶153), or (2) EZH is subjected to burdensome costs as the result of the RoCa3 Transaction. (Stip. ¶153) Any Burdensome Buyout Event caused by (1) EZH, or (2) a change in law of The Netherlands or European Union would require EZH to pay the greater of Sublease Termination Value or Fair Market Sales Value. (Stip. ¶154(c); Tr. 1148 (Holzman); Ex. 1 at page 120)

Voluntary Termination for Economic Obsolescence. If the RoCa3 Facility were to become technologically or economically obsolete to operate, EZH may declare a Voluntary Termination for Economic Obsolescence. (Stip. ¶155; Tr. 2936-38 (Mintun)) Voluntary termination provisions such as this are very common in leveraged leases, particularly those involving power plants. (Tr. 1149 (Holzman)) CED has two options in the event EZH was to declare a Voluntary Termination for Economic Obsolescence. (Stip. ¶¶157, 158) First, CED could elect to retain its Lease

Interest in the RoCa3 Facility. (Stip. ¶158; Tr. 1150 (Holzman)) CED would elect this option if it felt EZH's reasons for terminating the Sublease and Lease Agreements were not valid, and it could make money by keeping its interest in the RoCa3 Facility. (Tr. 1149 (Holzman)) Alternatively, CED could require EZH to attempt to sell CED's Lease Interest and pay CED the greater of Sublease Termination Value or the net cash proceeds from such sale. (Stip. ¶157; Tr. 1150 (Holzman))

Early Purchase Option. EZH may purchase CED's Lease Interest if CED or an affiliate becomes a competitor of EZH. (Stip. ¶159; Tr. 3170 (Ellis)) In leveraged leases, lessees are very concerned with the possibility that an equity investor might become a competitor. (Tr. 1150-51 (Holzman)) To purchase CED's Lease Interest, EZH would have to pay the greater of Sublease Termination Value or Fair Market Sales Value. (Stip. ¶159)

Events of Default Under the Sublease and CED's Remedies. During the Sublease Term, EZH could be placed in default upon the occurrence of certain events. (Stip. ¶163) Events of default under the Sublease include EZH's failure to: (1) pay rent on a timely basis, (2) comply with its maintenance obligations, (3) comply with its insurance obligations, (4) comply with the return requirements, and (5) remain solvent and stay out of bankruptcy (collectively, "Sublessee Events of Default"). (Stip. ¶163; Ex. 4 at pages 422-26; Tr. 1157-58 (Holzman)) Events of default under the Sublease also include EZH's making any Representation or Warranty that was untrue, inaccurate or misleading in any material respect. (Stip.

¶163; Ex. 4 at page 422-26; Tr. 1157-58 (Holzman); Tr. 2938-39 (Mintun)) This includes EZH's representation that "[t]here is no known factor" that will materially induce EZH to exercise the Sublease Purchase Option. (Ex. 56 at page 2511)

In general, the more comprehensive the list of events of default, the better for the sublessor (Tr. 3857 (Bent)), and Defendant's leasing expert Bent testified that he did not think any "typical provision" was missing from the Sublessee Events of Default or that the Sublease had any "atypical provision[s]." (Tr. 3858 (Bent)) This is important because any of these events of default can occur at any time during the Sublease Term. (Tr. 1158 (Holzman))

Should an event of default occur under the Sublease, CED may choose one or more remedies as set out in the Sublease Agreement. (Stip. ¶164; Tr. 3863 (Bent, testifying that the sublessor "typically" gets to choose the remedy))

First, CED could require EZH to return the Undivided Interest to CED for the remainder of the Lease Term. (Stip. ¶164(c); Tr. 1159-60 (Holzman)) CED can then exploit the value of the Undivided Interest by causing EZH to return the Undivided Interest to CED. (Tr. 1160-61 (Holzman); *see also* Stip. ¶164(e)) The "return" remedy is important because CED, as an experienced utility operator, may believe it can achieve greater value by selling its share of the RoCa3 Facility's output. (Tr. 1160 (Holzman)) Should EZH fail to provide CED with any documents CED requests in connection with the return of the Undivided Interest to CED, CED has the right to specific performance conferring CED with immediate possession of the Undivided Interest. (Ex. 4 at page 429) Defendant's leasing expert Bent

explained that the "return" remedy in the Sublease is a normal remedy generally found in leasing transactions. (Tr. 3860)

Second, CED could require EZH to pay the higher of Fair Market Sales Value or Sublease Termination Value. (Stip. ¶164(a)) This remedy would effectively terminate the RoCa3 Transaction at the cost to EZH of having to pay monetary damages. (*See* Ex. 4 at page 427) Defendant's leasing expert Bent testified that this remedy is "not . . . an unusual provision." (Tr. 3861 (Bent))

Finally, in addition to these specific remedies, CED would be entitled to seek any remedy afforded under the laws of New York State. (Ex. 4 at pages 430, 438)

**6. Sublease Termination Value and Source of Funds**

EZH can use the Sublease Deposit and the IJssel Deposits to satisfy a portion of the payment it may owe in the event of a Premature Termination Event. (Tr. 1161 (Holzman)) However, depending on the date of the Premature Termination Event, EZH could be required to pay an amount exceeding the value of these deposits by the tens of millions of dollars. (*See* Ex. 332 at page 7226-27 (column 6); Tr. 2945-46 (Mintun); Tr. 5183 (LaRue)) The amount CED would have a right to receive is not in any way tied to or dependent upon the value of either the Sublease Deposit or the IJssel Deposit. (Tr. 1166-67 (Holzman); Tr. 5183 (LaRue); Tr. 3826 (Bent)) Regardless of the combined value of these accounts, Sublease Termination Values are fixed, meaning they are not affected by the value of the IJssel Deposit or interest rates generally. (Tr. 1165-67 (Holzman); Tr. 5183 (LaRue); Tr. 3826 (Bent)) In other words, neither the amount EZH would have to pay under the Sublease nor

the amount CED would receive under the Sublease is influenced by the value of the IJssel Deposit. (Tr. 1166-67 (Holzman)) The risk of those values remain with EZH. (*See* Ex. 332 at pages 7226-27; Ex. 10073 (Ellis Initial Report) at page 20036 (columns numbered 1 and 5); Tr. 1174-75 (Holzman); Tr. 3213 (Ellis); Tr. 2945-46 (Mintun); Tr. 5183 (LaRue))

The ABC pricing runs Holzman prepared contain a Custom Termination Value Schedule. (Tr. 1169-70 (Holzman); Ex. 332 at pages 7226-32) This schedule shows, on a monthly basis, the Sublease Termination Values, the outstanding nonrecourse loan debt balance, the projected balance of the IJssel Deposit (based on an interest rate assumption that may prove either too high or low), and the projected amount EZH would have to pay in excess of the deposits. (Tr. 1170-75 (Holzman)) Ellis similarly prepared a table projecting expected annual amounts of the IJssel Deposit, the Sublease Termination Value, the Sublease Deposit and the amount that EZH will have to pay in excess of these deposits should a Premature Termination Event occur causing it to pay Sublease Termination Value. (Ex. 10073 (Ellis Initial Report) at page 20036; Tr. 3208-12 (Ellis)) Ellis stressed that the table contained expected values because "the IJssel Deposit is invested in Treasury Securities, and therefore, the actual value will not be known until we get to those dates." (Tr. 3208; Tr. 3826 (Bent))

For example, both tables show that on January 2, 2003, the Sublease Termination Value that would have been owed to CED was $197,249,997. (Ex. 332 at page 7226 (column 3); Ex. 10073 (Ellis Initial Report) at page 20036 (column

numbered 4); Ex. 4 at pages 447-56; Tr. 3213 (Ellis)) EZH could use the Sublease Deposit to partially satisfy this amount. (Ex. 10073 (Ellis Initial Report) at page 20036 (column numbered (2)); Ex. 23 at page 1065) As of this date, the Sublease Deposit was expected to total $114,227,540, which would equal the projected nonrecourse debt balance of $114,227,540. (*Compare* Ex. 8 at page 666 *with* Ex. 24 at page 1106; Tr. 1172-73 (Holzman)) This would leave EZH with a remaining $83,022,457 Sublease Termination Value liability. (Ex. 332 at page 7226 (column 6); Tr. 1172-73 (Holzman); Tr. 5182 (LaRue)) As of this date, the IJssel Deposit was projected to be only $41,049,673[29] (assuming there was no change in interest rates from the date the STRIPs were purchased through January 2, 2003), which would result in EZH's having to pay an additional $41,972,784 beyond the projected value of the Sublease Deposit and IJssel Deposit. (Ex. 332 at page 7226 (columns 7 and 8); Ex. 10073 (Ellis Initial Report) at page 20036 (columns numbered 1 and 5); Tr. 1174-75 (Holzman); Tr. 3213 (Ellis))

However, depending on the then-prevailing market interest rates, the actual value of the IJssel Deposit on January 2, 2003 could have resulted in EZH's having to pay either more or less than the projected $41,972,784 difference between the Sublease Termination Value and the amounts in the IJssel Deposit and Sublease Deposit. (Tr. 1175 (Holzman); Tr. 3213 (Ellis); Tr. 3828 (Bent)) For example, had interest rates increased by 1% from the date when the IJssel Deposit STRIPs were

[29] An inherent interest rate of 6.35% was used to project the aggregate expected value of the STRIPs in the IJssel Deposit on both an annual and monthly basis through the Lease Term. (*See* Ex. 332 at pages 7189, 7226-32.)

purchased, the value of the IJssel Deposit would have decreased by $15,349,213, increasing EZH's additional payment to CED by that amount. (Ex. 10073 (Ellis Initial Report) at page 20037; Tr. 3227-29 (Ellis); Tr. 1175 (Holzman))

Moreover, if on January 2, 2003 the Fair Market Sales Value was greater than the Sublease Termination Value, EZH would be required to pay an even greater amount. (Tr. 2941 (Mintun)) EZH must provide the funds required to cover any amount of the Sublease Termination Value in excess of the aggregate value of the Sublease Deposit and the IJssel Deposit. (Tr. 1167 (Holzman); Tr. 3228 (Ellis); Tr. 2945-46 (Mintun); Tr. 3828 (Bent))

With any Sublease Termination Value Payment owed by reason of EZH's default under the Sublease, a Sublease Facility Event of Loss or CED's acquisition of an EZH competitor, EZH would be required to pay tens of millions of dollars from its sources outside of the Sublease Deposit and IJssel Deposit. (*See* Ex. 332 at pages 7226-32 (column 8); Tr. 1174-75 (Holzman)) The amount could be even greater for those events that would require EZH to pay the Fair Market Sales Value of the RoCa Facility to CED. (Tr. 1147, 1159-60 (Holzman)) The amount not covered by EZH's establishment of the Sublease Deposit and IJssel Deposit can vary widely depending on changes in interest rates on the IJssel Deposit STRIPs from their inherent rate. (*See* Ex. 10073 (Ellis Initial Report) at page 20037 (showing the effect of a 1% interest rate change from the inherent interest rate on each STRIP from December 17, 1997 through 2018); Tr. 1175 (Holzman); Tr. 3215-16 (Ellis))

To mitigate the credit risk that EZH would not be able to pay the amount in excess of the expected values of the Sublease Deposit and IJssel Deposit (Stip. ¶226; Tr. 1175-76 (Holzman)), CED required EZH to obtain a standby letter of credit. (Tr. 1175-76 (Holzman); Tr. 2255-58 (DePlautt); *see also* Stip. ¶226) While letters of credit are commonly used in leveraged lease transactions (Tr. 1176 (Holzman)), they do not eliminate payment risk since it is not certain that the letter of credit provider would honor a drawing on the letter of credit or be able to pay upon being presented the letter of credit. (Tr. 1176 (Holzman)) Should the letter of credit provider make a payment in this transaction, EZH would be obligated to reimburse it in the amount of the payment. (Stip. ¶230; Ex. 35 at page 1308; Tr. 1177 (Holzman); Tr. 3397 (Ellis)) Any payment made by the letter of credit issuer is similar to the letter of credit bank making a loan to EZH, since EZH would be required to repay that amount. (Tr. 3397 (Ellis))

The amount secured by the letter of credit is adjusted annually on January 3. (Ex. 1 at page 58) The annual amount secured by the letter of credit is determined by a mathematical equation equal to the product of (1) the excess of the highest Letter of Credit Termination Value, as listed in Annex A to the Participation Agreement, over the fair market value of the IJssel Deposit determined as of the prior November 4th using the published values of the STRIPs in the Wall Street Journal, and (2) the Required Percentage. (Ex. 1 at page 57) The Required Percentage for (1) 1998 was 100%; (2) 1999 was 105% if EZH's long-term unsecured debt rate was rated below A by Standard & Poor's, A2 by Moody's or unrated; (3) for

years after 1999 is 125% if EZH's long-term unsecured debt rate is rated below A by Standard & Poor's, A2 by Moody's or unrated; or (4) all other instances is 100% . (Ex. 1 at page 153)

**7. Return Provisions**

EZH must comply with a number of return provisions at the termination of the Sublease when it returns the Undivided Interest to CED. (Ex. 4 at page 396-98; Tr. 3843-45 (Bent)) EZH may return the Undivided Interest at the end of the Sublease Basic Term, at the end of the Sublease Renewal Term, or at the time of certain premature termination events. (Tr. 1134 (Holzman)) The condition of the RoCa3 Facility must allow for the facility, at a minimum, to be capable of being operated at a level for which it was designed to operate on a continuing basis. (Ex. 4 at page 396) The RoCa3 Facility also must pass certain acceptance tests prior to its return, and EZH is responsible, at its own expense, to take all actions necessary to enable the facility to pass these tests. (Ex. 4 at page 397) Defendant's leasing expert Bent testified that return provisions such as these are typical in leveraged lease transactions. (Tr. 3844-45 (Bent)) EZH also must obtain an environmental report to ensure that there are no outstanding liabilities upon return. (Ex. 4 at pages 397-98; Tr. 3845-46 (Bent)) Return provisions for power plants like RoCa3 are facility specific, relate to the facility's performance capabilities, and ensure that the facility's quality is satisfactory upon its return. (Tr. 1134 (Holzman)) Holzman explained that the provisions had been negotiated by CED and EZH because the condition of the RoCa3 Facility upon its return "has the biggest impact" on CED's

residual value interest. (Tr. 1134-35 (Holzman)) Before entering into the RoCa3 Transaction, EZH was not subject to these requirements. (Tr. 2928-29 (Mintun))

### E. End of Sublease Basic Term Options

The Sublease Basic Term ends on January 2, 2018 and at that time, EZH can exercise the Sublease Purchase Option to purchase CED's remaining Lease Interest for $215,450,949.20 (the "Sublease Purchase Option Price"). (Stip. ¶165; Ex. 4 at pages 433, 479; Tr. 1178 (Holzman)) If EZH does not exercise the Sublease Purchase Option, CED has two choices: (1) it can exercise its Sublease Renewal Option, causing EZH to renew the Sublease for the Sublease Renewal Term of 16.5 years, or (2) it can cause the Undivided Interest to be returned to it for the remaining Lease Term of 23.1 years (referred to as the "Retention Option"). (Stip. ¶169; Ex. at page 434)

#### 1. The Sublease Purchase Option

If EZH elects the Sublease Purchase Option, it will have to pay the Sublease Purchase Option Price, which is $215,450,949.20. (Stip. ¶165) EZH can make this payment by either paying $215,450,949.20 to CED or transferring $123,615,472 together with the delivery of STRIPs from the IJssel Deposit. (Stip. ¶231; Ex. 4 at page 433) EZH can cause Stichting IJssel to transfer the STRIPs in the IJssel Deposit to CED by electing the Sublease Purchase Option and also electing not to pay the full Sublease Purchase Option Price with cash. (*See* Stip. 231; Ex. 22 at page 1038) However, as indicated, EZH can use other funds to pay the balance of the Sublease Purchase Option Price. (Ex. 22 at page 1043; Ex. 4 at page 433) To pay

the $123,615,472, EZH can use the funds in the Sublease Deposit, which are projected to equal $123,615,472. (*See* Ex. 23 at page 1065; Stip. ¶234)

On January 2, 2018, EZH also would be responsible for paying a final Sublease rental payment to CED of $7,326,950.33. (Stip. ¶166) EZH can use the securities in the IJssel Deposit to pay the final rental payment. (Stip. ¶232; Ex. 22 at page 1043)

After EZH pays the Sublease Purchase Price and its final Sublease rental payment, CED would then transfer its Lease Interest to EZH and the RoCa3 Transaction ends.[30] (Stip. ¶168) CED would then pay the remaining balance of the nonrecourse loan of $123,616,472 leaving CED with $99,162,427.53, which includes the final Sublease rental payment owed by EZH. (Stip. ¶167)

If EZH elects the Sublease Purchase Option, CED is projected to make an overall pretax profit of $60,974,397 (after the return of its equity investment of $43,445,500). (Ex. 609 at page 10815; Tr. 1229 (Holzman); Tr. 5153 (LaRue); *see* Ex. 20194 (LaRue Initial Report) at page 25150) On this overall pretax profit, CED is projected to pay at least $21,341,039 in federal income taxes, which would result in CED's receiving $39,633,358 in after-tax income over the life of its investment through January 2, 2018. (Ex. 609 at page 10815; Tr. 1229-30 (Holzman)) Had CED booked the RoCa3 Transaction for accounting purposes under the Sublease

---

[30] EZH's exercise of the Sublease Purchase Option would cause EZH to forgo the Final Basic Rent Payment because EZH agreed to undertake all of CED's Lease obligations. In addition, EZH's exercise of the Sublease Purchase Option would result in extinguishment of the Sublessee Loan. (Ex. 4 at pages 433-34)

Purchase Option scenario, the $39,633,358 amount is the total after-tax earnings it would have booked. (Ex. 669 at page 10815 (Column 6); Tr. 1230-31 (Holzman))

### 2. The Sublease Renewal Option

If EZH does not elect the Sublease Purchase Option, CED can elect either the Sublease Renewal Option or the Retention Option. (Ex. 4 at page 434) Defendant's leasing expert Bent testified that sublease renewal options at the discretion of the sublessor, like the Sublease Renewal Option in the RoCa3 Transaction, are "quite common in middle market" leases and he himself has seen them used in large-ticket leases. (Tr. 3824-25 (Bent))

Here, if CED elects the Sublease Renewal Option, the Sublease Agreement would remain in effect from January 2, 2018 through June 15, 2034 (the "Sublease Renewal Term"). (Ex. 1 at page 162) During this period, EZH would owe CED Sublease Renewal Rents (Stip. ¶172) and EZH would continue to be subject to all of the same obligations and default risks to which it was subject during the Sublease Basic Term. (*See, e.g.*, Ex. 4 at pages 399, 406, 417) The Sublease Renewal Rents would be as follows:

| Date | Scheduled Sublease Renewal Rents |
|---|---|
| Jan 2, 2019 | 18,225,000.00 |
| Jan 2, 2020 | 18,225,000.00 |
| Jan 2, 2021 | 18,225,000.00 |
| Jan 2, 2022 | 18,225,000.00 |
| Jan 2, 2023 | 18,225,000.00 |
| Jan 2, 2024 | 18,225,000.00 |
| Jan 2, 2025 | 18,225,000.00 |
| Jan 2, 2026 | 18,225,000.00 |
| Jan 2, 2027 | 18,225,000.00 |
| Jan 2, 2028 | 18,225,000.00 |

| | |
|---|---|
| Jan 2, 2029 | 18,225,000.00 |
| Jan 2, 2030 | 18,225,000.00 |
| Jan 2, 2031 | 18,225,000.00 |
| Jan 2, 2032 | 18,225,000.00 |
| Jan 2, 2033 | 18,225,000.00 |
| Jan 2, 2034 | 18,225,000.00 |
| Jun 15, 2034 | 8,251,875.00 |

(Stip. ¶140)

After the Sublease Renewal Term ends on June 15, 2034 (assuming the Sublease Renewal Term does not terminate early), EZH would return to CED the Undivided Interest in the RoCa3 Facility for the remaining Lease Term through February 24, 2041 (the Shirt-Tail Period). (Ex. 4 at page 396) CED may then lease the Undivided Interest to a third party for the remainder of the Lease Term or operate it at its own expense and for its own economic benefit for the remainder of the Lease Term. (Stip. ¶178)

The Deloitte Appraisal compared the Sublease Renewal Rents to the expected fair market value rents during the Sublease Renewal Term. (Ex. 46 at page 1578) Based on its analysis, Deloitte concluded that CED would not likely exercise the Sublease Renewal Option because the Sublease Renewal Rents provided for in the Sublease were expected to be only 90% of the fair market rental value for CED's Undivided Interest. (Ex. 46 at page 1578)

**a. Sublease Renewal Option: The Sublease Deposit and the IJssel Deposit**

If CED elects the Sublease Renewal Option, the Sublease Deposit and the IJssel Deposit both remain in place and continue to secure part of EZH's future payments under the Sublease. (*See* Stip. ¶¶ 185, 193, 207) The STRIPs in the IJssel

Deposit are to be reinvested by CSFB after they mature. (Ex. 19 at page 973) Thus, if EZH does not elect the Sublease Purchase Option, five STRIPs will come due on August 15, 2017, February 15, 2018, May 15, 2018, August 15, 2018 and November 15, 2018. (Stip. ¶212, Ex. 373 at page 7713) The interest rate that EZH can earn on the reinvestment of these funds is not known until the day on which reinvestment would occur. (*See* Ex. 19 at page 973) It is thus impossible to know if the IJssel Deposit will have sufficient funds to securitize the equity portion of EZH's renewal rent obligations under the Sublease and payments due under the Sublessee Loan (Tr. 4762-63 (Ray)) should EZH decide to use the IJssel Deposit to pay these obligations. (Ex. 22 at page 1043)

The Sublease Deposit will remain in place if CED elects the Sublease Renewal Option (Stip. ¶193; Tr. 4759 (Ray)) and continue to secure the debt portion of EZH's payment obligations under the Sublease, including Sublease Renewal Rents, until CED's nonrecourse loan from HBU is retired. (Stip. ¶193; Ex. 24 at pages 1089-91)

### b. CED's Obligations if It Elects the Sublease Renewal Option

Should CED elect the Sublease Renewal Option, it will continue to be required to make debt service payments on the nonrecourse loan through January 2, 2027 (Stip. ¶176) and remain obligated to make the Final Basic Rent Payment under the Lease on February 24, 2041. (Stip. ¶177) EZH required CED to provide security for the Final Basic Rent Payment. (Stip. ¶¶ 241, 242)

If CED elects the Sublease Renewal Option, CED may choose between two options for providing the collateral supporting its obligation for the Final Basic Rent Payment: (1) funding the "Lease Collateral Deposit" and the "Trustee Treasury Collateral" accounts, or (2) replace all or part of those accounts with Acceptable Substitute Collateral, such as a letter of credit. (Stip. ¶¶241, 242; Ex. 2 at page 328; Tr. 3924-26 (Bent); Tr. 4942-43, 4949 (Ray); Tr. 5228, 5296 (LaRue)) Acceptable Substitute Collateral includes any letter of credit, first priority security interest in cash or U.S.-backed securities held by CED, or any other collateral acceptable to EZH. (Stip ¶242; Ex. 2 at page 328) If CED funds the Trustee Treasury Collateral or the Lease Collateral Deposit accounts, it can later decide at any time during the Lease Term to replace any part or all of these accounts with a letter of credit or other Acceptable Substitute Collateral. (Stip. ¶242; Ex. 2 at page 328; Tr. 5228 (LaRue)) For example, should the value of these deposits increase, CED could reap the economic benefit of any funds in its deposits by replacing part or all of either account. (Tr. 3924-26 (Bent); Tr. 4950 (Ray)) This could occur whenever interest rates decrease from the original interest rate when funded. (Tr. 3924-26 (Bent); Tr. 4950 (Ray)) Similarly, CED could simply need the funds for use in its other operations; thus, CED could withdraw the amount it needs from these accounts and provide a letter of credit as security for its obligation to pay EZH the Final Basic Rent Payment in 2041. (*See* Ex. 2 at page 328) In fact, there are no limitations on CED's use of the funds from the replaced accounts; hence, CED may use the funds for any purpose it chooses. (Stip. ¶247)

#### (i) Sublease Renewal Option: Trustee Treasury Collateral

If CED decides to fund the Trustee Treasury Collateral, CEL[31] would purchase and deposit into a custodial account for its benefit on January 2, 2018 U.S. Government Obligations that would mature on or before February 24, 2041 with a value at maturity of $141,671,596.40; CEL would then provide a security interest in the deposit to EZH. (Stip. ¶245; *see* Ex. 1 at page 46 together with Ex. 2 at page 325) The Expected Treasury Price on January 2, 2018 is $34,036,691.62 for U.S. Government Obligations that would mature to $141,671,596.40 as of February 24, 2041. (Ex. 1 at page 174) On January 2, 2018, EZH owes CED a payment on its Sublessee Loan of $37,525,237. (Stip. ¶¶173, 182)) CED is not required, but may decide, to use part of this payment to fund the Trustee Treasury Collateral. (Tr. 4942-43 (Ray))

Should the Actual Treasury Price on January 2, 2018 be a price greater than the Expected Treasury Price, a series of adjustments are made under the Sublease to the Sublease Renewal Rent, Sublease Termination Value, Sublease Special Termination Value, Sublease Special Special Termination Value and the Sublessee Loan amounts in order to preserve CED's Net Economic Return. (Ex. 4 at page 390 together with Ex. 2 at page 325) Net Economic Return is CED's after-tax yield and aggregate after-tax cash flow through the Sublease Term (including the Sublease Basic Term and Sublease Renewal Term, if any). (Ex. 1 at page 143) No further

[31] The documents provide CEL (the Investor) its requirement to establish this account. (Ex. 1 at page 46)

adjustments are made on any date after January 2, 2018. (*See* Ex. 1 at page 46 together with Ex. 2 at page 325) Should interest rates change following CED's funding of the Trustee Treasury Collateral, therefore it could have more or less funds in 2041 than the projected maturity value of $141,671,596.40. (Tr. 3926-27 (Bent))

**(ii) Sublease Renewal Option: Lease Collateral Deposit**

As stated above, under the Sublease Renewal Option, CED remains obligated to make the Final Basic Rent Payment under the Lease on February 24, 2041 (Stip. ¶177), and EZH required CED to provide security for its obligation. (Stip. ¶242)

If CED decides to fund the Lease Collateral Deposit, CED (through the CEL Trust) would make deposits of (1) $3,678,511.92 on January 2, 2027; (2) $18,225,000 on each January 2 from 2028 to and including 2034; and (3) $8,251,875 on June 15, 2034. (Stip ¶243) CED is required to deposit these funds into an account with a financial institution that has AA Standard & Poor's and Aa2 Moody's long-term debt ratings. (Ex. 2 at pages 327) The deposit-taking financial institution was assumed to be able to pay a fixed interest rate of 6.86% (the "Expected Lease Collateral Rate") on this account through 2034. (Ex. 2 at pages 327, 354) As of June 15, 2034, the date of the last scheduled deposit, the Lease Collateral Deposit is projected to have a balance of $176,210,292.09. (Stip. ¶244; Tr. 5292 (LaRue))

On January 2, 2018, there could be a number of adjustments made under the Sublease if the Actual Lease Collateral Rate is other than the Expected Lease Collateral Rate. (Ex. 4 at page 390) The Actual Lease Collateral Rate is the interest

rate a financial institution will agree to pay in accepting the deposit. (Ex. 2 at page 327) Should the Actual Lease Collateral Rate differ from the Expected Lease Collateral Rate, adjustments to certain future payments will be made in order to preserve CED's expected Net Economic Return. (*Id.*) During the life of the RoCa3 Transaction, through the Sublease Renewal Term, CED expects to receive after-tax cash flow of $66,000,000 (Ex. 333 at page 7255; Tr. 1222 (Holzman)) and an after-tax yield of at least 12.2327592%. (Ex. 333 at page 7240) However, Defendant's leasing expert Ray agreed that no such adjustment would have any effect on CED's having to make the Final Basic Rent Payment of $831,525,734. (Tr. 4948-49)

On June 15, 2034, the Sublease Renewal Term ends, terminating the Sublease and the potential for an adjustment to any future payment that EZH may owe to CED. (*See* Ex. 2 at pages 327 and 354; *see also* Stip. ¶246; Ex. 1 at page 163)) Following the termination of the Sublease on June 15, 2034 through the remainder of the Lease Term, which ends on February 24, 2041, the interest rate paid on the Lease Collateral Deposit will depend on the then-prevailing market rates. (Ex. 2 at pages 327, 354; *see* Stip. ¶246; Ex. 1 at page 163; Tr. 5331 (LaRue))

#### c. CED's Projected Profit Through the Sublease Renewal Term

At the end of the Sublease Renewal Term on June 15, 2034, EZH will be required to return the Undivided Interest in the RoCa3 Facility to CED in compliance with the return provisions set out in the Sublease. (Ex. 4 at pages 396-98; *see* Stip. ¶178) CED may take possession of the RoCa3 Facility and have it operated for its own benefit at its expense or lease it to some third party for the

remaining 6.5 years of the Lease Term (the Shirt-Tail Period). (Stip. ¶¶178, 267, 269; Tr. 1181 (Holzman); Tr. 3156-57, 3160-61 (Ellis); Tr. 4829 (Ray))

Through the Sublease Renewal Termination Date of June 15, 2034, CED is expected to earn pretax income of $101,538,462. (Ex. 333 at pages 7255, 7254; Tr. 1226-27 (Holzman)) The projected $101,538,462 pretax income is the profit computed after the return of CED's initial investment of $43,445,000 (Tr. 1223 (Holzman); *see* Ex. 20194 at page 25153; Tr. 5155 (LaRue)) and does not include any residual value for the Shirt-Tail Period. (Ex. 333 at pages 7254-55; Tr. 1223 (Holzman); Tr. 5155, 5162-63 (LaRue)) On this pretax profit, CED is projected to pay $35,538,462 in Federal income taxes (Ex. 333 at pages 7254-55; Tr. 1223-24 (Holzman)), resulting in after-tax income of $66,000,000. (Ex. 333 at page 7255; Tr. 1224 (Holzman))

This income, however, does not include any residual value CED may receive from the Shirt-Tail Period. (Tr. 1222-23 (Holzman); Tr. 5155, 5162-63 (LaRue)) Any additional residual value or income from the Shirt-Tail Period will increase the overall pretax profits CED would earn (Tr. 1207, 1223 (Holzman)), CED's earnings from the RoCa3 Transaction and its after-tax yield. (Tr. 1206-08, 1222-23 (Holzman))

### d. Sublease Renewal Option: The Final Basic Rent Payment

Under the Sublease Renewal Option, CED would owe EZH the Final Basic Rent Payment of $831,525,734 on February 24, 2041.[32] (Ex. 2 at page 352) The sources from which CED may fund the Final Basic Rent Payment are contingent upon future events, including the amount of revenue CED could receive from selling its share of the RoCa3 Facility's output; whether CED elects to provide Acceptable Substitute Collateral; or instead funds the Lease Collateral Deposit and the Trustee Treasury Collateral; and the interest rate CED would earn on the Lease Collateral Deposit from June 15, 2034 through February 24, 2041. (*See* Stip. ¶246; Tr. 4947-4950 (Ray); Tr. 3924-28 (Bent); Tr. 5331 (LaRue)) It is possible that the Final Basic Rent Payment of $831,525,734 would equal the sum of (1) the final Sublessee Loan payment of $414,931,341 that EZH owes to CED, (2) the Trustee Treasury Collateral account (if CED elects to fund it on January 2, 2018 and does not elect to replace any part of it with Acceptable Substitute Collateral) of $141,671,596.40, and (3) the Lease Collateral Deposit (if CED elects to fund this deposit on the dates and in the amounts scheduled in the Lease Agreement, and does not elect to replace any part of it with Acceptable Substitute Collateral, and if CED is able to earn 6.86% interest on that account from June 15, 2034 through February 24, 2041). (Stip. ¶¶242, 246; Ex. 2 at page 328; Tr. 5331 (LaRue)) Because the interest rate on the Lease Collateral Deposit is not known, however, CED could have to pay an

[32] CED would also owe this amount if the Retention Option is chosen, as described in greater detail below.

additional unknown amount to pay the full Final Basic Rent Payment, or, in the alternative, it may get to keep any excess from this investment. (Tr. 4947-50 (Ray); Tr. 5292 (LaRue)) Should CED elect to provide a letter of credit in lieu of any part of the Trustee Treasury Collateral or the Lease Collateral Deposit, the Final Basic Rent Payment amount of $831,525,734 that CED owes to EZH on February 24, 2041 remains the same. (*See* Ex. 2 at pages 325, 352)

The $831,525,734 Final Basic Rent Payment is a recourse liability to the CEL Trust (*See* Ex. 1 at page 45, Ex. 2 at page 325), and is recourse to CEL up to $141,671,596.40. (Stip. ¶248; Ex. 1 at page 45; Ex. 2 at pages 351-52) CEL can satisfy this recourse liability by establishing the Trustee Treasury Collateral up to the maturity value of that account, $141,671,596.40. (Stip. ¶248; Ex. 1 at page 47) Thus, the difference between the recourse amount and the maturity value of the Trustee Treasury Collateral continues to be a recourse liability of CEL. (Stip. ¶248; Ex. 1 at page 47) Importantly, a CEL Trust's distribution to CED of profits from the sale of the RoCa3 Facility's output will increase CEL's recourse liability to the extent of the distribution. (Stip. ¶249; Ex. 1 at page 45-46)

### 3. Retention Option

If CED elects the Retention Option, EZH will be required to return the Undivided Interest to CED on January 2, 2018 for the remaining Lease Term until February 24, 2041 (the "Retention Option Period"). (Stip. ¶180; Ex. 4 at page 434) The Retention Option was critical to CED because it would entitle CED to choose to retain and exploit the value of the Undivided Interest through the end of the Lease

Term. (Tr. 1182 (Holzman)) CED would then be exposed to the risks and opportunities with respect to the operations of the RoCa3 Facility during the Retention Option Period from January 2, 2018 to February 24, 2041. (Tr. 3156-57 (Ellis); Tr. 4809-10, 4832 (Ray))

A condition to CED's electing the Retention Option requires CED to prepay the nonrecourse loan. (Ex. 7 at pages 622-23) CED can begin making arrangements for repayment of its nonrecourse loan from HBU following EZH's decision to not exercise the Sublease Purchase Option, which must occur during the 360-day period ending on the last 360 days (December 26, 2016) prior to the Sublease Basic Termination Date. (Ex. 4 at page 443) If CED makes payment arrangements that are acceptable to the HBU, EZH shall return the Undivided Interest in the RoCa3 Facility to CED in accordance with the return provisions under the Sublease. (Stip. ¶180; Ex. 4 at page 435) Should CED fail to make reasonably acceptable arrangements for the payment of the nonrecourse loan and should HBU timely notify both EZH and CED of this failure on the 45th day prior to the Sublease Basic Termination Date, the Sublease Renewal Option will be deemed to have been exercised. (Stip. ¶180; Ex. 4 at page 435) Because repayment of the nonrecourse loan is an event that CED can plan for in advance and because CED is a subsidiary of one of the largest utilities in the country, Con Edison, which has a strong credit rating and access to many sources of financing, CED could easily raise the capital necessary to repay the loan. (Tr. 3282-83 (Ellis))

Under the Retention Option, EZH would withdraw the projected Sublease Deposit balance of $123,615,472, exhausting the deposit, and EZH could use those funds as it chooses. (Stip. ¶251; Tr. 4942-45 (Ray); Tr. 3951-52 (Bent); Tr. 5255 (LaRue)) In other words, those funds are not paid to CED. (Stip. ¶251; Tr. 4943-45 (Ray); Tr. 3951-52 (Bent)) Similarly, the STRIPs in the IJssel Deposit are scheduled to mature at various times during 2017 and 2018 (*see* Facts Section VIII.D.3.f.), and those amounts will also be available to EZH. (Stip. ¶¶212, 252) Otherwise, the maturity amounts of each STRIP will be reinvested in new U.S. Government Obligations at the then-prevailing market rates to secure EZH's future payment obligations, including Sublessee Loan payments. (*See* Ex. 19 at page 973) During the 23-year Retention Option Period, EZH would not have any rental obligations to CED because the Sublease will have terminated. (*See* Ex. 4 at page 389) EZH would, however, remain liable for paying its obligations in accordance with the Sublessee Loan, and it is entitled to secure this obligation with a letter of credit. (Stip. ¶250)

**a. CED's Collateral Obligations During the Retention Option Period**

During the Retention Option Period (as was the case under the Sublease Renewal Option), CED would be obligated to provide certain collateral to secure the Final Basic Rent Payment due on February 24, 2041. (*See* Stip. ¶253) To provide security for its Final Basic Rent Payment, CED would have to choose whether to fund the Incremental Collateral Pledge and the Trustee Treasury Collateral or to provide Acceptable Substitute Collateral in lieu of funding all or part of either

deposit. (Stip. ¶¶253, 254; Ex. 2 at page 328; Tr. 3924-26 (Bent)) Acceptable Substitute Collateral includes letters of credit that are in the same payment amounts as the replaced collateral. (Stip. ¶254; Ex. 2 at page 328; Tr. 3924-26 (Bent); Tr. 4942-43 (Ray)) If CED decides to fund the Trustee Treasury Collateral or the Incremental Collateral Pledge, it can later decide at any time during the remaining lease term to replace all or any part of these accounts with Acceptable Substitute Collateral. (Ex. 2 at page 328; *see* Stip. ¶¶253; 254; Tr. 5228 (LaRue)) There are no limitations on CED's use of the replaced funds; hence, CED may use the replaced funds for any reason it desires. (Stip. ¶258; Tr. 5197-98 (LaRue))

**(i) Retention Option: Trustee Treasury Collateral**

If CED elects to fund the Trustee Treasury Collateral, CED would cause CEL to establish this account on January 2, 2018 in the same manner as described under the Sublease Renewal Option above. (*See* Facts Section VIII.E.2.b.(i).) Should the Actual Treasury Price (the actual cost of the securities) on January 2, 2018 be a price greater than the Expected Treasury Price ($34,036,691.62), an adjustment would be made to accelerate EZH's repayment of the Sublessee Loan amounts in order to preserve CED's Net Economic Return. (Ex. 4 at page 390 together with Ex. 2 at page 325; Ex. 44 at page 1453-54) Net Economic Return is CED's after-tax yield and aggregate after-tax cash flow through the Sublease Term (including the Sublease Basic Term and Sublease Renewal Term, if any). (Ex. 1 at page 143) No further adjustments are made for any date after January 2, 2018. (See Ex. 1 at page 46 together with Ex. 2 at page 325; Tr. 3969-70 (Bent)) Should interest rates change

following CED's funding of the Trustee Treasury Collateral, it could have more or less funds in 2041 than the projected maturity value of $141,671,596.40. (Tr. 3926-27 (Bent))

**(ii) Retention Option: Incremental Collateral Pledge**

If CED were to decide to fund the Incremental Collateral Pledge, CED would purchase either U.S. Government Obligations or corporate bonds with AA Standard & Poor's and Aa2 Moody's ratings on January 2, 2018 and deposit them into a custody account for its benefit. (Stip. ¶256) These purchased securities would bear a fixed rate of interest, based on the then-available market rates, and would mature close to the Lease Termination Date, February 24, 2041, in an amount equal to the excess of the Final Basic Rent Payment over the sum of (1) the expected aggregate maturity amounts of the Trustee Treasury Collateral—scheduled in Schedule 2A of the Participation Agreement—on February 24, 2041, and (2) the scheduled Sublessee Loan payment on that date.[33] (Stip. ¶256) The maturity value of the Incremental Collateral Pledge is expected to be $274,922,746.33. (*See also* Ex. 1 at page 174, Ex. 2 at page 352, Ex. 44 at page 1479) Because the interest rate that the securities in the Incremental Collateral Pledge would bear is unknown until it is funded (Stip. ¶256), the amount that CED would have to pay to purchase these securities is also unknown until the date the account is funded. (*See* Ex. 2 at pages 326-27)

[33] While the calculation to determine the Incremental Collateral Pledge makes reference to Lease Collateral Deposit, the Lease Collateral Deposit is not funded under the Retention Option. (Ex. 2 at page 327.)

### b. Retention Option: The Final Basic Rental Payment

Under the Retention Option, CED still would owe EZH the Final Basic Rent Payment of $831,525,734 on February 24, 2041. (Ex. 2 at page 352) CED owes this amount in cash, and nothing reduces or negates its obligation to pay this amount. (Tr. 3911-13 (Bent); *see* Ex. 2 at page 325) The sources from which CED may fund the Final Basic Rent Payment are based on contingent future events, such as (1) revenues from operations, (2) whether CED chooses to provide Acceptable Substitute Collateral or instead funds the Incremental Collateral Pledge and the Trustee Treasury Collateral, and (3) the interest rate CED would earn on the Incremental Collateral Pledge and Trustee Treasury Collateral from the date they are funded. (*See* Stip. ¶246; Ex. 11 at page 744) It is possible that the Final Basic Rent Payment of $831,525,734 would equal the sum of the final Sublessee Loan payment of $414,931,341, the Trustee Treasury Collateral account (if CED elects to fund it on January 2, 2018 and the interest rate on that account does not change until February 24, 2041) of $141,671,596.40, and the Incremental Collateral Pledge (if CED elects to fund this pledge at a currently unknown interest rate, and if it grows to the difference between Final Basic Rent Payment and the sum of the final Sublessee Loan payment and the Trustee Treasury Collateral). (*See* Stip. ¶¶256, 257) Regardless of whether CED elects to provide a letter of credit in lieu of any part of the Trustee Treasury Collateral or the Incremental Collateral Pledge at any time, the Final Basic Rent Payment amount of $831,525,734 that CED would owe to EZH on February 24, 2041 remains the same. (Ex. 2 at pages 325, 352)

The $831,525,734 Final Basic Rent Payment is a recourse liability to the CEL Trust (*See* Ex. 1 at page 45, Ex. 2 at page 325), and is recourse to CEL up to $141,671,596.40.[34] (Stip. ¶248; Ex. 1 at page 45; Ex. 2 at pages 351-52) CEL can satisfy this recourse liability by establishing the Trustee Treasury Collateral, up to the maturity value of that account. (Stip. ¶248; Ex. 1 at page 47) Thus, the difference between the recourse amount and the maturity value of the Trustee Treasury Collateral continues as a recourse liability of CEL. (Stip. ¶248; Ex. 1 at page 47) Importantly, CEL's recourse liability of $141,671,596.40 would be increased by the CEL Trust's distributing to CEL profits, if any, from the operation of the RoCa3 Facility during the period after the Sublease ends. (Ex. 1 at page 45-46; Stip. ¶249) Regardless of whether this Final Basic Rent Payment is recourse to CEL, it is fully recourse against all of the assets of the CEL Trust, which includes all operating revenues that the CEL Trust receives from the sale of the RoCa3 Facility's output. (*See* Ex. 1 at page 45, Ex. 2 at page 325)

### F. CED's Operating Rights and Obligations

Leveraged lease transactions involving facilities like the RoCa3 Facility commonly have more than one equity investor. (Tr. 1041 (Holzman)) An equity investor in such deals often receives an undivided interest in the facility. (Tr. 1041 (Holzman)) An undivided interest entitles the equity investor to sell its portion of the facility's output, and because there can only be a single operator of a facility at any given time, an operating agreement is commonly used to appoint a single

---

[34] CEL Trust and CEL are separate entities.

operator and govern the facility's operations. (Tr. 1042, 1395 (Holzman); Tr. 3067-68 (Mintun))

As part of the RoCa3 Transaction, CED, Banc One and EZH entered into the Facility Operating Agreement, Common Facility Use Agreement and the Facility Support Agreement, collectively referred to as the "Control Documents." (Ex. 1 at page 122) Banc One was a party to these documents since it entered into a separate lease-leaseback transaction for the remaining undivided interest in the RoCa3 Facility. (Stip. ¶58 fn. 2) For the most part, the Control Documents become applicable to CED after the Sublease ends—*i.e.,* after EZH commits a default under the Sublease, after the Sublease Renewal Term ends, or on January 2, 2018 if CED elects the Retention Option (*see* Ex. 11 at page 774; Tr. 1181 (Holzman))—entitling CED to exploit its share of the RoCa3 Facility's output equal to CED's Undivided Interest (47.47%) and requiring CED to pay its share of the costs of operating the RoCa3 Facility. (Tr. 2248-50 (DePlautt); 1181 (Holzman)) The purpose of the Control Documents is best summarized by EZH's Representations that CED (1) is entitled "on a commercially practicable basis" to use, operate, and possess the RoCa3 Facility, (2) has the necessary rights of "ingress and egress for any reasonable purpose in connection with its rights under the Control Documents," and (3) has contractually established rights to "the procurement of [natural] gas, water and other Operating Inputs, and transmission services from the Station Site to the SEP Grid or other such available [high-voltage transmission] grids." (Stip ¶107(ii); Ex. 1 at page 36-37)

### 1. Facility Operating Agreement

The Facility Operating Agreement deals with issues regarding the operation of the RoCa3 Facility with respect to CED after the Sublease ends. (Ex. 11 at page 735; Tr. 1103, 1183 (Holzman); Tr. 3379 (Ellis)) It controls the appointment and removal of the Operator, how the RoCa3 Facility is to be operated, and CED's right to sell its share of the facility's output and obligation to pay for its share of the operational and maintenance costs. (*See, e.g.*, Ex. 11 at pages 737, 740, 742, 744, 749-750). Under the Facility Operating Agreement, EZH was appointed the initial Operator, subject to removal by the Facility Users. (*Id.* at pages 736-37)

#### a. The Operator's Obligations

##### (i) During the Sublease Term

During the Sublease, EZH's duties and responsibilities as Operator are principally governed by the Sublease, not the Facility Operating Agreement. (*See* Ex. 11 at page 738) EZH cannot, however, make certain decisions—such as permanently removing the RoCa3 Facility from operation and commercial service (a "Final Shutdown")—without CED's consent.[35] (Ex. 11 at pages 740-41)

##### (ii) Following Termination of the RoCa3 Sublease

The Facility Operating Agreement provisions with respect to the Operator and CED would be triggered on the date that the Sublease terminates and the

[35] Section 4.1 of the Facility Operating Agreement requires a two-thirds vote by the Leaseholders, excluding EZH as Operator, to commence a Final Shutdown. (Ex. 11 at pages 740-01, Stip. ¶¶267, 268) CED holds 47.47% of the votes. (*See* Stip. ¶¶267, 268; Tr. 1188-89 (Holzman))

Undivided Interest is returned to CED.[36] (Ex. 11 at page 738) From this date forward, the Facility Operating Agreement controls and the Operator is responsible for operating the RoCa3 Facility in accordance with Prudent Industry Practice and has the responsibility for decisions regarding:

- Maintenance and operations of the RoCa3 Facility,
- Need and timing of any modifications, including those that are needed to keep the RoCa3 Facility in compliance with Dutch law,
- Scheduling outages for modifications,
- Determining the nature and timing of Capital Expenditure Budgets and Operating Expense Budgets, and
- Integrating RoCa3's Unit with the other units at the Station Site.

(Ex. 11 at pages 742-43) Before the Operator schedules any maintenance outages or installs any modification, the Operator must first consult with CED as a Facility User.[37] (Stip. ¶267; Ex. 11 at page 743)

In addition, many operational matters require CED's approval as a Facility User prior to the Operator taking any action.[38] (Ex. 11 at pages 740-41; Tr. 1089 (Holzman)) These actions would require approval by a two-thirds vote of all shares entitled to vote (Ex. 11 at pages 740-41), and CED would have 47.47% of the votes. (Stip. ¶267; Tr. 1189 (Holzman)) These matters include changing the RoCa3

[36] Commencement Date means any date that either sublease terminates, but not where EZH has purchased either CEL Trust's or Banc One Trust's leasehold interest. (Ex. 11 at page 773)
[37] Stip. ¶267 provides that CED is a Facility User during such period.
[38] After the termination of the Sublease, CED will be a Facility User. (Stip. ¶267; Tr. 1189 (Holzman))

Facility's capability of producing 220MW of electricity, 200MW of heat and 7 kg/s of carbon dioxide (the "Minimum Capability") of the plant; placing the facility out of service for any period and adopting Capital Expense Budgets and Operating Expense Budgets. (Ex. 11 at page 741; Tr. 1187-88 (Holzman)) Should CED and the other voters not agree on any operational matter it would be submitted to arbitration. (Ex. 11 at page 742).

**b. CED's Rights and Obligations**

Following the termination of the Sublease, for any reason other than EZH's election of the Sublease Purchase Option, CED is entitle to schedule for sale its portion of the RoCa3 Facility's output and retain any revenues from such sales. (Tr. 1184-85 (Holzman); Stip. ¶¶267, 269; Ex. 11 at pages 750-51) CED is entitled to sell 47.47% of the RoCa3 Facility's output. (Ex. 11 at page 750; Tr. 1189 (Holzman); Tr. 4829-30 (Ray); Tr. 3156-57 (Ellis); Tr. 5160-61 (LaRue)) Alternatively, CED can enter into a new sublease with a third party, under which CED can lease its Lease Interest to the new third party for a defined period (Ex. 2 at page 333; *see* Stip. ¶178), and this new sublessor would be entitled to schedule for sale 47.47% of the RoCa3 Facility's output and retain any revenue generated by such sales. (*See* Stip. ¶267 together with Ex. 11 at page 750)

Upon return of the Undivided Interest, CED is required to pay the Operator a monthly Operating Fee and its share (47.47%) of the Operation and Maintenance Expenses. (*See* Stip. ¶269; Ex. 11 at page 738, 750; Tr. 1186-89 (Holzman)) The Operator will propose the amount of its operating fee, which must be approved by a

two-thirds vote of the shares entitled to vote. (Ex. 11 at page 739) However, no operator, even EZH, that holds shares entitled to vote is permitted to vote on the approval of the Operating Fee. (*Id.*) Regardless, by virtue of its 47.47% of the shares entitled to vote, CED can approve or not approve the amount of any proposed fee. (*Id.*; *see* Stip. ¶267) If the Operator's proposed fee is not approved by the necessary two-thirds vote, one or more appraisers will be retained to determine a fair and reasonable operating fee. (Ex. 11 at pages 739, 781)

In addition, the Operator will submit to CED and to any other Facility User (*see* Stip. ¶267) prior to the beginning of each contract year an Operating Expense Budget that contains the Operator's estimate of the Operation and Maintenance Expenses. (Ex. 11 at page 749) Operation and Maintenance Expenses include payments made and obligations incurred by the Operator for engineering, purchasing, repair, inspecting, testing, operation, use and maintenance associated with the RoCa3 Facility's operations. (*Id.*) Because CED has 47.47% of the shares entitled to vote, CED's vote is necessary for the approval of the Operating Expense Budget. (*Id.* at pages 740-41)

#### c. Appointment and Removal of the Operator

On December 15, 1997, EZH was appointed the initial Operator of the RoCa3 Facility. (*Id.* at page 736) EZH will remain the Operator so long as either sublease—between CED and EZH, or Banc One and EZH—is in effect. (*Id.* at page 736) When either Sublease is in effect, CED and Banc One, as Leaseholders, can agree to remove EZH as Operator if EZH: (1) defaults in any material respect on its

obligations as Operator under the Facility Operating Agreement (a "Facility Operating Agreement Default") and does not remedy the default after being notified of such, or (2) commits an event of default under either sublease.[39] (Stip. ¶266; Ex. 11 at page 736) As the Operator, EZH cannot vote against removing itself for either of these reasons. (Ex. 11 at page 736) During the terms of both subleases to EZH, EZH may not resign as the Operator of the RoCa3 Facility unless both CED and BOL agree to EZH's resignation. (See Stip. ¶267 together with Ex. 11 at pages 737)

After both subleases have been terminated, EZH, or any replacement Operator, can be removed as Operator for either of two reasons. First, if a Facility Operating Agreement Default has occurred, EZH can be removed by a two-thirds vote of shares entitled to vote (the "Entitlement Shares"). (Ex. 11 at page 737) Thus, CED and Banc One together can remove EZH as Operator, since they would together hold two-thirds of the Entitlement Shares. (*See Id.* at page 737; Stip. ¶266) If EZH purchases Banc One's leasehold interest, CED, by itself, can remove EZH as the Operator if a Facility Operating Agreement Default has occurred and is continuing since EZH would not be entitled to vote as Operator.[40] (Ex. 11 at page 737)

---

[39] A Leaseholder includes either Trustee of the CEL Trust or the Banc One Trust, or EZH to the extent its Property Rights in the RoCa3 Facility are not subject to a lease by either trust. (Stip. ¶267) However, EZH, as Operator, is not permitted to vote against removing itself under situations (1) or (2). (Ex. 11 at page 736) CED and Banc One, respectively, have 47.47% and 52.53% of the Entitlement Shares (*see* Stip. ¶267; Ex. 11 at page 740), so each will need to vote in favor of removing EZH as Operator.

[40] This is because EZH cannot vote, as Operator, against its removal if a Facility Operating Agreement Default has occurred. (Ex. 11 at page 737)

Second, CED and Banc One can together vote to remove EZH as Operator regardless of whether EZH is in default or not. (*Id.* at page 737)

### 2. Facility Support Agreement

The Facility Support Agreement establishes many terms regarding how CED would get access to certain necessities with respect to the operation of the RoCa3 Facility. (Tr. 1104 (Holzman)) As part of this agreement, EZH agreed to provide certain services and rights to CED—such as access to the high-voltage transmission grid and the Cooling Water Station, and the provision of natural gas—upon the termination of the Sublease if EZH has not elected the Sublease Purchase Option.[41] (Tr. 1104 (Holzman); *see* Stip. ¶274; Ex. 13 at page 828)

After the termination of the Sublease, CED has the right to use the Facility Support Items, which include, among others things, access to all wires and other systems that are not located on the Building Site that connect the generating unit and the Cooling Water Channel, the Cooling Water Station and pipes that transport heat and carbon dioxide to the distributor. (Stip. ¶274; Ex. 13 at pages 829-30) EZH agreed to provide certain services, such as waste disposal services, access to water in an amount sufficient to operate the RoCa3 Facility and laboratory testing facilities. (Ex. 13 at page 830; *see* Stip. ¶275) CED would be responsible for paying its share (47.47%) of the fair market value of the Facility Support Items and Services that EZH provides. (Ex. 13 at pages 830-31)

---

[41] During the term of the Sublease, EZH's rights and obligations are governed by the Sublease. (Ex. 13 at page 829)

EZH is also required to provide a number of Operating Inputs, such as natural gas from Gasunie and other chemicals needed to operate the RoCa3 Facility. (*Id.* at page 831; Tr. 1104 (Holzman)) EZH will purchase gas on the best terms available from Gasunie and resell the gas at those prices to CED. (Ex. 13. at page 831; Tr. 1104 (Holzman)) CED will pay EZH for its provision of these Operating Inputs. (Ex. 11 at pages 755-56) EZH agreed to provide CED with access to the high-voltage transmission grid for the transmission of its share of the electricity generated by the RoCa3 Facility. (Ex. 13 at pages 829, 832) In addition, should there be no point of connection to the high-voltage transmission grid for the power generated by the RoCa3 Facility at the site, EZH is obligated to transmit RoCa3's power output to a commercially reasonable site so CED can transmit its power. (*Id.* at page 832) CED will be responsible for paying EZH its share (CED's 47.47%) of the fair market value of these transmission services. (*Id.* at pages 832-33)

### 3. Common Facility Use and Support Agreements

Two other power facilities share the site where the RoCa3 Facility is located. (Stip. ¶270) The Common Facility Support Agreement covers items that are to be shared by the RoCa3 Facility and the other two facilities at the site. (Tr. 1103-04 (Holzman)) For example, the Common Facility Use Agreement defines CED's and EZH's rights and obligations to Common Facilities, including CED making the control room available to the other two units at the site. (Tr. 1103-04 (Holzman); Stip. ¶270; Ex. 12 at pages 804-05) EZH will be able to use the Common Facilities

in connection with the operation of the other two units that are located beside the RoCa3 Facility. (Stip. ¶272; Ex. 11 at page 773)

### G. CED's Operational Risks with Respect to the Undivided Interest

CED would be subject to operational risks (1) if CED takes possession of the Undivided Interest in the RoCa3 Facility due to a Premature Termination Event, such as EZH's default under the Sublease, (2) during the Retention Option Period, or (3) during the Shirt-Tail Period following the Sublease Renewal Term. (Tr. 3156-57 (Ellis)) CED would bear the same operational risks regarding use and operation of the RoCa3 Facility under any of these scenarios. (Tr. 3160-61 (Ellis); Tr. 5163-64 (LaRue)) In fact, CED may be subject to a significant amount of operational risk. (Tr. 4836 (Ray) (indicating that operational risk is material)) The operational risks associated with being a power generator, which CED may be bear, include:

- potential for sale price fluctuations,
- potential for fuel price fluctuations,
- potential RoCa3 Facility efficiency and output level fluctuations,
- potential operation and maintenance cost fluctuations,
- potential costs related to environmental compliance requirements,
- potential reorganization of The Netherlands' electricity distribution system, and
- unknown power demand.

(Tr. 3157-58 (Ellis); Tr. 2695-96 (Reed); 4804-05 (Ray))

In addition, CED would also be subject to currency risk on the conversion of revenues from the sale of power, steam or carbon dioxide from Guilders (now Euros), the currency in which the power would be sold, to U.S. dollars. (Tr. 3158 (Ellis); Tr. 5163-64 (LaRue))

Also, based on the RoCa3 Facility's uncertain revenues and expenses, CED would be exposed to the risk that the RoCa3 Facility's operations may not be profitable if operating expenses increase without a corresponding increase in revenues, resulting in an operating loss. (Tr. 3158-59, 3168 (Ellis); Tr. 2608-10; 2620-26 (Reed)) Although future fluctuations in operating costs could be favorable, CED's profit or loss from 2018 through 2041 is unknown and will be subject to future uncertain market conditions. (Tr. 3160, 3168-69 (Ellis); Tr. 2609-10 (Reed))

Deloitte projected the annual cash flows based on the revenues and expenses from the sale of the RoCa3 Facility's power and heat for the Shirt-Tail Period following the Sublease Renewal Term and for the Retention Option Period. (Ex. 46 at pages 1746-49) The Deloitte Appraisal estimated that CED could earn $157,146,059[42] in after-tax cash flows from operating the RoCa3 Facility during the Shirt-Tail Period. (*See* Ex. 46 page 1749) In addition, the Deloitte Appraisal estimated that CED could earn $506,705,180[43] in after-tax cash flows from

---

[42] The total of the line entitled "cash flow" in Exhibit 46 on page 1749 (652,816,577 NLGs) reflects the after-tax cash flows from the entire RoCa3 Facility. To reflect CED's portion, this amount must be multiplied by CED's percentage interest in the RoCa3 Facility (approximately 47.47%) and divided by the exchange rate (1.972). The resulting amount is $157,146,059.

[43] The total of the line entitled "cash flow" in Exhibit 46 on pages 1746-48 (2,104,956,003 NLGs) reflects the after-tax cash flows from the entire RoCa3

operating the RoCa3 Facility during the Retention Option Period. (*See* Ex. 46 pages 1746-48)

## IX. POST-TRANSACTION DEVELOPMENTS

### A. Con Edison's Publicizing of the RoCa3 Transaction

CED drafted language to include in a press release regarding the RoCa3 Transaction and, in conjunction with EZH, developed several versions of this press release. (*See* Ex. 1280 at page 17964; Ex. 1282 at pages 17966-67; Ex. 1279 at pages 17962-63; Ex. 1284 at pages 17970-76) Ultimately, due to the closing date of the RoCa3 Transaction, December 15, 1997 and the drafting of the Con Edison's 1997 Annual report in early 1998, CED elected to include a section about the RoCa3 Transaction in the Annual Report rather than issue a press release. (*See* Ex. 1281 at page 17965) Once again, CED worked together with EZH on the language to be included in the Annual Report. (*See id*. at page 17965)

Con Edison's 1997 Annual Report summarized CED's investment strategy and highlighted CED's investments in The Netherlands, Guatemala and China. (Ex. 107 at page 2961; Tr. 177-80 (McGrath)) The Annual Report highlighted the RoCa3 Transaction by including a picture of tulips and emphasizing the environmental benefit provided by the RoCa3 Facility. (Ex. 107 at page 2961) It noted that the RoCa3 Facility's environmental design, allowing for the transfer of carbon dioxide to local greenhouses, made the RoCa3 Facility "one of the most

---

Facility. To reflect CED's portion, this amount must be multiplied by CED's percentage interest in the RoCa3 Facility (approximately 47.47%) and divided by the exchange rate (1.972). The resulting amount is $506,705,180.

innovative and environmentally friendly electric generation facilities in the world." (*Id.* at page 2961; Tr. 180-82 (McGrath); Tr. 983 (McCartney)) Con Edison was proud of the environmental features of the RoCa3 Facility (Tr. 780 (McCartney), and this environmental aspect was important to Con Edison's efforts to improve its environmental performance and become a more environmentally friendly company. (Tr. 181 (McGrath)) Con Edison produced over 100,000 copies of the 1997 Annual Report, and the intended audience for the report included shareholders, the investment community and Con Edison's employees. (Tr. 171 (McGrath)) The Annual Report was available to Con Edison's shareholders at a May 1998 shareholder meeting. (Tr. 984 (McCartney)) At this May 1998 shareholder meeting, McGrath reported on Con Edison's deregulation and restructuring plan, including CED's formation, strategy and investment in The Netherlands. (Ex. 857 at page 13456)

Later in 1998, a *Wall Street Journal* article regarding Con Edison's deregulation strategy also highlighted CED's international power plant investment in The Netherlands. (Ex. 858 at pages 13492-93; Tr. 4938-39 (Ray))

**B. CED's Financial Reporting of the RoCa3 Transaction**

For financial reporting and accounting purposes, CED reported income from the RoCa3 Transaction of $0 for 1997 and $8,096,792 for 1998. (Stip. ¶297; Ex. 423 at page 8442; Tr. 699 (Freilich)) The income reported for 1997 and 1998 in CED's certified financial statements (Ex. 423 at page 8442) equal the 1997 and 1998

amounts in the "Pre-tax income" column of the final pricing runs for the RoCa3 Transaction. (Ex. 333 at page 7254; Tr. 701 (Freilich))

Cornerstone had provided three pricing runs to CED, including (1) the final economic pricing run used to close the RoCa3 Transaction, (2) a final book accounting pricing run for the full 43-year Lease Term, and (3) a final book accounting pricing run that incorporated the exercise of the Sublease Purchase Option. (Ex. 331 at page 7154; Tr.1191-93 (Holzman)) As discussed above in Facts Section IV.D.1., these pricing runs were generated by the ABC pricing software program used to price the RoCa3 Transaction. (Tr. 1000-01 (Holzman)) Holzman pointed out that Exhibit 332[44] is the final economic pricing run, which was used to close the transaction (Tr. 1193-94, 1201 (Holzman)), Exhibit 333 is the final pricing run for the full Lease Term based on the Sublease Renewal Option being exercised (Tr. 1194-95 (Holzman)), and Exhibit 609 is the final pricing run that incorporated the exercise of the Sublease Purchase Option. (Tr. 1202 (Holzman)) CED used Exhibit 333, the final pricing run for the full 43-year Lease Term, to book the RoCa3 Transaction for financial reporting purposes. (Tr. 1204-05 (Holzman); Tr. 701 (Freilich))

### C. Officer's Certificates

Following the close of the RoCa3 Transaction, EZH was to provide an annual Officer's Certificate certifying that the officer's review of the transactions and conditions of EZH did not reveal a condition or event that constituted an event of

---

[44] As evidenced by the time stamp on the pricing runs, Holzman stated that Exhibit 330 was a duplicate of the pricing run at Exhibit 332. (Tr. 1201 (Holzman))

default under the Sublease. (Stip. ¶149; Ex. 1 at page 53) The Officer's Certificate was also to include the names of the Responsible Officers for the next 12-month period as well as the credit rating of the letter of credit issuer. (Stip. ¶149; Ex. 1 at pages 53-54)

CED had copies of the Officer's Certificate in its records for the years 1999 (Ex. 367), 2000 (Ex. 368), 2002 (Ex. 370) and 2004 (Ex. 369). (Stip. ¶150) The Officer's Certificate contains various representations, including statements about events of default, environmental claims and performance of maintenance. (*See*, *e.g.*, Exs. 367, 368, 369, 370) Defendant's leasing expert Ray agreed that the information and matters contained in the Officer's Certificates were typical for an officer's certificate indicating in the broadest terms that the party is in compliance with the sublease. (Tr. 4909-13, 4963) Also enclosed with the Officer's Certificate was a copy of the audited annual report. (*See*, *e.g.*, Exs. 786, 794, 797, 793) Annual Officer's Certificates on matters such as insurance (*see*, *e.g.*, Ex. 701) and maintenance indicated that these matters were important or significant CED. (Tr. 4909-13 (Ray))

**D. EZH's Post-RoCa3 Transaction Ownership Changes**

Since the close of the RoCa3 Transaction, EZH has undergone several ownership changes. (*See* Stip. ¶¶69, 70, 71) On July 16, 1999, EZH's shareholders agreed to sell their EZH stock to PreussenElektra AG. (Stip. ¶69; Ex. 292 at page 5733) PreussenElektra AG was a German utility and a subsidiary of the German VEBA group. (Stip. ¶69; Ex. 292 at page 5733) On July 20, 1999, EZH notified CED that its shareholders had agreed to sell their shares in EZH to PreussenElektra AG.

(Stip. ¶70; Ex. 293 at page 5788) In January 2000, PreussenElektra acquired 100 percent ownership of EZH. (Stip. ¶71; Ex. 294 at page 5789)

In June 2000, two German utilities, VEBA AG and VIAG AG, merged to form E.ON AG, a German company whose shares were then listed on both the Frankfurt and New York stock exchanges. (Stip. ¶71; Ex. 294 at page 5789) As part of this merger, E.ON AG transferred the stock of EZH to E.ON Energie AG, a wholly owned subsidiary of E.ON AG (collectively "E.ON). (Stip. ¶71; Ex. 294 at page 5789) On December 11, 2000, E.ON Benelux Generation N.V. informed CED that E.ON Energie AG caused EZH to change its name to E.ON Benelux Generation N.V. (Stip. ¶72; Ex. 295 at page 5791)

E.ON is a large European energy generator with locations and customers in Scandinavia, the United Kingdom, Western Europe and Eastern Europe. (Ex. 10074 (Goulding Initial Report) at page 20087) Currently, E.ON is building several plants across Europe to meet future needs, including one in The Netherlands. (Ex. 10074 (Goulding Initial Report) at page 20087)

**E. NUON**

In September 1998, CED was reviewing a potential leasing investment in NUON, a Netherlands natural gas distribution utility. (Ex. 262 at page 4978) As discussed above (*see* Facts Section I.), Con Edison's original line of business involved the distribution of natural gas to New York State. (Tr. 110 (McGrath); Ex. 856 at page 13402; Tr. 492 (Burke)) Accordingly, Con Edison, including McCartney, had significant experience in the gas distribution business and hoped to learn about

Dutch gas distribution techniques from CED's potential investment. (Tr. 796-97 (McCartney)) In addition, CED identified potential benefits of the NUON investment including front-loaded earnings, after-tax yield and strategic value. (Ex. 428 at pages 8593-94) CED prepared a project briefing memorandum, a white paper and an investment recommendation pertaining to the potential lease-leaseback of NUON's natural gas distribution assets. (Stip. ¶56(d); *see* Exs. 315, 316, 317, 318, 428) In October 1998, CED retained Cornerstone to provide advice in connection with the NUON transaction. (Stip. ¶56; Ex. 281) Near the end of October 1998, Cornerstone on behalf of CED submitted an initial proposal for the acquisition of a leasehold interest in NUON's gas distribution assets. (Ex. 312 at pages 6338-41) If CED's proposal was accepted by NUON, CED anticipated a potential closing date for the transaction of late December 1998 or early January 1999. (Ex. 195 at page 4300) On December 10, 1998, Cornerstone on behalf of CED submitted a revised proposal to NUON. (Ex. 319) In December, CED received an investment mandate from NUON's Board (*see* Ex. 262 at page 4983 and Ex. 212 at page 4363), and by late December, NUON and CED had started the negotiation process (Ex. 212 at page 4363) and the due diligence process. (Ex. 262 at page 4983; *see also* Ex. 217 at page 4381) On February 12, 1999, NUON accepted CED's proposal for investment in the NUON transaction. (Ex. 314) By the end of February, CED had made significant progress in negotiations and in the due diligence process and anticipated a closing date between March 18, 1999 and April 15, 1999. (Ex. 232 at page 4419)

CED closed the NUON transaction on May 18, 1999. (Stip. ¶56(d); *see* Ex. 313 at page 6352)

### F. Change in CED's Overall Investment Strategy

During 1998, CED transformed from a conceptual start-up company to an ongoing and growing business. (Ex. 262 at page 4967) In 1998, CED successfully acquired ownership interests in three power generation projects—two projects in the United States (Ada and Carson) and one project in Guatemala (GENOR)—and successfully participated in a bid for technical services in Zhejiang, China. (*Id.*) Since September 1998 and continuing through year's end, CED was in the process of negotiating to invest in the lease-leaseback of NUON's gas distribution assets in The Netherlands. (*Id.*)

In early 1999, CED began to refocus its investment strategy and efforts, including a concentration on energy projects in the northeastern United States, Guatemala and Central America. (*Id.* at page 4968; Ex. 272 at page 5334) Due to instability in the international market during 1998, including the Asian credit crisis and South American currency devaluation, CED elected to withdraw from its partnership with IEP (*see* Ex. 1063 at page 15601) and eventually to refocus its investment strategy on opportunities in locations that CED was comfortable with, such as the United States and Guatemala. (Tr. 2019-21 (Muoio))

### G. Post-Transaction Site Visit to RoCa3 Facility

Although CED's Sublease to EZH is not scheduled to end before 2018 (Stip. ¶135) and EZH's Officer's Certificates indicated EZH was not in default of any of its

obligations under the Sublease (*see, e.g.*, Exs. 367, 368), CED conducted an inspection trip to the RoCa3 Facility in November 2005. (Ex. 352) On this trip, CED management met with E.ON personnel, including the operations and maintenance manager for the RoCa3 Facility, and conducted a technical review of the RoCa3 Facility. (*Id.* at pages 7473-74) This technical review involved an evaluation of the RoCa3 Facility's operations and maintenance, including a thorough inspection of the gas turbine, $CO_2$ boiler and greenhouses. (*Id.* at pages 7475-76) In addition, CED spoke with employees at the RoCa3 Facility and noted that they recognized the importance of safety, environmental compliance, reliability and cost control. (*Id.* at page 7476)

## X. EXPERT TESTIMONY

Although much of the testimony given by the experts in this case is presented in the above description of the facts, Con Edison here, per the Court's request, summarizes the expert testimony specifically. Section X.A. briefly summarizes the qualification and opinions of each expert, while Section X.B. presents the information thematically.

### A. Qualifications and Roles of Expert Witnesses

Con Edison offered the testimony of five experts related to different aspects of its investment in the RoCa3 Facility: David M. Ellis, a leasing consultant; A.J. Goulding, a consultant in various international energy markets; John P. Kelly, an appraiser who focuses on energy assets; John J. Reed, a consultant in the purchase

and sale of large energy assets; and Roman L. Weil, an accounting professor at the University of Chicago.

Defendant offered the testimony of four expert witnesses: Paul Bent, a leasing consultant; David W. LaRue, a tax and accounting professor; Samuel Ray, a leasing consultant; and Jacob K. Thomas, an accounting and finance professor. Defendant also submitted a report by Jeffrey Tranen, an expert in the utility industry, regarding Con Edison's business purpose for entering into the RoCa3 Transaction. (Tr. 3665-66) Following the testimony of Con Edison's witnesses, Defendant's counsel did not call Tranen at trial even though he was available for testimony. (*Id.*)

**1. Paul Bent**

Paul Bent was qualified by Defendant as an expert in equipment leasing transactions, including the structuring, arranging, and negotiation of such transactions. (Tr. 3683-84) Bent has a Bachelor's degree in mathematics and computer science from UCLA and a J.D. from Southwestern University School of Law. (Tr. 3673) After some work as vice president and general counsel in a boutique leveraged leasing firm, Bent founded GoodSmith & Company in 1984, a corporate financial advisory firm focusing on equipment financing and leasing; he is still the CEO and general counsel. (Tr. 3667, 3673-74) He is also currently a principal in the ALTA Group, a consulting firm focusing on equipment leasing and finance. (Tr. 3667)

Bent testified as to the structure of the RoCa3 Transaction. Specifically, he opined that some features of the RoCa3 Transaction were not typical in leveraged leasing—such as (1) the use of a debt defeasance account (Tr. 3709-10); (2) the use of defeasance accounts to fully fund the Sublease Purchase Option (Tr. 3767); (3) the role he understood the Trustee Treasury Collateral, Lease Collateral Deposit, and Sublessee Loan to play in Con Edison's Final Basic Rent Payment obligation (Tr. 3762-66); and (4) the structure of the maintenance obligations under the Lease and Sublease. (Tr. 3766) He also testified, however, that many other aspects of the RoCa3 Transaction were typical: (1) the lease-leaseback structure (Tr. 3796-3800); (2) the nonrecourse loan covering two-thirds of the purchase price (Tr. 3866); (3) equity defeasance and investment trusts (Tr. 3760-61, 3819-20, 3692-93); (4) various provisions of the Participation Agreement and the Sublease (Tr. 3830-63); (5) the Sublease Termination Value provisions (Tr. 3751-52); (6) the use of a hell or high water provision, a net lease, and a tax indemnification agreement (Tr. 3849-50, 3864, 3874); (7) the fact that the Sublease rental payments were identical to CED's debt obligations, and that the Sublease rent was assigned directly to HBU (Tr. 3709, 3743, 3800-01, 3868-72); and (8) CED's expected pretax internal rate of return. (Tr. 3785-86)

Bent agreed that EZH has "enforceable obligations" under the transaction documents to pay sublease rent (Tr. 3805), but he nonetheless opined that so long as the deal "goes to term," EZH would never advance its own cash into the transaction. (Tr. 3715-16) This opinion was based in part on Bent's belief that it is "highly

unlikely" EZH would pay its Sublease Renewal Rent and Sublessee Loan repayment obligations based on its transaction "economics" (Tr. 3804-05, 3921-24), and in part on his conclusion that EZH could exercise the Sublease Purchase Option solely by using the value available to it in the IJssel Deposit and Sublease Deposit. (Tr. 3720-23)

Finally, Bent gave his opinion as to various aspects of CED's risk and return in the transaction. In Bent's general view, the defeasance accounts "virtually assure" CED and HBU of full repayment while simultaneously providing CED a return on its investment "without any involvement from the lease itself." (Tr. 3734-35, 3737, 3743-44) In addition, the Letter of Credit addresses any payment risk CED would face on an early termination by "fill[ing] the gap" between the termination payments CED would be owed and the balance in the defeasance accounts. (Tr. 3750-51) He also agreed, however, that (1) there were various circumstances in which EZH's obligations were not "fully defeased" (Tr. 3807, 3813-15); (2) potential revenues or losses from CED's sale of electricity during the Retention Option Period or Shirt-Tail Period of the Sublease Renewal Option would increase or decrease CED's return based on the actual results of the RoCa3 Facility's operations (Tr. 3955-57); and (3) under some potential Premature Termination Events scenarios, CED could receive a net payment of twice its initial investment in the RoCa3 Transaction, which would not be dependant on the value of the defeasance accounts. (Tr. 389-94, 3826-38)

### 2. David M. Ellis

David M. Ellis was qualified by Con Edison as an expert in the areas of finance, analysis and returns of complex financial transactions (including leases), and analysis and valuation of securities. (Tr. 3115-16) Ellis has a Bachelor's degree from the University of Durham (England), an M.B.A. with an emphasis in finance from Brigham Young University, and a Ph.D. in finance from the University of North Carolina–Chapel Hill. (Tr. 3085-86) He was an assistant professor of finance at Texas A&M University for seven years and an assistant professor at the business school of Babson College for three years; he taught classes in advanced corporate finance (including leasing and other financing methods), investments and derivatives, portfolio management, asset pricing and capital markets. (Tr. 3094-3100) Ellis is currently a vice president at National Economic Research Associates, an economic consulting firm, where he works in securities and finance and consults on large-ticket leveraged leases. (Tr. 3100-03, 3105-11)

Ellis gave testimony regarding the size and nature of the leveraged leasing market. (Tr. 3123-50) He identified ten economic factors common to all leveraged leases, which he found were also present in the RoCa3 Transaction. (Ex. 10073 (Ellis Initial Report) at pages 19995-96; Tr. 3150-53) He specifically discussed defeasance, including: (1) the reasons parties use defeasance and similar credit support (Tr. 3199-3206); and (2) the difference between legal defeasance arrangements and the economic defeasance that CED and EZH used in this transaction. (Tr. 3184-98, 3204-05)

Ellis also testified at length about the economic structure of leveraged leasing. First, he testified that taxes play an important role in all leveraged leases because the investment structure is set up to provide the investor with tax deferral through accelerated depreciation and interest deductions. (Tr. 3231-34) Second, he testified that investment and budgeting decisions are normally made on an after-tax basis. (Tr. 3235-36) This includes decisions regarding leasing because leveraged leases provide satisfactory rates of return only when tax aspects are taken into account. (Tr. 3235-36) Third, Ellis compiled leveraged leasing examples from different sources and compared the pretax internal rates of return, after-tax yields, and average treasury yields at the time of the investment. In each leveraged lease examined, the pretax yield on the transaction was lower than the treasury yield available at that time. (Tr. 3254-62)

### 3. A.J. Goulding

A.J. Goulding was qualified by Con Edison as an expert in the regulatory economics associated with electricity markets.[45] (Tr. 2364-65) Goulding has a Bachelor's degree in economics from Earlham College and a Master's degree in international business from Columbia University. (Tr. 2342) Goulding is currently the president of London Economics International, LLC, where he is involved in "electricity market design exercises around the world" (Tr. 2341, 2348); he is also an

---

[45] The field of regulatory economics includes "the regulation of monopolies" and the regulation of industries—such as the electric power industry—that were once thought to be natural monopolies but that are now regulated only in part. (Tr. 2350-51) Goulding's work in this field has "involve[d] either the design of tariffs for electricity or the design of markets for electricity." (Tr. 2350-51)

adjunct assistant professor attached to the School of International Public Affairs at Columbia University, where he teaches a course in electricity markets. (Tr. 2359-60) He has been involved in shaping deregulation policy in various countries: he has worked with the monopoly electricity supplier of France on internal transfer pricing as it unbundled its assets; provided support during the privatization of distribution networks in Romania; examined the regulations concerning third-party access to natural gas networks in Spain; directed the valuation of a cogeneration plant in France; reviewed valuations of hydropower assets in Austria and wire networks in Austria, The Netherlands, and Germany; wrote the electricity industry restructuring plan for Saudi Arabia; reviewed the arrangements governing the major utilities in Hong Kong; and worked on retail market design in Alberta, Canada. (Tr. 2352-55, 2358-59) He has also been involved in numerous generation asset acquisitions in the U.S. (Tr. 2356), and has published articles regarding performance-based rate making in the United Kingdom and the effects of the European Union directives on European electricity markets and investment opportunities there. (Tr. 2361-62)

Goulding testified about the regulation of energy markets in 1997. Specifically, he testified that at that time, international acquisitions of generation assets by large United States utilities were common. (Tr. 2368) Further, it was reasonable, from a regulatory and/or market perspective, for a company like Con Edison to invest in and/or operate a cogeneration facility in The Netherlands. (Tr. 2369) Goulding also opined that the description in the Deloitte Appraisal of The

Netherlands' regulatory framework was consistent with then-current information about the evolving Dutch environment (Tr. 2370), and that an asset like the RoCa3 Facility satisfied the criteria a United States utility like Con Edison would likely have used to analyze or assess a potential investment. (Tr. 2370)

Goulding also testified about reasonable expectations regarding 2018. He opined that in 1997, it would have been reasonable to expect that EZH would not have been under any regulatory or market compulsion to exercise the Sublease Purchase Option in 2018. (Tr. 2370-71) Further, it would have been reasonable at that time to expect that if CED had the right to the output of the RoCa3 Facility in 2018, it could either sell that output for its own benefit or sublease part or all of its Undivided Interest to a third party. (Tr. 2371)

#### 4. John P. Kelly

John P. Kelly was qualified by Con Edison as an expert in valuations, appraisals and appraisal reviews of utility properties. (Tr. 2755) Kelly has a B.S. in electrical engineering from Northeastern University; he has also taken graduate courses at the Northeastern University graduate school. (Tr. 2750) Kelly is a Registered Professional Engineer in Maine and a Certified General Real Estate Appraiser in Maine, Massachusetts, New York, and Michigan. (*Id.*) Over the course of his career, he has worked for a power company, an architectural engineering firm specializing in the energy industry (where he worked as an engineer, as a power plant and electric utility appraiser, and in management), and two consulting firms (where he did power plant valuation work). (Tr. 2750-53) Kelly has performed over

200 power plant appraisals and testified as an expert before utility commissions and courts approximately 50 times. (Tr. 2753-54) He is currently an Executive Adviser at Concentric Energy Advisers. (Tr. 2753)

Kelly opined that Deloitte's Appraisal of the RoCa3 Facility and Transaction was complete, relevant and reasonable in accordance with the Uniform Standards of Professional Appraisal Practice. (Ex. 10075 (Kelly Initial Report) at page 20129) He also "reperform[ed] the Deloitte analysis" and independently concluded that EZH would not be economically compelled to exercise the Sublease Purchase Option in 2018. (Tr. 2788)

**5. David W. LaRue**

David W. LaRue was qualified by Defendant as an expert in accounting and finance. (Tr. 5046) LaRue has a Bachelor's degree in production logistics management and a Master's degree in accountancy from the University of Houston. (Tr. 5010) He also has a Ph.D. from the University of Houston College of Business; in business school, his major fields of study were accounting and taxation, and he studied economics as a "supporting field." (Tr. 5029-30) LaRue is currently an associate professor at the University of Virginia. (Tr. 5011) During his academic career, he primarily has taught tax accounting, financial accounting, and international finance. (Tr. 5011-12, 5032-33)

LaRue opined as to the amount, timing and present value of the pretax and after-tax cash flows that he believed CED was reasonably assured of receiving from the RoCa3 Transaction under either the Sublease Purchase Option or the Sublease

Renewal Option (assuming, however, that CED did not have any residual profit or loss during the Shirt-Tail Period of the Sublease Renewal Option). (Ex. 20194 (LaRue Initial Report) at page 25150 (Sublease Purchase Option), 25153 (Sublease Renewal Option); Tr. 5233-34) Based on these specific cash flow charts, he determined that CED did not have a reasonable expectation of making a "pre-tax economic profit" under the Sublease Purchase Option or the Sublease Renewal Option: LaRue opined that "[a] negative net present value . . . results in an economic loss from the investment" (Tr. 5084), and the cash flows he identified from both the Sublease Purchase Option and the Sublease Renewal Option (disregarding any profits from the Shirt-Tail Period) had negative net present values under LaRue's chosen discount rate. (Ex. 20194 (LaRue Initial Report) at page 25111; Tr. 5052-53, 5233-34) LaRue's opinion did not examine the pretax economic profit CED could receive during the Retention Option Period. (Tr. 5233-34)

LaRue also testified that he believed CED's return on the RoCa3 Transaction was "preordained" and "fixed and determinable" at closing and that CED did not bear any "substantial, genuine risk" of economic loss—again assuming that only the Sublease Purchase Option or the Sublease Renewal Option is exercised, and also assuming that CED did not have any economic risks or benefits during the Shirt-Tail Period. (Ex. 20194 (LaRue Initial Report) at page 25111; Tr. 5234-36)

**6. Samuel M. Ray**

Samuel M. Ray was qualified by Defendant as an expert in large-ticket equipment lease transactions and the equipment leasing industry. (Tr. 4707) Ray

has a Bachelor's degree in mechanical engineering from Texas Tech University and a Master's degree in business administration from Southern Methodist University. (Tr. 4697-98) Ray worked for approximately 17 years as a mechanical engineer and financial analyst before he began working in the leasing division at Electronic Data Systems ("EDS"), where he stayed for 16 years. (Tr. 4698-99) The leasing division at EDS entered into leveraged leases as both a lessee and equity investor, and worked on two leases involving cogeneration power plants. (Tr. 4701, 4704-05) Ray has been retained as an expert in litigation involving equipment leases and has been asked to opine on leasing industry practices. (Tr. 4706-07) He is currently a principle with the ALTA Group. (Ex. 20195 (Ray Initial Report) at page 25201)

Ray opined as to CED's business purpose in entering into the RoCa3 Transaction. He opined that federal tax savings played a major role in CED's decision and that CED would not have closed on the transaction if it could not receive the anticipated tax benefits. (Ex. 20195 (Ray Initial Report) at pages 25186, 25199-200) He also testified, however, that he would have been "stunned" if CED had not taken tax benefits into account, as all equity investors involved in leveraged leasing enter into transactions in part for the tax benefits. (Tr. 4850-51) Although Ray indicated in his report that he believed "the tax treatment and the resulting accounting treatment are the only reasons Con Ed entered into the RoCa3 transaction" (Ex. 20195 (Ray Initial Report) at page 25195), he testified at trial that tax benefits were not the only element in CED's decision and that he has "no reason to doubt" that other factors were important to CED. (Tr. 4919-20)

Ray also opined that he believes it is "likely" EZH will exercise the Sublease Purchase Option (Tr. 4753), but that because circumstances could change between 1997 and 2018, no one could know now whether or not EZH would ultimately make that decision. (Tr. 4862-63, 4865, 4867-68)

Ray also discussed the risks to CED from the transaction. He testified that "essentially" all of the risks CED identified in its Risk Analysis chart (see Exhibit 363 at pages 7672 *et seq.*) were lessened through defeasance or by CED's transacting for EZH to bear the risk. (Tr. 4786, 4788) As a result, the only risk CED did not consider to be "low" was the risk that the U.S. tax treatment of the transaction would not be respected. (Ex. 20195 (Ray Initial Report) at page 25193; Tr. 4786-88) He also opined, however, that CED's operations risk is higher than CED indicated on the chart (Tr. 4804-05, 4810), and that there is "[m]aterial risk, material opportunity" for CED if EZH does not exercise the Sublease Purchase Option. (Tr. 4832)

**7. John J. Reed**

John J. Reed was qualified by Con Edison as an expert in the purchase, sale and valuation of power plants and in the economic and financial factors relating to such transactions. (Tr. 2580-81) Reed has a B.S. degree from the Wharton School of Business of the University of Pennsylvania, and he completed numerous graduate courses related to the securities industry. (Tr. 2567) More recently, Reed was the founder, chairman, and CEO of Reed Consulting, and the vice-chairman and co-CEO of Navigant Consulting, the largest publicly traded consulting firm in the

world. (Tr. 2569-70) At both companies, he worked in the financial and economic aspects of the energy industry. (Tr. 2569-71) He led transaction teams for the sale of over 50 fossil fuel plants and participated in sales transactions for generating facilities totaling more than $20 billion. (Tr. 2572-73) Reed is currently the chairman and CEO of Concentric Energy Advisors, where he acts as a financial analyst for companies transacting for the purchase or sale of major energy assets (including power plants). (Ex. 10076 (Reed Initial Report) at page 20228; Tr. 2568)

Reed testified that the uncertainty inherent in the valuation of CED's 2018 to 2041 Lease Interest would preclude the parties from concluding in 1997 that EZH would exercise Sublease Purchase Option in 2018. (Tr. 2581-82, 2633) In reaching this conclusion, he calculated that in 2018, the value of CED's remaining Lease Interest could range from $98 million to $265 million—a ratio of 2.7:1—based on only modest changes in the valuation equation. (Ex. 10076 (Reed Initial Report) at page 20200; Tr. 2633) He also opined that his uncertainty calculations were "reasonable, if not conservative" when compared to real-world evidence that the valuations of energy assets were unpredictable and volatile. (Ex. 10076 (Reed Initial Report) at page 20200; Tr. 2634-38, 2648-52)

**8. Jacob K. Thomas**

Jacob K. Thomas was qualified by Defendant as an expert in economics, with a specialization in accounting and financial economics. (Tr. 4473-74) Thomas has a Bachelor's degree from IIT (New Delhi), an M.B.A. from the Iran Center for Management Studies (Tehran), and a Ph.D. from the University of Michigan

Accounting Department. (Ex. 20197 (Thomas Initial Report) at page 25266; Tr. 4464) He is currently a professor of Accounting and Finance at Yale University. (*Id.*) Thomas researches and teaches financial statement analysis, valuation and managerial accounting. (Tr. 4465-66, 4468)

Thomas opined, based on his analysis of a hypothetical lease-leaseback transaction (Tr. 4511-13), that CED received "special" tax benefits from participating in the RoCa3 Transaction—such as the "arbitrage[d]" tax treatment of prepaid rent (Tr. 4513-15), and the ability to take present deductions on deferred rent that do not take into account the present value of the future rental payment. (Tr. 4515-17) He also testified that without these tax benefits, Con Edison did not receive a profit from the RoCa3 Transaction because its pretax internal rate of return was lower than the return on government bonds at the time. (Tr. 4492-97)

Although Thomas was qualified as an expert in economics, he also offered opinions about the expectations and motivations of the parties. He opined in his Initial Report and during direct examination that there were non-economic reasons to expect that EZH might exercise the Sublease Purchase Option. (Ex. 20197 (Thomas Initial Report) at pages 25258-60; Tr. 4520-25, 4573-74) He admitted at trial, however, that he had "no reason to doubt" the conclusions in Goulding's report (Tr. 4576), many of which contradicted Thomas' own opinions. (*See* Facts Section X.B.4.c.) Thomas also testified that he did not believe CED's involvement in the RoCa3 Transaction created any economic efficiencies, so that CED did not have the

"typical," "valid, non-tax motivation" for entering the RoCa3 Transaction that Thomas expected to find. (Tr. 4476-80)

**9. Roman L. Weil**

Roman L. Weil was qualified by Con Edison as an expert in economics, specifically in the subspecialties of accounting and related managerial decision making. (Tr. 3487-89) Weil earned his Bachelor's degree with a combined major in mathematics and economics from Yale; he also earned a Master of Science in industrial administration and a Ph.D. in economics from Carnegie Institute of Technology, now known as Carnegie Mellon University. (Tr. 3467-68) Weil is a Certified Public Accountant ("CPA") in Illinois and a Certified Management Accountant ("CMA"). (Tr. 3468-69) Weil joined the faculty of University of Chicago in 1965, became tenured in 1970, and is currently the V. Duane Rath professor of accounting at the University of Chicago. (Tr. 3466, 3468)

Over the course of Weil's academic career, he has taught courses to undergraduate, graduate and law students in fields including financial accounting, managerial accounting, operations research, managerial decision making and economics. (Tr. 3469-72) He has published over eighty articles during his career (Tr. 3473), in addition to approximately a dozen textbooks on accounting, three professional reference books on accounting or economics, and articles in the popular press. (Tr. 3476-77) Weil has experience teaching lease accounting since the 1970s, and all of Weil's textbooks address lease accounting in some way. (Tr. 3481-84) In addition, Weil has researched and published an article on leveraged lease

accounting. (Tr. 3483) Weil has taught courses with multiple classes devoted to managerial decision making and this topic appears throughout his textbook, *Management Accounting*, and is a large part of his professional handbook, *Handbook of Cost Management*. (Tr.3484-85)

Weil is the cofounder and director of the Directors Consortium, which brings together faculty from schools such as University of Chicago, Stanford Law School and Tuck Business School with corporate CEOs, CFOs, general counsel and board members to learn the duties of corporate governance more effectively. (Tr. 3477-79) Weil runs this program and teaches courses related to Audit Committees and accounting. (Tr. 3478) Weil served on the SEC's Committee on Replacement Cost Implementation (as advisor to the chief accountant) and on three FASB task forces: one on consolidation, one on financial instruments, and one on discounting. (Tr. 3479-81) Weil has testified as an expert approximately fifty times, including giving sworn reports and depositions. (Tr. 3485)

Weil testified that the RoCa3 Transaction is a leveraged lease requiring accounting pursuant to FAS 13 and that CED correctly used FAS 13 to account for the RoCa3 Transaction. (Ex. 10077 (Weil Initial Report) at pages 20253, 20269-71) Weil explained that under FAS 13, the equity investor in the lease records his investment for accounting purposes in the amount net of the nonrecourse debt. (*Id.* at page 20262) In addition, the equity investor must use the "separate phases" method to allocate all of the income from the transaction to those periods of time—at the front end of the lease and at the back end—when the equity investor has a

positive investment balance (*i.e.*, when the cumulative cash outflows exceed the inflows). (*Id.* at pages 20261-63) Weil testified that one of the accounting benefits provided by FAS 13 is the acceleration of income to the early years of the leveraged lease, although the total income recognized over the lease is always identical to the aggregate cash flow to the investor. (*Id.* at pages 20270, 20272; Tr. 3519-33) Finally, Weil offered his opinion that it was reasonable for Con Edison's management to believe that using FAS 13 accounting to achieve predictable, front-loaded accounting income and a smooth earnings profile would provide an economic benefit for the company by improving Con Edison's stock price. (Ex. 10077 (Weil Initial Report) at pages 20273-75; Tr. 3552)

## B. Themes of the Expert Witness Testimony

### 1. The Leasing Experts Testified That the RoCa3 Transaction Is Within the Mainstream of Typical Leveraged Leasing Projects

This section summarizes a number of points testified to by the experts regarding the operation of the leveraged leasing industry and the features commonly associated with leveraged lease transactions. It summarizes testimony from (1) Bent, Defendant's expert in equipment leasing transactions, including the structuring, arranging, and negotiation of such transactions; (2) Ellis, Con Edison's expert in the areas of finance, analysis and returns of complex financial transactions (including leases), and analysis and valuation of securities; and (3) Ray, Defendant's expert in large-ticket equipment lease transactions and the equipment leasing industry.

The leasing industry in 1997 was quite extensive: in that year alone, almost $180 billion of assets were placed into use through leasing transactions (Tr. 3123-24 (Ellis)) These transactions accounted for around one-third of all assets placed into use that year. (*Id.*) And the leasing industry continued to expand: it was responsible for placing $207 billion in assets in service in 1998, $226 billion in 1999, and $233 billion in 2000. (Ex. 10073 (Ellis Initial Report) at pages 19994-95, 20034; Tr. 3124 (Ellis))

The use of nonrecourse debt is an "integral part" of a leveraged lease transaction like this one. (Tr. 3126-27, 3174-75 (Ellis)) In a leveraged lease transaction, the party called the "equity investor" (this is usually the lessor, but here CED, the sublessor, is the equity investor) takes out a nonrecourse loan for the majority of the purchase price and therefore "essentially owns the asset." (Tr. 3126-28 (Ellis); Ex. 10073 (Ellis Initial Report), at pages 19997-98; Tr. 3866-67 (Bent); Tr. 4718 (Ray))

The lessee to a leveraged lease (here, because the sublease is the leveraged lease, EZH as sublessee is in this role) has the use of the asset while still retaining the ability to later "turn over the asset and walk away." (Tr. 3133 (Ellis)) The equity investor (CED in this case) generally seeks to earn a fair after-tax return on its capital through receipt of rental payments, associated tax benefits and the residual value of the property at the end of the lease term. (Tr. 3173-74 (Ellis)) The return is not fixed, however: it is unknown until the end of the lease term, when the "crucial"

fact of the property's residual value can be determined. (Ex. 10073 (Ellis Initial Report) at pages 19999-20000; Tr. 3141-43 (Ellis))

Leveraged lease transactions are complex, long-term transactions involving multiple parties with various rights and obligations toward each other. (Tr. 3128 (Ellis); *see also* Ex. 10073 (Ellis Initial Report) at page 20035 (containing a sample diagram of a leveraged lease of an electric generating facility, drawn from a textbook by Nevitt and Fabozzi)) The longer the term of the lease transaction, the more complex the terms of the deal become, as the parties work to deal with all possible eventualities. (Tr. 3128-29 (Ellis)) Transactions also become more complex when they involve assets that are large, fixed and/or have longer useful lives. (Tr. 3129-30 (Ellis))

Below is a summary of how various features of the RoCa3 Transaction compare with the typical leveraged lease structure:

**a. Due Diligence**

Defendant's own leasing expert Ray testified that CED "got all the [due diligence prior to closing] that you would expect when . . . making an investment like [the RoCa3 Transaction]." (Tr. 4746-47)

**(i) Accountants and Appraisers**

Ray described the employees of Deloitte as "competent" and "recognized" appraisers; they provided CED with a "quite extensive" appraisal report, and Ray had no reason to think CED's choice of appraiser was inappropriate. (Tr. 4750-51, 4896-97) Ray also testified that the involvement of Arthur Anderson and

PriceWaterhouse "was probably sufficient that [Con Edison] felt like they were on firm ground" regarding their chosen accounting treatment. (Tr. 4833)

**(ii) Duke Engineering Report**

The use of an engineering report is common in large facility transactions, and it is "unlikely" an investor would close such a transaction without receiving one. (Tr. 3831-32 (Ray)) Defendant's leasing expert Ray testified that the Duke Engineering report was a standard engineering report and that he did not see any problems with it on his read-through. (Tr. 4900-01) Ray also testified that it was appropriate for Deloitte to rely on this report to create their Appraisal. (Tr. 4900)

**(iii) Environmental Report**

It is common for a contract on an asset like the RoCa3 Facility to require an environmental report as a condition precedent to closing. (Tr. 3832 (Bent)) Ray testified that he has no reason to believe that Tauw's environmental assessment was insufficient or that CED did not do appropriate due diligence on this issue. (Tr. 4837-38)

**(iv) Legal Due Diligence**

Defendant's leasing expert Ray testified that Shearman & Sterling, the law firm CED hired to opine on the RoCa3 Transaction, is a recognized firm knowledgeable about the leveraged leasing industry. (Tr. 4905)

**(v) Site Visit**

According to Ray, during the site visit prior to closing, CED followed the standard procedure of bringing along an engineering consultant. (Tr. 4901-02) Ray further testified that the presence of Rick Ellsworth from Deloitte on that visit

provides evidence that CED evaluated the asset risks (Tr. 4896-98), while the presence of local Dutch counsel is evidence that CED undertook appropriate due diligence with respect to Dutch legal issues. (Tr. 4895-96) Also on the visit was Con Edison engineer Harold Morrison; Ray agreed that if Morrison was knowledgeable about the engineering of the RoCa3 Facility, it was prudent for Con Edison to have used his expertise. (Tr. 4894-95)

**b. Lease-Leaseback Structure**

Both of Defendant's leasing experts, Samuel Ray and Paul Bent, testified that in their experience, there is nothing inherently wrong with a lease-leaseback structure. (Tr. 3800 (Bent); Tr. 4807 (Ray)) Bent worked on deals utilizing this structure (Tr. 3797), and Ray testified that he likely has done so. (Tr. 4807-08)

**c. Investment Trust**

Bent also testified that "[i]t is very typical in large leveraged leases for the equity . . . participants to invest . . . through the vehicle of a trust." (Tr. 3692-93; *see also* Ex. 10073 (Ellis Initial Report) at pages 19995-96 (listing the use of a trust as a "key characteristic" of leveraged leasing))

**d. Nonrecourse Debt**

All of the leasing experts in this case testified that the equity investor in a leveraged lease always takes out a nonrecourse loan for the majority of the purchase price, generally financing around 80% of the purchase with debt. (Ex. 10073 (Ellis Initial Report) at page 19996; Tr. 3126-27 (Ellis); Tr. 3866-67 (Bent); Tr. 4718 (Ray)) In fact, Defendant's expert Bent noted that CED in the RoCa3

Transaction put up "more equity than [he has] seen in many other leveraged leases." (Tr. 3867-68)

**e. Equity Defeasance Accounts**

Some leveraged leases use defeasance to help the obligee mitigate payment risk, setting up accounts to fund the obligor's future obligations. (Tr. 3184-85, 3372-73 (Ellis); Tr. 3760-61 (Bent)) In this respect, defeasance accounts resemble sinking funds established by entities that issue bonds or pension and insurance reserve accounts. (Tr. 3199-3200 (Ellis)) For their part, lessees (as obligors) may wish to use such an arrangement to receive a better financing rate from the lessor or to protect against currency and interest rate risk. (Tr. 3820-21 (Bent); Tr. 3205-06 (Ellis)) According to Defendant's expert Bent equity defeasance is "a common mechanism" in leases and other financing transactions—especially in cross-border transactions, where it is used to protect against the lessor's inability to recover funds due to jurisdictional or currency reasons. (Tr. 3760-61, 3819-20)

Bent testified that the existence of a defeasance mechanism does not completely eliminate the payment risk. (Tr. 3737; Tr.3184 (Ellis)) Instead, defeasance effectively substitutes one party's credit for another and makes the payment risk akin to that of leasing to the defeasance party directly. (Tr. 4916 (Ray)) Defendant's expert Ray testified that leasing to a party with exceptionally good credit—such as an A, AA, or AAA-rated bank—still involves enough risk to impart the transaction with economic substance, and that he himself leased to entities with these strong credit ratings when working for EDS. (Tr. 4917-19)

### f. Rental Payments Tied to Debt Service

Rental payments in a leveraged lease are fixed, rather than linked to the profitability of the asset during the lease term. (Ex. 10073 (Ellis Initial Report) at page 19996; Tr. 3170-71 (Ellis)) Bent agreed that it is "typical of leveraged leases" that the rent is due from the lessee on the dates the lessor's leveraged debt payments are due. (Tr. 3800-01) Bent also testified that it is "true in most leveraged leases" that the rental payments are designed to be "the same as the debt service payments. (Tr. 3801) Further, it is common in leveraged leases that the debt payments are made directly by the lessee to the lender until the debt is paid off. (Tr. 3871-72 (Bent))

### g. Recovery of Equity Only After Debt Is Paid Off

Both of Defendant's leasing experts testified that "in most cases," the rental payments at the beginning of a leveraged lease "all go[] to debt service," so that the equity investor "doesn't get any cash rents . . . upfront." (Tr. 4719-20 (Ray); Tr. 3708-09, 3869 (Bent))

### h. Deferred Rents

Ray described the Sublessee Loan accruals in the early years of the transaction as "paper entries . . . [that] have been referred to as IOUs." (Tr. 4791) Defendant's other leasing expert Bent also agreed that the Sublessee Loan accruals were IOUs that EZH must eventually pay. (Tr. 3843) Bent testified that deferred rents—rents coming due, but paid with an IOU rather than in cash—are sometimes

used in lease transactions. (Tr. 3842-43) In fact, Bent has worked on deals where the rent and/or the initial equity investment is deferred in this way. (Tr. 3843)

#### i. Purchase and Renewal Options

Leveraged leases typically provide the sublessee the option to purchase the asset. (Ex. 10073 (Ellis Initial Report) at page 19996; Tr. 3171-72 (Ellis)) They also typically contain an option to renew, which can be negotiated to be the option of either the equity investor or the sublessee. (Ex. 10073 (Ellis Initial Report) at page 19996; Tr. 3174 (Ellis)) According to Bent, renewal options that operate as puts exercised by the equity investor are "quite common in middle market or smaller leases" and are also sometimes used in large leveraged leases. (Tr. 3824-25) Ellis clarified that a third type of option, the "return provision"—here called the Retention Option—is also common in leveraged leasing and that it is not uncommon for a transaction to incorporate all three options. (Tr. 3386)

#### j. Use of Equity Defeasance to Pay the Sublease Purchase Option Price

Defendant's expert Bent has personally worked on leveraged lease transactions where cash was available in a collateral or reserve account to fund a portion of the purchase option. (Tr. 3823) He said that it is "not unheard of" and "not unusual" for there to be full funding available for a purchase option. (Tr. 3957-58, 3862; Tr. 3372-73 (Ellis) (noting that some leveraged leases use "full defeasance"))

**k. Use of a Triple Net Lease**

The RoCa3 Transaction is a "triple-net lease," meaning that EZH as Sublessee "undertakes the obligations for maintenance, repairs, taxes, and insurance." (Tr. 3849-50 (Bent)) This is a common characteristic in leveraged leases. (Ex. 10073 (Ellis Initial Report) at page 19996) In fact, Ray testified, it would have been unusual if the RoCa3 Transaction had not employed this feature: he has never heard of a leveraged lease that did not. (Tr. 4880; Tr. 3850 (Bent) (agreeing that triple-net leases are "pretty much universal" in leveraged leasing))

**l. Use of a "Hell or High Water" Lease**

The Sublease (Ex. 4 at page 432) contains what is known as a "hell or high water" provision. (Tr. 4881 (Ray)) This means that "any moneys due under the [sub]lease are not susceptible to offset." (Tr. 4881 (Ray)) Leveraged leases usually contain these provisions, and neither Bent nor Ray has ever worked on one that did not. (Tr. 4881 (Ray); Tr. 3864 (Bent))

**m. Tax Indemnity Agreement (Ex. 9)**

The indemnity agreement used in the RoCa3 Transaction is an "acts and omissions" agreement common in leveraged leases, which provides protection for CED (as equity investor) "only for a loss of tax benefits that arises from [EZH's] own acts or failures to act . . . that have to do with the representations" EZH made in the transaction documents. (Tr. 3873-74 (Bent)) Bent testified that he has never worked on a transaction with less than "acts and omissions" indemnification, although he has worked on some with broader protection for the equity investor—such as where

the lessee represents that the lease is a true lease, and the lessee is thereby responsible for indemnifying the lessor if that is incorrect. (Tr. 3874) This broader protection was not present in the RoCa3 Transaction. (Tr. 3874 (Bent))

**n. Participation Agreement Provisions (Ex. 1)**

Defendant's expert Bent testified that participation agreements are "quite common" in leveraged lease transactions. (Tr. 3830) Bent described the following provisions in the RoCa3 Participation Agreement (Ex. 1) as common and/or normal for deals of this type: Conditions Precedent, including CED's receipt of the Duke Engineering Report (§3(*l*)) and environmental report from Tauw Milieu requirements (§3(m)), and the description of the site and facility (§3(t)); and Representations and Warranties, including those regarding the technical conditions of the facility (§7(gg)), and an accurate and complete disclosure requirement (§7(q)). (Ex. 1 at pages 11-16, 27-38; Tr. 3830-32, 3834-37, 3839-41) Bent also agreed that the Condition Precedent regarding the facility's plans and specifications (§3(s)), and the Representation and Warranty regarding the operation of the facility (§7(ff)) were "not unusual." (Tr. 3832-34; 3837-39)

**o. Sublease Provisions (Ex. 4)**

When reading through the Sublease, Bent did not find anything unusual about the following provisions of the document: Return of Undivided Interest (§5); Liens (§6); Maintenance (§7); Operations and Use, Possession, Sub-Subleasing (§8); Sublease Facility Event of Loss (§10); Insurance Requirements (§11); Sublessee

Events of Default (§14); or Remedies (§15). (Ex. 4 at pages 396-421, 422-431; Tr. 3843-61, 3863)

#### p. Schedule of Termination Values

Bent testified that "in every leveraged lease," there is a schedule of stipulated termination values corresponding to rent payment dates, and showing what the equity investor will be paid to be made whole in the case of an early termination. (Tr. 3751-52; Tr. 3175-77 (Ellis)) These stipulated payments generally include enough cash to repay any outstanding debt, recover the initial equity investment, recover potential income tax recapture payments and other taxes due, and "sometimes" collect a "booked residual value."[46] (Tr. 3752 (Bent))

#### q. Structure of the RoCa3 Transaction's Repricing Mechanism

Bent testified that the repricing provision, §3(e)(ii)-(iii), in the Sublease (Ex. 4 at page 390) provides "typical" repricing terms when it provides for the potential adjustment of sublease rental payments and termination values to preserve CED's net economic return. (Tr. 3963-65)

#### r. Protection Against Change in Law

As Bent testified, "[i]t is certainly not unusual to have protection [for the parties] against a change in law." (Tr. 3768) He has worked on "many deals" where

---

[46] As Holzman testified, a leasing investor books earnings for accounting purposes based in part on its assumptions about what residual value the investment will have at the end of the lease term. Investors typically use a conservative estimate of the residual value—sometimes a "zero residual"—to avoid later having to "writedown" the earnings in the books when the assumed residual value was not achievable. (Tr. 1207-09)

the parties agreed to pay "various amounts" if new laws affect their rights and responsibilities in the transaction. (*Id.*)

**s. Common Transaction Risks**

According to Defendant's leasing expert Ray, the level of risk CED took on in this transaction regarding debt financing, political and regulatory climate, technology, accounting, environmental hazard and the possibility of stranded assets was appropriate for CED's expected yields and consistent with his experience in the industry. (Tr. 4814-22, 4833-38; *see also*, Ex. 363 at pages 7672-75 (project briefing memorandum on which Ray was commenting))

**2. Expert Testimony Supports CED's Decision, from an Accounting Perspective, to Invest in a Leasing Transaction with a Pretax Profit in Order to Earn Predictable, Front-Loaded Earnings**

One of the leveraged leasing benefits CED identified in 1997 was the fact that a leveraged lease produces accelerated earnings, which CED could use to offset its early year losses from other development projects. (Ex. 243 at page 4494; Ex. 261 at page 4950; Tr. 755 (McCartney); Tr.1941-42 (Muoio); Tr. 686 (Freilich)) Accounting expert Roman Weil testified as to the reasonableness of this motivation for the RoCa3 Transaction.

Weil testified that given the structure of the RoCa3 Transaction, CED was required by Generally Accepted Accounting Principles ("GAAP") to account for the RoCa3 Transaction as a leveraged lease under the FAS 13 "separate phases"

accounting methodology.[47] (Ex. 10077 (Weil Initial Report) at pages 20256-60; Tr. 3530, 3564; Tr. 3147-3148 (Ellis)) He also noted in his initial report that CED's financial statements and Con Edison, Inc.'s 10-K filings show that CED and Con Edison did in fact account for the RoCa3 Transaction under this method. (Ex. 10077 (Weil Initial Report) at page 20263 n.39, 20270)

The benefit of early income recognition achieved by leveraged leases is a result of separate phases accounting treatment. (Ex. 10177 (Weil Initial Report) at page 20263; Tr. 3515-18 (Weil)) Under FAS 13, a typical leveraged lease has three phases of positive and negative investment, as follows:

(1) A positive investment in the early years when the investor's cumulative cash outflows exceed its inflows. (Ex. 10077 (Weil Initial Report) at page 20261) Weil's Report shows that CED had a positive investment from 1997 to 2008. (*Id.* at 20281 ("Lessor's Net Investment At End of Year"))

(2) Then a negative investment when the cumulative cash inflows exceed the cumulative cash outflows. (*Id.* at 20261) Weil's Report shows that CED had a negative investment from 2009 to 2030. (*Id.* at 20281 ("Lessor's Net Investment At End of Year"))

(3) Then a positive investment again as cumulative cash outflows are positive. (*Id.* at 20261) Weil's Report shows that CED had a positive investment from 2031 to 2041. (*Id.* at 20281 (Lessor's Net Investment At End of Year"))

The separates phases method provides that the investor should record zero earnings for all years in which it has a negative investment. (Tr. 3515 (Weil)) As a result, all income is "push[ed]" into the early and late phases of the transaction, which

[47] Although Weil refers to this method as the "separate phases" method (Tr. 3518-19 (Weil)), CED referred to it in its documentation as the Multiple Investment Sinking Fund ("MISF") method. (Ex. 640 at page 11441)

accelerates some of the income into the early periods (Ex. 10077 (Weil Initial Report) at pages 20263-67; Tr. 3517-18 (Weil)) "This accelerated income pattern for financial reporting helps explain why some companies prefer structuring transactions as leveraged leases." (Ex. 10077 (Weil Initial Report) at page 20267)

During his testimony, Weil stressed that the separate phases method of accounting does not change the total income attributed to the transaction; it merely changes the timing of that income. (*Id.* at page 20272) A company can only recognize accelerated income if the investment is already profitable independent of income taxes. (*Id.* at 20268; Tr. 3528-30 (Weil)) The tax benefits available to leveraged lessors does not alter this principle: "[i]f you have negative cash flows, negative income before taxes, I don't care what the tax rule is, it is going to stay negative." (Tr. 3529-30 (Weil))

Although Defendant offered two experts qualified in accounting (Tr. 4473-74 (Thomas); 5046 (LaRue)), neither expert challenged Weil's conclusions that the RoCa3 Transaction required FAS 13 accounting, that CED properly implemented such accounting, and that FAS 13 accounting results in a predictable, front-loaded earnings profile so long as the transaction will produce pretax income. (Ex. 20201 (Thomas Rebuttal Report) at pages 25360-64 (addressing other aspects of Weil's report); Ex. 20200 (LaRue Rebuttal Report) at page 25344 (identifying the scope of his rebuttal as encompassing only Ellis' testimony)) Neither did Defendant's counsel challenge Weil on cross examination as to his conclusion regarding the effects of the

required FAS 13 accounting. (*See* Tr. 3661-63 (Weil) (noting that Weil does not recall discussing this conclusion with Defendant's counsel))

Weil also testified that CED's management had good reason to believe that the predictable, accelerated accounting income from the RoCa3 Transaction could provide an economic benefit by filling a gap in CED's earnings profile. (Ex. 10077 (Weil Initial Report) at page 20275, 63; Tr. 3534-36, 3552, 3643-44) Weil explained that both stock markets and corporate management prefer smoothly growing income profiles. (Ex. 10077 (Weil Initial Report) at page 20272; Tr. 3535) Executives widely believe that the market uses a company's reported income to evaluate performance and that therefore a company's financial statements can affect stock price. (Ex. 10077 (Weil Initial Report) at page 20274; Tr. 3535, 3544 (Weil)) Specifically, "[a]n overwhelming majority of CFOs prefer smooth earnings," making "predictability of earnings . . . an over-arching concern among CFOs." (Ex. 10077 (Weil Initial Report) at page 20274; Tr. 3547-50 (Weil)) Research shows that the "stock price sometimes reacts positively to the management [of accounting income]" and sometimes does not react at all, resulting in a "heads-I-win, tails-I-break-even proposition" for management. (Ex. 10077 (Weil Initial Report) at page 20273) Further, a company with consistent periods of positive growth generally "produces a higher price-to-earnings ratio for the stock than a firm with some years [or periods] of negative earnings." (*Id.*)

Defendant's counsel did not challenge Weil regarding his conclusions to this effect on cross-examination. (Tr. 3663-64 (Weil) (noting Weil did not recall being

asked about this opinion)) Instead, Defendant's leasing expert Ray testified that his employer participated in leveraged leases where the equity investors entered into leveraged for the purpose of obtaining front-loaded earnings: "[t]hat's perfectly normal." (Tr. 4849, 4876-77)

### 3. Expert Testimony Supports CED's Decision, from a Market and Regulatory Perspective, to Invest in a Cogeneration Facility in The Netherlands

Another leveraged leasing benefit CED identified in 1997 was the opportunity to diversify internationally in response to deregulation and to realize an entrée into the European market. (Ex. 397 at pages 8118, 8123; Ex. 704 at pages 12092-93, 12095-96; Tr. 773-74, 791 (McCartney); Tr. 1908-09, 1915-16 (Muoio)) Regulatory economics expert Goulding testified as to the reasonableness of this motivation for the RoCa3 Transaction.

When CED closed on the RoCa3 Transaction in 1997, energy deregulation was occurring broadly in the United States: all but four states were undergoing restructuring activity (Tr. 237-79 (Goulding)), and the industry "expected that deregulation would ultimately reach most of the states, if not all of [them]." (Tr. 2381 (Goulding)) In New York, deregulation proceedings began in 1994, and by March of 1997, the state's Public Service Commission had both issued a "comprehensive" order setting forth a "road map to deregulation" (Tr. 2380 (Goulding)), and negotiated with Con Edison for that company "to sell 50 percent of its fossil [generation] plants by 2002." (Tr. 2391-93 (Goulding))

A United States utility whose home market was deregulating felt "pressure" on its profits. (Tr. 2378 (Goulding)) Although utility companies traditionally had been "vertically integrated"—owning and/or operating generation, transmission, and distribution assets—deregulation involved "unbundling" these assets to create a competitive generation sector with multiple companies. (Tr. 2380-81 (Goulding)) As a result of the unbundling, a utility's generation business was "no longer assured of a profit" because "returns could vary widely"—unlike the stable cost-plus profit model that was in place during regulation. (Tr. 2382-85 (Goulding))

Goulding explained that deregulated utilities found that the divestiture of their generation assets left them with cash "that they needed to . . . redeploy." (Tr. 2378) Contemporaneously, deregulated projects overseas "[brought] assets to the market" in those regions.[48] (Tr. 2377-78 (Goulding)) Investing in international utilities made sense for a United States utility because it not only reduced the utility's risk from being regulated by only one entity, but also the potential for higher profits and "differing [cash flow] profiles" that "could lead to more stable cash flows at the parent company level." (Tr. 2385-86 (Goulding)) And in fact, "international acquisitions of generation assets by large U.S. utilities were common in 1997"; these "acquisitions" took "many forms," including direct purchases, leases, and "joint ventures for entitlements to a portion of the output from various facilities." (Tr. 2376-77; *see also* Ex. 10074 (Goulding Initial Report) at pages 20078-

[48] As Ray noted, "[t]here weren't new projects being developed in New York" at this time, which would have given Con Edison a "reason [to look] overseas." (Tr. 4934-35)

81, 20093) Con Edison was "not one of the first movers in participating in international transactions." (Tr. 2541 (Goulding)) But, as Defendant's own expert recognized, Con Edison soon realized "that there were great opportunities in developing nations."[49] (Tr. 4935 (Ray))

Goulding testified that it was reasonable for a company like Con Edison[50]—a top-20 United States utility with experience owning and operating large generation assets—to invest in The Netherlands in 1997. (Tr. 2389-90) An investor in an international project like the RoCa3 Transaction would consider whether the target country had "a long history of private enterprise and a stable legal framework," "clear" market power rules, a "fair competitive environment," and counterparties with good credit. (Tr. 2419-22 (Goulding); *see also* Ex. 10074 (Goulding Initial Report) at pages 20069-71; Tr. 2419-22 (Goulding)) The Netherlands had all of these things. Furthermore, by 1997, The Netherlands had put forward a clear plan to begin deregulating in 1998. (Tr. 2395-97 (Goulding)) Dutch utilities in this market felt particular pressure to achieve "sufficient capitalization" and began looking for ways to "strengthen their balance sheets" and "learn[] and interact[] with larger organizations" with "another way of doing things." (Tr. 2397-98, 2502-03 (Goulding))

---

[49] Goulding further testified that in 1997, Wall Street looked "quite favorably" on companies with "aggressive unregulated business activity . . . of which international [investment] was a subset": companies with these profiles—like Dynergy and AES—were performing very well in the market. (Tr. 2439-40; Tr. 4932-33 (Ray) (agreeing that it was "certainly legitimate" for Con Edison to feel it needed to move overseas to compete with other domestic utilities))

[50] Goulding has no reason to believe that Con Edison itself would act differently than the companies "like ConEdison" that he opined upon. (Tr. 2562 (Goulding))

These interests converged with those of United States utilities looking for investment opportunities. (Tr. 2398 (Goulding))

Defendant's leasing expert Ray—whom Defendant hired to examine the record in this case and opine as to CED's business purpose in this transaction (Tr. 4693-94)—said he had no reason to doubt that CED, in 1997, thought leases could help them forge relationships with overseas utilities. (Tr. 4929-30) And as Goulding testified, an investor like CED could reasonably believe that investment in a cogeneration plant in The Netherlands could provide knowledge about potential investments in that country or in neighboring markets—like France, Belgium and Germany—where deregulation was expected to soon free up assets.[51] (Tr. 2423-26)

Ray also believes that it was important to CED to invest in assets related to its core areas of Con Edison's business, so that they could work with "assets they knew." (Tr. 4920-21) Ray agreed that such an approach was consistent with CED's stated business purpose, and is "a normal thing" in the leasing industry: his former employer, EDS, started out doing computer leases because that was the business it knew, before branching out into other types of leasing. (Tr. 4921-22)

Ray noted, however, that the documents indicate that CED "later" "pull[ed] back" from an international investment strategy "and focus[ed] more on the U.S." (Tr. 4930) Goulding's testimony was consistent with Ray's observation: Goulding

---

[51] Goulding testified that it was reasonable for a company like CED to invest in a cogeneration facility in The Netherlands even if the company had a country screening process, which did not focus on that country. Goulding would expect a company like CED to be "opportunistic in nature" and undertake attractive projects even if that project were not "part of [the company's] previous discussions." (Tr. 2431, 2526-28)

testified that in about 2000, "the crisis in the California electricity market and the somewhat slow motion collapse of Enron" caused utility companies to shift their focus from unregulated, international markets and go "'back to basics.'" (Tr. 2435-37; *see also* Ex. 10079 (Goulding Rebuttal Report) at pages 20396-97) Goulding believes this crisis would have affected Con Edison by causing it to "at a minimum . . . freeze activities." (Tr. 2437-38) Other companies that had invested overseas "either had a standstill policy or began a gradual retreat." (Tr. 2437-39 (Goulding)

#### 4. CED Was Not Assured That EZH Would Exercise the Sublease Purchase Option in 2018

##### a. Deloitte Reasonably Concluded in 1997 that EZH Would Not Be Economically Compelled to Exercise the Sublease Purchase Option

The Deloitte Appraisal concluded that EZH would not be economically compelled to exercise the Sublease Purchase Option in 2018 (*i.e.*, to buyout CED's remaining leasehold interest). (*See* Facts Section VI.D.) John Kelly, who has extensive experience in power plant appraisals (Facts Section X.A.4.), performed an appraisal review of the Deloitte Appraisal. Because Kelly was performing an independent review of Deloitte's work, (*see* Ex. 10075 (Kelly Initial Report) at page 20170), he had some disagreements with Deloitte's approach. (Tr. 2778-80, 2812 (Kelly) (explaining his disagreements with some of the inputs used in the discounted cash flow analysis)) None of these criticisms, however "whether taken alone or in conjunction with the other exceptions . . . , would appear to have changed [Deloitte]'s appraisal conclusions." (Ex. 10075 (Kelly Initial Report) at page 20157) Kelly ultimately concluded that the Deloitte Appraisal utilized complete

information, adequate and relevant data, and appropriate methods and techniques; he also concluded that the Deloitte Appraisal reached an appropriate and reasonable conclusion when it determined that EZH would not be economically compelled to exercise the Sublease Purchase Option. (*Id.* at pages 20129-30; Tr. 2762-63) Defendant did not offer any experts qualified in appraisal techniques or any alternative conclusions regarding the reasonableness of Deloitte's conclusion.

Kelly also "reperform[ed] the Deloitte analysis" (Tr. 2788, 2810-11) and offered his own opinion based on this data that EZH would not be economically compelled to exercise the Sublease Purchase Option in 2018. (Tr. 2781, 2787) Kelly first determined that "the price to be paid [by EZH] would exceed the value to be obtained . . . by about $18 million." (Tr. 2781-84; *see also* Ex. 10075 (Kelly Initial Report) at page 20178 "Step 1")) He then compared the costs to EZH of exercising the Sublease Purchase Option (paying the exercise price and foregoing the Final Basic Rent Payment) with the benefits to EZH (such as receiving the value of the facility, avoiding payments on the Sublessee Loan, and avoiding rent under either the sublease renewal or a market alternative lease). (*Id.* at page 20178 "Step 2")) Kelly's final calculations showed that exercising the Sublease Purchase Option would cost EZH either $25 million (compared to the scenario in which CED selected the Sublease Renewal Option) or $6.7 million (compared to the Retention Option). (*Id.*; Tr. 2784-87) Kelly testified that this potential cost shows EZH has no economic compulsion to exercise the Sublease Purchase Option; in fact, the analysis indicates

that EZH would want to "go the other way" and continue in the transaction (Tr. 2787)

Defendant did not offer an expert with an economic analysis of EZH's choice in 2018. Instead, Defendant's economics expert Thomas was asked to opine only on the non-economic question of whether the participants to the transaction *believed* the Sublease Purchase Option would be exercised.[52] (Tr. 4476 (Thomas))

**b. The Uncertainty Associated with the Projected 2018 Lease Interest Value Would Have Prevented Parties in 1997 from Feeling Assured that EZH Would Exercise the Sublease Purchase Option**

While Kelly's analysis focused on EZH's economic decision assuming that Deloitte reasonably predicted the value of CED's Lease Interest, John Reed focused on the uncertainty inherent in any such prediction. He concluded that participants in the 1997 United States energy market knew that asset values in the energy industry could vary significantly from expected values. (Tr. 2648) Therefore, "one could not say with any . . . high level of certainty" what the value of CED's leasehold would be in 2018 or whether "the [Sublease Purchase] [O]ption would or would not be exercised." (Tr. 2631 (Reed))

To perform his analysis, Reed relied upon the Deloitte Appraisal to provide a reasonable and a reliable starting point to test the "sensitivity" of the 2018 expected

---

[52] Defendant's expert in accounting and finance, LaRue, was not asked specifically to opine as to the likelihood of EZH's exercising the Sublease Purchase Option (*see* Facts Section X.A.5.), but he did offer his observation—similar to Thomas'—that some documents from 1997 indicated that participants in the transaction believed that CED was "reasonably assured" EZH would exercise the Sublease Purchase Option. (Tr. 5087-91)

value of CED's remaining leasehold interest. (Tr. 2593-95) Reed then altered four of the inputs of Deloitte's model—the fuel costs (*i.e.*, fuel costs), electricity prices, inflation rates and cost of capital—and ascertained the resulting range of possible fair market values. (Ex. 10076 (Reed Initial Report) at pages 20240-48; Tr. 2617 (Reed))

First Reed eliminated Deloitte's assumption that fuel prices and electricity prices "r[i]se at the same rate." (Tr. 2617-18); *see generally* Ex. 10076 (Reed Initial Report) at pages 20210-12) Instead, he retained Deloitte's fuel price, discount rate and inflation rate, but input different electricity prices: one that reflected a lower electricity price (as experienced historically over the last 15 years) (Tr. 2620-22), and one that reflected a higher electricity price, such as could be caused by new environmental regulations. (Tr. 2622-23, 2625-26) Using these electricity price inputs, Reed calculated that the fair market values of CED's remaining Lease Interest in 2018 could range from $106.8 million lower to $60 million higher than the value Deloitte estimated by assuming parallel increases in fuel and electricity prices. (Ex. 10076 (Reed Initial Report) at pages 20240, 20242 (boxes at bottom of pages); Tr. 2620-21, 2624) Reed considers these changes in value to be "very substantial" despite the fact that his input alterations were "relatively modest." (Tr. 2624)

Reed next considered the impact on values if one altered only the discount rate, using rates of nine and eleven percent rather than the ten percent Deloitte used. (Ex. 10076 (Reed Initial Report) at pages 20210-12; Tr. 2624-25) This range of

discount rates is "a modest representation of the actual market" (Tr. 2625); in Reed's experience, "different buyers have dramatically different views for the riskiness of the investment," and the range of financing rates offered for a single facility in actual competitive market situations is often broader than his modeled range. (Tr. 2618, 2625) Using these alternative discount rates, Reed calculated fair market values of CED's remaining Lease Interest in 2018 ranging from $16 million lower to $18.4 million higher than that estimated by Deloitte. (Ex. 10076 (Reed Initial Report) at pages 20244, 20246 (boxes at bottom of pages); Tr. 2624-25)

Finally, Reed altered the inflation rate used by Deloitte to reflect the "very, very speculative" nature of any long-term inflationary estimate. (Tr. 2618-19; *see also generally* Ex. 10076 (Reed Initial Report) at pages 20210-12) He used inflation rates one percent higher and lower than that used by Deloitte, which "any economist would agree [was] a plausible range of outcomes for inflation." (Tr. 2626-28) By making the corresponding calculations, Reed arrived at 2018 fair market values $34.7 million lower and $41.6 million higher than that estimated by Deloitte. (Ex. 10076 (Reed Initial Report) at pages 20248, 20248.002 (boxes at bottom of pages); Tr. 2627)

Reed's analysis therefore showed that "based on only a modest range of uncertainty in these . . . key variables," the actual value of CED's Lease Interest in

2018 could range from $98 million to $265 million—"a ratio of 2.7 to 1 [between the] high [and] low values."[53] (Tr. 2633)

Reed's experience with power plant auctions and energy asset sales backed up his conclusion that valuations of energy assets—both present and future—were unpredictable. (Ex. 10076 (Reed Initial Report) at pages 20213-18) Reed testified at trial that the data compiled from all instances where an energy facility was sold numerous times between 1999 and 2007 show "very dramatic changes in value for the same asset in a period of two, three, or four years," caused by actual fluctuations in input prices and electricity prices. (Tr. 2648-52) "[T]he fact that market participants would have witnessed the results of these sales and their deviations from expectations means that the fact that there could be uncertainty in future values would have been foreseeable at the time of the Transaction." (Ex. 10076 (Reed Initial Report) at page 20218) In addition, Reed cited power plant auctions that show "dramatic difference in the perspective on value for the same assets in the same market at the same time." (Tr. 2635) He described three auctions in which serious bidders for power assets submitted auction bids ranging from $100 million to $955 million, $355 million to $597 million and $293 million to $505 million. Each range of bids reflected buyers' evaluation of the same asset, at the same time, based on the same information. (Tr. 2634-38)

Backed up by this real-world evidence and his own economic analysis showing that the value of CED's 2018 Lease Interest was uncertain in 1997, Reed

---

53 The Sublease Purchase Option Price is on the higher end of this range: $215 million. (Stip. ¶165)

concluded that "one could not say with any . . . high level of certainty" in 1997 whether "the [Sublease Purchase] [O]ption would or would not be exercised." (Tr. 2631) Defendant's economic expert, Thomas, agreed there was uncertainty about what the Lease Interest value would be on the Sublease Purchase Option Date. (Ex. 20201 (Thomas Rebuttal Report) at page 25366; Tr. 4640)

#### c. The Only Expert Qualified in Regulatory Economics and Electricity Markets Testified that CED Would Not Have Assumed that Market or Regulatory Factors Would Compel the Exercise of the Sublease Purchase Option

Both Goulding and Thomas offered opinions regarding non-economic reasons that could arguably compel EZH to exercise its Sublease Purchase Option. In his report and testimony, Thomas identified non-economic reasons that convinced him EZH would exercise the Sublease Purchase Option. (Ex. 20197 (Thomas Initial Report) at pages 25258-59; Tr. 4573-74) Goulding, however, addressed the same topics as Thomas (as explained below), and testified that it would have been *unreasonable* for a company like CED[54] to assume in 1997 that market or regulatory factors would in fact compel EZH to exercise the Sublease Purchase Option. (Tr. 2455-56) The two experts brought very different expertise to these opinions: Goulding was qualified as an expert in regulatory economics associated with electricity markets (Tr. 2364-65) and described years of experience analyzing various foreign energy markets. (*See* Facts Section X.A.3.) Thomas, on the other hand, was qualified as an expert in economics, with a specialization in accounting

[54] Goulding has no reason to believe that CED itself would act differently than the companies "like Con Edison" that he opined upon. (Tr. 2562)

and financial economics. (Tr. 4473-74). He has no professional expertise "at all" in Dutch energy regulation. (Tr. 4574 (Thomas))

The first non-economic factor Thomas identified was his understanding—based solely on the Deloitte Appraisal—that Dutch regulations required its licensed generators to maintain a 2500 megawatt minimum capacity, that EZH would not be able to meet this requirement without the RoCa3 Facility, and that an unlicensed party like CED would likewise fall short if operating the facility after 2018. (Ex. 20197 (Thomas Initial Report) at page 25259; Tr. 4520, 4577) These regulations and their effects, Thomas observed, could be a disadvantage "to the extent that there is some benefit to being licensed." (Tr. 4520-21)

Goulding, however, testified that it would have been *unreasonable* for a company like CED to assume that EZH would have load obligations in 2018—despite the licensing requirements. (Tr. 2451) Goulding explained that The Netherlands in 1997 had a system of both licensed ("centralized") and unlicensed ("decentralized") generating utilities; the difference between the two options relates to how their electricity output would be priced. (Ex. 10074 (Goulding Initial Report) at pages 20062-66; Ex. 10079 (Goulding Rebuttal Report) at pages 20388-90; Tr. 2411-12) Further, Goulding testified that under the minimum capacity regulations in effect in 1997, a Dutch utility could drop below that requirement and nonetheless continue to operate its facilities with a license and under the tariff pricing arrangements. (Tr. 2452) Further, the licensing regime was likely to change: by 1997, the government had already published a white paper on energy policy (Ex.

483 at page 9189) stating that the minimum capacity requirement would be abolished. (Tr. 2453-55 (Goulding)) And indeed, the minimum capacity system was in fact eliminated in 1998; there are currently no licensed electricity producers in The Netherlands. (Tr. 2455 (Goulding))

Thomas testified that he had looked at Goulding's report and had "no reason to doubt" Goulding's conclusions. (Tr. 4576 (Thomas)) He agreed that if Goulding was correct that licensed generators were not at risk of losing their license when they fell below the 2500 megawatt requirement (Ex. 10074 (Goulding Initial Report) at page 20062 n.20), then Thomas' own conclusion that EZH would not remain a licensed provider if it gave up the RoCa3 Facility *was incorrect.* (Tr. 4577-78) Further, Thomas conceded that if Goulding's report is correct, there may be benefits to CED of being an unlicensed generator in 2018; Thomas did not assess this possibility, but just assumed that it was better to be licensed. (Tr. 4585-87, 4591-92) Goulding outlined these benefits of being an unlicensed generator: Because an unlicensed generator was entitled to the same electricity price as the average centralized generator, unlicensed generators could "more than cover their costs" if they were efficient. (Tr. 2412-13 (Goulding)) And because unlicensed facilities were proliferating, "the cost of the centralized [licensed] facilities [was] essentially allocated over smaller and smaller volumes, . . . push[ing] the price paid per unit up for centralized generators" and "provid[ing] a further incentive for people to build decentralized generation." (*Id.*)

The second non-economic factor Thomas identified as favoring the exercise of the Sublease Purchase Option was the possibility that the municipally-owned EZH "would value stability and other nonmonetary objectives over profits," and might exercise the Sublease Purchase Option in order to retain control of the facility. (Tr. 4521; *see also* Ex. 20197 (Thomas Initial Report) at page 25259) At the time he wrote his report, Thomas knew that EZH's shareholders had sold the company to a for-profit entity (Tr. 4605-06); he based his opinion, however, on his "impression" of what municipalities in general would prefer. (Tr. 4604)

Goulding disagreed with Thomas' impression, testifying that in his experience working with municipally owned utilities, the local governments "look to a municipal utility to fund other activities of the government, so they're very concerned actually about profitability at their municipal utility."[55] (Tr. 2456-57 (Goulding); *see also* Ex. 10079 (Goulding Rebuttal Report) at pages 20390-91) As a result, Goulding opined, it would have been unreasonable for a company like CED to expect that a municipally owned company—like EZH—would not care about profitability when deciding whether to exercise the Sublease Purchase Option. (Tr. 2456)

The third non-economic factor Thomas identified was the possibility that EZH could be influenced by environmental friendliness: "How will EZH feel about a

---

55 Further, it would have been unreasonable for a company like CED to assume in 1997 that EZH would think that exercising the Sublease Purchase Option was necessary to provide reliable electricity to its citizens. (Tr. 2457 (Goulding)) "Reliability comes from access to a network . . . connected to many generating stations," not from "reliance on any single generated unit." (Tr. 2457-58 (Goulding))