third party deciding that it is more profitable to simply vent the [carbon dioxide from the plant]," rather than piping it for re-use? (Ex. 20197 (Thomas Initial Report) at page 25260) In expressing this concern, however, Thomas was only "inferring" that a private entity would find it more economical to vent the carbon dioxide into the atmosphere rather than selling it for a profit. (Tr. 4635-36) Goulding, however, testified that it would have been *unreasonable* for a company like CED to assume in 1997 that EZH's municipal owners would exercise the Sublease Purchase Option out of concern for environmental damage a private operator might cause. (Tr. 2458) Not only would a municipality assume that the private operator was bound by national environmental regulations, but it could also pass additional environmental laws that it thought were appropriate for its locality. (Tr. 2458-59 (Goulding))

### 5. Expert Testimony Supported the Potential for CED to Operate the RoCa3 Facility and Sell Its Output

As Defendant's experts testified, EZH can be removed as Operator under the Facility Operating Agreement; further, CED can sublease its interest in the facility to a third party or "go it alone" and "operate the facility." (Tr. 4829-30 (Ray)) Defendant's experts also agreed that in certain circumstances CED could seek a residual value from the facility by selling the output for a profit or loss. (Tr. 4865 (Ray); Tr. 5106 (LaRue); Tr. 3931-33 (Bent); *see also* Tr. 3156-57, 3160-61 (Ellis))

Further, as regulatory economics expert Goulding testified, it would have been reasonable for a company like CED to expect in 1997 that it would be able to sell the output from the RoCa3 Facility for its own benefit in 2018 or to sublease its

interest in the facility to a third party. (Ex. 10074 (Goulding Initial Report) at pages 20053, 20087-88) At that time, companies like CED would reasonably have expected the emergence in The Netherlands of a competitive electricity market, which would be established well before 2018. (Tr. 2473 (Goulding)) And in fact, such a market did develop: The Netherlands currently has a "fully deregulated competitive electricity market" with generators and importers who sell electricity through contracts and over-the-counter trades, intermediary wholesalers that purchase electricity for resale, and distribution companies that purchase power to fulfill load obligations to their end customers. (Tr. 2469-70 (Goulding)) This market began developing soon after the RoCa3 Transaction closed: the process started in 1998 and transitioned over the next four to six years. (Tr. 2470 (Goulding))

Although CED would be entitled to only a share of the output from the RoCa3 Facility under these circumstances, Goulding testified that it is possible to divide the capacity of the plant "down to the megawatt hour" among various owners and give each an interest. (Tr. 2463) Goulding cited a number of such arrangements, including three where fractional owners receive a share of output without having any rights to operate the plant. (Tr. 2463-66) CED would have "a variety of alternatives" to sell its share of the output: for example, it could sell its share on the electricity exchange for the going rate, negotiate bilateral contracts with other parties, sell to resale electricity marketers, or sublease to another party. (Tr. 2464,

2466-67 (Goulding))[56] None of these options were dependent on CED's having the right to operate the facility itself. (Tr. 2554-55 (Goulding))

### 6. Defendant's Experts Testified that CED Would Bear Economic Risk Related to the Successful or Unsuccessful Operation of the RoCa3 Facility During the Retention Option Period or the Shirt-Tail Period of the Sublease Renewal Option

David LaRue alleged in his initial expert report that in some scenarios CED received only preordained and circular cash flows, lacked economic risk, and did not bear the benefits and burdens of ownership. However, he never claimed that these conclusions applied to all of the scenarios contemplated by the RoCa3 Transaction documents.

For example, LaRue's report charged that "it does not appear that [CED] would ever bear any of the potential economic risks (or benefit from any potential economic rewards) inherent in the facility." (Ex. 20194 (LaRue Initial Report) at page 25111) In his testimony, however, LaRue clarified that this statement did not encompass (1) the possibility that the transaction would terminate early; (2) the potential economic risks and rewards during the Retention Option Period; or (3) the potential economic risks and rewards during the Shirt-Tail Period. (Tr. 5234-36) Instead, he testified, "[t]here is a lot of risk associated with [the revenues under the Shirt-Tail Period]" such as "the risk of revenues being at a particular level," "the

[56] The Defendant's leasing expert Bent expressed skepticism that CED would want to take the steps necessary to sell the energy to which it was entitled. (Tr. 3933-36) Bent, however, was not qualified in any area related to energy assets or markets (*see* Facts Section X.A.1.), and he did not do any analysis of The Netherlands power industry in preparation for his report and testimony. (Tr. 3938 (Bent))

risk of expenses being at a certain level," the management fees CED would owe to EZH, and the currency exchange risk associated with converting revenue received in Dutch guilders back to U.S. dollars. (Tr. 5163-64 (LaRue)) There is "considerably more risk" under the Retention Option, where CED has "positive and negative risk" from 2018 onward associated with the "highly uncertain" market for electricity, as well as the currency exchange risk and the to-be-negotiated Operator Fee CED would owe to EZH at that time. (Tr. 5352-55 (LaRue))

Another of Defendant's experts, leasing consultant Ray, agreed with LaRue's assessment that CED would bear material risk in these scenarios: Ray testified that the operations risk to CED was not low, citing the long time span of the transaction, potential for fuel price fluctuations, expected reorganization of The Netherlands electricity distribution systems, and unexpected power demand or lack thereof. (Tr. 4804-05, 4810; Tr. 4832 (Ray) (stating that there is "material risk" and "material opportunity" for CED if EZH does not exercise the Sublease Purchase Option))

A second example of LaRue's limited conclusions about CED's economic benefit and risk in this transaction are his related claims that "[t]he amounts and timing of [CED's] pre-tax net cash flows . . . were preordained, secured, and defeased as of the inception of the transaction" (Ex. 20194 (LaRue Initial Report) at page 25111), and that CED's "positive . . . cash flows, many of them circular, were entirely unrelated to the potential economic profits and losses that might be realized from the successful or unsuccessful operation of the Facility." (*Id.*) Once again, however, LaRue testified that he did not intend this statement to apply to

either the cash flows CED might receive upon an Early Termination Event or the cash flows—positive or negative—that CED might receive during either the Retention Option Period or the Shirt-Tail Period of the Sublease Renewal Option. (Tr. 5238-40)

First, as LaRue testified, CED could very well be subject to cash flows during the Retention Option Period or the Shirt-Tail Period of the Sublease Renewal Option that are not preordained, secured, and defeased. (Tr. 5239; Tr. 3954-56 (Bent) (explaining that his demonstrative chart of cash flows at demonstrative Exs. 20214-15 did not include revenues or losses derived during the Shirt-Tail Period, and that CED could "increase its overall return on this deal by selling energy" or lose money by selling electricity at a loss)) And these cash flows would in fact be *"entirely dependent" on the successful or unsuccessful operation of the facility*. (Tr. 5241 (LaRue) (emphasis added)) Further, many of the cash flows payable upon an Premature Termination Event would be both substantial and noncircular. (Tr. 5181 (LaRue)) Second, although LaRue did not know how the termination values in this transaction were determined (Tr. 5347-48 (LaRue)), Bent explained that in leveraged leasing, the schedule of termination values is computed with reference to the equity investor's outstanding debt and a return on the equity investment (among other things). (Tr. 3751-52, 3771-73 (Bent)) The amount CED would recover upon a Premature Termination Event is fixed, irrespective of the value of the defeasance accounts (Sublease Deposit and IJssel Deposit); as such, it would be

mere "happenstance" if CED's payout upon a Premature Termination Event were equal to the value of the defeasance accounts. (Tr. 3826-27 (Bent))

LaRue's third conclusion in his report regarding CED's potential risk—that EZH did not transfer the benefits and burdens of ownership to CED (Ex. 20194 (LaRue Initial Report) at pages 25111-12)—was similarly limited. This aspect of LaRue's opinion was based on two facets of this transaction: First, because EZH had a fixed-price purchase option in 2018, "if there were any benefits and burdens being conveyed by EZH to [CED], it was a decision that EZH, in its sole discretion, would make" in year 2018. (Tr. 5244, 5246) LaRue had never before seen a transaction with a fixed-price purchase option. (Tr. 5246) Yet, neither of the government's leasing experts—including Bent, who specifically opined as to which features of the deal were individually or collectively atypical (Tr. 3760)—gave any indication that the use of a fixed-price purchase option was uncommon. Second, LaRue relied on the fact that CED's cash flows during these first 20 years were fixed, rather than linked to "the successful or unsuccessful operation of the facility itself." (Tr. 5244-45) But again, the leasing experts testified that it is typical in leveraged leases for the rental payments to be tied to a fixed schedule. (Tr. 3151-52, 3170 (Ellis) (explaining that rental payments are typically fixed in large-ticket leveraged leases); Tr. 3743 (Bent) (noting that it is typical for the rent to be set on a schedule equal to the debt obligations))

LaRue's opinion that EZH did not transfer the benefits and burdens of ownership to CED once again did not take into account any benefits and burdens

that might arise during the Retention Option Period. (Tr. 5247) LaRue acknowledged, however, that if EZH did not exercise the Sublease Purchase Option, EZH would convey to CED "the benefits and burdens of the ownership of . . . the undivided interest . . . [and CED] would begin to benefit from the operation and the ownership of the facility." (Tr. 5246-47) He also acknowledged that CED bore the same risks during the Shirt-Tail Period under the Sublease Renewal Option as it did during the Retention Option Period. (Tr. 5163-64)

### 7. CED's Consideration of the Tax Benefits of Leveraged Leasing Was Normal and Appropriate

Leasing expert Ray—whom Defendant hired to examine the record in this case and opine as to CED's business purpose in this transaction (Tr. 4693-94)—concluded that the tax treatment of the RoCa3 Transaction was not the only element in CED's decision to invest and agreed that there was "no reason to doubt" that other elements of the transaction were important to CED's decision.[57] (Tr. 4919-20)

Furthermore, Ray agreed that "[t]here is nothing in this transaction that causes it to have a lack of economic substance just because there are tax motivations that exist in the transaction." (Tr. 4850) He testified that all leveraged leases can be considered "tax-advantaged transaction[s]" (Tr. 4843) and that the

[57] Although Thomas testified that CED did not have the "sort of . . . non-tax motivation" that he was looking for—specifically, he believes the transaction did not create any efficiencies that would increase "the size of the pie" for the parties involved (Tr. 4478-80)—he too acknowledged that CED put forth other motivations for its involvement in the deal, including accounting benefits, strategic benefits, and pretax profits. (Tr. 4482)

expected tax treatment was a "key element" in his own leasing work at EDS. (Tr. 4919-20) In fact, Ray would have been "stunned" if CED had not taken the tax benefits into account when deciding whether to pursue the investment. (Tr. 4850-51; Tr. 4560 (Thomas) (agreeing that companies deciding how to fund an investment should make decisions "to the extent possible, to obtain . . . tax benefits"); Tr. 3231 (Ellis) ("Taxes are a part of lease transactions as they are a part of all business transactions."))

One of Defendant's experts Thomas, declared that the tax benefits in this case are "special tax benefits" because they are "unusual or different."[58] (Tr. 4462-63) According to Thomas, the so-called unusual tax benefits were those "generated mostly by [CED's] prepaid rent" under the Lease, but also those generated by its treatment of the deferred rent on the Lease. (Tr. 4513, 4515-16; *see also* Ex. 20197 (Thomas Initial Report) at pages 25257-58) Similarly, Thomas also opined that many of the features of the RoCa3 Transaction were "unusual," and that he therefore assumed that the transaction was "all about taxes." (Tr. 4528) The features Thomas cited as unusual were once again prepaid rent, deferred rent, and the existence of the Sublease Purchase Option. (Tr. 4528)

Thomas did not specify, however, on what basis he concluded that the rental structure, the Sublease Purchase Option, and CED's tax treatment were unusual. First, Thomas has never advised a participant in a commercial leasing transaction, nor has he been involved in such a transaction in any capacity. (Tr. 4552-53) As a

---

[58] The term "special," as Thomas used it, does not connote judgment as to whether those benefits were appropriate or not. (Tr. 4462 (Thomas))

result, Thomas admitted, he did not know whether parties to leveraged lease transactions generally use prepaid or deferred rents. (Tr. 4566-67) Second, Thomas did not actually know whether CED used the tax treatment he criticized; he simply "assum[ed]" as much. (Tr. 4654) Third, Thomas did not know how parties to leveraged leases generally account for deferred rental payments. (Tr. 4567) And finally, Thomas did not know how CED's tax benefits from the RoCa3 Transaction compared to a regular leveraged lease involving a domestic power plant or the leveraged lease of an asset such as an aircraft. (Tr. 4568)

### 8. Investors Do Not Use Analysis of Pretax Profitability Based Upon "Benchmark" Numbers to Evaluate Opportunities

Defendant retained one expert in accounting and finance, LaRue, and one in economics, Thomas, to opine as to the expected pretax economic consequences to CED of the RoCa3 Transaction. Thomas evaluated whether CED would expect an "economic loss" by comparing CED's expected pretax rate of return to the pretax return available on "a vanilla investment" such as government bonds. (Tr. 4494-95; *see also* Ex. 20197 (Thomas Initial Report) at page 25256) Under this definition, CED would suffer an "economic loss" simply because its positive pretax rate of return was lower than the government bond rate at that time. (Tr. 4498-99 (Thomas))

LaRue evaluated CED's expected potential for "pre-tax economic profit" using a discounted cash flow analysis based on the same government bond rates Thomas used. (Ex. 20194 (LaRue Initial Report) at page 25147 & nn.57-59; Tr. 5050-54

(LaRue)) To perform this analysis, LaRue identified what he believed were the "real" cash flows CED expected to realize over the course of the transaction.[59] (Tr. 5053-54, 5082) He then applied the 6.18% "risk-free" discount rate (drawn from the rate on United States Treasury securities) to arrive at a lower number that represented what he believed to be the value of each cash intake or outflow in today's dollars. (Ex. 20194 (LaRue Initial Report) at pages 25147 & nn.57-59, 25151, 25154; Tr. 5051-52, Tr. 5082-83 (LaRue))

Based on his analysis, LaRue concluded that the present value of CED's expected total pretax cash flow from the RoCa3 Transaction was negative under both the Sublease Purchase Option and the Sublease Renewal Option. (Ex. 20194 (LaRue Initial Report) at page 25111; Tr. 5051-53) Because LaRue takes the position that "[a] negative net present value . . . results in an economic loss from the investment" (Tr. 5084), he concluded that CED had "no realistic expectation of a pre-tax economic profit" under either of these two scenarios. (Tr. 5052-53)

LaRue performed another discounted cash flow analysis using CED's expected after-tax cash flows. (Tr. 5102-03) He then calculated both pretax and after-tax internal rates of return. (Tr. 5114-15) LaRue calculated pretax internal rates of return for CED of 4.44% under the Sublease Purchase Option and 3.18% under the Sublease Renewal Option. (Ex. 20194 (LaRue Initial Report) at pages 25151, 25154) He calculated after-tax internal rates of return at 15.25% under the

[59] The cash flows LaRue identified are set forth in his report (Ex. 20194) at pages 25150 (Sublease Purchase Option) and 25153 (Sublease Renewal Option).

Sublease Purchase Option and around 16.59% under the Sublease Renewal Option. (*Id.*)

When performing his discounted cash flow and internal rate of return analyses, LaRue did not take into account all possible cash flows and scenarios in the RoCa3 Transaction. For example, neither LaRue's report nor his testimony concerned the cash flows and pretax economic profit CED could reasonably earn if it exercised the Retention Option. (Ex. 20194 (LaRue Initial Report) at page 25111 (setting forth only two scenarios for analysis); Tr. 5233-34 (LaRue)) Neither did LaRue examine the cash flows or profits that would result from a potential early termination. (Tr. 5233-34 (LaRue)) And although LaRue admitted that cash flows "that might have resulted under [the Sublease Renewal Option] during the shirt-tail period" would have been "free cash, noncircular cash flows," he did not attempt to estimate and discount these cash flows. (Tr. 5098)

Defendant's leasing experts Ray and Bent testified as to pretax and after-tax rates of return common in the leveraged leasing industry, and their testimony cited returns similar to those LaRue calculated for CED's RoCa3 investment. Ray testified that he would be willing to work on a transaction with a pretax internal rate of return of around two to four percent. (Tr. 4874-76) He would not be dissuaded from the transaction even if that return were below the Treasury rates, as long as the transaction provided tax benefits. (*Id.*) Bent likewise testified that leveraged lease transactions with pretax internal rates of return of one to two percent are "not unusual or unheard of," and that he has personally worked on

deals with pretax internal rates of return ranging from one to four percent. (Tr. 3785; Tr. 3783-84 (clarifying how Bent uses the term "pre-tax yield")) Bent also testified that in the power industry deals he had worked on, it was "not uncommon" for equity investors to design a deal with a two to three percent "pre-tax yield, cash-on-cash return."[60] (Tr. 3785-86)

LaRue and Thomas both testified, however, that leveraged lease transactions with pretax rates of return ranging from one to three percent would produce economic losses under their proposed analytical methods. (Tr. 5260, 5262-63 (LaRue); Tr. 4565-66 (Thomas)) Neither expert has any experience advising the participants in a leveraged lease transaction. (Tr. 5147-48 (LaRue); Tr. 4552-53 (Thomas)) LaRue has never researched or published on the industry (Tr. 5148 (LaRue)) and was not even familiar with the market yields in the leasing industry. (Tr. 5149-50) Thomas also testified that he did not know what returns leasing experts expected because he did not have sufficient experience in the industry. (Tr. 4570-71)

Thomas calculated "economic loss" with reference to pretax, not after-tax, returns. (Tr. 4494-95 (Thomas)) And LaRue testified that he used a discounted pretax cash flow analysis to determine whether CED could earn a pretax economic profit because "[t]hat's a pretty standard way of measuring whether or not there is

---

[60] In leveraged lease transactions with a two to three percent pretax internal rate of return, it would "not [be] unusual" to have an eleven or twelve percent after-tax rate of return; Bent has worked on deals with such numbers. (Tr. 3786-87 (Bent); Tr. 4874-77 (Ray) (testifying that he would not be surprised if a transaction with two to three percent pretax returns had an after-tax internal rate of return of approximately twelve percent))

. . . an expected economic return on an investment." (Tr. 5130) All of the experts who testified on the leveraged leasing industry, however, said that leveraged lease investors focus on the after-tax returns rather than the pretax numbers LaRue used: Ray agreed that it was neither "necessary" nor "normal[]" for investors to use pretax cash flows to determine an internal rate of return; investors measure investment opportunities based on after-tax yields and generally do not think pretax internal rates of return are "relevant."[61] (Tr. 4870-71, 4874-76) Bent testified that in the leveraged leasing industry, equity investors formulate their deals around an intended "net economic return," which is commonly used in the industry to refer to the "net after-tax yield and aggregate after-tax cash flows in the transaction." (Tr. 3787-88) And Ellis stated that pretax internal rates of return are not considered in making leasing decisions, as they are not the most valid evaluation tool. (Tr. 3253-54)

In fact, Thomas himself testified that one generally looks at after-tax cash flows to make economic decisions, and that lessors generally make their decisions based on analysis of the after-tax economics. (Tr. 4557) He testified that when he did his own research to understand "the economics behind computer leases," he would have based his discounted cash flow analysis on after-tax numbers. (Tr. 4554-56)

---

[61] In fact, Ray and Ellis both testified that when investors determine "pretax" calculations, they do so by "grossing up" the after-tax yield, so that the after-tax yields are *lower* than the pretax internal rates of return. (Tr. 3253 (Ellis); Tr. 4871-73 (Ray)) This is not the same calculation as LaRue's pretax internal rate of return. (Tr. 3253 (Ellis); Tr. 4873-74 (Ray))

## ARGUMENT

### I. This Case Is Governed by a Well-Developed Body of Authorities that Specifies Standards for Determining True Lease Status for Tax Purposes

#### A. Introduction

For tax purposes, the classification of the parties to a lease, and their relationship to the leased property, depends upon which of the parties—the "lessor" or the "lessee"—should be treated as holding an equity interest in the property. *See, e.g.*, *Levy v. Comm'r*, 91 T.C. 838, 861-62 (1988) (lessor had equity interest in property); *Gefen v. Comm'r*, 87 T.C. 1471, 1493-94 (1986); Rev. Rul. 55-540, §3.02, 1955-2 C.B. 39, 41; *see also Colo. Nat'l Leasing, Inc. v. Gary Ref. Co. (In re Mesa Ref., Inc.)*, 65 B.R. 724, 727 (D.C. Colo. 1986) (applying the same standard under bankruptcy law). When a lessor has invested capital—equity—in property subject to a lease, the lessor is entitled to tax deductions for the "consumption of that capital." *Frank Lyon*, 435 U.S. at 581. This issue has also been referred to as determining which party possesses the benefits and burdens of ownership of the leased property. *Levy*, 91 T.C. at 859-62.

In this section, Con Edison provides a chronological overview of the specific standards governing the tax treatment of leases and whether a lease will be respected for tax purposes.

Section I.B. summarizes the administrative guidance, such as Revenue Rulings and Revenue Procedures, that the IRS has issued on leasing transactions, including the IRS "Leasing Guidelines," contained in Revenue Procedure 75-21,

1975-1 C.B. 715, and Revenue Procedure 75-28, 1975-1 C.B. 752, which govern the circumstances under which the IRS will issue an advance ruling that a taxpayer's leveraged lease will be respected for tax purposes. This section also examines cases that supply guidance on the requirements for true lease status, including the instances in which the cases set a standard less rigorous than the Leasing Guidelines.

Section I.C. discusses related tax law guidance that governs leasing transactions, including the tax treatment of nonrecourse debt, rental allocations under §467, and leases to tax-exempt entities under §470.

Section I.D. discusses *Frank Lyon* and its impact on the development of leasing law and on the development of the economic substance doctrine, which governs the tax treatment of all transactions.

Section I.E. summarizes four decisions by this Court's predecessor that provide guidance on the requirements for true lease status. The four relevant cases are *Johnson v. United States*, 11 Cl. Ct. 17 (1986) ("*Johnson I*"); *Johnson v. United States*, 32 Fed. Cl. 709 (1995) ("*Johnson II*"); *Transamerica Corp. v. United States*, 7 Cl. Ct. 441 (1985) ("*Transamerica I*"); and *Transamerica Corp. v. United States*, 15 Cl. Ct. 420 (1988) ("*Transamerica II*").

Section I.F. summarizes two recent rulings by the IRS, Revenue Ruling 99-14, 1999-1 C.B. 835, and Revenue Ruling 2002-69, 2002-2 C.B. 760, which set forth the IRS's position on the taxation of lease-in/lease-out or "LILO" transactions.

### B. Administrative Guidance Governing Leasing

Despite the significant tax issues associated with commercial leasing, there is no statutory guidance that defines the characteristics of a lease for tax purposes. *Equipment Leasing* §4.2.1 at 4-10. As a result, the definition of a "lease" for tax purposes has been well developed through the extensive interaction of IRS administrative announcements and case law decisions. There is a large body of such authority covering over 50 years. This section discusses the administrative rules and case decisions setting forth the factors that are analyzed in deciding whether a transaction constitutes a true lease for tax purposes.

The IRS guidance concerning the characteristics of a lease has come in the form of Revenue Rulings and Revenue Procedures. These published rulings are not entitled to the deference accorded Treasury Regulations, particularly when they are inconsistent with earlier pronouncements; they do not reflect a settled interpretation of law. *See Fed. Nat'l Mortgage Ass'n v. United States*, 397 F.3d 1303, 1308-09 (Fed. Cir. 2004). The following discussion will note those instances where the courts have imposed rules less rigorous than those provided in the IRS guidance.

#### 1. Revenue Rulings 55-540 and 55-541

The IRS's first attempt to define a lease for tax purposes was set forth in Revenue Ruling 55-540, 1955-2 C.B. 39, issued in 1955.[62] Revenue Ruling 55-540 recognized that many "new and unique types" of leasing agreements had been

---

[62] The year in which a Revenue Ruling or Revenue Procedure was issued is reflected in the first two digits (or four digits for ruling issued in 2002 and thereafter).

developed and attempted to set forth rules for the classification of such agreements. Rev. Rul. 55-540, §2.01, 1955-2 C.B. at 39. Revenue Ruling 55-540 also referenced three other revenue rulings that illustrate the principles set forth therein. *See* Rev. Rul. 55-542, 1955-2 C.B. 59; Rev. Rul. 55-541, 1955-2 C.B. 19; Rev. Rul. 55-25, 1955-1 C.B. 283. The principles set forth in Revenue Ruling 55-540 continue to be the "foundation" of leasing tax law. *Equipment Leasing* §4.2.2[C] at 4-16.

The essential characteristic of a lease is that it provides possession to the lessee for a period that is substantially shorter than the expected useful life of the property. When a lessor leases property to a lessee for a period substantially less than the useful life of the property, the property will still retain significant value when it is returned to the lessor. The value of property at the end of a lease is often referred to as "residual value," and the existence (or lack) of significant residual value at the termination of the lease is the most significant factor in determining the existence of a true lease. *See, e.g., Levy*, 91 T.C. at 860; *Torres v. Comm'r*, 88 T.C. 702, 721 (1987); *Gefen*, 87 T.C. at 1491-93; *Estate of Thomas v. Comm'r*, 84 T.C. 412, 434 (1985).

This principle was illustrated in Revenue Ruling 55-541 (one of the companion rulings to Revenue Ruling 55-540), which involved a lease of property worth $100 that had an expected useful life of 10 to 15 years. Rev. Rul. 55-541, 1955-2 C.B. at 19-20. The lease had a three-year term for a total rental of $116, and at the conclusion of the initial three-year term, the lessee could renew the lease for up to 10 years at a nominal rental of only $1 per year. *Id.* at 19. Thus, the lessee

was guaranteed possession of the property for 13 years, and since the property had a useful life of only 10 to 15 years, the lessee was guaranteed use and possession of the equipment "for substantially its entire useful life." *Id.* at 20. Therefore, the transaction was treated as a sale to the "lessee," rather than a lease, since the "lessee" would "enjoy all the benefits of ownership for substantially the entire useful life of the property." *Id.*

Revenue Ruling 55-540 recognized that lease agreements would often contain "an option [allowing the lessee] to purchase the equipment at a price fixed in advance which will approximate the fair market value of the equipment at the time of the election." Rev. Rul. 55-540, §2.02(a), 1955-2 C.B. at 40. The Revenue Ruling did not question the use of such an option, but rather provided that a transaction would not be treated as a lease if it contained a purchase option for a "nominal" amount:

> The property may be acquired under a purchase option at a price which is nominal in relation to the value of the property at the time when the option may be exercised, as determined at the time of entering into the original agreement, or which is a relatively small amount when compared with the total payments which are required to be made.

*Id.* at §4.01(e), 1955-2 C.B. at 42.

**2. Revenue Ruling 60-122**

In Revenue Ruling 60-122, 1960-1 C.B. 56, the IRS elaborated on the principles of Revenue Ruling 55-540 through examples of two lease transactions. The first example involved the lease of equipment with a three-year term that was renewable for three additional years in one-year renewals (for a total of six years),

and at the end of the lease, the equipment would be returned to the lessor. *Id.* at 56. The equipment had a useful life "substantially longer" than six years, and thus the lessor possessed a significant residual value interest in the property at the end of the lease term. *Id.* Accordingly, the IRS ruled that this transaction should be respected as a lease. *Id.* at 57. However, in the second lease transaction, the lessee was able to renew the lease indefinitely for a "nominal amount." *Id.* at 56. Thus, the lease was likely to be renewed indefinitely, the equipment would never "revert" to the lessor, and the lessor would not retain any residual interest in the property. *Id.* at 57. Accordingly, the IRS ruled that this transaction did not qualify as a true lease for tax purposes. Rev. Rul. 60-122, 1960-1 C.B. at 57. These two examples confirm that a significant residual value at the termination of the lease is the key characteristic which defines a lease.

The "nominal" renewal rents described in Revenue Ruling 60-122 have the same economic function as the nominal purchase option price in Revenue Ruling 55-540. In both cases, the lessee retains possession of the property for a nominal amount and the lessor is thus deprived of any residual interest in the property. Provisions for nominal rent or a nominal purchase price build up equity for the lessee and deprive the lessor of its equity interest in the property. *Transamerica I*, 7 Cl. Ct. at 449. Under these circumstances, as illustrated in Revenue Rulings 55-540 and 60-122, the transaction would be treated as a sale and the lessee is treated as the owner.

### 3. Revenue Procedure 75-21 and Revenue Procedure 75-28 ("Leasing Guidelines")

In 1975, the IRS set forth a comprehensive set of rules—which have come to be known as the "Leasing Guidelines," *Equipment Leasing* §4.2.2[C] at 4-16, 4-17—to be used in determining whether lease transactions will be respected for tax purposes.[63] The Leasing Guidelines consist of two documents, Revenue Procedure 75-21, 1975-1 C.B. 715, and Revenue Procedure 75-28, 1975-1 C.B. 752. Revenue Procedure 75-21 sets forth a list of criteria that a lease must satisfy in order to qualify for a favorable advance ruling, and Revenue Procedure 75-28 consists of a "checklist" of information required to support a request for an advance ruling. The Leasing Guidelines explain that a leveraged lease:

> generally involves three parties: a lessor, a lessee and a lender to the lessor. In general, these leases are net leases, the lease term covers a substantial part of the useful life of the leased property, and the lessee's payments to the lessor are sufficient to discharge the lessor's payments to the lender.

Rev. Proc. 75-21, §1, 1975-1 C.B. at 715.

The Leasing Guidelines were meant to be a safe harbor for obtaining an advance private letter ruling from the IRS that a proposed transaction would be respected as a true lease. *Equipment Leasing* §4.2.2[C] at 4-17. The Leasing Guidelines "do not define, as a matter of law, whether a transaction is or is not a lease for Federal income tax purposes," Rev. Proc. 75-21, §3, 1975-1 C.B. at 715, and thus a transaction can qualify as a lease for Federal income tax purposes even "[i]f

[63] The Leasing Guidelines were updated in 2001 without any substantive change. *Equipment Leasing*, §4.2.2.[C] at 4-16 n.31.

these guidelines are not satisfied." *Id.*; *see Frank Lyon*, 435 U.S. at 579 n.14; *Johnson I*, 11 Cl. Ct. at 26 (upholding lease where taxpayer "concededly does not meet all [of the Revenue Procedure 75-21] requirements"); *Estate of Thomas*, 84 T.C. at 440 n.51. As discussed below, the courts (including the Supreme Court) have routinely upheld leasing transactions that do not meet the provisions of the Leasing Guidelines.

However, the Leasing Guidelines have come to play a critical role in true lease analysis, because they bring together in one place all of the key factors that the myriad of case law and administrative authorities have considered in deciding whether a transaction will be respected as a lease:

> The [Leasing] Guidelines constitute a relatively clear and concise list of principles and propositions made relevant by case law, and for this and other reasons they have achieved an importance in the tax planning for lease transactions that has transcended their stated role as an instruction manual for the preparation of ruling requests. They also raise a convenient framework in which to consider some of the fundamental issues raised by the true lease analysis.

*Equipment Leasing* §4:2.2[C] at 4-18. Because the Leasing Guidelines help simplify the issues to be considered in a true lease analysis, Con Edison will examine the Leasing Guidelines in detail, noting those instances in which the case law authorities have imposed a standard less rigorous than the Leasing Guidelines' standards.

**a. Minimum Unconditional "At Risk" Investment**

**(i) Initial Minimum Investment**

In order to meet the Leasing Guidelines, a lessor must make an "at risk" investment (cash and personal liability) of at least 20% of the cost of the leased property. Rev. Proc. 75-21, §4(1)(A), 1975-1 C.B. at 715. This investment must be unconditional, *i.e.*, it cannot be returned to the lessor. *Id.*

In practice, the courts have routinely approved equity investments lower than 20%. *See, e.g., Frank Lyon*, 435 U.S. at 566-67 (6.5% equity investment respected); *Johnson I*, 11 Cl. Ct. at 23 (15% equity investment respected); *Estate of Thomas*, 84 T.C. at 436 (13% equity investment respected); *Emershaw v. Comm'r*, T.C. Memo 1990-246, 59 T.C.M. (CCH) 621, 628 (1990), *aff'd*, 949 F.2d 841 (6th Cir. 1991) (6% equity investment respected); *Pearlstein v. Comm'r*, T.C. Memo 1989-621, 58 T.C.M. (CCH) 699, 702 (1989) (8-9% equity investments respected); *see also Torres*, 88 T.C. at 709 (12% equity investment).

As described below at Argument Section III.I.2., when a taxpayer has made a significant equity investment in a leasing transaction financed with nonrecourse debt, the taxpayer will be compelled to honor the debt to protect its equity investment. Thus, the requirement for a significant equity investment ensures that the taxpayer will not prematurely abandon the transaction.

**(ii) Maintenance of Minimum Investment**

The initial minimum investment of 20% of the cost of the leased property must be maintained throughout the life of the lease, and in order to maintain the

minimum investment, the amounts (i) paid by the lessee to the lessor (ii) over the disbursements to be paid by the lessor must not exceed the sum of (a) any excess of the lessor's equity investment over 20% of the cost of the property plus (b) the cumulative pro rata portion of the projected profit from the transaction, exclusive of tax benefits. Rev. Proc. 75-21, §4(1)(B), 1975-1 C.B. at 715. In other words, the cash paid to the lessor over the lease term (excluding a pro rata share of the lessor's profit) must not reduce the lessor's equity investment below the 20% level.

**(iii) Residual Investment**

Since the minimum investment of 20% of cost must be maintained throughout the life of the lease, the Leasing Guidelines also provide that the expected fair market value of the property at the end of the lease term, *i.e.*, the residual value, should be at least 20% of the property's original cost. *Id.* at §4(1)(C), 1975-1 C.B. at 715-16. This residual value determination is to be performed without taking into account the effects of inflation or deflation. *Id.* In addition, the remaining useful life of the property at the end of the lease term should be equal to the longer of one year or 20% of the property's originally estimated useful life. *Id.*, 1975-1 C.B. at 716.

Revenue Procedure 75-21 provides that in determining the residual value and remaining useful life of the property at the end of the lease term, a taxpayer can rely on a contemporaneous "reasonable estimate" of residual value and remaining life. *Id.* at §4(a)(C), 1975-1 C.B. at 715-16. Revenue Procedure 75-28 provides guidelines for obtaining the residual value and remaining life opinions

required by Revenue Procedure 75-21, including that the opinions must be "from a qualified expert who has professional knowledge of the type of property subject to the lease," and that the opinions must describe the manner in which the residual value and remaining useful life at the end of the lease term were determined. Rev. Proc. 75-28, §4.02.6, 1975-1 C.B. at 753.

The case law, however, has not required a 20% residual value or remaining useful life, and the courts have routinely accepted residual interests of less than 20%. For example, in *Frank Lyon* the residual period was only 10 years out of a 75 year lease, or approximately 13.33%. *See Frank Lyon*, 435 U.S. at 566; *see also, e.g.*, *Levy*, 91 T.C. at 859 (residual value of 10-20%); *Torres*, 88 T.C. at 716-17 (residual period represented 11.7% of original life); *Mukerji*, 87 T.C. at 931, 951-55 (1986) (residual value of 12.5%); *Estate of Thomas*, 84 T.C. at 428-29 (residual value represented 14% of original value).

Cases have followed the Leasing Guidelines in allowing a taxpayer to rely on "reasonable estimates" in determining residual value and life. *See Levy*, 91 T.C. at 858; *Gefen*, 87 T.C. at 1491-92 ("[t]ax consequences cannot depend on unrealistic demands for certainty"); *Mukerji*, 87 T.C. at 965 ("no business can operate on the basis of hindsight"); *Estate of Thomas*, 84 T.C. at 428-29; *see also Gilman v. Comm'r*, 933 F.2d 143, 149 (2d Cir. 1991) (inquiry is limited to "what was reasonable to believe" at the lease inception, "not which expert was correct"); *Johnson I*, 11 Cl. Ct. at 35 ("The court need not decide what the projected 1987 residual value would have been in 1979. It need only conclude . . . that . . .

[taxpayer's] projection . . . was reasonable."); *Gefen*, 87 T.C. at 1491 n.10 ("[T]he question is not who was correct in predicting the actual residual value . . . in 1984; rather, the question is what was reasonable to believe in 1977 with respect to what the residual value . . . would be in 1984.").

**b. Lease Terms and Renewal Options**

The Leasing Guidelines continue to apply the principle set forth in Revenue Ruling 55-540 that in determining these tests, *e.g.*, the residual value test, "the lease term includes all renewal or extension periods except renewals or extensions at the option of the lessee at fair rental value." Rev. Proc. 75-21, §4(2), 1975-1 C.B. at 715-16; *accord* Rev. Rul. 55-540, 1955-2 C.B. at 42-43. Therefore, a lease containing a fixed rental rate renewal term will be analyzed under those Leasing Guidelines as if the lease term includes both the initial and renewal terms.

**c. Purchase and Sale Rights**

The Leasing Guidelines provide that the lessee must not have a "contractual right to purchase the property from the lessor at a price less than [the property's] fair market value at the time the right is exercised." Rev. Proc. 75-21, §4(3), 1975-1 C.B. at 716. Since, at the inception of the lease, the fair market value of the property at the time the right is exercisable in the future is unknown, a fixed-price purchase option could ultimately prove to be less than the property's fair value. The Leasing Guidelines therefore do not permit fixed-price purchase options, but rather require that the purchase option price be set at the fair market value of the

property, to be determined on the date of exercise. *Equipment Leasing*, §4.2.3[C][6][a] at 4-59.

The Leasing Guidelines' restrictions on fixed-price purchase options, however, are "incompatible with a long line of leasing authority," *id.*, and are contrary to Revenue Ruling 55-540, which allowed fixed price purchase options so long as the options were for more than a "nominal" price. *See* Rev. Rul. 55-540, §4.06, 1955-2 C.B. at 42-43. And as discussed in detail in Argument Sections I.D., I.E. and IV.C., the courts (including the Supreme Court) have routinely allowed fixed-price purchase options so long as the option price is not set at a price so nominal compared to the expected value of the property that the lessee is virtually certain or economically compelled to exercise the option.

A purchase option held by a lessee is inconsistent with status as a true lease only if the purchase option provides the lessee with an equity interest in the property. *See Frank Lyon*, 435 U.S. at 581; *Transamerica I*, 7 Cl. Ct. at 448; *Mesa Ref.*, 65 B.R. at 727. The lessee acquires an equity interest in the property when the purchase price of the property is nominal in relation to the property's value. *See Transamerica I*, 7 Cl. Ct. at 448; *Mesa Ref.*, 65 B.R. at 727. A nominal purchase option is evidence that the lessee has "'purchased' the property (or most of it) by making payments over the term of the lease." *Mesa Ref.*, 65 B.R. at 727.

In determining whether the lessee's purchase option represents an equity interest in the property, objective facts, such as the amount of the purchase price in relation to the value of the property, are controlling. *Mesa Ref.*, 65 B.R. at 727. The

parties' intentions and expectations are generally irrelevant, since these subjective views, without more, do not create an equity interest in the property. *Breece Veneer & Panel Co. v. Comm'r*, 232 F.2d 319, 323 (7th Cir. 1956); *Benton v. Comm'r*, 197 F.2d 745, 753 (5th Cir. 1952); *see also Transamerica II*, 15 Cl. Ct. at 440-41; *Ill. Valley Paving Co. v. Comm'r*, T.C. Memo. 1981-468, 42 T.C.M. (CCH) 909, 914 (1981).

The logic of these authorities is simple. The relevant inquiry is whether the lessee has an equity interest in the property. If the purchase option is not set at a bargain price, the lessee derives no equity in the property from the existence of the purchase option. *See Frank Lyon*, 435 U.S. at 581; *Transamerica II*, 15 Cl. Ct. at 436-37, 440; *Transamerica I*, 7 Cl. Ct. at 448. Where there is no bargain price, it is irrelevant whether the parties expect or hope that the lessee will exercise the option; even if the lessee ultimately exercises the option, the lessor will receive the proceeds from selling its residual interest to the lessee and will profit from the property's expected value as a result of holding an equity interest. Conversely, if the lessee is required to pay an amount equal to the property's fair market value to purchase the asset, then by definition the lessee had no equity in the property prior to the exercise of its option.

**d. No Investment by Lessee**

The Leasing Guidelines prohibit the lessee from providing any part of the cost of the property. Rev. Proc. 75-21, §4(4), 1975-1 C.B. at 716. The Leasing Guidelines make clear, however, that a lessee's role in maintaining and repairing

the property, as is commonly required under a net lease, is consistent with the Leasing Guidelines. *Id.* at §4(4)(B), 1975-1 C.B. at 716.

**e. No Lessee Loans or Guarantees**

The Leasing Guidelines prohibit the lessee from lending to the lessor any of the funds necessary to purchase the property. *Id.* at §4(5), 1975-1 C.B. at 716. In practice, however, courts have upheld lease transactions which contain debt funded by the lessee or an affiliate. *See, e.g., Johnson I*, 11 Cl. Ct. at 23 (lessee financing); *Hudspeth v. Comm'r*, 509 F.2d 1224, 1227 (9th Cir. 1975); *Mukerji*, 87 T.C. at 962 (debt provided by an affiliate of the lessee).

**f. Profit Requirement**

One of the most important requirements of the Leasing Guidelines and the case law is that the transaction is expected to produce a profit, *i.e.*, positive pretax cash flow, apart from the value of the tax benefits. As discussed below at Argument Section I.D.3., this requirement is closely related to the economic substance doctrine. The profitability (or lack thereof) of specific leasing investments has been the subject of more litigation than any other leasing issue. *See, e.g., Johnson II*, 32 Fed. Cl. 709; *Johnson I*, 11 Cl. Ct. 17; *Rice's Toyota World, Inc. v. Comm'r*, 752 F.2d 89 (4th Cir. 1985); *Transcapital Leasing Assoc. 1990-II L.P. v. United States*, 97 A.F.T.R.2d 2006-1916 (W.D. Tx. 2006); *Gefen*, 87 T.C. 1471; *Mukerji*, 87 T.C. 926; *Estate of Thomas*, 84 T.C. 412. As a result, the rules pertaining to the profitability of leasing transactions are well settled.

The Leasing Guidelines provide a two-part test for meeting the profit or pretax cash flow requirement for a lease. Rev. Proc. 75-21, §4(6), 1975-1 C.B. at 716.

### (i) Total Cash Flow

First, the Leasing Guidelines require that the amounts to be paid by the lessee to the lessor over the lease term, plus the residual value of the property at the end of the lease term, must exceed the amounts paid by the lessor for ownership of the property, including its original equity investment and direct financing costs. *Id.*

The Leasing Guidelines illustrate this profit test in the form of a mathematical computation, which requires that "a + b exceed c," where:

a = Rent paid by the lessee to the lessor.

b = The property's residual value at the end of the lease (without taking inflation into account).

c = Amounts paid by the lessor in connection with owning the property, including the initial equity investment and direct financing costs.

Rev. Proc. 75-28, §4.07, 1975-1 C.B. at 753.

The Leasing Guidelines do not require any minimum level of pretax profit, and a pretax cash flow of $1 would satisfy the profit test as set forth in the Leasing Guidelines. *Equipment Leasing*, §4.2.3[G] at 4-116. No court has ever addressed the extreme situation, allowed by the Leasing Guidelines, where the expected pretax profit was only $1. However, the courts have repeatedly indicated that only a minimal level of profit is necessary to support a lease transaction.

In *Johnson I*, this Court's predecessor stated that Revenue Procedure 75-21 requires only a "minimal" level of profit. *Johnson I*, 11 Cl. Ct at 26. The court noted that, "despite the opportunity," the IRS "has not [used the Leasing Guidelines to] set out a primary or dominant profit motive requirement." *Id.* The Tax Court has adopted a similar test regarding the level of profit necessary to support a lease. *See Estate of Thomas*, 84 T.C. at 440 n.52 (taxpayer should prevail if potential for profit is "more than de minimis").

The cases have followed the Leasing Guidelines, upholding leasing investments when the taxpayer has a reasonable expectation of a positive pretax cash flow and resisting efforts to impose a threshold for the minimum required profit. *Gefen*, 87 T.C. at 1499 (rejecting comparison of leasing profits against alternative investments); *Mukerji*, 87 T.C. at 968 (taxpayers would "at least recoup their initial cash investment"); *Estate of Thomas*, 84 T.C. at 440 n.52 (rejecting requirement of a "particular return"); *Johnson I*, 11 Cl. Ct. at 26, 36-37; *Ockels v. Comm'r*, T.C. Memo 1987-507, n.15, 54 T.C.M. (CCH) 785, 797 n.15 (1987) (refusing "to require that a particular return must be expected before a 'profit' is recognized"); *Kaufman v. Comm'r*, T.C. Memo 1987-350, n.17, 53 T.C.M. (CCH) 1348, 1355, n.17 (1987).

The minimal level of profit required by the Leasing Guidelines reflects the commercial reality of the leasing business. Defendant's leasing experts agreed that pretax profits of 2-4% are entirely normal in the leasing business. (*See* Facts Section X.B.8.) Further, as described at Facts Sections VIII.C.2. and X.B.1.f., as a matter of

commercial practice in many leveraged leases the rent received by the lessor from the lessee matches the lessor's debt service during the term of the lease. *See, e.g.*, *Mukerji*, 87 T.C. at 962; *Estate of Thomas*, 84 T.C. at 433-34. Thus, the lessor will not receive any significant cash flow during the term of the lease. In such cases, the lessor's profit (or lack thereof) will depend entirely upon the residual value of the property at the end of the lease term.

For this reason, many leasing cases have turned upon conflicting expert testimony over whether the taxpayer's original expectations concerning the residual value of the property were reasonable. *See, e.g.*, *Johnson I*, 11 Cl. Ct. at 33 ("The residual value of the equipment represents a significant portion of the Transaction's pretax profitability."). When the projection of expected residual value is reasonable, the transaction will usually display the requisite profit motive. *See id.* at 36 ("[p]rojected residual value . . . was reasonable and predictive of a reasonable chance for a reasonable profit . . . ."). In cases, however, where the projected residual value has been inflated or is unreasonable, the taxpayer will often not have a reasonable chance of making a profit. *See, e.g.*, *Rice's Toyota World, Inc. v. Comm'r*, 81 T.C. 184, 205-06 (1983), *aff'd*, 752 F.2d 89 (4th Cir. 1985); *Transcapital*, 97 A.F.T.R.2d at 2006-1916.

**(ii) Cash Flow over the Lease Term**

The Leasing Guidelines also require that the payments made to the lessor "over the lease term" must exceed the amounts paid by the lessor over the same term. Rev. Proc. 75-21, §4(6), 1975-1 C.B. at 716. This requirement of the Leasing

Guidelines imposes a "cash flow" requirement over the term of the lease (not including residual value) that is separate from the total cash flow requirement. *Equipment Leasing*, §4.2.3[G] at 4-116.

In practice, however, the courts have not enforced the lease term "cash flow" requirement set forth in the Leasing Guidelines. Many leases are structured so that the rental income from the lessee exactly matches the debt service owed to the lender by the lessee. In such leases, which have been described by the Tax Court as a "neutral commercial reality," the lessor will not receive significant cash flow during the term of the lease, and the lessor's profit will depend entirely upon the residual value of the property. *Mukerji*, 87 T.C. at 962; *Estate of Thomas*, 84 T.C. at 436. In *Frank Lyon*, the rental payments exactly matched Frank Lyon's debt service obligations, 435 U.S. at 571, yet the Supreme Court rejected the government's arguments based on this fact. Following *Frank Lyon*, numerous other cases have confirmed that similarities in the timing and amount of rent and debt service payments are entirely consistent with a valid leasing transaction. *See, e.g.*, *Levy*, 91 T.C. at 860; *Larsen v. Comm'r*, 89 T.C. 1229, 1267 (1987); *Estate of Thomas*, 84 T.C. at 436 ("[r]ent . . . geared to the cost of interest and mortgage amortization is . . . a neutral commercial reality"); *Dunlap v. Comm'r*, 74 T.C. 1377, 1436 (1980), *rev'd on another issue*, 670 F.2d 785 (8th Cir. 1982); *Hilton v. Comm'r*, 74 T.C. 305, 348 (1980), *aff'd per curiam*, 671 F.2d 316 (9th Cir. 1982).

#### g. Uneven Rent Payments

Leases often contain uneven rent payments that result in deferred or prepaid rent. The Leasing Guidelines provide that the IRS will not raise questions about uneven rent payments if the rent for any year is not more than 10% above or below the amount calculated by dividing the total rent over the lease term. Rev. Proc. 75-21, §5.01, 1975-1 C.B. at 716. The Leasing Guidelines thus allow rent payments which fall between 90% and 110% of the average annual rental. As described below at Argument Section I.C.2., this "90-110" rule for uneven rent payments was also included in the Treasury Regulations under §467.

#### h. Limited Use Property

In the Leasing Guidelines, the IRS raised the possibility that it would not issue a favorable ruling with respect to leases involving so-called "limited use property." Rev. Proc. 75-21, §5.02, 1975-1 C.B. at 716. "Limited use property" is property that cannot be used by the lessor at the end of the lease term except for purposes of continued leasing or transfer to the lessee. For example, a brick smokestack attached to a factory owned by the lessee is limited use property because the smokestack cannot be leased or sold to anyone except the owner of the factory, the lessee. *See* Rev. Proc. 76-30, §5(1), 1976-2 C.B. at 647, 648.

##### (i) Revenue Procedure 76-30

In Revenue Procedure 76-30, 1976-2 C.B. 647, the IRS confirmed that limited use property could not qualify for a private ruling under the Leasing Guidelines. *Id.* Since limited use property has no potential buyers or lessees at the end of the lease

term other than the lessee, the lessor will likely have no other option but to sell or rent the property to the lessee at the end of the lease. *Id.* Thus, the lessee will enjoy the use of the property for its entire useful life. *Id.*

Revenue Procedure 76-30 contains two examples which are important to the present case. The first example ("Example 5") concerns the lease of a power plant to a lessee where the lessee has control over the fuel source necessary for the operation of the plant. *Id.* Given these facts, the power plant is limited use property because the lessee's control over the fuel necessary to operate the plant would prevent anyone but the lessee from operating the plant. In the second example ("Example 6"), however, Revenue Procedure 76-30 states that if the lessor in Example 5 has an option, exercisable at the end of the lease, to gain access to the fuel source, the power plant would not be limited use property. *Id.*, 1976-2 C.B. at 648-49. Given these facts, either the lessor or a new lessee could operate the plant by utilizing the lessor's option to gain access to the fuel source.

**(ii) Revenue Ruling 82-61**

In Revenue Ruling 82-61, 1982-1 C.B. 13, the IRS applied the principles of Revenue Procedure 75-21 and Revenue Procedure 76-30 to the sale-leaseback of undivided interests in an electric power facility. The ruling describes two utilities, X and Z, which constructed a coal-fired generating facility on land owned by X and Z. Rev. Rul. 82-61, 1982-1 C.B. at 13. The power facility was adjacent to a coal source sufficient to supply the facility for its useful life, and X and Z had the right to mine the coal pursuant to a lease for a term equal to the useful life of the generating

facility. *Id.* In addition, the power facility was synchronized to the power grid, allowing the commercially feasible sale and distribution of the power plant's output to a number of different electric utilities. *Id.*

Z sold its 50% interest in the power plant to Y, a leasing subsidiary of a bank. *Id.* Y financed the purchase with a 25% down payment and a nonrecourse loan. *Id.* Z also transferred to Y, for a term equal to the power plant's useful life, Z's interest in (1) the land on which the facility was located, (2) the lease to mine the coal, and (3) the transmission facilities to the electricity power grid. Rev. Rul. 82-61, 1982-1 C.B. at 13. Y then leased its interest in the power facility back to Z for a period substantially less than the useful life of the facility. *Id.* Y also leased back to Z the land underlying the facility and the right to the coal lease, both for a term equal to the lease term of the power facility, *i.e.*, a period substantially less than the facility's useful life. *Id.*, 1982-1 C.B. at 14.

This transaction is a lease-leaseback, or "LILO," in certain respects. Y acquires from Z a leasehold interest in the land underlying the facility and in the coal lease. Y then leases its leasehold interest in the land and coal lease back to Z, the same person from whom Y obtained its leasehold interest, for a period shorter than Y's leasehold interest. In approving the status of the transaction as a lease, the Revenue Ruling necessarily holds that Y has obtained a current "property interest" in the land and coal lease through its leasehold rights to the land and the coal lease. *Id.*, 1982-1 C.B. at 15-16. Without these leasehold rights, Y's interest in the facility

would be limited use property, since Y would not be able to lease or sell its undivided interest in the facility to anyone except Z, the lessee. *Id.*

The operations of the facility in the Revenue Ruling are governed by an operating agreement between X and Z. *Id.*, 1982-1 C.B. at 14. Under this agreement, X and Z share the output from the facility and the cost of production, including operating, maintenance and fuel costs. Rev. Rul. 82-61, 1982-1 C.B. at 14. Although Y is entitled to receive rent from Z, Y has no control over the operation of the facility and no right to share in the power generated by the facility during the term of the lease to Z. *Id.* The operating agreement also provides that Y has only the rights of a lessor: no costs of production are allocated to Y, and Y has no responsibility to pay maintenance, operating or fuel costs during the lease term. *Id.*

At the conclusion of the lease to Z, Y may lease or sell its interest in the facility to a third party and may also sell its share of the facility's output on the open market. *Id.* The Revenue Ruling does not describe whether Y is entitled to operate the plant or to take physical possession of the plant after the lease term, but since 50% of the plant continues to be owned by X, a utility, it is likely that X will continue to operate the plant and that Y will have no ability to physically possess or operate the plant. In any event, there can be only one operator at a time.

The Revenue Ruling held that Y's undivided interest in the power facility was an interest in property that could be leased separately from other undivided interests. *Id.*, 1982-1 C.B. at 16. Furthermore, the Revenue Ruling held that Y's undivided interest was not limited use property:

> The facts in this revenue ruling are analogous to those in Example (6) of section 5 of Rev. Proc. 76-30, in which the Service indicated that an electric generating facility, under the circumstances described in the example, did not constitute "limited use property." The only significant difference is that instead of the entire facility being leased, as in Example (6) of Rev. Proc. 76-30, the lease in this revenue ruling involves an undivided interest in the facility. This difference does not, under the circumstances of this revenue ruling, cause the undivided interest in the facility under lease to become "limited use property" because: (1) at the end of the lease between *Y* and *Z*, *Y* will continue to hold an undivided interest in the facility with a substantial remaining useful life that will entitle it to a ratable share of the electrical capacity of the facility; (2) *Y* will hold an undivided interest in the coal lease capable of supplying the facility with coal for the remaining useful life of the facility; and (3) *Y* can dispose of the electricity produced by the facility on a commercially feasible basis because of the transmission system to the power grid. These factors insure that *Y* can dispose of or lease its undivided interest in the facility to utilities other than *Z*, and that these other utilities can operate and dispose of the electricity produced on a commercially feasible basis.

*Id.*, 1982-1 C.B. at 15. Thus, assuming the lease met the other requirements of Revenue Procedure 75-21, Y's lease of the facility to Z would constitute a valid lease for federal income tax purposes notwithstanding that it was the lease of an undivided interest in a power generation facility.

### C. Additional Guidance Related to the Tax Treatment of Leasing Transactions

Three additional aspects of tax law are relevant to the appropriate tax treatment of a leasing transaction: (1) the tax treatment of nonrecourse debt, (2) the tax treatment of rental allocations pursuant to §467, and (3) the tax treatment of leases to tax-exempt entities pursuant to §470. This section discusses certain case law and statutory provisions that, while not defining what constitutes a true lease, bear on the deductions claimed by Con Edison.

### 1. Nonrecourse Debt

Lessors frequently use nonrecourse debt to finance their acquisition of the property. *See, e.g.*, Rev. Rul. 82-61, 1982-1 C.B. at 13 (nonrecourse debt in power plant lease). This is due, in part, to FAS 13's requirement that nonrecourse financing be used in order to obtain the benefits of leveraged lease accounting. (*See* Facts Section VI.F.)

In *Crane v. Commissioner*, 331 U.S. 1 (1947), the Supreme Court held that nonrecourse debt must be included in determining the cost, or tax basis, of property. 331 U.S. at 11. For this purpose, there is no difference between recourse debt and nonrecourse debt so long as the nonrecourse debt is less than the value of the property:

> We are rather concerned with the reality that an owner of property, mortgaged at a figure less than that at which the property will sell, must and will treat the conditions of the mortgage exactly as if they were his personal obligations. If he transfers subject to the mortgage, the benefit to him is as real and substantial as if the mortgage were discharged, or as if a personal debt in an equal amount had been assumed by another.

*Id.* at 14. In other words, a lessor owning property subject to a nonrecourse debt will honor the nonrecourse debt so long as the lessor maintains an equity interest in the property which it stands to lose, *i.e.*, so long as the debt is less than the value of the leased property. In these circumstances, the lessor will treat the debt as a valid liability against its assets, since the lessor will be obliged to make payments on the debt to preserve its equity interest and to protect its expected profit. *See Torres*, 88 T.C. at 721-22; *Rice's Toyota*, 81 T.C. at 204, 208-09. Based on these principles, the

courts have upheld the use of nonrecourse debt in leasing transactions so long as the leased property is worth more than the amount of the debt and the transaction is expected to produce a profit. *See, e.g.*, *Levy*, 91 T.C. at 861-62; *Gefen*, 87 T.C. at 1493-94.

**2. Section 467**

Section 467 was added to the Internal Revenue Code in 1984 to provide rules for the timing of tax deductions when a rental agreement includes either rents increasing or decreasing over time, or deferred or prepaid rents. Treas. Reg. §1.467-1(c) (defining "section 467 rental agreement"). The Treasury Department did not issue regulations under §467 until May 31, 1996 (over a decade after being given statutory authority to issue regulations), when it issued a series of proposed regulations. *See* 61 Fed. Reg. 27834 (June 3, 1996). The proposed regulations provided that, except for certain tax avoidance transactions, they would not become effective until the date that the regulations were "published as final regulations in the Federal Register." *See* Prop. Treas. Reg. §1.467-8(a), 61 Fed. Reg. at 27850. For these tax avoidance transactions, the regulations would be effective retroactively as of June 3, 1996. Prop. Treas. Reg. §1.467-8(b), 61 Fed. Reg. at 27850. The proposed regulations were subsequently published as final regulations three years later on May 18, 1999. *See* T.D. 8820, 1999-1 C.B. 1209.

The proposed regulations provided a "safe harbor" for leases with a "90-110" lease accrual, *i.e.*, leases that meet the uneven rent test as set forth in the Leasing Guidelines. *See* Rev. Proc. 75-21, §5.01, 1975-1 C.B. at 716; Prop. Treas. Reg.

§1.467-3(c)(2)(i), 61 Fed. Reg. at 27844-45. According to the proposed regulations, a lease that provides for a "90-110" accrual cannot be regarded as having tax avoidance as a principal purpose and therefore is not subject to the retroactive application of the final regulations. Prop. Treas. Reg. §1.467-3(b)(ii), 61 Fed. Reg. at 27844. Thus, a lease with a "90-110" accrual pattern is permissible if the lease was entered into prior to May 18, 1999, the date the final regulations were published. The lease between CED and EZH was entered into on December 15, 1997 and therefore is not subject to the final §467 regulations.

Since rental payments satisfying the "90-110" rule "meet the uneven rent test contained in the proposed §467 regulations," LILO transactions following the "90-110" rule comply with §467 if they are entered into "on or before May 18, 1999." Rev. Rul. 2002-69, 2002-2 C.B. 760, 761. Defendant has not denied that CED's rental allocations comply with §467 or raised as an issue of law CED's compliance with §467.

**3. Section 470**

In 2004, Congress added §470 to the Internal Revenue Code. American Jobs Creation Act of 2004, Pub. L. No. 108-357, 118 Stat. 1418, 1602 (2004). Section 470 provides limitations on deductions allocable to certain leases to tax-exempt entities. Section 470 codifies some aspects of the Leasing Guidelines, at least with respect to leases to tax-exempt entities. *See* I.R.C. §470(d)(2) (codifying the 20% equity investment and residual value tests). Section 470 also appears to prohibit fixed

price purchase options and some—but not all—defeasance arrangements in circumstances where the section applies. *See* I.R.C. §470(d)(1), (d)(4).

For purposes of §470, EZH is a tax-exempt entity. Thus, if the RoCa3 Transaction were to take place today, it might be subject to §470 because it includes a fixed price purchase option and defeasance arrangements. Application of §470 would defer—but would not disallow—the deductions at issue. However, when §470 was enacted, Congress provided that it would be effective only for leases entered into after March 12, 2004, Pub. L. No. 108-357, 118 Stat. at 1606, and therefore §470 does not apply to the RoCa3 Transaction, which was completed long before the March 12, 2004 effective date.

In enacting §470, Congress also imposed a special "grandfather" date for leases of domestic transit assets in which the Federal Transit Administration ("FTA") was involved, and provided that §470 does not apply to certain lease transactions approved by the FTA prior to January 1, 2006. *Id.* at 1606-07. Thus, Congress understood the deductions from such transactions would continue to be allowed even if entered into after the March 12, 2004 effective date. In a letter to the Secretary of Transportation dated February 15, 2005, Eric Solomon, the Acting Deputy Assistant Secretary of the Treasury (Tax Policy), confirmed the "congressional intent" on this point. Letter from Eric Solomon to Norman Y. Mineta, Sec'y of U.S. Dep't of Transp. (Feb. 15, 2005), BNA DAILY TAX REPORT, Mar. 3, 2005.

Since the passage of §470, there have been several attempts in the Senate to make it retroactive, but on at least three occasions the House of Representatives has declined to enact legislation which would give §470 retroactive effect.

Shortly after §470 was enacted, the Senate proposed an amendment to the Safe, Accountable, Flexible and Efficient Transportation Equity Act of 2005. H.R. 3, 109th Cong. §5511 (2005). This amendment would have eliminated the "grandfathered" protection for the FTA transactions, but this provision was never enacted into law. *See* H.R.3, 109th Cong. §5511 (2005).

In 2007, the Senate again attempted to apply §470 retroactively. The Small Business and Work Opportunity Act of 2007 would have deferred deductions from leases with foreign tax-exempt lessees for "taxable years beginning after December 31, 2006," even if the transactions were entered into on or before March 12, 2004 (the effective date of §470). S. 349, 110th Cong. §201 (2007). While this bill would have deferred CED's deductions for 2006 and future years, it would have left untouched CED's deductions for 1997, the year before this court. Since the bill was limited to foreign tax-exempt deductions, it would also have exempted the FTA transactions. When this bill was under consideration, the Senate Finance Committee stated its understanding that deductions from LILO transactions "are continuing to provide a benefit to the taxpayers who participated in such transactions," but the Committee wished to deny "any *future* tax benefit with respect to the transactions." S. Rep. No. 100-1 at 29 (2007) (emphasis added). Thus, while the bill would have applied retroactively to all transactions, without regard to

the original effective date of March 12, 2004, the bill would have applied only to future deductions.

In the House of Representatives, however, the chairman of the Ways and Means Committee, Charles Rangel, described the retroactive application of §470 as "bad politics and bad policy." Wesley Elmore & Meg Shreve, *House Small Business Tax Package Headed Toward Bipartisan Passage*, 2007 TAX NOTES TODAY 31-1, Feb. 14, 2007. Chairman Rangel held hearings focusing on the implications of the retroactive provisions contained in the proposed legislation, *Unofficial Transcript of W&M Hearing on Small-Business Bill Is Available*, 2007 TAX NOTES TODAY 62-63, Mar. 14, 2007, and the bill has not been passed. *See* GovTrack.us (database of federal legislation), http://www.govtrack.us/congress/bill.xpd?bill=s110-349 (showing status of S. 349 bill as "Scheduled for Debate" as of Jan. 22, 2007, with no further action taken).

The Heartland, Habitat, Harvest and Horticulture Act of 2007 contained an identical provision. S. 2242, 110th Cong. §505. This bill also has not been passed. *See* Govtrack.us (database of federal legislation), http://www.govtrack.us/congress/bill.xpd?bill=s110-2242 (showing status of S. 2242 bill as "Scheduled for Debate" as of Oct. 25, 2007, with no further action taken).

Later in 2007, however, Congress did enact some technical changes to §470. *See* Tax Technical Corrections Act of 2007, Pub. L. No. 110-172, 121 Stat. 2473 (2007). It did not, however, make any changes to the effective date of §470. *See id.* Thus, on four separate occasions Congress has declined to apply §470 retroactively.

The prospective effective date of §470—and Congress' repeated refusal to apply it retroactively—indicates that the new rules of §470, such as restrictions on the use of defeasance, should be applied only on a prospective basis. *Cf. Petroleum Corp. of Tex., Inc. v. United States*, 939 F.2d 1165, 1169 (5th Cir. 1991); *Gunther v. Comm'r*, 909 F.2d 291, 297 (7th Cir. 1990).

### D. *Frank Lyon* and the Economic Substance Doctrine

While Section I.B. sets forth the factors analyzed in considering true lease status, it is also critically important to consider the impact of *Frank Lyon*, decided in 1978, and the economic substance doctrine. *Frank Lyon* is important here for a number of reasons. First, *Frank Lyon* upheld the bona fides of a sale-leaseback and in doing so rejected many of the arguments that Defendant has asserted here against Con Edison. Second, *Frank Lyon* anchors an extensive body of cases and rulings that have developed tests used to determine whether transactions in general possess "economic substance." As the Federal Circuit made clear in *Coltec*, a transaction must possess economic substance in order to be respected for tax purposes. *Coltec*, 454 F.3d at 1351-54 (following *Frank Lyon*). Third, *Frank Lyon* establishes that, where a leasing transaction possesses economic substance, "the form of the transaction adopted by the parties governs for tax purposes." *Frank Lyon*, 435 U.S. at 584.

#### 1. *Frank Lyon*

In *Frank Lyon*, Worthen Bank & Trust Company ("Worthen") sold its newly-constructed headquarters building (and leased the underlying ground) to Frank

Lyon Company ("Frank Lyon"), a home furnishings company. *Id.* at 565. As part of "complementary and interlocking agreements," *id.*, Frank Lyon simultaneously leased the building back to Worthen, which thus continued to hold physical possession of the building and continued to use the building in its banking operations. *Id.* at 565-66. Since the bank building was specifically built as Worthen's headquarters, the building was essential to Worthen's continuing operations as a bank. To the outside world, it would appear that nothing had happened to Worthen's ownership of the building:

1. Worthen, not Frank Lyon, continued to occupy the building, *id.* at 566;

2. Worthen, not Frank Lyon, continued to be responsible for maintenance of the building, *id.* at 567; and

3. Worthen, not Frank Lyon, continued to use the building for production of income in Worthen's banking business. *Id.* at 566.

Frank Lyon purchased the bank building with a $500,000 cash payment and a loan from New York Life Insurance Company ("New York Life"). *Id.* at 567. For the first 25 years of the lease to Worthen, the rent that Worthen owed Frank Lyon was exactly equal to the debt service Frank Lyon owed to New York Life, and the lease thus produced no cash return to Frank Lyon during this period. *Id.* at 566. The lease to Worthen was a "net lease" under which Worthen was liable for all expenses associated with the building, such as repairs, maintenance, taxes, insurance and utilities. *Id.* at 567. Worthen analyzed the transaction on the basis of its cost of funds. *Frank Lyon*, 435 U.S. at 576.

The transaction also, in part, involved a lease and leaseback, or LILO. Worthen leased the ground under the building to Frank Lyon for a term of approximately 75 years, and Frank Lyon leased the ground and building back to Worthen for a period of up to 65 years. *Id.* at 565-66. Thus, Frank Lyon's interest in the ground underlying the building was a leasehold interest. Further, as a practical matter, Frank Lyon's interest in the building was also a leasehold interest, since the building would revert to Worthen when the ground lease to Frank Lyon ended after 75 years. During the 10-year period between the end of the building lease (November 30, 2034) and the end of the ground lease (November 30, 2044), Frank Lyon would have physical "use" and "control" of the building unless the building had been repurchased by Worthen. *Id.*

Beginning 11 years after commencement of the building lease, Worthen had a series of fixed-price purchase options over the next 14 years to repurchase the building. *Id.* at 567. The exercise of any of these options would have repaid the New York Life loan, repaid Frank Lyon its $500,000 investment and provided Frank Lyon with a 6% return on its investment. *Id.*

Frank Lyon also had a very limited residual interest in the building. If the building were destroyed or condemned, the proceeds in excess of the mortgage balance and Frank Lyon's $500,000 investment would be paid to Worthen, and thus only Worthen, not Frank Lyon, would profit from the property's appreciation. *Id.* at 570-71.

The United States argued that the transaction should be viewed as nothing more than a financing scheme, in which Frank Lyon loaned Worthen $500,000 and would be repaid this amount with 6% interest. *Frank Lyon*, 435 U.S. at 569. The United States' "theorizing," however, was incompatible with the agreement between the parties, particularly since there was not a "$500,000 loan" between Lyon and Worthen. *Id.* at 582. The Supreme Court famously established that the form of a leasing transaction will be respected for tax purposes if the form is imbued with a business purpose and is not adopted solely for tax avoidance reasons:

> In short, we hold that where, as here, there is a genuine multiple-party transaction with economic substance which is compelled or encouraged by business or regulatory realities, is imbued with tax-independent considerations, and is not shaped solely by tax-avoidance features that have meaningless labels attached, the Government should honor the allocation of rights and duties effectuated by the parties. Expressed another way, so long as the lessor retains significant and genuine attributes of the traditional lessor status, *the form of the transaction adopted by the parties governs for tax purposes.*

*Id.* at 583-84 (emphasis added). The Supreme Court ruled in Frank Lyon's favor even though the transaction had undoubtedly been structured to provide "favorable tax consequences" to Frank Lyon. *Id.* at 580. The Court recognized that these tax benefits simply reflect the "reality that the tax laws affect the shape of nearly every business transaction." *Id.*

Justice Stevens dissented, arguing that Frank Lyon had acquired nothing more than a reversionary interest and thus could not be treated as owning a "present" interest in the building. *Frank Lyon*, 435 U.S. at 587 (Stevens, J., dissenting). According to Justice Stevens, Frank Lyon would not become the owner

unless and until Worthen made a commitment not to exercise its purchase option. *Id.* In rejecting Justice Stevens' claim that Frank Lyon did not own a present interest in the bank building, the majority focused on Frank Lyon's equity investment in the property:

> But it is equally clear that the facts focus upon Lyon as the one whose capital was committed to the building and as the party, therefore, that was entitled to claim depreciation for the consumption of that capital. The Government has based its contention that Worthen should be treated as the owner on the assumption that throughout the term of the lease Worthen is acquiring an equity in the property. In order to establish the presence of that growing equity, however, the Government is forced to speculate that one of the options will be exercised and that, if it is not, this is only because the rentals for the extended term are a bargain.

*Id.* at 581.

*Frank Lyon* and its progeny establish that many of the factors that Defendant points to here are irrelevant because they are present in leasing transactions generally and were present in that case:

*Right of Possession.* In a sale-leaseback context, the "lessor is normally not vested with the right of possession during the term of the lease." *Torres*, 88 T.C. at 721. The pertinent issue is whether the lessor possesses an equity interest and residual interest in the property; if it does, the lessor has a "meaningful possessory right in the property" and thus should be treated as the owner of the property. *Id.*

*Profits from Operation of the Asset.* "[I]t is normal for the lessee to receive profits from the operation of the property. . . ." *Id.*; *see also Frank Lyon*, 435 U.S. at 566 (taxpayer/lessor held to be owner of property even though Worthen Bank used the property and retained the profits from its operation).

*Net Lease*. The use of net leases is irrelevant to true lease status because net leases are part of normal commercial practice. *See, e.g., Frank Lyon*, 435 U.S. at 567; *Torres*, 88 T.C. at 721; *Mukerji*, 87 T.C. at 928; *Estate of Thomas*, 84 T.C. at 433.

*Rent Payments Equal to Debt Service*. Rent payments equal to debt service are disregarded as a neutral factor. *See, e.g., Frank Lyon*, 435 U.S. at 576-77; *Mukerji*, 87 T.C. at 962; *Estate of Thomas*, 84 T.C. at 433-34.

*Future Interest*. In rejecting Justice Steven's dissenting opinion claiming that Frank Lyon did not hold a "present" interest in the property, *Frank Lyon*, 435 U.S. at 587, the majority recognized that Frank Lyon owned a present interest in the property. *Id.* at 581; *see Mukerji*, 87 T.C. at 958 (rejecting the IRS's theory that the lessor held only a "future interest"). A lessor's present interest in property arises from its equity investment, not from physical possession. *See Frank Lyon*, 435 U.S. at 581; *Levy*, 91 T.C. at 860; *Mesa Ref.*, 65 B.R. at 727.

*Purchase Option*. The grant of a fixed-price purchase option to the lessee is not inconsistent with true lease status or the existence of economic substance. *Frank Lyon*, 435 U.S. at 567, 583-84.

### 2. Economic Substance

Besides its impact upon the tax law treatment of leases, *Frank Lyon* also had an enormous impact upon the development of the economic substance doctrine. In *Rice's Toyota*, which involved a sale-leaseback, the Fourth Circuit read *Frank Lyon* to establish a "two-pronged inquiry" to determine whether a transaction "is, for tax

purposes, a sham." *Rice's Toyota*, 752 F.2d at 91-92. Under this test, the form of a transaction should be respected unless a court finds that the "taxpayer was motivated by no business purpose other than obtaining tax benefits in entering the transaction, *and* that the transaction has no economic substance because no reasonable possibility of a profit exists." *Id.* (emphasis added). The first part of this test examines the taxpayer's subjective motive, *id.* at 92, while the second part of the test requires an "objective determination of whether a reasonable possibility of profit from the transaction existed apart from tax benefits." *Id.* at 94.

In subsequent years, the "two-pronged" inquiry identified in *Rice's Toyota* has been analyzed by many courts, both within and outside the leasing context. *See, e.g., United Parcel Serv. of Am., Inc. v. United States*, 254 F.3d 1014, 1018 (11th Cir. 2001); *IES Indus., Inc. v. United States*, 253 F.3d 350, 353-356 (8th Cir. 2001); *Mukerji*, 87 T.C. at 958-60. Much of the case discussion has concerned the relationship between subjective business purpose and objective economic substance: Will a transaction be respected if it has either subjective business purpose or objective economic substance, as the Fourth Circuit held in *Rice's Toyota*? Or must the taxpayer satisfy both the subjective and objective tests for the transaction to be respected? *See, e.g.*, *Kirchman v. Comm'r*, 862 F.2d 1486, 1490 (11th Cir. 1989).

In *Coltec*, the Federal Circuit forcefully reaffirmed the paramount importance of objective economic substance: "The Supreme Court cases and our predecessor court's cases have repeatedly looked to the objective economic reality of the transaction in applying the economic substance doctrine." *Coltec*, 454 F.3d at 1356.

*Coltec* teaches that a transaction has "objective economic substance" if it either: (a) presents the objective potential for a profit aside from tax benefits, or (b) has a genuine impact upon the interests of unrelated parties. *Id.* at 1355-58.

With respect to profit, economic substance looks for an "'*objective* determination of whether a *reasonable* possibility of profit from *the transaction* existed.'" *Id.* at 1356 (first two emphases added) (quoting *Black & Decker v. United States*, 436 F.3d at 441-42. It considers whether "the transaction has 'realistic financial benefit'" or whether "'*there was neither a possibility nor opportunity of profit* to the taxpayer separate and apart from the tax deduction.'" *Id.* at 1356 n.16 (emphasis added) (quoting *Rothschild v. United States*, 407 F.2d at 411, 414, 417). Courts must scrutinize "'whether the transaction affected the taxpayer's financial position in any way.'" *Id.* at 1356 (quoting *In re CM Holdings, Inc.*, 301 F.3d 96, 103 (3d Cir. 2002)). Hence, the doctrine disallows transactions "'*which do not vary control or change the flow of economic benefits.*'" *Id.* at 1355 (emphasis added) (quoting *Higgins v. Smith*, 308 U.S. 473, 476 (1940)). It denies respect to transactions that fail to "'appreciably affect [a taxpayer's] beneficial interest except to reduce his tax.'" *Id.* at 1352 (quoting *Ballagh v. United States*, 331 F.2d 874, 877-79 (Ct. Cl. 1964). Hence, the transaction at issue in *Coltec* failed because the taxpayer could not prove that the transaction produced any "change in the 'flow of economic benefits,' provided any real 'opportunity to make a profit,' or 'appreciably

affected' [taxpayer's] beneficial interests aside from creating a tax advantage."[64] *Id.* at 1360.

With respect to the impact upon third parties, *Coltec* emphasizes that "arrangements with subsidiaries *that do not affect the economic interest of independent third parties* deserve particularly close scrutiny." *Id.* at 1357 (emphasis added). *Coltec* noted that in *Frank Lyon* the Supreme Court distinguished a "'genuine multiple-party transaction'" from "more 'familial' arrangements involving only two parties." *Id.* (quoting *Frank Lyon*, 435 U.S. at 575, 583). *Coltec* also noted that in *United Parcel Service* "a transaction had economic substance because it created 'genuine obligations enforceable by an unrelated party' that was not under the taxpayer's control." *Id.* (quoting *United Parcel Serv.*, 254 F.3d at 1018-19).

*Coltec* equates business purpose with "subjective business profit motivation," *id.* at 1355 n.13, and directly disagreed with the Fourth Circuit's treatment of subjective business purpose, noting that the Fourth Circuit's "rule . . . that a transaction will be disregarded only if it both lacks economic substance and is motivated solely by tax avoidance" is inconsistent with *Frank Lyon*. *Id.* at 1355 n.14. Thus, *Coltec* cautions that the economic substance doctrine "may well also apply if the taxpayer's sole subjective motivation is tax avoidance." *Id.* at 1355.

---

[64] *See, e.g.*, *Rothschild*, 407 F.2d at 412 ("An examination of these cases convinces us that they are distinguishable from the case at bar because in each of those cases the taxpayer had a possibility or opportunity to make a profit on the transaction in which the tax deduction was sought, apart from the tax deduction. Whereas, in our case, there was neither a possibility nor an opportunity of profit to the taxpayer separate and apart from the tax deduction.")

### 3. Application of the Economic Substance Doctrine to Leases

The economic substance cases as applied to leasing transactions demonstrate three fundamental principles. First, as stated in *Frank Lyon*, "the form of the transaction adopted by the parties governs for tax purposes" so long as the transaction has economic substance. *Frank Lyon*, 435 U.S. at 583-84. Thus, the cases have repeatedly held that when a transaction has the formal characteristics of a lease and also passes the economic substance test, the form of the lease will be respected for tax purposes. *See, e.g.*, *Transamerica II*, 15 Cl. Ct. at 439, 443; *Levy*, 91 T.C. at 858; *Mukerji*, 87 T.C. at 968; *Torres*, 88 T.C. at 720-21, 727; *Gefen*, 87 T.C. at 1495; *Estate of Thomas*, 84 T.C. at 432; *Ockels*, T.C. Memo 1987-507, 54 T.C.M. (CCH) at 802.

Second, in deciding whether a leasing transaction has economic substance, the cases have universally interpreted *Frank Lyon* as holding that a transaction is imbued with economic substance when it presents a reasonable opportunity for a pretax profit, *i.e.*, the lessor's cash inflow is large enough to recoup the lessor's investment and provide a profit above this investment. *See, e.g.*, *Johnson I*, 11 Cl. Ct. at 25; *Levy*, 91 T.C. at 853-58; *Torres*, 88 T.C. at 718-19; *Cooper v. Comm'r*, 88 T.C. 84, 105-07 (1987); *Gefen*, 87 T.C. at 1490-91; *Estate of Thomas*, 84 T.C. at 432-37; *Dunlap*, 74 T.C. at 1436-37; *Shea v. Comm'r*, T.C. Memo 1991-518, 62 T.C.M. (CCH) 1027, 1033-34 (1991); *Emershaw*, T.C. Memo 1990-246, 59 T.C.M. (CCH) at 624-25; *Pearlstein*, T.C. Memo 1989-621, 58 T.C.M. (CCH) at 706; *Rubin v. Comm'r*, T.C. Memo 1989-484, 58 T.C.M. (CCH) 25, 31-32 (1989); *Moser v. Comm'r*, T.C.

Memo 1989-142, 56 T.C.M. (CCH) 1604, 1623-24 (1989); *Ockels*, T.C. Memo 1987-507, 54 T.C.M. (CCH) at 796; *Lansburgh v. Comm'r*, T.C. Memo 1987-491, 54 T.C.M. (CCH) 691, 696 (1987); *Greenbaum v. Comm'r*, T.C. Memo 1987-222, 53 T.C.M. (CCH) 708, 715-16 (1987); *L.W. Hardy Co, Inc. v. Comm'r*, T.C. Memo 1987-63, 52 T.C.M. (CCH) 1540, 1552 (1987); *see also Gilman*, 933 F.2d at 147 (residual value insufficient to recoup investment); *Transcapital*, 97 A.F.T.R.2d at 2006-1945. Con Edison is not aware of a single leasing case in which the taxpayer had a reasonable expectation of a pretax profit, but the transaction was held to lack economic substance.

Finally, sale-leasebacks generally will create tax deductions in the early years of a lease, followed by taxable profits and additional taxes due in the later years of the lease. *See, e.g.*, *Torres*, 88 T.C. at 730; *Mukerji*, 87 T.C. at 962-63, 968; *Gefen*, 87 T.C. at 1494; *Estate of Thomas*, 84 T.C. at 438; *Ockels*, T.C. Memo 1987-507, 54 T.C.M. (CCH) at 797; *Kaufman*, T.C. Memo 1987-350, 53 T.C.M. (CCH) at 1351. Thus, sale-leasebacks initially produce a deferral of tax, but ultimately result in additional taxable profits and taxes due. In the context of a profitable leasing transaction, this temporary tax deferral, and the accompanying temporary tax benefits, have never been treated as indicating a lack of economic substance.

**E. Court of Federal Claims Precedent**

This court's predecessor has decided four cases involving lease transactions. These four cases illustrate two key legal issues critical to the Con Edison case: the role of a profit motive and the treatment of purchase options in leasing transactions.

### 1. *Johnson v. United States*, 11 Cl. Ct. 17 (1986) (*Johnson I*)

The first of these cases is *Johnson I*. *Johnson I* involved a sale-leaseback of computer equipment. The taxpayer purchased certain computer equipment for $365,000, and the sales price was paid with a $55,000 recourse note (plus $15,000 in interest on the recourse note) and a nonrecourse note of $310,000. *Id.* at 20-22. The taxpayer simultaneously leased the equipment back to its seller in return for rent payments. *Id.*

The issues presented by these facts were (1) whether the transaction had economic substance, and (2) whether the transaction was "engaged in for profit" within the meaning of §183 of the Code. *Id.* at 24. Section 183, which does not apply to corporations, *id.*, and thus is not involved in Con Edison's case, imposes a higher threshold of profit than the economic substance test. *Id.* at 27-28, 37. Thus, a transaction which satisfies the "more rigorous" §183 standard will concurrently satisfy the economic substance test. *Id.* at 37.

The United States argued that the transaction "had no business purpose," since the taxpayer "could realize no economic gain apart from tax benefits." *Id.* at 25. Relying on *Rothschild*, *Frank Lyon* and *Rice's Toyota*, the court stated that "a mere 'modicum' of profit will satisfy the 'economic substance' test." *Id.* at 25, 37. While the parties agreed that this was the relevant standard, the court held the standard was also consistent with case law. *Id.* at 37.

The court thus analyzed the transaction to see if it passed the "more rigorous" §183 standard. In applying the §183 standard, the court focused on the following facts:

(a) the taxpayer's familiarity with the equipment;

(b) the taxpayer's due diligence, including evaluation of economic risk and tax risks;

(c) the taxpayer's analysis of cash flows, debt, and tax liabilities; and

(d) the taxpayer's retention of independent advisors.

*Id.* at 29.

The court held that the taxpayer's conduct and due diligence showed "due regard for the [t]ransaction's profit potential," *id.* at 28, and the court distinguished certain "tax shelter" cases where the taxpayer and its advisors had "little or no experience with the underlying industry." *Id.* at 29. The United States emphasized evidence that it claimed indicated "tax benefits were plaintiff's primary objective," *id.* at 29-30, but the court rejected this characterization:

> This evidence is indicative of a tax deferral, if not tax avoidance, motivation, but it is not dispositive of the absence of the requisite profit objective.
>
> . . . .
>
> . . . Johnson's concern with tax benefits apart from his demonstrated profit seeking objective is an economic reality in the business world. *See Commissioner v. Brown*, 380 U.S. 563, 579, 85 S. Ct. 1162, 1171, 14 L.Ed.2d 75 (1965) (Harlan, J., concurring). "The fact that favorable tax consequences were taken into account by [plaintiff] on entering into the transaction is no reason for disallowing those consequences. We cannot ignore the reality that the tax laws affect the shape of nearly every business transaction." *Frank Lyon Co. v. United States*, 435 U.S. 561, 580, 98 S.Ct. 1291, 1302, L.Ed.2d 550 (1978).

*Id.* at 30 (alteration in original).

Regarding the profitability of the transaction, the court reviewed conflicting evidence as to the property's residual value and concluded that the property would be worth $80,000 at the end of the lease. *Id.* at 35. This would result in a pretax profit of $27,600 on an investment of $55,000:

| | | |
|---|---|---|
| | $ 80,000 | Residual Value |
| Plus: | $ 17,600 | Rental Cash Flow |
| Less: | $ 55,000 | Equity Investment |
| Less: | $ 15,000 | Interest on Deferred Equity Investment |
| | $ 27,600 | |

*Id.* at 23, 33, 36.

This resulted in a 6.27% pretax return at a time when the prime lending rate was 15.5%. *Id.* at 36. Thus, the taxpayer could have made alternative investments which would have paid substantially more than 6.27%. Furthermore, as the result of a remarketing fee, the profit might have been as low as $6,300, which would have resulted in a 1.43% pretax return. *Id.* Based on these facts, the government argued that the plaintiff's pretax profit was "miniscule compared to the tax benefits from the [t]ransaction," *Johnson I*, 11 Cl. Ct. at 36, but the court disagreed:

> This reasoning is unpersuasive. Plaintiff must show "a reasonable chance of making a reasonable profit apart from tax considerations. . . . [M]ore than the 'modicum' of profit necessary to avoid a finding of a 'sham transaction' is necessary." Treas. Reg. §1.183-2(b)(9) states,
>
> > It is not, however, necessary that an activity be engaged in with the exclusive intention of deriving a profit or with the intention of maximizing profits. . . . [T]he availability of other investments which would yield a higher return, or which would be more likely to be profitable, is not evidence that an activity is not engaged in for profit.

> Indeed, "[o]ur sole task here is to determine whether a profit was reasonably likely on these facts in order to find that tax avoidance was not the sole motivation for the transaction." *Estate of Thomas*, 84 T.C. at 440 n.52.

*Johnson I*, 11 Cl. ct. at 36-37 (alterations in original). Since the transaction satisfied the more rigorous standard of §183, it necessarily had economic substance and was upheld. *Id.* at 37.

**2. *Transamerica Corporation v. United States*, 15 Cl. Ct. 420 (1988) (*Transamerica II*) and *Transamerica Corporation v. United States*, 7 Cl. Ct. 441 (1985) (*Transamerica I*)**

*Transamerica II* is particularly important to the Con Edison case because it provides detailed guidance on the analysis of purchase options in leasing transactions. *Transamerica II* involved two leases of title plants to the lessee as taxpayer. *Transamerica II*, 15 Cl. Ct. at 426. A "title plant" is necessary to operate a title abstract and insurance business and consists of a specialized set of books, records, maps, charts and related material concerning the title to a particular piece of property. *Id.* at 427. The United States challenged the lessee's rent deductions on substance-over-form and economic substance grounds, claiming that the transactions were not, for tax purposes, leases and that the taxpayer/lessee was actually the owner of the property. *Id.* at 439.

The first title plant lease (the "Boulder lease") was a thirty-year lease, under which the lessee was obligated to pay rent of between $20,000 to $40,000 per year. *Id.* at 431. At the end of the lease, the lessee had an option to purchase the title plant for $25,000. *Id.* During the term of the lease, all additions to the title plant

were the property of the lessee, and the lessee was responsible for insurance and risk of loss on the title materials. *Id.* at 431-32.

The terms of the second title plant lease (the "Mesa lease") were similar to the Boulder lease. The lessee leased the title plant for a 30-year period for an annual rent of the greater of $6,600 or 5% of the gross receipts of the Mesa County title business. *Id.* at 433. After 17 1/2 years, the lessee could exercise an option to buy the plant for $25,000, and the lessee did in fact exercise its option after 17 1/2 years. *Id.* at 434. As with the Boulder lease, the lessee was required to insure the property and was responsible for risk of loss. *Id.* at 434.

In both leases, the leased property was "indispensable" to the lessee's business, *id.* at 439, and the United States argued that the evidence at trial indicated that the lessee and the lessor both thought the lessee would exercise its options. *Id.* at 440-41. The lessee testified it expected to "exercise the option 'everything remaining equal'" and that it felt it had a "moral obligation" to exercise the option. *Id.* at 441. Furthermore, the lessors also expected the options to be exercised. *Id.* The United States also pointed to numerous "anomalies" to indicate that the option prices "could not have been intended to represent a true sales price based upon fair market values," *Transamerica II*, 15 Cl. Ct. at 441, including (1) that no attempt had been made to appraise the future values, and (2) that the option prices for the Mesa and Boulder leases were identical although the properties had different values at the inception. *Id.* Further, with respect to the Mesa lease, the lessee could avoid paying $82,500 in rent by paying the $25,000 option price

after 17 1/2 years, and the government argued that this disparity made it "absolutely certain" that the option would be exercised, and pointed out that the option was in fact exercised. *Id.*

Based on these facts, the government argued that the two leases were actually sales of assets rather than leases:

> Defendant's argument concentrates on the significance of the options, the expectation of the parties that the options would be exercised, and the characteristics of the option prices that bear upon the likelihood or guarantee they would be exercised.

*Id.* at 436. Nevertheless, the court rejected the government's arguments. In its analysis, the court recognized that the leases had all of the formal characteristics of a lease:

> In form, the challenged transactions had the traditional attributes of leases: the instruments identified the parties as lessee and lessor, designated a fixed term, designated the money payments as rents, provided title to the pre-1961 abstracting materials remained exclusively in the lessor, gave lessor a right of inspection, obligated the lessee to preserve the property and return it in good condition, obligated lessee to replace damaged property with no abatement of rent for destruction or damage to the property, and obligated the lessee to pay for fire and hazard insurance, and for errors and omissions liability insurance. The option to purchase in the Boulder lease was provided separately from the rental obligations, and was subject to exercise after the term without adjustment for previous rental payments. The option to purchase in the Mesa lease was a part of the section on rents, and it could be exercised after 17-1/2 years into the 30-year term, without adjustment for previous rental payments.

*Id.* at 439. In ruling against the government and upholding the status of the transactions as leases, the court found that the option prices were "not nominal":

> In both transactions, the option price was $25,000. This sum is not nominal. *See Oesterreich v. Commissioner*, 226 F.2d 798 (9th Cir. 1955) (purchase option $10-building worth $350,000); *Watson v.*

> *Commissioner*, 62 F.2d 35, 36 (9th Cir. 1932) (additional sum of $1, a mere formality in a transaction involving $109,900). The payment of rentals did not build up an equity that was reflected in reductions in the option prices, nor did such payments amount to any equity in the pre-1961 title plant materials.

*Id.* at 440. In addition, the court observed that the value of the title plants would diminish over time, since the additions to the title plant became the property of the lessee. Thus, there could be no certainty that the options would be exercised:

> It was not a certainty in 1961 that the options ever would be exercised. Prudence required [lessee] to have an extended term to support its expansion into the new territories. This it accomplished in the leases. Whether the expansion would prosper, however, depended on events that were unforeseeable. The nature of business and human experience dictates a future that includes possibilities for technological advances that requires changes in old patterns. The fact that the parties expected the options to be exercised is not inconsistent with an intent to enter a lease transaction. Whether the options would be exercised, in the light of future vagaries, was a speculative matter in 1961.

*Transamerica II*, 15 Cl. Ct. at 442.

Based on this evidence, the court concluded that the "Boulder and Mesa transactions were in substance and in form leases with options to purchase." *Id.* at 443. The holding in *Transamerica II* is consistent with other cases concerning purchase options. (*See* Argument Section IV.C.1.)

In deciding the case, the court distinguished an earlier decision involving the same taxpayer. *Id.* at 438 (distinguishing *Transamerica I*, 7 Cl. Ct. 441). In that case, Transamerica, as lessor, initially entered into short-term leases (five to eight months) of two aircraft with Saturn, as lessee, and Saturn agreed to purchase the airplanes at the end of the short-term leases. *Transamerica I*, 7 Cl. Ct. at 443.

Shortly after the initial transaction, one of Transamerica's employees discovered that Transamerica would be subject to a large investment tax credit recapture as a result of the short-term leases. *Id.* at 443-44. As a result, Transamerica approached Saturn to request that it extend the leases. *Id.* at 444. Saturn was initially reluctant, since it wanted to "pay cash and acquire title" to the aircraft. *Id.* For its part, Transamerica wanted a low option price to ensure that Saturn would exercise its option. *Id.* In the end, the parties renegotiated the original leases. *Id.* In the renegotiated leases, the total amount of the consideration for the two airplanes did not change, but was instead recharacterized, and the rental payments to be made by Saturn were applied against and reduced the purchase option price. *Id.*

For tax purposes, Transamerica treated the transaction as a lease, but the court agreed with the Commissioner's recharacterization of the transactions as conditional sales and held that the transactions did not qualify as leases. *Id.* at 446. The so-called "rental" payments were not paid for the use of property, but were in fact applied against and became part of the purchase price, and the rentals on comparable planes were less than half the "rentals" paid by Saturn to Transamerica. *Id.* at 447-48. After taking into account the application of rental payments against the option price, the option price for the two aircraft was $2.72 million. *Id.* at 448. At that point in time, the aircraft "would still be worth at least $8,300,000," making it "remote" that Saturn would fail to exercise its option. *Id.* If Saturn did not exercise the option, it "would have to forfeit" the $9.38 million it had

already paid, which effectively represented an equity interest in the property. *Id.* Based on these facts, the court applied the rule that "[w]here an option price is substantially below the contemplated fair market value of the property, it may be inferred that the parties were reasonably certain at the time they entered into the agreement that the option would in fact be exercised." *Transamerica I*, 7 Cl. Ct. at 448 (citations omitted).

### 3. *Johnson v. United States*, 32 Fed. Cl. 709 (1995) (*Johnson II*)

At issue in *Johnson II* was a mass-marketed tax shelter involving 87 plaintiffs. *Johnson II*, 32 Fed. Cl. at 710-11. In each transaction, the taxpayer purchased solar equipment from its manufacturer and leased the equipment back to one of the parties that managed the transaction. *Id.* at 711. The purchase price was financed by the manufacturer. *Id.*

As in *Johnson I*, the court first analyzed the transaction under §183. *Id.* at 714-16. In its §183 analysis, the court relied on the following factors:

(1) the taxpayers entrusted the leasing business to Solargistics, the entity that created the investment program, and did not monitor the location of their equipment;

(2) the taxpayers did not consult independent experts;

(3) the taxpayers had no experience in similar activity;

(4) the taxpayers had knowledge that rental payments were not being paid by the lessees and the transactions would thus not produce a profit; and

(5) the taxpayers did not exercise their remedies when rent was not paid, nor did they attempt to retrieve their property.

*Id.* at 715-16. For these reasons, in particular the historical absence of profit, the transactions did not satisfy the requirements of §183. *Id.* at 716.

The court next turned to economic substance, defining economic substance as follows:

> The determination of whether a transaction has economic substance is essentially a two part analysis: (1) whether the substance of the transaction is reflected in its form, and (2) whether the transaction had a reasonable objective possibility of providing a profit aside from tax benefits.

*Id.* at 717. With regard to the first part of the test (substance over form), the court held that "the formalities of the sale and lease" were likely sufficient, despite the court's concern over the lack of an independent lender and the investment manager's role as a lessee. *Johnson II*, 32 Fed. Cl. at 717. The transaction failed the second part of the test, however, because it did not have a reasonable objective possibility of providing a profit for the same reason it failed §183. *Id.* Information available at the time the taxpayers made their investment indicated the projected cash flow would not be forthcoming: "investors specifically were informed that many systems remained unplaced and that [the lessee] had defaulted on its rental payments." *Id.* Since it was "clear from the start that profits were not actually being made" the transaction did not have "an objectively reasonable possibility of making a profit" and the transaction therefore lacked economic substance. *Id.*

On appeal, the Federal Circuit affirmed the court's opinion. *Drobny v. United States*, 86 F.3d 1174 (1996).

**F. The Lease-In Lease-Out ("LILO") Rulings**

The IRS first set forth its position on the taxation of LILO transactions in Revenue Ruling 99-14, 1999-1 C.B. 835. Revenue Ruling 99-14 describes a LILO in which FM, a foreign municipality, leases property to a U.S. Corporation ("X") for 34 years (the "headlease"). *Id.*, 1999-1 C.B. at 835. X then subleases the property back to FM for a term of 30 years, including the sublease renewal (the "sublease"). *Id.* The residual life of the property is the four years remaining at the end of the sublease, which is equal to 11.8% of the headlease term. FM has an option after 20 years to purchase X's headlease interest for a fixed amount projected to be equal to the fair market value of the remaining headlease interest. *Id.*

As part of the transaction, FM set aside funds sufficient to collateralize, or "defease," its obligation to pay rent to X. *Id.* FM also set aside funds sufficient to exercise the purchase option, should it choose to exercise that option. *Id.* Since FM is a foreign party and its obligations are payable in U.S. dollars, these accounts protect FM against currency risk. (*See, e.g.*, Tr. 3178, 3205-06 (Ellis))

Although X expected a positive pretax return from the transaction, Revenue Ruling 99-14 states that this "pre-tax return is insignificant in relation to the net after-tax return." Rev. Rul. 99-14, 1999-1 C.B. at 835. The Revenue Ruling does not state the amount of the pretax return, but claims that the transaction lacks economic substance because its "pre-tax return is too insignificant, when compared to X's after-tax yield, to support a finding that the transaction has significant

economic consequences other than the creation of tax benefits." *Id.*, 1999-1 C.B. at 837.

The Revenue Ruling's conclusion cannot be reconciled with the relevant legal authorities. As stated above, the controlling law provides that only a "minimal" level of profit is necessary to uphold the form of a lease transaction. *See, e.g., Johnson I*, 11 Cl. Ct. at 26; *Estate of Thomas*, 84 T.C. at 440 n.52. Significantly, the Revenue Ruling did not cite any leasing authorities as support for its view that the pretax profit is "too insignificant." *See* Rev. Rul. 99-14, 1999-1 C.B. at 837.

Revenue Ruling 99-14 also claims that the defeasance accounts reduce X's risk of not being paid rent as it comes due. *Id.* at 836. The significance of this statement from a legal perspective is unclear. No case law or administrative authority has ever held that credit risk, or exposure to the risk of nonpayment by the lessee, is a necessary element of a lease, and the Leasing Guidelines have never referred to credit risk as a required element of a leasing transaction. In fact, the authorities provide to the contrary. *See Gefen,* 87 T.C. at 1503. ("[W]e perceive nothing … that requires an owner of property to enter into a transaction with a party that is a poor credit risk….") Other leasing cases have involved guarantees and other forms of credit support without any suggestion that the lease was thereby invalidated. *See, e.g., Torres*, 88 T.C. at 712; *Nw. Acceptance Corp. v. Comm'r*, 58 T.C. 836, 846-48 (1972), *aff'd per curiam*, 500 F.2d 1222 (9th Cir. 1974); *Lockhart Leasing Co. v. Comm'r*, 54 T.C. 301, 307-308, 315 (1970), *aff'd*, 446 F.2d 269 (10th Cir. 1971). Credit support is widely used, both in leasing and non-leasing

transactions. (Tr. 3199-203; 3277-79 (Ellis)); *Equipment Leasing*, §29.8 at 29-141. In fact, Revenue Ruling 99-14 recognizes that "in-substance defeasance" arrangements have been respected for tax purposes by the IRS in Revenue Ruling 85-42, 1985-1 C.B. 36, but without explanation or citation to authority, the Revenue Ruling distinguishes Revenue Ruling 85-42 on the basis that Revenue Ruling 85-42 involves defeasance of an outstanding debt, while defeasance exists at inception in a LILO. Rev. Rul. 99-14, 1999-1 C.B. at 837.

Revenue Ruling 99-14's analysis of the purchase option also breaks sharply with prior law, which permitted fixed-price purchase options at the property's estimated fair market value without causing a recharacterization of the lease for tax purposes. *See, e.g.*, *LTV Corp. v. Comm'r*, 63 T.C. 39, 50 (1974); *Lockhart Leasing Co. v. United States*, 446 F.2d at 269, 271-72 (10th Cir. 1971). The Revenue Ruling merely claims that since "FM has historically used the property" it can be expected to exercise the option. Rev. Rul. 99-14, 1999-1 C.B. at 837. However, the same could be said of virtually all leasing cases, such as *Frank Lyon*, where the Supreme Court upheld the status of the lease even though Worthen Bank used the building at issue as its headquarters. *Frank Lyon*, 435 U.S. at 565-66, 584; *see also Transamerica II*, 15 Cl. Ct. at 439 (lease upheld even though leased property was "indispensable" to lessee's business). Revenue Ruling 99-14 offers no authority for why this "expectation" should be controlling.

Perhaps the most striking feature of Revenue Ruling 99-14 is its complete failure to apply, or even cite, the settled principles of leasing law set forth in the

Leasing Guidelines. Revenue Ruling 99-14 ignores the following facts, all of which had been regarded as critical to valid lease treatment in earlier case law and administrative pronouncements:

(1) X's $29 million equity investment (greater than the 20% investment required by the Leasing Guidelines);

(2) X's residual interest (11.7%)[65] is equal to or longer than that required by case law;

(3) FM's right to purchase the property at a fixed price expected to approximate fair market value, not a "nominal" price; and

(4) X's pretax profit in excess of the amount required by the Leasing Guidelines.

In view of these deficiencies in Revenue Ruling 99-14, the IRS withdrew this Ruling in 2002 and replaced it with Revenue Ruling 2002-69. Revenue Ruling 2002-69 describes a LILO transaction similar to the LILO transaction described in Revenue Ruling 99-14. Revenue Ruling 2002-69, however, changes the facts of the Ruling compared to those present in Revenue Ruling 99-14:

(1) Revenue Ruling 2002-69 recognizes that the purchase option price is set at an amount greater than fair market value, Rev. Rul. 2002-69, 2002-2 C.B. at 761, as is true of CED's sublease with EZH. Thus, Revenue Ruling 2002-69 abandons the claim in Revenue Ruling 99-14 that the parties expect the purchase option to be exercised; and

(2) Revenue Ruling 2002-69 recognizes that X's residual interest in the property is greater than the 11.8% described in Revenue Ruling 99-14.

Most importantly, however, when the IRS issued Revenue Ruling 2002-69, it abandoned the earlier claim, made in Revenue Ruling 99-14, that LILOs lack

---

[65] In Revenue Ruling 2002-69, described below, the IRS described a longer residual life in recognition that LILOs generally have a longer residual period.

economic substance. When Revenue Ruling 2002-69 was issued, the IRS recognized that Revenue Ruling 99-14 was incorrect in relying on a purported lack of a pretax profit. B. John Williams, the IRS's Chief Counsel at the time, stated that "[w]e have refined our analysis of LILOs based on information from actual transactions," and, as a result, the IRS's new position as expressed in Revenue Ruling 2002-69 "*does not rely on the lack of a pre-tax profit potential or business purpose*." IRS Release No. IR-2002-108 (emphasis added). This represents a 180-degree change from Revenue Ruling 99-14, where the IRS had argued that the pretax profit was "too insignificant." Rev. Rul. 99-14, 1999-1 C.B. at 837.

The IRS's new theory, as set forth in Revenue Ruling 2002-69, is that a lease-leaseback imposes "offsetting obligations" that must be disregarded:

> During the first 20 years of its term, the Headlease confers to X a right to use the property that is immediately reversed by the Sublease grant to FM of substantially the same right to use property.

Rev. Rul. 2002-69, 2002-2 C.B. at 762.

The same statement, however, can be made for every sale-leaseback approved by the courts. For example, in *Frank Lyon*, Frank Lyon's "right to use" the Worthen bank building was "immediately reversed" by the lease back to Worthen, and Frank Lyon would not have the "right to use" the building for as long as 65 years. *Frank Lyon*, 435 U.S. at 566. The Supreme Court nevertheless treated Frank Lyon as the current owner of the property.

Revenue Ruling 2002-69 concludes that a LILO transaction confers only a "future interest in property" that will not mature into a present interest unless and

until the fixed purchase price option is not exercised. Rev. Rul. 2002-69, 2002-2 C.B. at 763. Thus, Revenue Ruling 2002-69 effectively adopts Justice Stevens' dissenting opinion in *Frank Lyon* by claiming that lease-leasebacks do not create a "present" interest in the property. The majority of the Supreme Court thought otherwise. *See Frank Lyon*, 435 U.S. at 581. Furthermore, in other leasing cases, the courts have rejected similar arguments that sale-leasebacks do not create a "present" interest in the leased property. *See, e.g., Mukerji*, 87 T.C. at 957-58; *Bolger v. Comm'r*, 59 T.C. 760, 767-69 (1973).

As was the case with Revenue Ruling 99-14, Revenue Ruling 2002-69 fails to cite or analyze the Leasing Guidelines and relevant case law and thus ignores the facts that have traditionally been viewed as establishing a present interest in leased property:

(1) A significant equity investment;

(2) A significant residual interest;

(3) A purchase option at greater than fair market value; and

(4) A pretax profit.

Since the transaction described in Revenue Ruling 2002-69 is expected to produce a pretax profit, the cases described above at Argument Section I.D.3. require that the "form of the transaction adopted by the parties governs for tax purposes." *Frank Lyon*, 435 U.S. at 583-84. The Revenue Ruling does not attempt to explain why these cases are not controlling.

Revenue Rulings 99-14 and 2002-69 are not long-standing, settled interpretations of law. In fact, they are in direct conflict with the Leasing

Guidelines and fifty years of settled precedent. Consequently, they are entitled to no deference. *Fed. Nat'l Mortgage Ass'n*, 379 F.3d at 1308-09.

## II. The RoCa3 Transaction Possesses Economic Substance

*Frank Lyon* provides that the form of a lease will be respected so long as the transaction has economic substance. *Frank Lyon*, 435 U.S. at 572-84; *see also Gefen*, 87 T.C. at 1495; *Mukerji*, 87 T.C. at 967-68; (*see generally* Argument Section I.D.) The RoCa3 Transaction possesses economic substance: Viewed objectively, the transaction possesses economic reality. Further, CED entered into the transaction for various non-tax business reasons.

### A. The RoCa3 Transaction Possesses Objective Economic Substance

#### 1. The RoCa3 Transaction Was Projected to Earn a Minimum of $61 Million in Pretax Profit and Was Reported for Financial Purposes on the Reasonable Assumption that CED Could Earn Over $101 Million in Pretax Profit

Con Edison proved at trial that the RoCa3 Transaction was projected to earn CED, at a minimum, $61 million of pretax profit beyond the recovery of its initial $43 million equity investment. Assuming that the transaction is not terminated prematurely due to a default or other Premature Termination Event (*see* Argument Section IV.B.4.b.; Facts Section VIII.D.6.), CED's profit from the RoCa3 Transaction depends on which option is selected at the end of the Sublease Basic Term on January 2, 2018:

- If EZH exercises the Sublease Purchase Option in 2018, CED would expect to receive a pretax profit of $61 million. (*See* Facts Section VIII.E.1.)

- If CED exercises its Sublease Renewal Option, it can expect a pretax profit of $101 million. (*See* Facts Section VIII.E.2.c.) These profits could be higher or lower depending on the residual value left to CED at the expiration of the Sublease Renewal Term in 2034 and the cost to CED of operating the RoCa3 Facility during the Shirt-Tail Period from 2034 to 2041. (*Id.*)

- If CED requires EZH to return its Lease Interest in 2018 pursuant to the Retention Option, CED will have the potential to earn a pretax profit even greater than that under the previous two options—as well as a commensurately greater risk of loss—depending on the performance of the RoCa3 Facility during the Retention Option Period. (*See* Facts Section VIII.E.3.)

As Argument Sections I.D. and I.E. demonstrate, the leasing cases have universally held that a reasonable expectation of pretax profit is sufficient to satisfy the economic substance test in the specific context of leasing. *See, e.g.*, *Gefen*, 87 T.C. at 1498-99; *Mukerji*, 87 T.C. at 968. Because, as Defendant's witnesses agreed, CED expected to earn a positive pretax cash flow from the transaction (Tr. 5152-53 (LaRue)), it possesses economic substance. *See Coltec*, 454 F.3d at 1356 n.16 (focusing on the "'*reasonable*' possibility of profit" (quoting *Black & Decker*, 436 F.3d at 441-42) "'separate and apart from the tax deduction'" (quoting *Rothschild*, 407 F.2d at 412)); *Mukerji*, 87 T.C. at 968 ("[T]he residual value of the equipment plus the cash flow generated by the rental of the equipment . . . allows petitioners to at least recoup their initial cash investment.").

**2. The RoCa3 Transaction Created Genuine Contractual Obligations and Economic Burdens and Benefits for CED, EZH and Other Parties Involved in the Transaction**

Courts also have held that a transaction possesses economic substance if it has other "'practical economic effects,'" *Horn v. Comm'r*, 968 F.2d 1229, 1237 (D.C.

Cir. 1992) (quoting *Sochin v. Comm'r*, 843 F.2d 351, 354 (9th Cir. 1988), such as the "creation of genuine obligations enforceable by an unrelated party." *United Parcel Serv.*, 254 F.3d at 1018 (citing *Frank Lyon*, 435 U.S. at 582-83); *see also Coltec*, 454 F.3d at 1357 ("[A]rrangements with subsidiaries that do not affect the economic interest of independent third parties deserve particularly close scrutiny.").

As set forth in detail at Argument Section IV.A.3., the RoCa3 Transaction created real contractual rights and obligations running among CED, EZH, HBU, ABN AMRO and Bayerische Landesbank (the letter of credit issuer). In fact, Defendant's leasing expert Bent had no hesitation at all in testifying that the RoCa3 Transaction resulted in legally enforceable obligations. (Tr. 3805) These legal obligations include the following:

- CED had rental obligations under the Lease that were not extinguished or offset by EZH's rental obligations under the Sublease or the use of defeasance (*see* Facts Section VIII.B.1.);

- CED had the right, under certain circumstances, to enter the premises, operate the RoCa3 Facility and keep its share of the profit or loss from such operation (*see* Facts Section VIII.B.2.);

- EZH had possession rights under the Sublease that could be extinguished upon certain Premature Termination Events (*see* Facts Section VIII.D.5.) and rental obligations under the Sublease that were not extinguished by the presence of the defeasance accounts in this transaction (*see* Facts Section VIII.D.2.);

- EZH was obligated to operate and maintain the RoCa3 Facility at a level of Prudent Industry Practice and to obtain certain types and levels of insurance for the RoCa3 Facility (*see* Facts Sections VIII.D.4.a. and VIII.D.4.c.);

- EZH's ability to sell or lease its interest in the RoCa3 Facility was limited (*see* Facts Section VIII.D.4.b.; Argument Section IV.A.);

- CED was obligated to pay HBU on its debt service, and this obligation was not extinguished by the sublease of CED's Lease Interest to EZH (*see* Facts Section VIII.C.); and

- EZH had the obligation to pay CED in the event of certain premature terminations of the Sublease (*see* Facts Section VIII.D.5.), and the obligation to pay Bayerische Landesbank in the event that the bank assisted EZH in meeting those obligations. (*See* Facts Section VIII.D.5.)

In other words, the RoCa3 Transaction is a "genuine multiple-party transaction," *Frank Lyon*, 435 U.S. at 583, that creates "genuine obligations enforceable by . . . unrelated part[ies]." *United Parcel Serv.*, 254 F.3d at 1018 (citing *Frank Lyon*, 435 U.S. at 582-83). These rights and obligations establish the economic substance of the transaction. *See Coltec,* 454 F.3d at 1355-57.

### B. CED Was Motivated By Genuine Business Reasons to Enter Into the RoCa3 Transaction

Con Edison proved at trial that CED's decision to enter into the RoCa3 Transaction in 1997 was motivated by a number of non-tax considerations. (*See* Facts Sections II.B. and VII.) Con Edison here focuses on the two business purposes that CED executives considered most important in evaluating the RoCa3 investment. First, this transaction provided CED with a pretax profit that could be turned into a significant accounting advantage at a time when the company was expecting losses. Second, the transaction provided CED and Con Edison strategic access to a new international market.

#### 1. The RoCa3 Transaction Generated a Pretax Profit that Provided CED Favorable Accounting Benefits

Con Edison proved at trial that CED entered into the RoCa3 Transaction to generate pretax business profits that produce a favorable accounting benefit. The

transaction thus easily satisfies any subjective business purpose test. *See Coltec*, 454 F.3d at 1355 n.13 (equating business purpose to "subjective business profit motivation") (citing *Dow*, 435 F.3d at 599); *Compaq Computer Corp. & Subsidiaries v. Comm'r*, 277 F.3d 778, 787 (5th Cir. 2001) ("In light of what we have said about the nature of Compaq's profit, both pretax and post-tax, we conclude that the transaction had a sufficient business purpose independent of tax considerations."); *IES*, 253 F.3d at 354-55 ("the proper inquiry is 'whether the taxpayer was induced to commit capital for reasons only relating to tax considerations or whether a non-tax motive, or legitimate profit motive, was involved.'" (quoting *Shriver v. Comm'r*, 899 F.2d 724, 726 (8th Cir. 1990)).

**a. CED Sought a Front-Loaded Earnings Profile for Financial Accounting and Reporting Purposes**

The RoCa3 Transaction was an integral part of CED's business strategy. As outlined in Facts Section I., the deregulation of the New York electricity industry required Con Edison to divest its power-generating assets, and the impact on Con Edison's financial outlook was enormous: the company lost 20% of its earnings base in the sale of its power plants. (Tr. 677-679 (Freilich)) Con Edison recognized that it needed to replace the earnings that would be lost in the divestiture of its generating assets. It elected to follow an investment strategy related to its core business and competencies in the energy industry. (*See* Facts Sections I.B., I.C.) As part of this plan, CED was established as an unregulated entity that would explore the acquisition of various generation and distribution assets. (Tr. 680 Freilich) During

1997, CED invested in or considered investing in numerous development projects, such as:

- Fisonic Technology: the development of an energy-saving technology that would replace traditional commercial water heating;
- International Energy Partners (IEP): an investment in a company exploring future greenfield power investments (*i.e.*, investments built from the ground up (Tr. 754-755 (McCartney))) in Asia and Latin America;
- Energy Investment Fund III (EIF): participation through a fund in diverse worldwide energy and infrastructure projects, which CED anticipated would open up other markets and future investment projects;
- IPP Development: development of new independent power projects around the world; and
- GENOR: an investment in the construction of a greenfield electric power plant and transmission line in Guatemala.

(*See* Facts Section II.C.)

In assembling these projects, CED endeavored to achieve a healthy investment portfolio. For example, it sought to diversify risk through participation in passive lower-risk investments like IEP and EIF. (Tr. 762 (McCartney); Tr. 688 (Freilich)) It was also particularly concerned about the expenses arising from the long-term development projects in the pipeline: CED was expected to operate at a loss until 2001 because of the up-front costs associated with the greenfield projects and other acquisitions. (Ex. 136 at pages 3240-41; Tr. 1924-25 (Muoio)) CED identified leasing as an excellent opportunity to achieve early earnings and thereby to make the subsidiary profitable more quickly:

- A June 1997 Presentation of CED contains a graph comparing the late earnings from development projects with the early earnings from leasing (*see* Ex. 252 at page 4731);

- The Project Briefing Memorandum that the CED Board relied upon to decide whether to pursue the RoCa3 Transaction contains a graph showing the front-loaded earnings profile of the transaction and a numerical chart detailing the allocated accounting earnings (*see* Ex. 363 at pages 7653, 7683);

- The Final Leasing White Paper prepared by CED for the benefit of Con Edison outlined the earnings profile for a typical leveraged lease, focusing on the early years of the transaction, and identified highly predictable, front-loaded earnings as the major benefit of leveraged lease transactions (*see* Ex. 397 at pages 8121-23);

- McCartney testified that the timing of earnings in leasing investments was "very important" to CED because the company "very much needed" near-term accounting earnings to balance out the economic effects of its planned greenfield investments, which start earning profits later and then "ramp[] up over time as the market develops" (Tr. 760-62); and

- Muoio testified that CED was "essentially spending equity for four or five years before we covered our own overhead expenses," which was an "earnings drain for the parent company." As such, he wanted "to mitigate or lessen the impact on earnings through various types of financial structuring, . . . [and] leases offered an opportunity to have earnings in the near term." (Tr. 1940-41)

As Joan Freilich—CFO of Con Edison and board member of CED—explained, utility companies like Con Edison are evaluated in the marketplace based on their reported earnings. (Tr. 687; Tr. 3544-46 (Weil)) As such, CED believed leasing opportunities like the RoCa3 Transaction would improve its financial outlook by providing front-loaded earnings at a time when other projects were generating up-front costs. (Tr. 682, 686 (Freilich); *see also* Ex. 10077 (Weil Initial Report) at page 20273 (explaining how consistent positive earnings growth can positively affect a

corporation's stock price); Tr. 3547-52 (Weil) (explaining that it was reasonable for the executives at Con Edison to seek predictable earnings and a smooth earning profile to improve the company's financials))

The accelerated income provided by the RoCa3 Transaction fulfilled this purpose. As Freilich testified, the $8 million of accounting income CED recognized on its 1998 financial statements from the RoCa3 Transaction was very significant to the company because "otherwise they had very small revenues and . . . considerable expenses, as they began their development efforts." (Tr. 701-02) In addition, the flow-through impact on the financials of Con Edison was significant because it was expected to raise share prices by almost three cents, which the executives considered to be "a meaningful amount." (Tr. 702 (Freilich)) Indeed, the expected impact on the share prices from the RoCa3 Transaction dovetailed with CED's 1998 business plan (Ex. 257 at page 4808); as Muoio explained, by the time this document was drafted in October of 1997, CED had set for itself the "aggressive stretch goal[]" of generating two cents per share in 1998 so that the company could have a "positive contribution to [Con Edison's] earnings instead of a negative." (Tr. 1949-51)

Defendant has never challenged Con Edison's contention that CED sought to use the RoCa3 Transaction to balance its up-front accounting losses on other projects. In fact, Defendant's own witnesses testified as much: Ray identified this business purpose as one of CED's considerations, agreeing that balancing earnings was a valid business purpose for entering into a leasing transaction and noting that

leasing transactions could be entered into quickly—in comparison to "[a] number of the other projects that [CED] looked at [that] were development projects." (Tr. 4928-29)

### b. The Leveraged Lease Structure Provides a Front-Loaded Earnings Profile for Accounting Purposes

The RoCa3 Transaction provided the up-front earnings CED sought. As Weil stressed, the RoCa3 Transaction is required to be accounted for as a leveraged lease under FAS 13. Weil explained that the RoCa3 Transaction meets all the tests for leveraged lease accounting:

- The transaction involves a lessee (EZH), a lessor (CED), and a long-term lender (HBU);
- The loan to CED is a nonrecourse loan that provides CED with substantial leverage; and
- CED's net investment declines during the early years and rises during the later years of the transaction.

(Ex. 10077 (Weil Initial Report) at pages 20256-60) (Tr. 3530; 3562-64) Defendant has not disputed that the RoCa3 Transaction qualifies for leveraged lease accounting.

FAS 13 dictates the "separate phases" method of accounting for leveraged leases, which assigns an accounting income of zero to the investor during the middle years of the transaction when the investor has taken money out of the investment and "is holding cash." (Tr. 3514-19 (Weil); *see also* Ex. 10077 (Weil Initial Report) at page 20280) As a result, all of the income from the transaction is "pushed" into the early and late phases of the transaction (Tr. 3518 (Weil)), and most of the income is

recognized in the early years of the lease. (Ex. 10077 (Weil Initial Report) at page 20267; *see also* Ex. 397 at pages 8121-22 (showing the front-loaded earnings profile); Tr. 690-93, 731-32 (Freilich)) Significantly, however, *the separate phases accounting treatment does not change the total income attributed to the transaction*; it merely changes the *timing* of that income. (Ex. 10077 (Weil Initial Report) at page 20272.) The RoCa3 Transaction is not unique in this regard: under the FAS rules, "a large part of the lessor's earnings are recognized over the first few years of the lease term." *Equipment Leasing*, §6.2.6 at 6-10.

A comparison of part of the final pricing run for the RoCa3 Transaction (Ex. 333) with the 1997 and 1998 Financial Statements for CED (Ex. 423) demonstrates how the "separate phases" accounting method impacted CED's reported earnings. Page 7254 of the pricing run shows in the "Cash Flow Allocated to Income" and "Pre-Tax Income" columns how CED accounted for its income from the RoCa3 Transaction. (*See* Ex. 333 at page 7254) The string of zeros for the years 2010 to 2030 shows the period of time when CED had a negative investment in the transaction under FAS 13, and the total pretax income of $101,538,462 (anticipated under the Sublease Renewal Option (*see* Facts Section IX.B.)) is allocated entirely to the early and late years of the transaction. (Ex. 333 at page 7254) Specifically, the "Pre-Tax Income" column in the pricing run shows allocated earnings for 1997 of $0 and for 1998 of $8,096,792. (*Id.*) Turning to CED's Financial Statements for 1997 and 1998, the list of revenues and expenses contains a line item for "Income from leveraged lease" with no income for 1997 and $8,096,000 for 1998. (*See* Ex. 423 at

page 8442) These line items were attributable to the RoCa3 Transaction. (Tr. 699, 701 (Freilich))

As is indicated by the above comparison, CED's financial statements used annual *pretax* income figures derived from proper leveraged lease accounting methods. (*See also* Ex. 10077 (Weil Initial Report) at page 20270) The earnings reported for 1998, while accelerated into 1998 under the rules of FAS 13, are nothing more than the appropriate share of the total $101 million accounting income on which CED based its financial statements. This can be confirmed by observing the total of the column labeled "Pre-Tax Income" on page 7254 of Exhibit 333, which totals $101 million. This figure is identical to the total expected pretax cash flow, as confirmed by LaRue. (*See* Ex. 333 at page 7255; Tr. 5154) In other words, the FAS 13 accounting for the RoCa3 Transaction merely changed the timing of pretax income, not the total amount of pretax income.

The pricing run also contains calculations of the "Tax Effect of Pre-Tax Income," which reflect the 35% taxes that CED will pay on each year's allocated "Pre-Tax Income." (*See* Ex. 333 at page 7254) By subtracting these taxes—which total $35 million over the life of the transaction—CED arrived at a total after tax net income of $66 million, which is then allocated under the "separate phases" method in the "Cash Flow Allocated to Income" column. (*See id.*; Tr. 697-98 (Freilich) (interpreting a pricing run contained in the Project Briefing Memorandum at Ex. 363)) Significantly, this after-tax income, which was used for accounting and reporting purposes, is *lower* than the pretax income. (*See* Ex. 10077 (Weil Initial

Report) at page 20267) In other words, *the income CED accelerated pursuant to FAS 13 requirements does not contain a penny of tax benefits. It reflects pure pretax profits reduced by taxes*. And once again, despite the front-loaded profile of the income in the pricing run, the total $66 million after-tax income in the "Cash Flow Allocated to Income" column is identical to the after-tax income calculated using the "Total Cash Flow." (*See* Ex. 333 at page 7254; *see also* Ex. 10077 (Weil Initial Report) at page 20270)

This comparison demonstrates that the $66,000,000 in after-tax earnings CED received from the RoCa3 Transaction—and accounted for using the front-loaded profile required by the FAS 13 "separate phases" method—were not in any way dependent upon the tax benefits it received. In fact, the aggregate earnings—and the aggregate taxes paid over the course of the transaction—would have been identical had CED used a different leasing structure and the associated "integral investment" accounting approach. (Tr. 3519-27 (Weil)) Further, Defendant has never argued that CED improperly accounted for the transaction using the "separate phases" methodology prescribed by FAS 13. (*See, e.g.*, Tr. 3661-62 (Weil) (Defendant's counsel did not question him regarding his opinion that the RoCa3 Transaction required FAS 13 accounting).

#### c. CED Would Not Have Entered Into the RoCa3 Transaction Without Pretax Profits Because Pretax Profits Are Necessary to Achieving the Desired Accounting Treatment

As explained in detail above, CED entered into the RoCa3 Transaction in order to achieve the accounting treatment and earnings profile associated with

leveraged leasing. CED could not achieve this goal, however, unless the transaction was projected to produce a pretax profit. Put simply, *a leveraged lease will not provide the benefits of accelerated accounting income unless it is already profitable independent of tax benefits*. (Ex. 10077 (Weil Initial Report) at page 20268; Tr. 3529-30 (Weil); Tr. 1374 (Holzman) (testifying on cross that a leveraged lease needs pretax cash flow to quality for FAS 13 accelerated accounting income)) As Freilich testified:

> Q. Ms. Freilich, [with regard to] the EZH leasing transaction, can there be any [accounting] earnings without profit with regard to that transaction?
>
> A. Essentially, the earnings are the profit.

(Tr. 726 (Freilich)) Because the front-loaded earnings profile was so important, Cornerstone programmed the pricing software to ensure that, even if other assumptions changed, CED would be projected to receive a pretax cash flow of over $101 million. (Tr. 1214-15, 1223-24 (Holzman) (explaining that the constraints at page 7250 of Exhibit 333 ensured CED an after-tax cash flow of at least $66 million, and explaining that the $66 million in after-tax cash flow was a function of the aggregate $101 million pretax cash flow CED would receive from the transaction))

In short, Con Edison—and specifically CED—felt significant profit pressure in 1997 due to deregulation of the New York electricity industry. CED understood that leveraged leasing provided immediate, predictable earnings that could help fill the anticipated gap in earnings as the company's regulated business fell off and the long-term development projects it was taking on garnered large expenses. These

earnings could not be achieved unless the RoCa3 Transaction was expected to produce pretax profit. By programming profit constraints into the software used to negotiate the terms of the transaction, Cornerstone protected CED's projected pretax profit throughout the negotiation process.

### 2. CED Entered into the RoCa3 Transaction to Gain Access to New European Energy Markets

Con Edison also saw the RoCa3 Transaction as an integral part of its diversification into markets around the world. Con Edison's fact witnesses testified that CED was interested in developing a presence in energy markets around the world, including Europe, in response to deregulatory pressures and the "expectation" created by the decisions of Con Edison's competitors to do so. (Tr. 773-74 (McCartney); *see also* Facts Section X.B.3. (summarizing Goulding's testimony that a company like Con Edison would have felt substantial pressure to invest internationally and that the deregulating European markets provided an excellent opportunity for United States utilities)) In fact, CED hired Muoio to serve as president of CED specifically because of the experience he could bring to its international development projects. (Tr. 1904-05 (Muoio)) Con Edison considered the RoCa3 Transaction, its first in Europe, to be its entrée into that market. (Tr. 791 (McCartney))

The documents from 1997 corroborate this testimony. CED's 1997 Business Plan, for example, shows that CED hoped to identify opportunities in international infrastructure developments by "[d]evelop[ing] strategic alliances." (Ex. 701 at page 12095) It also lists numerous international projects that could fulfill this goal, such

as the Energy Investors Fund III, International Energy Partners, and the Beijing Transmission and Distribution Study. (*See id.* at pages 12092-93, 12095-96; *see also* Tr. 1908-09, 1915-16 (Muoio)) The Leasing White Paper CED prepared to request funding from Con Edison for the RoCa3 Transaction included as an advantage of leasing the opportunity to "more fully understand the legal, regulatory, commercial and tax environment of the countries in which the leased assets are located." (Ex. 397 at pages 8118-23; Tr. 791 (McCartney))[66] In addition, although Con Edison provided extensive testimony from Goulding about the advantages to Con Edison of investing in European markets (*see* Facts Section X.B.3.), Defendant presented no expert of its own to refute this analysis.

To confirm that the RoCa3 Transaction complied with CED's investment objectives, CED and its advisors performed a significant amount of due diligence. (*See* Facts Section VI.) The due diligence included:

- An engineering report assessing the operations and quality of the RoCa3 Facility, prepared by Duke Engineering;
- An appraisal from Deloitte assessing, among other things, the fair market value of the RoCa3 Facility, CED's Lease Interest and the projected residual values of that Lease Interest;

[66] Defendant focused a great deal of energy on one contradictory, anonymous comment in a draft of the Leasing White Paper (Ex. 383 at page 7981), which indicates that this reviewer was not aware of any future investment plans in The Netherlands. (Tr. 4489-91 (Thomas); Tr. 4983-84 (Ray)) The final version of the Leasing White Paper, however, which was approved by the CED Board and forwarded to Con Edison, confirmed CED's desire to gain legal and commercial knowledge of The Netherlands. (*See* Ex. 397 at page 8123) It is apparent, therefore, that the anonymous reviewer's views were neither shared with nor adopted by the decision makers at Con Edison.

- An assessment of the facility's environmental health and safety from Tauw Milieu;
- Extensive pricing analysis performed by Cornerstone using the ABC Program;
- Credit analysis of EZH from Standard & Poor's; and
- Tax and other legal advice from Shearman & Sterling and Loeff Claeys (Dutch counsel).

Defendant's leasing expert Ray agreed that CED's due diligence process considered "all the things that you would expect." (Tr. 4746-47 (Ray)) And in fact, CED's due diligence exceeded the level of due diligence exhibited by taxpayers in numerous transactions that courts have held possess economic substance. *See, e.g.*, *Johnson I*, 11 Cl. Ct. at 29 (finding that the taxpayer "approached this investment with the kind of caution expected of a prudent businessman" because he reviewed the mechanics and risks of the investment and received an "independent analysis of the economic, tax, and legal aspects of the Transaction" from Price Waterhouse); *Torres*, 88 T.C. at 708 (describing the taxpayer's due diligence involving his attorney's discussions with an independent leasing consultant and with a person who performed a cash flow analysis and revenue projection); *Mukerji*, 87 T.C. at 930-31 (summarizing the taxpayer's due diligence efforts).

When CED assessed its first year of operations at the end of 1997, it determined that it had achieved its goal of gaining entry into international markets (Ex. 248 at page 4629) and that the RoCa3 Transaction had enhanced Con Edison's reputation in The Netherlands. (Ex. 242 at page 4471) In fact, Con Edison was so proud of the RoCa3 Transaction, including its importance to the company's new

international profile and efforts to explore environmentally friendly technology, that it widely publicized the RoCa3 Transaction. (*See* Facts Section IX.A.) For example, in 1998 *The Wall Street Journal* noted the connection between Con Edison's deregulation strategy and CED's investments in GENOR and the RoCa3 Transaction. (Ex. 858 at pages 13492-93) *The Wall Street Journal* emphasized that while Con Edison "has been slow to move compared to other utilities," it has "begun to show its strategy" in response to deregulation. (Ex. 858 at page 13492) Further, Con Edison's 1997 Annual Report highlighted CED's investments in The Netherlands, Guatemala and China. (Ex. 107 at page 2961) It focused specifically on the RoCa3 Transaction, including a color photograph of tulips to point out that the RoCa3 Facility was "one of the most innovative and environmentally-friendly electric generation facilities in the world." (*See id.*; Tr. 181-82 (McGrath); Tr. 780 (McCartney)) If the RoCa3 Transaction is an "abusive tax shelter" as Defendant claims, it must be the first transaction in the history of "abusive tax shelters" to be headlined contemporaneously in a public company's annual report.

In response to this evidence of CED's interest in international expansion, Defendant's counsel spent significant time at trial focusing on the country screening process CED undertook in February of 1998. (*See, e.g.*, Tr. 4487-88 (Thomas) (discussing the 2/3/98 country screening memo at Exhibit 1087)) This tactic was not successful, however. First, the country screening process Defendant identified was a 1998 project that does nothing to contradict the unanimous testimony from CED witnesses that in late 1997 they considered the RoCa3 Transaction an important

entrée into the European market. Second, and more importantly, however, Defendant's approach ignores entirely the purpose for which the country screening process was developed. As is discussed at length in Fact Section II.D. above, CED intended the country screening process to be a tool for organizing and reviewing future opportunities, not a method to eliminate countries from consideration altogether.[67] (Tr. 1967-68 (Muoio)) And in fact, CED's screening documents specifically address this prospect:

> Note: From time to time, countries that passed the risk screen—but not the screens for growth potential and financing—may present niche opportunities offering attractive potential for commensurate risk. *CED will pursue these specific project opportunities as they arise.*

(Ex. 374 at page 7740 (emphasis added))

Investment in countries not included in the country screen was not simply an abstract possibility for CED: although neither Germany nor Indonesia is identified as a target country in the February project (Ex. 374 at pages 7738-39), the CED Board Minutes from April of that same year show that CED was considering investments in Indonesia (later derailed due to "problems with the Indonesian economy") and Germany (a project that ultimately did not fit in with CED's business plan). (Ex. 159 at page 4151) The United States was also not one of the target countries in CED's screen (Ex. 374 at pages 7738-39), but at that very same April meeting, the CED Board approved the acquisition of the Carson cogeneration

[67] This use of the screening process is a normal business practice: as Goulding testified, in his experience working with utility companies that conduct screening processes in response to deregulation, country screens are not used to rule out future investments, but only to focus future analytic resources. (Tr. 2427-35)

plant in California. (Ex. 159 at pages 4150-51) CED acquired ownership interests in both Carson and in the Ada cogeneration plant in Michigan by the end of 1998 (Ex. 262 at page 4967), Thus, the evidence simply does not support Defendant's allegation that CED's choice not to focus its 1998 resources on analyzing the market in The Netherlands proves that CED did not believe in 1997 that the RoCa3 Transaction was an important foothold in its international expansion.

Defendant's counsel also attempted to make an issue of CED's change in overall investment strategy after the RoCa3 Transaction. (*See* Ex. 20195 (Ray Initial Report) at pages 25194-95; Tr. 891-93 (McCartney)) The evidence at trial showed, however, that in early 1999, CED began to refocus its investment strategy on the northeastern United States, Guatemala and Central America. (Ex. 262 at page 4968; Ex. 272 at page 5334; Tr. 2016-17, 2019-21 (Muoio) ("The goal of [CED] specifically was to do international development. . . . But, again, as I stated, we found that given the large number of participants [in the foreign markets], that was driving the returns down.")) Once again, there was nothing unusual about CED's shift in strategy: as Goulding testified, around 2000, American utility companies began shifting their focus away from international markets and implemented "standstill polic[ies] or began a gradual retreat." (Tr. 3435-39 (Goulding))

Defendant did not challenge this evidence of a market-wide shift in the approach of United States utility companies. Instead, Defendant's witnesses supported Con Edison's explanation. Ray—whom Defendant hired to opine regarding Con Edison's business purpose (Tr. 4693-94 (Ray))—said he had no

reason to doubt that, in 1997, Con Edison thought leases could help them forge relationships with overseas utilities. (Tr. 4929-30 (Ray)) Ray believes that only later did Con Edison pull back from its international strategy to focus on projects in the United States. (Tr. 4930 (Ray)) This fact simply has no bearing on the motivations of CED in 1997.

### 3. CED's Consideration of the Tax Benefits of the RoCa3 Transaction Is Irrelevant to the Economic Substance Doctrine

Defendant spent much time at trial seeking to prove that CED's decision to enter into the RoCa3 Transaction was motivated by a desire to obtain tax benefits. (Tr. 4722-23 (Ray)) However, Con Edison has never denied that it recognized and appreciated the tax benefits associated with the RoCa3 Transaction.

Indeed, Defendant's focus upon the tax benefits of the transaction ignores nearly a century of tax jurisprudence. As the Supreme Court established in *Gregory v. Helvering*, 293 U.S. 465, 469 (1935), "[t]he legal right of a taxpayer to decrease the amount of what otherwise would be his taxes or altogether avoid them, by means which the law permits, cannot be doubted." The Supreme Court reaffirmed this principle just this term in *Boulware v. United States*, __U.S __,128 S. Ct. 1168, 1176 n.7 (2008).

Given this long-standing tenet of tax law, it is no surprise that the courts have held that if a transaction is entered into for some non-tax business purpose, it is irrelevant that the taxpayer was also motivated by the desire to receive tax benefits. As the Federal Circuit pointed out in *Gulf Life Insurance Co. v. United*