*States*, 118 F.3d 1563 (Fed. Cir. 1997), when upholding the taxpayer's tax treatment of insurance premium rebates, "[a] 'major motive' to reduce taxes is not grounds of illegality." *Id.* at 1566 (citing *United States v. Cumberland Pub. Serv. Co.*, 338 U.S. 451, 455 (1950)). The Fifth Circuit in *Compaq* made clear that even a "primary" tax motive does not invalidate a transaction:

> [A]s to business purpose: *even assuming that Compaq sought primarily to get otherwise unavailable tax benefits* in order to offset unrelated tax liabilities and unrelated capital gains, this need not invalidate the transaction. . . . [T]he evidence in the record does not show that Compaq's choice to engage in the ADR transaction was *solely* motivated by the tax consequences of the transaction.

*Compaq*, 277 F.3d at 786-87 (emphasis added and internal citations omitted).

The testimony of Defendant's leasing expert Ray established that CED's motivations for entering into the RoCa3 Transaction were no different than those of any other taxpayer entering into a leveraged lease. For example, Ray's own former employer, Electronic Data Systems ("EDS"), was an information technology outsourcing business that began its involvement in leasing as a lessee and then, in 1983, began engaging in a large volume of leasing transactions as lessor. (Tr. 4844-45, 4878-79(Ray)) EDS leased cogeneration plants (Tr. 4847 (Ray)), wind energy facilities in the Mojave (Tr. 4847 (Ray)), aircraft (Tr. 4845-46 (Ray)), the fuel storage facility at Los Angeles International Airport (Tr. 4847 (Ray)), transmission and switching equipment and fiber optic cable to a telephone company (Tr. 4847 (Ray)), and an aluminum can manufacturing line. (Tr. 4848 (Ray)) Ray agreed that in engaging in leasing transactions, EDS's goal was not to make investments in specific kinds of assets, but rather to "make lease investments that generated

earnings" and "tax benefits." (Tr. 4846) Ray confirmed that the earnings EDS received from its leveraged leases "were front-loaded earnings" and that this earnings profile resulted from the tax benefits, agreeing that "[t]his is all perfectly normal stuff in leveraged leasing." (Tr. 4847)

Ray further confirmed that the term "tax-advantaged transaction" is "applicable to leveraged leases in general." (Tr. 4843) He agreed that there was nothing about the RoCa3 Transaction that he found to be abnormal with regard to CED's motivations as lessor. (Tr. 4879) The following colloquy is representative:

> Q You just said that, you just came to the conclusion that in this particular case, as in all cases, tax benefits were taken into account?
>
> A Yes, they were. And ConEd said that, they indicated in their presentations that the tax treatment was important and they indicated in testimony that they wouldn't have done the deal without it.
>
> Q And you would be stunned if that were not true, right?
>
> A I would be stunned. . .
>
> Q And by stunned, I mean, that's the conclusion you expected to find?
>
> A Yes.
>
> . . .
>
> Q I mean, you almost wouldn't have to even look at the evidence here, you could have just assumed that any equity investor in a leveraged lease was doing this at least in part for tax motivations, you would assume that?
>
> A Yes.
>
> Q And that's just a general observation in your experience?
>
> A Yes, that's right.

(Tr. 4850-51 (Ray))

Courts are cognizant of the dynamic Ray described and have explicitly recognized the role tax benefits play in the leasing industry. *See, e.g.*, *Philip Morris Capital Corp. v. Kmart Corp.*, 2007 No. 07 C 1926, WL 3171316, at *1 (N.D. Ill. Oct. 24, 2007) (describing a leveraged lease as "a transaction involv[ing] a series of agreements among several parties . . . with an investor whose primary motivation is to obtain the tax benefits associated with the property"); *see also Johnson I*, 11 Cl. Ct. at 30 ("[E]vidence . . . indicative of a tax deferral, if not tax avoidance, motivation, . . . is not dispositive of the absence of the requisite profit objective. . . . Johnson's concern with tax benefits apart from his demonstrated profit seeking objective is an economic reality in the business world."); *IES*, 253 F.3d at 355 ("A taxpayer's subjective intent to avoid taxes thus will not by itself determine whether there was a business purpose to the transaction."). The Supreme Court and other courts across the country have consistently upheld lease transactions including tax benefits where those transactions also promised the taxpayer a pretax profit. *See, e.g.*, *Johnson I*, 11 Cl. Ct. at 28, 36-37; *Gefen*, 87 T.C. at 1498-99; *Mukerji*, 87 T.C. at 968. Adopting Defendant's argument that CED's desire to receive tax benefits somehow negates the economic substance of the profitable RoCa3 Transaction would fly in the face of this settled precedent and risk the existence of a multibillion dollar industry.

## III. The RoCa3 Transaction Satisfies the Requirements Established By the Leasing Authorities

In addition to possessing economic substance, the RoCa3 Transaction easily satisfies all of the tax law requirements that have been imposed over the last fifty years to determine the status of true leases. The asset purchased by CED is its Lease Interest in the RoCa3 Facility. The tax regulations recognize that a leasehold interest in an asset, such as the RoCa3 Facility, is itself an asset and that the cost of this asset may be deducted over the term of the lease. Treas. Reg. §1.162-11(a) (as in effect in 1997). CED made an equity investment in this asset—its Lease Interest—by investing over $39 million of its own money. Thus, as in *Frank Lyon*, CED is entitled to tax deductions for the consumption of the capital invested in its Lease Interest in the RoCa3 Facility. After CED acquired its Lease Interest, it then subleased the Lease Interest back to EZH. CED expects to earn a profit from the Lease Interest. As demonstrated below, the application of the leasing rules to the Sublease confirms that the sublease to EZH is a true lease, not a sale, and thus CED continues to hold the benefits and burdens of ownership with respect to its Lease Interest, entitling it to tax deductions representing the consumption of its equity interest. *Frank Lyon*, 435 U.S. at 581.

The application of the leasing requirements to the RoCa3 Transaction is discussed below, in accordance with the issues identified in the Leasing Guidelines:

### A. Minimum Unconditional "At Risk" Investment

#### 1. Initial Minimum Investment

The Leasing Guidelines require that a lessor make an initial investment of at least 20% of the cost of the property that is leased to the other party. Rev. Proc. 75-21, 4(1)(A), 1975-1 C.B. at 715. CED's equity investment in its Lease Interest far exceeded this requirement. CED made a cash investment of $39,320,000 in its Lease Interest. (Stip. ¶¶117, 124) The total value of CED's Lease Interest, as determined by Deloitte, was $148,200,000. (Ex. 46 at pages 1501, 1503) Thus, CED's investment in the property was 26.53% of its cost. Defendant's leasing expert Bent testified that CED "put up more equity than I have seen in many other leveraged leases." (Tr. 3868)

CED's large equity investment in the property is a critical factor in determining its status as a lessor holding a current interest in the property, since a taxpayer is entitled to deductions for the consumption of its capital. *Frank Lyon*, 435 U.S. at 581. In fact, CED's equity investment in the property is much higher than that of the taxpayer in *Frank Lyon*, which paid only $500,000 in cash towards a purchase price of $7,640,000, an equity investment of only 6.5%. (*Id.* at 566-67) CED's equity investment is also higher than that of taxpayers in many cases where status as a lease was upheld. *See, e.g., Johnson I*, 11 Cl. Ct. at 33, 37 (15% equity investment); *Estate of Thomas*, 84 T.C. at 436 (13% equity investment); *Emershaw*, 59 T.C.M. (CCH) at 628 (6% equity investment); *see also Torres*, 88 T.C. at 709 (12% equity investment).

### 2. Maintenance of Minimum Investment

The Leasing Guidelines provide that to obtain a favorable advance ruling from the IRS on a proposed leasing transaction, the lessor must maintain a minimum investment in the property of 20% during the term of the lease. *See* Rev. Proc 75-28, §4.05, 1975-1 C.B. at 752-53. Here, the ABC pricing software establishes that CED would comply with the Leasing Guidelines by maintaining a minimum equity investment in the property of at least 20% throughout the life of the Sublease. (*See* Ex. 332 at pages 7218, 7221 (Column C, showing that the amount of equity is in excess of the required 20% of the purchase price))

### 3. Residual Investment

The Leasing Guidelines provide that to receive a favorable ruling a lessor should have a residual value interest at the end of the lease equal to at least 20% of the cost of the property, without taking into account inflation or deflation. *See* Rev. Proc. 75-21, §4(1)(C) 1975-1 C.B. at 715-16. Also, the remaining useful life of the property at the end of the lease term should equal 20% of the property's original useful life. *See id.* Courts, however, have routinely accepted residual values and remaining useful lives of less than 20%. (*See* Argument Section I.B.3.a.(iii).) In determining if it has met these requirements, a lessor is entitled to rely on a "reasonable estimate," Rev. Proc. 75-21, §4(1)(C), 1975-1 C.B. at 715-16, from "a qualified expert who has professional knowledge of the type of property subject to the lease." Rev. Proc. 75-28, §4.02.6, 1975-1 C.B. at 753.

CED satisfied the requirements of the Leasing Guidelines by obtaining an opinion from a "qualified expert who has professional knowledge of the type of property subject to the lease." Rev. Proc. 75-28, §4.02.6, 1975-1 C.B. at 753. The evidence at trial established that Ellsworth, the principal author of the Deloitte Appraisal, has extensive professional knowledge concerning the type of equipment involved in the RoCa3 Transaction. (Tr. 1623-24 (Ellsworth)) In fact, Deloitte has performed several hundred appraisals of power-generating assets throughout the world (Tr. 1617-19 (Ellsworth)), and Ellsworth has personally performed hundreds of appraisals, including 50 appraisals of power generating assets, 10 of which were gas-fired facilities like the RoCa3 Facility. (Tr. 1623-24 (Ellsworth)) Ellsworth completed his first appraisal of a power generating asset in 1986. (Tr. 1621 (Ellsworth))

The Deloitte Appraisal explained, in detail, the manner in which Ellsworth calculated the fair market value, residual value and residual life of the RoCa3 Facility. (Ex. 46 at pages 1538-68; Tr. 1654-59, 1674-78, 1684-1700, 1703, 1706-11 (Ellsworth)) In determining the useful life of the RoCa3 Facility, Deloitte relied on its analysis of similar power generating facilities, its experience and its review of Duke Engineering's engineering due diligence report that was also prepared as part of CED's transaction due diligence. (Ex. 46 at pages 1538-1542) Defendant's leasing expert Ray agreed that Deloitte was a "competent appraiser," that the Deloitte Appraisal was "quite extensive," and that he "found no fault" with Deloitte's conclusions. (Tr. 4750-51) Hence, the Deloitte Appraisal should be accepted, as its

methodology was reasonable. *See* Rev. Proc. 75-28, §4.02.6, 1975-1 C.B. 753; *see generally Mukerji*, 87 T.C. at 965.

CED's remaining residual interest in the RoCa3 Facility as of the Sublease Renewal Termination Date (June 15, 2034),[68] without taking into account inflation or deflation, is expected to be worth 22.7% of the original cost of CED's Lease Interest. (Ex. 46 at pages 1505, 1567-68, 1721) Thus, the value of CED's remaining interest passes the Leasing Guidelines' 20% residual value test. Taking into account inflation, CED's remaining residual interest as of the Sublease Renewal Termination Date is expected to be worth 70.9% of the original cost of CED's Lease Interest. (*Id.* at pages 1505, 1568, 1749)

The estimated remaining useful life (as opposed to value) of CED's interest in the RoCa3 Facility at the end of the Sublease Renewal Term is 6.7 years, or approximately 15.5% of CED's 43.2 year leasehold interest. (Ex. 46 at page 1504) While this amount is less than the 20% required by the Leasing Guidelines, Rev. Proc. 75-21, §4(1)(c), 1975-1 C.B. at 715-16, it exceeds the residual interest of 13.33% approved in *Frank Lyon*, 435 U.S. at 566. Case law has routinely approved leases with remaining useful lives of 15% or less. *See, e.g.*, *Torres*, 88 T.C. at 716-17 (remaining useful life of 11.7% of the original life). (*See* Argument Section I.B.3.a.(iii).) The Sublease therefore satisfies the remaining useful life requirements to be respected as a true lease.

---

[68] Rev. Proc. 75-21, §4(2), 1975-1 C.B. at 716, provides that the lease term includes all renewal options (except those at the option of the lessee at fair rental value); thus the Sublease Renewal Term is the period used.

In addition to the appraisal prepared by Deloitte, CED presented an appraisal review report prepared by John P. Kelly. (Ex. 10075 (Kelly Initial Report) at page 20124) Like Ellsworth, Kelly is an expert who has "professional knowledge of the type of property subject to the lease," Rev. Proc. 75-28, §4.02.6, 1975-1 C.B. at 753 (Tr. 2752-55 (Kelly)), and thus his experience fulfills the Revenue Procedure 75-28 standard. Kelly found that the material and data Deloitte used to create its appraisal was complete, adequate and relevant, and that the analyses, opinions and conclusions in the appraisal were appropriate and reasonable. (Ex. 10075 at page 20129) Kelly's report fully supports the Deloitte Appraisal's conclusions regarding fair market value, residual value and residual life. (*Id.* at pages 20133-20157)

Many leasing cases have focused upon conflicting evidence of whether the lessor's expectations concerning the residual life and residual value of the leased property were reasonable. *See*, *e.g.*, *Johnson I,* 11 Cl. Ct. at 33-36; *Estate of Thomas*, 84 T.C. at 428-29; *Gefen*, 87 T.C. at 1491-92; *Mukerji*, 87 T.C. at 965-67. In this case, however, Defendant did not present any appraisal or expert evidence contrary to the Deloitte Appraisal or to Kelly's appraisal review on these issues. Defendant's cross-examinations of Ellsworth and Kelly and the testimony of Defendant's own expert witnesses did not reveal any significant flaws in Ellsworth's report, methodology or testimony. The Deloitte Appraisal therefore provides a "reasonable estimate" of CED's Lease Interest's fair market value, residual value and residual life, and CED was entitled to rely on it.

**B. Lease Terms and Renewal Options**

The Leasing Guidelines provide that the term of a lease includes all renewals or extensions except those at the lessee's option set at fair market value. *See* Rev. Proc. 75-21; §4(2), 1975-1 C.B. at 716. Here, EZH does not hold any options to extend or renew its Sublease from CED, but CED can cause a renewal of the Sublease through June 15, 2034. Thus, for purposes of measuring residual life and value, the Sublease Term ends on June 15, 2034.

**C. Purchase and Sale Rights**

To receive a favorable ruling, the Leasing Guidelines provide that a lessee cannot have a fixed-price purchase option. Rev. Proc. 75-21, §4(3), 1975-1 C.B. at 716. The case law, however, has allowed the use of fixed-price purchase options so long as they are not set at nominal prices. *See, e.g.*, *Transamerica II*, 15 Cl. Ct. at 440-41; *Nw. Acceptance Corp.*, 58 T.C. at 847-48; *Am. Realty Trust v. United States*, 498 F.2d 1194, 1199 (4th Cir. 1974); *see also Frank Lyon*, 435 U.S. at 570; *Mesa Ref.*, 65 B.R. at 727-78.

Here, the projected fair market value of CED's remaining Lease Interest at the Sublease Purchase Option Date (January 2, 2018) is $205,554,840. (Ex. 46 at pages 1570, 1745-48; Ex. 10075 (Kelly Initial Report) at page 20165 n.67) EZH's net Sublease Purchase Option Price is expected to be $223,490,258,[69] which exceeds the expected fair market value of CED's Lease Interest on January 2, 2018 by

---

[69] This amount is equal to the Sublease Purchase Option Price, plus EZH's additional cost of foregoing the Final Basic Rent Payment, less the extinguishment of EZH's obligations under the Sublessee Loan. (Ex. 10075 (Kelly Initial Report) at pages 20165 n.67, 20178)

$17,935,418. (*See* Ex. 46 at pages 1570-71; Ex. 10075 (Kelly Initial Report) at page 20165 n.67) Thus, EZH's net Sublease Purchase Option Price is substantially greater than the expected fair market value of the property, and thus EZH is unlikely to exercise the option. *See, Am. Realty Trust*, 498 F.2d at 1199; *Lockhart Leasing*, 446 F.2d at 272.

The net Sublease Purchase Option Price of $223,490,258 is not "nominal." In addition, the Sublease Purchase Option Price was set at a price above the expected fair market value of CED's Lease Interest as of January 2, 2018. *See Mesa Ref.*, 65 B.R. at 727 (parties adopted "safeguards" "to ensure that no equity would be acquired," by pricing the option 5% above fair market value). Case law has uniformly respected such purchase options. (*See* Argument Sections I.B.3.C. and IV.C.1)

**D. No Investment by Lessee**

To receive a favorable ruling, the Leasing Guidelines prohibit the lessee from providing any part of the cost of the property. Rev. Proc. 75-28, §4.05, 1975-1 C.B. at 753. Here, the RoCa3 Transaction complies with this prohibition since EZH did not provide any part of the cost of CED's Lease Interest. The cost of CED's Lease Interest was $148,200,000 (Ex. 46 at page 1503), and Deloitte concluded that CED's rental payments equaled this amount. (Ex. 46 at page 1569) EZH did not provide any funds for CED to make its rental payments.

### E. No Lessee Loans or Guarantees

To receive a favorable ruling, the lessee may not lend the lessor any funds necessary to purchase the equipment. Rev. Proc. 75-21, §4(5), 1975-1 C.B. at 716. Here, EZH did not lend to CED any of the funds used to purchase its Lease Interest, since HBU is not related to EZH. (Ex. 1 at page 32; Stip. ¶107(v))

### F. Profit Requirement

As described above in Argument Section I.B.3.f., the Leasing Guidelines provide a two-part test to meet the pretax cash flow requirements to receive a favorable ruling. Rev. Proc. 75-21, §4(6), 1975-1 C.B. at 716.

#### 1. Part I: Total Cash Flow

The profit requirement under the Leasing Guidelines is expressed as "a + b exceeds c," Rev. Proc. 75-28, §4.07, 1975-1 C.B. at 753, where:

a = Rent paid by the lessee to the lessor

b = The property's residual value at the end of the lease

c = Total amounts paid by the lessor in connection with owning the property.

In this case, the evidence demonstrates, and Defendant's witnesses confirmed, that the RoCa3 Transaction is expected to produce a total positive pretax cash flow as defined in the Leasing Guidelines. In other words, applying the formula "a + b exceeds c" as set forth in the Leasing Guidelines, CED is expected to receive a positive pretax cash flow from every scenario, regardless of whether EZH elects the Sublease Purchase Option or CED elects the Sublease Renewal Option or the Retention Option.

In discussing the amounts of positive pretax cash flow set forth below, it is important to keep in mind that *none of these cash flows are attributable to tax savings*. Although the RoCa3 Transaction—like all leveraged leases—will produce tax deductions and tax benefits in early years, these deductions and the resulting tax benefits are temporary and will be recaptured in later years as the transaction produces income and tax liabilities. *See, e.g.*, *Frank Lyon*, 435 U.S. at 580; *Estate of Thomas*, 84 T.C. at 438. Thus, the pretax amounts set forth below reflect pretax cash flow without taking into account tax benefits, and the resulting after-tax cash flow reflects the pretax cash flow after imposing tax at 35%. (Tr. 1222-24 (Holzman))

**a. Sublease Purchase Option**

If EZH exercises its Sublease Purchase Option, CED will realize a pretax profit of $60,974,397 from the RoCa3 Transaction. (Ex. 609 at page 10815; Tr. 1228-29 (Holzman); *see* Facts Section VIII.E.1.) This profit will be subject to tax of $21,341,039, so CED will receive $39,633,358 in after-tax cash flow (assuming a 35% tax rate). (Ex. 609 at page 10815; Tr. 1229-30 (Holzman)) At trial, Holzman explained how this $39,633,358 after-tax cash flow was demonstrated in the pricing runs. (Tr. 1229-30 (Holzman)) Defendant's counsel mistakenly believed that the $39,633,358 after-tax cash flow should be netted against CED's $43,445,000 investment:

Q. Okay. This page [Ex. 609 at page 10815] shows what happens if the purchase option is exercised, correct?

A. It shows the cash flows associated with it on an annual basis, both pretax and after tax.

Q. So if you look at the after-tax cash flow here, it is about $39.6 million? Do you see that, 39.633—it is very small—358, and it is the fourth column over. Do you see that?

A. That is the total after-tax cash flow, I do see that.

Q. So in order to obtain that after-tax cash flow, ConEd invested $43 million; is that correct, in year one? Is that what this chart is showing?

A. The investment that Con Edison had, including its transaction expenses, in this transaction, was $43,445,000.

Q. And according to this chart at the end of the day, they are making 39 million?

A. Yes, on an after-tax basis.

Q. So they are actually—they have a negative return on this money, correct, according to this calculation?

A. No, because that 39 million includes—and I mentioned this yesterday—the 43.445 million. So if you want to know how much Con Edison made, you should add the 39.6 million, you should add the 43 million to it, because it received its investment back. And on top of that, also received 39.6 million.

Q. I do understand what you are saying.

(Tr. 1370-71)

While Defendant's counsel misunderstood how this after-tax cash flow was calculated, Defendant's accounting and finance expert LaRue agreed with Holzman and independently confirmed Holzman's calculations that CED would receive a pretax cash flow of approximately $61 million from the RoCa3 Transaction if the Sublease Purchase Option were exercised. (Ex. 20194 (LaRue Initial Report) at page 25150; Tr. 5154) LaRue independently checked Cornerstone's calculations. (Tr.

5120) In column J of Table 11 of LaRue's report (Ex. 20194 (LaRue Initial Report) at page 25150), LaRue demonstrated that CED would receive "free cash" flows of $104,419,403. Subtracting the "actual cash invested" of $43,397,500[70] shown in column I, CED's total profit is $61,016,495. (*Id.*) After subtracting taxes of $21,355,773 (column H), CED's total after-tax cash flow will be $39,666,130. (*Id.*) Thus, LaRue's calculations match Cornerstone's and CED's projections of the expected positive pretax and after-tax cash flows.

In his testimony, LaRue confirmed that CED would receive positive pretax cash flow of $61 million if the Sublease Purchase Option were exercised. (Tr. 5154):

Q. Let's go to page 25150 of your report, which is 20194.

A. I will direct your attention to column I and J. Column I shows the cash outflow on December 15th, 1997, and column J shows a free cash flow being received by or scheduled to be received by ConEd in 2012, and another pretax cash flow scheduled to be received in the form of the Treasury strips throughout 2018, that's shown in row 22 of column J.

Q. And if we have [an] investment of $43 million and we get out a total of 104, approximately, million dollars, does that mean we have, on a cash flow basis, positive cash flow of about $61 million?

A. *Positive cash flow of about $61 million, that's correct.*

Q. And that's under your scenario 1 [the Sublease Purchase Option]?

A. That's correct.

(Tr. 5154 (LaRue) (emphasis added); see also *id.* At 5051 (scenario 1 defined))

---

[70] There is a minor discrepancy between the transaction costs in the pricing runs and LaRue calculations of the transaction costs, so LaRue's calculations of cash invested and total profit are slightly different from the ABC pricing runs. (Tr. 5063 (LaRue)) The difference is not material.

Thus, there is no dispute that CED can expect to earn a $61 million pretax positive cash flow if the Sublease Purchase Option is exercised.

### b. Sublease Renewal Option

If EZH does not exercise the Sublease Purchase Option and CED exercises the Sublease Renewal Option, CED will receive a positive pretax cash flow of $101,538,462—before taking into account any cash flows from the Shirt-Tail Period (June 15, 2034 to February 24, 2041). (Ex. 333 at page 7255; Tr. 1223, 1227-1228 (Holzman); *see* Facts Section VIII.E.2.c.) After the imposition of $35,538,462 in taxes, CED can expect $66,000,000 in after-tax cash flow (once again, before any cash flow from the Shirt-Tail Period). (Ex. 333 at page 7255) These calculations are shown in Exhibit 333 at page 7255. (Tr. 1221-23 (Holzman))

Defendant's expert LaRue independently confirmed that CED could expect a pretax cash flow of approximately $101 million if CED elects the Sublease Renewal Option, *before* taking into account cash flows during the Shirt-Tail Period:

Q. All right. Are we able to do the same calculation under your scenario 2 [Sublease Renewal Option] as you have calculated it?

A. We are. Table 13 [Ex. 20194 at pages 25153].

Q. Table 13?

A. Page 47.

Q. All right. And that is at page 25153; is that correct?

A. That's correct.

Q. Where do we look here?

A. That would also be column I and J. And once again, you have the cash outflow of $43 million in 1997, and then you have a

stream of cash inflows at various points listed in column J. Those cash inflows total $144 million. The cash outflow is $43 million. *So the net cash flow would be around $101 million.*

Q. And that's without including any revenues from the so-called shirt-tail; is that correct?

A. That is correct.

Q. So on a cash flow basis, if there were additional revenues on the shirt-tail, it would add to that positive cash flow?

A. It would add to that positive cash flow and, again, without discounting.

(Tr. 5155-56 (emphasis added); *id.* at 5053 (scenario 2 defined))

At trial, Holzman explained that the $66 million in after-tax profits from the Sublease Renewal Option was important to CED, because this was the amount CED expected to report in its financial statements. (*See* Tr. 1052, 1215 (Holzman)) Throughout the negotiation of the transaction, CED management had represented to its Board of Directors that it would earn at least a $66 million profit. Cornerstone prepared an ABC pricing run dated September 30, 1997, indicating an after-tax profit of $66,000,000, which was included in the Project Briefing Memorandum dated October 23, 1997 and distributed to CED's Board of Directors. (Ex. 363 at pages 7612, 7683) In order to ensure that CED would receive this profit, Holzman entered a constraint into the ABC pricing software to ensure that CED would always receive at least $66 million in after-tax profit, even if the terms of the transaction were otherwise modified. (Tr. 1052, 1215 (Holzman)) Although many features of the RoCa3 Transaction changed during the course of negotiations with EZH (Tr. 1209-12 (Holzman) (testifying that the nonrecourse debt rate changed, the

remaining useful life of the RoCa3 Facility changed, and the anticipated closing date was moved back)), CED insisted on receiving a minimum after-tax profit of $66,000,000, and the final negotiated terms provided this profit without including any additional cash flow during the Shirt-Tail Period.

The amounts shown in Exhibit 333 do not reflect any income for the period from the termination of the Sublease on June 15, 2034, until the end of CED's leasehold interest in 2041. (*See* Ex. 333 at page 7257 (showing "0" in the "Rent" column for 2035 and subsequent years)) It is impossible to know with certainty how much income CED could earn during the Shirt-Tail Period, since this amount is not agreed in advance. The income earned from 2034 to 2041 will depend upon variables such as electricity and natural gas prices during that period, plus a host of other variables such as inflation and technological change. Reed discussed some of these variables in his testimony. (Tr. 2695-96; *see also* Tr. 3157-59 (Ellis); Tr. 4804-05 (Ray))

Since it is impossible to predict with certainty the amount of income CED might earn between 2034 and 2041, CED took the conservative approach of showing zero residual value for 2034 to 2041. In *Johnson I*, this court's predecessor recognized that in estimating residual values, prudent lessors will deliberately take a conservative view of residual value:

> [The taxpayer] knew the Price Waterhouse estimate of residual value was conservative, and properly so. "Consistently with its goals and responsibilities, financial accounting has as its foundation the principal of conservatism, with its corollary that 'possible errors in measurement [should] be in the direction of understatement rather than overstatement of net income and net assets.'" *Thor Power Tool*

> *Co. v. Commissioner*, 439 U.S. 522, 542, 99 S. Ct. 773, 786, 58 L.Ed.2d 785 (1979). Corbin and Kuchta from Price Waterhouse reflected this conservative analytical approach to the investment in their testimony.

*Johnson I*, 11 Cl. Ct. at 36.

At trial, Holzman explained why CED took the conservative approach of reporting zero residual value for 2034 to 2041:

> Q In your experience—in your experience, do investors book a zero residual in transactions?
>
> A Sometimes they do, yes.
>
> Q Does that mean that the investor does not expect to receive any residual?
>
> A No, it does not.
>
> Q Why is that?
>
> A Investors are conservative. Leverage lease investors are conservative with what they book in terms of residuals. Nobody wants to assume a certain level of residual only to find out later that it's not achievable because that would result in a book writedown. And investors aren't treated very well or the people that work at the investment units aren't treated well when they have book writedowns.
>
> So investors typically try to avoid book writedowns and, therefore, will book conservative or no residual in lease transactions, whether it be a leverage to lease like this or it be a simple lease of computer equipment.

(Tr. 1208)

DePlautt and Burke viewed the Cornerstone projections as setting forth a "base case" and understood that the actual cash flow could be higher. (Tr. 2124-26, 2144-47 (DePlautt); Tr. 559-60 (Burke)) The Leasing White Paper described the different scenarios at the end of the Sublease Basic Term on January 2, 2018, including CED's potential election of the Sublease Renewal Option (Ex. 397 at page

8121): Under the Sublease Renewal Option, the Sublease would end on June 15, 2034 (Ex. 1 at page 162), and CED "could either use the plant itself or lease the plant to third parties and in doing so obtain additional revenue." (Ex. 397 at page 8121) However, the "base case economics assume[d] no revenue for this [Shirt-Tail] period." (*Id.*)

Ellis confirmed that it is common practice in the leasing industry to take a conservative approach when reporting lease earnings for financial purposes, which thus necessitates a conservative approach to determining residual values. Ellis read into the record a passage from *Equipment Leasing*, which reflects this practice:

> Not surprisingly, the owner participants also want to be sure that they achieve the repayment of their investment and a reasonable yield on this investment. Unlike the lenders, the ultimate yield achieved by the equity investors is uncertain because of the unpredictability of the residual value. Nonetheless, all equity investors must "book" a certain yield for purposes of their GAAP accounting. This is often well below what they expect to earn because of the belief that it is easier to explain to your management an unexpected book profit than an unexpected book loss.

(Tr. 3167)

While it is impossible to predict residual values with absolutely certainty, it *is* possible to make "reasonable" estimates of future residual values, as required in the Leasing Guidelines. Rev. Proc. 75-21, §4(1)(c), 1975-1 C.B. at 715-16. The Deloitte Appraisal does in fact contain a detailed estimate of the positive after-tax and pretax cash flows CED might earn from 2034 to 2041.

This estimate is calculated in Exhibit XX of the Deloitte Appraisal, which shows estimated pretax cash flows from the RoCa3 Facility for the period from 2034

to 2041. (Ex. 46 at page 1749; *see* Facts Section VI.D.4.) The Deloitte Appraisal explains in detail how these amounts are calculated. (Ex. 46 at pages 1567-68, 1749; *see also id.* at 1564) Deloitte reviewed the RoCa3 Facility's operating income and expenses and applied an inflation factor to determine future income and expense. (Ex. 46 at page 1567) Deloitte also took into account special expenses such as maintenance and upgrade expenses. (*See id.* at page 1749 (operational costs and capital expenditures)) In addition, Deloitte took into account federal income taxes. (*Id.*)

The Deloitte Appraisal estimates that CED could expect pretax cash flows of $197,898,146.15[71] during the Shirt-Tail Period. (*See* Ex. 46 page 1749) This amount is, of course, only a reasonable estimate. While the operations of the RoCa3 Facility could produce additional profit for CED during the Shirt-Tail Period, these operations also present CED with a risk of loss. CED's operational risks include the price at which CED can sell its portion of the RoCa3 Facility's output of electricity, heat and carbon dioxide, as well as a host of costs associated with the operation of the facility, such as CED's obligation to pay for its portion of the RoCa3 Facility's fuel expense. (Tr. 2695-96 (Reed); Tr. 3157-58 (Ellis); Tr. 4804-05 (Ray))

Therefore, taking into account the positive pretax cash flow through the Sublease Basic and Renewal Terms (approximately $101 million), plus the expected

---

[71] This amount is the total of the lines entitled "cash flow" and "income taxes" on Exhibit 46 at page 1749. The amounts shown on page 1749 (totalling 822,109,004 NLG) reflect the entire cash flow from the RoCa3 Facility in Dutch Guilders. To reflect CED's portion of these amounts, they must be multiplied by CED's Undivided Interest percentage in the RoCa3 Facility (approximately 47.47%) and divided by the exchange rate (1.972). (Ex. 46 at page 1549)

profit during the Shirt-Tail Period (approximately $198 million), CED could expect a total pretax profit of approximately $299 million if it elects the Sublease Renewal Option.

c. **Retention Option**

If EZH does not exercise the Sublease Purchase Option and CED exercises the Retention Option, then CED's profit or loss will depend upon the operation of the RoCa3 Facility between 2018 and 2041. This scenario would present the possibility of the maximum profit for CED, but it also presents a significant risk of loss. (Tr. 2695-96 (Reed); *see also* Tr. 3156-59 (Ellis); 4804-05, 4809-10 (Ray); Tr. 5163-64 (LaRue))

CED did, however, expect to receive significant cash flow if it exercised the Retention Option. The Deloitte Appraisal estimated that CED could earn $729,018,996.19[72] in positive pretax cash flows from selling the output of the RoCa3 Facility during the Retention Option Period. (Ex. 46 at pages 1746-48) While the Retention Option is potentially CED's most profitable option, and therefore the option CED is most likely to select, as described in the Deloitte Appraisal (*See* Ex. 46 at page 1578), it is also the riskiest option. If CED selects the Retention Option, it will be exposed to the operational risks of the RoCa3 Facility for over 20 years, from January 2, 2018 to February 24, 2041. During this time, CED will be exposed to fluctuations in electricity prices, gas prices and all the other variables involved in

[72] See footnote 72 regarding the calculation of this amount. The estimated Retention Option pretax cash flows for the entire RoCa3 Facility, in Dutch guilders, are 3,028,492,649. (Ex. 46 at pages 1746-48)

the production of electricity. As Reed described, these fluctuations can lead to either large losses or large profits. (*See* Ex. 10076 (Reed Initial Report) at pages 20205-09, 20211-13; *see also* Tr. 2616-20; Argument Section at IV.D.1.)

If CED were to elect the Retention Option, it could lose most or all of its investment. Assume, for example, that shortly after CED elects the Retention Option, gas prices increase unexpectedly and, due to competitive pressures from electricity producers not utilizing gas, CED is unable to pass these price increases through to consumers. In this event, the RoCa3 Facility could operate at a loss for an extended period of time, and CED would fail to recoup its investment and suffer a loss.

In fact, Reed described how increased gas prices have in the past led to dramatic reductions in value of gas-fired facilities. (Tr. 2620-23; *see* Ex. 10076 (Reed Initial Report) at pages 20207-08, 20210-13; *see also* Tr. 4640 (Thomas) (agreeing that "there would be uncertainty about what the asset value would be in the future")) Defendant's leasing expert Ray agreed that CED would be exposed to gas price fluctuations as well as other operational risks. (Tr. 4804-05 (Ray)) Because of the presence of these risks, Ray recognized that CED would face "material risk" and "material opportunities" during the Retention Option Period. (Tr. 4832)

In summary, a reasonable estimate of CED's pretax cash profit, calculated as provided under Rev. Proc. 75-28, is as follows:

| | | |
|---|---|---|
| Sublease Purchase Option | - | $61 million |
| Renewal Option | - | $299 million |

Under the Retention Option CED could expect a positive pretax cash profit of $729 million from the RoCa3 Facility's operations over the Retention Option Period.

### 2. Part II: Cash Flow over Lease Term Without Any Residual

The total cash flow expected by CED over the Sublease Term, including the Sublease Renewal Term (but not including any cash from the residual value), is $101 million. This amount is shown at page 7257 of Exhibit 333 under the heading "Pre-Tax Cash Flow." Defendant's expert LaRue confirmed that CED would receive this amount. (Tr. 5155 (describing the net pretax cash flow CED would receive as indicated in Exhibit 20194 (LaRue Initial Report) at page 25153))

The cash flow CED expected satisfies the Leasing Guidelines requirements and is far greater than the taxpayer's expected cash flow in *Frank Lyon*, where the lessor did not expect any cash flow during the primary term of the lease. *Frank Lyon*, 435 U.S. at 566. CED's cash flow during the lease term also exceeds the amount present in many other cases where the rent was completely dedicated to debt service. *See, e.g.*, *Johnson I*, 11 Cl. Ct. at 32-33; *Coleman v. Comm'r*, 87 T.C. 178, 209 (1986); *Estate of Thomas*, 74 T.C. at 348. Even if the RoCa3 Transaction ends on January 2, 2018, CED will receive positive cash flow of $5 million in 2012. (Ex. 333, pages 7225, 7257) This positive income exceeds the amount in *Frank Lyon* and establishes that CED owns a present interest in the property.

## G. Uneven Rent Payments

The ABC Pricing software CED employed was programmed to ensure that the rental amounts owed by CED to EZH complied with the "90-110" safe harbor set

forth in Revenue Procedure 75-21, §5.01, 1975-1 C.B. at 716-17, and Proposed Treasury Regulation §1.467-3(c)(2)(i), 61 Fed. Reg. 27844-45. This calculation is shown on page 7174 of Exhibit 332. The total rent CED owed to EZH under the terms of the Lease is approximately $951,600,000. (*See* Stip. ¶116 (sum of CED's payments under the Lease)) This represents an average annual rent of $22,032,907.68; 110% of this amount is $24,236,198.45, and 90% of this amount is $19,829,616.92. (Ex. 332 at page 7174 (see columns 4 and 5, respectively)) For the 1997 tax year, CED claimed a pro rata share (16/360) of the annual rent calculated at the 110% level, or $1,077,164.38.

Similarly, the rental amounts EZH owed to CED under the terms of the Sublease Basic Term were calculated to comply with the safe harbor in Revenue Procedure 75-21, §5.01, 1975-1 C.B. at 716-17, and Proposed Treasury Regulation §1.467-3(c)(2)(i), 61 Fed. Reg. 27844-45. These calculations are shown at page 7219 of Exhibit 332. Similar calculations for the Sublease Renewal Term are shown at page 7220 of Exhibit 332.

**H. Limited Use Property**

Revenue Procedure 76-30, §1, 1976-2 C.B. at 647-48, confirmed that limited use property could not qualify for a private ruling under the Leasing Guidelines. CED's interest in the RoCa3 Facility is not limited use property because CED negotiated for all of the rights necessary to operate the RoCa3 Facility. *See* Rev. Rul. 82-61, 1982-1 C.B. at 15. Thus, CED could take its 47.47% share of the RoCa3 Facility's output (pursuant to the Facility Operating Agreement), or it could lease or

sell its interest to a third party. Revenue Ruling 82-61, specifies that a lessor of an undivided interest in a power facility must have access to the electrical grid and must have access to the fuel source needed to operate the power facility for its interest in the facility to not be considered limited use property. *Id.*, 1982-1 C.B. at 15. CED secured these rights, and also negotiated for many additional rights needed for commercial operation.

The Facility Support Agreement provides CED with access to the high-voltage grid, natural gas and other necessary equipment such as the Cooling Water Channel. (Tr. 1104 (Holzman)) Section 6 of the Facility Support Agreement provides CED with the contractual right to the "fuel . . . necessary to operate the Facility." (Ex. 13 at page 831) EZH agreed to procure gas at the best terms possible from Gasunie (the operator of the gas distribution network in The Netherlands) and pass these favorable prices on to CED. (*Id.*; Ex. 11 at pages 755-56 (requiring CED to pay EZH for Operating Input, *i.e.*, fuel)) Section 3 of the Facility Support Agreement ensures CED's access to the grid by providing CED use of the underground transmission cables. (Ex. 13 at page 829) CED has also been assured the use of systems connecting the RoCa3 Facility to the Network, which transports the heat and carbon dioxide produced by the RoCa3 Facility. (*Id.*) Section 3 also provides CED with other services such as access to inventory, accessories, planning services, parking facilities, storage facilities, heat, cooling, ventilation, lighting, electrical equipment, phone lines, water lines, sewer lines "and any other ancillary rights and additional equipment . . . necessary or useful in connection with operating,

maintaining, repairing, testing, renewing, or inspecting the Facility." (Ex. 13 at 829-30) In addition, under the Facility Support Agreement, EZH agreed to provide CED with access to the high voltage grid should there no longer be a Point of Interconnection to the grid at the RoCa3 Facility. (Ex. 13 at page 832)

The Common Facilities Use Agreement provides CED and EZH, and any other Facility User, access to areas necessary to operate the Facility, such as the office building containing the control room and necessary parking spaces. (Ex. 1 at page 122; Ex. 12 at 805; Tr. 1103-04 (Holzman)) This agreement was necessary because the site contains additional units besides the RoCa3 Facility, and thus both EZH and CED, as well as any other Facility User, must be able to use the Common Facilities. (*See* Tr. 1103-04 (Holzman)) Finally, the Access Agreement granted easements to CED to the extent necessary for CED to operate the RoCa3 Facility. (Ex. 14 at page 844; Tr. 1104 (Holzman))

As a result of these agreements, EZH confirmed that CED had obtained all the property rights necessary for the use, operation and possession of the RoCa3 Facility, the procurement of fuel, and transmission to the grid. (Stip. ¶107(ii)) Securing all the rights necessary to operate the RoCa3 Facility was, from CED's point of view, a critical part of the negotiations. (*See*, *e.g.*, Tr. 1115, 1120-21 (Holzman)) CED went to great lengths to ensure it had obtained the necessary rights. Holzman described the site visit as "incredibly important" because it was necessary to ensure that CED obtained all of the rights necessary to operate the RoCa3 Facility. (Tr. 1084, 1093-94) CED retained a Dutch lawyer, Femke Bierman,

to review CED's property interests in the RoCa3 Facility, including the interconnection to the grid and the access to the Cooling Water Channel. (Tr. 1082, 1089-90 (Holzman)) As a result of her review of the RoCa3 Facility during the site visit, numerous revisions to the RoCa3 Transaction documents were negotiated between CED and EZH to secure CED's property interests. (Tr. 1089-90, 1123-26 (Holzman))

CED's efforts to secure the property rights necessary to operate the RoCa3 Facility went far beyond the rights described in Revenue Ruling 82-61, which were limited to access to fuel and access to the grid. 1982-1 C.B. at 15. Thus, in accordance with Revenue Ruling 82-61, CED has secured an interest in the RoCa3 Facility that can be leased to a lessee other than EZH.

## I. CED Complied with Other Tax Law Standards Governing Lease Transactions

### 1. CED Complied with the §467 Rules

Defendant has not disputed that the RoCa3 Transaction complies with the rules of §467, and in fact has not identified §467 as an issue of law present in this case. As described above in Argument Section III.G., the rental amounts at issue complied with the "90-110" test set forth in Revenue Ruling 75-21. By complying with the "90-110" test, CED also complied with the §467 safe harbor rules. (*See* Argument Section I.C.2.)

At various points during trial, Defendant alluded to CED's desire to close the RoCa3 Transaction before new regulations under §467 were issued. (Tr. 2034-35 (Muoio); Tr. 4737-39 (Ray)) Actually, the new regulations were not issued until

May 18, 1999, and thus the RoCa3 Transaction closed 1 1/2 years before the new regulations. T.D. 8820, 1999-1 C.B. 1209. Defendant's leasing expert Ray testified that the "rumors existed that [the regulations] were about to come out for that entire 14-year period" (Tr. 4799), from 1984—when §467 was enacted—until 1999, when the final regulations were issued.

The legal significance of Defendant's point regarding the §467 regulations is not clear. Defendant does not deny that CED has fully complied with the §467 regulations as in effect on December 15, 1997, and its expert witnesses agreed CED complied with the "90-110" rules. (Ex. 20197 (Thomas Initial Report) at page 25279) Treasury's 14-year delay in issuing the final regulations speaks for itself; CED complied with the letter of the law.

Exhibit 550 states that EZH was interested in accelerating the closing of the RoCa3 Transaction because it was concerned interest rates would continue to decline and there was a rumor that new regulations would be issued in the not-too-distant future. (Ex. 550 at page 9950) It is hardly surprising that CED and EZH may have accelerated the closing of the transaction to comply with the existing regulations. CED and EZH had spent several months negotiating a transaction in which, as set forth above, the negotiated payments had been carefully calculated to comply with §467. (*See* Argument Section III.G.) They had invested a great deal of time and money to ensure their transaction complied with §467 and other provisions of leasing law. As Muoio testified, CED would not have closed the transaction "if it was not in compliance with the Code." (Tr. 2036) If the regulations

had been changed, the parties might have had to start from scratch in negotiating a transaction to comply with the new regulations. This could have resulted in substantial expense and delay. Given these circumstances, accelerating the closing of the transaction to ensure compliance with existing law was not only permissible, but was exactly what any prudent taxpayer would be expected to do.

#### 2. CED's Loan from HBU Should Be Respected as a *Bona Fide* Debt

The final legal issue Defendant raised is its claim that CED's nonrecourse loan from HBU should not be respected. Given the undisputed fact that the RoCa3 Transaction is expected to produce a pretax profit (*see* Argument Section III.F.), this issue can be disposed of quickly.

When a lessor acquires property with nonrecourse debt, the lessor will continue to make payments on the debt and otherwise act as the owner of the property so long as it has an equity interest in the property. *See, e.g., Crane*, 331 U.S. at 14; *Lebowitz v. Comm'r*, 917 F.2d 1314, 1318 (2d Cir. 1990); *Estate of Franklin v. Comm'r*, 544 F.2d 1045, 1048 (9th Cir. 1976); *Gefen*, 87 T.C. at 1493-94. In other words, a lessor will have a financial incentive to pay off the nonrecourse debt so long as the value of the lessor's property exceeds the amount of the nonrecourse debt. *Levy*, 91 T.C. at 861-62; *Gefen*, 87 T.C. at 1493-94.

As demonstrated above, CED has a significant equity interest in the RoCa3 Facility, having made more than a $39 million investment. (Stip. ¶117) To protect its equity investment, CED must continue to honor the terms of the nonrecourse loan. (*See* Ex. 7 at page 613-14 (granting HBU a mortgage right in, in among other

things, the Undivided Interest)) This fact, by itself, indicates that the nonrecourse loan from HBU to CED should be respected. If CED were to default on the nonrecourse loan from HBU, it would lose its equity investment of over $39 million; thus CED is compelled to continue making payments on the loan.

Furthermore, CED can also expect to earn at least a $61 million pretax profit on that investment. (*See* Argument Section III.F.) Hence, to protect its expected profit, CED must continue to honor the terms of the HBU loan. If it does not and defaults on the HBU loan, it will lose both its equity and its expected profit. Thus, CED is economically compelled to honor the HBU loan. The Court of Claims recognized this principle in *Rothschild*, which described cases upholding debt where there was a "possibility or opportunity to make a profit." 407 F.2d at 412.

Revenue Ruling 2002-69 relied on *Bridges v. Commissioner*, 325 F.2d 180 (4th Cir. 1963), as authority for disregarding the nonrecourse debt in LILO transactions. 2002-2 C.B. at 763. But *Bridges* described a transaction involving "no prospect whatever of any financial profit." *Id.* at 185. In fact, in deciding *Bridges*, the Fourth Circuit distinguished the Tax Court's earlier decision in *Stanton v. Commissioner*, 34 T.C. 1 (1960), where the transaction "actually resulted in a profit." *Bridges*, 325 F.2d at 185. Since, as demonstrated above, the RoCa3 Transaction is expected to produce at least $61 million in profit, *Stanton*, and not *Bridges*, would apply to the RoCa3 Transaction. The Court of Claims has also recognized this critical distinction between *Bridges* and *Stanton*. *See Rothschild*, 407 F.2d at 412-13.

## IV. Defendant's Criticisms of the Transaction Are Without Foundation in Leasing Law or the Record

As Con Edison has established, the RoCa3 Transaction possesses economic substance (*see* Argument Section II.) and satisfies all of the requirements set out in the authorities to be respected as a true lease transaction for tax purposes. (*See* Argument Section III.) In this section, Con Edison addresses in detail several of Defendant's arguments. Section IV.A. addresses Defendant's arguments that the transaction did not change the parties' substantive rights and obligations. Section IV.B. addresses Defendant's arguments concerning the use of the economic defeasance accounts. Section IV.C. addresses Defendant's arguments regarding the Sublease Purchase Option. Section IV.D. addresses Defendant's arguments that CED would never face any risks from operation of the RoCa3 Facility and that the payments in the transaction were "circular." Finally, Section IV.E. addresses Defendant's argument that, while the transaction was profitable, it purportedly did not produce an "economic" profit.

### A. The RoCa3 Transaction Created Real Rights and Imposed Real Obligations on Unrelated Parties

In its Trial Brief, Defendant argued that no "real world substantive rights and duties of the participants . . . actually changed as a consequence of the Transaction." (Def.Tr.Br. at 2) This argument is contradicted by two fundamental points. First, the key features of the RoCa3 Transaction that Defendant cites to show that "nothing purportedly changed" are common in leveraged leasing and sale-leaseback transactions. Second, as Defendant's leasing experts testified, there is no

question that the RoCa3 Transaction created binding rights and obligations running between CED and EZH, as well as binding rights and obligations running between CED and HBU.

### 1. Defendant's Arguments that EZH Never Transferred a Leasehold Interest to CED Would Bar Typical Features of Sale-Leasebacks and Leveraged Leases

Defendant claims that "the [t]ransaction did not result in a transfer of a current property interest from EZH to Con Ed." (Def.Tr.Br. at 2, 6) Defendant cites several features of the transaction in support of these claims. First, Defendant asserts that EZH retained the "continued and unabated use of its Facility at no cost to itself." (*Id.* at 3) Second, Defendant contends that CED "acquired no right to profit and had no exposure to loss from the operation of the Facility" because EZH "retain[s] all profits from operation." (*Id.* at 3, 6) Third, Defendant cites the fact that EZH "remain[s] responsible for all costs and capital improvements associated with the Facility's use and maintenance" throughout the Sublease Term. (*Id.* at 6) Finally, Defendant argues that "[t]he circular financing arrangement, in which Con Ed's 'debt' is paid by EZH's 'rent' and money never leaves the control of the lender's affiliates, is transparent and must [be] disregarded." (*Id.* at 7) However, all of these features are typical of sale-leasebacks and leveraged leases, and Defendant's assertions are inconsistent with the authorities and the record.

Regarding EZH's "continued and unabated use of its Facility" after the transaction's closing date (Def.Tr.Br. at 3; *see also id.* at 6), there is no question that this fact pattern is present in all sale-leasebacks, which courts repeatedly have

found acceptable for tax purposes. For example, in *Frank Lyon*, Worthen (the seller and lessee), not Frank Lyon, had the "continued and unabated use" of the bank building. *See Frank Lyon*, 435 U.S. at 566 (noting that only "[d]uring the period between the expiration of the building lease . . . and the end of the ground lease" did the lessor have "full ownership, use, and control of the building"); *see also Torres*, 88 T.C. at 702, 712, 721 (upholding a sale-leaseback transaction in which the seller-lessee retained the right to move or dispose of the subject property and noting that "a lessor is normally not vested with the right of possession during the term of the lease"); *Alstores Realty Corp. v. Comm'r*, 46 T.C. 363, 368 (1966) (noting that seller-lessee "Steinway & Sons continued in possession of certain areas specified in the 1956 space-occupancy [lease] agreement"). Furthermore, Ellis confirmed that the lessee's use of the asset is one of the basic characteristics of a big-ticket leveraged lease. (Tr. 3151-52, 3169-70)

Defendant's argument that "Con Ed acquired no right to profit and had no exposure to loss from the operation of the Facility" because EZH "retain[s] all profits from operation" (Def.Tr.Br. at 3, 6) is without merit. The lessor in *Frank Lyon*, for example, received fixed rent payments that did not reflect the profits from Worthen's operation of the building. 435 U.S. at 565. The Tax Court also upheld the sale-leaseback transaction in *Torres* even though the lessor was guaranteed a certain minimum rent, noting that "in a leaseback transaction it is normal for the lessee to receive profits from the operation of the property while the lessor's receipt of payments is less dependent upon the operation of the property." *Torres*, 88 T.C. at

721. At trial, Ellis testified that rental payments are typically fixed in big-ticket leveraged leases (Tr. 3151, 3171), and Bent confirmed that it was "quite common" for rental payments to be on a fixed schedule. (Tr. 3870-71)

Similarly irrelevant is Defendant's contention that EZH "remain[s] responsible for all costs and capital improvements associated with the Facility's use and maintenance." (*See* Def.Tr.Br. at 6) Such provisions are the defining characteristic of a net lease, which is commonly used in sale-leasebacks and leveraged leases in general, as recognized in the Leasing Guidelines. Rev. Proc. 75-21, 1975-1 C.B. at 715 ("In general, [leveraged] leases are net leases."); *see also Frank Lyon*, 435 U.S. at 567 ("The building lease was a 'net lease,' under which [the lessee] was responsible for all expenses usually associated with the maintenance of an office building. . . ."); (Facts Section X.B.1.k.) At trial, Ellis testified that use of a net lease was one of the basic features of big-ticket leveraged leasing. (Tr. 3151, 3171) In fact, Ray indicated that he had never heard of a leveraged lease that did not involve a net lease, *i.e.*, a lease where the lessee retained the obligation for maintenance and other expenses related to the leased asset, and confirmed that it would have been unusual by leveraged leasing industry standards if the RoCa3 Transaction did not involve a net lease. (Tr. 4880) Bent agreed that net leases are "pretty much universal" in leveraged leasing (Tr. 3850) and noted that the Sublease provision that requires EZH to maintain the RoCa3 Facility throughout the Sublease contains no "atypical" terms. (Tr. 3848-49)

Also contrary to the authorities and the record is Defendant's contention that the RoCa3 Transaction involves an impermissible "circular financing arrangement, in which CED's 'debt' is paid by EZH's 'rent' and money never leaves the control of the lender's affiliates." (Def.Tr.Br. at 7) As the Tax Court observed in *Estate of Thomas*, the fact that "[r]ent during an initial lease term [is] geared to the cost of interest and mortgage amortization is not, in and of itself, much more than a neutral commercial reality." 84 T.C. at 436; *see also Frank Lyon*, 435 U.S. at 576-77 (Worthen's rent equaled debt service payments Frank Lyon owed to lender); *Torres*, 88 T.C. at 725 ("The fact that the [guaranteed amount of rent] equaled the payments required on the [equity investor's note] does not suggest that [the equity investor] lacked the benefits and burdens of ownership.").[73]

Defendant's leasing expert Bent agreed that it is "typical" in leveraged leases that (1) rent is due from the lessee on the dates the leveraged debt payments are due (Tr. 3800-01); (2) rental payments are "designed to be the same as the debt service payments" (Tr. 3801); and (3) debt payments are made directly by the lessee to the lender until the debt is paid off. (Tr. 3871-72). Ray supported this point and testified that "in most cases," the sublease rentals in a leveraged lease "all go[] to[ward] debt service" so that the equity investor "doesn't get any cash rents" until the debt is retired. (Tr. 4719-20)

Furthermore, Defendant's contention that this debt payment arrangement was somehow invalid because HBU (the lender) and ABN AMRO (the debt

---

[73] *See also Dunlap*, 74 T.C. at 1436; *Hilton*, 74 T.C. at 348; *Warren v. Comm'r*, T.C. Memo 1989-34, 56 T.C.M. (CCH) 1125, 1131 (1989).

defeasance holder) were affiliates is erroneous. Several cases have involved debt financed by the lessee or an affiliate in its role as lender. *See Johnson I*, 11 Cl. Ct. at 23; *Mukerji*, 87 T.C. at 962. Defendant introduced absolutely no evidence that so much as implies that HBU and ABN AMRO failed to respect their status as legally separate entities and that the two accounts were not kept separately. The Operative Documents confirm that HBU and ABN AMRO are operated separately and maintain separate business operations. (Stip. ¶¶131, 132; Ex. 1 at page 42) Bent testified that he has "no doubt that" the loan account at HBU and the defeasance account at ABN AMRO "are independent accounts" held at "independent banking institutions" (Tr. 3803-04), and he agreed that there were "transfers of wealth" on behalf of EZH when cash was paid out of the Sublease Deposit to HBU for EZH's sublease rent obligations in satisfaction of CED's debt obligations. (Tr. 3803-06) (*See* Argument Section IV.B.)

Defendant's argument simply lacks the perspective imposed by tax law. While CED's residual interest may be "far off in the future" (Tr. 72 (Defendant's Opening Statement)), this was true as well in *Frank Lyon*. *See* 435 U.S. at 565-67. During the 65-year lease term, Frank Lyon had no ability to profit from the operations of the Worthen Bank building, and the benefits and burdens of the daily operations of the building remained with Worthen Bank alone. However, despite these facts and that Frank Lyon's residual value was far off in the future, the Supreme Court upheld Frank Lyon's status as the owner. Furthermore, by definition, a lessor does not have physical possession of the property during a lease

term. A lessor's claim to ownership rests not on physical occupancy, but instead on its equity investment and residual interest. *See Torres*, 88 T.C. at 721-22 (indicating that exposure to residual value determines whether the lessor has an equity interest in the leased property). As discussed in detail at Argument Sections III.A. and IV.D., CED has made an equity investment in the RoCa3 Facility and has thereby exposed itself to the RoCa3 Facility's residual value. This exposure to residual value is "the most significant benefit and burden" of ownership. *Gefen*, 87 T.C. at 1492. As Ellis pointed out, this exposure to residual value is typical in leveraged leasing. (Tr. 3153, 3156)

### 2. Lease-Leasebacks Are Commercially Common Variations of Sale-Leasebacks

The above analysis of sale-leasebacks applies equally to lease-leasebacks. As the record shows, lease-leasebacks are "variations" on sale-leasebacks, created to "accommodate increasingly complex accounting and tax laws and regulations." (Ex. 397 at page 8120) Although a lease-leaseback is "slightly different in structure" from the common sale-leaseback, it "follows the fundamental framework" of the sale-leaseback. (Tr. 2121-23 (DePlautt); *see* Tr. 1020-21 (Holzman))

Defendant's leasing experts confirmed that there is no inherent problem in the lease-leaseback structure. Ray agreed that a lease-leaseback "would be a perfectly fine transaction" (Tr. 4807) and testified that he was "sure" he had done lease-leaseback transactions in his leasing career. (Tr. 4807-08) Bent likewise agreed that there is nothing "atypical" about a lease-leaseback structure in itself (Tr. 3800) and testified that he had structured transactions involving property that

was leased and then leased back to the owner. (Tr. 3799-3800) In fact, *Frank Lyon* itself involved a lease-leaseback of the underlying land, and Frank Lyon would lose its interest in the building when the ground lease expired. 435 U.S. at 465-66. (*See* Argument Section I.D.1.) The IRS itself approved of a lease-leaseback in Revenue Ruling 82-61, 1982-2 C.B. 849. (*See* Argument Section I.B.3.h.(ii).)

Outside the tax context, numerous courts have recognized the commercial viability of lease-leaseback arrangements and respected the form of such transactions against legal challenges. For example, *City of Desert Hot Springs v. County of Riverside*, 91 Cal. App. 3d 441 (Cal. Dist. Ct. App. 1979), dealt with a transaction in which the tax-exempt city—in order to avoid constitutional debt limitations—leased property to a private party for 50 years, while simultaneously subleasing the property back for 15 years. *See id.* at 444-45. The county later assessed taxes against the leasehold interest of the private party, which the city paid under protest in fulfillment of its obligations under the sublease to pay all taxes due. *Id.* at 445. In suing for a tax refund, the city claimed that because it had continued possession of the property and a sublease purchase option that it expected to exercise, the private party had no taxable possessory interest. *See id.* at 449, 452-53.

In rejecting the city's argument, the court reasoned that "[t]he extrinsic evidence that the city entered into the 'lease-leaseback' arrangement 'as a method of financing construction' is not inconsistent with the existence of a lease." *Id.* at 449. Instead, the lease-leaseback arrangement "created two leaseholds." *Id.* The head

lease created a "right of possession" in the private party, and "[t]he possession by the city under the sublease is . . . pursuant to and subordinate to" the private party's leasehold interest and right of possession thereunder. *Id.* at 452-53. As such, "[t]he possession by the city under the sublease is not in opposition to [the private party's] right under the 50-year lease." *Id.* at 453.

Courts in Florida, Maryland and South Carolina reached similar conclusions about the legal effect of lease-leasebacks used to avoid debt limitations on local governments. *See State v. Sch. Bd. of Sarasota County*, 561 So. 2d 549 (Fla. 1990); *Caddell v. Lexington County Sch. Dist. No. 1*, 373 S.E.2d 598 (S.C. 1988); *Hall v. City of Balt.*, 250 A.2d 233 (Md. Ct. App. 1969). In each of these cases, a local entity leased property to a separate entity for the finance and construction of needed facilities and then subleased the property back. *See Sarasota County*, 561 So. 2d at 550-51; *Caddell*, 373 S.E.2d at 598-99; *Hall*, 250 A.2d at 234-35. Although the applicable law was different in each state and the reasoning therefore slightly different in each opinion, all three courts respected the form of the transaction and found the lease agreements to be valid and distinct from the prohibited debt obligations. *See Sarasota County*, 561 So. 2d at 552; *Caddell*, 373 S.E.2d at 599-600; *Hall*, 250 A.2d at 240-41.

### 3. The RoCa3 Transaction Created Binding Rights and Obligations

As the record further establishes, the RoCa3 Transaction has resulted in significant changes in the economic and contractual relations between EZH and CED and in each company's legal and risk relationship to the RoCa3 Facility. (*See*

Facts Section VIII.) These changes are additional proof of the economic substance of the transaction, as well as its status as a lease both in substance and in form. *See Coltec,* 454 F.3d at 1355 (transactions that "vary control or change the flow of economic benefits" have economic substance (quoting *Higgins v. Smith*, 308 U.S. 473, 476 (1940))); *United Parcel Serv.*, 254 F.3d at 1018-19.

The RoCa3 Transaction required CED and EZH to enter into a carefully negotiated network of agreements (the Operative Documents) that imposed real legal rights and obligations on both CED and EZH that did not exist prior to entering into the RoCa3 Transaction. As discussed at Facts Section X.B.1., Bent and Ray testified that the types of contractual features and provisions associated with the RoCa3 Transaction are typical of leveraged lease transactions.

For instance, in entering into the Participation Agreement, EZH made various Representations and Warranties to CED. These Representations and Warranties ensured that (1) CED would possess the necessary rights to permit economic operation of the RoCa3 Facility; (2) the Control Documents provided CED with access to and use of the RoCa3 Facility; and (3) CED would have the legal right to transmit and sell its share of the power from the RoCa3 Facility. (*See* Facts Section VIII.A.2.) If any Representation and Warranty were untrue in any material way, such a misrepresentation would result in EZH's being in default under the Sublease (Ex. 4 at pages 422-23), entitling CED to collect damages or undertake any other remedies available under the Sublease or the law. (Ex. 4 at pages 426-31; Tr. 1118-19 (Holzman); Tr. 2919 (Mintun))

In entering into the Lease, CED obtained the legal right to possession of the Undivided Interest in the RoCa3 Facility for 43.2 years. (*See generally* Facts Section VIII.B.) In return for this right, CED was obligated to make an initial rental payment of $120.1 million at the inception of the Lease and a payment of $831.5 million upon its termination. (*See* Facts Section VIII.B.1.) Further, the Lease prohibited EZH from interfering with CED's right to possession, use and quiet enjoyment of the Undivided Interest and permitted CED to sublease or sell its Undivided Interest in the RoCa3 Facility without EZH's consent. (*See* Facts Section VIII.B.2.) The Lease also provided that CED would be obligated to maintain and repair the RoCa3 Facility unless the Sublease or the Facility Operating Agreement was in effect. (*See id.*)

In entering into the Sublease, EZH obtained the legal right to possession of CED's Undivided Interest in the RoCa3 Facility for 20.1 years, with an option to purchase CED's Lease Interest at a price projected to be above-fair market value upon expiration of the Sublease Basic Term. (*See generally* Facts Sections VIII.D. and VIII.E.1.) In return, EZH was obligated to pay cumulative annual rentals of $164 million through the end of the Sublease Basic Term. (*See* Facts Section VIII.D.2.) If CED exercised the Sublease Renewal Option to renew the Sublease for an additional 16.5 years, EZH would be obligated to pay cumulative annual rentals of $300 million. (*See* Facts Section VIII.E.2.) Further, in return for CED's agreement to allow EZH to defer making the first seven annual rental payments,

EZH would be obligated to repay the principal amount of the Sublessee Loan ($46 million) plus interest at 7.43%. (*See* Facts Section VIII.D.2.b.)

Prior to the RoCa3 Transaction, EZH had control over the RoCa3 Facility and had no obligations to any third parties regarding the maintenance, insurance carried or the use and possession of the RoCa3 Facility. However, after entering into the Sublease, EZH was obligated to maintain the RoCa3 Facility at a level of Prudent Industry Practice (*see* Facts Section VIII.D.4.a.) and to obtain certain types and levels of insurance for the RoCa3 Facility. (*See* Facts Section VIII.D.4.c.) Further, entering into the Participation Agreement, Sublease and Facility Operating Agreement placed a number of limitations on EZH's use and possession of the RoCa3 Facility. The Participation Agreement limited EZH's ability to sell the RoCa3 Facility (Ex. 1 at page 52),[74] the Sublease limited EZH's right to sub-sublease the RoCa3 Facility (*see* Facts Section VIII.D.4.b.),[75] and the Facility Operating Agreement limited EZH's ability to remove the RoCa3 Facility from operation and commercial service. (*See* Facts Section VIII.F.1.a.(i).) These requirements and restrictions protect CED's interest in the RoCa3 Facility. They are all changes to the parties' obligations and rights that are standard in leasing transactions. (*See, e.g.*, Tr. 3138 (Ellis) (explaining that EZH was previously not under the maintenance requirements imposed by the Sublease); Tr. 2852-53 (Bent)

---

[74] The Participation Agreement also provides that even if EZH were to sell the RoCa3 Facility, EZH would remain "fully and primarily liable" for its obligations incurred under the Operative Documents. (Ex. 1 at page 52)
[75] Defendant's leasing expert Bent described the sub-sublease restriction as "a material restriction." (Tr. 3852)

(explaining that EZH had no restrictions on its ability to sublease the RoCa3 Facility prior to entering into the RoCa3 Transaction); Tr. 3063 (Mintun) (testifying that prior to the RoCa3 Transaction, EZH was free to decide any insurance terms))

Assume, for example, that EZH were to decide that the RoCa3 Facility had become surplus to its needs. The ongoing deregulation movement in Europe created an uncertain picture of future plant usage, to say the least. (Tr. 2448-51 (Goulding)) In 1999, two years after entering into the RoCa3 Transaction, EZH was sold to the predecessor of E.ON, a large German company that had operations throughout Europe. (*See* Facts Section IX.D.) E.ON may place less importance on the RoCa3 Facility than the prior municipal owners of EZH did. Further, deregulation may play an important role in E.ON's plans for the RoCa3 Facility. Reed explained how the forces of deregulation have created an active market for the buying and selling of power plants on a world-wide basis. (Tr. 2578-79) If, in the coming years, E.ON decides it no longer needs the RoCa3 Facility, E.ON might decide to sub-sublease the RoCa3 Facility, sell it or remove it from operation. However, due to the RoCa3 Transaction, E.ON's ability to take any of these steps is subject to substantial restrictions. In short, if E.ON were to decide that it no longer needed the RoCa3 Facility, its ability to divest itself of the plant would be seriously limited by the terms of the RoCa3 Transaction. The RoCa3 Transaction fundamentally altered EZH's relationship to the RoCa3 Facility.

Also, EZH's Sublease could be terminated by the occurrence of certain Premature Termination Events. (*See* Facts Section VIII.D.5.) In the case of a

Premature Termination Event, EZH would be obligated to make a payment to CED or, in some cases, to return the Undivided Interest to CED for the remaining Lease Term. (*See generally* Facts Section VIII.D.5.-7.) The amount that EZH would be obligated to pay CED, such as the Sublease Termination Value or Fair Market Sales Value, would depend on the event causing the premature termination. (*See* Facts Section VIII.D.5.) Premature Termination Events include among others a Voluntary Termination for Economic Obsolescence, an Early Purchase Option and an event of default (*see id.*); many of these Premature Termination Events are beyond EZH's control.

LaRue questioned the significance of these possible events and intimated that, because of the "magnitude" of the possible loss, EZH would "make sure that it didn't terminate the contract." (Tr. 5133) Later, however, LaRue agreed that the events leading to a termination of the contract "may or may not have been beyond EZH's control." (Tr. 5141, 5188) Indeed, many of the events which might lead to a premature termination or default *are* entirely beyond EZH's control, such as: inability of EZH to obtain a letter of credit; bankruptcy; inability to obtain insurance (Tr. 2933-35 (Mintun)); a Sublease Facility Event of Loss, such as a fire or other similar destructive event; certain changes in Netherlands law; and foreclosures on liens on the RoCa3 Facility.

Defeasance does not protect EZH or CED in the case of a Premature Termination Event, and EZH could be required to pay an amount exceeding these defeasance deposits by tens of millions of dollars. (*See* Facts Section VIII.D.6.) For

example, if Con Edison had acquired a competitor of EZH in 2003, EZH would have been able to purchase CED's Lease Interest by exercising the Early Purchase Option and paying the higher of the Sublease Termination Value or the Fair Market Sales Value to CED. (*See* Facts Section VIII.D.5.) In 2003, the Sublease Termination Value owed to CED was $197,249,997, but the Sublease Deposit and IJssel Deposit were expected to be only $114,227,540 and $41,049,673 respectively. (*See* Facts Section VIII.D.6.) This would result in EZH's being obligated to pay an additional $41,972,784 to CED from sources outside these deposits, and the amount could be even greater depending on the prevailing interest rate or if EZH is required to pay the Fair Market Sales Value of the RoCa3 Facility. (*See id.*)

Defendant's expert Bent had no hesitation at all that the RoCa3 Transaction resulted in legally enforceable obligations:

> Q Well, EZH owed sublease rents in this transaction; is that correct, under the sublease?
>
> A Under the documents, yes.
>
> Q Do you have any reason to believe the documents don't create enforceable obligations?
>
> A *I have no doubt that they create enforceable obligations*. I have some question as I raised in my report, and again on Friday, that those obligations are paid in cash.
>
> Q Well, okay. But EZH does have obligations to pay sublease rent and those obligations are satisfied by payments that come out of various defeasance deposits under certain circumstances; is that right?
>
> A That is right, yes.

Q *And so EZH's obligations are being paid by these amounts, I would take that to mean that there has been a transfer of wealth on behalf of EZH in that regard?*

A *I think generally that's true.* There are some exceptions in this transaction, I believe, *but if your question is when EZH owes sublease rent under the sublease to the sublessor, ConEd, and that rent is paid in cash from the debt defeasance account, and is credited as a payment of sublease rent, which is, in fact, paid to HBU to pay down the leveraged loan, my answer to your question would be, yes, that is correct.*

(Tr. 3804-06 (emphasis added))

### B. Defeasance Is a Commercially Common Technique for Mitigating Credit Risk and Does Not Deprive the RoCa3 Transaction of True Lease Status

In its Trial Brief, Defendant focused on the defeasance features of the RoCa3 Transaction to argue that the transaction should not be respected as a true lease for tax purposes. The exact nature of Defendant's arguments is unclear. Defendant at times claims that the use of defeasance accounts creates an "accounting circle" or "circular flow of funds" in which money "never truly changed hands." (Def.Tr.Br. at 3, 7; *see also id.* at 6 (claiming that "EZH will possess the Facility 'rent-free'")) At other times, Defendant contends that the defeasance accounts provided "a ready source of funds to repay the loan" and "mitigated all risk in the Transaction." (*Id.* at 5)

As an initial matter, Defendant's defeasance arguments ignore the potential operating risks to CED if EZH does not exercise the Sublease Purchase Option. (*See* Argument Section IV.D.) But even as to the pre-2018 period, Defendant's arguments concerning the defeasance accounts are untenable. Although the

accounts economically defeased EZH's payment obligations, EZH remained fully liable to pay the rent under the Sublease Agreement, and the defeasance accounts remain its property. The use of defeasance accounts to reduce credit risk does not defeat true lease status. Further, while the defeasance accounts did reduce credit risk in the transaction, both CED and EZH continue to face significant risks, particularly in the case of Premature Termination Events or in cases where the RoCa3 Facility is returned to CED under the Sublease.

### 1. Tax Law Principles Do Not Treat Economic Defeasance as Extinguishing Liability or Defeating True Lease Status

Under tax law principles, neither economic defeasance specifically nor credit risk reduction generally is inconsistent with true lease status.

#### a. Tax Law Principles Distinguish Between Economic and Legal Defeasance

Tax authorities distinguish between two types of defeasance arrangements. In a legal defeasance, the obligor places collateral in a trust or similar arrangement and is fully released from its payments obligations, even if the original collateral eventually proves insufficient. For tax purposes, any property, such as a deposit or securities, held pursuant to a legal defeasance arrangement becomes the obligee's property, because the property has been transferred to the obligee in full satisfaction of the obligor's obligations.

In an economic defeasance, on the other hand, the obligor continues to be primarily liable for payment of the underlying obligation, even if the parties expect that actual payment will be made out of the funds put up as collateral. For tax

purposes, the collateral remains the obligor's property, since the obligor uses it to satisfy its continuing obligation, but remains fully liable for payment if the collateral proves insufficient.

The tax law distinction between legal and economic defeasances derives from Supreme Court authority and was first established in a series of cases involving trusts established in connection with divorce proceedings. The first case, *Douglas v. Willcuts*, 296 U.S. 1 (1935), involved an economic defeasance. The taxpayer, pursuant to a divorce decree, established a trust in lieu of alimony due to his former wife. *Id.* at 3. The taxpayer contended that the trust income should be taxed to his former wife, not to him. In rejecting this argument, the Court reasoned that, under the divorce decree, the taxpayer had a continuing legal obligation to support his wife and the trust was only one means of satisfying this continuing obligation. The Court held that the taxpayer should be treated as though he had received the trust's income directly and then used it to pay the amounts he owed to his former wife. *Id.* at 9-10.

*Douglas* was subsequently distinguished in another Supreme Court case, this time involving a legal defeasance. In *Helvering v. Fuller*, 310 U.S. 69 (1940), the taxpayer's creation of the trust fully discharged his legal obligations to support his former wife. The Court reasoned that the case was similar to the transfer of property to satisfy a debt. *Id.* at 74-76; *see also Ingraham v. Comm'r*, 119 F.2d 223, 227-228 (9th Cir. 1941) (income from trust was not taxable to taxpayer to the extent trust income was used to support former wife, because taxpayer had no duty to pay

alimony, but was taxable to the extent used to support taxpayer's children, since taxpayer had ongoing obligation to them).

The principles distinguishing between legal and economic defeasance have been incorporated in Treasury Regulations and IRS rulings. For example, Treasury Regulation §1.61-13(b) discusses economic defeasance:

> If a corporation, for the sole purpose of securing the payment of its bonds or other indebtedness, places property in trust or sets aside certain amounts in a sinking fund . . . , the property or fund thus set aside by the corporation and held by the trustee is an asset of the corporation, and any gain arising therefrom is income of the corporation and shall be included in its gross income.

Treas. Reg. §1.61-13(b) (1957).

The IRS applied this Regulation in Revenue Ruling 85-42, 1985-1 C.B. 36, to treat a corporation as the owner of assets transferred to an irrevocable trust, even though under the then-applicable financial accounting standard, FAS 76, the corporation was considered to have extinguished the debt by virtue of creating the trust. The IRS determined that this financial accounting principle did not control for tax purposes because the taxpayer "is not legally released from being the primary obligor on the bonds" and "[c]onsequently . . . cannot be considered to have discharged the debt owed to its bondholders." *Id.* at 37.

The accounting rule in FAS 76 was later revoked and replaced with a rule similar to the tax law standard. The accounting standards for defeasance accounts in effect in 1997 and still in effect today (Tr. 3198-99 (Ellis)) reflect the principle, now consistent with the tax law, that an obligor has not discharged its debt by establishing an economic defeasance account. As Ellis testified, FAS 125 provides

that a debt cannot be removed from a party's financial statements under an economic defeasance arrangement because (1) the obligor remains responsible for any payment resulting from a shortfall in the defeasance account (Tr. 3189-92 (Ellis)); (2) the obligee does not have access to the account, which remains the property of the obligor (Tr. 3194-96 (Ellis)); and (3) the obligor has the right to any principal in the account in excess of the required payment obligations. (Tr. 3195-96 (Ellis))

Based on the tax authorities, the IRS issued a private ruling concluding that economic defeasance is not inconsistent with true lease status. Private Letter Ruling 88-04-020 (Oct. 29, 1987) involved cross-border leveraged leasing transactions in which the taxpayer leased property in a series of transactions. To reduce the amount of its debt for financial accounting purposes (under now-revoked FAS 76) and thus strengthen its balance sheet, the taxpayer proposed to engage in an in-substance, or economic, defeasance of its rental obligations. With respect to each lease, the taxpayer would contribute cash to an irrevocable trust established solely to pay taxpayer's scheduled rental payments; the trusts would provide "cash flows (from interest and maturity of securities) that approximately coincide[d], as to timing and amount, with the scheduled rental payments under each lease." *Id.* The taxpayer would not be legally released from liability to make rental payments, and it would be obligated to fund any shortfall if the trust assets proved insufficient to make the scheduled payments.

The Private Letter Ruling, citing Treasury Regulation §1.61-13(b) and Revenue Ruling 85-42, concluded that the taxpayer had not discharged its lease obligations upon the transfer of assets to the defeasance trusts. The IRS reached this conclusion even though "the likelihood that Taxpayer will be obligated to make future payments to the lessors [was] remote." I.R.S. Priv. Ltr. Rul. 88-04-020 (Oct. 29, 1987). Significantly, the Letter Ruling also made clear that economic defeasance is consistent with true lease status: it concluded that the creation of the defeasance trusts "ha[s] no impact upon the timing or amount of Taxpayer's rental deductions, or the lessors' rental income, under the . . . leases" because they do not "result in Taxpayer being deemed to have made any rental prepayments under the . . . leases." *Id.*

Treasury Regulations also confirm that a defeasance arrangement or other form of "credit enhancement" should not be viewed as "economically significant" for tax purposes unless it "results in a change in payment expectations," *i.e.*, it increases an obligor's capacity to pay from "speculative" to "adequate." *See* Treas. Reg. §1001-3(e)(1), (e)(4)(iv), (vi). Given the facts of the RoCa3 Transaction, the defeasance arrangements would not be "economically significant" under these Treasury Regulations, and thus, a defeasance arrangement would not be treated as a modification of the parties' agreements. Because EZH had a high credit rating (A or above) at the time of the RoCa3 Transaction (Ex. 477), its ability to pay would be

viewed as more than "adequate" and not "speculative."[76] Since EZH's ability to pay would be viewed as "adequate" under the Treasury Regulations, even without a defeasance or other credit enhancement, the addition of the defeasance or other credit enhancement would not be viewed as an "economically significant" event for tax purposes.

**b. Both the IRS and the Courts Have Recognized that the Use of Mechanisms to Reduce Credit Risk Does Not Defeat True Lease Status**

Defendant's argument in its Trial Brief that the defeasance accounts in the RoCa3 Transaction are problematic because they provide "a ready source of funds to repay the loan" that "virtually ensured payment of the respective obligations" (Def.Tr.Br. at 3, 5) essentially boils down to an argument that the use of effective credit enhancement techniques is somehow improper.

Defendant thus argues that a lease should not be respected unless the lessor is exposed to a risk of non-payment from the lessee without any credit protection against such a default. There is no legal authority for this proposition. The Leasing Guidelines have never imposed such a requirement, and the focus of the Leasing Guidelines is on the lessor's risk with respect to the leased property's residual value, not the credit risk of the lessee. (*See* Argument Section I.B.3.a.(iii).)

---

[76] The terminology of "adequate" and "speculative," as used in the Treasury Regulations, apparently derives from the Standard & Poor's ratings definitions. Under these definitions, any rating above BBB reflects an "adequate" ability to repay an obligor's obligations. *See Standard and Poor's Ratings Definitions*, Mar. 17, 2008, http://www2.standardandpoors.com/portal/site/sp/en/us/page.article/2,1,1,4,1204834067208.html.

Indeed, if the IRS believed reduction in credit risk were enough to deprive a transaction of true lease status, then there could be no true lease with the U.S. government as lessee, since the U.S. government is universally viewed as presenting no risk of default. Yet the IRS has never suggested that taxpayers cannot enter into true leases with the U.S. government. In fact, Defendant's leasing expert Ray testified that his former employer, EDS, entered into leasing transactions with the U.S. government as well as companies with A, AA and AAA credit ratings. (Tr. 4917-19) Ray agreed that leasing to entities with exceptionally good credit still involves enough risk for the transaction to have "economic substance," based on his understanding and use of the phrase. (Tr. 4919)

Defendant's argument is further undermined by court decisions that have repeatedly respected the validity of credit risk reduction techniques. For example, the courts long ago established that mechanisms such as a third party's guarantee for the lessees' payment of rent or a third party's promise to exercise purchase options if the lessees fail to do so are not inconsistent with true lease status. *See Nw. Acceptance Corp.*, 58 T.C. at 846-47, 848; *Lockhart Leasing*, 54 T.C. at 307-308, 315. As the Tax Court noted in *Northwest Acceptance*:

> The [third-party rental and purchase option] guaranties do not bind the lessees to purchase the equipment and petitioner's efforts to obtain them merely indicate its desire to make certain that the rented equipment would be disposed of with a minimum of effort and risk of loss should the residual value of the equipment be less than estimated at the time the lease was arranged. This strikes us as demonstrating no more than good business sense on the part of the petitioner.

58 T.C. at 848.

Similarly, the Tax Court in *Gefen*, rejected the argument that the lessee's use of credit-strengthening mechanisms makes the lessor's debt illusory. The lessee in *Gefen* assigned to the lessor its interest in a sublease with Exxon and set aside an escrow account for rental payments. 87 T.C. at 1484. The Tax Court held that:

> In leasing transactions, prudent businessmen will always seek lessees that are financially strong, and prudent lenders will always seek, if the risk inherent in the transaction demands it, a security interest in the property that is acquired with the borrowed funds. . . . Respondent would apparently have us hold that the indebtedness incurred by a lessor in a leasing transaction is genuine only if the lessee is financially weak and the lender does not have a security interest in the property that is acquired with the lender's funds. We decline to do so.

*Id.* at 1494 n.15.

In *Packard v. Commissioner*, 85 T.C. 397 (1985), the Tax Court rejected the contention that the creation of a collateral account from the proceeds of a bank loan created a "circular" flow of funding. In *Packard*, the taxpayers financed approximately 60% of their participation in a cattle feeding program through a bank loan. *Id.* at 400-01. They then used the loaned funds to pay the feed yard for feeding costs, and the feed yard purchased from the same lending bank a certificate of deposit in an amount equal to the loan, pledging the CD as security for repayment of the loan. *Id.* at 402. The Tax Court rejected the Commissioner's argument that the "loan arrangement with [the bank] was a 'circle of paper money,'" *id.* at 426, reasoning that the taxpayers were the actual borrowers and primary obligors on the loan, repayment of which was not contingent upon the success of the transaction. *Id.* at 427-428.

The highest courts of the United Kingdom and Canada have also embraced the principle that the use of economic defeasance arrangements does not deprive taxpayers of the tax benefits arising from sale-leaseback transactions. *See Barclays Mercantile Bus. Fin. Ltd. v. Mawson*, [2004] UKHL 51, [2005] 1 A.C. 684 (U.K.); *R. v. Canada Trustco Mortgage Co.*, [2005] SCC 54 (Can.) (*aff'g* [2003] 4 C.T.C. 2009 (Can. Tax Ct.), and [2004] 2 C.T.C. 276 (Can. Tax Ct.)).[77]

In *Barclays*, the seller-lessee in a natural gas pipeline sale-leaseback deposited the amounts it received upon the sale with Barclays Bank, which was also the leveraged lender and an affiliate of the purchaser-lessor. The deposit was to be used to satisfy the rentals owed to the lessor and to provide the seller-lessee with its desired economic benefit. [2004] UKHL 51 ¶¶14-17. The House of Lords held that the use of the defeasance accounts did not deprive the transaction of its status as a sale and leaseback:

> If the lessee chooses to make arrangements, even as a preordained part of the transaction for the sale and lease back, which result in the bulk of the purchase price being irrevocably committed to paying the rent, that is no concern of the lessor.

[2004] UKHL 51 ¶¶41-42. The court continued:

> The circularity of payments which so impressed . . . the special commissioners arose because [the lessor], in the ordinary course of its business, borrowed the money to buy the pipeline from Barclay's Bank and Barclays happened to be the bank which provided the cash collateralized guarantee to [the lessor] for the payment of the rent. But these were happenstances.

[77] Although these decisions rest upon the construction of foreign tax law, they are nonetheless "instructive" and provide "respected and significant confirmation" that a particular outcome is correct. *Roper v. Simmons,* 543 U.S. 551, 574, 577 (2005).

[2004] UHKL 51 ¶42.

In *Canada Trustco*, the seller-lessee used most of the funds it received on the sale to pre-pay its obligations under the lease: the funds were placed in defeasance deposits to secure repayment of the lessor's leveraged debt and the seller-lessee's purchase option payments and termination values. [2003] 4 C.T.C. Facts ¶¶22-27, Opinion ¶87. The Canadian Tax Court held that "[j]ust because [seller/lessee] had predetermined to prepay the lease, does not shift the nature of the cash [seller/lessee] received . . . [on] a conversion of its assets into cash." [2003] 4 C.T.C. Opinion ¶87. In affirming the Tax Court's opinion, the Supreme Court of Canada specifically addressed the legal irrelevance of the defeasance arrangement: "[Seller/lessee's] use of the money ultimately reduced the risk, but a company in the financing business is expected to do what it can to reduce risk." [2005] S.C.C. ¶78.

The next few Sections discuss why the application of these tax law principles to the record shows that Defendant's concern with the defeasance accounts is misplaced. First, since EZH's obligations were not legally defeased, EZH remains fully liable for its rental obligations and the defeasance accounts remain its property. Second, as Defendant's leasing experts testified, the use of economic defeasance is a commercially common technique that is often found in lease transactions, particularly cross-border leases. Finally, the use of the defeasance accounts simply reduced credit risk in the transaction, but it did not eliminate it. As the record shows, both CED and EZH continue to face significant risks, particularly in the case of Premature Termination Events.

### 2. EZH's Obligations Were Economically, Not Legally, Defeased

As explained above, case law, Treasury Regulations and IRS pronouncements establish the critical distinction for tax purposes between legal defeasance (in which the obligor is relieved of its obligations and effectively transfers funds to the obligee) and economic defeasance (under which the debt obligations remain intact and the obligor remains in possession of the defeasance account).

The record establishes—and Defendant does not contend otherwise—that EZH, as obligor, did not legally defease its obligations. (Tr. 1162-63 (Holzman) ("The IJssel deposit . . . is there so [EZH] can economically defease some of their obligations in the transactions, particularly equity payment obligations."); Tr. 3204-05 (Ellis) ("I believe [the Sublease Deposit and IJssel Deposit] are in-substance defeasance.")) As such, EZH remains liable for all of its payment obligations under the Sublease, regardless of the existence of the Sublease Deposit and IJssel Deposit. (Stip. ¶¶200, 217; Ex. 23 at page 1066; Ex. 19 at page 972) As Ellis testified:

Q And in the context, again, of the RoCa3 transaction, whose obligations are the sublease deposit and the IJssel deposit acting as security for?

A They are EZH's obligations.

Q And why is that?

A They are EZH's obligations under the terms of the transaction. Just simply because they have—defeasance accounts have been set up does not alter the fact that they are EZH's obligations.

(Tr. 3205 (Ellis))

Because EZH used economic defeasance, the defeasance account assets remain the property of EZH, not the property of CED or HBU. (Tr. 3194-98 (Ellis)) CED and HBU cannot directly access the funds in the defeasance accounts to force payment. (Tr. 3194-95 (Ellis)) If payments on EZH's obligations were not made from the defeasance accounts, however, CED could collect directly from the assets of EZH. (Tr. 3191-94 (Ellis))

### 3. Economic Defeasance Is Commonly Used in Leasing to Benefit Both the Lessor and Lessee

The courts have recognized that the use of economic defeasance and other security mechanisms is an ordinary commercial practice dictated by economic reality. (*See* Argument Section IV.B.1.) The record, including testimony from Defendant's own leasing experts, confirms that defeasance accounts are commonly used in commercial leasing transactions to reduce credit risk. Bent testified that the use of defeasance accounts is "not uncommon" in leasing transactions and agreed that their use is not "atypical." (Tr. 3819-22) Bent testified that "particularly in cross-border deals such as this, it is not at all unusual to establish a defeasance account or sometimes a related mechanism, reserve account or some form of security for the repayment of money." (Tr. 3761)

Ray agreed that the use of defeasance to reduce payment risk in leasing and other commercial transactions is "all normal," "especially" with respect to long-term transactions:

Q Defeasances are used in various applications and structures in commercial leasing and corporate finance. That's correct, is it?

A I thought you were reading something.

Q I am talking about defeasance. It is used in various applications and structures in commercial leasing and corporate finance?

A Yes.

Q And in such manner, defeasance mechanisms work in practice to greatly reduce or virtually eliminate risk to a lender or a lessor of repayment of funds, that's all normal?

A Yes. Are you reading from my report?

Q I am actually.

A Okay, all right.

Q I am paraphrasing.

A Okay.

Q Those are all accurate statements though, correct?

A Yes.

Q And that's especially true in long-term transactions such as this one?

A Yes, they would be.

(Tr. 4940-41; *see also* Ex. 20195 (Ray Initial Report) at pages 25180-82)

As Ellis explained, the use of defeasance accounts is but one of many techniques—such as sinking funds, insurance reserves, pension fund contributions, financial guarantees and letters of credit—that businesses routinely use to reduce credit risk. (Tr. 3199-200; Tr. 3203-16) As Bent readily admitted, defeasance accounts themselves are "a common mechanism in large financing transactions generally, not just leases." (Tr. 3760-61) For example, when Ellis worked in the

Salomon Brothers municipal bond group in the early 1980s (Tr. 3091-92), it was common for municipalities to create defeasance accounts securing their bond issues so as to provide sufficient funds to retire the bonds pursuant to the sinking fund requirements established in accordance with the bond issuance. (Tr. 3107-08; Tr. 3199-20) Similarly, defeasances are frequently used to support payment obligations incurred as part of the securitization of assets. (Tr. 3111-13, 3200-03 (Ellis))

While Defendant has emphasized the use of the defeasance accounts to protect the interests of CED as the lessor, defeasance accounts also protect the interests of lessees like EZH. Defeasance allows lessees, like other obligors, to obtain "more attractive" financing terms by "provid[ing] greater security to the obligee." (Tr. 3821 (Bent)) Defeasance also helps lessees in cross-border transactions mitigate their own risks, particularly currency risk: Mintun specifically identified the mitigation of currency risk as one of the benefits to EZH of establishing the defeasance accounts. (Tr. 2944-45) Ellis explained how this worked: because EZH's functional currency was the Dutch guilder, but its rental payments to CED were in dollars, the defeasance accounts mitigated currency risk by allowing EZH to "set aside in a dollar denominated account [an amount needed] to meet future dollar obligations," thereby locking in the present currency exchange rate. (Tr. 3205-06) If EZH did not take this step to protect itself from currency fluctuations, it could lose money from entering into the RoCa3 Transaction as the result of currency fluctuations between the dollar and the guilder.

### 4. The Use of Economic Defeasance Did Not Eliminate Risk from the RoCa3 Transaction

Defendant's theory that the defeasance deposits somehow made this a transaction free of credit risk—even if this were somehow relevant—is contrary to the record.

#### a. CED Faced Default Risk

Despite the debt defeasance, EZH and CED faced the risk that ABN AMRO might default on its obligations. As Bent confirmed, the existence of a defeasance mechanism does not completely eliminate payment risk. (Tr. 3737) Instead, defeasance effectively substitutes one party's credit for another and makes the payment risk akin to that of leasing to the defeasance party directly. (Tr. 4916-23 (Ray)) Although ABN AMRO held a strong credit rating of AA (Tr. 3282 (Ellis)), even ostensibly well-capitalized banks can run into unexpected financial trouble. Ellis pointed out that when he was at Salomon Brothers, Continental Illinois Bank "teeter[ed] on the edge of insolvency and failure" (Tr. 3277); more recently, a large German Bank, Landesbank Girozentrale, had to be bailed out by the German government. (Tr. 3277) In just the past few weeks, Bear Stearns' unexpected near financial collapse has dominated the financial news. *See, e.g.*, *Timothy Aeppel et al.*, *Bear Stearns's Ripples Reach Corporate Sector*, WALL ST. J., MARCH 18, 2008, ("In recent weeks, economic barometers and talk of recession have made CEOs wary. But the collapse of Bear Stearns Cos. has intensified the sense that no business is immune and that the financial crisis could touch every business, from makers of construction machines to retailers and telephone companies.").

In addition, the very existence of the multi-trillion-dollar credit default swap ("CDS") market establishes that even obligors with strong credit ratings present a material risk of default. In a CDS, a party who holds a corporate bond or similar obligation "insures" its right to payment by paying a premium to a third party, such as an investment bank, in return for the bank's guarantee of payment in the event of the obligor's default. (Tr. 3278-79 (Ellis); *see also* Ex. 10078 (Ellis Rebuttal Report) at pages 20362-363) The majority of CDSs are written on "investment grade" entities with credit ratings of AAA, AA and A. (Tr. 3279-80 (Ellis)) For example, as of September 2007, it would cost $531,440 per year to obtain a CDS with respect to a 10-year, $100 million obligation of Bank of America, which held a AA-1 or AA-2 credit rating. (Tr. 3280-82 (Ellis)) As Ellis explained, a premium at this price—53 basis points—indicates that the market recognizes a material risk of default, even for a highly rated bank. (Tr. 3460-61) Hence, while ABN AMRO was certainly a highly reliable entity to hold the debt defeasance deposit, both EZH and CED nevertheless faced a material risk that ABN AMRO might default on the debt defeasance deposit over the long period of this transaction. In fact, Defendant's leasing expert Ray testified that leasing to a party with a strong credit rating—as ABN AMRO had in 1997—still involves enough risk to impart the transaction with economic substance in his experience. (Tr. 4917-19)

With respect to the equity defeasance deposit, Treasury obligations are viewed as having virtually no default risk. As noted above, a defeasance makes payment risk akin to leasing to the defeasance party directly. Ray agreed that the

lack of credit risk does not mean that leases with the United States are not real leases:

> Q Within your expertise in the leasing industry, you have been involved in transactions where leases were made to the United States Government?
>
> A Yes.
>
> Q And have you ever had reason to believe that those transactions didn't have economic substance because of a lack of credit risk?
>
> A No. Well, now, wait a minute. If you want to go into the Federal Government, you always have the risk of nonappropriation and that sort of thing. I mean, you don't really have or you have a minimum payment risk, but you can have—you have other risks that come into play that they don't get the funds, if they are funding your transaction out of operating budgets, you always have that nonappropriations risk. And it is stated in the transaction, so it is not a surprise to anybody, but it is a risk and it has happened.
>
> Q Okay. But leasing to these exceptionally good credits still involves enough risk for you to think that the transaction has economic substance the way you were using the term earlier today?
>
> A Yes.

(Tr. 4918-19 (Ray))

#### b. Defeasance Did Not Protect Either CED or EZH in the Event of a Premature Termination of the RoCa3 Transaction

The defeasance accounts also would not protect either CED or EZH from the consequences of a Premature Termination Event. Like the parties to all leveraged leases (Tr. 3751-52 (Bent); Tr. 1149-50 (Holzman)), CED and EZH negotiated a series of provisions to protect their respective interests. As outlined in Facts Section VIII.D.5., the Sublease included provisions governing events that could result in an

early termination of the lease (*i.e.*, Premature Termination Events) and specifying the consequences arising therefrom. These consequences include the real prospect of EZH's either losing its right to the RoCa3 Facility or being required to make a payment that could cause it to lose tens of millions of dollars on the transaction.

A Premature Termination Event could arise from:

(1) A default by EZH (Sublessee Event of Default);

(2) A decision by EZH to end the lease because CED or an affiliate had become a competitor (Early Purchase Option);

(3) A termination arising from unforeseen losses (Sublease Facility Event of Loss);

(4) A development that makes the transaction illegal or economically burdensome for EZH (Burdensome Buyout Event); or

(5) A development that causes the RoCa3 Facility to become technologically or economically obsolete (Voluntary Termination for Economic Obsolescence).

(*See* Facts Section VIII.D.5.) Con Edison focuses here on two of these provisions—Sublessee Event of Default and the Early Purchase Option—to illustrate the potential financial impact of Premature Termination Events upon CED and EZH.

***Sublessee Event of Default.*** Pursuant to Section 14 of the Sublease Agreement (Ex. 4 at pages 422-26), EZH would be in default if it did not (1) pay rent

or other required payments on time, (2) maintain the property as it had agreed, or (3) comply with its insurance obligations. (Stip. ¶163(a), (c), (g); *see* Facts Section VIII.D.5.) EZH also would be in default if it (4) neglected to return the RoCa3 Facility in the promised condition upon an event requiring return of the RoCa3 Facility to CED, or (5) was declared bankrupt. (*Id.* ¶163 (d)) Finally, EZH would be in default if it made any representation or warranty that was untrue, inaccurate or misleading in any material respect. (*Id.* ¶163(b); Tr. 1157-58 (Holzman)) Bent confirmed that the list of events of default was comprehensive and that he neither saw an atypical provision nor noticed any typical provision that was missing. (Tr. 3857-58)

The list of required Representations and Warranties by EZH ran 11 pages long. (*See* Ex. 1 at pages 27-38) The list included not only promises that all of the financial information EZH had provided was accurate (*see* Facts Section VIII.A.2.), but also that EZH had provided accurate information with respect to all matters that relate to CED's ability to successfully operate the RoCa3 Facility. (*See* Facts Section VIII.A.2.) Hence, EZH warranted that the RoCa3 Facility's technical information and operating data were accurate, that the information provided to Duke Engineering was accurate, and that agreements such as the Access Agreement and Facility Operating Agreement provided CED with all required access to and use of the RoCa3 Facility. (*See* Facts Section VIII.A.2.) Bent described these Representations and Warranties as common and typical for leasing transactions generally. (Tr. 3636)

In case of an uncured default, such as a failure to cure an inaccurate representation or other default described above, CED had a choice of remedies. (*See* Ex. 4 at pages 426-31) First, CED could require EZH to return the Undivided Interest to CED for the remainder of the Lease Term and CED could then either directly exploit its Undivided Interest or sublease the Undivided Interest to other parties. (*See* Facts Section VIII.D.5.; *see also* Stip. ¶164(c)(e)) Second, CED could require EZH to pay the higher of Fair Market Sales Value or Sublease Termination Value, effectively terminating the transaction and providing damages to CED. (*See* Facts Section VIII.D.5.; *see also* Stip. ¶164(d)) Bent confirmed that he had found nothing unusual about the remedial provisions contained in §15 of the Sublease. He specifically confirmed that the remedies of taking back the facility and of receiving the higher of the termination value or the fair market value were normal, and that the lessor (here, CED) typically chooses its remedies. (Tr. 3858-61, 3863 (Bent))

Thus, the default provisions show that the RoCa3 Transaction was not risk-free to EZH or CED, regardless of the defeasance accounts. As a result of events that are common-place in the business world, EZH could end up in default, giving CED the contractual power to demand that EZH return the RoCa3 Facility to CED.

For example, in the event of EZH's bankruptcy, CED had the right to terminate the Sublease and begin exploiting its Undivided Interest directly. Even apparently healthy businesses, like Enron, go bankrupt. Lessees are no exception: as Ray testified, some of the airlines to which EDS, his former employer, leased planes went bankrupt. (Tr. 4863-64) The fact that EZH initially was owned by

municipalities does not eliminate this risk. Government entities are not immune from bankruptcy, as is evidenced by Orange County's declaration of bankruptcy in 1994. *Orange County Goes Bust*, TIME, Dec. 19, 1994, http://www.time.com/time/magazine/article/0,9171,982031-3,00.html. Further, two years after the transaction had closed, 100% of EZH's stock was purchased by the predecessor to E.ON, a publicly traded energy company. (*See* Facts Section IX.D.)

Similarly, by the terms of the transaction, EZH now faced the possibility of losing its Sublease rights to the plant if it did not adequately maintain or insure the plant. (*See* Facts Sections VIII.D.4.a. and VIII.D.4.c.; Tr. 3878-80 (Bent)) As Holzman testified, the transaction thus changed EZH's obligations toward the RoCa3 Facility:

Q If you could turn to Section 7 of the sublease agreement [Exhibit 4], which is at page 00399. That section is entitled Maintenance, Sublease, Modifications, Replacement Parts. Do you see that?

A Yes.

Q Are you familiar with that section?

A Yes.

Q Are you aware if EZH was under any such [maintenance] restrictions with regard to the RoCa3 facility prior to entering into the RoCa3 transaction?

A I'm not aware of any. This, I would imagine, like all these transactions, changed it.

(Tr. 1136-38 (Holzman))

Prior to entering into the RoCa3 Transaction, EZH may have chosen to reduce maintenance or insurance costs in response to financial pressures or

changing economic conditions. But EZH no longer has these options: if it spends inadequately on maintenance or insurance for the RoCa3 Facility, it could lose its Sublease interest.

***Early Purchase Option.*** A lessee is generally "very" concerned with the possibility that its lessor might become a business competitor. (Tr. 1151 (Holzman)) Hence, EZH negotiated the Early Purchase Option, which allowed it to purchase CED's interest in the RoCa3 Facility if CED or an affiliate began competing with EZH. (Stip.¶159) In order to exercise the Early Purchase Option, EZH was required to pay CED the higher of Fair Market Sales Value or Sublease Termination Value. (Stip. ¶159) This formulation was designed to protect CED's residual value should the RoCa3 Facility appreciate in value. (Tr. 1147 (Holzman); Tr. 3861-63 (Bent))

***Consequence of Premature Termination Events.*** Rather than deprive EZH of the RoCa3 Facility, CED could force EZH to pay the greater of Fair Market Sales Value or Sublease Termination Value. Or EZH could choose to voluntarily pay the greater of these amounts if it wished to terminate the transaction because CED or an affiliate had become a competitor. (Stip. ¶¶159, 164) In a case where such payment is required, the defeasance accounts do not protect the parties from the associated risks.

The RoCa3 Transaction, like all other leveraged leases, contains a schedule of stipulated termination values showing the minimum amounts EZH (as lessee) would have to pay CED (as equity investor) in the case of an early termination. (Tr. 3751-52 (Bent); Tr. 1149-50 (Holzman)) These payments, often called "stipulated

loss value payments" or "termination value payments," are designed to allow the lessor (*i.e.*, the equity investor) to pay off any outstanding debt, recover its investment in the transaction, make its intended profit and pay income tax on the intended profit. (Tr. 3751-52; Tr. 3787-88 (Bent)) As is the case here, these provisions also typically allow the lessor to demand to be paid fair market value under some circumstances if the value of its leasehold interest exceeds the scheduled termination value payment. (Tr. 3861-62 (Bent))

The Sublease Termination Payments posed serious financial risks to EZH. For example, if EZH had wished to exercise its Early Purchase Option as of January 2, 2003, the Sublease Termination Value on that date was $197,249,997.41. (*See* Facts Sections VIII.D.3.g.-h. and VIII.D.6.) While EZH was entitled to use the Sublease Deposit and the IJssel Deposit to defray the cost of this payment, as of January 2, 2003, the Sublease Deposit was expected to have accrued to only $114,227,540 and the IJssel Deposit was projected to be worth only $41,049,673, requiring EZH to come up with an additional $41,972,784 to discharge its obligation. (*See* Facts Section VIII.D.6.) This would also be the result if EZH committed a default and CED had elected to receive a premature termination payment rather than require the return of its Undivided Interest. (Ex. 4 at pages 426-31)

These numbers are only approximate, however, because the amount of the IJssel Deposit could not be known with certainty until the STRIPS reached maturity, since the value of the STRIPS until that point would fluctuate in response

to changes in prevailing interest rates. (*See* Facts Section VIII.D.3.g.) Thus, EZH's projected loss as a result of a Premature Termination Event could be greater or less than indicated on the termination value schedule. EZH was entirely at risk with respect to the value of the IJssel Deposit because any change in value from the projected value would impact how much EZH would have to pay from its other sources of funds. CED, on the other hand, has no such risk with respect to the value of the IJssel Deposit. Bent readily agreed that the benefits and risks of interest rate changes with respect to the IJssel Deposit belonged to EZH:

> Q And if the yield on those securities varies, that really lands in EZH's court, not ConEd's court, if you know what I mean by my—
>
> A I think I understand. The shortfall, or for that matter the overpayment would be for the account of EZH, I believe. Certainly the shortfall would be.
>
> Q And if there were an overpayment, what do you mean by overpayment?
>
> A Well, it is possible that interest rates could go down so much that those securities would be worth a lot more than what they were designed to do.
>
> Q And who would get the benefit of that?
>
> A Well, I think under the Ijssel agreement, once the equity obligations are paid, EZH retains whatever balance is left in that account, under the circumstances I think you are describing, which is that ConEd gets paid out.
>
> Q So if there is a shortfall, that's EZH's problem and if there is an overage, that's EZH's benefit in those securities.
>
> A That's my understanding of the documents, yes.

(Tr. 3826-27)

Not surprisingly, given the potential cost to EZH, CED stood to reap a potentially substantial financial benefit on the occurrence of a Premature Termination Event. For example, in the January 2, 2003 payment scenario, the Sublease Termination Value was $197,249,997. After subtracting CED's projected debt liability as of that date—$114,227,540 (*compare* Ex. 8 at page 666, *with* Ex. 24 at page 1106; Tr. 1172-73 (Holzman))—CED would still receive an $83,022,457 payment, nearly double its initial investment of $43 million over a five-year period. (Tr. 3792-93, 3794 (Bent)) The profit from this payment would be even greater if Fair Market Sales Value exceeded Sublease Termination Value.

In an effort to protect these profits against potential default risks, CED required EZH to obtain a stand-by letter of credit. Bent testified that letters of credit are often used to support obligations, "particularly" in "cross-border" transactions (Tr. 3882), and he also has seen them used to support termination value payments in leases. (Tr. 3881-82) In this transaction, CED could call upon the letter of credit if EZH were unable or unwilling to pay the amount required upon a Premature Termination Event. (*See* Facts Section VIII.D.6.)

Although the letter of credit is a standard credit protection device, the letter of credit did not fully eliminate CED's risk. As Holzman testified, while letters of credit are commonly used in leasing and other commercial transactions, they do not eliminate risk: the issuer might fail to honor the letter of credit (Tr. 1176; *see also* Tr. 3396-97 (Ellis)) or prove financially incapable of paying at the time the letter is

drawn upon. (Tr. 2377:2-15 (Ellis)) Bent agreed that the presence of security arrangements is no guarantee of payment:

> Q So in your experience, even though there is security provided in a transaction, there may be a lot of arguments over whether or not a particular amount is owing or not, arguments over how the transaction works?
>
> A: Yes.

(Tr. 3818-19)

Further, even if it were assumed that issuers of letters of credit always honored their obligations, this would only ameliorate the risk faced by CED; EZH itself would remain fully liable to reimburse the letter of credit issuer. (*See* Ex. 35 at page 1308; Tr. 2921-23 (Mintun)) EZH would thus bear the economic consequences of any payment resulting from a Premature Termination Event. As noted above, these economic consequences could be a loss running in the tens of millions of dollars:

> Q But on early termination options, you don't have a similar discussion with respect to how, you know, so-called circular cash flows; is that right?
>
> A That's correct.
>
> Q In fact, aren't a lot of the cash flows that would have to be paid on an early termination not circular?
>
> A That's correct.
>
> Q In fact, it could be very substantial?
>
> A That's correct.

(Tr. 5181 (LaRue))

Hence, as the record shows, the defeasance accounts still left both CED and EZH exposed to substantial financial risks in the transaction, even before operating risks post-2018 are taken into account.

### C. The Sublease Purchase Option Is a True Option and Is Consistent with True Lease Status

Defendant's arguments about the Sublease Purchase Option have varied. In its Trial Brief, Defendant acknowledged that the Sublease Purchase Option might not be exercised: "Granted, if EZH fails to exercise its prefunded Purchase Option and Con Ed fails to extend the sublease, there may come a time when Con Ed acquires an interest in the Facility, but that day has not yet arrived." (Def.Tr.Br. at 6) Less than two weeks later, during opening argument, Defendant had become positive: "EZH will exercise the purchase option, buy back their interest in the facility. And then everyone will walk away." (Tr. 65)

Under the authorities and the facts, the Sublease Purchase Option must be respected as a true option. The record establishes that the option price is not nominal, but rather was set well above the expected fair market value of CED's Lease Interest in 2018. (Ex. 46 at pages 1570-71; Tr. 4867 (Ray)) Hence, EZH will not be under any economic compulsion to exercise the option. (Ex. 46 at page 1572) As the testimony of Defendant's leasing expert Ray confirms, no one can know today whether or not EZH's management in 2018 will decide to exercise the option. (Tr. 4862, 4867-4868)

### 1. Under the Authorities, the Sublease Purchase Option Should Be Respected Because EZH Was Under No Economic Compulsion to Exercise It

The leasing authorities hold that lessee purchase options are consistent with true lease status unless the option price is so nominal in comparison to the expected value of the property that the lessee is virtually certain or economically compelled to exercise the option. *Oesterreich*, 226 F.2d at 802-03 ("virtually no question" a $10 purchase option would be exercised at end of 50-year lease term; property was worth $100,000 at outset and lessee would forfeit a $350,000 building if it failed to exercise); *Quartzite Stone Co. v. Comm'r*, 30 T.C. 511, 513, 518 (1958) (optionee "could not afford" not to exercise "extremely nominal" $1 purchase option), *aff'd on other grounds*, 273 F.2d 738 (10th Cir. 1959); *see* Rev. Rul. 55-540, 1955-2 C.B. 39, 42 (refusing to respect option price that is "nominal in relation to the value of the property at the time when the option may be exercised" or "which is a relatively small amount when compared with the total payments which are required to be made").[78]

If the option price is not nominal, the option is respected as bona fide. *See, e.g.*, *Nw. Acceptance Corp.*, 58 T.C. at 847-48 (option prices ranging from 10% to over 50% of the original cost of equipment do not provide an "absolutely certainty" of being exercised); *Am. Realty Trust*, 498 F.2d at 1199 (no "'economic compulsion'"

[78] *See also E. Coast Equip. Co. v. Comm'r*, 21 T.C. 112, 119 (1953) ("inconceivable" that option would not be exercised when price equaled rent due under lease and all rent was credited toward purchase option), *acq.*, 1954-1 C.B. 4, *aff'd*, 222 F.2d 676 (3d Cir. 1955); *Johnson v. Comm'r*, T.C. Memo 1962-209, 21 T.C.M. (CCH) 1126, 1131 (1962) ($1 option; clear holder was acquiring more than mere use or possession of property for lease term).

to repurchase property where testimony showed that fixed-price option was "'fair' and not an unduly low one"); *Cal-Maine Foods, Inc. v. Comm'r*, T.C. Memo 1977-89, 36 T.C.M. (CCH) 383, 389 (1977) (option price set at 12% of original cost "cannot be considered so insubstantial to raise of presumption of sale"). Indeed, options have been respected even when, in retrospect, the prices were "generous . . . to the point of encouraging the lessee's purchase of the equipment at the end of the lease term." *Nw. Acceptance Corp.*, 58 T.C. at 848.

The cases uniformly respect the validity of a purchase option when, at the time that the parties entered into the lease, they set the option at a price that approximated the expected fair market value of the property at the time the option might be exercised. *See Frank Lyon*, 435 U.S. at 569 (respecting trial court's conclusion that option prices "represented fair estimates of market value on the applicable dates"); *LTV Corp.*, 63 T.C. 39 (respecting option set at price comparable with estimated fair market value of computer at end of lease term); *Lockhart Leasing Co.*, 446 F.2d at 270 (option prices valid where "based upon expected value of the property at the time the option could be exercised"); *Belz Inv. Co. v. Comm'r*, 72 T.C. 1209, 1228-29 (1979), *acq.*, 1980-2 C.B.1, *aff'd on other grounds*, 661 F.2d 76 (6th Cir. 1981) (court had no way of knowing if option price would represent fair market value on exercise date, but had "no reason to believe that it would not be a fair price"); *cf. Transamerica I*, 7 Cl. Ct. at 448 ("Where an option price is substantially below the contemplated fair market value of the property, it may be inferred that the parties were reasonably certain at the time they entered into the

agreement that the option would in fact be exercised."); *see also* Rev. Rul. 55-540, 1955-2 C.B. at 42 (respecting option that "approximates the anticipated fair market value on the option date"); I.R.S. Priv. Ltr. Rul. 81-20-024 (Feb. 17, 1981) (respecting leveraged lease option to buy equipment for 20% of its original cost, a price represented to be "approximately equal to the fair market value"); I.R.S. Tech. Adv. Mem. 93-131-001 (Apr. 7, 1992) (respecting automobile lease where lessee had a fixed-price purchase option based on projected residual value and lessor insured its residual interest with independent insurance company).

Significantly, as this Court's predecessor concluded, where an option price is not nominal, it will be respected as an option even if the leased asset is "indispensable" to the lessee's business, the parties believe that the option will be exercised, and the lessee cannot "foresee any circumstances or conditions that might arise which would cause it not to exercise the purchase option[]." *Transamerica II*, 15 Cl. Ct. at 440-41.

As other courts have concluded, if the option price is not "unreasonably low" at the time the parties entered into the lease, it is irrelevant that the parties "desire[d] and hope[d]" that the lessee would exercise the option. *Benton*, 197 F.2d at 750, 753. As the Seventh Circuit noted, a party who acquires an option to purchase property manifestly "does so with the hope of exercising it"; however, a "hope does not create an equity." *Breece Veneer & Panel Co.*, 232 F.2d at 323; *see also Ill. Valley Paving Co. v. Comm'r*, T.C. Memo 1981-468, 42 T.C.M. (CCH) 909, 914 (1981) ("Although it was clear that petitioner hoped to exercise the options

when it entered the agreements herein, it was not certain then that petitioner would in fact do so at the end of the rental periods."), *aff'd on other grounds*, 687 F.2d 1043 (7th Cir. 1982).

#### 2. The Record Establishes That EZH Is Not Economically Compelled to Exercise the Purchase Option and That the Likely Outcome Is That CED Will Choose the Retention Option

Before entering into the transaction, CED obtained a detailed appraisal from Deloitte. (*See* Ex. 46) As part of this appraisal, Deloitte concluded that, in 2018, EZH will be under no economic compulsion to exercise the Sublease Purchase Option because the net Sublease Purchase Option Price exceeds the projected fair market value of CED's Lease Interest as of the exercise date. (*Id.* at pages 1503, 1571-72) If EZH does not elect the Sublease Purchase Option, CED will have the opportunity to choose between the Sublease Renewal Option and the Retention Option; Deloitte concluded that the most likely outcome is that CED would choose the Retention Option. (Ex. 46 at page 1578) In reaching those conclusions, Deloitte relied upon, among other things, EZH's specific representation that "[t]here is no known factor to EZH which creates a material inducement for EZH to exercise the [Sublease] Purchase Option. . . ." (Ex. 56 at page 2511; Ex. 681 at page 11878; Tr. 1773-74 (Ellsworth))

Deloitte's conclusions were confirmed by three experts: (1) Kelly confirmed the reasonableness of Deloitte's appraisal methodology and conclusions (Tr. 2762-63); (2) Reed confirmed that, from an economic perspective, EZH will not be compelled to exercise the Sublease Purchase Option (Tr. 2710); and (3) Goulding

confirmed that, based upon expected regulatory conditions in the Netherlands in 2018, EZH will not be compelled to exercise the Sublease Purchase Option. (Ex. 10074 (Goulding Initial Report) at pages 20052-53)

**a. Deloitte's Analysis Establishes that CED Will Choose the Retention Option**

**(i) EZH Will Not Be Economically Compelled to Exercise the Sublease Purchase Option**

As Holzman explained, in all leases that include a purchase option, the programmer of the ABC software file will include a constraint requiring that the purchase option price *exceed* the projected fair market value of the asset at the time that the option can be exercised. This constraint is designed to ensure that there can be no "economic compulsion" for the lessee to exercise the purchase option. (Tr. 1216-19)

The Deloitte Appraisal demonstrated that the most likely outcome in 2018 was that EZH would not exercise the Sublease Purchase Option because (1) the net Sublease Purchase Option Price was expected to exceed the fair market value of CED's Lease Interest as of January 2, 2018, (2) the cost of exercising the Sublease Purchase Option was expected to exceed its benefits, and (3) neither the RoCa3 Facility's physical attributes, the applicable return provisions, the terms and conditions of the Sublease Renewal Option nor any other identifiable factor would compel EZH to exercise the Sublease Purchase Option. (Ex. 46 at pages 1570-72; *see also* Ex. 56 at page 2511; Ex. 681 at page 11878 (EZH's affirming that no known

factor would create a "material inducement for EZH to exercise the [Sublease] Purchase Option"))

Deloitte first concluded that EZH was not compelled to exercise the Sublease Purchase Option (Ex. 46 at 1503 (Sublease Purchase Option Price exceeded projected fair market value)) because the cost of the net Sublease Purchase Option was expected to exceed the projected fair market value of CED's Lease Interest as of January 2, 2018. (*Id.* at pages 1570-71) As part of its comprehensive appraisal, Deloitte appraised the projected fair market value of CED's Lease Interest as of January 2, 2018 using the Discounted Cash Flow ("DCF") approach. (*Id.* at pages 1570, 1745-49) Based on its analysis, the projected fair market value of CED's Lease Interest as of January 2, 2018 was $205,554,840.[79] (Ex. 46 at pages 1570, 1745-49; Ex. 10075 (Kelly Initial Report) at page 20165 n.67) The net Sublease Purchase Option Price was expected to be $223,490,258,[80] and this exceeds the expected fair market value of CED's Lease Interest on January 2, 2018 by $17,935,418. (*See* Ex. 46 at pages 1570-71; Ex. 10075 (Kelly Initial Report) at page 20165 n.67 (Kelly confirming the Deloitte Appraisal))

---

[79] The fair market value of CED's Lease Interest as of January 2, 2018 was determined by taking the residual value of the entire RoCa3 Facility as determined by Deloitte, multiplying it by CED's Undivided Interest share of 47.47%, and converting this amount into U.S. dollars. (Ex. 10075 (Kelly Initial Report) at page 20165 n.67)

[80] This amount is equal to the Sublease Purchase Option Price, plus EZH's additional cost of foregoing the Final Basic Rent Payment, less the extinguishment of EZH's obligations under the Sublessee Loan. (Ex. 10075 (Kelly Initial Report) at pages 20165 n.67, 20178)

Second, Deloitte concluded that "[b]ased on the comparative costs" and benefits, EZH was "not expected to be under any economic compulsion to exercise the Sublease Purchase Option." (Ex. 46 at pages 1503, 1571-72; Ex. 10075 (Kelly Initial Report) at page 20164) The cost-benefit comparison required a two-part analysis, because the benefits EZH might receive by exercising the Sublease Purchase Option were expected to differ depending on whether CED exercised the Sublease Renewal Option or the Retention Option. (*See* Ex. 46 at page 1572; Ex. 10075 (Kelly Initial Report) at page 20164) EZH's cost of exercising the Sublease Purchase Option was expected to exceed the benefits of such option by $25,891,510 if CED were to elect the Sublease Renewal Option.[81] (*See* Ex. 46 at pages 1571-72; Ex. 10075 (Kelly Initial Report) at pages 20164, 20178) If CED were instead to elect the Retention Option, EZH's cost of exercising the Sublease Purchase Option was expected to exceed the benefits of such option by $6,764,473. (Ex. 10075 (Kelly Initial Report) at page 20178)

Deloitte also concluded that EZH would not be compelled to exercise the Sublease Purchase Option due to other non-economic factors, such as "the physical attributes of the Facility, the applicable return provisions or terms and conditions of

---

[81] The total expected cost of EZH exercising the Sublease Purchase Option equals the sum of the Sublease Purchase Option Price and the present value of the Final Basic Rent Payment, totaling $372,015,682. (*See* Ex. 46 at page 1571; Ex. 10075 (Kelly Initial Report) at page 20178) EZH's total expected benefit of not exercising the Sublease Purchase Option was $346,124,172, assuming CED were to elect the Sublease Renewal Option. (*See* Ex. 46 at page 1572; Ex. 10075 (Kelly Initial Report) at page 20178) EZH's total expected benefit of not exercising the Sublease Purchase Option was $365,251,209, assuming CED were to elect the Retention Option. (*See* Ex. 46 at page 1572; Ex. 10075 (Kelly Initial Report) at page 20178)

any Sublease Renewal Term, the cost savings that the Sublessee could realize by purchasing the Facility rather than any other power generating or distribution facilities not then operated by the Sublessee." (Ex. 46 at 1572; Tr. 1773 (Ellsworth)) This analysis was in part based on Deloitte's research into the Dutch electricity market and how facilities such as the RoCa3 Facility were expected to be operated in that market. (Tr. 1776, 1778-79 (Ellsworth)) Deloitte also relied upon EZH's specific representation in a letter dated November 26, 1997 from J.A.H. de Jong, finance director of EZH, that "[t]here is no known factor to EZH which creates a material inducement for EZH to exercise the [Sublease] Purchase Option." (Ex. 681 at page 11878; *see also* Ex. 46 at page 1603; Tr. 1711-14, 1773-74 (Ellsworth))

At trial, Holzman explained that the representation concerning "material inducement . . . to exercise the [Sublease] Purchase Option" was important to CED because "in this type of lease transaction, as many leveraged lease transactions, you cannot have a bargain purchase option." (Tr. 1431) Thus, Deloitte wanted to confirm that "EZH doesn't know of any factors that would cause it to exercise its purchase option or be a material inducement to do so." (Tr. 1430 (Holzman)) Given the importance of this statement, EZH reissued the letter as of December 15, 1997, the closing date, making the same representations, and the reissued letter was included in the transaction closing binders. (Stip. ¶1; Ex. 56; Tr. 1428-31 (Holzman))

**(ii) CED Will Most Likely Exercise the Retention Option**

If EZH does not elect the Sublease Purchase Option, CED will have the opportunity to choose between the Sublease Renewal Option and the Retention

Option. **(See Facts Section VIII.E.)** Deloitte concluded that, as between these two options, CED would be more likely to exercise the Retention Option since the projected value of CED's Lease Interest as of the exercise date was expected to exceed the value of the rentals that EZH would owe if CED elected the Sublease Renewal Option. (Ex. 46 at page 1578; *see* Ex. 10075 (Kelly Initial Report) at pages 20167-68) As part of this conclusion, Deloitte concluded that the Sublease Renewal Rents were no greater than 90% of the projected fair market value of third-party rentals over the Sublease Renewal Term. (Ex. 46 at pages 1577-78; 1759) Deloitte also identified 21 potential new sublessees with good credit ratings making them attractive counterparties. (*Id.* at page 1577) Thus, CED could earn more income by exercising the Retention Option and leasing the RoCa3 Facility to one of these parties than by exercising the Sublease Renewal Option.

**b. Reed's Economic Analysis Confirms that EZH Will Not Be Economically Compelled to Exercise the Sublease Purchase Option**

Reed used several analyses to confirm that, from an economic perspective, EZH would not be compelled to exercise the Sublease Purchase Option. (*See* Ex. 10076 (Reed Initial Report) at pages 20205-09, 20211-13; Tr. 2586-87) (Reed's report and testimony focused on the economic aspects of compulsion, whereas Goulding focused on noneconomic aspects.))

In his first analysis, Reed relied upon his extensive experience in the power industry to make minor changes to the assumptions Deloitte used in its DCF analysis. Reed computed possible future values of CED's Lease Interest by

modifying Deloitte's assumptions based upon different, but reasonable, scenarios concerning the four key drivers of projected fair market value: future electricity prices, future fuel prices, appropriate discount rates and inflation rates. (Ex. 10076 (Reed Initial Report) at pages 20205-13; Tr. 2616-20; *see also* Facts Section X.B.4.) These changes resulted in a range of possible future values of CED's Lease Interest from $98.7 million to $265 million as of January 2, 2018. (Ex. 10076 (Reed Initial Report) at page 20200; Tr. 2620-28, 2633 (Reed); Tr. 4640 (Thomas) (agreeing that "there would be uncertainty about what the asset value would be in the future")) The Sublease Purchase Option Price is close to the expected or mean value of this range. (Tr. 2657 (Reed))

As Reed explained, his analysis of and modifications to Deloitte's DCF analysis establishes two points. (*See* Tr. 2631 (Reed)) First, it confirmed that the "expected value of the [RoCa3] [F]acility from 2018 forward to the end of the head lease is below the option purchase price." (Tr. 2631 (Reed)) Second, it established that, given the dramatic deviations from the projected value based upon "quite modest changes in the assumptions," no one could predict with "any high level of certainty" that the option would or would not be exercised. (Tr. 2631 (Reed); Ex 10076 (Reed Initial Report) at pages 20224-25; *see also* Tr. 2633 (Reed); Ex. 10076 (Reed Initial Report) at pages 20210, 20213; Ex. 46 at page 1566 (noting "accurate future cash flows are difficult to forecast"); Tr. 4640 (Thomas)) Reed testified that he had "never seen two parties that have the exact same view or value when you are doing something that involves a long-term forecast." (Tr. 2732)