Reed confirmed these two points based on his personal experience in handling the purchase and sale of power plants. These transactions frequently involve the use of auctions to establish the asset price. (Tr. 2572-77 (Reed)) As Reed explained, "we see very dramatic variations in value associated with how different buyers or bidders value the same assets at the same time." (Tr. 2634; Ex. 10076 (Reed Initial Report) at pages 20215, 20221, 20224) For example, in an auction that Reed managed for Boston Edison in 1997 (Tr. 2635), the bids for generating assets ranged from $100 million to $955 million, "obviously a very dramatic difference in the perspective on value for the same assets, in the same market at the same time, based upon the same due diligence materials." (Tr. 2635, 2638; Ex. 10076 (Reed Initial Report) at pages 20215, 20224) Similarly, with respect to auctions run by Con Edison in 1999 for the sale of two different bundles of gas-fired assets, the final bids ranged from $355 million to $597 million for one bundle of assets (Ravenswood) and $293 million to $505 million for the second bundle of assets (Arthur Kill). (Tr. 2637-38; Ex. 10076 (Reed Initial Report) at pages 20215, 20224) As Reed explained:

> When we extrapolate from these examples to the EZH purchase option, which is one that's 20 years hence, we're trying to predict there what the value of the facility will be perceived to be in 2018, based upon another 30 years of forecasts, so essentially 50 years of analysis viewed 20 years hence.
>
> I think it's safe to say that the level of uncertainty, the range of values that exist for a current valuation, are large, and the range of values that would exist for a future valuation being done 20 years hence are going to be even larger. Certainly, the degree of uncertainty increases with the additional 20 years of passage of time.

(Tr. 2639-40)

Reed further explained that deregulation increased the volatility of energy asset prices as new entrants and market forces began shaping asset prices. (Tr. 2640-41) For example, in 1997, auctions of three plants in Australia generated prices "far more than [anyone] expected" as a result of winning bids submitted by foreign power companies "seeking to diversify their investments across border and into unregulated activities." (Tr. 2643-44 (Reed); Ex. 10076 (Reed Initial Report) at pages 20216-17) United States power plant sales in 1997 also resulted in prices "significantly greater than the expectations of the sellers" due to the participation of cross-border participants. (Tr. 2645-46 (Reed)) Reed looked at all available market data for the period of 1997 to 2007 involving multiple sales of the same plant and sales of newly constructed plants. (Tr. 2648-49) With respect to plants sold multiple times, the data show that plant prices over short periods can fall as much as 73% or increase as much as 158% due to changes in market conditions. (Tr. 2650-52 (Reed); Ex. 10076 (Reed Initial Report) at page 20221) With respect to sales of newly constructed plants, the data show that the sellers sometimes sold at substantial losses largely due to dramatic increases in the price of natural gas and overbuilding of plant capacity. (Tr. 2654-55 (Reed))

Reed ultimately concluded that, since the option price is close to the expected or mean value indicated by his testing of Deloitte's DCF analysis, rather than at either extreme of the distribution of expected values, "the same degree of uncertainty that exists as to value translates into uncertainty associated with whether the option will or will not be exercised." (Tr. 2657) Reed explained that

"[t]his is not a close call. This is a case where the reasonable analysis of the variability of the value indicates quite clearly that it is not even close to being certain that the purchase option is going to be elected." (Tr. 2745)

### c. Goulding Confirmed that EZH Would Not Be Under Any Regulatory or Market Compulsion to Exercise the Sublease Purchase Option

Goulding confirmed Deloitte's conclusion that EZH would not be under any non-economic compulsion in 2018 to exercise the Sublease Purchase Option. Goulding testified that the regulatory description in the Deloitte Appraisal was consistent with then-current information about the Dutch electricity regulatory framework. (Tr. 2370-71) Defendant did not challenge Goulding's testimony; instead, Thomas (Defendant's expert in economics) confirmed that CED would have anticipated deregulation in the Dutch power industry. (Tr. 4579-80)

Goulding testified that, in 1997, it would have been reasonable to expect that EZH would not be under any regulatory or market compulsion in 2018 to exercise the Sublease Purchase Option. (Tr. 2370-71) Goulding addressed three issues: (1) the capacity requirements for licensed central generators in The Netherlands (Tr. 2448-56); (2) whether, as a municipally owned entity, EZH would be concerned about profits or instead exercise the Sublease Purchase Option to ensure a stable source of energy for its citizens (Tr. 2456-58 (Goulding)); and (3) the likely impact of environmental concerns on EZH's decision whether to exercise its option. (Tr. 2458-60 (Goulding))

Goulding first addressed whether EZH would have regulatory or market obligations (such as a supply contract) to produce a minimum amount of electricity in 2018 that would require EZH to keep the right to the output of the RoCa3 Facility. (Tr. 2449, 2505-06) Goulding testified that, although there was a minimum capacity requirement for licensed utilities in effect in 1997 (2500 MW), a utility could drop below that requirement and continue to operate its facilities with a license and under the tariff pricing arrangements. (Tr. 2452) By 1997, the Dutch government had already published a white paper on energy policy (Ex. 483) stating that the minimum capacity requirement would be abolished. (Tr. 2453-55 (Goulding))

The minimum capacity system was in fact eliminated in 1998, and there are currently no licensed electricity producers in The Netherlands. (Tr. 2455 (Goulding)) Goulding thus concluded it would have been reasonable to believe in 1997 that EZH would not have any regulatory load requirements in 2018. (Tr. 2449)

To the extent that EZH had any other load obligations in 2018, such as a supply contract, it would have a number of means to acquire the required power. (Tr. 2448-49 (Goulding)) It could build or purchase other generation facilities, enter into a bilateral contract with another facility to provide the power, purchase power on the spot market, or import power from a neighboring region. (Tr. 2450-51 (Goulding)) Goulding concluding that it would have been unreasonable for a company like CED to assume in 1997 that EZH would specifically need the RoCa3 Facility to meet any capacity obligations in 2018. (Tr. 2451)

Defendant did not challenge Goulding on his conclusions regarding the operation of unlicensed facilities in The Netherlands, the expected abolition of the minimum capacity requirements,[82] the alternative means by which EZH could meet any capacity obligations, or—most importantly—his conclusion that it would have been unreasonable to assume that EZH would need the RoCa3 Facility in 2018 to meet regulatory or contract obligations. Nor did Defendant present any experts qualified to address regulatory economics and electricity markets in order to contradict Goulding's testimony on these points.

The second regulatory factor Goulding addressed was the potential effect of EZH's municipal ownership on its decision whether to exercise the Sublease Purchase Option. He testified that it would have been unreasonable to expect that a municipally owned company—like EZH—would not consider economics and profits when deciding whether to exercise the Sublease Purchase Option. (Tr. 2456 (Goulding)) Based on Goulding's specific experience working with municipally owned utilities, he testified that local governments "look to a municipal utility to fund other activities of the government, so they're very concerned actually about profitability at their municipal utility." (Tr. 2457) Goulding also testified that to the extent a municipal entity is concerned about providing reliable electricity to its citizens, "[r]eliability comes from access to a network . . . connected to many generating stations," not from "reliance on any single generated unit." (Tr. 2457-58) Thus, it would have been unreasonable to assume in 1997 that EZH would need to

[82] Defendant did, however, question Goulding on another regulatory scheme that The Netherlands had considered. (Tr. 2513-16)

exercise the Sublease Purchase Option just to provide reliable electricity to its citizens. (Tr. 2457)

The final regulatory factor Goulding addressed was the possibility that EZH, as a municipal entity, would have been concerned about transferring the ownership of the RoCa3 Facility to a private party that might cause environmental damage. Goulding noted that a municipality would not only assume that the private operator was bound by national environmental regulations, but also recognize that the municipality could pass additional environmental laws to ensure that the private party would not cause environmental damage. (Tr. 2458-59 (Goulding)) As such, Goulding concluded it would have been unreasonable to assume in 1997 that EZH would exercise the Sublease Purchase Option for environmental reasons. (Tr. 2458)

### 3. Defendant Offered No Credible Proof Regarding the Sublease Purchase Option

In considering Defendant's contentions that EZH will exercise the Sublease Purchase Option, a fundamental point stands out: Defendant did not even try to present any expert testimony based upon an economic or financial analysis as to whether the Sublease Purchase Option will be exercised. LaRue and Thomas offered opinions about the Sublease Purchase Option, but these were based upon their reading of various company documents, not an economic or financial analysis. Nor did Defendant try to challenge Goulding's conclusions that, based upon the expected regulatory environment in 2018, EZH will not be under any compulsion to exercise the Sublease Purchase Option. To the contrary, at trial Thomas essentially

retracted his non-economic analysis of the Sublease Purchase Option in light of Goulding's superior expertise.

**a. Defendant Presented No Economic Analysis Regarding the Likelihood the Purchase Option Will Be Exercised**

Although Defendant qualified two experts in finance and economics—LaRue in accounting and finance (Tr. 5046 (LaRue)) and Thomas in economics, with a specialization in accounting and financial economics (Tr. 4473-74 (Thomas))—Defendant did not ask either to present an economic or financial analysis as to whether EZH will be economically compelled to exercise the Sublease Purchase Option. Instead, Thomas presented a series of "non-economic" factors that he thought might influence EZH's decision. (See Argument Section IV.C.3.b.) Similarly, LaRue was asked to opine about the likelihood that EZH would exercise the Sublease Purchase Option based upon his personal reading of CED documents (not EZH documents), a reading to which he did not apply accounting terms and concepts. (Tr. 5087-88, 5173-75 (LaRue)) Although LaRue is an expert in economics, he did not review the Deloitte Appraisal (Tr. 5109-11 (LaRue)), and therefore he ignored the most important economic evidence, which is that the Sublease Purchase Option price exceeds the fair market value of CED's Lease Interest. LaRue ultimately opined that predicting whether EZH would exercise the Sublease Purchase Option and the factors that would go into that decision involves "pure speculation." (Tr. 5178-79 (LaRue))

Defendant's decision not to present an economic analysis is particularly telling with respect to Thomas, who has testified for Defendant in other leasing cases and performed "pure economic analys[e]s" to determine whether an option would be exercised at a future date. (Tr. 4642-43) These other engagements include one case in which Thomas performed a detailed analysis simulating hundreds of potential scenarios on the purchase option date and one case in which he analyzed and rebutted another expert's similarly detailed calculations. (*Id.*) Although Thomas believes that this type of extensive analysis would be ideal and appropriate for analyzing the Sublease Purchase Option (Tr. 4640-42), he undertook no such analysis here. (Tr. 4644 (Thomas)) To the contrary, he ultimately agreed with Reed that there is uncertainty in predicting the future value of CED's Lease Interest. (Tr. 4640 (Thomas))

#### b. Thomas' Testimony on the Purported Non-Economic Factors Was Flawed and Well Beyond His Expertise

Thomas' discussion of the Sublease Purchase Option in his initial report (*see* Ex. 20197 (Thomas Initial Report) at pages 25258-60) considered a series of non-economic factors in forming his opinion that EZH was "likely" to exercise its option. The deficiencies of Thomas' opinion in this respect are manifest. First, Thomas' views on the Sublease Purchase Option have nothing to do with his professional competence and his qualification to testify as an expert in the field of economics. (Tr. 4473-74) Second, Thomas' views were based upon a series of "inferences" and "assumptions" unsupported by any real-world experience or concrete examples. (Tr.

4591-92 (assumption); Tr. 4603, 4636-38 (inference)) Finally, Thomas' opinions were directly contradicted by Goulding, who *was* qualified to give opinions on the regulatory areas that Thomas attempted to address. Thomas himself agreed that there was no reason to doubt Goulding's contrary conclusions. (Tr. 4624-25, 4575-78, 4584-86 (Thomas))

The first non-economic factor Thomas identified was the 2500 MW minimum capacity requirement imposed in 1997 to acquire licensing in The Netherlands. Basing his understanding solely on the information contained in the Deloitte Appraisal (Tr. 4576-77 (Thomas)), Thomas indicated in his initial report that EZH would not be able to meet this requirement without the RoCa3 Facility and that EZH would therefore lose its license if the Sublease Purchase Option were not exercised. (Ex. 20197 (Thomas Initial Report) at pages 25258-59) Further, Thomas opined that "it seems unlikely that [CED] or another third party . . . would be able to obtain full benefit from the rights to use the facility" since such party would likewise fall short of the capacity requirement and therefore not be licensed. (*Id.* at page 25259)

At trial, Thomas admitted that the foundation of his opinion was based on his "assumption" that "being licensed was a privilege[,] and that it was better to be licensed than to be unlicensed." (Tr. 4591-92) Thomas, however, made no investigation or analysis as to whether his assumption was correct. (Tr. 4592) In addition, Thomas admitted he has no professional expertise "at all" in Dutch energy regulation. (Tr. 4574) While Thomas looked at the initial report submitted by

Goulding (Tr. 4575-76 (Thomas))—which addressed the licensing system in The Netherlands (*see* Ex. 10074 (Goulding Initial Report) at pages 20052-53, 20057 n.12, 20062 n.20)—he did not address any of Goulding's conclusions in his rebuttal report. Instead, Thomas agreed on the stand that if Goulding is correct that licensed generators were not at risk of losing their license when they fall below the 2500 MW requirement (Ex. 10074 (Goulding Initial Report), at page 20062 n.20), Thomas' conclusion that EZH would not remain a licensed provider if it gave up the RoCa3 Facility was wrong. (Tr. 4577-78)

Thomas further conceded that if Goulding's description of the Dutch market is correct, there may be benefits to CED of being an unlicensed generator in 2018. (Tr. 4585-87) Most importantly, Thomas also testified that he had "no reason to doubt" Goulding's conclusions in his initial report. (Tr. 4576) Thus, Thomas effectively renounced his opinion concerning the minimum capacity requirement.

Thomas' second justification for his opinion is equally unconvincing: EZH "would value stability and other nonmonetary objectives over profits" because it was a municipal entity, and it might therefore exercise the Sublease Purchase Option in order to retain control of the RoCa3 Facility. (Tr. 4520-21; *see also* Ex. 20197 (Thomas Initial Report), at page 25259) Thomas admitted that his discussion of this factor was "non-economic" (Ex. 20197 (Thomas Initial Report) at page 25258; Tr. 4638-39), and his opinion was based solely on his "impression" that municipalities would prefer not to lose control over the power supply. (Tr. 4604) He did not cite to

any specific experience or support—in either of his reports or in his testimony—to support this impression.

Further, Thomas' opinion contradicts the little knowledge he had regarding the goals of EZH's owners: He was aware when he wrote his report that EZH's municipal owners chose to sell the company to a for-profit entity shortly after the RoCa3 Transaction closed. (Tr. 4604-06; *see also* Facts Section IX.D.) Yet Thomas made no attempt to explain how this significant fact is compatible with his "impression" that EZH's municipal owners would not want to agree to a private company's taking control of the RoCa3 Facility.

Thomas' third basis for his opinion was the alleged "contrast between the explicit detail associated with contractual features described during the pre-[Sublease Purchase Option] period versus the fairly unstructured way in which the contracts deal with contingencies during the post-[Sublease Purchase Option] period." (Ex. 20197 (Thomas Initial Report) at page 25259) When asked about this contention during trial, Thomas correctly qualified his statement. He agreed that the contract provisions dealing with post-2018 contingencies are "fairly structured" (Tr. 4609-33 (Thomas)), clarifying that he had only meant that the contracts were "unstructured" as to one specific provision for which he had been searching. (Tr. 4633-35 (Thomas)) Of course, when Thomas drew this conclusion he "had not read [the transaction documents] very extensively" as he had only "sort of scann[ed] them . . . looking for certain kinds of arrangements that . . . are in the economics

literature." (Tr. 4608) Thomas agreed that he "may have certainly missed"[83] the provision he was searching for "[s]ince [he] did not do a thorough search." (Tr. 4635) Thomas' cursory review—made by someone with no real-world experience participating in or advising leasing transactions (Tr. 4552-53)—is no basis for a reliable opinion as to the level of contractual detail one should expect to find in the operating documents.

Thomas' final justification in his report for his conclusion that EZH was likely to exercise the Sublease Purchase Option was his claim that:

> EZH is proud of the "green" nature of the [RoCa3] [F]acility, especially the Carbon Dioxide (CO2) that is re-used by growers. How will EZH feel about a third party deciding that it is more profitable to simply vent the CO2?

(Ex. 20197 (Thomas Initial Report) at page 25260) First, Thomas was unable to cite any support for his statement that EZH was concerned about what a private party might do with the RoCa3 Facility. Instead, his opinion was "quite substantially" influenced by a visit he made to *another* plant that was involved in *another* leasing transaction for a *different* taxpayer. (Tr. 4636-37 (Thomas)) Second, Thomas had no basis for his further assumption that a private facility operator would not find it

[83] Thomas testified that he was unable to locate a provision that would resolve conflicts between joint owners of the RoCa3 Facility. (Tr. 4607) He did indeed "miss" the provision he was looking for. The Facility Operating Agreement (Ex. 11) contains numerous provisions that deal with conflicts between joint owners. For example, changing the RoCa3 Facility's production of 220 MW, placing the RoCa3 Facility out of service for any time, and the adoption of Capital Expense and Operating Expense Budgets all require a two-thirds vote of the shares entitled to vote. (Ex. 11 at pages 740-41, 749) If CED (which, with its 47.47% vote, can block a two-thirds vote) and the holders of the other shares cannot agree on these operational matters the "matter shall be submitted to arbitration." (Ex. 11 at page 742)

profitable to recycle carbon dioxide; instead, he simply "inferred" it without investigating this question at all. (Tr. 4636)

Finally, aside from the fact that Thomas testified outside his area of expertise, his testimony is problematic for another significant reason. Before submitting his rebuttal report, Thomas looked at Goulding's initial report (Ex. 10074 (Goulding Initial Report)) and recognized that it dealt with non-economic issues. (Tr. 4575-76) He must have been aware that Goulding addressed the licensing requirements, deregulation of the Dutch energy market, and other issues relevant to Thomas' own "non-economic" conclusions. Yet Thomas did not rebut any of the conclusions in Goulding's initial report. (Tr. 4574-75) Indeed, he testified that he had "no reason to doubt" Goulding's conclusions. (Tr. 4576 (Thomas)) Further, Thomas testified after Goulding and thus could have reviewed Goulding's transcript on these subjects, but instead made no attempt to refute Goulding's opinions. In light of Goulding's expertise with respect to the regulatory economics of electricity and Thomas' complete lack thereof, there is no "battle of the experts" here: Thomas' non-economic analysis of the Sublease Purchase Option is outside his area of expertise, is erroneous on its own terms and should be rejected.

#### c. Defendant's Expert Bent Testified that It Is Not Unusual in Leasing to Set Aside Amounts that Can Be Used to Fund the Exercise of Purchase Options

Defendant also has argued that the Sublease Purchase Option would be exercised because, if things went as hoped, the defeasance accounts would grow in value to an amount sufficient to fund EZH's exercise of the Sublease Purchase

Option in 2018. (Tr. 69) Mintun explained that this potential aspect of the defeasance accounts was established in order to protect the interests of EZH:

> One of the things that we wanted to make sure is that if they decided to exercise their purchase option, that there were no impediments to doing so, and that they weren't exposed to, you know, as I indicated earlier, to, for example, changes in exchange rates that would make that difficult.

(Tr. 3053-54)

Structuring an option arrangement to ensure that there are no "impediments" to exercise of the option is a far cry from having a compulsion to exercise the option. Defendant's leasing expert Bent in fact established that there is nothing unusual about this aspect of the defeasance accounts. Bent readily agreed that he personally has been involved in lease transactions "where there is some amount available, sometimes it is referred to as a reserve account, maybe a defeasance account, or some other collateral that's available to be liquidated and used to pay for the purchase option." (Tr. 3823) While Bent later qualified this testimony to state that "the deals that I have done, those are not referred to as defeasance accounts," he repeated that he had "done deals where there are funds available for that purpose, to pay part of the purchase option price." (Tr. 3824)

Initially, Bent insisted on direct that he did not "think it is usual—certainly not in [his] experience" for the "lessee to have access to a collateral account that pays 100 percent of the consideration required to exercise a purchase option." (Tr. 3823-24) However, as his testimony developed, Bent began qualifying his claim that it was not "usual" for a purchase option to be fully pre-funded. When asked about

this testimony again, Bent hedged: "I think what I said is it is not typical in my experience, *it is not unheard of*, but it is not the typical structure." (Tr. 3958 (emphasis added))

In fact, in the lease-leaseback case of *BB&T*, Bent submitted an expert report on behalf of the taxpayer opining that the use of defeasance accounts to fully fund purchase options is entirely consistent with commercial leasing practice:

> Q [Reading from Bent report in *BB&T*] "Because there are commonly accepted mechanisms such as defeasance by which certain contractual obligations of a lessee may be satisfied without the payment of cash from the lessee to the lessor at the time the lessee exercises an option to terminate the lease, this factor should not and cannot be used to support the conclusion that the subject transaction is 'not [consistent][84] with commercial leasing transactions'"?
>
> . . .
>
> Q Were those your words?
>
> A Yes.

(Tr. 3960-61)

On re-direct, Bent tried to explain his prior expert report by drawing a distinction between practices that are "not unusual, but not typical":

> Q Okay. And the first sentence of that paragraph, he had you look at the bottom part. The first sentence of that paragraph says, "in many large commercial leases, it is not unusual for a transaction to be structured so that a lease [*sic*] is granted an option which, if and when exercised, allows the lessee to terminate the lease without requiring the lessee to make any out-of-pocket cash payments to the lessor."

---

[84] Counsel erroneously read this word from Bent's *BB&T* report as "inconsistent," rather than consistent; the Court itself clarified for the record that the correct word was "consistent." (Tr. 3960-61)

Is that consistent with what you had testified with respect to whether a feature was unusual or – versus typical?

A Yes. My point here was that I was giving an opinion with respect to some statements made by an opposing expert, and the way you characterized it is exactly right. *It is not unusual, but it is not typical.*

(Tr. 3962 (emphasis added))

Whatever this purported distinction might mean, Bent's opinion in *BB&T* cannot be explained away: "*in many large commercial leases, it is not unusual for a transaction to be structured so that a lease [sic]*[85] *is granted an option which, if and when exercised, allows the lessee to terminate the lease without requiring the lessee to make any out-of-pocket cash payments to the lessor*." (Tr. 3962 (emphasis added)) As Bent explained in *BB&T*, this is "*[b]ecause there are commonly accepted mechanisms such as defeasance by which certain contractual obligations of a lessee may be satisfied without the payment of cash from the lessee to the lessor at the time the lessee exercises an option to terminate the lease . . . .*" (Tr. 3960 (emphasis added))

#### d. Defendant Misreads the Contemporaneous Business Documents

##### (i) CED Accounted for the Transaction Under the Assumption that the Purchase Option Would Not Be Exercised

At trial, Defendant's argument on the Sublease Purchase Option focused on accounting documents that were prepared prior to the close of the RoCa3 Transaction, without giving consideration to how CED actually reported the RoCa3

[85] This word should be "lessee."

Transaction for financial reporting purposes. In reporting the transaction on its financial statements, CED did not rely upon the ABC pricing run that showed the financial impact of the Sublease Purchase Option's being exercised. Rather, CED reported the transaction based upon the financial impact if the Sublease Renewal Option were exercised and the RoCa3 Transaction ran the full Lease Term ending February 21, 2041. (Tr. 1204-05 (Holzman); Tr. 701 (Freilich)) If CED actually thought that EZH intended to exercise the Sublease Purchase Option, CED would not have accounted for the transaction using an analysis predicated upon the assumption that the Sublease Purchase Option would not be exercised. (Tr. 1194-96, 1204-05 (Holzman))

**(ii) The Accounting Documents Are Not Evidence that EZH "Intended" to Exercise the Purchase Option**

At trial, Defendant placed particular emphasis upon a series of accounting-related documents prepared by Cornerstone and CED. None of these documents came from EZH and it is EZH that will eventually have to decide whether to exercise the Sublease Purchase Option.

As explained in more detail at Facts Section II.B., it was critically important to CED's business purposes that the RoCa3 Transaction receive the front-loaded earnings provided by FAS 13. Hence, before CED consummated the transaction, DePlautt worked with PriceWaterhouse ("PW"), CED's auditors (Tr. 2157), to see if the firm would accept FAS 13 accounting treatment for a leasing transaction. (Tr. 2138-40) In the course of this process, Cornerstone, on behalf of CED, retained

Arthur Andersen ("Andersen") to analyze the accounting treatment of a hypothetical lease-leaseback structure. (Tr. 1304 (Holzman)) Cornerstone provided Andersen with information about a hypothetical lease-leaseback structure and Andersen provided Cornerstone with a draft letter (later finalized) describing the accounting treatment of the hypothetical transaction. (Exs. 323, 1244; Tr. 1305-06 (Holzman); *Cf.* Ex. 722 (containing final opinion by Andersen and final "RoCa3 Transaction Structure Description" by Cornerstone))[86] Both a draft Cornerstone letter dated October 27, 1997 (Exs. 766, 1244) and a draft Andersen letter dated November 21, 1997 (Ex. 323) were provided by DePlautt to PW on November 20, 1997, and November 23, 1997, respectively. Holzman testified that, as of the time of the October 27, 1997 draft, little, if any, due diligence on the proposed RoCa3 Transaction had been performed. (Tr. 1426-27)

There are many tests to be applied in determining whether a lease is a leveraged lease. To qualify as a leveraged lease, the lease must first qualify as a capital lease under FAS 13. (Ex. 10077 (Weil Initial Report) at pages 20258-59) A lease will qualify as a capital lease if it meets any one of the four stated criteria in FAS 13. (Ex. 323 at pages 7021-22; Ex. 10077 (Weil Initial Report) at pages 20258-59) These four criteria are:

(a) the asset is transferred to the lessee at the end of the lease term;

(b) the lease contains a bargain purchase option, which FASB defines as an option set at a price "sufficiently lower than the

[86] As Holzman explained, the hypothetical structure in fact was based upon the EPON transaction, not the RoCa3 Transaction. The EPON transaction was not carried out. (Tr. 1306-12, 1419-22)

expected fair value" such that "exercise of the option appears, at the inception of the lease, to be reasonably assured." FAS No. 13, §§5(d), (7);

(c) the lease term is greater than 75% of the asset's useful life; and

(d) the minimum lease payments are 90% or more of the fair market value of the leased asset.

(*Id.*)

Regarding the purchase option for the hypothetical transaction, Cornerstone's draft letter stated:

> Although the Purchase Option Price will be greater than or equal to the expected fair market value of the Sublessor's Lease interest, taking into account possible required renewal rents, other non economic factors such as the strategic nature of the asset to Sublessee's business and the fact that the proceeds required to purchase the Sublessor's Lease interest are set aside at closing *tend to shift the probability* of the Sublessee executing the purchase option. *It is reasonable to assume*, based on non economic factors mentioned above plus the credit and collateral requirements outlined below that the Sublessee will exercise the Purchase Option.

(Ex. 1244 at 17746 (emphasis added))

On its face, this letter establishes that the hypothetical purchase option could not possibly meet criteria (b) (the bargain purchase option); since the Cornerstone memo states that the hypothetical "Purchase Option is greater than or equal to the fair market value" of the asset, the hypothetical purchase option is obviously not a bargain purchase option as defined by criteria (b).

Andersen therefore did not assume that criteria (b) would be met: "[t]he determination of whether exercise of the purchase option is 'reasonably assured' is judgmental and requires an analysis of the specific facts and circumstances of the transaction; a determination that is beyond the scope of an opinion letter on a

hypothetical transaction." (Ex. 323 at page 7022) But Andersen did conclude that criteria (d) would likely be met, since FAS No. 13 required that any put renewal rents be included in the calculation required by criteria (d). (Ex. 323 at page 7022-23; *see also* Ex. 10077 at pages 20258-60) Thus, the presence or absence of a bargain purchase option was irrelevant to Andersen's analysis. Weil's report confirmed that the RoCa3 Sublease would meet criteria (c) and (d), but not (b). (Ex. 10077 at pages 20259-60) In fact, the final opinion by Andersen, which discussed the actual RoCa3 Transaction, not a hypothetical transaction, and the final transaction structure description by Cornerstone did not include the Sublease Purchase Option discussion set forth above. (Ex. 722 at pages 12238, 12247) Andersen's final opinion confirmed the RoCa3 Sublease was a leveraged lease and relied on criteria (c) and (d), but not (b). (Ex. 722 at page 12239)

On November 21, 1997, Jim Dewey (of PW) sent DePlautt an email asking a series of questions, including: "Are you going to take the position that exercise of the purchase option is reasonably assured [sic]?" (Ex. 1142 at page 16779) After consulting with Cornerstone (Tr. 2243-44), DePlautt responded: "Yes, among the reasons are (a) facility is a newly built key asset for the utility, (b) sublessee has preplanned for the purchase and done his economic analysis on the assumption that the plant will be purchased." (Ex. 1142 at page 16776)

At trial, Holzman and DePlautt explained that the statements about the possible exercise of the option contained in these documents were predicated on a "more likely than not" accounting standard. Both individuals testified that they had

no knowledge that EZH management intended to exercise the Sublease Purchase Option. Regarding Exhibit 1244, Holzman explained: "Tend to shift the probability would mean that if it were not likely, maybe it would be more likely. That's my interpretation of that." (Tr. 1418) Regarding Exhibit 1142, DePlautt explained that, based on his conversations with Dewey, DePlautt understood "reasonably assured" to mean "probable," which he understood to mean "anything over 50 percent . . . . 50.01 is more likely than not." (Tr. 2140)

DePlautt testified that, in responding to Dewey, he was not "aware of any intent by EZH to exercise the Purchase Option." (Tr. 2141) Mintun, who represented EZH in the RoCa3 Transaction, confirmed that EZH's managers never told him that EZH intended to exercise the Sublease Purchase Option and, to his knowledge, EZH's managers never told anyone that they intended to do so. (Tr. 2947) Indeed, as a precondition to consummation of the transaction, EZH expressly warranted to CED that (a) it had taken no action that would require exercise of the Sublease Purchase Option, (b) no corporate document required it to exercise the purchase option, (c) no accounting or tax position under Dutch law would compel exercise of the purchase option, and (d) there were no agreements or side letters (and no present intention of entering into any such agreements) requiring exercise of the Sublease Purchase Option. (Ex. 9 at page 677; Tr. 1297-1302 (Holzman); *see also* Ex. 56 at page 2511 (EZH representing that there was no known factor that would materially induce its exercise of the Sublease Purchase Option))

These e-mail exchanges represent nothing more than speculation concerning what EZH might or might not do in 2018. This type of speculation, in the absence of a nominal purchase option, has never been regarded as evidence that a purchase option is likely to be exercised. *See, e.g.*, *Frank Lyon*, 435 U.S. at 581; *Transamerica II*, 15 Cl. Ct. at 441-42 (exercise of purchase option was "speculative" even when both parties expected it to be exercised).

As Reed explained, the "whole value of an option" is that the holder can "defer a decision until more information is known" and "[i]f one were to somehow prematurely commit to that option, or limit your choices with regard to the option, then you are destroying the value of the option." (Tr. 2732-33; Tr. 2585-86) Reed emphasized: "I have never seen anyone prematurely commit to that kind of an option, until all the information is in hand." (Tr. 2734)

DePlautt explained that, because the Sublease Purchase Option was "out of the money" (*i.e.*, the exercise price exceeded the anticipated fair market value of the property) the option "has no value or very little value." (Tr. 2247) DePlautt also pointed out that "preplanning" the ability to carry out a transaction does not mean that a party is going to carry out a transaction. (Tr. 2246) For example, as DePlautt explained, by the year 2018, EZH might not be in the generating business—just as Montana Power left the utility business to become a telecommunications company and Westinghouse left the electric manufacturing equipment business to operate a television network. (Tr. 2246-47) In fact, within two years after the close of the

RoCa3 Transaction, EZH was sold to the predecessor of E.ON, a publicly traded German energy company. (*See* Facts Section IX.D.)

The final Leasing White Paper, which DePlautt drafted and which was distributed to Con Edison management on December 9, 1997, confirms that the Sublease Purchase Option was a real option:

> At the end of the initial 20 year lease, the utility would have the option to purchase the plant at a pre-agreed fixed price. If the utility did purchase the plant at this time, the transaction would be completed. If the utility did not purchase the plant at the end of year 20, the trust would have the option to either (a) lease the plant to a third party for the remaining 24 years of the lease, (b) use the plant itself, or (c) require the utility to re-lease the plant for an additional 17 years at prices that would assure CED of its expected return.

(Ex. 397 at page 8121; Tr. 2123-24 (DePlautt)) If the Sublease Purchase Option were not exercised, CED could earn additional revenue from the plant:

> Responsibility for the condition of the plant would rest with the utility during the initial term of the lease, and with the third party during a subsequent lease. During the remaining seven years under the lease, CED could either use the plant itself or lease the plant to third parties and in doing so obtain additional revenue. The base case economics assume no revenue for this period. At the end of the 44 year lease CED would be required to return the plant to the utility.

(Ex. 397 at page 8121)

Hence, Con Edison management understood that the Sublease Purchase Option was a real option and that CED could earn additional profits from the RoCa3 Facility if the Sublease Purchase Option were not exercised. On cross-examination, Defendant challenged DePlautt to demonstrate that there had been any analysis of the economics of the transaction "for years 21 forward." (Tr. 2168) DePlautt explained that Cornerstone had prepared ABC pricing runs "that covered

both the initial lease term, and then the sum of the initial lease term and the subsequent lease term." (Tr. 2169) As DePlautt confirmed,[87] the pricing runs were prepared on the assumption that CED would elect the Sublease Renewal Option. (*See* Argument Section IV.C.3.d.(i).) While CED did not build projected profits from the Shirt-Tail Period into the "base case economics," this was for purposes of conservatism, not because the company thought there was no residual value. (Tr. 2124-2126 (DePlautt)) As DePlautt forthrightly confirmed on cross-examination, "I will tell you that it was my belief that there was a potential for value in the residual value." (Tr. 2164) Defendant has simply misunderstood the accounting documents and the accounting for the transaction.

---

[87] Q. And let's be clear about the ABC runs. The ABC runs were just the scheduled rent payments, correct?

A. The ABC runs had numerous pages that were in addition to just the scheduled rent payments. (Tr. 2168 (DePlautt))

Q. We're talking about the up-side economics after year 20. And you mentioned that the ABC runs would have some indication of – or some assistance in the analysis of the up-side economics. Is that a fair statement? (Tr. 2169 (DePlautt))

. . . .

A: Oh, after year 20. . . . [T]here were ABC runs done by Cornerstone that covered both the initial lease term, and then the sum of the initial lease term and the subsequent lease term.

(Tr. 2169 (DePlautt))

**(iii) As Defendant's Expert Ray Confirmed, No One Can Know Whether EZH's Management in 2018 Will Exercise the Sublease Purchase Option**

Under the authorities, Defendant's focus upon the accounting documents exchanged among CED, Arthur Andersen and PW is simply irrelevant. The Sublease Purchase Option price is not nominal in comparison to the expected value of CED's Lease Interest, but rather was set at a price above the Lease Interest's expected fair market value. (Ex. 46 at pages 1503, 1570-71) Under these circumstances, the authorities provide that the purchase option must be respected as a true option even if, to paraphrase this Court's predecessor, the RoCa3 Facility were somehow thought to be "indispensable" to EZH's business and the parties could not "foresee any circumstances or conditions that might arise which would cause [EZH] not to exercise the purchase option[]." *Transamerica II*, 15 Cl. Ct. at 440-41; (*see also* Argument Section IV.C.2.).

The testimony of Defendant's leasing expert Ray vividly demonstrates why the leasing authorities respect purchase options that are not nominally priced. As Ray agreed, even if it were thought that EZH's managers in 1997 secretly intended for the company to exercise the Sublease Purchase Option in 2018, it is all but certain that none of these managers will actually be around to make that decision 20 years later. (Tr. 4862-63 (Ray)) In fact, only two years after the RoCa3 Transaction, EZH had been sold to a German utility, which became E.ON. (See Facts Section IX.D.)

Ray testified:

> [I]f it is true that they only analyzed the case according to the ConEd document that I read, that they would, which would indicate to me they had in a sense made up their mind, you know, with 20 years in advance this that's what they were intending to do, *but there is nothing in that or this that says they couldn't change their mind because something came up down the road.*

(Tr. 4862 (emphasis added))

Ray's experience at EDS is telling. With respect to the aluminum can manufacturing line that EDS acquired and leased, Ray testified that EDS managers had no expectation that, upon the expiration of the lease, EDS was going to go into the can manufacturing business. Rather, EDS expected that the lessee would purchase the residual interest upon expiration of the lease.[88] However, after EDS entered into the lease, Anheuser-Busch purchased the original lessee and, because of its clout, was able to negotiate a lower price to purchase the equipment that EDS wanted. (Tr. 4848-49, 4863 (Ray)) Ray's testimony with respect to the aircraft leases was similar:

> Q And you probably hoped that the lessee would buy those aircraft back too?
>
> A I'm sure we hoped, but in many cases—in many—in several cases they didn't.
>
> Q It may happen; it may not, right?

---

[88] A: We leased an aluminum can manufacturing line to a manufacturer and –

Q: You didn't want to go into that business, did you?

A: No. And there was, *for a brief moment*, I thought I was going to be in that business, but—

(Tr. 4848 (Ray) (emphasis added))

A It may happen; it may not.

Q You kind of expected they would, but you didn't really know?

A No. And I affirmatively hoped some of them would not go into bankruptcy but they did.

(Tr. 4863-64)

While Ray's purported certainty about the Sublease Purchase Option's likelihood of exercise grew between the time of deposition and trial (inflating from 50/50 at deposition to "99/1" at trial (Tr. 4852, 4854)), Ray agreed on cross-examination that "things could change" over a 20-year period (Tr. 4862) and that EZH management would not make the ultimate decision whether to exercise the Sublease Purchase Option until the year 2018 "based on economic values at that time." (Tr. 4868) Ray explained that this decision "would depend on whether . . . in their analysis at the time the asset was worth more to them at the purchase option . . . ." (Tr. 4867)

As the following colloquy confirmed:

Q We don't know if EZH is going to exercise or not?

A We don't know for certain.

Q We don't—

A We don't know.

(*Id.*)

**(iv) The RoCa3 Transaction Does Not Involve "Reciprocal Options" Limiting CED's Benefits and Burdens of Ownership**

Defendant's Trial Brief also asserts that the Sublease Purchase Option and the Sublease Renewal Option "act in tandem to cap the residual value of Con Ed's purported leasehold interest, and protect Con Ed from the risk that the value of its interest will decline." (Def.Tr.Br. at 5-6) The argument apparently invokes instances where reciprocal *purchase* options are used to protect an ostensible lessor from the benefits and burdens of owning a residual interest in the leased property. *See Kwiat v. Comm'r*, T.C. Memo 1992-433, 64 T.C.M. (CCH) 327 (1992).

In *Kwiat*, the ostensible lessor held a put option to sell "leased" warehouse shelving (pallet racking) to the ostensible lessee for $238,910 for the period running October 13, 1985 to December 31, 1986. The ostensible lessee held a reciprocal call option to purchase the shelving for $159,452 for the period running November 13, 1987, to December 31, 1987. *Id.* at 330. In other words, the put price was higher than the call price.

In holding that these reciprocal purchase options deprived the ostensible lessor of the benefits and burdens of ownership, the Tax Court concluded that "[c]onsidering the 1980 Transaction as a whole, including the reciprocal put and call, we conclude that it was a remote possibility in 1980 that both the 1983 Put and Call would go unexercised." *Id.* at 335. "Such situation would come about only if the value of the pallet racking, from Oct. 13, 1985, to Dec. 31, 1986, remained above $238,910 and if such value thereafter fell sharply, remaining below $159,452, from

Nov. 13, 1987, to Dec. 31, 1987." *Id.* at 333 n.5; *see also Penn-Dixie Steel Corp. v. Comm'r*, 69 T.C. 837, 844 (1978) ("We consider it more than a remote possibility that Phoenix might so prosper in the first 3 years that Union would forego the exercise of its put and that the economic outlook for the steel industry could then change sufficiently in the following year to lead Continental to decide not to exercise its call."). Hence, in the case of reciprocal purchase options like those in *Kwiat*, the ostensible lessor knows that it will never be subject to residual value risk, since, if the lessor does not require the lessee to buy the property from the lessor at a high price, the lessee will be entitled to buy the property from the lessor for a low price.

Here, there are no reciprocal purchase options. Most important, CED has no put option to require EZH to purchase CED's Lease Interest at any time; CED simply has the option to extend the Sublease with EZH for an additional term, at rentals providing a lower return than CED could expect to get by retaining its interest in the RoCa3 Facility or subleasing that interest to a third party. (Ex. 46 at page 1578) At the end of any renewed Sublease with EZH, CED would still own its residual interest in the property, consistent with the leasing authorities.

Moreover, even if the Sublease Purchase Option and the Sublease Renewal Option were viewed as "reciprocal purchase options," the reasoning of *Kwiat and Penn-Dixie* establishes that it cannot be assumed that one or the other will be exercised. Looking forward from December 1997, there was more than a "remote possibility" that EZH would choose to not exercise its Sublease Purchase Option and CED would choose to not exercise its Sublease Renewal Option. Indeed, this is

precisely the outcome predicted as likely to occur in the Deloitte Appraisal, which prediction was supported by economic analysis. Defendant has made no attempt to refute Deloitte's economic analysis on this point. Thus, applying the reasoning of *Kwiat* and *Penn-Dixie*, it cannot be assumed that either the Sublease Purchase Option or the Sublease Renewal Option will necessarily be exercised, and therefore it cannot be assumed, as Defendant argues, that the value of CED's residual interest will necessarily be capped.

While EZH does have a purchase option to buy CED's Lease Interest, the price of the option exceeds the expected fair market value of the property as of the exercise date. If EZH does not exercise this option, then CED necessarily will retain its residual interest in the property. Based on the actual pricing of the options, the most likely result is that CED will choose the Retention Option and retain its residual interest. (*See* Argument Section IV.C.2.a.); *cf. Penn-Dixie*, 69 T.C. at 844 ("[T]he put and call arrangement did not legally, or as a practical matter, impose mutual obligations on Union to sell and on Continental to buy."). Hence, there are no reciprocal options that "cap the residual value."

### D. CED Will Earn a Profit or Suffer a Loss Based on the RoCa3 Facility's Operations During the Residual Value Period, and the Cash Flows During this Period Would Not Be "Circular"

The arguments of Defendant and its experts assume that CED's income is fixed and determinable and unrelated to the operation of the RoCa3 Facility. These arguments assume, however, that EZH will exercise the Sublease Purchase Option. For the reasons stated in Argument Section IV.C., this assumption is unjustified

and is contrary to case law and the evidence. If EZH does not exercise the Sublease Purchase Option, CED's income will not be fixed and determinable, but will directly depend upon the operation of the RoCa3 Facility.

The defining characteristic of a true lease is that when the property is returned to the lessor at the end of the lease, the property still has significant residual value, *i.e.*, the lease term is substantially shorter than the property's life. (See Argument Section I.) During this residual period following the end of a lease, the lessor will enjoy any profit and suffer any loss from the property's operation. This exposure to the property's operation during the residual period has been equated with the benefits and burdens of ownership, and therefore a lessor exposed to the property's value during this residual period possesses the benefits and burdens of ownership. (See Argument Section I.)

The evidence demonstrates that CED will enjoy the profits and suffer the losses of the RoCa3 Facility's operations after the Sublease expires. As explained in detail above (in Argument Section IV.C.1.), the Sublease Purchase Option price is not nominal and EZH will therefore not be compelled to exercise the Sublease Purchase Option. The case law therefore assumes CED will retain the residual value of the property. *See, e.g.*, *Nw. Acceptance Corp.*, 58 T.C. at 847-48.

If EZH does not exercise the Sublease Purchase Option (the most likely scenario (*see* Argument Section IV.C.)), then CED will necessarily be exposed to the operations of the RoCa3 Facility. If CED chooses the Retention Option, this residual value period will be 23 years, or 53% of CED's Lease Interest. However, even if CED

exercises the Sublease Renewal Option, the residual value period will be 6.5 years, or 15% of CED's Lease Interest. In either case, the length of CED's residual period will exceed the amount required by case law for true lease status. *See Frank Lyon*, 435 U.S. at 566 (13.33% residual life). (*See also* Argument Section III.A.3.)

Goulding agreed that it would have been reasonable for CED to have believed in 1997 that, as of 2018, it would have the ability to either sell the output from the RoCa3 Facility for its own benefit or sublease its interest in the RoCa3 Facility to a third party. (*See* Facts Section X.B.5.) Goulding reviewed the regulations and laws he expected to be in effect in The Netherlands in 2018 and concluded that there would be no regulatory restrictions on the ability of non-Dutch companies to operate a cogeneration facility in The Netherlands. (Tr. 2461-62; *see also* Ex. 10074 (Goulding Initial Report) at page 20088) Defendant did not challenge this conclusion, which is unsurprising given Goulding's extensive experience in shaping and analyzing national energy regulations. (*See* Facts Section X.A.3.)

### 1. Under the Terms of the Facility Operating Agreement, CED Will Share in the Profit and Losses of the RoCa3 Facility During the Retention Option Period as Well as the Shirt-Tail Period

When the Sublease expires (either in 2018 or 2034) and the residual value period begins, CED's economic relationship to the RoCa3 Facility will be controlled by the Facility Operating Agreement. (Ex. 11) At that time, CED will become a "Facility User" as defined in the Facility Operating Agreement (Ex. 11 at page 778) because it is a "Lessee" under the Lease (Ex. 2) and will no longer be subleasing the RoCa3 Facility to EZH. The use of facility operating agreements is common when

two or more parties own interests in the same facility. (Tr. 1042, 1394-95 (Holzman)) *See* Rev. Rul. 82-61, 1982-1 C.B. 13.

Many of CED's rights under the Facility Operating Agreement go into effect on the "Initial Commencement Date." Under the terms of the Facility Operating Agreement, an "Initial Commencement Date" will occur when either CED's or Banc One's Sublease to EZH expires, without EZH's having elected the Sublease Purchase Option. (Ex. 11 at page 735, 782) Assume, for example, that CED's Sublease to EZH expires on January 2, 2018, as a result of CED's exercising the Retention Option. At that point, CED will become a Facility User and an Initial Commencement Date will have occurred. If CED elects the Sublease Renewal Option, rather than the Retention Option, it will become a Facility User on June 15, 2034, rather than January 2, 2018.

Pursuant to Section 5.3 of the Facility Operating Agreement, CED, as a Facility User following an Initial Commencement Date, "may schedule for its own account" the "Capacity" (the expected output) from the RoCa3 Facility equal to the product of CED's "Entitlement Share" multiplied by the output of the RoCa3 Facility. (Ex. 11 at page 750) If the output is higher than expected, CED will also be entitled to its share of the surplus. (Ex. 11 at page 751) In other words, CED will be entitled to its 47.47% share of the RoCa3 Facility's output. (Tr. 4865 (Ray)) Under Sections 3 and 8 of the Facility Support Agreement, CED has been assured access to the high-voltage electrical transmission grid. (Ex. 13 at pages 829, 832) Thus, CED will be entitled to sell its 47.47% share of the RoCa3 Facility's output on the grid.

While CED will be entitled to its 47.47% of the RoCa3 Facility's output, it will also be required to pay 47.47% of the RoCa3 Facility's expenses during the period the Facility Operating Agreement is in effect, *i.e.*, the Retention Option Period. As a Facility User, CED is required to pay its share of Operation and Maintenance Expenses, which represent the normal costs of operation. (Ex. 11 at pages 749-50) CED must also pay its share of replacement parts (Ex. 11 at page 745); capital expenditures, repairs and construction costs (Ex. 11 at pages 747-49); fuel costs (Ex. 11 at page 750); and the fee paid to the Operator (assuming CED is not operating the RoCa3 Facility). (Ex. 11 at page 738)

Thus, after the termination of the Sublease to EZH, CED will receive its proportionate share of the RoCa3 Facility's gross revenue and be responsible for its share of the RoCa3 Facility's expenses, including capital costs. CED will therefore profit if the RoCa3 Facility operates at a profit or lose money if expenses outrun income.

As described above, the Deloitte Appraisal projects that CED's pretax cash flows from the RoCa3 Facility would be $729 million during the Retention Option Period or $299 million during the Shirt-Tail Period. (*See* Argument Section III.F.1.) Since these amounts are directly tied to the income and expenses of the RoCa3 Facility, they could be higher or lower, and they would result in a loss if the RoCa3 Facility operated at a loss.

As a power generator, there are many factors that could affect CED's projected cash flows from the end of the Sublease through the end of the Lease Term, including, but not limited to:

- the sale price of the RoCa3 Facility's power, heat, and carbon dioxide;
- the demand for power, heat and carbon dioxide;
- the cost of natural gas;
- the efficiency of the RoCa3 Facility;
- the RoCa3 Facility's output levels;
- operation and maintenance costs;
- technological developments; and
- costs related to environmental compliance requirements.

(Tr. 3157-58 (Ellis); Tr. 2695-96 (Reed); Tr. 4804-05 (Ray))

There are risks associated with each of these factors that would directly impact CED's cash flows from the sale of its 47.47% of the RoCa3 Facility's output. For instance, the revenues CED could generate from selling its share of the RoCa3 Facility's output would depend on market demand. (Tr. 2598-99 (Reed); Tr. 4804-05 (Ray)) The price at which CED would be able to sell the power—which is currently unknown—would affect revenues. (Tr. 3157 (Ellis); Tr. 4804-05 (Ray)) In addition, since the RoCa3 Facility would sell its output in the local market for local currency, CED would face exchange risk in converting its cash flow to dollars. (Tr. 5353 (LaRue)) The operational risks CED will face are significant. (Tr. 3156-57 (Ellis);

Tr. 4809-10, 4832 (Ray) (testifying that the risks CED will face are "more than low" because there is "[m]aterial risk [and] material opportunity" if EZH does not exercise the Sublease Purchase Option))

### 2. CED Will Participate in the Management of the RoCa3 Facility During the Retention Option Period and the Shirt-Tail Period

At trial, Defendant's witnesses devoted considerable testimony to the issue of whether CED can actually "operate" the RoCa3 Facility, *i.e.*, whether CED will ever actually have operational control over the RoCa3 Facility. This is a red herring, as demonstrated by the IRS's own Revenue Ruling 82-61. Revenue Ruling 82-61, discussed above at Argument Section I.B.3.h.(ii)., described a bank that held an undivided interest in a power facility. Obviously, the bank would never have direct operational control over the facility, particularly since the other 50% interest in the facility was owned by a utility. The ruling provides, however, that the bank was nonetheless the "owner" of its undivided share of the facility because it held a property interest in all of the property necessary for the operation of the facility. Significantly, Revenue Ruling 82-61 did not require that the bank actually operate the facility.

CED's ability to participate in the management of the RoCa3 Facility is much greater than that of the taxpayer in Revenue Ruling 82-61. If both CED and Banc One exercise the Retention Options, CED and Banc One, voting together, may remove EZH as the Operator of the RoCa3 Facility. (Ex. 11 at page 736-37) Banc One would then be able to appoint a new Operator, since its share of the RoCa3

Facility would be greater than CED's (52.53% oversees 47.47%). Under these circumstances, Banc One may appoint CED as the new Operator since CED would obviously have more relevant experience.

If CED elects the Retention Option, but Banc One chooses the Renewal Option, CED would still have a significant voice in the RoCa3 Facility's management. In these circumstances, CED would qualify as a Facility User, but Banc One would not because its Sublease would not have expired. (Ex. 11 at page 778) As a Facility User, CED would have a vote on all major decisions concerning the operation of the RoCa3 Facility, such as the adoption of budgets concerning the operation of the RoCa3 Facility. (Ex. 11 at pages 740-41) Since a two-thirds vote is required on such decisions (Ex. 11, at pages 740-41), EZH could not act without CED's consent. CED would also have the ability to remove EZH as Operator of the RoCa3 Facility if EZH were in continuing default of its obligations under the Facility Operating Agreement or its Sublease with Banc One. (Ex. 4 at pages 428-29) These rights to participate in the RoCa3 Facility's management are much more extensive than the lessor's rights in Revenue Ruling 82-61.

### 3. The Cash Flows Would Not Be Circular During Either the Retention Option Period or the Combined Sublease Renewal Term and Shirt-Tail Period

If EZH does not exercise the Sublease Purchase Option, then CED will be required to pay EZH the Final Basic Rent Payment on February 24, 2041. CED has the choice of supporting its obligation to make this payment either by providing CED with a letter of credit or by funding certain accounts. (Stip. ¶¶242, 254) If CED

chooses to fund these accounts, it will be exposed to interest rate risk: the amounts in these accounts on February 24, 2041 may be greater than or less than the amount of the Final Basic Rent Payment. CED will be responsible for any deficits and enjoy any surplus in these accounts. And CED may replace these accounts at any time with a letter of credit. (Stip. ¶¶242, 254)

CED's income during the Retention Option Period and the Shirt-Tail Period will come from the operation of the RoCa3 Facility. This operating income is subject to risk, is not subject to a defeasance, and it does not represent a circular flow of funds.

The parties' respective obligations to each other following election of the Retention Option or Sublease Renewal Option are described below.

**a. The Retention Option**

**(i) The Election of the Retention Option and the HBU Loan**

If CED elects the Retention Option, it will be required to repay the HBU loan in full on January 2, 2018. The projected balance of the HBU loan on that date is $123.6 million. (Ex. 8 at page 666) From the date EZH decides whether or not to elect the Sublease Purchase Option, which it must do no less than 360 days before January 2, 2018, CED will have until 45 days prior to January 2, 2018 to make arrangements to pay the nonrecourse loan balance. (*See* Ex. 4 at pages 433, 435) Thus, CED would effectively have a year, less 45 days, to arrange for the refinancing of the HBU loan. (Tr.3940-41 (Bent)) The $123.6 million that CED would be required to prepay to retire the nonrecourse debt is not defeased, and thus

CED would pay this amount from funds not generated by the RoCa3 Transaction. Given Con Edison's access to the capital markets (Tr. 3282-83 (Ellis)), and the funds immediately available to CED,[89] CED would have no problem repaying the HBU loan. (*Id.*)[90]

**(ii) The IJssel Deposit and Sublease Deposit Under the Retention Option**

If CED elects the Retention Option, EZH can withdraw the Sublease Deposit, which is expected to have a balance of $123.6 million. (Stip. ¶251) EZH will have no limitations on its use of those funds and can use them for any purpose it desires. LaRue agreed that "the balance" of the Sublease Deposit "would revert back to EZH." (Tr. 5255; *accord* Tr. 4943-45 (Ray); Tr. 3951-52 (Bent)) The receipt of these funds by EZH would obviously not represent a circular cash flow.

Under the Retention Option, the IJssel Deposit would remain intact. (*See* Facts Section VIII.E.3.) One of the STRIPs will mature in August 2017, and the remaining four STRIPs are scheduled to mature at different points during 2018. (*See* Facts Sections VIII.D.3.f. and VIII.E.3.) Upon maturity of each security, it would be reinvested in U.S. Government Obligations at the interest rates then available (*see* Facts Section VIII.E.3.; Stip. ¶212) and continue to secure EZH's obligations, the only remaining one of which would be the Sublessee Loan to CED.

---

[89] On its balance sheet dated December 31, 1997, Con Edison had $1.5 billion in current assets. (Ex. 106 at page 2922)

[90] In his report and testimony, Bent claimed that HBU could prevent exercise of the Retention Option by failing to agree to the refinancing of the loan. (Tr. 3941-42) Under cross-examination, however, Bent acknowledged that HBU could not object if EZH simply prepaid the HBU loan (Tr. 3948) and that CED would have a year less forty-five days to arrange for this prepayment.

(*See* Stip. ¶252) Because the interest rates in 2018 are unknown, it is impossible to know whether the balance of the IJssel Deposit will grow to a sufficient amount to cover payments EZH may owe to CED, or if perhaps it will yield a larger or smaller amount. The positive and negative risk of that investment, including the rate at which funds are reinvested, remains entirely with EZH, the owner of those funds.

Defendant has assumed that the IJssel Deposit will produce sufficient funds to secure EZH's payment obligations to CED during the Retention Option Period. However, none of Defendant's experts performed an analysis to support this assumption.

**(iii) The Retention Option and the Final Basic Rent Payment**

If CED elects the Retention Option, it remains obligated to pay EZH the Final Basic Rent Payment of $831.5 million on February 24, 2041. (*See* Facts Section VIII.E.3.b.) Assuming EZH makes its final Sublessee Loan Payment of $414,931,341 on February 24, 2041, CED can choose to put those funds towards satisfying its Final Basic Rent Payment due on that same date. (Stip. ¶257) The remaining amount owed by CED is $416,594,393. Of this $416,594,393 remaining amount owed by CED, $141,671,596.40 is a recourse obligation. (Stip. ¶259) CED can choose to secure its obligation to pay this amount either by providing EZH with a letter of credit[91] or by funding the Trustee Treasury Collateral. (Stip. ¶255) The remaining amount owed by CED to EZH is therefore $274,922,794. CED can secure

[91] Acceptable Substitute Collateral includes letters of credit that are in the same payment amounts as the Incremental Collateral Pledge and the Trustee Treasury Collateral. (Stip. ¶254; Ex. 2 at page 328; Tr. 3924-26 (Bent); Tr. 4942-43 (Ray))

its obligation to pay this amount either by providing a letter of credit or by funding the Incremental Collateral Pledge. (Stip. ¶¶253, 254, 256; Tr. 3924-26 (Bent)) This $274,922,794 obligation of CED is recourse to CED to the extent of any operating revenues CED receives from the CEL Trust after the Sublease Basic Termination Date (January 2, 2018). (Stip. ¶260) Since this remaining nonrecourse amount ($274,922,797) is significantly less than the amount CED is expected to earn from the RoCa3 Facility, and receive from the CEL Trust, after January 2, 2018, the remaining $274,922,794 owed to EZH is expected to be recourse to CED. (*See* Facts Section VIII.E.3.b. and Argument Section III.F.1.c.)

If CED chooses to put up a letter of credit, rather than funding the Incremental Collateral Pledge and the Trustee Treasury Collateral, it will be free to use the funds earned from the operation of the RoCa3 Facility (that it otherwise would have used to fund the Incremental Collateral Pledge and the Trustee Treasury Collateral) in any manner it desires. (Stip. ¶258; *see* Facts Section VIII.E.3.a.) For instance, CED could use these funds to make additional investments in the hope of making higher profits or to cover other operational costs. If CED were to use these funds to make additional investments, CED could lose all or part of the amount invested. Regardless, CED would still be obligated to pay EZH the Final Basic Rent Payment of $831.5 million on February 24, 2041. (*See* Stip. ¶¶246, 256, 257; Tr. 3911-13 (Bent); Ex. 2 at pages 325, 352) LaRue acknowledged that "if a letter of credit were used" he "wouldn't necessarily characterize this as a circular cash flow." (Tr. 5334-35)

If CED chooses to fund the Trustee Treasury Collateral, it has no assurance that funds received from EZH will be sufficient to fund this account. Under the Retention Option, EZH continues to owe CED payments on the Sublessee Loan, which includes a payment of $37,525,237 on January 2, 2018. (Stip. ¶182) CED can, but is not required to, use that amount to purchase the securities for the Trustee Treasury Collateral if it decides to fund this account. The Expected Treasury Price on January 2, 2018 to fund the Trustee Treasury Collateral, which is scheduled to mature to $141,671,596 as of February 24, 2041, is $34,036,692. (*See* Ex. 1 at page 174; Stip. ¶245) If the actual cost of the Trustee Treasury Collateral is greater than $34,036,692, the amount owed to CED by EZH could be adjusted pursuant to Section 3(e) of the Sublease Agreement as of January 2, 2018. But CED would then bear the risks and benefits of any further changes in interest rates between January 2, 2018 and February 24, 2041. If interest rates were less than anticipated, CED would have to make up the shortfall to pay the Final Basic Rent Payment.

If CED chooses to fund the Incremental Collateral Pledge, CED would establish this account on January 2, 2018 for its own benefit. This account would be comprised of either U.S. Government Obligations or corporate bonds that are rated AA and Aa2, or better. (Ex. 2 at page 326) The maturity value of the Incremental Collateral Pledge is *projected* to be $274,922,746. (*See* Facts Section VIII.E.3.a.(ii).; *see also* Stip. ¶256) However, CED does not know the amount of cash it would need to fund the Incremental Collateral Pledge, since that amount would depend on interest rates from 2018 to 2041. (*See* Stip. ¶¶256, 257)

Defendant's experts did not analyze CED's potential sources of cash to fund the Incremental Collateral Pledge. If they had, they would have realized that it is unlikely that the funds CED would need to fund the Incremental Collateral Pledge would come from EZH. On January 2, 2018, EZH owes CED a $37,525,237 Sublessee Loan payment. (Stip. ¶¶173, 182) This payment would likely be insufficient to fund both the Incremental Collateral Deposit and Trustee Treasury Collateral, because if CED funds the Trustee Treasury Collateral at the Expected Treasury Price of $34,036,692 (*see* Facts Section VIII.E.2.b.(i).), CED would have only $3,488,545 remaining to invest in the Incremental Collateral Pledge. Thus, should CED decide to establish the Incremental Collateral Pledge, it will likely have to make an additional investment from its own funds, including funds from the RoCa3 Facility's operations. (*See* Facts Section VIII.E.3.A.(ii).)

Finally, if CED elects to establish and fund both the Trustee Treasury Collateral and the Incremental Collateral Pledge, and to keep those accounts in place rather than replacing them with Acceptable Substitute Collateral, the interest rates on those accounts could be subject to change between January 2, 2018 and February 24, 2041, causing their values in 2041 to be unknown. If the interest rates on these accounts from 2018 to 2041 are less than 6.86%, CED will face a shortfall in funding the Final Basic Rent Payment. (Stip. ¶257) This shortfall would reduce its anticipated profit. If the securities CED purchases have a shorter term than 23 years, CED would need to reinvest those securities at an unknown interest rate upon maturity. If this future interest rate is less than 6.86%, CED would have to

contribute additional funds, either upon making this reinvestment or when the Final Basic Rent Payment is due. (*See* Facts Section VIII.E.3.a.-b.; Tr. 3926-27 (Bent))

**b. The Sublease Renewal Option**

If CED elects the Sublease Renewal Option, the Sublease Agreement will remain in effect and EZH will be required to pay CED Sublease Renewal Rents during the Sublease Renewal Term from January 2, 2018 through June 15, 2034. (Stip. ¶172)

Under the Sublease Renewal Option, CED remains obligated to pay the Final Basic Rent Payment of $831.5 million. (*See* Facts Section VIII.E.2.b.) As in the case of the Retention Option, CED can choose to secure this obligation either by providing a letter of credit or by funding certain accounts. (*See* Facts Section VIII.E.2.b.)

**(i) The IJssel Deposit and Sublease Deposit**

If CED elects the Sublease Renewal Option, the Sublease Deposit will remain in place and continue to secure the debt portion of EZH's payment obligations under the Sublease Agreement, including Sublease Renewal Rents, until the nonrecourse loan is retired in 2027. (*See* Facts Section VIII.E.2.a.)

The IJssel Deposit would also remain intact and would continue to secure the equity portion of EZH's payment obligations under the Sublease and Sublessee Loan. Upon maturity of the STRIPs in the IJssel Deposit, which come due during 2017 and 2018, those funds would be reinvested, but at rates currently unknown.

(*Id.*) Until the STRIPs mature and are reinvested, it is impossible to know the amount the IJssel Deposit will grow to and how this amount will relate to EZH's payment obligations under the Sublease Agreement (including Sublease Renewal Rents) and the Sublessee Loan. (Tr. 4762-63 (Ray)) Defendant's experts did not perform any analysis regarding whether the IJssel Deposit would have sufficient funds to collateralize each of EZH's payment obligations.

**(ii) The Sublease Renewal Option and the Final Basic Rent Payment**

If CED elects the Sublease Renewal Option, it will remain obligated to pay the Final Basic Rent Payment of $831.5 million. As in the case of the Retention Option, CED can choose to secure its obligations either by providing a letter of credit or by funding certain accounts. (Stip. ¶¶241-42; *see* Facts Section VIII.E.2.b.) LaRue acknowledged that CED's providing a letter of credit in lieu of funding all or part of these deposits would break the purported circular cash flows. (Tr. 5334-35)

The arrangements for paying the Final Basic Rent Payment under the Sublease Renewal Option are similar to those under the Retention Option. The primary difference is that if CED chooses to fund its collateral obligations under the Sublease Renewal Option, one of the relevant accounts for the Sublease Renewal Option would be called the "Lease Collateral Deposit" rather than the "Incremental Collateral Pledge." (*See* Facts Section VIII.E.2.b.; Stip. ¶242; Ex. 2 at page 327)

Further, even if CED should initially choose to fund the Trustee Treasury Collateral and the Lease Collateral Deposit, CED could later replace part or all of these accounts during the Lease Term with a letter of credit. (*See* Facts Section

VIII.E.2.b.; Stip. ¶247) Both Bent and Ray agreed that CED could at any time post a letter of credit and withdraw the funds from the Trustee Treasury Collateral or Lease Collateral Deposit. (Tr. 3924-26 (Bent); Tr. 4949-50 (Ray)) Thus, CED could reap the benefits of an increase in the value of either deposit. (Tr. 3924-26 (Bent); Tr. 4950 (Ray)) For instance, if in 2018 CED establishes either of such accounts with fixed income securities and such securities increase in value (due to a general decline in interest rates) CED could take such securities out of the deposit and sell them, retaining the proceeds, and simply post a letter of credit. (*See* Facts Sections VIII.D.2.b.-d.)

Con Edison summarized the potential scenarios for the Trustee Treasury Collateral in its discussion of the Retention Option. (*See* Argument Section IV.D.3.a.) The Lease Collateral Deposit analysis is similar. If established and kept in place, the Lease Collateral Deposit will be available to pay a portion of the Final Basic Rent Payment due in 2041, but the amount of the Lease Collateral Deposit at that date is unknown. That value is unknown because the interest rate earned on the Lease Collateral Deposit from June 15, 2034 through February 24, 2041 will be the then-prevailing market interest rate and there are no adjustments to the Sublease Rents provided in the Operative Documents for any such changes in rates because the Sublease will have terminated. (*See* Facts Section VIII.E.2.b.(ii).) Until June 15, 2034 the Lease Collateral Deposit is expected to earn 6.86% interest. (*See* Facts Section VIII.E.2.b.(ii).) As of June 15, 2034, the Sublease Renewal Term ends, thereby terminating the Sublease Agreement, and the Lease Collateral Account is

projected to have a balance of $176,210,292. (Stip. ¶244) The interest rate that CED will be able to earn on the Lease Collateral Deposit after June 15, 2034 will depend on then-prevailing market interest rates. (*See* Stip. ¶¶242, 246; Ex. 2 at pages 327, 354 (directing that the balance as of June 15, 2034 must equal $176,210,962.89); Tr. 5331 (LaRue)) Thus, the value of the Lease Collateral Deposit on February 24, 2041 will mature to $274,922,746.33 (the portion projected to be used to pay the Final Basic Rent Payment) *only* if CED can earn 6.86% on the Deposit from June 15, 2034 through February 24, 2041. (*See* Facts Section VIII.E.2.d.) If the interest rates from 2034 to 2041 are below 6.86%, CED would have to make up the shortfall to make the Final Basic Rent Payment. (Stip. ¶257) A higher rate will result in extra funds available to CED. CED therefore is exposed to both risks and benefits with respect to the Lease Collateral Deposit, if it chooses to fund that account.

#### 4. LaRue Agreed that All of the Conclusions in His Report Were Incorrect Unless the Sublease Purchase Option Is Exercised

In his report and testimony, LaRue reached the following conclusions regarding the cash flow that CED could expect from the RoCa3 Transaction:

- CED would never "bear any of the potential risks (or benefits from any of the potential rewards) inherent in the facility or its current and future business operations" (Tr. 5235; Ex. 20194 (LaRue Initial Report) at pages 25111-12);

- The "amounts and timing of the pre-tax net cash flows that [CED] would realize on its investment in the lease were preordained, secured, and defeased" (Tr. 5238; Ex. 20194 (LaRue Initial Report) at page 25111);

- The cash flows from the RoCa3 Transaction were "circular" (Tr. 5068; Ex. 20194 (LaRue Initial Report) at page 25111); and

- CED did not bear an "economic risk of loss" from the RoCa3 Transaction (aside from the loss of tax benefits). (Ex. 20194 (LaRue Initial Report) at page 25112)

Under cross-examination, however, LaRue admitted that all of these conclusions are correct only to the extent that one ignores the Shirt-Tail Period, the Retention Option and the possibility of premature termination. In other words, by examining only a very narrow aspect of the RoCa3 Transaction, LaRue came to very narrow conclusions. For example:

> Q. Okay. Isn't it true that every single one of the conclusions you have listed in your paragraphs 14 and 15 relate only to the scenarios 1 and 2 [*i.e.*, the Sublease Purchase Option and the Sublease Renewal Option].
>
> A. Yes.
>
> Q. Turning to paragraph 14 on page 25111 where you state, "at the time the trust/CELI entered into the lease, there was no reasonable expectation that the trust/CELI/ConEd could realize a pre-tax economic profit from its investment in the transaction." And that does not take into account any possibility of an early termination?
>
> A. That's correct.
>
> Q. And it does not take into account any cash flows from a retention option?
>
> A. You mean cash flows in excess of the amount of the sublease rent that was already scheduled under the sublease renewal option.
>
> Q. I am talking about a pre-tax economic profit as you defined it. That does not take into account the pre-tax cash flows from any retention option; is that correct?
>
> A. I did not consider the retention option in this report, as I mentioned.

Q. And it does not include any cash flows from a shirt-tail period?

A. That's correct.

(Tr. 5233-34)

Thus, each of LaRue's conclusions is incorrect unless one ignores the Retention Option, the Sublease Renewal Option and the possibility of a premature termination. LaRue agreed it was "pure speculation" to assume the Sublease Purchase Option would be exercised. (Tr. 5178-79) Thus, all of LaRue's conclusions are based on his speculative notion that the Sublease Purchase Option will be exercised and he ignored all other potential outcomes. As in *Frank Lyon*, *see* 435 U.S. at 581, this speculation is inappropriate.

Significantly, each of LaRue's conclusions would also be true of the *Frank Lyon* facts if one assumes (as did LaRue for the RoCa3 Transaction) that any of the four purchase options in *Frank Lyon* would be exercised. The purchase options in *Frank Lyon* were calculated to return Frank Lyon's investment with 6% interest. *Id.* at 567. Thus, Frank Lyon's cash flows were, to use LaRue's phrase, "preordained" *if* Worthen Bank exercised any of its four options.

Similarly, the cash flows expected by Frank Lyon were (once again, using LaRue's words) "entirely unrelated to the potential economic profits and losses that might be realized from the successful or unsuccessful operation" (Tr. 5241 (LaRue)) of the Worthen Bank building. Under the terms of the *Frank Lyon* lease, Worthen owed Frank Lyon a fixed amount of rent, which did not change based on the

"successful or unsuccessful operation" (Tr. 5240 (LaRue)) of the Worthen Bank building.

*Frank Lyon* also involved a "circular" flow of funds, as LaRue used that term. Frank Lyon paid Worthen $7,640,000, and Worthen was obligated to return that amount with 6% interest if it exercised any of its four options. Finally, Frank Lyon did not bear an economic risk of loss, in LaRue's terms, since it was assured it would receive back its investment with 6% interest *if* Worthen exercised one of its purchase options.

**a. Risks and Benefits from the RoCa3 Facility's Operations**

In his report and testimony, LaRue stated—without any qualification—that CED would never bear any of the risks or rewards of the RoCa3 Facility's operations. (Ex. 20194 (LaRue Initial Report) at page 25111) LaRue agreed at trial, however, that if the Sublease Purchase Option is not exercised, CED's revenues during the Shirt-Tail Period would depend on the operation of the RoCa3 Facility: "These cash flows would actually have been from the revenues, net of expenses, from the operation of the RoCa3 Facility. There is a lot of risk associated with that." (Tr. 5106)

He also agreed at trial that during the Retention Option Period, CED's revenues would be "entirely dependent" on the operation of the RoCa3 Facility:

> Q. In fact, with regard to the retention option in [sic][92] the shirt-tail, the cash flows would be far from entirely unrelated to the potential economic profits and losses that might be realized from

[92] This word probably should be "or".

the successful or unsuccessful operation of the facility, in fact, they would be entirely dependent on that, wouldn't they?

A. Yes.

(Tr. 5241 (LaRue))

Furthermore, these revenues, which in his report he chose to ignore, would be subject to risk:

Q. The revenues under the shirt-tail, there is a lot of risk associated with those? I think you testified to that this morning, right?

A. There is a lot of risk associated with that, yes.

. . . .

Q. And all those risks are the kinds of risks you would expect somebody who has an interest in the power plant overseas to bear with respect to the cash flows that might be generated from that investment?

A. That's correct.

(Tr. 5163-64 (LaRue))

As he readily agreed, LaRue's conclusions in his report concerning the risks presented to CED by operation of the RoCa3 Facility simply ignored all outcomes other than the Sublease Purchase Option. (Tr. 5240)

**b. Fixed Cash Flows**

While LaRue's report concluded that the cash flow from the RoCa3 Transaction would be "preordained" (Ex. 20194 (LaRue Initial Report) at page 25111), he agreed that the cash flows from the RoCa3 Transaction would not be "preordained" if the Sublease Purchase Option were not exercised:

Q. So, in other words, if the purchase option is not exercised, there would be cash flows that might occur that are not preordained, secured, and defeased in this transaction?

A. In the retention period?

Q. In the retention period or shirt-tail.

A. In the shirt-tail period, yes. In the retention period, yes.

(Tr. 5239)

Once again, LaRue's report simply "ignored those scenarios" which did not match his conclusions. (Tr. 5239)

#### c. Circularity

By limiting the scope of his report to the assumption that the Sublease Purchase Option is exercised, LaRue found that the cash flows would be circular. (Ex. 20194 (LaRue Initial Report) at page 25111) However, at trial, LaRue agreed that the cash flows from the RoCa3 Transaction would not be "circular" if the Sublease Purchase Option were not exercised. LaRue also confirmed that the cash flow received by CED during the Shirt-Tail Period would be "noncircular." (Tr. 5098) These amounts would come from the operation of the RoCa3 Facility and not from EZH. (Tr. 5241-42) Similarly, he agreed that his conclusions on "circularity" did not apply to the Retention Option. (Tr. 5239-40)

LaRue also agreed that the cash flows on an early termination would not be circular:

Q. But on early termination options, you don't have a similar discussion with respect to how, you know, so-called circular cash flows; is that right?

A. That's correct.

Q. In fact, aren't a lot of the cash flows that would have to be paid on an early termination not circular?

A. That's correct.

Q. In fact, it could be very substantial?

A. That's correct.

(Tr. 5181)

As described at Argument Section IV.B.4.b., these noncircular cash flows would create a large loss for EZH and a large gain for CED. (Tr. 5183-84) Once again, LaRue's limited review of the RoCa3 Transaction entirely determined his conclusions.

**d. Economic Loss**

In concluding that CED could not suffer an economic loss, LaRue again did not consider either the Retention Option or the Sublease Renewal Option. LaRue agreed, however, that "there is a lot of risk" (Tr. 5163) involved in these options, and that CED's cash flow would depend on the RoCa3 Facility's operation. (Tr. 5106, 5164) As explained at Argument Section IV.D.1., under the terms of the Facility Operating Agreement, CED would be responsible for the expenses of the RoCa3 Facility, and it would lose money if expenses were higher than revenue. Defendant's leasing expert Ray recognized that CED would face many significant risks which would affect, positively or negatively, the revenues CED would generate from selling its share of the RoCa3 Facility's output. (Tr. 4804-05, 4809-10, 4832)

LaRue also claimed that the payment of the Final Basic Rent Payment of $831.5 million on February 24, 2041 was circular and defeased. (Ex. 20194 (LaRue Initial Report) at pages 25133-39) There are two errors with this analysis.

First, LaRue assumed that CED "would be required" to fund the Trustee Treasury Collateral and the Lease Collateral Deposit. (Ex. 20194 (LaRue Initial Report) at pages 25121-22) However, as described above at Facts Section VIII.E.2.b., *and as the parties have stipulated* (Stip. ¶¶242, 254), CED *was not* required to fund the Trustee Treasury Collateral and the Lease Collateral Deposit. The parties have stipulated that these accounts could be replaced by a secured letter of credit. (Stip. ¶¶242, 254) LaRue was not aware of this fact when he wrote his report:

Q. Does ConEd have an option to replace that with a letter of credit and take the money for itself?

A. Apparently they do, with EZH's consent.

Q. And where is your understanding of that?

A. You will have to point me to a specific document. That is my understanding.

Q. First of all, did you mention that option in your report at any point?

A. Which option is that?

Q. The option to—well, the ability to replace this deposit with a letter of credit with EZH's consent.

A. I did not.

Q. Were you aware of it when you wrote your report?

A. I wasn't aware of it until you asked me that same question on deposition.

(Tr. 5192-93)

LaRue also testified:

Q. Couldn't Consolidated Edison take that money out of that lease collateral deposit merely by posting a letter of credit? Do you know?

A. I don't know. I don't believe so, but I don't know.

(Tr. 5227) LaRue apparently did not know the parties had already stipulated that CED could replace the collateral with a letter of credit. (Stip. ¶¶242, 254)

LaRue's belief that CED was required to fund the Trustee Treasury Collateral was the basis for his view that the RoCa3 Transaction included circular cash flows. (Tr. 5196-97) Therefore, if—as the parties have stipulated—these accounts can be replaced by a letter of credit, LaRue's testimony on circular cash flows is in error, as he himself agreed. (Tr. 5197-98)

LaRue's second error was that he assumed the Lease Collateral Deposit (if CED chooses to fund that account) would have a value of $274,922,796.33 on February 24, 2041. (Ex. 20194 (LaRue Initial Report) at page 25122) LaRue agreed "this 274 million figure" was part of his circular cash flow analysis. (Tr. 5211) Under cross-examination, however, LaRue could not demonstrate any support for his view that the Lease Collateral Deposit would have a value of $274,922,796.33. (Tr. 5200-11, 5219-20, 5223-24)

Once again, the parties' stipulation confirms that LaRue's testimony was in error. The parties stipulated that, if CED chooses to fund the Lease Collateral

Deposit, it would be funded to grow to a balance of $176,210,292.09 on June 15, 2034. (Stip. ¶244; Tr. 5206-07 (LaRue)) This amount would mature to $274,922,796.33, however, *only if* CED is able to earn interest at a rate of 6.86% from June 15, 2034 until February 24, 2041. (Stip. ¶246; Tr. 5207 (LaRue)) If CED could not earn this amount because of lower interest rates between 2034 and 2041, CED would earn less. LaRue mistakenly understood that this shortfall could be offset by "adjustments" to the "amount of the sublease rent." (Tr. 5207) But since the Sublease also ends on June 15, 2034, it would be impossible to adjust Sublease rents to cover this shortfall.

**E. LaRue's Testimony Concerning CED's "Economic Profit" Is Based on Two Fundamental Errors**

As demonstrated above (*see* Argument Section II.A.1.), the facts show that CED could expect to receive a positive pretax cash flow of at least $61 million from the RoCa3 Transaction. While LaRue agreed with this conclusion, he nevertheless testified that the RoCa3 Transaction would not produce a "pre-tax economic profit," as he defines that term. (Tr. 5152-54)

LaRue's testimony, however, contains two fundamental errors. First, his application of the "economic profit" test, as he defines it, is directly contrary to settled legal principles, including a decision from this court's predecessor. *See Johnson I*, 11 Cl. Ct. at 36-37. Second, by his own admission, LaRue's failure to review the Deloitte Appraisal led him to underestimate CED's potential pretax profit by hundreds of millions of dollars.

### 1. The Courts Have Not Accepted LaRue's Definition of "Economic Profit" In Leasing Cases

In his testimony, LaRue confirmed that CED could expect to receive pretax cash flow of $61 million if EZH exercises the Sublease Purchase Option, or $101 million if CED exercises the Sublease Renewal Option. (Tr. 5154-55; *see* Argument Section III.F.1.) As discussed below, these numbers fail to take into account the potential revenue from the Shirt-Tail Period, but LaRue agreed CED would earn a positive cash flow even before taking this additional revenue into account.

LaRue claimed, however, that the RoCa3 Transaction would not produce an "economic profit" because he discounted the pretax cash flows from the Transaction at a 6.183% interest rate. (Tr. 5100) This rate exceeds the 4.44% pretax internal rates of return[93] of the RoCa3 Transaction as calculated by LaRue. (Tr. 5114 (LaRue)) It is a tautology that if one selects a discount rate in excess of an internal rate of return, the discounted cash flows will be less than zero. This proves nothing other that the fact that the discount rate selected will always govern the result. LaRue therefore claims that a transaction will not produce an "economic profit" unless it produces an internal rate of return of at least 6.183%. (Tr. 5100)

In *Johnson I*, this court's predecessor, relying on the Tax Court's decision in *Estate of Thomas*, directly rejected the type of analysis presented by LaRue. *Johnson I*, 11 Cl. Ct. at 36. The leasing transaction in *Johnson* presented a 6.27% pretax cash flow at a time when the prime rate was 15.5%. Thus, the taxpayers

---

[93] LaRue's calculations do not follow the rules of leveraged lease accounting (*see* Facts Section X.B.2.), and therefore his calculations differ from the calculations reported by CED as required for financial reporting purposes.

could have invested their money in other transactions which would have produced a higher pretax return. The defendant therefore argued that the transaction should not be regarded as producing a "profit" unless it surpassed this higher discount rate:

> Defendant proposes that as an alternative means of determining the economic viability of the Transaction, the court should discount the expected residual value of the equipment back to 1979 dollars. A similar suggestion was made in *Estate of Thomas*, and the court said,
>
>> In the absence of statutory mandate, we decline to do so.
>>
>> . . . .
>>
>> Moreover, we do not feel competent, in the absence of legislative guidance, to require that a particular return must be expected before a "profit" is recognizable, the necessary conclusion to be drawn if we were to discount residual value.
>>
>> . . . .
>
> Defendant also charges that the pre-tax return on plaintiff's Transaction conclusively shows there was not a reasonable chance of making a profit. Assuming Equity did not exercise its right to remarket the equipment, plaintiff's receipt of the projected $80,000 residual would provide him with a pre-tax profit of $27,600, after subtracting the projected $52,400 tax loss. This represents a return of $3,450 per year, or a 6.27 percent per year pre-tax rate of return on an initial equity investment of $55,000. Defendant believes that when compared to the prime rate of interest at the time, 15.5 percent, this is not a reasonable profit. Because Johnson believed he could earn more than six percent after taxes, a profit maximizer would not invest money for a 6.27 percent pre-tax rate of return.
>
> . . . .
>
> This reasoning is unpersuasive. Plaintiff must show "a reasonable chance of making a reasonable profit apart from tax considerations . . . . [M]ore than a 'modicum' of profit necessary to avoid a finding of a 'sham transaction' is necessary." Treas. Reg. §1.183-2(b)(9) (1972) states:

> It is not, however, necessary that an activity be engaged in with the exclusive intention of deriving a profit or with the intention of maximizing profits . . . . [t]he availability of other investments which would yield a higher return, or which would be more likely to be profitable, is not evidence that an activity is not engaged in for profit.
>
> Indeed, "[o]ur sole task here is to determine whether a profit was reasonably likely on these facts in order to find that tax avoidance was not the sole motivation for the transaction." *Estate of Thomas*, 84 T.C. at 440 n.52. Plaintiff's annual return of 6.27 percent appears reasonably likely and is more than a modicum of profit.

*Johnson I*, 11 Cl. Ct. at 36-37.

Other cases besides *Johnson I* and *Estate of Thomas* have also rejected the notion of applying a discount rate to the cash flows from a lease or of requiring a certain level of minimal profit. *Gefen*, 87 T.C. at 1499, 1504; *Ockels*, 54 T.C.M. (CCH) at 795-96; *Kaufman*, 53 T.C.M. (CCH) at 1355 n.17; *Greenbaum*, 53 T.C.M. (CCH) at 720-21 (upholding a lease where "the profit is not de minimis"); *see also Lemmen v. Comm'r*, 77 T.C. 1326, 1346 n.29 (1981). The leasing cases have not adopted LaRue's approach.[94]

---

[94] The Tax Court made such a suggestion in *Hilton,* 74 T.C. at 353 n.23, but in upholding the Tax Court, the Ninth Circuit specifically disavowed this part of the Tax Court's opinion. *Hilton v. Comm'r*, 671 F.2d 316, 317 (9th Cir. 1982). In *Estate of Thomas*, the Tax Court described its earlier statement in *Hilton* as "dictum," which it declined to follow. 84 T.C. at 440 n.52.

The Tax Court applied a discount factor in a series of cases involving energy management systems, but made clear that its analysis was limited to cases involving this type of equipment. *See, e.g.*, *Schillinger v. Comm'r*, T.C. Memo 1990-640, 60 T.C.M. (CCH) 1470, 1477-78 (1990). These transactions also suffered from numerous other infirmities: the taxpayer paid $10,000 in advance rentals on equipment worth $1,000, and it was not clear the equipment was ever placed in service, or that it even existed. *Id*. at 1478. On the appeal of one of these energy

In his testimony, LaRue claimed that the decision in *Transcapital* (a case in which LaRue testified) "accepted the analyses of the government's experts, which involved discounted cash flows." (Tr. 5342) This statement is not correct. The court in *Transcapital* explicitly *did not* apply a discounted cash flow analysis. *Transcapital*, 97 A.F.T.R.2d at 2006-1916. The court in *Transcapital* found that the transaction would result in a "$2,092,261 negative cash flow impact" assuming the predicted residual values were received. The court specifically stated this cash flow was "undiscounted," and repeatedly stated that its projections were "undiscounted." *Id.* at 2006-1935. Thus, the *Transcapital* court did not adopt LaRue's discounted cash flow analysis, but simply followed the rule applied by other courts, *i.e.*, it measured the net cash flow on an "undiscounted" basis. While the opinion makes a brief reference to LaRue's testimony, *id.* at 2006-1939, it does not adopt or even reference his discounted cash flow analysis.

LaRue conceded that his application of a discount rate to CED's cash flows is contrary to the Leasing Guidelines, which do not provide for the discounting of cash flows:

> Q. Under those revenue procedures, focusing on that for a moment, under those revenue procedures, do you take the future value of the residual into account or the present value as of the closing date, using the discount rate?
>
> A. You do not use a discount rate.

(Tr. 5340)

---

management system cases, the court held that the decision was "affirmable irrespective of any present value analysis." *Walford v. Comm'r*, 123 Fed. Appx. 952, 955 (10th Cir. 2005).

LaRue's definition of "economic profit" is also contrary to other commonly accepted definitions of "profit." For example, LaRue agreed that the RoCa3 Transaction will produce a taxable profit for tax purposes, *i.e.*, taxable income. (Tr. 5152-53) As a result, LaRue's calculations show that CED will pay tens of millions of dollars in additional taxes it would not have paid but for entering into the RoCa3 Transaction. (Tr. 5187) LaRue (as well as Defendant's other witnesses) also did not dispute that the RoCa3 Transaction will produce a significant profit for accounting purposes. In fact, the after-tax cash flow, after-tax profit for accounting purposes and after-tax profit for tax purposes are exactly the same, *i.e.*, $66 million. (Tr. 1051-52; 1227 (Holzman))

LaRue's definition of "economic profit" would also mean that all investments in tax-exempt bonds are unprofitable. (Tr. 5261-62) Tax-exempt bonds will always pay an interest rate lower than taxable bonds with similar risks and duration. (Tr. 3244-46 (Ellis)) Thus, measured against the discount rate proposed by LaRue, these bonds would always produce a negative rate of return. Indeed, by LaRue's definition, any investment producing a rate of return less than 6.183% is a money-losing proposition. (Tr. 5260-62)

Finally, LaRue's definition of "economic profit" is contrary to the testimony of Defendant's leasing experts, Ray and Bent, concerning typical rates of return on leasing investments. (Tr. 3785-87 (Bent); Tr. 4874-76 (Ray)) If LaRue is correct, then none of the leasing deals routinely done by Defendant's own leasing experts would pass muster.

Bent confirmed that pretax yields on leases of 3-4% are quite normal:

Q. Are pre-tax returns of 1 to 2 percent common in your experience?

A. I don't think I would characterize them as common, but they are not unusual or unheard of.

Q. Have you done transactions with pre-tax yields of 1 to 2 percent?

A. Yes, I have.

Q. And have you personally worked on deals with pre-tax yields of 3 to 4 percent?

A. Yes, I believe I have.

Q. And you have worked on leasing projects in the power industry; is that right?

A. I have.

Q. And in power industry deals you have worked on, where there has been good credit behind the transaction, would you say that investors have accepted relatively low pre-tax yields?

A. Well, by relatively, I think you mean relative to the after-tax yield or relative to market rates of return?

Q. Just, I mean, the 2 to 3 percent, for instance.

A. Yes, it is not uncommon for investors to design a deal that returns that kind of pre-tax yield, cash-on-cash return.

Q. And in those deals where there has been a pre-tax yield of around 2 to 3 percent, was the after-tax yield markedly higher?

A. I would say it was higher. Again, I'm not sure I could quantify markedly higher, but certainly it adds to the after-tax yield, yes.

Q. Well, have you done deals where a pre-tax yield of 2 to 3 percent yielded an after-tax yield of around 11 or 12 percent?

A. I believe I have done deals with numbers in that range, yes.

Q. Those were power deals?

A. That I couldn't tell you specifically, I'm sorry, I don't remember the yields on a deal-by-deal basis, but overall those are not unusual numbers.

(Tr. 3785-87)

Mr. Ray testified to the same effect:

Q. You wouldn't—I mean, for instance, if it were 2 percent, 3 percent, 4 percent, those wouldn't cause you not to do the transaction?

A. That's right.

Q. Because you are looking at after-tax returns?

A. That's right.

Q. So would you be surprised if a transaction, a leveraged lease transaction that had an after-tax return of around 12 percent had a pre-tax internal rate of return on cash flows of, say, 2, 3, 4 percent?

A. No.

Q. And you wouldn't be dissuaded from doing that deal because of that fact, would you?

A. No.

Q. In fact, you wouldn't even think it was particularly relevant?

A. No.

Q. In other words, you would not think it is relevant?

A. I would not—let me get it right.

Q. Go ahead and repeat it back to me how you want to.

A. I would not think that that would be relevant on the face of it. There might be some mitigating circumstances where it could, but in general, no.

Q. And, in fact, if the, say, 3 percent return, pre-tax internal rate of return were only 3 percent, and that were below the Treasury rates, that wouldn't particularly bother you, would it?

A. No. As long as the tax—as long as the tax benefits were there.

Q. And this is an analysis you have done in every leverage lease you have done?

A. Yes, yes.

(Tr. 4874-76)

The transactions with 1-4% pretax yields, as described by Ray and Bent, would all fail LaRue's "economic profit" test, as LaRue himself confirmed:

Q. As a hypothetical, if I were to tell you as a hypothetical, though, hypothetically, that there are routinely, in leveraged lease transactions, pre-tax internal rates of return of only 1 to 2 to 3 percent, all of such transactions would fail your test and produce a negative economic profit pre-tax; is that correct?

A. I believe all of those transactions would produce a negative cash flow, negative discounted value.

Q. As you have—

A. A negative present value, I'm sorry.

Q. As you have concluded here for the RoCa3 transaction?

A. I have concluded here that discounting the free cash flows at the interest-free rate produces a negative present value, yes, a substantial negative present value.

Q. And by definition, in my hypothetical, lease transactions that had a pre-tax internal rate of return of only 1, 2, 3 percent would produce exactly the same result, not the same number, but they would all be negative as well, right?

A. I think the math works out that way, yes.

(Tr. 5263-64)

During the opening statement, Defendant's counsel claimed that the RoCa3 Transaction produced only a 2.4% pretax return and that this level of profit was insufficient. (Tr. 76) There are two problems with this statement. First, LaRue's calculations confirmed that the actual pretax rate of return was 4.44%, not 2.4%.[95] (Tr. 5051, 5114) Second, Defendant's leasing experts Ray and Bent both confirmed, as set forth above, that a pretax rate of return of 4.44% is entirely normal and, in fact, is on the high end of normal leveraged lease returns. Significantly, the yields on the RoCa3 Transaction fall squarely within, or perhaps slightly above, the typical yields described by Ray and Bent. (Tr. 3785-87 (Bent); Tr. 4874-76 (Ray)) According to LaRue, the pretax yield is 4.4% (Tr. 5114) and the after-tax yield as calculated for accounting purposes is 12.23%.

Ellis's testimony confirmed that virtually all leveraged leases would flunk LaRue's test. (Tr. 3254-63, 3270-73) Ellis located numerous representative lease transactions from published literature, including federal government publications, FASB publications and the decision in *Johnson I*. (Ex. 10073 (Ellis Initial Report) at page 20042; Tr. 3253-73)) These examples showed that, in each case, the pretax yield from the lease transaction would be lower than the yield from a risk-free investment from the same time period. (*Id.*)

[95] The reference to a 2.4% rate of return comes from the Leasing White Paper (Ex. 397; Tr. 76), and does not explain how this amount was calculated; it may reflect an after-tax calculation, not a pretax calculation. (Tr. 714 (Freilich)) Con Edison believes that LaRue's calculation of the pretax return is mathematically correct; however, as explained by Defendant's leasing expert Ray, the pretax rate of return is a meaningless number. (Tr. 4870-71, 4874-76)

LaRue criticized Ellis' examples (Tr. 5134-35), but LaRue confirmed that he has no experience or information concerning typical yields on leasing transactions. (Tr. 5149) Thus, LaRue, in contrast to Ray, Ellis and Bent, has no basis of knowledge that would confirm whether or not leasing yields are typically higher or lower than the risk-free rate of return, and he has no basis for judging whether CED's return from the RoCa3 Transaction is consistent with other leases.

Ellis' testimony regarding the economics of leasing explained why the pretax returns of leases will *always* be lower than the returns on comparable debt instruments. From a lessee's point of view, the principal reason for leasing, rather than buying, an asset is that the cost of leasing the asset is less than the cost of borrowing to buy the asset. (Tr. 3134-36 (Ellis)) The difference between the cost of lease financing and debt financing is the lessee's main motivation to lease rather than buy property:

> [L]ease rates on the leveraged leases are lower than debt rates on the loan. From the point of view of the lessee, this is the main motivation to lease, rather than purchase, the asset in the first place.

*Equipment Leasing*, §6:2.1, 6-4. An analysis of whether leasing an asset is cheaper than borrowing to buy the asset is called a "lease versus buy" analysis, and this analysis is commonly used in leasing transactions. (Tr. 3134-36 (Ellis)) Since a lessee will not choose to lease, rather than buy, property unless the amount paid to the lessor is less than the cost of borrowing to purchase the property, the pretax return paid to the lessor will *always* be less than the cost of borrowing; if it were not, the lessee would simply borrow the money and pocket the difference.

Thus, the lessor's pretax return from a lease will *always* be lower than the return of a debt obligation with similar terms, as Ellis' testimony demonstrated, and as was the case in *Johnson I*, 11 Cl. Ct. at 36. From the lessor's point of view, "a leveraged lease provides an unsatisfactory rate of return when analyzed without including the tax aspects" of the lessor's interest. (Tr. 3235 (Ellis)); *Equipment Leasing*, §6:2.1, 6-4. In analyzing a leasing transaction, a lessor will therefore always focus on the lessor's after-tax return, as Defendant's witnesses Ray and Bent confirmed. (Tr. 4870-71, 4874-76 (Ray); Tr. 3788 (Bent); *see* Ex. 10078 (Ellis Rebuttal Report) at pages 20368-69) A pretax analysis—such as that applied by LaRue—is meaningless, as Ray confirmed. (Tr. 4874-76)

The testimony of Ray and Bent therefore establishes three points:

(1) The pretax rates of return on leases are low (1-4%). (Tr. 3785-87 (Bent); Tr. 4874-76 (Ray))

(2) No one analyzes leases on a pretax basis. (Tr. 4870-71; 4874-76 (Ray); Tr. 3788 (Bent))

(3) Lessors always take into account tax benefits in analyzing leases. (Tr. 4717-18, 4721, 4849, 4850-51 (Ray))

There is nothing inappropriate in CED's taking into account tax benefits in the context of an otherwise profitable investment. *Frank Lyon*, 435 U.S. at 580. In Revenue Ruling 55-540, the IRS recognized that tax advantages may be a "significant motive" for structuring a transaction as a lease. Rev. Rul. 55-540, 1955-2 C.B. at 40. The cases have continued to uphold leasing transactions demonstrating a pretax profit, even when the tax deferral played a significant role in the lessor's decision. *Frank Lyon*, 435 U.S. at 580.

During the opening argument, Defendant's counsel denied that its arguments "would potentially disallow all other leveraged leases." (Tr. 99) The testimony of Bent, Ray and Ellis, however, establishes that LaRue's "economic profit test" *would* "disallow all other leveraged leases, thereby eliminating the entire multi-billion dollar industry." It is little wonder that the courts have uniformly rejected LaRue's definition of "economic profit" in leasing cases.

### 2. LaRue's Cash Flow Calculations Ignored the Shirt-Tail Period and the Retention Option

LaRue's report as to his "economic profit" test contains a second fundamental mistake. As discussed above, his report ignores the additional cash flows CED could expect during the Shirt-Tail Period, and his report completely ignores the cash flows that might be expected during the Retention Option Period. LaRue testified that he "ignored" these cash flows because he could not find calculations of these cash flows (Tr. 5110, 5116, 5157, 5239):

> Q In reviewing all the documents in this case that you reviewed, do you recall ever seeing any estimate or range of estimates of how much pre-tax cash flows in U.S. dollars that ConEd expected to receive during the shirt-tail period beginning in 2034?
>
> A. I saw no such analyses. And I looked very hard for—I expected to find them, and I didn't find them.
>
> Q. In reviewing documents in this case, do you recall ever seeing an estimate or range of estimates at how much pre-tax cash flows in U.S. dollars that ConEd expected to receive during the last 23 years if EZH did not exercise the purchase option, and ConEd did not elect the sublease renewal option?
>
> A. Same answer. I had expected to find those, and I did not find them. I looked for them.

(Tr. 5129)

As described above, however, the Deloitte Appraisal does contain detailed estimates of the cash flow that CED might expect under either the Retention Option Period or the Shirt-Tail Period. (*See* Argument Section IV.D.3.) Since Deloitte used the discounted cash flow method to value the Facility, estimating the future cash flows over the life of the RoCa3 Facility was a necessary part of Deloitte's analysis.

LaRue did not review these projections because he did not review the Deloitte Appraisal, other than its first few pages:

> Q. Okay. Let me ask you a question. You have been referencing the Deloitte report. Did you review the Deloitte appraisal at the time you prepared your report or your rebuttal report?
>
> A. At the time I prepared my report, I had looked at the Deloitte appraisal. It was one of many documents that I had looked through. Some documents I focused on and spent a lot of time on. The Deloitte appraisal, I did not spend a lot of time on. I read the first few pages and I may have glanced through—I am trying to remember—it seems to me that document was about 120 some odd pages long.
>
> That was an appraisal report. It did not, to my mind, purport to suggest what kind of U.S. cash dollar revenues that ConEd might expect to receive during the shirt-tail period under what I have referred to as scenario 2 or under the retention option that has been referred to, I understand, as scenario 3.
>
> So it didn't purport to do that. I don't believe that was the purpose of—I did not believe, and do not believe now, that that was the purpose of the appraisal.
>
> . . .
>
> *So my direct answer to your question, did I spend any time reviewing the Deloitte & Touche appraisal at the time I prepared my report or my rebuttal report, the answer is no*, I spent very little time, other than looking at the first few pages and then

> clicking through a lot of pages at a time to get to whatever was next.

(Tr. 5109-11) (emphasis added)

LaRue gave a series of contradictory reasons for ignoring the cash flow during the Shirt-Tail Period and Retention Option Period, aside from the fact that he failed to find these calculations. At one point, he claimed he ignored the Shirt-Tail Period and Retention Option Period because Cornerstone "made no attempt to determine . . . what amount of rent might be earned during the shirt-tail period . . . .[or] the retention option." (Tr. 5088 (LaRue)) This statement is simply untrue. As explained above, the Deloitte Appraisal does contain a detailed analysis of the cash flow that might be received during these periods. (*See* Facts Section VI.D.4.) LaRue, having no experience in leasing, apparently did not realize that it is standard practice to take a conservative view of lease residual value in pricing a transaction, which is why Cornerstone did not show these amounts in the pricing runs. (Tr. 1208 (Holzman); Tr. 3161 (Ellis)); *see Equipment Leasing*, § 2:5.3, 2-25.

At other points, LaRue stated that he did not consider the Retention Option or the Shirt-Tail Period because he "thought that that whole issue was moot" (Tr. 5104) because it appeared to LaRue that the Sublease Purchase Option would be exercised. This statement, however, is contradictory, because LaRue *did* analyze the Sublease Renewal Option, which presupposes that EZH has not exercised the Sublease Purchase Option. If EZH has not exercised the Sublease Purchase Option, then CED can elect *either* the Sublease Renewal Option or the Retention Option. LaRue could not explain why he ignored one option but not the other.

LaRue agreed that the cash flows from the Shirt-Tail Period and the Retention Option Period were not fixed and determinable, were not known in advance and were related to the operation of the RoCa3 Facility. (Tr. 5239-41) Thus, the potential cash flow from these periods—which he was not aware of when he filed his report—completely undermines each of LaRue's conclusions. (See Argument Section IV.D.4.)

## CONCLUSION

For the reasons set forth above and the evidence presented at trial, this Court should respect the RoCa3 Transaction and cause Defendant to refund $328,066, plus interest as allowed by law.

/s/ David F. Abbott
DAVID F. ABBOTT
MAYER BROWN LLP
1675 Broadway
New York, NY 10019-5820
Tel: (212) 506-2642
Fax: (212) 849-5642
dabbott@mayerbrown.com

Of Counsel:
JOEL V. WILLIAMSON
THOMAS L. KITTLE-KAMP
BRIAN W. KITTLE
MICHAEL R. EMERSON
MEGAN E. WERNKE
MAYER BROWN LLP

April 7, 2008

*Counsel for Plaintiff*