# APPENDIX A

## GLOSSARY

### Individuals

Paul Bent: Defendant's expert witness qualified as an expert in equipment leasing transactions, including the structuring, arranging and negotiation of such transactions. (Tr. 3683-3684) Bent has a Bachelor's degree in mathematics and computer science from UCLA (Tr. 3674) and a J.D. from Southwestern University School of Law. He is currently a principal with the ALTA Group, a lease consulting firm. (Tr. 3667)

Femke Bierman: Attorney with CED's outside Dutch legal advisor, Loeff Claeys. (Tr. 1082 (Holzman)) Bierman attended the site visit of the RoCa3 Facility on November 11, 1997, and with her assistance CED was able to ensure that the Operative Documents provided CED with the necessary rights to be able to sell its portion of the RoCa3 Facility's output. (Tr. 1078 (Holzman))

Kevin Burke: From 1993 though 1998, Burke was the vice president of Corporate Planning for Con Edison NY (Tr. 428), and he is Con Edison's current Chairman and CEO.(Tr. 425-26) Burke was involved in planning Con Edison's response to deregulation (Tr. 444-46) and the creation of CED. (Tr. 477-78, 480-81 (Burke))

Anthony DeCristofaro: A Duke Engineering employee involved in its engineering analysis of the RoCa3 Facility that was part of CED's RoCa3 Transaction due diligence. As of 1997, he had approximately 15 years of experience in power plant design and specialized in power plant controls. (Tr. 1833 (Gonzalez); Tr. 1499 (Radini))

Brian DePlautt: Vice president of CED beginning in early 1997. DePlautt had significant energy related project finance experience. (Tr. 2053-55 (DePlautt)) DePlautt's initial CED role was to search for energy-related investment opportunities within the core competencies of Con Edison that could provide earnings. (Tr. 2057, 2059 (DePlautt)) He was CED's internal reviewer for the RoCa3 Transaction.

Dr. David M. Ellis: Con Edison's expert witness qualified as an expert in the areas of finance, analysis and returns of complex financial transactions (including leases), and analysis and valuation of securities. (Tr. 3115-3116) Ellis has a Bachelor's degree from the University of Durham (England), an M.B.A. with an emphasis in finance from Brigham Young University, and a Ph.D. in finance from the University of North Carolina–Chapel Hill. (Tr. 3085-3085) He was an associate professor at Babson College (a renowned business school) and Texas A&M, where he taught various courses such as corporate finance, advanced finance, derivatives and

portfolio management. (Tr. 3095-100) He is currently employed by the consulting firm National Economic Research Associate, Inc. ("NERA"). (Ex. 10073 (Ellis Initial Report) at page 19990)

Richard K. Ellsworth: Ellsworth was the Deloitte appraiser that managed the appraisal review of the RoCa3 Facility. (Tr. 1601 (Ellsworth)) Ellsworth had personally performed hundreds of appraisals, including 50 appraisals on power generating assets, 10 of which were gas-fired facilities like RoCa3. (Tr. 1620, 1623-24) Ellsworth completed his first appraisal of a power generating asset, a wood-burning power plant, in 1986. (Tr. 1621)

Woody Flowers: Flowers was a Shearman & Sterling attorney and acted as one of CED's outside U.S. legal advisors. (Tr. 1092 (Holzman))

Gerald Foley: Senior mechanical engineer at Duke Engineering with about 40 years of experience in power plant design as of 1997. (Tr. 1833 (Gonzalez)) Foley was an employee Duke Engineering and assisted in the engineering evaluation of the RoCa3 Facility on behalf of CED. (Tr. 1856-57 (Gonzalez))

Joan Freilich: In 1997, Freilich was the CFO of Con Edison NY and served as a member of the CED Board of Directors. (Tr. 671)

Luis C. Gonzalez: Duke Engineering electrical engineer with over 30 years of experience related to power plant design and technical evaluation as of 1997. (Tr. 2271) Gonzalez selected the Duke Engineering due diligence team as well as attended the site visits, reviewed technical information, and assisted in the drafting and review of the engineering due diligence report. (Tr. 1856-57)

A.J. Goulding: Con Edison's expert witness qualified as an expert in the regulatory economics associated with electricity markets. (Tr. 2364-65) Goulding has a Bachelor's degree in economics from Earlham College and a Master's degree in international business from Columbia University. (Tr. 2342) Goulding has consulted for many clients in connection with various foreign energy markets, including shaping deregulation policy in various countries. (Tr. 2352-55, 2358-59)

Rob Holzman: In 1997, Holzman was a vice president at Cornerstone, CED's financial advisor in the RoCa3 Transaction. (Tr. 1004-05) He joined Cornerstone in 1990 as an associate, and his initial duties entailed performing economic analyses of leveraged lease transactions using pricing software. (Tr. 998-1000) Holzman was the Cornerstone employee principally involved in advising CED in the RoCa3 Transaction.

John P. Kelly: Con Edison's expert witness qualified as an expert in valuations, appraisals and appraisal reviews of utility properties. (Tr. 2755). Kelly has a B.S. in electrical engineering from Northeastern University; he has also taken graduate

courses at the Northeastern University graduate school. (Tr. 2750) He is a Registered Professional Engineer in Maine and a Certified General Real Estate Appraiser in Maine, Massachusetts, New York and Michigan. (Tr. 2750) He has performed over 200 power plant appraisals. (Tr. 2753-54)

Paul Kinkel: In 1997, Kinkel was the Vice President of Engineering for Con Edison NY and served as a member of the CED Board of Directors. (Ex. 141 at page 3337)

Dr. David W. LaRue: Defendant's expert witness qualified as an expert in accounting and finance. (Tr. 5046) LaRue has a Bachelor's degree in production logistics management and a Master's degree in accountancy from the University of Houston. (Tr. 5010) He also has a Ph.D. from the University of Houston College of Business; in business school, his major fields of study were accounting and taxation, and he studied economics as a supporting field. (Tr. 5029-5030) LaRue is currently an associate professor at the University of Virginia. (Tr. 5011)

Mary Jane McCartney: Since 1993, McCartney has been the Senior Vice President of Gas Operations of Con Edison NY, and in 1997, she served as Chairman of the CED Board of Directors. (Tr. 736-39)

Eugene McGrath: Con Edison NY CEO in 1997. During his tenure as CEO, Con Edison experienced deregulation in New York State's electricity industry (a process that began in the early 1990s). (Tr. 112, 133 (McGrath)) This resulted in Con Edison NY divesting most of its power generating assets in New York State. Con Edison NY's generating asset provided 20% of the Con Edison group's revenues prior to divestiture. (Tr. 136-37 (McGrath))

Phillip Mintun: In 1997, Mintun worked for Capstar (Tr. 2853-54) and he was involved in advising EZH in the RoCa3 Transaction. (Tr. 2865) Mintun represented EZH in connection with CED's the due diligence on the RoCa3 Transaction and other aspects of the RoCa3 Transaction. (Tr. 2865-66)

Harold Morrison: Knowledgeable Con Edison power engineer that attended CED's site visit of the RoCa3 Facility on November 11, 1997 to assist in the due diligence process. (Tr. 1081-82 (Holzman))

Charles Muoio: Joined Con Edison NY in 1995 with the Corporate Planning group. (Tr. 1895, 1902-03) Muoio was hired by Con Edison NY because of his experience working with deregulated companies and international development projects. (Tr. 1904 (Muoio)) He was appointed CEO and president of CED (Tr. 1905); as such, he was responsible for developing its first business plan in 1997. (Tr. 1906-07)

Hans Nieuwenhuis: Tauw employee and project manager in connection with CED's environmental due diligence of the RoCa3 Facility. (Tr. 1562 (Nieuwenhuis); Stip.

¶81) Nieuwenhuis has performed over 400 environmental due diligence projects. (Tr. 1553, 1556)

Richard K. Radini: Radini was Duke Engineering's head of non-nuclear, non-hydro, non-transmission/distribution group in 1997. (Tr. 1468 (Radini)) He had supervision responsibilities over Duke Engineering's technical engineering evaluation matters. (Tr. 1489, 1496)

Samuel M. Ray: Defendant's expert witness qualified as an expert in large-ticket equipment lease transactions and the equipment leasing industry. (Tr. 4707) Ray has a Bachelor's degree in mechanical engineering from Texas Tech University and a Master's degree in business administration from Southern Methodist University. (Tr. 4697-4798) He is currently a principal with the ALTA Group, a lease consulting firm. (Ex. 20195 (Ray Initial Report) at page 25201)

John J. Reed: Con Edison's expert witness qualified as an expert in the purchase, sale, and valuation of power plants and in the economic and financial factors relating to such transactions. (Tr. 2580-2581) Reed has a B.S. degree from the Wharton School of Business of the University of Pennsylvania, and he completed numerous graduate courses related to the securities industry. (Tr. 2567) He has led transaction teams involved in the sales of over 50 fossil fuel plants. (Tr. 2572-2573)

Dr. Jacob K. Thomas: Defendant's expert witness qualified as an expert in economics, with a specialization in accounting and financial economics. (Tr. 4473-4474) Thomas has a Bachelor's degree from IIT (New Delhi), an M.B.A. from the Iran Center for Management Studies (Tehran), and a Ph.D. from the University of Michigan Accounting Department. (Tr. 4464; Ex. 20197 (Thomas Initial Report) at page 25266) He is currently a professor of Accounting and Finance at Yale University. (Tr. 4464)

Dr. Roman L. Weil: Con Edison's expert witness qualified as an expert in economics, specifically in the subspecialties of accounting and related managerial decision making. (Tr. 3487-3489) Weil earned his Bachelor's degree with a combined major in mathematics and economics from Yale. He also earned a Master of Science in Industrial Administration and a Ph.D. in Economics from Carnegie Institute of Technology, now known as Carnegie Mellon University. (Tr. 3467-3468 (Weil)) Weil is a Certified Public Accountant (CPA) in Illinois and a Certified Management Accountant (CMA). (Tr. 3468-3469 (Weil))

**Terms**

ABC: Widely used pricing software developed by Warren & Selbert to optimize intricately structured financial transactions and to compare financial alternatives. It supports many types of models, including leveraged leasing, lease-versus-buy, project finance, debt and revenue optimization, securitization and portfolio analysis.

ABN AMRO: ABN AMBRO BANK N.V. Holder of the Sublease Deposit.

Acceptable Substitute Collateral: If CED elects either the Sublease Renewal Option or the Retention Option, CED is required to provide security to EZH for the Final Basic Lease Payment. Acceptable Substitute Collateral provides CED with the option of providing a letter of credit or other collateral to support its Final Basic Rent Payment obligation in lieu of establishing certain collateral accounts, such as the Trustee Treasury Collateral. (Stip. ¶¶242, 253)

Actual Treasury Price: The actual amount CED would have to pay to fund the Trustee Treasury Collateral if it decides to fund this account in 2018 if either the Sublease Renewal Option or Retention Option is exercised.

Arthur Andersen: Engaged by Cornerstone on behalf of CED to provide accounting advice in connection with leveraged lease transactions, including the RoCa3 Transaction. (Tr. 1054 (Holzman))

Banc One: Banc One Leasing Inc. Banc One separately invested in a leveraged lease for the remaining undivided interest in the RoCa3 Facility. (Stip. ¶58 n.2)

Board of Trustees: Con Edison NY's Board of Trustees (the equivalent of a board of directors).

Bundled/bundled format: Refers to the practice where the same legal entity generates, transmits and distributes that electricity to its customers. This is also referred as "vertically integrated."

Capital Expense Budgets: Annual budgets proposed by the Operator regarding projected capital expenditures that require CED's approval prior to implementation following the termination of the Sublease.

Capstar: Capstar Partners. EZH's advisor in the RoCa3 Transaction.

CED: Consolidated Edison Development, Inc. Con Edison is the parent company of CED. CED was known as Gramercy Development, Inc. until September of 1997 when the PSC permitted Con Edison to change GDI's name to Consolidated Development, Inc. CED is the parent of Consolidated Edison Leasing Inc. ("CEL"). For simplicity, the brief refers to the Investor of the transaction as CED, unless the context requires otherwise.

Lease Interest: This is the Sublessor's Lease Interest as defined in the Participation Agreement (Ex. 1) at page 166. By definition this includes all of CED's rights under the Lease and the Control Documents.

CEI: Con Edison, Inc. CEI has been the holding company (parent) of the Con Edison corporate group since January 1, 1998. (Stip. ¶24) Con Edison NY is a subsidiary of CEI, as are a number of other subsidiaries, including CED.

CEL: Consolidated Edison Leasing, Inc. CEL is defined as the Investor in the RoCa3 Transaction (Ex. 1 at page 136), but for simplicity Con Edison's post trial brief refers to CED as the Investor.

CEL Trust: Abbreviation for RoCa Facility Trust No. 2. CED, through CEL, formed this trust to enter into the Operative Documents.

Closing Date: December 15, 1997.

Common Facilities: The facilities, including the control room, the gas receiving station and parking spaces, that are shared by the RoCa3 Facility and two other smaller power generating facilities at the same site (Ex 12 at page 805). (Ex. 1 at page 122)

Con Edison: Refers to Con Edison corporate group, Plaintiff.

Con Edison NY: Consolidated Edison Company of New York, Inc.

Control Documents: The Participation Agreement defines this as the Access Agreement, the Facility Operating Agreement, the Common Facilities Use Agreement and the Facility Support Agreement. (Ex. 1 at page 122) Each of these agreements is part of CED's Lease Interest, and each is discussed in Con Edison's Opening Post Trial Brief.

Cooling Water Channel and Cooling Water Station: Equipment used to transport water from a river to the RoCa3 Facility to cool the RoCa3 Facility's waste heat.

Cornerstone: Cornerstone Financial Advisors L.P. Cornerstone is a financial advisory group that specializes in representing equity investors in leveraged lease transactions. Cornerstone had a significant amount of experience involving leveraged leases of power generating facilities. (Tr. 1040-41 (Holzman)) Cornerstone was CED's financial advisor in the RoCa3 Transaction. (Tr. 1005-07 (Holzman))

Corporate Planning: In the 1990s, Con Edison's Corporate Planning group focused on Con Edison's response to the impending deregulation process in New York State and worldwide as well as the resulting divesture of Con Edison's generating assets. (Tr. 444-46 (Burke))

DCF: Discounted Cash Flow approach—one of three methods used to value an asset.

Defendant: The United States.

Deloitte: Deloitte & Touche LLP. CED's appraiser that performed an appraisal of the RoCa3 Facility in connection the RoCa3 Transaction. (Ex. 46 at page 1502)

Deloitte Appraisal: Deloitte's appraisal on the RoCa3 Facility.

Duke Engineering: Duke Engineering & Services, Inc. Duke Engineering was CED's independent engineer that preformed an engineering due diligence evaluation of the quality of the RoCa3 Facility, including its design and construction, its useful life and its projected operating costs. (Tr. 1833-34 (Gonzalez); *see* Stip. ¶79)

E.ON: Refers to a large the corporate group of a large German utility with operations throughout Europe. In 199, EZH was acquired by a German utility, which eventually merged with another German utility to form E.ON AG. In 2000, E.ON changed EZH's name to E.ON Benelux Generation N.V. (Stip. ¶¶71, 72)

EDS: Electronic Data Systems. Defendant's leasing expert Samuel Ray was formerly employed by EDS, a corporation involved in leasing transactions of many different assets.

EIF: Energy Investment Fund III. EIF is a fund that made investments in energy and infrastructure projects worldwide. In 1997, CED anticipated that an investment in the EIF would produce near-term earnings. (Ex. 138 at page 3276) CED made an investment in the EIF in August, 1997. (Ex. 172 at page 4199)

Entitlement Shares: These shares allow CED to vote on certain matters related to operation of the RoCa3 Facility following the termination of the Sublease. CED possess 47.47% of the shares entitled to vote based on its Undivided Interest. (Stip. ¶267; Ex. 11 at page 740)

Equity investor: The party in a leveraged lease transaction that is making an equity investment. CED (the Sublessor), through CEL, is the equity investor in the RoCa3 Transaction.

Expected Treasury Price: The expected cost of the of U.S. Government Obligations CED would purchase if it decides to fund the Trustee Treasury Collateral if either the Sublease Renewal Option or Retention Option is exercised in 2018. The Expected Treasury Price is $34,036,691.62. (Ex. 1 at page 174)

EZH: Electriciteitsbedrijpf Zuid-Holland N.V. (Dutch utility, N.V.). EZH is CED's counterparty in the RoCa3 Transaction, and is the Lessor/Sublessee in the RoCa3 Transaction.

Facility Operating Agreement Default: A default by the Operator under the Facility Operating Agreement.

Facility User: Means (a) either CED or Banc One, or any other Person during the time and to the extent that it is subleasing an Undivided Interest; (b) EZH, with respect to its percentage interest, after the termination of CED's and Banc One's leases; or (c) EZH or any other Person during the time such person has been given the rights to market and sell the RoCa3 Facility's output. (Stip. ¶ 267; Ex. 11 at page 778)

Fair Market Sales Value: A potential payment obligation of EZH should a Premature Termination Event occur. This requires EZH to pay CED the fair market value for its Lease Interest.

FAS 13: Financial Accounting Standard 13, which was promulgated by the FASB for the financial reporting of leasing transactions, including leveraged leases.

FAS 125: Financial Accounting Standard 125, which contains financial reporting guidance for defeasances and was in effect as of the Closing Date of the RoCa3 Transaction.

FASB: Financial Accounting Standards Board.

Final Basic Rent Payment: An amount CED owes on February 24, 2041 equal to $831,525,734.

GAAP: United States Generally Accepted Accounting Principles.

Gasunie: The owner and manager of The Netherlands' high pressure natural gas grid. (Ex. 46 at pages 1512, 1519)

GDI: Gramercy Development, Inc. GDI was formed on October 18, 1996 by Con Edison NY to make unregulated energy investments. On September 24, 1997, GDI changed its name to Con Edison Development, Inc. ("CED").

GENOR: Generadora Electrica del Norte, Limitada, a relatively small power facility (40 MW) in Eastern Guatemala. CED indirectly acquired an approximate 44% ownership interest in GENOR.

Greenfield Projects: Development projects involving the building of a facility, in contrast to projects where one purchases an existing facility. Greenfield projects do not produce positive earnings for a number of years.

HBU: This is an acronym for Hollandsche Bank-Unie N.V.—HBU provided the non-recourse loan to CED.

HBU loan: The nonrecourse loan that HBU provided to CED.

Hell or high water lease: A lease that regardless of the circumstances the lessee or sublessee is required to make rental payments.

IEP: International Energy Partners. IEP was a development company that focused on greenfield energy projects in Asia and Latin America. (Ex. 165 at page 4175) CED invested in IEP in May of 1997. (Ex. 243 at page 4480)) This investment was intended to provide CED with a pipeline of investment opportunities. (*Id.*)

IJssel Deposit: An economic defeasance account EZH established for its benefit to provide security in connection with certain potential payment obligations.

Incremental Collateral Pledge: If CED elects the Retention Option in 2018, CED may decide to fund this account for its own benefit and to act as security for its obligation to pay the Final Basic Rent Payment in 2041 to EZH.

Initial Basic Rent Payment: CED's payment of $120,112,270.36 on December 15, 1997. This amount is comprised of CED's $39,320,000 equity commitment and its nonrecourse loan from HBU of $80,792,270.36.

Initial Commencement Date: The date on which the Sublease in the RoCa3 Transaction terminates and the Facility Operating Agreement, among others, governs the operations of the RoCa3 Facility, including CED's obligations.

IRR: Internal Rate of Return, the interest rate received for an investment consisting of payments and income that occur at regular periods.

Lease: EZH's lease of the Undivided Interest to CED, Exhibit 2.

Lease Collateral Deposit: A collateral account CED may decide to establish if it elects the Sublease Renewal Option. CED would establish this account for its own benefit to act as security for its obligation to pay the Final Basic Rent Payment in 2041.

Lease Term: December 15, 1997 through February 24, 2041, or 43.2 years.

Lease Termination Date: February 24, 2041.

Lessor/Sublessee: EZH in the RoCa3 Transaction.

Lessee/Sublessor: CEL Trust (referred to as CED for simplicity) in the RoCa3 Transaction. CED is also referred to as the equity investor.

LILO: This is an acronym Defendant uses to mean lease-in/lease-out.

Limited use property: Property that cannot be used by the lessor at the end of the lease term except for purposes of continued leasing or transfer to the lessee.

Loeff Claeys: Loeff Claeys Verbeke, CED's outside local Dutch legal advisor.

Multiple Investment Sinking Fund Method: ("MISF") The MISF is the same as the separate phases method that FAS 13 requires equity investors, like CED, to use for the financial reporting of a leveraged lease. (Ex. 10077 (Weil Initial Report) at page 20063 n.39)

Net Sublease Purchase Option Price: $223,490,258. This amount is equal to the Sublease Purchase Option Price, plus EZH's additional cost of foregoing the Final Basic Rent Payment, less the extinguishment of EZH's obligations under the Sublessee Loan. (Ex. 10075 (Kelly Initial Report) at pages 20165 n.67, 20178; Ex. 46 at pages 1570-71)

Network: The cables and pipes used to transport heat and carbon dioxide produced by the RoCa3 Facility.

NLGs: The Dutch Guilder, which was the currency in The Netherlands in 1997 (now the Euro).

NUON: NUON Energie-Onderneming voor Gelderland, Friesland en Flevoland. NUON is a Netherlands utility serving the Provinces of Gelderland, Friesland and Flevoland, located in the central portion of the Netherlands. In May of 1999, CED entered into a lease-leaseback transaction with NUON.

Operative Documents: The RoCa3 Transaction documents defined at Ex. 1 at page 145. These include, among others, the Participation Agreement, the Lease Agreement, the Sublease Agreement, the Facility Operating Agreement, the Loan and Security Agreement, the Facility Support Agreement, the Access Agreement and the Common Facilities Use Agreement.

Operating Expense Budget: An annual budget that the Operator will propose relating to operating expenses for the RoCa3 Facility. Following the termination of the Sublease, CED's vote is necessary to approve the budget and CED is required to pay it portion of these costs based on its Undivided Interest.

Operating Fee: Following the termination of the Sublease, CED is responsible for paying a monthly fee to the Operator for its services. (Ex. 11 at page 738) The Operator will propose its fee, and CED's vote is necessary to approve the fee. (Ex. 11 at page 739; Stip. ¶267)

Operating Inputs: These inputs, such as natural gas, chlorine and ammonia, are necessary for the operation of the RoCa3 Facility. EZH contracted to provide these to CED following the termination of the Sublease. (Ex. 13 at page 831)

Operator: EZH was appointed the initial Operator under the Facility Operating Agreement. However, EZH can be removed for a number of reasons. (*See* Ex. 11)

Operation and Maintenance Expenses: Expenses that CED is responsible for paying based on its Undivided Interest related to the operation and maintenance of the RoCa3 Facility following the termination of the Sublease.

Premature Termination Event: An event that would cause the Sublease to terminate such as an EZH default under the Sublease, Sublease Facility Event of Loss, Burdensome Buyout Event, Voluntary Termination for Economic Obsolescence or Early Purchase Option.

Pricing Runs/Pricing Reports: Spreadsheets showing the cash flows and financial results of leveraged lease transactions generated by the ABC pricing software.

PSC: The New York Public Service Commission, which regulates the New York State electricity industry. The PSC undertook deregulation of New York's electricity industry efforts in the early 1990s.

PW: PriceWaterhouse, the Con Edison corporate group's auditors for financial reporting.

Residual value: Refers to an asset's remaining value as of a specific point in time. (Tr. 1064 (Holzman))

Retention Option: One of two options CED that would take effect on January 2, 2018, if EZH does not elect the Sublease Purchase Option. The Retention Option terminates the Sublease and entitles CED to sell the output from the RoCa3 Facility from January 2, 2018 through February 24, 2041.

Retention Option Period: The period from January 2, 2018 through February 24, 2041, during which time CED is entitled to sell the output from the RoCa3 Facility.

RoCa3 Facility: This comprises the RoCa3 generating Unit, Common Facilities, the Cooling Water Station, the Cooling Water Channel and the Network as defined in the Participation Agreement at page 131.

RoCa3 Transaction: The lease-leaseback transaction at issue in this case.

SEC: Security Exchange Commission.

Separate phases method: The method FAS 13 requires for the reporting of a leveraged lease transaction. This is also referred to as the Multiple Investment Sinking Fund method ("MISF").

Shearman & Sterling: One of CED's outside U.S. legal advisors in connection with the RoCa3 Transaction.

Shirt-Tail Period: The remaining Lease Term after the Sublease Renewal Term ends. From June 15, 2034 through February 24, 2041.

STRIP: This is an acronym for Separate Trading of Registered Interest and Principal of Security. "Treasury Strips" refer to zero-coupon treasury bonds with a face value payable at maturity. STRIPs are purchased at a discount from the face value at maturity and promise a fixed rate of return for the life of the security called the yield to maturity; *i.e.*, the inherent interest rate.

Sublease: CED's sublease of the Undivided Interest to EZH, Exhibit 4.

Sublease Basic Rent: Rent owed during the Sublease Basic Term, December 15, 1997 through January 2, 2018. (Ex. 1 at page 158)

Sublease Basic Term: December 15, 1997 through January 2, 2018, or 20.1 years. (Stip. ¶135)

Sublease Basic Termination Date: January 2, 2018. (Stip. ¶135) The date that the Sublease is scheduled to terminate, unless it terminated earlier.

Sublease Deposit: An account EZH established for its benefit and to provide security to CED in connection with certain potential payment obligations.

Sublease Purchase Option: EZH's option to purchase CED's remaining Lease Interest at a fixed price. Should EZH elect this option, as provided for under the Sublease, it would take effect on January 2, 2018.

Sublease Purchase Option Price: $215,450,949.20. (Stip. ¶165)

Sublease Renewal Option: One of two options that CED can elect that would take effect on January 2, 2018, if EZH does not exercise the Sublease Purchase Option.

Sublease Renewal Rent: Rents paid by EZH to CED during the Sublease Renewal Term, if CED elects the Sublease Renewal Option.

Sublease Renewal Term: January 2, 2018 through June 15, 2034, or 16.5 years. (Stip. ¶136)

Sublease Renewal Termination Date: June 15, 2034. On this date, the Shirt-Tail Period begins.

Sublease Rents: Rents EZH owes to CED under the Sublease as long as the Sublease is in effect.

Sublease Term: This includes the Sublease Basic Term, and the Sublease Renewal Term, if any.

Sublease Termination Value: A fixed amount that EZH may have to pay should certain Premature Termination Events occur.

Sublease Special Termination Value: A fixed amount that EZH may have to pay should certain Premature Termination Events occur.

Sublease Special Special Termination Value: A fixed amount that EZH may have to pay should certain Premature Termination Events occur.

Sublessee Loan: Sublease rents that EZH owed to CED under the terms of the RoCa3 Transaction, which were deferred until future payment dates set forth in Exhibit 44. EZH continues to owe to CED these deferred rents together with a fixed rate of interest. (*See* Stip. ¶261)

Tauw: Tauw Milieu. CED's environmental consultant that performed an environmental, health and safety evaluation of the RoCa3 Facility in connection with CED's due diligence review of the RoCa3 Transaction. (Tr. 1562 (Nieuwenhuis))

Triple-net lease/net lease: A lease that requires the lessee to pay for the maintenance, insurance and taxes associated with the leased asset.

Trustee Treasury Collateral: A collateral account CED may decide to establish if it elects either the Retention Option or the Sublease Renewal Option. CED would establish this account for its own benefit to act as security for its obligation to pay the Final Basic Rent Payment in 2041.

Unbundled/unbundling: Refers to the separation electricity generating assets from transmission and distribution services. Utilities that offered services in a bundled format were required to divest their power generating assets as part of global deregulation efforts in the 1990s.

Undivided Interest: The percentage of the RoCa3 Facility that CED leased from EZH, equal to 47.468354430380% (rounded to 47.47%).

Unit: Part of the RoCa3 Facility. A gas-fired combined cycle cogeneration facility.

U.S. Government Obligations: Refers to United States Treasury securities (including STRIPS) maintained in the commercial book-entry system entitled Treasury/Reserve Automated Debt Entry System.

## APPENDIX B

## WITNESS TRANSCRIPT INDEX

| Date | Name |
|---|---|
| 10/17/07 | McGrath (Tr. 106-213) |
| 10/18/07 | McGrath (Tr. 226-423) / Burke (Tr. 424-468) |
| 10/19/07 | Burke (Tr. 475-667) / Freilich (Tr. 668-704) |
| 10/22/07 | Freilich (Tr. 710-734) / McCartney (Tr. 735-922) |
| 10/23/07 | McCartney (Tr. 938-991) / Holzman (Tr. 992-1237) |
| 10/24/07 | Holzman (Tr. 1246-1456) / Radini (Tr. 1459-1474) |
| 10/25/07 | Radini (Tr. 1480-1542) / Nieuwenheis (1545-1597) / Ellsworth (Tr. 1498-1665) |
| 10/26/07 | Ellsworth (Tr. 1671-1818) / Gonzalez (Tr. 1819-1884) |
| 10/29/07 | Muoio (Tr. 1891-2039) |
| 10/30/07 | DePlautt (Tr. 2051-2263) |
| 10/31/07 | Gonzalez (Tr. 2270-2339) / Goulding (Tr. 2340-2481) |
| 11/1/07 | Goulding (Tr. 2487-2562) / Reed (Tr. 2564-2670) |
| 11/2/07 | No Court |
| 11/5/07 | Reed (Tr. 2677-2747) / Kelly (Tr. 2748-2850) / Mintun (Tr. 2852-2884) |
| 11/6/07 | Mintun (Tr. 2890-3073) |
| 11/7/07 | Ellis (Tr. 3082-3283) |
| 11/8/07 | Ellis (Tr. 3365-3465) / Weil (Tr. 3465-3500) |
| 11/9/07 | Weil (Tr. 3506-3664) / Bent (Tr. 3666-3773) |
| 11/12/07 | Bent (Tr. 3781-3972) / Scher (3972-4048) |
| 11/13/07 | Scher (Tr. 4056-4315) |
| 11/14/07 | Scher (Tr. 4321-4403) / Thomas (Tr. 4458-4593) |
| 11/15/07 | Thomas (Tr. 4602-4685) / Ray (Tr. 4691-4766) |
| 11/16/07 | Ray (Tr. 4782-4991) |
| 11/27/07 | LaRue (Tr. 5003-5272) |
| 11/28/07 | LaRue (Tr. 5282-5364) |

# APPENDIX C

## TIMELINE

| Date | Event | Description |
|---|---|---|
| 1823 | Beginning of company | Consolidated Edison Company of New York started as a gas company in New York State.<br><br>(Ex. 856 at page 13402; Tr. 110 (McGrath); Tr. 492 (Burke)) |
| Nov. 1884 | Con Edison organized | Con Edison was organized as a regulated public utility under the laws of New York State.<br><br>(Stip.¶2) |
| 1989 | Gramercy Park environmental incident | Con Edison NY was involved in the release of asbestos at Gramercy Park in New York City resulting in $100 million in damages. Con Edison NY was placed on probation for its environmental programs.<br><br>(Ex. 1306 at page 18457; Ex. 114 at pages 3110-11; Tr. 129 (McGrath)) |
| 1990-1998 | Con Edison NY's response to proposed deregulation | Con Edison NY's Corporate Planning division was charged with reviewing the company's long-term strategy. Con Edison NY knew that the New York Public Service Commission ("PSC") would require it to restructure its regulated business to some degree. The company focused on the United Kingdom's electric industry since it had already undergone privatization and deregulation in 1990, which had encouraged new generation while maintaining reliability. Management educated Con Edison NY's Board of Trustees on California's deregulation proposals, which discussed the potential need for utilities to divest their generation assets for restructuring its electric utility business. Con Edison NY sent teams to the United Kingdom and California to learn about their deregulation processes and the electricity industry's response to such changes. Con Edison NY personnel, as well as other interested parties, attended numerous hearings, meetings and |

| | | |
|---|---|---|
| | | technical sessions that involved deregulation discussions.<br><br>(Ex. 114 at pages 3111-12; Ex. 115 at page 3113; Ex. 118 at pages 3122-23; Tr. 444-45, 451-53, 456-57 (Burke); Tr. 133, 149 (McGrath)) |
| Sept. 1990 | McGrath named CEO | Eugene McGrath was named the CEO of Con Edison NY.<br><br>(Tr. 112 (McGrath)) |
| Mar. 1993 | Power industry regulation | The PSC initiated the "Proceeding on Motion of the Commission to Address Competitive Opportunities Available to Customers of Electric and Gas Service and Develop Criteria for Utility Responses" (the "Competitive Opportunities Proceeding") in order to develop a competitive electricity industry in New York State.<br><br>(Stip. ¶6; Tr. 448-49 (Burke)) |
| 1993-1998 | Corporate Planning division of Con Ed NY | Kevin Burke was appointed the head of Corporate Planning by McGrath, and during his tenure, he focused on, among other things, Con Edison NY's response to the impending deregulation process and divestiture of its generating assets.<br><br>(Tr. 444-46 (Burke)) |
| Mar. 1993 | Power industry regulation | The Competitive Opportunities Proceeding was used to evaluate how the electricity services industry could be restructured to establish competitive options, including "a competitive market for wholesale electricity as well as a competitive market for retail electricity."<br><br>(Tr. 446-47 (Burke); Stip. ¶7) |
| Mar. 1993 | Competitive Opportunities Proceeding | The Proceeding was divided into two phases. Phase I of the Proceeding involved discussing, investigating, addressing, and confronting issues that would develop from moving toward a competitive market.<br><br>(Stip. ¶8; Ex. 110 at page 3080) |

| | | |
|---|---|---|
| July 1994 | Deregulation anticipated | Con Edison NY's management was aware that electricity utility services in New York State would have to be unbundled, which would likely result in utilities like Con Edison NY having to divest some or all of their power-generating assets.<br><br>(Ex. 116 at page 3118; Tr. 454-55 (Burke)) |
| July 26, 1994 | Plan for deregulation | The Planning and Environmental Committee of Con Edison NY's Board of Trustees considered opportunities for regulated utilities in non-regulated activities.<br><br>(Stip. ¶10; Ex. 112 at page 3101) |
| July 26, 1994 | Burke's research | Burke informed the Planning and Environmental Committee that power utility diversification efforts often included investments in independent power projects in the US and foreign countries, real estate development, energy services, financial services and energy marketing. Some utilities made investments far a field of the power industry, but those utilities that were the most financially successful made investments that related to their core businesses and competencies.<br><br>(Ex. 112 at pages 3101-02; Ex. 123 at page 3137; Tr. 464-66 (Burke); Tr. 150-51 (McGrath)) |
| Aug. 1994- May 1996 | Competitive Opportunities Proceeding | Phase II of the Proceeding commenced in August 1994 and involved identifying regulatory and ratemaking practices to assist the New York electric utility industry's move toward a competitive industry.<br><br>(Stip. ¶8; Ex. 110 at page 3080) |
| Aug. 1994- May 1996 | Competitive Opportunities Proceeding | The PSC specifically directed electric utilities to address whether the divestiture of their generating assets would enhance the electricity industry's move toward a competitive market.<br><br>(Ex. 110 at page 3080; Tr. 454-55 (Burke)) |
| April 20, | Con Edison NY's | Management advised the Con Edison NY Board of |

| | | |
|---|---|---|
| 1995 | reorganization proposal | Trustees that the company should develop additional services to market to its customers, explore additional sources of revenue outside of its regulated lines of business, and establish unregulated subsidiaries.<br><br>(Ex. 133 at pages 3172-73; Ex. 113 at page 3109; Tr. 466-67, 477-81 (Burke)) |
| May 2, 1995 | Con Edison NY's petition | Con Edison NY requested that it be allowed to invest up to 5% of its consolidated capital (about $504 million) in unregulated subsidiaries, which would make investments in non-utility businesses without needing prior PSC permission on an investment-by-investment basis.<br><br>(Stip. ¶¶8, 16, 17; Ex. 133 at page 3172; Ex. 113 at page 3109; Ex. 137 at page 3320; Tr. 477-78, 480-81, 484-85 (Burke)) |
| Nov. 28, 1995 | Unbundling | The PSC confirmed in their proposal that they would require utility companies to unbundle their electricity generation from their electricity transmission and distribution.<br><br>(Ex. 117 at page 3120; Ex. 119 at page 3126) |
| May 20, 1996 | Competitive Opportunities Proceeding | Phase II of the Proceeding concluded with the PSC issuing an Opinion and Order that revealed the PSC's vision to continue pursuing competition in the electricity generating industry.<br><br>(Ex. 299 at page 5834) |
| May 20, 1996 | PSC's Opinion and Order | The Opinion and Order instructed Con Edison NY to file a restructuring plan and the company's management began to plan its response and establish goals related to its restructuring, including developing new unregulated activities to replace the earnings expected to be lost through deregulation.<br><br>(Stip. ¶¶9, 21; Ex. 119 at page 3127; Ex. 855 at pages 13351-52; Tr. 137-39, 147, 152-58 (McGrath); Tr. 679 (Freilich); Tr. 456 (Burke)) |

| | | |
|---|---|---|
| May 20, 1996 | Competitive Opportunities Proceeding | The PSC strongly encouraged electricity utilities to sell their generating assets to unregulated entities in order to create a truly competitive market.<br><br>(Stip. ¶9; Ex. 299 at pages 5873-74; Tr. 452-53 (Burke)) |
| May 20, 1996 | Competitive Opportunities Proceeding | The PSC also urged utilities to propose corporate structures, including the use of unregulated subsidiaries that would further PSC's restructuring goals.<br><br>(Stip. ¶9) |
| May 20, 1996, Oct. 1, 1996 | Competitive Opportunities Proceeding | The Opinion and Order ordered most electric utilities, including Con Edison NY, to file proposed plans by Oct. 1, 1996, describing how each utility would restructure their operations to further PSC's goals.<br><br>(Ex. 299 at page 5887) |
| June 1996 | RoCa3 Facility comes into operation | (Stip. ¶¶73, 64, 74(b)-(e); Ex. 46 at pages 1511-14, 1518-19; Ex. 1 at pages 131, 243; Ex. 52 at pages 1840, 1844, 1847-49, 1858; Ex. 822 at page 13120; Tr. 1103-04 (Holzman)) |
| July 12, 1996 | PSC's Order | The PSC responded to Con Edison NY's May 2, 1995 petition by Order authorizing Con Edison NY to invest up to $50 million in unregulated subsidiaries for the purpose of making investments in energy infrastructure and the provision of technical services.<br><br>(Ex. 137 at pages 3317, 3320-21; Tr. 480-83 (Burke)) |
| Sept. 18, 1996 | Con Edison NY's response to the Order | Management sought approval from Con Edison NY's Board of Trustees to form a wholly-owned subsidiary to invest in infrastructure projects and to market technical services worldwide.<br><br>(Stip. ¶18) |
| Oct. 1, 1996 | Con Edison NY's proposed restructuring plan | Con Edison NY submitted a 162-page restructuring plan in response to the PSC's May 1996 Opinion and Order. |

| | | |
|---|---|---|
| | | (Ex. 143 at page 3346) |
| Oct. 1, 1996 | Con Edison NY's proposed restructuring plan | Con Edison NY's proposed restructuring plan stated that it would be restructuring almost every aspect of its business, including how it was operated and organized.<br><br>(Ex. 143 at page 3357) |
| Oct. 1, 1996 | Con Edison NY's proposed restructuring plan | Con Edison NY's proposed restructuring plan included divestiture of some of its power generating plants, a corporate reorganization and a plan to improve its retail competition.<br><br>(Stip. ¶21; Ex. 143 at pages 3359, 3482, 3494; Tr. 459-60 (Burke)) |
| Oct. 18, 1996 | Con Edison subsidiaries | Gramercy Development, Inc. ("GDI") was formed to invest in energy infrastructure projects around the world.<br><br>(Stip. ¶¶18, 19) |
| Oct. 28, 1996 | First meeting of the GDI/CED Board of Directors | The GDI Board (referred to hereafter as the CED Board) consisted of Mary Jane McCartney, Joan Freilich and Paul Kinkel. At this meeting, McCartney was elected Chairman of the Board, Charles Muoio was elected CED President and Peter Irwin was elected CED Secretary.<br><br>(Ex. 141 at pages 3337-39) |
| Late 1996/ early 1997 | CED's first business plan | Muoio drafted CED's first business plan.<br><br>(Ex. 167 at page 4183; Tr. 746-47 (McCartney); Tr. 1908-09 (Muoio)) |
| Jan. 1997 | Hiring employees for CED | Muoio was in negotiations to hire Michael Madia and Brian DePlautt as employees at CED.<br><br>(Ex. 165 at page 4173; Tr. 1907 (Muoio); Tr. 2053-55 (DePlautt)) |
| Jan. 3, 1997- Nov. | CED investment opportunities: | Fisonic Corporation and CED discussed in January of 1997 a joint venture to develop energy-saving technology. The Fisonic energy device would replace |

| | | |
|---|---|---|
| 1997 | Fisonic Technology | traditional commercial water heating. CED investigated and performed due diligence on the Fisonic technology throughout 1997. In May of 1997, after Muoio visited Russia to review applications of the technology, CED continued to contemplate a possible role in the development of the technology. CED was still investigating and testing the Fisonic technology in November of 1997.<br><br>(Ex. 165 at page 4174; Ex. 136 at page 3300; Ex. 166 at page 4179; Ex. 169 at page 4191; Ex. 154 at pages 4128-29) |
| Jan. 3, 1997-Dec. 18, 1997 | CED investment opportunities: technical services in China | In early January 1997, CED was working on a joint proposal with Power Technologies, Inc. ("PTI") for a study on the development of the transmission and distribution system for the Beijing municipal region. At the end of January 1997, CED submitted a proposal to North China Power Group Corporation, but was not ultimately selected for the Beijing project. McCartney and Muoio visited China in May 1997, and CED continued to investigate and pursue possible technical service opportunities in China. In June 1997, CED discussed a proposal to develop a distribution management system ("DMS") for Zhejiang, China. Kuo, CED's Business Development Manager, updated the CED Board on the status of the Zhejiang DMS project and the next steps in the proposal process in July and August of 1997. CED continued to refine the project action plan for the Zhejiang DMS project in December 1997.<br><br>(Ex. 165 at page 4176; Ex. 166 at page 4179; Ex. 167 at page 4184; Ex. 169 at page 4191; Ex. 170 at pages 4193-94; Ex. 171 at page 4197; Ex. 172 at page 4198; Ex. 156 at page 4136) |
| Jan. 30, 1997 | Hiring employees for CED | Muoio discussed with the CED Board hiring Vicki Kuo and the ongoing negotiations for hiring Madia and DePlautt.<br><br>(Ex. 166 at page 4179; Tr. 743 (McCartney)) |
| Jan. 30, | CED's 1997 | Muoio distributed a draft of the plan at a Board meeting. The plan described CED's mission, |

| | | |
|---|---|---|
| 1997 | business plan | objectives, business focus, business environment, market analysis and strategy, financial projections and potential initial investments.<br><br>(Ex. 166 at page 4180; Ex. 136 all and at pages 3233, 3239, 3249-50, 3253, 3256-58, 3261-65, 3268; Ex. 704; Tr. 1913-15, 1921-23 (Muoio); Tr. 748-50, 752-754 (McCartney); Tr. 2377, 2391 (Goulding)) |
| Jan. 30, 1997 | CED's 1997 business plan: financial projections | CED projected that it would sustain losses until 2001 since many of its expected investments would be capital-intensive projects. CED recognized the potential negative impact of sustained losses at CED on Con Edison's earnings. CED anticipated that greenfield projects, which take several years to generate earnings, would be balanced by investments that would generate near-term earnings from acquisitions and passive investments.<br><br>(Ex. 136 at pages 3240-41, 3272; Tr. 754 (McCartney); Tr. 1919-20, 1925-27 (Muoio); Tr. 681-82 (Freilich)) |
| Jan. 30, 1997 | CED's 1997 business plan: potential initial investments | CED identified various potential initial investments including the Energy Investors Fund III, International Energy Partners and several technical services opportunities in China.<br><br>(Ex. 136 at pages 3244-45, 3275-301; Tr. 751-53 (McCartney); Tr. 1913 (Muoio)) |
| Jan. 30, 1997 | CED's 1997 business plan | The plan recognized that as a new company, CED needed to be flexible and able to adapt to technical, financial, tax law and environmental regulation changes. Accordingly, CED would adjust its investment focus to coincide with and adapt to market changes and opportunities.<br><br>(Ex. 167 at page 4183; Ex. 136 at page 3310; Tr. 755-56 (McCartney); Tr. 1909, 1927-28 (Muoio)) |
| Jan. 1997 | CED investment opportunities: IEP | International Energy Partners ("IEP"), a development company that focused on greenfield power project opportunities in Asia and Latin America, discussed with CED a potential investment |

| | | |
|---|---|---|
| | | by CED of $10 million in IEP.<br><br>(Ex. 165 at page 4175) |
| Mar. 1997- May 1997 | CED investment opportunities: IEP | Negotiations with IEP continued until CED and IEP entered into an agreement in March of 1997. CED had committed to make a $10 million investment in IEP by May of 1997. Pursuant to the agreement, CED was given preferred rights to participate in certain investment opportunities identified by IEP. This provided CED with a project pipeline for new investment opportunities, including projects in Latin America and Asia.<br><br>(Stip. ¶35; Ex. 167 at page 4184; Ex. 243 at pages 4480-88; Ex. 136 at pages 3281-82; Ex. 252 at page 4710; Tr. 753 (McCartney)) |
| Mar. 1997 | CED employees | By March, Kuo, Madia and DePlautt had all joined CED. Kuo was CED's Business Development Manager and she used her contacts with utilities in China to assist with CED's search for projects there.<br><br>(Ex. 167 at page 4183; Ex. 171 at page 4195; Tr. 743 (McCartney)) |
| Mar. 10, 1997 | CED Board meeting | Madia and DePlautt were elected Vice Presidents of CED. DePlautt's initial role was to search for energy-related investment opportunities within the core competencies of Con Edison that provided earnings.<br><br>(Ex. 167 at page 4184; Tr. 2057, 2059 (DePlautt)) |
| Mar. 10, 1997 | CED considered investing in EIF | CED considered making a $5 million investment in the Energy Investment Fund III ("EIF"). EIF would utilize the funds received from CED and other equity investors to make investments in energy and infrastructure projects worldwide.<br><br>(Stip. ¶36; Ex. 167 at page 4185) |
| April 4, 1997 | Initial list of potential projects | CED had compiled an initial list of potential development and technical services projects, which included a description and status update on each potential project. |

| | | |
|---|---|---|
| | | (Ex. 250 at pages 4678-80) |
| April 1997 | CED investment in IEP | CED invested $3 million in IEP in April.<br><br>(Ex. 169 at page 4189) |
| May 7, 1997 | Cornerstone Financial Advisors | CED identified Cornerstone Financial Advisors ("Cornerstone") as a potential advisor in leasing investments. CED made initial contact with Cornerstone on or around May 7th.<br><br>(Stip. ¶51; Ex. 252 at page 4731; Ex. 243 at page 4497; Ex. 261 at page 4953; Tr. 2068-75, 2077-78, 2080-81 (DePlautt); Tr. 1014-16 (Holzman)) |
| May 7, 1997 | Cornerstone advised on a number of leveraged lease transactions | When CED contacted Cornerstone, CED made it clear that it intended to take advantage of Con Edison's core competencies as a utility by making investments in assets with which it was familiar. CED made it known that it was specifically interested in leasing transactions that involved power generation, transmission, or distribution assets.<br><br>(Ex. 261 at page 4950; Tr. 1040-41, 1044-45 (Holzman)) |
| May 19, 1997 | Environmental excellence | McGrath stated that Con Edison NY was "weaving environmental excellence into every aspect of" its "business."<br><br>(Ex. 855 at pages 13349-50) |
| May-Dec. 1997 | Plan for deregulation | Con Edison NY decided to invest in activities that related to their core businesses and competencies as they planned for deregulation.<br><br>(Ex. 136 at page 3253; Ex. 243 at page 4506; Ex. 354 at pages 7500-01; Ex. 856 at page 13419; Tr. 744-46, 756-58 (McCartney); Tr. 501-02 (Burke); Tr. 153-55 (McGrath)) |
| May 26, 1997-June 9, | CED investment opportunities: EGASA | In May 1997, CED was considering making a bid as part of a consortium for the acquisition of an interest in Empresa de Generacion de Arequipa S.A. ("EGASA"), a Peruvian electric utility that could |

| | | |
|---|---|---|
| 1997 | | produce 305 MW of power. CED ultimately withdrew from the bidding consortium due to the potential for an equity investment and bid price higher than originally contemplated.<br><br>(Stip. ¶¶41, 42; Ex. 168 at page 4186; Ex. 268 at pages 5253-55; Tr. 1935 (Muoio)) |
| May 29, 1997 | CED Board meeting | DePlautt made a presentation identifying lease investments as an option for CED. He reviewed the benefits and risks associated with lease investments with the Board, including the benefits of near-term earnings and cash flows. DePlautt indicated that CED was considering various leasing projects, the potential for co-investment with an experienced participant in the lease market, and engaging Cornerstone Financial Advisors as a lease advisor.<br><br>(Ex. 169 at pages 4189-90; Tr. 2077-78 (DePlautt)) |
| May 29, 1997 | Evaluations of leasing investments and Cornerstone | CED evaluated leveraged leasing investment opportunities, including the benefits and risks of leasing and the potential retention of Cornerstone at the CED Board meeting.<br><br>(Ex. 169 at pages 4189-90; Tr. 2077 (DePlautt)) |
| May 29, 1997 | CED investment opportunities: tax-advantaged investments | CED identified section 42 low-income housing projects and section 29 alternative energy projects as potential investment opportunities. These projects were eligible for special tax treatment under the Internal Revenue Code. Con Edison had participated in section 42 projects in the past, and CED hoped to achieve favorable public relations benefits by participating in projects in New York.<br><br>(Ex. 169 at page 4190; Ex. 1221 at page 17586; Tr. 814-16 (McCartney); Tr. 2063-64 (DePlautt)) |
| May 29, 1997 | CED investment opportunities: acquisition of independent power producer developer | CED considered acquiring an existing independent power producer ("IPP") developer and identified Charter Oak Energy as a potential candidate. Charter Oak had existing investments in several projects around the world and had identified several potential international investments. Other potential |

| | | |
|---|---|---|
| | | IPP developers that CED identified were Intergen, Catamount and CNG.<br><br>(Ex. 169 at page 4190; Ex. 261 at pages 4956-58) |
| May 29, 1997 | CED investment opportunities: acquisition of independent power producer project | CED discussed with Energy Management, Inc. ("EMI") investing in a new plant in Massachusetts. This plant was a new 165 MW merchant gas-fired combined cycle plant.<br><br>(Ex. 169 at page 4190; Ex. 261 at page 4959) |
| May 29, 1997 | CED investment opportunities: telecommunications industry | CED reviewed the possibility of participating in joint ventures in the telecommunications industry with Telergy, Inc. or Apollo South.<br><br>(Ex. 169 at page 4190; Tr. 1914-15, 1939-40 (Muoio)) |
| May 29, June 20, July 23, 1997 | CED investment opportunities: EEGSA | In May 1997, CED considered an investment of $30 million as part of a consortium to acquire electric generation from Empresa Elecrica de Guatemala ("EEGSA") and construct a new power plant in Guatemala subject to a power purchase agreement with EEGSA. In June, the CED Board continued to discuss the potential EEGSA investment and examined the letter of credit requirement for participation in the EEGSA bid. During July, CED further discussed the terms of the bid. At the July Board meeting, CED discussed the ongoing due diligence and informed the Board that CED's potential total investment would not exceed $32 million. It later became apparent that EEGSA would be privatized, so CED requested authorization to bid in a consortium for at least 80% of EEGSA's shares, but CED did not receive approval for participation in a bid of over $400 million and ultimately withdrew from the consortium.<br><br>(Stip. ¶39; Stip. ¶40; Ex. 169 at page 4190; Ex. 170 at page 4193; Ex. 171 at pages 4195-96; Ex. 159 at page 4152) |
| May 30, 1997 | CED's search for potential | CED continued to search for potential investments to meet its goal of becoming a development company involved in the acquisition, development, finance and |

| | | |
|---|---|---|
| | investments | management of infrastructure projects worldwide. CED also continued to follow its investment mission of creating a diversified portfolio of investments that would provide risk-appropriate rates of return.<br><br>(Ex. 243 at pages 4476-77) |
| May 30, 1997 | CED's investments | CED was pursuing passive investments like EIF and IEP, which would provide a project pipeline, an opportunity to work with experienced developers, portfolio diversity, and near-term earnings. CED was also in the process of reviewing potential telecommunication investments, technology investments, technical services projects such as transmission and distribution planning in China and Indonesia, and other potential investment opportunities, including leasing, section 42 low income housing credits, section 29 alternative fuel production credits, and independent power production developers and projects.<br><br>(Ex. 243 at pages 4479-80, 4489, 4491-4503, 4506; Ex. 136 at pages 3276, 3278; Ex. 261 at page 4949; Tr. 1919-20, 1945-46 (Muoio); Tr. 756-57 (McCartney)) |
| May 30, 1997 | Preliminary review of leveraged leasing projects | CED began a preliminary review of various domestic and international leveraged leasing projects involving power, water, gas, and telecommunication assets.<br><br>(Ex. 243 at pages 4494, 4497; Ex. 261 at pages 4950, 4953; Tr. 2065-66 (DePlautt); Tr. 1939-40 (Muoio)) |
| May 30, 1997 | Leasing projects and earnings goals | CED had identified early year earnings and returns as the goals of potential investment in leasing projects. Early year earnings from leasing could offset the startup losses associated with investments in greenfield project development.<br><br>(Ex. 243 at page 4494; Ex. 261 at page 4950; Tr. 755, 762 (McCartney); Tr. 1941-42 (Muoio); Tr. 686 (Freilich)) |
| May 1997 | Cornerstone's education of CED | Cornerstone began to educate CED on the risks and rewards associated with leveraged lease transactions. |

| | | |
|---|---|---|
| | | Specifically, Cornerstone educated CED on the:<br><br>• Commercial terms commonly used in a leveraged lease;<br><br>• Pretax and after-tax cash flows of the leveraged leases as they impact the financial reporting of leveraged leases;<br><br>• Leasing terminology and structures;<br><br>• Investor's after-tax yield, which is its after-tax return;<br><br>• Accounting benefits, such as when an investor is required to book and recognize income under FAS 13; and<br><br>• Residual value of the assets.<br><br>(Tr. 1019-23 (Holzman)) |
| June 18, 1997 | Rededication to the 1997 business plan | CED reiterated its goal of being involved in the acquisition, development, finance and management of infrastructure projects worldwide, and reemphasized its investment strategy of creating a diversified portfolio of investments with varying rates of risk and return.<br><br>(Ex. 252 at pages 4706-07) |
| June 18, 1997 | Rededication to the 1997 business plan | CED categorized energy projects such as greenfields as higher risk, infrastructure projects as medium risk, and leasing projects and passive investments as lower risk investments. CED expected to receive returns of 18-22% on higher risk investments, 14-17% on medium risk investments, and 10-13% on lower risk investments.<br><br>(Ex. 252 at page 4707; Tr. 688 (Freilich); Tr. 747, 762-64 (McCartney)) |
| June 18, 1997 | Continued review of leasing projects | CED continued to review various domestic and international leasing projects involving power, water, gas and telecommunication assets. Near-term earnings and returns remained the priority for |

| | | |
|---|---|---|
| | | potential investments in leasing projects.<br><br>(Ex. 252 at pages 4729-30, 4732) |
| June 18, 1997 | Using leasing projects to cover the earnings gap | The importance of near-term earnings and "cover" to CED's business was highlighted by CED's comparison of the earnings profile of a typical energy asset lease to an energy project such as a greenfield.<br><br>(Ex. 252 at page 4731; Tr. 760-62, 768 (McCartney); Tr. 2079-80 (DePlautt); Tr. 686-87 (Freilich)) |
| June 20, 1997 | EIF project investment authorized | The Board authorized CED to invest $5 million in the Project Investment Fund III sponsored by EIF.<br><br>(Stip. ¶36; Ex. 170 at page 4193) |
| July 23, 1997 | CED Board meeting | DePlautt provided an overview of CED's investigation of lease investments and informed the CED Board that Cornerstone Financial Advisors had been retained to assist in the analysis of lease investments.<br><br>(Ex. 171 at pages 4196-97) |
| July 23, 1997 | Criteria to assess potential lease investments | CED personnel, with input from the Board, developed criteria with which to assess potential lease investments. The criteria included:<br><br>• Focusing review of leasing transactions on power generation assets, and power, gas, steam, and water treatment transmission and distribution assets;<br><br>• Limiting the location of any potential leasing investments in infrastructure assets to Europe, Australia, and the United States; and<br><br>• Requiring any potential leasing transaction to provide a 9% to 11% after-tax return (measured by using the Multiple Investment Sinking Fund method on its investment as an acceptable return).<br><br>(Ex. 171 at pages 4196-97; Ex. 640 at page 11441) |

| | | |
|---|---|---|
| Aug. 4, 1997 | Deloitte's first physical inspection of the RoCa3 Facility | To prepare its appraisal report, Deloitte made a physical inspection of the RoCa3 Facility on August 4.<br><br>(Ex. 46 at pages 1505-06) |
| Aug. 25, 1997 | RoCa3 Facility investment identified to CED | Cornerstone notified CED of a potential leveraged lease transaction with EZH of a new cogeneration facility (the RoCa3 Facility) located near Rotterdam, Netherlands.<br><br>(Stip. ¶57; Tr. 994, 1025-27 (Holzman); Tr. 1082 (DePlautt)) |
| Aug. 27, 1997 | CED invested in EIF project | CED made a payment of $3.6 million to the EIF Project Investment Fund III. CED recognized that a benefit of making a passive investment in EIF was that the fund would provide portfolio diversity. The investment in EIF gave CED access to the various projects and markets EIF participated in and the opportunity to make additional investments in those projects.<br><br>(Ex. 172 at page 4199; Ex. 252 at page 4709; Tr. 1934-35 (Muoio)) |
| Aug. 27, 1997 | GENOR investment considered | CED discussed with Interamerican Power and Light ("IPL") participation in an investment in Generadora Electrica Del Norte ("GENOR"), a 40 MW electric power plant in Guatemala.<br><br>(Ex. 172 at page 4199; Tr. 758-59 (McCartney)) |
| Sept. 19, 1997 | Con Edison NY's restructuring plan | The PSC and Con Edison NY ultimately agreed on a restructuring plan that was embodied in an Amended and Restructured Agreement and Settlement ("Settlement").<br><br>(Stip. ¶22; Ex. 145 at pages 3698-761) |
| Sept. 19, 1997 | Con Edison NY's restructuring plan | Main features of the PSC Settlement:<br><br>• Commitment by Con Edison NY to divest at least 50% of its New York City electricity generating plants by year-end 2002 to |

| | | |
|---|---|---|
| | | unregulated third parties.<br><br>• Authorization for Con Edison NY to form a holding company whose subsidiaries would consist of Con Edison NY and several unregulated subsidiaries.<br><br>(Stip. ¶ 22; Tr. 678 (Freilich); Tr. 459-61 (Burke)) |
| Sept. 19, 1997 | Con Edison NY's restructuring plan | Con Edison NY understood that the 50% divestiture of its generating assets could be the minimum amount it would have to divest.<br><br>(Ex. 106 at page 2914) |
| Sept. 24, 1997 | GDI name change | GDI changed its name to Consolidated Edison Development, Inc. ("CED") following Con Edison NY's settlement with the PSC allowing Con Edison NY to change its unregulated subsidiaries' names to include the prominent "Con Edison" name.<br><br>(Stip. ¶19; Ex. 140 at page 3333; Tr. 740 (McCartney); Tr. 684 (Freilich)) |
| Sept. 24, 1997 | Project fact sheet for the RoCa3 Transaction | CED created a Project Fact Sheet for the RoCa3 Transaction.<br><br>(Ex. 388) |
| Sept. 25, 1997 | CED selected as contractor in China | CED was selected as a contractor for a transmission and distribution planning study for the Jiangsu Provincial Electric Power Company in China. This project involved a joint venture with PTI.<br><br>(Ex. 140 at page 3335; Ex. 178 at page 4226) |
| Sept. 25, 1997 | GENOR investment considered | Madia reviewed the details of CED's potential $12 million investment in GENOR with the CED Board.<br><br>(Ex. 140 at page 3334) |
| Sept. 25, 1997 | CED Board meeting | In September 1997, CED considered participating in the RoCa3 Transaction. DePlautt informed the Board that the leasing market required investors to have a net worth of approximately $100 million, and that additional funding would be needed in order to |

| | | |
|---|---|---|
| | | meet this net worth requirement.<br><br>(Ex. 140 at page 3335) |
| Sept. 25, 1997 | Investment in IEP | CED invested an additional $2 million in IEP and committed to make another investment of $5 million in 1998.<br><br>(Ex. 140 at page 3334) |
| Sept. 26, 1997 | RoCa3 initial proposal | Holzman submitted an initial proposal to EZH on behalf of CED and Banc One Leasing Corp. ("Banc One") to enter into a lease-leaseback of the RoCa3 Facility. EZH did not accept the September 26, 1997 proposal.<br><br>(Stip. ¶75; Ex. 297 at page 5823; Ex. 640 at page 11441; Tr. 1977 (Muoio); Tr. 2081-82 (DePlautt); Tr. 1041-42, 1055-56 (Holzman)) |
| Oct. 16-17, 1997 | Duke Engineering site visit to RoCa3 Facility | To perform the engineering due diligence, Duke Engineering usually prepared and sent to EZH a list of questions to inform EZH of the technical information that Duke Engineering would need to review during a site visit. Duke Engineering conducted an initial site visit of the RoCa3 Facility on October 16 and 17, 1997.<br><br>(Ex. 52 at pages 1813, 1962-69; Tr. 1834-36, 1838-41 (Gonzalez)) |
| Oct. 20, 1997 | GENOR project authorized | After receiving and reviewing detailed briefings and written materials, the CED Board authorized CED's investment in the GENOR project.<br><br>(Ex. 186 at pages 4255-56) |
| Oct. 21-22, 1997 | RoCa3 proposal accepted | On October 21, 1997, CED sent its own proposal (without Banc One) directly to EZH to make an equity investment in the lease-leaseback of a percentage interest of the RoCa3 Facility, which was accepted by EZH on October 22, 1997.<br><br>(Stip. ¶76; Ex. 298 at page 5830; Tr. 1057 (Holzman)) |
| Oct. 21, | The RoCa3 | Although as of October 21, 1997 very little RoCa3 |

| | | |
|---|---|---|
| 1997 – Dec. 1997 | Transaction due diligence | Facility specific due diligence had been done on CED's behalf, ultimately hundreds of hours of due diligence were performed. The specific due diligence performed by and on behalf of CED involved the undertaking of the following tasks:<br>• Credit analysis of the transaction, specifically of EZH;<br>• Analysis of the energy market in the Netherlands;<br>• An assessment of the RoCa3 Facility, including its operations, quality and capital expenditures;<br>• An assessment of current environmental issues and potential future issues through the operation of the RoCa3 Facility;<br>• Confirmation that the proposed transaction qualified for leveraged lease accounting; and<br>• Dutch legal issues pertaining to the RoCa3 Facility, including an extensive real estate legal review, and the transaction.<br>(Tr. 1046-47, 1054, 1077-80 (Holzman)) |
| Oct. 21, 1997 | The RoCa3 Transaction economics | The October 21, 1997 CED proposal established the estimated economics of the proposed transaction based on a number of pricing assumptions.<br>(Ex. 298 at pages 5831-33; Tr. 1065-75 (Holzman)) |
| Oct. 22, 1997 | CED's closing conditions for the RoCa3 Transaction | CED, in its accepted proposal, set numerous conditions precedent to its participation in the proposed leasing transaction, including finding the terms of the lender's participation such as the interest rate acceptable, negotiations resulting in transaction documentation acceptable to CED, CED's receipt of satisfactory engineering, environmental and appraisal reports, and adequate insurance on the facility.<br>(Stip. ¶77; Ex. 298 at page 5829; Tr. 2088-90 |

| | | |
|---|---|---|
| | | (DePlautt); Tr. 1058-59 (Holzman)) |
| Oct. 22, 1997 | The RoCa3 Transaction due diligence experts | Muoio and DePlautt engaged in discussions over the types of due diligence experts that CED was going to hire. The October 21, 1997 proposal informed EZH that CED had hired Shearman & Sterling as its United States legal counsel and that CED intended to hire Loeff Claeys Verbeke ("Loeff Claeys") as its Dutch counsel. CED also agreed to hire Deloitte & Touche as the appraiser, Duke Engineering & Services as an independent engineer, and Tauw Milieu as the environmental consultant.<br><br>(Ex. 298 at page 5828; Tr. 1969-70 (Muoio); Tr. 1023-24 (Holzman); Tr. 2085-87 (DePlautt)) |
| Oct. 23, 1997 | Project briefing memo on RoCa3 Transaction finalized | The two-volume Project Briefing Memorandum dated October 23, 1997 provided a detailed analysis and review of the proposed lease transaction. The Project Briefing Memorandum was compiled by DePlautt and consisted of information from various sources, including Cornerstone and EZH. The Project Briefing Memorandum was an attempt to provide a summary of much of the information that management and the CED Board would need to make a decision on the RoCa3 Transaction. On October 23, 1997, DePlautt provided the two-volume Project Briefing Memorandum to management and the CED Board, including Burke, McCartney and Freilich.<br><br>(Stip. ¶95(a); Ex. 363 all and at page 7613; Ex. 376; Ex. 489 at page 9577; Tr. 2091, 2093, 2104, 2108 (DePlautt); Tr. 502-03 (Burke); Tr. 776-77 (McCartney); (Tr. 696-97 (Freilich)) |
| Oct. 27, 1997 | Accounting matters for the RoCa3 Transaction | CED asked Cornerstone to assist it in obtaining an accounting opinion regarding whether the RoCa3 Transaction qualified for leveraged lease accounting.<br><br>On October 27, 1997, Holzman, together with other Cornerstone personnel, prepared a draft summary memorandum based on the proposed EPON leveraged lease transaction that CED was considering at the time. This memorandum was |

| | | |
|---|---|---|
| | | provided to Arthur Andersen to obtain an accounting letter with respect to whether the transaction described therein satisfied the criteria to be booked for financial reporting as a leveraged lease under FAS 13.<br><br>(Stip. ¶56(a); Ex. 776; Ex. 1244 at pages 17743-47; Tr. 1054, 1293-94, 1308-09, 1311-12, 1419-21, 1425-26 (Holzman)) |
| Oct. 28, 1997 | CED's strategy | CED continued to follow its strategy of utilizing Con Edison's core competencies and pursuing worldwide investment opportunities in energy, infrastructure and leasing projects.<br><br>(Ex. 254 at page 4783; Tr. 744-46 (McCartney)) |
| Oct. 28, 1997 | CED's targeted potential projects | CED anticipated closing an energy project and a lease project by the end of 1997. CED targeted potential energy projects that involved buying or building generation plants in Guatemala, Indonesia and Mexico; potential infrastructure projects that involved acquiring all or part of existing electric, gas, water or thermal utilities in Latin America, Europe and the United States; and potential leasing projects that involved the acquisition and leaseback of power plants and distributions systems in Europe, Australia and the United States.<br><br>(Ex. 254 at pages 4785, 4788-91) |
| Oct. 28, 1997 | CED's continued attention to benefits of leasing | CED continued to take into account the potential benefits of leasing, namely frontloaded, predictable earnings and reasonable rates of return.<br><br>(Ex. 254 at page 4790) |
| Oct. 28, 1997 | Con Edison Board of Trustees meeting | The Con Edison Board was provided information about CED and CED's search for investment projects. CED explained its strategy of leveraging core competencies in the pursuit of investment opportunities in energy, infrastructure, leasing, and technical services projects around the world. CED also presented a summary of its activities, goals, financial plan, and investments under consideration, |

| | | |
|---|---|---|
| | | including leasing projects and their attendant risks and benefits.<br><br>(Ex. 354 at pages 7500-01; Tr. 756-58 (McCartney)) |
| Oct. 28, 1997 | Con Edison Board of Trustees meeting | CED provided to the Con Edison Board of Trustees an overview of leasing as an investment opportunity and described the net worth requirement of $100 million for participation in leasing projects. CED was interested in leasing as an investment opportunity because leasing would provide near-term earnings that would balance CED's expected project development losses, reasonable rates of return and market entrance into new countries.<br><br>(Ex. 354 at pages 7500-01; Tr. 760-62 (McCartney); Tr. 688 (Freilich)) |
| Oct. 28, 1997 | Con Edison Board of Trustees meeting: EZH transaction | CED described a lease under active consideration with EZH that would be structured as a "lease-leaseback" of an undivided interest in the RoCa3 power plant located in the Netherlands. CED reported that its potential investment in the EZH transaction would be $43 million with a minimum after-tax yield of 12%. CED recommended that the Board of Trustees increase the capitalization of CED in order to meet the net worth requirement for participation in the leasing market. At the conclusion of this meeting, the Board of Trustees decided to defer consideration of CED's request for additional investment until a later date.<br><br>(Ex. 354 at pages 7501, 7513; Tr. 759-60 (McCartney)) |
| Oct. 29, 1997 | CED Board meeting | CED discussed the Board of Trustee's decision to defer action on CED's request for funding to support leasing transactions and what additional information on leasing could be provided to the Board of Trustees.<br><br>(Ex. 153 at page 4127) |
| Oct. 1997 | Creating the 1998 CED business plan | In October of 1997, CED had begun developing its business plan for 1998. CED anticipated making up to five investments in 1998 with a total equity |

| | | |
|---|---|---|
| | | investment of about $100 million, and expected to generate an additional $.02/share in earnings in 1998.<br><br>(Ex. 247 all and at page 4574; Ex. 253; Ex. 257 all and at page 4808; Ex. 634 at page 11315; Tr. 1951-52 (Muoio)) |
| Nov. 1997 | CED commenced the Jiangsu project | The Jiangsu Provincial Electric Power Company project commenced in November 1997.<br><br>(Ex. 178 at page 4226) |
| Nov. 11, 1997 | CED site visit of the RoCa3 Facility | On November 11, 1997, CED personnel and members of its due diligence team made a site visit to the RoCa3 Facility. The due diligence team members on the site visit included: outside Financial Advisor: Rob Holzman of Cornerstone, internal CED Reviewer: Brian DePlautt, internal Con Edison Engineering Reviewer: Harold Morrison, outside U.S. Legal Advisors: Woody Flowers and Dan Kiely of Shearman & Sterling, outside Engineering Reviewer: Luis Gonzales of Duke Engineering, outside RoCa3 Facility Appraiser: Rick Ellsworth of Deloitte, outside Local Dutch Legal Advisors: Femke Bierman of Loeff Claeys, and outside Environmental Reviewer: Hans Nieuwenhuis of Tauw.<br><br>During the site visit EZH personnel took the group on a tour of the site and the RoCa3 Facility, as well as the two other and much smaller facilities at the same site.<br><br>Gonzalez used the site visit as an opportunity to explain to CED what Duke Engineering had learned about the RoCa3 Facility based on its review of technical information on the RoCa3 Facility and its prior visit of the RoCa3 Facility.<br><br>Morrison attended the site visit to assist in the engineering due diligence on the RoCa3 Facility. Following the site visit, Morrison continued to ask questions, request additional information, and engage in discussions with the Duke Engineering due diligence team with regard to the RoCa3 Facility's |

| | | |
|---|---|---|
| | | efficiency and its production of carbon dioxide.<br><br>Ellsworth attended the site visit as part of his appraisal due diligence and to identify any issues that CED would need to address. This was the second site visit for Deloitte at the RoCa3 Facility.<br><br>Nieuwenhuis attended the site visit as part of his environmental analysis to determine whether any existing or potential environmental noncompliance issues existed at the RoCa3 Facility. Tauw had previously visited the RoCa3 Facility in connection with its environmental analysis.<br><br>Attorneys from Loeff Claeys and Shearman & Sterling were also present at the site visit to better understand the asset and make sure CED received the necessary rights to operate the RoCa3 Facility. Bierman attended the site visit to identify any potential issues with respect to CED's rights regarding the Station Site, access to the RoCa3 Facility, the RoCa3 Facility's connection to the grid and the Cooling Water Channel.<br><br>(Ex. 351 at page 7469; Ex. 1 at pages 36-37; Ex. 46 at page 1505; compare Ex. 298 at page 5833 with Ex. 956 at page 14421; Ex. 53; Tr. 2118-19 (DePlautt); Tr. 1078, 1081-96 (Holzman); Tr. 1843-46 (Gonzalez); Tr. 1631-32, 1634 (Ellsworth); Tr. 1589-90 (Nieuwenhuis)) |
| Nov. 19, 1997 | Credit analysis of EZH | Cornerstone assisted CED in understanding the credit risks involved in the transaction. In addition, because CED did not possess credit analysis expertise, it requested Cornerstone's assistance in receiving a credit rating on EZH from Standard & Poor's.<br><br>(Ex. 4 at pages 389, 399; Ex. 349 at page 7467; Ex. 477 at page 9168; Tr. 1046, 1048-50 (Holzman)) |
| Nov. 21, 1997 | CED memo on the RoCa3 Transaction | DePlautt wrote a memo updating the status of the RoCa3 Transaction. |

| | | |
|---|---|---|
| | | (Ex. 1150) |
| Nov. 24, 1997 | CED Board meeting | DePlautt reviewed the status of the proposed EZH lease project located in the Netherlands with the CED Board and indicated that negotiations and due diligence were ongoing.<br><br>(Ex. 154 at page 4130) |
| Dec. 9, 1997 | CED white paper on the RoCa3 Transaction | In response to a need to educate Con Edison's Board of Trustees on the specific issues, risks and opportunities presented by leasing, CED prepared a Leasing White Paper to provide them with a general understanding of leasing transactions. DePlautt drafted the Leasing White Paper and incorporated comments from various CED personnel, including McCartney and Freilich.<br><br>Along with the December 9, 1997 request for additional investment of $100 million in CED, CED submitted the Leasing White Paper to the Con Edison Board of Trustees.<br><br>(Ex. 397 at pages 8118-25; Tr. 2120-23, 2135-36 (DePlautt); Tr. 767, 789-90, 843, 850-51 (McCartney); Tr. 691-93, 712-14, 717-18 (Freilich); Tr. 507-08, 544-45 (Burke); Tr. 335 (McGrath); Tr. 4919-26 (Ray); Tr. 1036-37 (Holzman); Tr. 3231-34 (Ellis)) |
| Dec. 10, 1997 | CED's investment recommendation in RoCa3 Facility | Along with a proposed Board resolution authorizing CED's investment in the RoCa3 Facility, CED prepared an Investment Recommendation for CED's Board in October and December of 1997. The final Investment Recommendation, dated December 10, 1997, was submitted to the CED Board on December 10, 1997. The Investment Recommendation incorporated the October 23, 1997 Project Briefing Memorandum by reference and provided the CED Board with an overview of the potential investment in the RoCa3 Transaction, along with CED's recommendation and conditions for Board approval.<br><br>(Stip. ¶95(d), (q); Ex. 382; Ex. 396 all and at pages 8114-16; Ex. 398; Tr. 792 (McCartney)) |

| | | |
|---|---|---|
| Dec. 10, 1997 | CED Board's authorization of RoCa3 Transaction | On December 10, 1997, the CED Board authorized CED's investment and participation in the RoCa3 Transaction, subject to Con Edison approval of CED's request for $100 million and provision of the necessary funds. Prior to this approval, the CED Board received detailed briefings and written materials from CED management on September 25, 1997, October 23, 1997, and December 10, 1997.<br><br>(Ex. 355 at page 7514) |
| Dec. 12, 1997 | Additional funding for RoCa3 Transaction approved | After learning more about leasing and CED's due diligence on the RoCa3 Transaction, the Con Edison NY Board of Trustees approved CED's additional funding request.<br><br>(Stip. ¶98; Ex. 397 at pages 8118-25; Ex. 147 at page 3798)<br><br>On December 12, 1997, the Con Edison Board of Trustees authorized an additional $100 million investment in CED to support the leasing investments as described in the December 9, 1997 memorandum from McCartney to McGrath. The December 9, 1997 memorandum requested the Board of Trustees' authorization and attached a description of leasing investments (the Leasing White Paper) for the Board of Trustees' review.<br><br>(Ex. 147 at page 3798; Ex. 356 at page 7515; Ex. 397 at pages 8118-25; Ex. 536 at page 9734) |
| Dec. 12, 1997 | CEL established | CED established Consolidated Edison Leasing, Inc. ("CEL") to enter into the RoCa3 Transaction. On December 12, 1997, CEL entered into a Trust Agreement with Wilmington Trust Company (the "Trustee") to act as trustee of the RoCa Facility Trust No. 2 (the "CEL Trust"), for CEL's benefit in the RoCa3 Transaction. CEL formed the CEL Trust in order to enter into the Participation Agreement, the Sublease Agreement, the Lease Agreement and certain other Operative Documents in the RoCa3 Transaction. |

| | | |
|---|---|---|
| | | (Stip. ¶¶99, 102, 103; Ex. 6 at pages 581, 607) |
| Dec. 15, 1997 | Deloitte & Touche appraised the RoCa3 Facility | As of December 15, 1997, Deloitte had reached all of its final conclusions and had provided a final draft of its appraisal to CED.<br><br>(Tr. 1642-43 (Ellsworth)) |
| Dec. 15, 1997 | Duke Engineering due diligence report | Duke Engineering prepared an engineering due diligence report on the RoCa3 Facility for CED.<br><br>(Stip. ¶79; Ex. 52 at page 1802; Tr. 1495-96 (Radini); Tr. 1831-36 (Gonzalez)) |
| Dec. 15, 1997 | More details on the EZH lease project | DePlautt provided further details to CED's Board on the proposed investment in which CED would acquire a leasehold interest in the RoCa3 power plant from EZH and then subsequently lease back that interest to EZH.<br><br>(Ex. 155 at pages 4131-32) |
| Dec. 15, 1997 | RoCa3 Transaction approved and closed | After receiving and reviewing various detailed briefings and written materials, the CED Board authorized CED's investment in the EZH lease project. The RoCa3 Transaction closed on December 15, 1997.<br><br>(Stip. ¶¶58, 104; Ex. 355 at page 7514) |
| 1997 | CED's internal review of RoCa3 Transaction | Prior to the approval, as part of CED's review of the potential investment in the RoCa3 Transaction, CED employees (or others on their behalf) prepared a number of documents for use by CED and Con Edison management. These documents included, but are not limited to:<br><br>1. A September 24, 1997 Project Fact Sheet (Ex. 388);<br><br>2. An October 23, 1997 memorandum (Ex. 390);<br><br>3. An October 23, 1997 memorandum (Ex. 489);<br><br>4. An October 23, 1997 two-volume Project |

| | | |
|---|---|---|
| | | Briefing Memorandum (Exs. 363, 376);<br>5. An October 23, 1997 memorandum and suggested Board resolution (Ex. 392);<br>6. An October 27, 1997 memorandum (Ex. 382);<br>7. An October 29, 1997 Investment Recommendation (Ex. 382);<br>8. A November 21, 1997 memorandum (Ex. 1150);<br>9. A November 25, 1997 memorandum (Ex. 395);<br>10. A December 8, 1997 Leasing White Paper (Exs. 377);<br>11. A December 9, 1997 memorandum (Ex. 146);<br>12. A December 9, 1997 memorandum, suggested Board resolution and Leasing White Paper (Ex. 397);<br>13. A December 10, 1997 Investment Recommendation (Ex. 396); and<br>14. A December 10, 1997 Investment Recommendation and suggested Board resolution (Ex. 398).<br>(Stip. ¶95) |
| Dec. 15, 1997 | CEL and the RoCa3 Transaction | On December 15, 1997, EZH and CED, directly or through the CEL Trust, entered into the RoCa3 Transaction, along with third parties, by executing the Operative Documents. The primary Operative Documents include, the Participation Agreement, Lease Agreement, Sublease Agreement, Loan & Security Agreement, Facility Operating Agreement, Common Facilities Use Agreement, Facility Support Agreement, and Access Agreement.<br>(Stip. ¶104; Ex. 1 at page 145; Tr. 1096 (Holzman)) |
| Dec. 15, | EZH's letter to | As part of the RoCa3 Transaction, EZH provided |

| | | |
|---|---|---|
| 1997 | Deloitte regarding the RoCa3 Transaction | Deloitte with a signed letter dated December 15, 1997, in which EZH made three representations.<br><br>1. As of the closing date, the facility is in service and is capable of generating electric power, district heating and carbon dioxide. No major improvements, alterations, or modifications are required for the facility to render it complete for its intended use.<br><br>2. The facility is substantially in the same condition it was when it was inspected by Deloitte & Touche on August 4, 1997.<br><br>3. There is no known factor to EZH which creates a material inducement for EZH to exercise the purchase option or disregard the provisions of the Sublease Agreement and related Participation Agreement.<br><br>(Ex. 56 at page 2511; Tr. 1429-31 (Holzman)) |
| Dec. 15, 1997-Feb. 24, 2041 | RoCa3 Facility lease agreement | In the RoCa3 Transaction, EZH conveyed to CED its Lease Interest in the RoCa3 Facility for the Lease Term of 43.2 years (December 15, 1997 through February 24, 2041) via the Lease Agreement. CED accepted delivery of its 47.468354430380% Undivided Interest in the RoCa3 Facility from EZH on December 15, 1997.<br><br>(Stip. ¶¶112, 113, 114; Ex. 2 at pages 323-24; Ex. 1 at pages 121, 139, 171; Tr. 1102-03 (Holzman)) |
| Dec. 15, 1997-Feb. 24, 2041 | RoCa3 Facility lease agreement: payment of lease rent | On December 15, 1997, CED, via the CEL Trust, paid the Initial Basic Rent Payment of $120,112,270.36. This payment was made by combining CED's equity commitment payment of $39,320,000 together with the $80,792,270.36 from HBU's nonrecourse loan to CED. CED anticipated that it would have to pay $4,125,000 in transaction fees to third parties. These transaction fees together with CED's equity commitment increased CED's total investment amount to $43,445,000.<br><br>(Stip. ¶¶116, 125, 127, 128, 117, 118, 119; Ex. 365; |

| | | |
|---|---|---|
| | | Ex. 366; Ex. 874; Ex. 333 at pages 7256-57) |
| Dec. 15, 1997 | HBU's non-recourse loan to CED | CED directed EZH to pay its Sublease rental obligations, except for certain excluded payments, directly to HBU.<br><br>(Stip. ¶194A; Ex. 7 at page 619) |
| Dec. 15, 1997-Jan. 2, 2018 | Sublease agreement for the RoCa3 Transaction | The Sublease Agreement sets out the terms and conditions relating to CED's sublease of the Undivided Interest in the RoCa3 Facility to EZH. CED subleased the Undivided Interest in the RoCa3 Facility to EZH for a period of 20.1 years (the "Sublease Basic Term"), from December 15, 1997 through January 2, 2018 (the "Sublease Basic Termination Date"), which is 46.5278% of the Lease Term.<br><br>(Stip. ¶135; Tr. 1103, 1130 (Holzman)) |
| Dec. 15, 1997 | EZH's collateral accounts for the RoCa3 Transaction | EZH established two collateral accounts, the Sublease Deposit and the IJssel Deposit, as security for some of its payment obligations under the Sublease.<br><br>(Tr. 1161-62 (Holzman)) |
| Dec. 15, 1997 | EZH's collateral accounts for the RoCa3 Transaction: the sublease deposit | Prior to the close of the RoCa3 Transaction, EZH established Stichting Rotte to make deposits and grant security interests in its assets for the purpose of securing EZH's payment obligations under the Sublease and other Operative Documents. On December 15, 1997, EZH transferred $80,792,270.36 to Stichting Rotte by way of assignment and transfer of its rights in the ABN Account that the CEL Trust had assigned to EZH. Stichting Rotte used these funds to establish the Sublease Deposit, a deposit account held by ABN.<br><br>(Stip. ¶¶185, 186, 187, 128, 189, 202; Ex. 30 at pages 1226-32) |
| Dec. 15, 1997 | EZH's collateral accounts for the RoCa3 Transaction: | EZH granted CED a first priority security interest in the Sublease Deposit as security for EZH's rental payments or other payments due under the Sublease. |

| | | |
|---|---|---|
| | the security interest | CED repledged its security interest in the Sublease Deposit to HBU, as security for CED's debt service payments on the non-recourse loan.<br><br>(Stip. ¶¶193, 194, 203) |
| Dec. 15-17, 1997 | EZH's collateral accounts for the RoCa3 Transaction: the sublease deposit – the IJssel deposit | Prior to entering into the RoCa3 Transaction, EZH established Stichting IJssel for the purpose of purchasing debt instruments, making deposits and granting security interests related to certain payment obligations under the Sublease and other Operative Documents.<br><br>To secure a portion of its payments under the Sublease and the other Operative Documents, EZH transferred $31,252,643.73 to Stichting IJssel to be used to purchase U.S. Government Obligations. This was accomplished in three steps. On December 16, 1997, the day after closing, EZH and Credit Suisse First Boston ("CSFB") agreed that CSFB would purchase the U.S. Government Obligations. EZH caused $31,252,643.73 to be transferred to Stichting IJssel by way of transferring to it a custody account, with CSFB as custodian, held at Citibank, New York, with a balance of $31,252,643.73. On December 17, 1997, two days after closing, CSFB used the funds to purchase fixed-rate zero coupon U.S. Government Obligations, U.S. Treasury STRIPs. These U.S. Treasury STRIPs constitute the IJssel Deposit.<br><br>(Stip. ¶¶206, 208, 209, 211, 212, 214; Ex. 29 all and at pages 1210-11; Ex. 872; Ex. 43 at page 1426; Ex. 373 at page 7707; Tr. 1162 (Holzman)) |
| Dec. 15, 1997-2018 | EZH's maintenance for the RoCa3 Transaction, permitted improvements | The Sublease Agreement imposes a number of maintenance obligations upon EZH. EZH can make improvements to the RoCa3 Facility that it deems desirable, provided that no modification impairs the facility's operations; alters the facility's primary function; decreases its value, residual value, remaining useful life or utility; or causes the facility to be commercially unusable to any party other than EZH or an affiliate thereof. Similarly, the parts EZH uses as replacements have to meet specified standards such as having the same value, utility and |

| | | |
|---|---|---|
| | | useful life as the replaced part.<br><br>(Stip. ¶¶146, 147; Ex. 4 at pages 399-406, 423; Tr. 3849-50 (Bent); Tr. 1138 (Holzman); Tr. 3138-39 (Ellis)) |
| Dec. 15, 1997-Jan. 2, 2018 | EZH's restrictions on sub-subleasing in the RoCa3 Transaction | The Sublease restricts EZH's right to sub-sublease the RoCa3 Facility to another party. For instance, the term of any sub-sublease may not extend beyond the Sublease Basic Termination Date, January 2, 2018. EZH would also have to require any sub-sublessee to comply with the maintenance and replacement parts standards imposed under the Sublease.<br><br>(Stip. ¶143; Ex. 4 at pages 406-07, 423; Tr. 1139-41 (Holzman); Tr. 3851-53 (Bent); Tr. 2932-33 (Minton)) |
| Dec. 15, 1997-2018 | EZH's insurance for the RoCa3 Transaction | The Sublease Agreement requires EZH to maintain certain types and levels of insurance with respect to the RoCa3 Facility.<br><br>(Ex. 4 at pages 417-21, 424, 426-31; Tr. 3853-54 (Bent); Tr. 3139-40, 3206-07 (Ellis); Tr. 2933-35, 3063 (Minton)) |
| Dec. 15, 1997-2018 | Premature termination and event of default terms in the lease and sublease for the RoCa3 Transaction | The Sublease to EZH may be terminated before its term expires upon the occurrence of certain events ("Premature Termination Events"). In the case of a premature termination, EZH must make a payment or return the Undivided Interest to CED for the remaining Lease Term depending on which Premature Termination Event has occurred. The amount EZH may have to pay CED depends on the event causing the premature termination.<br><br>(Stip. ¶¶154, 156, 157, 159, 161, 151; Ex. 4 at pages 447-56; Tr. 3176-77 (Ellis); Tr. 3751-52 (Bent))<br><br>Premature Terminations include the following:<br><br>A Sublease Facility Event of Loss is the result of some event rendering the RoCa3 Facility incapable of continued use.<br><br>(Stip. ¶¶160, 161; Ex. 1 at page 133; Ex. 4 at page |

| | | |
|---|---|---|
| | | 413; Tr. 1141-43, 1146 (Holzman); Tr. 3855-56 (Bent); Tr. 2935-36 (Mintun))<br><br>A Burdensome Buyout Event is where: (1) a change in the Netherlands law makes it illegal for EZH to continue as Sublessee or for it to continue making payments under the Sublease, or (2) EZH is subjected to burdensome costs as the result of the RoCa3 Transaction.<br><br>(Stip. ¶153; Stip. ¶154(c); Ex. 1 at page 120; Tr. 1148 (Holzman))<br><br>A Voluntary Termination for Economic Obsolescence occurs if the RoCa3 Facility was to become technologically or economically obsolete to operate.<br><br>(Stip. ¶¶155, 157, 158, 153; Tr. 2936-38 (Mintun); Tr. 1149-50 (Holzman))<br><br>The Early Purchase Option is where EZH may purchase CED's Lease Interest if CED or an affiliate becomes a competitor of EZH.<br><br>(Stip. ¶159; Tr. 3170 (Ellis); Tr. 1150-51 (Holzman))<br><br>Events of Default Under the Sublease and CED's Remedies. During the Sublease Term, EZH could be placed in default upon the occurrence of certain events. Events of default under the Sublease include EZH's failure to: (1) pay rent on a timely basis, (2) comply with its maintenance obligations, (3) comply with its insurance obligations, and (4) comply with the return requirements as well as EZH going bankrupt or becoming insolvent. Events of default under the Sublease also include a discovery that EZH made any representation or warranty that was untrue, inaccurate or misleading in any material respect. Should an event of default occur under the Sublease, CED may choose one or more remedies as set out in the Sublease Agreement.<br><br>(Stip. ¶163; Stip. ¶164 all and (a), (c), (e); Ex. 4 at pages 422-26, 429-30, 438; Ex. 56 at page 2511; Tr. |

| | | |
|---|---|---|
| | | 1157-61 (Holzman); Tr. 2938-39 (Mintun); Tr. 3860-61, 3863 (Bent)) |
| Dec. 15, 1997-February 24, 2041 | The RoCa3 Facility operating agreement | The Facility Operating Agreement provisions with respect to the Operator and CED would be triggered on any date that the Sublease terminates and EZH returns to CED the Undivided Interest on the RoCa3 Facility.<br><br>(Ex. 11 at page 738; Ex. 4 at pages 396-97, 428-29, 434) |
| Dec. 15, 1997, 1999, 2000, 2002, 2004 | Officer's certificates for the RoCa3 Transaction | Following the close of the RoCa3 Transaction, EZH was to provide an annual Officer's Certificate certifying that the officer's review of the transactions and conditions of EZH did not reveal a condition or event that constituted an event of default under the Sublease. CED has copies of the EZH Officer's Certificates in its current records for the years 1999, 2000, 2002 and 2004.<br><br>(Stip. ¶¶149, 150; Ex. 1 at page 53; Ex. 367; Ex. 368; Ex. 370; Ex. 369; Tr. 4909-13, 4963 (Ray)) |
| Dec. 18, 1997 | CED considered investing in ADA Cogeneration Plant | CED discussed forming with Delta Power Company LLC a partnership in order to acquire an interest in ADA Cogeneration Plant in Ada, Michigan. The Ada plant provided about 30 MW of electricity under a power purchase agreement and supplied steam to a manufacturing facility.<br><br>(Ex. 156 at page 4135) |
| Dec. 18, 1997 | Discussion of the 1998 business plan | Muoio discussed the ongoing development of the 1998 business plan with the CED Board.<br><br>(Ex. 156 at page 4134) |
| 1997 | CED investment opportunities | CED pursued investments in Latin America, Europe, Asia, and the United States during 1997.<br><br>(Tr. 773 (McCartney)) |
| End of 1997 | CED's 1997 review | CED assessed its first year of operations and its growing investment portfolio. CED had completed several projects and achieved several of its goals |

| | | |
|---|---|---|
| | | including gaining entry into international markets and establishing strategic alliances with, among others, Delta and Banc One. In 1997, CED had focused on making generation investments, establishing an international presence, building strategic alliances and using leasing as a vehicle to ramp-up earnings in its initial years to assist CED in becoming self-supporting. At the end of 1997, CED's projects had enhanced Con Edison's reputation with strategic partners and with companies in Guatemala, the Netherlands and China.<br><br>(Ex. 248 at pages 4608-30; Ex. 242 at page 4471) |
| End of 1997 | CED's plan for 1998 | Going forward from 1997, CED planned to continue its efforts to build an international portfolio of energy, infrastructure and leasing projects with different risk profiles. CED's strategic focus for the next five years was to become a "Global Power Portfolio Builder" with a diversified portfolio that focused on generation and infrastructure. CED projected this diversified investment portfolio would be comprised of 35% generation, 30% infrastructure and 35% leasing investments. CED anticipated a weighted average return of 10% on leasing investments and a total weighted average return of 14% on this diversified portfolio. As part of CED's planned regional strategy, CED identified the United States for generation investments; Western Europe for generation, transmission, distribution and leasing investments; Eastern Europe, Asia and South America for generation, transmission, and distribution investments; and Central America for indexed generation investments. Moving forward, CED also planned to pursue higher risk and higher return investments.<br><br>(Ex. 242 at pages 4470-71; Ex. 248 at pages 4611, 4619, 4623, 4625, 4630) |
| End of 1997 | CED's plan for 1998 | Looking forward to 1998, CED planned to continue leveraging Con Edison's core competencies in the pursuit of investments in energy, infrastructure, and leasing projects around the world. |

| | | |
|---|---|---|
| | | (Ex. 247 at page 4574; Ex. 257 at pages 4808, 4818, 4826, 4828-29) |
| Jan. 1, 1998 | New company formed | Con Edison, Inc. ("CEI") was formed, and Con Edison NY and several unregulated subsidiaries became subsidiaries of CEI.<br><br>(Stip. ¶24) |
| Jan. 1, 1998 | Public trading of CEI stock | CEI, like Con Edison NY before it, is publicly traded on the New York Stock Exchange.<br><br>(Stip. ¶3) |
| Jan. 2, 1998-2034 | Sublease agreement for the RoCa3 Transaction | During the Sublease Term, EZH is required to pay annual rents every January 2 from 1998 through 2018. Should CED elect the Sublease Renewal Option in 2018, EZH will continue to pay CED annual rents every January 2 from 2019 through 2034, with a final Sublease rental payment due on June 15, 2034. None of the Sublease rents to be paid by EZH was prepaid, and EZH's obligation to pay Sublease rent is absolute and unconditional and is not subject to abatement, setoff, deduction or reduction.<br><br>(Stip. ¶¶139, 140, 142; Ex. 4 at pages 389, 422, 426-32, 445-46, 541-42; Tr. 1130, 1132-33 (Holzman); Tr. 3843 (Bent); Tr. 2927, 2938-39 (Mintun)) |
| Jan. 14, 1998 | Tauw's environmental, safety, and health report on the RoCa3 Facility delivered | Tauw prepared a report entitled Due Diligence Environmental, Safety and Health Report, which was delivered to CED in final form by letter dated January 14, 1998.<br><br>(Stip. ¶81; Ex. 53 all and pages 2094-2101; Tr. 1555 (Nieuwenhuis)) |
| Jan. 29, 1998 | Carson cogeneration project considered | CED considered a potential $8 million investment to acquire an interest in the Carson cogeneration project in Los Angeles, California.<br><br>(Ex. 178 at pages 4224-25) |
| Jan. 29, | Review of Niagara Mohawk Power | CED commenced a preliminary review of the possible acquisition of hydroelectric assets being sold by |

| | | |
|---|---|---|
| 1998 | acquisition | Niagara Mohawk Power Corporation.<br><br>(Ex. 178 at page 4225) |
| Jan. 29, 1998 | CEnergy project considered | CED considered a proposal to invest in Central European Energy Company ("CEnergy"), an energy investment company for Central European assets and projects.<br><br>(Ex. 178 at page 4225) |
| 1998 | Con Edison NY after CEI was formed | Con Edison NY had formed and continued to form unregulated subsidiaries as part of its plan to enter into unregulated business activities.<br><br>(Stip. ¶26) |
| 1998 | Con Edison subsidiaries | Consolidated Edison Solutions, Inc., formerly ProMark Energy, Inc., was previously formed to provide electricity and natural gas to commercial and residential customers in the Northeast.<br><br>(Stip. ¶27; Ex. 855 at page 13555; Ex. 106 at page 2912; Tr. 139 (McGrath); Tr. 680 (Freilich)) |
| 1998 | Con Edison subsidiaries | Consolidated Edison Energy, Inc. was formed to purchase and sell energy to wholesale customers.<br><br>(Stip. ¶28; Ex. 106 at page 2907; Tr. 139 (McGrath); Tr. 680 (Freilich)) |
| 1998 | Con Edison subsidiaries | Consolidated Edison Communications, Inc. was formed to build and manage communication networks.<br><br>(Stip. ¶29; Ex. 151 at page 4114) |
| Feb. 24, 1998 | Con Edison's 1997 Annual Report | This Report, along with providing a summary of CED's international investments in the Netherlands, Guatemala, and China, highlighted CED's strategy and potential moving forward into 1998. The Report said that CED aimed to become a leasing investor in energy infrastructure projects and was poised to benefit from the growth, privatization and restructuring trends shaping the energy industry. |

| | | |
|---|---|---|
| | | The Report highlighted the RoCa3 Transaction by emphasizing the environmental benefits provided by the RoCa3 Facility. The RoCa3 Facility's environmental design, allowing for the transfer of carbon dioxide to local greenhouses, made the RoCa3 Facility "one of the most innovative and environmentally friendly electric generation facilities in the world." The Report was available to Con Edison's shareholders at a May 1998 shareholder meeting.<br><br>(Ex. 107 at page 2961; Ex. 858 at pages 13492-93; Ex. 857 at page 13456; Tr. 171, 177-82 (McGrath); Tr. 780, 983-84 (McCartney); Tr. 4938-39 (Ray)) |
| Feb. 26, 1998 | CED's country screening process | At the CED Board meeting, Muoio outlined CED's 1998 business plan, including CED's strategies, goals, risk and return balance, and how the market and CED focus had changed. Muoio discussed CED's development of a country screening process with the CED Board.<br><br>(Ex. 157 at pages 4139-41; Ex. 374 all and at pages 7721, 7723-40; Ex. 262 at page 4978; Ex. 159 at page 4151; Tr. 1967-68 (Muoio); Tr. 2432-33 (Goulding); Tr. 649-51 (Burke)) |
| Feb. 26, 1998 | Discussion of proposed Ada investment | CED discussed the proposed Ada investment with the CED Board including the proposed refinancing of the project debt by ABN-AMRO Bank.<br><br>(Ex. 157 at pages 4138-40) |
| Feb. 26, 1998 | Ada investment authorized by CED's Board | After receiving and reviewing detailed briefings and written materials, the CED Board authorized CED's investment in the Ada project.<br><br>(Ex. 157 at pages 4139-40) |
| Mar. 19, 1998 | Ada transaction closed | The Ada transaction closed on Mar. 19, 1998.<br><br>(Ex. 158 at page 4147) |
| Mar. 25, 1998 | CED Board meeting | CED discussed how the proposed Carson project fit into CED's strategy, CED's need to find an |

| | | |
|---|---|---|
| | | appropriate balance between active and passive investments, and the development of CED's investment portfolio strategy. Muoio reviewed various topics including CED's strategic focus, the development of a portfolio of projects with different risks and returns, and how the business strategy changed over time.<br><br>(Ex. 158 at pages 4145-46) |
| Mar. 25, 1998 | CED Board meeting | CED provided the Board with information regarding the proposed acquisition with MICNIC Power Company of an interest in the Carson 40 MW cogeneration plant.<br><br>(Ex. 158 at page 4145) |
| Mar. 25, 1998 | Potential CEnergy investment | At the CED Board meeting, CED provided information regarding advantages and risks of the potential investment in a multiple utility company with energy investments in Central and Eastern Europe. CED indicated that a minimum $40 million investment would be required for an investor to obtain a management role in CEnergy.<br><br>(Ex. 158 at page 4146) |
| Mar. 25, 1998 | Lease investments in 1998 | DePlautt reported on the various leasing opportunities under consideration by CED, including the lease of electric facilities located in the Netherlands, Switzerland, the United Kingdom and Australia.<br><br>(Ex. 158 at page 4147) |
| April 30, 1998 | Carson investment | Madia provided details on the approximate $4 million investment in which CED, along with MICNIC, would acquire an interest in the Carson plant.<br><br>(Ex. 159 at page 4149-50) |
| April 30, 1998 | Carson investment authorized | After receiving and reviewing detailed briefings and written materials, the CED Board authorized CED's investment in the Carson project. |

| | | |
|---|---|---|
| | | (Ex. 159 at pages 4150-51) |
| April 30, 1998 | CED Board meeting discussion of CEPALCO project | Madia reported that CED and IEP were investigating a potential investment in Cagayan Electric Power and Light Co., Inc. ("CEPALCO"), an electric distribution company in the Philippines. Madia noted that IEP had shifted its focus to the Philippines and that IEP's strategy was similar to CED's Central American strategy of making a relatively small investment in a project that would serve as a platform for additional investment opportunities. Although the CEPALCO project was a viable investment, ultimately the Asian Crisis presented too much risk for CED to invest in the Philippines.<br><br>(Stip. ¶48; Ex. 159 at pages 4151-52) |
| April 1998 | 1998 investment opportunities: tax advantaged investments | CED continued to review the market, accounting, and tax issues relating to investments in Internal Revenue Code Section 42 affordable housing programs.<br><br>(Ex. 198 at page 4317) |
| May 18, 1998 | Shareholders meeting | McGrath reported on Con Edison's deregulation and restructuring plan, including CED's formation, strategy and investment in the Netherlands.<br><br>(Ex. 857 at page 13456) |
| July 1998 | Amendment to the 1997 Settlement | The PSC issued an order amending the 1997 Settlement and directing Con Edison to auction 100% of its New York City fossil-fuel generating capacity to third parties.<br><br>(Ex. 108 at page 3048; Tr. 135-36 (McGrath)) |
| Aug. 1998 | Jiangsu project completed | In 1998, CED participated in the Jiangsu Transmission & Distribution Planning project in China. In August 1998, CED completed the Jiangsu Transmission & Distribution Planning project.<br><br>(Stip. ¶49) |
| Sept. | NUON transaction | CED reviewed a potential leasing investment in |

| | | |
|---|---|---|
| 1998 | considered | NUON, a Netherlands natural gas distribution utility. Con Edison had significant experience in the gas distribution business and hoped to learn about Dutch gas distribution techniques from CED's potential investment. CED prepared a project briefing memorandum, a white paper and an investment recommendation pertaining to the potential lease-leaseback of NUON's natural gas distribution assets.<br><br>(Stip. ¶56 all and (d); Exs. 315, 316, 317, 318, 281; Ex. 312 at pages 6338-41; Ex. 195 at page 4300; Ex. 319; Ex. 212 at page 4363; Ex. 217 at page 4381; Ex. 232 at page 4419; Ex. 314; Ex. 313 at page 6352; Ex. 428 at pages 8593-94; Ex. 262 at pages 4978, 4983; Tr. 796-97 (McCartney)) |
| Sept. 11, 1998 | GENOR transaction closed | The GENOR transaction closed and CED ultimately had both an ownership and management role in the GENOR facility. CED hoped the GENOR investment would be a foundation for future investments in the region.<br><br>(Ex. 262 at page 4969; Ex. 1077 at page 15700; Ex. 1219 at page 17559; Tr. 2198 (DePlautt)) |
| Sept. 14, 1998 | Wall Street Journal article | A *Wall Street Journal* article regarding Con Edison's deregulation strategy highlighted Con Edison's international power plant investment in the Netherlands.<br><br>(Ex. 858 at pages 13492-93) |
| Sept. 23, 1998 | Memo summarizing RoCa3 Transaction shared with Arthur Andersen | After the RoCa3 Transaction closed, Holzman prepared a memorandum summarizing the RoCa3 Transaction's structure. This memorandum was shared with Arthur Andersen so that they could evaluate the RoCa3 Transaction and provide guidance as to whether the transaction could be booked for financial accounting purposes under FAS 13.<br><br>(Ex. 1151; Ex. 722 at page 12240; Tr. 1432-33 (Holzman)) |

| | | |
|---|---|---|
| Oct. 1998 | Cornerstone advised CED on NUON transaction | In October 1998, CED retained Cornerstone to provide advice in connection with the NUON transaction. Near the end of October 1998, Cornerstone, on behalf of CED, submitted an initial proposal for the acquisition of a leasehold interest in NUON's gas distribution assets.<br><br>(Stip. ¶56; Ex. 281; Ex. 312 at pages 6338-41; Ex. 195 at page 4300) |
| Nov. 1998 | Carson transaction closed | The Carson transaction closed in or around November of 1998.<br><br>(Ex. 164 at page 4170) |
| Dec. 10, 1998 | NUON proposal submitted | Cornerstone, on behalf of CED, submitted a revised proposal to NUON. CED received an investment mandate from NUON's Board and by late December NUON and CED had started negotiating and performing due diligence.<br><br>(Ex. 319; Ex. 262 at page 4983; Ex. 212 at page 4363; Ex. 217 at page 4381) |
| Dec. 31, 1998 | CED's financial reporting of the RoCa3 Transaction | For financial reporting and accounting purposes, CED reported income from the RoCa3 Transaction of $0 for 1997 and $8,096,792 for 1998. The income reported for 1997 and 1998 in CED's certified financial statements equal the 1997 and 1998 amounts in the "Pre-tax income" column of the final pricing runs for the RoCa3 Transaction.<br><br>(Stip. ¶297; Ex. 423 at page 8442; Ex. 333 at page 7254; Tr. 699, 701 (Freilich)) |
| 1998-1999 | Changes in CED's overall investment strategy | During 1998, CED transformed from a conceptual start-up company to an ongoing and growing business. In 1998, CED successfully acquired ownership interests in several power generation projects including two projects in the United States (Ada and Carson) and one project in Guatemala (GENOR). At the end of 1998, building on the success of the RoCa3 Transaction, CED was negotiating to invest in the lease-leaseback of NUON's gas distribution assets, also in the |

| | | |
|---|---|---|
| | | Netherlands.<br><br>(Ex. 262 at page 4967)<br><br>In 1999, CED decided to refocus its investment strategy and efforts, including a concentration on energy projects in the northeastern United States, Guatemala and Central America. Due to instability in the international market during 1998, including the Asian credit crisis and South American currency devaluation, CED elected to withdraw from its partnership with IEP.<br><br>(Ex. 262 at page 4968; Ex. 272 at page 5334; Ex. 1063 at page 15601; Tr. 2019-21 (Muoio)) |
| Feb. 12, 1999 | NUON accepted CED's proposal | NUON accepted CED's proposal for investment in the NUON transaction. By the end of February, CED had made significant progress in negotiations and in the due diligence process and expected the closing to happen in the next few months.<br><br>(Ex. 314; Ex. 232 at page 4419) |
| Mar. 2, 1999 | Divestment by Con Edison NY | By this time, Con Edison NY had sold almost 6,300 MW of its nearly 8,300 MW electrical generating capacity for $1.8 billion.<br><br>(Stip. ¶25; Tr. 461 (Burke)) |
| May 18, 1999 | NUON transaction closed | CED closed the NUON transaction on May 18, 1999.<br><br>(Stip. ¶56(d); Ex. 313 at page 6352) |
| July 16, 1999 | EZH's post-RoCa3 Transaction ownership changes | Since the close of the RoCa3 Transaction, EZH has undergone several ownership changes. On July 16, 1999, EZH's shareholders agreed to sell their EZH stock to PreussenElektra AG.<br><br>(Stip. ¶¶69, 70, 71; Ex. 292 at pages 5733, 5788; Ex. 294 at page 5789) |
| July 20, 1999 | EZH's post-RoCa3 Transaction ownership changes | On July 20, 1999, EZH notified CED that its shareholders had agreed to sell their shares in EZH to PreussenElektra AG, a subsidiary of VEBA AG. |

| | | |
|---|---|---|
| | | (Stip. ¶¶69, 70, 71; Ex. 292 at pages 5733, 5788; Ex. 294 at page 5789) |
| Jan. 2000 | EZH's post-RoCa3 Transaction ownership changes | In January 2000, PreussenElektra acquired 100 percent ownership of EZH.<br><br>(Stip. ¶¶69, 70, 71; Ex. 292 at pages 5733, 5788; Ex. 294 at page 5789) |
| June 2000 | EZH's post-RoCa3 Transaction ownership changes | In June 2000, two German utilities, VEBA AG and VIAG AG, merged to form E.ON AG, a German company whose shares were then listed on both the Frankfurt and New York stock exchanges. As part of this merger, E.ON AG transferred the stock of EZH to E.ON Energie AG, a wholly owned subsidiary of E.ON AG.<br><br>(Stip. ¶¶71, 72; Ex. 294 at page 5789; Ex. 295 at page 5791)<br><br>E.ON is a large European energy generator with locations and customers in Scandinavia, the United Kingdom, Western Europe and Eastern Europe.<br><br>(Ex. 10074 at page 20087) |
| Dec. 11, 2000 | EZH's post-RoCa3 Transaction ownership changes | On December 11, 2000, E.ON Benelux Generation N.V. informed CED that EZH had changed its name to E.ON Benelux Generation N.V.<br><br>(Stip. ¶¶71, 72; Ex. 294 at page 5789; Ex. 295 at page 5791) |
| 2000-2001 | Divestment by Con Edison NY | Con Edison NY sold its nuclear-generating facilities with electrical generating capacity of approximately 1000 MW for $504.5 million.<br><br>(Stip. ¶25) |
| 2001 | Divestment by Con Edison NY | Con Edison NY sold approximately 1,480 MW of electrical generating assets.<br><br>(Stip. ¶25) |
| Nov. | Post-transaction site visit to RoCa3 | CED conducted an inspection trip to the RoCa3 Facility. On this trip, CED management met with |

| | | |
|---|---|---|
| 2005 | Facility | E.ON personnel, including the operations and maintenance manager for the RoCa3 Facility, and conducted a technical review of the RoCa3 Facility. This technical review involved an evaluation of the RoCa3 Facility's operations and maintenance, including a thorough inspection of the gas turbine, $CO_2$ boiler and greenhouses. In addition, CED spoke with employees at the RoCa3 Facility and noted that they recognized the importance of safety, environmental compliance reliability and cost control. Based on its site visit and inspection, CED noted several miscellaneous issues to follow up on internally at CED or with E.ON.<br><br>(Ex. 352 at pages 7471-86) |
| 2018-2041 | The RoCa3 Facility support agreement | The Facility Support Agreement establishes many terms regarding how CED would get access to certain necessities with respect to the operation of the RoCa3 Facility. As part of this agreement, EZH agreed to provide certain services and rights to CED such as access to the grid and the cooling water station and the provision of natural gas.<br><br>(Stip. ¶¶274, 275; Ex. 13 at pages 828-32; Tr. 1104 (Holzman)) |
| 2018, 2034 | Return of undivided interest to CED in the RoCa3 Transaction | EZH must comply with a number of return provisions at the time that it returns the Undivided Interest to CED.<br><br>(Ex. 4 at pages 396-98; Tr. 3843-46 (Bent); Tr. 1134-35 (Holzman); Tr. 2928-29 (Mintun)) |
| 2018 | End of sublease basic term options for the RoCa3 Transaction | At the end of the Sublease Basic Term on January 2, 2018, EZH can exercise the Sublease Purchase Option to purchase CED's remaining leasehold interest for $215,450,949.20 (the "Purchase Option Price"). If EZH does not exercise the Sublease Purchase Option, CED has two choices: (1) it can exercise its Sublease Renewal Option, renewing the Sublease for the Sublease Renewal Term of 16.5 years, or (2) it can cause the Undivided Interest to be returned to it for the remaining Lease Term of 23.1 |

| | | |
|---|---|---|
| | | years (referred to as the "Retention Option").<br><br>(Stip. ¶¶136, 165, 169; Ex. 4 at pages 433-34, 479; Tr. 1178 (Holzman)) |
| 2018 | The sublease purchase option for the RoCa3 Transaction: CED's projected economic benefits | If EZH elects the Sublease Purchase Option, CED is projected to make an overall pretax profit of $60,974,397 (after taking into account the return of its equity investment of $43,445,500).<br><br>(Ex. 20194 at page 25150; Ex. 609 at page 10815; Tr. 1229 (Holzman); Tr. 5153 (LaRue)) |
| 2018-2041 | CED's projected profit through the sublease renewal term for the RoCa3 Transaction | At the end of the Sublease Renewal Term on June 15, 2034, EZH will be required to return the Undivided Interest in the RoCa3 Facility to CED in compliance with the return provisions set out in the Sublease. CED may take possession of the RoCa3 Facility and have it operated for its own benefit at its expense or lease it to some third party for the remaining 6.5 years of the Lease Term.<br><br>(Stip. ¶¶178, 267, 269; Ex. 4 at pages 396-98; Tr. 1181 (Holzman); Tr. 3156-67 (Ellis); Tr. 4829 (Ray))<br><br>Through the Sublease Renewal Termination Date, CED is expected to earn pretax income of $101,538,462. The projected $101,538,462 pretax income is the profit computed after the return of CED's initial investment of $43,445,000 and does not include any residual value for the period beginning after the expiration of the Sublease Renewal Term on June 15, 2034 and continuing through the Lease Termination Date on February 24, 2041. Any residual value or income will add to the overall pre-tax profits CED would earn. The residual value would increase CED's earnings from the RoCa3 Transaction and its after-tax yield.<br><br>(Ex. 333 at pages 7255, 7254; Ex. 20194 at page 25153; Tr. 1206-08, 1222-24, 1226-27 (Holzman); Tr. 5155, 5162-63 (LaRue)) |
| 2041 | Sublease renewal option for the | Under the Renewal Option, CED would owe EZH the Final Basic Rent Payment of $831,525,734 on |

| | | |
|---|---|---|
| | RoCa3 Transaction: the final basic rent payment | February 24, 2041. The sources from which CED may fund the Final Basic Rent Payment are contingent upon future events, including whether CED elects to provide Acceptable Substitute Collateral or instead funds the Lease Collateral Deposit and the Trustee Treasury Collateral, as well as the interest rate CED would earn on the Lease Collateral Deposit from June 15, 2034 through February 24, 2041.<br><br>(Stip. ¶¶242, 246; Ex. 2 at pages 325, 328, 352; Tr. 4947-50 (Ray); Tr. 3924-28 (Bent); Tr. 5292, 5331 (LaRue)) |
| 2041 | Retention option for the RoCa3 Transaction: the final basic rental payment | Under the Retention Option, CED still would owe EZH the Final Basic Rent Payment of $831,525,734 on February 24, 2041. The sources from which CED may fund the Final Basic Rent Payment are based on contingent future events, such as (1) revenues from operations; (2) whether CED chooses to provide Acceptable Substitute Collateral or instead funds the Incremental Collateral Pledge and the Trustee Treasury Collateral; and (3) the interest rate CED would earn on the Incremental Collateral Pledge and Trustee Treasury Collateral from the date they are funded.<br><br>(Stip. ¶¶256, 257, 246; Ex. 11 at page 744; Ex. 2 at pages 325, 352; Tr. 3911-13 (Bent)) |