**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| CONSOLIDATED EDISON COMPANY OF NEW YORK, INC. & SUBSIDIARIES, | ) | |
| Plaintiff, | ) | Case. No. 06-305T |
| v. | ) | Hon. Marian Blank Horn |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

**JOINT STATUS REPORT**

Pursuant to the Court's instructions the parties hereby file this Joint Status Report notifying the Court of actions in other pending LILO cases:

a. *BB&T Corporation v. United States*, Case No. 1:04-cv-00941-NCT (Middle District of North Carolina), *appeal*, Case No. 07-1177 (4th Cir.): On April 29, 2008 the Fourth Circuit issued an opinion affirming the trial court's grant of summary judgment for the United States. A copy of the Opinion is attached as Exhibit A.

b. *Fifth Third Bancorp & Subsidiaries v. United States*, Case No. 1:05-cv-350 (Southern District of Ohio): On April 18, 2008, at the conclusion of trial, the jury rendered a verdict in the trial of this case. As of this date, a final judgment has not been entered. The verdict form is attached hereto as Exhibit B.

Respectfully submitted this 6th day of May, 2008.

/s/ DAVID F. ABBOTT
Attorney of Record
MAYER BROWN LLP
1675 Broadway
New York, New York 10019-5820
Tel: (212) 506-2642
Email: dabbott@mayerbrown.com

THOMAS KITTLE-KAMP
MAYER BROWN LLP
71 South Wacker Drive
Chicago, Illinois 60606
Tel: (312) 701-7028
Email: tkittlekamp@mayerbrown.com

Counsel for Plaintiff

/s/ DAVID N. GEIER
Attorney of Record
U.S. Department of Justice, Tax Division
Post Office Box 26
Ben Franklin Station
Washington, DC 20044
Telephone: (202) 616-3448
Facsimile: (202) 307-0054

NATHAN J. HOCHMAN
Assistant Attorney General
DAVID GUSTAFSON
Chief, Court of Federal Claims Section

/s/ STEVEN I. FRAHM
Assistant Chief, Court of Federal Claims Section, Of Counsel

JOSEPH A. SERGI
Trial Attorney
ADAM R. SMART
Trial Attorney
KAREN M. GROEN
Trial Attorney

Counsel for United States of America

**PUBLISHED**

# UNITED STATES COURT OF APPEALS

**FOR THE FOURTH CIRCUIT**

| | |
|---|---|
| BB&T CORPORATION,<br>*Plaintiff-Appellant,*<br>v.<br>UNITED STATES OF AMERICA,<br>*Defendant-Appellee.*<br>———<br>EQUIPMENT LEASING AND FINANCE ASSOCIATION,<br>*Amicus Supporting Appellant.* | No. 07-1177 |

Appeal from the United States District Court
for the Middle District of North Carolina, at Durham.
N. Carlton Tilley, Jr., District Judge.
(1:04-cv-00941-NCT)

Argued: February 1, 2008

Decided: April 29, 2008

Before WILLIAMS, Chief Judge, WILKINSON, Circuit Judge, and Patrick Michael DUFFY, United States District Judge for the District of South Carolina, sitting by designation.

---

Affirmed by published opinion. Chief Judge Williams wrote the opinion, in which Judge Wilkinson and Judge Duffy joined.

---

**COUNSEL**

**ARGUED:** William Kearns Davis, BELL, DAVIS & PITT, P.A., Winston-Salem, North Carolina, for Appellant. Judith Ann Hagley,

EXHIBIT A

UNITED STATES DEPARTMENT OF JUSTICE, Tax Division, Washington, D.C., for Appellee. **ON BRIEF:** Alan M. Ruley, BELL, DAVIS & PITT, P.A., Winston-Salem, North Carolina; Robinson B. Lacy, Andrew S. Mason, Ann McLean Jordan, SULLIVAN & CROMWELL, L.L.P., New York, New York, for Appellant. Anna Mills Wagoner, United States Attorney, Greensboro, North Carolina; Richard T. Morrison, Acting Assistant Attorney General, Gilbert S. Rothenberg, Acting Deputy Assistant Attorney General, Richard Farber, UNITED STATES DEPARTMENT OF JUSTICE, Tax Division, Washington, D.C., for Appellee. Steven E. Grob, Edward A. Groobert, Anthony Ilardi, Jill M. Wheaton, DYKEMA GOSSETT, P.L.L.C., Bloomfield Hills, Michigan, for Amicus Supporting Appellant.

---

**OPINION**

WILLIAMS, Chief Judge:

This appeal requires us to determine the tax consequences of a complex financial transaction. BB&T Corp. entered into a "lease-in/lease-out" transaction, often called a "LILO," hoping to reduce its tax liability, but the Internal Revenue Service ("IRS") disallowed the deductions it claimed. After BB&T sued for a refund, the district court granted summary judgment in favor of the Government.

BB&T now appeals, arguing that the district court misapplied the "substance-over-form" doctrine in determining that it could not claim deductions for rent and interest under 26 U.S.C.A. §§ 162(a)(3) & 163(a) (West 2002 & Supp. 2007). Specifically, BB&T disputes the district court's conclusion that although the form of the transaction involved a lease financed by a loan, BB&T did not actually acquire a genuine leasehold interest or incur genuine indebtedness as a result of the transaction. For the following reasons, we affirm.

I.

Because this is an appeal from the district court's grant of summary judgment in favor of the Government, we review the facts in the light

most favorable to BB&T. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

A. *Background.*

The parties agree that the structure of the transaction at issue matches that of a "typical" LILO, so we begin with a brief overview of this complex transactional form.

In a typical LILO, a U.S. taxpayer leases property from a tax-exempt entity and simultaneously leases that property back to the owner. The tax-exempt owner's sublease has a shorter term than the taxpayer's lease. Upon expiration of the shorter sublease, the owner may exercise an option to buy back the remainder of the taxpayer's lease. Thus, in practical terms, the tax-exempt property owner continues to use the property during the sublease term just as it did before the transaction and bears no risk of losing control of its asset(s).

The taxpayer, meanwhile, receives tax benefits by deducting the rental payments on its lease, amortizing certain transaction costs, and, depending on its financing arrangement, deducting interest payments. Maxim Shvedov, CRS Report for Congress: Tax Implications of SILOs, QTEs, and Other Leasing Transactions with Tax-Exempt Entities 8 (2004). The tax benefits can be substantial and are achieved primarily by "[a]ccelerating the transaction-related deductions and delaying recognition of the corresponding revenues." *Id.* at 3. This delayed recognition creates a tax deferral, which, in practice, will function as a tax reduction due to the time value of money. *Id.* at 2, 8.

Generally, parties aim to structure a LILO in a way that essentially eliminates any risk of economic loss while maximizing the deductions that the taxpayer may claim. In this respect, the parties strive to "strike a balance between limiting their exposure to risks on one hand, and making sure the provisions do not disqualify the transaction as a [genuine] lease [for tax purposes] on the other. *Id.* at 9; *see also* Mark P. Gergen, *The Logic of Deterrence: Corporate Tax Shelters*, 55 Tax L. Rev. 255, 259 n.19 (2002) (noting that LILOs are often structured so that "there is no risk to any party, other than the tax law risk").

The chief tax risk associated with entering into a LILO is the possibility that the IRS will deem the transaction a sham. LILOs have been harshly criticized as abusive tax shelters that serve only to transfer tax benefits associated with property ownership from tax-indifferent entities, which have no use for them, to U.S. taxpayers. *See* David P. Hariton, *Response to "Old 'Brine' in New Bottles" (New Brine in Old Bottles)*, 55 Tax L. Rev. 397, 402 (2002) (noting one commentator's characterization of LILOs as abusive tax shelters and agreeing that LILOs "purport[ ] to create tax benefits that Congress did not intend to confer on anyone in respect of transactions that involve no business investment at all"). In 1996, the IRS issued proposed regulations that largely eliminated the tax benefits associated with LILOs; these regulations became effective in 1999. Section 467 Rental Agreements, 61 Fed. Reg. 27,834 (proposed June 3, 1996); 26 C.F.R. § 1.467-1 to -5 (2007). Although the regulations did not apply to transactions entered into before 1999, there remained a risk that the IRS would invoke generally applicable tax law principles to disallow LILO-related deductions. Despite the risk, many large financial institutions executed LILO transactions between 1996 and 1999.

B. *The Transaction.*

1. BB&T Enters into the LILO.

BB&T, a U.S. financial services company based in the Southeast, entered into the LILO at issue in this appeal with Sodra Cell AB ("Sodra"), the business division of a Swedish cooperative recognized as one of the world's leading wood pulp manufacturers.[1] The property at issue in the transaction is a 22% interest in the pulp manufacturing equipment at one of Sodra's mills (hereinafter "the Equipment").[2] As

[1]BB&T implemented the transaction through a trust, with Fleet National Bank ("Fleet") acting as trustee. The parties agree that use of the trust did not alter the tax consequences of the transaction, which would have been the same had BB&T entered into the transaction directly. Accordingly, we refer to both BB&T Corp. and the trust as "BB&T" unless the context otherwise requires.

[2]The remaining 78% interest in that mill's pulp-manufacturing equipment was the subject of a similar LILO between Wachovia Bank and Sodra.

explained more fully below, the transaction, which remains on-going, involves a lease and simultaneous (but shorter-term) lease-back, followed by a series of options.

A promoter, Knight, Tallman & van Tol Capital Partners, L.L.C. ("KTV"), solicited BB&T to participate in the transaction. KTV marketed the LILO to BB&T as a "tax driven structure" that would provide significant "[t]ax savings" while eliminating economic risk through the use of defeased accounts.[3] (J.A. at 173-186.)

Before entering into the LILO, BB&T performed an independent evaluation of the transaction. This internal assessment described the transaction as a "tax-driven deal" with an after-tax investment yield "largely generated by tax benefits associated with accelerated tax deductions" for rent. (J.A. at 187.) BB&T's Chief Financial Officer ("CFO") conceded that "if there were no tax benefits" BB&T would "[p]robably not" have moved forward with the LILO. (J.A. at 83.) The CFO claimed, however, that BB&T was "intrigued by the transaction" in part because it was "looking to grow loans and diversify [its] loan portfolio." (J.A. at 996-97.)[4]

As part of the process outlined in the KTV promotion, BB&T had the Equipment appraised. Deloitte and Touche, L.L.P. performed the appraisal and prepared a report estimating the equipment's useful life and fair market value, as well as the value of the interest BB&T would have in the equipment at different times.

Then, on June 30, 1997 (the "Closing Date"), BB&T and Sodra executed the transaction through a series of interrelated agreements. These agreements included, *inter alia*, a "Head Lease," a Sublease, a Debt Payment Undertaking Agreement ("Debt PUA"), and an Equity Payment Undertaking Agreement ("Equity PUA"). The Head Lease and Sublease govern the parties' interests in the Equipment, while the Debt PUA and Equity PUA set forth fiscal obligations.

[3]A defeased account is one in which funds are escrowed at a bank and pledged to the appropriate party.

[4]Interestingly, the transaction was not presented to BB&T's commercial leasing subsidiary, which played no role in initiating, evaluating, approving, or managing the transaction.

2. Property Interests — the Leases.

Pursuant to the Head Lease, BB&T leased the equipment from Sodra for a 36-year term. At the same time, under the terms of the Sublease, Sodra leased the equipment back from BB&T for a 15.5-year period that the parties refer to as the "Basic Lease Term." In effect, the Sublease retracted BB&T's rights and obligations under the Head Lease for the duration of the Basic Lease Term, but provided BB&T a right to make an annual inspection of the Equipment.[5] Sodra therefore continues to use and possess the Equipment as it did prior to the transaction. Between 1995 and 1997, Sodra made major improvements to the Equipment at a cost in excess of $125 million. After the Closing Date (between 1997 and 2001), Sodra continued to make improvements to the Equipment at a capital cost totaling $74.6 million.

When the Basic Lease Term expires on January 1, 2013, Sodra has the option to buy back BB&T's remaining interest under the Head Lease. Sodra's exercise of this option would terminate the transaction in 2013, following the close of the Basic Lease Term.

If Sodra declines this "purchase option," BB&T has options of its own. These options include (1) requiring Sodra to extend its Sublease an additional 13.3 years to April 18, 2026 (meaning the Sublease would then end 7.2 years prior to the expiration of the Head Lease) (the "renewal option"); (2) leasing the equipment to a party other than Sodra, subject to certain requirements concerning the terms of the replacement lease and the identity and creditworthiness of the

[5]The Head Lease gave BB&T the right to sole possession of the equipment (subject to an annual inspection by Sodra), the right to operate the equipment, and the right to retain all profits generated from its use of the equipment. The Sublease turned the tables, granting Sodra the right to sole possession of the equipment (subject to an annual inspection by BB&T), the right to operate the equipment, and the right to retain all profits generated by its use of the equipment.

Under the Head Lease, BB&T was required to maintain, service, repair, and overhaul the equipment in accordance with certain standards, and to bear all costs related the equipment's use and maintenance. Under the Sublease, however, Sodra took over these obligations.

replacement lessee (the "replacement lease option"); or (3) taking possession of the equipment and using it at its own expense and for its own benefit for the remainder of the Head Lease term (the "return option"). (J.A. at 1841.)

### 3. Financing Obligations.

#### i. Closing.

As we previously noted, *supra* note 1, BB&T implemented the transaction through a trust, with Fleet National Bank ("Fleet") acting as trustee. The closing proved relatively straightforward: ABN-AMRO Bank N.V. ("ABN"), one of the world's most secure financial institutions, assisted with the financing by depositing $68,008,236 in BB&T's trust account at ABN, while BB&T contributed $18,228,895 of its own funds to the trust account.[6] Acting pursuant to the Debt PUA, Fleet immediately transferred $68,008,236 (a sum equal to that furnished by ABN), back to a defeased account at ABN (the "Debt PUA account"). As a result of this irrevocable transfer, those funds became an asset solely of ABN, unreachable by Sodra, BB&T, or their respective creditors. Of the remaining $18,228,895, Fleet used $12,000,193 to purchase treasury bonds, which were placed in an account at Fleet. This purchase set in motion the Equity PUA. To complete the closing, Fleet transferred $6,228,702 to Sodra as Sodra's "incentive for doing the deal." (J.A. at 325.)

On paper, however, the closing proved far more complicated. The $68,008,236 ABN provided represented a non-recourse loan from one of ABN's subsidiaries, Hollandsche Bank-Unie N.V. ("HBU") (hereinafter the "HBU loan"), the proceeds of which ABN was transferring to BB&T's trust account on behalf of HBU. Once placed in the trust account, the HBU loan, coupled with BB&T's $18,228,895 investment, became BB&T's "Advance Head Lease Payment," the first (and, as explained below, potentially the only) rent payment due

[6]BB&T also paid an additional $5.53 million in gross fees in connection with the transaction, including an advisory fee to KTV and a $220,000 payment to ABN for its role in the transaction. (J.A. at 50.) KTV, in turn, paid BB&T a $1 million advisory fee in connection with the transaction.

Sodra under the Head Lease. Only the $6,228,702 "incentive" payment actually went to Sodra because the Debt PUA obligated Sodra to make a $68,008,236 payment to ABN, which was acting as "Debt PUA Issuer" for the transaction, and the Equity PUA mandated a $12,000,193 payment from Sodra to Fleet, which was serving as "Equity PUA Issuer." Accordingly, these funds were transferred to ABN and Fleet on Sodra's behalf, rather than paid to Sodra.

ii. Basic Lease Term (Closing Date-January 1, 2013).

The Head Lease calls for BB&T to pay rent to Sodra in two installments. The Advance Head Lease Payment represents the first installment, and a second payment of $557.8 million (the "Deferred Head Lease Payment") is due in 2038, five years after the Head Lease expires. BB&T thus will not make any rental payments during the Basic Lease Term.

Moreover, although Sodra is required to make annual rental payments during this term, Sodra does not supply any additional funds to satisfy this obligation. Instead, ABN, in its capacity as Debt PUA Issuer, makes the payments on Sodra's behalf from the funds it received at closing. BB&T does not receive any of these rental payments because BB&T assigned the right to receive rent from Sodra to HBU as part of providing collateral for the HBU loan.[7] Accordingly, ABN, acting as "Debt PUA Issuer," makes the annual payments directly to HBU from the Debt PUA account. Through 2012, these annual payments exactly equal the remaining principal and interest due on the loan. Because ABN, not HBU, provided the funds for the loan, however, ABN is actually paying itself from the $68,008,236 (the sum equal to the loan proceeds) that it received at closing. The net result is that no funds change hands during this period; only a cir-

[7]To secure its obligation to satisfy the HBU loan, BB&T assigned to HBU a lien on the Head Lease, Sublease, and BB&T's right to rent payments from Sodra, as well as the right to payments under the Debt PUA. The loan collateral specifically excludes what the transaction's promoter candidly termed the "real money" in the transaction, (J.A. at 175), the approximately $12 million in government bonds placed in the Equity PUA account.

cular intrabank transfer occurs. On its own books, therefore, ABN treats the loan as an off-balance sheet transaction carrying zero risk.

In the meantime, the treasury bonds purchased by Fleet as Equity PUA Issuer remain in an account at Fleet (the "Equity PUA account").

iii. January 1, 2013 to the Transaction's End.

a. Purchase Option.

If Sodra exercises its purchase option, the purchase would be funded from the resources BB&T supplied at closing. ABN, as Debt PUA Issuer, would fund part of the purchase price by making the final payment under the Debt PUA on January 1, 2013, thereby also retiring the HBU loan. Fleet, as Equity PUA Issuer, would pay the remaining balance of the purchase price on Sodra's behalf by dispersing the funds from the Equity PUA account to BB&T in five payments made at specified times in 2013.[8] Because Sodra would be buying back all of BB&T's interests and obligations under the Head Lease, including the obligation to make the Deferred Head Lease Payment, BB&T would be relieved of the obligation to make that payment. The transaction would therefore end with Fleet's final payment to BB&T in 2013.

The practical effect of this scenario would be no different than if BB&T had invested in the treasury bonds directly, except that BB&T paid roughly $6 million to Sodra as incentive for participating in the transaction, as well as various transaction fees, and would have received tax deductions for rent, interest, and amortization of transaction-related fees had the IRS not audited its tax return.

b. BB&T's Options.

If Sodra declines the purchase option, and BB&T elects to renew the Sublease, ABN, as Debt PUA Issuer, will still make the final pay-

[8]The payments and maturity dates of the treasury bonds in the Equity PUA account at Fleet are set to match the amount and timing of the funds due BB&T under the Equity PUA.

ment under the Debt PUA, retiring the HBU loan. This payment will still be considered made on Sodra's behalf, but as a rental payment. Sodra will also make annual rental payments each year of the renewed sublease term, as well as additional payments at the beginning of certain years and a deferred payment at the end of the renewed sublease. Meanwhile, the treasury bonds in the Equity PUA account will be reinvested and will serve as collateral for (and will be available to apply to) Sodra's rental payments.

The parties structured the transaction so that the rent from the renewed sublease would grow at a predetermined rate and ultimately equal the amount of the Deferred Head Lease Payment when it is due, thereby allowing BB&T to fulfill that obligation without investing additional funds. Moreover, even if interest rates are not as the parties assumed and the sums BB&T has pledged as collateral for the Deferred Head Lease Payment do not total $557.8 million in 2038, Sodra has no recourse against BB&T for any deficiency.

If BB&T does not exercise the renewal option, Fleet will deliver the funds in the Equity PUA Account to Sodra. The last payment under the Debt PUA will also go to Sodra, meaning that BB&T would be responsible for the final payment to retire the HBU loan.[9] BB&T would still be required to provide collateral for the Deferred Head Lease Payment—in the form of rents from the replacement sublease if it exercises that option, or an alternative such as a letter of credit or guarantee should it choose the return option—and Sodra would still have no recourse against BB&T for any shortfall in the Deferred Head Lease Payment.

4. Looking Ahead: BB&T and Sodra's Options.

Sodra has professed uncertainty as to whether it will exercise its purchase option, and BB&T maintains that as a result, any of the options made possible by the transaction *could* become a reality at the close of the Basic Lease Term. BB&T has conceded, however, that

[9]If, however, BB&T failed to pay the balance of the loan, Sodra would be required to purchase the loan from HBU. In this circumstance, Sodra's only recourse against BB&T is limited to the collateral BB&T provided for the HBU loan.

it entered into the transaction believing that "the most likely thing is [Sodra] would not walk away from the property," given that Sodra had been in business for years, making the purchase option or the renewal option the most likely scenarios. (J.A. at 85.) Of course, because the renewal option belongs to *BB&T*, not Sodra (and the renewal lease would not encompass the full Head Lease term), *Sodra* could ensure uninterrupted use and control of the Equipment only by exercising the purchase option. An expert report commissioned by the Government predicted this result, concluding that, for a number of reasons, including dislocation costs and cost of replacing lost manufacturing capacity, the purchase option represented the only economically viable scenario for Sodra. Deloitte & Touche's appraisal, in contrast, deemed Sodra unlikely to exercise the purchase option, reasoning that the purchase price exceeded the value of the Head Lease interest Sodra would acquire (apparently without taking into account that because the option was prefunded by BB&T, Sodra would pay nothing for its "purchase").[10]

The parties dispute whether BB&T can profit from the transaction if it does not receive the tax benefits it hoped the LILO's "tax driven structure" would generate. BB&T contends that, under the purchase option, it stands to make a minimum pre-tax net profit of $12,555,532, and under the renewal lease option, it could net a minimum pre-tax profit of $27,833,846. The Government disputes BB&T's methodology and has proffered an expert report concluding that in the absence of the tax benefits generated by the transaction, BB&T has no realistic expectation of realizing an economic gain.

[10]In connection with the transaction, Sodra signed a Tax Indemnity Agreement in which it agreed that for U.S. income tax purposes, neither it nor any of its personnel would take a position inconsistent with the characterization of Sodra as the owner, head lessor, and sublessee of the Equipment. Before Sodra entered into this agreement, however, Sodra's tax advisors characterized the transaction as a financing arrangement that did not affect Sodra's interests in the Equipment, apparently anticipating that Sodra would not surrender control of the Equipment to BB&T. (*See* J.A. at 1736 (internal tax evaluation explaining, among other things, that "[f]rom a value added tax law perspective, the transaction can be considered either based on its real meaning, that is, a financial transaction, or based on its formal content, that is two lease relationships").)

There is no dispute, however, that the transaction maximizes BB&T's protection from loss. Sodra was required to set up a long-term Letter of Credit for the protection of BB&T in the event that something happened to cause the transaction to unwind early. And, the structure of the transaction ensures that BB&T has the power to recoup the investment in government bonds from the Equity PUA account, if it so chooses. Finally, BB&T's obligations — the HBU loan and the Deferred Head Lease Payment — represent non-recourse obligations, with only proceeds and interests derived from the transaction itself pledged as collateral.

### C. *BB&T's 1997 Tax Return.*

In its 1997 tax return, BB&T reported rent from Sodra's sublease and amortization of an advisory fee as income. BB&T claimed deductions for: (1) $9,894,362 in rent paid to Sodra on the Head Lease; (2) $2,820,925 in interest on the HBU loan, and; (3) amortization of $137,943 in fees an expenses made in connection with the transaction. When the IRS audited BB&T, it disregarded the reported income and disallowed the deductions, resulting in a $9,416,592 increase in BB&T's taxable income for 1997.

### D. *Proceedings Before the District Court.*

Following the audit, on October 14, 2004, BB&T filed a complaint in the United States District Court for the Middle District of North Carolina, seeking a refund of taxes it claimed to have overpaid. Thereafter, BB&T and the Government filed cross-motions for summary judgment, and the district court granted summary judgment in favor of the Government.

With regard to the rental payment, the district court concluded that BB&T was not entitled to a deduction because even though the form of the transaction was a lease and immediate sublease, in substance BB&T had not acquired a genuine leasehold interest in the equipment. Relying primarily on two cases from the United States Tax Court, *Alstores Realty Corp. v. Comm'r*, 46 T.C. 363 (1966), and *Ashlock v. Comm'r*, 18 T.C. 405 (1952), the district court reasoned that "[w]here a conveyance of property is accompanied by retention of the same interest in the property, only a future interest is con-

veyed." (J.A. at 1848.)[11] The district court further reasoned that the various obligations in the transaction were offsetting and that, when those offsetting obligations were "collapsed" against each other, all that remained was BB&T's payment of transaction costs in a complicated circle ending with an investment in government bonds. The court concluded that the investment could have proceeded in an identical manner without the additional shuffling of paper.

Concerning the interest deduction, the district court concluded that "[w]hen the intermediate payment steps are disregarded, which must be done in order to consider the substance of the loan transaction and not the form selected by the parties, it becomes clear that the loan transaction is only a circular transfer of funds in which the . . . loan is paid from the proceeds of the loan itself." (J.A. at 1858.) Accordingly, it determined that the HBU loan did not constitute genuine indebtedness, and BB&T was not entitled to an interest deduction.

BB&T timely appealed, and we have jurisdiction pursuant to 28 U.S.C.A. § 1291 (West 2006).

II.

A.

We review *de novo* the district court's grant of summary judgment to the Government, applying the same standards that the district court was required to apply. *See Laber v. Harvey*, 438 F.3d 404, 415 (4th Cir. 2006) (en banc). "Summary judgment is appropriate 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Id.* (quoting Fed. R. Civ. P. 56(c) (West 1992)). We construe the evidence in the light most favorable to BB&T, the non-moving party, and draw all reasonable inferences in BB&T's favor. *Id.*

[11]IRS Revenue Ruling 2002-69, though not relied on by the district court, takes the same view. Rev. Rul. 2002-69, 2002-2 C.B. 760.

We begin our discussion with a few familiar rules. A taxpayer, of course, "has the legal right to decrease the amount of what otherwise would be his taxes, or altogether avoid them, by any means which the law permits." *Bridges v. Comm'r*, 325 F.2d 180, 183 (4th Cir. 1963). A taxpayer may not, however, claim tax benefits that Congress did not intend to confer by setting up a sham transaction lacking any legitimate business purpose, or by affixing labels to its transactions that do not accurately reflect their true nature. Accordingly, under the "economic substance doctrine," a transaction may be disregarded as a sham for tax purposes if the taxpayer "was motivated by no business purposes other than obtaining tax benefits" and "the transaction has no economic substance because no reasonable possibility of a profit exists." *Rice's Toyota World, Inc. v. Comm'r*, 752 F.2d 89, 91 (4th Cir. 1985). Similarly, the doctrine of "substance over form" recognizes that the substance of a transaction, rather than its form, governs for tax purposes. *See, e.g.*, *W.Va. N. R.R. Co. v. Comm'r*, 282 F.2d 63, 65 (4th Cir. 1960) ("It is well settled that in matters of taxation substance rather than form prevails and that the taxability of a transaction is determined by its true nature rather than by the name which the parties may use in describing it."). Because "an income tax deduction is a matter of legislative grace . . . the burden of clearly showing the right to the claimed deduction is on the taxpayer." *Interstate Transit Lines v. Comm'r*, 319 U.S. 590, 593 (1943); *see also Jack's Cookie Co. v. United States*, 597 F.2d 395, 400 (4th Cir. 1979) (noting the "settled principle that statutes authorizing deductions from income for federal tax purposes are to be strictly construed").

BB&T claims that it has demonstrated its entitlement to deductions for rent and interest under 26 U.S.C.A. §§ 162(a)(3) & 163(a) by showing that the transaction has economic substance and a form that must be respected for tax purposes. Thus, according to BB&T, neither the economic substance doctrine nor the substance-over-form doctrine prohibits BB&T from receiving the deductions it claimed. Given the procedural posture of this case, we take BB&T at its word that the transaction meets the criteria for economic substance set forth in *Rice's Toyota World*.[12] Accordingly, we direct our attention to

[12]We recognized in *Rice's Toyota World, Inc. v. Comm'r*, 752 F.2d 89 (4th Cir. 1985), that whether a particular transaction is a sham lacking

BB&T's argument that the form of the transaction, as evidenced by the parties' written agreements, accurately reflects its substance. We first address whether BB&T has acquired a genuine leasehold interest giving rise to a rent deduction under § 162(a)(3) before turning to the question of whether BB&T paid "interest on indebtedness" within the meaning of § 163(a).

B.

In applying the doctrine of substance over form, we "look[ ] to the objective economic realities of a transaction rather than to the particular form the parties employed," *Frank Lyon Co. v. United States*, 435 U.S. 561, 573 (1978). As the Supreme Court has repeatedly explained, "the simple expedient of drawing up papers" is not "controlling for tax purposes when the objective economic realities are to the contrary." *Id.* (internal quotation marks omitted). Accordingly, the parties agree that to deduct payment on the Head Lease as a "rental" payment under § 162(a)(3), BB&T must establish that it acquired a genuine leasehold interest in the Equipment. *See* 26 U.S.C.A. § 162(a)(3) (permitting a deduction for "rentals or other payments required to be made as a condition to the continued use or possession, for purposes of the trade or business, of property to which the taxpayer has not taken or is not taking title or in which he has no equity").

In *Frank Lyon Co.*, the Supreme Court provided guidance for determining when the form of a leasing transaction should be respected for tax purposes. In the course of analyzing a sale and leaseback arrangement, the *Frank Lyon Co.* Court held that

> where . . . there is a genuine multiple-party transaction with economic substance which is compelled or encouraged by business or regulatory realities, is imbued with tax-

economic substance "is an issue of fact." *Id.* at 92. The district court did not address this factual question in its summary judgment ruling. Because we need not address this issue to resolve this appeal and the parties continue to dispute BB&T's motives and profit potential, we too, will leave the economic-substance question unanswered.

> independent considerations, and is not shaped solely by tax-avoidance features that have meaningless labels attached, the Government should honor the allocation of rights and duties effectuated by the parties. *Expressed another way, so long as the lessor retains significant and genuine attributes of the traditional lessor status, the form of the transaction adopted by the parties governs for tax purposes.* What those attributes are in any particular case will necessarily depend upon its facts.

435 U.S. at 583-84 (emphasis added).

Thus, establishing that the Head Lease is, in substance, a true lease for tax purposes requires a demonstration that "the lessor retains significant and genuine attributes of the traditional lessor status." *Frank Lyon Co.*, 435 U.S. at 584. *Accord Estate of Thomas v. Comm'r*, 84 T.C. 412, 432 (Tax Court 1985) ("[T]he parties' characterization of the form of the transaction should be respected so long as the lessor retains significant and genuine attributes of a traditional lessor."). We are not persuaded that BB&T has made this showing with regard the leases at issue here.

First, each right and obligation BB&T obtained under the Head Lease it simultaneously returned to Sodra via the Sublease for the duration of the Basic Lease Term, leaving BB&T only a right to make an annual inspection of the Equipment. Second, although the transaction ostensibly provides for the exchange of tens of millions of dollars in rental payments during the Basic Lease Term, the only money that has (and that may ever) change hands between BB&T and Sodra is the $6,228,702 BB&T provided as Sodra's "incentive for doing the deal." (J.A. at 325.) Sodra has therefore not only continued to use the Equipment just as it had before the transaction, it has done so without paying anything to BB&T. Third, Sodra, through the purchase option, can unwind the transaction without ever losing dominion and control over the Equipment or having surrendered any of its own funds to BB&T, and has no economic incentive to do otherwise.[13] BB&T

[13]BB&T disputes the Government expert's conclusion that the purchase option represents the only economically viable scenario for Sodra

therefore does not expect Sodra to "walk away" from the Equipment. (J.A. at 85.) Finally, regardless of whether Sodra bucks this expectation, the structure of the transaction insulates BB&T from any risk of losing its initial $12,833,846 investment in the government bonds or incurring the obligation to invest additional funds.

In sum, the transaction does not allocate BB&T and Sodra's rights, obligations, and risks in a manner that resembles a traditional lease relationship. *See Alstores Realty Corp.*, 46 T.C. at 373 (holding that because a "so-called space-occupancy agreement placed the two parties' rights, obligations, and risks as they would be allocated in a typical lease arrangement[,] . . . the arrangement was a lease in substance as well as in form"); *Swift Dodge v. Comm'r*, 692 F.2d 651, 653-54 (9th Cir. 1982) (recharacterizing a lease as a conditional sales contract because the parties' obligations, legal rights, and risks were no different than they would be in a conditional sale arrangement and "Swift Dodge did not retain . . . significant and genuine attributes of a lessor"); *Aderholt Specialty Co. v. Comm'r*, 50 T.C.M. (CCH) 1101 (1985) (holding that a lease arrangement was a sale for federal tax purposes because the transaction "divested [the lessor] of any significant and genuine attributes of traditional lessor status" and "if the benefits, obligations, and rights of the putative lessor are essentially those of a secured seller, the substance of the arrangement must govern and it will be deemed a sale for tax purposes" (internal quotation marks omitted)).

Moreover, unlike the taxpayer in *Frank Lyon Co.*, BB&T has failed to show any "business or regulatory realities" that "compelled or encouraged," *id.* at 583, the structure of the transaction at issue here,

by relying on the appraisal report it commissioned. The report predicted that Sodra would be unlikely to exercise its purchase option because the purchase option price (which the report analyzed as including the obligation to make the Deferred Head Lease Payment) exceeds the anticipated value of the remaining term of the Head Lease. This prediction plainly does not reflect the economic reality of the transaction, however, as BB&T supplied the funds for the purchase, and Sodra need not pay itself the Deferred Head Lease Payment. Because the "purchase" is free to Sodra, price cannot be obstacle.

nor has it established that its LILO is "imbued with tax-independent considerations, and is not shaped solely by tax-avoidance features that have meaningless labels attached," *id.* at 583-84. To the contrary, BB&T has offered no regulatory or economic reality driving the transaction's simultaneous conveyance and retraction of rights and obligations, nor has it offered any non-tax related purpose for structuring the transaction in this manner.

In these respects, BB&T stands in sharp contrast to the lessor in *Frank Lyon Co.* There, regulatory restrictions prevented the Worthen-Bank & Trust Company ("Worthen") from financing the construction of a new bank and office building through a conventional mortgage. Worthen therefore arranged "an alternative solution" — a sale and lease-back arrangement with Frank Lyon Co. — that would "provide [Worthen] with the use of the building, satisfy the state and federal regulators, and attract the necessary capital." *Frank Lyon Co.*, 435 U.S. at 564. The arrangement did not create any tax benefits that could not have been enjoyed had the transaction taken another form, but it did result in a situation in which neither party "was the owner of the building in any simple sense." *Id.* at 581. The Supreme Court concluded that Frank Lyon should be treated as the owner for tax purposes (and not merely a lender of money and conduit for mortgage payments to a third party, as the government had argued) because Frank Lyon was the only one whose capital was committed to, and genuinely at risk in, the building. *Id.* at 577, 581. We are thus unpersuaded by BB&T's insistence that the same factors causing the Supreme Court to respect the form of the transaction at issue in *Frank Lyon Co.* are also present in this appeal. *Compare Coleman v. Comm'r*, 16 F.3d 821, 826 (7th Cir. 1994) (distinguishing *Frank Lyon Co.* and explaining that "the existence of the benefits and burdens of ownership" is dispositive of whether a taxpayer will be treated as the owner of leased property for tax purposes).

Likewise, BB&T's argument that the district court "violated the well-settled principle that the transaction in question must be viewed 'as a whole,'" (Appellant's Br. at 34 (quoting *ACM P'ship v. Comm'r*, 157 F.3d 231, 247 (3d Cir. 1998))), rings hollow. This principle does not require courts to treat needless additional steps or "tax-avoidance features that have meaningless labels attached," *Frank Lyon Co.*, 435 U.S. at 584, as legitimate by virtue of their attachment to a substan-

tive transaction, such as a purchase or sale. To the contrary, this aspect of the substance-over-form doctrine serves to prevent taxpayers from manipulating the tax code in that way. As the Supreme Court has explained,

> the transaction must be viewed as a whole, and each step, from the commencement of negotiations to the consummation of the sale, is relevant. A sale by one person cannot be transformed for tax purposes into a sale by another by using the latter as a conduit through which to pass title. To permit the true nature of a transaction to be disguised by mere formalisms, which exist solely to alter tax liabilities, would seriously impair the effective administration of the tax policies of Congress.

*Comm'r v. Court Holding Co.*, 324 U.S. 331, 334 (1945); *see also Minn. Tea Co. v. Helvering*, 302 U.S. 609, 613 (1938) (stating that "[a] given result at the end of a straight path is not made a different result because reached by following a devious path" and refusing to accord tax effect to a "meaningless and unnecessary incident" inserted into a transaction); *Morgan Mfg. Co. v. Comm'r*, 124 F.2d 602, 605 (4th Cir. 1941) (holding that a purported corporate reorganization "in its essence was a sale" because the parties' superficial compliance with the applicable statutes achieved an "object [that] could have been attained much more simply and easily" by a direct sale and "no explanation of the adoption of the more cumbersome method [was] offered").

Accordingly, we, like the district court, conclude that in substance, the transaction is a financing arrangement, not a genuine lease and sublease. All that BB&T has done is paid Sodra approximately $6 million dollars to sign documents meeting the formal requirements of a lease and sublease, arranged a circular transfer of funds from and then back to ABN, and invested approximately $12 million in government bonds. Sodra, meanwhile, maintains uninterrupted possession and control of the Equipment, and has no economic incentive to cede control to BB&T. Because the funds BB&T provided as the Advance Head Lease Payment do not, in substance, constitute "rental[ ] . . . payments required to be made as a condition to the continued use or possession" of the Equipment, BB&T is not entitled to a deduction

under § 162(a)(3). *Cf. W.Va. N. R.R. Co.*, 282 F.2d at 65 (upholding disallowance of rental deduction where an increase in rent was not in substance an ordinary and necessary business expense, but rather a device through which a third party purchased the company's stock); *Sun Oil Co. v. Comm'r*, 562 F.2d 258, 269 (3d Cir. 1977) (concluding that purported sale-leaseback was in substance a financing arrangement between the parties and disallowing a claim for rent deductions under § 162(a)(3)).

C.

We next consider BB&T's entitlement to deduct interest paid on the HBU loan from its taxable income. Under § 163(a), "[t]here shall be allowed as a deduction all interest paid or accrued within the taxable year on indebtedness." 26 U.S.C.A. § 163(a). "Explaining that 'interest' is to be given its usual, ordinary and everyday meaning, the Supreme Court has defined the term as compensation for the use or forbearance of money." *Halle v. Comm'r*, 83 F.3d 649, 652 (4th Cir. 1996) (internal quotation marks and citation omitted). Generally, the underlying "indebtedness" is defined as "an existing, unconditional, and legally enforceable obligation for the payment of a principal sum." *Id.* at 653 (internal quotation marks omitted).[14] And, in keeping with principles of substance over form, "deductible interest can only accrue on *genuine* indebtedness." *Halle*, 83 F.3d at 652, 655 (emphasis in original); *see also Midkiff v. Comm'r*, 96 T.C. 724, 735 (1991) ("'[I]ndebtedness' must be indebtedness in substance and not merely in form.").

[14]Even if conditional, an existing, legally enforceable obligation may constitute "indebtedness" if

> (1) the contingency on which the obligation rests is beyond the control of the party seeking the interest deduction, (2) the amount of the indebtedness on which the interest accrued was fixed as of the date that the interest began to accrue, and (3) the payor's liability to the payee is primary and direct.

*Halle v. Comm'r*, 83 F.3d 649, 653 (4th Cir. 1996). Also, "indebtedness may be imposed on the purchaser of property when the benefits and burdens of ownership shift before payment." *Id.* (internal quotation marks omitted).

BB&T claims that it accrued deductible interest on the HBU loan because, pursuant to the "Loan and Security Agreement" it signed with HBU, BB&T has a legal obligation to repay the loan. According to BB&T, the loan therefore necessarily constitutes genuine indebtedness, and the circularity of the parties' obligations, the non-recourse nature of the loan, and the other features of the transaction considered by the district court are irrelevant. We cannot accept this contention.

As an initial matter, it is difficult to see how the "interest" BB&T paid could represent "compensation for the use or forbearance of money." *Id.* at 652 (internal quotation marks omitted). At the transaction's closing, ABN supplied the $68,008,236 for the loan on behalf of HBU, and BB&T immediately returned $68,008,236 to ABN (as Debt PUA Issuer). Accordingly, ABN, which treated the loan as an off-balance sheet transaction, did not forbear any money during the time period in which BB&T sought to claim interest deductions. And, because the funds became an asset solely of ABN upon their transfer to the Debt PUA account, BB&T could not use the money after the transaction's closing.

Moreover, concluding that BB&T may claim a deduction for "interest . . . on indebtedness," 26 U.S.C. § 163(a), solely because it signed loan documents would turn the substance-over-form doctrine on its head. Instead, to determine whether the HBU loan constitutes genuine indebtedness, we must "look beyond the parties' terminology to the substance and economic realities" of the transaction. *Halle*, 83 F.3d at 655 (internal quotation marks omitted).

In so doing, we agree with the Government and the district court that the HBU loan does not constitute genuine indebtedness. Despite the loan documents providing that BB&T has a legal obligation to repay $68,008,236 to HBU, the transaction does not in fact require BB&T to pay any money to HBU. BB&T, having immediately returned a sum equal to the amount ABN supplied in furnishing the HBU loan to a defeased account at ABN, has relieved itself of any further repayment obligations. *Cf. Hines v. United States*, 912 F.2d 736, 741 (4th Cir. 1990) (concluding that a loan transaction was a sham where "the lease and debt payments between the three parties . . . were structured to be offsetting" and this "circularity meant that the transaction became self-sustaining after the payments at closing

with virtually no further financial input necessary from any of the parties").

BB&T makes much of the provision in its replacement lease and return options (two of the three alternatives BB&T could pursue in the event Sodra declined its purchase option) calling for: (1) ABN to make the final payment under the Debt PUA to Sodra rather than applying it toward the final payment on the HBU loan; and (2) for BB&T to supply the final loan payment from another source. This provision does not, however, create an unconditional obligation for BB&T to make further payment on the loan. As discussed above, Sodra has no economic incentive to decline the purchase option, and despite commissioning an appraisal report predicting that Sodra would consider the free purchase overpriced, BB&T does not expect Sodra to surrender control of the Equipment. Moreover, even if BB&T were given an occasion to select one of its three options following the conclusion of the Basic Lease Term, BB&T would not be unconditionally obligated to make any further payment toward the loan. BB&T would have to affirmatively choose to eschew its renewal option for one of the two options triggering that burden.[15]

Finally, we are unpersuaded by BB&T's argument that the district court should have distinguished this case from one involving a mere "circularization of funds which d[id] not amount to a loan," *Felcyn v. United States*, 691 F. Supp. 205, 212 (C.D. Cal. 1988), on the ground that, here, unlike in *Felcyn*, there was an actual delivery of the loan proceeds. A party simply does not incur genuine indebtedness by taking money out of a bank and then immediately returning it to the issu-

[15]In addition, were BB&T to make that choice, the loan is nonrecourse to BB&T. We see no economic incentive for BB&T to supply the funds needed to fully repay the loan, given that the loan collateral excludes what the transaction's promoter described as the "real money" in the transaction, (J.A. at 175), the approximately $12 million in government bonds placed in the Equity PUA account. *See Odend'hal v. Comm'r*, 748 F.2d 908, 912 (4th Cir. 1984) (disallowing interest deduction based on nonrecourse loan because although, in general, "a nonrecourse loan should be treated as a true loan," this is not the case where the "taxpayer[ ] ha[s] no economic incentive to repay the obligation[ ]" (internal quotation marks omitted)).

ing bank. This principle holds true even if the bank accepts the bookkeeping responsibility of repaying itself out of the loan proceeds for the duration of the loan. *See Bridges v. Comm'r*, 39 T.C. 1064, 1077, *aff'd* 325 F.2d 180 (4th Cir. 1963) (concluding that a transaction "merely provided the 'facade' of a loan," as "there was no reason to think that [the taxpayer] . . . would have been called upon to pay the note out of his own funds or to put up additional collateral").

III.

In closing, we are reminded of "Abe Lincoln's riddle . . . 'How many legs does a dog have if you call a tail a leg?'" *Rogers v. United States*, 281 F.3d 1108, 1118 (10th Cir. 2002). "The answer is 'four,' because 'calling a tail a leg does not make it one.'" *Id.* Here, BB&T styled the LILO as a lease financed by a loan, but did not in substance acquire a genuine leasehold interest or incur genuine indebtedness. Accordingly, although we decline to resolve whether the transaction as a whole lacks economic substance — that is, whether it has "reached the point where the tax tail began to wag the dog," *Hines*, 912 F.2d at 741, we conclude that the Government was entitled to recognize that tail for what it was, not what BB&T professed it to be. The judgment of the district court is therefore

*AFFIRMED.*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

---

**Fifth Third Bancorp & Subsidiaries,**
Plaintiff

vs

Case No. 1:05-cv-350
(Hogan, M. J.)

**United States of America,**
Defendant

---

**SPECIAL INTERROGATORIES**

---

Each of the following questions is to be resolved by unanimous vote of the jury:



EXHIBIT B

## MBTA TRANSACTION–
## SUBSTANCE OVER FORM

1. Did Fifth Third, in substance, obtain a genuine leasehold interest in the MBTA Equipment in 1997 that entitles Fifth Third to claim a deduction for rent expense and other transaction fees for that taxable year?

   YES __✓__ (in favor of Fifth Third)

   NO _____ (in favor of the United States)

2. Does the $31.8 million loan by Ambac Investments to Fifth Third constitute genuine indebtedness for tax purposes that entitles Fifth Third to claim an interest expense deduction?

   YES _____ (in favor of Fifth Third)

   NO __✓__ (in favor of the United States)

## MBTA TRANSACTION– ECONOMIC SUBSTANCE

3. Did Fifth Third prove that the MBTA Transaction appreciably affected its beneficial economic interest, aside from tax benefits?

_____ YES (in favor of Fifth Third)

__✓__ NO (in favor of the United States)

If your answer to Question 3 is YES, answer Question 4. If your answer to Question 3 is NO, do not answer Question 4 and proceed to Question 5.

4. Did Fifth Third prove that it had a non-tax business purpose because it was at least partially motivated by profit to participate in the MBTA Transaction?

_____ YES (in favor of Fifth Third)

_____ NO (in favor of the United States)

## RATP TRANSACTION–
## SUBSTANCE OVER FORM

5. Did Fifth Third, in substance, obtain a genuine leasehold interest in the RATP Equipment in 1997 that entitles Fifth Third to claim a deduction for rent expense and other transaction fees for that taxable year?

YES __✓__ (in favor of Fifth Third)

NO _____ (in favor of the United States)

6. Does the $29.9 million loan by Hollandsche Bank-Unie N.V. ("HBU") to Fifth Third constitute genuine indebtedness for tax purposes that entitles Fifth Third to claim an interest expense deduction?

YES _____ (in favor of Fifth Third).

NO __✓__ (in favor of the United States)

## RATP TRANSACTION–
## ECONOMIC SUBSTANCE

7. Did Fifth Third prove that the RATP Transaction appreciably affected its beneficial economic interest, aside from tax benefits?

YES _____ (in favor of Fifth Third)

NO __✓__ (in favor of the United States)

If your answer is to Question 7 is YES, answer Question 8. If your answer to Question 7 is NO, do not answer Question 8 and proceed to Question 9.

8. Did Fifth Third prove that it had a non-tax business purpose because it was at least partially motivated by profit to participate in the RATP Transaction?

YES _____ (in favor of Fifth Third)

NO _____ (in favor of the United States)

## BOGESTRA TRANSACTION–
## SUBSTANCE OVER FORM

9. Did Fifth Third, in substance, obtain a genuine leasehold interest in Bogestra Equipment in 1997 that entitles Fifth Third to claim a deduction for rent expense and other transaction fees for that taxable year?

YES ✓ (in favor of Fifth Third)

NO _____ (in favor of the United States)

10. Does the $27.1 million loan by Kreditanstalt für Weideraufbau ("KfW)to Fifth Third constitute genuine indebtedness for tax purposes that entitles Fifth Third to claim an interest expense deduction?

YES _____ (in favor of Fifth Third)

NO ✓ (in favor of the United States)

BOGESTRA TRANSACTION–
ECONOMIC SUBSTANCE

11. Did Fifth Third prove that the Bogestra Transaction appreciably affected its beneficial economic interest, aside from tax benefits?

YES _____ (in favor of Fifth Third)

NO ✓ (in favor of the United States)

If your answer is YES, answer Question 12. If your answer is NO, stop here and sign the verdict form.

12. Did Fifth Third prove that it had a non-tax business purpose because it was at least partially motivated by profit to participate in the Bogestra Transaction?

YES _____ (in favor of Fifth Third)

NO _____ (in favor of the United States)

ALL JURORS MUST SIGN THE VERDICT:

Foreperson: Jeffrey D. Roy

Robert Thompson

Caralyn Allen

Erin L. Frey

Debra A. Weitz

Lisa Morgan

Date: 4-18-08