**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **CONSOLIDATED EDISON COMPANY OF NEW YORK, INC. & SUBSIDIARIES,** | ) | |
| **Plaintiff,** | ) | **No. 06-305 T** |
| **v.** | ) | **Judge Marian Blank Horn** |
| **THE UNITED STATES,** | ) | |
| **Defendant.** | ) | |

# PLAINTIFF'S POST-TRIAL REPLY BRIEF

**DAVID F. ABBOTT**
**MAYER BROWN LLP**
**1675 Broadway**
**New York, NY 10019-5820**
**Tel: (212) 506-2642**
**Fax: (212) 849-5642**

**Of Counsel:**
**JOEL V. WILLIAMSON**
**THOMAS L. KITTLE-KAMP**
**BRIAN W. KITTLE**
**MICHAEL R. EMERSON**
**MEGAN E. WERNKE**
**MAYER BROWN LLP**
***Counsel for Plaintiff***

**June 27, 2008**

# TABLE OF CONTENTS

Page

STATEMENT OF FACTS ....................................................................................1

I. Con Edison's Reply to Defendant's Factual Statement (D.Br. at 8-86)...........1

A. Many of the Themes Underlying Defendant's Factual Statement Are Argumentative, Misleading and Incomplete ..................................1

1. Defeasance Does Not Eliminate CED's Risk or Cause the Payment Risk to Be Abnormal ..................................................1

2. The Sublease Purchase Option Is a True Option, and It Was at Closing and Still Is Currently Unknown Whether EZH Will Exercise It ...............................................................2

a. Defendant Incorrectly Characterizes the Mechanics of the Sublease Purchase Option ......................................4

b. Defendant's Allegation that "[A]ll of the Parties to the Transaction Understood that [EZH's Exercise of Sublease Purchase Option] Was the Predetermined Outcome of the Transaction" (D.Br. at 30) Is Argumentative and Not Supported by the Record...........7

c. Defendant's Allegation that "the Transaction Documents Contain Certain Features Which Provide Additional Incentives to Ensure that EZH Would Exercise the Sublease Purchase Option" (D.Br. at 31) Is Argumentative and Not Supported by the Evidence Cited or in the Record ...........................13

d. Defendant's Statement that "[O]nly Deloitte & Touche . . . , the Appraiser Retained By EZH to Provide CED With an Appraisal of the RoCa3 Facility, Concluded that the Most Likely Outcome Would Be that EZH Would Not Exercise Its Sublease Purchase Option" (D.Br. at 32) Is False and/or Misleading.........................................................17

3. It Is Unknown Whether the IJssel Deposit and the Sublease Deposit Will Be Sufficient to Meet EZH's Post-2018 Obligations.................................................................19

a. The Role of the IJssel Deposit and Sublease Deposit Under the Sublease Renewal Option..............................21

b. The Role of the IJssel Deposit and Sublease Deposit Under the Retention Option ...........................................23

**TABLE OF CONTENTS**
(continued)

**Page**


4. CED's Obligation to Make the Final Basic Rent Payment is Not "Offset" by Any Collateral Accounts ..... 24
   a. Sublease Renewal Option ..... 26
   b. The Retention Option ..... 28
   c. The Final Basic Rent Payment Is Recourse to the CEL Trust and CED ..... 29
5. Con Edison Is Not Required to Fund the Trustee Treasury Collateral, Incremental Collateral Pledge and/or Lease Collateral Deposit ..... 30
   a. Under the Sublease Renewal Option, CED Has the Option to Establish the Trustee Treasury Collateral and the Lease Collateral Deposit, or to Provide Acceptable Substitute Collateral in Lieu of Either or Both Accounts ..... 31
   b. Under the Retention Option, CED Has the Option to Establish the Trustee Treasury Collateral and the Incremental Collateral Pledge, or to Provide Acceptable Substitute Collateral In Lieu of Either or Both Accounts ..... 34
6. CED Would Face Real Operations Risk During the Shirt-Tail Period or the Retention Option Period ..... 36
7. CED's Decision to Not Book Residual Value Does Not Indicate that Such Residuals Were Nonexistent or that Con Edison Was Not Concerned With Potential Residual Value ..... 37
8. CED's "Cash-on-Cash Return" Is Not a Function of the U.S. Treasury STRIPs ..... 39
9. HBU and ABN AMRO Are Separate Entities ..... 42
10. The Email Referring to GE Capital's Leasing Strategy Does Not Reflect on "Typical" Industry Standards and Risks ..... 45
11. Defendant's Repeated References to the Transaction as "Tax Advantaged" or a "Tax Shelter" Are Argumentative and Misleading ..... 47

B. Regulatory and Statutory Background (D.Br. at 8) ..... 48

**TABLE OF CONTENTS**
(continued)

**Page**

C. Structure of the RoCa3 Transaction (D.Br. at 9-41) ....48

1. Defendant's General Allegation that "[t]o this Day, EZH Owns and Operates the RoCa3 Facility as if the LILO Transaction Never Occurred" (D.Br. at 10-11) is Untrue and Unsupported by the Facts Defendant Cites in Support ....49

2. Defendant Misstates Various Facts Related to the Initial Basic Rent Payment (D.Br. at 11-16) ....55

3. Defendant Makes Numerous Incorrect Statements Regarding the Mechanics of the Sublease Deposit (i.e., the Debt Defeasance Account) (D.Br. at 16-18) ....57

4. Defendant Makes Numerous Incorrect Statements Regarding the Mechanics of the IJssel Deposit (Equity Defeasance Account) (D.Br. at 19-24) ....65

a. Defendant's Description of the Funding and Purpose of the IJssel Deposit (D.Br. at 13-15, 19-20) Contains Numerous Errors and Misleading Statements ....65

b. Defendant's Description of the Use of IJssel Funds Prior to 2018 and in the Event of the Sublease Purchase Option (D.Br. at 20-21, 23) is Misleading ....71

c. Defendant's Description of the Disposition of the IJssel Deposit When EZH Does Not Exercise the Sublease Purchase Option (D.Br. at 21-22) Contains Numerous Errors and Misstatements Related to the Sublease Renewal Option ....73

d. Defendant's Broad Allegations Regarding the Connection Between the IJssel Deposit and CED's Return from the RoCa3 Transaction Are Argumentative and Misguided ....73

5. Defendant Makes Numerous Incorrect Statements Regarding the Mechanics of the Sublessee Loan (D.Br. at 24-26) ....76

6. Defendant Makes Numerous Incorrect Statements Regarding the Mechanics of the Letter of Credit (D.Br. at 26-29) ....79

**TABLE OF CONTENTS**
(continued)

**Page**


7. Defendant's Statements Regarding the Sublease Renewal Option (D.Br. at 32-35) Are False and/or Misleading ................83

8. Defendant's Statements Regarding the Retention Option (D.Br. at 36-38) Are False and/or Misleading ............................87

   a. Defendant's Various Allegations that CED and Its Advisors Did Not Consider or Analyze the Retention Option (D.Br. at 36-37) Are False and/or Misleading ................................................................87

   b. Defendant's Description of the Mechanics of the Retention Option (D.Br. at 36, 37-38) Contains Numerous Incorrect and Misleading Statements ...........90

9. Defendant's Statements About the Final Basic Rent Payment (D.Br. at 39-41) Are False and Require Numerous Unwarranted and Unproven Assumptions..............92

D. Path to the RoCa3 Transaction ..........................................................98

1. Defendant's Discussion of CED's History (D.Br. at 41-48) Is Misleading, Inaccurate and/or Argumentative......................98

   a. Defendant's Discussion of the Deregulation Proceedings in New York (D.Br. at 41-42) Is Incomplete and Misleading............................................98

   b. Defendant's Comparison of the RoCa3 Transaction with CED's Investment in GENOR (D.Br. at 44-45) Is Specious and Misleading.............................................99

   c. Defendant's Statements Regarding CED's "Anchor and Cluster Strategy" (D.Br. at 45-46) Are Misleading and Inaccurate...........................................101

   d. Defendant's Statements Regarding CED's Desired Earnings (D.Br. at 47-48) Are Argumentative, Misleading and Inaccurate...........................................105

2. Defendant's Statements Regarding CED's Consideration of LILO Transactions (D.Br. at 48-51) Are Misleading...........109

3. CED's Statements Regarding CED's Pursuit of the RoCa3 Transaction (D. Br. at 51-63) Are Inaccurate, Misleading, and Unsupported by the Record .............................................117

**TABLE OF CONTENTS**
(continued)

**Page**


a. Defendant's Statements Regarding CED's Use of Precedent Documents as a Starting Point in Its Proposals (D.Br. at 51-52) Are Incorrect and Incomplete ....117

b. Defendant's Broad Statements Regarding CED's and Con Edison's Review of the RoCa3 Transaction (D.Br. at 52-54) Are Incorrect and Misleading....119

c. Defendant's Statements Regarding CED's Proposals for the RoCa3 Transaction (D.Br. at 54) Are Inaccurate and Misleading....123

d. Defendant's Attempts to Cast Doubt on CED's Incorporation of Leasing into its Business Strategy (D.Br. at 54-56) Is Not Supported by the Record....126

e. Defendant's Attempts to Imply that CED Entered Into the RoCa3 Transaction Solely for Tax Benefits (D.Br. at 57-58) Are Misleading and Specious....129

f. Defendant's Statements Regarding the Leasing White Paper Are Misleading and Inaccurate (D.Br. at 59-62)....135

(i) Credit Risk ....136

(ii) Currency Risk ....138

(iii) Strategic Value of Leasing ....139

4. Defendant's Description of CED's Due Diligence Contains Numerous Inaccuracies, Omissions and Mischaracterizations (D.Br. at 63-78)....143

a. General Allegations (D.Br. at 63-65)....143

b. Duke Report (D.Br. at 65-67)....146

c. Deloitte Report (D.Br. at 67-73)....148

d. Credit Suisse Interest Rate Letters (D.Br. at 73-74)....155

e. Arthur Andersen and PriceWaterhouse (D.Br. at 74-77) ....157

5. Closing of the RoCa3 Transaction (D.Br. at 78) ....159

6. CED's Pursuit of Other Lease-Leasebacks (D.Br. at 78-83)....160

**TABLE OF CONTENTS**
(continued)

**Page**


a. ENECO Discussion (D.Br. at 78-79) ............................. 160

b. MEGA Discussion (D.Br. at 79-80) ............................. 161

c. NUON Discussion (D.Br. at 80-81) ............................. 162

7. Post-Transaction Activity (D.Br. at 81-83) ............................. 164

a. General Allegations ............................. 164

b. Officer's Certificates and Annual Reports ............................. 167

E. Risk Level of the RoCa3 Transaction ............................. 168

1. Defendant's Argument That the RoCa3 Transaction "Eliminates the Risks Normally Associated With Leveraged Leasing Transactions" (D.Br. at 83-86) Is Misleading and Unsupported by the Record ............................. 168

a. Defendant Misrepresents Ellis's Testimony and Its Relevance to CED's Risk from the RoCa3 Transaction (D.Br. At 83-84) ............................. 169

b. Defendant Misrepresents Bent's Testimony and Its Relevance to CED's Risk from the RoCa3 Transaction (D.Br. at 84-85) ............................. 175

c. Defendant's Claim That CED "Acknowledges [That] the EZH LILO Transaction Does Not Possess the Typical Risks Associated With Leveraged Leases" Is Incorrect and Misleading (D.Br. At 85-86) ............................. 179

ARGUMENT ............................. 179

II. The Relevant Facts and Circumstances of the Con Edison Case Are Different from Those of the BB&T and AWG Cases ............................. 186

A. The Law Requires that Leasing Issues Must Be Decided Upon the Facts and Circumstances of the Specific Case ............................. 186

B. In Both BB&T and AWG, in Contrast to the Facts of Con Edison's Case, the Evidence Demonstrated that the Purchase Options Were Certain to Be Exercised ............................. 188

1. The Purchase Options in BB&T and AWG Were Certain to Be Exercised, Thus Depriving the Lessors in Those Cases of the Benefits and Burdens of Ownership ............................. 188

a. The BB&T Transaction ............................. 188

**TABLE OF CONTENTS**
(continued)

**Page**


b. The AWG Transaction ........ 190

c. The Certainty that the Purchase Options Would Be Exercised in BB&T and AWG Controls the Outcome in Those Cases ........ 193

2. CED Produced Evidence That, in the Context of the Netherlands' Deregulated Energy Markets, EZH Was Not Certain to Exercise the Sublease Purchase Option ........ 194

3. In Con Edison's Case, Defendant Did Not Present the Type of Objective Economic Evidence On which the Court Relied in BB&T ........ 197

4. Under Cross-Examination, Thomas Agreed He Was Mistaken As to All the Alleged Noneconomic Factors He Initially Thought Would Lead EZH to Exercise the Purchase Option ........ 201

5. The Presence of a Deregulated Market in Con Edison's Facts Represents a Critical Distinguishing Factor ........ 206

6. The Evidence Demonstrates CED Expected to Share in the Output of the RoCa3 Facility ........ 210

7. The Cases Relied Upon in BB&T and AWG Are Distinguishable From Con Edison's Facts ........ 212

C. In Contrast to the Facts of BB&T, the Parties Are in Agreement that CED Expected To Earn a Pretax Profit ........ 216

D. In Contrast to the Facts of BB&T and AWG, CED Sought Out the RoCa3 Transaction To Fill a Previously Identified Nontax Business Need ........ 218

E. Defendant's Expert Agreed CED Retained the Rights Traditionally Associated with Status as a Lessor ........ 219

F. EZH Continued To Own the Funds in Its Defeasance Accounts ........ 222

G. The Exercise of the Sublease Purchase Option Is Not "Free" to EZH ........ 225

H. CED Was Not Insulated from the Risk of Losing Its Capital Investment ........ 228

I. The Use of a Nonrecourse Loan Was Consistent with Commercial Practice and CED's Obligation to Pay the Final Basic Rent Payment Is Supported by More Than Enough Assets ........ 231

**TABLE OF CONTENTS**
(continued)

**Page**


III. Contrary to Assertions in Defendant's Brief, CED Has Acquired Ownership of a Leasehold Interest in the RoCa3 Facility .......... 232

A. CED Has Acquired the Benefits and Burdens Arising from Acquisition of a Lease Interest in the RoCa3 Facility .......... 232

B. The Use of Defeasance Deposits Is Not Inconsistent with the Benefits and Burdens Test .......... 235

1. Credit Risk Is Not a Requirement of the Benefits and Burdens Test .......... 235

2. The Use of Defeasance and Other Credit Support Is an Established Commercial Practice .......... 238

C. CED Owns a Current Leasehold Interest in the RoCa3 Facility .......... 238

1. EZH's Use of the Facility Is Nothing More than the Use That Arises from Its Status As A Lessee .......... 240

2. EZH Did Not Receive a "Fee for Accommodating the Paperwork" .......... 241

3. The Temporary Tax Deferral from CED's Investment in the RoCa3 Transaction Is No Different from the Tax Deferral Present in All Lease Transactions .......... 245

4. The RoCa3 Transaction Does Not Involve a Circular Flow of Funds .......... 246

5. CED Can Lose Its Equity Investment from the Operation of the RoCa3 Facility .......... 246

6. CED's Residual Risk Is Not "Collared" .......... 247

7. The RoCa3 Transaction Does Not Contain Reciprocal Rights and Obligations .......... 248

D. Defendant Misstates the Regulatory and Statutory Background Concerning Lease-Leasebacks .......... 253

IV. Con Edison Is Entitled to Interest Expense Deductions Because the HBU Loan Constitutes Bona Fide Indebtedness .......... 254

V. Defendant's Claim that the Transaction Lacks Economic Substance Is Contrary to Undisputed Evidence in the Record .......... 261

A. Defendant's Discussion of the Sham Transaction and Economic Substance Doctrines Is Incomplete and Misleading .......... 261

**TABLE OF CONTENTS**
(continued)

**Page**


B. The Record Is Clear that the RoCa3 Transaction Has Economic Substance ....262

1. The Evidence Shows that the RoCa3 Transaction Was Expected To Produce a Pretax Profit as Defined in Case Law and the Leasing Guidelines ....262

2. CED's Expected Gains from the RoCa3 Transaction Were Typical for a Leveraged Lease ....264

C. Con Edison Put Forward Clear, Undisputed Evidence of CED's Business Purpose for Entering into the RoCa3 Transaction ....267

1. The Presence of Temporary Tax Benefits Is Irrelevant Given CED's Undisputed Nontax Reasons for Entering into the RoCa3 Transaction ....267

2. The Record Supports CED's Claim that It Entered into the RoCa3 Transaction for Nontax Business Purposes ....270

a. Defendant Admits that the Leveraged Lease Structure of the RoCa3 Transaction Was Essential to CED's Goal of Achieving Predictable, Near-Term Earnings ....270

b. Defendant's Allegations Do Not Undermine the Evidence that CED Entered into the RoCa3 Transaction to Gain Access to New Markets ....275

c. Contemporaneous Documents Show that CED Was Interested in the Environmental Aspects of the RoCa3 Facility ....279

CONCLUSION ....281

# TABLE OF AUTHORITIES

**Page**

## Cases

*Aderholt Specialty Company v. Comm'r*, 50 T.C.M. (CCH) 1101 (1985)....214, 215, 216

*Am. Elec. Power, Inc. v. United States*, 136 F. Supp. 2d 762 (S.D. Ohio), *aff'd*, 326 F.3d 737 (6th Cir. 2003)....272

*AWG Leasing Trust v. United States*, No. 1:07-CV-857 (N.D. Ohio May 28, 2008)....passim

*Basic Inc. v. United States*, 549 F.2d 740 (Ct. Cl. 1977)....270, 271

*BB&T Corp. v. United States*, 523 F.3d 461 (4th Cir. 2008)....passim

*Big "D" Dev. Corp. v. Comm'r*, 30 T.C.M. (CCH) 646 (1971)....253

*Blue Flame Gas Co. v. Comm'r*, 54 T.C. 584 (1970)....253

*Breece Veneer & Panel Co. v. Comm'r*, 232 F.2d 319 (7th Cir. 1956)....194, 197

*Bridges v. Comm'r*, 325 F.2d 180 (4th Cir. 1963)....257, 258, 261

*Brooks v Alameida*, 446 F. Supp. 2d 1179 (S.D. Cal. 2006)....198

*Brown v. Lippard*, 472 F.3d 384 (5th Cir. 2006)....197

*Bussing v. Comm'r*, 88 T.C. 449 (1987) (Bussing I)....251

*Bussing v. Comm'r*, 89 T.C. 1050 (1987) (Bussing II)....251, 252

*Chhetry v. U.S. Department of Justice*, 490 F.3 196 (2d Cir. 2007)....44

*City of Monroe Employees Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651 (6th Cir. 2005)....44

*Coleman v. Comm'r*, 16 F.3d 821 (7th Cir. 1994)....passim

*Coltec Industries, Inc. v. United States*, 454 F.3d 1340 (2006)....271

*Crane v. Commissioner*, 331 U.S. 1 (1947)....259

**TABLE OF AUTHORITIES**

**Page**

*Dippin' Dots, Inc. v. Frosty Bites Distrib., LLC*, 369 F.3d 1197 (11th Cir. 2004) ....... 44

*Estate of Thomas v. Comm'r*, 84 T.C. 412 (1985) ....... passim

*Fifth Third Bancorp. v. United States*, No. 1:05-CV-350 (S.D. Ohio June 10, 2008) ....... 179, 199

*Frank Lyon Co. v. United States*, 435 U.S. 561 (1978) ....... passim

*Gefen v. Comm'r*, 87 T.C. 1471 (1986) ....... passim

*Gilman v. Comm'r*, 933 F.2d 143 (2d Cir. 1991) ....... 248

*Greenfield v. Comm'r*, 44 T.C.M. (CCH) 1487 (1982) ....... 253

*Ieradi v. Mylar Lab., Inc.*, 203 F.3d 594 (3rd Cir. 2000) ....... 44

*In Re NAHC, Inc. Securities Litigation*, 306 F.3d 1314 (3d Cir. 2002) ....... 44

*Johnson v. Goldstein*, 864 F. Supp. 490 (E.D. Pa. 1994), *aff'd*, 66 F.3d 311 (3d Cir. 1995) ....... 44

*Johnson v. United States*, 11 Cl. Ct. 17 (1986) (Johnson I) ....... 187, 217, 264

*Johnson v. United States*, 32 Fed. Cl. 709 (1995) (Johnson II) ....... 187

*Kansas City So. Ry. Co. v. Comm'r*, 76 T.C. 1067 (1981) ....... 186

*Kaufman v. Comm'r*, T.C. Memo. 1987-360, 53 T.C.M. (CCH) 1348 (1987) ....... 217

*Kruesel v. United States*, 63-2 U.S.T.C. ¶9714 (D. Minn. 1963) ....... 250

*Kwiat v. Comm'r*, T.C. Memo 1992-433, 64 T.C.M. (CCH) 327 (1992) ....... 216

*L.W. Hardy Co, Inc. v. Comm'r*, 52 T.C.M. (CCH) 1540 (1987) ....... 181, 182, 216

*Larsen v. Comm'r*, 89 T.C. 1229 (1997) ....... 181, 182, 216

*Levy v. Comm'r*, 91 T.C. 838 (1988) ....... passim

## TABLE OF AUTHORITIES

**Page**

*McCulley Ashlock v. Comm'r*, 18 T.C. 405 (1952) ....................250

*Mukerji v. Comm'r*, 87 T.C. 926 (1986)....................183, 217, 261

*Ockels v. Comm'r*, T.C. Memo. 1987-507, 54 T.C.M. (CCH) 785 (1987)....................217

*O'Toole v. Northrop Grumman Corp.*, 499 F.3d 1218 (10th Cir. 2007)....................44

*Rickey v. Comm'r*, 502 F.2d 748 (9th Cir. 1974)....................252

*Rose v. Comm'r*, 868 F.2d 851 (6th Cir. 1989)....................263

*Rothschild v. United States*, 407 F.2d 404 (Ct. Cl. 1969) ....................258, 261

*Rubin v. Comm'r*, 58 T.C.M. (CCH) 25 (1989)....................181, 182, 183, 216

*Stanton v. Comm'r*, 34 T.C. 1 (1960)....................257, 258

*Swift Dodge v. Comm'r*, 692 F.2d 651 (9th Cir. 1982) ....................213, 214

*Torres v. Comm'r*, 88 T.C. 702 (1987)....................passim

*Transamerica Corp. v. United States*, 15 Cl. Ct. 420 (1988), *aff'd on other issues,* 902 F.2d 1540 (Fed. Cir. 1990) (Transamerica II)....................passim

*Transamerica Corp. v. United States*, 7 Cl. Ct. 441 (1985) (Transamerica I) ....................passim

*United States v. Ingalls*, 399 F.2d 143 (5th Cir. 1968), *cert. denied* 393 U.S. 1094 (1969)....................252

*Valore v. Islamic Republic of Iran*, 478 F. Supp. 2d 101 (D.D.C. 2007)....................44

*Young v. Selsky*, 41 F.3d 47 (2d Cir. 1994)....................197

# TABLE OF AUTHORITIES

**Page**

## Statutes

I.R.C. §168(g)(1)(B) ........ 193

I.R.C. §168(h)(2)(A)(iii) ........ 193

I.R.C. §470 ........ 254

I.R.C. §7701(h)(3)(A) ........ 213

## Treasury Regulations

Treas. Reg. §1.183-2(a) ........ 187

## Administrative Authorities

I.R.S. Rev. Rul. 82-61, 1982-1 C.B. 13 ........ passim

I.R.S. Rev. Rul. 99-14, 1999-1 C.B. 835 ........ 253

I.R.S. Rev. Rul. 2002-69, 2002-2 C.B. 760 ........ 253

I.R.S. Rev. Proc. 75-21, 1975-1 C.B. 715 ........ 183, 234, 236

## Legislative History

American Jobs Creation Act of 2004, Pub. L. No. 108-357, 118 Stat. 1418 ........ 254

Jobs Growth and Relief Reconciliation Act of 2003 (P.L. 108-27), section 302 ........ 254

## Other Authorities

Federal Rule of Evidence 201(b) ........ 43, 44, 198

Federal Rule of Evidence 201(d) ........ 43, 44

Federal Rule of Evidence 201(f) ........ 44

## TABLE OF AUTHORITIES

**Page**

*Fortis Says Will Complete Divestment of Hollandsche Bank by October*, FORBES, Feb. 28, 2008, *available at* http://www.forbes.com/feeds/afx/2008/02/28/afx4707972.html?partner=email .................................. 43-44

http://www.abnamro.com/pressroom/releasedetail.cfm?releaseid=303044 (ABN AMRO press release) ...................................................... 43

IAN SHRANK & ARNOLD G. GOUGH, JR., EQUIPMENT LEASING–LEVERAGED LEASING (4th ed. 2007) ............................................................ 39, 233

I.R.S. Release No. IR-2002-108 ............................................................................ 254

Statement of Financial Accounting Standards No. 13 (FAS 13) ........................ passim

*Tax Bar Grumbling Over Government's First LILO Win*, 2007 TNT 10-7 (Jan. 16, 2007) .................................................................................. 188

Timothy Aeppel, et al., *Bear Stearns's Ripples Reach Corporate Sector*, WALL ST. J., March 8, 2008) ................................................................. 58

In this Reply Brief, Con Edison first responds to Defendant's Factual Statement. Con Edison uses the terms and definitions contained in the glossary at Appendix A of Con Edison's Opening Post-Trial Brief.

Con Edison then responds to Defendant's Argument and demonstrates that Defendant misinterprets and improperly states the legal authorities as support for its argument.

## STATEMENT OF FACTS

### I. Con Edison's Reply to Defendant's Factual Statement (D.Br. at 8-86)

#### A. Many of the Themes Underlying Defendant's Factual Statement Are Argumentative, Misleading and Incomplete

Defendant's Factual Statement consists of numerous conclusory and argumentative statements without support or analysis. Accordingly, Con Edison first, in Section A, addresses several of the themes that recur throughout Defendant's Factual Statement. Sections B through E then follow the Defendant's brief line-by-line and address the numerous misleading and inaccurate statements that Defendant makes in its brief.

##### 1. Defeasance Does Not Eliminate CED's Risk or Cause the Payment Risk to Be Abnormal

Defendant alleges that EZH's use of "full" defeasance "eliminates the risks [to CED] normally associated with leveraged leasing transactions." (D.Br. at 83, 84) Aside from the fact the defeasances are not "full" in that there are many circumstances over the long life of the transaction where the sublessee, EZH, will be

required to make a payment from its own funds, the leasing experts unanimously testified that defeasance does not eliminate payment risk. (Tr. 3737 (Bent); Tr. 4940-41 (Ray); Tr. 3184 (Ellis)) It is not true that CED's risks in connection with the RoCa3 Transaction have been eliminated via defeasance. Instead, defeasance effectively substitutes one party's credit for another—making the payment risk to CED akin to that of leasing to the defeasance party directly. (Tr. 4916 (Ray)) The IJssel Deposit was held in a custodial account by Credit Suisse First Boston ("CSFB"), and the Sublease Deposit was in an account at ABN AMRO. (Stip. ¶¶189, 209, 211) Even assuming that these banks have and maintain over time excellent credit ratings, this fact does not negate CED's default risk. (*See* P.Br. at 402-04) Defendant's own leasing expert, Ray, opined that leasing to parties with A, AA or AAA ratings creates enough risk to impart the lease with economic substance; in fact, Ray himself negotiated leases to entities that possess such strong credit ratings on behalf of his former employer. (Tr. 4917-19) Further, defeasances do not protect CED's receipt of all payments in the event of a Premature Termination Event (P.Br. at 404-14), and significantly, they do not mitigate any risk regarding the residual value to which CED will be exposed under either the Shirt-Tail Period or the Retention Option Period. (P.Br. at 458-60)

### 2. The Sublease Purchase Option Is a True Option, and It Was at Closing and Still Is Currently Unknown Whether EZH Will Exercise It

At the end of the Sublease Term, EZH has the right to exercise a Sublease Purchase Option for a strike price greater than expected fair market value. (P.Br. at

171) EZH can exercise the Sublease Purchase Option to purchase CED's remaining Lease Interest for $215,450,949.20 (the "Sublease Purchase Option Price") (*Id.*) In entering into the RoCa3 Transaction, Deloitte analyzed on behalf of CED whether EZH would be compelled to exercise the Sublease Purchase Option and concluded that EZH would not have such compulsion. Deloitte concluded that EZH's decision to exercise this option was *not* the likely outcome (P.Br. at 415-19) since (a) the Sublease Purchase Option Price is expected to exceed the future fair market value of CED's Lease Interest at the end of the Sublease, (b) the cost to EZH of exercising the Sublease Purchase Option would exceed the benefits EZH would receive if it did exercise that option, and (c) there were no other factors that would compel EZH to exercise the option. (P.Br. at 419-23) Significantly, that final conclusion had been certified to by EZH in writing as of the closing date and such certification was relied on by Deloitte. (Tr. 1774-76 (Ellsworth)) Deloitte's "no compulsion" conclusion was confirmed at trial by Plaintiff's experts Reed, Goulding and Kelly, each of whose testimony was, for the most part, left unchallenged by Defendant. (P.Br. at 419-30) Thus, for the reasons set forth in Con Edison's Opening Post-Trial Brief, pages 414 through 454, the Sublease Purchase Option must be respected as a true option.

Defendant, in its Opening Post-Trial Brief, argues that EZH's exercise of the Sublease Purchase Option is "predetermined." (*See, e.g.*, D.Br. at 29-32) The first part of Defendant's argument stems from EZH's having sufficient funds in the IJssel Deposit and the Sublease Deposit to exercise the option. Defendant's argument is no better than saying one will pay more than value to buy a house

merely because one has the funds to do so. Defendant's argument is contrary to the wealth of evidence in the record, however, that shows EZH is unlikely to exercise the Sublease Purchase Option. The second part of Defendant's argument is that various documents indicate that the exercise of this option was predetermined to occur. As is shown in Con Edison's detailed responses to such statements below, Defendant has time and time again misread or misstated the contents of these documents and other evidence in the record.

### a. Defendant Incorrectly Characterizes the Mechanics of the Sublease Purchase Option

(1) In its introduction describing the structure of the RoCa3 Transaction, Defendant states, "At the end of the Sublease Basic Term (*i.e.*, January 2, 2018), EZH can exercise the (prefunded by CED) Sublease Purchase Option to purchase CED's leasehold interest." (D.Br. at 9) Although Defendant's citations support the uncontested point that if the defeasance account holders do not default on their obligations, there will be sufficient funds in the IJssel Deposit and Sublease Deposit for EZH to pay the Sublease Purchase Option Price (Tr. 1326-29 (Holzman)), these defeasance accounts were funded by EZH, not by CED. (*See* P.Br. at 149-55) None of the sources Defendant cites so much as imply that CED funded or owned the IJssel Deposit or the Sublease Deposit. In fact, it is EZH that owns the accounts and will receive any funds remaining in them after the obligations for which they were established have been paid. (*See*, *e.g.*, Stip. ¶251; Tr. 5255 (LaRue)) Defendant's leasing expert Bent agreed that EZH was the owner of these accounts:

Q. And if the yield on those securities varies, that really lands in EZH's court, not ConEd's court, if you know what I mean by my—

A. I think I understand. The shortfall, or for that matter the overpayment would be for the account of EZH, I believe. Certainly the shortfall would be.

Q. And if there were an overpayment, what do you mean by overpayment?

A. Well, it is possible that interest rates could go down so much that those securities would be worth a lot more than what they were designed to do.

Q. And who would get the benefit of that?

A. Well, I think under the IJssel agreement, once the equity obligations are paid, EZH retains whatever balance is left in that account, under the circumstances I think you are describing, which is that ConEd gets paid out.

Q. So if there is a shortfall, that's EZH's problem and if there is an overage, that's EZH's benefit in those securities.

A. That's my understanding of the documents, yes.

(Tr. 3827-28) EZH has the risk of investment, the risk of changes in interest rates and the risk of default on all funds in the defeasance accounts.

(2) Defendant states that on January 2, 2018, the funds remaining in the Sublease Deposit and IJssel Deposit together "will equal (and thus offset) the Sublease Purchase Option price." (D.Br. at 29) Defendant's statement is false and misleading. There is no offset to the Sublease Purchase Option Price: it is a recourse obligation of EZH to CED if EZH elects the Sublease Purchase Option, not a paper entry as Defendant implies. EZH may satisfy this recourse obligation by transferring its Sublease Deposit and its IJssel Deposit to CED if it chooses. (P.Br.

at 171; Stip. ¶231; Ex. 4 at page 433)). This is a real transfer of funds from EZH to CED, which Defendant's leasing expert Bent agreed was "a transfer of wealth" by EZH to CED. (Tr. 3803-06)

(3) Defendant states that through the Sublease Purchase Option, EZH can cause the termination of the RoCa3 Transaction in 2018 "at no real cost to itself." (D.Br. at 30) This statement is false. First, there is a significant "cost" to EZH of exercising the Sublease Purchase Option: EZH has to pay the Sublease Purchase Option Price. (Stip.¶¶165, 231) Even if paid from the defeasance accounts, EZH thereby loses the funds in such account that it could have used otherwise. The Sublease Purchase Option Price is $215 million, a significant sum of money—and a sum projected to be greater than the fair market value of the Undivided Interest—regardless of EZH's source for these funds. (Stip. ¶165A; Ex. 46 at page 1503) Further, as explained in detail in Con Edison's Opening Post-Trial Brief, the cost to EZH of exercising the Sublease Purchase Option would exceed the benefits of such option, regardless of whether CED exercised the Sublease Renewal Option or the Retention Option. (P.Br. at 422-23; Ex. 46 at pages 1503, 1571-72; Ex. 10075 (Kelly Initial Report) at page 20164)

Further, if EZH does not choose to exercise the Sublease Purchase Option and CED elects the Retention Option, EZH would be able to withdraw over $123 million from the Sublease Deposit and use it free and clear of the RoCa3 Transaction (P.Br. at 184; Stip. ¶251; Ex. 24 at page 1087; Tr. 3951-52 (Bent); Tr.

4942-45 (Ray); Tr. 5255 (LaRue)), an important fact that Defendant repeatedly ignores.

(4) Defendant states that if EZH exercises the Sublease Purchase Option, "the loan is simply considered paid off." (D.Br. at 30) It simply is not clear what loan Defendant is referring to here. HBU made a loan to CED backed by the Sublease rents and CED's own equity in the leasehold. (Stip. ¶¶118, 194A) If the Sublease Purchase Option is elected, CED must retire the loan and would do so from the proceeds it receives on the Sublease Purchase Option. (Stip. ¶167) This is nothing more than what one expects in a leveraged lease.

**b. Defendant's Allegation that "[A]ll of the Parties to the Transaction Understood that [EZH's Exercise of Sublease Purchase Option] Was the Predetermined Outcome of the Transaction" (D.Br. at 30) Is Argumentative and Not Supported by the Record**

In support of its sweeping allegation that "[a]ll of the parties to the transaction understood that [exercise of the Sublease Purchase Option] was . . . predetermined" (D.Br. at 30), Defendant cites only four isolated passages from the voluminous record. Defendant's interpretation of these passages is incorrect.

(1) Defendant cites Exhibit 288, EZH Board Meeting Minutes from October of 1997, as alleged proof of the fact that EZH had "predetermined" to exercise the Sublease Purchase Option, stating that "EZH only discussed the exercise of the Sublease Purchase Option (not any of the other possibilities . . . )." (D.Br. at 30) This document in no way indicates or even suggests that EZH had "predetermined" to exercise its option. Instead, it speaks of the Sublease Purchase

Option as just that, an *option*: "EZH will have the right to buy back the power plant at a price set ahead of time." (Ex. 288 at page 5648)

(2) Defendant states that "Mr. DePlautt, the main contact at CED with respect to the EZH LILO Transaction, was quite aware" that the Sublease Purchase Option was "predetermined to be exercised" and "relayed this information to CED's independent auditors, PriceWaterhouse." (D.Br. at 30) In support, however, Defendant cites only Exhibit 1142, this exhibit and DePlautt's testimony at trial makes clear that Defendant's characterization of this document is erroneous. When asked at trial about his communications with PriceWaterhouse and about Exhibit 1142 in particular, DePlautt testified that his conjecture that the Sublease Purchase Option was "reasonably assured" was based on a "more likely than not" accounting standard. As such, he understood "reasonably assured" to mean "probable," or "anything over 50 percent . . . 50.01 is more likely than not." (Tr. 2138-40) Further, he made clear that he had no knowledge that EZH management intended to exercise the Sublease Purchase Option (Tr. 2141; *see also* P.Br. at 441-48) and this was confirmed by Deloitte and numerous other exhibits. (Ex. 9 at page 677; Ex. 46 at page 1603; Ex. 56 at page 2511; Tr. 2947 (Mintun, EZH's advisor, testifying that EZH had not made any decision regarding the Sublease Purchase Option))

Andersen's draft letter and the hypothetical transaction structure provided to PriceWaterhouse states that the hypothetical "Purchase Option is greater than or equal to the fair market value" of the asset, and therefore the hypothetical purchase

option is not a bargain purchase option. (P.Br. at 443) More important, Andersen's draft analysis did not rely on the Sublease Purchase Option because the Sublease qualified as a leveraged lease under the other leveraged lease criteria and because reasonable assurance about option exercise is beyond the scope of an option on a hypothetical transactions. (P.Br. at 444) PriceWaterhouse's understanding of reasonably assured and its conclusion regarding the purchase option were irrelevant to the ultimate conclusion that the Sublease qualified as a leveraged lease under FAS 13. Neither CED nor its accountant determined that EZH was compelled to exercise the Sublease Purchase Option, and CED's accounting treatment of the transaction does not depend on any such view.

(3) Defendant states that "Mr. Scher, in-house counsel in CECONY's legal department, explained the transaction [in Exhibit 390] by stating that it is 'questionable' that CED will even have to make the back end rental payment (ostensibly because the Sublease Purchase Option would be exercised thus relieving CED of such an obligation)." (D.Br. at 30). Defendant's use here of a single word from a two-page document is misleading. Exhibit 390 contains a brief summary of the RoCa3 Transaction structure in which Scher noted both that EZH has an "option to purchase CED's interest in the Plant at a pre-determined price (the 'Call Option')" and that if EZH does not elect the Sublease Purchase Option, "CED will have the right to extend the Sublease . . . (the 'Put Option')." (Ex. 390 at page 8028) In both passages then, Scher referred to the options as just that: options. In the very next paragraph, the memo states that it is "questionable" whether CED will

have to make the Final Basic Rent Payment. This statement is merely a simple acknowledgement that if the purchase option were exercised, it would obviate CED's obligation to make the Final Basic Rent Payment in 2041. (Ex. 390 at page 8029) Most important, Exhibit 390 provides no evidence to support Defendant's claim that the parties understood that the exercise of the Sublease Purchase Option was "predetermined."

(4) Defendant also avers that the two-volume Project Briefing Memorandum prepared by CED in connection with its consideration of the RoCa3 Transaction "listed [EZH's] failure to exercise the Sublease Purchase Option as part of its risk analysis." (D.Br. at 30) Even if true, this would hardly be an assumption on CED's part that the option will be exercised; indeed, it is the opposite. In fact, Defendant misrepresents the document. Exhibit 363 lists as a risk EZH's failure to make the "Fixed Price Purchase Option Payment" after exercising the Sublease Purchase Option, not the failure to exercise the Sublease Purchase Option itself. (Ex. 363 at page 7674) This is evident from the context: all of the listed entries in this section describe payment risks, and the related mitigation strategies were therefore the credit support mechanisms discussed throughout trial. (*Id.*) DePlautt's uncontradicted testimony corroborated this reading: he explained that the entry referred to what funds EZH could use "if" it exercised the Sublease Purchase Option. (Tr. 2114-15)

Moreover, the entry directly above the Fixed Price Purchase Option Payment in the Project Briefing Memorandum is "Sublease Rent—Equity Portion" (Ex. 363 at

page 7674), indicating that CED was well aware the Sublease Purchase Option might not be exercised in 2018: the equity portion of Sublease rent is paid from 2027 to 2034. (*See* Ex. 20193 (Bent Initial Report) at pages 24091-92 (compare the Debt Service and Sublease Rent columns))

(5) Defendant states that "[f]or CED's federal tax purposes . . . the transaction documents had to be dressed to present the possibility that EZH may not exercise its purchase option." (D.Br. at 32) This is false, and Defendant produces no support here or elsewhere for its implication that CED's advisers did not act in an unbiased and independent manner. This is just a bold, uncorroborated assertion that Defendant simply wishes were true, but it is not. In fact, the Muoio testimony Defendant cites is as follows:

Q. Okay. Do you understand that a fixed price was set relating to the option of EZH to purchase CED's or Con Edison or the trust—do you understand when I refer to CED's interest in the lease transaction, do you understand what I am referring to?

A. Yes. And you are talking about the price option that they had to purchase at, I guess it was, 20 years into the future.

Q. And you recall that CED spent a lot of time concerning that price?

A. To make sure that it met all the accounting and tax requirements, yes. I believe we hired an appraiser to make sure that it was—I believe it was supposed to be above fair market value.

(Tr. at 1978) Muoio's testimony makes clear that CED acted prudently by hiring a qualified and independent appraiser to ensure the Sublease Purchase Option price was set above fair market value.

Defendant's only other support for this allegation is a memo drafted by Shearman & Sterling identifying various tax risks relating to a cross-border lease. (Ex. 329) Absolutely nothing in this memo even remotely suggests that the Sublease Purchase Option was not a true option. This document further illustrates that CED acted appropriately by hiring outside tax counsel to evaluate potential transactions. Shearman & Sterling is a respected law firm with experience in leveraged leasing. (Tr. 4905 (Ray))

(6) Defendant also tries to invent support for its version of the facts by stating that "under the Tax Indemnity Agreement, EZH was prohibited from 'formally' adopting a position with respect to the Sublease Purchase Option." (D.Br. at 32) As the parties have stipulated, this portion of the Tax Indemnity Agreement provides EZH's representation that it "was not a party to, nor did it have any present intention or understanding to enter into any . . . written or oral agreements" regarding its exercise of the Sublease Purchase Option. (Stip. ¶280; Ex. 9 at page 677) As such, EZH must have been comfortable at closing that this was in fact true or it would have voluntarily, needlessly and expensively exposed itself to liability. Further, Defendant's reliance on this citation alone tells an incomplete story. EZH also represented to CED that "there is no known factor to EZH" that would materially induce it to exercise the Sublease Purchase Option. (Ex. 56 at page 2511) Together, these clauses show that EZH specifically considered the issue and concluded that it had neither predetermined its exercise of the

Sublease Purchase Option nor knew of any reason that would cause it to do so. This was not merely a "formal" position; it was true.

**c. Defendant's Allegation that "the Transaction Documents Contain Certain Features Which Provide Additional Incentives to Ensure that EZH Would Exercise the Sublease Purchase Option" (D.Br. at 31) Is Argumentative and Not Supported by the Evidence Cited or in the Record**

In support of its allegation that certain features of the transaction "*ensure*" that EZH will exercise the Sublease Purchase Option (D.Br. at 31)—or, at the very least "dramatically skew[] any incentive EZH may have had for deciding not to exercise the Sublease Purchase Option" (D.Br. at 32) (Defendant is unclear as to its precise allegation)—Defendant has failed to provide a detailed, well-crafted analysis supported by factual statements. In fact, none of such features Defendant had identified before trial held up during the course of the trial.

(1) Defendant states that the Participation Agreement provides CED with the ability to "walk away from the transaction during either the Retention Option or the shirttail period" and that another "party would step into the Transaction" in place of CED. (D.Br. at 31) This statement is false because Defendant has mischaracterized and misread Participation Agreement section 11(e)(xvii).

In this provision, EZH agreed that if it does not elect the Sublease Purchase Option, it will notify CED of whom it has selected as Designated Successor Lessee—the party that would take CED's position as Lessee under the Lease should a Leasehold Interest Transfer occur after the Sublease ends. (Ex. 1 at page 65) In *no*

place in the Operative Documents is the term Leasehold Interest Transfer actually defined or used. Without a definition, the term has no bearing on the rights or obligations of CED because the defined event cannot occur. Defendant's confusion on this matter is unsurprising: Defendant's Opening Post-Trial Brief is the first and only instance in which Defendant raised or claimed that this provision in the Participation Agreement provides CED purported "walk away" rights. Importantly, not once at trial did Defendant pose a single question with respect to this provision to any witness, nor did any of Defendant's experts, including its leasing experts, mention it. On the stand were parties to the transaction with considerable knowledge of the documents and Defendant's experts were well versed in lease documentation. This provision simply does not do what Defendant claims it does, and Defendant's silence on it at trial is highly revealing.

(2) Defendant's second argument that EZH has contractual incentives to exercise the Sublease Purchase Option is that "in failing to exercise the Sublease Purchase Option, EZH gives up control of its destiny to CED." (D.Br. at 31) "In other words, even if EZH no longer desired to be in the sublease, CED could force it to continue on by exercising its renewal option. This is compounded by the fact that under the Operating Agreement, EZH can be forced to continue as the operator of the facility even after the sublease is terminated." (D.Br. at 31) Defendant has no evidence of such a concern by EZH. This is pure theory that ignores the concrete, contradictory evidence in the record. In its appraisal, Deloitte examined the exact

allegation Defendant here raises: that the prospect[1] of the Sublease Renewal Option would be so distasteful to EZH that it would choose the Sublease Purchase Option instead. (Ex. 46 at pages 1570-71, 1578) Deloitte determined in its extensive economic analysis, however, that EZH should prefer the Sublease Renewal Option, for a period less than the remaining Lease term, with its below-market rents, to paying the overpriced Sublease Purchase Option to acquire the entire balance of the Lease term. (*See id.*) Kelly also offered his expert testimony that exercising the Sublease Purchase Option would cost $25 million more than would the Sublease's renewal. (Ex. 10075 (Kelly Initial Report) at page 20178 ("Step 2"); Tr. 2784-87 (Kelly)) These conclusions directly refute Defendant's argument. Defendant failed to ask any questions of either Kelly or Ellsworth (the Deloitte appraiser) regarding their conclusions. Nor did Defendant ask any questions of Kelly or Ellsworth to support its own theory or sponsor an appraisal witness to support it.

In addition, the Facility Operating Agreement provides a mechanism for EZH to resign as Operator with CED's approval. Should EZH not want to operate the RoCa3 Facility, CED and the other leaseholders will make arrangements for a new operator to take EZH's place. (Ex. 11 at page 737) The Facility Operating Agreement requires EZH to provide notice one year prior to its resignation to facilitate an orderly transition; after one year, EZH's resignation would be effective. (*Id.*)

---

[1]Importantly, Deloitte concluded that the most likely outcome in 2018 is that EZH will not exercise its purchase option and that CED will exercise the Retention Option, not the Sublease Renewal Option. (P.Br. at 418) Defendant ignores that fact here, as it does throughout its brief.

(3) To overcome the built-in incentive for EZH *not* to exercise the Sublease Purchase Option—that the non-exercise will give EZH access to the funds in the defeasance accounts—Defendant contends that EZH would not get "unencumbered use of the funds held in the defeasance accounts" because it "still had numerous obligations." (D.Br. at 31) This statement acknowledges that should EZH not elect its Sublease Purchase Option, it may use the funds in the defeasances to meet its own obligations. Importantly, this is an admission that the funds were EZH's, which could use them to meet its obligations.

Further, the statement is inaccurate. First, under the Retention Option, EZH is entitled to withdraw over $123 million from the Sublease Deposit and use this amount however it chooses. (*See* R. Facts. Section I.A.2(a)(3)) Moreover, the Sublease Deposit and IJssel Deposit, even when they do remain intact, represent a benefit to EZH, not a burden or penalty that would distort the decision-making process. The fact that EZH considered the use of defeasance to be an advantage is shown in minutes from the December 10, 1997, EZH Board meeting: Mr. Krenger of EZH asked "why the 152 million dollars are kept on deposit, and are not utilized for investments?" (Ex. 288 at page 5637) Mr. Verwer explained in response that "a deposit in dollars was chosen because the termination value is in dollars and as such no risk is involved in terms of a currency exchange fluctuation." (Ex. 288 at page 5638; *see also* P.Br. at 147-49; Tr. 3819-20 (Bent) (agreeing that defeasance is common in cross-border transactions because it protects against currency risk)) Defendant's argument amounts to a claim that EZH would exercise the Sublease

Purchase Option—which is priced above expected Fair Market Value—because there is a *possibility* that if it does not, it may have to use the funds elsewhere in a beneficial manner.

**d. Defendant's Statement that "[O]nly Deloitte & Touche . . . , the Appraiser Retained By EZH to Provide CED With an Appraisal of the RoCa3 Facility, Concluded that the Most Likely Outcome Would Be that EZH Would Not Exercise Its Sublease Purchase Option" (D.Br. at 32) Is False and/or Misleading**

(1) As an initial matter, Defendant's statement that "EZH" retained Deloitte is false. (D.Br. at 32) Defendant's citation is simply not on point. (*See*, *e.g.*, Tr. 1795-96 (Ellsworth)) In fact, *CED* had retained Deloitte as its appraiser (Tr. 1600 (Ellsworth); Ex. 767 at page 12473) and Ellsworth testified that Deloitte's preparation of the appraisal was independent and unbiased. (Tr. 1603-07; Ex. 46 at page 1587) Defendant's expert Ray opined that Deloitte is a "competent" and "recognized" appraiser, that Deloitte provided CED with an "extensive" appraisal report, and that he had no reason to think CED's choice of appraiser was inappropriate. (Tr. 4750-51, 4896-97)

(2) Defendant's allegation also ignores two significant points: (1) Defendant proffered no appraisal or other economic analysis to discredit or rebut Deloitte's analysis and conclusions, and (2) Con Edison offered the testimony of three expert witnesses, each of whom confirmed the accuracy of Deloitte's conclusions in testimony that was essentially uncontradicted.

Deloitte performed two separate economic analyses showing that (1) the Net Sublease Purchase Option Price exceeded the anticipated fair market value of the residual value of CED's Lease Interest as of the January 2, 2018, the end of the Sublease Basic Term, and (2) the *cost* to EZH of its exercising the Sublease Purchase Option would exceed the *benefits* it would receive from doing so. (P.Br. at 419-21) Defendant has never raised any substantive issues with Deloitte's conclusions.

On the second point, Con Edison offered the opinion of three experts, each confirming aspects of Deloitte's conclusion that EZH will not be compelled to exercise its Sublease Purchase Option. First, Kelly confirmed the reasonableness of Deloitte's appraisal methodology and conclusions. (P.Br. at 241-43) Defendant offered no direct testimony to rebut Kelly's conclusions. Second, Reed confirmed that, from an economic perspective, EZH will not be compelled to exercise the Sublease Purchase Option. (P.Br. at 243-247) Instead of offering any direct testimony to rebut Reed's conclusion, Defendant's economics expert, Thomas, agreed with Reed's primary conclusion that there is significant uncertainty as to the value of CED's leasehold interest in 2018. (Ex. 20201 (Thomas Rebuttal Report) at page 25366; Tr. 4640) Third, Goulding confirmed Deloitte's conclusion that, based upon expected regulatory conditions in The Netherlands in 2018, EZH will not be compelled to exercise the Sublease Purchase Option. (P.Br. at 247-251) Thomas, an expert in economics with no professional expertise in Dutch energy regulation (Tr. 4473-74, 4574 (Thomas)), offered some unsupported opinions to this effect, but

ultimately testified that he had "no reason to doubt" many of Goulding's conclusions. (P.Br. at 249) Interestingly, Thomas' trial testimony and expert reports provide no analysis with respect to whether EZH would be economically compelled to exercise the Sublease Purchase Option, despite the fact Defendant qualified him as an economics expert. (*See* Tr. 4473-74)

**3. It Is Unknown Whether the IJssel Deposit and the Sublease Deposit Will Be Sufficient to Meet EZH's Post-2018 Obligations**

Defendant contends that the "circular financing arrangement from a defeased account ensures that the sublease rent and HBU loan are paid at no cost to either EZH or CED, and virtually eliminates any risk of loss on the Transaction." (D.Br. at 17) However, if EZH does not exercise the Sublease Purchase Option, CED has two choices: the Sublease Renewal Option and the Retention Option. (P.Br. at 171) Under the Sublease Renewal Option, CED would cause EZH to renew the Sublease for the Sublease Renewal Term of 16.5 years. (*Id.*) During any Sublease Renewal Term, EZH is obligated to, among other things, make rental payments to CED until the Sublease Renewal Term ends on June 15, 2034 (P.Br. at 173-74) and continue to make payments on the Sublessee Loan until it is retired. (P.Br. at 142-43, 174) The Sublease will remain in effect during the Sublease Renewal Term and thus so will the "hell or high water" provision requiring EZH to make its rental payments regardless of exigent circumstances. (Ex. 4 at page 432; *see also* Tr. 3911-12 (Bent)) (testifying that a "hell or high water" clause allows for no circumstances to abrogate a payment obligation)

Under the Retention Option, EZH is required to return CED's Lease Interest to CED for the remaining Lease Term of 23.1 years. (P.Br. at 171) During the Retention Period, EZH remains obligated to repay the Sublessee Loan. (P.Br. at 142-43)

Defendant's attack upon the substance of the RoCa3 Transaction depends upon its claim that the obligations owed by each of the parties during the Sublease Renewal Option or Retention Option periods consist of "circular" payments that somehow have been fully funded as of the closing date in 1997. The first piece of this argument is that if the Sublease Renewal Option or the Retention Option is chosen, EZH will be able to fully fund its obligations to pay Sublease Renewal Rent and make Sublessee Loan Payments from the amounts it originally placed in the IJssel Deposit and the Sublease Deposit. The second piece of this argument is that CED will be able to use the amounts received from EZH to fund collateral accounts that will fully discharge its obligation to make the Final Basic Rent Payment. Therefore, Defendant argues, the Final Basic Rent Payment is illusory because it is wholly paid from "offsets" and is nonrecourse.

Both pieces of this argument are contrary to the facts. As a result, Defendant's overall claim that the post-2018 transaction economics are circular cannot stand. Con Edison will address the second half of Defendant's argument in Facts Section I.A.5. regarding the Final Basic Rent Payment. Con Edison will address hereDefendant's contention that EZH can depend upon the reinvested

IJssel Deposit and Sublease Deposits to meet all of its obligations under the Sublease Renewal Option and the Retention Option. These claims are as follows:

- Under the Sublease Renewal Option, the reinvested funds in the IJssel Deposit will be "available to satisfy" "EZH's renewal sublease rent and other Payment Obligations, including the 'Excluded Payments'/'Excluded Portions' due at the end of the lease term pursuant to the Sublessee Loan Agreement described herein." (D.Br. at 21)

- "[A]ssuming *arguendo* that EZH does not exercise its Sublease Purchase Option, EZH is required to reinvest the funds resulting from the maturing Treasury STRIPS . . . in new government obligations sufficient to meet [its] free cash obligations. In other words, the new government obligations will have maturation dates and values that coincide with the free cash payment schedule under the sublessee loan." (D.Br. at 26)

- "Beginning in 2027, the sublease rent will be funded by a portion of the proceeds from a successor custodial account containing new government obligations purchased pursuant to the IJssell [sic] Agreement upon the maturation of the original Treasury STRIPS in the Equity Defeasance Account (originally funded with CED's equity investment)." (D.Br. at 33)

Defendant's theory is contrary to the facts, which establish that it is impossible to predict whether EZH will have enough funds (or more than enough) in the IJssel Deposit and Sublease Deposit to cover any rental and other payment obligations post-2018. (P.Br. at 174-75)

### a. The Role of the IJssel Deposit and Sublease Deposit Under the Sublease Renewal Option

Under the Sublease Renewal Option, the Sublease Deposit and the IJssel Deposit both remain in place and continue to secure part of EZH's future payments. (P.Br. at 174) The Sublease Deposit will continue to secure a portion of EZH's rental obligations during the Sublease Renewal Term through 2027, at which point it will

be exhausted. (P.Br. at 150-51) In 2017 and 2018, the five remaining STRIPs that comprise the IJssel Deposit are scheduled to mature in amounts totaling $99,199,000. (*See* P.Br. at 153 (the sum of the STRIPs)) The proceeds from each STRIP would be reinvested by CSFB after they mature. (P.Br. at 174) However, there is no way to know whether the funds will be sufficient to cover EZH's rental payment obligations from 2027 through 2034 and EZH's Sublessee Loan repayment obligations.

This can be demonstrated by considering EZH's liabilities and the amounts available from the IJssel Deposit to secure those liabilities. On January 2, 2018, EZH owes CED a $37,525,237.44 payment on the Sublessee Loan. (P.Br. at 142) EZH may, but need not, make this payment from the IJssel Deposit (Ex. 22 at page 1043), potentially leaving $61,673,762.56 in this account. Pursuant to the terms of the Sublease Renewal Option, EZH will cause this $61,673,762.56 to be reinvested in U.S. Government Obligations at a currently unknown interest rate (*i.e.*, the then-prevailing market interest rate). (P.Br. at 174-75)

Because the future interest rate on any reinvestment is unknown, it literally is impossible to know in advance whether the IJssel Deposit's $61,673,762.56 will grow to (or even potentially exceed) the amount necessary to secure EZH's remaining Sublease rental payment obligations from 2027 through 2034 (P.Br. at 175), equal to $139,505,387.[2] During this same period, EZH also would owe CED a

---

[2] This equals the sum of $3,678,512 in 2027, $18,225,000 per year from 2028 through 2034 and a final rental payment due on June 15, 2034 of $8,251,875. The 2027 figure is the difference between the $18,225,000 rental payment EZH owes in

series of payments on the Sublessee Loan—amounting to $136,273,945.83 without including the final Sublessee Loan Payment, or $534,205,287.11 including the final Sublessee Loan Payment. (P.Br. at 142 (the sum of EZH's Sublessee Loan payments from 2017); Ex. 44 at page 1478) Defendant has offered no evidence whatsoever that the reinvested IJssel Deposit would provide EZH enough funds to cover 100% of these payment obligations. In fact, it is extremely likely that the funds in the IJssel Deposit will be higher or lower than the amount EZH needs to fulfill its payment obligations, exposing EZH to investment risk on the Ijssel Deposit associated with any shortfall or excess.

**b. The Role of the IJssel Deposit and Sublease Deposit Under the Retention Option**

Under the Retention Option, EZH would withdraw the projected Sublease Deposit balance of $123,615,472, fully exhausting that deposit, and then be free to use those funds as it chooses. (P.Br. at 184) As in the Sublease Renewal Option, EZH would be required to reinvest the remaining $61,673,762.56 from the IJssel Deposit after it makes its Sublessee Loan payment due on January 2, 2018. (P.Br. at 153, 174-75) Although EZH would not owe any rental payments to CED under the Retention Option, it would continue to owe $534,205,287.11 in Sublessee Loan payments. (P.Br. at 142) Thus, EZH would face similar investment risks regarding the sufficiency of the IJssel Deposit to cover these payment obligations as discussed directly above regarding the Sublease Renewal Option.

---

2027 and the $14,546,488.08 remaining in the Sublease Deposit, which EZH can use to pay for a portion of this payment. (P.Br. at 178; Stip. ¶243)

### 4. CED's Obligation to Make the Final Basic Rent Payment is Not "Offset" by Any Collateral Accounts

Defendant states at various points that "the Final Basic Rent Payment from CED was illusory, as it primarily consisted of offsets." (D.Br. at 31; *see also id.* at 33-34, 39) Defendant's assertions to this effect are false and misleading. Moreover, an underlying theme Defendant returns to many times in its brief is that CED has no economic interest in exploiting its Lease Interest and would walk away from the transaction. This is also false.

Deloitte concluded that of the different options the parties have in 2018, EZH would not likely exercise the Sublease Purchase Option because the value of the RoCa3 Facility would be less than what EZH would pay for it, and that CED, in turn, would exercise the Retention Option, not the Sublease Renewal Option because the Retention Option offered to CED a greater potential return. (P.Br. at 418) These conclusions were confirmed by three experts at trial, Reed, Goulding and Kelly (P.Br. at 418-30), and Defendant did not offer any evidence to rebut Deloitte's conclusion that the Retention Option was the most likely option to be selected in 2018.

Under the Retention Option, CED would be required to pay the Final Basic Payment of $831,525,734 on February 24, 2041. (P.Br. at 187) Even under the most conservative estimate of CED's revenues from the operation of the RoCa3 Facility during the Retention Period, CED would have sufficient funds to make this payment, and then some. For example, CED's RoCa3 Transaction sources of pretax cash flows would be its sale of the RoCa3 Facility's output from 2018 through 2041,

which is projected to be $729,918,996.19[3] (P.Br. at 362), and all of the payments for deferred rentals that EZH owes CED via the Sublessee Loan, which total $588,730,524.55. (*See* P.Br. at 142 (summing the Sublessee Loan payments)) Thus, CED is expected at a minimum to have pretax cash flows of $1,318,649,520.74 (through the exact amount will depend on actual operations and risks borne by CED).

Even if CED does not reinvest the receipts and let them grow, the funds available are projected to exceed the liability. CED's expenses during this period include repayment of the nonrecourse loan of $123,615,472 on January 2, 2018 and the Final Basic Rent Payment of $831,525,734 on February 24, 2041. Thus, CED is expected to generate net cash flows of at least $363,508,314.74[4] over the Retention Option Period after taking into account the Final Basic Rent Payment. This is a substantial value which CED will not want to simply "leave on the table" or walk away from. Defendant's argument, for which it failed to provide a single citation or any evidence in support, cannot stand.

---

[3] Defendant did not challenge Deloitte's projection of revenues; however, this amount could be higher or lower than Deloitte's estimate. In addition, the costs, such as fuel costs, operation costs and capital expenditures, associated with the operation of the RoCa3 Facility are incorporated into this amount. (Ex. 46 at page 1746)

[4] This is a conservative estimate since it does not include an estimate for a rate of return CED would receive from investing any of the revenues from the RoCa3 Facility's Operations or Sublessee Loan Payments. Such an estimate was not made since it is currently unkown whether CED will fund certain collateral accounts in 2018 and what its rate of return would be on any investment.

**a. Sublease Renewal Option**

The Lease provides that CED's obligation to make the Final Basic Rent Payment is subject to a "hell or high water clause" requiring this payment to be made in cash; it provides no circumstances abrogating or negating this obligation. (Ex. 2 at pages 324-25; Tr. 3911-12 (Bent)) More than sufficient funds will be available with which to satisfy this obligation. While CED is required to arrange collateral to secure its obligation to make the Final Basic Rent Payment, the collateral does not insulate CED from the economic risk of making the payment.

For example, regarding the Sublease Renewal Option, the parties have stipulated that "the total amount of the final payment due pursuant to the Sublessee Loan Agreement ($414,931,341), plus the amount of the Trustee Treasury Collateral ($141,671,596.40) and the Lease Collateral Deposit would total $831,525,734 as of February 24, 2041, *assuming* that (i) CEL funds the Lease Collateral Deposit and the Trustee Treasury Collateral, *and* (ii) that CEL is able to earn an interest rate of 6.86% on the Lease Collateral Deposit from June 15, 2034 until February 24, 2041." (Stip. ¶246 (emphasis added)) Hence, as the parties' stipulation establishes, Defendant's assertion that the Final Basic Rent Payment will be funded from the collateral accounts can only be true if CED chooses to fund the Trustee Treasury Collateral *and* the Lease Collateral Deposit (rather than arranging other sources of cash to make the final Basic Rent Payment), *and* the Lease Collateral Deposit earns interest at 6.86% from June 15, 2034 until

February 24, 2041. As discussed in Facts Section I.C.4., CED faces interest rate risk on the collateral accounts that cannot be avoided.

Further, if CED exercises its right to provide Acceptable Substitute Collateral, CED could benefit from using the funds that otherwise would have been tied up in the collateral accounts. But it would also be exposed to risk to the extent that its use of those funds did not provide sufficient returns for CED to meet its obligations to make the Final Basic Rent Payment to the same extent the collateral accounts would have. For example, should interest rates fall after CED establishes these collateral accounts, CED could take advantage of the resulting higher value of the accounts by simply posting a letter of credit, selling the securities and keeping the proceeds. In 2041, if the letter of credit issuer makes a payment to EZH in satisfaction of CED's Final Basic Rent obligation, CED will have to repay the letter of credit issuer. If the funds that CED removed from the collateral accounts do not produce a return sufficient to make this payment, CED will be forced to make up the shortfall from its other assets.

While Defendant designates the $414,931,341 that EZH owes to CED on February 24, 2041 on the Sublessee Loan as a mere "offset" of the Final Basic Rent Payment (*See, e.g.*, D.Br. at 6, 12)—a term not found in any of the Operative Documents relating to these payments and obligations—Defendant's leasing expert Bent testified that it is common for lessors to allow lessees to defer rental payments, subject to an obligation to pay the deferred rental obligation at a subsequent date.

(Tr. 3843) Lessees' repayments of such deferred rental loan are to satisfy real obligations. (*Id.*)

Defendant also argues that the Sublessee Loan Payments EZH owes to CED can be increased to make up for any shortfall from the collateral accounts CED may establish. (D.Br. at 40 n.33) This statement is false. The amount of the Sublessee Loan that EZH owes to CED cannot be increased to cover CED's shortfall if CED does not have sufficient funds to pay the Final Basic Rent Payment. No Operative Document provides for this, which is why Defendant has provided no citation to support its contention. Instead, Defendant refers to the Section 3(e) of the Sublease Agreement (Ex. 4 at page 390), which will not even be in effect when CED's Final Basic Rent Payment to EZH is due as it terminates on January 2, 2018 under the Retention Option and on June 15, 2034 under the Renewal Option. (Ex. 1 at page 163) As discussed in Facts Section I.C.9., the only adjustments that can be made to the Sublessee Loan are during the Sublease Term, which permits acceleration of the Sublease Loan Payments under limited circumstances. All such adjustments, in any event, end years before the Final Basic Rent Payment is due.

**b. The Retention Option**

CED faces a similar set of risks regarding its source of funds to pay the Final Basic Rental Payment under the Retention Option. Once again, these risks revolve around whether CED chooses to provide Acceptable Substitute Collateral or instead fund the Incremental Collateral Pledge and the Trustee Treasury Collateral. (*See* R. Facts Section I.A.4(a); P.Br. at 187; Stip. ¶257)

#### c. The Final Basic Rent Payment Is Recourse to the CEL Trust and CED

Defendant argues that "only a small portion of [the Final Basic Rent Payment] was recourse" and CED's recourse obligation is "only to the extent of whatever funds existed in the Trustee Treasury Collateral Account." (D.Br. at 31) Defendant's statement is contrary to the record and its own stipulations. (*See* Stip. ¶¶248, 249, 259, 260) First, the total Final Basic Rent Payment of $831,525,734 is recourse to the CEL Trust, of which CED is the sole owner and whose assets would include any retained profits from all rentals or revenues from the operation of the plant. (P. Br. at 183, 188; Ex. 1 at page 45; Ex. 2 at page 325) Hence, all profits the CEL Trust accumulates from its sale of the RoCa3 Facility's output after January 2, 2018, increase the CEL Trust's ability to satisfy this obligation accordingly. These profits are projected to be very substantial. (*See* P.Br. at 356-64) Second, CED itself has, *at a minimum*, a *$141 million* recourse liability on the Final Basic Rent Payment. (P.Br. at 182, 188; Stip. 248; Ex. 1 at page 45) Further, any distribution of profits by the CEL Trust to CED, which are expected to be very substantial, will directly increase CED's own recourse liability in an equal amount. (P.Br. at 182, 188; Stip. ¶¶249, 260) Under either the Sublease Renewal Option or the Retention Option, these distributions may be in the hundreds of millions of dollars. (P.Br. at 361-62) Thus, CED and CEL face recourse liability for all or a significant part of the Final Basic Rent Payment.

The key to any analysis of whether the Final Basic Rent Payment is a real obligation or not is simply to ask whether there are expected to be sufficient sources

of funds with which to pay it. As demonstrated above, the parties to the RoCa3 Transaction diligently made provision for just that, and then some.

### 5. Con Edison Is Not Required to Fund the Trustee Treasury Collateral, Incremental Collateral Pledge and/or Lease Collateral Deposit

Defendant's argument further relies heavily on the erroneous proposition that CED will necessarily fund various collateral accounts, the funds in which will then be available to it to secure and pay the Final Basic Rent Payment:

- Under the Sublease Renewal Option, the reinvested funds in the IJssel Deposit will be "available to satisfy" "EZH's renewal sublease rent and other Payment Obligations, including the 'Excluded Payments'/'Excluded Portions' due at the end of the lease term pursuant to the Sublessee Loan Agreement described herein." (D.Br. at 21)

- If EZH does not exercise the Sublease Purchase Option, "CED would . . . use $34,036,691.62 of [the $37 million free cash payment] to fund the Trustee Treasury Collateral Account" that "serves to secure a portion of the Final Basic Rent Payment." (D.Br. at 22 & n.21)

- "The Lease Collateral Deposit is scheduled to grow at a predetermined rate so that by the time the Final Basic Rent Payment becomes due, the value of the Sublease Renewal rents is equal to a specified portion of the Final Basic Rent Payment." (D.Br. at 33)

- "The Lease Collateral Deposit is scheduled to grow to approximately $274,922,796.33 on the Lease Termination Date." (D.Br. at 33)

- "CED will then use [the $37 million payment it receives in 2018] to satisfy its requirement to purchase U.S. Government Obligations [creating the Trustee Treasury Collateral] with maturity amounts set forth in Schedule 2A of the Participation Agreement (i.e., $141,671,596.40), and maturity dates as close

to, but not later than, the Lease Termination Date (February 24, 2041)." (D.Br. at 34)[5]

- "CED would then deposit those U.S. Government Securities [from the IJssel Deposit] in a custodial account established by CED, for its own benefit, with a security interest in EZH's favor (known as the Trustee Treasury Collateral) to secure a portion (approximately $141.6 million) of CEL Trust's obligations to make the Final Basic Rent Payment." (D.Br. at 34)

- "Under the Retention Option CED would follow the same procedure it would under the Sublease Renewal Option with respect to creation of the Trustee Treasury Collateral." (D.Br. at 38)

- "The only difference [between the Sublease Renewal Option and the Retention Option] would be that instead of the Lease Collateral Deposit . . . , CED can create what is known as the Incremental Collateral Account, whereby it can purchase government obligations to satisfy the portion of the Final Basic Rent Payment that would typically have been covered by the Lease Collateral Deposit under the Sublease Renewal Option." (D.Br. at 38)

**a. Under the Sublease Renewal Option, CED Has the Option to Establish the Trustee Treasury Collateral and the Lease Collateral Deposit, or to Provide Acceptable Substitute Collateral in Lieu of Either or Both Accounts**

Under the Sublease Renewal Option, CED is responsible for making the Final Basic Rent Payment on February 24, 2041. (Stip. ¶¶241, 242) As might be expected from parties to a long-term lump sum obligation, various collateral or credit support mechanisms are required to be put in place that, within the flexibility granted therein, help mitigate the risk that adequate funds will not be available. CED may choose from two alternatives for providing collateral to support

[5] Defendant incorrectly states that EZH owes CED $34 million on the Sublessee Loan; the correct amount is $37 million. (Stip. ¶173)

its obligation for the Final Basic Rent Payment: (1) funding the "Trustee Treasury Collateral" and the "Lease Collateral Deposit" accounts, or (2) replacing all or any part of those accounts with Acceptable Substitute Collateral, such as a letter of credit. (P.Br. at 176; D.Br. at 40 (stating Acceptable Substitute Collateral can include "letters of credit, cash, or other securities, or any other collateral acceptable to EZH"); Stip. ¶¶241, 242, 253, 254) If CED funds either of these accounts, it can later decide at any time during the Lease Term to replace any part or all of these accounts with a letter of credit or other Acceptable Substitute Collateral. (P.Br. at 176) That flexibility is CED's at its sole discretion.

If CED exercises its right to provide Acceptable Substitute Collateral, such as a letter of credit, CED is free to use the Sublease Renewal Rent and Sublessee Loan Payments it receives as it chooses. (P.Br. at 176, 469-70) While any investment CED makes with this cash could result in additional profits or a loss, CED continues to be obligated to pay the Final Basic Rent Payment. (P.Br. at 181; Tr. 3911-13 (Bent))

On the other hand, if CED chooses to fund the Trustee Treasury Collateral, CED would be exposed to the risk that the interest rate on the collateral would be insufficient to secure CED's obligations. (P.Br. at 466) On January 2, 2018, EZH owes CED a payment on the Sublessee Loan of $37,525,237, which can be used in part to fund the Trustee Treasury Collateral. (P.Br. at 466) The cost to fund the Trustee Treasury Collateral on January 2, 2018 was projected to be $34,036,692, having a projected maturity value of $141,671,596 at the end of the Lease Term.

(P.Br. at 177, 466) The actual cost to fund such an account will depend on interest rates at the time, however. If the cost to fund this account is greater (because the interest rates assumed in the projections turn out to be different in 2018), EZH's repayment of the Sublessee Loan could be accelerated under Section 3(e) of the Sublease so that CED would have sufficient funds to establish this account. (P.Br. at 177, 466) However, because the Trustee Treasury Collateral Account is funded on January 2, 2018, CED would bear the risks and benefits of any changes in interest rates until February 24, 2041. (P.Br. at 177-78, 466) Any of the securities that mature prior to the Lease Termination Date would have to be reinvested. Thus, a decrease in interest rates from the date that the securities were originally purchased would result in the Trustee Treasury Collateral's maturity value being less than expected, and CED would be required to make up the shortfall to pay the Final Basic Rental Payment. (P.Br. at 178, 466)

Similar risks to CED exist if CED chooses to establish the Lease Collateral Deposit. In this case, CED will make a series of deposits from 2027 through 2034. (P.Br. at 178) It may use the Sublease Renewal Rents to fund this account for its benefit, or it may use any other source of cash. Under the parties' original projections, from 2027 through June 15, 2034 (the end of the Sublease Renewal Term), the deposit-taking financial institution is assumed to pay a fixed interest rate of 6.86% that would grow to a defined amount, $176,210,292.09, as of June 15, 2034. (P.Br. at 178) Under the terms of the Sublease, if the deposit-taking institution is not willing to pay 6.86% from 2027 to 2034, the amount of Sublease

Renewal Rent could be increased or the repayment of Sublessee Loan could be accelerated in order to preserve CED's net economic return. (Ex. 4 at page 390) However, after June 15, 2034, until the end of the Lease in 2041, no further adjustments could be made under the Sublease, as the Sublease Renewal Term, and with it the Sublease, will have terminated. CED is thus fully exposed to interest rate risk from that point on. (Ex. 1 at page 162; Ex. 4 at page 389) Hence, even if CED elects to fund the Lease Collateral Deposit, there is no way of knowing whether or not that account will grow to equal any specific portion of the Final Basic Rent Payment. Defendant's experts Ray and LaRue recognized this and thus agreed that CED may have to pay an additional unknown amount to cover any shortfall in the Final Basic Rent Payment not covered by the Lease Collateral Deposit. (P.Br. at 181-82; Tr. 4947-50 (Ray); Tr. 5292 (LaRue)) CED bears the investment risk of these collateral deposits, not EZH.

**b. Under the Retention Option, CED Has the Option to Establish the Trustee Treasury Collateral and the Incremental Collateral Pledge, or to Provide Acceptable Substitute Collateral In Lieu of Either or Both Accounts**

CED would also be obligated to provide certain collateral to secure its Final Basic Rent Payment if it exercises the Retention Option. (P.Br. at 184) Similar to its choices under the Sublease Renewal Option, CED may secure its future lease obligations by choosing from two alternatives: (1) funding the Trustee Treasury Collateral and the Incremental Collateral Deposit, or (2) replacing all or any part of those accounts with Acceptable Substitute Collateral. (P.Br. at 184) If CED decides

to fund either or both of these accounts, it can later decide at any time during the remaining lease term to replace all or any part of these accounts with Acceptable Substitute Collateral (P.Br. at 185), and CED would then be free to use as it sees fit any funds replaced with Acceptable Substitute Collateral. (P.Br. at 185)

If CED elects to fund the Trustee Treasury Collateral, CED would establish this account on January 2, 2018, in the same manner as described with respect to the Sublease Renewal Option above. (R. Facts Section I.A.4(a); P.Br. at 185) If interest rates change following CED's funding of the Trustee Treasury Collateral, the collateral may produce either more or less than the projected maturity value of $141,671,596.40. (P.Br. at 185) Again, CED is obligated to pay any shortfall and may keep any extra.

If CED decides to establish the Incremental Collateral Pledge, it will be required to purchase on January 2, 2018, securities with an aggregate projected maturity value of $274,944,946.33 on or before February 24, 2041. (P.Br. at 186, 466-67) The amount CED would have to pay for these securities is currently unknown since it is impossible to know in advance what the interest rate will be in 2018. (Stip. ¶¶256, 257; Ex. 2 at pages 326-27)

Contrary to Defendant's contentions, the source of cash CED would use to fund the Incremental Collateral Pledge is not provided for by specific fixed cash flows under the terms of the RoCa3 Transaction. (P.Br. at 464) On January 2, 2018, EZH owes CED a $37,525,237 payment on the Sublessee Loan, and if CED does not provide Acceptable Substitute Collateral, it will have to fund the Incremental

Collateral Pledge and the Trustee Treasury Collateral. (P.Br. at 466) Given that the cost to fund the Trustee Treasury Collateral is expected to be $34,036,692 (assuming no change in rates before 2018), CED would only have $3,488,545 to fund the Incremental Collateral Pledge, which obviously would not be sufficient to fund an account that is projected to grow to $274,992,746. (P.Br. at 466) Thus, CED would have to invest significant cash in addition to its initial equity investment to fund the Incremental Collateral Pledge. Further, it is important to note that the Sublease Section 3(e) does *not* provide for an acceleration of the Sublessee Loan to assist CED's funding of this account. (*See* Ex. 4 at page 390) In other words, CED once again bears the investment risk of these collateral deposits, not EZH.

### 6. CED Would Face Real Operations Risk During the Shirt-Tail Period or the Retention Option Period

Defendant contends that the "circular" payments from defeasance accounts "virtually eliminate[] any risk of loss on the Transaction." (D.Br. at 17) However, during the Retention Option Period (January 2, 2018 through February 24, 2041), CED will be exposed to significant risk of loss from the operation of the RoCa3 Facility. (P.Br. at 456-60) In addition, as pointed out in the exhibit Defendant relies upon, should CED choose the Sublease Renewal Option, "[d]uring the remaining seven years under the lease [after the Sublease Renewal Term ends], CED could either use the plant itself or lease the plant to third parties and in doing so obtain additional revenue." (Ex. 397 at page 8121) CED would have a very real risk of loss during this seven-year period, as CED must pay its share of the operational costs and these costs may exceed the revenues from CED's portion of the RoCa3 Facility's

output. (P.Br. at 456-460; Tr. 3156-58 (Ellis); Tr. 4804-05, 4809-10, 4828-30, 4832 (Ray); Tr. 5160-61 (LaRue); Tr. 2147-50 (DePlautt); Tr. 2595-98 (Reed))

### 7. CED's Decision to Not Book Residual Value Does Not Indicate that Such Residuals Were Nonexistent or that Con Edison Was Not Concerned With Potential Residual Value

Defendant states at various points that "CED essentially disregarded [the Shirt-Tail and Retention Periods], performed no analysis of [their] potential for additional value to CED, and gave [them] no weight in its decision whether to enter into the EZH LILO Transaction." (D.Br. at 35 (Shirt-Tail Period); *see also id.* at 36 (Retention Period))

To begin with, Defendant's claims are premised on the fact that CED employees did not perform any residual analyses. (*See, e.g.*, Tr. 2165 (cited at D.Br. at 35)) However, CED engaged Deloitte to appraise the RoCa3 Facility. As part of its appraisal, Deloitte projected the cash flows that CED could expect during the Retention Option Period and the Shirt-Tail Period. (P.Br. at 105-06) Defendant's witness LaRue recognized that Deloitte performed this residual value analysis on CED's behalf. (Tr. 5358-60 (LaRue); *see also* Tr. 3965-66 (Bent))

Moreover, CED took numerous other steps, including due diligence and transaction document negotiation, to ensure that the RoCa3 Facility would provide it with positive residual value. First, CED engaged Duke Engineering to perform an in-depth technical analysis of the RoCa3 Facility as part of the effort to ensure that CED was acquiring a leasehold interest in a quality asset and that the RoCa3 Facility had a sufficient remaining economic useful life to provide CED with the

opportunity to sell its share of the facility's output at a profit. (P.Br. at 74, 94-96) Second, CED, together with its due diligence team, visited the RoCa3 Facility to ensure that CED had the necessary rights to sell its share of the RoCa3 Facility's output at a profit. (P.Br. at 87) Third, CED engaged local Dutch counsel, Loeff Claeys, to identify and assist in resolving any potential issues regarding CED's rights to sell its share of the output from the RoCa3 Facility during either the Retention Option Period or the Shirt-Tail Period, and the issues identified by Loeff Claeys attorney Femke Beirman had a significant impact on the executed transaction documents. (P.Br. at 89-90) Fourth, CED and Cornerstone negotiated terms in the Operative Documents to ensure that CED had the necessary rights to sell its share of the output as well as to confirm that its interest in the RoCa3 Facility was protected. (*See*, *e.g.*, P.Br. at 90, 156, 170-71) CED and Cornerstone also negotiated the transactional documents to provide the Operator of the RoCa3 Facility, whether it be EZH or otherwise, with access to natural gas and the high-voltage transmission grid. (P.Br. at 195-96) Finally, Con Edison's own overarching intent to invest within its core competencies evidences an intent to hold assets it knows and has experience with. (*See, e.g.*, Tr. 756-58 (McCartney))

Significantly, as Exhibit 302 discusses, CED began negotiating another transaction involving the lease of power assets, ENECO, but later pulled out. Among the reasons cited in this exhibit was that during the due diligence process, CED had discovered regulatory obstacles to CED's taking control of the asset. (Ex. 302 at pages 6096-97) If CED was not interested in the residual profits to be earned

from operating the facilities in which it invested, this factor would not have played into its decision to withdraw from consideration in ENECO.

Defendant implies that CED's decision not to book earnings attributable to residual value for the Retention Option Period indicates that CED did not seriously acknowledge and consider this option. This assertion is likewise specious. As explained at trial, CED did not book any projected earnings attributable to residual value during the Retention Option Period (or the Shirt-Tail Period) because CED was new to leveraged leasing and wanted to take a conservative position with respect to the financial reporting of its residual value. (P.Br. at 359-60; Tr. 2124-26, 2144-50 (DePlautt); Tr. 559-60 (Burke); Tr. 889-90 (McCartney)) Ellis and Holzman both testified—and the leasing literature supports their statements—that equity investors like CED sometimes book no earnings attributable to residual value in leveraged lease transactions. (P.Br. at 359-60; *see* IAN SHRANK & ARNOLD G. GOUGH, JR., EQUIPMENT LEASING–LEVERAGED LEASING, at 2-25 (4th ed. 2007))[6] This is done since no investor wants to "write down" reported earnings that were not achieved. (P.Br. at 358-60; Tr. 1207-09 (Holzman))

### 8. CED's "Cash-on-Cash Return" Is Not a Function of the U.S. Treasury STRIPs

Defendant repeatedly contends that CED's "cash-on-cash return" "comes from the U.S. Treasury STRIPS." (D.Br. at 50) However, Defendant cites no support for this statement. (*See*, *e.g.*, D.Br. at 14-15, 16 n.15, 19 n.17, 34, 50) Defendant's

[6] This text is hereinafter referenced as *Equipment Leasing*. At trial, *Equipment Leasing* was qualified as a learned treatise under Federal Rule of Evidence 803.18. (Tr. 3165-66, 3234-35 (Ellis))

theory assumes that CED owns the STRIPs in the IJssel Deposit and its return is based on these STRIPs. However, the record establishes that EZH owns the IJssel Deposit (P.Br. at 397-99) and in fact, Bent recognized that these funds belonged to EZH. (P.Br. at 410-11) Further, the record is clear that EZH, not CED, bore all risks of returns on the STRIPs.

The fundamental error in Defendant's statement is its implication that CED's return on the RoCa3 Transaction depends solely on the ultimate value at maturity of the Treasury STRIPs. This is not true. CED's return on the RoCa3 Transaction derives from EZH's contractual obligation to make the payments required under the Sublease, not from the collateral held by EZH. EZH can make the decision whether or not to use the funds in the IJssel Deposit to satisfy its contractual obligations, and it will make that decision based on its own business interests. As the parties have stipulated, if the funds in the IJssel Deposit are insufficient to fully satisfy EZH's obligations or unavailable for any reason, Stichting IJssel is not obligated to make other funds available to satisfy EZH's payment obligations. (Stip. ¶216) Instead, those funds have to come from EZH: EZH's obligation to pay is not abrogated by the creation of the IJssel Deposit. (Stip. ¶217) Similarly, if the IJssel Deposit has a surplus of funds, as would happen if EZH paid the Sublease Purchase Option Price in cash, EZH would retain the funds in the IJssel Deposit. (Stip. ¶225)

Even assuming the IJssel Deposit functions without a default, Defendant's statement is simplistic and incorrect. First, if EZH were to exercise the Sublease Purchase Option—as Defendant apparently assumes—EZH would be required to

pay the Sublease Purchase Option Price of $215,450,949.20 (Stip. ¶¶165, 165A) EZH can choose to pay this price by transferring the remaining STRIPs in the IJssel Deposit plus the balance in cash, or by paying the entire price in cash. (P.Br. at 171)

Second, if CED exercises the Sublease Renewal Option, CED would receive payments expected to produce a minimum total profit on the RoCa3 Transaction of $101,538,462 from EZH in the form of Sublease Basic Rent, Sublease Renewal Rent and Sublessee Loan Payments. (P.Br. at 180) EZH need not use the IJssel Deposit to pay these obligations (Ex. 22 at page 1043), but rather may choose to pay them from any of its other sources. (Ex. 22 at page 1043) Further, even if EZH uses the IJssel Deposit to help defray the cost of these obligations, as described in Facts Section I.A.3(a), there is no reason to believe that the IJssel Deposit will be sufficient to cover EZH's obligations. (*See* P.Br. at 174-75) Again, CED's return under the Sublease Renewal Option in no way depends upon the value of the Ijssel Deposit; EZH bears the investment risk on that account.

Third, again under the Sublease Renewal Option, CED could potentially earn further profits from the operation of the Facility during the Shirt-Tail Period from 2034 to 2041. (P.Br. at 454-480) Deloitte estimated that CED could expect pretax profit of $197,898,146.15 from the operation of the RoCa3 Facility during the Shirt-Tail Period. (P.Br. at 360-61) None of these cash flows would come from the IJssel Deposit.

Finally, if CED exercises the Retention Option, Deloitte estimated that CED could earn $729,918,996.19 in pretax profit from the operation of the RoCa3 Facility during the Retention Option Period. (P.Br. at 362) None of these cash flows would be related to the IJssel Deposit.

### 9. HBU and ABN AMRO Are Separate Entities

At various points, Defendant makes the unsupported and spurious allegations that ABN AMRO acted as both lender and debt defeasance holder in the RoCa3 Transaction:

- "[T]he funds for the loan were furnished by ABN AMRO," and "ABN AMRO recognized this when early discussions concerning provision of the loan for the transaction were underway with EZH." (D.Br. at 12)
- "The EZH LILO Transaction is structured so that the loan proceeds remain with ABN AMRO." (*Id.*)
- "ABN AMRO treated the loan as if it stood on both sides of the deal" and that therefore "the representations in section 10(c) of the Participation Agreement (JX 1, Bates 42) lack any real meaning." (*Id.* at 13 n.11)
- "[T]he [loan] funds [never left] ABN AMRO (other than the split second transfers of ownership of the ABN AMRO Account that occurred at closing)." (*Id.* at 14)
- "Capstar also arranged the lenders, ABN AMRO and its subsidiary HBU . . . ." (*Id.* at 52)

Defendant would like to pretend these entities are the same and makes unsupported allegations about the impact, if any, of the relationship between the two.

As its primary support for these various claims, Defendant cites a fax it claims is evidence of ABN AMRO's understanding that it would provide the loan

funds itself. (D.Br. at 12) This fax, however, specifically proposes that HBU act as lender in the transaction. (Ex. 401 at page 8140) Moreover, the Closing Funding Memorandum confirms that HBU was the Lender, not ABN AMRO as claimed by Defendant. (Ex. 43 at pages 1424, 1438-40) HBU had funds for the loan in a deposit account it owned at ABN AMRO (*id.*), and it transferred ownership of this account to WTC on December 15, 1997. (*Id.* at 1438) Nothing in this document indicates that ABN AMRO owned or provided the loan funds. Defendant recognizes as much when it states that "HBU transferred its rights to the ABN AMRO account to CED (by way of the trust)." (D.Br. at 13)

There is no question that HBU and ABN AMRO are legitimate, separate legal entities, each with its own assets and liabilities. (*See*, *e.g.*, Ex. 1 at page 42 (containing HBU's warranties); Tr. 3802-04 (Bent) (agreeing that the banks are separate institutions)) This is no different than affiliates in the Citigroup company or GE company working together. The recent negotiations for the purchase of ABN AMRO, in which HBU will be divested as part of the plan of acquisition, further demonstrate that ABN AMRO and HBU are separate banking enterprises. *See* http://www.abnamro.com/pressroom/releasedetail.cfm?releaseid=303044 (ABN AMRO press release announcing the sale of its subsidiary Hollandsche Bank Unie, N.V. ("HBU") relating to Fortis's acquisition of ABN AMRO);[7] *Fortis Says*

[7] Pursuant to Federal Rule of Evidence 201(b) and (d), Con Edison requests that the Court take judicial notice of the fact that ABN AMRO is divesting HBU, pursuant to an agreement with the Commission of The European Communities ("European

*Will Complete Divestment of Hollandsche Bank by October*, FORBES, Feb. 28, 2008, *available at* http://www.forbes.com/feeds/afx/2008/02/28/afx4707972.html?partner=email.

---

Commission"), in order to gain approval for Fortis's acquisition of assets of ABN AMRO Holdings. The document contained in Appendix A is a true and correct copy of ABN AMRO's press release.

Judicial notice allows a fact to be introduced into evidence if the truth of that fact is so well known that it cannot be refuted. *See Dippin' Dots, Inc. v. Frosty Bites Distrib., LLC*, 369 F.3d 1197, 1204 (11th Cir. 2004) ("Judicial notice is a means by which adjudicative facts not seriously open to dispute are established as true without the normal requirement of proof by evidence."). Rule 201(d) states, "A court shall take judicial notice if requested by a party and supplied with the necessary information." Fed. R. Evid. 201(d) (West 2007); *see also Johnson v. Goldstein*, 864 F. Supp. 490, 494-95 (E.D. Pa. 1994), *aff'd*, 66 F.3d 311 (3d Cir. 1995). Rule 201(f) allows judicial notice to "be taken at any stage of the proceeding." Fed. R. Evid. 201(f); *see also Valore v. Islamic Republic of Iran*, 478 F. Supp. 2d 101, 104 n.1 (D.D.C. 2007).

The fact of ABN AMRO's commitment and divestiture of HBU satisfies Rule 201(b) as it is "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). The official nature of this release compares favorably to other sources courts have judicially noticed. *See, e.g., O'Toole v. Northrop Grumman Corp.*, 499 F.3d 1218, 1225 (10th Cir. 2007) (taking judicial notice of information on website since it is "not uncommon for courts to take judicial notice of factual information on the world wide web"); *Chhetry v. U.S. Department of Justice*, 490 F.3 196, 199-200 (2d Cir. 2007) (approving of notice taken of information on world wide web); *City of Monroe Employees Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 655 n.1 (6th Cir. 2005) (taking judicial notice of a definition provided on web site); *In Re NAHC, Inc. Securities Litigation*, 306 F.3d 1314, 1331 (3d Cir. 2002) (holding the district court did not err in taking judicial notice of facts contained in newspaper articles); *Ieradi v. Mylar Lab., Inc.*, 203 F.3d 594, 598 n.2 (3rd Cir. 2000) (appellate court taking judicial notice of a newspaper article).

Fortis's agreement to divest HBU is an adjudicative fact supported by an official document, the accuracy of which cannot reasonably be questioned. These attributes, along with the relevance of the fact to the issues presented, make the fact the proper subject of judicial notice.

### 10. The Email Referring to GE Capital's Leasing Strategy Does Not Reflect on "Typical" Industry Standards and Risks

Defendant cites Exhibit 1118 in support of the claim that CED believed the RoCa3 Transaction did not possess the "typical risks" of a leveraged lease and for the proposition that "CED chose to focus on tax risks, and eliminate credit and residual risks from its leasing transactions." (D.Br. at 53 n.54, 85-86)

The document simply cannot support such an interpretation. It was created in connection with CED's consideration of the ENECO lease-leaseback transaction in 1998 (not the RoCa3 Transaction, which had already closed), and contains DePlautt's answers to several general questions regarding lease-leaseback transactions. (Ex. 1118 at pages 16502-04) In response to a question regarding GE Capital, DePlautt explained how GE Capital's risk profile differed from CED's risk profile in that CED was not taking the "credit risks and residual risks that GEC takes." (Ex. 1118 at page 16502) CED wanted to take a more conservative position regarding these risks. One reason for this was that GE Capital had the "infrastructure necessary to take the credit risks and residual risks" that required a significant investment in infrastructure by GE Capital to "deal with lessee payment defaults" (credit risk) and "remarketing of assets at the end of the lease term" (residual risk). (Ex. 1118 at pages 16502-03)

At trial, DePlautt explained that he understood that GE was not only "adept at negotiating with lower tier credit parties" and managing that credit risk, but also had "terrific infrastructure" to analyze and "buil[d] . . . residual value into their

base case economics." (Tr. 2144) Because CED did not have this expertise and leasing infrastructure, CED instead conservatively analyzed the transaction without assuming residual value in its base case economics for financial reporting purposes so as to avoid the need to restate earnings if the assumed flows are not realized. (*See* Tr. 2145-47 (DePlautt); Tr. 1206-09 (Holzman)) CED understood that over a 34-year period many things can change, each of which can have a dramatic effect on the actual future cash flows that CED would be able to obtain. (P.Br. at 359-60; Tr. 2124-26, 2144-50 (DePlautt); Tr. 559-60 (Burke)) As confirmed by Ellis and a passage from a learned treatise on equipment leasing (P.Br. at 360), CED's conservative decision is consistent with leasing industry practice. (P.Br. at 360) It does not negate CED's understanding that the assets "absolutely" had residual value that could add to CED's economics when realized. (Tr. 2145-47 (DePlautt)) Moreover, although CED attempted to limit credit risk, it was only able to "reduce credit risk," not eliminate it. (Tr. 2145-47)

Tellingly, Defendant at trial did not once question DePlautt regarding his explanation of Exhibit 1118. Indeed, the key language in Exhibit 1118 does not state, as Defendant erroneously claims at footnote 54 (page 53) of its Opening Post-Trial Brief, that "CED chose to . . . eliminate credit and residual risks from its leasing transactions." Rather, Exhibit 1118 actually states that "CED has chosen to seek to exclude, *to the extent reasonably possible*, the credit risk and residual value risk *that GE Capital regularly accepts*." (Ex. 1118 at page 16502 (emphasis added)) Defendant's editing of this document is revealing.

Defendant's leasing expert Ray supported DePlautt's testimony. Ray explained that GE Capital had a "reputation" for engaging in many leasing "market segments" and for taking on higher credit and residual value risks than other leveraged lease equity investors such as EDS, Ray's own former leasing employer. (Tr. 4989) Further, EDS engaged in leveraged leases with the U.S. Government as lessee (as well as with other lessees with very high credit ratings), which Ray agreed were on par with EZH's establishment of the IJssel Deposit holding U.S. Treasury Bonds as credit support for its obligations. (Tr. at 4916-19) It was Ray's opinion that EDS's leasing transactions with the U.S. Government exposed EDS to sufficient credit risk for those transactions to have economic substance. (Tr. 4918-19)

### 11. Defendant's Repeated References to the Transaction as "Tax Advantaged" or a "Tax Shelter" Are Argumentative and Misleading

Defendant repeatedly labels the RoCa3 Transaction in ways that refer to the tax benefits of the RoCa3 Transaction. By calling the RoCa3 Transaction a "tax shelter" or by referring to CED documents that described the transaction as a "tax advantaged" investment, Defendant hopes to imply that the transaction is something other than what it represents to be. (*See*, *e.g.*, D.Br. at 47, 48 (citing Ex. 171 at page 4196)) The use of such argumentative labels is inappropriate in a statement of the facts.

Indeed, the RoCa3 Transaction is no different in this regard from other legitimate leasing transactions. All leveraged leases are "tax advantaged," as

Defendant's leasing expert Ray agreed. (Tr. 4843; *see also* Tr. 1252 (Holzman) (testifying on cross that all leveraged lease transactions are "tax oriented"); Tr. 3232-34 (Ellis) (testifying that like all leveraged lease transactions, the tax benefit in the RoCa3 Transaction is the deferral of taxes through depreciation, rental deductions and interest deductions)) Tax benefits are among the many reasons equity investors make leveraged lease investments. (P.Br. at 257-59; Tr. 4843, 4850-51 (Ray) (testifying that all leveraged leases are "tax advantaged" and that he would have been "stunned" if CED had not taken into account the tax benefits of leveraged leasing during its review of the proposed transaction); Tr. 1252 (Holzman) (testifying that all leveraged leases have tax benefits); Tr. 3173-74 (Ellis) (testifying that the deferral of tax is a common feature of all leveraged lease transactions)) In fact, this tax treatment was one reason Ray's former employer, EDS, engaged in leveraged lease transactions, all of which Ray presumably thought were perfectly legitimate investments. (Tr. 4920)

**B. Regulatory and Statutory Background (D.Br. at 8)**

Defendant here and elsewhere throughout its brief provides an incomplete description and makes various misrepresentations of the regulatory and statutory background governing this case. Con Edison's response to this section is discussed below at Argument Section III.D.

**C. Structure of the RoCa3 Transaction (D.Br. at 9-41)**

As indicated above, due to Defendant's numerous inaccurate and/or misleading statements throughout its Opening Post-Trial Brief, Con Edison

responds to the specific statements in Defendant's Opening Post-Trial Brief on a line-by-line basis here in Sections C through E.

**1. Defendant's General Allegation that "[t]o this Day, EZH Owns and Operates the RoCa3 Facility as if the LILO Transaction Never Occurred" (D.Br. at 10-11) is Untrue and Unsupported by the Facts Defendant Cites in Support**

Defendant makes the very broad allegation that EZH continues to own and operate the RoCa3 Facility "as if the [RoCa3] Transaction never occurred." (D.Br. at 10) This argumentative allegation misconstrues the record.

(1) Defendant states that "[a]s was the case prior to the Transaction, EZH has maintained possession of the RoCa3 Facility, continues to operate the facility in the normal course of its energy generation business, invests in major capital improvements to the RoCa3 Facility, remains responsible for all costs associated with its use and maintenance, and retains all of the income generated from the operation of the RoCa3 Facility." (D.Br. at 10 (citations omitted)) Defendant's leasing expert Ray, who opined as to those aspects of the RoCa3 Transaction that he thought were unusual (Tr. 3709-10, 3762-67), did not identify any of these aspects of the transaction as unusual. Instead, Ray, the other leasing experts and Holzman, who employed his own leasing experience in advising CED, all testified that these aspects of the transaction are normal features of leveraged lease transactions. (Ex. 10073 (Ellis Initial Report) at page 19996; Tr. 3170-71 (Ellis); Tr. 3800-01, 3843-61, 3863 (Bent); Tr. 4880 (Ray); Tr. 1343 (Holzman))

(2) Defendant states that "EZH must only maintain insurance of the same type it maintains on other facilities it operates. Similarly, EZH is required to use the same maintenance practices it uses at its other facilities. . . . Simply put, EZH undertook essentially no responsibilities greater than it already held as owner of the RoCa3 Facility." (D.Br. at 10 n.8 (citations omitted)) As an initial matter, EZH's obligations to maintain and insure the RoCa3 Facility at a similar level as similar facilities (*i.e.*, in accordance with Prudent Industry Practice) significantly changed EZH's relationship to the RoCa3 Facility. (*See generally* P.Br. at 155-59) Before entering into the RoCa3 Transaction, EZH was not subject to any maintenance or insurance requirements: a failure to maintain the facility would have simply resulted in a badly maintained facility, and therefore a decrease in the facility's value to EZH, and a failure to maintain insurance at a specific level would mean simply being less insured. Due to the consummation of the RoCa3 Transaction, however, EZH's failure to maintain the property and maintain certain types and amounts of insurance could result in EZH's being in default under the Sublease and entirely losing possession of the facility. (Tr. 2933-35, 3063 (Mintun); Tr. 1138 (Holzman); Tr. 3138-40 (Ellis))

Defendant also ignores the fact that the RoCa3 Transaction limited EZH's ability to sell or lease its interest in the RoCa3 Facility. (P.Br. at 157-58, 372-87) While Defendant cites Bent's initial report for the proposition that EZH's obligations toward the RoCa3 Facility did not change as a result of the RoCa3 Transaction, Defendant fails to note Bent significantly qualified this conclusion at

trial, admitting not only that in some circumstances EZH's rights and obligations had changed, but also that in other circumstances, Bent was simply not aware of whether or not the obligations had changed. (Tr. 3878-81 (Bent))

(3) Defendant states that "as long as EZH's sublease rent is 'paid,' CED cannot use or possess its leasehold interest in the RoCa3 Facility until 2018 . . . . (Stip. ¶180; Tr. 559-62 (Burke))." (D.Br. at 10-11) Defendant's statement is false and not supported by Defendant's citations. First, CED is using its Lease Interest throughout the Sublease Term when it subleases the Facility to EZH in exchange for rental payments. Second, as Kevin Burke, Con Edison's current CEO, explained in the very citation Defendant uses, CED may exploit the economic benefits from the plant's operation prior to 2018 if EZH does not comply with all the terms of the Sublease. (Tr. 559-61 (Burke)) For example, CED can cause EZH to return the Undivided Interest to CED if EZH fails to comply with its maintenance or insurance obligations, if EZH's Representations and Warranties are found to be false or misleading in any material respect, if EZH becomes insolvent or is declared bankrupt, or if EZH declares that the RoCa3 Facility has become technologically or economically obsolete and CED disagrees and elects to try to make money from its interest in the Facility. (Stip. ¶¶158, 163; Tr. 1150, 1157-58 (Holzman); *see generally* P.Br. at 159-65)

(4) Defendant erroneously states that "CED cannot actually use or possess the RoCa3 Facility itself, because it possesses only a 47.47% leasehold interest, and the remainder of the facility (the majority share) is subject to a LILO transaction

with Banc One Leasing Corp. (Stip. ¶58 n.2; JX 402, Bates 8143; Tr. 2867 (Mintun))." (D.Br. at 11) Defendant's citations support nothing more than the uncontested fact that Banc One Leasing Corp. also entered into a lease and sublease with EZH on December 15, 1997 and was a signatory to the Participation Agreement. The record is uncontradicted, however, that leveraged lease transactions involving facilities like the RoCa3 Facility commonly have numerous equity investors, each owning an undivided interest in the facility, and that ownership arrangements involving multiple owners do not prevent each owner from sharing in the economics of the facility. (Tr. 1041 (Holzman); Tr. 2463-67, 2554-55 (Goulding)) In fact, such arrangements are common enough in the power sector to have been considered in one of Defendant's own Revenue Rulings. (*See* Rev. Rul. 82-61, 1982-1 C.B. 13; *see also* P.Br. at 284-87 (summarizing this ruling))

EZH represented to CED in the Participation Agreement that CED is entitled "on a commercially practicable basis" to use, operate and possess the RoCa3 Facility. (Stip. ¶107(ii); Ex. 1 at pages 36-37) As Con Edison's Opening Post-Trial Brief sets forth in detail at pages 188 through 197, CED has the opportunity after the Sublease terminates (including a Premature Termination Event) to (1) approve certain operational decisions, (2) schedule for sale its portion of the RoCa3 Facility's output and retain the revenues from such sale, (3) approve the annual Operating Expense Budget, (4) vote to remove EZH as Operator, and (5) gain access to the necessary auxiliary facilities to operate the RoCa3 Facility. CED is also obligated upon the termination of the Sublease to pay an Operating Fee to the Operator, as well as its

share of the Operation and Maintenance Expenses. (*See* Stip. ¶269; Ex. 11 at pages 738, 750; Tr. 1186-89 (Holzman))

Given these rights, it is unclear what definition of "use or possess" Defendant is relying upon: the record is uncontradicted that CED "does not need to operate the plant in order to . . . procure inputs or sell outputs and reap the benefits of the inputs and the outputs."[8] (Tr. 2250 (DePlautt); *see also* Tr. 1041-42 (Holzman); Tr. 2554-55 (Goulding)) Although Defendant implies that CED could not become Operator of the Facility, Con Edison's Opening Post-Trial Brief explains the procedure by which EZH can be removed and another Operator, such as CED, can be installed. (*See* P.Br. at 193-195) Defendant's leasing experts agreed not only that EZH can be removed as Operator of the facility pursuant to the Facility Operating Agreement, giving CED the opportunity to operate the RoCa3 Facility itself, but also that CED could seek a residual value from the facility by selling its share of the plant's output for a profit or loss. (Tr. 4829-30, 4865 (Ray); Tr. 5106 (LaRue); Tr. 3931-33 (Bent); *see also* Tr. 3156-57, 3160-61 (Ellis))

(5) Defendant states that "the specifics of [how CED would obtain its share of the output and pay its share of expenses] remain[] undefined in large part. (*See* JX 11, Bates 738, 747)." (D.Br. at 11 n.9) However, Defendant cites only to provisions in the Facility Operating Agreement that require future determination of the annual Operating Expense Budgets and Operating Fees, which CED has the obligation to approve. Defendant's contention ignores various other provisions

[8] The IRS has implicitly recognized this logic. (*See, e.g.*, Revenue Ruling 82-61; P.Br. at 284-87)

setting forth in detail the interaction of the parties with the facility. For example, the Facility Operating Agreement includes provisions defining Entitlement Shares and voting rights (Ex. 11 at page 740); procedures for removing the Operator (*id.* at pages 736-37); maintenance operations the Operator cannot make without approval of the Facility Users (*id.* at pages 740-42, 744-746); procedures for scheduling the capacity from the facility, the surplus energy from the facility and station service requirements (*id.* at pages 750-52); and billing and dispute procedures. (*Id.* at 755) In addition, the parties entered into the Common Facilities Use Agreement (Ex. 12), Facilities Support Agreement (Ex. 13) and Facilities Access Agreement (Ex. 14), each described in detail at Con Edison's Opening Post-Trial Brief at pages 195 through 197.

In fact, Thomas, Defendant's own expert, disagrees with Defendant's statement: at trial, he qualified the statement in his report that the RoCa3 Transaction's contractual features were "unstructured." (P.Br. at 435-36) When Thomas drew this initial conclusion he "had not read [the transaction documents] very extensively," as he had only "sort of scann[ed] them . . . looking for certain kinds of arrangements that . . . are in the economics literature." (Tr. 4608) After looking through these provisions, Thomas admitted he "did not do a thorough search" initially and agreed that the documents were "fairly detailed" and "fairly structured" regarding the operation of the RoCa3 Facility after the termination of the Sublease. (Tr. 4633-35)

### 2. Defendant Misstates Various Facts Related to the Initial Basic Rent Payment (D.Br. at 11-16)

Much of Defendant's discussion in the "Lease Rent" section of its brief describes the funding and use of the IJssel Deposit and Sublease Deposit, as well as the Final Basic Rent Payment. Con Edison will address these statements together with Defendant's other descriptions of those deposits (D.Br. at 16-24) and the Final Basic Rent Payment (D.Br. at 39-41) below in Facts Sections I.C.3., I.C.4. and I.C.9. Here, Con Edison addresses Defendant's statements specific to the Initial Basic Rent Payment.

(1) Defendant states, "For tax purposes, the $120.1 million advance rent was allocated to the first five years of the lease term, and the deferred $831.5 million rental payment was allocated to the remaining years of the transaction. . . ." (D.Br. at 11-12) Defendant slightly misstates the allocation: the Initial Basic Rent Payment was allocated to the first five years of the lease (the periods ending on January 2 in the years 1998 through 2002), as well as to part of the rental payment due for the rental period ending January 2, 2003. (Stip. ¶120) The Final Basic Rent Payment was then allocated to the remaining rental periods of the Lease Term, including a part of the rental payment in 2003. (*Id.*)

Defendant alleges that "the funds for the loan were furnished by ABN AMRO" and that "ABN AMRO recognized this when early discussions concerning provision of the loan for the transaction were underway with EZH." (D.Br. at 12) These claims are false, as discussed above at Facts Section I.A.9.

(2) Defendant states that the amount of cash EZH retained after funding the IJssel Deposit and Sublease Deposit (*i.e.*, its net present value benefit) "is driven by CED's tax benefits." (D.Br. at 15) The transcript citation Defendant provides does not support Defendant's assertion. To the contrary, EZH's net present value benefit does not depend on CED's tax benefits or the net amount of Federal income tax CED will have to pay during the course of the RoCa3 Transaction. (*See* Tr. 3173-75 (Ellis)) Rather, EZH's net present value benefit, as in all leveraged lease transactions, is the present value of its cash inflows in excess of the present value of its cash outflows. (Ex. 10073 (Ellis Initial Report) at pages 19996, 19998) Here, EZH's cash inflows consist of CED's $120 million Initial Basic Rent Payment and $831 million Final Basic Rent Payment. EZH's cash outflows include the sublease rents and related Sublessee Loan payments, as well as any other payments EZH may have to pay in case of a premature termination event or if EZH elects the Sublease Purchase Option. As Holzman explained in detail (*see* P.Br. at 75-76, 80-83), EZH's anticipated net present value benefit from the RoCa3 Transaction was driven by changes in pricing inputs for the transaction, such as debt rates and the asset's cost. During the term of the RoCa3 Transaction, each of EZH's cash outflows would expose EZH's net present value benefit to interest rate and currency exchange risks. To limit this exposure, EZH established the Sublease Deposit and IJssel Deposit for its own benefit to act as security for certain of its future payment obligations. (Ex. 288 at page 5638; Tr.

3205-06 (Ellis)) By doing so, EZH attempted to protect at closing, under some but not all scenarios, the present value of its cash outflows.

### 3. Defendant Makes Numerous Incorrect Statements Regarding the Mechanics of the Sublease Deposit (*i.e.*, the Debt Defeasance Account) (D.Br. at 16-18)

(1) Defendant states that "no payments are due to be made" from "1997 through 2003 and part of 2004." (D.Br. at 16) While no payments were due on the HBU loan or from the Sublease Deposit during that time period (Stip. ¶197; Ex. 8 at page 666), payments of Sublease Basic Rent Payment were due. (Stip. ¶139) As described in Con Edison's Opening Post-Trial Brief, these payments form the principal of the Sublessee Loan. (P.Br. at 142)

(2) Defendant's statement that CED directed that "all rental payments (coming from ABN AMRO under the Rotte Agreement) be made directly to HBU" (D.Br. at 16-17) is overbroad. CED directed that EZH pay rental payments *other than Excluded Payments and Excluded Portions* directly to HBU *until HBU's lien is discharged*, *i.e.*, until the nonrecourse loan is paid off. (Stip. ¶194A) Some of these sublease rental payments (but not all) are expected to be paid by EZH out of the Sublease Deposit held at ABN AMRO on EZH's behalf. But EZH has recourse liability for all such sublease rental payments regardless of where it hopes to source those funds.

(3) Defendant states that "the remaining balance in the Debt Defeasance Account would always be sufficient to cover the remaining debt service on the HBU loan." (D.Br. at 17; *see also id.* at 14) This statement is true *so long as* ABN

AMRO continues to make the payment obligations it agreed to make under the Sublease Deposit, Pledge and Repledge Agreement (Stip. ¶199) and so long as ABN AMRO continues to pay the interest on the account at the agreed-upon rate. Should ABN AMRO fail to honor these obligations (*e.g.*, in case of insolvency), the Sublease Deposit would be insufficient to cover the remaining debt service obligations on the HBU Loan. This is a true risk, as evidenced by the recent sudden collapse of financial titan Bear Stearns. (P.Br. at 402; *Timothy Aeppel, et al., Bear Stearns's Ripples Reach Corporate Sector*, WALL ST. J., MARCH 18, 2008)

(4) Defendant states that "[t]he transfer from the Rotte Foundation to ABN AMRO was irrevocable" and that "[u]pon transfer, the funds in the Debt Defeasance Account became ABN AMRO's asset, pledged to HBU" which "[n]either EZH nor its creditors has any right to the money in the event of EZH's bankruptcy." (D.Br. at 17) As explained in Con Edison's Opening Post-Trial Brief, the defeasances used in the RoCa3 Transaction are economic defeasance accounts; an obligor does not discharge its obligation by establishing an economic defeasance account, but remains responsible for any payment resulting from a shortfall in the defeasance account, *which remains the property of the obligor*. (P.Br. at 146-47; 398-404; Tr. 3189-96 (Ellis)) Defendant cites no support for its contention that the Sublease Deposit funds become the asset of ABN AMRO; it cannot because the contention is false.

Further the transfer was not irrevocable, and the funds would be returned to EZH if no longer necessary to secure its obligations. (*See generally* R. Argument Section II.F.) For example, if CED exercises the Retention Option, the balance of the Sublease Deposit would be paid to EZH, which could use the funds for any purpose. (Stip. ¶¶204, 251) Similarly, EZH was allowed to replace the Sublease Deposit with other acceptable collateral if ABN AMRO's credit rating fell below A2 (Moody's) or A (S&P). (Ex. 1 at page 66) Bent agreed that EZH was entitled to the funds in the defeasance accounts. (Tr. 3804-06)

(5) Defendant states, "If EZH elects the Sublease Purchase Option, ABN AMRO will cause HBU to credit the remaining $123,615,472 [in the Sublease Deposit] . . . toward CED's obligations to HBU." (D.Br. at 18) Defendant has confused the parties. The Stipulation paragraphs cited by Defendant explain: if EZH chooses to exercise the purchase option, *EZH* can cause *ABN AMRO* to pay the balance of the Sublease Deposit owed by EZH to HBU, and this payment will be applied first as a payment of sublease rents by EZH and then HBU will provide credit toward CED's nonrecourse debt. (Stip. ¶236)

(6) Defendant alleges that if EZH elects the Sublease Purchase Option, "the HBU Loan will be paid in full without cost to CED." (D.Br. at 18) The use of the term "without cost" here—as is its use in other areas of Defendant's Factual Statement—is argumentative, inaccurate and misleading. EZH could pay the Sublease Purchase Option Price in part through ABN AMRO's transfer of the Sublease Deposit balance directly to HBU in satisfaction of CED's remaining debt,

but this constitutes a direct cost to CED. (*See* R. Facts Section I.A.2(a)(2)) Were no payment due on the HBU loan, EZH would pay the entire Sublease Purchase Option Price to CED, and CED would then be able to retain the entire $215 million. Instead, however, CED here uses a portion of the Sublease Purchase Option Price to repay its HBU loan, a "cost" to CED.

(7) Defendant states that because there is a mechanism "to replace ABN AMRO as the debt defeasance holder with other more secure defeasance mechanisms . . . the only way that the debt defeasance mechanism would not perform its designated function . . . is if the parties to the transaction decided not to use the alternative debt defeasance mechanisms provided in the Transaction and ABN AMRO subsequently defaulted on its obligation to make the payments to its own subsidiary HBU. This is simply an unrealistic result." (D.Br. at 18) Defendant's assertion of an unrealistic result is not supported by anything in the record. Defendant's conclusory statement is also inaccurate in numerous respects. The mechanism to which Defendant refers is found at pages 66 through 68 of the Participation Agreement. (Ex. 1) This provision provides that EZH may choose to replace the Sublease Deposit with Acceptable Substitute Credit Protection (*see* Ex. 1 at pages 113-15) if ABN AMRO's rating falls below A2 (Moody's) or A (S&P); contrary to Defendant's assertion, it does not contain a general replacement provision for EZH. (Ex. 1 at pages 66-68)

Defendant's statement assumes that neither ABN AMRO (assuming it retains its high credit score), nor the entity providing the Acceptable Substitute

Credit Protection (should ABN AMRO be replaced) could "realistically" default on its obligations. The record provides ample evidence to the contrary regarding the default risk of very highly rated entities. (*See* P.Br. at 402-14)

Defendant also mistakenly assumes that the replacement of ABN AMRO would be a simple, sure process. The provision, however, states that in certain circumstances HBU and CED would have to agree to a new interest rate on the HBU loan; in others, EZH would have to find a new lender to purchase the debt from HBU, and HBU would have to negotiate for that sale. (Ex. 1 at pages 66-67) Defendant's failure to acknowledge or analyze these potential obstacles leads to its incorrect assumption that the Acceptable Substitute Credit protection process is simple, quick and easy.

Finally, Defendant's claim that the Acceptable Substitute Credit Protection is a "more secure defeasance mechanism[]" is entirely unsupported by the record. (D.Br. at 18) Defendant cites nothing to sustain the notion that these alternative forms of collateral are preferable to the Sublease Deposit. Further, the Acceptable Substitute Credit Protection may take the form of one or more Letters of Credit (Ex. 1 at page 114), which are not defeasance mechanisms at all. (*See* P.Br. at 465, 469)

(8) Defendant describes EZH's obligation to pay Sublease rents as "a backstop to the[] various defeasance protections." (D.Br. at 18) This statement is contrary to the terms of the agreement between CED and EZH (as well as the testimony of witnesses); *it is the defeasance accounts that serve as backstops* and EZH that bears the payment obligation. Defendant's attempt to recharacterize the

transaction would rewrite the negotiated rights and obligations of the parties contained in the Operative Documents. The defeasances used in the RoCa3 Transaction are economic defeasance accounts. (P.Br. at 146-47; 398-404) The accounting standards and applicable tax law recognize that the obligor does not discharge its obligation by establishing an economic defeasance account, but rather: (1) the obligor remains responsible for any payment resulting from a shortfall in the defeasance account; (2) the obligee does not have access to the account, which remains the property of the obligor; and (3) the obligor has the right to any principal in the account in excess of the required payment obligations. (P.Br. at 146-47; 398-404; Tr. 3189-96 (Ellis)) These characteristics are true of the IJssel Deposit and Sublease Deposit in the RoCa3 Transaction. (P.Br. at 143-55 ; Tr. 3190-97 (Ellis))

Defendant's leasing expert Bent agreed that EZH owes the Sublease Rent, as the following colloquy shows:

Q. Well, EZH owed sublease rents in this transaction; is that correct, under the sublease?

A. Under the documents, yes.

Q. Do you have any reason to believe the documents don't create enforceable obligations?

A. *I have no doubt that they create enforceable obligations*. I have some question as I raised in my report, and again on Friday, that those obligations are paid in cash.

Q. Well, okay. But EZH does have obligations to pay sublease rent and those obligations are satisfied by payments that come out of various defeasance deposits under certain circumstances; is that right?

A. That is right, yes.

Q. And so EZH's obligations are being paid by these amounts, I would take that to mean that there has been a transfer of wealth on behalf of EZH in that regard?

A. *I think generally that's true. There are some exceptions in this transaction, I believe, but if your question is when EZH owes sublease rent under the sublease to the sublessor, ConEd, and that rent is paid in cash from the debt defeasance account, and is credited as a payment of sublease rent, which is, in fact, paid to HBU to pay down the leveraged loan, my answer to your question would be, yes, that is correct.*

(Tr. 3804-06 (emphasis added))

(9) Defendant states that "the source of the funds used to satisfy the rental payments and HBU loan repayments" is atypical because when "investors in traditional leverage[d] lease transactions . . . structure the transaction such that the lessee's rental payments satisfy the outstanding debt, the funds . . . come from the lessee's operation of the asset (or at least its operations generally), not from the funds fronted by the 'loan' itself." (D.Br. at 15-16 n.14) Defendant's conclusory statement is not supported by the record. First, it is uncontradicted that the funds used to pay EZH's rental obligations (which, in turn, are then used to satisfy CED's nonrecourse loan payments) are EZH's funds. (Tr. 3805-06 (Bent) (agreeing that when cash is paid out of the Sublease Deposit and credited against EZH's Sublease Rent, this effects a "transfer of wealth on behalf of EZH")) The fact that EZH chose to use a defeasance mechanism does not alter this fact: EZH's sublease rental payments were fully recourse to EZH and due come "hell or high water." (Stip. ¶142; Ex. 4 at page 432; Tr. 1132-33 (Holzman)) The existence of the Sublease Deposit, an economic defeasance, at no point

relieved EZH of its role as primary obligor on these rental payments. (P.Br. at 145-47)

Moreover, Defendant's focus on EZH's choice (*see* Ex. 288 at page 5638) to set aside funds to meet its obligations indicates that there is something problematic with the use of defeasance. Defendant cites no legal precedent in support of its allegation that tax law requires a lessee to pay rent from funds generated by its business operations. This is unsurprising, for there is no such precedent. This claim is also contrary to business realities. As Defendant's own experts testified, defeasance is a common commercial technique, especially in cross-border transactions. (P.Br. at 143-45, 227; Tr. 3760-61, 3819-20 (Bent))

(10) Defendant states that McCartney recognized the Sublease Deposit feature was "unique" when "she noted that (contrary to the structure of the actual Transaction) it would be 'logical' that EZH's ability to make its rental payments would derive from its ability to generate revenues from the operation of the RoCa3 Facility." (D.Br. at 15-16 n.14) Defendant's statement mischaracterizes McCartney's testimony. She testified as follows:

> Q. You don't believe that the returns from this project are tied to the output of the facility, do you?
>
> A. I'm really not intimately connected with how they work. But I— it makes sense to me that the facility operates, and it generates revenue, and revenue enables the lease partner to make payments. Now, that's logical. I don't know how that relates to the agreements.
>
> Q. So that's just based on your general—
>
> A. Yes.

(Tr. 951) She made no statement comparing the structure of this transaction to a typical lease structure, or even to her understanding of a "logical" lease structure. In fact, EZH's rent obligations do conform to the description McCartney gave: because they are due come "hell or high water" (Stip. ¶142; Ex. 4 at page 432; Tr. 1132-33 (Holzman)), and because the existence of the Sublease Deposit, an economic defeasance, does not relieve EZH of its role as primary obligor on these payments. (P.Br. at 145-47)

### 4. Defendant Makes Numerous Incorrect Statements Regarding the Mechanics of the IJssel Deposit (Equity Defeasance Account) (D.Br. at 19-24)

This section addresses Defendant's various statements and allegations regarding the use and function of the IJssel Deposit. (D.Br. at 19-24) The majority of these statements are from the section of Defendant's brief entitled "Equity Defeasance Account" (D.Br. at 19-24), although some of the statements addressed herein were contained in the "Lease Rent" (D.Br. at 11-15) section. Defendant's arguments and Con Edison's responses are organized thematically.

#### a. Defendant's Description of the Funding and Purpose of the IJssel Deposit (D.Br. at 13-15, 19-20) Contains Numerous Errors and Misleading Statements

(1) Defendant states that "the WTC Account [an account CED established holding its equity investment that it transferred to EZH as part of the transaction] is the source of funds used to obtain the Treasury STRIPS placed in the Equity Defeasance Account . . . ." (D.Br. at 13; *see also id.* at 20 ("Credit Suisse used approximately $21 million of CED's equity investment to purchase Treasury

STRIPS.")) Defendant's statement is inaccurate because it ignores the actual mechanics and parties involved in the IJssel Deposit's creation. CED made its equity investment by transferring $39,320,000 to the WTC Account and assigning its rights to that account to the CEL Trust. (P.Br. at 133; Ex. 43 at page 1424) The CEL Trust then assigned all of its rights in the WTC Account to EZH in connection with CED's Initial Basic Rent Payment. (P.Br. at 133; Ex. 43 at pages 1425, 1443) EZH entered into an agreement with Credit Suisse First Boston ("Credit Suisse" or "CSFB") that called for EZH to transfer a portion of the WTC Account ($31,252,643.73) to CSFB on December 16, 1997, which funds CSFB then used to purchase a series of STRIPs on December 17, 1997. (P.Br. at 152) These STRIPs were placed in the IJssel Deposit, a custody account, for EZH's benefit, acting as security for certain of EZH's payment obligations under the RoCa3 Transaction. (P.Br. at 152)

(2) Defendant states that "Credit Suisse used approximately $21 million of CED's equity investment to purchase Treasury STRIPS." (D.Br. at 20) Defendant misstates the price. CSFB used approximately $31 million to purchase the securities. (Stip. ¶¶209, 211, 212)

(3) Defendant states that "Credit Suisse [as Custodian of the IJssel Deposit] was required to . . . purchase Treasury STRIPS in amounts and with maturity dates sufficient to meet EZH's obligations under the operative documents." (D.Br. at 14-15) Defendant later qualifies this statement, noting that the IJssel Foundation's obligations were more limited and "includ[ed] the obligations to make

payment of any equity portion of sublease basic or renewal rent, the equity portion of the Sublease Purchase Option price, any termination payments, and any free cash payments required to be made under the operative documents." (D.Br. at 19) Even this qualified statement is incorrect. First, as part of the IJssel Agreement, Stichting IJssel agreed to make payments in satisfaction of the *equity portion* of the various termination payments on EZH's behalf, not the full amount of such payments, as Defendant's statement implies. (Ex. 19 at page 971) Second, the record is clear that the use of equity defeasance is common, especially in cross-border transactions such as these, and that defeasance benefited EZH by protecting it against currency and interest rate risk. (P.Br. at 143-45, 147-49; Ex. 288 at page 5638)

Most important, however, Defendant's statement ignores the significant possibility that the IJssel Deposit will be insufficient to cover EZH's equity obligations. For example, if the IJssel Deposit cannot fulfill the equity portion of various termination payments, EZH would then be obligated to pay tens of millions of dollars from its own funds to satisfy its equity obligations. (*See generally* P.Br. at 165-70) And Defendant has absolutely no support for its implicit claim that the IJssel Deposit will contain sufficient funds to pay the equity portions of Sublease Renewal Rent, if required, or Sublessee Loan Payments when they come due. Due to the interest rate risk inherent in the post-2018 collateral accounts, the IJssel Deposit may fall short. (*See* R. Facts Section I.A.3.)

(4) Defendant states, "The Equity Defeasance Account was pledged to CED . . . and could not be withdrawn by the IJssel Foundation prior to satisfying its obligations under the operative documents." (D.Br. at 15 (citations omitted); *see also* D.Br. at 19-20 ("The IJssell [sic] Foundation could not withdraw the investments in the Equity Defeasance Account until *all* Payment Obligations are satisfied.") There is an error in this statement. The IJssel Foundation granted a security interest to both CED (through the Trust and independently) *and EZH*.[9] (Stip. ¶218) Moreover, EZH, not the IJssel Foundation, has the right to withdraw the funds once all of the obligations have been met. (Stip. ¶225)

(5) Defendant states that the IJssel Deposit "was specifically excluded as collateral for the HBU loan," making the RoCa3 Transaction "unlike a traditional leveraged lease described by Plaintiff's expert, Dr. Ellis, in which a substantial portion of the overall investment by an equity investor may be at risk in the event of a default." (D.Br. at 19 & n.16) Defendant's statement is inaccurate and mischaracterizes the nature of a typical nonrecourse loan in a leasing transaction. By definition, the loan in a leveraged lease is nonrecourse to the equity investor, the borrower. (Ex. 10073 (Ellis Initial Report) at page 19996; Ex. 10077 (Weil Initial Report) at page 20256; FAS 13 ¶42)) Instead, the lender's recourse traditionally is to the rental payments owed to the equity investor and a security interest in the leased asset. (FAS 13 ¶42; Ex. 10073 (Ellis Initial Report) at page 19996) HBU received this collateral in this case: a first mortgage interest on CED's Lease

---

[9] Defendant recognizes this later. (*See* D.Br. at 19)

Interest and on all of the rental payments EZH owes to CED under the Sublease. (P.Br. at 137; Ex. 7 at page 613)

Defendant also has mischaracterized Ellis's report, which opines that in the event the "Lessee defaults, the Lessor's investment may be at risk since the Lender has the first mortgage rights to the asset," which it can "seize . . . in the event of default." (Ex. 10073 (Ellis Initial Report) at page 19999) Because the equity investor's investment is "a substantial portion of the cost of" its acquisition of the asset, "usually at least 20 percent," the equity investor stands to lose its equity investment in the event the lender seizes the asset. (Ex. 10073 at page 19999) In this case, as in the typical case Ellis described, CED stands to lose its equity investment of $39,320,000 (P.Br. at 133) should HBU take possession of CED's Lease Interest. (P.Br. at 137)

(6) Defendant describes the amount EZH retained after funding the IJssel Deposit and Sublease Deposit as the amount "paid to EZH as an accommodation fee and [for] the portion allocated to purchase the letter of credit." (D.Br. at 19) This characterization is argumentative and unsupported by the record. None of the sources Defendant cites characterize EZH's net present value benefit (the amount EZH retained after funding the accounts) as either a "payment" or an "accommodation fee"—or even come close to implying such a characterization.

By no means, however, do the Sublease Deposit and the IJssel Deposit insulate EZH's net present value benefit from the risk of loss; they only mitigate some of the risks that can diminish its economic benefit. For example, in the case of

a Premature Termination Event (P.Br. at 161-63), such as EZH's defaulting under the Sublease, EZH stands to lose its entire net present value benefit and faces the real risk of paying additional tens of millions of dollars. (P.Br. at 165-68) For example, the Sublease Deposit and IJssel Deposit were expected to only cover $155,277,213[10] of the $197,249,997 Sublease Termination Value Payment EZH would have owed to CED had a Premature Termination Event occurred on January 2, 2003, requiring EZH to cover the shortfall of $41,972,784 from its other funds.[11] (P.Br. at 167) EZH's shortfall would be even greater: (1) if the Fair Market Sales Value exceeds Sublease Termination Value and EZH has to pay the greater of the two (P.Br. at 168), and/or (2) if the then-prevailing market interest rate exceeds the implicit rate on the IJssel Deposit, which would result in the IJssel Deposit's being worth less than the projected value. (P.Br. at 167-68) This analysis would apply to any date on which a Premature Termination Event occurred resulting in EZH having to cover the respective shortfall. (*See* Ex. 332 at pages 7226-29 (column 8 showing the expected shortfall that EZH would be exposed to, which can be higher or lower depending on the then applicable interest rates and the then current Fair Market Sales Value))

---

[10] This is the sum of $114,227,540 (the expected funds in the Sublease Deposit) and $41,972,784 (the expected value of the IJssel Deposit). (P.Br. at 167)

[11] One of these sources is the Letter of Credit EZH purchased from Bayerische Landesbank. As discussed in Con Edison's Opening Post-Trial Brief, however, the Letter of Credit does not insulate EZH from paying the costs associated with an early termination because the Letter of Credit requires EZH to reimburse the bank in full for any funds the bank advances on EZH's behalf. (P.Br. at 168-70) Moreover, EZH bore the cost of purchasing and maintaining this Letter of Credit, which diminished its net present value benefit.

EZH thus stands to lose all of its expected net economic benefit from the RoCa3 Transaction, plus additional millions of dollars, should a Premature Termination Event occur. EZH internal documents identify and discuss the economic risk it could face in the case of an early termination event and how this would impact its "financial advantage" from the transaction. (Ex. 288 at pages 5648-49) Given this recognized risk, Defendant's characterization of EZH's involvement in the transaction as being merely a "fee" recipient is contrary to the record.

**b. Defendant's Description of the Use of IJssel Funds Prior to 2018 and in the Event of the Sublease Purchase Option (D.Br. at 20-21, 23) is Misleading**

(1) Defendant states that if EZH exercises the Sublease Purchase Option,[12] it "can satisfy the equity portion of the purchase price (approximately $92 million)" by transferring the remaining STRIPs in the IJssel Deposit to CED. (D.Br. at 20) This statement is incomplete and misleading. Defendant fails to inform the Court that EZH owes CED a Sublease rent payment of $7 million on January 2, 2018, which it must pay in addition to the Sublease Purchase Option Price. Thus, CED would receive $99 million total if EZH exercises the Sublease Purchase Option. (P.Br. at 172; Stip. ¶¶167, 237)

(2) Defendant states that Con Edison's expert Reed "admittedly did not take into account what actually happened to the funds in the Equity Defeasance

[12] In conjunction with this statement, Defendant also alleges that the parties to the RoCa3 Transaction "understood" that EZH would exercise the Sublease Purchase Option. (D.Br. at 20) This allegation is false, as is discussed extensively above at Facts Section I.A.2.

Account if EZH did not exercise the Sublease Purchase Option" when analyzing "whether one could say with virtual certainty whether the Sublease Purchase Option would be exercised." (D.Br. at 23 n.22) Defendant's point is irrelevant because this fact was not germane to Reed's analysis. As Con Edison described in its Opening Post-Trial Brief, Reed performed a sensitivity analysis of the projected 2018 fair market value of CED's remaining leasehold interest. (P.Br. at 243-47) He used Deloitte's estimated inputs for estimating the fair market value and adjusted each by a "modest" margin to reflect the range of real prices for those inputs and concluded that the 2018 value could range from $98 million to $265 million. (*Id.* at 245-46) Reed's analysis led him to conclude that "[t]his is not a close call. This is a case where the reasonable analysis of the variability of the value indicates quite clearly that it is not even close to being certain that the purchase option is going to be elected." (Tr. 2745) In fact, Reed's sensitivity analysis on the future value of CED's Lease Interest showed that the price of the Sublease Purchase Option fell with the mean value of the potential future value of the CED's Lease Interest. (P.Br. at 423-25) Thus, over half the time the Sublease Purchase Option price would exceed or even substantially exceed the value of CED's Lease Interest as of January 2, 2018. (P.Br. at 424)

**c. Defendant's Description of the Disposition of the IJssel Deposit When EZH Does Not Exercise the Sublease Purchase Option (D.Br. at 21-22) Contains Numerous Errors and Misstatements Related to the Sublease Renewal Option**

Defendant states that under the Sublease Renewal Option, the reinvested funds in the IJssel Deposit will be "available to satisfy" "EZH's renewal sublease rent and other Payment Obligations, including the 'Excluded Payments'/'Excluded Portions' due at the end of the lease term pursuant to the Sublessee Loan Agreement described herein." (D.Br. at 21) This statement is incomplete and vague on several key points. First, the IJssel Deposit is available only to satisfy the *equity* portion of EZH's Sublease Renewal Rent (Ex. 19 at page 971), not all of the Sublease Renewal Rent as Defendant states. Second, Defendant's sweeping allegation ignores EZH's interest rate risk and opportunity with respect to the IJssel Deposit. For Con Edison's response to this point, see Facts Section I.C.4(a)(3).

**d. Defendant's Broad Allegations Regarding the Connection Between the IJssel Deposit and CED's Return from the RoCa3 Transaction Are Argumentative and Misguided**

(1) Defendant erroneously asserts that "[b]y placing its equity investment in a defeased account, CED was able to ensure that it could recoup its investment in the Transaction, no matter what happened at the end of EZH's sublease—*i.e.*, its free cash payments would guarantee its returns, whether those payments came in

the form of the sublease purchase price, or as scheduled payments under the sublessee loan, all funded from the Equity Defeasance Account." (D.Br. at 23)

Defendant's statement reasserts Defendant's recurring contention that CED funded the IJssel Deposit and that CED's return in this transaction is derived from the IJssel Deposit.[13] This allegation is false, as addressed above. (*See* R. Facts Section I.A.8.) Defendant's allegation also presumes that defeasance removes all payment risk to CED and "ensures" it a return. As Con Edison examined in its Opening Post-Trial Brief, however, defeasance cannot protect against a default by the defeasance bank, a true risk especially in today's economic climate. (P.Br. at 402-04) Moreover, defeasance does not protect CED in the event of a Premature Termination Event (P.Br. at 404-14) and cannot protect CED against the operations risks it will face during either the Shirt-Tail Period or the Retention Period. (P.Br. at 454-71)

(2) Defendant's citation of the Final Leasing Whitepaper (Ex. 397 at pages 8121-22) for the proposition that "CED emphasized [that its] . . . equity investment would be returned . . . through EZH's exercise of its Sublease Purchase Option or CED's exercise of its Sublease Renewal Option" (D.Br. at 23-24) is misleading.

---

[13] Defendant states that "Excluded Payments" includes "the means by which CED obtains its return on its investment in the event EZH does not elect the Sublease Purchase Option." (D.Br. at 21 n.20) (citing JX 1, Bates 130, 137-38; DX 20193, Bates 25084, 25091-92)) It further states that "[t]he free cash payments derived from the Equity Defeasance Account . . . are sometimes referred to as Excluded Payments." (D.Br. at 19 n.17) It is absolutely untrue that CED receives its return via the "Excluded Payments." The term "Excluded Payments" carries a very specific definition that Defendant conflates with its mischaracterization of the IJssel Deposit's role in the RoCa3 Transaction.

When Defendant states that the Leasing White Paper discussed the Sublease Purchase Option and Sublease Renewal Option on page 8121, Defendant excises the reference to the Retention Option. Defendant's parenthetical reads: "If the utility did not purchase the plant at year 20 the trust would have the option to . . . require the utility to re-lease the plant for an additional 17 years at prices that would assure CED of its expected return" (D.Br. at 23-24) The language omitted and replaced with the ellipses is "(a) lease the plant to a third party for the remaining 24 years of the lease, (b) use the plant itself." (Ex. 397 at page 8121) Thus, as Defendant's own citation (once fully quoted) shows, Con Edison provided a complete description of all three options and did not emphasize one option over any others.

Moreover, the record makes clear that the Sublease Renewal Option, when considered as a whole including the Shirt-Tail Period, cannot guarantee CED a certain return. If CED were to exercise the Sublease Renewal Option, EZH's sublease would end in 2034, leaving seven years in which CED would be exposed to potential losses from the facility that could offset its return from the Sublease. For Con Edison's discussion of the very real risks facing Con Edison during this period, see Facts Section I.A.6. and Con Edison's Opening Post-Trial Brief at pages 454 through 460.