### 5. Defendant Makes Numerous Incorrect Statements Regarding the Mechanics of the Sublessee Loan (D.Br. at 24-26)

(1) Defendant states that Mr. DePlautt could not explain how the Sublessee Loan would "provide additional benefit to EZH." (D.Br. at 24) It is not clear from DePlautt's testimony, however, that he did not recall how the Sublessee Loan benefited EZH. When asked on Cross Examination "what the benefit was" that EZH gained from the Sublessee Loan, DePlautt responded: "I don't recall the quantification of the benefit." (Tr. 2226) Defendant's counsel then moved on to another line of questioning.

(2) Defendant characterizes the Sublessee Loan as follows: "Any annual sublease rental payments due but not paid from the Debt Defeasance Account were treated as deferred rents, and were treated as a sublessee loan." (D.Br. at 24) This statement is ambiguous, but implies that EZH could at any time choose not to pay its required Sublease rentals and receive a loan from CED. The Sublessee Loan, however, constitutes only those amounts set forth on Schedule A to the Sublessee Loan Agreement. (Stip. ¶¶261-63; Ex. 44 at page 1448) CED would lend these amounts to EZH at the same time and in the same amount as the Sublease Basic Rent EZH owed to CED in 1998 through 2003 (as well as a portion of the Sublease Basic Rent EZH owed for 2004). (Stip. ¶¶261-63; Ex. 44 at page 1448) As such, for those Sublease Basic Rent payments due in 1998 through 2003, as well as for part of the payment due in 2004, EZH would not make payments from the Sublease Deposit (the debt defeasance account) or from any other source. (Stip. ¶¶196, 197)

Because the seven amounts set forth on Schedule A of the Sublessee Loan Agreement are the only amounts that will constitute the principal of the Sublessee Loan, Defendant is incorrect that any rentals "due but not paid from the [Sublease Deposit]" are treated as a Sublessee Loan. For example, should CED exercise the Sublease Renewal Option, the last rental payment funded from the Sublease Deposit would be in 2027 (Stip. ¶197), but EZH would owe Sublease Renewal Rental Payments through 2034. (Stip. ¶140) The rental payments due from 2028 through 2034 do not constitute part of the Sublessee Loan.

(3) When Defendant states the amounts EZH is required to pay on the Sublessee Loan, it incorrectly states that payments are due on June 5, 2034 and January 1, 2035. (D.Br. at 25) These dates should be June 15, 2034 and January 2, 2035, respectively. (Stip. ¶¶173, 182) The amounts and other dates listed are correct.

(4) Defendant states that the final Sublessee Loan payment of $414,931,341, due on February 24, 2041, "would simply be credited against a portion of the Final Basic Rent Payment due from CED Trust." (D.Br. at 25) In support, Defendant cites an unsigned Investment Recommendation summarizing the potential Sublessee Loan structure prior to the investment. (*See* Ex. 396) An examination of the governing Operative Documents, however, makes clear that this structure was not adopted and Defendant's statement is therefore incorrect. Instead, the Sublessee Loan Agreement provides that the February 24, 2041 payment, like all the other payments, is due in cash. (Ex. 44 at page 1449; Tr.

4945-47 (Ray)) As Defendant's own expert agreed, the Lease provides that CED's Final Basic Rent Payment is due in cash. (Ex. 2 at page 325; Tr. 3911-13 (Bent) (agreeing that the Final Basic Rent payment must be "paid in cash" and there is no provision in the Operative Documents that "prevents or . . . negates" CED's obligation to make this payment in cash))

(5) Defendant states that "in the event that in 2018 the interest rates for the defeasance mechanism accounts or available loans were not the same as those expected at the time of closing, the scheduled payments under the Sublessee Loan Agreement could be adjusted *up or down* to preserve CED's return from the transaction." (D.Br. at 25) Defendant's statement is imprecise. The adjustment mechanism referred to states in relevant part that the Sublessee Loan payments shall be adjusted in 2018 if EZH does not exercise the Sublease Purchase Option and either (1) it is a date the Trustee Treasury Collateral is to be purchased (*i.e.*, if CED exercises either the Sublease Renewal Option or the Retention Option) and the Actual Treasury Price required to purchase that collateral differs from the Expected Treasury Price, or (2) the Lease Collateral Rate on the Lease Collateral Deposit (which can be funded under the Sublease Renewal Option) differs from the Expected Lease Collateral Rate. (Ex. 4 at page 390) It is unclear whether Defendant's statement encompasses any other scenarios. In any event, it is not unusual for interest rates and other terms on long-term indebtness to be adjusted from time to time.

### 6. Defendant Makes Numerous Incorrect Statements Regarding the Mechanics of the Letter of Credit (D.Br. at 26-29)

(1) Defendant states that CED paid approximately $1.4 million to purchase a letter of credit; it bases this estimate on pricing runs created by CED's advisers. (D.Br. at 26 (citing Exs. 330, 332)) There is absolutely no evidence in the record, however, regarding the price—approximate or otherwise—that EZH actually paid to fulfill its Letter of Credit obligations. That price was entirely a matter of negotiation between EZH and its Letter of Credit bank. There is no evidence that the CED pricing runs Defendant cites were shared with EZH, and to Con Edison's knowledge they were not. As such, Con Edison has no way of knowing how accurately its pricing runs predicted the letter of credit value. Further, as the Stipulation makes clear, the Letter of Credit was amended and/or replaced numerous times. (Stip. ¶¶227-229) EZH's cost of obtaining these amendments and replacement Letters of Credit were not known at the time of closing, and the cost of any future Letters of Credit are not known now, as they depend on future events such as EZH's credit rating.

(2) In its description of the operation of the Letter of Credit (D.Br. at 27-28), Defendant erroneously cites to page 296 of the Participation Agreement (Ex. 1), a listing of the "L/C Termination Values," as the amount EZH would owe to CED in the event of a Premature Termination Event. (D.Br. at 27) In fact, the possible amounts EZH could owe are set forth in the appendices containing the Sublease Termination Values, Sublease Special Termination Values or Sublease Special

Special Termination Values (Stip. ¶¶154, 156, 157, 159) contained at pages 543 through 573 of the Sublease (Ex. 4). In addition, EZH could owe CED the Fair Market Sales Value in certain circumstances. (Stip. ¶159) In no circumstances would it owe the amount set forth on the schedule Defendant cites. For a correct and complete description of the amounts EZH could owe under various Premature Termination Events, see Con Edison's Opening Post-Trial Brief at pages 159 through 165.

(3) Defendant states that "[t]he letter of credit was designed to cover an amount greater than the projected difference between the value of the Treasury STRIPS and the scheduled termination value." (D.Br. at 27; *see also id.* at 28 ("EZH would be required to make up any shortfall between this pre-maturation value of the Treasury STRIPS and the termination value . . . .")) This statement is inaccurate. Funds from *both* the IJssel Deposit (the STRIPs) *and* the Sublease Deposit are available to EZH for any required payments in the event of a Premature Termination Event. (Tr. 1161 (Holzman)) The letter of credit was designed to mitigate CED's payment risk for the amount of termination payment in excess of the *projected combined value* of the IJssel Deposit and the Sublease Deposit. (Tr. 1174-76 (Holzman)) Whether the projection of the shortfall borne by EZH is correct—and therefore whether the letter of credit amount is adequate to fill this gap—depends on prevailing interest rates and Fair Market Sales Value of the Undivided Interest at the time of the Premature Termination Event. (*See* P.Br. at 165-170)

(4) Defendant states that "in the event that EZH's credit rating dropped below a certain amount, a mechanism was built into the transaction whereby EZH would be required to provide a letter of credit in the amount of 125% of the expected shortfall." (D.Br. at 28) This statement is an oversimplification. The Participation Agreement provides that if EZH's long-term unsecured debt rating is below A by Standard & Poor's, A2 by Moody's or unrated, then *in any year after 1999*, the Required Percentage for that year will be 125%. (P.Br. at 169-70; Ex. 1 at pages 152-53) To calculate the amount of the required Letter of Credit, this Required Percentage is then multiplied by the excess of the highest Letter of Credit Termination Value (Ex. 1 at page 296) over the fair market value of the IJssel Deposit. (Ex. 1 at page 57)

Defendant also states that the Letter of Credit—with its interest rate adjustments and the potential for the Required Amount to rise to 125%—operates together with the defeasance structures to "virtually eliminate[] any risk to CED that it would not receive its expected return on the transaction in the unlikely event of a termination." (D.Br. at 29) Letters of credit do not eliminate payment risk, however. A letter of credit is a credit enhancement that partially shifts CED's risk exposure onto the letter of credit issuer. (Tr. 3396-97 (Ellis); Tr. 1338 (Holzman); Tr. 3882-83 (Bent)) There is no guarantee that the letter of credit provider would honor a drawing on the letter of credit or be able to pay upon being presented the letter of credit. (Tr. 1176, 1339 (Holzman); *see generally* P.Br. at 404-14)

(5) Defendant states that CED bore no "appreciable risk" that EZH would be unable to obtain a Letter of Credit because of the "requirement for EZH to obtain the renewal of the letter of credit prior to the expiration of the previous letter of credit. So, even if EZH could not renew the letter of credit, CED would have sufficient advance warning of this fact and be able to declare a default and recover under the letter of credit still in effect." (D.Br. at 28 n.26 (citations omitted)) Defendant's argument contradicts the Operative Documents. Section 14(h) of the Sublease provides that a Sublessee Event of Default occurs if EZH fails to "maintain, replace, renew, or ensure the maintenance of the Letter of Credit." (Ex. 4 at page 424) In other words, CED's and/or EZH's mere suspicion at the time one Letter of Credit is in effect that EZH will be unable to renew the Letter of Credit does not constitute a Sublessee Event of Default because at that time a Letter of Credit would still be in effect. Section 15 of the Sublease provides that CED can exercise its remedies, such as drawing on the Letter of Credit, only "[u]pon the occurrence of any Sublessee Event of Default and at any time thereafter." (*Id.* at 426) It does not provide for CED's right to exercise a remedy prior to the occurrence of a Sublessee Event of Default. Further, the Letter of Credit will only be paid if an event of default has already occurred. (Ex. 403 at pages 8318-19; Ex. 410 at page 8335.003)

If EZH fails to obtain a replacement Letter of Credit, it will be in default under the Sublease. (Stip. ¶163(h)) This will trigger CED's remedies as described in Con Edison's Opening Post-Trial Brief (P.Br. at 159-65), and EZH would then lose

its ability to operate and profit from the Facility and/or be obligated to pay tens of millions of dollars out of pocket (Stip. ¶164; P.Br. at 159-70), which payment will no longer be backstopped by the Letter of Credit bank.

### 7. Defendant's Statements Regarding the Sublease Renewal Option (D.Br. at 32-35) Are False and/or Misleading

(1) Defendant states that under the Sublease Renewal Option "EZH will also be required to post a letter of credit securing all amounts of sublease rents during the sublease renewal term, further eliminating credit risk to CED." (D.Br. at 33) Defendant's citation does not support its conclusion that the Letter of Credit eliminates credit risk to CED. (*See* Ex. 722 at page 12248) In fact, it does not, as is explained in Con Edison's Opening Post-Trial Brief at 169.

(2) Defendant claims "CED's internal evaluations of the LILO Transaction emphasized that, even if EZH declined to exercise its Sublease Purchase Option, CED had no real risk of loss because CED could 'require the utility to re-lease the plant for an additional 17 years at prices that would assure CED of its expected return,'" but it again cites only to the Leasing White Paper (Ex. 397) in support. (D.Br. at 34) Con Edison's response to this claim is addressed at Facts Section I.C.4(d)(2).

(3) Defendant states that "in reality CED attributed no value to [the Shirt-Tail Period]." (D.Br. at 34-35) This contention is false. As Defendant's statement implicitly acknowledges, subsequent to the return of CED's Lease Interest, CED is entitled to sell its share of the RoCa3 Facility's output. (P.Br. at

188-89, 192, 456-60) Defendant's allegation ignores CED's own internal memoranda that discuss CED's options and the base case economics, including the "additional revenue" CED could earn from "either us[ing] the plant itself or leas[ing] the plant to third parties. (*See* Ex. 397 at page 8121) It also ignores the analysis CED commissioned from Deloitte regarding CED's potential income during the Retention Option Period and Shirt-Tail Period. (*See* P.Br. at 360-63)

When CED did refer to a decision not to assume residual value for its "base case economics," such as in the document Defendant cites, it was referring specifically to its accounting treatment. For Con Edison's explanation of CED's appropriately conservative accounting treatment, see Facts Section I.A.10.

(4) In footnote 28 Defendant makes a series of statements attributable to Bent, such as: "[I]n typical leveraged lease transactions the residual value component of the transaction is taken into account when calculating the termination values that must be paid to the investor in an event of default." (D.Br. at 35) Defendant says Bent concluded that "there was no residual component in the termination values in this case." (*Id.*) Defendant's first two citations in this footnote are incorrect. (Defendant apparently meant to cite Tr. 3752-53.) But in any event, the record does not support Defendant's position. Bent's testimony was in fact narrower: that termination values "sometimes" incorporate "other elements as well, including the residual value" (Tr. at 3752), and that he "assum[ed]" that Sublease Termination Values in the RoCa3 Transaction did not include residual value. (Tr. 3753) Bent did not test whether his assumption was correct. (Tr. 3772) Defendant's

expansion of Bent's testimony is incorrect and misleading, especially in light of the extensive testimony in this case that CED did not build residual value into the economics of the transaction because that was the conservative accounting position. (*See* R. Facts Sections I.A.10. and I.C.8.)

Further, as explained in detail in Con Edison's Opening Post-Trial Brief, there are a number of Premature Termination events that would in fact require EZH to reimburse CED for the built-in residual value of its Lease Interest. Various provisions require EZH to pay the greater of Fair Market Sales Value and Sublease Termination Value. (*See*, *e.g.*, P.Br. at 163 (discussing EZH's Early Purchase Option and CED's remedies should EZH default under the Sublease)) Bent testified that the reason the Operative Documents require EZH to pay the higher of these two amounts is because CED is "entitled to the full value of [its Lease Interest]." (Tr. 3861-63) In other words, the Fair Market Sales Value provision protects CED's residual value interest in its leasehold since the actual future value of CED's Lease Interest may exceed the fixed Termination Values set on closing. (Tr. 1147 (Holzman); Tr. 3861-63 (Bent))

(5) Defendant states that "CED understood that upon the commencement of the shirttail period, it could simply require EZH to bear any benefits and/or burdens associated with the operation of the facility, walk away from any such obligations, and simply allow the accounts and offsets to run their course until the end of the Lease Term." (D.Br. at 35) Defendant provides no citation for its

statement, and in making this statement Defendant has ignored significant facts, rendering it meaningless.

Under Section 25 of the Lease, CED would be entitled to return its interest in the RoCa3 Facility to EZH on the day after the Sublease ends, which may be either January 2, 2018 or June 15, 2034. (Ex. 2 at page 344) CED would never return its Lease Interest to EZH in 2018, however, given the structure of the Sublease Renewal Option and the Retention Option: Even if CED is not interested in exercising the Retention Option in 2018, CED can instead elect the Sublease Renewal Option, requiring EZH to continue to lease the RoCa3 Facility for an additional 16.5 years, during which time CED would expect to earn a pretax profit of $101 million (without taking into consideration the Shirt-Tail Period profits). (P.Br. at 179-80, 356) No reasonable investor like CED would simply turn away an expected minimum profit of $101 million, and thus CED would be certain to exercise the Renewal Option if it decides not to exercise the Retention Option.

In addition, it is extremely unlikely that CED would return its Lease Interest to EZH on June 15, 2034, the end of the Sublease Renewal Term. Both Deloitte and Duke concluded that the RoCa3 Facility was expected to have a minimum economic useful life of 54 years from December 15, 1997 (until December 15, 2051). (P.Br. at 94-95, 99, 101-102) Defendant did not provide any testimony to the contrary. By definition, this means that CED expected it would be able to make a profit by exploiting its interest in the RoCa3 Facility through the Lease Term, which ends on February 24, 2041. (*See* Ex. 46 at page 1538; Tr. 1533 (Radini); Tr. 1654

(Ellsworth)) CED expects to generate an additional $197,898,146.15 in pretax profit during the Shirt-Tail Period from June 15, 2034 through February 24, 2041. (P.Br. at 361) Thus, CED would not decide to return its Lease Interest in the RoCa3 Facility unless the circumstances changed so dramatically that the RoCa3 Facility were worthless and CED would have no opportunity to profit from exploiting its Lease Interest. Although Reed's calculations showed that the value of the RoCa3 Facility could decline (Ex. 10076 (Reed Initial Report) at page 20213), it would still have a significant remaining useful life and value.

Finally, Defendant ignores the fact that if CED returns the RoCa3 Facility to EZH at the end of the Sublease, it remains obligated to pay the Final Basic Rent Payment of $831 million to EZH in 2041. (Ex. 2 at page 344) The payment of this amount is a recourse obligation of the CEL Trust (*see* R. Facts Section I.A.4(c)) and of CED to the extent that CED has received payments from the CEL Trust after the Sublease Basic Termination Date. (Stip. ¶249) Thus, if CED decided to return the RoCa3 Facility, it would be effectively required to disgorge its prior profits, as well as pass up future profits from the Shirt-Tail Period.

### 8. Defendant's Statements Regarding the Retention Option (D.Br. at 36-38) Are False and/or Misleading

#### a. Defendant's Various Allegations that CED and Its Advisors Did Not Consider or Analyze the Retention Option (D.Br. at 36-37) Are False and/or Misleading

Defendant cites numerous factual statements in support of its general allegation that CED's "failure to consider the Retention Option . . . (which according

to Plaintiff at trial is the potential source of residual upside and risk) is consistent with CED's view that it did not want to take on residual value risk in its lease transactions, the reason it chose to do LILO Transactions instead of traditional leverage[d] lease transactions to begin with." (D.Br. at 36-37)

Many of the supporting statements Defendant cites are inaccurate on their own merits, as Con Edison describes immediately below. The common thread running through many of them, however, is the implication that CED's decision not to book earnings attributable to residual value for the Retention Option Period indicates that it did not seriously acknowledge and consider this option. As explained above, however, CED did not book the earnings attributable to residual value because it wanted to take a conservative position with respect to residual value. (*See* R. Facts Section I.A.7.)

Other problems with Defendant's factual statements include:

(1) Defendant misleadingly cites McCartney's testimony to support its allegation that CED did no analysis of the Retention Option Period. (D.Br. at 36) The cited testimony, however, only states that for book purposes, CED "conservatively" assumed no residual earnings from entering into the RoCa3 Transaction. (Tr. 889-90 (McCartney))

(2) Defendant states that in "presenting the possible choices available in the EZH LILO Transaction internally, CED often fails to even mention the Retention Option." (D.Br. at 36) This statement is false and not supported by Defendant's citations. In fact, in the Project Briefing Memorandum, which

Defendant cites in support of its specious point, CED noted that if EZH does not exercise its purchase option after the Sublease Basic Term ends, CED could either "sublease the plant to a third party at market rates" or cause EZH to renew the Sublease. (Ex. 363 at page 7645) Leasing the RoCa3 Facility to a new third party is one of CED's alternatives if it elects the Retention Option. It is simply irrelevant that CED did not call this the "Retention Option."

Other internal documents also expressly describe the Retention Option. (*See, e.g.,* Ex. 397 at page 8121) Defendant's citation to one document that does not describe the Retention Option—a business plan outline that only briefly describes the transaction in conjunction with describing numerous other projects (Ex. 257 at pages 4825-26)—does not support Defendant's statement that CED "often" disregarded the Retention Option.

(3) Defendant states that "CED's own advisors made no attempt to explain the cash flows inherent in" the Retention Option Period, "much less mention the option when providing a detailed description of the transaction." (D.Br. at 36) Defendant's statement is false. Deloitte, CED's appraiser, detailed the cash flows available during the Retention Option Period in the appraisal. (P.Br. at 105; Ex. 46 at page 1567) Deloitte used the discounted cash flow method, which it explained in great detail, to determine these cash flows. (*See* Ex. 46 at pages 1564-56, 1716-19, 1745-48; *see also id.* at 1555-59)

In addition, it is false that CED's advisors did not mention the Retention Option. Both the Deloitte Appraisal and the Duke Engineering report make clear

that CED may cause EZH to return the Undivided Interest to it at the end of the Sublease Basic Term in 2018, enabling CED to exploit its interest in the RoCa3 Facility. (Ex. 46 at page 1509 (Appraisal); Ex. 52 at page 1810 (noting that EZH will have to return the Undivided Interest to CED at the end of either the Sublease Basic Term or the Sublease Renewal Term)) Finally, Defendant has ignored the testimony indicating that Cornerstone educated CED on the benefits and risks of leveraged leases, which included residual value. (Tr. 1021-24 (Holzman))

**b. Defendant's Description of the Mechanics of the Retention Option (D.Br. at 36, 37-38) Contains Numerous Incorrect and Misleading Statements**

(1) Defendant states that "[i]n theory CED would be able to request its proportional (47.47%) share of output from the facility and be required to pay its proportional share of the operational and maintenance expenses therein." (D.Br. at 36) Defendant's attempt to downplay this fact by couching it as a "theory" should be disregarded, since this is indeed exactly what would occur if CED exercises the Retention Option, as Defendant's own witnesses agreed. (*See* R. Facts Section I.A.6.; P.Br. at 454-61)

(2) Defendant states that "CED is required to arrange for payment of the principal amount of all Loan Certificates in a manner acceptable to HBU" if it elects the Retention Option and that "failure to do so will result in election of the Sublease Renewal Option." (D.Br. at 37) Defendant implies that there was a significant possibility of problems arising in this regard. Should CED elect the Retention Option, the Loan & Security Agreement requires it to prepay the nonrecourse loan

it received from HBU. (P.Br. at 183; Ex. 7 at pages 622-23) The record establishes that CED would be able to access the necessary capital to repay this loan, and Defendant did not challenge this evidence. (P.Br. at 183)

(3) Without a single citation in support, Defendant states that EZH's ability to withdraw over $123 million from the Sublease Deposit under the Retention Option "would seem to create a huge disincentive for CED to elect the Retention Option as it would take an approximately $120,000,000 hit at the beginning of the retention period by arranging to repay the outstanding loan balance itself without relying on the Debt Defeasance Deposit to satisfy those amounts." (D.Br. at 37-38 n.31) Defendant's characterization of the loan refinancing as a financial "hit" to CED is erroneous. Incurring reasonable levels of debt to finance an investment that will generate sufficient cash flow to retire that debt is a daily aspect of conducting business, not a financial injury. This is the business proposition the Retention Option presents CED: should CED elect the Retention Option and continue to owe that $120 million debt, CED would expect to generate anticipated pretax cash flow of $729 million from the operation and sale of the RoCa3 Facility's output. (P.Br. at 362-63) Given that CED's expected income from the Retention Option is $231 million more than its anticipated income under the Sublease Renewal Option[14] (P.Br. at 173-74, 361), CED's choice to exercise the Retention Option would be reasonable, even given the debt CED would finance.

---

[14] The pretax profit during the Sublease Renewal Term is equal to the sum of the Sublease Renewal Rent CED would receive from January 2, 2018 through June 15, 2034 ($299,851,875) (P.Br. at 173-74) and the Shirt-Tail Period pretax cash flows

(4) Defendant states that under the Retention Option, "EZH would still owe the same schedule of payments under the Sublessee Loan Agreement (including the 'free cash payments' that would provide CED with its return during this period)." (D.Br. at 38) It is false that EZH's payments on the Sublease Loan provide CED with its return during the Retention Option Period, and the paragraphs to the Stipulation of Facts that Defendant cites do not support this statement. As indicated at Facts Sections I.A.4(a)-(b), CED was projected to be able to generate $729 million in pretax profits from the sale of its share of the RoCa3 Facility's output during the Retention Option Period in addition to any payments EZH owes to CED on the Sublessee Loan. (P.Br. at 362-63) Thus, CED's return depends primarily on the profits, if any, it would receive from selling its share of the Roca3 Facility's output.

**9. Defendant's Statements About the Final Basic Rent Payment (D.Br. at 39-41) Are False and Require Numerous Unwarranted and Unproven Assumptions**

Defendant's entire analysis of the Final Basic Rent Payment revolves around its claims that CED's 2041 payment obligation was in fact "offset" by the creation of the Trustee Treasury Collateral and the Lease Collateral Deposit or Incremental Collateral Pledge and that CED "understood" this to be true "with the result that CED would not be out of pocket to actually make" the Final Basic Rent Payment of $831.5 million. (D.Br. at 39) For all of the reasons discussed above in Facts Section

---

CED expects to receive from the sale of the RoCa3 Facility's output ($197,898,146.15). (P.Br. at 361)

I.A.4., this allegation requires numerous logical leaps, none of which are supported by the record.

Defendant attempts to circumvent these stipulated facts, including paragraphs 242, 246, 256, 257, by alleging that "there are mechanisms in the transaction that render" CED's interest rate risk and option to use Acceptable Substitute Collateral "meaningless." (D.Br. at 39-40) Defendant's arguments are misleading and unconvincing, however.

(1) Defendant's first statement in support is that "Section 3(e) of the Sublease Agreement provides for adjustment of, among other things, the Sublease Renewal Rents, scheduled sublessee loan payments, and the amount of investment required by CED in the Trustee Treasury Collateral account, thereby ensuring that the inputs into the [Final Basic Rent Payment] of $831,525,734 can be adjusted to reach this number all while maintaining the economic return to CED under the interest rates available for the Trustee Treasury Collateral, Lease Collateral Deposit and Incremental Collateral Pledge at the time they are established." (D.Br. at 40) This statement is false.

First, if CED elects the Retention Option and chooses to establish the Incremental Collateral Pledge, there are no adjustments made under Section 3(e) of the Sublease with respect to this account. (Ex. 4 at page 390) Sublease Section 3(e) provides when an adjustment would occur: (1) if the interest rates change and the parties decide to refinance the RoCa3 Transaction, (2) if CED elects to establish the Trustee Treasury Collateral and the actual cost to fund this account exceeds the

expected amount, or (3) if CED elects to establish the Lease Collateral Account under the Sublease Renewal Option, and the actual rate CED is able to receive on this account is less than the Expected Lease Collateral Rate of 6.86%. (Ex. 4 at page 390) Therefore, no adjustments are made if CED elects the Retention Option and decides to fund the Incremental Collateral Deposit, which CED would fund on January 2, 2018 at the then-prevailing market interest rates. The record is devoid of any evidence that contradicts this fact. In testifying about Sublease Section 3(e), LaRue only stated that adjustments are made with respect to the Trustee Treasury Collateral and the Lease Collateral Deposit, and made no mention of the Incremental Collateral Pledge. (Tr. 5312-15)

Second, if CED elects the Sublease Renewal Option and decides to fund the Lease Collateral Deposit, Sublease Section 3(e)(iii) provides that if the actual interest rate CED can earn on this account is less than 6.86%, then (i) adjustments can be made to the Sublease Renewal Rent amount and (ii) CED can accelerate the Sublease Loan Payments, so that CED will be able to fund the account with cash sufficient to create a balance of $176,210,292.09 on June 15, 2034. (P.Br. at 178; Stip. ¶244) However, the Sublease Renewal Term terminates on June 15, 2034, and with it the Sublease and its readjustment provisions. (P.Br. at 179; Stip. ¶¶242, 246) Thus, from June 15, 2034 through February 24, 2041, no adjustments can be made (P.Br. at 179, 471; Stip. ¶246; *see* Ex. 2 at pages 327, 354; Ex. 1 at page 163)), exposing CED to interest rate risk with regard to the portion of the Final Basic Rent Payment that the Lease Collateral Deposit was expected to cover.

Third, under either the Sublease Renewal Option or the Retention Option, if CED chooses to fund the Trustee Treasury Collateral on January 2, 2018 and the cost of the securities is greater than $34,036,691.62, then Sublease Section 3(e)(ii) provides for adjustments (a) to Sublease Renewal Rents, or (b) to accelerate the Sublessee Loan repayment to provide CED with sufficient funds on that date to purchase the securities. (Ex. 4 at page 390) However, this adjustment is only made on the date CED could choose to "purchase" the securities for this account. (*Id.*) Therefore, CED would bear the risk of any future interest rate changes between January 2, 2018 and February 24, 2041 should CED want or need to purchase any securities after January 2, 2018. (P.Br. at 177-78; 466)

In summary, Defendant's statement is false as to all three optional collateral accounts: the Incremental Collateral Pledge, the Lease Collateral Deposit or the Trustee Treasury Collateral. The adjustment provisions to which Defendant refers do not "ensure" that these accounts "can be adjusted to reach [the Final Basic Rent Payment] all while maintaining the economic return to CED." (D.Br. at 40) These adjustment provisions provide some comfort that sufficient funds will be available to meet CED's Lease obligations, but substantial risks to CED still remain.

(2) Defendant states that the "Sublessee Loan schedule and amounts are essentially paper entries that offsets [sic] the majority of Final Basic Rent Payment" and "can be increased to meet any projected shortfall" from any collateral account CED establishes. (D.Br. at 40 n.33) This statement is false. First, Defendant attempts to rely on testimony by its expert Bent; however, Bent admitted that he

was "not sure [he] understands" the Sublessee Loan details. (Tr. 3763-64) On cross, Bent further acknowledged that he had worked on leasing transactions that involved deferred rent payments causing the creation of IOUs, which are real obligations that must be paid later. (Tr. 3842-43) Bent also agreed that the Sublessee Loan is like an IOU in that it must eventually be repaid. (Tr. 3843) Thus, Defendant's conclusions are wrong. These are not offsets or mere paper entries; these represent real obligations of the parties with meaningful consequences upon a default thereof.

Second, the Sublessee Loan cannot simply be increased to cover CED's shortfall if it does not have sufficient funds to pay the Final Basic Rent Payment because no Operative Document provides for this. Defendant has not provided a single citation to support its contention. Contrary to its statement, the adjustments can be made to the Sublessee Loan only during the Sublease Term and these adjustments do not "cover CED's shortfall," as discussed above. (*See* Ex. 4 at page 390 (Sublease providing for this adjustment)) Thus, no adjustments can be made to accelerate or change EZH obligations with respect to repaying the Sublessee Loan after the Sublease terminates, which under the Sublease Renewal Option is June 15, 2034 at the latest.

(3) Defendant states that "the Final Basic Rent Payment is only recourse to the amount of the Trustee Treasury Collateral, or the Acceptable Substitute Collateral, to the extent CED uses such collateral to replace the Trustee Treasury Collateral" and that therefore "[e]ssentially CED could walk away from the

transaction at the end of the Lease Term without ever making the Final Basic Rent Payment." (D.Br. at 40-41) Defendant similarly concludes that "once CED creates the Trustee Treasury Collateral Account or provides Acceptable Substitute Collateral . . . , CED's liability for its Final Basic Rent Payment becomes a non-recourse obligation that EZH cannot enforce against CED." (D.Br. at 40-41) Both of Defendant's statements are false, as discussed above at Facts Section I.A.4(c), and as Defendant has stipulated. (Stip. ¶¶249, 260) CED will earn more than enough money from the RoCa3 Transaction to satisfy its Lease obligation (*see* R. Facts Section I.A.4.), and it cannot be presumed to simply walk away from its obligation at the risk of forfeiting a very substantial equity interest in the RoCa3 Facility.

(4) Defendant states that Con Edison "may argue that by withdrawing the Trustee Treasury Collateral and replacing it with a letter of credit . . . it can have upside or risk from the use of the money it withdrew from the Trustee Treasury Collateral." (D.Br. at 41 n.34) Defendant here attempts to un-stipulate a fact. Defendant stipulated that if CED "elects to replace the . . . Trustee Treasury Collateral with Acceptable Substitute Collateral, it may use the replaced . . . Trustee Treasury Collateral for any purpose it deems appropriate." (Stip. ¶¶247, 258; Ex. 2 at pages 328-29; Ex. 1 at page 47) See Facts Section I.A.5. for a detailed discussion of CED's risks and opportunities should it choose to use Acceptable Substitute Collateral.

## D. Path to the RoCa3 Transaction

### 1. Defendant's Discussion of CED's History (D.Br. at 41-48) Is Misleading, Inaccurate and/or Argumentative

#### a. Defendant's Discussion of the Deregulation Proceedings in New York (D.Br. at 41-42) Is Incomplete and Misleading

(1) Defendant states that the New York Public Service Commission's ("PSC") July 1996 Order contemplated that the investments of Con Edison NY's unregulated subsidiaries "would for the most part be as an investor through established funds." (D.Br. at 42) This statement is misleading, however, because it fails to acknowledge the parties' express discussion of other types of projects. For example, Defendant fails to mention that the PSC July 1996 Order specifically contemplated that Con Edison NY's energy infrastructure project investments may be made through "development companies, investment funds, joint ventures and other vehicles." (Stip. ¶17) Defendant's citation to Burke's testimony—for the proposition that Con Edison NY had "represented to the PSC that its initial unregulated investments would be through investment funds" (D.Br. at 42)—is similarly incomplete. Burke explained at trial that the background information Con Edison NY provided to the PSC for the July 1996 Order provided not only that Con Edison NY's unregulated investments would initially be "primarily through funds," but also that Con Edison NY might make investments in a number of different ways. (Tr. 517-18)

(2) Defendant states that there is "no discussion of leasing transactions in the July 1996 Order" and that neither Con Edison NY's restructuring plan nor the PSC Settlement "mentioned leasing transactions." (D.Br. at 42-43) Although true, this statement is misleading. Defendant places improper emphasis on Con Edison NY's settlement process with the PSC. The PSC was concerned with Con Edison NY's divestiture of generating assets; specifically, it did not want Con Edison NY's subsidiaries investing in generating assets in New York State. (Tr. 483, 520 (Burke)) Accordingly, as Burke explained, Con Edison NY was requesting a "broad authorization [from the PSC] to make investments and pursue other business opportunities," and the PSC was not concerned with the identity or nature of the subsidiaries' investments outside of New York. (*See* Tr. 517-20)

The July 1996 Order was ultimately superseded by Con Edison NY's September 1997 Agreement and Settlement with the PSC (Stip. ¶22), which specifically provided that Con Edison did not have to obtain approval from the PSC for the investments of its unregulated subsidiaries. (D.Br. at 43; Stip. ¶21) Because it was unnecessary, then, Con Edison NY did not discuss the potential transactions of its subsidiaries with the PSC. (Tr. 520 (Burke))

**b. Defendant's Comparison of the RoCa3 Transaction with CED's Investment in GENOR (D.Br. at 44-45) Is Specious and Misleading**

(1) Defendant states that "CED often sent individuals to the GENOR project to help with maintenance and repairs," while it conversely had a "complete lack of involvement in the RoCa3 Facility subsequent to closing the EZH LILO

Transaction." (D.Br. at 44-45) Defendant's use of this comparison is highly misleading because it fails to consider an important distinction between GENOR and the RoCa3 Transaction—they are different types of investment projects. The RoCa3 Transaction is a leasing project where CED invested, through a typical long-term lease, in an existing cogeneration plant being operated by another party. (P.Br. at 53) In contrast, GENOR is a greenfield project subject to immediate operational risks where CED participated in the construction of a power plant and transmission line and had some operating oversight responsibilities. (P.Br. at 56) Defendant's statements attempt to portray CED's subsequent involvement with the RoCa3 Facility as inappropriate. In fact, as with any net lease, operational issues will become important as the period of the residual becomes imminent. That was not true in GENOR. Further, McCartney indicated that CED "visited plants that broke down," including GENOR, for the purpose of finding out why the plant was not operating properly. (Tr. 913) This situation never arose with the RoCa3 Facility: as the annual officer's certificates CED received from EZH indicated, the RoCa3 Facility operated properly throughout the transaction. (*See* P.Br. at 201)

(2) Defendant also uses a contrast with GENOR to claim that CED's investment in the RoCa3 Transaction was not "consistent with CED's stated goals of *actively* using its expertise in projects to optimize its returns." (D.Br. at 45 (emphasis added)) This statement mischaracterizes CED's goals. CED sought to develop an investment portfolio of assets within Con Edison's core competencies in order to achieve earnings. (P.Br. at 33-34) "Active" participation was not a stated

goal. In fact, CED's discussion with the PSC regarding participation in passive investments (Stip. ¶17), its inclusion of passive investments in its initial business plan (P.Br. at 36, 39-40), and its later participation in these passive investments (P.Br. at 49-51) belies Defendant's suggestion to the contrary. (*See* Stip. ¶17; Tr. 517 (Burke)) Furthermore, leasing and the RoCa3 Transaction are consistent with CED's actual, stated goals. (*See* P.Br. at 43-45; *see also* Ex. 107 at page 2961)

#### c. Defendant's Statements Regarding CED's "Anchor and Cluster Strategy" (D.Br. at 45-46) Are Misleading and Inaccurate

In the discussion of CED's anchor and cluster strategy, Defendant implies that CED invested in leasing in 1997 and then attempted to invent a business purpose for it later by tying it into the anchor and cluster strategy in 1998. (D.Br. at 45-46) To the contrary, in early 1997 CED established leasing as part of its business plan and identified formal criteria for reviewing potential leasing transactions. (P.Br. at 46-47) In fact, CED prepared numerous documents at that time analyzing the role of leasing and its relationship to CED's overall investment goals. (P.Br. at 43-47, 52; Ex. 243 at pages 4494-97 (May 1997 presentation); Ex. 261 at pages 4950-53 (May 1997 presentation); Ex. 169 at pages 4189-90 (May 1997 CED Board minutes); Ex. 252 at pages 4729-34 (June 1997 presentation); Ex. 171 at pages 4196-97 (July 1997 CED Board minutes); Ex. 640 at page 11441 (July 1997 leasing criteria))

Defendant's statements tying together CED's leasing strategy and its "anchor and cluster strategy" are misleading and specious. To begin with, Defendant does

not provide a timeline of CED's development of the anchor and cluster strategy or an accurate description of CED's application of this strategy, both of which undermine its allegations: by May 1998—*after* the RoCa3 Transaction had closed and in an effort to further develop the company's strategy for the "energy infrastructure market"—CED was considering several strategic possibilities, including the anchor and cluster strategy. (Ex. 1078 at pages 15705-06; Ex. 1307 at page 18586-87 (describing CED's mandate to rethink and articulate CED's strategy)) At the end of May 1998, CED informed the CED and CEI Boards that CED recommended developing an anchor and cluster strategy. (Ex. 160 at pages 4153-54; Ex. 1078 at pages 15706-08) CED's anchor and cluster strategy would focus on "creating and leveraging a competitive advantage on a regional basis to become a regional infrastructure leader." (Ex. 160 at page 4154) During 1998, CED was continuing to develop its business plan, strategy and investment portfolio of energy, infrastructure and leasing projects. (P.Br. at 57-59) As part of this development, CED adopted a regional anchor and cluster strategy as part of its overall business plan and applied this strategy in the pursuit of certain opportunities in Asia (Ex. 189 at page 4269) and Central America. (Ex. 266 at pages 5230-31; Ex. 204 at page 4343)

Given these facts, Defendant's specific claims regarding CED's anchor and cluster strategy are misleading and/or irrelevant:

(1) Defendant states that "in 1997" and 1998, CED "as part of this 'anchor and cluster' strategy" pursued an investment in EEGSA, an investment CED was

considering in Guatemala to construct a new power plant. (D.Br. at 45) This statement is incorrect. As explained above, CED did not develop its anchor and cluster strategy until May 1998. Further, Defendant fails to recognize the distinction between the two projects CED considered with EEGSA: a bid for acquisition of an interest in EEGSA in 1997 (P.Br. at 51) and a bid for participation in the privatization of EEGSA in 1998. (P.Br. at 63; Ex. 266)

(2) Defendant states that "in early to mid-1999" CED "abandon[ed] exploration of other 'anchor and cluster' investments in other parts of the world such as Eastern Europe, China and the Philippines." (D.Br. at 45-46) This description is misleading and not supported by Defendant's citation to Exhibit 1256. Exhibit 1256 does not describe these projects as "anchor and cluster" investments, but rather simply indicates that in May 1999, although CED had previously been "exploring development opportunities" in "Eastern Europe, China and the Philippines," CED's investment focus had shifted to Central America and the United States. (Ex. 1256 at pages 17823-24; *see also* P.Br. at 205)

(3) Defendant states that the RoCa3 Transaction and the NUON transaction cannot be part of CED's "anchor and cluster" strategy due to "the absence of any mention of these Transactions in any of CED's presentation materials concerning [the] strategy." (D.Br. at 46 n.42) This statement is irrelevant. As explained above, CED's anchor and cluster strategy was developed in May 1998, subsequent to the RoCa3 Transaction. Furthermore, as described above, this

regional anchor and cluster strategy was only one part of CED's overall business plan.

(4) Defendant claims that McCartney requested that DePlautt "come up with an *after the fact* rationale attempting to justify the leasing portfolio" and to "tie the EZH LILO Transaction to its 'anchor and cluster' strategy." (D.Br. at 46 n.42) As explained above, this statement is not supported by the record, as leasing was clearly part of CED's business plan and strategy in early 1997.

Further, Defendant's citation to Exhibit 1264 is inaccurate; Defendant mischaracterizes the nature of this exhibit. (D.Br. at 46 n.42) This document involves a discussion of CED's strategy and includes McCartney's request that DePlautt "defend[] leasing as a core business within CED" as part of a "whole strategy document" explaining how CED's strategy in the United States (the Ada and Carson projects (*see* P.Br. at 56, 61)) and Europe (the RoCa3 Transaction) "fit in with" CED's regional anchor and cluster strategy. (Ex. 1264 at page 17863) McCartney explained she was requesting that DePlautt prepare information in order to explain to Burke, a new member of the CED Board (Tr.511 (Burke)), how leasing was part of CED's overall strategy. (Tr. 884-85 (McCartney); Ex. 1264 at pages 17863-64) As explained above, CED's anchor and cluster strategy was also one part of CED's overall business plan and strategy.

Defendant's citation to Exhibit 1307 for the position that CED held May 1998 "meetings attempting to tie in 'financial strategy,' *i.e.*, leases, in with [sic] anchor and cluster strategy" (D.Br. at 46 n.42) is similarly false. Exhibit 1307 discusses

CED meetings in May 1998 to "refine [its] business plan" and "integrate [it] with [its] financial strategy," not to tie leases in with anchor and cluster strategy as the Defendant suggests. (Ex. 1307 at pages 18586, 18588) In fact, as explained above, in May 1998 CED was further developing its overall strategy and had not yet adopted the anchor and cluster strategy as part of its overall business plan. (*See* Ex. 1307 at pages 18587, 18591-94 (considering development of an anchor and cluster strategy as part of CED's overall strategy))

#### d. Defendant's Statements Regarding CED's Desired Earnings (D.Br. at 47-48) Are Argumentative, Misleading and Inaccurate

(1) Defendant states that CED, in its search for near-term earnings, "began looking at LILO . . . transactions." (D.Br. at 47) This claim is misleading. In fact, Defendant's citations indicate that CED considered leasing transactions in general, not LILO transactions specifically, as Defendant suggests. (Tr. 790 (McCartney); Tr. 542-43 (Burke); Tr. 1940-42 (Muoio)) A LILO is a type of lease. CED had reason to look at leasing of power or energy projects: in an effort to offset startup costs associated with greenfield projects and CED's resulting negative impact on the earnings of Con Edison, CED identified passive investments and leasing as methods to generate near-term earnings. (P.Br. at 42-43) Importantly, Defendant concedes this point: that CED pursued these transactions "in its effort to create up front earnings and cash flow to minimize the impact of its pursuit of greenfield projects." (D.Br. at 47)

(2) Defendant implies that CED's "realization that mergers and acquisition were simply too competitive a path" led CED to then instead pursue leasing as a way to generate upfront earnings. (D.Br. at 47) This suggestion is erroneous, as CED was actively investigating merger and acquisition opportunities (*i.e.*, infrastructure investments) at the same time it was considering leasing investments. (*See* P.Br. at 42-47, 51, 55, 56; Ex. 254 at page 4783; Ex. 156 at page 4135 (Ada acquisition)) Muoio's testimony on this issue provides further details that, although CED was indeed aggressively pursuing merger and acquisition opportunities, the market was exceptionally competitive "to the point where people were bidding prices at a return that we didn't feel was worth bidding on." (Tr. 1979-80)

(3) Defendant states not only that "LILO transactions were designed to generate upfront earnings and cash flow from the tax benefits associated with the transactions," but also that without the tax benefits, a LILO transaction would not have "upfront earnings" or positive "cash flows in the early years." (D.Br. at 47-48) This statement is misleading and inaccurate.[15] Tax benefits, whether large or small, do not increase the overall amount of accounting earnings. Rather, the after-tax earnings used for accounting purposes are the total earnings produced by the leveraged lease transaction over its entire term, less expenses—including projected

[15] Defendant's statements regarding the deferral of taxes are irrelevant. (D.Br. at 47 n.44) Deferral of taxes is a characteristic of all leveraged leasing transactions (P.Br. at 211), and Ray, one of Defendant's leasing experts, agreed that CED's motivations for entering into the RoCa3 transaction were no different than any other lessor entering into a leveraged lease transaction. (P.Br. at 341-42)

income taxes on those earnings. (P.Br. at 331-32) In other words, the after-tax earnings used to allocate accounting income are *lower* than the pretax profits.

Leveraged lease accounting under FAS 13, however, requires that these aggregate after-tax earnings be allocated to those years in which the lessor has a positive net investment: namely, the early and late years of the transaction. (*See* P.Br. at 46, 234-35) Accordingly, leveraged lease accounting results in front-loaded earnings. (P.Br. at 46) This was the benefit CED sought in its examination of leveraged leases.

Defendant simply cannot overcome the uncontradicted fact that a leveraged lease will not provide the benefits of accelerated income unless it is *already profitable independent of tax benefits*. (P.Br. at 332-33) The fact that CED properly accounted for the RoCa3 Transaction as a leveraged lease (P.Br. at 221) in fact supports the other evidence that the RoCa3 Transaction was profitable pretax.

(4) Defendant claims that Holzman "refus[ed] to state that the tax benefits had no effect on the front loaded earnings." (D.Br. at 47) This clearly mischaracterizes Holzman's testimony. The cited testimony is as follows:

> Q. Right. But you said the purpose of entering into this transaction, one of the purposes of entering into this transaction is for early earnings, correct?
>
> A. Well, that was one of the appeals for Con Edison to get into and enter into lease transactions in general. And generally, it is a benefit of FASB 13 and leveraged lease transactions.
>
> Q. And that benefit derives from the tax benefit?
>
> A. Well, ultimately, those earnings are derived from the fact that there is an aggregate of pretax cash flow in this transaction.

Without positive pretax cash flow, you wouldn't have earnings and you wouldn't have after-tax cash flow.

Q. So is it your testimony that the tax benefits have no effect on the front-loaded earnings in this case?

A. No, I don't believe that's what I just testified.

Q. Then let me ask it the other way. Do the tax benefits drive the front-loaded earnings in this case?

A. I don't think that's a yes-or-no question.

Q. Without the tax benefits, would there be front-loaded earnings in this transaction?

A. I have never run a leveraged lease transaction without tax benefits. I'm not sure I can answer that.

(Tr. 1374-75)

(5) Defendant further misconstrues Holzman's testimony when it states that Holzman agreed "that without the tax benefits there would not be a positive cash flow from the transaction during the sublease basic term." (D.Br. at 47-48) In fact, Holzman stated the opposite: referring to the Pre-Tax Cash Flow Column on page 10815 of Exhibit 609, Holzman explained that the exercise of the Sublease Purchase Option in 2018 would result in positive *pretax* cash flow for CED of approximately $61 million. (Tr. 1229, 1375-76) This $61 million is a result of CED's investment in 1997 of $43 million (negative cash flow) and CED's receipt of $5 million in 2012 and $99 million in 2018 (positive cash flows). (Ex. 609 at page 10815)

The positive pretax cash flow was key to CED because, as explained directly above and at length in Con Edison's Opening Post-Trial Brief (P.Br. at 234-35, 329-

32), CED could not achieve near-term earnings unless the transaction was projected to produce a profit independent of tax benefits.[16]

### 2. Defendant's Statements Regarding CED's Consideration of LILO Transactions (D.Br. at 48-51) Are Misleading

(1) Defendant states that "[a] discussion of leasing transactions appears in CED's board minutes for the first time on May 29, 1997." (D.Br. at 48) The relevance of Defendant's statement is entirely unclear. Given that the first draft of CED's business plan was not completed until January 30, 1997 (Ex. 166 at pages 4177, 4180), and that Muoio had not yet hired the CED management and staff (Ex. 167 at page 4183), the addition of new business strategies throughout 1997 was hardly surprising. Moreover, CED had been reviewing a variety of passive investments that would produce near-term earnings, *including leasing*, before CED's management brought leasing to its Board in May. (P.Br. at 42-43, 50-51) Shortly after CED's initial business plan was completed, CED began to review domestic and international leasing transaction projects involving utility assets, which complemented CED's core competencies. (P.Br. at 43) It identified near-term earnings and adequate returns as advantages of these transactions. (P.Br. at 43-44; Ex. 261 at pages 4948, 4950 (identifying in its May 16, 1997 Presentation "Early

---

[16] The Holzman testimony Defendant cites, and therefore Holzman's discussion of pretax profit, was in response to questions regarding Exhibit 609, a pricing run based on the Sublease Purchase Option's being exercised. (Tr. 1370) CED did not use this pricing run to book the RoCa3 Transaction. (P.Br. at 201) Instead, it used the pricing run at page 7254 of Exhibit 333, which reflects the Sublease Renewal Option and also shows a positive pretax cash flow over $101 million.

Year Earnings + Total Returns" as goals); *see also* Ex. 1081 at pages 15772, 15824 (including these goals in May 16, 1997 Board agenda packet))

The addition of leasing to CED's strategy was consistent with other steps CED had been taking to offset the company's projected losses from its greenfield development projects. (P.Br. at 39, 43, 325-29) For example, in CED's first business plan, CED anticipated that passive investments would provide it with near-term earnings. (P.Br. at 43; Ex. 136 at pages 3276, 3278)

(2) Defendant states that "[o]n May 21, 1997, Cornerstone gave a presentation to CED concerning leasing transactions," and that in "that presentation, Cornerstone indicated that a primary rationale for creating a leasing portfolio was 'the use of tax base as a resource to generate book income.'" (D.Br. at 48) Defendant omits significant facts: Exhibit 276, quoted by Defendant, lists four rationales for developing a leasing portfolio, including: (1) the ability to manage, within limits, book income from leases, (2) attractive rates of return when adjusted for economic risk, and (3) the opportunity for premium rates of return if there are foreign losses. (Ex. 276 at page 5410) Defendant's own leasing expert Ray, when discussing this exhibit, testified as to the import of the first: "[O]ne of the things that makes a leveraged lease attractive [to an investor] is that you get this front loading of income" under FAS 13. (Tr. 4726, 4724-27) Tellingly, Defendant did not cite Ray's testimony.

(3) Defendant states that at the July 23, 1997 meeting between CED and Cornerstone, "Mr. DePlautt discussed the various types of tax-advantaged leases

being considered by CED and the impact that the proposed Section 467 Treasury Regulations would have on its pursuit of the transactions." (D.Br. at 48-49) This statement is not supported by the record. Exhibit 171, containing CED's July 23, 1997 Board meeting minutes, indicates that DePlautt discussed a document entitled Lease Screening Criteria. (Ex. 171 at page 4196) This document lists CED's criteria for reviewing leveraged lease transactions, including the expected return of 9% to 11% and the desire to pursue investments involving electric and gas power assets. (Ex. 640 at page 11441) There is no indication, however, that DePlautt discussed the proposed §467 Treasury Regulation; neither the Board minutes nor the Lease Screening Criteria document mentions §467. (Ex. 171 at page 4196; Ex. 640 at page 11441) Defendant could have questioned DePlautt at trial regarding the Lease Screening Criteria and the discussion at the July 23, 1997 CED Board meeting, but Defendant did not pose a single question concerning either matter.

(4) Defendant states that Muoio testified that if Treasury Regulations under §467 were promulgated, "CED would not have pursued any further LILO Transactions." (D.Br. at 49 n.45) This statement mischaracterizes Muoio's testimony. Defendant's counsel never asked Muoio about CED's general plans to engage in further lease-leaseback transactions, but only asked specifically whether CED would have closed on the RoCa3 Transaction if the §467 Regulations had been finalized. (Tr. 2035-36) In response, Muoio made clear that CED would only engage in transactions that complied with the Code: "We would not do the transaction, if it was not in compliance with the Code, that's correct." (Tr. 2035-36) Muoio did not

testify as to the compliance of the RoCa3 Transaction, or any other leasing structure, with the proposed regulations.

(5) Defendant states that CED met with representatives from Shearman & Sterling LLP; Skadden, Arps, Slate, Meagher & Flom; and Hunton & Williams, and that a "primary focus of these meetings was for CED to become familiar with the tax aspects of LILO transactions, including the tax risks, the types of tax opinions each law firm could provide, and the impact of the proposed Section 467 Treasury Regulations on the transactions." (D.Br. at 49) First, Defendant seems to suggest that a taxpayer has improper motives merely because it consults with lawyers to assure itself that a contemplated transaction complies with the tax laws. Second, Defendant's failure to state why CED was meeting with well-respected law firms reveals that its interpretation of the documentary evidence is wrong. CED, like any interested prudent investor, met with and interviewed three law firms with leveraged lease experience that Cornerstone, CED's financial advisor, had recommended as candidates to act as CED's potential U.S. legal advisor. (Tr. 2204 (DePlautt)) In fact, every meeting memo states that CED wanted to meet with each law firm to (1) learn about the firm's leasing experience and inform the firm about CED's business, (2) discuss and gain an understanding of various leasing structures from a legal perspective, including tax, and (3) learn what "service, advice and opinions" CED could expect from each firm. (Ex. 335 at pages 7320-22; Ex. 336 at pages 7323-25; Ex. 344 at pages 7387-89) The meeting outlines also indicate that various cross-border leasing structures were going to be discussed at these

meetings, not a single structure as Defendant implies. (*See*, *e.g.*, Ex. 335 at pages 7321-22; Ex. 345 at pages 7391-92) After conducting the interviews, CED chose Shearman & Sterling as its U.S. legal advisor because of the firm's expertise in leasing transactions and because CED took significant comfort in having one of Con Edison NY's existing long-term legal advisors representing it. (Tr. 2083-84 (DePlautt); Tr. 386-87 (McGrath) (testifying that Shearman & Sterling's managing partner was also a member of Con Edison NY's Board of Trustees))

(6) Defendant states that "CED wanted to talk to these firms because it was looking for firms that 'facilitate' lease transactions (JX 282, Bates 5489), as opposed to firms that would independently review proposed lease transactions." (D.Br. at 49) Once again, Defendant has quoted a single word and editorialized the remaining portion of its "factual" statement without a shred of support. Defendant did not question the author of these notes, Holzman, as to his use of the word "facilitate" (Tr. 1347 (Holzman) (stating he drafted the notes marked as Exhibit 282)), but DePlautt did testify that CED wanted to work with top legal advisors with significant leasing expertise, rather than inexperienced counsel. (*See* Tr. 2083-84 (DePlautt)) Defendant's failure to provide a single citation for its allegation shows that the record is devoid of support for its interpretation.

Further, other documents in the record belie Defendant's claim. As Exhibit 302 discusses, CED began negotiating the ENECO leasing transaction but later pulled out as a result of various concerns raised by the due diligence process. (Ex. 302 at page 6096) The due diligence revealed that there were problems obtaining a

mortgage on all transaction assets, that there were regulatory obstacles to CED's taking control of the asset, that the return would not be high enough, and that the tax opinion level was "not as strong as CED would prefer." (*Id.* at 6096-97) It is apparent from the concerns unearthed during the ENECO due diligence process that CED's advisers, including the legal advisers, were independently reviewing various aspects of the transaction, rather than simply giving CED preordained conclusions. CED's decision to pull back from ENECO also demonstrates that CED took heed of concerns raised during the due diligence process. This evidence disproves Defendant's unsupported claim that CED did not want "firms that would independently review proposed lease transactions."

(7) Defendant makes a series of statements with respect to McGrath's testimony that he was not familiar with the specific tax benefits associated with the RoCa3 Transaction, and then implies that McGrath was being dishonest because "during conversations between Mr. McGrath and Ms. McCartney concerning LILO Transactions, Mr. McGrath recognized the dubious nature of these transactions when he asked Ms. McCartney, '[a]re we just an investment company finding tax shelters, and is this the best one?'" (D.Br. at 49-50 n.46) Defendant's implied accusation is incomplete and misleading. As an initial matter, Defendant fails to note that Exhibit 1132 is an email from October 5, 1998, after the closing date of the RoCa3 Transaction. (Ex. 1132 at page 16610) It does not imply, as Defendant insinuates, that McGrath understood the tax aspects of the RoCa3 Transaction itself, which closed almost a year prior.

More importantly, Defendant fails to acknowledge the testimony at trial indicating that the question posed in the email was not even McGrath's own question. Exhibit 1132 does not attribute the question to McGrath, and McGrath could not recall posing this question. (Tr. 255 (McGrath)) As McGrath testified, it was his responsibility as CEO and Chairman of the Board to ensure that management had considered every question that could be posed regarding an investment, and his role was to play "devil's advocate" with management to challenge them to ensure that any investment was thoroughly analyzed. (Tr. 255) A Con Edison Board member who was not familiar with leasing could pose any number of questions, and McGrath needed to be in a position to respond to any inquiry. (*See* Tr. 858 (McCartney)) Accordingly, Exhibit 1132 apparently consists of no more than a series of challenging potential questions regarding CED's business. (*See* Ex. 1132)

(8) Defendant states that "CED initially wanted to pursue what was referred to as a 'Pickle-Dole' leasing transaction." (D.Br. at 49-50) Defendant's statement is false and unsupported by the citations. DePlautt's testimony does not indicate that CED was initially interested in any one type of leveraged lease transaction: "[W]e looked at a range of transactions, Pickle-Dole transactions, 178 transactions, 467 transactions, so initially we looked at all transactions." (Tr. 2202, *see* Ex. 282 at page 5489) In fact, Exhibit 282, the very exhibit Defendant relies upon, contains notes that prior to DePlautt's meeting with McGrath on July 30,

1997, CED was learning about various leasing transactions, including "pickle [rules], [and §§]178 and 467." (Ex. 282 at page 5489)

(9) Defendant states that "[t]he only benefits explicitly discussed" in the briefing memorandum prepared during consideration of the EPON leasing transaction "were (1) tax benefits from the rental deductions; (2) tax benefits from the interest deductions; and (3) the cash-on-cash return on investment received at the end of the sublease term (which comes form [sic] the U.S. Treasury STRIPS)." (D.Br. at 50) Defendant's claim is simply incorrect. The EPON Project Briefing Memorandum discusses benefits beyond tax benefits and the cash-on-cash return; in fact, it contains a entire separate section entitled "GAAP Earnings Profile," which illustrates the front-loading of earnings required by FAS 13. (Ex. 300 at page 5958-59; *see also id.* at 5982 (pricing run dedicated to earnings under FAS 13)) Defendant has also ignored the record demonstrating that CED had already identified various other specific goals for leasing transactions, such as front-loaded earnings, near-term closings, adequate returns on investment and reduction in tax obligations, long before the EPON Project Briefing Memorandum was drafted. (*See* P.Br. at 43-45)

With regard to Defendant's claim that CED's cash-on-cash return would have been from the U.S. Treasury STRIPs, the EPON Project Briefing Memorandum does not state, either expressly or implicitly, that this was true. First, Defendant has simply inserted that parenthetical phrase as though it were in the document. (*See* Ex. 300 at page 5955) Indeed, the actual language of the document reads:

CED's "[a]ctual cash-on-cash return of investment *and profit*." (Ex. 300 at page 5955 (emphasis added); *see also* Ex. 300 at page 5977 (expecting to make a minimum pretax profit of $67,692,308)) Second, CED's return was in fact not from the Treasury STRIPs. (*See* R. Facts Section I.A.8.)

### 3. CED's Statements Regarding CED's Pursuit of the RoCa3 Transaction (D. Br. at 51-63) Are Inaccurate, Misleading, and Unsupported by the Record

#### a. Defendant's Statements Regarding CED's Use of Precedent Documents as a Starting Point in Its Proposals (D.Br. at 51-52) Are Incorrect and Incomplete

(1) Defendant states that the RoCa3 "Transaction was based on the terms and structure of the Maasvlakte LILO Transaction" (D.Br. at 51), but fails to provide any context for this decision. In most leveraged lease transactions, the parties start with documents previously used in a prior transaction because precedent documents are helpful as a starting point in addressing the numerous issues that need to be negotiated. (Tr. 1061 (Holzman); Tr. 2873-74 (Mintun); Ex. 1334 at pages 19481-83) In fact, by the time the RoCa3 Transaction closed, the documents were significantly different than the precedent documents. (*See* Tr. 2873-74 (Mintun))

Further, Defendant fails to state why CED believed its agreement to use the Maasvlakte documents would be beneficial. The Maasvlakte facility is an 800 MW coal-fired power-generating facility that was the subject of a leveraged lease transaction involving EZH prior to the RoCa3 Transaction. (P.Br. at 79) The Maasvlakte documents were negotiated over many months by Banc One and

Cornerstone, and both Banc One and Cornerstone were pleased with the commercial terms and conditions. (P.Br. at 79) In addition, CED believed its agreement to use the Maasvlakte documents would cause EZH to consider CED's proposal more seriously, making up somewhat for CED's relative lack of leasing inexperience. (P.Br. at 79-80)

(2) Defendant contends that "Capstar also arranged the lenders, ABN AMRO and its subsidiary HBU; the appraiser, Deloitte; and the engineer, Duke Engineering and Services ("Duke"), who would eventually be retained by CED." (D.Br. at 52 (citations omitted)) Defendant's statement is irrelevant. CED established a number of conditions that needed to be complied with before CED would enter into the RoCa3 Transaction. First, CED conditioned its participation in the RoCa3 Transaction on receiving acceptable terms for the nonrecourse loan, including an acceptable interest rate. (P.Br. at 78) Second, CED conditioned its participation in the RoCa3 Transaction on receipt of an appraisal that it found to be acceptable. (P.Br. at 78) CED agreed to use Deloitte as its appraiser since Deloitte had a great reputation for producing quality work and CED's management was familiar with Deloitte. (P.Br. at 84) In fact, Defendant's leasing expert Ray agreed that Deloitte was a "competent appraiser" (P.Br. at 85) and that he found the Deloitte Appraisal to be "quite extensive." (Tr. 4750-51) Third, CED conditioned its participation in the RoCa3 Transaction on receiving an acceptable engineering report. (P.Br. at 78) CED agreed to hire Duke Engineering to perform an engineering due diligence review of the RoCa3 Facility because Duke was an

extremely competent engineering consultant, which CED knew from Con Edison's reliance on Duke's expertise for various services for over ten years. (P.Br. at 84)

### b. Defendant's Broad Statements Regarding CED's and Con Edison's Review of the RoCa3 Transaction (D.Br. at 52-54) Are Incorrect and Misleading

(1) Defendant states that "[t]he [CED Board] minutes . . . reveal that, despite the fact that the proposed [RoCa3 Transaction] was significantly larger than any other transaction under consideration by CED, the discussions were brief and contained little mention of the structure of the transaction and the various options available to CED . . . , focusing primarily on the projected return." (D.Br. at 52) Defendant's statement is false. The CED Board meeting minutes reveal that the Board discussed the structure of the transaction, as well as information about the parties, the negotiations of the transaction documents, what was learned during the site visit, the Duke report, the information and analysis in the due diligence reports, the location of the RoCa3 Facility in The Netherlands, risks such as bankruptcy, and other legal and market considerations. (*See*, *e.g.*, Ex. 140 at page 3335; Ex. 154 at page 4130; Ex. 155 at pages 4130-31; *see also* P.Br. at 54) In addition, at the October 1997 Con Edison Board of Trustees meeting, CED management educated the board on the structure of the RoCa3 Transaction, CED's expected return on its investment, and the nature of the asset involved in the RoCa3 Transaction. (P.Br. at 53; Ex. 354 at page 7501) Following the October 1997 meeting, CED continued to educate Con Edison's Board on leasing. (P.Br. at 53-54)

(2) Defendant states that "[i]n conjunction with Cornerstone, CED created a briefing memorandum on the EZH LILO Transaction to present to its board of directors." (D.Br. at 52) For purposes of context, it should also be noted that the preparation of the Project Briefing Memorandum was routinely undertaken for all significant transactions, regardless of whether they involved leasing. (*See*, *e.g.*, Ex. 1219 (EEGSA Briefing Paper)) Furthermore, Defendant's suggestion that CED created the briefing memorandum in conjunction with Cornerstone is misleading. The Project Briefing Memorandum was compiled by CED and consisted of information from various sources, including Cornerstone, EZH and CED's own analyses. (P.Br. at 117) For a complete description of the Project Briefing Memorandum, see Plaintiff's Opening Post-Trial Brief at pages 117 through 122.

(3) Defendant states that, "as was the case in the EPON briefing memorandum, the only three benefits listed in the EZH briefing memorandum were (1) tax benefits from the rental deductions; (2) tax benefits from the interest deductions; and (3) the cash-on-cash return on investment received at the end of the sublease term (which derives from the maturation of the U.S. Treasury STRIPs purchased with CED's initial equity investment)." (D.Br. at 53) Defendant's statement, as with its statement regarding the EPON Project Briefing Memorandum discussed above, is false. The EZH Project Briefing Memorandum contains a separate section entitled "GAAP Earnings Profile," which illustrates the front-loading of earnings required by FAS 13. (Ex. 363 at page 7644 (noting that CED will have to leverage its investment with non-recourse debt to qualify for

leveraged lease accounting), 7653 (illustrating the front-loaded earnings profile CED expected to receive through leveraged lease accounting); *see also* Ex. 363 at page 7683 (pricing run dedicated to showing the amount and timing of CED's expected earnings); Ex. 243 at page 4506 (stating that return profiles were one factor guiding CED's investment decisions)) Defendant has also ignored the record demonstrating that CED identified specific goals such as front-loaded earnings, near-term closings, adequate returns on investment and reduction in tax obligations for any leasing transaction long before the EZH Project Briefing Memorandum was drafted. (*See* P.Br. at 43-45, 64-65; Ex. 243 at pages 4495-96; Ex. 261 at pages 4951-52; Tr. 1015-16 (Holzman); Tr. 2070-71, 2080-81 (DePlautt); Tr. 1941-42 (Muoio); Tr. 755-58, 762 (McCartney))

Once again, Defendant added the language in its brief implying that CED's cash-on-cash return would have been from the U.S. Treasury STRIPs. The actual language of the document reads: CED's "[a]ctual cash-on-cash return of investment *and profit*." (Ex. 300 at page 5955 (emphasis added); *see also id.* at 5977 (expecting to make a minimum pretax profit of $67,692,308)) For Con Edison's response to Defendant's repeated allegation that the return came from the STRIPs, see Facts Section I.A.8.

(4) Defendant states that "DePlautt, the individual at CED most involved in the EZH LILO Transaction, was unable to deny that the cash-on-cash return was the same as if CED had simply invested directly in Treasury STRIPs without the trappings of a LILO transaction; he claimed he would need to analyze the

transaction more to answer that question." (D.Br. at 53) Defendant has mischaracterized DePlautt's testimony from the following colloquy:

> Q. So the cash-on-cash return would be no different than, if I understand your testimony, if ConEd on day one deposited money in a strip and at the end of the transaction, received money back from the strip? Would that be a fair—
>
> A. I have never contemplated that transaction and would like to analyze it to determine whether it is the same or not. I can't tell you off the cuff.
>
> Q. Okay.

(Tr. 2175 (DePlautt) Defendant's counsel then immediately proceeded to a new line of questioning. (*Id.*) This is hardly an endorsement of Defendant's argument.

(5) Defendant states that "CED created a risk analysis chart with the help of Cornerstone and Shearman & Sterling, analyzing the potential risks of the EZH LILO Transaction." (D.Br. at 53) Defendant's citations do not support its position that Shearman & Sterling was involved in assisting CED to create the risk chart that was included in the EZH Project Briefing Memorandum.

(6) Defendant states that the risk analysis chart "indicated that CED's risks were low (which in several instances really meant non-existent), except for the risk that the Treasury would publish regulations prior to closing of the transaction which would explicitly disallow . . . the tax treatment sought by Plaintiff." (D.Br. at 53 (footnote and citations omitted)) Despite Defendant's repeated claims to the contrary, however, a low degree of risk means the risk still existed. DePlautt, who compiled this chart, testified that in entering into the RoCa3 Transaction CED attempted to mitigate the risks it faced, but also repeatedly testified that CED

understood it was not able to eliminate those risks. (Tr. 2104-5, 2145-46, 2231, 2245-46) Both of Defendant's leasing experts agreed that CED retained transaction risk despite CED's mitigation steps. (Tr. 3737 (Bent); 4940-41 (Ray))

For example, neither currency risk nor operations risk is nonexistent. Both Con Edison's experts and Defendant's experts indicated that CED will face significant risks during the Retention Option Period and the Shirt-Tail Period. (P.Br. at 459-60) If the Sublease has terminated and CED sells its portion of the output from the RoCa3 Facility, CED would be subject to operational risks. (*Id.*) Defendant's own leasing expert Ray opined that the Operation Risks might be higher than what CED had perceived. (Tr. 4804-06) Further, during either of these periods, CED would be exposed to currency risk on the conversion of revenues from the sale of power from Guilders (now Euros), the currency in which the power would be sold, to U.S. dollars. (P.Br. at 197-98; Tr. 5353 (LaRue) (agreeing that CED would face currency risk)) Ray also agreed that CED's quantification of the degree of risk it would face was accurate for a number of the identified risks. (*See, e.g.*, Tr. 4801-02) Further, Ray indicated that CED's risk during the Sublease Term was the same as if CED had leased to a AAA-rated bank or the U.S. government. (Tr. 4917-19 (Ray))

**c. Defendant's Statements Regarding CED's Proposals for the RoCa3 Transaction (D.Br. at 54) Are Inaccurate and Misleading**

(1) Defendant states, "[m]uch of the information included within [CED's September 26, 1997] proposal, including numbers and the consultants such as Duke

and Deloitte, was provided by EZH and Capstar to be included in the bid proposal." (D.Br. at 54) Defendant's statement is overbroad and incomplete insofar as it ignores the material inputs provided by CED and its advisers. As Con Edison discussed in its Opening Post-Trial Brief, pages 81 through 82, CED provided its maximum equity investment to purchase its leasehold interest in that asset. (Tr. 1068-69 (Holzman)) Deloitte, based on input from Duke regarding the useful life of the RoCa3 Facility, provided a useful life curve indicating the RoCa3 Facility had a remaining useful life of 55 years. (Ex. 768 at page 12484) And the lease term itself was provided not by EZH, but rather was driven by specific rules in FAS 13 (P.Br. at 111-12) and the tax requirements, in accordance with Duke's and Deloitte's useful life estimates of the asset. (Tr. 2221-22 (DePlautt); P.Br. at 81, 111, 273)

Further, Defendant's statement is incomplete because it fails to acknowledge that not a single number in that proposal was final (P.Br. at 82), but was instead subject to negotiation between the parties. In fact, many of the numbers changed before the close of the RoCa3 Transaction, including the remaining useful life of the RoCa3 Facility (the experts' final analysis indicated the RoCa3 Facility's useful life was 54 years rather than the 55 years indicated in their preliminary analyses), the term of the lease, the nonrecourse debt rate, and the closing date. (P.Br. at 82; Tr. 1209-12 (Holzman))

Finally, Defendant's statement that EZH dictated many of CED's advisors is not true. For example, as Defendant elsewhere acknowledges, in July 1997, CED was in the process of interviewing potential U.S. legal advisors, and CED decided to

use Shearman & Sterling as its consultant because of its leasing expertise and its long-standing relationship with Con Edison as an advisor. (D.Br. at 49 citing Ex. 335 (dated July 31, 1997); *see* R. Facts I.D.2(5)) These interviews took place well before CED learned of a potential leasing transaction with EZH on August 25, 1997. As for the selection of Deloitte and Duke, please see Con Edison's Opening Post-Trial Brief at pages 83 through 85 for a review of their excellent qualifications.

(2) Defendant states that the "numbers in the bid proposal, such as the lease term of 44 years, were chosen exclusively because of the tax regulations, and not for any business purpose." (D.Br. at 54) Defendant's statement is false. CED entered into the RoCa3 Transaction in large part to obtain leveraged lease accounting benefits and "fill the gaps" in their earnings created by development projects. (P.Br. at 325-334) In order to qualify for this accounting treatment, FAS 13 requires that the lease term must be greater than 75% of the asset's useful life. (P.Br. at 111) The 44-year lease was equal to 80% of Duke and Deloitte's preliminary calculation[17] of the RoCa3 Facility's expected useful life.

(3) Defendant states that the "terms did not differ at all" between CED's first proposal on September 26, 1997, and its second on October 21, 1997. (D.Br. at 54) This contention is false. First, Defendant's citation is only to a single page of each document. Even if its statement were intended to be limited to just those cited pages, however, Defendant is still incorrect. In fact, *the very first figure* ("Estimated

---

[17] As of closing, Duke and Deloitte both had concluded that the useful life of the RoCa3 Facility was not 55 years, but 54 years, and this resulted in the Lease's term being changed to 43 years. (Tr. 1211-12 (Holzman))

Facility Cost") changed between the September proposal ($250 to $275 million) and the October proposal ($250 to $300 million). (*Compare* Ex. 298 at page 5831, *with* Ex. 768 at page 12482).

More important, Defendant's sweeping statement fails to account for the other parts of each proposal. The October proposal imposes a series of conditions on CED's participation in the RoCa3 Transaction that were not included in the September 26, 1997 proposal. (Ex. 298 at page 5829) These conditions include CED's accepting the terms of the lender's participation, such as the debt rate, and CED's receipt of a satisfactory engineering report, appraisal and environmental assessment. (*Id.*)

It is also irrelevant that some of the economic terms were the same in each proposal because CED did not hire its due diligence experts until its October proposal (which was conditioned upon satisfactory due diligence) had been accepted. As such, many terms remained tentative and subject to further review, confirmation and acceptance. As of closing, many of those economic terms changed, including, but not limited to, the nonrecourse debt rate, the useful life of the RoCa3 Facility, the term of the Lease, and the closing date. (Tr. 1209-12 (Holzman))

#### d. Defendant's Attempts to Cast Doubt on CED's Incorporation of Leasing into its Business Strategy (D.Br. at 54-56) Is Not Supported by the Record

(1) Defendant states that "[s]hortly after CED entered into the EZH transaction, in January 1998, Cornerstone held a business planning meeting with CED whereby it helped CED in creating its business plan with respect to leasing

transactions." (D.Br. at 54 n.56) This statement is false, as CED's business plan was formed long before January 1998. As explained above and in Con Edison's Opening Post-Trial Brief, by May 1997, just months after CED had drafted its first business plan, CED had identified leasing as a potential investment vehicle. (P.Br. at 42-48; *see* R. Facts Section I.D.1(a)(1)) By July 23, 1997, CED had developed specific leasing criteria, such as the specific assets that CED would consider leasing, the locations in which CED would consider leasing an asset, and the return CED would require from entering into a proposed leasing transaction. (P.Br. at 46-47)

(2) Defendant states that Cornerstone "highlighted" for CED during a January 1998 business meeting "the fact that the terms and conditions for the LILO transactions were 'pre-defined.'" (D.Br. at 54 n.56) This statement and citation, without context, is misleading. Although the RoCa3 Transaction was based on precedent documents from the Maasvlakte transaction, CED investigated the asset and transaction structure thoroughly, and the transaction terms were subject to extensive negotiations, resulting in numerous changes to the precedent documents. (*See* P.Br. at 79-114)

(3) Defendant claims that "[r]egardless [of] whether CED actually marketed LILOs in the future, it had its eye on becoming a promoter" (D.Br. at 55 n.58) that would advise on lease-leaseback transactions for a fee when it was not personally involved in the investment. Defendant further implies that Cornerstone was a leasing transaction promoter. (*Id.*) Defendant's argumentative statement misconstrues the evidence. First, Muoio testified that it was possible CED would

gain sufficient experience that it could act as the *lead investor* in future leveraged lease transactions also involving other equity investors. (Tr. 2001-02) This is a far cry from being a promoter.

Second, Cornerstone did not "promote" the RoCa3 Transaction. Holzman's uncontradicted testimony was that Cornerstone was not in the market of promoting or selling leasing transactions, but rather was an advisor sought out by potential clients, given its wealth of experience in leasing and understanding of the assets involved. (Tr. 1005-07, 1012-14 (Holzman)) Defendant recognizes elsewhere in its brief that it was CED that sought out Cornerstone, not the reverse. (D.Br. at 48)

(4) Defendant states that Con Edison's "attempts to cast [Scher] as lacking any real understanding of the LILO Transaction" must fail because "[t]he evidence is [that] Mr. Scher is both an experienced tax attorney and had practical experience with leases." (D.Br. at 55 n.59) Defendant's attempts to build Scher up as an "experienced tax attorney" with leasing experience is misleading. In fact, Scher testified without contradiction that he had "practically no experience with leasing" before this transaction. (Tr. 3996 (Scher)) The record provides no support for Defendant's claim to the contrary, and Defendant has provided no citation.

(5) Defendant states that "[s]ince the market for LILO transactions imposed a $100 million net worth requirement on equity investors seeking the losses generated by LILO transactions (JX 140, Bates 3335; JX 234, Bates 4425; A 354, Bates 7500), and CED had limited net worth, it sought to obtain a $100 million stock subscription from CECONY to satisfy this obligation." (D.Br. at 56) Not a

single citation provided by Defendant supports its statement that equity investors in leveraged leases are seeking losses; to the contrary, the record is uncontradicted that the RoCa3 Transaction was expected to be *profitable* over its life and result in *net payments of federal income tax*. (P.Br. at 172, 180) Defendant's own leasing expert stated that investors in leveraged leases typically sought earnings (Tr. 4849, 4876-77 (Ray)), which is exactly what CED sought here. Further, Exhibit 703 makes clear that the $100 million requirement was imposed by lessees in leasing transactions to mitigate their risk that an equity investor would go bankrupt, since the equity investor's interest in the leased asset would be part of its bankruptcy estate. (Ex. 703 at page 12080)

**e. Defendant's Attempts to Imply that CED Entered Into the RoCa3 Transaction Solely for Tax Benefits (D.Br. at 57-58) Are Misleading and Specious**

(1) Defendant states that "Ms. McCartney later admitted that CED did not enter into the EZH LILO Transaction for any purported environmental benefits, but instead for the up-front, predictable earnings." (D.Br. at 57-58 n.61) This statement is misleading. While McCartney agreed that the main reason CED entered into the RoCa3 Transaction was the near-term earnings the transaction would generate under leveraged lease accounting, she made clear that CED would not have entered into the transaction unless the plant fully complied with all environmental regulations. (Tr. 910) Con Edison was proud of the environmental features of the RoCa3 Facility (Tr. 780 (McCartney)), which were important to Con Edison's efforts to improve its environmental performance and become a more

environmentally friendly company. (Tr. 181 (McGrath)) As McGrath explained at a 1997 shareholder's meeting, Con Edison NY was "weaving environmental excellence into every aspect of [its] business." (P.Br. at 19; *see also* P.Br. at 38 (achieving environmental excellence was part of CED's initial business plan); Ex. 107 at page 2961)

(2) Defendant states that when presenting leasing transactions on October 28, 1997 "to the CECONY Board of Trustees, Ms. McCartney and Mr. Muoio emphasized only the tax benefits of these transactions, noting that other utilities had used the transactions 'as a strategy to reduce tax payments,'" and other "than discussing the tax generated cash flows from the transactions, no other benefits of tax advantaged leasing were mentioned." (D.Br. at 57) Defendant's statements are false. First, McCartney and Muoio educated the Board on various matters (P.Br. at 53), including the "returns on these [leasing] investments" (Ex. 354 at page 7500) and the "cash flows under the lease." (Ex. 354 at page 7501) As explained above, CED had originally identified these two aspects as key benefits of leasing when it first began investigating such investments. (*See* R. Facts Section I.D.2(1); P.Br. at 43-47)

Although CED recognized that the temporary tax deferral of leveraged leasing produced a financial benefit (Ex. 354 at page 7501), this point is irrelevant. As explained above, all leveraged leases are tax advantaged, and tax benefits associated with leveraged leases are one of the many reasons equity investors make these investments. (*See* R. Facts Section I.A.11.; P.Br. at 257-59) Moreover, tax

benefits do not increase earnings; the RoCa3 Transaction would produce earnings for financial statement purposes only as a result of pretax cash flow. Weil explained that "[i]f there were no pretax profit, then you wouldn't get any positive income." (Tr. 3528) Defendant has not submitted any evidence to contradict Weil's testimony that a pretax profit was necessary to achieve CED's goals of reporting positive earnings. (*See* R. Facts Section I.D.1(d))

(3) Defendant states that the "testimony of witnesses in this case is replete with explanations that the returns from this transaction would only have been reasonable *with* the tax benefits at issue in this case and that CED would never have entered into the transaction without the tax benefits." (D.Br. at 58 n.62) Defendant's failure to provide any context causes this statement to be misleading.

First, taxes play an important role in all business transactions. (Tr. 3231 (Ellis)) Simply stated, all investment decisions attempt to "maximize total real returns after taxes." (Tr. 3235-39 (Ellis)) Further, leveraged leases are always evaluated on an after-tax basis because the ability to transfer tax benefits such as depreciation and interest deductions is what makes leveraged leasing an attractive business opportunity. (*See* P.Br. at 490-92; Tr. 3231-32 (Ellis))

Second, Defendant fails to recognize that pretax returns in the leveraged leasing industry are always low (P.Br. at 261-62) and that no one analyzes leveraged leases on a pretax basis, but rather investors always take into account tax benefits when analyzing a transaction. (P. Br. at 263) Leveraged lease pretax rates of return are normally in the range of 1% to 4%—Bent and Ray both agreed these

are normal pretax returns in leveraged lease transactions. (Tr. 3785 (Bent); Tr. 4874-76 (Ray)) Bent further testified that it is "not uncommon" for equity investors to receive a 2% to 3% pretax yield in leveraged leases involving power-generating assets like the RoCa3 Facility. (Tr. 3785-86) Bent agreed that in his experience pretax returns of 2% to 3% would yield after tax returns of 11% to 12% in leveraged leases (Tr. 3785-87 (Bent)), the ranges found here in the RoCa3 Transaction. The testimony elicited from Defendant's experts is consistent with leasing literature, which provides that a "leveraged lease provides an unsatisfactory rate of return when analyzed without including the tax aspects of the equipment ownership." (*Equipment Leasing Handbook*, ¶6:2.1 at 6-4; Tr. 3235 (Ellis)) Further, leveraged lease investors focus on the after-tax returns rather than the pretax numbers. (Tr. 4870-71, 4874-76 (Ray) (agreeing that investors measure investment opportunities based on after-tax yields); Tr. 3787-88 (Bent) (testifying that investors in the leveraged leasing industry focus on "net economic return," which commonly refers to the net after-tax yield and aggregate after-tax cash flows); Tr. 3253-54 (Ellis) (indicating that investors in the leveraged leasing industry do not consider pretax rates of return))

Third, Defendant's expert Ray agreed that CED's consideration of tax benefits is no different than any other taxpayer's evaluation of a leveraged lease. (P.Br. at 341-42) Ray testified that he would have been "stunned" if CED had not taken into account the tax benefits in its consideration of leveraged leases, including the RoCa3 Transaction. (P.Br. at 258; Tr. 4850-51; *see also* Tr. 3231 (Ellis)

(stating that tax considerations play a role in "all business transactions"); Tr. 4558-4560 (Thomas) (agreeing that parties make economic decisions based on after-tax income))

(4) Defendant states that "there is no discussion by any employee of Plaintiff concerning any expected return from the transaction other than its return on the Treasury STRIPS investment and the tax benefits, such as the claimed residual value benefit being asserted by Plaintiff." (D.Br. at 58 n.62) Defendant's statement is false. No Con Edison employee testified and none of the joint exhibits indicate that CED expected to derive its return on the transaction from the STRIPs. Defendant's statement lacks support entirely. At no point did CED analyze its investment in the RoCa3 Transaction as generating a return from or dependent on the STRIPs. Further, as explained above, CED determined that there was residual value and that it could earn additional profits on its interest in the facility if the Sublease Purchase Option were not exercised (P.Br. at 447-48; Tr. 2164 (DePlautt)). (*See* R. Facts Sections I.A.7., I.A.10.)

(5) Defendant states that Con Edison's Board of Trustees delayed its consideration of CED's request for $100 million because "[a]pparently there was a negative reaction to CED's business plan by the Board of Trustees." (D.Br. at 58) Defendant has no support (and cites none) for its statement that the Board of Trustees had a negative reaction to CED's business plan. In fact, CED's request was not voted on at this meeting, but was approved shortly thereafter at a subsequent meeting. (P.Br. at 114-15; Tr. 786, 835-36 (McCartney))

(6) Defendant states that the "day after the CECONY's Board of Trustees meeting, at a CED Board of Directors meeting, the CED officers and directors discussed the Board of Trustees' concerns with CED's business plans, CED's leasing strategy, and what further information it could provide to the board of Consolidated Edison about its tax advantaged leasing program." (D.Br. at 58) Defendant's statement is again not supported by the evidence it has cited. First, the CED Board meeting minutes make no mention of what questions were raised by the Con Edison Board of Trustees during the October 28, 1997 meeting. (Ex. 153 at 4127) Instead, the discussion mentioned that the Board of Trustees had deferred consideration of CED's request for a $100 million stock subscription and that CED should provide the Board of Trustees with additional materials on leasing to educate them. (Ex. 153 at 4127) Second, Exhibit 1229 is a memo dated December 10, 1997, which makes no mention of any discussion on October 28, 1997 about any questions raised in the October 28, 1997 Con Edison Board of Trustees meeting.

(7) In discussing the October 29, 1997 CED Board meeting, Defendant states that "CED determined that it would postpone indefinitely its consideration of the ENECO Lease Transaction." (D.Br. at 58) The documents Defendant cites provide no support for this statement. Exhibit 153 contains CED Board meeting minutes from October 29, 1997, and does not mention anything about the proposed leasing transaction with ENECO. Second, Exhibit 1229, dated December 10, 1997, does not state that the leasing transaction with ENECO had been postponed, but rather states that CED had not yet considered all of the economics of any such

lease, had not considered all of the issues in connection with this potential transaction, and had not yet begun the extensive due diligence that it would need to do before proceeding with any such transaction. (Ex. 1229) Third, in February 1998 CED discontinued its review of the potential leasing transaction with ENECO because its due diligence revealed a number of troubling business issues, "including lower than desired returns." (Ex. 262 at pages 4966, 4969-70; Ex. 302 at pages 6096-97) For a summary of these concerns, see Facts Section I.D.2(6).

#### f. Defendant's Statements Regarding the Leasing White Paper Are Misleading and Inaccurate (D.Br. at 59-62)

(1) Defendant states that, "[a]s explained in the final Leasing White Paper, the EZH LILO Transaction was structured in ways to make challenges to the structure 'difficult' for the IRS to litigate (JX 397, Bates 8124), an acknowledgment that the structure of the transaction was difficult to comprehend and decipher." (D. Br. at 59) Defendant's citation to Exhibit 397 is misleading and incomplete. Defendant omits what the text actually says: the transaction was "structured in ways that will make any challenges to the structure *by the IRS under current regulations* difficult to support or litigate." (Ex. 397 at page 8124 (emphasis added)) As DePlautt testified, this language meant transactions "will be well-structured and will comply with all the rules." (Tr. 2133) In other words, the IRS would have difficulty challenging the structure not because it was excessively complex, but because it was proper under tax law.

(2) Defendant states that the Leasing White Paper "purported to set forth several benefits and risks to the transaction." (D.Br. at 59) Con Edison here responds to Defendant's statements about these risks in turn:

**(i) Credit Risk**

Defendant states that the Leasing White Paper indicates "that the risk that EZH would default on its obligation to make rental payments was minimized because the payments were 'fully secured' through the use of defeasance deposits and a letter of credit." (D.Br. at 59) Defendant further claims that "CED's return from the transaction was not actually dependent on EZH's ability to operate the RoCa3 Facility, since EZH could lose its license to generate electricity and CED would still receive its rental payments under the transaction." (D.Br. at 59-60) Finally, Defendant suggests that this receipt of rental payments regardless of the RoCa3 Facility's operations "directly undermines Mr. Burke's claim that one of the reasons the investment was aligned with Plaintiff's core competencies is that having an investor like Plaintiff, who could oversee operation of the facility, was important because '[y]ou wouldn't get much value from the plant if you didn't have the plant operating.' (Tr. 501-02 (Burke))" (D.Br. at 60 n.64)

First, Defendant's statement about the possibility that EZH would lose its license is a red herring. Although Dutch regulations in 1997 required its licensed generators to maintain a 2500-megawatt minimum capacity, a Dutch utility could drop below this floor and nonetheless continue to operate its facilities with a license and under the tariff pricing arrangements. (P.Br. at 248) Moreover, in 1997 the

Netherlands government indicated that the minimum capacity requirement would be abolished, and it was indeed eliminated in 1998. There are currently no licensed electricity producers in The Netherlands. (P.Br. at 248-49)

Second, Defendant's statement that CED's receipt of rental payments was not dependent on EZH's ability to operate the RoCa3 Facility is misleading. In a typical lease, the lessee is *obligated* to make rental payments under the lease regardless of the profitability of the leased asset. Further, EZH's bankruptcy would be an event of default under the Sublease and CED could require EZH to return the Undivided Interest to CED for the remainder of the Lease Term. (P.Br. at 163-64) In this scenario, CED would not be entitled to additional rent payments from EZH, but rather CED would be able to exploit the value of the Undivided Interest by selling its share of the RoCa3 Facility's output. (*Id.*) CED also faced the real prospect of profiting (or losing money) from operating the plant during the Retention Option Period or the Shirt-Tail Period. Hence, as Burke noted, CED wouldn't get value from the plant during these periods if it were no longer operating.

Third, Defendant's suggestion that defeasance and the letter of credit somehow eliminated CED's credit risk in the RoCa3 Transaction is wrong and not supported by the record. Defeasance mitigates or minimizes credit risk, but does not eliminate it. (*See* R. Facts Section I.A.1.) Furthermore, letters of credit do not eliminate payment risk since it is not certain that the letter of credit issuer will honor a drawing on the letter of credit or be able to pay upon being presented the letter of credit. (P.Br. at

169) Over a long period of time, such as the Sublease Term, credit quality and credit issues cannot be presumed to be static. (*See* P.Br. at 402)

Finally, Defendant's statement mischaracterizes Burke's testimony. Burke testified as follows:

> Q. I understand. Based on your experience, could you explain whether or not ConEd had the competencies to operate the EZH plant that was subject to the lease transaction we have been discussing?
>
> A. Yes, I think we had, you know, the competence to run it or to oversee the operation and maintenance of the plant.
>
> Q. What if any importance did that fact play in your evaluation of the proposed EZH leasing transaction?
>
> A. I think it was important to be able to understand the assets that we were investing in. We wanted to make investments in assets that we understood. And if something went wrong during the term of the lease, that we needed to be able to step in or, like I said, oversee someone stepping in and getting value from the plant. You wouldn't get much value from the plant if you didn't have the plant operating.

(Tr. 501-02) Burke's testimony reveals the importance of CED's extensive due diligence on the RoCa3 Facility as CED understood it would be exposed to operation risks after the Sublease terminates, whenever that might be. As explained above, under a scenario where CED became responsible for overseeing operations of the RoCa3 Facility, CED would exploit the value of its Undivided Interest by scheduling for sale its share of the output from the RoCa3 Facility. (P.Br. at 189-92)

**(ii) Currency Risk**

Defendant states that "the White Paper explained that CED had no currency risk in the Transaction, because it was denominated in United States dollars" and

claims that this "further demonstrates that while CED may have characterized the risks in the transaction as 'low' in its earlier prepared briefing memorandum, at least some of these risks were non-existent." (D.Br. at 60) Plaintiff is unsure what relevance Defendant's argument has. Financial contracts must specify the functional currency of the contract and the choice, in cross-border settings, will add risk to one and lower risk for another.

**(iii) Strategic Value of Leasing**

(1) Defendant erroneously asserts that the benefit described as "strategic groundcover" in early versions of the Leasing White Paper (and "strategic value of leasing" in the final Leasing White Paper) was CED's "ability to leverage what it learned from the EZH LILO Transaction into other investments in the Netherlands." (D.Br. at 60) Defendant then contends that "[t]he effort to give substance to the EZH LILO Transaction by tying it to other potential Netherlands investments is mere window dressing." (D.Br. at 60) The statements Defendant relies on are misleading and do not support this contention. (*See* D.Br. at 60-61)

First, Defendant's statement about CED's failure to leverage the RoCa3 Transaction into other investments in the Netherlands is misleading. The strategic value of the RoCa3 Transaction was not limited to the Netherlands, but rather was an entrée into the entire European energy market. As McCartney explained:

> Q. There's also an item that relates to strategic value of leasing. It's number 5. Could you explain your understanding of that benefit.
>
> A. Well, this—leasing facilities in the Netherlands gave us our first foothold in Europe as it were, our first entree into the energy

> market in Europe in any form. So it gave us the opportunity to find other investments in Europe.

(Tr. 791; *see also* P.Br. at 334-337) CED anticipated that participation in the RoCa3 Transaction would give CED the opportunity to pursue other investments throughout Europe—an investment in a cogeneration plant in The Netherlands could provide knowledge about potential investments in that country or in neighboring markets like France, Belgium and Germany. (P.Br. at 240) Furthermore, Defendant's leasing expert Ray, hired to opine on CED's business purpose, said he had no reason to doubt that CED, in 1997, thought leases could help them forge relationships with overseas utilities. (*Id.*)

(2) Defendant focuses on a comment in one draft of the Leasing White Paper where a reviewer questioned the extent of CED's benefit from "strategic groundcover" (D. Br. at 60; Ex. 383 at page 7981) Defendant's focus on this anonymous comment in a *draft* of the Leasing White Paper is misguided. None of the CED witnesses who also reviewed drafts of the Leasing White Paper agreed with this reviewer's concerns. (*See, e.g.,* Tr. 657-58 (Burke) (saying that he did not agree with this comment); Tr. 2127 (DePlautt) (describing the strategic value of leasing as a "terrific opportunity" to learn about a country's energy market and potentially participate in an excellent overseas investment market)) The final version of the Leasing White Paper, which was approved by the CED Board and forwarded to Con Edison, confirmed CED's desire to gain legal and commercial knowledge of countries such as the Netherlands. (Ex. 397 at page 8123)

(3) Defendant states that CED's subsequent change, well after closing the RoCa3 Transaction, in its investment strategy to "focus its efforts on domestic transactions" prior to CED's "pursuit of the NUON LILO Transaction in the Netherlands" demonstrates "the disconnect between CED's genuine international transactions and its LILO transactions." (D. Br. at 62 n.67) Defendant claims that this change in investment strategy "was a major reason that Mr. Muoio left CED in February 1999" and that Ex. 1266 indicates that "CED's own employees recognized the inconsistency in its pursuit of tax-advantaged leasing transactions in Europe." (D. Br. at 62 n.67) Defendant also states that CED continued to look at other projects in the Netherlands, including a SILO/service contract "tax shelter transaction." (D. Br. at 62 n.67)

First, CED's change in investment strategy *in 1999* had no bearing on CED's motivations for entering into the RoCa3 Transaction *in 1997*. Further, CED did not refocus its investment efforts solely on domestic transactions as Defendant suggests. Due to instability in the international market, CED elected to refocus its investment strategy on opportunities in locations with which CED was comfortable. (P.Br. at 205) In early 1999, CED began to change its investment strategy to focus on the northeastern United States, Guatemala and Central America. (P.Br. at 205; 339-40) Muoio explained that "fully funding a large development organization, given the instability in the international market, wasn't prudent at that time" and that "[u]ntil the market stabilized" CED planned to focus on the United States, Guatemala and Central America while continuing to look for opportunities. (Tr.

2021) Furthermore, Muoio testified that "the board and I both reached a conclusion that it was time to part company," not that CED's change in investment strategy is why he left CED. (Tr. 2022-23)

Second, Defendant's statements regarding the timing of the NUON transaction are misleading. Starting in September 1998, CED was reviewing and negotiating to invest in the lease-leaseback of NUON's gas distribution assets in The Netherlands, and by the end of 1998 CED had invested significant time, effort and expense into this process. (P.Br. at 203-05) Although the transaction closed in May 1999, CED had originally anticipated various closing dates, including December 1, 1998 (Ex. 312 at page 6342), late December 1998 (Ex. 1192 at page 17382), and early January 1999. (P.Br. at 204)

Third, Defendant's assertion that CED's own employees recognized an inconsistency in CED's strategy is not supported by Defendant's citation to Ex. 1266. Ex. 1266 is an October 25, 1999 email from an employee of Consolidated Edison Energy ("CEE") asking for an explanation of how "$50 million per year in leasing *and acquisitions*" contemplated by CED "is consistent with [the] *CEE* business plan." (Ex. 1266 at page 17866 (emphasis added)) In this document, CEE is simply trying to understand how CED's business plan works in conjunction with CEE's.

### 4. Defendant's Description of CED's Due Diligence Contains Numerous Inaccuracies, Omissions and Mischaracterizations (D.Br. at 63-78)

As demonstrated below, Defendant incorrectly describes CED's due diligence as an effort to "paper the transaction with superficially independent and complete reviews of the facility and the transaction." (D.Br. at 77)[18] Defendant also contends that CED's due diligence "reveal[s] the true dependent, preordained, and accommodating conclusions of the opinions." (*Id.*) These statements are not supported by the record. Further, Defendant's statements in support of these assertions are misleading, inaccurate and unsupported by the record.

#### a. General Allegations (D.Br. at 63-65)

(1) Defendant states that "Plaintiff was aware, from its tax counsel, that to lend an air of legitimacy to the Transaction, it was necessary to have various reports and opinion letters." (D.Br. at 63) Defendant's statement is inaccurate and without any trace of support in the record. CED obtained various reports and opinion letters as part of CED's extensive due diligence on the RoCa3 Transaction. (P.Br. at 85) Defendant's citation to tax counsel advice as support for this mischaracterizes the context of this advice. Ex. 329, a memorandum from Shearman & Sterling, simply indicates that typically an "independent appraisal provides support for meeting most of the tests of the Leasing Guidelines" (Ex. 329 at page 7064) and that at closing parties often obtain interest rate letters from "a

[18] As explained above, the ENECO transaction is an example where CED withdrew from a transaction based on CED's thorough and independent due diligence. (*See* R. Facts Section I.D.2(6))

qualified financial institution." (*Id.* at page 7067) Ex. 1023, dated February 3, 1998, does not involve the RoCa3 Transaction and again simply indicates that a "credible valuation" typically contains information that could be used to support the tax treatment of a lease-leaseback transaction. (Ex. 1023 at page 15183)

(2) Defendant states that Duke, Deloitte and Tauw were retained "long before an investor (in this case CED) had been identified." (D.Br. at 64) Defendant's statement is misleading and inaccurate. The time frame of initial due diligence in late September and early October (Tr. 1588 (Nieuwenhuis); Ex. 940 at page 14345; Ex. 20027; Ex. 20028) is not "long before" CED's initial proposal on September 26, 1997 or CED's accepted proposal on October 22, 1997. (P.Br. at 76-78) Further, Defendant fails to mention that it is "standard practice" in any leasing transaction for the lessee to conduct certain due diligence as part of its initial investigation. The investor may engage different consultants if it thinks this is necessary. (Tr. 2882, 2892-94 (Mintun))

(3) Defendant states that "the equity investor would simply agree to use the preselected third parties chosen by the lessee." (D.Br. at 64) Defendant's statement is misleading and inaccurate. CED did not simply agree to the use of these third parties, but rather elected to use these third parties based on CED's prior experience with them or knowledge of their well-established reputation. (P.Br. at 84) Ray verified that Deloitte has a "reputation as a competent appraiser." (Tr. 4897) Cornerstone would have suggested that CED not retain Deloitte if it had no had confidence in Deloitte's work. (Tr. 1076-77 (Holzman)) Furthermore,

consultants are engaged by the lessee based on the quality of their reputation and work experience. (Tr. 2894 (Mintun))

(4) Defendant's statement that "CED did not retain Deloitte until almost a month after the transaction closed" is false. (D.Br. at 64) Deloitte had reached all of its final conclusions regarding the RoCa3 Transaction and had provided CED with a final draft of its Appraisal by the closing date. (Tr. 1642-43 (Ellsworth)) The engagement letter was signed after the RoCa3 Transaction had closed because of ongoing negotiations between Deloitte and CED over certain minor terms of that letter. (Tr. 1634-35 (Ellsworth))

(5) Defendant's statement that "Deloitte and Duke had been retained to participate in hundreds of LILO transactions" is misleading. (D.Br. at 64) Deloitte had performed thousands of appraisals, including several hundred involving power-generating assets, and Ellsworth had performed hundreds of appraisals and his first power-generating asset appraisal was in 1986. (P.Br. at 97) Duke had performed numerous engineering due diligence reviews for various assets, including power plants. (P.Br. at 91; Tr. 1826 (Gonzalez)) Further, Deloitte had a great reputation for producing quality work and Duke was an extremely competent engineering consultant. (*See* R. Facts Section I.A.2(d)(1); P.Br. at 84-85)

(6) Defendant's statement that "Deloitte and Duke made tens of millions of dollars by participating in LILO transactions" is not supported by the record. (D.Br. at 64 n.71) Tellingly, Defendant fails to provide any support or citation for this statement.

(7) Defendant's statement that Deloitte "would be told what conclusions it needed to reach in its appraisal reports" by counsel is false and is not supported by Defendant's citation to Ellsworth's testimony. (D.Br. at 64-65) Ellsworth testified that Deloitte may have been provided by counsel a framework of conclusions that would be necessary for the transaction to comply with the Leasing Guidelines established by the IRS, but independently performed its analysis to determine the appraisal's conclusions. (Tr. 1801-02 (Ellsworth)) Furthermore, Defendant's statement that Shearman & Sterling "made suggestions and comments to the Deloitte report" is misleading. (D.Br. at 65) Before advising CED to proceed with the RoCa3 Transaction, Shearman, CED's legal advisor in the RoCa3 Transaction, reviewed the Deloitte report on behalf of CED to determine if Deloitte's conclusions were in compliance with the types of appraisal issues needed to be addressed by the Leasing Guidelines established by the IRS.

**b. Duke Report (D.Br. at 65-67)**

(1) Defendant's statements regarding the role of the November 11, 1997 site visit to the RoCa3 Facility in the CED due diligence process are misleading and inaccurate. (D.Br. at 65 n.74) For instance, Nieuwenhuis testified that the site visit with CED was not part of *Tauw's* own due diligence process to complete its analysis. (Tr. 1595-96) Defendant did not ask nor did Nieuwenhuis provide any testimony on whether CED's attendance at this site visit was part of CED's due diligence process. CED's own site visit, including physical observation of the RoCa3 Facility and meeting with its various due diligence teams, was critical to CED's due diligence on

the RoCa3 Transaction. (P.Br. at 87-88) In fact, following the site visit Con Edison personnel engaged in follow-up discussions with the Duke Engineering due diligence team and requested additional information regarding the RoCa3 Facility. (P.Br. at 88; Tr. 1845 (Gonzalez))

(2) Defendant's statement "that the RoCa3 Facility was scheduled to operate at a mid-load level" that would impact "the useful life conclusions by Duke" is false. (D.Br. at 65-66) Defendant's reliance on Ex. 431 is misguided; this exhibit simply contains a discussion regarding middle load level in the context of "the latest *drafts* of documents." (Ex. 431 at page 8608 (emphasis added)) However, the final operative documents clearly indicate that the parties intended the RoCa3 Facility to operate at a base-load level. (Ex. 11 at page 744 (operated in a Base Load manner whenever possible by the Operator); Ex. 4 at pages 396-97 (return the Facility in a condition at least as good as it would have been in had it been operated in a Base Load manner whenever possible during the Sublease Term); Ex. 2 at page 332 (maintain, repair and service the RoCa3 Facility in accordance with Prudent Industry Practice for Base Load plants); *see also* Ex. 1 at page 118 (defining "Base Load")) The final operative documents clearly support Duke's assumption of a base-load level for the RoCa3 Facility. (*See* Ex. 52 at page 1819; Tr. 2276 (Gonzalez))

(3) Defendant's statements regarding language to be included in Duke's report and the RoCa3 Transaction legal documents is misleading and inaccurate. (D.Br. at 66-67) Defendant mischaracterizes Duke's communications and conclusion involving language regarding the combustion turbine and the useful life of the

RoCa3 Facility. (D.Br. at 66-67). Although the language regarding useful life (that the legal documentation addresses the issues associated with proper maintenance, repair, and replacement such that the facility can attain the projected useful life) was ultimately not included in Duke's final report, Duke would have been comfortable with the statement, but simply elected not to include it in its final report. (Tr. 1871-72, 2333 (Gonzalez)) Furthermore, this was addressed by language in the Sublease requiring repair or replacement of parts consistent with prudent industry practice. (Ex. 4 at page 399; Tr. 1868-72 (Gonzalez))

**c. Deloitte Report (D.Br. at 67-73)**

(1) Defendant's statement that counsel "required" Deloitte to reach a certain conclusion regarding the Sublease Purchase Option is false and is not supported by Defendant's citations. (D.Br. at 67) Ellsworth testified that Deloitte's conclusion was based on its own independent analysis, which indicated that there was no economic compulsion or non-economic factors to cause EZH to exercise the Purchase Option. (Tr. 1817 (Ellsworth)) Defendant's citations contain no evidence to the contrary.

(2) Defendant's argumentative statement that Deloitte's "conclusion [on non-economic factors] was based on the form letter from EZH" misrepresents Ellsworth's testimony. (D.Br. at 67) Ellsworth's testimony does not describe EZH's letter as a form letter, but instead explains that Deloitte's conclusion was based on several factors, including the EZH letter (Ex. 56) and Deloitte's examination of the

Dutch electricity market. (Tr. 1774-76 (Ellsworth)) There is nothing in the record to suggest that EZH did not take these statements seriously.

(3) Defendant contends that Deloitte's assumptions and calculations are "incomplete and/or inaccurate," that Deloitte's analysis took place in a "vacuum," and that Deloitte's conclusions are "unreliable." (D.Br. at 68, 70) Defendant's ensuing statements do not support these contentions. Defendant references various statements from the record without explaining how they purportedly impact any of Deloitte's assumptions, calculations or conclusions. Defendant had the opportunity at trial to question Ellsworth about all these theories and thereby attempt to demonstrate what impact, if any, they might have on Deloitte's assumptions, calculations and conclusions, but Defendant did not do so. Furthermore, Defendant did not present any expert testimony to counter the testimony of Ellsworth or Kelly regarding the reasonableness of the Deloitte appraisal or to otherwise discredit Deloitte's analysis. Despite this, Defendant now attacks the completeness, accuracy and reliability of the appraisal.

First, Defendant presents no evidence to support the suggestion that the availability of collateral "funds to exercise the Sublease Purchase Option" impacts, or even should impact, Deloitte's analysis. (D.Br. at 68-69) In fact, the availability of funds would not impact Deloitte's conclusions regarding the Sublease Purchase Option because it does not change the fact that the expected fair market value of the RoCa3 Facility in 2018 is less than the purchase option price. (P.Br. at 98, 419, 424) One may presume that to exercise an option one must have the available funds

to do so, but having such funds does not impact the economic choice of whether or not to use those funds. Second, Defendant mischaracterizes the IJssel Agreement's restrictions on EZH's ability "to use these funds in the event the Sublease Purchase Option was not exercised." (D.Br. at 68) Under the Retention Option, EZH is able to pocket free and clear the $123 million in the Sublease Deposit (P.Br. at 184), and if CED exercises the Sublease Renewal Option, EZH has use of the plant at below-market rent. (Ex. 46 at pages 1503, 1578, 1759-60)

Third, Defendant incorrectly suggests that Deloitte did not consider the consequences to EZH of not exercising the Sublease Purchase Option and ignored the Retention Option in its analysis. (D.Br. at 68, 69) Deloitte, in fact, evaluated the "Cost of not Exercising the Sublease Purchase Option" to the Sublessee (EZH) in its appraisal and concluded that the costs to EZH of exercising the Sublease Purchase Option would exceed the costs of not exercising. (Ex. 46 at pages 1571-72) Deloitte's cost-benefit comparison consisted of a two-part analysis, depending on whether CED exercised the Sublease Renewal Option or the Retention Option. (P.Br. at 421)[19]

Finally, Kelly's independent recalculation of Deloitte's analysis supported and confirmed Deloitte's conclusions regarding the Sublease Purchase Option. (P. Br. at 421; Ex. 10075 (Kelly Initial Report) at page 20178)

---

[19] Defendant also claims that Deloitte ignored several other costs in its cost comparison, but does not quantify these purported costs or establish how they could impact Deloitte's analysis. (D.Br. at 69) Defendant did not offer any expert proof on such matters.