(4) Defendant's statements that Kelly "recognized numerous mistakes" in the Deloitte appraisal, "had no idea how Deloitte arrived at the numbers" in the appraisal, and "did not understand how Deloitte" used those numbers are erroneous and misrepresent Kelly's testimony on this matter. (D.Br. at 68 n.76) Kelly stated that he recognized only one mistake, but noted that it did not have a significant impact on the appraisal conclusions. Although there were instances where he could not replicate Deloitte's numbers exactly, Kelly pointed out that there was likely a rational basis for these instances. (Tr. 2812-13, 2774-5, 2778-79) Furthermore, Kelly concluded that the "Deloitte appraisal was complete," that the appraisal data was "adequate and relevant" and that the appraisal methods and techniques "were appropriate." (Tr. 2762-63) Defendant offered no expert testimony to the contrary.

(5) Defendant claims that Deloitte "failed to take into consideration . . . the replacement cost of the gas turbine" in its residual value analysis for the Sublease Basic Termination Date, the Sublease Renewal Termination Date and in the determination of fair market rents for the Sublease Renewal Term, but Defendant fails to present any evidence that this would somehow impact any of Deloitte's conclusions or that this calculation was, in fact, in error. (D.Br. at 69) More importantly, Deloitte incorporated the gas turbine replacement cost into its discounted cash flow analysis. (Ex. 46 at pages 1684, 1693) Furthermore, the cost of replacement would not be "hundreds of millions of guilders" (D.Br. at 69), but would be the 1997 cost of $15 million (Ex. 52 at page 1914) multiplied by the NLG

exchange rate of 1.972 and adjusted for inflation. (*See* Ex. 10075 (Kelly Initial Report) at page 20148 (67,676,901 NLG))

(6) Also, Defendant's statements regarding the turbine replacement cost (D.Br. at 70 n.78) fail to recognize that the $15 million replacement cost represents the "entire cost to replace" the gas turbine, not CED's 47.47% interest, and that the gas turbine is a "relatively minor cost." (Tr. 1880 (Gonzalez)) Although Deloitte overstated this replacement cost in its calculations (Tr. 1699-1700 (Ellsworth)), Kelly's analysis incorporated the proper replacement cost and calculated the effect of this change on Deloitte's analysis. (Ex. 10075 (Kelly Initial Report) at pages 20148-49) Kelly concluded that this difference would not have affected Deloitte's overall conclusions and did not affect Kelly's opinion on the reasonableness and appropriateness of the Deloitte appraisal. (*Id.* at 20149) Defendant did not challenge Kelly's conclusion regarding the effect of the replacement cost or Kelly's opinion that "the analyses, opinions, and conclusions in the Deloitte appraisal were appropriate and reasonable, and the analyses performed and conclusions drawn by Deloitte regarding economic compulsion, as it relates to the sublease purchase option, were appropriate and reasonable." (Tr. 2762-2763) Finally, contrary to Defendant's assertions, Deloitte did not ignore that replacement of the turbine would require "the facility to be off-line." (D.Br. at 70) Deloitte instead incorporated this fact into its analysis by significantly reducing both revenues and fuel costs in year 28 in its cash flow projection. (Ex. 46 at page 1746)

(7) As explained immediately above, Defendant's statements regarding the inclusion of language in the transaction documents regarding the combustion turbine (D.Br. at 70) are misleading and inaccurate, as language in the Sublease requiring repair or replacement of parts consistent with prudent industry practice addresses this matter.

(8) As explained immediately above, contrary to Defendant's statements (D.Br. at 70-71), Deloitte did not "ignore the impact of the replacement" cost to meet the "requirements of tax counsel." In addition, Defendant's statements regarding CED's "awareness" and "calculated decision" with respect to this are not supported by the record, as evidenced by Defendant's failure to provide support or citation for these statements. (D.Br. at 71)

(9) Defendant contends that Deloitte's conclusion regarding non-economic factors "lacks credibility" based on the "knowledge that CED and its advisors had at the time of the Transaction." (D.Br. at 71) The statements Defendant relies on do not support this contention and are misleading.

First, Defendant's reference to the non-economic factors discussed in Ex. 324 is misleading. (D.Br. at 71 n.81) As Defendant admits, this information relates to a "hypothetical transaction" (*id.*) and not the RoCa3 Transaction and has no bearing on Deloitte's analysis of any specific non-economic factors that might be in the RoCa3 Transaction.

Second, Defendant's statement that Kelly did not verify Deloitte's non-economic analysis is misleading. (D.Br. at 72 n.82) As Defendant admits, Kelly

performed an "economic compulsion" analysis of Deloitte's appraisal (D.Br. at 69 n.77) and did not review the non-economic factors. Deloitte's conclusion regarding non-economic compulsion was reviewed and supported by Plaintiff's expert Goulding. (P.Br. at 427)

Third, Ellsworth's inability to remember a decade after the valuation whom Deloitte spoke to about noneconomic factors does not discredit Deloitte's conclusion. (D.Br at 71-72) Moreover, Defendant's allegation that Ellsworth's testimony regarding his conversations with DePlautt was "neither forthcoming, nor credible" is not supported by the record. (D.Br. at 72) First, as discussed in Facts Section I.A.2(b)(2), DePlautt did not believe EZH had already determined to exercise the Sublease Purchase Option, and his conversations with PriceWaterhouse do not indicate otherwise. Second, Defendant's contention that the Citibank materials (Ex. 20115[20]) influenced DePlautt's understanding of purchase options is false. (D.Br. at 72) These materials did not relate to EZH, and CED never reviewed or entered into any leasing transaction in which Citibank was involved. DePlautt testified he did not rely on these materials, as this information was not obtained as part of the RoCa3 Transaction. (Tr. 2217-18, 2261) In short, Defendant's attempt to discredit Ellsworth's testimony and Deloitte's conclusion—a conclusion it chose never to challenge at trial—fails.

Fourth, Defendant's reference to what Mintun "advised clients such as EZH" on the Sublease Purchase Option is misleading and inaccurate. (D.Br. at 72)

---

[20] Ex. 20115 was admitted for state of mind, not the truth of the document. (Tr. 2214-15)

Defendant has introduced no evidence that any such purported advice was given to EZH. Mintun did not recall providing any such advice to EZH (Tr. 3060) and specifically confirmed that EZH never told him that EZH intended to exercise the Sublease Purchase Option and, to his knowledge, EZH never told anyone that they intended to do so. (P.Br. at 445) EZH also represented that there is no known factor that would materially induce EZH to exercise the Sublease Purchase Option. (P.Br. at 163-164, 445) Further, EZH's own board minutes establish that no decision regarding the Sublease Purchase Option had been made. (Ex. 288 at page 5648)

Finally, Defendant claims that EZH's representation regarding the Sublease Purchase Option is somehow inappropriately influenced by the representation and warranty provisions of the Tax Indemnity Agreement. (D.Br. at 73) For the reasons discussed in Facts Section I.A.2(b)(6), this statement is untrue.

(10) Defendant's statement regarding Deloitte's understanding of "CED's internal documents" regarding the "Retention Option" is not supported by the record, as evidenced by Defendant's failure to provide support or citation for this statement. (D.Br. at 72 n.83)

**d. Credit Suisse Interest Rate Letters (D.Br. at 73-74)**

Defendant's statements regarding the Credit Suisse interest rate letters are misleading and inaccurate. (D.Br. at 73-74) Defendant did not question CED personnel about these interest rate letters at trial, but nonetheless now attacks CED's interest rate letters. Significantly, although Defendant casts aspersions regarding the Credit Suisse Interest Rate Letters, Defendant has presented no

evidence challenging that the rates were determined and negotiated at arm's length market interest rates.

(1) Defendant's references to Ex. 1169 and Ex. 1325 do not support Defendant's contention regarding CED's interest rate requirement in leasing transactions. (D.Br. at 73) Exhibit 1169 indicates that the interest rate "assumptions" used for modeling of the NUON transaction are "arm's length" (Ex. 1169 at page 16970), and Exhibit 1325 simply points out that parties usually obtain "written comfort from a qualified financial institution" that interest rates are at market rates. (Ex. 1325 at page 19107) Defendant's citation to these exhibits mischaracterizes the nature of the documents.

(2) Defendant's statement that CED had no interest in knowing that the interest rates are "reasonable" is not supported by the record, as evidenced by Defendant's failure to provide support or any citation for this statement. (D.Br. at 73) In fact, the parties stipulated that CED's proposal for the RoCa3 Transaction provided that it was subject to the receipt of satisfactory third-party expert letters concerning the reasonableness of the interest rates. (Stip. ¶77)

(3) Defendant's contention that the interest rate letters are "form letters" that were "filled in" by Credit Suisse is not supported by the record. (D.Br. at 74) Defendant's references to Ex. 969 and Ex. 912 are misleading because Ex. 969 and Ex. 912 do not indicate that interest rate letters were form letters filled in by Credit Suisse. These exhibits involved communications with Holzman about a sample interest rate letter (Ex. 969) and the timing of Credit Suisse's interest rate letters in

the RoCa3 Transaction. (Ex. 912) Defendant had the opportunity at trial to question Holzman about these communications and letters, but did not do so.

(4) Defendant's claims regarding CED's receipt of Credit Suisse's interest rate letters "after the closing" of the transaction are misleading. (D.Br. at 74) Although CED received the "final" versions of the interest rate letters after closing, Holzman's communications simply indicate some language changes were outstanding (Ex. 905) and do not indicate that Credit Suisse's determination on the reasonableness of the interest rates was not complete. Although Defendant had the opportunity at trial to question Holzman in order to clarify the timing and status of these interest rate letters, Defendant chose not to. Furthermore, Defendant's statement that CED obtained the letters "after the closing" to "paper the transaction" is not supported by the record, as evidenced by Defendant's failure to provide support or citation for this statement. (D.Br. at 74 n.85)

**e. Arthur Andersen and PriceWaterhouse (D.Br. at 74-77)**

(1) Defendant's continued focus on Arthur Andersen's preliminary letter based on a hypothetical transaction structure (Ex. 766), and not Arthur Andersen's final letter based on the actual RoCa3 Transaction structure (Ex. 722), is misleading and misguided. (*See* D.Br. at 74-76) As Holzman explained at trial, Cornerstone prepared this hypothetical transaction structure based on the EPON transaction (a lease investment CED did not participate in) and not the RoCa3 Transaction. (P.Br. at 112-113) Defendant claims, without support or citation, that this hypothetical transaction structure is "identical" to the RoCa3 Transaction

structure and that the hypothetical transaction description applies to the RoCa3 Transaction. (D.Br. at 74; *see* D.Br. at 75 n.87) Defendant provides no support for these statements. Instead, Defendant attempts to claim that the distinction is "irrelevant" while ignoring Holzman's uncontradicted testimony on this matter. (D.Br. at 74 n.87) Holzman testified that the hypothetical description does not fit the RoCa3 Transaction (Tr. 1309), and this is confirmed by the numerous differences between the hypothetical transaction description and the RoCa3 Transaction description. (*Compare* Ex. 766 at page 12461 *with* Ex. 722 at page 12246; *compare* Ex. 766 at page 12462 *with* Ex. 722 at page 12247) Holzman also pointed out that as of the October 27, 1997 date of the hypothetical transaction description in the draft little, if any, due diligence had been performed on the RoCa3 Transaction. (P.Br. at 113)

(2) Defendant's statement that Holzman "appeared to claim" that funds were not set aside in the RoCa3 Transaction is inaccurate and misrepresents Holzman's testimony. (D.Br. at 74 n.87) Holzman simply stated that the securities EZH obtained "at closing" would need to mature in order to fund the Sublease Purchase Option (*see also* Stip. ¶235 (*scheduled* balance on January 2, 2018 (emphasis added)) and that at the time Cornerstone drafted the hypothetical transaction structure no determination regarding any defeasances had been made in EPON. (Tr. 1309-12)

(3) Defendant's continued reliance on the language in Andersen's draft letter on the hypothetical transaction structure and application to EZH's Sublease

Purchase Option is misplaced. (D.Br. at 75-76) As explained above, the hypothetical transaction did not fit EZH's transaction description and accordingly Andersen's letter based on the hypothetical transaction does not apply to the RoCa3 Transaction. More important, Andersen's final letter and the RoCa3 Transaction description contained therein did not include this language. (P.Br. at 444) Defendant's claim that Andersen's final letter "avoids" this discussion is unfounded (D.Br. at 76 n.88); the "discussion" in question was unnecessary since the Sublease met the leveraged lease criteria without regard to the purchase option analysis. (P.Br. at 442-44)

(4) Defendant's statements regarding the PriceWaterhouse Opinion on the Sublease Purchase Option are equally misleading. (D.Br. at 76-77) Defendant fails to acknowledge that the conclusion in Andersen's final letter did not rely on the purchase option to conclude that the hypothetical transaction was a leveraged lease and misinterprets DePlautt's communications with PriceWaterhouse (Ex. 1142) as explained in Facts Section I.A.2.(b)(6) and Con Edison's Opening Post-Trial Brief at 444-45.

### 5. Closing of the RoCa3 Transaction (D.Br. at 78)

Defendant's statements that the RoCa3 Transaction's closing was set in stone and that the closing was moved up to avoid impending §467 Treasury Regulations are misleading. Although the RoCa3 Transaction ultimately closed on December 15, 1997, the closing date was a moving target throughout the negotiation/due diligence process. It was scheduled for various dates, including November 1, 1997 (Ex. 298 at

page 5831), December 3, 1997 (Ex. 940 at page 14345), December 16, 1997 (Ex. 935 at page 14317) and "the week of December 15-19, 1997." (Ex. 363 at page 7677)

Further, Defendant fails to mention that CED and the other parties elected to move the closing date to December 15, 1997 for several reasons, including that "changing market interest rates" could affect the economics of the RoCa3 Transaction. (Ex. 557 at page 9965) Although CED and the parties also considered the rumored effective date of the §467 Treasury Regulations, CED could not predict what the regulations would say; it simply wanted to ensure that the RoCa3 Transaction was consistent with and in compliance with the Internal Revenue Code and regulations. (Tr. 2035-36 (Muoio))

**6. CED's Pursuit of Other Lease-Leasebacks (D.Br. at 78-83)**

**a. ENECO Discussion (D.Br. at 78-79)**

(1) The record does not support Defendant's contention that DePlautt indicated that "monitor[ing] payment streams from the lessee" and "remarketing the assets" to realize residual value was necessary "to realize full value" from a lease transaction. (D.Br. at 79) Defendant's attempt to link this contention to Exhibit 1118 is misleading. (D.Br. at 79) In Exhibit 1118, DePlautt explained that, in contrast to CED, GE Capital had the "infrastructure necessary to take credit risks and residual risks," but that this infrastructure required a significant investment to "deal with lessee payment defaults" (credit risk) and "remarketing of assets at the end of the term" (residual risk). (Ex. 1118 at pages 16502-03) As explained in detail at Facts Sections I.A.3. and I.A.6., CED attempted to mitigate its

exposure to certain risks but it continued to be exposed to such risks, including significant residual value risk.

(2) Defendant's contention regarding "EZH's lease payments" that "CED understood that the rent payments were completely secured by the Transaction's defeasance mechanisms" is false and not supported by the record. (D.Br. at 79) Tellingly, Defendant provides no support for this contention. Further, Facts Sections I.A.3. and I.A.6 explain how CED remains exposed to significant risks.

(3) Defendant's description of the ENECO transaction is incomplete. (D.Br. at 79) For a more complete discussion of the proposed ENECO transaction, see Facts Section I.D.2(6).

**b. MEGA Discussion (D.Br. at 79-80)**

(1) Defendant's statement that CED anticipated that MEGA "would have a practically identical structure to the EZH transaction" is not supported by the record. (D.Br. at 79) Defendant cites Exhibit 203 which simply provides that the MEGA transaction "is structured in line with the EZH lease transaction" as a lease-leaseback of natural gas distribution assets. (Ex. 203 at page 4336)

(2) Defendant's description of the MEGA transaction is incomplete. (D.Br. at 80) Defendant fails to mention that Fleet Bank was chosen over CED as the investor in MEGA because Fleet offered MEGA more favorable pricing, terms and conditions. (Ex. 262 at page 4980)

(3) Defendant's statements regarding Dewey's conversations with PriceWaterhouse's purported "promoter division" are misleading. (D.Br. at 80 n.94)

Defendant references Ex. 1150 and Ex. 554 to support this statement, but Defendant mischaracterizes Dewey's conversations with PriceWaterhouse's leasing division. These exhibits show that Dewey, an audit partner at PriceWaterhouse, was simply gathering information on the proper accounting treatment for lease-leaseback transactions from colleagues with expertise in leasing matters. (*See* Ex. 1150 at page 16856 (request to PriceWaterhouse's leasing advisory division for insight on how participants account for lease-leaseback transactions); Ex. 554 at 9957 (request to PriceWaterhouse's national leasing division on appropriate accounting treatment for lease-leaseback transactions))

**c. NUON Discussion (D.Br. at 80-81)**

(1) Defendant's statement regarding the timing of CED's withdrawal from pursuit of international investments is misleading and inaccurate. (D.Br. at 80) Defendant contends that in October 1998, CED was required to withdraw from pursuit of "infrastructure transactions outside the northeast United States or Central America," but this is not supported by Defendant's citations to Ex. 262 and DePlautt's testimony. (D. Br. at 80) As explained in Facts Section I.D.3(f)(2)(iii)(3), Defendant's statements are not supported by the record.

(2) Defendant's statements regarding the closing date of the NUON transaction are misleading. (D.Br. at 80-81). As explained in Facts Section I.D.3(f)(2)(iii)(3), Defendant's statements regarding the timing of when CED began its review of the NUON are incorrect and misleading.

(3) Defendant's statement that "CED turned its attention to another type of leasing tax shelter transaction—SILOs" is inappropriate. (D. Br. at 81) Not only is Defendant's use of "tax shelter" an argument and not a statement of fact, it is also not supported by Defendant's reference to Ex. 1149, which simply indicates that CED was considering "alternate lease structures such as sale-leasebacks and service contracts." (Ex. 1149 at page 16855)

(4) Also, Defendant's statement that CED was involved in "a plan for converting the NUON LILO transaction to a SILO transaction" in response to the potential §467 Regulations is false and not supported by Defendant's reference to Ex. 1013. (D.Br. at 81 n.95) CED was not mentioned in and was not a recipient of this memorandum, and furthermore this memorandum does not involve a plan to convert NUON into a sale-leaseback. (Ex. 1013 at page 15022) Instead, this memorandum notes that the NUON transaction "could be structured to accommodate a future sale/leaseback service contract structure *for that part of the undivided interest that is not included in the LILO*." (Ex. 1013 at page 15022 (emphasis added))

(5) Defendant's statement that CED demonstrated "no inclination to pursue other types of international investments" is not supported by the record, as evidenced by Defendant's failure to provide support or citation for this statement (D.Br. at 81) Further, as explained above, CED pursued various international investments. (*See* R. Facts Section I.D.3(f)(2)(iii))

### 7. Post-Transaction Activity (D.Br. at 81-83)

In its section titled "CED's Pursuit of Other LILOs," Defendant includes a series of misstatements and misleading allegations regarding CED's treatment of the RoCa3 Facility and the RoCa3 Transaction after closing.

#### a. General Allegations

(1) Defendant's statements regarding CED's reporting and activity subsequent to the closing of the RoCa3 Transaction are misleading. (D.Br. at 81-82) Defendant's description of CED's reporting as "cursory" is inaccurate. (D.Br. at 81) As Defendant points out, CED regularly reported to the Boards of CED and Con Edison regarding the earnings (rent from EZH) from the RoCa3 Transaction (D.Br. at 81), but then mistakenly suggests that CED should also have been reporting on, among other things, the "operation of the plant" and "maintenance issues" of the RoCa3 Facility. (D.Br. at 81-82) CED's interest in the RoCa3 Facility was protected by the Operative Documents entered into between CED and EZH, which provided that EZH was required, among other things, to pay rent, maintain, repair and insure the RoCa3 Facility. (P.Br. at 139-40, 155-59, 382-83) EZH has made and CED has received the rental payment, and EZH confirmed each year that it had complied with its maintenance, insurance and other obligations. (*See* P.Br. at 201-202)

(2) Defendant's contention that "CED's financial reporting demonstrates a lack of oversight and interest" in the RoCa3 Transaction after closing is not supported by the record. (D.Br. at 81) Defendant's statement regarding CED's use of

the pricing runs is misleading and does not support this contention. (D.Br. at 81) After the closing date of the RoCa3 Transaction, CED requested Cornerstone, CED's financial advisor, to prepare final pricing runs in order to book the RoCa3 Transaction. (Tr. 1191-92 (Holzman)) Accordingly, CED used the final pricing run for the purpose for which it was intended—to book the ongoing results of the RoCa3 Transaction. (P.Br. at 200-01)

(3) Defendant's assertions that CED "made no effort to examine" financial information after the closing and that "CED's own files did not contain" financial information from after the closing is false and not supported by the record. (D.Br. at 81) After the closing date of the RoCa3 Transaction, CED was still evaluating how to book the transaction for financial reporting purposes and, in fact, requested financial information in the form of final pricing runs from Cornerstone after the closing date. (Tr. 1191-92 (Holzman)) After receiving the final pricing runs in March 1998 (Ex. 331), CED reviewed these pricing runs and determined how to book the RoCa3 Transaction. (P.Br. at 200-01) Furthermore, after the close of the RoCa3 Transaction, CED received annual officer's certificates from EZH that contained EZH specific financial information (P.Br. at 201-02), which coincided with EZH's obligation to pay rents on an annual basis. (Ex. 4 at pages 445-46) EZH's failure to pay rent on a timely basis would be an event of default under the Sublease (P.Br. at 163), and the annual officer's certificates certified that EZH was not in default under the Sublease. (P.Br. at 201-02; Ex. 367 at page 7699 ("no Sublessee (Event of) default exists"))

(4) Defendant's statements regarding Tauw's environmental analysis are misleading. (D.Br. at 82) Defendant claims that Tauw "identified a series of non-compliances" at the RoCa3 Facility (D.Br. at 82), but fails to mention that Tauw classified the "three minor non-compliances" as administrative in nature, and that there were no "major noncompliances" and "no major future issues." (Ex. 53 at page 2079-80; Tr. 1570-71, 1585-87 (Niewenhuis)) Defendant's contention that CED did not follow up on the EZH's remediation plan for these non-compliances is also misleading. (D.Br. at 82) Defendant's statement is irrelevant since EZH agreed to remediate the issues identified in Tauw's report and implemented a plan to carry out such remediation. (Ex. 62 at page 2554; Tr. 1585-87 (Niewenhuis))

(5) Defendant mischaracterizes and misquotes McGrath's testimony when it states that "McGrath testified, 'If [the RoCa3 Facility] blew up we might know' there was a problem." (D.Br. at 82) As demonstrated by the colloquy below, McGrath did not say this:

> Q. Okay. And you also understand that EZH and not Consolidated Edison was required to maintain that facility?
>
> A. Right. I would expect that if we saw that it wasn't being done properly, we would - - as I said, I thought we had the right to step in and operate it. But, yes, okay.
>
> Q. Consolidated Edison wasn't visiting the facility, was it?
>
> A. *I imagine if it blew up we might, you know.*

(Tr. 283 (emphasis added)) McGrath was simply indicating that CED would obviously visit if something happened to the RoCa3 Facility.

### b. Officer's Certificates and Annual Reports

(1) Defendant's statement that the annual officer's certificates and annual reports were the "only evidence" of CED's monitoring the RoCa3 Transaction and that "this information was extremely limited" is misleading. (D.Br. at 82) The parties contemplated monitoring of EZH and its obligations in the RoCa3 Transaction and accordingly provided for EZH's annual officer's certificate and annual report in the Operative Documents. (Stip. ¶149) Under the Participation Agreement, EZH was to provide CED with an annual officer's certificate along with its annual report. (Ex. 1 at page 53) In the annual officer's certificate, an officer of EZH familiar with the Operative Documents was to certify that a review of EZH's transactions and conditions did not reveal a default under the Sublease. (Ex. 1 at page 53, P.Br. at 201-02) EZH's annual officer's certificates also included certifications from EZH on matters important to CED, including maintenance, insurance and environmental claims. (P.Br. at 202)

(2) Defendant's statement that "there is no evidence CED ever requested" the maintenance reports CED was entitled to under the Sublease is irrelevant. (D.Br. at 83) Given that there was never an issue with the RoCa3 Facility and that the annual officer's certificate provided that "EZH has performed all Operation Maintenance with respect to the facility as set forth in the current Operation Maintenance Program" (*see*, *e.g.*, Ex. 367 at page 7699), it was unnecessary to request maintenance reports.

(3) Defendant's suggestion that CED had not "actually reviewed these documents" in regard to the annual officer's certificates is not supported by the record. (D.Br. at 82) Defendant had the opportunity to question CED employees, such as DePlautt and Muoio, about these annual officer's certificates, but elected not to do so.

(4) Defendant's attempt to imply that CED's not having "officer's certificates in its files for every year" (D. Br. at 82) is an indication that CED did not receive these officer's certificates is misleading. As Defendant observes in a footnote, the "missing certificates" were received by CED's trust on CED's behalf. (D.Br. at 82 n.96)

## E. Risk Level of the RoCa3 Transaction

### 1. Defendant's Argument That the RoCa3 Transaction "Eliminates the Risks Normally Associated With Leveraged Leasing Transactions" (D.Br. at 83-86) Is Misleading and Unsupported by the Record

In this section of its Opening Post-Trial Brief, titled "Risk Level of the EZH LILO Transaction," Defendant focuses on a series of opinions offered by Con Edison's leasing expert, Ellis, and one of Defendant's own leasing experts, Bent, regarding whether certain aspects of the RoCa3 Transaction were "typical." (D.Br. at 83-86) Defendant appears to make an argument that "typical" somehow supports its theories. Defendant makes absolutely no attempt, however, to explain how the purported frequency of such provisions in leveraged leasing deals is related to CED's risks in the transaction, which is the ostensible theme of this section. Further, Defendant bases these contentions upon the terminology of Bent, who

attempted to draw a distinction between lease terms that are "not typical" but "not unusual." (Tr. 3962; see also Tr. 3957-58, 3970-71. See generally P. Br. at 437-40) No reliable findings of fact can be based upon such a distinction.

**a. Defendant Misrepresents Ellis's Testimony and Its Relevance to CED's Risk from the RoCa3 Transaction (D.Br. At 83-84)**

To support its claim that the RoCa3 Transaction's structure "eliminates the risk normally associated with leveraged leasing transactions" (D.Br. at 83), Defendant relies on the list of "key characteristics" Ellis cites in his report (Ex. 10073 at pages 19995-96) and the fact that some features of the RoCa3 Transaction were not included in that list. Defendant at numerous times states that the lack of inclusion on this list implies that Ellis "acknowledged . . . [that] the EZH LILO Transaction differed from traditional leveraged leases" with regard to these features. (D.Br. at 84) This allegation misconstrues the purpose of Ellis's list, however. As he explained during trial, this list was not intended to be exhaustive, but to illustrate some of "the main predominant characteristics of all leveraged leases," leaving out any characteristic that could "var[y] from transaction to transaction." (Tr. 3374, 3376) As such, some elements of the RoCa3 Transaction that are in fact common in the leasing industry also were not included on the list (Tr. 3376, 3386 (Ellis)), a fact Defendant ignores in its allegations.

(1) Defendant alleges that "Dr. Ellis's starting point of interchanging the words sublease and lease was, in and of itself, a departure from traditional leveraged leases." (D.Br. at 84) The meaning and implication of this statement is unclear. At

the beginning of Ellis's testimony, Con Edison's counsel asked the Court whether it preferred that the transaction be discussed in generic terms or with reference to this specific leveraged lease. (Tr. 3131-32 (Ellis)) Since the leveraged lease is the Sublease in this case, this meant referring to CED as Sublessor and EZH as Sublessee. (*See also* Tr. 1009-1011 (Holzman) (describing the various roles of the parties and recording the Court's wish that witnesses use specific terminology)) The Court asked counsel and Ellis to use the more specific terms (Tr. 3132 (Ellis)), and the witness can hardly be faulted for complying with the Court's wishes.

To the extent that Defendant is implying that a transaction containing both a lease and a sublease is "a departure from traditional leveraged leases" and therefore somehow problematic, its own experts testified that transactions involving a lease-leaseback were not problematic and that they almost certainly had worked on such transactions previously. (Tr. 3797, 3800 (Bent); Tr. 4807-08 (Ray)) Further, Defendant's implication is inconsistent with the governing authorities: *Frank Lyon* involved an effective lease-leaseback, as did the transaction the IRS approved in Revenue Ruling 82-61. (*See* P.Br. at 285, 296; *Frank Lyon Co. v. United States*, 435 U.S. 561 (1978))

(2) Defendant states that Ellis "acknowledged . . . [that] the EZH LILO Transaction differed from traditional leveraged leases" because he stated that "full defeasance of both debt and equity is not a common characteristic of a leveraged lease." (D.Br. at 84) Ellis gave this testimony as an example of his criterion limiting "key characteristics" of leases to those features that appear in *all* leveraged leases;

given this definition, he stated, full defeasance "is not a common characteristic" because "[i]t occurs in some, but not all" leveraged leases. (*See* Tr. 3372-74, 3376, 3386) This testimony does not support the notion that Ellis believes the RoCa3 Transaction was "fully defeased" or that full defeasance would eliminate the "normal" leveraged leasing risk. In fact, Ellis never testified as to either of these points.

Defendant's broader allegation in this section that EZH's purported use of full defeasance "eliminates the risks [to CED] normally associated with leveraged leasing transactions" (D.Br. at 83-84) is not supported by the record. (*See generally* R. Facts Sections I.A.3., I.A.6.)

(3) Defendant states that Ellis "acknowledged . . . [that] the EZH LILO Transaction differed from traditional leveraged leases" because he did not list "completely circular cash flows . . . as a characteristic of typical leveraged leases." (D.Br. at 84) Although the citation supports the fact that "circular cash flows" are not included in Ellis's list, it does not support the notion that Ellis believes the RoCa3 Transaction contained circular cash flows or that such cash flows would eliminate the "normal" leveraged leasing risk. In fact, the questions by Defendant's counsel avoided these issues:

> Q. And on this list, which is Exhibit 10191, you don't list circular cash flows as a characteristic of typical leveraged leases, correct?
>
> A. How are you defining circular cash flows?
>
> Q. Well, let me ask it this way. Is circular cash flows on this chart?
>
> A. No, it is not, but, again, I don't know what you mean by circular cash flows.

Q. Well, then I won't bog down. I just want to make sure that it is not on this chart. . . .

(Tr. 3373 (Ellis))

(4) Defendant states that by not including a fully funded purchase option in his list of "key characteristics," Ellis "acknowledged . . . [that] the EZH LILO Transaction differed from traditional leveraged leases" because "a fully funded purchase option is not a characteristic of typical leveraged leases." (D.Br. at 84) Defendant mischaracterizes Ellis's testimony. Ellis in fact testified that he did not list such a purchase option "[b]ecause that can vary from transaction to transaction. I was trying to distill here what are common characteristics of the various types of leveraged leases." (Tr. 3374) Ellis also confirmed the "full defeasance"—an apparent reference to the availability of defeasance accounts to pay the Sublease Purchase Option Price—was used in some leveraged leases. (Tr. 3372-73) The testimony of Defendant's leasing expert supports this fact. (Tr. 3957-58, 3960-62 (Bent)) Further, there is no evidence in the record that the presence of the defeasance accounts to fund EZH's Sublease Purchase Option would eliminate the "normal" leveraged leasing risk, or that Ellis believed this was the case.

(5) Defendant states that Ellis "acknowledged . . . [that] the EZH LILO Transaction differed from traditional leveraged leases" because he testified that "the existence of tax indemnity agreements are not common in leveraged leases." (D.Br. at 84) This statement mischaracterizes Ellis's testimony. Ellis testified that the existence or lack of a tax indemnity agreement "varies from transaction to

transaction," but he did not say that it was not used in "traditional" leveraged leases or that it was not "common." (Tr. 3374)

Defendant's assertion with respect to tax indemnity agreements cannot be justified. Defendant's leasing expert Bent agreed that tax indemnity agreements are "common in leveraged leases generally" and testified that he had never worked on a leveraged leasing transaction that did not have a tax indemnity agreement. (Tr. 3874) As Bent testified, "I have done some where the protection was broader, but I haven't done any that didn't have a TIA [tax indemnity agreement] in it." (*Id.*) Given this fact, Defendant is incorrect to claim that the Tax Indemnity Agreement in this case eliminates the risks normally associated with leveraged leasing transactions.

(6) Defendant states that Ellis "acknowledged . . . [that] the EZH LILO Transaction differed from traditional leveraged leases" because he "did not include deferral of the basic rent for more than 40 years as a typical characteristic of a leveraged lease." (D.Br. at 84) Although Ellis testified that he had not listed this characteristic in his report, he did not say that such provisions are atypical or incompatible with "traditional leveraged lease" structures. (Tr. 3375) And once again, Defendant's allegation is undermined by its own expert's testimony: Bent testified that deferred rents are sometimes used in lease transactions and that he has worked on deals where the rent and/or the initial equity investment was deferred. (Tr. 3842-43) Once again, it is also entirely unclear what relationship the deferred rental

arrangement in this case has to Defendant's overarching allegation that CED did not bear "normal" risk with respect to the RoCa3 Transaction.

(7) Defendant states that Ellis "acknowledged . . . [that] the EZH LILO Transaction differed from traditional leveraged leases" because "the walk away provision, which permitted CED to walk away from the Transaction after the sublease basic term with ten days notice, was not a typical characteristic of a leveraged lease." (D.Br. at 84) Defendant's claim that the transaction contains a "walk away" provision is erroneous, as is discussed above at Facts Section I.A.2(c).

(8) Finally, Defendant states that Ellis "acknowledged . . . [that] the EZH LILO Transaction differed from traditional leveraged leases" because "the existence of the retention option, the purchase option, and the renewal option in the same transaction was not common." (D.Br. at 84) Once again, this characterization misstates Ellis's testimony. Although Ellis agreed that it is "not a requirement to have" all three options, he stated that retention options (*i.e.*, return provisions) are common in leveraged leasing, that purchase options and renewal options are typical, and that the presence of all three in the same lease "is not uncommon." (Ex. 10073 (Ellis Initial Report) at page 19996; Tr. 3386). He said absolutely nothing to support the idea that the presence of these three options eliminates the "normal" leveraged leasing risk.

**b. Defendant Misrepresents Bent's Testimony and Its Relevance to CED's Risk from the RoCa3 Transaction (D.Br. at 84-85)**

To support its claim that the RoCa3 Transaction's structure "eliminates the risk normally associated with leveraged leasing transactions" (D.Br. at 83), Defendant also relies on various opinions allegedly stated by its leasing expert Bent about "features of the transaction that collectively are atypical in leveraged leases." (D.Br. at 84)

(1) Defendant states that Bent opined that the use of the defeasance accounts in this case were "not typical of a leveraged lease," in part because they "were used to completely fund the exercise of various options under the [S]ublease." (D.Br. at 84, 85) These arguments are misleading, however. Both of Defendant's leasing experts, Bent and Ray, testified that defeasance is commonly used in leases and other financing transactions, especially long-term and cross-border deals. (Tr. 3760-61, 3819-20 (Bent); Tr. 4940-41 (Ray))

Bent also testified that the amount of funds placed in the defeasance accounts and the accounts' availability to EZH for the potential exercise of the Sublease Purchase Option were not unusual:

- Bent personally has been involved in lease transactions "where there is some amount available, . . . maybe a defeasance account, or some other collateral that's available to be liquidated and used to pay for the purchase option." (Tr. 3823)
- Although Bent first testified that the use of defeasance accounts to fully fund purchase options is not common enough in leveraged leasing to be considered "typical," he admitted that neither are such arrangements so uncommon as to be considered "unusual." (Tr. 3957-58, 3962) In fact, Bent submitted an expert

> report on behalf of the taxpayer in another lease-leaseback case, *BB&T*, in which he opined that the use of defeasance accounts to fully fund purchase options is entirely consistent with commercial leasing practice. (Tr. 3960-61)

More important, however, as discussed above in response to Defendant's allegations related to Ellis's testimony regarding the structure of the RoCa3 Transaction, the broader allegation that EZH's use of defeasance eliminates the risks [to CED] normally associated with leveraged leasing transactions is not supported by the record.

(2) Defendant alleges that "EZH, as sublessee, never realizes the actual value of the refinancing of its Facility." (D.Br. at 84) Defendant's statement is argumentative and has no factual support beyond Bent's conclusory allegations to the same effect. Defendant's contention appears to rest, however, on the fact that at closing, EZH was required to place its proceeds from the transactions net of its net present value benefit in defeasance accounts as collateral for its obligations. But, as Bent and Ray testified, defeasance is commonly used in leases and other financing transactions. (P.Br. at 227) Lessees in sale-leasebacks and lease-leasebacks always receive a net present value benefit that is less than the full value of the refinanced assets. (Ex. 10073 (Ellis Initial Report) at pages 19997-98 (discussing the "cost of financing" for the lessee))

(3) Defendant states that Bent testified that "the establishment and accrual of earnings on the Sublessee Loan and its use to provide an offset against around 50% of the Final Basic Rent Payment is atypical." (D.Br. at 84-85) The first half of Defendant's statement misrepresents Bent's testimony, and the

second half is untrue. Although Bent initially expressed concern with the Sublessee Loan during direct examination, he later agreed on cross-examination that the Sublessee Loan accruals were akin to IOUs, obligations that EZH must eventually pay. (Tr. 3843; *see also* Tr. 4791 (Ray)) Bent testified that rents coming due, but paid with an IOU rather than in cash, *i.e.*, deferred rents, are sometimes used in lease transactions. (Tr. 3842-43) In fact, Bent has worked on deals where the rent and/or the initial equity investment is deferred in this way. (Tr. 3843)

Defendant's claim that the Sublessee Loan provides an "offset" against the Final Basic Rent Payment is simply not true. (*See* R. Facts Section I.A.4.)

(4) Defendant states that "deemed payments of Recourse Lease Basic Rent, secured by the Trustee Treasury Collateral (in turn funded from the original Equity Defeasance Account) and the use of this device to account for approximately 17% of the Final Basic Rent Payment is not typical" and similarly that "the making of periodic Lease Collateral Deposits (in turn derived from the receipt of Sublease Renewal Rent) and the use of this mechanism to secure about one-third of the Final Basic Rent Payment is not typical." (D.Br. at 85) Defendant's statement contains numerous inaccuracies and factual assumptions, including Defendant's implication that the Trustee Treasury Collateral and Lease Collateral Deposits are both required by the Operative Documents and the statement that these accounts are guaranteed to "offset" certain portions of the Final Basic Rent Payment. For Con Edison's full response to this claim, see Facts Section I.A.4.

(5) As evidence that the RoCa3 Transaction eliminated normal leasing risk, Defendant cites the "constructive transfer from CED to EZH of CED's maintenance and repair obligations under the lease, even when no sublease was in place." (D.Br. at 85) Defendant's statement is misleading; it implies that CED would have been expected to expose itself to the risk of EZH's default under the Sublease, causing CED's own default under the Lease. The contractual provisions Defendant apparently refers to are those in Lease §7, which provide that CED is deemed to have complied with the Lease maintenance obligations so long as the Sublease or Facility Operating Agreement is in effect. (Stip. ¶115; Ex. 2 at page 332) Bent recognized that its effect was to prevent EZH's default under either the Sublease or the Facility Operating Agreement (as Operator) from automatically placing CED in default under the Lease. (Tr. 3893-94) In other words, these provisions remove the possibility of EZH's acting in a manner inconsistent with the agreement in order to benefit itself by unraveling the transaction. Bent agreed that contracting around such possibilities makes good business sense. (Tr. 3894-95)

(6) Defendant states that the use of the IJssel Deposit "as a hedge against the risk of loss due to unforseen [sic] changes in applicable Dutch law" was unusual and eliminated normal leveraged lease risk. (D.Br. at 85) This allegation is directly contrary to its own expert's testimony, however: Bent testified that "[i]t is certainly not unusual to have protection [for the parties] against a change in law." (Tr. 3768)

**c. Defendant's Claim That CED "Acknowledges [That] the EZH LILO Transaction Does Not Possess the Typical Risks Associated With Leveraged Leases" Is Incorrect and Misleading (D.Br. At 85-86)**

Defendant cites Exhibit 1118 in support of the claim that CED believed the RoCa3 Transaction did not possess the "typical risks" of a leveraged lease. Con Edison's response to this claim is laid out above in Facts Section I.A.10.

## ARGUMENT

Part I of this Brief addresses the issue that both parties agree is controlling in this case: whether CED or EZH bears the "benefits and burdens of ownership" with respect to CED's Lease Interest in the RoCa3 Facility. The evidence demonstrates that CED bears the "burdens and benefits of ownership" with respect to the Lease Interest, as that test has been applied to leasing transactions over the last five decades.

Since the submission of Con Edison's Opening Post-Trial Brief on April 7, 2008, two courts have issued decisions relevant to the issues presented by this case, *BB&T Corp. v. United States*, 523 F.3d 461 (4th Cir. 2008), and *AWG Leasing Trust v. United States*, No. 1:07-CV-857 (N.D. Ohio May 28, 2008).[21]

[21] In *Fifth Third Bancorp. v. United States*, a leasing case currently pending in the Southern District of Ohio, the court recently denied both parties' motions for judgment as a matter of law due to the presence of unresolved issues of fact. *See* No. 1:05-CV-350 (Denying judgment pursuant to Fed. R. Civ. P. 50) (S.D. Ohio, June 10, 2008). In particular, the court noted that "the question of whether the Purchase Option is virtually certain to be exercised is itself a factual issue which precludes the entry of judgment as a matter of law for either party." *Id.* at 9.

The jury in *Fifth Third* agreed that Fifth Third had obtained a genuine leasehold interest in the property that entitled Fifth Third to claim rental

Part II of this Brief addresses the *BB&T* and *AWG* decisions and their application to the issues presented by Con Edison's case. In both *BB&T* and *AWG*, the court concluded, based on the evidence there, that the lessees in those cases were certain to exercise their purchase options and, therefore, that those transactions did not qualify as leases. The facts of Con Edison's case, however, are different: the evidence establishes that it is uncertain whether EZH will exercise the Sublease Purchase Option.

Part III of this Brief addresses Defendant's claims, made at Part II of its Opening Post-Trial Brief, pages 88-105, that CED did not acquire a present interest in the RoCa3 Facility.

Part IV of this Brief addresses Defendant's claims, made at Part III of its brief, pages 105-07, that CED is not entitled to interest expense deductions with respect to the HBU Loan.

Part V of this Brief addresses Defendant's claims, made at Part IV of its brief, pages 107-31, that the RoCa3 Transaction lacks economic substance.

## I. CED Holds the Benefits and Burdens of Its Lease Interest

Both parties agree that the controlling issue in this case is whether CED or EZH should be regarded as holding the "benefits and burdens of ownership" with

---

deductions, but also stated that Fifth Third was not entitled to interest expense deductions and that the transactions did not appreciably affect Fifth Third's beneficial interests. The parties are currently briefing the meaning of the jury's verdict and the court has not entered a decision.

respect to CED's leasehold interest in the RoCa3 Facility. (*Compare* D.Br.[22] at 90 (attributes of a "traditional owner of a leasehold interest" are the "benefits and burdens normally incident to possession of such an interest"), *with* P. Br. at 264 (ownership depends upon "which party possesses the benefits and burdens of ownership of the leased property")) Decades of case law establish that the controlling principle is that a lessor cannot be treated as an owner of property unless it bears the benefits and burdens of ownership. *See, e.g.*, *BB&T*, 523 F.3d at 474; *Coleman v. Comm'r*, 16 F.3d 821, 826 (7th Cir. 1994); *AWG*, No. 1:07-CV-857, slip op. at 44; *Larsen v. Comm'r*, 89 T.C. 1229, 1266-68 (1997); *Rubin v. Comm'r*, 58 T.C.M. (CCH) 25, 34 (1989); *Levy v. Comm'r*, 91 T.C. 838, 859-61 (1988); *Torres v. Comm'r*, 88 T.C. 702, 720 (1987); *L.W. Hardy Co, Inc. v. Comm'r*, 52 T.C.M. (CCH) 1540, 1551-52 (1987); *Estate of Thomas v. Comm'r*, 84 T.C. 412, 431 (1985).

Defendant apparently agrees that the ownership of a leasehold interest in property is itself property that can be leased to a third party, since Defendant agrees the correct standard is whether CED "enjoys the benefits and bears the burdens normally incident to possession of such an interest." (D.Br. at 90) Defendant's leasing experts, Bent and Ray, agreed that there is nothing unusual about a lease-leaseback transaction and that they likely had done such transactions themselves. (Tr. 3797, 3800 (Bent); Tr. 4807-08 (Ray))

The differences between Con Edison and Defendant relate to the standards by which the "benefits and burdens of ownership" ought to be measured. Con Edison

---

[22] References to Defendant's and Plaintiff's Opening Post-Trial Briefs are referenced herein as "D.Br. at ___" and "P.Br. at ___," respectively.

has relied on an extensive body of case law that delineates the factors that must be considered in applying the benefits and burdens test. (*See* P.Br. at 266-314) In determining the benefits and burdens of ownership in leasing cases, the courts have focused on the following factors:

(1) the taxpayer's equity interest as a percentage of purchase price;

(2) the existence of useful life of the property in excess of the leaseback term (here, the life of the Lease Interest after the Sublease);

(3) if the lease can be renewed, whether the renewal rental at the end of the initial leaseback term is set at fair market value;

(4) if there is a purchase option, whether the option price is set at less than fair market value;

(5) the expectation of a "turn around" point which would result in the investor's realizing income in excess of deductions in later years and net tax benefits during the leaseback term less than the unrecovered cash investment; and

(6) whether the investor paid fair market value for the asset.

*See, e.g.*, *Levy*, 91 T.C. at 860-61; *Larsen*, 89 T.C. at 1267-68; *Rubin*, 58 T.C.M. (CCH) at 34-35; *Torres*, 88 T.C. at 720-25; *L.W. Hardy*, 52 T.C.M. (CCH) at 1552; *Estate of Thomas*, 84 T.C. at 432-35.

In the context of a leasing transaction, the lessee holds physical use and possession of the property during the lease term by definition. *See, e.g.*, *Torres*, 88 T.C. at 721. The defining characteristic of the lessor is the possession of the "most significant benefit and burden," *i.e.*, the "potential of realizing a profit or loss on the [residual value] of the equipment." *Gefen v. Comm'r*, 87 T.C. 1471, 1492 (1986); *see also Coleman v. Comm'r,* 16 F.3d 821, 827 (1994) ("residual value" is the "foremost

consideration" in determining benefits and burdens of ownership); *Rubin*, 58 T.C.M. (CCH) at 35; *Levy*, 91 T.C. at 862; *Mukerji v. Comm'r*, 87 T.C. 926, 961 (1986). Thus, in determining the "benefits and burdens of ownership," the case law has focused on the taxpayer's exposure to the property's value during the residual value period after the lease is terminated, not during the period of the lease itself.

Con Edison has also outlined in extensive detail the provisions of the Leasing Guidelines and their application to this case. (P.Br. at 270-87, 344-68) The Leasing Guidelines largely apply the same standards as applied in the "benefits and burdens" cases. For example, the Leasing Guidelines also look to a significant equity investment, a useful life in excess of the lease term and a pretax profit. *See* Rev. Proc. 75-21 §§4(1)(A), 4(1)(C), 6, 1975-1 C.B. 715-16.

Most of these factors are not in dispute in this case. Defendant has not disputed that CED invested 26.53% of the property's cost (P.Br. at 345), and Defendant's leasing expert Bent agreed that CED's equity investment in the RoCa3 Transaction is greater than the investment in many leveraged leasing transactions. (Tr. 3868) Defendant also has not disputed that the residual term (the Shirt-Tail Period) of CED's Lease Interest in the RoCa3 Facility is 15.5% of its total 43.2-year leasehold interest even if CED elects the Sublease Renewal Option; this residual period exceeds the remaining useful lives courts regularly approve. (P.Br. at 348-49) Defendant has not disputed that the rent under the Sublease Renewal Term is less than fair market value (Ex. 46 at page 1503) and, therefore, CED is expected to exercise the Retention Option. This would result in an even longer residual term

during which CED has opportunities and risks of the residual value. Defendant has not disputed that CED paid fair market value for its Lease Interest. (Ex. 46 at page 1503) There is no dispute that the RoCa3 Transaction will reach a "turn around" point where CED will realize taxable income in excess of its tax deductions claimed. (Ex. 20194 (LaRue Initial Report) at page 25150 (showing CED's total tax due of $21,355,773 (column H))

There is, in fact, only one factual dispute between the parties relating to the tests applied in the Leasing Guidelines and case law, but this dispute is critical to the outcome of this case. This dispute relates to whether or not EZH is certain to exercise the Sublease Purchase Option. The certainty—or lack thereof—that a lessee will exercise its purchase option will be a crucial factor in any leasing case. If a fixed-price purchase option is certain to be exercised at the end of the lease term, the lessor will, by definition, never own the residual value of the property and the residual value will remain with the lessee. Since a significant expected residual value in the leased property is the "foremost consideration" in determining the benefits and burdens of ownership, *Coleman,* 16 F.3d at 827, a purchase option that is certain to be exercised is incompatible with status as a lease. This has been the rule for over 50 years. (P.Br. at 267-68, 275-77, 308-13)

The importance of the purchase option in this case was underscored by Defendant's own experts, who acknowledged that CED will inevitably bear the benefits and burdens of ownership if EZH does not elect the Sublease Purchase Option. LaRue agreed that all of his conclusions regarding CED's risks and returns

from the RoCa3 Transaction simply ignored whether CED would profit or lose money on the operation of the RoCa3 Facility during the Shirt-Tail Period or Retention Period. (P.Br. at 471-80) Thus, LaRue, Bent and/or Ray agreed under cross-examination that if EZH does not exercise its Sublease Purchase Option:

- CED's revenues during the Retention Option Period or the Shirt-Tail Period would be "entirely dependent" on the operation of the RoCa3 Facility, and these revenues would be subject to "a lot of risk." (Tr. 5241, 5163-64, 5352-55 (LaRue); *see also* Tr. 3954-56 (Bent))
- CED's revenues would not be "preordained." (Tr. 5239 (LaRue))
- The cash flows would not be "circular." (Tr. 5239-41)
- CED could lose money from operation of the RoCa3 Facility (Tr. 5163-64, 5352-55 (LaRue); Tr. 4804-05, 4809-10, 4832 (Ray); Tr. 3954-56 (Bent))

Ray summed up the situation accurately when he confirmed that there was "[m]aterial risk, material opportunity" for CED if EZH did not elect the Sublease Purchase Option. (Tr. 4832-33) He agreed that CED will have "risks and opportunities . . . to generate profit or loss" from exploiting the "residual value by selling the output." (Tr. 4865-67 (Ray)) This "material risk" and "material opportunity" during the residual value period is the essence of the "benefits and burdens" analysis. If EZH does not exercise the Sublease Purchase Option, CED will necessarily encounter the "risks" and "opportunities" of the RoCa3 Facility during either the Retention Option Period or the Shirt-Tail Period (depending upon which option CED elects). LaRue specifically agreed that CED would have the benefits and burdens of a leasehold interest in the RoCa3 Facility if EZH did not elect the Sublease Purchase Option. (Tr. 5247) These "benefits and burdens" of

ownership during the residual value period are the critical factor in distinguishing between a loan and a conditional sale. *See, e.g.*, *BB&T*, 523 F.3d at 473-74; *AWG*, No. 1:07-CV-857, slip op. at 44.

The recent decisions in *AWG* and *BB&T* underscore the importance of the purchase option, and whether it is certain to be exercised, in the analysis of a leasing case. In both cases, the United States presented evidence, which the courts credited, that the purchase options in those cases were certain to be exercised, thus leading to the conclusion that the transactions should not be respected as true leases. *See BB&T*, 523 F.3d at 473; *AWG*, No. 1:07-CV-857, slip op. at 51-59. In Section II, Con Edison addresses those two decisions in detail and contrasts the evidence presented in those cases regarding the certainty of purchase option exercise with the record in Con Edison's case.

## II. The Relevant Facts and Circumstances of the Con Edison Case Are Different from Those of the *BB&T* and *AWG* Cases

### A. The Law Requires that Leasing Issues Must Be Decided Upon the Facts and Circumstances of the Specific Case

The law has long recognized that leasing cases must be decided "on the basis of all the facts and circumstances there presented." *Transamerica Corp. v. United States*, 15 Cl. Ct. 420, 436 (1988), *aff'd on other issues,* 902 F.2d 1540 (Fed. Cir. 1990) (*Transamerica II*) (quoting *Kansas City So. Ry. Co. v. Comm'r*, 76 T.C. 1067, 1094 (1981)). *Frank Lyon* mandates a "combing of all the facts" of a leasing transaction. *Id.* at 437, 438 (citing *Frank Lyon*, 435 U.S. at 566); *see also AWG*, No. 1:07-CV-857, slip op. at 40 ("Facts and contract provisions drive any determination

regarding whether a transaction sufficiently transfers an ownership interest. Each transaction need be judged on its own conditions.").

Since the analysis of a leasing case requires a review of all the facts, a particular form of a leasing transaction may—or may not—qualify as a lease, depending upon the unique facts of the particular transaction. Thus, for example, some sale-leasebacks of equipment have qualified as leases, while others have not. *Compare Johnson v. United States*, 11 Cl. Ct. 17 (1986) ("*Johnson I*") (upholding status as lease based on detailed review of the facts), *with Johnson v. United States*, 32 Fed. Cl. 709, 715-16 (1995) ("*Johnson II*") (denying status as a lease after applying Treas. Reg. §1.183-2(a) "facts and circumstances" test)).

Most importantly, given the facts of and decisions in *BB&T* and *AWG*, the substance of a leasing transaction requires a factual determination of whether the lessee will be economically compelled to exercise any purchase option it may have. *Compare Transamerica Corp. v. United States*, 7 Cl. Ct. 441, 448 (1985) ("*Transamerica I*") (purchase option "reasonably certain" to be exercised), *with Transamerica II*, 15 Cl. Ct. at 442 (exercise of options "not a certainty").

Defendant will likely argue that *BB&T* requires the disallowance of all LILO transactions, without regard to any of their individual facts, which will change from deal to deal and taxpayer to taxpayer.[23] This argument, however, makes no more

[23] The Fourth Circuit stated that the parties had agreed the BB&T structure was a "'typical' LILO." 523 F.3d at 464. Since the Court did not have the facts of any other transactions before it, there was no basis for that statement. Both parties may have had an incentive for arguing that BB&T was a "typical" transaction: the United States wanted to establish a precedent for all LILO transactions, while BB&T may

sense than claiming that *Frank Lyon* requires that all sale-leasebacks be respected without regard to their individual facts.[24]

The law therefore requires that this case be decided on its individual facts, as established through the trial exhibits and five weeks of testimony. A comparison of the facts here with the facts of *BB&T* and *AWG* demonstrates critical differences on key points regarding the characterization of the respective transactions as leases. In the discussion below, Con Edison identifies key factual findings in the *BB&T* and *AWG* cases and contrasts those findings with the evidence in Con Edison's case, much of which was uncontradicted.

## B. In Both *BB&T* and *AWG*, in Contrast to the Facts of Con Edison's Case, the Evidence Demonstrated that the Purchase Options Were Certain to Be Exercised

### 1. The Purchase Options in *BB&T* and *AWG* Were Certain to Be Exercised, Thus Depriving the Lessors in Those Cases of the Benefits and Burdens of Ownership

#### a. The *BB&T* Transaction

The *BB&T* transaction involved a LILO transaction between BB&T, a Southern bank, and Sodra, a Swedish wood pulp manufacturer. 523 F.3d at 465.

---

have wanted to tie its fate to cases where the purchase option was not certain of exercise.

The IRS specifically designated the BB&T case for litigation, meaning that the case could not be settled short of a full concession by the taxpayer. *See Tax Bar Grumbling Over Government's First LILO Win*, 2007 TNT 10-7 (Jan. 16, 2007). To the best of Con Edison's knowledge, no other LILO case has been so designated. It is safe to assume that, in designating *BB&T* for litigation, the IRS picked the case that presented the most favorable set of facts for the IRS's position.

[24] It appears that the taxpayer in *Transamerica I* and *II* made just such an argument. *Transamerica II*, 15 Cl. Ct. at 437; *Transamerica I*, 7 Cl. Ct. at 450-51.

The property which was the subject of the LILO was wood pulp mill equipment. *Id.* The transaction was marketed to BB&T as a "'tax driven structure.'" *Id.* As part of the transaction, BB&T did not retain any rights except the right to make an annual inspection of the equipment. *Id.* at 466, 473. The transaction was structured to "insulate[ ]" BB&T from "any risk" of loss. *Id.* at 473.

It is highly significant that in entering into the transaction, BB&T did not follow its normal due diligence procedures for entering into leasing investments. *Id.* at 466 n.4. It was unclear from the evidence presented on cross-motions for summary judgment, whether BB&T could ever make a profit on the transaction, aside from tax benefits. *Id.* at 469-70.

As part of the transaction, Sodra created certain defeasance accounts to defease its obligations under the lease-back from BB&T. Sodra gave up all rights to the funds in these accounts: as the result of an "irrevocable transfer, those funds became an asset solely of ABN, unreachable by Sodra, BB&T, or their respective creditors." *Id.* at 467.

The evidence on cross-motions for summary judgment (which BB&T apparently did not contest)[25] established that Sodra was certain to exercise its fixed-price purchase option, as "the purchase option represented the only economically viable scenario for Sodra." *Id.* at 469. In particular, the "cost of replacing lost manufacturing capacity," *i.e.*, the cost of replacing Sodra's pulp mill equipment, would compel Sodra to exercise the purchase option to avoid losing control of the

[25] If BB&T had contested this evidence, the district court would not have been able to decide the case on summary judgment.

pulp mill equipment. *Id.* Because Sodra "has no economic incentive to cede control to BB&T," BB&T would never obtain the burdens and benefits of ownership of the equipment and thus BB&T could not be treated as the owner of an interest in the equipment. *Id.* at 475.

Since BB&T was certain to exercise the purchase option, the cash flows from the transaction were entirely "circular" and BB&T was never at risk of losing any money. *See id.* at 473.

**b. The *AWG* Transaction**

The *AWG* transaction was a sale-leaseback between AWG Leasing Trust (the "Leasing Trust"), a partnership between two large banks, and AWG, a German corporation owned by a group of municipalities. No. 1:07-CV-857, slip op. at 1, 7. The subject property was a waste-to-energy disposal facility, *i.e.*, a plant that incinerates solid waste and generates electricity from the waste combustion process. *Id.* at 7. The Leasing Trust purchased the property from AWG and then leased it back to AWG for a period of 25 years. *Id.* at 18-19. At that point in time, AWG had two alternatives: AWG could repurchase the property pursuant to a purchase option, or it would have to enter into a "service contract" with the Leasing Trust. *Id.* at 25-27. Under the terms of the service contract, AWG was required to purchase waste disposal services from a third-party operator who would operate the facility on behalf of the Leasing Trust. *Id.* at 27. In order to enter into the service contract, however, AWG was required to arrange for nonrecourse refinancing of the debt the Leasing Trust originally incurred to purchase the facility. *Id.* In addition, the

municipal shareholders of AWG were required to guarantee AWG's payment obligations under the service contract. *Id.* at 54.

The district court in *AWG* first reviewed the *BB&T* decision, finding that in that case "the Fourth Circuit found the exercise of the purchase option was the near-certain result." *Id.* at 40. The court then reviewed the *AWG* facts and concluded: "[M]ost importantly, it is *nearly certain* that AWG will exercise the Fixed Purchase Option in 2024, thus ensuring that the Plaintiffs never actually acquire economic ownership" of the waste facility. *Id.* at 45 (emphasis added). Since the purchase option was nearly certain to be exercised, the Leasing Trust would never "experience any residual value risk." *Id.* at 50. Thus, the Leasing Trust would never acquire the benefits and burdens of ownership.

The district court gave a series of reasons for concluding that AWG would be compelled to exercise the purchase option. First, the United States' expert witness "testified persuasively that AWG will be compelled to exercise the Fixed Purchase Option in 2024 because it will be unable to obtain the required non-recourse financing." *Id.* at 52. The insurmountable hurdle for AWG was that the amount of the required refinancing was too high in relation to the property's expected fair market value, and the United States' expert testified that it would be "practically impossible" for AWG to find a bank willing to make such a loan. *Id.* at 52-53. In holding that the required financing could not be obtained, the court emphasized that the fees under the Service Contract, unlike rentals from the lease, were not to be paid on a "hell or high water" basis. *Id.* at 54. The Service Contract fees would

not be paid if the AWG facility was inoperable, and thus the court concluded that the fees "would not be included in the estimated value of collateral for a lender considering whether" to make the non-recourse loan. *Id.* This left the lessee with the insurmountable burden of obtaining financing against an asset with a projected value just barely in excess of the amount to be financed and no guaranteed cash flows against which to service the debt. *Id.* at 52-54. Also, under the parties' agreement, defeasance of the refinanced loan was not allowed. (*Id.* at 27, 53) Thus, the contingent fees under the service contract and the expected value of the facility were the only permitted collateral. The court agreed with the United States that no reasonable lender would make a non-recourse loan under these circumstances. *Id.* at 53-55.

Second, the court concluded it was "highly unlikely that AWG's municipal shareholders would provide a guarantee of AWG's obligations under the Service Contract," which was also a condition precedent to electing the service contract. *Id.* at 54. Finally, the court concluded that it would be "politically unpopular" for AWG to elect any option other than the purchase option. *Id.* at 58-59.

The court did recognize, however, that the *AWG* sale-leaseback had economic substance, since it was expected to produce a pretax profit of 3.4%, which was commensurate with the profits from the Leasing Trust's partners' other leveraged lease transactions. *Id.* at 42-43. The court agreed that this was a sufficient economic profit to pass the economic substance test. *Id.* The court in *AWG* was influenced by what it viewed as "exotic efforts to transfer tax deductions from tax indifferent

entities." *Id.* at 6. However, the Code specifically allows, and provides rules for, leases to tax-exempt entities, including foreign entities. I.R.C. §§168(g)(1)(B), (h)(2)(A)(iii). Defendant has never even attempted to assert that the RoCa3 Transaction violates any statutory requirements, relying instead upon tax common law doctrines. Ironically, *AWG* itself notes that leasing is used, instead of debt finance, when lessees are "unable to fully utilize tax benefits" and thus enter into transactions "that allow[] them to transfer the tax benefits associated with depreciation and interest expense deductions to lessors who could more fully use these tax benefits." No. 1:07-CV-857, slip op. at 4.

#### c. The Certainty that the Purchase Options Would Be Exercised in *BB&T* and *AWG* Controls the Outcome in Those Cases

In its opening brief, Con Edison explained that a lease will not be respected if the lessee is under an "economic compulsion" to exercise its purchase option. (P.Br. at 415-18) But if an option is not certain of exercise, the form of the transaction as a lease will be upheld even in the presence of a fixed-price purchase option. *See, e.g.*, *Transamerica II*, 15 Cl. Ct. at 440, 442. In both *BB&T* and *AWG*, the United States presented evidence, which the courts accepted, that the lessees would be compelled to exercise their respective purchase options. *See BB&T*, 523 F.3d at 473; *AWG*, No. 1:07-CV-857, slip op. at 51-59.

The certainty that the purchase option would be exercised in *BB&T* and *AWG* therefore necessarily controls the outcome in those cases.[26] Because the purchase options were certain to be exercised, BB&T and the Leasing Trust would never be exposed to the most important benefit and burden of ownership, *i.e.*, the possibility of profit or loss from fluctuations in the property's residual value. The transactions would terminate at the end of the lease terms and BB&T and the Leasing Trust would never be subject to the risk of the property's operation. Similarly, since those purchase options were certain to be exercised, BB&T and the Leasing Trust would receive a fixed return—no more and no less. Thus, the *BB&T* and *AWG* transactions resemble loans, not leases.

### 2. CED Produced Evidence That, in the Context of the Netherlands' Deregulated Energy Markets, EZH Was Not Certain to Exercise the Sublease Purchase Option

The determination of whether the Sublease Purchase Option was certain to be exercised therefore requires a careful review of the factual record before the court in Con Edison's case. At trial, Con Edison produced two witnesses who testified that it was uncertain whether EZH would exercise the Sublease Purchase Option. Goulding was qualified as an expert in regulatory economics related to energy

[26] Although the decisions in both *BB&T* and *AWG* referred to the parties' expectations concerning exercise of those options, *see BB&T*, 523 F.3d at 473-74; *AWG*, No. 1:07-CV-857, slip op. at 43-44, both cases relied on objective economic evidence that demonstrated that the purchase option would always be the less costly alternative. Reliance on the parties' subjective expectations (many years before the relevant exercise date) concerning the exercise of the purchase option would be contrary to well settled authority. *Transamerica II*, 15 Cl. Ct. at 441-42; *Breece Veneer & Panel Co. v. Comm'r*, 232 F.2d 319, 323 (7th Cir. 1956). (P.Br. at 416-18)

markets. He testified that, as a result of the impending deregulation of the Dutch markets, it would have been reasonable to expect that in 2018, EZH would not be under any regulatory or market compulsion to exercise the Sublease Purchase Option. (P.Br. at 427-30) In particular, even if EZH needed the amount of power produced by the RoCa3 Facility, EZH would have easily been able to obtain this power in a deregulated energy environment. (Tr. 2448-51 (Goulding))

Further, Reed testified that, as a result of the expected deregulation of the Netherlands markets, the value of the RoCa3 Facility was likely to be subject to wide swings in value, thereby making any predictions regarding the exercise of the Sublease Purchase Option entirely speculative. (Tr. 2640-42) Reed produced empirical evidence demonstrating that, in a deregulated environment, the prices of energy assets were likely to fluctuate, and thus there would be uncertainty whether EZH would exercise the Sublease Purchase Option. (Tr. 2630-33, 2640-42, 2655-57, 2743-45)

Defendant's expert Ray agreed that EZH's decision whether to exercise the Sublease Purchase Option would simply boil down to an "economic decision as to whether or not the price is worth what you are getting for it." (Tr. 4990-91) If the value of the RoCa3 Facility declines, and "what you are getting for" the purchase price declines, there would be no reason to exercise the Sublease Purchase Option. EZH could keep this money and devote it to other uses.

Defendant did not offer any testimony in rebuttal to either Goulding or Reed, nor, obviously did it seek to impeach its own expert on this point.[27] Defendant did not produce testimony from any witnesses with experience in energy markets or Dutch regulatory matters; in fact, Defendant withdrew its only expert (Tranen) who had any knowledge of electricity markets. (Tr. 3665-66) Defendant's experts agreed EZH would decide whether to make the Sublease Purchase Option when that option is exercisable, based on the information available at that time. (Tr. 4868 (Ray); Tr. 5178 (LaRue))

In summary, Con Edison produced detailed and compelling economic evidence at trial, which Defendant did not attempt to rebut, that EZH would not be under any compulsion to exercise the Sublease Purchase Option in 2018. Further, the reasons that the *AWG* court held that the purchase option was nearly certain to be exercised are not present here. If CED elects the Retention Option, it can simply repay the HBU Loan out of its own funds. (P.Br. at 183) The Sublease Renewal Option does not include a refinancing requirement, but merely provides for HBU and CED to agree on a new interest rate at the commercially available rates then available. (Ex. 4 at 434) Thus, there would be no change in the loan documentation and no change in the lender. Since the rate is reset at a fair market value rate, there is no reason to believe that HBU (or any other lender, for that matter) would not continue to hold the loan certificates at the new rate. In addition, in the event

[27] This point holds true even if the property does not decline in value, since the Sublease Purchase Option price was set above expected fair market value. (D.Br. at 5 (*citing* Tr. 1978 (Muoio))

CED elects the Sublease Renewal Option, the value of the RoCa3 Facility would continue to be supported by a "hell or high water" lease (Ex. 4 at 432), backed up by a defeasance account. (P.Br. at 174; Stip. ¶¶185, 195, 207) The absence of this credit support played a critical role in the *AWG* analysis. *AWG*, No. 1:07-CV-857, slip op. at 51, 54. Defendant has not argued that the necessity of resetting the interest rate would compel EZH to exercise the Sublease Purchase Option.

### 3. In Con Edison's Case, Defendant Did Not Present the Type of Objective Economic Evidence On which the Court Relied in *BB&T*

The Fourth Circuit's decision in *BB&T* relies on the United States' expert, who concluded that Sodra had no "economically viable" options other than exercising the purchase option. 523 F.3d at 469. This expert testimony established that "dislocation costs and [the] cost of replacing lost manufacturing capacity" would render the purchase option "the only economically viable" scenario. *Id.* The *BB&T* opinion does not identify this expert, but it apparently was Jacob Thomas,[28]

[28] The court's opinion in *BB&T* states that the unidentified expert demonstrated that Sodra had no "economically viable" option other than exercise of the purchase option. 523 F.3d at 469. This phrase appears to come directly from Thomas' report, where he stated that the "only viable scenario" is the purchase option, and that the purchase option "scenario is economically viable." *BB&T* J.A. at 1047. In reaching the conclusions in his report, Thomas relied both on "the open market costs of replacing lost manufacturing capacity" and "dislocation costs." *BB&T* J.A. at 1049-50. These factors are identical to the factors specifically mentioned in the *BB&T* decision. 523 F.3d at 469.

Con Edison requests that this Court take judicial notice of Thomas's Report in *BB&T*, which is attached as Appendix B. This Court may take judicial notice of a fact involving a separate court proceeding. *See Brown v. Lippard*, 472 F.3d 384, 387 (5th Cir. 2006) (taking judicial notice of the existence of testimony in a separate proceeding); *Young v. Selsky*, 41 F.3d 47, 50 (2d Cir. 1994) (taking judicial notice of transcripts from a prior proceeding); *Brooks v Alameida*, 446 F. Supp. 2d 1179 (S.D.

who also testified for the Defendant in Con Edison's case. In *BB&T*, Thomas prepared an economic cash flow analysis which concluded that the only economically "viable scenario" was the exercise of the purchase option. *BB&T* J.A. at 1047.[29]

In Con Edison's case, Thomas testified that in reaching his conclusions in *BB&T*, he had relied on an intricate set of calculations computing the benefits for each party under each possible scenario at the end of the sublease to Sodra. (Tr. 4643-44) In reaching his conclusion that Sodra would be forced to exercise the purchase option (as indicated in *BB&T*, 523 F.3d at 469), one of Thomas' principal considerations was that the "extra costs" of electing the purchase option were attributable to the "open market costs of replacing lost manufacturing capacity," *i.e.*, the cost of replacing the pulp mill equipment. *BB&T* J.A. at 1049. In short, in *BB&T*, Thomas used his skills as an economist to provide an economic analysis establishing that BB&T had no other economically viable alternative but to exercise the purchase option.

Thomas' testimony and conclusions in *BB&T* were dramatically different from his testimony and conclusions in Con Edison's case. In *BB&T*, Thomas performed detailed calculations of the possible scenarios in order to determine whether there were economically viable options other than exercise of the purchase

---

Cal. 2006) (finding that, because documents that comprised court file in prior action were public records whose authenticity was not questioned, it was appropriate to take judicial notice of those documents pursuant to Fed. R. Evid. 201(b)(2)).

[29] References to the *BB&T* Joint Appendix are referred to herein as "*BB&T* J.A. at ___." For the convenience of the Court, the cited pages are attached as an Appendix to this brief.

option present in that case. (Tr. 4643-44) These calculations were done because he thought they were necessary to determine if the lessee would be compelled to exercise its purchase option:

A. I looked at a very detailed calculation in the *BB&T* case, and did a very detailed calculation in the *Fifth Third* case.

Q. All right. So you looked at very detailed calculations of the different scenarios that might prevail on the purchase option date?

A. Yes.

Q. And you did this because you wanted to see whether the purchase option would be exercised if they came to the purchase option date, right?

A. The question that was being asked there is, on a pure numbers basis, let's call that an economic analysis, on a pure economic analysis, is it the case that, sitting in 1997, one can project whether the purchase option will or will not be exercised.

(Tr. 4643)

But Thomas *did not* undertake or consider a similar type of "economic analysis" in Con Edison's case:

Q. And you didn't do that kind of analysis here, correct?

A. I did not.

(Tr. 4644)

Since Thomas did not undertake the same analysis as he did in *BB&T*, he admitted he had no idea how the *BB&T* analysis would apply in Con Edison's case:

Q. You don't know what the model -- what it would indicate here, do you, if you applied it to this transaction? You don't know?

A. I don't know the specifics, no.

(Tr. 4646)

Thomas' failure to perform these calculations in Con Edison's case means that the evidence which formed the basis of Thomas' opinion in *BB&T* (and upon which the Fourth Circuit relied) is simply not present here. Thomas thus has no basis for any claim that EZH is certain to exercise the Sublease Purchase Option. Defendant cannot find support in its other experts: Defendant's other experts agreed it was impossible to predict whether EZH would exercise the Sublease Purchase Option. (Tr. 4865 (Ray); Tr. 5178-79 (LaRue)) As a result, there is no evidence in the record contradicting Reed's and Goulding's testimony that it was uncertain whether the Sublease Purchase Option would be exercised.

Defendant apparently recognizes that the proof presented in this case demonstrates that the Sublease Purchase Option is not certain to be exercised, and that CED is therefore likely to come into possession of the RoCa3 Facility's residual value. Defendant admits:[30]

> While there may come a time when CED acquires an interest in EZH's RoCa3 Facility if the parties reciprocal options end (*i.e.*, the 6.2 year shirt-tail period or the 23 year Retention Period in the event EZH does not exercise the Sublease Purchase Option), that day has not yet arrived.

(D.Br. at 97)

Defendant thus recognizes that its trial proof has fallen short of the evidence necessary to prove that the Sublease Purchase Option is certain to be exercised. Case law has repeatedly and uniformly held that if a purchase option is not certain

[30] At various other points in its Opening Post-Trial Brief, Defendant recognizes that the Sublease Purchase Option is not certain to be exercised. *See*, *e.g.*, D.Br. at 97, 100.

of exercise, then the lessor must be treated as the owner of the residual value of the property. (P.Br. at 415-18) In its Opening Post-Trial Brief, Con Edison established that the relevant standard is whether the lessee will be economically compelled to exercise its purchase option. (*Id.*) This is an objective standard which measures whether the price of the option is so low in comparison to the value of the property that the option is certain to be exercised. (P.Br. at 415-18) If the option is not certain to be exercised under this objective standard, it will be respected as an option even if the lessee cannot "foresee any circumstances or conditions that might arise which would cause it not to exercise the purchase option[]." *Transamerica II*, 15 Cl. Ct. at 440-41.

The difference in the facts concerning the certainty of the purchase option as between *AWG* and *BB&T*, on the one hand, and the facts of Con Edison's case, on the other hand, therefore controls the result. *Compare Transamerica I*, 7 Cl. Ct. at 448 (purchase option certain of exercise) *with Transamerica II*, 15 Cl. Ct. at 442 (purchase option not certain of exercise). CED must therefore be treated as the owner of the Lease Interest.

#### 4. Under Cross-Examination, Thomas Agreed He Was Mistaken As to All the Alleged Noneconomic Factors He Initially Thought Would Lead EZH to Exercise the Purchase Option

Instead of performing the economic analysis he performed in *BB&T*, Thomas relied only on a series of "noneconomic factors" for his conclusion that EZH would exercise the purchase option. (Tr. 4573-74) Most of these factors involved details of Dutch regulatory markets, an area in which Thomas readily admitted he has no

expertise. (Tr. 4574) As will be detailed below, Thomas admitted that his report was in error as to each of these factors.

First, Thomas claimed in his report that since EZH was owned by municipalities, these municipalities would prefer stability over profit[31] and would not like to lose control of a strategic asset. (Tr. 4521; Ex. 21096 at page 25216) The error in this assumption could not be more obvious—by the time Thomas wrote his report, the municipalities had already disposed of their interest in EZH and given up control of the RoCa3 Facility. (Stip. ¶¶69-71; Tr. 4605-06 (Thomas)) Even though Thomas was aware of this sale, his report inexplicably states that the municipalities would prefer to keep control of the RoCa3 Facility after they had already sold their interest in it. (Tr. 4604-06) Goulding, Con Edison's expert in regulatory economics related to electricity markets (Tr. 2364-65), testified that this turn of events was entirely foreseeable as a result of deregulation in The Netherlands. (Tr. 2456-58, 2471-73 (Goulding))

Next, Thomas claimed that EZH would exercise the purchase option to avoid falling below the 2500-megawatt limit required under then-extant Dutch regulatory requirements for a licensed producer. (Tr. 4520; Ex. 21096 at page 25216) When he wrote his report, however, Thomas was not aware that a licensed producer could drop below the 2500-megawatt limit and that this would not endanger its status as

[31] Thomas' claim that the municipalities would prefer "stability" over "profit" implicitly recognizes that—unlike the case in *BB&T*—the municipal owners could make a profit by disposing of the RoCa3 Facility. Indeed, in contradiction of Thomas' opinion, the municipal owners of EZH chose "profit" over "stability" when they sold EZH.

a licensed producer. (Tr. 4577-78) Accordingly, the conclusion in his report that EZH would be compelled to exercise the Sublease Purchase Option to prevent loss of its status as a licensed producer was wrong, and Thomas admitted as much. (Tr. 4578-79)

Furthermore, Thomas agreed that his conclusion would be wrong if the parties anticipated the removal of the 2500-megawatt limitation as a result of the impending deregulation process. (Tr. 4579-80) In fact, Con Edison had in its possession studies confirming the 2500-megawatt limit "will be abolished" as a consequence of deregulation. (Tr. 4581-82 (Thomas)) Thomas admitted he was not aware of this fact when he wrote his report. (Tr. 4583)

Thomas also claimed that because of the 2500-megawatt limit, Con Edison would not be able to obtain the full benefits of operating the RoCa3 Facility as a licensed producer. (Tr. 4584-85) First, this conclusion assumes—erroneously—that the 2500-megawatt limit would stay in place, which in fact was not expected. But even if the 2500-megawatt limit had stayed in place, Goulding testified Con Edison could have operated the RoCa3 Facility as an independent (unlicensed) producer. (Ex. 10074 at pages 20062-63) In fact, there were numerous incentives to operate as an independent producer. (Ex. 10074 at pages 20062-63) Thomas admitted he had no reason to disagree with Goulding's conclusions. (Tr. 4586) Thomas did not make an assessment of whether it was better to be a licensed or unlicensed producer, but simply "made an assumption that being licensed was better." (Tr. 4590, 4592) Thomas "did not analyze" his assumption (Tr. 4592), and therefore, as he testified

at trial, he does not know whether this factor would or would not lead to the exercise of the Sublease Purchase Option. (Tr. 4592)

Next, Thomas testified that the "explicit details" of the contractual features of the RoCa3 Transaction prior to the Sublease Purchase Option date, as compared to the "fairly unstructured" way in which the contracts dealt with events after the Sublease Purchase Option date, led him to believe the Option would be exercised. (Tr. 4607) On cross-examination, Con Edison's counsel reviewed with Thomas in detail the provisions of the agreements which governed the parties' rights and obligations following the Sublease Purchase Option date. (Tr. 4608-35) At the end of this testimony, Thomas agreed that the provisions dealing with events after the Sublease Purchase Option date were in fact "fairly detailed" and "fairly structured" and that he had not adequately reviewed the documents prior to preparing his report. (Tr. 4633-35) He agreed that as a result of the cross-examination, he "can no longer" maintain his opinion that the contracts were "unstructured" after the Sublease Purchase Option date. (Tr. 4634)

Next, Thomas testified that the environmental aspects of the RoCa3 Facility, especially the environmentally friendly $CO_2$ production and distribution, would deter the owners of RoCa3 from disposing of their interest in the Facility to a "third party." (Ex. 20196 at pages 25216-17; Tr. 4635) Once again, however, Thomas managed to overlook the fact that the municipalities had already disposed of the RoCa3 Facility to a "third party" when he wrote his report, thus disproving his theory. Under cross-examination, Thomas agreed that his conclusions were based

only on "inference[s]," and that he had not actually determined whether or not the $CO_2$ production was profitable and therefore likely to be continued by a third-party purchaser. (Tr. 4636-38) He also testified that these "inference[s]" were "substantially" based on his experience in *BB&T*, where he had conducted a plant tour and interviews with the lessee. Thomas did not conduct those same activities in Con Edison's case and thus his conclusions were not based upon any investigation of Con Edison's actual facts. (Tr. 4637)

Finally, in his report, Thomas stated there may be other "economic, engineering, legal, or other political analyses" that would support his conclusions. (Ex. 20197 (Thomas Initial Report) at page 25259) At trial, however, Thomas testified he had not seen any other such analyses. (Tr. 4606-07)

Even prior to his correction at trial of the numerous errors in his report, Thomas had concluded merely that his "intuition" led him to believe that "EZH will *generally* choose to exercise the [Sublease Purchase Option]." (Ex. 20201 at page 25366 (emphasis added)) He did not testify that EZH was certain to exercise the option. This conclusion falls far short of his *BB&T* report, where he concluded Sodra had no viable option other than exercise of the purchase option. *BB&T* J.A. at 1047. It also falls far short of the applicable legal standard, which requires that the purchase option be certain of exercise if the form of the transaction is to be disregarded. *Transamerica II*, 15 Cl. Ct. at 441-42; *Transamerica I*, 7 Cl. Ct. at 448; *see generally, BB&T*, 523 F.3d at 473; *AWG*, No. 1:07-CV-857, slip op. at 38-40. Thus, Thomas' own testimony establishes that the economic compulsion to exercise

the purchase option which he found in *BB&T* is completely lacking in Con Edison's case.

Defendant's other economic witness, LaRue, accurately summed up the situation when he agreed it was "speculation" to assume that EZH would exercise the Sublease Purchase Option. (Tr. 5178-79) Defendant's witness Ray agreed "[w]e don't know" whether the option will be exercised. (Tr. 4867) If the outcome of EZH's Sublease Purchase Option decision is a matter of "speculation," then by definition the economic compulsion test applied in *BB&T* and *AWG* has not been satisfied. *Frank Lyon*, 435 U.S. at 581 (form of a lease must be upheld when the exercise of the purchase option is a matter of "speculation").

### 5. The Presence of a Deregulated Market in Con Edison's Facts Represents a Critical Distinguishing Factor

In the *BB&T* case, one of the court's key assumptions was that Sodra would need the manufacturing capacity represented by the pulp mill. The need to replace the pulp mill equipment, *i.e.*, the "cost of replacing lost manufacturing capacity," was a decisive factor in *BB&T*. 523 F.3d at 469, 473. Similarly, in *AWG*, the court concluded that for political reasons AWG would want to retain its ownership of the waste-to-energy facility. No. 1:07-CV-857, slip op. at 40.

The RoCa3 Transaction, however, unlike the *BB&T* and *AWG* transactions, took place in the context of a deregulating market. This has two critical consequences for the exercise of the Sublease Purchase Option.

First, Con Edison presented evidence establishing that sales and other dispositions of power plants in The Netherlands were not only "economically viable," but were expected and likely to occur as a result of the deregulation in the European energy markets. In fact, *the municipal owners of the RoCa3 Facility have already disposed of their interest in the Facility*. (P.Br. at 202-03) Thus, unlike the situation in *BB&T* and *AWG*, the owners of the RoCa3 Facility plainly had "economically viable" options other than the continued retention and operation of the Facility. In 1997, at the time of the RoCa3 Transaction, EZH was owned by several municipalities. (Stip. ¶66) Only two years later, however, the municipalities sold their interest in the RoCa3 Facility by selling EZH to Preussen Elektra AG, a German utility. (Stip. ¶¶69, 70, 71) Preussen Elektra was later part of a merger which created a large German conglomerate. (Stip. ¶¶70-71) The evidence presented at trial regarding the sale of power companies and power assets during that time frame establishes that this turn of events was entirely foreseeable. (*See, e.g.*, Ex. 10074 (Goulding Initial Report) at pages 20078-80))

In a deregulated market, electricity is fungible and, as Goulding testified, can be obtained from a number of sources on the open market. (Tr. 2450-51) But the pulp mill in *BB&T* is not fungible: if Sodra wanted to stay in the pulp business, it would have to exercise its purchase option or replace the pulp mill. Thomas' calculations in *BB&T* showed the latter alternative, "the cost of replacing lost manufacturing capacity," was too expensive and therefore Sodra would have no choice but to exercise its purchase option. *BB&T*, 523 F.3d at 469; *BB&T* J.A. at

1047. This additional cost of replacing lost manufacturing capacity, which was decisive in *BB&T*, is simply not present in Con Edison's case. Thomas did not even attempt to calculate such a factor in Con Edison's case.

The deregulation of the energy industry in The Netherlands has a second crucial consequence for the "economic viability" of EZH's Sublease Purchase Option. Reed testified in great detail concerning the effects of deregulation on the prices of energy assets. Reed's testimony established by empirical data that the prices of energy assets were likely to fluctuate widely in an unregulated market. (Tr. 2640-42) As a result, Reed testified there was a great deal of uncertainty concerning the value of the RoCa3 Facility as of 2018. (P.Br. at 243-46) Reed also demonstrated that this uncertainty was foreseeable as of 1997. (Ex. 10076 (Reed Initial Report) at pages 20216-18; Tr. 2648)) Market data since 1997 confirmed Reed's conclusions. (Tr. 2648-56)

Since the value of the RoCa3 Facility is subject to wide fluctuations, the exercise of the Sublease Purchase Option is necessarily uncertain. Ray agreed that the exercise of the Sublease Purchase Option is "an economic decision as to whether or not the price is worth what you are getting for it." (Tr. 4990-91) If the value of "what you are getting," *e.g.*, the value of the RoCa3 Facility declines, there will be no reason to pay the Sublease Purchase Option price. To put the issue into the terms used in *BB&T*, there is a range of "economically viable" options as of 2018, depending upon the value of the RoCa3 Facility as of that date. *See* 523 F.3d at 469.

Defendant did not present any witnesses to dispute Reed's testimony. In fact, Thomas agreed with Reed's conclusions:

> Q. You do in fact agree with Mr. Reed that there's uncertainty about the lease values at the purchase option date, correct?
>
> A. Yes.

(Tr. 4640)

In his rebuttal report, Thomas testified that in order to rebut Reed's testimony, "[t]he appropriate analysis is to consider different scenarios" and to "consider the net present value to EZH of all relevant cash flows under each of the different option outcomes." (Ex. 20201 at page 25366) In other words, in order to rebut Reed, Thomas agreed that he would need to carry out the detailed analysis that he had performed in *BB&T*:

> Q. All right. So [in *Fifth Third* and *BB&T*] you looked at very detailed calculations of the different scenarios that might prevail on the purchase option date?
>
> A. Yes.

(Tr. 4643) *But Thomas did not do this analysis*, even though he agreed it was necessary to rebut Reed:

> Q. And you didn't do that kind of analysis here, correct?
>
> A. I did not.

(Tr. 4644)

Thus, there is no evidence in the record to contradict Reed's conclusions that the uncertainty regarding the value of the RoCa3 Facility would present EZH with viable alternatives other than the exercise of the Sublease Purchase Option.

Defendant's approach in *BB&T* and *AWG* shows that Defendant knows how to obtain an expert analysis that a purchase option is certain to be exercised if the facts will support such an analysis. Defendant's failure to produce this sort of expert analysis here is telling.

### 6. The Evidence Demonstrates CED Expected to Share in the Output of the RoCa3 Facility

In *AWG*, the court concluded that, because of the conditions imposed on AWG, AWG would be compelled to exercise its purchase option. The Leasing Trust therefore knew it would never control the facility involved in that case because the transaction had been structured to produce that result. No. 1:07-CV-857, slip op. at 51, 53, 59. The evidence in Con Edison's case, however, establishes that the Sublease Purchase Option was not certain of exercise. CED's management therefore took steps to ensure it was prepared to take control of the Facility if necessary.[32] CED limited its consideration of leasing transactions to assets with which ConEdison was familiar, *i.e.*, power assets. If CED had been interested only in the tax aspects of leasing, the nature of the asset and its relationship to Con Edison's core business would have been irrelevant.

Instead, CED undertook a careful inspection of the RoCa3 Facility. (P.Br. at 86-90) It sent an engineer to the Facility to ensure that CED could operate the Facility if necessary. (*Id.*) CED engaged local counsel to review its property interests in the RoCa3 Facility to confirm that CED had obtained all of the property

[32] As set forth in Con Edison's Opening Post-Trial Brief at pages 456-60, CED's right to share in the output of the RoCa3 Facility gives it ownership of a leasehold interest even if it does not actually operate the Facility.

rights necessary for obtaining CED's share of the Facility's output. (P.Br. at 367-68; Tr. 1082, 1089-90 (Holzman)) Defendant's leasing expert Ray confirmed that CED's due diligence was appropriate and that CED "got all the things that you would expect" in the due diligence process. (Tr. 4746, 4901-02 (Ray)) At trial, CED's management explained that CED's ability to operate the Facility was an important part of its review process. (*See*, *e.g.*, Tr. 501-02 (Burke); Tr. 888-90 (McCarthy)) These facts distinguish Con Edison's case from *AWG*, where the court concluded that the Leasing Trust knew it would never control the property.

Significantly, CED rejected transactions when it encountered doubts about its ability to take control over the asset. In the ENECO transaction, as a result of "regulatory hurdles," CED was not sure it had a "clear cut opportunity to obtain control of the asset in a manner that is consistent with the expectations of management." (Ex. 302 at page 6097) CED chose to withdraw from the ENECO transaction even though it expected this withdrawal to have an "adverse impact" on its "credibility" as an investor in the leasing industry. (Ex. 302 at page 6096) If CED were merely looking for "tax shelters," there would have been no reason for it to reject the ENECO transaction, with the attendant harmful impact upon its credibility.

The evidence in the record therefore demonstrates that CED took very seriously the possibility that it would be called upon to take control of its share of the RoCa3 Facility's output and operations.

### 7. The Cases Relied Upon in *BB&T* and *AWG* Are Distinguishable From Con Edison's Facts

The cases relied upon in the *BB&T* and *AWG* decisions support Con Edison's position that exposure to residual value (*i.e.*, profit and loss following the termination of a lease) and the lack of a compelled purchase option are controlling in determining the benefits and burdens of ownership.

*BB&T*, 523 F.3d at 474, and *AWG*, 1:07-CV-00857, slip. op. at 44, both relied on *Coleman v. Commissioner,* 16 F.3d 821, 826 (7th Cir. 1994), as setting forth the "burdens and benefits of ownership" test. In *Coleman*, the Seventh Circuit stated that "[e]stimates of residual value are basic to . . . the benefit and burdens of ownership" and that "residual value" is the "foremost consideration" in determining the benefits and burdens of ownership. 16 F.3d at 827. The evidence in *Coleman* established that the residual value of the equipment in that case would be less than the remaining indebtedness on the equipment. *Id.* In other words, the investor had negative equity in the asset. Therefore, the taxpayer would walk away from the equipment at the end of the lease and would never profit from its residual value. *Id.* Thus, the transaction in *Coleman* violated the requirement, set forth in the Leasing Guidelines, that the lessor maintain a minimum 20% equity interest in the property at the end of the lease term. (P.Br. at 272-73, 346) The RoCa3 Transaction, in contrast, easily passes the 20% equity requirement. (P.Br. at 346)

The *Coleman* facts are simply not present in Con Edison's case. Defendant has not disputed the residual value of the RoCa3 Facility through expert testimony, as it did in *Coleman*. *See Coleman*, 16 F.3d at 827. Similarly, Defendant has not

denied that the value of the RoCa3 Facility will at all times exceed the value of the HBU Loan by a substantial amount. (P.Br. at 370-71) Thus, in Con Edison's case, unlike *Coleman*, Con Edison will never have an incentive to "walk away" from the HBU Loan, since it would lose both its equity investment and its expected profit if it did so.

In *BB&T*, the Fourth Circuit also relied on the decision in *Swift Dodge v. Commissioner*, 692 F.2d 651 (9th Cir. 1982). *BB&T*, 523 F.3d at 473. *Swift Dodge* involved an "open-ended" lease, where, at termination, the lessee is required to pay (or entitled to receive) the amount by which the actual value of the leased car is lower than (or exceeds) a fixed sum representing the original estimated value of the car at the lease termination.[33] 692 F.2d at 652. This agreement thus shifted to the lessee 100% of the residual risk of loss or chance for gain. *Id.* at 654.

The court in *Swift Dodge* held that the use of such an "open-ended" lease shifted all risk of gain or loss to the lessee. *Id.* at 654. Since the lessee had all the residual risk of gain or loss, the lessor by definition did not possess the benefits and burdens of ownership. *See id.*

The facts of Con Edison's case are obviously different, as the Sublease is not an "open-ended" lease. At the end of either the Sublease Basic Term or the Sublease Renewal Term (depending upon which option is exercised), there is no adjustment mechanism by which the gain or loss inherent in the value of the RoCa3 Facility would be shifted to EZH. A purchase option does not represent such a mechanism,

[33] The Internal Revenue Code has been subsequently amended to allow "open-ended" leases for motor vehicles. *See* §7701(h)(3)(A).

so long as the purchase option is not nominal or certain of exercise. *See Transamerica II*, 15 Cl. Ct. at 440.

Defendant's witnesses recognized this point when they testified that CED would necessarily be exposed to gain or loss if EZH does not exercise the Sublease Purchase Option. (Tr. 4865 (Ray); Tr. 5106 (LaRue)) Thus, the facts of *Swift Dodge* are not relevant to Con Edison's case.

The decision in *BB&T* also relies on *Aderholt Specialty Company v. Commissioner*, 50 T.C.M. (CCH) 1101 (1985). The facts in *Aderholt* were similar to those in *Swift Dodge*. The lessor and lessee executed reciprocal options *for the same date* at *exactly the same price*; in other words, the lessee could buy the leased airplane for a stated price, or the lessor could force the lessee to buy the airplane for exactly the same price. 50 T.C.M. (CCH) at 1103-04.

The court held that the reciprocal options shifted 100% of the burdens of depreciation and the benefits of appreciation to the lessee. *Id.* at 1107-09. If the plane were worth anything more than the stated purchase price, the lessee would exercise the option to obtain this benefit. But if the plane were worth anything less than the purchase price, the lessor would exercise its put option to shift the loss to the lessee. Thus, in all events, the lessee would enjoy all the benefits and burdens of ownership. *See id.* at 1109.

The court pointed out, however, that the situation would be different if the case did not involve reciprocal options (*i.e.*, the lessee held an option but the lessor did not):

> If, however, [the lessor] could not compel [the lessee] to purchase the airplane, then [the lessor] retained the risk that the value of the airplane at the end of the "lease" would be less than the option price. . . . If the option price exceed[ed] the airplane's expected fair market value, . . . *then the risk of depreciation is very real*.

50 T.C.M. (CCH) at 1107 n.13 (emphasis added).

That is exactly the situation in Con Edison's facts. CED has no right to compel EZH to buy back the Lease Interest from CED. And since EZH's Sublease Purchase Option "exceeds . . . expected fair market value," CED's "risk of depreciation is very real." *Id.* at 1107 n.13. If the value of the RoCa3 Facility diminishes, CED will bear this burden, and it cannot shift this burden to EZH through a "put" purchase option. Reed's testimony established that the value of the RoCa3 Facility may drop dramatically in a deregulated environment, and Defendant has not presented any evidence to the contrary. (Tr. 2640-42) Indeed, Thomas, Defendant's only witness on the economics of the purchase option, agreed with Reed that there is significant uncertainty as to the future value of CED's lease interest. (Ex. 20201 (Thomas Rebuttal Report) at page 25366; Tr. 4640)

Defendant claims that the Sublease Renewal Option amounts to a reciprocal option that protects CED against risk of loss. (D.Br. at 95-98) This is not true. The Sublease Renewal Option does not transfer all of the residual value risk to EZH; it merely extends the Sublease for a total sublease period equal to approximately 85% of the term of use granted to CED under the Lease. (Ex. 46 at page 1504) At the end of the Sublease Renewal Term, CED would still own the Lease Interest and would be subject to the benefits and burdens of the RoC3 Facility. The remaining 15%

period of use is more than sufficient to establish ownership under the case law. *See, e.g., Frank Lyon*, 435 U.S. at 566 (residual period was only 10 years of a 75-year lease, or 13.33%); *Torres*, 88 T.C. at 716-17 (residual period was 11.7% of useful life). The exposure to the benefits and burdens of ownership during this residual value period has repeatedly been regarded as the controlling factor in determining the benefits and burdens of ownership. *BB&T*, 523 F.3d at 474; *Coleman*, 16 F.3d at 826; *AWG*, No. 1:07-CV-857, slip op. at 44; *Larsen*, 89 T.C. at 1267-68; *Rubin*, 58 TCM (CCH) at 34; *Levy*, 91 T.C. at 860-61; *Torres*, 88 at 721; *L.W. Hardy*, 52 T.C.M. (CCH) at 1551-52; *Estate of Thomas*, 84 T.C. at 431.

Finally, the court in *AWG* relied upon *Kwiat v. Comm'r*, T.C. Memo 1992-433, 64 T.C.M. (CCH) 327 (1992). *AWG*, No. 1:07-CV-857, slip. op. at 50. As explained in Plaintiff's Opening Brief, that case was similar to *Aderholt* in that both the lessor and lessee held reciprocal purchase options, and one or the other option was certain to be exercised, depending upon the value of the property. (P.Br. at 452-54) Thus, *Kwiat* is simply one more case in which the facts showed the purchase option was certain to be exercised, and it has no relevance, absent similar facts.

### C. In Contrast to the Facts of *BB&T*, the Parties Are in Agreement that CED Expected To Earn a Pretax Profit

The decision in *BB&T* included the following statement:

> **"The parties dispute whether BB&T can profit from the transaction if it does not receive the [hoped for] tax benefits. . . ."**

523 F.3d at 469. There is no such dispute in Con Edison's case. Defendant's expert witness, LaRue, confirmed Con Edison's calculation of its expected profits. LaRue

agreed that, if EZH exercises the Sublease Purchase Option, CED will realize pretax cash flow, or profit, of $61 million. (Tr. 5154) LaRue also confirmed that, if CED exercises the Sublease Renewal Option, CED will receive pretax profit of $101 million, *before* taking into account profits (and potential losses) from the Shirt-Tail Period. (Tr. 5155-56) The Deloitte Appraisal projected an additional $198 million of profit during the Shirt-Tail Period. (P.Br. at 360-61) Finally, if CED elects the Retention Option, it can expect $729 million of pretax cash flow from the operations of the RoCa3 Facility during the Retention Period, but it also faces the risk that these projections will not come true and that it will instead suffer losses. (P.Br. at 361-63) Defendant did not challenge Deloitte's calculations.

These profits from the RoCa3 Transaction are calculated by the standards set forth in the Leasing Guidelines: they reflect CED's expected rental income and cash from residual value in excess of CED's original equity investment plus CED's direct financing costs. (P.Br. at 352-64) The same standard is set forth in case law, which examines whether the cash flow is sufficient to recoup the lessor's investment. *See, e.g.*, *Johnson I*, 11 Cl. Ct. at 26, 36-37; *Gefen*, 87 T.C. at 1499; *Mukerji*, 87 T.C. at 968; *Estate of Thomas*, 84 T.C. at 440 n.52; *Ockels v. Comm'r*, T.C. Memo. 1987-507, 54 T.C.M. (CCH) 785, 797 n.15 (1987); *Kaufman v. Comm'r*, T.C. Memo. 1987-360, 53 T.C.M. (CCH) 1348, 1355 n.17 (1987).

Defendant's leasing expert witnesses, Ray and Bent, both confirmed that CED's expected pretax profit from the RoCa3 Transaction was in line with, if not higher than, the profit from other leasing transactions. (P.Br. at 261-62)

Finally, the expected profit from the RoCa3 Transaction is higher than the expected profit in *AWG*, where the court held that the transaction had economic substance. (*Compare AWG*, No. 1:07-CV-857, slip op. at 42 (3.4% pretax profit), with Ex. 20194 (LaRue Initial Report) at page 25151 (4.44% pretax profit assuming minimum cash flow of $61 million under the Sublease Purchase Option))

### D. In Contrast to the Facts of *BB&T* and *AWG*, CED Sought Out the RoCa3 Transaction To Fill a Previously Identified Nontax Business Need

The decision in *BB&T* included the following factual findings:

> **"A promoter . . . solicited BB&T to participate in the transaction" and "marketed the LILO to BB&T as a 'tax driven structure.'"**

523 F.3d at 465. The facts of the Con Edison case are quite different. There is no evidence in the record that a "promoter" "marketed" the RoCa3 Transaction to Con Edison as a "tax driven structure." To the contrary, the record contains overwhelming evidence demonstrating that Con Edison sought out leasing investments similar to the RoCa3 Transaction because they matched CED's previously identified business needs. (P.Br. at 41-48) These business needs included the necessity to invest in new projects related to Con Edison's core business, which would provide up-front earnings to offset CED's early-year losses from longer-term projects. (P.Br. at 41-43)

The record reflects that CED had identified the need to make investments in transactions producing near-term earnings *before* it ever learned of leases. (P.Br. at 39-42) Defendant does not dispute that the RoCa3 Transaction provides accelerated

earnings under the provisions of FAS 13. Con Edison featured the RoCa3 Transaction in its 1997 annual report, highlighting the RoCa3 Facility's environmental features and its role in Con Edison's program of pursuing international investments. (Ex. 107 at page 2961) Thus, the RoCa3 Transaction satisfied CED's previously identified business need and was not marketed or chosen as a "tax shelter."

Since the BB&T transaction was marketed and reviewed internally as a "tax driven structure," BB&T did not follow its normal procedures for "initiating, evaluating, approving, or managing the transaction." 523 F.3d at 466 n.4. CED, by contrast, undertook a rigorous due diligence procedure before making the decision to invest in the RoCa3 Transaction. (P.Br. at 85-114) Defendant's expert Ray agreed he could find no flaws in CED's due diligence. (Tr. 4746-47) In particular, CED wanted to be sure that it had the rights needed to take and sell its share of the RoCa3 Facility's output after the Sublease expired and to operate the plant if necessary. (P.Br. at 367-68) It rejected the ENECO transaction when its due diligence efforts indicated problems with the ability to control the asset. (Ex. 302 at page 6097)

### E. Defendant's Expert Agreed CED Retained the Rights Traditionally Associated with Status as a Lessor

The decision in *BB&T* included the following factual findings:

**"[T]he Sublease retracted BB&T's rights and obligations under the Head Lease for the duration of the Basic Lease Term, but provided BB&T a right to make an annual inspection of the Equipment."**

523 F.3d at 466. Here, CED presented extensive evidence—much of it coming from Defendant's own leasing experts—confirming that, despite the existence of the Sublease, CED retained all of the incidents of ownership connected with its investment in the Lease Interest. Similarly, Defendant's leasing experts confirmed that EZH's rights in the property were restricted as a result of the Lease and Sublease. (P.Br. at 382-86)

As an initial matter, Bent agreed lease-leasebacks are not uncommon and that he had had personal experience in such transactions. (Tr. 3798-99) Ray agreed that it is "perfectly fine" to combine a lease with a sublease back of the same property, and believes he has probably done such transactions. (Tr. 4807-08)

As part of the lease-leaseback, CED received a multitude of rights that correspondingly restricted EZH's rights in the property. The most important of these is the right to receive rental payments from the lessee. (*See* P.Br. at 139-41) Bent specifically confirmed that, as a result of the transaction, EZH undertook a legally binding obligation to pay rent to CED and that these rental payments resulted in a diminution of EZH's wealth. (Tr. 3804-05, 3858, 3860) CED also obtained and retained the right to repossess the property if EZH failed to make these rental payments. (Stip. ¶¶163, 164)

At pages 381-387 of Plaintiff's Opening Pre-Trial Brief, Con Edison listed some of the many rights retained by CED. These included: (1) the right to rely on EZH's Representations and Warranties; (2) the right to enforce the limitations placed on EZH's use of the property; and (3) the right to enforce the covenants

placed upon EZH. If EZH did not comply with these terms, CED retained the right to repossess the RoCa3 Facility or declare a default and collect damages. (P.Br. at 381-87) The rights retained by CED also represent obligations of EZH. (*Id.*) At trial, Bent agreed that the RoCa3 Transaction placed obligations on EZH that had not existed prior to entering into the transaction and that such obligations were typical of a leasing transaction. (*See*, *e.g.*, Tr. 3850-53) For example, Bent agreed the restrictions that CED placed on EZH's ability to sublease the RoCa3 Facility created a "material restriction" on EZH's rights that had not existed prior to the RoCa3 Transaction. (Tr. 3852-53)

EZH understood that the failure to comply with its obligations would result in a default and could lead to a huge loss for EZH. At one of its meetings, EZH's board was told:

> EZH will have certain obligations imposed on it in the lease documentation, including regarding the maintenance of the power plant, insurances and credit worthiness of EZH itself. If EZH does not abide by these obligations during the lease period, EZH will owe the US lessor a so-called "termination value". This will be greater during the first years after the commencement of the transaction than the amounts already received by EZH, so a disadvantage will be created if the transaction is to be dissolved.

(Ex. 288 at page 5657)

The evidence at trial demonstrated that this potential loss for EZH was $42 million or more, depending on the fluctuation of interest rates and the fair market value of the facility. (P.Br. at 166-68) The risk of loss to EZH demonstrates that the RoCa3 Transaction cannot be treated as a loan, since in a loan the borrower would

never be subject to such a risk of loss in the event of a default. EZH fully understood that the risks it was taking on were those of a lease and not those of a loan.

Finally, as explained above, CED retained the most important right of all, which is the right to a direct share of the RoCa3 Facility's profits or losses after the termination of the Sublease. (P.Br. at 182-83)

During his trial testimony, Bent affirmed that the characteristics of the RoCa3 Transaction were common of all leveraged leases:

- The use of nonrecourse loans is "typical" and in fact required for a leveraged lease. (Tr. 3866)
- CED's equity investment is typical of leveraged leases. (Tr. 3867-68)
- The use of defeasance is "not at all unusual" in cross-border leases. (Tr. 3760-61, 3819-20)
- The lack of cash flow during the lease term is typical of leveraged leases. (Tr. 3708-09)
- The representations and warranties that EZH gave CED reflecting EZH's "various obligations" were "common and typical." (Tr. 3835-36)
- The provisions controlling the return of the RoCa3 Facility by EZH to CED were typical. (Tr. 3844-45)
- Contrary to Defendant's claim (D.Br. at 84), the use of tax indemnification agreements is "common in leveraged leases generally." (Tr. 3874)

### F. EZH Continued To Own the Funds in Its Defeasance Accounts

The decision in *BB&T* included the following factual findings regarding the defeasance account:

> **The funds held in the Payment Undertaking Account ("Debt PUA") account, as the result of an "irrevocable transfer," "became an asset solely of ABN, unreachable by Sodra, BB&T, or their respective creditors"**

523 F.3d at 467. The parties in *BB&T* stipulated to this fact, *BB&T* J.A. at 54,[34] and also stipulated that Sodra had no "right, title or interest" in the funds and could not recover the funds once deposited in the Debt PUA. *Id.*

Con Edison's facts are different, because the defeasance structure EZH employed used a standard bank deposit, not the Debt PUA employed in *BB&T*. (P.Br. at 149-50) The funds placed in the Sublease Deposit continued to belong to EZH, just as the funds placed in any bank deposit belong to the depositor. Principal and interest on the Sublease Deposit were payable to the Rotte Foundation, which was controlled by and operated for the benefit of EZH. (Ex. 24 at page 1087) For so long as the Lien of the Loan Agreement is in effect, the Rotte Foundation and EZH agreed that payments on the Sublease Deposit would be directed to HBU in satisfaction of EZH's rental obligations to CED and then to meet CED's debt service requirements. (Stip. ¶194A) Bent agreed this direct payment of rent to the lender was "common" because "it is equivalent to the lessee paying the lessor and the lessor paying the lender." (Tr. 3871-72)

Any amounts left in the Sublease Deposit, however, were the property of the Rotte Foundation and were to be repaid to EZH. (Stip. ¶204) For example, if EZH does not elect the Sublease Purchase Option and CED elects the Retention Option,

[34] This reference is to the Stipulation Regarding Undisputed Facts in *BB&T*. Con Edison requests this Court take judicial notice of the BB&T Stipulation of Facts, which is attached as Appendix C, based on the principles set out in fn. 28 above.

the balance of the Sublease Deposit will be paid to EZH, and EZH can use these funds for whatever purpose it desires. (Stip. ¶¶204, 225, 251) In other words, contrary to the situation in *BB&T,* the amounts EZH paid into the IJssel Deposit and Sublease Deposit were *not* irrevocable, and could be returned to EZH if no longer needed to secure its obligations. (*See* Stip. ¶¶ 204, 225, 251) Further, since the funds in the Sublease Deposit belonged to EZH, EZH was allowed to replace the Sublease Deposit with other acceptable collateral if ABN's credit rating fell below A2 (Moody's) or A (S&P). (Ex. 1 at page 66) This reflects the fact that EZH was at risk for any failure by ABN to carry out its obligations pursuant to the Sublease Deposit.

Defendant's expert Bent confirmed that the funds in the Sublease Deposit continued to belong to EZH and that EZH therefore suffers a diminution in its wealth when funds are transmitted to CED in payment of rent. (Tr. 3805-06) Defendant's expert Ray also agreed these funds belong to EZH. (Tr. 4990-91)

In its opening brief, Con Edison also demonstrated that, for purposes of financial accounting, the funds in the defeasance deposits continue to belong to EZH. FAS 76 (in effect in 1997) and its successor FAS 125 provide that these funds belong to EZH, since these funds are intended to be used to pay EZH's obligations. (P.Br. at 390-91) Similarly, for tax purposes, the defeasance funds are treated as EZH's property, since EZH uses these funds to satisfy its obligations. (P.Br. at 388-93) Defendant has not presented any legal authority to the contrary.

### G. The Exercise of the Sublease Purchase Option Is Not "Free" to EZH

The decision in *BB&T* included the following factual findings:

> **Because the [sublease] 'purchase' [option] is free to Sodra, price cannot be [sic] obstacle.**

523 F.3d at 497 n.13. In Con Edison's case, the evidence establishes that the funds held in both the Sublease Deposit and the IJssel Deposit continue to belong to EZH. Contrary to the situation in *BB&T*, the transfer of funds to these Deposits was not irrevocable, and any balance in these funds would be available to EZH if it does not exercise the Sublease Purchase Option. (Stip. ¶¶239, 240, 251, 252) Defendant's expert Bent agreed that any distributions of assets out of those defeasance accounts represents a diminution of EZH's assets. (Tr. 3805-06)

Since the funds in the defeasance deposit continue to belong to EZH, regardless of which option it chooses, EZH will never be indifferent to the use of those funds. In particular, there is no reason to suspect that EZH will part with those funds in order to buy an asset for more than its value. Thus, unlike the situation in *BB&T*, price *will* be an obstacle if the terms of the Sublease Purchase Option would result in EZH's using its own funds to buy an asset for more than its value.

Reed explained that, since the funds in the defeasance accounts belong to EZH and are available to EZH no matter which option is elected, the availability of the funds would not lead EZH to prefer one option over another:

> The existence of a defeasance accounts [sic] has a similar effect on all three scenarios, that is, the scenario in which the purchase option is