> elected, the scenario in which the sublease renewal option is elected, or the scenario in which the retention option is elected.
>
> Because these defeasance account funds are available similarly in all three scenarios for purposes of EZH, they do not have an impact in differentiating the likelihood of any one of those three scenarios occurring. My point is that the defeasance accounts are not earmarked for a single purpose. They are in fact available under all three scenarios for the economic use of EZH and, therefore, don't enter into the equation with regard to one option over the other option being selected.

(Tr. 2664-65)

On cross-examination, counsel for Defendant challenged Reed's claim that the funds in the defeasance account were available to EZH without regard to which option was chosen:

> Q. Okay. If it is determined that EZH does not have access to the defeasance accounts, if they do not elect the purchase option, would that be relevant to your opinion?

(Tr. 2707) Defendant's question, however, assumes facts contrary to the parties' stipulation: on redirect examination, Reed confirmed by reference to the Stipulation that the funds in the defeasance accounts were available to EZH regardless of which option it chooses. (Tr. 2736-37; Stip. ¶¶239, 251))

Defendant's expert Ray agreed with Reed's testimony. He testified that the presence of the defeasance funds will not affect the Sublease Purchase Option decision, so long as those funds are available for the other options that may be chosen.

> Q. And I think you said that one of the reasons why the purchase option would be exercised is because EZH wouldn't have to come out of pocket for cash to pay?
>
> A. I did say that.

Q. And if they chose not to exercise the purchase option, that cash would be available for other obligations they have potentially, right?

A. That's right.

Q. So they wouldn't have to come out of pocket for those obligations either?

A. If they chose not to exercise the purchase option.

Q. Right.

A. That's right.

Q. So long as they have the cash available to them for one purpose or the other, it is still an economic decision as to whether or not the price is worth what you are getting for it, right?

A. Yes.

(Tr. 4990-91)

Based upon his prior testimony for the taxpayer in *BB&T*, Defendant's leasing expert Bent agreed that the use of a defeasance deposit is a "commonly accepted mechanism[ ]" that "cannot be used" to support a conclusion that a lease is "not consistent . . . with commercial leasing transactions." (Tr. 3960)

Ellis explained why the defeasance of an obligation is a commonly accepted practice in cross-border leasing. Without the use of defeasance deposits, a foreign lessee, such as EZH, would be exposed to significant risk from currency fluctuations. (Tr. 3204-06) EZH must pay rent to CED in U.S. dollars, but EZH's functional currency was the Dutch guilder. *Id*. If EZH had not defeased its obligations, it would be exposed to the possibility of significant losses, particularly over the long life of the RoCa3 Transaction.

The record in this case confirms that this protection from currency fluctuation is precisely the reason EZH defeased its lease obligations. During the consideration of the RoCa3 Transaction, one of EZH's board members questioned why the cash received from CED was placed in a deposit and not utilized for investments. (Ex. 288 at page 5637) Mr. Verwer (who was apparently in charge of presenting the RoCa3 Transaction to the board) responded that EZH had "chosen" "a deposit in dollars . . . because the termination value is in dollars and as such no risk is involved in terms of a currency exchange fluctuation." (*Id.* at page 5638) EZH chose to invest the amount received from CED in dollar-denominated investments in order to protect itself from currency exchange fluctuations with respect to the obligations it had incurred as a result of entering into the Sublease. In its brief, Defendant notes the question presented to Mr. Verwer (D.Br. at 16 n.14), but it neglects to provide his answer, which establishes that EZH chose to create the defeasance accounts for its own business reasons.

Mintun, EZH's advisor, confirmed that the dollar deposits were employed to protect EZH from currency risk. (Tr. 2944-45) Bent agreed that the use of deposits in this manner was normal. (Tr. 3760-61, 3820-21)

### H. CED Was Not Insulated from the Risk of Losing Its Capital Investment

The decision in *BB&T* included the following factual findings:

> **[T]he structure of the Transaction insulates BB&T from any risk of losing its initial $12,833,846 investment in the government bonds or incurring the obligation to invest additional investments.**

523 F.3d at 473. This statement is true of *BB&T* only because the evidence in *BB&T* demonstrated that the purchase option was the only "economically viable" option. *See id.* at 473 n.13. Since Sodra was certain to exercise its purchase option, BB&T would never be exposed to the possibility of losing money from the operation of the Sodra facility during a residual period.

If, however, the lessee's exercise of the purchase option is a matter of "speculation" and not "reasonably certain," the lessor will be subject to these risks. *Compare Frank Lyon*, 435 U.S. at 581 with *Transamerica I*, 7 Cl. Ct. at 448. The facts of Con Edison's case bear this out.

Defendant's leasing expert Ray agreed that CED would face "[m]aterial risk [and] material opportunity" if EZH does not exercise the Sublease Purchase Option. (Tr. 4832) LaRue confirmed that, if EZH does not exercise the Sublease Purchase Option, CED's cash flows would depend on "revenues, net of expenses, from the operation of the RoCa3 Facility. There is a lot of risk associated with that." (Tr. 5106)

In its Opening Post-Trial Brief, Con Edison demonstrated that, if EZH does not exercise the Sublease Purchase Option, CED will necessarily have an opportunity for profit, as well as risk of loss, from the operations of the RoCa3 Facility. (P.Br. at 454-60) If the RoCa3 Facility operates at a loss in those years, CED will suffer a loss. (*Id.* at 458) CED's projections showed that the operations during either the Shirt-Tail Period or the Retention Option Period were likely to result in a large profit. (*Id.*) But part of being the owner means the residual value is

at risk and not guaranteed. As Reed demonstrated, the values of gas-fired facilities, such as the RoCa3 Facility, can fluctuate widely in a deregulated environment. (Tr. 2640-42) One need only read the newspaper (or fill up a car with gas) to understand the current tumult in the energy markets. If the expenses of the RoCa3 Facility (*e.g.*, fuel costs) outran its revenue, CED would have no protection against this possibility, and it could lose some or all of its investment. (*See* P.Br. at 458-59)This is the essence of the burdens and benefits of ownership.

Aside from the operation of the RoCa3 Facility, the terms of the RoCa3 Transaction present CED with a second possibility for risk of loss. If EZH does not exercise the Sublease Purchase Option, CED will be required to pay the Final Basic Rent Payment of $831.5 million on February 24, 2041. (Ex. 2 at page 352) As discussed at pages 464 through 471 of Con Edison's Opening Post-Trial Brief, CED can choose to secure its obligations to pay the Final Basic Rent Payment either by providing a letter of credit or by funding certain collateral accounts.[35] These alternative forms of securing the payment could be very attractive to CED, depending upon prevailing interest rates. (*See generally* R. Facts Section I.A.5.) If CED chooses to secure its obligations by a letter of credit, it will not be required to fund any collateral accounts and will be able to use the funds earned from the operation of the RoCa3 Facility (that would otherwise be used to fund the collateral accounts) in any manner it desires. *Id*. CED would then be subject to the risk of loss on the use of these funds; if CED invested these funds and did not earn a sufficient

[35] The Incremental Collateral Pledge, if the Retention Option is elected, or the Lease Collateral Deposit, if the Renewal Option is elected.

return on these funds, it would be required to make up any shortfall in funding the Final Basic Rent Payment. *Id.*

Even if CED chooses to fund the collateral accounts, it has no assurance that these accounts will be sufficient to fund the Final Basic Rent Payment. The parties have stipulated that, if CED is not able to earn an interest rate of 6.86% on the Collateral Accounts throughout the period from 2018 to 2041, CED will face a shortfall in funding the Final Basic Rent Payment. (Stip. ¶¶246, 257) CED would be required to fund this shortfall from other funds (Tr. 3926-28 (Bent)), thereby lowering its profit from the transaction.

### I. The Use of a Nonrecourse Loan Was Consistent with Commercial Practice and CED's Obligation to Pay the Final Basic Rent Payment Is Supported by More Than Enough Assets

The decision in *BB&T* included the following factual findings:

> **Finally, BB&T's obligations—the HBU loan and the Deferred Head Lease Payment—represent non-recourse obligations, with only proceeds and interests derived from the transaction itself pledged as collateral. (*BB&T*, F.3d at 470)**

The use of nonrecourse financing in the RoCa3 Transaction was well within normal leasing standards. First, the provisions of FAS 13 required that the loan to CED be nonrecourse in order for CED to claim the benefits of leveraged lease accounting. (P.Br. at 135-36) Bent and Ray, Defendant's leasing experts, agreed that the use of nonrecourse loans in a leveraged lease is entirely normal. (Tr. 3866-67 (Bent); *see also* Tr. 4717-18 (Ray))

Further, numerous cases have upheld the use of nonrecourse debt in leasing transactions, so long as the debt is less than the value of the leased property. *See, e.g.*, *Levy*, 91 T.C. at 843, 861-62; *Gefen*, 87 T.C. at 1492-94. The pricing runs confirm that the amount of the HBU Loan will always be significantly less than the expected value of CED's Lease Interest. (Compare Ex. 332 page 7181 with page 7188) Thus, under governing precedent, the HBU Loan must be respected as a true debt.

Finally, CED's obligations to make the Final Basic Rent Payment is in part a recourse obligation and, to the extent it is not recourse, is well supported by assets against which EZH could collect the full amount of the final rental payment. (*See* R. Facts Section I.A.4.(c))

## III. Contrary to Assertions in Defendant's Brief, CED Has Acquired Ownership of a Leasehold Interest in the RoCa3 Facility

### A. CED Has Acquired the Benefits and Burdens Arising from Acquisition of a Lease Interest in the RoCa3 Facility

The parties agree that, in Defendant's words, Con Edison must establish that CED "both attained and retained attributes . . . of a traditional owner of property, or more precisely, a traditional owner of a leasehold interest in EZH's property." (D.Br.at 90) It must be emphasized that the benefits and burdens of ownership are the benefits and burdens of leasehold interest ownership in the RoCa3 Facility, not the benefits and burdens of fee simple ownership of the plant. Con Edison and Defendant agree that CED must be treated as the owner of a leasehold interest in

the RoCa3 Facility if it "enjoys the benefits and burdens normally incident to possession of such an interest." (D.Br. at 90)

The parties part company, however, in explaining how this test should be applied. In determining whether the form of a leasing transaction should be respected, the courts and the IRS have developed a series of specific tests over the last 50 years. (P.Br. at 266-314) In its Opening Post-Trial Brief, Con Edison demonstrated that, under these principles, CED must be treated as owning its Lease Interest. (P.Br. at 321-71)

In its brief, Defendant chose to ignore the Leasing Guidelines, despite the Court's specific request that the parties brief the applicable administrative guidance, which includes the Leasing Guidelines. (Tr. 5380-81, 5392-93)) Defendant's Opening Post-Trial Brief does not contain a single citation to the Leasing Guidelines, despite their recognized role in both legal and commercial practice. *See Equipment Leasing*, §4:2.2[C] at 4-18; P.Br. at 270-87. The reasons for Defendant's strategy are obvious: its current litigating position is wholly incompatible with the Leasing Guidelines.

Defendant, in contrast to Con Edison, does not discuss the accepted standards to be applied in determining the "benefits and burdens of ownership." Instead Defendant adopts an *ad hoc* approach that does not follow the established leasing principles. Defendant offers up a hodge-podge of factual claims, all of which are either contrary to the record or to the accepted legal standards.

This *ad hoc* approach leads Defendant into numerous legal errors. For example, Defendant emphasizes that the Sublease is a net lease under which EZH remains responsible for all maintenance costs. (D.Br. at 96-97) Both the Leasing Guidelines and case law, however, allow the use of net leases, recognizing that net leases represent normal commercial practice that must be respected for tax purposes. Rev. Proc. 75-21 §1, 1975-1 C.B. at 715 ("In general, [leveraged] leases are net leases"); *Estate of Thomas*, 84 T.C. at 433 ("Net leases are commonly used today and do not necessarily reflect an absence of ownership."). Defendant's leasing expert Ray agreed he had never heard of a leveraged lease that was not a net lease. (Tr. 4880)

Similarly, Defendant attacks the transaction's use of nonrecourse debt. (*See, e.g.*, D.Br. at 105) The Leasing Guidelines, however, explicitly apply to "leveraged leases," Rev. Proc. 75-21, §1, 1975-1 C.B. at 715, which are, as a matter of definition, funded with nonrecourse debt. (Tr. 3126-27, 3174-75 (Ellis)) Case law allows the use of nonrecourse debt so long as the taxpayer has sufficient equity in the property. *See, e.g., Torres*, 88 T.C. at 721-22. Indeed, the entire purpose of the 20% equity requirement in the Leasing Guidelines is to police this requirement and ensure that excessive leverage is not used. *See* Rev. Proc. 75-21, §4(1), 1975-1 C.B. at 715-16. Both Ray and Bent agreed the use of nonrecourse debt is normal in leveraged leases. (Tr. 3866-67 (Bent); Tr. 4718 (Ray))

Besides contradicting accepted legal authority, Defendant's *ad hoc* approach is also inconsistent with, and thus threatens, normal commercial practice. For

example, much of Defendant's argument attacks the use of the defeasance accounts created by EZH (D.Br. at 3, 90, 94), even though Defendant's own leasing expert agreed that defeasance is commonly used, especially in cross-border transactions. (Tr. 3761 (Bent))

### B. The Use of Defeasance Deposits Is Not Inconsistent with the Benefits and Burdens Test

One of Defendant's central claims is that EZH's defeasance of its lease obligations somehow deprives CED of the benefits and burdens of owning a leasehold interest. (D.Br. at 90, 94) There is absolutely no support for such a claim, either in the law or in commercial practice.

Much of Defendant's argument regarding defeasance focuses upon the relationship between HBU and ABN. (D.Br. at 3, 94) For Con Edison's response to this point, see Facts Section I.A.9.

#### 1. Credit Risk Is Not a Requirement of the Benefits and Burdens Test

In its Opening Post-Trial Brief, Defendant states that, since the decision in *Frank Lyon*, "courts have focused on the existence of both credit risk, and market value risk as central features of tax ownership." (D.Br. at 91) Con Edison agrees as to the centrality of "market value risk." As explained in R. Argument Section I, "market value risk," or the exposure to the property's value during the residual value period, is the defining characteristic in identifying the "benefits and burdens of ownership."

But there simply is no legal authority that supports Defendant's claim that "credit risk" is necessary in order to establish the burdens and benefits of ownership. For example, in *Frank Lyon*, there was no reason to believe that Worthen Bank was unlikely to pay its rent obligations as they became due, and that Frank Lyon was therefore subject to credit risk. To the contrary, the *Frank Lyon* Court referred to the chance that "something will go wrong and that Worthen will not be able to make its payments" as nothing more than an "abstract possibility." *Frank Lyon*, 435 U.S. at 577. Similarly, the Leasing Guidelines specifically allow guarantees of a "lessee's obligation to pay rent." Rev. Proc. 75-21, §4.5, 1975-1 C.B. at 716. While such a guarantee reduces the credit risk of the lessee, it is not inconsistent with true lease status.

Indeed, in its Opening Post-Trial Brief, Con Edison cited to numerous other authorities that allow guarantees or other credit support of a lessee's obligations designed to reduce credit risk in true leases. (P.Br. at 394-97) The Tax Court has specifically rejected the view that credit support mechanisms are inconsistent with status as a true lease. *See Gefen*, 87 T.C. at 1494 n.15. In the leading case of *Estate of Thomas*, the Tax Court specifically noted that the lease would be upheld, even though there was "little risk that lease payments would not fully amortize the debt." *Estate of Thomas*, 84 T. C. at 431-32. The IRS itself issued a private ruling allowing the economic defeasance of lease obligations. (P.Br. at 391) Defendant's leasing expert Ray confirmed that leasing to "exceptionally good credits still involves enough risk" for the transaction to qualify as a lease. (Tr. 4918-19)

It is easy to understand why credit risk cannot be treated as a condition of a true lease. For example, a lease to the United States government would involve no credit risk and, thus, if Defendant were correct, could never be treated as a lease for tax purposes. Similarly, leases to Microsoft, General Electric or other highly-rated and stable entities involve very little credit risk and thus presumably would not be treated as leases. But the same lease, with the same terms, would apparently be treated as a lease if the lease were made to a risky entity. Defendant's leasing expert Ray agreed that EZH's defeasance of its lease obligations with accounts held by ABN presented the same credit risk as leasing to ABN itself. (Tr.4915-17) There is no rule that prevents leasing to a high-credit entity, such as ABN.

Most importantly, the use of the defeasance accounts will have absolutely no effect on any of CED's benefits and burdens with respect to its leasehold interest. As noted above, the most important benefit and burden is the exposure to residual risk. [See R. Argument Section I] The presence or absence of the defeasance accounts will have no effect on CED's exposure to residual risk. CED's exposure to the operations of the RoCa3 Facility will be exactly the same, whether or not EZH has chosen to defease its obligations. Defeasance does not change the duration of the Sublease, the amount of CED's equity or the residual value. Further, for the reasons stated at [R. Argument Section II.F.], above, EZH's defeasance of its obligations will not affect its decision whether or not to exercise the Sublease Purchase Option, since EZH will have access to the funds in the defeasance accounts whether or not it exercises the option.

### 2. The Use of Defeasance and Other Credit Support Is an Established Commercial Practice

The record establishes that defeasance is a common commercial practice that presented significant business benefits for EZH. Defendant's leasing experts Ray and Bent agreed that defeasance in leasing transactions is normal, especially with respect to long-term, cross-border transactions. (P.Br. at 399-401) Bent explained that the use of defeasance allows lessees, like EZH, to obtain "more attractive" financing terms by providing "greater security to" lessors. (Tr. 3821) As explained at Reply Facts Section I.A.2.(c)(3), the use of defeasance accounts here also protects EZH against the currency risks that could otherwise eliminate the economic benefits for which it had bargained. EZH's corporate minutes and the trial testimony of its advisor reveal that this was precisely the reason why EZH chose to defease its obligations. (R. Facts Section I.A.2.(c)(3); Ex. 288 at pages 5637-38; Tr. 2944-45 (Mintun))

Courts should be reluctant to apply new rules that would interfere with common commercial practice.

## C. CED Owns a Current Leasehold Interest in the RoCa3 Facility

In its opening brief, Con Edison demonstrates (P.Br. at 344-72) that, by applying well-established leasing tax law principles, CED's investment in the RoCa3 Facility meets all of the requirements for a current leasehold interest in leased property:

- CED made an equity investment in the property;

- EZH's purchase option does not diminish CED's equity interest, since EZH is not economically compelled to exercise the option;
- CED expects to earn a pretax profit from the rental income paid by EZH and the residual value of the property.

(P.Br. at 172, 180, 321-22) In particular, CED has the most significant "benefit and burden," which is the possibility of profiting, or of incurring a loss, from the property's residual value. (P.Br. at 360-62)

As previously noted, Defendant eschews any discussion of the tax law principles set forth in the Leasing Guidelines and the cases. Rather, Defendant employs an *ad hoc* series of arguments to contend that "CED Failed to Acquire a Current Leasehold Interest in the EZH RocCa3 Facility." (D. Br. at 89) In addition to those arguments refuted in Argument Sections I and II, these arguments can be summarized as follows:

(1) EZH had the "continued and unabated use of the RoCa3 Facility at no cost to itself" (D.Br. at 90);

(2) "EZH received a fee for accommodating the paperwork" (D.Br. at 89);

(3) The RoCa3 Transaction was a "ploy to generate tax benefits" (D.Br. at 89);

(4) The RoCa3 Transaction involved "circular flow[s]" of funds (D.Br. at 90);

(5) CED cannot lose its initial investment (D.Br. at 94);

(6) CED's residual risk is "collar[ed]" by the Sublease Purchase Option and the Sublease Renewal Option. (D.Br. at 95);

(7) The RoCa3 Transaction uses "reciprocal rights and obligations," which can be ignored (D.Br. at 101).

Con Edison addresses each of these arguments in turn.

### 1. EZH's Use of the Facility Is Nothing More than the Use That Arises from Its Status As A Lessee

Defendant argues that "EZH retained the continued and unabated use of the RoCa3 Facility." (D.Br. at 90) The flaw in this argument is obvious: in a sale-leaseback or lease-leaseback, the original owner of the property will *always* retain "continued and unabated use" of the property in its new role as lessee. For example, in *Frank Lyon*, 435 U.S. 561, after Worthen Bank sold its headquarters building to Frank Lyon, Worthen retained the continued use of the building for as long as 65 years. *Id.* at 566 (25-year initial lease term and 5-year renewal terms, up to 65 years). The Supreme Court obviously concluded that Worthen Bank's continued use of the building was irrelevant to Frank Lyon's status as lessor. *See id.* at 583-84. Indeed, in any sale-leaseback or lease-leaseback, the original owner will continue to use the property as a matter of definition in its new role as lessee. *See Torres*, 88 T.C. at 721 ("a lessor is normally not vested with the right of possession during the term of the lease"); *see also* Rev. Rul. 82-61, 1982-1 C.B. 13 (approving sale-leaseback of undivided interests in electric power facility). (*See* discussion at P.Br. at 284-87) The lessee's use of property continues unabated for the term of the lease so long as it is not in default. Hence, the continued use of property by a lessee pursuant to a lease or sublease is not relevant; that is simply what a lease is, after all.

Defendant's claim that EZH's use of the property is "rent-free" is directly contradicted by the testimony of its own leasing expert, Bent, who agreed that EZH

had an "enforceable obligation[ ]" to pay rent to CED. (Tr. 3804-06) If EZH did not pay that rent to CED, CED had a legally enforceable right to repossess the property or to exercise its other remedies. (Stip. ¶¶163(a), 164)

Although EZH paid this rent out of funds it held in the Sublease Deposit, EZH was primarily liable for the payment of rent and the Sublease was a "hell or high water" lease, since EZH was obligated to pay rent "regardless of any other circumstances." (Tr. 3864-65 (Bent)) Since EZH retained primary liability to pay the Sublease rent owed to CED, the funds EZH used to satisfy its rental obligations must be treated as EZH's funds both for accounting and tax purposes. (R. Argument Section II.F.; P.Br. at 146-47, 388-93, 398-99) Bent specifically agreed that, when EZH transfers funds out of the defeasance accounts to satisfy its rent obligations, this transfer represents a diminution of EZH's wealth. (Tr. 3805-06) Defendant's own expert thus disproves its claim that the use of the property was "rent-free." Therefore, EZH's use of the RoCa3 Facility is not rent-free: EZH uses the funds in the Sublease Deposit to pay rent, which Bent agreed diminishes EZH's assets, and if it ever stops the payment of rent, CED may repossess the RoCa3 Facility.

### 2. EZH Did Not Receive a "Fee for Accommodating the Paperwork"

Defendant claims that the funds received by EZH were a "fee for accommodating the paperwork." (D.Br. at 89) This claim is incorrect. First, the documents and the parties' agreements do not contain any provision to pay a "fee" to EZH and Defendant does not claim otherwise. Defendant thus errs in

recharacterizing the form of the parties' agreements to impute the existence of agreements not actually entered into. *Frank Lyon*, 435 U.S. at 583-84; P.Br. at 97.

As part of the transaction, CED agreed to pay rent to EZH and EZH acquired an obligation to pay rent to CED (P.Br. at 139-41) and, should EZH choose to exercise that Option, EZH would have an obligation to pay the Sublease Purchase Option price to CED. (Stip. ¶165) EZH's "benefit" from the RoCa3 Transaction is the difference between the amount received from its conveyance of the Lease Interest and its ongoing obligations under the Sublease. (*See* Ex. 10073 (Ellis Initial Report) at page 19998) As Ellis explained, this is precisely how the benefit to the lessee is computed in every sale-leaseback or lease-leaseback. *Id.* ("In some leases, such as Sale-Leasebacks or Lease-Leasebacks, the benefit to the Lessee is the difference between the cash inflow that it receives as the purchase price (in the case of a Sale-Leaseback) or rent (in the case of a Lease-Leaseback) under the Lease and the cash outflow that it pays under the Sublease. The difference between the present value of the inflows and the present value of the outflows is the benefit retained by the Lessee ('the Lessee's NPV Benefit')."). (*See also* Ex. 10073 at page 19998)

In any sale-leaseback or lease-leaseback, the seller/lessee receives funds at the front-end from entering into the transaction, but it simultaneously also incurs an obligation to pay rent. In *Frank Lyon*, 435 U.S. 561, for example, Worthen Bank received $7,640,000 on the sale of its bank headquarters. *Id.* at 566. But it did not get to "keep" this amount, because it simultaneously incurred an obligation to pay rent back to Frank Lyon. *Id.* The value of the transaction, from Worthen Bank's

point of view, was that the ongoing payment of rent presented a cheaper source of financing than borrowing to finance the building. *See, generally, id.*. at 576. Thus, Worthen Bank's benefit was not the full amount of the sales price but was the difference between the $7,640,000 sales proceeds and the cost of paying rent.[36]

The same is true here. Pursuant to the Lease, CED agreed to pay EZH the cost of the Lease Interest. (Ex. 2 at page 325) But EZH does not get to "keep" this money, since EZH also has agreed to pay Sublease rent to CED. (Ex. 4 at pages 390-90) EZH's financial benefit from the RoCa3 Transaction is, therefore, the difference between the amount it received as proceeds from conveying the Lease Interest to CED and the cost of paying rent under the Sublease. (*See* Tr. 1070-72 (Holzman)) This benefit is exactly the same as the benefit in *Frank Lyon*.

Here, however, there is one important difference from transactions involving only U.S. entities, such as *Frank Lyon*. EZH is located overseas, and its functional currency at the time the RoCa3 Transaction closed was the Dutch guilder. (Stip. ¶¶191, 215) Because CED required payment in U.S. dollars (Stip. ¶¶191, 215), EZH faced a significant currency exchange risk, since, over the minimum 20-year term of the Sublease, fluctuations between the guilder and the U.S. dollar could increase the cost of paying rent and reduce or even reverse EZH's benefit from entering into the RoCa3 Transaction. (P.Br. at 147-48)

As EZH's board minutes establish, EZH recognized this currency exchange risk, and management explained to the board that the defeasance "deposit in

---

[36] As the Supreme Court noted, Worthen Bank analyzed the transaction based on its cost of funds. *Frank Lyon*, 435 U.S. at 576.

dollars" was chosen because of the "currency exchange fluctuation." (Ex. 288 at page 5638; *see also* R. Facts Section I.A.2.(c)) By creating and funding the Sublease Deposit with U.S. dollars, EZH created a hedge of its obligation to pay rent in U.S. dollars. (*See* Ex. 288 at page 5638) This helped to protect the net economic benefit for which EZH had bargained from erosion due to currency risk.

No amounts received by EZH can be characterized as a "fee," because all such amounts are at risk if EZH defaults on its obligations. The record establishes that EZH may lose tens of millions of dollars if it defaults on its obligations under the RoCa3 Transaction. (P.Br. at 166-68, 385-86) EZH's management was aware of this fact and of EZH's continuing obligations. (*See*, *e.g.*, Ex. 288 at pages 5638, 5648) If EZH had been simply negotiating a "fee for accommodating the paperwork" (D.Br. at 89), it would never have agreed to jeopardize this fee and to potentially face tens of millions in additional liability. Instead, EZH agreed to these consequences, because these provisions are typical of leases generally. It is customary in leases for the lessee to make payments to the lessor in the case of a premature termination of the lease. (*See* P.Br. at 165-70) Hence, the amount received by EZH was not a "fee," but rather the same financial benefit present in every lease-leaseback or sale-leaseback.

Finally, defendant ignores the fact that EZH will receive an additional $831 million if it chooses not to exercise the Sublease Purchase Option. (Stip. ¶¶168, 177, 183)

### 3. The Temporary Tax Deferral from CED's Investment in the RoCa3 Transaction Is No Different from the Tax Deferral Present in All Lease Transactions

Defendant claims that the RoCa3 Transaction was a "ploy" to generate tax deductions. This argument was discussed in detail at pages 340-43 of Con Edison's Opening Post-Trial Brief.

All leasing transactions create tax benefits in the early years of the transaction, but these benefits are recaptured in later years; the taxpayer eventually pays higher taxes as a result of entering in the transaction. *Levy*, 91 T.C. at 861. Such tax benefits are a defining characteristic of leveraged lease accounting under FAS 13. (P.Br. at 112 citing FAS 13) Defendant's witness LaRue agreed that CED will pay at least $21 million in additional taxes as the result of the RoCa3 Transaction. (P.Br. at 355, 485) Thus, Defendant is less than forthcoming in claiming that "the amounts of tax benefits claimed in subsequent years are and will be very substantial." (D.Br. at 2, n.1) Taking into account *all* "subsequent years," CED will realize *no* net tax losses and will in fact pay at least $21 million in additional taxes by entering into the RoCa3 Transaction. (P.Br. at 172) In fact, all of CED's profit in the transaction, whether high or low, will be subject to income tax. Defendant has never challenged this fact.

The case law has repeatedly recognized that the temporary tax deferral arising from a lease is permissible so long as it is later reversed by additional taxable income. *See, generally, Frank Lyon*, 435 U.S. at 580; *Estate of Thomas*, 84 T.C. at 438; (P.Br. at 304, 353)

### 4. The RoCa3 Transaction Does Not Involve a Circular Flow of Funds

Defendant claims that the RoCa3 Transaction involves a "circular flow" of funds. (D.Br. at 90) If the Sublease Purchase Option is not exercised, the flow of cash will not be circular, as Defendant's expert LaRue agreed. (P.Br. at 476-77) CED's cash flow and profit (or loss) will come from the operation of the RoCa3 Facility. (P.Br. at 476-77; Tr. 5241-42 (LaRue)) Similarly, there would not be a "circular flow" of funds in the event of a default or other Premature Termination Event. (*See* R. Facts Section I.A.1., 3., 9.; P.Br. at 165-70) Finally, while Defendant argues that the relationship between ABN and HBU produces a "circular flow" of funds, this relationship will come to an end with the divestiture of HBU. (*See* R. Facts Section I.A.1., 3., 9.)

### 5. CED Can Lose Its Equity Investment from the Operation of the RoCa3 Facility

In its Opening Brief, Con Edison identified in detail those provisions of the Operative Documents that require CED to bear its pro rata share of the expenses of operating the RoCa3 Facility during the Retention Option Period and the Shirt-Tail Period. (P.Br. at 188-98) If EZH does not elect the Sublease Purchase Option, CED can lose its investment if the RoCa3 Facility operates at a loss. (P.Br. at 474-75)

### 6. CED's Residual Risk Is Not "Collared"

Defendant argues that the combination of the Sublease Purchase Option and the Sublease Renewal Option "collars" the downside risk to EZH. For the reasons stated above, EZH is not expected to exercise the Sublease Purchase Option. It is

unlikely that CED will elect the Sublease Renewal Option, which is set at 90% of fair market value rent, and more likely that CED will instead elect the Retention Option, which is projected to be more lucrative. (Ex. 46 at page 1578)

But even if CED elects the Sublease Renewal Option, its exposure to residual value will still exceed the amount required by case law. If CED elects the Sublease Renewal Option, the Sublease will expire on June 15, 2034. (Stip. ¶136) CED will therefore share in the output of the RoCa3 Facility, and in its profits or losses, for the remaining Lease Term, until February 24, 2041. (Stip. ¶113) This period (the Shirt-Tail Period) is approximately 15.5% of the term of the Lease Interest. Furthermore, the value of CED's Lease Interest at the beginning of this period is 22.7% of the original cost of the Lease Interest. (Ex. 46 at pages 1505, 1567-68, 1721)

The length of the residual life and amount of the residual value during this remaining period meet the requirement that CED have a significant expectation of residual value. *See* P.Br. at 273-75. The length of CED's residual interest in the RoCa3 Facility is actually *longer* than Frank Lyon's residual interest, which was approximately 10 years out of a 75-year period, or 13.33%. *Frank Lyon*, 435 U.S. at 566. Thus, the Sublease Renewal Option does not "collar" CED's exposure to residual value in a manner inconsistent with the "benefits and burdens" analysis as that test has been applied by the Supreme Court and other judicial authorities.

The Defendant also argues that CED has a right to abandon the property at the end of the Sublease, which would reduce its exposure to the RoCa3 Facility's

residual value. (D.Br. at 84, 98 n.110) It is extremely unlikely that CED would ever exercise this option, since (as described above) the RoCa3 Facility is expected to have significant residual value at the end of the Sublease, even if CED elects the Sublease Renewal Option. Furthermore, Defendant does not point out that, if CED were to elect this option, it would nevertheless still be required to make the Final Basic Rent Payment of $831 million in 2041. (Ex. 2 at page 344) There is no reason why CED would ever walk away from the RoCa3 Facility, particularly since it would still be required to make the Final Basic Rent Payment. Case law has always held that, if the projected value of property provides the taxpayer with equity in the property and a profit from the transaction, there is no reason to believe the taxpayer will walk away from the property. *See, e.g.*, *Torres*, 88 T.C. at 721-22. These judgments must be made at the inception of the transaction, not with the benefit of 20-20 hindsight. *See Gilman v. Comm'r*, 933 F.2d 143, 149 (2d Cir. 1991).

**7. The RoCa3 Transaction Does Not Contain Reciprocal Rights and Obligations**

Defendant argues that the Lease and Sublease constitute reciprocal obligations that should be ignored, because the Sublease transfers back to EZH the same interest that EZH had transferred to CED. (D.Br. at 101) The obvious flaw with this argument is that every sale-leaseback or lease-leaseback will, by definition, involve a transfer of an interest in property, followed by a transfer back of an interest in that same property. This transfer back, however, will qualify as a lease so long as the interest transferred back is shorter than the original interest, thus leaving the lessor with a substantial interest in the residual value of the

property. As stated above, the presence of a significant residual interest in the property is controlling for the analysis of a lease. In other words, the obligations are not reciprocal and offsetting so long as the lessor holds an interest in the property for a period longer than the lessee and therefore holds the residual value.

This principle was illustrated in *Frank Lyon*. In that case, as a result of "complementary and interlocking agreements," 435 U.S. at 565, Worthen Bank transferred an interest in the building to Frank Lyon, and Frank Lyon simultaneously leased the building back to Worthen Bank. Because of the ground lease under the building, the life of Frank Lyon's interest was 76 years and 7 months. *Id.* at 565-66. Frank Lyon leased the building back for a period of up to approximately 66 years, leaving a 10-year residual interest period where "full ownership, use, and control of the building were Lyon's." *Id.* at 566. Therefore, even though the sale and the leaseback in *Frank Lyon* involved transfers of an interest in the same property, these transfers were not treated as offsetting, since Frank Lyon retained a residual interest in the property. The majority rejected the dissenting opinion's claim that the sale and leaseback did not create a "present" interest in the property. *Id.* at 587.

Under the terms of the RoCa3 Transaction, the parties' obligations are not offsetting. To give only one example, Bent agreed that EZH has a binding legal obligation to pay rent to CED and that CED can repossess the property if EZH does not comply with this obligation. (Tr. 3804-05, 3858, 3860) But CED's obligation to pay rent does not match or offset EZH's obligation; CED has already made its initial

rental payment, while EZH has a continuing obligation to pay rent over the life of the Sublease. (Stip ¶¶116, 128, 139, 140) Defendant's argument also contradicts the testimony of its leasing experts, Bent and Ray, who agreed that lease-leasebacks are commonly used and not problematic. (Tr. 3798-99 (Bent); Tr. 4807 (Ray))

The Defendant relies primarily on the district court's decision in *BB&T*, but the Fourth Circuit did not endorse the logic of the district court's decision. Instead, the Fourth Circuit applied the traditional "benefits and burdens" analysis, finding that, because of the certainty of the exercise of the purchase option, BB&T would never own the "benefits and burdens" of the residual value. *See* 523 F.3d at 472-74.

The other cases cited at page 101 of Defendant's Opening Post-Trial Brief are not leasing cases, and therefore they are of no help in determining whether a lease-leaseback creates reciprocal and offsetting obligations. Similarly, *McCulley Ashlock v. Comm'r*, 18 T.C. 405 (1952), and *Kruesel v. United States*, 63-2 U.S.T.C. ¶9714 (D. Minn. 1963), did not involve sale-leasebacks or lease-leasebacks and so are inapplicable. In addition, both cases predated *Frank Lyon* and thus do not reflect the current state of the law.

Defendant argues that *Bussing v. Commissioner*, 88 T.C. 449 (1987) ("*Bussing I*"), applies the "collapsing [of] reciprocal obligations" principle. However, Defendant does not correctly state the facts of that case. (See D.Br. at 103-04) *Bussing I* involved a purported sale-leaseback between two parties. 88 T.C. at 449. In order to create the impression that the transaction was a "genuine multiple party transaction," the parties inserted a straw-man—Sutton—into the chain of title. *Id.*

at 457. The record was "barren of any evidence" that this conveyance to Sutton had actually occurred. *Id.* at 457. Sutton's own president had no recollection of its participation, and the taxpayer was not aware of Sutton's participation. *Id.* Sutton disappeared from the transaction after the closing. *Id.* at 458. Although the taxpayer was scheduled to receive rental payments, these payments were never made. *Id.* at 454, 458. On this evidence, the court disregarded Sutton's role. *Id.* at 457. Without Sutton, the transaction was a two-party transaction that did not satisfy the standards of *Frank Lyon*. *Id.* at 457-58. The two parties' obligations to each other were offsetting and not in fact paid. *Id.* at 458.

In ruling on the subsequent motion for reconsideration, *Bussing v. Commissioner*, 89 T.C. 1050 (1987), ("*Bussing II*"), the court distinguished cases where the "purchaser's indebtedness was to a genuine third-party lender," 89 T.C. at 1055, and the court approved the "matching of rent to debt obligations" in situations involving a genuine third-party lender:

> This two-party transaction is conceptually different from a typical multiple party sale-leaseback in two respects: first, in a multiple-party sale-leaseback the purchaser is obligated to an unrelated third-party lender, regardless of whether rent is paid, and the purchaser receives the present economic benefit of a real payment of rent in order to make a real economic outlay of a debt service payment. *The channeling of the rent directly to the lender in a multiparty transaction is a matter of convenience, and it does not derogate the economic significance of either the rent payment or the debt service payment. Each is real.*

*Id.* at 1057-59 (emphasis added).

The holding in *Bussing* is obviously inapplicable here. HBU is not a "straw-man," as was the case with Sutton in *Bussing*. The record contains extensive

evidence and documentation of HBU's participation. (P.Br. at 135-38) HBU is a large bank regularly engaged in the banking business, with its own assets and operations. (*Id.*) HBU's participation is expected to last at least 20 years, as contrasted to the "blink-of-an-eye" role of Sutton. *Id.*

Since HBU is a genuine third party, there are no offsetting obligations as in *Bussing*. CED owes debt service to HBU, but HBU does not owe any payments to CED. *Id.* The fact that CED receives rental income from EZH that it can use to satisfy debt service payments owed to HBU does not indicate a lack of economic substance; this type of three-party relationship was explicitly approved in *Frank Lyon* and *Bussing*. *Frank Lyon*, 435 U.S. at 583-84; *Bussing*, 89 T.C. at 1057-59.

Similarly, on page 101 of its brief, Defendant refers to *Rickey v. Comm'r*, 502 F.2d 748 (9th Cir. 1974), and other cases as support for its argument to collapse "reciprocal obligations." Most of these cases involve offsetting mutual obligations between two parties, not the type of multiparty relationship present here and explicitly approved in *Frank Lyon*. *Rickey*, 502 F.2d 748; *United States v. Ingalls*, 399 F.2d 143 (5th Cir. 1968), *cert. denied* 393 U.S. 1094 (1969); *Blue Flame Gas Co. v. Comm'r*, 54 T.C. 584 (1970); *Big "D" Dev. Corp. v. Comm'r*, 30 T.C.M. (CCH) 646 (1971); *Greenfield v. Comm'r*, 44 T.C.M. (CCH) 1487 (1982).

### D. Defendant Misstates the Regulatory and Statutory Background Concerning Lease-Leasebacks

Finally, in its Factual Statement, Defendant provides an erroneous description of the regulatory and statutory background governing lease-leasebacks. Defendant states, "In 1999, the Service advised taxpayers that it would disallow

under the economic-substance doctrine the rent and interest-expense deductions claimed in LILOs. Rev. Rul. 99-14 . . . ." (D.Br. at 8) Defendant's description of Revenue Ruling 99-14 is misleading in that it implies the Ruling automatically disallowed rent and interest deductions in all LILOs. In fact, however, the Ruling held only that "[a] taxpayer may not deduct [rent and interest] in connection with a lease-in/lease-out (LILO) that lacks economic substance." Rev. Rul. 99-14, 1999-1 C.B. 835, 837. It then reasoned that the LILO addressed in the Ruling lacked economic substance because it lacked the potential for any significant economic effects other than the creation of tax benefits. *Id.* at 836. The Ruling, however, did not address other forms of LILO transactions that have economic substance. As discussed in Con Edison's Opening Post-Trial Brief, Revenue Ruling 99-14 was not consistent with the relevant legal authorities and was therefore withdrawn. (*See* P.Br. at 315-21)

Defendant next states that the IRS "later ruled that it *also* would deny [tax benefits associated with LILO transactions] under the substance-over-form doctrine. Rev. Rul. 2002-69, 2002-2 C.B. 760." (D.Br. at 8 (emphasis added)) In this statement, Defendant implies that Revenue Ruling 2002-69 maintained the theory that LILOs would lack economic substance. In fact, however, the IRS's Chief Counsel at the time, B. John Williams, stated that the new Ruling "does not rely on the lack of a pretax profit potential or business purpose." IRS Release No. IR-2002-108. Instead, the Ruling promulgated the theory that the lease and sublease impose

"offsetting obligations" that, when disregarded, result in a future interest in the property. (*See* P.Br. at 315-21)

Defendant concludes by stating that the Jobs Growth and Relief Reconciliation Act of 2003 (P.L. 108-27), section 302, was passed to "prophylactically eliminate" LILOs "[b]ecause Congress considered LILOs, and related abusive shelters to be a widespread problem." (D.Br. at 8) Defendant's citation does not support either the stated change in law or the motive it attributes to Congress. Presumably, Defendant meant to refer to the American Jobs Creation Act of 2004, (Pub. L. No. 108-357, 118 Stat. 1418), which added I.R.C. §470, a leasing-related provision. Con Edison discusses the provisions of §470, which do not apply to the RoCa3 Transaction, in its Opening Post-Trial Brief at pages 290-294. Neither Act contains information as to Congress' motivation or opinion of LILOs and related transactions.

## IV. Con Edison Is Entitled to Interest Expense Deductions Because the HBU Loan Constitutes Bona Fide Indebtedness

The Court's decision on whether CED has acquired the benefits and burdens with respect to the Lease Interest controls whether the HBU Loan should be respected as true debt. Because CED has indeed acquired a property interest, the debt incurred to acquire that interest must be respected.

The recent decisions in *BB&T* and *AWG* are clearly distinguishable because in those cases the purported lessor did not actually acquire an interest in property. As the court noted in *AWG*, the "court has already concluded that the Plaintiffs did not purchase economic ownership" of the facility in question and therefore the

Leasing Trust "did not use the loans to acquire ownership of a capital asset." No. 1:07-CV-857, slip op. at 63, 65. Similarly, in *BB&T* the Fourth Circuit concluded that BB&T had not acquired a genuine leasehold interest. 523 F.3d at 475, 477. As demonstrated above, Con Edison has acquired the benefits and burdens with respect to its leasehold interest in the RoCa3 Facility. Therefore, the HBU Loan, which CED used to acquire its interest in the Facility, must be respected. In this case, unlike BB&T and the Leasing Trust, CED has had the use of the money loaned from HBU, since the use of this money was necessary to acquire the Lease Interest.

In *BB&T*, the court further grounded its analysis upon the peculiar nature of the defeasance account used in that case, where the defeased funds, because of an "irrevocable transfer," "became an asset solely of ABN, unreachable by Sodra, BB&T, or their respective creditors." 523 F.3d at 467. In holding that the debt was not bona fide, the court emphasized this unusual feature: "[B]ecause the funds became an asset solely of ABN upon their transfer to the Debt PUA account, BB&T could not use the money after the transaction's closing." *Id.* at 476. BB&T had immediately repaid the "borrowed" money by irrevocably transferring possession of it back to ABN: "BB&T, having immediately returned a sum equal to the amount ABN supplied in furnishing the HBU loan to a defeased account at ABN, has relieved itself of any further repayment obligations." *Id.* Hence, there was no debt outstanding.

The facts are different here. Con Edison has demonstrated that the funds in the defeasance accounts used here belong to EZH, as a matter of law and of financial accounting, and that any excess amounts in these accounts will be returned to EZH (as will happen if EZH does not exercise the Sublease Purchase Option). (Stip. ¶¶204, 225, 239, 240, 250, 251, 252; P.Br. at 146-47, 174-75, 184) Thus, unlike the situation in *BB&T*, the amounts deposited into the defeasance accounts were not irrevocably transferred.

Con Edison has also demonstrated that EZH chose to establish these accounts for its own business purposes (*i.e.*, to protect itself from currency fluctuations) that, over the life of a 20-year lease, could cost EZH millions of dollars in unanticipated expense. (R. Facts Section I.A.2.(c)(3)) Bent agreed that payments out of these accounts represent a diminution in EZH's wealth. (Tr. 3805-06) Thus, the payments that CED receives from EZH's funds held in the defeasance accounts are payments from the use of the property (*i.e.,* they are the rental payments that Bent agreed EZH was required to make to CED if EZH wanted to retain possession of RoCa3). (*See id.*) Thus, because CED repays the HBU loan from funds derived from its Lease Interest in the Facility, the HBU Loan should therefore be respected.

Furthermore, as demonstrated at Facts Section I.A.1., 3., 7., the cash flows here are not circular. In Defendant's Opening Post-Trial Brief, Defendant questions why CED would pay off $123,000,000 on the HBU Loan in order to elect the Retention Option. (D.Br. at 38 n.31) The answer to this question is quite simple—the Retention Option is expected to produce $729,018,996.19 in pretax cash flow

from the sale of the RoCa3 Facility's output. (*See* R. Facts Section I.C.8.(b)(3); P.Br. at 362) It is therefore very clear that CED will have an incentive to elect the Retention Option and pay off the HBU Loan.

In support of its claim that the HBU Loan lacks substance, Defendant relies primarily on *Bridges v. Commissioner*, 325 F.2d 180 (4th Cir. 1963). (*See* D.Br. at 105) In *Bridges*, the taxpayer sought to generate an interest deduction by borrowing money from banks and purchasing Treasury notes at a discount from face value. *See* 325 F.2d at 182. The transactions were structured so that the interest owed to the banks exceeded the maximum possible gain from the taxpayer's later sale of the Treasury notes. *Id*. at 183. As the court explained, "there was no prospect whatever of any financial profit," and the taxpayer admitted as much. *Id*. at 185. Thus, *Bridges* is consistent with a well-established line of cases that disallow interest deductions when the transaction in which the money was borrowed presents no possibility of a profit aside from the tax benefits. In *Bridges*, the Fourth Circuit specifically distinguished the decision in *Stanton v. Commissioner*, 34 T.C. 1 (1960), where the transactions "were entered into for profit" and "actually resulted in a profit (before taxes)." *Bridges*, 325 F.2d at 185.

One of the cases in this line is the Court of Claims decision in *Rothschild v. United States*, 407 F.2d 404 (Ct. Cl. 1969), which Defendant fails to cite. *Rothschild* addressed a transaction (borrowing to buy and sell Treasuries) very similar to the one in *Bridges*. *Id*. at 406. As in *Bridges*, the court ruled against the taxpayer, because "there was neither a possibility nor an opportunity of profit to the

taxpayer." *Id.* at 412. The Court of Claims distinguished *Stanton* and other cases where "the taxpayer had a possibility or opportunity to make a profit . . . apart from the tax deduction." *Id.* The court in *Rothschild* specifically noted that *Bridges* had distinguished *Stanton* "as a case where the taxpayer made a profit, apart from the tax deduction, and for that reason was entitled to the interest deduction." *Id.*

For the reasons stated above at Argument Section II.D., the record demonstrates that CED expected a pretax profit from the RoCa3 Transaction. This is not a case where the taxpayer's only possible profit from the transaction arose from a claimed interest deduction on the borrowed funds. Rather, CED, in borrowing to acquire its leasehold interest, "acquired all the rights of ownership, including the possibility of making a profit . . . or the chance of losing money . . . ." *Rothschild*, 407 F.2d at 413.

Defendant makes two other attacks upon the HBU loan. First, Defendant claims that (unlike the case in *Frank Lyon*) the HBU loan is a nonrecourse loan. (D.Br. at 106) Second, Defendant claims (incorrectly) that the loan proceeds in *Frank Lyon* were "fully committed to construct the building in question." *Id.* Both of these attempts to distinguish *Frank Lyon* are misplaced.

Ever since *Crane v. Commissioner*, 331 U.S. 1 (1947), the courts have recognized that nonrecourse debt must be respected as true debt so long as the value of the encumbered property exceeds the amount of the debt. *Id.* at 14. This principle has repeatedly been applied in leasing cases. *Levy*, 91 T.C. at 861-62; *Torres*, 88 T.C. at 721-22; *Gefen*, 87 T.C. at 1493-94. It is also recognized in the

IRS's own guidance, including Revenue Ruling 82-61, 1982-1 C.B. 13, which involved the sale-leaseback of a power plant. Indeed, for a lease to qualify for leveraged lease accounting under FAS 13, the debt *must* be nonrecourse. (P.Br. at 135-36)

The application of this principle to the facts of this case indicates that the HBU loan must be regarded as true debt. Defendant has not suggested that the value of the Lease Interest is less than the amount of the HBU loan. The calculations in the ABC pricing runs confirm that the amount of the HBU loan is always expected to be less than the value of the Lease Interest (Compare Ex. 332 at page 7181 with *id.* at page 7188), and therefore CED will maintain an equity interest in the Lease Interest throughout the life of the RoCa3 Transaction, as required by the Leasing Guidelines and case law. (*See* P.Br. at 272-75, 345-49)

Since CED has an equity interest in the Lease Interest, it is economically compelled to make payments on the HBU loan in order to preserve its equity, just as if the HBU loan were a recourse loan. *See Crane*, 331 U.S. at 14. (P.Br. at 370-71) Thus, the courts have not viewed the recourse nature of the loan in *Frank Lyon* as a controlling factor and have repeatedly ruled in the taxpayer's favor in cases involving leases funded with nonrecourse debt. *See, e.g.*, *Levy*, 91 T.C. at 861-62; *Gefen*, 87 T.C. at 1493-94.

Defendant next states that one of the "key factors" in *Frank Lyon* was that the "loan proceeds" were used to "construct the building in question." (D.Br. at 106) First, this point is irrelevant. There is no indication in any leasing case that a lease

cannot be entered into with respect to an existing asset; to the contrary, Revenue Ruling 82-61, 1982-1 C.B. 13, approved the use of a sale-leaseback with respect to an existing power plant. (P.Br. at 284-87) Second, this point is simply not true. The building was already under construction by Worthen Bank "before Lyon was selected." *Frank Lyon*, 435 U.S. at 565. Thus, Worthen Bank itself apparently built the building with its own or borrowed funds.[37] The building was then sold to Frank Lyon "as it was constructed." *Id.* at 566. The sale-leaseback in question thus refinanced Worthen Bank's original expenditures in constructing the building. The funds Frank Lyon borrowed were used to buy the building, not to construct the building. Defendant is simply wrong in claiming a "key factor" in *Frank Lyon* was that the "loan proceeds" were used to "construct the building."

Ellis explained that—as was the case in *Frank Lyon*—leases are commonly used to refinance an existing asset. (Ex. 10073 (Ellis Initial Report) at page 19997; *see* Tr. 3442) Worthen Bank evaluated the transaction on the basis of its cost of funds. *Frank Lyon*, 435 U.S. at 576. Case law has also recognized that leases can be used to refinance existing assets and to preserve capital for other uses. *Mukerji*, 87 T.C. at 942, 968.

---

[37] Although the facts of *Frank Lyon* clearly state that the building was under construction prior to the sale to Frank Lyon (*id.* at 565) the case does not state how the original construction was financed. Presumably, Worthen Bank financed the construction with its own funds or with borrowed construction financing, and the sale-leaseback refinanced this original investment at a lower cost to Worthen Bank. That is why Worthen Bank evaluated the transaction based on its cost of funds (*id.* at 576); the sale-leaseback provided cheaper financing.

Finally, Defendant claims (once again relying on *Bridges*) that CED "has no real use of the borrowed money." (D.Br. at 107) To the contrary, CED used the borrowed funds to buy an interest in the RoCa3 Facility. (*See* P.Br. at 135-36) The acquisition of this interest is expected to produce a significant pretax profit (P.Br. at 352-64), and thus *Bridges* is distinguishable, as the Court of Claims recognized in *Rothschild*.

## V. Defendant's Claim that the Transaction Lacks Economic Substance Is Contrary to Undisputed Evidence in the Record

### A. Defendant's Discussion of the Sham Transaction and Economic Substance Doctrines Is Incomplete and Misleading

At pages 108 through 114 of its Opening Post-Trial Brief, Defendant provides a selective analysis of the economic substance doctrine. Con Edison and Defendant agree that economic substance is measured with reference to both the objective economic benefits of the transaction (*i.e.*, the presence of a pretax profit) and the taxpayer's subjective business purpose in entering into the transaction. (D.Br. at 109-10; P.Br. at 303-14) Defendant does not explain, however, how the courts have applied the economic substance doctrine to leasing transactions. (*See* P.Br. at 303-15) Nor does Defendant discuss the Leasing Guidelines, which compile several factors that indicate whether a lease should be respected for tax purposes and also provide specific tests for measuring the pretax profit from a leasing transaction. (See P.Br. at 270-287) As such, the general principles Defendant sets forth are not helpful for purposes of examining the substance of the RoCa3 Transaction. For a

thorough discussion of how courts have applied the economic substance doctrine to leasing transactions, see Plaintiff's Opening Brief at pages 294 through 321.

### B. The Record Is Clear that the RoCa3 Transaction Has Economic Substance

#### 1. The Evidence Shows that the RoCa3 Transaction Was Expected To Produce a Pretax Profit as Defined in Case Law and the Leasing Guidelines

The evidence concerning the amount of CED's pretax profit from the RoCa3 Transaction is not in dispute. As described above, the calculations of Defendant's expert LaRue match CED's calculations. (R. Argument Section II.D.)

These profits have been calculated in accordance with the relevant legal standard: they compare (i) CED's equity investment plus the direct costs of financing to (ii) the cash flow from rent and residual value. This formula is set forth in Plaintiff's Opening Post-Trial Brief at pages 352 through 364.

Case law has followed this formulation. As set forth in Con Edison's Opening Post-Trial Brief at pages 303 through 304, the case law has upheld leasing transactions when the lessor's cash flow is large enough to recoup the lessor's investment and to provide a profit above this investment. The cases have also rejected attempts to set forth a minimum profit standard for leveraged leases. (P.Br. at 280-81, 481-92)

After calculating CED's cash flow from the RoCa3 Transaction, however, Defendant's expert LaRue applied a discount rate to this cash flow. (P.Br. at 481-84) As explained in Con Edison's Opening Post-Trial Brief (pages 481-84) this method of measuring pretax profit has been specifically rejected by this Court's predecessor,

as well as the Tax Court. (P.Br. at 481-84) LaRue admitted that his method of discounting cash flows is contrary to the Leasing Guidelines. (Tr. 5340) Defendant says that none of Con Edison's experts "conducted the sort of analysis Dr. LaRue performed." (D.Br. at 117) It is true that Con Edison did not conduct this "sort of analysis," since this sort of analysis is contrary to settled legal principles.

The *AWG* opinion further supports Con Edison's claim that the RoCa3 Transaction has economic substance. In that case, the court found that the pretax rate of return on the AWG transaction would be 3.4% and that this was a "pretax profit . . . sufficient to show that the transaction had some 'practicable economic effects other than the creation of income tax losses.'" No. 1:07-CV-857, slip op. at 42-43 (citing *Rose v. Comm'r*, 868 F.2d 851, 853 (6th Cir. 1989)). The AWG transaction therefore had economic substance. *Id.* In the RoCa3 Transaction, CED will earn a higher return than the Leasing Trust in *AWG* (4.44%).[38]

As have other courts, the court in *AWG* also rejected the notion that the profit from a leasing transaction must meet some minimal level, such as the 6.18% rate suggested by LaRue. (Ex. 20194 (LaRue Initial Report) at page 25151) The court stated, "[t]he taxpayer generally must only show a reasonably expected, minimal pre-tax profit in order to prove that a transaction has economic substance and is not required to show that its transaction will yield a higher pre-tax return than all

[38] CED will earn 4.44% even assuming that it earns no more than the minimum anticipated pretax profit: $61 million under the Sublease Purchase Option. (P.Br. at 353-56; Ex. 20194 (LaRue Initial Report) at 25151) If EZH does not exercise the Sublease Purchase Option, CED could earn a projected $729 million. (P.Br. at 356-64)

other possible investment opportunities." *Id.* The RoCa3 Transaction satisfies this standard and therefore the transaction has economic substance.

### 2. CED's Expected Gains from the RoCa3 Transaction Were Typical for a Leveraged Lease

Defendant claims that Plaintiff "[c]ould [n]ot [e]xpect [t]o [r]ealize [e]conomic [g]ains [t]ypically [a]ssociated [w]ith [l]everaged [l]easing." (D.Br. at 117) This statement is inconsistent with the testimony of Bent and Ray, Defendant's own leasing experts. As described in detail in Con Edison's Opening Post-Trial Brief (pages 485-89) Bent and Ray both confirmed that pretax yields of 2 to 4% were commonplace in the leasing industry. (P.Br. at 485-89) The minimum yield from the RoCa3 Transaction, 4.44%, is higher than the amounts Bent and Ray stated were common. (P.Br. at 485-88)

Bent and Ray's testimony is supported by that of Ellis, Con Edison's leasing expert. Ellis surveyed a series of reputable sources, including FASB, federal government sources, and this Court's opinion in *Johnson I*. (Ex. 10073 (Ellis Initial Report) at pages 20014-15, 20042; Ex. 10078 (Ellis Rebuttal Report) at page 20380; Tr. 3269-72) These sources showed that the pretax yields on leasing transactions are regularly in the 2 to 3% range (*id.*), which is lower than the yield on the RoCa3 Transaction.

Evidence presented in *AWG* also supports Con Edison's position and further confirms Bent's, Ray's and Ellis' testimony. The evidence in *AWG* indicated that typical leasing pretax yields are 2.5% to 3.5%. *AWG*, No. 1:07-CV-857, slip op. at 42. Once again, the yield on the RoCa3 Transaction is higher than this amount.

Defendant did not present any testimony on leasing yields. On cross, Thomas and LaRue both agreed that they were not familiar with normal yields in the leasing industry. (Tr. 4570-71 (Thomas); Tr. 5149 (LaRue)) There is simply no evidence in the record to rebut the testimony of Ellis, Ray and Bent that the yield from the RoCa3 Transaction was consistent with that of other leasing transactions.

Defendant points to a memorandum regarding GE Capital's leasing business (Ex. 1118) and claims that this memorandum indicates that CED sought to eliminate the normal risks of leasing. (D.Br. at 117) Defendant misreads the memo, which says only that CED sought to exclude risk "*to the extent reasonably possible*." (Ex. 1118 at page 16502 (emphasis added)) CED's primary method of limiting risk was to limit its investments to assets with which it was familiar—energy assets. (Tr. 150-51 (McGrath); Tr. 464-66 (Burke)) Some utilities did not impose a similar limitation and lost money invested in assets "far afield" from their core competency. (Tr. 150-51 (McGrath); *see also* Tr. 464-66 (Burke)) Second, CED followed a careful program of due diligence, including sending knowledgeable personnel to inspect the asset. (*See* P.Br. at 85-114) CED's attempts to limit risk "to the extent possible" were nothing more than good business sense.

Defendant's expert Ray agreed that GE Capital had a reputation in the leasing market for taking on risks that other lessors were unwilling to take. (Tr. 4989) Ray also agreed that GE Capital invested in a wide variety of market segments. (*Id.*) CED was just starting in the leasing business. (*See* P.Br. at 41-48) Defendant's argument that CED should have taken on the same risks as GE

Capital, one of the biggest and most established lessors in the business, does not make any sense. CED was prudent and reasonable by sticking to investments in assets with which it was familiar.

Invoking Ray and Bent, Defendant contends that CED's decision to book no residual value makes the RoCa3 Transaction different from "typical leveraged lease transactions." (D.Br. at 36-36 & nn.28-29) Insofar as Defendant invokes Bent for this proposition, Defendant apparently is relying upon Bent's semantic distinction between features that are "not unusual, but . . . not typical." (*See* Tr. 3962; P.Br. at 439-40) Indeed, Bent's testimony indicates he has seen leases with a zero residual value. (Tr. 3772-73 (testifying that, if there were zero residual value booked in a leveraged lease, there would "normally" be no residual value included in the termination values)) Defendant is wrong in claiming that CED did not analyze the residual value, since the Deloitte Appraisal contained specific projections of the potential cash flow during both the Retention Period and the Shirt-Tail Period (Ex. 46 at pages 1564, 1567-68, 1746-49)—a point that Bent himself noted in response to a question from Defendant's counsel. (Tr. 3966; *see also* Tr. 5358-60 (LaRue)) When the residual value is uncertain, as it is here, it is a common commercial practice to take a conservative view of the value for financial reporting purposes. (P.Br. at 358-60)

### C. Con Edison Put Forward Clear, Undisputed Evidence of CED's Business Purpose for Entering into the RoCa3 Transaction

#### 1. The Presence of Temporary Tax Benefits Is Irrelevant Given CED's Undisputed Nontax Reasons for Entering into the RoCa3 Transaction

Much of Defendant's argument in Section IV.C.1. of its Opening Post-Trial Brief is devoted to citing a handful of documents that Defendant claims show tax benefits were the "only" or "overriding" advantage memorialized in CED's discussion of the RoCa3 Transaction and of leveraged lease opportunities in general. However, each of these exhibits cited by Defendant in fact shows that CED examined numerous aspects of the transaction:

- Exhibit 363, the Project Briefing Memorandum, discusses the tax benefits of the transaction, together with "cash-on-cash return"[39] as primary benefits of the transaction and includes a chart analyzing the transaction's front-loaded earnings profile. (Ex. 363 at pages 7647, 7652-53)
- The minutes from Con Edison's October 28, 1997 board meeting specifically note that CED's management discussed the purchase and leaseback of power plants or distribution systems, CED's target lease [the RoCa3 Transaction] and the returns on these investments, including an after-tax yield on the RoCa3 Transaction of "a minimum of 12% per annum." (Ex. 354 at pages 7500-01)
- The Leasing White Paper draft Defendant cites (Ex. 383) contains a list of benefits associated with leasing transactions, including highly predictable earnings, front-loaded earnings, good to excellent investment yields, and understanding "the

[39] Defendant implies that the Project Briefing Memorandum identified the "investment return from the Treasury STRIPS" as a benefit of the RoCa3 Transaction. (D.Br. at 128-29) An examination of the document makes clear that this is false; the cited part of the document does not refer to the STRIPs at all. (Ex. 363 at page 7647) For Con Edison's response to Defendant's allegation that the STRIPs provide Con Edison's return in this transaction, see Facts Section I.A.8.

legal, regulatory, commercial and tax environment of the countries in which the leased assets are located."[40] (*Id.* at pages 7980-81) These same advantages were included in the final Leasing White Paper. (Ex. 397 at pages 8122-23)

The length and detail of the Project Briefing Memorandum and the Leasing White Paper, which between them contain detailed discussions of the Facility itself, the Dutch energy market, EZH as an entity and the mechanics of the transaction (*see, generally,* P.Br. at 117-25), belie Defendant's implied allegation that CED did not fully understand and investigate the RoCa3 Transaction. Moreover, as discussed at Con Edison's Opening Brief (pages 41-48 and 114-26) numerous other documents detail the importance of nontax business reasons for CED's decision to enter into the RoCa3 Transaction (*see, e.g.*, Ex. 243 at pages 4494-96 (identifying the goal of leasing investments, "Early Year Earnings + Total Returns," and five "[a]dvantages" to leasing investments, four of which were unrelated to tax benefits and instead related to the financial benefits of leasing: near-term closings, immediate earnings, frontloaded income profile, and vehicle to provide early year earnings "cover" for unregulated start-ups))

In short, the record is undisputed that numerous factors were important to CED's participation in the transaction:

- That the investment be within Con Edison's "core competencies" (P.Br. at 42-44, 46-48, 66);

[40] Defendant's focus on one anonymous comment in a draft of the Leasing White Paper (Ex. 383 at page 7981), which indicates that this reviewer was not aware of any future investment plans in The Netherlands (D.Br. at 129), is misleading. The final version of the Leasing White Paper, which was approved by the CED Board and forwarded to Con Edison, confirmed CED's desire to gain legal and commercial knowledge of The Netherlands. (Ex. 397 at page 8123)

- That CED have all necessary rights to exploit the output generated by the Facility after the Sublease ends (P.Br. at 87, 89-90, 130-33);
- That the RoCa3 Facility comply with all environmental rules and regulations (P.Br. at 108-11; Stip. ¶82; Tr. 910 (McCartney));
- That the transaction be projected to return a positive pretax return (P.Br. at 332-34);
- That the transaction provide CED an entrée into the European energy market (P.Br. at 334-40); and
- That the transaction provide CED with a front-loaded earnings profile (P.Br. at 324-34).

Ultimately, Defendant's contention in this section is simply that CED would not have entered into the transaction if it could not receive the tax benefits. (D.Br. at 121-22) However, as discussed at pages 340-43 of Con Edison's Opening Brief, Defendant's leasing expert Ray confirmed that *all* equity investors, when entering into leveraged leases, take into account the front-loaded earnings and tax benefits. (Tr. 4850-51 (Ray); *see also* Tr. 3231 (Ellis)) The law has long recognized and allowed the presence of a temporary tax deferral in leasing transactions, so long as the transaction produces a pretax profit. (P.Br. at 304) In other words, the entire leveraged leasing industry would be shut down if Defendant's position were adopted. Likewise, Defendant's position would foreclose the municipal bond market, as taxpayers would not invest in municipal bonds if they did not receive the associated tax benefits. (Tr. 3240-42 (Ellis))

### 2. The Record Supports CED's Claim that It Entered into the RoCa3 Transaction for Nontax Business Purposes

#### a. Defendant Admits that the Leveraged Lease Structure of the RoCa3 Transaction Was Essential to CED's Goal of Achieving Predictable, Near-Term Earnings

Section IV.C.2. of Defendant's Opening Post-Trial Brief indicates that Defendant admits numerous important points regarding CED's business purposes for entering into the RoCa3 Transaction. First, "CED, an unregulated subsidiary [of Con Edison], was organized to obtain . . . several goals . . . such as investing in international energy and infrastructure." (D.Br. at 124; *see also* P.Br. at 29-33) Second, CED's initial investments "were losing money in the early years, and CED desperately needed to offset those losses." (D.Br. at 125; *see also* P.Br. at 324-34) Third, lease-leaseback structures "create up front earnings and cash flow" (D.Br. at 47) and are "one of the fastest and least commercially risky ways to obtain those results [of offsetting losses]." (D.Br. at 125; *see also* P.Br. at 324-34)

Given all of these admissions, Defendant's claim that Con Edison "has not established any reasonable business purpose" for using the lease-leaseback structure "that gave rise to the claimed tax benefit" is odd. (D.Br. at 124 (citing *Basic Inc. v. United States*, 549 F.2d 740 (Ct. Cl. 1977)) As the record establishes, it is the leveraged lease structure itself that creates the front-loaded earnings profile.

As explained in Con Edison's Opening Brief, a leveraged lease structure like the lease-leaseback here requires the use of "separate phases" accounting, which pushes all of the income from the transaction into the early and late phases of the

lease, thereby creating a front-loaded earnings profile. (P.Br. at 233-36, 329-32) If CED had structured the deal differently and used a direct financing lease rather than a leveraged lease, it would not have obtained up-front earnings, but rather an earnings profile that "starts low and grows" larger in the later years of the lease. (Tr. 3519-3522 (Weil) (discussing Dem. Ex. 10214)) Defendant's own admissions, then, show that the use of a leveraged lease allowed CED to achieve its admitted business purpose. Unlike in *BB&T*, where the taxpayer failed to offer, much less prove, "any 'business or regulatory realities' that 'compelled or encouraged' the structure of the transaction [there] at issue" (*BB&T*, 523 F.3d at 473 (citation omitted)), the leveraged lease structure here fulfilled CED's business purposes and is in line with the requirements of *Basic*, *Coltec Industries, Inc. v. United States*, 454 F.3d 1340 (2006), and the other cases Defendant cites. (*See* D.Br. at 123-24) As the court recognized in *Frank Lyon*, the favorable accounting treatment of a profitable transaction supports the business purpose of the transaction:

> Accounting methods or descriptions, without more, do not lend substance to that which has no substance. But in this case accepted accounting methods, as understood by the several parties to the respective agreements and as applied to the transaction by others, gave the transaction a meaningful character consonant with the form it was given.

435 U.S. at 577.

This analysis also shows a key distinction between the facts of this case and those of *BB&T*. As discussed above, in *BB&T*, the taxpayer failed to offer, much less prove "any 'business or regulatory realities' that 'compelled or encouraged' the structure of the transaction [there] at issue." *BB&T*, 523 F.3d at 473 (citation

omitted). The Fourth Circuit therefore found that BB&T had not "offered any non-tax related purpose for structuring the transaction in this manner." *Id.* at 474. This was simply not the case for CED, given its goals in the wake of the New York state electricity market deregulation.[41] The leveraged lease structure was critical to its goals.

Perhaps realizing the fallacy of its initial argument, Defendant contends that, even if the lease-leaseback structure is necessary to obtain a business-related accounting benefit, "[a]n accounting benefit from a transaction that lacks economic substance cannot imbue the transaction generating the tax benefit with economic substance for tax purposes." (D.Br. at 130 (citing *Am. Elec. Power, Inc. v. United States*, 136 F. Supp. 2d 762, 791-92 (S.D. Ohio), *aff'd*, 326 F.3d 737 (6th Cir. 2003)) This legal point is inapposite: in *American Electric*, the taxpayer entered into a transaction that had no possibility of generating a pretax profit. 136 F. Supp. at 787-88. Here, the record is uncontradicted that CED wanted front-loaded earnings made possible by a specific financial accounting standard, properly attained those front-loaded earnings and was only able to do so because the investment was profitable independent of income taxes. (P.Br. at 324-34) CED expected to earn a

---

[41] The *BB&T* opinion also indicates that the taxpayer in that transaction did not perform adequate due diligence. In describing the taxpayer's pre-closing actions, the Fourth Circuit notes only that BB&T's "internal assessment described the transaction as a 'tax-driven deal'" and that BB&T did not follow its normal procedures for reviewing leases. *See* 523 F.3d at 465-66 & n.4. This description is in stark contrast to the evidence in this case of CED's extensive analysis of the various benefits of the transaction and engagement of numerous due diligence experts as was appropriate for a transaction of this type and magnitude. (P.Br. at 41-48, 52-54, 57-60, 63-126, 224-26) Defendant's leasing expert Ray agreed CED had carried out the appropriate due diligence. (Tr. 4746-47; P.Br. at 224)

minimum of $61 million pretax profit, a 4.44% internal rate of return. (P.Br. at 171-73, 481; Ex. 20194 (LaRue Initial Report) at page 25151) This return is well above the return required in the economic substance cases, including *AWG*. *AWG*, No. 1:07-CV-857, slip op. at 42. (P.Br. at 485-89) Defendant cites no authority (because there is none) holding that it is an invalid business purpose for a taxpayer to enter into a business transaction in order to secure the favorable accounting treatment specifically provided for by the governing financing accounting standard where, as here, economic substance is already present in the transaction. Significantly, Defendant does not dispute that the accounting treatment applied here is universally applied to all leveraged leases.

Given Defendant's acknowledgement that the evidence shows that in 1997 CED sought near-term accounting earnings and that leasing was an integral part of its solution to this problem, the rest of Defendant's contentions related to CED's implementation of the leasing program are beside the point. Con Edison will nonetheless address them briefly here.

First, Defendant claims that the leasing program of which the RoCa3 Transaction was a part "need not have been done by CED at all, and it was anticipated that CED . . . would do a couple of leases and then break the leasing company off and turn it back over to the parent company." (D.Br. at 125-26 (citing Tr. 1992-93 (Muoio)) Defendant's citation simply does not support the claim that the RoCa3 Transaction could have been entered into by another Con Edison entity, however. In the testimony cited, Muoio said that the parent company might

eventually take advantage of the leasing structure in the future once CED developed an expertise in the area. (Tr. 1992-93) The record is clear, however, that the RoCa3 Transaction itself was key to CED's business plan and CED's need for near-term earnings, not to Con Edison's needs as a consolidated group. (P.Br. at 33-60) Specifically, Muoio testified that "it was important for the unregulated subsidiaries to minimize their earnings drain on the parent company, and this was one of the financial structures that we thought would help the parent company, if you would, reduce those losses." (Tr. 1993; D.Br. at 125 (recognizing that CED was worried about repercussions from its parent company "if it did not earn a sufficient return over time"))

Second, Defendant contends that the addition of leasing to CED's business plan in May of 1997 indicates that it was not as legitimate as proposals discussed earlier in the process of developing the company's mission. (D.Br. at 123) Given that the first draft of CED's business plan was not completed until January 30, 1997 (Ex. 166 at page 4180) and that Muoio had not yet hired the CED management and staff in March 1997 (*see* Ex. 167 at pages 4181, 4183), the addition of further elements to CED's business plan a few months later is hardly surprising. (*See*, *e.g.*, Tr. 1927-28 (Muoio) (testifying that the business plan was a "very dynamic document"); Tr. 755-56 (McCartney) (testifying that the business plan was "preliminary" and "always changing")) Moreover, leasing was added to CED's business plan in response to CED's initial projection that the company would operate at a loss until 2001. (P.Br. at 325-29)

Finally, Defendant's allegations that CED's leasing program was "kept completely separate and [was] unrelated to [CED's] other purposes" of investing in international energy and infrastructure projects (D.Br. at 124) is false. Numerous documents discuss the RoCa3 Transaction alongside non-leasing transactions, such as GENOR and EEGSA, as part of the same comprehensive business strategy. (*See, e.g.*, Ex. 254 at pages 4783-86; Ex. 248 at pages 4610, 4619-20) Defendant cites only one exhibit (Ex. 1268), which does not support Defendant's allegations. In fact, Exhibit 1268 itself states that "CED made some niche investments in both power plant projects and leases" in 1997 and 1998 and lists the RoCa3 Transaction in a list of projects, including numerous non-leasing transactions. (*Id.* at pages 17871-72)[42]

**b. Defendant's Allegations Do Not Undermine the Evidence that CED Entered into the RoCa3 Transaction to Gain Access to New Markets**

As is set forth at Con Edison's Opening Post-Trial Brief (at pages 334 through 340), the documentary and testimonial record establishes that CED wanted to develop a presence in energy markets around the world, including Europe, and that CED considered the RoCa3 Transaction to be its entrée into Europe. Defendant's leasing expert Ray, hired to opine on CED's business purpose, said he had no reason to doubt that CED, in 1997, thought leases could help it forge

[42] For Con Edison's response to Defendant's claim that CED turned to "financial structuring" projects like leveraged leasing only when merger and acquisition projects "proved too competitive" (D.Br. at 125), see Facts Section I.D.1.d.(2).

relationships with overseas utilities and that only later did Con Edison pull back from that international strategy to focus on domestic projects. (Tr. 4929-30 (Ray))

In pursuit of its contention to the contrary, Defendant here repeats a number of arguments that Con Edison thoroughly discredited in its Opening Brief and Reply to Defendant's Factual Statement. These can be dealt with briefly here.

First, Defendant cites Exhibit 1132, an October 1998 email that contains a series of challenging "devil's advocate" questions regarding CED's business strategy that management believed the Con Edison Board might ask. (D.Br. at 126) It claims this document is proof that CED saw its leasing transactions as tax shelters. Con Edison responds to this argument above. (R. Facts Section I.D.2(7))

Second, Defendant's allegations that CED's various "country screen[ing]" procedures belie its international development purpose (D.Br. at 127) are specious. The country screenings were used as a tool to organize thinking and review opportunities, not to eliminate countries. (Tr. 1967-68 (Muoio); Tr. 2432-33 (Goulding)) CED invested in projects in several countries not contained on the screen. (*See* P.Br. at 59-60, 337-39)

Finally, Defendant's allegation that CED "pushed forward" with the NUON transaction in the Netherlands "even after CED stopped considering international investments altogether" (D.Br. at 127) is similarly erroneous. As set forth in Plaintiff's Opening Post-Trial Brief at pages 203 through 205 and pages 339 through 340, CED began exploring the NUON transaction in September 1998, and negotiation and due diligence on the project were well under way by early 1999

when CED decided to refocus its investment strategy. The closing dates initially contemplated for the NUON transaction were all well before the shift in strategy. (P.Br. at 203-05, 339-40; R. Facts Section I.D.3.F.(iii)(2)) As Muoio testified, CED wanted to "complete [its] work" where it had already invested time and resources. (Tr. 2020-21) The document Defendant cites as evidence of CED's shift in strategy a March 2000 email regarding the GENOR project, which shows that Defendant was still completing its international pull-out at that time, long after the close of the NUON transaction (May 1999). (*See* Ex. 1249)

Defendant also makes two new arguments in this section of its brief that deserve response. First, Defendant compares Con Edison's decision to purchase software after a technical symposium in China (D.Br. at 46-47, & n.43) with its purported lack of effort to "learn about the Netherlands" and "leverag[e] its experience" in the RoCa3 investment. (D.Br. at 128 & n.124) In doing so, Defendant compares apples with oranges. Although Con Edison undoubtedly learned useful technical information from the lease transactions (*see*, *e.g.*, Tr. 795-97 (McCartney) (describing the knowledge of gas distribution technology she learned from the NUON leasing transaction)), learning new ways to generate energy—already Con Edison's area of expertise—was not the primary goal in these transactions. As McCartney testified, CED's "primary learning" opportunity from the RoCa3 Transaction is with regard to new knowledge regarding the Dutch "energy market." (Tr. 911) CED anticipated that participation in the RoCa3 Transaction would give

CED the opportunity to pursue other investments in that country or in neighboring markets like France, Belgium and Germany. (P.Br. at 240)

Second, Defendant alleges that "the timeline of Plaintiff's business purpose claims" indicates that initial documents discussed only tax benefits, while "newer business reasons," such as strategic learning opportunities were, added only at the later stage of drafting the Leasing White Paper. (D.Br. at 128-29) This claim is unfounded and incorrect. When DePlautt presented leasing to the CED Board on May 29, 1997, he covered a wide variety of lease-related topics, including "the tax advantages of lease structures, the expected returns, [and] the possibility of near term enhancements to earnings and cash flows." (Ex. 169 at pages 4188-90) Similarly, a May 30, 1997 CED presentation outline identifies the goal of leasing investments to be "Early Year Earnings + Total Returns" (Ex. 243 at page 4473) and five "advantages" to leasing investments, four of which were entirely unrelated to tax: near-term closings, immediate earnings, frontloaded income profile, and a vehicle to provide early year earnings "cover" for unregulated start-ups. (*Id.* at 4495)

In support of its claim that the *earlier* documents focused on leasing as "a good strategy for reducing tax benefits," Defendant cites the Project Briefing Memorandum (Ex. 363) and a set of Board minutes (Ex. 354), both from October 1997, which were created well into the review process and after the various advantages listed above had been identified. Moreover, as discussed above both of

these documents, along with the Leasing White Paper, evidence a variety of business concerns other than tax benefits.

### c. Contemporaneous Documents Show that CED Was Interested in the Environmental Aspects of the RoCa3 Facility

CED also recognized that the RoCa3 Facility was an environmentally friendly plant. Defendant's attempt to diminish Con Edison's credibility by claiming that "[t]here is not a single pre-transactional document that shows Plaintiff ever considered this a benefit" (D.Br. at 129) is simply untrue. The documents show that CED consistently emphasized the Facility's carbon dioxide recapture technology. The September 24, 1997 Project Fact Sheet, for example, includes an asset description that focuses on the fact that the plant created "CO2 for sale to local greenhouses." (Ex. 388 at page 8021; *see also* Ex. 382 at page 7972 ("a Stork Ketels heat recovery steam generator and C02 boiler")) The Project Briefing Memorandum discusses the RoCa3 Facility's technology at length and specifically notes that the RoCa3 Facility was one of the most innovative and environmentally friendly generators in the world. (Ex. 363 at pages 7632-38)

Further, Defendant mischaracterizes the witnesses' testimony. For example, Defendant claims that McCartney acknowledged that "the idea for mentioning the positive environmental characteristics of the RoCa3 Facility . . . was not a benefit Plaintiff considered when it entered into the transaction." (D.Br. at 129 (citing Tr. 910)) To the contrary, McCartney's testimony was clear that Con Edison considered

the environmental aspects of the RoCa3 Facility to be very important at the time of the transaction:

> Q. Okay. And CED didn't enter into the EZH transaction because of its environmental aspects, did it?
>
> A. Put it this way, we would not have entered into it if it didn't have favorable environmental aspects.
>
> Q. Okay.
>
> A. Favorable meaning in compliance in every way. And in this case, better than compliance.

(Tr. 910) This testimony is consistent with the uncontradicted fact that CED made the receipt of a satisfactory environmental report a condition precedent to its participation in the RoCa3 Transaction. (Stip. ¶82; Tr. 1113 (Holzman); Tr. 782-83 (McCartney))

Con Edison widely publicized the RoCa3 Facility as part of its international and environmental strategy. *The Wall Street Journal*, for example, cited the RoCa3 Transaction as evidence of Con Edison's response to deregulation and new international profile. (Ex. 858 at pages 13492-93) Con Edison's 1997 Annual Report highlighted CED's international investments and focused specifically on the RoCa3 Transaction, including a color photograph of tulips to point out that the RoCa3 Facility was "one of the most innovative and environmentally-friendly electric generation facilities in the world." (Ex. 107 at 2961) The fact is Con Edison did not enter into the transaction as a "tax shelter," and it was not perceived as such by either Con Edison's shareholders, as witnessed by the annual report, or by the public, as witnessed by the *Wall Street Journal* article. The RoCa3 Transaction was

a business transaction that produced benefits to CED's business. Defendant's attacks are unfounded.

## CONCLUSION

For the reasons set forth above and the evidence presented at trial, this Court should respect the RoCa3 Transaction and cause Defendant to refund $328,066, plus interest as allowed by law.

/s/ David F. Abbott
DAVID F. ABBOTT
MAYER BROWN LLP
1675 Broadway
New York, NY 10019-5820
Tel: (212) 506-2642
Fax: (212) 849-5642
dabbott@mayerbrown.com

*Counsel for Plaintiff*

Of Counsel:

JOEL V. WILLIAMSON
THOMAS L. KITTLE-KAMP
BRIAN W. KITTLE
MICHAEL R. EMERSON
MEGAN E. WERNKE

MAYER BROWN LLP

June 27, 2008