# APPENDIX C

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| BB&T CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Civil No. 1:04 CV 00941 |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |

**STIPULATION REGARDING UNDISPUTED FACTS**

Plaintiff, BB&T Corporation, and defendant, the United States of America, by their undersigned counsel, hereby stipulate to the following statements solely for purposes of this litigation. For purposes of this stipulation, terms such as lease, sublease, loan, debt, proceeds, purchase, transfer and sale are used for the convenience of the Court, and do not indicate that defendant respects them as such. The parties reserve the right to dispute the relevance of the facts set forth in this Stipulation and to assert the truth and relevance of other facts. Capitalized terms that are not defined in this Stipulation are defined in Appendix A to the Participation Agreement dated as of June 27, 1997 among Sodra Cell A.B., Sodra Skogsagarna Ekonomisk Forening, Branch Banking & Trust Company, and the other parties named therein (the "Participation Agreement") and the other Operative Documents.

GOVERNMENT EXHIBIT
1
PENGAD 800-631-6989

## STIPULATION

1. Plaintiff BB&T Corporation is a financial services company organized under the laws of North Carolina and headquartered in Winston-Salem. It files consolidated income tax returns for itself and its direct and indirect subsidiaries. Except where the context otherwise requires, "BB&T Corporation" refers to BB&T Corporation and all the direct and indirect subsidiaries included in its 1997 consolidated income tax return.

2. As of December 31, 1997, BB&T Corporation had banking subsidiaries in North Carolina, South Carolina, and Virginia.

3. BB&T Corporation's subsidiaries presently operate banking offices in North and South Carolina, Virginia, Maryland, Georgia, Tennessee, West Virginia, Kentucky, Florida, Alabama, Indiana, and Washington, D.C.

4. Through its subsidiaries, BB&T Corporation offers a wide variety of banking and financial services, including lending and deposit, trust, insurance, brokerage and underwriting, leasing, factoring, and treasury and international services.

5. BB&T Corporation's largest subsidiary is Branch Banking & Trust Company ("BB&T").

6. One of BB&T's principal subsidiaries is BB&T Leasing Corporation ("BB&T Leasing").

7. BB&T Leasing specializes in lease financing for domestic commercial businesses.

8. During 1997, BB&T – through BB&T Leasing – provided leases of vehicles, rolling stock, and tangible personal property for small to medium sized commercial customers located primarily in North Carolina, South Carolina, and Virginia.

9. In addition to the leases provided through BB&T Leasing, in 1997 BB&T Corporation directly solicited leasing business from municipalities in North and South Carolina through its subsidiary banks.

10. BB&T is not aware that it directly or indirectly participated in any transaction it considers to be a leveraged lease transaction prior to June 30, 1997.

11. Sodra Skogsagarna Ekonomisk Forening (the "Sodra Economic Association") is a cooperative association that is owned by over 30,000 forest owners in the Kingdom of Sweden.

12. The forests owned by the Sodra Economic Association's members are located primarily in southern Sweden.

13. Many of the forests owned by the Sodra Economic Association's members are family owned.

14. Many of the forests owned by the Sodra Economic Association's members have been cultivated by the same families for generations.

15. The Sodra Economic Association engages in a number of forestry-related businesses, including timber trading and the processing of timber logs into sawn timber, pulp, and bio-fuels.

16. The overall objective of the Sodra Economic Association is to ensure a safe and appropriate distribution of its members' forestry products at satisfactory prices.

17. Most of the yield from the forests owned by the Sodra Economic Association's members is converted in the association's own plants into pulp, sawn timber or fuel.

18. The Sodra Economic Association's activities are divided among five operating subsidiaries: Sodra Cell AB; Sodra Skog; Sodra Timber; Sodra Skogsenergi; and Sodra Finans.

19. The focus of Sodra Cell AB ("Sodra") is manufacturing wood pulp.

20. Sodra is one of the world's leading manufacturers of wood pulp for the open market.

21. In terms of profit, Sodra is the most important business area of the Sodra Economic Association.

22. As of June 30, 1997, the Sodra Economic Association held, either directly or indirectly, all of Sodra's issued and outstanding stock.

23. Sodra owns and operates pulp-manufacturing facilities located in southern Sweden at Morrum, Varo, and Monsteras.

24. Sodra's three pulp-manufacturing facilities in Sweden, like many of the 46 pulp-manufacturing facilities that were operating in Sweden in 1997, are located in relatively close proximity to the forests owned by the Sodra Economic Association's members.

25. The transaction that is the subject of this action (the "Transaction") concerns pulp-manufacturing equipment located at the Morrum facility (the "Equipment").

26. The Equipment includes wood handling machinery, a soft wood pulp line, a hard wood pulp line, a bleaching plant, drying machines, and evaporation and recovery equipment.

27. Sodra opened the Morrum facility in 1962.

28. At the time of the Transaction Sodra manufactured pulp at the Morrum facility continuously, seven days a week, all year round.

29. Between 1995 and 1997, Sodra made extensive improvements to the Equipment at a cost in excess of $125 million.

30. The improvements made between 1995 and 1997 were made in an effort to increase the Equipment's production capacity and to reduce its emissions.

31. Sodra has informed BB&T that, between 1997 through 2001, Sodra made additional modifications to the Equipment at capital costs of $10.6 million (1997); $10.5 million (1998); $3.8 million (1999); $6.8 million (2000); $21.6 million (2001); and $21.3 million (2002), respectively.

32. In or about May 1997, Craig Knight from Knight, Tallman & van Tol Capital Partners, L.L.C. ("KTV") solicited BB&T to participate in the Transaction.

33. The Transaction involved a lease of an undivided interest in the Equipment to BB&T pursuant to a "Head Lease" and a shorter term sublease of the undivided interest in the Equipment to Sodra pursuant to a "Lease," and is therefore referred to as a lease-in, lease-out or "LILO" transaction. The Transaction also involved a number of other inter-related and mutually dependent agreements to which the Transaction Participants agreed to be bound.

34. By the time KTV solicited BB&T, Wachovia Bank N.A. ("Wachovia") had already been considering whether to enter into a LILO transaction involving the same Equipment.

35. Wachovia and Sodra had agreed to many of the terms of their LILO transaction before KTV approached BB&T, and BB&T was offered the opportunity to

enter into its Transaction on essentially similar terms. Nonetheless, BB&T was able to independently review the terms of the Transaction before entering into it.

36. The BB&T executives responsible for reviewing, evaluating, and approving the Transaction included John Allison, Henry Williamson, Scott Reed, Sherry Kellett, John Ipock, Kendall Chalk, and Kenneth Daniels.

37. BB&T Leasing did not play a role in initiating, evaluating, approving, or managing the Transaction.

38. As of June 27, 1997, BB&T entered into a Trust Agreement with Fleet National Bank ("Fleet"), under which Fleet agreed to act as trustee of a trust for the benefit of BB&T (the "BB&T Trust") in connection with the Transaction.

39. For federal income tax purposes, BB&T is required to report, and does report, the income and expenses of the BB&T Trust as if they were BB&T's own income and expenses. Except as otherwise stated in this Stipulation, "BB&T" refers to both BB&T and the Trust.

40. As of June 27, 1997, Sodra and BB&T entered into the Transaction by executing a series of agreements including, among others: (1) a Participation Agreement; (2) the Head Lease; (3) a Head Lease Certificate of Acceptance; (4) the Lease; (5) a Loan and Security Agreement; (6) a Tax Indemnity Agreement; (7) a Debt Payment Undertaking Agreement; (8) an Equity Payment Undertaking Agreement; (9) a Joint Operating Agreement; and (10) a Support Agreement. These agreements contained a number of clerical and other errors, and in April 1999 the parties entered into an Amendment to Participation Agreement, Support Agreement, Joint Operating Agreement, Head Lease, Head Lease Certificate of Acceptance, Lease, Irrevocable

Standby Letter of Credit, Loan and Security Agreement, Debt Payment Undertaking Agreement, Equity Payment Undertaking Agreement, Lessee Security Agreement and Lessor Security Agreement (the "Amendment Agreement"). True copies of the each of these agreements are identified in Attachment 1 to this Stipulation

41. BB&T's Transaction involved a 21.94% undivided interest in the Equipment. At the same time, a trust formed by Wachovia (the "Wachovia Trust") entered into a LILO transaction with Sodra with respect to the remaining 78.06% undivided interest in the Equipment. In the rest of this Stipulation, the term "Equipment" refers to the undivided interest in the Equipment that Sodra leased to BB&T.

42. Pursuant to the Head Lease, Sodra leased the Equipment to BB&T for a period of 36 years ending on June 30, 2033 (the "Head Lease Term").

43. Pursuant to the Lease, BB&T immediately leased the Equipment back to Sodra for a period of 15.5 years (the "Basic Lease Term"), with BB&T having a conditional option to require Sodra to renew the Lease for an additional 13.3 years (the "Lease Renewal Term").

44. BB&T's risk of loss on the Transaction is reduced but not eliminated as the result of the collateral pledged by Sodra through the defeasance arrangements that secure certain of Sodra's obligations and potential obligations under the Lease.

45. In 1997 BB&T assigned risk grades to transactions on a scale of 1 to 10.

46. A risk grade of 1 reflected the lowest possible risk of default to BB&T.

47. BB&T considered the Transaction to be a grade 1 risk.

48. BB&T considered all of the LILO transactions in which it participated to be grade 1 risks.

49. The Transaction represented the first LILO that BB&T had ever considered.

50. In connection with the Transaction, BB&T retained Deloitte & Touche LLP to prepare an appraisal report concerning the value of the Equipment, its expected useful life, the value of the leasehold interest that BB&T acquired pursuant to the Head Lease, and a number of other matters relating to the Transaction (the "Appraisal").

51. The English version of the 1997 annual report for Sodra Economic Association and its subsidiaries states, on page 25:

> Sodra Cell carried out a leasing transaction with two American banks as counterparty [*sic*]. The transaction meant that equipment at the Morrum mill has been leased-out and leased-in. Rental income and expenses are paid in advance in line with practice for this type of transaction which means that SEK 216M net was added to the Group and is credited to the year's results.

Note 22 to the financial statements included in the annual report includes the following statement:

> During the year, Sodra Cell AB carried out a leasing transaction with two American banks as counterparty [*sic*]. Supporting document [*sic*] for the transaction is a usufruct to [*sic*] the equipment at Morrums Bruk. The usufruct has been leased out in two so-called principal leases with a tenor of 36 years. Part of the rental has been received in advance. On their part and at the same time, Sodra Cell AB has leased back the usufruct via two so-called underleases with a tenor of just over 28.5 years. A bank has taken over the payment responsibility for the rental payments after Sodra Cell AB made a payment in advance. After approximately 15.5 years, Sodra Cell AB has an option either to buy or hand back the usufruct. For Sodra Cell AB's contractual discharge of the payment commitments which may arise, the Parent Company has signed a guarantee as for an own liability [*sic*].

52. In the Tax Indemnity Agreement, Sodra agreed that for financial accounting purposes, it would treat itself as the owner, head lessor, and sublessee of the Equipment.

53. In the Tax Indemnity Agreement, Sodra agreed that for U.S. federal income tax purposes, neither it nor any of its personnel would take a position that is inconsistent with the characterization of Sodra as the owner, head lessor, and lessee of the Equipment.

54. Prior to the Closing Date, Sodra, as the owner of the Equipment, operated the Equipment in the normal course of its pulp-manufacturing business.

55. Prior to the Closing Date, Sodra, as the owner of the Equipment, was responsible for all of the costs related to the Equipment's use and maintenance.

56. Under the Head Lease, BB&T is entitled to sole possession of the Equipment until the end of the Head Lease Term, subject to Sodra's right to an annual inspection of the Equipment, so long as it satisfies all of its obligations under the Head Lease.

57. Under the Head Lease, BB&T is entitled to operate the Equipment until the end of the Head Lease Term so long as it satisfies all of its obligations under the Head Lease.

58. Under the Head Lease, BB&T is required to use, operate, maintain, service, repair, and overhaul the Equipment in accordance with certain standards specified in the Head Lease.

59. Under the Head Lease, BB&T is responsible for all costs related to the use and maintenance of the Equipment during the Head Lease Term.

60. BB&T is entitled to retain all profits generated from its use of the Equipment under the Head Lease.

61. Section 12 of the Head Lease provides that during the term of the Lease, any Replacement Lease, or any Acceptable Lease, all of BB&T's obligations under the Head Lease, except for the obligation to pay rent and to remove certain Liens, shall be deemed to have been performed by the agreement of the Lessee (*i.e.*, Sodra), Replacement Lessee, or any Acceptable Lessee, as the case may be, to perform such obligations, and that BB&T shall take such actions as Sodra may reasonably request, at Sodra's expense, to enforce the provisions of such agreement.

62. Under the Lease, Sodra is entitled to sole possession of the Equipment until the end of the Basic Lease Term, subject to BB&T's right to an annual inspection of the Equipment, so long as it satisfies all of its obligations under the Lease.

63. Under the Lease, Sodra is entitled to operate the Equipment until the end of the Basic Lease Term so long as it satisfies all of its obligations under the Lease.

64. Under the Lease, Sodra is required to use, operate, maintain, service, repair, and overhaul the Equipment in accordance with certain standards specified in the Lease.

65. Under the Lease, Sodra is responsible for all costs related to the use and maintenance of the Equipment during the Lease Term.

66. Sodra is entitled to retain all profits generated from its use of the Equipment under the Lease.

67. The combined effect of the Head Lease and Lease is that BB&T does not have the right to possess the Equipment (apart from its right to make an annual

inspection) until, at the earliest, the first to occur of (1) the end of the Basic Lease Term, (2) the occurrence of a Lease Event of Default, as defined in the Lease, or (3) an early termination of the Lease pursuant to Sodra's right to terminate the Lease for obsolescence beginning in 2007.

68. The combined effect of the Head Lease and Lease is that BB&T does not have the right to use the Equipment except by leasing it to Sodra until, at the earliest, the first to occur of (1) the end of the Basic Lease Term, (2) the occurrence of a Lease Event of Default, as defined in the Lease, or (3) an early termination of the Lease pursuant to Sodra's right to terminate the Lease for obsolescence beginning in 2007.

69. The Head Lease required BB&T to pay rent to Sodra in two installments. The first installment – in the amount of approximately $86.2 million – was due on the Closing Date (the "Advance Head Lease Payment"). The second installment – in the amount of approximately $557.8 million – is due in 2038, five years after the expiration of the Head Lease Term (the "Deferred Head Lease Payment").

70. The Head Lease allocates the Advance Head Lease Payment to the first five years of the Head Lease Term (*i.e.*, 1997-2001), and allocates the Deferred Head Lease Payment to the last 31.5 years of the Head Lease Term (*i.e.*, 2001-2033).

71. BB&T paid the Advance Head Lease Payment in the amount of approximately $86.2 million on the Closing Date.

72. In addition to the Advance Head Lease Payment, BB&T paid gross fees in the amount of $5,530,000 in connection with the Transaction.

73. KTV received an advisory fee in connection with the Transaction and the Wachovia Transaction of which $4,030,000 was paid by BB&T.

74. KTV shared its advisory fee with Wachovia Capital Markets, Inc. pursuant to a preexisting agreement.

75. KTV paid BB&T an advisory fee of $1,000,000 in connection with the Transaction.

76. BB&T paid the Advance Head Lease Payment with $18,228,895 of its own money, plus proceeds of a non-recourse loan from Hollandsche Bank-Unie N.V. ("HBU") to BB&T in the amount of $68,008,236 pursuant to the Loan and Security Agreement (the "HBU Loan").

77. HBU is a wholly-owned subsidiary of ABN-AMRO Bank N.V. ("ABN").

78. HBU was not formed for purposes of the Transaction and has business and assets independent of those associated with the Transaction.

79. ABN is one of the most prominent financial institutions in the world and regularly participates in all types of financial transactions and services.

80. On June 30, 1997, ABN, on behalf of HBU, transferred $68,008,236 (*i.e.*, the funds representing the HBU Loan) to the Trust's account at ABN in New York.

81. At closing, BB&T transferred $18,228,895 (*i.e.*, the funds representing the equity portion of the Advance Head Lease Payment) to the Trust's account at ABN in New York.

82. As a condition precedent to the Transaction, Sodra was required to pay at closing:

a. $68,008,236 to ABN as "Debt PUA Issuer" under the Debt Payment Undertaking Agreement ("Debt PUA") (an amount equal to the HBU Loan); and

b. $12,000,193 to Fleet as "Equity PUA Issuer" under the Equity Payment Undertaking Agreement ("Equity PUA").

83. At closing, the Trust, on behalf of Sodra, made the payment Sodra was required to make to the Debt PUA Issuer, using proceeds of BB&T's Advance Head Lease Payment.

84. At closing, the Trust, on Sodra's behalf, made the payment Sodra was required to make to the Equity PUA Issuer, using proceeds of BB&T's Advance Head Lease Payment.

85. After making the payments required by the Debt PUA and Equity PUA on Sodra's behalf, the Trust transferred the balance of the Advance Head Lease Payment – $6,228,701.95 – to Sodra's account at ABN.

86. During the Basic Lease Term, Sodra is required to pay annual rents to BB&T in the amounts set forth in Schedule I to the Lease, as amended by the Amendment Agreement.

87. Sodra's annual rent payments to BB&T during the Basic Lease Term are equal to BB&T's scheduled debt service payments to HBU through January 1, 2012.

88. Section 3(f) of the Lease provides that the rent payments shall be adjusted upward or downward to reflect any adjustment in the amount, amortization, or interest rate pursuant to Section 2.12 or 2.13 of the Loan and Security Agreement. Section 2.12 relates to the determination of the interest rate if the HBU Loan is renewed to extend beyond its original maturity date (which coincides with the end of the Basic Lease Term), and Section 2.13 relates to changes in the interest rate if the Debt PUA is replaced with Acceptable Substitute Credit Protection pursuant to the Participation Agreement.

89. Under the terms of the Debt PUA, ABN is obligated to make certain payments to BB&T on Sodra's behalf.

90. BB&T's scheduled debt payments to HBU, and Sodra's annual rent payments during the Basic Lease Term, are equal to the scheduled payments required by the Debt PUA until January 1, 2012.

91. In the Loan and Security Agreement, BB&T assigned to HBU a lien (referred to as the "Lien of the Loan Agreement") on, among other things, the Head Lease, the Lease, BB&T's right to receive rent from Sodra, and its right to receive payments pursuant to the Debt PUA, to secure BB&T's obligation to satisfy the HBU Loan.

92. In the Lease, BB&T instructed Sodra to pay the rent pursuant to the Lease directly to HBU so long as the Lease was subject to the Lien of the Loan Agreement. The Debt PUA provides that as long as it remains subject to the Lien of the Loan Agreement, the payments pursuant to the Debt PUA shall be paid to HBU.

93. The Debt PUA payments, if and when made, satisfy BB&T's scheduled debt payments under the Loan and Security Agreement.

94. The Debt PUA payments, if and when made, satisfy Sodra's annual rent obligations to BB&T during the Basic Lease Term.

95. So long as ABN has satisfied its obligations pursuant to the Debt PUA, The Scheduled Payments that ABN remains obligated to pay pursuant to the Debt PUA at any time will equal to the remaining principal and interest payments due on the HBU Loan.

96. As part of its payment of $5,530,000 in gross fees, BB&T paid ABN a fee of approximately $220,000.00 for serving as the Debt PUA Issuer.

97. HBU possess a first priority security interest in BB&T's right, title, and interest in and to the Debt PUA.

98. In Section 2.1 of the Debt PUA, Sodra agreed that its payment of approximately $68 million to ABN pursuant to the Debt PUA was "absolute and unconditional," that it would "not have any right, title or interest in or to" the payment after it was made, that the payment would "become an asset solely of" ABN, and that neither Sodra nor any of its creditors would be able to assert any lien or claim with respect to the payment.

99. The Debt PUA states that the funds paid to the Debt PUA Issuer cannot be recovered by Sodra as debtor in possession or any trustee, receiver, liquidator, custodian, or similar official in connection with a liquidation, reorganization, or similar relief in a bankruptcy proceeding.

100. As Debt PUA Issuer, ABN was required to have a Moody's credit rating of A1.

101. As of the Closing Date, ABN had a Moody's credit rating of Aa1.

102. ABN's Moody's credit rating has dropped from Aa1 at the Closing Date to Aa3 as of May 17, 2006.

103. A Moody's credit rating of Aaa represents the lowest possible risk of default of any of Moody's credit ratings.

104. Prior to the Closing Date, BB&T determined that all of the Transaction Participants were low credit risks.

105. Under the Equity PUA, Fleet is obligated to use the funds it received in its capacity as Equity PUA Issuer (*i.e.*, $12,000,193) to purchase the Government Obligations set forth in Schedule II of the Equity PUA.

106. Fleet used the funds paid pursuant to the Equity PUA to purchase two U.S. Treasury STRIPS (Separate Trading of Registered Interest and Principal of Securities), a Resolution Funding Strip, Treasury Interest (TINTS), and a U.S. Treasury Security Stripped INT PMT.

107. The investments purchased by Fleet, together with the earnings thereon, are included in the "Account Collateral."

108. Section 3.2 of the Equity PUA provides that $12,000,193 payment was unconditional and irrevocable and that Sodra has no right to the payment except as provided in Section 2.6 with respect to excess payments received by BB&T and in Section 7.9(a) with respect to rebate obligations.

109. Except as provided in Section 2.6 of the Equity PUA (with respect to excess Equity Lease Payments), Sodra has no right to any of the payments under the Equity PUA any sooner than the end of the Basic Lease Term.

110. Section 7.9(a) of the Equity PUA provides that if Sodra does not exercise the Purchase Option under the Lease, it has satisfied all its obligations under the Lease, and BB&T has not renewed the Lease, then the Account Collateral or it proceeds shall be delivered to Sodra in accordance with Sodra's directions.

111. As security for its obligation to make payments under the Equity PUA, the Equity PUA Issuer granted a first priority security interest in the Account Collateral to BB&T.

112. BB&T possesses a first priority security interest in the Account Collateral.

113. As security for its obligation to make payments to Sodra under Section 7.9(a) of the Equity PUA, the Equity PUA Issuer granted a second priority security interest in the Account Collateral to Sodra.

114. Sodra possesses a second priority security interest in the Account Collateral, subordinated only to BB&T's security interest in the Account Collateral.

115. The Account Collateral was specifically excluded as collateral under the Loan and Security Agreement between BB&T and HBU.

116. HBU does not possess a security, or any other, interest in the Account Collateral.

117. At the end of the Basic Lease Term (on January 1, 2013), Sodra can elect to purchase BB&T's remaining interest under the Head Lease (the "Purchase Option") for the Purchase Option Price plus the assumption by Sodra of all of BB&T's obligations under the Head Lease, including the obligation to make the Deferred Head Lease Payment.

118. The Lease provides that the Purchase Option Price shall consist of five payments payable at specified times in 2013, totaling $46,856,927.

119. If Sodra exercises the Purchase Option, the Equity PUA requires the Equity PUA Issuer, if it has not been required to make any other payments (which would only be required in the event of any early termination of the Lease or Sodra's exercise of its right to acquire BB&T's leasehold interest under the Head Lease pursuant to section 13 of the Lease), to make five payments to BB&T at specified times during 2013.

120. If the Purchase Option is exercised, the final Scheduled Payment due under the Debt PUA and the first payment due under the Equity PUA would both be due on January 1, 2013, and would together equal the first installment of the Purchase Option Price, which would be due the same day.

121. If the Purchase Option is exercised, the second through fifth payments due under the Equity PUA would be equal to and due on the same dates as the second through fifth installments of the Purchase Option Price.

122. If Sodra exercises the Purchase Option, the funds payable under the Debt PUA and Equity PUA will be paid as follows:

a. ABN will pay the final payment due pursuant to the Debt PUA ($11,542,500) to HBU. That payment will be credited toward Sodra's payment of the Purchase Option Price to BB&T, and shall in turn be credited toward BB&T's payment of its obligations under the HBU Loan. If ABN has made all the payments it is required to make under the Debt PUA to HBU, the HBU Loan will be paid in full.

b. The Equity PUA Issuer shall make the five payments due under the Equity PUA ($35,314,427), assuming no other payments have been required, to BB&T.

123. The investments representing the Account Collateral have payments due at maturity and mature dates designed to ensure that the Equity PUA Issuer will have the funds needed to make the payments due to BB&T under the Equity PUA.

124. If Sodra exercises the Purchase Option, then upon BB&T's receipt of the Purchase Option Price and Sodra's assumption of BB&T's obligations under the Head Lease, BB&T's interest in the Head Lease will revert to Sodra and Sodra will assume BB&T's obligation to make the Deferred Head Lease Payment. In this scenario, BB&T will be relieved of its obligation to make the Deferred Head Lease Payment, and Sodra will owe the Deferred Head Lease Payment to itself.

125. The payments due from Sodra to BB&T under the Operative Documents are guaranteed by Sodra's parent, Sodra Economic Association.

126. In accordance with Section 8(b)(7)(A) of the Participation Agreement, Sodra caused the Strip Guarantor, ABN-AMRO Bank N.V., Stockholm Branch, to issue a letter of credit ("Equity LOC") in favor of BB&T.

127. ABN-AMRO Bank N.V., Stockholm Branch is a branch of ABN.

128. The cost of the Equity LOC was paid by BB&T as part of its payment of gross fees in the amount of $5,530,000.

129. Section 9 of the Lease provides that if Sodra defaults under the Lease, Sodra may, under certain circumstances, be required to pay BB&T, among other amounts, a Termination Value as defined in the Participation Agreement. The Termination Value and other amounts that Sodra may be required to pay upon a default are intended to be sufficient to repay the HBU Loan (principal and interest), repay BB&T's out-of-pocket investment, and pay BB&T's anticipated after-tax yield on the Transaction through the date when the payment is due.

130. The amounts payable to BB&T under the Debt PUA and the Equity PUA upon a default by Sodra under the Lease may be less than the Termination Value. In that

event, BB&T could draw on the Equity LOC, up to a maximum amount stated in the LOC, to cover all or a portion of the shortfall between the Termination Value and the amounts received pursuant to the Debt PUA and the Equity PUA, assuming that the Strip Guarantor satisfies its obligations under the Equity LOC.

131. If Sodra fails to exercise the Purchase Option, BB&T can (i) require Sodra to renew the Lease for a Lease Renewal Term of 13.3 years (the "Lease Renewal Option"); (ii) enter into a lease with a third party unrelated to Sodra (the "Replacement Lease Option"); or (iii) take possession of the Equipment (the "Return Option").

132. BB&T will be deemed to have elected the Lease Renewal Option unless it affirmatively elects either the Replacement Lease Option or the Return Option.

133. Under the Lease Renewal Option, Sodra is obligated to pay rents to BB&T in the amounts and at the times set forth in Schedule II to the Lease, as amended in the Amendment Agreement. The Lease and Schedule provides for Allocated Rent of $12,850,000 per year, and further provides that a "Current Pay Rent Amount" shall be payable at the beginning of each of certain years and that "Deferred Rent Amounts," equal to the balance of the Allocated Rent for each year, shall be deferred , with interest, to the end of the Lease Renewal Term (*i.e.*, April 18, 2026).

134. The amount of interest payable by Sodra on the Deferred Rent Amounts was agreed to by the parties and implies a rate of 10% per annum until January 1, 2025 and 8.25% thereafter.

135. The total amount of Deferred Rent Amounts and interest due from Sodra on April 18, 2026 is $211,957,384.

136. Under the Lease Renewal Option, Sodra is required to pay a Current Pay Rent Amount of $12,825,000 on January 1, 2013.

137. If BB&T exercises the Lease Renewal Option, a payment of $11,542,500 is due on January 1, 2013 from ABN Amro under the Debt PUA.

138. If the Debt PUA Issuer makes all the Scheduled Payments required by the Debt PUA, the payment due on January 1, 2013 will retire the HBU Loan (assuming that the Lease was not previously terminated and the HBU Loan was not previously repaid).

139. If the Lease is renewed and all conditions of Section 12(a) of the Lease have been satisfied, the Account Collateral and earnings thereon will be collateral for, and will be available to apply to, Sodra's rental payments during the Lease Renewal Term.

140. Section 7.9(b) of the Equity PUA states that once the Account Collateral has been distributed to BB&T, Sodra, or a successor Equity PUA Issuer pursuant to Section 7.9(a), the Equity PUA shall terminate and no longer be in effect.

141. If BB&T does not exercise the Lease Renewal Option, it may exercise the Replacement Lease Option or the Return Option. Under the Replacement Lease Option, BB&T may lease the Equipment to a party other than Sodra, subject to certain requirements concerning the terms of the Replacement Lease and the identity and creditworthiness of the Replacement Lessee.

142. Under the Replacement Lease Option or the Return Option, the securities and cash held pursuant to the Equity PUA, worth approximately $35.3 million in 2013, are transferred or paid to Sodra.

143. Under the Replacement Lease Option, if the HBU Loan has not been repaid in full on the Lease Expiration Date (i.e., the end of the Basic Lease Term), BB&T is obligated to arrange a refinancing of the HBU Loan, and if it fails to do so, Sodra is required to purchase the HBU Loan on the Lease Expiration Date for a price equal to the unpaid principal amount plus interest accrued but unpaid as of the date of the purchase (i.e., $11,542,500). Following the refinancing or purchase of the HBU Loan, the final payment pursuant to the Debt PUA, in the amount of $11,542,500, is paid to Sodra. If BB&T has not arranged a refinancing of the HBU Loan and Sodra purchases the HBU Loan, BB&T will be obligated to pay the principal and accrued but unpaid interest on the HBU Loan to Sodra on the Lease Expiration Date. Sodra's recourse for this obligation is limited to the collateral provided for the HBU Loan.

144. Under the Return Option, BB&T is required to pay the balance of the HBU Loan due on the Lease Expiration Date. Following the payment of the balance of the HBU Loan, the final payment pursuant to the Debt PUA, in the amount of $11,542,500, is paid to Sodra. If BB&T does not pay the balance of the HBU Loan on the Lease Expiration Date, BB&T shall be deemed to have elected the Lease Renewal Option.

145. Under the Return Option, BB&T may take possession of the Equipment and have the Equipment operated at its own expense and for its own benefit pursuant to the Joint Operating Agreement and the Support Agreement for the rest of the Head Lease Term. The Return Option would have the same effects on Sodra as the Replacement Lease Option, except that it would limit BB&T's options for providing Head Lease

Collateral, as discussed below, so the BB&T would be required to provide collateral, a letter of credit, or a guaranty for the full amount of the Deferred Head Lease Payment.

146. At the end of the Lease Renewal Term (in 2026), BB&T may lease the Equipment to another party or Sodra for the remainder of the Head Lease Term or take possession of the Equipment and have it operated at its own expense and for its own benefit pursuant to the Joint Operating Agreement and the Support Agreement for the rest of the Head Lease Term.

147. BB&T recognized at the time that it agreed to participate in the Transaction that Sodra had been in the pulp-manufacturing business for many years.

148. At the time it agreed to participate in the Transaction BB&T anticipated, but did not know, that Sodra would continue to manufacture pulp after the Basic Lease Term expires.

149. BB&T continues to anticipate, but does not know, that Sodra will manufacture pulp after the Basic Lease Term expires.

150. The obligation to pay the Deferred Head Lease Payment pursuant to the Head Lease is an obligation of the Trust, and not of BB&T Corporation or Branch Banking & Trust Company. During the period from the beginning of the Lease Renewal Term or Replacement Lease Term until the Deferred Head Lease Payment is paid, however, the Trust must provide Sodra with Acceptable Head Lease Collateral for its obligation to make the Deferred Head Lease Payment (approximately $557.8 million due in the year 2038).

151. In 1998 and 1999, BB&T entered into 13 other LILO transactions.

152. All of BB&T's LILO transactions involved foreign-owned assets.

153. The closing date of BB&T's last LILO was April 1, 1999.

154. On June 3, 1996, before BB&T entered into the Transaction, the Internal Revenue Service had issued proposed rules pursuant to Section 467 of the Internal Revenue Code.

155. The rules proposed on June 3, 1996 remained pending as proposed rules until May 18, 1999.

156. Effective May 18, 1999, the Internal Revenue Service adopted final regulations under Section 467 of the Internal Revenue Code.

157. As a result of the final regulations under Section 467 of the Internal Revenue Code, BB&T did not participate in any LILOs after April 1, 1999.

158. BB&T Corporation reported the following items of income on its 1997 federal income tax return with respect to the Transaction:

a. rent from Sodra in the amount of $3,381,518; and

b. amortization of the advisory fee it received from KTV, in the amount of $55,120.

159. BB&T Corporation claimed the following deductions on its 1997 federal income tax return with respect to the Transaction:

a. rent to Sodra in the amount of $9,894,362;

b. interest expense in the amount of $2,820,925; and

c. amortization of the fees and expenses paid in connection with the Transaction, in the amount of $137,943.

160. Upon audit of BB&T Corporation's 1997 federal income tax return, the Internal Revenue Service ("IRS") disregarded the income, and disallowed the deductions, reported by BB&T Corporation from the Transaction.

161. The Internal Revenue Service's proposed adjustments resulted in an increase of $9,416,592 in BB&T Corporation's taxable income for 1997.

162. As a result of its proposed adjustments, the Internal Revenue Service assessed against BB&T Corporation a deficiency for 1997 in the amount of $3,295,807.

163. BB&T Corporation paid this deficiency, plus $1,296,861 in interest as calculated by the IRS, for a total of $4,592,668.

164. BB&T Corporation filed a claim for refund (Form 1120X) with the Internal Revenue Service on December 12, 2003.

165. The Internal Revenue Service denied BB&T Corporation's claim for refund on June 17, 2004.

166. The documents listed as Exhibits in Attachment 1 hereto are true copies of the documents they purport to be, were prepared by any persons identified therein as their creators, and were prepared at or about the time they purport to have been prepared.

167. The documents listed as Exhibits 12, 13, 14, 15, 17, 20, 21, 22, 23, 26, 28, 29, 30, 33, 37, 53b, 55, 56, 58, 59, 62, 63, 68, 104, 105, 106, 107, 108, 196 and 197 in Attachment 1 hereto constitute records of regularly conducted activity or are otherwise subject to exceptions to the hearsay rule under Fed. R. Evid. 803.

168. Except as stated in the preceding two paragraphs, the parties reserve the right to object to the admissibility of any of the documents listed in Attachment 1 on the grounds of relevance or any other grounds.

DATED: May 30, 2006

William K. Davis, Esq.
Bell, Davis & Pitt, P.A.
100 North Cherry Street
Suite 600
Winston-Salem, N.C. 27120

Robinson B. Lacy, Esq.
Sullivan & Cromwell LLP
125 Broad Street
New York, N.Y. 10004

ATTORNEYS FOR PLAINTIFF

Angelo A. Frattarelli
Jennifer L. Best
Trial Attorneys, Tax Division
U.S. Department of Justice
Post Office Box 227
Ben Franklin Station
Washington, D.C. 20044

ATTORNEYS FOR DEFENDANT

**Attachment 1 to Stipulation Regarding Undisputed Facts dated May 30, 2006**

Exhibits numbered 1-192 correspond to exhibits marked by the defendant for purposes of the depositions in this action, but in some cases the deposition exhibits have been replaced with better or more complete copies, and the identification of a document by means of its Bates numbers is controlling. The Bates numbers are the numbers stamped on the documents by the parties that produced them in the course of discovery in this action, except that plaintiff's counsel stamped the Bates numbers beginning with "K" on documents produced by Knight, Tallman & van Tol Capital Partners, L.L.C., and provided a set of the stamped documents to defendant's counsel before this Stipulation was executed.

| Ex. No. | Description | Bates Nos. |
|---|---|---|
| 1. | ABB Credit Confidential Memorandum | K 548-631 |
| 2. | Sodra: The True Picture | BBT 12439-12448 |
| 3. | Sodra: A Brief Summary | BBT 12449-12458 |
| 4. | Sodra Position Paper | BBT 12459-12518 |
| 5. | KTV letter to Chalk (5/12/97) | K 744 |
| 6. | KTV letter to Reed w/Accounting & Tax Analyses (5/23/97) | K 1, 6-64 |
| 7. | Response to IDR 157 | K 65-124 |
| 8. | Alternative Tax Treatment Analysis (May 1997) | K 395-427 |
| 9. | KTV letter to Williamson w/Technical Analysis (5/20/97) | K 177<br>K 209-250 |
| 10. | KTV Presentation to BB&T (June 1997) | K 355-393 |
| 11. | KTV Presentation to BB&T (May 1997) (annotated) | BBT 6037-6070 |
| 12. | 6/6/97 Conference call notes | BBT 8787-8789 |
| 13. | Handwritten notes (undated) | BBT 8792-8795 |
| 14. | Sherry Kellett notes (6/6/97) | BBT 9287-9288 |
| 15. | Different sets of Sherry Kellett notes | BBT 9289-9299 |
| | a. Notes (undated) w/ no heading | BBT 9289-9290 |

1729413.1

| | | |
|---|---|---|
| | b. Notes (undated) w/ heading of Cheryl Witt | BBT 9291 |
| | c. Notes (6/24/97) | BBT 9293 |
| | d. Notes (6/23/97) | BBT 9294-9299 |
| 16. | KTV letter to Kellett (6/9/97) | K 748 and K 750 |
| 17. | Kellett Memo to Reed (6/12/97) | BBT 1426-1427 |
| 18. | KTV Fax to Kellett (6/17/97) | K 751-759 |
| 19. | KTV Fax to Daniels (6/18/97) | K 760-769 |
| 20. | Kellett Memo to Reed (6/23/97) | BBT 1430-1431 |
| 21. | Daniel Memo to Chalk (7/7/97) | BBT 1432-1434 |
| 22. | Sodra LILO Credit Package (1998) | BBT 1332-1361 |
| 23. | Sodra LILO Presentation | BBT 6025-6027 |
| 24. | Leverage Lease Approval Checklist | BBT 3293 |
| 25. | Sodra ABC run | BBT 5813-5862 |
| 26. | Final Transaction Analysis (6/30/97) | BBT 2011-2086 |
| 27. | Final Transaction Analysis (annotated) | BBT 5750-5812 |
| 28. | Sodra Closing Documents | BBT 1-1331 |
| | a. Closing Checklist | BBT 1-9 |
| | b. Participation Agreement | BBT 3987-4250 |
| | c. Form 1001 for Hollandsche Bank-Unie N.V. | BBT 271 |
| | d. Form W-8 for Sodra Cell AB and Sodra Skogsagarna Ekonomisk Forening | BBT 272-275 |
| | e. Deloitte & Touche Appraisal | DT 650-979 |
| | f. Trust Agreement | BBT 637-661 |
| | g. Joint Operating Agreement | BBT 662-691 |
| | h. Support Agreement | BBT 4825-4846 |
| | i. Tax Indemnity Agreement | BBT 711-745 |
| | j. Guarantee | BBT 746-750 |
| | k. Head Lease | BBT 751-790 |
| | l. Head Lease Certificate of Acceptance | BBT 791-792 |
| | m. Lease | BBT 793-881 |
| | n. Account Trust Agreement | BBT 882-900 |
| | o. Letter of Credit and Reimbursement Agreement | BBT 901-948 |
| | p. Irrevocable Standby Letter of Credit | BBT 949-961 |

| | |
|---|---|
| q. Loan and Security Agreement | BBT 962-1000 |
| r. Facility Note on file with Trustee | BBT 1000A |
| s. Dutch Supplemental Pledge to Loan and Security Agreement | BBT 1001-1010 |
| t. Debt Payment Undertaking Agreement | BBT 1011-1025 |
| u. Equity Payment Undertaking Agreement | BBT 1026-1045 |
| v. Notification of Security Interest in Account Collateral | BBT 1046-1062 |
| w. Lessee Security Agreement | BBT 1063-1074 |
| x. Dutch Supplemental Pledge to Lessee Security Agreement | BBT 1075-1082 |
| y. Lessor Security Agreement | BBT 1083-1090 |
| z. UCC-1 Financing Statement for Fleet National Bank and Hollandsche Bank-Unie N.V. | BBT 1091-1102 |
| aa. UCC-1 Financing Statement for Fleet National Bank and Fleet National Bank | BBT 1103-1113 |
| bb. UCC-1 Financing Statement for Fleet National Bank and Sodra Cell AB | BBT 1114-1123 |
| cc. Articles of Association of Sodra Cell AB | BBT 1124-1128 |
| dd. Registration Certificate of Sodra Cell AB | BBT 1129-1138 |
| ee. Officer's Certificate of Sodra Cell AB | BBT 1139-1169 |
| ff. Sodra Cell AB General Counsel's Opinion | BBT 1170-1173 |
| gg. Approvals/Consents of all other trustees or holders of indebtedness | BBT 1174-1175 |
| hh. Abstract of minutes of June 13, 1997 board meeting of Sodra Cell AB | BBT 1176-1177 |
| ii. Insurance Policies | BBT 1178-1191 |
| jj. Consent Letter from Process Agent | BBT 1192 |
| kk. Articles of Association of Sodra Skogsagarna Ekonomisk Forening | BBT 1193-1205 |
| ll. Registration Certificate of Sodra Skogsagarna Ekonomisk Forening | BBT 1206-1207 |
| mm. Guarantor Certificate | BBT 1208-1210 |
| nn. Abstract of minutes of June 13, 1997 board meeting of Sodra Skogsagarna Ekonomisk Forening | BBT 1211-1212 |
| oo. Trustee's Certificate | BBT 1213-1215 |

| | | |
|---|---|---|
| | pp. Articles of Association of Fleet National Bank | BBT 1216-1235 |
| | qq. Certificate of Secretary of Wachovia Bank | BBT 1236-1239 |
| | rr. Officer's Certificate of BB&T | BBT 1240 |
| | ss. Opinion of BB&T In-House Counsel | BBT 1241-1243 |
| | tt. Consent Letter from Process Agent | BBT 1244 |
| | uu. Opinion Letter of Thacher Proffitt & Wood | BBT 1245-1248 |
| | vv. Opinion Letter of Simpson Thacher & Bartlett | BBT 1254-1263 |
| | ww. Opinion Letter of Mannheimer & Swartling | BBT 1264-1271 |
| | xx. Opinion Letter of KPMG Bohlins | BBT 1278-1281A |
| | yy. Opinion Letter of Shipman & Goodwin | BBT 1282-1288 |
| | zz. Opinion Letter of White & Case | BBT 1289-1292 |
| | aaa. Opinion Letter of Nauta Dutilh | BBT 1293-1304 |
| | bbb. Opinion Letter of ABB Credit regarding debt pricing and discount rate used in the Transaction | BBT 1309-1313 |
| | ccc. Opinion Letter of ABB Credit regarding the representations made in Section 8(a)(7) of the Participation Agreement | BBT 1314 |
| | ddd. Deed of Establishment of Account Beneficiary | BBT 1315-1327 |
| | eee. Tax Law Change Agreement | BBT 1328-1330 |
| | fff. Representation Letter of Sodra Cell AB to Deloitte & Touche LLP | BBT 1331 |
| 29. | Amendment to Sodra Documents (4/7/99) | USB 172- 279 |
| 30. | Verwoerdt Memo to Fowler (4/20/99) | BBT 3355-3356 |
| 31. | Summary of Sodra Agreements | BBT 7603-7611 |
| 32. | Sodra Cell Closing Cash Flows (6/29/97) | BBT 3307-3310 |
| 33. | ABN AMRO (NY) Transaction Details | - |
| 34. | KTV Letter to BB&T w/Sodra Closing Cash Flow Instructions/Fees/Expenses (6/26/97) | K 772-777 |
| 35. | KTV Letter to Fleet re: Sodra Fees/Expenses (6/27/97) | K 778-779 |
| 36. | Daniel Payment Authorization to Fleet (6/30/97) | USB 1419-1421 |
| 37. | Cash Disbursements to KTV/ABN | USB 1422-1424 |
| 38. | BB&T Response to IDR 101: Summary of Sodra Transaction Expenses | - |
| 40. | KTV Fax to Kellett re: Fleet, Shipman and Wachovia | WAC 267-274 |

| | | |
|---|---|---|
| | travel expenses (10/23/97) | |
| 41. | KTV Fax to Kellett re: ABN expenses (7/22/97) | - |
| 42. | KTV Fax to Kellett re: Sodra expenses (1/23/98) | WAC 262-0263 |
| 43. | KTV Fax to Kellett re: misc. invoices (7/3/97) | - |
| 44. | Craig Knight Memo re: Miles Smith Finders Fee (7/3/97) | WAC 334 |
| 45. | KTV Fax to Fowler re: transaction expenses (8/24/98) | BBT 11259-11274 |
| 46. | KTV Fax to Newsome re: Sodra expense acct (5/13/99) | BBT 3416-3420 |
| 47. | ABB Fax re: Sodra expenses account (11/25/99) | BBT 1984-1985 |
| 48. | Sodra letter re: transaction expenses account (12/13/99) | BBT 3372-3373 |
| 51. | TPW letter to Fowler re: Replacement LOC (5/10/99) | BBT 3399-3400 |
| 52. | TPW letter to Fowler re: Replacement LOC (7/27/99) | BBT 6176-6177 |
| 53. | Correspondence re: Replacement LOC | |
| | a. TPW letter to Fowler re: Replacement LOC (8/20/99) (annotated) | BBT 6180 |
| | b. Fowler to Chalk memo (9/10/99) | BBT 6181 |
| 55. | LILO Equity LOC balances | BBT 6023-6024 |
| 56. | Various LILO/Service Contract Status Reports and Termination Value Coverage spreadsheets | BBT 5219-5231 |
| | a. LILO/Service Contract Status Report (12/31/00) | - |
| | b. LILO/Service Contract Status Report and Termination Value Coverage (6/30/01) | - |
| | c. LILO/Service Contract Status Report and Termination Value Coverage (3/31/01) | - |
| | d. LILO/Service Contract Status Report and Termination Value Coverage (9/30/01) | - |
| | e. LILO Leveraged Leases Year End Balances | - |
| | f. Schedule of Leverage Lease Investment | - |
| 57. | KTV Letter to BB&T re: Internal Credit Limits (9/16/98) | K 813-817 |
| 58. | BB&T Internal Credit Limits (as of 12/31/97) | BBT 6079 |
| 59. | Spreadsheets re: LRMS | BBT 6701-6702 |
| 60. | BB&T Form 10-K (1997) | BBT 9145-9275 |

| | | |
|---|---|---|
| 61. | Ipock Memo to Kellett re: Leveraged Lease Presented by KTV (6/11/97) | BBT 7345-7346 |
| 62-63. | Ipock Memo to File re: Lease Classification (6/11/97) | BBT 6721-6728 |
| 65. | TPW letter to BB&T (6/25/97) | BBT 1958-1959 |
| 68. | Watson Memo re: Sodra Tax Analysis & Discussion | BBT 7503-7523 |
| 70. | Mayer Brown & Platt: Cross-Border Leasing: Techniques, Opportunities & Tax Analysis | BBT 7567-7590 |
| 78. | Spreadsheet - Consolidated Leasing Taxable Income Adjustments (1997-2006) | BBT 8955-8961 |
| 79. | Sodra Letter to Kellett re: Annual Procedure (2/27/98) | BBT 1986-1990 |
| 80. | TPW Fax to Kellett re: Sodra Tickler checklist (3/26/98) | BBT 3498-3512 |
| 81. | BBT Capital Markets Letter to Fleet re: Sodra correspondence (2/19/99) | BBT 3497 |
| 82. | Sodra Cell letter re: Sodra Cell 1997 Annual Report (4/2/98) w/ Sodra Cell 1997 Financial Statement | BBT 4691-4716 |
| | a. Sodra Cell 1997 Annual Report | BBT 4695-4716 |
| 83. | Sodra Skogsagarna Ekonomisk Forening letter w/ Sodra Skogsagarna Ekonomisk Forening 1997 Annual Report (4/7/98) | BBT 4742-4785 |
| 84. | Acknowledgment of receipt by Kellett | BBT 3595-3596 |
| 85. | Sodra Cell AB letter to BB&T re: 1998 Annual Certificate (4/15/99) w/ 1998 Annual Certificate | BBT 3608, 3413-3414 |
| 86. | Sodra Cell AB letter to BB&T re: Sodra Cell AB 1998 Annual Report w/ 1998 Annual Report | BBT 3609-3611, 4786-4796 |
| 87. | Sodra letter to State Street re: 1998 Annual Certificate (4/8/99) w/ 1998 Annual Certificate | USB 771-773 |
| 88. | Sodra Skogsagarna Ekonomisk Forening 1998 Annual Report | USB 780-815 |
| 89. | Sodra Cell AB letter to BB&T re: 1999 Annual Certificate (4/25/00) w/ 1999 Annual Report and Annual Certificate | BBT 3602-3604, BBT 4661-4677, USB 665-667 |
| 90. | Sodra Cell AB 1999 Annual Report | BBT 4661-4677 |
| 91. | Various Sodra letters | |
| | a. Letter from Sodra Cell AB (1/31/01) re: modifications made in 2000 | USB 641-643 |
| | b. State Street fax acknowledgment of Sodra Cell AB | USB 644-650 |

| | | |
|---|---|---|
| | letter re: modifications made in 2000 (3/29/01) | |
| | c. excerpt of Participation Agreement | USB 651-653 |
| | d. State Street acknowledgment (5/2/00) of letter from Sodra Cell AB re: 2000 certificate on environmental matters w/ copy of certificate | USB 654-656 |
| | e. State Street fax acknowledgment (5/2/00) of Sodra Cell AB letter re: annual insurance report w/ copy of 1999 Annual Insurance Report | USB 657-661 |
| | f. State Street acknowledgment (5/2/00) of letter from Sodra Cell AB re: Sodra Cell AB1999 financial statement and officer's certificate | USB 662-663 |
| | g. Sodra Cell AB Annual Certificate 1999 regarding Lease Event of Default or Event of Loss | USB 664 |
| | h. State Street acknowledgment (5/2/00) of Sodra Skogsagarna Ekonomisk Forening 1999 financial statement and officer's certificate | USB 665 |
| | i. Sodra Skogsagarna Ekonomisk Forening 1999 Annual Certificate regarding Lease Event of Default or Event of Loss | USB 666 |
| | j. Mailing list for Sodra Skogsagarna Ekonomisk Forening letter | USB 667 |
| 92. | Sodra Skogsagarna Ekonomisk Forening 1999 Annual Report | USB 686-736 |
| 93. | Sodra Cell AB letter re: 2000 Financial Statement (4/27/01) | USB 474-498, USB 565 |
| 94. | Sodra Cell AB 2000 Annual Report | USB 550-565 |
| 95. | Sodra Cell AB letter re: 2000 Annual Certificate (4/27/01) | USB 474-475 |
| 96. | Sodra Skogsagarna Ekonomisk Forening 2000 Annual Report | USB 499-549 |
| 97. | Sodra Cell AB letter to State Street re: 2001 Financial Statement (4/15/02) | USB 378-382 |
| 98. | Sodra Cell AB 2001 Annual Report | USB 383-400 |
| 99. | Sodra Skogsagarna Ekonomisk Forening letter re: 2001 Annual Certificate (4/15/02) w/ Annual Certificate | USB 407-410 |
| 100. | Sodra Skogsagarna Ekonomisk Forening 2001 Annual Report | USB 411-467 |

| | | |
|---|---|---|
| 101. | Sodra Annual Statements of Environmental Compliance (1997-2000) | |
| | a. Cover sheet entitled "Statement of Environmental Compliance" and note | BBT 3629-3630 |
| | b. Acknowledgment letter by BB&T of receipt of Sodra Cell AB 2000 certificate on environmental matters | BBT 3631 |
| | c. Sodra Cell AB 2000 certificate on environmental matters | BBT 3632 |
| | d. Mailing list for Sodra letter | BBT 3633 |
| | e. Acknowledgment letter by BB&T of receipt of Sodra Cell AB 1999 certificate on environmental matters | BBT 3634-3635 |
| | f. Sodra Cell AB 1999 certificate on environmental matters | BBT 3636 |
| | g. Sodra Cell AB 1998 certificate on environmental matters | BBT 3637 |
| | i. Acknowledgment letter by BB&T of receipt of Sodra Cell AB 1998 certificate on environmental matters | BBT 3638-3639 |
| | j. Sodra Cell AB letter to BB&T re: Sodra Cell AB 1997 certificate on environmental matters | BBT 3640-3641 |
| | k. Sodra Cell AB 1997 certificate on environmental matters | BBT 3642 |
| 102. | Sodra Annual Insurance Reports (1997-2000) | |
| | a. Cover sheet entitled "Insurance Report" | BBT 3613 |
| | b. Acknowledgment letter by BB&T of receipt of Sodra Cell AB 2000 Annual Insurance Report | BBT 3614 |
| | c. Sodra Cell AB 2000 Annual Insurance Report | BBT 3615 |
| | d. Mailing list for Sodra letter | BBT 3616 |
| | e. Acknowledgment letter by BB&T of receipt of Sodra Cell AB 1999 Annual Insurance Report | BBT 3617-3618 |
| | f. Sodra Cell AB 1999 Annual Insurance Report | BBT 3619 |
| | g. Acknowledgment letter by BB&T of receipt of Sodra Cell AB 1998 Annual Insurance Report | BBT 3620-3621 |
| | h. Sodra Cell AB 1998 Annual Insurance Report | BBT 3622 |
| | i. Sodra Cell AB letter to BB&T re: Sodra Cell AB 1997 Annual Insurance Report | BBT 3626-3627 |

| | | |
|---|---|---|
| | j. Sodra Cell AB 1997 Annual Insurance Report | BBT 3628 |
| 103. | Sodra Facility Modification Reports (1997-2001) | |
| | a. 1997 modifications report | BBT 4683-4684 |
| | b. 1998 modifications report | BBT 4717-4719 |
| | c. 1999 modifications report | BBT 3605-3607 |
| | d. 2000 modifications report | BBT 4820-4821 |
| | e. 2001 modifications report | USB 469-473 |
| | f. 2002 modifications report | USB 1352-1354 |
| 104. | Closing Documentation Review | BBT 2582-2586 |
| 105. | 1999 LILO Lease Review | BBT 2587-2591 |
| 106. | 2000 LILO Lease Review w/ monitoring checklist | BBT 2592-2604 |
| 107. | 2001 LILO Lease Review | BBT 2605; 2624-2627 |
| 108. | Fowler e-mail re: LILO Annual review (1/28/01) with attached schedule | BBT 13081-13083 |
| 109. | Process Flow Analysis for LILOs generally | BBT 2609 |
| 110. | Process – Risk Analysis Worksheet for LILOs generally | BBT 2616-2617 |
| 111. | VSM Analysis Worksheet | BBT 2619-2620 |
| 112. | Tallman Memo re: Review of Current Leasing Business (7/10/96) (Wachovia) | - |
| 114. | KTV Memo re: Leasing Business Analysis for Wachovia (7/31/96) | - |
| 115. | Nations Bank letter to KTV (7/16/96) | - |
| 116. | CIBC letter to KTV (7/31/96) | - |
| 117. | KTV letter to Kellett re: final Sodra presentation | BBT 6860-6861 |
| 118. | Knight letter to Williamson re: Sodra closing and Metsa-Serla | BBT 1428-1429 |
| 175. | Watson Memo to Kellett re: LILO capacity (6/17/98) | BBT 9420 |
| 176. | Memo to Watson re: LILO Capacity (2/16/99) | BBT 7662 |
| 177. | Watson e-mail to Newsome re: LILO capacity (3/16/99) | BBT 7660-7661 |
| 178. | Watson e-mail to Verwoerdt re: revised LILO capacity w/ spreadsheet (4/8/99) | BBT 7658-7659 |
| 179. | Newsome Memo re: LILO Update (2/19/99) | BBT 7665-7666 |

| | | |
|---|---|---|
| 180. | March 15, 1999 conference call notes | BBT 7745-7747 |
| 181. | Ipock e-mail re: LILO lease analysis w/o attachment (6/4/99) | BBT 11360 |
| 184. | KTV Presentation: LILO/Service Contract Comparison (6/21/99) | BBT 1404-1425 |
| 186. | Knight Tallman letter to Watson re: IRS notice w/ enclosures (2/8/01) | BBT 8875-8882 |
| 187. | BBT Disclosure Statements to IRS (9/12/00) | BBT 8893-8911 |
| 188. | BBT Disclosure Statements to IRS for 2000 w/ cover letter (9/6/01) | BBT 9014-9052 |
| 189. | BBT Disclosure Statements to IRS for 2001 (8/30/02) | BBT 9056-9095 |
| 190. | BBT Disclosure Statements to IRS for 2002 w/ cover letter (9/3/03) | BBT 9098-9139 |
| 191. | Leveraged Leasing Summary (11/19/98) | BBT 17794-17796 |
| 192. | Ipock Memo re: LRMS APB 23 Requirements (12/29/2000) | BBT 7223-7224 |
| 193. | Letter from Olov Tornqvist (National Tax Board) to Carol A. Dunhoo (I.R.S. Representative, U.S. Embassy in London) re: #106056 w/ enclosed answer from Sodra (12/9/02) | LM 481-487 |
| 194. | Frederic S. Mishkin and Stanley G. Eakins, Financial Markets and Institutions 136-154 (3d ed. 2000) | Dep. Ex. M.C. 13 |
| 195. | Fax from Sodra to Orlando Setola (Deloitte & Touche) re: wood pulp data (5/28/97) | DT 3569-3593 |
| 196. | ABN AMRO Bank Statement of Account (6/25/97-6/30/97) (account no. 451022187241) | USB 1677 |
| 197. | ABN Amro Request for Funds Transfer (6/30/97) | USB 1685 |
| 198. | NLK Consultants Ltd., *Pulp Price Trends* (Mar. 1997) | Dep. Ex. M.C. 9 |
| 199. | Hawkins Wright, *Revised Outlook for Market Pulp Demand, Supply and Prices* (April 1997) | Dep. Ex. M.C. 10 |
| 200. | Clifford W. Smith, Jr. and L. Macdonald Wakeman, *Determinants of Corporate Leasing Policy*, 40 Journal of Finance 895 (July 1985) | Dep. Ex. Thomas 7 |
| 201. | Transportation Cooperative Research Program, *Legal Research Digest* (Aug. 1999) | LM 136-181 |
| 202. | Federal Transit Administration, Innovative Financing Initiatives, Final Report (12/1/99) | LM 182-211 |

| | | |
|---|---|---|
| 203. | U.S. Department of Transportation, Innovative Financing Initiative: Administrative Policies and Procedures Facilitating Use of Innovative Finance Techniques in Federal-Assisted Projects: Notice (5/9/95) | LM 212-215 |
| 207. | Paul Marx, Office of Policy Development, Federal Transit Administration, *Financing Innovations in Transit: Methods and Issues* (7/10/01) | LM 216-225 |
| 208. | Letter from Gordon Linton, U.S. Department of Transportation, to Gregory B. Garback, Washington Metropolitan Area Transit Authority (10/19/1998) | LM 268-69 |
| 209. | Federal Transit Administration, *Innovative Financing Techniques for America's Transit Systems* (Sept. 1998) | LM 270-383 |
| 210. | Explanation of Items, Issue 16C.516, and Exhibits | 242-280 |
| 211. | Memorandum from Terrence Dawson to Chief, International Program (5/28/02) regarding a request for assistance pursuant to Article 26 of the Income Tax Treaty between Sweden and the United States | 791-798 |