**No. 06-305 T**
**(Judge Marian Blank Horn)**

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

**CONSOLIDATED EDISON COMPANY OF NEW YORK, INC. & SUBSIDIARIES**

**Plaintiff**

**v.**

**THE UNITED STATES**

**Defendant**

# UNITED STATES' REPLY BRIEF

**NATHAN J. HOCHMAN**
***Assistant Attorney General***

**DAVID GUSTAFSON**
**STEVEN I. FRAHM**
**DAVID N. GEIER**
**JOSEPH A. SERGI**
**ADAM R. SMART**
**KAREN M. GROEN**
***Attorneys***
***Tax Division***
***Department of Justice***
***Washington, D.C. 20044***
**(202) 616-3448 (telephone)**
**(202) 307-0054 (facsimile)**

## TABLE OF CONTENTS

**TABLE OF AUTHORITIES** . . . . . . . . . . v

**INTRODUCTION** . . . . . . . . . . 1

**POST TRIAL RULINGS** . . . . . . . . . . 3

**I.** ***BB&T Corp. v. United States*, Fourth Circuit** . . . . . . . . . . 4

**II.** **Other Leasing Cases** . . . . . . . . . . 13

A. *Fifth Third Bancorp v. United States* . . . . . . . . . . 13

B. *AWG Leasing v. United States* . . . . . . . . . . 14

**RESTATEMENT OF FACTS** . . . . . . . . . . 18

**I.** **CED Did Not Bear Risk From the RoCa3 LILO Transaction** . . . . . . . . . . 18

A. *There is a Lack of Market Risk to CED from Entering into the RoCa3 LILO Transaction* . . . . . . . . . . 18

B. *The Structure of the Transaction Eliminates Credit Risk to CED* . . . . . . . . . . 22

C. *The HBU Loan Does Not Pose Any Risk to CED's Return* . . . . . . . . . . 24

D. *The Possibility of a Premature Termination Does Not Create Risk to CED* . . . . . . . . . . 26

E. *The Existence of Other Remedies Does Not Imbue the Transaction With Risk* . . . . . . . . . . 28

F. *Plaintiff Erroneously Claims There Could Be a Final Basic Rental Payment Shortfall that CED Would Have to Pay* . . . . . . . . . . 29

G. *CED Even Protected Itself from Pre-Closing Risk* . . . . . . . . . . 32

H. *CED's Internal Evaluation of the RoCa3 LILO Transaction Confirms the Lack of Risk Facing CED* . . . . . . . . . . 32

I. *Inappropriate Focus on Risk to EZH* . . . . . . . . . . 34

**II. CED's Primary Purpose for Entering into the RoCa3 LILO Transaction was Tax Benefits** . . . . 34

A. *CED Entered the RoCa3 LILO Transaction for the Tax Benefits* . . . . 34

B. *Plaintiff's Accounting Benefits Were Driven by the Tax Benefits* . . . . 36

C. *There Was not a Reasonable Expectation of Residual Upside From the RoCa3 LILO Transaction* . . . . 38

1. CED Understood that the Transaction is Designed so that the Purchase Option Would be Exercised . . . . 38

2. The Transaction Contains Numerous Disincentives that Temper the Possibility of the Retention Option . . . . 40

D. *Plaintiff Has Failed to Prove that Other Than Tax Benefits Plaintiff Had a Legitimate Reason For Its Entry Into the RoCa3 LILO Transaction* . . . . 43

1. Purported Entree into Europe . . . . 48

2. Core Competencies . . . . 50

3. Purported Public Relations Benefits . . . . 53

**III. Plaintiff Mischaracterizes its Involvement and Use of the Due Diligence Conducted in Connection with the RoCa3 LILO Transaction** . . . . 53

A. *Plaintiff had Limited Involvement in Securing the Due Diligence* . . . . 53

B. *Plaintiff's Assertions as to the Reasons for the Due Diligence are Misleading* . . . . 55

C. *Plaintiff's Reliance on the Deloitte Appraisal is Misplaced* . . . . 59

1. Deloitte Ignores the Pre-Funded Nature of the Sublease Purchase Option . . . . 60

2. Deloitte Ignores the Non-Recourse Nature of the Final Basic Rent Payment . . . . 61

3. CED Did Not Actually Rely on the Deloitte Appraisal in Entering the Transaction . . . . . 65

**IV. Other Areas in Which Plaintiff has Ignored or Misrepresented the Facts of the Case** . . . . . 67

A. *EZH Operated the Facility as Before* . . . . . 67

B. *CED Experience* . . . . . 68

C. *Summary of Experts* . . . . . 69

**ARGUMENT** . . . . . 72

**I. Introduction** . . . . . 72

**II. Substance Over Form vs. Economic Substance** . . . . . 73

A. *The Doctrines* . . . . . 74

**III. Substance Over Form** . . . . . 78

A. *CED Did Not Acquire a Current Leasehold Interest in the Facility* . . . 78

B. *Frank Lyon Supports the Government's Position, Not Plaintiff's* . . . . . 85

C. *The HBU Loan Should be Disregarded* . . . . . 87

D. *The Court Should Collapse Reciprocal Rights and Obligations* . . . . . 91

E. *Plaintiff's Attempt to Draw Distinctions Between Legal and Economic Defeasance is Without Merit* . . . . . 94

F. *At Least During the Term That They Overlap, the Lease and Sublease Are Not True Leases* . . . . . 96

**IV. Economic Substance** . . . . . 98

A. *Plaintiff's Transaction Should be Disallowed Under the Economic Substance Doctrine* . . . . . 98

B. *There Was no Reasonable Expectation to Achieve Any Net Economic Benefit from the RoCa3 LILO Transaction* . . . . . . . . . . . . . . . . . . . . . . 104

1. Plaintiff Could Not Reasonably Expect to Achieve Any Net Economic Benefit from the Cash Flows from the RoCa3 LILO Transaction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 104

2. Plaintiff Could Not Reasonably Expect to Achieve Any Net Economic Benefit From Credit Fluctuations or Residual Value . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 109

C. *Plaintiff Did Not Enter this Transaction for a Valid Non-Tax Business Purpose* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 116

1. Plaintiff Could Not Obtain an Accounting Benefit Without the Tax Benefits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 116

2. Plaintiff Did Not Enter this Transaction for Any Other Non-Tax Reason . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 120

**V. Irrelevant Authority Cited by Plaintiff** . . . . . . . . . . . . . . . . . . . . . . . . . . . 123

**CONCLUSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 127

## TABLE OF AUTHORITIES

### FEDERAL CASES

*ACM P'ship v. Comm'r*, 157 F.3d 231 (3d Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . 75, 105

*Aderholt Specialty Co. v. Comm'r*, 50 T.C.M. (CCH) 1101 (1985 . . . . . . . . . . . . . . . . . . . . . 7, 82

*Alstores Realty Corp. v. Comm'r*, 46 T.C. 363 (T.C. 1966) . . . . . . . . . . . . . . . . . . . . . . . . . 7, 124

*Am. Elec. Power v. United States*, 136 F. Supp. 2d 775 (S.D. Ohio 2001), *aff'd* 326 F.3d 737 (6th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Passim

*Assoc. Wholesale Grocers, Inc. v. United States*, 89-2 U.S. Tax Cas. (CCH) ¶ 9,518 (D. Kan. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 123

*AWG Leasing Trust v. United States*, 2008 WL 2230744 (N.D. Ohio May 28, 2008) . . . . Passim

*Ballagh v. United States*, 166 Ct. Cl. 191 (1964) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 108

*Basic, Inc. v. United States*, 212 Ct. Cl. 399 (Ct. Cl. 1977) . . . . . . . . . . . . . . . . . . . . . . . . . . 108

*BB&T Corp. v. United States*, 2007 WL 37798 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Passim

BB&T Corp. v. United States, 523 F.3d 461 (4th Cir. 2008) . . . . . . . . . . . . . . . . . Passim

*Benedict v. United States*, 881 F. Supp. 1532 (D. Utah 1995) . . . . . . . . . . . . . . . . . . . . . . . . . 98

*Big "D" Dev. Corp. v. Comm'r*, 30 T.C.M. (CCH) 646 (1971) *aff'd per curiam*, 453 F.2d 1365 (5th Cir.), *cert. denied*, 406 U.S. 945 (1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 91

*Black & Decker Corp. v. United States*, 436 F.3d 431 (4th Cir. 2006) . . . . . . . . . . . . . . . 108, 124

*Blue Flame Gas Co. v. Comm'r*, 54 T.C. 584 (1970) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 91

*Bridges v. Comm'r*, 39 T.C. 1064 *aff'd* 325 F.2d 180 (4th Cir. 1963) . . . . . . . . . . . . . . . . . . 88, 90

*Buckeye Power v. United States*, 38 Fed. Cl. 283 (Ct. Cl. 1997) . . . . . . . . . . . . . . . . . . . . . . 123

*Bussing v. Comm'r* 88 T.C. 449, 451-55, *reconsideration denied*, 89 T.C. 1050 (1987) . . . . . . 92

*In re CM Holdings*, 301 F.3d 96 (3d Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Passim

*Coltec Indus., Inc. v. United States*, 454 F.3d 1340 (Fed. Cir. 2006) . . . . . . . . . . . . . . . . . Passim

*Comm'r v. Trans. Trading & Terminal Corp.*, 176 F.2d 570 (2d Cir. 1949), *cert. denied*, 338 U.S. 955 (1950) . . . . . . . . . . 75

*Danielson v. United States*, 378 F.2d 771 (3d Cir.) . . . . . . . . . . 83

*Deputy v. DuPont*, 308 U.S. 488 (1940) . . . . . . . . . . 88

*Douglas v. Willcuts*, 296 U.S. 1 (1935) . . . . . . . . . . 95

*Dow Chemical v. United States*, 435 F.3d 594 (6th Cir. 2006) . . . . . . . . . . Passim

*Estate of Thomas*, 84 T.C. 412 (1985) . . . . . . . . . . Passim

*Felcyn v. United States*, 691 F. Supp. 205 (C.D. Cal. 1988) . . . . . . . . . . 89, 90

*Frank Lyon Co. v. United States*, 435 U.S. 561 (1978) . . . . . . . . . . Passim

*Gefen v. Comm'r*, 87 T.C. 1471 (1986) . . . . . . . . . . 77, 94

*Goldstein v. Comm'r*, 364 F.2d 734 (2d Cir. 1966) . . . . . . . . . . 88

*Greenberg's Express, Inc. v. Comm'r*, 62 T.C. 324 (1974) . . . . . . . . . . 123

*Greenfield v. Comm'r*, 44 T.C.M. (CCH) 1487 (1982) . . . . . . . . . . 91

*Gregory v. Helvering*, 293 U.S. 465 (1935) . . . . . . . . . . 75

*Griffin Paper Corp. v. Comm'r*, T.C. Memo 1997-409 . . . . . . . . . . 83

*H.J. Heinz Co. v. United States*, 76 Fed. Cl. 570 (2007) . . . . . . . . . . Passim

*Halle v. Comm'r*, 83 F.3d 649 (4th Cir. 1996) . . . . . . . . . . 88

*Helvering v. Fuller*, 310 U.S. 69 (1940) . . . . . . . . . . 95

*Hines v. United States*, 912 F.2d 736 (4th Cir. 1990) . . . . . . . . . . 13

*Illes v. Comm'r*, 982 F.2d 163 (6th Cir. 1992) . . . . . . . . . . 121

*Jade Trading, LLC v. United States*, 80 Fed. Cl. 11 (2007 . . . . . . . . . . Passim

*Johnson v. United States*, 11 Cl. Ct. 17 (1986) (*Johnson I*) . . . . . . . . . . 39, 99

*Johnson v. United States*, 32 Fed. Cl. 709 (1995) (*Johnson II*) . . . . . . . . . . 99, 100

*Kenco Rest. Inc. v. Comm'r*, 206 F.3d 588 (6th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 123

*Kirchman v. Comm'r*, 862 F.2d 1486 (11th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 79

*Knetsch v. United States*, 364 U.S. 361 (1960) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Passim

*Kwiat v. Comm'r,* T.C. Memo (RIA) 1992-433 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 82, 83, 97

*Lerman v. Comm'r*, 939 F.2d 44 (3d Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 79

*Levy v. Comm'r,* 91 T.C. 838 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 76, 77

*Lockhart Leasing Co. v. Comm'r*, 446 F.2d 269 (10th Cir. 1971) . . . . . . . . . . . . . . . . . . . . . . . 81

*Mahoney v. Comm'r*, 808 F.2d 1219 (6th Cir. 1987)) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 121

*McCulley Ashlock v. Comm'r,* 18 T.C. 405 (1952) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 124

*Mukerji v. Comm'r*, 87 T.C. 926 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 77

*Northwest Acceptance Corp. v. Comm'r*, 58 T.C. 836 (1972) . . . . . . . . . . . . . . . . . . . . . . . . . 80

*Odend'hal v. Comm'r*, 748 F.2d 908 (4th Cir.1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Passim

*Ockels v. Comm'r*, T.C. Memo 1987-507 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 77

Packard v. Comm'r, 85 T.C. 397 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 93

*Penn-Dixie Steel Corp. v. Comm'r, 69 T.C. 837 (T.C. 1978)* . . . . . . . . . . . . . . . . . . . . . . . . . 82

*Pulvermacher v. United States*, 1998 WL 240492 (S.D.N.Y. 1998) . . . . . . . . . . . . . . . . . . . . . 123

*R.E. Dietz Corp. v. United States*, 939 F.2d 1 (2d Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . 123

*Rice's Toyota World, Inc. v. Comm'r*, 752 F.2d 89 (4th Cir. 1989) . . . . . . . . . . . . . . . . . . . . 6, 99

*Rickey v. Comm'r,* 502 F.2d 748 (9th Cir. 1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 91

*Rogers v. United States*, 281 F.3d 1108 (10th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . Passim

*Rothschild v. United States*, 186 Ct. Cl. 709 (1969) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 108

*Sacks v. Comm'r,* 69 F.3d 982 (9th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 107

*Swift Dodge v. Comm'r*, 692 F.2d 651 (9th Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . Passim

*TIFD III-E, Inc. v. United States*, 342 F. Supp. 2d 94 (D. Conn. 2004) . . . . . . . . . . . . . . . . . . . . 74

*TIFD III-E, Inc. v. United States*, 459 F.3d 220 (2d Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . 78

*Torres v. Comm'r*, 88 T.C. 702 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 76, 96

*Transamerica Corp. v. United States*, 7 Cl. Ct. 441 (1985) (*Transamerica I*) . . . . . . . . 76, 77, 80

*Transamerica Corp. v. United States*, 15 Cl. Ct. 420, 439, 443 (1988)
*(Transamerica II)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 76, 81

*United States v. Ingalls*, 399 F.2d 143 (5th Cir. 1968) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 91

*United States v. Wexler*, 31 F.3d 117 (3d Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 79

*Williams v. Commi'r*, 1 F.3d 502 (7th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 98

*Winn-Dixie Stores, Inc. v. Comm'r*, 113 T.C. 254 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 126

*Winn-Dixie Stores, Inc. v. Comm'r*, 254 F.3d 1313 (11th Cir. 2001) . . . . . . . . . . . . 101, 116, 119

**DOCKETED CASES**

*Fifth Third Bancorp v. United States*, No. 1:05-cv-350 (S.D. Ohio) . . . . . . . . . . . . . . . . . . . . 3, 13

**FEDERAL STATUTES**

H.R. Rep. No. 755, 108th Cong., 2d Sess. at 660, 662-63 (2004) . . . . . . . . . . . . . . . . . . . 126, 127

I.R.C. § 1.467-1(a)(4) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 125

I.R.C. § 467 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 125, 126

I.R.C. § 470 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 126, 127

I.R.C. § 6110(K)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 95

Rev. Rul. 72-543, 1972-2 C.B. 87 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 82

Rev. Rul. 99-14, 1999-1 C.B. 835 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 124

Rev. Rul. 2002-69 2002-2 C.B. 760 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 82, 124

OTHER

*David P. Hariton, Response to "Old 'Brine' in New Bottles" (New Brine in Old Bottles),* 55 Tax L. Rev. 397, 402 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 15

Brief for Equipment Leasing Finance Association as Amicus Curiae Supporting Petitioner, *BB&T*, 523 F. 3d 461 (4th Cir. 2008) (Dkt # 07-1177, Motion for Amicus Brief at 3-4) . . . . . . . 6

## INTRODUCTION

During December 1997, Plaintiff, through a subsidiary, Consolidated Edison Development ("CED"), engaged in a lease-in/lease-out tax shelter commonly referred to as a LILO (herein the "RoCa3 LILO Transaction" or "Transaction"). The RoCa3 LILO Transaction involved a facility located in the Netherlands ("the RoCa3 Facility") owned and operated by EZH. CED purported to lease a 47.47% interest in the RoCa3 Facility from EZH under a lease and simultaneously purported to sublease that interest back to EZH. To this day, EZH (and now its successor) operates the RoCa3 Facility in its business as it always has.

Plaintiff's federal income tax return reported large deductions for rent expense, interest, and amortized transactions costs that far exceeded the reported rental income from the Transaction. The Internal Revenue Service disallowed the deductions and disregarded the rental income. Plaintiff then paid the resulting deficiency, and filed this suit for a tax refund.

Plaintiff's claimed tax deductions are improper for three reasons. First, looking at the Transaction as a whole reveals that CED did not in substance acquire a present leasehold interest in EZH's property. Second, CED did not incur genuine indebtedness for the funds that were used to make payments that traveled in a circle and accounted for the claimed tax benefits. Third, and alternatively, the RoCa3 LILO Transaction should be disregarded under the economic substance doctrine. Plaintiff bears the burden of proof on all these issues.

At the commencement of this case, Plaintiff represented that this was a simple case, involving a simple leveraged lease, requiring little discovery. Plaintiff has since shifted its strategy to one in which it is attempting to make this case confusing and unnecessarily complex. Plaintiff's opening brief was over 500 pages long. In addition, Plaintiff submitted a 50-page

timeline that begins in 1823. The brief engages in lengthy, repetitious references to administrative actions and rulings, abandoned legislation, foreign law and discussion by the House of Lords.

Despite its length, Plaintiff's opening brief skirts the legal issues. The brief fails to acknowledge the holding of the single decided case (at that time) involving an obviously similar transaction. Moreover, its recitation of the facts is both incomplete and erroneous. While it would be impossible to address all of the inaccuracies in plaintiff's extraordinarily lengthy brief, this reply points out the major problems.

As an example, Plaintiff ignores its own key fact witness, Mr. Andrew Scher. Mr. Scher is a tax attorney and employee of plaintiff who was tasked with providing advice to plaintiff about this transaction and its tax consequences. He wrote two memoranda, each of which conveys Plaintiff's understanding and purpose regarding this transaction.[1] Mr. Scher also was involved in the administrative and pretrial process in this case, and he testified over several days at trial. Nevertheless, Mr. Scher's name does not appear in the text of Plaintiff's brief, and Plaintiff even omits his name from its "glossary" of the witnesses who testified at trial (*see* Pl. Br. at A-1 though A-4). Plaintiff cannot erase Mr. Scher's testimony.

---

[1] As we explained in our opening brief (*see* U.S. Brief at 55-56 n.59), Mr. Scher was the liaison between CED and CEI during CED's consideration of the RoCa3 LILO Transaction. He had regular meetings with CED to discuss legal issues facing CED. (Tr. 1999 (Muoio)). Further, as a tax attorney, he recognized the aggressive nature of the transaction from his early involvement in the matter and further recognized the dubiousness of any claim that EZH would not exercise the purchase option. (*See* U.S. Br. at 56, citing JX 390, Bates 8029).

**POST TRIAL RULINGS**

When the parties filed their opening briefs, one district court had ruled on the tax issues raised by LILOs . *BB&T Corp. v. United States*, 2007 WL 37798 (M.D.N.C. Jan. 4, 2007). The district court had granted summary judgment in favor of the United States, and *BB&T* had appealed to the Fourth Circuit.

On April 29, 2008, the Fourth Circuit affirmed the district court's decision. *BB&T Corp. v. United States*, 523 F.3d 461 (4th Cir. 2008) (petition for rehearing denied on June 27, 2008). Like the District Court, the Fourth Circuit held for the government under the substance over form doctrine.[2]

Two other courts have addressed similar leasing transactions and found for the government since our opening brief was filed. *AWG Leasing Trust v. United States*, 2008 WL 2230744 (N.D. Ohio May 28, 2008) (Sale-in/Lease-out transaction "SILO"); *Fifth Third Bancorp & Subsidiaries v. United States,* Case No. 1:05-cv-350 (S.D. Ohio), (jury verdict for the government in a LILO case, in part, on the basis of the substance over form doctrine, and in part, on the basis of the economic substance doctrine).

---

[2] The parties cross-moved for summary judgment. BB&T argued that the Transaction should be respected under two related but distinct common-law tax doctrines, the economic-substance doctrine and the substance-over-form doctrine (both of which BB&T had to satisfy). The United States opposed, arguing that it was entitled to summary judgment under the substance-over-form doctrine but that the economic-substance determination raised disputed factual issues (related to BB&T's motives and ability to profit from the headlease) that could not be decided on summary judgment. On appeal, BB&T again argued that the transaction had economic substance. In response, the government argued that economic substance was not relevant to the substance over form holding of district court and that BB&T's argument relied on disputed issues of fact. The Fourth Circuit agreed. BB&T filed a Petition for Reconsideration *en banc* and the Fourth Circuit denied the petition.

In these cases, the courts have unanimously concluded that the circular debt incurred to finance these transactions does not reflect the substance of the transactions and have disallowed the interest deductions. In *BB&T* and *AWG*, the courts concluded that the overall transaction was a loan and not a lease. Finally, in *Fifth Third*, the jury concluded that LILO transaction lacked economic substance apart from the tax benefits generated by deductions, and consequently, that claimed interest amounts were not deductible.

Because the RoCa3 LILO Transaction is fundamentally indistinguishable from these decided cases, and the rulings are persuasive, this Court likewise should disallow Plaintiff's claimed deductions.

## I. *BB&T Corp. v. United States*, Fourth Circuit

As described in the United States' opening brief (U.S. Br. at 91-93, 97-98, 102), *BB&T* involved a nearly identical LILO transaction, which the IRS disregarded for federal tax purposes. *BB&T*, 2007 WL 37798. In 1997, BB&T, like CED here, purported to lease property from a foreign entity in a LILO transaction and reported sublease rent income and claimed much larger deductions for head lease rent, interest and transaction expenses. *Id.* at *1-4. The district court granted the United States' motion for summary judgment and held that BB&T failed to prove that it had acquired a genuine leasehold interest or had engaged in purposeful borrowing. *Id.* at *8, 10, 12. In form, BB&T had acquired a "lease" and a "loan," but the district court, noting the absence of an at-risk investment, determined that, in substance, the taxpayer lacked an interest in the property. *Id.* at *8.

The district court held that the foreign entity, in substance, retained its interest in the property and continued to enjoy the benefits and burdens of ownership it had before the

Transaction. *Id.* The court further concluded that the transaction was not sustainable under precedent upholding sale/leaseback transactions. *Id.* at *6-7. The taxpayer appealed.

The Fourth Circuit affirmed. *BB&T*, 523 F.3d 461. The circuit court determined that the LILO was not a genuine lease and sublease, and the taxpayer was not entitled to deductions for head lease rent expense, interest expense or business expense amortization. *Id.* at 475. The circuit court further held that, although the transaction documents provided in form for substantial payments, the only money that actually changed hands between the leasing parties was payment to the foreign entity as an incentive for doing the deal. *Id.* at 473. The Fourth Circuit also determined that the foreign entity, through a purchase option, could have unwound the transaction without losing dominion and control over the "leased" asset, or the need to surrender any of its own funds to the taxpayer to "repurchase" the leasehold interest and that the structure of the transaction insulated the taxpayer from any risk. *Id.* Finally, the circuit court determined that the non-recourse loan involved in the LILO did not constitute genuine indebtedness, because the transaction did not, in fact, require the bank to pay any money as a result of the use of defeasance mechanisms.[3] *Id.* at 476.

In reaching its decision, the Fourth Circuit recognized the criticisms leveled at LILO transactions as tax shelters:

> LILOs have been harshly criticized as abusive tax shelters that serve only to transfer tax benefits associated with property ownership from tax-indifferent entities, which have no use for them, to U.S. taxpayers. *See* David P. Hariton, *Response to "Old 'Brine' in New Bottles" (New Brine in Old Bottles)*, 55 TAX L. REV. 397, 402 (2002) (noting one commentator's characterization

---

[3] The *BB&T* Court did not rule on economic substance since there is a factual component to that determination.

> of LILOs as abusive tax shelters and agreeing that LILOs "purport[ ] to create tax benefits that Congress did not intend to confer on anyone in respect of transactions that involve no business investment at all").

*BB&T*, 523 F.3d at 465.

In its opening brief, Plaintiff makes a weak effort to distinguish *BB&T*. First, Plaintiff complains that the decision does not take into consideration the views of the leasing industry. (Pl. Br. at 17). To the contrary, the Equipment Leasing and Finance Association (ELFA) submitted an *amicus curiae* brief to the Fourth Circuit. In its Motion, requesting leave to file an amicus brief, ELFA stated:

> Because ELFA members engage in lease finance transactions, ELFA has both an important interest in the outcome of this case and has the ability to provide information that is helpful to this Court. The present case involves a so-called "LILO" transaction (for "lease-in-lease-out") (see Rev. Rul. 2002-69 2002-2 C.B. 760), but it is, in essence, a lease leaseback transaction in which one of the parties is exempt from United States taxes. While Congress in 2004 adopted legislation that effectively limits LILOs (*see* 26 U.S.C. § 470(c)(21) and § 168(h)(2)(A)(ii)), nonetheless, this case has major significance to ELFA members because the consequences of the district court's opinion are not limited to LILOs. Rather, the district court's opinion potentially affects all lease leaseback as well as sale leaseback transactions, including those where all parties are subject to United States taxation.
>
> From its national perspective, ELFA s uniquely situated to assist the Court in its consideration of the important issues presented by this case. The attached brief will assist the Court by illuminating the compelling reasons why the district court's opinion should not be affirmed. The law concerning the tax treatment of lease leaseback and sale leaseback transactions is well-settled. Supreme Court and Fourth Circuit Court precedent establish that as long as such a transaction has tax independent considerations and is not solely motivated by tax avoidance features, the form of the transaction selected by the taxpayer should be respected. *Frank Lyon Co. v. United States*, 435 U.S. 561 (1978); *Rice's Toyota*

> *World, Inc. v. Comm 'r*, 752 F.2d 89 (4th Cir. 1989). Nonetheless, the district court in the present case, without adequate consideration of this settled law, concluded that the taxpayer only acquired a future interest and, therefore, was not entitled to current tax benefits from the transaction. The district court's resurrection of the future interest theory, rejected by a majority of the Supreme Court in *Frank Lyon*, casts an unwarranted cloud over numerous non-LILO transactions that have been completed, as well as threatening to deter the completion of future legitimate transactions.

Brief for Equipment Leasing Finance Association as Amicus Curiae Supporting Petitioner, *BB&T*, 523 F. 3d 461 (4th Cir. 2008) (Dkt # 07-1177, Motion for Amicus Brief at 3-4). The Fourth Circuit accepted ELFA's *amicus* brief, but nonetheless affirmed the district court's ruling and held that the LILOs substance did not comport with its form. The Fourth Circuit distinguished the LILO from a traditional lease:

> In sum, the transaction does not allocate BB&T and Sodra's [the foreign counterparty] rights, obligations, and risks in a manner that resembles a traditional lease relationship. *See* [*Alstores Realty Corp. v. Commissioner*, 46 T.C. 363, 373 (T.C. 1966)] (holding that because a "so-called space-occupancy agreement placed the two parties' rights, obligations, and risks as they would be allocated in a typical lease arrangement[,] . . . the arrangement was a lease in substance as well as in form"); *Swift Dodge v. Comm'r*, 692 F.2d 651, 653-54 (9th Cir. 1982) (recharacterizing a lease as a conditional sales contract because the parties' obligations, legal rights, and risks were no different than they would be in a conditional sale arrangement and "Swift Dodge did not retain . . . significant and genuine attributes of a lessor"); *Aderholt Specialty Co. v. Comm'r*, 50 T.C.M. (CCH) 1101 (1985) (holding that a lease arrangement was a sale for federal tax purposes because the transaction "divested [the lessor] of any significant and genuine attributes of traditional lessor status" and "if the benefits, obligations, and rights of the putative lessor are essentially those of a secured seller, the substance of the arrangement must govern and it will be deemed a sale for tax purposes" (internal quotation marks omitted)).

*BB&T*, 523 F.3d at 473.

Plaintiff also argues that *BB&T* is distinguishable on the basis that *BB&T* was decided on a stipulated record:

> As was the case in *Fifth Third*, genuine issues of fact exist concerning the status of the RoCa3 Transaction. For this reason, the *BB&T* decision is distinguishable if for no other reason than the *BB&T* court ruled based on stipulated record.

(Pl. Br. at 18 (citations omitted)).[4] However, the evidence presented at trial demonstrates that the RoCa3 LILO Transaction is nearly identical to the BB&T LILO transaction.

The following chart compares the RoCa3 LILO Transaction to the LILO in the *BB&T* case.[5]

---

[4] As explained more fully below, the jury in that case determined that the overall transaction lacked economic substance and the loans were not true indebtedness.

[5] Given that LILO transactions were marketed and sold based on their structure, and were implemented using form documents, it is not surprising that the RoCa3 LILO Transaction varies little from the transaction in *BB&T*, or the "typical" LILO structure. Plaintiff argues at page 80 of its opening brief that this Court should not infer that Plaintiff's use of precedent documents implies that the terms of the RoCa3 LILO Transaction are essentially the same as those used in EZH's previous LILO Transaction with Banc One, the Maasvlakte Transaction. (Pl. Br. at 79-80). Plaintiff offered conclusory testimony that there are differences between the two transactions. For example, Plaintiff states that the documents for a successor transaction "would" look very different than the precedent documents. (*Id.* at 80). However, Plaintiff has not pointed to any examples of material distinctions for the purposes of this Court's determination, referring instead only to immaterial distinctions such as that one facility is coal fired and another is gas fired. (*Id.*, citing Tr. 2874 (Mintun)). The truth is revealed in Mr. Holzman's detailed, contemporaneous notes, revealing that Woody Flowers, counsel from Shearman & Sterling, told Mr. DePlautt in connection with its consideration of LILO Transactions that "there wouldn't be much new negotiating except from new issues." (JX 282, Bates 5490). Thus, not only is the RoCa3 LILO Transaction nearly identical in all material respects to the LILO transaction at issue in *BB&T*, as well as the "typical LILO" discussed therein, it is similar in most material respects to the Maasvlakte LILO Transaction consummated by EZH and Banc One approximately ten months prior to the close of the RoCa3 LILO Transaction.

| BB&T | RoCa3 |
|---|---|
| BB&T formed a special purpose trust to enter the LILO transaction. Cir. 465 n.1;[6] Dist. 1.[7] | CED formed a special purpose trust to enter the LILO transaction. (Stip ¶¶ 102, 103). |
| BB&T leased equipment from Sodra (a foreign entity not subject to U.S. tax) for 36 years. Cir. 466; Dist. 1. | CED leased an interest in the Facility from EZH (a foreign entity not subject to U.S. tax) for 43.2 years. (Stip ¶¶ 104, 113, 135). |
| Sodra subleased the equipment back from BB&T for 15.5 years. Cir. 466; Dist. 1. | EZH subleased this interest in the Facility back from CED for 20.1 years. (Stip ¶¶ 104, 113, 135). |
| At the end of 15.5 years Sodra has the ability to buy back the equipment at no out of pocket cost by using the funds in the equity and debt defeasance accounts. Cir. 466; Dist. 3. | At the end of 20.1 years EZH has the ability to buy back the Facility at no out of pocket cost by using the funds in the equity and debt defeasance accounts. (Stip ¶¶ 165, 235; DX 20035, Bates 21361). |
| If Sodra fails to buy the equipment back, BB&T has the ability to force Sodra to renew the lease for 13.3 years. Cir. 466; Dist. 3. | If EZH fails to buy back its interest in the Facility, CED has the ability to force EZH to renew the lease for 16.5 terms. (Stip ¶ 169). |
| If Sodra fails to buy the equipment back, BB&T has an option to lease the equipment to a third party. Cir. 466; Dist. 3. | If EZH fails to buy back its interest in the Facility, CED has an option to lease the interest in the Facility to a third party. (JX 46, Bates 1573)). |
| If Sodra fails to buy the equipment back, BB&T has an option to use the equipment itself. Cir. 466-67; Dist. 3. | If EZH fails to buy the facility back, Con Ed has an option to obtain the output from the Facility corresponding to its interest. (JX 46, Bates 1573; Tr. 3931 (Bent)). |
| BB&T took a $68 million nonrecourse loan from HBU to consummate the transaction. Cir. 467; Dist. 2. | CED took a $81 million nonrecourse loan from HBU to consummate the transaction. (Stip ¶¶ 117, 118, 131). |

[6] Cir. cites to *BB&T*, 523 F.3d 461 (4th Cir. 2008).

[7] Dist. cites to *BB&T*, 2007 WL 37798.

| BB&T | RoCa3 |
|---|---|
| The proceeds of the loan were deposited in a defeasance account at ABN AMRO, the parent of HBU.[8] Cir. 467; Dist. 2. | The proceeds of the loan were deposited in a defeasance account at ABN AMRO, the parent of HBU. (Stip ¶¶ 126, 127, 187, 189, 198, 199). |
| Letters of credit were available to cover defeasance shortfalls in event of default. Cir. 470; Dist. 2. | Letters of credit were available to cover defeasance shortfalls in event of default. (JX 397, Bates 8124). |
| The rent payments under the Leaseback exactly match, in both amount and timing, the principal and interest payments due on BB&T's non-recourse loans. Cir. 468; Dist. 2. | The rent payments under the Leaseback exactly match, in both amount and timing, the principal and interest payments due on CED's non-recourse loans. (Stip ¶¶ 118, 188, 199; Tr. 1272 (Holzman)). |
| $12 Million in cash was deposited by BB&T into an equity defeasance account and used to purchase US Treasury Bonds to fund the repurchase its interest in the equipment.[9] Cir. 467 and 468 n. 7; Dist. 2. | $31 Million in cash was deposited by CED into an equity defeasance account and used to purchase US Treasury STRIPS to fund the repurchase of its interest in the Facility. (Stip ¶¶ 208-210). |
| The remaining cash, after transaction costs was used to pay Sodra an accommodation fee for its participation in the shelter. Cir. 467; Dist. 2. | The remaining cash, after transaction costs was used to pay EZH an accommodation fee referred to as its Net Present Value Benefit for its participation in the shelter. (Tr. 2971-73 (Mintun)). |
| Other than the accommodation fee, Sodra receives no other money. Cir. 467. | Other than the Net Present Value Benefit, EZH receives no other money. (Tr. 2971-73 (Mintun)). |
| The transaction is structured so under the renewal option BB&T would not have to inject any further funds to make its final rent payment. Cir. 468-69 | The transaction is structured so that under the Sublease Renewal Option CED would not have to inject any further funds to make its final rent payment. (U.S. Br. at 34). |
| If the interest rates are not as the parties predict at the end of the basic lease term Sodra has no recourse to BB&T for any shortfall in the final rent payment. Cir. 469 | If the interest rates are not as the parties predict at the end of the basic lease term EZH has no recourse to CED for any shortfall in the final basic rent payment. (*Infra* at 29-32). |

[8] The debt defeasance was in substance defeasance and not legal defeasance.

[9] The equity defeasance was in substance defeasance and not legal defeasance.

| BB&T | RoCa3 |
| --- | --- |
| Deloitte performed an appraisal of the asset. Cir. 466; Dist. 1. | Deloitte performed an appraisal of the asset. (Stip ¶ 83). |
| Deloitte determined that there was no material inducement that would require Sodra to exercise the purchase option. Cir. 469. | Deloitte determined that there was no material inducement that would require EZH to exercise the purchase option. (Tr. 1795-96 (Ellsworth)). |
| The Tax Indemnity Agreement required that for U.S. income tax purposes, neither Sodra nor any of its personnel would take a position inconsistent with the characterization of Sodra as the owner, head lessor, and sublessee of the Equipment. Cir. 469 n.10; Dist. 4. | the Tax Indemnity Agreement required that for U.S. income tax purposes, neither EZH nor any of its personnel would take a position inconsistent with the characterization of EZH as the owner, head lessor, and sublessee of the RoCa3 Facility. (Stip ¶¶ 280-81). |
| Deloitte determined the most likely option was for BB&T to use the equipment. Cir. 469; Dist. 3. | Deloitte determined the most likely option was for CED to use the facility. (Tr. 1795-96 (Ellsworth)). |
| Sodra continued to the use the facility as it always has. Cir. 466; Dist. 6. | EZH continued to the use the facility as it always has. (U.S. Br. at 97, 101). |
| Each year BB&T has the right to make an inspection of the facility. Cir. 466; Dist. 6. | Each year CED has the right to make an inspection of the facility. (Stip ¶¶ 149-150). |
| BB&T describes the transaction as a “tax driven deal” with an after tax investment yield largely driven by tax benefits. Cir. 465; Dist. 1. | Plaintiff says the taxes are what make this deal interesting because of an after tax investment yield largely driven by tax benefits. (JX 1231; JX 390, Bates 8029). |
| Transaction was done in U.S. Dollars. Cir. 467. | Transaction was done in U.S. Dollars. (JX 397, Bates 8125; Tr. 967-68 (McCartney)). |
| Without the deductions BB&T would “probably not” have gone forward. Cir. 465-466. | Without the tax benefits CED would not have entered this transaction. (JX 390; Tr. 850-51 (McCartney); Tr. 2039-40 (DePlautt); Tr. 2035-36 (Muoio)). |

As a result of these marked similarities, the analysis of *BB&T* by the district court and the Fourth Circuit is persuasive and relevant to any examination of Plaintiff's LILO Transaction.[10]

The Fourth Circuit describes what it considers to be a typical LILO:

> In a typical LILO, a U.S. taxpayer leases property from a tax exempt entity and simultaneously leases that property back to the owner. The tax-exempt owner's sublease has a shorter term than the taxpayer's lease. Upon expiration of the shorter sublease, the owner may exercise an option to buy back the remainder of the taxpayer's lease. Thus, in practical terms, the tax-exempt property owner continues to use the property during the sublease term just as it did before the transaction and bears no risk of losing control of its asset(s).
>
> The taxpayer, meanwhile, receives tax benefits by deducting the rental payments on its lease, amortizing certain transaction costs, and, depending on its financing arrangement, deducting interest payments. Maxim Shvedov, CRS Report for Congress: Tax Implications of SILOs, QTEs, and Other Leasing Transactions with Tax-Exempt Entities 8 (2004). The tax benefits can be substantial and are achieved primarily by "[a]ccelerating the transaction-related deductions and delaying recognition of the corresponding revenues." *Id.* at 3. This delayed recognition creates a tax deferral, which, in practice, will function as a tax reduction due to the time value of money. *Id.* at 2, 8.
>
> Generally, parties aim to structure a LILO in a way that essentially eliminates any risk of economic loss while maximizing the deductions that the taxpayer may claim. In this respect, the parties strive to "strike a balance between limiting their exposure to risks on one hand, and making sure the provisions do not disqualify the transaction as a [genuine] lease [for tax purposes] on the other. *Id.* at 9; *see also* Mark P. Gergen, *The Logic of Deterrence: Corporate Tax Shelters*, 55 Tax L. Rev. 255, 259 n.19 (2002) (noting that LILOs are often structured so that "there is no risk to any party, other than the tax law risk").

---

[10] What is different in this case from *BB&T* is the issue of economic substance. Because there is a trial record, this Court has can resolve the factual issue whether Plaintiff has met its burden to show that the transaction has economic substance under *Coltec Indust., Inc. v. United States,* 454 F.3d 1340, 1355 (Fed. Cir. 2006).

*BB&T*, 523 F.3d 464.

The RoCa3 LILO Transaction is a typical LILO. In fact, a major theme of Plaintiff's brief is that this transaction is just like every other leveraged lease. Regarding the substance versus the form of the purported lease in *BB&T*, the Fourth Circuit provided this blunt assessment:

> In closing, we are reminded of "Abe Lincoln's riddle . . . 'How many legs does a dog have if you call a tail a leg?'" *Rogers v. United States*, 281 F.3d 1108, 1118 (10th Cir. 2002). "The answer is 'four,' because 'calling a tail a leg does not make it one.'" *Id.* Here, BB&T styled the LILO as a lease financed by a loan, but did not in substance acquire a genuine leasehold interest or incur genuine indebtedness. Accordingly, although we decline to resolve whether the transaction as a whole lacks economic substance — that is, whether it has "reached the point where the tax tail began to wag the dog," *Hines*, 912 F.2d at 741, we conclude that the Government was entitled to recognize that tail for what it was, not what BB&T professed it to be.

*BB&T Corp.*, 523 F.3d at 477.

As in *BB&T*, the Court should disallow the claimed tax benefits purportedly arising from the RoCa3 LILO Transaction, because the form of the transaction does not comport with its substance.

## II. Other Leasing Cases

### A. *Fifth Third Bancorp v. United States*

The first decided case to address a LILO under the economic substance doctrine was *Fifth Third* recently tried before a jury in the Southern District of Ohio. *Fifth Third,* No. 1:05-cv-350 (S.D. Ohio). The facts were similar to those in *BB&T* and the RoCa3 LILO Transaction.

As explained in Plaintiff's Brief (Pl. Br. at 17-18), the district court, applying Sixth Circuit law, determined that summary judgment was premature on the issue of substance over

form. At the close of the trial, the Court also denied the parties' cross-motions for judgment as a matter of law and submitted the case to the jury. The jury issued a verdict in favor of the United States.[11] (Docket # 101, Exhibit B (Status Report in this case containing jury verdict). In response to special interrogatories, the jury found that there was no economic substance to the transaction other than the avoidance of tax. (*Id.*). The jury also determined that although the transaction was in substance a lease, the loan from HBU[12] did not constitute bona fide indebtedness. (*Id.*).

B. *AWG Leasing v. United States*

On May 28, 2008, the United States District Court for the Northern District of Ohio held that a bank involved in a SILO tax shelter never obtained an ownership interest sufficient to claim deductions for depreciation. *AWG*, 2008 WL 2230744, at *1. The court also determined that the bank was not entitled to deduct interest paid on the "loans," or to other claimed tax benefits. *Id.* Finally, the court sustained the imposition of accuracy-related penalties at the partnership level for the substantial understatement of tax liability. *Id.* The district court compared SILOs to LILOs:

> SILOs are a modified version of their tax-driven financial predecessors, lease-in/lease-out ("LILO") transactions. Although each transaction is factually distinct, SILOs generally differ from LILOs by having a longer-term head lease that is sufficiently long to qualify for tax purposes as a sale. In a typical LILO, the taxpayer leases property from a tax-exempt entity and simultaneously leases the same property back to the owner and gives the owner an option to repurchase the lease. In practical

---

[11] There is no final judgment in the case. Plaintiff filed for a JNOV challenging the verdict.

[12] As in *BB&T* and this case, the nonrecourse debt was borrowed from a bank and deposited into a defeasance account at a subsidiary institution.

> terms, the tax-exempt property owner continues unfettered use of the property just as before the transaction, but the taxpayer claims tax benefits. As the Fourth Circuit Court of Appeals recently noted, "LILOs have been harshly criticized as abusive tax shelters that serve only to transfer tax benefits associated with property ownership from tax-indifferent entities, which have no use for them, to U.S. taxpayers." *BB&T Corp. v. United States*, 523 F.3d 461, 465 (4th Cir. 2008) (citing David Hariton, Response to "*Old 'Brine' in New Bottles" (New Brine in Old Bottles)*, 55 TAX L. REV. 397, 402 (2002)).

*Id.* at *2.

There are several factual similarities between the transaction at issue in the *AWG* case, and those in *BB&T*, *Fifth Third* and here: Key Bank leased a German waste facility from AWG and called for AWG to lease the facility back. *Id.* at *9. The transaction documents also gave AWG an option to repurchase the facility in 2024 using "escrow-type accounts to guarantee AWG's sublease of the facility and to fund the exercise of the 2024 purchase option."[13] *Id.* at *10. Because of these similarities, the court found "that both the facts and legal issues presented by the *BB&T* case and this present litigation are similar in many regards." *Id* at *24. Moreover, the court, over taxpayer's objections, concluded that "that the precedent set by the Fourth Circuit in *BB&T* is relevant and instructive, although certainly not binding on this Court."[14] *Id.* After trial, the court concluded there was no sale and that the Trust did not become the owner for tax purposes:

---

[13] The court concluded that "unless AWG rejects that purchase option, the 1999 transaction results in a simple circular flow of money." *Id.* at *10. The escrow accounts in the *AWG* transaction are analogous to the defeasance accounts present in the RoCa3 LILO Transaction.

[14] With regard to the structure of the transaction, the court stated, " the structure of the transactions in both cases are remarkably alike." With regard to the debt, the court noted, "The structure and intended use of the Series A and B Loans in this case is remarkably similar to the loan at issue in the *BB&T* case." *Id.* at *39.

> while the AWG SILO transaction does have some economic substance apart from the tax benefits, the transaction's stated form as a "sale" is not consistent with its economic reality. Because the Court finds that the Trust never actually became the owner of the Facility for purposes of U.S. federal tax law, the Court concludes that the Trust is not entitled to the depreciation or amortization deductions claimed on its tax returns for 1999, 2000, 2001, 2002, and 2003 ("the Taxable Years"). After discussing relevant case law on the issue, the Court will then analyze the AWG transaction under both the "economic substance" and the "substance over form" tests.

*Id.* at *21.[15] The Court offered several reasons for its conclusion:

> For the following reasons, the Court concludes that the AWG transaction is not properly characterized as a transfer of a depreciable ownership interest in the Facility to the Plaintiffs because: (I) no substantive benefits or burdens of ownership are transferred between the parties during the Initial Leaseback Period; (ii) no significant cash flows between the parties exist during the Initial Leaseback Period; (iii) the AWG transaction creates little, if any, risk for the Plaintiffs throughout the Head Lease; and (iv), most importantly, it is nearly certain that AWG will exercise the Fixed Purchase Option in 2024, thus ensuring that the Plaintiffs never actually acquire economic ownership of the Facility. In sum, the Court concludes that the Trust did not become the owner of the Facility at closing in 1999 and it is highly likely that the Trust never will acquire such ownership under the terms of the AWG sale-leaseback transaction.

---

[15] The court in *AWG* found there to be substance because the taxpayers produced evidence that the return on their investment (2.5 and 3 percent) is the same rate of return that the taxpayers expected on their other leverage lease transactions. There is no evidence that shows that Plaintiff believed that its transaction had a reasonable rate of return without the tax benefits. In fact, the only evidence in this record is that Plaintiff would not have done this transaction for a 2 percent return. (JX 390; Tr. 850-51 (McCartney); Tr. 2039-40 (DePlautt); Tr. 335 (McGrath)). Moreover, there is no evidence in this record that shows how Plaintiff, who bears the burden, calculated the 2.4 percent return claimed in the White Paper. (JX 397, Bates 8124). Further, given that the source of this return is the investment of a portion of CED's equity investment in U.S. Treasury STRIPS, which could have been done without the artifice of a lease transaction to ratchet up the claimed tax benefits, this return is not truly a return from the lease transaction itself.

*AWG*, at * 27. Because the RoCa3 LILO Transaction is fundamentally indistinguishable from those in the prior cases, the Court should disallow Plaintiff's claimed deductions.[16]

---

[16] Undoubtedly Plaintiff will claim that the RoCa3 LILO Transaction should be treated differently by latching on to factor (iv) of the district court's analysis and claim that unlike in that case the Sublease Purchase Option here is not nearly certain to be exercised. As explained in *BB&T* this is not a necessary prerequisite to a finding that the substance fo the RoCa3 LILO Transaction does not match its form. *See BB&T*, 523 F.3d at 473 (Noting that even in the unlikely event that the tax exempt entity fails to exercise the purchase option, the structure of the transaction insulates [the taxpayer] from any risk of losing its initial investment . . . in the government bonds or incurring the obligation to invest additional funds."). In any event as explained *infra*, the Sublease Purchase Option is nearly certain to be exercised. Plaintiff will likely support its claim by citing to the Deloitte appraisal's conclusion (and Mr. Kelly's confirmation there of) that it is more likely EZH will not exercise the Sublease Purchase Option, and to the testimony of its expert John Reed, who offered his opinion that one could not say with "virtual certainty" that the purchase option would be exercised. (Tr. 2582, 2698-99 (Reed)).

First, as explained in the United States' opening brief (U.S. Br. at 30-31) the Transaction is designed for the Sublease Purchase Option to be exercised. (*See infra* at n.17). Second, Deloitte's appraisal (and Kelly's supposed confirmation of that appraisal) do not change that result as they are faulty in many material respects including failure to consider either the fact that the Sublease Purchase Option is prefunded or the actual economic results of EZH choosing to exercise the Sublease Purchase Option. Third, Mr. Reed's opinion, even if accepted by the Court, that one cannot say with "virtual certainty" that EZH will exercise the Sublease purchase Option does not carry the day. Mr. Reed defined his term "virtual certainty" as approximately 98%-99% certainty. (Tr. 2699, 2724 (Reed)). In other words Mr. Reed was essentially saying that while you could not say with 100% certainty whether EZH would exercise the Sublease Purchase Option, you could say so with up to a 97% certainty. In other words, by providing such a low threshold, 2%-3% uncertainty, Mr. Reed has not demonstrated that, in light of the other evidence in the case, the exercise of the Sublease Purchase Option is not "nearly certain" as stated in the *AWG* opinion. Fourth, even Mr. Reed's limited conclusions are unreliable. Mr. Reed acknowledged that he had never worked with a transaction that had a structure like the RoCa3 LILO Transaction. (Tr. 2680-81 (Reed)). Mr. Reed acknowledged that he did not believe that the prefunded nature of the Sublease Purchase Option was something that effects whether the Sublease Purchase Option will be exercised. (Tr. 2702-03 (Reed)). He based this conclusion in part on his understanding (from Plaintiff's counsel) that EZH had unfettered access to the funds in the Equity Defeasance Account if it chose not to exercise the Sublease Purchase Option. (Tr. 2704-05, 2707 (Reed); PX 10076, Bates 20203). However, as acknowledged in Plaintiff's brief (Pl. Br. at 464, 467), this assumption was false (JX 19, Bates 971-73; U.S. Br. at 21-23). Mr. Reed acknowledged a change in this assumption could affect his opinion. (Tr. 2707 (Reed)). Further, Mr. Reed admitted that he had no actual understanding of the financial consequences to EZH if it failed to exercise the Sublease Purchase Option (Tr. 2707 (Reed)),

(continued...)

## RESTATEMENT OF FACTS

There are significant discrepancies between the factual assertions in the parties' opening briefs. The key differences between the facts presented by the parties are in the following areas: 1) the absence of risk in the RoCa3 LILO Transaction; 2) the purported non-tax benefits Plaintiff sought from entering into the RoCa3 LILO Transaction; and 3) Plaintiff's purported due diligence. In addition, Plaintiff's incomplete and inaccurate characterization of the structure of the RoCa3 LILO Transaction is an important factor in each of these areas.

### I. CED Did not Bear Risk from the RoCa3 LILO Transaction

#### A. *There is a Lack of Market Risk to CED from Entering into the RoCa3 LILO Transaction*

Plaintiff argues that it is exposed to the risk of fluctuations in value of the RoCa3 Facility as a result of entering into the Transaction. (Pl. Br. at 362-63). However, Plaintiff ignores several key facts that eliminate this risk. Fluctuations in the value of the RoCa3 Facility have no impact on the return to CED from the Transaction. Plaintiff ignores that the exercise of the Sublease Purchase Option is the intended consequence of the Transaction.[17] More importantly,

---

[16] (...continued)
instead relying on counsel's "general" explanation of the flow of funds in the Transaction. (Tr. 2700-02 (Reed)). In fact, instead of reviewing the entirety of the only Operative Documents he listed in his report (the Participation Agreement, Lease and Sublease), Mr. Reed relied on counsel to tell him which provisions were relevant to his opinion. (Tr. 2701 (Reed)). Even Mr. Reed's calculations (which were performed by his staff and not reviewed by Mr. Reed (Tr. 2713-14 (Reed)) rest on a flimsy basis as he relied heavily on the numbers set forth by Deloitte in its appraisal. Numbers which he made no attempt to verify. (Tr. 2711, 2714-15 (Reed)).

[17] The Transaction was structured so that the Sublease Purchase Option would be exercised by EZH. (U.S. Br. at 29-32). The funds were set aside for this occurrence (Stip ¶¶ 234, 235, 237; Tr. 1326-29 (Holzman); Tr. 2167 (DePlautt); Tr. 1796-98 (Ellsworth)), and if EZH chose not to exercise the Purchase Option it did not receive the benefit of those funds, but had to reinvest
(continued...)

Plaintiff fails to acknowledge that even if fluctuations in the value of the Facility would impact EZH's decision with respect to the Sublease Purchase Option, CED is protected from such fluctuations. If, for example, the property appreciates and EZH exercises the Sublease Purchase Option in year 20, the funds held in the Equity Defeasance Account will be returned to Plaintiff providing its expected return from the Transaction. (U.S. Br. at 19-24, 95-97, 104). Alternatively, if hypothetically the value of the RoCa3 Facility declines to a point where EZH is purportedly disinclined to exercise the Sublease Purchase Option, and Plaintiff is unable to lease its interest in Facility to another lessee under the Retention Option for a price that will assure that it can recover its investment, as recognized by Plaintiff, CED can elect the Sublease Renewal Option and force EZH to extend the sublease for 16.5 more years. (*Id.*). Under this option, Plaintiff is assured to recover its equity investment, with interest, through the equity portions of the annual rental payments it will receive during the extended sublease term.[18] (DX 20193, Bates 25093; JX 388, Bates 8021; JX 397, Bates 8121 ("If the utility did not purchase the plant at the end of year 20 the trust [for the benefit CED] would have the option to . . . require

17 (...continued)
them in additional Treasury Securities. (JX 19, Bates 971-73; U.S. Br. at 21-23; Pl. Br. at 464, 467). Further, in order to not exercise the Sublease Purchase Option, EZH was required to reach an agreement with a successor lessee to step into the shoes of CED if CED so desired, and EZH was required to pay that successor lessee to do so. (JX 1, Bates 65 ("Designated Successor Lessee"); Tr. 3375-76 (Ellis)). Thus, the Transaction is designed to encourage EZH to exercise the Sublease Purchase Option, and eliminate any residual value risk to CED.

18 And, of course, the Transaction is structured to allow those payments to be made from funds set aside under the Equity Defeasance Account. (U.S. Br. at 21-23, 26, 34). The mechanics of these payments under the Sublease Renewal Option, as explained in the United States' opening brief (JX 19, Bates 971-73; U.S. Br. at 21-23), and confirmed by Plaintiff (Pl. Br. at 464, 467), are that EZH is required to reinvest the proceeds of the IJssell Deposit (the equity defeasance account) to secure the free cash payments expected by CED in the later years of the lease term, which are the source of CED's expected return from the Transaction.

the utility to re-lease the plant for an additional 17 years at prices that would assure CED of its expected return."); JX 390 ("In either case [comparing EZH's exercise of the Sublease Purchase Option and CED's exercise of the renewal option], CED will receive sufficient funds from the EZH Sub-lessee (as rent and/or proceeds from the sale of the Head Lease pursuant to the [Sublease Purchase Option]) to pay-off the third party loans, recover its equity investment, and earn a return."); Tr. 3051 (Mintun); Tr.3738-40 (Bent); DX 20194, Bates 25120 (noting that even if EZH does not exercise the Sublease Purchase Option the funds in the Equity Defeasance Account would be returned through the subsequent free cash payments)). Although CED recognized this at the time, Plaintiff now ignores it in an attempt to rewrite history.[19]

Plaintiff sidesteps its failure to demonstrate risk that the free cash payments under either the Sublease Renewal or Retention Options will not be made. Plaintiff claims that the United States has not proven that the successor equity defeasance accounts will be sufficient to satisfy the free cash rental payments at the end of the Sublease Renewal Term. (Pl. Br. at 464 and 467). Plaintiff can't shift the burden of proof in this case to the United States. Plaintiff bears the burden of proving that there is risk to CED that these free cash payments would not be made if the Sublease Purchase Option is not exercised. Plaintiff does not satisfy this burden by claiming that the United States has failed to prove otherwise.

All of Plaintiff's contemporaneous documents indicate that CED will in fact recover its equity investment in this manner if the Sublease Renewal Option is elected. (*See, e.g.*, JX 397, Bates 8121; JX 390). Moreover, Plaintiff's claim that the United States' experts failed to do an

---

[19] Even if the renewal option is exercised involuntarily CED is still covered by these mechanisms. (*See* Pl. Br. at 183).

analysis of this portion of the RoCa3 LILO Transaction, ignores the presentations by Mr. Bent and Dr. LaRue, discussing how these funds are reinvested to satisfy the free cash payments scheduled for the end of the lease term should EZH not exercise the Sublease Purchase Option. (Tr. 3712, 3728-31 (Bent); DX 20193, Bates 25091-92; DX 20194, Bates 25120, 25137). In fact, not until the United States' expert, Mr. Bent, testified close to the end of trial did any witness attempt to explain the mechanics of the RoCa3 LILO transaction in comprehensive detail.[20] In short, Plaintiff has failed to meet its burden of demonstrating a genuine risk it would not receive its return from the Equity Defeasance Accounts, even in the unlikely event EZH fails to exercise the Sublease Purchase Option.[21]

In addition, even though EZH could hypothetically fail to exercise the Sublease Renewal Option, there are provisions that ensure CED will not face any market risk during the resulting

[20] Despite bearing the burden of proof, none of Plaintiff's experts explained the flows of funds in the RoCa3 LILO Transaction, and in performing their analyses, they relied on explanations from Plaintiff's counsel as to the operation of the transaction. (*See* Tr. 2683, 2700-02, 2704-05, (Reed); Tr. 3394 (Ellis); Tr. 3609-18 (Weil)). Based on several misconceptions of Plaintiff's experts, these explanations apparently omitted key provisions that would have a bearing on these experts analysis, thus rendering their opinions unreliable. (*See, e.g.*, Tr.2704-2707 (Reed) (who believed, based on an explanation from Plaintiff's counsel, that EZH could do as it wished with the funds in the Equity Defeasance Account). Plaintiff's own officers and directors could not explain much of the transaction in which it invested over $40 million dollars. (*See, e.g.*, Tr. 945, 949 (McCartney) (where Plaintiff's counsel acknowledged this, asserting that Ms. McCartney the chairperson of CED, who approved entry into the Transaction, was not competent to testify about the details of the RoCa3 LILO transaction); Tr. 2030-31 (Muoio) (noting that at one time he understood financial aspects of the Transaction, but could not explain them today)). And even in the case of those witnesses who one would expect would be in the best position to know – Mr. DePlautt (the individual at CED responsible for the details of the Transaction), or the shelter promoters Mr. Holzman and Mr. Mintun – Plaintiff did not even ask them to describe the flow of funds during the Sublease Renewal Term or Retention Option or the risks attendant to those funds.

[21] The United States has demonstrated the mechanics of these free cash payments in any event.

shirttail period. CED understood that it faced no residual risk from the Sublease Renewal Option after receiving its predetermined return because of the existence of a walk away provision. (JX 605; Tr. 3375-76 (Ellis)). CED understood that it had the right upon the commencement of the shirttail period to require EZH to bear any benefits and/or burdens associated with this period of operation of the facility, walk away from any such obligations, and simply allow the accounts and offsets to run their course until the end of the Lease Term.[22] (*Id.*). Thus, any residual risk was theoretical only, because the risk could be avoided.[23]

B. *The Structure of the Transaction Eliminates Credit Risk to CED*

Plaintiff also relies heavily on the supposed credit risk from the Transaction. (*See, e.g.*, Pl. Br. at 149, 165). Plaintiff's documents, however, belie such risk.[24] (*See, e.g.*, JX 241, Bates

---

[22] Because of the structure of the Final Basic Rent Payment discussed in the United States opening brief (U.S. Br. at 39-41), CED does not need any of the revenue it could hypothetically make under the Retention Option in order to meet its obligation to make the Final Basic Rent Payment. (*See* JX 722, Bates 12240 ("Although a portion of the second Head Lease payment due at year 43.2 is described as 'recourse' to the investor in the legal documents (Participation Agreement), there is no situation in which the Trustee [Investor] would have to provide additional funding from outside the transaction to satisfy such obligation.")). Thus, any claim that CED will have to make a certain amount of money to overcome the cost of the Final Basic Rent Payment is inaccurate.

[23] In addition, availability of a substitute lessee (JX 1, Bates 65 ("Designated Successor Lessee")), though not necessary to demonstrate that CED did not actually face any market risk concerning the value of CED's interest in the RoCa3 Facility, provides further protection against any potential downside to CED. In fact, the substitute lessee provision would protect CED from downside risk even if the Retention Option is exercised, because if the returns were not as it anticipated when CED selected that option, the substitute lessee would provide protection to CED as it would be substituted for CED. However, this factor, while demonstrating the extreme risk protection measures employed in this Transaction, is not necessary to find that CED did not face market risk because as explained above, CED can select the Sublease Renewal Option, so any risk purportedly existing if the Retention Option could be avoided.

[24] This lack of credit risk was confirmed by the United States' experts who examined the structure of the RoCa3 LILO Transaction. (DX 20199, Bates 25338; DX 20200, Bates 25354).

4459 ("We require full credit support for the utility's rent obligations (Letters of Credit and Treasuries)"); JX 397, Bates 8124 ("In the event the utility fails to make the lease rent payments due, the investor can use the Treasuries and the proceeds from the letter of credit to return its capital and provide it with its expected yield.")). In fact, Plaintiff referred to this method of credit protection as a "belt and suspenders" approach, recognizing the extreme nature of the credit protection it could draw upon to eliminate any real possibility of a shortfall from the RoCa3 LILO Transaction. (JX 1167, Bates 16949). Despite Plaintiff's claims, CED explained that it chose to participate in LILOs instead of typical leveraged lease transactions because LILOs remove credit risk and residual value risk, leaving only tax risk. (JX 1118).

As explained in the United States' opening brief and in further detail below, the Debt Defeasance Account ensures that during the Sublease Basic Term and through satisfaction of the HBU Loan there is no realistic possibility of a default on the debt portion of EZH's rental payments (which in turn ensures that the HBU Loan will never fail to be serviced). (U.S. Br. at 18). Similarly, the Equity Defeasance Account, funded with CED's own money, ensures that the equity portion of EZH's rental payments will be satisfied, since the zero-risk U.S. Treasury STRIPS are purchased to ensure payment of those portions.[25] (U.S. Br. at 19-20). As such, no

[25] To the extent Plaintiff asserts that the defeasance accounts would not cover "supplemental rents" under the Transaction (*See* Tr. 1413 (Holzman)) it has not offered sufficient proof on the likelihood of this possibility. Further, these hypothetical obligations do not appear to have any impact on CED's expected return from the Transaction, and certainly would not impact CED's ability to recoup its initial equity investment.

matter what occurs with the operation of the RoCa3 Facility, or EZH's other facilities for that matter, CED can be assured that the fully defeased[26] rental payments will continue to be made.[27]

C. *The HBU Loan Does Not Pose Any Risk to CED's Return*

Plaintiff claims, without any record citation, that CED was at risk of losing its $39 million equity investment if it defaulted on the HBU loan.[28] (Pl. Br. at 371). There is no evidence to support this claim. As we explained in our opening brief, there is no risk of default on the HBU loan to begin with, as the Debt Defeasance Account is set up to completely satisfy the HBU loan. (U.S. Br. at 16-18). This is because the Debt Defeasance Account is fully funded with the proceeds of the original loan from HBU, is held at the parent bank of HBU, ABN

[26] Plaintiff attempts to distinguish these defeasance mechanisms based on the fact that they are in substance defeasance as opposed to legal defeasance. This is a distinction without a difference.

[27] Plaintiff makes a tortured argument on pages 402 and 403 of its brief in an attempt to imbue the RoCa3 LILO Transaction with risk despite the existence of the debt and equity defeasance accounts. In essence, Plaintiff claims that the Court should look at these defeasance mechanisms as if they were leases with ABN AMRO and the United States directly. Its attempts are strained and ignore key facts that render them unreliable. With respect to the equity defeasance analogy, and as quoted by Plaintiff in its brief, Mr. Ray identifies reasons for non-payment in Plaintiff's posited lease with the United States that would be inapplicable to a U.S. Treasury STRIP, that destroy Plaintiff's attempt to draw such an analogy. In the ABN AMRO defeasance account analogy, Plaintiff ignores that the defeasance arrangement actually runs between ABN AMRO and its subsidiary HBU. Simply treating it as a third party lease between ABN AMRO and CED without considering HBU is improper. Plaintiff also ignores the fact that the Operative Documents provide for mechanisms that reduce even further any minimal risk that may actually exist concerning the credit of ABN AMRO as a defeasance party. (U.S. Br. at18). Further, because the HBU loan is non-recourse to CED, it is unclear that Plaintiff would face any true risk in any event. Finally, as Plaintiff is wont to do, by using these analogies, it is looking at each individual component of the RoCa3 LILO Transaction in isolation instead of focusing on how the various mechanisms provided for work together to eliminate the risk of loss to CED.

[28] On page 148 of Plaintiff's brief it also asserts that CED faces interest rate risk with respect to the HBU loan. However this is not true because the HBU Loan and the Debt Defeasance Account have the same, fixed, interest rates. (U.S. Br. at 15-17).

AMRO, and is structured to fully satisfy the HBU Loan.[29] Despite Plaintiff's implications to the contrary (Pl. Br. at 137), this is true even in the unlikely event that EZH commits an event of default because even in that situation the funds in the Debt Defeasance Account would be available to use and be sufficient to satisfy the outstanding obligation to HBU. (U.S. Br. at 16-17).[30]

Second, because the funds in the Equity Defeasance Account (which are the source of CED's return from the Transaction) are not pledged as collateral for the non-recourse HBU loan (U.S. Br. at 19), CED is assured of its return irrespective of any loan default. Thus, there is no realistic possibility that CED can default on the HBU loan and lose its equity investment.[31]

---

[29] Plaintiff acknowledges that the Debt Defeasance Account is fully insulated from all claims by ABN AMRO, and is required to be used to repay the HBU Loan. (Pl. Br. at 150 (noting that ABN AMRO cannot use the funds in the Debt Defeasance Account to offset anything HBU owes ABN AMRO, and can only be used to pay the loan back to HBU)).

[30] Plaintiff misrepresents the United States' explanation of the circular nature of the financing arrangement employed in the RoCa3 LILO Transaction. (Pl. Br. at 376). To be clear, it is not solely that EZH's rent payments are scheduled to satisfy the HBU loan scheduled payments until the HBU Loan is satisfied, on which the United States' maintains the financing arrangement is circular. It is that, in addition, the Debt Defeasance Account fully defeases the rental payments and payments on the HBU loan and the source of the funds in the Debt Defeasance Account is the original HBU loan itself. (U.S. Br. at 17). While Mr. Bent and Dr. Ellis agree with Plaintiff that it is typical in leveraged leases to have the rent schedules match the loan repayment schedules (Pl. Br. at 376), they both explained that the fully defeased nature of these payments in this case is what distinguishes the financing arrangement in this case from a "typical" leverage lease. (Tr. 3957-58 (Bent); Tr. 3732-34 (Ellis)). Plaintiff ignores this material distinction.

Further, despite Plaintiff's arguments to the contrary (Pl. Br. at 393) the United States is not arguing that the use of defeasance accounts to mitigate some aspects of the risk a legitimate lessee may face from entering a transaction is improper, or that a lessee cannot have any credit protection against a default, it is use of these specific defeasance accounts, which fully defease EZH's obligations in this case and virtually eliminate credit risk that the United States challenges. Plaintiff's assertion that there is no legal authority for this position is contrary to the holding in *BB&T*, 523 F.3d 461, as well as the more recent decision in *AWG*, 2008 WL 2230744.

[31] The relationship of the loop debt in the RoCa3 LILO Transaction to the source of the $61
(continued...)

D. *The Possibility of a Premature Termination Does Not Create Risk to CED*

Plaintiff claims that a premature termination presents a risk to CED. (Pl. Br. at 165). However, the Equity Defeasance Account, in combination with the letter of credit required to be purchased by EZH, ensures that CED's equity investment will be recovered even in the event of a premature termination. (U.S. Br. at 23). Thus there is no downside risk to CED in such a situation.[32] Further, even CED's expected return on its equity investment is protected by the combination of the Equity Defeasance Account and letter of credit.[33] (U.S. Br. at 23). Plaintiff offers several unrealistic hypotheticals to argue that CED faced risk from the Transaction in the event of a premature termination. (Pl. Br. at 410-413). But Plaintiff offers no evidence regarding the genuine possibility any such event could occur (Tr. 3404 (Ellis) (admitting that he did not quantify the risk of a termination event under the operative documents)), or the likelihood that such a shortfall would in reality occur given the adjustment mechanisms imposed

---

[31] (...continued)
million profit also demonstrates that there truly is no purposeful use for the HBU Loan. All of the returns to CED from participation in the RoCa3 LILO Transaction during the term of the HBU Loan are the result of the investment of CED's equity investment in Treasury STRIPS. The HBU Loan in no way impacts these returns.

[32] As explained by Mr. Bent, such a situation has never occurred since the closing of the RoCa3 LILO Transaction (DX 20199, Bates 25338, 25342), and the adjustment mechanisms incorporated into the Transaction sufficiently protect against it ever in fact occurring. (DX 20200, Bates 25342-43; Tr. 3755-56 (Bent); U.S. Br. at 27-28).

[33] The sum of the Treasury STRIP amounts and the available letter of credit would always be sufficient to recoup CED's investment and Plaintiff's experts have not argued otherwise. Ellis' calculations concerning the potential fluctuations in the value of the U.S. Treasury STRIPS, when combined with the available letter of credit amount is really only focused on the margins of CED's expected return from the investment, not the return of its initial equity investment. (PX 10073).

on the letter of credit requirements.[34] (Tr. 3403-04 (Ellis) (acknowledging that he did not attempt to quantify the risk that the letter of credit would not be sufficient to satisfy any shortfall in an event of default), Tr. 3404-05 (Ellis) (acknowledging that he did not know the likelihood of the fluctuations he set forth in his report actually occurring and was not aware of any such analysis performed by Plaintiff)). Further, Plaintiff's blanket assertion that there was a risk of non-payment on the letter of credit ignores the provisions allowing for substitution of the letter of credit provider on a yearly basis and requires an unrealistic hypothetical failure of the issuing bank to actually honor a properly payable letter of credit.[35] Neither Mr. Holzman (Tr. 1176) nor Dr. Ellis (Tr. 3230-31, 3404 (only stating that "it is not unknown")) could quantify these supposed risks[36]; however, Mr. Bent's analysis demonstrated that there was not a realistic possibility of the letter of credit not covering any potential shortfall between the termination

---

[34] As explained in the United States' opening brief, in order for CED to be unable to recover its expected return from the RoCa3 LILO Transaction, not only would the letter of credit have to fail to cover the shortfall between the termination value and the then current value of the U.S. Treasury STRIPS, EZH would have to be financially unable to make up whatever tiny amount of the termination amount would theoretically be owing after the letter of credit was called upon. (U.S. Br. at 28).

[35] The banks supplying the letter of credit were required to be AA rated, and other mechanisms were put into place in the event this rating dropped below this level during the one year period before another letter of credit could be obtained from a different AA rated bank. (Stip ¶ 226; JX 397, Bates 8121).

[36] Plaintiff cites generalized statements by Paul Bent concerning Plaintiff's counsel's questions on whether an argument or dispute is possible in a transaction involving security in an attempt to support its assertion that the letter of credit may not be honored. (Pl. Br. at 413, citing Tr. 3818-19 (Bent)). As explained by Mr. Bent during the course of this dialogue, which Plaintiff's counsel appears to have purposely kept vague to get a sound bite for Plaintiff's brief, as opposed to asking Mr. Bent directly his opinion with respect to whether a letter of credit will be honored in a particular case, in his experience as a mediator and lawyer, nothing can prevent people from arguing. (Tr. 3818 (Bent)). The fact that people may pursue unrealistic arguments over the terms of an agreement cannot be sufficient to present a risk that the letter of credit would not be honored under its terms.

value and the value of the equity defeasance.[37] (DX 20199, Bates 25338-39, 25342). Plaintiff has not met its burden of establishing these as truly viable risks in the RoCa3 LILO Transaction. Instead Plaintiff is engaging in rank speculation in an attempt to get around the fact that the Transaction was designed to eliminate virtually all risk of nonpayment to CED.

E. *The Existence Of Other Remedies Does not Imbue the Transaction With Risk*

Plaintiff also points to the inclusion of other remedies in the Operative Documents to posit that it may elect a remedy that would not guarantee the return of its investment in an event of default. (*See* Pl. Br. at 407). For example, Plaintiff claims that CED could choose to have its undivided interest in the RoCa3 Facility returned to it upon an event of default, and thus could be exposed to operating risk of the RoCa3 Facility to the extent it did not obtain favorable returns from selling its share of the output of the RoCa3 Facility. As explained by Mr. DePlautt, CED had no plans to actually operate the RoCa3 Facility (Tr. 2223 (DePlautt)), and as the structure of the Transaction demonstrates, took affirmative steps to prevent this from occurring. Further, the only remedies discussed in its contemporaneous documents are the termination values, and the fact that they are "fully secured" by the defeasance mechanisms. (*See*, *e.g.*, JX 397, Bates 8123). In any event, the contemporaneous documents establish that CED was concerned with only one thing: the ability to recoup its equity investment and expected return through the termination values without risk. Whatever other theoretical remedies are available are window dressing which went unnoticed and undiscussed by CED during its consideration of the Transaction. Simply put, CED only cared about the one remedy that would make it whole and eliminated the risk of not recovering its investment from the Transaction.

[37] And even less of a possibility that return of the initial equity investment will not be covered.

F. *Plaintiff Erroneously Claims There Could Be a Final Basic Rental Payment Shortfall that CED Would Have to Pay*

In several places Plaintiff claims, incorrectly, that under the Sublease Renewal Option or Retention Option, it is subject to the risk that it will have to make up any shortfall in the amounts set aside to make the Final Basic Rent Payment. (Pl. Br. at 467-68, 470-71). Plaintiff incorrectly claims that if the interest rates are below 6.86% at the end of the Sublease Basic Term (i.e. 20.1 years), CED would have to make up a shortfall to make the Final Basic Rent Payment.[38] Plaintiff is only telling part of the story; it is ignoring key provisions of the Operative Documents. While paragraph 257 of the Stipulation of Facts provides that the sum of the Lease Collateral Account, Trustee Treasury Collateral Account and obligation under the Sublessee Loan will equal $831,525,734 on February 24, 2041, if certain conditions are satisfied, including the ability to obtain a 6.86% interest rate on the Lease Collateral Deposit. (Stip. ¶ 257). As demonstrated by the Operative Documents, the converse is simply not true. The stipulation does not explain what happens if the interest rate is not 6.86% at the time the Lease Collateral Deposit is funded (the scenario Plaintiff asserts in its brief). As explained in our opening brief, CED would not have to make up the shortfall because of adjustment mechanisms in the Operative Documents that Plaintiff ignores. (U.S. Br. at 39, citing JX 321, Bates 7010; JX 722, Bates 12240; Tr. 1294-95 (Holzman); Tr. 3919-20 (Bent)). In essence, the adjustment mechanisms mean that regardless of the interest rate on the date of funding the Lease Collateral Account, the sum of the Lease Collateral Deposit, Trustee Treasury Collateral, and obligation under the Sublessee Loan Account will fully satisfy its obligation to make the Final Basic Rent

[38] Plaintiff first makes this assertion on page 462 in the introduction to this section; however, it provides no citation to support its claim.

Payment. In short, the paragraph Plaintiff cites provides no support for Plaintiff's assertion that CED would have to make up a shortfall (and Plaintiff has not and cannot point to any other evidence to demonstrate such a flawed proposition). In fact, as discussed in the United States' opening brief, the non-recourse nature of the Final Basic Rent Payment also eliminates any risk CED would otherwise face with respect to the Lease Collateral Deposit. (U.S. Br. at 40-41). Thus, Plaintiff's unsupported claim that it may have to make up some hypothetical shortfall is a mischaracterization of the terms of the RoCa3 LILO Transaction and does not demonstrate it bore risk.

Plaintiff presents a similarly incomplete and misleading, discussion of the Trustee Treasury Collateral Account[39] on pages 465 through 466 of its brief. It asserts that if there were a shortfall of the Trustee Treasury Collateral on February 24, 2041, that CED would have to make up the shortfall in making the Final Basic Rent Payment. This ignores the impact of the adjustment mechanism Plaintiff identified two sentences earlier (Pl. Br. at 466 ("If the actual cost of the Trustee Treasury Collateral is greater than $34,036,692, the amount owed to CED by

---

[39] Plaintiff attempts to inject the possibility of risk to CED into the transaction after the sublease purchase option date by claiming that the provisions allowing for use of letters of credit in lieu of funding the Trustee Treasury Collateral Account with the proceeds of the maturing Treasury STRIPS. (Pl. Br. at 176, 185, 465). Any gain or loss on the funds from the maturing Treasury STRIPS that otherwise would have been placed in the Trustee Treasury Collateral Account as a result of investing or using them outside of the Transaction is not a risk or benefit arising from the scope of the RoCa3 LILO Transaction. It is the transaction that generates the tax benefits that is the proper focus of the Court's attention, not some potential outside investment CED may hypothetically engage in subsequent to the end of the Sublease Basic Term. Again, the important point to recognize is that while these substitute collateral provisions hypothetically may be available subsequent to the 20.1 year Sublease Basic Term, CED entered into a transaction where it insulated itself from risk and provided a mechanism that it could ensure its return from the investment without risk to itself by establishing the Trustee Treasury Collateral Account.

EZH could be adjusted pursuant to Section 3(e) of the Sublease Agreement as of January 2, 2018"), and also ignores that, as explained by Cornerstone, the obligation to make the Final Basic Rental Payment is essentially only recourse to the Trustee Treasury Collateral Account.[40] (U.S. Br. at 40 n.33; JX 4, Bates 390). As such, CED will not have to come out of pocket to make the Final Basic Rent Payment, no matter the interest rates on the date the Trustee Treasury Collateral Account is funded (by the amount received from the maturation of one of the U.S. Treasury STRIPS on January 2, 2018).[41] (U.S. Br. at 40 n.33; JX 4, Bates 390). Thus, contrary to the structure of the transaction, the explanation of its own shelter promoter, and without any citation of evidence, Plaintiff erroneously asserts that CED would have to make up the shortfall

---

[40] Plaintiff's assertion that because the Final Basic Rent Payment is recourse to the Trust (but not CEL) somehow creates a likelihood that EZH will receive the full payment of the Final Basic Rent Payment is misleading. (Pl. Br. 182). The trust was set up solely to participate in the RoCa3 LILO Transaction and has no assets that can be called upon outside of the Transaction to satisfy this purportedly recourse obligation. In other words, this has no bearing on any risk faced by CED or Plaintiff concerning the Final Basic Rent Payment. The only relevance this distinction has, as explained herein, is if CED were actually to choose to operate the facility, it would now have an obligation to use the proceeds of that operation to pay the otherwise non-recourse obligation to make the Final Basic Rent Payment (*See* Pl. Br. at 188), as those are the only remotely foreseeable assets of the trust that could be available to make the Final Basic Rent Payment.

[41] Plaintiff's claim that CED would not have to use this amount to fund the Trustee Treasury Collateral Deposit is irrelevant. As explained with respect to the source of funds for the Purchase Option Price (*see* U.S. Br. at 29-30), if CED chose to use another source of funds it is a zero sum game, and would require an additional convoluted step of locating funds from another source, to then replace those funds with the $34,036,692 from the maturation of the Treasury STRIPS. The Court need not accept Plaintiff's assertion that CED would take this unneeded additional steps to fund the Trustee Treasury Collateral account when those funds are readily available, by design, from within the Transaction.

to pay the Final Basic Rent Payment if there is an unexpected rate on the date of funding of the Trustee Treasury Collateral.[42] (Pl. Br. 466).

G. *CED Even Protected Itself from Pre-Closing Risks*

Even before the closing, Plaintiff's return from the Transaction was, by design, protected from the impact of changes in interest rates or other factors. As explained in the United States' opening brief, the sublessee loan was one of these mechanisms. (U.S. Br. at 24, n.23). Further, EZH was aware that it was the party facing any remaining risk from changing interest rates prior to the closing, not CED. (JX 552; JX 396, Bates 8115). On page 81 of its brief Plaintiff acknowledges this protection, noting that CED's return was protected by adjustment mechanics prior to closing. (Pl. Br. at 81, citing Tr. 1070-72 (Holzman)).

H. *CED's Internal Evaluation of the RoCa3 LILO Transaction Confirms the Lack of Risk to CED*

CED evaluated the risks of the RoCa3 LILO Transaction in its contemporaneous documents. Those evaluations demonstrate the lack of any appreciable risk. Plaintiff offers a revisionist history of these evaluations and mischaracterizes several of the documents to manufacture risk where there is none. For example, Plaintiff's discussion of the risk spectrum CED utilized in connection with the briefing memorandum is inaccurate. (Pl. Br. at 122). Plaintiff relies on the direct testimony of Mr. DePlautt to assert that there were four levels of risk, high, medium, low and non-existent. (Pl. Br. at 122, citing Tr. 2107-08 (DePlautt)).

---

[42] Plaintiff does not explain how to reconcile the fact that the Trustee Treasury Collateral Account has a fixed rate established on the date of funding with its claim that "CED would then bear the risks and benefits of any further changes in interest rates between January 2, 2018 and February 24, 2041." (Pl. Br. at 178, 466). Plaintiff's claim is not only lacking in citation, but is erroneous.

However, when asked on cross, Mr. DePlautt acknowledged that there were only three levels of risk used in evaluating the RoCa3 LILO Transaction, high, medium and low.[43] (Tr. 2229-30 (DePlautt)). Thus, the labeling of risks as "low" in Plaintiff's briefing memorandum was effectively at the lowest level on the spectrum it was using.[44] And in our opening brief, we explained why some of the risks characterized by Plaintiff as low were in fact nonexistent.[45] (U.S. Br. at 53).

CED's June 1997 presentation on leasing discusses the possible risks to leasing transactions: credit, technology, and audit risks. (Pl. Br. at 45, citing JX 252, Bates 4732). As explained by CED's officers and directors, and the contemporaneous documents, the structure of the RoCa3 LILO Transaction eliminated any appreciable risk to Plaintiff stemming from EZH's credit (through the use of the defeasance accounts and letters of credit). (JX 1129) (noting that "risks are fully considered and covered with insurance (Treasury Securities and bank CDs)" in reference to the equity and debt defeasance accounts incorporated into the RoCa3 LILO Transaction). CED also was aware that the technology risk was similarly eliminated by these features as CED's return from the transaction was guaranteed independent of the operation of the

---

[43] The only other two categories identified by Mr. DePlautt were "open," which referred to a category that had not been assessed, and "n/a," referring to a category that was not relevant to this particular transaction (such as a risk involving the plant's construction where here the plant was already complete and operating). (Tr. 2229-30 (DePlautt); JX 363, Bates 7672-73).

[44] As explained in one of Plaintiff's internal memorandum, CED chose to participate in LILOs because it wanted to eliminate credit and residual value risks and instead focus on tax risks. (JX 1118). Further, Plaintiff acknowledges throughout its brief that the RoCa3 LILO Transaction was a low risk transaction. (*See, e.g.*, Pl. Br. at 45).

[45] If there was a nonexistent risk level as inaccurately claimed by Plaintiff in its brief, then surely Plaintiff would have characterized the currency risk to Plaintiff in such a manner. (*See* JX 397, Bates 8125).

RoCa3 facility. (U.S. Br. at 59-60, citing Tr. 2231-32 (DePlautt)). Indeed, this was consistent with Plaintiff's desire to focus only on tax risk and eliminate the credit and residual value risk normally present in traditional leveraged lease transactions. (JX 1118).

I. *Inappropriate Focus on Risk to EZH*

Plaintiff argues throughout its brief that both CED and EZH faced numerous risks as a result of entering into the RoCa3 LILO Transaction. First, many of those risks to EZH are those EZH would have borne in any event from operating the RoCa3 Facility if the Transaction had not occurred, such as maintenance or operational risks. Second, even those limited risks that EZH may face as a result of entry into the Transaction (*see*, *e.g.*, Pl. Br. 169, noting that EZH will have to repay the letter of credit in an event of default) are irrelevant to demonstrate CED possessed the burdens of a present leasehold interest. In short, it is CED's interest, not EZH's, that must be evaluated.

## III. CED's Primary Purpose for Entering into the RoCa3 LILO Transaction was Tax Benefits

A. *CED Entered into the RoCa3 LILO Transaction for the Tax Benefits*

As explained previously in the United States' opening brief, CED entered into the RoCa3 LILO Transaction to obtain the tax benefits from rent and interest deductions that exceeded the sublease rental income. (U.S. Br. at 121-22). Plaintiff does not dispute that it entered into the RoCa3 LILO Transaction for tax benefits[46]; however, it claims that this was not the primary

---

[46] Plaintiff claims that CED has always acknowledged that the RoCa3 LILO Transaction contains attendant tax benefits in addition to the other purported benefits it sought by entering into the Transaction. (Pl. Br. at 340). However, at least one of Plaintiff's witnesses, Eugene McGrath, former CEO of CEI, refused to acknowledge that tax benefits played any part of the RoCa3 LILO Transaction. (Tr. 227 (McGrath) (claiming CED never considered it a tax

(continued...)

reason for doing so. (Pl. Br. at 340). Plaintiff ignores the documentary evidence that asserts the tax benefits as the reason CED entered into the Transaction and the testimony of its own officers that without the tax benefits it would not have entered into the Transaction (*see* U.S. Br. at 121-22). For instance, Plaintiff's discussion of the briefing memorandum Brian DePlautt prepared in conjunction with Cornerstone presents an incomplete picture. (Pl. Brief at 120-21). Plaintiff omits one of the most critical portions of the briefing memorandum: a description of the actual transaction being contemplated, which includes, among other things the benefits CED expected to receive from the transaction.[47] (JX 363, Bates 7646-47). As explained in the United States' opening brief, the benefits identified were limited to:

1. Tax benefits from the deduction of allocated head lease rent,
2. Tax benefits from the interest deduction taken (derived from the interest paid on the nonrecourse debt), and

---

[46] (...continued)
advantaged transaction)). Given that this was the *only* benefit discussed at the October 1997 CEI board of trustees meeting over which Mr. McGrath presided when LILOs were discussed (JX 354, Bates 7500-01) and was identified as "tax-advantaged" leasing in several document provided to him contemporaneously (*see, e.g.*, JX 389, Bates 8022), Mr. McGrath's testimony is not credible on this point.

[47] On page 52 of its brief Plaintiff emphasizes the review of "near-term earnings and cashflows" from LILO transactions. Plaintiff conveniently leaves out the fact that Mr. DePlautt focused on the tax advantages of these transactions (JX 169, Bates 4189-90), and fails to explain that these near-term earnings and cash flows are generated by the tax benefits in this transaction. (*See, e.g.*, JX 330, Bates 7128 (showing in three far right columns that before the tax benefits there is no cash flow, but after taxes, the cash flow is equal to the tax benefits); Tr. 717-18 (Freilich) (stating that the Transaction would not have the front loaded earnings without the tax benefits); Tr. 850-51 (McCartney) (noting that the tax benefits enhanced the earnings from the Transaction)).

3. Actual cash-on-cash return of investment and profit received at the end of the term of the sublease agreement (via the increase in the STRIPS (*See* Tr. 2174-75 (DePlautt)).

(U.S. Br. at 122, citing JX 363, Bates 7647).

Similarly, when setting forth a discussion of the October 1997 CECONY Board of Trustees Meeting (Pl. Br. at 47-48), Plaintiff contends that CED presented a summary of its proposed leasing projects and its benefits and risks. Again on page 53 of its brief, Plaintiff appears to assert that at that October 1997 CECONY Board of Trustees meeting CED explained that it wanted to use lease transactions, because they would provide near term earnings, reasonable rates of return and market entrance into new countries.[48] (Pl. Br. at 53). This is not true. As explained in the United States opening brief at page 121, the only benefit CED mentioned to the board of trustees in connection with leasing transactions was the tax benefits that the transactions generate. (*See* JX 354, Bates 7501). As confirmed by Mr. McGrath, chairman of the board of trustees at the time, if something was important to CED/CECONY it would have made it into the board minutes and would have been in the presentations about the transaction. (Tr. 231-32 (McGrath)). Tellingly, the only benefit listed in these board minutes was the tax benefits.

B. *Plaintiff's Accounting Benefits Were Driven By The Tax Benefits*

Plaintiff attempts to avoid the impact of the tax benefits in its claim that CED entered into the RoCa3 LILO Transaction, because the transaction had a "pre-tax profit that was under

[48] As explained in the United States opening brief (U.S. Br. at 57-58 n.61), any reliance on Ms. McCartney's testimony concerning what benefits CED expressed to the Board of Trustees in seeking to obtain approval for the transaction is misplaced given her faulty memory.

FAS 13 front-loaded . . . into the early years of the transaction." (Pl. Br. at 9, 324). Plaintiff is only half correct. CED did enter into the RoCa3 Transaction for the front loaded earnings and cash, but, as explained in further detail in the legal argument, those were generated by the tax benefits. (Tr. 717-18, 720-21 (Freilich); *see also* Tr. 850-51 (McCartney); Tr. 1373-76 (Holzman) (acknowledging that the benefits of leveraged lease accounting in the EZH LILO Transaction are largely dependent on the tax deductions)).[49] (*See also infra* at discussing the impact of the taxes on the front loaded earnings). In none of the contemporaneous discussions of this concept identified by Plaintiff in its brief (Pl. Br. at 325-29) does the concept of the front loading of pre-tax profits arise. Thus, Plaintiff's assertion that CED sought "pre-tax" front loaded earnings is erroneous, and is contradicted by the CEO of Plaintiff who notes that they always evaluate projects on an after-tax basis. (Tr. 508 (Burke); *see also* Tr. 2154 (DePlautt); Pl. Br. at 259-63 (setting forth expert testimony that it is improper to look at a transaction on a pre-tax basis). If Plaintiff did not even examine the transaction on a pre-tax basis, then it could not have entered into the transaction for front-loaded pre-tax returns. As demonstrated throughout the United States' opening brief, the reality is that CED entered into the RoCa3 LILO Transaction for the tax benefits from the transaction, not the other reasons asserted by Plaintiff. (U.S. Br. at 122).

---

[49] Even if Plaintiff's explanation of the operation of the front loading of pre-tax earnings were correct, it does not explain why CED entered into the Transaction, because all of CED's officers who testified on the issue, including the CFO, Ms. Freilich, testified that the taxes drove the front loaded earnings. (Tr. 717-18, 720-21 (Freilich); *see also* Tr. 850-51 (McCartney)). Thus, an expert is wrong to suggest a possible reason for entering into the Transaction which differs from the understanding of the officers of CED. This is especially true when the expert lacks credibility and admits that the tax benefits, in part, generate the front loaded earnings, but cannot quantify the role taxes played. (Tr. 3653 (Weil)).

C. *There Was not a Reasonable Expectation of Residual Upside From the RoCa3 LILO Transaction*

1. <u>CED Understood that the Transaction is Designed so that the Purchase Option Would be Exercised.</u>

The transaction was designed such that CED would never have the opportunity to obtain any of the "upside" in the Retention Option or the shirttail period it claims were anticipated throughout its brief. *See supra* n.17. As explained in detail in the United States' opening brief and herein, the transaction was designed such that EZH would exercise its pre-funded Sublease Purchase Option. (U.S. Br. at 29-32). CED's own documents also reveal that it did not believe that it would ever attain this purported residual "upside." (*See* U.S. Br. at 71-76, 118-19). Plaintiff admits that it did no analysis of the potential returns from the retention period or the shirttail period and that the potential upside was not a focus of CED when it decided whether to enter into the RoCa3 LILO Transaction. (Tr. 2165-66, 2170 (DePlautt); Tr. 888-90 (McCartney)). Plaintiff asserts that booking a zero residual should not be used as evidence that CED did not expect a residual in its interest in the RoCa3 Facility. (Pl. Br. at 358-60). Plaintiff claims that CED was merely being conservative by booking a zero residual, and that it is improper to read anything else into Plaintiff's decision to book the transaction in this manner. (*Id.*). In addition to all of the evidence pointing towards the exercise of the Sublease Purchase Option, and CED's explanation that it chose LILO transactions so that it could avoid residual value risk (JX 1118), the decision to book a zero residual is simply one more factor demonstrating that it did not expect to benefit from any supposed residual in the RoCa3 LILO Transaction.

Plaintiff's reliance on *Johnson v. United States*, 11 Cl. Ct. 17 (1986) (*Johnson I*) at page 358 of its brief for the conclusion that accounting for zero residual is merely a conservative estimate of residual value is misplaced. Plaintiff suggests that a zero residual value was used in that case. To the contrary, while *Johnson I* does imply that it is better to be conservative than overstate potential residual, there is a distinct difference between assigning some value but in a conservative manner and simply not assigning any value at all. 11 Cl. Ct 17, at 35-36 (1986). In that case the conservative view being discussed by the Court was a residual value estimate of 5% in a downside scenario to 15% in an upside scenario, a projection the Court noted to be conservative as compared to the 20% demonstrated at trial. *Id.* Here, CED accorded no residual value to the Transaction so *Johnson I* is inapplicable in that respect.[50] In fact, the notable absence of testimony from Dr. Ellis concerning the use of zero specifically as a "conservative" estimate of residual value is telling. Plaintiff cites to Dr. Ellis' discussion during his direct testimony that it is common practice to conservatively book residual values. (Tr. 3167 (Ellis)). Plaintiff then points to a treatise to support the view that, specifically, a zero residual value is common. However, on cross-examination, Dr. Ellis admitted that none of the material he was relying on stated that a zero residual value was appropriate. (Tr. 3432, 3436 (Ellis) (noting that the learned treatises made reference to booking a low residual at some value, but not zero)).

---

[50] Unlike the taxpayer in *Johnson I*, who at least had the conservative estimate of residual value when entering into the transaction at issue in that case (to obtain at a later time the more accurate estimate relied upon by the Court), CED had no estimate of residual value when entering into the RoCa3 LILO Transaction, conservative or otherwise. At trial, the only evidence as to residual value was the Deloitte appraisal, which contained obvious errors and was never seen by Plaintiff prior to closing the Transaction. Moreover, Dr. LaRue stated that his examination of the residual values asserted in the Deloitte appraisal did not change his conclusion that there was no reasonable expectation that CED could realize a pre-tax economic profit from its investment. (U.S. Br. at 120, citing (Tr. 5124-25, 5363-64 (LaRue)).

Plaintiff then argues that it is possible to make reasonable estimates of future residual values, and points to the "detailed" estimate of cash flows Deloitte set forth in its appraisal. (Pl. Br. at 360). Plaintiff on the one hand points to the claimed $197,898,146.15 available to CED during the shirttail period to support its claim that there was indeed a reasonable expectation of residual value for purposes of its arguments concerning the leasing guidelines, but on the other hand wants this Court to accept that booking this same potential residual at zero is merely being conservative. Plaintiff cannot have it both ways. The more reasonable explanation in light of Plaintiff's assertions that such massive potential residual value exists in this period is that CED believed that the transaction would never reach this period in the lease because the Sublease Purchase Option would be exercised.

2. The Transaction Contains Numerous Disincentives that Temper the Possibility of the Retention Option

Even in the unlikely event EZH fails to exercise the Sublease Purchase Option, the Retention Option is not a realistic possibility. Plaintiff claims, without citation to any testimony or documents other than the Deloitte appraisal, that CED "expected" to receive significant cash flow if it exercised the Retention Option. (Pl. Br. at 362). As explained in detail below, because there is no evidence CED actually reviewed the Deloitte appraisal prior to entering into the RoCa3 LILO Transaction, and the officers and directors of CED unanimously acknowledge that they did no analysis concerning the Retention Option (Tr. 2165-66 (DePlautt); Tr. 889-90 (McCartney)), Plaintiff's' assertion that CED expected a residual value is inaccurate.

In fact, Plaintiff next claims, based on the Deloitte appraisal, that because the Retention Option is potentially CED's most profitable option, it is the option CED is most likely to select. (Pl. Br. at 362). Plaintiff's blind reliance on the Deloitte appraisal to the exclusion of the

testimony of CED's officers and directors and CED's contemporaneous documents which focus on the Renewal Option to the exclusion of the Retention Option renders Plaintiff's argument defective.

Further, Deloitte's conclusion ignores the terms of the Transaction bearing on financial analysis of the Retention Option, and its failure to include the impact of those terms in its analysis completely undermines this conclusion. Specifically under the Retention Option, CED would have to obtain financing to satisfy the outstanding HBU loan. (Stip. ¶ 180; JX 4, Bates 435; JX 7, Bates 623; Tr. 3940-43 (Bent); Pl. Br. at 462). At that point the outstanding loan would be equivalent to $116.2 million. (JX 8, Bates 666 (year 2018 balance)). Even putting aside whether CED could realistically obtain such financing, CED would start out the retention option period $116.2 million dollars in the red. (Tr. 3948-49 (Bent) (noting that CED would need to recoup a great deal of money)). The other key provision ignored by Deloitte is that even though the $274,922,794 portion of the Final Basic Rent Payment not covered by the Trustee Treasury Collateral Account or the offset from the Sublessee Loan obligation is non-recourse to CED, it would become recourse only to the extent CED profits from the operation of the RoCa3 Facility. (*See* U.S. Br. at 25; Pl. Br. at 465; Stip ¶ 260). The effect of this provision is to impose an enforceable obligation upon CED by making it personally liable for payment in cash to EZH of Final Basic Rent in an amount equal to the profits CED obtained from operation of the RoCa3 Facility during the shirttail period or lease period during the Retention Option, a result it could avoid if another option is selected.[51] However, because under the Sublease Renewal Option the

---

[51] In contrast, under the Sublease Renewal Option, CED does not have to pay off the HBU loan, and (if the walk away provision is exercised) CED does not have a true enforceable obligation to (continued...)

Lease Collateral Deposit[52] is designed to offset this portion of the Final Basic Rent Payment, any potential upside in the shirttail period would not necessarily be applied to the Final Basic Rent Payment under the provision creating a recourse obligation.

Therefore, CED would have to take at least the first several hundred million dollars it makes during the Retention Option and pay those to EZH on the Final Basic Rent Termination. Neither Deloitte (*see, e.g.*, JX 46, Bates 1578 (comparing only the potential revenues but ignoring the costs for each alternative)) nor Mr. Kelly (PX 10075, Bates 20167 (affirming Deloitte's analysis without regard to these costs)) has taken into account that to actually experience this "upside" during the Retention Option period, CED must make an amount of money that exceeds the amount sufficient to satisfy the new loan it must take out at the beginning of the retention option, as well as the non-recourse portion of the Final Basic Rental Payment (which it would otherwise have had no economic incentive to actually pay). *See BB&T*, 523 F.3d at 476 n.15 (noting that a non-recourse obligation which a party has no economic incentive to satisfy cannot be considered a true obligation). In fact, Mr. Kelly acknowledged that he had no idea what steps CED had to take in order to exercise the Retention Option. (Tr. 2837-39 (Kelly), and could not state whether CED's obligation to repay the HBU

---

51 (...continued)
pay EZH the Final Basic Rental Payment in cash because the profit under this option is not the result of the operation of the RoCa3 Facility. (*See* JX 722, Bates 12240 ("Although a portion of the second Head Lease payment due at year 43.2 is described as 'recourse' to the investor in the legal documents (Participation Agreement), there is no situation in which the Trustee[/Investor] would have to provide additional funding from outside the transaction to satisfy such obligation.")).

52 This is designed to be funded by EZH's own rental payments and in turn paid back to EZH as a portion of the Final Basic Rent Payment, meaning EZH has essentially funded this portion of the Final Basic Rent Payment itself. (DX 20194, Bates 25122; *see* Stip ¶ 243).

loan in order to elect the Retention Option would impact his conclusions because he did not know what the cash flows would be (*Id.*).[53] This failure renders both Deloitte and Mr. Kelly's conclusions unreliable on this issue and undercuts Plaintiff's claims that it would choose the Retention Option .[54]

D. *Plaintiff Has Failed to Prove that Other than Tax Benefits Plaintiff had a Legitimate Reason For Its Entry Into the RoCa3 LILO Transaction*

Plaintiff sets forth several other purported non-tax business purposes it claims imbue the RoCa3 LILO Transaction with subjective economic substance.[55] As explained in the United States opening brief (U.S. Br. at 60-62, 127-131) and below, Plaintiff's characterization of these purported benefits is inaccurate, and they do not satisfy Plaintiff's burden to demonstrate subjective economic substance.

1. Purported Entree into Europe

As explained in the United States' opening brief (U.S. Br. at 126-128), Plaintiff's argument that its foray into the Netherlands was related to its expansion into Western Europe is contrary to the evidence. Plaintiff relies on the testimony of Ms. McCartney (Tr. at 773

---

[53] This admission is particularly troubling in that Mr. Kelly was specifically retained by Plaintiff to evaluate the Deloitte appraisal and to understand the cash flows in the transactions (Tr. 2711, 2722 (Reed) (noting he relied on Mr. Kelly's analysis of the discounted cash flows in rendering his opinions)).

[54] The Court in *AWG* relied on similar errors in that case to discredit the Deloitte appraisal. *AWG*, 2008 WL 2230744, at *8 n.6, *33 (noting that in addition to methodology and calculation errors which render its discounted cash flows unreliable, Deloitte's conclusion with respect to the purchase option in that case relied on "unsupported assumptions."). That report was written by the same Deloitte employees that drafted the RoCa3 Facility appraisal. *Id.* at *8 (citing Mr. Ellsworth).

[55] Plaintiff relies heavily on the United States' expert Sam Ray to support its claims. However, as discussed below, this reliance is misplaced.

(McCartney)) for its assertion on page 48 of its opening brief that as part of its initial business plan CED was pursuing investments in Europe. However, none of the investments it then goes on to list (other than leases) were in Europe. (Pl. Br. at 48-57). Further, when asked specifically whether CED pursued any projects in Western Europe other than lease transactions, Ms. McCartney stated: "I don't think we looked at any - we didn't have any opportunities at that time [1997 through 1998] in Western Europe." (Tr. at 892 (McCartney)). As explained by Mr. Muoio, leases were not part of CED's initial business plan, which later evolved to include leases in the financial structuring aspect of its business. (Tr. at 1981 (Muoio)).

In addition, while Plaintiff relies on its expert, Dr. Goulding, to claim generally that a company like Consolidated Edison would have felt pressure to invest internationally and that European markets provided an excellent opportunity to do that (*see*, *e.g*, Pl. Br. at 238-39), this testimony contradicts the testimony of Mr. Muoio, President of CED. Mr. Muoio testified that the European markets were not an excellent opportunity for CED, because the competition and premiums being paid for investments rendered these investments undesirable from CED's perspective. (Tr. 1979-80 (Muoio)). In other words, Plaintiff is attempting to use an expert speaking generally, instead of focusing on the facts and experiences of CED that contradict this testimony. A major limitation to the usefulness of Dr. Goulding's opinions is that he speaks so broadly of investments in general, but ignores LILOs in particular. (Tr. 2490-96 (Goulding)). Dr. Goulding's testimony about a traditional investment in a power facility in the Netherlands cannot give legitimacy to the RoCa3 LILO Transaction. The active involvement of CED in its traditional infrastructure projects such as GENOR (U.S. Br. at 44-45), as compared to its passive, hands off approach to the RoCa3 LILO Transaction highlights this flaw in Dr.

Goulding's opinions. As pointed out by Plaintiff, when listing international projects that could generate strategic alliances, it listed EIF, IEP and its investments in China. (Pl. Br. at 334-335). It did not list its pursuit of LILO Transactions as a way to reach that goal.

In addition, contrary to Plaintiff's assertion with respect to the GENOR project in Guatemala, which it affirmatively represented it hoped would be "a foundation for future investments in the region" (Pl. Br. at 56), Plaintiff cannot point to such a claim in the documents with respect to its participation in the RoCa3 LILO Transaction. As explained in its opening brief, Plaintiff could not point to a single instance of CED attempting to use the RoCa3 LILO Transaction to enter into any other investments in the region, other than additional LILO and SILO transactions. (U.S. Br. at 127-28). Indeed, Plaintiff did not visit the RoCa3 Facility until after the Service began its audit of the Transaction, in preparation for the current litigation. (U.S. Br. at 62 and 83, citing JX 352).

Plaintiff asserts on page 69 of its brief that it believed the RoCa3 LILO Transaction would open the doors to other investments in the European markets. It relies on testimony of the current and former CEOs of CEI, not actual officers and directors of CED who authorized the transaction. Further, Mr. Burke (current CEO of CEI) clarified that he meant that pursuit of lease transactions would let others know it was interested in further leases, not international energy investments generally. (U.S. Br. at 60-61, citing Tr. 566-67 (Burke)). Ms. McCartney, chair of the board of CED at the time of the Transaction, admitted that she had no idea how CED would use the RoCa3 LILO Transaction to learn about the Netherlands. As explained in the United States' opening brief, this is consistent with the redline comments in the white paper stating "NOT MUCH OF A BENEFIT SINCE WE DO NOT PLAN ON DOING ANY OTHER

WORK IN THOSE COUNTRIES." (JX 383, Bates 7981). Plaintiff attempts to downplay these comments by stating that they are unattributed and do not appear in the final version of the white paper.[56] However, Plaintiff is unable to deny that the comment is consistent with CED's actual practice of not pursuing other types of work (other than tax motivated leases) in the Netherlands and the rest of Western Europe.[57] Thus, whether or not CED included the comment in the final version, it is in fact representative of its practices, and demonstrates in connection with the other evidence in the case, that CED had no plans for using the RoCa3 LILO Transaction to expand into the Netherlands or other parts of Western Europe.

Plaintiff claims that the list of 37 countries should not indicate it had no interest in pursuing investments in the Netherlands. (Pl. Br. at 60, 338). To support its argument, it sets forth several countries in which CED purportedly pursued investments in despite not being part of the 37 on the final list produced as a result of the Country screening process. (*Id.*). However, an examination of these selected countries demonstrates the fallacy of Plaintiff's claim. First, it lists the Netherlands. (*Id.*). Yet, the document on which it relies, JX 262, Bates 4978, refers to the NUON LILO Transaction in the Netherlands. This confirms that CED did not pursue traditional infrastructure investments in the Netherlands, just other tax shelters. (U.S. Br. at 60-

---

[56] Plaintiff neglects to mention that the United States sought, by way of a 30(b)(6) deposition, the identity of the author of these comments, but that Mr. Scher, the representative Plaintiff put forward to respond, testified that he was unable to identify the author. Given Mr. Scher's continuing credibility issues, it calls into question Mr. Scher's diligence in seeking the identity of the author, and further highlights the prejudice the United States has suffered by Mr. Scher's destruction of electronic records, which would have contained emails forwarding such redlined versions that the United States could have used to identify the author to elicit testimony on this subject.

[57] This plan is also consistent with CED's plan to become a tax shelter (LILO) promoter like an investment banker, as explained by Mr. Scher's memorandum. (JX 1231).

62, 126-128). Further, as explained in its opening brief, the country screening process was not intended to cover the United States. (U.S. Br. at 61 n.66). Finally, the citation it uses to claim CED was pursuing an investment in Indonesia, JX 159, Bates 4151, does not support the assertion Plaintiff makes. The only reference is to the failure of the Indonesian economy, and is in the context of CED's consideration of an investment in the Philippines. (*Id.*). What this exhibit does demonstrate is that when a non-leasing investment opportunity in a German refinery was brought to the CED board, the board rejected the potential investment as inconsistent in both scope and nature with CED's business plan. (*Id.*). Despite this, CED continued to investigate tax motivated leasing opportunities in Germany. (*See* JX 262, Bates 4978). Plaintiff's attempt to diminish the country screening process as evidence that it had no intention to pursue non-leasing investments in Western Europe actually supports the United States' argument.

Plaintiff also argues (Pl. Br. at 339-40) that its shift in overall business purpose to focus on the United States, Guatemala, and Central America in 1999 is not indicative of its motivations with respect to the RoCa3 LILO Transaction. Once again Plaintiff has only presented part of the picture. While the decision to refocus its investment strategy in isolation does not bear on CED's motivations, when paired with CED's decision to continue pursuing the NUON Transaction subsequent to this shift, as well as additional SILO transactions in Europe (*see* U.S. Br. at 62 n.67), demonstrates that the LILO transactions were not actually related at all to any potential expansion into traditional energy infrastructure projects in Europe. If that was a motivation of these transactions, then CED would have treated it consistently with its new

strategy instead of treating its LILO transactions as the exception to this pull-back from international transactions.[58]

2. Core Competencies

By weaving discussions of CED's core competencies throughout its brief (*see*, *e.g.*, Pl. Br. at 30, 42-43, 53, 58-59, 66, 69), Plaintiff attempts to associate the Transaction with them and give it legitimacy. As explained by Mr. McGrath, "[a]nd the third unregulated subsidiary was Con Edison Development, whose function was to use our expertise in generation, designing, building and managing and operating generation plants that we have learned over a lot of years outside of our service territory."[59] (Tr. 140 (McGrath)). Mr. McGrath truthfully explained that the expertise involved in Plaintiff's core competencies is "[t]he expertise of designing, building, operating all aspects of energy from its supply to its end use." (Tr. 155 (McGrath)).

But Plaintiff fails to show how those core competencies were connected to the Transaction to benefit CED. CED hired outside engineers to perform the engineering analysis of the RoCa3 Facility, instead of using its own internal expertise to perform due diligence. (JX 504). CED purportedly relied on Banc One Leasing Corp., and wanted to ride their "coattails" in

---

[58] Mr. Muoio testified that Mr. Madia was responsible for this aspect of CED's business. (Tr. 2033 (Muoio)). Mr. Madia had almost no involvement in CED's LILO Transactions (*see* JX 272, Bates 5336 to 5338 (outlining Mr. Madia's activities) and Mr. DePlautt had almost no involvement in the projects Mr. Madia pursued for CED (Tr. 2255 (DePlautt)). (*See also* Tr. 2033 (Muoio)). Tellingly, Plaintiff failed to present him as a witness at trial to explain how the LILO transactions fit within the line of business of which Mr. Madia oversaw – i.e., traditional energy infrastructure investments

[59] Mr. McGrath also explained it this way: "Con Edison Development is a subsidiary that we hope to be able to use to take our expertise in designing distribution systems and building power plants and things like that in other areas outside our service territory, and maybe other parts of the world." (Tr. 157 (McGrath)).

entering into the RoCa3 LILO Transaction. (JX 282, Bates 5490). In contrast with its active participation in other facilities in which it made in legitimate infrastructure transactions, CED did not participate in any way in the operation or oversight of the RoCa3 facility following entry into the RoCa3 LILO Transaction. (*See* U.S. Br. at 44-45). Plaintiff did not even visit the RoCa3 Facility until almost eight years after entry into the RoCa3 LILO Transaction. (JX 352). As explained by Mr. DePlautt, Plaintiff did not want to operate the facility (Tr. 2223, 2249 (DePlautt) (noting that it was not part of CED's plan to operate the RoCa3 Facility)), and made no effort to determine what would be necessary to do so. (*Id.* at 2223-24).

Plaintiff admits that CED pursued section 42 low income housing investments as part of its business plan. (Pl. Br. at 54). CED understood that these transactions were tax advantaged investments that were entitled to tax advantaged treatment under the Internal Revenue Code. (Pl. Br. at 54). Plaintiff relies on Mr. DePlautt's testimony claiming that it hoped to gain a public relations benefit from its participation in these transactions. (Pl. Br. at 55, citing Tr. at 2063-64 (DePlautt)). However, a review of CED's contemporaneous documents reveals that CED never discussed the possibility of this type of benefit. (*See* JX 197, Bates 4312; JX 238, Bates 4443; JX 252, Bates 4735; JX 160, Bates 4155). The only benefits CED discussed in connection with these transactions were the tax benefits and the ability to use these investments as a method to ameliorate the impact on CED when the LILO tax shelters it was considering were eliminated by the pending regulations. (*See*, *e.g.*, JX 360, Bates 7586; JX 160, Bates 4155; JX 198, Bates 4317; Tr. 808-10 (McCartney)). Plaintiff admitted these investments were not in the 'core competence' of CED. (Tr. 806 (McCartney); JX 1332, Bates 19251 (Mr. Tai, former board member of CED and member of corporate planning at CEI)). The fact that CED was willing to

invest in opportunities that were outside of its core competencies when the tax benefits could provide returns to it, coupled with Plaintiff's lack of involvement in any way in the RoCa3 Facility (*see* U.S. Br. at 82), highlights that it was the tax benefits that were the true selling point of the RoCa3 LILO Transaction, not the supposed leveraging of its core competencies.[60]

Tellingly, CED sought out help from the shelter promoter, Cornerstone, in developing a rationale it could present for pursuing LILO transactions. (JX 282, Bates 5487). Even after investing in the RoCa3 LILO Transaction CED was tried to create a post-hoc rationalization for how the LILO Transactions fit within its legitimate energy pursuits. (JX 1264 (requesting DePlautt to attempt to create a post-hoc rationalization for LILO Transactions and how they purportedly fit into CED's legitimate "anchor and cluster" pursuits); *see also* JX 1307, Bates 18588 (outline of meetings attempting to tie in "financial strategy," i.e. leases, with anchor and cluster strategy in May 1998)). The contemporaneous documents demonstrate these LILO Tax Shelters did not relate to CED's legitimate pursuit of energy infrastructure investments or the leveraging of its core competencies.

3. <u>Purported Public Relations Benefits</u>

Plaintiff asserts on numerous occasions that it was proud of the RoCa3 LILO Transaction, going so far as to assert that if the RoCa3 LILO Transaction is an abusive tax shelter "it must be the first transaction in the history of 'abusive tax shelters' to be

---

[60] CED didn't feel its experience with co-generation facilities and core competency in energy infrastructure projects could be used to provide an advantage in the RoCa3 LILO Transaction, since it retained Duke to perform the same type of evaluation that it supposedly had the expertise in house to perform.

contemporaneously highlighted in a public company's annual report."[61] (Pl. Br. at 336-37). However, numerous facts contradict Plaintiff's assertion that it entered into the RoCa3 LILO Transaction to boost its public image.[62] When asked whether CED thought about publicizing its involvement in the RoCa3 LILO Transaction as it was entering into the transaction, Mr. DePlautt could not recall ever having such discussions prior to closing of the transaction. (Tr. 2226 (DePlautt)). When discussing disclosure of the transaction to its shareholders, CED specifically noted that it only wanted to give "limited information" on the transaction with no mention of it being a leasing transaction. (JX 1280; JX 1283). Also of note is EZH's reaction to Plaintiff's initial attempt to include this limited information in a press release. Mr. DePlautt sent EZH a draft press release for the company's review. (JX 1280; JX 1283). EZH issued the following response, "For obvious reasons, we do not like any publicity regarding these kinds of financial transactions. . . . [W]e think we can accept much of the wording of version 1, but we object to the fact that you speak about an investment in the plant. We, therefore, suggest that you use in the heading: 'Consolidated Edison subsidiary participates in the refinancing of a Dutch Energy Plant' and in line 2 of the wording '. . . participates in the refinancing of a . . . near Rotterdam, the Netherlands.' In the third: please replace 'our interest in' 'Our financial participation in this plant.'" (JX 1282; JX 1279). Mr. DePlautt then discusses EZH's response in an email to Ms.

---

[61] This is simply hyperbole for which Plaintiff provides no support.

[62] On a related note, Plaintiff's assertions that it entered the Transaction because of supposed environmental benefits is similarly misplaced. As explained by Ms. McCartney, CED did not enter into the RoCa3 LILO Transaction because of any potential environmental benefits to CED. (U.S. Br. at 129, citing Tr. 910 (McCartney)). Further, any claim that it wanted to import the technology concerning the use of carbon-dioxide is a baseless claim (*see*, *e.g.*, Pl. Br. at 88). As Ms. McCartney explained, Plaintiff had no expectation that it could actually use this technology because it was selling off all of its generation assets. (Tr. 908-09 (McCartney)).

McCartney and states: "The confidentiality provision contained in the EZH project documents precludes the release of any information regarding the transaction." (JX 836). After discussions about the press release between EZH and CED, where EZH required that CED refer to its participation in the transaction as "providing capital," CED decided to forego issuance of the press release, and only made a passing reference to the transaction in its annual report, with no details of the transaction.[63] (JX 107, Bates 2961). As was noted by a representative of CED in the margins of one of the drafts of the proposed press release "How to handle questions" (presumably resulting from public release of Plaintiff's participation in the LILO transaction), the response should be that it was a "private investment can't reveal details." (JX 837, Bates 13300).

At the annual shareholder's meeting following entry into the transaction Mr. McGrath made only a cursory reference to the transaction and did not emphasize any of the supposed benefits Plaintiff could expect from the transaction, only stating that CED provided capital to a power plant in the Netherlands. (JX 857, Bates 13456). Even in its later annual report the mention of the RoCa3 Transaction was merely a brief reference that gave no explanation of the transaction or what Plaintiff hoped to gain from participating in the transaction. (*See, e.g.*, JX 107, Bates 2961). Thus, the evidence contradicts Plaintiff's claim that it was proud of the RoCa3 LILO Transaction. Plaintiff chose to provide only "limited information" to its

[63] Even with respect to Plaintiff's assertion that the inclusion of the reference to the RoCa3 Facility as one of the most environmentally friendly plants in the world was indicative of its belief that there were environmental benefits to investing in the facility, Ms. McCartney admitted that CED did not actually consider these in entering into the transaction and at most they were an after-the-fact story to be put into its Annual Report. (Tr. 910 (McCartney)).

shareholders concerning the Transaction, and kept its shareholders and the public in the dark as to the true nature of and motivations for entering into the Transaction.[64]

## III. Plaintiff Mischaracterizes its Involvement and Use of Due Diligence Conducted in Connection with the RoCa3 LILO Transaction

Plaintiff attempts to show that the "due diligence" performed by CED was extensive and similar to that utilized in traditional leveraged lease transactions. In fact, as explained in the United States' opening brief, Plaintiff's "due diligence" was simply an attempt to paper the Transaction with legitimacy, without regard to the true nature of the LILO Transaction. (U.S. Br. at 77). As explained in the United States' opening brief, there were errors contained in the appraisal, some of which either CED, or its advisor, Cornerstone, were aware of, and which were ignored in favor of proceeding to close with the RoCa3 LILO Transaction. (U.S. Br. at 70). There is no evidence that CED actually reviewed all of these reports in the period leading up to the closing of the RoCa3 LILO Transaction. These circumstances together demonstrate that the "due diligence" so heavily relied upon in Plaintiff's brief was window dressing to convince the Service that CED's participation in the RoCa3 LILO Transaction was legitimate.[65]

### A. *Plaintiff had Limited Involvement in Securing the Due Diligence*

The picture Plaintiff attempts to paint concerning its retention of various parties to assist it in entering into the RoCa3 LILO Transaction is contradicted by both contrary testimony and

---

[64] The Wall Street Journal Article Plaintiff relies on (Pl. Br. at 200, citing JX 858) makes only a cursory reference to an investment in the Netherlands and provides no details of the transaction or how it supposedly was good for Plaintiff's business.

[65] Papering the Transaction through reports from "independent" advisors was one way of making any challenges by the government "difficult to support or litigate." (*See* JX 397, Bates 8124).

documentary evidence.[66] On page 83 of Plaintiff's opening brief, Plaintiff claims it sought assistance from competent third party advisors to evaluate the RoCa3 facility in connection with the Transaction. It relies on Mr. Muoio's testimony (Tr. 1969-70) to support this claim. However, Mr. Muoio's testimony is based upon a "misunderstanding" of the facts of the case. As explained in the United States opening brief, EZH retained Duke, Deloitte and Tauw to perform the "due diligence" necessary to support the useful life and values used in the transaction, long before an investor (in this case CED) had been identified. (Tr. 1588 (Nieuwenhuis); Tr. 2171-72 (DePlautt); Tr. 2882, 2892-93, 2896 (Mintun); JX 940, Bates 14345; JX 20027; JX 20028; JX 1287; JX 1288). Further, much of the due diligence was conducted before an equity investor was selected by EZH. (*Compare* JX 52, Bates 813 (showing site visit occurred on October 16 and 17, 1997), *with* JX 298 (CED's bid was accepted on October 22, 1997); *See also* JX 53, Bates 2106 (Tauw site visits occurred on October 7 and 23, 1997); Tr. 1590-92 (Nieuwenhuis) (noting that he never spoke to anyone from CED until much of its due diligence had been performed)). As part of that process, CED agreed to use the previously retained engineering firm. (JX 298, Bates 5828). When asked whether he was aware of this, Mr. Muoio acknowledged that he was not aware that Duke and Tauw had already been engaged by EZH to evaluate the RoCa3 facility. (Tr. 2025-26 (Muoio)). Thus, Mr. Muoio provides no support for Plaintiff's claim it retained third party advisors such as Duke for

[66] On page 113 of Plaintiff's brief, Plaintiff asserts that nothing by the way of due diligence had been prepared when EZH accepted CED's offer to participate in the RoCa3 LILO Transaction. (Pl. Br. at 113). But Duke and Deloitte had already been retained by EZH by then and they had already made due diligence visits to the RoCa3 Facility. (*See* JX 46, Bates 1547 (Deloitte visited in August 1997); JX 52, Bates 1813 (Duke visited in mid-October 1997); DX 20027; DX 20028; Tr. 2892-93, 2984-85, 2996 (Mintun)).

deciding whether to enter into the Transaction.[67] Plaintiff presents no other evidence to support its claim, presumably because all the other evidence consistently demonstrates that Duke, Deloitte and Tauw were all retained by EZH prior to any equity investor being identified, and because each of these third party advisors began performing due diligence before CED ever reached an agreement with EZH to pursue the RoCa3 LILO Transaction. This "due diligence" was in large part to support the tax opinion letters. This can be demonstrated in part by the involvement by the tax lawyers and shelter promoters (Cornerstone here), were heavily involved in the drafting of these so-called "independent" reviews. (*See* Tr. 1801-02, 1805-06 (Ellsworth) (noting that in connection with its LILO appraisals Deloitte would have been provided a framework for the conclusions by tax counsel which it was expected Deloitte would provide the analysis to support and that Deloitte drafted portions of the appraisal together with tax counsel); JX 1029 (mark-up of appraisal sent from Plaintiff's tax counsel on March 17,1998, three months after Transaction closed); JX 1049 (mark-up of appraisal from Cornerstone, including changes to structure of the transaction sent on February 20, 1998, two months after the Transaction closed).

B. *Plaintiff's Assertions as to the Reasons for the Due Diligence are Misleading*

Plaintiff also claims that this due diligence was conducted with an eye towards operating the RoCa3 Facility. (Pl. Br. at 85-90). Similarly, on page 367 of Plaintiff's brief, it asserts that

[67] Mr. Muoio also testified that he assumed that CED went to a number of financial institutions and sought their participation in the RoCa3 LILO Transaction. (Tr. 2032 (Muoio)). Again, in reality CED had almost no involvement in selecting ABN AMRO (and its subsidiary HBU) to participate in the RoCa3 LILO Transaction, which was prearranged by Capstar and EZH. (U.S. Br. at 12, citing JX 401; Tr. 1273 (Holzman) (noting that he assumed Capstar, EZH's advisor, arranged for this)). Perhaps this faulty assumption is based on his understanding that in typical arms length transactions the party seeking to obtain the financing would be involved in the actual decision to use a particular financial entity.

"Securing all the rights necessary to operate the RoCa3 Facility was from, CED's point of view, a critical part of the negotiations." Oddly, Plaintiff relies on the testimony of Mr. Holzman, one of the promoters, to explain what was important from "CED's point of view," and not testimony from anyone employed by CED at the time. (Pl. Br. at 367). Indeed Mr. DePlautt, the lead individual at CED tasked with carrying out the Transaction (Tr. 1973, 2031 (Muoio)), directly contradicted Mr. Holzman. Mr. DePlautt testified that it was not in CED's business plan to operate the RoCa3 Facility. (Tr. 2223 (DePlautt).

Plaintiff describes the one-day site visit to the RoCa3 facility as "critical" to the due diligence process. (Pl. Br. at 87). However, this characterization doesn't fit the documentary evidence. There are no documents describing what, purportedly, was learned on the visit. There is no evidence the results of this visit were ever discussed at CED or CEI board meetings. There is no evidence the visit was "critical" to CED's evaluation of the Facility for any legitimate use. Once again, Plaintiff relies heavily on Mr. Holzman's hearsay characterization of why the various attendees at the one-day site visit were in attendance. (Pl. Br. at 87-88). For example, Mr. Holzman claims that Mr. Nieuwenhuis attended the site visit as part of Tauw's environmental analysis. (Pl. Br. at 88 (citing Tr. 1086-87 (Holzman)). However when Mr. Nieuwenhuis was asked, he contradicted Mr. Holzman, stating that the site visit was not part of the due diligence process and was really more of a meet and greet between the consultants, the investors, and their attorneys. (Tr. 1592 (Nieuwenhuis) ("A: No. What I remember of that meeting was that it was a kind of joint meeting with all kinds of parties involved. Q: Okay. So it wasn't a due diligence type meeting. A: No, no."). Plaintiff also claims there were

communications subsequent to the site visit between Harold Morrison,[68] an engineer at CED, and Duke (Pl. Br. at 88). However, Plaintiff does not cite to any documents memorializing that any such communications ever took place.[69] Similarly, Plaintiff relies on Mr. Holzman's hearsay testimony as to the involvement of counsel at the site visit. (Pl. Br. at 89). Instead of calling the attorneys as witnesses, Plaintiff used Mr. Holzman to make assertions about negotiations that took place involving counsel. (*Id.*). And despite Plaintiff's repeated claims that there were negotiations and revisions to the Operative Documents as a result of Ms. Bierman's suggestions, it never provided any documentary evidence to support that claim. For example, Plaintiff never provided any drafts of the Operative Documents that would demonstrate such negotiations actually took place and the provisions that were consequently revised. The lack of documentary evidence to verify these negotiations (the final Participation Agreement cannot demonstrate the addition or negotiation of terms when it is not compared to a version existing prior to the supposed negotiations),[70] render Mr. Holzman's testimony unpersuasive at best.

---

[68] Plaintiff, who bears the burden of proof, did not call Mr. Morrison as a witness at trial. Instead, it chose to have witnesses guess why Mr. Morrison went on the trip. (*See, e.g.*, Tr. 1081-82 (Holzman)). If his participation was important in demonstrating the legitimacy of the due diligence undertaken by CED, one would have expected Plaintiff to have called him as a witness. The same is true Dutch counsel Femke Bierman, discussed in this section.

[69] Plaintiff should not be permitted to claim such communications took place in light of Mr. Scher's failure to preserve documents as detailed in full in the United States brief in support of its spoliation claim. The burden is on Plaintiff, who has failed to produce credible evidence that these communications occurred.

[70] In fact, the NUON LILO Transaction participation agreement (JX 313, Bates 6388) contained an extremely similar provision as that in the RoCa3 LILO Transaction Participation Agreement (JX 1, Bates 36-37), demonstrating that it is a standard provision, and not a provision over which there was extensive negotiation.

Although not called as an expert, Mr. Holzman also provided testimony regarding the reason for due diligence in leveraged lease transactions generally. (Tr. 1093-94 (Holzman)). Plaintiff cites this general discussion to support its claim that CED used the site visit to ensure that the operative documents provided CED with all the rights necessary to sell its output from the RoCa3 Facility. (Pl. Br. at 87). However, this testimony was in direct conflict with testimony that the RoCa3 LILO transaction was not like typical leverage lease transactions (*See* U.S. Br. at 85 (citing Tr.3768-69 (Bent)) and the fact that, as demonstrated by, among other things, the knowledge of Brian DePlautt that CED was reasonably assured that the Sublease Purchase Option would be exercised, CED was not actually interested in having the rights to have the facility operated for its own account.[71] (U.S. Br. at 31, 76). Even if, hypothetically, EZH does not exercise the Sublease Purchase Option, Plaintiff's documents are clear that it never anticipated having the facility run for its own account: "If EZH did not purchase the plant at that time, CED would have the right to 'put' a lease back to CED, in effect forcing EZH to re-lease the Plant for an additional 17 years. At the end of this 'put' renewal lease CED could either lease the plant to a third party for 7 years or put the plant into storage. The CED base case

[71] To the extent Plaintiff is claiming that it wanted to make sure it had sufficient rights to operate the facility, the testimony of Mr. DePlautt demonstrates that CED had absolutely no interest in operating the RoCa3 Facility. (Tr. 2223-24 (DePlautt) (noting that it was not part of CED's business plan that it would ever be operating the RoCa3 Facility and that it had no plans demonstrating how it would actually operate the facility)). Further, because the provisions of the control documents essentially prohibited CED from inserting itself as operator of the RoCa3 Facility. (Stip ¶¶ 58, 267, 268 (because Banc One would possess a majority of the entitlement shares if EZH was ever removed as operator under the Operating Agreement); *see also* PX 10080, Bates 20408 n.9 (where Plaintiff's expert Mr. Reed acknowledges that Banc One's participation in the RoCa3 Facility may hinder CED's ability to actually operate the RoCa3 Facility if that was its intention)).

economics assume no economic benefit from this 7 year 'shirt-tail' period." (JX 257, Bates 4825-26). In short, CED was not interested in obtaining these rights for any purposeful use.

C. *Plaintiff's Reliance on the Deloitte Appraisal is Misplaced*

Plaintiff spends a large portion of its opening brief focusing on the Deloitte appraisal and the information contained in that appraisal. Contrary to Plaintiff's claim (Pl. Br. at 349) that the United States cannot show any problems with the appraisal, the government identified numerous flaws and inaccuracies that rendered it unreliable. (*See* U.S. Br. at 68-73). Plaintiff attempts to shore up these flaws in the Deloitte appraisal by citing Mr. Kelly's opinion that the information Deloitte relied on and the methodology it used to be "complete, adequate and relevant" and found that the "analyses, opinions and conclusions in the appraisal were appropriate and reasonable." (Pl. Br. at 349). However, Mr. Kelly's opinions were insufficiently supported, were based on some of the same errors Deloitte made, and were even contrary his own underlying analysis of how the Transaction should be evaluated. For example, as indicated by Mr. Kelly's calculations (PX 10075, Bates 20178), an important component of whether there is economic compulsion for EZH to exercise the Sublease Purchase Option is the financial consequence of that decision to EZH. Mr. Ellsworth admitted that as part of the appraisal he did not recall taking into account the consequences to EZH of not exercising the Sublease Purchase Option, and emphasized that this was not something that Deloitte was asked to include in its report. (Tr. 1768-69 (Ellsworth)). If Deloitte did not take into account the financial consequences to EZH of its decision concerning exercise of the Sublease Purchase Option it is unclear how it could legitimately conclude that EZH was under no economic compulsion to exercise the Sublease Purchase Option. Further, Mr. Kelly also admitted that he only looked at

one of the source documents Deloitte relied upon in rendering its report. (Tr. 2804-05 (Kelly)). These, and the other inadequacies with Mr. Kelly's report discussed herein,[72] completely undermine Mr. Kelly's conclusions that Deloitte's methodology and analysis were complete, adequate, appropriate and reasonable.

1. Deloitte Ignores the Pre-Funded Nature of the Sublease Purchase Option

As explained in the United States opening brief, even if the purchase price is greater than the expected fair market value of the property, Plaintiff's claim that EZH is unlikely to exercise the purchase option (Pl. Br. at 351) does not follow. As explained by Messrs. Bent and Mintun, the funds necessary for EZH to exercise the sublease purchase option were set aside at closing. (*See* U.S. Br. at 29). Mr. Ellsworth admitted that he was aware of the presence of the funds in an account for EZH to exercise the Sublease Purchase Option, but stated that this was not a factor included in his analysis. (Tr. 1797-98 (Ellsworth)). As noted by the Fourth Circuit in *BB&T*, this fact alone renders Deloitte's calculations with respect to EZH's decision to exercise the Sublessee Purchase Option meaningless. *BB&T*, 523 F.3d at 469, 473 n.13 ("This prediction plainly does not reflect the economic reality of the transaction, however, as BB & T supplied the funds for the purchase, and Sodra need not pay itself the Deferred Head Lease Payment. Because the "purchase" is free to Sodra, price cannot be obstacle.").[73]

---

[72] This lapse would probably explain why there were no calculations by Deloitte explaining its conclusions in this respect (Tr. 2810-12, 2831 (Kelly)); they would not support the outcome. It was much easier for Deloitte to simply conclude no economic compulsion existed without relying on any actual calculations then to explain away the fact that the calculations did not actually support the conclusion.

[73] This same flaw is also repeated in the analysis of both Messrs. Kelly and Reed who provided expert opinions on behalf of Plaintiff in this action. (*See* Tr. 2837 (Kelly); Tr. 2702-03 (Reed);
(continued...)

Further, Plaintiff's assertion ignores the evidence in the case concerning the exercise of the Sublease Purchase Option. (*See* JX 1142, Bates 16776 (DePlautt instructing CEI's independent auditor that exercise of the purchase option is reasonably assured because ". . . among the reasons are (a) [the] facility is a newly built key asset for the utility, (b) [EZH] has preplanned and done [its] economic analysis on the assumption that the plant will be purchased."); Tr. 2238-39 (DePlautt); JX 325, Bates 7032; JX 288, Bates 5648 (only mentioning the exercise of the purchase option); JX 390; JX 363, Bates 7674 (listing the failure of EZH to exercise the Sublease Purchase Option as a low risk to CED because of the fully defeased nature of the option); JX 324, Bates 7029; Tr. 3061-62 (Mintun); U.S. Br. at 31-32). Mr. DePlautt recognized the reality that both Plaintiff and Deloitte chose to ignore. EZH needed to retain the RoCa3 Facility at the end of the Sublease Basic Term and CED provided the funds to ensure that EZH could do so without expending its own funds.

2. <u>Deloitte Ignores the Non-Recourse Nature of the Final Basic Rent Payment</u>

Deloitte and Mr. Kelly incorrectly treat the totality of the Final Basic Rental payment as money that EZH would actually receive in the transaction if it chose not to exercise the Sublease Purchase Option. (*See, e.g.*, Pl. Br. at 350 n.69; PX 10075, Bates 20161). Only $141,671,596.40 of the Final Basic Rent Payment is recourse, and only to the extent the Trustee Treasury Collateral account is funded (which comes from CED's initial equity investment on the closing date). (*See* Stip ¶ 248). As Cornerstone explained to CED, "[a]lthough a portion of the second

---

[73] (...continued)
PX 10080, Bates 20411 (criticizing Dr. LaRue and Mr. Ray for considering the fact that the Sublease purchase option was prefunded in their analyses).

Head Lease payment in year 43.2 is described as 'recourse' to the investor in the legal documents (Participation Agreement), there is no situation in which the Trustee[/Investor] will have to provide additional funding from outside the transaction to satisfy such obligation."[74] ( JX 722, Bates 12240; *see also* Tr. 1294-95 (Holzman)). The Fourth Circuit recently explained in *BB&T* that while a non-recourse obligation in general should be treated as a true obligation, that is not the case where there is no economic incentive to repay that obligation. 523 F.3d at 476 n.15 (citing *Odend'hal v. Comm'r*, 748 F.2d 908, 912 (4th Cir.1984)). Because there is no economic incentive for CED to pay the non-recourse portion of the Final Basic Rent Payment, EZH could not realistically have an expectation of receiving the full Final Basic Rent Payment from CED. This is important because it directly impacts both Deloitte and Mr. Kelly's economic compulsion conclusions concerning the Sublease Purchase Option.[75] Essentially it decreases the cost to EZH of exercising the Sublease Purchase Option because EZH is not foregoing the entirety of the Final Basic Rent Payment, which is a major factor in the economic compulsion analysis. (*See* PX 10075, Bates 20164 (Chart 2) & 20178 (Step 2, Lines 9-11)). The result of this decrease makes it more economically appealing to EZH to exercise the Sublease Purchase Option. By properly taking this into account, Deloitte and Mr. Kelly's conclusions that (1) EZH is under no economic compulsion to exercise the Sublease Purchase Option and (2) that the net

[74] The United States' expert Mr. Bent confirmed this understanding, stating, "ConEd does not pay that amount out of its pocket and does not pay anything further into this deal after its initial equity investment of $39 million." (*See* Tr. 3920-21 (Bent)).

[75] As conceded by Mr. Kelly, despite that Deloitte was willing to offer a conclusion on economic compulsion, Deloitte did not perform any calculations to support that conclusion. (Tr. 2810-12, 2831 (Kelly)).

Sublease Purchase Option Price exceeds the expected fair market value of CED's lease interest on January 2, 2018 are shown to be incorrect.[76] (Pl. Br. at 350-51).

---

[76] Dr. Thomas also refers to this in his rebuttal of Mr. Kelly's report explaining that the net benefit of EZH exercising the Sublease purchase Option would be increased (i.e. its economic incentive to exercise the Sublease Purchase Option) to the extent EZH did not receive all of the Final Basic Rent Payment. (DX 20201, Bates 25365). This can be demonstrated by making a single adjustment to Mr. Kelly's calculations to exclude the non-recourse portion of the Final Basic Rent Payment not covered by the Sublessee Loan offset. Specifically, on Exhibit JPK_1, Schedule 2, step 2, Mr. Kelly includes the number $159,822,870 on line 10 as the foregone value of the Final Basic Rent Payment to EZH. (PX 10075, Bates 20178 (also seen on Bates 20164)). He arrives at this value using the calculations on Exhibit JPK_1, Schedule 2b. (*Id.* at Bates 20180). The following is a replication of that table:

| Line | Item | Amount | Date | Notes/Bates Reference |
|---|---|---|---|---|
| 1 | Future Value | 831,525,734 | 2/24/2041 | Value - PF000381; Date - PF000168 |
| 2 | Years | 23 | | (Line 1- Line 4)/365 |
| 3 | Rate | 7.28% | | Dec. 8, 1998 Moody's<br>Baa Debt rate (see, PF001733) |
| 4 | Present Value | 159,822,870 | 1/2/2018 | =Line 1* (1/(1+Line 3)^$^{\text{Line 2}}$) |

By adjusting the input under Amount on Line 1 to reflect the non-recourse portion of the Final Basic Rent Payment not addressed by the Sublessee Loan (*see* Stip ¶¶ 246, 248, 257-259) ($831,525,734 - $414,931,341 - $141,671,596 = $274,922,797) the present value in Line 4 is decreased significantly. If the $274,922,797 non-recourse portion is subtracted from Mr. Kelly's $831,525,734 figure from Line 1 above the calculation is as follows:

| Line | Item | Amount | Date | Notes/Bates Reference |
|---|---|---|---|---|
| 1 | Future Value | 556,602,937 | 2/24/2041 | Value - PF000381; Date - PF000168 |
| 2 | Years | 23 | | (Line 1- Line 4)/365 |
| 3 | Rate | 7.28% | | Dec. 8, 1998 Moody's<br>Baa Debt rate (see, PF001733) |
| 4 | Present Value | 108,219,943 | 1/2/2018 | =Line 1*(1/(1+Line 3)^$^{\text{Line 2}}$) |

If the Court were to insert this number of $108,219,943 into Kelly's calculations on line 10 of (continued...)

Dr. Thomas points out additional errors with the calculations performed by Mr. Kelly with respect to economic compulsion. In his report, Dr. Thomas explains that because Mr. Kelly used an improper discount rate when determining the present value of the Final Basic Rent Payment, Mr. Kelly overstates the foregone value by $24.7 million. (DX 20201, Bates 25365; Tr. 4540-42 (Thomas)). By using the appropriate discount rate, Dr. Thomas demonstrates that using Mr. Kelly's calculations at JPK__1, Schedule 2 of his report (PX 10075, Bates 20178), EZH would actually be economically compelled to exercise the Sublease Purchase Option when compared to the Retention Option, and the difference when compared to the Sublease Renewal Option is exceedingly small. (DX 20201, Bates 25365; Tr. 4540-43 (Thomas)). These errors demonstrate that even if the Court chooses to ignore the pre-funded nature of the Sublease

---

[76] (...continued)
Step 2 of his calculations on page 20178 of his report, the result would significantly change, with EZH being economically compelled to exercise the Sublease Purchase Option.
Because the costs to EZH would now be $320,412,755 (from adding $212,192,812 to $108,219,943), as compared to the benefits as calculated by Mr. Kelly, the change would now be a net benefit to exercise the Sublease Purchase Option of $25,711,417 in the case of the Sublease Renewal Option and a net benefit to exercise the Sublease Purchase Option of $44,838,454 in the case of the Retention Option, thus demonstrating economic compulsion in either scenario.

Further, this figure also caries over into step one of Mr. Kelly's calculations on page 20178 of his report and would result in the Net Sublease Purchase Option Price (line 1 of Step 1) being reduced from $223,490,258 to $171,887,331 (212,192,812 +108,219,943 -148,525,424). This would result in the "Net Sublease Purchase Option Price" now being $33,667,509 *less* than the "PV of Con Ed's remaining interest in the lease as of 1/2/2018" (JX 10075, Bates 20178), resulting in economic compulsion to EZH to exercise the Sublease Purchase Option under the so called "Step 1" approach employed by Deloitte as discussed by Mr. Kelly. (*See* PX 10075, Bates 20160, 20165 "Comparison of the Sublease Purchase Option price to Residual Value").

These calculations are consistent with Mr. Mintun's explanation that as advisor to the tax exempt entities in these transactions (who have no vested interest in the results of the economic compulsion test presented to the Court) he has advised them that it is in their economic interest to exercise the purchase option. (Tr. 3060-62 (Mintun)).

Purchase Option, the calculations Plaintiff uses to claim that there is not economic compulsion to exercise the Sublease Purchase Option are severely flawed.

3. <u>CED Did Not Actually Rely on the Deloitte Appraisal in Entering the Transaction</u>

Setting aside the reliability of the Deloitte appraisal, there is no evidence that anyone at CED relied on it before CED entered into the RoCa3 LILO Transaction. The uncontradicted documentary evidence shows that the final appraisal was not sent to CED until at least February, 1998 – after the closing. (JX 1049; JX 1029 (sending a "final draft" markup in March 1998). Furthermore, Plaintiff had no draft appraisals in its files. The only drafts obtained by the United States (from sources other than Plaintiff) provide no indication that CED ever received copies of them. (*See*, *e.g.*, JX 896; JX 1049). Plaintiff claims that Mr. Ellsworth sent a draft appraisal to CED prior to the closing (Pl. Br. at 97, citing Tr. 1642-43 (Ellsworth)). The transcript reveals, however, that Mr. Ellsworth never made such a statement. (*See* Tr. 1642-43 (Ellsworth)). Further, there is no credible testimony that the contents of any draft appraisal were even

discussed with CED.[77] Quite simply, Plaintiff has not met its burden of demonstrating that anyone at CED ever saw the appraisal before CED entered into the RoCa3 LILO Transaction.[78]

Plaintiff's claims that the Court should focus on whether the lessor's (here CED) expectations concerning residual value and residual life were reasonable (Pl. Br. at 349), are misplaced. CED had not seen the Deloitte Appraisal and therefore did not have expectations based on the Deloitte appraisal when it entered into the RoCa3 Transaction.

Plaintiff's claim that it obtained the appraisal to make sure that it did not overpay for the asset (Pl. Br. at 78), is a *non-sequitur*, since it did not see the appraisal prior to closing.
In any event, it was in Plaintiff's interest to have the largest possible rental payment obligation, as that would generate the greatest tax benefits. (*See* Tr. 4476 (Thomas)). At most, Plaintiff entered into the Transaction with an understanding that Deloitte would provide an appraisal that would support the constraints used in the Transaction and would provide the necessary support

---

[77] Ms. McCartney implies that Plaintiff had reports from the outside consultants and that the final approval of the transaction by the CED board on December 10, 1997 would have been the culmination of the review process. (Tr. 793 (McCartney)). However, the evidence reveals that Ms. McCartney's recollection is again faulty on this matter, because there is no documentary evidence that CED received copies of these reports at that time. (*See* JX 52, Bates 1802 (Duke Report dated December 17, 1997); JX 896 (Correspondence forwarding draft of Duke Report from Duke's files (CDU bates), no evidence ever sent to CED); *see also* Tr. 531-32 (Burke) (noting that although he knows they had reports done he does not recall ever seeing them)). Further, the only evidence concerning the report of Tauw being provided to CED is JX 53, which was sent on January 14, 1998, one month after the transaction closed. (JX 53, Bates 2086). The Deloitte appraisal conclusion letter was not sent to CED until January 30, 1998 (JX 602 (*see* fax line) and the appraisal was still not completed as of February 1998 (JX 1049). Indeed Deloitte was not even retained by Plaintiff until January 8, 1998. (JX 1024, JX 1097). Ms. McCartney does not actually state that she reviewed these reports prior to the closing. (*See* Tr. at 793 (McCartney)).

[78] Thus, for example, Plaintiff's assertion at page 71 of its opening brief that the deregulation discussion in the appraisal was somehow important to CED is unsupported.

for the tax opinion issued by Shearman & Sterling. (*See* Tr. 1978-79 (Muoio); JX 1097, Bates 16226 (noting that the report will be used by CED and tax counsel in analyzing the tax consequences of the RoCa3 LILO Transaction); *see also* Pl. Br. at 75-76 (listing some of the constraints including value of the asset and leasehold interest)).

## IV. Other Areas in Which Plaintiff has Ignored or Misrepresented the Facts of the Case

### A. *EZH Operated the Facility as Before*

Plaintiff claims that EZH's circumstances have changed appreciably as a result of entering into the RoCa3 LILO Transaction. (Pl. Br. at 13-14, 158, 384). The facts reveal otherwise. (U.S. Br. at 2, 96-97; Tr. 3717 (Bent)). As explained in the United States' opening brief, many of the maintenance requirements contained in the Operative Documents are essentially the same as those undertaken and performed by EZH prior to entering into the RoCa3 LILO Transaction. (U.S. Br. at 10, n.8). Similarly, EZH was required to maintain insurance of the type and amount it already maintained on its other facilities.[79] (*Id.*). As to the Transaction's so-called reporting requirements, EZH only had to send a copy of the annual report it already prepared for other purposes, and it only had to send certain reports if it prepared them in the normal course of its business. (*Id.*). Plaintiff asserts without citation that the RoCa3 LILO Transaction would impose substantial restrictions on EZH's ability to divest itself of the RoCa3 Facility. (Pl. Br. at 384). Plaintiff has simply not met its burden to demonstrate that this is true. Despite presenting testimony from an expert with extensive knowledge on the global electricity

---

[79] Contrary to Plaintiff's claim, there is no real risk that EZH may default due to the unavailability of insurance for certain types of assets. (Pl. Br. at 159). The Operative Documents only require EZH to obtain insurance of a kind similarly available to its other facilities. Thus if an insurer were to stop offering insurance on certain types of facilities, it would not result in a default. (Tr. 2949-50 (Mintun); JX 4, Bates 417).

market (Tr. 2488 (Goulding)) and an expert purporting to possess extensive knowledge concerning the buying and selling of power plants (Tr. 2580 (Reed)), Plaintiff failed to ask either of these individuals to comment on the actual impact these claimed restrictions would have on the ability of EZH to sell the RoCa3 Facility. There is simply a failure of proof on this issue.[80]

B. *CED Experience*

Plaintiff claims that CED had little experience with leveraged lease transactions prior to considering the RoCa3 LILO Transaction, and that it needed Cornerstone's assistance because it did not understand leveraged leases. (Pl. Br. at 65). Plaintiff relies on testimony by Mr. Holzman as to what CED's knowledge base was, ignoring CED officers' testimony as to the scope of that experience. Mr. Muoio, president of CED at the time, acknowledged that he had numerous years of experience with financial structuring (Tr. 1996 (Muoio)), and explained that Mr. DePlautt had good experience in financial structuring, including leasing. (Tr. 1946 (Muoio)). The officers of CED did have experience with leveraged leases. What they did not have was experience with LILO tax shelters. Plaintiff needed the help of Cornerstone (a tax shelter promoter) to help arrange this type of transaction.[81]

---

[80] This is especially true given that the RoCa3 Facility is now run by E.ON, who has simply stepped into EZH's role in the Transaction with no negotiation with Plaintiff. (*See* JX 292; JX 293; JX 294).

[81] Plaintiff also claims that it wanted Banc One as a partner in the RoCa3 LILO Transaction so that it could learn from and rely on its expertise. (*See*, *e.g.*, Pl. Br. at 80). However the documentary evidence does not correspond with this assertion. There are no documents in the record indicating any communications took place between CED and Banc One. The real reasons for seeking their participation were that CED, as a new entity, could not get access to sufficient capital to be the sole equity investor in the Transaction (*see* JX 282, Bates 5488 (noting that CED only had about $33.5 to $33.9 million to invest)). Because Banc One had already entered into a LILO with EZH, CED could simply ride on the coattails of Banc One to obtain the tax

(continued...)

C. *Summary of Experts*

Plaintiff introduced testimony from five experts. Many of Plaintiff's experts did not offer opinions directly related to the Transaction.[82] Mr. Goulding was not even asked to examine this transaction,[83] but instead only to discuss whether a hypothetical company like Plaintiff would enter into a hypothetical transaction, which may or may not have been this transaction.[84] (*See* Tr. 2490-96 (Goulding)). Dr. Ellis was asked to identify similarities (but not differences) between the sublease portion of the EZH LILO Transaction and a traditional leveraged lease and without examining the transaction as a whole.[85] (Tr. 3372-75, 3377 (Ellis)). Dr. Weil discussed FASB accounting in general. [86] (Tr. 3519-33 (Weil)). Mr. Kelly reviewed the Deloitte report and,

---

[81] (...continued)
benefits it sought. (JX 282, Bates 5490).

[82] With respect to each of its experts, Plaintiff limited its experts' access to relevant documents and testimony and each expert admitted that they relied upon Plaintiff's counsel to explain the transaction to them (except Mr. Goulding, who did not review many of Plaintiff's documents since, presumably, he was offering an opinion on a hypothetical company and transaction). (*See* Tr. 2494, 2526-29 (Goulding); Tr. 2683, 2700-01, 2704-05, (Reed); Tr. 3394 (Ellis); Tr. 3609-18 (Weil)).

[83] Similarly, Dr. Weil offered an opinion that the leveraged lease accounting for this transaction would result in earnings smoothing for Plaintiff, despite the fact that Dr. Weil (or his support company) never reviewed Plaintiff's financial data. (Tr. at 3644 (Weil)).

[84] On cross-examination, Mr. Goulding admitted that the hypothetical company would immediately have the ability to run the plant a fact not present in this transaction. (Tr. 2510-12 (Goudling)).

[85] As explained in the United States' opening brief, during cross-examination Dr. Ellis admitted to several differences, including many that were relied upon by Mr. Bent to determine that Plaintiff had stripped out all the true benefits and burdens of leasing. (U.S. Br. at 83-85).

[86] In fact, it was revealed that many of the calculations contained in Dr. Weil's report were created by a company at the direction of Plaintiff's counsel that relied upon Plaintiff's counsel's explanation of the transaction, including a memo that described the transaction. (Tr. 3599-605,
(continued...)

although finding numerous errors, nonetheless found the report to be complete, relevant, and reasonable. (PX 10075, Bates 20129; Tr. 2812-13 (Kelly)).[87] Mr. Kelly admitted that he only looked at one of the many source documents Deloitte purportedly relied upon in rendering its conclusions (Tr. 2804-05 (Kelly), yet was still was able to opine that Deloitte's analysis and methodology was reasonable and complete. Dr. Reed was asked whether he could say with "virtual certainty" (defined as 98%-99% certainty) that EZH would exercise the purchase option, but he did not consider the prefunded nature of the Sublease Purchase Option in his analysis. (*See* Tr. 2582, 2699 (Reed); *supra* n.16).[88]

Plaintiff also relies on Robert Holzman, a tax shelter salesperson with Cornerstone, with respect to testimony beyond his personal knowledge and which is contradicted by the record. As explained above, the reason CED consulted him was to understand tax avoidance transactions, not leasing in general. Mr. Holzman was instructed not to read documents until after his deposition in an attempt to hinder the government's deposition examination. (Tr. 1248-49

---

86 (...continued)
3618 (Weil)).

87 Mr. Kelly admitted that he was not asked to look at the actual impact of any potential noneconomic factors on EZH's decision to exercise the Sublease Purchase Option, noting that his assignment was limited to an examination of economic compulsion only. (Tr. 2831-32 (Kelly)).

88 As explained above, *supra* n.16, Mr. Reed also did not review his staff's model to ensure that it accurately reflected the Deloitte information. (Tr. at 2713 (Reed)). Nor did he consider the source of the funds in his evaluation of the purchase option, but instead relied on Plaintiff's litigation counsel's explanation, including for the misconception that EZH had complete and unfettered access to the amount in the Equity Defeasance Account if does not exercise the purchase option. (Tr.2704-07 (Reed)). Mr. Reed admitted this factor could impact his opinions. (Tr. 2707 (Reed)). As acknowledged by Plaintiff in its own brief, this is incorrect. (Pl. Br. at 464, 467). The funds in the Equity Defeasance Account are required to fund EZH's free cash obligations to CED towards the end of the lease term. (U.S. Br. at JX 19, Bates 971-73; U.S. Br. at 21-23).

(Holzman)). He was paid $750 an hour by Plaintiff to serve as a fact witness (Tr. 1246 (Holzman)), and testified to defend his company's activities.

Plaintiff cites the United States' expert Mr. Ray for several propositions, including many beyond his area of expertise[89], and for legal conclusions that are the province of this Court. For example, he was asked whether leasing to a party with good credit has enough risk to impart economic substance on the Transaction. (*See* Pl. Br. at 149, 227, 257, 394, 403). Mr. Ray's testimony was not as clear as Plaintiff claims. While Mr. Ray agreed that some of the business purposes Plaintiff claimed, if true, could be a legitimate reason for pursuing an investment in the Netherlands generally, he pointed out that he did not believe that the evidence demonstrated that the RoCa3 LILO Transaction was for such purposes. (Tr. 4930 (Ray) (noting that a purported reason of forging relationships to open the door to further opportunities may be legitimate in and of itself, but that it is unclear how the RoCa3 LILO Transaction would actually do that); Tr. 4934 (Ray) (noting that the purported reason of diversifying geography, while a legitimate reason for a transaction in general, appeared to apply to traditional infrastructure transactions and not to leasing transactions)). In fact, in his report Mr. Ray specifically stated, "I conclude that the tax treatment and the resulting accounting treatment are the only reasons Plaintiff

---

[89] To the extent Plaintiff relies on Mr. Ray's understanding of the Operative Documents and the structuring and mechanics of the Transaction (*see, e.g.*, Pl. Br. at 175), the Court should note that the United States' expert Mr. Bent, was the expert proffered by the United States in this regard. (Tr. 3683 (Bent)). In fact, Mr. Ray acknowledged that he relied on Mr. Bent's understanding of the Transaction and did not do an independent reconstruction of the mechanics. (Tr. 4708 (Ray) (noting that Mr. Bent wrote the section describing the mechanics of the Transaction)). Further, the structure of the transaction was not an integral component of many of Mr. Ray's opinions. In sum, especially where Mr. Ray's understanding varies from the terms of the Operative Documents, Plaintiff places undue emphasis on Mr. Ray's understanding of the operation of the Transaction.

entered into the RoCa3 transaction." (DX 20195, Bates 25195). Mr. Ray opined that CED would not have entered this transaction were it not for the tax benefits.[90] (*Id.*, Bates 25200).

Similarly, Plaintiff relies on Mr. Ray to argue that while CED's contemporaneous documents state that it is likely EZH will exercise the Sublease Purchase Option, a lot of things could change before then and thus there is no way to know what EZH will decide. (Pl. Br. at 217, 414, 449-51, 16). However, one of the main conclusions in Ray's report was that it would be reasonable for EZH to exercise the Sublease Purchase Option based on non-economic factors present in the Transaction.[91] (DX 20195, Bates 25191-92). He also opined in his rebuttal report that EZH would likely exercise the Sublease Purchase Option. (DX 20202, Bates 25385; *See also* Tr. 4753 (Ray)). In fact, Mr. Ray pointed out that CED's analysis was based upon exercise of the purchase option. (Tr. 4757-58 (Ray)). Plaintiff also cites Mr. Ray for the proposition that CED's operations risk is/might be higher than indicated on the risk matrix (Pl. Br. at 217). Yet Mr. Ray opined in his report "It is my opinion that the only risk Plaintiff had in this transaction is that its tax treatment would not be upheld." (DX 20195, Bates 25193).

## ARGUMENT

### I. Introduction

Plaintiff is not entitled to the tax sheltering benefits it has claimed. The Transaction as a whole reveals that CED did not in substance acquire a present leasehold interest in the RoCa3 Facility. Plaintiff also not incur a genuine indebtedness or obtain a benefit from the use or

---

[90] Mr. Ray also concluded that the lack of inspections or visits by CED subsequent to the closing led him to believe Plaintiff only entered the transaction for the tax benefits. (Tr. 4749 (Ray)).

[91] Including the fact that the Sublease purchase Option was fully funded, a primary consideration for the Court in *BB&T* as well.

forbearance of money. During the taxable year in issue, Con Ed did not enjoy the benefits and burdens of owning an interest in the RoCa3 Facility had no debt or equity risk capital committed to or invested in the RoCa3 Facility, and possessed at most a contingent future interest in property akin to but even more ephemeral than an option.

In the alternative, the Transaction should be disregarded under the economic substance doctrine because it does not have a reasonable expectation of profit existing outside of the tax benefits and was not motivated by a valid non-tax business purpose.

## II. Substance Over Form vs. Economic Substance

Before trial, the parties agreed that there were three issues to be resolved in this case:

(1). Whether the form of the Transaction will be respected for federal tax purposes.

(2). Whether the loan by Hollandsche Bank-Unie N.V. to Plaintiff constitutes bonafide indebtedness and should be respected for federal tax purposes.

(3). Whether the investment by Con Edison NY in the EZH lease and sublease transaction which closed December 15, 1997 (the "EZH Lease Transaction") has economic substance.

(Joint Statement of Issues Law, Dkt. # 54). The parties have agreed that Plaintiff has the burden of proof on each of these issues.[92] (*Id.*).

---

[92] Despite this, Plaintiff repeatedly argues that the government has failed to present evidence to support its case. In fact, Plaintiff goes as far as to say, "Con Edison deducted $9,698 in transaction costs allocated to 1997. (Stip ¶ 300). Defendant has not made any separate arguments regarding these transaction costs and has not challenged this amount, but presumably claims that they are not deductible based upon its substance/form and economic substance theories." (Pl. Br. at 1-2). While the government believes that there is ample evidence in the record to show that Plaintiff's transaction should be disregarded, the burden is, in fact, on Plaintiff to prove that it is entitled to each and every deduction and to prove that its transaction possesses substance. *Coltec*, 454 F.3d at 1355-56.

These three questions are based upon two legal doctrines: (1) Substance over Form and (2) Economic Substance. Each doctrine requires an analysis, which focuses on different factors. Despite this, Plaintiff's brief combines the two separate doctrines erroneously as the economic substance doctrine citing facts and authority, both relevant and irrelevant, from both issues interchangeably. To avoid confusion, it is necessary to describe the history of and differences between the doctrines.[93]

A. *The Doctrines*

There often is more than one way to consummate a business transaction. The business result may be the same, but the tax consequences may differ depending on which method the taxpayer chooses. Taxpayers and their financial advisors naturally endeavor to creatively structure such economic affairs in ways which produce the most favorable tax consequences. As Plaintiff correctly states, taxpayers have the right to do so. However, there is a limitation: a transaction that has no economic substance or engaged in for the sole purpose of generating tax

---

[93] Courts have applied a number of common law doctrines in an attempt to determine whether the form chosen for particular transactions are in accord with their substance, and whether the substance of the transactions support the specific tax benefits claimed by the taxpayer. These common law doctrines include, but are not limited to, the substance over form doctrine, the step transaction doctrine, the economic substance doctrine, the sham transaction doctrine (including both "shams in fact" and "shams in substance"), and the business purpose doctrine. While related in origin, each of these doctrines asks different questions and requires distinct proofs. As will be more fully explained below, since *Frank Lyon*, 435 U.S. 561 (1978), taxpayers attempting to claim tax benefits in connection with leveraged leasing and sale/leaseback transactions have been required to "clear" two distinct "hurdles": proving that their transaction, in whole or in relevant part, is not an "economic sham" and proving that if their transaction has some economic reality or substance, that substance comports with the transaction's form and provides support for the specific tax benefits claimed by the taxpayer. *BB&T*, 523 F.3d 461; *AWG*, 2008 WL 2230744; *TIFD III-E, Inc. v. United States*, 342 F. Supp. 2d 94, 108 (D. Conn. 2004). To be fair, the courts have not always been clear as to the boundaries of these doctrines or their relationships to each other. Nor have they consistently articulated the purpose served by the various doctrines.

benefits will not be respected for tax purposes. *ACM P'ship v. Comm'r*, 157 F.3d 231, 253 (3d Cir. 1998).

The tax law has always employed common sense limits upon the use of artifices employed to avoid taxation. Illustrative of these limits is the seminal case of *Gregory v. Helvering*, 293 U.S. 465 (1935), a case involving a taxpayer who contended that she had, through an inventive application of corporate reorganization provisions, succeeded in transferring appreciated stock from a controlled corporation to herself without first recognizing income and paying tax at the corporate level. *Id.* at 467. When the Service disagreed, the taxpayer argued she was entitled to the tax benefits because the form she chose for the transaction literally satisfied every element of the non-recognition statute. *Id.* at 468. The Supreme Court disagreed, stating–

> The whole undertaking, though conducted according to the terms of [the statute], was in fact an elaborate and devious form of conveyance masquerading as a corporate reorganization, and nothing else. . . . *[T]he transaction upon its face lies outside the plain intent of the statute. To hold otherwise would be to exalt artifice above reality and to deprive the statutory provision in question of all serious purpose*.

*Id.* at 470 (emphasis added); *see also Knetsch v. United States*, 364 U.S. 361 (1960) (denying interest deductions on offsetting loans and annuity contracts); *Comm'r v. Trans. Trading & Terminal Corp.*, 176 F.2d 570, 572 (2d Cir. 1949) (L. Hand, J.) ("[I]n construing words of a tax statute which describe commercial or industrial transactions we are to understand them to refer to transactions entered upon for commercial or industrial purposes and not to include transactions entered upon for no other motive but to escape taxation."), *cert. denied*, 338 U.S. 955 (1950).

As described more fully in our opening brief (and below), the substance over form doctrine is separate and distinct from, and broader in scope, than the economic substance doctrine. If a transaction fails under the substance over form doctrine, the transaction will be recharacterized to reflect its true nature, regardless of its form or labels and taxed accordingly. However, if a transaction fails under the economic substance doctrine, the transaction will be disregarded for federal income tax purposes. Each doctrine calls for a different analysis. The substance over form doctrine does not require a court to delve into the taxpayer's motives or purposes for engaging in a transaction, or to examine a transaction's overall potential objective pre-tax profit potential. The substance over form inquiry simply requires a court to determine the true nature of a transaction to ensure that the tax consequences are based upon its actual substance, not mere labels. *Rogers v. United* States, 281 F.3d 1108, 1113-1118 (10th Cir. 2002). Under the economic substance doctrine, however, courts examine the taxpayer's motives and expectations to determine whether the transaction should be disregarded as an economic sham.

Under a substance over form analysis, the Plaintiff's Transaction does not comport with the form of a legitimate leasing transaction, because CED did not acquire a current property interest in the Roca3 Facility by obtaining significant and genuine attributes of a traditional lessor, and cannot acquire an interest in the RoCa3 Facility unless and until EZH says it can.

Plaintiff blurs the distinction between the two doctrines and erroneously asserts that "the form of the transaction adopted by the parties governs for tax purposes so long as the transaction has economic substance." (Pl. Br. at 294, 303). To support this contention, Plaintiff cites *Transamerica Corp. v. United States*, 15 Cl. Ct. 420, 439, 443 (1988) *(Transamerica II)*; *Levy v. Comm'r*, 91 T.C. 838, 858 (1988); *Mukerji v. Comm'r*, 87 T.C. 926, 968 (1986); *Torres v.*

*Comm'r*, 88 T.C. 702, 720-21, 727 (1987); *Gefen v. Comm'r,* 87 T.C. 1471, 1495 (1986); *Estate of Thomas*, 84 T.C. 412, 432 (1985); *Ockels v. Comm'r*, T.C. Memo 1987-507. However none of these decisions (or any others we are aware of) supports Plaintiff's erroneous mixing the two doctrines. To the contrary, the cases distinguish the two doctrines. First, the cases provide that the form of the transaction should be respected so long as the lessor retains significant and genuine attributes of a traditional lessor. Second, the cases provide that a transaction must have a genuine economic substance. *See Transamerica II*, 15 Cl. Ct. at 437, 439; *Levy,* 91 T.C. at 853-54; *Mukerji*, 87 T.C. at 968; *Gefen*, 87 T.C. at 1495; *Estate of Thomas*, 84 T.C. at 432; *Ockels,* T.C. Memo 1987-507.

The Court in *Frank Lyon* likewise distinguished the two doctrines:

> The conclusion that the transaction is not a simple sham to be ignored does not, of course, automatically compel the further conclusion that Lyon is entitled to the items claimed as deductions. Nevertheless, on the facts, this readily follows. As has been noted, the obligations on which Lyon paid interest were its obligations alone, and it is entitled to claim deductions therefore under § 163(a). . . .
>
> As is clear from the facts, none of the parties to this sale-and-leaseback was the owner of the building in any simple sense. But it is equally clear that the facts focus upon Lyon as the one whose capital was committed to the building and as the party, therefore, that was entitled to claim depreciation for the consumption of that capital. . . . We therefore conclude that it is Lyon's capital that is invested in the building according to the agreement of the parties, and it is Lyon that is entitled to the depreciation deductions, under § 167 of the 1954 Code . . .

435 U.S. at 580-81. The Tax Court in *Torres* also stated that, "holding that the transaction in question is not to be disregarded for Federal tax purposes does not foreclose further discussion of whether the form of the transaction must be accepted for Federal tax purposes." 88 T.C. at 720.

The Court of Federal Claims has addressed this issue in *H.J. Heinz Co. v. United States*, 76 Fed. Cl. 570 (2007) (appeal pending). In *Heinz*, after concluding that there was no genuine business purpose for HCC's acquisition of the Heinz stock and Heinz's subsequent redemption, the Court of Federal Claims noted that "[i]n light of this conclusion, the court need not *specifically* deal with the other potential basis upon which the transaction in question could be deemed a sham—whether the transaction lacked economic substance." 76 Fed. Cl. at 587 n.30 (emphasis added).

Most recently, the court in *AWG* described these two concepts as follows:

> In order to determine whether a taxpayer is entitled to claimed tax deductions, therefore, the Court must decide whether the underlying transaction had genuine economic substance apart from tax benefits. If the Court finds that the transaction does have economic substance aside from tax benefits, then the Court must also decide if the substance of the transaction is consistent with its stated form. The Fourth Circuit accurately describes this two-part analysis as the "economic substance" and the "substance over form" tests. *BB&T Corp*., 523 F.3d at 471-72.

*AWG*, 2008 WL 2230744, at *19; *see also BB&T*, 523 F.3d at 471-72; *TIFD III-E, Inc. v. United States*, 459 F.3d 220, 231 (2d Cir. 2006).

**III. Substance Over Form**

A. *CED Did Not Acquire a Current Leasehold Interest in the Facility*

As explained in the opening brief, the substance over form doctrine requires courts to look beyond the form of a transaction and to determine whether its substance, in fact, mirrors its form. (*See* U.S. Br. at 88-104). If a transaction's form complies with the Code's requirements, but the transaction lacks the factual or economic substance that the form represents, then expenses or losses incurred in connection with the transaction are not deductible. *Knetsch*, 364

U.S. at 365-66; *United States v. Wexler*, 31 F.3d 117, 122 (3d Cir. 1994); *Lerman v. Comm'r*, 939 F.2d 44, 45 (3d Cir. 1991), *cert. denied*, 502 U.S. 910 (1992); *Kirchman v. Comm'r*, 862 F.2d 1486, 1490 (11th Cir. 1989).

The pertinent inquiry for determining whether CED acquired a current leasehold interest in the Facility is whether CED – as the putative owner of that interest – possesses an equity investment in the RoCa3 Facility that can be lost if the residual value of its interest in the RoCa3 Facility at the end of the sublease to EZH is insufficient to recoup that investment. *Swift Dodge v. Comm'r*, 692 F.2d 651, 652-54 (9th Cir. 1982) (recharacterizing a lease as a conditional sales contract because the parties' obligations, legal rights, and risks were no different than they would be in a conditional sale arrangement and "Swift Dodge did not retain . . . significant and genuine attributes of a lessor"); *Estate of Thomas*, 84 T.C. at 433 ("[T]he parties' characterization of the form of the transaction should be respected so long as the lessor retains significant and genuine attributes of a traditional lessor."). Plaintiff appears to agree with this general proposition, but argues that it bears real risk with respect to the value of the RoCa3 Facility during the shirttail period from the end of the Sublease Renewal Term to the end of the Lease Term or similarly during the Retention Option period. This, while not only false, is insufficient. To prevail, Plaintiff must show that it assumed the burden associated with the risk of loss of its equity investment at the time it entered into the Transaction. *See Frank Lyon*, 435 U.S. at 581; *Estate of Thomas*, 84 T.C. at 435; *Swift Dodge*, 692 F.2d at 653-54. Plaintiff has failed to meet its burden.

Plaintiff's own documents demonstrate that its equity investment in the Transaction is not truly exposed to the market conditions that can affect the value of its interest in the RoCa3

Facility, and is never in any real jeopardy. If, for example, the property appreciates and EZH exercises the Sublease Purchase Option in year 20, the funds held in the Equity Defeasance Account will be returned to Plaintiff providing its expected return from the Transaction. (U.S. Br. at 19-24, 95-97, 104). Alternatively, if the value of the RoCa3 Facility declines to a point where EZH is purportedly disinclined to exercise the Sublease Purchase Option,[94]and Plaintiff is unable to lease the Facility to another lessee under the Retention Option for a price that will assure that it can recover its investment, Plaintiff can elect the Sublease Renewal Option and force EZH to extend the sublease for 16.5 more years. (*Id.*) Under this option, Plaintiff still is assured it will recover its equity investment, with interest, through the equity portions of the annual rental payments it will receive during the extended sublease term.[95] (U.S. Br. at 23, 32-35). That the possibility exists that the value of the RoCa3 Facility may fluctuate over the life of the Transaction is of little consequence: Plaintiff will recoup its entire investment before it ever needs to depend on the output or value of the facility to generate profits.

While CED's ability to recover its investment is not in doubt, its potential to use or otherwise benefit from the RoCa3 Facility depends entirely upon EZH. The reciprocal nature of the parties' rights and responsibilities under the Operative Documents, coupled with the Equity

---

[94] As explained in the United States' opening brief, corporate logic dictates that EZH would exercise the purchase option even if the facility were to go down in value or even if EZH wanted to get out of the power industry all together and had no future need for the facility. This is because it is in EZH's interest to take possession (at no cost) of the facility since 1) CED could force them to stay for an additional term and 2) EZH is in a better position to dispose of the asset now, rather than at the end of the lease term (or earlier if Plaintiff exercises the walk away provision). (U.S. Br. at 120). In addition, EZH will likely exercise the option because its failure to do so would seriously depart from its past conduct. *Dow*, 435 F.3d at 601-02.

[95] The Transaction is structured to allow those payments to be made from funds set aside under the Equity Defeasance Account. (U.S. Br. at 22-23, 26, 34).

and Debt Defeasance that allows EZH to exercise rent-free dominion and control over the Facility, means that CED cannot do anything with the Facility unless and until EZH decides to relinquish its control over it. (U.S. Br. at 97, 104-05). The fact that CED will not possess the Facility during the Sublease Basic Term, and cannot possess the facility after that term expires if EZH exercises its purchase option, demonstrates that CED acquired nothing more than a conditional right to acquire an interest in the Facility at some point in the future.

To challenge this conclusion, Plaintiff relies on cases respecting leasing transactions with a lessee purchase option, the exercise of which was not preordained. *See, e.g., Frank Lyon*, 435 U.S. 561; *Transamerica Corp. v. United States*, 7 Cl. Ct. 441 (1985) (*Transamerica I*); *Transamerica II*, 15 Cl. Ct. 420; *Nw. Acceptance Corp. v. Comm'r*, 58 T.C. 836 (1972), *aff'd*, 500 F. 2d 1222 (9th Cir. 1974); *Lockhart Leasing Co. v. Comm'r*, 446 F. 2d 269 (10th Cir. 1971). Those cases did not, however, involve, as here, a lessee purchase option that could be exercised with funds provided by the taxpayer/lessor and set aside at the inception of the transaction that were adequate, together with the earnings thereon, to fully fund the purchase option exercise.[96] That fact, present in *BB&T, supra* and *AWG, supra*, was the basis for those courts' findings that the owner/lessee's purchase options were cost free to the taxpayers (i.e., less than nominal) and were therefore, as a matter of law, to be treated as certain to be exercised and as continuing the owner/lessee's dominion and control over the property. Nor did the taxpayers in those cases have a put renewal option that would require the lessee to continue to lease the property from the taxpayer for a period of time sufficient to assure that the taxpayer could fully

[96] Contrary to Plaintiff's assertion, *Frank Lyon* was not a LILO case. (Pl. Br. 296).

recover its equity investment from a secure source.[97] Here, the presence of those facts leaves the upside rewards and downside risks of CED's purported leasehold interest with EZH for the duration of the Sublease Basic Term, and perhaps throughout the Sublease Renewal Term as well. For these reasons, the benefits and burdens of ownership of the lease interest have not passed from EZH to CED. *See BB&T*, 523 F.3d at 473 (noting that even if the purchase option in that LILO transaction was not exercised, the taxpayers investment was protected from risk of loss). Accordingly, Plaintiff does not possess the benefits and burdens associated with owning an interest in EZH's property during the taxable year at issue, even if the Court were to accept Deloitte & Touche's conclusion that Plaintiff is unlikely to exercise the Sublease Purchase Option.[98] *Id.; see Kwiat v. Comm'r*, T.C. Memo (RIA) 1992-433.[99] So Plaintiff's claim that

---

[97] Dr Ellis testified that a fully funded purchase option is not a characteristic of typical leveraged leases. (Tr. 3374 (Ellis)).

[98] For numerous reasons discussed in both the United States' opening brief and above, Deloitte's conclusion in this and several other instances is flawed. (U.S. Br. at 67-73).

[99] Plaintiff argues that the end-of-lease term option structure does not prevent it from acquiring the benefits and burdens of ownership of a leasehold interest and cites *Penn-Dixie Steel Corp. v. Commissioner*, 69 T.C. 837 (1978) and *Kwiat*, T.C. Memo (RIA) 1992-433 for the proposition that the government must show that the exercise of the purchase option is virtually certain (i.e. not remote) and that the Sublease Renewal Option is virtually certain to be exercised. (Pl. Br. at 453). But, in determining whether a transaction structured as a lease is in substance a sale, other general authorities conclude that "the mere existence" of reciprocal call and put options can mean that the nominal lessee bears both the risk of depreciation and the opportunity for gain in the event of unanticipated residual value so that a benefits and burdens analysis supports treating the transaction as in substance a sale. *See Kwiat,* T.C. Memo (RIA) 1992-433 ("the mere *possibility* that neither the put nor the call will be exercised should not be determinative that a sale has not occurred"); *Aderholt Specialty Co. v. Commissioner*, T.C. Memo 1985-491 (same); Rev. Rul. 72-543, 1972-2 C.B. 87 (sale and leaseback in substance a financing due to reciprocal options); *compare Griffin Paper Corp. v. Commissioner*, T.C. Memo 1997-409 at n.5 (*Kwiat* analysis inapplicable in context of reciprocal options with respect to stock). Moreover, Plaintiff fails to mention that the standard of proof adopted in *Penn Dixie* was a higher standard imposed because the taxpayer in that case was seeking to depart from the chosen form of its transaction.

(continued...)

"Defendant Presented No Economic Analysis Regarding the Likelihood the Purchase Option Will Be Exercised" (Pl. Br. at 431) is misplaced for several reasons: 1) it misstates the test; 2) it misstates the burden; 3) it ignores the noneconomic factors that ensure that EZH would exercise the purchase option; and 4) it ignores the impeachment of both the Appraisal and its' experts' economic analyses.

Unlike the cases cited by Plaintiff, there are cases directly on point. In *BB&T Corp. v United States*, the Fourth Circuit analyzed a very similar transaction and concluded it did not resemble a lease:

> Thus, establishing that the Head Lease is, in substance, a true lease for tax purposes requires a demonstration that "the lessor retains significant and genuine attributes of the traditional lessor status." *Frank Lyon*, 435 U.S. at 584. . . . *Accord Estate of Thomas*, 84 T.C. 412, 432 . . . ("[T]he parties' characterization of the form of the transaction should be respected so long as the lessor retains significant and genuine attributes of a traditional lessor."). We are not persuaded that BB&T has made this showing with regard the leases at issue here.
>
> First, each right and obligation BB&T obtained under the Head Lease it simultaneously returned to Sodra via the Sublease for the duration of the Basic Lease Term, leaving BB&T only a right to make an annual inspection of the Equipment. Second, although the transaction ostensibly provides for the exchange of tens of millions of dollars in rental payments during the Basic Lease Term, the only money that has (and that may ever) change hands between BB&T and Sodra is the $6,228,702 BB&T provided as Sodra's "incentive for doing the deal." (J.A. at 325.) Sodra has therefore not only continued to use the Equipment just

[99] (...continued)
*Danielson v. United States*, 378 F.2d 771, 775 (3d Cir.) (en banc) (To allow one party to recharacterize a transaction at a later date to achieve favorable tax advantages would be tantamount to granting that party "a unilateral reformation of the contract with a resulting unjust enrichment."). These same burdens are not placed on the Government under the substance over form doctrine.

> as it had before the transaction, it has done so without paying anything to BB&T. Third, Sodra, through the purchase option, can unwind the transaction without ever losing dominion and control over the Equipment or having surrendered any of its own funds to BB&T, and has no economic incentive to do otherwise. BB&T therefore does not expect Sodra to "walk away" from the Equipment. (J.A. at 85.) Finally, regardless of whether Sodra bucks this expectation, the structure of the transaction insulates BB&T from any risk of losing its initial $12,833,846 investment in the government bonds or incurring the obligation to invest additional funds.
>
> In sum, the transaction does not allocate BB&T and Sodra's rights, obligations, and risks in a manner that resembles a traditional lease. relationship.

*BB&T*, 523 F.3d at 472-73.

The district court in *AWG* reached a similar conclusion in dealing with a SILO transaction, a lease transaction possessing an extremely similar structure to the transaction at issue here:

> In sum, the AWG transaction does not allocate the rights, responsibilities, and risks between AWG and the Plaintiffs in a way that resembles a traditional sale. Further, as in the *BB&T* case, the Plaintiffs here have "failed to show any 'business or regulatory realities' that 'compelled or encouraged' the structure of the transaction at issue here, nor has it established that its [SILO] is 'imbued with tax-independent considerations, and is not shaped solely by tax-avoidance features that have meaningless labels attached.'" *BB&T Corp. v. United States*, 523 F.3d 461, 473 (4th Cir. 2008) (internal citations omitted).
>
> Accordingly, this Court concludes that, in reality, the AWG transaction is a financing arrangement designed in significant measure to increase tax deductions available to the Plaintiffs. The AWG transaction was is not a genuine sale and leaseback. Essentially all that the Trust did was to pay AWG a $28.5 million accommodation fee to sign paperwork meeting the formal requirements of a sale and leaseback and to arrange a circular and largely meaningless flow of cash from and then back to Norddeutsche Landesbank and Landesbank Baden-Wurttenburg. AWG, meanwhile, continues to have undisturbed and

> uninterrupted possession and control of the Facility, continues to claim the tax benefits of ownership of the Facility under German law, and has no economic or political motivation to give up control of the plant to the Plaintiffs at any time. Because the Plaintiffs never became the true owners of the Facility, they are not entitled to deductions for the depreciation or amortization of expenses associated with the asset.

*AWG*, 2008 WL 2230744, at *35.

B. *Frank Lyon Supports the Government's Position, Not Plaintiffs*

Surprisingly, Plaintiff cites *Frank Lyon*, 435 U.S. 561 in support of its position. Nevertheless, for the following reasons, *Frank Lyon* supports the United States in both LILO and SILO cases. *Frank Lyon* involved the sale and leaseback of a bank headquarters building involving Worthen Bank (which claimed to be the seller/lessee) and Frank Lyon (which claimed to be the buyer/lessor). 435 U.S. at 562. Frank Lyon acquired the building using a combination of its own cash ($500,000 equity) and recourse financing attained in the first instance through construction financing (by City Bank) and later through permanent financing (from New York Life). *Id.* at 567-68. Every dollar that went into the building was risk capital committed to the asset by Frank Lyon and every dollar borrowed went into the building. *Id.* at 566-68, 577. The debt payments made by Lyon during the lease term matched in timing and amount the rent payments made under the lease. *Id.* at 568, 577. The District Court below had found, and the Supreme Court found no reason to disbelieve, that the rentals were set at fair rental values. *Id*. at 569-570, 582-83. The Court also found that the repurchase options were set at what was anticipated to be fair market values on the day they could be exercised, though they also equaled the outstanding balance on the loan, plus $500,000 plus 6% interest on the $500,000 until repaid.

*Id*. at 567, 582. Any purchase option exercised was paid for by Worthen, not Lyon. On the basis of these facts, the Supreme Court stated:

> There is no simple device available to peel away the form of this transaction and to reveal its substance. . . . . Here, however, and most significantly, it was Lyon alone, and not Worthen, who was liable on the notes, first to City Bank, and then to New York Life.

435 U.S. at 576. On the basis of these findings, the Supreme Court first decided that the transaction was not a "simple [economic] sham." 435 U.S. 580. The Court then stated:

> The conclusion that the transaction is not a simple sham does not, of course, automatically compel the further conclusion that Lyon is entitled to the items claimed as deductions. Nevertheless, on the facts, this readily follows. As has been noted, the obligations on which Lyon paid interest were its obligations alone . . .[and] it is equally clear that the facts focus upon Lyon as the party whose capital was committed to the building and as the party, therefore, that was entitled to claim depreciation for the consumption of that capital. . . . We therefore conclude that it is Lyon's capital that is invested in the building according to the agreement of the parties, and it is Lyon that is entitled to depreciation deductions. . . .

435 U.S. 580-81.

In contrast, in the RoCa3 LILO Transaction, Plaintiff has not put its capital at risk through either debt or equity. The debt is non-recourse, the amounts held in the Debt Defeasance are sufficient to fully pay off the non-recourse loan when and as due, and the equity deposited in the Equity Defeasance Account and the earnings on the investment of that deposit are not security for the loan. (*See* U.S. Br. at 16-18 (debt defeasance), 19-24 (equity defeasance); Stip ¶ 219). As for Plaintiff's equity investment, Plaintiff is assured of its return, regardless of whether EZH exercises its Purchase Option or Plaintiff elects its own Sublease Renewal Option. (*See* U.S. Br. at 23-24). Moreover, at no point in the transaction until (and

unless) those two options go unexercised will Plaintiff's equity be at risk or at all dependent on the fair market value of Plaintiff's purported leasehold interest, residual or otherwise.

Because of these critical factual differences between *Frank Lyon* and the RoCa3 LILO Transaction, the answer to the second question here would not "readily follow" as it did in *Frank Lyon* Because Plaintiff has not made a committed risk capital investment in its purported leasehold interest, it cannot be said that Plaintiff incurred a cost or made an investment in the leasehold.[100] Plaintiff may not currently claim a cost recovery deduction for costs it currently has not and may never incur.[101] At most, Plaintiff has acquired a contingent future interest in this leasehold.[102]

C. *The HBU Loan Should be Disregarded*

CED's nonrecourse loan lacks substance, and should not be treated as a genuine debt. The funds used to make the purported loan were "loaned" to CED (nonrecourse) by the lender (HBU); CED in turn "paid" the funds to EZH; EZH then "paid" the funds to the lender's parent (ABN AMRO) as debt defeasance. (U.S. Br. at 12-14). The parent (ABN AMRO) then "paid" these funds to its subsidiary (the lender, HBU) to satisfy both EZH's rent obligations under the lease and CED's obligations under the loan agreement, completing the circular flow of funds. (*Id.*) Thus, no funds left the lender's corporate umbrella, and no portion of this purported

---

[100] This same factor differentiates the RoCa3 LILO Transaction from *Transamerica I and Transamerica II.*

[101] Both depreciation and rent amortization deductions are forms of capital cost recovery.

[102] It was Frank Lyon's committed risk capital, a fact in that case not present here, that led the Court's majority not to join Justice Steven's future interest characterization there. 435 U.S. at 381.

borrowing was ever invested in the Facility, or put to any other purposeful use by either Plaintiff or EZH.

Section 163(a) generally permits taxpayers a deduction for all interest paid or accrued within the taxable year on genuine indebtedness. *Bridges v. Comm'r*, 325 F.2d 180, 184 (4th Cir. 1963) (citing *Knetsch*, 364 U.S. at 365). Because tax deductions are a matter of legislative grace, Plaintiff bears the burden of showing that the interest expense deduction it claimed on its 1997 tax return falls within the scope of that provision. *Halle v. Comm'r*, 83 F.3d 649, 652 (4th Cir. 1996). To meet this burden, Plaintiff argues that the deduction for interest on the HBU loan should be allowed because the loan agreement unconditionally obligates CED to repay HBU. (*See* Pl. Br. at 324). Plaintiff's explanation is incomplete. An obligation in and of itself does not necessarily constitute indebtedness for tax purposes. *Halle*, 83 F.3d at 653 (citing *Deputy v. DuPont*, 308 U.S. 488, 497 (1940)). Rather, the obligation giving rise to the interest expense must finance "purposive activity" before the taxpayer can claim a deduction. *Goldstein v. Comm'r*, 364 F. 2d 734, 740-42 (2d Cir. 1966).

The funds from the HBU loan never left the ABN AMRO corporate umbrella, were never invested in the RoCa3 Facility, and are not available for any business use by EZH or Plaintiff.[103] The purported debt, which Plaintiff claims was used to finance the Advance Lease Payment that gave rise to Plaintiff's large, claimed deduction for rent under the Lease, was, in actuality, not available to EZH, and was only used to completely fund the repayment of the loan itself.

---

[103] As explained by the United States' expert Paul Bent, this was unlike a typical leveraged lease, where the proceeds of the loan are available for use. (*See* U.S. Br. at 84, citing Tr. 3717-18, 3760-61, 3957 (Bent) (noting that it is very unusual that very little of the actual cash invested in the Transaction goes to EZH)).

Accordingly, the HBU loan is not a genuine debt and Plaintiff's interest expense deduction should be denied. *Goldstein*, 364 F.2d at 742 ("We here decide that Section 163(a) does not 'intend' that taxpayers should be permitted deductions for interest paid on debts that were entered into solely in order to obtain a deduction.")

The district court in *BB&T* denied interest deductions for the purported loan associated with that LILO whose proceed also traveled in a circle.

> [T]he stipulated facts relevant to the section 163(a) deduction are as follows: (1) BB&T paid the advance Head Lease payment, in part, with the proceeds of a non-recourse loan from HBU in the amount of $68,008,236; (2) At closing, ABN, "on behalf of HBU," transferred $68,008,236 to BB&T's Trust account at ABN; (3) At closing, the Trust made a $68,008,236 payment, on behalf of Sodra, to ABN as the Debt PUA Issue; (4) During the Basic Lease Term, BB & T's scheduled debt payments to HBU and Sodra's annual rent payments to BB & T are equal to the scheduled payments required by the Debt PUA; (5) During the basic lease term, the Debt PUA payments will satisfy both Sodra's rent to BB&T and BB&T's debt service payments (including principal and interest) to HBU in full; and (6) On its 1997 federal income tax return, BB&T claimed an interest expense deduction in the amount of $2,820,925.
>
> When the intermediate payment steps are disregarded, which must be done in order to consider the substance of the loan transaction and not the form selected by the parties, it becomes clear that the loan transaction is only a circular transfer of funds in which the HBU loan is paid from the proceeds of the loan itself. There was no money lent to BB&T in a substantive sense, and the HBU loan does not reflect genuine indebtedness. *See Felcyn v. United States*, 691 F. Supp. 205, 212 (C.D. Cal. 1988) (finding taxpayer was not entitled to section 163(a) deduction where interest purportedly paid on the "loan" at issue was "simply part[ ] of a circularization of funds which do not amount a loan").

2007 WL 37798 *9-10 (emphasis added) (internal citations omitted).[104]

The Fourth Circuit was similarly unmoved that the circular funding was real debt.

> Finally, we are unpersuaded by BB&T's argument that the district court should have distinguished this case from one involving a mere "circularization of funds which d[id] not amount to a loan," *Felcyn v. United States*, 691 F. Supp. 205, 212 (C.D. Cal. 1988), on the ground that, here, unlike in *Felcyn*, there was an actual delivery of the loan proceeds. A party simply does not incur genuine indebtedness by taking money out of a bank and then immediately returning it to the issuing bank. This principle holds true even if the bank accepts the bookkeeping responsibility of repaying itself out of the loan proceeds for the duration of the loan. *See Bridges v. Comm'r,* 39 T.C. 1064, 1077, *aff'd* 325 F.2d 180 (4th Cir. 1963) (concluding that a transaction "merely provided the 'facade' of a loan," as "there was no reason to think that [the taxpayer] . . . would have been called upon to pay the note out of his own funds or to put up additional collateral").

*BB&T*, 523 F.3d at 477.

As the evidence shows, Plaintiff is not entitled to deduct interest on the purported loan for the same reasons that were persuasive to the Fourth Circuit. Plaintiff never had uncontrolled use of the funds. Plaintiff is not entitled to deduction for the use of money it never received.

---

[104] Similarly, the Tax Court has explained that a taxpayer is not entitled to claim interest expense deductions when payment to a bank is not for the use of money, but for a tax deucstion.:

> [P]etitioner at no time had the uncontrolled use of any additional money, of the bonds, or of the interest on the bonds. He assumed no risk of a rise or fall in the market price of the bonds and could not take advantage of such. His payment to the bank was not for the use or forbearance of money; it was for … a tax deduction. Petitioner incurred no genuine indebtedness, within the meaning of the statute . . .

*Bridges*, 39 T.C. at 1078-79.

D. *The Court Should Collapse Reciprocal Rights and Obligations*

The Lease Agreement purports to provide CED with a leasehold interest in a 47.47% undivided interest in the RoCa3 Facility for 43.2 years. (Stip. ¶ 113). At the same time, however, the sublease purports to provide EZH with a leasehold interest in that same interest in the RoCa3 Facility which allows EZH to continue to possess the RoCa3 Facility and use it in its business. (Stip. ¶ 135; Tr.1343 (Holzman); Tr. 1756-57 (Ellsworth); Tr. 282-83 (McGrath); *see also* Tr. 2223 (DePlautt) (stating that CED had no plans to actually run the RoCa3 Facility); (Tr. 559-60 (Burke) (noting that, at least for the initial sublease term, if everything went according to plan EZH, not CED, would be running the RoCa3 Facility)). Where, as here, parties have purported to enter into two separate transactions that result in similar and reciprocal obligations, the transaction should be collapsed to reflect its true substance. *See Rogers*, 281 F.3d 1108 (loan and option to purchase shareholder's stock collapsed to reveal a redemption of stock); *See BB&T*, 2007 WL 37798 at *8-10; *Rickey v. Comm'r*, 502 F.2d 748 (9th Cir. 1974); *United States v. Ingalls*, 399 F.2d 143 (5th Cir. 1968), *cert. denied*, 393 U.S. 1094 (1969); *Blue Flame Gas Co. v. Comm'r*, 54 T.C. 584 (1970); *Greenfield v. Comm'r*, 44 T.C.M. (CCH) 1487 (1982); *Big "D" Dev. Corp. v. Comm'r,* 30 T.C.M. (CCH) 646 (1971), *aff'd per curiam*, 453 F.2d 1365 (5th Cir.), *cert. denied*, 406 U.S. 945 (1972).

Plaintiff attempts to rely on the participation of the other participants to give this transaction substance. (*See* Pl. Br. at 302, 322-24). Its assertions are in error. HBU and ABN AMRO's passive participation in the deal cannot transform what is, in substance, a two-party deal between CED and EZH, because the HBU loan and corresponding Debt Defeasance Account also lack substance (and do not even appear on ABN AMRO's balance sheet). (JX 401

(ABN AMRO memorandum noting that the loan would be structured in such a way that it would be accredited a 0% risk weighting for ABN AMRO's purposes); JX 943 (describing the financing as "loop debt")). Indeed, the circular financing arrangement – which starts and ends with HBU, and funds most of CED's Advance Rent Payment to EZH, all of EZH's sublease rent payments to CED during the initial term of the lease,[105] and all of CED's loan repayments to HBU – is transparent, and must be disregarded.[106] (*See* Stip ¶¶ 126, 127, 187, 189, 198, 199). Once this debt loop is stripped away from the EZH LILO Transaction, the reciprocal head lease and sublease can be collapsed; and all that is left is CED's payment of transaction costs and its investment in Treasury STRIPS held by Credit Suisse, which it will have returned to it with interest via the free cash payments and exercise of the Sublease Purchase Option.[107]

---

[105] There is one free cash payment funded by the maturity of one of the Treasury STRIPS in the Equity Defeasance Account. (*See* JX 330, Bates 7084; Tr. 1277-78 (Holzman)). This single payment does not alter the analysis. *See AWG*, 2008 WL 2230744 ("The only exception to this perfectly off-setting payment schedule is a $ 1.2 million payment to be made from the Equity PUA to PNC on March 7, 2000.")

[106] CED disregarded the loan (other than the deductions it sought) by failing to obtain a single account statement from HBU subsequent to the closing of the Transaction.

[107] As explained more fully in the opening brief, *Bussing v. Commissioner* involves a factually similar case in which the principle of collapsing reciprocal obligations was applied. In that case, the taxpayer claimed depreciation deductions through a purported sale-leaseback of computer equipment between the taxpayer and two corporations (AG and Sutton). 88 T.C. 449, 451-55, *reconsideration denied*, 89 T.C. 1050 (1987). As was the case in *Bussing*, the RoCa3 LILO Transaction is not the kind the Supreme Court envisioned in *Frank Lyon* – a "genuine multi-party transaction with economic substance . . . compelled or encouraged by business or regulatory realities." 435 U.S. at 562. On the contrary, CED's documents identify the Transaction as part of its "tax driven transactions" (DX 20099) and identified its cross-border leases (i.e. EZH and NUON) as "tax advantaged investments" in which CED obtained "significant tax benefits" at "low risk" in return for a fee to EZH. (JX 1255, Bates 17810). CED described these tax benefits as "in effect, interest free loans from the government." (JX 1133, Bates 16628; JX 1167, Bates 16957).

Plaintiff cites to *Packard v. Commissioner*, 85 T.C. 397 (1985) for the proposition that the debt should be respected even though it was secured by collateral. (Pl. Br. at 395). *Packard* is distinguishable for several reasons. First, unlike the non-recourse HBU loan, *Packard* involved the use of recourse debt where the taxpayer was personally liable for any shortfalls.[108] 85 T.C. at 401. Second, the collateral that was used to secure the debt (a CD) accrued at a different rate of interest than the debt, unlike the RoCa3 LILO Transaction debt structure, where the loan and the Debt Defeasance Account, by design, have identical interest rates.[109] *Id.* at 401-

---

[108] Although non-recourse debt can be genuine, in general, the nonrecourse nature is relevant when determining whether a taxpayer has made an at risk capital investment in an asset. Non-recourse debt can constitute an investment when the taxpayer is also making a meaningful equity capital investment. But where the taxpayer makes a no risk investment through either debt or equity, the taxpayer has not made a capital investment and has no right to claim cost recovery deductions for a cost the taxpayer has not yet and may never incur. *See BB&T*, 523 F.3d at n.15 ("In addition, were BB&T to make that choice, the loan is nonrecourse to BB&T. We see no economic incentive for BB&T to supply the funds needed to fully repay the loan, given that the loan collateral excludes what the transaction's promoter described as the "real money" in the transaction, (J.A. at 175), the approximately $12 million in government bonds placed in the Equity PUA account."); *see also Odend'hal*, 748 F.2d at 912 (disallowing interest deduction based on nonrecourse loan because although, in general, "a nonrecourse loan should be treated as a true loan, "this is not the case where the "taxpayer[ ] ha[s] no economic incentive to repay the obligation[ ]") (internal quotation marks omitted).

[109] On this, the Fourth Circuit in *BB&T* commented:

> [I]t is difficult to see how the "interest" BB&T paid could represent "compensation for the use or forbearance of money." *Id.* at 652 (internal quotation marks omitted). At the transaction's closing, ABN supplied the $68,008,236 for the loan on behalf of HBU, and BB&T immediately returned $68,008,236 to ABN (as Debt PUA Issuer). Accordingly, ABN, which treated the loan as an off-balance sheet transaction, did not forbear any money during the time period in which BB&T sought to claim interest deductions. And, because the funds became an asset solely of ABN upon their transfer to the Debt PUA account, BB&T could not use the money after the transaction's closing.

*BB&T*, 523 F.3d at 476. *See also AWG*, 2008 WL 2230744, at *39 ("As in our case, the funds that the Swedish bank "loaned" the taxpayer were immediately returned to it at closing and (continued...)

06; (U.S. Br. at 3, citing Stip. ¶¶ 118, 188, 199). Third, unlike the loan in *Packard,* which was designed to be repaid from the proceeds of the cattle sales with the CD merely operating as potential collateral, here the loan will not be paid off from the operation of the facility and, like in other LILO cases, is specifically designed to be repaid from the Debt Defeasance Account. 85 T.C. at 428; (U.S. Br. at 12-14, 16-17). The RoCa3 LILO Transaction is structured to ensure that the Debt Defeasance Account, fully funded by the proceeds of the loan, is used to repay, and fully satisfy the HBU loan. (U.S. Br. at 12-14); *see BB&T,* 523 F.3d at 476; *AWG*, 2008 WL 2230744, at *4, *38 ("In this case, however, the true source of repayment of the Loans *are* the Loans. The Plaintiffs' own assets, profits, and cash flow have no bearing on the repayment of the Loans.").[110]

In short, Plaintiff has not demonstrated that the HBU loan is a genuine debt; therefore, the interest expense deduction it claimed on account of that loan must be denied.

E. *Plaintiff's Attempt to Draw Distinctions Between Legal and Economic Defeasance is Without Merit*

Plaintiff argues that there should be a definitive distinction between "legal" defeasance and "in substance" defeasance in applying the substance over form doctrine to the RoCa3 transaction. Much as it has in entering into this transaction, Plaintiff would have this court ignore economic realities and extol form. The relevant inquiry is not whether the defeasance "is in

---

[109] (...continued)
placed into a Debt PUA account that was untouchable by the taxpayer.").

[110] Similarly, *Gefen,* 87 T.C. 1471 is distinguishable from the debt structure here. The discussion cited by Plaintiff refers to a security interest in the property acquired with the lender's funds. As discussed in the United States opening brief (U.S. Br. at 12-14, 16), in this Transaction the security is the funds themselves.

substance" or "legal," but rather how these defeasance structures, as used in this transaction, affect the allocation of substantive rights and obligations as between the parties. The level and use of equity and debt defeasance structures in this case eliminates the benefits and burden of ownership in this transaction for Plaintiff, and strips it of any legitimate support for the specific tax benefits Plaintiff seeks. The federal courts that have ruled on defeasance structures similar in size and that serve a similar function to those present in the RoCa3 transaction have determined the transactions before them were not true leases.[111] *See BB&T*, 523 F.3d at 461*; AWG*, 2008 WL 2230744.

In addition, this attack attempts to skew the United States' argument. The United States does not argue that a defeasance account extinguishes liability of the owner. rather, the United States' contents that the combination of the defeasance accounts and the letter of credit eliminates risk to CED that it would not receive its initial investment and expected return on the transaction. Without the risk, CED cannot be considered a current leasehold owner with benefits and burdens, whose equity investment is exposed to market conditions or credit.

Plaintiff mainly relies on *Douglas v. Willcuts*, 296 U.S. 1 (1935), *Helvering v. Fuller,* 310 U.S. 69 (1940) and PLR 88-04-020 (Oct. 29, 1987)[112] (Pl. Br. at 389-91) to support its

---

111/ Plaintiff cites Canadian and U.K. cases to support its position. (Pl. Br. at 396). The Court should give no weight to these foreign cases. Moreover, the *Barclays* case, quoted by Plaintiff, the House of Lords pointed to the happenstance nature of Barclays involvement in that lease transaction. (*Id.*). However, here, the use of ABN and HBU (affiliates) to stand on both sides of the transaction is not a happenstance and was specifically contemplated as the solicitation to ABN sought it to provide both the loan an the defeasance account in the RoCa3 LILO Transaction. (U.S. Br. at 12; JX 401; Tr. 1273 (Holzman)).

[112] Private letter rulings cannot be used or cited as precedent. Such a ruling only applies to the taxpayer who has requested it. I.R.C. § 6110(K)(3)

argument. (Pl. Br. at 389-91). These authorities only provide that a simple defeasance account does not extinguish obligations of its owner, which is not an issue in the RoCa3 LILO Transaction.

F. *At Least During the Term That They Overlap, the Lease and Sublease Are Not True Leases*

Plaintiff next argues that the simultaneous leases between CED and EZH should be respected as "true leases" under a multi-factor test developed by the Tax Court in the wake of the *Frank Lyon* decision. (*See* Pl. Br. at 344-67). That test is utilized to determine the true owner of the property for tax purposes when the ownership of property is separated from its use. *See Torres*, 84 T.C. at 420-21, 432-39. In this case, however, ownership and use of the RoCa3 Facility were not separated; they remained with EZH (U.S. Br. at 96-98). The substance of the Transaction should be evaluated by looking at the transaction as a whole, not by mechanically focusing on its individual components in isolation. *See Rogers*, 281 F.3d at 1121-22. The Transaction's true substance comes into focus when the Lease and Sublease are considered together, and evaluated in conjunction with the other features of the deal that mitigate most, if not all, of the risks to both CED and EZH. Viewed in this light, the circular rights and responsibilities that permit EZH to retain – at its discretion – dominion and control over its RoCa3 Facility are clear, and the form of the Transaction as a lease to respected under federal tax law unravels.

The most important characteristic of a true lease is whether the lessor remains exposed to market value risk (including residual value risk) from the inception through the termination of the term of the lease. *Swift Dodge*, 692 F.2d at 652-54; *Estate of Thomas*, 84 T.C. at 434. The fact that CED was not dependent on the fair market value of the property purportedly leased

(U.S. Br. at 95-97, 104-105) is conclusive evidence that CED is not exposed to market value risk and is not invested in the Facility with respect to which it seeks to claim tax benefits. Either through EZH's exercise of its Sublease Purchase Option or through CED's exercise of its own Sublease Renewal Option, CED was assured of a return of its initial investment, without regard to what happened to the market value of its purported "leasehold interest." (U.S. Br. at 23-26, 34-35). CED's return from EZH's Sublease Purchase Option or CED's conditional Sublease Renewal Option were both payable with the funds set aside in the Equity Defeasance Account. (U.S. Br. at 19-23). These pre-funded contract options to act to "collar" the upside rewards and downside risks to which the owner of a property interest is normally exposed. [113] Such a "collaring" of the risks and rewards of ownership is inconsistent with the notion that CED attained significant and genuine attributes of an owner of a property interest in the RoCa3 Facility at the time of the Transaction. *Kwiat*, T.C. Memo (RIA) 1992-433.

The evidence demonstrates that EZH has retained all of the benefits and burdens of ownership of the RoCa3 Facility for the duration of the Sublease Basic Term, and has the unfettered right to decide what to do with its RoCa3 Facility when that term ends. That is far different than the situation in *Frank Lyon*. In this case, the RoCa3 Facility is owned by EZH, will continue to be owned by EZH (or its successor), when the sublease ends, and can be used and possessed by EZH for as long as EZH chooses simply by giving CED its money back. Under the circumstances as they presently exist, CED has nothing more than a conditional option to acquire an interest in the RoCa3 Facility that is contingent on EZH's option to end the

---

[113] Indeed, given CED's own pre-funding of these contractual benefits, it can be said that whatever benefits CED enjoys if EZH exercises the Sublease Purchase Option will already have been paid for by CED.

Transaction with funds CED provided at closing. *See*, *e.g.*, *Williams v. Comm'r*, 1 F.3d 502, 505-507 (7th Cir. 1993), *aff'g*, 63 T.C.M. (CCH) 2959 (1992); *Benedict v. United States*, 881 F. Supp. 1532 (D. Utah 1995).

## IV. Economic Substance

### A. *Plaintiff's Transaction should be Disallowed Under the Economic Substance Doctrine*

Where there is nothing of substance to be realized from a transaction apart from income tax savings, the transaction will be disregarded for federal tax purposes, for the law does not recognize a transaction that does not appreciably affect a taxpayer's beneficial interest except to reduce his tax. *Knetsch*, 364 U.S. at 366.

In this Circuit, while the economic substance doctrine "may well also apply if the sole subjective motivation is tax avoidance even if the transactions has economic substance, a lack of economic substance is sufficient to disqualify the transaction without proof that the taxpayer's sole motive is tax avoidance." *Coltec*, 454 F.3d at 1355. Plaintiff bears the burden of proving that the LILO Transaction has economic substance. *Id.* at 1355-56. This burden is "unusually heavy." *Id.* at 1355; *Heinz*, 76 Fed. Cl. at 584 ("[A] taxpayer must prove that its transaction was both purposeful and substantive–if proof in either regard is lacking, the transaction is a sham."). In short, Plaintiff must demonstrate that its transaction possesses non-tax economic substance. *Coltec*, 459 F.3d at 1355. The economic substance of a transaction must be viewed objectively, not subjectively. *Id*. at 1256.

In addition to misstating the test enunciated in *Coltec*,[114] Plaintiff describes two cases, *Johnson I* and *Johnson II*, decided in the predecessor to the Court of Federal Claims, which Plaintiff argues explain the economic substance doctrine. As discussed below, the analysis in those cases, to the extent it conflicts with the Federal Circuit's holdings on the economic substance test, are no longer good law.

*Johnson I* involved a sale-leaseback of computer equipment. The court examined whether the transaction was a sham, adopting the disjunctive two-pronged analysis of *Rice's Toyota World, Inc. v. Commissioner*, 752 F.2d 89 (4th Cir. 1985): To treat a transaction as an economic sham, the court concluded that it must find that (1) the taxpayer was motivated by no business purposes, other than obtaining tax benefits in entering the transaction, and (2) the transaction has no economic substance because no reasonable possibility of a reasonable profit exists. *Johnson I*, 11 Cl. Ct. at 25. In ruling for the taxpayer, the court found that the taxpayer expected to receive profits from the transaction, apart from the value of or benefits obtained from tax deductions, allowances, credits and other tax attributes arising from the transaction and engaged in the transaction with the objective of, and had a reasonable chance of making, a profit apart from tax considerations. *Id.*

In *Johnson v. United States*, 32 Fed. Cl. 709 (1995) (*Johnson II*), the individual taxpayers (multiple individuals) engaged in a sale-leaseback of solar energy equipment. When examining the economic substance issue, the court applied the disjunctive two-pronged analysis of *Rice's Toyota*, which requires objective and subjective economic substance to avoid a finding

[114] As described below, Plaintiff ignores portions of the Federal Circuit's holding and misplaces a heavy emphasis on the effect of the transaction on third parties.

of sham. *Id.* The court held that the historical absence of profits, showed that the investors' primary motive was other than for profit. With regard to any objective reasonability of profit, the transactions at issue were without economic substance. *Id.* The court concluded that the investors had not established their claims for depreciation deductions, investment tax credits, or energy tax credits. Thus, the investors were not entitled to refunds. *Id.*

Plaintiff separately and extensively illustrated and analyzed *Johnson I* and *II* under the heading of “Court of Federal Claims Precedent.” By doing so, Plaintiff attempts to create the impression that the analyses applied in *Johnson I* and *II* reflect the currently applicable economic substance tests in the Court of Federal Claims. To the contrary, however, as the Federal Circuit in *Coltec* supercedes the *Johnson* cases and has expressed a more demanding formulation of the economic substance test .

In *Coltec*, a special purpose subsidiary assumed its parent's contingent asbestos liabilities. 454 F.3d at 1343-44. The parent contributed a note from one of its subsidiaries to the special purpose subsidiary and the subsidiary assumed the defense and payment of the asbestos liability claims. *Id.* at 1344-45. The parent took the position that the contingent asbestos liabilities claims did not reduce the parent’s basis in its subsidiary and it took a loss when it sold the subsidiary. *Id.* at 1346.

The Federal Circuit explained that the economic substance doctrine has been used to prevent taxpayers from subverting the legislative purpose of the tax code by engaging in transactions that are fictitious or lack economic reality simply to reap a tax benefit. *Id.* at 1355. Instead of applying the previous tests that the Claims Court used in *Johnson I* and *II*, the Federal Circuit adopted the following new test:

(1) The law does not permit the taxpayer to reap tax benefits from a transaction that lacks economic reality. With this principle, the Federal Circuit adopted a conjunctive analysis and dismissed the previously applied disjunctive two-pronged test.

(2) It is the taxpayer who bears the burden of proving that the transaction has economic substance. The court noted that the burden is unusually heavy.

(3) The economic substance of a transaction must be viewed objectively rather than subjectively. In other words, the court should examine whether a reasonable possibility of nontax profit from the transaction exists. [115]

(4) The transaction or portion of the transaction to be analyzed is the one that gave rise to the alleged tax benefit. The Federal Circuit explained that there is a material difference between structuring a real transaction in particular way to provide a tax benefit, and creating a transaction, without a business purpose, in order to create a tax benefit.

(5) Arrangements with subsidiaries that do not affect the commercial or economic interests of independent third parties deserve particularly close scrutiny. [116]

*Coltec*, 454 F.3d at 1355-57.

Since *Coltec*, the Court of Federal Claims has applied *Coltec's* principles to two subsequent economic substance cases, such as *Heinz,* 76 Fed. Cl. at 570 and *Jade Trading, LLC v. United States,* 80 Fed. Cl. 11 (2007). The analysis in *Johnson I* and *II* has been superceded.

---

[115] Though not specifically articulated in *Coltec*, Plaintiff argues that the subjective test is whether the transaction was solely motivated by the avoidance of tax. This is not correct. While it is true that transaction that exists solely to avoid taxes are devoid of substance, the converse (that transactions that don't exist solely to avoid taxes possess substance) is not necessarily true. *See Heinz*, 76 Fed. Cl. at 584 (Fed. Cl. 2007); *Winn-Dixie Stores, Inc. v. Comm'r*, 254 F.3d 1313, 1316 (11th Cir. 2001), *cert. denied*, 535 U.S. 986 (2002) (noting that the doctrine has "few bright lines," but clearly applies to "'transactions whose sole function is to produce tax deductions'" (quoting *Kirchman*, 862 F.2d at 1492). This is especially true in this case where the transaction was not used to accomplish these so-called business purposes (i.e. further investment in Western Europe), were after the fact (environmental and PR) or are a direct result of the tax benefits (accounting and funding for green field projects).

[116] Plaintiff puts an unreasonable emphasis on this point going so far as to state if a transaction affects third parties, that is strong evidence that a transaction must have substance. This is simply not the case.

In *Heinz*, which involved basis shifting transactions, the Court of Federal Claims acknowledged *Coltec's* five principles by stating that "a taxpayer must prove that its transaction was both purposeful and substantive - if proof in either regard is lacking, the transaction is a sham." 76 Fed. Cl. at 584. The court found the transaction to be sham for the following reasons: (1) the plaintiff's vice president testified that the transaction was orchestrated to produce the desired carryback losses; (2) the record suggested that the plaintiff could not have reasonably anticipated any gain due to regulatory issues; (3) the plaintiff incurred unreasonably high expenses; and (4) the plaintiff's alleged business purpose could not be accomplished by the transaction. *Id.* at 585. Accordingly, in light of the objective evidence, the court found the transaction to be sham: "this court will not don blinders to the realities of the transaction before it." *Id.* at 587.

In *Jade Trading*, three brothers sold their business and earned a profit of more than $40 million. 80 Fed. Cl. at 13. Each of the brothers used an LLC to simultaneously purchase a euro option for a premium of $15 million from AIG and sell a euro option for a premium of $14.9 million to AIG, paying AIG only the difference between the two options. *Id*. Each LLC contributed the option spread to Jade Trading, LLC. *Id*. Each LLC claimed a basis of $15 million in its Jade interest by including only the premium for the purchased call option. *Id.* The high basis generated a loss of $15 million when each LLC redeemed its partnership interest at its fair market value. *Id.*

After applying *Coltec's* five principles, the court held that the plaintiffs did not satisfy their burden of demonstrating that the transactions objectively had economic substance. *Jade Trading*, 80 Fed. Cl. at 14-15. The court ruled that the claimed losses were fictional because the

plaintiffs purchased an option for $15 million and sold an option for $14.9 million. *Id.* at 14. Since the investment in offsetting options was a hedge, the plaintiffs were protected and their gains and losses were limited no matter how the euro performed. *Id.* at 48. The court stated that the counterbalancing positions cannot be separated here because they were totally dependent of one another from an economic and pragmatic standpoint. *Id.* at 14.

The *Jade Trading* Court then acknowledged that several courts analyzed economic substance objectively by viewing an investment transaction through the eyes of a "prudent investor" at the time of the transaction - asking whether a prudent investor would engage in the transaction with a belief that profits could be earned. *Id.* at 48-49. Because the maximum profit would not cover the fees incurred by the plaintiffs, the *Jade Trading* court found the transaction lacked economic substance. *Id.* at 49-50.

The court found that the form of the transaction which was chosen by the plaintiffs had no effect on the investment's value, quality, or profitability, other than the tax consequences. *Id.* at 14. The court stated that the issue of whether Jade Trading and its partners had the potential to earn pre-tax profits from the transaction as a whole is irrelevant in light of *Coltec*. *Id.* at 47. The court stated that what matters is whether the single transaction which gave rise to the tax benefits (i.e., the spread transaction contributed to Jade) had the ability to earn pre-tax profits. *Id.* at 47.

The court also pointed out that in addition to its inherent lack of potential profitability, the transaction was devised and marketed by a tax accounting group, as a tax product, not by an investment advisor as a vehicle to earn profit.[117] *Id.* at 50.

Based on the above facts, the court ruled that "this transaction's fictional loss, inability to realize a profit, lack of investment character, meaningless inclusion in a partnership, and disproportionate tax advantage as compared to the amount invested and potential return, compel a conclusion that the spread transaction objectively lacked economic substance."[118] *Id.* at 14.

B. *There was no Reasonable Expectation to Achieve Any Net Economic Benefit from the RoCa3 LILO Transaction.*

1. <u>Plaintiff Could Not Reasonably Expect To Achieve Any Net Economic Benefit from the Cash Flows from the RoCa3 LILO Transaction</u>

As explained in the United States' opening brief (U.S. Br. at 114-17), Dr. LaRue analyzed the cash flows in the ABC printouts to determine whether the cash flows could be expected to generate a profit.[119]

---

[117] This is similar to the way Plaintiff treats its LILOs as tax advantaged investments and lumps them together with Section 42 Housing rather than including them in the discussion of its "real" infrastructure and investment projects. For example, in its report to the CEI Board of Trustees CED explained that LILOs were part of its tax advantaged investment line which was designed to take advantage of CEI's large taxable position. (JX 1252, Bates 17782). Further, only in connection with its LILO Transactions does CED involve outside tax counsel and obtain tax opinions concerning the transactions. In fact, as explained by Mr. Muoio, CED expected that after it completed several LILO transactions it would sever that business line so that it could focus on its traditional energy infrastructure investments. (Tr. 1992-93 (Muoio)).

[118] The court also explained that the transaction did not affect the economic interests of independent third parties, pointing out that AIG had nothing to gain or lose beyond its fee in that case. *Jade Trading*, 80 Fed. Cl. at 52. This is similar to the RoCa3 LILO Transaction in that EZH has nothing to gain or lose on this transaction other than its accommodation net present value fee.

[119] Plaintiff argues this analysis is improper because Leases are not considered on a pre-tax basis
(continued...)

| Pre-Tax Cash Flows | Net Present Value<br><br>Pre-Tax Before Fees | Net Present Value<br><br>Pre-Tax After Fees | Net Present Value<br><br>After Taxes |
|---|---|---|---|
| Purchase Option | $0 | ($12,331,190) | $21,229,672 |
| Renewal Option | ($15,619,393) | ($27,950,583) | $39,534,490 |

Dr. LaRue determined that, when including transaction costs, the RoCa3 LILO Transaction produces a negative net present value at a discount factor of 6.184%, the risk-free rate of return.[120] (Tr. 5060-62, 5067-73, 5079-80 (LaRue); DX 20194, Bates 25155).[121] On a pre-tax

---

[119] (...continued)
and that the pre-tax profitability of its LILO transaction was relevant only to the analysis of its subjective business motivation to help inform the inquiry as to why it entered into the transaction. (Pl. Br. at 481-92). This is simply not true. "Although the existence of a reasonable expectation of pre-interest deduction profitability is relevant to the subjective prong of the analysis, it is also relevant to the objective analysis." *In re CM Holdings*, 254 B.R. 578, 624 n.51 (D. Del 2000), *aff'd*, 301 F.3d 96 (3d Cir. 2002). The court in *CM Holdings* concluded that the standard for determining the objective economic substance of a transaction – *i.e.*, whether it had practicable economic effects apart from the tax deductions – *required* it to evaluate the profitability of the transaction on a pre-tax basis. *Id.* Moreover, Mr. Muoio conceded that present value calculation comparisons of expected returns versus expenses were one of the measurements CED used to evaluate transactions. (Tr. 2004-05 (Muoio) (discussing JX 1802, Bates 15854; JX 1061, Bates 15599)). Thus, Plaintiff's claim that it is inappropriate to consider the economic effect of the projected cash flows on a present value basis is undercut by its own practices (in fact that its own expert performed an economic analysis concerning the purchase option using discounted cash flows (PX 10076, Bates 20245-48)).

[120] "In transactions that are designed to yield deferred rather than immediate returns, present value adjustments are, as the courts have recognized, an appropriate means of assessing the transaction's actual and anticipated economic effects." *ACM P'ship*, 157 F.3d at 259. Despite this, Plaintiff insists this Court ignore the time value of money. (Pl. Br. at 481-92).

[121] This testimony was not rebutted and neither Plaintiff, nor any of its experts conducted the sort of analysis Dr. LaRue performed. (Tr. 5127-30 (LaRue)). In fact Dr. Weil acknowledged that the time value of money takes into account that a dollar today is worth more than a dollar in the future and that "[r]elative to the cash flows or accounting income, the taxable income is pushed back, the deductions are pulled forward" in this transaction. (Tr. 3631-62 (Weil)). Interestingly, Plaintiff criticizes Dr. Thomas for not performing the same analysis even though he was not tasked with doing so. (Pl. Br. at 432).

basis, the projected cash flow of the Transaction was economically bereft. In short, when solely looking at a discounted cash flow basis, the RoCa3 LILO was incapable of generating any economic profit to CED absent the tax benefits. As such, Plaintiff's LILO tax shelter is devoid of objective economic substance apart from tax benefits.

For the first time in this case, Plaintiff now claims that one of CED's non-tax business purposes was to obtain a pre-tax profit. (Pl. Br. at 352-53). In short, their position is *"none of these cash flows are attributable to tax savings*." (Pl. Br. at 353 (emphasis in original)). Plaintiff is misleadingly conflating the phrases "tax savings" and "tax benefits." As explained in the Fourth Circuit's opinion in *BB&T*, "The tax benefits can be substantial and are achieved primarily by '[a]ccelerating the transaction-related deductions and delaying recognition of the corresponding revenues.'" 523 F.3d at 464. "This delayed recognition creates a tax deferral, which, in practice, will function as a tax reduction due to the time value of money." *Id.* at 464 (citation omitted). The same is true in the RoCa3 LILO Transaction. So, while Plaintiff describes tax savings as permanently eliminating the taxes, all of the income from this transaction (with the exception of the small return on the U.S. Treasury STRIPS due at the end of the Sublease Basic Term) is generated by tax benefits created by the deferral. Thus, while tax savings are not at play in a LILO transaction, it is the tax benefits (i.e., tax deferral) that is the proper focus. Plaintiff makes no claim that tax benefits do not generate the upfront benefits. Instead it focuses on the undiscounted cash flows, thus ignoring the economic reality of the time value of money. (Tr. 5316-17 (LaRue)).

Plaintiff argues that disallowing Plaintiff's claimed deductions under the objective economic substance test would in effect disallow the claimed tax benefits of all leveraged leases

because all leveraged leases would fail the objective economic substance test. (Pl. Br. at 485-488). This issue has been examined before in the context of Corporate Owned Life Insurance(COLI), a tax shelter that involves large corporate deductions for leveraged life insurance taken out on employees. In those shelters, several taxpayers argued that all life insurance would fail the economic substance test. Specifically, in *CM Holdings*, the taxpayer argued that because life insurance is a tax favored product, the Court should examine the objective economic substance of its COLI transaction only on an after-tax basis. 254 B.R. at 623. The taxpayer in that case cited *Sacks v. Commissioner*, 69 F.3d 982, 991 (9th Cir. 1995), for the proposition that when a transaction has economic substance, it does not become a sham merely because it is likely to be unprofitable on a pre-tax basis. *CM Holdings*, 254 B.R. at 623. In distinguishing *Sacks*, the court in *CM Holdings* emphasized that a central consideration in *Sacks* was that the tax deductions and credits under attack by the IRS were targeted tax provisions crafted by Congress and state legislatures in order to encourage taxpayer investment in solar energy equipment. *Id.* at 623. The court noted that the IRS in this case was not in any way challenging or attacking the Congressionally mandated tax deferral on inside buildup in life insurance.[122] *Id.* at 624. Rather, as the court pointed out in *CM Holdings*, the issue is "whether [the taxpayer's] policy loan interest deductions are deductible under the generic, non-targeted

[122] In examining each transaction, the courts in the COLI cases recognized that taxpayers are entitled to rely on the tax treatment normally accorded life insurance, including borrowing, in transactions with non-tax benefits. "Life insurance is tax-favored, and a company may utilize the tax advantages of a COLI plan so long as the plan has real economic consequences." *Am. Elec. Power. Co., Inc. v. United States*, 326 F.3d 737, 744 (6th Cir. 2003). The Sixth Circuit found: "The controlling question, however, is whether there is anything of 'substance to be realized by [the taxpayer] from [a] transaction beyond a tax deduction.'" *Id.* (citing *Knetsch*, 364 U.S. at 366). In short, whether the transaction involved an element of tax planning is irrelevant, so long as there is an opportunity for the transaction to have a non-tax economic effect.

I.R.C. Section 163(a)." *Id.* at 583. The *CM Holdings* court then went on to emphasize, as the Tax Court did in *Winn-Dixie*, that the taxpayer had not pointed to any evidence supporting the notion that Congress, in enacting any tax provision, specifically intended to induce parties to invest in the type of broad-based, leveraged COLI plan at issue in that case. *Id.* at 599-600. The same would be true here. Congress never intended for taxpayers to invest in LILO transactions without substance to reduce their taxable income.[123]

In its brief, Plaintiff also contends that comparing the pre-tax profitability of the RoCa3 LILO Transaction with the after-tax returns is an economically inappropriate form of analysis. (Pl. Br. at 262-63). Rather, Plaintiff argues that every leveraged lease would fail if this analysis was applied. The problem with abandoning the pre-tax analysis - and the reason that Plaintiff so vehemently urges the Court to do so - is that it bypasses altogether the inquiry the Court must make in determining whether the LILO transaction has economic substance – whether a reasonable possibility of nontax profit from the transaction exists. *Coltec*, 454 F.3d at 1356 n.15; *Black & Decker Corp. v. United States*, 436 F.3d 431, 441-42 (4th Cir. 2006); *Dow*, 435 F.3d 594; *Ballagh v. United States*, 166 Ct. Cl. 191 (1964); *Rothschild v. United States*, 186 Ct. Cl. 709 (1969); *Basic, Inc. v. United States*, 212 Ct. Cl. 399 (Ct. Cl. 1977). As the court stated in *CM Holdings*: "Implicit in this statement is the *requirement* that the Court look at the transaction's profitability apart from the interest deductions." *CM Holdings*, 254 B.R. at 624 n.51 (emphasis added). In short, the only way for a court to evaluate whether a transaction has

[123] In fact, Congress made sure that the Internal Revenue Service could challenge these transactions on the basis of judicial doctrines like substance over form and economic substance.

practical economic effects apart from the tax benefits generated by the challenged deductions is to separate those tax benefits from the rest of the transaction.

### 2. Plaintiff Could Not Reasonably Expect To Achieve Any Net Economic Benefit From Credit Fluctuations or Residual Value

Alternatively, the objective non-tax economic substance of the RoCa3 LILO Transaction can be evaluated by separately analyzing the two principal benefits ordinarily associated with leasing: credit and residual benefits. CED has effectively stripped every possible risk and benefit from the transaction other than tax risk and benefit. When these non-tax economic components of the RoCa3 LILO Transaction are evaluated individually, it becomes evident that the Transaction is devoid of non-tax substance and that a simple cash flow analysis is appropriate.

As described above, and more fully in the opening brief (U.S. Br. at 53-54, 84-85), the structure of the Transaction stripped away any risks other than tax risk. (JX 1118). This included the elimination of any credit risk. The use of the defeasance accounts ensured that Plaintiff's preplanned return was never at risk. However, it also ensured that Plaintiff would never benefit from taking on credit risk. The use of defeasance accounts, combined with a letter of credit, guaranteed Plaintiff's return, there was no more or no less to be gained from the Transaction. As such, the discounted pre-tax cash flows would be negative.

Plaintiff also argues (Pl. Br. at 412) that the Transaction has economic substance because in an event of default its rate of return would be even higher as the termination values included CED's expected return over the entire term of the transaction, but would be paid out earlier than the normal term of the transaction. (JX 4, Bates 447 (Termination Values in Operative Documents)). Given the belt and suspenders approach taken in the Transaction, there is very

little chance for a default. Further there is no evidence anyone in the Transaction actually thought there was a reasonable chance EZH would default. In fact, Plaintiff, while offering testimony concerning various events of default, did not offer any testimony concerning their likelihood. Further, CED ran no analysis of this possibility in deciding to enter into the RoCa3 LILO Transaction.

Plaintiff also expends considerable effort urging the Court to look at the objective residual value (as Plaintiff asserted was determined by Deloitte). (Pl. Br. at 360-61). This argument misses the point, because CED could obtain the residual value in the shirttail only in the unlikely event that EZH fails to exercise the Sublease Purchase Option. (U.S. Br. at 34-35).[124] Further, the Transaction is designed so that even assuming EZH does not exercise the Sublease Purchase Option, CED would simply walk away at the commencement of the shirttail period, avoiding any risk, and foregoing any residual value. (U.S. Br. at 35, citing JX 605; Tr. 3375-76 (Ellis)). On the one hand for the substance over form inquiry, whether the purchase option is exercised is irrelevant.[125] On the other hand, for the economic substance doctrine, the

---

[124] While Plaintiff would receive a portion of this residual value as part of the preordained purchase option price, any benefit from the case flow derived from that value would be negative at a NPV. (DX 20194 Bates 25155). In addition, Dr. LaRue determined that a review of cash flows from any other option would not change his opinion that Plaintiff had no reasonable expectation to profit from the ROCA3 Transaction without the tax benefits. (Tr. 5124-25, 5363 (LaRue)).

[125] Plaintiff argues that it is the exposure to residual value that is important when evaluating whether CED has the "benefits and burdens" of ownership of its lease interest for the substance over form inquiry. (Pl. Br. at 378). Plaintiff again misunderstands the United States' arguments when it comes to the fact that Plaintiff does not currently possess a residual interest in the RoCa3 Facility. This is not a case where, as in *Frank Lyon*, the residual interest is a definite; it just so happens to be at the end of a 65 year term. This is a case where unless and until EZH declines to exercise the Sublease Purchase Option, CED has no residual interest in the facility. Because of
(continued...)

Court must examine whether there was a reasonable possibility or expectation for Plaintiff to profit from the residual value.[126]

---

125 (...continued)
the nature of the Sublease Purchase Option, in conjunction with the Sublease Renewal and Retention Options, the existence of a residual value is speculative and does not convey a present property interest establishing the benefits and burdens of ownership of a lease interest. Thus, it is not the fact that the residual interest is not to be realized until at least 20.1 years into the RoCa3 LILO Transaction that demonstrates a lack of a present leasehold interest, it is the fact that the residual interest may never be realized, and only if and when EZH fails to exercise the Sublease Purchase Option could CED obtain a present lease interest in the RoCa3 Facility. Plaintiff claims "the existence (or lack) of significant residual value at the termination of the lease is the most significant factor in determining the existence of a true lease." (Pl. Br. at 267). However, contrary to Plaintiff's assertion, if a taxpayer recovers its investment even if the projected residual value does not materialize, it should be classified as a creditor, not an owner of property. An owner of property has residual value risk, the risk that it will not recover its investment unless the property has the projected value at the termination of the lease. That is not the case here.

126 The record demonstrates that Plaintiff did not intend to receive any pre tax income until 2012, when one of the strips were to mature and then not again until the end of the Sublease Basic Term, in year 20.1. As a result, other than a *de minimis* pre-tax cash flow in year 2012, this transaction does not have any undiscounted pre-tax return for 20.1 years. While it is the government's position that the transaction has no economic substance over the life of the Transaction (U.S. Br. at 114-16) on a discounted net present value basis, the Court need only look at the first 14 years to determine that this program lacks substance. There is ample legal basis for conducting the objective economic substance inquiry over this initial 14-year period. In *Knetsch*, the Supreme Court, rejecting taxpayer assertions of what was intended to occur in the future, limited its economic substance analysis of the taxpayer's thirty year annuity transactions to the two years before the Court, preferring to base its inquiry on what had actually occurred rather than what might eventually occur. *Knetsch*, 364 U.S. at 362-64 n.3. In *American Electric Power*, the court limited its objective economic analysis to the first 20 plan years, despite the fact that the plan was expected to continue for a much longer period. *Am. Elec. Power*, 136 F. Supp. 2d at 787, *aff'd*, 326 F.3d 737 (6th Cir. 2003). There is yet another reason that supports an analysis of Plaintiff transaction over this limited 10-year period, and that is Plaintiff's expectation, repeatedly reflected in the company's pre-transaction documents, that the attraction of LILOs would be short lived as a result of Congressional action curtailing the tax benefits of the LILOs. Indeed, Plaintiff was heavily focused during the pre-transaction period on steps it could take to "unwind" its plans in the likely event of adverse tax legislation (JX 1013), which, as Plaintiff accurately anticipated, ultimately came to fruition in 1999, a scant two years after the company initiated its RoCa3 LILO Transaction and within days of its NUON LILO

(continued...)

There is more than ample evidence to demonstrate that there was no reasonable expectation of a residual value from the RoCa3 LILO Transaction. As described in the United States' opening brief (U.S. Br. at 32) and above, the structure of the transaction demonstrates that the Sublease Purchase Option is the designed outcome. In fact, Mr. DePlautt not only told his independent auditor that the exercise of the Sublease Purchase Option was "reasonably assured" he also gave reasons why it would be exercised.[127](U.S. Br. at 76, citing JX 1142). Mr. Scher also explained that the obligation to make the back end rental payment, which would only be an obligation if the Sublease Purchase Option was not exercised, was "questionable." (JX 390, Bates 8029). This is also confirmed by CED never placing a value on the shirttail period. (U.S. Br. at 34-35). This is not a typical practice in connection with leveraged leases. (U.S. Br. at n.22). Plaintiff claims it did not account for the residual value because the company was conservative. (Pl. Br. at 358-60). Based on the surrounding facts, the true reason is more likely that it did not intend to have the property during the shirttail period. In fact, the only expert presented by Plaintiff on this issue concluded that he could not say with "virtual certainty" that EZH would exercise the purchase option (Tr. 2581 (Reed)).[128] This is a far short of Plaintiff proving that CED had a reasonable possibility of profiting from the residual value.

---

[126] (...continued)
Transactions. (U.S. Br. at 81-82).

[127] At trial, Mr. DePlautt defined "reasonably assured" as 50.1 percent, thus contradicting the plain meaning of the words in his document.

[128] Mr. Reed stated that virtual certainty was somewhere around 98% percent. (Tr. 2699 (Reed)). Although he used words like "reasonable certainty" and some possibility in his testimony, after being questioned by counsel for the United States he indicated that each time he meant to use the words "virtual certainty." (Tr. 2663-65 (Reed)). Thus to the extent Plaintiff cites the use of the phrase reasonable certainty by Mr. Reed in support of its claims, such citation is disingenuous and inaccurate. (*See*, *e.g.*, Pl. Br. at 218).

Despite the fact that Plaintiff never intends to receive the residual value, Plaintiff points to the Deloitte appraisal as the sole indicator of residual value. This reasoning is flawed. First, Plaintiff did not even receive the appraisal until after the transaction was consummated. (JX 46). Second, as discussed in our opening brief (U.S. Br. at 67-73) and above, the report was filled with errors.[129] In fact, the report was so flawed that Plaintiff needed to hire an independent expert to purportedly fix it for trial.[130] (*See* Tr. 2788 (Kelly) (purporting to perform calculations Deloitte never performed and attempting to demonstrate that the errors in Deloitte's report did not effect its conclusions)). The Court in *AWG* found a similar Deloitte report not to be credible.[131] This was true for several reasons:

> With regard to the market comparable methodology, Deloitte improperly compared companies and failed to adjust those companies' Earnings Before Interest, Taxes, Depreciation, and Amortization ("EBITDA") for one-time events. Also, Deloitte failed to use readily available information on AWG's EBITDA. Deloitte's use of an estimated EBITDA instead of the actual EBITDA also causes the cash flow valuation to be unreliable.

*AWG*, 2008 WL 2230744, at *8, n.6.

> The 1999 Deloitte report that supported the argument that AWG would likely enter the Service Contract relies upon unsupported

---

[129] Plaintiff points to the fact that Deloitte performed hundreds of tax advantaged LILO appraisals to show their experience. Instead, because LILO Transactions occurred over a relatively short window of time from 1997 through mid 1999, this shows that Deloitte had little time to ensure the report is correct. (Tr. 1795-96 (Ellsworth)).

[130] Not surprisingly, none of the numerous errors discovered by Mr. Kelly were enough to change his opinions that the Deloitte report was credible. (Tr. 2788 (Kelly)). As explained in the United States' opening brief (U.S. Br. at 66, 68-69, 72) and above, Mr. Kelly's analysis was flawed in several respects. Further, it is quite telling that Plaintiff never took steps to correct or discover these flaws at the time it entered the Transaction.

[131] In fact, Messrs. Ellsworth and Revock worked on both Plaintiff's report and the report in *AWG*.

> assumptions. If the Service Contract is chosen, Deloitte says AWG could deduct capacity and other charges and applies a 40.85% marginal tax rate. This assumption was obviously wrong and significantly overstates the expenses deductible under the Service Contract. The Deloitte report accompanies this error with the inconsistent assumption that the $521 million received from the PUAs would not be taxable in 2024. Obviously, if the $521 million were taxable at 25% it would reduce the after-tax return from entering the Service Contract by over $ 130 million.

*Id.* at *33 (footnotes omitted).

Equally telling, the Fourth Circuit in *BB&T* stated:

> Deloitte & Touche's appraisal, in contrast, deemed Sodra unlikely to exercise the purchase option, reasoning that the purchase price exceeded the value of the Head Lease interest Sodra would acquire (apparently without taking into account that because the option was prefunded by BB&T, Sodra would pay nothing for its "purchase").

*BB&T*, 523 F.3d at 469. Thus, errors in Deloitte's appraisal reports, including the one for the RoCa3 LILO Transaction, are quite common. Because these errors render the Deloitte appraisal report unreliable, the Court should not consider it.

Plaintiff next argues that EZH represented that, "there is no known factor to EZH which creates a material inducement for EZH to exercise the Purchase Option or disregards the provision of the Sublease an[d] related Participation Agreement." (JX 46, Bates 1603). However, EZH was party to a Tax Indemnity Agreement as part of the LILO Transaction, which penalized EZH for denying the plausibility of CED's options or representing in writing that it had taken a position with respect to its exercise of the Sublease Purchase Option. (Stip. ¶¶ 280-81; JX 9, Bates 676- 77). The same was true in *BB&T*, where the Court determined:

> In connection with the transaction, Sodra signed a Tax Indemnity Agreement in which it agreed that for U.S. income tax purposes, neither it nor any of its personnel would take a position

> inconsistent with the characterization of Sodra as the owner, head lessor, and sublessee of the Equipment. Before Sodra entered into this agreement, however, Sodra's tax advisors characterized the transaction as a financing arrangement that did not affect Sodra's interests in the Equipment, apparently anticipating that Sodra would not surrender control of the Equipment to BB&T. (See J.A. at 1736 (internal tax evaluation explaining, among other things, that "[f]rom a value added tax law perspective, the transaction can be considered either based on its real meaning, that is, a financial transaction, or based on its formal content, that is two lease relationships")).

*BB&T Corp.*, 523 F.3d at 469 n.10.

Similarly, EZH insisted that Plaintiff describe this transaction as a financing long before the government ever disallowed Plaintiff's LILO. This is especially apparent in EZH's insistence that Plaintiff refer to the transaction as a "refinancing" in any public documents and not as an ownership interest. (JX 1282).

Plaintiff did not reasonably expect to derive any net economic benefit from traditional leasing. To the contrary, Plaintiff took extraordinary measures to eliminate the risk and corresponding benefit of both the residual value and credit fluctuations. As a result, the only economic benefit left for Plaintiff to realize derives from the cash flow generated by the investment in the strips. As described above, when discounted to present value at the risk free rate of return, these pre-tax cash flows are negative. In short, if the tax benefits are removed, Plaintiff has no reasonable expectation of profit from its involvement in the LILO transaction. Put another way, the cash flows illustrated in the ABC are the only economic return that Plaintiff can reasonably expect to receive from the Transaction. Because these cash flows returns rely on tax benefits to generate a positive net present value return, Con Ed had no reasonable expectation for profit from this Transaction.

C. *Plaintiff Did Not Enter this Transaction for a Valid Non-Tax Business Purpose*

1. Plaintiff Could Not Obtain an Accounting Benefit Without the Tax Benefits

Plaintiff claims, relying solely on the expert opinion of Dr. Weil, that, "The income CED accelerated pursuant to FAS 13 requirements [i.e. front loaded earnings] does not contain a penny of tax benefits."[132] (Pl. Br. at 332). This is simply not true. In fact, on cross examination, Dr. Weil[133] stated the following:

> Q. Well, let me ask you this way. Isn't it true that this transaction would not have front-loaded earnings without the tax benefits?
>
> A. It wouldn't have front-loaded earnings unless it has a negative investment phase in the middle. And I would not be surprised that some of that, but not all of that, comes from the tax benefits.

(Tr. 3653 (Weil)).[134] And while Dr. Weil claimed he did not know how much of the accounting benefit was derived, this was explained by Dr. Thomas as follows:

> . . . 30.1 says that it has been claimed that by engaging in the transaction, Con Ed will increase their accounting earnings. And I would agree with that, but I believe that that increase, as I

[132] Dr. Weil had a unique definition of the phrase tax benefits: "Accelerating – or decelerating reportable income relative to a fixed pattern of cash flows." (Tr. 3529 (Weil)). With regard to this definition, Dr. Thomas stated, "That's the first time I have heard that definition . . . I would just say it is an unusual definition of tax benefits that I certainly don't subscribe to and I have not heard of it before." (Tr. 4534-35 (Thomas)).

[133] At trial, the government demonstrated that several courts had rejected Dr. Weil's opinions because they were not helpful, were incorrect or were meritless. (Tr. 3573-3594 (Weil)). In addition, the Court of Federal Claims found Dr. Weil's model to contain infirmities and flaws that rendered them speculative. (*Id.*).

[134] This is also confirmed by the fact that banks have had to take accounting changes as a result of the disallowance of the LILO and SILO programs. *See* Wachovia Responds to Tax Ruling in Leveraged Lease Transactions; Wachovia May Take Charge of up to $1 Billion, PR Newswire (April 30, 2008).

> understand it, is coming from the tax benefits. And so it didn't seem appropriate to include the tax benefits in the accounting earnings increase. And my claim is that once I removed the tax benefits, then those accounting benefits disappear. So that's the first point I am making.
>
> Q. Okay.
>
> A. The second point has to do with the front loading of accounting earnings, which, again, is derived from the after-tax cash flows, which generate the after-tax profits, which generate the front loading. So if you go from after-tax numbers to pre-tax numbers, there is no front loading, but one of the points that I wanted to make was that if the cash flows don't change it and you just front load earnings, I am not sure how that's an economic benefit.

(Tr. at 4483-84 (Thomas)).

This was confirmed by Plaintiff's own witnesses. Specifically, the fact witness most qualified to describe the proper accounting for the RoCa3 LILO Transaction, Plaintiff's CFO, acknowledged that the tax benefits generate the upfront accounting benefits. (Tr. 717-18, 720-21 (Freilich); *see also* Tr. 850-51 (McCartney); Tr. 1373-76 (Holzman) (acknowledging that the benefits of leveraged lease accounting in the EZH LILO Transaction are largely dependent on the tax deductions)). *See generally BB&T*, 2007 WL 37798 at * n.1 ("In this case, the KTV presentation materials are not offered to prove the truth of the matter asserted in those materials, that is whether BB&T would in fact receive tax benefits and acceleration of accounting income on after tax cash flows by entering into the Transaction.").

An accounting benefit from a transaction that lacks economic substance cannot imbue the transaction generating the tax benefit with economic substance for tax purposes. *Am. Elec. Power*, 136 F. Supp. 2d at 791-92 (quoting *Winn-Dixie Stores, Inc. v. Comm'r,* 113 T.C. 254, 287 (1999), *aff'd* 254 F.3d 1313 (11th Cir. 2001), *cert. denied*, 535 U.S. 986 (2002)) (holding

that if a legitimate business purpose for the use of the tax savings "were sufficient to breathe substance into a transaction whose only purpose was to reduce taxes, [then] every sham tax-shelter device might succeed.").

Plaintiff's documents reveal that the primary purpose of the Transaction was tax benefits. As explained in the opening brief, when this transaction was first presented to the board of CED, the benefits were described as follows:

1. Tax benefits from the deduction of allocated Head Lease Rent.

2. Tax benefits from the interest deductions taken (derived from the interest paid on the nonrecourse debt)

3. Actual cash-on-cash return of investment and profit received at the end of the term of the Sublease Agreement.

(JX 363, Bates 7647). During the presentation to Plaintiff's board of trustees on October 28th, 1997, only one benefit was memorialized in the minutes: "Several utilities have engaged in these cross-border leases as a strategy to reduce tax payments." (JX 354, Bates 7501).

Both of these statements show that taxes were the primary motivating factor. Moreover, and as more fully discussed in the opening brief, a draft version of the White Paper shows Plaintiff's lack of desire to obtain the 2.4 percent the transaction would generate without the tax benefits:[135] "What is the likelihood of a 2.4 percent return? Such a return is unacceptable." (JX 383, Bates 7981). Moreover, Mr. Scher, secretary and counsel to CED, described the CED's

---

[135] There is no evidence in the record on how this supposed 2.4 percent return was calculated. This number may not include transaction costs, which would substantially reduce any return. There is no indication of the base was used to calculate the return (whether it was on the alleged $43 million investment) or just the out of pocket fees of $12 million. Finally, it is not clear if this number takes into account the time value of money. As the burden is on Plaintiff to produce this information, and it has not done so, it has failed to meet its burden of proof. Instead, Plaintiff points to Dr. LaRue to now claim that the return was 4.4%. (Pl. Br. at 489).

view on the purported non-tax returns as follows: "However, I suspect that the return on this transaction would not be acceptable without the tax benefits described below." (JX 390). This conclusion was confirmed at trial by not only Mr. Scher, but also several of Plaintiff's employees and officers. (Tr. 850-51 (McCartney) (noting that CED would not have entered into the RoCa3 LILO Transaction if the Transaction only guaranteed a 2.4% return); *see also* Tr. 2035-36 (Muoio)). Even Mr. McGrath stated that he could not run a business at a 2.4 percent return.[136] (Tr. 335 (McGrath)). These statements and the evidence make clear that, without the tax benefits, Plaintiff would never have considered this transaction, let alone enter it spending approximately $12 million in transaction and accommodation fees.[137]

From the outset, the decision to pursue the RoCa3 LILO Transaction was not motivated by genuine economic considerations. Instead, the transactions were primarily a function of tax risk from potential IRS disallowance of deductions. This is clear from examining the risk chart contained in the Briefing Memorandum, where every nontax risk is low.[138] (JX 363, Bates 7672-75). This was also explained in a memorandum by Mr. DePlautt discussing why CED was pursuing Section 467 LILOs if GE Capital was not. (JX 1118). That memorandum explained that Plaintiff chose to minimize anything other than tax risks. (*Id.*) ("CED has chosen to seek to exclude, to the extent reasonably possible, the credit and residual value of asset risk that GE Capital regularly accepts, and instead to participate in transactions that have a concentration of

[136] Mr. Burke also testified the importance of having a cash flow. (Tr. 641-62 (Burke)). As Dr. Larue's unrebutted testimony demonstrates, this transaction has a negative cash flow absent the tax benefits. (*See* DX 20194, Bates 25155).

[137] *See* DX 20193, Bates 25093 and DX 20194, Bates 25144-45 setting forth the fees.

[138] As revealed at trial, Plaintiff's definition of "low" could sometimes mean nonexistent. (U.S. Br. at 53, 59-60, 118.

risk centered on tax risk."). Ultimately, the decision to enter into the transaction was governed not by legitimate economic considerations, but rather, by how far Plaintiff felt it could safely push the envelope with the IRS.[139] (*See* JX 397, Bates 8124 ("It is anticipated that the transactions will be structured in ways that will make any challenges to the structure by the IRS under current regulations difficult to support or litigate."); JX 1118 (noting that the LILO transactions will be "well structured" and have "defensible tax positions supported by strong opinions from top law firms.")).

2. Plaintiff Did Not Enter this Transaction for Any Other Non-Tax Reason

Despite explaining how every lease would fail the economic substance test and that everyone participates in leveraged leases for the tax benefits (Pl. Br. at 262-63), Plaintiff then attempts to demonstrate that CED, in fact, had several non-tax purposes for entering this Transaction. (Pl. Br. at 324-43). These purported purposes include the learning experiences and ability to open the market of the Netherlands, and possibly Europe, for additional, non-LILO investment opportunities as well as the public relations benefits, especially the environmental public relations benefits. As explained more fully in the opening brief (U.S. Br. at 120-31) and above, the evidentiary support for these purported purposes for the RoCa3 LILO Transaction is lacking. The evidence shows that Plaintiff did not enter into the RoCa3 LILO Transaction for the public relations benefits or the environmental benefits (U.S. Br. at 57 n.61, 129-30). The evidence also demonstrates that CED made no effort to use the RoCa3 LILO Transaction as an

[139] This is also evidenced by the manner in which Plaintiff rushed into the Transaction without first obtaining the third party reports. If Plaintiff were concerned about the economics, it would have more closely evaluated these supporting reports. In addition, it might have spent more than just one day at the RoCa3 Facility, an event referred to as more of a meet and greet between the consultants, the investors, and their attorneys. (Tr. 1592, 1595-96 (Niewenhuis)).

opportunity to pursue non LILO Transactions in the Netherlands or even Europe more generally.[140] (U.S. Br. at 60-62). While CED, an unregulated subsidiary, was organized to pursue international energy investments, the leasing activities were kept completely separate and were unrelated to those other purposes.[141] Exhibit 1268 describes the history and activities of CED.

---

[140] Instead of pointing to evidence of what CED actually did with respect to pursuing other investments in the Netherlands or Europe more broadly, Plaintiff offers expert testimony (Dr. Goulding) about the motivations of a hypothetical power company's hypothetical investment in a gas fired facility in the Netherlands. (Tr. 2368 (Goulding)). Dr. Goulding acknowledged that he did not look at the type of investment actually used by CED, he had no real understanding of the limitations in the Operative Documents (*see, e.g.*, Tr. 2512), and did not take into account factors CED actually looked at when deciding to enter into the RoCa3 LILO Transaction. (Tr. 2492-93, 2495-96, (Goulding)). Further, Dr. Goulding's testimony was based on the understanding that the returns from the investment would be derived in some manner from the output of the hypothetical power facility in the Netherlands (Tr. 2490 (Goulding)), unlike the situation here where the returns were derived from the investment in U.S. Treasury STRIPS and the claimed tax benefits. Given that business purpose is a subjective inquiry, Plaintiff cannot meet its burden by relying on expert testimony about the purposes for which a hypothetical power company would use an energy investment in the Netherlands, especially when the expert's testimony does not take into account the specific type of transaction at issue in this case.

[141] Except that Plaintiff may have viewed these LILOs as a funding vehicle for the other transactions. *See* Ex. 1252 ("To summarize, CED's plans to use leases to produce front-end earnings and help optimize CEI's tax position, acquisitions of operating infrastructure to provide steady, ongoing returns and development of greenfield generation projects to provide [financial statement] earnings growth. (Greenfield projects require upfront expenditures in the early years, but [only] turn profitable as they operate and grow, although they may take up to 3 to 5 years to realize results.)"). This is not permissible. The proper test for determining whether a transaction is an economic sham "consists of an examination of the transaction, *not the taxpayer*. If the *transaction* lacks economic substance, then the deduction must be disallowed without regard to the 'niceties' of the taxpayer's intent." *Illes v. Comm'r*, 982 F.2d 163, 166 (6th Cir. 1992) (citing *Mahoney v. Comm'r*, 808 F.2d 1219, 1220 (6th Cir. 1987)) (emphasis added). "Whether [the taxpayer] intended to apply [shelter] proceeds to the sympathetic purpose of funding employee benefits or for any other corporate purpose does not "breathe substance" into a transaction whose purpose is to generate positive cash flows and earnings solely through tax deductions. *CM Holdings*, 254 B.R. at 639 (citing *Winn-Dixie Stores, Inc.*, 113 T.C. at 287-88).

> Con Edison Development Inc., CED, was legally established in the fourth quarter of 1996, and began operations with a four-person staff in March of 1997. CED's initial charter was to develop, invest, own and manage infrastructure assets in the United States, as well as in a select list of carefully screened countries in Latin America, Europe and the Pacific Rim. In addition, CED would create a tax advantage leasing segment to take advantage of certain cross-border leasing opportunities, while at the same time leveraging CEI's tax position.

(JX 1268). In fact, leasing was not even in the original business plan for the company. (JX 1079). Exhibit 1252 states: "Leases of this type provide CEI with an opportunity to enhance project returns by taking advantage of CEI's large and predictable tax obligations." (JX 1252, Bates 17782). The leasing transactions were not an integral part of CED's business–as explained by Mr. Muoio, CED anticipated only doing a couple of the tax advantaged leasing transactions and then turning the business over to the parent company (the true end user of the tax benefits generated by these transactions). (Tr. 1992-93 (Muoio)).

As discussed above, Plaintiff also would attach significance to the fact that the LILO in this case involves a power company. First, that the facility generates power does not breathe subjective business purpose into the LILO Transaction. Second, as explained above, the evidence demonstrates that CED did not treat this like its other traditional investments in power assets, did not utilize its knowledge of power generation assets in the operation or maintenance of the RoCa3 Facility, and essentially paid no attention to the RoCa3 Facility after the Transaction closed. Even Mr. McGrath, whom Plaintiff offered to describe Plaintiff's "core competencies," understood that CED's LILO transactions were a separate matter. In a 1998 memorandum, Ms. McCartney summarizes a conversation she had with Mr. McGrath:

> ERM said that even a leasing business is somewhat foreign to our board and would have to be carefully sold. Are we just an

> investment company finding tax shelters, and is this the best one?[142]

(JX 1132). In sum, Plaintiff has failed to demonstrate that CED had a legitimate non-tax business purpose for entering into the RoCa3 LILO Transaction sufficient to demonstrate subjective economic substance.

## IV. Irrelevant Authority Cited by Plaintiff

Plaintiff also spends several hundred pages going through IRS administrative decisions to create something it refers to as "The Leasing Authorities."[143] Much of this discussion is irrelevant. Because a court must conduct a *de novo* review and redetermine the entire tax liability, "[t]he factual and legal analysis employed by the Commissioner is of no consequence to the district court." *R.E. Dietz Corp. v. United States*, 939 F.2d 1, 4 (2d Cir. 1991); *accord*, *Pulvermacher v. United States*, 1998 WL 240492, *1 (S.D.N.Y. 1998); *Assoc. Wholesale Grocers, Inc. v. United States*, 89-2 U.S. Tax Cas. (CCH) ¶ 9,518, at 89,535 (D. Kan. 1989). Accordingly, "courts generally do not examine the underlying *motives* or *policy* of the Commissioner's determination." *Kenco Restaurants Inc. v. Comm'r*, 206 F.3d 588, 596 (6th Cir. 2000) (emphasis added); *Greenberg's Express, Inc. v. Comm'r*, 62 T.C. 324, 327 (1974). *See also Buckeye Power v. United States*, 38 Fed. Cl. 283, 286 (Ct. Cl. 1997) ("the court expressly stated that the [IRS administrative material] did not bind defendant.")

---

[142] At trial, Mr. McGrath said he was merely playing devil's advocate (Tr. 255 (McGrath)), but that begs the question why if, as he claimed, he never thought about the RoCa3 LILO Transaction as anything other than an energy investment that he felt the need to focus on the tax considerations of the Transaction.

[143] Plaintiff also discusses "The Leasing Guidelines" which would be necessary for Plaintiff to receive a favorable advance ruling for its transaction. Plaintiff never applied for an advance ruling and these guidelines are irrelevant.

Plaintiff next attacks Revenue Ruling 2002-69.[144] (Pl. Br. at 318-21). Plaintiff's criticisms miss the mark. In Revenue Ruling 2002-69, the Service held that the taxpayer in a hypothetical LILO was not entitled to the tax benefits from the transaction because it only acquired a contingent future interest in the subject property. In that ruling, the Internal Revenue Service reasoned that the reciprocal nature of the rights and obligations created by the transaction did not result in the transfer of a current property interest to the taxpayer. Contrary to Plaintiff's assertions, Revenue Ruling 2002-69 does not conflict with Frank Lyon or is "in direct conflict with the Leasing Guidelines and fifty years of settled precedent."[145] (Pl. Br at 321-22.) In fact, both the district court and the Fourth Circuit in *BB&T* applied the same reasoning as 2002-69. *See BB&T Corp.*, 523 F.3d at 470; *BB&T Corp.*, 2007 WL 37798.

---

[144] Contrary to Plaintiff's argument (Pl. Br. at 315-19), when the Internal Revenue Service issued Rev. Rul. 2002-69, it "modified and superseded" Rev. Rul. 99-14, 1999-1 C.B. 835. The Internal Revenue Service did not revoke Rev. Rul 99-14 or abandon the potential application of economic substance to challenge LILOs. In IR-2002-108, the Internal Revenue Service indicated that it would be using substance over form as the primary theory for attacking LILOs, and that this primary theory did not require courts to determine whether a transaction had overall pre-tax profit potential or a non-tax motive. The Internal Revenue Service also indicated that it would assert other common law theories against LILO transactions when appropriate.

[145] Indeed, a closer examination reveals that with Revenue Ruling 2002-69 is entirely consistent. For example, in *Alstores*, the Tax Court found, and the Service agreed, that the sale of a building to the taxpayer, who then leased the building back to the seller, resulted in a current transfer of tax ownership because the taxpayer assumed the risks and burdens of ownership of the building upon the sale. *Alstores Realty Corp. v. Comm'r*, 46 T.C. 363, 370-72 (1966). But when the seller retains those benefits and burdens, no such transfer occurs until they are actually assumed by the buyer. *McCulley Ashlock v. Comm'r*, 18 T.C. 405, 411-12 (1952), *acq*. 1952-2 C.B. 1. In a LILO that transfer cannot occur until after the owner relinquishes economic control over the property to the taxpayer, which cannot happen here until, at the earliest, if EZH chooses to forgo its Sublease Purchase Option and CED exercises the Retention Option.

Plaintiff also attempts to equate compliance with I.R.C. § 467 with substance.[146] Whether the Transactions satisfied certain technical provisions of the proposed regulations under Section 467, which deal with the allocation of rent, is irrelevant. Section 467 and the regulations thereunder deal with the period in which a rental deduction can be claimed. Section 467 and its regulations presuppose the existence of a valid lease for tax purposes, and the regulations expressly reserve "true lease" issues. Thus, the proposed regulations do not even come into consideration unless the Plaintiff establishes that valid leases existed during the relevant time period – meaning leases that independently meet the substance over form and economic substance tests. If the leases do not meet both of these tests, no valid leases exist, and Section 467 and the regulations do not apply. Thus, the Transaction can fail to satisfy the requirements of the substance over form doctrine and/or be an economic sham, even if it would otherwise satisfy the rental allocation requirements of Section 467 and the regulations. Put another way, proof that the Plaintiff would have satisfied the allocation requirements of the proposed regulations under Section 467 does not prove that the Transaction meets the requirements of either the substance over form doctrine or the economic substance doctrine. *Coltec*, 454 F.3d at 1354 (economic substance doctrine applies despite literal statutory compliance); *Dow*, 435 F.3d at 599, *cert. denied*, 127 S.Ct. 1257 (2007) (deductions disallowed for economic substance in spite of formal compliance with I.R.C.); *Am. Elec. Power Co.*, 326 F.3d at 741 (formal compliance with I.R.C. is insufficient); *Black & Decker Corp.*, 436 F.3d 431 (remanding case to

[146] Plaintiff also states, "Defendant has not denied that CED's rental allocations comply with § 467 . . . ." (Pl. Br. at 290). The I.R.C. Section 467 regulations provide that no inference should be drawn from the Section 467 regulations that a transaction should be treated as a true lease for federal income tax purposes. *See* I.R.C. § 1.467-1(a)(4). Thus, Plaintiff's reliance on these regulations is misplaced.

determine whether shelter transaction had economic substance, even though the transaction predated IRS notice and Congress's closing of statutory loopholes); *CM Holdings*, 301 F.3d at 102 (even if transaction complies precisely with all statutory requirements, deductions nevertheless disallowed for economic shams); *Winn-Dixie Stores, Inc.*, 113 T.C. at 290-94 (rejecting argument that compliance with Section 264 obviates need to examine transaction under sham transaction doctrine); H.R. Rep. No. 755, 108th Cong., 2d Sess. at 660, 662-63 (2004). In short, I.R.C. § 467 is not relevant to any issue in this case.

Similarly, Plaintiff cites to legislative history to infer that its LILO has been approved by Congress. (Pl. Br. at 290-91). Plaintiff is simply wrong. For example Plaintiff discusses a grandfather date for I.R.C. § 470, related to exempt property, for "Qualified Transportation Property." Since the term "Qualified Transportation Property" has nothing to do with the property in this transaction, this grandfather date is inapplicable.[147] Therefore, there is no reason to examine this statute except to create an incorrect inference that Congress blessed all LILOs.[148] This is simply not so. The legislative history of the 2004 Act contains "savings clause" language (at pp. 660 and 662-663) indicating that the general effective date is without prejudice to the Government's right to challenge earlier LILO and SILO transactions under common law "true lease" theories such as the Economic Substance and Substance over Form doctrines.

---

[147] Plaintiff even admits "470 does not apply to the RoCa3 Transaction, which was completed long before the March 12, 2004 effective date." (Pl. Br. at 291). However, Section 470 presumes a valid lease. Thus, even if the RoCa3 transaction had been entered into after March 12, 2004, it would still not be subject to section 470.

[148] Plaintiff goes a step further and cites to bills that would make I.R.C. § 470 retroactive that have never passed. (Pl. Br. at 292). First, if a statute is never enacted it cannot be relied on as authority. Moreover, whether or not section 470 is ever made retroactive with respect to foreign property transactions is irrelevant.

Specifically, according to the legislative history, the new provisions should not be read as "altering or supplanting the present-law tax rules providing that a taxpayer is treated as the owner of leased property only if the taxpayer acquires and retains significant and genuine attributes of an owner of the property, including the benefits and Burdens of ownership." *See* H.R. Rep. No. 755, 108th Cong., 2d Sess. at 660, 662-663 (2004).[149] It was further provided that the new provisions are "not intended to affect the scope of any other present-tax rules or doctrines applicable to purposed lease transactions." *Id.* In sum, Section 470, like Section 467, has no bearing on the issue before the Court.

**CONCLUSION**

The Commissioner's determinations should be sustained and Plaintiff's refund claim denied. CED did not acquire a present leasehold interest in EZH's RoCa3 Facility for tax purposes. As the property's owner and user under the sublease, EZH 1) maintains dominion and control over the Facility; 2) bears all of the benefits and burdens associated with ownership; and 3) enjoys the unilateral right to terminate Plaintiff's interest in the Head Lease with funds Plaintiff provided. Thus, Plaintiff's Initial Lease Payment was not for the "continued use or possession" of property as required by section 162(a)(3) of the Internal Revenue Code. Nor was the interest on the purported HBU loan paid for the use or forbearance of money as required by section 163(a). Accordingly, the tax deductions for rent, interest, and transaction costs that

---

[149] The Conference Report indicated that the House and the Senate did not intend to change the application of the common law by enacting I.R.C. § 470. "Even if a transaction satisfies each of the following requirements, the taxpayer will be treated as the owner of the leased property only if the taxpayer acquires and retains significant and genuine attributes of an owner of the property under the present-law tax rules, including the benefits and burdens of ownership." H.R. Rep. No. 755, 108th Cong., 2d Sess. at 657.

Plaintiff claimed on its 1997 tax return as a result of entering into the EZH LILO Transaction are improper, and must be disallowed. In the alternative, the Court should disregard the EZH LILO Transaction for a lack of economic substance. The evidence in this case demonstrates that Plaintiff lacked a reasonable expectation of a pre-tax benefit from the Transaction and lacked a legitimate non-tax business purpose for participating in the Transaction.

Respectfully submitted,

s/ David N. Geier
DAVID N. GEIER
Attorney of Record
U.S. Department of Justice, Tax Division
Post Office Box 26
Washington, D.C. 20044
Telephone: (202) 616-3448
Facsimile: (202) 307-0054

NATHAN J. HOCHMAN
Assistant Attorney General
DAVID GUSTAFSON
Chief, Court of Federal Claims Section

JOSEPH A. SERGI
ADAM R. SMART
KAREN M. GROEN
Trial Attorneys

s/ Steven I. Frahm
STEVEN I. FRAHM
Assistant Chief, Court of Federal Claims Section
Of Counsel

June 27, 2008